# EXHIBIT B
# Petition for Review, 25CV2244

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/15/2025 10:19 AM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners/Plaintiffs Center for
Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**
**SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>        Petitioners/Plaintiffs,<br>  v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>        Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>        Real Parties in Interest. | Case No.     25CV02244<br><br>**VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>[Code Civ. Proc. §§ 1094.5, 1085; Pub. Resources Code § 21000 *et seq*. (California Environmental Quality Act); Gov. Code § 51010 *et seq*.; 49 U.S.C. § 60101 *et seq*. (Pipeline Safety Laws)] |

VERIFIED PETITION AND COMPLAINT

Petitioners and Plaintiffs Center for Biological Diversity and Wishtoyo Foundation bring this action on their own behalf, on behalf of their members, on behalf of the general public, and in the public interest, and allege as follows:

**INTRODUCTION**

1. This Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief challenges the December 17, 2024, decision of the California Department of Forestry and Fire Protection and its Office of the State Fire Marshal (collectively Cal Fire) to grant pipeline safety regulation waivers (State Waivers) that enable Sable Offshore Corp. to restart the Las Flores Pipeline System and its connected oil and gas production and transport infrastructure ten years after a catastrophic oil spill from the pipeline system shut down operations. Cal Fire approved the State Waivers without any environmental review, public notice, hearing, opportunity for public comment, or the required findings in violation of the California Environmental Quality Act (CEQA) and California and federal pipeline safety laws.

2. The onshore Las Flores Pipeline System carried oil from the Santa Ynez Unit off the coast of Santa Barbara until May 19, 2015, when Line 901 (now known as CA-324) ruptured after extensively corroding over time, causing one of the largest oil spills in California's history, known as the Refugio State Beach oil spill.

3. According to the Pipeline & Hazardous Materials Safety Administration's (PHMSA) failure investigation report, the direct and proximate cause of the rupture was "progressive external corrosion" that occurred due to the pipelines' ill-designed coating and insulation system and the inability of the pipeline system's "cathodic protection system" to effectively prevent corrosion as intended.

4. The spill had devastating environmental impacts: it damaged approximately 1,500 acres of shoreline habitat and 2,200 acres of subtidal and fish habitats; it killed at least 558 birds—across over 28 species—and 232 marine mammals; and it resulted in the loss of over 140,000 user days in Santa Barbara and Ventura counties—including opportunities to fish, harvest shellfish, camp, sunbathe, beach comb, exercise, swim, view wildlife, dive, boat, and surf.

1

5.      After the spill, the then-owners and operators of the Santa Ynez Unit oil and gas assets did not attempt to restart the failed and defectively designed pipeline system, with its attendant risks to public health and safety. Instead, it pursued permits to truck oil across California highways in the short term, while seeking permits to build a new replacement pipeline system for the long term.

6.      As described in more detail below, the previous owners abandoned the pipeline replacement plans and sold the Santa Ynez Unit assets to a newly formed Texas company, Sable Offshore Corp., which is now attempting to restart the corroded pipeline system without fixing the core problem that caused the 2015 rupture. This proposal comes with great risk. According to a draft Environmental Impact Report prepared by Santa Barbara County for the abandoned pipeline replacement project, restarting the existing pipeline could result in an oil spill *once a year* and a rupture *once every four years* even with the installation of additional valve stations intended to reduce spill volumes. According to the same document, the public safety and oil spill risks of a restart would be significant and unavoidable. The analysis also notes a Cal Fire report that indicates the risk of a spill from the pipeline system without effective cathodic protection system is a full five times greater than had previously been estimated.

7.      To restart the heavily corroded and corrosion-prone Las Flores Pipeline System without effective cathodic protection and with its fundamental design flaws, Sable Offshore Corp.'s only option was to seek State Waivers from federal pipeline safety laws from Cal Fire. Without these waivers, restart is not an option. By taking this restart and State Waivers pathway, Sable is essentially abandoning a front-end, corrosion-preventing cathodic protection system and replacing it with an untested, kludged-together collection of risk management and monitoring procedures on the back end that are not consistent with public safety or protection of the environment or as safe as a properly designed pipeline.

8.      Although Cal Fire initially made assurances that it would not issue the State Waivers before holding a public meeting, on information and belief, Cal Fire did not post any notice or hold any public comment period or hearing before granting the State Waivers. On information and belief, Cal Fire also did not post any notice after it approved the State Waivers

VERIFIED PETITION AND COMPLAINT

to indicate how it had fulfilled its CEQA responsibilities. Rather, nearly four weeks after approving the State Waivers, Cal Fire posted the State Waivers on its website *Pathways for Restarting CA-324 and CA-325,* https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

9.    Forty years ago, state and federal agencies prepared a National Environmental Policy Act (NEPA)/CEQA review on the environmental impacts of what was called the Celeron/All American and Getty Pipeline Projects to transport heated crude oil 1,200 miles from the Santa Barbara and Santa Maria Basins to a pump station in Kern County (via what is now known as the Las Flores Pipeline System) and onward to McCamey, Texas. That NEPA/CEQA review contemplated a 30-year service life for the Las Flores Pipeline System, which came online in 1991–1992. The Environmental Impact Report (EIR)/Environmental Impact Statement (EIS) stated that the "entire pipeline system would be protected from corrosion" by proper coating and a functioning cathodic protection system, that it would not experience corrosion problems, and that it would have a low oil spill risk. It failed to address the environmental consequences of a pipeline system that failed catastrophically, whose primary pipeline integrity and spill prevention technology is defective, whose critically flawed anti-corrosion cathodic protection system cannot be fixed, and that now requires State Waivers from otherwise federally-mandated corrosion prevention and mitigation measures to restart—waivers that rely on alternative measures that have their own, never-analyzed impacts.

10.    Cal Fire was required by law to initiate a new environmental review process, consult with all other responsible agencies, and provide public hearing and comment opportunities before granting State Waivers that enable Sable Offshore Corp. to restart the Santa Ynez Unit oil and gas operations and transport of oil through the Las Flores Pipeline System (Project).

11.    Petitioners Center for Biological Diversity and Wishtoyo Foundation challenge Respondents' issuance of the State Waivers for this Project absent new environmental review and without a public hearing and public comment opportunities despite the pipeline system's inherent design flaws, history of failure, continued susceptibility to corrosion, and the extensive

3

VERIFIED PETITION AND COMPLAINT

environmental impacts associated with the waivers themselves and the Santa Ynez Unit restart as a whole.

12. Cal Fire's approval of the State Waivers for the Project violated CEQA and state and federal pipeline safety laws including, without limitation, failing to conduct full environmental review; failing to provide public notice and a public hearing; failing to demonstrate that the State Waivers are consistent with pipeline safety, that they are not a risk to public safety, and that the probability of injury or damage is remote; and failing to provide a statement of reasons and discussion of significant factors before issuing its decisions.

**PARTIES**

13. Petitioner and Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit conservation organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has over 93,900 members worldwide, including over 18,000 members who live in California, and over 550 members who live in Santa Barbara, San Luis Obispo, and Kern counties. The Center has worked for many years to protect imperiled plants and wildlife, open space, air and water quality, and the overall quality of life for people in the region where the Project is proposed. Members of the Center will be directly and adversely affected by the approval and operation of the Project. Although there has been no formal public comment opportunity, the Center nonetheless submitted numerous written comments to Cal Fire objecting to and commenting on the Project.

14. Petitioner and Plaintiff WISHTOYO FOUNDATION was founded in 1997 to preserve and protect Chumash culture, the culture of first nations peoples; to protect natural cultural resources essential to Chumash lifeways and all people; and to educate and instill in youth environmental values, awareness, and stewardship. Wishtoyo is a place, organization, and movement inspiring people to live in harmony with our Earth again. Wishtoyo serves as a "rainbow bridge" linking Chumash and indigenous lifeways with the protection of natural and cultural resources, utilizing traditional ecological knowledge to provide environmental and cultural preservation, justice, education, research, and advocacy. Wishtoyo has a longstanding

4

VERIFIED PETITION AND COMPLAINT

record of protecting and restoring the coastal watersheds of Chumash homelands, the Santa Barbara Channel, and the Pacific Ocean.

