# EXHIBIT F

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/15/2025 9:48 AM
By: Narzralli Baksh, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

       Petitioners and Plaintiffs,

  vs.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,

       Respondents and Defendants,

  and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

       Real Parties in Interest.

Case No.: 25CV02247

**VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Petitioners and Plaintiffs ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, and SANTA BARBARA CHANNELKEEPER (collectively, "Petitioners") respectfully petition this Court for a writ of mandate pursuant to Code of Civil Procedure sections 1085 and 1094.5 and seek declaratory and injunctive relief against Respondents and Defendants CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through its component agency OFFICE OF THE STATE FIRE MARSHAL, and State Fire Marshal DANIEL BERLANT (collectively, "Respondents"), and allege as follows:

## INTRODUCTION

1. This case arises from the efforts of Sable Offshore Corp. and its wholly-owned subsidiary Pacific Pipeline Company (together, "Sable") to restart the Las Flores Pipeline System — a defective pipeline system that ruptured in 2015, causing one of the worst oil disasters in California history.

2. On May 19, 2015, pipeline CA-324, a segment of the Las Flores Pipeline System, ruptured at Refugio State Beach Park, spilling more than 120,000 gallons of heavy crude oil into the surrounding environment. The spill was catastrophic. It closed public parks and beaches, killed and injured wildlife, shut down fisheries, and sickened nearby residents with chemical pneumonia.

3. Upon investigation, the Pipeline Hazardous Materials Safety Administration (PHMSA) determined that the rupture was a result of "progressive external corrosion," and that the pipeline's cathodic protection system — intended to prevent such corrosion — had failed. Concerningly, PHMSA ultimately determined that, by flaw of design, cathodic protection is ineffective on the Las Flores Pipeline System, leaving it vulnerable to pervasive corrosion.

4. Because of the Las Flores Pipeline System's dangerous design defects, few suspected that an operator would attempt to bring it back online. In fact, since the pipeline system was idled in 2015, a series of proposals were floated to replace or bypass the system, ostensibly due to the pipelines' obvious risks to public safety.

5. Now, however, Sable — a new, speculative company — is attempting to restart, rather than replace, the defective pipeline system, disregarding a litany of environmental and safety concerns as it rushes to resume drilling off the Gaviota Coast.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

6.      Because of the Las Flores Pipeline System's extensive corrosion issues, in order to restart it, Sable must obtain waivers from the Office of the State Fire Marshal (OSFM) that excuse it from complying with certain regulatory requirements. Specifically, Sable must obtain State Waivers "for the limited effectiveness of cathodic protection" on CA-324 and CA-325, the two pipeline segments that comprise the Las Flores Pipeline System. Sable submitted applications for the two aforementioned State Waivers in April 2024.

7.      Importantly, Sable's proposal to operate the Las Flores Pipeline System without effective cathodic protection represents a substantial departure from the project that was initially reviewed and approved. When first proposed in the 1980's, the pipeline system was expressly proposed as one that would be protected, in its entirety, by cathodic protection. Hence, environmental review of the project, conducted *forty* years ago, was largely premised on effective cathodic protection; indeed, in considering the project's potential impacts, the Environmental Impact Report (EIR) expressly relied on cathodic protection as a design specification that would be "very effective" in preventing an oil spill, and it assumed the same in evaluating potential impacts.

8.      The risks of operating the Las Flores Pipeline System without effective cathodic protection have never been fully evaluated. However, an analysis prepared by OSFM found that operating buried pipelines without cathodic protection can increase the risk of a spill by as much as *five times*. And a separate analysis, discussed below, found that operating this particular pipeline system without effective cathodic protection could result in a spill *every year*, and a major rupture *every four*.

9.      We have already seen first-hand the devastation that these pipelines can wreak on coastal resources. But the 120-mile long pipeline system also threatens major sources of water supply, renowned parks and ecological reserves, and a number of endangered and special-status species. Perhaps most concerning, however, is that it runs directly under a populated suburban neighborhood in Buellton, California, complete with schools, parks, and dozens of residential homes.

10.      In light of the obvious threat to public health and safety posed by these defective pipelines, community organizations sent multiple requests to OSFM for increased transparency and public engagement as it considered Sable's State Waiver applications. Petitioners called on OSFM to hold a public hearing on the applications, as required by law. They also pointed out that operating the

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the original EIR for the project, necessitating that OSFM conduct further environmental review pursuant to the California Environmental Quality Act (CEQA).

11.     Community outcry was echoed by thirteen state legislators, who sent a letter of their own to OSFM calling for environmental review of Sable's State Waiver applications and a transparent public process. The letter stated that the legislators "have grave reservations regarding the restart of CA-324 and CA-325, which have *already* caused a catastrophic oil spill, and which Sable intends to restart without effective protection from corrosion. . . . [O]ne governing body has already identified that proceeding in this manner would inevitably lead to another oil spill, one that could be twice the size of the 2015 disaster."

12.     Acknowledging "the public's considerable interest in the restart of these pipelines," OSFM committed to holding a "public meeting" — not a hearing, as required — *before* making a determination on Sable's State Waiver applications.

13.     Then, on December 17, 2024, without having held any sort of "public meeting," OSFM approved the State Waiver applications. OSFM did not offer any cognizable public process in advance of its decision or even release key documents (like the applications themselves); did not conduct environmental review of the State Waiver applications; and did not provide any supporting analysis or justification for its decision to grant the Waivers. In doing so, OSFM entirely disregarded applicable pipeline safety laws, bedrock environmental laws, and its own previous commitments to state legislators and the public.

14.     Given the unprecedented nature of these Waivers, and the critical resources that this 120-mile-long pipeline system can impact, the need for public comment, independent expert scrutiny, and environmental review was especially critical here. Yet OSFM pushed the Waivers through behind closed doors, reneging even on its minimal commitment to first have a "public meeting" on the issue.

15.     Without the benefit of public review, the Waivers that OSFM approved have a number of glaring deficiencies, and they ultimately fail to ensure that the pipelines will be "as safe or safer" than if they had effective cathodic protection — the standard under which OSFM reviewed Sable's applications. Those deficiencies are discussed at length below and in the attached expert reports.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

16.     Most notably, the logic underpinning the Waivers is fundamentally flawed. Instead of *proactively* preventing corrosion in the first place, the Waivers condition operation of the pipelines on a number of *reactive* measures — namely, conducting more frequent inspections to check for corrosion — that leave room for operator error. The management program contemplated by the Waivers, which *allows* the progressive corrosion of the Las Flores Pipeline System to continue, cannot, by any measure, be considered as safe as preventing corrosion in the first place.

17.     Moreover, the Waivers are largely (and naively) premised on the hope that Sable will do a better job than the previous operator at detecting and remediating corrosion. But there is little reason to suspect that will be the case. The in-line inspection tools used to detect corrosion have proven to be inaccurate and unreliable when measuring corrosion on the Las Flores Pipeline System; in fact, the failure of such tools was a contributing factor of the Refugio Oil Spill. And Sable — a new, speculative company that has never actually operated an oil and gas pipeline — has done little to assure that it can or will comply with the Waivers' intensive management program.

18.     Restarting the Las Flores Pipeline System in the manner envisioned by OSFM would not only invite another oil disaster on the Central Coast, but all but ensure it. The decision to grant the Waivers represents a grave dereliction of OSFM's duty to ensure the safety of hazardous liquid pipelines, made worse by the fact that OSFM provided no public process or justification for its decisions.

19.     This Petition challenges Respondents' discretionary approval of the State Waivers on the grounds that Respondents (1) failed to comply with mandatory procedures outlined in state and federal pipeline safety laws, (2) failed to comply with CEQA's environmental review process, and (3) prejudicially abused its discretion in issuing the Waivers.

### JURISDICTION AND VENUE

20.     Petitioners hereby incorporate by reference each and every allegation set forth above.

21.     This Court has jurisdiction over Petitioners' claims against Respondents under sections 1060, 1085, and 1094.5 of the Code of Civil Procedure, and Article VI, section 10 of the California Constitution.

22.     This case is properly classified as an unlimited civil case, and therefore within the

jurisdiction of this court, because it is not one of the types of cases listed as limited civil cases in section 85 or 86 of the Code of Civil Procedure.

23.     Venue for this action properly lies in the Superior Court of the State of California in and for Santa Barbara County, as the Las Flores Pipeline System is located in Santa Barbara County and the causes of action arose therein.

24.     Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law but depend on the Court granting the relief requested herein to require Respondents to satisfy their obligations under state and federal law.

## PARTIES

25.     Petitioner and Plaintiff ENVIRONMENTAL DEFENSE CENTER (EDC) is a non-profit, public interest environmental law firm that defends nature and advances environmental justice on California's Central Coast through advocacy and legal action. EDC has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. EDC's members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of EDC are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. EDC, by and through its counsel, has submitted written comments to OSFM that detail its concerns with respect to the State Waivers. As such, EDC is beneficially interested in the outcome of this proceeding and in OSFM's performance of its legal duties.

26.     Petitioner and Plaintiff SANTA BARBARA COUNTY ACTION NETWORK (SBCAN) is a nonprofit grassroots organization that works to promote social and economic justice, preserve environmental and agricultural resources, and create sustainable communities within Santa Barbara County, California. SBCAN advocates a holistic approach to community planning that integrates housing, open space, and transportation to meet the needs of all members of the community and future

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

generations. SBCAN works in cooperation with a broad range of progressive activists and organizations to bridge the gap between environmental and social justice issues and ensure that all members of the community share a voice in its future. SBCAN has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. SBCAN's members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of SBCAN are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. SBCAN, by and through its counsel, has submitted written comments to OSFM that detail its concerns with respect to the State Waivers. As such, SBCAN is beneficially interested in the outcome of this proceeding and in OSFM's performance of its legal duties.

27.    Petitioner and Plaintiff GET OIL OUT! (GOO!) is a non-profit organization that was formed in the wake of the 1969 Santa Barbara Oil Spill and continues to work to protect California from further oil and gas development and exploitation. GOO! has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. GOO!'s members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of GOO! are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. GOO!, by and through its counsel, has submitted written comments to OSFM that detail its concerns with respect to the State Waivers. As such, GOO! is beneficially interested in the outcome of this proceeding and in OSFM's performance of its legal duties.

28.    Petitioner and Plaintiff SIERRA CLUB, a national nonprofit organization with thousands of members in California, is dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and encouraging humanity to protect and restore the quality of the natural and human

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

environment; and to using all lawful means to carry out these objectives. Sierra Club has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. Sierra Club's members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of Sierra Club are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. As such, Sierra Club is beneficially interested in the outcome of this proceeding and in OSFM's performance of their legal duties.

29.     Petitioner and Plaintiff SANTA BARBARA CHANNELKEEPER (SBCK) is a nonprofit organization. Its mission is to protect and restore the Santa Barbara Channel and its watersheds through science-based advocacy, education, field work, community engagement, and enforcement of environmental laws. SBCK has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. SBCK's members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of SBCK are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. As such, SBCK is beneficially interested in the outcome of this proceeding and in OSFM's performance of their legal duties.

30.     Respondent and Defendant CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION (CalFIRE) is, and at all relevant times hereto has been, an agency of the State of California. The OFFICE OF THE STATE FIRE MARSHAL is, and at all relevant times hereto has been, a division and component agency of CalFIRE. OSFM is charged with ensuring the safety of intrastate hazardous liquid pipelines and their compliance with state and federal laws. CalFIRE and OSFM qualify as administrative tribunals and persons for purposes of sections 1085 and 1094.5 of the

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

Code of Civil Procedure.

31.    Respondent and Defendant DANIEL BERLANT serves as California's State Fire Marshal and is sued in his official capacity as the head of OSFM.

32.    On information and belief, Real Party in Interest SABLE OFFSHORE CORP. is, and at all times relevant hereto has been, a Delaware corporation based in Houston, Texas. On information and belief, Sable Offshore Corp. is the designated operator of the Las Flores Pipeline System and applied for the State Waivers at issue.

33.    On information and belief, Real Party in Interest PACIFIC PIPELINE COMPANY (PPC) is, and at all times relevant hereto has been, a Delaware corporation based in Houston, Texas. PPC is a wholly owned subsidiary of Sable. On information and belief, PPC is the owner of the Las Flores Pipeline System and, together with Sable Offshore Corp., applied for the State Waivers at issue.

34.    Petitioners are ignorant of the true names or capacities of the respondents sued herein under the fictitious names DOES 1 through 10, and will seek leave to amend this petition to identify them in their true names and capacities when and if identified.

## AUTHENTICITY OF EXHIBITS ATTACHED

35.    Petitioners hereby incorporate by reference each and every allegation set forth above.

36.    The documents accompanying this petition are true and correct copies of the original documents and are incorporated herein by reference as though fully set forth in this petition.

## FACTUAL AND PROCEDURAL BACKGROUND

37.    Petitioners hereby incorporate by reference each and every allegation set forth above.

### Overview of the Las Flores Pipeline System

38.    The Las Flores Pipeline System was constructed in the early 1990's to transport crude oil produced off the coast of Santa Barbara County to inland refineries. Today, its sole remaining purpose is to service the Santa Ynez Unit ("SYU") — a dormant oil and gas production unit located on the Gaviota Coast.

39.    When operational, the SYU produces crude oil and natural gas from three offshore platforms that sit in federal waters: Harmony, Heritage, and Hondo. Once extracted, oil and gas are transported via subsea pipelines to a consolidated processing facility located in Las Flores Canyon, just

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

west of Goleta, California. From there, crude oil is transported inland through the Las Flores Pipeline System. The pipeline system is the only available means by which oil produced at the SYU can be transported and brought to market.



40.     From its starting point in Las Flores Canyon, the Las Flores Pipeline System travels approximately 120 miles, traversing three counties en route to Pentland Station. Along the way, the buried pipeline system passes through sensitive coastal habitat, major rivers and groundwater basins, world-renowned parks and ecological reserves, and a populated suburban area.

41.     As depicted above, the Las Flores Pipeline System consists of two major sections: line CA-324 (formerly "Line 901") and line CA-325 (formerly "Line 903"). CA-325 is further subdivided into sections A and B.

42.     **CA-324**, the first section of the pipeline system, is a 24-inch diameter pipeline that travels westward along the Gaviota Coast in close proximity to the Pacific Ocean. It transports oil from the Las Flores Canyon processing facility approximately eleven miles to Gaviota Station.

43.     The area through which CA-324 travels — the very heart of the Gaviota Coast — is of

considerable local import, and is home to globally significant natural, cultural, historical, and recreational resources. It is a spectacular rural landscape defined by rugged mountains, rolling coastal hills, and the ecologically rich Santa Barbara Channel. It is also, famously, one of the last remaining stretches of undeveloped coastline in Southern California.

44.    As such, CA-324 traverses some of the most cherished and environmentally sensitive areas in Santa Barbara County, if not the state. In just eleven miles, the pipeline crosses oft-visited recreation areas; drainages, wetlands, and perennial creeks that feed directly into the nearby Pacific Ocean; and critical habitat for multiple special-status species. Most notably, the pipeline passes directly through the Arroyo Hondo Preserve — an area popular for recreation and rich in Chumash and early California history. Arroyo Hondo Creek, the central feature of the Preserve, is currently home to over two hundred federally endangered Southern California Steelhead.

45.    After CA-324 terminates at Gaviota Station, oil is transported northward via **CA-325A** — a 30-inch diameter pipeline that extends approximately thirty-eight miles to Sisquoc Station.

46.    At the outset of its route, CA-325A traverses much of Gaviota State Park, where it crosses Gaviota Creek before redirecting inland. The Park provides abundant recreational opportunities to some 100,000 annual visitors. However, it also serves to protect a range of environmentally sensitive habitat areas, including oak woodland, chaparral and sage scrub, and riparian habitats. In fact, the portion of Gaviota Creek affected by the pipeline includes some of the highest quality riparian habitat remaining in southern Santa Barbara County. The perennial creek also provides critical habitat to the federally endangered Southern California steelhead and threatened California red-legged frog, as well as other special-status species, like the Southwestern pond turtle. Notably, the pipeline crosses the creek just a few hundred meters from where it empties into the Pacific Ocean.

47.    After leaving the Park, CA-325A again crosses Gaviota Creek before heading northward through the Santa Ynez Mountains. En route to Sisquoc Station, CA-325A passes through multiple watersheds, dozens of creeks and drainages, and two major rivers: the Santa Ynez River and the Sisquoc River. Aside from their obvious ecological and recreational benefits, the underflows of these two rivers provide critical sources of domestic, municipal, and agricultural water supply for nearby communities. Relatedly, CA-325A permeates large swaths of three major groundwater basins — the Santa Ynez River

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

Valley basin, San Antonio Creek basin, and Santa Maria River Valley basin — which are some of the foremost sources of water supply in Santa Barbara County.

48.    Perhaps most concerning, however, is that CA-325A passes directly through a suburban neighborhood in the city of Buellton, California. The pipeline runs by a preschool, an elementary school, and several popular parks. It also runs directly beneath, or in close proximity to, dozens of residential homes.



49.    At Sisquoc Station, oil transfers to **CA-325B**, the last section of the Las Flores Pipeline System. CA-325B is a 30-inch pipeline that runs the remaining seventy-four miles to Pentland Station.

50.    CA-325B begins by climbing over the rugged Sierra Madre Mountains and descending into the Cuyama River Valley, where it crosses the Cuyama River into San Luis Obispo County. Just a few miles downstream of the pipeline crossing, the Cuyama River is dammed at Twitchell, creating the Twitchell Reservoir. Among other things, the Reservoir provides an important source of groundwater recharge for the region.

51.    After crossing the Cuyama River, CA-325B turns east, traveling parallel and in close proximity to the River for much of the remaining pipeline route. Before reaching its terminus, the pipeline crosses two additional areas of prominent ecological significance: the Carrizo Plain Ecological Reserve and the Bitter Creek National Wildlife Refuge. Between these two interconnected areas, the region supports the largest number of endangered, threatened, and sensitive species in the state.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

52. CA-325B ultimately terminates at Pentland Station in Kern County, which marks the end of the Las Flores Pipeline System. From there, oil produced at the SYU is blended with crude oil delivered from other lines and transported to Los Angeles refineries in a separate pipeline system.

**Design, Construction, and Environmental Review of the Las Flores Pipeline System**

53. The inception of the Las Flores Pipeline System dates back to the early 1980's, when Celeron Pipeline Company ("Celeron") proposed building a buried pipeline system that would service oil production facilities in the Gaviota Coast area. The proposal was a subset of a larger project, known and referred to as the Celeron/All American Pipeline Project, which envisioned a pipeline route that would ultimately extend all the way to refineries in Midland, Texas.

54. In light of the scope of the Las Flores Pipeline System (described at length above), Celeron's project required approvals from a number of federal agencies, state agencies, and local governing bodies. However, construction and operation of the pipeline system was primarily overseen and permitted by the Bureau of Land Management, the California State Lands Commission, and Santa Barbara County (the "County"), which together prepared a joint Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the project, as required by both CEQA and the National Environmental Policy Act (NEPA). A final joint EIR/EIS was certified in 1985 (the "1985 EIR/EIS"), which each agency relied on in its respective review of the project.[1]

55. Among other things, the 1985 EIR/EIS included a comprehensive description of Celeron's proposed project, from design and construction of the pipeline system through to operation and abandonment. On information and belief, it is the only surviving, publicly available document that contains a complete description of the proposed project.

56. Of the pipeline features detailed in the 1985 EIR/EIS, two are particularly relevant here.

57. The first is the pipeline's coating and insulation system. Because of the high viscosity of the Outer Continental Shelf oil produced off Santa Barbara County, it cannot be pumped at ambient temperatures. Instead, it must be delivered to a pipeline at a relatively high temperature — e.g., as

---

[1] The Final EIR/EIS published in 1985 is a finalizing addendum to the 1984 Draft EIR/EIS. The preface of the Final EIR/EIS explains that the Final EIR/EIS is intended to be read "in conjunction with, rather than in place of, the Draft EIR/EIS that was released for public review on August 1, 1984." Thus, collectively, the two documents and their appendices form the project EIR/EIS. The Draft EIR/EIS is available on the County's website, at https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672. The Final EIR/EIS is likewise available at https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

proposed by Celeron, 160 degrees — and then maintained at an elevated temperature during transport. Accordingly, to minimize heat loss from the line, the 1985 EIR/EIS specified that the "[e]ntire . . . pipeline . . . would be insulated . . . with 1.5 inches of polyurethane with a vinyl outer jacket." (Draft EIR/EIS, p. 2-5.)

58.    Thus, the Las Flores Pipeline System was ultimately installed with three "layers" of material: (1) a coal tar urethane coating, which was applied directly to the pipes' bare steel to help ward off corrosion; then (2) 1.5-inches of urethane foam insulation, which was sprayed onto the pipe over the coating; and, lastly, (3) a wrap of polyethylene tape, which would act as a moisture barrier and protect the insulation on the pipe.



Polyethylene Tape

1.5 - inch thick rigid polyurethane foam

Coal tar urethane coating

API 5L Grade X65 line pipe steel

59.    The second, and perhaps most important, feature of the proposed pipeline system was its cathodic protection system — the foremost means by which the pipeline would be protected from corrosion.

60.    Corrosion, in essence, is an electrochemical reaction between metal and its environment. In steel pipelines — like the Las Flores Pipeline System — external corrosion occurs naturally over time as electrons in the pipeline's metal atoms transfer to the surrounding environment, causing metal loss from the surface of the pipe. Corrosion is especially aggressive in buried pipelines that are in direct contact with the ground.

61.    The first line of protection from external corrosion is a pipeline's coating, which can prevent the flow of electrons to the pipe's surroundings. However, even the best coating will wear over time, leaving bare spots in the coating (called "holidays") where steel can leave the pipe. Thus, even if

14

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

properly coated, a buried pipeline will inevitably corrode without additional protection. Accordingly, buried pipelines are generally equipped with an additional corrosion control feature called a cathodic protection system, which targets and prevents corrosion in areas where the pipe's coating has been compromised.

62.    In short, a cathodic protection system imparts an electric current onto a pipeline through a process that, when effective, causes a substitute source of metal to corrode in place of the pipeline. As long as the current is sufficient, the system theoretically prevents any corrosion of the pipeline, or at least holds it in check.

63.    More specifically, a cathodic protection system works as follows: first, a device called a rectifier sends an electric current to "sacrificial" metals in the earth, which are positioned near the pipeline; next, the current picks up electrons from the metals and travels through the ground to the pipeline, which receives the electrons; and lastly, the current travels through the pipeline and back to the rectifier, completing the circuit. The pipeline's receipt of electrons from the sacrificial metals prevents it from losing electrons and corroding; the metals, meanwhile, corrode in place of the pipeline, "sacrificing" themselves to protect the pipeline. (The process effectively creates an electrochemical cell, with the sacrificial metals serving as the "anode" of the cell (which loses electrons, or "oxidizes") and the pipeline as the "cathode" (which gains electrons, or "reduces") — hence the name "cathodic protection.")



64. Federal regulations have long required that buried pipelines generally be equipped with cathodic protection. (*See* 49 C.F.R. § 195.563.) Thus, consistent with those regulations, Celeron's proposal specified that "[t]he *entire* pipeline would be protected from corrosion with cathodic protection systems." (Draft EIR/EIS, p. 2-5). To ensure the cathodic protection system was functioning as intended, the system would be periodically inspected and maintained, and "[c]orrosion control test stations would be installed with which to test the integrity of the corrosion protection." (Draft EIR/EIS, pp. 2-5, 2-32, 4-106).

65. The importance of the proposed cathodic protection system, and its centrality to the project itself, cannot be overstated. As the pipelines' ultimate means of corrosion control, cathodic protection was foundational to the overall design of the Las Flores Pipeline System and the success of the project. As the 1985 EIR/EIS acknowledged, "[p]rotection of a pipeline from corrosion is of *critical importance* to the environment as well as the pipeline operator"; without such protection, the strength of the pipeline wall can deteriorate, leading to a break in the pipe and a possible oil spill. (Draft EIR/EIS, p. 4-106 (emphasis added).)

66. Relatedly, environmental review of the project was largely premised on an effective cathodic protection system. Indeed, in predicting the likelihood of an oil spill — the primary environmental impact considered — the 1985 EIR/EIS explicitly relied on cathodic protection as a design specification that "would reduce the probability of an event [i.e., oil spill] occurring," and would be "very effective" in doing so. (Final EIR/EIS, pp. 2-57, Appendix 4.3.)

67. After certification of the 1985 EIR/EIS, Celeron received all necessary approvals for construction and operation of the Las Flores Pipeline System. Celeron proceeded with construction in the late 1980's, and the pipeline system went into service in or around 1992.

68. In 1998, the pipeline system was acquired by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P. (together, "Plains"), which would own and operate the pipelines for the majority of their life.

**The 2015 Refugio Oil Spill and Ineffectiveness of Cathodic Protection**

69. On May 19, 2015, CA-324 ruptured near Refugio State Beach Park, releasing more than 120,000 gallons of heavy crude oil into the surrounding environment. The spill devastated

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

approximately 150 miles of the California coast. Thousands of acres of shoreline and subtidal habitat were destroyed, and an untold number of animals — including marine mammals — were injured or killed. The spill also forced the closure of fisheries and beaches, which jeopardized local businesses and caused an estimated 140,000 lost recreational user days between Santa Barbara and Ventura Counties.

70. The spill was one of the largest in California history, and the damage to the region's unparalleled resources was immeasurable. However, the economic toll of the spill was also considerable. To date, Plains, which owned and operated the Las Flores Pipeline System at the time of the spill, has spent upwards of $870M in clean up costs, remediation, and compensatory damages to various third parties. $200M of that went to local business and property owners affected by the spill.

71. Upon investigation, PHMSA determined that the rupture in CA-324 was a result of "progressive external corrosion," and that the pipeline's cathodic protection system — intended to prevent such corrosion — was ineffective.[2] Without sufficient protection from corrosion, the pipeline wall had thinned as much as 89% at the point of rupture, and was thus no longer able to withstand the internal pressure of operations. Notably, the pipeline was only operating at approximately 55% of its maximum operating pressure at the time it failed.

72. As it turns out, the ineffectiveness of cathodic protection on CA-324 was a product of the pipeline's flawed design. Specifically, the various layers of material installed on the pipeline — its coating, foam insulation, and outer protective tape wrap — created conditions that prevented the pipeline's cathodic protection system from functioning as intended.

73. The coal tar urethane coating installed on the Las Flores Pipeline System is an older type of coating that is nonconductive, meaning cathodic protection current cannot pass through it. It also has a tendency to lose its adhesion over time, becoming separated or disbonded from the pipe. When it becomes disbonded — as it did here — moisture can reach the pipe's bare steel and form corrosion cells underneath the coating. Those corrosion cells, in turn, can cause many different forms of corrosion, including stress corrosion cracking and selective seam corrosion cracking, *which cannot be prevented or remedied by cathodic protection*.

---

[2] PHMSA's Failure Investigation Report, cited herein, is available on PHMSA's website, at https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

17

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

74.    The pipeline's insulation and protective tape barrier separately rendered cathodic protection ineffective on the line, for a few reasons. First and foremost, the external tape wrap installed on the pipeline is not conductive, and it thus acted to prevent cathodic protection current from reaching the pipeline's wall. Likewise, the underlying foam insulation worked to shield the pipeline from the electric current.

75.    Additionally, the pipeline's external tape wrap wrinkled and cracked over time, allowing water to saturate the underlying foam insulation and, eventually, ingress all the way to the pipeline wall. Water then accumulated along the pipeline and migrated to the lowest local elevation point, becoming trapped beneath the insulation. Where the moisture reached the pipe's bare steel, it created corrosion cells that aggressively ate away at the pipe over time. This phenomenon, called "corrosion under insulation," was identified as "the primary corrosion mechanism" that led to the rupture in CA-324. (PHMSA Failure Investigation Report, Appendix M, p. 18.) According to PHMSA, cathodic protection cannot prevent "corrosion under insulation" when, as here, the outer wrap that protects the insulation inevitably becomes compromised. (PHMSA Failure Investigation Report, p. 14.)

76.    Importantly, the above issues were not limited to CA-324. Ultimately, **PHMSA found pervasive metal loss throughout the entirety of the Las Flores Pipeline System, and it concluded that cathodic protection is ineffective on both CA-324 and CA-325**. (PHMSA Failure Investigation Report, pp. 3, 14, Appendix E.) That information was not known until 2016 — more than thirty years after the 1985 EIR/EIS was certified.

77.    PHMSA further concluded that, as a general matter, "[cathodic protection] is ineffective on buried, insulated pipelines" writ large. (PHMSA Failure Investigation Report, Appendix E, p. 2.) On information and belief, it may have been previously understood that buried, insulated lines could be susceptible to aggressive corrosion, but the earliest report considering the ineffectiveness of cathodic protection on such lines, prepared by the National Association of Corrosion Engineers (NACE), was not issued until 1992 — seven years after the 1985 EIR/EIS was certified.

78.    In addition to the failure of the pipeline's cathodic protection system, PHMSA cited another factor that contributed to the spill: Plains' failure to properly detect and mitigate corrosion.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

79.    In the years leading up to the spill, Plains had been periodically running an in-line inspection ("ILI") tool to assess the integrity of the Las Flores Pipeline System, as required by federal regulations. The ILI surveys, unsurprisingly, revealed an alarming pattern of progressive corrosion. The below charts depict results from ILI surveys that Plains conducted on CA-324 in 2007 and May 6, 2015, and show the areas where, according to the surveys, the pipeline wall had corroded more than 40%.





Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

80.     Equally alarming is that the ILI tool used by Plains proved to be inaccurate and unreliable. When Plains performed exploratory digs to corroborate the results of its 2007 and 2012 ILI surveys — as required by federal regulations — its field measurements were inconsistent with the ILI results. In many areas, the ILI tool had significantly underestimated (or "undercalled") the depth of corrosion that was actually present. Plains, however, did not consult its ILI vendor about the inaccuracies or take any meaningful steps to resolve the issue.

81.     PHMSA's investigation, which included a number of its own exploratory excavations, revealed that Plains' May 2015 ILI survey was likewise inaccurate. According to PHMSA, the ILI tool was only "accurate," per industry standards, 57% of the time. And it had wildly undercalled the corrosion in the area where the pipeline ultimately ruptured. While the 2015 survey showed a corrosion depth of 49%, in actuality the pipeline wall had thinned about 89%. The chart below compares the 2015 ILI survey results with measurements taken in the field, depicting the inaccuracy of the ILI tool.



82.     Following the Refugio Oil Spill, PHMSA issued a series of Corrective Action Orders (CAOs) requiring, *inter alia*, that the Las Flores Pipeline System be emptied, purged, and idled, and it remains idle to date. Due to the unavailability of the pipeline system, the SYU was shut in, and production at the unit was suspended indefinitely. Neither the Las Flores Pipeline System nor the SYU have been operated for almost ten years.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**Transfer of Jurisdiction to OSFM and Conditions for Restarting**

83.     At the time of the Refugio Oil Spill, the Las Flores Pipeline System was classified as an *interstate* pipeline system and, thus, was subject to the exclusive regulatory jurisdiction of PHMSA. However, following the spill, Plains cancelled its Federal Energy Regulatory Commission (FERC) certificates for the pipeline system, acknowledging that the pipelines had never actually been used to facilitate interstate commerce and, in any event, were no longer available to do so. By cancelling its FERC certificates, Plains effectively reclassified the Las Flores Pipeline System as an *intrastate* pipeline system, which transferred regulatory and enforcement jurisdiction over the pipelines to OSFM.

84.     In May 2016, PHMSA formally acknowledged the reclassification of the pipelines and the transfer of jurisdiction to OSFM. The pipelines, which were previously known as Lines 901 and 903, were given the new monikers CA-324 and CA-325, respectively, and rebranded as the Las Flores Pipeline System.

85.     Several years later, PHMSA, OSFM, and a number of other state and federal agencies sued Plains seeking civil penalties and compensation for natural resource damages associated with the spill. (*U.S. v. Plains All American Pipeline*, United States District Court for the Central District of California, Civil Action No. 2:20-cv-02415.) The parties settled, and the agreement was memorialized in a Consent Decree entered by the court.[3]

86.     In addition to imposing monetary penalties on Plains, the Consent Decree contemplated the future of the Las Flores Pipeline System. It offered three paths forward for Plains (and any subsequent owner) in light of the pipelines' design defects. First, Plains could simply abandon and decommission the defunct pipelines. Second, Plains could replace the pipeline system with new, non-insulated pipe, which could potentially allow cathodic protection to function properly. And last, as a third and final option, Plains could restart the existing pipelines, but only under strict conditions.

87.     As relevant here, those restart conditions included the following: (1) complete all remaining corrective actions required by PHMSA's CAOs, such as repairing metal loss anomalies on the pipelines; (2) install new automatic shutoff valves along the Las Flores Pipeline System, which,

---

[3] The Consent Decree is available on the Environmental Protection Agency's website, at https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

importantly, do not *prevent* a spill, but can help reduce the volume of a spill should one occur; and (3) obtain State Waivers from OSFM "for the limited effectiveness of cathodic protection" on both CA-324 and CA-325, which would excuse Plains from complying with the regulations that require cathodic protection. (Consent Decree, at Appendix B, Article I, § 1.) Notably, nowhere does the Consent Decree suggest that OSFM *must* issue a State Waiver for either CA-324 or CA-325.

88.    Should Plains complete (1), (2), and (3) above, the final step in the restart process would be (4) submitting Restart Plans to OSFM for review and approval, and obtaining ultimate approval from OSFM to restart CA-324 and CA-325. The Consent Decree is clear that neither Plains nor any subsequent owner/operator may operate CA-324 or CA-325 "until authorized to do so by OSFM," at OSFM's discretion.

### Interim Efforts to Restart the SYU and the Las Flores Pipeline System

89.    Recall that the Las Flores Pipeline System is integral to the viability of the SYU; without it, oil produced at the SYU cannot be transported or brought to market. Hence, the SYU was shut-in when the pipeline system was taken offline in 2015. Notably, in the last full year it was active, the SYU was responsible for 50% of all greenhouse gas emission in Santa Barbara County.

90.    With the Las Flores Pipeline System out of service, ExxonMobil ("Exxon"), the longtime owner and operator of the SYU, first attempted to resume production at the SYU by bypassing the pipeline system altogether. Specifically, it applied to the County for permission to truck, rather than pipe, its oil from Las Flores Canyon to Kern County. The County denied Exxon's application in March 2022, citing obvious environmental and safety concerns.

91.    Meanwhile, Plains sought to replace the Las Flores Pipeline System, ostensibly due to the risk the corroded pipelines pose to public health and safety.

92.    Plains applied to the County for the necessary land use permits, and the County began conducting environmental review of Plains' proposal, as required by CEQA. In preparing a Draft EIR for the project, the County considered, as an alternative to replacement, the impacts of simply restarting the existing pipelines. An analysis prepared by the County's consultants suggested that restarting the defective pipelines would not only invite another disastrous spill, but all but ensure it. Relying on a report prepared by OSFM, the analysis found that, without effective cathodic protection, the risk of a

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

spill from the pipelines was *five times greater* than initially estimated. **The analysis further concluded that restarting — rather than replacing — the Las Flores Pipeline System could result in a spill once a year, and a rupture (a spill greater than five barrels) every four.** And a spill in the coastal zone, it found, could be nearly twice the size of the 2015 spill, even with the addition of automatic shut-off valves. An excerpt of this analysis is attached hereto as **Exhibit A**.

93. As Plains' application to replace the pipelines was pending, Plains sold the Las Flores Pipeline System to PPC, then a wholly-owned subsidiary of Exxon. Shortly thereafter, on October 24, 2023, Exxon withdrew the application. In reneging on the plan to replace the pipeline system, it cited, in part, "a high degree of local permitting and business uncertainty . . . that has impacted investment commitment . . . ."

94. Pivoting, Exxon instead sought to *restart* the existing Las Flores Pipeline System, despite the threat of another spill from the defective pipelines. Pursuant to the Consent Decree, on July 10, 2023, Exxon, via PPC, applied to OSFM for State Waivers for the limited effectiveness of cathodic protection on CA-324 and CA-325.

95. Exxon's restart proposal would also require retrofitting the Las Flores Pipeline System with new safety valves, as mandated by the Consent Decree and Government Code section 51013.1 — a pipeline safety statute enacted in response to the Refugio Oil Spill. Installation of the valves, however, required County approval.

96. The County Planning Commission denied Exxon's application to install new valves, which, again, would facilitate restart of the defective pipeline system. The Planning Commission rejected the idea that the Las Flores Pipeline System could be safely or responsibly restarted, pointing to the pipelines' degraded condition and ineffective cathodic protection system. On appeal, the Board of Supervisors voted 2-2 on the issue, effectively denying Exxon's application.[4]

97. Having repeatedly failed in its attempts to restart the SYU, Exxon eventually looked to offload its SYU assets. Enter Sable, a new, speculative entity formed to chance the regulatory hurdles that Exxon failed to clear.

---

[4] Exxon later sued the County in United States District Court for the Central District of California, Case No. 2:23-cv-09218-DMG-MRW. After Sable acquired PPC, the parties reached a settlement agreement that cleared the way for PPC to install the valves.

**Sable's Acquisition and Haphazard Efforts to Restart the Las Flores Pipeline System**

98. Sable Offshore Corp. began in 2020 as several special purpose entities, which were organized to evaluate and facilitate a potential acquisition of the SYU and associated assets. The corporations were formed by current Sable CEO Jim Flores, who had just led a different, troubled venture to bankruptcy.

99. On February 14, 2024, Sable Offshore Corp. acquired the SYU from Exxon and all its associated assets: the three offshore platforms, the subsea pipelines and infrastructure, and the Las Flores Canyon processing facilities. Sable Offshore Corp. also acquired PPC, and with it, the defunct Las Flores Pipeline System.

100. However, Sable, being undercapitalized, lacked the financial resources to fund the $625M deal with Exxon. Thus, Sable was forced to secure a $622M loan from Exxon — a whopping 99% of the purchase price — just to finance it. In exchange, Sable agreed that the SYU assets may, at Exxon's option, revert to Exxon if the SYU is not back online by early 2026.

101. The SYU assets — which have not been operational since 2015 — remain Sable's only assets, leaving Sable without a reliable or predictable source of revenue. Sable is currently operating at an astounding ~$700M deficit, and it will continue operating at a deficit unless and until it restarts the SYU. Hence, according to Sable itself, "substantial doubt exists about the Company's ability to continue," and it "may have insufficient funds available to operate its business prior to first production."

102. With the clock ticking on Sable's ability and window to restart the SYU, Sable is, predictably, trying to cut any regulatory corners it can.

103. Following in Exxon's footsteps, Sable is attempting to restart, rather than replace, the defective Las Flores Pipeline System, which has now aged past its expected lifespan. And, as it rushes to bring the Las Flores Pipeline System back online, Sable has repeatedly violated state law, ignored directives from state agencies, and otherwise shown an aversion to regulatory compliance.

104. Recall that, in order to restart the pipelines, the Consent Decree requires that Sable install additional safety valves along the pipeline system and conduct repairs where severe corrosion has been detected. On information and belief, beginning September 2024, Sable began extensive excavations along the pipeline route, including in wetlands, critical habitat for special-status species, and other

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

sensitive areas — all without coordinating with relevant agencies or applying for necessary permits.

105. When the California Coastal Commission (CCC) got wind of Sable's activities, it issued Sable a Notice of Violation (NOV) clarifying that Sable is required to obtain Coastal Development Permits (CDPs) for both the valve installations and repair work. Alarmingly, *Sable continued working despite the NOV*, prompting the CCC to issue a second NOV and, ultimately, a Cease-and-Desist Order, which directed Sable to apply for CDPs.

106. Separately, in December 2024, Sable received two NOVs from the Regional Water Quality Control Board alerting it of violations of the Clean Water Act and California Water Code and directing it to apply for necessary permits. Sable also received an NOV from the California Department of Fish and Wildlife (CDFW), which alleged that Sable had potentially trespassed on state property, harmed endangered species, and improperly disturbed a number of streambeds.

107. On information and belief, Sable temporarily ceased work in response to the above NOVs. However, on February 14, 2025, Sable resumed work on the Las Flores Pipeline System — willfully ignoring state law and many of the above NOVs. The CCC was forced to issue yet another Cease-and-Desist Order, and *Sable proceeded to continue work in violation of the order*. At a March 13, 2025, town hall, a representative of CCC stated that never in the history of the CCC had a company so brazenly violated a Cease-and-Desist Order.

108. Due to Sable's continuous violations of state law, on April 10, 2025, the CCC issued Sable an ~$18M fine — the maximum penalty it could impose and the largest in the agency's history.

109. On information and belief, Sable has now completed installing new valves on the pipeline system as well as the vast majority of its planned repair work — two key prerequisites to restart. However, as discussed above, there are still a few other boxes that Sable must check before restarting, including obtaining State Waivers from OSFM.

**OSFM Grants State Waivers with No Public Process, Environmental Review, or Justification**

110. On April 24, 2024, Sable, via PPC, notified OSFM that it would be assuming Exxon's applications for State Waivers for CA-324 and CA-325, which had been pending since July 2023. The applications requested, pursuant to the Consent Decree, permission to operate despite the limited effectiveness of cathodic protection on the pipelines. They also "request[ed] relief from the requirements

to evaluate and remediate all corrosion of or along longitudinal seam welds per 49 C.F.R. § 195.452(h)(4)(iii)(H)." Sable's April 24, 2024 correspondence, with the two applications attached, is attached hereto as **Exhibit B**.

111.    In light of the threat to public health and safety posed by the Las Flores Pipeline System, beginning in March 2024, community organizations began asking OSFM for increased transparency and public engagement as it considered whether to permit the restart of CA-324 and CA-325. In response, OSFM agreed to "[h]old public meetings and engage with the public at appropriate milestones for a potential restart," including, specifically, "at the State Waiver step of the process."

112.    On September 27, 2024, Petitioners EDC, SBCAN, and GOO! sent a letter to OSFM renewing their request for a public process. Petitioners explained that not only was a public hearing appropriate under the circumstances but, in the case of the State Waivers, required by law. Petitioners also pointed out that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR/EIS or any project approval, and the potential impacts of doing so have never been fully considered. Thus, the letter also called on OSFM to conduct environmental review of Sable's State Waiver applications, as well as Sable's broader restart proposal, pursuant to its obligations under CEQA. Petitioners' September 27, 2024 letter is attached hereto as **Exhibit C**. OSFM never responded to the letter.

113.    Also on September 27, 2024, thirteen state legislators sent a letter of their own to OSFM echoing the calls of community organizations for environmental review of Sable's restart proposal and a transparent public process. The letter stated that the legislators "have grave reservations regarding the restart of CA-324 and CA-325, which have *already* caused a catastrophic oil spill, and which Sable intends to restart without effective protection from corrosion. . . . [O]ne governing body has already identified that proceeding in this manner would inevitably lead to another oil spill, one that could be twice the size of the 2015 disaster." The legislators' September 27, 2024 letter is attached hereto as **Exhibit D**.

114.    On November 7, 2024, OSFM responded to the state legislators. It inaccurately downplayed its role in overseeing the restart of the Las Flores Pipeline System, and it refused to commit to conducting environmental review or holding a formal public process. However, acknowledging "the

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

public's considerable interest in the restart of these pipelines," OSFM reiterated its commitment to hold a "public meeting" — not a hearing — at an indefinite point in the future. On information and belief, the agency also verbally committed to holding the "public meeting" *before* making a determination on Sable's State Waiver applications.

115.    On December 17, 2024, without having held any sort of "public meeting," OSFM preliminarily approved the State Waiver applications. OSFM did not offer any sort of public process in advance of its decision, or even release key documents (like the applications themselves). Nor did it conduct environmental review of the State Waiver applications. In other words, in approving the Waivers, OSFM entirely disregarded applicable procedural requirements, critical environmental laws, and its own previous commitments to state legislators and the public.

116.    On December 23, 2024, EDC and Center for Biological Diversity submitted to OSFM an expert report prepared by Accufacts, Inc. — the first of two such reports. The report explained why cathodic protection is ineffective on the Las Flores Pipeline System. It also identified deficiencies in ILI technologies which lead to inaccurate assessments of external corrosion threats that most likely exist on the pipelines. Notably, the report explained why the pipelines were at risk of failure and cannot be made as safe as new pipelines. Accufacts, Inc.'s first report is attached hereto as **Exhibit E**. OSFM did not respond to the report.

117.    OSFM submitted the State Waivers to PHMSA on December 18, 2024, triggering a 60-day review period for PHMSA to consider the Waivers. On February 11, 2025, PHMSA notified OSFM that it would not object to either State Waiver, rendering the Waivers final and effective. The State Waivers for CA-324 and CA-325 are attached hereto as **Exhibits F and G**, respectively.

118.    As requested by Sable, the State Waivers permit the operation of CA-324 and CA-325 despite their lack of effective cathodic protection, and, separately, relieve Sable of compliance with 49 C.F.R. § 195.452(h)(4)(iii)(H), so long as Sable complies with some sixty conditions outlined in the Waivers. According to OSFM, the conditions ensure that the pipelines will be "as safe or safer" than if they had effective cathodic protection.

119.    At first blush, the imposition of sixty-plus conditions would suggest that the Waivers comprehensively address the pipelines' defects and safety issues. But a closer review reveals substantial

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

and concerning deficiencies with the Waivers.

120.    In short, the Waivers substitute cathodic protection with more frequent inspections of the pipelines using ILI tools — tools which we know from the 2015 spill to be demonstrably unreliable. In other words, rather than *proactively* preventing corrosion in the first place with proven technology, the Waivers instead rely on purely *reactive* measures — i.e., attempting to track down corrosion (with inherently unreliable tools), locate anomaly sites in the field, and properly repair them — which leave room for technical and operator error.

121.    Put differently, the Waivers allow for the pervasive, progressive corrosion of the Las Flores Pipeline System that we saw leading up to the 2015 spill to continue, and naively hope that Sable will do a better job than Plains at detecting and remediating it. Yet there is little reason to suspect that will be the case. The tools themselves, we know, can be inaccurate. And Sable — a new, speculative company that has never actually operated an oil and gas pipeline — has done little to assure that it can or will comply with the maintenance program contemplated by the Waivers. In fact, considering its pattern of regulatory aversion and violations, all we have definitively seen from Sable is the opposite.

122.    The many deficiencies of the Waivers are explained at length in a second expert report prepared by Accufacts, Inc., which is attached hereto as **Exhibit H**. The report concludes that, contrary to OSFM's determination, the Las Flores Pipeline System will not be made safe by the Waivers' conditions.

123.    Perhaps realizing the indefensibility of the Waivers, OSFM did not even bother to provide any supportive reasoning for its decisions. Indeed, the Waivers do not include *any* analysis as to why the pipelines will be "as safe or safer" than if they had effective cathodic protection, despite such an analysis being required by state and federal law.

124.    On information and belief, OSFM's approvals here were unconventional and unprecedented. The Waivers are, for all intents and purposes, entirely experimental. In fact, the State Fire Marshal, Daniel Berlant, all but admitted as much at a town hall on March 13, 2025, acknowledging that a number of other jurisdictions are closely watching to see how the Waivers play out.

125.    Given the "experimental" nature of the Waivers, and the critical resources that this 120-mile-long pipeline system can impact, the need for public comment, independent expert scrutiny, and

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

environmental review was especially critical here, as highlighted by the two reports prepared by Accufacts, Inc. Instead, OSFM pushed the Waivers through behind closed doors, reneging even on its minimal commitment to first have a public meeting on the issue.

## LEGAL BACKGROUND

126.    Petitioners hereby incorporate by reference each and every allegation set forth above.

**OSFM's Delegated Authority under the Federal Hazardous Liquid Pipeline Safety Act**

127.    Pipeline safety is generally regulated by the federal government pursuant to the federal Hazardous Liquid Pipeline Safety Act (the "Federal PSA"), 49 United States Code section 60101 *et seq.*, which is administered by PHMSA. However, the extent of the federal government's regulatory authority varies between interstate and intrastate pipelines.

128.    For *interstate* pipelines, PHMSA has exclusive jurisdiction over matters of pipeline safety. In fact, state authorities are expressly preempted from "adopt[ing] or continu[ing] in force safety standards for interstate pipeline facilities. (49 U.S.C. § 60104(c).)

129.    However, PHMSA's authority over *intrastate* pipelines — like the Las Flores Pipeline System — is merely provisional. Pursuant to 49 U.S.C. section 60105, states have the option to assume exclusive responsibility for regulating intrastate pipelines by submitting an annual certification to the Secretary of Transportation ("Certification"). Among other things, the Certification must affirm that the state has adopted the minimum federal pipeline safety standards, which are outlined in Title 49 of the Code of Federal Regulations, Part 195 ("Part 195").

130.    Once a state has submitted a valid Certification, exclusive regulatory and enforcement authority over intrastate pipelines passes to the state. (*See* 49 U.S.C. § 60105(a).) Indeed, PHMSA is prohibited from "prescrib[ing] or enforc[ing] safety standards and practices" on intrastate pipelines that are regulated under a certified program. (49 U.S.C. § 60105(a).)

131.    Like most other states, California has and maintains such a Certification, giving it the authority to regulate its intrastate pipelines. That authority is delegated to OSFM, which administers the state's pipeline safety laws and regulations under color of the Certification. (*See* Gov. Code, § 51010.) OSFM also effectively administers the federal safety standards outlined in Part 195, which, as required for Certification, are incorporated by reference in California's pipeline safety regulations. (*See* 19

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

C.C.R. § 2000.)

## State Waivers under the Federal PSA

132.    Where a state has a valid Certification, the Federal PSA grants state authorities the flexibility to depart from federal minimum safety standards. They are free, for example, to impose more stringent safety standards than those required by federal law. (49 U.S.C. § 60104(c).) Or, they can excuse compliance with federal safety standards by issuing a "State Waiver." (49 U.S.C. 60118(d).)

133.    Specifically, 49 U.S.C. section 60118 provides that, "[i]f a [Certification] . . . is in effect, the State authority *may*" — i.e., at its discretion — "waive compliance with a safety standard to which the [C]ertification . . . applies." (49 U.S.C. 60118(d) (emphasis added).) However, the statute imposes an important limitation on that authority: a State Waiver can only be issued "*in the same way and to the same extent* that the Secretary [of Transportation] may waive compliance under subsection (c)" of the statute. (49 U.S.C. § 60118(d) (emphasis added).) In other words, while a state authority has the discretion to grant a State Waiver, it can only do so by following the standards and procedures set forth in 49 U.S.C. section 60118(c).

134.    49 U.S.C. section 60118(c), in turn, outlines the corollary authority of the Secretary to waive federal safety standards for pipelines directly under PHMSA's jurisdiction — e.g., interstate pipelines.[5] (49 U.S.C. 60118(c).) It prescribes the procedures by which the Secretary may issue a waiver and sets forth the substantive standard for issuing both "nonemergency" and "emergency" waivers. (*Id.*)

135.    For "nonemergency waivers," subsection (c) provides that the Secretary can issue a waiver "on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118(c)(1)(A).) However, as relevant here, subsection (c) explicitly states that "[t]he Secretary may act on a waiver . . . *only after notice and opportunity for a hearing*." (49 U.S.C. § 60118(c)(1)(B) (emphasis added).) And, it directs that "[t]he Secretary *shall* state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3) (emphasis added).)

136.    Again, the provision authorizing state authorities to issue waivers incorporates the standards and procedures outlined in 49 U.S.C. section 60118(c). (49 U.S.C. § 60118(d).) Thus, to grant

---

[5] When the Secretary issues a waiver, it is the functional equivalent of a State Waiver, but it is called a "Special Permit."

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

a State Waiver, a state authority must (1) provide the public with notice and an opportunity for a hearing on the waiver application, (2) properly determine that the waiver would not be inconsistent with pipeline safety, and (3) provide a statement of reasons explaining its decision. (49 U.S.C. § 60118(c), (d).) Where a state authority fails to comply with one or more of these requirements, it violates the Federal PSA.

137.    Additionally, before issuing a State Waiver, a state authority "must give the Secretary written notice of the waiver at least 60 days before its effective date." (49 U.S.C. § 60118(d).) The Secretary can concur with the waiver, object, or simply let the sixty days lapse without taking any action. (*See id.*) Should the Secretary concur or take no action, the waiver becomes final and effective.

**Additional Waiver Requirements under the State Elder Pipeline Safety Act**

138.    California's Elder Pipeline Safety Act of 1981 (the "State PSA"), Government Code section 51010 *et seq.*, is the state's preeminent pipeline safety law. To the extent allowed by the Federal PSA, it grants the State Fire Marshal the "exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines" in California, and it outlines a number of pipeline safety requirements above and beyond what is required by federal minimum standards. (*See* Gov. Code, § 51010.)

139.    The State PSA also directs the State Fire Marshal to "adopt hazardous liquid pipeline safety regulations in compliance with federal law." (Gov. Code, § 51011.)  As noted above, among the regulations that OSFM has adopted is 19 C.C.R. section 2000, which incorporates by reference the entirety of Part 195.

140.    Like the Federal PSA, the State PSA allows for the waiver of certain safety requirements. However, it imposes a higher standard for such "exemptions." It states: "The State Fire Marshal may exempt the application of regulations adopted pursuant to this section" — like Part 195's federal minimum safety standards — "to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011(b).)

141.    Should the State Fire Marshal grant an exemption, it must be in writing, and the notice of exemption "shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code., § 51011(c).)

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**California Environmental Quality Act**

142.    CEQA was enacted to ensure that government agencies consider the environmental consequences of their actions before approving projects. (Pub. Res. Code, §§ 21000 *et. seq.*) CEQA's statutory requirements are further defined and implemented by the "CEQA Guidelines." (14 Cal. Code Regs., §§ 15000 *et. seq.*)

143.    A central element of CEQA is to require public agency decision makers to evaluate and document the potential environmental implications of their actions. (Pub. Res. Code, §§ 21000, 21001; CEQA Guidelines, §§ 15002, 15003; *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal. 3d. 247, 254-56.) In enacting CEQA, the state legislature intended the law "to be interpreted in such a manner as to afford the fullest possible protection to the environment . . . ." (CEQA Guidelines, § 15003(f); *Friends of Mammoth*, 8 Cal. 3d at 259.)

144.    CEQA contains both procedural and substantive requirements. A critical procedural requirement is the need to prepare an EIR for projects that may result in a significant effect on the environment. (CEQA Guidelines, § 15064.) The purpose of an EIR is to consider the significant effects of a project, as well as alternatives and mitigation measures that can avoid or mitigate such effects. (Pub. Res. Code, §§ 21002.1, 21061; CEQA Guidelines, §§ 15003, 15126, 15126.2, 15126.4, 15126.6.) The EIR requirement "is the heart of CEQA." (CEQA Guidelines, § 15003(a); *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810.) "The EIR process protects not only the environment but also informed self-government." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal. 3d 376, 392.)

145.    In addition to the procedural requirements of CEQA, the law contains a "substantive mandate" requiring agencies to impose feasible alternatives and/or mitigation measures to avoid or substantially lessen the environmental effects of projects. (Pub. Res. Code, § 21002; CEQA Guidelines, § 15091.) These alternatives and mitigation measures must first be identified and discussed in an EIR. (CEQA Guidelines §§ 15126.4, 15126.6.)

146.    Public participation is essential to the function of CEQA. (Pub. Res. Code, § 21000(e); *Environmental Planning and Information Council v. County of El Dorado* (1982) 131 Cal. App. 3d 350, 354 ("A paramount consideration is the right of the public to be informed in such a way that it can

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

intelligently weigh the environmental consequences of any contemplated action and have an appropriate voice in the formulation of any decision.").)

147.    When an EIR has been prepared for a project, subsequent or supplemental environmental review is required if certain events occur which may result in new or increased significant effects on the environment. (Pub. Res. Code § 21166; CEQA Guidelines § 15162(a).) Specifically, a subsequent EIR is required where:

(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or Negative Declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or Negative Declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative.

(CEQA Guidelines § 15162(a).)

148.    If an agency is faced with a new discretionary decision after a project has been approved, the agency must consider whether any of the conditions set forth in CEQA Guidelines section 15162(a) apply, and if so, the agency must prepare a subsequent EIR. (CEQA Guidelines § 15162(c).)

## FIRST CAUSE OF ACTION

### Violation of the Federal PSA — Failure to Provide a Public Process

### (Code Civ. Proc., § 1085; 49 U.S.C. § 60118(d))

149.    Petitioners hereby incorporate by reference each and every allegation set forth above.

150.    49 U.S.C. section 60118(d), which incorporates the standards and procedures outlined in section 60118(c), imposed a mandatory and nondiscretionary duty on OSFM to provide the public with "notice and an opportunity for a hearing" prior to granting the State Waivers for CA-324 and CA-325. (49 U.S.C. § 60118(c), (d).)

151.    Prior to granting the State Waivers, OSFM did not provide any cognizable public process. OSFM did not provide formal notice to the public of its intent to consider the State Waiver applications; did not invite or consider public comment on the applications; and did not provide the public with any opportunity for a hearing. In fact, OSFM did not even make the State Waiver applications publicly available prior to granting the Waivers, despite repeated requests from the public to do so.

152.    Thus, OSFM violated its mandatory and nondiscretionary duty under the Federal PSA to provide the public with notice and an opportunity for a hearing.

153.    The State Waivers for both CA-324 and CA-325 became final and effective on February 11, 2025, when PHMSA notified OSFM that it would not object to either State Waiver. Thus, each State Waiver constitutes a final agency action that is ripe for judicial review.

154.    Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief, and they depend on the Court granting the relief

requested herein to require OSFM to satisfy its obligations under the Federal PSA. (*See* Code Civ. Proc., § 1086.)

155.    In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners had a beneficial right to performance of OSFM's duties. (*See* Cal. Const. arts. I, §§ 1, 3(a); Code Civ. Proc., § 1085.)

<div align="center">

**SECOND CAUSE OF ACTION**

**Violation of the Federal PSA — Failure to Provide a Statement of Reasons**

**(Code Civ. Proc., § 1085; 49 U.S.C. § 60118(d))**

</div>

156.    Petitioners hereby incorporate by reference each and every allegation set forth above.

157.    49 U.S.C. section 60118(d), which incorporates the standards and procedures outlined in section 60118(c), imposed a mandatory and nondiscretionary duty on OSFM to, for each State Waiver, "state . . . the reasons for granting the [W]aiver." (49 U.S.C. § 60118(c), (d).)

158.    Each State Waiver includes, in its entirety, the following: a perfunctory recital of Sable's requests, a statement of OSFM's regulatory jurisdiction, and the scope and conditions of each approved Waiver. But neither Waiver provides *any* justification, supporting analysis, or reasons for OSFM's decision to grant the Waiver. On information and belief, OSFM did not issue any other letter, order, or document in approving the Waivers that included a statement of reasons for its decision.

159.    Thus, OSFM violated its mandatory and nondiscretionary duties under the Federal PSA to provide, for each State Waiver, a statement of reasons for granting the Waiver.

160.    The State Waivers for both CA-324 and CA-325 became final and effective on February 11, 2025, when PHMSA notified OSFM that it would not object to either State Waiver. Thus, each State Waiver constitutes a final agency action that is ripe for judicial review.

161.    Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief, and they depend on the Court granting the relief requested herein to require OSFM to satisfy its obligations under the Federal PSA. (*See* Code Civ. Proc., § 1086.)

<div align="center">

35

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

</div>

162.    In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners had a beneficial right to performance of OSFM's duties. (*See* Cal. Const. arts. I, §§ 1, 3(a); Code Civ. Proc., § 1085.)

### THIRD CAUSE OF ACTION

**Declaratory Relief — State Waiver Procedures Required under the Federal PSA**

**(Code Civ. Proc., § 1060; 49 U.S.C. § 60118(d))**

163.    Petitioners hereby incorporate by reference each and every allegation set forth above.

164.    As noted, OSFM did not offer any cognizable public process before granting the State Waivers, and, on information and belief, has a pattern and practice of granting such waivers without providing the public with notice, an opportunity for a hearing, or a statement of reasons for its decision, as required by the Federal PSA.

165.    An actual controversy has arisen and now exists between Petitioners, on the one hand, and OSFM, on the other hand, relative to their respective rights and duties as it relates to Petitioners' request that OSFM provide a public process before approving Sable's State Waiver applications.

166.    Petitioners seek a judicial determination regarding the scope of OSFM's obligations under the Federal PSA. Petitioners seek a declaration that, in granting a State Waiver, OSFM must comply with same standards and procedures that the Secretary of Transportation must adhere to in granting a waiver under 49 U.S.C. section 60118(c), including providing the public with notice, an opportunity for a hearing, and a statement of reasons.

### FOURTH CAUSE OF ACTION

**Abuse of Discretion under the Federal PSA**

**(Code Civ. Proc., § 1094.5; 49 U.S.C. § 60118(d))**

167.    Petitioners hereby incorporate by reference each and every allegation set forth above.

168.    The State Waivers for CA-324 and CA-325 constitute final administrative decisions that were quasi-judicial in nature.

169.    Code of Civil Procedure section 1094.5 permits judicial review of quasi-judicial administrative decisions. In reviewing a quasi-judicial decision, the court considers, in part, "whether

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5(b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by evidence." (*Id.*)

170.   As a matter of procedure, OSFM abused its discretion by failing to comply with the mandatory State Waiver procedures outlined in the Federal PSA, as explained in Petitioners' First and Second Causes of Action.

171.   As to the merits of OSFM's decisions, the Federal PSA only allows a State Waiver to be granted if the relevant state authority "determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118(c)(1)(A), (d).) OSFM has consistently construed this standard to mean that a State Waiver can only be granted where the operator's "proposed alternative measures can provide an equal or greater level of safety than the required regulation." (*Pathways for Restarting Pipelines*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.) In other words, as OSFM has also put it, the proposed alternative measures must ensure the pipeline will be "as safe or safer" than if it was in compliance.

172.   As discussed above, OSFM did not provide any analysis in support of its decisions to grant the State Waivers. Nor, relatedly, did it make any specific findings as to why the conditions of the Waivers would ensure that CA-324 and CA-325 are "as safe or safer" than if they had effective cathodic protection, or complied with 49 C.F.R. § 195.452(h)(4)(iii)(H). In fact, neither Waiver even referenced the applicable State Waiver standard in the Federal PSA, making it impossible to determine whether OSFM applied the appropriate legal standard in its review.

173.   By failing to provide *any* findings in support of its decisions, OSFM abused its discretion. (*See Topanga Assn. for a Scenic Comm. V. County of Los Angeles* (1974) 11 Cal.3d 506, 515 ("[I]mplicit in [Code of Civil Procedure] section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order.").)

174.   Moreover, even a cursory review of the State Waivers reveals that they are patently inadequate to address the defects in the Las Flores Pipeline System and, ultimately, fail to ensure that CA-324 and CA-325 will be "as safe or safer" than if they complied with all applicable regulations.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

175.    First, as noted above, the fundamental logic underpinning the State Waivers is flawed from the start. The Waivers allow Sable to replace effective cathodic protection, which prevents corrosion from occurring in the first place, with something akin to an enhanced management program. Indeed, instead of *proactively* preventing corrosion with proven technology, the Waivers require only that the operator *reactively* track down and remediate the incessant corrosion of the pipelines, primarily by using ILI tools.

176.    You do not have to be a pipeline safety expert to see that the management program contemplated by the Waivers, which *allows* the progressive corrosion of the Las Flores Pipeline System to continue, is not, by any measure, as safe as preventing corrosion in the first place.

177.    Second, we have already seen the shortcomings of the risk management measures on which the Waivers rely. As discussed, the failure of ILI tools was a contributing factor to the Refugio Oil Spill. Plains periodically conducted ILI inspections of the Las Flores Pipeline System, but the results of those inspections were often erroneous, and they failed to accurately detect the anomaly that ultimately caused the rupture in CA-324. With the real possibility that anomalies are undercalled or go unnoticed, effective cathodic protection is the only way to ensure the Las Flores Pipeline System does not again corrode to the point of rupture.

178.    Third, and compounding that concern, OSFM has failed to consider Sable's operational capacity. The management program outlined in the Waivers puts an enormous amount of faith in the operator's capacity to properly and timely run ILI tools, review the results of the ILI surveys, precisely locate corrosion anomalies, and properly repair them. But there is no indication that Sable merits such trust. Sable is a new, speculative entity that has never actually operated an active oil and gas facility. And all it has affirmatively demonstrated is a propensity to cut regulatory corners.

179.    Fourth, the Waivers only consider the risk of corrosion under insulation ("CUI"). While CUI is certainly an issue on the Las Flores Pipeline System, it is only one of many corrosion threats that the pipelines are vulnerable to without effective cathodic protection.

180.    As previously discussed, the pipelines' heavy shielding, tape barrier, vintage and type of coating, operating temperature, and surrounding environment all work in concert to create external corrosion in various forms. Such external corrosion falls into four general categories: (1) wall loss or

thinning, (2) cracking or crack-like corrosion, (3) pitting, and (4) corrosion within dents. The latter two forms of corrosion are especially difficult to identify via ILI tools, and almost impossible to reliably predict when it comes to estimating failure. The Waivers do not address these threats.

181.    Fifth, while the Waivers require hydrotesting of CA-324 and CA-325A before they return to service, they inexplicably exclude CA-325B. Without a hydrotest, OSFM cannot assure that previously-identified anomalies on CA-325B have been properly repaired.

182.    Sixth, and relatedly, the parameters for the hydrotest of CA-324, including the pressure within the line, are insufficient to accurately test CA-324's integrity.

183.    Seventh, the Waivers do not require critical corrosion tracking that can inform an operator of corrosion "hot spots" along the pipeline system and sites where there may be interactive threats, like general wall loss in combination with cracking corrosion. Given the pipelines' history of pervasive corrosion, separately identifying and plotting corrosion indications by type, severity, and approximate milepost is a necessary step towards ensuring their safety.

184.    The above list is representative of why the Waivers fail to ensure that the Las Flores Pipeline System will be "as safe or safer" as if it complied with all applicable regulations, but it is non-exhaustive. Petitioners' review of the Waivers is ongoing, and, as OSFM releases more pertinent documents, Petitioners and their retained expert(s) will likely identify additional deficiencies with the Waivers.

185.    In sum, the Waivers represent an astonishing lapse of judgment in an agency that is charged with overseeing pipeline safety, made worse by the fact that OSFM provided no public process or justification for its decisions. Because (1) OSFM failed to comply with the mandatory State Waiver procedures outlined in the Federal PSA, (2) OSFM failed to provide *any* findings in support of its decisions, and (3) the State Waivers, by any measure, fail to ensure the Las Flores Pipeline System will be as safe or safer than if it complied with all applicable regulations, OSFM prejudicially abused its discretion in issuing the Waivers, warranting administrative mandamus relief. (Code Civ. Proc., § 1094.5(b).)

186.    Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

adequate remedy at law other than mandamus relief.

187. In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners are beneficially interested in OSFM's decisions on Sable's State Waiver applications.

## FIFTH CAUSE OF ACTION

### Violation of the State PSA — Failure to Provide a Discussion of Significant Factors

### (Code Civ. Proc., § 1085; Gov. Code, § 51011(c))

188. Petitioners hereby incorporate by reference each and every allegation set forth above.

189. The Las Flores Pipeline System is subject to the State PSA and the regulations adopted thereunder, which are codified at Title 19 of the California Code of Regulations, section 2000 *et seq*. (*See* Gov. Code, § 51010.5(a).)

190. Government Code section 51011 allows the State Fire Marshal to "exempt the application of regulations adopted pursuant to [the State PSA]." (Gov. Code, 51011(b).) However, should the State Fire Marshal grant such an exemption, Government Code section 51011 imposes a mandatory and nondiscretionary duty to "include a discussion of those factors that the State Fire Marshal consider[ed] significant to the granting of the exemption." (Gov. Code, § 51011(c).)

191. The waivers that OSFM issued for CA-324 and CA-325 function, incontrovertibly, as State Waivers for purposes of the Federal PSA. But they also constitute "exemptions" under the State PSA, as they effectively excuse compliance with "regulations adopted pursuant to [the State PSA]." (Gov. Code, § 51011(b).) Specifically, and as noted in the Waivers themselves, they excuse Sable from fully complying with Title 19 of the California Code of Regulations, section 2000, which incorporates by reference Part 195's federal minimum safety standards.

192. Thus, in addition to the standards and procedures for waivers required by the Federal PSA, Respondents had a concurrent obligation to comply with the more onerous waiver/exemption requirements required by the State PSA. Accordingly, in granting the State Waivers, Respondents had a mandatory and nondiscretionary duty to, for each Waiver, include in its decision a discussion of factors significant to the decision. (Gov. Code, § 51011(c).)

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

193. As discussed above in Petitioners' Second Cause of Action, in issuing the State Waivers, neither OSFM nor the State Fire Marshal provided *any* justification, supporting analysis, or reasons for its decision. Nor did they otherwise provide "a discussion of factors that the State Fire Marshal consider[ed] significant" to the decision. (Gov. Code, § 51011(c).)

194. Thus, Respondents violated their mandatory and nondiscretionary duties under the State PSA to provide, for each Waiver, a discussion of the factors they considered significant to the decision.

195. The Waivers (and "exemptions") for both CA-324 and CA-325 became final and effective on February 11, 2025. Thus, each State Waiver constitutes a final agency action that is ripe for judicial review.

196. Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief, and they depend on the Court granting the relief requested herein to require Respondents to satisfy their obligations under the State PSA. (*See* Code Civ. Proc., § 1086.)

197. In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners had a beneficial right to performance of Respondents' duties. (*See* Cal. Const. arts. I, §§ 1, 3(a); Code Civ. Proc., § 1085.)

### SIXTH CAUSE OF ACTION

**Abuse of Discretion under the State PSA**

**(Code Civ. Proc., § 1094.5; Gov. Code, § 51011(b))**

198. Petitioners hereby incorporate by reference each and every allegation set forth above.

199. The State Waivers for CA-324 and CA-325 constitute final administrative decisions that were quasi-judicial in nature.

200. Code of Civil Procedure section 1094.5 permits judicial review of quasi-judicial administrative decisions. In reviewing a quasi-judicial decision, the court considers, in part, "whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5(b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is

not supported by the findings, or the findings are not supported by evidence." (*Id.*)

201. The State PSA only allows the State Fire Marshal to "exempt the application of regulations adopted pursuant to [the State PSA] . . . when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011(b).)

202. As discussed above, neither OSFM nor the State Fire Marshal provided any analysis in support of its decisions to grant the State Waivers. Nor, relatedly, did either expressly determine that the risk of the Waivers to public safety is slight and the probability of injury or damage remote, suggesting that they failed to properly consider and apply Government Code section 51011(b). Nor did OSFM or the State Fire Marshal make any specific findings to support such a determination. For that reason alone, approval of the waivers constitutes an abuse of discretion. (*See Topanga Assn. for a Scenic Comm. V. County of Los Angeles* (1974) 11 Cal.3d 506, 515 ("[I]mplicit in [Code of Civil Procedure] section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order.").)

203. Moreover, for the same reasons that the Waivers failed to meet the Federal PSA standard — outlined above in Petitioners' Third Cause of Action — they failed to meet the more onerous standard imposed by the State PSA.

204. Indeed, the risk of a rupture from the Las Flores Pipeline System is not merely hypothetical; it has already caused one of the worst oil spill disasters in California history. The Waivers would allow Sable — a speculative company — to resurrect the pipeline system without correcting or adequately addressing the fundamental design defect that caused the 2015 spill. Should Sable proceed under the Waivers, another spill is not just possible, but according to one independent analysis, likely. And the 120-mile long Las Flores Pipeline System — which passes through a suburban neighborhood, a number of popular recreation areas, and critical sources of water for inland communities — poses a substantial and direct threat to public safety.

205. Because the State Fire Marshal did not — and cannot — determine that the risk of the Waivers to public safety is slight and the probability of injury or damage remote, the Waivers constitute a prejudicial abuse of discretion, warranting administrative mandamus relief. (Code Civ. Proc., § 1094.5(b).)

206. Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief.

207. In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners are beneficially interested in the State Fire Marshal's decisions on Sable's State Waiver applications.

## SEVENTH CAUSE OF ACTION

### Declaratory Relief — Standards and Procedures Required under the State PSA

### (Code Civ. Proc., § 1060; Gov. Code, § 51011(b), (c))

208. Petitioners hereby incorporate by reference each and every allegation set forth above.

209. As noted, in granting the State Waivers, Respondents apparently did not consider the relevant requirements of the State PSA. Specifically, Respondents apparently ignored the standard set forth in Government Code section 51011(b). And they failed to provide a discussion of factors that were significant to the decisions to grant the waivers, as required by Government Code section 51011(c).

210. On information and belief, Respondents have a pattern and practice of granting State Waivers that effectively exempt compliance with state regulations without complying with, or even considering, the relevant requirements of the State PSA.

211. An actual controversy has arisen and now exists between Petitioners, on the one hand, and OSFM, on the other hand, relative to their respective rights and duties.

212. Petitioners seek a judicial determination regarding the scope of Respondents' obligations under the State PSA when issuing a State Waiver that effectively exempts an operator from compliance with state regulations. Petitioners seek a declaration that, in granting such a State Waiver, Respondents must comply with Government Code section 51011, including by considering a requested waiver under the standard set forth in Section 51011(b), and providing a discussion of factors significant to the decision to grant the waiver.

## EIGHTH CAUSE OF ACTION

### CEQA — Failure to Prepare a Subsequent EIR

**(Code Civ. Proc., § 1085; Pub. Res. Code, § 21166 ; 14 Cal. Code Regs. § 15162)**

213.    Petitioners hereby incorporate by reference each and every allegation set forth above.

214.    Sable's applications for State Waivers required approval by OSFM. OSFM had the discretion whether to grant the requested Waivers, and if so, on what terms. (*See* 49 U.S.C. § 60118(c), (d); Gov. Code, § 51011(b).)

215.    Because discretionary approval by OSFM was required, the agency needed to determine whether any of the criteria set forth in Public Resources Code section 21166 and CEQA Guidelines section 15162(a) applied. (*See* CEQA Guidelines § 15162(c).) On information and belief, OSFM failed to even consider these three criteria, in violation of CEQA. However, all three apply here.

216.    First, substantial changes are proposed in the project which require major revisions of the 1985 EIR/EIS.

217.    The original project was proposed as an oil and gas pipeline system that would be protected, in its entirety, by cathodic protection. The 1985 EIR/EIS relied on this project description when it evaluated the potential impacts of the project, and its analysis assumed that the pipelines' cathodic protection system would be "very effective" at reducing the probability of an oil spill.

218.    Now, however, Sable, via the Waivers, is proposing to operate the pipelines without effective cathodic protection, potentially increasing the risk of a spill as much as five times.

219.    Additionally, the lack of effective cathodic protection will necessitate more excavations to check for and respond to anomalies, and such excavations are required by the Waivers to be conducted on a regular basis. These excavations, which were not contemplated in the 1985 EIR/EIS, will increase potential impacts to sensitive resources along the 120-mile pipeline route, including rivers, streams and wetlands; environmentally sensitive habitats; rare, endangered, and threatened species; and cultural resources.

220.    Thus, operating without effective cathodic protection, and under the conditions imposed by the Waivers, constitutes a substantial change in the project that increases the risk and severity of impacts and requires major revisions to the 1985 EIR/EIS. Accordingly, OSFM must prepare a subsequent EIR. (CEQA Guidelines § 15162(a)(1).)

221.    Second, the failure of the pipelines' cathodic protection system and resulting corrosion

constitutes a change in circumstances that requires a subsequent EIR. As discussed, without effective cathodic protection, the pipeline is vulnerable to pervasive, continuous, and progressive corrosion that was not accounted for in the 1985 EIR/EIS. This changed circumstance increases the risk and severity of potential oil spill-related impacts, and thus requires preparation of a subsequent EIR. (CEQA Guidelines § 15162(a)(2).)

222. Third, it was only after the 2015 spill that the Las Flores Pipeline System was discovered to lack effective cathodic protection. This new information, which shows that the risk of an oil spill is substantially more severe than previously determined, could not have been known with the exercise of reasonable due diligence when the 1985 EIR/EIS was certified thirty-one years earlier. As to buried, insulated lines more generally, no formal report existed as to the ineffectiveness of cathodic protection prior to an industry analysis published by NACE in 1992 — seven years after certification of the 1985 EIR/EIS.

223. Accordingly, that cathodic protection is ineffective on the Las Flores Pipeline System constitutes new information that was not known, and could not have been known, when the previous EIR/EIS was certified. Thus, OSFM is required to prepare a subsequent EIR to ensure an adequate analysis of the potential impacts of operating the Las Flores Pipeline System without effective cathodic protection. (CEQA Guidelines, § 15162(a)(3).)

224. OSFM failed to comply with CEQA when it approved the State Waivers without preparing a subsequent EIR.

225. On April 11, 2025, Petitioners served a Notice of Commencement of Action on Respondents pursuant to Public Resources Code section 21167.5. The Notice is attached hereto as **Exhibit I**.

226. Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief, and they depend on the Court granting the relief requested herein to require OSFM to satisfy its obligations under CEQA. (*See* Code Civ. Proc., § 1086.)

227. In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

natural resources, Petitioners had a beneficial right to performance of OSFM's duties. (*See* Cal. Const. arts. I, §§ 1, 3(a); Code Civ. Proc., § 1085.)

### **PRAYER FOR RELIEF**

WHEREFORE, Petitioners pray as follows:

1. That the Court immediately, and on an *ex parte* basis, issue a temporary stay of OSFM's approval of the State Waivers, pending completion of judicial review, pursuant to Code Civ. Proc., § 1094.5(g) and Rule 3.1202(c) of the California Rules of Court;

2. That the Court issue temporary, preliminary, and permanent injunctive relief preventing restart of the Las Flores Pipeline System under the State Waivers;

3. That the Court issue a peremptory writ of mandate directing CalFIRE, by and through OSFM, to set aside and vacate its approval of the State Waiver for CA-324;

4. That the Court issue a peremptory writ of mandate directing CalFIRE, by and through OSFM, to set aside and vacate its approval of the State Waiver for CA-325;

5. That the Court issue a peremptory writ of mandate directing Respondents, should they reconsider Sable's State Waiver applications, to:

   a. prepare a subsequent EIR that considers the potential impacts of operating the Las Flores Pipeline System without effective cathodic protection, without complying with 49 C.F.R. § 195.452(h)(4)(iii)(H), and under the conditions of the proposed State Waivers;

   b. conduct any other procedures that the Court deems necessary and/or appropriate under CEQA;

   c. provide the public with notice and an opportunity for a hearing before granting a State Waiver for either CA-324 or CA-325, as required by the Federal PSA;

   d. in granting a State Waiver for either CA-324 or CA-325, provide a statement of reasons, as required by the Federal PSA; and

   e. in granting a State Waiver for either CA-324 or CA-325, provide a discussion of factors significant to its decision, as required by the State PSA;

6. That the Court issue the specific additional declaratory relief prayed for in Petitioners'

Third and Seventh Causes of Action;

7.     That Petitioners be awarded attorneys' fees and costs pursuant to Sections 1021.5 and 1032(b) of the Code of Civil Procedure, and any other applicable law; and

8.     For such other and further relief as the Court deems just and proper.

Dated: April 15, 2025                    Respectfully submitted,

ENVIRONMENTAL DEFENSE CENTER

By:_____
LINDA KROP
JEREMY M. FRANKEL
TARA C. RENGIFO
Attorneys for Petitioners and Plaintiffs

47
Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

## **<u>VERIFICATION</u>**

I, the undersigned, declare:

I am the Executive Director of Environmental Defense Center, a Petitioner in this action, and am authorized to make this verification for an on its behalf. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on ___April 11, 2025___, in ___Santa Barbara___, California.

*Alex Katz*

Alex Katz
Executive Director
Environmental Defense Center

## VERIFICATION

I, the undersigned, declare:

I am the President of Get Oil Out!, a Petitioner in this action, and am authorized to make this verification for an on its behalf. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on April 10 2025 in Santa Barbara, California.

Michael T. Lyons
President
Get Oil Out!

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**VERIFICATION**

I, the undersigned, declare:

I am the Executive Director of Santa Barbara County Action Network, a Petitioner in this action, and am authorized to make this verification for an on its behalf. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on ___4-11-25___, in ___Santa Maria___, California.

_____
Ken Hough
Executive Director
Santa Barbara County Action Network

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**VERIFICATION**

I, the undersigned, declare:

I, Maureen Ellenberger, am the Santa Barbara/Ventura Chapter Chair of Sierra Club, a Petitioner in this action, and I have been authorized to make this verification on behalf of Sierra Club. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on 4/09/25, in Santa Barbara, California.

Maureen Ellenberger
Santa Barbara/Ventura Chapter Chair
Sierra Club

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

## **VERIFICATION**

I, the undersigned, declare:

I am the Executive Director of Santa Barbara Channelkeeper, a Petitioner in this action, and am authorized to make this verification for an on its behalf. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on *April 10, 2015*, in *Santa Barbara*, California.

Walter Edward Morton
Executive Director
Santa Barbara Channelkeeper

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

# EXHIBIT A

07/25/2024  12:45:32 PM

Impacts related to Hazardous Materials and Risk of Upset would only be related to maintenance and construction activities and these maintenance activities would have a minor impact on risk due to the potential for localized spills of hydraulic or diesel oils. **Impact RISK.1, RISK.2, RISK.3** would not be applicable and mitigation measures RISK.2-1 through RISK.2-7 would not be applicable. Impacts would therefore be **insignificant**.

Construction activities related to valve stations, pump stations and some segments of the pipeline that could be abandoned could potentially produce an increased risk of wildfires during construction, and **RISK.4** would still be applicable and mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable**.

### No Project, Existing Pipeline Restart Alternative

Under this alternative, the existing pipeline would be utilized instead of a new pipeline being installed, and transportation of crude oil would occur through the existing pipeline. The existing pipeline would be brought into compliance with existing requirements related to AB 864 and CSFM best available technologies (BAT), including the installation of additional valves along the pipeline route. The Applicant would have to apply to the CSFM for a waiver to utilize the existing pipeline since the existing pipeline is subject to corrosion under insulation, which could affect the efficacy of cathodic protection systems. Generally, a pipeline is not allowed to operate with ineffective cathodic protection systems. There is uncertainty as to whether the Applicant could demonstrate to the CSFM that the pipeline could be operated safely, and therefore this variation and the variation above (no Project, No Pipeline Alternative) are both addressed.

Assuming that a CSFM waiver is granted, the Applicant would have to install additional valves along the pipeline in order to comply with AB 864 and BAT requirements, similar to the proposed Project pipeline design. The installation of these additional valves would require some construction activities and some limited clearing at multiple locations along the pipeline ROW.

The existing pipeline is insulated, and therefore there would be no need for heaters at the Sisquoc Pump Station or the installation of the gas pipeline.

The installation of valves would most likely be at locations similar to the proposed Project valve installations as the pipeline would follow a similar ROW and similar terrain.

Hazards are associated with risks to the public from a spill and subsequent fire, as well as impacts from a spill to the environment, impacts to schools and potential wildfire impacts. The existing pipeline is a larger diameter pipeline, and therefore the draindown spill volumes would be larger than the proposed Project. This results in potentially larger spills and larger fires, impacting more people, as well as larger spills to the environment. In addition, the frequency of a spill from the existing pipeline would be higher due to its age and the potential for the cathodic protection to be compromised by the insulation. These factors have been incorporated into the analysis presented below.

### Risks to Public Safety

**Impact RISK.1** describes the potential spill sizes and the estimated frequency of spills from the pipeline system and the potential for immediate (fires, etc.) health impacts on the public.

### Crude Pipeline Spill Volumes

The spill volumes for this alternative were calculated based on the pipeline size, which would be larger than the proposed Project, and the associated terrain for different segments of the pipeline. The Applicant

07/25/2024  12:45:32 PM

provided a risk assessment for the proposed Project and this analysis was utilized to estimate the spill volumes associated with a larger pipeline size. Figure 5.6-11 shows the estimated spill volumes along the pipeline route for each segment as a worst case for that segment. The worst-case sized spill volume is shown in Table 5.6-16 for the different portions of the crude oil pipeline alternative.

*Crude Pipeline Spill Frequencies*

Spill frequencies from a crude pipeline are based on the PHMSA failure rates for the California pipeline database. The PHMSA base failure rate for crude oil pipelines is shown in Table 5.6-17. The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age. However, the CSFM study indicated a minimal increase in failure rate for pipelines that are less than 40 years old and the PHMSA database used to estimate the base failure rate includes many older pipelines. Therefore, only the five times factor was applied as an estimate of the increased failure rate for this pipeline.

**Figure 5.6-11    No Project – Existing Pipeline Restart Alternative Spill Volume by Segment Milepost**



Source: based on Applicant QRA and EFRD 2019, with adjustments for the size of the existing pipeline.

Draft Print

07/25/2024  12:45:32 PM

**Table 5.6-16     No Project – Existing Pipeline Restart Alternative Crude Pipeline Worst Case Spill Volumes**

| Location | Proposed Project - Maximum Spill Volume, gallons | Alternative - Maximum Spill Volume, gallons |
|---|---|---|
| LFC – Gaviota Plant | 84,000 | 126,000 |
| Gaviota – Sisquoc | 131,040 | 284,594 |
| Sisquoc - Pentland | 198,030 | 657,893 |
| Coastal Segments | 117,600 | 237,344 |

Source: based on Applicant QRA and EFRD 2019, with modification to address spill duration of 60 minutes. Coastal segments include up to valve station 2-500. Includes the installation of additional valve stations as per the proposed Project locations.

**Table 5.6-17     No Project – Existing Pipeline Restart Alternative Crude Pipeline Spill Frequencies**

| Location | Spill Frequency | Return Period, years rupture/leak/total |
|---|---|---|
| PHMSA California Crude oil base rate | 1.62 per 1,000-mile years | - |
| Adjustment due to Pipeline Condition | 5.3 factor | - |
| PHMSA Adjusted Rate | 8.56 per 1,000-mile years | - |
| Failure rate for L901R (49.2 miles) | 0.43 failures per year | 9/3/2 years |
| Failure Rate for L903R (74.1 miles) | 0.63 failures per year | 6/2/2 years |
| Failure Rate for L901R + L903R | 1.07 failures per year | 4/1/1 years |

Source: based on Applicant QRA and EFRD 2019 with CSFM 1991 adjustment factor. PHMSA data since 2010. The return period is the anticipated period between releases. Includes leaks and ruptures.

*Crude Pipeline Population Densities*

The population densities along the route are based on estimates for remote, rural, low density and high-density areas with some additions for highways. The population densities are similar to those used for the proposed Project except for the area through the City of Buellton, since the existing pipeline would pass through the City of Buellton and the proposed Project would pass around the City of Buellton to the west.

*Crude Pipeline Fires*

In the event of a spill of oil and subsequent ignition resulting in a pool fire, the heat (i.e., thermal radiation) from the fire could result in a serious injury or fatality. The assumptions for impacts would be the same as for the proposed Project.

*Gas Pipeline*

The proposed gas pipeline would not be installed as part of this alternative since heaters at Sisquoc would not be installed.

*Alternative Pipeline: Public Safety Risk*

The combination of scenario frequency and consequences is combined to estimate risk using FN curves. FN curves are depictions of the risk levels of a project and show the frequency (F) of scenarios that could produce a given fatality or injury level (N) or greater. These are presented for the proposed Project in **Impact RISK.1**. Santa Barbara County has established risk thresholds that use societal risk profiles (FN curves) to determine the significance of hazardous material releases. These FN curves address both injury and fatality. The Santa Barbara County's adopted thresholds are generally applicable to fixed facilities and pipelines. The risk FN curves are shown in Figure 5.6-12 and are based on the FN curves developed as part of the Plains 2019 QRA analysis, with adjustments for the existing pipeline (increased pipeline diameter

and failure frequency). The FN curves would be located within the amber region, and the impacts to public health due to pipeline releases would be **significant and unavoidable.**

**Figure 5.6-12     No Project – Existing Pipeline Restart Alternative Pipeline Risk FN Curves**



Source: Plains 2019 with modifications

### Risks to the Environment

A spill of crude oil from the pipeline could impact resources in the vicinity of the pipeline ROW. See Section 5.2 Biological Resources, Section 5.4 Cultural Resources and Section 5.9 Hydrology and Water Quality for a discussion of the impacts of a crude oil spill on biological, hydrological and cultural resources along the crude oil pipeline ROW.

### Crude Pipeline Spill Volumes

The spill volumes are discussed above under **Impact RISK.1**. For the public health assessment under **Impact RISK.1**, a worst-case spill shutdown time of 15 minutes was used due to the already conservative analysis for fires and impacts to the public used in the QRA. However, for spills that could affect the environment, a longer duration is used. As evidenced by the May 2015 Refugio spill, there is the potential for a pipeline shutdown to take longer than 15 minutes.

### Crude Pipeline SCADA System

The SCADA system used for the alternative would be the same as that used for the proposed Project since the SCADA system would be required to be updated per CSFM and AB864 requirements.

07/25/2024  12:45:32 PM

*Proposed Project Pipeline: Spills Affecting Marine Resources*

Portions of the pipeline extend along the Santa Barbara County coastline. A crude oil spill could drain from the spill location through existing culverts or drainages and enter the marine environment. This is what occurred during the May 2015 Refugio Beach spill. An estimated 43 percent of the oil entered the ocean from the Refugio spill location, which was an estimated 750-foot pathway from the ocean shoreline. Because the proposed pipeline is located onshore at various distances from the shoreline, a rupture at different locations spilling the same amount of oil could allow for oil to enter the marine environment. Assuming a linear function of oil being trapped and adsorbed onshore with distance, the maximum amount of oil could enter the ocean where the pipeline is closest to the ocean and potential worst-case spill volumes are large. An estimated maximum amount of 71,621 gallons of crude oil could enter the ocean at the worst-case spill location. An estimated 11.8 miles of the 16.6-mile coastal portion (71 percent) of the pipeline would be vulnerable to spills entering the ocean if a spill were to occur along any of those segments and the adsorption rate were similar to that which occurred during the Refugio spill. This assumes that no rain event is occurring and that drainages are not flowing.

There are a number of variables affecting the amount of oil that could reach the ocean from an onshore spill, including the terrain, the location of drainages under the freeway and the railroad tracks, the soil type, and extent of rocky interfaces as well as the amount of moisture. During a rain event, when drainages and creeks are flowing, a spill into the waterways could follow the flow and enter the marine environment more readily. A spill under these conditions would also have more extensive terrestrial impacts and reach the marine environment more readily but would also be subjected to turbulence and mixing along the drainages.

For inland areas, the area with the largest potential impacts is along the Cuyama River. Based on the elevation profile and the spill volumes, the maximum spill volume along the Cuyama River segments of the pipeline (between proposed Project valve 3-800 and 5-400 nearest the Cuyama River) and using the absorption rate as seen in the Refugio spill, a spill along the Cuyama River portion of the pipeline could impact resources a distance as far as about 3,200 feet, which means that pipeline segments within about 3,200 feet of the Cuyama River could potentially impact the river in the event of a spill.

*Potential Impacts*

Depending on the location of the spill, the environmental conditions, and the biological resources present, Impact RISK.2 short and long-term effects to biological resources associated with a crude oil spill has the potential to be significant and unavoidable. Mitigation measures RISK.1-1 through RISK.1-7 would apply. Due to the increased size and frequency of spills, this significant and unavoidable impact would be a greater severity than that presented by the proposed Project.

**Risks to Schools**

For **Impact RISK.3** (schools), the pipeline construction activities for the existing pipeline would only affect areas near the proposed valve installations. The existing pipeline is located about 500 feet from the Oak Valley School in western Buellton. In order to address the risk levels to this school, the California Department of Education (CDE) school siting risk protocol was utilized to determine the risk levels.

The assessments demonstrated that the risk levels are acceptable under the CDE Risk Protocols with a Total Individual Risk/Individual Risk Criteria (TIR/IRC) ratio of 0.29, with a 1.0 TIR/IRC ratio being the CDE Protocol threshold. It is important to note that the CDE protocol examines the individual risk at the closest school and does not examine the risks cumulatively along the entire pipeline route. Because the CDE

# EXHIBIT B

# SABLE
## OFFSHORE

April 24, 2024

Chief Jim Hosler
CAL FIRE – Office of the State Fire Marshal
Chief of Pipeline Safety and CUPA Programs
Pipeline Safety
3780 Kilroy Airport Way, Suite 500
Long Beach, CA  90806

RE:    **Pacific Pipeline Company (operated by Sable Offshore Corp., OPID #40851)**
       **State Waiver Applications for:**
       **Las Flores Pipeline CA-324 (OSFM #0015)**
       **Las Flores Pipeline CA-325A/B (OSFM #0001)**

Chief Hosler,

As you are aware, Sable Offshore Corp. purchased exclusive ownership of the shares in Pacific Pipeline Company, owner of the Las Flores Pipeline, from ExxonMobil affiliate Mobil Pacific Pipeline Company, at which point Pacific Pipeline Company became a wholly owned subsidiary of Sable Offshore Corp.  Subsequent to its acquisition, Sable Offshore Corp. filed for and received an OPID from the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration (OPID #40851) to be named operator of the Las Flores Pipeline system.

This letter serves to confirm Sable Offshore Corp.'s intention to continue pursuit of the referenced State Waiver Applications submitted by Pacific Pipeline Company on July 10, 2023.

Please update your office's records to reflect the new contact information for Pacific Pipeline Company as applicant and Sable Offshore Corp. as operator to be:

Pacific Pipeline Company
Sable Offshore Corp. (Operator ID #40851)
845 Texas Ave. Suite 2920
Houston, TX  77002
lyearwood@sableoffshore.com

If you have any questions, or require anything further, please do not hesitate to contact me at (832) 434-9461.

Sincerely,

Lance Yearwood
Vice President
Sable Offshore Corp.

**845 TEXAS AVENUE, SUITE 2920, HOUSTON, TEXAS 77002**

**Pacific Pipeline Company**
22777 Springwoods Village Parkway
Spring, Texas 77389



July 10, 2023

<u>VIA ELECTRONIC MAIL</u>

James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
Pipeline Safety Division

3780 Kilroy Way, Suite 500
Long Beach, California 90806

**Subject:  Pacific Pipeline Company (OPID #40475) State Waiver Application for the**
            ***Las Flores Pipeline CA-324 (OSFM #0015)***

Dear Mr. Hosler:

Pacific Pipeline Company ("PPC") requests a ten-year State Waiver from the Office of the State Fire Marshal ("OSFM") for the intrastate pipeline segment CA-324 (formerly Line 901) to comply with Civil Action No. 2:20-CV-02415 Consent Decree, DOJ Case #90-5-1-1-1130, pursuant to Appendix B, Article I(1)A.  Within the State Waiver, PPC also requests relief from the requirements to evaluate and remediate all corrosion of or along longitudinal seam welds per 49 C.F.R. § 195.452(h)(4)(iii)(H).  (Collectively, the "Application").

Please note, the Application contains confidential information that is exempt from disclosure under the California Public Records Act (PRA), the Freedom of Information Act (FOIA), and other laws including, but not limited to, Gov't Code § 7927.705, § 7927.500, 5 U.S.C. § 552(b)(3), (4), (6), 6 U.S.C. § 133, and 6 U.S.C. § 1207-1208.  The submission also contains information that constitutes homeland security and critical infrastructure information that should be protected from public disclosure.  If OSFM does not concur that the information contained herein is exempt from disclosure, PPC hereby respectfully requests that OSFM contact me and our legal counsel, Rebekah Bennett (copied here) to discuss the matter and appropriate next steps.  PPC also requests OSFM to notify PPC if OSFM intends to provide copies of any of the enclosed materials to other public agencies (including those agencies that are parties to the Consent Decree) so that PPC and OSFM can further discuss and coordinate procedures to protect confidential information from public disclosure.  If OSFM subsequently receives a PRA request that seeks disclosure of the Application, PPC requests advance notice and the opportunity to contest any production of any confidential information to third parties.

The following information is provided as part of the State Waiver application:

---

**(1) The name, mailing address, and telephone number of the applicant and whether the applicant is an operator;**

Pacific Pipeline Company (Operator ID #40475)
Attn: Diana Skates, Pipeline Safety Advisor
22777 Springwoods Village Pkwy
Spring, TX 77389
diana.r.skates@exxonmobil.com

**(2) A detailed description of the pipeline facilities for which the special permit is sought, including:**

**(i) The beginning and ending points of the pipeline mileage to be covered and the Counties and States in which it is located;**

A State Waiver is sought for a segment of the Las Flores Pipeline system, identified under trunk line CA-324 (formerly Line 901). Table 1 summarizes relevant information. A map of the pipeline system is included as **Attachment A** and further details about the pipeline are included in **Attachment B**.

**Table 1: Pipelines Applicable to State Waiver Application**

| System Name | Line ID | Line Designation | Location | Mileage | California County |
|---|---|---|---|---|---|
| Las Flores Pipeline | 0015 | CA-324 | Las Flores Canyon to Gaviota<br>34.478915°, -120.041783°<br>34.476081°, -120.198142° | 10.86 | Santa Barbara |

**(ii) Whether the pipeline is interstate or intrastate and a general description of the right-of-way including proximity of the affected segments to populated areas and unusually sensitive areas;**

The Las Flores Pipeline is a common carrier intrastate pipeline. CA-324 has potential to impact High Consequence Areas, including unusually sensitive areas. A map of the pipeline system is included as **Attachment A** and further details about the pipeline and its right-of-way are included in **Attachment B**.

**(iii) Relevant pipeline design and construction information including the year of installation, the material, grade, diameter, wall thickness, and coating type;**

The Las Flores Pipeline CA-324 was constructed in 1990, hydrostatically tested in November 1990, and placed into crude oil service in 1992. The Las Flores Pipeline is specifically designed and permitted to transport outer continental shelf (OCS) and other

locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins.

Additional, relevant, design and construction information is summarized in **Attachment B.**

**(iv)   Relevant operating information including operating, leak history, and most recent testing or assessment results;**

**Operating Information**

The pipeline transported crude oil in continuous service from its initial commissioning until 2015.  CA-324 has not transported crude oil since May 19, 2015.  Information related to historic operations and continued operating information upon resuming transportation of crude oil is included in **Attachment B**.

**Leak History**

Prior to May 19, 2015, there were no releases from CA-324 pipeline which met reportable criteria.  On May 19, 2015, CA-324 (formerly Line 901) experienced a release on a section of buried pipe.  PHMSA's Failure Investigation Report (May 2016) attributed the rupture of the pipeline to "progressive external corrosion of the insulated, 24-inch diameter steel pipeline."  PHMSA's findings indicate that the direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released crude oil.  PHMSA's investigation identified the following categories of contributory causes:

1.  Ineffective protection against external corrosion of the pipeline
    - The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.
    - The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.
2.  Failure by the Operator to detect and mitigate the corrosion
    - The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

Subsequently, PHMSA issued a Corrective Action Orders (CAOs) to the Operator identifying additional findings.  The Operator responded to PHMSA's CAOs and on October 14, 2020, a Consent Decree was entered by the United States District Court for the Central District of California.  Pursuant to Section X of the Consent Decree, the CAOs issued by PHMSA were closed and all remaining obligations of the CAOs became part of the Consent Decree.  Hence, the Consent Decree is the document governing the particular requirements and obligations of the Operator to resume crude oil transportation in the pipeline, including the requirement for a State Waiver. In October 2022, PPC acquired the pipeline asset and assumed certain obligations of the Consent Decree that transferred with the asset, including the requirement for a State Waiver for the Las Flores Pipeline.

**Assessment Results**

Assessment results are included in **Attachment B.**

### *(3) A list of the specific regulation(s) from which the applicant seeks relief;*

1. Pacific Pipeline Company is seeking to comply with Civil Action No. 2:20-CV-02415 Consent Decree, DOJ Case #90-5-1-1-1130, pursuant to Appendix B, Article I(1)A:
   A. *Prior to restarting [CA-324], [Pacific Pipeline Company] shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on [CA-324]. [Pacific Pipeline Company] must receive a State Waiver from the OSFM prior to restarting [CA-324].*

2. Pacific Pipeline Company seeks relief from 49 C.F.R. 195.452(h)(4)(iii)(H) – Corrosion of or along a longitudinal seam weld.

### *(4) An explanation of the unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for its facility;*

**General External Corrosion Under Insulation**

CA-324 was shutdown in 2015 following the release on CA-324.  A Consent Decree was entered by the District Court on October 14, 2020, that requires a State Waiver prior to restarting CA-324 and CA-325A/B.  These specific requirements of the Consent Decree became applicable to PPC upon transfer of the assets.  CA-324 is comprised of buried and insulated pipe.  The pipeline has a coal-tar coating system and insulation wrap that provides corrosion deterrence.

PPC seeks approval to manage external corrosion of the pipeline through a supplemental combination of accelerated reassessments, usage of the appropriate assessment tools, integration of data from the appropriate alternating ILI technologies, enhanced anomaly response criteria targeted at corrosion under insulation, and advanced data analysis techniques to account for potential growth of corrosion under insulation including feature interaction criteria for anomaly assessment.

**Selective Seam Weld Corrosion (SSWC)**

The PHMSA Fact Sheet on Selective Seam Corrosion (known in industry as SSC or SSWC) describes SSWC as "a localized corrosion attack along the bond line of low-frequency electric resistance welded (LF-ERW) and electric flash welded (EFW) piping, that leads to the development of a wedge-shaped groove that is often filled with corrosion products."[1]  The Fact Sheet goes on to say that "LF-ERW or EFW pipe manufacturing processes first came into use in the 1920s.  Both types of pipe are manufactured by forming steel plates into round cylinders and then joining the longitudinal edges through a welding process.  Due to technology and quality control issues with some of the pipe manufactured prior to 1970, the weld bondline may

---

[1] PHMSA Fact Sheet on Selective Seam Corrosion, December 1, 2011; <https://primis.phmsa.dot.gov/comm/FactSheets/FSSelectiveSeamCorrosion.htm>

be susceptible to corrosion processes.  This is particularly true if the pipeline has the following conditions present:

- Exposure to corrosive conditions due to poor or absent coating;
- Ineffective cathodic protection; or
- The presence of non-metallic inclusions in the weld bondline region (e.g., contaminants present during the manufacturing process).

SSWC is generally not considered to be a concern with pipe manufactured after 1970 due to the use of cleaner steels having greatly reduced sulfur contents and the replacement of low frequency welding equipment with high frequency equipment in the manufacturing process." As provided in **Attachment B**, Line CA-324 contains exclusively high frequency ERW (HF-ERW) longitudinal seamed pipe manufactured in 1985 and 1986.  When ILI tools call corrosion along the seam, it may simply be corrosion incidental to the seam rather than preferential.  Indeed, SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system.  Therefore, the threat of SSWC is not considered applicable to Line CA-324.  As such, selection of future inspection technologies will prioritize the identification and characterization of external blunt metal loss as the primary threat to this buried, insulated line, namely ultrasonic wall measurement (UTWM) and axial magnetic flux leakage (MFL-A) technologies.

Note that PPC only accepts calls from circumferential magnetic flux leakage (MFL-C), spiral magnetic flux leakage (SMFL), ultrasonic crack detection (UTCD) and/or electro magnetic acoustic transducer (EMAT) ILI systems when applying criteria for corrosion interaction with the longitudinal seam weld, as these technologies are designed for and, therefore are best suited for detection of the longitudinal seam weld and axially oriented corrosion.  MFL-A and/or UTWM are not designed for detection of the longitudinal seam weld or axially oriented corrosion, so calls from those ILI systems are not reviewed for longitudinal seam weld interaction.

The CA-324 Las Flores Canyon to Gaviota testable segment was inspected using a MFL-C tool in February 2022, to better characterize the threat of external metal loss under insulation. Since SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system, PPC is therefore requesting OSFM to approve a State Waiver which allows for the use of prescript outlined engineering analysis and protocols to differentiate between corrosion anomalies that do not present a specific risk to the seam weld and associated heat affected zones in lieu of the current requirement under 49 C.F.R. § 195.452(h)(4)(iii)(H).  Remediation and repair activities would then be scheduled according to the findings of the proposed evaluation. The following protocols would be applied to the 2022 MFL-C assessment of CA-324, along with all subsequent assessment results (as applicable, per the discussion above regarding tool technology), until the termination of the waiver.

**(5) *A description of any measures or activities the applicant proposes to undertake as an alternative to compliance with the relevant regulation, including an explanation of how such measures will mitigate any safety or environmental risks;***

The Application includes memorializing certain integrity management procedures included in the Consent Decree in addition to further measures to maintain the integrity of the pipeline, including measures specific to SSWC.  Many of these measures were negotiated and aligned upon as part of the Consent Decree.

The following measures are proposed, and have been categorized under inspection frequency, inspection validation, remediation criteria, selective seam weld corrosion, and general programmatic considerations.

**Inspection Frequency**
Rather than relying solely on fitness for service analysis to determine the deadline for next inspection and associated interval, PPC proposes to manage the potential for external corrosion rates on the pipeline by the following prescriptive guidelines for inspection frequency:

- PPC will inspect for potential external metal loss prior to restarting CA-324.
- PPC will inspect using UTWM ILI technology within 7 days of achieving initial steady-state operation in accordance with an ILI survey schedule approved by OSFM.
- PPC will inspect CA-324 for potential external metal loss annually, not-to-exceed a 15-month interval between inspections.  The annual inspections will alternate ILI survey technologies employed (i.e., axial magnetic flux leakage (MFL-A) or ultrasonic wall measurement (UTWM)).  Alternatively, PPC may run a UTWM tool each year.
- Where any ILI survey fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, the ILI tool will be rerun to cover the area lacking coverage.

**Inspection validation**
Inspection validation is crucial to ensuring tool tolerances and developing corrosion growth analyses that accurately reflect the integrity condition of the pipeline.  Following an ILI survey to evaluate potential external metal loss, PPC proposes the following:

- ILI surveys will be validated consistent with API Standard 1163 In-line Inspection Systems Qualification, 3rd Edition, September 2021 Level 2 validation methodology, at a minimum. This process will leverage field direct examination measurements of previously repaired external metal loss anomalies that have been preserved (e.g. corrosion mechanism has been arrested by recoating or composite repair installation) to support validation as well as any additional external metal loss validation inspections necessary to support validation.  The depths relied upon for validation of the ILI survey will include external metal loss depths between 10% and 40%.
- ILI tool vendors will be required to apply interaction/clustering criteria of 6t by 6t for applicable ILI tools.
- ILI tool vendors will report all external metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.
- When employing magnetic flux leakage (MFL) ILI tools, ILI tool vendors will be required to manually grade any external metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss and the vendor's ILI report must note any

differences between what the computer algorithm reported and the vendor's manual grade.
- All field direct examination measurements gathered by PPC will be provided to the ILI tool vendor following completion of direct examinations for an ILI survey.

**Remediation criteria**
Following an ILI survey, the following guidelines are proposed to address survey results:
- PPC will remediate all external metal loss anomalies that have an ILI reported depth without including tool tolerance of 40% or greater wall loss, within one year of discovery.  If PPC is unable to remediate such anomalies within one year of discovery, PPC will notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).
- All external metal loss anomalies will be further evaluated via suitable remaining strength calculation methods, which per 49 C.F.R. § 195.452(h)(4)(i)(B) include, but are not limited to, ASME/ANSI B31G (incorporated by reference, see § 195.3) and PRCI PR-3-805 (R-STRENG) (incorporated by reference, see 49 C.F.R. § 195.3).  Anomalies will then be scheduled for remediation per 49 C.F.R. § 195.452(h)(4)(i), (ii), and (iii)(A-G) and (I), and consistent with PPC's Integrity Management Program.  All remaining anomalies that do not meet depth or remaining strength conditions for remediation will be subject to a corrosion growth analysis that accounts for ILI tool tolerance, and all anomalies will be reassessed or repaired by their resultant half-life.
- Any time a shrink sleeve is exposed during an anomaly investigation, the shrink sleeve will be removed, investigated circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoated with two-part epoxy.

Annual inspections will allow for prompt identification of locations with accelerated corrosion growth rates, and the proposed remediation criteria will effectively arrest corrosion growth of remaining features well before approaching potential failure states.  In fact, at a metal loss depth of 40% of nominal wall thickness, there is no credible length at which an anomaly will fail at a burst pressure (calculated using ASME/ANSI Modified B31G) less than or equal to MOP, for all pipe specifications across the entire Las Flores Pipeline system operated by PPC.

**Selective Seam Weld Corrosion**
PPC maintains that the pipe comprising the Las Flores Pipeline system is not susceptible to Selective Seam Weld Corrosion (SSWC), as supported by field data collected during excavation and inspection activities which finds the characterization of corrosion *incidental* to the long seam rather than *preferential* to the long seam. However, PPC proposes the following measures in relation to SSWC:
- All anomalies 'of or along the longitudinal seam weld' and associated heat affected zone (defined as being 1" wide on either side of the weld) will be subject to API RP 1176 for Assessment and Management of Cracking in Pipelines and associated response methodology, and in accordance with API 579-1/ASME FFS-1, December 2021 Fitness-For-Service.  All such anomalies will be further evaluated as blunt metal loss

7

corrosion via suitable remaining strength calculation methods.  Anomalies will then be scheduled for remediation per 49 C.F.R. § 195.452(h)(4)(i), (ii), and (iii)(A-G) and (I), and consistent with PPC's Integrity Management Program.

- All corrosion anomalies 'of or along the longitudinal seam weld' and associated heat affected zone will first be evaluated as crack-like features using API RP 579-1/ASME FFS-1, December 2021 – Level II or Level III fitness for service calculations to determine the Failure Pressure Ratio (FPR) for each anomaly.  Material properties will be selected consistent with 49 C.F.R. § 192.712 - Analysis of predicted failure pressure.  Anomaly depth and FPR values will then be evaluated against API RP 1176 response criteria (Section 11.7) for 'likely cracks' (most severe classification).  All remaining anomalies that do not meet depth or remaining strength conditions for remediation will be subject to fatigue analysis performed using an applicable fatigue growth law (e.g. Paris Law) or other technically appropriate engineering methodology.  Final anomaly size will be determined using a fracture mechanics model appropriate to the failure mode (ductile, brittle, or both) and boundary condition used (pressure test, ILI, or other).  Accounting for tool tolerance, all anomalies will be reassessed or repaired by their resultant half-life.

- All corrosion anomalies 'of or along the longitudinal seam weld' and associated heat affected zone will then be evaluated as blunt metal loss via suitable remaining strength calculation methods, which per 49 C.F.R. § 195.452(h)(4)(i)(B) include, but are not limited to, ASME/ANSI B31G (incorporated by reference, see § 195.3) and PRCI PR-3-805 (R-STRENG) (incorporated by reference, see § 195.3).  Anomalies will then be scheduled for remediation per 49 C.F.R. § 195.452(h)(4)(i), (ii), and (iii)(A-G) and (I), and consistent with PPC's Integrity Management Program. In addition to the standard requirements – and consistent with the set of waiver conditions proposed for External Corrosion – all metal loss anomalies with an ILI reported depth of 40% or greater wall loss will be scheduled for remediation within one year of Discovery.  As previously stated, if PPC is unable to remediate such anomalies within one year of Discovery, PPC will notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).  All remaining anomalies that do not meet depth or remaining strength conditions for remediation will be subject to a corrosion growth analysis, where once again – and accounting for tool tolerance – all anomalies will be reassessed or repaired by their resultant half-life.  Note that this does not supersede the annual UTWM/MFL requirements set forth per the External Corrosion waiver conditions.

- After the analyses are complete, anomalies not scheduled for remediation will be tracked, and corrosion growth will be assessed with each future ILI survey.  P&M measures will be assessed through regular IMP activities and implemented on the pipeline per 49 C.F.R. § 195.452 (f)(6) as needed.

**General Programmatic Considerations**
PPC will conduct its preventative and mitigative measures process to integrate and analyze all available data for CA-324, including, but not limited to:
- Assessment data from in-line inspection (ILI) tool runs;
- Anomaly investigation, inspection, and repair data;

- Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;
- Operational data, such as pressure and flow data;
- Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;
- Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results; and
- Other pipeline characteristics, such as length, diameter, presence of HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR § 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

The potential for external corrosion and selective seam weld corrosion will be re-examined as new and additional data becomes available through integrity assessment activities and through normal operation of the pipeline.  PPC will amend its Integrity Management Program, to include the State Waiver conditions specific to CA-324.

**(6) *A description of any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a special permit would be in the public interest;***

Positive impacts on affected stakeholders and operating the covered pipeline segments in accordance with the State Waiver will be in the public interest for the following reasons:
- Limit impacts to the environment and potential locations for cultural resources by reducing unnecessary anomaly digs in areas of low or no risk.
- Maintain the priority of pipeline maintenance activities to sections of the pipeline in greatest need of monitoring for pipeline safety.
- Reduce unnecessary excavation around other critical infrastructure.
- Reduce the permitting workload of public agencies along the pipeline right-of-way.
- Reduce the general risks and impacts, to both the workforce and the public, associated with excavations in and along public highways and other rights-of-way.
- Limit disruptions to the public and to property owners.

**(7) *A certification that operation of the applicant's pipeline under the requested waiver would not be inconsistent with pipeline safety;***

Approval of this State Waiver request focused on characterization and remediation of external corrosion features, will help prioritize conditions that are the most important for the continued

safe operation of this pipeline system and will enhance the effectiveness of the Las Flores Pipeline integrity management program.  This request also supports prioritization of resources and aligns pipeline integrity evaluation criteria with explicit protocols.  All of the operational protocols that PPC is proposing exceed other regulatory requirements and are protective of pipeline safety.

**(8) If the application is for a renewal of a previously granted waiver or special permit, a copy of the original grant of the waiver or permit; and**

*N/A; this is an initial application.*

**(9) Any other information PHMSA may need to process the application including environmental analysis where necessary.**

Note that PPC is not seeking relief from 49 C.F.R. § 195.563 and the requirements to provide cathodic protection for buried pipelines.  The cathodic protection system remains active and continues to be maintained on the Las Flores Pipeline system.  Rather, PPC proposes the aforementioned inspection and remediation actions as a means of addressing the limitations of cathodic protection PHMSA observed for buried, insulated pipe.

Cathodic protection will continue to be implemented on the pipeline system at appropriate levels in adherence to 49 C.F.R. 195 and tested at appropriate intervals.  Cathodic protection will continue to function with high effectiveness at pipeline repair locations where the thermal insulation has been removed.

---

PPC maintains that the proposed conditions and facts-at-matter for the pipeline describe a conservative and measured approach to the identification and remediation of external corrosion metal loss features on the Las Flores Pipeline system, adequately manage risk factors associated with cathodic protection, and enable safe, long-term operation of the pipeline.

We thank you for your consideration of this State Waiver request.  If you have any questions, or require anything further to conduct your review of this request, please do not hesitate to contact me.  I also ask that PPC be given the opportunity to amend this application as needed to provide additional information or address deficiencies identified by the OSFM before formal action is taken to reject or deny the application.

Sincerely,


Diana Skates
Pipeline Safety Advisor
Pacific Pipeline Company

Attachments:  A:      Las Flores Pipeline System Map & Trunk Line Chart
               B:      Las Flores Pipeline Background Data

cc:  Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
     Andy Chau, Supervising Pipeline Safety Engineer, OSFM
     Brandon Ferry, Supervising Pipeline Safety Engineer, OSFM
     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
     Durga Shrestha, Pipeline Safety Engineer, OSFM
     Huy Tran, Supervising Pipeline Safety Engineer, OSFM
     Josh Cleaver, Staff Counsel, OSFM
     Matthew Young, Senior Pipeline Integrity Advisor, ExxonMobil Pipeline Company LLC (EMPCo)
     Rebekah Bennett, General Counsel, PPC & EMPCo

# ATTACHMENT A



Las Flores Pipeline System

# ATTACHMENT A



# *Pipeline System Background Data*

## Attachment B
## of
## State Waiver Application

### PACIFIC PIPELINE COMPANY

### LAS FLORES PIPELINE SYSTEM
### CA-324, CA-325A/B

**June 2023**

Issued by:



**PACIFIC PIPELINE COMPANY**

## PURPOSE

Supplemental information to Pacific Pipeline Company's State Waiver Application is included herein to summarize relevant details related to the pipelines and associated operation that may be considered in support of State Waiver conditions.  The following is summarized:

- Pipeline Description
- Pipeline Specifications
- Hydrostatic Test Information
- Maximum Operating Pressure
- Normal Operating Pressures
- In-line Inspection History
- Coating and Cathodic Protection System Information

## PIPELINE DESCRIPTION

The CA-324 24-inch pipeline (formerly referred to as Line 901) is approx. 10.86 miles in length and generally parallels U.S. Highway 101 along the south coast between the Las Flores Canyon consolidated oil and gas processing facility and the Gaviota Station.  The pipeline is located north of U.S. 101 and generally follows powerline and/or natural gas pipeline rights-of-way across coastal terraces and incised canyons.

The CA-325A 30-inch pipeline (formerly referred to as Line 903 – Gaviota to Sisquoc) is approx. 38.72 miles in length.  The pipeline extends west from the Gaviota Station to an MOV located east of Gaviota Creek and U.S. Highway 101.  It then enters Gaviota State Park approx. 0.5 miles east of U.S. Highway 101 and extends westerly across the gently sloping coastal terrace and Cañada del Barro before dropping into the Cañada de la Gaviota drainage area.  It then crosses U.S. Highway 101 and Gaviota Creek (Cañada de la Gaviota) immediately south of the U.S. Highway 101 "Caltrans" rest stop area.  The pipeline then extends west and north from the Gaviota Creek MOV. The pipeline continues west up a broad spur ridge to the ridge crest and the westerly boundary of Gaviota State Park.  The pipeline traverses narrow ridge crests, crosses out of the Park and onto Hollister Ranch for approx. 0.5 miles, and then crosses back into the Park before descending toward the west fork of Gaviota Creek (Betty Creek).  The right-of-way passes west of the Vista del Mar School and Las Cruces Adobe and then crosses beneath Highway 1 west of its intersection with U.S. Highway 101.  The pipeline continues northward along the west side of U.S. Highway 101 through the Santa Ynez Mountains.  It crosses long expanses of grasslands across the Las Cruces Ranch and steep walled canyons that form part of the Nojoqui Creek watershed.  North of Moonshine Creek, the route crosses ridges with rock outcroppings.  The pipeline crosses beneath the Santa Ynez River west and south of Buellton and continues north across the Purisima and Solomon Hills.  It crosses the northern edge of the San Rafael Mountains and the eastern edge of the Santa Maria Valley.  The pipeline crosses beneath the Sisquoc River and continues north across the River Valley.  It traverses moderately to severely sloping foothills at Kelly Canyon and extends west to the Sisquoc Station at the southern end of Santa Maria Canyon.

The CA-325B 30-inch pipeline (formerly referred to as Line 903 – Sisquoc to Pentland) is approx. 74.84 miles in length.  The pipeline follows Santa Maria Canyon after leaving the Sisquoc Station.  It then extends northeast towards Tepusquet Road.  The route crosses relatively gentle terrain until it reaches the crest of the Sierra Madre Mountains where it traverses steep slopes approaching Suey Canyon and Buckhorn Canyon.  The pipeline follows the northern edge of the Sierra Madre Mountains south of State Highway 166 through the Los Padres National Forest.  The route crosses

rugged terrain across the crests of the Sierra Madre Mountains, descends the mountains, crosses the Sierra Madre Ridge Road, and enters the Cuyama River Valley near Gypsum Canyon.  At the Cuyama River crossing, the pipeline exits Santa Barbara County and enters San Luis Obispo County. The pipeline continues for approx. 44.5 miles through ranch land, terminating at the Pentland Station in Kern County.

The routing of the Las Flores Pipelines has been considered for its impact on High Consequence Areas (HCA) per established PPC Integrity Management Plan guidelines and applicable regulations. Table B-1 provides a high-level summary of High Consequence Areas (HCAs) along the Las Flores Pipeline System.

**TABLE B-1: HIGH CONSEQUENCE AREA SUMMARY**

| Pipeline Designation | Location | Total Mileage | High Consequence Area (HCA) Type |
|---|---|---|---|
| CA-324 | Las Flores Canyon to Gaviota | 10.86 | Impact to ecologically sensitive regions (coastline) |
| CA-325A | Gaviota to Sisquoc | 38.72 | Impact to the city of Buellton (population center, drinking water), and ecologically sensitive regions |
| CA-325B | Sisquoc to Pentland | 74.84 | Impact to ecologically sensitive regions |

The Las Flores Pipeline traverses multiple Counties as well as State and Federal jurisdictions. Approximate mileage is included in Table B-2, below.

**TABLE B-2: JURISDICTIONAL MILEAGE**

| | Jurisdiction | CA-324 (miles) | CA-325A (miles) | CA-325B (miles) | Total (miles) |
|---|---|---|---|---|---|
| **County** | Santa Barbara County | 10.9 | 38.7 | 23.8 | 73.4 |
| | San Luis Obispo County | 0 | 0 | 37.2 | 37.2 |
| | Kern County | 0 | 0 | 13.8 | 13.8 |
| | Total | 10.9 | 38.7 | 74.8 | 124.4 |
| **Sub-Jurisdiction (Note 1)** | California State Parks and Recreation (Gaviota State Park) | 0 | 4.1 | 0 | 4.1 |
| | U.S. Forest Service | 0 | 0 | 6.3 | 6.3 |
| | U.S. Fish and Wildlife (Bitter Creek Wildlife Refuge) | 0 | 0 | 4.5 | 4.5 |
| | California Dept. of Fish and Wildlife (Carrizo Plain Ecological Reserve) | 0 | 0 | 4.5 | 4.5 |
| | Bureau of Land Management | 0 | 0 | 1.0 | 1.0 |
| | City of Buellton | 0 | 1.1 | 0 | 1.1 |
| | Total | 0 | 5.2 | 16.3 | 21.5 |

*Note 1: Mileage included in County jurisdiction*

## PIPELINE SPECIFICATIONS

CA-324 is manufactured of low carbon steel.  It contains predominantly 0.344-inch nominal wall thickness, high frequency electric resistance welded (HF-ERW) API 5L X65 pipe manufactured in 1985 and 1986 by Nippon Steel Corp., Hikari Works mill, in Japan using plate steel with UOE pipe forming process.  A summary of CA-324 line pipe specifications is included in Table B-3.

CA-325A/B is manufactured of low carbon steel.  It contains various grades and wall thicknesses of double submerged arc welded (DSAW) API 5L pipe manufactured between 1984 and 1986, from a variety of mills in Belgium, Brazil, France, Germany, and Israel, summarized in Table B-4.  Additionally, it includes small portions of replaced sections with newer pipe, including HF-ERW.  A summary of CA-325A/B line pipe specifications is included in Table B-3.

### TABLE B-3: LINE PIPE SPECIFICATIONS

| Pipeline Designation | Outside Diameter (in) | Nominal Wall Thickness (in) | Grade | Seam Type | Year Installed | Length (mi) |
|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 24 | 0.344 | X65 | HF-ERW | 1990 | 10.69 |
| | 24 | 0.375 | X65 | HF-ERW | 1990 | 0.02 |
| | 24 | 0.5 | X60 | HF-ERW | 1990 | 0.16 |
| CA-325A Gaviota to Sisquoc | 30 | 0.281 | X70 | DSAW | 1986 | 21.85 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 12.47 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 2.27 |
| | 30 | 0.375 | X65 | DSAW | 2014 | 0.12 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.38 |
| | 30 | 0.406 | X65 | HF-ERW | 2000 | 0.03 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 0.17 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.75 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.562 | X65 | DSAW | 1986 | 0.06 |
| | 30 | 0.75 | X65 | DSAW | 1986 | 0.35 |
| CA-325B Sisquoc to Pentland | 30 | 0.281 | X70 | DSAW | 1986 | 19.29 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 17.03 |
| | 30 | 0.344 | X65 | DSAW | 2007 | 0.24 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 12.88 |
| | 30 | 0.375 | X70 | DSAW | 2017 | 0.16 |
| | 30 | 0.375 | X70 | DSAW | 2018 | 0.02 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.12 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 24.41 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.13 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.625 | X65 | DSAW | 1986 | 0.01 |
| | 30 | 0.75 | X70 | DSAW | 1986 | 0.27 |

**TABLE B-4: CA-325A/B LINE PIPE MILL INFORMATION**

| Mill | Location | Plate or Coil | Pipe Forming Process |
|---|---|---|---|
| Bergroh | Germany | Plate | Three Beam Rollers |
| Confab | Brazil | Plate | UOE |
| Hoesch | Germany | Coil | Spiral |
| Metco | Israel | Coil | Spiral |
| Sacilor | France | Coil | Spiral |
| Tubemeuse | Belgium | Coil | Spiral |
| Tubes de Belville | France | Plate | C-press |
| Vallourec (GTS) | France | Plate | UOE |
| Mannesmann | Germany | Plate | UOE |

## HYDROSTATIC TEST INFORMATION

CA-324 was hydrostatically pressure-tested on November 25, 1990 to 1765 pounds per square inch gauge (psig), as calculated at the highest elevation.  CA-325A was hydrostatically pressure-tested in nine separate segments between pressures of approx. 778 to 1757 psig, as calculated at the highest elevations of each segment, between October 14, 1986 and December 3, 1986.  CA-325B was hydrostatically pressure-tested within eleven separate segments between pressures of 686 to 1753 psig, as measured at the highest elevations of each segment, between January 13, 1986 and November 8, 1986.  Portions of pipe replaced after original construction hydrotest were tested at or above the originally established test pressure and established maximum operating pressure (MOP) prior to being placed into service.  A summary of the percent of specified minimum yield strength (%SMYS) and the corresponding MOP, as established by the original construction hydrotest records, is included in Table B-5.  A summary of original construction hydrotest records are included in Table B-6.

**TABLE B-5: ORIGINAL CONSTRUCTION HYDROTEST – %SMYS AND MOP RANGES**

| Pipeline Designation | %SMYS | | Corresponding MOP to Test Pressure (psig) | |
|---|---|---|---|---|
| | Min | Max | Min | Max |
| CA-324 | 54.5% | 72.0% | 1133 | 1410 |
| CA-325A | 25.8% | 72.0% | 622 | 1085 |
| CA-325B | 37.0% | 72.0% | 549 | 1472 |

**TABLE B-6: HISTORIC HYDROTEST SUMMARY**

| Pipeline Designation | Test Segment Identifier | Date | Begin Station | End Station | Minimum Test Pressure at Max Elevation (psig) | MOP at Max Elevation (psig) (Note 1) |
|---|---|---|---|---|---|---|
| CA-324 | LF – Gav | 11/25/1990 | 0 | 57352 | 1416 | 1133 |
| CA-325A | 11 | 10/14/1986 | 238652 | 259872 | 863 | 690 |
|  | 12 | 11/14/1986 | 179721 | 235388 | 778 | 622 |
|  | 13 | 11/14/1986 | 144307 | 179721 | 784 | 627 |
|  | 14 | 11/21/1986 | 137049 | 144307 | 1083 | 866 |
|  | SYR | 12/3/1986 | 135120 | 137049 | 1757 | 1406 |
|  | 15-16 | 10/30/1986 | 111386 | 135120 | 1155 | 924 |
|  | 17 | 10/29/1986 | 93221 | 111386 | 1120 | 896 |
|  | 18 | 11/19/1986 | 66621 | 93221 | 906 | 725 |
|  | 19 | 11/19/1986 | 55421 | 66621 | 1105 | 884 |
| CA-325B | 1 | 1/13/1986 | 639412 | 733359 | 1344 | 1075 |
|  | 1A | 9/7/1986 | 618385 | 639412 | 1025 | 820 |
|  | 2 | 9/9/1986 | 608271 | 618385 | 906 | 725 |
|  | 3 | 9/14/1986 | 505520 | 608271 | 686 | 549 |
|  | 4 | 9/17/1986 | 415547 | 505520 | 1125 | 900 |
|  | 5A | 9/17/1986 | 385240 | 415547 | 1753 | 1403 |
|  | 5B | 11/8/1986 | 359963 | 385240 | 1219 | 975 |
|  | 6 | 10/18/1986 | 338470 | 359963 | 992 | 793 |
|  | 7 | 10/21/1986 | 316971 | 338470 | 1484 | 1187 |
|  | 8-9 | 10/16/1986 | 268171 | 316971 | 1183 | 946 |
|  | 10 | 10/14/1986 | 260278 | 268171 | 1449 | 1160 |

*Note 1: This value is simply the resultant, corresponding, MOP based upon the hydrostatic test record. It does not reflect the MOP value the Operator, Pacific Pipeline Company, assigns the pipelines and is only included for context.*

## MAXIMUM OPERATING PRESSURE

Due to the dramatic elevation profile and resultant hydraulic pressure profile of the Las Flores Pipeline System, Maximum Operating Pressure (MOP) has been documented using a variable MOP methodology, in which MOP is a function of pipe stationing (distance).  The documented MOP is based upon hydrostatic test records, documented pipeline elevation profile, relevant design codes, and Pacific Pipeline Company's hydraulic analysis that contemplates all possible steady-state and transient operating scenarios, including surge and incorrect operations.

All potential modes of operation, including normal and abnormal, were evaluated in an engineering and hydraulic analysis conducted in 2023 to determine maximum pressures that may be experienced on the pipeline during various modes of operation.  The hydraulic analysis considered multiple worse-case steady-state operating conditions, such as maximum flow and maximum hydraulic pressure gradient scenarios as well as over sixty initiating transient events, including inadvertent valve closures, start-up and shutdown, and pump trips.

The maximum pressures that resulted from the analysis were compared to historic hydrostatic test records, official pipeline elevation data from inspections, and considered regulation and design

code.  The basis to define the pipeline's MOP for each segment is summarized in Table B-7.  The absolute maximum steady-state and transient pressure profile for all possible normal and abnormal operating modes is represented in Figures B-1, B-2, and B-3.  A summary of the percent of specified minimum yield strength (%SMYS) and the corresponding current, documented and official, MOP for the pipeline is included in Table B-8.

**TABLE B-7: SUMMARY OF MOP BASIS**

| Pipeline Designation | Explanation of MOP Basis |
|---|---|
| CA-324 | 100 psi above max steady-state & transient pressure profile |
| CA-325A | 100 psi above max steady-state & transient pressure profile |
| CA-325B | 50 psi above max steady-state & transient pressure profile for Mile Post 49.57 to Mile Post 117.41  80% of original construction hydrostatic test pressure for Mile Post 117.41 to Mile Post 124.42 |

**TABLE B-8: DOCUMENTED, OFFICIAL MOP – %SMYS AND MOP RANGES**

| Pipeline Designation | %SMYS | | Documented MOP (psig) | |
|---|---|---|---|---|
| | Min | Max | Min | Max |
| CA-324 | 28.5% | 55.4% | 684 | 1003 |
| CA-325A | 21.7% | 67.9% | 444 | 1000 |
| CA-325B | 21.9% | 72.0% | 317 | 1292 |

**FIGURE B-1: CA-324 MAXIMUM OPERATING PRESSURE**



**FIGURE B-2: CA-325A MAXIMUM OPERATING PRESSURE**



**FIGURE B-3: CA-325B MAXIMUM OPERATING PRESSURE**



## NORMAL OPERATING PRESSURES

In order to establish the Normal Operating Pressure (NOP) range for the Las Flores Pipeline System, PPC evaluated over seventeen different operating conditions to document relevant hydraulic information.  An array of the following conditions and variables were considered to capture the range of potential operating conditions.

- Flow rates
- Suction pressure, discharge pressure, and backpressure control parameters
- Allowable pump and pressure/flow control device operating scenarios
- Fluid temperatures
- Soil temperatures
- Fluid characteristics (e.g. density, viscosity)

Historical operating data was used to validate the hydraulic model and ensure analysis accuracy, and a few historical operating data points are captured in Figures B-4, B-5, and B-6, for reference. The resultant minimum and maximum typical pressure ranges based upon the range of steady state scenarios are documented in Figures B-4, B-5, and B-6.

**FIGURE B-4: CA-324 NORMAL OPERATING PRESSURE**



**FIGURE B-5: CA-325A NORMAL OPERATING PRESSURE**



**FIGURE B-6: CA-325B NORMAL OPERATING PRESSURE**



## IN-LINE INSPECTION HISTORY

The following Table B-9 provides a summary of CA-324, CA-325A, and CA-325B In-Line Inspection (ILI) activities, as of July 2023. Note that CA-324 Las Flores Canyon to Gaviota has been inspected since the 2015 release, in February and December of 2022 (circumferential magnetic flux leakage (MFL-C) and ultrasonic wall measurement (UTWM) surveys, respectively).

**TABLE B-9: IN LINE INSPECTION SUMMARY**

| Pipeline Designation | Date of Inspection | Technology | Vendor | No. of Ext Metal Loss | No. of Ext ML On/Near Seam | No. of Int Metal Loss | No. of Dents | No. of Seam ML Anomalies | No. of Repair Digs |
|---|---|---|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 6/18/2007 | Def+MFL+IMU | Rosen | 386 | N/A | 237 | 0 | N/A | 13 |
| | 7/3/2012 | Def+MFL+IMU | Rosen | 1578 | N/A | 6 | 1 | N/A | 41 |
| | 5/6/2015 | Def+MFL+IMU | Rosen | 1747 | N/A | 0 | 6 | N/A | 25 |
| | 2/23/2022 | CMFL | Baker Hughes | 2489 | 415 | 151 | 8 | 330 | TBD |
| | 12/10/2022 | UTWM | Baker Hughes | 1603 | N/A | 205 | N/A | N/A | TBD |
| CA-325A Gaviota to Sisquoc | 1/1/2003 | Def+MFL+IMU | Tuboscope | 362 | N/A | 0 | 22 | N/A | 1 |
| | 3/20/2008 | Def+MFL+IMU | Rosen | 1772 | N/A | 4932 | 12 | N/A | 21 |
| | 4/21/2008 | Def | | | | | | | |
| | 5/8/2008 | Def+MFL+IMU | | | | | | | |
| | 4/29/2013 | Def+MFL+IMU | Rosen | 14152 | N/A | 21135 | 10 | N/A | 90 |
| CA-325B Sisquoc to Pentland | 10/1/1994 | Unknown | Tuboscope | Unknown | Unknown | Unknown | Unknown | Unknown | N/A |
| | 1/8/2003 | Def+MFL | Tuboscope | 295 | N/A | 0 | 9 | N/A | N/A |
| | 10/21/2006 | Def+MFL | Tuboscope | 162 | N/A | 0 | 4 | N/A | 2 |
| | 3/10/2012 | Def+MFL | TDW | 14459 | N/A | 27501 | 9 | N/A | 101 |
| | 6/12/2013 | MFL | | | | | | | |

## COATING AND CATHODIC PROTECTION SYSTEM INFORMATION

The Las Flores Pipeline System is externally coated with the following coating system as illustrated in Figure B-7:

- Coal tar urethane (CTU) coating in intimate contact with the steel pipe
- Layer of rigid thermal polyurethane (PU) foam insulation
- Outer layer of polyethylene (PE) tape wrap

### FIGURE B-7: EXTERNAL COATING SYSTEM DIAGRAM



Shrink sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at original construction pipeline field joints.  The use of the PU foam and PE tape was selected at the time of original construction to minimize heat loss of the crude oil within the pipeline during transit.  The pipeline system has an impressed-current cathodic protection (CP) system that was energized at the time of installation.  The CP system consists of active rectifiers at Las Flores Canyon Station, Gaviota Station, and Sisquoc Station, a critical bond at Pentland, as well as over 140 test stations across the entire CA-324 and CA-325A/B pipeline.  The PU insulation and PE tape wrap has the ability to shield the cathodic protection.  As a result, the CP current may not reach the pipe surface to arrest corrosion in the limited instance the CTU coating becomes disbonded.  As a result, despite ongoing operation of the cathodic protection system in compliance with applicable regulations, the pipeline remains at risk of corrosion under insulation (CUI).

The CP system remains active and provides a level of external corrosion deterrence, and it is highly effective on portions of the pipeline without insulation (e.g. FBE and epoxy-coated regions).  Cathodic protection has and will continue to be implemented, tested, and maintained on the pipeline at appropriate levels and in compliance with applicable regulations.  Additionally, the use of

modern, advanced in-line inspection technologies, along with explicit integrity management programs and procedures for robust characterization, validation, and criteria for anomaly repair support supplemental integrity management steps that exceed regulatory corrosion protection requirements and enable safe, responsible operation.  Comprehensive conditions for effective management of the threat of external corrosion are included in Sections 5 of this Application.

# EXHIBIT C



**environmental**
DEFENSE CENTER

September 27, 2024

Mr. Joe Tyler, Director/Fire Chief
Mr. Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
P.O. Box 944246
Sacramento, CA 94244-2460
*Via Email: Joe.Tyler@fire.ca.gov; Daniel.Berlant@fire.ca.gov*

> **Re:**    **Restart of CA-324 and CA-325: Office of State Fire Marshal's Obligation to Conduct Environmental Review; Renewed Request for Public Process**

Dear Mr. Tyler and Mr. Berlant:

On behalf of Get Oil Out! ("GOO!"), Santa Barbara County Action Network ("SBCAN"), and the Environmental Defense Center ("EDC"),[1] we write to request that the Office of the State Fire Marshal ("OSFM") conduct environmental review of Sable Offshore Corporation's ("Sable") proposal to restart pipelines CA-324 and CA-325, pursuant to OSFM's obligations under the California Environmental Quality Act ("CEQA"). We also renew our request for a public process, which is appropriate under the circumstances and, in the case of Sable's request for a State Waiver, required by law.

As you know, Sable is seeking approval from OSFM to restart CA-324 and CA-325[2] (together, the "Las Flores Pipeline System") despite their lack of effective cathodic protection. As OSFM also knows, this lack of protection is ultimately what caused CA-324 to rupture in 2015, resulting in a catastrophic oil spill at Refugio Beach State Park. The spill closed public

---

[1] GOO! was formed in the wake of the 1969 Santa Barbara Oil Spill and continues to work to protect California from further oil and gas development and exploitation. SBCAN is a countywide grassroots organization that works to promote social and economic justice, to preserve our environmental and agricultural resources, and to create sustainable communities. EDC is a nonprofit public interest law firm that defends nature and advances environmental justice on California's Central Coast through advocacy and legal action.

[2] These pipelines were previously known as Lines 901 and 903 before they were reclassified as intrastate pipelines.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 2 of 14

parks and beaches, killed and injured wildlife, shut down fisheries, and destroyed sensitive habitats and cultural resources.[3]

Our clients were involved in the immediate response to the Refugio Oil Spill and remain concerned about the risks of operating the Las Flores Pipeline System. They have well-founded concerns that CA-324 and CA-325 cannot be safely restarted and, as to Sable, that this speculative company will not be able to responsibly operate the pipelines or fulfill its remediation obligations when another spill occurs.

Developments in the wake of the spill — namely, the discovery that these pipelines lack effective cathodic protection — have fundamentally altered the project that was envisioned when the pipelines were installed nearly four decades ago. Without cathodic protection, the risk of a spill from these pipelines is five times greater than was initially estimated.[4] Indeed, bringing the pipelines back online would not only invite another oil disaster on the Central Coast, but according to at least one governing body, all but ensure it.[5] But for OSFM's discretionary approvals here, no environmental impacts from these pipelines would occur.

Accordingly, in reviewing Sable's proposal to restart the pipelines, CEQA requires that OSFM prepare a new or subsequent Environmental Impact Report ("EIR") that considers the risks associated with operating these corroded pipelines without effective cathodic protection, which, to date, have not been evaluated. Thus, we urge OSFM to conduct additional environmental review *before* approving a restart of these pipelines, as the law requires.

I.  **OSFM Must Conduct Environmental Review under CEQA before Authorizing Sable to Restart Lines CA-324 and CA-325.**

Pursuant to the 2020 Consent Decree entered in *U.S. v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (the "Consent Decree"), as well as state law passed in the wake of the Refugio Oil Spill, Sable has asked — or will ask — OSFM to approve (1) a Risk Analysis, (2) a State Waiver for the limited effectiveness of cathodic protection, and, ultimately, (3) a Restart Plan. Thus, cumulatively, Sable seeks approval from OSFM to restart the Las Flores Pipeline System without effective cathodic protection (the "Restart Project").

Should OSFM take the position that the proposed restart does not constitute a new "project" — which is subject to reasonable dispute[6] — that would not mark the end of its CEQA analysis or relieve its obligation to conduct environmental review.

---

[3] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 3 (June 2021) [hereinafter "NRDA"], available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.

[4] Santa Barbara County, Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 79 [hereinafter "County Draft EIR"], attached hereto.

[5] *Id.*

[6] Having not transported oil or gas for nearly ten years, a restart of these pipelines would not simply be a return to the status quo, particularly in light of the State Waiver Sable is seeking. The Restart Project is fundamentally

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 3 of 14

If the Restart Project is not itself considered a "project," then OSFM's determinations here would constitute new approvals for the Celeron/All American and Getty Pipeline Project (the "Celeron Project"), which was the initial proposal to install and operate the Las Flores Pipeline System. Where, as here, an agency issues subsequent discretionary approvals for a project — *see* Part I.A., *infra* — it is required to examine the sufficiency of the project's prior EIR. (*Friends of the Coll. of San Mateo Gardens v. San Mateo Cnty. Cmty. Coll. Dist.* (2016) 1 Cal.5th 937, 951-52.)

The EIR for the Celeron Project (the "Celeron EIR")[7] was certified in 1985[8] — nearly forty years ago, and before the discovery that the Las Flores Pipeline System lacks effective cathodic protection. Because the findings in the prior EIR were premised on an effective cathodic protection system, and Sable is now proposing to operate the pipelines without such protection, CEQA requires that OSFM prepare a subsequent EIR. (*See* Pub. Res. Code, § 21166; CEQA Guidelines § 15162.)

**A.    OSFM's Approval of the Restart Project is Discretionary, not Ministerial, and Thus is Not Exempt from CEQA.**

Compliance with CEQA may be excused where a proposed activity falls within certain statutory or categorical exemptions. (*See, e.g., Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1186.) The threshold statutory exemption is for "ministerial projects," "which are defined generally as projects whose approval does not require an agency to exercise discretion." (*Id.*; *accord* Pub. Res. Code, § 21080(b)(1); CEQA Guidelines § 15369.) However, because OFSM has wide latitude at each step of the restart process to approve, deny, or modify the Restart Project, OSFM's approval of the Restart Project is a discretionary decision that is not exempt from CEQA review.

**1.    Discretionary versus Ministerial Projects**

Distinguishing discretionary projects from ministerial ones turns on whether the exercise of judgment or deliberation is required in making the decision. (CEQA Guidelines § 15357.) The "key question is whether the public agency can use its subjective judgment to decide whether and how to carry out or approve [the] project." (*Id.*; see also CEQA Guidelines § 15002(i).) "Whether an agency has discretionary or ministerial controls over a project depends

---

different than the initial proposal to install and operate these pipelines in the 1980's, which was considered as a 30-year project. Restarting the pipelines would be akin to bringing online a new and different oil and gas operation that capable of causing significant environmental effects. (*See* Pub. Res. Code, § 21065; *see also* CEQA Guidelines § 15378(a) (defining "project" as an action "which has a potential for resulting in either a direct physical change in the environment or a reasonably foreseeable indirect physical change").)

[7] The Final EIR published in 1985 is a finalizing addendum to the 1984 Draft EIR. The preface of the Final EIR explains that the Final EIR is intended to be read "in conjunction with, rather than in place of, the Draft EIR/EIS that was released for public review on August 1, 1984." Thus, collectively, the two documents and their appendices form the project EIR.

[8] California State Lands Commission et al., *Final Environmental Impact Report Environmental Impact Statement*, (January 1985) [hereinafter "Final Celeron EIR"].

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 4 of 14

on the authority granted by the law providing the controls over the activity." (CEQA Guidelines § 15002(i)(2).)

Courts have developed a "functional test" to refine the distinction between discretionary and ministerial projects, which focuses on the scope of agency discretion. (*See Protecting our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 459, 467.)  The touchstone of the test "is whether the relevant 'approval process . . . allows the government to shape the project in any way [by requiring modifications] which could respond to any of the concerns which might be identified' by environmental review." (*Id.* (citations omitted).) "If so, the project is discretionary." (*Id.*)

## 2.    Discretionary Aspects of OSFM Approval

As an initial matter, the Consent Decree, which controls and outlines the restart process, does not actually require that OSFM approve a restart or any of Sable's underlying applications. It vests OSFM with the authority to approve a Risk Analysis, State Waiver, and Restart Plan, but it does not set forth conditions under which OSFM must do so. Nor does it purport to limit the scope of OSFM's discretion in considering them. In fact, as discussed further below, the Consent Decree specifically acknowledges OSFM's wide latitude to approve or modify the Restart Project.

Indeed, OSFM has itself acknowledged the broad discretion it has here in reviewing the Restart Project. The OSFM website, for example, notes that the Consent Decree only specifies "the *minimum requirements* for restarting CA-324 and CA-325."[9] Per Deputy State Fire Marshal Kara Garret, OSFM may impose "other safety requirements deemed necessary by our office," suggesting that it generally has discretion to shape the Restart Project. [10] The County, which has also weighed in on OSFM's discretion here, was even more explicit: "discretionary actions to permit restart activities are needed from [OSFM]."[11]

Such discretion, which can be exercised to shape the Restart Project, is apparent at each step of the restart process.

Take OSFM's Risk Analysis review, for example. Pursuant to 19 C.C.R. section 2110(b), OSFM must assess the "adequacy" of a Risk Analysis by evaluating, among other things, what constitutes "best available technology," the "assumptions and conclusions reached by an operator," and any "additional information that may be relevant to . . . .assessing or determining the adequacy of a [R]isk [A]nalysis." Each of these considerations, and the determination of

---

[9] *Pathways for Restarting Pipelines*, Office of the State Fire Marshal, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited September 26, 2024).

[10] Giana Magnoli, *Sable Offshore Corp. Takes Over Exxon's Santa Barbara Oil Assets, Sets Sights on Restarting Operations*, Noozhawk (February 14, 2024) (emphasis added), available at: https://www.noozhawk.com/sable-offshore-corp-takes-over-exxons-santa-barbara-oil-assets-sets-sights-on-restarting-operations.

[11] Santa Barbara County, *Revised Notice of Preparation*, pp. 2-3 [hereinafter "Revised NOP"], available at https://files.ceqanet.opr.ca.gov/170616-2/attachment/kMgGnx0tQr16ZTEvxK9MMeqNrLQO9Zgzm79wtnPIiz9ypKehMDgvTH0hm3te5DOx4NMf_ebkpJow0wNe0.

adequacy as a whole, inherently requires that OSFM exercise a large degree of subjective judgment — a hallmark of discretion. (*See* CEQA Guidelines § 15357.) Moreover, OSFM is explicitly authorized to condition its acceptance of a Risk Analysis on additional requirements or modifications. (19 C.C.R. § 2112(d).) "If [an] agency is empowered to disapprove or condition approval of a project . . . the project is discretionary." (*Protecting Our Water*, 10 Cal.5th at 494.)

The State Waiver process is likewise replete with agency discretion. The federal statute authorizing OSFM to issue a State Waiver provides that a state authority "*may* waive compliance with a safety standard," but it does not *require* approval of a waiver, and it does not set forth specific conditions under which OSFM may approve a waiver. (49 U.S.C. § 60118(d) (emphasis added).) It suggests only that a waiver may be granted on terms that OSFM "considers appropriate," which is echoed in our state statutory scheme that regulates safety exemptions. (*See* 49 U.S.C. § 60118(c), (d); Gov. Code, § 51011(b).) In other words, whether to grant a waiver, and under what conditions, is entirely at the discretion of OSFM. The Consent Decree recognizes as much, stating that "[n]othing in this CD shall be construed to limit the authority of [] OSFM to require additional terms or conditions in the State Waiver."[12] Notably, review of a Special Permit — the federal equivalent to a State Waiver — generally requires environmental review at the federal level.[13]

As to the Restart Plan, it appears to be a creature of the Consent Decree and lacks specific statutory or regulatory guidance. However, the Consent Decree requires that the Restart Plan include, for example, "*adequate* patrolling" and "*sufficient* surveillance."[14] Such conditions are imbued with ambiguity, and they ultimately require OSFM to exercise its subjective judgment to determine whether they are met. Ambiguous terms that "permit a great degree of latitude in the review of [] plans and are not subject to mechanical application" suggest discretionary action. (*Natural Resources Defense Council, Inc. v. Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 970.)

In sum, OSFM's review of the Restart Project — and each underlying approval — necessarily requires that it use its subjective judgment. And, OSFM is authorized at each step of the approval process to condition and/or modify the project to address specific safety concerns and environmental hazards. Thus, the Restart Project is plainly a discretionary project that is not exempt from CEQA review. (*See Protecting our Water*, 10 Cal.5th at 467 (outlining the "functional test").)

---

[12] Consent Decree, at Appendix B, Condition 1(E), U.S. v. Plains All American Pipeline, Civil Action No. 2:20-cv-02415 (March 13, 2020) [hereinafter "Consent Decree"], available at https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf.

[13] *See generally* U.S. Department of Transportation Pipeline Safety and Hazardous Materials Safety Administration, *Final Environmental Assessment and Finding of No Significant Impact* (October 2018), available at https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2020-08/2017-0155-HECO-Waiau-Pipeline-SP-FEA-and-FONSI.pdf.

[14] Consent Decree, *supra* note 12, at Appendix D, Conditions 1(B)(2), (3), emphasis added.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 6 of 14

**B.     OSFM Must Prepare a Subsequent EIR Before Approving the Restart Project.**

Again, where an agency issues subsequent discretionary approvals for a project, it is required to examine the sufficiency of the project's prior EIR.  (*Friends of the Coll. of San Mateo Gardens*, 1 Cal.5th at 951-52.) That inquiry is two-fold. (*Id.*) First, the agency must consider whether the prior EIR retains any "informational value" to inform its subsequent determinations. (*Id.*) If it does not, then it must prepare a new EIR. (*Id.*) If it does, then the agency must evaluate whether additional environmental review is warranted under Public Resources Code section 21166. (*Id.*)

Section 21166 requires additional environmental review when (1) certain new information, which was not known and could not have been known at the time the EIR was certified as complete, becomes available; (2) substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the EIR; or (3) substantial changes are proposed in the project which will require major revisions of the EIR.  (Pub. Res. Code § 21166; CEQA Guidelines § 15162; *Friends of the Coll. of San Mateo Gardens*, 1 Cal.5th at 943.) The proposal to restart the Las Flores Pipeline System despite the recent discovery that the pipelines lack effective cathodic protection warrants subsequent review under each of the Section 21166 considerations.

1.     The Discovery that the Las Flores Pipeline System Lacks Effective Cathodic Protection Constitutes New Information that Requires OSFM to Prepare a Subsequent EIR.

Under CEQA, additional environmental review is required when

New information of substantial importance, which was not known and could not have been known with the exercise of reasonable due diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows . . . :

. . .

(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR.

(CEQA Guidelines § 15162(a)(3)(B).)

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 7 of 14

> a.   *The Discovery that the Pipelines Lack Effective Cathodic Protection is "New Information of Substantial Importance."*

The Celeron Project was proposed as a pipeline system that would have effective cathodic protection to prevent corrosion. And, in evaluating the environmental effects of the project, the Celeron EIR understood that to be true.[15]

However, as we unfortunately now know, that is not the case. In the wake of the 2015 Refugio Oil Spill, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") determined that the rupture in CA-324 was a result of progressive external corrosion, and that the Las Flores Pipeline System's cathodic protection system — intended to prevent such corrosion — was ineffective.[16] That information was not known until 2016 — thirty-one years after the Celeron EIR was certified.

As to buried, insulated lines more generally, it was previously understood that they could be susceptible to aggressive corrosion despite the implementation of cathodic protection. But no formal consensus existed as to the ineffectiveness of cathodic protection prior to a National Association of Corrosion Engineers ("NACE") report that was issued in 1992 — seven years after the Celeron EIR was certified.[17]

Thus, the Las Flores Canyon System's extensive corrosion issues and coating/insulation failures were unknown and unaccounted for in the antiquated Celeron EIR. Indeed, the Celeron EIR indicates staff were unaware that cathodic protection would be ineffective, as it states that the project "would be equipped with a cathodic protection system to reduce or prevent pipeline corrosion."[18]

The relative importance of this new finding cannot be understated. It fundamentally alters the nature of the Celeron Project and upends the foundational underpinnings of the Celeron EIR. Indeed, in predicting the likelihood of an oil spill — the primary environmental impact considered — the Celeron EIR relied on cathodic protection as a design specification that "would reduce the probability of an event [oil spill] occurring."[19] While the lead agency likely expected its predictions of the probability of an oil spill to be reasonable, not perfect, the difference in effectiveness of cathodic protection on insulated pipelines meant that the risk of a leak was *five times higher* than anticipated, as discussed further below.[20]

---

[15] Final Celeron EIR, *supra* note 8, at 2-57 (citing "cathodic corrosion protection" as a measure that would be "very effective" in reducing the risk of groundwater contamination from an oil spill); *see also id.* at 2-94, 2-106.

[16] Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California*, pp. 3, 14 (May 2016) [hereinafter "PHMSA Report"], available at: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/ PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

[17] *Id.* at Appendix O, p. 7.

[18] California State Lands Commission et al., *Draft Environmental Impact Report Environmental Impact Statement*, p. H-35 (August 1984) [hereinafter "Draft Celeron EIR"].

[19] Final Celeron EIR, *supra* note 8, at Appendix 4.3.

[20] County Draft EIR, *supra* note 4, at Section 5.6, p. 79.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 8 of 14

Accordingly, the limited effectiveness of cathodic protection in the Las Flores Pipeline System is incredibly consequential to an analysis of the pipelines' environmental impact. And, as discussed, that information was only discovered after the 2015 spill. Thus, it constitutes "new information of substantial importance" for purposes of Section 21166. (*See, e.g., Sec. Env't Sys., Inc. v. S. Coast Air Quality Mgmt. Dist.* (1991), 229 Cal.App.3d 110, 124 (holding that new information that undermined a key assumption used to evaluate the impacts of a project was of substantial importance).)

> b.      *Without Effective Cathodic Protection, the Effects Considered in the Celeron EIR Substantially Increase in Severity.*

As noted, without cathodic protection, the risk of a spill from the Las Flores Pipeline System increases dramatically.

As one governing body already found, another spill would not be a matter of if, but when.[21] According to a recent analysis conducted by the County of Santa Barbara, the lack of an effective cathodic protection system increases the likelihood of an oil spill by *five times*:

> The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate.[22]

The County concluded that restarting the pipelines without effective cathodic protection could result in a spill every year, and a rupture (a spill greater than five barrels) every four years.[23] And, a spill in the coastal zone could be nearly twice the size of the 2015 spill.[24]

The Celeron EIR assessed possible environmental impacts from pipeline operations in part by considering the likely frequency of spills.[25] However, as noted above, the EIR's spill frequency estimates were expressly premised on an effective cathodic protection system; without such protection, the likelihood of a spill is five times greater than the Celeron EIR estimated. By using an erroneous estimate of spill frequency to assess the project's environmental impacts, the Celeron EIR necessarily underestimated the severity of those impacts, and its impact findings are unreliable.

An increased frequency of spills could also lead to environmental impacts that were never even considered in the Celeron EIR. Indeed, the aggregate effects of multiple oil spills in

---

[21] *See id.*
[22] *Id.* at Section 5.6, p. 78.
[23] *Id.* at Section 5.6, p. 79.
[24] *Id.* at Section 5.6, p. 78.
[25] *See, e.g.,* Final Celeron EIR, *supra* note 8, at 1-20, 1-24.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 9 of 14

sensitive areas were never specifically addressed. For example, if another spill were to occur in an area impacted by the 2015 spill, damage to still-recovering coastal flora and fauna could be irreparable. Likewise, the compound effect of multiple spills into certain groundwater systems may be unmitigable.

With the possibility of five times as many spills as initially expected, the potential cumulative environmental impacts over the lifetime of the Celeron Project are far more severe than the Celeron EIR anticipated. Thus, OSFM is required to prepare a subsequent EIR before approving the Restart Project. (*See* CEQA Guidelines § 15162(a)(3)(B); *Sec. Env't Sys., Inc.*, 229 Cal.App.3d at 124.)

> 2.   OSFM Must Prepare a Subsequent EIR due to Substantial Changes in the Project and the Circumstances under which the Project is Being Undertaken.

OSFM is also required to prepare a subsequent EIR due to the proposed changes to the Celeron Project and the substantial changes with respect to the circumstances under which the project is being undertaken. (Pub. Res. Code, § 21166(a), (b).) These changes, which stem from the failure of pipelines' cathodic protection system, create new significant effects and a substantial increase in the severity of previously identified significant effects. (CEQA Guidelines § 15162(a)(1), (2).)

> a.   *The Failure of the Cathodic Protection System and Resulting Corrosion Constitutes a Change in Circumstances that Requires a Subsequent EIR.*

As discussed above, the Celeron EIR relied on a cathodic protection system to prevent corrosion and minimize oil spill impacts.[26] It stated that "protection of a pipeline from corrosion is of critical importance" and "the entire pipeline would be protected from corrosion with cathodic protection systems . . . ."[27] And, it cited "cathodic corrosion protection" as a measure that would be "very effective" in reducing the risk of groundwater contamination from an oil spill.[28] The cathodic protection system failed, however, causing the pipelines to corrode and eventually rupture.[29]

As noted, the lack of an effective cathodic protection system increases the likelihood of an oil spill by five times and leads to pervasive corrosion throughout a pipeline system.[30] Operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the Celeron EIR.

---

[26] *See id.* at 4-53, 4-54, 4-55; Draft Celeron EIR, *supra* note 18, at H-35.
[27] Draft Celeron EIR, *supra* note 18, at 2-5, 4-106, 4-117.
[28] Final Celeron EIR, *supra* note 8, at 2-57; *see also* Final Celeron EIR at 2-94, 2-106.
[29] PHMSA Report, *supra* note 16, at 3, 13.
[30] County Draft EIR, *supra* note 4, at Section 5.6, p. 78.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 10 of 14

This change in circumstances means more possible spills over the lifetime of the project, which, as explained above, will result in additional and more severe environmental impacts than the Celeron EIR accounted for. (*See* Part II.B.2, *supra*.) Thus, OSFM must prepare a subsequent EIR to evaluate this change and the potential impacts it will cause.  (CEQA Guidelines § 15162(a)(2).)

Indeed, EIRs are specifically intended to "provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment." (Pub. Res. Code § 21061.) The failure to prepare a subsequent EIR improperly deprives the public "of meaningful participation regarding the issue" of environmental harm cause by changed circumstances. (*Mira Monte Homeowners Assn. v. County of Ventura* (1985) 165 Cal.App.3d 357, 365.)

> b.    *The Change in Project Design to Operate Without Effective Cathodic Protections Requires Preparation of a Subsequent EIR.*

The Celeron Project was proposed as an oil and gas pipeline system that would have an effective cathodic protection system to prevent corrosion. And that is the project that was ultimately approved.

Now, however, Sable is seeking a State Waiver to operate the Las Flores Pipeline System without an effective cathodic protection system and well past its 30-year projected lifespan.[31] As discussed above, effective cathodic protection was a foundational aspect of the Celeron Project and its environmental review.[32] Indeed, as repeatedly alluded to throughout the Celeron EIR, such protection was an essential design element of the project, and the principal technology relied on to prevent a spill.[33]

Restarting the pipelines without an effective cathodic protection system represents a grave departure from the project that was initially envisioned and approved. (*See City of San Jose v. Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1015-17 (change in how water would be supplied to a project required additional environmental review).) The public, and other responsible agencies reviewing aspects of this project, have a right to understand how the project will be modified to address the defective cathodic protection system, and how the change affects the risk of another oil spill.

As explained at length above, operating without effective cathodic protection will result in additional and more severe environmental impacts than the Celeron EIR accounted for. (*See* Part II.B.2, *supra*.) This increase in severity of impacts, directly related to the failure of the cathodic protection system, requires the OSFM to prepare a subsequent EIR before deciding

---

[31] Draft Celeron EIR, *supra* note 18, at 2-35.

[32] *See, e.g.,* Final Celeron EIR, *supra* note 8, at 2-57, 2-94, 2-106, 4-53, 4-54, 4-55, H-35; Draft Celeron EIR, *supra* note 18, at 2-5, 4-106, 4-117.

[33] *See, e.g.,* Final Celeron EIR, *supra* note 8, at 2-57, 2-94, 2-106, 4-53, 4-54, 4-55, H-35; Draft Celeron EIR, *supra* note 18, at 2-5, 4-106, 4-117.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 11 of 14

whether to approve the State Waiver or the Restart Project as a whole. (Pub. Res. Code, §
21166(a).)

**II.      OSFM Should, and in Some Cases Must, Engage the Public Before Issuing Any
Approvals Associated with the Restart Project.**

Our clients and a number of other community organizations have twice asked OSFM for
transparency and public engagement as it considers whether to approve the Restart Project. But
OSFM has yet to hold any public meetings, invite public review and comment of any of Sable's
applications, or release pertinent documents related to its determinations.

OSFM is a public agency, working on behalf of the people of California, that is charged
with "safeguard[ing] our communities" from the hazards inherent in oil and gas transport.[34]
Public participation is essential to ensuring that OSFM makes fully informed decisions, that
OSFM understands the views of the public on whose behalf it is acting, and that the public
maintains trust in our government agencies.

Should OSFM approve the Restart Project, our clients and our community will bear the
consequences. We will be the ones who suffer from poorer air quality.[35] When another oil spill
occurs, we will be the ones who watch dead mammals wash up on the shore, are deprived of
access to the beaches we cherish, and whose businesses will suffer. And it may very well be the
people of California who are forced to foot the bill to clean up a spill, or eventually, to
decommission these facilities. **All we are asking for is a voice in a decision that will directly
and substantially impact our community and the future of the Central Coast.**

Not only is public participation uniquely appropriate here, but in the case of the State
Waiver, it is required by law.

OSFM's authority to issue a State Waiver comes from 49 U.S.C. § 60118(d), which
provides that it "may waive compliance with a safety standard" — here, the requirement for
effective cathodic protection — "*in the same way and to the same extent* that the Secretary [of
Transportation] may waive compliance under subsection (c) of this section." (Emphasis added.)
Subsection (c), in turn, explicitly states that "[t]he Secretary may act on a waiver . . . *only* after
notice and an opportunity for a hearing." (49 U.S.C. § 60118(c)(B) (emphasis added).)

Thus, while OSFM has the discretion to approve a State Waiver, it can only do so by
following the explicit procedures set forth in 49 U.S.C. § 60118, including providing the public
with notice and an opportunity for a hearing. OSFM's failure to allow for public participation
would void OSFM's approval of the waiver.

---

[34] *Pathways for Restarting Pipelines*, Office of the State Fire Marshal, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited September 26, 2024).
[35] *Pollution Mapping Tool Data*, California Air Resources Board, https://www.arb.ca.gov/ei/tools/pollution_map/
(last visited September 26, 2024).

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 12 of 14

Accordingly, we respectfully request that, in addition to conducting environmental review, (1) OSFM release all documents pertinent to the Restart Project and (2) hold public hearings and solicit public comment at each step of the restart process *before* making any determinations.

## III.  Conclusion

The circumstances surrounding the operation of these pipelines have substantially changed since they were initially evaluated and installed. In the last ten years, the pipelines have aged past their expected lifespan, were found to lack effective cathodic protection, and caused a catastrophic oil spill. Together, these developments have so fundamentally altered the nature of operations that a request to restart the pipelines, after ten years of dormancy, requires new environmental review.

Indeed, in light of the substantial increase in the risk of an oil spill from these pipelines, the environmental impacts from the Restart Project would be different and more severe than those considered in the Celeron EIR and have not been properly evaluated. Thus, CEQA requires that OSFM prepare either a new or subsequent EIR to evaluate the risks associated with operating a corroded pipeline without an effective cathodic protection system.

Lastly, we renew our request for public engagement and transparency in OSFM's review of the Restart Project. The Restart Project is a matter of profound public import with the potential to impact our community for years to come. We again ask OSFM to release all pertinent documents related to its review of the project, and to hold public hearings before it makes any further determinations, as is appropriate under the circumstances and required by law.

Thank you for your consideration.

Sincerely,

Linda Krop,
Chief Counsel

Jeremy Frankel,
Staff Attorney

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 13 of 14


cc:

David Sapp, Legal Affairs Secretary
Office of Governor Gavin Newsom
david.sapp@gov.ca.gov

Lauren Sanchez, Senior Advisor for Climate
Office of Governor Gavin Newsom
lauren.sanchez@gov.ca.gov

Christine Hironaka, Senior Advisor for Energy
Office of Governor Gavin Newsom
christine.hironaka@gov.ca.gov

Wade Crowfoot, Secretary
California Natural Resources Agency
wade.crowfoot@resources.ca.gov
secretary@resources.ca.gov

Christopher Calfee, Special Counsel to the Secretary
California Natural Resources Agency
christopher.calfee@resources.ca.gov

Amanda Hansen, Deputy Secretary for Climate Change
California Natural Resources Agency
amanda.hansen@resources.ca.gov

Shannon O'Rourke, Deputy Director of Office of Energy Infrastructure Safety
California Natural Resources Agency
amanda.hansen@resources.ca.gov

Le-Quyen Nguyen, Deputy Secretary for Energy
California Natural Resources Agency
le-guyen.nguyen@resources.ca.gov

Jenn Eckerle, Deputy Secretary for Oceans and Coastal Policy
California Natural Resources Agency
jenn.eckerle@resources.ca.gov

Rob Bonta, Attorney General
State of California Department of Justice
rob.bonta@doj.ca.gov

Jim Hosler, Chief /Assistant Deputy Director
California Department of Forestry and Fire Protection

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 14 of 14


jim.hosler@fire.ca.gov

Joshua Cleaver, Staff Attorney
California Department of Forestry and Fire Protection
joshua.cleaver@fire.ca.gov

Senator Monique Limón
California State Senate
Monique.Limon@sen.ca.gov

Assemblymember Gregg Hart
California State Assembly
Gregg.Hart@asm.ca.gov

Santa Barbara County Board of Supervisors
sbcob@co.santa-barbara.ca.us

---

Attachments:

1. Excerpt of Santa Barbara County Administrative Draft of Draft EIR for Plains Pipeline Replacement Project

2. Excerpt of Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California* (May 2016)

# ATTACHMENT 1

Impacts related to Hazardous Materials and Risk of Upset would only be related to maintenance and construction activities and these maintenance activities would have a minor impact on risk due to the potential for localized spills of hydraulic or diesel oils. **Impact RISK.1, RISK.2, RISK.3** would not be applicable and mitigation measures RISK.2-1 through RISK.2-7 would not be applicable. Impacts would therefore be **insignificant**.

Construction activities related to valve stations, pump stations and some segments of the pipeline that could be abandoned could potentially produce an increased risk of wildfires during construction, and **RISK.4** would still be applicable and mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable**.

### *No Project, Existing Pipeline Restart Alternative*

Under this alternative, the existing pipeline would be utilized instead of a new pipeline being installed, and transportation of crude oil would occur through the existing pipeline. The existing pipeline would be brought into compliance with existing requirements related to AB 864 and CSFM best available technologies (BAT), including the installation of additional valves along the pipeline route. The Applicant would have to apply to the CSFM for a waiver to utilize the existing pipeline since the existing pipeline is subject to corrosion under insulation, which could affect the efficacy of cathodic protection systems. Generally, a pipeline is not allowed to operate with ineffective cathodic protection systems. There is uncertainty as to whether the Applicant could demonstrate to the CSFM that the pipeline could be operated safely, and therefore this variation and the variation above (no Project, No Pipeline Alternative) are both addressed.

Assuming that a CSFM waiver is granted, the Applicant would have to install additional valves along the pipeline in order to comply with AB 864 and BAT requirements, similar to the proposed Project pipeline design. The installation of these additional valves would require some construction activities and some limited clearing at multiple locations along the pipeline ROW.

The existing pipeline is insulated, and therefore there would be no need for heaters at the Sisquoc Pump Station or the installation of the gas pipeline.

The installation of valves would most likely be at locations similar to the proposed Project valve installations as the pipeline would follow a similar ROW and similar terrain.

Hazards are associated with risks to the public from a spill and subsequent fire, as well as impacts from a spill to the environment, impacts to schools and potential wildfire impacts. The existing pipeline is a larger diameter pipeline, and therefore the draindown spill volumes would be larger than the proposed Project. This results in potentially larger spills and larger fires, impacting more people, as well as larger spills to the environment. In addition, the frequency of a spill from the existing pipeline would be higher due to its age and the potential for the cathodic protection to be compromised by the insulation. These factors have been incorporated into the analysis presented below.

### *Risks to Public Safety*

**Impact RISK.1** describes the potential spill sizes and the estimated frequency of spills from the pipeline system and the potential for immediate (fires, etc.) health impacts on the public.

### *Crude Pipeline Spill Volumes*

The spill volumes for this alternative were calculated based on the pipeline size, which would be larger than the proposed Project, and the associated terrain for different segments of the pipeline. The Applicant

07/25/2024  12:45:32 PM

provided a risk assessment for the proposed Project and this analysis was utilized to estimate the spill volumes associated with a larger pipeline size. Figure 5.6-11 shows the estimated spill volumes along the pipeline route for each segment as a worst case for that segment. The worst-case sized spill volume is shown in Table 5.6-16 for the different portions of the crude oil pipeline alternative.

*Crude Pipeline Spill Frequencies*

Spill frequencies from a crude pipeline are based on the PHMSA failure rates for the California pipeline database. The PHMSA base failure rate for crude oil pipelines is shown in Table 5.6-17. The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age. However, the CSFM study indicated a minimal increase in failure rate for pipelines that are less than 40 years old and the PHMSA database used to estimate the base failure rate includes many older pipelines. Therefore, only the five times factor was applied as an estimate of the increased failure rate for this pipeline.

**Figure 5.6-11    No Project – Existing Pipeline Restart Alternative Spill Volume by Segment Milepost**



Source: based on Applicant QRA and EFRD 2019, with adjustments for the size of the existing pipeline.

**Table 5.6-16    No Project – Existing Pipeline Restart Alternative Crude Pipeline Worst Case Spill Volumes**

| Location | Proposed Project - Maximum Spill Volume, gallons | Alternative - Maximum Spill Volume, gallons |
|---|---|---|
| LFC – Gaviota Plant | 84,000 | 126,000 |
| Gaviota – Sisquoc | 131,040 | 284,594 |
| Sisquoc - Pentland | 198,030 | 657,893 |
| Coastal Segments | 117,600 | 237,344 |

Source: based on Applicant QRA and EFRD 2019, with modification to address spill duration of 60 minutes. Coastal segments include up to valve station 2-500. Includes the installation of additional valve stations as per the proposed Project locations.

**Table 5.6-17    No Project – Existing Pipeline Restart Alternative Crude Pipeline Spill Frequencies**

| Location | Spill Frequency | Return Period, years rupture/leak/total |
|---|---|---|
| PHMSA California Crude oil base rate | 1.62 per 1,000-mile years | - |
| Adjustment due to Pipeline Condition | 5.3 factor | - |
| PHMSA Adjusted Rate | 8.56 per 1,000-mile years | - |
| Failure rate for L901R (49.2 miles) | 0.43 failures per year | 9/3/2 years |
| Failure Rate for L903R (74.1 miles) | 0.63 failures per year | 6/2/2 years |
| Failure Rate for L901R + L903R | 1.07 failures per year | 4/1/1 years |

Source: based on Applicant QRA and EFRD 2019 with CSFM 1991 adjustment factor. PHMSA data since 2010. The return period is the anticipated period between releases. Includes leaks and ruptures.

*Crude Pipeline Population Densities*

The population densities along the route are based on estimates for remote, rural, low density and high-density areas with some additions for highways. The population densities are similar to those used for the proposed Project except for the area through the City of Buellton, since the existing pipeline would pass through the City of Buellton and the proposed Project would pass around the City of Buellton to the west.

*Crude Pipeline Fires*

In the event of a spill of oil and subsequent ignition resulting in a pool fire, the heat (i.e., thermal radiation) from the fire could result in a serious injury or fatality. The assumptions for impacts would be the same as for the proposed Project.

*Gas Pipeline*

The proposed gas pipeline would not be installed as part of this alternative since heaters at Sisquoc would not be installed.

*Alternative Pipeline: Public Safety Risk*

The combination of scenario frequency and consequences is combined to estimate risk using FN curves. FN curves are depictions of the risk levels of a project and show the frequency (F) of scenarios that could produce a given fatality or injury level (N) or greater. These are presented for the proposed Project in **Impact RISK.1**. Santa Barbara County has established risk thresholds that use societal risk profiles (FN curves) to determine the significance of hazardous material releases. These FN curves address both injury and fatality. The Santa Barbara County's adopted thresholds are generally applicable to fixed facilities and pipelines. The risk FN curves are shown in Figure 5.6-12 and are based on the FN curves developed as part of the Plains 2019 QRA analysis, with adjustments for the existing pipeline (increased pipeline diameter

Draft Print
07/25/2024  12:45:32 PM

and failure frequency). The FN curves would be located within the amber region, and the impacts to public health due to pipeline releases would be **significant and unavoidable.**

**Figure 5.6-12    No Project – Existing Pipeline Restart Alternative Pipeline Risk FN Curves**



Source: Plains 2019 with modifications

### *Risks to the Environment*

A spill of crude oil from the pipeline could impact resources in the vicinity of the pipeline ROW. See Section 5.2 Biological Resources, Section 5.4 Cultural Resources and Section 5.9 Hydrology and Water Quality for a discussion of the impacts of a crude oil spill on biological, hydrological and cultural resources along the crude oil pipeline ROW.

### *Crude Pipeline Spill Volumes*

The spill volumes are discussed above under **Impact RISK.1**. For the public health assessment under **Impact RISK.1**, a worst-case spill shutdown time of 15 minutes was used due to the already conservative analysis for fires and impacts to the public used in the QRA. However, for spills that could affect the environment, a longer duration is used. As evidenced by the May 2015 Refugio spill, there is the potential for a pipeline shutdown to take longer than 15 minutes.

### *Crude Pipeline SCADA System*

The SCADA system used for the alternative would be the same as that used for the proposed Project since the SCADA system would be required to be updated per CSFM and AB864 requirements.



07/25/2024  12:45:32 PM

*Proposed Project Pipeline: Spills Affecting Marine Resources*

Portions of the pipeline extend along the Santa Barbara County coastline. A crude oil spill could drain from the spill location through existing culverts or drainages and enter the marine environment. This is what occurred during the May 2015 Refugio Beach spill. An estimated 43 percent of the oil entered the ocean from the Refugio spill location, which was an estimated 750-foot pathway from the ocean shoreline. Because the proposed pipeline is located onshore at various distances from the shoreline, a rupture at different locations spilling the same amount of oil could allow for oil to enter the marine environment. Assuming a linear function of oil being trapped and adsorbed onshore with distance, the maximum amount of oil could enter the ocean where the pipeline is closest to the ocean and potential worst-case spill volumes are large. An estimated maximum amount of 71,621 gallons of crude oil could enter the ocean at the worst-case spill location. An estimated 11.8 miles of the 16.6-mile coastal portion (71 percent) of the pipeline would be vulnerable to spills entering the ocean if a spill were to occur along any of those segments and the adsorption rate were similar to that which occurred during the Refugio spill. This assumes that no rain event is occurring and that drainages are not flowing.

There are a number of variables affecting the amount of oil that could reach the ocean from an onshore spill, including the terrain, the location of drainages under the freeway and the railroad tracks, the soil type, and extent of rocky interfaces as well as the amount of moisture. During a rain event, when drainages and creeks are flowing, a spill into the waterways could follow the flow and enter the marine environment more readily. A spill under these conditions would also have more extensive terrestrial impacts and reach the marine environment more readily but would also be subjected to turbulence and mixing along the drainages.

For inland areas, the area with the largest potential impacts is along the Cuyama River. Based on the elevation profile and the spill volumes, the maximum spill volume along the Cuyama River segments of the pipeline (between proposed Project valve 3-800 and 5-400 nearest the Cuyama River) and using the absorption rate as seen in the Refugio spill, a spill along the Cuyama River portion of the pipeline could impact resources a distance as far as about 3,200 feet, which means that pipeline segments within about 3,200 feet of the Cuyama River could potentially impact the river in the event of a spill.

*Potential Impacts*

Depending on the location of the spill, the environmental conditions, and the biological resources present, Impact RISK.2 short and long-term effects to biological resources associated with a crude oil spill has the potential to be significant and unavoidable. Mitigation measures RISK.1-1 through RISK.1-7 would apply. Due to the increased size and frequency of spills, this significant and unavoidable impact would be a greater severity than that presented by the proposed Project.

**Risks to Schools**

For **Impact RISK.3** (schools), the pipeline construction activities for the existing pipeline would only affect areas near the proposed valve installations. The existing pipeline is located about 500 feet from the Oak Valley School in western Buellton. In order to address the risk levels to this school, the California Department of Education (CDE) school siting risk protocol was utilized to determine the risk levels.

The assessments demonstrated that the risk levels are acceptable under the CDE Risk Protocols with a Total Individual Risk/Individual Risk Criteria (TIR/IRC) ratio of 0.29, with a 1.0 TIR/IRC ratio being the CDE Protocol threshold. It is important to note that the CDE protocol examines the individual risk at the closest school and does not examine the risks cumulatively along the entire pipeline route. Because the CDE

# ATTACHMENT 2



**U.S. Department of Transportation**

**Pipeline and Hazardous Materials Safety Administration**

**Failure Investigation Report**

**Plains Pipeline, LP, Line 901**
**Crude Oil Release, May 19, 2015**
**Santa Barbara County, California**

**May 2016**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Table of Contents

Executive Summary........................................................................................................3

Final Report Methodology............................................................................................4

Facility Background .......................................................................................................4

Events Immediately Prior to and During the Crude Oil Release....................................6

Plains' Field Response and National Response Center Notifications ............................7

PHMSA's Corrective Action Order ...............................................................................9

Pipeline Alignment .......................................................................................................9

Las Flores Station to Gaviota Station Line 901 Elevation Description ........................9

Gaviota to Pentland Station Line 903 Elevation Description .....................................10

Post-Incident Investigation Results ............................................................................11

Metallurgical Evaluation of Failed Pipe ...................................................................11

In-Line Inspection Survey Review ...........................................................................12

Number of Anomalies ...........................................................................................13

Cathodic Protection Findings....................................................................................13

Spill Volume Estimate from Plains' Third-Party Consultant ....................................13

Investigation Findings and Conclusions......................................................................14

Proximate or Direct Cause .......................................................................................14

Contributory Causes.................................................................................................14

PHMSA Post-Incident Action Chronology ................................................................18

Appendices .................................................................................................................20

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Executive Summary

At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl) of heavy crude oil.[i]  An estimated 500 bbl of crude oil entered the Pacific Ocean.  Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station.  On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901.  Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release.  As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified. On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan.[ii] No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.

PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

1) Ineffective protection against external corrosion of the pipeline

- The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.

- The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2) Failure by Plains to detect and mitigate the corrosion

- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

3) Lack of timely detection of and response to the rupture

- The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.

- Control room staff did not detect the abnormal conditions in regards to the release as they occurred.  This resulted in a delayed shutdown of the pipeline.

- The pipeline controller restarted the Line 901 pipeline after the release occurred.

- The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report. PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage. PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

## Final Report Methodology

PHMSA conducted relevant interviews, gathered and reviewed numerous historical documents and available records, and performed a thorough review of the Plains Control Room in Midland, TX. An ILI subject matter expert (SME) was hired to review the raw magnetic flux leakage (MFL) data and final vendor reports from the MFL surveys, and evaluated Plains actions as a result of their review of the vendor reports. PHMSA issued a CAO which in part instructed Plains to have the failed pipe examined by a PHMSA-approved metallurgical laboratory and to have a root cause failure analysis (RCFA) performed by a third party independent consultant.

The factual evidence reviewed includes: the Plains Integrity Management Plan (IMP), CP records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures and reports obtained from the pipeline operator and PHMSA SMEs.

The arrangement of this report provides a general description of the pipeline system, the events that occurred on the day of the release, and acts or omissions of the operator that led to this failure and release of crude oil. Specific evidence is supplied and pertinent statements from each report are excerpted where appropriate.

## Facility Background

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

(1) Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam.  The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.



**Figure 1.** Map of Plains' Western Division Pipelines.  The arrow points to the approximate release site on Line 901.

At Sisquoc Station, crude oil can be pumped to one of two locations: a nearby refinery via a 12-inch diameter pipeline operated by Phillips 66, or continue down Line 903 to Pentland Station. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream.  At Emidio Station crude oil is delivered to above-ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.

Prior to the May 19, 2015 release, there had been four small releases meeting PHMSA reportable criteria at pump stations on Lines 901 and 903. No releases were reported to PHMSA on the pipelines outside of pump stations prior to 2015.  The  operator reported maximum operating pressure (MOP) of Line 901 is 1,341 psig.

At the time of the spill, Plains All American Pipeline (PAAPL) operated Line 901 and Line 903 under a Federal Energy Regulatory Commission (FERC) certificate  of economic regulatory jurisdiction that was issued in 1987.  Plains Pipeline, LP, is a subsidiary of PAAPL.  Based on the FERC filing, Lines 901 and 903 were classified as interstate  pipelines, pursuant to 49 U.S.C. § 60101(7), as facilities used to transport hazardous liquid in  interstate or foreign commerce, and as such, were regulated by PHMSA as interstate pipelines. Plains cancelled the FERC certificates for Lines 901 and 903 on February 12, 2016 and April 29, 2016,

Page **5** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

respectively, stating that the transportation service was no longer available in interstate commerce. Line 903 from Gaviota to Sisquoc to Pentland Stations was purged with nitrogen in accordance with Amendment No. 2 to the CAO, and remains shut down between these stations. The Pentland to Emidio segment of Line 903 is active and operating intermittently at low pressures. This section of pipe between Pentland and Emidio is not directly connected to the Gaviota to Pentland segment and is used to transport crude product from breakout tanks in Pentland Station.

## Events Immediately Prior to and During the Crude Oil Release

On the morning of May 19, 2015, Lines 901 and 903 were transporting crude oil with a flow rate setpoint of 1,240 bbl per hour (BPH) leaving the Las Flores Station, and the discharge pressure was approximately 575 psig.  Pumps were operating at the Las Flores Station on Line 901 and Sisquoc Station on Line 903.  A Plains instrumentation and electrical technician was dispatched that morning to disconnect and remove a motor from a non-operational pump at the Sisquoc Station.  While the technician was performing his work, the operational pump (Pump 401) at the Sisquoc Station was shut down unintentionally (i.e., "uncommanded").  When Pump 401 on Line 903 stopped operating, the pressure in Line 901 increased. The pressure rose to a maximum of 696 psig at the Las Flores Station discharge.  The controller shut down the pump at Las Flores Station and the pressure remained at 677 psig.  Approximately four minutes later, the pump at Las Flores Station was restarted.  At approximately 10:55 a.m. PDT, the flow rate at Las Flores Station climbed from zero to 2,042 BPH.  Concurrently, the line pressure rose to a high of 721 psig, then dropped to 199 psig, and then slightly increased to approximately 210 psig until the Las Flores pump was shut down a second and final time.  Generally, a sudden increase in flow rate accompanied by a decrease in pressure is indicative of a release. PHMSA has determined that Pump 401 going offline in an "uncommanded" manner on the morning of May 19, 2015, was an abnormal event, but that this in itself should not have caused Line 901 to rupture.

PHMSA performed a detailed review of the SCADA event and alarm logs, and pressure and flow records.  The review indicated that there was information reported by the SCADA system that indicated a release had occurred by approximately 10:58 a.m., and an alarm was generated on low pressure.  The alarm was not set at an appropriate value.  The alarm also did not have a major priority/severity or safety-related alarm status.  The controller did not recognize the information he received as indicative of an abnormal operation.  Evidence indicates that the controller was focused on the events at Sisquoc Station (i.e., restarting the Sisquoc pump that had gone down once uncommanded, and a second time on high case temperature along with other duties).[iii]

Due to the Sisquoc Station maintenance activity resulting in an unplanned pump shutdown, the controller anticipated alarms would be activated from the pipeline leak monitoring (PLM) system.  According to interviews and a review of the alarm log, the PLM inhibit was requested by the controller to the step-up shift supervisor between 11:15 and 11:22 a.m.[iv]  The step-up shift supervisor then inhibited (shut off) the PLM system alarms.[v]  Also, during this time, the controller started an investigation of the SCADA data in an attempt to understand the operational abnormalities that were occurring.  After attempting to restart the Sisquoc pump twice, the controller shut down the pipeline.  PHMSA requested the operator review the flow imbalance calculations and provide a time when the PLM system would have generated an alarm if not inhibited, and it was determined that  alarms would have been generated

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

approximately two minutes before the controller shut down the pipeline.[vi]



**Figure 2**. Schematic of Plains Pipeline, LP, Line 901 and spill path.

## Plains' Field Response and National Response Center Notifications

The following is a timeline of Plains and emergency responder activities conducted immediately prior to locating the leak site:[vii]

- At 11:42 a.m. a call reporting a petroleum smell was received at Santa Barbara Fire Department (SBFD) Station 18. Engine 18 left the station to investigate the odor complaint near Refugio State Beach.

- At approximately 12:15 p.m., prior to a scheduled tabletop spill drill required by federal regulations 49 C.F.R. §194, the pre-drill meeting was completed and adjourned. A representative from the Santa Barbara Office of Emergency Management (SB-OEM) received a call from the SBFD reporting that there was oil on Refugio Beach. The SB-OEM representative and the Plains representatives left the spill drill and drove separately to Highway 101 at Refugio Beach.

- The Santa Barbara Dispatch notified the National Response Center (NRC #1116950) at 12:43 p.m. PDT of an unknown sheen in the ocean at Highway 101 and Refugio Beach.[viii]

- At approximately 12:55 p.m., the two Plains representatives arrived at the south side of Highway 101 where the SBFD personnel were. They noted oil in the ocean but could not determine the source of the oil. One of the Plains representatives told the assembled group that he did not think the oil was coming from Line 901 because the pipeline is located on the other side of Highway 101, and there would be oil flowing across Highway 101 if Line 901 was leaking.

Page **7** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- The Plains representatives drove to the company's pipeline right-of-way (ROW).  At approximately 1:27 p.m., the Plains representatives located the leak site on the Plains ROW.  They called the controller to report the leak and to tell the controller to leave Line 901 shut down and to close the Refugio gate valve.  The Plains representatives used their cell phones to contact other Plains personnel, the landowner where the leak occurred, Plains' oil spill response contractors, and others.  The Plains representatives noted that crude oil from the release site had entered a culvert that crosses under the Highway 101 and railroad tracks and discharges to Refugio Beach.  The Plains representatives, along  with Fire Department personnel, attempted to stop the flow of oil into the culvert.  However, the culvert was too large to stop the flow with shovels, and sand bags were not  readily available, so their immediate efforts were unsuccessful.  At approximately 3:00 p.m., additional equipment and  personnel arrived, the culvert was dammed and oil was prevented from entering the  culvert.

- At 2:56 p.m., a representative from Plains called the NRC to report (NRC #1116972) the release of crude oil  at 2:56 p.m. PDT. This report indicated that the release was at Latitude: 34° 27' 43" N; and  Longitude: 120° 05' 24" W.  This NRC report was made 89 minutes after the release site was  found by Plains field personnel.[ix]



**Figure 3**. Spill location relative to Refugio Beach in Santa Barbara County, CA. Photo: John L. Wiley http://flickr.com/jw4pix

Federal pipeline safety regulations, (49 C.F.R. § 195.52), require that the NRC be notified at the earliest practicable moment following discovery of a release of a hazardous liquid, including "[a]ny failure that resulted in pollution of any stream, river, lake, reservoir, or other similar body of water that violated applicable water quality stands, caused a discoloration of the surface of the water or adjoining shoreline, or deposited a sludge or emulsion beneath the surface of the water or upon adjoining shorelines."  On January 30, 2013, PHMSA issued an

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Advisory Bulletin clarifying that this was to be interpreted as within one hour of discovery.  Plains reported the rupture to the NRC approximately 89 minutes after discovery, thus notifying the NRC 29 minutes late.

The estimated costs reported by the operator as of December 23, 2015, were $142,931,884. This figure includes all costs the operator spent as a result of this release through the date reported, including commodity lost, the operator's property damage and repairs, operator's emergency response, environmental remediation, and estimated other costs spent including government agency costs and media relations expenses.[x]

## PHMSA's Corrective Action Order

On May 21, 2015, PHMSA issued a CAO, CPF No. 5-2015-5011H, to Plains.   The  CAO required Plains to purge Line 901; review the pipeline's construction, operating,  maintenance, and integrity management history; expedite the review of data from the May 5,  2015, ILI tool run; conduct metallurgical evaluation of the failed pipe; repair any   integrity-threatening anomalies identified by the ILI survey; and conduct a root cause failure  analysis.  The CAO requires Plains to purge Line 901 and to keep Line 901 shut down until PHMSA approves the restart of the pipeline.  Plains' Line 901 was purged and filled with an inert nitrogen gas on June 18, 2015.

On June 3, 2015, PHMSA issued Amendment No. 1 to the CAO.  The amendment was issued to address preliminary findings from the early stages of PHMSA's investigation, and the possibility that the conditions on Line 901 also existed on Plains Line 903.   The amendment to the CAO  required Plains to conduct additional non-destructive testing of ILI anomalies on Lines 901 and  903; review the construction, operating, maintenance, integrity management, and ILI history of  Line 903; and reduce the operating pressure of Line 903 to 80% of the highest pressure sustained  for a continuous 8-hour period during the month before the May 19 failure.  This pressure  reduction was intended to enhance safety until all facets of the line's integrity could be evaluated.

On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO.  The amendment required Plains to empty and purge Line 903 between Gaviota and Pentland Stations and fill it with an inert gas.  Line 903 was purged between Gaviota and Pentland Stations and filled with inert nitrogen.  The complex purging operations began in December 2015, and were completed on April 18, 2016.  Both Line 901 and the purged sections of Line 903 will remain shut down until all actions required by PHMSA's CAO and subsequent amendments have been completed.  PHMSA may continue to issue additional amendments to the CAO as necessary.

## Pipeline Alignment

### Las Flores Station to Gaviota Station Line 901 Elevation Description

To fully understand the Line 901 release, it is vital to understand the elevation profile of Line 901 and Line 903 from the Las Flores Canyon to Pentland Station.  Line 901 starts at the Las Flores Station at an elevation of approximately 180 feet.  There are two large hills downstream of the originating pump station.  The first hill has a peak elevation of approximately 740 feet and the second hill has an elevation of approximately 600 feet.  The release occurred downstream of the second hill at an elevation of approximately 80 feet.  Immediately downstream of the release point, the pipeline rises slightly and then runs relatively level approaching the Gaviota station.  This fact is important because as soon as the pump at Las

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Flores Pump Station was turned off the second time, the only crude oil that could be released was the height of oil in the pipeline above the release site and not the amount located between the two aforementioned hills.

## Gaviota to Pentland Station Line 903 Elevation Description

Line 903 receives all of the crude oil delivered by Line 901. The line elevation at Gaviota is approximately 150 feet.  The elevation at Sisquoc is approximately 880 feet.  Downstream of Sisquoc,  Line 903 rises to 2,420 feet and then to a height of approximately 2,750 feet and ultimately to an elevation of close to 3,000 feet before dropping into Pentland Station at an elevation of approximately 690 feet.  Line 903 exhibits many of the same construction and operation conditions as Line 901 and was addressed by the amendments to the CAO. Pump 401 at Sisquoc Station has adequate capacity to push the oil up and over the downstream hills and into Pentland Station but only if it has full suction pressure and full flow coming into the pump. Because of the release, the pump could not push the oil over the downstream hills, and so the oil in the pump became hot and the pump shut down to prevent overheating.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Post-Incident Investigation Results

### Metallurgical Evaluation of Failed Pipe

The failed pipe segment has been analyzed by third-party metallurgical experts, Det Norske Veritas (U.S.A.), Inc.'s (DNV-GL) in Dublin, OH.  The failed pipe assessment and testing was witnessed  by PHMSA, the California Department of Fish and Wildlife, and the U.S. Department of Justice.



**Figure 4**. The failed pipe and surrounding insulation and coating.



**Figure 5**. Pipe External Surface at the Line 901 failure site after cleaning.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

DNV-GL's draft report was completed and disseminated to Plains and PHMSA on August 6, 2015.  The draft report was reviewed by PHMSA engineers, and a number of comments and clarification  requests were made.  DNV-GL reviewed the comments and revised the report. The Final Report  was issued on September 18, 2015.

The Final Report provides a summary of findings, including the following excerpt:

"The results of the metallurgical analysis indicate that the leak occurred at an area of  external corrosion that ultimately failed in ductile overload under the imposed operating  pressure.  The morphology of the external corrosion observed on the pipe section is  consistent with corrosion under insulation facilitated by wet-dry cycling."[xi]

## In-Line Inspection Survey Review

Plains conducted ILI surveys on Line 901 (10.7 miles in length) to assess the integrity of the pipeline in accordance  with PHMSA regulations in 2007, 2012, and 2015.  According to 49 C.F.R. § 195.452(j)(3), the pipeline is required to be surveyed at  intervals commensurate with the pipeline's risk of integrity threats, but at least every 5 years.   Plains changed Line 901 from a 5-year assessment cycle to a 3-year assessment cycle after the 2012 ILI survey.

The data collected during these surveys must be fully evaluated within 180 days of the ILI, and an operator must take action upon discovery of any "immediate repair conditions" as defined in 49 C.F.R. § 195.452(h) unless the operator can demonstrate that the 180-day period is impracticable.

The most recent ILI survey for Line 901 was completed on May 6, 2015.  The 2015 ILI survey data for  the first 2 miles of Line 901, as measured from the Las Flores Station, was found to be incomplete and not useable for ILI analysis.   For the rest of the ILI survey, the correlation digs,  which are used to gauge survey data accuracy in the ILI vendor's preliminary report, had not been finished  at the time of the May 19, 2015 failure.

PHMSA's independent third-party ILI SME also performed an analysis of the data from past ILI surveys of  Line 901.  Preliminary data from the results of each of the ILI surveys are summarized below  and show a growing number of corrosion anomalies on Line 901.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

**Number of Anomalies**

| Metal loss | June 19, 2007 | July 3, 2012 | May 6, 2015 |
|---|---|---|---|
| Greater than 80% | 0 | 0 | 2 |
| 60-79% | 2 | 5 | 12 |
| 40-59% | 12 | 54 | 80 |

The May 6, 2015 ILI survey data and subsequent analysis by the ILI vendor predicted external corrosion at the failure site with an area of 5.38 inches by 5.45 inches, and a maximum depth of 47% of the original pipe wall thickness.  After the failure, the DNV-GL metallurgical investigators physically measured external corrosion at the failure site to have a maximum depth of 89%.[xii]  The dimensions of the corrosion feature were 12.1 inches axially by 7.4 inches in circumference.  The maximum depth, as measured using laser scan data, was 0.318 inches or 89% of the measured wall thickness (0.359 inches).

The ILI summary report prepared by PHMSA's SME also examined the "as-called" (ILI-predicted) versus as-found (field measured) lengths, widths and area for the excavated anomalies on Line 901.  The report demonstrates that the lengths and widths of the anomalies were under-called (underestimated) in many cases, however many were also over-called. Plains submitted little documentation concerning their analysis of how the field measured anomalies compared to the ILI vendor analysis.  Furthermore, Plains did not provide documentation showing that discrepancies between the originally reported anomaly sizes predicted by the ILI vendor and Plain's actual field-measured sizing of the corrosion anomalies were subsequently discussed with the ILI vendor, as required by Plains' IMP.[xiii]

## Cathodic Protection Findings

According to 49 C.F.R. § 195.563, CP is required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines.  Historical CP records for line 901 have been reviewed and reveal protection levels that typically are sufficient to protect non-insulated, coated steel pipe. Line 901 and Line 903, however, are insulated.  An increasing frequency and extent of corrosion anomalies were noted on both Lines 901 and 903 in ILI survey results, anomaly excavations, and repairs.  PHMSA inspectors noted moisture entrained in the insulation at four excavations performed by Plains on Line 901 after the May 19 spill and prior to the PHMSA-mandated purging of the pipelines.

## Spill Volume Estimate from Plains' Third-Party Consultant

Plains initially estimated the volume of spilled crude oil to be approximately 2,400 bbl, of which 500 bbl was estimated to have reached the ocean.   On  August 4, 2015, Plains reported to the Unified Command that the 2,400  bbl release estimate was still accurate.  However, after Plains completed the PHMSA-mandated purge, the  company's calculations indicated that up to 3,400 bbl had possibly been released from the  pipeline.   Plains notified the Unified Command

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

that RPS Knowledge Reservoir (RPS), a third-party investigator hired by Plains, was still trying to reconcile the difference.

On November 24, 2015, Plains informed PHMSA that RPS had completed their analysis regarding the release volume and produced a report of findings. RPS used the OLGA simulation software tool to model the behavioral dynamics of the pipeline prior to, during, and immediately after the May 19, 2015 leak. The report concluded that the discharge leak volume was 2,934 bbl. The RPS report was dated November 11, 2015. Plains has reported 1,100 bbl of crude oil have been recovered.

## Investigation Findings and Conclusions

Line 901 pipeline ruptured at approximately 56% of the MOP. Although the operational events that occurred on the morning of the release were abnormal, this should not have caused the release if the pipeline's integrity had been maintained to federal standards.

### Proximate or Direct Cause

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated, 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.

PHMSA's investigation identified numerous contributory causes of the rupture. The contributory causes can be grouped into three categories: 1) ineffective protection against external corrosion of the pipeline; 2) failure by Plains to detect and mitigate the corrosion;, and 3) lack of timely detection of the rupture. Below is a summary of the key contributory causes:

### Contributory Causes

1) Ineffective protection against external corrosion of the pipeline

   - Plains' CP system was ineffective in protecting thermally insulated underground pipeline systems from external corrosion. Industry practices recognize that an impressed current system like the one utilized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised. The external coating in the area of the rupture had allowed moisture to enter the insulation adjacent to the steel pipe.[xiv] Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised.[xv]

2) Failure by Plains to detect and mitigate external corrosion

   - Plains did not identify CUI as a risk-driving threat in their federally-mandated integrity management program (IMP).

Page **14** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- Plains' did not fully implement their IMP.
    - Plains did not perform suitable analysis of the field measurements of the excavated corrosion anomalies that occurred after ILI surveys were completed in 2007 and 2012.
    - The data reported by the ILI vendor were inconsistent (and did not meet the published accuracy of the ILI tools of +/- 10%, 80% of the time for depth) when compared to the results of the field-measured corrosion anomalies.
    - Plains' as-found field measurements of corrosion anomalies were inconsistent with the as-called vendor-provided ILI data and analytical reports. ILI surveys conducted in 2007 and 2012 revealed inconsistencies in the character of the anomalies. In both of these cases, Plains did not consult the ILI vendor to help resolve the inconsistency.
    - Plains failed to follow written procedures directing the IMP group to perform appropriate statistical analysis after the anomaly dig reports were received from the field, and to discuss any inconsistencies with the ILI vendor.[xvi]
        - Plains' Pipeline Integrity group created a unity plot for depth after the 2012 ILI survey and anomaly digs. There is no documentation detailing what was done with the information from the unity plot.
    - Plains incorrectly added the over-called anomalies in the close-out reports.
        - The close-out reports should have only reported the anomalies that were within the reported accuracy of the ILI tool. The reported tool accuracy is +/- 10 %, 80 % of the time. Adding the overcalled anomalies outside of the tool accuracy skews the data.
- Plains' Pipeline Integrity group was historically focused on pitting corrosion under "shrink sleeves" at the pipeline girth welds (circumferential welds to join pipe segments).
    - The release location was within 6 feet of a corrosion anomaly that was exposed and repaired after the 2012 ILI survey. There was evidence of corrosion and degraded coating systems between the 2012 repair site and the 2015 rupture site.
    - The anomaly that ruptured was called out by the ILI tool at 45% depth in 2012. Plains' IMP specified adding 10% to all anomalies (55% depth in this case) then "growing them" to predicted failure using an anticipated corrosion growth rate. This analysis would provide a predicted failure time. Plains did not excavate the anomaly that failed.

3) Lack of timely detection of and response to the rupture

- The controller did not have information communicated from the SCADA system in such a manner to be successful in detecting abnormal operations. The pipeline SCADA system did not have safety-related alarms on low pressure configured at the

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

correct value or priority to alert the control room staff of the rupture. When this alarm was provided to the controller, the discharge pressure at Las Flores was 199 psig but, within a minute, pressure elevated above 210 psig, the alarm status cleared, and the discharge pressure remained above 200 psig (approximately 210-211 psig) until the pipeline was purged. The pipeline was still leaking when the discharge pressure at Las Flores was above 200 psig, and continued to do so without additional alarm indications. When the pipeline was down, isolated but still leaking, the minimum pipeline discharge pressure at Las Flores remained at 210-211 psig. The low discharge pressure alarm setpoint value was not set properly as it should have been above 211 psig. This type of alarm should be identified as a high priority safety related alarm. While the controllers and shift supervisors can access historical trend data or continue to monitor a given pressure or flow, when the pipeline was ultimately shut down at 11:30 a.m., neither the controller nor step-up shift supervisor detected any drop of pressure at the specific failure location that would indicate that oil was being released.

- Neither the pipeline controller nor step-up shift supervisor detected the initial abnormal conditions as the release occurred. There was an indication of decreased pressure and increased flow between 10:53 and 10:58 a.m., which is consistent with a pipeline release. This resulted in a delayed shutdown of the pipeline. Adequate alarm setpoint values with correct priorities are essential to controller and shift supervisor recognition of abnormal operations, especially when many pipeline systems are operated from the same console.

- The pipeline controller restarted Line 901 after the release occurred.

- The pipeline leak detection system lacked instrumentation and associated calculations to monitor line pack.

  o The function of the PLM system was a simple line balance calculation based on flow meter values without line pack considerations. The PLM relies on comparing "meter in – meter out" calculations over time. This type of leak detection system without the use of safety-related, high-priority, low-pressure alarms does not provide the controller or shift supervisors with adequate information when the pipeline is down.

  o When the pipeline is not running, even if only due to scheduling and not required maintenance activities, flows will be close to zero and the imbalance calculation will provide little if any value as currently configured. Leak detection on a down pipeline requires a robust system of planned and accurate high-priority alarm types and alarm setpoint values in order for response to occur on critical low pressures.

  o The leak detection system for Lines 901 and 903 consists of two leak detection segments. Additional instrumentation such as pressure and temperature transmitters located at Refugio Gate and Cuyama valve settings (both transmitter types on each side of the valves) would allow additional information about the operating status of the pipeline to be presented and pack calculations pursued.

  o Plains utilizes the SimSuite application for other pipelines in the control

Page **16** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

center.  This application does allow for pack calculations to be utilized in the leak detection system.  According to information obtained during meetings with Plains hydraulic specialists, Lines 901 and 903 were pipeline systems with a low to medium priority defined for future modeling efforts compared to other assets in the Plains operations. The approach utilized by Plains for prioritizing which systems should be modeled first did not appear to take into account all appropriate consequence-based asset impacts (such as culverts providing a pathway to the ocean) associated with these two systems. Existing instrumentation and the need for added instrumentation would factor into this prioritization decision.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as alarms.

  o Interviews determined that the step-up shift supervisor and shift supervisor training lacked formalized and succinct requirements, including that for leak detection system functions such as "inhibit" options.  The interviews determined that different shift supervisors performed PLM inhibit functions without contacting the console supervisor first as required by procedure.

  o Step-up and shift supervisor responsibilities include emergency shutdown of any pipeline.  However, training does not cover a means by which to accomplish this for all relevant pipelines.  A general emergency shutdown provision has not been programed for supervisory use on all systems.

- The oil spill response plan required by 49 C.F.R. §194 did not account for a culvert near the release site that traversed the Pacific Coast Highway and Amtrak railroad tracks.  This culvert provided a quick flow path between the pipeline ROW and the Pacific Ocean, thereby allowing crude oil to flow easily towards Refugio State Beach and the ocean.  The response plan did not have a response strategy that considered the presence of the culverts.

Page **17** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## PHMSA Post-Incident Action Chronology

Following the May 19, 2015 Plains Pipeline, LP, Line 901 rupture in Santa Barbara County, CA, PHMSA took the following actions:

- On May 19, 2015, PHMSA deployed inspectors to investigate the Plains Pipeline LP Line 901 pipeline failure in Santa Barbara County, CA.  PHMSA also provided information updates to the Unified Command (UC), US Coast Guard, the Federal on Scene Coordinator (FOSC), State Fish and Wildlife, and other agencies on site.
- On May 21, 2015:
  - PHMSA issued a Corrective Action Order (CAO), CPF No. 5-2015-5011H,  to Plains Pipeline LP ordering it to suspend operations and to specific safety actions to further protect the public, property, and the environment from potential hazards associated with the recent failure.  PHMSA staff reviewed the CAO with the operator and briefed the California State Attorney on the CAO and provided an overview of PHMSA's regulations.
  - PHMSA sent an inspector to Plains' control room in Midland, Texas to collect operational data and interview the control room operators on duty at the time of the incident and their supervisors.  The inspector gathered any pertinent logs and information, including electronic copies of relevant data from the Supervisory Control and Data Acquisition (SCADA) system.
  - PHMSA staff worked with the operator to review their plan to expose the pipe and to cold tap it to ensure there was no pressure or crude left in the line at a low spot immediately downstream of the release point. The plan was signed off by the UC at approximately 5 pm PDT.
- On May 22, 2015:
  - PHMSA staff met with representatives from the Assistant U.S. Attorney, DOT Inspector General, EPA Criminal Investigation Division, California Attorney General, and others to brief them on PHMSA's process for securing and transporting the failed pipe to a metallurgical lab for evaluation.
  - PHMSA staff remained on the scene as the operator exposed, tapped, removed any remaining product, and excavated the pipeline downstream of the release site.
- On May 25, 2015:
  - PHMSA issued an approval letter for Plains to excavate, remove and secure the failed joint of pipe under the supervision of two DNV metallurgists (third party contractor) but requested that the coating and insulation not be touched until the failed pipe has been removed because the DNV personnel were interested in in gathering available samples there as well.
  - A PHMSA inspector returned to Midland, TX to interview the controller and the Operations Control Center supervisor and to obtain any handwritten logs created by the controller on the morning of the release.
- On May 28, 2015:
  - A PHMSA investigator was on site when affected pipeline was removed, crated, and transported to secure location for metallurgical evaluation.  PHMSA retained a third-party ILI expert to examine the 2012 and 2015 ILI runs. DNV personnel took soil and insulation samples.
- On June 3, 2015, PHMSA amended the CAO to address preliminary findings from the early stages of the investigation (Amendment No. 1).  The amended CAO mandated

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

additional safety requirements on Line 901 and expanded the scope of the CAO to include the 128-mile long Line 903, which is located downstream of Line 901.  The amendment reduced the operating pressure of the Lone 903 by 80% of the highest 8 hour continuous pressure between April 19, 2015 and May 19, 2015.  On May 30, 2015, Plains voluntarily shutdown Line 903.

- On June 18, 2015, PHMSA staff monitored the Line 901 purge to ensure safety during the purging process. Plains completed the purge and injected inert gas in Line 901.

- On September 18, 2015, PHMSA received the DNV Final Mechanical and Metallurgical Report.  PHMSA staff reviewed the document and provided comments.

- On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO, which ordered Plains to purge and shutdown Line 903 from Gaviota to Pentland.

- On December 1, 2015, PHMSA staff monitored Plains moving Freeport McMoRan crude oil from their offshore platforms into Line 903 from Gaviota Station to Sisquoc Station. Movement of the Freeport McMoRan oil was completed on December 10, 2015.

- On December 4, 2015, PHMSA staff received the DNV Root Cause Failure Analysis Report.  PHMSA reviewed and commented on the report.

- On December 14, 2015, PHMSA staff monitored the purge process on Line 903 from Gaviota Station to Sisquoc Station. The purge was completed on December 18, 2015 and the line was filled with inert gas.

- On February 17, 2016, PHMSA issued a Preliminary Factual Final Report.

- On April 2, 2016, PHMSA staff monitored the Line 903 Sisquoc to Pentland portion purge that was completed on April 18, 2016.  Line 901 and 903 are shutdown, except for the Pentland to Emidio section of Line 903, which is not connected to 903 any longer.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## APPENDICES

A.  Investigation Summary Detail

B.  Supervisory Control and Data Acquisition (SCADA) Log Excerpts

C.  Pipeline Leak Monitoring Details

D.  Excerpts and Discussion of Plains Integrity Management Plan (IMP) Requirements

E.  Corrosion Control and Pipeline Conditions

F.  Industry Standards and General Requirements for In-Line Inspection

G.  In-Line Inspection Report

H.  PHMSA's Independent Analysis of In-Line Inspection Data

I.  Maps and Photographs

J.  National Response Center Report #1

K.  National Response Center Report #2

L.  Form PHMSA F 7000.1: Accident Report for Hazardous Liquid Pipeline Systems

M.  Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Mechanical and Metallurgical Testing

N.  Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Technical Root Cause Analysis

O.  NACE International: Effectiveness of Cathodic Protection on Thermally Insulated Underground Metallic Structures

---

[i] According to the *FRACTURE CONTROL TECHNOLOGY FOR NATURAL GAS PIPELINES CIRCA 2001* (the PRCI report superseding NG-18 Report 208): "The distinction between leak and rupture for the pipeline community is based on the size and configuration of the breach, not how it develops." Based on these calculations and visual observations, the length of the feature is consistent with a leak, arresting within the corrosion feature, and did not propagate outside of the feature into nominal wall-thickness pipe. According to the instructions for completing PHMSA Accident Form 7000-1, this type of accident would be classified as a rupture since PHMSA defines a "rupture" as a "loss of containment that immediate impairs the operation of the pipeline".

[ii] The remedial action plan requires: a) investigation and remediation of anomalies on Line 901 (including anomalies requiring repair per 49 C.F.R. § 195.452(h) and similar anomalies); b) analysis of field measurements taken from anomaly investigations; c) re-grade of previous in-line inspection (ILI) data from 2012 and 2015 ILI surveys using an expanded set of interaction criteria; d) additional integrity assessments using a circumferential magnetic flux leakage (MFL-C) ILI tool and integration of MFL-C ILI data with previous ILI survey results; e) investigation and remediation of anomalies that are identified in the MFL-C tool run (if any); f) based on information collected from remedial work plan and root cause analysis report released by Det Norske Veritas (U.S.A.), Inc., improving the integrity management program; and g) integrity studies to reduce spill volumes, including an emergency flow restriction device evaluation and a surge study. Completion of the remedial work plan is required prior to the PHMSA Western Region Director approving a restart plan and return to service for Line 901.

[iii] High case temperature refers to the oil temperature inside the pump cavity.  The case holds the pump impeller

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

---

where oil passes through.  This was a centrifugal pump that continues spinning whether there is product in the pump or not.  When the rupture occurred, there was not enough pressure or flow rate to allow the pump to continue pumping the oil over the hills and into Pentland Station.  Therefore, the oil that was in the pump remained in place and as the pump continued to spin, and temperature was reported to the SCADA system.  If the pump reaches the high temperature setpoint, the pump shuts itself off to protect itself from burning up.

[iv] The PCR utilizes two shift supervisors to cover the entire set of 22 consoles.  The California Console is handled by shift supervisor B.  The shift supervisor B position at the time of the failure was filled by a step-up shift supervisor.  A step-up shift supervisor is a controller who is currently qualified on a specific console in the PCR and has received some informal training by working on shift with other shift supervisors.  Step-up shift supervisors are used to cover the shift supervisor positions when additional personnel are needed due to illness, vacation, training, etc.  Plains has indicated that two step-up shift supervisors are not allowed to be on duty at the same time so one shift supervisor is paired with a step-up shift supervisor when additional personnel is needed.

[v] PLM is the SCADA vendor software tool that serves as the leak detection system for PCR.

[vi] *See* Appendix B.

[vii] SCADA Data/Plains Control Room time is local to the Central Time Zone.  A two-hour time difference separates Central Time from Pacific Time, with Central Time falling two hours ahead. The release occurred in the Pacific Time Zone which is two (2) hours earlier.  All times in this report have been adjusted to Pacific Time.

[viii] *See* Appendix J.

[ix] *See* Appendix K.

[x] *See* Appendix L.

[xi] *See* Appendix M.

[xii] PHMSA has access to this data through a view-only web portal.

[xiii] *See* Appendix G.

[xiv] The inability of an impressed cathodic protection system to protect insulated pipelines was most recently reaffirmed in the National Association of Corrosion Engineers (NACE) Publication 10A392 (2006 Edition) – "Effectiveness of Cathodic Protection (CP) on Thermally Insulated Underground Metallic Structures."

[xv] *See* NACE Report at Appendix O, Background section stating that "[o] n most thermally insulated oil and gas transmission pipelines installed prior to 1980 to 1981, a shop mold-formed thermal insulation was placed directly over the bare steel pipe, with an outer jacket applied to moisture-proof the system. At the field joint, preformed insulation half shells were applied over the joint area to fit between the ends of the shop-applied insulation. After the insulation was fitted, a heat shrink sleeve or a tape wrap was applied over the insulation. When the integrity of the outer moisture barrier was compromised, the space, gap, or void between the edges of the preformed half shells and the shop-applied insulation allowed oxygenated water to diffuse to the bare steel beneath. Damage to the outer moisture barrier has also occurred remote from the joint, allowing oxygenated ground water ingress.

"Thermally insulated pipelines have experienced relatively aggressive corrosion, with some failures occurring within three years of service, although acceptable industry standards of CP had been applied and maintained shortly after line construction. The most predominant failures have been those occurring at joints; however, moisture has migrated along the pipeline steel surface to create electrochemical corrosion cells remote from the field joint, culminating in extensive replacements of substantial lengths of line. An article titled 'Corrosion of Underground Insulated Pipelines' supports this committee's conclusions that sufficient CP current from an external source may not reach the insulated metallic surface in sufficient quantity to establish adequate corrosion control."

[xvi] *See* Appendix D.

# EXHIBIT D

# California Legislature

September 27, 2024

Delivered Electronically

Mr. Joe Tyler, Director/Fire Chief
Mr. Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
P.O. Box 944246
Sacramento, CA 94244-2460

**Re: Transparency and Public Engagement in OSFM's Determination of Whether to Restart Pipelines CA-324 and CA-325**

Dear Mr. Tyler and Mr. Berlant,

It has come to our attention that the Office of the State Fire Marshal ("OSFM") is considering whether to allow Sable Offshore Corp. ("Sable") to restart the pipeline that caused the 2015 oil spill at Refugio State Beach Park. We write to express our concern regarding the process used by the OSFM to consider approving a project that would invite another coastal oil spill and impact the safety of the Central Coast community.

The restart of this pipeline, now known as CA-324, and related facilities, including three offshore drilling platforms, and the onshore oil processing facility at Las Flores Canyon, is a matter of profound importance to our constituents along the Central Coast. When this pipeline ruptured in 2015, the effect on nearby communities was catastrophic. The spill devastated at least 150 miles of coastline, forced the closure of fisheries and beaches, killed an untold number of marine mammals, cost hundreds of millions of dollars to clean up, negatively impacted local businesses, and caused an estimated 140,000 lost recreational user days between Santa Barbara, Ventura, and Los Angeles Counties. Many of the restoration projects were funded just last year and have just begun work.[1]

---

[1] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 18 (June 2021) [hereinafter "NRDA"], available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.

CA-324 and CA-325 do not have effective protection against corrosion, which is ultimately what caused the 2015 spill.[2]  Without protection from corrosion, another spill from these pipelines is incredibly likely.  When Santa Barbara County was considering a proposal to replace these pipelines, it estimated the pipelines would result in a spill once a year, and a rupture once every four years.[3]  The County also estimated that another spill from these pipelines could be twice the size of the 2015 spill — even if the pipelines are retrofitted with automatic shut-off valves.[4]

In light of the threat to public health and safety that these facilities pose, several community organizations asked OSFM for increased transparency and public engagement as it considers whether to restart CA-324 and CA-325.  In response, OSFM agreed to "[h]old public meetings and engage with the public at appropriate milestones for a potential restart.'[5]

OSFM has approved a Risk Analysis, which Sable is now implementing. OSFM is also currently reviewing Sable's application for a state waiver to allow this pipeline to operate without meeting Federal standards or fixing the flaws that caused it to rupture almost 10 years ago. We understand that OSFM is scheduling a public hearing in mid-October, but we have heard concerns that this could be after a determination of the state waiver, which would allow for the functional restart of the pipeline with no opportunities for public participation. We believe it would be helpful to invite public review and comment on the available information before any decision is finalized.

We would urge the OSFM to be as transparent as possible with the documents that are germane to public participation. The safety of these pipelines is a serious concern for many in our community, and it is important that the public is aware of the conditions of the pipelines and what is being done to make them operate safely.

The OSFM is a public agency working on behalf of the people of California, specifically charged with "safeguard[ing] our communities" from the inherent hazards in oil and gas transportation.[6] We are concerned that the people of California will be left holding the bag for the exorbitant clean-up costs if Sable, a speculative company with no operational assets, files for bankruptcy.

With the significant health, fiscal, and environmental risks posed with this restart, public participation is essential to ensuring that OSFM makes fully informed decisions. As an agency

---

[2] Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California*, pp. 13-14 (May 2016) [hereinafter "PHMSA Report"], available at: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

[3] Santa Barbara County Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 79.

[4] *Id.*

[5] *See Pathways for Restarting Pipelines*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited Sept. 17, 2024).

[6] *Pipeline Safety and CUPA*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa (last visited Sept. 17, 2024).

acting on behalf of the public, it is important that OSFM understand the views of the public to maintain a level of trust in our government agencies. We respectfully request the following:

- Release all documents pertinent to Sable's restart, unless OSFM is prohibited from doing so by law;
- Conduct environmental review pursuant to the California Environmental Quality Act, to ensure consideration of potential environmental impacts before decisions are made; and
- Hold public meetings and invite public comment at each step of the restart process *before* making any determinations.  As identified on the OSFM website, those steps would include, for example, implementation of the Risk Analysis, OSFM's consideration of a State Waiver, deferred maintenance that must be completed, and consideration of a Restart Plan[7].

We have grave reservations regarding the restart of CA-324 and CA-325, which have *already* caused a catastrophic oil spill, and which Sable intends to restart without effective protection from corrosion. Again, one governing body has already found that proceeding in this manner would inevitably lead to another oil spill, one that could be twice the size of the 2015 disaster.[8]

Thank you for your consideration of our comments and your prompt attention to this matter.

Sincerely,

**Monique Limón**
Senator, District 19

---

[7] *Pathways for Restarting Pipelines*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited Sept. 17, 2024).
[8] Santa Barbara County Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 79.

Cc: Jim Hosler, Assistant Deputy Director, Pipeline Safety and CUPA

# EXHIBIT E

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Evaluation of Las Flores Pipeline System Startup Proposal*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**December 20, 2024**

Accufacts Inc. 12-20-24

## Table of Contents

I.   *Executive summary and major findings* ...........................................................................*1*

II.  *Accufacts experience qualifying me as an expert in this matter.*................................*3*

III. *A brief historical perspective*........................................................................................*4*

IV.  *The Las Flores Pipeline System.* ...................................................................................*5*

V.   *TIMP regulations are not working to protect the public or the environment.*.........*8*

    1) Hydrotesting assessments. .......................................................................................**8**

    2) ILI assessments. ...................................................................................................**10**

VI.  *The greatest threat on the Las Flores Pipeline System is from external corrosion.* .................................................................................................................... **11**

VII.  *High pipeline operating temperatures accelerate all forms of corrosion.*........... **13**

VIII. *The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.*...................................... **14**

IX.  *The poorly designed Pipelines cannot be made as safe as new pipelines.*.............. **14**

X.   *Conclusion.* .................................................................................................................. **15**

## I.    Executive summary and major findings

Accufacts Inc. ("Accufacts") was asked to review the documents related to the Las Flores Pipeline System ("Pipelines") for possible restart.  A Consent Decree signed in March, 2020 places responsibility for approving processes related to the onshore pipeline system restart on the California Office of the State Fire Marshal, or OSFM, the agency responsible for intrastate hazardous liquid pipeline safety.[1]  The Consent Decree replaces various Corrective Action Orders issued on the Pipelines by the Pipeline and Hazardous Materials Safety Administration, or PHMSA, the federal agency responsible for pipeline safety.[2]  PHMSA is the federal agency responsible for establishing minimum pipeline safety regulations for many pipelines operating in the U.S., including intrastate hazardous liquid transmission pipelines.  States meeting certain conditions can impose pipeline safety standards for intrastate pipelines beyond PHMSA regulations as long as such state regulations are not in conflict with PHMSA regulations.  By agreement, the Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed wavier alternative measures "provide an equal or greater level of safety."[3, 4]  The Consent Decree is inadequate, missing many corrosion threats to the Pipelines that can result in rupture.

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1. **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2. **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3. **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4. **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

---

[1] Such state responsibility is dependent on whether the state agency meets certain qualifications required by PHMSA and whether the state Legislature has granted such state authority, as California has.

[2] UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, ex rel. DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, ex rel. CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, ex rel. CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, ex rel. CALIFORNIA STATE LANDS COMMISSION, ex rel. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARCHALL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (Plaintiffs) v. PLAINS ALL AMERICAN PIPELINE L.P. and PLAINS PIPELINE, L.P. (Defendants), Consent Decree, Civil Action No. 2:20-cv-20415 signed March 2020 ("Consent Decree").

[3] *Ibid.,* Appendix B & Appendix D, paragraph 1.

[4] PHMSA website, " Special Permits and State Waivers Overview," at https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

Accufacts Inc. 12-20-24                                                                    Page 1 of 15

Oil spills are catastrophic events, and operation of any pipeline carries a risk of spill. At best, good pipeline design and pipeline integrity management tools can reduce—but not eliminate—the risk. The Consent Decree is replacing incomplete integrity management ("IM") approaches implemented by Plains that failed to prevent a pipeline rupture from the poor design of the Pipelines, with another incomplete IM approach expecting a change in the outcome.

The Pipelines have been sitting shut down for over nine years at ambient temperatures without effective CP protection.  While external corrosion rates in this shutdown mode are significantly reduced because of lower temperatures as discussed later in this report, **the risk of external corrosion is not eliminated**.  The Consent Decree requires the OSFM to seek a waiver of the federal pipeline safety CP requirements defined under Subpart H, subject to the approval of PHMSA, to permit the Pipelines to restart.[5, 6]  Complicating this matter is the incorporation of risk analysis by the state into the Consent Decree that is under the control of the pipeline operator and is not made fully public, but subject only to the "review and comment" of the OSFM.  To be fair, the OSFM must meet certain state legislated risk analysis requirements that though well-meaning, are incomplete, such as, for example, how to define what a reasonable worst-case discharge is to prudently evaluate the risk of a pipeline failure.[7]  This is a problem I often see abused in federal pipeline oil spill response plans that doesn't adequately capture pipeline rupture hydraulics.[8]  One of the major problems with risk analysis, a determination of the likelihood of an event occurring, and why it is not codified into federal pipeline safety regulations, is that such approaches are usually not complete or representative of the true risks of a specific pipeline operation.  The impacts of any pipeline failure are significant and long-lasting, causing destruction of habitats, death of wildlife, and even human fatalities. It is impossible to predict a pipeline failure, and decision-making based on the perceived probability of failure does not adequately account for the severe consequences that will ensue, particularly if those decisions fail to capture pipeline rupture hydraulics. I call this "Space Shuttle Syndrome," because, in the rush to launch the space shuttle program, NASA decisionmakers understated its true risks and dismissed well established safety culture protocols, resulting in the loss of two space shuttles and their crews and ending the space shuttle program.

The Consent Decree is placing undue responsibilities on the OSFM which might not appreciate the limits of current inline inspection technical capabilities.  The Consent Decree overly relies on ILI technologies and their associated engineering critical assessments that are not capable of prudently addressing many forms of external corrosion, especially interactive forms such as Stress Corrosion Cracking, or SCC, whose time to failure is difficult, if not impossible, to predict as discussed later in this report.  The current poorly designed Pipelines do not permit CP protection to mitigate external corrosion on the Pipelines that must operate at uniquely high temperatures. The required high temperatures accelerate all forms of external corrosion.  New pipelines would incorporate proper design such as non-insulated pipe and newer forms of pipeline coating technology, that would permit CP to be effective in addressing external corrosion even at high temperatures to help assure pipeline safety.  No pipeline waiver issued under the conditions addressed in the Consent Decree is consistent with pipeline safety nor can ensure the same level

---

[5] 49CFR§195 Subpart H - Corrosion Control.
[6] Consent Decree, Appendix B, "State Waivers for Line 901, 903 …..,".
[7] CA Code CCR 19§2111 – Risk Analysis.
[8] 49CFR§194 Response Plans for Onshore Oil Pipelines.

Accufacts Inc. 12-20-24                                        Page 2 of 15

of safety as that associated with a prudently designed pipeline system. Neither Plains, the pipeline operator at the time of the May 19, 2015 failure, nor the new owner, Sable, designed or built the present Pipelines with their serious deficiencies, but as a pipeline operator Sable bears the ultimate responsibilities should the Pipelines fail.

## II.    Accufacts experience qualifying me as an expert in this matter.

Accufacts Inc. ("Accufacts") was asked to review the Line 901/903 pipelines, now renamed Lines CA-324/CA-325 ("Pipelines"), and related documents such as those produced by the OSFM on their website.  A Consent Decree places responsibility for approving processes related to the onshore pipeline system restart first on the OSFM, then on PHMSA.[9]  The Center for Biological Diversity and The Environmental Defense Center asked Accufacts to provide an independent evaluation of documents related to a possible restart of the Pipelines to safely move heavy oil production from offshore platforms in the Santa Barbara Channel into the Pipelines.  It should be noted that the OSFM has recently issued a waiver on PHMSA's CP obligations for the Pipelines. I have not seen the details related to OSFM's decision on the granting of such a waiver.

I am a chemical engineer with over fifty years of experience in the energy industry, including over 25 years as president of Accufacts Inc. ("Accufacts").  Accufacts provides independent expert consulting services to assist decision makers in making informed decisions concerning pipelines. Pipeline safety expertise is provided in areas including, but not limited to: pipeline failure investigation, risk management/risk analysis, siting, construction, design, operation, maintenance, training, control room management including Supervisory Control and Data Acquisition ("SCADA") approaches, leak/rupture detection, integrity management, emergency and spill response, and pipeline safety regulatory development and compliance.  Much of my background is grounded in pipeline incident investigations following numerous pipeline rupture tragedies spanning several decades.

For the past two decades I have been involved as a representative of the public, which carries special obligations to avoid a conflict of interest, in advancing pipeline safety regulations at the federal and various state levels as demonstrated by my CV that is included as Attachment 1.  For example, I played a significant role representing the public in developing integrity management federal pipeline safety regulations in the early 2000s for both liquid and gas transmission pipelines. These regulatory approaches emulated safety process approaches that I instituted and developed for the City of Bellingham, WA to assure that a ruptured pipeline there could be restarted and operated safely.  This safety process approach, identified as the Pipeline Safety Immediate Action Plan, or PSIAP, identified steps that the pipeline operator was to complete following the Bellingham rupture tragedy of June 10, 1999, before that pipeline could be permitted to safely return to service.  The PSIAP is a matter of public record compliments of Washington State's Right-to-Know laws.  PSIAP formed a template for the integrity management safety regulations developed by the Office of Pipeline Safety, which morphed into PHMSA in 2003.

---

[9] Consent Decree, Appendix B & Appendix D.

Accufacts Inc. 12-20-24                                                                                    Page 3 of 15

For approximately fifteen years, through the development of federal standards for Transmission Integrity Management Programs ("TIMP") for both liquid and gas integrity regulations, control room management ("CRM"), and Operator Qualification ("OQ") rulemaking efforts, to cite a few pipeline safety rulemaking efforts, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee, or LPAC, to advise PHMSA on possible pipeline safety regulation advancement. After a brief hiatus of several years, I have recently been reappointed by the Secretary of Transportation to represent the public again on LPAC, which carries numerous obligations to avoid a conflict of interest. I believe I am more than qualified to comment as an expert on the various issues related to CA-324/CA-325 pipeline system possible restart.

## III.    A brief historical perspective



**Figure 1 – Overview of Pipelines**

Since the May 19, 2015 onshore pipeline rupture and oil release that spilled into the Santa Barbara Channel and beyond, the pipeline system known at the time as Lines 901/903, and offshore oil platforms feeding this system have been shut down. Lines 901/903 have recently been renumbered CA-324 and CA-325, respectively. These pipelines, which were classified as interstate pipelines at the time of the release, were ordered to be shut down and oil purged from the Pipelines and placed under nitrogen atmospheres under Corrective Action Orders instituted by PHMSA. Line 901 experienced an onshore pipeline rupture failure caused by massive external corrosion and released on the late morning of May 19, 2015 near Refugio State Beach that placed a considerable amount of oil into the sensitive waters of the Santa Barbara Channel and beyond. While the years since 2015 involved discussions for possible construction of new pipelines to replace the poorly

Accufacts Inc. 12-20-24                                                      Page 4 of 15

designed Lines 901/903, recent activities shifting ownership of the pipelines and associated infrastructure to Sable Offshore Corp. ("Sable"), are now focused on restarting the existing pipelines under new ownership and conditions stated under a Consent Decree.

The May 19, 2015 Line 901 rupture failure occurred at approximately 4 miles (MP 4) downstream of the Las Flores Canyon Pump Station due to extensive external corrosion.  The Line 901 ruptured at approximately 56 % of the maximum operating pressure ("MOP") of 1341 pounds per square inch gauge ("psig") (which is 72 % specified minimum yield strength ("SMYS")).[10]  In addition, further metallurgical forensic reports attached to the PHMSA Final Report, indicate that pipeline ruptured at a pressure of 737 psig, which was 39.6% of SMYS.[11]  This pipeline failed at very low stress levels, not a surprise given that the depth of the corrosion failure was 89% of the measured wall thickness, and the ILI tools significantly mis indicated the size of the corrosion threats.[12]

**Figure 2 – Overview of Pipelines route with MPs estimated**



## IV.    The Las Flores Pipeline System.

The following is based on information readily in the public domain, as demonstrated by the footnote references.  Because of many variations in MP numbers in various documents, MP numbers referenced in this report should be considered approximate with slight variations that don't really impact my findings/conclusions/recommendations.

---

[10] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.14 of 23.
[11] DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing, - Report No: OAPUS309DNOR (PP136049)," September 18, 2015, p. iii.
[12] *Ibid.,* "Summary of Observations," p. vi.

Accufacts Inc. 12-20-24                                                    Page 5 of 15

The Pipelines, formerly identified as Line 901/903 operated by Plains (aka Plains All American Pipeline L.P. and Plains Pipeline L.P.), represent a pipeline system of approximately 125 miles in length running from the Las Flores Canyon Pump Station (milepost 0) to the Pentland Metering (and Storage) facility (at Milepost 125.3). Figure 1 is a general overview of the Pipelines routing. CA-224 (old Line 901) that runs from the Las Flores Canyon Pump Station (Milepost 0) to the Gaviota Meter Station (Milepost 10.7). Note that I have reversed the Milepost reported in PHMSA's Final Report to follow more conventional milepost numbering, increasing from the pipeline inlet at the Las Flores Canyon Pump Station (MP 0), to the pipeline outlet of the 24-inch diameter Line 901/CA-224 pipeline, the Gaviota Metering Station (MP 10.7). CA-324 is the sole feed into the 30-inch pipeline, CA-325A. CA-325A runs from the Gaviota Metering Station to the Sisquoc pump station (MP 49.2). CA-325B, also a 30-inch diameter pipeline, runs from the Sisquoc pump station (MP 49.2) to the Pentland metering station (~MP 125.3). Figure 2 shows the general route adding approximate MP numbers following this similar MP increasing numbering all the way to Pentland.

According to the PHMSA Final Report on the 2015 rupture:

> Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

> Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-

ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.[13]

**Figure 3 - Approximate Elevation Profile - Las Flores Canyon Pump Station (MP 0) to Pentland Station (MP ~125.3)**



PHMSA provided additional information related to Line 903:

> (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). [14]

> Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds similar to the Affected Pipeline {Line 901}.[15]

It is not clear from the documents produced if Line 903 insulation is also tape wrapped like Line 901, that would further shield the CP system from the Pipelines, assuring that CP is ineffective.

Figure 3 is an approximate elevation profile (approximate elevation of pipeline in feet versus pipeline milepost) for the Las Flores Pipeline System developed by the Center for Biological Diversity's Geographic Information System, or GIS, specialist using information readily available in the public domain. Pipeline elevation profiles play a critical role in understanding liquid transmission pipeline operation and risks, such as evaluating ILI runs, valve placement/actuator decisions, emergency and oil spill actions, and spill response planning. In addition, if a pipeline hydraulic profile, also referred to as a hydraulic gradient, is superimposed on an elevation profile, much information about pipeline risk can be gained. A hydraulic gradient is required of the pipeline operator under California Risk Analysis regulation.[16] A pipeline hydraulic gradient includes a plot of operating pressure versus milepost for a specified crude oil gravity and flow rate, but for this unique system, a crude oil viscosity and temperature should also be included on the

---

[13] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016, pp. 4 & 5 of 21.
[14] *Ibid.,* p. 4 of 21.
[15] PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H," p. 2.
[16] CA Code CCR 19§2111 – Risk Analysis (2) Pipeline Description (A).

Accufacts Inc. 12-20-24                                                      Page 7 of 15

hydraulic gradient as these parameters seriously impact the hydraulic gradient evaluation. Such hydraulic gradient information is important in evaluating the risks of a pipeline restart program, especially on the Pipelines given their highly unique elevation profile among other factors (See Figure 3). This information is probably not likely to be made public, though a competent experienced engineer can develop an approximate hydraulic profile for a pipeline system if they understand certain crude oil blended properties and temperatures.

## V.   TIMP regulations are not working to protect the public or the environment.

In the passage of the federal pipeline safety regulations setting standards for Transmission Integrity Management Programs, or TIMP, first for liquid, then gas, in 2002 and 2003, respectively, the use of performance-based approaches versus more prescriptive based regulations were agreed to as a compromise to advance important needed pipeline safety regulation in this area. Until the passage of TIMP regulations, pipeline operators were under no obligation to periodically assess the condition of their mainline pipelines. Performance-based regulation, in theory, allows a pipeline operator to choose between various alternatives that may work best for their pipeline. Prescriptive-based pipeline safety regulations historically have been imposed in federal pipeline safety regulatory efforts. Prescriptive regulations impose certain conditions that pipeline operators must, or shall, follow.

TIMP efforts for liquid pipelines define four basic approaches permitted in pipeline integrity assessment, depending on the pipeline threat that a pipeline segment might experience. Briefly, the major assessment methods most appropriate for this pipeline system are hydrostatic pressure testing ("hydrotesting") and inline inspection ("ILI") also known as smart pigging. As the Line 901 onshore oil release that flowed into sensitive waterway areas has clearly demonstrated, TIMP regulation is not working for many pipeline operators, even after the operator had run multiple ILI corrosion tool runs which I will expand on further below. Another unexpected outcome of TIMP performance-based regulation is that such less than clear regulation efforts are harder to enforce.

It's important to note that pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity.

### 1) Hydrotesting assessments.

Properly performed hydrotesting can be an important pipeline integrity assessment tool that proofs a pipeline's fitness for service to safely operate at MOP at the time of the hydrotest. Hydrotesting involves shutting down a pipeline and filling a pipeline segment with water. Proof of pipeline integrity or fitness for service testing is verified by carefully increasing water pressure with a water injection pump after air has been removed and the pipeline segment temperature stabilized. While federal pipeline safety regulations for liquid transmission pipelines define a "Subpart E" hydrotest to establish or verify maximum operating pressure, or MOP, a term having specific meaning in regulation, the regulations are not specific on important parameters to ensure a quality hydrotest that doesn't damage the pipe. Minimum hydrotest pressures are established to verify the MOP at the time of the hydrotest, with

Accufacts Inc. 12-20-24                                          Page 8 of 15

sufficient pressure safety margin at the time of the hydrotest.  A Subpart E hydrotest is a proof for fitness test that the pipeline, at the time of the test, can withstand pressures above the MOP with a certain margin of pressure safety.[17]

One important caveat is needed regarding Subpart E hydrotests, which are often called strength tests.  For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats that likely exist along the Las Flores Pipeline System—**a subpart E hydrotest is inadequate**.  Current ILI technology cannot reliably identify if such cracking threats are present.  More importantly, nor can associated engineering critical assessments provide prudent evaluation of such threats due to the inability to reliably predict corrosion colonies that can interact or link together in unpredictable ways.  SCC colonies can be associated with disbonded coatings such as that occurring on the Pipelines where CP current is prevented from reaching the outer pipewall steel.  A much higher pressure (higher % Specified Minimum Yield Strength, or SMYS) hydrotest is warranted.  A prudent risk analysis should clearly demonstrate if such external corrosion cracking threats from environmental factors are possible around the Pipelines.  **I need to note that it is not clear whether hydrotesting, if performed, will be a Subpart E test or a higher % SMYS hydrotest intended to address cracking threats such as SCC**.  The Consent Decree strangely makes no mention of corrosion cracking threats or hydrotesting.

While considerable discussion in the Consent Decree has focused on the use of ILI to identify possible general wall loss corrosion threats well before failure, this agreement makes no mention of other forms of corrosion related threats such as corrosion cracking SCC or SSC.  These forms of corrosion cracking are very challenging to identify via ILI, and more importantly, engineering critical assessments associated with ILI to predict time to failure can be highly unreliable, given the inactive threat nature of these type of corrosion cracking threats.  The corrosion cracking threats tend to fail as pipeline ruptures.  It is important that the cracking threat potentials on the Pipelines be prudently addressed and proposed solution be made public and transparent.

For pipeline segments that undergo large elevation changes, like the Line 325A/B segments, the pipeline must be cut up into segments to assure hydrotesting pressure ranges do not permanently deform the pipe.  Hydrotesting can be more expensive than other pipeline integrity assessments such as ILI, but there are no built-in assumptions about the quality and thoroughness of the assessment that can be mismanaged such as that which can and often does occur with ILI approaches resulting in numerous pipeline ruptures after ILI assessments, as the May 19, 2015 release has clearly demonstrated.  Hydrotesting is much more reliable than other pipeline integrity assessment approaches, such as ILI, at verifying a pipeline's fitness for service at the time of the test.  Hydrotesting is usually performed by contractor firms experienced and qualified to perform a proper hydrotest for specific types of threats.  The Consent Decree requires certain threshold general corrosion threats if identified by ILI be remediated before restart.[18]

---

[17] 49CFR§195.304 Test pressure
[18] Consent Decree, Appendix B (4) Integrity Management.

Hydrotesting is warranted, justified, and vastly appropriate for the Pipelines which have been sitting for over nine years without effective CP. I also need to mention that the use of nitrogen gas to idle the pipeline was meant to avoid internal corrosion attack and plays no role in preventing external corrosion attacks to keep the Pipelines in a "corrosion-free state" as mentioned by Steve Rusch, Sable's vice president of environmental and regulatory affairs.[19] The external corrosion sites experience reduced corrosion rates from the lower ambient soil temperatures as no hot oil was passing through the system, but the corrosion sites are not inactive, especially if CP systems are ineffective, such as on the Pipelines.

**2) ILI assessments.**

In the U.S., ILI or smart pig tool efforts started to develop in the early 1980s depending on the threat a pipeline operator was trying to address. ILI tools are usually multi-ton devices run inside a pipeline while the pipeline is operating to ascertain the condition of the pipeline depending on the type of threats trying to be analyzed. Given the advancements in technology including shrinking the equipment, ultrasonic, or UT, approaches that focus on direct anomaly measurement has historically proven superior for general wall thinning corrosion evaluation to approaches using inferred software-based algorithms, such as magnetic flux leakage ("MFL") testing. Some ILI tools are more suitable than others depending on the threat. There is a wide spectrum of ILI tools and different technological approaches to select from depending on the type of threat trying to be reviewed. Operators don't always select the ILI technology best suited to help identify threats on their system. Even with the advances in tool development and approaches there can still be a wide variation as to whether a specific ILI tool or vendor can properly identify a specific pipe threat and permit it to be further properly characterized after an ILI run. This is why pipeline operators will incorporate ILI tool tolerances and perform field verification digs to produce "unity plots" for a specific ILI run, to verify ILI vendor claims about their technology and its specific performance. This field verification data was not shared by Plains with the ILI vendor, a serious deficiency in ILI utilization. It is worth noting the PHMSA made it a point in their Failure Analysis of the Line 901 release, that the pipeline operator had not provided field dig verification feedback to the ILI vendor to confirm ILI capability.[20] For example, corrosion attacks can take on many forms such as general pipewall thinning (usually the easiest to determine depending on the ILI technology), various forms of corrosion cracking such as stress corrosion cracking ("SCC"), selective seam corrosion cracking ("SSC"), and pit corrosion. All such corrosion threats can lead to a pipeline failure and release. Based on my experience involving investigations of liquid transmission pipeline ruptures from SCC and SSC after ILI runs, some segments of the Pipelines exhibit the potential for SCC or SSC. Such external corrosion cracking threats are often found on pipelines with disbonded coating that are exposed to corrosion environments such as that introduced by the Pipeline's insulation. It is incumbent on the new Pipeline operator, Sable, to demonstrate to the OSFM, and to the public and various regulatory agencies that SCC/SSC external cracking environments do not exist.

---

[19] Los Angeles Times article by Tony Briscoe, "*Plan to restart pipeline sparks anger*," Front page, October 20, 2024.
[20] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.13 of 21.

Some forms of ILI technology to identify certain pipeline threats, if properly managed, can be superior to hydrotesting as they may identify some threats well before they go to failure. As too clearly demonstrated, however, in the May19, 2015 Line 901 rupture, ILI cannot address all forms of external corrosion threat that are likely to exist on the Pipelines because of their poor design, their unique high temperature operation, and ineffectiveness of CP. If a corrosion ILI tool can be utilized within the limits of the pig vendor specification (i.e., such as maintaining pig speed within the operating pipeline), and if the ILI tool run is independently field verified, some ILI tools can be a superior form of assessment for many types of pipeline threats, such as general internal and external corrosion (i.e. wall-thinning) if prudently managed. The more specialized forms of corrosion, cracking and pitting, or corrosion within dents, however, can be much more challenging as ILI tools and their related engineering critical assessments still have technical limits. ILI tool vendors place specific limitations on their various tools, and it is important that the pipeline operator follow such restrictions that can easily invalidate an ILI tool run reading or result. ILI runs in hilly terrain, such as that which exist with the Pipelines (See Figure 3) can be quite challenging for ILI tools that can easily exceed multiple tons in weight as gravity never shuts off.

In investigating numerous pipeline rupture failures after ILI tool runs, I consistently see failures on the part of the pipeline operators to perform sufficient field verification digs to determine if bias is being introduced in a specific ILI tool approach on a specific pipeline segment, for a specific pipeline threat, and that the ILI tool selected is really appropriate to identify certain pipeline threats. Some pipeline operators repeatedly fail to recognize or even consider ILI tool capabilities and tolerances, especially as ILI vendors and pipeline engineers have tried to improve technologies and assessment techniques. It is worth noting that no one markets ILI tools claiming they don't work. An important consideration in integrity management approaches is whether the right ILI technology has been selected and is being prudently utilized by the pipeline operator. It is further worth noting that while running an ILI tool is not inexpensive, the cost of running such a tool is relatively less expensive compared to the overall quality of the field integrity verification program to assure the ILI tool is doing its job for a specific type of pipeline threat, on a specific pipeline segment.

Part of the problem is that many forms of interactive external corrosion pipeline cracking threats cannot be accurately characterized to allow meaningful engineering critical assessments that are reliable. Such assumptions or inability to properly engineer and predict interactive threats introduce significant margins of error to fitness for service predictions using ILI assessments. Just doing ILI reassessments when they really aren't capable of dealing with interactive corrosion threats is an illusion of safety. Basically, performing an inappropriate ILI assessment more often is not the solution as further explained below.

## VI.  The greatest threat on the Las Flores Pipeline System is from external corrosion.

It should not take a pipeline failure to identify that the greatest pipeline integrity threat on the Pipelines is from various forms of external corrosion due to poor design of these Pipelines rendering CP systems ineffective at reducing or preventing external corrosion failure.

The PHMSA Final Report stated:

**Proximate or Direct Cause**

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.[21]

PHMSA goes on to list numerous contributory causes, among them a significant observation, "Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised."[22]  This important fact should also play a major role into any decision to restart the Las Flores Pipeline System as explained in further detail in this report.  This critically important PHMSA observation should not come as a surprise to any pipeline operator.  Bottom line, Plains acquired a poorly designed set of Pipelines in the early 1990s that rendered the CP system ineffective at preventing or mitigating external corrosion on a pipeline system operating at high temperatures.  Some years after acquiring the Pipelines and after TIMP regulations were promulgated in late 2002, Plains did not implement an appropriate integrity management program to prevent the pipeline failure from external corrosion attack.  The question now is whether Sable's compliance with the Consent Decree under the approval of the OSFM relying on the capabilities of ILI tools can prevent another failure on the Pipelines?  **Clearly, current ILI technology does not meet an obligation to reliably identify all forms of external corrosion most likely present on much of the Pipelines.**  The CP systems required by PHMSA regulations will not be effective on most of the pipeline mileage in the Las Flores Pipeline System as previously discussed, and from my perspective there is serious doubt as to whether these poorly designed pipelines can be made as safe as new pipelines that have properly functioning cathodic protections.

Regarding the Las Flores Pipeline restart decision and related integrity assessments, it is important to understand how CP systems are supposed to work.  In layman's terms, a CP system impresses a weak current into a pipeline turning the pipeline into a cathode in an electrochemical corrosion cell on the outside of a buried pipeline, to control or reduce external corrosion.  Older nonconducting pipeline coatings such as that which exists on the Pipelines do not allow for CP current to pass through them.  The purpose of the CP system is thus to introduce current to the outer pipewall where the older coatings have been penetrated, such as with holes or tears in the outer coating.  Unfortunately, older pipeline external coatings such as the urethane coal tar outer coatings, like those on the Pipelines, are also well known to not adhere tightly to a pipeline over time, causing coating separation or disbondment.  Such disbondment can result in external

---

[21] *Ibid*, p. 14 of 21.
[22] *Ibid.,* p. 14 of 21.

pipewall corrosion cells under the coating, generating many different forms of corrosion, especially SCC and SSC cracking in the wrong environments, that are not protected by CP.  To add to this threat of external corrosion, the Las Flores Pipeline System's external insulation traps and serves as a water conduit further increasing external corrosion as a water fed corrosion attack. And lastly, the Polyken tape wrap installed during pipeline installation around the outside of the insulation is also well known to not be conductive, further shielding and preventing CP current from reaching the outer pipe wall.  **This is a perfect storm or combination of factors all working to render CP ineffective.** Without effective cathodic protections, the pipeline is at particularly high risk of spilling again.  To further underscore the lack of a proper integrity management program, this pipeline operates at elevated temperature that accelerates external corrosion as explained further below.  New types of pipeline coatings now allow the passage of CP current through such coating to mitigate external corrosion even if the coating disbonds from the pipeline.

## VII. High pipeline operating temperatures accelerate all forms of corrosion.

**Figure 4  Los Flores Temperature Data from DNV Line 901 Release (5/19/15) Technical Root Cause Analysis included in PHMSA Final Report.[23]**



If one is experienced in handling/refining the heavy crude oils produced offshore that feed into the Las Flores Pipeline System, this crude oil not only needs to be diluted with natural gas liquids, or NGLs, but the pipeline must be operated at high pipeline temperatures, approximately 135 °F, that also is required to reduce the blended oil viscosity to get the fluid over the main hill beyond the Sisquoc Pump Station to Pentland.  While the PHMSA Final Report mentions 135 °F as a pipeline operating temperature, Figure 4 represents a temperature graph indicting 135 °F was not unusual, but higher fluid temperature to improve the flow and capacity of the Pipelines did occur.

Chemical engineers experienced in reaction kinetics are familiar with the Arrhenius equation which indicates that chemical reaction rates, such as that for corrosion, essentially double for every 10 °C (18 °F) increase in temperature.  This means that the rate of corrosion at 140 °F is about 32

---

[23] *Ibid.,* "Figure 23, L901 Las Flores Station Temperature Data," p. 375 of 510.

Accufacts Inc. 12-20-24                                                                 Page 13 of 15

times that for a pipeline operating at 60 °F, a typical ambient soil condition.  Because of the higher viscosity of unblended offshore oil there probably is little opportunity to reduce the Las Flores Pipeline System temperature to help reduce corrosion rates on a pipeline system where the CP system is ineffective. If the Pipelines are returned to operation, all forms of external corrosion will remain a primary threat of concern for pipeline failure.

## VIII.  The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.

It is important to understand that the Consent Decree is just a compromise agreement between the signature parties and may be missing important technical matters related to the Pipelines.  I find it odd that many of the technical issues discussed above were not identified or addressed in the Consent Decree.  External corrosion cracking risk was well known for many decades to be a threat of concern for pipelines exhibiting disbonded external coating where CP systems are ineffective.

I find it especially strange that Plains the pipeline operator at the time of the Line 901 rupture got itself into serious trouble by failing to understand that the poor design of the Pipelines could not be adequately addressed by ILI.  It appears that the Consent Decree continues to foster the illusion that ILI can adequately permit assessment of corrosion risks, especially cracking threats most likely to exist on major segments of the Pipelines (see Figure 3, for example).  The Consent Decree doesn't even mention corrosion cracking threats for this system operating at high temperature that exacerbates all forms of external corrosion as previously discussed.

And lastly, I would caution that the Consent Decree gives authority to the OSFM on certain pipeline safety related decisions. These OSFM decisions, however, cannot violate federal pipeline safety regulations and that I believe require a public decision process for PHMSA approval to assure any waiver meets or exceeds the level of safety had the wavier not been requested.

## IX.  The poorly designed Pipelines cannot be made as safe as new pipelines.

Sable's website implies that the Pipelines will be repaired, stating "PPC undertook a comprehensive repair and maintenance program to restore the pipeline to "as-new" condition."[24]  As referenced in footnote 19 above, this isn't the only time that a Sable representative has suggested the Pipelines will be restored to "as-new" condition or a "corrosion free" state.  A new pipeline would be properly designed such that the federal pipeline safety regulations requiring a CP system would be effective and do its job, while allowing CP monitoring to assure the new pipelines were adequately protected from external corrosion attack by an effective CP design.  A new pipeline would not be trying to utilize CP on a pipeline improperly coated, that seriously disbonds from the pipe, with a system insulated to assist in water reaching the outer pipe steel, while operating at higher temperature.  All these poor design factors accelerate all forms of external corrosion including cracking.  It is a misguided illusion that relying on ILI can attempt to stay ahead of pipeline failure on such a poorly designed system.  A cursory review of the PHMSA Final

---

[24] See Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx.

Report, Appendix G In-Line Inspection report will indicate that even running ILI tools, it is impossible to return Line 901 to an "as new" condition given the numerous corrosion anomalies.[25] The idea that running ILI tools should be sufficient to assure an "as-new" pipeline condition and safe operation of these poorly designed Pipelines with ineffective CP protection is a false premise, as the Pipelines are far from being in a new condition, with numerous anomalies, given their poor design approach and operating history.

## X.    Conclusion.

Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure. Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

The above represents my opinions based on experience with too many pipeline rupture investigations. I reserve the right to update this report if more relevant information is made available.

Richard B. Kuprewicz
President
Accufacts Inc.

---

[25] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara Country, California, - Appendix G In-Line Inspection Report by Lamontagne for the Oak Ridge National Laboratory" May 2016, pp. 44 – 138 of 510.

**Attachment 1**

## Curriculum Vitae.

# Richard B. Kuprewicz

**8151 164th Ave NE**
**Redmond, WA  98052**

**Tel:  425-802-1200 (Office)**
**E-mail: kuprewicz@comcast.net**

---

**Profile:**

As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**

**Accufacts Inc.**                                     **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

**Position:**     President
**Duties:**       > Full business responsibility
                  > Technical Expert

**Alaska Anvil Inc.**                                 **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

**Position:**     Process Team Leader
**Duties:**       > Led process engineers group
                  > Review process designs
                  > Perform hazard analysis
                  > HAZOP Team leader
                  > Assure regulatory compliance in pipeline and process safety management

**ARCO Transportation Alaska, Inc.**           **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

**Position:**     Senior Technical Advisor
**Duties:**       > Access to all Alaska operations with partial Arco ownership
                  > Review, analysis of major Alaska pipeline projects

**ARCO Transportation Co.**                     **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

**Position:**     Manager Gas Pipeline Projects
**Duties:**       > Project management
                  > Oil pipeline conversion to gas transmission
                  > New distribution pipeline installation
                  > Full turnkey responsibility for new gas transmission pipeline, including FERC filing

10-22-24                                                                 Page 1 of 9

**<u>Four Corners Pipeline Co.</u>**                              **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**     Vice President and Manager of Operations
**Duties:**        > Full operational responsibility
                   > Major ship berth operations
                   > New acquisitions
                   > Several thousand miles of common carrier and private pipelines

**<u>Arco Product CQC Kiln</u>**                                **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**     Plant Manager
**Duties:**        > Team building of new facility that had been failing
                   > Plant design modifications and troubleshooting
                   > Setting expense and capital budgets, including key gas supply negotiations
                   > Modification of steam plant, power generation, and environmental controls

**<u>Arco Products Co.</u>**                                   **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**     Operations Manager of Process Services
**Duties:**        > Modernize refinery utilities and storage/blending operations
                   > Develop hydrocarbon product blends, including RFGs
                   > Modification of steam plants, power generation, and environmental controls
                   > Coordinate new major cogeneration installation, 400 MW plus

**<u>Arco Products Co.</u>**                                   **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**     Manager of Refinery Planning and Evaluation
**Duties:**        > Establish monthly refinery volumetric plans
                   > Develop 5-year refinery long range plans
                   > Perform economic analysis for refinery enhancements
                   > Issue authorization for capital/expense major expenditures

**<u>Arco Products Co.</u>**                                   **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**     Operations Supervisor/Process Engineer
**Duties:**        > FCC Complex Supervisor
                   > Hydrocracker Complex Supervisor
                   > Process engineer throughout major integrated refinery improving process yield
                      and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.
   Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).
   Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

**Publications in the Public Domain:**

1.  "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2.  "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3.  "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4.  "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5.  "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6.  "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7.  "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8.  "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9.  "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA.  Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267.  Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac.  Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel.  Final testimony to the docket submitted May 19, 2023.  This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

# EXHIBIT F

STATE OF CALIFORNIA — NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-324)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable
Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara
County, California as described in the request of state waiver dated April 24,
2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 87148E7A-ED76-4984-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at
PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a) Dates for integrity assessment

   b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 6

> segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
>
> c) In-line inspection tool vendor(s)
> d) Required tool specifications including operational specifications and anomaly sizing tolerances
> e) Tool validation methodology
> f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
> g) Criteria used to identify locations for excavation and field verification
> h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

**180-Day Repair Conditions**[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Docusign Envelope ID: 87148E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 87148E7A-FB76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 87148E7A-FB76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Lance Yearwood
December 17, 2024
Page 13

    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
    o. Safety factors used for fatigue life and/or predicted failure pressure calculations
    p. Reassessment time interval and safety factors
    q. The date of the review
    r. Confirmation of the results by qualified technical subject matter expert(s)
    s. Approval by responsible Sable management personnel
    t. Records of additional preventive and mitigative (P&M) measures performed
    u. Reports required by this State Waiver.

**Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:
    a. Tool type and run date
    b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c. Dig sheets
    d. Field contact information for Sable
    e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Lance Yearwood
December 17, 2024
Page 14

        a. Tool type
        b. Run date
        c. Summary of Conditions Report[18]
        d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324.* At a minimum, the annual report shall contain the following, if applicable:

    a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
           1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
    c. The third-party ILI expert reviews in accordance with Condition 52
    d. AC and DC Interference surveys that are due in accordance with Condition 53
    e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT G

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



<u>**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**</u>

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:   LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of
Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa
Barbara County, San Luis Obispo County, and Kern County, California as
described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under
insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

## **In-Line Inspection (ILI) Assessment and Frequency**

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to  meet  the  tool  accuracy specification  provided  by  the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 13

      n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

      o. Safety factors used for fatigue life and/or predicted failure pressure calculations

      p. Reassessment time interval and safety factors

      q. The date of the review

      r. Confirmation of the results by qualified technical subject matter expert(s)

      s. Approval by responsible Sable management personnel

      t. Records of additional preventive and mitigative (P&M) measures performed

      u. Reports required by this State Waiver.

**Reporting**

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B*. The email notification shall include, if applicable:

      d. Tool type and run date

      e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

      f. Dig sheets

      g. Field contact information for Sable

      h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

      i. Tool type

      j. Run date

      k. Summary of Conditions Report[18]

      l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B.* At a minimum, the annual report shall contain the following, if applicable:

   a. A Closure Report for the previous calendar (CY) which contains:
      i. Features that were remediated in previous CY
         1. Provide documentation for the in-the-ditch assessments and repairs
      ii. Identify features that remain to be assessed
      iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
   c. The third-party ILI expert reviews in accordance with Condition 53
   d. AC and DC Interference surveys that are due in accordance with Condition 54
   e. A copy of the CGRA for prior year including:
      i. Mean corrosion growth rate for the pipeline
      ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT H

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**February 21, 2025**

Accufacts Inc. Final

## Table of Contents

I.      *Summary*....................................................................................................................*1*

II.     *The current installation renders the CP system ineffective*.......................................*2*

III.    *Compliance with CP regulatory requirements is ineffective, making
        performance with this regulatory requirement meaningless*....................................*3*

IV.     *This is more than simple corrosion under installation (CUI) issue*. .........................*3*

V.      *External corrosion on buried pipelines falls into four major categories*................*4*

    1.  **Pipe wall loss corrosion is generally understood to occur over larger areas of
        the pipe.**..................................................................................................................4

    2.  **Cracking or crack-like corrosion is usually an environmental threat difficult to
        assess.**......................................................................................................................4

    3.  **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**
        ....................................................................................................................................5

    4.  **Corrosion within dents is a special form of dent threat.**..............................................5

VI.     *Types of ILI technology.* ..........................................................................................*5*

    1.  **General wall loss corrosion.** .......................................................................................5

    2.  **Cracking corrosion.**.....................................................................................................6

VII.    *What is the purpose of hydrotesting?*......................................................................*6*

VIII.   *The illusion that corrosion growth rate can be accurately predicted needs to be
        explained.* .................................................................................................................*7*

IX.     *Major state waiver deficiencies:*..............................................................................*7*

    1.  **A key corrosion performance tracking process step in the state waivers for the
        Pipelines is missing.** ..................................................................................................7

    2.  **A major state waiver deficiency for Line 324.** ...........................................................8

    3.  **Major state waiver deficiencies for Line 325A/B.** .......................................................9

X.      *Conclusions.* ............................................................................................................*9*

## I.    Summary.

Accufacts Inc. ("Accufacts") was asked to provide my expert opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A, and CA-325B ("Pipelines") made public in mid-January 2025 by the Office of the State Fire Marshal ("OSFM").[1]  This report builds on a previous Accufacts report issued on December 20, 2024."[2]  By agreement, a Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed state waiver alternative measures "provide an equal or greater level of safety."[3]  It is my understainding that PHMSA can choose to: 1) Not comment on this matter allowing the State Waiver to occur and startup to proceed, 2) Not approve the waiver preventing the startup, or 3) Impose additional requirements to assure an equal or greater level of safety to current minimum federal pipeline safety regulations occurs.

The current coating installations do not provide "limited effectiveness of the cathodic protection system," as mentioned by the Decision letters issued by the OSFM.  This I believe is a poor choice of words that understates the fact that the CP system is ineffective on most of the Pipelines' mileage.  The OSFM is thus being asked to grant a state waiver on federal pipeline safety minimum requirements intended to address external pipeline corrosion from an ineffective CP installation, while relying on hydrotesting and various forms of inline inspection, ILI or smart pigging, to avoid pipeline failure from the resulting external corrosion.

The waivers attempt to allow startup of the Pipelines relying mainly on ILI technology to identify corrosion threats before failure.  In addition, the Application by the Pipeline's operator appears to be relying on a circumferential magnetic flux leakage (MFL-C tool) approach run in February 2022 to argue for the removal of federal regulation requiring the 180 day condition for scheduling remediation of "corrosion of or along a longitudinal seam weld."[4, 5]  Our experience with MFL-C tools is that if certain parameters are not incorporated, such ILI tools can miss a lot of cracks.  I see no mention of such important conditions in the referenced letter that would demonstrate that this ILI run is reliable.  I do not see sufficient justification to waive 49CFR452(h)(4)(iii)(H) as such a waiver would not provide an equal or greater level of safety as no carbon steel pipeline, even new modern steel pipelines, are invincible to corrosion attack.

---

[1] OSFM letter to Sable/PPC Offshore Corp, "Letter of Decision on the Sate Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) ("Decision Letter 324") and Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) ("Decision Letter 325A/B")", dated 12/17/24.

[2] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024.

[3] PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

[4] Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run.

[5] 49CFR452(h)(4)(iii)(H).

Accufacts Inc. Final                                                      Page 1 of 9

A simple plot of the type and approximate milepost location of external corrosion such as wall loss or cracking, including field as well as ILI indications along the Pipelines, will underscore how challenging the operation of the present Pipelines will be without effective CP.  Such a plot will clearly demonstrate that the Pipelines are not "like new" as indicated by some recent Sable/PPC representatives.  Further explanation is also warranted as to why the pipeline operator assumes there is no SCC or SSC risks associated with water on the Pipelines.

A proposal to replace the Pipelines with a new smaller diameter heated pipeline that would be uninsulated and built with modern unshielding coatings was aborted.[6]  This proposal would have permitted the CP system to do its job addressing external corrosion, while complying with federal pipeline regulation.

## II.      The current installation renders the CP system ineffective.

The construction of Line 324 in the late 1980s utilized coal tar urethane coating applied to the bare steel pipeline, covered by sprayed on insulation to assure the pipeline was operated at higher temperatures.  The insulation was then wrapped with a non-conductive polyethylene tape coating.[7]  While there may be some confusion as to the coating installation on what is now named 325A/B, information leads us to believe this coating installation is similar on these pipelines as that on Line 324.   To anyone vaguely familiar with pipeline external corrosion protection and cathodic protection ("CP") intent, this approach is a fundamental failure of design/installation reflecting much inexperience in pipelines.  The polyethylene tape shields and prevents CP current from getting to the external pipeline steel, and the insulation system works to shield while increasing the likelihood of water in close proximity to the pipe, especially in areas where the coal tar coating directly on the pipeline steel has separated, or disbonded, from the pipe.[8]  <u>With such heavy shielding there is thus no way for any CP system current to ever reach the pipeline to reduce/prevent external corrosion.</u>

With the exception of a few feet of buried pipe that has undergone repairs, replacing the existing poor design and coating installations with a few feet of dual epoxy coatings, the shielded CP system is ineffective.  The various threats of external corrosion on the Pipelines are exacerbated by the elevated temperature, the potential for water to accumulate along the Pipelines via the insulation, the application of non-conducting tape wrap around the insulation, and the use of older coal tar coating directly on the pipeline that exhibits separation (aka disbondment) from the pipe steel.  Disbonded coating in the wrong environments is especially conducive to cracking threats, such as SCC or SSC as discussed in this report.  I have seen no convincing arguments that water environments conducive to corrosion cracking are not around or under the coating on the Pipelines.

---

[6] Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022.

[7] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), "Failure Investigation Report Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, May 2016, Appendix E: Corrosion Control and Pipeline Conditions, page 1 of 4.

[8] *Ibid.,* Page 3 of 21, and Mechanical and Metallurgical Testing, Photos Figure 1 through 20.

Accufacts Inc. Final                                                                                      Page 2 of 9

## III.    Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.

The Pipelines thus have ineffective CP protection from external corrosion that is exacerbated by operation of the Pipelines at elevated temperatures, seriously increasing corrosion rate as discussed in my previous report.[9]   Attempts to gauge the effectiveness of the CP system utilizing CP performance measures identified in PHMSA regulations are meaningless in such heavily shielded installations.   Just operating the Pipeline with CP "on" to meet federal minimum regulatory requirements will not prevent external corrosion attacks that can take on various forms on the Pipelines.  It should be noted that the OSFM has required "Where the operator discovers external corrosion in combination with coating deterioration, the operator must recoat with a two-part epoxy.  Sable must recoat in accordance with their repair procedure." which does allow repair replacing with the existing installation approach, given its many shortcomings to prevent external corrosion.[10]  This requirement places the responsibility on the pipeline operator to identify when or if any, field digs should occur to confirm coating degradation.  The operator should be primarily focused on identifying environments around the pipeline that are precursors to various forms of external corrosion attack, given the many conditions related to the pipeline design/installation conducive to external corrosion attack.

It is on the limited repaired sections, measured in feet, that the CP should be effective as such short length repairs replace the poorly designed shielding original coating installations.  For the vast majority of the Pipelines mileage, however, the CP remains ineffective.  The requirements to measure CP performance stated in 49CFR§195.2 (NACE SP 0169 – 2007 edition, paragraph 6.2.2) are meaningless when heavy shielding, such as that which occurs on CA-324 and CA-325A/B, prevents CP current from reaching the pipeline.

## IV.    This is more than simple corrosion under installation (CUI) issue.

Considerable past discussions have suggested that this is a corrosion under installation (or CUI") problem implying that this is the only controlling issue.  While CUI is certainly a contributing factor, the corrosion threats go well beyond CUI.  As previously discussed, heavy shielding, the tape coating around the insulation, the vintage/type of coating directly on the Pipelines prone to disbondment, the operating temperature, and the environment around the Pipelines, work in concert to create external corrosion in its various forms.  The Consent Decree is an agreement based on the premise that higher risks of external corrosion can be mainly addressed by ILI tools. The multiple forms of external corrosion which can occur on the Pipelines require various different approaches, beyond ILI, as discussed further in this report.

---

[9] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024, p. 13.
[10] OS OSFM letter to Sable/PPC Offshore Corp, "Decision Letter 324 and Decision Letter 325A/B")," dated 12/17/24, pp. 11 and 11 respectively.

Accufacts Inc. Final                                                    Page 3 of 9

## V.  External corrosion on buried pipelines falls into four major categories.

External corrosion on buried steel pipelines falls into four general categories:  1) wall loss or thinning of the pipe wall, 2) cracking or crack-like, 3) pitting, and 4) corrosion within dents.

1.  **Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.**

    Internal or external corrosion can cause pipe wall thinning.  Such thinning differs from pit corrosion discussed below, in that pipe wall loss thinning tends to occur over a wider area of the pipe.  Despite previous multiple ILI runs, external corrosion pipe wall loss, or thinning, was the condition that resulted in the May 19, 2015 pipeline rupture failure.  External corrosion on the shielded pipe allowed general corrosion thinning of the pipeline until the pipe failed under pressure.  It should be worth noting that wall loss in excess of 0.8 wall thickness (actually 0.91) which occurred in the May 19, 2015 rupture, places the operator at great risks.  Ironically, pipe wall loss is generally one pipeline failure threat that advances in the ILI technology over recent decades was intended to address, either with ILI mag flux or ultrasonic approaches which are different technical methods.

2.  **Cracking or crack-like corrosion is usually an environmental threat difficult to assess.**

    This is associated with various forms of pipeline cracking, such as selective seam corrosion or stress corrosion cracking.  While engineers like to think they can calculate time to failure, such time to failure estimates for these forms of corrosions are hard to reliably predict.  Given the probability that such cracking, especially if in clusters, can interact with other cracks, or weaknesses in the pipe body near/at welds, makes prediction to failure highly unreliable.  Such pipe weaknesses can occur at weld heat affected zones, at girth welds, or at manufacturing related pipe seams, in unpredictable ways that can quickly negate time to failure calculation/estimates, even if cracking potential is identified.

    Sable/PPC has requested an exemption from 49CFR452(h)(4)(iii)(H) explaining this is usually a SSC threat related to earlier vintage manufacturing processes such as LF-ERW which tends to exhibit lower pipe toughness. There are other related risks to the manufacturing process of modern steels such as DSAW and HF-ERW concerning cracking potential from poor coating/ineffective CP approaches. Because of the nature of disbonded coating in proximity to water, coating can tent at weld seams creating potential for cracking corrosion attack, such as SSC.  Even modern pipe steels are not invincible to such cracking corrosion potential, especially on pipelines operating at elevated temperatures.  Unless the operator can show why such environments don't exist, their request to be exempted from 49CFR452(h)(4)(iii)(H) should be denied.  These explanations should go well beyond a MAG-C pig run the pipeline operator has provided.

3. **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**

This is the loss of pipe steel in concentrated small areas, forming localized small holes or pits, usually at girth welds, that can weaken the pipeline and cause a release. Pit corrosion identification via ILI, even newer generations of ILI tools, can be very challenging. Pit corrosion threats are usually verified via field digs or pipeline releases. While this threat can be a bona fide threat on the Pipelines that are heavily shielded rendering CP ineffective, there has been no mention that this threat has been identified.

4. **Corrosion within dents is a special form of dent threat.**

Corrosion or cracking within a dent, also known as "dents with stress concentrators" are hard to identify via ILI, and almost impossible to reliably predict time to failure. Such threats are usually identified by high-definition geometric ILI dent tools, the location around the pipeline, and field dig verification assessments. The ILI determination using high resolution caliper or geo pigs, have proven reliable at identifying dents and their location on a pipeline.

## VI.    Types of ILI technology.

Given the possible types of external corrosion on the Pipelines, I now focus on a simple high-level discussion of corrosion ILI technical approaches.

1. **General wall loss corrosion.**

After the advancement of geometric or deformation ILI technology, the next early phase of ILI use focused on general corrosion wall loss, or pipeline thinning along the axis or flow direction of the pipeline. In this field, technology split into two different approaches, magnetic flux leakage and ultrasonic. Magnetic flux leakage (or mag flux) approaches utilized software algorithms to characterize changes in magnetic flux to identify wall loss aligned in the axial, or direction of flow, usually the most insidious and common corrosion flaws for pipe. Mag flux ILIs fall into two general categories: low resolution (usually associated with earlier generation) and high resolution (usually more complex and more expensive). Mag flux technology shifted from low resolution to the more sophisticated high resolution approaches where corrosion is problematic. There are still pipelines that utilize low resolution mag flux because of cost, so care should be exercised in the application of this form of ILI on liquid pipelines. The waivers specifically require UT ILI the first two years of operation, but are moot, indicating magnetic flux ILI in the future could be allowed without clarification as to high res or low res ILI.

Ultrasonic ILI approaches use beams of ultrasonic energy to identify both external and internal corrosion wall loss. While a simplification, ultrasonic approaches are analogous to radar, where reflected energy readings are utilized to measure changes in pipe wall thickness. Originally, ultrasonic approaches, focusing on wall loss evaluation, directed UT energy directly into the pipe in the radial direction for wall thickness and resulting wall loss corrosion sizing determinations.

Accufacts Inc. Final                                                    Page 5 of 9

2. **Cracking corrosion.**

Pipeline ruptures from cracking threats drove a need for ILI tool cracking development. Thus, a next generation of ultrasonic ILI approaches advanced by changing the angle of the UT beam from radial into the pipe to at an angle to help spot cracks that might be developing. This form of UT approach is identified as shear wave. As more pipeline failures from cracking were uncovered, additional advances known as phased array ultrasonic (PAUT) have recently developed, though such measurements are currently focused on field measurement of uncovered pipeline, as ILI in this area I would categorize as still under development.

I have investigated too many pipeline ruptures that occurred after an ILI run which indicates more regulatory work is needed in ILI regulations related to applications of ILI. No ILI vendor provides such tools claiming they will not work. It is the pipeline operator's responsibility to ensure ILI runs meet the restrictions placed by the tool vendor (such as speed) and to verify the tool vendor's claimed capability with a proper number of field verification digs.

## VII.    What is the purpose of hydrotesting?

There are basically two types of hydrotesting mentioned in federal pipeline safety: 1) What I call a subpart E, or proof of MOP test, and 2) a crack hydrotest, what is referred to as a "spike hydrotest" that is performed at much higher test pressures as a %SMYS. Both forms of hydrotesting are proof test, good at the time of the test, and don't characterize time dependent pipeline threats such as corrosion.

The purpose of an MOP hydrotest is to proof the fitness for service of a pipeline at the time of the test, with a certain margin of pressure safety that usually deteriorates with time. Subpart E MOP tests are not crack integrity test. If a pipeline system has crack forming potential an MOP test is not appropriate.

Spike hydrotests are meant to avoid pressure reversals associated with crack threats on pipelines. Pressure reversals are where cracks remaining after MOP hydrotest tests can enlarge for various reasons to result in possible failure during operation, usually at lower pressures. It is my experience that spike hydrotests are meant to deal with cracking threats if such a threat exists. The performance metric for the suitability of a spike hydrotest is the range of %SMYS for the specific test segment. For pipeline elevation changes like that associated with 325A/B, a spike hydrotest requires the pipeline be segmented to keep test pressures within reasonable ranges that don't produce permanent yielding of the pipe. The information made public to date indicates that the previous hydrotests performed in 1986, because of elevation changes, required Line 325A to undergo hydrotesting in 9 segments and in Line 325B in 11 segments. Unfortunately, the hydrotest segments in the public record application are identified by station number and not by approximate milepost. Since there is usually no correlation between station number and milepost, I thus cannot evaluate whether the Decision Letter 325A/B pressure testing parameters are adequate for Line 325A.[11] It is worth noting that the Decision Letter 325A/B makes no mention of a subpart E

---

[11] Decision Letter 325A/B, "Pressure Testing," page 5.

Accufacts Inc. Final                                                    Page 6 of 9

hydrotest or spike hydrotest on Line 325B.  The proposed segments for hydrotests on 325A need to be identified by approximate milepost to permit evaluation as to whether the waiver requirements are appropriate.  The reasons for hydrotesting exclusion on Line 325B need to be properly justified and made public by the OSFM.

## VIII.    The illusion that corrosion growth rate can be accurately predicted needs to be explained.

One of the critical parameters that I have observed in too many pipeline rupture investigations is that ILI can be utilized to accurately predict corrosion growth rates ("CGR") to help set a critical ILI run timing, for example.  The Pipelines essentially have no effective CP, operate as a higher temperature system, contain disbonded coating, incorporate heavy shielding which prevents CP from reaching the Pipelines and operate with insulation that moves water on/near the outside of the pipe.  Such a combination of factors can provide a wide variation in types of external corrosion as well as corrosion rate estimates.  CGR estimates can be especially problematic if CGR approaches miss possible corrosion interaction threats that can considerably shorten time to failure estimates.  I advise that CGR be utilized with extreme caution given this possible variation, especially for corrosion threats that can interact, such as SCC, whose time to failure can be highly unpredictable.  Corrosion growth rate estimates can vary considerably given the various form of external corrosion, especially related to cracking in combination with its location near sensitive pipe locations such as seam or girth welds.

## IX.    Major state waiver deficiencies:

Key observation on the state waivers for the Pipelines:

1.   **A key corrosion performance tracking process step in the state waivers for the Pipelines is missing.**

    While not specially required in minimum pipeline safety regulations or the waivers, a prudent pipeline operator on a pipeline system highly susceptible to corrosion will plot or graph corrosion indications by type and severity, by approximate milepost.  This is especially important on the Pipelines given their history of extensive corrosion caused by the lack of CP effectiveness, poor coating types causing disbondment or shielding, increased temperature, insulation that tends to wick water, and poor performance of ILI.  Such graphing aids a pipeline operator in understanding possible corrosion "hot spot" segments whose threats on a pipeline increase because of environmental factors that merit additional assessment, and maybe even pipeline segment replacement from a corrosion point of view.

    Care also needs to be taken that all corrosion sites are prudently evaluated for possible interactive threats, such as general wall loss in combination with cracking, or near pipe welds, such as that which can occur with cluster corrosion.  I see no mention in the Letters of Decision and waivers requiring such important corrosion tracking on the Pipelines.

Accufacts Inc. Final                                                             Page 7 of 9

2.  **A major state waiver deficiency for Line 324.**

Given the pipeline properties stated for Line 324 (a single grade X65, 0.344 in wall thickness, 24-inch diameter, HF-ERW), I can calculate the various % SMYS for the spike (minimum and maximum test pressures, and MOP hydrotests) based on an estimated approximate elevation profile by milepost as Line 324 can be hydrotested as one segment given its limited elevation profile.

A critical condition in the OSFM Decision letter 324 is:

> "12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike hydrotest is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:
>
> a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
> b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP."[12]

For the 24-inch diameter pipe, wall thickness and grade stated in the Decision Letter 324, 100% SMYS calculates to 1863 psig.  1.5 times the stated MOP of 1003 psig calculates to 1504 psig, at the highest elevation point.  Thus, the spike test at the highest elevation point as required above is likely to be the lower maximum test pressure of 1504 psig which calculates to about 81% SMYS, **a value I believe is too low for corrosion cracking screening and evaluation**.  The OSFM needs to explain why the proposed spike hydrotest of Line 324 is so low.

The bottom line is that Sable/PPCs should demonstrate whether there are environmental conditions around Line 324 that are conducive to cracking either SCC or SSC, and these conditions should go well beyond a Mag-C tool run (such as sufficient field digs to verify the ILI tool's claimed capability).  I see no such important conditions in Sable/PPCs application that instill confidence that Line 324 does not have environments favoring external cracking.  While it is true that certain pipe manufactured before 1970 is more prone to SSC, or SSWC, for various reasons, there is no modern pipe, even HF-ERW located in Line 324 or DSAW located in 325 A/B, that is invincible to such corrosion cracking threats, especially if the coating directly applied to the pipe has "tented" on the weld seam, allowing water to enter between the coating and the pipe to create a corrosion cell.  There is no carbon steel pipeline, even new modern manufactured steel pipelines, invincible to such corrosion attack.

---

[12] Decision Letter 324, "Pressure Testing," pages 4 – 5.

3. **Major state waiver deficiencies for Line 325A/B.**

Decision Letter 325 states that Line 325A and 325B is composed of 30-inch diameter of two pipe grades (X65 with a thickness of mainly 0.344 inch and X70 with a wall thickness mainly of 0.281 inches composed of DSAW, with one small segment of 0.03 miles containing HF-ERW). I used the term "mainly" as Sable's/PPC's application indicates these two lines are also largely composed of these grades with a small percentage of varying thicknesses.[13] For these two pipe grades, and thicknesses, 100 % SMYS calculates to 1490 psig for X65 and 1311 psig for X70. Since the location of the various pipe grades by approximate mileposts within CA-325A/B are not indicated, and given the dramatic elevation profiles for 325A/B the proposed hydrotest segments, if any, by milepost and elevation segments need to be made public. Without such information, I cannot calculate the % SMYS range for hydrotests given the OSFM conditions. Hydrotest segments are identified by station number which don't necessarily sync with milepost or MP.[14] **These important test segment parameters, by approximate MP, and elevation need to be made public to assure prudent hydrotesting is being required to address the possible general corrosion and cracking risks on Line 325A/B**.

It is worth noting that the OSFM does not require a MOP and spike hydrotest of 325B which has very significant elevation changes. This would suggest that Line 325B is not being evaluated by hydrotesting. The reason(s) for this decision needs to be made public.

## X.    Conclusions.

Hydrotest segments proposed for the Pipelines need to be made transparent and include approximate MP, given the major role that elevation change plays on this system. Critical parameters related to location by milepost of the varying grades and thicknesses of pipe on 325 A/B and their associated hydrotest segments need to be identified by approximate MP as well, to verify if the OSFM parameters are sufficient for the specific types of corrosion threat. The reason as to why a spike hydrotest on 324 and 325 A are limited needs to be explained, as well as to why 325B hydrotesting has not been included in either a subpart E or spike hydrotest,

The incompleteness of the waivers lead me to conclude that I cannot determine the waivers provide sufficient information to assure an equal or greater level of safety for the Pipelines had the operator had an unshielded coating design that complied with federal minimum pipeline CP protection intended to avoid pipeline failure from external corrosion.

Richard B. Kuprewicz
President
Accufacts Inc.

*Richard B Kuprewicz*

---

[13] Sable/PPC letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115). Pipeline System Background Data Attachment B of State Application Table B-3 Line Pipe Specifications," July 2023, p. 4.

[14] *Ibid*., "Table B-6 Historic Hydrotest Summary," p. 6.

Accufacts Inc. Final                                                                            Page 9 of 9

# EXHIBIT I



**environmental**
DEFENSE CENTER

April 11, 2025

<u>**Via U.S. Mail**</u>

Office of the State Fire Marshal,
California Department of Forestry and Fire Protection
PO Box 944246
Sacramento, CA 94244-2460
Attn: Daniel Berlant, State Fire Marshal


   **Re:**     <u>**Notice of Intent to File CEQA Petition**</u>


To Department of Forestry and Fire Protection:

   **PLEASE TAKE NOTICE**, under Public Resources Code §21167.5, that Petitioners and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (collectively, "Petitioners"), intend to file a petition and complaint under the provisions of the California Environmental Quality Act (CEQA) against Respondents and Defendants California Department of Forestry and Fire Protection (CalFIRE), by and through its component agency Office of the State Fire Marshal (OSFM), and State Fire Marshal Daniel Berlant (collectively, "Respondents"), challenging Respondents' approval of State Waivers for pipelines CA-324 and CA-325, the two segments of the Las Flores Pipeline System.

   The petition and complaint is brought upon the following grounds: Respondents (1) failed to comply with CEQA's environmental review process, (2) failed to comply with mandatory procedures outlined in state and federal pipeline safety laws, and (3) prejudicially abused their discretion in issuing the State Waivers.

   The petition and complaint prays for the following relief:

   1.     That the Court immediately, and on an *ex parte* basis, issue a temporary stay of OSFM's approval of the State Waivers, pending completion of judicial review, pursuant to Code Civ. Proc., § 1094.5(g) and Rule 3.1202(c) of the California Rules of Court;

   2.     That the Court issue temporary, preliminary, and permanent injunctive relief

Case 2:26-cv-05242-SVW-SSC   Document 2   Filed 05/14/26   Page 209 of 701   Page ID #:563

April 11, 2025
Notice of Intent to File CEQA Petition
Page 2 of 2

preventing restart of the Las Flores Pipeline System under the State Waivers;

3. That the Court issue a peremptory writ of mandate directing CalFIRE, by and through OSFM, to set aside and vacate its approval of the State Waiver for CA-324;

4. That the Court issue a peremptory writ of mandate directing CalFIRE, by and through OSFM, to set aside and vacate its approval of the State Waiver for CA-325;

5. That the Court issue a peremptory writ of mandate directing Respondents, should they reconsider Sable's State Waiver applications, to:

   a. prepare a subsequent Environmental Impact Report that considers the potential impacts of operating the Las Flores Pipeline System without effective cathodic protection, without complying with 49 C.F.R. § 195.452(h)(4)(iii)(H), and under the conditions of the proposed State Waivers;

   b. conduct any other procedures that the Court deems necessary and/or appropriate under CEQA;

   c. provide the public with notice and an opportunity for a hearing before granting a State Waiver for either CA-324 or CA-325, as required by federal law;

   d. in granting a State Waiver for either CA-324 or CA-325, provide a statement of reasons, as required by federal law; and

   e. in granting a State Waiver for either CA-324 or CA-325, provide a discussion of factors significant to its decision, as required by state law;

6. That the Court issue the specific additional declaratory relief prayed for in Petitioners' Third and Seventh Causes of Action;

7. That Petitioners be awarded attorneys' fees and costs pursuant to Sections 1021.5 and 1032(b) of the Code of Civil Procedure, and any other applicable law; and

8. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:     STATE BAR NO:

NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)

FIRM NAME: Environmental Defense Center

STREET ADDRESS: 906 Garden Street

CITY: Santa Barbara     STATE: CA     ZIP CODE: 93101

TELEPHONE NO.: (805) 963-1622     FAX NO. :

E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org

ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al.

**FOR COURT USE ONLY**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara

STREET ADDRESS: 1100 Anacapa Street

MAILING ADDRESS: P.O. Box 21107

CITY AND ZIP CODE: Santa Barbara, CA 93121

BRANCH NAME: Anacapa Division

Plaintiff/Petitioner: Environmental Defense Center et al.

Defendant/Respondent: Cal. Dep't of Forestry and Fire Protection

CASE NUMBER:

JUDICIAL OFFICER:

DEPARTMENT:

## PROOF OF SERVICE—CIVIL

**Check method of service (only one):**

[ ] By Personal Service    [x] By Mail    [ ] By Overnight Delivery

[ ] By Messenger Service    [ ] By Fax

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. [ ] The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* April 11, 2025      I served the following **documents** *(specify):*

   Notifce of Intent to File CEQA Petition

   [ ] The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:

   a. Name of person served: CalFIRE - Office of the State Fire Marshal

   b. [x] *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

   Business or residential address where person was served:
   PO Box 944246, Sacramento, CA 94244-2460

   c. [ ] *(Complete if service was by fax.)*

   Fax number where person was served:

   [ ] The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service— Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. [ ] **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
POS-040 [Rev. January 1, 2020]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

Code of Civil Procedure, §§ 1011, 1013, 1013a,
2015.5; Cal. Rules of Court, rule 2.306
*www.courts.ca.gov*

POS-040

| CASE NAME: | CASE NUMBER: |
|---|---|
| | |

6. b. [x] **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

(1) [x] deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

(2) [ ] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):* Santa Barbara, CA

c. [ ] **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. [ ] **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. [ ] **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 11, 2025

Jeremy Frankel
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ] **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

_____
(NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Linda Krop (Bar No. 118773); Jeremy Frankel (Bar No. 344500); Tara C. Rengifo (Bar No. 307670); 906 Garden Street, Santa Barbara, CA 93101 | ELECTRONICALLY FILED Superior Court of California County of Santa Barbara Darrel E. Parker, Executive Officer 4/15/2025 9:48 AM By: Narzralli Baksh , Deputy |

TELEPHONE NO.: (805) 963-1622    FAX NO.: (805) 962-3152
EMAIL ADDRESS: lkrop@environmentaldefensecenter.org
ATTORNEY FOR *(Name)*: Petitioners/Plaintiffs Environmental Defense Ctr. et al.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SANTA BARBARA**
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121
BRANCH NAME: Anacapa

CASE NAME:
Environmental Defense Center et al. v. Cal. Dep't of Forestry and Fire Protection et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: 25CV02247 |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $35,000)   [ ] **Limited** (Amount demanded is $35,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[x] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [ ] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify):* 8
5. This case [ ] is [x] is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: April 15, 2025
Jeremy Frankel
_____    ►    _____
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**                    **CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice– Physicians & Surgeons
   Other Professional Health Care Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip and fall)
   Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
   Intentional Infliction of Emotional Distress
   Negligent Infliction of Emotional Distress
   Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
   Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/ Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court Case Matter
   Writ–Other Limited Court Case Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-harassment)*
   Mechanics Lien
   Other Commercial Complaint Case *(non-tort/non-complex)*
   Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late Claim
   Other Civil Petition

CM-010 [Rev. January 1, 2024]                    **CIVIL CASE COVER SHEET**                    **Page 2 of 2**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(NAME AND ADDRESS)*:       TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|
| Linda Krop (Bar No. 118773)<br>Jeremy Frankel (Bar No. 344500)<br>Tara C. Rengifo (Bar No. 307670)<br>906 Garden Street, Santa Barbara, CA 93101          (805) 963-1622<br>ATTORNEY FOR *(NAME)*:  Petitioners/Plaintiffs Environmental Defense Ctr et al. | ELECTRONICALLYFILED<br>Super Court of Cali<br>County Santa Barbara<br>Darrel E Parker, Executive Officer<br>4/15/2025 9:48 AM<br>By: Narzralli Baksh, Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**

☒ Santa Barbara–Anacapa    ☐ Santa Maria-Cook    ☐ Lompoc Division
  1100 Anacapa Street       312-C East Cook Street   115 Civic Center Plaza
Santa Barbara, CA  93101    Santa Maria, CA  93454    Lompoc, CA  93436

PLAINTIFF:   Environmental Defense Center et al.

DEFENDANT: Cal. Dep't of Forestry and Fire Protection et al.

| **CIVIL CASE COVER SHEET ADDENDUM** | CASE NUMBER 25CV02247 |
|---|---|

Santa Barbara County Superior Court Local Rule, rule 201 divides Santa Barbara County geographically into two separate regions referred to as "South County" and "North County," the boundaries of which are more particularly defined in rule 201.  "South County" includes the cities of Carpinteria, Santa Barbara, and Goleta; "North County" includes the cities of Santa Maria, Lompoc, Buellton and Solvang.  A map depicting this geographical division is contained in Appendix 1 to the local rules.

Local Rule 203 provides: "When, under California law, 'North County' would be a 'proper county' for venue purposes, all filings for such matters shall be in the appropriate division of the Clerk's office in North County.  All other filings shall be made in the Clerk's office in the appropriate division of the Court in South County.  The title of the Court required to be placed on the first page of documents pursuant to CRC 2.111 includes the name of the appropriate Court division."

A plaintiff filing a new complaint or petition is required by Local Rule 1310 to complete and file this Civil Case Cover Sheet Addendum to state the basis for filing in North County or South County.

The undersigned represents to the Court:

This action is filed in    ☐ North County   ☒ South County   because venue is proper in this region for the following reason(s):

☐  A defendant resides or has its principal place of business in this region at:  _____
_____

☐  The personal injury, damage to property, or breach of contract that is claimed in the complaint occurred in this region at: _____

☐  There is a related case filed with the court in this region (e.g., the related personal injury action to a petition to transfer structured settlement payments) [identify case, including case number]:  _____
_____

☒ Venue is otherwise proper in this region because [explain]:  A key segment of the Las Flores Pipeline System, the subject of this litigation, is located entirely in South County and previously ruptured at Refugio State Beach.

Dated:  April 15, 2025                           _____
                                                *Signature of Plaintiff or Plaintiff's Counsel*

Form Adopted for Mandatory Use          **CIVIL CASE COVER SHEET ADDENDUM**
Santa Barbara Superior Court
SC-2069 [New July 2018]

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/15/2025 9:48 AM
By: Narzralli Baksh, Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,<br><br>    Petitioners and Plaintiffs,<br><br>    vs.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>    Respondents and Defendants,<br><br>    and<br><br>SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,<br><br>    Real Parties in Interest. | Case No.:    25CV02247<br><br><br>**PETITIONERS' NOTICE OF ELECTION TO PREPARE ADMINISTRATIVE RECORD** |

**TO RESPONDENTS CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, BY AND THROUGH THE OFFICE OF THE STATE FIRE MARSHAL, AND STATE FIRE MARSHAL DANIEL BERLANT:**

In the above-captioned action, Petitioners and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (collectively, "Petitioners") are petitioning this Court, in part, for a Writ of Mandate to set aside Respondents' approval of State Waivers for pipelines CA-324 and CA-325, which together comprise the Las Flores Pipeline System. Petitioners bring this action, in part, on grounds that Respondents failed to comply with the California Environmental Quality Act, Public Resources Code section 21000 et seq.

**PLEASE TAKE NOTICE THAT,** pursuant to Public Resources Code section 21167.6(b)(2), Petitioners elect to prepare the record of the proceedings related to this action or pursue an alternative method of record preparation following further discussion with Respondents. The record will be organized chronologically, paginated consecutively, and indexed so each document may be clearly identified as to its contents and source, in a form and format consistent with the California Rules of Court, Rule 3.2205.

Dated: April 15, 2025

Respectfully Submitted,



Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**<br><br>STREET ADDRESS:    1100 Anacapa Street<br>CITY AND ZIP CODE:    Santa Barbara CA  93101<br>BRANCH NAME:    Anacapa | *FOR COURT USE ONLY*<br><br>**FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**04/15/2025**<br>Darrel E. Parker, Executive Officer<br>BY  Baksh, Narzralli<br>_____<br>Deputy Clerk |
| CAPTION:<br><br>**Environmental Defense Center et al vs California Department of Forestry and Fire Protection  et al** | |
| | CASE NUMBER: **25CV02247** |

## ORDER & NOTICE OF CASE ASSIGNMENT

The above case is hereby assigned to Honorable Donna D Geck for ALL purposes, including trial.  All future matters, including ex-parte matters, are to be scheduled with the assigned judge.  Counsel shall include the name of the assigned judge in the caption of every document filed with the court.

ANY NEW PARTY BROUGHT INTO THIS CASE IS TO BE IMMEDIATELY NOTICED BY THE PLAINTIFF/PETITIONER OF THE JUDGE ASSIGNMENT AND A PROOF OF SERVICE OF THIS NOTICE IS TO BE FILED WITH THE COURT WITHIN FIVE (5) DAYS OF SERVICE OF NOTICE. FAILURE TO GIVE NOTICE AND FILE PROOF THEREOF MAY RESULT IN THE IMPOSITION OF SANCTI0NS.

Dated:    4/15/2025

_____
Judge of the Superior Court
Von Deroian

---

### CLERK'S CERTIFICATE OF SERVICE

I certify that I am not a party to this action and that a true copy of the foregoing was electronically served to the electronic service address shown, or mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the electronic service or mailing of the foregoing and execution of this certificate occurred at (*place*): Santa Barbara, California on (*date):* 04/15/2025.

Linda J Krop
Environmental Defense Center
906 Garden St
Santa Barbara      CA  93101

Darrel E. Parker, Executive Officer        By    _____ Narzralli Baksh _____    Deputy Clerk

---

SC-2057 [Rev. April 19, 2001]        **ORDER & NOTICE OF CASE ASSIGNMENT**

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/15/2025 12:50 PM
By: Narzralli Baksh , Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CAL. DEP'T OF FORESTRY AND FIRE PROTECTION - OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT; SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
ENVIRONMENTAL DEFENSE CENTER; GET OIL OUT!; SANTA BARBARA COUNTY ACTION NETWORK; SIERRA CLUB; and SANTA BARBARA CHANNELKEEPER

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court of California, County of
Santa Barbara, Anacapa Div. 1100 Anacapa Street, Santa Barbara, CA 93121

CASE NUMBER:
*(Número del Caso):* 25CV02247

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Linda Krop, Jeremy Frankel, Tara Rengifo, Environmental Defense Center; 906 Garden St, Santa Barbara, CA 93101; (805) 963-1622

DATE: 4/15/2025
*(Fecha)*

Clerk, by /s/ Narzralli Baksh , Deputy
*(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [ ] on behalf of *(specify):*

under: [ ] CCP 416.10 (corporation)    [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation)    [ ] CCP 416.70 (conservatee)
[ ] CCP 416.40 (association or partnership)    [ ] CCP 416.90 (authorized person)
[ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/16/2025 4:39 PM
By: Sarah Sisto , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation,

                Petitioners and Plaintiffs,

   vs.

CALIFORNIA DEPARTMENT OF
FORESTRY AND FIRE PROTECTION, an
agency of the State of California; OFFICE OF
THE STATE FIRE MARSHAL, an agency of
the State of California; Daniel Berlant, in his
official capacity as State Fire Marshal; and
DOES 1 to 10, inclusive,

                Respondents and Defendants,

   and

SABLE OFFSHORE CORP., a Delaware
corporation; and PACIFIC PIPELINE
COMPANY, a Delaware Corporation,

                Real Parties in Interest.

Case No.: 25CV02247

**NOTICE TO ATTORNEY GENERAL**

[Pub. Res. Code, § 21167.7; CCP, § 388]

Petition Filed: April 15, 2025

1
Notice to Attorney General

To the Attorney General of the State of California:

PLEASE TAKE NOTICE, under Public Resources Code section 21167.7 and Code of Civil Procedure section 388, that on April 15, 2025,  Petitioners and Plaintiffs ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, and SANTA BARBARA CHANNELKEEPER (collectively, "Petitioners"), filed a petition for writ of mandate against Respondents and Defendants, CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through its component agency OFFICE OF THE STATE FIRE MARSHAL (OSFM), and State Fire Marshal DANIEL BERLANT (collectively, "Respondents"), in the above-referenced Court. The petition alleges, in part, that Respondents violated the California Environmental Quality Act (CEQA) in waiving certain regulatory requirements for pipelines CA-324 and CA-325, the two pipeline segments that comprise the Las Flores Pipeline System. Petitioners' petition is brought upon the following grounds: (1) Respondents failed to comply with mandatory procedures outlined in state and federal pipeline safety laws, (2) Respondents failed to comply with CEQA, and (3) Respondents prejudicially abused their discretion in issuing the waivers. **A copy of the petition is attached to this notice.**

Dated: April 16, 2025

Respectfully

_____

Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/15/2025 9:48 AM
By: Narzralli Baksh, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA BARBARA**

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners and Plaintiffs,

vs.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,

Respondents and Defendants,

and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

Case No.: 25CV02247

**VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Petitioners and Plaintiffs ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, and SANTA BARBARA CHANNELKEEPER (collectively, "Petitioners") respectfully petition this Court for a writ of mandate pursuant to Code of Civil Procedure sections 1085 and 1094.5 and seek declaratory and injunctive relief against Respondents and Defendants CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through its component agency OFFICE OF THE STATE FIRE MARSHAL, and State Fire Marshal DANIEL BERLANT (collectively, "Respondents"), and allege as follows:

## INTRODUCTION

1. This case arises from the efforts of Sable Offshore Corp. and its wholly-owned subsidiary Pacific Pipeline Company (together, "Sable") to restart the Las Flores Pipeline System — a defective pipeline system that ruptured in 2015, causing one of the worst oil disasters in California history.

2. On May 19, 2015, pipeline CA-324, a segment of the Las Flores Pipeline System, ruptured at Refugio State Beach Park, spilling more than 120,000 gallons of heavy crude oil into the surrounding environment. The spill was catastrophic. It closed public parks and beaches, killed and injured wildlife, shut down fisheries, and sickened nearby residents with chemical pneumonia.

3. Upon investigation, the Pipeline Hazardous Materials Safety Administration (PHMSA) determined that the rupture was a result of "progressive external corrosion," and that the pipeline's cathodic protection system — intended to prevent such corrosion — had failed. Concerningly, PHMSA ultimately determined that, by flaw of design, cathodic protection is ineffective on the Las Flores Pipeline System, leaving it vulnerable to pervasive corrosion.

4. Because of the Las Flores Pipeline System's dangerous design defects, few suspected that an operator would attempt to bring it back online. In fact, since the pipeline system was idled in 2015, a series of proposals were floated to replace or bypass the system, ostensibly due to the pipelines' obvious risks to public safety.

5. Now, however, Sable — a new, speculative company — is attempting to restart, rather than replace, the defective pipeline system, disregarding a litany of environmental and safety concerns as it rushes to resume drilling off the Gaviota Coast.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

6.      Because of the Las Flores Pipeline System's extensive corrosion issues, in order to restart it, Sable must obtain waivers from the Office of the State Fire Marshal (OSFM) that excuse it from complying with certain regulatory requirements. Specifically, Sable must obtain State Waivers "for the limited effectiveness of cathodic protection" on CA-324 and CA-325, the two pipeline segments that comprise the Las Flores Pipeline System. Sable submitted applications for the two aforementioned State Waivers in April 2024.

7.      Importantly, Sable's proposal to operate the Las Flores Pipeline System without effective cathodic protection represents a substantial departure from the project that was initially reviewed and approved. When first proposed in the 1980's, the pipeline system was expressly proposed as one that would be protected, in its entirety, by cathodic protection. Hence, environmental review of the project, conducted *forty* years ago, was largely premised on effective cathodic protection; indeed, in considering the project's potential impacts, the Environmental Impact Report (EIR) expressly relied on cathodic protection as a design specification that would be "very effective" in preventing an oil spill, and it assumed the same in evaluating potential impacts.

8.      The risks of operating the Las Flores Pipeline System without effective cathodic protection have never been fully evaluated. However, an analysis prepared by OSFM found that operating buried pipelines without cathodic protection can increase the risk of a spill by as much as *five times*. And a separate analysis, discussed below, found that operating this particular pipeline system without effective cathodic protection could result in a spill *every year*, and a major rupture *every four*.

9.      We have already seen first-hand the devastation that these pipelines can wreak on coastal resources. But the 120-mile long pipeline system also threatens major sources of water supply, renowned parks and ecological reserves, and a number of endangered and special-status species. Perhaps most concerning, however, is that it runs directly under a populated suburban neighborhood in Buellton, California, complete with schools, parks, and dozens of residential homes.

10.     In light of the obvious threat to public health and safety posed by these defective pipelines, community organizations sent multiple requests to OSFM for increased transparency and public engagement as it considered Sable's State Waiver applications. Petitioners called on OSFM to hold a public hearing on the applications, as required by law. They also pointed out that operating the

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the original EIR for the project, necessitating that OSFM conduct further environmental review pursuant to the California Environmental Quality Act (CEQA).

11.    Community outcry was echoed by thirteen state legislators, who sent a letter of their own to OSFM calling for environmental review of Sable's State Waiver applications and a transparent public process. The letter stated that the legislators "have grave reservations regarding the restart of CA-324 and CA-325, which have *already* caused a catastrophic oil spill, and which Sable intends to restart without effective protection from corrosion. . . . [O]ne governing body has already identified that proceeding in this manner would inevitably lead to another oil spill, one that could be twice the size of the 2015 disaster."

12.    Acknowledging "the public's considerable interest in the restart of these pipelines," OSFM committed to holding a "public meeting" — not a hearing, as required — *before* making a determination on Sable's State Waiver applications.

13.    Then, on December 17, 2024, without having held any sort of "public meeting," OSFM approved the State Waiver applications. OSFM did not offer any cognizable public process in advance of its decision or even release key documents (like the applications themselves); did not conduct environmental review of the State Waiver applications; and did not provide any supporting analysis or justification for its decision to grant the Waivers. In doing so, OSFM entirely disregarded applicable pipeline safety laws, bedrock environmental laws, and its own previous commitments to state legislators and the public.

14.    Given the unprecedented nature of these Waivers, and the critical resources that this 120-mile-long pipeline system can impact, the need for public comment, independent expert scrutiny, and environmental review was especially critical here. Yet OSFM pushed the Waivers through behind closed doors, reneging even on its minimal commitment to first have a "public meeting" on the issue.

15.    Without the benefit of public review, the Waivers that OSFM approved have a number of glaring deficiencies, and they ultimately fail to ensure that the pipelines will be "as safe or safer" than if they had effective cathodic protection — the standard under which OSFM reviewed Sable's applications. Those deficiencies are discussed at length below and in the attached expert reports.

16. Most notably, the logic underpinning the Waivers is fundamentally flawed. Instead of *proactively* preventing corrosion in the first place, the Waivers condition operation of the pipelines on a number of *reactive* measures — namely, conducting more frequent inspections to check for corrosion — that leave room for operator error. The management program contemplated by the Waivers, which *allows* the progressive corrosion of the Las Flores Pipeline System to continue, cannot, by any measure, be considered as safe as preventing corrosion in the first place.

17. Moreover, the Waivers are largely (and naively) premised on the hope that Sable will do a better job than the previous operator at detecting and remediating corrosion. But there is little reason to suspect that will be the case. The in-line inspection tools used to detect corrosion have proven to be inaccurate and unreliable when measuring corrosion on the Las Flores Pipeline System; in fact, the failure of such tools was a contributing factor of the Refugio Oil Spill. And Sable — a new, speculative company that has never actually operated an oil and gas pipeline — has done little to assure that it can or will comply with the Waivers' intensive management program.

18. Restarting the Las Flores Pipeline System in the manner envisioned by OSFM would not only invite another oil disaster on the Central Coast, but all but ensure it. The decision to grant the Waivers represents a grave dereliction of OSFM's duty to ensure the safety of hazardous liquid pipelines, made worse by the fact that OSFM provided no public process or justification for its decisions.

19. This Petition challenges Respondents' discretionary approval of the State Waivers on the grounds that Respondents (1) failed to comply with mandatory procedures outlined in state and federal pipeline safety laws, (2) failed to comply with CEQA's environmental review process, and (3) prejudicially abused its discretion in issuing the Waivers.

## JURISDICTION AND VENUE

20. Petitioners hereby incorporate by reference each and every allegation set forth above.

21. This Court has jurisdiction over Petitioners' claims against Respondents under sections 1060, 1085, and 1094.5 of the Code of Civil Procedure, and Article VI, section 10 of the California Constitution.

22. This case is properly classified as an unlimited civil case, and therefore within the

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

jurisdiction of this court, because it is not one of the types of cases listed as limited civil cases in section 85 or 86 of the Code of Civil Procedure.

23. Venue for this action properly lies in the Superior Court of the State of California in and for Santa Barbara County, as the Las Flores Pipeline System is located in Santa Barbara County and the causes of action arose therein.

24. Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law but depend on the Court granting the relief requested herein to require Respondents to satisfy their obligations under state and federal law.

**PARTIES**

25. Petitioner and Plaintiff ENVIRONMENTAL DEFENSE CENTER (EDC) is a non-profit, public interest environmental law firm that defends nature and advances environmental justice on California's Central Coast through advocacy and legal action. EDC has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. EDC's members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of EDC are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. EDC, by and through its counsel, has submitted written comments to OSFM that detail its concerns with respect to the State Waivers. As such, EDC is beneficially interested in the outcome of this proceeding and in OSFM's performance of its legal duties.

26. Petitioner and Plaintiff SANTA BARBARA COUNTY ACTION NETWORK (SBCAN) is a nonprofit grassroots organization that works to promote social and economic justice, preserve environmental and agricultural resources, and create sustainable communities within Santa Barbara County, California. SBCAN advocates a holistic approach to community planning that integrates housing, open space, and transportation to meet the needs of all members of the community and future

generations. SBCAN works in cooperation with a broad range of progressive activists and organizations to bridge the gap between environmental and social justice issues and ensure that all members of the community share a voice in its future. SBCAN has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. SBCAN's members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of SBCAN are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. SBCAN, by and through its counsel, has submitted written comments to OSFM that detail its concerns with respect to the State Waivers. As such, SBCAN is beneficially interested in the outcome of this proceeding and in OSFM's performance of its legal duties.

27.     Petitioner and Plaintiff GET OIL OUT! (GOO!) is a non-profit organization that was formed in the wake of the 1969 Santa Barbara Oil Spill and continues to work to protect California from further oil and gas development and exploitation. GOO! has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. GOO!'s members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of GOO! are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. GOO!, by and through its counsel, has submitted written comments to OSFM that detail its concerns with respect to the State Waivers. As such, GOO! is beneficially interested in the outcome of this proceeding and in OSFM's performance of its legal duties.

28.     Petitioner and Plaintiff SIERRA CLUB, a national nonprofit organization with thousands of members in California, is dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and encouraging humanity to protect and restore the quality of the natural and human

environment; and to using all lawful means to carry out these objectives. Sierra Club has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. Sierra Club's members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of Sierra Club are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. As such, Sierra Club is beneficially interested in the outcome of this proceeding and in OSFM's performance of their legal duties.

29.     Petitioner and Plaintiff SANTA BARBARA CHANNELKEEPER (SBCK) is a nonprofit organization. Its mission is to protect and restore the Santa Barbara Channel and its watersheds through science-based advocacy, education, field work, community engagement, and enforcement of environmental laws. SBCK has members who live, visit, work, and recreate in and around the area that would be affected by the restart of the Las Flores Pipeline System under the State Waivers. SBCK's members are interested in protecting resources along the 120-mile long pipeline route — including coastal resources; rivers, creeks, and wetlands; special-status species; and abundant recreational opportunities — from the risks of renewed oil and gas production. Members of SBCK are also interested in preserving the environmental integrity of sensitive areas along the pipeline route that would be exposed to the risk of another oil spill, as well as continuous excavations required by the Waivers' management program. As such, SBCK is beneficially interested in the outcome of this proceeding and in OSFM's performance of their legal duties.

30.     Respondent and Defendant CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION (CalFIRE) is, and at all relevant times hereto has been, an agency of the State of California. The OFFICE OF THE STATE FIRE MARSHAL is, and at all relevant times hereto has been, a division and component agency of CalFIRE. OSFM is charged with ensuring the safety of intrastate hazardous liquid pipelines and their compliance with state and federal laws. CalFIRE and OSFM qualify as administrative tribunals and persons for purposes of sections 1085 and 1094.5 of the

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

Code of Civil Procedure.

31.    Respondent and Defendant DANIEL BERLANT serves as California's State Fire Marshal and is sued in his official capacity as the head of OSFM.

32.    On information and belief, Real Party in Interest SABLE OFFSHORE CORP. is, and at all times relevant hereto has been, a Delaware corporation based in Houston, Texas. On information and belief, Sable Offshore Corp. is the designated operator of the Las Flores Pipeline System and applied for the State Waivers at issue.

33.    On information and belief, Real Party in Interest PACIFIC PIPELINE COMPANY (PPC) is, and at all times relevant hereto has been, a Delaware corporation based in Houston, Texas. PPC is a wholly owned subsidiary of Sable. On information and belief, PPC is the owner of the Las Flores Pipeline System and, together with Sable Offshore Corp., applied for the State Waivers at issue.

34.    Petitioners are ignorant of the true names or capacities of the respondents sued herein under the fictitious names DOES 1 through 10, and will seek leave to amend this petition to identify them in their true names and capacities when and if identified.

## AUTHENTICITY OF EXHIBITS ATTACHED

35.    Petitioners hereby incorporate by reference each and every allegation set forth above.

36.    The documents accompanying this petition are true and correct copies of the original documents and are incorporated herein by reference as though fully set forth in this petition.

## FACTUAL AND PROCEDURAL BACKGROUND

37.    Petitioners hereby incorporate by reference each and every allegation set forth above.

### Overview of the Las Flores Pipeline System

38.    The Las Flores Pipeline System was constructed in the early 1990's to transport crude oil produced off the coast of Santa Barbara County to inland refineries. Today, its sole remaining purpose is to service the Santa Ynez Unit ("SYU") — a dormant oil and gas production unit located on the Gaviota Coast.

39.    When operational, the SYU produces crude oil and natural gas from three offshore platforms that sit in federal waters: Harmony, Heritage, and Hondo. Once extracted, oil and gas are transported via subsea pipelines to a consolidated processing facility located in Las Flores Canyon, just

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

west of Goleta, California. From there, crude oil is transported inland through the Las Flores Pipeline System. The pipeline system is the only available means by which oil produced at the SYU can be transported and brought to market.



40.     From its starting point in Las Flores Canyon, the Las Flores Pipeline System travels approximately 120 miles, traversing three counties en route to Pentland Station. Along the way, the buried pipeline system passes through sensitive coastal habitat, major rivers and groundwater basins, world-renowned parks and ecological reserves, and a populated suburban area.

41.     As depicted above, the Las Flores Pipeline System consists of two major sections: line CA-324 (formerly "Line 901") and line CA-325 (formerly "Line 903"). CA-325 is further subdivided into sections A and B.

42.     **CA-324**, the first section of the pipeline system, is a 24-inch diameter pipeline that travels westward along the Gaviota Coast in close proximity to the Pacific Ocean. It transports oil from the Las Flores Canyon processing facility approximately eleven miles to Gaviota Station.

43.     The area through which CA-324 travels — the very heart of the Gaviota Coast — is of

considerable local import, and is home to globally significant natural, cultural, historical, and recreational resources. It is a spectacular rural landscape defined by rugged mountains, rolling coastal hills, and the ecologically rich Santa Barbara Channel. It is also, famously, one of the last remaining stretches of undeveloped coastline in Southern California.

44.     As such, CA-324 traverses some of the most cherished and environmentally sensitive areas in Santa Barbara County, if not the state. In just eleven miles, the pipeline crosses oft-visited recreation areas; drainages, wetlands, and perennial creeks that feed directly into the nearby Pacific Ocean; and critical habitat for multiple special-status species. Most notably, the pipeline passes directly through the Arroyo Hondo Preserve — an area popular for recreation and rich in Chumash and early California history. Arroyo Hondo Creek, the central feature of the Preserve, is currently home to over two hundred federally endangered Southern California Steelhead.

45.     After CA-324 terminates at Gaviota Station, oil is transported northward via **CA-325A** — a 30-inch diameter pipeline that extends approximately thirty-eight miles to Sisquoc Station.

46.     At the outset of its route, CA-325A traverses much of Gaviota State Park, where it crosses Gaviota Creek before redirecting inland. The Park provides abundant recreational opportunities to some 100,000 annual visitors. However, it also serves to protect a range of environmentally sensitive habitat areas, including oak woodland, chaparral and sage scrub, and riparian habitats. In fact, the portion of Gaviota Creek affected by the pipeline includes some of the highest quality riparian habitat remaining in southern Santa Barbara County. The perennial creek also provides critical habitat to the federally endangered Southern California steelhead and threatened California red-legged frog, as well as other special-status species, like the Southwestern pond turtle. Notably, the pipeline crosses the creek just a few hundred meters from where it empties into the Pacific Ocean.

47.     After leaving the Park, CA-325A again crosses Gaviota Creek before heading northward through the Santa Ynez Mountains. En route to Sisquoc Station, CA-325A passes through multiple watersheds, dozens of creeks and drainages, and two major rivers: the Santa Ynez River and the Sisquoc River. Aside from their obvious ecological and recreational benefits, the underflows of these two rivers provide critical sources of domestic, municipal, and agricultural water supply for nearby communities. Relatedly, CA-325A permeates large swaths of three major groundwater basins — the Santa Ynez River

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

Valley basin, San Antonio Creek basin, and Santa Maria River Valley basin — which are some of the foremost sources of water supply in Santa Barbara County.

48.    Perhaps most concerning, however, is that CA-325A passes directly through a suburban neighborhood in the city of Buellton, California. The pipeline runs by a preschool, an elementary school, and several popular parks. It also runs directly beneath, or in close proximity to, dozens of residential homes.



49.    At Sisquoc Station, oil transfers to **CA-325B**, the last section of the Las Flores Pipeline System. CA-325B is a 30-inch pipeline that runs the remaining seventy-four miles to Pentland Station.

50.    CA-325B begins by climbing over the rugged Sierra Madre Mountains and descending into the Cuyama River Valley, where it crosses the Cuyama River into San Luis Obispo County. Just a few miles downstream of the pipeline crossing, the Cuyama River is dammed at Twitchell, creating the Twitchell Reservoir. Among other things, the Reservoir provides an important source of groundwater recharge for the region.

51.    After crossing the Cuyama River, CA-325B turns east, traveling parallel and in close proximity to the River for much of the remaining pipeline route. Before reaching its terminus, the pipeline crosses two additional areas of prominent ecological significance: the Carrizo Plain Ecological Reserve and the Bitter Creek National Wildlife Refuge. Between these two interconnected areas, the region supports the largest number of endangered, threatened, and sensitive species in the state.

52.     CA-325B ultimately terminates at Pentland Station in Kern County, which marks the end of the Las Flores Pipeline System. From there, oil produced at the SYU is blended with crude oil delivered from other lines and transported to Los Angeles refineries in a separate pipeline system.

**Design, Construction, and Environmental Review of the Las Flores Pipeline System**

53.     The inception of the Las Flores Pipeline System dates back to the early 1980's, when Celeron Pipeline Company ("Celeron") proposed building a buried pipeline system that would service oil production facilities in the Gaviota Coast area. The proposal was a subset of a larger project, known and referred to as the Celeron/All American Pipeline Project, which envisioned a pipeline route that would ultimately extend all the way to refineries in Midland, Texas.

54.     In light of the scope of the Las Flores Pipeline System (described at length above), Celeron's project required approvals from a number of federal agencies, state agencies, and local governing bodies. However, construction and operation of the pipeline system was primarily overseen and permitted by the Bureau of Land Management, the California State Lands Commission, and Santa Barbara County (the "County"), which together prepared a joint Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the project, as required by both CEQA and the National Environmental Policy Act (NEPA). A final joint EIR/EIS was certified in 1985 (the "1985 EIR/EIS"), which each agency relied on in its respective review of the project.[1]

55.     Among other things, the 1985 EIR/EIS included a comprehensive description of Celeron's proposed project, from design and construction of the pipeline system through to operation and abandonment. On information and belief, it is the only surviving, publicly available document that contains a complete description of the proposed project.

56.     Of the pipeline features detailed in the 1985 EIR/EIS, two are particularly relevant here.

57.     The first is the pipeline's coating and insulation system. Because of the high viscosity of the Outer Continental Shelf oil produced off Santa Barbara County, it cannot be pumped at ambient temperatures. Instead, it must be delivered to a pipeline at a relatively high temperature — e.g., as

---

[1] The Final EIR/EIS published in 1985 is a finalizing addendum to the 1984 Draft EIR/EIS. The preface of the Final EIR/EIS explains that the Final EIR/EIS is intended to be read "in conjunction with, rather than in place of, the Draft EIR/EIS that was released for public review on August 1, 1984." Thus, collectively, the two documents and their appendices form the project EIR/EIS. The Draft EIR/EIS is available on the County's website, at https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672. The Final EIR/EIS is likewise available at https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

proposed by Celeron, 160 degrees — and then maintained at an elevated temperature during transport. Accordingly, to minimize heat loss from the line, the 1985 EIR/EIS specified that the "[e]ntire . . . pipeline . . . would be insulated . . . with 1.5 inches of polyurethane with a vinyl outer jacket." (Draft EIR/EIS, p. 2-5.)

58.     Thus, the Las Flores Pipeline System was ultimately installed with three "layers" of material: (1) a coal tar urethane coating, which was applied directly to the pipes' bare steel to help ward off corrosion; then (2) 1.5-inches of urethane foam insulation, which was sprayed onto the pipe over the coating; and, lastly, (3) a wrap of polyethylene tape, which would act as a moisture barrier and protect the insulation on the pipe.



59.     The second, and perhaps most important, feature of the proposed pipeline system was its cathodic protection system — the foremost means by which the pipeline would be protected from corrosion.

60.     Corrosion, in essence, is an electrochemical reaction between metal and its environment. In steel pipelines — like the Las Flores Pipeline System — external corrosion occurs naturally over time as electrons in the pipeline's metal atoms transfer to the surrounding environment, causing metal loss from the surface of the pipe. Corrosion is especially aggressive in buried pipelines that are in direct contact with the ground.

61.     The first line of protection from external corrosion is a pipeline's coating, which can prevent the flow of electrons to the pipe's surroundings. However, even the best coating will wear over time, leaving bare spots in the coating (called "holidays") where steel can leave the pipe. Thus, even if

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

properly coated, a buried pipeline will inevitably corrode without additional protection. Accordingly, buried pipelines are generally equipped with an additional corrosion control feature called a cathodic protection system, which targets and prevents corrosion in areas where the pipe's coating has been compromised.

62.    In short, a cathodic protection system imparts an electric current onto a pipeline through a process that, when effective, causes a substitute source of metal to corrode in place of the pipeline. As long as the current is sufficient, the system theoretically prevents any corrosion of the pipeline, or at least holds it in check.

63.    More specifically, a cathodic protection system works as follows: first, a device called a rectifier sends an electric current to "sacrificial" metals in the earth, which are positioned near the pipeline; next, the current picks up electrons from the metals and travels through the ground to the pipeline, which receives the electrons; and lastly, the current travels through the pipeline and back to the rectifier, completing the circuit. The pipeline's receipt of electrons from the sacrificial metals prevents it from losing electrons and corroding; the metals, meanwhile, corrode in place of the pipeline, "sacrificing" themselves to protect the pipeline. (The process effectively creates an electrochemical cell, with the sacrificial metals serving as the "anode" of the cell (which loses electrons, or "oxidizes") and the pipeline as the "cathode" (which gains electrons, or "reduces") — hence the name "cathodic protection.")



64.     Federal regulations have long required that buried pipelines generally be equipped with cathodic protection. (*See* 49 C.F.R. § 195.563.) Thus, consistent with those regulations, Celeron's proposal specified that "[t]he *entire* pipeline would be protected from corrosion with cathodic protection systems." (Draft EIR/EIS, p. 2-5). To ensure the cathodic protection system was functioning as intended, the system would be periodically inspected and maintained, and "[c]orrosion control test stations would be installed with which to test the integrity of the corrosion protection." (Draft EIR/EIS, pp. 2-5, 2-32, 4-106).

65.     The importance of the proposed cathodic protection system, and its centrality to the project itself, cannot be overstated. As the pipelines' ultimate means of corrosion control, cathodic protection was foundational to the overall design of the Las Flores Pipeline System and the success of the project. As the 1985 EIR/EIS acknowledged, "[p]rotection of a pipeline from corrosion is of *critical importance* to the environment as well as the pipeline operator"; without such protection, the strength of the pipeline wall can deteriorate, leading to a break in the pipe and a possible oil spill. (Draft EIR/EIS, p. 4-106 (emphasis added).)

66.     Relatedly, environmental review of the project was largely premised on an effective cathodic protection system. Indeed, in predicting the likelihood of an oil spill — the primary environmental impact considered — the 1985 EIR/EIS explicitly relied on cathodic protection as a design specification that "would reduce the probability of an event [i.e., oil spill] occurring," and would be "very effective" in doing so. (Final EIR/EIS, pp. 2-57, Appendix 4.3.)

67.     After certification of the 1985 EIR/EIS, Celeron received all necessary approvals for construction and operation of the Las Flores Pipeline System. Celeron proceeded with construction in the late 1980's, and the pipeline system went into service in or around 1992.

68.     In 1998, the pipeline system was acquired by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P. (together, "Plains"), which would own and operate the pipelines for the majority of their life.

**The 2015 Refugio Oil Spill and Ineffectiveness of Cathodic Protection**

69.     On May 19, 2015, CA-324 ruptured near Refugio State Beach Park, releasing more than 120,000 gallons of heavy crude oil into the surrounding environment. The spill devastated

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

approximately 150 miles of the California coast. Thousands of acres of shoreline and subtidal habitat were destroyed, and an untold number of animals — including marine mammals — were injured or killed. The spill also forced the closure of fisheries and beaches, which jeopardized local businesses and caused an estimated 140,000 lost recreational user days between Santa Barbara and Ventura Counties.

70. The spill was one of the largest in California history, and the damage to the region's unparalleled resources was immeasurable. However, the economic toll of the spill was also considerable. To date, Plains, which owned and operated the Las Flores Pipeline System at the time of the spill, has spent upwards of $870M in clean up costs, remediation, and compensatory damages to various third parties. $200M of that went to local business and property owners affected by the spill.

71. Upon investigation, PHMSA determined that the rupture in CA-324 was a result of "progressive external corrosion," and that the pipeline's cathodic protection system — intended to prevent such corrosion — was ineffective.[2] Without sufficient protection from corrosion, the pipeline wall had thinned as much as 89% at the point of rupture, and was thus no longer able to withstand the internal pressure of operations. Notably, the pipeline was only operating at approximately 55% of its maximum operating pressure at the time it failed.

72. As it turns out, the ineffectiveness of cathodic protection on CA-324 was a product of the pipeline's flawed design. Specifically, the various layers of material installed on the pipeline — its coating, foam insulation, and outer protective tape wrap — created conditions that prevented the pipeline's cathodic protection system from functioning as intended.

73. The coal tar urethane coating installed on the Las Flores Pipeline System is an older type of coating that is nonconductive, meaning cathodic protection current cannot pass through it. It also has a tendency to lose its adhesion over time, becoming separated or disbonded from the pipe. When it becomes disbonded — as it did here — moisture can reach the pipe's bare steel and form corrosion cells underneath the coating. Those corrosion cells, in turn, can cause many different forms of corrosion, including stress corrosion cracking and selective seam corrosion cracking, *which cannot be prevented or remedied by cathodic protection*.

---

[2] PHMSA's Failure Investigation Report, cited herein, is available on PHMSA's website, at https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

74. The pipeline's insulation and protective tape barrier separately rendered cathodic protection ineffective on the line, for a few reasons. First and foremost, the external tape wrap installed on the pipeline is not conductive, and it thus acted to prevent cathodic protection current from reaching the pipeline's wall. Likewise, the underlying foam insulation worked to shield the pipeline from the electric current.

75. Additionally, the pipeline's external tape wrap wrinkled and cracked over time, allowing water to saturate the underlying foam insulation and, eventually, ingress all the way to the pipeline wall. Water then accumulated along the pipeline and migrated to the lowest local elevation point, becoming trapped beneath the insulation. Where the moisture reached the pipe's bare steel, it created corrosion cells that aggressively ate away at the pipe over time. This phenomenon, called "corrosion under insulation," was identified as "the primary corrosion mechanism" that led to the rupture in CA-324. (PHMSA Failure Investigation Report, Appendix M, p. 18.) According to PHMSA, cathodic protection cannot prevent "corrosion under insulation" when, as here, the outer wrap that protects the insulation inevitably becomes compromised. (PHMSA Failure Investigation Report, p. 14.)

76. Importantly, the above issues were not limited to CA-324. Ultimately, **PHMSA found pervasive metal loss throughout the entirety of the Las Flores Pipeline System, and it concluded that cathodic protection is ineffective on both CA-324 and CA-325**. (PHMSA Failure Investigation Report, pp. 3, 14, Appendix E.) That information was not known until 2016 — more than thirty years after the 1985 EIR/EIS was certified.

77. PHMSA further concluded that, as a general matter, "[cathodic protection] is ineffective on buried, insulated pipelines" writ large. (PHMSA Failure Investigation Report, Appendix E, p. 2.) On information and belief, it may have been previously understood that buried, insulated lines could be susceptible to aggressive corrosion, but the earliest report considering the ineffectiveness of cathodic protection on such lines, prepared by the National Association of Corrosion Engineers (NACE), was not issued until 1992 — seven years after the 1985 EIR/EIS was certified.

78. In addition to the failure of the pipeline's cathodic protection system, PHMSA cited another factor that contributed to the spill: Plains' failure to properly detect and mitigate corrosion.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

79.    In the years leading up to the spill, Plains had been periodically running an in-line inspection ("ILI") tool to assess the integrity of the Las Flores Pipeline System, as required by federal regulations. The ILI surveys, unsurprisingly, revealed an alarming pattern of progressive corrosion. The below charts depict results from ILI surveys that Plains conducted on CA-324 in 2007 and May 6, 2015, and show the areas where, according to the surveys, the pipeline wall had corroded more than 40%.





Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

80.     Equally alarming is that the ILI tool used by Plains proved to be inaccurate and unreliable. When Plains performed exploratory digs to corroborate the results of its 2007 and 2012 ILI surveys — as required by federal regulations — its field measurements were inconsistent with the ILI results. In many areas, the ILI tool had significantly underestimated (or "undercalled") the depth of corrosion that was actually present. Plains, however, did not consult its ILI vendor about the inaccuracies or take any meaningful steps to resolve the issue.

81.     PHMSA's investigation, which included a number of its own exploratory excavations, revealed that Plains' May 2015 ILI survey was likewise inaccurate. According to PHMSA, the ILI tool was only "accurate," per industry standards, 57% of the time. And it had wildly undercalled the corrosion in the area where the pipeline ultimately ruptured. While the 2015 survey showed a corrosion depth of 49%, in actuality the pipeline wall had thinned about 89%. The chart below compares the 2015 ILI survey results with measurements taken in the field, depicting the inaccuracy of the ILI tool.



82.     Following the Refugio Oil Spill, PHMSA issued a series of Corrective Action Orders (CAOs) requiring, *inter alia*, that the Las Flores Pipeline System be emptied, purged, and idled, and it remains idle to date. Due to the unavailability of the pipeline system, the SYU was shut in, and production at the unit was suspended indefinitely. Neither the Las Flores Pipeline System nor the SYU have been operated for almost ten years.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**Transfer of Jurisdiction to OSFM and Conditions for Restarting**

83.     At the time of the Refugio Oil Spill, the Las Flores Pipeline System was classified as an *interstate* pipeline system and, thus, was subject to the exclusive regulatory jurisdiction of PHMSA. However, following the spill, Plains cancelled its Federal Energy Regulatory Commission (FERC) certificates for the pipeline system, acknowledging that the pipelines had never actually been used to facilitate interstate commerce and, in any event, were no longer available to do so. By cancelling its FERC certificates, Plains effectively reclassified the Las Flores Pipeline System as an *intrastate* pipeline system, which transferred regulatory and enforcement jurisdiction over the pipelines to OSFM.

84.     In May 2016, PHMSA formally acknowledged the reclassification of the pipelines and the transfer of jurisdiction to OSFM. The pipelines, which were previously known as Lines 901 and 903, were given the new monikers CA-324 and CA-325, respectively, and rebranded as the Las Flores Pipeline System.

85.     Several years later, PHMSA, OSFM, and a number of other state and federal agencies sued Plains seeking civil penalties and compensation for natural resource damages associated with the spill. (*U.S. v. Plains All American Pipeline*, United States District Court for the Central District of California, Civil Action No. 2:20-cv-02415.) The parties settled, and the agreement was memorialized in a Consent Decree entered by the court.[3]

86.     In addition to imposing monetary penalties on Plains, the Consent Decree contemplated the future of the Las Flores Pipeline System. It offered three paths forward for Plains (and any subsequent owner) in light of the pipelines' design defects. First, Plains could simply abandon and decommission the defunct pipelines. Second, Plains could replace the pipeline system with new, non-insulated pipe, which could potentially allow cathodic protection to function properly. And last, as a third and final option, Plains could restart the existing pipelines, but only under strict conditions.

87.     As relevant here, those restart conditions included the following: (1) complete all remaining corrective actions required by PHMSA's CAOs, such as repairing metal loss anomalies on the pipelines; (2) install new automatic shutoff valves along the Las Flores Pipeline System, which,

---

[3] The Consent Decree is available on the Environmental Protection Agency's website, at https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf.

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

importantly, do not *prevent* a spill, but can help reduce the volume of a spill should one occur; and (3) obtain State Waivers from OSFM "for the limited effectiveness of cathodic protection" on both CA-324 and CA-325, which would excuse Plains from complying with the regulations that require cathodic protection. (Consent Decree, at Appendix B, Article I, § 1.) Notably, nowhere does the Consent Decree suggest that OSFM *must* issue a State Waiver for either CA-324 or CA-325.

88.    Should Plains complete (1), (2), and (3) above, the final step in the restart process would be (4) submitting Restart Plans to OSFM for review and approval, and obtaining ultimate approval from OSFM to restart CA-324 and CA-325. The Consent Decree is clear that neither Plains nor any subsequent owner/operator may operate CA-324 or CA-325 "until authorized to do so by OSFM," at OSFM's discretion.

### Interim Efforts to Restart the SYU and the Las Flores Pipeline System

89.    Recall that the Las Flores Pipeline System is integral to the viability of the SYU; without it, oil produced at the SYU cannot be transported or brought to market. Hence, the SYU was shut-in when the pipeline system was taken offline in 2015. Notably, in the last full year it was active, the SYU was responsible for 50% of all greenhouse gas emission in Santa Barbara County.

90.    With the Las Flores Pipeline System out of service, ExxonMobil ("Exxon"), the longtime owner and operator of the SYU, first attempted to resume production at the SYU by bypassing the pipeline system altogether. Specifically, it applied to the County for permission to truck, rather than pipe, its oil from Las Flores Canyon to Kern County. The County denied Exxon's application in March 2022, citing obvious environmental and safety concerns.

91.    Meanwhile, Plains sought to replace the Las Flores Pipeline System, ostensibly due to the risk the corroded pipelines pose to public health and safety.

92.    Plains applied to the County for the necessary land use permits, and the County began conducting environmental review of Plains' proposal, as required by CEQA. In preparing a Draft EIR for the project, the County considered, as an alternative to replacement, the impacts of simply restarting the existing pipelines. An analysis prepared by the County's consultants suggested that restarting the defective pipelines would not only invite another disastrous spill, but all but ensure it. Relying on a report prepared by OSFM, the analysis found that, without effective cathodic protection, the risk of a

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

spill from the pipelines was *five times greater* than initially estimated. **The analysis further concluded that restarting — rather than replacing — the Las Flores Pipeline System could result in a spill once a year, and a rupture (a spill greater than five barrels) every four.** And a spill in the coastal zone, it found, could be nearly twice the size of the 2015 spill, even with the addition of automatic shut-off valves. An excerpt of this analysis is attached hereto as **Exhibit A**.

93.    As Plains' application to replace the pipelines was pending, Plains sold the Las Flores Pipeline System to PPC, then a wholly-owned subsidiary of Exxon. Shortly thereafter, on October 24, 2023, Exxon withdrew the application. In reneging on the plan to replace the pipeline system, it cited, in part, "a high degree of local permitting and business uncertainty . . . that has impacted investment commitment . . . ."

94.    Pivoting, Exxon instead sought to *restart* the existing Las Flores Pipeline System, despite the threat of another spill from the defective pipelines. Pursuant to the Consent Decree, on July 10, 2023, Exxon, via PPC, applied to OSFM for State Waivers for the limited effectiveness of cathodic protection on CA-324 and CA-325.

95.    Exxon's restart proposal would also require retrofitting the Las Flores Pipeline System with new safety valves, as mandated by the Consent Decree and Government Code section 51013.1 — a pipeline safety statute enacted in response to the Refugio Oil Spill. Installation of the valves, however, required County approval.

96.    The County Planning Commission denied Exxon's application to install new valves, which, again, would facilitate restart of the defective pipeline system. The Planning Commission rejected the idea that the Las Flores Pipeline System could be safely or responsibly restarted, pointing to the pipelines' degraded condition and ineffective cathodic protection system. On appeal, the Board of Supervisors voted 2-2 on the issue, effectively denying Exxon's application.[4]

97.    Having repeatedly failed in its attempts to restart the SYU, Exxon eventually looked to offload its SYU assets. Enter Sable, a new, speculative entity formed to chance the regulatory hurdles that Exxon failed to clear.

---

[4] Exxon later sued the County in United States District Court for the Central District of California, Case No. 2:23-cv-09218-DMG-MRW. After Sable acquired PPC, the parties reached a settlement agreement that cleared the way for PPC to install the valves.

**Sable's Acquisition and Haphazard Efforts to Restart the Las Flores Pipeline System**

98.     Sable Offshore Corp. began in 2020 as several special purpose entities, which were organized to evaluate and facilitate a potential acquisition of the SYU and associated assets. The corporations were formed by current Sable CEO Jim Flores, who had just led a different, troubled venture to bankruptcy.

99.     On February 14, 2024, Sable Offshore Corp. acquired the SYU from Exxon and all its associated assets: the three offshore platforms, the subsea pipelines and infrastructure, and the Las Flores Canyon processing facilities. Sable Offshore Corp. also acquired PPC, and with it, the defunct Las Flores Pipeline System.

100.     However, Sable, being undercapitalized, lacked the financial resources to fund the $625M deal with Exxon. Thus, Sable was forced to secure a $622M loan from Exxon — a whopping 99% of the purchase price — just to finance it. In exchange, Sable agreed that the SYU assets may, at Exxon's option, revert to Exxon if the SYU is not back online by early 2026.

101.     The SYU assets — which have not been operational since 2015 — remain Sable's only assets, leaving Sable without a reliable or predictable source of revenue. Sable is currently operating at an astounding ~$700M deficit, and it will continue operating at a deficit unless and until it restarts the SYU. Hence, according to Sable itself, "substantial doubt exists about the Company's ability to continue," and it "may have insufficient funds available to operate its business prior to first production."

102.     With the clock ticking on Sable's ability and window to restart the SYU, Sable is, predictably, trying to cut any regulatory corners it can.

103.     Following in Exxon's footsteps, Sable is attempting to restart, rather than replace, the defective Las Flores Pipeline System, which has now aged past its expected lifespan. And, as it rushes to bring the Las Flores Pipeline System back online, Sable has repeatedly violated state law, ignored directives from state agencies, and otherwise shown an aversion to regulatory compliance.

104.     Recall that, in order to restart the pipelines, the Consent Decree requires that Sable install additional safety valves along the pipeline system and conduct repairs where severe corrosion has been detected. On information and belief, beginning September 2024, Sable began extensive excavations along the pipeline route, including in wetlands, critical habitat for special-status species, and other

sensitive areas — all without coordinating with relevant agencies or applying for necessary permits.

105.    When the California Coastal Commission (CCC) got wind of Sable's activities, it issued Sable a Notice of Violation (NOV) clarifying that Sable is required to obtain Coastal Development Permits (CDPs) for both the valve installations and repair work. Alarmingly, *Sable continued working despite the NOV*, prompting the CCC to issue a second NOV and, ultimately, a Cease-and-Desist Order, which directed Sable to apply for CDPs.

106.    Separately, in December 2024, Sable received two NOVs from the Regional Water Quality Control Board alerting it of violations of the Clean Water Act and California Water Code and directing it to apply for necessary permits. Sable also received an NOV from the California Department of Fish and Wildlife (CDFW), which alleged that Sable had potentially trespassed on state property, harmed endangered species, and improperly disturbed a number of streambeds.

107.    On information and belief, Sable temporarily ceased work in response to the above NOVs. However, on February 14, 2025, Sable resumed work on the Las Flores Pipeline System — willfully ignoring state law and many of the above NOVs. The CCC was forced to issue yet another Cease-and-Desist Order, and *Sable proceeded to continue work in violation of the order*. At a March 13, 2025, town hall, a representative of CCC stated that never in the history of the CCC had a company so brazenly violated a Cease-and-Desist Order.

108.    Due to Sable's continuous violations of state law, on April 10, 2025, the CCC issued Sable an ~$18M fine — the maximum penalty it could impose and the largest in the agency's history.

109.    On information and belief, Sable has now completed installing new valves on the pipeline system as well as the vast majority of its planned repair work — two key prerequisites to restart. However, as discussed above, there are still a few other boxes that Sable must check before restarting, including obtaining State Waivers from OSFM.

**OSFM Grants State Waivers with No Public Process, Environmental Review, or Justification**

110.    On April 24, 2024, Sable, via PPC, notified OSFM that it would be assuming Exxon's applications for State Waivers for CA-324 and CA-325, which had been pending since July 2023. The applications requested, pursuant to the Consent Decree, permission to operate despite the limited effectiveness of cathodic protection on the pipelines. They also "request[ed] relief from the requirements

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

to evaluate and remediate all corrosion of or along longitudinal seam welds per 49 C.F.R. § 195.452(h)(4)(iii)(H)." Sable's April 24, 2024 correspondence, with the two applications attached, is attached hereto as **Exhibit B**.

111. In light of the threat to public health and safety posed by the Las Flores Pipeline System, beginning in March 2024, community organizations began asking OSFM for increased transparency and public engagement as it considered whether to permit the restart of CA-324 and CA-325. In response, OSFM agreed to "[h]old public meetings and engage with the public at appropriate milestones for a potential restart," including, specifically, "at the State Waiver step of the process."

112. On September 27, 2024, Petitioners EDC, SBCAN, and GOO! sent a letter to OSFM renewing their request for a public process. Petitioners explained that not only was a public hearing appropriate under the circumstances but, in the case of the State Waivers, required by law. Petitioners also pointed out that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR/EIS or any project approval, and the potential impacts of doing so have never been fully considered. Thus, the letter also called on OSFM to conduct environmental review of Sable's State Waiver applications, as well as Sable's broader restart proposal, pursuant to its obligations under CEQA. Petitioners' September 27, 2024 letter is attached hereto as **Exhibit C**. OSFM never responded to the letter.

113. Also on September 27, 2024, thirteen state legislators sent a letter of their own to OSFM echoing the calls of community organizations for environmental review of Sable's restart proposal and a transparent public process. The letter stated that the legislators "have grave reservations regarding the restart of CA-324 and CA-325, which have *already* caused a catastrophic oil spill, and which Sable intends to restart without effective protection from corrosion. . . . [O]ne governing body has already identified that proceeding in this manner would inevitably lead to another oil spill, one that could be twice the size of the 2015 disaster." The legislators' September 27, 2024 letter is attached hereto as **Exhibit D**.

114. On November 7, 2024, OSFM responded to the state legislators. It inaccurately downplayed its role in overseeing the restart of the Las Flores Pipeline System, and it refused to commit to conducting environmental review or holding a formal public process. However, acknowledging "the

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

public's considerable interest in the restart of these pipelines," OSFM reiterated its commitment to hold a "public meeting" — not a hearing — at an indefinite point in the future. On information and belief, the agency also verbally committed to holding the "public meeting" *before* making a determination on Sable's State Waiver applications.

115.    On December 17, 2024, without having held any sort of "public meeting," OSFM preliminarily approved the State Waiver applications. OSFM did not offer any sort of public process in advance of its decision, or even release key documents (like the applications themselves). Nor did it conduct environmental review of the State Waiver applications. In other words, in approving the Waivers, OSFM entirely disregarded applicable procedural requirements, critical environmental laws, and its own previous commitments to state legislators and the public.

116.    On December 23, 2024, EDC and Center for Biological Diversity submitted to OSFM an expert report prepared by Accufacts, Inc. — the first of two such reports. The report explained why cathodic protection is ineffective on the Las Flores Pipeline System. It also identified deficiencies in ILI technologies which lead to inaccurate assessments of external corrosion threats that most likely exist on the pipelines. Notably, the report explained why the pipelines were at risk of failure and cannot be made as safe as new pipelines. Accufacts, Inc.'s first report is attached hereto as **Exhibit E**. OSFM did not respond to the report.

117.    OSFM submitted the State Waivers to PHMSA on December 18, 2024, triggering a 60-day review period for PHMSA to consider the Waivers. On February 11, 2025, PHMSA notified OSFM that it would not object to either State Waiver, rendering the Waivers final and effective. The State Waivers for CA-324 and CA-325 are attached hereto as **Exhibits F and G**, respectively.

118.    As requested by Sable, the State Waivers permit the operation of CA-324 and CA-325 despite their lack of effective cathodic protection, and, separately, relieve Sable of compliance with 49 C.F.R. § 195.452(h)(4)(iii)(H), so long as Sable complies with some sixty conditions outlined in the Waivers. According to OSFM, the conditions ensure that the pipelines will be "as safe or safer" than if they had effective cathodic protection.

119.    At first blush, the imposition of sixty-plus conditions would suggest that the Waivers comprehensively address the pipelines' defects and safety issues. But a closer review reveals substantial

and concerning deficiencies with the Waivers.

120.    In short, the Waivers substitute cathodic protection with more frequent inspections of the pipelines using ILI tools — tools which we know from the 2015 spill to be demonstrably unreliable. In other words, rather than *proactively* preventing corrosion in the first place with proven technology, the Waivers instead rely on purely *reactive* measures — i.e., attempting to track down corrosion (with inherently unreliable tools), locate anomaly sites in the field, and properly repair them — which leave room for technical and operator error.

121.    Put differently, the Waivers allow for the pervasive, progressive corrosion of the Las Flores Pipeline System that we saw leading up to the 2015 spill to continue, and naively hope that Sable will do a better job than Plains at detecting and remediating it. Yet there is little reason to suspect that will be the case. The tools themselves, we know, can be inaccurate. And Sable — a new, speculative company that has never actually operated an oil and gas pipeline — has done little to assure that it can or will comply with the maintenance program contemplated by the Waivers. In fact, considering its pattern of regulatory aversion and violations, all we have definitively seen from Sable is the opposite.

122.    The many deficiencies of the Waivers are explained at length in a second expert report prepared by Accufacts, Inc., which is attached hereto as **Exhibit H**. The report concludes that, contrary to OSFM's determination, the Las Flores Pipeline System will not be made safe by the Waivers' conditions.

123.    Perhaps realizing the indefensibility of the Waivers, OSFM did not even bother to provide any supportive reasoning for its decisions. Indeed, the Waivers do not include *any* analysis as to why the pipelines will be "as safe or safer" than if they had effective cathodic protection, despite such an analysis being required by state and federal law.

124.    On information and belief, OSFM's approvals here were unconventional and unprecedented. The Waivers are, for all intents and purposes, entirely experimental. In fact, the State Fire Marshal, Daniel Berlant, all but admitted as much at a town hall on March 13, 2025, acknowledging that a number of other jurisdictions are closely watching to see how the Waivers play out.

125.    Given the "experimental" nature of the Waivers, and the critical resources that this 120-mile-long pipeline system can impact, the need for public comment, independent expert scrutiny, and

environmental review was especially critical here, as highlighted by the two reports prepared by Accufacts, Inc. Instead, OSFM pushed the Waivers through behind closed doors, reneging even on its minimal commitment to first have a public meeting on the issue.

**<u>LEGAL BACKGROUND</u>**

126. Petitioners hereby incorporate by reference each and every allegation set forth above.

**OSFM's Delegated Authority under the Federal Hazardous Liquid Pipeline Safety Act**

127. Pipeline safety is generally regulated by the federal government pursuant to the federal Hazardous Liquid Pipeline Safety Act (the "Federal PSA"), 49 United States Code section 60101 *et seq.*, which is administered by PHMSA. However, the extent of the federal government's regulatory authority varies between interstate and intrastate pipelines.

128. For *interstate* pipelines, PHMSA has exclusive jurisdiction over matters of pipeline safety. In fact, state authorities are expressly preempted from "adopt[ing] or continu[ing] in force safety standards for interstate pipeline facilities. (49 U.S.C. § 60104(c).)

129. However, PHMSA's authority over *intrastate* pipelines — like the Las Flores Pipeline System — is merely provisional. Pursuant to 49 U.S.C. section 60105, states have the option to assume exclusive responsibility for regulating intrastate pipelines by submitting an annual certification to the Secretary of Transportation ("Certification"). Among other things, the Certification must affirm that the state has adopted the minimum federal pipeline safety standards, which are outlined in Title 49 of the Code of Federal Regulations, Part 195 ("Part 195").

130. Once a state has submitted a valid Certification, exclusive regulatory and enforcement authority over intrastate pipelines passes to the state. (*See* 49 U.S.C. § 60105(a).) Indeed, PHMSA is prohibited from "prescrib[ing] or enforc[ing] safety standards and practices" on intrastate pipelines that are regulated under a certified program. (49 U.S.C. § 60105(a).)

131. Like most other states, California has and maintains such a Certification, giving it the authority to regulate its intrastate pipelines. That authority is delegated to OSFM, which administers the state's pipeline safety laws and regulations under color of the Certification. (*See* Gov. Code, § 51010.) OSFM also effectively administers the federal safety standards outlined in Part 195, which, as required for Certification, are incorporated by reference in California's pipeline safety regulations. (*See* 19

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

C.C.R. § 2000.)

### State Waivers under the Federal PSA

132.    Where a state has a valid Certification, the Federal PSA grants state authorities the flexibility to depart from federal minimum safety standards. They are free, for example, to impose more stringent safety standards than those required by federal law. (49 U.S.C. § 60104(c).) Or, they can excuse compliance with federal safety standards by issuing a "State Waiver." (49 U.S.C. 60118(d).)

133.    Specifically, 49 U.S.C. section 60118 provides that, "[i]f a [Certification] . . . is in effect, the State authority *may*" — i.e., at its discretion — "waive compliance with a safety standard to which the [C]ertification . . . applies." (49 U.S.C. 60118(d) (emphasis added).) However, the statute imposes an important limitation on that authority: a State Waiver can only be issued "*in the same way and to the same extent* that the Secretary [of Transportation] may waive compliance under subsection (c)" of the statute. (49 U.S.C. § 60118(d) (emphasis added).) In other words, while a state authority has the discretion to grant a State Waiver, it can only do so by following the standards and procedures set forth in 49 U.S.C. section 60118(c).

134.    49 U.S.C. section 60118(c), in turn, outlines the corollary authority of the Secretary to waive federal safety standards for pipelines directly under PHMSA's jurisdiction — e.g., interstate pipelines.[5] (49 U.S.C. 60118(c).) It prescribes the procedures by which the Secretary may issue a waiver and sets forth the substantive standard for issuing both "nonemergency" and "emergency" waivers. (*Id.*)

135.    For "nonemergency waivers," subsection (c) provides that the Secretary can issue a waiver "on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118(c)(1)(A).) However, as relevant here, subsection (c) explicitly states that "[t]he Secretary may act on a waiver . . . *only after notice and opportunity for a hearing*." (49 U.S.C. § 60118(c)(1)(B) (emphasis added).) And, it directs that "[t]he Secretary *shall* state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3) (emphasis added).)

136.    Again, the provision authorizing state authorities to issue waivers incorporates the standards and procedures outlined in 49 U.S.C. section 60118(c). (49 U.S.C. § 60118(d).) Thus, to grant

---

[5] When the Secretary issues a waiver, it is the functional equivalent of a State Waiver, but it is called a "Special Permit."

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

a State Waiver, a state authority must (1) provide the public with notice and an opportunity for a hearing on the waiver application, (2) properly determine that the waiver would not be inconsistent with pipeline safety, and (3) provide a statement of reasons explaining its decision. (49 U.S.C. § 60118(c), (d).) Where a state authority fails to comply with one or more of these requirements, it violates the Federal PSA.

137. Additionally, before issuing a State Waiver, a state authority "must give the Secretary written notice of the waiver at least 60 days before its effective date." (49 U.S.C. § 60118(d).) The Secretary can concur with the waiver, object, or simply let the sixty days lapse without taking any action. (*See id.*) Should the Secretary concur or take no action, the waiver becomes final and effective.

**Additional Waiver Requirements under the State Elder Pipeline Safety Act**

138. California's Elder Pipeline Safety Act of 1981 (the "State PSA"), Government Code section 51010 *et seq.*, is the state's preeminent pipeline safety law. To the extent allowed by the Federal PSA, it grants the State Fire Marshal the "exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines" in California, and it outlines a number of pipeline safety requirements above and beyond what is required by federal minimum standards. (*See* Gov. Code, § 51010.)

139. The State PSA also directs the State Fire Marshal to "adopt hazardous liquid pipeline safety regulations in compliance with federal law." (Gov. Code, § 51011.) As noted above, among the regulations that OSFM has adopted is 19 C.C.R. section 2000, which incorporates by reference the entirety of Part 195.

140. Like the Federal PSA, the State PSA allows for the waiver of certain safety requirements. However, it imposes a higher standard for such "exemptions." It states: "The State Fire Marshal may exempt the application of regulations adopted pursuant to this section" — like Part 195's federal minimum safety standards — "to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011(b).)

141. Should the State Fire Marshal grant an exemption, it must be in writing, and the notice of exemption "shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code., § 51011(c).)

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**California Environmental Quality Act**

142.    CEQA was enacted to ensure that government agencies consider the environmental consequences of their actions before approving projects. (Pub. Res. Code, §§ 21000 *et. seq.*) CEQA's statutory requirements are further defined and implemented by the "CEQA Guidelines." (14 Cal. Code Regs., §§ 15000 *et. seq.*)

143.    A central element of CEQA is to require public agency decision makers to evaluate and document the potential environmental implications of their actions. (Pub. Res. Code, §§ 21000, 21001; CEQA Guidelines, §§ 15002, 15003; *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal. 3d. 247, 254-56.) In enacting CEQA, the state legislature intended the law "to be interpreted in such a manner as to afford the fullest possible protection to the environment . . . ." (CEQA Guidelines, § 15003(f); *Friends of Mammoth*, 8 Cal. 3d at 259.)

144.    CEQA contains both procedural and substantive requirements. A critical procedural requirement is the need to prepare an EIR for projects that may result in a significant effect on the environment. (CEQA Guidelines, § 15064.) The purpose of an EIR is to consider the significant effects of a project, as well as alternatives and mitigation measures that can avoid or mitigate such effects. (Pub. Res. Code, §§ 21002.1, 21061; CEQA Guidelines, §§ 15003, 15126, 15126.2, 15126.4, 15126.6.) The EIR requirement "is the heart of CEQA." (CEQA Guidelines, § 15003(a); *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810.) "The EIR process protects not only the environment but also informed self-government." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal. 3d 376, 392.)

145.    In addition to the procedural requirements of CEQA, the law contains a "substantive mandate" requiring agencies to impose feasible alternatives and/or mitigation measures to avoid or substantially lessen the environmental effects of projects. (Pub. Res. Code, § 21002; CEQA Guidelines, § 15091.) These alternatives and mitigation measures must first be identified and discussed in an EIR. (CEQA Guidelines §§ 15126.4, 15126.6.)

146.    Public participation is essential to the function of CEQA. (Pub. Res. Code, § 21000(e); *Environmental Planning and Information Council v. County of El Dorado* (1982) 131 Cal. App. 3d 350, 354 ("A paramount consideration is the right of the public to be informed in such a way that it can

intelligently weigh the environmental consequences of any contemplated action and have an appropriate voice in the formulation of any decision.").)

147.    When an EIR has been prepared for a project, subsequent or supplemental environmental review is required if certain events occur which may result in new or increased significant effects on the environment. (Pub. Res. Code § 21166; CEQA Guidelines § 15162(a).) Specifically, a subsequent EIR is required where:

(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or Negative Declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or Negative Declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative.

(CEQA Guidelines § 15162(a).)

148. If an agency is faced with a new discretionary decision after a project has been approved, the agency must consider whether any of the conditions set forth in CEQA Guidelines section 15162(a) apply, and if so, the agency must prepare a subsequent EIR. (CEQA Guidelines § 15162(c).)

## FIRST CAUSE OF ACTION

### Violation of the Federal PSA — Failure to Provide a Public Process

### (Code Civ. Proc., § 1085; 49 U.S.C. § 60118(d))

149. Petitioners hereby incorporate by reference each and every allegation set forth above.

150. 49 U.S.C. section 60118(d), which incorporates the standards and procedures outlined in section 60118(c), imposed a mandatory and nondiscretionary duty on OSFM to provide the public with "notice and an opportunity for a hearing" prior to granting the State Waivers for CA-324 and CA-325. (49 U.S.C. § 60118(c), (d).)

151. Prior to granting the State Waivers, OSFM did not provide any cognizable public process. OSFM did not provide formal notice to the public of its intent to consider the State Waiver applications; did not invite or consider public comment on the applications; and did not provide the public with any opportunity for a hearing. In fact, OSFM did not even make the State Waiver applications publicly available prior to granting the Waivers, despite repeated requests from the public to do so.

152. Thus, OSFM violated its mandatory and nondiscretionary duty under the Federal PSA to provide the public with notice and an opportunity for a hearing.

153. The State Waivers for both CA-324 and CA-325 became final and effective on February 11, 2025, when PHMSA notified OSFM that it would not object to either State Waiver. Thus, each State Waiver constitutes a final agency action that is ripe for judicial review.

154. Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief, and they depend on the Court granting the relief

requested herein to require OSFM to satisfy its obligations under the Federal PSA. (*See* Code Civ. Proc., § 1086.)

155.   In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners had a beneficial right to performance of OSFM's duties. (*See* Cal. Const. arts. I, §§ 1, 3(a); Code Civ. Proc., § 1085.)

## SECOND CAUSE OF ACTION

**Violation of the Federal PSA — Failure to Provide a Statement of Reasons**

**(Code Civ. Proc., § 1085; 49 U.S.C. § 60118(d))**

156.   Petitioners hereby incorporate by reference each and every allegation set forth above.

157.   49 U.S.C. section 60118(d), which incorporates the standards and procedures outlined in section 60118(c), imposed a mandatory and nondiscretionary duty on OSFM to, for each State Waiver, "state . . . the reasons for granting the [W]aiver." (49 U.S.C. § 60118(c), (d).)

158.   Each State Waiver includes, in its entirety, the following: a perfunctory recital of Sable's requests, a statement of OSFM's regulatory jurisdiction, and the scope and conditions of each approved Waiver. But neither Waiver provides *any* justification, supporting analysis, or reasons for OSFM's decision to grant the Waiver. On information and belief, OSFM did not issue any other letter, order, or document in approving the Waivers that included a statement of reasons for its decision.

159.   Thus, OSFM violated its mandatory and nondiscretionary duties under the Federal PSA to provide, for each State Waiver, a statement of reasons for granting the Waiver.

160.   The State Waivers for both CA-324 and CA-325 became final and effective on February 11, 2025, when PHMSA notified OSFM that it would not object to either State Waiver. Thus, each State Waiver constitutes a final agency action that is ripe for judicial review.

161.   Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief, and they depend on the Court granting the relief requested herein to require OSFM to satisfy its obligations under the Federal PSA. (*See* Code Civ. Proc., § 1086.)

162.    In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners had a beneficial right to performance of OSFM's duties. (*See* Cal. Const. arts. I, §§ 1, 3(a); Code Civ. Proc., § 1085.)

### THIRD CAUSE OF ACTION

**Declaratory Relief — State Waiver Procedures Required under the Federal PSA**

**(Code Civ. Proc., § 1060; 49 U.S.C. § 60118(d))**

163.    Petitioners hereby incorporate by reference each and every allegation set forth above.

164.    As noted, OSFM did not offer any cognizable public process before granting the State Waivers, and, on information and belief, has a pattern and practice of granting such waivers without providing the public with notice, an opportunity for a hearing, or a statement of reasons for its decision, as required by the Federal PSA.

165.    An actual controversy has arisen and now exists between Petitioners, on the one hand, and OSFM, on the other hand, relative to their respective rights and duties as it relates to Petitioners' request that OSFM provide a public process before approving Sable's State Waiver applications.

166.    Petitioners seek a judicial determination regarding the scope of OSFM's obligations under the Federal PSA. Petitioners seek a declaration that, in granting a State Waiver, OSFM must comply with same standards and procedures that the Secretary of Transportation must adhere to in granting a waiver under 49 U.S.C. section 60118(c), including providing the public with notice, an opportunity for a hearing, and a statement of reasons.

### FOURTH CAUSE OF ACTION

**Abuse of Discretion under the Federal PSA**

**(Code Civ. Proc., § 1094.5; 49 U.S.C. § 60118(d))**

167.    Petitioners hereby incorporate by reference each and every allegation set forth above.

168.    The State Waivers for CA-324 and CA-325 constitute final administrative decisions that were quasi-judicial in nature.

169.    Code of Civil Procedure section 1094.5 permits judicial review of quasi-judicial administrative decisions. In reviewing a quasi-judicial decision, the court considers, in part, "whether

there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5(b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by evidence." (*Id.*)

170.     As a matter of procedure, OSFM abused its discretion by failing to comply with the mandatory State Waiver procedures outlined in the Federal PSA, as explained in Petitioners' First and Second Causes of Action.

171.     As to the merits of OSFM's decisions, the Federal PSA only allows a State Waiver to be granted if the relevant state authority "determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118(c)(1)(A), (d).) OSFM has consistently construed this standard to mean that a State Waiver can only be granted where the operator's "proposed alternative measures can provide an equal or greater level of safety than the required regulation." (*Pathways for Restarting Pipelines*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.) In other words, as OSFM has also put it, the proposed alternative measures must ensure the pipeline will be "as safe or safer" than if it was in compliance.

172.     As discussed above, OSFM did not provide any analysis in support of its decisions to grant the State Waivers. Nor, relatedly, did it make any specific findings as to why the conditions of the Waivers would ensure that CA-324 and CA-325 are "as safe or safer" than if they had effective cathodic protection, or complied with 49 C.F.R. § 195.452(h)(4)(iii)(H). In fact, neither Waiver even referenced the applicable State Waiver standard in the Federal PSA, making it impossible to determine whether OSFM applied the appropriate legal standard in its review.

173.     By failing to provide *any* findings in support of its decisions, OSFM abused its discretion. (*See Topanga Assn. for a Scenic Comm. V. County of Los Angeles* (1974) 11 Cal.3d 506, 515 ("[I]mplicit in [Code of Civil Procedure] section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order.").)

174.     Moreover, even a cursory review of the State Waivers reveals that they are patently inadequate to address the defects in the Las Flores Pipeline System and, ultimately, fail to ensure that CA-324 and CA-325 will be "as safe or safer" than if they complied with all applicable regulations.

175. First, as noted above, the fundamental logic underpinning the State Waivers is flawed from the start. The Waivers allow Sable to replace effective cathodic protection, which prevents corrosion from occurring in the first place, with something akin to an enhanced management program. Indeed, instead of *proactively* preventing corrosion with proven technology, the Waivers require only that the operator *reactively* track down and remediate the incessant corrosion of the pipelines, primarily by using ILI tools.

176. You do not have to be a pipeline safety expert to see that the management program contemplated by the Waivers, which *allows* the progressive corrosion of the Las Flores Pipeline System to continue, is not, by any measure, as safe as preventing corrosion in the first place.

177. Second, we have already seen the shortcomings of the risk management measures on which the Waivers rely. As discussed, the failure of ILI tools was a contributing factor to the Refugio Oil Spill. Plains periodically conducted ILI inspections of the Las Flores Pipeline System, but the results of those inspections were often erroneous, and they failed to accurately detect the anomaly that ultimately caused the rupture in CA-324. With the real possibility that anomalies are undercalled or go unnoticed, effective cathodic protection is the only way to ensure the Las Flores Pipeline System does not again corrode to the point of rupture.

178. Third, and compounding that concern, OSFM has failed to consider Sable's operational capacity. The management program outlined in the Waivers puts an enormous amount of faith in the operator's capacity to properly and timely run ILI tools, review the results of the ILI surveys, precisely locate corrosion anomalies, and properly repair them. But there is no indication that Sable merits such trust. Sable is a new, speculative entity that has never actually operated an active oil and gas facility. And all it has affirmatively demonstrated is a propensity to cut regulatory corners.

179. Fourth, the Waivers only consider the risk of corrosion under insulation ("CUI"). While CUI is certainly an issue on the Las Flores Pipeline System, it is only one of many corrosion threats that the pipelines are vulnerable to without effective cathodic protection.

180. As previously discussed, the pipelines' heavy shielding, tape barrier, vintage and type of coating, operating temperature, and surrounding environment all work in concert to create external corrosion in various forms. Such external corrosion falls into four general categories: (1) wall loss or

38

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

thinning, (2) cracking or crack-like corrosion, (3) pitting, and (4) corrosion within dents. The latter two forms of corrosion are especially difficult to identify via ILI tools, and almost impossible to reliably predict when it comes to estimating failure. The Waivers do not address these threats.

181. Fifth, while the Waivers require hydrotesting of CA-324 and CA-325A before they return to service, they inexplicably exclude CA-325B. Without a hydrotest, OSFM cannot assure that previously-identified anomalies on CA-325B have been properly repaired.

182. Sixth, and relatedly, the parameters for the hydrotest of CA-324, including the pressure within the line, are insufficient to accurately test CA-324's integrity.

183. Seventh, the Waivers do not require critical corrosion tracking that can inform an operator of corrosion "hot spots" along the pipeline system and sites where there may be interactive threats, like general wall loss in combination with cracking corrosion. Given the pipelines' history of pervasive corrosion, separately identifying and plotting corrosion indications by type, severity, and approximate milepost is a necessary step towards ensuring their safety.

184. The above list is representative of why the Waivers fail to ensure that the Las Flores Pipeline System will be "as safe or safer" as if it complied with all applicable regulations, but it is non-exhaustive. Petitioners' review of the Waivers is ongoing, and, as OSFM releases more pertinent documents, Petitioners and their retained expert(s) will likely identify additional deficiencies with the Waivers.

185. In sum, the Waivers represent an astonishing lapse of judgment in an agency that is charged with overseeing pipeline safety, made worse by the fact that OSFM provided no public process or justification for its decisions. Because (1) OSFM failed to comply with the mandatory State Waiver procedures outlined in the Federal PSA, (2) OSFM failed to provide *any* findings in support of its decisions, and (3) the State Waivers, by any measure, fail to ensure the Las Flores Pipeline System will be as safe or safer than if it complied with all applicable regulations, OSFM prejudicially abused its discretion in issuing the Waivers, warranting administrative mandamus relief. (Code Civ. Proc., § 1094.5(b).)

186. Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or

adequate remedy at law other than mandamus relief.

187. In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners are beneficially interested in OSFM's decisions on Sable's State Waiver applications.

## FIFTH CAUSE OF ACTION

### Violation of the State PSA — Failure to Provide a Discussion of Significant Factors

### (Code Civ. Proc., § 1085; Gov. Code, § 51011(c))

188. Petitioners hereby incorporate by reference each and every allegation set forth above.

189. The Las Flores Pipeline System is subject to the State PSA and the regulations adopted thereunder, which are codified at Title 19 of the California Code of Regulations, section 2000 *et seq*. (*See* Gov. Code, § 51010.5(a).)

190. Government Code section 51011 allows the State Fire Marshal to "exempt the application of regulations adopted pursuant to [the State PSA]." (Gov. Code, 51011(b).) However, should the State Fire Marshal grant such an exemption, Government Code section 51011 imposes a mandatory and nondiscretionary duty to "include a discussion of those factors that the State Fire Marshal consider[ed] significant to the granting of the exemption." (Gov. Code, § 51011(c).)

191. The waivers that OSFM issued for CA-324 and CA-325 function, incontrovertibly, as State Waivers for purposes of the Federal PSA. But they also constitute "exemptions" under the State PSA, as they effectively excuse compliance with "regulations adopted pursuant to [the State PSA]." (Gov. Code, § 51011(b).)  Specifically, and as noted in the Waivers themselves, they excuse Sable from fully complying with Title 19 of the California Code of Regulations, section 2000, which incorporates by reference Part 195's federal minimum safety standards.

192. Thus, in addition to the standards and procedures for waivers required by the Federal PSA, Respondents had a concurrent obligation to comply with the more onerous waiver/exemption requirements required by the State PSA. Accordingly, in granting the State Waivers, Respondents had a mandatory and nondiscretionary duty to, for each Waiver, include in its decision a discussion of factors significant to the decision. (Gov. Code, § 51011(c).)

193. As discussed above in Petitioners' Second Cause of Action, in issuing the State Waivers, neither OSFM nor the State Fire Marshal provided *any* justification, supporting analysis, or reasons for its decision. Nor did they otherwise provide "a discussion of factors that the State Fire Marshal consider[ed] significant" to the decision. (Gov. Code, § 51011(c).)

194. Thus, Respondents violated their mandatory and nondiscretionary duties under the State PSA to provide, for each Waiver, a discussion of the factors they considered significant to the decision.

195. The Waivers (and "exemptions") for both CA-324 and CA-325 became final and effective on February 11, 2025. Thus, each State Waiver constitutes a final agency action that is ripe for judicial review.

196. Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief, and they depend on the Court granting the relief requested herein to require Respondents to satisfy their obligations under the State PSA. (*See* Code Civ. Proc., § 1086.)

197. In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners had a beneficial right to performance of Respondents' duties. (*See* Cal. Const. arts. I, §§ 1, 3(a); Code Civ. Proc., § 1085.)

<div align="center">

**<u>SIXTH CAUSE OF ACTION</u>**

**Abuse of Discretion under the State PSA**

**(Code Civ. Proc., § 1094.5; Gov. Code, § 51011(b))**

</div>

198. Petitioners hereby incorporate by reference each and every allegation set forth above.

199. The State Waivers for CA-324 and CA-325 constitute final administrative decisions that were quasi-judicial in nature.

200. Code of Civil Procedure section 1094.5 permits judicial review of quasi-judicial administrative decisions. In reviewing a quasi-judicial decision, the court considers, in part, "whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5(b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is

<div align="center">

41

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

</div>

not supported by the findings, or the findings are not supported by evidence." (*Id.*)

201. The State PSA only allows the State Fire Marshal to "exempt the application of regulations adopted pursuant to [the State PSA] . . . when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011(b).)

202. As discussed above, neither OSFM nor the State Fire Marshal provided any analysis in support of its decisions to grant the State Waivers. Nor, relatedly, did either expressly determine that the risk of the Waivers to public safety is slight and the probability of injury or damage remote, suggesting that they failed to properly consider and apply Government Code section 51011(b). Nor did OSFM or the State Fire Marshal make any specific findings to support such a determination. For that reason alone, approval of the waivers constitutes an abuse of discretion. (*See Topanga Assn. for a Scenic Comm. V. County of Los Angeles* (1974) 11 Cal.3d 506, 515 ("[I]mplicit in [Code of Civil Procedure] section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order.").)

203. Moreover, for the same reasons that the Waivers failed to meet the Federal PSA standard — outlined above in Petitioners' Third Cause of Action — they failed to meet the more onerous standard imposed by the State PSA.

204. Indeed, the risk of a rupture from the Las Flores Pipeline System is not merely hypothetical; it has already caused one of the worst oil spill disasters in California history. The Waivers would allow Sable — a speculative company — to resurrect the pipeline system without correcting or adequately addressing the fundamental design defect that caused the 2015 spill. Should Sable proceed under the Waivers, another spill is not just possible, but according to one independent analysis, likely. And the 120-mile long Las Flores Pipeline System — which passes through a suburban neighborhood, a number of popular recreation areas, and critical sources of water for inland communities — poses a substantial and direct threat to public safety.

205. Because the State Fire Marshal did not — and cannot — determine that the risk of the Waivers to public safety is slight and the probability of injury or damage remote, the Waivers constitute a prejudicial abuse of discretion, warranting administrative mandamus relief. (Code Civ. Proc., § 1094.5(b).)

206. Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief.

207. In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and natural resources, Petitioners are beneficially interested in the State Fire Marshal's decisions on Sable's State Waiver applications.

## SEVENTH CAUSE OF ACTION

### Declaratory Relief — Standards and Procedures Required under the State PSA

### (Code Civ. Proc., § 1060; Gov. Code, § 51011(b), (c))

208. Petitioners hereby incorporate by reference each and every allegation set forth above.

209. As noted, in granting the State Waivers, Respondents apparently did not consider the relevant requirements of the State PSA. Specifically, Respondents apparently ignored the standard set forth in Government Code section 51011(b). And they failed to provide a discussion of factors that were significant to the decisions to grant the waivers, as required by Government Code section 51011(c).

210. On information and belief, Respondents have a pattern and practice of granting State Waivers that effectively exempt compliance with state regulations without complying with, or even considering, the relevant requirements of the State PSA.

211. An actual controversy has arisen and now exists between Petitioners, on the one hand, and OSFM, on the other hand, relative to their respective rights and duties.

212. Petitioners seek a judicial determination regarding the scope of Respondents' obligations under the State PSA when issuing a State Waiver that effectively exempts an operator from compliance with state regulations. Petitioners seek a declaration that, in granting such a State Waiver, Respondents must comply with Government Code section 51011, including by considering a requested waiver under the standard set forth in Section 51011(b), and providing a discussion of factors significant to the decision to grant the waiver.

## EIGHTH CAUSE OF ACTION

### CEQA — Failure to Prepare a Subsequent EIR

**(Code Civ. Proc., § 1085; Pub. Res. Code, § 21166 ; 14 Cal. Code Regs. § 15162)**

213. Petitioners hereby incorporate by reference each and every allegation set forth above.

214. Sable's applications for State Waivers required approval by OSFM. OSFM had the discretion whether to grant the requested Waivers, and if so, on what terms. (*See* 49 U.S.C. § 60118(c), (d); Gov. Code, § 51011(b).)

215. Because discretionary approval by OSFM was required, the agency needed to determine whether any of the criteria set forth in Public Resources Code section 21166 and CEQA Guidelines section 15162(a) applied. (*See* CEQA Guidelines § 15162(c).) On information and belief, OSFM failed to even consider these three criteria, in violation of CEQA. However, all three apply here.

216. First, substantial changes are proposed in the project which require major revisions of the 1985 EIR/EIS.

217. The original project was proposed as an oil and gas pipeline system that would be protected, in its entirety, by cathodic protection. The 1985 EIR/EIS relied on this project description when it evaluated the potential impacts of the project, and its analysis assumed that the pipelines' cathodic protection system would be "very effective" at reducing the probability of an oil spill.

218. Now, however, Sable, via the Waivers, is proposing to operate the pipelines without effective cathodic protection, potentially increasing the risk of a spill as much as five times.

219. Additionally, the lack of effective cathodic protection will necessitate more excavations to check for and respond to anomalies, and such excavations are required by the Waivers to be conducted on a regular basis. These excavations, which were not contemplated in the 1985 EIR/EIS, will increase potential impacts to sensitive resources along the 120-mile pipeline route, including rivers, streams and wetlands; environmentally sensitive habitats; rare, endangered, and threatened species; and cultural resources.

220. Thus, operating without effective cathodic protection, and under the conditions imposed by the Waivers, constitutes a substantial change in the project that increases the risk and severity of impacts and requires major revisions to the 1985 EIR/EIS. Accordingly, OSFM must prepare a subsequent EIR. (CEQA Guidelines § 15162(a)(1).)

221. Second, the failure of the pipelines' cathodic protection system and resulting corrosion

constitutes a change in circumstances that requires a subsequent EIR. As discussed, without effective cathodic protection, the pipeline is vulnerable to pervasive, continuous, and progressive corrosion that was not accounted for in the 1985 EIR/EIS. This changed circumstance increases the risk and severity of potential oil spill-related impacts, and thus requires preparation of a subsequent EIR. (CEQA Guidelines § 15162(a)(2).)

222.    Third, it was only after the 2015 spill that the Las Flores Pipeline System was discovered to lack effective cathodic protection. This new information, which shows that the risk of an oil spill is substantially more severe than previously determined, could not have been known with the exercise of reasonable due diligence when the 1985 EIR/EIS was certified thirty-one years earlier. As to buried, insulated lines more generally, no formal report existed as to the ineffectiveness of cathodic protection prior to an industry analysis published by NACE in 1992 — seven years after certification of the 1985 EIR/EIS.

223.    Accordingly, that cathodic protection is ineffective on the Las Flores Pipeline System constitutes new information that was not known, and could not have been known, when the previous EIR/EIS was certified. Thus, OSFM is required to prepare a subsequent EIR to ensure an adequate analysis of the potential impacts of operating the Las Flores Pipeline System without effective cathodic protection. (CEQA Guidelines, § 15162(a)(3).)

224.    OSFM failed to comply with CEQA when it approved the State Waivers without preparing a subsequent EIR.

225.    On April 11, 2025, Petitioners served a Notice of Commencement of Action on Respondents pursuant to Public Resources Code section 21167.5. The Notice is attached hereto as **Exhibit I**.

226.    Petitioners have performed all conditions precedent to filing this action and have exhausted all available remedies to the extent required by law. Petitioners do not have a plain, speedy, or adequate remedy at law other than mandamus relief, and they depend on the Court granting the relief requested herein to require OSFM to satisfy its obligations under CEQA. (*See* Code Civ. Proc., § 1086.)

227.    In their capacity as members of the public interested in ensuring agency compliance with laws, regulations, and guidance concerning pipeline safety and the preservation of public health and

natural resources, Petitioners had a beneficial right to performance of OSFM's duties. (*See* Cal. Const. arts. I, §§ 1, 3(a); Code Civ. Proc., § 1085.)

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioners pray as follows:

1. That the Court immediately, and on an *ex parte* basis, issue a temporary stay of OSFM's approval of the State Waivers, pending completion of judicial review, pursuant to Code Civ. Proc., § 1094.5(g) and Rule 3.1202(c) of the California Rules of Court;

2. That the Court issue temporary, preliminary, and permanent injunctive relief preventing restart of the Las Flores Pipeline System under the State Waivers;

3. That the Court issue a peremptory writ of mandate directing CalFIRE, by and through OSFM, to set aside and vacate its approval of the State Waiver for CA-324;

4. That the Court issue a peremptory writ of mandate directing CalFIRE, by and through OSFM, to set aside and vacate its approval of the State Waiver for CA-325;

5. That the Court issue a peremptory writ of mandate directing Respondents, should they reconsider Sable's State Waiver applications, to:

   a. prepare a subsequent EIR that considers the potential impacts of operating the Las Flores Pipeline System without effective cathodic protection, without complying with 49 C.F.R. § 195.452(h)(4)(iii)(H), and under the conditions of the proposed State Waivers;

   b. conduct any other procedures that the Court deems necessary and/or appropriate under CEQA;

   c. provide the public with notice and an opportunity for a hearing before granting a State Waiver for either CA-324 or CA-325, as required by the Federal PSA;

   d. in granting a State Waiver for either CA-324 or CA-325, provide a statement of reasons, as required by the Federal PSA; and

   e. in granting a State Waiver for either CA-324 or CA-325, provide a discussion of factors significant to its decision, as required by the State PSA;

6. That the Court issue the specific additional declaratory relief prayed for in Petitioners'

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

Third and Seventh Causes of Action;

7.  That Petitioners be awarded attorneys' fees and costs pursuant to Sections 1021.5 and 1032(b) of the Code of Civil Procedure, and any other applicable law; and

8.  For such other and further relief as the Court deems just and proper.

Dated: April 15, 2025                    Respectfully submitted,

ENVIRONMENTAL DEFENSE CENTER

By:_____

LINDA KROP
JEREMY M. FRANKEL
TARA C. RENGIFO
Attorneys for Petitioners and Plaintiffs

---

47

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

## **VERIFICATION**

I, the undersigned, declare:

I am the Executive Director of Environmental Defense Center, a Petitioner in this action, and am authorized to make this verification for an on its behalf. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on   April 11, 2025  , in   Santa Barbara        , California.

*Alex Katz*
Alex Katz
Executive Director
Environmental Defense Center

---

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

## **VERIFICATION**

I, the undersigned, declare:

I am the President of Get Oil Out!, a Petitioner in this action, and am authorized to make this verification for an on its behalf. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on April 10, 2025 in Santa Barbara, California.

Michael T. Lyons
President
Get Oil Out!

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**VERIFICATION**

I, the undersigned, declare:

I am the Executive Director of Santa Barbara County Action Network, a Petitioner in this action, and am authorized to make this verification for an on its behalf. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on ___4-11-25___, in ___Santa Maria___, California.

_____
Ken Hough
Executive Director
Santa Barbara County Action Network

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

**VERIFICATION**

I, the undersigned, declare:

I, Maureen Ellenberger, am the Santa Barbara/Ventura Chapter Chair of Sierra Club, a Petitioner in this action, and I have been authorized to make this verification on behalf of Sierra Club. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on 4/09/25, in Santa Barbara, California.

Maureen Ellenberger
Santa Barbara/Ventura Chapter Chair
Sierra Club

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

## **VERIFICATION**

I, the undersigned, declare:

I am the Executive Director of Santa Barbara Channelkeeper, a Petitioner in this action, and am authorized to make this verification for an on its behalf. I have read the foregoing Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") and know its contents. The facts alleged in the above Petition are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on *April 10, 2015*, in *Santa Barbara*, California.

Walter Edward Morton
Executive Director
Santa Barbara Channelkeeper

---

Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief

# EXHIBIT A



07/25/2024  12:45:32 PM

Impacts related to Hazardous Materials and Risk of Upset would only be related to maintenance and construction activities and these maintenance activities would have a minor impact on risk due to the potential for localized spills of hydraulic or diesel oils. **Impact RISK.1, RISK.2, RISK.3** would not be applicable and mitigation measures RISK.2-1 through RISK.2-7 would not be applicable. Impacts would therefore be **insignificant**.

Construction activities related to valve stations, pump stations and some segments of the pipeline that could be abandoned could potentially produce an increased risk of wildfires during construction, and **RISK.4** would still be applicable and mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable**.

### *No Project, Existing Pipeline Restart Alternative*

Under this alternative, the existing pipeline would be utilized instead of a new pipeline being installed, and transportation of crude oil would occur through the existing pipeline. The existing pipeline would be brought into compliance with existing requirements related to AB 864 and CSFM best available technologies (BAT), including the installation of additional valves along the pipeline route. The Applicant would have to apply to the CSFM for a waiver to utilize the existing pipeline since the existing pipeline is subject to corrosion under insulation, which could affect the efficacy of cathodic protection systems. Generally, a pipeline is not allowed to operate with ineffective cathodic protection systems. There is uncertainty as to whether the Applicant could demonstrate to the CSFM that the pipeline could be operated safely, and therefore this variation and the variation above (no Project, No Pipeline Alternative) are both addressed.

Assuming that a CSFM waiver is granted, the Applicant would have to install additional valves along the pipeline in order to comply with AB 864 and BAT requirements, similar to the proposed Project pipeline design. The installation of these additional valves would require some construction activities and some limited clearing at multiple locations along the pipeline ROW.

The existing pipeline is insulated, and therefore there would be no need for heaters at the Sisquoc Pump Station or the installation of the gas pipeline.

The installation of valves would most likely be at locations similar to the proposed Project valve installations as the pipeline would follow a similar ROW and similar terrain.

Hazards are associated with risks to the public from a spill and subsequent fire, as well as impacts from a spill to the environment, impacts to schools and potential wildfire impacts. The existing pipeline is a larger diameter pipeline, and therefore the draindown spill volumes would be larger than the proposed Project. This results in potentially larger spills and larger fires, impacting more people, as well as larger spills to the environment. In addition, the frequency of a spill from the existing pipeline would be higher due to its age and the potential for the cathodic protection to be compromised by the insulation. These factors have been incorporated into the analysis presented below.

### *Risks to Public Safety*

**Impact RISK.1** describes the potential spill sizes and the estimated frequency of spills from the pipeline system and the potential for immediate (fires, etc.) health impacts on the public.

### *Crude Pipeline Spill Volumes*

The spill volumes for this alternative were calculated based on the pipeline size, which would be larger than the proposed Project, and the associated terrain for different segments of the pipeline. The Applicant

07/25/2024  12:45:32 PM

provided a risk assessment for the proposed Project and this analysis was utilized to estimate the spill volumes associated with a larger pipeline size. Figure 5.6-11 shows the estimated spill volumes along the pipeline route for each segment as a worst case for that segment. The worst-case sized spill volume is shown in Table 5.6-16 for the different portions of the crude oil pipeline alternative.

*Crude Pipeline Spill Frequencies*

Spill frequencies from a crude pipeline are based on the PHMSA failure rates for the California pipeline database. The PHMSA base failure rate for crude oil pipelines is shown in Table 5.6-17. The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age. However, the CSFM study indicated a minimal increase in failure rate for pipelines that are less than 40 years old and the PHMSA database used to estimate the base failure rate includes many older pipelines. Therefore, only the five times factor was applied as an estimate of the increased failure rate for this pipeline.

**Figure 5.6-11    No Project – Existing Pipeline Restart Alternative Spill Volume by Segment Milepost**



Source: based on Applicant QRA and EFRD 2019, with adjustments for the size of the existing pipeline.



07/25/2024  12:45:32 PM

**Table 5.6-16    No Project – Existing Pipeline Restart Alternative Crude Pipeline Worst Case Spill Volumes**

| Location | Proposed Project - Maximum Spill Volume, gallons | Alternative - Maximum Spill Volume, gallons |
|---|---|---|
| LFC – Gaviota Plant | 84,000 | 126,000 |
| Gaviota – Sisquoc | 131,040 | 284,594 |
| Sisquoc - Pentland | 198,030 | 657,893 |
| Coastal Segments | 117,600 | 237,344 |

Source: based on Applicant QRA and EFRD 2019, with modification to address spill duration of 60 minutes. Coastal segments include up to valve station 2-500. Includes the installation of additional valve stations as per the proposed Project locations.

**Table 5.6-17    No Project – Existing Pipeline Restart Alternative Crude Pipeline Spill Frequencies**

| Location | Spill Frequency | Return Period, years rupture/leak/total |
|---|---|---|
| PHMSA California Crude oil base rate | 1.62 per 1,000-mile years | - |
| Adjustment due to Pipeline Condition | 5.3 factor | - |
| PHMSA Adjusted Rate | 8.56 per 1,000-mile years | - |
| Failure rate for L901R (49.2 miles) | 0.43 failures per year | 9/3/2 years |
| Failure Rate for L903R (74.1 miles) | 0.63 failures per year | 6/2/2 years |
| Failure Rate for L901R + L903R | 1.07 failures per year | 4/1/1 years |

Source: based on Applicant QRA and EFRD 2019 with CSFM 1991 adjustment factor. PHMSA data since 2010. The return period is the anticipated period between releases. Includes leaks and ruptures.

*Crude Pipeline Population Densities*

The population densities along the route are based on estimates for remote, rural, low density and high-density areas with some additions for highways. The population densities are similar to those used for the proposed Project except for the area through the City of Buellton, since the existing pipeline would pass through the City of Buellton and the proposed Project would pass around the City of Buellton to the west.

*Crude Pipeline Fires*

In the event of a spill of oil and subsequent ignition resulting in a pool fire, the heat (i.e., thermal radiation) from the fire could result in a serious injury or fatality. The assumptions for impacts would be the same as for the proposed Project.

*Gas Pipeline*

The proposed gas pipeline would not be installed as part of this alternative since heaters at Sisquoc would not be installed.

*Alternative Pipeline: Public Safety Risk*

The combination of scenario frequency and consequences is combined to estimate risk using FN curves. FN curves are depictions of the risk levels of a project and show the frequency (F) of scenarios that could produce a given fatality or injury level (N) or greater. These are presented for the proposed Project in **Impact RISK.1**. Santa Barbara County has established risk thresholds that use societal risk profiles (FN curves) to determine the significance of hazardous material releases. These FN curves address both injury and fatality. The Santa Barbara County's adopted thresholds are generally applicable to fixed facilities and pipelines. The risk FN curves are shown in Figure 5.6-12 and are based on the FN curves developed as part of the Plains 2019 QRA analysis, with adjustments for the existing pipeline (increased pipeline diameter

Draft Print
07/25/2024  12:45:32 PM

and failure frequency). The FN curves would be located within the amber region, and the impacts to public health due to pipeline releases would be **significant and unavoidable.**

**Figure 5.6-12    No Project – Existing Pipeline Restart Alternative Pipeline Risk FN Curves**

 

Source: Plains 2019 with modifications

***Risks to the Environment***

A spill of crude oil from the pipeline could impact resources in the vicinity of the pipeline ROW. See Section 5.2 Biological Resources, Section 5.4 Cultural Resources and Section 5.9 Hydrology and Water Quality for a discussion of the impacts of a crude oil spill on biological, hydrological and cultural resources along the crude oil pipeline ROW.

*Crude Pipeline Spill Volumes*

The spill volumes are discussed above under **Impact RISK.1**. For the public health assessment under **Impact RISK.1**, a worst-case spill shutdown time of 15 minutes was used due to the already conservative analysis for fires and impacts to the public used in the QRA. However, for spills that could affect the environment, a longer duration is used. As evidenced by the May 2015 Refugio spill, there is the potential for a pipeline shutdown to take longer than 15 minutes.

*Crude Pipeline SCADA System*

The SCADA system used for the alternative would be the same as that used for the proposed Project since the SCADA system would be required to be updated per CSFM and AB864 requirements.

07/25/2024  12:45:32 PM

*Proposed Project Pipeline: Spills Affecting Marine Resources*

Portions of the pipeline extend along the Santa Barbara County coastline. A crude oil spill could drain from the spill location through existing culverts or drainages and enter the marine environment. This is what occurred during the May 2015 Refugio Beach spill. An estimated 43 percent of the oil entered the ocean from the Refugio spill location, which was an estimated 750-foot pathway from the ocean shoreline. Because the proposed pipeline is located onshore at various distances from the shoreline, a rupture at different locations spilling the same amount of oil could allow for oil to enter the marine environment. Assuming a linear function of oil being trapped and adsorbed onshore with distance, the maximum amount of oil could enter the ocean where the pipeline is closest to the ocean and potential worst-case spill volumes are large. An estimated maximum amount of 71,621 gallons of crude oil could enter the ocean at the worst-case spill location. An estimated 11.8 miles of the 16.6-mile coastal portion (71 percent) of the pipeline would be vulnerable to spills entering the ocean if a spill were to occur along any of those segments and the adsorption rate were similar to that which occurred during the Refugio spill. This assumes that no rain event is occurring and that drainages are not flowing.

There are a number of variables affecting the amount of oil that could reach the ocean from an onshore spill, including the terrain, the location of drainages under the freeway and the railroad tracks, the soil type, and extent of rocky interfaces as well as the amount of moisture. During a rain event, when drainages and creeks are flowing, a spill into the waterways could follow the flow and enter the marine environment more readily. A spill under these conditions would also have more extensive terrestrial impacts and reach the marine environment more readily but would also be subjected to turbulence and mixing along the drainages.

For inland areas, the area with the largest potential impacts is along the Cuyama River. Based on the elevation profile and the spill volumes, the maximum spill volume along the Cuyama River segments of the pipeline (between proposed Project valve 3-800 and 5-400 nearest the Cuyama River) and using the absorption rate as seen in the Refugio spill, a spill along the Cuyama River portion of the pipeline could impact resources a distance as far as about 3,200 feet, which means that pipeline segments within about 3,200 feet of the Cuyama River could potentially impact the river in the event of a spill.

*Potential Impacts*

Depending on the location of the spill, the environmental conditions, and the biological resources present, Impact RISK.2 short and long-term effects to biological resources associated with a crude oil spill has the potential to be significant and unavoidable. Mitigation measures RISK.1-1 through RISK.1-7 would apply. Due to the increased size and frequency of spills, this significant and unavoidable impact would be a greater severity than that presented by the proposed Project.

**Risks to Schools**

For **Impact RISK.3** (schools), the pipeline construction activities for the existing pipeline would only affect areas near the proposed valve installations. The existing pipeline is located about 500 feet from the Oak Valley School in western Buellton. In order to address the risk levels to this school, the California Department of Education (CDE) school siting risk protocol was utilized to determine the risk levels.

The assessments demonstrated that the risk levels are acceptable under the CDE Risk Protocols with a Total Individual Risk/Individual Risk Criteria (TIR/IRC) ratio of 0.29, with a 1.0 TIR/IRC ratio being the CDE Protocol threshold. It is important to note that the CDE protocol examines the individual risk at the closest school and does not examine the risks cumulatively along the entire pipeline route. Because the CDE

# EXHIBIT B



April 24, 2024

Chief Jim Hosler
CAL FIRE – Office of the State Fire Marshal
Chief of Pipeline Safety and CUPA Programs
Pipeline Safety
3780 Kilroy Airport Way, Suite 500
Long Beach, CA  90806

**RE:    Pacific Pipeline Company (operated by Sable Offshore Corp., OPID #40851)
State Waiver Applications for:
Las Flores Pipeline CA-324 (OSFM #0015)
Las Flores Pipeline CA-325A/B (OSFM #0001)**

Chief Hosler,

As you are aware, Sable Offshore Corp. purchased exclusive ownership of the shares in Pacific Pipeline Company, owner of the Las Flores Pipeline, from ExxonMobil affiliate Mobil Pacific Pipeline Company, at which point Pacific Pipeline Company became a wholly owned subsidiary of Sable Offshore Corp.  Subsequent to its acquisition, Sable Offshore Corp. filed for and received an OPID from the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration (OPID #40851) to be named operator of the Las Flores Pipeline system.

This letter serves to confirm Sable Offshore Corp.'s intention to continue pursuit of the referenced State Waiver Applications submitted by Pacific Pipeline Company on July 10, 2023.

Please update your office's records to reflect the new contact information for Pacific Pipeline Company as applicant and Sable Offshore Corp. as operator to be:

Pacific Pipeline Company
Sable Offshore Corp. (Operator ID #40851)
845 Texas Ave. Suite 2920
Houston, TX  77002
lyearwood@sableoffshore.com

If you have any questions, or require anything further, please do not hesitate to contact me at (832) 434-9461.

Sincerely,

Lance Yearwood
Vice President
Sable Offshore Corp.

**845 TEXAS AVENUE, SUITE 2920, HOUSTON, TEXAS 77002**

**Pacific Pipeline Company**
22777 Springwoods Village Parkway
Spring, Texas 77389

**PACIFIC PIPELINE COMPANY**

July 10, 2023

VIA ELECTRONIC MAIL

James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
Pipeline Safety Division

3780 Kilroy Way, Suite 500
Long Beach, California 90806

**Subject:  Pacific Pipeline Company (OPID #40475) State Waiver Application for the**
***Las Flores Pipeline CA-324 (OSFM #0015)***

Dear Mr. Hosler:

Pacific Pipeline Company ("PPC") requests a ten-year State Waiver from the Office of the State Fire Marshal ("OSFM") for the intrastate pipeline segment CA-324 (formerly Line 901) to comply with Civil Action No. 2:20-CV-02415 Consent Decree, DOJ Case #90-5-1-1-1130, pursuant to Appendix B, Article I(1)A.  Within the State Waiver, PPC also requests relief from the requirements to evaluate and remediate all corrosion of or along longitudinal seam welds per 49 C.F.R. § 195.452(h)(4)(iii)(H).  (Collectively, the "Application").

Please note, the Application contains confidential information that is exempt from disclosure under the California Public Records Act (PRA), the Freedom of Information Act (FOIA), and other laws including, but not limited to, Gov't Code § 7927.705, § 7927.500, 5 U.S.C. § 552(b)(3), (4), (6), 6 U.S.C. § 133, and 6 U.S.C. § 1207-1208.  The submission also contains information that constitutes homeland security and critical infrastructure information that should be protected from public disclosure.  If OSFM does not concur that the information contained herein is exempt from disclosure, PPC hereby respectfully requests that OSFM contact me and our legal counsel, Rebekah Bennett (copied here) to discuss the matter and appropriate next steps.  PPC also requests OSFM to notify PPC if OSFM intends to provide copies of any of the enclosed materials to other public agencies (including those agencies that are parties to the Consent Decree) so that PPC and OSFM can further discuss and coordinate procedures to protect confidential information from public disclosure.  If OSFM subsequently receives a PRA request that seeks disclosure of the Application, PPC requests advance notice and the opportunity to contest any production of any confidential information to third parties.

The following information is provided as part of the State Waiver application:

---

**(1) The name, mailing address, and telephone number of the applicant and whether the applicant is an operator;**

Pacific Pipeline Company (Operator ID #40475)
Attn: Diana Skates, Pipeline Safety Advisor
22777 Springwoods Village Pkwy
Spring, TX 77389
diana.r.skates@exxonmobil.com

**(2) A detailed description of the pipeline facilities for which the special permit is sought, including:**
  **(i) The beginning and ending points of the pipeline mileage to be covered and the Counties and States in which it is located;**

A State Waiver is sought for a segment of the Las Flores Pipeline system, identified under trunk line CA-324 (formerly Line 901). Table 1 summarizes relevant information. A map of the pipeline system is included as **Attachment A** and further details about the pipeline are included in **Attachment B**.

**Table 1: Pipelines Applicable to State Waiver Application**

| System Name | Line ID | Line Designation | Location | Mileage | California County |
|---|---|---|---|---|---|
| Las Flores Pipeline | 0015 | CA-324 | Las Flores Canyon to Gaviota<br>34.478915°, -120.041783°<br>34.476081°, -120.198142° | 10.86 | Santa Barbara |

  **(ii) Whether the pipeline is interstate or intrastate and a general description of the right-of-way including proximity of the affected segments to populated areas and unusually sensitive areas;**

The Las Flores Pipeline is a common carrier intrastate pipeline. CA-324 has potential to impact High Consequence Areas, including unusually sensitive areas. A map of the pipeline system is included as **Attachment A** and further details about the pipeline and its right-of-way are included in **Attachment B**.

  **(iii) Relevant pipeline design and construction information including the year of installation, the material, grade, diameter, wall thickness, and coating type;**

The Las Flores Pipeline CA-324 was constructed in 1990, hydrostatically tested in November 1990, and placed into crude oil service in 1992. The Las Flores Pipeline is specifically designed and permitted to transport outer continental shelf (OCS) and other

locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins.

Additional, relevant, design and construction information is summarized in **Attachment B.**

**(iv)  *Relevant operating information including operating, leak history, and most recent testing or assessment results;***

### Operating Information
The pipeline transported crude oil in continuous service from its initial commissioning until 2015.  CA-324 has not transported crude oil since May 19, 2015.  Information related to historic operations and continued operating information upon resuming transportation of crude oil is included in **Attachment B**.

### Leak History
Prior to May 19, 2015, there were no releases from CA-324 pipeline which met reportable criteria.  On May 19, 2015, CA-324 (formerly Line 901) experienced a release on a section of buried pipe.  PHMSA's Failure Investigation Report (May 2016) attributed the rupture of the pipeline to "progressive external corrosion of the insulated, 24-inch diameter steel pipeline."  PHMSA's findings indicate that the direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released crude oil.  PHMSA's investigation identified the following categories of contributory causes:

1. Ineffective protection against external corrosion of the pipeline
   - The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.
   - The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.
2. Failure by the Operator to detect and mitigate the corrosion
   - The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

Subsequently, PHMSA issued a Corrective Action Orders (CAOs) to the Operator identifying additional findings.  The Operator responded to PHMSA's CAOs and on October 14, 2020, a Consent Decree was entered by the United States District Court for the Central District of California.  Pursuant to Section X of the Consent Decree, the CAOs issued by PHMSA were closed and all remaining obligations of the CAOs became part of the Consent Decree.  Hence, the Consent Decree is the document governing the particular requirements and obligations of the Operator to resume crude oil transportation in the pipeline, including the requirement for a State Waiver. In October 2022, PPC acquired the pipeline asset and assumed certain obligations of the Consent Decree that transferred with the asset, including the requirement for a State Waiver for the Las Flores Pipeline.

### Assessment Results
Assessment results are included in **Attachment B.**

### (3) A list of the specific regulation(s) from which the applicant seeks relief;

1. Pacific Pipeline Company is seeking to comply with Civil Action No. 2:20-CV-02415 Consent Decree, DOJ Case #90-5-1-1-1130, pursuant to Appendix B, Article I(1)A:
   A. *Prior to restarting [CA-324], [Pacific Pipeline Company] shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on [CA-324]. [Pacific Pipeline Company] must receive a State Waiver from the OSFM prior to restarting [CA-324].*

2. Pacific Pipeline Company seeks relief from 49 C.F.R. 195.452(h)(4)(iii)(H) – Corrosion of or along a longitudinal seam weld.

### (4) An explanation of the unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for its facility;

**General External Corrosion Under Insulation**
CA-324 was shutdown in 2015 following the release on CA-324.  A Consent Decree was entered by the District Court on October 14, 2020, that requires a State Waiver prior to restarting CA-324 and CA-325A/B.  These specific requirements of the Consent Decree became applicable to PPC upon transfer of the assets.  CA-324 is comprised of buried and insulated pipe.  The pipeline has a coal-tar coating system and insulation wrap that provides corrosion deterrence.

PPC seeks approval to manage external corrosion of the pipeline through a supplemental combination of accelerated reassessments, usage of the appropriate assessment tools, integration of data from the appropriate alternating ILI technologies, enhanced anomaly response criteria targeted at corrosion under insulation, and advanced data analysis techniques to account for potential growth of corrosion under insulation including feature interaction criteria for anomaly assessment.

**Selective Seam Weld Corrosion (SSWC)**
The PHMSA Fact Sheet on Selective Seam Corrosion (known in industry as SSC or SSWC) describes SSWC as "a localized corrosion attack along the bond line of low-frequency electric resistance welded (LF-ERW) and electric flash welded (EFW) piping, that leads to the development of a wedge-shaped groove that is often filled with corrosion products."[1]  The Fact Sheet goes on to say that "LF-ERW or EFW pipe manufacturing processes first came into use in the 1920s.  Both types of pipe are manufactured by forming steel plates into round cylinders and then joining the longitudinal edges through a welding process.  Due to technology and quality control issues with some of the pipe manufactured prior to 1970, the weld bondline may

---

[1] PHMSA Fact Sheet on Selective Seam Corrosion, December 1, 2011; <https://primis.phmsa.dot.gov/comm/FactSheets/FSSelectiveSeamCorrosion.htm>

be susceptible to corrosion processes.  This is particularly true if the pipeline has the following conditions present:
- Exposure to corrosive conditions due to poor or absent coating;
- Ineffective cathodic protection; or
- The presence of non-metallic inclusions in the weld bondline region (e.g., contaminants present during the manufacturing process).

SSWC is generally not considered to be a concern with pipe manufactured after 1970 due to the use of cleaner steels having greatly reduced sulfur contents and the replacement of low frequency welding equipment with high frequency equipment in the manufacturing process." As provided in **Attachment B**, Line CA-324 contains exclusively high frequency ERW (HF-ERW) longitudinal seamed pipe manufactured in 1985 and 1986.  When ILI tools call corrosion along the seam, it may simply be corrosion incidental to the seam rather than preferential.  Indeed, SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system.  Therefore, the threat of SSWC is not considered applicable to Line CA-324.  As such, selection of future inspection technologies will prioritize the identification and characterization of external blunt metal loss as the primary threat to this buried, insulated line, namely ultrasonic wall measurement (UTWM) and axial magnetic flux leakage (MFL-A) technologies.

Note that PPC only accepts calls from circumferential magnetic flux leakage (MFL-C), spiral magnetic flux leakage (SMFL), ultrasonic crack detection (UTCD) and/or electro magnetic acoustic transducer (EMAT) ILI systems when applying criteria for corrosion interaction with the longitudinal seam weld, as these technologies are designed for and, therefore are best suited for detection of the longitudinal seam weld and axially oriented corrosion.  MFL-A and/or UTWM are not designed for detection of the longitudinal seam weld or axially oriented corrosion, so calls from those ILI systems are not reviewed for longitudinal seam weld interaction.

The CA-324 Las Flores Canyon to Gaviota testable segment was inspected using a MFL-C tool in February 2022, to better characterize the threat of external metal loss under insulation. Since SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system, PPC is therefore requesting OSFM to approve a State Waiver which allows for the use of prescript outlined engineering analysis and protocols to differentiate between corrosion anomalies that do not present a specific risk to the seam weld and associated heat affected zones in lieu of the current requirement under 49 C.F.R. § 195.452(h)(4)(iii)(H).  Remediation and repair activities would then be scheduled according to the findings of the proposed evaluation. The following protocols would be applied to the 2022 MFL-C assessment of CA-324, along with all subsequent assessment results (as applicable, per the discussion above regarding tool technology), until the termination of the waiver.

**(5)** *A description of any measures or activities the applicant proposes to undertake as an alternative to compliance with the relevant regulation, including an explanation of how such measures will mitigate any safety or environmental risks;*

The Application includes memorializing certain integrity management procedures included in the Consent Decree in addition to further measures to maintain the integrity of the pipeline, including measures specific to SSWC.  Many of these measures were negotiated and aligned upon as part of the Consent Decree.

The following measures are proposed, and have been categorized under inspection frequency, inspection validation, remediation criteria, selective seam weld corrosion, and general programmatic considerations.

**Inspection Frequency**
Rather than relying solely on fitness for service analysis to determine the deadline for next inspection and associated interval, PPC proposes to manage the potential for external corrosion rates on the pipeline by the following prescriptive guidelines for inspection frequency:

- PPC will inspect for potential external metal loss prior to restarting CA-324.
- PPC will inspect using UTWM ILI technology within 7 days of achieving initial steady-state operation in accordance with an ILI survey schedule approved by OSFM.
- PPC will inspect CA-324 for potential external metal loss annually, not-to-exceed a 15-month interval between inspections.  The annual inspections will alternate ILI survey technologies employed (i.e., axial magnetic flux leakage (MFL-A) or ultrasonic wall measurement (UTWM)).  Alternatively, PPC may run a UTWM tool each year.
- Where any ILI survey fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, the ILI tool will be rerun to cover the area lacking coverage.

**Inspection validation**
Inspection validation is crucial to ensuring tool tolerances and developing corrosion growth analyses that accurately reflect the integrity condition of the pipeline.  Following an ILI survey to evaluate potential external metal loss, PPC proposes the following:

- ILI surveys will be validated consistent with API Standard 1163 In-line Inspection Systems Qualification, 3rd Edition, September 2021 Level 2 validation methodology, at a minimum. This process will leverage field direct examination measurements of previously repaired external metal loss anomalies that have been preserved (e.g. corrosion mechanism has been arrested by recoating or composite repair installation) to support validation as well as any additional external metal loss validation inspections necessary to support validation.  The depths relied upon for validation of the ILI survey will include external metal loss depths between 10% and 40%.
- ILI tool vendors will be required to apply interaction/clustering criteria of 6t by 6t for applicable ILI tools.
- ILI tool vendors will report all external metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.
- When employing magnetic flux leakage (MFL) ILI tools, ILI tool vendors will be required to manually grade any external metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss and the vendor's ILI report must note any

differences between what the computer algorithm reported and the vendor's manual grade.

- All field direct examination measurements gathered by PPC will be provided to the ILI tool vendor following completion of direct examinations for an ILI survey.

**Remediation criteria**

Following an ILI survey, the following guidelines are proposed to address survey results:

- PPC will remediate all external metal loss anomalies that have an ILI reported depth without including tool tolerance of 40% or greater wall loss, within one year of discovery.  If PPC is unable to remediate such anomalies within one year of discovery, PPC will notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).
- All external metal loss anomalies will be further evaluated via suitable remaining strength calculation methods, which per 49 C.F.R. § 195.452(h)(4)(i)(B) include, but are not limited to, ASME/ANSI B31G (incorporated by reference, see § 195.3) and PRCI PR-3-805 (R-STRENG) (incorporated by reference, see 49 C.F.R. § 195.3).  Anomalies will then be scheduled for remediation per 49 C.F.R. § 195.452(h)(4)(i), (ii), and (iii)(A-G) and (I), and consistent with PPC's Integrity Management Program.  All remaining anomalies that do not meet depth or remaining strength conditions for remediation will be subject to a corrosion growth analysis that accounts for ILI tool tolerance, and all anomalies will be reassessed or repaired by their resultant half-life.
- Any time a shrink sleeve is exposed during an anomaly investigation, the shrink sleeve will be removed, investigated circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoated with two-part epoxy.

Annual inspections will allow for prompt identification of locations with accelerated corrosion growth rates, and the proposed remediation criteria will effectively arrest corrosion growth of remaining features well before approaching potential failure states.  In fact, at a metal loss depth of 40% of nominal wall thickness, there is no credible length at which an anomaly will fail at a burst pressure (calculated using ASME/ANSI Modified B31G) less than or equal to MOP, for all pipe specifications across the entire Las Flores Pipeline system operated by PPC.

**Selective Seam Weld Corrosion**

PPC maintains that the pipe comprising the Las Flores Pipeline system is not susceptible to Selective Seam Weld Corrosion (SSWC), as supported by field data collected during excavation and inspection activities which finds the characterization of corrosion *incidental* to the long seam rather than *preferential* to the long seam. However, PPC proposes the following measures in relation to SSWC:

- All anomalies 'of or along the longitudinal seam weld' and associated heat affected zone (defined as being 1" wide on either side of the weld) will be subject to API RP 1176 for Assessment and Management of Cracking in Pipelines and associated response methodology, and in accordance with API 579-1/ASME FFS-1, December 2021 Fitness-For-Service.  All such anomalies will be further evaluated as blunt metal loss

corrosion via suitable remaining strength calculation methods.  Anomalies will then be scheduled for remediation per 49 C.F.R. § 195.452(h)(4)(i), (ii), and (iii)(A-G) and (I), and consistent with PPC's Integrity Management Program.

- All corrosion anomalies 'of or along the longitudinal seam weld' and associated heat affected zone will first be evaluated as crack-like features using API RP 579-1/ASME FFS-1, December 2021 – Level II or Level III fitness for service calculations to determine the Failure Pressure Ratio (FPR) for each anomaly.  Material properties will be selected consistent with 49 C.F.R. § 192.712 - Analysis of predicted failure pressure.  Anomaly depth and FPR values will then be evaluated against API RP 1176 response criteria (Section 11.7) for 'likely cracks' (most severe classification).  All remaining anomalies that do not meet depth or remaining strength conditions for remediation will be subject to fatigue analysis performed using an applicable fatigue growth law (e.g. Paris Law) or other technically appropriate engineering methodology.  Final anomaly size will be determined using a fracture mechanics model appropriate to the failure mode (ductile, brittle, or both) and boundary condition used (pressure test, ILI, or other).  Accounting for tool tolerance, all anomalies will be reassessed or repaired by their resultant half-life.

- All corrosion anomalies 'of or along the longitudinal seam weld' and associated heat affected zone will then be evaluated as blunt metal loss via suitable remaining strength calculation methods, which per 49 C.F.R. § 195.452(h)(4)(i)(B) include, but are not limited to, ASME/ANSI B31G (incorporated by reference, see § 195.3) and PRCI PR-3-805 (R-STRENG) (incorporated by reference, see § 195.3).  Anomalies will then be scheduled for remediation per 49 C.F.R. § 195.452(h)(4)(i), (ii), and (iii)(A-G) and (I), and consistent with PPC's Integrity Management Program. In addition to the standard requirements – and consistent with the set of waiver conditions proposed for External Corrosion – all metal loss anomalies with an ILI reported depth of 40% or greater wall loss will be scheduled for remediation within one year of Discovery.  As previously stated, if PPC is unable to remediate such anomalies within one year of Discovery, PPC will notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).  All remaining anomalies that do not meet depth or remaining strength conditions for remediation will be subject to a corrosion growth analysis, where once again – and accounting for tool tolerance – all anomalies will be reassessed or repaired by their resultant half-life.  Note that this does not supersede the annual UTWM/MFL requirements set forth per the External Corrosion waiver conditions.

- After the analyses are complete, anomalies not scheduled for remediation will be tracked, and corrosion growth will be assessed with each future ILI survey.  P&M measures will be assessed through regular IMP activities and implemented on the pipeline per 49 C.F.R. § 195.452 (f)(6) as needed.

**General Programmatic Considerations**
PPC will conduct its preventative and mitigative measures process to integrate and analyze all available data for CA-324, including, but not limited to:
- Assessment data from in-line inspection (ILI) tool runs;
- Anomaly investigation, inspection, and repair data;

- Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;
- Operational data, such as pressure and flow data;
- Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;
- Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results; and
- Other pipeline characteristics, such as length, diameter, presence of HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR § 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

The potential for external corrosion and selective seam weld corrosion will be re-examined as new and additional data becomes available through integrity assessment activities and through normal operation of the pipeline.  PPC will amend its Integrity Management Program, to include the State Waiver conditions specific to CA-324.

**(6) *A description of any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a special permit would be in the public interest;***

Positive impacts on affected stakeholders and operating the covered pipeline segments in accordance with the State Waiver will be in the public interest for the following reasons:
- Limit impacts to the environment and potential locations for cultural resources by reducing unnecessary anomaly digs in areas of low or no risk.
- Maintain the priority of pipeline maintenance activities to sections of the pipeline in greatest need of monitoring for pipeline safety.
- Reduce unnecessary excavation around other critical infrastructure.
- Reduce the permitting workload of public agencies along the pipeline right-of-way.
- Reduce the general risks and impacts, to both the workforce and the public, associated with excavations in and along public highways and other rights-of-way.
- Limit disruptions to the public and to property owners.

**(7) *A certification that operation of the applicant's pipeline under the requested waiver would not be inconsistent with pipeline safety;***

Approval of this State Waiver request focused on characterization and remediation of external corrosion features, will help prioritize conditions that are the most important for the continued

safe operation of this pipeline system and will enhance the effectiveness of the Las Flores Pipeline integrity management program.  This request also supports prioritization of resources and aligns pipeline integrity evaluation criteria with explicit protocols.  All of the operational protocols that PPC is proposing exceed other regulatory requirements and are protective of pipeline safety.

**(8) *If the application is for a renewal of a previously granted waiver or special permit, a copy of the original grant of the waiver or permit; and***

*N/A; this is an initial application.*

**(9) *Any other information PHMSA may need to process the application including environmental analysis where necessary.***

Note that PPC is not seeking relief from 49 C.F.R. § 195.563 and the requirements to provide cathodic protection for buried pipelines.  The cathodic protection system remains active and continues to be maintained on the Las Flores Pipeline system.  Rather, PPC proposes the aforementioned inspection and remediation actions as a means of addressing the limitations of cathodic protection PHMSA observed for buried, insulated pipe.

Cathodic protection will continue to be implemented on the pipeline system at appropriate levels in adherence to 49 C.F.R. 195 and tested at appropriate intervals.  Cathodic protection will continue to function with high effectiveness at pipeline repair locations where the thermal insulation has been removed.

---

PPC maintains that the proposed conditions and facts-at-matter for the pipeline describe a conservative and measured approach to the identification and remediation of external corrosion metal loss features on the Las Flores Pipeline system, adequately manage risk factors associated with cathodic protection, and enable safe, long-term operation of the pipeline.

We thank you for your consideration of this State Waiver request.  If you have any questions, or require anything further to conduct your review of this request, please do not hesitate to contact me.  I also ask that PPC be given the opportunity to amend this application as needed to provide additional information or address deficiencies identified by the OSFM before formal action is taken to reject or deny the application.

Sincerely,


Diana Skates
Pipeline Safety Advisor
Pacific Pipeline Company

Attachments:  A:      Las Flores Pipeline System Map & Trunk Line Chart
              B:      Las Flores Pipeline Background Data

cc:  Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
     Andy Chau, Supervising Pipeline Safety Engineer, OSFM
     Brandon Ferry, Supervising Pipeline Safety Engineer, OSFM
     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
     Durga Shrestha, Pipeline Safety Engineer, OSFM
     Huy Tran, Supervising Pipeline Safety Engineer, OSFM
     Josh Cleaver, Staff Counsel, OSFM
     Matthew Young, Senior Pipeline Integrity Advisor, ExxonMobil Pipeline Company LLC (EMPCo)
     Rebekah Bennett, General Counsel, PPC & EMPCo

# ATTACHMENT A



**Legend**
- ✚ Facilities
- ── CA - 324
- ── CA - 325B
- ── CA - 325A
- ── Highways

PACIFIC PIPELINE COMPANY
SCS ENGINEERS

North

Scale
1 in = 5 miles
0  2  4  6  8  10 Miles

Prepared by SCS Engineers
January 2022
Source: GCS, NAD 83

*Las Flores Pipeline System*

# ATTACHMENT A



# *Pipeline System Background Data*

## Attachment B
## of
## State Waiver Application

### PACIFIC PIPELINE COMPANY

### LAS FLORES PIPELINE SYSTEM
## CA-324, CA-325A/B

**June 2023**

Issued by:



## PURPOSE

Supplemental information to Pacific Pipeline Company's State Waiver Application is included herein to summarize relevant details related to the pipelines and associated operation that may be considered in support of State Waiver conditions.  The following is summarized:

- ▪ Pipeline Description
- ▪ Pipeline Specifications
- ▪ Hydrostatic Test Information
- ▪ Maximum Operating Pressure
- ▪ Normal Operating Pressures
- ▪ In-line Inspection History
- ▪ Coating and Cathodic Protection System Information

## PIPELINE DESCRIPTION

The CA-324 24-inch pipeline (formerly referred to as Line 901) is approx. 10.86 miles in length and generally parallels U.S. Highway 101 along the south coast between the Las Flores Canyon consolidated oil and gas processing facility and the Gaviota Station.  The pipeline is located north of U.S. 101 and generally follows powerline and/or natural gas pipeline rights-of-way across coastal terraces and incised canyons.

The CA-325A 30-inch pipeline (formerly referred to as Line 903 – Gaviota to Sisquoc) is approx. 38.72 miles in length.  The pipeline extends west from the Gaviota Station to an MOV located east of Gaviota Creek and U.S. Highway 101.  It then enters Gaviota State Park approx. 0.5 miles east of U.S. Highway 101 and extends westerly across the gently sloping coastal terrace and Cañada del Barro before dropping into the Cañada de la Gaviota drainage area.  It then crosses U.S. Highway 101 and Gaviota Creek (Cañada de la Gaviota) immediately south of the U.S. Highway 101 "Caltrans" rest stop area.  The pipeline then extends west and north from the Gaviota Creek MOV. The pipeline continues west up a broad spur ridge to the ridge crest and the westerly boundary of Gaviota State Park.  The pipeline traverses narrow ridge crests, crosses out of the Park and onto Hollister Ranch for approx. 0.5 miles, and then crosses back into the Park before descending toward the west fork of Gaviota Creek (Betty Creek).  The right-of-way passes west of the Vista del Mar School and Las Cruces Adobe and then crosses beneath Highway 1 west of its intersection with U.S. Highway 101.  The pipeline continues northward along the west side of U.S. Highway 101 through the Santa Ynez Mountains.  It crosses long expanses of grasslands across the Las Cruces Ranch and steep walled canyons that form part of the Nojoqui Creek watershed.  North of Moonshine Creek, the route crosses ridges with rock outcroppings.  The pipeline crosses beneath the Santa Ynez River west and south of Buellton and continues north across the Purisima and Solomon Hills.  It crosses the northern edge of the San Rafael Mountains and the eastern edge of the Santa Maria Valley.  The pipeline crosses beneath the Sisquoc River and continues north across the River Valley.  It traverses moderately to severely sloping foothills at Kelly Canyon and extends west to the Sisquoc Station at the southern end of Santa Maria Canyon.

The CA-325B 30-inch pipeline (formerly referred to as Line 903 – Sisquoc to Pentland) is approx. 74.84 miles in length.  The pipeline follows Santa Maria Canyon after leaving the Sisquoc Station.  It then extends northeast towards Tepusquet Road.  The route crosses relatively gentle terrain until it reaches the crest of the Sierra Madre Mountains where it traverses steep slopes approaching Suey Canyon and Buckhorn Canyon.  The pipeline follows the northern edge of the Sierra Madre Mountains south of State Highway 166 through the Los Padres National Forest.  The route crosses

---

rugged terrain across the crests of the Sierra Madre Mountains, descends the mountains, crosses the Sierra Madre Ridge Road, and enters the Cuyama River Valley near Gypsum Canyon.  At the Cuyama River crossing, the pipeline exits Santa Barbara County and enters San Luis Obispo County. The pipeline continues for approx. 44.5 miles through ranch land, terminating at the Pentland Station in Kern County.

The routing of the Las Flores Pipelines has been considered for its impact on High Consequence Areas (HCA) per established PPC Integrity Management Plan guidelines and applicable regulations. Table B-1 provides a high-level summary of High Consequence Areas (HCAs) along the Las Flores Pipeline System.

**TABLE B-1: HIGH CONSEQUENCE AREA SUMMARY**

| Pipeline Designation | Location | Total Mileage | High Consequence Area (HCA) Type |
|---|---|---|---|
| CA-324 | Las Flores Canyon to Gaviota | 10.86 | Impact to ecologically sensitive regions (coastline) |
| CA-325A | Gaviota to Sisquoc | 38.72 | Impact to the city of Buellton (population center, drinking water), and ecologically sensitive regions |
| CA-325B | Sisquoc to Pentland | 74.84 | Impact to ecologically sensitive regions |

The Las Flores Pipeline traverses multiple Counties as well as State and Federal jurisdictions. Approximate mileage is included in Table B-2, below.

**TABLE B-2: JURISDICTIONAL MILEAGE**

| | Jurisdiction | CA-324 (miles) | CA-325A (miles) | CA-325B (miles) | Total (miles) |
|---|---|---|---|---|---|
| **County** | Santa Barbara County | 10.9 | 38.7 | 23.8 | 73.4 |
| | San Luis Obispo County | 0 | 0 | 37.2 | 37.2 |
| | Kern County | 0 | 0 | 13.8 | 13.8 |
| | Total | 10.9 | 38.7 | 74.8 | 124.4 |
| **Sub-Jurisdiction (Note 1)** | California State Parks and Recreation (Gaviota State Park) | 0 | 4.1 | 0 | 4.1 |
| | U.S. Forest Service | 0 | 0 | 6.3 | 6.3 |
| | U.S. Fish and Wildlife (Bitter Creek Wildlife Refuge) | 0 | 0 | 4.5 | 4.5 |
| | California Dept. of Fish and Wildlife (Carrizo Plain Ecological Reserve) | 0 | 0 | 4.5 | 4.5 |
| | Bureau of Land Management | 0 | 0 | 1.0 | 1.0 |
| | City of Buellton | 0 | 1.1 | 0 | 1.1 |
| | Total | 0 | 5.2 | 16.3 | 21.5 |

*Note 1: Mileage included in County jurisdiction*

## PIPELINE SPECIFICATIONS

CA-324 is manufactured of low carbon steel.  It contains predominantly 0.344-inch nominal wall thickness, high frequency electric resistance welded (HF-ERW) API 5L X65 pipe manufactured in 1985 and 1986 by Nippon Steel Corp., Hikari Works mill, in Japan using plate steel with UOE pipe forming process.  A summary of CA-324 line pipe specifications is included in Table B-3.

CA-325A/B is manufactured of low carbon steel.  It contains various grades and wall thicknesses of double submerged arc welded (DSAW) API 5L pipe manufactured between 1984 and 1986, from a variety of mills in Belgium, Brazil, France, Germany, and Israel, summarized in Table B-4.  Additionally, it includes small portions of replaced sections with newer pipe, including HF-ERW.  A summary of CA-325A/B line pipe specifications is included in Table B-3.

### TABLE B-3: LINE PIPE SPECIFICATIONS

| Pipeline Designation | Outside Diameter (in) | Nominal Wall Thickness (in) | Grade | Seam Type | Year Installed | Length (mi) |
|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 24 | 0.344 | X65 | HF-ERW | 1990 | 10.69 |
| | 24 | 0.375 | X65 | HF-ERW | 1990 | 0.02 |
| | 24 | 0.5 | X60 | HF-ERW | 1990 | 0.16 |
| CA-325A Gaviota to Sisquoc | 30 | 0.281 | X70 | DSAW | 1986 | 21.85 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 12.47 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 2.27 |
| | 30 | 0.375 | X65 | DSAW | 2014 | 0.12 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.38 |
| | 30 | 0.406 | X65 | HF-ERW | 2000 | 0.03 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 0.17 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.75 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.562 | X65 | DSAW | 1986 | 0.06 |
| | 30 | 0.75 | X65 | DSAW | 1986 | 0.35 |
| CA-325B Sisquoc to Pentland | 30 | 0.281 | X70 | DSAW | 1986 | 19.29 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 17.03 |
| | 30 | 0.344 | X65 | DSAW | 2007 | 0.24 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 12.88 |
| | 30 | 0.375 | X70 | DSAW | 2017 | 0.16 |
| | 30 | 0.375 | X70 | DSAW | 2018 | 0.02 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.12 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 24.41 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.13 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.625 | X65 | DSAW | 1986 | 0.01 |
| | 30 | 0.75 | X70 | DSAW | 1986 | 0.27 |

### TABLE B-4: CA-325A/B LINE PIPE MILL INFORMATION

| Mill | Location | Plate or Coil | Pipe Forming Process |
|---|---|---|---|
| Bergroh | Germany | Plate | Three Beam Rollers |
| Confab | Brazil | Plate | UOE |
| Hoesch | Germany | Coil | Spiral |
| Metco | Israel | Coil | Spiral |
| Sacilor | France | Coil | Spiral |
| Tubemeuse | Belgium | Coil | Spiral |
| Tubes de Belville | France | Plate | C-press |
| Vallourec (GTS) | France | Plate | UOE |
| Mannesmann | Germany | Plate | UOE |

## HYDROSTATIC TEST INFORMATION

CA-324 was hydrostatically pressure-tested on November 25, 1990 to 1765 pounds per square inch gauge (psig), as calculated at the highest elevation.  CA-325A was hydrostatically pressure-tested in nine separate segments between pressures of approx. 778 to 1757 psig, as calculated at the highest elevations of each segment, between October 14, 1986 and December 3, 1986.  CA-325B was hydrostatically pressure-tested within eleven separate segments between pressures of 686 to 1753 psig, as measured at the highest elevations of each segment, between January 13, 1986 and November 8, 1986.  Portions of pipe replaced after original construction hydrotest were tested at or above the originally established test pressure and established maximum operating pressure (MOP) prior to being placed into service.  A summary of the percent of specified minimum yield strength (%SMYS) and the corresponding MOP, as established by the original construction hydrotest records, is included in Table B-5.  A summary of original construction hydrotest records are included in Table B-6.

### TABLE B-5: ORIGINAL CONSTRUCTION HYDROTEST – %SMYS AND MOP RANGES

| Pipeline Designation | %SMYS | | Corresponding MOP to Test Pressure (psig) | |
|---|---|---|---|---|
| | Min | Max | Min | Max |
| CA-324 | 54.5% | 72.0% | 1133 | 1410 |
| CA-325A | 25.8% | 72.0% | 622 | 1085 |
| CA-325B | 37.0% | 72.0% | 549 | 1472 |

**TABLE B-6: HISTORIC HYDROTEST SUMMARY**

| Pipeline Designation | Test Segment Identifier | Date | Begin Station | End Station | Minimum Test Pressure at Max Elevation (psig) | MOP at Max Elevation (psig) *(Note 1)* |
|---|---|---|---|---|---|---|
| CA-324 | LF – Gav | 11/25/1990 | 0 | 57352 | 1416 | 1133 |
| CA-325A | 11 | 10/14/1986 | 238652 | 259872 | 863 | 690 |
| | 12 | 11/14/1986 | 179721 | 235388 | 778 | 622 |
| | 13 | 11/14/1986 | 144307 | 179721 | 784 | 627 |
| | 14 | 11/21/1986 | 137049 | 144307 | 1083 | 866 |
| | SYR | 12/3/1986 | 135120 | 137049 | 1757 | 1406 |
| | 15-16 | 10/30/1986 | 111386 | 135120 | 1155 | 924 |
| | 17 | 10/29/1986 | 93221 | 111386 | 1120 | 896 |
| | 18 | 11/19/1986 | 66621 | 93221 | 906 | 725 |
| | 19 | 11/19/1986 | 55421 | 66621 | 1105 | 884 |
| CA-325B | 1 | 1/13/1986 | 639412 | 733359 | 1344 | 1075 |
| | 1A | 9/7/1986 | 618385 | 639412 | 1025 | 820 |
| | 2 | 9/9/1986 | 608271 | 618385 | 906 | 725 |
| | 3 | 9/14/1986 | 505520 | 608271 | 686 | 549 |
| | 4 | 9/17/1986 | 415547 | 505520 | 1125 | 900 |
| | 5A | 9/17/1986 | 385240 | 415547 | 1753 | 1403 |
| | 5B | 11/8/1986 | 359963 | 385240 | 1219 | 975 |
| | 6 | 10/18/1986 | 338470 | 359963 | 992 | 793 |
| | 7 | 10/21/1986 | 316971 | 338470 | 1484 | 1187 |
| | 8-9 | 10/16/1986 | 268171 | 316971 | 1183 | 946 |
| | 10 | 10/14/1986 | 260278 | 268171 | 1449 | 1160 |

*Note 1: This value is simply the resultant, corresponding, MOP based upon the hydrostatic test record. It does not reflect the MOP value the Operator, Pacific Pipeline Company, assigns the pipelines and is only included for context.*

## MAXIMUM OPERATING PRESSURE

Due to the dramatic elevation profile and resultant hydraulic pressure profile of the Las Flores Pipeline System, Maximum Operating Pressure (MOP) has been documented using a variable MOP methodology, in which MOP is a function of pipe stationing (distance).  The documented MOP is based upon hydrostatic test records, documented pipeline elevation profile, relevant design codes, and Pacific Pipeline Company's hydraulic analysis that contemplates all possible steady-state and transient operating scenarios, including surge and incorrect operations.

All potential modes of operation, including normal and abnormal, were evaluated in an engineering and hydraulic analysis conducted in 2023 to determine maximum pressures that may be experienced on the pipeline during various modes of operation.  The hydraulic analysis considered multiple worse-case steady-state operating conditions, such as maximum flow and maximum hydraulic pressure gradient scenarios as well as over sixty initiating transient events, including inadvertent valve closures, start-up and shutdown, and pump trips.

The maximum pressures that resulted from the analysis were compared to historic hydrostatic test records, official pipeline elevation data from inspections, and considered regulation and design

code.  The basis to define the pipeline's MOP for each segment is summarized in Table B-7.  The absolute maximum steady-state and transient pressure profile for all possible normal and abnormal operating modes is represented in Figures B-1, B-2, and B-3.  A summary of the percent of specified minimum yield strength (%SMYS) and the corresponding current, documented and official, MOP for the pipeline is included in Table B-8.

**TABLE B-7: SUMMARY OF MOP BASIS**

| Pipeline Designation | Explanation of MOP Basis |
|---|---|
| CA-324 | 100 psi above max steady-state & transient pressure profile |
| CA-325A | 100 psi above max steady-state & transient pressure profile |
| CA-325B | 50 psi above max steady-state & transient pressure profile for Mile Post 49.57 to Mile Post 117.41<br>80% of original construction hydrostatic test pressure for Mile Post 117.41 to Mile Post 124.42 |

**TABLE B-8: DOCUMENTED, OFFICIAL MOP – %SMYS AND MOP RANGES**

| Pipeline Designation | %SMYS | | Documented MOP (psig) | |
|---|---|---|---|---|
| | Min | Max | Min | Max |
| CA-324 | 28.5% | 55.4% | 684 | 1003 |
| CA-325A | 21.7% | 67.9% | 444 | 1000 |
| CA-325B | 21.9% | 72.0% | 317 | 1292 |

**FIGURE B-1: CA-324 MAXIMUM OPERATING PRESSURE**



### FIGURE B-2: CA-325A MAXIMUM OPERATING PRESSURE



### FIGURE B-3: CA-325B MAXIMUM OPERATING PRESSURE



## NORMAL OPERATING PRESSURES

In order to establish the Normal Operating Pressure (NOP) range for the Las Flores Pipeline System, PPC evaluated over seventeen different operating conditions to document relevant hydraulic information.  An array of the following conditions and variables were considered to capture the range of potential operating conditions.

- Flow rates
- Suction pressure, discharge pressure, and backpressure control parameters
- Allowable pump and pressure/flow control device operating scenarios
- Fluid temperatures
- Soil temperatures
- Fluid characteristics (e.g. density, viscosity)

Historical operating data was used to validate the hydraulic model and ensure analysis accuracy, and a few historical operating data points are captured in Figures B-4, B-5, and B-6, for reference. The resultant minimum and maximum typical pressure ranges based upon the range of steady state scenarios are documented in Figures B-4, B-5, and B-6.

**FIGURE B-4: CA-324 NORMAL OPERATING PRESSURE**



**FIGURE B-5: CA-325A NORMAL OPERATING PRESSURE**



**FIGURE B-6: CA-325B NORMAL OPERATING PRESSURE**



## IN-LINE INSPECTION HISTORY

The following Table B-9 provides a summary of CA-324, CA-325A, and CA-325B In-Line Inspection (ILI) activities, as of July 2023. Note that CA-324 Las Flores Canyon to Gaviota has been inspected since the 2015 release, in February and December of 2022 (circumferential magnetic flux leakage (MFL–C) and ultrasonic wall measurement (UTWM) surveys, respectively).

**TABLE B-9: IN LINE INSPECTION SUMMARY**

| Pipeline Designation | Date of Inspection | Technology | Vendor | No. of Ext Metal Loss | No. of Ext ML On/Near Seam | No. of Int Metal Loss | No. of Dents | No. of Seam ML Anomalies | No. of Repair Digs |
|---|---|---|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 6/18/2007 | Def+MFL+IMU | Rosen | 386 | N/A | 237 | 0 | N/A | 13 |
| | 7/3/2012 | Def+MFL+IMU | Rosen | 1578 | N/A | 6 | 1 | N/A | 41 |
| | 5/6/2015 | Def+MFL+IMU | Rosen | 1747 | N/A | 0 | 6 | N/A | 25 |
| | 2/23/2022 | CMFL | Baker Hughes | 2489 | 415 | 151 | 8 | 330 | TBD |
| | 12/10/2022 | UTWM | Baker Hughes | 1603 | N/A | 205 | N/A | N/A | TBD |
| CA-325A Gaviota to Sisquoc | 1/1/2003 | Def+MFL+IMU | Tuboscope | 362 | N/A | 0 | 22 | N/A | 1 |
| | 3/20/2008 | Def+MFL+IMU | Rosen | 1772 | N/A | 4932 | 12 | N/A | 21 |
| | 4/21/2008 | Def | | | | | | | |
| | 5/8/2008 | Def+MFL+IMU | | | | | | | |
| | 4/29/2013 | Def+MFL+IMU | Rosen | 14152 | N/A | 21135 | 10 | N/A | 90 |
| CA-325B Sisquoc to Pentland | 10/1/1994 | Unknown | Tuboscope | Unknown | Unknown | Unknown | Unknown | Unknown | N/A |
| | 1/8/2003 | Def+MFL | Tuboscope | 295 | N/A | 0 | 9 | N/A | N/A |
| | 10/21/2006 | Def+MFL | Tuboscope | 162 | N/A | 0 | 4 | N/A | 2 |
| | 3/10/2012 | Def+MFL | TDW | 14459 | N/A | 27501 | 9 | N/A | 101 |
| | 6/12/2013 | MFL | | | | | | | |

## COATING AND CATHODIC PROTECTION SYSTEM INFORMATION

The Las Flores Pipeline System is externally coated with the following coating system as illustrated in Figure B-7:

- Coal tar urethane (CTU) coating in intimate contact with the steel pipe
- Layer of rigid thermal polyurethane (PU) foam insulation
- Outer layer of polyethylene (PE) tape wrap

### FIGURE B-7: EXTERNAL COATING SYSTEM DIAGRAM



Shrink sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at original construction pipeline field joints.  The use of the PU foam and PE tape was selected at the time of original construction to minimize heat loss of the crude oil within the pipeline during transit.  The pipeline system has an impressed-current cathodic protection (CP) system that was energized at the time of installation.  The CP system consists of active rectifiers at Las Flores Canyon Station, Gaviota Station, and Sisquoc Station, a critical bond at Pentland, as well as over 140 test stations across the entire CA-324 and CA-325A/B pipeline.  The PU insulation and PE tape wrap has the ability to shield the cathodic protection.  As a result, the CP current may not reach the pipe surface to arrest corrosion in the limited instance the CTU coating becomes disbonded.  As a result, despite ongoing operation of the cathodic protection system in compliance with applicable regulations, the pipeline remains at risk of corrosion under insulation (CUI).

The CP system remains active and provides a level of external corrosion deterrence, and it is highly effective on portions of the pipeline without insulation (e.g. FBE and epoxy-coated regions).  Cathodic protection has and will continue to be implemented, tested, and maintained on the pipeline at appropriate levels and in compliance with applicable regulations.  Additionally, the use of

modern, advanced in-line inspection technologies, along with explicit integrity management programs and procedures for robust characterization, validation, and criteria for anomaly repair support supplemental integrity management steps that exceed regulatory corrosion protection requirements and enable safe, responsible operation.  Comprehensive conditions for effective management of the threat of external corrosion are included in Sections 5 of this Application.

# EXHIBIT C



**environmental**
DEFENSE CENTER

September 27, 2024

Mr. Joe Tyler, Director/Fire Chief
Mr. Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
P.O. Box 944246
Sacramento, CA 94244-2460
*Via Email: Joe.Tyler@fire.ca.gov; Daniel.Berlant@fire.ca.gov*

Re:     **Restart of CA-324 and CA-325: Office of State Fire Marshal's Obligation to Conduct Environmental Review; Renewed Request for Public Process**

Dear Mr. Tyler and Mr. Berlant:

On behalf of Get Oil Out! ("GOO!"), Santa Barbara County Action Network ("SBCAN"), and the Environmental Defense Center ("EDC"),[1] we write to request that the Office of the State Fire Marshal ("OSFM") conduct environmental review of Sable Offshore Corporation's ("Sable") proposal to restart pipelines CA-324 and CA-325, pursuant to OSFM's obligations under the California Environmental Quality Act ("CEQA"). We also renew our request for a public process, which is appropriate under the circumstances and, in the case of Sable's request for a State Waiver, required by law.

As you know, Sable is seeking approval from OSFM to restart CA-324 and CA-325[2] (together, the "Las Flores Pipeline System") despite their lack of effective cathodic protection. As OSFM also knows, this lack of protection is ultimately what caused CA-324 to rupture in 2015, resulting in a catastrophic oil spill at Refugio Beach State Park. The spill closed public

---

[1] GOO! was formed in the wake of the 1969 Santa Barbara Oil Spill and continues to work to protect California from further oil and gas development and exploitation. SBCAN is a countywide grassroots organization that works to promote social and economic justice, to preserve our environmental and agricultural resources, and to create sustainable communities. EDC is a nonprofit public interest law firm that defends nature and advances environmental justice on California's Central Coast through advocacy and legal action.

[2] These pipelines were previously known as Lines 901 and 903 before they were reclassified as intrastate pipelines.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 2 of 14

parks and beaches, killed and injured wildlife, shut down fisheries, and destroyed sensitive habitats and cultural resources.[3]

Our clients were involved in the immediate response to the Refugio Oil Spill and remain concerned about the risks of operating the Las Flores Pipeline System. They have well-founded concerns that CA-324 and CA-325 cannot be safely restarted and, as to Sable, that this speculative company will not be able to responsibly operate the pipelines or fulfill its remediation obligations when another spill occurs.

Developments in the wake of the spill — namely, the discovery that these pipelines lack effective cathodic protection — have fundamentally altered the project that was envisioned when the pipelines were installed nearly four decades ago. Without cathodic protection, the risk of a spill from these pipelines is five times greater than was initially estimated.[4] Indeed, bringing the pipelines back online would not only invite another oil disaster on the Central Coast, but according to at least one governing body, all but ensure it.[5] But for OSFM's discretionary approvals here, no environmental impacts from these pipelines would occur.

Accordingly, in reviewing Sable's proposal to restart the pipelines, CEQA requires that OSFM prepare a new or subsequent Environmental Impact Report ("EIR") that considers the risks associated with operating these corroded pipelines without effective cathodic protection, which, to date, have not been evaluated. Thus, we urge OSFM to conduct additional environmental review *before* approving a restart of these pipelines, as the law requires.

I.   **OSFM Must Conduct Environmental Review under CEQA before Authorizing Sable to Restart Lines CA-324 and CA-325.**

Pursuant to the 2020 Consent Decree entered in *U.S. v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (the "Consent Decree"), as well as state law passed in the wake of the Refugio Oil Spill, Sable has asked — or will ask — OSFM to approve (1) a Risk Analysis, (2) a State Waiver for the limited effectiveness of cathodic protection, and, ultimately, (3) a Restart Plan. Thus, cumulatively, Sable seeks approval from OSFM to restart the Las Flores Pipeline System without effective cathodic protection (the "Restart Project").

Should OSFM take the position that the proposed restart does not constitute a new "project" — which is subject to reasonable dispute[6] — that would not mark the end of its CEQA analysis or relieve its obligation to conduct environmental review.

---

[3] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 3 (June 2021) [hereinafter "NRDA"], available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.

[4] Santa Barbara County, Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 79 [hereinafter "County Draft EIR"], attached hereto.

[5] *Id.*

[6] Having not transported oil or gas for nearly ten years, a restart of these pipelines would not simply be a return to the status quo, particularly in light of the State Waiver Sable is seeking. The Restart Project is fundamentally

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 3 of 14

If the Restart Project is not itself considered a "project," then OSFM's determinations here would constitute new approvals for the Celeron/All American and Getty Pipeline Project (the "Celeron Project"), which was the initial proposal to install and operate the Las Flores Pipeline System. Where, as here, an agency issues subsequent discretionary approvals for a project — *see* Part I.A., *infra* — it is required to examine the sufficiency of the project's prior EIR. (*Friends of the Coll. of San Mateo Gardens v. San Mateo Cnty. Cmty. Coll. Dist.* (2016) 1 Cal.5th 937, 951-52.)

The EIR for the Celeron Project (the "Celeron EIR")[7] was certified in 1985[8] — nearly forty years ago, and before the discovery that the Las Flores Pipeline System lacks effective cathodic protection. Because the findings in the prior EIR were premised on an effective cathodic protection system, and Sable is now proposing to operate the pipelines without such protection, CEQA requires that OSFM prepare a subsequent EIR. (*See* Pub. Res. Code, § 21166; CEQA Guidelines § 15162.)

## A.   OSFM's Approval of the Restart Project is Discretionary, not Ministerial, and Thus is Not Exempt from CEQA.

Compliance with CEQA may be excused where a proposed activity falls within certain statutory or categorical exemptions. (*See, e.g., Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1186.) The threshold statutory exemption is for "ministerial projects," "which are defined generally as projects whose approval does not require an agency to exercise discretion." (*Id.*; *accord* Pub. Res. Code, § 21080(b)(1); CEQA Guidelines § 15369.) However, because OFSM has wide latitude at each step of the restart process to approve, deny, or modify the Restart Project, OSFM's approval of the Restart Project is a discretionary decision that is not exempt from CEQA review.

### 1.   Discretionary versus Ministerial Projects

Distinguishing discretionary projects from ministerial ones turns on whether the exercise of judgment or deliberation is required in making the decision. (CEQA Guidelines § 15357.) The "key question is whether the public agency can use its subjective judgment to decide whether and how to carry out or approve [the] project." (*Id.*; see also CEQA Guidelines § 15002(i).) "Whether an agency has discretionary or ministerial controls over a project depends

---

different than the initial proposal to install and operate these pipelines in the 1980's, which was considered as a 30-year project. Restarting the pipelines would be akin to bringing online a new and different oil and gas operation that capable of causing significant environmental effects. (*See* Pub. Res. Code, § 21065; *see also* CEQA Guidelines § 15378(a) (defining "project" as an action "which has a potential for resulting in either a direct physical change in the environment or a reasonably foreseeable indirect physical change").)

[7] The Final EIR published in 1985 is a finalizing addendum to the 1984 Draft EIR. The preface of the Final EIR explains that the Final EIR is intended to be read "in conjunction with, rather than in place of, the Draft EIR/EIS that was released for public review on August 1, 1984." Thus, collectively, the two documents and their appendices form the project EIR.

[8] California State Lands Commission et al., *Final Environmental Impact Report Environmental Impact Statement*, (January 1985) [hereinafter "Final Celeron EIR"].

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 4 of 14

on the authority granted by the law providing the controls over the activity." (CEQA Guidelines § 15002(i)(2).)

Courts have developed a "functional test" to refine the distinction between discretionary and ministerial projects, which focuses on the scope of agency discretion. (*See Protecting our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 459, 467.) The touchstone of the test "is whether the relevant 'approval process . . . allows the government to shape the project in any way [by requiring modifications] which could respond to any of the concerns which might be identified' by environmental review." (*Id.* (citations omitted).) "If so, the project is discretionary." (*Id.*)

### 2.    Discretionary Aspects of OSFM Approval

As an initial matter, the Consent Decree, which controls and outlines the restart process, does not actually require that OSFM approve a restart or any of Sable's underlying applications. It vests OSFM with the authority to approve a Risk Analysis, State Waiver, and Restart Plan, but it does not set forth conditions under which OSFM must do so. Nor does it purport to limit the scope of OSFM's discretion in considering them. In fact, as discussed further below, the Consent Decree specifically acknowledges OSFM's wide latitude to approve or modify the Restart Project.

Indeed, OSFM has itself acknowledged the broad discretion it has here in reviewing the Restart Project. The OSFM website, for example, notes that the Consent Decree only specifies "the *minimum requirements* for restarting CA-324 and CA-325."[9] Per Deputy State Fire Marshal Kara Garret, OSFM may impose "other safety requirements deemed necessary by our office," suggesting that it generally has discretion to shape the Restart Project.[10] The County, which has also weighed in on OSFM's discretion here, was even more explicit: "discretionary actions to permit restart activities are needed from [OSFM]."[11]

Such discretion, which can be exercised to shape the Restart Project, is apparent at each step of the restart process.

Take OSFM's Risk Analysis review, for example. Pursuant to 19 C.C.R. section 2110(b), OSFM must assess the "adequacy" of a Risk Analysis by evaluating, among other things, what constitutes "best available technology," the "assumptions and conclusions reached by an operator," and any "additional information that may be relevant to . . . .assessing or determining the adequacy of a [R]isk [A]nalysis." Each of these considerations, and the determination of

---

[9] *Pathways for Restarting Pipelines*, Office of the State Fire Marshal, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited September 26, 2024).

[10] Giana Magnoli, *Sable Offshore Corp. Takes Over Exxon's Santa Barbara Oil Assets, Sets Sights on Restarting Operations*, Noozhawk (February 14, 2024) (emphasis added), available at: https://www.noozhawk.com/sable-offshore-corp-takes-over-exxons-santa-barbara-oil-assets-sets-sights-on-restarting-operations.

[11] Santa Barbara County, *Revised Notice of Preparation*, pp. 2-3 [hereinafter "Revised NOP"], available at https://files.ceqanet.opr.ca.gov/170616-2/attachment/kMgGnx0tQr16ZTEvxK9MMeqNrLQO9Zgzm79wtnPIiz9ypKehMDgvTH0hm3te5DOx4NMf_ebkpJow0wNe0.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 5 of 14

adequacy as a whole, inherently requires that OSFM exercise a large degree of subjective judgment — a hallmark of discretion. (*See* CEQA Guidelines § 15357.) Moreover, OSFM is explicitly authorized to condition its acceptance of a Risk Analysis on additional requirements or modifications. (19 C.C.R. § 2112(d).) "If [an] agency is empowered to disapprove or condition approval of a project . . . the project is discretionary." (*Protecting Our Water*, 10 Cal.5th at 494.)

The State Waiver process is likewise replete with agency discretion. The federal statute authorizing OSFM to issue a State Waiver provides that a state authority "*may* waive compliance with a safety standard," but it does not *require* approval of a waiver, and it does not set forth specific conditions under which OSFM may approve a waiver. (49 U.S.C. § 60118(d) (emphasis added).) It suggests only that a waiver may be granted on terms that OSFM "considers appropriate," which is echoed in our state statutory scheme that regulates safety exemptions. (*See* 49 U.S.C. § 60118(c), (d); Gov. Code, § 51011(b).) In other words, whether to grant a waiver, and under what conditions, is entirely at the discretion of OSFM. The Consent Decree recognizes as much, stating that "[n]othing in this CD shall be construed to limit the authority of [] OSFM to require additional terms or conditions in the State Waiver."[12] Notably, review of a Special Permit — the federal equivalent to a State Waiver — generally requires environmental review at the federal level.[13]

As to the Restart Plan, it appears to be a creature of the Consent Decree and lacks specific statutory or regulatory guidance. However, the Consent Decree requires that the Restart Plan include, for example, "*adequate* patrolling" and "*sufficient* surveillance."[14] Such conditions are imbued with ambiguity, and they ultimately require OSFM to exercise its subjective judgment to determine whether they are met. Ambiguous terms that "permit a great degree of latitude in the review of [] plans and are not subject to mechanical application" suggest discretionary action. (*Natural Resources Defense Council, Inc. v. Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 970.)

In sum, OSFM's review of the Restart Project — and each underlying approval — necessarily requires that it use its subjective judgment. And, OSFM is authorized at each step of the approval process to condition and/or modify the project to address specific safety concerns and environmental hazards. Thus, the Restart Project is plainly a discretionary project that is not exempt from CEQA review. (*See Protecting our Water*, 10 Cal.5th at 467 (outlining the "functional test").)

---

[12] Consent Decree, at Appendix B, Condition 1(E), U.S. v. Plains All American Pipeline, Civil Action No. 2:20-cv-02415 (March 13, 2020) [hereinafter "Consent Decree"], available at https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf.

[13] *See generally* U.S. Department of Transportation Pipeline Safety and Hazardous Materials Safety Administration, *Final Environmental Assessment and Finding of No Significant Impact* (October 2018), available at https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2020-08/2017-0155-HECO-Waiau-Pipeline-SP-FEA-and-FONSI.pdf.

[14] Consent Decree, *supra* note 12, at Appendix D, Conditions 1(B)(2), (3), emphasis added.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 6 of 14

**B.     OSFM Must Prepare a Subsequent EIR Before Approving the Restart Project.**

Again, where an agency issues subsequent discretionary approvals for a project, it is required to examine the sufficiency of the project's prior EIR.  (*Friends of the Coll. of San Mateo Gardens*, 1 Cal.5th at 951-52.) That inquiry is two-fold. (*Id.*) First, the agency must consider whether the prior EIR retains any "informational value" to inform its subsequent determinations. (*Id.*) If it does not, then it must prepare a new EIR. (*Id.*) If it does, then the agency must evaluate whether additional environmental review is warranted under Public Resources Code section 21166. (*Id.*)

Section 21166 requires additional environmental review when (1) certain new information, which was not known and could not have been known at the time the EIR was certified as complete, becomes available; (2) substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the EIR; or (3) substantial changes are proposed in the project which will require major revisions of the EIR.  (Pub. Res. Code § 21166; CEQA Guidelines § 15162; *Friends of the Coll. of San Mateo Gardens*, 1 Cal.5th at 943.) The proposal to restart the Las Flores Pipeline System despite the recent discovery that the pipelines lack effective cathodic protection warrants subsequent review under each of the Section 21166 considerations.

1.     The Discovery that the Las Flores Pipeline System Lacks Effective Cathodic Protection Constitutes New Information that Requires OSFM to Prepare a Subsequent EIR.

Under CEQA, additional environmental review is required when

New information of substantial importance, which was not known and could not have been known with the exercise of reasonable due diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows . . . :

. . .

(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR.

(CEQA Guidelines § 15162(a)(3)(B).)

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 7 of 14

> a.    *The Discovery that the Pipelines Lack Effective Cathodic Protection is "New Information of Substantial Importance."*

The Celeron Project was proposed as a pipeline system that would have effective cathodic protection to prevent corrosion. And, in evaluating the environmental effects of the project, the Celeron EIR understood that to be true.[15]

However, as we unfortunately now know, that is not the case. In the wake of the 2015 Refugio Oil Spill, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") determined that the rupture in CA-324 was a result of progressive external corrosion, and that the Las Flores Pipeline System's cathodic protection system — intended to prevent such corrosion — was ineffective.[16] That information was not known until 2016 — thirty-one years after the Celeron EIR was certified.

As to buried, insulated lines more generally, it was previously understood that they could be susceptible to aggressive corrosion despite the implementation of cathodic protection. But no formal consensus existed as to the ineffectiveness of cathodic protection prior to a National Association of Corrosion Engineers ("NACE") report that was issued in 1992 — seven years after the Celeron EIR was certified.[17]

Thus, the Las Flores Canyon System's extensive corrosion issues and coating/insulation failures were unknown and unaccounted for in the antiquated Celeron EIR. Indeed, the Celeron EIR indicates staff were unaware that cathodic protection would be ineffective, as it states that the project "would be equipped with a cathodic protection system to reduce or prevent pipeline corrosion."[18]

The relative importance of this new finding cannot be understated. It fundamentally alters the nature of the Celeron Project and upends the foundational underpinnings of the Celeron EIR. Indeed, in predicting the likelihood of an oil spill — the primary environmental impact considered — the Celeron EIR relied on cathodic protection as a design specification that "would reduce the probability of an event [oil spill] occurring."[19] While the lead agency likely expected its predictions of the probability of an oil spill to be reasonable, not perfect, the difference in effectiveness of cathodic protection on insulated pipelines meant that the risk of a leak was *five times higher* than anticipated, as discussed further below.[20]

---

[15] Final Celeron EIR, *supra* note 8, at 2-57 (citing "cathodic corrosion protection" as a measure that would be "very effective" in reducing the risk of groundwater contamination from an oil spill); *see also id.* at 2-94, 2-106.

[16] Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California*, pp. 3, 14 (May 2016) [hereinafter "PHMSA Report"], available at: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

[17] *Id.* at Appendix O, p. 7.

[18] California State Lands Commission et al., *Draft Environmental Impact Report Environmental Impact Statement*, p. H-35 (August 1984) [hereinafter "Draft Celeron EIR"].

[19] Final Celeron EIR, *supra* note 8, at Appendix 4.3.

[20] County Draft EIR, *supra* note 4, at Section 5.6, p. 79.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 8 of 14

Accordingly, the limited effectiveness of cathodic protection in the Las Flores Pipeline System is incredibly consequential to an analysis of the pipelines' environmental impact. And, as discussed, that information was only discovered after the 2015 spill. Thus, it constitutes "new information of substantial importance" for purposes of Section 21166. (*See, e.g., Sec. Env't Sys., Inc. v. S. Coast Air Quality Mgmt. Dist.* (1991), 229 Cal.App.3d 110, 124 (holding that new information that undermined a key assumption used to evaluate the impacts of a project was of substantial importance).)

> b. *Without Effective Cathodic Protection, the Effects Considered in the Celeron EIR Substantially Increase in Severity.*

As noted, without cathodic protection, the risk of a spill from the Las Flores Pipeline System increases dramatically.

As one governing body already found, another spill would not be a matter of if, but when.[21] According to a recent analysis conducted by the County of Santa Barbara, the lack of an effective cathodic protection system increases the likelihood of an oil spill by *five times*:

> The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate.[22]

The County concluded that restarting the pipelines without effective cathodic protection could result in a spill every year, and a rupture (a spill greater than five barrels) every four years.[23] And, a spill in the coastal zone could be nearly twice the size of the 2015 spill.[24]

The Celeron EIR assessed possible environmental impacts from pipeline operations in part by considering the likely frequency of spills.[25] However, as noted above, the EIR's spill frequency estimates were expressly premised on an effective cathodic protection system; without such protection, the likelihood of a spill is five times greater than the Celeron EIR estimated. By using an erroneous estimate of spill frequency to assess the project's environmental impacts, the Celeron EIR necessarily underestimated the severity of those impacts, and its impact findings are unreliable.

An increased frequency of spills could also lead to environmental impacts that were never even considered in the Celeron EIR. Indeed, the aggregate effects of multiple oil spills in

---

[21] *See id.*
[22] *Id.* at Section 5.6, p. 78.
[23] *Id.* at Section 5.6, p. 79.
[24] *Id.* at Section 5.6, p. 78.
[25] *See, e.g.,* Final Celeron EIR, *supra* note 8, at 1-20, 1-24.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 9 of 14

sensitive areas were never specifically addressed. For example, if another spill were to occur in an area impacted by the 2015 spill, damage to still-recovering coastal flora and fauna could be irreparable. Likewise, the compound effect of multiple spills into certain groundwater systems may be unmitigable.

With the possibility of five times as many spills as initially expected, the potential cumulative environmental impacts over the lifetime of the Celeron Project are far more severe than the Celeron EIR anticipated. Thus, OSFM is required to prepare a subsequent EIR before approving the Restart Project. (*See* CEQA Guidelines § 15162(a)(3)(B); *Sec. Env't Sys., Inc.*, 229 Cal.App.3d at 124.)

> 2.   OSFM Must Prepare a Subsequent EIR due to Substantial Changes in the Project and the Circumstances under which the Project is Being Undertaken.

OSFM is also required to prepare a subsequent EIR due to the proposed changes to the Celeron Project and the substantial changes with respect to the circumstances under which the project is being undertaken. (Pub. Res. Code, § 21166(a), (b).) These changes, which stem from the failure of pipelines' cathodic protection system, create new significant effects and a substantial increase in the severity of previously identified significant effects. (CEQA Guidelines § 15162(a)(1), (2).)

> a.   *The Failure of the Cathodic Protection System and Resulting Corrosion Constitutes a Change in Circumstances that Requires a Subsequent EIR.*

As discussed above, the Celeron EIR relied on a cathodic protection system to prevent corrosion and minimize oil spill impacts.[26] It stated that "protection of a pipeline from corrosion is of critical importance" and "the entire pipeline would be protected from corrosion with cathodic protection systems . . . ."[27] And, it cited "cathodic corrosion protection" as a measure that would be "very effective" in reducing the risk of groundwater contamination from an oil spill.[28] The cathodic protection system failed, however, causing the pipelines to corrode and eventually rupture.[29]

As noted, the lack of an effective cathodic protection system increases the likelihood of an oil spill by five times and leads to pervasive corrosion throughout a pipeline system.[30] Operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the Celeron EIR.

---

[26] *See id.* at 4-53, 4-54, 4-55; Draft Celeron EIR, *supra* note 18, at H-35.
[27] Draft Celeron EIR, *supra* note 18, at 2-5, 4-106, 4-117.
[28] Final Celeron EIR, *supra* note 8, at 2-57; *see also* Final Celeron EIR at 2-94, 2-106.
[29] PHMSA Report, *supra* note 16, at 3, 13.
[30] County Draft EIR, *supra* note 4, at Section 5.6, p. 78.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 10 of 14

This change in circumstances means more possible spills over the lifetime of the project, which, as explained above, will result in additional and more severe environmental impacts than the Celeron EIR accounted for. (*See* Part II.B.2, *supra*.) Thus, OSFM must prepare a subsequent EIR to evaluate this change and the potential impacts it will cause. (CEQA Guidelines § 15162(a)(2).)

Indeed, EIRs are specifically intended to "provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment." (Pub. Res. Code § 21061.) The failure to prepare a subsequent EIR improperly deprives the public "of meaningful participation regarding the issue" of environmental harm cause by changed circumstances. (*Mira Monte Homeowners Assn. v. County of Ventura* (1985) 165 Cal.App.3d 357, 365.)

> b.    *The Change in Project Design to Operate Without Effective Cathodic Protections Requires Preparation of a Subsequent EIR.*

The Celeron Project was proposed as an oil and gas pipeline system that would have an effective cathodic protection system to prevent corrosion. And that is the project that was ultimately approved.

Now, however, Sable is seeking a State Waiver to operate the Las Flores Pipeline System without an effective cathodic protection system and well past its 30-year projected lifespan.[31] As discussed above, effective cathodic protection was a foundational aspect of the Celeron Project and its environmental review.[32] Indeed, as repeatedly alluded to throughout the Celeron EIR, such protection was an essential design element of the project, and the principal technology relied on to prevent a spill.[33]

Restarting the pipelines without an effective cathodic protection system represents a grave departure from the project that was initially envisioned and approved. (*See City of San Jose v. Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1015-17 (change in how water would be supplied to a project required additional environmental review).) The public, and other responsible agencies reviewing aspects of this project, have a right to understand how the project will be modified to address the defective cathodic protection system, and how the change affects the risk of another oil spill.

As explained at length above, operating without effective cathodic protection will result in additional and more severe environmental impacts than the Celeron EIR accounted for. (*See* Part II.B.2, *supra*.) This increase in severity of impacts, directly related to the failure of the cathodic protection system, requires the OSFM to prepare a subsequent EIR before deciding

---

[31] Draft Celeron EIR, *supra* note 18, at 2-35.

[32] *See, e.g.,* Final Celeron EIR, *supra* note 8, at 2-57, 2-94, 2-106, 4-53, 4-54, 4-55, H-35; Draft Celeron EIR, *supra* note 18, at 2-5, 4-106, 4-117.

[33] *See, e.g.,* Final Celeron EIR, *supra* note 8, at 2-57, 2-94, 2-106, 4-53, 4-54, 4-55, H-35; Draft Celeron EIR, *supra* note 18, at 2-5, 4-106, 4-117.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 11 of 14

whether to approve the State Waiver or the Restart Project as a whole. (Pub. Res. Code, § 21166(a).)

## II.    OSFM Should, and in Some Cases Must, Engage the Public Before Issuing Any Approvals Associated with the Restart Project.

Our clients and a number of other community organizations have twice asked OSFM for transparency and public engagement as it considers whether to approve the Restart Project. But OSFM has yet to hold any public meetings, invite public review and comment of any of Sable's applications, or release pertinent documents related to its determinations.

OSFM is a public agency, working on behalf of the people of California, that is charged with "safeguard[ing] our communities" from the hazards inherent in oil and gas transport.[34] Public participation is essential to ensuring that OSFM makes fully informed decisions, that OSFM understands the views of the public on whose behalf it is acting, and that the public maintains trust in our government agencies.

Should OSFM approve the Restart Project, our clients and our community will bear the consequences. We will be the ones who suffer from poorer air quality.[35] When another oil spill occurs, we will be the ones who watch dead mammals wash up on the shore, are deprived of access to the beaches we cherish, and whose businesses will suffer. And it may very well be the people of California who are forced to foot the bill to clean up a spill, or eventually, to decommission these facilities. **All we are asking for is a voice in a decision that will directly and substantially impact our community and the future of the Central Coast.**

Not only is public participation uniquely appropriate here, but in the case of the State Waiver, it is required by law.

OSFM's authority to issue a State Waiver comes from 49 U.S.C. § 60118(d), which provides that it "may waive compliance with a safety standard" — here, the requirement for effective cathodic protection — "*in the same way and to the same extent* that the Secretary [of Transportation] may waive compliance under subsection (c) of this section." (Emphasis added.) Subsection (c), in turn, explicitly states that "[t]he Secretary may act on a waiver . . . *only* after notice and an opportunity for a hearing." (49 U.S.C. § 60118(c)(B) (emphasis added).)

Thus, while OSFM has the discretion to approve a State Waiver, it can only do so by following the explicit procedures set forth in 49 U.S.C. § 60118, including providing the public with notice and an opportunity for a hearing. OSFM's failure to allow for public participation would void OSFM's approval of the waiver.

---

[34] *Pathways for Restarting Pipelines*, Office of the State Fire Marshal, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited September 26, 2024).
[35] *Pollution Mapping Tool Data*, California Air Resources Board, https://www.arb.ca.gov/ei/tools/pollution_map/ (last visited September 26, 2024).

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 12 of 14

Accordingly, we respectfully request that, in addition to conducting environmental review, (1) OSFM release all documents pertinent to the Restart Project and (2) hold public hearings and solicit public comment at each step of the restart process *before* making any determinations.

## III.   Conclusion

The circumstances surrounding the operation of these pipelines have substantially changed since they were initially evaluated and installed. In the last ten years, the pipelines have aged past their expected lifespan, were found to lack effective cathodic protection, and caused a catastrophic oil spill. Together, these developments have so fundamentally altered the nature of operations that a request to restart the pipelines, after ten years of dormancy, requires new environmental review.

Indeed, in light of the substantial increase in the risk of an oil spill from these pipelines, the environmental impacts from the Restart Project would be different and more severe than those considered in the Celeron EIR and have not been properly evaluated. Thus, CEQA requires that OSFM prepare either a new or subsequent EIR to evaluate the risks associated with operating a corroded pipeline without an effective cathodic protection system.

Lastly, we renew our request for public engagement and transparency in OSFM's review of the Restart Project. The Restart Project is a matter of profound public import with the potential to impact our community for years to come. We again ask OSFM to release all pertinent documents related to its review of the project, and to hold public hearings before it makes any further determinations, as is appropriate under the circumstances and required by law.

Thank you for your consideration.

Sincerely,

Linda Krop,
Chief Counsel

Jeremy Frankel,
Staff Attorney

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 13 of 14

cc:

David Sapp, Legal Affairs Secretary
Office of Governor Gavin Newsom
david.sapp@gov.ca.gov

Lauren Sanchez, Senior Advisor for Climate
Office of Governor Gavin Newsom
lauren.sanchez@gov.ca.gov

Christine Hironaka, Senior Advisor for Energy
Office of Governor Gavin Newsom
christine.hironaka@gov.ca.gov

Wade Crowfoot, Secretary
California Natural Resources Agency
wade.crowfoot@resources.ca.gov
secretary@resources.ca.gov

Christopher Calfee, Special Counsel to the Secretary
California Natural Resources Agency
christopher.calfee@resources.ca.gov

Amanda Hansen, Deputy Secretary for Climate Change
California Natural Resources Agency
amanda.hansen@resources.ca.gov

Shannon O'Rourke, Deputy Director of Office of Energy Infrastructure Safety
California Natural Resources Agency
amanda.hansen@resources.ca.gov

Le-Quyen Nguyen, Deputy Secretary for Energy
California Natural Resources Agency
le-guyen.nguyen@resources.ca.gov

Jenn Eckerle, Deputy Secretary for Oceans and Coastal Policy
California Natural Resources Agency
jenn.eckerle@resources.ca.gov

Rob Bonta, Attorney General
State of California Department of Justice
rob.bonta@doj.ca.gov

Jim Hosler, Chief /Assistant Deputy Director
California Department of Forestry and Fire Protection

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 14 of 14


jim.hosler@fire.ca.gov

Joshua Cleaver, Staff Attorney
California Department of Forestry and Fire Protection
joshua.cleaver@fire.ca.gov

Senator Monique Limón
California State Senate
Monique.Limon@sen.ca.gov

Assemblymember Gregg Hart
California State Assembly
Gregg.Hart@asm.ca.gov

Santa Barbara County Board of Supervisors
sbcob@co.santa-barbara.ca.us

---

Attachments:

1. Excerpt of Santa Barbara County Administrative Draft of Draft EIR for Plains Pipeline Replacement Project

2. Excerpt of Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California* (May 2016)

# ATTACHMENT 1



07/25/2024  12:45:32 PM

Impacts related to Hazardous Materials and Risk of Upset would only be related to maintenance and construction activities and these maintenance activities would have a minor impact on risk due to the potential for localized spills of hydraulic or diesel oils. **Impact RISK.1, RISK.2, RISK.3** would not be applicable and mitigation measures RISK.2-1 through RISK.2-7 would not be applicable. Impacts would therefore be **insignificant**.

Construction activities related to valve stations, pump stations and some segments of the pipeline that could be abandoned could potentially produce an increased risk of wildfires during construction, and **RISK.4** would still be applicable and mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable**.

### *No Project, Existing Pipeline Restart Alternative*

Under this alternative, the existing pipeline would be utilized instead of a new pipeline being installed, and transportation of crude oil would occur through the existing pipeline. The existing pipeline would be brought into compliance with existing requirements related to AB 864 and CSFM best available technologies (BAT), including the installation of additional valves along the pipeline route. The Applicant would have to apply to the CSFM for a waiver to utilize the existing pipeline since the existing pipeline is subject to corrosion under insulation, which could affect the efficacy of cathodic protection systems. Generally, a pipeline is not allowed to operate with ineffective cathodic protection systems. There is uncertainty as to whether the Applicant could demonstrate to the CSFM that the pipeline could be operated safely, and therefore this variation and the variation above (no Project, No Pipeline Alternative) are both addressed.

Assuming that a CSFM waiver is granted, the Applicant would have to install additional valves along the pipeline in order to comply with AB 864 and BAT requirements, similar to the proposed Project pipeline design. The installation of these additional valves would require some construction activities and some limited clearing at multiple locations along the pipeline ROW.

The existing pipeline is insulated, and therefore there would be no need for heaters at the Sisquoc Pump Station or the installation of the gas pipeline.

The installation of valves would most likely be at locations similar to the proposed Project valve installations as the pipeline would follow a similar ROW and similar terrain.

Hazards are associated with risks to the public from a spill and subsequent fire, as well as impacts from a spill to the environment, impacts to schools and potential wildfire impacts. The existing pipeline is a larger diameter pipeline, and therefore the draindown spill volumes would be larger than the proposed Project. This results in potentially larger spills and larger fires, impacting more people, as well as larger spills to the environment. In addition, the frequency of a spill from the existing pipeline would be higher due to its age and the potential for the cathodic protection to be compromised by the insulation. These factors have been incorporated into the analysis presented below.

### *Risks to Public Safety*

**Impact RISK.1** describes the potential spill sizes and the estimated frequency of spills from the pipeline system and the potential for immediate (fires, etc.) health impacts on the public.

### *Crude Pipeline Spill Volumes*

The spill volumes for this alternative were calculated based on the pipeline size, which would be larger than the proposed Project, and the associated terrain for different segments of the pipeline. The Applicant

provided a risk assessment for the proposed Project and this analysis was utilized to estimate the spill volumes associated with a larger pipeline size. Figure 5.6-11 shows the estimated spill volumes along the pipeline route for each segment as a worst case for that segment. The worst-case sized spill volume is shown in Table 5.6-16 for the different portions of the crude oil pipeline alternative.

*Crude Pipeline Spill Frequencies*

Spill frequencies from a crude pipeline are based on the PHMSA failure rates for the California pipeline database. The PHMSA base failure rate for crude oil pipelines is shown in Table 5.6-17. The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age. However, the CSFM study indicated a minimal increase in failure rate for pipelines that are less than 40 years old and the PHMSA database used to estimate the base failure rate includes many older pipelines. Therefore, only the five times factor was applied as an estimate of the increased failure rate for this pipeline.

**Figure 5.6-11    No Project – Existing Pipeline Restart Alternative Spill Volume by Segment Milepost**



Source: based on Applicant QRA and EFRD 2019, with adjustments for the size of the existing pipeline.



07/25/2024  12:45:32 PM

**Table 5.6-16     No Project – Existing Pipeline Restart Alternative Crude Pipeline Worst Case Spill Volumes**

| Location | Proposed Project - Maximum Spill Volume, gallons | Alternative - Maximum Spill Volume, gallons |
|---|---|---|
| LFC – Gaviota Plant | 84,000 | 126,000 |
| Gaviota – Sisquoc | 131,040 | 284,594 |
| Sisquoc - Pentland | 198,030 | 657,893 |
| Coastal Segments | 117,600 | 237,344 |

Source: based on Applicant QRA and EFRD 2019, with modification to address spill duration of 60 minutes. Coastal segments include up to valve station 2-500. Includes the installation of additional valve stations as per the proposed Project locations.

**Table 5.6-17     No Project – Existing Pipeline Restart Alternative Crude Pipeline Spill Frequencies**

| Location | Spill Frequency | Return Period, years rupture/leak/total |
|---|---|---|
| PHMSA California Crude oil base rate | 1.62 per 1,000-mile years | - |
| Adjustment due to Pipeline Condition | 5.3 factor | - |
| PHMSA Adjusted Rate | 8.56 per 1,000-mile years | - |
| Failure rate for L901R (49.2 miles) | 0.43 failures per year | 9/3/2 years |
| Failure Rate for L903R (74.1 miles) | 0.63 failures per year | 6/2/2 years |
| Failure Rate for L901R + L903R | 1.07 failures per year | 4/1/1 years |

Source: based on Applicant QRA and EFRD 2019 with CSFM 1991 adjustment factor. PHMSA data since 2010. The return period is the anticipated period between releases. Includes leaks and ruptures.

*Crude Pipeline Population Densities*

The population densities along the route are based on estimates for remote, rural, low density and high-density areas with some additions for highways. The population densities are similar to those used for the proposed Project except for the area through the City of Buellton, since the existing pipeline would pass through the City of Buellton and the proposed Project would pass around the City of Buellton to the west.

*Crude Pipeline Fires*

In the event of a spill of oil and subsequent ignition resulting in a pool fire, the heat (i.e., thermal radiation) from the fire could result in a serious injury or fatality. The assumptions for impacts would be the same as for the proposed Project.

*Gas Pipeline*

The proposed gas pipeline would not be installed as part of this alternative since heaters at Sisquoc would not be installed.

*Alternative Pipeline: Public Safety Risk*

The combination of scenario frequency and consequences is combined to estimate risk using FN curves. FN curves are depictions of the risk levels of a project and show the frequency (F) of scenarios that could produce a given fatality or injury level (N) or greater. These are presented for the proposed Project in **Impact RISK.1**. Santa Barbara County has established risk thresholds that use societal risk profiles (FN curves) to determine the significance of hazardous material releases. These FN curves address both injury and fatality. The Santa Barbara County's adopted thresholds are generally applicable to fixed facilities and pipelines. The risk FN curves are shown in Figure 5.6-12 and are based on the FN curves developed as part of the Plains 2019 QRA analysis, with adjustments for the existing pipeline (increased pipeline diameter

Draft Print

07/25/2024   12:45:32 PM

and failure frequency). The FN curves would be located within the amber region, and the impacts to public health due to pipeline releases would be **significant and unavoidable.**

**Figure 5.6-12    No Project – Existing Pipeline Restart Alternative Pipeline Risk FN Curves**



Source: Plains 2019 with modifications

### Risks to the Environment

A spill of crude oil from the pipeline could impact resources in the vicinity of the pipeline ROW. See Section 5.2 Biological Resources, Section 5.4 Cultural Resources and Section 5.9 Hydrology and Water Quality for a discussion of the impacts of a crude oil spill on biological, hydrological and cultural resources along the crude oil pipeline ROW.

### Crude Pipeline Spill Volumes

The spill volumes are discussed above under **Impact RISK.1**. For the public health assessment under **Impact RISK.1**, a worst-case spill shutdown time of 15 minutes was used due to the already conservative analysis for fires and impacts to the public used in the QRA. However, for spills that could affect the environment, a longer duration is used. As evidenced by the May 2015 Refugio spill, there is the potential for a pipeline shutdown to take longer than 15 minutes.

### Crude Pipeline SCADA System

The SCADA system used for the alternative would be the same as that used for the proposed Project since the SCADA system would be required to be updated per CSFM and AB864 requirements.

*Proposed Project Pipeline: Spills Affecting Marine Resources*

Portions of the pipeline extend along the Santa Barbara County coastline. A crude oil spill could drain from the spill location through existing culverts or drainages and enter the marine environment. This is what occurred during the May 2015 Refugio Beach spill. An estimated 43 percent of the oil entered the ocean from the Refugio spill location, which was an estimated 750-foot pathway from the ocean shoreline. Because the proposed pipeline is located onshore at various distances from the shoreline, a rupture at different locations spilling the same amount of oil could allow for oil to enter the marine environment. Assuming a linear function of oil being trapped and adsorbed onshore with distance, the maximum amount of oil could enter the ocean where the pipeline is closest to the ocean and potential worst-case spill volumes are large. An estimated maximum amount of 71,621 gallons of crude oil could enter the ocean at the worst-case spill location. An estimated 11.8 miles of the 16.6-mile coastal portion (71 percent) of the pipeline would be vulnerable to spills entering the ocean if a spill were to occur along any of those segments and the adsorption rate were similar to that which occurred during the Refugio spill. This assumes that no rain event is occurring and that drainages are not flowing.

There are a number of variables affecting the amount of oil that could reach the ocean from an onshore spill, including the terrain, the location of drainages under the freeway and the railroad tracks, the soil type, and extent of rocky interfaces as well as the amount of moisture. During a rain event, when drainages and creeks are flowing, a spill into the waterways could follow the flow and enter the marine environment more readily. A spill under these conditions would also have more extensive terrestrial impacts and reach the marine environment more readily but would also be subjected to turbulence and mixing along the drainages.

For inland areas, the area with the largest potential impacts is along the Cuyama River. Based on the elevation profile and the spill volumes, the maximum spill volume along the Cuyama River segments of the pipeline (between proposed Project valve 3-800 and 5-400 nearest the Cuyama River) and using the absorption rate as seen in the Refugio spill, a spill along the Cuyama River portion of the pipeline could impact resources a distance as far as about 3,200 feet, which means that pipeline segments within about 3,200 feet of the Cuyama River could potentially impact the river in the event of a spill.

*Potential Impacts*

Depending on the location of the spill, the environmental conditions, and the biological resources present, Impact RISK.2 short and long-term effects to biological resources associated with a crude oil spill has the potential to be significant and unavoidable. Mitigation measures RISK.1-1 through RISK.1-7 would apply. Due to the increased size and frequency of spills, this significant and unavoidable impact would be a greater severity than that presented by the proposed Project.

**Risks to Schools**

For **Impact RISK.3** (schools), the pipeline construction activities for the existing pipeline would only affect areas near the proposed valve installations. The existing pipeline is located about 500 feet from the Oak Valley School in western Buellton. In order to address the risk levels to this school, the California Department of Education (CDE) school siting risk protocol was utilized to determine the risk levels.

The assessments demonstrated that the risk levels are acceptable under the CDE Risk Protocols with a Total Individual Risk/Individual Risk Criteria (TIR/IRC) ratio of 0.29, with a 1.0 TIR/IRC ratio being the CDE Protocol threshold. It is important to note that the CDE protocol examines the individual risk at the closest school and does not examine the risks cumulatively along the entire pipeline route. Because the CDE

# ATTACHMENT 2



## U.S. Department of Transportation

# Pipeline and Hazardous Materials Safety Administration

**Failure Investigation Report**

**Plains Pipeline, LP, Line 901**
**Crude Oil Release, May 19, 2015**
**Santa Barbara County, California**

**May 2016**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Table of Contents

Executive Summary.................................................................................................................3

Final Report Methodology......................................................................................................4

Facility Background ...............................................................................................................4

Events Immediately Prior to and During the Crude Oil Release...........................................6

Plains' Field Response and National Response Center Notifications ....................................7

PHMSA's Corrective Action Order .......................................................................................9

Pipeline Alignment ................................................................................................................9

  Las Flores Station to Gaviota Station Line 901 Elevation Description .............................9

  Gaviota to Pentland Station Line 903 Elevation Description ..........................................10

Post-Incident Investigation Results .....................................................................................11

  Metallurgical Evaluation of Failed Pipe ........................................................................11

  In-Line Inspection Survey Review ...................................................................................12

      Number of Anomalies ................................................................................................13

  Cathodic Protection Findings...........................................................................................13

  Spill Volume Estimate from Plains' Third-Party Consultant ..........................................13

Investigation Findings and Conclusions...............................................................................14

  Proximate or Direct Cause ...............................................................................................14

  Contributory Causes.........................................................................................................14

PHMSA Post-Incident Action Chronology ..........................................................................18

Appendices ...........................................................................................................................20

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Executive Summary

At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl) of heavy crude oil.[i]  An estimated 500 bbl of crude oil entered the Pacific Ocean.  Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station.  On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901.  Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release.  As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified.  On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan.[ii] No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.

PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

1) Ineffective protection against external corrosion of the pipeline

- The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.

- The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2) Failure by Plains to detect and mitigate the corrosion

- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

3) Lack of timely detection of and response to the rupture

- The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.

- Control room staff did not detect the abnormal conditions in regards to the release as they occurred.  This resulted in a delayed shutdown of the pipeline.

- The pipeline controller restarted the Line 901 pipeline after the release occurred.

- The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report. PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage. PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

## Final Report Methodology

PHMSA conducted relevant interviews, gathered and reviewed numerous historical documents and available records, and performed a thorough review of the Plains Control Room in Midland, TX. An ILI subject matter expert (SME) was hired to review the raw magnetic flux leakage (MFL) data and final vendor reports from the MFL surveys, and evaluated Plains actions as a result of their review of the vendor reports. PHMSA issued a CAO which in part instructed Plains to have the failed pipe examined by a PHMSA-approved metallurgical laboratory and to have a root cause failure analysis (RCFA) performed by a third party independent consultant.

The factual evidence reviewed includes: the Plains Integrity Management Plan (IMP), CP records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures and reports obtained from the pipeline operator and PHMSA SMEs.

The arrangement of this report provides a general description of the pipeline system, the events that occurred on the day of the release, and acts or omissions of the operator that led to this failure and release of crude oil. Specific evidence is supplied and pertinent statements from each report are excerpted where appropriate.

## Facility Background

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

(1) Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel

Plains Pipeline, LP - Failure Investigation Report

*Santa Barbara County, California Crude Oil Release - May 19, 2015*

in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam.  The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.



**Figure 1.** Map of Plains' Western Division Pipelines.  The arrow points to the approximate release site on Line 901.

At Sisquoc Station, crude oil can be pumped to one of two locations: a nearby refinery via a 12-inch diameter pipeline operated by Phillips 66, or continue down Line 903 to Pentland Station. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream.  At Emidio Station crude oil is delivered to above-ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.

Prior to the May 19, 2015 release, there had been four small releases meeting PHMSA reportable criteria at pump stations on Lines 901 and 903. No releases were reported to PHMSA on the pipelines outside of pump stations prior to 2015.  The  operator reported maximum operating pressure (MOP) of Line 901 is 1,341 psig.

At the time of the spill, Plains All American Pipeline (PAAPL) operated Line 901 and Line 903 under a Federal Energy Regulatory Commission (FERC) certificate  of economic regulatory jurisdiction that was issued in 1987.  Plains Pipeline, LP, is a subsidiary of PAAPL.  Based on the FERC filing, Lines 901 and 903 were classified as interstate  pipelines, pursuant to 49 U.S.C. § 60101(7), as facilities used to transport hazardous liquid in  interstate or foreign commerce, and as such, were regulated by PHMSA as interstate pipelines. Plains cancelled the FERC certificates for Lines 901 and 903 on February 12, 2016 and April 29, 2016,

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

respectively, stating that the transportation service was no longer available in interstate commerce. Line 903 from Gaviota to Sisquoc to Pentland Stations was purged with nitrogen in accordance with Amendment No. 2 to the CAO, and remains shut down between these stations. The Pentland to Emidio segment of Line 903 is active and operating intermittently at low pressures. This section of pipe between Pentland and Emidio is not directly connected to the Gaviota to Pentland segment and is used to transport crude product from breakout tanks in Pentland Station.

## Events Immediately Prior to and During the Crude Oil Release

On the morning of May 19, 2015, Lines 901 and 903 were transporting crude oil with a flow rate setpoint of 1,240 bbl per hour (BPH) leaving the Las Flores Station, and the discharge pressure was approximately 575 psig.  Pumps were operating at the Las Flores Station on Line 901 and Sisquoc Station on Line 903.  A Plains instrumentation and electrical technician was dispatched that morning to disconnect and remove a motor from a non-operational pump at the Sisquoc Station.  While the technician was performing his work, the operational pump (Pump 401) at the Sisquoc Station was shut down unintentionally (i.e., "uncommanded").  When Pump 401 on Line 903 stopped operating, the pressure in Line 901 increased. The pressure rose to a maximum of 696 psig at the Las Flores Station discharge.  The controller shut down the pump at Las Flores Station and the pressure remained at 677 psig.  Approximately four minutes later, the pump at Las Flores Station was restarted.  At approximately 10:55 a.m. PDT, the flow rate at Las Flores Station climbed from zero to 2,042 BPH.  Concurrently, the line pressure rose to a high of 721 psig, then dropped to 199 psig, and then slightly increased to approximately 210 psig until the Las Flores pump was shut down a second and final time.  Generally, a sudden increase in flow rate accompanied by a decrease in pressure is indicative of a release. PHMSA has determined that Pump 401 going offline in an "uncommanded" manner on the morning of May 19, 2015, was an abnormal event, but that this in itself should not have caused Line 901 to rupture.

PHMSA performed a detailed review of the SCADA event and alarm logs, and pressure and flow records.  The review indicated that there was information reported by the SCADA system that indicated a release had occurred by approximately 10:58 a.m., and an alarm was generated on low pressure.  The alarm was not set at an appropriate value.  The alarm also did not have a major priority/severity or safety-related alarm status.  The controller did not recognize the information he received as indicative of an abnormal operation.  Evidence indicates that the controller was focused on the events at Sisquoc Station (i.e., restarting the Sisquoc pump that had gone down once uncommanded, and a second time on high case temperature along with other duties).[iii]

Due to the Sisquoc Station maintenance activity resulting in an unplanned pump shutdown, the controller anticipated alarms would be activated from the pipeline leak monitoring (PLM) system.  According to interviews and a review of the alarm log, the PLM inhibit was requested by the controller to the step-up shift supervisor between 11:15 and 11:22 a.m.[iv]  The step-up shift supervisor then inhibited (shut off) the PLM system alarms.[v]  Also, during this time, the controller started an investigation of the SCADA data in an attempt to understand the operational abnormalities that were occurring.  After attempting to restart the Sisquoc pump twice, the controller shut down the pipeline.  PHMSA requested the operator review the flow imbalance calculations and provide a time when the PLM system would have generated an alarm if not inhibited, and it was determined that  alarms would have been generated

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

approximately two minutes before the controller shut down the pipeline.[vi]



**Figure 2**. Schematic of Plains Pipeline, LP, Line 901 and spill path.

## Plains' Field Response and National Response Center Notifications

The following is a timeline of Plains and emergency responder activities conducted immediately prior to locating the leak site:[vii]

- At 11:42 a.m. a call reporting a petroleum smell was received at Santa Barbara Fire Department (SBFD) Station 18.  Engine 18 left the station to investigate the odor complaint near Refugio State Beach.

- At approximately 12:15 p.m., prior to a scheduled tabletop spill drill required by federal regulations 49 C.F.R. §194, the pre-drill meeting was completed and adjourned.  A representative from  the Santa Barbara Office of Emergency Management (SB-OEM) received a call from the  SBFD reporting that there was oil on Refugio Beach.  The SB-OEM representative and  the Plains representatives left the spill drill and drove separately to Highway 101 at  Refugio Beach.

- The Santa Barbara Dispatch notified the National Response Center (NRC #1116950) at 12:43  p.m. PDT of an unknown sheen in the ocean at Highway 101 and Refugio Beach.[viii]

- At approximately 12:55 p.m., the two Plains representatives arrived at the south side of Highway 101 where the SBFD personnel were.  They noted oil in the ocean but could not  determine the source of the oil.  One of the Plains representatives told the assembled group that he did not think the oil was coming from Line 901 because the pipeline is located on the  other side of Highway 101, and there would be oil flowing across Highway 101 if Line 901 was leaking.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- The Plains representatives drove to the company's pipeline right-of-way (ROW). At approximately 1:27 p.m., the Plains representatives located the leak site on the Plains ROW. They called the controller to report the leak and to tell the controller to leave Line 901 shut down and to close the Refugio gate valve. The Plains representatives used their cell phones to contact other Plains personnel, the landowner where the leak occurred, Plains' oil spill response contractors, and others. The Plains representatives noted that crude oil from the release site had entered a culvert that crosses under the Highway 101 and railroad tracks and discharges to Refugio Beach. The Plains representatives, along with Fire Department personnel, attempted to stop the flow of oil into the culvert. However, the culvert was too large to stop the flow with shovels, and sand bags were not readily available, so their immediate efforts were unsuccessful. At approximately 3:00 p.m., additional equipment and personnel arrived, the culvert was dammed and oil was prevented from entering the culvert.

- At 2:56 p.m., a representative from Plains called the NRC to report (NRC #1116972) the release of crude oil at 2:56 p.m. PDT. This report indicated that the release was at Latitude: 34° 27' 43" N; and Longitude: 120° 05' 24" W. This NRC report was made 89 minutes after the release site was found by Plains field personnel.[ix]



**Figure 3**. Spill location relative to Refugio Beach in Santa Barbara County, CA. Photo: John L. Wiley http://flickr.com/jw4pix

Federal pipeline safety regulations, (49 C.F.R. § 195.52), require that the NRC be notified at the earliest practicable moment following discovery of a release of a hazardous liquid, including "[a]ny failure that resulted in pollution of any stream, river, lake, reservoir, or other similar body of water that violated applicable water quality stands, caused a discoloration of the surface of the water or adjoining shoreline, or deposited a sludge or emulsion beneath the surface of the water or upon adjoining shorelines." On January 30, 2013, PHMSA issued an

Page **8** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Advisory Bulletin clarifying that this was to be interpreted as within one hour of discovery.  Plains reported the rupture to the NRC approximately 89 minutes after discovery, thus notifying the NRC 29 minutes late.

The estimated costs reported by the operator as of December 23, 2015, were $142,931,884. This figure includes all costs the operator spent as a result of this release through the date reported, including commodity lost, the operator's property damage and repairs, operator's emergency response, environmental remediation, and estimated other costs spent including government agency costs and media relations expenses.[x]

## PHMSA's Corrective Action Order

On May 21, 2015, PHMSA issued a CAO, CPF No. 5-2015-5011H, to Plains.   The  CAO required Plains to purge Line 901; review the pipeline's construction, operating,  maintenance, and integrity management history; expedite the review of data from the May 5,  2015, ILI tool run; conduct metallurgical evaluation of the failed pipe; repair any   integrity-threatening anomalies identified by the ILI survey; and conduct a root cause failure  analysis.  The CAO requires Plains to purge Line 901 and to keep Line 901 shut down until PHMSA approves the restart of the pipeline.  Plains' Line 901 was purged and filled with an inert nitrogen gas on June 18, 2015.

On June 3, 2015, PHMSA issued Amendment No. 1 to the CAO.  The amendment was issued to address preliminary findings from the early stages of PHMSA's investigation, and the possibility that the conditions on Line 901 also existed on Plains Line 903.   The amendment to the CAO  required Plains to conduct additional non-destructive testing of ILI anomalies on Lines 901 and  903; review the construction, operating, maintenance, integrity management, and ILI history of  Line 903; and reduce the operating pressure of Line 903 to 80% of the highest pressure sustained  for a continuous 8-hour period during the month before the May 19 failure.  This pressure  reduction was intended to enhance safety until all facets of the line's integrity could be evaluated.

On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO.  The amendment required Plains to empty and purge Line 903 between Gaviota and Pentland Stations and fill it with an inert gas.  Line 903 was purged between Gaviota and Pentland Stations and filled with inert nitrogen.  The complex purging operations began in December 2015, and were completed on April 18, 2016.  Both Line 901 and the purged sections of Line 903 will remain shut down until all actions required by PHMSA's CAO and subsequent amendments have been completed.  PHMSA may continue to issue additional amendments to the CAO as necessary.

## Pipeline Alignment

### Las Flores Station to Gaviota Station Line 901 Elevation Description

To fully understand the Line 901 release, it is vital to understand the elevation profile of Line 901 and Line 903 from the Las Flores Canyon to Pentland Station.  Line 901 starts at the Las Flores Station at an elevation of approximately 180 feet.  There are two large hills downstream of the originating pump station.  The first hill has a peak elevation of approximately 740 feet and the second hill has an elevation of approximately 600 feet.  The release occurred downstream of the second hill at an elevation of approximately 80 feet.  Immediately downstream of the release point, the pipeline rises slightly and then runs relatively level approaching the Gaviota station.  This fact is important because as soon as the pump at Las

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Flores Pump Station was turned off the second time, the only crude oil that could be released was the height of oil in the pipeline above the release site and not the amount located between the two aforementioned hills.

### Gaviota to Pentland Station Line 903 Elevation Description

Line 903 receives all of the crude oil delivered by Line 901. The line elevation at Gaviota is approximately 150 feet.  The elevation at Sisquoc is approximately 880 feet.  Downstream of Sisquoc,  Line 903 rises to 2,420 feet and then to a height of approximately 2,750 feet and ultimately to an elevation of close to 3,000 feet before dropping into Pentland Station at an elevation of approximately 690 feet.  Line 903 exhibits many of the same construction and operation conditions as Line 901 and was addressed by the amendments to the CAO. Pump 401 at Sisquoc Station has adequate capacity to push the oil up and over the downstream hills and into Pentland Station but only if it has full suction pressure and full flow coming into the pump. Because of the release, the pump could not push the oil over the downstream hills, and so the oil in the pump became hot and the pump shut down to prevent overheating.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Post-Incident Investigation Results

### Metallurgical Evaluation of Failed Pipe

The failed pipe segment has been analyzed by third-party metallurgical experts, Det Norske Veritas (U.S.A.), Inc.'s (DNV-GL) in Dublin, OH.  The failed pipe assessment and testing was witnessed  by PHMSA, the California Department of Fish and Wildlife, and the U.S. Department of Justice.



**Figure 4**. The failed pipe and surrounding insulation and coating.



**Figure 5**. Pipe External Surface at the Line 901 failure site after cleaning.

Page **11** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

DNV-GL's draft report was completed and disseminated to Plains and PHMSA on August 6, 2015.  The draft report was reviewed by PHMSA engineers, and a number of comments and clarification  requests were made.  DNV-GL reviewed the comments and revised the report. The Final Report  was issued on September 18, 2015.

The Final Report provides a summary of findings, including the following excerpt:

"The results of the metallurgical analysis indicate that the leak occurred at an area of  external corrosion that ultimately failed in ductile overload under the imposed operating  pressure.  The morphology of the external corrosion observed on the pipe section is  consistent with corrosion under insulation facilitated by wet-dry cycling."[xi]

## In-Line Inspection Survey Review

Plains conducted ILI surveys on Line 901 (10.7 miles in length) to assess the integrity of the pipeline in accordance  with PHMSA regulations in 2007, 2012, and 2015.  According to 49 C.F.R. § 195.452(j)(3), the pipeline is required to be surveyed at  intervals commensurate with the pipeline's risk of integrity threats, but at least every 5 years.   Plains changed Line 901 from a 5-year assessment cycle to a 3-year assessment cycle after the 2012 ILI survey.

The data collected during these surveys must be fully evaluated within 180 days of the ILI, and an operator must take action upon discovery of any "immediate repair conditions" as defined in 49 C.F.R. § 195.452(h) unless the operator can demonstrate that the 180-day period is impracticable.

The most recent ILI survey for Line 901 was completed on May 6, 2015.   The 2015 ILI survey data for  the first 2 miles of Line 901, as measured from the Las Flores Station, was found to be incomplete and not useable for ILI analysis.    For the rest of the ILI survey, the correlation digs,  which are used to gauge survey data accuracy in the ILI vendor's preliminary report, had not been finished  at the time of the May 19, 2015 failure.

PHMSA's independent third-party ILI SME also performed an analysis of the data from past ILI surveys of  Line 901.  Preliminary data from the results of each of the ILI surveys are summarized below  and show a growing number of corrosion anomalies on Line 901.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

**Number of Anomalies**

| Metal loss | June 19, 2007 | July 3, 2012 | May 6, 2015 |
|---|---|---|---|
| Greater than 80% | 0 | 0 | 2 |
| 60-79% | 2 | 5 | 12 |
| 40-59% | 12 | 54 | 80 |

The May 6, 2015 ILI survey data and subsequent analysis by the ILI vendor predicted external corrosion at the failure site with an area of 5.38 inches by 5.45 inches, and a maximum depth of 47% of the original pipe wall thickness. After the failure, the DNV-GL metallurgical investigators physically measured external corrosion at the failure site to have a maximum depth of 89%.[xii] The dimensions of the corrosion feature were 12.1 inches axially by 7.4 inches in circumference. The maximum depth, as measured using laser scan data, was 0.318 inches or 89% of the measured wall thickness (0.359 inches).

The ILI summary report prepared by PHMSA's SME also examined the "as-called" (ILI-predicted) versus as-found (field measured) lengths, widths and area for the excavated anomalies on Line 901. The report demonstrates that the lengths and widths of the anomalies were under-called (underestimated) in many cases, however many were also over-called. Plains submitted little documentation concerning their analysis of how the field measured anomalies compared to the ILI vendor analysis. Furthermore, Plains did not provide documentation showing that discrepancies between the originally reported anomaly sizes predicted by the ILI vendor and Plain's actual field-measured sizing of the corrosion anomalies were subsequently discussed with the ILI vendor, as required by Plains' IMP.[xiii]

## Cathodic Protection Findings

According to 49 C.F.R. § 195.563, CP is required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines. Historical CP records for line 901 have been reviewed and reveal protection levels that typically are sufficient to protect non-insulated, coated steel pipe. Line 901 and Line 903, however, are insulated. An increasing frequency and extent of corrosion anomalies were noted on both Lines 901 and 903 in ILI survey results, anomaly excavations, and repairs. PHMSA inspectors noted moisture entrained in the insulation at four excavations performed by Plains on Line 901 after the May 19 spill and prior to the PHMSA-mandated purging of the pipelines.

## Spill Volume Estimate from Plains' Third-Party Consultant

Plains initially estimated the volume of spilled crude oil to be approximately 2,400 bbl, of which 500 bbl was estimated to have reached the ocean. On August 4, 2015, Plains reported to the Unified Command that the 2,400 bbl release estimate was still accurate. However, after Plains completed the PHMSA-mandated purge, the company's calculations indicated that up to 3,400 bbl had possibly been released from the pipeline. Plains notified the Unified Command

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

that RPS Knowledge Reservoir (RPS), a third-party investigator hired by Plains, was still trying to  reconcile the difference.

On November 24, 2015, Plains informed PHMSA that RPS had completed their analysis regarding the release volume and produced a report of findings.  RPS used the OLGA simulation software tool to model the behavioral dynamics of the pipeline prior to, during, and immediately after the May 19, 2015 leak.  The report concluded that the discharge leak volume was 2,934 bbl.  The RPS report was dated November 11, 2015.  Plains has reported 1,100 bbl of crude oil have been recovered.

## Investigation Findings and Conclusions

Line 901 pipeline ruptured at approximately 56% of the MOP.  Although the operational events that occurred on the morning of the release were abnormal, this should not have caused the release if the pipeline's integrity had been maintained to federal standards.

## Proximate or Direct Cause

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated, 24-inch diameter steel pipeline.  The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap.  Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised.  The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory.  The release was a single event caused at an area where external corrosion had thinned the pipeline wall.  There is no evidence that the pipeline leaked before the rupture.  There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.

PHMSA's investigation identified numerous contributory causes of the rupture.  The contributory causes can be grouped into three categories: 1) ineffective protection against external corrosion of the pipeline; 2) failure by Plains to detect and mitigate the corrosion;, and 3) lack of timely detection of the rupture.  Below is a summary of the key contributory causes:

## Contributory Causes

1)  Ineffective protection against external corrosion of the pipeline

   - Plains' CP system was ineffective in protecting thermally insulated underground pipeline systems from external corrosion.  Industry practices recognize that an impressed current system like the one utilized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised.  The external coating in the area of the rupture had allowed moisture to enter the insulation adjacent to the steel pipe.[xiv]  Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised.[xv]

2)  Failure by Plains to detect and mitigate external corrosion

   - Plains did not identify CUI as a risk-driving threat in their federally-mandated integrity management program (IMP).

Page **14** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- Plains' did not fully implement their IMP.

  o Plains did not perform suitable analysis of the field measurements of the excavated corrosion anomalies that occurred after ILI surveys were completed in 2007 and 2012.

  o The data reported by the ILI vendor were inconsistent (and did not meet the published accuracy of the ILI tools of +/- 10%, 80% of the time for depth) when compared to the results of the field-measured corrosion anomalies.

  o Plains' as-found field measurements of corrosion anomalies were inconsistent with the as-called vendor-provided ILI data and analytical reports.  ILI surveys conducted in 2007 and 2012 revealed inconsistencies in the character of the anomalies.  In both of these cases, Plains did not consult the ILI vendor to help resolve the inconsistency.

  o Plains failed to follow written procedures directing the IMP group to perform appropriate statistical analysis after the anomaly dig reports were received from the field, and to discuss any inconsistencies with the ILI vendor.[xvi]

    ▪ Plains' Pipeline Integrity group created a unity plot for depth after the 2012 ILI survey and anomaly digs.  There is no documentation detailing what was done with the information from the unity plot.

  o Plains incorrectly added the over-called anomalies in the close-out reports.

    ▪ The close-out reports should have only reported the anomalies that were within the reported accuracy of the ILI tool. The reported tool accuracy is +/- 10 %, 80 % of the time. Adding the overcalled anomalies outside of the tool accuracy skews the data.

- Plains' Pipeline Integrity group was historically focused on pitting corrosion under "shrink sleeves" at the pipeline girth welds (circumferential welds to join pipe segments).

  o The release location was within 6 feet of a corrosion anomaly that was exposed and repaired after the 2012 ILI survey.  There was evidence of corrosion and degraded coating systems between the 2012 repair site and the 2015 rupture site.

  o The anomaly that ruptured was called out by the ILI tool at 45% depth in 2012. Plains' IMP specified adding 10% to all anomalies (55% depth in this case) then "growing them" to predicted failure using an anticipated corrosion growth rate.  This analysis would provide a predicted failure time.  Plains did not excavate the anomaly that failed.

3) Lack of timely detection of and response to the rupture

- The controller did not have information communicated from the SCADA system in such a manner to be successful in detecting abnormal operations.  The pipeline SCADA system did not have safety-related alarms on low pressure configured at the

Page **15** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

correct value or priority to alert the control room staff of the rupture.  When this alarm was provided to the controller, the discharge pressure at Las Flores was 199 psig but, within a minute, pressure elevated above 210 psig, the alarm status cleared, and the discharge pressure remained above 200 psig (approximately  210-211 psig) until the pipeline was purged.  The pipeline was still leaking when the discharge pressure at Las Flores was above 200 psig, and continued to do so without additional alarm indications.  When the pipeline was down, isolated but still leaking, the minimum pipeline discharge pressure at Las Flores remained at 210-211 psig.  The low discharge pressure alarm setpoint value was not set properly as it should have been above 211 psig.  This type of alarm should be identified as a high priority safety related alarm.  While the controllers and shift supervisors can access historical trend data or continue to monitor a given pressure or flow, when the pipeline was ultimately shut down at 11:30 a.m., neither the controller nor step-up shift supervisor detected any drop of pressure at the specific failure location that would indicate that oil was being released.

- Neither the pipeline controller nor step-up shift supervisor detected the initial abnormal conditions as the release occurred.  There was an indication of decreased pressure and increased flow between 10:53 and 10:58 a.m., which is consistent with a pipeline release.  This resulted in a delayed shutdown of the pipeline.  Adequate alarm setpoint values with correct priorities are essential to controller and shift supervisor recognition of abnormal operations, especially when many pipeline systems are operated from the same console.

- The pipeline controller restarted Line 901 after the release occurred.

- The pipeline leak detection system lacked instrumentation and associated calculations to monitor line pack.

  o The function of the PLM system was a simple line balance calculation based on flow meter values without line pack considerations.  The PLM relies on comparing "meter in – meter out" calculations over time. This type of leak detection system without the use of safety-related, high-priority, low-pressure alarms does not provide the controller or shift supervisors with adequate information when the pipeline is down.

  o When the pipeline is not running, even if only due to scheduling and not required maintenance activities, flows will be close to zero and the imbalance calculation will provide little if any value as currently configured.  Leak detection on a down pipeline requires a robust system of planned and accurate high-priority alarm types and alarm setpoint values in order for response to occur on critical low pressures.

  o The leak detection system for Lines 901 and 903 consists of two leak detection segments.  Additional instrumentation such as pressure and temperature transmitters located at Refugio Gate and Cuyama valve settings (both transmitter types on each side of the valves) would allow additional information about the operating status of the pipeline to be presented and pack calculations pursued.

  o Plains utilizes the SimSuite application for other pipelines in the control

Page **16** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

center.  This application does allow for pack calculations to be utilized in the leak detection system.  According to information obtained during meetings with Plains hydraulic specialists, Lines 901 and 903 were pipeline systems with a low to medium priority defined for future modeling efforts compared to other assets in the Plains operations. The approach utilized by Plains for prioritizing which systems should be modeled first did not appear to take into account all appropriate consequence-based asset impacts (such as culverts providing a pathway to the ocean) associated with these two systems. Existing instrumentation and the need for added instrumentation would factor into this prioritization decision.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as alarms.

    o Interviews determined that the step-up shift supervisor and shift supervisor training lacked formalized and succinct requirements, including that for leak detection system functions such as "inhibit" options.  The interviews determined that different shift supervisors performed PLM inhibit functions without contacting the console supervisor first as required by procedure.

    o Step-up and shift supervisor responsibilities include emergency shutdown of any pipeline.  However, training does not cover a means by which to accomplish this for all relevant pipelines.  A general emergency shutdown provision has not been programed for supervisory use on all systems.

- The oil spill response plan required by 49 C.F.R. §194 did not account for a culvert near the release site that traversed the Pacific Coast Highway and Amtrak railroad tracks.  This culvert provided a quick flow path between the pipeline ROW and the Pacific Ocean, thereby allowing crude oil to flow easily towards Refugio State Beach and the ocean.  The response plan did not have a response strategy that considered the presence of the culverts.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## PHMSA Post-Incident Action Chronology

Following the May 19, 2015 Plains Pipeline, LP, Line 901 rupture in Santa Barbara County, CA, PHMSA took the following actions:

- On May 19, 2015, PHMSA deployed inspectors to investigate the Plains Pipeline LP Line 901 pipeline failure in Santa Barbara County, CA.  PHMSA also provided information updates to the Unified Command (UC), US Coast Guard, the Federal on Scene Coordinator (FOSC), State Fish and Wildlife, and other agencies on site.
- On May 21, 2015:
  - PHMSA issued a Corrective Action Order (CAO), CPF No. 5-2015-5011H,  to Plains Pipeline LP ordering it to suspend operations and to specific safety actions to further protect the public, property, and the environment from potential hazards associated with the recent failure.  PHMSA staff reviewed the CAO with the operator and briefed the California State Attorney on the CAO and provided an overview of PHMSA's regulations.
  - PHMSA sent an inspector to Plains' control room in Midland, Texas to collect operational data and interview the control room operators on duty at the time of the incident and their supervisors.  The inspector gathered any pertinent logs and information, including electronic copies of relevant data from the Supervisory Control and Data Acquisition (SCADA) system.
  - PHMSA staff worked with the operator to review their plan to expose the pipe and to cold tap it to ensure there was no pressure or crude left in the line at a low spot immediately downstream of the release point. The plan was signed off by the UC at approximately 5 pm PDT.
- On May 22, 2015:
  - PHMSA staff met with representatives from the Assistant U.S. Attorney, DOT Inspector General, EPA Criminal Investigation Division, California Attorney General, and others to brief them on PHMSA's process for securing and transporting the failed pipe to a metallurgical lab for evaluation.
  - PHMSA staff remained on the scene as the operator exposed, tapped, removed any remaining product, and excavated the pipeline downstream of the release site.
- On May 25, 2015:
  - PHMSA issued an approval letter for Plains to excavate, remove and secure the failed joint of pipe under the supervision of two DNV metallurgists (third party contractor) but requested that the coating and insulation not be touched until the failed pipe has been removed because the DNV personnel were interested in in gathering available samples there as well.
  - A PHMSA inspector returned to Midland, TX to interview the controller and the Operations Control Center supervisor and to obtain any handwritten logs created by the controller on the morning of the release.
- On May 28, 2015:
  - A PHMSA investigator was on site when affected pipeline was removed, crated, and transported to secure location for metallurgical evaluation.  PHMSA retained a third-party ILI expert to examine the 2012 and 2015 ILI runs. DNV personnel took soil and insulation samples.
- On June 3, 2015, PHMSA amended the CAO to address preliminary findings from the early stages of the investigation (Amendment No. 1).  The amended CAO mandated

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

additional safety requirements on Line 901 and expanded the scope of the CAO to include the 128-mile long Line 903, which is located downstream of Line 901.  The amendment reduced the operating pressure of the Lone 903 by 80% of the highest 8 hour continuous pressure between April 19, 2015 and May 19, 2015.  On May 30, 2015, Plains voluntarily shutdown Line 903.

- On June 18, 2015, PHMSA staff monitored the Line 901 purge to ensure safety during the purging process. Plains completed the purge and injected inert gas in Line 901.

- On September 18, 2015, PHMSA received the DNV Final Mechanical and Metallurgical Report.  PHMSA staff reviewed the document and provided comments.

- On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO, which ordered Plains to purge and shutdown Line 903 from Gaviota to Pentland.

- On December 1, 2015, PHMSA staff monitored Plains moving Freeport McMoRan crude oil from their offshore platforms into Line 903 from Gaviota Station to Sisquoc Station. Movement of the Freeport McMoRan oil was completed on December 10, 2015.

- On December 4, 2015, PHMSA staff received the DNV Root Cause Failure Analysis Report.  PHMSA reviewed and commented on the report.

- On December 14, 2015, PHMSA staff monitored the purge process on Line 903 from Gaviota Station to Sisquoc Station. The purge was completed on December 18, 2015 and the line was filled with inert gas.

- On February 17, 2016, PHMSA issued a Preliminary Factual Final Report.

- On April 2, 2016, PHMSA staff monitored the Line 903 Sisquoc to Pentland portion purge that was completed on April 18, 2016.  Line 901 and 903 are shutdown, except for the Pentland to Emidio section of Line 903, which is not connected to 903 any longer.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## APPENDICES

A. Investigation Summary Detail

B. Supervisory Control and Data Acquisition (SCADA) Log Excerpts

C. Pipeline Leak Monitoring Details

D. Excerpts and Discussion of Plains Integrity Management Plan (IMP) Requirements

E. Corrosion Control and Pipeline Conditions

F. Industry Standards and General Requirements for In-Line Inspection

G. In-Line Inspection Report

H. PHMSA's Independent Analysis of In-Line Inspection Data

I. Maps and Photographs

J. National Response Center Report #1

K. National Response Center Report #2

L. Form PHMSA F 7000.1: Accident Report for Hazardous Liquid Pipeline Systems

M. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Mechanical and Metallurgical Testing

N. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Technical Root Cause Analysis

O. NACE International: Effectiveness of Cathodic Protection on Thermally Insulated Underground Metallic Structures

---

[i] According to the *FRACTURE CONTROL TECHNOLOGY FOR NATURAL GAS PIPELINES CIRCA 2001* (the PRCI report superseding NG-18 Report 208): "The distinction between leak and rupture for the pipeline community is based on the size and configuration of the breach, not how it develops." Based on these calculations and visual observations, the length of the feature is consistent with a leak, arresting within the corrosion feature, and did not propagate outside of the feature into nominal wall-thickness pipe. According to the instructions for completing PHMSA Accident Form 7000-1, this type of accident would be classified as a rupture since PHMSA defines a "rupture" as a "loss of containment that immediate impairs the operation of the pipeline".

[ii] The remedial action plan requires: a) investigation and remediation of anomalies on Line 901 (including anomalies requiring repair per 49 C.F.R. § 195.452(h) and similar anomalies); b) analysis of field measurements taken from anomaly investigations; c) re-grade of previous in-line inspection (ILI) data from 2012 and 2015 ILI surveys using an expanded set of interaction criteria; d) additional integrity assessments using a circumferential magnetic flux leakage (MFL-C) ILI tool and integration of MFL-C ILI data with previous ILI survey results; e) investigation and remediation of anomalies that are identified in the MFL-C tool run (if any); f) based on information collected from remedial work plan and root cause analysis report released by Det Norske Veritas (U.S.A.), Inc., improving the integrity management program; and g) integrity studies to reduce spill volumes, including an emergency flow restriction device evaluation and a surge study. Completion of the remedial work plan is required prior to the PHMSA Western Region Director approving a restart plan and return to service for Line 901.

[iii] High case temperature refers to the oil temperature inside the pump cavity.  The case holds the pump impeller

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

where oil passes through.  This was a centrifugal pump that continues spinning whether there is product in the pump or not.  When the rupture occurred, there was not enough pressure or flow rate to allow the pump to continue pumping the oil over the hills and into Pentland Station.  Therefore, the oil that was in the pump remained in place and as the pump continued to spin, and temperature was reported to the SCADA system.  If the pump reaches the high temperature setpoint, the pump shuts itself off to protect itself from burning up.

[iv] The PCR utilizes two shift supervisors to cover the entire set of 22 consoles.  The California Console is handled by shift supervisor B.  The shift supervisor B position at the time of the failure was filled by a step-up shift supervisor.  A step-up shift supervisor is a controller who is currently qualified on a specific console in the PCR and has received some informal training by working on shift with other shift supervisors.  Step-up shift supervisors are used to cover the shift supervisor positions when additional personnel are needed due to illness, vacation, training, etc.  Plains has indicated that two step-up shift supervisors are not allowed to be on duty at the same time so one shift supervisor is paired with a step-up shift supervisor when additional personnel is needed.

[v] PLM is the SCADA vendor software tool that serves as the leak detection system for PCR.

[vi] *See* Appendix B.

[vii] SCADA Data/Plains Control Room time is local to the Central Time Zone.  A two-hour time difference separates Central Time from Pacific Time, with Central Time falling two hours ahead. The release occurred in the Pacific Time Zone which is two (2) hours earlier.  All times in this report have been adjusted to Pacific Time.

[viii] *See* Appendix J.

[ix] *See* Appendix K.

[x] *See* Appendix L.

[xi] *See* Appendix M.

[xii] PHMSA has access to this data through a view-only web portal.

[xiii] *See* Appendix G.

[xiv] The inability of an impressed cathodic protection system to protect insulated pipelines was most recently reaffirmed in the National Association of Corrosion Engineers (NACE) Publication 10A392 (2006 Edition) – "Effectiveness of Cathodic Protection (CP) on Thermally Insulated Underground Metallic Structures."

[xv] *See* NACE Report at Appendix O, Background section stating that "[o] n most thermally insulated oil and gas transmission pipelines installed prior to 1980 to 1981, a shop mold-formed thermal insulation was placed directly over the bare steel pipe, with an outer jacket applied to moisture-proof the system. At the field joint, preformed insulation half shells were applied over the joint area to fit between the ends of the shop-applied insulation. After the insulation was fitted, a heat shrink sleeve or a tape wrap was applied over the insulation. When the integrity of the outer moisture barrier was compromised, the space, gap, or void between the edges of the preformed half shells and the shop-applied insulation allowed oxygenated water to diffuse to the bare steel beneath. Damage to the outer moisture barrier has also occurred remote from the joint, allowing oxygenated ground water ingress.

"Thermally insulated pipelines have experienced relatively aggressive corrosion, with some failures occurring within three years of service, although acceptable industry standards of CP had been applied and maintained shortly after line construction. The most predominant failures have been those occurring at joints; however, moisture has migrated along the pipeline steel surface to create electrochemical corrosion cells remote from the field joint, culminating in extensive replacements of substantial lengths of line. An article titled 'Corrosion of Underground Insulated Pipelines' supports this committee's conclusions that sufficient CP current from an external source may not reach the insulated metallic surface in sufficient quantity to establish adequate corrosion control."

[xvi] *See* Appendix D.

# EXHIBIT D

# California Legislature

September 27, 2024

Delivered Electronically

Mr. Joe Tyler, Director/Fire Chief
Mr. Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
P.O. Box 944246
Sacramento, CA 94244-2460

**Re: Transparency and Public Engagement in OSFM's Determination of Whether to Restart Pipelines CA-324 and CA-325**

Dear Mr. Tyler and Mr. Berlant,

It has come to our attention that the Office of the State Fire Marshal ("OSFM") is considering whether to allow Sable Offshore Corp. ("Sable") to restart the pipeline that caused the 2015 oil spill at Refugio State Beach Park. We write to express our concern regarding the process used by the OSFM to consider approving a project that would invite another coastal oil spill and impact the safety of the Central Coast community.

The restart of this pipeline, now known as CA-324, and related facilities, including three offshore drilling platforms, and the onshore oil processing facility at Las Flores Canyon, is a matter of profound importance to our constituents along the Central Coast. When this pipeline ruptured in 2015, the effect on nearby communities was catastrophic. The spill devastated at least 150 miles of coastline, forced the closure of fisheries and beaches, killed an untold number of marine mammals, cost hundreds of millions of dollars to clean up, negatively impacted local businesses, and caused an estimated 140,000 lost recreational user days between Santa Barbara, Ventura, and Los Angeles Counties. Many of the restoration projects were funded just last year and have just begun work.[1]

---

[1] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 18 (June 2021) [hereinafter "NRDA"], available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.

CA-324 and CA-325 do not have effective protection against corrosion, which is ultimately what caused the 2015 spill.[2]  Without protection from corrosion, another spill from these pipelines is incredibly likely.  When Santa Barbara County was considering a proposal to replace these pipelines, it estimated the pipelines would result in a spill once a year, and a rupture once every four years.[3]  The County also estimated that another spill from these pipelines could be twice the size of the 2015 spill — even if the pipelines are retrofitted with automatic shut-off valves.[4]

In light of the threat to public health and safety that these facilities pose, several community organizations asked OSFM for increased transparency and public engagement as it considers whether to restart CA-324 and CA-325.  In response, OSFM agreed to "[h]old public meetings and engage with the public at appropriate milestones for a potential restart.'[5]

OSFM has approved a Risk Analysis, which Sable is now implementing. OSFM is also currently reviewing Sable's application for a state waiver to allow this pipeline to operate without meeting Federal standards or fixing the flaws that caused it to rupture almost 10 years ago. We understand that OSFM is scheduling a public hearing in mid-October, but we have heard concerns that this could be after a determination of the state waiver, which would allow for the functional restart of the pipeline with no opportunities for public participation. We believe it would be helpful to invite public review and comment on the available information before any decision is finalized.

We would urge the OSFM to be as transparent as possible with the documents that are germane to public participation. The safety of these pipelines is a serious concern for many in our community, and it is important that the public is aware of the conditions of the pipelines and what is being done to make them operate safely.

The OSFM is a public agency working on behalf of the people of California, specifically charged with "safeguard[ing] our communities" from the inherent hazards in oil and gas transportation.[6] We are concerned that the people of California will be left holding the bag for the exorbitant clean-up costs if Sable, a speculative company with no operational assets, files for bankruptcy.

With the significant health, fiscal, and environmental risks posed with this restart, public participation is essential to ensuring that OSFM makes fully informed decisions. As an agency

---

[2] Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California*, pp. 13-14 (May 2016) [hereinafter "PHMSA Report"], available at: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

[3] Santa Barbara County Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 79.

[4] *Id.*

[5] *See Pathways for Restarting Pipelines*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited Sept. 17, 2024).

[6] *Pipeline Safety and CUPA*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa (last visited Sept. 17, 2024).

acting on behalf of the public, it is important that OSFM understand the views of the public to maintain a level of trust in our government agencies. We respectfully request the following:

- Release all documents pertinent to Sable's restart, unless OSFM is prohibited from doing so by law;
- Conduct environmental review pursuant to the California Environmental Quality Act, to ensure consideration of potential environmental impacts before decisions are made; and
- Hold public meetings and invite public comment at each step of the restart process *before* making any determinations. As identified on the OSFM website, those steps would include, for example, implementation of the Risk Analysis, OSFM's consideration of a State Waiver, deferred maintenance that must be completed, and consideration of a Restart Plan[7].

We have grave reservations regarding the restart of CA-324 and CA-325, which have *already* caused a catastrophic oil spill, and which Sable intends to restart without effective protection from corrosion. Again, one governing body has already found that proceeding in this manner would inevitably lead to another oil spill, one that could be twice the size of the 2015 disaster.[8]

Thank you for your consideration of our comments and your prompt attention to this matter.

Sincerely,

**Monique Limón**
Senator, District 19

---

[7] *Pathways for Restarting Pipelines*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited Sept. 17, 2024).
[8] Santa Barbara County Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 79.

Cc: Jim Hosler, Assistant Deputy Director, Pipeline Safety and CUPA

# EXHIBIT E

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Evaluation of Las Flores Pipeline System Startup Proposal*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**December 20, 2024**

Accufacts Inc. 12-20-24

## Table of Contents

I.   *Executive summary and major findings* ...............................................................*1*

II.  *Accufacts experience qualifying me as an expert in this matter.*.................................*3*

III. *A brief historical perspective*...........................................................................*4*

IV.  *The Las Flores Pipeline System.* ........................................................................*5*

V.   *TIMP regulations are not working to protect the public or the environment.*.........*8*

   *1) Hydrotesting assessments.* .......................................................................... 8

   *2) ILI assessments.* ......................................................................................*10*

VI.  *The greatest threat on the Las Flores Pipeline System is from external corrosion.*
   ...................................................................................................................... 11

VII.  *High pipeline operating temperatures accelerate all forms of corrosion.*........... 13

VIII. *The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.*...................................... 14

IX.  *The poorly designed Pipelines cannot be made as safe as new pipelines.*.............. 14

X.   *Conclusion.* .................................................................................................... 15

## I.    Executive summary and major findings

Accufacts Inc. ("Accufacts") was asked to review the documents related to the Las Flores Pipeline System ("Pipelines") for possible restart.  A Consent Decree signed in March, 2020 places responsibility for approving processes related to the onshore pipeline system restart on the California Office of the State Fire Marshal, or OSFM, the agency responsible for intrastate hazardous liquid pipeline safety.[1]  The Consent Decree replaces various Corrective Action Orders issued on the Pipelines by the Pipeline and Hazardous Materials Safety Administration, or PHMSA, the federal agency responsible for pipeline safety.[2]  PHMSA is the federal agency responsible for establishing minimum pipeline safety regulations for many pipelines operating in the U.S., including intrastate hazardous liquid transmission pipelines.  States meeting certain conditions can impose pipeline safety standards for intrastate pipelines beyond PHMSA regulations as long as such state regulations are not in conflict with PHMSA regulations.  By agreement, the Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed wavier alternative measures "provide an equal or greater level of safety."[3, 4]  The Consent Decree is inadequate, missing many corrosion threats to the Pipelines that can result in rupture.

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1. **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2. **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3. **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4. **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

---

[1] Such state responsibility is dependent on whether the state agency meets certain qualifications required by PHMSA and whether the state Legislature has granted such state authority, as California has.

[2] UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, ex rel. DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, ex rel. CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, ex rel. CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, ex rel. CALIFORNIA STATE LANDS COMMISSION, ex rel. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARCHALL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (Plaintiffs) v. PLAINS ALL AMERICAN PIPELINE L.P. and PLAINS PIPELINE, L.P. (Defendants), Consent Decree, Civil Action No. 2:20-cv-20415 signed March 2020 ("Consent Decree").

[3] *Ibid.,* Appendix B & Appendix D, paragraph 1.

[4] PHMSA website, " Special Permits and State Waivers Overview," at https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

Accufacts Inc. 12-20-24                                                                 Page 1 of 15

Oil spills are catastrophic events, and operation of any pipeline carries a risk of spill. At best, good pipeline design and pipeline integrity management tools can reduce—but not eliminate—the risk. The Consent Decree is replacing incomplete integrity management ("IM") approaches implemented by Plains that failed to prevent a pipeline rupture from the poor design of the Pipelines, with another incomplete IM approach expecting a change in the outcome.

The Pipelines have been sitting shut down for over nine years at ambient temperatures without effective CP protection. While external corrosion rates in this shutdown mode are significantly reduced because of lower temperatures as discussed later in this report, **the risk of external corrosion is not eliminated**. The Consent Decree requires the OSFM to seek a waiver of the federal pipeline safety CP requirements defined under Subpart H, subject to the approval of PHMSA, to permit the Pipelines to restart.[5, 6] Complicating this matter is the incorporation of risk analysis by the state into the Consent Decree that is under the control of the pipeline operator and is not made fully public, but subject only to the "review and comment" of the OSFM. To be fair, the OSFM must meet certain state legislated risk analysis requirements that though well-meaning, are incomplete, such as, for example, how to define what a reasonable worst-case discharge is to prudently evaluate the risk of a pipeline failure.[7] This is a problem I often see abused in federal pipeline oil spill response plans that doesn't adequately capture pipeline rupture hydraulics.[8] One of the major problems with risk analysis, a determination of the likelihood of an event occurring, and why it is not codified into federal pipeline safety regulations, is that such approaches are usually not complete or representative of the true risks of a specific pipeline operation. The impacts of any pipeline failure are significant and long-lasting, causing destruction of habitats, death of wildlife, and even human fatalities. It is impossible to predict a pipeline failure, and decision-making based on the perceived probability of failure does not adequately account for the severe consequences that will ensue, particularly if those decisions fail to capture pipeline rupture hydraulics. I call this "Space Shuttle Syndrome," because, in the rush to launch the space shuttle program, NASA decisionmakers understated its true risks and dismissed well established safety culture protocols, resulting in the loss of two space shuttles and their crews and ending the space shuttle program.

The Consent Decree is placing undue responsibilities on the OSFM which might not appreciate the limits of current inline inspection technical capabilities. The Consent Decree overly relies on ILI technologies and their associated engineering critical assessments that are not capable of prudently addressing many forms of external corrosion, especially interactive forms such as Stress Corrosion Cracking, or SCC, whose time to failure is difficult, if not impossible, to predict as discussed later in this report. The current poorly designed Pipelines do not permit CP protection to mitigate external corrosion on the Pipelines that must operate at uniquely high temperatures. The required high temperatures accelerate all forms of external corrosion. New pipelines would incorporate proper design such as non-insulated pipe and newer forms of pipeline coating technology, that would permit CP to be effective in addressing external corrosion even at high temperatures to help assure pipeline safety. No pipeline waiver issued under the conditions addressed in the Consent Decree is consistent with pipeline safety nor can ensure the same level

---

[5] 49CFR§195 Subpart H - Corrosion Control.
[6] Consent Decree, Appendix B, "State Waivers for Line 901, 903 …..,".
[7] CA Code CCR 19§2111 – Risk Analysis.
[8] 49CFR§194 Response Plans for Onshore Oil Pipelines.

of safety as that associated with a prudently designed pipeline system. Neither Plains, the pipeline operator at the time of the May 19, 2015 failure, nor the new owner, Sable, designed or built the present Pipelines with their serious deficiencies, but as a pipeline operator Sable bears the ultimate responsibilities should the Pipelines fail.

## II.    Accufacts experience qualifying me as an expert in this matter.

Accufacts Inc. ("Accufacts") was asked to review the Line 901/903 pipelines, now renamed Lines CA-324/CA-325 ("Pipelines"), and related documents such as those produced by the OSFM on their website.  A Consent Decree places responsibility for approving processes related to the onshore pipeline system restart first on the OSFM, then on PHMSA.[9]  The Center for Biological Diversity and The Environmental Defense Center asked Accufacts to provide an independent evaluation of documents related to a possible restart of the Pipelines to safely move heavy oil production from offshore platforms in the Santa Barbara Channel into the Pipelines.  It should be noted that the OSFM has recently issued a waiver on PHMSA's CP obligations for the Pipelines. I have not seen the details related to OSFM's decision on the granting of such a waiver.

I am a chemical engineer with over fifty years of experience in the energy industry, including over 25 years as president of Accufacts Inc. ("Accufacts").  Accufacts provides independent expert consulting services to assist decision makers in making informed decisions concerning pipelines. Pipeline safety expertise is provided in areas including, but not limited to: pipeline failure investigation, risk management/risk analysis, siting, construction, design, operation, maintenance, training, control room management including Supervisory Control and Data Acquisition ("SCADA") approaches, leak/rupture detection, integrity management, emergency and spill response, and pipeline safety regulatory development and compliance.  Much of my background is grounded in pipeline incident investigations following numerous pipeline rupture tragedies spanning several decades.

For the past two decades I have been involved as a representative of the public, which carries special obligations to avoid a conflict of interest, in advancing pipeline safety regulations at the federal and various state levels as demonstrated by my CV that is included as Attachment 1.  For example, I played a significant role representing the public in developing integrity management federal pipeline safety regulations in the early 2000s for both liquid and gas transmission pipelines. These regulatory approaches emulated safety process approaches that I instituted and developed for the City of Bellingham, WA to assure that a ruptured pipeline there could be restarted and operated safely.  This safety process approach, identified as the Pipeline Safety Immediate Action Plan, or PSIAP, identified steps that the pipeline operator was to complete following the Bellingham rupture tragedy of June 10, 1999, before that pipeline could be permitted to safely return to service.  The PSIAP is a matter of public record compliments of Washington State's Right-to-Know laws.  PSIAP formed a template for the integrity management safety regulations developed by the Office of Pipeline Safety, which morphed into PHMSA in 2003.

---

[9] Consent Decree, Appendix B & Appendix D.

Accufacts Inc. 12-20-24                                                                                    Page 3 of 15

For approximately fifteen years, through the development of federal standards for Transmission Integrity Management Programs ("TIMP") for both liquid and gas integrity regulations, control room management ("CRM"), and Operator Qualification ("OQ") rulemaking efforts, to cite a few pipeline safety rulemaking efforts, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee, or LPAC, to advise PHMSA on possible pipeline safety regulation advancement. After a brief hiatus of several years, I have recently been reappointed by the Secretary of Transportation to represent the public again on LPAC, which carries numerous obligations to avoid a conflict of interest. I believe I am more than qualified to comment as an expert on the various issues related to CA-324/CA-325 pipeline system possible restart.

## III.    A brief historical perspective



**Figure 1 – Overview of Pipelines**

Since the May 19, 2015 onshore pipeline rupture and oil release that spilled into the Santa Barbara Channel and beyond, the pipeline system known at the time as Lines 901/903, and offshore oil platforms feeding this system have been shut down. Lines 901/903 have recently been renumbered CA-324 and CA-325, respectively. These pipelines, which were classified as interstate pipelines at the time of the release, were ordered to be shut down and oil purged from the Pipelines and placed under nitrogen atmospheres under Corrective Action Orders instituted by PHMSA. Line 901 experienced an onshore pipeline rupture failure caused by massive external corrosion and released on the late morning of May 19, 2015 near Refugio State Beach that placed a considerable amount of oil into the sensitive waters of the Santa Barbara Channel and beyond. While the years since 2015 involved discussions for possible construction of new pipelines to replace the poorly

Accufacts Inc. 12-20-24                                                          Page 4 of 15

designed Lines 901/903, recent activities shifting ownership of the pipelines and associated infrastructure to Sable Offshore Corp. ("Sable"), are now focused on restarting the existing pipelines under new ownership and conditions stated under a Consent Decree.

The May 19, 2015 Line 901 rupture failure occurred at approximately 4 miles (MP 4) downstream of the Las Flores Canyon Pump Station due to extensive external corrosion.  The Line 901 ruptured at approximately 56 % of the maximum operating pressure ("MOP") of 1341 pounds per square inch gauge ("psig") (which is 72 % specified minimum yield strength ("SMYS")).[10]  In addition, further metallurgical forensic reports attached to the PHMSA Final Report, indicate that pipeline ruptured at a pressure of 737 psig, which was 39.6% of SMYS.[11]  This pipeline failed at very low stress levels, not a surprise given that the depth of the corrosion failure was 89% of the measured wall thickness, and the ILI tools significantly mis indicated the size of the corrosion threats.[12]

**Figure 2 – Overview of Pipelines route with MPs estimated**



## IV.    The Las Flores Pipeline System.

The following is based on information readily in the public domain, as demonstrated by the footnote references.  Because of many variations in MP numbers in various documents, MP numbers referenced in this report should be considered approximate with slight variations that don't really impact my findings/conclusions/recommendations.

---

[10] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.14 of 23.
[11]  DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing, - Report No: OAPUS309DNOR (PP136049)," September 18, 2015, p. iii.
[12] *Ibid.,* "Summary of Observations," p. vi.

Accufacts Inc. 12-20-24                                                        Page 5 of 15

The Pipelines, formerly identified as Line 901/903 operated by Plains (aka Plains All American Pipeline L.P. and Plains Pipeline L.P.), represent a pipeline system of approximately 125 miles in length running from the Las Flores Canyon Pump Station (milepost 0) to the Pentland Metering (and Storage) facility (at Milepost 125.3). Figure 1 is a general overview of the Pipelines routing. CA-224 (old Line 901) that runs from the Las Flores Canyon Pump Station (Milepost 0) to the Gaviota Meter Station (Milepost 10.7). Note that I have reversed the Milepost reported in PHMSA's Final Report to follow more conventional milepost numbering, increasing from the pipeline inlet at the Las Flores Canyon Pump Station (MP 0), to the pipeline outlet of the 24-inch diameter Line 901/CA-224 pipeline, the Gaviota Metering Station (MP 10.7). CA-324 is the sole feed into the 30-inch pipeline, CA-325A. CA-325A runs from the Gaviota Metering Station to the Sisquoc pump station (MP 49.2). CA-325B, also a 30-inch diameter pipeline, runs from the Sisquoc pump station (MP 49.2) to the Pentland metering station (~MP 125.3). Figure 2 shows the general route adding approximate MP numbers following this similar MP increasing numbering all the way to Pentland.

According to the PHMSA Final Report on the 2015 rupture:

> Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.
>
> Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-

ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.[13]

**Figure 3 - Approximate Elevation Profile - Las Flores Canyon Pump Station (MP 0) to Pentland Station (MP ~125.3)**



PHMSA provided additional information related to Line 903:

> (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). [14]

> Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds similar to the Affected Pipeline {Line 901}.[15]

It is not clear from the documents produced if Line 903 insulation is also tape wrapped like Line 901, that would further shield the CP system from the Pipelines, assuring that CP is ineffective.

Figure 3 is an approximate elevation profile (approximate elevation of pipeline in feet versus pipeline milepost) for the Las Flores Pipeline System developed by the Center for Biological Diversity's Geographic Information System, or GIS, specialist using information readily available in the public domain.  Pipeline elevation profiles play a critical role in understanding liquid transmission pipeline operation and risks, such as evaluating ILI runs, valve placement/actuator decisions, emergency and oil spill actions, and spill response planning.  In addition, if a pipeline hydraulic profile, also referred to as a hydraulic gradient, is superimposed on an elevation profile, much information about pipeline risk can be gained.  A hydraulic gradient is required of the pipeline operator under California Risk Analysis regulation.[16]  A pipeline hydraulic gradient includes a plot of operating pressure versus milepost for a specified crude oil gravity and flow rate, but for this unique system, a crude oil viscosity and temperature should also be included on the

---

[13] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016, pp. 4 & 5 of 21.

[14] *Ibid.,* p. 4 of 21.

[15] PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H," p. 2.

[16] CA Code CCR 19§2111 – Risk Analysis (2) Pipeline Description (A).

hydraulic gradient as these parameters seriously impact the hydraulic gradient evaluation. Such hydraulic gradient information is important in evaluating the risks of a pipeline restart program, especially on the Pipelines given their highly unique elevation profile among other factors (See Figure 3). This information is probably not likely to be made public, though a competent experienced engineer can develop an approximate hydraulic profile for a pipeline system if they understand certain crude oil blended properties and temperatures.

## V. TIMP regulations are not working to protect the public or the environment.

In the passage of the federal pipeline safety regulations setting standards for Transmission Integrity Management Programs, or TIMP, first for liquid, then gas, in 2002 and 2003, respectively, the use of performance-based approaches versus more prescriptive based regulations were agreed to as a compromise to advance important needed pipeline safety regulation in this area. Until the passage of TIMP regulations, pipeline operators were under no obligation to periodically assess the condition of their mainline pipelines. Performance-based regulation, in theory, allows a pipeline operator to choose between various alternatives that may work best for their pipeline. Prescriptive-based pipeline safety regulations historically have been imposed in federal pipeline safety regulatory efforts. Prescriptive regulations impose certain conditions that pipeline operators must, or shall, follow.

TIMP efforts for liquid pipelines define four basic approaches permitted in pipeline integrity assessment, depending on the pipeline threat that a pipeline segment might experience. Briefly, the major assessment methods most appropriate for this pipeline system are hydrostatic pressure testing ("hydrotesting") and inline inspection ("ILI") also known as smart pigging. As the Line 901 onshore oil release that flowed into sensitive waterway areas has clearly demonstrated, TIMP regulation is not working for many pipeline operators, even after the operator had run multiple ILI corrosion tool runs which I will expand on further below. Another unexpected outcome of TIMP performance-based regulation is that such less than clear regulation efforts are harder to enforce.

It's important to note that pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity.

### 1) Hydrotesting assessments.

Properly performed hydrotesting can be an important pipeline integrity assessment tool that proofs a pipeline's fitness for service to safely operate at MOP at the time of the hydrotest. Hydrotesting involves shutting down a pipeline and filling a pipeline segment with water. Proof of pipeline integrity or fitness for service testing is verified by carefully increasing water pressure with a water injection pump after air has been removed and the pipeline segment temperature stabilized. While federal pipeline safety regulations for liquid transmission pipelines define a "Subpart E" hydrotest to establish or verify maximum operating pressure, or MOP, a term having specific meaning in regulation, the regulations are not specific on important parameters to ensure a quality hydrotest that doesn't damage the pipe. Minimum hydrotest pressures are established to verify the MOP at the time of the hydrotest, with

Accufacts Inc. 12-20-24                                                          Page 8 of 15

sufficient pressure safety margin at the time of the hydrotest. A Subpart E hydrotest is a proof for fitness test that the pipeline, at the time of the test, can withstand pressures above the MOP with a certain margin of pressure safety.[17]

One important caveat is needed regarding Subpart E hydrotests, which are often called strength tests. For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats that likely exist along the Las Flores Pipeline System—**a subpart E hydrotest is inadequate**. Current ILI technology cannot reliably identify if such cracking threats are present. More importantly, nor can associated engineering critical assessments provide prudent evaluation of such threats due to the inability to reliably predict corrosion colonies that can interact or link together in unpredictable ways. SCC colonies can be associated with disbonded coatings such as that occurring on the Pipelines where CP current is prevented from reaching the outer pipewall steel. A much higher pressure (higher % Specified Minimum Yield Strength, or SMYS) hydrotest is warranted. A prudent risk analysis should clearly demonstrate if such external corrosion cracking threats from environmental factors are possible around the Pipelines**. I need to note that it is not clear whether hydrotesting, if performed, will be a Subpart E test or a higher % SMYS hydrotest intended to address cracking threats such as SCC**. The Consent Decree strangely makes no mention of corrosion cracking threats or hydrotesting.

While considerable discussion in the Consent Decree has focused on the use of ILI to identify possible general wall loss corrosion threats well before failure, this agreement makes no mention of other forms of corrosion related threats such as corrosion cracking SCC or SSC. These forms of corrosion cracking are very challenging to identify via ILI, and more importantly, engineering critical assessments associated with ILI to predict time to failure can be highly unreliable, given the inactive threat nature of these type of corrosion cracking threats. The corrosion cracking threats tend to fail as pipeline ruptures. It is important that the cracking threat potentials on the Pipelines be prudently addressed and proposed solution be made public and transparent.

For pipeline segments that undergo large elevation changes, like the Line 325A/B segments, the pipeline must be cut up into segments to assure hydrotesting pressure ranges do not permanently deform the pipe. Hydrotesting can be more expensive than other pipeline integrity assessments such as ILI, but there are no built-in assumptions about the quality and thoroughness of the assessment that can be mismanaged such as that which can and often does occur with ILI approaches resulting in numerous pipeline ruptures after ILI assessments, as the May 19, 2015 release has clearly demonstrated. Hydrotesting is much more reliable than other pipeline integrity assessment approaches, such as ILI, at verifying a pipeline's fitness for service at the time of the test. Hydrotesting is usually performed by contractor firms experienced and qualified to perform a proper hydrotest for specific types of threats. The Consent Decree requires certain threshold general corrosion threats if identified by ILI be remediated before restart.[18]

---

[17] 49CFR§195.304 Test pressure
[18] Consent Decree, Appendix B (4) Integrity Management.

Accufacts Inc. 12-20-24                                                                      Page 9 of 15

Hydrotesting is warranted, justified, and vastly appropriate for the Pipelines which have been sitting for over nine years without effective CP. I also need to mention that the use of nitrogen gas to idle the pipeline was meant to avoid internal corrosion attack and plays no role in preventing external corrosion attacks to keep the Pipelines in a "corrosion-free state" as mentioned by Steve Rusch, Sable's vice president of environmental and regulatory affairs.[19] The external corrosion sites experience reduced corrosion rates from the lower ambient soil temperatures as no hot oil was passing through the system, but the corrosion sites are not inactive, especially if CP systems are ineffective, such as on the Pipelines.

**2) ILI assessments.**

In the U.S., ILI or smart pig tool efforts started to develop in the early 1980s depending on the threat a pipeline operator was trying to address. ILI tools are usually multi-ton devices run inside a pipeline while the pipeline is operating to ascertain the condition of the pipeline depending on the type of threats trying to be analyzed. Given the advancements in technology including shrinking the equipment, ultrasonic, or UT, approaches that focus on direct anomaly measurement has historically proven superior for general wall thinning corrosion evaluation to approaches using inferred software-based algorithms, such as magnetic flux leakage ("MFL") testing. Some ILI tools are more suitable than others depending on the threat. There is a wide spectrum of ILI tools and different technological approaches to select from depending on the type of threat trying to be reviewed. Operators don't always select the ILI technology best suited to help identify threats on their system. Even with the advances in tool development and approaches there can still be a wide variation as to whether a specific ILI tool or vendor can properly identify a specific pipe threat and permit it to be further properly characterized after an ILI run. This is why pipeline operators will incorporate ILI tool tolerances and perform field verification digs to produce "unity plots" for a specific ILI run, to verify ILI vendor claims about their technology and its specific performance. This field verification data was not shared by Plains with the ILI vendor, a serious deficiency in ILI utilization. It is worth noting the PHMSA made it a point in their Failure Analysis of the Line 901 release, that the pipeline operator had not provided field dig verification feedback to the ILI vendor to confirm ILI capability.[20] For example, corrosion attacks can take on many forms such as general pipewall thinning (usually the easiest to determine depending on the ILI technology), various forms of corrosion cracking such as stress corrosion cracking ("SCC"), selective seam corrosion cracking ("SSC"), and pit corrosion. All such corrosion threats can lead to a pipeline failure and release. Based on my experience involving investigations of liquid transmission pipeline ruptures from SCC and SSC after ILI runs, some segments of the Pipelines exhibit the potential for SCC or SSC. Such external corrosion cracking threats are often found on pipelines with disbonded coating that are exposed to corrosion environments such as that introduced by the Pipeline's insulation. It is incumbent on the new Pipeline operator, Sable, to demonstrate to the OSFM, and to the public and various regulatory agencies that SCC/SSC external cracking environments do not exist.

---

[19] Los Angeles Times article by Tony Briscoe, "*Plan to restart pipeline sparks anger*," Front page, October 20, 2024.
[20] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.13 of 21.

Some forms of ILI technology to identify certain pipeline threats, if properly managed, can be superior to hydrotesting as they may identify some threats well before they go to failure.  As too clearly demonstrated, however, in the May19, 2015 Line 901 rupture, ILI cannot address all forms of external corrosion threat that are likely to exist on the Pipelines because of their poor design, their unique high temperature operation, and ineffectiveness of CP.  If a corrosion ILI tool can be utilized within the limits of the pig vendor specification (i.e., such as maintaining pig speed within the operating pipeline), and if the ILI tool run is independently field verified, some ILI tools can be a superior form of assessment for many types of pipeline threats, such as general internal and external corrosion (i.e. wall-thinning) if prudently managed.  The more specialized forms of corrosion, cracking and pitting, or corrosion within dents, however, can be much more challenging as ILI tools and their related engineering critical assessments still have technical limits.  ILI tool vendors place specific limitations on their various tools, and it is important that the pipeline operator follow such restrictions that can easily invalidate an ILI tool run reading or result.  ILI runs in hilly terrain, such as that which exist with the Pipelines (See Figure 3) can be quite challenging for ILI tools that can easily exceed multiple tons in weight as gravity never shuts off.

In investigating numerous pipeline rupture failures after ILI tool runs, I consistently see failures on the part of the pipeline operators to perform sufficient field verification digs to determine if bias is being introduced in a specific ILI tool approach on a specific pipeline segment, for a specific pipeline threat, and that the ILI tool selected is really appropriate to identify certain pipeline threats.  Some pipeline operators repeatedly fail to recognize or even consider ILI tool capabilities and tolerances, especially as ILI vendors and pipeline engineers have tried to improve technologies and assessment techniques.  It is worth noting that no one markets ILI tools claiming they don't work.  An important consideration in integrity management approaches is whether the right ILI technology has been selected and is being prudently utilized by the pipeline operator.  It is further worth noting that while running an ILI tool is not inexpensive, the cost of running such a tool is relatively less expensive compared to the overall quality of the field integrity verification program to assure the ILI tool is doing its job for a specific type of pipeline threat, on a specific pipeline segment.

Part of the problem is that many forms of interactive external corrosion pipeline cracking threats cannot be accurately characterized to allow meaningful engineering critical assessments that are reliable.  Such assumptions or inability to properly engineer and predict interactive threats introduce significant margins of error to fitness for service predictions using ILI assessments.  Just doing ILI reassessments when they really aren't capable of dealing with interactive corrosion threats is an illusion of safety.  Basically, performing an inappropriate ILI assessment more often is not the solution as further explained below.

## VI.  The greatest threat on the Las Flores Pipeline System is from external corrosion.

It should not take a pipeline failure to identify that the greatest pipeline integrity threat on the Pipelines is from various forms of external corrosion due to poor design of these Pipelines rendering CP systems ineffective at reducing or preventing external corrosion failure.

The PHMSA Final Report stated:

**Proximate or Direct Cause**

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.[21]

PHMSA goes on to list numerous contributory causes, among them a significant observation, "Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised."[22]  This important fact should also play a major role into any decision to restart the Las Flores Pipeline System as explained in further detail in this report.  This critically important PHMSA observation should not come as a surprise to any pipeline operator.  Bottom line, Plains acquired a poorly designed set of Pipelines in the early 1990s that rendered the CP system ineffective at preventing or mitigating external corrosion on a pipeline system operating at high temperatures.  Some years after acquiring the Pipelines and after TIMP regulations were promulgated in late 2002, Plains did not implement an appropriate integrity management program to prevent the pipeline failure from external corrosion attack.  The question now is whether Sable's compliance with the Consent Decree under the approval of the OSFM relying on the capabilities of ILI tools can prevent another failure on the Pipelines?  **Clearly, current ILI technology does not meet an obligation to reliably identify all forms of external corrosion most likely present on much of the Pipelines.**  The CP systems required by PHMSA regulations will not be effective on most of the pipeline mileage in the Las Flores Pipeline System as previously discussed, and from my perspective there is serious doubt as to whether these poorly designed pipelines can be made as safe as new pipelines that have properly functioning cathodic protections.

Regarding the Las Flores Pipeline restart decision and related integrity assessments, it is important to understand how CP systems are supposed to work.  In layman's terms, a CP system impresses a weak current into a pipeline turning the pipeline into a cathode in an electrochemical corrosion cell on the outside of a buried pipeline, to control or reduce external corrosion.  Older nonconducting pipeline coatings such as that which exists on the Pipelines do not allow for CP current to pass through them.  The purpose of the CP system is thus to introduce current to the outer pipewall where the older coatings have been penetrated, such as with holes or tears in the outer coating.  Unfortunately, older pipeline external coatings such as the urethane coal tar outer coatings, like those on the Pipelines, are also well known to not adhere tightly to a pipeline over time, causing coating separation or disbondment.  Such disbondment can result in external

---

[21] *Ibid*, p. 14 of 21.
[22] *Ibid.,* p. 14 of 21.

pipewall corrosion cells under the coating, generating many different forms of corrosion, especially SCC and SSC cracking in the wrong environments, that are not protected by CP.  To add to this threat of external corrosion, the Las Flores Pipeline System's external insulation traps and serves as a water conduit further increasing external corrosion as a water fed corrosion attack.  And lastly, the Polyken tape wrap installed during pipeline installation around the outside of the insulation is also well known to not be conductive, further shielding and preventing CP current from reaching the outer pipe wall.  **This is a perfect storm or combination of factors all working to render CP ineffective.** Without effective cathodic protections, the pipeline is at particularly high risk of spilling again.  To further underscore the lack of a proper integrity management program, this pipeline operates at elevated temperature that accelerates external corrosion as explained further below.  New types of pipeline coatings now allow the passage of CP current through such coating to mitigate external corrosion even if the coating disbonds from the pipeline.

## VII. High pipeline operating temperatures accelerate all forms of corrosion.

**Figure 4  Los Flores Temperature Data from DNV Line 901 Release (5/19/15) Technical Root Cause Analysis included in PHMSA Final Report.[23]**



If one is experienced in handling/refining the heavy crude oils produced offshore that feed into the Las Flores Pipeline System, this crude oil not only needs to be diluted with natural gas liquids, or NGLs, but the pipeline must be operated at high pipeline temperatures, approximately 135 °F, that also is required to reduce the blended oil viscosity to get the fluid over the main hill beyond the Sisquoc Pump Station to Pentland.  While the PHMSA Final Report mentions 135 °F as a pipeline operating temperature, Figure 4 represents a temperature graph indicting 135 °F was not unusual, but higher fluid temperature to improve the flow and capacity of the Pipelines did occur.

Chemical engineers experienced in reaction kinetics are familiar with the Arrhenius equation which indicates that chemical reaction rates, such as that for corrosion, essentially double for every 10 °C (18 °F) increase in temperature.  This means that the rate of corrosion at 140 °F is about 32

---

[23] *Ibid.,* "Figure 23, L901 Las Flores Station Temperature Data," p. 375 of 510.

Accufacts Inc. 12-20-24                                                                                     Page 13 of 15

times that for a pipeline operating at 60 °F, a typical ambient soil condition.  Because of the higher viscosity of unblended offshore oil there probably is little opportunity to reduce the Las Flores Pipeline System temperature to help reduce corrosion rates on a pipeline system where the CP system is ineffective. If the Pipelines are returned to operation, all forms of external corrosion will remain a primary threat of concern for pipeline failure.

## VIII.  The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.

It is important to understand that the Consent Decree is just a compromise agreement between the signature parties and may be missing important technical matters related to the Pipelines.  I find it odd that many of the technical issues discussed above were not identified or addressed in the Consent Decree.  External corrosion cracking risk was well known for many decades to be a threat of concern for pipelines exhibiting disbonded external coating where CP systems are ineffective.

I find it especially strange that Plains the pipeline operator at the time of the Line 901 rupture got itself into serious trouble by failing to understand that the poor design of the Pipelines could not be adequately addressed by ILI.  It appears that the Consent Decree continues to foster the illusion that ILI can adequately permit assessment of corrosion risks, especially cracking threats most likely to exist on major segments of the Pipelines (see Figure 3, for example).  The Consent Decree doesn't even mention corrosion cracking threats for this system operating at high temperature that exacerbates all forms of external corrosion as previously discussed.

And lastly, I would caution that the Consent Decree gives authority to the OSFM on certain pipeline safety related decisions. These OSFM decisions, however, cannot violate federal pipeline safety regulations and that I believe require a public decision process for PHMSA approval to assure any waiver meets or exceeds the level of safety had the wavier not been requested.

## IX.  The poorly designed Pipelines cannot be made as safe as new pipelines.

Sable's website implies that the Pipelines will be repaired, stating "PPC undertook a comprehensive repair and maintenance program to restore the pipeline to "as-new" condition."[24] As referenced in footnote 19 above, this isn't the only time that a Sable representative has suggested the Pipelines will be restored to "as-new" condition or a "corrosion free" state.  A new pipeline would be properly designed such that the federal pipeline safety regulations requiring a CP system would be effective and do its job, while allowing CP monitoring to assure the new pipelines were adequately protected from external corrosion attack by an effective CP design.  A new pipeline would not be trying to utilize CP on a pipeline improperly coated, that seriously disbonds from the pipe, with a system insulated to assist in water reaching the outer pipe steel, while operating at higher temperature.  All these poor design factors accelerate all forms of external corrosion including cracking.  It is a misguided illusion that relying on ILI can attempt to stay ahead of pipeline failure on such a poorly designed system.  A cursory review of the PHMSA Final

---

[24] See Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx.

Report, Appendix G In-Line Inspection report will indicate that even running ILI tools, it is impossible to return Line 901 to an "as new" condition given the numerous corrosion anomalies.[25] The idea that running ILI tools should be sufficient to assure an "as-new" pipeline condition and safe operation of these poorly designed Pipelines with ineffective CP protection is a false premise, as the Pipelines are far from being in a new condition, with numerous anomalies, given their poor design approach and operating history.

## X.   Conclusion.

Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure.  Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

The above represents my opinions based on experience with too many pipeline rupture investigations.  I reserve the right to update this report if more relevant information is made available.

Richard B. Kuprewicz
President
Accufacts Inc.

---

[25] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara Country, California, - Appendix G In-Line Inspection Report by Lamontagne for the Oak Ridge National Laboratory" May 2016, pp. 44 – 138 of 510.

## Curriculum Vitae.

# Richard B. Kuprewicz

**8151 164th Ave NE**
**Redmond, WA   98052**

**Tel:  425-802-1200 (Office)**
**E-mail: kuprewicz@comcast.net**

---

**Profile:**  As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**  **Accufacts Inc.**                                              **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

**Position:**  President
**Duties:**  > Full business responsibility
> Technical Expert

**Alaska Anvil Inc.**                                              **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

**Position:**  Process Team Leader
**Duties:**  > Led process engineers group
> Review process designs
> Perform hazard analysis
> HAZOP Team leader
> Assure regulatory compliance in pipeline and process safety management

**ARCO Transportation Alaska, Inc.**             **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

**Position:**  Senior Technical Advisor
**Duties:**  > Access to all Alaska operations with partial Arco ownership
> Review, analysis of major Alaska pipeline projects

**ARCO Transportation Co.**                              **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

**Position:**  Manager Gas Pipeline Projects
**Duties:**  > Project management
> Oil pipeline conversion to gas transmission
> New distribution pipeline installation
> Full turnkey responsibility for new gas transmission pipeline, including FERC filing

10-22-24                                                                                              Page 1 of 9

**Four Corners Pipeline Co.**                              **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**     Vice President and Manager of Operations
**Duties:**       > Full operational responsibility
                  > Major ship berth operations
                  > New acquisitions
                  > Several thousand miles of common carrier and private pipelines

**Arco Product CQC Kiln**                                 **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**     Plant Manager
**Duties:**       > Team building of new facility that had been failing
                  > Plant design modifications and troubleshooting
                  > Setting expense and capital budgets, including key gas supply negotiations
                  > Modification of steam plant, power generation, and environmental controls

**Arco Products Co.**                                     **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**     Operations Manager of Process Services
**Duties:**       > Modernize refinery utilities and storage/blending operations
                  > Develop hydrocarbon product blends, including RFGs
                  > Modification of steam plants, power generation, and environmental controls
                  > Coordinate new major cogeneration installation, 400 MW plus

**Arco Products Co.**                                     **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**     Manager of Refinery Planning and Evaluation
**Duties:**       > Establish monthly refinery volumetric plans
                  > Develop 5-year refinery long range plans
                  > Perform economic analysis for refinery enhancements
                  > Issue authorization for capital/expense major expenditures

**Arco Products Co.**                                     **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**     Operations Supervisor/Process Engineer
**Duties:**       > FCC Complex Supervisor
                  > Hydrocracker Complex Supervisor
                  > Process engineer throughout major integrated refinery improving process yield
                    and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.

Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).

Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

**Publications in the Public Domain:**

1. "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2. "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3. "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4. "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5. "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6. "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7. "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8. "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9. "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA.  Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267.   Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac.  Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel.  Final testimony to the docket submitted May 19, 2023.  This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24                                                                                                                                        Page 8 of 9

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

# EXHIBIT F

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                          Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## <u>CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08</u>

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:    LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-324)**

Operator:    Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:    OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable
Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara
County, California as described in the request of state waiver dated April 24,
2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
    a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
    b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
    c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

 a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

 b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

 a) Dates for integrity assessment

 b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 87148E7A-ED76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 6

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)

d) Required tool specifications including operational specifications and anomaly sizing tolerances

e) Tool validation methodology

f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

g) Criteria used to identify locations for excavation and field verification

h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

  a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

  b. USCD Performance Specification Requirements

    i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

    ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

    iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

    iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

> document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Docusign Envelope ID: 87148E7A-FB76-4984-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 87148E7A-FB76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 11

  b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

  c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

  a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

  b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 87148E7A-FB76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Lance Yearwood
December 17, 2024
Page 13

    e.  Evaluation methodology used
    f.  Models used
    g.  Direct in situ examination data
    h.  All in-line inspection tool assessments information evaluated
    i.  Pressure test data and results
    j.  All in-the-ditch assessments performed on the pipeline segments
    k.  All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l.  All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
    n.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
    o.  Safety factors used for fatigue life and/or predicted failure pressure calculations
    p.  Reassessment time interval and safety factors
    q.  The date of the review
    r.  Confirmation of the results by qualified technical subject matter expert(s)
    s.  Approval by responsible Sable management personnel
    t.  Records of additional preventive and mitigative (P&M) measures performed
    u.  Reports required by this State Waiver.

## Reporting

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324*. The email notification shall include, if applicable:
    a.  Tool type and run date
    b.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c.  Dig sheets
    d.  Field contact information for Sable
    e.  Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Docusign Envelope ID: 87148E7A-FB76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 14

      a. Tool type
      b. Run date
      c. Summary of Conditions Report[18]
      d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324.* At a minimum, the annual report shall contain the following, if applicable:

    a. A Closure Report for the previous calendar (CY) which contains:
      i. Features that were remediated in previous CY
        1. Provide documentation for the in-the-ditch assessments and repairs
      ii. Identify features that remain to be assessed
      iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
    c. The third-party ILI expert reviews in accordance with Condition 52
    d. AC and DC Interference surveys that are due in accordance with Condition 53
    e. A copy of the CGRA for prior year including:
      i. Mean corrosion growth rate for the pipeline
      ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## **Limitations**

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 15

> failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:   Doug Allen, Supervising Pipeline Safety Engineer, OSFM
      Andy Chau, Supervising Pipeline Safety Engineer, OSFM
      Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
      Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
      Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
      Tuan Tran, Pipeline Safety Engineer, OSFM
      Josh Cleaver, Staff Counsel, CAL FIRE
      Max Kieba, Engineering and Research Division, PHMSA
      Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT G

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY

Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

**Operator:**   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**Pipeline:**   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 166BEEF3-241E-476E-8B10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.

14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.

16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.

18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

## **In-Line Inspection (ILI) Assessment and Frequency**

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

    a) Dates for integrity assessment

    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

    c) In-line inspection tool vendor(s)

    d) Required tool specifications including operational specifications and anomaly sizing tolerances

    e) Tool validation methodology

    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    g) Criteria used to identify locations for excavation and field verification

    h) Non-destructive examination

20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

21. Metal Loss Tool(s)

    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to  meet  the  tool  accuracy specification  provided  by  the  vendor  (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

### 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

### Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
   b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
   c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
   a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
   b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAED95600F3B

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Lance Yearwood
December 17, 2024
Page 13

     n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

     o. Safety factors used for fatigue life and/or predicted failure pressure calculations

     p. Reassessment time interval and safety factors

     q. The date of the review

     r. Confirmation of the results by qualified technical subject matter expert(s)

     s. Approval by responsible Sable management personnel

     t. Records of additional preventive and mitigative (P&M) measures performed

     u. Reports required by this State Waiver.

## **Reporting**

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:

     d. Tool type and run date

     e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

     f. Dig sheets

     g. Field contact information for Sable

     h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

     i. Tool type

     j. Run date

     k. Summary of Conditions Report[18]

     l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B.* At a minimum, the annual report shall contain the following, if applicable:
   a. A Closure Report for the previous calendar (CY) which contains:
      i. Features that were remediated in previous CY
         1. Provide documentation for the in-the-ditch assessments and repairs
      ii. Identify features that remain to be assessed
      iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
   c. The third-party ILI expert reviews in accordance with Condition 53
   d. AC and DC Interference surveys that are due in accordance with Condition 54
   e. A copy of the CGRA for prior year including:
      i. Mean corrosion growth rate for the pipeline
      ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## **Limitations**

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT H

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**February 21, 2025**

Accufacts Inc. Final

## Table of Contents

I.      *Summary*..................................................................................................*1*

II.     *The current installation renders the CP system ineffective.*.......................*2*

III.    *Compliance with CP regulatory requirements is ineffective, making
        performance with this regulatory requirement meaningless.*.................*3*

IV.     *This is more than simple corrosion under installation (CUI) issue.*.........*3*

V.      *External corrosion on buried pipelines falls into four major categories.*................*4*

        1. **Pipe wall loss corrosion is generally understood to occur over larger areas of
        the pipe.**......................................................................................4

        2. **Cracking or crack-like corrosion is usually an environmental threat difficult to
        assess.**........................................................................................4

        3. **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**
        ......................................................................................................5

        4. **Corrosion within dents is a special form of dent threat.**............................5

VI.     *Types of ILI technology.*..............................................................*5*

        1. **General wall loss corrosion.**......................................................5

        2. **Cracking corrosion.**.................................................................6

VII.    *What is the purpose of hydrotesting?*...........................................*6*

VIII.   *The illusion that corrosion growth rate can be accurately predicted needs to be
        explained.*....................................................................................*7*

IX.     *Major state waiver deficiencies:*....................................................*7*

        1. **A key corrosion performance tracking process step in the state waivers for the
        Pipelines is missing.**....................................................................7

        2. **A major state waiver deficiency for Line 324.**................................8

        3. **Major state waiver deficiencies for Line 325A/B.**...........................9

X.      *Conclusions.*................................................................................*9*

# I.    Summary.

Accufacts Inc. ("Accufacts") was asked to provide my expert opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A, and CA-325B ("Pipelines") made public in mid-January 2025 by the Office of the State Fire Marshal ("OSFM").[1]  This report builds on a previous Accufacts report issued on December 20, 2024."[2]  By agreement, a Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed state waiver alternative measures "provide an equal or greater level of safety."[3]  It is my understainding that PHMSA can choose to: 1) Not comment on this matter allowing the State Waiver to occur and startup to proceed, 2) Not approve the waiver preventing the startup, or 3) Impose additional requirements to assure an equal or greater level of safety to current minimum federal pipeline safety regulations occurs.

The current coating installations do not provide "limited effectiveness of the cathodic protection system," as mentioned by the Decision letters issued by the OSFM.  This I believe is a poor choice of words that understates the fact that the CP system is ineffective on most of the Pipelines' mileage.  The OSFM is thus being asked to grant a state waiver on federal pipeline safety minimum requirements intended to address external pipeline corrosion from an ineffective CP installation, while relying on hydrotesting and various forms of inline inspection, ILI or smart pigging, to avoid pipeline failure from the resulting external corrosion.

The waivers attempt to allow startup of the Pipelines relying mainly on ILI technology to identify corrosion threats before failure.  In addition, the Application by the Pipeline's operator appears to be relying on a circumferential magnetic flux leakage (MFL-C tool) approach run in February 2022 to argue for the removal of federal regulation requiring the 180 day condition for scheduling remediation of "corrosion of or along a longitudinal seam weld."[4,5]  Our experience with MFL-C tools is that if certain parameters are not incorporated, such ILI tools can miss a lot of cracks.  I see no mention of such important conditions in the referenced letter that would demonstrate that this ILI run is reliable.  I do not see sufficient justification to waive 49CFR452(h)(4)(iii)(H) as such a waiver would not provide an equal or greater level of safety as no carbon steel pipeline, even new modern steel pipelines, are invincible to corrosion attack.

---

[1] OSFM letter to Sable/PPC Offshore Corp, "Letter of Decision on the Sate Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) ("Decision Letter 324") and Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) ("Decision Letter 325A/B")", dated 12/17/24.

[2] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024.

[3] PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

[4] Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run.

[5] 49CFR452(h)(4)(iii)(H).

Accufacts Inc. Final                                                         Page 1 of 9

A simple plot of the type and approximate milepost location of external corrosion such as wall loss or cracking, including field as well as ILI indications along the Pipelines, will underscore how challenging the operation of the present Pipelines will be without effective CP.  Such a plot will clearly demonstrate that the Pipelines are not "like new" as indicated by some recent Sable/PPC representatives.  Further explanation is also warranted as to why the pipeline operator assumes there is no SCC or SSC risks associated with water on the Pipelines.

A proposal to replace the Pipelines with a new smaller diameter heated pipeline that would be uninsulated and built with modern unshielding coatings was aborted.[6]  This proposal would have permitted the CP system to do its job addressing external corrosion, while complying with federal pipeline regulation.

## II.    The current installation renders the CP system ineffective.

The construction of Line 324 in the late 1980s utilized coal tar urethane coating applied to the bare steel pipeline, covered by sprayed on insulation to assure the pipeline was operated at higher temperatures.  The insulation was then wrapped with a non-conductive polyethylene tape coating.[7] While there may be some confusion as to the coating installation on what is now named 325A/B, information leads us to believe this coating installation is similar on these pipelines as that on Line 324.  To anyone vaguely familiar with pipeline external corrosion protection and cathodic protection ("CP") intent, this approach is a fundamental failure of design/installation reflecting much inexperience in pipelines.  The polyethylene tape shields and prevents CP current from getting to the external pipeline steel, and the insulation system works to shield while increasing the likelihood of water in close proximity to the pipe, especially in areas where the coal tar coating directly on the pipeline steel has separated, or disbonded, from the pipe.[8]  <u>With such heavy shielding there is thus no way for any CP system current to ever reach the pipeline to reduce/prevent external corrosion.</u>

With the exception of a few feet of buried pipe that has undergone repairs, replacing the existing poor design and coating installations with a few feet of dual epoxy coatings, the shielded CP system is ineffective.  The various threats of external corrosion on the Pipelines are exacerbated by the elevated temperature, the potential for water to accumulate along the Pipelines via the insulation, the application of non-conducting tape wrap around the insulation, and the use of older coal tar coating directly on the pipeline that exhibits separation (aka disbondment) from the pipe steel.  Disbonded coating in the wrong environments is especially conducive to cracking threats, such as SCC or SSC as discussed in this report.  I have seen no convincing arguments that water environments conducive to corrosion cracking are not around or under the coating on the Pipelines.

---

[6] Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022.

[7] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), "Failure Investigation Report Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, May 2016, Appendix E: Corrosion Control and Pipeline Conditions, page 1 of 4.

[8] *Ibid.,* Page 3 of 21, and Mechanical and Metallurgical Testing, Photos Figure 1 through 20.

Accufacts Inc. Final                                                                 Page 2 of 9

## III.    Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.

The Pipelines thus have ineffective CP protection from external corrosion that is exacerbated by operation of the Pipelines at elevated temperatures, seriously increasing corrosion rate as discussed in my previous report.[9]   Attempts to gauge the effectiveness of the CP system utilizing CP performance measures identified in PHMSA regulations are meaningless in such heavily shielded installations.   Just operating the Pipeline with CP "on" to meet federal minimum regulatory requirements will not prevent external corrosion attacks that can take on various forms on the Pipelines.  It should be noted that the OSFM has required "Where the operator discovers external corrosion in combination with coating deterioration, the operator must recoat with a two-part epoxy.  Sable must recoat in accordance with their repair procedure." which does allow repair replacing with the existing installation approach, given its many shortcomings to prevent external corrosion.[10]  This requirement places the responsibility on the pipeline operator to identify when or if any, field digs should occur to confirm coating degradation.  The operator should be primarily focused on identifying environments around the pipeline that are precursors to various forms of external corrosion attack, given the many conditions related to the pipeline design/installation conducive to external corrosion attack.

It is on the limited repaired sections, measured in feet, that the CP should be effective as such short length repairs replace the poorly designed shielding original coating installations.  For the vast majority of the Pipelines mileage, however, the CP remains ineffective.  The requirements to measure CP performance stated in 49CFR§195.2 (NACE SP 0169 – 2007 edition, paragraph 6.2.2) are meaningless when heavy shielding, such as that which occurs on CA-324 and CA-325A/B, prevents CP current from reaching the pipeline.

## IV.    This is more than simple corrosion under installation (CUI) issue.

Considerable past discussions have suggested that this is a corrosion under installation (or CUI") problem implying that this is the only controlling issue.  While CUI is certainly a contributing factor, the corrosion threats go well beyond CUI.  As previously discussed, heavy shielding, the tape coating around the insulation, the vintage/type of coating directly on the Pipelines prone to disbondment, the operating temperature, and the environment around the Pipelines, work in concert to create external corrosion in its various forms.  The Consent Decree is an agreement based on the premise that higher risks of external corrosion can be mainly addressed by ILI tools. The multiple forms of external corrosion which can occur on the Pipelines require various different approaches, beyond ILI, as discussed further in this report.

---

[9] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024, p. 13.
[10] OS OSFM letter to Sable/PPC Offshore Corp, "Decision Letter 324 and Decision Letter 325A/B")," dated 12/17/24, pp. 11 and 11 respectively.

Accufacts Inc. Final                                                        Page 3 of 9

## V.     External corrosion on buried pipelines falls into four major categories.

External corrosion on buried steel pipelines falls into four general categories:  1) wall loss or thinning of the pipe wall, 2) cracking or crack-like, 3) pitting, and 4) corrosion within dents.

1.  **Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.**

    Internal or external corrosion can cause pipe wall thinning.  Such thinning differs from pit corrosion discussed below, in that pipe wall loss thinning tends to occur over a wider area of the pipe.  Despite previous multiple ILI runs, external corrosion pipe wall loss, or thinning, was the condition that resulted in the May 19, 2015 pipeline rupture failure.  External corrosion on the shielded pipe allowed general corrosion thinning of the pipeline until the pipe failed under pressure.  It should be worth noting that wall loss in excess of 0.8 wall thickness (actually 0.91) which occurred in the May 19, 2015 rupture, places the operator at great risks.  Ironically, pipe wall loss is generally one pipeline failure threat that advances in the ILI technology over recent decades was intended to address, either with ILI mag flux or ultrasonic approaches which are different technical methods.

2.  **Cracking or crack-like corrosion is usually an environmental threat difficult to assess.**

    This is associated with various forms of pipeline cracking, such as selective seam corrosion or stress corrosion cracking.  While engineers like to think they can calculate time to failure, such time to failure estimates for these forms of corrosions are hard to reliably predict.  Given the probability that such cracking, especially if in clusters, can interact with other cracks, or weaknesses in the pipe body near/at welds, makes prediction to failure highly unreliable.  Such pipe weaknesses can occur at weld heat affected zones, at girth welds, or at manufacturing related pipe seams, in unpredictable ways that can quickly negate time to failure calculation/estimates, even if cracking potential is identified.

    Sable/PPC has requested an exemption from 49CFR452(h)(4)(iii)(H) explaining this is usually a SSC threat related to earlier vintage manufacturing processes such as LF-ERW which tends to exhibit lower pipe toughness. There are other related risks to the manufacturing process of modern steels such as DSAW and HF-ERW concerning cracking potential from poor coating/ineffective CP approaches. Because of the nature of disbonded coating in proximity to water, coating can tent at weld seams creating potential for cracking corrosion attack, such as SSC.  Even modern pipe steels are not invincible to such cracking corrosion potential, especially on pipelines operating at elevated temperatures.  Unless the operator can show why such environments don't exist, their request to be exempted from 49CFR452(h)(4)(iii)(H) should be denied.  These explanations should go well beyond a MAG-C pig run the pipeline operator has provided.

3.  **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**

This is the loss of pipe steel in concentrated small areas, forming localized small holes or pits, usually at girth welds, that can weaken the pipeline and cause a release.  Pit corrosion identification via ILI, even newer generations of ILI tools, can be very challenging.  Pit corrosion threats are usually verified via field digs or pipeline releases.  While this threat can be a bona fide threat on the Pipelines that are heavily shielded rendering CP ineffective, there has been no mention that this threat has been identified.

4.  **Corrosion within dents is a special form of dent threat.**

Corrosion or cracking within a dent, also known as "dents with stress concentrators" are hard to identify via ILI, and almost impossible to reliably predict time to failure.  Such threats are usually identified by high-definition geometric ILI dent tools, the location around the pipeline, and field dig verification assessments.  The ILI determination using high resolution caliper or geo pigs, have proven reliable at identifying dents and their location on a pipeline.

# VI.    Types of ILI technology.

Given the possible types of external corrosion on the Pipelines, I now focus on a simple high-level discussion of corrosion ILI technical approaches.

1.  **General wall loss corrosion.**

After the advancement of geometric or deformation ILI technology, the next early phase of ILI use focused on general corrosion wall loss, or pipeline thinning along the axis or flow direction of the pipeline.  In this field, technology split into two different approaches, magnetic flux leakage and ultrasonic.  Magnetic flux leakage (or mag flux) approaches utilized software algorithms to characterize changes in magnetic flux to identify wall loss aligned in the axial, or direction of flow, usually the most insidious and common corrosion flaws for pipe.  Mag flux ILIs fall into two general categories: low resolution (usually associated with earlier generation) and high resolution (usually more complex and more expensive).  Mag flux technology shifted from low resolution to the more sophisticated high resolution approaches where corrosion is problematic.  There are still pipelines that utilize low resolution mag flux because of cost, so care should be exercised in the application of this form of ILI on liquid pipelines.  The waivers specifically require UT ILI the first two years of operation, but are moot, indicating magnetic flux ILI in the future could be allowed without clarification as to high res or low res ILI.

Ultrasonic ILI approaches use beams of ultrasonic energy to identify both external and internal corrosion wall loss.  While a simplification, ultrasonic approaches are analogous to radar, where reflected energy readings are utilized to measure changes in pipe wall thickness.  Originally, ultrasonic approaches, focusing on wall loss evaluation, directed UT energy directly into the pipe in the radial direction for wall thickness and resulting wall loss corrosion sizing determinations.

2.  **Cracking corrosion.**

> Pipeline ruptures from cracking threats drove a need for ILI tool cracking development.  Thus, a next generation of ultrasonic ILI approaches advanced by changing the angle of the UT beam from radial into the pipe to at an angle to help spot cracks that might be developing.  This form of UT approach is identified as shear wave.  As more pipeline failures from cracking were uncovered, additional advances known as phased array ultrasonic (PAUT) have recently developed, though such measurements are currently focused on field measurement of uncovered pipeline, as ILI in this area I would categorize as still under development.

I have investigated too many pipeline ruptures that occurred after an ILI run which indicates more regulatory work is needed in ILI regulations related to applications of ILI.  No ILI vendor provides such tools claiming they will not work.  It is the pipeline operator's responsibility to ensure ILI runs meet the restrictions placed by the tool vendor (such as speed) and to verify the tool vendor's claimed capability with a proper number of field verification digs.

## VII.     What is the purpose of hydrotesting?

There are basically two types of hydrotesting mentioned in federal pipeline safety: 1) What I call a subpart E, or proof of MOP test, and 2) a crack hydrotest, what is referred to as a "spike hydrotest" that is performed at much higher test pressures as a %SMYS.  Both forms of hydrotesting are proof test, good at the time of the test, and don't characterize time dependent pipeline threats such as corrosion.

The purpose of an MOP hydrotest is to proof the fitness for service of a pipeline at the time of the test, with a certain margin of pressure safety that usually deteriorates with time.  Subpart E MOP tests are not crack integrity test.  If a pipeline system has crack forming potential an MOP test is not appropriate.

Spike hydrotests are meant to avoid pressure reversals associated with crack threats on pipelines.  Pressure reversals are where cracks remaining after MOP hydrotest tests can enlarge for various reasons to result in possible failure during operation, usually at lower pressures.  It is my experience that spike hydrotests are meant to deal with cracking threats if such a threat exists.  The performance metric for the suitability of a spike hydrotest is the range of %SMYS for the specific test segment.  For pipeline elevation changes like that associated with 325A/B, a spike hydrotest requires the pipeline be segmented to keep test pressures within reasonable ranges that don't produce permanent yielding of the pipe.  The information made public to date indicates that the previous hydrotests performed in 1986, because of elevation changes, required Line 325A to undergo hydrotesting in 9 segments and in Line 325B in 11 segments.  Unfortunately, the hydrotest segments in the public record application are identified by station number and not by approximate milepost.  Since there is usually no correlation between station number and milepost, I thus cannot evaluate whether the Decision Letter 325A/B pressure testing parameters are adequate for Line 325A.[11]  It is worth noting that the Decision Letter 325A/B makes no mention of a subpart E

---

[11] Decision Letter 325A/B, "Pressure Testing," page 5.

hydrotest or spike hydrotest on Line 325B.  The proposed segments for hydrotests on 325A need to be identified by approximate milepost to permit evaluation as to whether the waiver requirements are appropriate.  The reasons for hydrotesting exclusion on Line 325B need to be properly justified and made public by the OSFM.

## VIII.    The illusion that corrosion growth rate can be accurately predicted needs to be explained.

One of the critical parameters that I have observed in too many pipeline rupture investigations is that ILI can be utilized to accurately predict corrosion growth rates ("CGR") to help set a critical ILI run timing, for example.  The Pipelines essentially have no effective CP, operate as a higher temperature system, contain disbonded coating, incorporate heavy shielding which prevents CP from reaching the Pipelines and operate with insulation that moves water on/near the outside of the pipe.  Such a combination of factors can provide a wide variation in types of external corrosion as well as corrosion rate estimates.  CGR estimates can be especially problematic if CGR approaches miss possible corrosion interaction threats that can considerably shorten time to failure estimates.  I advise that CGR be utilized with extreme caution given this possible variation, especially for corrosion threats that can interact, such as SCC, whose time to failure can be highly unpredictable.  Corrosion growth rate estimates can vary considerably given the various form of external corrosion, especially related to cracking in combination with its location near sensitive pipe locations such as seam or girth welds.

## IX.    Major state waiver deficiencies:

Key observation on the state waivers for the Pipelines:

1. **A key corrosion performance tracking process step in the state waivers for the Pipelines is missing.**

   While not specially required in minimum pipeline safety regulations or the waivers, a prudent pipeline operator on a pipeline system highly susceptible to corrosion will plot or graph corrosion indications by type and severity, by approximate milepost.  This is especially important on the Pipelines given their history of extensive corrosion caused by the lack of CP effectiveness, poor coating types causing disbondment or shielding, increased temperature, insulation that tends to wick water, and poor performance of ILI.  Such graphing aids a pipeline operator in understanding possible corrosion "hot spot" segments whose threats on a pipeline increase because of environmental factors that merit additional assessment, and maybe even pipeline segment replacement from a corrosion point of view.

   Care also needs to be taken that all corrosion sites are prudently evaluated for possible interactive threats, such as general wall loss in combination with cracking, or near pipe welds, such as that which can occur with cluster corrosion.  I see no mention in the Letters of Decision and waivers requiring such important corrosion tracking on the Pipelines.

Accufacts Inc. Final                                                                 Page 7 of 9

2.  **A major state waiver deficiency for Line 324.**

Given the pipeline properties stated for Line 324 (a single grade X65, 0.344 in wall thickness, 24-inch diameter, HF-ERW), I can calculate the various % SMYS for the spike (minimum and maximum test pressures, and MOP hydrotests) based on an estimated approximate elevation profile by milepost as Line 324 can be hydrotested as one segment given its limited elevation profile.

A critical condition in the OSFM Decision letter 324 is:

"12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike hydrotest is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
   b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP."[12]

For the 24-inch diameter pipe, wall thickness and grade stated in the Decision Letter 324, 100% SMYS calculates to 1863 psig.  1.5 times the stated MOP of 1003 psig calculates to 1504 psig, at the highest elevation point.  Thus, the spike test at the highest elevation point as required above is likely to be the lower maximum test pressure of 1504 psig which calculates to about 81% SMYS, **a value I believe is too low for corrosion cracking screening and evaluation**.  The OSFM needs to explain why the proposed spike hydrotest of Line 324 is so low.

The bottom line is that Sable/PPCs should demonstrate whether there are environmental conditions around Line 324 that are conducive to cracking either SCC or SSC, and these conditions should go well beyond a Mag-C tool run (such as sufficient field digs to verify the ILI tool's claimed capability).  I see no such important conditions in Sable/PPCs application that instill confidence that Line 324 does not have environments favoring external cracking.  While it is true that certain pipe manufactured before 1970 is more prone to SSC, or SSWC, for various reasons, there is no modern pipe, even HF-ERW located in Line 324 or DSAW located in 325 A/B, that is invincible to such corrosion cracking threats, especially if the coating directly applied to the pipe has "tented" on the weld seam, allowing water to enter between the coating and the pipe to create a corrosion cell.  There is no carbon steel pipeline, even new modern manufactured steel pipelines, invincible to such corrosion attack.

---

[12] Decision Letter 324, "Pressure Testing," pages 4 – 5.

**3. Major state waiver deficiencies for Line 325A/B.**

Decision Letter 325 states that Line 325A and 325B is composed of 30-inch diameter of two pipe grades (X65 with a thickness of mainly 0.344 inch and X70 with a wall thickness mainly of 0.281 inches composed of DSAW, with one small segment of 0.03 miles containing HF-ERW). I used the term "mainly" as Sable's/PPC's application indicates these two lines are also largely composed of these grades with a small percentage of varying thicknesses.[13] For these two pipe grades, and thicknesses, 100 % SMYS calculates to 1490 psig for X65 and 1311 psig for X70. Since the location of the various pipe grades by approximate mileposts within CA-325A/B are not indicated, and given the dramatic elevation profiles for 325A/B the proposed hydrotest segments, if any, by milepost and elevation segments need to be made public. Without such information, I cannot calculate the % SMYS range for hydrotests given the OSFM conditions. Hydrotest segments are identified by station number which don't necessarily sync with milepost or MP.[14] **These important test segment parameters, by approximate MP, and elevation need to be made public to assure prudent hydrotesting is being required to address the possible general corrosion and cracking risks on Line 325A/B**.

It is worth noting that the OSFM does not require a MOP and spike hydrotest of 325B which has very significant elevation changes. This would suggest that Line 325B is not being evaluated by hydrotesting. The reason(s) for this decision needs to be made public.

## X.    Conclusions.

Hydrotest segments proposed for the Pipelines need to be made transparent and include approximate MP, given the major role that elevation change plays on this system. Critical parameters related to location by milepost of the varying grades and thicknesses of pipe on 325 A/B and their associated hydrotest segments need to be identified by approximate MP as well, to verify if the OSFM parameters are sufficient for the specific types of corrosion threat. The reason as to why a spike hydrotest on 324 and 325 A are limited needs to be explained, as well as to why 325B hydrotesting has not been included in either a subpart E or spike hydrotest,

The incompleteness of the waivers lead me to conclude that I cannot determine the waivers provide sufficient information to assure an equal or greater level of safety for the Pipelines had the operator had an unshielded coating design that complied with federal minimum pipeline CP protection intended to avoid pipeline failure from external corrosion.

Richard B. Kuprewicz
President
Accufacts Inc.

*Richard B Kuprewicz*

---

[13] Sable/PPC letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115). Pipeline System Background Data Attachment B of State Application Table B-3 Line Pipe Specifications," July 2023, p. 4.

[14] *Ibid.*, "Table B-6 Historic Hydrotest Summary," p. 6.

Accufacts Inc. Final                                                                                      Page 9 of 9

# EXHIBIT I



**environmental**
DEFENSE CENTER

April 11, 2025

<u>**Via U.S. Mail**</u>

Office of the State Fire Marshal,
California Department of Forestry and Fire Protection
PO Box 944246
Sacramento, CA 94244-2460
Attn: Daniel Berlant, State Fire Marshal

     **Re:**     <u>**Notice of Intent to File CEQA Petition**</u>

To Department of Forestry and Fire Protection:

     **PLEASE TAKE NOTICE**, under Public Resources Code §21167.5, that Petitioners and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (collectively, "Petitioners"), intend to file a petition and complaint under the provisions of the California Environmental Quality Act (CEQA) against Respondents and Defendants California Department of Forestry and Fire Protection (CalFIRE), by and through its component agency Office of the State Fire Marshal (OSFM), and State Fire Marshal Daniel Berlant (collectively, "Respondents"), challenging Respondents' approval of State Waivers for pipelines CA-324 and CA-325, the two segments of the Las Flores Pipeline System.

     The petition and complaint is brought upon the following grounds: Respondents (1) failed to comply with CEQA's environmental review process, (2) failed to comply with mandatory procedures outlined in state and federal pipeline safety laws, and (3) prejudicially abused their discretion in issuing the State Waivers.

     The petition and complaint prays for the following relief:

1.     That the Court immediately, and on an *ex parte* basis, issue a temporary stay of OSFM's approval of the State Waivers, pending completion of judicial review, pursuant to Code Civ. Proc., § 1094.5(g) and Rule 3.1202(c) of the California Rules of Court;

2.     That the Court issue temporary, preliminary, and permanent injunctive relief

April 11, 2025
Notice of Intent to File CEQA Petition
Page 2 of 2

    preventing restart of the Las Flores Pipeline System under the State Waivers;

3.     That the Court issue a peremptory writ of mandate directing CalFIRE, by and through OSFM, to set aside and vacate its approval of the State Waiver for CA-324;

4.     That the Court issue a peremptory writ of mandate directing CalFIRE, by and through OSFM, to set aside and vacate its approval of the State Waiver for CA-325;

5.     That the Court issue a peremptory writ of mandate directing Respondents, should they reconsider Sable's State Waiver applications, to:

    a. prepare a subsequent Environmental Impact Report that considers the potential impacts of operating the Las Flores Pipeline System without effective cathodic protection, without complying with 49 C.F.R. § 195.452(h)(4)(iii)(H), and under the conditions of the proposed State Waivers;

    b. conduct any other procedures that the Court deems necessary and/or appropriate under CEQA;

    c. provide the public with notice and an opportunity for a hearing before granting a State Waiver for either CA-324 or CA-325, as required by federal law;

    d. in granting a State Waiver for either CA-324 or CA-325, provide a statement of reasons, as required by federal law; and

    e. in granting a State Waiver for either CA-324 or CA-325, provide a discussion of factors significant to its decision, as required by state law;

6.     That the Court issue the specific additional declaratory relief prayed for in Petitioners' Third and Seventh Causes of Action;

7.     That Petitioners be awarded attorneys' fees and costs pursuant to Sections 1021.5 and 1032(b) of the Code of Civil Procedure, and any other applicable law; and

8.     For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:     STATE BAR NO:

NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)
FIRM NAME: Environmental Defense Center
STREET ADDRESS: 906 Garden Street
CITY: Santa Barbara          STATE: CA     ZIP CODE: 93101
TELEPHONE NO.: (805) 963-1622          FAX NO. :
E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org
ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al.

**FOR COURT USE ONLY**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara
  STREET ADDRESS: 1100 Anacapa Street
  MAILING ADDRESS: P.O. Box 21107
  CITY AND ZIP CODE: Santa Barbara, CA 93121
  BRANCH NAME: Anacapa Division

Plaintiff/Petitioner: Environmental Defense Center et al.

Defendant/Respondent: Cal. Dep't of Forestry and Fire Protection

CASE NUMBER:

JUDICIAL OFFICER:

DEPARTMENT:

### PROOF OF SERVICE—CIVIL

**Check method of service (only one):**

| | By Personal Service | **x** | By Mail | | By Overnight Delivery |
|---|---|---|---|---|---|
| | By Messenger Service | | By Fax | | |

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. ☐ The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* April 11, 2025          I served the following **documents** *(specify):*

   Notifce of Intent to File CEQA Petition

   ☐ The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:

   a. Name of person served: CalFIRE - Office of the State Fire Marshal

   b. ☒ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

      Business or residential address where person was served:
      PO Box 944246, Sacramento, CA 94244-2460

   c. ☐ *(Complete if service was by fax.)*

      Fax number where person was served:

   ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

Page 1 of 3

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [Rev. January 1, 2020] | **PROOF OF SERVICE—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1011, 1013, 1013a,<br>2015.5; Cal. Rules of Court, rule 2.306<br>www.courts.ca.gov |
|---|---|---|

POS-040

| CASE NAME: | CASE NUMBER: |
|---|---|
| | |

6. b. [x] **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

(1) [x] deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

(2) [ ] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):* Santa Barbara, CA

c. [ ] **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. [ ] **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. [ ] **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 11, 2025

Jeremy Frankel
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ] **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

_____
(NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

POS-040 [Rev. January 1, 2020]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

Page 2 of 3

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY:   STATE BAR NO: | FOR COURT USE ONLY |
|---|---|
| NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670) | ELECTRONICALLY FILED Superior Court of California County of Santa Barbara Darrel E. Parker, Executive Officer 4/16/2025 4:39 PM By: Sarah Sisto , Deputy |

ATTORNEY OR PARTY WITHOUT ATTORNEY:       STATE BAR NO:

NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)
FIRM NAME: Environmental Defense Center
STREET ADDRESS: 906 Garden Street
CITY: Santa Barbara          STATE: CA      ZIP CODE: 93101
TELEPHONE NO.: (805) 963-1622          FAX NO. :
E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org
ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121
BRANCH NAME: Anacapa Division

Plaintiff/Petitioner: Environmental Defense Center et al.

Defendant/Respondent: Cal. Dep't of Forestry and Fire Protection et al.

CASE NUMBER:
25CV02247

JUDICIAL OFFICER:

DEPARTMENT:

**PROOF OF SERVICE—CIVIL**

**Check method of service (only one):**

☐ By Personal Service      ☒ By Mail      ☐ By Overnight Delivery
☐ By Messenger Service      ☐ By Fax

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. ☐ The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* April 16, 2025          I served the following **documents** *(specify):*
   Notice to Attorney General of CEQA Petition (PRC 21167.7; CCP 388)

   ☐ The documents are listed in the *Attachment to Proof of Service—Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:

   a. Name of person served: Office of the Attorney General - Environment Section (Attn: CEQA Coordinator)

   b. ☒ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

   Business or residential address where person was served:
   1300 "I" Street, Sacramento, CA 95814-2919

   c. ☐ *(Complete if service was by fax.)*

   Fax number where person was served:

   ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
POS-040 [Rev. January 1, 2020]

**PROOF OF SERVICE—CIVIL**
(Proof of Service)

Code of Civil Procedure, §§ 1011, 1013, 1013a,
2015.5; Cal. Rules of Court, rule 2.306
www.courts.ca.gov

**POS-040**

| CASE NAME: | CASE NUMBER: |
|---|---|
|  | 25CV02247 |

6. b. [x] **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

(1) [x] deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

(2) [ ] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):* Santa Barbara, California

c. [ ] **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. [ ] **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. [ ] **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 16, 2025

Jeremy Frankel
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ] **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

_____
(NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA** | *FOR COURT USE ONLY* |
| STREET ADDRESS:   1100 Anacapa Street<br>CITY AND ZIP CODE:   Santa Barbara CA  93101<br>BRANCH NAME:   Anacapa | **FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**04/18/2025**<br>Darrel E. Parker, Executive Officer<br>BY ___Baksh, Narzralli___<br>Deputy Clerk |
| CAPTION:<br><br>**Environmental Defense Center et al vs California Department of Forestry and Fire Protection  et al** | |
| **ORDER & NOTICE OF CASE RE-ASSIGNMENT** | CASE NUMBER:<br><br>**25CV02247** |

The above case is hereby assigned to Honorable Thomas P Anderle for ALL purposes, including trial.

All future matters, including ex-parte matters, are to be scheduled with the new re-assigned judge

Dated:   4/18/2025

_____
Judge of the Superior Court
Von Deroian

---

### CLERK'S CERTIFICATE OF SERVICE

I certify that I am not a party to this cause, and that a true copy of this document was electronically served or mailed first class, postage prepaid in a sealed envelope addressed as shown, and that the electronic service or mailing of the foregoing and execution of this certificate occurred at *(place)* Santa Barbara, California on *(date)*: 04/18/2025.

**SEE ATTACHMENT**

Darrel E. Parker, Executive Officer          By _____/s/  Narzralli Baksh_____  Deputy Clerk

---

SC-2066N [Rev. April 19, 2001]          **ORDER & NOTICE OF CASE RE-ASSIGNMENT**

**ATTACHMENT – ALL SERVICE NAMES AND ADDRESSES**


Linda J Krop
Environmental Defense Center
906 Garden St
Santa Barbara        , CA  93101

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 1100 Anacapa Street<br>CITY AND ZIP CODE: Santa Barbara CA 93101<br>BRANCH NAME: Anacapa | **FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**04/18/2025**<br>Darrel E. Parker, Executive Officer<br>BY _Baksh, Narzralli_<br>Deputy Clerk |
| CAPTION:<br><br>**Environmental Defense Center et al vs California Department of Forestry and Fire Protection et al** | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>**25CV02247** |

You are hereby notified that a Case Management Conference hearing has been set for

**07/16/2025** at **8:30 AM** in **SB Dept 3** of the Superior Court located at the court address above.

Each party, or their counsel, appearing in the case shall attend the Case Management Conference. The persons attending shall have sufficient knowledge of the case to represent to the court that the case is or is not ready for setting and to furnish sufficient information to the court concerning the case to permit the court to determine if the case is ready to be assigned a date certain for trial.

Appearance by Zoom video conference is currently optional for Civil Case Management Conferences. Please refer to the court's website for information about remote proceedings https://www.santabarbara.courts.ca.gov/system/files/general/information-remote-appearances-website.pdf. Use the links provided to access the Remote Hearing Information flyer in English https://www.santabarbara.courts.ca.gov/system/files/general/zoom-information-civil.pdf, and in Spanish https://www.santabarbara.courts.ca.gov/system/files/general/zoom-instructions-civil-spanish.pdf. Or visit the to the court's website at https://santabarbara.courts.ca.gov/ and click on Remote Appearance by Zoom.

Darrel E. Parker, Executive Officer

Date:    4/18/2025

By _____
          Narzralli Baksh
          Deputy Clerk

---

### CLERK'S CERTIFICATE OF MAILING

I certify that I am not a party to this action and that a true copy of the foregoing was mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the mailing of the foregoing and execution of this certificate occurred at (*place*):Santa Barbara, California on (*date*) 04/18/2025

**SEE ATTACHMENT**

Darrel E. Parker, Executive Officer          By _____ , Deputy
                                                     Narzralli Baksh

---

SC-2025 [Rev. July 1, 2013]          **NOTICE OF CASE MANAGEMENT CONFERENCE**

**ATTACHMENT – ALL MAILING NAMES AND ADDRESSES**


Linda J Krop
Environmental Defense Center
906 Garden St
Santa Barbara        CA 93101

| Attorney or Party without Attorney: | For Court Use Only |
|---|---|
| LINDA KROP (SBN 118773) ENVIRONMENTAL DEFENSE CENTER<br>906 GARDEN STREET SANTA BARBARA , CA 93101<br>Telephone No:  805.963.1622 x100 | |

| | Ref. No. or File No.: | |
|---|---|---|
| Attorney For:   Petitioners/Plaintiffs | 19035 | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/18/2025 2 38 PM<br>By: Gabriel Moreno , Deputy |

Insert name of Court, and Judicial District and Branch Court:
SUPERIOR COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF SANTA BARBARA

Plaintiff:   ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al.

Defendant:   CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al.

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>25CV02247 |
|---|---|---|---|---|

1.  *At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the SUMMONS; CIVIL CASE COVER SHEET; CIVIL CASE COVER SHEET ADDENDUM; PETITION FOR WRIT OF MANDATE; PETITIONERS' NOTICE OF ELECTION TO PREPARE ADMINISTRATIVE RECORD; ADR INFORMATION PACKET

3.  *a.   Party served:*   CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California
    *b.   Person served:*   Joe Tyler, Director and Chief.

4.  *Address where the party was served:*   715 P Street, Sacramento, CA 95814

5.  *I served the party:*
    a. **by substituted service.**   On: Thu, Apr 17 2025 at: 12:18 PM by leaving the copies with or in the presence of:
       Andres De La Rosa, Office Tech.
    (1)  [X]  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
    (2)  [ ]  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
    (3)  [ ]  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
    (4)  [X]  **(Declaration of Mailing)** is attached.
    (5)  [ ]  **(Declaration of Diligence)** attached stating actions taken first to attempt personal service.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
    a.  [ ]   as an individual defendant.
    b.  [ ]   as the person sued under the fictitious name of *(specify)*:
    c.  [ ]   as occupant.
    d.  [X]   On behalf of *(specify)*:   CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION
         under the following Code of Civil Procedure section:

| | |
|---|---|
| [ ]   416.10 (corporation) | [ ]   415.95 (business organization, form unknown) |
| [ ]   416.20 (defunct corporation) | [ ]   416.60 (minor) |
| [ ]   416.30 (joint stock company/association) | [ ]   416.70 (ward or conservatee) |
| [ ]   416.40 (association or partnership) | [ ]   416.90 (authorized person) |
| [X]   416.50 (public entity) | [ ]   415.46 (occupant) |
| [ ]   other: | |



| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | PROOF OF SERVICE<br>SUMMONS | 13120829<br>*(8165630)*<br>**Page 1 of 2** |
|---|---|---|

| Plaintiff: ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al.<br><br>Defendant: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al. | Case Number:<br>25CV02247 |
|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
   a.  Name:               Michael Morris
   b.  Address:           **FIRST LEGAL**
                                 5450 Ralston Street, Ste. 111
                                 VENTURA, CA 93003
   c.  Telephone number:    (805) 654-1535
   d.  **The fee** for service was:  $352.40
   e.  I am:
      (1)  ☐  not a registered California process server.
      (2)  ☐  exempt from registration under Business and Professions Code section 22350(b).
      (3)  ☒  a registered California process server:
         (i)    ☐ owner  ☐ employee  ☒ independent contractor
         (ii)   Registration No:  2012-33, Sacramento
         (iii)  County:  Sacramento

8.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

04/17/2025
*(Date)*

Michael Morris

| | | |
|---|---|---|
| **FL** FIRST LEGAL | Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF SERVICE**<br>**SUMMONS** |

| Attorney or Party without Attorney:<br>LINDA KROP (SBN 118773)<br>ENVIRONMENTAL DEFENSE CENTER<br>906 GARDEN STREET SANTA BARBARA , CA 93101 | | **For Court Use Only** |
|---|---|---|
| Telephone No:  805.963.1622 x100 | | |
| Attorney For:  Petitioners/Plaintiffs | Ref. No. or File No.:<br>19035 | |
| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF SANTA BARBARA | | |
| Plaintiff:  ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al.<br>Defendant:  CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al. | | |

| **PROOF OF SERVICE**<br>**By Mail** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>25CV02247 |
|---|---|---|---|---|

1. *I am over the age of 18 and not a party to this action. I am employed in the county where the mailing occurred.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; CIVIL CASE COVER SHEET ADDENDUM; PETITION FOR WRIT OF MANDATE; PETITIONERS' NOTICE OF ELECTION TO PREPARE ADMINISTRATIVE RECORD; ADR INFORMATION PACKET

3. By placing a true copy of each document in the United States mail, in a sealed envelope by **First Class** mail with postage prepaid as follows:
   a. Date of Mailing: Thu, Apr 17, 2025
   b. Place of Mailing: VENTURA, CA
   c. Addressed as follows: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION,
   by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California
   715 P Street, Sacramento, CA 95814

4. *I am readily familiar with the business practice for collection and processing of correspondence as deposited with the U.S. Postal Service on Thu, Apr 17, 2025 in the ordinary course of business.*

Recoverable cost Per CCP 1033.5(a)(4)(B)

5. **Person Serving:**
   a. Janos Wohner
   **b. FIRST LEGAL**
     5450 Ralston Street, Ste. 111
     VENTURA, CA 93003
   c. (805) 654-1535

   **d. The Fee** for Service was:   $352.40
   **e.** I am: Not A Registered California Process Server

6. ***I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.***

| 04/17/2025 | |
|---|---|
| *(Date)* | *Janos Wohner* |



| Judicial Council Form<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF SERVICE**<br>**BY MAIL** | *13120829*<br>*(8165630)* |
|---|---|---|

| Attorney or Party without Attorney:<br>LINDA KROP (SBN 118773)<br>ENVIRONMENTAL DEFENSE CENTER<br>906 GARDEN STREET SANTA BARBARA , CA 93101<br>Telephone No:  805.963.1622 x100 | | *For Court Use Only* |
|---|---|---|
| Attorney For:  Petitioners/Plaintiffs | *Ref. No. or File No.:*<br>19035 | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/18/2025 238 PM<br>By: Gabriel Moreno , Deputy |

*Insert name of Court, and Judicial District and Branch Court:*
SUPERIOR COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF SANTA BARBARA

**SERVICE QUESTIONABLE**

| | | |
|---|---|---|
| *Plaintiff:* | ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al. | |
| *Defendant:* | CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al. | |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>25CV02247 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; CIVIL CASE COVER SHEET ADDENDUM; PETITION FOR WRIT OF MANDATE; PETITIONERS' NOTICE OF ELECTION TO PREPARE ADMINISTRATIVE RECORD; ADR INFORMATION PACKET

3. *a.  Party served:*   DANIEL BERLANT, in his official capacity as State Fire Marshal

4. *Address where the party was served:*   715 P Street, Sacramento, CA 95814

5. *I served the party:*
   a. **by substituted service.**    On: Thu, Apr 17 2025 at: 12:18 PM by leaving the copies with or in the presence of:
   Andres De La Rosa, Office Tech.
   (1)  [X]  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
   (2)  [ ]  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
   (3)  [ ]  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
   (4)  [X]  **(Declaration of Mailing)** is attached.
   (5)  [ ]  **(Declaration of Diligence)** attached stating actions taken first to attempt personal service.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a.  [ ]         as an individual defendant.
   b.  [ ]         as the person sued under the fictitious name of *(specify)*:
   c.  [ ]         as occupant.
   d.  [X]         On behalf of *(specify)*:    DANIEL BERLANT, in his official capacity as State Fire Marshal
   under the following Code of Civil Procedure section:

   | | |
   |---|---|
   | [ ]  416.10 (corporation) | [ ]  415.95 (business organization, form unknown) |
   | [ ]  416.20 (defunct corporation) | [ ]  416.60 (minor) |
   | [ ]  416.30 (joint stock company/association) | [ ]  416.70 (ward or conservatee) |
   | [ ]  416.40 (association or partnership) | [ ]  416.90 (authorized person) |
   | [X]  416.50 (public entity) | [ ]  415.46 (occupant) |
   | [ ]  other: | |



| | | |
|---|---|---|
| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | PROOF OF SERVICE<br>SUMMONS | 13120864<br>*(8165631)*<br>**Page 1 of 2** |

| | | Case Number: |
|---|---|---|
| *Plaintiff:* | ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al. | 25CV02247 |
| *Defendant:* | CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al. | |

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
    a.   Name:              Michael Morris
    b.   Address:          **FIRST LEGAL**
                            5450 Ralston Street, Ste. 111
                            VENTURA, CA 93003
    c.   Telephone number:    (805) 654-1535
    d.   **The fee** for service was:   $331.65
    e.   I am:
        (1)   ☐   not a registered California process server.
        (2)   ☐   exempt from registration under Business and Professions Code section 22350(b).
        (3)   ☒   a registered California process server:
            (i)    ☐ owner   ☐ employee   ☒ independent contractor
            (ii)   Registration No:   2012-33, Sacramento
            (iii)   County:   Sacramento

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

04/17/2025
*(Date)*

*Michael Morris*

| | | | |
|---|---|---|---|
| Judicial Council Form POS-010 Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF SERVICE SUMMONS** | | *13120864* *(8165631)* **Page 2 of 2** |

| Attorney or Party without Attorney:<br>LINDA KROP (SBN 118773)<br>ENVIRONMENTAL DEFENSE CENTER<br>906 GARDEN STREET<br>SANTA BARBARA , CA 93101<br>Telephone No:   805.963.1622 x100<br><br>Attorney For:   Petitioners/Plaintiffs | *Ref. No. or File No.:*<br>19035 | **For Court Use Only** |
|---|---|---|

| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF SANTA BARBARA | |
|---|---|

| Plaintiff: | ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al. |
|---|---|
| Defendant: | CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al. |

| PROOF OF SERVICE<br>By Mail | Hearing Date: | Time: | Dept/Div: | Case Number:<br>25CV02247 |
|---|---|---|---|---|

1. *I am over the age of 18 and not a party to this action. I am employed in the county where the mailing occurred.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; CIVIL CASE COVER SHEET ADDENDUM; PETITION FOR WRIT OF MANDATE; PETITIONERS' NOTICE OF ELECTION TO PREPARE ADMINISTRATIVE RECORD; ADR INFORMATION PACKET

3. By placing a true copy of each document in the United States mail, in a sealed envelope by **First Class** mail with postage prepaid as follows:
   a. Date of Mailing: Thu, Apr 17, 2025
   b. Place of Mailing: VENTURA, CA
   c. Addressed as follows: DANIEL BERLANT, in his official capacity as State Fire Marshal
   715 P Street, Sacramento, CA 95814

4. *I am readily familiar with the business practice for collection and processing of correspondence as deposited with the U.S. Postal Service on Thu, Apr 17, 2025 in the ordinary course of business.*

Recoverable cost Per CCP 1033.5(a)(4)(B)

5. **Person Serving:**
   a. Janos Wohner
   **b. FIRST LEGAL**
   5450 Ralston Street, Ste. 111
   VENTURA, CA 93003
   c. (805) 654-1535

    **d. *The Fee* for Service was:**   $331.65
    **e.** I am: Not A Registered California Process Server

6. ***I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.***

04/17/2025

*(Date)* — Janos Wohner



| Judicial Council Form<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF SERVICE**<br>**BY MAIL** | *13120864*<br>*(8165631)* |
|---|---|---|

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:          STATE BAR NO:

NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)

FIRM NAME: Environmental Defense Center

STREET ADDRESS: 906 Garden Street

CITY: Santa Barbara          STATE: CA      ZIP CODE: 93101

TELEPHONE NO.: (805) 963-1622          FAX NO. :

E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org

ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al.

**FOR COURT USE ONLY**

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darre E. Parker, Executive Officer
4/21/2025 1:37 PM
By: Terri Chavez , Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara

STREET ADDRESS: 1100 Anacapa Street

MAILING ADDRESS: P.O. Box 21107

CITY AND ZIP CODE:   Santa Barbara, CA 93121

BRANCH NAME:   Anacapa Division

Plaintiff/Petitioner: Environmental Defense Center et al.

Defendant/Respondent: Cal. Dep't of Forestry and Fire Protection

CASE NUMBER:
25CV02247

JUDICIAL OFFICER:
Honorable Donna D. Geck

DEPARTMENT:
Dept. 4

## PROOF OF SERVICE—CIVIL

**Check method of service** *(only one):*

☐ By Personal Service      ☒ By Mail      ☐ By Overnight Delivery

☐ By Messenger Service      ☐ By Fax

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. ☐ The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* April 21, 2025          I served the following **documents** *(specify):*
   Order and Notice of Case Assignment

   ☐ The documents are listed in the *Attachment to Proof of Service—Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:

   a. Name of person served: CalFIRE - Office of the State Fire Marshal

   b. ☒ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

   Business or residential address where person was served:
   P.O. Box 944246, Sacramento, CA 94244-2460

   c. ☐ *(Complete if service was by fax.)*

   Fax number where person was served:

   ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

**Page 1 of 3**

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [Rev. January 1, 2020] | **PROOF OF SERVICE—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1011, 1013, 1013a,<br>2015.5;  Cal. Rules of Court, rule 2.306<br>*www.courts.ca.gov* |

POS-040

| CASE NAME:<br>Environmental Defense Center et al. v. Cal. Dep't of Forestry and Fire Protection et al. | CASE NUMBER:<br>25CV02247 |
|---|---|

6. b.   [ x ]   **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

    (1)   [ x ]   deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

    (2)   [   ]   placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

    I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):* Santa Barbara, CA

  c.   [   ]   **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

  d.   [   ]   **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

  e.   [   ]   **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 21, 2025

Jeremy Frankel

| (TYPE OR PRINT NAME OF DECLARANT) | (SIGNATURE OF DECLARANT) |
|---|---|

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[   ]   **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

  At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

  I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

| (NAME OF DECLARANT) | (SIGNATURE OF DECLARANT) |
|---|---|

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:          STATE BAR NO:

NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)

FIRM NAME: Environmental Defense Center

STREET ADDRESS: 906 Garden Street

CITY: Santa Barbara          STATE: CA     ZIP CODE: 93101

TELEPHONE NO.: (805) 963-1622          FAX NO. :

E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org

ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara

STREET ADDRESS: 1100 Anacapa Street

MAILING ADDRESS: P.O. Box 21107

CITY AND ZIP CODE: Santa Barbara, CA 93121

BRANCH NAME: Anacapa Division

Plaintiff/Petitioner: Environmental Defense Center et al.

Defendant/Respondent: Cal. Dep't of Forestry and Fire Protection

**FOR COURT USE ONLY**

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/21/2025 1:37 PM
By: Terri Chavez , Deputy

CASE NUMBER:
25CV02247

JUDICIAL OFFICER:
Honorable Donna D. Geck

DEPARTMENT:
Dept. 4

**PROOF OF SERVICE—CIVIL**

**Check method of service (only one):**

By Personal Service     [x] By Mail     By Overnight Delivery

By Messenger Service     By Fax

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. [ ] The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* April 21, 2025          I served the following **documents** *(specify):*
   Order and Notice of Case Assignment

   [ ] The documents are listed in the *Attachment to Proof of Service—Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:

   a. Name of person served: Daniel Berlant, in his official capacity as State Fire Marshal

   b. [x] *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

      Business or residential address where person was served:
      P.O. Box 944246, Sacramento, CA 94244-2460

   c. [ ] *(Complete if service was by fax.)*

      Fax number where person was served:

   [ ] The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. [ ] **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
POS-040 [Rev. January 1, 2020]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

Code of Civil Procedure, §§ 1011, 1013, 1013a,
2015.5; Cal. Rules of Court, rule 2.306
*www.courts.ca.gov*

**POS-040**

| CASE NAME:<br>Environmental Defense Center et al. v. Cal. Dep't of Forestry and Fire Protection et al. | CASE NUMBER:<br>25CV02247 |
|---|---|

6. b. [x] **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

(1) [x] deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

(2) [ ] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):* Santa Barbara, CA

c. [ ] **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. [ ] **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. [ ] **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 21, 2025

Jeremy Frankel
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ] **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

_____
(NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

POS-040 [Rev. January 1, 2020]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

**Page 2 of 3**

| Attorney or Party without Attorney:<br>LINDA KROP (SBN 118773)<br>ENVIRONMENTAL DEFENSE CENTER<br>906 GARDEN STREET<br>SANTA BARBARA , CA 93101<br>  Telephone No:   805.963.1622 x100<br><br>  Attorney For:   Petitioners/Plaintiffs | | *For Court Use Only* |
|---|---|---|
| | *Ref. No. or File No.:*<br>ENVIRONMENTAL DEFENSE | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/22/2025 10:36 AM<br>By: Gabriel Moreno , Deputy |

| *Insert name of Court, and Judicial District and Branch Court:*<br>SUPERIOR COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF SANTA BARBARA |
|---|

| *Plaintiff:*   ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al.<br><br>*Defendant:*   CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al. |
|---|

| PROOF OF SERVICE<br>SUMMONS | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>25CV02247 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; CIVIL CASE COVER SHEET ADDENDUM; PETITION FOR WRIT OF MANDATE; PETITIONERS' NOTICE OF ELECTION TO PREPARE ADMINISTRATIVE RECORD; ADR INFORMATION PACKET; Notice of Case Assignment

3.   *a.*  *Party served:*   SABLE OFFSHORE CORP.
       *b.*  *Person served:*  JESSIE GASTELUM, INTAKE SPECIALIST, CT CORPORATION SYSTEM, REGISTERED AGENT FOR SERVICE OF PROCESS.

4. *Address where the party was served:*   330 North Brand Boulevard Suite 700, Glendale, CA 91203

5. *I served the party:*
   a. **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Mon, Apr 21 2025 (2) at *(time)*: 12:40 PM
   (1)  **[X]**  **(business)**
   (2)  **[  ]**  **(home)**
   (3)  **[  ]**  **(other)** :

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a.  [  ]  as an individual defendant.
   b.  [  ]  as the person sued under the fictitious name of *(specify)*:
   c.  [  ]  as occupant.
   d.  **[X]**  On behalf of *(specify)*:  SABLE OFFSHORE CORP.
         under the following Code of Civil Procedure section:
   
   | | |
   |---|---|
   | **[X]**  416.10 (corporation) | [  ]  415.95 (business organization, form unknown) |
   | [  ]  416.20 (defunct corporation) | [  ]  416.60 (minor) |
   | [  ]  416.30 (joint stock company/association) | [  ]  416.70 (ward or conservatee) |
   | [  ]  416.40 (association or partnership) | [  ]  416.90 (authorized person) |
   | [  ]  416.50 (public entity) | [  ]  415.46 (occupant) |
   | [  ]  other: | |



| Plaintiff: ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al.<br><br>Defendant: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al. | Case Number:<br>25CV02247 |
|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7.  **Person who served papers**
    a.   Name:           Douglas Forrest
    b.   Address:        **FIRST LEGAL**
                           5450 Ralston Street, Ste. 111
                           VENTURA, CA 93003
    c.   Telephone number:    (805) 654-1535
    d.   **The fee** for service was:    378.90
    e.   I am:
        (1)  ☐   not a registered California process server.
        (2)  ☐   exempt from registration under Business and Professions Code section 22350(b).
        (3)  ☒   a registered California process server:
            (i)     ☐ owner   ☐ employee   ☒ independent contractor
            (ii)   Registration No:   5141, Los Angeles
            (iii)  County:   Los Angeles

8.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

04/21/2025
*(Date)*                                      *Douglas Forrest*

FL FIRST LEGAL    Judicial Council Form POS-010    **PROOF OF SERVICE SUMMONS**    *13136223*
Rule 2.150.(a)&(b) Rev January 1, 2007    *(8165724)*
**Page 2 of 2**

| | | | | |
|---|---|---|---|---|
| *Attorney or Party without Attorney:*<br>LINDA KROP (SBN 118773)<br>ENVIRONMENTAL DEFENSE CENTER<br>906 GARDEN STREET<br>SANTA BARBARA , CA 93101<br>　*Telephone No:*　805.963.1622 x100<br><br>　*Attorney For:*　Petitioners/Plaintiffs | | | *Ref. No. or File No.:*<br>ENVIRONMANTAL DEFENSE | ***For Court Use Only***<br><br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/22/2025 10:36 AM<br>By: Gabriel Moreno , Deputy |

*Insert name of Court, and Judicial District and Branch Court:*
SUPERIOR COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF SANTA BARBARA

|  |  |
|---|---|
| *Plaintiff:*　ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al.<br>*Defendant:*　CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al. | |

| PROOF OF SERVICE<br>SUMMONS | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>25CV02247 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; CIVIL CASE COVER SHEET ADDENDUM; PETITION FOR WRIT OF MANDATE; PETITIONERS' NOTICE OF ELECTION TO PREPARE ADMINISTRATIVE RECORD; ADR INFORMATION PACKET; Notice of Case Assignment

3. *a.*　*Party served:*　PACIFIC PIPELINE COMPANY
   *b.*　*Person served:*　JESSIE GASTELUM, INTAKE SPECIALIST, CT CORPORATION SYSTEM, REGISTERED AGENT FOR SERVICE OF PROCESS.

4. *Address where the party was served:*　330 North Brand Boulevard Suite 700, Glendale, CA 91203

5. *I served the party:*
   a. **by personal service.**　I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Mon, Apr 21 2025 (2) at *(time)*: 12:40 PM
   (1)　[ X ]　**(business)**
   (2)　[　]　**(home)**
   (3)　[　]　**(other)** :

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a.　[　]　as an individual defendant.
   b.　[　]　as the person sued under the fictitious name of *(specify)*:
   c.　[　]　as occupant.
   d.　[ X ]　On behalf of *(specify)*:　PACIFIC PIPELINE COMPANY
   　　　under the following Code of Civil Procedure section:
   　　　[　]　416.10 (corporation)　　　　　　　　　　　[ X ]　415.95 (business organization, form unknown)
   　　　[　]　416.20 (defunct corporation)　　　　　　　[　]　416.60 (minor)
   　　　[　]　416.30 (joint stock company/association)　　[　]　416.70 (ward or conservatee)
   　　　[　]　416.40 (association or partnership)　　　　　[　]　416.90 (authorized person)
   　　　[　]　416.50 (public entity)　　　　　　　　　　　[　]　415.46 (occupant)
   　　　[　]　other:



| | | |
|---|---|---|
| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | PROOF OF<br>SERVICE<br>SUMMONS | *13136235*<br>*(8165726)*<br>**Page 1 of 2** |

| | | |
|---|---|---|
| *Plaintiff:* | ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation, et al. | **Case Number:**<br>25CV02247 |
| *Defendant:* | CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California, et al. | |

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**

   a. Name:                Douglas Forrest

   b. Address:             **FIRST LEGAL**
      5450 Ralston Street, Ste. 111
      VENTURA, CA 93003

   c. Telephone number:    (805) 654-1535

   d. **The fee** for service was:    331.65

   e. I am:

   (1) ☐ not a registered California process server.

   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

   (3) ☒ a registered California process server:

   (i)  ☐ owner   ☐ employee   ☒ independent contractor

   (ii) Registration No:   5141, Los Angeles

   (iii) County:   Los Angeles

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

| | |
|---|---|
| 04/21/2025 | |
| *(Date)* | *Douglas Forrest* |

| | | |
|---|---|---|
| **FL**<br>FIRSTLEGAL | Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF**<br>**SERVICE**<br>**SUMMONS** | *13136235*<br>*(8165726)*<br>**Page 2 of 2** |

**POS-040**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:    STATE BAR NO:<br>NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)<br>FIRM NAME: Environmental Defense Center<br>STREET ADDRESS: 906 Garden Street<br>CITY: Santa Barbara          STATE: CA     ZIP CODE: 93101<br>TELEPHONE NO.: (805) 963-1622          FAX NO. :<br>E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org<br>ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al. | *FOR COURT USE ONLY*<br><br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/22/2025 1:26 PM<br>By: Laura Kenny , Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara
STREET ADDRESS:    1100 Anacapa Street
MAILING ADDRESS:   P.O. Box 21107
CITY AND ZIP CODE:    Santa Barbara, CA 93121
BRANCH NAME:    Anacapa Division

| | |
|---|---|
| Plaintiff/Petitioner: Environmental Defense Center et al.<br><br>Defendant/Respondent: Cal. Dep't of Forestry and Fire Protection | CASE NUMBER:<br>25CV02247 |

| | |
|---|---|
| **PROOF OF SERVICE—CIVIL** | JUDICIAL OFFICER:<br>Honorable Thomas P. Anderle |
| **Check method of service *(only one)*:**<br>☐ By Personal Service    ☒ By Mail    ☐ By Overnight Delivery<br>☐ By Messenger Service    ☐ By Fax | DEPARTMENT:<br>Dept. 3 |

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. ☐ The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* April 22, 2025          I served the following **documents** *(specify):*
   Order and Notice of Case Reassignment
   Notice of Case Management Conference

   ☐ The documents are listed in the *Attachment to Proof of Service—Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:
   a. Name of person served: CalFIRE - Office of the State Fire Marshal

   b. ☒ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

   Business or residential address where person was served:
   P.O. Box 944246, Sacramento, CA 94244-2460

   c. ☐ *(Complete if service was by fax.)*

   Fax number where person was served:

   ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

**Page 1 of 3**

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [Rev. January 1, 2020] | **PROOF OF SERVICE—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1011, 1013, 1013a,<br>2015.5;  Cal. Rules of Court, rule 2.306<br>*www.courts.ca.gov* |

**POS-040**

| CASE NAME:<br>Environmental Defense Center et al. v. Cal. Dep't of Forestry and Fire Protection et al. | CASE NUMBER:<br>25CV02247 |
|---|---|

6. b. ☒ **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

(1) ☒ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

(2) ☐ placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):*

c. ☐ **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. ☐ **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. ☐ **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 22, 2025

Jeremy Frankel
(TYPE OR PRINT NAME OF DECLARANT)

▶ (SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

**DECLARATION OF MESSENGER**

☐ **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

(NAME OF DECLARANT)

▶ (SIGNATURE OF DECLARANT)

POS-040 [Rev. January 1, 2020]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

**Page 2 of 3**

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY:          STATE BAR NO: | FOR COURT USE ONLY |
|---|---|

NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)
FIRM NAME: Environmental Defense Center
STREET ADDRESS: 906 Garden Street
CITY: Santa Barbara            STATE: CA      ZIP CODE: 93101
TELEPHONE NO.: (805) 963-1622          FAX NO. :
E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org
ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara
  STREET ADDRESS: 1100 Anacapa Street
  MAILING ADDRESS: P.O. Box 21107
  CITY AND ZIP CODE:   Santa Barbara, CA 93121
  BRANCH NAME: Anacapa Division

**ELECTRONICALLY FILED**
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/22/2025 1:26 PM
By: Laura Kenny , Deputy

Plaintiff/Petitioner: Environmental Defense Center et al.

Defendant/Respondent: Cal. Dep't of Forestry and Fire Protection

CASE NUMBER:
25CV02247

JUDICIAL OFFICER:
Honorable Thomas P. Anderle

DEPARTMENT:
Dept. 3

### PROOF OF SERVICE—CIVIL
**Check method of service (only one):**

☐ By Personal Service    ☒ By Mail    ☐ By Overnight Delivery
☐ By Messenger Service    ☐ By Fax

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. ☐ The fax number from which I served the documents is *(complete if service was by fax)*:

4. On *(date):* April 22, 2025          I served the following **documents** *(specify):*
   Order and Notice of Case Reassignment
   Notice of Case Management Conference

   ☐ The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:
   a. Name of person served: Daniel Berlant, in his official capacity as State Fire Marshal

   b. ☒ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

   Business or residential address where person was served:
   P.O. Box 944246, Sacramento, CA 94244-2460

   c. ☐ *(Complete if service was by fax.)*

   Fax number where person was served:

   ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

**Page 1 of 3**

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [Rev. January 1, 2020] | **PROOF OF SERVICE—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1011, 1013, 1013a,<br>2015.5;  Cal. Rules of Court, rule 2.306<br>*www.courts.ca.gov* |

**POS-040**

| CASE NAME: | CASE NUMBER: |
|---|---|
| Environmental Defense Center et al. v. Cal. Dep't of Forestry and Fire Protection et al. | 25CV02247 |

6.  b.  [ x ]  **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

 (1)  [ x ]  deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

 (2)  [   ]  placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

 I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):*

 c.  [   ]  **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

 d.  [   ]  **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

 e.  [   ]  **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 22, 2025

Jeremy Frankel
(TYPE OR PRINT NAME OF DECLARANT)

► _____
(SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[   ]  **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

 At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

 I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

_____
(NAME OF DECLARANT)

► _____
(SIGNATURE OF DECLARANT)

| POS-040 [Rev. January 1, 2020] | **PROOF OF SERVICE—CIVIL** <br> **(Proof of Service)** | **Page 2 of 3** |
|---|---|---|

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY:        STATE BAR NO: | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:        STATE BAR NO:
NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)
FIRM NAME: Environmental Defense Center
STREET ADDRESS: 906 Garden Street
CITY: Santa Barbara          STATE: CA      ZIP CODE: 93101
TELEPHONE NO.: (805) 963-1622      FAX NO. :
E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org
ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al.

**FOR COURT USE ONLY**

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/22/2025 1:26 PM
By: Laura Kenny , Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Barbara
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121
BRANCH NAME: Anacapa Division

Plaintiff/Petitioner: Environmental Defense Center et al.

Defendant/Respondent: Cal. Dep't of Forestry and Fire Protection

CASE NUMBER:
25CV02247

JUDICIAL OFFICER:
Honorable Thomas P. Anderle

DEPARTMENT:
Dept. 3

### PROOF OF SERVICE—CIVIL
**Check method of service** *(only one):*

☐ By Personal Service   ☒ By Mail   ☐ By Overnight Delivery
☐ By Messenger Service   ☐ By Fax

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. ☐ The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* April 22, 2025        I served the following **documents** *(specify):*
   Order and Notice of Case Reassignment
   Notice of Case Management Conference

   ☐ The documents are listed in the *Attachment to Proof of Service—Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:

   a. Name of person served: Sable Offshore Corp.; Jessie Gastelum, Registered Agent for Service of Process

   b. ☒ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

      Business or residential address where person was served:
      330 North Brand Boulevard Suite 700, Glendale, CA 91203

   c. ☐ *(Complete if service was by fax.)*

      Fax number where person was served:

   ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

Page 1 of 3

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [Rev. January 1, 2020] | **PROOF OF SERVICE—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1011, 1013, 1013a,<br>2015.5; Cal. Rules of Court, rule 2.306<br>*www.courts.ca.gov* |

POS-040

| CASE NAME:<br>Environmental Defense Center et al. v. Cal. Dep't of Forestry and Fire Protection et al. | CASE NUMBER:<br>25CV02247 |
|---|---|

6. b. [x] **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

   (1) [x] deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

   (2) [ ] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

   I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state)*:

   c. [ ] **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

   d. [ ] **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

   e. [ ] **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 22, 2025

Jeremy Frankel
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ] **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date)*:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

_____
(NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

POS-040 [Rev. January 1, 2020]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

Page 2 of 3

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY:        STATE BAR NO: | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:        STATE BAR NO:

NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)

FIRM NAME: Environmental Defense Center

STREET ADDRESS: 906 Garden Street

CITY: Santa Barbara        STATE: CA        ZIP CODE: 93101

TELEPHONE NO.: (805) 963-1622        FAX NO. :

E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org

ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Barbara

STREET ADDRESS: 1100 Anacapa Street

MAILING ADDRESS: P.O. Box 21107

CITY AND ZIP CODE: Santa Barbara, CA 93121

BRANCH NAME: Anacapa Division

Plaintiff/Petitioner: Environmental Defense Center et al.

Defendant/Respondent: Cal. Dep't of Forestry and Fire Protection

**FOR COURT USE ONLY**

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/22/2025 1:26 PM
By: Laura Kenny , Deputy

CASE NUMBER:
25CV02247

JUDICIAL OFFICER:
Honorable Thomas P. Anderle

DEPARTMENT:
Dept. 3

**PROOF OF SERVICE—CIVIL**

**Check method of service (only one):**

☐ By Personal Service    ☒ By Mail    ☐ By Overnight Delivery

☐ By Messenger Service    ☐ By Fax

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. ☐ The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* April 22, 2025        I served the following **documents** *(specify):*
   Order and Notice of Case Reassignment
   Notice of Case Management Conference

   ☐ The documents are listed in the *Attachment to Proof of Service—Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:

   a. Name of person served: Pacific Pipeline Company; Jessie Gastelum, Registered Agent for Service of Process

   b. ☒ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

   Business or residential address where person was served:
   330 North Brand Boulevard Suite 700, Glendale, CA 91203

   c. ☐ *(Complete if service was by fax.)*

   Fax number where person was served:

   ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

**Page 1 of 3**

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [Rev. January 1, 2020] | **PROOF OF SERVICE—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1011, 1013, 1013a,<br>2015.5; Cal. Rules of Court, rule 2.306<br>*www.courts.ca.gov* |
|---|---|---|

**POS-040**

| CASE NAME:<br>Environmental Defense Center et al. v. Cal. Dep't of Forestry and Fire Protection et al. | CASE NUMBER:<br>25CV02247 |
|---|---|

6. b. [x] **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

    (1) [x] deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

    (2) [ ] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

    I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):*

c. [ ] **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. [ ] **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. [ ] **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 22, 2025

Jeremy Frankel

_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ] **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

_____
(NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

**CM-015**

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Jeffrey D. Dintzer (SBN 139056); Matthew Wickersham (SBN 241733)<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071-1410<br>TELEPHONE NO.: 213-576-1000        FAX NO. *(Optional):* 213-576-1100<br>E-MAIL ADDRESS *(Optional):* jeffrey.dintzer@alston.com; matt.wickersham@alston.com<br>ATTORNEY FOR *(Name):* Sable Offshore Corp. and Pacific Pipeline Company | *FOR COURT USE ONLY*<br><br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/23/2025 5:33 PM<br>By: Terri Chavez , Deputy |

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**<br>STREET ADDRESS: 1100 Anacapa Street<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Santa Barbara, CA 93101<br>BRANCH NAME: | |
| PLAINTIFF/PETITIONER: ENVIRONMENTAL DEFENSE CENTER et al. | CASE NUMBER:<br>25CV02247 |
| DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al. | JUDICIAL OFFICER:<br>Thomas P Anderle |
| **NOTICE OF RELATED CASE** | DEPT.:<br>3 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1.  a.  Title: Sable Offshore Corp. et al. v . California Coastal Commission

    b.  Case number: 25CV00974

    c.  Court: ☒ same as above

        ☐ other state or federal court *(name and address):*

    d.  Department: 3

    e.  Case type: ☐ limited civil ☒ unlimited civil ☐ probate ☐ family law ☒ other *(specify):* Writ of Mandate

    f.  Filing date: February 18, 2025

    g.  Has this case been designated or determined as "complex?" ☐ Yes ☒ No

    h.  Relationship of this case to the case referenced above *(check all that apply):*

        ☒ involves the same parties and is based on the same or similar claims.

        ☒ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

        ☐ Additional explanation is attached in attachment 1h

    i.  Status of case:

        ☒ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

2.  a.  Title: Center for Biological Diversity et al .v. California Department of Forestry and Fire Protection et al.

    b.  Case number: 25CV02244

    c.  Court: ☒ same as above

        ☐ other state or federal court *(name and address):*

    d.  Department: 4

**Page 1 of 3**

CM-015

| | |
|---|---|
| PLAINTIFF/PETITIONER:  ENVIRONMENTAL DEFENSE CENETER et al.<br><br>DEFENDANT/RESPONDENT:  CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al. | CASE NUMBER:<br>25CV02247 |

2.  *(continued)*

    e.  Case type: ☐ limited civil  ☒ unlimited civil  ☐ probate  ☐ family law  ☒ other *(specify):* Writ of

    f.  Filing date: April 15, 2025

    g.  Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

    h.  Relationship of this case to the case referenced above *(check all that apply):*

        ☒  involves the same parties and is based on the same or similar claims.

        ☒  arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐  involves claims against, title to, possession of, or damages to the same property.

        ☐  is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐  Additional explanation is attached in attachment 2h

    i.  Status of case:

        ☒  pending

        ☐  dismissed  ☐ with  ☐ without prejudice

        ☐  disposed of by judgment

3.  a.  Title:

    b.  Case number:

    c.  Court: ☐ same as above

        ☐ other state or federal court *(name and address):*

    d.  Department:

    e.  Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

    f.  Filing date:

    g.  Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

    h.  Relationship of this case to the case referenced above *(check all that apply):*

        ☐  involves the same parties and is based on the same or similar claims.

        ☐  arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐  involves claims against, title to, possession of, or damages to the same property.

        ☐  is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐  Additional explanation is attached in attachment 3h

    i.  Status of case:

        ☐  pending

        ☐  dismissed  ☐ with  ☐ without prejudice

        ☐  disposed of by judgment

4.  ☐  Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: April 23, 2025

Jeffrey D. Dintzer
_____
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ /s/ Jeffrey D. Dintzer
_____
(SIGNATURE OF PARTY OR ATTORNEY)

| | | |
|---|---|---|
| CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | **Page 2 of 3** |

CM-015

| PLAINTIFF/PETITIONER:   ENVIRONMENTAL DEFENSE CENTER et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al. | 25CV02247 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed In the county where the mailing took place, and my residence or business address is *(specify):* Alston & Bird, LLP, 350 S. Grand Ave., 51st Floor, Los Angeles, CA  90071

2. | served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. ☐   deposited the sealed envelope with the United States Postal Service.

   b. ☒   placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:
   a. on *(date):* April 23, 2025
   b. from *(city and state):* Los Angeles, CA

4. The envelope was addressed and mailed as follows:

   a. Name of person served: Julie Teel Simmonds

      Street address: 2100 Franklin St., Suite 374

      City: Oakland

      State and zip code: California 94612

   b. Name of person served: Wyatt Sloan-Tribe

      Street address: 300 Spring Street, Suite 1702
      City: Los Angeles
      State and zip code: California 90013

   c. Name of person served: Linda Krop

      Street address: 906 Garden Street

      City: Santa Barbara

      State and zip code: California 93101

   d. Name of person served:

      Street address:
      City:
      State and zip code:

☐   Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 23, 2025

Kim Niz
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ /s/  Kim Niz
_____
(SIGNATURE OF DECLARANT)

CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | **Page 3 of 3**

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Linda Krop (Bar No. 118773); Jeremy Frankel (Bar No. 344500);<br>Tara C. Rengifo (Bar No. 307670); 906 Garden Street, Santa Barbara, CA 93101<br><br>TELEPHONE NO.: (805) 963-1622          FAX NO. *(Optional):*<br>EMAIL ADDRESS *(Optional):* lkrop@environmentaldefensecenter.org<br>ATTORNEY FOR *(Name):* Petitioners/Plaintiffs Environmental Defense Ctr. et al. | **FOR COURT USE ONLY**<br><br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>4/23/2025 1:57 PM<br>By: Terri Chavez , Deputy |
|---|---|

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121
BRANCH NAME: Anacapa

| | |
|---|---|
| PLAINTIFF/PETITIONER: Environmental Defense Center et al. | CASE NUMBER:<br>25CV02247 |
| DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al. | JUDICIAL OFFICER:<br>Hon. Thomas P. Anderle |
| **NOTICE OF RELATED CASE** | DEPT:.<br>3 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.

   b. Case number: 25CV02244

   c. Court:  [x] same as above

      [ ] other state or federal court *(name and address):*

   d. Department: Dept. 4

   e. Case type:  [ ] limited civil   [x] unlimited civil   [ ] probate   [ ] family law   [ ] other *(specify):*

   f. Filing date: April 15, 2025

   g. Has this case been designated or determined as "complex?"  [ ] Yes  [x] No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      [x] involves the same parties and is based on the same or similar claims.

      [x] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      [ ] involves claims against, title to, possession of, or damages to the same property.

      [ ] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         [ ] Additional explanation is attached in attachment 1h

   i. Status of case:

      [x] pending

      [ ] dismissed  [ ] with  [ ] without prejudice

      [ ] disposed of by judgment

2. a. Title:

   b. Case number:

   c. Court:  [ ] same as above

      [ ] other state or federal court *(name and address):*

   d. Department:

Page 1 of 3

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>*www.courts.ca.gov* |

CM-015

| PLAINTIFF/PETITIONER: Environmental Defense Center et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al. | 25CV02247 |

2. *(continued)*

    e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

    f. Filing date:

    g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

    h. Relationship of this case to the case referenced above *(check all that apply):*

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐ Additional explanation is attached in attachment 2h

    i. Status of case:

        ☐ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

3. a. Title:

    b. Case number:

    c. Court: ☐ same as above

        ☐ other state or federal court *(name and address):*

    d. Department:

    e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

    f. Filing date:

    g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

    h. Relationship of this case to the case referenced above *(check all that apply):*

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐ Additional explanation is attached in attachment 3h

    i. Status of case:

        ☐ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: April 23, 2025

Jeremy Frankel
_____
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

► _____
(SIGNATURE OF PARTY OR ATTORNEY)

CM-015 [Rev. July 1, 2007]

**NOTICE OF RELATED CASE**

Page 2 of 3

CM-015

| PLAINTIFF/PETITIONER: Environmental Defense Center et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al. | 25CV02247 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL

### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*
906 Garden Street, Santa Barbara, CA 93101

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. [ x ]  deposited the sealed envelope with the United States Postal Service.

   b. [  ]  placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:

   a. on *(date):* April 23, 2025

   b. from *(city and state):*  Santa Barbara, CA

4. The envelope was addressed and mailed as follows:

   a. Name of person served:
   CalFIRE - Office of the State Fire Marshal
   Street address: P.O. Box 944246
   City: Sacramento
   State and zip code: California 94244-2460

   b. Name of person served:
   Sable Offshore Corp.; Jessie Gastelum, Registered Agent
   Street address: 330 North Brand Boulevard, Suite 700
   City: Glendale
   State and zip code: California 91203

   c. Name of person served:
   State Fire Marshal Daniel Berlant
   Street address: P.O. Box 944246
   City: Sacramento
   State and zip code: California 94244-2460

   d. Name of person served:
   Pacific Pipeline Company; Jessie Gastelum, Agent
   Street address: 330 North Brand Boulevard, Suite 700
   City: Glendale
   State and zip code: California 91203

   [  ]  Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 23, 2025

Jeremy Frankel

(TYPE OR PRINT NAME OF DECLARANT) ▶ (SIGNATURE OF DECLARANT)

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# FOR THE COUNTY OF SANTA BARBARA

| | | | |
|---|---|---|---|
| **Date & Entered:** | 5/5/2025 | **Time:** | n/a |
| **Judicial Officer:** | THOMAS P. ANDERLE | | |
| **Deputy Clerk:** | Naylea Calderon | **Dept:** | 3 |
| **Deputy Sheriff:** | // | | |
| **Court Reporter:** | // | **Case #:** | 25CV02247 |

**Caption:** Environmental Defense Center et al vs California Department of Forestry and Fire Protection et al

**NATURE OF PROCEEDINGS**: **NOTICE OF RELATED CASES DENIED**

On 04/23/2025 Plaintiff Environmental Defense Center filed a Notice of Related Case in case #25CV02247, relating the following cases:

25CV02244 - Center for Biological Diversity et al vs California Department of Forestry and Fire Protection et al
25CV00974 - Sable Offshore Corp et al vs California Coastal Commission

The Court is not going to relate these cases at this time.

**DARREL E. PARKER, EXECUTIVE OFFICER**

**CLERK OF THE SUPERIOR COURT**

By, _____Deputy
              Naylea Calderon

## CLERK'S CERTIFICATE OF MAILING

I certify that I am not a party to the action and that a true copy of the foregoing was mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the mailing of the foregoing and execution of this certificate occurred in Santa Barbara, California on: 5/5/2025

**DARREL E. PARKER, EXECUTIVE OFFICER**

**CLERK OF THE SUPERIOR COURT**

By, _____ Deputy
              Naylea Calderon

**SEE ATTACHMENT**

**Minute Order**

**ATTACHMENT – ALL MAILING NAMES AND ADDRESSES**

Linda J Krop
Environmental Defense Center
906 Garden St
Santa Barbara, CA 93101

Wyatt E Sloan-Tribe
Deputy Attorney General
300 South Spring Street Suite 1702
Los Angeles,CA 90013

Julie Teel Simmonds
Center for Biological Diversity
2100 Franklin Street Suite 375
Oakland, CA 94612

Jeffrey D Dintzer
Alston & Bird LLP
350 South Grand Avenue 51st Floor
Los Angeles,CA 90071

---

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(NAME AND ADDRESS)*:          TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|
| Linda Krop (Bar No. 118773); Jeremy Frankel (Bar No. 344500); Tara C. Rengifo (Bar No. 307670); 906 Garden Street, Santa Barbara, CA 93101 <br><br> lkrop@environnmentaldefensecenter.org <br> EMAIL ADDRESS (Optional) Petitioners/Plaintiffs Environmental Defense Ctr. et al. <br> ATTORNEY FOR *(NAME):* | ELECTRONICALLY FILED <br> Superior Court of California <br> County of Santa Barbara <br> Darrel E. Parker, Executive Officer <br> 5/6/2025 2:19 PM <br> By: Terri Chavez , Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**

| ☒ Santa Barbara–Anacapa | ☐ Santa Maria-Cook | ☐ Lompoc Division |
|---|---|---|
| 1100 Anacapa Street | 312-C East Cook Street | 115 Civic Center Plaza |
| Santa Barbara, CA  93101 | Santa Maria, CA  93454 | Lompoc, CA  93436 |

PLAINTIFF:   Environmental Defense Center et al.

DEFENDANT:   Cal. Dep't of Forestry and Fire Protection et al.

| **DECLARATION OF PREJUDICE CCP §170.6** <br> **(PEREMPTORY CHALLENGE)** | CASE NUMBER: <br><br> 25CV02247 |
|---|---|

| Name of Judicial Officer: (PRINT) <br><br> Hon. Thomas P. Anderle | Dept. Number: <br><br> 3 |
|---|---|
| ☒ Judge          ☐ Commissioner          ☐ Referee | |

I am a party (or attorney for a party) to this action or special proceeding. The judicial officer named above, before whom the trial of, or a hearing in, this case is pending, or to whom it has been assigned, is prejudiced against the party (or his or her attorney) or the interest of the party (or his or her attorney), so that declarant cannot, or believes that he or she cannot, have a fair and impartial trial or hearing before the judicial officer.

---

## DECLARATION

**I declare under penalty of perjury, under the laws of the State of California, that the information entered on this form is true and correct.**

Filed on behalf of:  Environmental Defense Center          ☒ Plaintiff/Petitioner          ☐ Cross Complainant
                              *(Name of Party)*                              ☐ Defendant/Respondent        ☐ Cross Defendant
                                                                                        ☐ Other: _____

Dated:  May 6, 2025          _____
                                                         *(Signature of Declarant)*

                                              Linda Krop
                                              *(Printed Name)*

| SC-1002 [Rev. July 2020] | **DECLARATION OF PREJUDICE CCP 170.6** <br> **(PEREMPTORY CHALLENGE)** | CCP §170.6 |
|---|---|---|

POS-030

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Linda Krop (Bar No. 118773); Jeremy Frankel (Bar No. 344500); Tara C. Rengio (Bar No. 307670)<br><br>906 Garden Street, Santa Barbara, CA 93101<br>TELEPHONE NO.: (805) 963-1622    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* lkrop@environmentaldefensecenter.org<br>ATTORNEY FOR *(Name):* Petitioners/Plaintiffs Environmental Defense Center et al. | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>5/6/2025 4:31 PM<br>By: Terri Chavez , Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121
BRANCH NAME: Anacapa

PETITIONER/PLAINTIFF: Environmental Defense Center et al.
RESPONDENT/DEFENDANT: California Department of Forestry and Fire Protection et al.

| PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL | CASE NUMBER:<br>25CV02247 |
|---|---|

***(Do not use this Proof of Service to show service of a Summons and Complaint.)***

1. I am over 18 years of age and **not a party to this action.** I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:
   906 Garden Street, Santa Barbara, CA 93101

3. On *(date):* 5/6/2025     I mailed from *(city and state):* Santa Barbara, CA
   the following **documents** *(specify):*
   Declaration of Prejudice CCP 170.6 (Peremptory Challenge)

   ☐ The documents are listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Documents Served)* (form POS-030(D)).

4. I served the documents by enclosing them in an envelope and *(check one):*
   a. ☒ **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.
   b. ☐ **placing** the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

5. The envelope was addressed and mailed as follows:
   a. **Name** of person served:
   b. **Address** of person served:

   ☒ The name and address of each person to whom I mailed the documents is listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Persons Served)* (POS-030(P)).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 5/6/2025

Jeremy Frankel
_____
(TYPE OR PRINT NAME OF PERSON COMPLETING THIS FORM)     ▶     (SIGNATURE OF PERSON COMPLETING THIS FORM)

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-030 [New January 1, 2005] | **PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1013, 1013a<br>www.courts.ca.gov |

POS-030(P)

| SHORT TITLE: Environmental Defense Center et al. v. CalFIRE et al. | CASE NUMBER: 25CV02247 |
|---|---|

## ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)
*(This Attachment is for use with form POS-030)*

**NAME AND ADDRESS OF EACH PERSON SERVED BY MAIL:**

| Name of Person Served | Address *(number, street, city, and zip code)* |
|---|---|
| California Dep't of Forestry and Fire Protection - Office of State Fire Marshal | P.O. Box 944246, Sacramento, CA 94244-2460 |
| State Fire Marshal Daniel Berlant | P.O. Box 944246, Sacramento, CA 94244-2460 |
| Sable Offshore Corp. (Attn: Jessie Gastelum) | 330 N. Brand Boulevard, Glendale, CA 91203 |
| Pacific Pipeline Company (Attn: Jessie Gastelum) | 330 N. Brand Boulevard, Glendale, CA 91203 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Form Approved for Optional Use
Judicial Council of California
POS-030(P) [New January 1, 2005]

**ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)**
**(Proof of Service)**

Page __2__ of __2__

For your protection and privacy, please press the Clear This Form button after you have printed the form.

Print this form    Save this form    Clear this form

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 1100 Anacapa Street<br>CITY AND ZIP CODE: Santa Barbara CA 93101<br>BRANCH NAME: Anacapa | **FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**05/09/2025**<br>Darrel E. Parker, Executive Officer<br>BY  Buenrostro, Monica<br>Deputy Clerk |

| CAPTION:<br><br>**Environmental Defense Center et al vs California Department of Forestry and Fire Protection et al** | |
|---|---|
| **ORDER & NOTICE OF CASE RE-ASSIGNMENT;<br>NOTICE OF RESCHEDULED HEARING/CMC** | CASE NUMBER:<br>**25CV02247** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

The above case is hereby ordered re-assigned to **Donna D Geck** for ALL purposes, including trial. All future matters, including ex-parte matters, are to be scheduled with the new re-assigned judge.

The **Case Management Conference** now scheduled is rescheduled as follows:

**08/01/2025** at **8:30 AM** in **SB Dept 4** of the court address above.

Please refer to the court's website for information about court proceedings authorized for remote appearance or that require a personal appearance https://www.santabarbara.courts.ca.gov/system/files/general/information-remote-appearances-website.pdf. Authorized remote appearances are conducted by Zoom videoconferencing. If appearance by Zoom is not authorized for the above hearing, please plan to appear in-person. All persons entering the courthouse must go through weapons screening and are subject to the face covering requirements in effect while on court premises.

For authorized appearances by Zoom, use the links provided to access the Remote Hearing Information flyer in English https://www.santabarbara.courts.ca.gov/system/files/general/zoom-information-civil.pdf and in Spanish https://www.santabarbara.courts.ca.gov/system/files/general/zoom-instructions-civil-spanish.pdf.

Or visit the to the court's website at https://santabarbara.courts.ca.gov/ and click on Remote Appearance by Zoom. The moving party must provide the Remote Hearing Information to all other parties to the hearing not listed on the Clerk's Certificate of Service.

Dated:    5/9/2025                                    By _____
                                                                        Judge of the Superior Court

---

### CLERK'S CERTIFICATE OF SERVICE

I certify that I am not a party to this cause, and that a true copy of this document was electronically served or mailed first class, postage prepaid in a sealed envelope addressed as shown, and that the electronic service or mailing of the foregoing and execution of this certificate occurred at *(place)* Santa Barbara, California on *(date)*: 05/09/2025

**SEE ATTACHMENT**

Darrel E. Parker, Executive Officer                  By _____ Monica Buenrostro _____ , Deputy

**ATTACHMENT**

**Mail Recipients:**

Linda J Krop
Environmental Defense Center
906 Garden St
Santa Barbara CA 93101

_____

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
5/16/2025 9:31 AM
By: Gabriel Moreno , Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br>    Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br>    Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br>    Real Parties in Interest. | Case No.: 25CV02247 <br><br> **NOTICE TO TRUSTEE AND RESPONSIBLE AGENCIES** <br><br> [Pub. Res. Code, § 21167.6.5(c)] <br><br> Petition Filed: April 15, 2025 |

**PLEASE TAKE NOTICE**, under Public Resources Code section 21167.6.5(c), that on April 15, 2025, Petitioners and Plaintiffs ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, and SANTA BARBARA CHANNELKEEPER (collectively, "Petitioners"), filed a petition for writ of mandate against Respondents and Defendants, CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through its component agency OFFICE OF THE STATE FIRE MARSHAL (OSFM), and State Fire Marshal DANIEL BERLANT (collectively, "Respondents"), in the above-referenced Court.

The petition alleges, in part, that Respondents violated the California Environmental Quality Act (CEQA) in waiving certain regulatory requirements for pipelines CA-324 and CA-325, the two pipeline segments that comprise the Las Flores Pipeline System. Petitioners' petition is brought upon the following grounds: (1) Respondents failed to comply with mandatory procedures outlined in state and federal pipeline safety laws, (2) Respondents failed to comply with CEQA, and (3) Respondents prejudicially abused their discretion in issuing the waivers.

Dated: May 16, 2025

Respectfully

_____

Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners

POS-030

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Linda Krop (Bar No. 118773); Jeremy Frankel (Bar No. 344500); Tara C. Rengifo (Bar No. 307670)<br><br>906 Garden Street, Santa Barbara, CA 93101<br>TELEPHONE NO.: (805) 963-1622    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* lkrop@environmentaldefensecenter.org<br>ATTORNEY FOR *(Name):* Petitioners/Plaintiffs Environmental Defense Center et al. | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>5/16/2025 9:31 AM<br>By: Gabriel Moreno , Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121
BRANCH NAME: Anacapa

PETITIONER/PLAINTIFF: Environmental Defense Center et al.

RESPONDENT/DEFENDANT: California Department of Forestry and Fire Protection et al.

| PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL | CASE NUMBER:<br>25CV02247 |
|---|---|

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1. I am over 18 years of age and **not a party to this action.** I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:

    906 Garden Street, Santa Barbara, CA 93101

3. On *(date):* May 16, 2025       I mailed from *(city and state):* Santa Barbara, California
   the following **documents** *(specify):*

    Notice of CEQA Petition to Truseee and Responsible Agenceis

    [ ] The documents are listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Documents Served)* (form POS-030(D)).

4. I served the documents by enclosing them in an envelope and *(check one):*

    a. [x] **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.

    b. [ ] **placing** the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

5. The envelope was addressed and mailed as follows:

    a. **Name** of person served:

    b. **Address** of person served:

    [x] The name and address of each person to whom I mailed the documents is listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Persons Served)* (POS-030(P)).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: May 16, 2025

Jeremy Frankel
_____
(TYPE OR PRINT NAME OF PERSON COMPLETING THIS FORM)

▶       _____
(SIGNATURE OF PERSON COMPLETING THIS FORM)

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-030 [New January 1, 2005] | **PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1013, 1013a<br>www.courts.ca.gov |

POS-030(P)

| SHORT TITLE: Environmental Defense Center et al. v. CalFIRE et al. | CASE NUMBER: 25CV02247 |
|---|---|

## ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)
*(This Attachment is for use with form POS-030)*

**NAME AND ADDRESS OF EACH PERSON SERVED BY MAIL:**

| Name of Person Served | Address  *(number, street, city, and zip code)* |
|---|---|
| Kate Huckelbridge, Executive Director California Coastal Commission | 45 Fremont Street, Suite 2000 San Francisco, CA 94105-2219 |
| Charlton Bonham, Director Cal. Dept' of Fish and Wildlife | P.O. Box 944209 Sacramento, CA 94244-2090 |
| Laura Capps, Chair Santa Barbara County Bd. of Supervisors | 105 E. Anapamu Street Santa Barbara, CA 93101 |
| Ryan Lodge, Executive Officer Regional Water Quality Control Bd. | 895 Aeorvista Place, Suite 101 San Luis Obispo, CA 93401-7906 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Form Approved for Optional Use
Judicial Council of California
POS-030(P) [New January 1, 2005]

**ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)**
**(Proof of Service)**

Page  2  of  2

For your protection and privacy, please press the Clear
This Form button after you have printed the form.

Print this form    Save this form    Clear this form

POS-030

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Linda Krop (Bar No. 118773); Jeremy Frankel (Bar No. 344500); Tara C. Rengifo (Bar No. 307670)<br><br>906 Garden Street, Santa Barbara, CA 93101<br>TELEPHONE NO.: (805) 963-1622    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* lkrop@environmentaldefensecenter.org<br>ATTORNEY FOR *(Name):* Petitioners/Plaintiffs Environmental Defense Center et al. | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>5/21/2025 10:31 AM<br>By: Terri Chavez , Deputy |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA |
|---|
| STREET ADDRESS: 1100 Anacapa Street |
| MAILING ADDRESS: P.O. Box 21107 |
| CITY AND ZIP CODE: Santa Barbara, CA 93121 |
| BRANCH NAME: Anacapa |

| PETITIONER/PLAINTIFF: Environmental Defense Center et al. |
|---|
| RESPONDENT/DEFENDANT: California Department of Forestry and Fire Protection et al. |

| PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL | CASE NUMBER:<br>25CV02247 |
|---|---|

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1. I am over 18 years of age and **not a party to this action.** I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:

   906 Garden Street, Santa Barbara, CA 93101

3. On *(date):* 5/21/2025          I mailed from *(city and state):* Santa Barbara, CA
   the following **documents** *(specify):*

   Order & Notice of Case Re-Assignment; Notice of Rescheduled Hearing/CMC

   ☐ The documents are listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Documents Served)* (form POS-030(D)).

4. I served the documents by enclosing them in an envelope and *(check one):*

   a. ☒ **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.

   b. ☐ **placing** the envelope for collection and mailing following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

5. The envelope was addressed and mailed as follows:

   a. **Name** of person served:

   b. **Address** of person served:

   ☒ The name and address of each person to whom I mailed the documents is listed in the *Attachment to Proof of Service by First-Class Mail—Civil (Persons Served)* (POS-030(P)).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 5/21/2025

Jeremy Frankel
_____    ►    _____
(TYPE OR PRINT NAME OF PERSON COMPLETING THIS FORM)          (SIGNATURE OF PERSON COMPLETING THIS FORM)

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-030 [New January 1, 2005] | **PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL**<br>**(Proof of Service)** | Code of Civil Procedure, §§ 1013, 1013a<br>www.courts.ca.gov |
|---|---|---|

POS-030(P)

| SHORT TITLE: Environmental Defense Center et al. v. CalFIRE et al. | CASE NUMBER: 25CV02247 |
|---|---|

## ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)

*(This Attachment is for use with form POS-030)*

**NAME AND ADDRESS OF EACH PERSON SERVED BY MAIL:**

| Name of Person Served | Address *(number, street, city, and zip code)* |
|---|---|
| California Dep't of Forestry and Fire Protection - Office of State Fire Marshal | P.O. Box 944246, Sacramento, CA 94244-2460 |
| State Fire Marshal Daniel Berlant | P.O. Box 944246, Sacramento, CA 94244-2460 |
| Sable Offshore Corp. (Attn: Jessie Gastelum) | 330 N. Brand Boulevard, Glendale, CA 91203 |
| Pacific Pipeline Company (Attn: Jessie Gastelum) | 330 N. Brand Boulevard, Glendale, CA 91203 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Form Approved for Optional Use
Judicial Council of California
POS-030(P) [New January 1, 2005]

**ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)**
**(Proof of Service)**

Page  2  of  2

For your protection and privacy, please press the Clear This Form button after you have printed the form.

| Print this form | Save this form | | Clear this form |
|---|---|---|---|

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 10:15 AM
By: Narzralli Baksh , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA – ANACAPA DIVISION

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **PETITIONERS' EX PARTE APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANUDM OF POINTS AND AUTHORITIES** <br><br> [*Filed concurrently with Declaration of Linda Krop; Declaration of Richard B. Kuprewicz; Request for Judicial Notice; and Proposed Orders*] <br><br> Date: June 3, 2025 <br> Time: 8:30 a.m. <br> Dept.: 4 <br> Judge: Honorable Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

---

1

Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order

**EX PARTE APPLICATION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

On June 3, 2025, at 8:30 a.m. in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, CA 93121, Petitioners and Plaintiffs ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, and SANTA BARBARA CHANNELKEEPER (collectively, "Petitioners") will and hereby do bring this Ex Parte Application for a Stay or, in the alternative, an Order to Show Cause (OSC) and Temporary Restraining Order (TRO) against (1) Respondents and Defendants CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL, and DANIEL BERMANT (collectively, "Respondents"); and (2) Real Parties in Interest SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY (collectively, "Real Parties").

Specifically, Petitioners hereby apply for a stay of the operation of Respondents' approval of State Waivers for CA-324 and CA-325A/B pending the judgment of the Court. In the alternative, Petitioners apply for:

A TRO prohibiting (1) Respondents, their agents, employees, or anyone acting in concert with them, and (2) Real Parties, their agents, employees, or anyone acting in concert with them, from causing or permitting restart or operation of CA-324 and CA-325A/B, as contemplated by the Letters of Decision on the State Waiver Requests for CA-324 and CA-325A/B, and challenged by the Verified Petition and Complaint on file in this action.

An Order requiring Respondents, Real Parties, and anyone acting in concert with them to show cause, if any they have, why they should not be enjoined as set forth above during the pendency of this action.

This Ex Parte Application for Stay is made on the grounds that a stay is in the public's interest and good cause exists to grant emergency relief. In the alternative, this Ex Parte Application for a TRO is made on the grounds that great and irreparable injury will result before the matter can be heard on notice.

The Application is supported by this Ex Parte Application; the accompanying Memorandum of Points and Authorities in support thereof; the accompanying Declarations of Linda Krop and Richard B.

Kuprewicz, and all exhibits attached thereto; the accompanying Request for Judicial Notice, and all exhibits attached thereto; the Verified Petition and Complaint on file in this action; and any other evidence and argument the Court may consider at the hearing. There have been no previous applications for ex parte relief in this matter.

Pursuant to Rule 3.1202(a) of the California Rules of Court, the known contact information for the parties in this matter are:

| **Petitioners** | **Respondents** | **Real Parties** |
|---|---|---|
| Linda Krop<br>Chief Counsel<br>Environmental Defense Center<br>906 Garden Street | Michael S. Dorsi<br>Deputy Attorney General<br>CA Office of Attorney General<br>455 Golden Gate Ave, Ste.<br>11000 | D.J. Moore<br>Counsel<br>Paul Hastings LLP<br>1999 Avenue of the Stars,<br>Twenty-Seventh Floor |
| Santa Barbara, CA 93101<br>(805) 963-1622<br>lkrop@environmentaldefense<br>center.org | Sacramento, CA 94102-7020<br>(415) 510-3802<br>Michael.Dorsi@doj.ca.gov | Century City, CA 90067<br>(310) 620-5779<br>Djmoore@paulhastings.com |

In accordance with Rule 3.1203 of the California Rules of Court, Petitioners notified counsel for Respondents of this Ex Parte Application and hearing on June 2, 2025, by voicemail at approximately 9:15 a.m., and by email at approximately 9:40 a.m. (*See* Declaration of Linda Krop in Support of Ex Parte Application, ¶ 2.)

Petitioners notified counsel for Real Parties of this Ex Parte Application and hearing on June 2, 2025, by voicemail and email at approximately 9:30 a.m. (*See* Declaration of Linda Krop in Support of Ex Parte Application, ¶ 3.)

Dated: June 2, 2025                        Respectfully submitted,

ENVIRONMENTAL DEFENSE CENTER



By:_____
    LINDA KROP
    JEREMY M. FRANKEL
    TARA C. RENGIFO
    Attorneys for Petitioners and Plaintiffs

Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................... 4

TABLE OF AUTHORITIES .................................................................................................... 5

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 7

   I.         INTRODUCTION ............................................................................................. 7

   II.        FACTUAL BACKGROUND ........................................................................... 9

         A.    The 2015 Pipeline Oil Spill.......................................................................... 9

         B.    Proposal to Construct a New Pipeline ....................................................... 9

         C.    State Waivers ................................................................................................ 10

         D.    Proposal for Imminent Restart .................................................................. 11

   III.       LEGAL STANDARD..................................................................................... 12

   IV.       ARGUMENT ................................................................................................... 13

         A.    The Court Should Issue a Stay Pending Trial. ...................................... 13

         B.    A TRO is Necessary to Prevent Great or Irreparable Harm. ............ 14

         C.    Petitioners are Likely to Prevail on their Claim that Respondents' Approval of the State Waivers Violates CEQA and Pipeline Safety Laws. ......................................................... 14

             1.    Petitioners are Likely to Prevail on the Merits because OSFM Failed to Comply with Pipeline Safety Laws Requiring a Public Review Process. ............. 15

             2.    Petitioners are Likely to Prevail on the Merits Because OSFM Failed to Conduct Environmental Review as Required by CEQA........................................ 17

         D.    The Harm to Petitioners if Injunctive Relief is Denied Outweighs any Harm to Sable. .. 20

   V.        CONCLUSION................................................................................................. 21

Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order

**TABLE OF AUTHORITIES**

**Cases**

*Bd. of Med. Quality Assurance v. Superior Court* (1980) 114 Cal.App.3d 272 ................................. 12, 14

*Canyon Crest Conservancy v. County of Los Angeles* (2020) 46 Cal.App.5th 398 ............................... 12

*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432 ................................................. 21

*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512 ...................................................... 14

*County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795 ......................................................... 18

*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal. 3d. 247 ........................................ 17

*In Re MidAmerican Energy Co.*, 2002 WL 31155601 (2002) .................................................... 16

*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal. 3d 376 .......... 18

*Right Site Coalition v. Los Angeles Unified School Dist.* (2008) 160 Cal.App. 4th 336 .................... 20, 21

*Sterling v. Santa Monica Rent Control Bd.* (1985) 168 Cal.App.3d 176 .................................... 12

*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal. App. 5th 380 ..................... 12, 21

**Statutes**

49 U.S.C. § 60104(c) ...................................................................................... 15, 16

49 U.S.C. § 60105 ......................................................................................... 15, 16

49 U.S.C. § 60105(a) ...................................................................................... 15

49 U.S.C. § 60118(c) ...................................................................................... 16

49 U.S.C. § 60118(c)(1) ................................................................................... 15

49 U.S.C. § 60118(c)(1)(A) ................................................................................ 16

49 U.S.C. § 60118(c)(1)(B) ................................................................................ 16

49 U.S.C. § 60118(c)(3) ................................................................................... 16

49 U.S.C. § 60118(d) ...................................................................................... 16

Code Civ. Proc. § 527(c)(1) ............................................................................... 12

Code Civ. Proc., § 1094.5(g) .............................................................................. 12

Gov. Code § 51010 ......................................................................................... 15, 17

Gov. Code § 51011(b) ...................................................................................... 17

Gov. Code. § 51011(c) ..................................................................................... 15, 17

Pub. Res. Code § 21061 ................................................................................................ 17

Pub. Res. Code § 21166 ................................................................................................ 18

Pub. Res. Code, § 21002.1 ........................................................................................... 17

**Regulations**

14 C.C.R. § 15002 ........................................................................................................ 17

14 C.C.R. § 15002(f)(1) ............................................................................................... 17

14 C.C.R. § 15003 ........................................................................................................ 17

14 C.C.R. § 15003(a); .................................................................................................. 18

14 C.C.R. § 15003(f) .................................................................................................... 17

14 C.C.R. § 15126 ........................................................................................................ 17

14 C.C.R. § 15126.2 ..................................................................................................... 17

14 C.C.R. § 15126.4 ..................................................................................................... 18

14 C.C.R. § 15126.6 ..................................................................................................... 18

14 C.C.R. § 15162 ........................................................................................................ 18

14 C.C.R. § 15162(a)(1) ............................................................................................... 18

14 C.C.R. § 15162(a)(2) ............................................................................................... 19

14 C.C.R. § 15162(a)(3) ............................................................................................... 19

19 C.C.R. § 2000 .......................................................................................................... 15

Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order

<div align="center">**MEMORANDUM OF POINTS AND AUTHORITIES**</div>

## I.    INTRODUCTION

Petitioners filed this action to enforce safety and environmental laws, and to require Respondents to conduct formal public review before deciding whether to allow Sable Offshore Corp. ("Sable") to restart the very pipeline that ruptured in 2015, spilling more than 120,000 gallons of oil along more than a hundred miles of California coast and killing hundreds of marine mammals and seabirds, closing public beaches and fisheries, and devastating the local economy. Petitioners seek a stay to protect the public interest and to allow the Court to consider this matter on the merits before imminent harm occurs.

In the alternative, Petitioners seek an order to show cause (OSC) and temporary restraining order (TRO) prohibiting Respondents and Real Parties from restarting and operating the Las Flores Pipeline System (the "Pipeline System") in reliance on the State Waivers which are challenged by the Verified Petition and Complaint on file in this action.

The Pipeline System, consisting of CA-324 and CA-325A/B, has been shut down since the 2015 oil spill. The pipeline rupture was caused by unmitigated corrosion, which in turn was caused by the failure of the cathodic protection system installed on the pipeline. Corrosion is a pervasive problem that exists throughout the 120-mile pipeline system. Although the owner at the time of the oil spill applied to build a new pipeline with effective corrosion prevention design and technology, Sable seeks to restart the existing pipeline despite the corrosion risks from failed cathodic protection.

Because the existing pipeline does not comply with pipeline safety regulatory requirements, the company was required to apply for State Waivers from Respondent Office of the State Fire Marshal (OSFM). Petitioners submitted reports from Richard B. Kuprewicz, a pipeline safety expert with over fifty years of experience in the energy industry, explaining why the pipelines cannot be safely operated and why the Waivers will not ensure the integrity and safety of the pipelines or prevent another oil spill. Despite these concerns, however, Respondents failed to conduct any environmental or public review as required by law and, instead, simply approved the Waivers.

Timing could not be more critical. Without a stay or TRO, Sable will likely restart the pipelines before a hearing can be scheduled for a preliminary injunction. If that happens, there will be no opportunity to prevent great and irreparable harm to the environment. According to Sable's recent filings with the

Securities and Exchange Commission (SEC), the company restarted production from its offshore platforms on May 15, 2025, completed its anomaly repairs on May 18, 2025, and concluded hydrotesting the pipelines on May 27, 2025. Sable intends to fill its onshore storage facilities by the middle of June 2025.

This order is necessary to protect the public interest and maintain the status quo until the potential impacts of the project can be evaluated and the public can participate as required by state and federal pipeline safety laws and the California Environmental Quality Act (CEQA, Public Resources Code section 21000 *et seq*.).

Specifically, the federal Hazardous Liquid Pipeline Safety Act (the "Federal PSA," 49 U.S.C. section 60101 *et seq*.) and California's Elder Pipeline Safety Act of 1981 (the "State PSA," Government Code section 51010 *et seq*.) require a public hearing before a waiver may be approved. In addition, Respondents may not approve a waiver without providing a statement of decision and discussion of the factors considered by OSFM in granting a waiver. Respondents must also prepare a Subsequent Environmental Impact Report (EIR) pursuant to CEQA in this case, due to changes in the project and circumstances since the original EIR was prepared, as well as new information that was not available at the time. These changes and new information reveal significant new or increased impacts due to the faulty design of the pipeline, the corrosion that developed over time, the lack of an effective cathodic protection system through the Pipeline System, and the significant risk of another catastrophic oil spill.

A stay will protect the public interest in preventing another oil spill. This is not a speculative concern; this pipeline already ruptured once, causing devastating harm to much of the California coast. The State Waivers cannot take the place of an effective corrosion prevention system and are inadequate to detect or prevent future corrosion.

In the alternative, a TRO is necessary to prevent great or irreparable harm to the environment and public health. In addition, a preliminary injunction should be issued because Petitioners are likely to succeed on the merits, and the harm to the environment and public far outweighs any temporary inconvenience to Sable.

## II.    FACTUAL BACKGROUND

### A.    The 2015 Pipeline Oil Spill

On May 19, 2015, the Pipeline System ruptured near Refugio State Beach Park, releasing more than 120,000 gallons of heavy crude oil into the surrounding environment. (Request for Judicial Notice (RJN), Exhibit A.) The spill was one of the largest in California history, and the damage to the region's unparalleled resources was immeasurable. The spill devastated more than 100 miles of the California coast. (*Id*., p. 17.) Thousands of acres of shoreline and subtidal habitat were destroyed, and hundreds of animals — including marine mammals — were injured or killed. (*Id*., p. 3.) The spill also forced the closure of fisheries and beaches, which jeopardized local businesses and caused an estimated 140,000 lost recreational user days between Santa Barbara and Ventura Counties. (*Id*.)

The federal Pipeline and Hazardous Materials Safety Administration (PHMSA) conducted an investigation and determined that the rupture was the result of "progressive external corrosion," and that the Pipeline System's cathodic protection system — intended to prevent such corrosion — was ineffective. (RJN, Exhibit B.) As it turns out, the ineffectiveness of cathodic protection was a product of the Pipeline System's flawed design. PHMSA concluded that, as a general matter, "[cathodic protection] is ineffective on buried insulated pipelines" like the Pipeline System. (*Id*., Appendix E, p. 2.)

The Pipeline System has been shut down since the oil spill ten years ago.

### B.    Proposal to Construct a New Pipeline

Due to the extensive corrosion on the pipelines, Plains All American Pipeline Company - the owner of the Pipeline System at the time of the spill - applied in August of 2017 to build a new pipeline with improved technology to prevent corrosion. (RJN, Exhibit K.) The County of Santa Barbara initiated preparation of an EIR pursuant to CEQA. The EIR evaluated the potential restart of the existing pipeline as an alternative to the proposed project. Although the replacement pipeline project application was subsequently withdrawn, the County's 2022 Administrative Draft EIR revealed that restarting the existing Pipeline System (even with installation of additional valves) would likely result in a spill every year, a rupture every four years, and a spill along the coast nearly twice the size of the 2015 spill. (Declaration of Linda Krop ("Krop Dec."), Exhibit E, p. 5.6-79.)

## C.      State Waivers

Sable acquired the Pipeline System in early 2024. Rather than pursue development of a new, safer pipeline, Sable opted to restart the existing pipelines. As such, Sable requested approval of State Waivers from OSFM for the limited effectiveness of cathodic protection on CA-324 and CA-325A/B. (RJN, Exhibits G, H.) Such Waivers may be approved by OSFM if the State follows the standards and procedures set forth in the Federal PSA (*see* 49 U.S.C. section 60118(d)), which require "notice and opportunity for a hearing" (*id.*, § 60118(c)), as well as issuance of a statement of reasons in support of a decision granting a waiver (*id.,* § 60118(c)(3).) PHMSA's guidance provides that waivers must not only be "consistent with pipeline safety," but in fact must "provide an equal or greater level of safety." (RJN, Exhibit L, p. 1.) The State PSA further requires that a waiver may only be granted if OSFM determines that "the risk to public safety is slight and probability of injury or damage remote." (Gov. Code § 51011(b).) If OSFM decides to grant a waiver, it must "include a discussion of those factors that the State Fire Marshal considers significant in granting of the exemption." (*Id.*, § 51011(c).)

Petitioners, other organizations, and members of the state legislature submitted letters to OSFM, requesting environmental review and public hearings regarding Sable's proposal to restart the Pipeline System. (Krop Dec. ¶¶ 4, 5, Exhibits A – D.) Despite these requests, OSFM granted preliminary approval and submitted the Waivers to PHMSA on December 18, 2024, without providing any formal opportunity for, or consideration of, public input. (RJN, Exhibits G, H.) Despite the lack of public notice or opportunity for comment, Petitioners submitted an expert report evaluating the condition of the Pipeline System and proposed Waivers. (Declaration of Richard B. Kuprewicz ("Kuprewicz Dec."), Exhibit B; Krop Dec. ¶ 6.) The report explained the defects in the Pipeline System and the inadequacy of testing methods to detect external corrosion – the very factor that caused the rupture in 2015. (Kuprewicz Dec.)

Specifically, the report explained why the cathodic protection system on the Pipeline System is ineffective to prevent external corrosion, as required by state and federal law. (*Id.*) The report also pointed out why current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion that most likely exist on the pipelines. (*Id.*) To make matters worse, the high operating temperatures required to transport the heavy crude oil significantly accelerate external corrosion; this increased risk will not be mitigated given the ineffectiveness of the cathodic protection system. (*Id.*)

Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order

Finally, the report explained why corrosion-related cracking is such a high risk on the Pipeline System. (*Id.*) Despite these significant concerns, OSFM did not respond to the report or address these concerns in the conditions of approval. (Krop Dec., ¶ 7.)

On February 11, 2025, PHMSA notified OSFM that it would not object to the State Waivers, rendering them final and effective. (RJN, Exhibits D, E.) Petitioners submitted a second expert report evaluating the Waivers. (Krop Dec. ¶¶ 8, 9; Kuprewicz Dec., Exhibit C.) The report noted several deficiencies and omissions in the Waivers that threaten the integrity and safety of the pipelines. For one, the report noted that the proposed ILI technologies are not adequate to detect all potential types of corrosion and may understate the degree of corrosion. (*Id.*) In addition, the report disclosed that the proposed hydrotests are not adequate to identify crack forming potential or corrosion growth rates. (*Id.*) In particular, the report pointed out that the spike test proposed for CA-324 is based on values that are too low for corrosion cracking screening and evaluation, the testing parameters for CA-325A are missing critical information so cannot be evaluated, and no hydrotests are required on CA-325B. (*Id.*) These defects and omissions on CA-325A/B are especially concerning given the elevation changes. (*Id.*)

This report was submitted to OSFM on or about March 2, 2025, but again, no response was provided by the agency. (Krop Dec. ¶ 9.) Not only did OSFM fail to provide public notice and a hearing, but the agency did not issue a statement of reasons or discussion of the factors that led to the decision to approve the Waivers.

### D.    Proposal for Imminent Restart

On May 19, 2025, Sable filed a Form 8-K report with the SEC with an attached press release and presentation materials. (Krop Dec. ¶ 11, Exhibit F.) According to the press release, Sable had completed its repairs on the Pipeline System. (*Id.*, Exhibit 99.1) In addition, Sable had initiated production on one of the Santa Ynez Unit (SYU) platforms on May 15, 2025, and anticipated completing tests of wells on the platform "over the course of the next several days." (*Id.*) Of particular relevance here, Sable "expects to fill the ~ 540,000 barrels of crude oil storage capacity at [Las Flores Canyon] by the middle of June." (*Id.*) On May 27, 2025, Sable filed another Form 8-K report, announcing the completion of hydrotesting on the Pipeline System, thereby "satisfying the final operational condition to restart of the [Pipeline System]." (Krop Dec. ¶ 12, Exhibit G.)

Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order

Now that Sable has allegedly completed its repairs and hydrotests, and is resuming production from the offshore platforms, Petitioners are concerned that Respondents will authorize restart of the onshore pipelines without necessary safety precautions and without addressing the very factors that caused the massive oil spill in 2015.

## III.    LEGAL STANDARD

Courts "may stay the operation of [an] administrative order or decision pending the judgment of the court, or until the filing of a notice of appeal from the judgment or until the expiration of the time for filing the notice, whichever occurs first. However, no such stay shall be imposed or continued if the court is satisfied that it is against the public interest." (Code Civ. Proc., § 1094.5(g).) This language "unequivocally requires that the superior court weigh the public interest in each individual case." (*Sterling v. Santa Monica Rent Control Bd.* (1985) 168 Cal.App.3d 176, 187.) In fact, whether the stay would be against the public interest is the *only* factor that must inform the Court's discretion. (*Bd. of Med. Quality Assurance v. Superior Court* (1980) 114 Cal.App.3d 272, 276 ["subdivision (g) of section 1094.5 requires only that before the issuance of a stay order 'the court [be] satisfied that it is [not] against the public interest'"].) It does not require the court to consider the likelihood of success on the merits. (*See Canyon Crest Conservancy v. County of Los Angeles* (2020) 46 Cal.App.5th 398, 407 (court "not required to make any additional findings in order to grant the stay" in a CEQA case, aside from "finding that granting a stay would not be against the public interest").)

In addition, Code of Civil Procedure section 527 provides for the granting of a temporary restraining order or a preliminary injunction. A temporary restraining order is appropriate where "great or irreparable injury will result to the applicant before the matter can be heard on notice." (Code Civ. Proc. § 527(c)(1)).

A preliminary injunction is proper upon a showing that (1) a plaintiff is likely to prevail on the merits and (2) that the harm that the plaintiff is likely to sustain if the injunction is denied outweighs the harm that the defendant is likely to suffer if the injunction is granted. (*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal. App. 5th 380, 396-97.) In CEQA cases, the public's interest in compliance with the law "must be considered in evaluating the relative balance of harms from granting or denying a preliminary injunction." (*Id*. at 408 – 16.)

## IV.    ARGUMENT

The Court should grant a stay because it is in the public interest to enforce pipeline safety and environmental review laws by ensuring public and environmental review *before* the Pipeline System is restarted. To deny the stay would clearly be against the public interest. The risks to the environment are substantial, and state law is clear that the public is entitled to a hearing and opportunity to comment on the potential environmental risks and impacts that may result if the Pipeline System is restarted without an effective corrosion prevention system in place. To date, neither the OSFM nor any other agency has conducted such review or allowed any public input.

In the alternative, the Court should issue a TRO to prevent great or irreparable harm. This matter is urgent because Sable is likely to restart pipeline operations before the matter can be heard on notice. An injunction is appropriate because Petitioners are likely to prevail on the merits, and the harm to Petitioners far outweighs any potential harm to Sable. As explained below, OSFM's failure to conduct environmental review or hold a public hearing before approving the Waivers clearly violates CEQA and state and federal pipeline safety laws. The harm to Petitioners and the public if Sable is allowed to restart the Pipeline System without environmental and public review outweighs any temporary economic harm to Sable. Granting a TRO will maintain the status quo and prevent further (potentially irreparable) harm for a few weeks until the court schedules a hearing on a preliminary injunction. A temporary delay for Sable is also reasonable given that Sable still needs to obtain approvals from other agencies before it can restart the Pipeline System.

### A.    The Court Should Issue a Stay Pending Trial.

Restart of the pipeline threatens the California coast with significant harm. The public's interest in this matter is substantial, and yet the public has not been granted *any* opportunity to provide input to OSFM as required by CEQA and other laws. The public's interest has been severely impaired by Respondents' decision to deny the public a meaningful opportunity to submit information regarding the State Waivers through a formal process that requires consideration and responsive explanation before decision-making.

A stay is also necessary to ensure that OSFM considers the potential environmental impacts of allowing restart *before* a decision is made, as required by CEQA. A stay would allow time for the Court

to consider Petitioners' claims and rule on the need for environmental review before Sable restarts the Pipeline System without consideration of impacts and measures to avoid or reduce such impacts.

A stay will maintain the status quo and protect the public's interests pending a hearing on the merits. (*Bd. of Med. Quality Assurance*, 114 Cal.App.3d at 277 (a stay pursuant to C.C.P. section 1094.5 is only in effect "temporarily, that is, the time period between the issuance of the stay order by the trial court and the finality of the judgment in the mandamus proceeding in the trial court.").)

**B.    A TRO is Necessary to Prevent Great or Irreparable Harm.**

In the alternative, a TRO should be granted here due to the great and irreparable harm that will result if the pipeline is restarted. (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528 (the purpose of a TRO and preliminary injunction is preservation of the status quo until final determination of the merits).) The restart and operation of the Pipeline System must be put on hold until Respondents conduct environmental and public review. The public's right to provide input and assure informed decision-making will be irreparably obstructed if a TRO is not issued.

A TRO is also necessary to prevent actual harm to the environment. As described herein, the pipelines traverse through uniquely sensitive resources. The 2015 oil spill destroyed many of these resources and was caused by external corrosion on the pipeline. (RJN, Exhibits A, B.) The State Waivers approved by OSFM will not adequately prevent or detect such corrosion if the Pipeline System is restarted. (Kuprewicz Dec.). Instead, the Waivers are likely to result in additional pipeline spills and ruptures, potentially much larger than the 2015 spill. (Krop Dec., Exhibit E.)

If a TRO is not issued, it will likely be too late to prevent this harm. Accordingly, Petitioners do not have the luxury of waiting for a noticed hearing. A TRO will maintain the status quo and prevent great and irreparable harm pending a hearing on Petitioners' request for a preliminary injunction.

**C.    Petitioners are Likely to Prevail on their Claim that Respondents' Approval of the State Waivers Violates CEQA and Pipeline Safety Laws.**

Petitioners are also entitled to a preliminary injunction because they are likely to prevail on the merits and because the harm to Petitioners and the environment far outweighs any temporary harm to Sable.

Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order

1.     <u>Petitioners are Likely to Prevail on the Merits because OSFM Failed to Comply with Pipeline Safety Laws Requiring a Public Review Process.</u>

As noted above, a state *may* waive compliance with a safety standard, but only if the waiver "is not inconsistent with pipeline safety" and "*only after notice and opportunity for a hearing.*" (49 U.S.C. § 60118(c)(1) (emphasis added).) Additionally, the state must provide a statement of reasons explaining its decision. (Gov. Code. § 51011(c).) OSFM failed to provide notice and opportunity for a hearing and failed to provide a statement of reasons and discussion of factors explaining its decision, thus violating state and federal mandates.

By way of background, it is helpful to understand the regulatory framework that applies to the Pipeline System. Pipeline safety is generally regulated by the federal government pursuant to the Federal PSA and administered by PHMSA. However, the extent of the federal government's regulatory authority varies between interstate and intrastate pipelines. While PHMSA has exclusive jurisdiction over interstate pipelines (see 49 U.S.C. § 60104(c)), the agency's authority over *intrastate* pipelines — like the Pipeline System — is merely provisional. Pursuant to 49 U.S.C. section 60105, states have the option to assume exclusive responsibility for regulating intrastate pipelines by submitting an annual certification to the Secretary of Transportation ("Certification"). Among other things, the Certification must affirm that the state has adopted the minimum federal pipeline safety standards, which are outlined in Title 49 of the Code of Federal Regulations, Part 195 ("Part 195"). (*Id.*) Once a state has submitted a valid Certification, exclusive regulatory and enforcement authority over intrastate pipelines passes to the state. (*See* 49 U.S.C. § 60105(a).) Indeed, PHMSA is prohibited from "prescrib[ing] or enforc[ing] safety standards and practices" on intrastate pipelines that are regulated under a certified program. (*Id.*)

California has and maintains such a Certification, giving it the authority to regulate its intrastate pipelines. That authority is delegated to OSFM, which administers the state's pipeline safety laws and regulations under color of the Certification. (*See* Gov. Code § 51010.) OSFM also effectively administers the federal safety standards outlined in Part 195, which, as required for Certification, are incorporated by reference in California's pipeline safety regulations. (*See* 19 C.C.R. § 2000.)

Where a state has a valid Certification, the Federal PSA grants state authorities the flexibility to depart from federal minimum safety standards. They are free, for example, to impose more stringent safety

standards than those required by federal law. (49 U.S.C. § 60104(c).) Or, they can excuse compliance with federal safety standards by issuing a "State Waiver." (49 U.S.C. § 60118(d).)

Specifically, 49 U.S.C. section 60118(d) provides that, "[i]f a [Certification] . . . is in effect, the State authority *may*" — i.e., at its discretion — "waive compliance with a safety standard to which the [C]ertification . . . applies." (*Id.* (emphasis added).) However, the statute imposes an important limitation on that authority: a State Waiver can only be issued "*in the same way and to the same extent* that the Secretary [of Transportation] may waive compliance under subsection (c)" of the statute. (*Id.* (emphasis added).) In other words, while a state authority has the discretion to grant a State Waiver, it can only do so by following the standards and procedures set forth in 49 U.S.C. section 60118(c). For "nonemergency waivers," subsection (c) provides that the Secretary can issue a waiver "on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118(c)(1)(A).) In addition, subsection (c)(1)(B) explicitly states that "[t]he Secretary may act on a waiver . . . <u>only</u> *after notice and opportunity for a hearing*." (49 U.S.C. § 60118(c)(1)(B) (emphasis added).) Finally, it directs that "[t]he Secretary *shall* state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3) (emphasis added).)

These provisions are binding on states that are certified to regulate intrastate pipelines. (49 U.S.C. § 60105.) Thus, to grant a State Waiver, a state authority must (1) provide the public with notice and an opportunity for a hearing on the waiver application, (2) properly determine that the waiver would not be inconsistent with pipeline safety, and (3) provide a statement of reasons explaining its decision. (49 U.S.C. § 60118(c), (d).) (*See In Re MidAmerican Energy Co.*, 2002 WL 31155601 (2002) (when a certified state seeks a waiver pursuant to section 60118(d), the state agency must "give notice and opportunity for written comments and hearing before granting the waiver, unless the state agency finds that the notice is impractical, unnecessary, or not in the public interest.").) Where a state authority fails to comply with one or more of these requirements, it violates the Federal PSA.

In addition to these federal requirements, California has its own pipeline safety law – the State PSA, Government Code § 51010 *et seq*. To the extent allowed by the Federal PSA, this law grants OSFM the "exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines" in

California, and it outlines a number of pipeline safety requirements above and beyond what is required by federal minimum standards. (*See* Gov. Code § 51010.)

Like the Federal PSA, the State PSA allows for the waiver of certain safety requirements. However, it imposes a higher standard for such "exemptions." It states: "The State Fire Marshal may exempt the application of regulations adopted pursuant to this section" — like Part 195's federal minimum safety standards — "to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code § 51011(b).) Should the State Fire Marshal grant an exemption, it must be in writing, and the notice of exemption "shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code. § 51011(c).)

Despite these clear mandates, OSFM considered and approved Sable's applications for State Waivers without any public opportunity to submit comments or participate in a hearing. Nor did OSFM provide a public statement of reasons or discussion of the factors it considered in granting the Waivers. These omissions are consequential and prejudicial, as evidenced by the concerns raised by pipeline safety expert Richard Kuprewicz.

2.    Petitioners are Likely to Prevail on the Merits Because OSFM Failed to Conduct Environmental Review as Required by CEQA.

Second, Petitioners are likely to prevail on the merits because OSFM's decision to approve the State Waivers without any environmental review violates CEQA. CEQA was enacted to ensure that government agencies consider the environmental consequences of their actions before approving projects. (CEQA Guidelines §§ 15002, 15003; *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d. 247, 254-56.) In enacting CEQA, the state legislature intended the law "to be interpreted in such a manner as to afford the fullest possible protection to the environment . . . ." (CEQA Guidelines § 15003(f); *Friends of Mammoth*, 8 Cal. 3d at 259.)

A critical requirement of CEQA is the need to prepare an EIR for projects that *may* result in a significant effect on the environment. (CEQA Guidelines § 15002(f)(1).) The purpose of an EIR is to consider the significant effects of a project, as well as alternatives and mitigation measures that can avoid or mitigate such effects. (Pub. Res. Code §§ 21002.1, 21061; CEQA Guidelines §§ 15003, 15126,

15126.2, 15126.4, 15126.6.) The EIR requirement "is the heart of CEQA." (CEQA Guidelines § 15003(a); *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810.) "The EIR process protects not only the environment but also informed self-government." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal. 3d 376, 392.)

Where a prior EIR has been prepared and a new discretionary decision is requested, an agency must consider whether any factors exist to require subsequent environmental review. These factors include: (1) whether substantial changes are proposed in the project which require major revisions of the earlier EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; (2) whether substantial changes occur with respect to the circumstances under which the project is being undertaken which require major revisions to the EIR due to new significant effects or a substantial increase in the severity of significant effects; or (3) whether new information, which was not known and could not have been known at the time the EIR was certified, becomes available and shows, *inter alia*, the existence of new significant effects or a substantial increase in the severity of impacts. (Pub. Res. Code § 21166; CEQA Guidelines § 15162.)

In this case, an EIR was prepared in 1985 for the original pipeline project ("1985 EIR"). The EIR stated that "protection of a pipeline from corrosion is of critical importance." (RJN, Exhibit I, p. 4-106.) In its analysis of the project, the EIR noted that the entire pipeline would be equipped with a corrosion protection system which would be "very effective" at reducing impacts from oil spills. (RJN, Exhibit I, pp. 2-5, 4-106, 4-117; RJN, Exhibit J, pp. 2-57, 2-94, Appendix 4.3, pp. 4-53 - 4-55.) However, the corrosion protection system failed, and Sable now seeks waivers for the limited effectiveness of cathodic protection.

When OSFM exercised its discretion to consider Sable's request for the Waivers, the agency was required to determine whether any of the factors necessitating subsequent environmental review applied to the request. OSFM, however, failed to do so.

A subsequent EIR is required in this case for three reasons. First, operating the Pipeline System without an effective cathodic protection system throughout the entire length of the pipeline constitutes a change in the project that increases the risk and severity of impacts and requires major revisions to the 1985 EIR. (CEQA Guidelines § 15162(a)(1).) As noted by Mr. Kuprewicz, the State Waivers do not

Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order

provide the same protection against corrosion as an effective cathodic protection system. (Kuprewicz Dec. ¶¶ 10, 11.) The increased probability of corrosion results in a substantial increase in the severity of previously identified impacts from oil spills and requires preparation of a subsequent EIR.

Second, the failure of the Pipeline System's cathodic protection system and resulting corrosion constitutes a change in circumstances that requires a subsequent EIR. The corroded condition of the pipeline is a change in circumstance. In addition, without effective cathodic protection, the pipeline is vulnerable to further pervasive, continuous, and progressive corrosion that was not accounted for in the 1985 EIR. This changed circumstance increases the risk and severity of potential oil spill-related impacts and thus requires preparation of a subsequent EIR. (CEQA Guidelines § 15162(a)(2).)

Third, it was only after the 2015 spill that the Pipeline System was discovered to lack effective cathodic protection. This new information, which shows that the risk of an oil spill is substantially more severe than previously determined, could not have been known with the exercise of reasonable due diligence when the 1985 EIR was certified thirty-one years earlier. As to buried, insulated lines more generally, no formal report existed as to the ineffectiveness of cathodic protection prior to an industry analysis published by NACE in 1992 — seven years after certification of the 1985 EIR. (RJN, Exhibit B, p. 2.) Accordingly, that cathodic protection is ineffective on the Pipeline System constitutes new information that was not known, and could not have been known, when the previous EIR was certified. Thus, OSFM is required to prepare a subsequent EIR to ensure an adequate analysis of the potential impacts of operating the Pipeline System without effective cathodic protection. (CEQA Guidelines, § 15162(a)(3).)

The requirement for subsequent environmental review is critical to OSFM's decision regarding the requested Waivers. The serious risk of an oil spill from restarting the Pipeline System is evidenced by the County's 2022 analysis, which predicted a spill every year and a rupture every four years. (Krop Dec., Exhibit E.) In addition, Mr. Kuprewicz explained in his report why the Waivers and associated testing protocols will not sufficiently reduce the risk of corrosion and another oil spill. (Kuprewicz Dec.)

Not only is the risk of a spill greater than previously understood, but the consequences of a spill will likely be greater. The 1985 EIR did not predict a spill as large as the 2015 spill, and the County's 2022 Administrative Draft EIR predicted an oil spill that could be even larger if the Pipeline System is

restarted. (Krop Dec., Exhibit E, p. 5.6-79.) The potentially devastating impacts of such a spill are borne out by what happened in 2015. As noted above, that spill devastated more than 100 miles of the California coast, as far south as Los Angeles County. (RJN, Exhibit A, p. 17.) Thousands of acres of shoreline and subtidal habitat were destroyed, and an untold number of animals — including marine mammals — were injured or killed. (*Id.*, p. 3.) The spill also forced the closure of fisheries and beaches, which jeopardized local businesses and caused an estimated 140,000 lost recreational user days between Santa Barbara and Ventura Counties. (*Id.*)

A recent report issued by the California Coastal Commission (CCC) identified the numerous natural resources that occur within and near the Pipeline System. (RJN, Exhibit C.) As described by the CCC, the Pipeline System is located within and near state-protected environmentally sensitive habitats, including coastal scrub, chaparral, riparian and wetland habitat, woodlands, and annual and native grasslands. (*Id.*, p. 5.) Not only are these areas protected under the California Coastal Act (Public Resources Code section 30000 *et seq.*), but many are home to rare, threatened, and endangered species such as southern California steelhead, California red-legged frog, southwestern pond turtle, and marine mammals. (*Id.*, p. 6.)

The Central Coast Regional Water Quality Control Board (CCRWQCB) also identified significant waterways along the Pipeline System. (RJN, Exhibit F.) These areas include Arroyo Quemada Creek, several drainages, and tributaries to Cuyama River, Peterson Creek, Nojoqui Creek, and Foxen Canyon (*Id.*, p. 4.)

Restarting the Pipeline System without effective cathodic protection poses significant risk and impacts to these sensitive resources. In addition, an oil spill from the onshore pipeline can have a devastating effect on marine resources. (RJN, Exhibit A.) Accordingly, Respondents must prepare a subsequent EIR to analyze these new or increased impacts. Such review must occur *before* a decision is made to allow restart of the pipelines.

**D.     The Harm to Petitioners if Injunctive Relief is Denied Outweighs any Harm to Sable.**

If the court finds it likely that Petitioners will prevail on the merits, it may issue a preliminary injunction regardless of the severity of the harm at issue. (*Right Site Coalition v. Los Angeles Unified School Dist.* (2008) 160 Cal.App. 4th 336, 342 (quoting *King v. Meese* (1987) 43 Cal.3d 1217, 1227).)

Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order

"This is especially true when the requested injunction maintains, rather than alters, the status quo." (*Id.*) In fact, where a party makes a "sufficiently strong showing of likelihood of success on the merits, the trial court has discretion to issue the injunction notwithstanding that party's inability to show that the balance of harms tips in his favor." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 447.)

In this case, Petitioners have made a strong showing on the merits, especially given the clear mandate for a public hearing to be held prior to approving a waiver. (49 U.S.C. § 60118(d).) In addition, Petitioners have demonstrated a clear violation of CEQA's clear mandate for informed decision making and public participation. (*Tulane Lake Canal Co.*, 92 Cal. App. 5th at 415.)

Regardless, an injunction is warranted here due to the significant harm to Petitioners and the public — not only because of the great and irreparable harm to unique, irreplaceable natural resources, but also because of Respondents' failure to even consider the impacts of the project or allow for public input. These harms outweigh any temporary delay for Sable. Not only would any delay be short-lived, but any effects of delay are mitigated by the fact that Sable still needs approvals and must comply with requirements imposed by several other agencies, including the CCC, CCRWQCB, Department of Conservation, California Department of Fish and Wildlife, and California Department of Parks and Recreation, before it can proceed with restart of the Pipeline System. (RJN, Exhibit M.)

## V.    CONCLUSION

For the reasons stated above, Petitioners request a stay or, in the alternative, a temporary restraining order to prevent serious harm pending proper environmental and public review.

Dated: June 2, 2025                        Respectfully submitted,

ENVIRONMENTAL DEFENSE CENTER



By:_____
     LINDA KROP
     JEREMY M. FRANKEL
     TARA C. RENGIFO
     Attorneys for Petitioners and Plaintiffs

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 10:15 AM
By: Narzralli Baksh , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **DECLARATION OF LINDA KROP IN SUPPORT OF PETITIONERS' EX PARTE APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** <br><br> [*Filed concurrently with Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order; Proposed Order*] <br><br> Date:      June 3, 2025 <br> Time:      8:30 a.m. <br> Dept.:      4 <br> Judge:      Honorable Donna G. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

1

Declaration of Linda Krop in Support of Petitioners' Application for Stay or OSC and TRO

## DECLARATION OF LINDA KROP

I, Linda Krop, hereby declare as follows:

1. I am Chief Counsel for the non-profit, public interest law firm Environmental Defense Center (EDC) and am counsel for Petitioners in this action. I am duly licensed to practice law before this Court. I have personal knowledge of the following and, if called as a witness, would and could testify competently thereto.

2. On June 2, 2025, I left a voicemail for Michael Dorsi at approximately 9:15a.m. and emailed him at approximately 9:40 a.m., to provide notice of Petitioners' Ex Parte Application for a Stay, Temporary Restraining Order, and Order To Show Cause why a Preliminary Injunction should not issue, restraining the Office of the State Fire Marshal (OSFM) from allowing restart of Sable Offshore Corporation's Las Flores Pipeline System (the "Pipeline System," comprised of CA-324 and CA-325A/B) until and unless OSFM conducts environmental review and holds a public hearing regarding Sable's application for waivers for the limited effectiveness of cathodic protection on CA-324 and CA-325A/B. The notice included the date, time, manner, and location for the presentation of the application, the nature of the relief sought, and an inquiry as to whether OSFM would appear to oppose the application. Notice was given within the applicable time under California Rule of Court 3.1203.

3. On June 2, 2025, I left voicemails for Matt Wickersham and Jeffrey Dintzer and emailed them and DJ Moore (attorneys for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (together, "Sable")) at approximately 9:30 a.m., to provide notice of Petitioners' Ex Parte Application for a Stay, Temporary Restraining Order, and Order To Show Cause why a Preliminary Injunction should not issue, restraining the Office of the State Fire Marshal (OSFM) from allowing restart of Sable Offshore Corporation's Las Flores Pipeline System (the "Pipeline System," comprised of CA-324 and CA-325A/B) until and unless OSFM conducts environmental review and holds a public hearing regarding Sable's application for waivers for the limited effectiveness of cathodic protection on CA-324 and CA-325A/B. The notice included the date, time, manner, and location for the presentation of the application, the nature of the relief sought, and an inquiry as to whether Sable would appear to oppose the application. Notice was given within the applicable time under California Rule of Court 3.1203.

4.      The public has submitted multiple requests for environmental review and public hearings regarding Sable's proposal to restart the Pipeline System. For example, on March 1, 2024, several environmental organizations sent a letter to OSFM, requesting public review and hearings. A true and correct copy of the letter is attached hereto as **Exhibit A**. Another request was submitted on September 10, 2024. A true and correct copy of the letter is attached hereto as **Exhibit B**.

5.      On September 27, 2024, EDC submitted a letter to OSFM, requesting environmental and public review of Sable's application for a waiver for the limited effectiveness of the cathodic protection system on CA-324 and CA-325A/B. A true and correct copy of the letter is attached hereto as **Exhibit C**. OSFM did not respond to this request. A similar request was submitted by thirteen members of the State Legislature. A true and correct copy of the letter is attached hereto as **Exhibit D**.

6.      EDC and Center for Biological Diversity (CBD) then retained a pipeline safety expert, Richard B. Kuprewicz, to evaluate the proposed waivers. Mr. Kuprewicz provided his report on or about December 20, 2024. (See *Evaluation of the Las Flores Pipeline System Startup Proposal*, attached to Declaration of Richard B. Kuprewicz.) In his report, Mr. Kuprewicz explained why inline inspection (ILI) technologies "cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the pipelines." He also pointed out that segments of the pipeline at risk for "corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure" and the existing pipeline "cannot be made as safe as new pipelines." He concluded that the same problem that caused the 2015 pipeline rupture – external corrosion – cannot be avoided by the terms and conditions of the proposed waivers. Specifically, he noted that both ILI tools and hydrotests are inadequate to detect all types of corrosion.

7.      On or about December 23, 2024, EDC and CBD submitted Mr. Kuprewicz's report to Joe Tyler, California Fire Chief. Neither the Fire Chief nor any other staff at OSFM responded to the report.

8.      When EDC learned that OSFM had granted preliminary approval of the requested State Waivers, EDC again retained Mr. Kuprewicz to evaluate the Waivers for compliance with State and Federal pipeline safety standards. Mr. Kuprewicz provided his report to EDC and CBD on or about February 21, 2025. (See *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*, attached to Declaration of Richard B. Kuprewicz.)

In his report, Mr. Kuprewicz identified "[m]ajor" deficiencies, including reliance on ILI tools that "can miss a lot of cracks" in the pipelines, and are ineffective to detect pit corrosion and corrosion within dents; lack of a key corrosion tracking process; inadequate hydrotest pressure to screen for corrosion cracking; and lack of hydrotesting for CA-325B. He also noted that ILI runs failed to adequately identify pipe wall loss prior to the 2015 spill. He concluded that there is insufficient justification to find that the Waivers will provide an equal or greater level of safety as a pipeline with an effective corrosion prevention system.

9. On or about March 2, 2025, CBD submitted Mr. Kuprewicz's report to OSFM. OSFM did not respond to this report.

10. **Exhibit E**, attached hereto, is a true and correct copy of excerpts from the County of Santa Barbara's Administrative Draft Environmental Impact Report/Environmental Impact Statement for the Plains Rp, dated February 2022. The excerpt includes a Risk of Upset analysis regarding the potential restart of the Pipeline System. EDC obtained this document through a Public Records Act request.

11. On May 19, 2025, Sable filed a Form 8-K report with the Securities and Exchange Commission (SEC). The report, which included a press release and presentation materials, states that Sable began producing oil from Platform Harmony on May 15, 2025, and expects to fill the storage facilities at Las Flores Canyon by the middle of June, 2025. **Exhibit F**, attached hereto is a true and correct copy of the report and attachments that I downloaded from SEC's website on May 27, 2025, at https://www.sec.gov/Archives/edgar/data/1831481/000119312525122079/d943067d8k.htm.

12. On May 27, 2025, Sable filed a Form 8-K report with the SEC. The report states that Sable "has now successfully hydrotested all segments of Line 324 and Line 325 (collectively, the "Onshore Pipeline"), satisfying the final operational condition to restart of the Onshore Pipeline in the Consent Decree. Therefore, no more repairs are required to the Onshore Pipelines prior to restart." **Exhibit G**, attached hereto is a true and correct copy of the report and that I downloaded from SEC's website on May 28, 2025, at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148125000042/socc-20250527.htm.

13.     On May 19, 2025, I sent an email to Josh Cleaver, counsel for OSFM, inquiring whether the public would be able to review and comment on Sable's Restart Plans for CA-324 and CA-325A/B. Later that day, Mr. Cleaver informed me via email that there would be no opportunity for public review and comment regarding the Restart Plans.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 2nd day of June, 2025, in Santa Barbara, California.



_____

Linda Krop

Declaration of Linda Krop in Support of Petitioners' Application for Stay or OSC and TRO

## Exhibit Index

*[Exhibits Supporting Declaration of Linda Krop in Support of Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order]*

| Exhibit | Description | Page No. |
|---|---|---|
| A | Letter from environmental organizations to OSFM, requesting public review and hearings, sent March 1, 2024 | 7-13 |
| B | Letter from environmental organizations to OSFM, requesting public review and hearings, sent September 10, 2024 | 14-23 |
| C | Letter from EDC to OSFM, requesting environmental and public review of Sable's application for a waiver for the limited effectiveness of the cathodic protection system on CA-324 and CA-325A/B, sent September 27, 2024 | 24-66 |
| D | Letter by thirteen members of the State Legislature to OSFM, similarly requesting environmental and public review of Sable's application for a waiver for the limited effectiveness of the cathodic protection system on CA-324 and CA-325A/B | 67-71 |
| E | Excerpts from the County of Santa Barbara's Administrative Draft Environmental Impact Report/Environmental Impact Statement for the Plains Rp, dated February 2022 | 72-175 |
| F | Form 8-K report, filed by Sable with the Securities and Exchange Commission (SEC), downloaded from SEC's website on May 27, 2025 | 176-199 |
| G | Form 8-K report, filed by Sable with the Securities and Exchange Commission (SEC), downloaded from SEC's website on May 28, 2025 | 200-203 |

# Exhibit A

     

   

    

  

   

March 1, 2024

Chief Jim Hosler, Assistant Deputy Director
Pipeline Safety and CUPA
Office of the State Fire Marshal
715 P Street
Sacramento, CA 94244-2460

**Re:    Request for Public Hearings and Engagement on the Risk Analysis, State Waiver, and Restart Plan for Line 901/903**

Dear Chief Hosler,

We, the undersigned 23 organizations, write to request from the Office of the State Fire Marshal (CalFIRE) more transparency and public engagement in evaluating the safety of the restart of pipeline 901/903, which caused one of the most disastrous oil spills in California history. Ultimately, this pipeline should be decommissioned and not returned to service. However, if CalFIRE continues to evaluate a restart request for this pipeline system, it must conduct more public outreach. The potential reactivation of this pipeline poses considerable risks to both public safety and environmental integrity, warranting thorough public scrutiny and input before any decision is made.

**CalFIRE should ultimately deny requests to restart this unsafe pipeline, which should instead be decommissioned**

On May 19, 2015, Plains' Line 901 ruptured and spilled over 450,000 gallons of crude oil into the surrounding environment.[1] This rupture was caused in part by progressive external corrosion and ineffective protection against that corrosion.[2] The pipeline failed despite receiving prior approvals from state and federal agencies, and it is increasingly likely to fail again with each passing year if allowed to resume operations. The previous owner of the pipeline was found criminally liable for failing to maintain the pipeline, and killing marine wildlife, among other charges. The report found that the company had allowed the pipeline wall to corrode to 1/16th of an inch before the spill occurred.

The PHMSA failure investigation report states that "cathodic protections are required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines," but that cathodic protections are not effective on a pipeline like Line 901/903, a buried *insulated* pipeline.

These extensive corrosion issues and coating/insulation failures were unknown and unaccounted for in the antiquated and inadequate 1986 Environmental Impact Report (EIR)[3]. This EIR also indicated that the intended lifespan of the pipeline was 30 years, and that timeframe has now lapsed.

The pipeline has sat idle in the environment ever since that catastrophic rupture almost ten years ago. It has been deemed unsuitable for the generally required safety measures and should just be decommissioned.  The outdated EIR for the pipeline's operation, the lack of a clear and transparent plan to account for present and future external corrosion, and the urgency of securing a commitment and execution of pipeline decommissioning all serve as valid reasons for CalFIRE to reject any application for activities associated with Line 901/903. While they once pursued a new pipeline, its owners/operators have now doubled down on trying to restart the decaying pipeline. Restarting Line 901/903 risks more fouling of our beaches, waterways, wildlife, Tribal cultural resources, human health, ecosystems, and coastal economy and is contrary to California's commitment to transition away from fossil fuels and their infrastructure.

---

[1] Expert Report of Igor Mezic, Ph.D., Andrews v. Plains All American Pipeline, L.P., United States District Court, Central District of California, Case No. 2:15-cv-04113-PSG-JEM, March 29, 2019 (pp. 16-17).
[2] U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 (May 2016). Available at: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf

[3] 1986 Environmental Impact Report for the Celeron/All American/Getty Pipeline Projects, available at: https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt

For these reasons, we request that CalFIRE reject any state waiver, startup plan, or other authorizations that would allow restart of Lines 901/903.

If despite all of this, CalFIRE proceeds, it must do so with full public participation and transparency.

**Consideration of a Line 901/903 restart must be done with public transparency and engagement**

While our position is that CalFIRE should deny the applicant's state waiver, startup plan, and other approvals required to restart pipeline 901/903, we request at minimum with this letter that CalFIRE be much more transparent with the public and actively engage stakeholders as this process unfolds. Appropriate public outreach should include:

- Maintaining a publicly available dashboard for this process: the public deserves clear communication on the steps and timeline for restart. This pipeline is an issue of extreme concern for Santa Barbara, San Luis Obispo, and Kern County residents in particular, but it is of broader public interest as well. We urge CalFIRE to create a public, online dashboard with routine updates and relevant links and documents to keep the public informed about the processes underway and evaluations being made (for example, publicly available smart pigging data and hydrostatic testing results) for pipeline 901/903.

- Providing documents to the public before decisions are made and without the need to submit public records act requests: these documents include any applications or requests submitted by the applicants/operators; draft and approved risk analyses; proposed pipeline corrosion prevention plans; integrity management plans; evidence of the applicants/operators financial assurances, including bonding, for pipeline accidents and decommissioning; operator communications; state waiver requests (from cathodic protection or any other requirements), analyses and documentation; proposed restart plans; all decision documents from reviewing agencies to the applicants/operators; and any other relevant documents or communications.

- Holding multiple public hearings: CalFIRE should schedule several public hearings that provide the public with an opportunity to comment on the restart request, risk analysis, state waiver, restart plan, and any other approvals needed to return to service. The pipeline's and industry's history of environmental harm, highlighted by the disastrous spill in 2015, and their request for waivers from generally required technologies and processes

underscores the critical need for transparency and community involvement in the decision-making process. It is imperative that affected communities, Tribes, scientists, state agencies including but not limited to the California Natural Resources Agency, the Office of Spill Prevention and Response (OSPR), California Coastal Commission (CCC), and the California State Lands Commission (SLC), and the public have the opportunity to voice their concerns, raise questions, and offer insights regarding the proposed restart plan.

A public hearing or meeting would provide a platform for stakeholders to engage in meaningful dialogue with CalFIRE officials, exchange vital information, and collectively explore alternatives that prioritize public safety and environmental protection. By fostering transparency, accountability, and inclusivity, such a forum would not only enhance the decision-making process but also reaffirm CalFIRE's commitment to upholding the public interest and its public trust duties.

We appreciate your consideration of these requests and would appreciate a written response to each of them within 2 weeks.

Sincerely,

Brady Bradshaw
Senior Oceans Campaigner
Center for Biological Diversity

Gabriel Frausto
Tribal Chair
Coastal Band of the Chumash Nation

Tevin Schmitt
Watershed Scientist
Wishtoyo Chumash Foundation

Linda Krop
Chief Counsel
Environmental Defense Center

Ana Citrin
Legal and Policy Director
Gaviota Coast Conservancy

Katie Davis
Chair
Sierra Club Santa Barbara-Ventura Chapter

Ken Hough
Co-Executive Director
Santa Barbara County Action Network

Sharon Broberg
Steering Committee Member
350 Santa Barbara

Farah Stack
Policy Associate
Community Environmental Council

Michael Lyons
President
Get Oil Out!

Veronica Wilson
California Organizer
Labor Network for Sustainability

Irene Cooke
Organizer
Society of Fearless Grandmothers - Santa Barbara

Rachel Altman
Administrator
Santa Barbara Standing Rock Coalition

Dee Fromm
Managing Director
Coastal Lands Action Network

Haley Ehlers
Executive Director
Climate First: Replacing Oil & Gas (CFROG)

Marcia Hanscomb
Community Organizer
Defend Ballona Wetlands

Robert J. van de Hoek
Environmental Scientist and Conservation Biologist
Ballona Wetlands Institute

Leanne Ly and Isabella Ponce
Co-Executive Chairs
UCSB AS Environmental Affairs Board

Carla Mena
Director of Policy and Legislative Affairs
Los Padres ForestWatch

Carolyn Chaney
Co-Chair
Live Oak Unitarian Universalist Social Justice Ministry

Robert M. Gould, MD
President
San Francisco Bay Physicians for Social Responsibility

Cari Barcas
Communications Director
Stand.earth

Vicki Allen
Vice President for Communications
League of Women Voters of Santa Barbara

# Exhibit B



































September 10, 2024

Chief Jim Hosler, Assistant Deputy Director
Pipeline Safety and CUPA
Office of the State Fire Marshal
715 P Street
Sacramento, CA 94244-2460

**Re:    Request for Public Hearings and Engagement on the Risk Analysis, State Waiver, and Restart Plan for Lines 901/903 (CA-324/CA-325)**

Dear Chief Hosler,

We, the undersigned 28 organizations, write to renew our request from the Office of the State Fire Marshal (CAL FIRE) for more transparency and public engagement in evaluating the safety of the restart of pipelines 901 and 903, now referred to by CAL FIRE as CA-324 and CA-325, respectively, which caused one of the most disastrous oil spills in California history. Ultimately, these pipelines should be decommissioned and

not returned to service. The potential reactivation of these pipelines poses considerable risks to both public safety and environmental integrity, warranting thorough public scrutiny and input before any decision is made.

On March 22, 2024, CAL FIRE responded to a community letter requesting an open and transparent process that allows for meaningful public input. In its response, CAL FIRE agreed to "[h]old public meetings and engage with the public at appropriate milestones for a potential restart." Identified milestones included the risk analysis, state waiver, repairs and testing, and restart plan.

**We maintain that CAL FIRE should ultimately deny requests to restart these unsafe pipelines, which should instead be decommissioned. We also request public hearings regarding each milestone event <u>before</u> decisions are made.**

On May 19, 2015, Plains' Line 901 (CA-324) ruptured and spilled over 450,000 gallons of crude oil into the surrounding environment.[1] This rupture was caused in part by progressive external corrosion and ineffective protection against that corrosion.[2] The pipeline failed despite receiving prior approvals from state and federal agencies, and it is increasingly likely to fail again with each passing year if allowed to resume operations. The previous owner of the pipeline was found criminally liable for failing to maintain the pipeline and killing marine wildlife, among other charges. The PHMSA failure investigation report found that the company had allowed the pipeline wall to corrode to 1/16th of an inch before the spill occurred.

The PHMSA failure investigation report also stated that "cathodic protections are required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines," but that cathodic protections are not effective on a pipeline like Lines 901/903 (CA-324 and CA-325), a buried insulated pipeline.

These extensive corrosion issues and coating/insulation failures were unknown and unaccounted for in the antiquated and inadequate 1986 Environmental Impact Report (EIR).[3] This EIR also indicated that the intended lifespan of the pipelines was 30 years, and that timeframe has now lapsed.

---

[1] Expert Report of Igor Mezic, Ph.D., Andrews v. Plains All American Pipeline, L.P., United States District Court, Central District of California, Case No. 2:15-cv-04113-PSG-JEM, March 29, 2019 (pp. 16-17).
[2] U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 (May 2016), available at:
https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf
[3] 1986 Environmental Impact Report for the Celeron/All American/Getty Pipeline Projects, available at: https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.

The pipelines have sat idle in the environment ever since that catastrophic rupture almost ten years ago. They have been deemed unsuitable for the generally required safety measures and should just be decommissioned. The outdated EIR for the pipelines' operation, the lack of a clear and transparent plan to account for present and future external corrosion, and the urgency of securing a commitment and execution of pipeline decommissioning all serve as valid reasons for CAL FIRE to reject any applications for activities associated with Lines 901/903 (CA-324 and CA-325).

While they once pursued a new pipeline, their owners/operators have now doubled down on trying to restart the decaying pipelines. Yet the draft EIR for the abandoned pipeline replacement project is instructive. It cites a 1993 Office of the State Fire Marshall report for the proposition that there is "a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age."[4] It then estimated that restarting Lines 901/903 (CA-324 and CA-325) could result in a spill once a year, and a rupture once every four years even with the "installation of additional valve stations" as proposed.[5]

Restarting Lines 901/903 (CA-324 and CA-325) risks more fouling of our beaches, waterways, wildlife, Tribal cultural resources, human health, ecosystems, and coastal economy and is contrary to California's commitment to transition away from fossil fuels and their infrastructure.

For these reasons, we request that CAL FIRE reject any state waiver, startup plan, or other authorizations that would allow restart of Lines 901/903 (CA-324 and CA-325).

If despite all of this, CAL FIRE proceeds, it must do so with full public participation, transparency, and environmental review.

**Consideration of a restart for** Lines 901/903 (CA-324 and CA-325) **must be done with public transparency, engagement, and robust environmental review.**

While our position is that CAL FIRE should deny the applicant's state waiver, startup plan, and other approvals required to restart Lines 901/903 (CA-324 and CA-325), we request at minimum with this letter that CAL FIRE be much more transparent with the public and actively engage stakeholders as this process unfolds and conduct a full environmental review of the restart. Appropriate public outreach should include:

- Maintaining a publicly available dashboard for this process: the public deserves clear communication on the steps and timeline for restart. These

---

[4] Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 78, available at https://www.environmentaldefensecenter.org/wpcontent/ uploads/2024/08/DEIR_PlainsReplacementPipeline_03.21.22.pdf.
[5] *Id.* at p. 79.

pipelines are an issue of extreme concern for Santa Barbara, San Luis Obispo, and Kern County residents in particular, but it is of broader public interest as well. We urge CAL FIRE to create a public, online dashboard with routine updates and relevant links and documents to keep the public informed about the processes underway and evaluations being made (for example, publicly available smart pigging data and hydrostatic testing results) for Lines 901/903 (CA-324 and CA-325). While CAL FIRE's website provides general information about pipeline restart processes, it fails to inform the public about clear opportunities for public engagement and fails to invite public input in any way.

- <u>Providing documents to the public before decisions are made and without the need to submit public records act requests</u>: these documents include any applications or requests submitted by the applicants/operators; draft and approved risk analyses; proposed pipeline corrosion prevention plans; integrity management plans; evidence of the applicants/operators financial assurances, including bonding, for pipeline accidents and decommissioning; operator communications; state waiver requests (from cathodic protection or any other requirements), analyses and documentation; proposed restart plans; all decision documents from reviewing agencies to the applicants/operators; and any other relevant documents or communications. If CAL FIRE is currently reviewing applications for a state waiver, the public has so far been denied the opportunity to understand or provide input on the waiver.

- Conducting a full environmental review of the restart decisions. If CAL FIRE were to approve a proposed restart for Lines 901/903 (CA-324 and CA-325), the public will have been denied an opportunity to provide critical input on an action that not only should be available for public input, but should also be subject to extensive environmental review. CAL FIRE has also not provided any clarity about when (or even if) it will conduct environmental review of its actions relating to restart of CA-324 and CA-325.

- <u>Holding multiple public hearings</u>: CAL FIRE should schedule several public hearings that provide the public with an opportunity to comment on the restart request, risk analysis, state waiver, restart plan, and any other approvals needed to return to service. The pipeline's and industry's history of environmental harm, highlighted by the disastrous spill in 2015, and their request for waivers from generally required technologies and processes underscore the critical need for transparency and community involvement in

Exhibits - Page 18

the decision-making process. It is imperative that affected communities, Tribes, scientists, state agencies (including but not limited to the California Natural Resources Agency, the Office of Spill Prevention and Response (OSPR), California Coastal Commission (CCC), and the California State Lands Commission (SLC)), and the public have the opportunity to voice their concerns, raise questions, and offer insights regarding the proposed restart plan. CAL FIRE's response committed to holding public meetings and engaging with the public throughout the process of reviewing the necessary restart applications. We are asking, specifically, for CAL FIRE to provide public hearings for each stage of the restart process – prior to decision-making - so that the public and entities noted above can meaningfully participate and provide input to the agency decisions.

Public hearings in which members of the public can provide input **in advance of** any agency decisions would provide a platform for stakeholders to engage in meaningful dialogue with CAL FIRE officials, exchange vital information, and collectively explore alternatives that prioritize public safety and environmental protection. By fostering transparency, accountability, and inclusivity, such a forum would not only enhance the decision-making process but also reaffirm CAL FIRE's commitment to upholding the public interest and its public trust duties.

Any pending approvals of applications for restart of Lines 901/903 (CA-324 and CA-325) should not move forward without meaningful public engagement, including and environmental review, specifically, all of the elements we have mentioned in this letter.

We appreciate your consideration of these requests and would appreciate a written response to each of them within 1 week.

Sincerely,

Brady Bradshaw
Senior Oceans Campaigner
Center for Biological Diversity

Gabriel Frausto
Tribal Chair
Coastal Band of the Chumash Nation

Linda Krop
Chief Counsel
Environmental Defense Center

Tevin Schmitt
Watershed Scientist
Wishtoyo Chumash Foundation

Katie Davis
Chair
Sierra Club Santa Barbara-Ventura Chapter

Ken Hough
Co-Executive Director
Santa Barbara County Action Network

Michael Lyons
President
Get Oil Out!

Ted Morton
Executive Director
Santa Barbara Channelkeeper

Haley Ehlers
Executive Director
Climate First: Replacing Oil & Gas (CFROG)

Sharon Broberg
Steering Committee Member
350 Santa Barbara

Farah Stack
Policy Associate
Community Environmental Council

Barbara Sattler, RN, DrPH, FAAN
Leadership Council
California Nurses for Environmental Health and Justice

Leanne Ly and Isabella Ponce
Co-Executive Chairs
UCSB AS Environmental Affairs Board

Carla Mena
Director of Policy and Legislative Affairs
Los Padres ForestWatch

Vicki Allen
Vice President for Communications
League of Women Voters of Santa Barbara

Veronica Wilson
California Organizer
Labor Network for Sustainability

Irene Cooke
Organizer
Society of Fearless Grandmothers – Santa Barbara

Matt Leonard
Director
Oil and Gas Action Network (OGAN)

Nicole Ghio
Senior Fossil Fuels Program Manager
Friends of the Earth US

Emiliano Campobello
Administrator
Santa Barbara Standing Rock Coalition

Shoshana Wechsler
Co-coordinator
Sunflower Alliance

Dee Fromm
Managing Director
Coastal Lands Action Network

Marcia Hanscomb
Community Organizer
Defend Ballona Wetlands

Robert J. van de Hoek
Environmental Scientist, Conservation Biologist
Ballona Wetlands Institute

Carolyn Chaney
Co-Chair
Live Oak Unitarian Universalist Social Justice Ministry

Robert M. Gould, MD
President
San Francisco Bay Physicians for Social Responsibility

Cari Barcas
Communications Director
Stand.earth

Valerie Ventre-Hutton
Legislative Analyst
350 Bay Area Action

cc:

Lieutenant Governor Eleni Kounalakis
Office of the Lieutenant Governor of California

Matthew Dumlao, Chief of Staff
Office of the Lieutenant Governor

Brian Goldman, Deputy Legal Affairs Secretary
Office of Governor Gavin Newsom

Lauren Sanchez, Senior Climate Advisor
Office of Governor Gavin Newsom

Senator Monique Limón
California State Senate

Assemblymember Gregg Hart
California State Assembly

Joe Tyler, Director
California Department of Forestry and Fire Protection

Wade Crowfoot, Secretary
California Natural Resources Agency

Le-Quyen Nguyen, Deputy Secretary for Energy
California Natural Resources Agency

David Shabazian, Director
California Department of Conservation

Lisa L. Halko, Chief Counsel
California Department of Conservation

Benjamin Turner, Chief Policy and Planning Advisor
California Department of Conservation

Jennifer Lucchesi, Executive Officer
California State Lands Commission

Kate Huckelbridge, Executive Director
California Coastal Commission

Cassidy Teufel, Deputy Director
California Coastal Commission

Malia Cohen, State Controller
California State Controller's Office

Kristina Kunkel, Deputy State Controller
California State Controller's Office

Joe Stephenshaw, Director
California Department of Finance

Michele Perrault, Chief Deputy Director, Policy
California Department of Finance

Supervisor Das Williams, District 1
Santa Barbara County Board of Supervisors

Supervisor Laura Capps, District 2
Santa Barbara County Board of Supervisors

Supervisor Joan Hartmann, District 3
Santa Barbara County Board of Supervisors

Supervisor Bob Nelson, District 4
Santa Barbara County Board of Supervisors

Supervisor Steve Lavagnino, District 5
Santa Barbara County Board of Supervisors

# Exhibit C



**environmental**
DEFENSE CENTER

September 27, 2024

Mr. Joe Tyler, Director/Fire Chief
Mr. Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
P.O. Box 944246
Sacramento, CA 94244-2460
*Via Email: Joe.Tyler@fire.ca.gov; Daniel.Berlant@fire.ca.gov*

Re:    **Restart of CA-324 and CA-325: Office of State Fire Marshal's Obligation to Conduct Environmental Review; Renewed Request for Public Process**

Dear Mr. Tyler and Mr. Berlant:

On behalf of Get Oil Out! ("GOO!"), Santa Barbara County Action Network ("SBCAN"), and the Environmental Defense Center ("EDC"),[1] we write to request that the Office of the State Fire Marshal ("OSFM") conduct environmental review of Sable Offshore Corporation's ("Sable") proposal to restart pipelines CA-324 and CA-325, pursuant to OSFM's obligations under the California Environmental Quality Act ("CEQA"). We also renew our request for a public process, which is appropriate under the circumstances and, in the case of Sable's request for a State Waiver, required by law.

As you know, Sable is seeking approval from OSFM to restart CA-324 and CA-325[2] (together, the "Las Flores Pipeline System") despite their lack of effective cathodic protection. As OSFM also knows, this lack of protection is ultimately what caused CA-324 to rupture in 2015, resulting in a catastrophic oil spill at Refugio Beach State Park. The spill closed public

---

[1] GOO! was formed in the wake of the 1969 Santa Barbara Oil Spill and continues to work to protect California from further oil and gas development and exploitation. SBCAN is a countywide grassroots organization that works to promote social and economic justice, to preserve our environmental and agricultural resources, and to create sustainable communities. EDC is a nonprofit public interest law firm that defends nature and advances environmental justice on California's Central Coast through advocacy and legal action.

[2] These pipelines were previously known as Lines 901 and 903 before they were reclassified as intrastate pipelines.

906 Garden St. Santa Barbara, CA 93101
PHONE (805) 963-1622
www.EnvironmentalDefenseCenter.org                    Exhibits - Page 25

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 2 of 14

parks and beaches, killed and injured wildlife, shut down fisheries, and destroyed sensitive habitats and cultural resources.[3]

Our clients were involved in the immediate response to the Refugio Oil Spill and remain concerned about the risks of operating the Las Flores Pipeline System. They have well-founded concerns that CA-324 and CA-325 cannot be safely restarted and, as to Sable, that this speculative company will not be able to responsibly operate the pipelines or fulfill its remediation obligations when another spill occurs.

Developments in the wake of the spill — namely, the discovery that these pipelines lack effective cathodic protection — have fundamentally altered the project that was envisioned when the pipelines were installed nearly four decades ago. Without cathodic protection, the risk of a spill from these pipelines is five times greater than was initially estimated.[4] Indeed, bringing the pipelines back online would not only invite another oil disaster on the Central Coast, but according to at least one governing body, all but ensure it.[5] But for OSFM's discretionary approvals here, no environmental impacts from these pipelines would occur.

Accordingly, in reviewing Sable's proposal to restart the pipelines, CEQA requires that OSFM prepare a new or subsequent Environmental Impact Report ("EIR") that considers the risks associated with operating these corroded pipelines without effective cathodic protection, which, to date, have not been evaluated. Thus, we urge OSFM to conduct additional environmental review *before* approving a restart of these pipelines, as the law requires.

**I.**    <u>**OSFM Must Conduct Environmental Review under CEQA before Authorizing Sable to Restart Lines CA-324 and CA-325.**</u>

Pursuant to the 2020 Consent Decree entered in *U.S. v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (the "Consent Decree"), as well as state law passed in the wake of the Refugio Oil Spill, Sable has asked — or will ask — OSFM to approve (1) a Risk Analysis, (2) a State Waiver for the limited effectiveness of cathodic protection, and, ultimately, (3) a Restart Plan. Thus, cumulatively, Sable seeks approval from OSFM to restart the Las Flores Pipeline System without effective cathodic protection (the "Restart Project").

Should OSFM take the position that the proposed restart does not constitute a new "project" — which is subject to reasonable dispute[6] — that would not mark the end of its CEQA analysis or relieve its obligation to conduct environmental review.

---

[3] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 3 (June 2021) [hereinafter "NRDA"], available at: https://nrm.dfg. ca.gov/FileHandler.ashx?DocumentID=193144&inline.

[4] Santa Barbara County, Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 79 [hereinafter "County Draft EIR"], attached hereto.

[5] *Id.*

[6] Having not transported oil or gas for nearly ten years, a restart of these pipelines would not simply be a return to the status quo, particularly in light of the State Waiver Sable is seeking. The Restart Project is fundamentally

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 3 of 14

If the Restart Project is not itself considered a "project," then OSFM's determinations here would constitute new approvals for the Celeron/All American and Getty Pipeline Project (the "Celeron Project"), which was the initial proposal to install and operate the Las Flores Pipeline System. Where, as here, an agency issues subsequent discretionary approvals for a project — *see* Part I.A., *infra* — it is required to examine the sufficiency of the project's prior EIR. (*Friends of the Coll. of San Mateo Gardens v. San Mateo Cnty. Cmty. Coll. Dist.* (2016) 1 Cal.5th 937, 951-52.)

The EIR for the Celeron Project (the "Celeron EIR")[7] was certified in 1985[8] — nearly forty years ago, and before the discovery that the Las Flores Pipeline System lacks effective cathodic protection. Because the findings in the prior EIR were premised on an effective cathodic protection system, and Sable is now proposing to operate the pipelines without such protection, CEQA requires that OSFM prepare a subsequent EIR. (*See* Pub. Res. Code, § 21166; CEQA Guidelines § 15162.)

### A.  OSFM's Approval of the Restart Project is Discretionary, not Ministerial, and Thus is Not Exempt from CEQA.

Compliance with CEQA may be excused where a proposed activity falls within certain statutory or categorical exemptions. (*See, e.g., Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1186.) The threshold statutory exemption is for "ministerial projects," "which are defined generally as projects whose approval does not require an agency to exercise discretion." (*Id.*; *accord* Pub. Res. Code, § 21080(b)(1); CEQA Guidelines § 15369.) However, because OFSM has wide latitude at each step of the restart process to approve, deny, or modify the Restart Project, OSFM's approval of the Restart Project is a discretionary decision that is not exempt from CEQA review.

#### 1.  Discretionary versus Ministerial Projects

Distinguishing discretionary projects from ministerial ones turns on whether the exercise of judgment or deliberation is required in making the decision. (CEQA Guidelines § 15357.) The "key question is whether the public agency can use its subjective judgment to decide whether and how to carry out or approve [the] project." (*Id.*; see also CEQA Guidelines § 15002(i).) "Whether an agency has discretionary or ministerial controls over a project depends

---

different than the initial proposal to install and operate these pipelines in the 1980's, which was considered as a 30-year project. Restarting the pipelines would be akin to bringing online a new and different oil and gas operation that capable of causing significant environmental effects. (*See* Pub. Res. Code, § 21065; *see also* CEQA Guidelines § 15378(a) (defining "project" as an action "which has a potential for resulting in either a direct physical change in the environment or a reasonably foreseeable indirect physical change").)

[7] The Final EIR published in 1985 is a finalizing addendum to the 1984 Draft EIR. The preface of the Final EIR explains that the Final EIR is intended to be read "in conjunction with, rather than in place of, the Draft EIR/EIS that was released for public review on August 1, 1984." Thus, collectively, the two documents and their appendices form the project EIR.

[8] California State Lands Commission et al., *Final Environmental Impact Report Environmental Impact Statement*, (January 1985) [hereinafter "Final Celeron EIR"].

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 4 of 14

on the authority granted by the law providing the controls over the activity." (CEQA Guidelines § 15002(i)(2).)

Courts have developed a "functional test" to refine the distinction between discretionary and ministerial projects, which focuses on the scope of agency discretion. (*See Protecting our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 459, 467.)  The touchstone of the test "is whether the relevant 'approval process . . . allows the government to shape the project in any way [by requiring modifications] which could respond to any of the concerns which might be identified' by environmental review." (*Id.* (citations omitted).) "If so, the project is discretionary." (*Id.*)

### 2. Discretionary Aspects of OSFM Approval

As an initial matter, the Consent Decree, which controls and outlines the restart process, does not actually require that OSFM approve a restart or any of Sable's underlying applications. It vests OSFM with the authority to approve a Risk Analysis, State Waiver, and Restart Plan, but it does not set forth conditions under which OSFM must do so. Nor does it purport to limit the scope of OSFM's discretion in considering them. In fact, as discussed further below, the Consent Decree specifically acknowledges OSFM's wide latitude to approve or modify the Restart Project.

Indeed, OSFM has itself acknowledged the broad discretion it has here in reviewing the Restart Project. The OSFM website, for example, notes that the Consent Decree only specifies "the *minimum requirements* for restarting CA-324 and CA-325."[9] Per Deputy State Fire Marshal Kara Garret, OSFM may impose "other safety requirements deemed necessary by our office," suggesting that it generally has discretion to shape the Restart Project. [10] The County, which has also weighed in on OSFM's discretion here, was even more explicit: "discretionary actions to permit restart activities are needed from [OSFM]."[11]

Such discretion, which can be exercised to shape the Restart Project, is apparent at each step of the restart process.

Take OSFM's Risk Analysis review, for example. Pursuant to 19 C.C.R. section 2110(b), OSFM must assess the "adequacy" of a Risk Analysis by evaluating, among other things, what constitutes "best available technology," the "assumptions and conclusions reached by an operator," and any "additional information that may be relevant to . . . .assessing or determining the adequacy of a [R]isk [A]nalysis." Each of these considerations, and the determination of

---

[9] *Pathways for Restarting Pipelines*, Office of the State Fire Marshal, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited September 26, 2024).

[10] Giana Magnoli, *Sable Offshore Corp. Takes Over Exxon's Santa Barbara Oil Assets, Sets Sights on Restarting Operations*, Noozhawk (February 14, 2024) (emphasis added), available at: https://www.noozhawk.com/sable-offshore-corp-takes-over-exxons-santa-barbara-oil-assets-sets-sights-on-restarting-operations.

[11] Santa Barbara County, *Revised Notice of Preparation*, pp. 2-3 [hereinafter "Revised NOP"], available at https://files.ceqanet.opr.ca.gov/170616-2/attachment/kMgGnx0tQr16ZTEvxK9MMeqNrLQO9Zgzm79wtnPIiz9ypKehMDgvTH0hm3te5DOx4NMf_ebkpJow0wNe0.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 5 of 14

adequacy as a whole, inherently requires that OSFM exercise a large degree of subjective judgment — a hallmark of discretion. (*See* CEQA Guidelines § 15357.) Moreover, OSFM is explicitly authorized to condition its acceptance of a Risk Analysis on additional requirements or modifications. (19 C.C.R. § 2112(d).) "If [an] agency is empowered to disapprove or condition approval of a project . . . the project is discretionary." (*Protecting Our Water*, 10 Cal.5th at 494.)

The State Waiver process is likewise replete with agency discretion. The federal statute authorizing OSFM to issue a State Waiver provides that a state authority "*may* waive compliance with a safety standard," but it does not *require* approval of a waiver, and it does not set forth specific conditions under which OSFM may approve a waiver. (49 U.S.C. § 60118(d) (emphasis added).) It suggests only that a waiver may be granted on terms that OSFM "considers appropriate," which is echoed in our state statutory scheme that regulates safety exemptions. (*See* 49 U.S.C. § 60118(c), (d); Gov. Code, § 51011(b).) In other words, whether to grant a waiver, and under what conditions, is entirely at the discretion of OSFM. The Consent Decree recognizes as much, stating that "[n]othing in this CD shall be construed to limit the authority of [] OSFM to require additional terms or conditions in the State Waiver."[12] Notably, review of a Special Permit — the federal equivalent to a State Waiver — generally requires environmental review at the federal level.[13]

As to the Restart Plan, it appears to be a creature of the Consent Decree and lacks specific statutory or regulatory guidance. However, the Consent Decree requires that the Restart Plan include, for example, "*adequate* patrolling" and "*sufficient* surveillance."[14] Such conditions are imbued with ambiguity, and they ultimately require OSFM to exercise its subjective judgment to determine whether they are met. Ambiguous terms that "permit a great degree of latitude in the review of [] plans and are not subject to mechanical application" suggest discretionary action. (*Natural Resources Defense Council, Inc. v. Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 970.)

In sum, OSFM's review of the Restart Project — and each underlying approval — necessarily requires that it use its subjective judgment. And, OSFM is authorized at each step of the approval process to condition and/or modify the project to address specific safety concerns and environmental hazards. Thus, the Restart Project is plainly a discretionary project that is not exempt from CEQA review. (*See Protecting our Water*, 10 Cal.5th at 467 (outlining the "functional test").)

---

[12] Consent Decree, at Appendix B, Condition 1(E), U.S. v. Plains All American Pipeline, Civil Action No. 2:20-cv-02415 (March 13, 2020) [hereinafter "Consent Decree"], available at https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf.

[13] *See generally* U.S. Department of Transportation Pipeline Safety and Hazardous Materials Safety Administration, *Final Environmental Assessment and Finding of No Significant Impact* (October 2018), available at https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2020-08/2017-0155-HECO-Waiau-Pipeline-SP-FEA-and-FONSI.pdf.

[14] Consent Decree, *supra* note 12, at Appendix D, Conditions 1(B)(2), (3), emphasis added.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 6 of 14

**B.    OSFM Must Prepare a Subsequent EIR Before Approving the Restart
Project.**

Again, where an agency issues subsequent discretionary approvals for a project, it is
required to examine the sufficiency of the project's prior EIR.  (*Friends of the Coll. of San
Mateo Gardens*, 1 Cal.5th at 951-52.) That inquiry is two-fold. (*Id.*) First, the agency must
consider whether the prior EIR retains any "informational value" to inform its subsequent
determinations. (*Id.*) If it does not, then it must prepare a new EIR. (*Id.*) If it does, then the
agency must evaluate whether additional environmental review is warranted under Public
Resources Code section 21166. (*Id.*)

Section 21166 requires additional environmental review when (1) certain new
information, which was not known and could not have been known at the time the EIR was
certified as complete, becomes available; (2) substantial changes occur with respect to the
circumstances under which the project is being undertaken which will require major revisions in
the EIR; or (3) substantial changes are proposed in the project which will require major revisions
of the EIR.  (Pub. Res. Code § 21166; CEQA Guidelines § 15162; *Friends of the Coll. of San
Mateo Gardens*, 1 Cal.5th at 943.) The proposal to restart the Las Flores Pipeline System despite
the recent discovery that the pipelines lack effective cathodic protection warrants subsequent
review under each of the Section 21166 considerations.

1.    The Discovery that the Las Flores Pipeline System Lacks Effective
Cathodic Protection Constitutes New Information that Requires OSFM to
Prepare a Subsequent EIR.

Under CEQA, additional environmental review is required when

New information of substantial importance, which was not known and could not
have been known with the exercise of reasonable due diligence at the time the
previous EIR was certified as complete or the negative declaration was adopted,
shows . . . :

. . .

(B) Significant effects previously examined will be substantially more severe than
shown in the previous EIR.

(CEQA Guidelines § 15162(a)(3)(B).)

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 7 of 14

> *a.    The Discovery that the Pipelines Lack Effective Cathodic Protection is "New Information of Substantial Importance."*

The Celeron Project was proposed as a pipeline system that would have effective cathodic protection to prevent corrosion. And, in evaluating the environmental effects of the project, the Celeron EIR understood that to be true.[15]

However, as we unfortunately now know, that is not the case. In the wake of the 2015 Refugio Oil Spill, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") determined that the rupture in CA-324 was a result of progressive external corrosion, and that the Las Flores Pipeline System's cathodic protection system — intended to prevent such corrosion — was ineffective.[16] That information was not known until 2016 — thirty-one years after the Celeron EIR was certified.

As to buried, insulated lines more generally, it was previously understood that they could be susceptible to aggressive corrosion despite the implementation of cathodic protection. But no formal consensus existed as to the ineffectiveness of cathodic protection prior to a National Association of Corrosion Engineers ("NACE") report that was issued in 1992 — seven years after the Celeron EIR was certified.[17]

Thus, the Las Flores Canyon System's extensive corrosion issues and coating/insulation failures were unknown and unaccounted for in the antiquated Celeron EIR. Indeed, the Celeron EIR indicates staff were unaware that cathodic protection would be ineffective, as it states that the project "would be equipped with a cathodic protection system to reduce or prevent pipeline corrosion."[18]

The relative importance of this new finding cannot be understated. It fundamentally alters the nature of the Celeron Project and upends the foundational underpinnings of the Celeron EIR. Indeed, in predicting the likelihood of an oil spill — the primary environmental impact considered — the Celeron EIR relied on cathodic protection as a design specification that "would reduce the probability of an event [oil spill] occurring."[19] While the lead agency likely expected its predictions of the probability of an oil spill to be reasonable, not perfect, the difference in effectiveness of cathodic protection on insulated pipelines meant that the risk of a leak was *five times higher* than anticipated, as discussed further below.[20]

---

[15] Final Celeron EIR, *supra* note 8, at 2-57 (citing "cathodic corrosion protection" as a measure that would be "very effective" in reducing the risk of groundwater contamination from an oil spill); *see also id.* at 2-94, 2-106.

[16] Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California*, pp. 3, 14 (May 2016) [hereinafter "PHMSA Report"], available at: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

[17] *Id.* at Appendix O, p. 7.

[18] California State Lands Commission et al., *Draft Environmental Impact Report Environmental Impact Statement*, p. H-35 (August 1984) [hereinafter "Draft Celeron EIR"].

[19] Final Celeron EIR, *supra* note 8, at Appendix 4.3.

[20] County Draft EIR, *supra* note 4, at Section 5.6, p. 79.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 8 of 14

Accordingly, the limited effectiveness of cathodic protection in the Las Flores Pipeline System is incredibly consequential to an analysis of the pipelines' environmental impact. And, as discussed, that information was only discovered after the 2015 spill. Thus, it constitutes "new information of substantial importance" for purposes of Section 21166. (*See, e.g., Sec. Env't Sys., Inc. v. S. Coast Air Quality Mgmt. Dist.* (1991), 229 Cal.App.3d 110, 124 (holding that new information that undermined a key assumption used to evaluate the impacts of a project was of substantial importance).)

> b.    *Without Effective Cathodic Protection, the Effects Considered in the Celeron EIR Substantially Increase in Severity.*

As noted, without cathodic protection, the risk of a spill from the Las Flores Pipeline System increases dramatically.

As one governing body already found, another spill would not be a matter of if, but when.[21] According to a recent analysis conducted by the County of Santa Barbara, the lack of an effective cathodic protection system increases the likelihood of an oil spill by *five times*:

> The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate.[22]

The County concluded that restarting the pipelines without effective cathodic protection could result in a spill every year, and a rupture (a spill greater than five barrels) every four years.[23] And, a spill in the coastal zone could be nearly twice the size of the 2015 spill.[24]

The Celeron EIR assessed possible environmental impacts from pipeline operations in part by considering the likely frequency of spills.[25] However, as noted above, the EIR's spill frequency estimates were expressly premised on an effective cathodic protection system; without such protection, the likelihood of a spill is five times greater than the Celeron EIR estimated. By using an erroneous estimate of spill frequency to assess the project's environmental impacts, the Celeron EIR necessarily underestimated the severity of those impacts, and its impact findings are unreliable.

An increased frequency of spills could also lead to environmental impacts that were never even considered in the Celeron EIR. Indeed, the aggregate effects of multiple oil spills in

---

[21] *See id.*
[22] *Id.* at Section 5.6, p. 78.
[23] *Id.* at Section 5.6, p. 79.
[24] *Id.* at Section 5.6, p. 78.
[25] *See, e.g.,* Final Celeron EIR, *supra* note 8, at 1-20, 1-24.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 9 of 14

sensitive areas were never specifically addressed. For example, if another spill were to occur in an area impacted by the 2015 spill, damage to still-recovering coastal flora and fauna could be irreparable. Likewise, the compound effect of multiple spills into certain groundwater systems may be unmitigable.

With the possibility of five times as many spills as initially expected, the potential cumulative environmental impacts over the lifetime of the Celeron Project are far more severe than the Celeron EIR anticipated. Thus, OSFM is required to prepare a subsequent EIR before approving the Restart Project. (*See* CEQA Guidelines § 15162(a)(3)(B); *Sec. Env't Sys., Inc.*, 229 Cal.App.3d at 124.)

        2.      <u>OSFM Must Prepare a Subsequent EIR due to Substantial Changes in the Project and the Circumstances under which the Project is Being Undertaken.</u>

OSFM is also required to prepare a subsequent EIR due to the proposed changes to the Celeron Project and the substantial changes with respect to the circumstances under which the project is being undertaken. (Pub. Res. Code, § 21166(a), (b).) These changes, which stem from the failure of pipelines' cathodic protection system, create new significant effects and a substantial increase in the severity of previously identified significant effects. (CEQA Guidelines § 15162(a)(1), (2).)

        *a.*      *The Failure of the Cathodic Protection System and Resulting Corrosion Constitutes a Change in Circumstances that Requires a Subsequent EIR.*

As discussed above, the Celeron EIR relied on a cathodic protection system to prevent corrosion and minimize oil spill impacts.[26] It stated that "protection of a pipeline from corrosion is of critical importance" and "the entire pipeline would be protected from corrosion with cathodic protection systems . . . ."[27] And, it cited "cathodic corrosion protection" as a measure that would be "very effective" in reducing the risk of groundwater contamination from an oil spill.[28] The cathodic protection system failed, however, causing the pipelines to corrode and eventually rupture.[29]

As noted, the lack of an effective cathodic protection system increases the likelihood of an oil spill by five times and leads to pervasive corrosion throughout a pipeline system.[30] Operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the Celeron EIR.

---

[26] *See id.* at 4-53, 4-54, 4-55; Draft Celeron EIR, *supra* note 18, at H-35.
[27] Draft Celeron EIR, *supra* note 18, at 2-5, 4-106, 4-117.
[28] Final Celeron EIR, *supra* note 8, at 2-57; *see also* Final Celeron EIR at 2-94, 2-106.
[29] PHMSA Report, *supra* note 16, at 3, 13.
[30] County Draft EIR, *supra* note 4, at Section 5.6, p. 78.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 10 of 14

This change in circumstances means more possible spills over the lifetime of the project, which, as explained above, will result in additional and more severe environmental impacts than the Celeron EIR accounted for. (*See* Part II.B.2, *supra*.) Thus, OSFM must prepare a subsequent EIR to evaluate this change and the potential impacts it will cause. (CEQA Guidelines § 15162(a)(2).)

Indeed, EIRs are specifically intended to "provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment." (Pub. Res. Code § 21061.) The failure to prepare a subsequent EIR improperly deprives the public "of meaningful participation regarding the issue" of environmental harm cause by changed circumstances. (*Mira Monte Homeowners Assn. v. County of Ventura* (1985) 165 Cal.App.3d 357, 365.)

> b.    *The Change in Project Design to Operate Without Effective Cathodic Protections Requires Preparation of a Subsequent EIR.*

The Celeron Project was proposed as an oil and gas pipeline system that would have an effective cathodic protection system to prevent corrosion. And that is the project that was ultimately approved.

Now, however, Sable is seeking a State Waiver to operate the Las Flores Pipeline System without an effective cathodic protection system and well past its 30-year projected lifespan.[31] As discussed above, effective cathodic protection was a foundational aspect of the Celeron Project and its environmental review.[32] Indeed, as repeatedly alluded to throughout the Celeron EIR, such protection was an essential design element of the project, and the principal technology relied on to prevent a spill.[33]

Restarting the pipelines without an effective cathodic protection system represents a grave departure from the project that was initially envisioned and approved. (*See City of San Jose v. Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1015-17 (change in how water would be supplied to a project required additional environmental review).) The public, and other responsible agencies reviewing aspects of this project, have a right to understand how the project will be modified to address the defective cathodic protection system, and how the change affects the risk of another oil spill.

As explained at length above, operating without effective cathodic protection will result in additional and more severe environmental impacts than the Celeron EIR accounted for. (*See* Part II.B.2, *supra*.) This increase in severity of impacts, directly related to the failure of the cathodic protection system, requires the OSFM to prepare a subsequent EIR before deciding

---

[31] Draft Celeron EIR, *supra* note 18, at 2-35.

[32] *See, e.g.,* Final Celeron EIR, *supra* note 8, at 2-57, 2-94, 2-106, 4-53, 4-54, 4-55, H-35; Draft Celeron EIR, *supra* note 18, at 2-5, 4-106, 4-117.

[33] *See, e.g.,* Final Celeron EIR, *supra* note 8, at 2-57, 2-94, 2-106, 4-53, 4-54, 4-55, H-35; Draft Celeron EIR, *supra* note 18, at 2-5, 4-106, 4-117.

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 11 of 14

whether to approve the State Waiver or the Restart Project as a whole. (Pub. Res. Code, § 21166(a).)

**II.    OSFM Should, and in Some Cases Must, Engage the Public Before Issuing Any Approvals Associated with the Restart Project.**

Our clients and a number of other community organizations have twice asked OSFM for transparency and public engagement as it considers whether to approve the Restart Project. But OSFM has yet to hold any public meetings, invite public review and comment of any of Sable's applications, or release pertinent documents related to its determinations.

OSFM is a public agency, working on behalf of the people of California, that is charged with "safeguard[ing] our communities" from the hazards inherent in oil and gas transport.[34] Public participation is essential to ensuring that OSFM makes fully informed decisions, that OSFM understands the views of the public on whose behalf it is acting, and that the public maintains trust in our government agencies.

Should OSFM approve the Restart Project, our clients and our community will bear the consequences. We will be the ones who suffer from poorer air quality.[35] When another oil spill occurs, we will be the ones who watch dead mammals wash up on the shore, are deprived of access to the beaches we cherish, and whose businesses will suffer. And it may very well be the people of California who are forced to foot the bill to clean up a spill, or eventually, to decommission these facilities. **All we are asking for is a voice in a decision that will directly and substantially impact our community and the future of the Central Coast.**

Not only is public participation uniquely appropriate here, but in the case of the State Waiver, it is required by law.

OSFM's authority to issue a State Waiver comes from 49 U.S.C. § 60118(d), which provides that it "may waive compliance with a safety standard" — here, the requirement for effective cathodic protection — "*in the same way and to the same extent* that the Secretary [of Transportation] may waive compliance under subsection (c) of this section." (Emphasis added.) Subsection (c), in turn, explicitly states that "[t]he Secretary may act on a waiver . . . *only* after notice and an opportunity for a hearing." (49 U.S.C. § 60118(c)(B) (emphasis added).)

Thus, while OSFM has the discretion to approve a State Waiver, it can only do so by following the explicit procedures set forth in 49 U.S.C. § 60118, including providing the public with notice and an opportunity for a hearing. OSFM's failure to allow for public participation would void OSFM's approval of the waiver.

---

[34] *Pathways for Restarting Pipelines*, Office of the State Fire Marshal, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited September 26, 2024).
[35] *Pollution Mapping Tool Data*, California Air Resources Board, https://www.arb.ca.gov/ei/tools/pollution_map/ (last visited September 26, 2024).

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 12 of 14

Accordingly, we respectfully request that, in addition to conducting environmental review, (1) OSFM release all documents pertinent to the Restart Project and (2) hold public hearings and solicit public comment at each step of the restart process *before* making any determinations.

### III.    Conclusion

The circumstances surrounding the operation of these pipelines have substantially changed since they were initially evaluated and installed. In the last ten years, the pipelines have aged past their expected lifespan, were found to lack effective cathodic protection, and caused a catastrophic oil spill. Together, these developments have so fundamentally altered the nature of operations that a request to restart the pipelines, after ten years of dormancy, requires new environmental review.

Indeed, in light of the substantial increase in the risk of an oil spill from these pipelines, the environmental impacts from the Restart Project would be different and more severe than those considered in the Celeron EIR and have not been properly evaluated. Thus, CEQA requires that OSFM prepare either a new or subsequent EIR to evaluate the risks associated with operating a corroded pipeline without an effective cathodic protection system.

Lastly, we renew our request for public engagement and transparency in OSFM's review of the Restart Project. The Restart Project is a matter of profound public import with the potential to impact our community for years to come. We again ask OSFM to release all pertinent documents related to its review of the project, and to hold public hearings before it makes any further determinations, as is appropriate under the circumstances and required by law.

Thank you for your consideration.

Sincerely,

Linda Krop,
Chief Counsel

Jeremy Frankel,
Staff Attorney

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 13 of 14


cc:

David Sapp, Legal Affairs Secretary
Office of Governor Gavin Newsom
david.sapp@gov.ca.gov

Lauren Sanchez, Senior Advisor for Climate
Office of Governor Gavin Newsom
lauren.sanchez@gov.ca.gov

Christine Hironaka, Senior Advisor for Energy
Office of Governor Gavin Newsom
christine.hironaka@gov.ca.gov

Wade Crowfoot, Secretary
California Natural Resources Agency
wade.crowfoot@resources.ca.gov
secretary@resources.ca.gov

Christopher Calfee, Special Counsel to the Secretary
California Natural Resources Agency
christopher.calfee@resources.ca.gov

Amanda Hansen, Deputy Secretary for Climate Change
California Natural Resources Agency
amanda.hansen@resources.ca.gov

Shannon O'Rourke, Deputy Director of Office of Energy Infrastructure Safety
California Natural Resources Agency
amanda.hansen@resources.ca.gov

Le-Quyen Nguyen, Deputy Secretary for Energy
California Natural Resources Agency
le-guyen.nguyen@resources.ca.gov

Jenn Eckerle, Deputy Secretary for Oceans and Coastal Policy
California Natural Resources Agency
jenn.eckerle@resources.ca.gov

Rob Bonta, Attorney General
State of California Department of Justice
rob.bonta@doj.ca.gov

Jim Hosler, Chief /Assistant Deputy Director
California Department of Forestry and Fire Protection

September 27, 2024
Restart of CA-324 and CA-325: Requests for Environmental Review and Public Process
Page 14 of 14


jim.hosler@fire.ca.gov

Joshua Cleaver, Staff Attorney
California Department of Forestry and Fire Protection
joshua.cleaver@fire.ca.gov

Senator Monique Limón
California State Senate
Monique.Limon@sen.ca.gov

Assemblymember Gregg Hart
California State Assembly
Gregg.Hart@asm.ca.gov

Santa Barbara County Board of Supervisors
sbcob@co.santa-barbara.ca.us

---

Attachments:

1. Excerpt of Santa Barbara County Administrative Draft of Draft EIR for Plains Pipeline Replacement Project

2. Excerpt of Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California* (May 2016)

# ATTACHMENT 1



07/25/2024  12:45:32 PM

Impacts related to Hazardous Materials and Risk of Upset would only be related to maintenance and construction activities and these maintenance activities would have a minor impact on risk due to the potential for localized spills of hydraulic or diesel oils. **Impact RISK.1, RISK.2, RISK.3** would not be applicable and mitigation measures RISK.2-1 through RISK.2-7 would not be applicable. Impacts would therefore be **insignificant**.

Construction activities related to valve stations, pump stations and some segments of the pipeline that could be abandoned could potentially produce an increased risk of wildfires during construction, and **RISK.4** would still be applicable and mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable**.

### *No Project, Existing Pipeline Restart Alternative*

Under this alternative, the existing pipeline would be utilized instead of a new pipeline being installed, and transportation of crude oil would occur through the existing pipeline. The existing pipeline would be brought into compliance with existing requirements related to AB 864 and CSFM best available technologies (BAT), including the installation of additional valves along the pipeline route. The Applicant would have to apply to the CSFM for a waiver to utilize the existing pipeline since the existing pipeline is subject to corrosion under insulation, which could affect the efficacy of cathodic protection systems. Generally, a pipeline is not allowed to operate with ineffective cathodic protection systems. There is uncertainty as to whether the Applicant could demonstrate to the CSFM that the pipeline could be operated safely, and therefore this variation and the variation above (no Project, No Pipeline Alternative) are both addressed.

Assuming that a CSFM waiver is granted, the Applicant would have to install additional valves along the pipeline in order to comply with AB 864 and BAT requirements, similar to the proposed Project pipeline design. The installation of these additional valves would require some construction activities and some limited clearing at multiple locations along the pipeline ROW.

The existing pipeline is insulated, and therefore there would be no need for heaters at the Sisquoc Pump Station or the installation of the gas pipeline.

The installation of valves would most likely be at locations similar to the proposed Project valve installations as the pipeline would follow a similar ROW and similar terrain.

Hazards are associated with risks to the public from a spill and subsequent fire, as well as impacts from a spill to the environment, impacts to schools and potential wildfire impacts. The existing pipeline is a larger diameter pipeline, and therefore the draindown spill volumes would be larger than the proposed Project. This results in potentially larger spills and larger fires, impacting more people, as well as larger spills to the environment. In addition, the frequency of a spill from the existing pipeline would be higher due to its age and the potential for the cathodic protection to be compromised by the insulation. These factors have been incorporated into the analysis presented below.

### *Risks to Public Safety*

**Impact RISK.1** describes the potential spill sizes and the estimated frequency of spills from the pipeline system and the potential for immediate (fires, etc.) health impacts on the public.

### *Crude Pipeline Spill Volumes*

The spill volumes for this alternative were calculated based on the pipeline size, which would be larger than the proposed Project, and the associated terrain for different segments of the pipeline. The Applicant

Exhibits - Page 40

provided a risk assessment for the proposed Project and this analysis was utilized to estimate the spill volumes associated with a larger pipeline size. Figure 5.6-11 shows the estimated spill volumes along the pipeline route for each segment as a worst case for that segment. The worst-case sized spill volume is shown in Table 5.6-16 for the different portions of the crude oil pipeline alternative.

*Crude Pipeline Spill Frequencies*

Spill frequencies from a crude pipeline are based on the PHMSA failure rates for the California pipeline database. The PHMSA base failure rate for crude oil pipelines is shown in Table 5.6-17. The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age. However, the CSFM study indicated a minimal increase in failure rate for pipelines that are less than 40 years old and the PHMSA database used to estimate the base failure rate includes many older pipelines. Therefore, only the five times factor was applied as an estimate of the increased failure rate for this pipeline.

**Figure 5.6-11    No Project – Existing Pipeline Restart Alternative Spill Volume by Segment Milepost**



Source: based on Applicant QRA and EFRD 2019, with adjustments for the size of the existing pipeline.

Exhibits - Page 41

07/25/2024  12:45:32 PM

**Table 5.6-16    No Project – Existing Pipeline Restart Alternative Crude Pipeline Worst Case Spill Volumes**

| Location | Proposed Project - Maximum Spill Volume, gallons | Alternative - Maximum Spill Volume, gallons |
|---|---|---|
| LFC – Gaviota Plant | 84,000 | 126,000 |
| Gaviota – Sisquoc | 131,040 | 284,594 |
| Sisquoc - Pentland | 198,030 | 657,893 |
| Coastal Segments | 117,600 | 237,344 |

Source: based on Applicant QRA and EFRD 2019, with modification to address spill duration of 60 minutes. Coastal segments include up to valve station 2-500. Includes the installation of additional valve stations as per the proposed Project locations.

**Table 5.6-17    No Project – Existing Pipeline Restart Alternative Crude Pipeline Spill Frequencies**

| Location | Spill Frequency | Return Period, years rupture/leak/total |
|---|---|---|
| PHMSA California Crude oil base rate | 1.62 per 1,000-mile years | - |
| Adjustment due to Pipeline Condition | 5.3 factor | - |
| PHMSA Adjusted Rate | 8.56 per 1,000-mile years | - |
| Failure rate for L901R (49.2 miles) | 0.43 failures per year | 9/3/2 years |
| Failure Rate for L903R (74.1 miles) | 0.63 failures per year | 6/2/2 years |
| Failure Rate for L901R + L903R | 1.07 failures per year | 4/1/1 years |

Source: based on Applicant QRA and EFRD 2019 with CSFM 1991 adjustment factor. PHMSA data since 2010. The return period is the anticipated period between releases. Includes leaks and ruptures.

### Crude Pipeline Population Densities

The population densities along the route are based on estimates for remote, rural, low density and high-density areas with some additions for highways. The population densities are similar to those used for the proposed Project except for the area through the City of Buellton, since the existing pipeline would pass through the City of Buellton and the proposed Project would pass around the City of Buellton to the west.

### Crude Pipeline Fires

In the event of a spill of oil and subsequent ignition resulting in a pool fire, the heat (i.e., thermal radiation) from the fire could result in a serious injury or fatality. The assumptions for impacts would be the same as for the proposed Project.

### Gas Pipeline

The proposed gas pipeline would not be installed as part of this alternative since heaters at Sisquoc would not be installed.

### Alternative Pipeline: Public Safety Risk

The combination of scenario frequency and consequences is combined to estimate risk using FN curves. FN curves are depictions of the risk levels of a project and show the frequency (F) of scenarios that could produce a given fatality or injury level (N) or greater. These are presented for the proposed Project in **Impact RISK.1**. Santa Barbara County has established risk thresholds that use societal risk profiles (FN curves) to determine the significance of hazardous material releases. These FN curves address both injury and fatality. The Santa Barbara County's adopted thresholds are generally applicable to fixed facilities and pipelines. The risk FN curves are shown in Figure 5.6-12 and are based on the FN curves developed as part of the Plains 2019 QRA analysis, with adjustments for the existing pipeline (increased pipeline diameter

Exhibits - Page 42

Draft Print
07/25/2024  12:45:32 PM

and failure frequency). The FN curves would be located within the amber region, and the impacts to public health due to pipeline releases would be **significant and unavoidable.**

**Figure 5.6-12    No Project – Existing Pipeline Restart Alternative Pipeline Risk FN Curves**



Source: Plains 2019 with modifications

### Risks to the Environment

A spill of crude oil from the pipeline could impact resources in the vicinity of the pipeline ROW. See Section 5.2 Biological Resources, Section 5.4 Cultural Resources and Section 5.9 Hydrology and Water Quality for a discussion of the impacts of a crude oil spill on biological, hydrological and cultural resources along the crude oil pipeline ROW.

### Crude Pipeline Spill Volumes

The spill volumes are discussed above under **Impact RISK.1**. For the public health assessment under **Impact RISK.1**, a worst-case spill shutdown time of 15 minutes was used due to the already conservative analysis for fires and impacts to the public used in the QRA. However, for spills that could affect the environment, a longer duration is used. As evidenced by the May 2015 Refugio spill, there is the potential for a pipeline shutdown to take longer than 15 minutes.

### Crude Pipeline SCADA System

The SCADA system used for the alternative would be the same as that used for the proposed Project since the SCADA system would be required to be updated per CSFM and AB864 requirements.



07/25/2024  12:45:32 PM

*Proposed Project Pipeline: Spills Affecting Marine Resources*

Portions of the pipeline extend along the Santa Barbara County coastline. A crude oil spill could drain from the spill location through existing culverts or drainages and enter the marine environment. This is what occurred during the May 2015 Refugio Beach spill. An estimated 43 percent of the oil entered the ocean from the Refugio spill location, which was an estimated 750-foot pathway from the ocean shoreline. Because the proposed pipeline is located onshore at various distances from the shoreline, a rupture at different locations spilling the same amount of oil could allow for oil to enter the marine environment. Assuming a linear function of oil being trapped and adsorbed onshore with distance, the maximum amount of oil could enter the ocean where the pipeline is closest to the ocean and potential worst-case spill volumes are large. An estimated maximum amount of 71,621 gallons of crude oil could enter the ocean at the worst-case spill location. An estimated 11.8 miles of the 16.6-mile coastal portion (71 percent) of the pipeline would be vulnerable to spills entering the ocean if a spill were to occur along any of those segments and the adsorption rate were similar to that which occurred during the Refugio spill. This assumes that no rain event is occurring and that drainages are not flowing.

There are a number of variables affecting the amount of oil that could reach the ocean from an onshore spill, including the terrain, the location of drainages under the freeway and the railroad tracks, the soil type, and extent of rocky interfaces as well as the amount of moisture. During a rain event, when drainages and creeks are flowing, a spill into the waterways could follow the flow and enter the marine environment more readily. A spill under these conditions would also have more extensive terrestrial impacts and reach the marine environment more readily but would also be subjected to turbulence and mixing along the drainages.

For inland areas, the area with the largest potential impacts is along the Cuyama River. Based on the elevation profile and the spill volumes, the maximum spill volume along the Cuyama River segments of the pipeline (between proposed Project valve 3-800 and 5-400 nearest the Cuyama River) and using the absorption rate as seen in the Refugio spill, a spill along the Cuyama River portion of the pipeline could impact resources a distance as far as about 3,200 feet, which means that pipeline segments within about 3,200 feet of the Cuyama River could potentially impact the river in the event of a spill.

*Potential Impacts*

Depending on the location of the spill, the environmental conditions, and the biological resources present, Impact RISK.2 short and long-term effects to biological resources associated with a crude oil spill has the potential to be significant and unavoidable. Mitigation measures RISK.1-1 through RISK.1-7 would apply. Due to the increased size and frequency of spills, this significant and unavoidable impact would be a greater severity than that presented by the proposed Project.

**Risks to Schools**

For **Impact RISK.3** (schools), the pipeline construction activities for the existing pipeline would only affect areas near the proposed valve installations. The existing pipeline is located about 500 feet from the Oak Valley School in western Buellton. In order to address the risk levels to this school, the California Department of Education (CDE) school siting risk protocol was utilized to determine the risk levels.

The assessments demonstrated that the risk levels are acceptable under the CDE Risk Protocols with a Total Individual Risk/Individual Risk Criteria (TIR/IRC) ratio of 0.29, with a 1.0 TIR/IRC ratio being the CDE Protocol threshold. It is important to note that the CDE protocol examines the individual risk at the closest school and does not examine the risks cumulatively along the entire pipeline route. Because the CDE

Exhibits - Page 44

# ATTACHMENT 2



**U.S. Department of Transportation**

**Pipeline and Hazardous Materials Safety Administration**

**Failure Investigation Report**

**Plains Pipeline, LP, Line 901**

**Crude Oil Release, May 19, 2015**

**Santa Barbara County, California**

**May 2016**

Plains Pipeline, LP - Failure Investigation Report
Santa Barbara County, California Crude Oil Release - May 19, 2015

## Table of Contents

Executive Summary ... 3
Final Report Methodology ... 4
Facility Background ... 4
Events Immediately Prior to and During the Crude Oil Release ... 6
Plains' Field Response and National Response Center Notifications ... 7
PHMSA's Corrective Action Order ... 9
Pipeline Alignment ... 9
Las Flores Station to Gaviota Station Line 901 Elevation Description ... 9
Gaviota to Pentland Station Line 903 Elevation Description ... 10
Post-Incident Investigation Results ... 11
Metallurgical Evaluation of Failed Pipe ... 11
In-Line Inspection Survey Review ... 12
Number of Anomalies ... 13
Cathodic Protection Findings ... 13
Spill Volume Estimate from Plains' Third-Party Consultant ... 13
Investigation Findings and Conclusions ... 14
Proximate or Direct Cause ... 14
Contributory Causes ... 14
PHMSA Post-Incident Action Chronology ... 18
Appendices ... 20

ii

Exhibits - Page 47

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Executive Summary

At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl) of heavy crude oil.[i]  An estimated 500 bbl of crude oil entered the Pacific Ocean.  Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station.  On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901.  Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release.  As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified.  On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan.[ii] No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.

PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

1) Ineffective protection against external corrosion of the pipeline

- The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.

- The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2) Failure by Plains to detect and mitigate the corrosion

- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

3) Lack of timely detection of and response to the rupture

- The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.

- Control room staff did not detect the abnormal conditions in regards to the release as they occurred.  This resulted in a delayed shutdown of the pipeline.

- The pipeline controller restarted the Line 901 pipeline after the release occurred.

- The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as

Page **3** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report. PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage. PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

## Final Report Methodology

PHMSA conducted relevant interviews, gathered and reviewed numerous historical documents and available records, and performed a thorough review of the Plains Control Room in Midland, TX. An ILI subject matter expert (SME) was hired to review the raw magnetic flux leakage (MFL) data and final vendor reports from the MFL surveys, and evaluated Plains actions as a result of their review of the vendor reports. PHMSA issued a CAO which in part instructed Plains to have the failed pipe examined by a PHMSA-approved metallurgical laboratory and to have a root cause failure analysis (RCFA) performed by a third party independent consultant.

The factual evidence reviewed includes: the Plains Integrity Management Plan (IMP), CP records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures and reports obtained from the pipeline operator and PHMSA SMEs.

The arrangement of this report provides a general description of the pipeline system, the events that occurred on the day of the release, and acts or omissions of the operator that led to this failure and release of crude oil. Specific evidence is supplied and pertinent statements from each report are excerpted where appropriate.

## Facility Background

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

(1) Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.



**Figure 1.** Map of Plains' Western Division Pipelines. The arrow points to the approximate release site on Line 901.

At Sisquoc Station, crude oil can be pumped to one of two locations: a nearby refinery via a 12-inch diameter pipeline operated by Phillips 66, or continue down Line 903 to Pentland Station. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.

Prior to the May 19, 2015 release, there had been four small releases meeting PHMSA reportable criteria at pump stations on Lines 901 and 903. No releases were reported to PHMSA on the pipelines outside of pump stations prior to 2015. The operator reported maximum operating pressure (MOP) of Line 901 is 1,341 psig.

At the time of the spill, Plains All American Pipeline (PAAPL) operated Line 901 and Line 903 under a Federal Energy Regulatory Commission (FERC) certificate of economic regulatory jurisdiction that was issued in 1987. Plains Pipeline, LP, is a subsidiary of PAAPL. Based on the FERC filing, Lines 901 and 903 were classified as interstate pipelines, pursuant to 49 U.S.C. § 60101(7), as facilities used to transport hazardous liquid in interstate or foreign commerce, and as such, were regulated by PHMSA as interstate pipelines. Plains cancelled the FERC certificates for Lines 901 and 903 on February 12, 2016 and April 29, 2016,

Page **5** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

respectively, stating that the transportation service was no longer available in interstate commerce. Line 903 from Gaviota to Sisquoc to Pentland Stations was purged with nitrogen in accordance with Amendment No. 2 to the CAO, and remains shut down between these stations. The Pentland to Emidio segment of Line 903 is active and operating intermittently at low pressures. This section of pipe between Pentland and Emidio is not directly connected to the Gaviota to Pentland segment and is used to transport crude product from breakout tanks in Pentland Station.

## Events Immediately Prior to and During the Crude Oil Release

On the morning of May 19, 2015, Lines 901 and 903 were transporting crude oil with a flow rate setpoint of 1,240 bbl per hour (BPH) leaving the Las Flores Station, and the discharge pressure was approximately 575 psig. Pumps were operating at the Las Flores Station on Line 901 and Sisquoc Station on Line 903. A Plains instrumentation and electrical technician was dispatched that morning to disconnect and remove a motor from a non-operational pump at the Sisquoc Station. While the technician was performing his work, the operational pump (Pump 401) at the Sisquoc Station was shut down unintentionally (i.e., "uncommanded"). When Pump 401 on Line 903 stopped operating, the pressure in Line 901 increased. The pressure rose to a maximum of 696 psig at the Las Flores Station discharge. The controller shut down the pump at Las Flores Station and the pressure remained at 677 psig. Approximately four minutes later, the pump at Las Flores Station was restarted. At approximately 10:55 a.m. PDT, the flow rate at Las Flores Station climbed from zero to 2,042 BPH. Concurrently, the line pressure rose to a high of 721 psig, then dropped to 199 psig, and then slightly increased to approximately 210 psig until the Las Flores pump was shut down a second and final time. Generally, a sudden increase in flow rate accompanied by a decrease in pressure is indicative of a release. PHMSA has determined that Pump 401 going offline in an "uncommanded" manner on the morning of May 19, 2015, was an abnormal event, but that this in itself should not have caused Line 901 to rupture.

PHMSA performed a detailed review of the SCADA event and alarm logs, and pressure and flow records. The review indicated that there was information reported by the SCADA system that indicated a release had occurred by approximately 10:58 a.m., and an alarm was generated on low pressure. The alarm was not set at an appropriate value. The alarm also did not have a major priority/severity or safety-related alarm status. The controller did not recognize the information he received as indicative of an abnormal operation. Evidence indicates that the controller was focused on the events at Sisquoc Station (i.e., restarting the Sisquoc pump that had gone down once uncommanded, and a second time on high case temperature along with other duties).[iii]

Due to the Sisquoc Station maintenance activity resulting in an unplanned pump shutdown, the controller anticipated alarms would be activated from the pipeline leak monitoring (PLM) system. According to interviews and a review of the alarm log, the PLM inhibit was requested by the controller to the step-up shift supervisor between 11:15 and 11:22 a.m.[iv] The step-up shift supervisor then inhibited (shut off) the PLM system alarms.[v] Also, during this time, the controller started an investigation of the SCADA data in an attempt to understand the operational abnormalities that were occurring. After attempting to restart the Sisquoc pump twice, the controller shut down the pipeline. PHMSA requested the operator review the flow imbalance calculations and provide a time when the PLM system would have generated an alarm if not inhibited, and it was determined that alarms would have been generated

Page **6** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

approximately two minutes before the controller shut down the pipeline.[vi]



**Figure 2**. Schematic of Plains Pipeline, LP, Line 901 and spill path.

## Plains' Field Response and National Response Center Notifications

The following is a timeline of Plains and emergency responder activities conducted immediately prior to locating the leak site:[vii]

- At 11:42 a.m. a call reporting a petroleum smell was received at Santa Barbara Fire Department (SBFD) Station 18. Engine 18 left the station to investigate the odor complaint near Refugio State Beach.

- At approximately 12:15 p.m., prior to a scheduled tabletop spill drill required by federal regulations 49 C.F.R. §194, the pre-drill meeting was completed and adjourned. A representative from the Santa Barbara Office of Emergency Management (SB-OEM) received a call from the SBFD reporting that there was oil on Refugio Beach. The SB-OEM representative and the Plains representatives left the spill drill and drove separately to Highway 101 at Refugio Beach.

- The Santa Barbara Dispatch notified the National Response Center (NRC #1116950) at 12:43 p.m. PDT of an unknown sheen in the ocean at Highway 101 and Refugio Beach.[viii]

- At approximately 12:55 p.m., the two Plains representatives arrived at the south side of Highway 101 where the SBFD personnel were. They noted oil in the ocean but could not determine the source of the oil. One of the Plains representatives told the assembled group that he did not think the oil was coming from Line 901 because the pipeline is located on the other side of Highway 101, and there would be oil flowing across Highway 101 if Line 901 was leaking.

Page **7** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- The Plains representatives drove to the company's pipeline right-of-way (ROW).  At approximately 1:27 p.m., the Plains representatives located the leak site on the Plains ROW.  They called the controller to report the leak and to tell the controller to leave Line 901 shut down and to close the Refugio gate valve.  The Plains representatives used their cell phones to contact other Plains personnel, the landowner where the leak occurred, Plains' oil spill response contractors, and others.  The Plains representatives noted that crude oil from the release site had entered a culvert that crosses under the Highway 101 and railroad tracks and discharges to Refugio Beach.  The Plains representatives, along  with Fire Department personnel, attempted to stop the flow of oil into the culvert.  However, the culvert was too large to stop the flow with shovels, and sand bags were not  readily available, so their immediate efforts were unsuccessful.  At approximately 3:00 p.m., additional equipment and  personnel arrived, the culvert was dammed and oil was prevented from entering the  culvert.

- At 2:56 p.m., a representative from Plains called the NRC to report (NRC #1116972) the release of crude oil  at 2:56 p.m. PDT. This report indicated that the release was at Latitude: 34° 27' 43" N; and  Longitude: 120° 05' 24" W.  This NRC report was made 89 minutes after the release site was  found by Plains field personnel.[ix]



**Figure 3**. Spill location relative to Refugio Beach in Santa Barbara County, CA. Photo: John L. Wiley http://flickr.com/jw4pix

Federal pipeline safety regulations, (49 C.F.R. § 195.52), require that the NRC be notified at the earliest practicable moment following discovery of a release of a hazardous liquid, including "[a]ny failure that resulted in pollution of any stream, river, lake, reservoir, or other similar body of water that violated applicable water quality stands, caused a discoloration of the surface of the water or adjoining shoreline, or deposited a sludge or emulsion beneath the surface of the water or upon adjoining shorelines."  On January 30, 2013, PHMSA issued an

Page **8** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Advisory Bulletin clarifying that this was to be interpreted as within one hour of discovery. Plains reported the rupture to the NRC approximately 89 minutes after discovery, thus notifying the NRC 29 minutes late.

The estimated costs reported by the operator as of December 23, 2015, were $142,931,884. This figure includes all costs the operator spent as a result of this release through the date reported, including commodity lost, the operator's property damage and repairs, operator's emergency response, environmental remediation, and estimated other costs spent including government agency costs and media relations expenses.[x]

## PHMSA's Corrective Action Order

On May 21, 2015, PHMSA issued a CAO, CPF No. 5-2015-5011H, to Plains. The CAO required Plains to purge Line 901; review the pipeline's construction, operating, maintenance, and integrity management history; expedite the review of data from the May 5, 2015, ILI tool run; conduct metallurgical evaluation of the failed pipe; repair any integrity-threatening anomalies identified by the ILI survey; and conduct a root cause failure analysis. The CAO requires Plains to purge Line 901 and to keep Line 901 shut down until PHMSA approves the restart of the pipeline. Plains' Line 901 was purged and filled with an inert nitrogen gas on June 18, 2015.

On June 3, 2015, PHMSA issued Amendment No. 1 to the CAO. The amendment was issued to address preliminary findings from the early stages of PHMSA's investigation, and the possibility that the conditions on Line 901 also existed on Plains Line 903. The amendment to the CAO required Plains to conduct additional non-destructive testing of ILI anomalies on Lines 901 and 903; review the construction, operating, maintenance, integrity management, and ILI history of Line 903; and reduce the operating pressure of Line 903 to 80% of the highest pressure sustained for a continuous 8-hour period during the month before the May 19 failure. This pressure reduction was intended to enhance safety until all facets of the line's integrity could be evaluated.

On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO. The amendment required Plains to empty and purge Line 903 between Gaviota and Pentland Stations and fill it with an inert gas. Line 903 was purged between Gaviota and Pentland Stations and filled with inert nitrogen. The complex purging operations began in December 2015, and were completed on April 18, 2016. Both Line 901 and the purged sections of Line 903 will remain shut down until all actions required by PHMSA's CAO and subsequent amendments have been completed. PHMSA may continue to issue additional amendments to the CAO as necessary.

## Pipeline Alignment

### Las Flores Station to Gaviota Station Line 901 Elevation Description

To fully understand the Line 901 release, it is vital to understand the elevation profile of Line 901 and Line 903 from the Las Flores Canyon to Pentland Station. Line 901 starts at the Las Flores Station at an elevation of approximately 180 feet. There are two large hills downstream of the originating pump station. The first hill has a peak elevation of approximately 740 feet and the second hill has an elevation of approximately 600 feet. The release occurred downstream of the second hill at an elevation of approximately 80 feet. Immediately downstream of the release point, the pipeline rises slightly and then runs relatively level approaching the Gaviota station. This fact is important because as soon as the pump at Las

Page **9** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Flores Pump Station was turned off the second time, the only crude oil that could be released was the height of oil in the pipeline above the release site and not the amount located between the two aforementioned hills.

## Gaviota to Pentland Station Line 903 Elevation Description

Line 903 receives all of the crude oil delivered by Line 901. The line elevation at Gaviota is approximately 150 feet.  The elevation at Sisquoc is approximately 880 feet.  Downstream of Sisquoc,  Line 903 rises to 2,420 feet and then to a height of approximately 2,750 feet and ultimately to an elevation of close to 3,000 feet before dropping into Pentland Station at an elevation of approximately 690 feet.  Line 903 exhibits many of the same construction and operation conditions as Line 901 and was addressed by the amendments to the CAO. Pump 401 at Sisquoc Station has adequate capacity to push the oil up and over the downstream hills and into Pentland Station but only if it has full suction pressure and full flow coming into the pump. Because of the release, the pump could not push the oil over the downstream hills, and so the oil in the pump became hot and the pump shut down to prevent overheating.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Post-Incident Investigation Results

### Metallurgical Evaluation of Failed Pipe

The failed pipe segment has been analyzed by third-party metallurgical experts, Det Norske Veritas (U.S.A.), Inc.'s (DNV-GL) in Dublin, OH.  The failed pipe assessment and testing was witnessed  by PHMSA, the California Department of Fish and Wildlife, and the U.S. Department of Justice.



**Figure 4**. The failed pipe and surrounding insulation and coating.



**Figure 5**. Pipe External Surface at the Line 901 failure site after cleaning.

Page **11** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

DNV-GL's draft report was completed and disseminated to Plains and PHMSA on August 6, 2015.  The draft report was reviewed by PHMSA engineers, and a number of comments and clarification  requests were made.  DNV-GL reviewed the comments and revised the report. The Final Report  was issued on September 18, 2015.

The Final Report provides a summary of findings, including the following excerpt:

"The results of the metallurgical analysis indicate that the leak occurred at an area of  external corrosion that ultimately failed in ductile overload under the imposed operating  pressure.  The morphology of the external corrosion observed on the pipe section is  consistent with corrosion under insulation facilitated by wet-dry cycling."[xi]

## In-Line Inspection Survey Review

Plains conducted ILI surveys on Line 901 (10.7 miles in length) to assess the integrity of the pipeline in accordance  with PHMSA regulations in 2007, 2012, and 2015.  According to 49 C.F.R. § 195.452(j)(3), the pipeline is required to be surveyed at  intervals commensurate with the pipeline's risk of integrity threats, but at least every 5 years.   Plains changed Line 901 from a 5-year assessment cycle to a 3-year assessment cycle after the 2012 ILI survey.

The data collected during these surveys must be fully evaluated within 180 days of the ILI, and an operator must take action upon discovery of any "immediate repair conditions" as defined in 49 C.F.R. § 195.452(h) unless the operator can demonstrate that the 180-day period is impracticable.

The most recent ILI survey for Line 901 was completed on May 6, 2015.   The 2015 ILI survey data for  the first 2 miles of Line 901, as measured from the Las Flores Station, was found to be incomplete and not useable for ILI analysis.   For the rest of the ILI survey, the correlation digs,  which are used to gauge survey data accuracy in the ILI vendor's preliminary report, had not been finished  at the time of the May 19, 2015 failure.

PHMSA's independent third-party ILI SME also performed an analysis of the data from past ILI surveys of  Line 901.  Preliminary data from the results of each of the ILI surveys are summarized below  and show a growing number of corrosion anomalies on Line 901.

Page **12** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

**Number of Anomalies**

| Metal loss | June 19, 2007 | July 3, 2012 | May 6, 2015 |
|---|---|---|---|
| Greater than 80% | 0 | 0 | 2 |
| 60-79% | 2 | 5 | 12 |
| 40-59% | 12 | 54 | 80 |

The May 6, 2015 ILI survey data and subsequent analysis by the ILI vendor predicted external corrosion at the failure site with an area of 5.38 inches by 5.45 inches, and a maximum depth of 47% of the original pipe wall thickness.  After the failure, the DNV-GL metallurgical investigators physically measured external corrosion at the failure site to have a maximum depth of 89%.[xii]  The dimensions of the corrosion feature were 12.1 inches axially by 7.4 inches in circumference.  The maximum depth, as measured using laser scan data, was 0.318 inches or 89% of the measured wall thickness (0.359 inches).

The ILI summary report prepared by PHMSA's SME also examined the "as-called" (ILI-predicted) versus as-found (field measured) lengths, widths and area for the excavated anomalies on Line 901.  The report demonstrates that the lengths and widths of the anomalies were under-called (underestimated) in many cases, however many were also over-called.  Plains submitted little documentation concerning their analysis of how the field measured anomalies compared to the ILI vendor analysis.  Furthermore, Plains did not provide documentation showing that discrepancies between the originally reported anomaly sizes predicted by the ILI vendor and Plain's actual field-measured sizing of the corrosion anomalies were subsequently discussed with the ILI vendor, as required by Plains' IMP.[xiii]

## Cathodic Protection Findings

According to 49 C.F.R. § 195.563, CP is required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines.  Historical CP records for line 901 have been reviewed and reveal protection levels that typically are sufficient to protect non-insulated, coated steel pipe. Line 901 and Line 903, however, are insulated.  An increasing frequency and extent of corrosion anomalies were noted on both Lines 901 and 903 in ILI survey results, anomaly excavations, and repairs.  PHMSA inspectors noted moisture entrained in the insulation at four excavations performed by Plains on Line 901 after the May 19 spill and prior to the PHMSA-mandated purging of the pipelines.

## Spill Volume Estimate from Plains' Third-Party Consultant

Plains initially estimated the volume of spilled crude oil to be approximately 2,400 bbl, of which 500 bbl was estimated to have reached the ocean.   On  August 4, 2015, Plains reported to the Unified Command that the 2,400  bbl release estimate was still accurate.  However, after Plains completed the PHMSA-mandated purge, the  company's calculations indicated that up to 3,400 bbl had possibly been released from the  pipeline.   Plains notified the Unified Command

Page **13** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

that RPS Knowledge Reservoir (RPS), a third-party investigator hired by Plains, was still trying to reconcile the difference.

On November 24, 2015, Plains informed PHMSA that RPS had completed their analysis regarding the release volume and produced a report of findings. RPS used the OLGA simulation software tool to model the behavioral dynamics of the pipeline prior to, during, and immediately after the May 19, 2015 leak. The report concluded that the discharge leak volume was 2,934 bbl. The RPS report was dated November 11, 2015. Plains has reported 1,100 bbl of crude oil have been recovered.

## Investigation Findings and Conclusions

Line 901 pipeline ruptured at approximately 56% of the MOP. Although the operational events that occurred on the morning of the release were abnormal, this should not have caused the release if the pipeline's integrity had been maintained to federal standards.

### Proximate or Direct Cause

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated, 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.

PHMSA's investigation identified numerous contributory causes of the rupture. The contributory causes can be grouped into three categories: 1) ineffective protection against external corrosion of the pipeline; 2) failure by Plains to detect and mitigate the corrosion;, and 3) lack of timely detection of the rupture. Below is a summary of the key contributory causes:

### Contributory Causes

1)  Ineffective protection against external corrosion of the pipeline

    - Plains' CP system was ineffective in protecting thermally insulated underground pipeline systems from external corrosion. Industry practices recognize that an impressed current system like the one utilized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised. The external coating in the area of the rupture had allowed moisture to enter the insulation adjacent to the steel pipe.[xiv] Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised.[xv]

2)  Failure by Plains to detect and mitigate external corrosion

    - Plains did not identify CUI as a risk-driving threat in their federally-mandated integrity management program (IMP).

Page **14** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- Plains' did not fully implement their IMP.
  - o Plains did not perform suitable analysis of the field measurements of the excavated corrosion anomalies that occurred after ILI surveys were completed in 2007 and 2012.

  - o The data reported by the ILI vendor were inconsistent (and did not meet the published accuracy of the ILI tools of +/- 10%, 80% of the time for depth) when compared to the results of the field-measured corrosion anomalies.

  - o Plains' as-found field measurements of corrosion anomalies were inconsistent with the as-called vendor-provided ILI data and analytical reports.  ILI surveys conducted in 2007 and 2012 revealed inconsistencies in the character of the anomalies.  In both of these cases, Plains did not consult the ILI vendor to help resolve the inconsistency.

  - o Plains failed to follow written procedures directing the IMP group to perform appropriate statistical analysis after the anomaly dig reports were received from the field, and to discuss any inconsistencies with the ILI vendor.[xvi]

    - Plains' Pipeline Integrity group created a unity plot for depth after the 2012 ILI survey and anomaly digs.  There is no documentation detailing what was done with the information from the unity plot.

  - o Plains incorrectly added the over-called anomalies in the close-out reports.

    - The close-out reports should have only reported the anomalies that were within the reported accuracy of the ILI tool. The reported tool accuracy is +/- 10 %, 80 % of the time. Adding the overcalled anomalies outside of the tool accuracy skews the data.

- Plains' Pipeline Integrity group was historically focused on pitting corrosion under "shrink sleeves" at the pipeline girth welds (circumferential welds to join pipe segments).

  - o The release location was within 6 feet of a corrosion anomaly that was exposed and repaired after the 2012 ILI survey.  There was evidence of corrosion and degraded coating systems between the 2012 repair site and the 2015 rupture site.

  - o The anomaly that ruptured was called out by the ILI tool at 45% depth in 2012. Plains' IMP specified adding 10% to all anomalies (55% depth in this case) then "growing them" to predicted failure using an anticipated corrosion growth rate.  This analysis would provide a predicted failure time.  Plains did not excavate the anomaly that failed.

3) Lack of timely detection of and response to the rupture

- The controller did not have information communicated from the SCADA system in such a manner to be successful in detecting abnormal operations.  The pipeline SCADA system did not have safety-related alarms on low pressure configured at the

Page **15** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

correct value or priority to alert the control room staff of the rupture. When this alarm was provided to the controller, the discharge pressure at Las Flores was 199 psig but, within a minute, pressure elevated above 210 psig, the alarm status cleared, and the discharge pressure remained above 200 psig (approximately 210-211 psig) until the pipeline was purged. The pipeline was still leaking when the discharge pressure at Las Flores was above 200 psig, and continued to do so without additional alarm indications. When the pipeline was down, isolated but still leaking, the minimum pipeline discharge pressure at Las Flores remained at 210-211 psig. The low discharge pressure alarm setpoint value was not set properly as it should have been above 211 psig. This type of alarm should be identified as a high priority safety related alarm. While the controllers and shift supervisors can access historical trend data or continue to monitor a given pressure or flow, when the pipeline was ultimately shut down at 11:30 a.m., neither the controller nor step-up shift supervisor detected any drop of pressure at the specific failure location that would indicate that oil was being released.

- Neither the pipeline controller nor step-up shift supervisor detected the initial abnormal conditions as the release occurred. There was an indication of decreased pressure and increased flow between 10:53 and 10:58 a.m., which is consistent with a pipeline release. This resulted in a delayed shutdown of the pipeline. Adequate alarm setpoint values with correct priorities are essential to controller and shift supervisor recognition of abnormal operations, especially when many pipeline systems are operated from the same console.

- The pipeline controller restarted Line 901 after the release occurred.

- The pipeline leak detection system lacked instrumentation and associated calculations to monitor line pack.

  o The function of the PLM system was a simple line balance calculation based on flow meter values without line pack considerations. The PLM relies on comparing "meter in – meter out" calculations over time. This type of leak detection system without the use of safety-related, high-priority, low-pressure alarms does not provide the controller or shift supervisors with adequate information when the pipeline is down.

  o When the pipeline is not running, even if only due to scheduling and not required maintenance activities, flows will be close to zero and the imbalance calculation will provide little if any value as currently configured. Leak detection on a down pipeline requires a robust system of planned and accurate high-priority alarm types and alarm setpoint values in order for response to occur on critical low pressures.

  o The leak detection system for Lines 901 and 903 consists of two leak detection segments. Additional instrumentation such as pressure and temperature transmitters located at Refugio Gate and Cuyama valve settings (both transmitter types on each side of the valves) would allow additional information about the operating status of the pipeline to be presented and pack calculations pursued.

  o Plains utilizes the SimSuite application for other pipelines in the control

Page **16** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

center.  This application does allow for pack calculations to be utilized in the leak detection system.  According to information obtained during meetings with Plains hydraulic specialists, Lines 901 and 903 were pipeline systems with a low to medium priority defined for future modeling efforts compared to other assets in the Plains operations. The approach utilized by Plains for prioritizing which systems should be modeled first did not appear to take into account all appropriate consequence-based asset impacts (such as culverts providing a pathway to the ocean) associated with these two systems. Existing instrumentation and the need for added instrumentation would factor into this prioritization decision.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as alarms.

  o Interviews determined that the step-up shift supervisor and shift supervisor training lacked formalized and succinct requirements, including that for leak detection system functions such as "inhibit" options.  The interviews determined that different shift supervisors performed PLM inhibit functions without contacting the console supervisor first as required by procedure.

  o Step-up and shift supervisor responsibilities include emergency shutdown of any pipeline.  However, training does not cover a means by which to accomplish this for all relevant pipelines.  A general emergency shutdown provision has not been programed for supervisory use on all systems.

- The oil spill response plan required by 49 C.F.R. §194 did not account for a culvert near the release site that traversed the Pacific Coast Highway and Amtrak railroad tracks.  This culvert provided a quick flow path between the pipeline ROW and the Pacific Ocean, thereby allowing crude oil to flow easily towards Refugio State Beach and the ocean.  The response plan did not have a response strategy that considered the presence of the culverts.

Page **17** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## PHMSA Post-Incident Action Chronology

Following the May 19, 2015 Plains Pipeline, LP, Line 901 rupture in Santa Barbara County, CA, PHMSA took the following actions:

- On May 19, 2015, PHMSA deployed inspectors to investigate the Plains Pipeline LP Line 901 pipeline failure in Santa Barbara County, CA.  PHMSA also provided information updates to the Unified Command (UC), US Coast Guard, the Federal on Scene Coordinator (FOSC), State Fish and Wildlife, and other agencies on site.
- On May 21, 2015:
  - PHMSA issued a Corrective Action Order (CAO), CPF No. 5-2015-5011H,  to Plains Pipeline LP ordering it to suspend operations and to specific safety actions to further protect the public, property, and the environment from potential hazards associated with the recent failure.  PHMSA staff reviewed the CAO with the operator and briefed the California State Attorney on the CAO and provided an overview of PHMSA's regulations.
  - PHMSA sent an inspector to Plains' control room in Midland, Texas to collect operational data and interview the control room operators on duty at the time of the incident and their supervisors.  The inspector gathered any pertinent logs and information, including electronic copies of relevant data from the Supervisory Control and Data Acquisition (SCADA) system.
  - PHMSA staff worked with the operator to review their plan to expose the pipe and to cold tap it to ensure there was no pressure or crude left in the line at a low spot immediately downstream of the release point. The plan was signed off by the UC at approximately 5 pm PDT.
- On May 22, 2015:
  - PHMSA staff met with representatives from the Assistant U.S. Attorney, DOT Inspector General, EPA Criminal Investigation Division, California Attorney General, and others to brief them on PHMSA's process for securing and transporting the failed pipe to a metallurgical lab for evaluation.
  - PHMSA staff remained on the scene as the operator exposed, tapped, removed any remaining product, and excavated the pipeline downstream of the release site.
- On May 25, 2015:
  - PHMSA issued an approval letter for Plains to excavate, remove and secure the failed joint of pipe under the supervision of two DNV metallurgists (third party contractor) but requested that the coating and insulation not be touched until the failed pipe has been removed because the DNV personnel were interested in in gathering available samples there as well.
  - A PHMSA inspector returned to Midland, TX to interview the controller and the Operations Control Center supervisor and to obtain any handwritten logs created by the controller on the morning of the release.
- On May 28, 2015:
  - A PHMSA investigator was on site when affected pipeline was removed, crated, and transported to secure location for metallurgical evaluation.  PHMSA retained a third-party ILI expert to examine the 2012 and 2015 ILI runs. DNV personnel took soil and insulation samples.
- On June 3, 2015, PHMSA amended the CAO to address preliminary findings from the early stages of the investigation (Amendment No. 1).  The amended CAO mandated

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

additional safety requirements on Line 901 and expanded the scope of the CAO to include the 128-mile long Line 903, which is located downstream of Line 901.  The amendment reduced the operating pressure of the Lone 903 by 80% of the highest 8 hour continuous pressure between April 19, 2015 and May 19, 2015.  On May 30, 2015, Plains voluntarily shutdown Line 903.

- On June 18, 2015, PHMSA staff monitored the Line 901 purge to ensure safety during the purging process. Plains completed the purge and injected inert gas in Line 901.
- On September 18, 2015, PHMSA received the DNV Final Mechanical and Metallurgical Report.  PHMSA staff reviewed the document and provided comments.
- On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO, which ordered Plains to purge and shutdown Line 903 from Gaviota to Pentland.
- On December 1, 2015, PHMSA staff monitored Plains moving Freeport McMoRan crude oil from their offshore platforms into Line 903 from Gaviota Station to Sisquoc Station. Movement of the Freeport McMoRan oil was completed on December 10, 2015.
- On December 4, 2015, PHMSA staff received the DNV Root Cause Failure Analysis Report.  PHMSA reviewed and commented on the report.
- On December 14, 2015, PHMSA staff monitored the purge process on Line 903 from Gaviota Station to Sisquoc Station. The purge was completed on December 18, 2015 and the line was filled with inert gas.
- On February 17, 2016, PHMSA issued a Preliminary Factual Final Report.
- On April 2, 2016, PHMSA staff monitored the Line 903 Sisquoc to Pentland portion purge that was completed on April 18, 2016.  Line 901 and 903 are shutdown, except for the Pentland to Emidio section of Line 903, which is not connected to 903 any longer.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## APPENDICES

A. Investigation Summary Detail

B. Supervisory Control and Data Acquisition (SCADA) Log Excerpts

C. Pipeline Leak Monitoring Details

D. Excerpts and Discussion of Plains Integrity Management Plan (IMP) Requirements

E. Corrosion Control and Pipeline Conditions

F. Industry Standards and General Requirements for In-Line Inspection

G. In-Line Inspection Report

H. PHMSA's Independent Analysis of In-Line Inspection Data

I. Maps and Photographs

J. National Response Center Report #1

K. National Response Center Report #2

L. Form PHMSA F 7000.1: Accident Report for Hazardous Liquid Pipeline Systems

M. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Mechanical and Metallurgical Testing

N. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Technical Root Cause Analysis

O. NACE International: Effectiveness of Cathodic Protection on Thermally Insulated Underground Metallic Structures

---

[i] According to the *FRACTURE CONTROL TECHNOLOGY FOR NATURAL GAS PIPELINES CIRCA 2001* (the PRCI report superseding NG-18 Report 208): "The distinction between leak and rupture for the pipeline community is based on the size and configuration of the breach, not how it develops." Based on these calculations and visual observations, the length of the feature is consistent with a leak, arresting within the corrosion feature, and did not propagate outside of the feature into nominal wall-thickness pipe. According to the instructions for completing PHMSA Accident Form 7000-1, this type of accident would be classified as a rupture since PHMSA defines a "rupture" as a "loss of containment that immediate impairs the operation of the pipeline".

[ii] The remedial action plan requires: a) investigation and remediation of anomalies on Line 901 (including anomalies requiring repair per 49 C.F.R. § 195.452(h) and similar anomalies); b) analysis of field measurements taken from anomaly investigations; c) re-grade of previous in-line inspection (ILI) data from 2012 and 2015 ILI surveys using an expanded set of interaction criteria; d) additional integrity assessments using a circumferential magnetic flux leakage (MFL-C) ILI tool and integration of MFL-C ILI data with previous ILI survey results; e) investigation and remediation of anomalies that are identified in the MFL-C tool run (if any); f) based on information collected from remedial work plan and root cause analysis report released by Det Norske Veritas (U.S.A.), Inc., improving the integrity management program; and g) integrity studies to reduce spill volumes, including an emergency flow restriction device evaluation and a surge study. Completion of the remedial work plan is required prior to the PHMSA Western Region Director approving a restart plan and return to service for Line 901.

[iii] High case temperature refers to the oil temperature inside the pump cavity.  The case holds the pump impeller

Page **20** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

where oil passes through.  This was a centrifugal pump that continues spinning whether there is product in the pump or not.  When the rupture occurred, there was not enough pressure or flow rate to allow the pump to continue pumping the oil over the hills and into Pentland Station.  Therefore, the oil that was in the pump remained in place and as the pump continued to spin, and temperature was reported to the SCADA system.  If the pump reaches the high temperature setpoint, the pump shuts itself off to protect itself from burning up.

[iv] The PCR utilizes two shift supervisors to cover the entire set of 22 consoles.  The California Console is handled by shift supervisor B.  The shift supervisor B position at the time of the failure was filled by a step-up shift supervisor.  A step-up shift supervisor is a controller who is currently qualified on a specific console in the PCR and has received some informal training by working on shift with other shift supervisors.  Step-up shift supervisors are used to cover the shift supervisor positions when additional personnel are needed due to illness, vacation, training, etc.  Plains has indicated that two step-up shift supervisors are not allowed to be on duty at the same time so one shift supervisor is paired with a step-up shift supervisor when additional personnel is needed.

[v] PLM is the SCADA vendor software tool that serves as the leak detection system for PCR.

[vi] *See* Appendix B.

[vii] SCADA Data/Plains Control Room time is local to the Central Time Zone.  A two-hour time difference separates Central Time from Pacific Time, with Central Time falling two hours ahead. The release occurred in the Pacific Time Zone which is two (2) hours earlier.  All times in this report have been adjusted to Pacific Time.

[viii] *See* Appendix J.

[ix] *See* Appendix K.

[x] *See* Appendix L.

[xi] *See* Appendix M.

[xii] PHMSA has access to this data through a view-only web portal.

[xiii] *See* Appendix G.

[xiv] The inability of an impressed cathodic protection system to protect insulated pipelines was most recently reaffirmed in the National Association of Corrosion Engineers (NACE) Publication 10A392 (2006 Edition) – "Effectiveness of Cathodic Protection (CP) on Thermally Insulated Underground Metallic Structures."

[xv] *See* NACE Report at Appendix O, Background section stating that "[o] n most thermally insulated oil and gas transmission pipelines installed prior to 1980 to 1981, a shop mold-formed thermal insulation was placed directly over the bare steel pipe, with an outer jacket applied to moisture-proof the system. At the field joint, preformed insulation half shells were applied over the joint area to fit between the ends of the shop-applied insulation. After the insulation was fitted, a heat shrink sleeve or a tape wrap was applied over the insulation. When the integrity of the outer moisture barrier was compromised, the space, gap, or void between the edges of the preformed half shells and the shop-applied insulation allowed oxygenated water to diffuse to the bare steel beneath. Damage to the outer moisture barrier has also occurred remote from the joint, allowing oxygenated ground water ingress.

"Thermally insulated pipelines have experienced relatively aggressive corrosion, with some failures occurring within three years of service, although acceptable industry standards of CP had been applied and maintained shortly after line construction. The most predominant failures have been those occurring at joints; however, moisture has migrated along the pipeline steel surface to create electrochemical corrosion cells remote from the field joint, culminating in extensive replacements of substantial lengths of line. An article titled 'Corrosion of Underground Insulated Pipelines' supports this committee's conclusions that sufficient CP current from an external source may not reach the insulated metallic surface in sufficient quantity to establish adequate corrosion control."

[xvi] *See* Appendix D.

Page **21** of **21**

# Exhibit D

STATE CAPITOL
P.O. BOX 942849
SACRAMENTO, CA 94249-0115

# California Legislature

September 27, 2024

Delivered Electronically

Mr. Joe Tyler, Director/Fire Chief
Mr. Daniel Berlant, State Fire Marshal
California Department of Forestry and Fire Protection
P.O. Box 944246
Sacramento, CA 94244-2460

**Re: Transparency and Public Engagement in OSFM's Determination of Whether to Restart Pipelines CA-324 and CA-325**

Dear Mr. Tyler and Mr. Berlant,

It has come to our attention that the Office of the State Fire Marshal ("OSFM") is considering whether to allow Sable Offshore Corp. ("Sable") to restart the pipeline that caused the 2015 oil spill at Refugio State Beach Park. We write to express our concern regarding the process used by the OSFM to consider approving a project that would invite another coastal oil spill and impact the safety of the Central Coast community.

The restart of this pipeline, now known as CA-324, and related facilities, including three offshore drilling platforms, and the onshore oil processing facility at Las Flores Canyon, is a matter of profound importance to our constituents along the Central Coast. When this pipeline ruptured in 2015, the effect on nearby communities was catastrophic. The spill devastated at least 150 miles of coastline, forced the closure of fisheries and beaches, killed an untold number of marine mammals, cost hundreds of millions of dollars to clean up, negatively impacted local businesses, and caused an estimated 140,000 lost recreational user days between Santa Barbara, Ventura, and Los Angeles Counties. Many of the restoration projects were funded just last year and have just begun work.[1]

---

[1] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 18 (June 2021) [hereinafter "NRDA"], available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.

CA-324 and CA-325 do not have effective protection against corrosion, which is ultimately what caused the 2015 spill.[2] Without protection from corrosion, another spill from these pipelines is incredibly likely. When Santa Barbara County was considering a proposal to replace these pipelines, it estimated the pipelines would result in a spill once a year, and a rupture once every four years.[3] The County also estimated that another spill from these pipelines could be twice the size of the 2015 spill — even if the pipelines are retrofitted with automatic shut-off valves.[4]

In light of the threat to public health and safety that these facilities pose, several community organizations asked OSFM for increased transparency and public engagement as it considers whether to restart CA-324 and CA-325. In response, OSFM agreed to "[h]old public meetings and engage with the public at appropriate milestones for a potential restart.'[5]

OSFM has approved a Risk Analysis, which Sable is now implementing. OSFM is also currently reviewing Sable's application for a state waiver to allow this pipeline to operate without meeting Federal standards or fixing the flaws that caused it to rupture almost 10 years ago. We understand that OSFM is scheduling a public hearing in mid-October, but we have heard concerns that this could be after a determination of the state waiver, which would allow for the functional restart of the pipeline with no opportunities for public participation. We believe it would be helpful to invite public review and comment on the available information before any decision is finalized.

We would urge the OSFM to be as transparent as possible with the documents that are germane to public participation. The safety of these pipelines is a serious concern for many in our community, and it is important that the public is aware of the conditions of the pipelines and what is being done to make them operate safely.

The OSFM is a public agency working on behalf of the people of California, specifically charged with "safeguard[ing] our communities" from the inherent hazards in oil and gas transportation.[6] We are concerned that the people of California will be left holding the bag for the exorbitant clean-up costs if Sable, a speculative company with no operational assets, files for bankruptcy.

With the significant health, fiscal, and environmental risks posed with this restart, public participation is essential to ensuring that OSFM makes fully informed decisions. As an agency

---

[2] Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California*, pp. 13-14 (May 2016) [hereinafter "PHMSA Report"], available at: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

[3] Santa Barbara County Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 79.

[4] *Id.*

[5] *See Pathways for Restarting Pipelines*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited Sept. 17, 2024).

[6] *Pipeline Safety and CUPA*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa (last visited Sept. 17, 2024).

acting on behalf of the public, it is important that OSFM understand the views of the public to maintain a level of trust in our government agencies. We respectfully request the following:

- Release all documents pertinent to Sable's restart, unless OSFM is prohibited from doing so by law;
- Conduct environmental review pursuant to the California Environmental Quality Act, to ensure consideration of potential environmental impacts before decisions are made; and
- Hold public meetings and invite public comment at each step of the restart process *before* making any determinations.  As identified on the OSFM website, those steps would include, for example, implementation of the Risk Analysis, OSFM's consideration of a State Waiver, deferred maintenance that must be completed, and consideration of a Restart Plan[7].

We have grave reservations regarding the restart of CA-324 and CA-325, which have *already* caused a catastrophic oil spill, and which Sable intends to restart without effective protection from corrosion. Again, one governing body has already identified that proceeding in this manner would inevitably lead to another oil spill, one that could be twice the size of the 2015 disaster.[8]

Thank you for your consideration of our comments and your prompt attention to this matter.

Sincerely,

**Monique Limón**
Senator, District 19

**Gregg Hart**
Assemblymember, District 37

**Scott Weiner**
Senator, District 11

**Dawn Addis**
Assemblymember, District 30

**John Laird**
Senator, District 17

**Steve Bennett**
Assemblymember, District 38

---

[7] *Pathways for Restarting Pipelines*, OSFM, https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last visited Sept. 17, 2024).
[8] Santa Barbara County Administrative Draft of Draft EIR for Plains Pipeline Replacement Project, Section 5.6, p. 79.

**Ben Allen**
Senator, District 24

**Henry Stern**
Senator, District 27

**Lena Gonzalez**
Senator, District 33

**Catherine Blakespear**
Senator, District 38

**Jacqui Irwin**
Assemblymember, District 42

**Rick Zbur**
Assemblymember, District 51

**Tina McKinnor**
Assemblymember, District 61

Cc: Jim Hosler, Assistant Deputy Director, Pipeline Safety and CUPA

# Exhibit E

07/25/2024  12:45:28 PM

## 5.6 Hazardous Materials and Risk of Upset

This section describes environmental and regulatory settings related to hazardous materials and risk of upset, identifies reasonable worst-case scenario of potential hazardous material and risk of upset impacts of the proposed Project and cumulative impacts from this and other projects in the region, discusses alternatives and provides mitigation measures to reduce impacts to less than significant levels.

The analysis in this section addresses both the crude oil pipeline and the SoCalGas pipeline. The risk of upset analysis addresses potential failures and accidents that could impact the public or the environment associated with the crude oil and natural gas pipelines, as well as equipment and operations at the pump stations. The analysis addresses the impacts associated with releases of hazardous materials such as oil spills, gas releases, potential fires, and cleanup and restoration activities.

The impacts on public health from fires that could result from a hazardous materials release is based upon a Quantitative Risk Assessment (QRA) prepared by the Applicant and peer reviewed by the EIR preparer. The analysis of the potential for impacts from a crude oil spill on the environment are discussed in this section as well as in the following sections: Section 5.2, Biological Resources; Section 5.4, Cultural Resources and Tribal Cultural Resources; Section 5.7, Land Use, Planning, and Recreation; and Section 5.9, Hydrology and Water Quality. Technical documents related to hazardous materials and risk of upset are provided in Appendix I.

For a list of references used in the preparation of this section, please refer to Section 5.6.10, References.

### 5.6.1 Environmental Setting/Existing Environment

This section discusses the environmental setting for the proposed Project consisting of the baseline and areas that could be affected by a release from the proposed Project facilities. For baseline operations, the existing pipeline would not be operating; therefore, risks associated with the baseline would be related to the periodic testing and maintenance of equipment, such as the valve and pump emergency generators.

Some This section provides limited background on the May 2015 Refugio oil spill is also presented. Additionally,

information on the SYU historical operations risk of upset impacts is also discussed in Section 5.6.3.5, Cumulative Effects.

#### 5.6.1.1 Area Communities and Environmental Resources

The majority of the crude oil pipeline ROW passes through rural areas with scattered populations and residences as well as very remote areas with generally no populations. A portion of the pipeline ROW would also pass adjacent to the City of Buellton. Population densities vary along the pipeline route, from about 59 percent of the route having no recorded populations nearby, to a small percentage of the route with a population density peak of 8,400 persons per square mile near the City of Buellton (2010 Census data by block level). The average population density along the ROW is about 20 persons per square mile. About 69 miles of the 123-mile route has no recorded populations in the respective census block group. The pump stations are or would be remote and generally not accessible to the public.

The gas pipeline ROW passes through sparely populated areas of the eastern Santa Ynez valley, with some low-density residential areas located north of the community of Garey and passes along Santa Maria Mesa Road among mostly agricultural and some industrial areas.

Exhibits - Page 73

Environmental resources within the Project ROW include river crossings at Gaviota Creek, Santa Ynez River, Sisquoc River, and the Cuyama River (all proposed for HDD installations), as well as over 140 smaller creeks and unnamed drainages (see Section 5.9, Hydrology and Water Quality). Flows in the rivers listed above vary substantially, with water flowing anywhere from 26 to 96 percent of the year (USGS 2020). Spills into flowing creeks and rivers would potentially result in substantially greater impacts than spills into dry areas. Environmental resources are discussed in more detail in Section 5.2, Biological Resources and Section 5.9, Hydrology and Water Quality.

### 5.6.1.2   Wildfire Risk

Portions of the proposed Project are within very high fire hazard areas, including areas within Gaviota, areas south of Buellton, and areas along the Santa Ynez River west of Cuyama. Very high fire hazard areas are those regions exposed to significant fuel loads, such as large areas of undisturbed native or naturalized vegetation or areas that due to location have less than optimal fire response times and are specifically designated as such by CalFIRE (CalFIRE 2020).

The proposed Project area is covered by a range of fire departments and locations within Santa Barbara County, San Luis Obispo County, and Kern County, depending on the location of the pipeline segment of concern.

### 5.6.1.3   Las Flores Canyon Fire Protection

The start of the proposed Project pipeline is at the LFC facility. The LFC area falls within the jurisdiction of the Santa Barbara County Fire Department (SBCFD) and is served by County Fire Station 38, which is located at 17200 Mariposa Reina in Gaviota. Station 38 is about 12 miles, or approximately 20 minutes, from the LFC facilities. The two other closest county fire stations to the LFC are Station 11, located at 6901 Frey Way in Goleta, and Station 14, at 320 Los Carneros Road in Goleta. Both stations are about 14 miles from the LFC facilities and have similar travel times as Station 38.

The LFC facilities have an Integrated Fire Protection Plan that is reviewed and approved by Santa Barbara County on a regular basis. The facilities are equipped with a fire protection water system that includes water storage tanks, fire pumps, fire service water mains and fire hydrants. The facility has several fixed fire protection systems including automatic fire sprinklers, deluge systems, foam systems, gaseous extinguishing systems and various manual firefighting equipment. The LFC facilities are also equipped with a hazards monitoring system that includes fire, combustible gas, and toxic gas alarms. Three types of fire detectors are used on-site, including ultraviolet, thermal, and smoke (ionization) detectors.

The natural vegetation in the area of the LFC facilities is dominated by chaparral, coastal sage scrub, riparian woodland, and grasslands. This represents a high fire hazard during the normal seasonal dry weather cycles experienced on the south coast. Fires in the developed areas could spread to the brush and threaten the nearby watershed. The LFC facilities (operated by ExxonMobil) has a Wildland Fire Protection Plan that requires that ExxonMobil maintain native plant communities within the LFC facilities. Flammable vegetation along the facility perimeter and access roads are mowed to approximately six inches in height and 10 feet away from the roads to minimize the potential spread of fires within the facilities to the undeveloped portion of the property.

Wildland fires could also originate outside the developed areas of the LFC. These fires could threaten equipment, structures, and other developed features. The LFC facilities maintains a Vegetation Management Plan to reduce the potential exposure of the developed site from wildland fire threats.

Exhibits - Page 74

07/25/2024  12:45:28 PM

Additionally, there are various measures that are employed to protect the LFC facilities from wildland fires. These measures include, but are not limited to, the following:

- Posting of fire watches;

- Extinguishing embers;

- Activating fire monitors to create water curtains; and

- Using water spray and deluge system to keep facilities cool and having site personnel wet down critical areas.


### 5.6.1.4   Agency Spill Response

The SBCFD is the primary first responder for fire protection/spill response along the pipeline routes. The County relies on the CDFW Area Spill Response Plans (see below) as well as the facility-specific plans for emergency response planning. Primarily, the SBCFD uses the Santa Barbara County Operational Area Oil Spill Contingency Plan (SBCOA OSCP) revised in 2019. The 2019 version is in draft form, pending approval by the CDFW Office of Spill Prevention and Response (OSPR). The purpose of the SBCOA OSCP is to outline procedures for a coordinated response to an oil spill with local, state, and federal agencies and the responsible party. The SBCOA OSCP is to be used if an oil spill impacts or threatens to impact inland surface waterways, the Channel Islands, or the Santa Barbara County coastline. The SBCOA OSCP addresses many of the issues that arose from the Refugio spill (see below) and addresses the following issues:

- Roles and responsibilities (first responders, incident management team, unified command, etc.);

- Operations (discovery and notification, preliminary assessment, containment, and cleanup);

- Logistics (staging areas, incident command posts, environmentally sensitive sites, and shoreline access); and

- Plan review and exercises (training and drills).

Figure 5.6-1 shows the location of the proposed Project area fire stations that are located along the proposed pipeline route. All these stations have various types and quantities of firefighting equipment and personnel.

SBCFD has a hazardous material (HAZMAT) team that includes firefighters from Station 38 (Gaviota) and Station 31 (Buellton). The team is a group of firefighters and staff who have the specialized training in the prevention and mitigation of incidents involving hazardous materials. SBCFD maintains a HAZMAT trailer centrally located in the county at Station 31 in the City of Buellton. Inside the trailer are a host of equipment necessary in fulfilling the mission of mitigating a hazardous materials upset situation. The SBCFD also maintains oil spill prevention and response trailers at Station 38 (Gaviota) and Station 14 (Goleta). Construction equipment is maintained at Station 24 (Los Alamos).

The HAZMAT teams are trained to deploy the equipment in the response trailers. Other fire staff are trained to take initial action such as inflating hoses for use as containment booms; however, they are not necessarily trained in hazardous response. SBCFD conducts HAZMAT training on spills and conducts oil spill drills and training with operators for fixed facilities such as LFC and for transmission pipelines in the County's jurisdiction.

Response times along the proposed pipeline route vary depending upon the location, with the longest response times being to areas along State Route 166. Depending upon the location, type of incident, and

Exhibits - Page 75

07/25/2024  12:45:28 PM

equipment needed, response times could vary from 20 minutes to over two hours for some of the far eastern stretches of the pipeline route.

**Figure 5.6 1    Location of Key Fire Stations Along Proposed Pipeline Route**



Source: prepared by EIR preparer using data from Santa Barbara County and City of Santa Maria Fire Departments.

The CDFW-OSPR has state oversite for spills that impact California waterways. OSPR's mission is to provide best achievable protection of California's natural resources by preventing, preparing for, and responding to spills of oil and enhancing affected resources.

In 2014, then-Governor Brown expanded the CDFW-OSPR program to cover all state surface waters at risk of oil spills from any source, including pipelines, production facilities, and the increasing shipments of oil transported by railroads. This expansion provided critical administrative funding for industry preparedness, spill response, and continued coordination with local, state, and federal government along with industry and nongovernmental organizations. State Senate Bill 861 authorized the expansion and provided the additional statutory and regulatory authority for the prevention, preparedness, and response activities in the new inland areas of responsibility.

CDFW-OSPR maintains a list of certified oil spill response organizations (OSROs) that are approved to help with oil spill cleanup operations. These OSROs play an integral part in CDFW-OSPR's planned response to any oil spill incident. Each certified OSRO has been evaluated through CDFW-OSPR's drill program and can rapidly respond to a variety of oil spill incidents. Several OSROs have been approved by CDFW-OSPR for terrestrial and marine spill response.

CDFW-OSPR has developed an oil spill response plan for Santa Barbara and San Luis Obispo counties (the Los Angeles – Long Beach Area Contingency Plan also includes Ventura, Los Angeles and Orange counties) that provides detailed response plans for the sensitive waterways that drain directly to the ocean. This

Exhibits - Page 76

07/25/2024  12:45:28 PM

includes the following sensitive waterways along the Gaviota Coast that could be affected by a pipeline spill (CDFW 2019):

- Canada Del Agua Caliente;

- Gaviota Creek;

- Canada Del Alcatraz and Cementario Creeks;

- Arroyo Hondo Preserve and Creek;

- Refugio Creek; and

- Corral-Las Flores Creek.

A March 21, 2020, tanker truck oil spill on State Route 166 (discussed in more detail in the ExxonMobil Interim Trucking EIR [SBC 2020]), required response actions similar to a spill from the proposed Project pipeline, which would travel in parallel to portions of State Route 166, or other water locations. In this incident, a truck trailer carrying crude oil separated from the tractor and rolled down the embankment into the Cuyama River. A unified command was established to handle the containment, cleanup, and recovery operations. To limit the spread of the oil, a berm was constructed approximately two miles downstream from the spill site to contain the oil. Two pipes were installed beneath the berm to keep clean water flowing while absorbent pads were used to soak up the oil on the surface. Vacuum trucks and skimming devices were used to remove oil and contaminated water from a containment zone. CDFW-OSPR reported that the containment system held up well by preventing oil from moving toward the Twitchell Dam and Reservoir downstream of the spill site. Crews continuously monitored the river through visible observations and drone flights and did not document impacts downstream of the containment zone, including at the reservoir. As many as 79 people were involved in the on-site response during the peak response.

San Luis Obispo has an Emergency Operations Plan (SLOC 2016) and a Hazardous Materials Emergency Response Plan (SLOC 2013), both of which address a range of issues including organization, operations, recovery, and hazard assessments.

**5.6.1.4   Kern County has a Multi-Jurisdiction Hazard Mitigation Plan (Kern County 2020) addressing planning, risk assessment, mitigation strategies, plan implementation and maintenance. The plan addresses issue such as earthquake and landslide vulnerabilities. The Kern County Fire Department also maintains a Unit Strategic Fire Plan (Kern County 2018) primarily focused on wildland fire management and planning.Federal Lands Fire Protection and Emergency Response**

***Bureau of Land Management – Carrizo Plain National Monument***

The Carrizo Plain National Monument area has two major sources of access. From the north, the access is via Soda Lake Road from State Route 58. The second major access is from the south via Soda Lake Road from State Route 33/166. The area is primarily comprised of dirt road access, which may become impassable during heavy rain or snowfall. Emergency response access restrictions may occur during high fire hazard periods or other hazard conditions. Project area on these lands is accessible via State Route 58 and State Route 33/166.

The Bureau of Land Management does not maintain a fire or hazardous materials (HazMat) team within the Carrizo Plain National Monument area. They maintain a Memorandum of Understanding with the Kern County HazMat team for response needs for Carrizo Plain land. Further, three HazMat teams are

Exhibits - Page 77

07/25/2024  12:45:28 PM

assigned to Carrizo Plain as their response district. These teams include two teams within Santa Maria, San Luis Obispo County and one team in the city of San Luis Obispo. HazMat teams were mapped within ESRI for response times; the anticipated response time to the Project area is expected to be 1.15 hours to 1.5 hours.

### *Bureau of Land Management – Other BLM Managed Lands*

The proposed Project would cross 0.55 miles of BLM managed lands that are categorized as Other lands. Project area on these lands is accessible via State Highway 33 with the nearest town being Maricopa located in Kern County, California.

The BLM does not maintain a fire or HazMat team within the Other Managed-Lands area. They maintain a Memorandum of Understanding with the Kern County HazMat team for the Other Managed-Lands area. HazMat teams were mapped within ESRI for response times, anticipated response time to the Project area is expected to be 0.5 hours to 1 hour.

### *U.S. Forest Service – Los Padres National Forest*

The proposed Project would cross 5.06 miles of USFS-managed lands within the Los Padres National Forest. The Project area within the national forest is accessible via State Highway 166 and Forest Road, with the nearest town being Santa Maria in San Luis Obispo.

USFS personnel within Los Padres National Forest are trained for HazMat response. However, they currently do not maintain equipment to handle a spill or release.  HazMat teams at Santa Barbara County Fire Stations 31 and 38 in Buellton and Gaviota, respectively, are responsible for HazMat response within the Los Padres National Forest as part of their response district. HazMat teams were mapped within ESRI for response times; anticipated response time to the Project area is expected to be 0.5 hours to 1.15 hours.

### *U.S. Fish and Wildlife Service – Bitter Creek National Wildlife Refuge*

The proposed Project would cross 0.95 miles of USFWS-managed Lands within Bitter Creek NWR. The Project area located on these lands is accessible via State Highway 166, with the nearest town being Maricopa, California.

The Bitter Creek NWRe does not maintain a HazMat or fire team on the lands crossed by the Proposed project. The Refuge has a Fire Management Plan that identifies the Kern County Fire District as the provider for wildland fire and structural fire protection to the Refuge under a cooperative fire protection agreement. This agreement is a sub-agreement of the BLM mutual aid agreement that is tied to the Carrizo Plains. There are two HazMat teams located in Bakersfield, Kern County that are responsible for HazMat response within the Bitter Creek NWR. HazMat teams were mapped within ESRI for response times, anticipated response time to the project area is expected to be 1 hour to 1.5 hours.

### 5.6.1.5   Local Agency Spill Response

### *Santa Barbara County*

The SBCFD is the primary first responder for fire protection/spill response along the pipeline routes. The County relies on the CDFW Area Spill Response Plans (see below) as well as the facility-specific plans for emergency response planning. Primarily, the SBCFD uses the Santa Barbara County Operational Area Oil Spill Contingency Plan (SBCOA OSCP) revised in 2019. The 2019 version is in draft form, pending approval by the CDFW Office of Spill Prevention and Response (OSPR). The purpose of the SBCOA OSCP is to outline

Exhibits - Page 78


07/25/2024  12:45:28 PM

procedures for a coordinated response to an oil spill with local, state, and federal agencies and the responsible party. The SBCOA OSCP is to be used if an oil spill impacts or threatens to impact inland surface waterways, the Channel Islands, or the Santa Barbara County coastline. The SBCOA OSCP addresses many of the issues that arose from the Refugio spill (see below) and addresses the following issues:

- Roles and responsibilities (first responders, incident management team, unified command, etc.);

- Operations (discovery and notification, preliminary assessment, containment, and cleanup);

- Logistics (staging areas, incident command posts, environmentally sensitive sites, and shoreline access); and

- Plan review and exercises (training and drills).

Figure 5.6-1 shows the location of the proposed Project area fire stations that are located along the proposed pipeline route. All these stations have various types and quantities of firefighting equipment and personnel.

SBCFD has a hazardous material (HAZMAT) team that includes firefighters from Station 38 (Gaviota) and Station 31 (Buellton). The team is a group of firefighters and staff who have the specialized training in the prevention and mitigation of incidents involving hazardous materials. SBCFD maintains a HAZMAT trailer centrally located in the county at Station 31 in the City of Buellton. Inside the trailer are a host of equipment necessary in fulfilling the mission of mitigating a hazardous materials upset situation. The SBCFD also maintains oil spill prevention and response trailers at Station 38 (Gaviota) and Station 14 (Goleta). Construction equipment is maintained at Station 24 (Los Alamos).

The HAZMAT teams are trained to deploy the equipment in the response trailers. Other fire staff are trained to take initial action such as inflating hoses for use as containment booms; however, they are not necessarily trained in hazardous response. SBCFD conducts HAZMAT training on spills and conducts oil spill drills and training with operators for fixed facilities such as LFC and for transmission pipelines in the County's jurisdiction.

Response times along the proposed pipeline route vary depending upon the location, with the longest response times being to areas along State Route 166. Depending upon the location, type of incident, and equipment needed, response times could vary from 20 minutes to over two hours for some of the far eastern stretches of the pipeline route.

Exhibits - Page 79

Draft Print

07/25/2024  12:45:28 PM

**Figure 5.6-1    Location of Key Fire Stations Along Proposed Pipeline Route**



Source: prepared by EIR preparer using data from Santa Barbara County and City of Santa Maria Fire Departments.

The CDFW-OSPR has state oversite for spills that impact California waterways. OSPR's mission is to provide best achievable protection of California's natural resources by preventing, preparing for, and responding to spills of oil and enhancing affected resources.

In 2014, then-Governor Brown expanded the CDFW-OSPR program to cover all state surface waters at risk of oil spills from any source, including pipelines, production facilities, and the increasing shipments of oil transported by railroads. This expansion provided critical administrative funding for industry preparedness, spill response, and continued coordination with local, state, and federal government along with industry and nongovernmental organizations. State Senate Bill 861 authorized the expansion and provided the additional statutory and regulatory authority for the prevention, preparedness, and response activities in the new inland areas of responsibility.

CDFW-OSPR maintains a list of certified oil spill response organizations (OSROs) that are approved to help with oil spill cleanup operations. These OSROs play an integral part in CDFW-OSPR's planned response to any oil spill incident. Each certified OSRO has been evaluated through CDFW-OSPR's drill program and can rapidly respond to a variety of oil spill incidents. Several OSROs have been approved by CDFW-OSPR for terrestrial and marine spill response.

CDFW-OSPR has developed an oil spill response plan for Santa Barbara and San Luis Obispo counties (the Los Angeles – Long Beach Area Contingency Plan also includes Ventura, Los Angeles and Orange counties) that provides detailed response plans for the sensitive waterways that drain directly to the ocean. This includes the following sensitive waterways along the Gaviota Coast that could be affected by a pipeline spill (CDFW 2019):

▪ Canada Del Agua Caliente;

- Gaviota Creek;

- Canada Del Alcatraz and Cementario Creeks;

- Arroyo Hondo Preserve and Creek;

- Refugio Creek; and

- Corral-Las Flores Creek.

A March 21, 2020, tanker truck oil spill on State Route 166 (discussed in more detail in the ExxonMobil Interim Trucking EIR [SBC 2020]), required response actions similar to a spill from the proposed Project pipeline, which would travel in parallel to portions of State Route 166, or other water locations. In this incident, a truck trailer carrying crude oil separated from the tractor and rolled down the embankment into the Cuyama River. A unified command was established to handle the containment, cleanup, and recovery operations. To limit the spread of the oil, a berm was constructed approximately two miles downstream from the spill site to contain the oil. Two pipes were installed beneath the berm to keep clean water flowing while absorbent pads were used to soak up the oil on the surface. Vacuum trucks and skimming devices were used to remove oil and contaminated water from a containment zone. CDFW-OSPR reported that the containment system held up well by preventing oil from moving toward the Twitchell Dam and Reservoir downstream of the spill site. Crews continuously monitored the river through visible observations and drone flights and did not document impacts downstream of the containment zone, including at the reservoir. As many as 79 people were involved in the on-site response during the peak response.

### San Luis Obispo County

San Luis Obispo has an Emergency Operations Plan (SLOC 2016) and a Hazardous Materials Emergency Response Plan (SLOC 2013), both of which address a range of issues including organization, operations, recovery, and hazard assessments.

### Kern County

Kern County has a Multi-Jurisdiction Hazard Mitigation Plan (Kern County 2020) addressing planning, risk assessment, mitigation strategies, plan implementation and maintenance. The plan addresses issue such as earthquake and landslide vulnerabilities. The Kern County Fire Department also maintains a Unit Strategic Fire Plan (Kern County 2018) primarily focused on wildland fire management and planning.

### 5.6.1.5 5.6.1.1 Marine Spill Response

For marine spill responses, area oil and gas operators, including historically Plains, contract with the Marine Spill Response Corporation (MSRC), which purchased Clean Seas in 2017. This company (then named Clean Seas) responded to and provided the marine response to the 2015 Refugio spill. The MSRC has the following equipment stationed in Santa Barbara County (as per the MSRC website):

- Comet support vessel, located near Santa Barbara Harbor;

- 20,000 Feet 20/10" Curtain Internal Foam Boom, three Workboats, 17,657 Corexit Dispersant, five Skiffs, 900 Feet 24/6" Curtain Internal Foam Boom, An interior response trailer with 1000 feet of boom, boat, underflow dams and skimmer , located at a facility in Carpinteria; and

- Fast Response vessel, 2,000 Curtain self-inflatable boom, skimmers, 250 gallons dispersant located at the Cojo Mooring near Point Conception.

07/25/2024  12:45:28 PM

~~5.6.1.6~~5.6.1.1 Plains Spill Response

~~5.6.1.6    Plains has a Facility Response Plan that includes contingency planning for spill and emergency response for various facilities throughout California. Industry contingency plans, for both marine and inland facilities, are required per 14 CCR §790-820. Affected industry members were required to submit facility contingency plans and Certificates of Financial Responsibility by January 1, 2016, to OSPR (https://wildlife.ca.gov/OSPR/Financial-Responsibility). Adequate personnel, equipment, and response plans must be in place at all times in order to successfully implement the Facility Response Plan.~~ Marine Spill Response

For marine spill responses, area oil and gas operators, including historically Plains, contract with the Marine Spill Response Corporation (MSRC), which purchased Clean Seas in 2017. This company (then named Clean Seas) responded to and provided the marine response to the 2015 Refugio spill. The MSRC has the following equipment stationed in Santa Barbara County (as per the MSRC website):

- Comet support vessel, located near Santa Barbara Harbor;

- 20,000 Feet 20/10" Curtain Internal Foam Boom, three Workboats, 17,657 Corexit Dispersant, five Skiffs, 900 Feet 24/6" Curtain Internal Foam Boom, An interior response trailer with 1000 feet of boom, boat, underflow dams and skimmer , located at a facility in Carpinteria; and

- Fast Response vessel, 2,000 Curtain self-inflatable boom, skimmers, 250 gallons dispersant located at the Cojo Mooring near Point Conception.

### 5.6.1.7   Plains Spill Response

Plains has a Facility Response Plan that includes contingency planning for spill and emergency response for various facilities throughout California. Industry contingency plans, for both marine and inland facilities, are required per 14 CCR §790-820. Affected industry members were required to submit facility contingency plans and Certificates of Financial Responsibility by January 1, 2016, to OSPR (https://wildlife.ca.gov/OSPR/Financial-Responsibility). Adequate personnel, equipment, and response plans must be in place at all times in order to successfully implement the Facility Response Plan.

### ~~5.6.1.7~~5.6.1.8 Refugio Oil Spill

On May 19, 2015, the Plains Pipeline Line 901 pipeline in Santa Barbara County ruptured, resulting in the release of crude oil that subsequently ran down drainages and reached the ocean. An estimated 123,228 gallons was spilled with an estimated 53,000 gallons reaching the ocean (Baker 2018). During installation, the pipelines were coated with coal tar urethane and covered with foam insulation, which in turn was covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, were present at all of the pipeline joints on Line 901 and multiple locations on Line 903.

The Federal Department of Transportation PHMSA findings indicated that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil (PHMSA 2016). PHMSA's investigation identified numerous contributory causes of the rupture, including:

Draft Print

07/25/2024  12:45:28 PM

1. Ineffective protection against external corrosion of the pipeline;

2. Failure by Plains to detect and mitigate the corrosion; and

3. Lack of timely detection of and response to the rupture.

In addition, there was evidence of corrosion and degraded coating systems, allowing moisture to reach the steel pipe walls near the failure site. The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

After the spill, Lines 901 and 903 were purged with nitrogen in accordance with the PHMSA corrective action orders and remain out of service.

The following is a summary of the event from the PHMSA Failure Investigation Report (PHMSA 2016).

On the morning of May 19, 2015, Lines 901 and 903 were transporting crude oil with a flow rate setpoint of 1,240 barrels per hour leaving the LFC, and the discharge pressure was approximately 575 pounds per square inch in gauge (psig). Pumps were operating at the Las Flores Station on Line 901 and Sisquoc Station on Line 903. While a Plains technician was performing his work, the operational pump at the Sisquoc Station was shut down, unintentionally causing the pressure in Line 901 to increase. The pressure rose to a maximum of 696 psig at the LFC discharge. The controller shut down the pipeline pump at the LFC and the pressure remained at 677 psig. The pipeline pump at LFC was then restarted and the flow rate at LFC then climbed from zero to 2,042 barrels per hour. Concurrently, the line pressure rose to a high of 721 psig, then dropped to 199 psig, and then slightly increased to approximately 210 psig until the LFC pipeline pump was shut down a second and final time (PHMSA 2016).

Generally, a sudden increase in flow rate accompanied by a decrease in pressure is indicative of a release. PHMSA determined that the Sisquoc pump going offline was an abnormal event, but that this in itself should not have caused Line 901 to rupture. A PHMSA review of the Supervisory Control and Data Acquisition (SCADA) system event and alarm logs and pressure and flow records indicated that there was information reported by the SCADA system that indicated a release had occurred by approximately 10:55 a.m., and an alarm was generated on low pressure. The alarm, however, was not set at an appropriate value. The controller did not recognize the information they received as indicative of an abnormal operation and a potential release (PHMSA 2016).

The pipeline had undergone three Smart Pig Surveys in 2007, 2012, and 2015. In a Smart Pig Survey special instruments are passed through the inside of the pipeline to detect internal and external corrosion, dents, and other anomalies. The total number of metal loss anomalies had increased from 14 anomalies greater than 40 percent wall loss in 2007 to 94 anomalies greater than 40 percent wall loss in 2015, with two anomalies in 2015 being greater than 80 percent. The failure site was recorded as a wall loss of 47 percent, whereas subsequent analysis indicated that the actual wall loss was closer to 89 percent (PHMSA 2016). This inaccuracy was estimated to be due to buildup of corroded material outside of the pipeline between the pipe wall and the insulation.

Table 5.6-1 shows a timeframe of the incident.

**Table 5.6-1    Refugio Beach May 2015 Spill Timeline**

| Time of Day (19 May 2015) | Elapsed Time From Release, hours:minutes | Event |
|---|---|---|
| 10:42 a.m. | -0:13 | Sisquoc pipeline pump shut down during maintenance activities |

Exhibits - Page 83

**Table 5.6-1        Refugio Beach May 2015 Spill Timeline**

| Time of Day (19 May 2015) | Elapsed Time From Release, hours:minutes | Event |
|---|---|---|
| 10:48 a.m. | -0:07 | Plains controller shut down the LFC pipeline pump: 677 psig pressure and 1,220 bph |
| 10:49 a.m. | -0:06 | Sisquoc pipeline pump restarted |
| 10:52 a.m. | -0:03 | LFC pipeline pump restarted |
| 10:52 – 10:56 a.m. | -0:03 to 0:01 | Pressure increased to 721 psig and flow rate of 2,042 bph |
| 10:55 a.m. | 0:00 | PHMSA determination of rupture time. |
| 10:57 a.m. | 0:02 | Discharge pressure dropped to 199 psig, low-pressure alarm sounded. |
| 10:58 a.m. | 0:03 | Discharge pressure increased to 210 psig, above the alarm setpoint, causing the alarm to reset. |
| 11:00 a.m. | 0:05 | Flow rate of 1,458 bph |
| 11:15 a.m. | 0:22 | Sisquoc pipeline pump shut down on high temperature |
| 11:20 a.m. | 0:27 | Pressure in pipeline too low to accept crude oil from Venoco (an adjacent supplier entering the pipeline just downstream of the LFC) |
| 11:22 a.m. | 0:27 | Pipeline leak monitoring system potentially indicated an "imbalance" |
| 11:26 a.m. | 0:31 | Attempts to restart the Sisquoc pipeline pump failed. |
| 11:30 a.m. | 0:35 | LFC pipeline pump stopped. Mainline valve at LFC closes. Pressure at 211 psig. |
| 11:42 a.m. | 0:47 | A call reporting a petroleum smell was received at SBFD Station 18. |
| 12:15 p.m. | 1:20 | A representative from the SB-OEM received a call from the SBFD reporting that there was oil on Refugio Beach. |
| 12:43 p.m. | 1:48 | The Santa Barbara Dispatch notified the National Response Center |
| 12:55 p.m. | 2:00 | Two Plains representatives arrived at the south side of U.S. Highway 101 where the SBFD personnel were located. |
| 1:27 p.m. | 2:32 | The Plains representatives located the leak site on the Plains ROW. They called the controller to report the leak and to tell the controller to leave Line 901 shut down and to close the Refugio gate valve. The Plains representatives, along with fire department personnel, attempted to stop the flow of oil into the culvert. However, the culvert was too large to stop the flow with shovels, and sandbags were not readily available, so their immediate efforts were unsuccessful. |
| 2:56 p.m. | 4:01 | A representative from Plains called the NRC to report the release of crude oil. |
| 3:00 p.m. | 4:05 | Additional equipment and personnel arrived, the culvert was dammed, and oil was prevented from entering the culvert. |

Source: PHMSA 2016
Key:
bph = barrels per hour
LFC = Las Flores Canyon
NRC = National Response Center
psig = pounds per square inch gauge
ROW = right of way
SBFD = Santa Barbara Fire Department
SB-OEM = Santa Barbara Office of Emergency Management

### ~~5.6.1.8~~5.6.1.9 Refugio Oil Spill Lessons Learned

As part of the post-spill assessment of the Refugio Oil Spill response, Santa Barbara County developed a report detailing the strengths and opportunities for improvement based on the lessons learned associated with the County's response to the oil spill (SBC 2016). The document is aligned with the core capabilities

Exhibits - Page 84

Draft Print

07/25/2024  12:45:28 PM

identified by the federal government under the National Preparedness Goal and was developed leveraging planning meetings as outlined under the Homeland Security Exercise and Evaluation Program.

Primary relevant recommendations for improvement include the following:

- Recommendation 2.1: Align and include cultural resources in planning;

- Recommendation 3.1: Develop and incorporate into plans (as appropriate) processes to select the local-on-scene-coordinator along with qualifications, required training, duties, responsibilities, authorities, and coordination and interaction with established structures for emergency management;

- Recommendation 10.1: Ensure a local liaison is established to support coordination with local governments and UCSB;

- Recommendation 13.3: Develop formal programs to expand county-level skilled volunteers and spontaneous volunteers;

- Recommendation 14.1: Develop a formal process and structure to engage local nontraditional nongovernmental organizations;

- Recommendation 16.1: Document the County's current capability and capacity to support immediate oil response operations. The County does not have a current inventory of assets, resources, and personnel capabilities to support response to an oil spill. The County should document their capabilities and understand potential capability gaps to support immediate and sustained response operations. Personnel, organization, equipment, training, and exercises should all be considered in this assessment;

- Recommendation 16.2: Review and assess the requirements contained in oil company contingency plans as they apply to contract support and increase requirements associated with standby resources;

- Recommendation 16.3: Consider expanding training programs for County staff to increase skill sets and capacity, particularly regarding Hazardous Waste Operations and Emergency Response (HAZWOPER) training;

- Recommendation 18.1: Pre-identify facilities that can be used as the incident command post; and

- Revise Response Plans to specify the management and maintenance of public information resources outside of the responsible party.

In addition, the report after-action meeting participant feedback produced these additional relevant recommendations/concerns:

- Initial response to incident could have been far more robust, both on- and offshore;

- The response suffered because of the lack of local knowledge by the responsible party/federal regulators;

- The County must not rely on the responsible party. Assuming the response is not the County's responsibility creates a lack of action environment;

- Interagency communication and coordination (state/federal/local) was slow to synchronize, resulting in issues throughout the cleanup process, as has been reported in greater detail by those involved in the decision-making process;

- Need more immediate and effective response, in particular for an oil spill that starts onshore and spreads offshore. There was a significant lack of available personnel, vessels, equipment, staging, and

Exhibits - Page 85

07/25/2024  12:45:28 PM

planning. The fisherman's response program did not seem to be activated at the beginning of the spill. MSRC (then Clean Seas), while activated, could not prevent oil from reaching the ocean. The main response did not occur until almost 24 hours after the spill when much of the oil had already been washed to sea;

- Need better communication with the public, including open press conferences. Also, the lack of oil sampling information was frustrating for meeting participants. The responsible party should be required to provide information to the public such as the quantity of oil spilled;

- The Unified Command (a system of providing direction and control during a response activity i.e., how the representatives of all agencies having response role) should have consulted with scientists who had modeling and other information that would have improved oil spill response; and

- Need to integrate nongovernmental organizations in terms of assistance and communication;

- The volunteer program was extremely frustrating. The websites provided inaccurate information, then the websites stated that no volunteers were needed when volunteers were needed; training was deferred; the public was not adequately notified of volunteer opportunities other than beach cleanups, which were available earlier in the response process.

In addition, the National Academy of Sciences held a workshop in Santa Barbara in 2019 to address improving oil spill preparedness and response (NAS 2019). Some of the lessons learned from this workshop included:

- More timely communication, better coordination and transparency among emergency responders and media, clearer media guidelines, more centralized information, and multilingual resources;

- Establish baseline environmental conditions before a spill, require better coordination among entities carrying out sampling and monitoring efforts, and resolve issues related to site access restrictions that hinder monitoring efforts;

- Address site restrictions that hamper response efforts;

- Engage in data sharing and create databases; increase technological resources, such as drones; develop or obtain night lighting and nighttime imaging capabilities;

- Identify the best available science by bringing together scientists and experts from academia and government agencies;

- Take preventive measures, such as fixing vulnerabilities in pipelines that can cause great damage if overlooked, keeping spills small via better inspection of pipelines (including remote detection capability), addressing infrastructural vulnerabilities, and increasing the number of practice scenarios and drills within a year;

- Develop leak detection systems and shutoff systems;

- Incorporate new information into contingency plans regularly in order to improve them and facilitate rapid response operations;

- Streamline the authorization process associated with responsible party involvement delays and response;

- Develop better localized resource mobilization capabilities since mobilization is limited by time and distance;

Exhibits - Page 86

- Identify pathways for potential spills in facility oil spill contingency plans and include mechanisms to prevent or minimize onshore-to-offshore spills by identifying how to prevent oil from reaching the ocean and how to contain nearshore spills;

- Allow the marine OSROs to effectively respond to nearshore leaks by improving access to shore;

- Provide effective training and allow mobilization of small vessel operators such as fishing vessels; and

- Provide better volunteer training.

### 5.6.1.10 Environmental Remediation Sites (Federal Lands Only)

Data sets were reviewed through both ESRI and NEPAssist for Environmental Remedial Sites within a two-mile radius of the Project area. Based on the data analysis, no remediation sites were identified within the portion of the Project area that crosses federal lands. Further, no remediation sites exist within the two-mile search radius of these lands that could have indirect impacts.

### 5.6.1.11 Underground/Aboveground Storage Tanks (Federal Lands Only)

During the analysis of ESRI data sets, only one area of interest was found. Reyes Service Station is located within one-half mile of the Project area within the Bitter Creek National Wildlife Refuge.  The EPA Facility Report Services (from ESRI) denotes a leaking storage tank at this facility. Further research was conducted through the California State Water Resources Control Board GeoTracker. Based on the information reviewed, a case was opened in 1996. Site assessments continued through 2002. The case was marked as complete and closed in 2004. Based on the information reviewed, this facility is not suspected of negatively impacting the project site at this time.

### 5.6.1.9 5.6.1.12   Baseline Operations Risk of Upset

The baseline for the proposed Project is the currently shut-down existing facilities. As the existing pipeline no longer contains any crude oil, it does not present a risk due to potential oil spills. Minor risk impacts exist for ongoing maintenance of the valves and pump station generators, and periodic maintenance of the pipeline segments due to the potential for localized spills of hydraulic fluids and/or diesel oils.

## 5.6.2   Regulatory Setting

This section presents the regulatory setting as it relates to the proposed Project.

### 5.6.2.1   Federal Regulations

***Federal Pipeline Safety Regulations – 49 Code of Federal Regulations Parts 186–199***

PHMSA oversees the federal pipeline safety regulations (49 Code of Federal Regulations [CFR] Parts 186–199). They are currently in the process of amending these rules to include the following:

1. Require the inspection of pipelines in areas affected by extreme weather and natural disasters;

2. Require integrity assessments at least once every ten years of onshore hazardous liquid pipeline segments located outside of high consequence areas and that they are "Smart Piggable";

3. Extend the required use of leak detection systems beyond high consequence areas to all regulated, non-gathering hazardous liquid pipelines; and

Exhibits - Page 87

4.  Require that all pipelines in or affecting high consequence areas be capable of accommodating in-line inspection tools within 20 years, unless the basic construction of a pipeline cannot be modified to permit that accommodation.

### Protecting Our Infrastructure of Pipeline and Enhancing Safety Act of 2016 – Title 14 Amended

The Protecting Our Infrastructure of Pipeline and Enhancing Safety Act (or "PIPES Act"), effective July 1, 2020, requires an analysis of pipeline age, condition, materials, and construction have on safety and risk related to high consequence areas and requires Federal or State regulators to review how those risks are being addressed.

Additional requirements include:

- (A) using internal inspection technology appropriate for the integrity threat are completed not less often than once every 12 months; and

- (B) using pipeline route surveys, depth of cover surveys, pressure tests, external corrosion direct assessment, or other technology that the operator demonstrates can further the understanding of the condition of the pipeline facility are completed on a schedule based on the risk that the pipeline facility poses to the high consequence area in which the pipeline facility is located."

### Spill Prevention, Control, and Countermeasures

*Overview of 40 CFR Parts 109, 110, 112, 113, and 114*

The requirements identified in these regulatory programs apply to oil storage and transportation facilities and terminals, tank farms, bulk plants, oil refineries, and production facilities as follows:

- Part 109 establishes the minimum criteria for developing oil-removal contingency plans for certain inland navigable waters by state, local, and regional agencies in consultation with the regulated community (i.e., oil facilities);

- Part 110 prohibits discharge of oil such that applicable water quality standards would be violated or that would cause a film or sheen on or in the water. These regulations were updated in 1987 to adequately reflect the intent of Congress in Section 311(b) (3) and (4) of the Clean Water Act, specifically incorporating the provision "in such quantities as may be harmful.";

- Part 112 deals with oil spill prevention and preparation of Spill Prevention, Control, and Countermeasure Plans. These regulations establish procedures, methods, and equipment requirements to prevent the discharge of oil from onshore and offshore facilities into or upon the navigable waters of the United States. These regulations apply only to non-transportation-related facilities;

- Part 113 establishes financial liability limits; however, these limits were preempted by the Oil Pollution Act of 1990; and

- Part 114 provides civil penalties for violations of the oil spill regulations.

### U.S. Environmental Protection Agency

The U.S. Environmental Protection Agency (EPA) is responsible for the National Contingency Plan and acts as the lead agency in response to an onshore oil spill. EPA also serves as co-chair of the Regional Response Team, which is a team of agencies established to provide assistance and guidance to the on-scene coordinator during the response to a spill. The EPA also regulates disposal of recovered oil and is

Exhibits - Page 88

Draft Print
07/25/2024  12:45:29 PM

responsible for developing regulations for Spill Prevention, Control, and Countermeasures Plans. Spill Prevention, Control, and Countermeasures Plans are required for non-transportation-related onshore and offshore facilities that have the potential to spill oil into waters of the United States or adjoining shorelines (see above). Other EPA regulations are described below.

*Emergency Planning and Community Right-to-Know Act*

Under the Emergency Planning and Community Right-to-Know Act, or Title III of the Superfund Amendments and Reauthorization Act of 1986, the EPA requires local agencies to regulate the storage and handling of hazardous materials and requires development of a plan to mitigate the release of hazardous materials. Businesses that manage any of the specified hazardous materials must submit to government agencies (i.e., fire departments) an inventory of the hazardous materials, an emergency response plan, and an employee training program. The business plans must provide a description of the types of hazardous materials/waste on-site and the location of these materials. The information in the business plan can then be used in the event of an emergency to determine the appropriate response action, the need for public notification, and the need for evacuation.

*Hazardous Waste Handling Requirements Resource Conservation and Recovery Act and Associated Hazardous and Solid Waste Amendments, 40 CFR 260.*

Implementation of Hazardous Waste Handling Requirements Resource Conservation and Recovery Act (RCRA) resulted in the creation of a major federal hazardous waste regulatory program that is administered by the EPA. Under the RCRA, the EPA regulates the generation, transportation, treatment, storage, and disposal of hazardous waste. The RCRA was amended by the Associated Hazardous and Solid Waste Amendments, which affirmed and extended the concept of regulating hazardous wastes from generation through disposal. The Hazardous and Solid Waste Amendments specifically prohibit the use of certain techniques for the disposal of some hazardous wastes. Under the RCRA, individual states may implement their own hazardous waste programs, if the state program is at least as stringent as the federal Hazardous Waste Handling Requirements. The EPA approved California's program to implement federal hazardous waste regulations on August 1, 1992.

*Hazardous Materials Management Planning Section 112(r) of the Clean Air Act Amendments of 1990, 40 CFR 68.*

The EPA requires facilities that handle listed regulated substances to develop Risk Management Programs (RMP) to prevent accidental releases of these substances. Stationary sources with more than a threshold quantity of a regulated substance are to be evaluated to determine the potential for, and impacts of, accidental releases from that process. Under certain conditions, the owner or operator of a stationary source may be required to develop and submit an RMP. An RMP consists of three main elements: a hazard assessment that includes off-site consequences analyses and a five-year accident history; a prevention program; and an emergency response program. An RMP for the existing facilities was required to be submitted in 1999 and must be updated every five years.

### Occupational Safety and Health Administration

OSHA is part of the United States Department of Labor. Congress created OSHA in 1970 to ensure safe and healthful working conditions for workers by setting and enforcing standards and by providing training, outreach, education and assistance. OSHA promulgates a number of relevant regulations related to hazardous materials as discussed below.

Exhibits - Page 89

*Process Safety Management, 29 CFR 1910.119.*

Under this section, facilities that use, store, manufacture, handle, process, or move hazardous materials are required to:

1.  Conduct employee safety training;

2.  Have an inventory of safety equipment relevant to potential hazards;

3.  Have knowledge on use of the safety equipment;

4.  Prepare an illness prevention program;

5.  Provide hazardous substance exposure warnings;

6.  Prepare an emergency response plan; and

7.  Prepare a fire prevention plan.

In addition, 29 CFR 1910.119, Process Safety Management of Highly Hazardous Chemicals, specifically requires prevention program elements to protect workers at facilities that have toxic, flammable, reactive or explosive materials. Prevention program elements are aimed at preventing or minimizing the consequences of catastrophic releases of chemicals and include process hazard analyses, formal training programs for employees and contractors, investigation of equipment mechanical integrity, and an emergency response plan. The Occupational Safety and Health Administration (OSHA) Process Safety Management regulation CFR 1910.119(a)(2)(ii) applies to oil and gas extraction operations.

*Worker Health and Safety, 29 CFR 1910.*

OSHA implements regulations under this part to ensure employers provide a healthy and safe work environment that included informing employees of workplace hazards (Hazard Communication, 29 CFR 1910.1200). Along with the California Division of Occupational Safety and Health (DOSH or Cal/OSHA), OSHA's goal is to ensure that employers provide their workers a place of employment free from recognized hazards to safety and health, such as exposure to toxic chemicals, excessive noise levels, mechanical dangers, heat or cold stress, or unsanitary conditions. OSHA 1910 contains several standards that describe requirements for the safe management of hazards associated with processes using, storing, manufacturing, handling, or moving highly hazardous chemicals on-site. It emphasizes the management of hazards through an established comprehensive program that integrates technologies, procedures, and management practices, including communication.

1.  1910.119 (Subpart H) – Process Safety Management of Highly Hazardous Chemicals;

2.  1910.120 (Subpart H) – Hazardous Waste Operations and Emergency Response; and

3.  1910 (Subpart N) – Materials Handling and Storage.

### 5.6.2.2  State Regulations

State laws address gas and liquid pipelines, oil and gas facilities, and hazardous materials and waste. Each is discussed below.

***California Health and Safety Code (H&SC)***

1.  Division 20, Chapter 6.5, §25100-25249, Hazardous Waste Control;

Exhibits - Page 90

07/25/2024  12:45:29 PM

2. Division 20, Chapter 6.95, §25500, et seq. Hazardous Materials Management Plan and Community Right-to-Know and Hazardous Materials Release Response Plans and Inventory (Business Plan Program);

3. Proposition 65 Compliance, H&SC §25249.5 et seq;

4. H&SC §25340-25392, Carpenter-Presley-Tanner Hazardous Substance Account Act; and

5. H&SC §25531 through 25541, Risk Management and Prevention Program.

***California Code of Regulations***

1. Title 8, §5189, Process Safety Management of Acutely Hazardous Materials;

2. Title 8, §5192, Hazardous Waste Operations and Emergency Response;

3. Title 14, Division 2, Department of Conservation;

4. Title 19, §2729, Employee Training Program;

5. Title 22, Division 4, Chapter 30, Hazardous Wastes;

6. Title 22, Division 4.5, §§66260 through 67786, Hazardous Waste Requirements; and

7. Title 22, §66265.50 through §66265.56, Contingency/Emergency Response Plan.

***Lempert-Keene-Seastrand Oil Spill Prevention and Response Act***

The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act created an Administrator appointed by the Governor who has the primary authority in California to direct prevention, removal, abatement, response, containment, and cleanup efforts with regard to all aspects of any oil spill in marine waters of the state. The governor, through the administrator, must provide the best achievable protection of surface waters of the state. The administrator is also the Chief Deputy Director of the CDFW, and as such has been delegated the additional responsibilities of carrying out the statewide water pollution enforcement authority of the CDFW.

Senate Bill 861, adopted in 2014, expanded the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act and the administrator's responsibilities relating to oil spills to cover all waters of the state. The bill also imposed a state-mandated local program. The bill requires the regulators to provide for the best achievable protection of all waters and natural resources of the state. The existing Lempert-Keene-Seastrand Oil Spill Prevention and Response Act requires the administrator (upon request by a local government) to provide a program for training and certification of a local emergency responder designated as a spill response manager by a local government that has jurisdiction over or directly adjacent to waters of the state. This bill made this program optional at the discretion of the administrator.

***Hazardous Materials Worker Safety***

California OSHA requires that employers have an effective injury and illness prevention program that includes training and instruction on safe work practices. Additionally, the program should include a system for the employer to communicate with the employee with the aim of recognizing and reporting health and safety hazards.

***California State Fire Marshal***

The Pipeline Safety Division of the California Office of the State Fire Marshal (CSFM) has sole authority for the inspection and enforcement of federal and state regulations for intrastate pipelines within California.

Exhibits - Page 91

07/25/2024  12:45:29 PM

Federal authority is granted through an agreement with the U.S. Department of Transportation, PHMSA. The following sections of state and federal law define the Pipeline Safety Division's authority:

*The Elder Pipeline Safety Act of 1981 (California Government Code §51010 through 51019.1)*

Gives regulatory jurisdiction to the CSFM for the safety of all intrastate hazardous liquid pipelines and all interstate pipelines used for the transportation of hazardous or highly volatile liquid substances. The law establishes the governing rules for interstate pipelines to be the federal Hazardous Liquid Pipeline Safety Act and federal pipeline safety regulations.

Recent amendments require pipelines to include means of leak prevention and cathodic protection, with acceptability to be determined by the CSFM. New pipelines must also be designed to accommodate passage of instrumented inspection devices (Smart Pigs) through the pipeline.

*California Code of Regulations, Title 19 §2000 through 2075, Chapter 14*

Addresses hazardous liquid pipeline safety under the CSFM. The chapter includes issues related to annual inspections, fees, operator drug testing, and enforcement proceedings. The annual inspections require the completion of the Intrastate Pipeline Operator Annual Report (form PSD-101) requirements, including pipeline specifications, distances, integrity testing, preventive and mitigative measures, and scheduled projects. Annual inspections include evaluations of the risks based on operator history, integrity testing results, preventive and mitigative measures, leak history and compliance history.

*Federal Law 49 U.S.C. §60101-60141*

Addresses pipeline safety for gas and liquid pipelines, incorporating inspection and maintenance, excess flow valves, response plans, etc.

*49 CFR Part 194*

Addresses response plans for onshore pipelines, including worst-case discharges, response plans, training and resources. The response shall include notification procedures, spill detection and mitigation procedures, training and drills, and equipment testing.

*49 CFR Part 195*

Addresses transportation of hazardous liquids by pipeline and incorporates reporting, design requirements, construction, pressure testing, cathodic protection requirements, operations and maintenance, corrosion control, and integrity management programs.

*CSFM Notifications*

State law requires pipeline operators to notify the CSFM, Pipeline Safety Division of certain activities or changes in operations. Starting December 2018, pipeline operators must notify the CSFM for the following: ownership change; change of service; hydrostatic testing notification; in-line inspection waiver requests; construction notification; and deferred maintenance requests (see advisory bulletin 2016-05).

*Senate Bill 295 – Pipeline Safety Inspections*

Requires, among other things, that the CSFM annually inspect all intrastate pipelines and operators of intrastate pipelines under its jurisdiction and requires the CSFM to adopt regulations needed to implement these requirements. Requires the submissions of the PSD-101 form annually that contains data

Exhibits - Page 92

and validated inspection results from the previous calendar year. Regulations pursuant to Senate Bill 295 have been fully implemented.

*Assembly Bill 864 - Requirements For New Or Replacement Pipeline Near Environmentally And Ecologically Sensitive Areas In The Coastal Zone:*

As a result of the May 19, 2015, pipeline incident at Refugio Beach in Santa Barbara County, Assembly Bill 864 mandated the CSFM to develop regulations requiring the use of best available technology (BAT) on new, replacement, or retrofitted pipelines near (defined as within 0.5 miles) environmentally and ecologically sensitive areas in the Coastal Zone. The requirements include the following (as per August 28, 2020, final text, California Code of Regulations [CCR], Title 19, Division 1, Chapter 14, Article 7, Section 2100-2120):

1. Submittal of plans to equip new pipelines or to retrofit existing pipelines with BAT, including the installation of leak detection technology, automatic shutoff systems, emergency flow restrictive devices (EFRD), or remote-controlled sectionalized block valves, or any combination of these technologies, based on a risk analysis conducted by the operator, to reduce the amount of oil released in an oil spill to protect state waters and wildlife;

2. Coastal Zone and Environmentally and Ecologically Sensitive Areas datasets are used to define sensitive areas;

3. Risk analysis shall be prepared that include: piping and instrument diagrams; maps; a spill analysis including a trajectory analysis to determine potential rates of flow, direction of flow, and time of travel of a worst-case discharge; worst-case discharge volume based on response time, pipeline flow rate, drainage volume; training requirements for best available technologies; updating every five years;

4. Implementation plans to detail the time frame to implement the proposed upgrades;

5. Testing requirements include leak detection testing every three years, annual tests of automatic shutoff systems and EFRDs;

6. If a pipeline has a release that affects a sensitive area, the pipeline becomes subject to the article (if it was not already) and shall prepare a risk analysis;

7. Pipelines operating by gravity or at a stress level of 20 percent or less of the specified minimum yield strength of the pipe can be exempted;

8. The dates of compliance and BAT in place are set as seven months after the regulation effective date for new or replacement pipelines and 30 months after the regulation effective date for existing pipelines;

9. BAT regulated pipelines include all pipelines that meet the definition of a pipeline under California Government Code and are within ½ mile of the coastal zone and/or the environmentally and ecologically sensitive area. Per the BAT regulation, the environmentally and ecologically sensitive area is defined by the Administrator of the OSPR pursuant to subdivision(d) of Section 8574.7 of the California Government Code;

10. The BAT regulated pipelines include any regulated pipelines under California Government Code that is within a half mile of an environmentally and ecologically sensitive area or ecologically sensitive area with a connection to the coastal zone;

11. If a segment of regulated pipelines passes within ½ mile of coastal zone and/or environmentally and ecologically sensitive area, the entire line is subject to the BAT regulation; and

Exhibits - Page 93

12. On May 1, 2021, the State Fire Marshal shall commence enforcement against any new or replacement pipeline; On October 1, 2021, the State Fire Marshal shall commence enforcement against an operator of an existing pipeline that is required to submit a risk analysis and a plan to retrofit existing pipelines with the BAT; On April 1, 2023, the State Fire Marshal shall commence enforcement of this Article against an operator of an existing pipeline that is required to complete retrofit of existing pipelines with the BAT.

***California Public Utilities Commission General Order No. 112-F, State of California Rules Governing Design, Construction, Testing, Operation, and Maintenance of Gas Gathering, Transmission, and Distribution Piping Systems***

The purpose of General Order No. 112-F is to establish, in addition to 49 CFR Parts 186-199 (federal pipeline safety regulations), minimum requirements for the design, construction, quality of materials, locations, testing, operations and maintenance of facilities used in the gathering, transmission and distribution of gas to safeguard life or limb, health, property and public welfare and to provide that adequate service will be maintained by gas operators under the jurisdiction of the California Public Utilities Commission. General Order No. 112-F is incorporated in addition to the federal pipeline safety regulations, specifically, Title 49 CFR Parts 190-199 which govern the design, construction, testing, operation, and maintenance of gas piping systems in California. General Order No. 112-F does not supersede the federal pipeline safety regulations, but rather supplements the federal regulations.

***California Accidental Release Prevention Program***

The California Accidental Release Prevention (CalARP) program mirrors the federal RMP except that it adds external events and seismic analysis to the requirements and includes facilities with lower inventories of materials. A CalARP or RMP for federal requirements is a document prepared by the owner or operator of a stationary source containing detailed information including:

1. Regulated substances held on-site at the stationary source;

2. Off-site consequences of an accidental release of a regulated substance;

3. The accident history at the stationary source;

4. The emergency response program for the stationary source;

5. Coordination with local emergency responders;

6. Hazard review or process hazard analysis;

7. Operating procedures at the stationary source;

8. Training of the stationary source's personnel;

9. Maintenance and mechanical integrity of the stationary source's physical plant; and

10. Incident investigation.

***Hazardous Waste Control Law***

The Hazardous Waste Control Law is administered by the California Environmental Protection Agency, Department of Toxic Substances Control, which has adopted extensive regulations governing the generation, transportation, and disposal of hazardous wastes. These regulations impose cradle-to-grave requirements for handling hazardous wastes in a manner that protects human health and the environment. The Hazardous Waste Control Law regulations establish requirements for identifying,

Exhibits - Page 94

packaging, and labeling hazardous wastes. They prescribe management practices for hazardous wastes; establish permit requirements for hazardous waste treatment, storage, disposal, and transportation; and identify hazardous wastes that cannot be disposed of in landfills. Hazardous waste is tracked from the point of generation to the point of disposal or treatment using hazardous waste manifests. The manifests list a description of the waste, its intended destination, and regulatory information about the waste.

### Hazardous Materials Management Planning

The Office of Emergency Services, in support of local government, coordinates the overall state agency response to major disasters. The Office of Emergency Services is responsible for assuring the state's readiness to respond to and recover from natural, man-made, and war-caused emergencies, and for assisting local governments in their emergency preparedness, response, and recovery efforts. During major emergencies, the Office of Emergency Services may call upon all state agencies to help provide support. Due to their expertise, the California National Guard, California Highway Patrol, Department of Forestry and Fire Protection, Conservation Corps, Department of Social Services, and Caltrans are the agencies most often asked to respond and assist in emergency response activities.

### California Education Code (§17210 et seq.)

The California Education Code (§17210 et seq.) describes the requirements of school facilities near or on known or suspected hazardous materials sites, or near facilities that emit hazardous air emissions, handle hazardous or acutely hazardous materials, substances, or waste (5 CCR 13). The code requires that, prior to commencing the acquisition of property for a new school site, an environmental site investigation be completed to determine the health and safety risk (if any) associated with a site.

### CCR, Title 5, §14010 (School Site Selection Standards), and California Education Code §17212

Within the CCR Title 5, and under the existing Leroy F. Greene School Facilities Act of 1998 (5 CCR 13), there are certain criteria described for selecting or siting schools in regards to power line setbacks, railroad track setbacks, pipeline and fuel storage tanks, and hazardous waste setbacks (CDE 2007). The following is a partial list of minimum setback distances for school sites:

1. Power lines – 1,500 feet;
2. Railroad tracks – 1,500 feet;
3. On-site fuel tank storage (only listed as "near"); and
4. On-site hazardous pipelines or hazardous pipeline easements – 1,500 feet.

## 5.6.2.3   Local Regulations

### Santa Barbara County

*Petroleum Code*

This code sets forth specific regulations for onshore oil and gas development that are intended to protect the health, safety, public welfare, physical environment and natural resources of the County. Sections 25-21 through 25-43 include specific requirements for well design, hazardous emission control, fire prevention, and well and equipment spacing, abandonment and restoration procedures. The Petroleum Code also provides for annual County inspections of lease sites, tanks and well sites, including associated pipelines, to ascertain conformity with the standards set forth in the Code.

Exhibits - Page 95

*Land Use and Development Code*

Development standards applicable to oil and gas pipelines are listed in Section 35.52.080.B of the Land Use and Development Code:

a.  *Zone regulations not applicable*. The regulations in Article 35.2 (Zones and Allowable Land Uses), for the applicable zones in which oil and gas pipelines are allowed, shall not apply to the oil and gas pipelines.

b.  *Delivery hours*. Except in an emergency, materials, equipment, tools, or pipes shall not be delivered to or removed from a pipeline construction site through streets within a residential zone between the hours of 9 p.m. and 7 a.m. of the next day.

c.  *Post-installation requirements*. After completion of backfilling and compacting of the pipeline ditch, the site shall be returned to grade where practical and the excess soil shall be removed to an appropriate disposal site.

d.  *Drainage*. During construction of the pipeline, there shall not be permanent blocking of surface drainages.

e.  *Location of pipeline corridor*. A pipeline corridor shall be sited so as to avoid significant impacts to resources (e.g., aquatic habitats, and archaeological areas) to the maximum extent feasible.

f.  *Spills*. Where pipeline segments carrying hydrocarbon liquids pass through sensitive resource areas (e.g., aquatic habitats) as identified by the project environmental review, provisions identified in the environmental review shall be applied to minimize the amount of liquids released in the sensitive areas in the event of a spill. The potential for damage in those areas shall be minimized by considering spill volumes, duration, and trajectories in the selection of a pipeline corridor. In addition, appropriate measures for spill containment and cleanup (e.g., catch basins to contain a spill) shall be included as part of the required emergency response plan.

g.  *Burial within corridor*. Permits for new pipeline construction shall require engineering of pipe placement and burial within a corridor to minimize incremental widening of the corridor during subsequent pipeline projects, unless the proposed route is determined to be unacceptable for additional pipelines. Storage tanks associated with the transfer of hydrocarbons to pipelines or tanker trucks may not be located closer than 500 feet to an occupied residence within a residential or commercial zone (Land Use and Development Code §35.52.050.B.b).

*System Safety and Reliability Review Committee*

The System Safety and Reliability Review Committee (SSRRC) is responsible for identifying and requiring mitigation of possible design and operational hazards for oil and gas projects prior to construction, during project operations, and for project modifications. The goal of SSRRC review is to substantially reduce the risks of project-related hazards that may result in loss of life and injury and/or damage to property and the natural environment. This process occurs through the review and approval of project design, operation and maintenance plants, and facility inspections and audits during operations. The SSRRC consists of representatives from the Planning and Development Department (Energy, Minerals & Compliance and Building & Safety Divisions), County Fire Department, Environmental Health Services Hazardous Materials Unit, Air Pollution Control District and County Executive Office (Office of Emergency Management). Other County departments participate for specific issues as needed. The SSRRC may employ a third-party technical review to help identify and correct possible design and construction hazards and to ensure mitigation of potential public risk prior to construction and for subsequent design modifications. The SSRRC also oversees the development and implementation of a Safety Inspection,

Exhibits - Page 96

07/25/2024  12:45:29 PM

Maintenance, and Quality Assurance Program (SIMQAP). The SIMQAP is a guidance document that identifies a facility's safety, safety devices, equipment preventative maintenance, and operation processes and procedures. SSRRC oversight and preparation of a SIMQAP may be required for specific projects as conditions of approval by the County decision-makers.

### San Luis Obispo County

*Energy Element and Conservation and Open Space Element*

In 1995, the County of San Luis Obispo adopted the Energy Element as part of the County's General Plan, subsequently merged with the Conservation and Open Space Element. The Conservation and Open Space Element contains a goal of protecting public health, safety, and environment and several policies that promote the stated goal. The applicable policies include:

1. Policy 56. Encourage existing and proposed facilities to focus on measures and procedures that prevent oil, gas, and other toxic releases into the environment. This policy is to ensure that facilities: (1) take measures to prevent releases and spills; (2) prepare for responding to a spill or release; and (3) provide for the protection of sensitive resources. A review of a facilities spill response plan, or reports from other agencies, should be completed to monitor compliance.

2. Policy 64. Guideline 64.1. To reduce the possibility of injury to the public, facility employees, or the environment, the Applicant shall submit an emergency response plan which details response procedures for incidents that may affect human health and safety or the environment. The plan shall be based on the results of the comprehensive risk analysis. In the case of a facility modification, the existing response plan shall be evaluated by the safety review committee and revisions made as recommended.

3. Flammable and Combustible Liquid Storage. County Coastal Zone Land Use Ordinance Section 23.06.126 includes requirements for flammable and combustible liquid storage relating to: applicability, permit requirements, limitation on use, limitation on quantity, setbacks, and including California Department of Forestry and Fire Prevention (CAL FIRE) recommendations, as applicable. Without approval through a Development Plan, aboveground storage limits of combustible liquid is 20,000 gallons and 2,000 gallons for flammable liquids.

### Kern County

*Kern County General Plan (KCGP)*

The Project area is located within the Kern County General Plan (KCGP) area and, therefore, would be subject to applicable policies and measures of the KCGP. The Land Use, Conservation, and Open Space Element, Circulation Element, Safety Element, and Energy Element of the KCGP includes goals, policies, and implementation measures related to hazards and hazardous materials that apply to the Project, as described below.

**Chapter 1. Land Use, Conservation, and Open Space Element.**

**1.4 Public Facilities and Services**

**Goals**

**Goal 9.** Serve the needs of industries and Kern County residents in a manner that does not degrade the water supply and the environment and protect the public health and safety by avoiding surface and

Exhibits - Page 97

07/25/2024  12:45:29 PM

subsurface nuisances resulting from the disposal of hazardous wastes, irrespective of the geographic origin of the waste.

**Implementation Measures**

**Implementation Measure N.** Secure complete and accurate information on all hazardous wastes generated, handled, stored, treated, transported, and disposed of within or through Kern County.

**2.5.4. Transportation of Hazardous Materials**

**Goals**

**Goal 1.** Reduce risk to public health from transportation of hazardous materials.

**Policies**

**Policy 1.** The commercial transportation of hazardous material, identification and designation of appropriate shipping routes will be in conformance with the adopted Kern County and Incorporated Cities Hazardous Waste Management Plan.

**Policy 2.** Kern County and affected cities should reduce use of County-maintained roads and city-maintained streets for transportation of hazardous materials.

**Chapter 4. Safety Element**

**4.2. General Provisions**

**Goals**

**Goal 4.** The County shall encourage extra precautions be taken for the design of significant lifeline installations, such as highways, utilities, and petrochemical pipelines.

**4.3. Seismic Safety**

**Policy**

**Policy 1.** The County shall require development for human occupancy to be placed at a location away from an active earthquake fault in order to minimize safety concerns.

**Implementation Measures**

**Implementation Measure I.** Design significant lifeline installations, such as highways, utilities, and petrochemical pipelines which cross an active fault, to accommodate potential fault movement without prolonged disruption of essential service or creating threat to health and safety.

**4.9. Hazardous Materials**

**Implementation Measures**

**Implementation Measure A**. Facilities used to manufacture, store, and use of hazardous materials shall comply with the Uniform Fire Code, with requirements for siting or design to prevent on-site hazards from affecting surrounding communities in the event of inundation.

Exhibits - Page 98

07/25/2024  12:45:29 PM

## Chapter 4.6. Wildland and Urban Fire

### Hazard Identification

Access and Evacuation Routes - Good planning principles, as well as existing policies and laws, dictate that all developments must be planned with circulation routes that will assure safe access for fire and other emergency equipment. The circulation routes must include secondary means of ingress and egress, consistent with topography, to meet emergency needs.

The general circulation routes are provided throughout the County by federal, state, and County-maintained road systems which are adequate for access and evacuation. State and County laws regulate the standards for new public circulation routes.

Private circulation routes that are not maintained by the state or County are subject to the standards set forth in Kern County Ordinance No. G-1832.

Clearance of Vegetative Cover for Fire Control - In 1963 the State of California enacted the Public Resources Code clearance law. This is a minimum statewide clearance law of flammable vegetative growth around structures, especially in brush- and tree-covered watershed areas. The enactment of a local ordinance is necessary where more restrictive fire safety clearance measures are desirable to meet local conditions.

Fuel Breaks and Firebreaks - Fuel breaks and/or firebreaks separating communities or clusters of structures from the native vegetation may be required. Such fuel breaks may be "greenbelts," as all vegetation need not be removed but thinned or landscaped to reduce the volume of fuel.

All fuel and firebreaks are required to meet the minimum design standards of the Kern County Fire Chief.

The Fire Department's Chief may require a fire plan for a development during the critical fire season. This plan should reflect the proposed course of action for fire prevention and suppression.

The parcel size and setback distances of buildings placed thereon should be such that adequate clearance of flammable vegetation cover may be performed within the limits of the owner's parcel of land.

Should the owner of a property fail to apply the required firebreak clearance, following proper notice, the County may elect to clear the firebreak vegetation and make the expense of the clearing a lien against the property upon which the work was accomplished.

Hazardous Fire Area - The Hazardous Fire Areas consists mainly of wildlands, which are mountain and hill land in an uncultivated, more or less natural state, covered with timber, wood, brush, and grasslands. This area includes some urban influence and agricultural use, such as exists around Isabella Lake and the Kern River, Woody/Glennville, Tehachapi/Cummings Valley, and Lebec/Frazier Park/Lake of the Woods.

The wildlands provide prime habitats for deer, mountain lions, bears, kit foxes, quail, chucker, wild turkeys, and condors. They also harbor fifteen identified and important rare botanic communities and vegetation associations.

The Kern County Hazardous Fire Area was established by an amendment to the Uniform Fire Code, Section 1.49H under Section 4016 of the Kern County Ordinance Code.

The boundaries of the Hazardous Fire Area are determined and publicly announced before the start of each annual "fire season" and is normally the period from April 15 to December 1 of each year, except when the Fire Chief extends this period.

Exhibits - Page 99

The wildlands include valuable watersheds that must be preserved for receiving and passing water into surface streams and underground storage. Protection of the watersheds will prevent erosion and flood damages.

For the protection of our wildlands we must consider all factors which will aid in fulfilling the policy stated in the California Environmental Quality Act, Public Resources Code Section 21000 et seq., to "create and maintain conditions under which man and nature can exist in productive harmony to fulfill the social and economic requirements of present and future generations."

In implementing their Fire Prevention Program, Fire Department personnel periodically inspect the areas around all buildings for accumulations of flammable material and closure of openings of vacant buildings.

**Policies**

**Policy 1.** Require discretionary projects to assess impacts on emergency services and facilities.

**Policy 2.** The County will encourage the promotion of public education about fire safety at home and in the work place.

**Policy 3.** The County will encourage the promotion of fire prevention methods to reduce service protection costs and costs to taxpayers.

**Policy 4.** Ensure that new development of properties have sufficient access for emergency vehicles and for the evacuation of residents.

**Policy 5.** Require that all roads in wildland fire areas are well marked and that homes have addresses prominently displayed.

**Policy 6.** All discretionary projects shall comply with the adopted Fire Code and the requirements of the Fire Department.

**Implementation Measures**

**Implementation Measure A.** Require that all development comply with the requirements of the Kern County Fire Department or other appropriate agency regarding access, fire flows, and fire protection facilities.

*Kern County Multi-Jurisdictional Hazard Mitigation Plan (2020)*

The purpose of the hazard mitigation plan is to reduce or eliminate long-term risk to people and property from natural hazards and their effects in Kern County, California. This plan has been prepared to meet the Disaster Mitigation Act of 2000 requirements. The plan and planning process lay out the strategy that will enable Kern County to become less vulnerable to future disaster losses.

*Kern County Hazardous Waste Management Plan (1988)*

State Assembly Bill 2948 (1986) authorized local governments to develop comprehensive hazardous waste management plans. The intent of each plan is to ensure that adequate treatment and disposal capacity is available to manage the hazardous wastes generated within the local government's jurisdiction. The Kern County and Incorporated Cities Hazardous Waste Management Plan (Hazardous Waste Plan) was first adopted by Kern County and each incorporated city before September 1988 and was subsequently approved by the State Department of Health Services (Kern County 1991). The Hazardous Waste Plan was updated and incorporated by reference into the Kern County General Plan in 2004 as permitted by Health and Safety Code Section 25135.7(b) and thus must be consistent with all other aspects of the Kern County

Exhibits - Page 100

Draft Print

07/25/2024  12:45:29 PM

General Plan (Kern County 2009). The Hazardous Waste Plan provides policy direction and action programs to address current and future hazardous waste management issues that require local responsibility and involvement in Kern County. In addition, the Hazardous Waste Plan discusses hazardous waste issues and analyzes current and future waste generation in the incorporated cities, county, and state and federal lands. The purpose of the Hazardous Waste Plan is to coordinate local implementation of a regional action to effect comprehensive hazardous waste management throughout Kern County. The action program focuses on development of programs to equitably site needed hazardous waste management facilities; to promote on-site source reduction, treatment, and recycling; and to provide for the collection and treatment of small quantity hazardous waste generators. An important component of the Hazardous Waste Management Plan is the monitoring of hazardous waste management facilities to ensure compliance with federal and state hazardous waste regulations. The siting criteria and any subsequent environmental documentation required pursuant to CEQA would also ensure the mitigation of adverse impacts associated with the siting of any new hazardous waste facility.

*Kern County Certified Unified Program Agency*

The Certified Unified Program Agency (CUPA) was developed to consolidate the administration of hazardous materials programs. In the Kern County, the CUPA is the Environmental Health Services Division. The city of Bakersfield's CUPA is the Bakersfield Fire Department. Under CUPA, site inspections of aboveground storage tanks, underground storage tanks, hazardous waste treatment, hazardous waste generators, hazardous materials management and response plans, and the California Fire Code are consolidated in a single inspection. These departments also provide emergency response to hazardous materials events.

### 5.6.2.4   Fire Risk, Prevention, and Protection

***Santa Barbara County***

For unincorporated areas of the county, as well as smaller cities with cooperative agreements with the County, fires are generally the responsibility of the SBCFD.

*Santa Barbara County Fire Development Standards*

The following Santa Barbara County Fire Department standards address the following issues:

- Private Road and Driveway;
- Fire Hydrant Spacing and Flow Rates;
- Stored Water Fire Protection Systems;
- Automatic Fire Sprinkler System;
- Automatic Alarm System;
- Defensible Space; and
- Access Gates.

The following Santa Barbara County Fire Department standards are applied in evaluating impacts associated with the proposed Project.

- The emergency response thresholds include fire department staff standards of one on-duty firefighter per 4,000 persons (generally one engine company per 12,000 people, assuming three firefighters per station). The emergency response time standard is approximately five to six minutes;

- The ability of the County's engine companies to extinguish fires (based on maximum flow rates through hand-held line) meets state and national standards assuming a 5,000- square-foot structure. Therefore, in any portion of the fire department's response area, all structures over 5,000 square feet are an unprotected risk (a significant impact) and therefore should have internal fire sprinklers;

- Access road standards include a minimum width (depending on number of units served and whether parking would be allowed on either side of the road), with some narrowing allowed for driveways. Cul-de-sac diameters, turning radii, and road grade must meet minimum fire department standards based on project type; and

- Two means of egress may be needed, and access must not be impeded by fire, flood, or earthquake. A significant impact could occur in the event any of these standards is not adequately met.

### San Luis Obispo County

Code Section 22.50 – Fire Safety: This section provides standards for precautions to minimize hazards to life and property in the event of fire. In rural areas, a Fire Safety Plan must be submitted to the CalFire or designated appointee. It must include the location of water storage, storage of fuel, explosives, flammable or combustible liquids and gases, and identification of the extent of vegetative fuel reduction areas.

*San Luis Obispo County Fire Department standards include the following:*

1. Defensible Space, water system verifications and fire watch requirements;

2. Water supply, water supply tanks;

3. Accessibility;

4. Road standards; and

5. Private driveway and access.

### Kern County

Kern County Fire Code: Kern County has adopted, by reference, portions of the California Building Standards Code and the UFC, with modifications and amendments, in Chapter 17.32 of the Kern County Code of Building Regulations (Fire Code). The purpose of this code is to prescribe the minimum requirements necessary to establish a reasonable level of fire safety to protect life and property from hazards created by fire, explosion, and dangerous conditions.

The Kern County Fire Code defines a hazardous fire area as any land that is covered with grass, grain, brush, or forest and situated (e.g., in an inaccessible location) so that a fire originating upon such land would present an abnormally difficult job of suppression and would result in great and unusual damage through fire or the resulting erosion.

*Kern County Fire Department Standards*

Kern County Fire Department has a number of codes and requirements including the following:

1. Knox Box requirements;

2. Fire Code Ordinance 8866;

3. Fire Extinguishers;

4. Fire Sprinkler Systems; and

5. Underground Fuel Storage.

### 5.6.2.5 Other Applicable Guidelines, National Codes and Standards

The following is a list of professional association codes and standards that also may be incorporated into federal, state, and local regulations by reference.

1. Safety and Corrosion Prevention Requirements — American Society of Mechanical Engineers (ASME), NACE International (formerly National Association of Corrosion Engineers), American National Standards Institute (ANSI), American Petroleum Institute (API);

2. ASME and ANSI B16.1 Cast Iron Pipe Flanges and Flanged Fittings;

3. ASME and ANSI B16.9, Factory-Made Wrought Steel Butt Welding Fittings;

4. ASME and ANSI B31.1a, Power Piping;

5. ASME and ANSI B31.4a, Current Edition, Liquid Transportation Systems for Hydrocarbons, Liquid Petroleum Gas, Anhydrous Ammonia, and Alcohols;

6. NACE Standard RP0190-95, Item No. 53071. Standard Recommended Practice External Protective Coatings for Joints, Fittings, and Valves on Metallic Underground or Submerged Pipelines and Piping Systems;

7. NACE Standard RP0169-07, Item No. 53002. Standard Recommended Practice Control of External Corrosion on Underground or Submerged Metallic Piping Systems; cited in regulations (latest edition 2013);

8. NACE MR-01-75, ISO 15156, Petroleum and natural gas industries – Materials for use in H2S-containing environments in oil and gas production, Parts 1, 2 and 3;

9. API 49, Recommended Practice for Drilling and Well Service Operations Involving Hydrogen Sulfide;

10. API 54, Recommended Practice for Occupational Safety for Oil and Gas Well Drilling and Servicing Operations;

11. API 510 Pressure Vessel Inspection Code;

12. API 570 Piping Inspection Code, applies to in-service metallic piping systems used for the transport of petroleum products;

13. API 572 Inspection of Pressure Vessels;

14. API 574 Inspection Practices for Pipe System Components;

15. API 575 API Guidelines and Methods for Inspection of Existing Atmospheric and Low-pressure Storage Tanks;

16. API 576 Inspection of Pressure-Relieving Devices;

17. API 651 Cathodic Protection of Aboveground Storage Tanks;

18. API 653, Tank Inspection, Repair, Alteration, and Reconstruction;

19. API 1130 Computational Pipeline Monitoring;

20. API 1175 Pipeline Leak Detection Management Systems;

21. API 2610, Design, Construction, Operation, Maintenance, and Inspection of Terminal & Tank Facilities; and

Exhibits - Page 103

07/25/2024  12:45:30 PM

22. API Spec 12B – Bolted Tanks for Storage of Production Liquids.

***Fire and Explosion Prevention and Control, National Fire Protection Agency Standards***

1.  National Fire Protection Association (NFPA) 11 Foam Extinguishing Systems;

2.  NFPA 12 A&B Halogenated Extinguishing Agent Systems;

3.  NFPA 15 Water Spray Fixed Systems;

4.  NFPA 20 Centrifugal Fire Pumps;

5.  NFPA 30 Flammable and Combustible Liquids Code and Handbook;

6.  CEC California Electrical Code; and

7.  CFC California Fire Code.

### 5.6.2.6   Significance Thresholds

***CEQA Significance Thresholds***

*California Environmental Quality Act*

Impacts resulting from hazards and hazardous materials, including risk of upset, are evaluated pursuant to the CEQA Appendix G (2019). As defined therein, a project will result in a significant impact if it would:

▪ Create a significant hazard to the public or the environment through the routine transport, use, or disposal of hazardous materials;

▪ Create a significant hazard to the public or the environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment;

▪ Emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within 0.25 miles of an existing or proposed school;

▪ Be located on a site which is included on a list of hazardous materials sites compiled pursuant to Government Code Section 65962.5 and, as a result, would it create a significant hazard to the public or the environment;

▪ For a project located within an airport land use plan or, where such a plan has not been adopted, within two miles of a public airport or public use airport, result in a safety hazard or excessive noise for people residing or working in the project area;

▪ Impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan; or

▪ Expose people or structures, either directly or indirectly, to a significant risk of loss, injury, or death involving wildland fires.

*Santa Barbara County Public Safety and Risk of Upset Thresholds*

Santa Barbara County adopted Public Safety Thresholds in August 1999. The County incorporated these thresholds into its Environmental Thresholds and Guidelines Manual (SBC 2021). The thresholds provide three zones—green, amber, and red—for guiding a determination of significance or insignificance of project specific impacts, based on the estimated frequency and consequences of an accident that would cause fatalities or serious injuries to the public (see Figure 5.6-2). In addition, a Safety Element Supplement was adopted in February 2000 covering hazardous materials (SBC 2000). The Safety Element

Exhibits - Page 104



07/25/2024  12:45:30 PM

defines unacceptable risk in a manner that guides consistent and sound land use decisions involving hazardous facilities. The Safety Element also defines criteria applicable to new development as well as to modifications to existing development if those modifications increase risk.

The public safety thresholds do not address risk of environmental damage. The threshold applied in previous EIRs for risk of significant environmental impact due to accidental spills is as follows: an impact of spills would be significant if operations would increase the probability or volume of oil spills into the environment.

The County requires a QRA to be conducted on the potential for public exposure from projects that involve the storage or transport of hazardous materials. In order to determine the potential level of public safety impacts from risk of upset events, the Project is evaluated against Table 5.6-2, the Santa Barbara County's Potential Significance Classes for Risk and Figure 5.6-2, Santa Barbara County Fatality and Injury Risk Thresholds.

The injury and fatality risk profiles of a project are generated from the modeling completed as part of the QRA and are depicted as FN (Frequency Number) curves plotted on the societal risk graphs and which fall in the green, amber, or red zone (see Figure 5.6-2).

**Table 5.6-2    County of Santa Barbara Potential Significance Classifications for Project Risks**

| Impact Classification | Description |
|---|---|
| Significant and Unavoidable Impacts | Significant and unavoidable impacts apply to adverse impacts that the County considers unavoidable and significant (i.e., cannot be mitigated to insignificance via feasible measures). The County considers a societal risk spectrum that falls in the red or amber zones after application of all feasible mitigation to be an unavoidable impact. Unreasonable risk shall be determined for each project individually, based on policies provided in the Safety Element and other relevant policies and codes. Lacking any such determination, project approval requires a statement of overriding considerations by the applicable authority, showing that the benefits of the proposed development exceed its adverse impacts to public safety. |
| Significant but Mitigable Impacts | Significant but mitigable impacts apply to adverse impacts that the County considers significant but avoidable through application of feasible mitigation (i.e., mitigation can render the impact to be insignificant). The County considers a societal risk spectrum that falls in either the red or amber zones to be a significant impact. Such risk is considered a significant but mitigable impact if application of feasible mitigation is sufficient to lower the risk spectrum so that it falls fully within the green zone. |
| Insignificant Impacts | Insignificant applies to adverse impacts that the County considers to be insignificant for purposes of complying with CEQA. The County considers a societal risk spectrum that falls completely in the green zone to be an insignificant impact to public safety and no mitigation is required for purposes of compliance with CEQA. |
| Beneficial Impacts | Impacts beneficial to the environment. |

Source: SBC 2021
Key:
CEQA = California Environmental Quality Act

The County's FN curves were originally developed based upon the Netherlands and the United Kingdom's research and guidance on societal risk associated with facilities handling hazardous materials. The societal risk criteria developed by the United Kingdom Health and Safety Executive (UKHSE) for facilities handling hazardous materials is discussed in a guidance document titled *Reducing Risks, Protecting People* (UKHSE 2001). The UKHSE Hazardous Installation Directorate (HID) also developed an annex to this document titled *Societal Risk and Societal Concern* that specifically addresses societal concerns and societal risk and defines a set of acceptable and unacceptable societal risk areas for specific projects. The determinations

Exhibits - Page 105

07/25/2024  12:45:30 PM

of acceptable and unacceptable social risk outlined in the aforementioned document emulate the green, amber, and red zones that are currently used by Santa Barbara County.

The UKHSE HID's annex document *Societal Risk and Societal Concern,* includes guidance on acceptable and unacceptable levels of risk for multiple projects (i.e., cumulative projects). The UKHSE HID's annex document asserts that when multiple sites contribute to societal risk the unacceptable region of risk will be taken an order of magnitude higher than the corresponding line for project specific societal risk (UKHSE 2001).

At this time, Santa Barbara County does not currently have formally adopted significance criteria and thresholds for assessing cumulative risk. Therefore, in order to assess cumulative risk of upset impacts, the County will utilize the guidance provided by the UKHSE that the green, amber and red areas of the FN curves shown in Figure 5.6-2 are shifted up one order of magnitude for cumulative risk. In assessing the significance of cumulative risk of upset impact the classifications in Table 5.6-2 would apply.

Occupational safety or risk is governed by state and federal OSHA standards and is considered 'voluntary' risk. Voluntary risk addresses exposure to potential hazards associated with an activity, such as driving a car, work activities and others, that is consciously undertaken by an individual and is evaluated according to different standards than those applied in assessing involuntary exposure. The public safety thresholds addressed under this EIR do not apply to occupational safety.

The Santa Barbara County Fire Department standards are also applied in evaluating impacts associated with the proposed Project (see regulatory section above, Section 5.6.2.4 Fire Risk, Prevention, and Protection).

Exhibits - Page 106

Draft Print

07/25/2024  12:45:30 PM

**Figure 5.6-2    Santa Barbara County Project Specific Fatality and Injury Risk Thresholds**





Source: SBC 2000

Exhibits - Page 107

*San Luis Obispo County Thresholds*

San Luis Obispo County relies on the CEQA guidelines Appendix G for thresholds. The San Luis Obispo County Fire Standards are also applicable (see Section 5.6.2.4 Fire Risk, Prevention, and Protection).

*Kern County Thresholds*

Kern County relies on the CEQA guidelines Appendix G for thresholds. The Kern County Fire Department standards are also applicable (see Section 5.6.2.4 Fire Risk, Prevention, and Protection).

*CEQA Thresholds Used in this Document*

The Santa Barbara County thresholds are used for CEQA in this document.

### NEPA Significance Thresholds

The NEPA significance thresholds are the same as the CEQA significance thresholds discussed above.

## 5.6.3    Proposed Project

The proposed Projects environmental impacts, mitigation measures, residual impacts, CEQA significance conclusions and cumulative effects are discussed below.

### 5.6.3.1   Environmental Impacts

A release is defined as a loss of containment of the pipeline system and involves a release of liquid (e.g., crude oil) or gas (e.g., natural gas) depending on the pipeline system. A spill is a release of liquids, in this case crude oil.

The proposed Project could present risks due to potential for accidental spills and fires associated with the pipelines, pump stations, gas pipeline, and existing SYU facilities. The crude oil pipeline and the associated facilities could present risks due to the potential for accidental oil spills and fires associated with crude oil spills, both of which could cause impacts to the environment and public health. The gas pipeline could also present risks due to the potential for a release of natural gas that could result in a fire, causing the potential for thermal impacts to the public. The existing equipment at the SYU (i.e., from the Platforms and the LFC equipment) would also generate risks during the proposed Project operation phase. These risks are discussed in Section 5.6.3.5.

Issues related to impacts to public health from upset conditions, impacts from a spill, impacts to schools, and impacts due to wildfires are discussed in more detail in the sections below.

### Applicant Proposed Avoidance and Minimization Measures (AMMs)

The Applicant has incorporated several Applicant-proposed Avoidance and Minimization Measures (AMMs) into the Project, most of which would be regulatory requirements but are included herein for emphasis, to ensure compliance and for full disclosure due to their importance. A list of the risk-related AMMs are presented in Table 5.6-3. The measures listed are all Project design features and have been included in the impact estimates summarized below.

Exhibits - Page 108

07/25/2024  12:45:30 PM

Table 5.6-3    Applicant-Proposed AMMs Related to Risk of Upset

| AMM # | Measure |
|---|---|
| AMM - Risk-01 | Conduct an Excess Flow Restrictive Device (EFRD) study and the installation of a motor-operated valves (MOVs) and check valves that would reduce the size of spills. |
| AMM - Risk-02 | Conduct a surge study identifying issues and measures in place to ensure protection of the pipeline equipment given emergency valve closures and emergency operations. |
| AMM - Risk-03 | Installation of at least one belowground warning tape above each pipeline. |
| AMM - Risk-04 | Use of leak detection SCADA system with 24-hour per day monitoring and control. |
| AMM - Risk-05 | Compliance with a range of regulatory requirements, including those related to in-line inspection requirements, cathodic protection, pipeline route markers, etc. |
| AMM - Risk-06 | Upgrades to the monitoring system, emergency response plans, and operator training as per the PHMSA corrective action orders requirements. |
| AMM - Risk-07 | Security fencing around all valve and pump stations. |

Notes: Based on Plains 2018.
Key:
AMM = avoidance and minimization measure
EFRD = emergency flow restriction device
MOV = motor-operated valve
PHMSA = Pipeline and Hazardous Materials Safety Administration
SCADA = supervisory control and data acquisition

### Risks to Public Safety

This impact describes the potential release sizes and the estimated frequency of releases from the proposed Project pipeline systems and the potential for immediate (fires, etc.) health impacts on the public. Both the proposed Project crude oil pipeline and the gas pipeline are examined, and the risks combined to compared to the risk thresholds. Normal operations would not involve any release of materials.  Upset conditions could result in a release of materials and potential impacts and are discussed below.

| Impact # | Impact Description | Phase | Impact Classification |
|---|---|---|---|
| RISK.1 | The proposed Project could generate risks to public safety and a significant hazard to the public through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment | Operations: Accidental Spill | Insignificant |

In order to define a "significant hazard" related to upset conditions, this analysis utilizes a quantitative approach to estimating risk levels as specified in the Santa Barbara County CEQA Thresholds Guidelines Manual (SBC 2021). Public health risk related to the crude oil pipeline and the natural gas pipeline are discussed below. Impacts to the environment are discussed in RISK.2 below.

### Crude Pipeline

The spill size from a crude oil pipeline is a function of a number of parameters including the location of the spill relative to the terrain, the location of valve stations and check valves, the pipeline diameter, and the pipeline throughput rate. The crude oil that would spill out of a leak or rupture would be composed of the pumping rate of the crude oil through the pipeline plus the drain down volume. The drain down volume is the volume of crude oil that would drain from a hole in the pipeline. For a rupture or leak located at a low point on the pipeline, the drain down volume could be substantial. For a rupture or leak located at a high point on the pipeline, the drain down volume could be much smaller.

Exhibits - Page 109

07/25/2024  12:45:30 PM

In the event of a pipeline spill, the leak detection system should detect and shut down the pipeline by stopping pumps and closing valves. Leak detection systems operate by monitoring the flow rates into and out of the pipeline system (called volume balancing) as well as monitoring the pressures along the pipeline to identify any operating parameters that might indicate a potential release, such as sudden drops in pressure or imbalances in flow levels. Temperatures are also monitored to estimate "line pack," which accounts for the compressibility of the fluids.

Given a spill, once the pipeline is shut down, the oil would continue to be released from the spill site until it drains from the associated segments of the pipeline between the closed valves as defined by the terrain "valleys" (the draindown volume). The leak detection system is designed as part of the Applicant Project design to shut down the pipeline in 15 minutes. For the public safety analysis in this impact, a shutdown period of 15 minutes is used. As there are a number of components of the risk analysis for public safety that are very conservative, such as assumptions related to spill spreading in a perfect circle as opposed to following drainages and contours, and that historically crude oil spills have rarely produced fatalities (see below), the QRA analysis with the use of a 15-minute response period for public health impacts is considered a very conservative analysis of risk levels from a crude oil pipeline.

Crude oil pipeline leaks are similar to ruptures, except that the leaks involve smaller-sized releases from a pipeline. This distinction between leaks and ruptures accounts for the different failure frequencies that exist between them. Pipeline leaks occur more frequently than pipeline ruptures and are most commonly a result of corrosion and erosion of the steel in the pipeline. Although a leak generally occurs more frequently than a rupture, it has a smaller impact area. Both leaks and ruptures are identified as possible release scenarios in this EIR in order to address a range of risk levels.

**Crude Pipeline Spill Volumes**

The spill volumes from the proposed Project crude pipeline were calculated based on the pipeline size and the associated terrain for different segments of the pipeline. Figure 5.6-3 shows the estimated spill volumes along the pipeline route for each segment as a worst case for that segment. The worst-case sized spill volume is shown in Table 5.6-4 for the different portions of the proposed Project crude oil pipeline.

Exhibits - Page 110

Draft Print
07/25/2024 12:45:30 PM

**Figure 5.6-3    Spill Volume by Segment Milepost for Crude Pipeline Segments**



Source: Based on Plains 2018, worst case spill volume for each segment.

**Table 5.6-4    Proposed Project Crude Oil Pipeline Worst-Case Spill Volumes**

| Location | Maximum Spill Volume, gallons |
|---|---|
| LFC – Gaviota Plant | 84,000 |
| Gaviota – Sisquoc | 131,040 |
| Sisquoc - Pentland | 198,030 |
| Coastal Segments | 117,600 |

Source: Based on Applicant QRA and EFRD 2019, with modification to address spill duration of 60 minutes. Coastal segments are designated up to valve station 2-500.

**Crude Pipeline SCADA System**

A SCADA system is the computerized system that monitors the pipeline system. The pipeline system is equipped with flow meters that measure the amount of flow going into or out of the system, as well as pressure and temperature sensors. This information is fed into the computer system, which watches for situations that might represent a leak and generate an alarm. Given an alarm, the SCADA system could then either automatically shut down the pipeline system by stopping pumps and closing valves or alert the operators who could then take action (see Section 2.0, Project Description).

Exhibits - Page 111

07/25/2024  12:45:30 PM

The Applicant provided a modeling analysis to estimate the responsiveness of the SCADA system for different sizes of spills. The following pipeline operating parameters were assumed for all segments of the pipelines:

- Steady State Flow: 1,450 barrels per hour;

- Custody quality flow meters: 0.25 percent of flow;

- API gravity of product: 18.1;

- Pressure gauge uncertainties: 11.25 pounds per square inch;

- Temperature uncertainties: 2.4 degrees Fahrenheit (°F);

- Discharge Pressures: 1,200 psig;

- Suction Pressures: 100 psig; and

- Temperature ranges: 140 °F to 155 °F.

Due to the variability of the pipeline diameters throughout the Line 901R and Line 903R system, the analysis was broken into four pipeline segments as delineated in Table 5.6-5. The table represents performance of the SCADA system for different spill sizes and release rates. The SCADA system takes longer to detect slower spill rates with a spill rate of greater than about 42 gallons per minute required in order to detect the spill in less than 10 minutes (along the Gaviota segment), while a spill rate of more than about four gallons per minute would be required to detect a spill over 24 hours. Spill volumes over longer periods can be larger even though the spill rate is lower. Based on the land adsorption rate seen in the Refugio spill, these longer duration, lower rate spills (24-hour detection time shown in Figure 5.6-8) could generate impacts about an additional 60 feet from the spill site assuming dry conditions. Water flowing or rain would generate substantially greater impact distances, and these distances do not include the draindown volumes, which can be substantial, as the draindown volume is a function of the exact spill location.

For spills that produce spill rates smaller than these, generally the SCADA system would not be able to detect the spill and the spill would need to be discovered in another manner, most likely visual inspections or encounters by the public.

**Table 5.6-5    Proposed Project Crude Pipeline SCADA Flow Balancing Performance**

| Pipeline Segment | Parameter | SCADA Detection Time Flow Balancing Only* | | | |
|---|---|---|---|---|---|
| | | < 10 Minutes | 1 hour | 5 hours | 24 hours |
| Las Flores to Gaviota | Minimum Spill Size That Could Still Be Detected, gallons | 416 | 467 | 1,154 | 5,184 |
| | Spill Rate, gallons/minute | 42 | 7.8 | 3.8 | 3.6 |
| | Estimated Impacted Distance from Dry Spill Site, feet | 5 | 5 | 12 | 56 |
| Gaviota to Sisquoc | Minimum Spill Size That Could Still Be Detected, gallons | 2,326 | 2,336 | 2,563 | 5,667 |
| | Spill Rate, gallons/minute | 233 | 38.9 | 8.5 | 3.9 |
| | Estimated Impacted Distance from Dry Spill Site, feet | 25 | 25 | 28 | 61 |
| Sisquoc to Russell Ranch | Minimum Spill Size That Could Still Be Detected, gallons | 1,833 | 1,845 | 2,126 | 5,483 |
| | Spill Rate, gallons/minute | 183 | 30.8 | 7.1 | 3.8 |

Exhibits - Page 112

07/25/2024  12:45:30 PM

**Table 5.6-5    Proposed Project Crude Pipeline SCADA Flow Balancing Performance**

| Pipeline Segment | Parameter | SCADA Detection Time Flow Balancing Only* | | | |
|---|---|---|---|---|---|
| | | < 10 Minutes | 1 hour | 5 hours | 24 hours |
| | Estimated Impacted Distance from Dry Spill Site, feet | 20 | 20 | 23 | 59 |
| Russell Ranch to Pentland | Minimum Spill Size That Could Still Be Detected, gallons | 1,698 | 1,711 | 2,010 | 5,439 |
| | Spill Rate, gallons/minute | 170 | 28.5 | 6.7 | 3.8 |
| | Estimated Impacted Distance from Dry Spill Site, feet | 18 | 19 | 22 | 59 |

Source: Based on Applicant Application Submittals.
Note:
* for smaller leakers below the leak rates indicated most likely would not be detected. For larger leaks, the use of pressure sensors as part of the SCADA system would most likely detect the release rate in a shorter period of time. Spill sizes do not include draindown volumes released from the pipeline after the pipeline is shut down.
Key:
SCADA = Supervisory Control and Data Acquisition

Spills that are substantially larger (for example, the Refugio spill spilled over 123,000 gallons in about 30 minutes, or a rate of over 4,000 gallons per minute) the SCADA system should be able to detect this release using flow balancing in under 10 minutes. In addition, the use of pressure sensors along the pipeline allows for rapid detection of abnormal conditions associated with larger spills. For example, pressure sensors on the pipeline during the Refugio spill indicated a sudden pressure loss within 2 minutes of the estimated release time. But pressure sensors only can identify leaks if they are relatively large (and the SCADA system and operators respond appropriately), whereas flow balancing can identify smaller leaks. Effective SCADA systems utilize a combination of flow balancing and pressure changes to identify leaks.

**Crude Oil Pipeline Spill Frequencies**

Spill frequencies from a crude oil pipeline are based on the PHMSA failure rates from the California pipeline database. The PHMSA base failure rate for crude oil pipelines is shown in Table 5.6-6. The PHMSA database on liquid pipeline incidents indicates a total of 3,549 incidents on all liquid pipelines in the United States since 2010 with 1,788 of those on crude oil pipelines (PHMSA 2020). The all-liquid pipeline incidents resulted in four fatal accidents; three fatalities were due to releases of ammonia or propane and one fatality was from crude oil. In the incident involving a crude oil pipeline, the fatality was due to an automobile that crashed into a crude oil pipeline. Fatalities resulting from pipeline releases of crude oil are very low, with essentially none occurring in the last ten years.

**Table 5.6-6    Proposed Project Crude Oil Pipeline Spill Frequencies**

| Location | Spill Frequency | Return Period, years rupture/leak/total |
|---|---|---|
| PHMSA California Crude oil base rate | 1.62 per 1,000 mile years | - |
| Failure rate for L901R (49.2 miles) | 0.08 failures per year | 50/17/13 years |
| Failure Rate for L903R (74.1 miles) | 0.12 failures per year | 33/11/8 years |
| Failure Rate for L901R + L903R | 0.20 failures per year | 20/7/5 years |

Sources: Plains 2018 and PHMSA 2020. The return period is the anticipated period between releases.

Exhibits - Page 113

07/25/2024  12:45:30 PM

## Crude Oil Pipeline Population Densities

The population densities along the route are based on estimates for remote, rural, low-density and high-density areas with some additions for highways. Generally, the Applicant QRA overestimated population densities to be conservative, with an estimated average population density along the route of about 60 persons per square mile, while the U.S. Census data block groups average density along the pipeline route is on the order of 20 persons per square mile.

## Crude Oil Pipeline Fires

In the event of a crude oil spill and subsequent ignition resulting in a pool fire, the heat (i.e., thermal radiation) from the fire could result in a serious injury or fatality. Table 5.6-7 provides the assumptions related to a large and small pool fires.

**Table 5.6-7    Crude Oil Pool Fires**

| Item | Risk Assessment Value |
|---|---|
| Fatality Exposures | 10% fatality at exposures ≥ 10 kW/m$^2$ |
| Injury Exposure Levels | 90% injury at exposures ≥ 10 kW/m$^2$<br>10% injury at exposures between 5 kW/m$^2$ and 10 kW/m$^2$ |
| Spill Size Distribution | 25% large spills, 75% small spills |
| Large Spill Sizes | Defined by terrain and valve operations |
| Small Spill Sizes | Defined by SCADA system detection limits |
| Ignition Probabilities | Off-site: 0.00726, On-site: 0.0194<br>based on PHMSA data since 1986 |

Source: Plains 2019
Key:
kW/m$^2$ = kilowatt per square meter thermal energy

In the event of crude oil spill, a flammable vapor cloud could also form that, if ignited, would result in a flash fire. Ignition of a flammable vapor cloud could be caused by vehicles on a nearby road or an ignition source adjacent to the ROW. A flash fire could result in injury or fatality to people in the vicinity of the vapor cloud if they are not able to evacuate the area before the vapor cloud ignites.

The pool fire hazard areas are larger than the vapor cloud hazards and would be a greater threat to nearby populations. Energy from a pool fire radiates in 360 degrees and has the potential to impact a larger area, whereas the flammable vapor cloud dimensions are generally narrower and only occur in the direction of the wind. Also, due to the low gravity of the crude oil (18–19 API [API gravity]), the flammable vapor hazards are considered substantially smaller than the fire risks and are a much smaller risk and were therefore not considered.

### Gas Pipeline

The Applicant prepared a QRA for the gas pipeline (Plains 2019) that was peer reviewed by the EIR preparer. A release of natural gas from the proposed Project gas pipeline could produce impacts to public health through jet fires and vapor clouds that result in deflagrations. The EPA Areal Locations of Hazardous Atmospheres Model (ALOHA, EPA 2013) was used to estimate the impacts associated with a rupture or leak from the natural gas pipeline. PHMSA data was utilized to estimate the frequency of a release with assumptions on large verses small release distributions. Table 5.6-8 shows the assumptions used in the gas pipeline QRA.

Exhibits - Page 114



07/25/2024  12:45:30 PM

**Table 5.6-8    Proposed Project Gas Pipeline Risk Analysis Assumptions**

| Parameter | Value |
|---|---|
| Pipeline release base frequency, per year, PHMSA data on | 0.0354 incidents per 1,000-mile years |
| Large releases | 25% of the time |
| Smaller releases | 75% of the time |
| Jet fires immediate ignition | 10% of the time |
| Met data | Assumes worst case F/1.5 m/s |

Source: based on Applicant QRA. PHMSA data since 2010.
Key:
PHMSA = Pipeline and Hazardous Materials Safety Administration
F/1.5 = F stability and 1.5 m/s wind speed
m/s = meter/second

Population densities along the gas pipeline route are generally low as it passes through mostly agricultural areas with scattered residences. The residential area located north of the community of Garey along Foxen Canyon Road is the highest density residential area that could be exposed to potential gas pipeline releases.

*Proposed Project Pipelines: Public Safety Risk*

The combination of scenario frequency and consequences is used to estimate risk using FN curves. FN curves are depictions of the risk levels of a project and show the frequency (F) of scenarios that could produce a given fatality or injury level (N) or greater.

Crude oil spills could impact the public in the vicinity of the ROW as well as environmental resources such as biological, cultural and water resources (see **Impact RISK.2**). Other than crude oil and gas, other hazardous materials that are used as part of the proposed Project, including diesel fuels and oils related to pipeline construction or operational/maintenance procedures, do not present a significant hazard to the public due to their lack of flammability or toxicity and low amounts of use and storage.

The QRA evaluates the risk to the public from exposure to hazardous materials under upset conditions during potential pipeline releases. The QRA was prepared following the requirements of the Santa Barbara County Planning and Development Department thresholds, which specify thresholds for significant impacts to public safety.

The crude oil pipeline ROW was divided into 148 different segments based on potential spill sizes and population densities. Public safety risks were analyzed using frequencies (estimated annual chance of occurrence) in conjunction with modeled consequences (estimated number of serious injuries or fatalities) for various accident scenarios. Each segment represents a different scenario in developing the FN curves which define the risk levels.

The analysis conservatively assumes that a spill of crude oil would form a perfect circle with the circle diameter defined by the quantity of crude oil spilled and the pool thickness. This is a very conservative assumption as spill areas generally are defined by terrain and, in urban areas, curbs and drainage systems. For example, in Buellton, where the existing pipeline passes near a residential neighborhood in the western portion of the city, the spill would be assumed to create a circle with a diameter of 125 feet with impacts from a fire reaching out almost 300 feet in diameter. Historical crude oil spills have not demonstrated this level of impacts thereby indicating the level of conservative analysis.

For the gas pipeline, the pipeline route was divided into eight segments based on population densities along the route. FN curves were developed based on the potential for impacts to the public along with the estimated frequency of releases and resulting fires.

Exhibits - Page 115

07/25/2024  12:45:30 PM

The analysis for public risk impacts from fires does not include the impacts from pump stations scenarios on the public since they are remote and contained behind gated facilities. The analysis also does not include employees of the pipeline company, as this analysis only examines the risks to the public.

Santa Barbara County has established risk thresholds that use societal risk profiles (FN curves) to determine the significance of hazardous material releases. These FN curves address both injury and fatality. Santa Barbara County's adopted thresholds are generally applicable to fixed facilities and pipelines. The risk FN curves are shown in Figure 5.6-4 and are based on the FN curves developed as part of the Plains 2019 QRA analysis, with adjustments included to address the scenarios that could occur in low-density areas. The majority of the risk levels associated with the crude pipeline occur in the Buellton area and other areas where the pipeline passes nearby residential or industrial areas. The majority of the gas pipeline risk occurs near residential areas north of Garey near Foxen Canyon Road.

As the FN curves are located within the green region, the impacts to public health due to both crude oil and gas pipeline releases would be **insignificant.**

Exhibits - Page 116

**Draft Print**

07/25/2024  12:45:30 PM

**Figure 5.6-4    Proposed Project Pipeline Risk FN Curves**



Source: Plains 2019 with modifications

07/25/2024  12:45:30 PM

*Risks to the Environment*

A crude oil spill from the pipeline could impact resources in the vicinity of the pipeline ROW as well as resources in lower topographical areas downstream of the ROW. See Section 5.2, Biological Resources; Section 5.4, Cultural Resources; and Section 5.9, Hydrology and Water Quality for discussions of the impacts of a crude oil spill on biological, cultural, and hydrological resources.

A release from the gas pipeline would not generate direct impacts to environmental resources aside from the immediate vicinity of a release due to fire impacts or fire response activities.

| Impact # | Impact Description | Phase | Impact Classification |
|---|---|---|---|
| RISK.2 | Oil spills associated with the pipeline transportation of crude oil could create a significant hazard to the environment through reasonably foreseeable upset and accident conditions and impact sensitive resources including biological, water, cultural, and marine resources along the pipeline route, and downstream of the ROW. | Operations: Accidental Spill | Significant and Unavoidable |

In the event of a crude oil spill from the pipeline there could be impacts to sensitive natural resources depending upon the location of the spill, the size of the spill, and the weather conditions when the spill occurred. The probability of a spill of about five gallons[1] or more is estimated to be once in five years, and once in 20 years for larger spills (see Table 5.6-6).

*Crude Pipeline Spill Volumes*

The spill volumes are discussed above under **Impact RISK.1.** For the public health assessment under **Impact RISK.1**, a worst-case spill shutdown time of 15 minutes was used due to the already conservative analysis for fires and impacts to the public used in the QRA. However, for spills that could affect the environment, a longer time duration is used. As was the case for the May 2015 Refugio spill, there is the potential for a pipeline shutdown to take longer than 15 minutes. If the leak detection system is not operational, or is overridden by an operator, the crude oil pumping could continue for 60 minutes as a worst case, causing potentially more damage to the environment than a 15-minute shut down time. The 60-minute worst-case scenario response time for pump shutdown is used in this analysis for environmental spill impacts and is a conservative estimate based on the time taken to respond to the May 2015 Refugio spill of more than 30 minutes.

However, because the worst-case spill volume would also include the conditional probability of this longer shutdown period, it would not necessarily present higher risk levels associated with immediate public health impacts (fires, etc.) as discussed above under **RISK.1**.

**Proposed Project Pipeline: Spills Affecting Onshore Areas**

A crude oil spill from the pipeline could impact resources along numerous rivers, creeks, and drainages and other areas along the pipeline ROW. Liquids spills from pipelines generally follow the terrain. The exact location impacted by spills are a function of the material properties as well as the terrain type and slopes, the rockiness of the area, the absorption properties of the soil, the presence of flowing water and a wide range of variables. The historical adsorption rate of crude oil by a spill moving over dry terrain

---

[1] Five gallons is the federal reportable quantity for transportation (49 CFR part 171.16).

Exhibits - Page 118

varies widely. For example, the May 2015 Refugio spill had an adsorption rate of about 98 gallons per foot of travel.

If there is moisture and water flow, either from rains causing flow through normally dry storm drains or culverts, or the spill reaches a creek/river over dry land, and the creek/river is flowing, then spills can travel a substantial distance. As discussed above, some rivers along the ROW are flowing most periods of the year. Rain days per year where more than 0.5 inches of rain is received averaged nine days per year along the ROW, with a peak of 27 days per year near Gaviota (for the years 1974 through 2018) (SBC 2020). The potential impacts to biological and water resources would be greater during periods of rain events since the oil could be transported more easily into waterways by the rain runoff along drainage areas and stormwater management systems.

**Proposed Project Pipeline: Spills Affecting Marine Areas**

Portions of the pipeline would extend along the Santa Barbara County coastline. A crude oil spill could drain from the spill location through existing culverts or drainages and enter the marine environment. This is what occurred during the May 2015 Refugio Beach spill. An estimated 43 percent of the oil entered the ocean from the Refugio spill location, that was an estimated 750-foot pathway from the ocean shoreline. As the proposed pipeline is located onshore at various distances from the shoreline, a rupture at different locations spilling the same amount of oil could allow for more or less oil to enter the marine environment. Assuming a linear function of oil being trapped and adsorbed onshore with distance, the maximum amount of oil could enter the ocean where the pipeline is closest to the ocean and potential worst-case spill volumes are large. This occurs at milepost 7.4, from the LFC where the pipeline is approximately 420 feet distance from the ocean and the worst-case spill size is 76,650 gallons (near Canada de la Pila and Arroyo Quemada).

Under the proposed Project operating conditions, with the maximum spill size along the coastal segment, an estimated maximum amount of 37,322 gallons of crude oil could enter the ocean if the worst-case spill were to occur at milepost 7.4 (Plains 2019 QRA with modifications to account for a 60-minute release time). An estimated 5.9 miles of the 16.6-mile coastal portion of the proposed Project pipeline (35 percent) would be vulnerable to spills entering the ocean if a spill were to occur along any of those segments and the adsorption rate were similar to that which occurred during the Refugio spill. This assumes that no rain event is occurring and that drainages are not flowing.

There are a number of variables affecting the amount of oil that could reach the ocean from an onshore spill, including the terrain, the location of drainages under the freeway and the railroad tracks, the soil type, and extent of rocky interfaces as well as the amount of moisture. During a rain event, when drainages and creeks are flowing, a spill into the waterways could follow the flow and enter the marine environment more readily and have more extensive terrestrial impacts and reach the marine environment more readily but would also be subjected to turbulence and mixing along the drainages.

The extent of the oil spills impacting the marine environment is discussed in Section 5.2, Biological Resources, and in Appendix D, Marine Oil Spill Impact Assessment Report.

**Proposed Project Pipeline Coastal Segments: Hydraulic Drainage Analysis**

Given a spill, the crude oil could enter drainages and travel along waterways to the ocean. If waterways and drainages are dry, the areas where a spill could reach the ocean and affect the marine environment are more limited than if waterways are flowing. To access the hydrologic flow pathways that a release could affect, the geographic information system (GIS) program ArcGIS, along with the ArcGIS hydraulic package, was used to estimate flow trajectories and the drainages that could be most affected by a spill.

Exhibits - Page 119

07/25/2024  12:45:30 PM

The analysis divided the coastal portion of the pipeline into 100-foot segments and simulated a spill from each of these 100-foot segments, producing flow trajectories based on terrain. The analysis utilizes terrain and slope to define the pathway (trajectory) of the spill to the marine environment and indicates through which drainage a spill might pass. This helps to identify the drainages that are most likely to be affected by a spill and could therefore assist in developing mitigation to rapidly respond to a spill. Table 5.6-9 lists the drainages that could be most affected by a spill, and the resulting length of pipeline that could affect each drainage.

The coastal segment of the proposed Project crude oil pipeline (from LFC to Highway 1) would be equipped with ten MOVs (including at the LFC and Gaviota Pump Stations) and four check valves. MOVs have the advantage that they can stop the flow of oil, and therefore the draindown releases, from both directions along the pipeline.  However, the disadvantage of MOVs is that they do not close unless they are instructed to do so by the SCADA system and/or the operators, and therefore could stay open in the event of a spill if it is not detected. Check valves have the disadvantage that they only stop the flow in the reverse direction, but the advantage that they act immediately, independent of any intervention for the operation. An effective valve protection system uses both types of valves, usually using an MOV upstream of a low point or stream crossing and a check valve immediately after, or downstream, of the crossing to prevent crude oil from flowing back toward the spill. MOVs are more equipment intensive as they require electricity and communications systems. Check valves do not require any electricity or communication systems.

**Table 5.6-9        Proposed Project Pipeline Spill Affected Coastal Zone Drainages**

| Drainage Location | Length of Pipeline from Which a Spill Could Affect the Drainage, Feet | Could a Spill Reach the Marine Environment during Dry Conditions? | Pipeline Installation Method - HDD/Bore? | Valve Protection - MOV/Check? |
|---|---|---|---|---|
| Canada de Corral | 7,000 | N | N | N/N |
| Canada de la Vina | 5,250 | N | Y | N/N |
| Refugio | 8,500 | Y | N | Y/Y |
| Tajiguas | 8,250 | Y | Y | N/N |
| Arroyo Quemada | 5,000 | Y | Y | Y/N |
| Canada de la Pila | 2,000 | Y | Y | N/N |
| Canada Huerta | 2,000 | Y | Y | N/N |
| Arroyo Hondo | 3,500 | Y | Y | N/N |
| Canada de Guillermo | 3,000 | Y | Y | N/N |
| Canada de Posta | 2,500 | Y | N | N/N |
| Canada de Molino | 3,000 | Y | Y | N/N |
| Canada de las Zorillas | 3,000 | Y | N | Y/N |
| Canada San Onofre | 2,500 | N | Y | N/N |
| Canada de Leon | 2,250 | N | N | N/N |
| Canada Alcatraz | 2,250 | N | N | N/N |
| Canada Del Clementaria | 3,250 | N | Y | N/Y |
| Canada de Barro | 3,500 | N | N | N/N |
| Gaviota | 19,000 | N | Y | Y/Y |
| Hollister | 3,250 | N | N | NA |

Source: based on ArcGIS hydrologic analysis using flow paths.
Key:
HDD = horizontal directional drilling
MOV = motor-operated valve

Exhibits - Page 120

Figure 5.6-5 shows the drainage under the freeway at the Arroyo Hondo drainage. Drainages that the pipeline would cross with substantial HDD installations would not include MOVs or check valves due to the depth of the pipeline.

Based on the lengths of pipeline from which a spill could impact a given drainage (Table 5.6-9), the most likely drainages that could be impacted by the proposed Project include Gaviota, Refugio, Tajiguas, Canada de Corral, Canada de la Vina and Arroyo Quemada. A summary of the designed protections for these drainages consists of the following:



**Figure 5.6-5  Drainage Under Freeway: Arroyo Hondo**

1. Gaviota and Refugio are equipped with valve protection;

2. Tajiguas Creek is protected by a 3,606-foot-long HDD installation with check valve 1-700 and MOV 1-600 located upstream;

3. Canada de Corral is the canyon that the LFC sits in and is protected by the LFC drainage systems and a creek "gate" located near the entrance gate to the LFC. The gate is kept closed to prevent any spill from traveling to the marine environment without authorization;

4. Canada de la Vina is the drainage immediately to the west of the LFC and is protected by an MOV located immediately upstream. The proposed HDD is 216 feet. Note this segment is not estimated to affect the marine environment given a spill;

5. Arroyo Quemada is located farther west and is equipped with a proposed HDD of 1,831 feet. An MOV is located 2,300 feet downstream; and

6. Other areas of interest that could potentially drain to the marine environment include Canada de la Pila and Canada de la Posta, both of which are not protected by valve protection. Pila would be equipped with a 467-foot HDD and Posta does not have an HDD proposed nor any valve protection.

**Proposed Project Pipeline Inland Segments Drainage Analysis**

For inland segments of the pipeline, there are numerous areas where a spill could enter drainages or other low-lying areas. The principal locations of concern are those areas where rivers could be impacted, particularly because some of the rivers have flow for a high percentage of the year. Principal areas include Gaviota Creek, Santa Ynez River, Sisquoc River, and the Cuyama River—all of which would be crossed using HDD techniques and each are equipped with valve protections (MOV upstream, check valve downstream). Table 5.6-10 shows the U.S. Geological Survey average stream flow data for each of the major waterways along the pipeline ROW.

The pipeline ROW generally runs perpendicular to and crosses streams, except along the Pacific Ocean (16 miles running parallel), the Cuyama River (25 miles running parallel), Nojoqui Creek (three miles running parallel), and Aliso Creek (one mile running parallel). Once the pipeline ROW crosses the Cuyama River, it parallels the river until about valve 5-400 before moving northward toward Pentland. During this period, the pipeline slowly climbs from about 1,300 feet elevation to 2,100 feet elevation at the eastern end of the Cuyama Valley.

Exhibits - Page 121

07/25/2024  12:45:31 PM

**Table 5.6-10     Crude Pipeline Major Stream Data**

| Stream | Percentage of the year that the Stream is Flowing | Average Flow, ft³/second (when stream is not dry) | Years of Data |
|---|---|---|---|
| Gaviota | 96% | 7 | 20 |
| Santa Ynez | 71% | 123 | 82 |
| Sisquoc | 23% | 227 | 80 |
| Cuyama | 68% | 31 | 61 |

Source: USGS 2020
Key:
ft = feet

About 80 miles of the pipeline route is within 0.5 mile of a major stream as classified by the CDFW, with about 46 of those miles after the Cuyama River crossing in the Cuyama Valley. About 19 miles of the pipeline length are within 500 feet of a major stream, with about 11 of those miles after the Cuyama River crossing in the Cuyama Valley, where segments of the pipeline are as close as 160 feet from the Cuyama River.

The Cuyama River is the principal location of concern for the drainage analysis on inland pipeline sections as it has the most exposure to the pipeline. Based on the elevation profile, maximum spill volumes, and the adsorption rate seen in the Refugio 2015 spill, a spill along the Cuyama River portion of the pipeline could impact resources a distance as far as about 1,300 feet. About 18 miles of the pipeline is located within 1,300 feet of the Cuyama River.

The average spacing of valves between the Cuyama River crossing, at valve 3-800, and when the proposed pipeline turns away from the river, at valve 5-400, is 2.8 miles, and includes seven check valves and four MOVs.

*Proposed Project Valve Placement – Coastal Segments*

The development of the specific locations of the check valves and MOVs along the pipeline route near the coastal areas can substantially affect the spill volumes impacting marine resources and onshore biological resources. The proposed placement of the valves produces a substantial reduction in the spill volumes over an installation with minimal valves, such as with the existing pipeline. Figure 5.6-6 shows the draindown volumes of the pipeline segments located along the coastal portion of the pipeline from the LFC to the area near Buellton. This draindown spill volume profile was developed by dividing the pipeline into 150-foot segments and examining the potential spill volume from each segment, utilizing different valve arrangements. Areas located at elevations above the spill location would drain to the spill location, depending on the location of MOVs and check valves and the terrain profile. The effect of the Applicant's proposed valve arrangement is shown in Figure 5.6-6 and produces a maximum spill volume of about 52,000 gallons with an average volume of 12,598 gallons along the coastal segments.

With the additional valves as proposed in the mitigation measures below, located along the two drainages at Canada de la Pila and Canada de la Posta, as well as at the base of the Gaviota Hill, average spill volumes could be further reduced to 12,481 gallons, with the advantage of reductions along portions of the pipeline where a spill could impact the ocean. For comparison, as an indication of the effectiveness of the valve installations, the coastal portion of the pipeline without any valves installed would have draindown spill volumes as high as almost 93,000 gallons with an average spill volume of about 39,000 gallons.

Exhibits - Page 122

Draft Print
07/25/2024  12:45:31 PM

**Figure 5.6-6    Drain Down Spill Volume by Segment – Coastal Areas**



Source: based on spill volume draindown analysis. The "draindown no valves" scenario assumes a MOV at the Gaviota Pump Station.

*Potential Impacts*

Depending on the location of the spill, the environmental conditions, and the biological, cultural and water resources present, the short- and long-term effects to resources associated with a crude oil spill have the potential to be significant and unavoidable. The best method for preventing oil spills is to reduce the frequency of a spill occurring through effective pipeline maintenance programs. If a spill does occur, effective emergency response and cleanup is important. A number of recommendations have been developed as part of the Refugio Oil Spill Lessons Learned (see Section 5.6.1.8) and were used to develop the mitigation measures described below.

Mitigation measures aim to reduce impacts of an oil spill if it does occur, including:

1.  That the pipeline is equipped with design features, such as leak detection and valve protection along segments of the pipeline where a spill could enter the marine environment;

2.  Response plans that document information on the location of sensitive environmental resources along the ROW;

3.  Identification of storm drains along the pipeline route;

4.  Measures to be taken at each drainage and storm drain;

07/25/2024  12:45:31 PM

5.  Identification of specific containments; and

6.  Defined cleanup methods for sensitive areas to ensure effective, efficient, and rapid response to a spill.

These plans would allow for better coordination with first responders, particularly SBCFD and CDFW-OSPR.

In addition, mitigation measures to ensure response agencies are well equipped and trained and that the staging of response equipment is located near the highest probability drainages would improve response capabilities.

Below are listed mitigation measures that could help to reduce the impacts of an oil spill.

**Mitigation Measures**

RISK.2-1   **Oil Spill Contingency Plan and Emergency Response.** The Applicant shall complete an Oil Spill Contingency Plan (OSCP) that covers the entire pipeline route. The OSCP shall be consistent with existing plans, including the ExxonMobil LFC/SYU plans, Santa Barbara County Operational Area Oil Spill Contingency Plan, State Area Contingency Plans, San Luis Obispo/Kern County Fire Department Response Plans and Geographic Response Plans. Response Plan documents are dynamic and, as such, shall be reviewed jointly by the permittees and Santa Barbara/San Luis Obispo/Kern Counties and revised as appropriate to incorporate new planning strategies or changes in procedures, new technologies, and the acquisition and implementation of more effective feasible recovery and containment equipment as it becomes available. The permittees shall demonstrate the effectiveness of the OSCP by responding to no more than two surprise drills each year along the pipeline route, which may be called by Santa Barbara/San Luis Obispo/Kern Counties. If critical operations are underway, the permittees need not respond to the surprise drills but shall explain the nature of the critical operations and why response is not possible. The permittees shall implement reasonable changes as required by OSCP-reviewing agencies (Santa Barbara County Office of Emergency Management, Fire Department, and Energy, Minerals & Compliance Division-P&D, San Luis Obispo County agencies and Kern County agencies) after review of the permittees' drill performance. The plan shall contain at a minimum the following:

a.  **Spill Notification Procedures –** A list of immediate contacts and phone numbers to call in the event of a threat of or actual spill of oil. This list shall include a designated qualified individual with the Applicant, the California Highway Patrol, local fire departments, California Governor's Office of Emergency Services, the State Warning Center, the National Response Center, the spill response organizations listed in the OSCP (e.g. CDFW, USFWS), the shipper of the oil (ExxonMobil and others in the future), agency jurisdiction (Santa Barbara County, San Luis Obispo County or Kern County), and any other care or treatment organizations listed in the OSCP. The notification procedures shall contain a checklist of the information that shall be reported to the various parties listed.

b.  **Resources at Risk –** The OSCP shall contain the following information for all areas along the pipeline route*:*

1.  Habitat and shoreline types, as identified in Table 1 and in Appendix C of the National Oceanic and Atmospheric Administration Shoreline Assessment Manual (Aug. 2013),

Exhibits - Page 124

07/25/2024  12:45:31 PM

or as identified in the American Petroleum Institute's Options for Minimizing Environmental Impacts of Inland Spill Response (Oct. 2016);

2. A summary of potential state and federally listed rare, protected, and threatened and endangered species, as well as state species of special concern, including aquatic and terrestrial animal, fish, and plant resources;

3. A summary of aquatic resources including special status fish, amphibians, invertebrates, and plants including important spawning, migratory, nursery and foraging areas;

4. A summary of potential terrestrial animal and plant resources;

5. A summary of potential migratory and resident birds and mammals, including relevant migration routes, as well as breeding, stopover, nursery, haul-out, and population concentration areas by season;

6. Identification and appropriate contacts applicable to emergency response for the following: (i) Commercial and recreational fisheries areas, aquaculture sites, public beaches, parks, marinas, boat ramps, and recreational use areas; (ii) Industrial, irrigation, and drinking water intakes, dams, power plants, salt pond intakes, and important underwater structures; and (iii) Known historical and archaeological sites, and areas of cultural or economic significance to Native Americans; and

7. Representation (by listing and graphic) of all drainages and all storm drains that drain to the marine environment, as well as rivers and creeks. Each drainage and storm drain shall be identified by GIS coordinates and specific measures shall be detailed for each drainage and storm drain to ensure rapid techniques for closing and protecting the drainage or storm drain are available.

The OSCP may rely on and cite applicable State Area Contingency Plans, Geographic Response Plans, the Santa Barbara County Operational Area Oil Spill Contingency Plan, San Luis Obispo plans, Kern County plans and other sources to identify the information required by the items above.

c. **Response Resources –** The OSCP shall provide the following:

1. A list of rated oil spill response organizations that are under contract with the permittee. A rated oil spill response organization is one who has been certified by the California Department of Fish and Wildlife-Office of Spill Prevention and Response pursuant to CCR Title 14, Division 1, Subdivision 4, Chapter 3, Subchapter 3.5 § 819. (Oil Spill Response Organization Ratings). Oil spill response organizations under contract shall include those for near shore marine, on-waters, and terrestrial services;

2. A list of properly trained Native American Monitors who are qualified to monitor oil spill cleanup activities;

3. A detailed listing of all response resources, including equipment and personnel, and the resource locations, that could be used for responding to a spill in any location along the pipeline ROW. Standby resources shall be reviewed with and approved by Santa Barbara County P&D and the Fire Department, applicable San Luis Obispo County agencies and Kern County agencies to ensure adequate standby resources are

Exhibits - Page 125

07/25/2024  12:45:31 PM

available for all spill locations. The Applicant shall provide additional standby response resources if these resources are determined to be inadequate*;*

4. The Applicant shall fund the cost of oil spill response trailers for the Santa Barbara County Fire Department to be located at Santa Maria/Cuyama Fire Stations, or other locations as determined by the Fire Department. The Applicant funding shall be limited to a maximum of $100,000*;*

5. The Applicant shall fund the cost of an unmanned aerial vehicle (UAV) for the Santa Barbara County Fire Department. The Applicant funding shall be limited to a maximum of $16,000 and shall include UAV training costs*;*

6. The Applicant shall fund the purchase of construction equipment suitable for stopping a spill into storm drains or drainages. Equipment at a minimum shall include a backhoe and portable underflow-dams (or equivalent). Equipment shall be housed at a South County fire station location (such as Station 38 in Gaviota) capable of rapid response to a spill along the coast, and with associated support equipment and operator training. The Applicant funding shall be limited to a maximum of $150,000*;*

7. The Applicant shall place emergency response equipment at strategic locations along the coastal zone drainages to ensure rapid response capabilities, including at the Refugio, Tajiguas, Arroyo Hondo, Gaviota and San Julian Road drainages. The location of the equipment shall be placed in weather-proof boxes, or equivalent, readily available to response personnel in the event of a release and located in close proximity to areas potentially affected at the drainage. Equipment shall be located at the following locations or other location agreed upon by the County Fire Department; at the Refugio valve station; along Calle Real near Tajiguas Creek drainage crossing underneath Highway 101; at the Arroyo Hondo drainage tunnel underneath Highway 101; at the Gaviota Beach Road Gaviota Creek bridge or at the Gaviota valve station; at the crossing near San Julian Road; and at the parking area along Highway 101 inside the entrance to the LFC facilities.  The Applicant shall work with landowners, State Park and respective agencies in order to secure agreements to store equipment at these critical drainage locations. Equipment shall include at a minimum; sand bags, booms, shovels, and piping to allow for construction of a boom/under flow oil catch systems. Coordination with and access for the County Fire Department shall be established;

8. Additional response capabilities shall be installed at priority storm drain systems most likely to be impacted by a potential spill. Storm drains shall be equipped with response equipment, weir-type systems, or closable storm valve systems (such as flap valves) that allow for the capture or blockage of oil. Storm drain systems at priority locations and areas most likely to be affected shall be determined in coordination with the Fire Department and shall include the following: drainage into the east side of Refugio State Park (CaltransID# 511016003691), the storm drain at the Refugio Spill Location (CaltransID# 511010103775), Arroyo Quemada (CaltransID# 511010003981), Canada De Molino (CaltransID# 511010004268), Canada De Zorillas (CaltransID# 511014004331), and Canada De Barro (Caltrans ID# 51101000455), and any other locations determined to be high priority by the Fire Department;

Exhibits - Page 126

9. A maintenance program to ensure that the additional spill response resources are readily available and properly maintained shall be implemented and documented. Documentation shall be provided to Santa Barbara County P&D, applicable San Luis Obispo County agencies and Kern County agencies and the Fire Department on an annual basis;

10. The OSCP shall pre-identify facilities that can be used as an Incident Command Post;

11. The OSCP shall consult with and designate scientists who have oil spill modeling experience and other information that can ensure effective oil spill response so that it can be utilized during a spill event; and

12. The Applicant shall fund the development of marine nearshore response capabilities, including a nearshore boat (similar to the Chevron El Segundo Refinery M/V Duke J or equivalent), nearshore boom, other appropriate equipment and training for boom and boat deployment. Funding shall be directed to the Fire Department. The Applicant funding shall be limited to a maximum initial of $250,000 with an additional annual cost of maintenance and training of up to $50,000.

d. **Training –** The OSCP shall document that Applicant staff receive training applicable to their role in a spill including but not limited to:

1. Incident command system, including command or general staff position-specific training;

2. Oil spill emergency response training as required by state and federal health and safety laws for the pipeline company personnel likely to be engaged in oil spill response. The level of training shall be commensurate with the level of engagement for company personnel that would be involved in the oil spill response; and

3. Training records shall be maintained for at least three years from the date of the training.

e. **Desktop Exercises –** The plan holder shall conduct an annual tabletop exercise that covers the following:

1. Notifications: Make notifications about the spill scenario to the oil spill response organization, qualified individuals, the spill management team listed in the OSCP, the California Governor's Office of Emergency Services, and the National Response Center;

2. Staff Mobilization: Assemble the spill management team and other appropriate personnel identified in the OSCP and discuss the approach to spill response along with required roles and responsibilities;

3. HAZMAT Training: conduct HAZMAT training with the Santa Barbara County Fire Department, applicable San Luis Obispo County agencies and Kern County agencies on an annual basis. The training shall include in the field assessments of different potential challenges presented by a pipeline spill at different locations, with documentation and planning for appropriate response activities added to the OSCP; and

Draft Print

07/25/2024  12:45:31 PM

4.  Equipment Review and Testing: The annual tabletop exercise shall include review, and testing where applicable, of the oil spill response equipment listed in Section (c) above to confirm the availability and condition of that equipment.

f.  **In The Field Exercises**– In the field response activities shall be performed to ensure effective response and to identify any deficiencies in response capabilities. In the field response drills shall utilize different locations along the coastal segment (or other areas as agreed to with the Santa Barbara County, applicable San Luis Obispo County agencies and Kern County agencies) to familiarize response personnel with the different potential spill locations and the particularities of each location (i.e., site access, drain blocking techniques, location of and mobilization of response equipment, etc.). In the field response drills shall include the County of Santa Barbara, applicable San Luis Obispo County agencies and Kern County agencies, responsible fire departments, CDFW, and other agencies as applicable. In the field response drills shall be conducted annually with associated documentation, including implementation of lessons learned and recommendations for improvements. Offshore boom deployment drills shall also be conducted annually, in coordination with applicable agencies and local NGOs and fisherman-related resources with associated documentation, including implementation of lessons learned and recommendations for improvements.

g.  **Coordination with Agencies** – The Applicant shall include procedures for coordination with local agencies. The Applicant shall also develop and incorporate an organization chart into the OSCP, including qualifications, required training, duties, responsibilities, authorities, and the process for coordination and interaction. A person from the responsible party shall be designated within the plan as the company liaison for all communications.

h.  **GIS and Website Systems**– The Applicant shall fund Santa Barbara County for the establishment, implementation and maintenance of a GIS website system that can provide information to responders and the public in the event of a spill. All information related to any project incident shall be coordinated with and posted through the website. The GIS system shall be readily available to all responders and shall include: the locations of sensitive resources; locations of pipeline ROW access points; locations of potential access to areas that could be affected by a spill (such as beach or drainage access); access point gate codes; access points ownership contact information; the location and inventory of response equipment; the location and information of all drainages and storm drains; and any other information that could be related to spill response. The website shall be utilized during desktop and in the field drills and shall be maintained current at all times. The annual funding shall not exceed $75,000 per year

i.  **Initial Spill Response Responsibility** – The Santa Barbara County Fire Department shall be designated as the initial spill response Local-On-Scene-Coordinator for all spills in Santa Barbara County's jurisdiction, with associated authority to mobilize personnel and equipment and other response resources, including Applicant owned, contracted, and operated resources, as necessary to effectively and rapidly respond to any spill scenario. Similar arrangements shall be established with San Luis Obispo and Kern Counties. This designation and authority shall be clearly delineated in all response planning documents.

j.  **Contingency Plan Updates –** Contingency Plans shall be updated whenever changes to response activities could generate modification to planning including, but not limited to;

Exhibits - Page 128

changes to response planning measures due to in the field or tabletop drills; modifications to response equipment staging and storage locations or arrangements; modifications to leak detection systems and alarms due to testing; and any other issues determined by the Applicant or Santa Barbara County or applicable San Luis Obispo County agencies and Kern County agencies to warrant updates to the contingency planning. Notifications' listings shall be verified and updated as necessary on a biannual basis to ensure contact staff and telephone numbers are current.

**PLAN REQUIREMENTS AND TIMING:** The OSCP shall be submitted to Santa Barbara County P&D, applicable San Luis Obispo County agencies and Kern County agencies and the Santa Barbara Fire Department for review and approval prior to the issuance of the proposed Project CUP. The requirements of the approved OSCP shall be implemented by the plan holder in the event of a spill along the pipeline routes. The approved OSCP shall be submitted to Kern County Planning and Natural Resources prior to issuance of grading or building permits.

**MONITORING:** Permit Compliance Staff and Fire Department shall be invited to the annual oil spill tabletop and in the field drills and in the event of a spill, on-site inspection(s) to verify and document implementation of emergency action measures.

**RISK.2-2    Pipeline Design Review.** Prior to construction of each project component, and prior to making subsequent modifications to such components, the permittees shall submit to the Santa Barbara County System Safety and Reliability Committee (SSRRC), and applicable San Luis Obispo County agencies and Kern County agencies, relevant construction drawings and supporting text and calculations demonstrating compliance with relevant conditions. Construction may not commence until Santa Barbara County, or applicable San Luis Obispo County agencies and Kern County agencies, has approved this submittal and all necessary construction permits are issued. Santa Barbara County, or applicable San Luis Obispo County agencies and Kern County agencies, shall either provide written notice to proceed with construction or indicate in writing conditions which have not been met. When such conditions have been met, construction approval shall be granted. Santa Barbara County SSRRC, or applicable San Luis Obispo County agencies and Kern County agencies, may require post-construction inspections and review of as-built drawings, as necessary to confirm consistency with the approved submittals. At a minimum, the following plans and design considerations shall be submitted to the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies, for review and approval.

a.   **Plans and design documentation** - shall include, but not be limited to, the following:

1.   All requirements associated with the PHMSA Corrective Action Orders that are applicable to the proposed Project pipeline design and installation with all documentation used to complete these measures;

2.   The Process Flow Diagrams (PFDs); Process & Instrumentation Diagrams (P&IDs) and Process Hazard Analyses conducted for the Pipelines, Pump Stations, Storage Tanks and other installations;

3.   The AB 864 required Risk Analysis, the Risk Analysis Assessment provided by the CSFM (for review only), and the Risk Analysis Implementation Plan with all associated documentation and analyses;

Exhibits - Page 129

Case 2:26-cv-05242-SVW-SSC   Document 2   Filed 05/14/26   Page 628 of 701   Page ID #:982

07/25/2024  12:45:31 PM

4. The Final Surge Study details associated with the pipeline design and full documentation of the analysis, including: the hydraulic analysis with hydraulic modeling inputs and outputs; the full analysis and results of the hydraulic analysis used to develop the surge study; assumptions and design criteria; and electronic numerical inputs and outputs (such as spreadsheets or other software-related tools associated with the analysis);

5. The Final Excess Flow Restrictive Device (EFRD) study associated with the pipeline design including a complete High Consequence Area impact analysis and ERFD assessment (such as those performed by G2 Integrated Solutions or equivalent). Full documentation of the analysis shall be submitted, including assumptions and design criteria for the EFRD, and electronic numerical inputs and outputs (such as spreadsheets or other software-related tool inputs/outputs) associated with the EFRD analysis;

6. A Final SCADA and leak detection system design and associated analysis including: thresholds for alarms and shutdown setpoints for flow, pressure and temperature system; flow, pressure and temperature system locations and placement; and any other design considerations associated with the implementation of the SCADA and leak detection systems including their detection criteria, accuracy, and limitations;

7. All components of the Project and their operators, shall be linked together by emergency communications systems, such as radio, satellite phone or other equivalent technology that allows for communications along all portions of the pipeline ROW for purposes of emergency response. All pipelines shall have adequate safety measures to provide rapid detection of small or large leaks, and automatic shutdown. An automatic shutdown is defined as a shutdown that is performed independent of operator input. Any break, rupture, and/or damage to the pipeline system shall result in the orderly shutdown of the operations and will activate shut down valves in a manner to minimize environmental damage. The permittees shall demonstrate to the satisfaction of the Santa Barbara County SSRRC, and applicable San Luis Obispo County agencies and Kern County agencies, the performance of the SCADA system interconnection and emergency communications systems prior to pipeline operations;

8. The SCADA system shall include specific thresholds for alarms and automatic shutdowns, including any five percent deviation from normal operating pressures to trigger an alarm, and any 10 percent deviation to trigger an automatic shutdown, or otherwise agreed-upon thresholds as reviewed and approved by Santa Barbara County, and applicable San Luis Obispo County agencies and Kern County agencies. Any SCADA system failure shall trigger an automatic shutdown. In case of a low-pressure shutdown, the entire pipeline system shall be assessed for a leak or a rupture and the pipeline shall not be restarted without Santa Barbara County, and applicable San Luis Obispo County agencies and Kern County agencies, approval. Any other shutdown and restart shall require immediate notification to Santa Barbara County and applicable San Luis Obispo County agencies and Kern County agencies;

9. Documentation demonstrating compliance with American Petroleum Institute Standards API 1130 (Computational Pipeline Monitoring for Liquid Pipelines) and API 1175 (Pipeline Leak Detection Program Management);

Exhibits - Page 130

10. All emergency response plans associated with the pipeline system and all associated documentation and analysis, including drainage and storm culvert identification and planning;

11. Results of any CSFM determinations or directives or other requirements and associated documentation and analysis;

12. Any other design and installation considerations and analysis that Santa Barbara County, or applicable San Luis Obispo County agencies and Kern County agencies, determines are related to safety and risk of upset;

13. Upon completion of pipeline construction, the permittees shall provide all jurisdictional agencies with maps, in both PDF and GIS format, showing the finished pipeline routes and shall include locations accessible by fire department emergency response vehicles;

14. The Applicant shall submit Welding Procedure Specifications, Procedure Qualification Records, and Welder Qualification Records to Santa Barbara County, and applicable San Luis Obispo County agencies and Kern County agencies, for review and approval prior to construction. During construction, the Applicant shall submit weld x-rays and other Non-Destructive Testing (NDT) inspection details including the weld maps for review and approval as well as all pertinent Quality Assurance /Quality Control (QA/QC) documents; and

15. A plastic ribbon or other suitable material shall be buried 12 to 78 inches above the pipeline and shall cover the length of the pipeline. The material shall be brightly colored and be labeled with a warning that this area contains a hazardous liquid pipeline trench. This measure shall be noted on the design and construction plans to be reviewed and approved by the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies.

b. **Additional Valve Protection**– The Applicant shall add additional block valves or check valves on the coastal segments of the proposed pipeline ROW to ensure that spills that could reach the marine environment are minimized. These shall include, but not be limited to: additional check valves at Canada de Pila, Canada de Posta, and at the base of the Gaviota Hill. Plans and design calculations shall be submitted to the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies, for review and approval.

**PLAN REQUIREMENTS AND TIMING:** The pipeline designs and plans, including full documentation of the EFRD and Surge study and Hydraulic analysis, shall be submitted to the Santa Barbara County SSRRC, and applicable San Luis Obispo County agencies and Kern County agencies, for review and approval prior to issuance of the proposed Project Zoning Clearance.

**MONITORING:** Permit Compliance Staff shall document implementation of measures through plan review and in the field inspections.

**RISK.2-3  Pipeline Operations Management Plan.**  The Applicant shall submit a Pipeline Operations Management Plan to the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies, for review and approval. The Pipeline Operations Management Plan shall include the following:

a. **Pipeline Internal Inspections –** Enhanced pipeline internal inspection by the Smart Pig Surveys using the most recent technologies, such as magnetic flux technology, ultrasonic or their combination shall be implemented within the first six months of pipeline operation in order to establish a baseline pipeline condition, and then on an annual basis for the first three years of pipeline operations. Pigging frequency and tools selection shall be determined after three years with the review and approval of Santa Barbara County SSRRC, and applicable San Luis Obispo County agencies and Kern County agencies, with the period between Smart Pig Surveys not to exceed five years. Thresholds for pipeline anomaly in the field confirmation inspection and remediation shall be set at 40 percent to ensure timely capture of any potential issues.

b. **Pipeline Leak Detection System Testing –** the Applicant shall test the leak detection system and operator response activities annually at a minimum through unannounced simulations of a leak , utilizing in the field measures to simulate leaks with the use of bypass valves around flow meters, leaving a drain line valve open, pressure sensor control systems/isolation mechanisms, or other equivalent measures. System design shall include the use of leak-simulation equipment (bypass valves, etc.) and shall be included in system design documentation. In the field testing and simulation of leaks shall be coordinated with Santa Barbara County, and applicable San Luis Obispo County agencies and Kern County agencies, but performed unannounced to operators. In the field leak simulations shall document the leak system performance and shall include estimates of leak detection capabilities and leak size response sensitivities. Documentation of the testing shall be submitted to Santa Barbara County and applicable San Luis Obispo County agencies and Kern County agencies.

c. **PHMSA Corrective Action Orders (CAO) Requirements –** all requirements associated with the PHMSA CAOs that are applicable to the proposed Project pipeline operations shall be completed and all documentation used to complete these measures shall be provided to the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies. These shall include, but not be limited to, the following:

   1. Midland Control Room Enhancements;

   2. Revised Facility Response Plan and Training Records;

   3. Emergency Response Plan and Training Review; and

   4. Enhanced Preventative and Mitigation Measures.

d. **Maintenance Oversight** – all maintenance activities, including those part of regulatory and non-regulatory activities. These include, but are not limited to, the following:

   1. Pipeline internal inspections, including Smart Pig Surveys, hydrotesting, direct inspections of pipeline issues, confirmation digs, anomaly repairs, etc.;

   2. Operating records including operating pressures, flow records and pump operations;

   3. Any maintenance records and activities associated with any pipeline appurtenances, including MOVs, check valves, pipe segment replacement, pump station equipment, etc.;

   4. Emergency response or spill plan updates and revisions;

Exhibits - Page 132

07/25/2024  12:45:31 PM

5. Spill incident reports and reviews;

6. Monthly operating data, including throughput, maintenance activities, fuel use, incidents, scheduled events such as Smart Pig Survey, and any other operating information as determined by Santa Barbara County and applicable San Luis Obispo County agencies and Kern County agencies, in the form of monthly production and maintenance reports; and

7. The use of any specialty tools such as Cracking Tool Smart Pig Survey.

e. **Regulatory Submittals –** all submittals as required by regulatory requirements, such as AB 864, or any CSFM requirements, shall also be submitted to Santa Barbara County and applicable San Luis Obispo County agencies and Kern County agencies for review and approval.

f. **Hydrotesting** - The pipeline shall be hydrotested per State Fire Marshal guidelines prior to operation. Any relocated or realigned portion of the pipeline shall be hydrotested prior to operation. Within 60 days of each hydrotest inspection, the permittees shall provide the report to the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies for review.

g. **Cathodic Protection** - A baseline pipe-to-soil cathodic profile and readings shall be obtained after the pipeline has been installed, but before any cathodic protection facilities are connected. Other utilities shall disconnect their bonds as well. This measure shall be included on the construction plans which shall be reviewed by the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies.

**PLAN REQUIREMENTS AND TIMING:** The Pipeline Management Plan shall be reviewed and approved by the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies prior to issuance of the proposed Project CUP.

**MONITORING***:* Permit Compliance Staff shall document implementation of measures through plan review and in the field inspections including review of the annual leak detection system testing.

**RISK.2-4** **Safety, Inspection, Maintenance, and Quality Assurance Program (SIMQAP).** The Applicant shall submit a SIMQAP to the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies for review and approval. The SIMQAP shall be consistent with the Santa Barbara County SSRRC Administrative Guidelines document dated February 2002 (revised 11/6/2003). The SIMQAP shall be a dynamic document updated at least every 2 years or sooner if warranted by design, Pipeline Operating Procedures and their Annual Revalidations; and operation, or maintenance changes. The Program shall include, but not be limited to:

a. Establishing procedures for review of safety inspection records, including smart pig inspections, valve and pressure sensor maintenance and inspections, and compliance with manufacturers minimum inspection and maintenance procedures;

b. Regular maintenance and safety inspections, including frequency of inspection, written procedures to following during inspections, recordkeeping requirements, and submissions to agency requirements;

Exhibits - Page 133

07/25/2024  12:45:31 PM

c.  Periodic safety audits, including a detail audit protocols, recordkeeping requirements, audit personnel minimal capabilities, and agency submittal requirements;

d.  Development of safety system testing protocols, including testing of SCADA systems and in-field testing of leak detection capabilities and responses, pressure detection system testing; alarm system response, automatic shutdown system testing procedures, and recordkeeping and report methods.

e.  Training and experience standards for personnel, including auditors, maintenance personnel, operators, SCADA system operators and response personnel;

f.  Use of simulators in training programs, including SCADA system operators; and

g.  Monitoring of critical safety devices and systems including flow meters use in the SCADA system, pressure sensor and detection system used in the SCADA system and alarms and automate shutdown systems.

The Program shall be reviewed and approved by the Santa Barbara County SSRRC and/or its consultants and applicable San Luis Obispo County agencies and Kern County agencies prior to the pipeline system start up. The permittees shall implement the approved SIMQAP and shall provide for involvement of the Santa Barbara County Onsite Environmental Coordinator and County staff or its consultants, and applicable San Luis Obispo County agencies and Kern County agencies, in all inspections. All costs associated with this review process shall be borne by the permittee.

**PLAN REQUIREMENTS AND TIMING:** The SIMQAP shall be reviewed and approved by the Santa Barbara County SSRRC and applicable San Luis Obispo County agencies and Kern County agencies prior to issuance of the proposed Project CUP.

**MONITORING:** Permit Compliance Staff shall document implementation of the SIMQAP through program review and in the field inspections including SIMQAP audits as outlined in the Section IV.D of the Santa Barbara County SSRRC Guidelines.

**RISK.2-5** **Environmental Quality Assurance Program (EQAP).** The permittee shall prepare an EQAP. The program shall include (or if separate plans exist, reference) all plans relevant to construction and operations of the proposed facilities specified by these conditions and shall describe the steps the permittee will take to assure compliance. This plan is intended to provide a framework for all other programs and plans specified by these conditions. As such, the EQAP is a comprehensive reference document for Santa Barbara County, applicable San Luis Obispo County agencies and Kern County agencies, other agencies, and the public regarding the project. The plan shall also provide a structure for data collection, environmental monitoring, and management coordination by a contractor selected by Santa Barbara County and applicable San Luis Obispo County agencies and Kern County agencies, after consultation with the permittee. The contractor will be under contract and responsible to the County. Preparation and implementation of the plan shall be funded by the permittee.

As part of the EQAP, the permittee shall provide semi-annual reports throughout construction and annual summary reports during operations to Santa Barbara County P&D and applicable San Luis Obispo County agencies and Kern County agencies. These reports shall describe:

a.  Project status, including but not be limited to:

1.  extent to which construction has been completed;

Exhibits - Page 134

07/25/2024  12:45:31 PM

2. the rate of production/throughput during operation;

3. environmental planning and implementation efforts; and

4. any revised time schedules or timetables of construction and operation that will occur within the following one year period.

b. Evidence of compliance, including letters of commitment, written approvals, and memoranda of Agreements as identified in various permit conditions.

c. Results and analyses of all data collection efforts being conducted by the permittee pursuant to these permit conditions.

**PLAN REQUIREMENTS AND TIMING:** The EQAP shall be reviewed and approved by Santa Barbara County and applicable San Luis Obispo County agencies and Kern County agencies, prior to issuance of the proposed Project Zoning Clearance. The approved EQAP, shall be provided to Kern County Planning and Natural Resources prior to the issuance of grading or building permits. All subsequent annual reports shall be submitted to Kern County Planning and Natural Resources concurrent with submittal to Santa Barbara County.

**MONITORING***:* Permit Compliance Staff shall document implementation of EQAP through program review and in the field inspections including EQAP audits.

**RISK.2-6** **County Emergency Response Funding.** The permittee shall enter into an agreement with Santa Barbara County and applicable San Luis Obispo County agencies and Kern County agencies, to provide training for Santa Barbara County staff, Fire Department staff, and applicable San Luis Obispo and Kern County staff, including but not limited to: HAZMAT training; HAZWOPER training; and spill-response volunteer coordination and training. In addition, the Applicant shall provide funding to Santa Barbara County and applicable San Luis Obispo County agencies and Kern County agencies, to develop a formal process and structure to engage local NGOs and other local resources, including a Fisherman's Oil Response Program or other equivalent, to assist in the event of an oil spill. The annual funding shall not exceed $250,000 per year.

**PLAN REQUIREMENTS AND TIMING:** The funding arrangement shall be reviewed and approved by Santa Barbara County P&D and applicable San Luis Obispo County agencies and Kern County agencies, prior to issuance of the proposed Project Zoning Clearance.

**MONITORING***:* Permit Compliance Staff shall document the implementation of the funding arrangement.

**RISK.2-7** **Fire Protection Plan.** The permittee shall submit and obtain approval of a Fire Protection Plan (FPP) from the Santa Barbara County Fire Department, San Luis Obispo Fire Department and the Kern County Fire Department for the pipeline route, the pump stations and the valve stations in each respective county. The FPP shall be revalidated annually or updated as deemed necessary by the Fire Department to reflect any operational changes or facility modifications which may present a fire hazard risk. Modifications to the FPP must be reviewed and approved by the Fire Department. The FPP shall address, but not be limited to the following, as they apply to the Project construction and operations:

a. Facility Description*;*

b. Process Description*;*

Exhibits - Page 135

07/25/2024   12:45:31 PM

c.   Potential Fire Hazards*;*

d.   Potential Ignition Sources*;*

e.   List of Personnel Responsible for Fire Prevention Measures*;*

f.   Housekeeping Practices*;*

g.   On-Site Fire Fighting Equipment and Water Supply*;*

h.   Fire and Gas Detection Equipment*;*

i.   Fire Department Access*;*

j.   Vegetation Management*;*

k.   Employee Training and Safe Practices*;*

l.   Process Control and Monitoring*;*

m.   Drainage and Containment*;*

n.   Inspection and Maintenance Practices*;*

o.   Inspection and Maintenance Schedule*;*

p.   Hazard and Risk Analysis*;*

q.   Tank Fire Preplans; and

r.   Site Map*.*

**PLAN REQUIREMENTS AND TIMING:** The FPP shall be reviewed and approved by Santa Barbara County P&D and applicable San Luis Obispo County agencies and Kern County agencies, and Fire Department prior to issuance of the proposed Project Zoning Clearance.

**MONITORING***:* Permit Compliance Staff and the Fire Department shall document implementation of FPP through program review and in the field inspections including FPP audits.

*Impacts Remaining After Mitigation*

Mitigation measure RISK.2-1 listed above would help improve the response to an oil spill by developing route-specific oil spill response plans and providing additional oil spill response resources, including spill response trailers and specifying the SBCFD as the principal initial responder. These oil spill plans and equipment would allow quicker notification in the event an oil spill and for better coordination with the first responders, particularly the SBCFD and CDFW-OSPR. As shown during the Refugio spill from 2015, the lack of sufficient coordination and available means of blocking the storm drain system allowed substantial amounts of crude oil to drain into the storm drain system. The installation of a flap valve (pictured in Figure 5.6-7 and listed under mitigation measure RISK.2-1.c.8) or readily available equipment on this drainage and/or on storm drains that could be the most impacted by a spill may also allow for control of spills. Although flap valves are



**Figure 5.6-7  Flap Valve**

Exhibits - Page 136

Draft Print
07/25/2024  12:45:31 PM

commonly installed on drain systems, they are normally installed on the outlet ends of drainage culverts to prevent backflow, but they, or an equivalent system, could be used to prevent flow from entering a storm drain system as well through manually closing the valve in the event of a spill (they would normally be in the open position for storm water drainage). Ensuring systems are immediately available and located adjacent to drainages and storm drains to allow for drain blockage and spill control would help to reduce the probability of oil impacting larger areas and areas potentially in the marine environment.

A number of locations are specified in mitigation measure RISK.2-1 for the installation of response equipment and modifications to priority storm drains.  Storms drains were identified based on Caltrans storm drain database and the hydrology trajectory analysis for areas that could be most impacted by a spill. Figure 5.6-8 shows the storm drains that were affected by the 2015 Refugio spill and allowed the crude oil to drain to the marine environment. Figure 5.6-9 shows the locations along the coastal segments where equipment is proposed for installation.

**Figure 5.6-8    2015 Refugio Spill Storm Drains**



(a) First culvert through which product flowed.    (b) Second culvert through which product flowed.

Source: DNVGL 2015

Mitigation measure RISK.2-2 would ensure that appropriate pipeline design is implemented with Santa Barbara County oversight, review, and approval of all design documentation. For SCADA system design parameters, during the 1997 Nuevo rupture, the pipeline was shut down safely due to low pressure. However, the operator restarted the pipeline immediately without any investigation of the low pressure and that subsequently caused a major offshore spill. Therefore, ensuring that there is approval prior to restart of the pipeline after SCADA alarms will ensure that this type of scenario is not repeated.

Mitigation measure RISK.2-2 would also provide additional valve protection along areas of the pipeline that have the potential for impacting the marine environment and would also help reduce the spill sizes. Although the Applicant has proposed more valves than the historical configuration, thereby reducing the potential spill sizes on most parts of the pipeline system, the addition of check valves (e.g., as shown in Figure 5.6-10) along the coastal segment will ensure that spill sizes are minimized regardless of the response time of the SCADA system (check valves operate independently of the SCADA system). This would provide the greatest degree of protection of nearby sensitive resources.

Exhibits - Page 137

Draft Print

07/25/2024  12:45:32 PM

**Figure 5.6-9      Locations of Spill Response Equipment – Coastal Segments**



Source:  Google Earth Aerial

Mitigation measures RISK.2-3, RISK.2-4, and RISK.2-5 would ensure the appropriate Santa Barbara County operation oversight, through operational parameters and maintenance records review and SIMQAP and EQAP implementations. These mitigation measures would ensure that the well-established Santa Barbara County oversight programs are fully implemented for the pipeline, and that Plains is well aware of these requirements and accepts them prior to any issuance of a land use permit or a CUP. This oversight would minimize the potential for spills due to failed maintenance or operational programs.

Mitigation measure RISK.2-6 would ensure that proper training of Santa Barbara County staff, including SBCFD staff, is implemented annually. The Santa Barbara County Office of Emergency Management, 2015 Refugio Oil Spill After-Action Report and Improvement Plan (SBC 2016) documented the need for additional training and resources (as also included in mitigation measure RISK.2-1). A high level of training and coordination among County staff, volunteers, and fisherman/public resources is vital for efficient and effective responses.



**Figure 5.6-10  Check Valve**

Mitigation measure RISK.2-7 provides planning and implementation of specific fire protection measures to reduce the risk of fires from operations.

However, even with the implementation of the above mitigation measures, the potential impacts to sensitive biological, water, marine, recreational, and cultural resources for an oil spill would be **significant and unavoidable** if a spill were to impact any of these resources.


### Risks to Schools

| Impact # | Impact Description | Phase | Impact Classification |
|---|---|---|---|
| RISK.3 | The proposed Project could emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within 0.25 miles of an existing or proposed school. | Operations | Insignificant |

The pipeline construction activities would be performed in mostly rural areas except for near the City of Buellton, where the pipeline would be installed about 190 feet from the Oak Valley School in western Buellton.

The operational phase of the Project would involve the operation of the pipeline in proximity to the Oak Valley Elementary School in Buellton and the K-8 Vista de las Cruzes school near Highway 1. The California Department of Education (CDE) school siting risk protocol was utilized to determine the risk levels to these schools.

The CDE developed an advisory protocol to assist local education agencies in assessing the safety of locating schools within 1,500 feet of a pipeline. The acceptability of a new school or pipeline proposal is determined by an estimation of individual risk at the school site. If the estimated risk of fatality is less than one in a million years (1 x 10⁻⁶ per year), it is below the threshold of significance, and no significant safety hazard is predicted for the individual school. If the estimated risk of fatality is greater than one in a million years, mitigation measures are required to reduce the risk to acceptable limits.

The CDE protocol was developed to ensure that risks are calculated in a consistent manner. The methodology uses historic data to estimate the probability of a pipeline release, models to determine the consequences of a release, the probability of fatality for different exposures, and school attendance hours. These are combined to estimate the risk of fatality. The CDE protocols are provided in the Guidance Protocol for School Site Pipeline Risk Analysis, 2007 (CDE 2007). Although the protocol is developed for natural gas releases, it can easily be applied to pipeline releases of any material that have the potential for public impacts. The resulting risk levels are used to determine significance under CEQA.

The CDE protocol was applied to the Oak Valley Elementary School and Vista de las Cruzes School, and the analysis incorporated the spill frequencies as discussed above. The assessments demonstrated that the risk levels are acceptable under the CDE Risk Protocols. As the CDE protocol indicates acceptability for these closest schools to the pipeline route, risks to schools would be **insignificant**.

### Risks of Wildfires

Operations of the pipeline generally would not involve activities that could generate sparks or other fire control issues, as the pipeline would be located below ground. However, operationally the pipeline valve stations would involve the use of emergency generators with hot exhausts that could potentially create sparks and start a wildfire if not sufficiently controlled or if the surrounding areas are not cleared of combustible materials.

Construction of the pipeline would involve clearing of ROW materials, including brush and grasses and trees that could be ignited by hot exhaust systems from construction equipment or sparks from welding activities and could be a potential impact.

Exhibits - Page 139

07/25/2024  12:45:32 PM

| Impact # | Impact Description | Phase | Impact Classification |
|----------|--------------------|-------|-----------------------|
| RISK.4 | Operations and construction in a very high fire hazard areas without adequate firefighting capabilities or adequate access for firefighting could contribute to wildfire risks. | Construction and Operation | Significant but Mitigable |

In the unlikely event of a spill and resultant fire at the pump station operations, any oil would be contained within the pump station spill containment system. The LFC facility has an existing Integrated Fire Protection Plan (IFPP). The IFPP was prepared pursuant to Permit Condition Xl-2.i of the Santa Barbara County Final Development Plan for ExxonMobil's onshore oil and gas facilities at LFC and Permit Condition P-10 of the POPCO Compliance Program. The IFPP addresses the potential fire hazards associated with operations within LFC and identifies the firefighting capabilities available at the site. The County has found the IFPP adequate for the current LFC facilities.

Other pump stations would fall under the Plains fire protection and emergency response planning program. Additional equipment added at the Sisquoc, Cuyama and/or Russell Ranch pump stations or the Cuyama or Rancho pump stations would need to be added to any existing emergency response planning programs.

A spill along the pipeline route, as discussed under **Impact RISK.1** related to public safety, if ignited, could cause a fire and subsequent wildfire.  Ignition probabilities for crude oil spills are very low, particularly for spills located away from populated areas. Spills within populated areas would normally generate rapid response activities thereby minimizing the potential for wildfires to develop. As the frequency of spills with subsequent ignition in unpopulated areas where a wildfire could develop would be very low, the impacts are considered insignificant.

Operational activities related to valve station generators could introduce hot exhaust into areas with very high fire hazards. Construction activities, particularly related to clearing of vegetation using construction equipment or welding, could introduce the potential for spark-initiation of wildfires and could be significant.

**Mitigation Measures**

**RISK.4-1    Pump Station Equipment Spacing and Fire Protection Equipment.**  The operator shall ensure that design and construction of equipment comply with applicable codes and standards for equipment spacing, particularly those related to tank locations and distances to public areas, installation of fire detection and prevention systems, flame detection, flammable gas detection, fire foam, protection of storm drains from spills, and associated alarms and alert systems. These codes and standards shall include, at a minimum, California Fire Code, SBCFD Fire Prevention Standards, API 2610, NFPA 11 and NFPA 30. The design and construction compliance status shall be verified by audits overseen by the County Fire Department.

**RISK.4-2    Emergency Response and Planning.**  The field operator shall develop or include in existing emergency response plans the pump station's fire-fighting capabilities pursuant to the most recent NFPA requirements, California Code of Regulation, and API requirements, in coordination with County Fire Department. The plan should also address coordination with local emergency responders. Emergency response plans shall address the issues related to wildfire risks and response, including development of fuel management/modification zone, as well as first response tactics and equipment.

Exhibits - Page 140

07/25/2024  12:45:32 PM

**RISK.4-3  Fuel Modification Zones and Generator Configurations.** The operator shall ensure that fuel modification areas create at least 30 feet of clearance from all pump stations and pipeline valve station equipment and 10 feet from all roadways to reduce the potential for ignition sources starting wildfires. Valve generators shall be equipped with spark arrestors on exhaust outlets.

**RISK.4-4  Construction Measures.** The Applicant shall ensure that appropriate wildfire response equipment is located at all construction sites, including the availability of water trucks full of water and hot work requirements implementing a fire watch designated at all times. All construction equipment shall be equipped with spark arrestors, and monitoring and training to prevent vehicle traffic off roadways to ensure activities do not impact dry brush and lead to fire, and placing firefighting equipment at the construction site. Requirements shall be posted at all construction areas and placed on construction plans.

*Impacts Remaining After Mitigation*

The pump station operations would represent a small change to the overall fire hazards at the LFC facility and at other pipeline pump stations. However, valve station generators or construction activities through very high fire hazard areas could produce significant impacts. With mitigation impacts would be **significant but mitigable**.

### 5.6.3.2  Mitigation Measures

Table 5.6-11 lists the mitigation measures proposed for addressing potential impacts from the hazardous materials.

**Table 5.6-11    Mitigation Monitoring and Reporting Program**

| MM # | MM Title | Monitoring/ Reporting Action | Timing & Method of Verification | Agency or County Responsibilities | Applicant Responsibilities |
|---|---|---|---|---|---|
| RISK.2-1 | Oil Spill Contingency Planning | P&D and SBCFD attendance at annual oil spill tabletop and in the field drills and in the event of a spill, on-site inspection(s) to verify and document implementation of emergency action measures | Prior to the issuance of the proposed Project CUP | P&D | Development and implementation of measures and plans. |
| RISK.2-2 | Pipeline Design Review | Submission of plans and programs to P&D, in-field inspection of plan requirements | Submission of plans prior to Zoning Clearance. | P&D | Development and implementation of measures and plans. |
| RISK.2-3 | Pipeline Management Plan | Document implementation of measures through plan review and in-field inspections including review of the annual leak detection system testing | Prior to issuance of the proposed Project CUP | P&D | Development and implementation of measures and plans. |

Exhibits - Page 141

07/25/2024  12:45:32 PM

**Table 5.6-11    Mitigation Monitoring and Reporting Program**

| MM # | MM Title | Monitoring/ Reporting Action | Timing & Method of Verification | Agency or County Responsibilities | Applicant Responsibilities |
|------|----------|------------------------------|--------------------------------|-----------------------------------|----------------------------|
| RISK.2-4 | SIMQAP | Program review and in-field inspections including SIMQAP audits | Prior to issuance of the proposed Project CUP | P&D | Development and implementation of measures and plans. |
| RISK.2-5 | EQAP | Program review and in the field inspections including EQAP audits | Prior to issuance of the proposed Project Zoning Clearance | P&D | Development and implementation of measures and plans. |
| RISK.2-6 | Emergency Response Funding | Document the implementation of the funding arrangement. | Prior to issuance of the proposed Project Zoning Clearance | P&D | Development and implementation of measures and plans. |
| RISK.2-7 | Fire Protection Plan | Program Review and in-field inspections | Prior to issuance of the proposed Project Zoning Clearance. | P&D | Development and implementation of measures and plans. |
| RISK.4-1 | Pump Station Equipment Spacing and Fire Protection Equipment | Submission of design plans to P&D, review and approval of documents, in-field inspections | Submission of plans and documentation prior to CUP issuance. | P&D | Development and implementation of measures and plans. |
| RISK.4-2 | Emergency Response and Planning | Submission of plans to P&D, review and approval of documents, in-field inspections | Submission of plans and documentation prior to CUP issuance. | P&D | Development and implementation of measures and plans. |
| RISK.4-3 | Fuel Modification Zones and Generator Configurations | Submission of plans to P&D, review and approval of documents, in-field inspections | Submission of plans and documentation prior to CUP issuance. | P&D | Development and implementation of measures and plans. |
| RISK.4-4 | Construction Measures | Submission of plans to P&D, review and approval of documents, in-field inspections | Submission of plans and documentation prior to CUP issuance. | P&D | Development and implementation of measures and plans. |

Key:
CUP = Conditional Use Permit
EQAP = Environmental Quality Assurance Program
SBCFD = Santa Barbara County Fire Department
SIMQAP = Safety Inspection, Maintenance, and Quality Assurance Program

### 5.6.3.3  Residual Impacts

Residual impacts associated with the proposed Project would be significant and unavoidable for crude oil spills **(RISK.2),** insignificant for public safety risks **(RISK.1)** and schools **(RISK.3)**, and significant but mitigable for wildfire **(RISK.4)**.

Exhibits - Page 142


### 5.6.3.4 Significance Conclusions

***CEQA Significance Conclusions***

Evaluating the proposed Project against CEQA Appendix G issues (see Section 5.6.2.6), the following Appendix G issues are considered having no impacts or not applicable:

- The Project would not create a potential impact through the routine transport, use, or disposal of hazardous materials;

- The Project would not create a significant hazard through the mobilization of contaminated soils or other materials;

- The Project would not conflict with any airport land use; and

- The Project would not interfere with any adopted emergency response plans.

During normal, routine operations, the crude oil transported by the pipeline systems would be contained within the pipeline and would not produce impacts to the public or the environment. During normal, routine operations, the gas transported by the gas pipeline would be contained within the pipeline and would not produce impacts to the public or the environment. Impacts are related to accidental releases, as discussed in **RISK.1** and **RISK.2**.

The Project would be located within the existing ROW of the existing pipeline and therefore would not be located on a site included on a list of hazardous materials sites compiled pursuant to Government Code §65962.5. As a result, the Project would not create a significant hazard to the public or the environment through the mobilization of contaminated soils or other materials.

The proposed Project would not conflict with any airport land use plan and would not result in a safety hazard or excessive noise for people residing or working within two miles of a public, or public use, airport. The proposed Project also would not impair implementation of or physically interfere with an adopted emergency response plan or emergency evacuation plan as the construction areas would be relatively remote, and during operations, there would not be any obstructions to areas as the pipeline would be located underground.

CEQA significance conclusions for other areas are shown in Table 5.6-12.

**Table 5.6-12     CEQA Significance Conclusions for the Proposed Project**

| Impact # | Impact Description | Phase | Impact Classification |
|---|---|---|---|
| RISK.1 | The proposed Project could generate risks to public safety and a significant hazard to the public through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment | Operations | Insignificant |
| RISK.2 | Oil spills associated with the pipeline transportation of crude oil could create a significant hazard to the environment through reasonably foreseeable upset and accident conditions and impact sensitive resources including biological, water, cultural, and marine resources along the pipeline route, and downstream of the ROW. | Operations | Significant and Unavoidable |
| RISK.3 | The proposed Project could emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within 0.25 miles of an existing or proposed school. | Operations | Insignificant |

**Table 5.6-12    CEQA Significance Conclusions for the Proposed Project**

| Impact # | Impact Description | Phase | Impact Classification |
|---|---|---|---|
| RISK.4 | Operations and construction in a very high fire hazard areas without adequate firefighting capabilities or adequate access for firefighting could contribute to wildfire risks. | Construction and Operations | Significant but Mitigable |

***NEPA Significance Conclusions***

The NEPA significance conclusions are the same as the CEQA significance conclusions discussed above.

### 5.6.3.5   Cumulative Effects

Cumulative projects include the restart or continued operations of the ExxonMobil SYU facilities, oil and gas projects proposed for the area, and other residential, commercial, and industrial projects in the area. A summary of cumulative projects is presented below. Cumulative projects are discussed in detail in Section 4.0, Cumulative Effects.

***SYU Cumulative Projects***

Cumulative projects at the SYU facilities would include the restart of the SYU facilities consisting of a continuation of the SYU operations as delineated under the ExxonMobil Interim Trucking project (County Case No. 17RVP-00000-00081) with a decrease in production over historical SYU operations, or full pre-restart activities of the SYU facilities that could take place during the pipeline construction (see Section 4.0, Cumulative Effects).

The SYU facility operations include various hazardous materials used as part of the operations of the facilities. ExxonMobil is both required to prepare a Hazardous Material Business Plan that provides an inventory of the hazardous materials. This plan would be submitted to the respective fire departments (i.e., SBCFD). The hazardous materials stored may include crude oil, lubricant oils, and fuels.

The major risk of upset events associated with the operations of the SYU are crude oil spills and releases of produced gas. These risk of upset events are evaluated in previous environmental documents, including the Environmental Impact Statement/Report [EIS/EIR] for the Santa Ynez Unit/Las Flores Canyon Development and Production Plan (June 1984), the Supplemental Environmental Impact Report [SEIR] for the Exxon Santa Ynez Unit Project (August 1986), and the 1984 EIR/EIS completed for the Celeron/All American and Getty Pipeline Project (SCH # 83110902, Contract # R-8353. A summary of upset events from both offshore and onshore SYU facilities are summarized below.

***Offshore Platforms***

Between May 2010 and May 2015 there were a total of ten reportable spills from the offshore portion of the SYU project. These are listed in Table 5.6-13. The combined volume of oil spilled from these reportable releases was less than one gallon.

**Table 5.6-13    Reportable Offshore Spills from SYU Operations (May 2010 through May 2015)**

| Date Occurred - Incident | Release Type | Primary Medium | Chemical Spill Vol. Released, gal | Oil Spill Vol. Released, gal | Executive Summary |
|---|---|---|---|---|---|
| 6/21/2010 | Oil | Surface Water-Offshore | 0.000 | 0.008 | A fusible loop inadvertently parted, activating the platform deluge |

Exhibits - Page 144

Draft Print
07/25/2024  12:45:32 PM

**Table 5.6-13     Reportable Offshore Spills from SYU Operations (May 2010 through May 2015)**

| Date Occurred - Incident | Release Type | Primary Medium | Chemical Spill Vol. Released, gal | Oil Spill Vol. Released, gal | Executive Summary |
|---|---|---|---|---|---|
| | | | | | system. The water from the deluge swept residual light hydrocarbon through a deck penetration. |
| 7/7/2010 | Oil | Surface Water-Offshore | 0.000 | 0.004 | Pin-hole leak at deck penetration on low-pressure drain header upstream of low-pressure sump vessel. |
| 7/11/2010 | Oil | Surface Water-Offshore | 0.000 | 0.017 | Condensed water from air conditioning unit leaked on decking and picked up a small amount of oil and then leaked into water. |
| 10/20/2011 | Oil | Surface Water-Offshore | 0.000 | 0.008 | A contract ROV lost power under the facility and light oil droplets appeared on the surface causing a very light sheen. |
| 10/24/2011 | Oil | Surface Water-Offshore | 0.000 | 0.004 | While making repairs to an ROV aboard the dive boat, a small amount of hydraulic fluid leaked onto deck of the vessel and was washed overboard by-passing crew boats. |
| 12/17/2011 | Oil | Surface Water-Offshore | 0.000 | 0.008 | The diesel tank on an engine driven fire water pump was being filled. The sight glass was restricted, and diesel overflowed out of the atmospheric vent into the water. |
| 4/22/2012 | Chemical | Surface Water-Offshore | 0.004 | 0.000 | Pin-hole leak at deck penetration on vent line coming off glycol sump vessel. |
| 1/26/2013 | Oil | Surface Water-Onshore | 0.000 | 0.004 | Small amount of diesel from generator line rupture. |
| 2/13/2013 | Oil | Surface Water-Offshore | 0.000 | 0.004 | While depressuring accumulator bottle, small amount of hydraulic fluid blew into the ocean. |
| 4/22/2013 | Oil | Surface Water-Offshore | 0.000 | 0.004 | Droplets of lubricant expelled from wireline lubricator and fell into water. |

Source: SBC 2020
Key:
ROV = remotely operated vehicle
SYU = Santa Ynez Unit

The 1984 EIR identified a number of risk of upset events for the offshore SYU operations. Table 5.6-14 provides a list of the potential major risk of upset events identified for the offshore SYU operations. Most of these are related to oil spills that could occur from well blowouts or equipment failures. The largest identified potential risk of upset oil spill was 1,000,000 barrels, which was associated with a subsea blowout. The 1984 EIR and subsequent CEQA documents identified the risk of upset as a significant and unavoidable impact.

Exhibits - Page 145

Draft Print

**Table 5.6-14      1984 EIR Identified Risk of Upset Events for Offshore SYU Operations**

| Event | Worst-Case Consequence | Likelihood Range (frequency per year) |
|---|---|---|
| Ship Hits Platform (major) | 500,000 bbl Oil Spilled | $10^{-4}$ to $10^{-6}$ |
| Ship Hits Platform (minor) | 15,000 bbl Oil Spilled | $10^{-2}$ t0 $10^{-4}$ |
| Blowout on Platform (major) | 500,000 bbl Oil Spilled Possible $H_2S$ Release | $10^{-4}$ to $10^{-6}$ |
| Blowout on Platform (minor) | 15,000 bbl Oil Spilled Possible $H_2S$ Release | $10^{-2}$ t0 $10^{-4}$ |
| Subsea Blowout (major) | 1,000,000 bbl Oil Spilled | $10^{-4}$ to $10^{-6}$ |
| Subsea Blowout (minor) | 3,000 bbl Oil Spilled | $10^{-2}$ t0 $10^{-4}$ |
| Emulsion Pipeline/Riser Rupture | 15,000 bbl Oil Spilled | $10^{-2}$ t0 $10^{-4}$ |
| Gas Pipeline/Riser Rupture | 60 tons Flammable/ Toxic Gas Release | $10^{-2}$ t0 $10^{-4}$ |

Source: SBC 1984
Key:
bbl = barrel
EIR = environmental impact report
H2S = hydrogen sulfide
SYU = Santa Ynez Unit

*Onshore SYU Facilities*

Between May 2010 and May 2015 there were no reportable spills at LFC. The 1984 EIR and 1986 SEIR identified a number of risk of upset events for the LFC operations. Table 5.6-15 provides a list of the potential major risk of upset events identified for the LFC operations.

**Table 5.6-15      1984 EIR Identified Risk of Upset Events for Las Flores Canyon Operations**

| Event | Worst-Case Consequence | Likelihood Range (frequency per year) |
|---|---|---|
| Oil Tank Spill (major) | 250,000 bbl oil spilled | $10^{-4}$ to $10^{-6}$ |
| Oil Tank Spill (minor) | 44,000 bbl oil spilled | $10^{-2}$ t0 $10^{-4}$ |
| NGL Tank Rupture | 2,000 bbl NGL spilled | $10^{-4}$ to $10^{-6}$ |
| NGL Tank Leak | 1,000 bbl NGL spilled | $10^{-2}$ t0 $10^{-4}$ |
| NGL Truck Spill (major) | Full volume of truck | $10^{-4}$ to $10^{-6}$ |
| NGL Truck Spill (minor) | Minimal NGL spill | $10^{-2}$ t0 $10^{-4}$ |
| Ammonia Release* | Full tank release | $10^{-4}$ to $10^{-6}$ |

Source: SBC 1984
Note:
*Likelihood range is an MRS Environmental estimate. Not estimated in previous EIR or SEIR.
Key:
bbl = barrel
EIR = environmental impact report
NGL = natural gas liquid
SEIR = supplemental environmental impact report

The potential major risk of upset events at the LFC are related to oil spills, natural gas liquid releases, and ammonia releases. The largest identified risk of upset oil spill was 250,000 barrels from a crude oil tank spill, that would be contained within facility berms. The 1984 EIR and subsequent CEQA documents identified the risk of upset as a significant and unavoidable impact.

Portions of the LFC facility are subject to CalARP, which is the Federal Risk Management Plan Program with additional state requirements. In Santa Barbara County, this program is administered by the County Department of Environmental Health. The major risk of upset hazards identified in the most recent SYU CalARP documents were a release of ammonia from the storage tank, and a release of flammable gas from the crude oil treating plant. For the POPCO gas plant, the release scenarios identified in the most recent CalARP document was a release of natural gas liquids from the processing facility.

Exhibits - Page 146

Hazards associated with the operation of the onshore and offshore SYU facilities would remain the same as the historical operations, which were evaluated under prior environmental analysis, and no new hazards at the SYU facilities would occur with the proposed Project.

*Oil Spills*

Spill risks related to the operation of the existing onshore LFC and offshore platforms were addressed in prior environmental analyses. The major spill risk associated with the existing SYU facilities consists of an oil spill from the platforms due to equipment and pipeline failures and release from production wells. In addition, LFC oil spills could occur from equipment, pipeline, and storage tank failures. These spill impacts were found to be significant and unavoidable in the previous EIR/EIS prepared for these facilities.

Under the proposed Project, no new potential spill risk at the SYU facilities would occur, as the historical spill risks with the LFC included crude pipeline transportation.

Spills from the SYU facilities offshore could impact the same marine resource receptors as a spill from the proposed Project pipeline would. As potential spills from the SYU offshore operations were determined to be significant and unavoidable, and the proposed Project operations associated with oil spills is determined to be significant and unavoidable, the cumulative impacts would also be **significant and unavoidable.**

**Other Oil Development Cumulative Projects**

Santa Barbara County has been processing applications for several proposed crude oil development projects within the Cat Canyon area that would involve the trucking of crude oil and/or light oil for blending that would travel along similar routes as the pipeline ROW (e.g., along Highway 166). Some of the larger projects, such as the Aera project, the ERG West Cat Canyon Revitalization project, and the PetroRock project, have been withdrawn and are no longer considered cumulative projects. Other small oil development projects could add a few truck trips per day and could add additional oil trucks along portions of U.S. Highway 101 or State Route 166.

As indicated in Section 4.0, Cumulative Projects, the Phillips 66 Santa Maria Refinery Decommissioning project may alter the movement of crude oil in the region, shift some of the crude oil transportation from pipeline transportation to transportation by truck and reroute existing trucks.  Once the Santa Maria Refinery (SMR) is shutdown to begin decommissioning, the Santa Maria Pump Station (SMPS) would no longer be operational and would no longer receive trucks for offloading with subsequent pipeline transportation to the SMR (SMPS tanks to SMR is done by pipeline).  Pipelines which receive crude oil from area producers for transport to the SMR would also be shut down.

The historical trucks using the SMPS have averaged 138 trucks per day (SBC 2020), which includes 92 oil trucks coming from the East to the SMPS. Under this cumulative scenario, the 92 crude oil trucks per day currently using the SMPS would most likely no longer occur. Although the resulting destination of crude oil trucks currently using the SMPS once the SMR and SMPS shut down is speculative, as they could go south to Los Angeles or other areas, it is possible that other crude oil trucks currently going to the SMPS from the Santa Maria area could start using State Route 166 to get to the Pentland Terminal (the remaining 46 trucks coming from other non-easterly locations).

In addition, producers that historically have used pipelines to supply crude oil to the SMR could shift this transportation mode to truck and utilize State Route 166 to Pentland, or other destinations. Some producers, such as the OCS Pt. Pedernales and LOGP, do not have truck loading facilities and this would require additional construction and permitting of truck loading facilities.  Some other producers, such as

Exhibits - Page 147

07/25/2024  12:45:32 PM

Arroyo Grande oil field, have truck loading facilities and up until recently have utilized trucks as the transportation method (the Arroyo Grande oil field converted to pipeline transportation recently). Current production levels transported by pipeline to the SMR include sources such as OCS sources, Arroyo Grande Oil Field, Orcutt Area oil fields, LOGP area, etc. and, if all of this production is converted to truck transportation, could total over 80 trucks per day if not more.  Under this cumulative scenario with the SMPS and SMR not in operation, the net change in crude oil trucks using State Route 166 could increase.

For projects that transport crude oil by truck along State Route 166, as State Route 166 runs parallel to the Cuyama River, as does the proposed Project ROW, a spill from a crude oil truck accident could impact the same areas that a spill from the proposed Project pipeline could affect. Trucking of crude oil along State Route 166 was identified as a significant and unavoidable impact in the ExxonMobil Interim Trucking EIR (SBC 2020), although the ExxonMobil trucking project would not be operational when the proposed Project pipeline is operational. Other projects, such as the smaller oil projects, could utilize State Route 166 for the transportation of either crude oil or light oils and would generate significant and unavoidable spill impacts from trucking. As the proposed Project would also be a significant and unavoidable impact due to oil spills along this same area of the Cuyama Valley, there would be a **cumulatively significant and unavoidable impact** due to oil spills.

### *Residential, Commercial, and Infrastructure Cumulative Projects*

A number of projects would involve construction at potential similar timeframes as the proposed Project in somewhat close proximity. Each of these projects would involve construction that could overlap with the proposed Project construction activities. All of these projects would utilize construction equipment with the potential for small spills of diesel fuel or hydraulic oils. As none of these construction projects would generate large spills that could impact the same areas as the proposed pipeline construction Project, cumulative construction impacts would be **insignificant**.

Operations of the cumulative projects would not involve the transportation or use of large quantities of hazardous materials that could produce environmental spills or impacts to public health. Therefore, cumulative operational impacts would be **insignificant**.

## 5.6.4   No Project/No Action Alternative

Under the no project alternative, the proposed Project and the installation of a new pipeline would not be constructed. Under this scenario, there are multiple variations that could occur, each of these reasonably expected to occur in the foreseeable future if the proposed Project were to not be installed. The Applicant could abandon the project and not move forward with transporting oil via pipeline, or the Applicant could restart the operation of the existing pipeline. Each of these is discussed below.

### 5.6.4.1  Environmental Impacts

#### *No Project, No Pipeline Alternative*

Under this alternative, there would be no pipeline utilized and no transportation of crude oil via pipeline would occur. The existing pipeline would need to be abandoned and, in some areas as per ROW agreements, removed. The removal of pipeline segments and the removal of valve stations and pump stations would require construction activities. Removal of addition elements of the oil and gas infrastructure, such as the ExxonMobil SYU facility, are not addressed in this analysis and would be subject to additional decommissioning permits and CEQA analysis.

Exhibits - Page 148

07/25/2024  12:45:32 PM

Impacts related to Hazardous Materials and Risk of Upset would only be related to maintenance and construction activities and these maintenance activities would have a minor impact on risk due to the potential for localized spills of hydraulic or diesel oils. **Impact RISK.1, RISK.2, RISK.3** would not be applicable and mitigation measures RISK.2-1 through RISK.2-7 would not be applicable. Impacts would therefore be **insignificant**.

Construction activities related to valve stations, pump stations and some segments of the pipeline that could be abandoned could potentially produce an increased risk of wildfires during construction, and **RISK.4** would still be applicable and mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable**.

### No Project, Existing Pipeline Restart Alternative

Under this alternative, the existing pipeline would be utilized instead of a new pipeline being installed, and transportation of crude oil would occur through the existing pipeline. The existing pipeline would be brought into compliance with existing requirements related to AB 864 and CSFM best available technologies (BAT), including the installation of additional valves along the pipeline route. The Applicant would have to apply to the CSFM for a waiver to utilize the existing pipeline since the existing pipeline is subject to corrosion under insulation, which could affect the efficacy of cathodic protection systems. Generally, a pipeline is not allowed to operate with ineffective cathodic protection systems. There is uncertainty as to whether the Applicant could demonstrate to the CSFM that the pipeline could be operated safely, and therefore this variation and the variation above (no Project, No Pipeline Alternative) are both addressed.

Assuming that a CSFM waiver is granted, the Applicant would have to install additional valves along the pipeline in order to comply with AB 864 and BAT requirements, similar to the proposed Project pipeline design. The installation of these additional valves would require some construction activities and some limited clearing at multiple locations along the pipeline ROW.

The existing pipeline is insulated, and therefore there would be no need for heaters at the Sisquoc Pump Station or the installation of the gas pipeline.

The installation of valves would most likely be at locations similar to the proposed Project valve installations as the pipeline would follow a similar ROW and similar terrain.

Hazards are associated with risks to the public from a spill and subsequent fire, as well as impacts from a spill to the environment, impacts to schools and potential wildfire impacts. The existing pipeline is a larger diameter pipeline, and therefore the draindown spill volumes would be larger than the proposed Project. This results in potentially larger spills and larger fires, impacting more people, as well as larger spills to the environment. In addition, the frequency of a spill from the existing pipeline would be higher due to its age and the potential for the cathodic protection to be compromised by the insulation. These factors have been incorporated into the analysis presented below.

### Risks to Public Safety

**Impact RISK.1** describes the potential spill sizes and the estimated frequency of spills from the pipeline system and the potential for immediate (fires, etc.) health impacts on the public.

### Crude Pipeline Spill Volumes

The spill volumes for this alternative were calculated based on the pipeline size, which would be larger than the proposed Project, and the associated terrain for different segments of the pipeline. The Applicant

Exhibits - Page 149

provided a risk assessment for the proposed Project and this analysis was utilized to estimate the spill volumes associated with a larger pipeline size. Figure 5.6-11 shows the estimated spill volumes along the pipeline route for each segment as a worst case for that segment. The worst-case sized spill volume is shown in Table 5.6-16 for the different portions of the crude oil pipeline alternative.

*Crude Pipeline Spill Frequencies*

Spill frequencies from a crude pipeline are based on the PHMSA failure rates for the California pipeline database. The PHMSA base failure rate for crude oil pipelines is shown in Table 5.6-17. The spill frequencies are adjusted for the pipeline potential higher failure rate due to the compromised cathodic protection system and the potential for corrosion under the insulation issues. This correction is based on the CSFM report (CSFM 1993) indicating a five times increase in failure frequencies for pipelines that are not equipped with cathodic protection over the average failure rate. In addition, because the existing pipeline is older, it could experience a higher failure rate due to age. However, the CSFM study indicated a minimal increase in failure rate for pipelines that are less than 40 years old and the PHMSA database used to estimate the base failure rate includes many older pipelines. Therefore, only the five times factor was applied as an estimate of the increased failure rate for this pipeline.

**Figure 5.6-11    No Project – Existing Pipeline Restart Alternative Spill Volume by Segment Milepost**



Source: based on Applicant QRA and EFRD 2019, with adjustments for the size of the existing pipeline.

Draft Print
07/25/2024 12:45:32 PM

**Table 5.6-16    No Project – Existing Pipeline Restart Alternative Crude Pipeline Worst Case Spill Volumes**

| Location | Proposed Project - Maximum Spill Volume, gallons | Alternative - Maximum Spill Volume, gallons |
|---|---|---|
| LFC – Gaviota Plant | 84,000 | 126,000 |
| Gaviota – Sisquoc | 131,040 | 284,594 |
| Sisquoc - Pentland | 198,030 | 657,893 |
| Coastal Segments | 117,600 | 237,344 |

Source: based on Applicant QRA and EFRD 2019, with modification to address spill duration of 60 minutes. Coastal segments include up to valve station 2-500. Includes the installation of additional valve stations as per the proposed Project locations.

**Table 5.6-17    No Project – Existing Pipeline Restart Alternative Crude Pipeline Spill Frequencies**

| Location | Spill Frequency | Return Period, years rupture/leak/total |
|---|---|---|
| PHMSA California Crude oil base rate | 1.62 per 1,000-mile years | - |
| Adjustment due to Pipeline Condition | 5.3 factor | - |
| PHMSA Adjusted Rate | 8.56 per 1,000-mile years | - |
| Failure rate for L901R (49.2 miles) | 0.43 failures per year | 9/3/2 years |
| Failure Rate for L903R (74.1 miles) | 0.63 failures per year | 6/2/2 years |
| Failure Rate for L901R + L903R | 1.07 failures per year | 4/1/1 years |

Source: based on Applicant QRA and EFRD 2019 with CSFM 1991 adjustment factor. PHMSA data since 2010. The return period is the anticipated period between releases. Includes leaks and ruptures.

*Crude Pipeline Population Densities*

The population densities along the route are based on estimates for remote, rural, low density and high-density areas with some additions for highways. The population densities are similar to those used for the proposed Project except for the area through the City of Buellton, since the existing pipeline would pass through the City of Buellton and the proposed Project would pass around the City of Buellton to the west.

*Crude Pipeline Fires*

In the event of a spill of oil and subsequent ignition resulting in a pool fire, the heat (i.e., thermal radiation) from the fire could result in a serious injury or fatality. The assumptions for impacts would be the same as for the proposed Project.

*Gas Pipeline*

The proposed gas pipeline would not be installed as part of this alternative since heaters at Sisquoc would not be installed.

*Alternative Pipeline: Public Safety Risk*

The combination of scenario frequency and consequences is combined to estimate risk using FN curves. FN curves are depictions of the risk levels of a project and show the frequency (F) of scenarios that could produce a given fatality or injury level (N) or greater. These are presented for the proposed Project in **Impact RISK.1**. Santa Barbara County has established risk thresholds that use societal risk profiles (FN curves) to determine the significance of hazardous material releases. These FN curves address both injury and fatality. The Santa Barbara County's adopted thresholds are generally applicable to fixed facilities and pipelines. The risk FN curves are shown in Figure 5.6-12 and are based on the FN curves developed as part of the Plains 2019 QRA analysis, with adjustments for the existing pipeline (increased pipeline diameter

Exhibits - Page 151

07/25/2024  12:45:32 PM

and failure frequency). The FN curves would be located within the amber region, and the impacts to public health due to pipeline releases would be **significant and unavoidable.**

**Figure 5.6-12    No Project – Existing Pipeline Restart Alternative Pipeline Risk FN Curves**



Source: Plains 2019 with modifications

***Risks to the Environment***

A spill of crude oil from the pipeline could impact resources in the vicinity of the pipeline ROW. See Section 5.2 Biological Resources, Section 5.4 Cultural Resources and Section 5.9 Hydrology and Water Quality for a discussion of the impacts of a crude oil spill on biological, hydrological and cultural resources along the crude oil pipeline ROW.

*Crude Pipeline Spill Volumes*

The spill volumes are discussed above under **Impact RISK.1**. For the public health assessment under **Impact RISK.1**, a worst-case spill shutdown time of 15 minutes was used due to the already conservative analysis for fires and impacts to the public used in the QRA. However, for spills that could affect the environment, a longer duration is used. As evidenced by the May 2015 Refugio spill, there is the potential for a pipeline shutdown to take longer than 15 minutes.

*Crude Pipeline SCADA System*

The SCADA system used for the alternative would be the same as that used for the proposed Project since the SCADA system would be required to be updated per CSFM and AB864 requirements.

Exhibits - Page 152

*Proposed Project Pipeline: Spills Affecting Marine Resources*

Portions of the pipeline extend along the Santa Barbara County coastline. A crude oil spill could drain from the spill location through existing culverts or drainages and enter the marine environment. This is what occurred during the May 2015 Refugio Beach spill. An estimated 43 percent of the oil entered the ocean from the Refugio spill location, which was an estimated 750-foot pathway from the ocean shoreline. Because the proposed pipeline is located onshore at various distances from the shoreline, a rupture at different locations spilling the same amount of oil could allow for oil to enter the marine environment. Assuming a linear function of oil being trapped and adsorbed onshore with distance, the maximum amount of oil could enter the ocean where the pipeline is closest to the ocean and potential worst-case spill volumes are large. An estimated maximum amount of 71,621 gallons of crude oil could enter the ocean at the worst-case spill location. An estimated 11.8 miles of the 16.6-mile coastal portion (71 percent) of the pipeline would be vulnerable to spills entering the ocean if a spill were to occur along any of those segments and the adsorption rate were similar to that which occurred during the Refugio spill. This assumes that no rain event is occurring and that drainages are not flowing.

There are a number of variables affecting the amount of oil that could reach the ocean from an onshore spill, including the terrain, the location of drainages under the freeway and the railroad tracks, the soil type, and extent of rocky interfaces as well as the amount of moisture. During a rain event, when drainages and creeks are flowing, a spill into the waterways could follow the flow and enter the marine environment more readily. A spill under these conditions would also have more extensive terrestrial impacts and reach the marine environment more readily but would also be subjected to turbulence and mixing along the drainages.

For inland areas, the area with the largest potential impacts is along the Cuyama River. Based on the elevation profile and the spill volumes, the maximum spill volume along the Cuyama River segments of the pipeline (between proposed Project valve 3-800 and 5-400 nearest the Cuyama River) and using the absorption rate as seen in the Refugio spill, a spill along the Cuyama River portion of the pipeline could impact resources a distance as far as about 3,200 feet, which means that pipeline segments within about 3,200 feet of the Cuyama River could potentially impact the river in the event of a spill.

*Potential Impacts*

Depending on the location of the spill, the environmental conditions, and the biological resources present, Impact RISK.2 short and long-term effects to biological resources associated with a crude oil spill has the potential to be significant and unavoidable. Mitigation measures RISK.1-1 through RISK.1-7 would apply. Due to the increased size and frequency of spills, this significant and unavoidable impact would be a greater severity than that presented by the proposed Project.

**Risks to Schools**

For **Impact RISK.3** (schools), the pipeline construction activities for the existing pipeline would only affect areas near the proposed valve installations. The existing pipeline is located about 500 feet from the Oak Valley School in western Buellton. In order to address the risk levels to this school, the California Department of Education (CDE) school siting risk protocol was utilized to determine the risk levels.

The assessments demonstrated that the risk levels are acceptable under the CDE Risk Protocols with a Total Individual Risk/Individual Risk Criteria (TIR/IRC) ratio of 0.29, with a 1.0 TIR/IRC ratio being the CDE Protocol threshold. It is important to note that the CDE protocol examines the individual risk at the closest school and does not examine the risks cumulatively along the entire pipeline route. Because the CDE

Exhibits - Page 153

07/25/2024  12:45:32 PM

Protocol indicates acceptability for the closest school to the pipeline route, risks to schools and the impacts of hazardous materials would be **insignificant**.

### Risks of Wildfires

For **Impact RISK.4**, operations of the pipeline generally would not involve activities that could generate sparks or other fire control issues because the pipeline would be located below ground. However, operationally the pipeline valve stations would involve the use of emergency generators, which have hot exhausts and could potentially create sparks and start a wildfire if not sufficiently controlled or areas are not cleared of combustible materials.

Construction of the pipeline valve stations would involve some clearing of materials, including brush and grasses and trees, which could be ignited by hot exhaust systems from construction equipment or sparks from welding activities and could generate a potential impact.

The pump station operations would represent no change to the overall fire hazards at the LFC facility and at other pipeline pump stations. However, valve station generators or construction activities through very high fire hazard areas could produce significant impacts. With mitigation measures RISK.4-1 through RISK.4-4, including fire prevention measures and appropriate firefighting capabilities, impacts would be **significant but mitigable**.

### 5.6.4.2   Mitigation Measures

All mitigation proposed under the proposed Project would be applicable to this alternative variation of the existing pipeline use.

### 5.6.4.3   Residual Impacts

Residual significant and unavoidable impacts would exist for the public safety risks and for the crude oil spill risks.  The severity of the significant and unavoidable crude oil spill risk impact would be greater under this alternative than under the significant risk identified for the proposed Project.

### 5.6.4.4   Significance Conclusions

### CEQA Significance Conclusions

CEQA significance for this alternative where the existing pipeline is utilized would be as follows for each of the impacts identified for the proposed Project:

- **RISK.1,** public safety risks, would be **significant and unavoidable**.  This is an increase over the proposed Project from insignificant;

- **RISK.2**, spill risks, would be **significant and unavoidable** with greater severity than the proposed Project with mitigation measures RISK.2-1 through RISK.2-7 applicable;

- **RISK.3**, for risks to schools, would be **insignificant;** and

- **RISK.4**, for wildfire risks**,** would be **significant but mitigable** with mitigation measures RISK.4.1 through RISK.4-4 applicable.

No new impacts, aside from those above, would be realized with this alternative over the proposed Project.

Exhibits - Page 154



07/25/2024  12:45:33 PM

*NEPA Significance Conclusions*

The NEPA significance conclusions are the same as the CEQA significance conclusions discussed above.

### 5.6.4.5  Cumulative Effects

Cumulative effects would be the same as the proposed Project, except that the **cumulatively significant and unavoidable** crude oil spill risks would be greater severity.

## 5.6.5    Alternative A (Construction of a Greater [Further West] Reroute around the City of Buellton)

Under the Construction of a Greater [Further West] Reroute around the City of Buellton Alternative, the proposed Project would be installed in the same location as the proposed Project pipeline except that the pipeline location near Buellton would be installed further west and farther away from Buellton.

### 5.6.5.1  Environmental Impacts

All impacts associated with this alternative would be the same as the proposed Project except that the pipeline would be longer, as it is located farther west of Buellton, by about 6,675 feet.  In addition, the pipeline would pass through less densely populated areas as it would be farther away from the Buellton. The longer pipeline would cause the failure rate to increase slightly and may cause the pipeline spill volume to marginally increase as well.  Overall pipeline failure frequency would increase by about one percent.  The FN curves associated with public safety **Impact RISK.1** would be slightly less severe as shown in Figure 5.6-13 due to the lower population density along this alternative route and would remain insignificant.

**Impact RISK.2** related to crude oil spill volumes would increase in severity slightly with this alternative as the pipeline would be longer, and the resulting spill frequency would increase by about one percent. **Impact RISK.2** would remain **significant and unavoidable**.

**Impacts RISK.3** related to schools would continue to be **insignificant** under the CDE criteria yet would be reduced in severity as the pipeline would be moved farther away from the schools.

**Impact RISK.4** would remain the same as the proposed Project and would be **significant but mitigable**.

Exhibits - Page 155

**Figure 5.6-13    Alterative A Project Pipeline Risk FN Curves**

 

### 5.6.5.2    Mitigation Measures

Mitigation measures would be the same as the proposed Project.

### 5.6.5.3    Residual Impacts

Residual significant and unavoidable impacts would remain for the crude oil spills, with slightly greater severity than the proposed Project.

### 5.6.5.4    Significance Conclusions

***CEQA Significance Conclusions***

CEQA significance for this alternative where the pipeline is routed more west of Buellton would be as follows for each of the impacts identified for the proposed Project:

- **RISK.1,** public safety risks, would be **insignificant**.  There is a slight decrease in severity over the proposed Project, and still remains insignificant;

- **RISK.2**, spill risks, would be **significant and unavoidable** with slightly greater severity than the proposed Project with mitigation measures RISK.2-1 through RISK.2-7 applicable;

- **RISK.3**, for risks to schools, would be **insignificant;** and

- **RISK.4**, for wildfire risks**,** would be **significant but mitigable** with mitigation measures RISK.4.1 through RISK.4-4 applicable.

Exhibits - Page 156

07/25/2024  12:45:33 PM

No new impacts, aside from those above, would be realized with this alternative over the proposed Project.

### *NEPA Significance Conclusions*

The NEPA significance conclusions are the same as the CEQA significance conclusions discussed above.

### 5.6.5.5  Cumulative Effects

Cumulative effects would be the same as the proposed Project.

## 5.6.6  Alternative B (Use of Existing Pipeline Trench [Removing Existing Pipeline and Install Replacement Pipeline in Same Trench])

Under the Use of Existing Pipeline Trench Alternative, the proposed Project would be installed in the same trench as the existing pipeline and the existing pipeline would be removed entirely. An exception is the area near Buellton, where the pipeline would be rerouted and follow the proposed Project route.

### 5.6.6.1  Environmental Impacts

Impacts related to Hazardous Materials and Risk of Upset would be related to operation of the crude oil pipeline and the potential for spills resulting in fires or environmental impacts. This alternative would deviate from the existing pipeline route at the City of Buellton and would utilize the proposed Project route around the City of Buellton. Therefore, **Impact RISK.1** (public safety) would produce the same risks to the public as the proposed Project due to the use of the same route which would pass through the same population areas. Impacts would be **insignificant.**

**Impact RISK.2** (environmental impacts) would also be the same as the proposed Project as the pipeline **route** would be similar to the proposed Project, valves would be installed at the same locations and environmental resources would be the same. Mitigation measures RISK.2-1 through RISK.2-7 would be applicable to this alternative. Impacts would be **significant and unavoidable.**

**Impact RISK.3** (schools) would be the same as the proposed Project and impacts would be **insignificant.**

**Impact RISK.4** (wildfires) would be the same as the proposed Project. As construction activities related to valve stations, pump stations and segments of the pipeline and valve generators exhaust during operations could potentially produce an increased risk of wildfires, mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable.**

### 5.6.6.2  Mitigation Measures

Mitigation measures would be the same as the proposed Project and all mitigation measures would be applicable.

### 5.6.6.3  Residual Impacts

Residual impacts would be the same as the proposed Project and would be significant and unavoidable for crude oil spills (RISK.2), insignificant for public safety risks (RISK.1) and schools (RISK.3), and significant but mitigable for wildfire (RISK.4).

Exhibits - Page 157

07/25/2024  12:45:33 PM

### 5.6.6.4  Significance Conclusions

*CEQA Significance Conclusions*

CEQA significance conclusions would be the same as the proposed Project.

*NEPA Significance Conclusions*

The NEPA significance conclusions are the same as the CEQA significance conclusions discussed above.

### 5.6.6.5  Cumulative Effects

Cumulative effects would be the same as the proposed Project.

## 5.6.7   Alternative C (Reduced Temporary Construction Corridor at Eight Waters of the U.S Crossings)

This alternative would follow the same route and construction techniques as the proposed Lines 901R and 903R. Other elements of the proposed Project, including pipeyards, installation of valve stations, improvements to existing pump stations, and construction of new pump stations, would be the same under this alternative. This alternative includes a reduced temporary construction corridor (50 feet) at eight of the 123 open trench locations.  Otherwise, all activities would be the same as the proposed Project.

### 5.6.7.1  Environmental Impacts

Impacts related to Hazardous Materials and Risk of Upset would be related to operation of the crude oil pipeline and the potential for spills resulting in fires or environmental impacts. This alternative would have the same pipeline route and operations as the proposed Project. Therefore, **Impact RISK.1** (public safety) would produce the same risks to the public as the proposed Project due to the use of the same route which would pass through the same population areas. Impacts would be **insignificant.**

**Impact RISK.2** (environmental impacts) would also be the same as the proposed Project as the pipeline route would be the same as the proposed Project, valves would be installed at the same locations and environmental resources would be the same. Mitigation measures RISK.2-1 through RISK.2-7 would be applicable to this alternative. Impacts would be **significant and unavoidable.**

**Impact RISK.3** (schools) would be the same as the proposed Project and impacts would be **insignificant.**

**Impact RISK.4** (wildfires) would be the same as the proposed Project. As construction activities related to valve stations, pump stations and segments of the pipeline and valve generators exhaust during operations could potentially produce an increased risk of wildfires, mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable.**

### 5.6.7.2  Mitigation Measures

Mitigation measures would be the same as the proposed Project and all mitigation measures would be applicable.

Exhibits - Page 158

### 5.6.7.3  Residual Impacts

Residual impacts would be the same as the proposed Project and would be significant and unavoidable for crude oil spills **(RISK.2)**, insignificant for public safety risks **(RISK.1)** and schools **(RISK.3)**, and significant but mitigable for wildfire **(RISK.4)**.

### 5.6.7.4  Significance Conclusions

***CEQA Significance Conclusions***

CEQA significance conclusions would be the same as the proposed Project.

***NEPA Significance Conclusions***

The NEPA significance conclusions are the same as the CEQA significance conclusions discussed above.

### 5.6.7.5  Cumulative Effects

Cumulative effects would be the same as the proposed Project.

## 5.6.8  Alternative D (Construction of Line 901R and Restart of a Portion of Existing Line 903 Pipeline)

Under this alternative, only the proposed Line 901R (approximately 49.3 miles) would be constructed from Las Flores Canyon to the Sisquoc Pump Station. From the Sisquoc Pump Station, oil would be transported through the existing portion of Line 903 from the Sisquoc Pump Station to the Pentland Delivery Point.

### 5.6.8.1  Environmental Impacts

The impacts of this alternative would be a combination of the proposed Project for the first section of the pipeline (SYU to Sisquoc) and the no project alternative, existing pipeline restart for the section of the pipeline between Sisquoc and Pentland.

As the pipeline between Sisquoc and Pentland would utilize the existing, larger diameter pipeline, the spill sizes would be larger along this section of the alternative pipeline.  In addition, as this pipeline would be older and insulated, it could experience higher rates of failure than the new pipeline, as discussed under the no project alternative, existing pipeline restart variation.

For **Impact RISK.1**, public safety, almost all of the public exposure is located between SYU and Sisquoc, primarily the City of Buellton.  The public exposure from Sisquoc to Pentland is minimal.  Therefore, the FN curves defined by the proposed Project would be about the same as this alternative and risk levels would be insignificant.

For **Impact RISK.2**, spill volumes along the Sisquoc to Pentland portion of the pipeline would be larger, relating in potentially larger spills if a leak or rupture were to occur.  Figure 5.6-11 and Table 5.6-16 show the graphs of spill volumes for the Sisquoc-Pentland portion as well as the worst-case spill volumes.  As part of the pipeline would be new, without insulation, and would have a lower failure rate, the overall pipeline failure rate would be lower than the no project alternative, existing pipeline restart, with the overall spill frequency being once every six years for large spills and once every two years for small spills. Impacts would be significant and unavoidable, as per the proposed Project, except that the severity would increase as the potential spill sizes along the Sisquoc to Pentland segments and the overall pipeline spill frequency would increase.

Exhibits - Page 159

07/25/2024  12:45:33 PM

For **Impact RISK.3**, impacts to schools would be the same as the proposed Project and would be insignificant.

For **Impact RISK.4**, for wildfire risks, impacts would be similar to the proposed Project, mitigations measures RISK.4-1 through RISK.4-4 would still be applicable, and impacts would be significant but mitigable.

### 5.6.8.2  Mitigation Measures

Mitigation measures would be the same as the proposed Project.

### 5.6.8.3  Residual Impacts

Residual significant and unavoidable impacts would remain for the crude oil spills, with greater severity than the proposed Project.

### 5.6.8.4  Significance Conclusions

*CEQA Significance Conclusions*

CEQA significance for this alternative where new pipeline is installed between SYU and Sisquoc, and the existing pipeline is utilized between Sisquoc and Pentland, would be as follows for each of the impacts identified for the proposed Project:

- **RISK.1**, public safety risks, would be **insignificant**.  There is a slight increase in severity over the proposed Project, and still remains insignificant;

- **RISK.2**, spill risks, would be **significant and unavoidable** with greater severity than the proposed Project with mitigation measures RISK.2-1 through RISK.2-7 applicable;

- **RISK.3**, for risks to schools, would be **insignificant;** and

- **RISK.4**, for wildfire risks**,** would be **significant but mitigable** with mitigation measures RISK.4.1 through RISK.4-4 applicable.

No new impacts, aside from those above, would be realized with this alternative over the proposed Project.

*NEPA Significance Conclusions*

The NEPA significance conclusions are the same as the CEQA significance conclusions discussed above.

### 5.6.8.5  Cumulative Effects

Cumulative effects would be the same as the proposed Project.

## 5.6.9  Alternative E (Trucking to the Pentland Delivery Point)

Under the Trucking to Pentland Alternative, the proposed Project would involve the installation of a truck loading rack at the LFC facility and the movement of the crude oil via truck to Pentland instead of a pipeline. ExxonMobil has submitted an application to the County of Santa Barbara for the interim movement of crude oil via trucks from the LFC, titled "ExxonMobil Interim Trucking for Santa Ynez Unit (SYU) Phased Restart Project" (County EIR No. 19EIR-00000-00001). Therefore, a scaled-down version of this alternative has been evaluated for environmental impacts in ExxonMobil Project's EIR. Under that

Exhibits - Page 160



07/25/2024  12:45:33 PM

project, trucking would occur seven days per week, 24-hours per day, with no more than 68 trucks leaving the LFC facility within a 24-hour period for the Pentland Facility. Each truck would transport approximately 160 barrels of crude oil (equivalent to 6,720 gallons). Production from the SYU facilities during the ExxonMobil Project's trucking operations would be about 11,200 barrels per day of oil.

Under this alternative, crude oil would be trucked from the Las Flores Canyon Facility to the Pentland Delivery Point. The truck loading rack at the LFC would load and transport up to 252 trucks per day or approximately 40,000 bbls of oil per day. There would be an estimated 15 loading racks installed at the LFC.

### 5.6.9.1   Environmental Impacts

Impacts related to Hazardous Materials and Risk of Upset would be related to operation of the crude oil loading rack and the potential for spills along highways resulting in fires or environmental impacts. Under this alternative, the existing pipeline selected portions would still be removed, and some pipeline construction related to removal would still occur.

***Risks to Public Safety***

**Impact RISK.1** (public safety) would follow a similar analysis as that for pipeline, except it would be applicable to the truck route. The ExxonMobil EIR examined the risks of upset on public safety for the trucking of crude oil. This analysis was utilized and scaled upwards to address the public safety risks associated with the increased level of trucking in this alternative over the ExxonMobil Project.

It was assumed that all trucks entering and leaving the LFC facility would use the Refugio Road on and off-ramps at U.S. 101. Trucks traveling to the Pentland Terminal would exit U.S. 101 at the State Route 166 Interchange and use State Route 166 to Basic School Road. The analysis used route specific accident data from the California Highway Patrol Statewide Integrated Traffic Records System (SWITRS) to develop the likelihood of a truck accident rate along each of the proposed transportation routes. In developing the overall truck accident rate, one of the sources of data used was route specific accident data from the State of California that covered the years 2012 to 2016. The accident data was categorized by road segment for the proposed truck routes. Local influences on accident data associated with road access, road gradients, visibility and weather are inherently included within these route specific accident rates.

The length of the route from LFC to the Pentland Terminal is 140 miles. The annual number of truck trips (roundtrips) to the Pentland Terminal would be a maximum 91,980.

In the event of a truck accident that results in the release of crude oil, there is a potential for the crude to ignite, which could result in a pool fire. If the spill does not ignite, then a flammable vapor cloud would form that if ignited by a remote source such as an automobile could result in a flash fire. In the event of a truck accident that results in a spill of oil and subsequent pool fire, the heat (i.e., thermal radiation) from the fire could result in a serious injury for fatality.

Impacts at the LFC facility of a crude oil spill and fire would be limited to those areas on-site and would not impact the public.

Table 5.6-18 shows the frequency of spills and crude oil fires. Table 5.6-19 shows the potential hazards areas associated with spills and fires.

Exhibits - Page 161

07/25/2024  12:45:33 PM

**Table 5.6-18    Trucking Alternative Frequency of Crude Oil Fires and Spills**

| Item | Truck Route to Plains Pentland Terminal |
|---|---|
| Route Length (miles) | 140 |
| Average Incident Rate per million miles | 0.46 |
| Truck Incident Rate per Trip | 6.4E-05 |
| Number of Daily Laden Trips | 252 |
| Number of Annual Laden Trips | 91,980 |
| Truck Incidents per Year (collision and non-collision) | 5.94 |
| Probability of Large Fire on Incident | 0.0043 |
| Frequency of Large Fire per year | 0.026 (1 in 39 years) |
| Probability of Small Fire on Incident | 0.00064 |
| Frequency of Small Fire per year | 0.0038 (1 in 263 years) |
| Probability of a Large Spill per year | 0.13 (1 in 7.8 years) |

Source: ExxonMobil TQRA 2020 with modifications, for laden trucks only.

**Table 5.6-19    Trucking Alternative Hazard Distances for Spill of 160 Barrels of Crude to Pavement**

| Hazard Type | Meteorological Conditions Stability Class /Wind Speed (m/s) | Hazard Distance (feet) | | |
|---|---|---|---|---|
| | | Pool Fire | Thermal Radiation Fatality | Thermal Radiation Injury |
| Large Pool Fire | F/1.5 | 59 | 110 | 160 |
| | D/4 | 59 | 178 | 239 |
| Hazard Type | Meteorological Conditions Stability Class /Wind Speed (m/s) | Hazard Distance (feet) | | |
| | | LFL | | ½ LFL |
| Flammable Vapor Fire | F/1.5 | 69 | | 94 |
| | D/4 | 25 | | 38 |

D Stability – Neutral air stability with minimal mixing.
F Stability – Stable air with windspeeds less than 3 m/s.
LFL – Lower Flammability Limit.
½ LFL – ½ the Lower Flammability Limit.
Source: ExxonMobil TQRA 2020

Santa Barbara County has established risk thresholds that use societal risk profiles (known as F/N curves) to determine the significance of hazardous material releases. These F/N curves address both injury and fatality. The Santa Barbara County's adopted thresholds are generally applicable to fixed facilities when the hazard potential and public exposure is limited to that within the impact range around the facility. Figure 5.6-13 provides the injury and fatality risk profiles (F/N curves) for the proposed truck route to the Pentland Terminal. Risk levels would be in the amber region and are significant.

There are a number of mitigation measures which could help to reduce the risks, including training and hiring and truck inspection protocols. These are listed below. Note that many of these elements would be applicable to the LFC operations and planning as the truck loading facilities would be located within the LFC oil and gas facility.

Exhibits - Page 162

**Figure 5.6-13    Trucking Alternative Risk FN Curves**



Source: ExxonMobil TQRA 2020 with modifications

### Risks to the Environment

**Impact RISK.2**, risks to the environmental, would be applicable. Risks to the environment would exist due to the potential for a spill from a truck accident impacting sensitive biological, water or cultural resources along the trucking route.  The ExxonMobil EIR examined the risks of upset on the environment for the trucking of crude oil, listed a large number of biological, water and cultural resources along the trucking route, which would be the same as the trucking route under this alternative.  The ExxonMobil EIR and concluded that risks to the environment would be significant and unavoidable.  As this alternative would involve substantially more trucks, and a higher frequency of potential accidents, the impacts would also be significant and unavoidable.

### Risks to Schools

**Impact RISK.3** (schools) would be applicable to this alternative as the truck route would pass by a number of schools, including Alan Hancock College and Fester Junior high School in Santa Maria, Family Partnership Charter in Orcutt and the Cuyama Valley High School in Cuyama. The closest portions of these schools to the travel lanes of the highways which would be carrying the laden trucks is 180 feet. As described in the impact zones listed above, none of the impact zones associated with fatalities would reach these schools given a truck accident and subsequent spill and fire. The injury impact for the thermal zone under favorable meteorological conditions would just reach the closest portions of the schools. However, as none of the fatality zones would reach the schools, and only a small portion of the injury zones would reach the schools, the CDE protocol would not be applicable, and risks would be **insignificant**.

Exhibits - Page 163

07/25/2024  12:45:33 PM

*Risk of Wildfires*

**Impact RISK.4** (wildfires) would be similar to the proposed Project for the pipeline removal construction. As construction activities related to valve stations, pump stations and segments of the pipeline removal could potentially produce an increased risk of wildfires during construction, mitigation measures RISK.4-1 through RISK.4-4 would still be applicable. Impacts related to **Impact RISK.4** and wildfires would therefore be **significant but mitigable**.

Risk of wildfires does exist for trucks, as accident associated with trucks can start fires which could evolve into a wildfire. In October 2021, a crude truck crashed east of Santa Maria which started a fire in nearby vegetation and burned about ¼ acre (https://www.ksby.com/news/local-news/crash-involving-oil-tanker-truck-sparks-fire-east-of-santa-maria).  However, fire response was rapid as the truck driver was able to notify the local fire department.  Therefore, wildfire risk from trucks is not anticipated to be significant.

### 5.6.9.2  Mitigation Measures

Table 5.6-20 lists the mitigation measures proposed for addressing potential impacts from the hazardous materials for the trucking alternative.

Note these are the same mitigation measures as prescribed in the ExxonMobil Trucking EIR.

**Table 5.6-20    Mitigation Monitoring and Reporting Program**

| MM # | MM Title | Monitoring/ Reporting Action | Timing & Method of Verification | Agency or County Responsibilities | Applicant Responsibilities |
|---|---|---|---|---|---|
| Alt E – RISK.1-1 | Truck Hazard Mitigation Plan | Prepare and Implement a Truck Hazard Mitigation Plan. | Approval of Hazard Mitigation Plan prior to Issuance of Zoning Clearance. Periodic review of trucking records and site inspections. | P&D review and approval. P&D staff to monitor implementation. | Prepare and submit a Truck Hazard Mitigation Plan as part of CO-TRMPP. Implement Plan requirements for the life of the trucking Project. |
| Alt E – RISK.1-2 | Updated SYU Emergency Plans | Update and implement the SPCC, ERP, and FRP to include the trucking loading operations. | Approval of updated Plans Prior to Issuance of Zoning Clearance. Onsite review of implementation requirements and participation in spill drills. | P&D review and approval. P&D staff to monitor implementation. | Prepare and submit the updates to the SPCC, ERP, and FRP to include the trucking loading operations. Implement requirements of the Plans for the life of the trucking Project. |
| Alt E – RISK.1-3 | Trucking Company Financial Responsibility | Obtain proof of financial responsibility from each trucking company. | Verify proof of financial responsibility prior to use of trucking company. | P&D review and approval of financial responsibility documents. | Obtain financial responsibility documents from truck companies. Assure financial responsibility maintained for duration of trucking contract. |

Exhibits - Page 164

07/25/2024  12:45:33 PM

**Table 5.6-20    Mitigation Monitoring and Reporting Program**

| MM # | MM Title | Monitoring/ Reporting Action | Timing & Method of Verification | Agency or County Responsibilities | Applicant Responsibilities |
|---|---|---|---|---|---|
| Alt E – RISK.1-4 | Trucking Route Oil Spill Contingency Plan | Obtain copy of trucking company Oil Spill Contingency Plan for the trucking routes. | Approval of trucking route Oil Spill Contingency Plan prior to use of trucking company. Onsite review of implementation requirements and participation in spill drills. | P&D review and approval. P&D staff to monitor implementation. | Obtain copy of trucking company Oil Spill Contingency Plan for the trucking routes and assure meets all the specified requirements. |
| Alt E – RISK.1-5 | Oil Spill Response Trailer | Provided to SBCFD funds for the purchase of an oil spill trailer. | Funds for oil spill trailer have been provide to SBCFD prior to shipment of oil from LFC via truck. | SBCFD receives funds for oil spill response trailer. P&D verifies receipt of funds and purchase of trailer. | Provide funds to SBCFD for the oil spill response trailer. |
| Alt E – RISK.1-6 | Unmanned Aerial Vehicle | Provided to SBCFD funds for the purchase of an unmanned aerial vehicle. | Funds for unmanned aerial vehicle have been provide to SBCFD prior to shipment of oil from LFC via truck. | SBCFD receives funds for unmanned aerial vehicle. P&D verifies receipt of funds and purchase of unmanned aerial vehicle. | Provide funds to SBCFD for the unmanned aerial vehicle. |

**Alt E-RISK.1-1   Transportation Risk Management and Prevention Program.**   A Transportation Risk Management and Prevention Program (TRMPP) shall be prepared that addresses the various aspects of truck operation safety with the goal of minimizing the potential for an accident or release to occur. The Plan shall include the following:

7.   Drivers shall have a minimum of two years of commercial driver experience for hazardous materials, plus extensive training in defensive driving, emergency response, and other driving skills and shall be subject to a drug and alcohol testing program;

8.   Drivers shall be trained on Project-specific requirements, including loading and transportation procedures, local traffic concerns and hazards, driver safety, and driver courtesy;

9.   Drivers shall be trained to use dedicated routes;

10. All trucks shall be linked to an integrated fleet geographical information management system that provides real-time satellite tracking and mapping of locations, speeds, and other parameters;

11. The geographical information management system shall be used to set and measure compliance to speed limits, acceleration, and de-acceleration for trucks in a specific area and/ or at a specific time of day;

12. All tanker trucks shall be equipped with dual-sided dashboard video cameras;

13. All tanker trucks shall be equipped with Roll Stability Control (RSC) systems;

Exhibits - Page 165

14. The fleet shall operate an Electronic Driver Vehicle Inspection Report system, integrated with its maintenance system;

15. Truck carriers shall be required to complete a Crude Oil - Motor Carrier Safety Survey prior to starting shipments from LFC to assure proper contractor selection;

16. Crude oil trucks shall be equipped with speed monitor and limiting systems;

17. LFC Operators shall have an approved procedure for the trucks to follow during the truck loading that includes over filing and grounding protections;

18. All crude oil trucks shall be model year 2017 or newer; and

19. LFC operations personnel shall conduct a safety and operability inspection of each crude oil truck and truck driver prior to loading and prior to departing from LFC. Any crude oil truck or driver that receives an unsatisfactory inspection shall no longer be permitted to transport crude from LFC until the issue has been corrected.

In addition, incident and annual reporting procedures shall be included.

**PLAN REQUIREMENTS and TIMING:** The Truck Hazard Mitigation Plan shall be submitted to P&D for review and approval prior to issuance of the Zoning Clearance.

**MONITORING:** P&D shall verify implementation of the approved Truck Hazard Mitigation Plan through review of incident and annual reports, and site inspection as needed throughout Project operations.

**Alt E-RISK.1-2    Updated SYU Emergency Plans.**  The following existing plans shall be updated to include the trucking operations that would occur at the LFC facility.

a. **LFC Spill Prevention Control and Countermeasure Plan (SPCC) –** Section 2.6 shall be updated to cover the truck loading racks. The section shall include a brief description of the rack and loading operations, and the measures in place to avoid releases of oil;

b. **LFC Emergency Response Plan (ERP) -** The ERP shall be updated to include the truck loading operations with the FLC facility. This shall include a discussion of the actions to be taken in the event of an oil spill from the loading operations, and trucks traveling within the LFC facility including reference to other emergency plans; and

c. **SYU Facility Response Plan (FRP)** – The FRP shall be updated to include the truck loading operations with the LFC facility. This shall include a discussion of the actions to be taken in the event of an oil spill from the loading operations, and trucks traveling within the LFC facility including reference to other emergency plans.

**PLAN REQUIREMENTS AND TIMING:** The updated emergency plans shall be submitted to P&D for review and approval prior to issuance of the Zoning Clearance. The requirements of the approved Emergency Plans shall be implemented by the Owner/Applicant as necessary in the event of a spill with the LFC facility. The Owner/Applicant shall report its implementation of emergency measures to P&D consistent with the Santa Barbara County's Emergency Notification Guidance Matrix, which is part of the approved LFC Emergency Response Plan.

**MONITORING:** P&D shall conduct on-site inspection(s) to verify and document implementation of emergency action measures.

Exhibits - Page 166

Draft Print

07/25/2024  12:45:33 PM

**Alt E-RISK.1-3    Trucking Company Financial Responsibility.  The** Applicant shall assure that the trucking companies have demonstrated financial responsibility to cover the costs of an oil spill cleanup in the amount of at least $5,000,000.

**PLAN REQUIREMENTS and TIMING:** The Applicant shall provide evidence of financial responsibility from the trucking companies to P&D for review and approval prior to the Applicant using a trucking company to haul SYU crude from the LFC facility. The Applicant may use any of the methods identified in CCR Title 14, Division 1, Subdivision 4, Chapter 2, § 795. (Evidence of Financial Responsibility) to demonstrate financial responsibility. The Applicant shall assure that the financial responsibility is maintained by the trucking company for the duration of the trucking contract.

**MONITORING:** P&D shall review the evidence of financial responsibility on an annual basis for all trucking companies under contract with the Applicant to transport crude oil.

**Alt E-RISK.1-4    Trucking Route Oil Spill Contingency Plan.  The** Applicant shall assure that each trucking company used to haul SYU crude from the LFC facility has an Oil Spill Contingency Plan that covers the trucking routes. The Oil Spill Contingency Plans shall contain at a minimum the following.

    a.  **Spill Notification Procedures –** A list of immediate contacts and phone numbers to call in the event of a threat of or actual spill of oil. This list shall include a designated qualified individual with the trucking company, the California Highway Patrol, the local fire department, California Governor's Office of Emergency Services, State Warning Center, the National Response Center, the spill response organizations listed in the contingency plan, the shipper of the oil, Santa Barbara County Planning and Development, and any other care or treatment organizations listed in the contingency plan. The notification procedures shall contain a checklist of the information that shall be reported to the various parties.

    b.  **Spill Protection Measures –** The contingency plan shall describe measures that reduce or mitigate the potential for truck accidents. Such description may include, but is not limited to the following: (1) Schedules, methods and procedures for testing, maintaining and inspecting the trucks; and (2) items that are included in the design and operation of the trucks that serve to reduce the potential for an accident. At a minimum this would include the measures identified in mitigation measures RISK-1.

    c.  **Resources at Risk –** The contingency plan shall contain the following information for the specific truck routes.

        20. Habitat and shoreline types, as identified in Table 1 and in Appendix C of the National Oceanic and Atmospheric Administration Shoreline Assessment Manual (Aug. 2013), or as identified in the American Petroleum Institute's Options for Minimizing Environmental Impacts of Inland Spill Response (Oct. 2016);

        21. A summary of potential state or federally-listed rare, fully protected, or threatened or endangered species, or state species of special concern, which includes aquatic and terrestrial animal, fish, and plant resources;

        22. A summary of aquatic resources including state fish, amphibians, invertebrates, and plants including important spawning, migratory, nursery and foraging areas;

        23. A summary of potential terrestrial animal and plant resources;

Exhibits - Page 167

07/25/2024  12:45:33 PM

24. A summary of potential migratory and resident bird and mammal, including relevant migration routes, breeding, stopover, nursery, haul-out, and population concentration areas by season; and

25. Identify the following, and include appropriate contacts, as applicable to emergency response: (i) commercial and recreational fisheries areas, aquaculture sites, public beaches, parks, marinas, boat ramps, and recreational use areas; (ii) Industrial, irrigation, and drinking water intakes, dams, power plants, salt pond intakes, and important underwater structures; and (iii) Known historical and archaeological sites, and areas of cultural or economic significance to Native Americans.

The contingency plan may rely on and cite applicable State Area Contingency Plans, Geographic Response Plans, Santa Barbara County Operational Area Oil Spill Contingency Plan, and other sources to identify the information required by items 1 through 5 above.

a. **Response Resources –** The contingency plan shall provide the following:

1. A list of rated oil spill response organizations that are under contract. A rated oil spill response organization is one who has been certified by the California Department of Fish and Wildlife-Office of Spill Prevention and Response pursuant to CCR Title 14, Division 1, Subdivision 4, Chapter 3, Subchapter 3.5 § 819. (Oil Spill Response Organization Ratings). Oil spill response organizations under contract shall include ones for near shore marine, on-waters, and terrestrial services; and

2. A list of properly trained Native American Monitors who are qualified to monitor oil spill cleanup activities.

b. **Training –** The contingency plan shall document that trucking company personnel employed by the plan holder regularly receive training applicable to their role in a spill including but not limited to:

1. Incident command system, including command or general staff position-specific training;

2. Oil spill emergency response training as required by state and federal health and safety laws for trucking company personnel likely to be engaged in oil spill response. The level of training shall be commensurate with the level of engagement for each of the trucking company personnel that would be involved in the oil spill response; and

3. Training records shall be maintained for three years from the date of the training.

c. **Exercises –** The plan holder shall conduct an annual tabletop exercise that covers the following:

1. Notifications: Make actual notifications about the spill scenario to the oil spill response organization, qualified individual, and spill management team listed in the contingency plan, and to the California Governor's Office of Emergency Services and the National Response Center.

2. Staff Mobilization: Assemble the trucking company spill management team and other personnel identified in the contingency plan as appropriate for the training and discuss the approach to spill response along with required roles and responsibilities.

Exhibits - Page 168

07/25/2024  12:45:33 PM

**PLAN REQUIREMENTS and TIMING:** The trucking route contingency plans shall be submitted to P&D and Santa Barbara County Fire for review and approval prior commencing of a trucking company operation to haul SYU crude from the LFC facility. The requirements of the approved contingency plans shall be implemented by the plan holder in the event of a spill along the trucking routes.

**MONITORING:** P&D and Santa Barbara County Fire shall be invited in the annual tabletop drills and in the event of a spill, on-site inspection(s) to verify and document implementation of emergency action measures.

**Alt E-RISK.1-5   Oil Spill Response Trailer.** The Applicant shall fund the cost of an oil spill response trailer for the Santa Barbara County Fire Department to be located at one of the County Fire Stations in Santa Maria. The Applicant funding shall be limited to a maximum of $25,000.

**PLAN REQUIREMENTS and TIMING:** Santa Barbara County Fire shall provide the Applicant with a cost breakdown of the oil spill response trailer and the Applicant shall provide the required funding to Santa Barbara County Fire prior to any oil being hauled via truck from the LFC facility.

**MONITORING:** P&D shall verify that the oil spill response trailer is stationed at one of the County Fire Stations in Santa Maria.

**Alt E-RISK.1-6   Unmanned Aerial Vehicle.** The Applicant shall fund the cost of an unmanned aerial vehicle (UAV) for the Santa Barbara County Fire Department. The Applicant funding shall be limited to a maximum of $8,000.

**PLAN REQUIREMENTS and TIMING:** Santa Barbara County Fire shall provide the Applicant with a cost quote for the UAV and the Applicant shall provide the required funding to Santa Barbara County Fire prior to any oil being hauled via truck from the LFC facility.

**MONITORING:** P&D shall verify that Santa Barbara County Fire has purchased the UAV.

### 5.6.9.3   Residual Impacts

Implementation of mitigation measure Alt E-RISK.1-1 would reduce the likelihood of a truck accident and would serve to reduce the probability of an oil spill impacting public safety.

Mitigation measures Alt E-RISK.1-2 through Alt E-RISK.1-6 would help to improve the response to an oil spill by having truck route specific oil spill response plans and providing additional oil spill response resources. These oil spill plans would allow quicker notification in the event an oil spill and for better coordination with the first responders, particularly Santa Barbara County Fire Department and CDFW-OSPR.

However, even with the implementation of these mitigation measures, the impacts to public safety would be **significant and unavoidable**.

**Impact RISK.2** (environmental impacts) would apply to this alternative as truck accidents and spills into area creeks and waterways could occur, as indicated by the 2020 truck spill into the Cuyama River. However, spill volumes would be smaller than the proposed Project pipeline and would most likely not reach the marine environment if the spill were to occur along the coastal areas and if no water is flowing in area creeks. With water flowing, spills from a truck accident could have substantial reach and impacts could reach the marine environment for a spill along the coast. Impacts would be significant.

Exhibits - Page 169

07/25/2024  12:45:33 PM

Mitigation measures for spills are detailed above under public safety risks. These address issues such as emergency preparedness, resources, and planning. Even with the implementation of these mitigation measures, the impacts to sensitive biological, water, marine and cultural resources would be **significant and unavoidable** if a spill were to impact any of these resources.

### 5.6.9.4   Significance Conclusions

***CEQA Significance Conclusions***

CEQA significance for this alternative where the crude oil is moved by truck would be as follows for each of the impacts identified for the proposed Project:

▪ **RISK.1,** public safety risks, would be **significant and unavoidable**.  This is an increase in impact over the proposed Project, which was insignificant;

▪ **RISK.2**, spill risks, would be **significant and unavoidable** with mitigation measures RISK.2-1 through Alt E-RISK.1-1 through Alt E-RISK.1-5 applicable;

▪ **RISK.3**, for risks to schools, would be **insignificant;** and

▪ **RISK.4**, for wildfire risks**,** would be **significant but mitigable** with mitigation measures RISK.4.1 through RISK.4-4 applicable.

No new impacts, aside from those above, would be realized with this alternative over the proposed Project.

***NEPA Significance Conclusions***

The NEPA significance conclusions are the same as the CEQA significance conclusions discussed above.

### 5.6.9.5   Cumulative Effects

For risk of upset, there are several smaller North County oil development projects identified in the cumulative scenario (see Section 4.0). These smaller projects could add additional oil trucks along portions of U.S. Highway 101 or Highway 166 that would be used by the proposed Project. As indicated in the ExxonMobil Truck EIR, these numbers would be small (about 10 trucks per day) and the cumulative impacts to public safety would therefore be less than the cumulative thresholds (see FN curves and the ExxonMobil Trucking EIR) and would be cumulative less than significant.

As this alternative would present significant and unavoidable risk to the environment, and other crude oil transportation projects would also present incremental increases in the spill risk, the short- and long-term effects of these impacts could be **cumulatively significant and unavoidable** depending upon the location and extent of the spill as well as what resources were affected.

Risks due to wildfires would be mitigated under this alternative and cumulative impacts would be insignificant.

## 5.6.10  References

Baker, Greg. 2018. Summary of the Trustees' Analysis of the Volume of Line 901 Oil Released to the Ocean, National Oceanic and Atmospheric Administration. February 8, 2018.

California Department of Education (CDE). 2007. Guidance for Protocol for School Site Risk Analysis. (Accessed 2021/04/01) https://www.cde.ca.gov/ls/fa/sf/protocol07.asp. Accessed 2020 Apr 1.

Exhibits - Page 170

California Department of Fish and Wildlife (CDFW). 2019. LA Long Beach Area Contingency Plan, v.2019.1 Volume 1, https://wildlife.ca.gov/OSPR/Preparedness/LA-LB-Spill-Contingency-Plan  2021 Mar 15

CalFIRE. 2020. FACT SHEET: California's Fire Hazard Severity Zones California Department of Forestry and Fire Protection Office of the State Fire Marshal. https://www.sccgov.org/sites/dpd/DocsForms/Documents/Fire_Hazard_Zone_Fact_Sheet.pdf. Accessed 2021 Jan 1.  Accessed 2020 Apr 1.

EPA. 2013. NOAA Technical Memorandum NOS OR&R 43, ALOHA® (Areal Locations Of Hazardous atmospheres) 5.4.4, Technical Documentation, November 2013

Kern County. 1991. Hazardous Waste Management Plan, https://psbweb.co.kern.ca.us/planning/pdfs/haz_waste_mgt_plan.pdf Accessed 11/4/2021

Kern County. 2009. General Plan, https://kernplanning.com/planning/planning-documents/general-plans-elements/,  Accessed 11/4/2021

Kern County. 2018. Unit Strategic Fire Plan, March 2018

Kern County. 2020. Multi-Jurisdictional Hazard Mitigation Plan, http://mitigatehazards.com/county-of-kern/kern-hmp-docs/, Accessed 11/4/2021

National Academy of Sciences (NAS). 2019. Schulhof, M. and Grifman, P. Workshop report: Improving oil spill preparedness and response in Santa Barbara, CA. USCSG-TR-01-2019. https://dornsife.usc.edu/assets/sites/291/docs/SB_Oil_Spill_Report_final_8.19.19.pdf Accessed 2021 Mar 15.

Pipeline and Hazardous Materials Safety Administration (PHMSA). 2016. Pipeline Hazardous Materials Safety Administration, Failure Investigation Report, PLAINS Pipeline LP Line 901 Crude Oil Release, May 19, 2015. Santa Barbara County, California. May 2016.

Pipeline and Hazardous Materials Safety Administration (PHMSA). 2020. Accident Data, (Accessed 4/2020) https://www.phmsa.dot.gov/data-and-statistics/pipeline/data-and-statistics-overview. Accessed 2020 Apr 1.

Plains. 2018. Application Materials, including Surge Study (Sept 28, 2018), EFRD Analysis (July 10, 2017), SCADA Operating Parameters (Feb 7, 2018).

Plains. 2019. Quantitative Risk Assessment, Plain Pipeline Project. By SCS Engineers; June 2019. As part of the Plains Application submittal.

San Luis Obispo County (SLOC). 2013. Hazardous Materials Emergency Response Plan; San Luis Obispo County/Operational Area. November 2013.

San Luis Obispo County (SLOC). 2016. Emergency Operations Plan; revised December 2016.

Santa Barbara County (SBC). 1984. SYU project (Environmental Impact Statement/Report (EIS/EIR) Sant Ynez Unit/Las Flores Canyon Development and Production Plan [June 1984] and Supplemental Environmental Impact Report (SEIR) Exxon Santa Ynez Unit Project [August 1986]).

Santa Barbara County (SBC). 2000. Santa Barbara County Comprehensive Plan. Safety Element Supplement. Board of Supervisors Resolution 00-56.

Exhibits - Page 171

07/25/2024  12:45:34 PM

Santa Barbara County (SBC). 2016. 2015 Refugio Oil Spill After-Action Report and Improvement Plan, (accessed 2021/01/20)http://countyofsb.org/ceo/oem/refugioAfter-ActionReport.sbc. Accessed 2020 Apr 1.

Santa Barbara County (SBC). 2020. Final Supplemental Environmental Impact Report, ExxonMobil Interim Trucking for Santa Ynez Unit (SYU) Phased Restart Project, County EIR No. 19EIR-00000-00001, County Case No. 17RVP-00000-00081, State Clearinghouse No. 2018061035, July 2020 https://www.countyofsb.org/plndev/projects/energy/ExxonMobil-InterimTrucking.sbc. Accessed 2021 Aug 10.

Santa Barbara County (SBC). 2021. Santa Barbara County Environmental Thresholds and Guidelines Manual, revised January 2021. https://cosantabarbara.app.box.com/s/vtxutffe2n52jme97lgmv66os7pp3lm5

United Kingdom Health and Safety Executive (UKHSE). 2001. Reducing Risks, Protecting People, HSE's Decision Making Process. 2001.http://www.hse.gov.uk/risk/theory/r2p2.pdf. Accessed 2020 Apr 1.

U.S. Geological Survey (USGS). 2020. California River and Streams Data. https://waterdata.usgs.gov/ca/nwis/dv?referred_module=sw&search_site_no_match_type=anywhere&format=station_list&sort_key=site_no&period=31. Accessed 2020 Apr 1.

Exhibits - Page 172


**Table of Contents**

5.6  Hazardous Materials and Risk of Upset......................................................................................5.6-1

5.6.1        Environmental Setting/Existing Environment ...........................................................5.6-1

5.6.1.1      Area Communities and Environmental Resources .......................................................5.6-1

5.6.1.2      Wildfire Risk.................................................................................................................5.6-2

5.6.1.3      Las Flores Canyon Fire Protection ...............................................................................5.6-2

5.6.1.4      Agency Spill Response ..................................................................................................5.6-3

5.6.1.5      Marine Spill Response.................................................................................... 5.6-95.6-5

5.6.1.6      Plains Spill Response..................................................................................... 5.6-105.6-5

5.6.1.7      Refugio Oil Spill ............................................................................................ 5.6-105.6-6

5.6.1.8      Refugio Oil Spill Lessons Learned ................................................................. 5.6-125.6-8

5.6.1.9      Baseline Operations Risk of Upset............................................................... 5.6-155.6-10

5.6.2        Regulatory Setting ....................................................................................... 5.6-155.6-10

5.6.2.1      Federal Regulations ..................................................................................... 5.6-155.6-10

5.6.2.2      State Regulations ......................................................................................... 5.6-185.6-13

5.6.2.3      Local Regulations ......................................................................................... 5.6-235.6-18

5.6.2.4      Fire Risk, Prevention, and Protection ........................................................... 5.6-295.6-24

5.6.2.5      Other Applicable Guidelines, National Codes and Standards ........................... 5.6-315.6-26

5.6.2.6      Significance Thresholds ................................................................................. 5.6-325.6-27

5.6.3        Proposed Project .......................................................................................... 5.6-365.6-31

5.6.3.1      Environmental Impacts................................................................................. 5.6-365.6-31

5.6.3.2      Mitigation Measures..................................................................................... 5.6-695.6-64

5.6.3.3      Residual Impacts.......................................................................................... 5.6-705.6-65

5.6.3.4      Significance Conclusions............................................................................... 5.6-715.6-66

5.6.3.5      Cumulative Effects ....................................................................................... 5.6-725.6-67

5.6.4        No Project/No Action Alternative.................................................................. 5.6-765.6-71

5.6.4.1      Environmental Impacts................................................................................. 5.6-765.6-71

5.6.4.2      Mitigation Measures..................................................................................... 5.6-825.6-77

5.6.4.3      Residual Impacts.......................................................................................... 5.6-825.6-77

5.6.4.4      Significance Conclusions............................................................................... 5.6-825.6-77

5.6.4.5      Cumulative Effects ....................................................................................... 5.6-835.6-78

5.6.5        Alternative A (Construction of a Greater [Further West] Reroute around the City of Buellton) 5.6-835.6-78

5.6.5.1      Environmental Impacts................................................................................. 5.6-835.6-78

5.6.5.2      Mitigation Measures..................................................................................... 5.6-845.6-79

5.6.5.3      Residual Impacts.......................................................................................... 5.6-845.6-79

5.6.5.4      Significance Conclusions............................................................................... 5.6-845.6-79

5.6.5.5      Cumulative Effects ....................................................................................... 5.6-855.6-80

5.6.6        Alternative B (Use of Existing Pipeline Trench [Removing Existing Pipeline and Install Replacement Pipeline in Same Trench]) ...................................................................... 5.6-855.6-80

5.6.6.1      Environmental Impacts................................................................................. 5.6-855.6-80

5.6.6.2      Mitigation Measures..................................................................................... 5.6-855.6-80

5.6.6.3      Residual Impacts.......................................................................................... 5.6-855.6-80

5.6.6.4      Significance Conclusions............................................................................... 5.6-865.6-81

5.6.6.5      Cumulative Effects ....................................................................................... 5.6-865.6-81

5.6.7        Alternative C (Reduced Temporary Construction Corridor at Eight Waters of the U.S Crossings)....................................................................................................... 5.6-865.6-81

07/25/2024  12:45:34 PM

5.6.7.1        Environmental Impacts.................................................................... 5.6-865.6-81

5.6.7.2        Mitigation Measures...................................................................... 5.6-865.6-81

5.6.7.3        Residual Impacts ........................................................................... 5.6-875.6-82

5.6.7.4        Significance Conclusions ............................................................... 5.6-875.6-82

5.6.7.5        Cumulative Effects ........................................................................ 5.6-875.6-82

5.6.8          Alternative D (Construction of Line 901R and Restart of a Portion of Existing Line 903 Pipeline) 5.6-875.6-82

5.6.8.1        Environmental Impacts.................................................................. 5.6-875.6-82

5.6.8.2        Mitigation Measures...................................................................... 5.6-885.6-83

5.6.8.3        Residual Impacts ........................................................................... 5.6-885.6-83

5.6.8.4        Significance Conclusions ............................................................... 5.6-885.6-83

5.6.8.5        Cumulative Effects ........................................................................ 5.6-885.6-83

5.6.9          Alternative E (Trucking to the Pentland Delivery Point)................... 5.6-885.6-83

5.6.9.1        Environmental Impacts.................................................................. 5.6-895.6-84

5.6.9.2        Mitigation Measures...................................................................... 5.6-925.6-87

5.6.9.3        Residual Impacts ........................................................................... 5.6-975.6-92

5.6.9.4        Significance Conclusions ............................................................... 5.6-985.6-93

               Cumulative Effects........................................................................ 5.6-985.6-93

5.6.9.5        5.6-985.6-93

5.6.10         References ..................................................................................... 5.6-985.6-93

**List of Tables**

Table 5.6-1     Refugio Beach May 2015 Spill Timeline................................................. 5.6-115.6-7

Table 5.6-2     County of Santa Barbara Potential Significance Classifications for Project Risks 5.6-335.6-28

Table 5.6-3     Applicant-Proposed AMMs Related to Risk of Upset ..................................... 5.6-375.6-32

Table 5.6-4     Proposed Project Crude Oil Pipeline Worst-Case Spill Volumes...................... 5.6-395.6-34

Table 5.6-5     Proposed Project Crude Pipeline SCADA Flow Balancing Performance .......... 5.6-405.6-35

Table 5.6-6     Proposed Project Crude Oil Pipeline Spill Frequencies................................. 5.6-415.6-36

Table 5.6-7     Crude Oil Pool Fires.................................................................... 5.6-425.6-37

Table 5.6-8     Proposed Project Gas Pipeline Risk Analysis Assumptions ............................ 5.6-435.6-38

Table 5.6-9     Proposed Project Pipeline Spill Affected Coastal Zone Drainages................... 5.6-485.6-43

Table 5.6-10    Crude Pipeline Major Stream Data .................................................... 5.6-505.6-45

Table 5.6-11    Mitigation Monitoring and Reporting Program.......................................... 5.6-695.6-64

Table 5.6-12    CEQA Significance Conclusions for the Proposed Project............................. 5.6-715.6-66

Table 5.6-13    Reportable Offshore Spills from SYU Operations (May 2010 through May 2015) ........5.6-725.6-67

Table 5.6-14    1984 EIR Identified Risk of Upset Events for Offshore SYU Operations .......... 5.6-745.6-69

Table 5.6-15    1984 EIR Identified Risk of Upset Events for Las Flores Canyon Operations... 5.6-745.6-69

Table 5.6-16    No Project – Existing Pipeline Restart Alternative Crude Pipeline Worst Case Spill Volumes ................................................................................... 5.6-795.6-74

Table 5.6-17    No Project – Existing Pipeline Restart Alternative Crude Pipeline Spill Frequencies .....5.6-795.6-74

Table 5.6-18    Trucking Alternative Frequency of Crude Oil Fires and Spills ......................... 5.6-905.6-85

Table 5.6-19    Trucking Alternative Hazard Distances for Spill of 160 Barrels of Crude to Pavement 5.6-905.6-85

Exhibits - Page 174

**Draft Print**

07/25/2024  12:45:34 PM

Table 5.6-20    Mitigation Monitoring and Reporting Program.............................................. 5.6-92~~5.6-87~~

**List of Figures**

Figure 5.6-1    Location of Key Fire Stations Along Proposed Pipeline Route ......................................5.6-4
Figure 5.6-2    Santa Barbara County Project Specific Fatality and Injury Risk Thresholds....... 5.6-35~~5.6-30~~
Figure 5.6-3    Spill Volume by Segment Milepost for Crude Pipeline Segments .................... 5.6-39~~5.6-34~~
Figure 5.6-4    Proposed Project Pipeline Risk FN Curves ........................................................ 5.6-45~~5.6-40~~
Figure 5.6-5    Drainage Under Freeway: Arroyo Hondo........................................................ 5.6-49~~5.6-44~~
Figure 5.6-6    Drain Down Spill Volume by Segment – Coastal Areas.................................... 5.6-51~~5.6-46~~
Figure 5.6-7    Flap Valve ........................................................................................................ 5.6-64~~5.6-59~~
Figure 5.6-8    2015 Refugio Spill Storm Drains...................................................................... 5.6-65~~5.6-60~~
Figure 5.6-9    Locations of Spill Response Equipment – Coastal Segments........................... 5.6-66~~5.6-61~~
Figure 5.6-10   Check Valve ...................................................................................................... 5.6-66~~5.6-61~~
Figure 5.6-11   No Project – Existing Pipeline Restart Alternative Spill Volume by Segment Milepost ...5.6-78~~5.6-73~~
Figure 5.6-12    No Project – Existing Pipeline Restart Alternative Pipeline Risk FN Curves... 5.6-80~~5.6-75~~
Figure 5.6-13    Alterative A Project Pipeline Risk FN Curves................................................. 5.6-84~~5.6-79~~
Figure 5.6-13    Trucking Alternative Risk FN Curves .............................................................. 5.6-91~~5.6-86~~

# Exhibit F

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): May 19, 2025**

---

# Sable Offshore Corp.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **001-40111** | **85-3514078** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **845 Texas Avenue, Suite 2920** | |
|---|---|
| **Houston, Texas** | **77002** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(713) 579-6161**
**(Registrant's telephone number, including area code)**

---

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencements communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | SOC | The New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

**Item 7.01**          **Regulation FD Disclosure.**

On May 19, 2025, Sable Offshore Corp. (the "Company") issued a press release announcing restart of oil production at the Santa Ynez Unit and anticipated oil sales from the Las Flores Pipeline System in July 2025. A copy of the press release is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

Also on May 19, 2025, the Company posted presentation materials on its website, www.sableoffshore.com. The presentation materials are attached hereto as Exhibit 99.2 and incorporated herein by reference. These materials may also be used by the Company at one or more presentations with analysts, investors or other stakeholders.

The information contained in the attached press release and presentation materials is summary information that is intended to be considered in the context of the Company's Securities and Exchange Commission filings and other public announcements. The Company undertakes no duty or obligation to publicly update or revise this information, although it may do so from time to time.

The information furnished pursuant to this Item 7.01, including Exhibits 99.1 and 99.2, shall not be deemed "filed" for purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities under that Section and shall not be deemed to be incorporated by reference in any filing made by the Company under the Securities Act or the Exchange Act.

**Cautionary Statement Regarding Forward-Looking Statements**

The information in this Current Report on Form 8-K includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," " may," " believe," " anticipate," " intend," " estimate," "expect," "project," "continue," "plan," forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence production of the SYU assets and the cost and time required therefor; litigation, complaints and/or adverse publicity; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2024, and any subsequent Quarterly Report on Form 10-Q or Current Report on Form 8-K, which are filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this Current Report on Form 8-K.

**Disclaimer: Restart Production**

The SYU assets discussed in this Form 8-K have not sold commercial quantities of hydrocarbons since such SYU assets were shut in during June of 2015 when the only onshore pipeline transporting hydrocarbons produced from such SYU assets to market ceased transportation. There can be no assurance that the necessary permits will be obtained that would allow the onshore pipeline to recommence transportation and allow the SYU assets to recommence sales. If Restart Production (as defined in the purchase and sale agreement, dated November 1, 2022 (as amended, the "Sable-EM Purchase Agreement"), between Sable Offshore Corp., Exxon Mobil Corporation ("EM") and Mobil Pacific Pipeline Company) is not achieved by March 1, 2026, the terms of the Sable-EM Purchase Agreement with EM could result in the SYU assets being reverted to EM without any compensation to Sable therefor.

2

**Item 9.01**        **Financial Statements and Exhibits**

(d)      *Exhibits*

| Exhibit No. | Description of Exhibits |
|---|---|
| 99.1 | Press Release of Sable Offshore Corp., dated May 19, 2025. |
| 99.2 | Presentation Materials. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

3

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sable Offshore Corp.**

Date: May 19, 2025

By: /s/ Gregory D. Patrinely

Name: Gregory D. Patrinely

Title: Executive Vice President and Chief Financial Officer

4

Exhibit 99.1

**Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in July 2025**

**Houston, May 19, 2025** – Sable Offshore Corp. ("Sable," or the "Company")(NYSE: SOC) today announced that as of May 15, 2025, it has restarted production at the Santa Ynez Unit ("SYU") and has begun flowing oil production to Las Flores Canyon ("LFC"). Additionally, with the completion of the Gaviota State Park anomaly repairs on the Las Flores Pipeline System (the "Onshore Pipeline") on May 18, 2025, Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by the Consent Decree, the governing document for the restart and operations of the Onshore Pipeline.

Seven of the eight sections of the Onshore Pipeline have been successfully hydrotested. Sable will complete the final hydrotest in order to meet the final operational condition to restart the Onshore Pipeline as outlined in the Consent Decree. Sable expects to fill the ~540,000 barrels of crude oil storage capacity at LFC by the middle of June 2025 and subsequently recommence oil sales in July 2025.

**Production Restart**

- On May 15, 2025, Sable initiated the flow of oil production from six wells on Platform Harmony of the SYU to LFC at a rate of ~6,000 barrels of oil per day.

- Sable has been testing wells on Platform Harmony throughout May 2025 and the well tests have performed consistently stronger than they did at the time of shut-in on May 19, 2015 when the SYU produced approximately 45,000 barrels of oil equivalent per day.

- Approximately 30% of the 32 producing wells at Platform Harmony have been tested as of May 18, 2025 with the remaining Platform Harmony wells projected to be tested over the course of the next several days.

- Sable expects to initiate production from the additional 44 wells on Platform Heritage and the additional 26 wells on Platform Hondo in July 2025 and August 2025, respectively.

**Updated Guidance**

| | 2H25 Guidance | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Prior Guidance (1)** | | | **Updated Guidance (2)** | | |
| **Production** | | | | | | |
| Net Average Daily Production (BOE/D) | 20,000 | — | 25,000 | 40,000 | — | 50,000 |
| Working Interest (%) | | 100.0% | | | 100.0% | |
| Average Net Revenue Interest (%) | | 83.6% | | | 83.6% | |
| **Cash Costs ($ / BOE)** | | | | | | |
| Lease Operating Expense | $ 17.00 | — | $ 19.00 | $ 11.00 | — | $ 13.50 |
| *% Fixed LOE* | | | | *75%* | *—* | *85%* |
| Gathering, Processing & Transportation | $ 2.50 | — | $ 3.50 | $ 2.50 | — | $ 3.50 |
| Cash General & Administrative | $ 4.50 | — | $ 5.50 | $ 2.50 | — | $ 3.50 |
| Severance & Ad Valorem Taxes (% of Revenue) | 0.5% | — | 1.0% | 0.5% | — | 1.0% |
| **Operational Capex** | | | | | | |
| Facilities Capex ($MM) | $ 50 | — | $ 60 | $ 50 | — | $ 60 |
| Workover Capex ($MM) | 20 | — | 30 | 20 | — | 30 |
| Total Capex ($MM) | $ 70 | — | $ 90 | $ 70 | — | $ 90 |

(1) *Prior production and operational capex guidance reflect 2H25 guidance as of March 2025. Prior cash costs guidance reflects 4Q24 guidance as of May 2024.*

(2) *Updated guidance amount is based on production level well test data at the time of the 2015 shut in, initial Harmony well results, the anticipated restart of production at Heritage and Hondo in Q3 2025, management's best estimates based upon numerous technical data points such as bottom-hole pressures, material balance calculations and estimates, reservoir simulations, management experience operating producing assets offshore California, and planned capital expenditures. Deviations from the anticipated timing and magnitude of such assumptions may impact actual results.*

**Management Commentary**

"SOC is proud to have safely and responsibly achieved first production at the Santa Ynez Unit" said Jim Flores, Chairman and Chief Executive Officer. He continued, "The impressive well tests from Platform Harmony confirm the prolific nature of the Santa Ynez Unit reservoir after being dormant for ten years. SOC is excited about our development plan and prospects for the future. This milestone achievement is a result of a tremendous amount of effort from all of Sable's employees, contractors, Board of Directors, stakeholders, and suppliers. We are very grateful for the cooperation and partnership from our local community and regulatory bodies as we seek to provide energy security to the State of California."

**About Sable**

Sable Offshore Corp. is an independent oil and gas company, headquartered in Houston, Texas, focused on responsibly developing the Santa Ynez Unit in federal waters offshore California. The Sable team has extensive experience safely operating in California.

**Forward-Looking Statements**

The information in this press release include "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence production of the SYU assets and the cost and time required therefor; global economic conditions and inflation; increased operating costs; lack of availability of drilling and production equipment, supplies, services and qualified personnel; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainties; litigation, complaints and/or adverse publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2024, and any subsequent Quarterly Report on Form 10-Q or Current Report on Form 8-K, which are filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this press release.

**Disclaimers**

*Restart Production*

The SYU assets discussed in this press release have not sold commercial quantities of hydrocarbons since such SYU assets were shut in during June of 2015 when the only Onshore Pipeline transporting hydrocarbons produced from such SYU assets to market ceased transportation. There can be no assurance that the necessary permits will be obtained that would allow the Onshore Pipeline to recommence transportation and allow the SYU assets to recommence sales. If Restart Production (as defined in the purchase and sale agreement, dated November 1, 2022 (as amended, the "Sable-EM Purchase Agreement"), between Sable Offshore Corp., Exxon Mobil Corporation ("EM") and Mobil Pacific Pipeline Company) is not achieved by March 1, 2026, the terms of the Sable-EM Purchase Agreement with EM could result in the SYU assets being reverted to EM without any compensation to Sable therefor.

Exhibits - Page 182

*Use of projections and estimates*

This presentation contains financial projections and estimates for Sable, including with respect to its future capital expenditures, initial timing and production estimates and future cash costs. Sable's auditors have not audited, reviewed, compiled or performed any procedures with respect to the projections and estimates for the purpose of their inclusion in this presentation, and, accordingly, no such auditors have expressed an opinion or provided any other form of assurance with respect thereto for the purpose of this presentation. These projections and estimates are for illustrative purposes only and should not be relied upon as being necessarily indicative of future results. The assumptions and estimates underlying the projected information are inherently uncertain and are subject to a wide variety of significant business, regulatory, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projected information. Even if the assumptions and estimates are correct, projections and estimates are inherently uncertain due to a number of factors outside Sable's control. Accordingly, there can be no assurance that the projected results are indicative of Sable's future performance or that actual results will not differ materially from those presented in the projected information. Inclusion of the projected information in this presentation should not be regarded as a representation by any person, including, without limitation, Sable, that the results contained in the projected information will be achieved.

**Contacts**

Investor Contact:
Harrison Breaud
Vice President, Finance & Investor Relations
IR@sableoffshore.com
713-579-8111



# Disclaimer

**FORWARD LOOKING STATEMENTS**

The information in this presentation includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this presentation, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence production of the SYU assets and the cost and time required therefor, production levels once recommenced; commodity price volatility; low prices for oil and/or natural gas; global economic conditions and inflation; increased operating costs; lack of availability of drilling and production equipment, supplies, services and qualified personnel; processing volumes and pipeline throughput; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainties; the uncertainty inherent in estimating oil and natural gas resources and in projecting future rates of production; reductions in cash flow and lack of access to capital; restrictions in existing or future debt agreements or structured or other financing arrangements; managing growth and integration of acquisitions, and failure to realize the expected value of acquisitions; the ability to recognize the anticipated benefits of the business combination; developments relating to our competitors and our industry; litigation, complaints and/or adverse publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2024, and any subsequent Quarterly Report on Form 10-Q or Current Report on Form 8-K, which are filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this presentation.

**RESTART PRODUCTION**

The SYU assets discussed in this presentation have not sold commercial quantities of hydrocarbons since such SYU assets were shut in during June of 2015 when the only Onshore Pipeline transporting hydrocarbons produced from such SYU assets to market ceased transportation. There can be no assurance that the necessary permits will be obtained that would allow the Onshore Pipeline to recommence transportation and allow the SYU assets to recommence sales. If Restart Production (as defined in the purchase and sale agreement, dated November 1, 2022 (as amended, the "Sable-EM Purchase Agreement"), between Sable Offshore Corp., Exxon Mobil Corporation ("EM") and Mobil Pacific Pipeline Company) is not achieved by March 1, 2026, the terms of the Sable-EM Purchase Agreement with EM could result in the SYU assets being reverted to EM without any compensation to Sable therefor.

**OIL AND GAS RESOURCE INFORMATION**

This presentation includes information regarding estimates of oil and natural gas resources attributable to the SYU. None of the oil and gas resources attributable to the SYU are currently classifiable as proved or other reserves because, since the cessation of operations on the pipeline transporting production from the assets, there has been no means to deliver production from the assets to market. Sable has obtained a report (the "NSAI Report") from Netherland, Sewell & Associates, Inc. ("NSAI"), independent petroleum consultants, with respect to the net estimated contingent resources attributable to the acquired assets and the related pre-tax discounted (at 10%) future net contingent cash flow from such contingent resources, as of December 31, 2021, based on 12-month unweighted arithmetic average of the first-day-of-the-month prices for each month in the period from January to December 2021. As defined by the Society of Petroleum Engineers and used in the NSAI Report, "contingent resources" are those quantities of petroleum which are estimated, on a given date, to be potentially recoverable from known accumulations, but which are not currently considered to be commercially recoverable. Contingent resource estimates may be characterized further as 1C (low estimate), 2C (best estimate) and 3C (high estimate). The contingent resources reflected in the NSAI Report are, as stated in the report, category 1C (low estimate). The NSAI Report states that the estimates included in the report are contingent on (1) approval from federal, state and local regulators to restart production, (2) reestablishment of oil transportation systems to deliver production to market, and (3) commitment to restart the wells and facilities. The NSAI Report states that, if these contingencies are successfully addressed, some portion of the contingent resources estimated in the report may be reclassified as reserves but notes that the estimates have not been risked to account for the possibility that the contingencies are not successfully addressed. The NSAI Report does not address (1) the portion of the contingent resources that could be reclassified as reserves if the contingencies are successfully addressed or (2) whether or to what extent any of the contingent resources that could be so reclassified would be classified as proved, probable or possible reserves. As defined in the Society of Petroleum Engineers' Petroleum Resources Management System ("PRMS"), "best estimate" is the most realistic assessment of recoverable quantities if only a single result were reported. There is at least a 50% probability that the quantities actually recovered will equal or exceed the "best estimate." As defined in the PRMS, "low estimate" is a conservative estimate of the quantity that will actually be recovered from the accumulation by a project. There is at least a 90% probability that the quantities actually recovered will equal or exceed the "low estimate." The resource estimates and related future cash flow information included in this presentation reflect management's estimates, based in part on the contingent resources estimated in the NSAI Report and supplemented by management's own estimates of contingent resources attributable to the acquired assets and using the pricing and other assumptions noted in this presentation, of the contingent resources and cash flow that may have been attributable to the acquired assets if the contingencies had been addressed successfully on the date as of which the information is presented. Resource engineering is a process of estimating underground accumulations of hydrocarbons that cannot be measured in an exact way. The accuracy of any resource or reserve estimate depends on the quality of available data, the interpretation of such data, and price and cost assumptions made by reserve engineers. In addition, the results of drilling, testing, and production activities may justify revisions of estimates that were made previously. If significant, such revisions could impact the combined company's strategy and change the schedule of any production and development drilling. Accordingly, resource estimates may differ significantly from the quantities of oil and natural gas that are ultimately recovered.

**USE OF PROJECTIONS AND ESTIMATES**

This presentation contains financial projections and estimates for Sable, including with respect to its future capital expenditures, initial timing and production estimates and future cash costs. Sable's auditors have not audited, reviewed, compiled or performed any procedures with respect to the projections and estimates for the purpose of their inclusion in this presentation, and, accordingly, no such auditors have expressed an opinion or provided any other form of assurance with respect thereto for the purpose of this presentation. These projections and estimates are for illustrative purposes only and should not be relied upon as being necessarily indicative of future results. The assumptions and estimates underlying the projected information are inherently uncertain and are subject to a wide variety of significant business, regulatory, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projected information. Even if the assumptions and estimates are correct, projections and estimates are inherently uncertain due to a number of factors outside Sable's control. Accordingly, there can be no assurance that the projected results are indicative of Sable's future performance or that actual results will not differ materially from those presented in the projected information. Inclusion of the projected information in this presentation should not be regarded as a representation by any person, including, without limitation, Sable, that the results contained in the projected information will be achieved.



2

# Sable Offshore Corp. (NYSE: SOC)

## Premier offshore California asset paired with experienced management team

**High Quality Asset**

### Santa Ynez Unit ("SYU") is a massive oil-weighted resource

- Three offshore platforms located in federal waters north of Santa Barbara, California

- Wholly-owned onshore production treatment facilities

- Discovered in 1968 with significant production history. SYU produced 45,000 boe/d rate at shut-in in 2015

- **Production restarted on May 15, 2025 with significantly improved well tests compared to those at shut-in[1]**

- >100 identified infill drilling and step-out opportunities, along with workovers and ESP[2] installation on existing wellbores

**Santa Ynez Unit**



**Highly-Qualified Stewards of the Asset**

### Sable management are well-qualified to operate Santa Ynez

- Exemplary track record of operating safely in California and offshore[3]

- Demonstrated expertise via numerous awards from state and federal agencies

- Developing strategy for carbon capture and storage ("CCS") leveraging existing infrastructure and access

**Las Flores Canyon Processing Facility**



(1) SYU-produced oil is being held in the Company's storage tanks at LFC while Sable completes the final hydrotest in order to meet the final operational condition to restart the Las Flores Pipeline System as outlined in the Consent Decree. Initial restart of production is higher than expected sustained production and there is uncertainty regarding the amount and timing of production decline from recently opened wells.
(2) Electric Submersible Pump.
(3) While at Plains Exploration & Production, current Sable management team operated platforms included Irene at Point Pedernales and Hidalgo, Harvest and Hermosa at Point Arguello.



3

# SYU History

## Premier offshore project developed by Exxon over 40+ years

### SYU Development Background

- Discovered in 1968, over the course of 14 years Exxon consolidated more than a dozen offshore federal oil leases into a streamlined production unit known as SYU

  – SYU construction began in 1976 with Platform Hondo, with first production in 1981, followed by Platform Harmony and Platform Heritage (both online in 1994); both Harmony and Heritage have dedicated rigs for future development

  – SYU includes 112 wells (90 producers, 12 injectors, 10 idle); sizable inventory of infill drilling and additional step-out drilling opportunities[1]

  – Platforms located 5 to 9 miles offshore Santa Barbara County in shallow water depths of 900-1,200'[2]

- Wholly-owned onshore oil and natural gas processing facility at Las Flores Canyon (not visible from highway)

- Shut in from June 2015 to May 2025 due to pipeline issue (Plains All-American Pipeline ("AAPL") operated)

  – Production at all Exxon platforms and facilities was safely suspended. SYU was placed into a preserved state with regular inspections and maintenance

  – AAPL received Consent Decree and began work to re-start

  – Exxon acquired pipeline from AAPL

- Sable restarted production at SYU Platform Harmony in May 2025 and began flowing production to Las Flores Canyon[3]

- Sable actively evaluating strategy for CCS utilizing existing infrastructure and access





(1) Sable management have identified >100 infill drilling and step-out opportunities.
(2) Primary Reservoir: Miocene Monterey formation (Sour low-gravity oil (4-26 API); Secondary Reservoirs: Oligocene and Eocene oil/gas sandstone (Sweet high-gravity oil (35 API).
(3) SYU-produced oil is being held in the Company's storage tanks at LFC while Sable completes the final hydrotest in order to meet the final operational condition to restart the Las Flores Pipeline System as outlined in the Consent Decree.

**SABLE OFFSHORE**

4

# SYU Technical Overview

## Significant production history and massive resource potential

### Santa Ynez Unit Overview

- Between 1981 and 2014, SYU produced over 671 MMBoe
  - Production averaged 29 MBbl/d and 27 MMcf/d in 2014 (gross), the last full year when the asset was online
  - Low, stable decline anticipated of ~8% on average annually from existing NSAI Low Estimate Base Contingent Resources over the next five years[1]
- Sable has also identified >100 additional infill development and step-out opportunities across the leasehold
  - In 2010, Exxon drilled the world's longest extended-reach well from an existing fixed platform drilling rig, increasing the ability to produce more oil from existing facilities; the well extends more than six miles horizontally



### Robust Production Prior to Pipeline Closure



### 1 Billion + Barrels Recoverable



| SYU Reservoir Characterization | | |
|---|---|---|
| 1,700' | Original Oil Column |
| (300') | Depleted Oil |
| (400') | Gas Cap Expansion |
| 1,000' | Oil Column Remaining |

| Massive Resource | | |
|---|---|---|
| 1,207 | MMBoe of Net Recoverable Total Resources |
| (561) | MMBoe of Net Cum. Prod. |
| 646 | MMBoe of Remaining Total Net Estimated Contingent Resources |

Note: Management estimates are inherently uncertain and subject to numerous risks. Actual results may differ in a material amount from management estimates and projections.
(1) 5-year period begins after production re-start.

**SABLE** OFFSHORE

5

# Las Flores Canyon Infrastructure

**Wholly-owned infrastructure at Las Flores Canyon reduces cash costs**



## Las Flores Canyon Cogeneration & Processing Facility

- Fully integrated oil and gas processing facilities acquired by Sable for managing 100% of the SYU produced volumes with additional capacity for future SYU development

- Gas and NGL volumes sold into the Southern California market to homes and businesses and oil volumes sold at Brent based pricing to local refineries

- Sable management believes that the facilities have been well maintained during the downtime

- Evaluating significant CCS opportunity leveraging existing infrastructure and access

**Transportation Terminal**

**Produced Water Pipeline**

**Crude Storage Tanks**
- 540 kbbl capacity

**Biologic Water Treating Plant**
- Free Oil Removal
- Degassing
- Biological Treatment

**LPG Storage & Loading**

**POPCO Gas Plant**
- Gas Sweetening
- NGL Fractionation
- Sulfur Recovery
- Gas Compression

**Co-Generation Power Plant**
- Gas Turbine (40 MW)
- Steam Generation
- Steam Turbine (10 MW)

**Oil Treating Plant**
- Crude Dehydration
- Crude Stabilization
- Gas Separation & Compression

**Gas Processing Plant**
- Gas Sweetening
- Sulfur Recovery
- NGL Fractionation
- Fuel Gas sent to Power Plant
- CCS opportunities available through existing infrastructure



6

# SYU Acreage Overview

## SYU leases are all located in Federal waters



- **Offshore Position**
  - 16 Federal Leases, ~76,000 acres
  - First leased in 1969
- **Santa Ynez Unit Agreement**
  - Effective date: November 12, 1970
  - Unit blocks: OCS-P 180, 181, 182, 183, 187, 188, 189, 190, 191, 192, 193, 194, 195, 326, 329, 461
  - Sable operated, 100% WI, 83.6% NRI
  - Annual lease extensions granted by the Bureau of Safety and Environmental Enforcement and authorized well re-work since shut-in; supported by quarterly updates
- **Onshore Position**
  - ~1,480 surface acres, facilities occupy ~35 acres
  - Facilities 100% Sable owned

Note: Line 324 and Line 325 were formerly known as Line 901 and Line 903, respectively.

**SABLE** OFFSHORE

7

# Undrilled Inventory



## New Drill Inventory Overview

- Technical opportunity inventory is based on 80-acre drainage area, maturing field from original 120 acre spacing
- Future development strategy focuses on the high-quality Monterey Upper Siliceous reservoir in areas that have undergone increased diagenesis which leads to a more fractures, allowing for greater storage of oil and increased permeability
- Wellbores will be aligned to maximize contact with the primary fracture orientation for the field and average over 2,000' gross perforations per well



# Harmony Platform Commenced Restart Production

## Initial well tests at Harmony Platform have exceeded expectations

**Harmony Platform**

**Production Restart: May 15, 2025**[1]

- Estimated 2H25 net production: ~15.0 – 19.0 MBoe/d[2]
- Wells: 32
- Available well slots: 23-27[3]



**Heritage Platform**

**Estimated Production Restart: July 2025**[4]

- Estimated 2H25 net production: ~19.0 – 23.0 MBoe/d[2]
- Wells: 44
- Available well slots: 15-17[3]



**Hondo Platform**

**Estimated Production Restart: August 2025**[4]

- Estimated 2H25 net production: ~6.0 – 8.0 MBoe/d[2]
- Wells: 26
- Available well slots: 10[3]



(1) SYU-produced oil is being held in the Company's storage tanks at LFC while Sable completes the final hydrotest in order to meet the final operational condition to restart the Las Flores Pipeline System as outlined in the Consent Decree. Initial restart of production is higher than expected sustained production and there is uncertainty regarding the amount and timing of production decline from recently opened wells.

(2) Updated guidance amount is based on production levels at the time of the 2015 shut in, initial Harmony well results, the anticipated restart of production at Heritage and Hondo in Q3 2025, management's best estimates based upon numerous technical data points such as bottom-hole pressures, material balance calculations and estimates, reservoir simulations, management experience operating producing assets offshore California, and planned capital expenditures. Deviations from the anticipated timing and magnitude of such assumptions may impact actual results.

(3) Available well slots include those either actively unused or available for opportunistic reclamation.

(4) The timing of restart of production at Heritage and Hondo platforms is subject to numerous risks. Refer to slide "Disclaimer – Forward-Looking Statements".

**SABLE OFFSHORE**

9

# Sable Operational Plan

**Maintain, re-allocate, and optimize total capital spend to grow initial flush production rates**



Note: Management estimates are inherently uncertain and subject to numerous risks. Actual results may differ in a material amount from management estimates and projections. Proposed development plan is based on market conditions and subject to annual Board approval.
(1)  Reflects midpoint of 2H25 guidance.

# Substantial Resource Base

### Contingent Resource Summary[1][2][3]

| | Net Estimated Contingent Resources | | | | Estimated Cash Flows ($MM) | |
| Resource Category | Oil (MMBbls) | Gas (Bcf) | NGL (MMBbls) | Total (MMBoe) | Capex ($MM) | PV-10 SEC Pricing |
|---|---|---|---|---|---|---|
| NSAI Adjusted Low Estimate Base Forecast[4] | 111 | 121 | 2 | 133 | – | $2,285 |
| ESP Installations Low Estimate[5] | 41 | 33 | 1 | 47 | $100 | 1,013 |
| **Total Low Estimate Contingent Resources** | 151 | 154 | 2 | 179 | $100 | $3,298 |
| Development Drilling Program Best Estimate[6] | 308 | 251 | 4 | 354 | $1,997 | $4,810 |
| Development Workover Program Best Estimate[7] | 98 | 80 | 1 | 113 | 245 | 1,921 |
| **Total Best Estimate Contingent Resources** | 406 | 332 | 5 | 467 | $2,242 | $6,731 |
| **Total Net Estimated Contingent Resources / Total Blended NAV** | **557** | **486** | **7** | **646** | **$2,342** | **$10,029** |

### Net Contingent Resources (MMBoe)

Development Workover Program Best Estimate 113
NSAI Adjusted Low Estimate Base Forecast 133
ESP Installations Low Estimate 47
Development Drilling Program Best Estimate 354

### PV-10 Contingent Resources ($MM)

Development Workover Program Best Estimate $1,921
NSAI Adjusted Low Estimate Base Forecast $2,285
ESP Installations Low Estimate $1,013
Development Drilling Program Best Estimate $4,810

### Contingent Resources by Commodity

NGL 1%
Gas 13%
Oil 86%

(1) Assumes SEC pricing as of April 2024 and effective date of May 1, 2024. April 2024 SEC Pricing: Oil $83.14 / Bbl; Gas $2.40 / MMBtu; NGL $64.85 / Bbl.
(2) Management estimates are inherently uncertain. Actual results may differ in a material amount from management estimates and projections.
(3) Net quantities shown herein are unrisked volumes and may represent levels of uncertainty as to their technical and commercial recovery.
(4) Estimated using NSAI Report Resources at SEC Brent Pricing and Sable management estimated lease operating expenses; low estimate contingent resources with 90% probability of delivering unrisked remaining recoverable volumes from field-wide individual historical well performance. Assumes the wells and facilities will resume operation under similar production and sales conditions present at the time production was suspended.
(5) Low estimate contingent resources with 90% probability of delivering unrisked incremental recoverable volumes from statistical field-wide historical well performance driven by the installation of ESPs.
(6) Best estimate contingent resources with 50% probability of delivering unrisked remaining recoverable volumes from statistical field-wide historical new drill locations in untested fault compartments or sub-accumulations within test fault compartments.
(7) Best estimate contingent resources with 50% probability of delivering unrisked remaining recoverable volumes from existing wellbores calculated from statistical field-wide historical work-over well performance.

**SABLE OFFSHORE**

11

Exhibits - Page 194

# Key Milestones

**Sable is steadily advancing through regulatory and technical milestones**



| | | | | |
|---|---|---|---|---|
| **February 14, 2024** | **May 23, 2024** | **July 11, 2024** | **August 30, 2024** | **September 26, 2024** |
| Completed Business Combination with SOC and $440MM PIPE | BOEM[1] approved assignments of title from XOM to SOC; BSEE[2] approved SOC as operator of SYU | OSFM[3] affirmed Risk Analysis & Implementation Plan | Safety valve settlement agreement with Santa Barbara County | Closed $150MM PIPE |

| | | | | |
|---|---|---|---|---|
| **November 4, 2024** | **December 19, 2024** | **February 12, 2025** | **May 15, 2025** | **Q2 2025** |
| Completed redemption of public warrants for $183.5MM | OSFM[3] approved implementation of enhanced pipeline integrity standards | Received confirmation from Santa Barbara County that certain pipeline repair work is authorized by existing permits | Restarted production at the Harmony Platform[4] | Hydrotest of final pipeline segment in order to meet the final operational condition outlined in the Consent Decree |

**Completed**    **Anticipated**

(1)  Bureau of Ocean Energy Management
(2)  Bureau of Safety and Environmental Enforcement
(3)  California Office of the State Fire Marshal.
(4)  SYU-produced oil is being held in the Company's storage tanks at LFC while Sable completes the final hydrotest in order to meet the final operational condition to restart the Las Flores Pipeline System as outlined in the Consent Decree.

**SABLE** OFFSHORE

12

Exhibits - Page 195

# Health, Safety, and Environmental Highlights

## Sable management team is an award-winning, safe, and prudent California Operator

### Offshore California Highlights



**2004:** Received Santa Barbara County's First and Only "Resolution for Good Operator" Recognizing PXP's Outstanding Operating Performance

**2008:** Santa Barbara County Commendation for Outstanding Maintenance Practices at LOGP



**2011:** Occupational Excellence Achievement Award for 21 PXP locations

**2009-2010:** Perfect Record Award for operating 11,390 employee hours without occupational injury or illness involving days away from work

**2009:** National Industry Leadership Award

**2007-2008:** Occupational Excellence Achievement Awards for Outstanding Safety Practices

Occupational Excellence Achievement Awards for Outstanding Safety Practices



**2004:** Ranked MMS's Best Operator in the Pacific OCS for Safety of Platform and Pipeline Operations

### Onshore California Highlights



**2006:** U.S. Bureau of Land Management Operator of the Year Award

**2006:** Best Management Practices National Award in Habitat Conservation



**2008-2004:** Recipient of the Environmental Lease Maintenance Award

**2006:** Recipient of the Clean Lease Awards

Division of Oil, Gas and Geothermal Resources (DOGGR) Lease Maintenance Award for Outstanding Safety and Lease Maintenance 12 years and 13 years in a row at Packard and San Vicente



**2010:** Occupational Excellence Achievement Award for PXP's California Los Angeles Basin San Vicente and Packard locations



Two commendations from the Air Pollution Control District for Emissions Reductions and Use of Innovative Emissions Control Technology at the Arroyo Grande Oil Field

### Risk Management Partner to Local Communities

- Sable Management has a track record of excellence as a safe and responsible steward of California's onshore and offshore resources
- As PXP, owned / operated offshore Point Arguello (Harvest Platform, Hermosa Platform, and Hidalgo Platform) and Point Pedernales (Irene Platform)
- Onshore operations included Arroyo Grande, Los Angeles Basin, and San Joaquin Valley assets

- *"Due to PXP's generosity and civic mindedness … [using] their facility, nearly 200 firefighters have received important Survival Training"* – Ron Lawrence, **Central Regional Training / Safety Captain LA County Fire Department**
- *"The Culver City Fire Department is forever grateful to Plains Exploration & Production Co. for their continued training support and expertise"* – Tim Wilson, **Captain / Training Officer, Culver City Fire Dept.**



*Platform Heritage*



*Platform Hondo*



*Platform Harmony*

(1) Minerals Management Service (MMS) was reorganized into Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement (BSEE) in 2011.
(2) Division of Oil, Gas and Geothermal Resources (DOGGR) was reorganized into California Geologic Energy Management Division (CalGEM) in 2020.

**SABLE** OFFSHORE

13

Exhibits - Page 196

# Financial Overview

## 2H 2025 Financial Guidance[1]

| | Prior Guidance [2] | | Updated Guidance | |
|---|---|---|---|---|
| **Production** | | | | |
| Net Average Daily Production (BOE/D) | 20,000 | – 25,000 | 40,000 | – 50,000 |
| Working Interest (%) | 100.0% | | 100.0% | |
| Average Net Revenue Interest (%) | 83.6% | | 83.6% | |
| **Cash Costs ($ / BOE)** | | | | |
| Lease Operating Expense | $17.00 | – $19.00 | $11.00 | – $13.50 |
| % Fixed LOE | | | 75% | – 85% |
| Gathering, Processing & Transportation | $2.50 | – $3.50 | $2.50 | – $3.50 |
| Cash General & Administrative | $4.50 | – $5.50 | $2.50 | – $3.50 |
| Severance & Ad Valorem Taxes (% of Revenue) | 0.5% | – 1.0% | 0.5% | – 1.0% |
| **Operational Capex** | | | | |
| Facilities Capex ($MM) | $50 | – $60 | $50 | – $60 |
| Workover Capex ($MM) | 20 | – 30 | 20 | – 30 |
| Total Capex ($MM) | $70 | – $90 | $70 | – $90 |

## Capital Structure

| $MM, unless noted otherwise | Capitalization |
|---|---|
| Share Price (as of 5/16/2025) | $28.86 |
| (x) Common Shares Outstanding, MM[3] | 89.4 |
| **Equity Value** | **$2,580** |
| (+) 1L Term Loan (Net of Deposit)[4] | $855 |
| (–) Cash on Balance Sheet[3] | 189 |
| **Enterprise Value** | **$3,246** |

## Financial Objectives

- *Refinance 1st lien term loan*

    – Optimize capital structure to allow for maximum shareholder returns

- *Implement hedging program*

    – Reduce downside risk while maintaining upside exposure via combination of deferred premium puts and costless collars

- *Institute aggressive shareholder return program*

    – Target fixed quarterly dividend

    – Opportunistically repurchase shares with excess cash

    – Maintain conservative leverage profile

Note: Management estimates are inherently uncertain and subject to numerous risks. Actual results may differ in a material amount from management estimates and projections. Proposed development plan is based on market conditions and subject to annual Board approval.

(1) Updated guidance amount is based on production levels at the time of the 2015 shut in, initial Harmony well results, the anticipated restart of production at Heritage and Hondo in Q3 2025, management's best estimates based upon numerous technical data points such as bottom-hole pressures, material balance calculations and estimates, reservoir simulations, management experience operating producing assets offshore California, and planned capital expenditures. Deviations from the anticipated timing and magnitude of such assumptions may impact actual results.
(2) Prior production and operational capex guidance reflect 2H25 guidance as of March 2025. Prior cash costs guidance reflects 4Q24 guidance as of May 2024.
(3) Private Placement Warrants and Working Capital Warrants have the option to convert on a cashless basis. Common Shares Outstanding as of 5/16/2025.
(4) 1L Term Loan and Unrestricted Cash balances as of 3/31/2025.



14

# Attractive Production & Resources Profile at a Discount

| I | Large Production Base | ~45 MBoe/d<br>Net Production Midpoint Forecast for 2H 2025 | ■ Substantial production base that is ~83% oil with decades of productive history<br>■ Initial well tests consistently performing stronger than they did at time of shut-in on May 19, 2015 when SYU produced 45,000 Boe/d |
|---|---|---|---|
| II | Shallow Decline | ~8% YoY[2][3]<br>5-Year Annual Average Resource Decline | ■ Shallow decline profile reduces reinvestment rate required to maintain projected production |
| III | Attractive Discount to NAV | 1.6x<br>Low Estimate Contingent Resources (Including Workover Program) PV-10 / TEV | ■ Attractive public valuation |
| IV | ~32% Discount to Peer Group on PD Reserves | $11.08<br>TEV / Low Estimate Contingent Resources (Including Workover Program) $ / Boe | ■ Versus peer group average of $16.25[4] |
| V | Deep Inventory Opportunity | >100<br>Identified, Undrilled Opportunities | ■ Highly economic oil development opportunities representing infill and step-out locations with decades of performance history |

Note: Management estimates are inherently uncertain and subject to numerous risks. Actual results may differ in a material amount from management estimates and projections. Market data as of May 16, 2025.
(1) Initial restart of production is higher than expected sustained production and there is uncertainty regarding the amount and timing of production decline from recently opened wells.
(2) 5-year period begins after production re-start.
(3) Based on projected 5-year average annual decline at time of the 2015 shut-in. Given promising initial well results due to increased bottom-hole pressures the go-forward average annual declines may differ from historical projections.
(4) Peer group includes: BRY, CHRD, CIVI, CRC, KOS, MGY, MUR, TALO and WTI.

**SABLE** OFFSHORE

15

Exhibits - Page 198

# Key Investment Highlights

**Premier asset and experienced management team drive shareholder value**

| ✓ | **Attractive Returns** | ▪ Low-Cost, low-decline assets enable an aggressive shareholder return program via dividends and share repurchases |
| --- | --- | --- |
| ✓ | **Primed for Low-Cost Production Growth** | ▪ Modest reinvestment required in the near-term as Sable capitalizes on ESP installations and workovers on existing wellbores |
| ✓ | **Substantial Upside** | ▪ De-risked reservoir first discovered in the 1960's<br>▪ Potential for substantial growth with accelerated development |
| ✓ | **High Operational Control** | ▪ 100% operated with favorable 16.4% royalty burden |
| ✓ | **Conservative Leverage Profile** | ▪ Sable management targeting long-term leverage ratios of ~1.0x to maximize flexibility for distributions and development |
| ✓ | **Access to Infrastructure & End Markets** | ▪ Wholly-owned pipeline and processing helps preserve margin<br>▪ Oil sales contracts linked to Brent Crude |
| ✓ | **HS&E Stewardship** | ▪ Outstanding HS&E[1] and operational track record in California<br>▪ Significant opportunity for CCS utilizing existing assets |

**Santa Ynez Unit is a Differentiated, Value Driven Asset**

(1) Health, safety and environment.

**SABLE** OFFSHORE

16

# Exhibit G

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): **May 27, 2025**

# Sable Offshore Corp.

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-40111** | **85-3514078** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |

| **845 Texas Avenue, Suite 2920**<br>**Houston, TX** | **77002** |
|---|---|
| (Address of Principal Executive Offices) | (Zip code) |

**(713) 579-6161**

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.0001 | SOC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01        Other Events.**

On May 27, 2025 Sable Offshore Corp. conducted a successful hydrotest of the final segment of Line 325 and has now successfully hydrotested all segments of Line 324 and Line 325 (collectively, the "Onshore Pipeline"), satisfying the final operational condition to restart of the Onshore Pipeline as outlined in the Consent Decree. Therefore, no more repairs are required to the Onshore Pipelines prior to restart.

**Item 9.01        Financial Statements and Exhibits**

(d) Exhibits:

| Exhibit No. | Description of Exhibits |
| --- | --- |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

Exhibits - Page 202

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sable Offshore Corp.**

| Date: | May 28, 2025 | By: | /s/ Gregory D. Patrinely |
|---|---|---|---|
| | | Name: | Gregory D. Patrinely |
| | | Title: | Executive Vice President and Chief Financial Officer |