15. Petitioners are organizations whose missions and work for decades have focused on combatting the negative impacts of oil development and transportation on human health and the environment and whose members both in and outside of Santa Barbara, San Luis Obispo, and Kern counties care about air quality, water quality, wildlife and their habitat, cultural and historic resources, and human health. Their members' very safety and enjoyment of this region will be directly affected by the outcome of this case. Petitioners and their members have been engaged in a years-long effort to ensure that after the Refugio State Beach oil spill disaster, no restart will occur without full compliance with the law, including CEQA and pipeline safety statutes and regulations. The Center and Wishtoyo Foundation represent members across the three directly implicated counties and have interests in protecting public health, cultural resources, and the environment from the environmental impacts of the Project. Petitioners' members include people who reside, go to school, recreate, and work in areas around the Las Flores Pipeline System and other Santa Ynez Unit infrastructure and would be impacted by the Project. The Project could jeopardize their health, safety, and enjoyment of the area.

16. On information and belief, Respondent and Defendant CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION is a political subdivision of the State of California, organized and existing under the laws of the State of California, with the capacity to sue and be sued. The California Department of Forestry and Fire Protection includes several organizational programs, including the Office of the State Fire Marshal.

17. On information and belief, Respondent and Defendant OFFICE OF THE STATE FIRE MARSHAL is a political subdivision of the State of California, organized and existing under the laws of the State of California, with the capacity to sue and be sued. The Office of the State Fire Marshal is the state agency responsible for ensuring the safety of intrastate hazardous liquid pipelines and their compliance with state and federal laws. In 2016, the Office of the State Fire Marshal assumed authority to regulate the Las Flores Pipeline System (Lines 901/CA-324

VERIFIED PETITION AND COMPLAINT

and 903/CA-325) from the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA).

18.    On information and belief, Respondent and Defendant DANIEL BERLANT is the State Fire Marshal and is sued in his official capacity as head of the Office of the State Fire Marshal.

19.    On information and belief, Real Party in Interest SABLE OFFSHORE CORP. (Sable) is a Project applicant for purposes of the State Waivers and CEQA, the operator of the Las Flores Pipeline System, and a recipient of the approvals challenged in this action.

20.    On information and belief, Real Party in Interest PACIFIC PIPELINE COMPANY is a wholly owned subsidiary of Sable, the legal owner of the Las Flores Pipeline System, a Project applicant for purposes of the State Waivers and CEQA, and a recipient of the approvals challenged in this action.

21.    Petitioners do not know the true names and capacities, whether individual, corporate, associate, or otherwise, of respondents DOES 1 through 10, inclusive, and therefore sue said respondents under fictitious names. Petitioners will amend this Petition to show their true names and capacities when they have been ascertained. Each of the respondents is the agent and/or employee of Respondents, and each performed acts on which this action is based within the course and scope of such respondents' agency and/or employment.

22.    Petitioners do not know the true names and capacities, whether individual, corporate, associate, or otherwise, of real parties in interest DOES 11 through 20, inclusive, and therefore sue said real parties in interest under fictitious names. Petitioners will amend this Petition to show their true names and capacities when they have been ascertained.

**JURISDICTION AND VENUE**

23.    This Court has jurisdiction under California Code of Civil Procedure section 1085 or, in the alternative, section 1094.5 and under Article VI, section 10 of the California Constitution to issue a writ of mandate setting aside the California Department of Forestry and Fire Protection and its Office of the State Fire Marshal's (collectively Cal Fire) decision to

VERIFIED PETITION AND COMPLAINT

approve the Project. Judicial review of Petitioners' CEQA claims is governed by Public Resources Code sections 21167, 21168, 21168.5, and/or 21168.9.

24. Venue for this action properly lies in the Superior Court of Santa Barbara County under Code of Civil Procedure sections 393, 395, and 401, subdivision (1), because a significant portion of the proposed site of the Project is in the County, many of the significant environmental impacts from the Project would occur in the County, and the Project affects the interests of County residents, including members of Petitioners.

25. Respondents have taken final agency action by approving the State Waivers for the Project and did not undertake any CEQA environmental review process when it did so. Respondents had a duty to comply with CEQA prior to issuing the discretionary approvals at issue in this lawsuit.

26. On information and belief, Cal Fire did not post any notice of exemption or notice of determination for this Project. This action is timely filed within 180 days of Cal Fire's decision to issue the State Waivers in accordance with Public Resources Code section 21167, subdivision (a), and California Code of Regulations, title 14, section 15112, subdivision (c)(5).[1]

27. Petitioners complied with the requirements of Public Resources Code section 21167.5 on April 12, 2025, by serving a written notice of Petitioners' intention to commence this action on Respondents. A copy of the written notice and proof of service is attached as **Exhibit A.**

28. Petitioners elected to prepare the record of proceedings in this proceeding or pursue an alternative method of record preparation pursuant to Public Resources Code section 21167.6, subdivision (b)(2). A copy of Petitioners' Election to Prepare Administrative Record of Proceedings is attached as **Exhibit B.**

29. Petitioners complied with Public Resources Code section 21167.7 and Code of Civil Procedure section 388 by providing the Attorney General of the State of California with a

---

[1] CEQA Guidelines are codified in title 14, section 15000 et seq. of the California Code of Regulations; all references to "CEQA Guidelines" refer to these sections in title 14.

7

VERIFIED PETITION AND COMPLAINT

copy of the Petition and notice of filing this action. A true and correct copy of the notice and proof of service to the Attorney General are attached as **Exhibit C**.

30.     Petitioners complied with the requirements of CEQA Guidelines section 15232 by concurrently filing a request for a hearing. A copy of the Petitioners' Request for Hearing and Notice of Request is attached as **Exhibit D.**

31.     Petitioners have satisfied all conditions precedent to filing this instant action and have exhausted any and all administrative remedies to the extent required by law. This Petition is timely filed in accordance with Public Resources Code section 21167 and California Code of Regulations, title 14, section 15112.

32.     Petitioners do not have a plain, speedy, or adequate remedy at law because Petitioners and their members will be irreparably harmed by Cal Fire's issuance of the State Waivers in violation state and federal law and the environmental damage the Project will cause.

**STATEMENT OF FACTS**

**A.     The Las Flores Pipeline System and Environmental Setting**

33.     There are currently thirty active oil and gas leases on the Pacific Outer Continental Shelf (OCS) from which oil and gas drilling extraction activities occur or have occurred. Most of these leases are organized into units. The Santa Ynez Unit is in the Santa Barbara Channel and consists of sixteen leases issued between 1968 and 1982.

34.     There are three offshore production platforms at the Santa Ynez Unit: Platform Harmony, Platform Heritage; and Platform Hondo. Platform Hondo was installed in June 1976, Platform Harmony in June 1989, and Platform Heritage in October 1989. Production began from these platforms between April 1981 and December 1993.

35.     In 1986, Santa Barbara County approved the Celeron/All American Pipeline Projects to transport oil from the Santa Ynez Unit onshore under a Final Development Plan and Development Plan Conditions. The County relied on a 1984 Draft EIR/EIS and Final EIR/EIS for the Celeron/All American Pipeline and Getty Pipeline Projects that was prepared by the California State Lands Commission and the U.S. Department of the Interior's Bureau of Land Management and certified in January 1985.

8

VERIFIED PETITION AND COMPLAINT

36.    Pipelines with effective coating and cathodic protection systems designed to prevent corrosion and minimize the risk of oil spills were fundamental to the 1985 pipeline system design, environmental analysis, and ultimate approvals. For example, the EIR/EIS contended, "[t]he entire pipeline would be protected from corrosion with cathodic protection systems." It specified that certain "design features" were proposed "to prevent the adverse impacts of an oil spill," with the first being a cathodic protection system. It noted that the pipeline system's coating and cathodic corrosion protection were "very effective in reducing the risk" of oil spills and the environmental harm they cause, thereby concluding that "it is unlikely that any spills would occur."

37.    Pipelines like these corrode because of an electro-chemical reaction between the steel pipe and its environment. When metal is exposed to oxygen, water, and other elements, its surface loses ions, resulting in corrosion. Corrosion can cause general pipewall thinning and various forms of corrosion cracking, such as stress corrosion cracking, selective seam corrosion cracking, and pit corrosion. Each of these types of corrosion can lead to a pipeline failure.

38.    Cathodic protection is the chief method required and relied upon to prevent and reduce external corrosion in buried, steel pipelines—like Line 901/CA-324 and Line 903/CA-325 that make up the Las Flores Pipeline System. It is intended to function by impressing a weak electrical current into the pipeline to stop the process of corrosion. So long as the current reaching the pipe's surface is sufficient, corrosion can be prevented or minimized.

39.    The Las Flores Pipeline System's steel pipelines were constructed from 1988 to1991. Line 901/CA-324 is a  buried, insulated, 24-inch diameter pipeline that extends just under eleven miles along the ecologically rich and undeveloped Gaviota coastline. When operational, the line transported heated crude oil from ExxonMobil's storage tanks in Las Flores Canyon to the Gaviota Pump Station. Line 901/CA-324 went into service in 1992.

40.    Line 903/CA-325 is a 30-inch diameter pipeline that extends approximately 114 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc and Pentland. The crude oil was ultimately delivered to various inland refineries. Line 903/CA-325 became operational in 1991.

VERIFIED PETITION AND COMPLAINT

41.     The pipelines are coated with coal tar urethane and covered with foam insulation covered by a tape wrap over the insulation. Shrink wrap sleeves intended to provide a barrier between the pipelines and soil to prevent corrosion are present at all of Line 901/CA-324's pipeline joints and "multiple locations" on Line 903/CA-325.

42.     When operational, the pipelines carried high viscosity crude oil at a high temperature (approximately 135 degrees Fahrenheit) to facilitate transport.

43.     The Las Flores Pipeline System starts at 150 feet of elevation and rises to close to 3,000 feet of elevation before dropping to approximately 690 feet of elevation at its Pentland Station terminus. The required operating temperatures to transport heavy crude oil across that elevation profile are uniquely high. These high operating temperatures accelerate external pipeline corrosion.

44.     The approximately 125-mile pipeline system crosses three California counties: Santa Barbara County (over 72 miles), San Luis Obispo County (over 37 miles), and Kern County (over 13 miles).

45.     The Las Flores Pipeline System travels along the coastline and across more than 20 miles of public lands, including Gaviota State Park (4.1 miles), the Los Padres National Forest (6.3 miles), Carrizo Plain Ecological Reserve (4.5 miles), Carrizo Plain National Monument (4.5 miles), and Bitter Creek National Wildlife Refuge (0.98 miles).

46.     The Pipeline System crosses what are known as High Consequence Areas, including unusually sensitive areas. It crosses active faults; steep slopes; sensitive groundwater basins; drinking water aquifers; floodplains; and numerous streams, creeks, and rivers, including Gaviota Creek, the Santa Ynez River, Sisquoc River, and Cuyama River.

47.     The Pipeline System also traverses the critical habitat of several threatened and endangered species, including the California red-legged frog, Gaviota tarplant, Southwestern willow flycatcher, and Southern California steelhead. It also crosses areas with documented occurrences of other special status, threatened, and endangered species, including but not limited to the California tiger salamander, California condor, Crotch's bumble bee, Kern mallow, Nelson's antelope squirrel, San Joaquin kit fox, San Joaquin woollythreads, blunt-nosed leopard

10

VERIFIED PETITION AND COMPLAINT

lizard, giant kangaroo rat, monarch butterfly, southwestern pond turtle, tidewater goby, and western spadefoot toad.

48.     Finally, the Pipeline System also passes through a suburban neighborhood in the city of Buellton, California, close to schools, parks, and homes.

**B.      The 2015 Refugio State Beach Oil Spill**

49.     For decades, ExxonMobil Corporation owned and operated all three offshore oil and gas platforms and produced oil from the Santa Ynez Unit. The original owner and operator of the pipeline system was Celeron Pipeline Company, which in 1998 sold the pipelines to Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P.

50.     In 2015, Line 901/CA-324, carrying oil from the Santa Ynez Unit, ruptured and caused one of the most disastrous oil spills in California history, devastating approximately 150 miles of the California coast.

51.     The corroded pipeline spilled what is now believed to be over 450,000 gallons of oil, killing hundreds of birds and mammals and closing fisheries and beaches. A wide variety of nearshore fish species were impacted by the spill, including surfperch and grunion, which were spawning when the spill occurred. The spill also impacted a wide variety of coastal habitats, including that for kelp wrack, feather boa kelp, surfgrass, and eelgrass. Species protected under the Endangered Species Act (including humpback whales and Western snowy plovers) were observed swimming through oil or with oil on them.

52.     On May 21, 2015, PHMSA issued a Corrective Action Order that ordered the operator to shut down Line 901/CA-324. PHMSA then conducted an investigation into what caused the  rupture and a spill of this magnitude.

53.     The PHMSA Failure Report, issued a year later, noted that while thankfully there were no human injuries or fatalities as a result of the rupture or spill, it "resulted in substantial damage to natural habitats and wildlife." The PHMSA Failure Report found that the pipeline wall had corroded to 1/16th of an inch before the spill occurred. Notably, the pipeline was only operating at approximately 55 percent of its maximum operating pressure at the time it failed.

VERIFIED PETITION AND COMPLAINT

The report documented pervasive corrosion and metal loss throughout the Las Flores Pipeline System.

54.    The Failure Report concluded that the "proximate or direct cause" of the failure was "progressive external corrosion" that occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied to the bare pipe, which was then covered by foam thermal insulation and wrapped with Polyken tape. The Failure Report noted that water had been trapped inside the pipeline's foam insulation, "indicating that the integrity of the coating system had been compromised."

55.    With the coating compromised, the pipeline system's cathodic protection system was rendered ineffective at "preventing corrosion from occurring beneath the pipeline's coating/insulation system." The Failure Report stated that "[i]ndustry practices recognize that the [cathodic protection] system like the one utilized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised." It is now well accepted that impressed cathodic protection systems cannot protect insulated pipelines like Line 901/CA-324 and Line 903/CA-325 from external corrosion.

56.    In the Failure Report's "Cathodic Protection Findings," PHMSA noted that federal pipeline safety regulations (49 C.F.R. § 195.563) require cathodic protection to "prevent external corrosion of buried pipelines," which are generally more prone to corrosion. The report noted that historical cathodic protection records for Line 901/CA-324 reveal "protection levels that typically are sufficient to protect non-insulated, coated steel pipe. Line 901 and 903, however, are insulated." The findings conclude by stating, "[a]n increasing frequency and extent of corrosion anomalies were noted on both Line 901 and 903 in [In-Line Inspection] survey results, anomaly excavations and repairs" and that PHMSA inspectors "noted moisture entrained in the insulation at four excavations performed by Plains on Line 901" after the spill and before the pipelines were ordered purged.

57.    In addition to ineffective cathodic protection, PHMSA's Failure Report found that the operator failed to detect and mitigate the corrosion, highlighting that the "in-line inspection

12

VERIFIED PETITION AND COMPLAINT

(ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately."

58.     While the Las Flores Pipeline System was classified as an interstate pipeline at the time of the spill and was therefore exclusively regulated by the federal government, PHMSA formally acknowledged in a May 2016 Memorandum of Understanding (MOU) that Lines 901/CA-324 and 903/CA-325 were no longer considered interstate hazardous liquid pipelines and are now classified as intrastate pipelines subject to the regulatory and enforcement jurisdiction of Cal Fire, pursuant to state certification from PHMSA.

59.     In March 2020, the federal government and State of California sued Plains All American Pipeline, L.P., and Plains Pipeline, L.P., for the extensive natural resource and other damages the spill caused (*see United States v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (C.D. Cal.)) The case was resolved through a Consent Decree entered later that year, which incorporated elements of three post-spill Corrective Action Orders from PHMSA. The Consent Decree envisioned three possible pathways forward for the pipeline system: Plains All American could replace the pipeline, abandon the pipeline, or pursue restarting the pipeline if conducted in accordance with the Consent Decree's terms "and applicable law."

60.     For any operating segments of the Las Flores Pipeline System, the Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery."

61.     The Consent Decree also expressly required that prior to any restart, the operator "shall apply for a State Waiver through [Cal Fire] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [Cal Fire] prior to restarting." Cal Fire has described a State Waiver as "an order that modifies compliance with a regulatory requirement if an operator demonstrates that alternative measures are consistent with pipeline safety."

62.     The Consent Decree stated that Cal Fire has the discretion to require additional terms and conditions if it grants any request for a State Waiver. The Consent Decree also noted

13

VERIFIED PETITION AND COMPLAINT

that "[n]othing in it shall be interpreted to limit" Cal Fire's authority to require additional terms and conditions in any State Waiver.

**C.      Sable's Pursuit of Restart and the Implications of Cal Fire's State Waivers**

63.      For almost ten years since the 2015 Refugio State Beach oil spill, the three offshore platforms, offshore pipelines, the two onshore processing facilities, and the onshore Las Flores Pipeline System have been shut down.

64.      On February 14, 2024, Sable closed on a Purchase and Sale Agreement with ExxonMobil Corporation and Mobil Pacific Pipeline Company to acquire the Santa Ynez Unit assets as well as all outstanding shares of Pacific Offshore Pipeline Company and Pacific Pipeline Company. According to the terms of that acquisition, if production of oil and gas does not resume from the Santa Ynez Unit by early 2026, the assets revert to ExxonMobil Corporation, which loaned Sable the majority of the funding it needed to acquire the assets.

65.      Sable is now the listed owner and operator of Platforms Harmony, Heritage, and Hondo and lessee on all sixteen federal oil and gas leases in the Santa Ynez Unit. Pacific Offshore Pipeline Company (POPCO) remains the legal owner of the POPCO Gas Plant, and Pacific Pipeline Company remains the legal owner of the Las Flores Pipelines.

66.      While its predecessors once pursued building new, replacement pipelines for the Las Flores Pipeline System, Sable is instead taking the third path laid out in the 2020 Consent Decree and attempting to restart Santa Ynez Unit oil production and transport using the old, extensively corroded pipeline system that failed in 2015 and has exceeded its intended thirty-year lifespan.

67.      Setting its sights on restart, Sable set out to complete the require anomaly repairs where it has found corrosion has reached an unacceptable level. Sable identified 121 anomalies requiring repairs, many of which it contends it has completed. To this end, the company has undertaken extensive development along the pipeline system, which the California Coastal Commission has determined was and is unauthorized. These activities are now the subject of a Commission cease-and-desist order, restoration order, and administrative penalty order. Other state and federal agencies have also issued notices of violation or potential violation to Sable for

14

VERIFIED PETITION AND COMPLAINT

this work on and along the pipeline, including the State Water Control Resource Board, Regional Water Quality Control Board, California Department of Fish and Wildlife, Department of Parks and Recreation, and U.S. Fish and Wildlife Service. As a second step of a possible restart, Sable has pursued State Waivers to address the ineffective cathodic protection system and consequent ongoing risk of corrosion under insulation.

68.     Since learning of this restart plan, Petitioners have repeatedly put Cal Fire on notice of their concerns and urged the agency (through calls, emails, and letters) to conduct an analysis on the Project and provide opportunities for meaningful public participation under CEQA. For example, on September 24, 2024, Petitioners submitted a letter to Cal Fire about the agency's duty to conduct a CEQA review process and requesting that it prepare an environmental impact report for any approvals it issues enabling the restart of Lines 901/CA-324 and 901/CA-325 given the pipeline system's failure, the previous catastrophic rupture and spill, and the fact that it had been idle for almost ten years.

69.     The comments documented how restarting this decades-old, post-failure Las Flores Pipeline System would have serious environmental impacts across multiple categories, including air, health, climate, water, and species. For example, the comments included information and references relating to the risks of oil spills in aging pipelines; the increased risks of oil spills in pipelines without effective cathodic protection systems; the restart's impacts on climate change; the human health impacts associated with oil and gas operations; and the impacts of restart on sensitive habitat and rare, threatened, and endangered species.

70.     On April 24, 2024, Sable and Pacific Pipeline Company confirmed by letter to Cal Fire their intention to continue to pursue State Waiver applications submitted by their predecessors in July 2023. The applications request permission to restart the pipelines even though the thermally insulated pipeline's cathodic protection system has "limited effectiveness" and Sable would need "relief from the requirements to evaluate and remediate all corrosion of or along longitudinal seam welds per 49 C.F.R. § 195.452(h)(4)(iii)(H)."

71.     Although Cal Fire previously assured the public and state legislators it would not issue any waiver absent a public meeting, Sable filed a Form 8-K with the U.S. Securities and

15

VERIFIED PETITION AND COMPLAINT

Exchange Commission on December 17, 2024, in which it announced that Cal Fire issued the State Waivers on that same day, unbeknownst to the public. Indeed, Petitioners only learned of the State Waivers from the December 17, 2024, filing, despite having submitted a California Public Records Act Request to Cal Fire on September 13, 2024, requesting records relating to Sable's application for and Cal Fire's consideration and issuance of any State Waivers (to which Cal Fire only responded in March 2025).

72. After Cal Fire issued the State Waivers in December, it was required by law to transmit them to PHMSA for a 60-day review period during which PMHSA could approve, object to, or remain silent on the waiver, in which case the waivers would take effect after the review period lapsed.

73. On December 23, 2024, the Center sent a letter to Cal Fire and PHMSA to communicate its concern that Sable had announced it received State Waivers on December 17, 2024, particularly given, that on and information and belief, Cal Fire had previously communicated that it would not issue any State Waivers until after holding a public meeting.

74. The Center's December 23, 2024, letter referenced and attached an *Evaluation of the Las Flores Pipeline System Startup Proposal* prepared by Accufacts Inc. for the Center for Biological Diversity and Environmental Defense Center. Accufacts Inc. reviewed the publicly available information on the pipeline system and conveyed serious technical concerns with the proposed pipeline system restart given the condition of the pipeline, its design flaws, and the risks associated with reliance on inspection tools in lieu of effective cathodic protection. Accufacts Inc.'s president who authored the evaluation, Richard Kuprewicz, is a chemical engineer with over fifty years of experience in the energy industry, including extensive experience conducting pipeline incident investigations after pipeline rupture tragedies.

75. On December 24, 2024, the Center sent an additional email inquiry to Cal Fire about the Center's Public Record Act Request, as it had not received any response or any responsive records from the agency. On January 15, 2025, the Center received an email from Cal Fire that the agency had posted the State Waivers on a webpage it developed for the proposed restart (after repeated requests from the public for more transparency), titled *Pathways for*

16

VERIFIED PETITION AND COMPLAINT

*Restarting CA-324 and CA-325*. It did not provide the application for the State Waivers or any further responsive records relating to its issuance of the State Waivers at that time.

76.     The State Waiver issued for Line 901/CA-324 covers a 10.86-mile, 24-inch outside diameter pipeline segment along the coast in Santa Barbara County. It waives compliance with just one pipeline safety regulations, specifically relating to remediation measures for "[c]orrosion of or along a longitudinal seam weld." (49 C.F.R. § 195.452(h)(4)(iii)(H).) According to the State Waiver, "Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP)."

77.     The State Waiver issued for Line 903/CA-325A/B covers a 30-inch outside diameter pipeline segment that crosses 113.56 miles in Santa Barbara County, San Luis Obispo County, and Kern County (Gaviota to Pentland). As with the waiver issued for the coastal segment of the pipeline, it waives the requirement to remediate the "[c]orrosion of or along a longitudinal seam weld." (49 C.F.R. § 195.452(h)(4)(iii)(H).) It also includes the same explanation attributed to Sable: that its goal and plan is to try to mitigate the risks posed by corrosion under insulation resulting from the ineffective cathodic protection system.

78.     On January 17, 2025, PHMSA Deputy Administrator Tristan Brown sent the Center a letter acknowledging receipt of its December 23, 2024, letter and conveying that PHMSA had received the State Waivers from Cal Fire on December 18, 2024, starting the federal agency's 60-day review period. PHMSA's letter noted that it might need more time for review, it had communicated that possibility to Cal Fire, and "[a]llowing for additional time for review is merited here as it has been in certain other instances involving similar highly technical waiver reviews by PHMSA." PHMSA also opened a non-rulemaking federal docket for each State Waiver (Docket ID PHMSA-2025-002 for CA-324 and Docket ID PHMSA-2025-003 for CA-325) on January 28, 2025, on the website, Regulations.gov.

17

VERIFIED PETITION AND COMPLAINT

79.     In contrast to that communication, just fourteen days later, on February 11, 2025, PHMSA's Associate Administrator for Pipeline Safety issued two identical, brief letters concurring with Cal Fire's State Waivers, noting that the agency "does not object" to the granting of either waiver.

80.     The State Waivers in essence allow Sable to supplant corrosion-*preventing* cathodic protection requirements with corrosion-*monitoring* and risk management measures; including pipeline testing; in-line inspections; verification digs; repairs; corrosion growth rate and predicted failure analyses; and various recordkeeping and reporting requirements.

81.     If the Las Flores Pipeline System is allowed to restart using State Waivers from Cal Fire, external pipeline corrosion will not be prevented or even minimized by the ineffective cathodic protection system. Nor will the State Waivers address the years of accumulated corrosion that have not yet been identified as necessitating remediation. A 1994 Cal Fire report indicates that there is a five-fold increase in failure frequencies for pipelines that are not equipped with cathodic protection.

82.     This is not a repair of the failed cathodic protection system—it is essentially abandonment of that legally-required system. Pipeline integrity management tools are not a substitute for proper pipeline design and effective coating and cathodic protections. Current in-line inspection technologies are not able to adequately detect and inform an adequate assessment of all types of external corrosion threats that are most likely present along the Las Flores Pipeline System. The pipeline segments at the highest risk of failure are those at risk of corrosion related to cracking, including stress corrosion cracking and selective seam corrosion cracking. A pipeline's time to failure from stress corrosion cracking is difficult if not impossible to predict.

83.     Even if integrity management tools were a substitute for a properly designed and functioning pipeline (which they are not), the State Waivers contemplate over 190 digs and excavations over the next 10 years just to attempt to validate the results of the contemplated in-line inspections. There has been no environmental review of the impacts of such digs and excavations or any other aspects of this Project.

VERIFIED PETITION AND COMPLAINT

84.    Given its coating and cathodic protection design flaws and failures, projected thirty-year lifespan, and the existing corrosion along the pipelines, the Las Flores Pipeline System cannot be made as safe as new pipelines. It is also well-understood that the risk of spills increases with the age of a pipeline. As the 1985 Celeron/All American and Getty Pipeline Projects EIR/EIS acknowledged, the risk of an oil spill *more than doubles* as pipelines age from twenty to forty years. These pipelines were constructed in the late 1980s and went into service in 1991 (Line 903/CA-325) and 1992 (Line 901/CA-324).

85.    The Las Flores Pipeline System poses unique threats of environmental damage and future oil spills due to its age, design flaws, existing levels of corrosion, location, and necessary operating conditions, which Cal Fire has failed to meaningfully assess.

86.    Nor has Cal Fire assessed the Project's other significant environmental impacts as required. For example, resuming drilling and oil production at the Santa Ynez Unit would increase vessel traffic, thereby increasing the risk of vessel strikes of various threatened and endangered animals. Restart would also resume pollution from an onshore processing facility, which was Santa Barbara County's largest source of greenhouse gas emissions prior to being shut down. It emitted 55 percent of the County's greenhouse gas emissions along with a significant number of other pollutants, including particulate matter and volatile organic compounds (VOCs), which are harmful to human health.

87.    On March 2, 2025, the Center sent Cal Fire a letter requesting revocation of the State Waivers to ensure that (1) Cal Fire proceeds in full compliance with the procedural and substantive requirements of federal and state pipeline safety laws and CEQA, and (2) Sable's other noticed violations of law are remedied before the agency considers issuing any pipeline safety regulation waivers. The Center attached a second February 25, 2025, report prepared by Accufacts Inc. after it reviewed the State Waivers, which concludes that restarting the pipeline system continues to pose a high risk of dangerous corrosion and failure for reasons the State Waivers did not adequately address. A month later, Cal Fire responded to the Center's letter, communicating its position that revocation of the State Waivers is not appropriate at this time.

VERIFIED PETITION AND COMPLAINT

88.     On March 13, 2025, Cal Fire, the State Water Control Resources Board, Regional Water Quality Control Board, California Department of Fish and Wildlife, Department of Parks and Recreation, California Department of Conservation, and California Coastal Commission participated in a Town Hall meeting organized by state lawmakers representing Santa Barbara County to discuss the agencies' respective roles in the Project and to answer questions from the public about the status of the restart of oil and gas operations from the Santa Ynez Unit, including use of the Las Flores Pipeline System to transport crude oil. There, it was confirmed that, to date, no CEQA process has been initiated or completed for the Project.

89.     Sable announced in a March 17, 2025, Form 8-K filing that it intends to restart oil and gas production from the Santa Ynez Unit in the second quarter of 2025 (which we are now in) after completing the remaining anomaly repairs and hydrotesting the pipeline system.

## LEGAL BACKGROUND

**A.     Oil and Gas Pipeline Safety Laws and Regulations**

90.     Cal Fire implements and enforces a Pipeline Safety Program that is certified by the U.S. Department of Transportation under section 60105 of title 40 of the United States Code.

91.     California's Elder California Pipeline Safety Act of 1981 directed Cal Fire to "adopt hazardous liquid pipeline safety regulations in compliance with the federal law relating to hazardous liquid pipeline safety." (Gov. Code § 51011, subd. (a).) Cal Fire adopted the federal pipeline safety regulations (49 C.F.R. part 195) by reference as they relate to hazardous liquid pipelines. (Cal. Code Regs., tit. 19, § 2000.)

92.     Pursuant to these federal pipeline safety regulations (49 C.F.R. § 195.557), buried pipelines constructed after a certain date, including Line 901/CA-324 and Line 903/CA-325, must have an external coating to prevent external corrosion. Specifically, the external coating must:

> (a) Be designed to mitigate corrosion of the buried or submerged pipeline; (b) Have sufficient adhesion to the metal surface to prevent under film migration of moisture; (c) Be sufficiently ductile to resist cracking; (d) Have enough strength to resist damage due to handling and soil stress; (e) Support any supplemental cathodic protection; and (f) If the coating is an insulating type, have low moisture absorption and provide high electrical resistance.

20

(49 C.F.R. § 195.559.)

93.    Buried pipelines constructed after a certain date, including Line 901/CA-324 and Line 903/CA-325, must have cathodic protection. (49 C.F.R. § 195.563.)

94.    The federal pipeline safety risk indicator table places pipelines greater than 25 years of age in the "High" risk category. (Guidance for Implementation of an Integrity Management Program, 49 C.F.R. part 195 Appendix C, § III.

95.    Actions required to remediate pipeline integrity problems are defined in section 195.452(h). (49 C.F.R. § 195.452(h).) Despite the flaws and ineffectiveness of the pipeline system's coating and cathodic protection system, the sole regulation from which Sable sought State Waivers relates to "[c]orrosion of or along a longitudinal seam weld," which is considered a "180-day condition" for which an operator is required to schedule evaluation and remediation within 180 days of discovering the condition. (49 C.F.R. § 195.452(h)(4)(iii)(H).)

96.    State authorities like Cal Fire that have been certified by PHMSA may "waive compliance with a safety standard to which the certification or agreement applies *in the same way and to the same extent* the Secretary [of Transportation] may waive compliance under subsection (c) of this section." (49 U.S.C. § 60118(d)), italics added.)

97.    The Secretary of Transportation "by order may waiver compliance with any part of an applicable standard prescribed under this chapter [49 USCS §§ 60101 et seq.] with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118(c); *see also* 49 C.F.R. § 190.341(a) (federal regulations relating to waivers the Department of Transportation issues.))

98.    The Secretary of Transportation may issue a waiver "only after notice and an opportunity for a hearing." (49 U.S.C. § 60118(c)(1)(B).) The Secretary is also required to include a "statement of reasons" in an order granting the waiver. (*Id*. § 60118(c)(3).)

99.    When it receives an application for a waiver, PHMSA provides a notice of intent to consider the application and "invite comment." (49 C.F.R. § 190.341(d)(1).). PHMSA also "may consult with other Federal agencies before granting or denying an application or renewal

VERIFIED PETITION AND COMPLAINT

on matters PHMSA believes may have significance for proceedings under their areas of responsibility." (*Id.*)

100.   Applications to PHMSA for waivers must contain a "detailed description of the pipeline facilities" for which the waiver, also known as a special permit, is sought, including proximity to "unusually sensitive areas," an explanation of the "unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for this facility," a description of alternative measures or activities proposed and "how such measures will mitigate any safety or environmental risks," a description of "any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a [waiver] would be in the public interest," and any other information that the agency may need "to process the application including environmental analysis where necessary." (49 C.F.R. § 190.341(c).) "Conditions may be imposed on the grant [of a waiver] if the Associate Administrator concludes they are necessary to assure safety, environmental protection, or are otherwise in the public interest." (49 C.F.R. § 190.341(d)(2).)

101.   The U.S. Department of Transportation conducts environmental review for waivers that it issues, consistent with governing legislation, Secretarial Order DOT 5610.1C, and PHMSA National Environmental Policy Act (NEPA) implementing procedures. Under its procedures, waivers are one of three general categories of PHMSA major federal actions that are subject to environmental review, along with regulatory actions and natural gas distribution grant actions. PHMSA's Pipeline and Hazardous Materials Safety Administration NEPA Implementing Procedures and Categorical Exclusions Report states:

> PHMSA's grant or denial of the special permit request is a major federal action under NEPA. Therefore, in addition to analyzing any potential risks to public safety, PHMSA also analyzes any potential risks to the environment that could result from such grant or denial. Specifically, PHMSA evaluates whether the special permit would significantly impact the likelihood of a pipeline spill or failure as compared to the environmental status quo in the absence of the special permit . . . issuance of special permits often prevents ground disturbance from excavation activities, thereby avoiding the associated environmental effects often associated with ground disturbance.

VERIFIED PETITION AND COMPLAINT

102.     The Elder California Pipeline Safety Act of 1981 contains additional requirements relevant to any State Waiver. It authorizes Cal Fire to "exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the *risk to public safety is slight and the probability of injury or damage remote*." (*See* Gov. Code § 51011, subd. (b), italics added.) Notifications of exemption "shall be written, and shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code § 51011, subd. (c).)

**B.      CEQA's Environmental Review Requirements**

103.     CEQA is a comprehensive statute designed to provide for the long-term protection of the environment. (Pub. Resources Code §§ 21001, subd. (d), 21080, subd. (a); Cal. Code Regs., tit. 14, § 1681 *et seq*.)

104.     One of the fundamental purposes of the CEQA process is to provide decisionmakers and the public with detailed information about the environmental impacts a proposed project is likely to have and to find feasible ways to avoid or significantly reduce those impacts. (CEQA Guidelines § 15002, subd. (a).) To that end, "[u]nder CEQA, an agency must solicit and respond to comments from the public and from other agencies concerned with the project" to ensure that the public and other agencies are informed and able to participate in the process. (*Id*. at subd. (j).)

105.     CEQA is triggered by any "project," which is defined as an action subject to a public agency's discretionary funding or approval that has the potential to either (1) cause a direct physical change in the environment; or (2) cause a reasonably foreseeable indirect physical change in the environment. (Pub. Resources Code § 21065.) A "project" includes (1) an activity directly undertaken by any public agency; (2) an activity undertaken by a private party but supported in whole or in part by public agency assistance such as contracts or grants, and (3) an activity that involves an agency's issuance to a person of a lease, permit, license, or other entitlement for use. (Pub. Resources Code § 21065; *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 701 [overruled in part on other grounds].) "The key question is whether the public agency can use its subjective judgment to decide whether and how to carry out or approve

23

VERIFIED PETITION AND COMPLAINT

a project." (Cal. Code Regs., tit. 14, § 15357; *Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 493.)

106.    CEQA defines a lead agency as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (Pub. Resources Code § 21067; CEQA Guidelines § 15367.) Conversely, a responsible agency is "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (Pub. Resources Code § 21069; CEQA Guidelines § 15381.)

107.    Where two or more public agencies are involved in a project and the project is to be carried out by a nongovernmental person or entity, the lead agency shall be the public agency with the greatest responsibility for supervising or approving the project. (CEQA Guidelines § 15051(b).) Where more than one public agency equally meets such criteria, the agency which acts first on the project is normally the lead agency. (*Id*. at subd. (c).)

108.    Subject to certain limited statutory and categorical exemptions, CEQA requires lead agencies to, at minimum, conduct an initial study on any project that "may have a significant effect on the environment." (CEQA Guidelines § 15063(a).) This study must examine all significant direct, indirect, and cumulative impacts of the proposed project.

109.    Where a lead agency determines after an initial study that the project may have a significant impact on the environment, the lead agency must prepare an Environmental Impact Report (EIR). (Pub. Res. Code § 21151; CEQA Guidelines § 15064(f) & (h).) The "heart" of CEQA's environmental review requirement is the EIR. (See *No Oil, Inc. v. City of Los Angeles* (1974) 529 P.2d 66, 76 (quoting *City of Inyo v. Yorty* (1973) 108 Cal.Rptr.3d 377, 388).) The EIR has been described as an environmental "alarm bell" whose purpose is to alert the public and decisionmakers to environmental changes "before they have reached ecological points of no return." (*City of Inyo v. Yorty*, *supra*, 108 Cal.Rptr.3d at page 388.)

110.    An EIR must identify and describe "[d]irect and indirect significant effects of the project on the environment." (CEQA Guidelines § 15126.2(a).) The EIR must also describe feasible mitigation measures and alternatives to the project that could avoid or minimize

24

significant environmental impacts. (CEQA Guidelines §§ 15126.4, 15126.6.) Additionally, an EIR must identify and analyze cumulative effects when the "incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Cal. Code Regs., tit. 14, § 15065, subd. (a)(3); *see also id.* § 15130, subd. (a).)

111. Immediately following its decision to prepare an EIR, the lead agency must issue a notice of preparation to the public and responsible agencies to allow for input. (CEQA Guidelines § 15082.) Additionally, the lead agency must file a notice of completion and notice of public availability as soon as a draft EIR is completed. (CEQA Guidelines §§ 15085, 15087.) A public review period of no less than 30 days must be provided. (CEQA Guidelines §§ 15105, 15073, subd. (a), 15087, subd. (e).)

112. The lead agency must consider all comments received during the public review period. (CEQA Guidelines §§ 15074, subd. (b), 15132, subd. (c).) Additionally, the lead agency must consult with and request comments from all responsible agencies and respond to all comments that raise significant environmental issues. (CEQA Guidelines §§ 15086, 15132, subd. (d).)

113. Under CEQA, agencies can only approve projects if all feasible alternatives or mitigation measures that would substantially lessen a project's significant environmental effects have been imposed. (Pub. Res. Code, § 21002; CEQA Guidelines § 15091.)

**FIRST CAUSE OF ACTION**
**(Violations of Federal Pipeline Safety Laws – 49 U.S.C. § 60118)**

114. Petitioners reallege and incorporate the allegations contained in the foregoing paragraphs.

115. Cal Fire violated the requirement that it only "waive compliance with a safety standard to which the certification or agreement applies *in the same way and to the same extent* the Secretary [of Transportation] may waive compliance under subsection (c) of this section." (49 U.S.C. § 60118(d), italics added.) It did so by failing to demonstrate that the State Waivers are consistent with pipeline safety; provide public notice and a public hearing before issuing the

25

waivers; include a statement of reasons in its decisions to approve the waivers; and conduct environmental review before issuing its waiver decisions.

116.    As discussed above, the risk to public safety and probability of environmental damage stemming from the Project—including restart of Line 901/CA-324 and Line 903/CA-325 with defective coating, ineffective cathodic protection, and serious ongoing corrosion threats—is significant. As a result, Cal Fire violated the federal requirement that waivers may only be issued if "not inconsistent with pipeline safety." (49 U.S.C. § 60118(c)(1)(A).)

117.    Cal Fire failed to provide any public notice or hearing opportunity prior to issuing the State Waivers, and therefore violated the requirement that waivers may be issued "only after notice and an opportunity for a hearing." (49 U.S.C. § 60118(c)(1)(B).)

118.    Cal Fire failed to provide an order containing "the reasons for granting the waiver(s)." 49 U.S.C. § 60118(c)(3).) The State Waivers merely recited Sable's request and included general conditions of approval.

119.    Cal Fire also failed to conduct any environmental review for the State Waivers, as discussed below, despite the U.S. Department of Transportation's requirement to conduct environmental review for waivers it issues, consistent with governing legislation, Secretarial Order DOT 5610.1C, and the PHMSA National Environmental Policy Act Implementing Procedures.

120.    Cal Fire committed a prejudicial abuse of discretion, violated mandatory duties under federal law, and failed to proceed in the manner required by law when it issued the State Waivers for the Project in violation of federal pipeline safety laws.

**SECOND CAUSE OF ACTION**
**(Violations of State Pipeline Safety Laws – Gov. Code § 51011)**

121.    Petitioners reallege and incorporate the allegations contained in the foregoing paragraphs.

122.    Cal Fire violated the requirement that it "may exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote."

26

VERIFIED PETITION AND COMPLAINT

(Gov. Code § 51011, subd. (b).) The State Waivers issued to Sable did not include any analysis or justifications for their issuance let alone findings related to risks to public safety or the probability of injury or damage.

123.    Cal Fire violated the requirement that waivers or exemptions "include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code § 51011, subd. (c).) Instead of providing any Project-specific findings, evidence, or analysis justifying the decisions, Cal Fire merely recounts that

> Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

124.    The waivers contain no discussion of the risks that restarting these aged pipelines with ineffective external coating and cathodic protections poses to the environment, public safety, and the public interest. Nor do the waivers address the environmental and safety impacts of their conditions of approval (which will require repeated verification digs and excavations, among other activities).

125.    Cal Fire committed a prejudicial abuse of discretion, violated mandatory duties under state law, and failed to proceed in the manner required by law when it issued the State Waivers for the Project in violation of state pipeline safety laws.

**THIRD CAUSE OF ACTION**
**(Violations of CEQA – Pub. Resources Section 21000, *et seq.*;**
**14 Cal. Code Regs. section 15000, *et seq.*)**

126.    Petitioners reallege and incorporate the allegations contained in the foregoing paragraphs.

127.    Cal Fire is the lead agency principally responsible for approving the Project as it has provided the majority of state oversight for the Project to date, including issuing the State Waivers for the Project and reviewing and approving compliance with the requirements of the

27

Consent Decree, pipeline integrity management requirements, and Sable's startup plans for the pipelines, among other responsibilities. (CEQA Guidelines §§ 15367, 15051, subd. (b).)

128. Cal Fire violated CEQA by issuing the State Waivers without preparing any environmental documentation or providing any public notice or public comment opportunity. Cal Fire therefore failed CEQA's core objective to provide decisionmakers and the public with detailed information about the Project's environmental impacts, consider appropriate mitigation measures, and properly weigh Project alternatives. (CEQA Guidelines § 15002(a).)

129. Cal Fire's violations include, but are not limited to, the following:

A. Failure to prepare an Initial Study for the Project. (CEQA Guidelines § 15063, subd. (a).)

B. Failure to prepare an Environmental Impact Report for the Project. (CEQA Guidelines § 15063, subd. (b).)

C. Failure to publish a Notice of Preparation for the Project. (CEQA Guidelines § 15082.)

D. Failure to file a Notice of Completion or provide a public notice of the availability of a draft Environmental Impact Report for the Project. (CEQA Guidelines §§ 15085, 15087.)

E. Failure to provide a public review period for the Project. (CEQA Guidelines §§ 15105, 15073, subd. (a), 15087, subd. (e).)

F. Failure to request, consider, and respond to comments on the Project. (CEQA Guidelines §§ 15074, subd. (b), 15086, 15132, subds. (b) & (d).)

G. Failure to certify that Cal Fire considered all pertinent environmental information in an Environmental Impact Report prior to approving the Project and that the Environmental Impact Report reflects Cal Fire's independent judgment and analysis. (CEQA Guidelines § 15090).

H. Failure to adopt a Mitigation Monitoring or Reporting Program for the Project. (CEQA Guidelines §§ 15074, subd. (d), 15097.)

VERIFIED PETITION AND COMPLAINT

I.      Failure to make written findings for the Project. (CEQA Guidelines §§ 15091, 15093.)

J.      Failure to file a Notice of Determination for the Project. (CEQA Guidelines §§ 15075, 15094.)

130.    In the alternative, Cal Fire violated CEQA by failing to conduct subsequent environmental review for the Project. (Pub. Resources Code § 21166; CEQA Guidelines §§ 15052, 15096(e), 15162.)

131.    Cal Fire committed a prejudicial abuse of discretion, failed to proceed in the manner required by law, and acted without substantial evidentiary support when it issued the State Waivers for the Project without environmental documentation or public involvement pursuant to CEQA.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioners pray for entry of judgment as follows:

1.      For a writ of mandate or peremptory writ pursuant to Code of Civil Procedure section 1085, or in the alternative, section 1094.5, to:

A.      Declare that Cal Fire violated federal pipeline safety laws in approving the State Waivers without public notice, a public hearing, a statement of reasons, or environmental review;

B.      Declare that Cal Fire violated federal pipelines safety laws by issuing State Waivers without demonstrating that they are consistent with pipeline safety;

C.      Declare that Cal Fire violated state pipeline safety laws by issuing State Waivers without demonstrating that risk to public safety is slight and the probability of injury or damage remote;

D.      Declare that Cal Fire violated state pipeline safety laws by issuing State Waivers without including a discussion of the factors considered significant to the granting of the exemption;

29

VERIFIED PETITION AND COMPLAINT

E.      Declare that Cal Fire violated CEQA in approving the State Waivers without conducting the required CEQA review for the Project;

F.      Direct Cal Fire to vacate and set aside the State Waivers until Cal Fire complies with its obligations under federal and state pipeline safety laws and CEQA; and

G.      Direct Cal Fire to refrain from granting any further approvals for the Project unless and until Cal Fire complies with its obligations under CEQA and federal and state pipeline safety laws.

2.      For entry of temporary, preliminary, and permanent injunctive relief prohibiting Cal Fire and the Real Parties in Interest from conducting any further activity in furtherance of the Project until Cal Fire complies with the requirements of CEQA and federal and state pipeline safety laws.

3.      For Petitioners' fees and costs, including reasonable attorneys' fees and costs, as authorized by Code of Civil Procedure section 1021.5 and any other applicable provisions of law.

4.      For such other legal and equitable relief as this Court deems appropriate and just.

DATED: April 15, 2025          Respectfully submitted,

                               s/ *Julie Teel Simmonds*

                               JULIE TEEL SIMMONDS (Bar No. 208282)
                               jteelsimmonds@biologicaldiversity.org
                               DAVID PETTIT (Bar No. 67128)
                               dpettit@biologicaldiversity.org
                               TALIA NIMMER (Bar No. 331002)
                               tnimmer@biologicaldiversity.org
                               CENTER FOR BIOLOGICAL DIVERSITY
                               2100 Franklin St., Ste. 375
                               Oakland, CA 94612
                               Tel. (510) 844-7100

                               *Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

30

VERIFIED PETITION AND COMPLAINT

**VERIFICATION**

I, Peter Galvin, hereby declare I am the Director of Programs for Petitioner Center for Biological Diversity, a non-profit corporation with offices in Oakland, California. I have read the foregoing petition and am familiar with its contents. The facts alleged in it are true to my personal knowledge and belief. I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this verification is executed on this 14th day of April 2025, in Athens, Alabama.

Peter Galvin, Director of Programs
Center for Biological Diversity

31

VERIFIED PETITION AND COMPLAINT

**VERIFICATION**

I, Mati Waiya hereby declare I am the Tribal Chair of the Coastal Band of the Chumash Nation and Executive Director of the Petitioner Wishtoyo Foundation, a non-profit corporation with an office in Malibu, California. I have read the foregoing petition and am familiar with its contents. The facts alleged in it are true to my personal knowledge and belief. I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this verification is executed on this 14th day of April 2025, in Santa Paula, California.

Mati Waiya
Executive Director
Wishtoyo Foundation

32

VERIFIED PETITION AND COMPLAINT

# Exhibit A

CENTER *for* BIOLOGICAL DIVERSITY                    *Because life is good.*

*Via UPS*

April 12, 2025

Joe Tyler, Director/Fire Chief
Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
710 Riverpoint Court
West Sacramento, CA 95605-1689

**Re: Notice of Commencement of Legal Action Pursuant to CEQA and Pipeline Safety Laws**

Dear Director Tyler and Fire Marshal Berlant:

Please take notice that the Center for Biological Diversity and Wishtoyo Foundation intend to file a Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief related to the State Waivers that the Office of the State Fire Marshal granted to Sable Offshore Corp. for the Las Flores Pipeline System (CA-324, CA-325A/B). We provide this notice pursuant to Public Resources Code section 21167.5.

This litigation will be filed in Santa Barbara County Superior Court on or after April 15, 2025, and it will be based on the Office of the State Fire Marshal's issuance of State Waivers to Sable Offshore Corp. without complying with the California Environmental Quality Act, Pub. Res. Code § 21000 *et seq.*, or the requirements of applicable federal and state pipeline safety laws and regulations. The Office of the State Fire Marshal granted the State Waivers on December 17, 2024, for Line CA-324 and Line CA-325A/B, and the Pipeline & Hazardous Materials Safety Administration's concurred in the issuance of these waivers on February 11, 2025.

Please contact one of us immediately if you need clarification or wish to discuss this notice.

Sincerely,

 s/ *Julie Teel Simmonds*

Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
(510) 844-7133

*Attorneys for Petitioners/Plaintiffs*

Attachment: Proof of Service

*Alaska • Arizona • California • Florida • Minnesota • Nevada • New Mexico • New York • Oregon • Vermont • Washington, DC*

www.BiologicalDiversity.org

**PROOF OF SERVICE**

I, Cynthia Elkins, declare as follows:

I am a resident of Humboldt County, California, and I am over the age of 18 and not a party to this action. My business address is Center for Biological Diversity, PO Box 220, Shelter Cove, California. My email address is celkins@biologicaldiversity.org.

On April 12, 2025, I served the preceding **Notice of Commencement of Legal Action Pursuant to CEQA** by enclosing a true and correct copy in a sealed envelope, which I deposited for collection and overnight delivery, postage fully pre-paid, at an office of an overnight delivery carrier in Athens, Alabama, addressed to the following persons:

Joe Tyler, Director/Fire Chief
California Department of Forestry and Fire Protection
710 Riverpoint Court
West Sacramento, CA 95605-1689

Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
710 Riverpoint Court
West Sacramento, CA 95605-1689

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and this Declaration was executed in Athens, Alabama, on April 12, 2025.


_____
Cynthia Elkins

# Exhibit B

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological
Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**
**SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>        Petitioners/Plaintiffs,<br><br>  v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>        Respondents/Defendants.<br>───────────────────────────<br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>        Real Parties in Interest. | Case No.<br><br>**PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD**<br><br>[Pub. Res. Code § 21167.6(b)(2)] |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to California Public Resources Code section 21167.6(b)(2), Petitioners CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION hereby elect to prepare the record of proceedings before Respondents CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION and OFFICE OF THE STATE FIRE MARSHAL, relating to the subject of the above-captioned action, or to pursue an alternative method of record preparation following further discussion with Respondents.

The record will be organized chronologically, paginated consecutively, and indexed so that each document may be clearly identified as to its contents and source, in a form and format consistent with California Rules of Court Rule 3.2205.

DATED: April 15, 2025                  Respectfully submitted,

s/ *Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Ste. 375
Oakland CA 94612

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

1

PETITIONER'S NOTICE OF ELECTION TO PREPARE THE ADMINISTRATIVE RECORD

# Exhibit C

CENTER *for* BIOLOGICAL DIVERSITY                    *Because life is good.*

April 15, 2025

Via USPS Priority Mail and Electronic Mail

CEQA Coordinator
Office of the Attorney General
Environment Section
1300 I Street
Sacramento, CA 95814-2919
CEQA@doj.ca.gov

**Re:    Notice of Commencement of Legal Action Alleging Environmental Harm: Cal Fire
State Waivers for Las Flores Pipeline System**

Dear Attorney General Bonta:

Please take notice of the enclosed Petition for Writ of Mandate and Complaint for
Declaratory and Injunctive Relief, which the Center for Biological Diversity and Wishtoyo
Foundation filed in Santa Barbara County Superior Court on April 15, 2025 (*Center for
Biological Diversity v. California Department of Forestry and Fire Protection*). The Center and
Wishtoyo Foundation provide this notice pursuant to Code of Civil Procedure section 388 and
Public Resources Code section 21167.7.

This case challenges the California Department of Forestry and Fire Protection and
Office of the State Fire Marshal's (Cal Fire's) failure to conduct an environmental review under
the California Environmental Quality Act (CEQA) (Pub. Resources Code. § 21000, *et seq.*)
before waiving federal pipeline safety regulations for an oil pipeline system in Santa Barbara,
San Luis Obispo, and Kern counties. Specifically, Cal Fire issued two State Waivers to Sable
Offshore Corp. in December 2024, which waive safety requirements meant to prevent corrosion
of pipelines and minimize the risk of oil spills. The pipeline system, known as the Las Flores
Pipeline System, ruptured and caused the catastrophic Refugio Oil Spill in 2015 due to excessive
corrosion resulting from its flawed and ineffective coating and cathodic protection system. The
State Waivers at issue in this case would allow Sable to restart offshore oil operations and
transport that crude oil using the same defective and corrosion-prone pipeline system rather than
replacing it.

Cal Fire's approvals of the State Waivers are likely to adversely impact air quality, water
quality, cultural resources, and wildlife; deepen California's reliance on fossil fuels; ramp up
local emissions of greenhouse gases that contribute to climate change; and increase the risk of
another catastrophic oil spill. Cal Fire's decisions to grant these State Waivers are discretionary
actions under CEQA.

*Arizona • California • Colorado • Florida • N. Carolina • New York • Oregon • Virginia • Washington, D.C. • La Paz, Mexico*

BiologicalDiversity.org

The Center and Wishtoyo Foundation now seek a court order setting aside the State Waivers and prohibiting Cal Fire and Real Parties of Interest from commencing any activities authorized in the State Waivers unless and until it considers, analyzes, and publicly discloses these impacts pursuant to CEQA, and unless and until it complies with applicable federal and state pipeline safety laws and regulations.

Thank you for your attention to this matter.

Sincerely,

 s/ *Julie Teel Simmonds*
JULIE TEEL SIMMONDS
jteelsimmonds@biologicaldiversity.org
DAVID PETTIT
dpettit@biologicaldiversity.org
TALIA NIMMER
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

Attachment:
Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**PROOF OF SERVICE**

I, Cynthia Elkins, hereby declare:

I am over the age of 18 years, not a party to this action, and employed by the Center for Biological Diversity. My business and mailing address is PO Box 220, Shelter Cove, CA 95589.

On April 15, 2025, I mailed the preceding **Notice of Commencement of Legal Action**, along with an enclosed **Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief**, via First Class, Priority Mail by enclosing a true and correct copy of each document in a sealed envelope, which I deposited with the U.S. Postal Service, postage fully prepaid, in Rogersville, Alabama, addressed as follows:

CEQA Coordinator
Office of the Attorney General
1300 I Street
Sacramento, CA 95814-2919

Additionally, on April 15, 2025, I sent the Notice of Commencement and Verified Petition referenced above by electronic mail to the following address:

CEQA@doj.ca.gov

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct, and this Declaration was executed in Athens, Alabama, on April 15, 2025.


_____
Cynthia Elkins

# Exhibit D

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners/Plaintiffs Center for Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**
**SOUTH COUNTY REGION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>                Petitioners/Plaintiffs,<br><br>        v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>                Respondents/Defendants.<br><br>---<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>                Real Parties in Interest. | Case No.<br><br>**PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST**<br><br>[Pub. Resources Code § 21167.4]<br><br>Petition Filed April 15, 2025 |

NOTICE IS HEREBY GIVEN that, pursuant to Public Resources Code section 21167.4, Petitioners Center for Biological Diversity and Wishtoyo Foundation request a hearing on the merits of the Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief (Petition), which alleges violations of, inter alia, the California Environmental Quality Act (CEQA), Public Resources Code section 21000 *et seq*.

This request is being filed with the Court and served on the parties. Following the filing of this Request for Hearing and Notice of Request, any party may apply to the Court to establish a briefing schedule and hearing date for the hearing. (*Leavitt v. County of Madera* (2004) 123 Cal.App.4th 1502, 1514–23.) The hearing date, time, and place, and the briefing schedule for the hearing are to be established by the Court following such application by any party or at any case management conference to be scheduled by the Court. (*See id*.)

DATED: April 15, 2025                    Respectfully submitted,


 s/ *Julie Teel Simmonds*
Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Ste. 375
Oakland CA 94612

*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

1

PETITIONER'S REQUEST FOR HEARING AND NOTICE OF REQUEST