# EXHIBIT G

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 10:15 AM
By: Narzralli Baksh , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **DECLARATION OF RICHARD B. KUPREWICZ IN SUPPORT OF PETITIONERS' EX PARTE APPLICATION FOR STAY, ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** <br><br> [*Filed concurrently with Ex Parte Application for Stay, Order to Show Cause and Temporary Restraining Order*] <br><br> Date:    June 3, 2025 <br> Time:    8:30 a.m. <br> Dept.:    4 <br> Judge:   Hon. Donna G. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

---

1

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

**DECLARATION OF RICHARD KUPREWICZ**

I, Richard B. Kuprewicz, hereby declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called as a witness, would and could testify competently thereto.

2. I am a chemical engineer with over fifty years of experience in the energy industry. For over twenty-five years, I have worked as the president of Accufacts, Inc., which provides independent expert consulting services to assist decision makers in making informed decisions concerning oil and gas pipelines. I provide pipeline safety expertise in areas including (but not limited to): pipeline failure investigation; risk management and risk analysis; pipeline siting, construction, design, operation, and maintenance, training, and control room management, including Supervisory Control and Data Acquisition (SCADA) approaches; leak/rupture detection; integrity management; emergency and spill response; and pipeline safety regulatory development and compliance. Much of my background is grounded in conducting numerous pipeline incident investigations following pipeline rupture tragedies spanning several decades.

3. I have developed and performed safety and risk management and analysis for chemical plants, liquefied natural gas facilities, refineries, and pipelines. I have also consulted for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design.

4. For the past two decades I have been involved as a representative of the public in advancing pipeline safety regulations at the federal and various state levels. From 2004 to 2018, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee (LPAC), to advise the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) on improvements to pipeline safety regulations. After a brief hiatus, the Secretary of Transportation reappointed me in late 2024 to represent the public again on the LPAC. In the early 2000s while serving on the LPAC, I played a significant role representing the public in developing federal integrity management pipeline safety regulations for both liquid and gas transmission pipelines.[1] These regulatory approaches emulated safety process approaches

---

[1] *See generally* 49 C.F.R. §§ 195.551-195.591, 192.901-192.951.

2

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

that I instituted and developed for the City of Bellingham, Washington, to assure that a ruptured pipeline there could be restarted and operated safely. I also served for seven years as a member of the Washington State Citizens Committee on Pipeline Safety ("CCOPS").  Positions to CCOPS are appointed by the Governor.

5.      I am an expert in oil and gas pipeline safety and risk management analysis based on my training, education, and experience. Attached as **Exhibit A** is my curriculum vitae.

6.      I have investigative expertise in the topic of various forms of seam corrosion, such as selective seam corrosion, stress corrosion cracking, and am a recognized expert in early vintage cracking having investigated pipeline ruptures associated with these types of cracking threats.

7.      I was asked by the Environmental Defense Center (EDC) and Center for Biological Diversity (CBD) to utilize my experience and expertise to evaluate safety and integrity issues regarding the proposal to restart the Las Flores Pipeline System, which includes CA-324 and CA-325A/B ("the Pipelines"). A true and correct copy of my report, titled *Evaluation of Las Flores Pipeline System Startup Proposal*, dated December 20, 2024, is attached to this declaration as **Exhibit B**.

8.      The report sets forth my opinion, based on my review of the Consent Decree and other documents, references, and regulations related to the Pipelines, including: the "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016); DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing – Report No.: OAPUS309DNOR (PP136049)" (September 18, 2015); PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H;" CA Code CCR 19 § 2111 – Risk Analysis (2) Pipeline Description (A); 49 CFR § 195.304 Test Pressure; and Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx. In summary, I identified the following technical issues concerning the proposed restart of the Pipelines:

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

a.  The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective.

b.  Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines.

c.  The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation.

d.  Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure.

e.  The poorly designed Pipelines cannot be made as safe as new pipelines.

9.  Following the preliminary approval of the State Waivers for the pipelines, EDC and CBD asked me to review and evaluate the Letters of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld for CA-324 and CA-325A/B ("State Waivers"). A true and correct copy of my report, titled *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*, dated February 21, 2025, is attached to this declaration as **Exhibit C**.

10.  The report sets forth my opinion based on my review of the State Waivers and related documents, references, and regulations, including: Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run; 49 CFR § 452(h)(4)(iii)(H); PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview; Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022; and "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016). My opinion, as set forth in my report, is as follows:

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

a.  The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them.

b.  The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack forming potential on the Pipelines.

c.  The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B.

d.  A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines.

e.  The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate.

11.  Based on the facts I reviewed and my professional analysis, in my opinion the Las Flores Pipeline System is not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of May 2025, in Nipomo, California.

Richard B. Kuprewicz

_____

Richard B. Kuprewicz

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

## Exhibit Index

*[Exhibits Supporting Declaration of Richard B. Kuprewicz in Support of Petitioners' Ex Parte Application for Stay, Order to Show Cause and Temporary Restraining Order]*

| Exhibit | Description | Page No. |
|---|---|---|
| A | Curriculum vitae of Richard B. Kuprewicz | 7-16 |
| B | Evaluation of Las Flores Pipeline System Startup Proposal, dated December 20, 2024 | 17-43 |
| C | Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart, dated February 21, 2025 | 44-55 |

# Exhibit A

## Curriculum Vitae.

# Richard B. Kuprewicz

8151 164th Ave NE
Redmond, WA  98052

Tel:  425-802-1200 (Office)
E-mail: kuprewicz@comcast.net

---

**Profile:**  As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**  **Accufacts Inc.**                              **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

| | |
|---|---|
| **Position:** | President |
| **Duties:** | > Full business responsibility |
| | > Technical Expert |

**Alaska Anvil Inc.**                              **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

| | |
|---|---|
| **Position:** | Process Team Leader |
| **Duties:** | > Led process engineers group |
| | > Review process designs |
| | > Perform hazard analysis |
| | > HAZOP Team leader |
| | > Assure regulatory compliance in pipeline and process safety management |

**ARCO Transportation Alaska, Inc.**             **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

| | |
|---|---|
| **Position:** | Senior Technical Advisor |
| **Duties:** | > Access to all Alaska operations with partial Arco ownership |
| | > Review, analysis of major Alaska pipeline projects |

**ARCO Transportation Co.**                        **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

| | |
|---|---|
| **Position:** | Manager Gas Pipeline Projects |
| **Duties:** | > Project management |
| | > Oil pipeline conversion to gas transmission |
| | > New distribution pipeline installation |
| | > Full turnkey responsibility for new gas transmission pipeline, including FERC filing |

**Four Corners Pipeline Co.**                                   **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**        Vice President and Manager of Operations
**Duties:**          > Full operational responsibility
                     > Major ship berth operations
                     > New acquisitions
                     > Several thousand miles of common carrier and private pipelines

**Arco Product CQC Kiln**                                       **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**        Plant Manager
**Duties:**          > Team building of new facility that had been failing
                     > Plant design modifications and troubleshooting
                     > Setting expense and capital budgets, including key gas supply negotiations
                     > Modification of steam plant, power generation, and environmental controls

**Arco Products Co.**                                          **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**        Operations Manager of Process Services
**Duties:**          > Modernize refinery utilities and storage/blending operations
                     > Develop hydrocarbon product blends, including RFGs
                     > Modification of steam plants, power generation, and environmental controls
                     > Coordinate new major cogeneration installation, 400 MW plus

**Arco Products Co.**                                          **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**        Manager of Refinery Planning and Evaluation
**Duties:**          > Establish monthly refinery volumetric plans
                     > Develop 5-year refinery long range plans
                     > Perform economic analysis for refinery enhancements
                     > Issue authorization for capital/expense major expenditures

**Arco Products Co.**                                          **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**        Operations Supervisor/Process Engineer
**Duties:**          > FCC Complex Supervisor
                     > Hydrocracker Complex Supervisor
                     > Process engineer throughout major integrated refinery improving process yield
                        and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.
Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).
Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

10-22-24

**Exhibits –Page 10**

**Publications in the Public Domain:**

1. "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2. "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3. "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4. "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5. "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6. "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7. "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8. "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9. "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA. Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267. Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac. Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel. Final testimony to the docket submitted May 19, 2023. This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24                                                                                                                Page 8 of 9

**Exhibits –Page 15**

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

10-22-24

**Exhibits –Page 16**

# Exhibit B

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Evaluation of Las Flores Pipeline System Startup Proposal*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**December 20, 2024**

Accufacts Inc. 12-20-24

## Table of Contents

I.    *Executive summary and major findings* ...............................................................1

II.   *Accufacts experience qualifying me as an expert in this matter.*................................3

III.  *A brief historical perspective*........................................................................4

IV.   *The Las Flores Pipeline System.* .......................................................................5

V.    *TIMP regulations are not working to protect the public or the environment.*.........8

      1) Hydrotesting assessments. ..............................................................................8

      2) ILI assessments. ...........................................................................................10

VI.   *The greatest threat on the Las Flores Pipeline System is from external corrosion.*
      ......................................................................................................................11

VII.  *High pipeline operating temperatures accelerate all forms of corrosion.*...........13

VIII. *The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.*......................................14

IX.   *The poorly designed Pipelines cannot be made as safe as new pipelines.*...............14

X.    *Conclusion.* ..................................................................................................15

Accufacts Inc. 12-20-24                                                                    i

## I.    Executive summary and major findings

Accufacts Inc. ("Accufacts") was asked to review the documents related to the Las Flores Pipeline System ("Pipelines") for possible restart.  A Consent Decree signed in March, 2020 places responsibility for approving processes related to the onshore pipeline system restart on the California Office of the State Fire Marshal, or OSFM, the agency responsible for intrastate hazardous liquid pipeline safety.[1]  The Consent Decree replaces various Corrective Action Orders issued on the Pipelines by the Pipeline and Hazardous Materials Safety Administration, or PHMSA, the federal agency responsible for pipeline safety.[2]  PHMSA is the federal agency responsible for establishing minimum pipeline safety regulations for many pipelines operating in the U.S., including intrastate hazardous liquid transmission pipelines.  States meeting certain conditions can impose pipeline safety standards for intrastate pipelines beyond PHMSA regulations as long as such state regulations are not in conflict with PHMSA regulations.  By agreement, the Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed wavier alternative measures "provide an equal or greater level of safety."[3, 4]  The Consent Decree is inadequate, missing many corrosion threats to the Pipelines that can result in rupture.

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1. **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2. **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3. **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4. **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

---

[1] Such state responsibility is dependent on whether the state agency meets certain qualifications required by PHMSA and whether the state Legislature has granted such state authority, as California has.

[2] UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, ex rel. DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, ex rel. CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, ex rel. CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, ex rel. CALIFORNIA STATE LANDS COMMISSION, ex rel. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARCHALL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (Plaintiffs) v. PLAINS ALL AMERICAN PIPELINE L.P. and PLAINS PIPELINE, L.P. (Defendants), Consent Decree, Civil Action No. 2:20-cv-20415 signed March 2020 ("Consent Decree").

[3] *Ibid.,* Appendix B & Appendix D, paragraph 1.

[4] PHMSA website, " Special Permits and State Waivers Overview," at https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

Accufacts Inc. 12-20-24                                                                                   Page 1 of 15

Oil spills are catastrophic events, and operation of any pipeline carries a risk of spill. At best, good pipeline design and pipeline integrity management tools can reduce—but not eliminate—the risk. The Consent Decree is replacing incomplete integrity management ("IM") approaches implemented by Plains that failed to prevent a pipeline rupture from the poor design of the Pipelines, with another incomplete IM approach expecting a change in the outcome.

The Pipelines have been sitting shut down for over nine years at ambient temperatures without effective CP protection.  While external corrosion rates in this shutdown mode are significantly reduced because of lower temperatures as discussed later in this report, **the risk of external corrosion is not eliminated**.  The Consent Decree requires the OSFM to seek a waiver of the federal pipeline safety CP requirements defined under Subpart H, subject to the approval of PHMSA, to permit the Pipelines to restart.[5, 6]  Complicating this matter is the incorporation of risk analysis by the state into the Consent Decree that is under the control of the pipeline operator and is not made fully public, but subject only to the "review and comment" of the OSFM.  To be fair, the OSFM must meet certain state legislated risk analysis requirements that though well-meaning, are incomplete, such as, for example, how to define what a reasonable worst-case discharge is to prudently evaluate the risk of a pipeline failure.[7]  This is a problem I often see abused in federal pipeline oil spill response plans that doesn't adequately capture pipeline rupture hydraulics.[8]  One of the major problems with risk analysis, a determination of the likelihood of an event occurring, and why it is not codified into federal pipeline safety regulations, is that such approaches are usually not complete or representative of the true risks of a specific pipeline operation.  The impacts of any pipeline failure are significant and long-lasting, causing destruction of habitats, death of wildlife, and even human fatalities. It is impossible to predict a pipeline failure, and decision-making based on the perceived probability of failure does not adequately account for the severe consequences that will ensue, particularly if those decisions fail to capture pipeline rupture hydraulics. I call this "Space Shuttle Syndrome," because, in the rush to launch the space shuttle program, NASA decisionmakers understated its true risks and dismissed well established safety culture protocols, resulting in the loss of two space shuttles and their crews and ending the space shuttle program.

The Consent Decree is placing undue responsibilities on the OSFM which might not appreciate the limits of current inline inspection technical capabilities.  The Consent Decree overly relies on ILI technologies and their associated engineering critical assessments that are not capable of prudently addressing many forms of external corrosion, especially interactive forms such as Stress Corrosion Cracking, or SCC, whose time to failure is difficult, if not impossible, to predict as discussed later in this report.  The current poorly designed Pipelines do not permit CP protection to mitigate external corrosion on the Pipelines that must operate at uniquely high temperatures. The required high temperatures accelerate all forms of external corrosion.  New pipelines would incorporate proper design such as non-insulated pipe and newer forms of pipeline coating technology, that would permit CP to be effective in addressing external corrosion even at high temperatures to help assure pipeline safety.  No pipeline waiver issued under the conditions addressed in the Consent Decree is consistent with pipeline safety nor can ensure the same level

---

[5] 49CFR§195 Subpart H - Corrosion Control.
[6] Consent Decree, Appendix B, "State Waivers for Line 901, 903 …..,".
[7] CA Code CCR 19§2111 – Risk Analysis.
[8] 49CFR§194 Response Plans for Onshore Oil Pipelines.

Accufacts Inc. 12-20-24                                                      Page 2 of 15

of safety as that associated with a prudently designed pipeline system. Neither Plains, the pipeline operator at the time of the May 19, 2015 failure, nor the new owner, Sable, designed or built the present Pipelines with their serious deficiencies, but as a pipeline operator Sable bears the ultimate responsibilities should the Pipelines fail.

## II.   Accufacts experience qualifying me as an expert in this matter.

Accufacts Inc. ("Accufacts") was asked to review the Line 901/903 pipelines, now renamed Lines CA-324/CA-325 ("Pipelines"), and related documents such as those produced by the OSFM on their website.  A Consent Decree places responsibility for approving processes related to the onshore pipeline system restart first on the OSFM, then on PHMSA.[9]  The Center for Biological Diversity and The Environmental Defense Center asked Accufacts to provide an independent evaluation of documents related to a possible restart of the Pipelines to safely move heavy oil production from offshore platforms in the Santa Barbara Channel into the Pipelines.  It should be noted that the OSFM has recently issued a waiver on PHMSA's CP obligations for the Pipelines. I have not seen the details related to OSFM's decision on the granting of such a waiver.

I am a chemical engineer with over fifty years of experience in the energy industry, including over 25 years as president of Accufacts Inc. ("Accufacts").  Accufacts provides independent expert consulting services to assist decision makers in making informed decisions concerning pipelines. Pipeline safety expertise is provided in areas including, but not limited to: pipeline failure investigation, risk management/risk analysis, siting, construction, design, operation, maintenance, training, control room management including Supervisory Control and Data Acquisition ("SCADA") approaches, leak/rupture detection, integrity management, emergency and spill response, and pipeline safety regulatory development and compliance.  Much of my background is grounded in pipeline incident investigations following numerous pipeline rupture tragedies spanning several decades.

For the past two decades I have been involved as a representative of the public, which carries special obligations to avoid a conflict of interest, in advancing pipeline safety regulations at the federal and various state levels as demonstrated by my CV that is included as Attachment 1.  For example, I played a significant role representing the public in developing integrity management federal pipeline safety regulations in the early 2000s for both liquid and gas transmission pipelines. These regulatory approaches emulated safety process approaches that I instituted and developed for the City of Bellingham, WA to assure that a ruptured pipeline there could be restarted and operated safely.  This safety process approach, identified as the Pipeline Safety Immediate Action Plan, or PSIAP, identified steps that the pipeline operator was to complete following the Bellingham rupture tragedy of June 10, 1999, before that pipeline could be permitted to safely return to service.  The PSIAP is a matter of public record compliments of Washington State's Right-to-Know laws.  PSIAP formed a template for the integrity management safety regulations developed by the Office of Pipeline Safety, which morphed into PHMSA in 2003.

---

[9] Consent Decree, Appendix B & Appendix D.

Accufacts Inc. 12-20-24                                                              Page 3 of 15

For approximately fifteen years, through the development of federal standards for Transmission Integrity Management Programs ("TIMP") for both liquid and gas integrity regulations, control room management ("CRM"), and Operator Qualification ("OQ") rulemaking efforts, to cite a few pipeline safety rulemaking efforts, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee, or LPAC, to advise PHMSA on possible pipeline safety regulation advancement. After a brief hiatus of several years, I have recently been reappointed by the Secretary of Transportation to represent the public again on LPAC, which carries numerous obligations to avoid a conflict of interest. I believe I am more than qualified to comment as an expert on the various issues related to CA-324/CA-325 pipeline system possible restart.

## III.    A brief historical perspective



**Figure 1 – Overview of Pipelines**

Since the May 19, 2015 onshore pipeline rupture and oil release that spilled into the Santa Barbara Channel and beyond, the pipeline system known at the time as Lines 901/903, and offshore oil platforms feeding this system have been shut down. Lines 901/903 have recently been renumbered CA-324 and CA-325, respectively. These pipelines, which were classified as interstate pipelines at the time of the release, were ordered to be shut down and oil purged from the Pipelines and placed under nitrogen atmospheres under Corrective Action Orders instituted by PHMSA. Line 901 experienced an onshore pipeline rupture failure caused by massive external corrosion and released on the late morning of May 19, 2015 near Refugio State Beach that placed a considerable amount of oil into the sensitive waters of the Santa Barbara Channel and beyond. While the years since 2015 involved discussions for possible construction of new pipelines to replace the poorly

Accufacts Inc. 12-20-24                                                                 Page 4 of 15

designed Lines 901/903, recent activities shifting ownership of the pipelines and associated infrastructure to Sable Offshore Corp. ("Sable"), are now focused on restarting the existing pipelines under new ownership and conditions stated under a Consent Decree.

The May 19, 2015 Line 901 rupture failure occurred at approximately 4 miles (MP 4) downstream of the Las Flores Canyon Pump Station due to extensive external corrosion. The Line 901 ruptured at approximately 56 % of the maximum operating pressure ("MOP") of 1341 pounds per square inch gauge ("psig") (which is 72 % specified minimum yield strength ("SMYS")).[10] In addition, further metallurgical forensic reports attached to the PHMSA Final Report, indicate that pipeline ruptured at a pressure of 737 psig, which was 39.6% of SMYS.[11] This pipeline failed at very low stress levels, not a surprise given that the depth of the corrosion failure was 89% of the measured wall thickness, and the ILI tools significantly mis indicated the size of the corrosion threats.[12]

**Figure 2 – Overview of Pipelines route with MPs estimated**



## IV.    The Las Flores Pipeline System.

The following is based on information readily in the public domain, as demonstrated by the footnote references. Because of many variations in MP numbers in various documents, MP numbers referenced in this report should be considered approximate with slight variations that don't really impact my findings/conclusions/recommendations.

---

[10] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.14 of 23.

[11] DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing, - Report No: OAPUS309DNOR (PP136049)," September 18, 2015, p. iii.

[12] *Ibid.,* "Summary of Observations," p. vi.

The Pipelines, formerly identified as Line 901/903 operated by Plains (aka Plains All American Pipeline L.P. and Plains Pipeline L.P.), represent a pipeline system of approximately 125 miles in length running from the Las Flores Canyon Pump Station (milepost 0) to the Pentland Metering (and Storage) facility (at Milepost 125.3).  Figure 1 is a general overview of the Pipelines routing. CA-224 (old Line 901) that runs from the Las Flores Canyon Pump Station (Milepost 0) to the Gaviota Meter Station (Milepost 10.7).  Note that I have reversed the Milepost reported in PHMSA's Final Report to follow more conventional milepost numbering, increasing from the pipeline inlet at the Las Flores Canyon Pump Station (MP 0), to the pipeline outlet of the 24-inch diameter Line 901/CA-224 pipeline, the Gaviota Metering Station (MP 10.7).  CA-324 is the sole feed into the 30-inch pipeline, CA-325A.  CA-325A runs from the Gaviota Metering Station to the Sisquoc pump station (MP 49.2).  CA-325B, also a 30-inch diameter pipeline, runs from the Sisquoc pump station (MP 49.2) to the Pentland metering station (~MP 125.3).  Figure 2 shows the general route adding approximate MP numbers following this similar MP increasing numbering all the way to Pentland.

According to the PHMSA Final Report on the 2015 rupture:

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.  There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-

Accufacts Inc. 12-20-24                                                                 Page 6 of 15

ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.[13]

**Figure 3 - Approximate Elevation Profile - Las Flores Canyon Pump Station (MP 0) to Pentland Station (MP ~125.3)**



PHMSA provided additional information related to Line 903:

> (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). [14]

> Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds similar to the Affected Pipeline {Line 901}.[15]

It is not clear from the documents produced if Line 903 insulation is also tape wrapped like Line 901, that would further shield the CP system from the Pipelines, assuring that CP is ineffective.

Figure 3 is an approximate elevation profile (approximate elevation of pipeline in feet versus pipeline milepost) for the Las Flores Pipeline System developed by the Center for Biological Diversity's Geographic Information System, or GIS, specialist using information readily available in the public domain. Pipeline elevation profiles play a critical role in understanding liquid transmission pipeline operation and risks, such as evaluating ILI runs, valve placement/actuator decisions, emergency and oil spill actions, and spill response planning. In addition, if a pipeline hydraulic profile, also referred to as a hydraulic gradient, is superimposed on an elevation profile, much information about pipeline risk can be gained. A hydraulic gradient is required of the pipeline operator under California Risk Analysis regulation.[16] A pipeline hydraulic gradient includes a plot of operating pressure versus milepost for a specified crude oil gravity and flow rate, but for this unique system, a crude oil viscosity and temperature should also be included on the

---

[13] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016, pp. 4 & 5 of 21.
[14] *Ibid.,* p. 4 of 21.
[15] PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H," p. 2.
[16] CA Code CCR 19§2111 – Risk Analysis (2) Pipeline Description (A).

hydraulic gradient as these parameters seriously impact the hydraulic gradient evaluation. Such hydraulic gradient information is important in evaluating the risks of a pipeline restart program, especially on the Pipelines given their highly unique elevation profile among other factors (See Figure 3). This information is probably not likely to be made public, though a competent experienced engineer can develop an approximate hydraulic profile for a pipeline system if they understand certain crude oil blended properties and temperatures.

## V. TIMP regulations are not working to protect the public or the environment.

In the passage of the federal pipeline safety regulations setting standards for Transmission Integrity Management Programs, or TIMP, first for liquid, then gas, in 2002 and 2003, respectively, the use of performance-based approaches versus more prescriptive based regulations were agreed to as a compromise to advance important needed pipeline safety regulation in this area. Until the passage of TIMP regulations, pipeline operators were under no obligation to periodically assess the condition of their mainline pipelines. Performance-based regulation, in theory, allows a pipeline operator to choose between various alternatives that may work best for their pipeline. Prescriptive-based pipeline safety regulations historically have been imposed in federal pipeline safety regulatory efforts. Prescriptive regulations impose certain conditions that pipeline operators must, or shall, follow.

TIMP efforts for liquid pipelines define four basic approaches permitted in pipeline integrity assessment, depending on the pipeline threat that a pipeline segment might experience. Briefly, the major assessment methods most appropriate for this pipeline system are hydrostatic pressure testing ("hydrotesting") and inline inspection ("ILI") also known as smart pigging. As the Line 901 onshore oil release that flowed into sensitive waterway areas has clearly demonstrated, TIMP regulation is not working for many pipeline operators, even after the operator had run multiple ILI corrosion tool runs which I will expand on further below. Another unexpected outcome of TIMP performance-based regulation is that such less than clear regulation efforts are harder to enforce.

It's important to note that pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity.

### 1) Hydrotesting assessments.

Properly performed hydrotesting can be an important pipeline integrity assessment tool that proofs a pipeline's fitness for service to safely operate at MOP at the time of the hydrotest. Hydrotesting involves shutting down a pipeline and filling a pipeline segment with water. Proof of pipeline integrity or fitness for service testing is verified by carefully increasing water pressure with a water injection pump after air has been removed and the pipeline segment temperature stabilized. While federal pipeline safety regulations for liquid transmission pipelines define a "Subpart E" hydrotest to establish or verify maximum operating pressure, or MOP, a term having specific meaning in regulation, the regulations are not specific on important parameters to ensure a quality hydrotest that doesn't damage the pipe. Minimum hydrotest pressures are established to verify the MOP at the time of the hydrotest, with

Accufacts Inc. 12-20-24                                                                Page 8 of 15

sufficient pressure safety margin at the time of the hydrotest.  A Subpart E hydrotest is a proof for fitness test that the pipeline, at the time of the test, can withstand pressures above the MOP with a certain margin of pressure safety.[17]

One important caveat is needed regarding Subpart E hydrotests, which are often called strength tests.  For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats that likely exist along the Las Flores Pipeline System—**a subpart E hydrotest is inadequate**.  Current ILI technology cannot reliably identify if such cracking threats are present.  More importantly, nor can associated engineering critical assessments provide prudent evaluation of such threats due to the inability to reliably predict corrosion colonies that can interact or link together in unpredictable ways.  SCC colonies can be associated with disbonded coatings such as that occurring on the Pipelines where CP current is prevented from reaching the outer pipewall steel.  A much higher pressure (higher % Specified Minimum Yield Strength, or SMYS) hydrotest is warranted.  A prudent risk analysis should clearly demonstrate if such external corrosion cracking threats from environmental factors are possible around the Pipelines**.  I need to note that it is not clear whether hydrotesting, if performed, will be a Subpart E test or a higher % SMYS hydrotest intended to address cracking threats such as SCC**.  The Consent Decree strangely makes no mention of corrosion cracking threats or hydrotesting.

While considerable discussion in the Consent Decree has focused on the use of ILI to identify possible general wall loss corrosion threats well before failure, this agreement makes no mention of other forms of corrosion related threats such as corrosion cracking SCC or SSC.  These forms of corrosion cracking are very challenging to identify via ILI, and more importantly, engineering critical assessments associated with ILI to predict time to failure can be highly unreliable, given the inactive threat nature of these type of corrosion cracking threats.  The corrosion cracking threats tend to fail as pipeline ruptures.  It is important that the cracking threat potentials on the Pipelines be prudently addressed and proposed solution be made public and transparent.

For pipeline segments that undergo large elevation changes, like the Line 325A/B segments, the pipeline must be cut up into segments to assure hydrotesting pressure ranges do not permanently deform the pipe.  Hydrotesting can be more expensive than other pipeline integrity assessments such as ILI, but there are no built-in assumptions about the quality and thoroughness of the assessment that can be mismanaged such as that which can and often does occur with ILI approaches resulting in numerous pipeline ruptures after ILI assessments, as the May 19, 2015 release has clearly demonstrated.  Hydrotesting is much more reliable than other pipeline integrity assessment approaches, such as ILI, at verifying a pipeline's fitness for service at the time of the test.  Hydrotesting is usually performed by contractor firms experienced and qualified to perform a proper hydrotest for specific types of threats.  The Consent Decree requires certain threshold general corrosion threats if identified by ILI be remediated before restart.[18]

---

[17] 49CFR§195.304 Test pressure
[18] Consent Decree, Appendix B (4) Integrity Management.

Accufacts Inc. 12-20-24                                                                 Page 9 of 15

Hydrotesting is warranted, justified, and vastly appropriate for the Pipelines which have been sitting for over nine years without effective CP.  I also need to mention that the use of nitrogen gas to idle the pipeline was meant to avoid internal corrosion attack and plays no role in preventing external corrosion attacks to keep the Pipelines in a "corrosion-free state" as mentioned by Steve Rusch, Sable's vice president of environmental and regulatory affairs.[19] The external corrosion sites experience reduced corrosion rates from the lower ambient soil temperatures as no hot oil was passing through the system, but the corrosion sites are not inactive, especially if CP systems are ineffective, such as on the Pipelines.

**2)  ILI assessments.**

In the U.S., ILI or smart pig tool efforts started to develop in the early 1980s depending on the threat a pipeline operator was trying to address.  ILI tools are usually multi-ton devices run inside a pipeline while the pipeline is operating to ascertain the condition of the pipeline depending on the type of threats trying to be analyzed.  Given the advancements in technology including shrinking the equipment, ultrasonic, or UT, approaches that focus on direct anomaly measurement has historically proven superior for general wall thinning corrosion evaluation to approaches using inferred software-based algorithms, such as magnetic flux leakage ("MFL") testing.  Some ILI tools are more suitable than others depending on the threat.  There is a wide spectrum of ILI tools and different technological approaches to select from depending on the type of threat trying to be reviewed.   Operators don't always select the ILI technology best suited to help identify threats on their system.  Even with the advances in tool development and approaches there can still be a wide variation as to whether a specific ILI tool or vendor can properly identify a specific pipe threat and permit it to be further properly characterized after an ILI run.  This is why pipeline operators will incorporate ILI tool tolerances and perform field verification digs to produce "unity plots" for a specific ILI run, to verify ILI vendor claims about their technology and its specific performance.  This field verification data was not shared by Plains with the ILI vendor, a serious deficiency in ILI utilization.  It is worth noting the PHMSA made it a point in their Failure Analysis of the Line 901 release, that the pipeline operator had not provided field dig verification feedback to the ILI vendor to confirm ILI capability.[20]  For example, corrosion attacks can take on many forms such as general pipewall thinning (usually the easiest to determine depending on the ILI technology), various forms of corrosion cracking such as stress corrosion cracking ("SCC"), selective seam corrosion cracking ("SSC"), and pit corrosion.  All such corrosion threats can lead to a pipeline failure and release.  Based on my experience involving investigations of liquid transmission pipeline ruptures from SCC and SSC after ILI runs, some segments of the Pipelines exhibit the potential for SCC or SSC.  Such external corrosion cracking threats are often found on pipelines with disbonded coating that are exposed to corrosion environments such as that introduced by the Pipeline's insulation.  It is incumbent on the new Pipeline operator, Sable, to demonstrate to the OSFM, and to the public and various regulatory agencies that SCC/SSC external cracking environments do not exist.

---

[19] Los Angeles Times article by Tony Briscoe, "*Plan to restart pipeline sparks anger,*" Front page, October 20, 2024.
[20] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.13 of 21.

Accufacts Inc. 12-20-24                                                                                    Page 10 of 15

Some forms of ILI technology to identify certain pipeline threats, if properly managed, can be superior to hydrotesting as they may identify some threats well before they go to failure. As too clearly demonstrated, however, in the May19, 2015 Line 901 rupture, ILI cannot address all forms of external corrosion threat that are likely to exist on the Pipelines because of their poor design, their unique high temperature operation, and ineffectiveness of CP. If a corrosion ILI tool can be utilized within the limits of the pig vendor specification (i.e., such as maintaining pig speed within the operating pipeline), and if the ILI tool run is independently field verified, some ILI tools can be a superior form of assessment for many types of pipeline threats, such as general internal and external corrosion (i.e. wall-thinning) if prudently managed. The more specialized forms of corrosion, cracking and pitting, or corrosion within dents, however, can be much more challenging as ILI tools and their related engineering critical assessments still have technical limits. ILI tool vendors place specific limitations on their various tools, and it is important that the pipeline operator follow such restrictions that can easily invalidate an ILI tool run reading or result. ILI runs in hilly terrain, such as that which exist with the Pipelines (See Figure 3) can be quite challenging for ILI tools that can easily exceed multiple tons in weight as gravity never shuts off.

In investigating numerous pipeline rupture failures after ILI tool runs, I consistently see failures on the part of the pipeline operators to perform sufficient field verification digs to determine if bias is being introduced in a specific ILI tool approach on a specific pipeline segment, for a specific pipeline threat, and that the ILI tool selected is really appropriate to identify certain pipeline threats. Some pipeline operators repeatedly fail to recognize or even consider ILI tool capabilities and tolerances, especially as ILI vendors and pipeline engineers have tried to improve technologies and assessment techniques. It is worth noting that no one markets ILI tools claiming they don't work. An important consideration in integrity management approaches is whether the right ILI technology has been selected and is being prudently utilized by the pipeline operator. It is further worth noting that while running an ILI tool is not inexpensive, the cost of running such a tool is relatively less expensive compared to the overall quality of the field integrity verification program to assure the ILI tool is doing its job for a specific type of pipeline threat, on a specific pipeline segment.

Part of the problem is that many forms of interactive external corrosion pipeline cracking threats cannot be accurately characterized to allow meaningful engineering critical assessments that are reliable. Such assumptions or inability to properly engineer and predict interactive threats introduce significant margins of error to fitness for service predictions using ILI assessments. Just doing ILI reassessments when they really aren't capable of dealing with interactive corrosion threats is an illusion of safety. Basically, performing an inappropriate ILI assessment more often is not the solution as further explained below.

## VI.  The greatest threat on the Las Flores Pipeline System is from external corrosion.

It should not take a pipeline failure to identify that the greatest pipeline integrity threat on the Pipelines is from various forms of external corrosion due to poor design of these Pipelines rendering CP systems ineffective at reducing or preventing external corrosion failure.

Accufacts Inc. 12-20-24                                                                 Page 11 of 15

The PHMSA Final Report stated:

**Proximate or Direct Cause**

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.[21]

PHMSA goes on to list numerous contributory causes, among them a significant observation, "Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised."[22]  This important fact should also play a major role into any decision to restart the Las Flores Pipeline System as explained in further detail in this report.  This critically important PHMSA observation should not come as a surprise to any pipeline operator.  Bottom line, Plains acquired a poorly designed set of Pipelines in the early 1990s that rendered the CP system ineffective at preventing or mitigating external corrosion on a pipeline system operating at high temperatures.  Some years after acquiring the Pipelines and after TIMP regulations were promulgated in late 2002, Plains did not implement an appropriate integrity management program to prevent the pipeline failure from external corrosion attack.  The question now is whether Sable's compliance with the Consent Decree under the approval of the OSFM relying on the capabilities of ILI tools can prevent another failure on the Pipelines?  **Clearly, current ILI technology does not meet an obligation to reliably identify all forms of external corrosion most likely present on much of the Pipelines.**  The CP systems required by PHMSA regulations will not be effective on most of the pipeline mileage in the Las Flores Pipeline System as previously discussed, and from my perspective there is serious doubt as to whether these poorly designed pipelines can be made as safe as new pipelines that have properly functioning cathodic protections.

Regarding the Las Flores Pipeline restart decision and related integrity assessments, it is important to understand how CP systems are supposed to work.  In layman's terms, a CP system impresses a weak current into a pipeline turning the pipeline into a cathode in an electrochemical corrosion cell on the outside of a buried pipeline, to control or reduce external corrosion.  Older nonconducting pipeline coatings such as that which exists on the Pipelines do not allow for CP current to pass through them.  The purpose of the CP system is thus to introduce current to the outer pipewall where the older coatings have been penetrated, such as with holes or tears in the outer coating.  Unfortunately, older pipeline external coatings such as the urethane coal tar outer coatings, like those on the Pipelines, are also well known to not adhere tightly to a pipeline over time, causing coating separation or disbondment.  Such disbondment can result in external

---

[21] *Ibid*, p. 14 of 21.
[22] *Ibid.,* p. 14 of 21.

Accufacts Inc. 12-20-24                                                                      Page 12 of 15

pipewall corrosion cells under the coating, generating many different forms of corrosion, especially SCC and SSC cracking in the wrong environments, that are not protected by CP.  To add to this threat of external corrosion, the Las Flores Pipeline System's external insulation traps and serves as a water conduit further increasing external corrosion as a water fed corrosion attack. And lastly, the Polyken tape wrap installed during pipeline installation around the outside of the insulation is also well known to not be conductive, further shielding and preventing CP current from reaching the outer pipe wall.  **This is a perfect storm or combination of factors all working to render CP ineffective.** Without effective cathodic protections, the pipeline is at particularly high risk of spilling again.  To further underscore the lack of a proper integrity management program, this pipeline operates at elevated temperature that accelerates external corrosion as explained further below.  New types of pipeline coatings now allow the passage of CP current through such coating to mitigate external corrosion even if the coating disbonds from the pipeline.

## VII. High pipeline operating temperatures accelerate all forms of corrosion.

**Figure 4  Los Flores Temperature Data from DNV Line 901 Release (5/19/15) Technical Root Cause Analysis included in PHMSA Final Report.[23]**



If one is experienced in handling/refining the heavy crude oils produced offshore that feed into the Las Flores Pipeline System, this crude oil not only needs to be diluted with natural gas liquids, or NGLs, but the pipeline must be operated at high pipeline temperatures, approximately 135 °F, that also is required to reduce the blended oil viscosity to get the fluid over the main hill beyond the Sisquoc Pump Station to Pentland.  While the PHMSA Final Report mentions 135 °F as a pipeline operating temperature, Figure 4 represents a temperature graph indicting 135 °F was not unusual, but higher fluid temperature to improve the flow and capacity of the Pipelines did occur.

Chemical engineers experienced in reaction kinetics are familiar with the Arrhenius equation which indicates that chemical reaction rates, such as that for corrosion, essentially double for every 10 °C (18 °F) increase in temperature.  This means that the rate of corrosion at 140 °F is about 32

---

[23] *Ibid.,* "Figure 23, L901 Las Flores Station Temperature Data," p. 375 of 510.

Accufacts Inc. 12-20-24                                                                 Page 13 of 15

times that for a pipeline operating at 60 °F, a typical ambient soil condition. Because of the higher viscosity of unblended offshore oil there probably is little opportunity to reduce the Las Flores Pipeline System temperature to help reduce corrosion rates on a pipeline system where the CP system is ineffective. If the Pipelines are returned to operation, all forms of external corrosion will remain a primary threat of concern for pipeline failure.

## VIII.  The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.

It is important to understand that the Consent Decree is just a compromise agreement between the signature parties and may be missing important technical matters related to the Pipelines. I find it odd that many of the technical issues discussed above were not identified or addressed in the Consent Decree. External corrosion cracking risk was well known for many decades to be a threat of concern for pipelines exhibiting disbonded external coating where CP systems are ineffective.

I find it especially strange that Plains the pipeline operator at the time of the Line 901 rupture got itself into serious trouble by failing to understand that the poor design of the Pipelines could not be adequately addressed by ILI. It appears that the Consent Decree continues to foster the illusion that ILI can adequately permit assessment of corrosion risks, especially cracking threats most likely to exist on major segments of the Pipelines (see Figure 3, for example). The Consent Decree doesn't even mention corrosion cracking threats for this system operating at high temperature that exacerbates all forms of external corrosion as previously discussed.

And lastly, I would caution that the Consent Decree gives authority to the OSFM on certain pipeline safety related decisions. These OSFM decisions, however, cannot violate federal pipeline safety regulations and that I believe require a public decision process for PHMSA approval to assure any waiver meets or exceeds the level of safety had the wavier not been requested.

## IX.  The poorly designed Pipelines cannot be made as safe as new pipelines.

Sable's website implies that the Pipelines will be repaired, stating "PPC undertook a comprehensive repair and maintenance program to restore the pipeline to "as-new" condition."[24] As referenced in footnote 19 above, this isn't the only time that a Sable representative has suggested the Pipelines will be restored to "as-new" condition or a "corrosion free" state. A new pipeline would be properly designed such that the federal pipeline safety regulations requiring a CP system would be effective and do its job, while allowing CP monitoring to assure the new pipelines were adequately protected from external corrosion attack by an effective CP design. A new pipeline would not be trying to utilize CP on a pipeline improperly coated, that seriously disbonds from the pipe, with a system insulated to assist in water reaching the outer pipe steel, while operating at higher temperature. All these poor design factors accelerate all forms of external corrosion including cracking. It is a misguided illusion that relying on ILI can attempt to stay ahead of pipeline failure on such a poorly designed system. A cursory review of the PHMSA Final

---

[24] See Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx.

Accufacts Inc. 12-20-24                                                    Page 14 of 15

**Exhibits –Page 33**

Report, Appendix G In-Line Inspection report will indicate that even running ILI tools, it is impossible to return Line 901 to an "as new" condition given the numerous corrosion anomalies.[25] The idea that running ILI tools should be sufficient to assure an "as-new" pipeline condition and safe operation of these poorly designed Pipelines with ineffective CP protection is a false premise, as the Pipelines are far from being in a new condition, with numerous anomalies, given their poor design approach and operating history.

## X.    Conclusion.

Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure.  Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

The above represents my opinions based on experience with too many pipeline rupture investigations.  I reserve the right to update this report if more relevant information is made available.

Richard B. Kuprewicz
President
Accufacts Inc.

---

[25] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara Country, California, - Appendix G In-Line Inspection Report by Lamontagne for the Oak Ridge National Laboratory" May 2016, pp. 44 – 138 of 510.

Accufacts Inc. 12-20-24                                                    Page 15 of 15

**Attachment 1**

## Curriculum Vitae.

# Richard B. Kuprewicz

**8151 164th Ave NE**
**Redmond, WA  98052**

**Tel:  425-802-1200 (Office)**
**E-mail: kuprewicz@comcast.net**

---

**Profile:**        As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

---

**Employment:**      **Accufacts Inc.**                              **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

**Position:**    President
**Duties:**      > Full business responsibility
                 > Technical Expert

**Alaska Anvil Inc.**                              **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

**Position:**    Process Team Leader
**Duties:**      > Led process engineers group
                 > Review process designs
                 > Perform hazard analysis
                 > HAZOP Team leader
                 > Assure regulatory compliance in pipeline and process safety management

**ARCO Transportation Alaska, Inc.**        **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

**Position:**    Senior Technical Advisor
**Duties:**      > Access to all Alaska operations with partial Arco ownership
                 > Review, analysis of major Alaska pipeline projects

**ARCO Transportation Co.**                  **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

**Position:**    Manager Gas Pipeline Projects
**Duties:**      > Project management
                 > Oil pipeline conversion to gas transmission
                 > New distribution pipeline installation
                 > Full turnkey responsibility for new gas transmission pipeline, including FERC filing

10-22-24                                                              Page 1 of 9

**Exhibits –Page 35**

**<u>Four Corners Pipeline Co.</u>**                    **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**    Vice President and Manager of Operations
**Duties:**      > Full operational responsibility
                 > Major ship berth operations
                 > New acquisitions
                 > Several thousand miles of common carrier and private pipelines

**<u>Arco Product CQC Kiln</u>**                      **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**    Plant Manager
**Duties:**      > Team building of new facility that had been failing
                 > Plant design modifications and troubleshooting
                 > Setting expense and capital budgets, including key gas supply negotiations
                 > Modification of steam plant, power generation, and environmental controls

**<u>Arco Products Co.</u>**                          **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**    Operations Manager of Process Services
**Duties:**      > Modernize refinery utilities and storage/blending operations
                 > Develop hydrocarbon product blends, including RFGs
                 > Modification of steam plants, power generation, and environmental controls
                 > Coordinate new major cogeneration installation, 400 MW plus

**<u>Arco Products Co.</u>**                          **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**    Manager of Refinery Planning and Evaluation
**Duties:**      > Establish monthly refinery volumetric plans
                 > Develop 5-year refinery long range plans
                 > Perform economic analysis for refinery enhancements
                 > Issue authorization for capital/expense major expenditures

**<u>Arco Products Co.</u>**                          **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**    Operations Supervisor/Process Engineer
**Duties:**      > FCC Complex Supervisor
                 > Hydrocracker Complex Supervisor
                 > Process engineer throughout major integrated refinery improving process yield
                   and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.
    Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).
    Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

**Publications in the Public Domain:**

1. "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2. "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3. "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4. "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5. "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6. "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7. "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8. "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9. "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

10-22-24                                                                                                    Page 7 of 9

**Exhibits –Page 41**

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA.  Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267.   Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac.  Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel.  Final testimony to the docket submitted May 19, 2023.  This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24                                                                                                                            Page 8 of 9

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

10-22-24

# Exhibit C

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*

**Prepared For**

## The Center for Biological Diversity
## &
## The Environmental Defense Center

**February 21, 2025**

Accufacts Inc. Final

## Table of Contents

I.      Summary...........................................................................................................*1*

II.     The current installation renders the CP system ineffective.....................................*2*

III.    Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless....................................*3*

IV.     This is more than simple corrosion under installation (CUI) issue. .........................*3*

V.      External corrosion on buried pipelines falls into four major categories...............*4*

      1.  Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe............................................................................................................*4*

      2.  Cracking or crack-like corrosion is usually an environmental threat difficult to assess.........................................................................................................*4*

      3.  Pitting corrosion is a special form of wall loss that is difficult to identify via ILI. ...................................................................................................................*5*

      4.  Corrosion within dents is a special form of dent threat............................................*5*

VI.     Types of ILI technology. ......................................................................................*5*

      1.  General wall loss corrosion. .............................................................................*5*

      2.  Cracking corrosion...........................................................................................*6*

VII.    What is the purpose of hydrotesting?....................................................................*6*

VIII.   The illusion that corrosion growth rate can be accurately predicted needs to be explained. ............................................................................................................*7*

IX.     Major state waiver deficiencies:.........................................................................*7*

      1.  A key corrosion performance tracking process step in the state waivers for the Pipelines is missing. ........................................................................................*7*

      2.  A major state waiver deficiency for Line 324. ..................................................*8*

      3.  Major state waiver deficiencies for Line 325A/B. .............................................*9*

X.      Conclusions. .......................................................................................................*9*

Accufacts Inc. Final                                                                                    i

## I.      Summary.

Accufacts Inc. ("Accufacts") was asked to provide my expert opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A, and CA-325B ("Pipelines") made public in mid-January 2025 by the Office of the State Fire Marshal ("OSFM").[1]  This report builds on a previous Accufacts report issued on December 20, 2024."[2]  By agreement, a Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed state waiver alternative measures "provide an equal or greater level of safety."[3]  It is my understainding that PHMSA can choose to: 1) Not comment on this matter allowing the State Waiver to occur and startup to proceed, 2) Not approve the waiver preventing the startup, or 3) Impose additional requirements to assure an equal or greater level of safety to current minimum federal pipeline safety regulations occurs.

The current coating installations do not provide "limited effectiveness of the cathodic protection system," as mentioned by the Decision letters issued by the OSFM.  This I believe is a poor choice of words that understates the fact that the CP system is ineffective on most of the Pipelines' mileage.  The OSFM is thus being asked to grant a state waiver on federal pipeline safety minimum requirements intended to address external pipeline corrosion from an ineffective CP installation, while relying on hydrotesting and various forms of inline inspection, ILI or smart pigging, to avoid pipeline failure from the resulting external corrosion.

The waivers attempt to allow startup of the Pipelines relying mainly on ILI technology to identify corrosion threats before failure.  In addition, the Application by the Pipeline's operator appears to be relying on a circumferential magnetic flux leakage (MFL-C tool) approach run in February 2022 to argue for the removal of federal regulation requiring the 180 day condition for scheduling remediation of "corrosion of or along a longitudinal seam weld."[4, 5]  Our experience with MFL-C tools is that if certain parameters are not incorporated, such ILI tools can miss a lot of cracks.  I see no mention of such important conditions in the referenced letter that would demonstrate that this ILI run is reliable.  I do not see sufficient justification to waive 49CFR452(h)(4)(iii)(H) as such a waiver would not provide an equal or greater level of safety as no carbon steel pipeline, even new modern steel pipelines, are invincible to corrosion attack.

---

[1] OSFM letter to Sable/PPC Offshore Corp, "Letter of Decision on the Sate Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) ("Decision Letter 324") and Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) ("Decision Letter 325A/B")", dated 12/17/24.

[2] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024.

[3] PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

[4] Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run.

[5] 49CFR452(h)(4)(iii)(H).

Accufacts Inc. Final                                                                                          Page 1 of 9

A simple plot of the type and approximate milepost location of external corrosion such as wall loss or cracking, including field as well as ILI indications along the Pipelines, will underscore how challenging the operation of the present Pipelines will be without effective CP.  Such a plot will clearly demonstrate that the Pipelines are not "like new" as indicated by some recent Sable/PPC representatives.  Further explanation is also warranted as to why the pipeline operator assumes there is no SCC or SSC risks associated with water on the Pipelines.

A proposal to replace the Pipelines with a new smaller diameter heated pipeline that would be uninsulated and built with modern unshielding coatings was aborted.[6]  This proposal would have permitted the CP system to do its job addressing external corrosion, while complying with federal pipeline regulation.

## II.    The current installation renders the CP system ineffective.

The construction of Line 324 in the late 1980s utilized coal tar urethane coating applied to the bare steel pipeline, covered by sprayed on insulation to assure the pipeline was operated at higher temperatures.  The insulation was then wrapped with a non-conductive polyethylene tape coating.[7] While there may be some confusion as to the coating installation on what is now named 325A/B, information leads us to believe this coating installation is similar on these pipelines as that on Line 324.   To anyone vaguely familiar with pipeline external corrosion protection and cathodic protection ("CP") intent, this approach is a fundamental failure of design/installation reflecting much inexperience in pipelines.  The polyethylene tape shields and prevents CP current from getting to the external pipeline steel, and the insulation system works to shield while increasing the likelihood of water in close proximity to the pipe, especially in areas where the coal tar coating directly on the pipeline steel has separated, or disbonded, from the pipe.[8]  With such heavy shielding there is thus no way for any CP system current to ever reach the pipeline to reduce/prevent external corrosion.

With the exception of a few feet of buried pipe that has undergone repairs, replacing the existing poor design and coating installations with a few feet of dual epoxy coatings, the shielded CP system is ineffective.  The various threats of external corrosion on the Pipelines are exacerbated by the elevated temperature, the potential for water to accumulate along the Pipelines via the insulation, the application of non-conducting tape wrap around the insulation, and the use of older coal tar coating directly on the pipeline that exhibits separation (aka disbondment) from the pipe steel.  Disbonded coating in the wrong environments is especially conducive to cracking threats, such as SCC or SSC as discussed in this report.  I have seen no convincing arguments that water environments conducive to corrosion cracking are not around or under the coating on the Pipelines.

---

[6] Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022.

[7] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), "Failure Investigation Report Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, May 2016, Appendix E: Corrosion Control and Pipeline Conditions, page 1 of 4.

[8] *Ibid.,* Page 3 of 21, and Mechanical and Metallurgical Testing, Photos Figure 1 through 20.

Accufacts Inc. Final                                                                              Page 2 of 9

## III.    Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.

The Pipelines thus have ineffective CP protection from external corrosion that is exacerbated by operation of the Pipelines at elevated temperatures, seriously increasing corrosion rate as discussed in my previous report.[9]   Attempts to gauge the effectiveness of the CP system utilizing CP performance measures identified in PHMSA regulations are meaningless in such heavily shielded installations.   Just operating the Pipeline with CP "on" to meet federal minimum regulatory requirements will not prevent external corrosion attacks that can take on various forms on the Pipelines.  It should be noted that the OSFM has required "Where the operator discovers external corrosion in combination with coating deterioration, the operator must recoat with a two-part epoxy.  Sable must recoat in accordance with their repair procedure." which does allow repair replacing with the existing installation approach, given its many shortcomings to prevent external corrosion.[10]  This requirement places the responsibility on the pipeline operator to identify when or if any, field digs should occur to confirm coating degradation.  The operator should be primarily focused on identifying environments around the pipeline that are precursors to various forms of external corrosion attack, given the many conditions related to the pipeline design/installation conducive to external corrosion attack.

It is on the limited repaired sections, measured in feet, that the CP should be effective as such short length repairs replace the poorly designed shielding original coating installations.  For the vast majority of the Pipelines mileage, however, the CP remains ineffective.  The requirements to measure CP performance stated in 49CFR§195.2 (NACE SP 0169 – 2007 edition, paragraph 6.2.2) are meaningless when heavy shielding, such as that which occurs on CA-324 and CA-325A/B, prevents CP current from reaching the pipeline.

## IV.    This is more than simple corrosion under installation (CUI) issue.

Considerable past discussions have suggested that this is a corrosion under installation (or CUI") problem implying that this is the only controlling issue.  While CUI is certainly a contributing factor, the corrosion threats go well beyond CUI.  As previously discussed, heavy shielding, the tape coating around the insulation, the vintage/type of coating directly on the Pipelines prone to disbondment, the operating temperature, and the environment around the Pipelines, work in concert to create external corrosion in its various forms.  The Consent Decree is an agreement based on the premise that higher risks of external corrosion can be mainly addressed by ILI tools. The multiple forms of external corrosion which can occur on the Pipelines require various different approaches, beyond ILI, as discussed further in this report.

---

[9] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024, p. 13.
[10] OS OSFM letter to Sable/PPC Offshore Corp, "Decision Letter 324 and Decision Letter 325A/B")," dated 12/17/24, pp. 11 and 11 respectively.

Accufacts Inc. Final                                                    Page 3 of 9

## V.    External corrosion on buried pipelines falls into four major categories.

External corrosion on buried steel pipelines falls into four general categories:  1) wall loss or thinning of the pipe wall, 2) cracking or crack-like, 3) pitting, and 4) corrosion within dents.

1. **Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.**

   Internal or external corrosion can cause pipe wall thinning.  Such thinning differs from pit corrosion discussed below, in that pipe wall loss thinning tends to occur over a wider area of the pipe.  Despite previous multiple ILI runs, external corrosion pipe wall loss, or thinning, was the condition that resulted in the May 19, 2015 pipeline rupture failure. External corrosion on the shielded pipe allowed general corrosion thinning of the pipeline until the pipe failed under pressure.  It should be worth noting that wall loss in excess of 0.8 wall thickness (actually 0.91) which occurred in the May 19, 2015 rupture, places the operator at great risks.  Ironically, pipe wall loss is generally one pipeline failure threat that advances in the ILI technology over recent decades was intended to address, either with ILI mag flux or ultrasonic approaches which are different technical methods.

2. **Cracking or crack-like corrosion is usually an environmental threat difficult to assess.**

   This is associated with various forms of pipeline cracking, such as selective seam corrosion or stress corrosion cracking.  While engineers like to think they can calculate time to failure, such time to failure estimates for these forms of corrosions are hard to reliably predict.  Given the probability that such cracking, especially if in clusters, can interact with other cracks, or weaknesses in the pipe body near/at welds, makes prediction to failure highly unreliable.  Such pipe weaknesses can occur at weld heat affected zones, at girth welds, or at manufacturing related pipe seams, in unpredictable ways that can quickly negate time to failure calculation/estimates, even if cracking potential is identified.

   Sable/PPC has requested an exemption from 49CFR452(h)(4)(iii)(H) explaining this is usually a SSC threat related to earlier vintage manufacturing processes such as LF-ERW which tends to exhibit lower pipe toughness. There are other related risks to the manufacturing process of modern steels such as DSAW and HF-ERW concerning cracking potential from poor coating/ineffective CP approaches.  Because of the nature of disbonded coating in proximity to water, coating can tent at weld seams creating potential for cracking corrosion attack, such as SSC.  Even modern pipe steels are not invincible to such cracking corrosion potential, especially on pipelines operating at elevated temperatures.  Unless the operator can show why such environments don't exist, their request to be exempted from 49CFR452(h)(4)(iii)(H) should be denied.  These explanations should go well beyond a MAG-C pig run the pipeline operator has provided.

Accufacts Inc. Final                                                                 Page 4 of 9

3. **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**

This is the loss of pipe steel in concentrated small areas, forming localized small holes or pits, usually at girth welds, that can weaken the pipeline and cause a release. Pit corrosion identification via ILI, even newer generations of ILI tools, can be very challenging. Pit corrosion threats are usually verified via field digs or pipeline releases. While this threat can be a bona fide threat on the Pipelines that are heavily shielded rendering CP ineffective, there has been no mention that this threat has been identified.

4. **Corrosion within dents is a special form of dent threat.**

Corrosion or cracking within a dent, also known as "dents with stress concentrators" are hard to identify via ILI, and almost impossible to reliably predict time to failure. Such threats are usually identified by high-definition geometric ILI dent tools, the location around the pipeline, and field dig verification assessments. The ILI determination using high resolution caliper or geo pigs, have proven reliable at identifying dents and their location on a pipeline.

## VI.    Types of ILI technology.

Given the possible types of external corrosion on the Pipelines, I now focus on a simple high-level discussion of corrosion ILI technical approaches.

1. **General wall loss corrosion.**

After the advancement of geometric or deformation ILI technology, the next early phase of ILI use focused on general corrosion wall loss, or pipeline thinning along the axis or flow direction of the pipeline. In this field, technology split into two different approaches, magnetic flux leakage and ultrasonic. Magnetic flux leakage (or mag flux) approaches utilized software algorithms to characterize changes in magnetic flux to identify wall loss aligned in the axial, or direction of flow, usually the most insidious and common corrosion flaws for pipe. Mag flux ILIs fall into two general categories: low resolution (usually associated with earlier generation) and high resolution (usually more complex and more expensive). Mag flux technology shifted from low resolution to the more sophisticated high resolution approaches where corrosion is problematic. There are still pipelines that utilize low resolution mag flux because of cost, so care should be exercised in the application of this form of ILI on liquid pipelines. The waivers specifically require UT ILI the first two years of operation, but are moot, indicating magnetic flux ILI in the future could be allowed without clarification as to high res or low res ILI.

Ultrasonic ILI approaches use beams of ultrasonic energy to identify both external and internal corrosion wall loss. While a simplification, ultrasonic approaches are analogous to radar, where reflected energy readings are utilized to measure changes in pipe wall thickness. Originally, ultrasonic approaches, focusing on wall loss evaluation, directed UT energy directly into the pipe in the radial direction for wall thickness and resulting wall loss corrosion sizing determinations.

Accufacts Inc. Final                                                                 Page 5 of 9

**2.  Cracking corrosion.**

> Pipeline ruptures from cracking threats drove a need for ILI tool cracking development.  Thus, a next generation of ultrasonic ILI approaches advanced by changing the angle of the UT beam from radial into the pipe to at an angle to help spot cracks that might be developing.  This form of UT approach is identified as shear wave.  As more pipeline failures from cracking were uncovered, additional advances known as phased array ultrasonic (PAUT) have recently developed, though such measurements are currently focused on field measurement of uncovered pipeline, as ILI in this area I would categorize as still under development.

I have investigated too many pipeline ruptures that occurred after an ILI run which indicates more regulatory work is needed in ILI regulations related to applications of ILI.  No ILI vendor provides such tools claiming they will not work.  It is the pipeline operator's responsibility to ensure ILI runs meet the restrictions placed by the tool vendor (such as speed) and to verify the tool vendor's claimed capability with a proper number of field verification digs.

## VII.      What is the purpose of hydrotesting?

There are basically two types of hydrotesting mentioned in federal pipeline safety: 1) What I call a subpart E, or proof of MOP test, and 2) a crack hydrotest, what is referred to as a "spike hydrotest" that is performed at much higher test pressures as a %SMYS.  Both forms of hydrotesting are proof test, good at the time of the test, and don't characterize time dependent pipeline threats such as corrosion.

The purpose of an MOP hydrotest is to proof the fitness for service of a pipeline at the time of the test, with a certain margin of pressure safety that usually deteriorates with time.  Subpart E MOP tests are not crack integrity test.  If a pipeline system has crack forming potential an MOP test is not appropriate.

Spike hydrotests are meant to avoid pressure reversals associated with crack threats on pipelines.  Pressure reversals are where cracks remaining after MOP hydrotest tests can enlarge for various reasons to result in possible failure during operation, usually at lower pressures.  It is my experience that spike hydrotests are meant to deal with cracking threats if such a threat exists.  The performance metric for the suitability of a spike hydrotest is the range of %SMYS for the specific test segment.  For pipeline elevation changes like that associated with 325A/B, a spike hydrotest requires the pipeline be segmented to keep test pressures within reasonable ranges that don't produce permanent yielding of the pipe.  The information made public to date indicates that the previous hydrotests performed in 1986, because of elevation changes, required Line 325A to undergo hydrotesting in 9 segments and in Line 325B in 11 segments.  Unfortunately, the hydrotest segments in the public record application are identified by station number and not by approximate milepost.  Since there is usually no correlation between station number and milepost, I thus cannot evaluate whether the Decision Letter 325A/B pressure testing parameters are adequate for Line 325A.[11]  It is worth noting that the Decision Letter 325A/B makes no mention of a subpart E

---

[11] Decision Letter 325A/B, "Pressure Testing," page 5.

Accufacts Inc. Final                                                                    Page 6 of 9

hydrotest or spike hydrotest on Line 325B.  The proposed segments for hydrotests on 325A need to be identified by approximate milepost to permit evaluation as to whether the waiver requirements are appropriate.  The reasons for hydrotesting exclusion on Line 325B need to be properly justified and made public by the OSFM.

## VIII.    The illusion that corrosion growth rate can be accurately predicted needs to be explained.

One of the critical parameters that I have observed in too many pipeline rupture investigations is that ILI can be utilized to accurately predict corrosion growth rates ("CGR") to help set a critical ILI run timing, for example.  The Pipelines essentially have no effective CP, operate as a higher temperature system, contain disbonded coating, incorporate heavy shielding which prevents CP from reaching the Pipelines and operate with insulation that moves water on/near the outside of the pipe.  Such a combination of factors can provide a wide variation in types of external corrosion as well as corrosion rate estimates.  CGR estimates can be especially problematic if CGR approaches miss possible corrosion interaction threats that can considerably shorten time to failure estimates.  I advise that CGR be utilized with extreme caution given this possible variation, especially for corrosion threats that can interact, such as SCC, whose time to failure can be highly unpredictable.  Corrosion growth rate estimates can vary considerably given the various form of external corrosion, especially related to cracking in combination with its location near sensitive pipe locations such as seam or girth welds.

## IX.    Major state waiver deficiencies:

Key observation on the state waivers for the Pipelines:

1.  **A key corrosion performance tracking process step in the state waivers for the Pipelines is missing.**

    While not specially required in minimum pipeline safety regulations or the waivers, a prudent pipeline operator on a pipeline system highly susceptible to corrosion will plot or graph corrosion indications by type and severity, by approximate milepost.  This is especially important on the Pipelines given their history of extensive corrosion caused by the lack of CP effectiveness, poor coating types causing disbondment or shielding, increased temperature, insulation that tends to wick water, and poor performance of ILI.  Such graphing aids a pipeline operator in understanding possible corrosion "hot spot" segments whose threats on a pipeline increase because of environmental factors that merit additional assessment, and maybe even pipeline segment replacement from a corrosion point of view.

    Care also needs to be taken that all corrosion sites are prudently evaluated for possible interactive threats, such as general wall loss in combination with cracking, or near pipe welds, such as that which can occur with cluster corrosion.  I see no mention in the Letters of Decision and waivers requiring such important corrosion tracking on the Pipelines.

Accufacts Inc. Final                                                                                    Page 7 of 9

## 2. A major state waiver deficiency for Line 324.

Given the pipeline properties stated for Line 324 (a single grade X65, 0.344 in wall thickness, 24-inch diameter, HF-ERW), I can calculate the various % SMYS for the spike (minimum and maximum test pressures, and MOP hydrotests) based on an estimated approximate elevation profile by milepost as Line 324 can be hydrotested as one segment given its limited elevation profile.

A critical condition in the OSFM Decision letter 324 is:

"12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike hydrotest is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP."[12]

For the 24-inch diameter pipe, wall thickness and grade stated in the Decision Letter 324, 100% SMYS calculates to 1863 psig. 1.5 times the stated MOP of 1003 psig calculates to 1504 psig, at the highest elevation point. Thus, the spike test at the highest elevation point as required above is likely to be the lower maximum test pressure of 1504 psig which calculates to about 81% SMYS, **a value I believe is too low for corrosion cracking screening and evaluation**. The OSFM needs to explain why the proposed spike hydrotest of Line 324 is so low.

The bottom line is that Sable/PPCs should demonstrate whether there are environmental conditions around Line 324 that are conducive to cracking either SCC or SSC, and these conditions should go well beyond a Mag-C tool run (such as sufficient field digs to verify the ILI tool's claimed capability). I see no such important conditions in Sable/PPCs application that instill confidence that Line 324 does not have environments favoring external cracking. While it is true that certain pipe manufactured before 1970 is more prone to SSC, or SSWC, for various reasons, there is no modern pipe, even HF-ERW located in Line 324 or DSAW located in 325 A/B, that is invincible to such corrosion cracking threats, especially if the coating directly applied to the pipe has "tented" on the weld seam, allowing water to enter between the coating and the pipe to create a corrosion cell. There is no carbon steel pipeline, even new modern manufactured steel pipelines, invincible to such corrosion attack.

---

[12] Decision Letter 324, "Pressure Testing," pages 4 – 5.

Accufacts Inc. Final                                                                 Page 8 of 9

3.  **Major state waiver deficiencies for Line 325A/B.**

Decision Letter 325 states that Line 325A and 325B is composed of 30-inch diameter of two pipe grades (X65 with a thickness of mainly 0.344 inch and X70 with a wall thickness mainly of 0.281 inches composed of DSAW, with one small segment of 0.03 miles containing HF-ERW).  I used the term "mainly" as Sable's/PPC's application indicates these two lines are also largely composed of these grades with a small percentage of varying thicknesses.[13]  For these two pipe grades, and thicknesses, 100 % SMYS calculates to 1490 psig for X65 and 1311 psig for X70.  Since the location of the various pipe grades by approximate mileposts within CA-325A/B are not indicated, and given the dramatic elevation profiles for 325A/B the proposed hydrotest segments, if any, by milepost and elevation segments need to be made public.  Without such information, I cannot calculate the % SMYS range for hydrotests given the OSFM conditions.  Hydrotest segments are identified by station number which don't necessarily sync with milepost or MP.[14]  **These important test segment parameters, by approximate MP, and elevation need to be made public to assure prudent hydrotesting is being required to address the possible general corrosion and cracking risks on Line 325A/B**.

It is worth noting that the OSFM does not require a MOP and spike hydrotest of 325B which has very significant elevation changes.  This would suggest that Line 325B is not being evaluated by hydrotesting.  The reason(s) for this decision needs to be made public.

## X.    Conclusions.

Hydrotest segments proposed for the Pipelines need to be made transparent and include approximate MP, given the major role that elevation change plays on this system.  Critical parameters related to location by milepost of the varying grades and thicknesses of pipe on 325 A/B and their associated hydrotest segments need to be identified by approximate MP as well, to verify if the OSFM parameters are sufficient for the specific types of corrosion threat.  The reason as to why a spike hydrotest on 324 and 325 A are limited needs to be explained, as well as to why 325B hydrotesting has not been included in either a subpart E or spike hydrotest,

The incompleteness of the waivers lead me to conclude that I cannot determine the waivers provide sufficient information to assure an equal or greater level of safety for the Pipelines had the operator had an unshielded coating design that complied with federal minimum pipeline CP protection intended to avoid pipeline failure from external corrosion.

Richard B. Kuprewicz
President            *Richard B Kuprewicz*
Accufacts Inc.

---

[13] Sable/PPC letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115). Pipeline System Background Data Attachment B of State Application Table B-3 Line Pipe Specifications," July 2023, p. 4.
[14] *Ibid*., "Table B-6 Historic Hydrotest Summary," p. 6.

Accufacts Inc. Final                                             Page 9 of 9

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 10:18 AM
By: Narzralli Baksh , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PETITIONERS' EX PARTE APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Date:     June 3, 2025 <br> Time:     8:30 a.m. <br> Dept.:     4 <br> Judge:   Hon. Donna G. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

---

1

Petitioners' Request for Judicial Notice in support of Ex Parte Application for Stay or OSC and TRO

**REQUEST FOR JUDICIAL NOTICE**

PLESE TAKE NOTICE THAT Petitioners and Plaintiffs ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, and SANTA BARBARA CHANNELKEEPER (collectively, "Petitioners") request that, pursuant to California Rule of Court 3.1306(c) and Evidence Code sections 452(c), 452(h), and 453, this Court take judicial notice of the following documents, true and correct copies of which are attached hereto:

| Exhibit | Description |
| --- | --- |
| **Exhibit A** | California Department of Fish and Wildlife (CDFW), *et al.*, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment, dated June 2021 |
| **Exhibit B** | U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, dated May 2016 |
| **Exhibit C** | Staff Report Recommending that the California Coastal Commission (CCC) issue a Cease and Desist Order (CDO), Restoration Order, and Administrative Civil Penalty to Sable Offshore Corp. ("Sable"), dated March 28, 2025 |
| **Exhibit D** | Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-324 by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 |
| **Exhibit E** | Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-325A/B by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 |
| **Exhibit F** | Notice of Violation from the RWQCB to Sable, dated April 15, 2025 |
| **Exhibit G** | OSFM letter granting the waiver for CA-324, dated December 17, 2024 |
| **Exhibit H** | OSFM letter granting the waiver for CA-325A/B, dated December 17, 2024 |
| **Exhibit I** | Excerpts from Draft Environmental Impact Report (EIR) and Environmental Impact |

Petitioners' Request for Judicial Notice in support of Ex Parte Application for Stay or OSC and TRO

Statement (EIS) for the Proposed Celeron/All American and Getty Pipeline Projects prepared by the California State Lands Commission (CSLC) and Bureau of Land Management, Department of the Interior (BLM) dated August 1984

**Exhibit J**    Excerpts from Final EIR and EIS for the Proposed Celeron/All American and Getty Pipeline Projects prepared by CSLC and BLM dated January 1985

**Exhibit K**    Santa Barbara County ("County") Webpage "901/903 Replacement Pipeline Project" (last accessed May 27, 2025)

**Exhibit L**    PHMSA Webpage "Pipeline Special Permits and State Waivers Overview" (last accessed May 30, 2025)

**Exhibit M**    California Natural Resources Agency's (CNRA) summary of state regulation of crude oil pipelines in the County prepared and maintained by CNRA, last updated on May 14, 2025 (last accessed May 28, 2025)

The above-referenced exhibits concern the waivers from regulatory requirements granted by OSFM to Sable for its activities to restart the pipeline system, consisting of CA-324 and CA-325A/B. The exhibits without any environmental or public review and despite the failure of the cathodic protection system, which led to one of the largest oil spills in California history in 2015.

This Request for Judicial Notice is made on the grounds that the above-referenced exhibits are relevant to the Court's review of Petitioners' Ex Parte Application for Stay, Temporary Restraining Order, and Order to Show Cause and will aid this Court in determining the same. As explained more fully in the attached Memorandum of Points and Authorities, each of the Exhibits is a document subject to judicial notice pursuant to the California Evidence Code.

Dated:  June 2, 2025             ENVIRONMENTAL DEFENSE CENTER

_____

LINDA KROP
JEREMY FRANKEL
TARA C. RENGIFO
Attorneys for Petitioners and Plaintiffs

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.       INTRODUCTION AND LEGAL STANDARD**

Pursuant to California Evidence Code section 453, the Court shall take judicial notice of any matter specified in section 452, provided that the requesting party (1) gives adequate notice to the adverse party and (2) includes sufficient information to enable the Court to take judicial notice of the matter. The documents referenced in this request are directly within the category of matters appropriate for judicial notice under the Evidence Code.

**II.      ARGUMENT**

   **A.       Exhibits A through J are Official Records of State and Federal Agencies.**

Petitioners respectfully request, pursuant to California Evidence Code section 452(c), that the Court take judicial notice of public state and federal agency records attached hereto as Exhibits A through J.

Evidence Code section 452(c) provides that judicial notice may be taken of "[o]fficial acts of the legislative, executive, and judicial departments of the United States and of any state of the United States."  The Court is entitled to take judicial notice of the records and files of state administrative agencies. (*See, e.g., Hogen v. Valley Hospital* (1983) 147 Cal.App.3d 119, 125 (taking judicial notice of records of the Board of Medical Quality Assurance); *Chas. L. Harney, Inc. v. State of California* (1963) 217 Cal.App.2d 77, 85-86 (taking judicial notice of records of the State Board of Control and Office of State Controller).)

**Exhibit A** is a report prepared and published by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife Service, and National Oceanic and Atmospheric Administration, which are state and federal agencies. The report quantifies and describes the injuries to natural resources resulting from the 2015 Refugio Oil Spill and outlines the restoration projects intended to compensate the public for those injuries. Exhibit A is probative of the potential harm of a future spill from the Las Flores Pipeline System.

**Exhibit B** is an investigative report prepared and published by the Pipeline and Hazardous Materials Safety Administration (PHMSA), which is a federal administrative agency. This report

Petitioners' Request for Judicial Notice in support of Ex Parte Application for Stay or OSC and TRO

discusses the cause of the 2015 Refugio Oil Spill and the extent of the corrosion issues in the Las Flores Pipeline System, which is the impetus for the project at issue.

**Exhibit C** is a report dated March 28, 2025 prepared by California Coastal Commission (CCC) staff to the Commission setting forth staff's recommendations and findings for issuance of a Cease and Desist Order (CDO), Restoration Order, and Administrative Civil Penalty against Sable Offshore Corp. ("Sable") related to its efforts to restart the Santa Ynez Unit oil production operations and bring the pipeline system back into use. In Section V.B.2, entitled "Development Inconsistent with the Coastal Act," the report describes the areas surrounding the pipeline system, which include, but are not limited to, environmentally sensitive habitats that provide habitat to support several rare, threatened and endangered species.

**Exhibit D** is a formal letter dated February 11, 2025 from PHMSA declaring its non-objection pursuant to 49 U.S.C. § 60118(d) to the approved waiver for CA-324 by CAL FIRE – Office of the State Fire Marshal (OSFM). The official decision by PHMSA set forth in Exhibit D rendered the waiver for CA-324 final and effective, which is the subject of this action.

**Exhibit E** is a formal letter dated February 11, 2025 from PHMSA declaring its non-objection pursuant to 49 U.S.C. § 60118(d) to the approved waiver for CA-325A/B by OSFM. The official decision by PHMSA set forth in Exhibit E rendered the waiver for CA-325A/B final and effective, which is the subject of this action.

**Exhibit F** is a Notice of Violation issued to Sable for continuous violations of state law associated with its construction work on the Las Flores Pipeline System. This Notice was an official act by the Central Coast Regional Water Quality Control Board (RWQCB). The Notice discloses several locations along the pipeline system route where RWQCB "staff observed and documented unauthorized discharges of waste [] that could affect the quality of waters of the state and Untied States," including, but not limited to, Arroyo Quemado Creek, a water of the United States, as well as tributaries to Cuyama River, Peterson Creek, Nojoqui Creek, and Foxen Canyon.

**Exhibit G** is a formal letter dated December 17, 2024, from OSFM granting preliminary approval of the waiver requested for CA-324, and is the subject of this action. It is an official agency document that was sent via certified mail to Sable.

**Exhibit H** is a formal letter dated December 17, 2024, from OSFM granting preliminary approval of the waiver requested for CA-325A/B, and is the subject of this action. It is an official agency document that was sent via certified mail to Sable.

**Exhibit I** are excerpts from the Draft Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the Proposed Celeron/All American and Getty Pipeline Projects prepared by the California State Lands Commission (CSLC) and Bureau of Land Management, Department of the Interior (BLM) dated August 1984. The Project Description in the Draft EIR/EIS is for an oil and gas pipeline system that would be protected, in its entirety, by cathodic protection, and the Draft EIR/EIS relied on this assumption when it evaluated the potential impacts of the project.

**Exhibit J** are excerpts from the Final EIR and EIS for the Proposed Celeron/All American and Getty Pipeline Projects prepared by CSLC and BLM dated January 1985. The Final EIR/EIS describes the project as an oil and gas pipeline system that would be wholly protected by cathodic protection, and the analysis relied upon the pipelines' "very effective" cathodic protection system in examining the potential impacts of the project.

**B.    Exhibit K, L, and M are Agency Records and/or include Facts not Reasonably Subject to Dispute.**

Petitioners respectfully request, pursuant to California Evidence Code section 452(c) and (h), that the Court take judicial notice of text from the websites of various relevant state and federal agencies, which are attached hereto as Exhibits K, L, and M.

As noted above, the Court is entitled to take judicial notice of the records and files of federal and state administrative agencies. (*See, e.g., Hogen* (1983) 147 Cal.App.3d at 125.) Judicially noticeable agency records can include information published on an agency's website. (*See City of Alameda v. Sheehan* (2024) 105 Cal.App.5th 447, n. 7 (taking judicial notice of business search on Secretary of State website); (*Kilker v. Stillman* (2015) 233 Cal.Ap.4th 320, 328 (taking judicial notice of pages from the official website of the United States Social Security Administration).)

Moreover, the Court may take notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).) This includes text from the websites of various

governmental agencies and entities. (*See Moehring v. Thomas* (2005) 126 Cal.App.4th 1515, 1524, fn. 5 (taking judicial notice of a management plan and "other information" found on the United States Department of Agriculture Forest Service's website pursuant to Evidence Code section 452); *Scott v. JPMorgan Chase Bank, N.A.*, 214 Cal.App.4th 743, 753 (2013) (court took judicial notice of information on FDIC website that was not subject to dispute).)

**Exhibit K** is information downloaded from a County of Santa Barbara ("County") webpage dedicated to the 901/903 Replacement Pipeline Project. It summarizes the timeline for that proposed project, which was initiated after an application for the replacement of the existing Line 901 and 903 pipeline system (now known as CA-324 and CA-325A/B) was submitted to the County on August 15, 2017.

**Exhibit L** is information downloaded from a PHMSA webpage that provides an overview of special permits (the federal equivalent of state waivers). Exhibit L summarizes PHMSA's guidance requiring that waivers must "provide an equal or greater level of safety."

**Exhibit M** is a California Natural Resources Agency (CNRA) record prepared and maintained by CNRA that summarizes state regulations for crude oil pipelines in Santa Barbara County. Exhibit M outlines the state agencies that oversee the pipeline system, including oil pipeline construction, maintenance and operations. Exhibit M details the required approvals and other actions necessary to allow the pipeline system to restart. This document is available for public viewing and was downloaded from the CNRA website.

## III.    CONCLUSION

Based on the foregoing, Petitioners respectfully request that this Court take judicial notice of the documents identified in this request.

Dated:  June 2, 2025          ENVIRONMENTAL DEFENSE CENTER



LINDA KROP
JEREMY FRANKEL
TARA C. RENGIFO
Attorneys for Petitioners and Plaintiffs

Petitioners' Request for Judicial Notice in support of Ex Parte Application for Stay or OSC and TRO

**Exhibit Index**

*[Exhibits Supporting Request for Judicial Notice in Support of Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order; Memorandum of Points and Authorities]*

| Exhibit | Description | Page No. |
|---|---|---|
| A | California Department of Fish and Wildlife (CDFW), *et al.*, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment, dated June 2021 | 9-192 |
| B | U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, dated May 2016 | 193-214 |
| C | Staff Report Recommending that the California Coastal Commission (CCC) issue a Cease and Desist Order (CDO), Restoration Order, and Administrative Civil Penalty to Sable Offshore Corp. ("Sable"), dated March 28, 2025 | 215-304 |
| D | Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-324 by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 | 305-307 |
| E | Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-325A/B by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 | 308-310 |
| F | Notice of Violation from the RWQCB to Sable, dated April 15, 2025 | 311-319 |
| G | OSFM letter granting the waiver for CA-324, dated December 17, 2024 | 320-335 |
| H | OSFM letter granting the waiver for CA-325A/B, dated December 17, 2024 | 336-351 |
| I | Excerpts from Draft Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the Proposed Celeron/All American and Getty Pipeline Projects prepared by the California State Lands Commission (CSLC) and Bureau of Land Management, Department of the Interior (BLM) dated August 1984 | 352-357 |
| J | Excerpts from Final EIR and EIS for the Proposed Celeron/All American and Getty Pipeline Projects prepared by CSLC and BLM dated January 1985 | 358-370 |
| K | Santa Barbara County ("County") Webpage "901/903 Replacement Pipeline Project" (last accessed May 27, 2025) | 371-374 |
| L | PHMSA Webpage "Pipeline Special Permits and State Waivers Overview" (last accessed May 30, 2025) | 375-377 |
| M | California Natural Resources Agency's (CNRA) summary of state regulation of crude oil pipelines in the County prepared and maintained by CNRA, last updated on May 14, 2025 (last accessed May 28, 2025) | 378-387 |

# Exhibit A



   

# Refugio Beach Oil Spill
## Final Damage Assessment and Restoration Plan/Environmental Assessment

Prepared by:
California Department of Fish and Wildlife
California State Lands Commission
California Department of Parks and Recreation
University of California
The Department of Interior, U.S. Fish and Wildlife Service
National Oceanic and Atmospheric Administration

      

# Refugio Beach Oil Spill

# FINAL

# Damage Assessment and Restoration Plan/Environmental Assessment

June 2021

**On the Cover:**
Oiled Beach by U.S. Coast Guard
Oiled octopus and invertebrates by Natural Resource Damage Assessment Trustees
Dolphins by Natural Resource Damage Assessment Trustees
Pelicans by Natural Resource Damage Assessment Trustees
Harbor seal by Santa Barbara Channelkeeper

**Suggested Citation:**
Refugio Beach Oil Spill Trustees. 2021. *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment.* Prepared by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife Service, and National Oceanic and Atmospheric Administration.

2

# Refugio Beach Oil Spill Natural Resource Damage Assessment Summary:

## Shoreline Habitats
**$5.5 million**

**Injury:** Approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.

## Subtidal and Fish Habitats
**$6.1 million**

**Injury:** Approximately 2,200 acres of benthic subtidal habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, remove Ellwood seawall, restore sand dwelling kelp offshore of Goleta Beach.

## Birds
**$2.2 million**

**Injury:** 558 birds were estimated killed, representing over 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.

## Marine Mammals
**$2.3 million**

**Injury:** 156 pinnipeds and 76 cetaceans were estimated injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbra and Ventura County, and Increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.

## Human Uses
**$3.9 million**

**Injury:** The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

**Restoration:**
Restoration funds (53%) will be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach.

Restoration funds (46%) will be administered by State Trustees for use on projects benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach.

Restoration funds (approximately 1%) will be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

## Restoration Planning, Implementation, and Oversight
**$2 million**

## Public Input

Full Document: https://go.usa.gov/xvWEg

Administrative Record: https://go.usa.gov/xvWEc

Submit Questions: RefugioRestoration@fws.gov

# Executive Summary

On May 19, 2015 a 24-inch diameter on-shore pipeline (Line 901) that extends approximately 10.7 miles along the Santa Barbara County coastline in California ruptured resulting in the release of approximately 2,934 barrels (123,228 gallons) of heavy crude oil (U.S. DOT 2016, hereafter referred to as "the spill"). Line 901 is a buried, insulated pipeline that transported heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station. The pipeline is owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains). The Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that the cause of the Line 901 failure was external corrosion under insulation that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. Crude oil from the buried pipeline saturated the soil and flowed into a culvert that crosses under Highway 101 and railroad tracks, and ultimately discharged into the Pacific Ocean at Refugio State Beach.

The crude oil that entered the ocean posed a significant risk to and injured marine plants and wildlife, including seagrasses, kelp, invertebrates, fish, birds, and mammals. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend, resulting in losses for local businesses and lost opportunities for the public to visit and enjoy the shore and offshore areas. Tar balls attributable to the Line 901 release were carried by southerly ocean currents and eventually reached some beaches in Los Angeles County (California Department of Fish and Wildlife 2016).

The response (cleanup) to this significant spill brought together a number of federal, state, local agencies, and Native American tribes operating under a Unified Command. For the spill response, Incident Commanders consisted of representatives of the United States Coast Guard (USCG), California Department of Fish and Wildlife, Office of Spill Prevention and Response (CDFW-OSPR), Santa Barbara County, and Plains[1]. The Refugio Beach oil spill cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard, 2016). Phase III monitoring activities were largely concluded on May 26, 2016 and the Unified Command disestablished on March 10, 2017 (U.S. Coast Guard 2017).

In parallel with the response and cleanup effort, the natural resources trustee agencies (Trustees) conducted a Natural Resource Damage Assessment (NRDA) to quantify the injuries to natural resources from the spill and assess natural resource damages. In this case, the Trustees for the natural resources injured by the spill include the United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the United States Fish and Wildlife Service

---

[1] The National Contingency Plan calls for the Responsible Party to be a member of the Unified Command; ref. 40 CFR 300.135(d)

5

(USFWS), National Park Service (NPS) and Bureau of Land Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California (the Trustees). As a designated Trustee, each of these agencies is authorized to act on behalf of the public under state and/or federal laws to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured as a result of a discharge of oil.

In accordance with the Oil Pollution Act (OPA) NRDA regulations (33 U.S.C. 2706(e)), the Trustees have cooperatively gathered information and prepared this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA). This document describes the injuries resulting from the spill and the restoration projects selected to compensate the public for those injuries. This document is also an Environmental Assessment intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the proposed restoration projects under the National Environmental Policy Act (NEPA) and is therefore called a DARP/EA. Prior to releasing this Final DARP/EA, the Trustees released a Draft DARP/EA for public review and comment.  After considering the public comments received, the Trustees prepared this Final DARP/EA.  A full environmental review would be premature for some of the selected projects in this Final DARP/EA, as well as projects that were deemed "second tier" or of lower priority. The need for additional NEPA review will be determined once detailed engineering design work or operational plans are developed for selected projects. Additional review may also be required if any second tier projects are implemented.

This document describes the restoration projects selected by the Trustees to address the various resources impacted by the spill, as well as a process to identify appropriate human use projects for funding. All of the selected projects are designed to restore, replace, or acquire the equivalent of the lost resources and/or their services through restorative on-the-ground actions. Furthermore, several of the projects address multiple resources. The projects were selected based upon the biological needs of the injured species and the feasibility of restoring the resources.

Under OPA, the responsible party is liable for the cost of implementing restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees settled their claim for natural resource damages with Plains. A summary of the injury to each resource category, the approximate allocation of damages and selected restoration projects are shown below. Web links to data used in the injury assessment can be found in Appendix B of the DARP/EA.

6

SHORELINE HABITATS                                                                          $5.5 million

**Injury:** Trustees estimate that approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.



SUBTIDAL AND FISH HABITATS                                                                  $6.1 million

**Injury:** Trustees estimate that approximately 2,200 acres of benthic subtidal and fish habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, restore sand-dwelling kelp offshore of Goleta Beach, and remove Ellwood seawall.



BIRDS                                                                                      $2.2 million

**Injury:** Trustees estimate 558 birds were killed, representing approximately 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.



MARINE MAMMALS                                                                             $2.3 million

**Injury:** Trustees estimate 156 pinnipeds and 76 cetaceans were injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties, and increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.



HUMAN USE                                                            $3.9 million

**Injury:** Trustees estimate over 140,000 recreational user days were lost.
**Restoration:** Various projects to improve human recreation, to be administrated as follows - 53% to State Parks for projects benefitting camping or shore-based recreation including and upcoast of El Capitan State Beach; 46% for a grants program for projects downcoast of El Capitan State Beach, on non-State Parks lands benefitting coastal recreation as well as boating and off-shore recreation in Santa Barbara, Ventura, and Los Angeles Counties; and approximately 1% to Coal Oil Point Reserve for projects benefitting research, education, and outreach.



RESTORATION PLANNING, IMPLEMENTATION, AND OVERSIGHT            $2.0 million

9

The Trustees have prepared this Final DARP/EA to inform the public about the natural resource damage assessment (NRDA) and restoration planning efforts that have been conducted following the spill. This document is also an Environmental Assessment (EA) intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects, and the alternatives considered, under NEPA.  As environmental review would be premature for some of the projects in the document, additional review may be required in some instances.  This will be determined once recreational use projects are identified and/or when more detailed engineering design work or operational plans for the selected projects are available.  To coordinate and oversee implementation of this DARP/EA, the Trustees have formed a Trustee Council comprised of representatives from each of the Trustee agencies.  To submit questions or contact the Trustee Council, please use the following contact information:

## Electronic Mail:

RefugioRestoration@fws.gov

## U.S. Mail:

Refugio Beach Oil Spill Natural Resource Trustees
C/O Ventura Fish and Wildlife Office
2493 Portola Road, Suite B
Ventura, California 93003

Attn:
Michael Anderson, California Department of Fish and Wildlife
Jennifer Boyce, National Oceanic and Atmospheric Administration
Colleen Grant, U.S. Fish and Wildlife Service

10

# Abbreviations

| | | | |
|---|---|---|---|
| BLM | Bureau of Land Management | RP | Responsible Party |
| CDFW | California Department of Fish and Wildlife | SCAT | Shoreline Cleanup and Assessment Team |
| CESA | California Endangered Species Act | USFWS | United States Fish and Wildlife Service |
| CEQA | California Environmental Quality Act | UV | Ultraviolet light |
| CFR | Code of Federal Regulations | | |
| CSLC | California State Lands Commission | | |
| CSSC | California Species of Special Concern | | |
| CWA | Clean Water Act | | |
| CZMA | Coastal Zone Management Act | | |
| DARP | Damage Assessment and Restoration Plan | | |
| DOC | United States Department of Commerce | | |
| DOI | United States Department of the Interior | | |
| EA | Environmental Assessment | | |
| EFH | Essential Fish Habitat | | |
| EIR | Environmental Impact Report | | |
| EIS | Environmental Impact Statement | | |
| ESA | Endangered Species Act | | |
| FLAT | Federal Lead Administrative Trustee | | |
| FONSI | Finding of No Significant Impact | | |
| FWCA | Fish and Wildlife Coordination Act | | |
| GNOME | General NOAA Operation Modeling Environment | | |
| HEA | Habitat Equivalency Analysis | | |
| IBA | Important Bird Area | | |
| IEc | Industrial Economics, Inc. | | |
| LAT | Lead Administrative Trustee | | |
| MBTA | Migratory Bird Treaty Act | | |
| MMPA | Marine Mammal Protection Act | | |
| NCP | National Contingency Plan | | |
| NEPA | National Environmental Policy Act | | |
| NMFS | National Marine Fisheries Service | | |
| NMSA | National Marine Sanctuaries Act | | |
| NOAA | National Oceanic and Atmospheric Administration | | |
| NOI | Notice of Intent | | |
| NPDES | National Pollution Discharge Elimination System | | |
| NPFC | National Pollution Funds Center | | |
| NPS | National Park Service | | |
| NRDA | Natural Resource Damage Assessment | | |
| NWR | National Wildlife Refuge | | |
| ONMS | Office of National Marine Sanctuaries | | |
| OPA | Oil Pollution Act of 1990 | | |
| OSPR | Office of Spill Prevention and Response | | |
| PAHs | Polycyclic aromatic hydrocarbons | | |
| REA | Resource Equivalency Analysis | | |
| RFP | Request for Proposals | | |

11

# Common and Scientific Names

**Mammals and Other Vertebrates**

Blue whale (*Balaenoptera musculus*)
California red-legged frog (*Rana draytonii*)
California sea lion (*Zalophus californianus*)
Common bottlenose dolphin (*Tursiops truncatus*)
Fin whale (*Balaenoptera physalus*)
Gray whale (*Eschrichtius robustus*)
Green turtle (*Chelonia mydas*)
Guadalupe fur seal (*Arctocephalus townsendi*)
Hawksbill turtle (*Eretmochelys imbricate*)
Humpback whale (*Megaptera novaeangliae*)
Leatherback turtle (*Dermochelys coriacea*)
Loggerhead turtle (*Dermochelys coriacea*)
Long-beaked common dolphin (*Delphinus capensis*)
Northern elephant seal (*Mirounga angustirostris*)
Northern fur seal (*Callorhinus ursinus*)
Pacific harbor seal (*Phoca vitulina*)
Pacific white-sided dolphin (*Lagenorhynchus obliquidens*)
Short-beaked common dolphin (*Delphinus delphis*)
Southern sea otter (*Enhydra lutris nereis*)
Steller sea lion (*Eumetopias jubatus*)

**Birds**

American pipit (*Anthus rubescens*)
Ashy storm-petrel (*Oceanodroma homochroa*)
Belding's savannah sparrow (*Passerculus sandwichensis beldingi*)
Black-bellied plover (*Pluvialis squatarola*)
Black-crowned night heron (*Nycticorax nycticorax*)
Black phoebe (*Sayornis nigricans*)
Brandt's cormorant (*Phalacrocorax penicillatus*)
Brown pelican (*Pelecanus occidentalis*)
California gull (*Larus californicus*)
California least tern (*Sterna antillarum browni*)
Common loon (*Gavia immer*)
Ducks (Anatidae)
Forster's tern (*Sterna forsteri*)
Glaucous-winged gull (*Larus glaucescens*)
Horned grebe (*Podiceps auritus*)
Horned lark (*Eremophila alpestris*)
Light-footed Ridgeway's rail (*Rallus obsoletus levipes*)
Long-billed curlew (*Numenius americanus*)
Long-billed dowitcher (*Limnodromus scolopaceus*)
Marbled godwit (*Limosa fedoa*)
Mew gull (*Larus brachyrynchus*)
Red-throated loon (*Gavia stellata*)
Ring-billed gull (*Larus delawarensis*)

Royal tern (*Thalasseus maximus*)
Sanderling (*Calidris alba*)
Say's phoebe (*Sayornis saya*)
Scripp's murrelet (*Synthliboramphus scrippsi*)
Short-billed dowitcher (*Limnodromus griseus*)
Surf scoter (*Melanitta perspicillata*)
Western grebe (*Aechmorphorus occidentalis*)
Western gull (*Larus occidentalis*)
Western snowy plover (*Charadrius nivosus nivosus*)
Whimbrel (*Numenius phaeopus*)
White-winged scoter (*Melanitta fusca*)
Willet (*Tringa semipalmata*)
Yellow-rumped warbler (*Setophaga coronate*)

**Fish**

Anchovy (Engraulidae)
Barred surfperch (*Amphistichus argenteus*)
Blenny (*Blennioidei*)
Broomtail grouper (*Mycteroperca xenarcha*)
Cabezon (*Scorpaenichthys marmoratus*)
California corbina (*Menticirrhus undulates*)
California grunion (*Leuresthes tenuis*)
California sheephead (*Semicossyphus pulcher*)
Chinook "King" salmon (*Oncorhynchus tshawytscha*)
Coho "Silver" salmon (*Oncorhynchus kisutch*)
Croaker (Sciaenidae)
Garibaldi (Hypsypops rubicundus)
Giant "Black" sea bass (*Stereolepis gigas*)
Giant kelpfish (Heterostichus rostratus)
Gopher rockfish (*Sebastes carnatus*)
Grass rockfish (*Sebastes rastrelliger*)
Guitarfish (Rhinobatidae)
Halfmoon fish (*Medialuna californiensis*)
Kelp bass (*Paralabrax clathratus*)
Kelp rockfish (*Sebastes atrovirens*)
Leopard shark (*Triakis semifasciata*)
Northern anchovy (*Engraulis mordax*)
Opaleye (*Girella nigricans*)
Pacific halibut (*Hippoglossus stenolepis*)
Painted greenling (*Oxylebius pictus*)
Plainfin midshipman (*Porichthys notatus*)
Ray (Batoidea)
Sandab (*Citharichthys* spp.)
Scorpion fish (Scorpaenidae)
Señorita (*Oxyjulis californica*)
Silverside (Atherinidae)
Skate (Rajidae)
Smooth-hound shark (*Mustelus* spp.)

12

Sole (Soleidae)
Starry flounder (*Platichthys stellatus*)
Steelhead trout (*Oncorhynchus mykiss*)
Surfperch (Embiotocidae)
Tidepool sculpin (*Oligocottus maculosus*)
Tidewater goby (*Eucyclogobius newberryi*)
Topsmelt (*Atherinops affinis*)
Walleye surfperch (*Hyperprosopon argentuem*)
White seabass (*Atractoscion nobilis*)
White shark (*Carcharodon carcharias*)

**Invertebrates**
Acorn barnacle (*Balanus* spp.)
Bat star (Patiria miniata)
Beach hopper (*Megalorchestia* spp.)
Bean clam (*Donax gouldii*)
Black abalone (*Haliotis cracherodii*)
Bloodworm (*Thoracophelia mucronata*)
Bryozoan (Bryozoa)
California mussel (*Mytilus californianus*)
California spiny lobster (*Panulirus interruptus*)
Chiton (Polyplacophora)
Clam (Bivalvia)
Cup coral (*Balanophyllia elegans*)
Decorator crab (Majoidea)
Feather duster worm (Sabellidae)
Gastropod (Gastropoda)
Globose dune beetle (*Coelus globosus*)
Gooseneck barnacle (*Pollicipes polymerus*)
Hermit crab (Paguroidea)
Inshore "Market" squid (*Loligo opalescens*)
Isopod (Alloniscus perconvexus and Tylos punctatus)
Kelp fly (Diptera)
Keyhole limpet (Fissurellidae)
Limpet (Gastropoda)
Lined shore crab (*Pachygrapsus crassipes*)
Mole crab (*Emerita* spp.)
Nemertean worm (Nemertea)
Nudibranch (Nudibranchia)
Ochre sea star (*Pisaster ochraceus*)
Octopus (Cephalopoda)
Olive snail (*Olivella biplicata*)
Opheliid polychaete worm (Ophelia)
Pacific purple sea urchin (*Strongylocentrotus purpuratus*)
Periwinkle snail (*Littorina littorea*)
Pismo clam (Tivela stultorum)
Polychaete worm (Polychaeta)
Red abalone (*Haliotis rufescens*)
Red sea urchin (*Mesocentrotus franciscanus*)
Rock crab (*Cancer productus*)

Rove beetle (Staphylinidae)
Salp (Salpidae)
Sand castle "Honeycomb" worm (*Phragmatopoma californica*)
Sand crab (*Emerita analoga*)
Sand dollar (Echinodermata)
Sea anemone (Actiniaria)
Sea cucumber (Holothuroidea)
Sea hare (Anaspidea)
Sheep crab (*Loxorhynchus grandis*)
Shrimp (Dendrobranchiata and Caridea)
Sponge (Porifera)
Talitrid amphipod (*Megalorchestia* spp.)
Top snail (Trochidae)
Tunicate (Tunicata)
Turban snail (*Tegula funebralis*)
Whelk (Gastropoda)
White abalone (*Haliotis sorenseni*)
Plants and algae
Bladder chain kelp (*Stephanocystis osmundacea*)
Bladder kelp (*Sargassum muticum*)
Cape ivy (*Delairea odorata*)
Coast live oak (*Quercus agrifolia*)
Coralline algae (Corallina/Bossiella/Calliarthron spp.)
Cordgrass (*Spartina alterniflora* and *Spartina densiflora*)
Eelgrass (*Zostera pacifica*)
Feather boa kelp (*Egregia menziesii*)
Gaviota tarplant (*Deinandra increscens ssp. villosa*)
Giant kelp (*Macrocystis pyrifera*)
Grapestone seaweed (*Mastocarpus papillatus*)
Nailbrush seaweed (*Endocladia muricata*)
Palm tree (Arecaceae)
Red algae (*Prionitis* spp. and *Porphyra* spp.)
Rockweed (*Fucus distichus* and *Silvetia compressa*)
Sea lettuce (*Ulva lactuca*)
Surfgrass (*Phyllospadix* spp.)
Turkish-towel seaweed (*Chondracanthus* spp.)
Western sycamore (*Platanus racemose*)

13

# Table of Contents

**1.0    Introduction and Purpose** ................................................................................ 15

   1.1    Overview of the Incident.......................................................................................16

   1.2    NRDA Overview ..................................................................................................22

   1.3    Summary of Natural Resource Injuries ...............................................................23

   1.4    Summary of Selected Restoration Projects..........................................................24

**2.0    Affected Environment** ..................................................................................... 27

   2.1    Physical Environment ..........................................................................................27

   2.2    Marine and Coastal Managed and Protected Areas .............................................30

   2.3    Biological Resources ...........................................................................................32

   2.4    Archeological and Cultural Resources..................................................................38

   2.5    Recreational Services...........................................................................................42

**3.0    Coordination and Compliance**.......................................................................... 43

   3.1    Federal and State Trustee Agencies.....................................................................43

   3.2    Coordination ........................................................................................................43

   3.3    Compliance with Environmental Laws, Regulations, and Policies ..........................45

**4.0    Injury Quantification and Restoration Planning Methods**.................................... 58

   4.1    Quantification of Damages ..................................................................................58

   4.2    Restoration Project Selection Criteria.................................................................. 60

**5.0    Injury Quantification and Restoration Alternatives** ................................................ 59

   5.1    Shoreline Habitats................................................................................................65

   5.2    Subtidal and Fish Habitats ...................................................................................94

   5.3    Birds.....................................................................................................................117

   5.4    Marine Mammals ..................................................................................................140

   5.5    Human Uses .........................................................................................................152

**6.0    NEPA Alternatives Analysis** .......................................................................... 163

   6.1    Preferred Alternatives ..........................................................................................163

   6.2    Non-Preferred Alternatives..................................................................................165

   6.3    No Action Alternative...........................................................................................165

   6.4    Cumulative Impacts .............................................................................................166

References........................................................................................................................ 174

Preparers ........................................................................................................................ 174

Acknowledgements.......................................................................................................... 182

14

## List of Appendices

| | |
|---|---|
| Appendix A | Oil Fate and Transport |
| Appendix B | Data Management and Access |
| Appendix C | Resource Equivalency Analysis |
| Appendix D | Shoreline Exposure and Injury Evaluation Studies |
| Appendix E | Supplemental Bioassay Report Information |
| Appendix F | Shoreline Habitat Equivalency Analysis |
| Appendix G-1 | Fish and Invertebrate Mortality Observations |
| Appendix G-2 | Field and Laboratory Assessment of Injury to Grunion |
| Appendix G-3 | Assessment of Surfperch Exposure |
| Appendix G-4 | Oil Exposure and Potential Effects to Fish, Invertebrate Early Life Stages, and Kelp |
| Appendix G-5 | Changes in the Condition of Surfgrass and Macroalgae |
| Appendix G-6 | Field Assessment of Subtidal Exposure |
| Appendix G-7 | Polycyclic Aromatic Hydrocarbons in Nearshore Fish and Invertebrate Tissues |
| Appendix H | Subtidal Injury Quantification and Habitat Equivalency Analysis |
| Appendix I | Bird Injury Assessment |
| Appendix J | Marine Mammal Exposure, Injury, and Restoration |
| Appendix K | Recreational Camping Damages |
| Appendix L | Recreational Shoreline Use Damages |
| Appendix M | Recreational Boating and Offshore Use Damages |
| Appendix N | Summary of Proposed Restoration Projects |
| Appendix O | Response to Public Comments on the Draft Damage Assessment and Restoration Plan/Environmental Assessment |

# 1.0   Introduction and Purpose

The purpose of this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA) is to provide information to the public about the results of the Natural Resource Damage Assessment (NRDA) that was conducted to assess injuries to natural resources that were caused by the Refugio Beach Oil Spill. This document further describes the selected restoration projects to restore habitats and natural resources affected by the spill and compensate for interim losses of natural resources and their services from the date of the incident until recovery.  A list of second tier restoration projects are also identified, should any selected restoration projects become infeasible or funded by other entities. The document incorporates feedback provided through the public comment process. A full summary of public comments received on the Draft DARP/EA and the Trustees' responses to those comments can be found in Appendix O. The document also serves as an Environmental Assessment under the National Environmental Policy Act (NEPA) evaluating the potential effects to the environment from implementing the selected restoration projects.

## 1.1   Overview of the Incident

On May 19, 2015, a 24-inch diameter buried pipeline known as Line 901, owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains), ruptured in Santa Barbara County, California, in the vicinity of Refugio State Beach. Line 901 transported heated crude oil extracted from deep subsea formations at several offshore platforms. As a result of the rupture, an estimated 2,934 barrels (123,228 gallons) of heavy crude oil were released from the pipeline (U.S. DOT 2016). A significant portion of the oil reached the Pacific Ocean at Refugio State Beach after flowing through culverts and across several upland areas (Figure 1). The incident is referred to throughout this document as the Refugio Beach Oil Spill or the "spill."

Plains initially estimated that approximately 2,400 barrels (100,800 gallons), of crude oil were spilled and that 500 barrels (21,000 gallons) reached the ocean (U.S. DOT 2016). The total volume released from the pipeline was later revised to 2,934 barrels (123,228 gallons) (U.S. DOT 2016). Subsequently, consultants for Plains increased the estimate of oil reaching the ocean to 598 barrels (25,116 gallons). An analysis on behalf of the Trustees concluded that as much as 1,262 barrels (53,000 gallons) of oil reached the ocean (Baker 2018).

Within hours of the spill, based on recommendations from the California Office of Environmental Health Hazard Assessment (OEHHA), the California Department of Fish and Wildlife (CDFW) initiated a fishery closure in the vicinity of the spill. The following day, Governor Edmund G. Brown, Jr., declared a state of emergency for Santa Barbara County. Several beaches in Santa Barbara County were closed to the public, including Refugio and El Capitan State Beaches (described further in Section 5.5). On May 21, 2015, the fishery closure was expanded along the shore and offshore out to 6 miles, encompassing a total area of 138 square miles, based on aerial observations and National Oceanic and Atmospheric

16

Administration (NOAA) oil spill trajectory models of where the oil was likely to move (OEHHA 2015). The fishery closure ended on June 29, 2015 (OEHHA 2015).



**Figure 1.** Flow path of the Line 901 pipeline rupture into culverts under Highway 101 and railroad tracks and ultimately into the Pacific Ocean at Refugio State Beach. Credit: John Wiley (http://flickr.com/jw4pix)

The crude oil smothered and soaked into terrestrial areas along the pathway from the pipeline rupture to the site where the oil entered the ocean, a short distance west of Refugio Cove (Figure 1). The shorelines from the release point, within Refugio State Beach to El Capitan State Beach, received the heaviest coastal oiling. Shorelines downcoast as far as Long Beach were intermittently oiled with tarballs and subject to beach closures, with the level of oiling generally decreasing farther away from the release point. Subtidal habitats in the vicinity of the release point also experienced oil exposure.

In the days after the spill, ocean surface currents and strong afternoon winds carried oil mostly downcoast, although some oil was deposited on beaches upcoast of the release site.

Marine organisms, including plants, invertebrates, fish, birds, and mammals, were exposed to oil. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend resulting in lost opportunities for the public to visit and enjoy the shore and offshore areas after the spill. Floating oil attributed to Line 901 was identified 17 km southwest of the release site, and more than 8 miles offshore (Valentine 2017). Tarballs attributed to the Line 901 release were identified as far south as Los Angeles County, more than 100 miles from the release site, where there were additional beach closures.

## 1.1.1  Cleanup Operations

The spill brought together many federal, state, and local agencies for cleanup operating under a Unified Command. For the spill response, the Incident Commanders consisted of representatives

17

of the USCG, CDFW-OSPR, Santa Barbara County, and Plains[2]. Throughout the response, the incident received high interest from news media, legislators, non-governmental organizations, members of the public, and other stakeholders.

The Unified Command conducted a phased approach to oil spill cleanup, in accordance with the National Oceanic and Atmospheric Administration's Shoreline Assessment Manual that provides for defined cleanup processes and goals for each cleanup phase. The cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard 2016). Phase III monitoring activities were largely concluded on May 26, 2016, and the Unified Command was disestablished on March 10, 2017 (U.S. Coast Guard 2017).

The majority of the response effort was focused on minimizing environmental and cultural site damage and maximizing the recovery of discharged oil. Oil spill response operations were divided into three areas including an Inland Branch, Shoreline Branch, and On-water Branch.

The Inland Branch included the discharge site and pathway of oil to the Pacific Ocean. Inland branch response operations included oil recovery and removal, pipeline excavation, contaminated soil removal, contaminated vegetation removal, community and responder air monitoring, and oil sampling from the source of discharge.

The Shoreline Branch addressed oil in the path of discharge from the top of a cliff down to the beach and along 96 miles of affected shoreline. Response teams applied manual and mechanical recovery methods, primarily removal and disposal of oiled sand, wrack, and marine organisms. Removal of oil from rock was accomplished with scrapers or wire brushes. In some areas, dry ice was also used in conjunction with compressed air to freeze oil on rocks, allowing it to flake off more easily. In other areas, oiled cobble was placed in the surf zone to be scrubbed clean by wave action and tumbling amongst other cobble. Other operations included community and responder air monitoring, oil sampling, and wildlife recovery, rehabilitation, and release.

The On-water Branch addressed recoverable oil in offshore waters affected by the spill. On-water response operations included the use of oil containment and protection boom, skimmers, and oil recovery vessels. Local private vessels were also enlisted to assist with removal of oil from the marine environment.

---

[2] The National Contingency Plan calls for the Responsible Party, in this case Plains, to be a member of the Unified Command; ref. 40 CFR 300.135(d).

18

Staff responsible for conducting reconnaissance, recovery, and rehabilitation for wildlife exposed to Line 901 oil throughout the response area were organized and deployed through a Wildlife Branch that operated throughout the spill-affected area.

## 1.1.2   Transport and Fate of the spilled Oil

Line 901 oil coated shores predominantly downcoast for several miles from the release site within hours of the spill, primarily due to along-shore transport of the oil by currents, surge and surf action. While there are known active natural off-shore oil seeps in the spill vicinity, virtually all oil observed in the area from the release point to El Capitan in the days immediately after the spill, was from the Refugio Beach Oil Spill. Oil was also transported offshore by currents, surge action and wind drift and was observed during Unified Command overflights between May 20 and June 3 (Figure 3). Over time, oil from the spill spread farther offshore and downcoast, and in the days and weeks after the spill, light to moderate shoreline oiling, largely in the form of tarballs, occurred much farther away from the spill site. By May 28 unusually heavy tar ball stranding was reported in Ventura County near Oxnard. Soon after, unusually heavy depositions of tar balls were reported at several beaches near Redondo and Manhattan Beaches in Los Angeles County. The presence of stranded oil along some Los Angeles County beaches was heavy enough that several beach closures were declared by County officials, and a separate Unified Command was established in Los Angeles to respond to the oiling.



**Figure 2.** Results of hindcast modeling that shows the simulated oil transport trajectory based on the spill origin, winds, and currents that occurred between May 19, 2015 and May 29, 2015. The colors represent particle density, with red/orange being the highest density, yellow moderate density, and blue low density. See Appendix B for data associated with this figure.

To further understand and illustrate the transport and fate of spilled Line 901 oil, NOAA performed hindcast modeling using the General NOAA Operation Modeling Environment (GNOME). GNOME is an oil spill trajectory model in which the surface oil is divided into a

19

large number of small particles of equal mass that move under the influence of surface ocean currents, wind drift, and horizontal mixing from the time of the spill. GNOME also includes algorithms that simulate surface oil weathering, e.g., evaporation and dispersion. GNOME modeling snapshots (Figure 2) show Line 901 oil moving into the Santa Barbara Channel May 20, 2015 and May 21, 2015, transiting the waters of the Channel Islands National Marine Sanctuary, but no particles reached the Channel Island shores. Rather, the particles move east, making landfall on the Ventura coast about May 25, 2015 with subsequent deposition by May 29, 2015 in Los Angeles County. More information on the GNOME modeling can be found in Appendix A.



**Figure 3.** Map showing total U.S. Coast Guard overflight observations of surface oil over a 14 day period between May 21, 2015 and June 3, 2015. Note that the representations of sheen in this graphic are cumulative, i.e., oil was not in all of these locations at any given time. See Appendix B for data associated with this figure.

Line 901 oil was also transported downward through the water column due to mixing in the nearshore environment and the surf zone. Submerged oil was observed at several locations between May 22, 2015 and June 2, 2015 by UCSB and other entities. Of the oil observed, seven samples were collected and analyzed forensically, five of the samples matched Line 901 oil (Valentine 2019). The Unified Command undertook a submerged oil survey on May 29, 2015 through May 30, 2015 and reported no recoverable submerged oil. Oil may have been mixed with sediment through the surf action and was subsequently redistributed along the bottom and surface through sinking, tidal action, and surf transport. Based on general oceanographic conditions in the area vertical mixing of oil droplets and dissolved oils is estimated to occur to a depth of approximately 14 meters (Appendix A).

20

### 1.1.3  Forensic Identification of Line 901 Oil in the Environment

There are active, well-studied natural oil seeps in the region where the Refugio Beach Oil Spill occurred (Lorenson et al. 2009; Lorenson et al. 2011). These seafloor seeps release oil and gas that float to the ocean surface and periodically strand on regional shorelines, generally in the form of tar balls. Thus, not all of the oil evident in the region in the aftermath of the initial spill came from the Line 901 pipeline.

Spilled Line 901 oil can be distinguished from natural seep oil by using specialized chemical fingerprinting techniques[3]. In the days after the spill, hundreds of oil samples were collected from Santa Barbara, Ventura, Los Angeles, and Orange Counties. Selected samples were analyzed and forensically interpreted by experts working on behalf of the Natural Resource Trustees (Trustees), as well as by several other laboratories and experts engaged by the Unified Command and independently by Plains (Valentine 2015; Jeffrey 2016; Stout 2016; Stout et al. 2018). Oil samples collected from the ocean surface and from beaches were determined in some cases to be from Line 901, in other cases to be from known natural seeps, and in some cases to have characteristics of both, implying they were mixtures of natural seep and spilled oil.

After careful investigation, the Trustees concluded that oil from the Refugio Beach Oil Spill was deposited intermittently on shores from Gaviota State Park in Santa Barbara County to Los Angeles County (Figure 4). For purposes of the NRDA, the furthest southern extent of the spill was determined to be Long Beach based on beach closures.



**Figure 4.** Geographic extent of Line 901 oil. This Figure shows oil samples collected and analyzed on behalf of the Trustees through June 2, 2015 when the Trustees' trajectory modeling suggests that oil would have moved through the impacted area. This does not include samples collected by the response and analyzed for the criminal investigation. In People of the State of California v Plains All American Pipeline, L.P., Sup. Court of State of California, County of Santa Barbara, Case No. 1495091, People's Trial Exhibit 078.0001 oil was documented as far south as Seal Beach in Orange County. See Appendix B for data associated with this figure.

---

[3] Plains does not agree.

21

## 1.2 NRDA Overview

There are typically four types of claims that are made against responsible parties in an oil spill such as this one:

1. reimbursement for cleanup costs;
2. natural resource damages (including the costs of assessment);
3. fines and penalties under various laws; and
4. third-party claims (e.g. from non-government parties, such as commercial fisheries and affected businesses).

This document is only concerned with the second item, natural resource damages. This Damage Assessment and Restoration Plan and Environmental Assessment (DARP/EA) has been prepared by state and federal natural resource Trustee agencies responsible for restoring natural resources[4] and resource services[5] injured by the release of oil from the May 19, 2015, Refugio Beach Oil Spill. This document provides details regarding:

- Environment affected by the spill (Section 2);
- Coordination and compliance among the government agencies and responsible party (Section 3);
- Injury quantification and restoration planning methods (Section 4);
- Nature and scope of injuries and the quantification of those injuries (Section 5);
- Selected restoration projects to address the injuries (Section 5); and
- NEPA alternatives analysis (Section 6).

Consistent with the Oil Pollution Act (OPA) and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq., the purpose of restoration planning is to identify and evaluate restoration alternatives and to provide the public with an opportunity for review and comment on the proposed restoration alternatives. Restoration planning provides the link between injury and restoration. The purpose of restoration, as stated in this DARP/EA, is to make the environment and the public whole for injuries resulting from the spill by implementing restoration actions that return injured natural resources and services to baseline conditions and compensate for interim losses.

United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the U.S. Fish and Wildlife Service (USFWS), National Park Service (NPS), and Bureau of Land

---

[4] Natural resources are defined under the Oil Pollution Act as "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any State or local government or Indian tribe, or any foreign government." 33 U.S.C. §2701(20).

[5] Services (or natural resources services) means the functions performed by a natural resource for the benefit of another natural resource and/or the public.

22

Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California are the Trustees who are addressing the natural resources injured by the spill. As a designated Trustee, each agency is authorized to act on behalf of the public under state and/or federal law to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured by a discharge of oil. For purposes of coordination and compliance with OPA and NEPA, NOAA is designated as the lead federal Trustee.

The Trustees have prepared this DARP/EA to inform the public about the NRDA and restoration planning efforts that have been conducted following the spill. This document is also an EA intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects under NEPA. As full environmental review would be premature for some of the selected projects in the document pending development of sufficient project-level detail. This will be determined once detailed engineering design work or operational plans are developed for those projects.

## 1.3 Summary of Natural Resource Injuries

The injuries from the oil spill can be divided into the following categories: shoreline habitats, subtidal and fish habitats, birds, marine mammals, and human uses. The injuries to each category are summarized here (Figure 5) and presented in greater detail in Section 5.

- **Shoreline Habitats**: The Trustees estimate approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.
- **Subtidal and Fish Habitats**: The Trustees estimate approximately 2,200 acres of benthic subtidal habitat were impacted.
- **Birds:** The Trustees estimate 558 birds were killed, representing over 28 different species. The primary species impacted were brown pelicans, representing 57% of the total estimated mortality. Western snowy plovers were also impacted through effects to reproduction the year after the spill, following oil exposure.
- **Marine Mammals**: The Trustees estimate that 156 pinnipeds (94% California sea lions, 5% northern elephant seals and 1% Pacific harbor seals) and 76 cetaceans (95% long-beaked common dolphins and 5% common bottlenose dolphins) were injured or killed by the spill.
- **Human Uses**: The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

23



**Figure 5.** Refugio Beach Oil Spill fingerprint matches (red circles) along with the habitats and resources that were injured by the spill. See Appendix B for data associated with this figure.

## 1.4    Summary of Selected Restoration Projects

The Trustees' mandate under OPA (see 33 U.S.C. 2706(b)) is to make the environment and the public whole for injuries to natural resources and natural resource services resulting from the discharge of oil. This requirement must be achieved through the restoration, rehabilitation, replacement, or acquisition of equivalent natural resources and/or services. Thus, for a project to be considered there must be a connection, or nexus, between the natural resource injuries and the proposed restoration actions.

Compensatory restoration is any action taken to compensate for interim losses of natural resources and services pending recovery to baseline conditions. The scale, or amount, of the required compensatory restoration will depend on the extent and severity of the initial resource injury and how quickly each resource and associated service returns to baseline. Primary restoration actions that speed resource recovery will reduce the amount of required compensatory restoration.

The Trustees considered restoration concepts and alternatives with the potential to provide compensatory restoration. These were evaluated based on selection criteria developed by the Trustees, consistent with the legal guidelines provided in the OPA regulations (15 C.F.R. 990.54(a)). Section 4.2 presents OPA-based selection criteria developed by the Trustees for the spill. Based on the Trustees' evaluation, and after considering public comments on the Draft DARP/EA, a suite of preferred restoration projects were selected and are summarized below.

24

Additional details on all projects that met the threshold screening criteria are presented in Section 5.

The Trustees have grouped the injuries into categories, sometimes combining impacts to similar species. In this way, one restoration project, benefiting a suite of species or one primary species, may address all injuries for that category. In accordance with OPA, all of the selected projects have been "scaled" in size, such that the benefits of the restoration offset the injuries caused by the spill. Summaries of the selected restoration projects are provided below. More details on the projects are provided in Section 5.

Under OPA, the responsible party is liable for the cost of the compensatory restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees have settled this claim for natural resource damages with the responsible party for $22.3 million. The following amounts are allocated to fund the projects described in this document:

**Shoreline Habitats**                                                    $5.5 million
- Remove the Ellwood seawall that is currently constraining natural functioning condition of sandy beach and subtidal habitats;
- Restore black abalone populations to enhance the overall health of rocky intertidal habitats; and
- Restore degraded sand dune habitats by removing invasive/non-native vegetation, and/or precluding disturbance to sensitive areas to allow native dune vegetation to regrow.

**Subtidal and Fish Habitats**                                           $6.1 million
- Restore abalone populations in Marine Protected Areas along the Gaviota coast to enhance the overall health of subtidal habitats;
- Restore eelgrass beds on the Gaviota Coast to enhance overall health of subtidal habitat; and
- Extend a pilot project for restoring sand-dwelling kelp offshore of Goleta Beach to determine the feasibility of this novel method for restoring kelp forests.

**Birds**                                                                $2.2 million
- Remove invasive plants from brown pelican nesting colonies on Anacapa Island to prevent these important breeding sites from becoming unsuitable for nesting;
- Reduce seabird injuries from recreational fishing; and
- Implement conservation actions for western snowy plovers at Coal Oil Point Reserve to protect and enhance breeding success.

25

**Marine Mammals**                                                      $2.3 million
- Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties to increase survivorship of pinnipeds; and
- Expand the capacity to respond to instances of cetacean entanglement in the Santa Barbara Channel to increase survivorship of entangled cetaceans.

**Human Use**                                                          $3.9 million
- Restoration funds (53%) to be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach;
- Restoration funds (46%) to be administered by State Trustees for use on projects outside of State Park property benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach; and
- Restoration funds (approximately 1%) to be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

The remaining funds will be used by the Trustees for restoration planning and oversight. Any unused funds will be allocated toward one or more projects described in this document, or identified through further project scoping.

26

# 2.0   Affected Environment

This section presents a brief description of the physical, biological, and cultural environment affected by the oil spill.

The physical environment considered in the NRDA encompasses approximately 155 miles of shoreline from Gaviota to Long Beach, as well as the Santa Barbara Channel, and supports a rich diversity of coastal and marine species[6]. Many areas within the affected environment are protected by state or federal designations to preserve the biological integrity of the habitat, while other areas are available to the public for recreation. The affected environment also is home to a wide variety of culturally and historically important resources.

This section also provides information on the affected environment for the preferred restoration projects which are located within the general spill-affected area. For restoration projects that occur outside of the spill-affected area, information on the affected environment is provided along with the project descriptions in Section 5.

## 2.1   Physical Environment

This subsection describes the physical setting of the coastal areas affected by the Refugio Beach Oil Spill, including areas where restoration projects are proposed. The geographical extent of the physical environment described herein extends from Gaviota to Long Beach.

### 2.1.1   Climate

The atmospheric climate in the region is generally, consistently mild and considered Mediterranean-like. Winters are rainy and summers are dry, and predominant coastal breezes suppress wide air temperature changes. Air temperatures generally range between the mid-60s and mid-70s (16-21ºC). The years 2015 and 2016 were characterized by El Niño conditions, officially beginning in March 2015. El Niño conditions in southern California typically mean increased precipitation in the winter and higher sea surface temperatures (NOAA 2016; SCCOOS 2019).

### 2.1.2   Land Use and Geology

The spill originated at Refugio State Beach, in an area known as the "Gaviota Coast" which is one of southern California's largest remaining continuous stretches of undeveloped rural coastline. As described in the Gaviota Coast Plan, the Gaviota Coast includes the shoreline between Vandenberg Air Force Base to the west and Coal Oil Point to the east (Figure 6). It is world renowned as a biodiversity hotspot and one of the most ecologically diverse regions on the planet. The Gaviota Coast Plan, developed by Santa Barbara County, describes natural resources in the area. The Plan is intended to preserve the rural character of Gaviota by protecting and

---

[6] Not all areas within this physical environment were impacted by the spill.

27

enhancing its varied and unique natural and cultural resources, agricultural productivity, and by enhancing public recreation and access consistent with the capacity of its resources. Downcoast from Gaviota, beginning with the cities of Goleta and Santa Barbara and extending into Ventura County, the majority of the land use is residential, light commercial, and agricultural, with areas of undeveloped open space. The spill-affected area extends into Los Angeles County, from Santa Monica to Long Beach, which is heavily populated, developed, and industrialized.

The coastal terrestrial landscapes are equally significant, diverse, and rare, representing a high degree of endemism. They include such diverse vegetation alliances as active coastal fore dunes, coastal terrace prairie, and northern coastal salt marsh. The shoreline and offshore physical environment are typically sandy beaches and submerged sandy seabed, but also include boulder cobble fields and rock bench platforms in the intertidal and subtidal rocky reefs in the nearshore area. The Gaviota Coast also includes tidally influenced lagoons, harbors, and jetties. Because of the range of habitats, the marine biodiversity in the region is high.



**Figure 6.** The location of the spill origin and various Trustee post-spill study sites along the Santa Barbara Coastline.

### 2.1.3   Ocean Waters

The waters offshore of the mainland comprise the Santa Barbara Channel with surface seawater temperatures typically ranging from about 54°F (12°C) in spring to about 66°F (19°C) in fall. The Channel is oriented east-west, extending from Point Conception to Ventura and bounded on the north side by the mainland coast and on the south side by the northern Channel Islands (San Miguel, Santa Rosa, Santa Cruz, Santa Barbara, and Anacapa). The Santa Barbara Channel is where the California Current of cold water flowing south meets and mixes with the warmer water of the Davidson Current flowing north. The convergence and mixing in the marine region tends to occur as a counterclockwise gyre or eddy in the Channel (Nishimoto and Washburn 2002). As a result, the Santa Barbara Channel is a transition zone where the composition of many groups of marine species (fishes, invertebrates, and algae) shifts from species typically associated with the cooler waters north of Point Conception to species typically associated with the warmer waters south of Point Conception. The Channel area can thus be recognized as a dividing line between two bioregions that represent geographically distinct

28

ecological systems, the Oregonian Province from Point Conception northward and the San Diegan Province from Point Conception southward (Stephens, et.al. 2016). The fact that the affected area overlaps with the transition region in the Santa Barbara Channel underscores the importance of this section of the California coastline being unique for its diversity and sensitivity to environmental changes.

Unusual ocean weather and climate patterns were observed throughout 2014 and 2015 across the North Pacific basin. An area of the North Pacific from Alaska into California was as much as 5°C (9° F) warmer than average. This atmospheric anomaly nicknamed "the blob," due to its amoeba-like form, impacted oceanic productivity and food availability for marine life in some areas. In addition, El Niño conditions, which strengthened in early March 2015, are also associated with warmer sea surface temperatures.

## 2.1.4  Petroleum Seeps

Natural oil seeps are common in the area (Hornafius et al. 1999; Lorenson et al. 2009). For example, the seep field just offshore from Coal Oil Point in Goleta extends over approximately one square mile. These seeps slowly release weathered oil from fractures in the ocean floor. Because of the slow nature of seep oil traveling through the ocean floor substrate before making its way into the water column, some of the volatile, more toxic, components of seep oil dissipate before the oil reaches the ocean surface. At the surface, the oil continues to weather, forming tarballs generally less than one centimeter (0.4 inches) in diameter that may be moved by winds and currents to strand on the shoreline (Del Sontro 2007). The weathered nature and pattern of slow release of seep oil poses a lower exposure risk to marine life and has a lower acute toxicity than fresh oil that contains more toxic fractions. In contrast, during an oil spill, the amount of more toxic fresh oil released from a point source in a short time can overwhelm an ecosystem (National Research Council 2003).

In 1969, an oil spill occurred five miles off the coast of Summerland from a blow-out at Union Oil Platform A. Over 3,000,000 gallons (11 million liters) of crude oil was released that mainly affected the area from Gaviota to Carpinteria. Some oil from the spill was detected as far north as Pismo Beach, located approximately 75 miles (121 km) north from the spill point (straight line distance), and as far south as Mexico located approximately 200 miles (322 km) south from the spill point (straight line distance). At that time, this was the largest oil spill in U.S. history, and is credited as having catalyzed the U.S. environmental movement.

29

## 2.2    Marine and Coastal Managed and Protected Areas

Several Marine Protected Areas (MPAs) occur near or within the general area affected by the spill from Point Conception to Ventura. MPAs are protected areas of ocean where human activity, such as fishing, is restricted for conservation purposes. MPAs come in a variety of forms that include National Marine Sanctuaries and State Marine Protected Areas. MPAs are a versatile management tool for helping to maintain biological diversity and productivity, rebuild fishery stocks, support sustainable fisheries, and conserve and protect historical and cultural artifacts. In addition, the Channel Islands National Park and portions of the California Coastal National Monument provide protected habitat for resources in the area. Finally, public beaches, including high use beaches were affected by the spill (Figure 7).



**Figure 7.** Public lands and protected areas in the vicinity of the Refugio Beach Oil Spill origin. Additional public lands managed by Counties and Cities occur in the area but are not shown on this map. See Appendix B for data associated with this figure.

### 2.2.1   County and City Beaches

Several County and City beaches were affected by the spill within Santa Barbara, Ventura, and Los Angeles Counties. For example, Goleta Beach Park is a day use facility managed by the Santa Barbara County Parks. It is located on a section of sand beach east of the University of California, Santa Barbara (UCSB). Amenities include a fishing pier, picnic tables, BBQs, trails, grass park, play areas, restaurant, and launch/hoist for small boats at the end of the pier. Isla Vista Beach at Isla Vista is used extensively by UCSB students and the community. Haskell's Beach (previously known as Tecolote Canyon Beach) is a high public use beach and surfing area in the City of Goleta. City and County beaches within Ventura and Los Angeles Counties are

30

frequently used as recreation access points for surfing, fishing, diving, boating, and general beach use.

### 2.2.2  University of California Santa Barbara Natural Reserve System

The Coal Oil Point Reserve is part of the University of California Natural Reserve System. The reserve protects coastal dune, estuarine, tidal lagoon, sandy beach, and rocky reef habitats to support research, education, outreach, and stewardship.

### 2.2.3  State Beaches

Within the spill-affected area, Gaviota State Park, Refugio, El Capitan, Carpinteria, Emma Wood and McGrath State Beaches are areas of high public use with amenities for overnight camping and shore access. The State Beaches along the Gaviota coast provide the public with unique camping and recreational opportunities that are highly sought after and are booked well in advance. Additionally, San Buenaventura and Mandalay State Beaches provide coastal day use access. The pier at Gaviota State Beach was closed in 2014 due to storm damage, so public use was precluded prior to the spill.

### 2.2.4  State Marine Protected Areas

In 1999, the State legislature enacted the Marine Life Protection Act. This directed the CDFW to restructure the state's MPA system to increase the ability to protect marine life, habitats, and ecosystems. In 2012, MPAs were designated along the Santa Barbara County coast south of Point Conception.

Seven state marine conservation areas occur in the spill-affected area with varying levels of resource protection ranging from no-take to limited take involving fishes, invertebrates, kelp, and restoration, maintenance, and operation of artificial structures; these are Kashtayit, Naples, Campus Point, Goleta Slough, Point Dume, and Point Vincente State Marine Conservation Areas (Figure 7). The Goleta Slough Ecological Reserve overlaps with a portion of the Goleta Slough State Marine Conservation Area where no human activities are allowed, except access on an established trail/bike path. Public access is limited because the airport is next to the Reserve. To the west of the spill-affected area is the Point Conception State Marine Reserve of no-take.

### 2.2.5  National Marine Sanctuary System

NOAA's Office of National Marine Sanctuaries serves as the trustee for a network of underwater parks encompassing more than 600,000 square miles of marine and Great Lakes waters. The network includes a system of 13 national marine sanctuaries and two marine national monuments. The program's function through the creation of National Marine Sanctuaries is to protect marine environments with special ecological, historical, cultural, archeological, scientific, educational, recreational, and aesthetic qualities.

There was no oil observed or collected matching Line 901 oil within the waters of the Channel Island National Marine Sanctuary (CINMS).  However according to the GNOME trajectory, it is

31

possible that scattered tarballs did travel through CINMS waters at some point in time. The CINMS, designated in 1980, warrants inclusion in this report for its importance with regards to environmental protection and public interest proximate to the spill. The CINMS (Figure 7) encompasses the waters surrounding five Channel Islands (San Miguel, Santa Rosa, Santa Cruz, Anacapa, and Santa Barbara) below the mean high tide level and out 6.9 miles (6 nautical miles, 11 km). Associated with the Channel Islands are 20 other MPAs. Within five Federal, and 11 State Marine Reserves, it is unlawful to injure, damage, take, or possess any living geological, or cultural marine resource. In another five State Marine Conservation Areas, limited take is allowed, and within two State Special Closure Areas boating activities are restricted in waters adjacent to sea bird rookeries and/or marine mammal haulout sites.

### 2.2.6  National Park System

The Channel Islands National Park consists of San Miguel, Santa Rosa, Santa Cruz, Anacapa, and Santa Barbara Islands (Figure 7) and the waters extending out one nautical mile around each island. Congress established the Channel Islands as a National Park in 1980 in order to protect their natural, scenic, wildlife, marine, ecological, archeological, cultural, and scientific values. The Islands are home to over 2,000 plant and animal species, of which 145 are found nowhere else in the world, and much of the terrestrial environment is managed as proposed or potential Wilderness Area. Important to this incident, West Anacapa and Santa Barbara Islands provide the only breeding colonies for the California Brown Pelican in the western United States. Tourism is allowed, and hiking, camping, and kayaking occur at varying levels on and around each island.

### 2.2.7  California Coastal National Monument

The California Coastal National Monument, managed by the Bureau of Land Management, consists of the rocky areas above the mean high tide level, including over 20,000 offshore rocks, islands, reefs, and pinnacles within 13.8 miles (12 nautical miles, 22 km) of the mainland shore. Sixty-two of these rocky features occur along the shore from the Gaviota Pier east to Campus Point at U.C. Santa Barbara. The monument provides untrammeled nesting habitat for breeding seabirds and protected haulout habitat for seals and sea lions.

## 2.3   Biological Resources

The affected area has one of the most diverse and abundant assemblages of marine organisms in the world. A rich array of habitats including the open ocean, rugged rocky shores, sandy beaches, lush kelp forests, and wetlands, support large numbers of seals and sea lions, whales, fish, otters, and seabirds. For many migratory species such as whales, seals, salmonids, and brown pelicans, the affected area is also an important link to other habitats. This section includes a broad description of all biological resources in areas that were affected by the spill, as well as resources that weren't affected by the spill but may be included in restoration projects. A description of resources that were injured is presented in Section 5.

32

### 2.3.1  Marine Mammals

The mainland coast of southern California that includes Santa Barbara County and the Channel Islands provides important breeding, pupping and resting areas for most of the pinniped species in the region. These include two species of sea lions (California sea lion and Stellar sea lion), four species of seals (northern elephant seal, Pacific harbor seal, northern fur seal, and the endangered Guadalupe fur seal). The threatened southern sea otter also occurs along the mainland coast of Santa Barbara County, primarily west of Gaviota.

California sea lions are the most abundant pinniped. Nearly all breeding and pupping occurs in the California Channel Islands area. Sea lions also haul out on offshore rocks and beaches on the mainland and Channel Islands.

Northern elephant seals breed in the winter months, molt in spring, and forage in offshore waters throughout the eastern North Pacific during summer and fall. Peak haul out abundances occur during spring when juveniles and females come ashore to molt.

Pacific harbor seals are year-round residents in the area. They haul out on several mainland beaches within the spill-affected area and on the Channel Islands. Mainland haulouts include near El Capitan State Beach, Naples, Haskell's, and a major rookery at Carpinteria, peaking in February-June when breeding, pupping and molting is occurring. Harbor seals typically forage relatively close to where they haul out.

More than 20 species of whales, dolphins, and porpoises occur regularly in the waters off Santa Barbara and Ventura Counties and the Channel Islands, but the following are the most common: gray, blue and humpback whales, long- and short-beaked common dolphins, common bottlenose dolphins, and Pacific white-sided dolphins. The whales are migratory and are most often sighted during spring and summer. Dolphins are considered year-round residents. The region is also the migratory pathway of gray whales (adult females and calves), which migrate within 1 km of shore as they travel north to their summer foraging grounds. Other large baleen whales also forage in the area. The coastal ecotype of common bottlenose dolphin, a distinct population, live within 1 km of shore, and both species of common dolphin can be regularly sighted from shore.

### 2.3.2  Seabirds

The spill-affected area is also within the Pacific Flyway, which is a major north-south flyway for migratory birds in America, extending from Alaska to Patagonia, South America. The spill-affected area includes several areas identified by the Audubon Society as Important Bird Areas (IBAs): Point Conception, Santa Barbara Basin, Point Mugu, Santa Cruz Basin, Northern Channel Islands, and Palos Verdes. The Goleta Coast IBA is also within the spill-affected area, and includes Coal Oil Point and Goleta Slough and the beaches between.

Seabirds characteristic of open water areas within the spill-affected area include surf and white-winged scoters; horned and western grebes; red-throated and common loons; brown pelicans;

33

Brandt's, double-crested, and pelagic cormorants; and many species of gulls and terns. Pelagic seabirds that were present in the area during the summer when the spill occurred include black-footed albatrosses, shearwaters, storm-petrels, phalaropes, jaegers, and several alcids including Scripp's murrelets.

Seabirds characteristic of rocky shores within the spill-affected area include black oystercatchers, Brandt's and pelagic cormorants, and pigeon guillemots. Rocky platforms exposed during low tide tend to be occupied by black and ruddy turnstones, great and snowy egrets, brown pelicans, black-crowned night-herons, shorebirds, and gulls. Western snowy plovers, California least terns, and horned larks all nest on sandy beaches and dune areas within the spill area; the same areas are also utilized by shorebirds that include black-bellied plovers, whimbrels, long-billed curlews, marbled godwits, sanderlings and willets, gulls (mew, ring-billed, western, California, glaucous-winged), and Forster's and royal terns. Beach wrack in the upper zones of sandy beaches are used by short-billed and long-billed dowitchers, black and Say's phoebes, American pipits, and yellow-rumped warblers.

### 2.3.3  Subtidal and Fish Habitats

Fish composition and abundance are both strongly associated with habitat type and structure, and each type of habitat generally supports its own characteristic assemblage of fishes. The Santa Barbara County nearshore coastal fish habitats described and defined here are the habitats inshore of the -66 ft (-20 m) depth contour relative to the mean lower low water (MLLW) tide level. This nearshore zone includes kelp forests, rocky reefs, sandy bottom, seagrass beds, and the pelagic water column.

Submerged rocky reefs support forests of giant kelp. Anchored by holdfasts to the rocky seafloor, the buoyant stipes and fronds rise through the water column and spread out on the sea surface. Kelp forests thus provide benthic (seafloor), mid-water, and surface habitats that are utilized by many fish species, many of which are residential in kelp forests (Schiel and Foster 2015). Fishes, such as kelp rockfish, surfperch, sheephead, opaleye, halfmoon, señorita, white seabass, and kelp bass tend to occur in the mid-water and swim about freely in the kelp forest. Kelp forests also provide habitat for certain sharks, such as leopard and smoothhound sharks.

In addition to kelp, submerged rocky reefs also support macroalgae and surfgrass species, often occurring as understory to giant kelp. Fish, such as gopher rockfish, grass rockfish, giant kelpfish, scorpion fish, cabezon, and painted greenlings are bottom-dwellers (demersal fishes) and are often associated with the foliose algal understory. Adult spiny lobsters inhabit cracks and crevices of the rocky reef, while juvenile spiny lobsters use surfgrass habitat in the shallow subtidal for refuge and feeding.

Along sand flats and in sand channels bisecting rocky reefs, rays, skates, and flat fishes (halibut, sandabs, flounders, soles) are more common. Seagrasses (eelgrass and surfgrass) occur as meadows of long grass-green leaves (blades) that provide refuge and foraging areas for many of

34

the same species of fish that occur in kelp forests and on sand flats. Eelgrass beds also provide spawning habitat for fish.

The pelagic water column habitat contains numerous species of plankton, or life forms that cannot swim against the current but rather move primarily by drifting. Many of these plankton are important food sources for fishes and other marine creatures, providing a foundation for the complex food webs that make up the marine environment in the marine region. The larvae and eggs of many fish and invertebrate species are also considered plankton, though their adult stages are sessile or free-swimming organisms. These marine larvae develop and grow while subject to the movement of ocean currents that can transport them many miles from their natal (spawning) habitat. Eventually, these planktonic larvae mature into their non-planktonic life stage and settle out in their adult habitats, which can include kelp forests, rocky reefs, seagrass beds, sand flats, and deep offshore water. The nearshore pelagic water column habitat is also the main habitat for many species of schooling fishes, such as anchovies, sardines, and topsmelt, and also includes mobile invertebrates (e.g., market squid). In turn, these forms are the basis food source for larger forms (e.g., predatory fishes, sharks, seabirds, and marine mammals).

The rocky intertidal zone, the shore between the high and low tidal levels, is also habitat for fishes. The fishes in this zone are characterized by a smaller group of species specially adapted for life in tidepools and in the spaces beneath and between cobbles and boulders. The most representative intertidal fish species are tidepool sculpins, juvenile opaleye, and blennies.

Sandy beaches are extensive along the Santa Barbara, Ventura, and Los Angeles County coasts, and many beaches in south Santa Barbara County are important spawning habitat for California grunion. A variety of other fish species, such as barred surfperch, walleye surfperch, and corbina, forage on the burrowing intertidal invertebrates in surf and swash zones.

Several fishes that occur in the area have special protections. The Southern California Coast Distinct Population Segment (DPS) of steelhead trout is a federally endangered species. Steelhead are rainbow trout that spend the majority of their life in the ocean and return to freshwater streams to spawn (anadromous species). However, unlike the closely related salmon that are also anadromous, adult steelhead return to spawn in freshwater several times, not just once. In addition to steelhead trout, coho (silver) salmon and Chinook (king) salmon can also occur in the marine region. The coho salmon is both a state and federally listed endangered species, and the Chinook (king) salmon is a federally threatened species in California coastal waters.

Giant (black) sea bass is a marine species prohibited from commercial and recreational fishery take, and the International Union for Conservation of Nature classifies giant (black) sea bass as a critically endangered species. However, one giant (black) sea bass may be taken incidentally per trip in gill or trammel nets in the commercial fisheries, which is not uncommon. Take of great white sharks is also prohibited, with exceptions for possible incidental and accidental take in

35

commercial fisheries. Broomtail grouper is another fully protected marine fish species with a large range (San Francisco-Peru, South America) that can occur along the Santa Barbara, Ventura, and Los Angeles County coasts. One of the more visible fishes is the garibaldi, a very recognizable, bright orange damselfish. California State Legislature designated the garibaldi as the state marine fish and prohibited from take in California coastal waters.

### 2.3.4  Shoreline Habitats

The richness and diversity of intertidal invertebrates in any given area is closely related to the composition, rugosity, and stability of the substrate, tidal level, depth, and exposure to waves. Much of the rocky intertidal habitat in the affected environment consists of low-lying shale or sandstone occurring as ridges parallel to shore with lower elevation portions heavily exposed to periodic sand burial and sand scour. Some intertidal areas near creek mouths can be characterized as being largely boulder fields. Mussel beds are limited to the areas of larger and harder rock substrate in areas above sand burial depths. Common intertidal invertebrates can also include sand castle (honeycomb) worms, acorn and gooseneck barnacles, sea anemones, purple sea urchins, bryozoans, tunicates, and sponges. Common mobile invertebrate species in the intertidal zone include ochre sea stars, bat stars, hermit crabs, turban snails, limpets, whelks, nudibranchs, chitons, lined shore crabs, polychaete and nemertean worms, and more. The high intertidal splash zone is inhabited by periwinkle snails and limpets. Many more invertebrates occur in the mid- and low-intertidal zone, and also in the subtidal zone. These include octopus, top snails, abalone, red sea urchins, clams, California spiny lobsters, shrimp, rock crabs, decorator crabs, cup corals, feather duster worms, and more.

Sandy beaches are the most common intertidal habitat in the spill-affected area, and support a diversity of invertebrates tolerant of the constantly shifting sands from wave action and strong directional longshore transport of sand. Bivalve mollusks, polychaete worms (including bloodworms), beach endemic insects, and crustaceans that include sand or mole crabs, and beach hoppers (i.e., talitrid amphipods) are the predominant invertebrates on sandy beaches. The accumulation of drift algae (wrack) that is stranded on sandy beaches provides food and habitat for many species of beach hoppers, terrestrial isopods, and insects. Insects include the kelp fly, flightless beetles such as the globose dune beetle (candidate for federal listing), and predatory rove beetles. The sand bottom of the surf zone and immediately beyond support sand dollars, clams, and gastropods such as the purple olive snail.

### 2.3.5  Algae and Seagrasses

Macroalgae such as kelp and marine grasses (discussed above in the Subtidal and Fish Habitats section) such as surfgrass and eelgrass are examples of foundational species for the nearshore environment along the Gaviota Coast. A foundational species is one where the organism itself creates ecological communities by providing habitat structure and primary productivity.

Intertidal algae tend to occur as bands parallel to shore and their distribution depends on exposure to waves, tidal height, and rock structure. The upper vertical range of an algal species

36

in the rocky intertidal is largely determined by its ability to withstand desiccation. Accordingly, the high intertidal zone that is only occasionally wetted by wave splash is sparsely populated with algae. The barren appearance of the splash zone disappears lower in the intertidal zone, below the +3 ft (1 m) Mean Low-Low Water (MLLW) tide level and lower, with algal cover being more prevalent and persistent. Algal forms can be blade/sheet-like, branch-like, turf, filamentous, and crustose. Some of the more conspicuous intertidal species include the turf-like nailbrush seaweed and the blade-like grapestone seaweed, which are perennial species. A species group characteristic of most mid-intertidal zones in California but conspicuously absent or in low abundances along the Santa Barbara, Ventura, and Los Angeles County coast are brown rockweed species of the order Fucales. In the low-intertidal, Turkish-towel seaweed can be abundant with articulated coralline algae. The lowest zones will include brown feather boa kelp, bladder kelp, and branched red alga.

Unlike algal species, seagrasses are true plants. They have vascular tissue to transport internal metabolites and nutrients, and they reproduce via flowers and seeds instead of spores, as is the case with algae. The plants are attached to the substrate by rhizomes, and the remaining structure consists of long narrow emerald green leaves (blades) up to 1.5 m long. Seagrasses are important primary producers, and they provide important habitat functions, including shelter and nursery grounds for invertebrates and fishes. Seagrasses also stabilize sand from shifting about. Surfgrass occurs on boulders and rocky reefs from the low-intertidal to as deep as approximately -23 ft (-7 m) MLLW with abundance declining with depth (Williams 1995). Along the south coast, eelgrass grows in soft sediments between depths of approximately -20 ft (-6 m) and -40 ft (-12 m) (J. Altstatt, personal communication, April 9, 2018). Seagrass habitat is classified as Essential Fish Habitat by NOAA, National Marine Fisheries Service (NMFS).

Subtidal algal composition is largely dependent on the stability of the substrate and available light based on water clarity and depth. Giant kelp are the predominant kelp along the coast, occurring as dense forests growing on rocky reefs from the low-intertidal to depths of approximately -18 m MLLW. Bladder chain kelp and feather boa kelp are common in shallower water along the inshore fringes of giant kelp forests. The algal understory is generally characterized by mostly red algal species of various sizes, morphology, distribution, and abundance.

The wrack created from the seasonal loss of these plants (e.g., beach-stranded drift algae and surf grass) through storms also fuels the productivity of local sand beach and nearshore sand bottom habitats. Loss of or damage to these plants, particularly in the spring and summer, have cascading consequences for multiple associated fish and invertebrate species in the affected area.

### 2.3.6  Threatened and Endangered Species

Federal and state levels of special-status designations include:
- Federally Endangered;
- Federally Threatened;

37

- State Endangered;
- State Threatened;
- State Fully Protected Species; and
- California Species of Special Concern (pursuant to the 2008 list).

The federal Endangered Species Act (ESA) of 1973 (16 USC Section 1531 et seq.) and the California Endangered Species Act (CESA) of 1970 (Ca. Fish and Game Code Section 2050 et seq.) require the protection and conservation of listed endangered and threatened fishes, plants, and wildlife. The habitat of endangered, threatened, and rare species also takes on special importance because of these laws, and the protection and conservation of these species requires diligent management. At least three state- and/or federally-listed species were exposed to Line 901 oil from the spill: the threatened western snowy plover, the endangered black abalone, and the endangered humpback whales.

Several other state- and federally-listed or protected species occur in areas exposed to the spill. However, these species are not thought to have been affected by the spill either because they were not present in the area at the time of the spill due to migration timing, low overall population density or scarcity, or because oil never reached their habitat. These species include the California red-legged frog, Gaviota tarplant, light-footed Ridgway rail, Belding's savannah sparrow, California least tern, southern sea otter, Steller sea lion, Guadalupe fur seal, blue whale and fin whale, green turtle, hawksbill turtle, leatherback turtle, and loggerhead turtle. For pelagic seabirds such as the Scripps's murrelet it is possible that these birds could have encountered oil from the spill, but there was no evidence of mortality.

Two federally endangered fish species, the tidewater goby and Southern California Coast Steelhead DPS, are known to occur in coastal watersheds along the Gaviota Coast (USFWS 2005; NMFS 2012). Following the spill, a visual assessment of the entrances to streams and estuaries was completed by USFWS and NOAA. It was determined that there were large natural berms or artificial booms in place at the entrances to the streams and estuaries in the spill-affected area, making exposure to oil unlikely. Thus, the Trustees did not pursue further studies in these watersheds.

## 2.4    Archeological and Cultural Resources

The affected environment along the Gaviota coast is home to a wide variety of culturally and historically important resources. A number of Federal and State laws, regulations, and policies govern the protection of cultural and historic resources during an emergency response and subsequent NRDA restoration, including the National Historic Preservation Act of 1966, The Native American Graves Protection and Repatriation Act of 1990, and California Executive Order B-10-11.

38

To protect cultural and archeological resources during the spill response, the Unified Command established a Cultural/Historic Group comprised of State, Federal and tribal representatives with knowledge and expertise of the cultural and historical resources in the area. The Unified Command invited California tribes listed by the Native American Heritage Commission, regardless of federal recognition status, to be a part of the response (CDFW 2016). The Cultural/Historic Group's participating tribes included:

- Santa Ynez Band of the Chumash Indians (federally-recognized);
- Coastal Band of the Chumash Nation, including the Owl Clan;
- Barbareno Band of Chumash Indians; and
- Barbareno Ventureno Band of Mission Indians.

A report of cultural resource monitoring that occurred during the spill, along with a summary of impacts to cultural resources, was compiled by Nocerino et al. (2016) of Applied Earth Works. Because it contains archeological site information, it is confidential. The sections below are excerpted largely from Nocerino et al. (2016) and contain the non-confidential details summarizing the general nature of archeological and cultural resources in the spill-affected area, as well as impacts to those resources from the spill and response activities.

The Chumash Indians and their Native American ancestors have occupied the Santa Barbara Channel region for at least 13,000 years and thousands of their descendants live in the area today. Prior to European contact, the coastal Chumash had some of the highest population densities recorded for hunter-gatherers in North America. The Chumash people lived in villages along the California coast from Malibu to Morro Bay, and extended to the northern Channel Islands (McGinnis et al. 2004). Along the Santa Barbara Channel, the antiquity and density of Chumash occupation has led to a very large number of archeological sites ranging from historic Chumash coastal towns to ancient villages, cemeteries, campsites, and temporary locations. The density of Native American sites is particularly high within the central response area along the western Santa Barbara Channel, where the narrow coastal plain concentrated settlement within a thin band of land. The area also contains numerous historical sites dating to the Spanish, Mexican, and American periods, including shipwrecks, homesteads, ranching and fishing facilities, roads, railroads, oil facilities, and more. In some cases, historical facilities such as piers and seawalls extended into the intertidal zone and into nearshore waters. As was the case with Native American sites, coastal erosion has also resulted in the exposure or redeposition of historic artifacts or properties in the intertidal zone or on beaches of the Santa Barbara Coast.

The archeological sites along the Gaviota coast demonstrate an intimate use of coastal resources for subsistence of native people and their cultural traditions through time. Sites dating back to at least 13,000 years contain stemmed points and flaked stone crescents associated with remains of shellfish, fish, marine mammals, seabirds, and waterfowl, including a number of species closely associated with kelp forest habitats. The Channel Islands region is considered the place of origin for the Chumash people and is central to their cosmology (Office of National Marine Sanctuaries 2019). A Chumash creation story tells of the crossing of Chumash people from the Channel Islands to the mainland across a wištoyo (rainbow), during which some become dizzy and fall

39

from the bridge and are transformed into 'alolk'oy (dolphins) by Hutash (Earth Goddess) (Tumamait-Stenslie 2014). This story exemplifies the foundational importance of the Santa Barbara Channel and its natural resources to the Chumash people, and illustrates the cultural importance of key species, such as dolphins. Dolphins and abalone are regarded as Chumash brothers and sisters of the ocean (Office of National Marine Sanctuaries 2019).

Applied Earthworks initiated a records search on May 20, 2015, in order to identify the types of cultural resources that may be encountered in the response area. The records search encompassed the area within 0.5 mile of the shoreline between Point Conception and Rincon Point. A review of the records identified 99 archeological sites were within the "response envelope" between Gaviota and Rincon Point, from the low tideline to 0.25 mile inland. Only one other cultural resource (a row of historic palm trees at Refugio State Beach) is within the response envelope. Of the 99 archeological sites within the response envelope, 26 sites plus the row of palm trees were assessed for potential impacts resulting from response activities. The remaining 73 sites were not in or near response activities and were not assessed. Three previously unrecorded archeological sites, six previously unrecorded historic seawalls, and a historical culvert were identified within the response envelope during the cleanup monitoring and survey.

During beach and shoreline cleaning operations, the Cultural/Historical Group, led by a Cultural/Historical Technical Specialist from CDFW, coordinated tribal representatives and non-tribal archeologists to be present to identify bones, artifacts, and potential artifacts encountered. Additional details of this coordination are available in the Refugio Oil Spill Response Evaluation Report (CDFW 2016). In several areas, access to beaches necessitated foot travel by cleanup crews across archeological sites because no safe alternatives could be identified. Trail delineations, carpet anchored with sandbags, and all–terrain vehicle restrictions were implemented for these locations. In addition, archaeologists and tribal representatives were present to ensure crews remained on the paths and protective measures remained in place.

During cleaning operations, isolated redeposited artifacts were noted in the intertidal zone at Refugio State Beach and El Capitan State Beach, within the jurisdiction of California State Parks, beginning on the first day of the incident response. The majority of the items were ground stone fragments (e.g., bowl or mortar fragments). These artifacts were evaluated by the Cultural/Historical Group. Because their original context could not be identified, these items were considered ineligible for listing on the National Register of Historic Places and California Register of Historical Resources. Some tribal representatives expressed concerns regarding sensitive cultural values associated with these intertidal artifacts and their desire to avoid oiling or other disturbance of these items during response activities.

The incident's Historic Properties Treatment Plan called for leaving isolated intertidal artifacts in place unless there was an imminent risk of oiling or disturbance by incoming tides, in which case such artifacts were to be temporarily collected until such risk abated. During the spill, the Cultural/Historical Group collected 37 artifacts from the intertidal zone, as well as numerous other items that were inspected and determined not to be artifacts. Of the items collected, two

40

were redeposited at sea during the response, following consultation among the Cultural/Historical Group. The remaining artifacts were archived at the La Purisima Mission State Historic Park following discussion and consent among California State Parks and the involved tribes.

Nocerino et al. (2016) conclude that there were no significant impacts to potentially significant archeological deposits due to the oil release or resulting response operations, and that efforts made by the Unified Command, and the Cultural/Historical Group successfully avoided significant impacts to cultural resources.

## 2.4.1  Coordination with Native American Tribes

During the course of the NRDA, the Trustees coordinated with several tribes identified during the oil spill response with cultural and traditional affiliation to the area affected by the spill, including:

- Santa Ynez Band of the Chumash Indians (federally-recognized);
- Coastal Band of the Chumash Nation, including the Owl Clan;
- Barbareño Band of Chumash Indians; and
- Barbareño/Ventureño Band of Mission Indians.

Most of these tribes participated in the oil spill response by providing monitors to protect historic sites during cleanup operations. Under OPA, federally-recognized tribes may designate tribal officials to act as trustee for their tribal natural resources and may make a claim for injuries to those resources, such as in cases where reservation lands or a treaty right has been injured by the spill. In this case, reservation lands of the Santa Ynez Band of Chumash Indians were not impacted, and no treaty rights were identified to have been injured by the spill. However, the natural resources that are the subject of the NRDA are culturally important to all of the affected tribes and, as such, the Trustees made efforts to communicate with the tribes throughout the NRDA process and to seek their input on restoration priorities.

While the other bands do not have trustee status under OPA, the trustees from the State of California communicated with as many tribes as possible throughout the process consistent with state law and policies. During the public comment period following the release of the Draft DARP/EA, the Trustees were informed that additional tribes, bands and clans may have an interest in some of the Tier 1 and 2 projects impact natural cultural resources important to the Chumash community and/or restore sensitive ecosystems critical to Chumash lifeways.

Following the public comment period, the Trustees contacted the Native American Heritage Commission to obtain an updated list of tribes with cultural and traditional affiliation to the area of impact.  In addition, through the public comment process the Trustees were provided the names of the additional tribes, bands and clans that may have an interest in some of the Tier 1 and 2 projects. Through these combined efforts, the following additional tribes were identified:

- Barbareño Chumash Tribal Council;

41

- Chumash Indian Council of Bakersfield of California;
- Northern Chumash Tribal Council;
- Salinan-Chumash Nation;
- San Luis Obispo County Chumash Council;
- Tejon Indian Tribe; and
- Yak Tityu Tityu Yak Tilhini Northern Chumash.

The Trustees conducted additional coordination with tribes following the public comment process and before finalizing the DARP/EA. We anticipate continued coordination with tribes throughout the implementation of restoration to ensure that restoration is conducted in a way that is protective of sacred sites and is respectful of cultural keystone species that have significance beyond their role in the ecosystem. This coordination will allow tribes to share traditional and local knowledge of managing the resources that were damaged as a result of the spill (Sea Grant Network 2018).

## 2.5    Recreational Services

The impacted beaches are some of the most popular in the state. Refugio and El Capitan State Beaches are among the few places on the California coast where one can camp immediately adjacent to the beach in the shade of coast live oaks, western sycamores, and in the case of Refugio, palm trees. These campgrounds are often full in the summer and require reservations made long in advance. In addition to these camping areas, there are numerous coastal access points where the public can enjoy beach access along undeveloped areas with a variety of recreation activities. The affected environment also supports boating and offshore recreation opportunities such as diving and fishing. There are significant recreational impacts from the spill that are described further in Section 5.5.

42

## 3.0   Coordination and Compliance

## 3.1   Federal and State Trustee Agencies

United States Department of Commerce represented by NOAA; the United States Department of the Interior represented by USFWS, NPS and BLM; the CDFW-OSPR; the CDPR; the CSLC; and the Regents of the University of California are the Trustees who are addressing the natural resources injured by the spill. NOAA and DOI are designated Trustees for natural resources pursuant to the Oil Pollution Act (33 U.S.C. §§ 2701–2762) and subpart G of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) (40 C.F.R § 300.600) and Executive Order 12580 (3 CFR, 1987 Comp., p. 193, 52 Fed. Reg. 2923 (January 23, 1987), as amended by Exec. Order No. 12777 (56 Fed. Reg. 54757 (October 22, 1991)). CDFW and CDPR have been designated as state trustees for natural resources pursuant to Section 1006(b)(3) of the OPA. In addition, CDFW has state natural resource trustee authority pursuant to Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (Government Code § 8670.1 et seq.). CDPR and UC Regents also have jurisdiction over natural resources within the state park system and the natural reserve system, respectively, which are held in trust for the people of the State of California. Finally, CSLC is participating as a Trustee pursuant to its jurisdiction under Public Resources Code §§ 6009 and 6301 over all state sovereign lands, including ungranted tidelands and submerged lands. As a designated Trustee, each agency is authorized to act on behalf of the public under state and/or federal law to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured as a result of a discharge of oil.

## 3.2   Coordination

### 3.2.1   Coordination Among the Trustees

Federal regulations implementing OPA with respect to natural resource damages ("OPA NRDA regulations") provide that where an oil spill affects the interests of multiple Trustees, they should act jointly to ensure that full restoration is achieved without double recovery of damages (15 CFR § 990.14(a)). The Trustees in this matter have worked together closely in a shared effort to fully assess the nature and extent of injuries to natural resources and plan appropriate actions to restore the injured resources.

At the beginning of the NRDA, the Trustees jointly designated CDFW as the Lead Administrative Trustee (LAT) to act as coordinator pursuant to 15 CFR § 990.14(a)(1). The Trustees also designated NOAA as the Federal Lead Administrative Trustee (FLAT) to coordinate those activities, such as NEPA compliance, that must be undertaken by a Federal agency. In addition to coordinating amongst themselves, the Trustees also coordinated NRDA activities with other affected entities, including Santa Barbara County, the City of Goleta and others.

43

### 3.2.2  Coordination with Federally Recognized and Non-Federally Recognized Tribes

The Trustees coordinated with several American Indian tribes in the course of this NRDA. These included:

- Santa Ynez Band of the Chumash Indians (federally-recognized);
- Coastal Band of the Chumash Nation, including the Owl Clan;
- Barbareno Band of Chumash Indians; and
- Barbareno Ventureno Band of Mission Indians.

These tribes participated in the oil spill response by providing monitors to protect historic sites during cleanup operations. Under OPA, federally-recognized tribes may serve as natural resource trustees and make a claim for NRD. In this case, the Santa Ynez Band of Chumash Indians elected not to join the claim, but remain interested in the restoration process generally. For this reason, the Trustees continue to engage with Santa Ynez Band of Chumash regularly, simultaneously fulfilling the federal Trustees' tribal consultation obligations. While the non-federally recognized tribes are not eligible to be a natural resource trustee under OPA, the state Trustees have communicated with these tribes throughout the process, regardless of recognition status.

### 3.2.3  Coordination with the Responsible Party

The OPA NRDA regulations encourage natural resource trustees and responsible parties to cooperate in the assessment and restoration process, providing broad discretion to the parties to determine the nature and extent of participation (15 C.F.R. § 990.14(c)). However, the Trustees retain sole authority to make determinations regarding injury and restoration (15 C.F.R. § 990.14(c)(4)).

In accordance with the regulations, the Trustees extended an invitation to the responsible party, Plains, within days of the Incident, and Plains accepted (15 C.F.R. § 990.14(c)). Thereafter, the Parties established an active cooperative assessment process, by which Trustee representatives would coordinate studies and other technical activities in the injury determination and quantification stages of the assessment with representatives of Plains. The Trustees formed technical working groups that included biologists, economists, toxicologists, and other specialists, and developed work plans that were used to guide injury assessment activities. Plains commented on work plans and participated in some studies.

This DARP/EA, while prepared solely by the Trustees, reflects consideration of the input provided by Plains' representatives. Plains does not agree with certain conclusions presented in this document.

### 3.2.4  Coordination with the Public

Throughout the NRDA process, the Trustees have made information available to the public. The Trustees held a public meeting in Santa Barbara shortly after the oil spill on January 20, 2016,

44

and they published a series of newsletters to keep the public up to date on the progress of the NRDA.

The Trustees published a Notice of Intent (NOI) to Conduct Restoration Planning on March 8, 2019, pursuant to the OPA NRDA regulations (15 C.F.R § 990.44), and concurrently opened an administrative record (15 CFR § 990.45). The Record includes documents relied upon or considered by the Trustees during the assessment and restoration planning process.

A 45-day public review period was held for the Draft DARP/EA that began on April 22, 2020 and closed on June 8, 2020. During the public review period, the Trustees received extensive comments on the DARP/EA, which can be found with the Trustees' responses in Appendix O.

The Trustees held virtual public meetings on May 13, 2020 at 1:00 and 6:00 pm PDT. At these meetings, the Trustees presented an overview of the Draft DARP/EA, answered questions, and accept public comments.

The Administrative Record is available at: https://www.diver.orr.noaa.gov/web/guest/diver-admin-record/6104. The administrative record is also available upon request at:

> Ventura Fish and Wildlife Office
> U.S. Fish and Wildlife Service
> 2493 Portola Road, Suite B
> Ventura, California 93004
> (805) 644-1766.

## 3.3    Compliance with Environmental Laws, Regulations, and Policies

### 3.3.1  The Oil Pollution Act

The Oil Pollution Act (33 U.S.C. § 2701–2762) establishes a liability regime for oil spills into navigable waters or adjacent shorelines that injure or are likely to injure natural resources and the services that those resources provide to the ecosystem or humans. Pursuant to OPA, federal and state agencies and Indian tribes may act as Trustees on behalf of the public to assess the injuries, scale restoration to compensate for those injuries, and implement restoration. The DARP/EA has been prepared jointly by DOI, NOAA, CDFW, CSPR, CSLC, and UC Regents. As described above, each of these agencies is a designated Trustee for natural resources injured by the spill.

OPA defines "natural resources" to include land, fish, wildlife, water sources, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any State or local government or Indian tribe, or any foreign government (33 U.S.C. § 2701(20)). OPA authorizes the Trustees to assess damages for injured natural resources under their trusteeship, and develop and implement a plan for the restoration, rehabilitation,

45

replacement, or acquisition of the equivalent of those injured natural resources (33 U.S.C. § 2706(c)).

The regulations for natural resource damage assessments under OPA are found at 15 C.F.R Part 990. These regulations provide the Trustees with guidelines on processes and methodologies for carrying out an NRDA, including guidelines for conducting assessments cooperatively with the responsible parties. While the decision whether or not to follow the NRDA regulations is left to the discretion of the Trustees, OPA provides that if the Trustees conduct the NRDA in accordance with the regulations, their determination or assessment of damages to natural resources will have the force and effect of a rebuttable presumption in an administrative or judicial proceeding under OPA (33 U.S.C. § 2706(e)(2); 15 C.F.R. § 990.13). In this case, the Trustees elected to conduct the NRDA in accordance with the OPA NRDA regulations.

### 3.3.2   National Marine Sanctuaries Act, 16 USC. § 1431, et seq.

The National Marine Sanctuaries Act (NMSA) authorizes the Secretary of Commerce (Secretary) to designate and manage areas of the marine environment with special national significance due to their conservation, recreational, ecological, historical, scientific, cultural, archeological, educational, or esthetic qualities as national marine sanctuaries. Day-to-day management of national marine sanctuaries has been delegated by the Secretary to the Office of National Marine Sanctuaries (ONMS). The primary objective of the NMSA is to protect marine resources, such as coral reefs, sunken historical vessels or unique habitats.

The NMSA prohibits the destruction, loss of, or injury to any sanctuary resource. The Secretary is required to conduct such enforcement activities as are necessary and reasonable to carry out the Act. The Secretary may issue special use permits which authorize specific activities in a sanctuary to establish conditions of access to and use of any sanctuary resource or to promote public use and understanding of a sanctuary resource. The NMSA also establishes, similar to OPA, liability for response costs and natural resource damages for injury to sanctuary natural resources.

In this case, the ONMS participated because of potential injury to the Channel Islands Marine Sanctuary (CINMS). CINMS staff participated as part of the Trustee group early on to identify potential injury to Sanctuary resources concurrently with similar work being conducted under OPA. However, no injuries were assessed within Sanctuary boundaries, although oiled marine mammals and birds use marine sanctuaries as part of their habitats.

The CINMS also participated in restoration planning, identifying appropriate restoration projects occurring within the CINMS. This coordination will continue for restoration projects that have the potential to affect resources within a sanctuary.

46

### 3.3.3  The National Environmental Policy Act

The National Environmental Policy Act (NEPA) is the basic national charter for the protection of the environment, and it sets forth a specific process of impact analysis and public review for federal agency actions that may significantly affect the environment (42 U.S.C. §§ 4321–4335; 40 C.F.R. § 1500.1). Its purposes are to "encourage productive and enjoyable harmony between man and the environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; and to enrich the understanding of the ecological systems and natural resources important to the Nation" 42 U.S.C. §4321. NEPA provides a mandate and a framework for federal agencies to consider all reasonably foreseeable environmental effects of their proposed actions and to potentially involve and inform the public in their process. NEPA also established the Council on Environmental Quality (CEQ) in the Executive Office of the President to formulate and recommend national policies which ensure that the programs of the federal government promote improvement of the quality of the environment. CEQ also promulgated regulations to provide Federal agencies with procedures to comply with NEPA (40 C.F.R. § 1500.1(a)).

Where potential environmental impacts are unknown or considered not likely to be significant, federal agencies will prepare an environmental assessment (EA). The EA may undergo a public review and comment period, and the process concludes with either a finding by the action agency of no significant impact (FONSI) or a determination that an Environmental Impact Statement (EIS) should be prepared. An EIS is prepared for actions considered to have significant effects on the environment, and after public review and comment, findings are documented in a record of decision (ROD).

In accordance with the regulations implementing the OPA NRDA process, the Trustees have integrated OPA restoration planning with the NEPA process (15 C.F.R. § 990.23). Accordingly, the DARP/EA serves as both an OPA restoration plan and a NEPA EA document. The Trustees anticipate that this DARP/EA will meet NEPA requirements for most of the restoration projects described herein. However, subsequent NEPA compliance may be required prior to implementation of some of the restoration actions pending development of sufficient project-level detail. The need for additional NEPA review will be determined once detailed engineering design work or operational plans are developed for selected projects. Additional review may also be required if any second tier projects are implemented.

### 3.3.4  Other Federal and State Laws, Regulations, and Policies

As described above, OPA, NMSA, and NEPA, and federal regulations implementing these laws are the major federal laws and regulations guiding the development of this DARP/EA for restoration of injured resources and services resulting from the spill. However, there are other federal and state laws, regulations or policies that may be pertinent to this DARP/EA or to implementation of the specific restoration actions described herein. Potentially relevant laws, regulations, and policies are set forth below.

47

*Clean Water Act*

The federal Water Pollution Control Act (commonly referred to as the Clean Water Act or CWA) is the principal federal statute governing water quality (33 U.S.C. §§ 1257–1387). The CWA's objective is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. The CWA regulates both the direct (point source) and indirect (non-point source) discharge of pollutants into the Nation's waters.

Section 402 of the CWA established the National Pollution Discharge Elimination System (NPDES) program. The CWA allows EPA to authorize state governments to implement the NPDES program. Section 301 of the CWA prohibits the discharge into navigable waters of any pollutant by any person from a point source unless it is in compliance with a National Pollution Discharge Elimination System (NPDES) permit. Section 319 of the CWA directs states to identify best management practices and measures to reduce non-point source pollution.

Section 311 of the CWA regulates, among other things, the discharge of oil and other hazardous substances into navigable waters, adjoining shorelines, and waters of the contiguous zone. The CWA allows the federal government to remove the discharges and assess the removal costs against the responsible party. The CWA defines removal costs to include costs for the restoration or replacement of natural resources damaged or destroyed as a result of a discharge of oil or a hazardous substance.

Section 404 of the CWA authorizes the U.S. Army Corps of Engineers (the Corps) to issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into the waters of the United States. Section 401 of the CWA provides that any applicant for a federal permit or license to conduct any activity which may result in any discharge into navigable waters must obtain certification of compliance with state water quality standards.

The Trustees anticipate that some restoration projects may trigger CWA permitting requirements. For those projects, such as the Ellwood seawall removal, the implementing entity will be required, as a condition of receiving restoration funds, to obtain the appropriate permits prior to project implementation.

*Rivers and Harbors Appropriation Act of 1899*

The Rivers and Harbors Appropriation Act of 1899 regulates the development and use of the nation's navigable waterways (33 USC. §§ 401–427). Section 10 of the Act prohibits unauthorized obstruction or alteration of navigable waters and vests the U.S. Army Corps of Engineers with authority to regulate discharges of fill and other materials into such waters.

The Trustees do not believe that any of the restoration projects set forth in this DARP/EA have the potential to negatively affect navigable waters because none of the projects will result in the obstruction or alteration of navigable waters.

48

### *Coastal Zone Management Act*

The goal of the Coastal Zone Management Act (CZMA) is to encourage and assist states to preserve, protect, develop and, where possible, restore and enhance valuable natural coastal resources (16 U.S.C. §§ 1451–1466). Participation by states is voluntary. California developed the California Coastal Management Program pursuant to the requirements of the federal CZMA, and NOAA approved the program in 1977. The State has also enacted the federally approved California Coastal Act.

Section 1456 of the CZMA requires that any federal action inside or outside of the coastal zone that affects any land or water use or natural resources of the coastal zone shall be consistent to the maximum extent practicable with the enforceable policies of approved state management programs. It states that no federal license or permit may be granted without giving the State the opportunity to concur that the project is consistent with the state's coastal policies. The regulations implementing the CZMA outline the consistency procedures.

The California Coastal Commission (CCC) is designated under California's federally approved Coastal Management Program as the state agency responsible for reviewing all consistency documents concerning most coastal lands in California. Under the California Coastal Management Program, the CCC is empowered to use the authority of the federal CZMA to ensure that federal projects and activities within the coastal zone are consistent with the policies of the California Coastal Management Program and state law.

The Trustees believe that the projects set forth in this DARP/EA can be implemented in a manner that will either have no adverse effect on coastal resources or uses or will be consistent to the maximum extent practicable with the CZMA, the California Coastal Act (California Public Resources Code Sections 30000, et seq.), and the California Coastal Management Program. Prior to implementation, the Trustees and/or the project implementers, as appropriate, will seek concurrence from the CCC for these projects.

### *Endangered Species Act*

The purpose of the Endangered Species Act (ESA) is to conserve endangered and threatened species and the ecosystems upon which they depend (16 U.S.C. §§ 1531–1544). The ESA, among other things, directs all federal agencies to utilize their authorities to further these purposes. Pursuant to Section 7 of the ESA, federal agencies shall, in consultation with the Secretaries of the Interior and/or Commerce, ensure that any action that they authorize, fund, or carry out is not likely to jeopardize the continued existence of any endangered or threatened species, or result in the destruction or adverse modification of designated critical habitat.

Under the ESA, the National Marine Fisheries Service (NFMS) and the USFWS publish lists of endangered and threatened species. Before initiating an action, the federal action agency (i.e., the federal agency authorizing, funding, or carrying out a discretionary activity or program), or its

49

non-federal permit applicant, must ask the USFWS and/or NMFS to provide a list of threatened, endangered, proposed, and candidate species and designated critical habitat that may be present in the project area. If no species or critical habitats are known to occur in the action area[7], the federal action agency has no further ESA obligations under Section 7. If the federal action agency determines that a project may affect a listed species or designated critical habitat, consultation is required.

If the federal action agency concludes that the project will not adversely affect listed species or critical habitat, the agency submits a "not likely to adversely affect" determination to the USFWS and/or NMFS. If the USFWS and/or NMFS concur with the federal action agency's determination of "not likely to adversely affect," then the consultation (informal to this point) is completed and the decision is put in writing.

If the federal action agency determines that the project is likely to adversely affect either a listed species or its critical habitat, then more formal consultation procedures are required. There is a designated period in which to consult (90 days), and beyond that, another set period for the USFWS and/or NMFS to prepare a biological opinion (45 days). The determination of whether or not the proposed action would be likely to jeopardize the species or adversely modify its critical habitat is contained in the biological opinion. If a jeopardy or adverse modification determination is made, the biological opinion must identify any reasonable and prudent alternatives that could allow the project to move forward.

Several federally-listed species occur in the project areas for this DARP/EA. For each selected project described in this Final DARP/EA, the Trustees and/or the project implementer, as appropriate, will evaluate the potential effects of the project on listed species and critical habitat. Based on this analysis, the Trustees and/or project implementer will perform the appropriate level of consultation with the USFWS and/or NMFS pursuant to Section 7 of the ESA.

***Magnuson-Stevens Fishery Conservation and Management Act***
The federal Magnuson-Stevens Fishery Conservation and Management Act, as amended and reauthorized by the Sustainable Fisheries Act of 1996, establishes a program to promote the protection of essential fish habitat (EFH) in the review of projects conducted under federal permits, licenses, or other authorities that affect or have the potential to affect such habitat (16 U.S.C. §§ 1801–1869). After EFH has been described and identified in fishery management plans by the regional fishery management councils, federal agencies are obligated to consult with the Secretary of Commerce with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any EFH.

---

[7] An "action area" consists of all areas that may be affected directly or indirectly by the proposed action and not merely the immediate area involved in the action.

50

EFH occurs within the project areas for this DARP/EA. For each selected project in this Final DARP/EA, the Trustees and/or the project implementer, as appropriate, will evaluate the potential effects of the project on EFH. Based on this analysis, the Trustees and/or project implementer will perform the appropriate level of consultation with NMFS.

*Fish and Wildlife Coordination Act*

The Fish and Wildlife Coordination Act (FWCA) provides the basic authority for the USFWS involvement in the evaluation of impacts to fish and wildlife from proposed water resource development projects (16 U.S.C. §§ 661–667d). The FWCA requires that federal agencies consult with the USFWS (and/or NMFS as may be appropriate) and state wildlife agencies for activities that affect, control or modify waters of any stream or other bodies of water, in order to minimize the adverse impacts of such actions on fish and wildlife resources and habitat. This consultation is generally incorporated into the process of complying with Section 404 of the Clean Water Act, NEPA or other federal permit, license or review requirements.

The Trustees or the project implementer, as appropriate, will consult with the necessary agencies on any of the selected restoration projects that involve activities that affect, control, or modify streams or other bodies of water.

*Marine Mammal Protection Act*

The Marine Mammal Protection Act (MMPA) prohibits, with certain exceptions, the take of marine mammals in US waters and by US citizens on the high seas, and the importation of marine mammals and marine mammal products into the United States. (16 U.S.C. §§ 1361–1423h). Under the MMPA, the Secretary of Commerce, through NMFS, is responsible for the conservation and management of pinnipeds (other than walruses) and cetaceans, and the Secretary of the Interior, through USFWS, is responsible for walruses, sea and marine otters, polar bears, manatees, and dugongs. Title II of the MMPA established an independent Marine Mammal Commission which provides independent oversight of the marine mammal conservation policies and programs being carried out by federal regulatory agencies. The Commission is charged with developing, reviewing, and making recommendations on domestic and international actions and policies of all federal agencies with respect to marine mammal protection and conservation. The MMPA provides for several exceptions to the moratorium on taking and importing marine mammals and marine mammal products. NMFS and USFWS may issue permits for take or importation for purposes of scientific research, public display, photography for educational or commercial purposes, enhancing the survival or recovery of a species or stock, importation of certain polar bear parts taken in sports hunting in Canada, and incidental taking in the course of commercial fishing operations.

The restoration actions set forth by the Trustees in this DARP/EA are permitted actions under the MMPA. The Trustees will consult with NMFS and/or USFWS to ensure the selected restoration projects do not violate the MMPA.

51

*Migratory Bird Treaty Act of 1918*
The Migratory Bird Treaty Act (MBTA) implements four international treaties involving protection of migratory birds, including all marine birds, and is one of the earliest statutes to provide for avian protection by the federal government (16 U.S.C. §§ 703–712). The MBTA generally prohibits actions to "pursue, hunt, take, capture, kill, attempt to take, kill, possess, offer for sale, sell, offer to purchase, deliver for shipment, ship, cause to be shipped, deliver for transportation, transport, cause to be transported, carry, or cause to be carried by any means whatever, receive for shipment, transportation or carriage, or export, at any time, or in any manner, any migratory bird...or any part, nest, or egg of such bird." Exceptions to these prohibitions are only allowed under regulations or permits issued by the USFWS. Hunting of migratory game birds is regulated annually through a process in which the USFWS sets "framework regulations" and "special regulations" designed to maintain sustainable hunting levels. All other actions prohibited by the MBTA are only allowed under specific permits issued by the USFWS Regional Bird Permit Offices.

Implementation of restoration projects selected in this Final DARP/EA will be conducted in full compliance with the MBTA.

*Executive Order 11988 – Construction in Flood Plains*
The 1977 Executive Order 11988 seeks to avoid, to the extent possible, the long-and short-term adverse impacts associated with the occupancy and modification of flood plains and to avoid direct or indirect support of development in flood plains wherever there is a practicable alternative. Each federal agency is responsible for evaluating the potential effects of any action it may take in a flood plain. Before taking an action, the federal agency should determine whether the proposed action would occur in a flood plain. For any major federal action significantly affecting the quality of the human environment, the evaluation would be included in the agency's environmental impact statement prepared pursuant to NEPA. The agency should consider alternatives to avoid adverse effects and incompatible development in flood plains. If the only practicable alternative requires siting in a flood plain, the agency should: (1) design or modify the action to minimize potential harm, and (2) prepare and circulate a notice containing an explanation of why the action is proposed to be located in the flood plain.

None of the restoration projects set forth in this DARP/EA involve construction in a floodplain.

*Executive Order 13112 – Invasive Species*
The 1999 Executive Order 13112 requires that all federal agencies whose actions may affect the status of invasive species shall, to the extent practicable and permitted by law, (1) identify such actions, and (2) take actions specified in the Order to address the problem consistent with their authorities and budgetary resources; and (3) not authorize, fund, or carry out actions that they believe are likely to cause or promote the introduction or spread of invasive species in the United States or elsewhere unless, "pursuant to guidelines that it has prescribed, the agency has determined and made public its determination that the benefits of such actions clearly outweigh

52

the potential harm caused by invasive species; and that all feasible and prudent measures to minimize risk of harm will be taken in conjunction with the actions."

The Trustees do not believe that any of the restoration projects set forth in this DARP/EA have the potential to cause or promote the introduction or spread of invasive species. However, some of the restoration projects considered in this DARP/EA are aimed at the removal or control of non-native species.

### Executive Order 12898 – Environmental Justice

The 1994 Executive Order 12898 requires each federal agency to identify and address, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority and low-income populations. In the memorandum to heads of departments and agencies that accompanied executive Order 12898, the President specifically recognized the importance of procedures under NEPA for identifying and addressing environmental justice concerns. The memorandum states that "each federal agency shall analyze the environmental effects, including human health, economic and social effects, of federal actions, including effects on minority communities and low-income communities, when such analysis is required by [NEPA]." The memorandum particularly emphasizes the importance of NEPA's public participation process, directing that "each federal agency shall provide opportunities for community input in the NEPA process." Agencies are further directed to "identify potential effects and mitigation measures in consultation with affected communities, and improve the accessibility of meetings, crucial documents, and notices." The CEQ has oversight of the federal government's compliance with Executive Order 12898 and NEPA.

The Trustees have involved the affected communities by providing notice to the public, seeking public comments, holding public meetings and providing public access to the Administrative Record. In addition, all selected actions described in this Final DARP/EA are expected to have positive environmental impacts and not to impose any adverse impacts on any community.

### Information Quality Act, Public Law 106-554, Section 515

Information disseminated by federal agencies to the public after October 1, 2002, is subject to information quality guidelines developed by each agency pursuant to Section 515 of Public Law 106-554 that are intended to ensure and maximize the quality of the objectivity, utility and integrity of such information. This DARP/EA is an information product covered by information quality guidelines established by NOAA and DOI for this purpose. The quality of the information contained herein is consistent with the applicable parts of these guidelines.

## 3.3.5   State Laws, Regulations, and Policies

### California Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code § 9574.1, et seq.

The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act became effective on September 24, 1990. This legislation and subsequent amendments are the key state compensatory

53

mechanism for oil spills and establishes a comprehensive liability scheme for damages resulting from oil spills into waters of the state, excluding groundwater. The legislation also established an Administrator for oil spill response, appointed by the Governor, and the Office of Spill Prevention and Response (OSPR) within the CDFW. The Administrator is required to ensure that, as part of the response to any significant spill, damages to natural resource are assessed. Recoverable damages include damages for the injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss, the cost of rehabilitating wildlife, habitat, and other resources, and the loss of use and enjoyment of natural resources, public beaches, and other public resources.

The Administrator, a chief deputy director of CDFW, must coordinate all actions required by state or local agencies to assess injury to, and provide full mitigation for injury to, or to restore, rehabilitate, or replace, natural resources, including wildlife, fisheries, wildlife or fisheries habitat, and beaches and other coastal areas, that are damaged by an oil spill. Such actions include actions required by state trustees under Section 1006 of OPA (requiring state trustees to assess natural resource damages under their trusteeship and to develop and implement a plan for restoration of natural resources).

In this case, the state Trustees participated as part of the Trustee group to identify and quantify injuries to natural resources, including wildlife, fisheries, wildlife or fisheries habitat, and beaches and other coastal areas, and the loss of their use, under the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act concurrently with similar work being conducted under OPA.

The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act does not contain public participation requirements like OPA; however, since the natural resources belonging to, managed by, controlled by, or appertaining to the State of California or political subdivision thereof that were injured by the spill are also compensable under OPA, they are dealt with concurrently in this document.

*California Environmental Quality Act, Pub. Res. Code 21000-21178.1*
The California Environmental Quality Act (CEQA) was adopted in 1970. Its basic purposes are to inform California governmental agencies and the public about the potentially significant effects of proposed activities, to identify ways that environmental damage can be avoided or significantly reduced, to prevent significant avoidable damage to the environment through adoption of feasible alternatives or mitigation measures, and to disclose the reasons for agency approval of a project resulting in significant environmental effects.

The CEQA process begins with a preliminary review as to whether CEQA applies to the project in question. Generally, a project is subject to CEQA if it involves a discretionary action that is carried out, funded or authorized by an agency (i.e., the lead agency), and has the potential to impact the environment, including tribal cultural resources. Once the lead agency determines that the project is subject to CEQA, the lead agency must then determine whether the action is

54

exempt from CEQA compliance under either a statutory or categorical exemption. Examples of categorical exemptions include actions taken by regulatory agencies for protection of natural resources and actions by regulatory agencies for protection of the environment (Title 14 CCR, Chapter 3, §§ 15307-15308).

If the lead agency determines that the project is not exempt, then an Initial Study is generally prepared to determine whether the project may have a significant effect on the environment. Based on the results of the Initial Study, the lead agency determines whether to prepare a Negative Declaration (i.e., the project will not result in significant adverse effects to the environment) or an Environmental Impact Report (EIR). The test for determining whether an EIR or negative declaration must be prepared is whether a fair argument can be made based on substantial evidence that the project may have a significant adverse effect on the environment. Lead agencies must also provide notice to tribes that are traditionally and culturally affiliated with the geographic area of a proposed project and who have requested notice of projects proposed within that area. If the tribe requests consultation, the lead agency must consult with the tribe and consider any alternatives or mitigation measures recommended by the tribe.

CEQA encourages the use of a federal EIS or FONSI prepared pursuant to NEPA when such documents are available, or the preparation of joint state/federal documents, in lieu of preparing a separate EIR or negative declaration under CEQA. Accordingly, this DARP/EA and subsequent FONSI, if issued, may be relied upon by the lead agency towards compliance with CEQA as required for discretionary projects that are authorized, funded or carried out by California state or local agencies. Toward this end, the state Trustees will coordinate with the federal Trustees to ensure the Final DARP/EA and FONSI (if issued) are consistent with the provisions of CEQA Guidelines including state public review requirements. (Title 14 CCR, Chapter 3, § 15220 *et seq*.).

The Trustees anticipate that this DARP/EA and subsequent FONSI, if issued, will comply with the CEQA guidelines for most of the restoration projects described herein. However, subsequent CEQA compliance may be required prior to implementation of some of the restoration actions that are conceptual at this stage, pending development of sufficient project-level detail. This will be determined once detailed engineering design work or operational plans are developed for the selected projects, and once human use projects have been defined.

***California Coastal Act, California Public Resources Code § 30000, et seq.***
The California Coastal Act was enacted by the California State Legislature in 1976 to provide long-term protection of California's 1,100-mile coastline for the benefit of current and future generations. The Coastal Act created a partnership between the state (acting through the California Coastal Commission [Commission]) and coastal cities and counties to manage the conservation and development of land and water in the coastal zone through a comprehensive planning and regulatory program. New development in the coastal zone may require a permit from the Commission or the appropriate local governmental agency. Development activities are

55

broadly defined to include construction projects, divisions of land, and activities that change the intensity of use of land or public access to coastal waters. The Commission also reviews and approves Local Coastal Programs, which are the basic planning tools used by local governments to guide development in the coastal zone. The coastal zone established by the Coastal Act does not include San Francisco Bay which is regulated by the BCDC pursuant to the McAteer-Petris Act (California Government Code Sections 66690, et seq.).

While the Trustees do not anticipate that any of the restoration projects will adversely affect coastal resources, some of the projects may meet the definition of development under the California Coastal Act, such as the Ellwood seawall removal project. The implementing entity for each selected project will be required to apply for any necessary permits and approvals, including any required coastal development permit. In addition, the federal Trustees or the implementing entity, as appropriate, will conduct consultation with the CCC, as discussed above under the CZMA.

***California Endangered Species Act, Fish and Game Code 2050 et seq.***
Pursuant to CESA (California Fish and Game Code Sections 2050 et seq.), it is the policy of the State of California that state agencies should not approve projects that would jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat essential to the continued existence of those species if there are reasonable and prudent alternatives available. However, if reasonable alternatives are infeasible, individual projects may be approved if appropriate mitigation and enhancement measures are provided.

Pursuant to the CESA, the Fish and Game Commission has established a list of threatened and endangered species based on criteria recommended by the California Department of Fish and Game. Section 2080 of the California Fish and Game Code prohibits "take" of any species that the Commission determines to be an endangered species or a threatened species. Take is defined in Section 86 of the Fish and Game Code as "hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill." The CESA allows for take incidental to otherwise lawful development projects. The CESA emphasizes early consultation to avoid potential impacts to rare, endangered, or threatened species and to develop appropriate mitigation planning to offset project-caused losses of populations of listed species and their essential habitats.

Several state-listed species occur in the spill-affected area. While the Trustees do not believe the restoration projects set forth in this DARP/EA will result in the take of any state-listed species, the Trustees will evaluate the potential effects of the projects on these species and consult with the CDFW as may be appropriate pursuant to the requirements of the CESA.

56

*Public Resources Code, Division 6, § 6001, et seq.*

The Public Resources Code, Division 6, gives the California State Lands Commission trustee ownership over State sovereign tide and submerged lands. Permits or leases may be required from the State Lands Commission if a restoration project is located on such lands.

### 3.3.6   Other Potentially Applicable Statues and Regulations

Additional legal requirements may be applicable to NRDA restoration planning activities. The statutes listed below, or their implementing regulations, may require permits from federal or state permitting authorities:

- National Park Service Organic Act of 1916, 54 U.S.C. 100101-104907;
- Archaeological Resources Protection Act, 16 USC 460, et seq.;
- National Historic Preservation Act of 1966 as amended (16 USC 470-470t, 110);
- Clean Air Act, 42 USC 7401, et seq.; and
- Porter-Cologne Water Quality Control Act, Water Code Sections 13000 et seq.

57

# 4.0   Injury Quantification and Restoration Planning Methods

The Oil Pollution Act NRDA regulations define injury as "an observable or measurable adverse change in a natural resource or impairment of a natural resource service." The goal of an injury assessment is to determine the nature, extent and severity of injuries to natural resources, thus providing the technical basis for evaluating and properly scaling potential restoration actions to compensate for resource injuries. An impairment or loss of human uses of the natural resources, e.g., lost recreation, is compensable under the OPA NRDA regulations, as well. In contrast, natural resource damages are the monetary damages recoverable by natural resource trustees to compensate the public for the injuries to natural resources and the loss or impairment of human uses of natural resources resulting from an oil spill. Such damages include the cost to restore the injured natural resources, the monetary value of spill-related human use impacts, as well as the reasonable cost of the assessment.

For each of the injury categories evaluated following the spill and discussed in this DARP/EA, the Trustees, informed in part by the contributions of the responsible party, selected assessment procedures based on (1) the range of procedures available under section 990.27(b) of the OPA regulations; (2) the time and cost necessary to implement the procedures, and considering whether the additional cost of more complex procedures were related to the expected increase in the quantity and/or quality of the information to be acquired; (3) the potential nature, degree, and spatial and temporal extent of the injury; (4) potential restoration actions for the injury; (5) the relevance and adequacy of information generated by the procedures to meet information requirements of planning appropriate restoration actions; and (6) input from scientific experts. (15 C.F.R. § 990.27(c)).

## 4.1   Quantification of Damages

Each injury assessment focused on determining both the magnitude of the injury to a resource or a natural resource service (e.g., number of animals killed, acres impacted, or days of lost recreational opportunity) and the time to full recovery. This produced an estimate of the initial and interim (from the time of injury until full recovery) losses resulting from the oil spill.

The Trustees' next task is to determine the scale of restoration actions that adequately compensate the public for the injuries resulting from the spill. For wildlife and habitat, the Trustees have used Resource Equivalency Analysis (REA) or Habitat Equivalency Analysis (HEA), an approach that quantifies both the injury from the spill and the benefits of potential restoration projects, such that they may be compared with each other. For human recreational losses, the Trustees have used a valuation approach, estimating the number of lost user days for various activities and locations, and then calculating the lost value, in dollars, of that lost use. These methods are further described below.

58

### 4.1.1  Equivalency Analysis

For the quantification of injuries to wildlife and habitat, the Trustees have relied on a service-to-service restoration-based approach, in accordance with 990.53(d)(2). In other words, the Trustees have sought appropriate restoration projects to both restore the injured resources and compensate for the interim losses between the time of the spill and full recovery to the conditions that would have existed had the spill not occurred (see NOAA 1997). Restoration scaling is the process of determining the appropriate size of a restoration project, so as to compensate for the injuries and lost services. These projects, because of their compensatory nature, are intended to restore, replace, rehabilitate, or acquire the equivalent resources "of the same type and quality, and of comparable value" as those injured (NOAA 1995). For this task, the Trustees relied upon equivalency methods, sometimes specified as HEA when applied to habitat injuries or REA when applied to resources in general. These methods are described in greater detail in Appendix C.

### 4.1.2  Value of Lost Human Uses

To quantify lost and impaired human uses resulting from the Incident, the Trustees, partially in cooperation with the responsible party, have gathered data regarding visitor use of impacted sites and associated activities. To value those lost uses the Trustees used a travel cost model for beach camping and are employing the benefits transfer method for other shoreline and offshore uses. In other words, the Trustees determined the lost monetary value of each lost trip, and multiplied the resulting value by the number of lost trips. To compensate for the lost and diminished human uses arising from the spill, the Trustees intend to solicit project ideas from public agencies, non-governmental organizations, as well as from the general public. The Trustees will then select restoration actions using a value to cost approach, by which the cost of the restoration actions is equivalent to the lost monetary value of human uses.

For a number of reasons, the value-to-cost method is the most commonly used approach to address lost recreational use in NRD cases across the nation. The Trustees' determined that a value-to-value or service-to-service approach, which attempts to compare the value or benefits of specific restoration actions to the injury, would be impractical as the scope and/or number of studies required to implement either approach would be prohibitively time-consuming and expensive, and therefore less desirable under the assessment procedure criteria laid out in 990.27(c) and listed above.

A wide variety of recreational activities were affected by the spill. Examples include camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, and dog-walking, as well as more specialized activities such as fishing, diving, boating, and surfing. Additionally, a wide variety of shoreline locations in Santa Barbara, Ventura, and Los Angeles Counties were impacted. The Trustees anticipate implementing a suite of restoration projects to compensate for impacts to various types of activities across the spill-affected area. The Trustees' anticipate that multiple projects will compensate for recreational use impacts. Each project will require significant coordination among the landowner or manager where the projects will be

59

implemented, the local governments and the public. To properly implement a value-to-value or service-to-service approach in these circumstances would have required the Trustees to separately study, evaluate and determine the value and benefits of each individual proposed project in a range of locales. Such studies of the potential benefits of the proposed projects could easily take several years and cost several times more than the value-to-cost method employed by the Trustees.

## 4.2    Restoration Project Selection Criteria

The Trustees considered numerous restoration alternatives to compensate the public for spill-related injuries. Each restoration alternative presented in this plan was evaluated using the factors outlined in section 990.54 of the OPA regulations, as well as additional criteria deemed necessary to identify the optimal suite of restoration projects. The criteria are described below. Applying these criteria to the restoration project concepts received to date resulted in the Trustees' selection of preferred restoration alternatives described in this Final DARP/EA. All restoration alternatives submitted by the public or developed by the Trustees, other than Human Use projects, are presented in Section 5 and/or Appendix N. Appendix N includes both selected projects and second tier projects (that may be implemented if funding allows), as well as projects that did not meet the Threshold Criteria and were not further evaluated.

| Threshold Criteria | If a project does not meet these criteria, it will not be considered further per OPA 990.53(a)(2). |
|---|---|
| 1.  Consistency with Trustees' Restoration Goals | • Does the project provide tangible benefits to plants, animals, and their habitats that were affected by the spill (e.g., shoreline habitats and resources, subtidal and fish habitats and resources, birds, marine mammals)?<br>• Does the project provide tangible benefits for enhancing recreational opportunities that were affected by the spill? |
| 2.  Technical Feasibility | • Is the project technically and procedurally sound, and not already been funded or completed? |
| **Evaluation Criteria** | |
| 1.  Nexus between the Restoration Project and the Impacts of the spill on Natural Resources | • To what extent does the project benefit shoreline habitats and resources, subtidal habitats and resources, birds, marine mammals, or recreational opportunities and users that were affected by the spill?<br>• To what extent does the project location or geographic scope of project benefits correspond to areas impacted by the spill? |
| 2.  Compliance with Applicable Laws | • Will the potential project implementer have the legal right to access the project site and conduct the project, including all necessary long-term maintenance?<br>• Are there willing landowners who support the project? |

60

| | |
|---|---|
| | • How difficult and complex are the permitting processes required to implement the project?<br>• How readily will the likely project implementer be able to meet all applicable laws and obtain all relevant permits. |
| 3. Cost-Effectiveness | • Projects that deliver greater benefits relative to their costs will be preferred over projects that provide fewer benefits relative to their costs. |
| 4. Range of Restoration Project Benefits | • Will the project benefit more than one natural resource and/or service?<br>• Does the project fit within a total suite of selected restoration projects that address the geographic distribution and types of injuries or recreation impacts associated with the spill?<br>• The Trustees consider the extent to which a project contributes to the overall restoration plan. This includes the degree to which a project may benefit any otherwise uncompensated spill injuries. |
| 5. Time to Provide Benefits | • Projects that begin providing benefits to the target resource or public sooner are preferred to projects where the onset of benefits is not expected until far into the future.<br>• For capital improvements, projects that are "shovel ready" will be preferred over those projects that are in the design or pre-design phases. Projects where permitting is completed (or otherwise straightforward) will be preferred to projects that require complex permitting processes that will take significant time.<br>• For projects in general, those projects that can articulate how target resource benefits or public benefits will begin in the near future will be preferred to projects that cannot. |
| 6. Duration of Project Benefits, and Maintenance Requirements | • Projects expected to have longer term benefits are favored over those that have shorter term benefits.<br>• If long term benefits are expected, is there a mechanism in place to ensure that those benefits are realized and maintained through time?<br>• Is there an entity that will be responsible for maintaining the project over time? |
| 7. Avoidance of Collateral Injury from Project Implementation | • Project should not benefit one natural resource to the detriment of others.<br>• A project that addresses ongoing diminishment of natural resources that resulted from the spill will be preferred. |
| 8. Likelihood of Project Success | • Projects with a higher likelihood of successful implementation (e.g., obtaining necessary permits, constructing improvements, carrying out project-related activities), and that are otherwise more technically feasible are preferred. |

61

| | |
|---|---|
| | • Will there be objective indicators to measure project success and demonstrate that the project has provided natural resource benefits? |
| 9. Total Project Cost and Accuracy of Estimate | • Trustees prefer the least costly project of otherwise equivalent alternatives<br>• Projects with greater certainty of the costs related to successful implementation will be preferred over projects with high budget uncertainty. |
| 10. Effect of Project on Public Health and Safety | • Projects that enhance public health and safety are preferred. |
| 11. Opportunities for Collaboration | • Projects with matching funds are preferred to projects without matching funds. |
| 12. Non-Duplication | • Projects funded through damages should not displace other funds.<br>• Project should not duplicate other efforts already ongoing at the same location. |
| 13. Education/Research Value | • Does the project have the potential for public education and outreach or to advance scientific knowledge for the benefit of natural resources management? |
| 14. Cultural Value | • Does the project have the potential for cultural resources conservation and/or education? |
| 15. Ability to Document Benefits to the Public | • The Trustees consider the ability to document receipt or delivery of benefits to the public as a result of a project or other use of funds. |

62

# 5.0   Injury Quantification and Restoration Alternatives

This section describes the nature, extent, and severity of injuries to natural resources and human uses resulting from the spill, as well as potential restoration alternatives, including selected alternatives, to compensate for these injuries. This section is divided into the following resource categories:

- Shoreline Habitats;
- Subtidal and Fish Habitats;
- Birds;
- Marine Mammals; and
- Human Uses.

At the time of the spill, the Trustees created these categories to organize the assessment of injuries to natural resources. The Trustees used available information, field data, focused studies, and expert scientific judgment to arrive at their best estimate of the injuries. Scientific investigators included state and federal scientists, academic research scientists, consultants with damage assessment experience, and recognized experts within each resource category. During, and for some time following the spill, field teams were organized that included the investigators above, as well as one or more representatives of Plains (see Section 3.2.3).

In addition, the Trustees divided the spill footprint into four geographic zones (Zones A, B, C, and D) based on level of oiling (Figure 8). This was primarily done for purposes of assessing injury to shoreline and subtidal habitat.

**Zone A**
- Location: Gaviota State Park to Arroyo Hondo (approximately 6 miles of coastline)
- Level of oiling: moderately to lightly oiled

**Zone B**
- Location: Arroyo Hondo to Coal Oil Point (approximately 18 miles of coastline)
- Level of oiling: heavy to moderately oiled

**Zone C**
- Location: Coal Oil Point to the Santa Barbara Harbor (approximately 18 miles of coastline)
- Level of oiling: moderately to lightly oiled

**Zone D**
- Location: Santa Barbara Harbor to Long Beach (approximately 296 miles of coastline)
- Level of oiling: intermittent oil, characterized as moderate to no observed oil.

63



**Figure 8.** Exposure zones A-D defined for the Refugio Beach Oil Spill NRDA (black lines) with shoreline oiling categories documented during Shoreline Cleanup Assessment Technique surveys conducted by the Unified Command. See Appendix B for data associated with this figure.

The Trustees assessed injury by comparing oiled areas to "baseline" conditions, as that term is used in the OPA regulations. Baseline describes the ecological services that are present "but for" the oil spill, including factors such as the abundance, biomass, diversity, age classes of characteristic plants and animals, the availability of suitable habitat for shelter, foraging, and reproduction, and the availability of food items for fish and wildlife.

As discussed throughout this section, the Trustees concluded that the magnitude of the injuries caused by the spill has been sufficiently delineated through the various studies described herein to enable the Trustees to identify and scale appropriate restoration. While there is some uncertainty inherent in the assessment of impacts from oil spills, and while collecting more information may increase the precision of the estimate of the impacts, the Trustees believe that the type and scale of potential restoration actions would not substantially change as a result of more studies. Therefore, the Trustees sought to balance the desire for more information with the reality that further research would be costly and would delay the implementation of the restoration projects.

Each resource category section below begins with an overview of the studies conducted during the assessment and the results of those studies. The pathway of the oil and exposure are discussed and the conclusions of the injury assessment are then summarized, and the injury is quantified. Finally, the potential restoration alternatives are described, with the selected projects described in greater detail. The project descriptions include a discussion of the anticipated environmental impacts, or consequences, of the selected projects. The second tier projects are also listed and described, in lesser detail, as well (Appendix N). These projects may be

64

reconsidered and selected for implementation if funds become available or if selected projects prove to be infeasible. Potential cumulative impacts of implementing restoration projects are summarized in Section 6.0.

## 5.1   Shoreline Habitats

After the release, Line 901 oil mixed into the surf and coated Refugio State Beach and nearby beaches. Oil was also carried offshore and down shore by wave action, currents and winds. The oil spread along the Gaviota coastline and then stranded intermittently downcoast for over 155 miles, depositing oil from Gaviota State Park to the north-west, along Santa Barbara County, and intermittently throughout Ventura and Los Angeles Counties to the southeast. Affected shorelines were assessed for injuries and losses to natural resource services that they provide. For the purposes of the shoreline injury assessment, separate analyses were conducted for sand beach and rocky intertidal habitats. Each habitat assessment relied upon field data and a variety of literature sources to examine effects of the spill on shoreline biota and document the effects of oil on beaches and intertidal flora and fauna. Injuries occurring within each habitat type were quantified within distinct exposure zones (Figure 8) based upon proximity to the oil release point and oiling characteristics. Potential restoration projects also were identified and scaled appropriately based on injuries quantified within each exposure zone.

### 5.1.1   Overview of Data Collection and Studies

The list below summarizes various field studies, data collection tasks, and analyses used by the Trustees to assess shoreline habitat injuries.

*Response Information - Compilation of Oiled Shoreline Data*
Immediately after and throughout the duration of the spill, Shoreline Cleanup and Assessment Technique (SCAT) Teams were dispatched to document the location and severity of shoreline oiling and to develop cleanup recommendations. These response teams reported on details concerning the approximate location, thickness, and percent cover of oil on intertidal habitats throughout the spill-affected shorelines. This information is primarily collected to assist response crews in prioritizing cleanup decisions. Along with NRDA team member observations, the Trustees used SCAT information during their injury assessment to gain an understanding of the severity of oiling along the affected shoreline segments over time.

*Extent of Oiling Quantification and Mapping*
The SCAT data and supplemental information described below were compiled to create maps showing the geographical extent and maximum observed degree of oiling along each shoreline segment. The oiling of shoreline habitats was quantified in terms of area in acres and degree of oiling using SCAT descriptions (e.g. heavy, moderate, light, very light) and mapped according to shoreline type (rocky intertidal, sandy beach, mixed rocky sandy shoreline, etc.). The area of affected shoreline, in acres, was calculated for each oiling category and each habitat type (Nixon

65

2018). The Trustees used the compilation from this effort to define the exposure zones discussed above (Figure 8).

### *Oil Sample Collection and Analysis*

Polycyclic aromatic hydrocarbons (PAHs) are a suite of chemical components found in petroleum products, and all oil sources display a "fingerprint" of the unique proportions of the different PAHs and other chemical markers. This enables forensic evaluation of the source(s). Forensic analyses were conducted on oil, tarballs, and tissues to confirm the shorelines affected by Line 901 oil (Stout et al. 2018).

### *Environmental Sample Collection and Chemical Analysis*

The Trustees collected invertebrate samples (i.e., mussels, sand crabs, beach hoppers, sand-associated polychaete worms, see Section 2.3.4) and water samples (surf zone, sediment pore water, Figure 9) from a wide variety of intertidal locations within the spill-affected area and analyzed for PAHs and other components of oil. Samples were collected before and after Line 901 oil impacted the shoreline to confirm and provide estimates of degree and duration of exposure to shoreline fauna. PAHs are toxic to organisms, and some of the animal body burden concentrations were compared to toxicology literature values as an indicator for potential health effects to marine invertebrates. PAHs were elevated in all media collected at locations oiled by Line 901 compared to reference locations. Chemistry data are provided in Appendix B and results are further discussed herein, in Appendix D, and in "Shoreline data summary" (Donohoe and Joab 2018).



**Figure 9.** Sediment porewater sample location showing oil sheen on the surface. Photo Credit: Natural Resource Damage Assessment Trustees.

66

*Sandy Beach Intertidal Invertebrate Population Surveys*
Study sites were established by the Trustees to monitor changes in populations of beach hoppers. Sites were surveyed approximately 1 month after the oil spill, 4 months after the spill and again two years later to document changes in population abundance, biomass and size structure of these indicator animals. Data from previous surveys of populations of beach hoppers at a subset of the sites were also compared to post spill data. Study sites within the spill area showed reductions in population numbers, when compared to unoiled sites, indicative of oil spill-related impacts. For further information, see the report "Population survey results on talitrid amphipods for the Refugio Beach Oil Spill NRDA" (Dugan 2018).

*Rocky Intertidal Habitat Photo Transect*
The Trustees conducted Rocky Intertidal substrate surveys to monitor changes in abundances of sessile organisms, substrate, and "condition" (oil/tar presence, bleaching), within fixed plots established along vertical or horizontal shoreline transects over time (post spill and six/twelve months post-spill). Assessment sites were selected throughout the primary spill area, using a survey protocol developed for oil spills. Additionally, teams visited permanent Long Term Monitoring plots (https://www.eeb.ucsc.edu/pacificrockyintertidal/index.html) that occur within the approximate spill area footprint for comparison to historical data. Photos were collected at fixed plots along the transects, i.e., photoplots, and were then scored and analyzed for substrate, condition (oiling/bleaching), species composition and proportion within the photo plot. Sites were re-visited in Fall 2015, and Spring 2016, to examine for community differences, presence/absence, or proportional changes to communities or substrate. Study sites within the Zone B showed most of the species examined were more common in sites that did not experience oiling, with the exception of Ulva and Porphyra, shorter lived opportunistic seaweeds that are often associated with disturbance. For further information, see the report "Assessment of potential impacts to rocky intertidal community following the Refugio Beach Oil Spill, Santa Barbara County" (Raimondi, 2019).

*Laboratory Tests with Shoreline Species*
The Trustees performed laboratory studies (i.e., bioassays) with mussels and sand crabs to determine the aquatic toxicity of the Line 901 oil and its constituents. Results were then compared to the measured concentration of oil constituents in the surf zone and sediment porewater on sandy beaches. Toxicity of Line 901 oil was observed in juvenile sand crabs, mussel larvae, and larval silversides. Appendix E provides an overview of the Line 901 bioassays performed. Appendix D includes an evaluation of the toxic impacts of Line 901 oil on these organisms based on measured concentrations of PAHs in surf and pore water following the spill.

*Shoreline Clean Up Data*
Clean up activities, primarily beach trampling and wrack (kelp/seaweed) removal, contributed to shoreline injuries caused by the spill. The Trustees compiled information on effort, such as number of days of cleaning, mass of materials removed by cleaning teams, and the types of

67

cleaning expected to affect shoreline organisms as summarized in the report "Refugio Beach Oil Spill shoreline cleanup effort data report 30 Aug 2016" (Hubbard 2016)

### 5.1.2   Shoreline Injury

As mentioned in Section 4.1.1, the Trustees used the HEA method to estimate injury for each of the shoreline habit types[8]. Inputs to the HEA include the area of shoreline habitat impacted, the reduction in ecological services because of the spill, and time and trajectory for recovery of the affected environment. The degree of injury was related to the degree of oiling and quantified by zones (Figure 8). All rocky intertidal, sandy beach and mixed rocky sandy shorelines within the spill area were quantified in terms of acreages impacted by the spill. Degree of injury to the ecological services provided by each habitat and duration of injury until full recovery were estimated based on evidence from collected data including chemical, biological, and toxicological studies, inputs from scientific literature, and consultation with regional ecologists. Benefits of potential restoration projects were estimated and quantified in terms of their likely long-term ecological benefits. In this way, each project was "scaled" to be appropriate in size to the injury that incurred in each habitat type. Details are provided below and in Appendix F.

### 5.1.3   Sandy Beach Habitat Injury
*Background*
Much of the sandy shoreline affected by the spill is a mixture of cobble, sand, and boulders. For sandy beach environments, the Trustees chose to focus the assessment largely on invertebrates that dwell on and in sand and serve as prey items for both fish and birds, and to use these invertebrates as indicators of both exposure to and injury from the oil and its chemical components.

Line 901 oil from the release site at Refugio State Beach washed over and stranded along the Gaviota coast, and also stranded sporadically in Ventura County and some Los Angeles County beaches. Services provided by the sandy beach habitat to fish, birds and other wildlife were affected. In the most heavily oiled areas, there was smothering and fouling of invertebrates and other fauna. In areas of oil deposition, the entire intertidal zone was exposed to the oil, as it traveled back and forth with individual waves throughout the tidal cycle, until it either washed back out to sea, was stranded on the shore by the receding tides, or was buried by cycles of sand accumulation on the beach. Oil moved into the substrate as droplets, tarballs or dissolved liquid into sediment pore water as wave run-up percolated into pore spaces during higher tides. Larger oil deposits formed and persisted for long periods during periods of sand accumulation following the spill. Injuries resulting from the spill were attributed to direct contact (i.e., fouling) with oil, as well as the toxic effects of oil, including those attributed to PAHs.

In addition, shoreline cleanup efforts extended for many months and caused impacts to intertidal habitats and organisms over an extended period. In heavily oiled areas, the macrophyte wrack

---

[8] Plains disagrees with the extent of shoreline injury assessed by the Trustees and asserts shoreline injury is materially lower than the Trustee's estimate.

68

(stranded drift algae and surfgrass) was often oiled, and initially wrack was removed as part of cleanup operations. Wrack is of prime importance as food and habitat for a variety of invertebrate species that are a critical food source for higher trophic level organisms, including birds, fish, and crabs. Suspended detritus is another major food source for the masses of invertebrates living in the intertidal zone, and can be fouled by adhesion to oil particles or film. Conceptual diagrams shown in Figure 10 illustrate the movement of beach invertebrates and predators with tidal flux, as well as sediment porewater flow with oiling.



**Figure 10.** Conceptual diagrams of Refugio coast shoreline, sandy beach environments at high tide (top) and low tide (bottom). Sand crabs, polychaete worms, and beach hoppers are prey for birds and fish. Porewater flow down the beach profile is shown at low tide.

69

### Sandy Beach Habitat Injury Assessment

*Area of Impact*

The Trustees split the area of impact into four geographic zones (Zones A through D, Figure 8) that covered the spill-affected area from west to east. Most data were collected in Zone B, the most heavily oiled zone. The area of affected shorelines within Zones A-D, in acres, was calculated based on beach width, tidal swell, and run-up data available during the oiling period. A summary of the shoreline acres affected and the duration of the injury is further discussed below and in Appendix F.

*Baseline Conditions*

The Trustees assessed injury by comparing oiled areas to baseline conditions, per the OPA regulations. The Trustees estimated those baseline conditions from the collection and chemical analysis of water and shoreline invertebrate samples, data on beach hopper populations from earlier studies, and other data and scientific literature pertinent to the occurrence and abundance of organisms by habitat type and location. These data were collected either before the spill, outside of the spill area or up to two years after the incident when the Trustees assumed continued exposure to Line 901 oil would have been eliminated or greatly reduced. For example, monthly to yearly sampling of sediment porewater and invertebrate tissues for chemical analysis over a two-year period in the spill area was used to estimate baseline conditions. See Appendix D for further details.



**Figure 11.** Oil on the shoreline at Refugio State Beach, May 19, 2015. Photo Credit: Natural Resource Damage Assessment Trustees.

70

*Injury*

The initial acute injury to sandy beach resources (direct smothering/fouling and toxicity) from the spill occurred over a period of many days. The incident started on May 19, 2015, at Refugio State Beach in Santa Barbara County, California, and the oil was transported up and down the coastline by winds and currents and deposited along the shoreline (Figure 11).

Near the end of May 2015, Line 901 oil from the spill eventually reached beaches in Ventura County and some beaches in Los Angeles County (i.e., Manhattan Beach and Redondo Beach). Spill impacts including impacts from cleanup were most severe and continued for months near the release site to El Capitan and then decreased downcoast. Mortality caused by the oil fouling and smothering of intertidal-associated organisms such as sand crabs and beach hoppers was also highest in areas near the release point to El Capitan and decreased downcoast (Figure 12; Figure 13).



**Figure 12.** Oiled young sand crabs on Refugio State Beach, May 19, 2015. Photo Credit: Natural Resource Damage Assessment Trustees.



**Figure 13.** Oiled beach hoppers (talitrid amphipods) on Refugio State Beach, May 22, 2015. Photo Credit: Natural Resource Damage Assessment Trustees.

71



**Figure 14.** Total PAH concentrations in sediment porewater measured at several locations over time. 2017 values indicated by the red circle are representative of baseline conditions. See Appendix B for data associated with this figure.

Sediment porewater concentrations of PAHs between Gaviota and Haskell's along the Gaviota Coast became elevated soon after the spill and remained elevated months later, as shown in Figure 14. While seep oil is known to occur on shorelines in this area, the porewater data demonstrated a pattern over space and time that shows the spilled Line 901 oil increased the amount of PAHs in the porewater to an appreciable extent in May of 2015 and beyond. Initial PAH concentrations were highest at the locations closest to the release site and decreased as distance from the spill site increased. For example, porewater PAH concentrations decreased at locations between June and September of 2015, and by 2017, all locations were found to have very low (baseline) PAH concentrations (Figure 14). These trends suggest that the peak concentrations at the sampling sites were immediately following the spill, and then they began to decrease over time. Following a similar trend as porewater, Figure 15 shows elevated tissue concentrations of PAHs in beach hopper tissues immediately after the spill, with lower concentrations in 2016 and 2017 when compared to 2015.

72



**Figure 15**. Total PAH concentrations in beach hopper tissue measured at several locations over time. See Appendix B for data associated with this figure.

Tissues of other shoreline organisms, including mussels, sand crabs, and sand-associated polychaete worms, also showed significant increases in tissue PAH concentrations (Appendix D, Donohoe and Joab 2018).

Sand crab toxicity thresholds for PAHs were exceeded in surf water, based on Line 901 bioassay results (Appendix D, Appendix E). Studies have shown that ultraviolet light (UV) from sunlight can enhance the toxicity of PAHs by a factor from 2-1000 (Barron 2017). Some PAHs in fish and invertebrate tissues are photo-activated by UV forming reactive products that cause oxidative damage. For the purpose of this evaluation, the Trustees adjusted $LC_{50}$ values by a 10-fold factor to estimate photo-enhanced toxicity.

73



**Figure 16.** Mean values (+1 standard error) for population abundance of talitrid amphipods in June 1999-2001 and June 2015 at four sites on the spill-affected shoreline including three sites in Zone B, and one site in Zone D.

The shoreline assessment focused on two categories of impacts: 1) fouling and removal of beach wrack as well as other cleanup impacts and 2) oil exposure to intertidal invertebrate populations. Treatment or cleaning options for oiled wrack or stranded seaweed were limited. Oiling of wrack results in invertebrate contamination and mortality, leading to lessened and contaminated prey resources for birds. The removal of wrack material from the beach removes an exposure mechanism to the oil, but also removes the associated invertebrates and has long-term effects on foraging options for birds due to reduced invertebrate community abundance and biomass (Dugan et al. 2003; Beeler 2009). Both of these occurred in the aftermath of the spill as oiled wrack was collected and removed from heavily oiled beaches, but remained in place on more lightly oiled or unvisited stretches.

Sand crabs and beach hoppers dominate the invertebrate biomass on southern California sandy beaches (Dugan et al. 2003). As a defining ecological characteristic of lower intertidal communities, sand crabs were used to estimate and describe injury to lower intertidal habitats. Beach hoppers were selected as a proxy for assessing impacts to the upper intertidal community, as they are an important part of the sandy beach ecosystem. Beach hoppers process organic matter such as wrack. In addition, they make up a significant portion of the diet for several shorebird and other bird species. Finally, because they dominate the upper-intertidal invertebrate community it was relatively easy to assess their populations through field sampling.

74

Large decreases in the abundance of beach hoppers (talitrid amphipods) were documented in Zone B as well, as can be seen in Figure 16. A similar trend was apparent with biomass measurements of these organism (Dugan 2018).

The degree of injury resulting from fouling, toxicity and cleanup was estimated by the Trustees within subzones (i.e., further described as "micro-zones" in Appendix F) of Zone B. The Trustees focused on Zone B for logistical reasons and because this was the zone where oiling was the heaviest and cleanup activities were the most intense. Injury was estimated separately for lower intertidal fauna and for upper intertidal fauna. Upper and lower intertidal results were then averaged to estimate 'whole-beach' injury for a given zone. The sandy beach injury and much of the resulting HEA details are shown in Figure 17 and in Table 1. In Zones A and C, injury per acre was estimated as a fixed percent of the average per-acre injury found in Zone B: 20% in Zone A and 25% in Zone C. Those percentages approximate impacts associated with a lesser amount of oiling in Zones A and C when compared to Zone B. Zone D was estimated to be 5% injured in year one only, with no injury in subsequent years. Impacts in Zone D were lower because they were primarily based on removal of organisms by direct contact with oil or tarballs and other cleanup activities, along with the removal of a portion of the wrack material during cleanup activities.

*Recovery*

The Trustees estimates of recovery time for injured sandy beach communities were based on literature values and life history patterns of California sandy beach species, as well as monitoring data. First consideration was given to recovery of heavily disturbed sites in which there was evidence that representative fauna (sand crabs and beach hoppers) had been substantially impacted (a large percentage of mortality in several age classes). Cleanup and driving impacted some sandy beaches through at least January 2016, approximately eight months after the spill. The animals on sandy beaches have highly seasonal reproduction and will take several years to re-establish populations with full size and age structures and biomass. In addition, some sandy beach animals are more sensitive to disturbance and can take much longer to recover from severe disturbances (i.e., Pismo clams, olive snails, upper beach isopods).

Recovery to baseline is the attainment of 100% of the ecological services that would be present but for the spill, including abundance, biomass, diversity, and age classes of organisms in the affected habitats. Time to recovery was based on monitoring data, observations, and the life histories of the specific flora and fauna present in each habitat type, and relative to the degree of initial acute injury.

Sand crabs lost substantial proportions of three age classes during the Refugio Beach Oil Spill incident, and because recruitment is seasonal and episodic, recovery time for lower intertidal portion of sandy beaches was assessed as approximately three years in Zone B.

Most of the upper beach species have life histories that do not include planktonic larval stages (i.e., beach hoppers, beetles, isopods). This means there is no recruitment from planktonic

75

sources to replenish their populations. These species rely exclusively on the reproduction of resident individuals for population replenishment. If local populations of these taxa are extinguished or severely depressed, population recovery will be protracted. Recovery time for upper beach species (i.e., beach hoppers) was therefore assessed as approximately four years in Zone B.

*Habitat Equivalency Analysis Results*

As previously described, injury in Zones A and C was estimated to be a percentage or fraction of the injury determined in Zone B, since the same mechanisms of injury were present, just with lesser amounts of oil and generally less severe impacts present. In Zone D, farthest from the spill location, injury resulted from contact with oil and the resulting fouling of organisms, as well as the cleanup activities, and was much more limited (Table 1, Figure 17).

**Table 1.** Summary of Sandy and Mixed Sand/Rocky Substrate Injury (losses) and Habitat Equivalency Analysis results by zone.

| Zone - Predominant max. oiling category | Acres exposed | Fraction of Zone B | dSAY[1] lost/ acre | Acre – years for compensation (dSAYs) |
|---|---|---|---|---|
| Zone A – Moderate/Lightly Oiled | 63.2 | 0.2 | 0.2954 | 18.66 |
| Zone B – Heavily Oiled | 345.8 | 1 | 1.4771 | 510.70 |
| Zone C – Moderately Oiled | 191.3 | 0.25 | 0.3693 | 70.64 |
| Zone D – Lightly Oiled | 888.0 | 0.034 | 0.0500 | 44.40 |
| Total | 1488 | --- | --- | **644.4** |

[1]dSAY = discounted service acre-year. See Appendix C.



**Figure 17.** Map showing the summary of shoreline injury by zones. See Appendix B for data associated with this figure.

76

A total of 1,488 acres of sandy beach habitat was exposed to and injured by the oil spill and is expected to recover within approximately four years, depending on oiling level. Appendix D provides additional information on the injury assessment and quantification of sandy beach habitat injuries, and the scaling details are further described in Appendix F.

## 5.1.4   Rocky Intertidal Habitat Injury

***Background***

The shoreline habitat within the area affected by the Refugio Beach Oil Spill includes a variety of rocky and mixed rocky/sand substrates, ranging from artificial to natural and an approximately six-foot tidal range. Substrates investigated by the Trustees included bedrock, boulder, cobble, and some man-made riprap and seawall. The habitat used by biota is three dimensional, with organisms on the surfaces of rocks, as well as along the sides, undersides, and between substrates. The biota present on these substrates vary depending upon tidal elevation. Figure 18 shows the conceptual diagrams of the rocky intertidal habitats and some of the immediate and longer-term impacts of oil exposure.

***Rocky Intertidal Habitat Injury Assessment***

*Area of Impact*

The Trustees quantified the number of impacted acres by using SCAT data, as described above. Injury categories were subdivided based on regional differences in biota and exposure and by differences between more natural rocky substrates and rip-rap as described below. The Gaviota Coast shoreline includes a mixture of sandy and rocky intertidal habitat. Sand migrates significantly throughout the year, burying boulders and rock outcroppings, a process that tends to scour any sessile organisms and prevent them from forming significant communities. The Trustees assessed that a total of 5.4 acres of pure rocky intertidal habitat was injured in the HEA (Appendix F), with the remainder of the shoreline (mixed rocky/sandy and sandy beach) included in the sandy beach assessment and quantification.

*Baseline Conditions*

The Trustees evaluated pre-spill data that provides a quantitative description of rocky intertidal biota within the spill-affected area. Historical long-term monitoring data, generated by the Multi-Agency Rocky Intertidal Network (MARINe) program, were used to determine general "pre-spill" conditions. Historical data are located at https://www.eeb.ucsc.edu/pacificrockyintertidal/index.html.

77



**Figure 18.** Conceptual model of oil immediate effects (top) and long-term effects (bottom) of oil in rocky intertidal habitats.

78



**Figure 19.** Photographs of oiled rocky habitat and organisms following the spill. Photo Credit: Natural Resource Damage Assessment Trustees.

*Injury*

The Trustees determined that the degree of impacts varied with the amount of oiling. The most significant fouling was noted in locations directly adjacent to the release site (rocky outcrops adjacent to Refugio, Corral Canyon, and El Capitan, Figure 19). Impacts to rocky intertidal habitat were assessed through a number of field-based studies. Similar to the sandy beach habitat, the degree of oiling was classified in rocky intertidal habitat based on descriptors used in the SCAT data. In additional to the field studies conducted after the oil spill, the Trustees also relied on other monitoring programs (e.g., MARINe) that had pre-existing, long-term monitoring data in locations affected by the spill. The Trustees determined that the initial acute injury was caused by direct smothering/fouling and toxicity of individual organisms and habitats at those

79

locations nearest to the oil release site. Subsequent injury was the result of tissue necrosis/bleaching of the sessile organisms populating these habitats within the same locations. Furthermore, injury due to trampling (from spill assessment and cleanup activities), physical cleaning of rocky intertidal habitats, and sublethal effects from exposure to PAHs were evaluated.

The Trustees collected mussels from intertidal habitats throughout the spill-affected area for PAH analysis, both immediately after the release and several weeks later. This provided an indication of those shorelines most significantly fouled by the oil, as well as the duration of exposure. Mussels collected soon after the spill from rocky shores adjacent to Refugio beach and El Capitan contained the highest PAH concentrations of all samples and continued to contain the highest concentrations two weeks later (Appendix B).

The Trustees conducted rocky intertidal photo-plot surveys to monitor changes within fixed plots over time. These were conducted at nearby long-term monitoring sites and compared to sites selected in the spill-affected area. The sites were re-visited in Fall 2015, and Spring 2016, to survey for community differences or proportional changes to communities or substrate. Study sites within the heaviest oiling areas (Refugio, El Capitan, and Coal Oil Point) documented oiled organisms and substrate after the spill. Further, community changes in follow-up surveys, potentially indicative of oil-related impacts, were noted when compared to less impacted sites away from the heaviest oiling area (Raimondi et. al., 2019).

*Recovery*
The Trustees based recovery on the life histories of affected biota and on notable increases of "disturbance indicator" species (sea lettuce and the red algae, *Porphyra*) quantified during anniversary surveys at the most impacted sites. In addition, recovery estimates were based upon the recovery time of key intertidal assemblages (fucoid, barnacle, mussel, and mid-intertidal red algae) following disturbance. Recovery was also estimated based upon key intertidal assemblages (fucoid, barnacle, mussel, and mid-intertidal red algae) as summarized in a UC Santa Cruz disturbance study (Conway-Cranos 2012).

*Habitat Equivalency Analysis Results*
 The Trustees estimated that a total of 5.4 acres of rocky intertidal habitat was exposed to and injured by the oil spill and is expected to have recovered after two years (Table 2). Appendix F provides additional information on the injury assessment and quantification of these habitat injuries.

80

**Table 2.** Summary of Rocky Intertidal Injury (losses) and Habitat Equivalency Analysis results

| Zone - Predominant max. oiling category | Acres exposed | dSAY[1] lost/acre | Acre – years for compensation (dSAYs) |
|---|---|---|---|
| Zone B– Heavily oiled | 5.4 | 0.34 | 1.83 |
| Total | 5.4 | --- | **1.83** |

[1]dSAY = discounted service acre-year. See Appendix C.

## 5.1.5  Summary of Injury

Shoreline habitats were subject to heavy oiling near the spill site in the days following the oil spill on May 19, 2015. Rocky (bedrock and cobble), sandy beach, and mixed shores received heavy coatings of liquid oil that were transported up and down the shore by waves and spring high tides. In the splash zone, oil was deposited much higher than the reach of the tides.

The oil remained in the environment in the weeks and months after the spill, attaching to rocky habitat, settling into intertidal cobble beds, and percolating into, or being buried by, accumulating sand on sandy beaches. As a result, beach porewater retained elevated concentrations of PAHs much longer than the surf zone water, with elevated values continuing for weeks and months after the spill.

Shoreline plants and animals at all intertidal levels were exposed to Line 901 oil and were fouled by it. Toxic effects on a variety of intertidal marine species were evident in field observations as well as in toxicity tests run in the laboratory with shoreline invertebrates.

Shoreline animal tissues sampled before the spill had low concentrations of PAHs. These concentrations increased dramatically after exposure to Line 901 oil and then declined over weeks to months.

Some elements of the shoreline cleanup continued until January 2016. Clean up involved removing oil, sand, and wrack from the shoreline, scraping, blasting, shoveling, sifting and driving on shoreline habitats. Two of these activities, removing wrack and driving, have significant impacts on beach ecosystems.

As the spill spread more than 155 miles east and southward, the character of the oil changed. The oil that landed on Los Angeles County beaches[9] was less liquid but still sticky and buoyant. It was deposited with kelp and other wrack in the intertidal zone where abundant beach organisms live. The decision was made that it should be removed from the shoreline. This cleanup effort removed oil, wrack, and the animals associated with that material.

[9] Tarballs matching Line 901 oil landed on two South Los Angeles County beaches – Manhattan Beach and Redondo Beach.

81

Recovery of the impacted shoreline zones is expected to vary from one to four years, varying by zone, and based on the severity of the initial acute injury.

## 5.1.6  Selected Restoration Projects

The Trustees selected four projects described below to compensate for injuries to sandy beach and rocky intertidal habitats caused by the oil spill (Table 3).

For the shoreline habitats, no single preferred restoration project was able to compensate for all the injury. For this reason, four restoration projects were selected. These projects ranked as providing the greatest benefits to the injured ecosystem.

**Table 3.** Four selected projects to compensate for shoreline injury

| ID# | SELECTED PROJECTS | BENEFITS |
|---|---|---|
| SHORE-1 | Ellwood Seawall Removal | shoreline habitats, sandy beach |
| SHORE-2 | Ventura County Dunes Restoration | shoreline habitats, sandy beach |
| SHORE-3 | Santa Monica Dune and Beach | shoreline habitats, sandy beach |
| SHORE-4 | Black Abalone Restoration and Relocation | shoreline habitats, rocky intertidal |

***Ellwood Seawall Removal (SHORE-1)***

The goal of this project is to restore sandy beach and mixed shoreline ecosystems and dynamics in Zone B, the area where the greatest impacts of the spill were realized. This project will also benefit subtidal and fish habitats offshore of the seawall (section 5.2.3). The project site is Ellwood Beach in Goleta, CA (Santa Barbara County). A wooden seawall currently constrains natural functioning of the ecosystem as well as lateral access along the shoreline at high tide.

*Affected Environment*

The project will have impacts to intertidal shoreline (currently sandy beach, mixed rocky habitat, sandy shore, artificial structures, creosote preserved timber bulkhead, and rock/concrete rubble revetments), coastal bluff and shallow subtidal habitats.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* – The removal of the armoring structure will allow overall intertidal habitat to increase in width, functions and diversity, specifically restoring upper beach and supralittoral zone habitats that are currently absent from the armored coastline. Intertidal zones that have been lost will be restored along with ecosystem functions and biota dependent on those zones, including wrack deposition and processing, invertebrate abundance and diversity, bird abundance and diversity, and grunion spawning habitat.

82

There is potential adverse biological impact to vegetation and habitat established on the bluff faces and tops during the removal activities and from the removal activities and the expected erosion that takes place once the intact portions of the seawall are removed. During the removal activity there will be crushing of some of the sandy beach organisms, such as invertebrates in and under the surface of the sand, from the machinery used in the processes of removal. Birds are expected to temporarily be disturbed on the affected shoreline while removal activities are undertaken. These impacts are anticipated to affect a small number of organisms for a limited amount of time, and will have long-term beneficial effects for these biological resources.

2. *Physical Impacts* – Longer term, post removal, the beach is expected to be wider than it is currently where the seawall is intact, and there will be a reduction of reflective processes that remove sand from the beach. Removal will also eliminate the source for creosote-contaminated debris along the shoreline as the wall deteriorates and is broken up by wave action. Movement of equipment and machinery needed to remove the seawall is expected to temporarily block some portions of this shoreline and temporarily compact the substrate. Noise from this activity will be present in the short term, until the removals are completed. Short-term adverse effects from construction activities (potentially higher turbidity, sediment transport) are expected to be minimal but may occur. Longer term impacts will include a return to natural bluff erosion rates and mobilization of loose material at the bluff toe during extreme high tides.

3. *Human Impacts* – Lateral access to people along the shoreline at high tide is expected to increase where the seawall is currently intact. Temporary disturbance to recreation in the demolition area will occur during removal activities. Human uses of any land on the slope to and on top of the bluff, near the edge that is expected to erode, will be changed as erosion occurs; however, the removal of the seawall allows for the potential future installation of pathways to access the beach from the bluff. Overall, there will be a small temporary loss of beach use by the public during the construction, but an overall long-term increase in public access in the area where the seawall will be removed. Overall, there will be a small temporary loss of beach use by the public during the construction, but an overall increase in public access to the beach in the area where the seawall will be removed.

*Probability of Success*

Project success is likely as the implementation actions will lead to immediate adjustments in the physical properties of the shoreline. Project implementation will require a high level of planning and coordination to work within short tidal periods; however these factors have been considered and planned for, and the probability of success is high. Ecological services should respond within a few years of the physical changes. Longer term responses will depend on the balancing of sediment supply, bluff erosion and sea level rise. While the exact progression of bluff erosion is uncertain over the long term, this project removes a barrier that is interfering with natural coastal dynamics in the area, and removing that barrier is anticipated to benefit ecological resources.

83

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. The restoration of natural coastal dynamics at the restoration project site should allow for recovery of physical and ecological functions and services over time. Monitoring efforts should track indicators associated with the structure and function of the restored ecosystem. In addition, the responses of bluff topography, profile and vegetation should be monitored to document shoreline evolution at the site. Key physical and ecological indicators will be measured and monitored regularly at the project and reference site or sites for five years.

Performance criteria may include:
- Intertidal beach habitat area: area and distribution of ecological habitat zones;
- Marine subsidies: standing crop of marine macrophyte wrack;
- Sandy intertidal invertebrates: diversity, biomass and abundance of key taxa by intertidal zone; and
- Bird use: use of beach zones by shorebirds, gulls, roosting seabirds, other species.

Performance criteria will be calculated based on multiple surveys at an appropriate reference site or sites or multiple transects within the site.

*Evaluation*
The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. This type and scale of project will effectively provide appropriate compensation for injured sandy intertidal habitat because of the spill, and the Trustees have therefore selected this project as one of four preferred alternatives.

**Ventura County Dune Restoration (SHORE-2)**
Three dune enhancement projects at Ormond Beach, San Buenaventura and McGrath State Beaches in Ventura County will reduce invasive plant abundance and restore native plants, dune forms and processes that will support rare coastal species. These projects are all located in Zone D.

*Affected Environment*
The project site will include intertidal sandy beach and degraded (trampled and invaded by non-native plants) dune habitat. Portions of the three project sites are nesting and brood-rearing areas for special status birds: western snowy plovers and California least terns.

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

84

1. *Biological Impacts* – The project will restore a higher level of ecological functioning to degraded dune habitat. The current ecosystem services of the degraded dune area are reduced by high cover of non-native plants, altered physical processes and trampling in un-fenced areas. Removal of invasive plants will increase the amount of useable nesting areas for the western snowy plover (threatened) and, in some locations, the California least tern (endangered) and reduce cover for predators of eggs, chicks and adult birds. The presence of workers to implement the non-native plant removal in the dunes, along with their equipment, may temporarily disturb or displace birds and other wildlife. These temporary adverse effects are anticipated to be minor, and the overall long-term biological impacts are anticipated to be make a tangible improvement in the habitat quality for listed birds and other coastal wildlife.

2. *Physical Impacts* – Enhancement of native vegetation also permits the development of more natural dune dynamics that promotes the maintenance of more suitable slope faces and important material exchanges between the dunes and the intertidal sandy beach that can buffer erosion on beaches. This allows the dunes to provide a physical benefit to the intertidal sandy beach. Any adverse physical impacts during the implementation of the project are expected to be negligible, and long term benefits to the physical environment are anticipated upon completion of the project through restoration of dune habitats and processes.

3. *Human Impacts* **–** The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. Increased bird use, such as by western snowy plover or California least tern could be expected to increase birdwatching interest in the restored dune areas. Dunes could become somewhat less stable and allow for movement to a greater extent than this sand currently does. If such movement affects parking, driving, or other developed areas, this may be undesired.

*Probability of Success*
The project is very likely to succeed in all three project sites. The proposed restoration methods—weed control and fencing to reduce trampling disturbance—have been shown to be effective in nearby sites and elsewhere in southern California as well as throughout the State.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. Key ecological indicators to be measured and monitored include cover of native and non-native vegetation, as well as nest monitoring of western snowy plovers and California least terns. These efforts will be compatible and complementary with existing monitoring programs and continue for a period of up to five years to evaluate the ecological integrity of the site following implementation of restoration.

85

- For dunes, the target goals may include but are not limited to:
  - Restoring and increasing resiliency of dune habitat;
  - Reducing non-native vegetation cover to <99% in project area during lifetime of project; non-native vegetation cover should remain at <1% throughout project monitoring phase; and
  - Increasing native dune vegetation in areas where non-natives have been removed; native vegetation should persist into project monitoring phase.
- For bird use, the project will include monitoring the following attributes up to a period of five years:
  - Number of nests per year;
  - Number of fledglings per year; and
  - Comparison with baseline assessment.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. The dune restoration projects in Ventura County are located within the spill-affected area, and are the closest option that the Trustees have identified for this type of restoration. This type and scale of project will effectively provide appropriate compensation for sandy beach habitat injured as a result of the spill, and the Trustees have therefore selected this project as one of four preferred alternatives.

**Santa Monica Bay Beach and Dune Restoration (SHORE-3)**

The goal of this project is to restore sandy beach and coastal dune habitat that has been degraded by intensive mechanical grooming. The project site is a public beach in Santa Monica Bay in Zone D (Los Angeles County).

*Affected Environment*

The project site will include intertidal sandy beach and degraded (unvegetated) coastal strand and dune habitat.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

The project will restore ecosystem function of sandy beach, coastal strand and dune habitats by protecting approximately five acres from the daily disturbance caused by mechanical beach grooming with heavy equipment and vehicle traffic and by planting upland portions of the site with native dune plants. The project will restore a high level of ecological functioning to degraded beach and dune habitat. The current ecosystem services of the degraded dune area is close to zero due to mechanical grooming activities, and those of the beach habitat is severely depressed.

86

1. *Biological Impacts* – By eliminating intense regular disturbance with heavy equipment, this restoration project will allow natural coastal processes to reshape the topography and ecology of the site, promoting the recovery of natural biodiversity and function. With appropriate stewardship, hummocks and vegetation will develop on the shoreline supporting native plants, birds and invertebrates that are currently extirpated at the site. The restored habitat will retain macrophyte wrack subsidies, increase intertidal and invertebrate abundance and diversity, increase the abundance and diversity of birds and will be more suitable for grunion spawning. No adverse biological impacts are anticipated, as the restoration area has very low sandy beach ecological services currently. Following restoration, the area is expected to increase in ecological functionality due to the foundational habitat that will be replaced where none currently exists.

2. *Physical Impacts* – The topography is expected to change at the restored site, with the formation of natural hummocks which is consistent with increased resilience to sea level rise. Fencing around the site will be present once the restoration is underway. Any adverse physical impacts during the implementation of the project are expected to be negligible, and long term benefits to the physical environment are anticipated upon completion of the project.

3. *Human Impacts* – The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. Fencing will restrict the access through and around the restored site to some extent, but human access will continue on the site, although the types of recreational activities may change somewhat toward wildlife viewing. Increased plant, floral, and wildlife activity on the site may attract increase interest from bird watchers and others interested in the flora and fauna that will repopulate the site.

*Probability of Success*
The project is very likely to succeed in both of the target habitat zones. Cessation of grooming has been shown to be an effective beach restoration technique. The dune restoration plan will be based on a pilot project currently underway in Santa Monica. This model has been effective through planning and early implementation phases.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. Project site selection will likely be based on very low initial function level (mechanically groomed with no vegetation or dunes, low nutrient beach sand). Ecological responses to restoration actions will likely begin slowly and increase over the five-year monitoring period. Performance criteria may be expressed as trajectories of increasing function over time and divergence from groomed reference sites.

87

Performance Criteria may include the following key physical and ecological indicators:
- Project Area: acres measured each year to ensure project is not encroached upon.
- Topography/elevation/profile:
    - Dune and hummock building (sand storage, increased topography and resilience);
    - Increased elevations of topography and sand storage;
    - Altered profile (formation of foredune); and
    - Criterion: maximum elevation of dune features to increase across the site to increase at 0.1 m per year in the first five years.
- Vegetation:
    - Absolute cover of native dune plant species;
    - Absolute cover of non-native plant species (less than 1%); and
    - Native dune plant species richness.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. The Santa Monica Bay beach and dune restoration project is conceived to be implemented within Los Angeles (LA) County. Since shoreline resources were the largest area of habitat impacted by the oil spill, implementing this restoration in LA County offers an opportunity to compensate for injured resources near the ends of the spill-impacted area. This type and scale of project will effectively provide appropriate compensation for sandy intertidal habitat injured as a result of the spill, and the Trustees have therefore selected this project as one of four preferred alternatives.

### Black Abalone Restoration and Relocation (SHORE-4)

The goal of this project is to aid in restoration of intertidal black abalone populations in areas affected by the spill. The project is comprised of four tasks: (1) characterization of the genetic structure of the donor and recipient population, (2) clearing areas of fouling organisms and placing recruitment modules to make habitat suitable for transplanted post-emergent black abalone and for settlement of larval black abalone, (3) transplantation of post-emergent black abalone from a donor population, and (4) adaptive assessment and management of transplants.

*Affected Environment*

Locations will be identified throughout the Gaviota coast, which are suitable for abalone. These will have the specific habitat attributes associated with abalone occupation (in general, deep cracks and crevices within the tidal range of black abalone).

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

88

1. *Biological Impacts* –This project seeks to ameliorate current conditions in suitable intertidal habitat, by preparing the substrate for better recruitment, while also transplanting adults to augment the likelihood of future recruitment. Recovery of a species from massive decline requires successful recruitment of new individuals into areas where local populations were impacted. Recruitment is dependent on both an available supply of new individuals and specific environmental conditions required to induce settlement. The goal is to restore a viable population of black abalone in suitable intertidal locations that are selected. Areas will be cleared of fouling organisms, leaving clean surfaces in the cracks and will be maintained until donor individuals are transplanted. The impacts of clearing the fouling organisms from the transplant areas are anticipated to be negligible to the ecosystem function, and will result in long term ecological benefits when viable populations of black abalone are reestablished.

2. *Physical Impacts* – The Trustees do not anticipate major impacts to the physical environment, such as water, air, sediment, etc. Any adverse physical impacts are expected to be negligible. Areas will be cleared of fouling organisms, leaving clean surfaces in the cracks and will be maintained until donor individuals are transplanted.

3. *Human Impacts* – The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc.

*Probability of Success*

Project implementers have been monitoring regional black abalone populations for nearly 25 years, and have been assessing the recruitment of new individuals and the biogenic habitats required for successful recruitment. The project implementers will strive to maximize the probability of success based on their knowledge and experience with black abalone.

*Performance Criteria and Monitoring*

The success of the project will be evaluated by assessing metrics associated with natural resource services. An important step towards recovery is the aggregation of abalone at densities high enough for successful fertilization, through both success of transplantation and aggregation of individuals, and recruitment of new juveniles. Because black abalone larvae have never been reared successfully in the lab to settlement stage, a field approach is required. Metrics for success include maintenance of an appropriate density of adult individuals (approximately 2 individuals per square meter), and the other is the recruitment of new juveniles. Based on previous studies, recruitment modules, consisting of small stacked tiles that mimic small crevice features of boulder fields, may be used to effectively attract new recruits. These modules may then be used to attract larvae to restored habitat areas, or move newly settled juveniles from sites with recruitment, to areas where recruits are absent. These modules will allow easy monitoring of recruitment and growth, for up to 10 years, to determine success of the project.

Success may be assessed relative to controls. Should greater recruitment occur in areas subjected to restoration via translocation of adults than in control areas, we would conclude the

89

translocation enhanced repopulation of black abalone. The ratio of recruitment in restored areas relative to controls could be a quantitative metric of enhancement value. Should no recruitment occur in either control or restoration areas we will compare results to other areas not demographically affected by withering disease. If recruitment occurred over the 10-year period in the unaffected sites but not in the restored areas, then the effectiveness of the restoration will be called into question and methods for future restoration efforts will be modified accordingly.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. The Trustees believe that this type and scale of project will effectively provide appropriate compensation for rocky intertidal habitat injured because of the spill and have therefore selected this project as a preferred alternative.

## 5.1.7   Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 4), and determined that many are valid projects that would provide benefits to shoreline habitat. However, these projects were not selected as preferred for various reasons described below. These projects may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

**Table 4.** Second tier shoreline restoration projects that may be implemented if funds allow.

| ID# | OTHER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| SHORE-5 | Surfer's Point Phase II | Sandy beach |
| SHORE-6 | Matilija Dam removal | Sandy beach, riparian |
| SHORE-7 | Gaviota Creek Watershed Restoration | Riparian, lagoon, sandy beach |
| SHORE-8 | El Capitan State Park Concrete Removal Project/Bike Path and Rip Rap Removal | Sandy beach |
| SHORE-9 | Santa Barbara County Seawall Removals | Sandy beach |
| SHORE-10 | Coastal Hazards Removal, Goleta Beaches from hazards removal, Arroyo Hondo to Coal Oil Point | Not clear. Sandy beach |
| SHORE-11 | Coal Oil Point Research and Education | Coal Oil Point Preserve |
| SHORE-12 | Devereux Slough Restoration | Slough and meadow |
| SHORE-13 | Funding a Quick Reaction Cleanup Crew for Tar Found on Beaches | Sandy and rocky shoreline |
| SHORE-14 | BEACON, San Ysidro and Cold Springs/Montecito Creek, and San Antonio Creek Debris Basin Removal Projects to Improve Sediment Transport for Beach Nourishment. Removal of Unnecessary Sediment Basins from the Gaviota Coast | Sandy beach |

90

| SHORE-15 | Refugio and Gaviota Coast Human Impact Mitigation and Protection Program (Tajiguas, Mariposa Reina South, and Vista) Human Impact Mitigation | Sanitation, recreational |
|---|---|---|
| SHORE-16 | Other Dune Restoration Projects, including but not limited to, Hollywood Beach, Ellwood Invasive Plant Restoration, Ventura City Beaches, Vandenberg AFB | Sandy beach |
| SHORE-17 | Coal Oil Point Pilings and Debris Removal | Lagoon, human safety, possible sandy beach |
| SHORE-18 | Classroom Education and Outreach | Rocky intertidal |
| SHORE-19 | Refugio and El Capitan Rocky Intertidal Docent Program | Rocky intertidal |
| SHORE-20 | Increase Substrates for Rocky Intertidal Species | Rocky intertidal |
| SHORE-21 | Cessation of Beachgrooming | Sandy beach |
| SHORE-22 | Rindge Dam Removal | Sandy beach, riparian |

### *Surfer's Point Phase II (SHORE-5)*

This project includes infrastructure and habitat enhancements to the Surfer's Point shoreline area in Ventura. It is not currently among the preferred projects as its focus is on recreational use rather than ecological benefit. Therefore, it does not appear feasible at the time of this plan, unless it receives support from recreational use funding from the Trustees or other sources. Ecological restoration costs would be expected to be a small part of the total project.

### *Matilija Dam Removal (SHORE-6)*

This project is the removal of Matilija Dam, which is full of sediment and does not function as a drinking water reservoir which was its intended purpose. Removal of the dam would restore natural sediment flows, which enrich beaches through sand deposition. This project was not selected, as it is not yet clear if it is technically feasible, and due to the very high cost associated with the project (estimates over $100 million). Also, this project is too early in the planning and environmental review phase to be properly evaluated at the time this restoration plan was prepared.

### *Gaviota Creek Watershed Restoration (SHORE-7)*

This project includes the relocation of the Gaviota State Park entrance road along with riparian/estuarine enhancements. The relationship to injured resources directly on the shoreline is more tenuous, though it may have recreational benefits to human uses. The time to provide benefits to sandy beach resources is potentially distant. Also, while this project meets some sandy shore restoration goals as a beach nourishment project, it is not a preferred approach to achieving these benefits. The duration of benefits is projected to be short for the sandy beaches and the costs are relatively high (estimated at approximately $10 million). This project was not selected to be carried forward for implementation at this time because the project does not

91

contain sufficient information for the Trustees to understand the benefits to shoreline resources injured by the spill.

***El Capitan State Park Concrete Removal Project/Bike Path and Rip Rap Removal (SHORE-8)***
This project involves the removal of large rip-rap boulders and concrete that are located at the base of a portion of the bicycle trail between Refugio and El Capitan State Parks. The concept is to remove legacy rip-rap (currently serving no purpose) outside of the area where riprap currently exists to protect the Exxon-owned pipeline located there. Removal of legacy rip-rap may partially restore a segment of this shoreline to a more natural and unarmored condition. Feasibility and cost-benefit of this project has not been fully assessed.

***Santa Barbara County Seawall Removals (SHORE-9)***
This project would involve the removal of concrete seawall structures located in Santa Barbara County to restore the shoreline to a less armored condition. The Trustees evaluated selected sites proposed by the County and determined that seawall removal could cause structural compromises to the railroad infrastructure. As of the release of this plan, no formal written proposal has been submitted or reviewed on this effort, so it is not clear if this is a fully developed plan or project.

***Coastal Hazards Removal, Goleta Beaches Extending From Arroyo Hondo To Coal Oil Point (SHORE-10)***
This project would involve removal of coastal hazards other than the Ellwood seawall. The elements evaluated to date by the Trustees, such as iron material protruding from the shoreline surface, would not provide any tangible benefits to plants, animals, and their habitats that were affected by the spill. The State Lands Commission, the proponent of this project, has successfully pursued other funding sources for this work, primarily as an effort to reduce hazards to humans. The nexus to restoring shoreline resource services that were injured during the spill event is unclear, so this project is not currently among the selected projects.

***Coil Oil Point Research and Education (SHORE-11)***
This is a proposal to fund staff to provide research and education at the Coal Oil Point Preserve. The elements evaluated to date by the Trustees, such as funding an endowment for the education coordinator at Coal Oil Point Preserve, would not provide any direct benefits to plants, animals, and their habitats that were affected by the spill. Any identified benefits to the impacted resources would be indirect.

***Devereux Slough Restoration (SHORE-12)***
This is a proposal to restore Devereux Slough through acquisition of a former golf course to expand the slough to a greater portion of its historical extent. The elements evaluated to date by the Trustees, such as habitat enhancement and monitoring in the former golf course, while beneficial to some natural resources, would not provide any tangible benefits to the shoreline natural resources that were affected by the spill. While no slough or meadow habitats were injured by the spill, this project may, however, provide broad ecosystem benefits for multiple

92

species that utilize shoreline habitats and its proximity to shoreline habitats creates ecosystem connectivity that may benefit coastal resources that were affected by the spill.

### Funding a Quick Reaction Cleanup Crew for Tar found on Beaches (SHORE-13)

This proposal is to fund a personnel that would respond quickly to perform cleanup duties on the shoreline when tar is found. The Trustees have concerns that the likelihood of success for this would be very difficult to determine. Cost effectiveness is likely to be low, and benefits to the public would be challenging to quantify. Duplication would also be high in the event of an oil spill incident, given that the spill response effort oversees the task of oil removal and cleanup. Hazardous material handling and disposal cost and liability questions are also significant considerations.

### Removal of unnecessary sediment basins from the Gaviota coast (SHORE-14)

This is a proposal to remove sedimentation basins to allow more natural transport of materials to the shorelines for the purposes of beach nourishment. Only basins that are deemed no longer necessary to protect public safety and property would be considered for removal. Recent fire and flow events call into question the viability of removing sediment basins along the Gaviota coast.

### Refugio and Gaviota Coast Human Impact Mitigation (SHORE-15)

This proposal aims to reduce human waste material on the Refugio and Gaviota shoreline by providing portable toilet facilities. The Trustees considered this to be less a sandy beach or shoreline restoration project and more of a sanitation project, given that it that would install restroom services. It does not provide significant tangible benefits to plants, animals, and their habitats that were affected by the spill. Any benefits that might exist would be challenging to quantify and primarily human sanitation and recreational in nature.

### Other Dune Restoration Projects (SHORE-16)

These are dune restoration projects similar to the other ones listed in the selected project section, but in different locations. Some of these projects lack owner consent, have a need for partner funding, or are not proximal to the spill area. Those with owner consent, funding resources, permitting in place, long term stewardship, and well described costs within the spill area have been selected as preferred. The remaining dune restoration projects would require more details to be better understood, or need more clarification regarding technical feasibility before being considered preferred projects. However, these projects may be considered at a later time, as more information on these projects is gathered or if the selected dune restoration projects become infeasible.

### Coal Oil Point Pilings and Debris Removal (SHORE-17)

This project involves removal of pilings and debris from a lagoon area. However, it appears to have benefits associated with human use and safety rather than the injured shoreline resources. There also appears to be some permitting issues associated with the removal effort that may disturb sensitive natural resources located at or near the lagoon. Much of the identified debris is associated with the lagoon habitat rather than shoreline, making the nexus to the injured

93

resources weaker. Benefits would be challenging to quantify and scale for the injured resources. Both ecological benefits and the cost benefit need to be more clearly understood before the Trustees would reconsider funding this project.

### *Outdoor Classroom Education and Outreach (SHORE-18)*

Building on the successful implementation of the Channel Islands Marine Sanctuary's Rocky Intertidal Protection Program, students from local schools would be engaged to learn about the ecology of rocky intertidal habitats, including hands-on implementation of rocky intertidal monitoring. Students would also be engaged in docent programs to share their knowledge of rocky intertidal habitats with the public at popular tidepool areas. Benefits would be less direct, as they would rely on an overall change in behavior and attitudes by users of rocky intertidal areas.

### *Refugio and El Capitan State Beach Rocky Intertidal Docent Programs (SHORE-19)*

This project involves the development and implementation of a docent program at rocky intertidal sites at Refugio and El Capitan State Beaches to educate and oversee visitors and contact law enforcement personnel, if needed. Benefits would be less direct and would rely on an overall change in behavior and attitudes by users of rocky intertidal areas.

### *Increase Substrate for Rocky Intertidal Species (SHORE-20)*

This project involves the creation of new shoreline habitat or modification of existing habitat to increase substrate for rocky intertidal species. Examples include wrapping pier pilings, or creating "living walls" at hardened shoreline structures such as breakwaters. No viable locations or methods were identified as of the drafting of this plan, but the concept may be viable in the future.

### *Cessation of Beachgrooming (SHORE-21)*

This project involves the cessation of beach grooming along beaches in Los Angeles and Ventura Counties. No specific locations identified as of the drafting of this plan. There is a need for a project proponent and partnerships that do not currently exist.

### *Rindge Dam Removal (SHORE-22)*

This project is the removal of the Rindge Dam and/or dams upstream. The Rindge Dam is full of sediment and does not function as a water reservoir which was its intended purpose. Removal of the dam would restore natural sediment flows, which enrich beaches through sand deposition. This has a very high cost associated with the project (estimates over $100 million) and is too early in the planning and environmental review phase to be properly evaluated at the time this restoration plan was prepared.

94

## 5.2    Subtidal and Fish Habitats

In the initial days and weeks after the Refugio Beach Oil Spill, the Trustees investigated the potential for injuries to subtidal fish, invertebrates, and aquatic vegetation. Animals and plants may be harmed by oil spills if they are exposed directly to the oil, to the fraction of the oil that dissolves into the water, or if they eat oil-contaminated prey. When the Line 901 oil reached the ocean, wave action actively mixed the oil throughout the water column within the surf zone. In addition, the oil was transported offshore and along shore by wind and currents (Figure 2). Offshore, much of the oil floating on the surface was mixed into the water column as oil droplets or particulates, some fraction of the oil dissolved into the water column, and some was taken up into the food chain (Figure 20).



**Figure 20.** Oil exposure in subtidal habitats.

As discussed in Section 2, the spill occurred along the Gaviota coast. Ocean waters in this area are generally in a transition zone where warmer waters off southern California mix with cooler waters off northern and central California. The Gaviota Coast subtidal habitats include sensitive rocky reefs where plants, such as kelp and surfgrass, provide a physical structure that connects the ocean floor to the sea surface. These habitats support diverse communities of plants and animals, and several are designated as Essential Fish Habitat (EFH) under the Magnuson-Stevens Fishery Conservation and Management Act. Other subtidal habitats include eelgrass beds and sand bottom. Given the ecological importance of rocky reef habitats, the Trustees conducted an in-depth assessment of the potential for injuries to coastal subtidal habitats.

Aquatic vegetation was used as a proxy for determining the health of subtidal habitats[10]. Surfgrass, eelgrass, and kelp provide essential food and habitat for a diverse group of fish and

---

[10] Plains does not agree with a number of Trustee interpretations in the subtidal and fish habitats section. In particular, Plains does not agree with Trustees use of a seagrass proxy for the deeper water column injury and does not agree that grunion are a valid indicator species for determining subtidal injury since grunion eggs are exposed on the beach.

95

invertebrate species. Fish in these habitats include California sheephead, kelp bass, rockfishes, red urchins, California spiny lobster, and sea cucumbers. These rocky reef habitats also serve as spawning and nursery grounds for fish and invertebrates. Early life stages of many species were present during the time of the spill and are expected to be sensitive to the effects of oil.



**Figure 21.** Exposure Zones defined for the Refugio Oil Spill NRDA showing shoreline tarball fingerprint matches (red circles). Zone B is the area of heaviest oiling and the extent of subtidal habitat injuries assessed. The inset shows the subtidal assessment area identifying the 10 m depth offshore extent of injury (red polygon). See Appendix B for data associated with this figure.

In the shallower, nearshore environment (0-3 m depth interval) within Zone B (Figure 21), surfgrass and many algal species were visibly coated with oil. Farther offshore (3-10 m depth interval) within Zone B, eelgrass beds and giant kelp attached to rocky reefs were exposed to oil in the water column, and there was documentation that the surface of the kelp forest canopy was oiled.

## 5.2.1 Overview of Data Collection and Studies

The list below summarizes the various field studies, data collection tasks, and analyses used to assess subtidal and fish habitat injuries.

### *Fish and Invertebrate Mortality Observations*

Immediately following the spill, and for several days after, dead fish and invertebrates were observed on the beaches along the Gaviota coast within Zone B. From May 19 to June 19, 2015, the Trustees deployed boxes as repositories for response crews to deposit dead animals during beach cleanup operations. Thereafter, on a daily basis, the Trustees photo-documented, counted, and identified the dead animals in the boxes (Figure 22). Dead fish and invertebrates were also recorded, when feasible, on wildlife search effort log forms and NRDA daily field forms. Fish and invertebrate species comprising well over 30 taxa that inhabit surfgrass, eelgrass, kelp and

96

open sand habitats were found dead on the beaches, primarily during the first week after the spill from Refugio State Beach to El Capitan State Beach. These dead animals indicate that subtidal fish and invertebrates were injured as a result of the spill, but the relatively opportunistic collection method and the limited number of collection times and locations prevented rigorous injury quantification from these data.

**Table 5.** Dead fish and invertebrates found in 2015 during the spill, and one year later in 2016.

| Dead Fish and Invertebrates (abridged) | 2015 | 2016 |
|---|---|---|
| Sand crabs | Y | N |
| Rock crabs | Y | Y |
| Shore crabs | Y | N |
| Kelp crabs | Y | Y |
| Spiny lobster | Y | Y* |
| Beach hopper | Y | N |
| Urchins | Y | N |
| Starfish | Y | N |
| Octopus | Y | N |
| Limpets | Y | N |
| Sea Hare | Y | Y |
| Skate/rays | Y | Y |
| Rockfish | Y | N |
| Kelp greenling | Y | N |
| Surfperch | Y | N |

*\*One lobster was identified that may or may not be a molt, all others were molts.*

In June 2016, the Trustees conducted a follow-up survey of dead organisms along the Gaviota Coast. While direct comparisons using statistical methods (comparing 2015 to 2016 data) were not possible due to differences in study designs, it appears that the species composition and apparent abundance of dead fish and invertebrates found on the beaches was substantially lower in 2016 than in 2015, supporting the conclusion that the oil spill caused acute mortality of fish and invertebrates (Table 5). For example, intact dead lobsters were frequently found during the 2015 collections; however, only one dead lobster was found in the 2016 survey, and may or may not have been a molt (see Table 5). A more detailed summary of the findings is presented in Appendix G-1.

97



**Figure 22.** Examples of unprecedented diversity of dead, oiled fish and invertebrates from diverse subtidal habitats found in the days immediately following the Line 901 spill (clockwise): a. spiny lobster; b. rockfish; c. guitarfish; d. octopus; e. midshipman. Photo Credit: Natural Resource Damage Assessment Trustees.

### *California Grunion Assessment*

California grunion were spawning on some beaches in the spill-affected area during and after the spill (May – September). During semi-lunar high tides these fish bury their eggs in the sand where they incubate until hatching approximately two weeks later during the next semi-lunar high tide (Martin, 2015) (Figure 23). Following the spill, adults and newly hatched larvae would have been exposed to oil in the surf zone, and the incubating eggs may have been adversely impacted by oil stranded on the beach or by cleanup activities (such as raking, machinery, trampling) disturbing nests. In addition to observing and evaluating direct impacts of Line 901 oil on grunion, the life history and accessibility of grunion early life stages make them an ideal model for evaluating the impacts of Line 901 oil on marine fish early life stages in field conditions. Accordingly, the Trustees studied grunion as an indicator of injury.

Grunion spawning was observed at oiled beaches (Refugio State Beach and El Capitan State Beach) and relatively unoiled beaches (East Beach and Topanga Beach) during 2015 and 2016. Based on predator behavior during the days of and immediately following the spill, adult grunion were staging for spawning runs at Refugio State Beach on those evenings. However, the Trustees were not able to access the beach to collect samples of eggs prior to shoreline oiling and/or cleanup activities, therefore, when the trustees attempted to collect eggs, none were found and were presumed to have been removed by cleanup activities. In areas were the Trustees were able to collect eggs from the observed spawning locations, eggs were incubated in the laboratory (Figure 23).

98



**Figure 22.** Examples of unprecedented diversity of dead, oiled fish and invertebrates from diverse subtidal habitats found in the days immediately following the Line 901 spill (clockwise): a. spiny lobster; b. rockfish; c. guitarfish; d. octopus; e. midshipman. Photo Credit: Natural Resource Damage Assessment Trustees.

### *California Grunion Assessment*

California grunion were spawning on some beaches in the spill-affected area during and after the spill (May – September). During semi-lunar high tides these fish bury their eggs in the sand where they incubate until hatching approximately two weeks later during the next semi-lunar high tide (Martin, 2015) (Figure 23). Following the spill, adults and newly hatched larvae would have been exposed to oil in the surf zone, and the incubating eggs may have been adversely impacted by oil stranded on the beach or by cleanup activities (such as raking, machinery, trampling) disturbing nests. In addition to observing and evaluating direct impacts of Line 901 oil on grunion, the life history and accessibility of grunion early life stages make them an ideal model for evaluating the impacts of Line 901 oil on marine fish early life stages in field conditions. Accordingly, the Trustees studied grunion as an indicator of injury.

Grunion spawning was observed at oiled beaches (Refugio State Beach and El Capitan State Beach) and relatively unoiled beaches (East Beach and Topanga Beach) during 2015 and 2016. Based on predator behavior during the days of and immediately following the spill, adult grunion were staging for spawning runs at Refugio State Beach on those evenings. However, the Trustees were not able to access the beach to collect samples of eggs prior to shoreline oiling and/or cleanup activities, therefore, when the trustees attempted to collect eggs, none were found and were presumed to have been removed by cleanup activities. In areas were the Trustees were able to collect eggs from the observed spawning locations, eggs were incubated in the laboratory (Figure 23).

98

*Water Chemistry and Effects to Fish and Invertebrate Early Life Stages*

In order to evaluate the toxicity of the spilled oil, the Trustees conducted bioassays using early life stages of inland silversides and sand crabs and exposed them to different concentrations of Line 901 oil. The bioassay was a seven-day exposure study for fish or a six-day exposure study for sand crabs to evaluate survival and growth (Appendix E). The inland silverside is representative of nearshore fish in the spill-affected area. It is in the same family as grunion and topsmelt, both common surf zone fish in the Santa Barbara area. Sand crabs are prey species of surfperch and other fish and birds in the Santa Barbara area. The bioassay studies quantified the relationships between PAH water concentrations and mortality for both juvenile fish and early life stage invertebrates. Bioassay results also were compared to PAH concentrations measured in surf water during the first two months after the spill. Surf water chemistry results were compared to crude oil bioassay results with other fish and invertebrate species that have been reported in the scientific literature. Surf water concentrations following the spill exceeded lethal PAH concentrations for fish and invertebrate early life stages. See Appendices D, E and G for more information.

As discussed previously, the Trustees also considered the potential for enhanced toxicity caused by exposure to UV light. Studies have shown that ultraviolet light (UV) from sunlight can enhance the toxicity of PAHs by a factor from 2-1000 (Barron 2017). Some PAHs in fish and invertebrate tissues are photo-activated by UV forming reactive products that cause oxidative damage. Oil sheen exposure was documented throughout the spill-affected area and is known to cause toxicity to fish and invertebrate early life stages. A summary of the evaluation is provided in Appendix G-4.

*Subtidal Habitat Exposure Assessment*

Divers from the University of California at Santa Barbara (UCSB) reported patches of oil and heavily oiled wrack on the seafloor in Refugio Bay four days after the spill occurred (Michel 2015). In response to this reported sighting of sunken oil, the Unified Command conducted a sunken oil assessment in Refugio Bay between 11 and 13 days after the spill. Methods included multi-beam sonar surveys, side scan sonar surveys, videos and photographs from a remotely operated vehicle and diver inspections at priority sites. The area surveyed was from near the shoreline to depths of 10m from the spill origin, north of Refugio State Beach, to El Capitan State Beach. Thirteen days after the spill, the divers only observed small tarballs near El Capitan Beach (Michel 2015). The Trustees also sent a team of divers to Refugio Bay 13 days after the spill to collect sediment, vegetation, and invertebrates from three habitat types: kelp bed habitat, eelgrass habitat, and surfgrass habitat in the bay. Tissues samples were analyzed for PAHs, and fingerprinting analyses were conducted (Stout, 2018). In each habitat type, oil (as PAHs) was detected in vegetation and fingerprinted to Line 901 oil. A variety of invertebrate species in the kelp and surfgrass habitats had detectable oil (as PAHs) that was consistent with Line 901 oil. Additionally, NOAA modelers estimated that, based on wave, wind and temperature conditions, dissolved oil and oil droplets likely mixed to a depth of approximately 14 m in this area. Overall,

100

the study showed that these subtidal habitats were exposed to Line 901 oil. A summary of the results is presented in Appendix G-6.

### PAHs in Nearshore Fish and Invertebrate Tissues

On May 19, 2015, the California Office of Environmental Health Hazard Assessment (OEHHA) recommended that CDFW initiate a fishing and shellfish harvesting closure for the coastal area near Refugio Beach. A closure was therefore initiated by CDFW on May 19, 2015, extending from approximately 1 mile upcoast of Refugio Beach to 1 mile downcoast of the beach, from the shoreline to one quarter mile offshore. The closure area was expanded on May 21, 2015, based on aerial observations and oil trajectory models, to include the coastal areas from Canada de Alegria downcoast to Coal Oil Point, and extending from the shoreline to 6 miles offshore (approximately 138 square miles). Between May 24 and June 18, 2015, OEHHA collected and analyzed several species of commonly caught fish and invertebrates, as well as kelp, to determine levels of contamination and safety for human consumption. After the last sampling period, benzo(a)pyrene PAH carcinogenic equivalents had fallen below the limit of concern for human health, and the closure was lifted on June 29, 2015 (OEHHA 2015). For the purposes of evaluating exposure of fish and invertebrates in the spill-affected area, the sum of 45 PAHs in the sampled tissues were evaluated. Elevated PAH concentrations were detected in drift kelp consumers (urchins and sea cucumbers) that were collected from fishing blocks close to the release point. PAH concentrations in tissue samples from animals collected from less than 10 m depth were higher than tissue samples collected from animals greater than 10 meters depth, supporting the conclusion that exposure was highest in the 0-10 m subtidal habitats near the spill origin. The analysis is provided in Appendix G-7.

### Surfgrass and Algae Surveys

Approximately two months after the spill, discolored and dead surfgrass was observed at Refugio State Beach and El Capitan State Beach—both areas of heavy oiling (Figure 8). Based on these



**Figure 24.** Surfgrass injury studies (left to right). The first two pictures show an example of how brown and necrotic surfgrass looked in the field. Middle picture shows an injured experimental plot. Far right shows a reference plot with bright green, healthy plants. Photo Credit: Natural Resource Damage Assessment Trustees.

101

observations, additional intertidal and subtidal surveys were initiated to quantify the extent of discolored surfgrass and algae. Condition and abundance of surfgrass and algae were assessed at eight sampling sites over several dates from July 2015 to June 2016. Oil-related injuries, including bleaching, necrosis, loss of biomass, cellular death and loss of surfgrass leaf tensile strength, occurred throughout the range of surfgrass habitats within Zone B (Figure 24). During the August 2015 survey, the proportion of dying surfgrass ranged from 37.4% at Arroyo Hondo to 82% at Corral Canyon, compared to 2.2% at the reference site (Mussel Shoals located in Zone D where shoreline oiling was absent, sporadic or light-to-moderate). For algae, the cover of dead and dying plants ranged from 86.1% at Coal Oil Point to 99.2% at Corral Canyon, compared to 6.1% at the reference site. An area-weighted average of the percent area of dead and dying plants was used to quantify injury for subtidal habitats. By the 2016 field season, surfgrass was not fully recovered at the heavily oiled Arroyo Hondo site. Survey methods and results are detailed in Appendix G-5.

## 5.2.2   Subtidal and Fish Habitat Injury

*Area of Impact*

Due to the nature of the Refugio oil release into the surf zone, the nearshore coastal processes and the physical properties of the oil, the Trustees concluded that exposure of aquatic organisms was likely to be highest in nearshore, relatively shallow subtidal habitats[11]. Therefore, the Trustees focused the subtidal injury assessment within Zone B where oiling was heaviest, for depths of up to 10 meters (m) (Figure 21). The Trustees selected 10 m depth as the outer boundary for subtidal resources within Zone B based upon the following considerations:

1. Submerged oil droplets and masses were observed within Zone B to 10 m depth;
2. Ten meters is the depth at which there was fairly high confidence that oil would mix throughout the water column to the bottom (Appendix A);
3. There was direct evidence that animals and plants in the near shore environment within Zone B were injured and/or exposed to oil (Appendix G), and
4. Aquatic vegetation such as kelp or seagrass provide critical foundational subtidal habitat, and rarely extends beyond 10 m deep.

*Baseline Condition*

The Trustees assessed injury by comparing oiled areas to baseline conditions, per the OPA regulations. The Trustees estimated those baseline conditions by using unoiled reference sites in 2015 (for grunion studies, surfgrass studies and surfperch exposure studies) and by repeating one-year, post-spill anniversary studies (grunion studies, surfperch studies and mortality observation studies), when the Trustees assumed continued exposure to Line 901 oil would have been eliminated or greatly reduced.

---

[11] Plains disagrees with the extent of subtidal injury assessed by the Trustees and asserts subtidal injury is materially lower than the Trustee's estimate.

102

***Injury Determination and Quantification***

For injury determination, the Trustees considered the presence and species composition of dead, oiled fish and invertebrates in mortality observation studies, the observed reduction in hatching success in grunion, the poor health of oiled macroalgae and seagrass, and a large number of recent toxicity studies on the effects of crude oil to early life stages of fish and macroinvertebrates. These provided, at a minimum, qualitative evidence for the Trustees to conclude that there was injury to natural resources in the shallow subtidal (0-10 m depth) area in Zone B.

For injury quantification, the Trustees used injury observed from surfgrass and algae studies as a proxy for general injuries to subtidal benthic[12] and water column habitats, and their associated biota. The Trustees determined that surfgrass/algal habitat (surfgrass habitat) was a reasonable proxy for other similar vegetated subtidal benthic habitats (e.g., kelp and eelgrass) because: (1) surfgrass is a foundational habitat for a highly diverse group of fish and invertebrates species that occupy the 0-10 m depth interval; (2) surfgrass habitat includes all of the major taxa found in other subtidal habitats (vascular plants, red and brown algae); and (3) surfgrass habitat is more accessible for the comprehensive surveys needed to quantify injury.

Surfgrass and algae surveys were conducted throughout Zone B (Figure 8) to identify the percent cover of discolored, dead, and dying surfgrass and algae (Figure 24). Injury was defined as the area-weighted average across all study sites, representing a maximum injury of 54%. This was used as the basis for the injury assessment for subtidal habitat (Figure 25), with weighting factors for relative habitat types and depth strata (i.e., 0-3 m versus 3-10 m depth interval):

*0-3 m Depth interval*
For the 0-3 m depths, the Trustees applied the weighted average 54% injury to all eelgrass, rocky reef, kelp, and surfgrass habitats within Zone B. Because sand bottom habitats are less biologically productive, the Trustees applied an ecological injury of 5.4%, representing one tenth of the injury of vegetated and rocky reef habitat (Appendix H).

*3-10m Depth interval*
For the 3-10 m depth interval, the Trustees assessed injury separately for benthic habitats, for surface water (top 2 m of water column), and for midwater (2-10 m depth interval) (Figure 26).

---

[12] Benthic means relating to the bottom of the ocean and to the organisms that live there.

103



**Figure 25.** The surfgrass and algal injury quantification was driven by studies where the area of discolored, dead and dying plants were assessed. Injury was defined as the percent cover of discolored, dead and dying surfgrass and algae at a study site. The overall area-weighted average percent injury was 54%. Green dots are sampling sites.

For the benthic habitat the Trustees calculated losses based on areal dispersion of submerged oil across the benthic footprint of Zone B to a depth of 10 m. Sunken oil would not necessarily dilute out into the water column, but would persist as small sediment-laden oil particles and droplets and spread across the sea bottom due to wave action and currents. Sunken oil also has a high likelihood of being trapped in or slowed by the bottom vegetation. The Trustees considered that injury to the benthic community would decrease linearly with distance from the shore. This would range from an 54% injury in the nearshore (0-3 m depth) to 0% injury at the 10 m depth, after calculating average offshore distances to the 10 m depth stratum. This resulted in the application of a 13% injury across the 3-10 depth range for benthic rocky reef, surfgrass, kelp, and eelgrass habitats. As with the 0-3 m zone, for sand bottom habitats in this depth stratum the Trustees are claiming one tenth of that loss due to lower productivity/services associated with sand bottom habitats. This resulted in a 1.3% loss for sand bottom habitats (Table 6). More detailed discussion of the injury quantification is presented in Appendix H.

For the top 2 m of the water column in the 3-10 m depth interval (Figure 26, light blue area), exposure would have primarily come from the short term exposure of surface oil in the approximately 2 weeks post spill. The Trustees determined there were short-term losses to the biota in the water column, ranging from 54% loss (determined by using surfgrass as a proxy) to 80% loss (based on literature). Studies in recent years have demonstrated high mortality (approximately 80%) to fish early life stages and planktonic organisms at low levels of PAH exposure, especially when exposed to UV light (Morris et al. 2015). The Trustees also assessed injuries to fish and planktonic organisms in the mid-water column of the 3-10 m depth stratum, at a 5% loss (Figure 26, dark blue area). The midwater injuries are based on the concept of oil

104

mixing from the surface and from the bottom, but with a recognition that dilution, weathering
and dispersion will greatly reduce exposure, and thus, the level of injury (Table 6).



**Figure 26.** Summary of subtidal injury quantification. The average distance offshore from the 0 to 3 m depth range is 76 m. The
average distance from 3 m to 10 m depth range is 232 m. The benthic habitat injury of 13% in the 3-10 m depth range was
calculated by multiplying the injury in the 0-3 m depth range (54%) by the proportion of the offshore linear distance 0-3m depth
compared to the total offshore linear distance of 0-10 m depth.

### *Habitat Equivalency Analysis Results*

The Trustees used HEA (Appendix C) to scale compensatory restoration for the subtidal benthic
injury. The HEA was based on the percent injury for the various components of the subtidal
environment, which in turn were based on the documented injury to surfgrass and algae. For the
recovery component, the HEA calculations take into account the rapid initial loss that occurred
in the first 6 months of the spill. This was evidenced by a high percentage of discolored, dying
surfgrass and algae in August of 2015 and January 2016. Recovery was assumed to be rapid, -
88% recovered after a year (consistent with 2016 study observations), 94% after two years, and
100% after 5 years. Applying the injury levels discussed above, this analysis resulted in a loss of
178.5 acre-years in the 0-3 m depth interval and 117.4 acre-years in the 3-10 m depth interval
(Appendix H).

The Trustees considered how to address injuries to the upper- and mid-water zones of the 3-10 m
depth interval and ultimately chose not scale restoration for these areas because the restoration
projects selected to benefit benthic resources will likely provide significant benefits to water
column resources as well. In addition, the injury to fish early life stages, while significant, would
also have been ephemeral and the Trustees were unable to readily identify restoration projects
that were both targeted to water column species and highly scalable to the estimated injury.
Given these facts, the Trustees decided to defer until later a determination on how best to
compensate for any remaining injury to water column species. The Trustees anticipate having
subtidal restoration funds available after the completion of the projects discussed below. If
selected, these projects should yield additional information on their beneficial impacts. The
Trustees will then decide whether remaining funds should be spent to augment an existing
subtidal project or implement a new water column-focused project.

105

**Table 6.** Subtidal injury (losses) and Habitat Equivalency Analysis results.

| Depth Zone | Habitat type | Max injury (% Loss) | Recovery time (years) | Habitat area (acres) | Acre – years for compensation (dSAY[1]) |
|---|---|---|---|---|---|
| Nearshore Benthic Habitats (0-3 m depth zone) | Rocky reef, kelp canopy, seagrass, and sand bottom | 54% | 5 | 514 | 178.5 |
| Offshore Benthic Habitats (3-10 m depth zone) | Rocky reef, kelp canopy, seagrass, and sand bottom | 13% | 5 | 1657 | 117.4 |

[1]dSAY = discounted service acre-year. See Appendix C.

## 5.2.3   Selected Restoration Projects

The Trustees identified four categories of restoration activities (abalone restoration, eelgrass restoration, kelp restoration, and seawall removal) to compensate for losses to subtidal habitats caused by the release of Line 901 oil. Subtidal projects were selected and prioritized by their ability to enhance and restore subtidal habitats in the region affected by the spill. Projects within Zone B were heavily prioritized over other projects that were located in the region affected by the spill but outside Zone B. These projects are discussed below in order of priority (Table 7).

**Table 7.** Subtidal selected restoration projects.

| ID# | SELECTED PROJECTS | BENEFITS |
|---|---|---|
| SubT-1 | Abalone Restoration | Rocky reef habitats and associated fish and invertebrates |
| SubT-2 | Coastal Eelgrass Restoration | Eelgrass habitats and associated fish and invertebrates |
| SubT-3 | Sand-dwelling Kelp Project | Kelp habitats, and associated fish and invertebrates |
| SubT-4 | Ellwood Seawall Removal | Rocky reef habitats |

***Abalone Restoration in Naples Reef and Campus Point MPAs (SubT-1)***
The goal of this project is to enhance the function of rocky reef habitats within the two Marine Protected Areas (Campus Point and Naples Reef) off the Gaviota Coast that were directly affected by the spill. This project would supplement abalone populations through outplanting of juvenile abalone and translocating adult abalone from a nearby system.

To maximize success, the Trustees propose applying multiple approaches when possible (e.g., adult translocation and juvenile captive propagation and outplanting) over a multi-year period, with repeated outplanting and translocation events. The Trustees propose a 10-acre restoration project (5 acres within each of the Marine Reserves) that will be implemented over a 5-year period and subsequently monitored for an additional 5 years.

*Affected Environment*

106

The restoration sites to which abalone will be translocated or outplanted comprise over 5 acres at each of the Naples Reef and Campus Point Marine Protected Areas. The donor population for adult abalone translocation is from San Miguel Island or another similarly robust southern California population. The Trustees will work with the appropriate local, state, and federal agencies, as well as abalone experts and NGOs to identify appropriate commercial or research abalone farm(s) for juvenile abalone outplants.

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* - The long term biological impacts of this project to the marine protected areas are highly beneficial to the public, as abalone become re-established. Red abalone are an iconic resident of California kelp forests. Ecologically, abalone are grazers that keep rocky habitat available for diverse algal and benthic invertebrate occupants of rocky reefs. Abalone are competitors with sea urchins, but are less destructive grazers than sea urchins, thus abalone promote a healthy rocky reef system. There is the potential for minor adverse biological impacts to the abalone population of San Miguel Island or other selected donor population through the removal of abalone adults. In addition, there is the potential for injury to the translocated abalone. However, any removal will be done under permit, using best practices, and carefully planned to avoid any injury to translocated abalone or adverse reduction to the donor population or associated habitats. In addition, the project proponents are fully aware of the potential for disease in abalone populations and will use local abalone experts to screen and test outplants and transplants to avoid any chance of introducing disease into a wild population.

2. *Physical Impacts* – The Trustees do not anticipate major impacts to the physical environment, such as water, air, sediments, etc. Any negative physical impacts (e.g., harm to reef structure) would be unlikely and, at worst, would likely be mitigated by the use of best practices. Ultimately, any adverse physical impacts are expected to be negligible.

3. *Human Impacts* - The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. There is likely a benefit to human recreational use as the presence of abalone and a more robust rocky reef/kelp habitat create a more diverse, healthy ecosystem, which will benefit divers and other recreational users of the MPAs.

*Probability of Success*
This project has high likelihood of success if implemented at this scale. In addition, abalone outplanting and translocation presents few environmental risks that are easily mitigated through established best management practices (BMPs). The CDFW has already developed many of

107

these BMPs as part of the red abalone outplanting work they have initiated in Los Angeles and San Diego Counties. Furthermore, abalone outplanting and translocation require no on site construction or physical modification of the sea floor, so permitting requirements will be limited to scientific collection and stocking permits, which will allow for a streamlined implementation process.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites. The success of this project will be measured through up to 10 years of post-transplant/outplant monitoring of abalone population density and size structure, as well as an evaluation of rocky reef ecosystem for success.

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:
- Number and size of abalone deployed to site per outplanting event as compared to pre-project levels pre-outplanting;
- Density of abalone present on site over time as compared to pre-project levels pre-outplanting; and
- Rocky reef ecosystem response will be measured through kelp density and stipe counts and fish, invertebrate and algae and habitat characterization surveys.

*Evaluation*
The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for injured subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

**Refugio Bay Eelgrass Restoration (SubT-2)**
The goal of this project is to enhance habitat services within Zone B through the restoration of eelgrass. There are limited opportunities for coastal eelgrass restoration within Zone B because of depth, substrate and wave energy limitations. However, the Trustees have identified a subtidal site where the substrate, depth and wave energy are likely to support eelgrass, but which is far enough from existing beds that natural recruitment is unlikely (Altstatt, personal communication).

*Affected Environment*
The project includes creating additional eelgrass habitat in areas in or adjacent to Refugio Bay, including the southeastern portion of the Gaviota Coast, an area that was directly and heavily impacted by Line 901 oil. This would be accomplished through harvesting of plants from a donor site and transplanting them to the project site.

108

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* – This project would provide long-term beneficial biological impacts to the environment. Eelgrass habitat provides unique and critical ecosystem services to the shallow subtidal component of the California coastal shelf. Eelgrass beds are an important source of primary productivity and create 3-dimensional biogenic habitat that is used by a diverse assemblage of fish and invertebrates as nursery and foraging habitat. Eelgrass habitat is also identified by NOAA as a Habitat of Particular Concern under the Magnuson-Stevens Fishery Conservation and Management Act. There is a slight possibility of adverse biological impacts if the project implementer takes too much eelgrass from donor sites. However, given the Trustees' experience and expertise in eelgrass restoration, this risk is extremely small. The Trustees, in addition to having implemented similar projects successfully in the past, would draw on the expertise of local experts in implementing this project.

2. *Physical Impacts* – The Trustees anticipate only minor impacts to the physical environment. The project will likely create beneficial impacts because eelgrass provides a three-dimensional habitat for fish and invertebrate species and stabilizes sediments, reducing scour and enhancing light penetration in the water column. Any adverse impacts would be associated with implementation (i.e., project implementers moving in and around the donor and transplant sites) and are expected to be negligible.

3. *Human Impacts* – The Trustees do not anticipate any impacts from this project on socio-economics, aesthetics, health and safety, historical properties, recreational use, etc.

*Probability of Success*
Eelgrass restoration in southern California has proven successful in many coastal locations. However, most of these projects were conducted with estuarine species. Because this project focuses on the coastal species, the Trustees are proposing to implement the restoration based on the successful methods used by Altstatt (2014). Based on that work, it is expected that full maturation of the restored eelgrass bed may take 7-10 years.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites. The project includes up to 10 years of monitoring for restoration success. The specific details of the monitoring actions will be  outlined in the project monitoring plan

109

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Acres restored;
- Density of eelgrass shoots, cover, and blade length before and after; and
- Ecosystem response measured through fish and invertebrate and habitat characterization surveys.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for injured subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

**Sand-Dwelling Kelp Restoration (SubT-3)**

The goal of this project is to support an existing effort to re-establish sand-dwelling kelp canopy to the Goleta Beach area. There are no other opportunities for direct kelp forest restoration within Zone B. The existing project is currently underway under separate funding, initiated by a small group of dedicated citizen scientists who are attempting to restore the kelp forest that once existed in Goleta Bay. While there is no rocky reef habitat in the bay that typically supports kelp forests, it has been speculated that the kelp had once established itself on tube-forming worm colonies that frequent open sand habitats (e.g., colonies of the tube worms belonging to the genus *Diopatra*). The project aims to restore these "sand-dwelling" kelp plants by inserting small granite columns into the sediment, exposing the top 10-20 cm of the column to kelp recruitment. The ultimate goal of this project is that kelp holdfasts will spread beyond the area occupied by the granite column and form a kelp forest of sufficient density to support kelp canopy.

The scope of the NRDA project is to extend the existing project by expanding the permits associated with the current one-acre project and to implement a systematic monitoring program. At this time, the Trustees are not proposing a larger scale buildout of this project because the results are still preliminary, and the longer-term viability of the approach is unknown. However, if the project continues to show success, the Trustees will consider expansion, subject to permits and other considerations.

*Affected Environment*

The location of the project currently encompasses sand bottom offshore of Goleta Beach, just outside of Zone B, the heaviest oiled area. The project would re-introduce sand-dwelling kelp to the area. There are limited opportunities for other kinds of kelp restoration due to lack of rocky reef habitat.

110

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* - The Trustees' proposal regarding this project does not include any additional active restoration work. Rather, it covers only an extension in the duration of the existing project and associated monitoring activities. Extending the current project will have no negative effects to the environment and may have beneficial effects, as the project currently provides some ecosystem benefits to fish and invertebrates. Kelp also provides food to subtidal, intertidal and beach communities (e.g., a large component of beach wrack is produced by giant kelp). If the Trustees extend the time period of the project, the beneficial impacts will increase accordingly. As the monitoring activities would be the Trustees' only physical interaction with the project, any adverse impacts are expected to be negligible.

2. *Physical Impacts* – As with biological impacts, the Trustees expect any physical impacts from this project to be negligible.

3. *Human Impacts* - The Trustees do not anticipate any impacts from this project on socio-economics, aesthetics, health and safety, historical properties, recreational use, etc.

*Probability of Success*

The project was implemented as a pilot project, and to date has shown some success, in that kelp plants have recruited to a number of the granite columns. Longer-term monitoring of the existing project will help the trustees evaluate success, especially from consequences of large storm events.

*Performance Criteria and Monitoring*

The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. This time series of metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites. This proposal calls for 5 years or more of monitoring for success of the pilot project. The specific details of the monitoring actions will be outlined in the project monitoring plan.

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Density of kelp plants as compared to pre-project conditions;
- Kelp stipe counts and canopy cover compared to pre-project conditions; and
- Ecosystem response will be measured through fish and invertebrate and habitat characterization surveys.

111

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

### Ellwood Seawall Removal (SubT-4)

This project will benefit shoreline (sandy beach) resources and is discussed in Section 5.1.6 (Shoreline) above. However, the Trustees agree that there are likely benefits to subtidal resources offshore of the existing structure. The subtidal component of this project consists of pre- and post-removal monitoring to confirm and document benefits.

*Affected Environment*

The project site is Ellwood Beach in Goleta, CA. A wooden seawall currently constrains natural functioning of the ecosystem as well as lateral access along the shoreline at high tide.

*Environmental Consequences (Beneficial and Adverse) (to the subtidal environment)*

This project will only be undertaken if it is ultimately selected to compensate for sandy beach injuries, as discussed in Section 5.1.6 above. Accordingly, its status as a preferred alternative to compensate for subtidal injuries will have no impact on the potential environmental impacts described above. The only additional activity associated with the subtidal "component" is non-invasive monitoring, which the Trustees anticipate will have negligible, if any, environmental impacts.

1. *Biological Impacts* – The project is expected to benefit the environment by reducing scour and turbidity to the nearshore environments (due to the reduction in reflective wave energy after removal of the seawall). Scour inhibits settlement and success of algal and seagrass species, as well as benthic invertebrates. Turbidity inhibits algal and seagrass growth. Reduction in scour is expected to increase species diversity and habitat function in the affected offshore area. Short-term adverse effects from construction are expected to be negligible with respect to the existing offshore environment.

2. *Physical Impacts* – The benefits to subtidal habitats include an expected reduction in turbidity and scour in the offshore habitats resulting from the reduction in reflective wave energy that will occur after the seawall has been removed. Short term adverse effects from construction activities (potentially higher turbidity, sediment transport) are expected to be negligible.

3. *Human Impacts* - The Trustees do not anticipate any impacts from this project on socio-economics, aesthetics, health and safety, historical properties, recreational use, etc. in the offshore environment.

112

*Probability of Success*
The Trustees consider this project to have a good likelihood of success in providing benefits to the nearshore subtidal habitats because wave reflectivity and scour will be significantly reduced compared to current conditions.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites.  The project envisions up to 10 monitoring events, pre- and post-removal over a five-year period. The specific details of the monitoring actions will be  outlined in the project monitoring plan

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Presence of sessile macrofauna and macroalgae sensitive to scour relative to pre-project conditions; and
- Decrease in turbidity relative to pre-project conditions.

*Evaluation*
The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for injured subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

## 5.2.4   Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 8) and determined that many are valid projects that would provide benefits to subtidal and fish habitat. However, these projects were not selected for various reasons described below. These projects may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

113

**Table 8.** Second tier subtidal restoration projects that may be implemented if funds allow.

| ID# | OTHER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| SubT-5 | Net and Trap Removal (marine debris) | Fish, some benefit to benthic invertebrates |
| SubT-6 | Artificial Reef | Fish and subtidal habitats |
| SubT-7 | *Undaria* Removal at Anacapa Island | Subtidal habitat |
| SubT-8 | Marine Protected Area Management and Stewardship Program | Subtidal habitat |
| SubT-9 | Grunion Habitat Restoration and Education | Beach, subtidal and fish |
| SubT-10 | Slough and Salt Marsh Restoration | Early lifestage fish |
| SubT-11 | Kelp Restoration in Santa Barbara Channel Area | Subtidal habitat |
| SubT-12 | Sargassum Removal | Early lifestage fish |
| SubT-13 | Lobster Restoration | Lobster |
| SubT-14 | Boater Outreach to Reduce the Spread of Invasive Algae | Subtidal habitat |
| SubT-15 | Gaviota Creek Fish Barrier Removal | Fish |

### Net and Trap Removal (marine debris) (SubT-5)

This project was considered because marine debris removal, particularly derelict fishing gear, can have some benefits to marine habitats and can also reduce mortality of marine fish, birds, invertebrates and mammals. Marine debris removal is identified as a lower priority for a number of reasons. The degree of benefit that fishing gear removal has to each of these resources depends greatly on the location and habitat from which the gear is removed, and the nature of the items removed. While there are some opportunities to remove fishing gear from the greater southern California Bight, opportunities to remove gear from Zone B have proven to be limited. Thus, direct benefits of gear removal to the benthic marine habitats that were injured by the spill are also limited. Gear removal would be more likely to address injuries to water column species, so the Trustees may reconsider this project if they determine later that it is appropriate to conduct water column species-specific restoration (as opposed to using remaining funds to expand habitat projects with water column species benefits).

### Artificial Reef (SubT-6)

The Trustees considered proposed artificial reef creation via reef balls or imported rock near Bird Island. Artificial reef creates new hard structure, promoting rocky reef habitat enhancement, potentially including kelp establishment. However, for the purposes of NRDA, the Trustees determined that significant barriers, such as permitting and maintenance issues, exist. These barriers will lessen the likelihood of timely implementation of the project. Therefore, the Trustees dropped this project from further consideration at this time.

### Undaria Removal at Anacapa Island (SubT-7)

*Undaria pinnatifida* is an Asian seaweed of the intertidal and shallow subtidal zone, which was first discovered invading Anacapa Island in 2016. Invasive seaweeds crowd out native seaweeds

114

and potentially introduce co-occurring invertebrates, with potential for cascading effects to the ecosystem. The proposed project would implement an *Undaria* removal program in subtidal areas around the Channel Islands. Although the Trustees consider this a beneficial project, in general, there was concern that the project had high costs that may not achieve lasting benefits to subtidal habitats. Further, the habitat and ecosystem benefits occur outside of the subtidal area affected by the spill.

### Marine Protected Area Management and Stewardship Program (SubT-8)

This project focuses on ecological and human use monitoring to support adaptive management and agency enforcement of MPA regulations. This project may include cleanup of marine debris identified within MPAs, removal of invasive kelps, and education and outreach to promote awareness, compliance, and stewardship of MPAs. The project is heavily focused on monitoring, and the tangible subtidal benefits are undefined, making it a less attractive project for implementation than those listed as "preferred" in Table 7. The Trustees will consider whether this project can be combined with the abalone restoration project that is also focused within MPAs.

### Grunion Habitat Restoration and Education (SubT-9)

This project focuses on developing management practices that restrict grunion capture and other impacts to Grunion until after the first 2-3 days of spawning. Public outreach to raise awareness would be a necessary component of the project. Also, increased public awareness of this species' presence at Refugio and El Capitan State Beaches is directly attributed to the Refugio Beach Oil Spill cleanup, and an interpretive program would help to mitigate expected increased fishing pressure for grunion at these locations. Also, increasing the number of grunion greeters and/or increased CDFW enforcement would help protect grunion. The Trustees consider these measures to be beneficial to grunion. However, there are several other projects targeting shoreline restoration that provide significant benefits to grunion spawning habitat. This project would require a change in the current regulatory framework by the Fish and Game Commission, which is outside the authority of the Trustees. Thus, a specific grunion shoreline project is not preferred at this time.

### West Goleta, Carpinteria and Devereux Slough Restoration Projects (SubT-10)

These are three separate projects considered for wetland, tidal marsh and upland restoration to benefit estuarine and marsh habitats. These habitats benefit early life stage fish and crab species by serving as refugia and feeding habitat. While the habitat injured by the oil spill was marine, shallow subtidal habitats, these projects may provide broad ecosystem benefits and contribute to subtidal health by supporting early life stages of subtidal species and through indirect effects to subtidal habitats such as water quality improvement.

### Kelp Restoration in the Santa Barbara Channel Area (SubT-11)

Restoration of kelp could lend to protection of shoreline habitats from storms, provide habitat for prey of marine mammals and birds, provide additional habitat for fish, provide wrack for sandy beach, and improve recreational diving. However, the project lacked specific descriptions,

115

locations, and timelines to gauge its feasibility. The Trustees believe that the abalone project and the sand kelp project (identified as "selected" projects) meet the goals of restoring kelp habitat. The Trustees will continue to monitor opportunities and feasibility for such projects for the future.

### *Sargassum Removal (SubT-12)*

*Sargassum* is an invasive, floating kelp that has recently invaded southern California. Invasive seaweeds crowd out native seaweeds and potentially introduce co-occurring invasive invertebrates, with potential for cascading effects to the ecosystem. The Trustees agree that *Sargassum* establishment and dispersal in Santa Barbara Channel is a concern, but there was no project proposed that specified activities, timeframe, locations or scope to gauge feasibility for a *Sargassum* removal project. This project was not selected to be carried forward for implementation at this time because the project does not contain sufficient information for the Trustees to understand the benefits to subtidal resources injured by the spill.

### *Lobster Restoration (SubT-13)*

This project concept involves multiple methods for conducting lobster restoration including various studies, purchasing Global Positioning System units for permit holders, fishermen surveys, enforcement assistance, and education programs. The benefits of these projects are indirect to subtidal habitats and to lobsters. The ecosystem-level benefits from the projects listed as "selected" in Table 7 are anticipated to also provide benefits to lobsters.

### *Boater Outreach to Reduce the Spread of Invasive Algae (SubT-14)*

This project involves educating boaters about reducing the spread of invasive algae by sending educational materials to boaters along with their registration information, and providing resources for removing algae from boats at launch locations. The benefits of this project are anticipated to be less than would be achieved through direct restoration of habitat, and the effectiveness of education in reducing the spread of invasive algae is uncertain.

### *Gaviota Creek fish barrier removal (SubT-15)*

This project involves removing numerous fish barriers along the Gaviota Creek watershed. Some of these barriers restrict the ability of fish to migrate upstream while others interfere with the creek's natural functions. This project will benefit Southern California steelhead and other aquatic organisms that live within the Gaviota Creek Watershed. The removal of steelhead barriers is focused on one species that was not documented to be injured by the spill, therefore it did not rise to the level of a "selected" project. Furthermore the commencement of watershed-wide restoration is contingent on the relocation of the access road to Gaviota State Beach and Hollister Ranch, and removal of the current road that comprises a substantial impediment in the watershed. The scale of this project exceeds the resources that could be provided through NRDA settlement funds; however, the Trustees have included this as a second tier project.

116

## 5.3    Birds

Birds are especially vulnerable to oil spills, as the oil compromises the ability of their feathers to keep them warm in the cold ocean water (Moskoff 2000). For a species that forages in the water, even a relatively small amount of oil (e.g., the size of a nickel) may result in death. Like a hole in a wetsuit, the oil destroys the feathers' ability to insulate the bird, thus allowing cold ocean water to spread against the bird's skin. Birds which contact oil typically die of hypothermia. With their rapid metabolism, birds also suffer starvation when they cannot forage for a few days (Oka and Okuyama 2000). They can also ingest toxic amounts of oil while preening, as they attempt to clean themselves. Finally, larger amounts of oil can smother birds, affecting their mobility and ability to survive.

A total of 269 birds were collected live and dead after the oil spill, encompassing at least 28 species. The Trustees structured our assessment of bird injury into three injury categories based on the birds' behavior patterns and location of the affected species. These categories are:

- Brown pelicans;
- Western snowy plovers; and
- All other bird species.



**Figure 27.** Location of live and dead birds recovered during wildlife operations. The back lines show the NRDA Exposure Zone boundaries for reference; however these boundaries were not used in the quantification of injury to birds.

### 5.3.1    Overview of Data Collection and Studies

This section describes the data that were collected or analyzed by the Trustees in order to assess injury to birds resulting from the spill. These data were generated by several efforts, including studies that were conducted by the spill cleanup, data collected by the NRDA team, and studies that were not specifically developed for the spill but that provide relevant information for

117

understanding and determining injuries to birds resulting from the spill. These studies are listed below and described in more detail in Appendix I.

### Wildlife Reconnaissance Aerial Surveys

On May 21, 2015, aerial surveys for pelagic birds were conducted roughly between Point Conception and the City of Goleta. The objective of these surveys was to understand the general location and quantity of seabirds in the vicinity of the spill-affected area in order to inform spill response activities. These surveys, conducted by the Unified Command, documented at least 13 unique pelagic bird species in groups ranging in size from a single individual to 120 individuals.

### Live and Dead Bird Intake Data

Documentation of live and dead birds was collected as a normal part of the spill response. These data describe the collection of each bird, with such information as date, location, species, condition of bird, degree of oiling, etc. Locations of live and dead birds collected are shown in Figure 27, and the species collected are identified in Table 9. During spill response operations all live distressed birds were taken to rehabilitation centers for further care. All dead birds encountered within the spill area were collected. A total of 66 live birds and 203 dead bids comprised of over 28 species were collected between May 20, 2015 and June 24, 2015 (OWCN 2015).

**Table 9.** All birds collected live and dead by species (or closest known taxon).

| Species | Collected Live | Collected Dead | Total |
|---|---|---|---|
| Black storm-petrel | 0 | 1 | 1 |
| Barn owl | 0 | 1 | 1 |
| Black skimmer | 0 | 1 | 1 |
| Brandt's cormorant | 2 | 11 | 13 |
| Masked/Nazca booby | 0 | 1 | 1 |
| Brown pelican | 47 | 26 | 73 |
| California gull | 1 | 5 | 6 |
| Cassin's auklet | 0 | 1 | 1 |
| Clark's grebe | 0 | 2 | 2 |
| Common loon | 0 | 3 | 3 |
| Common murre | 5 | 33 | 38 |
| Cormorant sp. | 0 | 4 | 4 |
| Double-crested cormorant | 0 | 14 | 14 |
| Domestic duck sp. | 0 | 2 | 2 |
| Eared grebe | 0 | 1 | 1 |
| Elegant tern | 0 | 1 | 1 |
| Forster's tern | 0 | 1 | 1 |
| Grebe sp. | 0 | 3 | 3 |
| Heermann's gull | 0 | 3 | 3 |
| Loon sp. | 0 | 5 | 5 |
| Mew gull | 0 | 1 | 1 |
| Northern fulmar | 0 | 5 | 5 |

118

| | | | |
|---|---|---|---|
| Pacific loon | 6 | 17 | 23 |
| Pelagic cormorant | 0 | 2 | 2 |
| Pigeon guillemot | 0 | 1 | 1 |
| Rhinoceros auklet | 0 | 2 | 2 |
| Rock pigeon (feral) | 0 | 1 | 1 |
| Red-throated loon | 1 | 12 | 13 |
| California scrub-jay | 0 | 1 | 1 |
| Shorebird sp. | 0 | 1 | 1 |
| Sooty shearwater | 0 | 16 | 16 |
| Surf scoter | 1 | 2 | 3 |
| Western grebe | 1 | 8 | 9 |
| Western gull | 2 | 9 | 11 |
| Unknown | 0 | 6 | 6 |
| TOTAL | **66** | **203** | **269** |

### *Search Effort Data Compilation*

Understanding how well beaches within the spill area were searched is important to estimating how many carcasses may have been missed. The Trustees compiled and analyzed records from SCAT teams, wildlife reconnaissance teams, cleanup crews, and NRDA operations to understand the geographic extent and frequency of beach searches that would have had the potential to identify live and dead birds during the cleanup period.

119



**Figure 28.** Western snowy plover at Coal Oil Point during cleanup operations. Photo Credit: Coal Oil Point Reserve, UCSB.

### *Western Snowy Plover Studies*

Western snowy plovers utilize several sandy beaches within Santa Barbara and Ventura Counties for nesting, including Coal Oil Point Reserve, San Buenaventura State Beach, McGrath State Beach, Mandalay State Beach, Ormond Beach, Hollywood Beach, and on Naval Base Ventura County at Point Mugu. Routine monitoring of plovers nest numbers and nest success were conducted at each of these beaches during the 2015 nesting season (Coal Oil Point Reserve 2015; Hartley 2015; Barringer 2015; Frangis and Cox 2015). All nesting beaches are located in Ventura County, with the exception of Coal Oil Point Reserve in Santa Barbara County, which was subject to elevated oil exposure and extensive cleanup operations (Figure 28).

### *Anacapa Island Brown Pelican Surveys*

Anacapa Island is home to the largest breeding colony of California brown pelicans in the United States. The only other significant U.S. breeding colony is located on Santa Barbara Island, which is much farther from the mainland and was unlikely to be heavily impacted by the spill. A much larger number of pelicans breed in Baja California, Mexico. After breeding, many of these birds migrate north and make up the majority of pelicans in the state in summer and fall. During the oil spill, many of the Baja pelicans were already migrating north, due to a failed breeding season in Mexico, and were passing through the spill-affected area. A reconnaissance level, boat-based survey of the nesting colony on Anacapa was conducted by Channel Islands National Park staff on June 5, 2015 during the initial cleanup effort, and no oiled pelicans were observed (Larramendy et al. 2018); however, the survey did not include direct, on-island access. Ground

120

surveys were conducted later on September 20 and 21, 2015 (following the end of the nesting season).

Hundreds of nests were inspected for oiling. Evidence of oiling was limited to one juvenile brown pelican carcass on Middle Anacapa Island, in which a small amount of weathered oil was found on several wing tips, and a few specks on the downy feathers around its shoulder (Larramendy et al. 2018). The survey team estimated the bird was about 6 weeks of age at the time of death, which is essentially full grown.

### *Brown Pelican Roost Surveys*

Due to their large size, pelicans can survive for many days after oiling. In order to assess the extent of oiling of brown pelicans, surveys of known pelican roost sites on the mainland from Morro Bay to Los Angeles were performed in the days immediately after the spill (Jaques et al. 2015). Surveys were conducted by ground and by boat to evaluate the proportion of pelicans at each roost site that showed visible oiling. An aerial survey of pelican roosts were conducted on May 27, 2015 (Jaques et al. 2015). Aerial surveys are ideal for documenting the total number of individuals at each roost by taking photographs and counting brown pelicans (which are easily distinguishable from other birds due to their body size) at each roost. Because no single survey method is able to detect both the proportion of oiled individuals at any given roost and the total number of individuals at the roost, the Trustees analyzed these datasets together to estimate the total number of oiled pelicans at each roost site.

### *Brown Pelican Rehabilitation Survival Studies*

The Oiled Wildlife Care Network (OWCN) assisted with wildlife operations during the spill, including rehabilitation of oiled birds. In order to understand the survival rate of rehabilitated oiled wildlife, the OWCN and other collaborators tracked rehabilitated pelicans to determine their survival and distribution relative to birds that were not oiled and rehabilitated during the spill (Fiorello et al. 2017). Several individuals traveled >5000 km, migrating to northern California or central Oregon in late summer and early fall. In the spring, most birds traveled south, some as far as Baja California. It appeared that both pelicans from Anacapa and Baja were impacted because they flew to those locations after being released. Mortality was documented among both rehabilitated and control birds.

121

### *Sandpiper Pier Cormorant Colony Surveys*

Brandt's cormorants in the spill-affected area nest in a single colony on four nesting platforms that were constructed offshore of Ellwood Beach in Santa Barbara County. Surveys were conducted from the shore to assess the number and status of nests throughout the 2015 breeding season (Figure 29). Based on these observation, the Trustees concluded that nests were not abandoned and chicks successfully hatched during the spill period at a normal rate. Adverse effects from exposure to oil were not visibly apparent during these surveys. However, health effects from ingestion of oil may not have culminated during the survey period, and cannot be easily assessed based on a visual survey.



**Figure 29.** Cormorant nests on platform 1 during a May 22, 2015 survey. Red circles indicate nests that were monitored during the May and June surveys. Photo Credit: Natural Resource Damage Assessment Trustees.

### *Baseline Carcass Deposition Surveys*

Information about the baseline rate of bird deposition on beaches throughout the spill-affected area is available from information collected through the Beach Coastal Ocean Mammal and Bird Education & Research Surveys (BeachCOMBERS) program. The program utilizes highly trained citizen scientists to conduct monthly beach surveys using a dedicated protocol for documenting the number and status of beached birds and mammals within each survey segment. Data collected includes species identification, decomposition state, observations of carcass scavenging, observations of carcass oiling, and other factors. All carcasses encountered during a survey are marked to identify whether the carcass has been observed on previous surveys (a new mark is made each month). The goal of the BeachCOMBERS program is to establish long-term data on baseline bird and mammal stranding rates, so that when unusual mortality events occur (e.g., oil spills, disease events, etc.), resource managers can understand and explore the magnitude and cause of the bird and/or mammal mortality. The spill occurred within the South Coast Chapter of BeachCOMBERS which began collecting monthly data in January 2013.

122

## 5.3.2  Brown Pelican injury analysis

*Background*

The California brown pelican is a subspecies of brown pelican that ranges throughout the west coast of North America. It nests in Mexico and on the Channel Islands. The brown pelican was delisted as a protected species by the State in June 2009 and by the federal government in December 2009. During the spill, brown pelicans were nesting on the Channel Islands, and many were migrating north through the spill area following breeding failure in Mexico. Brown pelicans typically forage in relatively shallow coastal waters, feeding almost entirely on surface-schooling fish caught by plunge diving. Brown pelicans are rarely found away from salt water and do not normally venture more than 32 kilometers (20 miles) out to sea. During the non-breeding season, brown pelicans roost communally on offshore rocks and structures such as piers and wharfs. Brown pelicans have wettable plumage so they must have roost sites to dry after feeding or swimming (Jaques and Anderson 1987). Roost sites are also important for resting and preening. The essential characteristics of roosts include: nearness to adequate food supplies; presence of physical barriers to protect the bird from predation and disturbance; sufficient surface space for individuals to interact normally; and adequate protection from adverse environmental factors such as wind and surf (Jaques and Anderson 1987).

**Brown Pelican Injury Assessment**

Brown pelicans were the most numerous bird species to be found alive and dead during the spill period. Of the birds collected during the spill, 72% of the live birds (n=47), and 13% of the dead birds (n=26) were brown pelicans. Not all of the live and dead brown pelicans affected by the spill were captured or collected. Brown pelicans are capable of long-distance flights and oiled individuals can survive for several days to weeks before becoming weak and either succumb to their exposure or become lethargic enough to be captured. To estimate the total number of brown pelicans injured by the spill, the Trustees applied the following methodology which is discussed in detail in Appendix I.

1) Determine brown pelican distribution during the spill;
2) Determine brown pelican oiling rate;
3) Calculate brown pelicans injured within the cleanup zone;
4) Calculate brown pelicans injured outside the spill cleanup zone;
5) Adjust for rehabilitated birds; and
6) Calculate total number of brown pelicans injured.

*Summary of Brown Pelican Injury*

Based on the number of brown pelicans recovered live and collected dead during the cleanup, the estimated number injured by the spill but missed by the cleanup, and the rehabilitation success of pelicans that were treated and released, the Trustees estimate that a total of 319 brown pelicans were injured by the spill (Table 10)[13].

---

[13] Plains disagrees with the Trustee estimate of brown pelicans injured by the spill.

123

**Table 10.** Total Brown Pelican injury from the Refugio Beach Oil Spill.

| | |
|---|---|
| Brown pelicans injured within the spill cleanup zone | 72 |
| Brown pelicans missed by the spill cleanup | + 279 |
| Rehabilitation credit | - 32 |
| **TOTAL Brown Pelican Injury** | **319** |

## 5.3.3  Western snowy plover injury analysis

*Background*

When the spill occurred, federally threatened western snowy plovers, were in the midst of their breeding season, with many chicks recently hatched and foraging on sandy beaches. Western snowy plovers are among very few species that nest directly on sandy beaches, which makes them vulnerable to conflicts with human activities. In the spill-affected area, there are several locations where plovers nest: Coal Oil Point Reserve (COPR) at University of California Santa Barbara, San Buenaventura State Beach, McGrath State Beach, Mandalay State Beach, Hollywood Beach, Ormond Beach, and Point Mugu (Figure 30). All of the beaches shown in Figure 30 received oiling and/or tar balls in varying degrees during the spill. The maximum amount of oil observed by SCAT teams ranged from heavy at COPR to very light at Ormond Beach. The presence of cleanup crews corresponded to the degree of oiling.

As COPR was exposed to the greatest oiling and most intense cleanup activities of any western snowy plover breeding sites within the spill-affected area, it was also the most intensively studied to determine injury to plovers from oil exposure and cleanup actions. Injury to plovers from cleanup actions, wrack removal, and food web impacts at McGrath Beach, Hollywood Beach, and Ormond Beach are incorporated into the assessment of shoreline habitat injury described in Section 5.1 of the DARP/EA.

*Western Snowy Plover Injury Assessment*

Effects of the spill on western snowy plovers were assessed using the following methodology, which is described further in Appendix I.

1) Determine effect of the spill on western snowy plover population size at COPR;
2) Determine effect of the spill on behaviors and breeding success at COPR in 2015;
3) Determine amount of body oiling on western snowy plovers at COPR during the spill;
4) Conduct a literature review to identify risk of toxicity from oil ingestion;
5) Determine effects of the spill on western snowy plover fertility at COPR; and
6) Estimate western snowy plover injury.

124



**Figure 30.** Refugio oil spill release location relative to nesting western snowy plover nesting sites.

*Estimate of Western Snowy Plover Injury*

Western snowy plovers at Coal Oil Point Reserve in Santa Barbara County, and various locations within Ventura County, were exposed to Line 901 oil during the Refugio Beach Oil Spill. The spill occurred during the breeding season, and at the time of the spill many nests had been formed and eggs had been laid. COPR was exposed to heavy oiling and extensive cleanup actions, and the Trustees determined that an assessment of injury to this population was warranted.

All western snowy plover populations in Ventura County were also exposed to some level of tarball oiling and disturbance from cleanup actions. Due to the relatively low injury expected from this oiling and disturbance, these effects are captured as part of the shoreline habitat injury assessment which considers impacts to western snowy plover's prey base and disturbances to their habitat from cleanup actions.

Cleanup workers and land managers at COPR worked closely together to minimize impacts to western snowy plovers from oil spill cleanup actions. Managers documented oiling on western snowy plovers at COPR and disturbances to the birds from the presence of cleanup crews; however, no mortality was recorded and hatching and fledging rates met or exceeded long term averages. Therefore no injury to western snowy plovers at COPR was estimated in 2015, above impacts to food webs (through depressed beach invertebrate populations) and cleanup impacts that are quantified as part of the shoreline injury assessment.

The year following the spill (2016), western snowy plover infertility substantially increased compared to the long term average, with a total of 12 infertile eggs, none of which contained embryos. Background infertility under normal conditions is around 2%, therefore, of the 12

125

infertile eggs, two would be expected to occur without the effects of the spill. The additional 10 infertile eggs cannot be explained by background infertility rates. These infertilities were likely caused by oil exposure to western snowy plover adults during the 2015 breeding season. Adults were observed with oil on their plumage and beaks, which they preened and ingested. Adults were also observed foraging within oiled wrack, and their prey species (e.g., sandy beach invertebrates such as sand crabs) were documented to have increased hydrocarbons in their tissue. In 2017, the infertility rate reduced to a level that is within the range of normal variation. Based on typical hatching and fledging rates at COPR, the Trustees anticipate that of the 10 infertile eggs documented at COPR in 2016, four would have hatched and fledged. Therefore, we assert that at least four western snowy plovers at COPR were injured through reproductive injury from the Refugio Beach Oil Spill. Additional injury to western snowy plovers may have occurred from direct oil exposure, prey reduction, and impacts from cleanup operations. Effects to plovers from injuries to their habitat are captured in the shoreline injury analysis.

### 5.3.4  Other Bird Injury Analysis

*Background*

This category includes all birds other than brown pelicans and western snowy plovers that were impacted by the spill. This category includes at least 29 species of seabirds, shorebirds, and landbirds. Table 9 lists all the birds by species collected alive and dead during the spill cleanup. Figure 31 groups the species into related categories. After pelicans, impacts were spread among a variety of marine waterbirds. Because the spill occurred during the nesting season for most North American birds, and most affected species do not nest locally, the impacts to other birds were largely limited to non-nesting individuals, such as sub-adults that were likely over-summering in the area. Had the spill occurred in winter, many more individuals from these species groups would have been impacted.

126



**Figure 31.** Total live and dead birds captured and collected following the spill.

### *Other Bird Injury Assessment*

In order to estimate mortality for these species, the Trustees applied the following methodology, which is described in Appendix I.

1)  Determine which of the collected birds were related to the spill:
    a.  Identify species and numbers of birds collected;
    b.  Identify number of oiled and non-visibly oiled birds;
    c.  Oiled dead birds – adjust for baseline oiling from natural seeps; and
    d.  Non-visibly oiled dead birds – adjust for background deposition.
2)  Use the Beached Bird Model to identify how many birds were missed:
    a.  Determine carcass persistence on beaches;
    b.  Determine search effort and efficiency; and
    c.  Calculate total injury.

### *Beached Bird Model*

As with the pelican assessment above, it is very likely that the actual number of other species impacted by the spill exceeds the number collected and attributed to the spill. Birds impacted by an oil spill may not be collected for a variety of reasons:

1.  They may travel outside of the response area. As described above, this occurred with the large number of pelicans migrating north.
2.  They may die at sea, sink, or be carried away from beaches that were searched.
3.  They may come ashore on inaccessible beaches that cannot be searched.
4.  Once on the beach, they may be removed by other animals scavenging on the beach.

127

5.  For carcasses that do make it to accessible beaches and are not removed by scavengers, searchers may miss them.

In this case, with the non-pelican species, it is difficult to assess the first two reasons. Some species, such as loons, were migrating north, but most non-pelican species may have been more acutely debilitated by the oil, limiting their dispersal distance. Because the spill was nearshore, substantial loss of birds at sea was unlikely. Given these caveats, we did not specifically apply any correction factors for these first two reasons for non-pelican bird species.

The remaining three factors, inaccessible beaches, carcass removal, and search efficiency, can be incorporated into a Beached Bird Model in order to estimate total mortality. The model is based on the number of birds recovered, the probability of a beached bird persisting over a given time interval, and the likelihood that searchers will detect a beached bird. Derivation of the basic equation is from Ford et al. (1996) and Page et al. (1990). This approach has been used for most major oil spill bird mortality events for several decades. Using a simplified example, if the probability of a bird being removed by a scavenger in the course of a day is 50 percent, and the probability of it being overlooked by a searcher is 50 percent, then the probability of it being recovered is 25 percent. This would imply that, for every one bird found, three more are missed. This would result in a "beached bird multiplier" of four. That is, one bird found implies that four birds were impacted.

### *Estimated Injury to Other Birds*
The final results of the Beached Bird Model, incorporating scavenging, search efficiency, and unsearched areas, were that 236 birds, not including pelicans and western snowy plovers, were killed by the spill (Table 11).

**Table 11.** Summary of estimated mortality of "other birds" based on the results of the Beached Bird Model.

| Bird Taxon | Total Carcasses Collected[1] | Total Estimated Mortality |
|---|---|---|
| Alcids | 42 | 56 |
| Loons | 44 | 53 |
| Procellarids/Boobies | 23 | 35 |
| Gulls/Terns/Skimmer | 24 | 33 |
| Cormorants | 33 | 24 |
| Grebes | 15 | 21 |
| Surf Scoter | 3 | 6 |
| Other/Unknown | 9 | 8 |
| **TOTAL** | **193** | **236** |

[1] Not including pelicans, domestic ducks, rock pigeons, and three birds collected live, rehabilitated and released. Note that a proportion of these carcasses were found to not be spill-related.

128

## 5.3.5  Summary of Bird Injury

In summary, the assessment of injury to birds from the Refugio Beach Oil Spill was conducted by dividing all affected birds into three categories: brown pelicans, western snowy plovers, and all other birds. The assessment methods for each category were designed around the species' life history strategy and feasible methods for quantifying injury. Table 12 shows the overall summary of estimated bird mortality by species group.

**Table 12.** Summary of total estimated bird mortality caused by the Refugio Beach Oil Spill.

| Bird Taxon | Total Estimated Mortality |
|---|---|
| Brown Pelicans | 319 |
| Western Snowy Plovers | 4 |
| Alcids | 56 |
| Loons | 53 |
| Procellarids/Boobies | 35 |
| Gulls/Terns/Skimmer | 33 |
| Cormorants | 23 |
| Grebes | 21 |
| Surf Scoter | 6 |
| Other/Unknown | 8 |
| **TOTAL** | **558** |

## 5.3.6  Selected Restoration Projects

Restoration alternatives for brown pelicans fall into two broad categories: improvement or protection of nesting habitat, and reduction of human-caused mortality during the non-breeding season. Selected projects that benefit brown pelicans are listed in Table 13 below.

The Trustees selected brown pelican colony protection at Anacapa Island as the primary restoration project for brown pelicans. The Trustees also selected a project to reduce or prevent injury to seabirds from recreational fishing to restore brown pelicans. This project will also benefit other seabird species, and is the restoration project selected for other birds. To address injury to western snowy plovers, the Trustees selected a project to fund management actions at Coal Oil Point Reserve that protect western snowy plovers from human activities and predators during their nesting season. Each of these projects are described further below. Other proposed second tier projects (Table 14) were not selected due to concerns over feasibility or lower anticipated benefits, but could be implemented if funds allow.

**Table 13.** Selected restoration projects for birds

| ID# | SELECTED PROJECTS | SPECIES BENEFITS |
|---|---|---|
| BIRD-1 | Brown Pelican Colony Protection at Anacapa Island | Brown Pelican |
| BIRD-2 | Prevention of Injury to Seabirds Related to Recreational Fishing | Seabirds |
| BIRD-3 | Western Snowy Plover Management at Coal Oil Point Reserve | Western snowy plovers |

129

***Brown Pelican Colony Protection at Anacapa Island (BIRD-1)***

This project is intended to protect the largest United States breeding colony of California brown pelicans, on Anacapa Island, from nest displacement and loss caused by invasive Cape ivy.

The goal of this project is to eradicate the Cape ivy infestation on West Anacapa Island. Methods will include: 1) initial assessment of infested areas and baseline vegetation, along with pelican surveys, 2) two initial herbicide treatments to infested areas via helicopter and hand application in the first year, 3) follow-up treatment for the following 4 years, and 4) follow-up vegetation and pelican surveys. As part of the project, a water cache will be installed to allow for follow-up treatments over a longer timeframe. Treatments will occur outside the pelican breeding season, during fall/early winter when native vegetation is dormant and before winter rains.

*Affected Environment*

Anacapa Island is composed of a series of narrow islets, with the three main islets being East, Middle and West Anacapa. Despite its small size, Anacapa Island supports nearly 200 types of native plants from 50 plant families (Junak and Philbrick 2018). There are several infestations of Cape ivy on the north side of West Anacapa Island. This invasive plant displaces native vegetation and reduces the amount of available nesting and roosting habitat for pelicans. The largest infestation is in Summit Canyon (Figure 32). Anacapa Island has the largest breeding colony of the California brown pelican in the United States, and one of the only three in California. Middle and West Anacapa Islands serve as critical breeding and roosting habitat for the California brown pelican. Anacapa Island also supports the largest western gull (*Larus occidentalis*) colonies in the Channel Islands. A total of 17 landbird species are also known to breed on Anacapa Island (Davidson et al. 2014).



**Figure 32.** Project location for the brown pelican colony protection at Anacapa Island, the grey outline indicates a nesting area where Cape ivy is expanding and may decrease habitat suitability.

130

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* –This project will benefit brown pelicans by enhancing nesting and roosting habitat through controlling invasive Cape ivy. By targeting active areas of infestation, the project will reduce the non-native cover and allow for native vegetation recovery and use by brown pelicans. The eradication of this species will protect nesting habitat and the native plant community which brown pelicans use to construct and support its nests. An increase in suitable habitat will allow for an increase in the number of nesting birds and subsequent fledglings on Anacapa Island.

   In addition, control of this invasive plant at its current locations will prevent its spread and additional loss of adjacent occupied habitat for brown pelicans. Additionally, the eradication of Cape ivy will protect the native flora and fauna on West Anacapa Island, and will also help prevent the introduction to the other Anacapa islets, as well as the other northern Channel Islands where Cape ivy is currently not found. The eradication of Cape ivy on West Anacapa Island will also protect rare plants found throughout the islets, which are currently outcompeted by this invasive plant. Overall, a diverse assemblage of native flora and fauna depend on intact vegetation communities. This project will benefit a range of species, including nesting seabirds (in particular the brown pelican and western gull), terrestrial songbirds, migratory birds, rare plants, and invertebrates that depend on the native vegetation communities.

   Herbicide applications for invasive plant treatments are covered under a NPS Categorical Exclusion (NPS 2019). Herbicide treatments can have impacts to non-target native vegetation within the treatment area. To reduce potential impacts, efforts will be made to minimize over spray and drift onto non-target species, including spot treatment of invasive plants adjacent to intact native vegetation. Herbicides will be applied by a certified applicator and in accordance with application guidelines and the manufacturer label. Although there may be short-term impacts to native plants within the treatment area, the long-term, negative consequences of not treating the Cape ivy or other invasive plant species far outweigh impacts to individual plants. Another potential adverse consequence of this project could be the unintentional spread of invasive plants from the treatment sites to other parts of the island via due to foot traffic. In order to reduce this potential, extreme caution will be used to reduce the spread of seeds via clothing and footwear by implementing existing biosecurity protocols for the Channel Islands. Also, in order to avoid impacts to nesting birds, including seabirds and resident terrestrial birds, herbicide treatment and vegetation monitoring will occur in fall/early winter, well before nesting season begins. Overall, any biological impacts from the implementation of the project are anticipated to be

131

minor in comparison to the overall long-term beneficial impacts from restoring the native plant community to protect brown pelican nesting habitat.

2. *Physical Impacts* – The Trustees do not anticipate major adverse impacts to the physical environment, such as water, air, sediments, etc. Any negative physical impacts would be unlikely and, at worst, would likely be mitigated by the use of best practices. Ultimately, any adverse physical impacts are expected to be negligible.

3. *Human Impacts* – The Trustees do not anticipate adverse impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. There is likely a benefit to the public as the sustained or increased presence of brown pelicans would create more opportunities for wildlife viewing.

*Probability of Success*

With the relatively small footprint of Cape ivy on West Anacapa Island (1-2 acres as of September 2018), the probability of successfully eradicating this species from this location is high. This multi-year, sustained effort would enable successive treatments over a six-year period as needed. This continued follow-up after initial treatment is critical to retreating any sprouts and ensuring success.

The control of other invasive species (Russian thistle, ice plant, etc.) in the project area also has a high probability of success. Herbicide treatment and manual removal are proven techniques to help control populations and limit the spread of invasive weeds. The eradication and control methodologies proposed have been tested and utilized successfully on the Channel Islands.

*Performance Criteria and Monitoring*

The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. The success of this project will be measured with a minimum of three monitoring events are proposed which will be outlined in project monitoring plan. Additional monitoring of brown pelicans will continue post project as part of Channel Islands National Park's Inventory and Monitoring Program. Specifically, monitoring may include, but is not limited to:

- Documenting brown pelican abundance, distribution, phenology, and reproductive success in and adjacent to the treatment areas.
- Monitoring annual vegetation during all six years of the project within the project area. Monitoring will follow established protocols and will document treatment area, efficacy of treatments, and recovery of native vegetation communities.
- Analyzing treatment efficacy though post treatment monitoring. Post treatment monitoring will include both visual estimates of percent cover of Cape ivy and counts of stem number within permanent quadrats.
- Establishing photo points to document the progression of the treatment areas.

132

- Eradicating Cape ivy from Summit Canyon. Efforts to control other invasive weeds within the scope of this project will be prioritized upon initial assessments. Additional control efforts on Anacapa Island will be documented and mapped each year.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for brown pelicans injured as a result of the spill, and the Trustees have therefore selected this project as a preferred alternative.

### Birds and Fishing Conflict Reduction (BIRD-2)

In an analysis of all seabirds brought to International Bird Rescue rehabilitation centers in Los Angeles and San Francisco between 2002 and 2015, fishing hook and line injuries were by far the most common anthropogenic injury, totaling 2,957 birds (Duerr 2016). Brown pelicans and other seabirds, including cormorants and gulls, are often attracted to nearshore areas where schooling bait fish are abundant. If anglers are fishing in these areas (e.g., from coastal piers), seabirds can be inadvertently hooked or entangled in fishing line. In addition, discarded waste fishing line can entangle seabirds. This project would use outreach to raise public awareness and educate anglers about ways to reduce their chances of hooking birds and what to do if one is hooked. Outreach could include printed materials and/or training of docents. This project may also provide support to bird rehabilitation centers to help recover and rehabilitate seabirds with fishing hook and line injuries.

This project is also intended to reduce seabird injury in areas where birds are attracted to fishing waste disposal areas. Brown pelicans and various gull species are often attracted to commercial fishing vessels off-loading small fish (e.g., sardines and anchovies) and squid, and to fish waste receptacles used by recreational anglers. These birds may attempt to dive into open bins of fish and may get injured by off-loading machinery and vehicles. In addition, repeated bodily contact with fish and fish oil can lead to a loss of waterproofing on the birds, resulting in hypothermia and other health issues.

*Affected Environment*

This project will be located in various locations along the Santa Barbara, Ventura, and Los Angeles County coastlines where recreational and commercial fishing activities are causing injuries to seabirds. Locations with fishing piers, harbors, and other fishing facilities will be targeted. This project may also focus on offshore fishing activities, if needed.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

133

1. Biological Impacts – The Trustees do not anticipate any adverse effects to biological resources. Beneficial effects to seabirds are anticipated to be achieved by providing resources and training to recreational and commercial fishermen to reduce entanglements by implementing best practices, and being trained to capture and disentangle birds or transport birds to rehabilitation centers for professional treatment.

2. Physical Impacts – The Trustees do not anticipate any adverse impacts to the physical environment, such as water, air, sediments, etc. Beneficial effects to the physical environment are anticipated from reduced fishing line and fishing waste from entering coastal habitats.

3. Human Impacts – The Trustees do not anticipate adverse impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. This project is not intended to reduce any recreational and commercial fishing opportunities, rather it is focused on working with willing recreational and commercial fishermen and fisherwomen to allow them to continue fishing while reducing their impact on seabirds.

*Probability of Success*

The probability of success of implementing the project is high. The effectiveness of the project in reducing seabird entanglements, however is dependent on the willingness and ability of the target audience to effectively implement what they learn. In order to maximize the probability that the outreach efforts implemented are successful in reducing entanglements, the project will be implemented by people that are knowledgeable about seabird handling/rehabilitation and will seek to create opportunities for anglers to participate in the program in a way that is convenient and approachable for them. For example, trainings may be held at piers, or tackle shops.

*Performance Criteria and Monitoring*

The performance of this project will be measured by evaluating incidence of birds with fishing hook and line injuries that enter rehabilitation centers after the program is implemented. The goal of the project is to reduce 60 bird deaths per year from fishing hook and line entanglement. It is not possible to measure the performance of the project in terms of the exact number of birds saved; however, evaluating the instances of birds with fishing hook and line injuries being admitted to rehabilitation centers will be a proxy for estimating whether the program is successful.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for seabirds injured by the spill, and the Trustees have therefore selected this project as a preferred alternative.

134

***Western Snowy Plover Management at Coal Oil Point Reserve (BIRD-3)***
The goal of this project is to protect a breeding colony of threatened western snowy plovers from predation and human disturbance. The focal colony, one of the largest in the region, is located in UC Santa Barbara's Coal Oil Point Reserve and became established largely due to species management efforts. The project aims to compensate for lost fledges due to infertility, as well as for additional unquantified injuries resulting from the oil spill, such as low over-winter survival and decreased breeding effort. Activities may include: predator control, upgraded signage and fences, outreach to reduce disturbances, leashes to lend for pets, and eradication of iceplant in areas of nesting habitat on Ellwood Beach.

*Affected Environment*
Coal Oil Point Reserve is part of the University of California Natural Reserve system, and protects a variety of coastal and estuarine habitats and fauna, including the threatened western snowy plover. Specifically, this reserve protects coastal dune, estuarine, tidal lagoon, sandy beach, and rocky reef habitats. Coal Oil Point Reserve, which is utilized by western snowy plovers for nesting, was exposed to the greatest oiling and most intense cleanup activities of any plover breeding sites within the spill-affected area.

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. Biological Impacts – This project benefits the population of western snowy plovers that was directly impacted by the spill. Management actions at Coal Oil Point Reserve aim to protect the plovers from predators and human activities during their nesting season. Benefits include maintaining the current colony of snowy plovers at COPR, along with preventing its displacement and loss. Many of the potential proposed activities will also be beneficial to other bird species and native plants in the area.

2. Physical Impacts – The Trustees do not anticipate any major or minor impacts to the physical environment, such as water, air, sediments, etc. Any physical impacts from activities such as installing symbolic fencing are temporary and negligible to the physical environment.

3. Human Impacts – The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. COPR has struck a balance between human recreation and access to the coastal environment, while protecting western snowy plovers and other wildlife species and their habitats. This project will seek to continue and expand that dual mission of allowing recreation and protecting natural resources.

135

*Probability of Success*

The probability of success is high. Western snowy plover breeding was extirpated at COPR in the 1980s due to high human use of the coastal environment in close proximity to UC Santa Barbara. Due to targeted protective measures, Coal Oil Point Reserve has established a robust nesting population that continues to thrive today. This project has a high probability of success due to the knowledge and expertise of staff at Coal Oil Point Reserve that will be implementing the project.

*Performance Criteria and Monitoring*

Metrics such as nest success will be compared to initial conditions at the project site. Staff at Coal Oil Point Reserve monitor the western snowy plover population annually to track the number of pairs, nest success, and other parameters. This monitoring will continue throughout the implementation of this project and will be used to determine the success of the project.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for western snowy plovers injured as a result of the spill, and the Trustees have therefore selected this project as a preferred alternative.

## 5.3.7   Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 14), and determined that many are valid projects that would provide benefits to seabirds. However, these projects were not selected for various reasons described below. These projects may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

**Table 14.** Second tier bird restoration projects that may be implemented if funds allow.

| ID# | OTHER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| BIRD-4 | Social Attraction for Brown Pelicans at Alcatraz Island | Brown pelicans |
| BIRD-5 | Enhancement of Brown Pelican Nesting Habitat at San Clemente Island | Brown pelicans |
| BIRD-6 | Continue Revegetation Projects on Santa Barbara Island to Promote and Expand Suitable Brown Pelican Nesting Habitat. | Brown pelicans |
| BIRD-7 | Western Snowy Plover Predator Control | Western snowy plovers |
| BIRD-8 | Raven Exclusion Devices for Nesting Ashy-storm Petrels on Channel Islands | Ashy-storm petrels |

136

| BIRD-9 | Western Snowy Plover Monitoring and Habitat Protection at McGrath, Mandalay, and San Buenaventura State Beaches | Western snowy plovers |
|---|---|---|
| BIRD-10 | Dune Restoration | Western snowy plovers |
| BIRD-11 | Reduction of Disturbances to Seabirds at the Channel Islands (Seabird Protection Network Channel Islands Chapter) | Various seabirds |
| BIRD-12 | Andre Clark Bird Refuge | Various seabirds |
| BIRD-13 | Protection of Nesting Grebes | Grebe species |
| BIRD-14 | Artificial Nest Habitat Creation at Anacapa, Santa Barbara, and/or San Clemente Island | Scripps's murrelets |
| BIRD-15 | Restore and Increase Artificial Nest Habitat at San Miguel Island | Scripps's murrelets, Cassin's auklets |
| BIRD-16 | Restore Native Habitat at Anacapa Island | Scripps's murrelets, western gulls |
| BIRD-17 | Establishment of Bird and Marine Mammal Rescue and Rehabilitation Facility | Various seabirds, marine mammals |

***Brown pelican restoration at Alcatraz Island (BIRD-4)***
This project involves restoring habitat and using social attraction to try and establish brown pelican breeding on Alcatraz Island. This project could be considered as a second tier project and social attraction could potentially result in recolonization of Alacatraz Island by breeding brown pelicans, but the feasibility of this project is unknown. Alcatraz Island is outside of the current breeding range for brown pelicans, and is substantially distant from the spill-affected area.

***Brown pelican restoration on San Clemente Island (BIRD-5)***
Brown pelicans have nested on San Clemente Island in the recent past and could benefit from protection actions such as the establishment of exclusion zones from cats, fox, and rats. This action may benefit other seabirds as well. The feasibility of this project is unknown at this time, and would require additional planning. Greater benefits to brown pelicans would be achieved where nesting densities are greater.

***Restoration through revegetation on Santa Barbara Island (BIRD-6)***
Building on restoration that has begun on Santa Barbara Island, this project would involve promoting suitable brown pelican nesting habitat by revegetating habitat areas. Currently access to Santa Barbara Island is limited due to a damaged boat landing. Upon repair of landing facilities at Santa Barbara Island, this project may become cost effective.

***Western snowy plover predator control (BIRD-7)***
Provide funding for control of ravens and other predators that kill nesting western snowy plovers in FWS recovery unit 5 (including the spill-affected area) and unit 4 (north of the spill-affected area). Predator control at COPR is listed as a preferred project because that is the location where

137

western snowy plovers were injured by the Refugio Beach Oil Spill. Predator control efforts could be expanded to other areas, if funds allow.

### Raven Exclusion Devices for Nesting Ashy-Storm Petrels on the Channel Islands (BIRD-8)
This project involves providing enhanced protection for nesting Ashy-storm petrels that are preyed upon by common ravens. This project may be funded as a second tier project if funds allow, as the impact of the spill on this species was low compared to other seabirds.

### Western Snowy Plover Monitoring and Habitat Protection at McGrath, Mandalay, and San Buenaventura State Beaches (BIRD-9)
Much of the suitable habitat for western snowy plovers and California least terns is within California State Parks ownership. This project would include monitoring and protecting western snowy plovers and California least terns in State Parks through installation of symbolic fencing, signage, docent programs, predator control, and other measures necessary to monitor and protect nesting shorebirds. These sites have been identified as secondary priorities, and could be implemented if preferred locations become infeasible.

### Dune restoration (BIRD-10)
By removing invasive non-native plants that degrade dune ecosystems, these projects will restore dune habitats, native species and landscapes, and enhance ecosystem functions. Removal of invasive plants will increase the amount of useable nesting areas for the western snowy plover and, in some locations, the California least tern. It will also reduce cover for predators of eggs, chicks and adult birds. This project is a selected project in the Shoreline Restoration section of this plan. Additional project locations could be funded if birds would benefit, and if funds allow.

### Seabird Protection Network – Channel Islands (BIRD-11)
This project would implement tasks identified by the Channel Islands Seabird Protection Network that are aimed at reducing human disturbances to seabirds at the Channel Islands. This is a second tier project, as the anthropogenic threats to seabirds are greater along the mainland coastline where the human population is greater. If funds allow, this project would be implemented.

### Andre Clark Bird Refuge Restoration (BIRD-12)
Located near the Santa Barbara Zoo, this project is designed to improve water quality and habitat for both bird and aquatic species, and to allow the bird refuge to function as nursery habitat for ocean going fish. The proposed project includes five primary components: 1) restoration of 1.5 acres of coastal dune habitat; 2) restoration of 5 acres of coastal salt marsh habitat; 3) construction of a new multi-use recreational loop trail around the restored lagoon; 4) dredging of flow channels and deep pools to improve circulation and provide refuge for fish and other aquatic organisms; and 5) removal of flow barriers to improve flushing between the ocean and the lagoon in order to improve water quality, bird, and fish habitat. The benefits of this project to bird species impacted by the spill are unclear. The existing habitat at the Andre Clark Bird

138

Refuge serves as resting habitat for seabirds, and the improvements from the project to seabirds are unclear.

### Protection of nesting grebes (BIRD-13)

Western and Clark's grebes have historically nested at Cachuma Lake in Santa Barbara County and Lake Casitas in Ventura County. This project would improve nesting success of grebes at these lakes. Restoration projects to improve grebe nesting success have been successfully implemented in northern California, focused primarily on outreach to reduce human disturbance at nesting colonies. No specific project has been proposed for lakes in Santa Barbara or Ventura Counties, and it is not known what management actions at these lakes would result in greater nesting success.

### Artificial nest habitat creation at Anacapa, Santa Barbara, and/or San Clemente Islands (BIRD-14)

This project would improve nesting success of Scripps's murrelets at Anacapa, Santa Barbara, and/or San Clemente Islands. On Anacapa Island, the project would benefit murrelet populations by placing structures in the habitat adjacent to traditional nesting areas in Landing Cove and newly restored upland habitat. Scripps's murrelets have been utilizing artificial nest burrows placed within the habitat restoration area near Landing Cove at Santa Barbara Island. Additional artificial modules placed in other restored areas on this island would enhance murrelet populations by providing additional nest sites that typically have high nest success. Scripps's murrelet populations are severely limited by nest sites on San Clemente Islands. Several areas occur at San Clemente Island within the Seal Cove area where artificial nest sites could be installed and significantly increase the size of the nesting population at this island. This project is a second tier project as there was no evidence of injury to Scripp's murrelets and other alcids by the spill and the damages were not quantified.

### Restore and increase artificial nest habitat at San Miguel Island (BIRD-15)

Increase the number of nesting boxes and improve older auklet boxes to protect the continued existence of this colony well into the future. Both Scripps's murrelet and Cassin's auklets could utilize artificial nests. This project is a second tier project as there was no evidence of injury to Scripp's murrelets and other alcids by the spill and the damages were not quantified.

### Restore native habitat at Anacapa Island (BIRD-16)

The project would benefits Scripps's murrelets, western gulls, as well as many other native birds, insects, amphibians, reptiles, and restores ecosystem functions. The project could contribute to ongoing efforts to restore native habitat at Anacapa Island and help restore additional nesting habitat for both Scripps's murrelets and western gulls. This project is a second tier project as there was no evidence of injury to Scripp's murrelets and other alcids by the spill and the damages were not quantified.

139

*Establishment of bird and marine mammal rescue and rehabilitation facility (BIRD-17)*

This project would facilitate the establishment of a bird and marine mammal rescue and rehabilitation facility in Ventura County. This project is a second tier project because establishing a new bird and mammal rescue is beyond the Trustees' ability to implement.

## 5.4   Marine Mammals

Marine mammal species exposed to oil may suffer immediate or long-term health problems, leading to death or reproductive impairment. Small doses of oil may impact and animal's physiology or behavior by causing skin or gastrointestinal irritation, impairing reproduction, and compromising its immune system. Marine mammals can be exposed to oil through ingestion of contaminated food and water, grooming, absorption through wounds or eyes, inhalation of oil-derived volatiles, and aspiration of oil droplets directly to the lungs.

Most marine mammal species of California occur in the waters adjacent to the Gaviota coast, some transitory, some resident. These include pinnipeds, such as California sea lions, harbor seals, Guadalupe fur seals, and northern elephant seals; mustelids, such as southern sea otters; and cetaceans, such as bottlenose dolphins, long beaked common dolphins, gray whales, and humpback whales.

Marine mammals are generally difficult to study because of their wide-ranging pelagic life styles. Accordingly, comprehensive marine mammal surveys and studies can be logistically prohibitive to conduct and may last years. Therefore, the Trustees relied heavily on mammal stranding[14] data in conducting their assessment because visible and easily-tracked strandings can provide an index to what is happening in the marine mammals' environment. Records of strandings from May 19, 2015, through July 7, 2015, formed the basis of the Trustees' assessment and quantification of injuries to marine mammals (Figure 33)[15].

---

[14] A stranding can be defined as (1) a dead marine mammal on the beach or in the water, (2) a live marine mammal on the beach and unable to return to the water, or (3) a live mammal in the water that is unable to function normally due to sickness or injury.

[15] Plains disagrees with the Trustees' injury quantification, scaling, and restoration projects for marine mammals.

140



**Figure 33.** Location of marine mammal strandings, live and dead, collected during the spill cleanup period. The back lines show the NRDA Exposure Zone boundaries for reference; however these boundaries were not used in the quantification of injury to marine mammals.

## 5.4.1  Overview of Data Collection and Studies

This list below summarizes field surveys, data collection tasks, and analyses for the assessment of marine mammal exposure and injuries.

### *Live and Dead Marine Mammal Intake Data—Unified Command*

Documentation of oiled live and dead animals is performed as a normal part of the spill response through the Unified Command. Intake logs describe the collection of each mammal, including the date, location, species, sex, condition (*e.g.* live or dead), and degree of oiling at the time of collection. These data provided the foundation for estimating mammal injury. Oiled wildlife were collected from May 19 through June 24, 2015.

### *California Marine Mammal Stranding Network Data*

In addition to the intake logs for the marine mammals collected as part of the spill response (including date, location, species, sex, and condition), data on stranded, or beached marine mammals are routinely collected along the Santa Barbara and Ventura County coast lines through NOAA's Marine Mammal Health and Stranding Response Program. These data collected by the stranding network from 2000-2015 provided key information for estimating total marine mammal mortality for this assessment. A total of 264 marine mammals were recovered between May 19 and July 7, 2015, the period considered for this assessment.

141



**Figure 34.** Oiled California sea lion recovered during cleanup operations. Photo Credit: Santa Barbara Channelkeeper.

## *Wildlife Response Reconnaissance surveys*

The Unified Command conducted aerial surveys on May 21, 2015, between Point Conception and Goleta to document wildlife in the area and search for oiled animals. Additional surveys were performed on May 24 and May 26, 2015. Marine mammal sightings included California sea lions (Figure 34), harbor seals and unidentified whales and dolphins. No sea otters were observed during the survey. One additional aerial survey was conducted on May 28, 2015, to document presence or exposure of southern sea otters in the area. During this survey, no southern sea otters were detected in the cleanup area, and were therefore not considered further for the NRDA.

**Table 15.** Daily summary of marine mammal sightings (and average group size per sighting) during boat-based surveys in 2015.

| Species | 6/2 | 6/3 | 6/4 | 6/5 | 6/6 | 6/7 | Total sighting |
|---|---|---|---|---|---|---|---|
| Dolphin, Coastal Bottlenose | 0 | 2 (5) | 3 (3) | 2 (6) | 2 (7) | 4 (4) | 13 |
| Dolphin, Long-beaked Common | 1 (1050) | 3 (42) | 0 | 1 (70) | 0 | 6 (205) | 11 |
| Dolphin, Common, unidentified to species | 1 (41) | 0 | 0 | 0 | 0 | 0 | 1 |
| Pinniped, California Sea Lion | 6 (7) | 3 (7) | 4 (1) | 3(1) | 8 (1) | 5(7) | 29 |
| Pinniped, Harbor Seal | 1 (1) | 1 (1) | 4 (1) | 0 | 6 (1) | 4 (2) | 16 |
| Whale, Gray | 1 (2) | 0 | 1 (2) | 0 | 0 | 1 (2) | 3 |
| Whale, Humpback | 0 | 1 (2) | 0 | 2(1) | 0 | 1 (14) | 4 |

## *Pre-Assessment Marine Mammal Surveys*

To estimate the number of common bottlenose dolphins in the affected area and to document exposure of marine mammals to oil, photo-identification surveys were conducted from small boats and from shore along the Santa Barbara and Ventura County coastline from May 24 to June 7, 2015. Figure 35 gives an example trackline of one of the survey days. Dolphins, whales

142

and pinnipeds were sighted on all days of the survey. Table 15 shows sightings from the boat-based surveys, which include group size estimates.



**Figure 35.** Tracklines of one day of NRDA mammal surveys, including sightings for that day. See Appendix B for data associated with this figure.

## 5.4.2 Pinniped Injury Analysis

### *Background*

California sea lions are the most frequently stranded marine mammal in California. The stranding numbers vary seasonally by age class and stranding patterns are correlated with the reproductive cycle. Pups strand in the highest numbers during the spring, when they are being weaned. The spill year, 2015, was an anomalous stranding year[16] for California sea lion pups, with unusually high numbers stranding much earlier in the year than usual. By the time of the oil spill, after this surge of unusual strandings, pup stranding rates had lowered. Typically, fewer older animals, i.e., non-pups, strand throughout the year although, reproductive females frequently strand in the spring, just prior to the annual birth pulse.

Northern elephant seals and Pacific harbor seals strand in much lower numbers than California sea lions, which largely reflects their relative population sizes. However, like the California sea lions, strandings vary seasonally and are correlated with the reproductive cycle. Stranding numbers are highest when pups are weaning, which is in late winter/early spring in the cleanup area. The Guadalupe fur seal, an endangered species, was not observed either stranded or at-sea during any NRDA post-spill surveys and so were not considered further for the assessment. Similarly, the northern fur seal, a depleted species, was not observed and therefore not considered for the assessment.

---

[16] This was the third year of an unusual mortality event for California sea lions, declared January 1, 2013. The unusual mortality event was in part attributed to reduced prey availability (McClatchie et al. 2016).

143

*Injury assessment*

The Trustees assessed injuries to California sea lions, northern elephant seals and harbor seals by determining the number of strandings that occurred in the spill-affected area (Santa Barbara and Ventura Counties) from May 19 through July 7, 2015, and comparing that number to the baseline stranding patterns for the region. This provided a framework for the Trustees' injury assessment by providing insight into how many strandings would be expected "but for" the oil spill.

In addition to quantifying stranding baseline numbers for each species, the Trustees reviewed the available data for individual strandings recorded during the assessment period to determine whether the recovered strandings could be attributed to non-spill related causes (e.g. fishery related deaths). The Trustees also reviewed carcass decomposition information to remove strandings that likely occurred before the spill (i.e., dead, highly decomposed animals). Once it was determined how many documented strandings were likely due to the spill, they applied a correction factor for animals that would likely have died from the spill but were not found due to drift, sinking, scavenging or other factors. No correction factor was applied to live stranding numbers to account for animals that might have been exposed to oil and moved out of the area. The number of observed strandings attributed to the spill are given in Table 16.

For harbor seals and northern elephant seals, past stranding numbers during the time of year in which the cleanup occurred were low (i.e., fewer than 5 per year) and often zero. Because of this and the highly unusual fact that the strandings of these species were alive and oiled and died during rehabilitation, no baseline correction was applied to the stranding numbers. That is, the observed number of strandings for both species were considered spill-related injuries after removing any pre-spill and fishery-related strandings.

**Table 16.** Strandings of pinnipeds recorded in Santa Barbara and Ventura Counties after the spill. Records for each stranding were reviewed to determine whether they likely died before the spill (i.e., "pre-spill") or had injuries consistent with fishery entanglement (i.e., "fishery related"). "Pre-spill" animals were removed prior to adjusting for stranding baseline.

| Species | Total Stranded May 19-July 7 | Stranded | | | |
| | | Pre-spill | Fishery-related | Baseline | Spill Period |
|---|---|---|---|---|---|
| California sea lion | 221 (89 live, 132 dead) | -40 | 0 | -87 | 94 |
| Northern elephant seal | 9 (8 live, 1 dead) | -1 | 0 | 0 | 8 |
| Harbor seal | 2 | 0 | 0 | 0 | 2 |

## 5.4.3  Cetaceans

*Background*

Long-beaked common dolphins (LBCO) are the most frequently stranded cetacean (whales, dolphins and porpoises) in the affected area and throughout southern California. Strandings of common bottlenose dolphins are rare, in part because their population off the California coast is

144

small (~500 individuals) and mobile, with dolphins ranging from Ensenada, Mexico, to San Francisco, California. From the pre-assessment survey, approximately 20% of the common bottlenose dolphin coastal ecotype population was estimated to be present in the area in the weeks following the spill. Dolphins of both species as well as other cetaceans were observed from shore and at sea in the weeks following the spill (Figure 36; Table 17)

No large whales stranded during the spill period, but several were observed (including a mother/calf pair) in the spill area both by local news agencies in the first days of the spill and during NRDA marine mammal boat surveys between May 27 and June 6, 2015 (see Figure 36).

### *Injury assessment*

Similar to pinnipeds, the Trustees assessed injuries to long-beaked common dolphins and bottlenose dolphins by comparing strandings observed during the assessment period to a baseline of strandings for the area, after removing records of strandings that likely occurred prior to the spill. A correction factor was applied to the strandings deemed to be likely spill related to account for animals that likely died but were not been found due to drift, sinking, scavenging or other factors

The number of observed strandings attributed to the spill is given in Table 17. For both dolphin species considered for the injury assessment, previous years' strandings are variable, and for the LBCO have been tied to episodic algal blooms. While algal blooms were present during the spill period, principally north of Point Conception, there were no data that tied dolphin deaths to algal blooms in the oil spill-affected area. The Trustees concluded that oil was the more likely causal factor in the dolphin strandings in Santa Barbara and Ventura Counties during the timeframe considered.

**Table 17.** Dead dolphin strandings collected after the spill. Records were reviewed and dolphins were not considered potential spill-related injuries if they were determined to have stranded before the spill (i.e., "pre-spill") or had injuries consistent with fishery entanglement (i.e., "fishery related"). Baseline refers to the expected "natural" deposition that would occur under non-spill conditions.

| Species | Total Stranded May 19-July 7, 2015 | Stranded | | | |
|---|---|---|---|---|---|
| | | Pre-spill | Fishery-related | Baseline | Spill period |
| Dolphin, long-beaked common | 22 | -2 | -2 | 0 | 18 |
| Dolphin, bottlenose | 1 | 0 | 0 | 0 | 1 |

145



**Figure 36.** Top - gray whale observed on June 7, 2015, near Gaviota State Beach during boat-based surveys. Bottom - long-beak common dolphins swimming in an oil slick during NRDA boat surveys. Photo Credit: Natural Resource Damage Assessment Trustees.

146

## 5.4.4   Final Injury Determination

The final step in quantifying marine mammal injuries for both pinnipeds and cetaceans was to account for animals that died but were not observed. The Trustees assumed that for mammals, all carcasses that reached the beach were found. However, the Trustees could not account for animals that died at sea and either sank, floated, or were scavenged before being observed and counted. Therefore, the Trustees applied a correction factor ('lost at sea factor') to the observed dead, spill-related strandings based on a study by local marine mammal scientists on common bottlenose dolphin carcass recovery off the southern California coastline (Table 17) (Carretta et al. 2016). The final injury numbers are given in Table 18[17].

**Table 18.** Final injury numbers for marine mammals affected by the Refugio Beach Oil Spill.

| Species | Dead | Live | Observed spill related strandings | Lost-at-sea factor (for dead animals) | Estimated number injured |
|---|---|---|---|---|---|
| California sea lion | 52 | 42 | 94 | 2 | 146 |
| Northern elephant seal | 0 | 8 | 8 | NA | 8 |
| Harbor seal | 0 | 2 | 2 | NA | 2 |
| Long-beaked common dolphin | 18 | 0 | 18 | 4 | 72 |
| Bottlenose dolphin | 1 | 0 | 1 | 4 | 4 |

## 5.4.5   Selected Restoration Projects

The Trustees are proposing the projects described below to compensate for injuries to marine mammals caused by the oil spill (Table 19). The two selected projects benefit pinnipeds (MAMM-1) and cetaceans (MAMM-2).

**Table 19.** Selected projects for marine mammals

| ID# | SELECTED PROJECTS | BENEFITS |
|---|---|---|
| MAMM-1 | Pinniped rehabilitation survival improvement | Pinnipeds |
| MAMM-2 | Cetacean entanglement response | Cetaceans |

***Pinniped Rehabilitation Survival Improvement (MAMM-1)***

The goal of this project is to supplement and improve stranding response capabilities in Santa Barbara and Ventura Counties by providing enhanced rehabilitation capacities and veterinary facilities for stranded marine mammals. The program will augment the stranding cleanup and treatment activities of an existing, local facility which is authorized and permitted to respond to and treat stranded marine mammals. The project includes labor and supplies to treat sick and injured pinnipeds, including food, medical evaluations and treatments.

---

[17] Plains does not agree with the Trustees' final injury numbers for marine mammals.

147

*Affected Environment*

The project area is mainland Santa Barbara and Ventura Counties. Sick or injured pinnipeds are rarely rescued at sea. Stranding response most often takes place on beaches and rehabilitation centers.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only negligible, if any, adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts.* Stranding response removes sick and injured live pinnipeds from beaches, potentially reducing the spread of disease amongst other populations. Treatment of diseased and injured marine mammals improves animal health, and thus the biological environment. Because the activities will be carried out by personnel trained and experienced in marine mammal recovery, no adverse biological impacts are anticipated, as most outdoor project activities will occur on beaches, which are already heavily-trafficked by humans. There will be minimal, if any, interaction with particularly sensitive habitats. No adverse biological impacts are anticipated

2. *Physical Impacts.* This project involves trained personnel removing stranded mammals from beaches and treating them. The project is expected to have negligible adverse or beneficial impacts to the physical environment.

3. *Human Impact.* Removal of sick and injured live pinnipeds from beaches and rocky coast will reduce the risk of spread of disease and other adverse interactions with humans. Humans should experience improved beach experience with the removal and treatment of diseased animals. No adverse effects to humans are expected.

*Probability of Success*

This project will expand the rehabilitation facility's capacity to treat live pinnipeds and increase the number of healthy animals released, approximately 30% of animals treated. Rescue and rehabilitation/ treatment of pinnipeds under veterinary care has a successful track record. Increasing capabilities are expected to further improve the success rate.

*Performance Criteria and Monitoring*

This project will expand the rehabilitation facility's capacity to treat live pinnipeds and increase the number of healthy animals released, approximately 30% of animals treated. Rescue and rehabilitation/ treatment of pinnipeds under veterinary care has a successful track record. Increasing capabilities are expected to further improve the success rate.  The proposed time period of the project is three to seven years, depending on the need of the program with a goal of a total of 150 additional marine mammals successfully responded to and/or treated through the program.

148

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration.  Based on responses and outcomes from before implementation of the project, we will monitor:

- The number of animals (and species) taken in per year for treatment/rehabilitation;
- The number of live and dead animals responded to per year; and
- Outcomes from live strandings, including from treatment at the facility or in the field.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for pinnipeds injured as a result of the spill, and the Trustees have therefore selected this project.

### Cetacean Entanglement Response (MAMM-2)

Entanglement in fishing gear is a source of mortality to whales and dolphins off the California coast and nearly all entangled animals die. The program will augment an existing permitted and authorized program by providing additional gear and personnel to disentangle cetaceans in areas not currently covered off the southern California coast.

*Affected Environment*

This project will operate within the southern California to respond to entangled cetaceans reported off Santa Barbara, Ventura, Los Angeles and Orange County coastlines.

*Environmental Consequences (Beneficial and Adverse)*

 Overall, this project is anticipated to have only negligible, if any, adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts.* Increased preparedness for entanglement response will provide a beneficial biological impact by reducing fishing gear-related mortality to whales and dolphins. Personnel implementing this this project would be trained and experienced in entanglement response and would operate using best practices to avoid adverse impacts to the environment. Therefore, no adverse biological effects are anticipated.

2. *Physical Impacts.* This activity will minimally increase boat use because of increased response capabilities. Personnel implementing this this project would be trained and experienced in entanglement response and would operate using best practices to avoid adverse impacts to the environment. Therefore, no adverse physical effects are anticipated.

149

3.  *Human Impacts.* Human enjoyment of wildlife viewing will be enhanced by (1) encountering fewer dead cetaceans floating in the water or beached and (2) seeing fewer animals in distress due to gear entanglements. For larger whales, a dead whale can be a hazard to navigation, so reducing mortality will reduce the number of potential hazards. While this project will minimally increase boat use, the Trustees anticipate that this will have negligible adverse impacts to boaters.

*Probability of Success*

This Project is anticipated to double the response capacity of the current cetacean disentanglement program operating off California's coast, which has a proven record of success. For this reason, the probability of success for the project is very high.

*Performance Criteria and Monitoring*

The number of whales with gear successfully removed compared to the number of entangled whales reported will be the criteria used to measure success. These data will be available to the Trustees because entangled whales are reported to the NMFS, which authorizes and coordinates entanglement response activities. Disentanglement response meet the guidelines and protocols of the MMPA and Animal Welfare statutes.

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Increased capacity to respond to entanglement events, measured by numbers of responses during the funding period compared to past performance; and
- Outcomes from entanglement response, by species.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for cetaceans injured as a result of the spill, and the Trustees have therefore selected this project.

## 5.4.6  Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 20), and determined they are valid projects that would provide benefits to marine mammals. However, these projects were not selected for various reasons described below. They may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

150

**Table 20.** Second tier marine mammal restoration projects that may be implemented if funds allow

| ID# | SECOND TIER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| MAMM-3 | Reduce California Sea Lion Entanglement Mortality on San Miguel Island | Pinnipeds |
| MAMM-4 | Mitigate Entanglement Risk for Pinnipeds | Pinnipeds |
| MAMM-5 | Protect Marine Mammal Haulouts and Rookeries | Pinnipeds |
| MAMM-6 | Mitigate Cetacean Ship Strikes | Cetaceans |
| MAMM-7 | Remove Derelict Fishing Gear | Cetaceans/pinnipeds |
| MAMM-8 | Establish a Bottlenose Dolphin Protection Area | Cetaceans |

*Reduce California sea lion entanglement mortality on San Miguel Island (MAMM-3)*
The goal of this project is to remove fishing gear from live pinnipeds on San Miguel Island and identify the source fishery from the recovered gear. Individual pinnipeds would be branded and tagged to monitor their survival after gear removal. The project benefits pinnipeds by directly removing entangled gear, a known source of mortality. A secondary, unquantified benefit to all marine mammals is identifying the source fishery causing the entanglements and likely bycatch. The Trustees are satisfied with the feasibility of this project and consider it a potential alternative to the selected pinniped project, if necessary.

*Mitigate Entanglement Risk for Pinnipeds (MAMM-4)*
The goal of this project is to remove fishing gear from live pinnipeds that come ashore on mainland beaches in Orange, Los Angeles, Ventura and Santa Barbara Counties. The project was not selected because it did not specify how success would be measured, and it would be implementing new, unproven technology. This project could be reconsidered if the selected pinniped project is not feasible.

*Protect Mammal Haulouts and Rookeries (MAMM-5)*
The goal of this project is to further protect the Pacific harbor seal rookery and haulout areas at various areas throughout Santa Barbara and Ventura Counties. Other than Carpinteria, no specific locations or actions were identified.

A specific project at Carpinteria proposed to enhance protection by purchasing conservation easements at Carpinteria Beach to provide further buffers for the rookery. It would also consider other areas that that could provide additional protected rookery habitat. This proposal includes an outreach component to reduce human disturbance to marine mammals at rookeries. The rookery is already protected under the MMPA, and the proposed additional conservation easements would increase existing buffers to reduce risk of harassment. Routine monitoring of the rookery would provide data to estimate pupping success, but it would be difficult to specifically quantify the beneficial effects of the project separate from those protections already provided by the MMPA. This project was not selected to be carried forward for implementation at this time because the project does not contain sufficient information for the Trustees to understand the benefits to marine mammals injured by this spill.

151

*Mitigate Cetacean Ships Strikes (MAMM-6)*

The goal of this project is to quantify ship strike risk to large whales attributable to a voluntary vessel speed reduction program in the Santa Barbara Channel shipping lane. This project would monitor ship speed and ship strike rate of large cetaceans to compare to historic data. This project may provide data to evaluate how much the vessel reduction program would reduce large ship-strike cetacean mortality. However, the program's methods to estimate and monitor ship strike risk are unclear, the voluntary nature of the program makes implementation uncertain, and metrics for measuring success in terms of whales saved are currently unavailable. The Trustees determined that this could be reconsidered as a pilot project if other preferred projects became infeasible.

*Remove Derelict Fishing Gear (MAMM-7)*

The goal of this project is to reduce entanglement risk of lost fishing gear for marine mammals by removing large nets and traps. Based on recent past gear removal projects conducted in southern California, there appear to be a low number of marine mammals entangled in lost nets. The Trustees concluded that this program could be beneficial to both cetaceans and pinnipeds, but the benefits would be difficult to quantify. Other projects proposed and evaluated in this Plan provide more direct benefits to marine mammals. The Trustees could reconsider this project if the selected projects became infeasible.

*Establish a Bottlenose Dolphin Protection Area (MAMM-8)*

The goal of this project is to improve habitat for the coastal population of bottlenose dolphin by establishing a bottlenose dolphin protection area along the Santa Barbara county coastline. The protection area would regulate chemical contamination and anthropogenic noise. The proposal did not identify a specific area, provide criteria to identify one, or indicate how success would be measured. This project would also be challenging, as it involves complex legal and regulatory issues that are not within the direct control of the Trustee agencies. The Trustees would consider this project if other projects to benefit cetaceans are not possible.

## 5.5   Human Uses

In the wake of an oil spill, some people may decide not to visit the shoreline. Others choose to visit alternative sites. Some visit affected shorelines but experience reduced enjoyment due to the spill. These all represent spill impacts.

The Trustees quantified impacts to selected human uses resulting from the Refugio Beach Oil Spill. Effects were identified from as far north as Gaviota State Beach to as far south as Long Beach. This stretch of coastline includes a range of public access points with rich natural resources and scenic vistas that provide exceptional recreational opportunities. People in the region engage in a variety of recreational activities. Examples include camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, and dog-walking, as well as more

152

specialized activities such as fishing, diving, boating, and surfing. Trustees did not quantify impacts from third-party claims (e.g., from non-government parties, such as commercial fisheries and affected businesses), pursuant to NRDA regulations.

The Refugio Beach Oil Spill entered the ocean in Santa Barbara County just west of Refugio State Beach. Spill impacts on human recreation were highest in this area. Refugio and El Capitan State Beaches, popular state campgrounds and day use areas, were closed for 59 and 37 days, respectively. Access to adjacent small pocket beaches was restricted through August 28, 2015. There was significant oiling along the Gaviota Coast down to the University of California Coal Oil Point Reserve, where cleanup operations and closures disrupted normal reserve operations. Recreational fishing in this region was closed for 41 days (see Figure 37).

Spill impacts on recreation were less severe south of Coal Oil Point Reserve. Although spill-related oiling, advisories, and significant media coverage of the incident occurred, no closures were identified along the remaining sections of the Santa Barbara and Ventura County coastlines. This stretch includes several incorporated cities (Santa Barbara, Carpinteria, Ventura, Oxnard), county properties, and additional State Park holdings. While the impacts were not as prominent as those found along the Gaviota Coast to the north, many of the affected beaches have significant visitation, particularly during and after Memorial Day weekend. Thus, even a small percentage decrease in use can translate into a sizeable reduction in the number of trips taken.

In Los Angeles County, there were two separate beach closures after an unusual amount of tar balls washed up on beaches. The first occurred in southern Santa Monica Bay from May 27 to 29, 2015. The second occurred in Long Beach (June 3 to 5, 2015). Both events triggered cleanup operations and resulted in closures of the beach seaward of the lifeguard towers.

This assessment and restoration plan focuses primarily on impacts to public recreational use and does not include private claims for losses to commercial fishing or recreation-based concessionaires. Impacts to commercial activities and other private party claims may be addressed through third party claims procedures under OPA or in private civil litigation.

153



**Figure 37.** Overview of posted Closures and Advisories after the Refugio Beach Oil Spill.

## 5.5.1  Scaling Approach

The natural resource damages for human uses are based on the monetary value of spill-related human use impacts. Monetary value is measured using the economic concept of "consumer surplus". For recreation, consumer surplus is the value that an individual places on their recreational activities above and beyond the cost they incur to engage in those activities. It is not a calculation of the cost of participating in various recreational activities, nor is it the resulting economic impact in the community. Lost income to recreational businesses, lost tax revenue to municipalities, and lost user fees to public parks, while related to lost public use, are third-party claims that are not compensable under NOAA's NRDA regulations under OPA. However, these losses are indicative of loss of public recreation.

For calculating lost value, human uses were broken up into four general categories. These categories were delineated based upon the qualitative character of the use and the inherent separability of the relevant data available to identify losses:

### *Coastal Camping*
Coastal camping includes overnight stays at campgrounds that are within relatively short walking distance to the beach or shoreline. In addition to camping, these users typically engage in a range of related day use activities (e.g., general beach use, bike riding, swimming, fishing, picnicking). Coastal camping impacts were measured in camping nights at identified camping areas.

### *Non-Camping Shoreline Recreation*
Non-camping shoreline recreation captures a broad range of day use activities pursued by non-campers. It includes traditional beach use activities, such as sunbathing, walking, exercising, picnicking, beach combing, wildlife viewing, swimming, and surfing. However, it also includes diving, kayaking, standup paddle boarding and similar activities that originate from the adjacent

154

shoreline, rather than from a marina or specified boat launch. Different quantification methods were used for (1) Santa Barbara and Ventura Counties (Section 5.5.4) and (2) Los Angeles County (Section 5.5.5). Impacts to non-camping shoreline use were measured in user days for the northern two counties and in direct lost value for Los Angeles County.

### *Boating and Offshore Recreation*
Boating and offshore recreation includes motor boating, sail boating, and use of the Channel Islands National Park, as well as non-motorized boating originating from harbor marinas or identified boat launches that are not associated with specific recreational day use shoreline areas. Non-motorized boating includes activities such as kayaking, standup paddle boarding, and canoeing, as long as they originate from a marina or specified boat launch. Launches associated with data connected to "Non-Camping Shoreline Recreation" are addressed under that category of use (Sections 5.5.4 and 5.5.5). Motorized boating includes charter fishing trips, charter dives, and charter boat-based wildlife viewing. Lost use for these activities was measured in user days.

### *Research, Education, and Outreach*
Research, Education, and Outreach refers to trips to the University of California Coal Oil Point Reserve for the purpose of conducting research, participating in university-level classes, and reserve related outreach activities. Lost use for these activities was measured in user days.

Our quantification of lost value incorporates measures of affected human use activity (e.g., lost, diminished, and substituted trips). Total lost value is further adjusted by a three-percent annual percentage rate (compounded monthly) to reflect the change in value associated with delaying compensation.

## 5.5.2  Overview of Data Collection and Studies
The list below summarizes various field studies, data collection tasks, and analyses used for the assessment of human use impacts.

### *Documentation of Closures, Advisories, and Spill-related Notifications*
The Trustees tracked site closures and posted advisories by location and date. The Trustees also evaluated conventional media coverage of the spill along with social media posts and public announcements from selected organizations (e.g., public agencies).

### *Data Collection around the Time of the Spill*
The Trustees conducted systematic counts of people on the beach in selected locations in Santa Barbara and Ventura Counties. The Trustees also tracked foot and bike entries to El Capitan State Beach and conducted daily monitoring of automatic car counters at Goleta Beach and Arroyo Burro County Parks. Finally, the Trustees contacted water- and shore-oriented recreation businesses regarding impacts to their customers.

155

*Compilation and Evaluation of Existing Data Related to Spill-Effects or Baseline Use*
The Trustees compiled historical data related to the public use of various sites, and then assessed these data for their relevance and efficacy for estimating spill-effects and baseline use. The data sources compiled and evaluated included:

- o Paid vehicles at State Park properties from Gaviota to Point Mugu;
- o Overnight stays at State Park properties from Gaviota to Point Mugu;
- o Parking fee data from select coastal lots between Santa Barbara and Malibu;
- o Historic records of automated car counters at Santa Barbara County Parks;
- o Marine Protected Area (MPA) Watch shoreline user counts;
- o South Coast MPA Baseline Program survey data, collected by researchers at Point 97/Ecotrust and Natural Equity;
- o Jalama County Park Camping Occupancy;
- o Commercial Passenger Fishing Vessel (CPFV) log summaries;
- o California Recreational Fisheries Survey (CRFS) angler estimates;
- o Fuel Sales at Santa Barbara Harbor fuel dock;
- o Channel Islands National Park visitation;
- o University of California, Santa Barbara (UCSB) Coal Oil Point spot counts;
- o USCB Coal Oil Point Reserve annual estimates of research, education, and outreach use;
- o Long Beach lifeguard beach user estimates; and
- o Los Angeles County lifeguard beach user estimates.

*Data Collection on the First Anniversary of the Spill*
The Trustees evaluated gaps in the assessment data listed above. These gaps guided the prioritization and research design of data collection around the first anniversary of the spill. The Trustees conducted interviews and user counts to estimate baseline use and augment existing data to estimate spill-related changes in use at selected sites.

*Analysis of Camping Losses*
The Trustees evaluated data and other information on coastal camping in Santa Barbara and Ventura Counties. Data from the spillthe spill period were compared to historical information. Camping impacts were identified at Refugio State Beach, El Capitan State Beach, and Gaviota State Park. Site-specific economic models were developed from existing data on camping reservations to estimate the value of a camping night. See Appendix K.

*Analysis of Non-Camping Shoreline Recreation Losses in Santa Barbara and Ventura Counties*
The Trustees examined data on recreational use along the Santa Barbara and Ventura County coast. In general, data from outside the spill period were used to create statistical predictions of recreational use had the spill not occurred. These predictions accounted for weather, day-of-the-week, and other site-specific factors. Where reductions in recreation were identified, the trustees translated these reductions into estimates of lost user days. Lost value was calculated by

156

multiplying the number of lost user days by an estimated dollar value per user day derived from economic research on shoreline recreation in California (English 2010). See Appendix L.

***Analysis of Shoreline Recreation Losses in Los Angeles County***
The Trustees' estimate of lost value in Los Angeles County focuses on the relatively short periods where shoreline areas were closed in southern Santa Monica Bay and in Long Beach. The estimate of lost value was determined utilizing the southern California Beach Recreation Valuation Model (Hanemann et al. 2004), a state of the art recreation demand model designed specifically for the Los Angeles County beaches affected by the spill. See Appendix L.

***Analysis of Boating and Offshore Recreation Losses***
The Trustees considered a range of data sources for evaluating losses to boating and offshore recreation. The estimate of offshore recreation losses was based upon a series of phone contacts to recreational businesses that collected information on the reduction in passenger trips that these businesses experienced following the spill. The estimate of lost value per trip was based on a study of the consumer surplus value of boating trips to the Channel Islands (Gornik et al. 2013). See Appendix M.

## 5.5.3  Coastal Camping

The trustees identified spill impacts at Refugio State Beach, El Capitan State Beach, and Gaviota State Park campgrounds. The Refugio State Beach campground was closed for the longest time period (59 days). El Capitan State Beach experienced a shorter closure period (37 days), but it has more campsites and therefore more users were affected per day of closure. Both of these campgrounds are popular and reach capacity in summer months. Once the closures were lifted, the campsite occupancy recovered to near baseline conditions rather quickly at both locations (i.e., within a few weeks). Thereafter, small trailing reductions in use occurred over the entire summer. Gaviota State Park did not experience a closure. However, reductions in camping use were identified during the first two weeks after the spill. A total of 49,188 camping nights were lost across all three sites.

Data on the origin of visitors (by zip code) was combined with census data to create an economic model to estimate the value per camping night. This analysis resulted in an estimate of $29.57 (July 2018 dollars) per camping night lost. The total undiscounted damages are therefore $1,454,663, and the resulting total lost value is $1,593,571 (July 2018 dollars and present value). The model, along with the analysis of lost camping nights, is described in more detail in Appendix K.

## 5.5.4  Non-Camping Shoreline Recreation Use: Santa Barbara and Ventura Counties

The Trustees identified impacts to recreational shoreline users at multiple locations along the Santa Barbara and Ventura County coastlines (Table 21). Reductions in recreational use were assessed through quantitative analyses of a range of data indicators related to shoreline recreation (see Appendix L).

157

The observed impacts were greatest upcoast of Coal Oil Point Reserve, where sections of shoreline were subject to relatively long access and recreational fishing restrictions. Refugio and El Capitan State Beaches, and associated day use recreation opportunities, were officially closed for extended periods (59 and 37 days, respectively). Access to pocket beaches at Tajiguas, Venadito, and Las Flores were limited through August 28, 2015 by spill-related restrictions to roadside parking at historic highway pull offs. After the closures, recreational use at most of the sites returned to expected levels relatively quickly, within two to four weeks. The only exception was Refugio State Beach, where recreational use did not return to baseline until 8 weeks after the park reopened.

Shoreline recreation impacts on the Santa Barbara and Ventura Coastlines downcoast of Coal Oil Point were less severe. These locations were subject to a range of posted advisories, oilings, and media coverage about the "Santa Barbara spill". However, relative reductions in recreational use were generally modest, returning to baseline within two to four weeks after the initial spill. The only exception to this was at Leadbetter Beach on the Santa Barbara Waterfront, where lower levels of recreational use were observed in the data for 12 weeks.

A total of 89,380 shoreline recreation user days in Santa Barbara and Ventura Counties were estimated as lost due to the spill. Each user day was assigned a value of $21.45 (July 2018 dollars) based on an evaluation of economic research of shoreline recreation in California. Associated undiscounted damages are $1,917,317, and total lost value is $2,101,467 (July 2018 dollars and present value) This analysis is described in detail in Appendix L.

**Table 21.** Non-Camping Shoreline Losses in Santa Barbara and Ventura Counties

| Section of Coastline | Estimate of Lost Value (July 2018 dollars) |
|---|---|
| Gaviota State Park through El Capitan State Beach | $ 723,987 |
| El Capitan to Coal Oil Point | $ 295,335 |
| Coal Oil Point to Santa Barbara Waterfront | $185,783 |
| Santa Barbara Waterfront | $297,957 |
| Santa Barbara Waterfront to Ventura County Line | $43,006 |
| Ventura County Line through Emma Wood State Beach | $21,635 |
| Surfers' Point/San Buenaventura to Pt. Mugu | $349,614 |
| Total Undiscounted Damages | $1,917,317 |
| **Total Value Lost** | **$2,101,467** |

## 5.5.5  Non-Camping Shoreline Recreation Use: Los Angeles County

The Trustees quantified spill-related losses in Los Angeles County based on the number of days with oil-related beach closures following the spill (Table 22). Closures in south Santa Monica Bay began on May 27 and ended on May 29. Closures at Long Beach City Beach were initiated

158

on June 3 and ended on June 5. The affected beaches were closed seaward of the lifeguard towers.

Damages for the Los Angeles County closures were based upon the southern California Beach Recreation Valuation Model (Hanemann et al. 2004), an economic model that was constructed to evaluate the impact of closures and water quality changes to recreational use on southern California beaches. Specific sites affected by the closures are included in the model (Manhattan Beach, Hermosa Beach, Redondo Beach, Long Beach, and Belmont Shore). See Appendix L.

**Table 22.** Non-camping shoreline recreation losses in Los Angeles County

| Section of Coastline | Estimate of Lost Value (July 2018 dollars) |
|---|---|
| South Santa Monica Bay (Manhattan Beach to Redondo Beach), May 27-29 | $445,125 |
| Long Beach (1st Place to 72nd Place), June 3-5 | $92,444 |
| Total Undiscounted Damages | $537,568 |
| **Total Lost Value** | **$590,067** |

## 5.5.6  Boating and Offshore Recreation

The spill closed an area of fishing off the Gaviota Coast for 41 days. Cleanup vessels conducted cleanup operations in the cove at Refugio State Beach and elsewhere in the days following the spill. Information about the spill was reported in the media throughout the summer. Businesses that provide boat transport and other services to recreational users reported a total loss of 2,379 client trips (See Appendix M). These trips originated from marinas along the Santa Barbara, Ventura, and Los Angeles County coastline. These trips do not include launches of non-motorized boats (e.g., canoes, kayaks, standup paddle boards) that occurred from shoreline areas covered in the estimated loss of "Non-Camping Shoreline Recreational Use". These trips were assigned a value of $59.01 (July 2018 dollars) based upon Gornik et al. (2013). Total undiscounted damages are $140,384. Total lost value for this category of human use is $153,867 (July 2018 dollars and present value).

## 5.5.7  Research, Education, and Outreach

The Coal Oil Point Reserve at the University of California, Santa Barbara was closed for 26 days. In addition to providing opportunities for traditional beach recreation (e.g., sunbathing, beach combing, exercising, and swimming, which are covered above), the University of California operates the reserve to benefit its mission to provide high quality educational opportunities and conduct research. The Coal Oil Point Reserve provides a real world laboratory in which these activities can occur.

The University of California Natural Reserve System reports 7,521 research, education, and outreach user days for the 339 days that the Coal Oil Point Reserve was open between July 1, 2014 to June 30, 2015. Staff at the reserve system believe that the amount of research, education,

159

and outreach activities on the days that the reserve was open provides a reasonable basis for estimating use over the 26 days that the reserve was closed. Applying the resulting overall rate of 22.2 users per day to the 26 days of closure yields a user day loss estimate of 577 user days.

A value of $47.00 (July 2018 dollars) was attached to each of these user days. The Trustees were not able to identify a direct measure of consumer surplus for research, education, and outreach. This estimate is based upon the approximate tuition and fee cost of a course-day of instruction at the University of California, Santa Barbara, accounting for the proportion of undergraduate versus graduate and in-state versus out-of-state students. This results in a $27,116 estimate of undiscounted damage, and a total lost value estimate of $29,735 for this category (July 2018 dollars and present value).

### 5.5.8  Summary of Injury

The lost recreation use value estimated by the Trustees (July 2018 dollars and present value) is summarized in Table 23 by general geography and type of use.

160

**Table 23.** Total lost value by section of shoreline and quantified human uses.

| Section of Shoreline | Camping | Non-Camping Shoreline | Boating, Offshore | Research, Education, Outreach | All Activities Combined |
|---|---|---|---|---|---|
| Gaviota SP to El Capitan SB | $1,593,571 | $792,815 | | | $2,386,385 |
| El Capitan to Ellwood | | $285,425 | | | $285,425 |
| Sands Beach / Coal Oil Point Reserve | | $38,392 | | $29,735 | $68,126 |
| Santa Barbara Waterfront | | $326,364 | $127,592 | | $453,956 |
| Santa Barbara County (Other)* | | $250,795 | | | $250,795 |
| Ventura County | | $407,677 | $1,580 | | $409,258 |
| Los Angeles County | | $590,067 | $24,695 | | $614,762 |
| **Total Lost Value** | **$1,593,571** | **$2,691,534** | **$153,867** | **$29,735** | **$4,468,707** |

*This includes sections of coastline both upcoast and downcoast of Santa Barbara Waterfront.

As explained above, the lost use value represents the lost consumer surplus value to the public. It does not represent the cost of participating in these activities, nor the sum of their travel expenditures and resulting economic impact in the community. Table 23 represents the Trustees' best estimate of lost value, i.e., $4.47 million[18].

### 5.5.9  Proposed Restoration

The Trustees (including the University of California) intend to select a suite of restoration projects to compensate the public for lost use of the recreational resources caused by the spill. The Trustees will work cooperatively with local government agencies and non-governmental organizations to identify a suite of potential restoration projects according to the relative magnitude of spill impacts. These projects may include improvements or enhancements to public piers, parks, bike paths, boat ramps, fishing areas, or other infrastructure in order to increase the value of recreational experiences involving beach use, boating, and/or fishing. Specific examples include, but are not limited to: beach and waterfront access; boardwalk construction and improvements; fishing pier and dock improvements; beach sand management and replacement; beach fire rings; beach shower and restroom improvements; picnic facilities; Coastal Trail improvements; public access components of large ecological restoration projects; interpretive, educational, and wildlife viewing facilities.

---

[18] This is less than the amount to be recovered for lost recreation through the pending settlement process, i.e., $3.90 million. However, the Trustees believe the amount to be recovered through the settlement is adequate based on the following considerations: the amount is within the range of values the Trustees deem plausible given the uncertainties in some of the data; the Trustees' desire to reach a settlement and commence restoration more quickly; and the inherent risks involved in litigation if a settlement is not reached.

161

It is a goal of the Trustees to select projects spanning the geographic area of the spill and to address the various types of activities (e.g. camping, fishing, day use, other uses) that were impacted by the spill. To that end, and to the extent feasible, funds will be allocated among the regions affected by the spill according to the relative magnitude of the spill impacts, as described in Table 24.

**Table 24.** Geographic distribution of lost value across all quantified human uses.

| Section of Shoreline | Share of Total Lost Value |
|---|---|
| Gaviota SP to El Capitan SB | 53.40% |
| El Capitan to Coal Oil Point (excluding Research, Education, Outreach) | 7.25% |
| Coal Oil Point Reserve (Research, Education, Outreach only) | 0.67% |
| Santa Barbara Waterfront | 10.16% |
| Santa Barbara County (Other)* | 5.61% |
| Ventura County | 9.16% |
| Los Angeles County | 13.76% |

*This includes sections of coastline both upcoast and downcoast of Santa Barbara Waterfront.

These percentages reflect the approximate estimated distribution of losses across the spill area. In the event funds allocated to one or more geographic area(s) remain, and such funds are insufficient to implement additional recreation project(s) and/or insufficient feasible recreation projects are identified for one or more geographic areas, the Trustees shall have discretion to spend the money in another geographic area identified in Table 23. Compliance with environmental and other applicable laws will be the responsibility of the implementing agency for each selected project.

The distribution of the $3.9 million in damages recovered for lost recreational value will be administered as follows:

*State Parks*
State Parks will administer 53.4% ($2.08 Million) of the restoration funds for projects to be selected by State Parks with the approval of the Trustee Council. State Parks will work cooperatively with Santa Barbara County and other local government and non-government organizations to identify appropriate projects located within State Parks' property. These projects are to benefit recreational activities associated with units of CDPR from Gaviota to El Capitan. Funds are intended to compensate for all shore-based recreation losses, with approximately two-thirds being directed to camping and approximately one-third being directed other shoreline uses (including non-camping day use, shore-based fishing, diving, etc.).

162

*South Coast Shoreline Parks and Outdoor Recreation Grants Program – Other Coastal Areas*
The State Trustees (including University of California) will administer 45.93% ($1.79 Million) of the restoration funds for projects to be selected by the Trustees to primarily benefit recreational activities to compensate for recreational losses downcoast of El Capitan State Beach. The Trustees will work cooperatively with Santa Barbara, Ventura, and Los Angeles Counties, local cities, and other public and private organizations to identify a suite of potential projects according to the relative magnitude of the spill impacts, considering the availability of viable projects and types of affected uses. Projects will then be selected for funding using a competitive grant process, until all funds are spent.

*University of California*
The University of California Natural Reserve System will administer 0.67% ($26,000) to fund projects selected by University of California in coordination with the Trustee Council and with input from the public. These will address the research, education, and outreach missions of the University of California at Coal Oil Point Reserve.

# 6.0   NEPA Alternatives Analysis

## 6.1   Preferred Alternatives

The preferred alternative involves the implementation of the projects listed in Table 25. Anticipated impacts to the environment from implementation of each of these projects is described in Section 5. In the event any of these projects cannot be implemented, the Trustees will look at second tier projects also described in Section 5. Recreation projects to compensate for oil impacts to human uses will be administered by State Parks or handled under a grants program, administered by the State Trustees, and may undergo additional environmental analyses in subsequent NEPA reviews as needed. Project ideas submitted by the public will be considered by State Parks or through this grants program. Appendix N lists all projects submitted by the public and considered by the Trustees.

**Table 25.** Restoration projects that would be implemented under the preferred alternative.

| Shoreline Habitat Restoration | | |
|---|---|---|
| Shore-1 | Ellwood Seawall Removal | Restore sandy beach and mixed shoreline ecosystems and dynamics by removing a wooden seawall at Ellwood Beach that is currently constraining natural functioning condition of the sandy beach ecosystem as well as lateral access along the shoreline at high tide. |
| Shore-2 | Ventura County Dunes Restoration | Remove invasive dune species, protect sensitive bird populations, and enhance public access routes. |
| Shore-3 | Santa Monica Beach Restoration Pilot Project | Restoration of a highly impacted beach system in Santa Monica by stopping beach grooming and |

163

| | | restoring a diverse, endemic-rich, coastal plant and wildlife community. |
|---|---|---|
| Shore-4 | Black Abalone Restoration and Relocation | Transplant black abalone into specific locations within rocky intertidal habitat to enhance the overall health of the rocky intertidal ecosystem by returning this important grazer to the community. |
| **Subtidal and Fish Habitat Restoration** | | |
| SubT-1 | Abalone Restoration | Transplant abalone from donor sites and cultivated populations to a target population within MPAs, in order to bolster the abalone population within MPAs that serve an important ecological role as benthic grazers. |
| SubT-2 | Eelgrass Restoration | Eelgrass restoration in Refugio Cove. |
| SubT-3 | Sand-Dwelling Kelp Restoration Offshore of Goleta Beach | Funding for this project would extend monitoring of the existing pilot project to assess long-term benefits of the project, and viability of the restoration design. |
| SubT-4 | Ellwood Seawall Removal | Removing the Ellwood seawall primarily benefits sandy beach ecosystems, but subtidal habitats adjacent to the seawall are also projected to improve. |
| **Bird Restoration** | | |
| Bird-1 | BRPE Colony Enhancement on Anacapa Island | Enhance brown pelican breeding habitat on Anacapa Island by removing invasive plants or taking other actions to improve breeding attempts and success. |
| Bird-2 | Prevention of Injury to Seabirds Related to Recreational Fishing | This project would use outreach to raise public awareness and educate anglers about ways to reduce their chances of hooking birds and what to do if one is hooked, and to make improvements to fishing areas to prevent fishing waste from entering the environment. |
| Bird-3 | Coal Oil Point Western Snowy Plover Protection | This may include: predator control; upgraded signage and fences; outreach to reduce disturbances at COPR; leashes to lend; and eradicate iceplant over nesting habitat on Ellwood Beach. |
| **Marine Mammal Restoration** | | |
| Mamm-1 | Improve Pinniped Rehabilitation Survival | Increase survival rates for live stranded pinnipeds recovered in Santa Barbara and Ventura Counties. |
| Mamm-2 | Cetacean Entanglement Response | Expand response capacity for cetacean entanglement response program to increase survival rates of cetaceans entangled in fishing gear by staging gear in additional locations for quick response to reports of entangled whales in the Santa Barbara Channel. |

164

## 6.2    Non-Preferred Alternatives

This alternative includes consideration of second tier projects. These projects are discussed in Section 5, and listed in Appendix N. The Trustees may consider these projects for implementation in the event that the preferred projects are no longer available or are infeasible due to unforeseen circumstances. A full environmental review in this DARP/EA was premature for second tier projects considered non-preferred, as they are not yet ready for NEPA analyses for various reasons (e.g., project details and feasibility unknown at this time). Should the Trustees consider these projects for implementation in the future, additional review may be required as project-specific details become available, in which case any subsequent NEPA analyses needed would tier from this DARP/EA.

## 6.3    No Action Alternative

NEPA requires the Trustees to consider a "no action" alternative, and the OPA regulations require consideration of a roughly equivalent "natural recovery" alternative. Under this alternative, the Trustees would take no direct action to restore injured natural resources or to compensate for lost services. Instead, the Trustees would rely on natural processes for recovery of the injured natural resources.

The principal advantages of the natural recovery approach are the ease of implementation and the absence of monetary costs. However, while natural recovery may occur over time for many of the injured resources, the public would not be compensated for interim losses under the "no action" alternative. In some cases, changing environmental conditions may prevent the environment from recovering to baseline. For example, native kelp species that were killed by the spill may be replaced by invasive kelp that do not support the same ecosystem functions as native species. OPA clearly establishes Trustee responsibility to seek compensation for interim losses pending recovery of natural resources. Losses were, and continue to be, suffered during the period of recovery from the spill, including the loss of an estimated 558 birds, 232 marine mammals, degradation of nearly 1,500 acres of shoreline habitat, degradation of over 2,200 acres of benthic subtidal habitat, and the loss of human uses estimated at 49,000 camping nights and over 80,000 other user days (i.e., general beach use, surfing, boating, fishing, research, etc.). Technically feasible project alternatives exist to compensate for these losses. Thus, the Trustees reject the "no action" alternative and instead have selected the appropriately scaled restoration projects described above as the preferred alternatives.

By definition, the no action alternative lacks physical interaction with the environment. Accordingly, the no action alternative would cause no direct biological, physical, or human impacts to the environment. However, if the Trustees undertook no action, the environment would not benefit from the ecological uplift created by active restoration. Active restoration would restore injured areas and resources, and potentially prevent further injury. The no action

165

alternative may have minor to moderate short or long-term adverse indirect effects on the environment.

## 6.4    Cumulative Impacts

The Trustees examined a variety of alternatives to restore resources and/or services lost because of the Refugio Beach Oil Spill. Anticipated environmental consequences arising from each of the selected projects are provided in Section 5. As required by NEPA, this section addresses the potential overall cumulative impacts of implementing the projects selected in this restoration plan.

Cumulative impacts are impacts that result from an action along with other past, present, and reasonably foreseeable near-term future actions taken together. Significant cumulative impacts can result from a combination of actions that do not have significant impacts individually. Taken collectively, the effects of several actions may be additive, countervailing, or synergistic. Impacts are considered regardless of the agencies or parties involved. Thus, in considering cumulative impacts, this analysis is not limited to the impacts of restoration projects detailed herein, but also considers other significant activities and anthropogenic impacts throughout the region.

Overall, the Trustees' selected restoration projects for the Refugio NRDA will result in long-term net improvement in fish and wildlife habitat, restored ecological balance in areas where disturbances have led to adverse impacts on sensitive native species, and improved natural resource services provided to and by fish and wildlife in the region. The Trustees evaluated the restoration projects selected in this DARP/EA in conjunction with other known past, proposed, or foreseeable closely related projects, activities, and anthropogenic impacts that could potentially add to or interact with these projects within the spill-affected area to determine whether significant cumulative impacts may occur. Each resource category is quite different regarding the geographic scope of restoration projects, so cumulative impacts for each category are first treated separately followed by a summary statement regarding aggregate cumulative impacts.

Cumulatively, it is anticipated that there would be a long-term adverse effect to the biological, physical, and cultural environment were the no action/natural recovery alternative selected because no active restoration would occur. However, relative to the magnitude of adverse ecological impacts that currently exist in the project area, the adverse cumulative effect of the no action alternative is not expected to be significant as defined under NEPA.

### 6.4.1    Shoreline
All shoreline restoration projects are proposed to occur within the habitats formed at the interface of the land and Pacific Ocean, including sandy beaches, rocky intertidal habitats, and rocky-sandy mixed habitats. Within Santa Barbara, Ventura, and Los Angeles Counties, the condition

166

of these habitats is influenced by a variety of anthropogenic activities including coastal armoring, sediment diversion/stabilization, beach nourishment, and beach grooming, as described further below.

### *Cumulative Impacts Issues*
Some projects may have minor, short-term adverse effects, such as heavy equipment use on the beaches adjacent to the Ellwood seawall removal area; however, the cumulative effects of any short-term effects are anticipated to be negligible to the overall shoreline environment.

### *Geographic Scope of Restoration Projects*
The geographic scope of the shoreline restoration projects includes sandy beach and rocky intertidal habitats in Santa Barbara, Ventura, and Los Angeles County.

### *Timeframe for Project Implementation*
After the DARP/EA is finalized, projects are anticipated to begin within one year, and will be implemented for a period between five and ten years.

### *Other actions affecting the resources, ecosystems, and human communities of concern*
Major anthropogenic stressors that affect the shoreline environment can be grouped into five categories:

1. *Sediment deficit*. Southern California beaches are now receiving less than 50% of their historical sand budgets. This loss of sediment has a significant negative affect on the extent of shoreline habitat, the ecosystem services provided by shoreline habitats, and the amount and intensity of coastal erosion.
2. *Coastal armoring*. Approximately 27% of the southern California coast is armored and shoreline armoring associated with sea level rise is increasing every year. This removes habitat directly from a finite and shrinking resource, and further diminishes ecological and public uses.
3. *Beach nourishment.* Nourishment is an expensive, and as practiced in southern California, only a short-term approach to address sand deficits. Unless nourishment is implemented with great skill and consideration, it can have negative impacts on beach and other coastal environments.
4. *Beach grooming*. Beach cleaning or grooming includes removing trash and kelp wrack with heavy equipment and causes substantial disturbance, loss of productivity, and reduction in species diversity to the shoreline ecosystem.
5. *Invasive species*. Invasive, non-native, plant species such as iceplant and European beach grass have been planted or introduced into the shoreline environment and have spread and out-competed native plant species. In some instances, the spread of these invasive plant species have degraded the diversity and quality of sand dune ecosystems, and precluded species such as the western snowy plover from using these habitats for breeding.

167

6. *Changing environmental conditions (e.g., sea level rise, ocean acidification, etc.)* Future climate scenarios predict rising sea levels, which results in increased overall coastal erosion. Ocean acidification is projected to cause impacts to animals with calcium-carbonate shells (oysters, abalone, sand crabs, etc.), which are a major component of shoreline habitats. Larger storms may also impact coastal areas in the future, causing shoreline habitat degradation and loss.

Individually and in aggregate, all of these stressors have reduced the environmental quality of the shoreline ecosystem. The shoreline restoration projects selected by the Trustees, aim to reverse a portion of the negative effects that these stressors have had. For example, the Ellwood seawall project will remove a section of unnecessary coastal armoring in the City of Goleta, the Santa Monica dune and beach restoration project will discontinue beach grooming in an area of high potential for ecological recovery, and the Ventura County dune restoration project will remove invasive non-native plants from dunes that can be used by rare birds. All selected shoreline restoration projects are anticipated to have long-term beneficial effects.

## 6.4.2   Subtidal and Fish Habitats

The Trustees believe that the projects selected in this restoration plan that address injuries to subtidal habitats, in conjunction with other existing and anticipated coastal restoration projects, including those funded from damage recoveries from other OPA and CERCLA cases, will have a local and regional, long term, moderate beneficial impact on the extent and productivity of subtidal habitats within the geographic scope of the project implementation footprint. The majority of projects are geared toward restoring or enhancing subtidal rocky reef, kelp forest and eelgrass habitats. All three of these habitats provide ecosystem benefits to a diverse community of fish and invertebrates. As an example, kelp forests provide food to subtidal, intertidal and beach communities (e.g., a large component of beach wrack is produced by giant kelp). Southern California kelp forests have experience profound losses in area coverage and in some cases losses in diversity and abundance of the key species that serve to regulate the complex community of algae and invertebrates that are foundational to the habitat.

*Cumulative Impacts Issues*

Some projects may have minor, short-term adverse effects, such as minor air quality impacts via the use of boats to transport divers and equipment to restoration sites and heavy equipment use on the beaches adjacent to the Ellwood seawall removal area; however, the cumulative effects of any short-term effects are anticipated to be negligible to the overall subtidal environment.

*Geographic Scope of Restoration Projects*

The geographic scope of the subtidal restoration projects is subtidal habitats within three miles of the Santa Barbara County coast.

168

***Timeframe for project Implementation***
After the DARP/EA is finalized, projects are anticipated to begin within one year, and will be implemented for a period between five and ten years.

***Other actions affecting the resources, ecosystems, and human communities of concern***
Major processes or anthropogenic stressors that affect the nearshore subtidal environment can be grouped into six categories:

1. *Loss of kelp forest substrate*. The Santa Barbara coast has experienced a loss of approximately 215 acres of productive kelp forest habitat due to the loss of appropriate structure for kelp holdfasts to attach.
2. *Loss of coastal marine eelgrass habitat*. Eelgrass habitat provides unique and critical ecosystem services to the shallow subtidal component of the California coastal shelf. Eel grass beds are an important source of primary productivity and create 3-dimensional biogenic habitat that is used by a diverse assemblage of fish and invertebrates as nursery and foraging habitat. Eelgrass habitat is also identified by NOAA as a Habitat of Particular Concern under the Magnuson-Stevens Fishery Conservation and Management Act.
3. *Invasive species.* Invasive, non-native, species such as *Sargassum horneri* and *Undaria pinnatifida* have been introduced into the southern California bight and have spread and out-competed native species. The spread of these invasive plant species have degraded the diversity and quality of giant kelp and other subtidal vegetated habitat, making restoration of native habitat critically important.
4. *Coastal erosion and associated turbidity and scour.* A variety of coastal activities (seawall armoring, excessive irrigation practices, beach nourishment, etc) have been shown to reduce productivity of subtidal habitats due to the impacts of sedimentation (leading to burial of structured habitats), chronic turbidity (leading to reductions in primary production and growth of algae and plants that create three dimensional habitat), and scour (sediment washing over hard substrate and removing algae, attached invertebrates and other living habitat elements).
5. *On-going activities associated with oil extraction*. Numerous activities associated with oil extraction can have significant cumulative impacts on subtidal habitats. Clearly pipeline ruptures and spills from other sources have catastrophic impacts, but ongoing impacts associated with establishing and maintenance of the infrastructure needed to support oil extraction (e.g., pipeline construction and maintenance) can result in impacts to marine habitats.
6. *Changing environmental conditions (e.g., warming temperatures, ocean acidification, altered circulation)*. Future climate scenarios predict rising sea levels, which results in increased overall coastal erosion. Ocean acidification is projected to cause impacts to animals with calcium-carbonate shells (oysters, abalone, sand crabs, etc.), which are a major component of shoreline habitats. Larger storms may also impact coastal areas in the future, causing shoreline habitat degradation and loss.

169

Individually and in aggregate, these processes or anthropogenic stressors have reduced the environmental quality of the subtidal ecosystem. The subtidal restoration projects selected by the Trustees, aim to reverse a portion of these negative effects. Projects were selected with the primary goal of creating positive benefits in the face of the numerous anthropogenic stressors described above. All selected and second tier subtidal restoration projects are anticipated to have beneficial effects. Any adverse effects would be temporary and minor, and are not anticipated to cumulatively have any substantial adverse effects on subtidal resources within the project area.

### 6.4.3  Bird and Marine Mammal Projects

Unlike shoreline and subtidal habitats, birds and marine mammals travel widely within and outside of the spill-affected area, and the restoration projects selected to benefit these species are likewise located both within and outside of the spill-affected area, in places where the projects can have the greatest benefits. The selected projects will create positive benefits to birds and mammals in the face of anthropogenic effects, such as the ones described above. In many cases, restoration projects were selected to counter-act negative effects that existing human activities are having on bird and mammal resources.

*Cumulative Impacts Issues*

All selected bird and mammal restoration projects are anticipated to have beneficial effects. Any adverse effects would be temporary and minor, and are not anticipated to cumulatively have any substantial adverse effects on bird and mammal resources within the project area.

*Geographic Scope of Restoration Projects*

Projects are proposed to occur along the California mainland coast of Santa Barbara, Ventura, and Los Angeles Counties, and on the Channel Islands.

*Timeframe for project Implementation*

After the Final DARP/EA is released, projects are anticipated to begin within one year, and will be implemented for a period between five and ten years.

Other actions affecting the resources, ecosystems, and human communities of concern: Environmental quality in the project areas has been affected by a number of anthropogenic stressors grouped into four categories as follows:

1. *Modification of the coastline.* Extensive modification and human use of the shoreline has drastically changed the use of the coastline by birds and marine mammals. Bird and mammal breeding activities are not well-tolerated by human disturbance, and so many birds and mammals have adjusted the location of breeding to move away for areas that humans have modified and inhabited.

170

2. *Fishing gear entanglement.* As described elsewhere in this document, fishing hook and line injuries are by far the leading source of anthropogenic injury to seabirds brought to rehabilitation centers in Los Angeles and San Francisco.

3. *Harmful algal blooms.* Harmful algal blooms, such as the acute proliferation of plankton that produce the neurotoxin domoic acid, are becoming somewhat more frequent in southern California. These acute harmful algal blooms affect birds and mammals, often lethally.

4. *Changing environmental conditions.* Warmer ocean waters in the southern California area in the past decade have effects on upwelling and primary productivity, which has cascading effects up the food chain. Low prey availability for birds and mammals has caused increased mortality due to starvation.

The selected projects aim to to create positive benefits to birds and mammals in the face of anthropogenic effects, such as the ones described above. In many cases, restoration projects were selected to counter-act negative effects that existing human activities are having on bird and mammal resources.

## 6.4.4   Human Uses

Human uses along the shoreline are comprised of a variety of activities including boating, camping, surfing, general beach use, and other forms of recreation. The Trustees believe that, overall, the alternatives selected in this restoration plan, when considered along with past and reasonably foreseeable future projects, will have long term local and regional beneficial impacts to natural resources and recreation. Any negative impacts are anticipated to be short term, and minor.

### Cumulative Impacts Issues

The proposed projects to improve human uses have not yet been selected and will be the subject of a future decision process. However, we anticipate that the benefits of these projects will significantly enhance recreational opportunities along the shoreline. Some projects may create a temporary closure or re-routing of coastal access. For example, one possible project is improved beach access from Ellwood Mesa to Ellwood Beach. Currently, there is a steep dirt trail, which could be improved by the installation of a ramp or staircase to provide safe public access. While the construction of this project may create a month or longer temporary closure of the trail, the completed project will ultimately improve coastal access and provide recreational benefits for many years to come.

### Geographic Scope of Restoration Projects

Projects are proposed to occur along the California coast of Santa Barbara, Ventura, and Los Angeles Counties.

**Timeframe for project Implementation:** CDPR will select projects that will enhance camping and/or other shoreline recreational activities associated with units of CDPR from Gaviota to El

171

Capitan at State Beaches. A grants program will be initiated to solicit and select proposals for remaining projects to compensate for lost recreation. The Trustees anticipate that projects would be implemented for a period between one and eight years after the grant program has begun.

***Other actions affecting the resources, ecosystems, and human communities of concern***
In many areas of the coastline within Santa Barbara, Ventura, and Los Angeles Counties, access to the coastline for recreation is precluded or curtailed due to private ownership of coastal property and potential access points. As part of the restoration project selection criteria [in Section 4.2], recreational use projects will be selected and prioritized based on the degree to which they provide positive benefits to recreation in the face of numerous conflicting private and public interests. For example, projects will be selected to ameliorate limitations that exist for public access due to private ownership or limited beach access points. All proposed projects are anticipated to have beneficial effects for human uses within the affected area. Any adverse effects would be temporary and minor, and would not be anticipated to have any substantial adverse cumulative effects. The types of human use projects that are anticipated to be implemented through this plan are generally described by the categories below. When specific projects are selected for implementation, project-specific environmental reviews will be completed and assess the impacts of each project to the environment. Types of projects being considered to be selected by the Trustees may be grouped into the following four categories:

1. Shoreline Access and Amenity Improvements. Create, improve, and maintain access or otherwise improve recreational enjoyment of a day use recreation sites and public amenities that are both adjacent to land along the coast or and on the water. This includes, but is not limited to:
   - Trail improvement;
   - Pier repair, construction and accessibility improvements;
   - Boardwalk repair, construction, and accessibility improvements;
   - Boat launch repair, construction, and accessibility improvements;
   - Beach sand management;
   - Parking improvements at day use recreation sites
   - General infrastructure upgrades that can facilitate access;
   - Signage designed to enhance recreational experience; and
   - Infrastructure upgrades that improve recreational enjoyment of shoreline recreation sites, including locations where on-water recreation is initiated (e.g., dive sites, boat launches, harbors, marinas).

2. Camping. Add, improve, and maintain camping amenities and associated day use amenities at campgrounds. This includes, but is not limited to:
   - Benches and/or picnic facilities;
   - Fire rings;
   - Restrooms/showers;
   - Parking lot improvements;

172

- Fish/bait cleaning stations, fishing rod holders;
- Interpretive programs and/or signage;
- Shoreline access improvements at campground sites; and
- General infrastructure improvements that increase the efficiency, utilization, or enjoyment of campground amenities.

3. Recreational Programs. Programs including but not limited to:
   - Guided trips;
   - Education aimed at increasing public utilization of shoreline and on-water recreation resources; and
   - Equipment that supports recreation programs (e.g., kayaks, fishing gear).

4. Research, Education, and Outreach at University of California, Santa Barbara property.

The Trustees believe that, overall, the alternatives selected in this restoration plan, when considered along with past and reasonably foreseeable future projects, will have long term local and regional beneficial impacts to natural resources, as well as short term, minor negative impacts to human uses.

173

# References

*Documents that are in the Refugio Beach Oil Spill Natural Resource Damage Assessment Administrative Record  (RBOS NRDA AR) can be accessed here:*
*https://www.diver.orr.noaa.gov/web/guest/diver-admin-record?diverWorkspaceSiteId=6104*

Altstatt, J., R. Ambrose, J. Carroll, J. Coyer, J. Wible, and J. Engle. 2014. Eelgrass meadows return to Frenchy's Cove, Anacapa Island: recovery ten years after successful transplantation. Monographs of the Western North American Naturalist 7:500-517.

Barron M.G. 2017. Photoenhanced toxicity of petroleum to aquatic invertebrates and fish. Archives of Environmental Contamination and Toxicology 73:40–46.

Baker G. 2018. Summary of the Trustees' Analysis of the Volume of Line 901 Oil Released to the Ocean. National Oceanic and Atmospheric Administration. Refugio Beach Oil Spill NRDA Administrative Record.

Barringer, D. 2015. Final 2015 breeding season monitoring report for Western Snowy Plover and California Least Tern. Submitted to U.S. Fish and Wildlife Service, Region 8, Ventura, California. Refugio Beach Oil Spill NRDA Administrative Record.

Beeler, H. 2009. Community succession in macroalgal wrack: implications for prey resources of breeding western snowy plovers (*Charadrius alexandrines nivosus*) on Northern California beaches. Thesis presented to Humboldt State University, Arcata, California.

California Department of Fish and Wildlife. 2016. Refugio oil spill response evaluation report: summary and recommendations from the Office of Spill Prevention and Response. Office of Spill Prevention and Response, Sacramento, California. Refugio Beach Oil Spill NRDA Administrative Record

Carretta, J.V., K. Danil, S. J. Chivers, D.W. Weller, D.S. Janiger, M. Berman-Kowalewski, K.M. Hernandez, J.T. Harvey, R.C. Dunkin, D.R. Casper, S. Stoudt, M. Flannery, K. Wilkinson, J. Huggins, and D.M. Lambourn. 2015. Carcass recovery rates of California coastal bottlenose dolphins. Marine Mammal Science 32:349-362.

Conway-Cranos, L.L. 2012. Geographic variation in resilience: an experimental evaluation of four rocky intertidal assemblages. Marine Ecology Progress Series 457:67-83.

Coal Oil Point Reserve. 2015. Final Report on the Western Snowy Plovers. University of California Natural Reserve System, Santa Barbara, California. Refugio Beach Oil Spill NRDA Administrative Record.

Davidson, A.D., A.K. McEachern, T.J. Coonan, W.T. Bean, A.J. Armstrong, and B.R. Hudgens. 2014. Channel Islands National Park: natural resource condition assessment. Natural Resource

174

Technical Report NPS/CHIS/NRTR—2014. National Park Service, Fort Collins, Colorado. Refugio Beach Oil Spill NRDA Administrative Record.

Del Sontro, T.S., I. Leifer, B.P. Luyendyk, and B.R. Broitman. 2007. Beach tar accumulation, transport mechanisms, and sources of variability at Coal Oil Point, California. Marine Pollution Bulletin 544:1461-1471.

Donohoe, R., and B. Joab. 2018. Shoreline assessment data summary. Prepared by the California Department of Fish and Wildlife, Office of Spill Prevention and Response, Sacremento, California. Refugio Beach Oil Spill NRDA Administrative Record.

Duerr, R. 2016. Assessment of anthropogenic injuries to California brown pelicans and other seabirds received by International Bird Rescue's Los Angeles and San Francisco Bay Wildlife Centers 2002-2015. International Bird Rescue, Fairfield, California. Prepared for California Department of Fish and Wildlife, Office of Spill Prevention and Response. Refugio Beach Oil Spill NRDA Administrative Record.

Dugan, J.E. 2018. Population survey results on intertidal talitrid amphipods for the Refugio Beach Oil Spill NRDA. Prepared for Refugio NRDA. Refugio Beach Oil Spill NRDA Administrative Record.

Dugan, J.E., D.M. Hubbard, M.D. McCrary, and M.O. Pierson. 2003. The response of macrofauna communities and shorebirds to macrophyte wrack subsidies on exposed sandy beaches of southern California. Estuarine, Coastal, and Shelf Science 2003:25-40.

English, E. 2010. Damage Estimate for Shoreline Recreation. Report prepared for Cosco Busan NRDA. Refugio Beach Oil Spill NRDA Administrative Record.

Fiorello, C., P. Jodice, J. Lamb, Y. Satge, K. Mills-Parker, D. Jaques, L. Henkel, R. Golightly, and M. Ziccardi. 2017. Post-release monitoring of oiled brown pelicans from the 2015 Refugio oil spill. International Oil Spill Conference Proceedings 2017:605-617.

Ford, R.G., M.L. Bonnell, D.H. Varoujean, G.W. Page, H.R. Carter, B.E. Sharp, D. Heinmann and J.L. Casey. 1996. Total direct mortality of seabirds from the Exxon Valdez oil spill. American Fisheries Society Symposium 18:684-711.

Frangis, A., and N. Cox. 2015. Western snowy plover annual report 2015. California State Parks, Channel Coast District, Ventura, California.  Refugio Beach Oil Spill NRDA Administrative Record.

Gornik, K., T. Lin, G. McDonald, N. Ng, C. Quigley, and D. Viana. 2013. The non-market value of private recreational boating in the Channel Islands National Marine Sanctuary. Bren School of Environmental Science & Management, University of California, Santa Barbara.

175

Hanemann, M., L. Pendleton, C. Mohn, J. Hilger, K. Kurisawa, D. Layton, and F. Vasquez. 2004. Using revealed preference models to estimate the effect of coastal water quality on beach choice in Southern California. University of California, Berkeley. Prepared for the U.S. National Oceanic and Atmospheric Administration.

Hartley, C. 2015. Western snowy plover and California least tern breeding survey. Submitted to U.S. Fish and Wildlife Service, Region 8, Ventura, California. Refugio Beach Oil Spill NRDA Administrative Record.

Hornafius, J.S., D. Quigley, B.P. Luyendyk. 1999. The world's most spectacular marine hydrocarbon seeps (Coal Oil Point, Santa Barbara Channel, California): quantification of emissions. Journal of Geophysical Research 104:20703-20711.

Hubbard, D. and J. Dugan. 2016. Refugio Beach Oil Spill Shoreline Clean Up Effort Data Report 30 Aug 2016. Refugio Beach Oil Spill NRDA Administrative Record.

Jaques, D.L. and D.W. Anderson. 1987. Conservation implications of habitat use and behavior of wintering Brown Pelicans. Page 49. Unpublished report. PSRDP program, University of California Davis, Davis, California

Jaques, D. L., P. J. Capitolo, and J. N. Davis. 2015. Brown pelican roost aerial photographic survey report.. Prepared by Pacific EcoLogic, Astoria Oregon, and Colibri Ecological Consulting, Fresno, California. Refugio Beach Oil Spill NRDA Administrative Record.

Jeffrey, A. 2016. Refugio Incident—Goleta CA. Page 19. Responsible Party Technical Report for Response. Prepared for CTEH, Arvada, Colorado. Refugio Beach Oil Spill NRDA Administrative Record.

Junak, S. and R. Philbrick. 2018. The flowering plants and ferns of Anacapa Island, California. Western North American Naturalist 78:652-673.

Larramendy, P.T., J.A. Howard, A.J. Duvall, D.M. Maxurkiewicz, M.W. Parker, C. Carter, F. Gress, and D.W. Anderson. 2018. Breeding status of the California brown pelican on Anacapa and Santa Barbara Islands, California, in 2015 and 2016. Unpublished report. Prepared byCalifornia Institute of Environmental Studies, Ventura, California. Refugio Beach Oil Spill NRDA Administrative Record.

Lorenson, T.D, F.D. Hostettler, R.J. Rosenbauer, K.E. Peters, K.A. Kvenvolden, J.A. Dougherty, C.E. Gutmacher, F.L. Wong, and W.R. Normark. 2009. Natural offshore seepage and related tarball accumulation on the California coastline; Santa Barbara Channel and the southern Santa Maria Basin; source identification and inventory. Page 116 and spreadsheets. U.S. Geological Survey Open-File Report 2009-1225 and MMS report 2009-030. U.S. Geological Survey, Menlo Park, California. Refugio Beach Oil Spill NRDA Administrative Record.

176

Lorenson, T.D., I. Leifer, F.L. Wong, R.J. Rosenbauer, P.L. Campbell, A. Lam, F.D. Hostettler, J. Greinert, D.P. Finlayson, E.S. Bradley, and B.P. Luyendyk. 2011. Biomarker chemistry and flux quantification methods for natural petroleum seeps and produced oils, offshore southern California. Page 45. U.S. Geological Survey Scientific Investigations Report 2011-5210 and Bureau of Ocean Energy Management OCS Study BOEM 2011-016. Pacific Coastal Marine Science Center, Santa Cruz, California. Available at https://pubs.usgs.gov/sir/2011/5210/

Martin, K.L. 2015. Beach-spawning fishes, reproduction in an endangered ecosystem. CRC Press, Boca Raton, Florida.

McClatchie, S., J. Field, A.R. Thompson, T. Gerrodette, M. Lowry, P.C. Fiedler, W. Watson, K.M. Nieto, and R.D. Vetter. 2016. Food limitation of sea lion pups and the decline of forage off central and sourthern California. Royal Society Open Science 3: 2-9.

McGinnis, M. V., R.R. Cordero, and M. Stadler. 2004. Tribal Marine Protected Areas: Protecting Maritime Ways and Practice, A Special White Paper for the Wishtoyo Foundation. Bioregional Planning Associates, Santa Barbara, California

Michel, J. 2015. Sunken oil assessment survey results: Refugio incident. Report prepared for the Incident Command, Santa Barbara, California.  Refugio Beach Oil Spill NRDA Administrative Record

Morris, J.M., H.P. Forth, C.R. Lay, R. Takeshita, and J. Lipton. 2015. Toxicity of thin floating oil slicks to fish and invertebrates. DWH-AR0280221. Technical Report for Deepwater Horizon Trustees. Prepared for National Oceanic and Atmospheric Administration, Washington, D.C.

Moskoff, W. 2000. The impact of oil spills on birds: Looking back at the Exxon Valdez. Birding February 2000: 44-49.

National Marine Fisheries Service. 2012. Southern California Steelhead Recovery Plan. Southwest Region, Protected Resources Division, Long Beach, California.

National Park Service 2019. Invasive Plant Treatments. Categorical Exclusion Form, issued February 22, 2019. Channel Islands National Park, Ventura, California.  Refugio Beach Oil Spill NRDA Administrative Record

National Oceanic Atmospheric Administration. 2016. 2015 state of the climate: El Niño came, saw, and conquered. Climate.gov, National Oceanic Atmospheric Administration, 2 August 2016. Available: <https://www.climate.gov/news-features/understanding-climate/2015-state-climate-el-ni%C3%B1o-came-saw-and-conquered>

177

Nishimoto, M.M., L. Washburn. 2002. Patterns of coastal eddy circulation and abundance of pelagic juvenile fish in the Santa Barbara Channel, California, USA. Marine Ecology Progress Series 241: 183-199.

Nixon, Z. 2018. Refugio Beach oil spill shoreline oil exposure quantification technical report. Prepared for California Department of Fish and Wildlife, Oil Spill Prevention and Response, Santa Barbara, California. Refugio Beach Oil Spill Administrative Record

Nocerino, E., J. M. Erlandson, J. Smallwood, C. G. Lebow, and A. M. Muns. 2016. Cultural resource monitoring and impact assessment Plains All American pipeline Refugio oil spill response, Santa Barbara County, California. Prepared for Plains All American Group LLC., Bakersfield, California.

Office of Environmental Health Hazard Assessment. 2015. Risk assessment of seafood consumption following the Refugio Beach Oil spill incident in Santa Barbara County, California. Page 44. Office of Environmental Health Hazard Assessment, California Environmental Protection Agency, Sacramento, California,Refugio Beach Oil Spill NRDA Administrative Record

Office of National Marine Sanctuaries. 2019. Channel Islands National Marine Sanctuary 2016 Condition Report. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Office of National Marine Sanctuaries, Silver Spring, MD. pp. 182-203

Oka, N. and M. Okuyama. 2000. Nutritional status of dead oiled rhinoceros auklets (*Cerorhinca monocerata*) in the Southern Japan Sea. Marine Pollution Bulletin 40:340-347.

Oiled Wildlife Care Network. 2015. OWCN oiled animal data log for the Refugio Beach oil spill. OWCN, Davis, California. Refugio Beach Oil Spill NRDA Administrative Record.

Page, G.W., H.R. Carter, R.G. Ford. Numbers of seabirds killed or debilitated in the 1986 Apex Houston oil spill in central California. 1990. Studies in Avian Biology 14:164-174.

Planning and Development Department, County of Santa Barbara. 2016. Gaviota Coast Plan. Available: < https://www.countyofsb.org/plndev/policy/communityplans/gaviota.sbc>

Raimondi, P., C. Bell, K. Ammann, R. Gaddam, D. Lohse, M. Douglas, M. George, N. Fletcher, L. Anderson, M. Miner. 2019. Assessment of potential impacts to rock intertidal community following the Refugio Beach Oil Spill, Santa Barbara County. Report prepared for California Department of Fish and Wildlife, Oil Spill Prevention and Response, Santa Barbara, California. Refugio Beach Oil Spill NRDA Administrative Record.

Southern California Coastal Ocean Observing System. 2019. El Niño. Southern California Coastal Ocean Observing System, La Jolla, California. Available:  <http://sccoos.org/data/el-nino/>

178

Schiel, D.R. and M.S. Foster. 2015. The biology and ecology of giant kelp forests. University of California Press, Oakland, California.

Schulhof, M. and Grifman, P. 2019. Workshop report: Improving oil spill preparedness and response in Santa Barbara, CA. USCSG-TR-01-2019.

Sea Grant Network. 2018. Traditional and Local Knowledge: A Vision for the Sea Grant Network. NOAA.

Stephens J., D. Pondella, J. Steinbeck , J. Carrol, M. Love. 2016. Biography of the trawl-caught fishes of California and an examination of the point conception faunal break. CalCOFI Report 57:89-108.

Stout, S.A. 2016. Refugio Beach oil spill NRDA investigation: trustees forensic oil source analyses. Page 61. Refugio Beach Oil Spill NRDA Administrative Record.

Stout, S.A., D.L. Valentine, and C.M. Reddy. 2018. Refugio Beach oil spill NRDA investigation: supplemental chemical fingerprinting assessment. Page 83Refugio Beach Oil Spill NRDA Administrative Record.

Tumamait-Stenslie, J. 2014. Chumash story: the rainbow bridge. WilderUtopia, Los Angeles, California. Available: <https://www.youtube.com/watch?v=w0iyd68oBok>

U.S. Coast Guard. 2016. Refugio Beach Oil Spill Santa Barbara County, California Federal On-scene Coordinator's After Action Report. Page 47. U.S. Coast Guard, Sector Los Angeles, California.  Refugio Beach Oil Spill NRDA Administrative Record.

U.S. Coast Guard. 2017. Refugio Incident Closeout and Disestablishment of Unified Command memo. U.S. Coast Guard, Sector Los Angeles, California. Refugio Beach Oil Spill NRDA Administrative Record.

U.S. Department of Transportation. 2016. Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California. Failure Investigation Report. Refugio Beach Oil Spill NRDA Administrative Record.

U.S. Fish and Wildlife Service. 2005. Recovery plan for the tidewater goby (*Eucyclogobius newberryi*). U.S. Fish and Wildlife Service, Pacific Region 1, Portland, Oregon.

Valentine, D.L. 2015.  Forensic hydrocarbon analysis conducted in response to the Line 901 rupture at Refugio. Unified Command report. Prepared by Valentine Scientific and Consulting Services, Inc., Goleta, California. Refugio Beach Oil Spill NRDA Administrative Record.

179

Valentine, D.L. 2017. Latent transport of floating oil aggregates to California offshore waters, from the Line 901 rupture at Refugio: a compilation of evidence. Page 18. NRDA Technical Report.Refugio Beach Oil Spill NRDA Administrative Record.

Valentine, D.L. 2019. Benthic oiling from the 19 May 2015 Line 901 rupture at Refugio: a compilation of evidence. Page 14. NRDA Technical report. Refugio Beach Oil Spill NRDA Administrative Record.

Williams, S.L. 1995. Surfgrass (*Phyllospadix torreyi*) reproduction: reproductive phenology, resource allocation, and male rarity. Ecology Society of America 76:1953-1970.

Personal Communications
Altstatt, J. 2018. Long-term Monitoring Program and Experiential Training for Students Coordinator, National Marine Sanctuaries, Santa Barbara, California.

180

# Preparers

The following Trustees participated in the development of this DARP/EA:

**California Department of Fish and Wildlife, Office of Spill Prevention and Response**

Michael Anderson

Bruce Joab

Regina Donohoe

Matthew Zafonte

Bryand Duke

Steve Hampton

Katherine Verrue-Slater

**National Oceanic and Atmospheric Administration**

Laurie Sullivan

Robert Ricker

Mathew Dorsey

David Witting

Gregory Baker

Natalie Cosentino-Manning

Jennifer Boyce

Christopher Plaisted

**US Department of the Interior**

Clare Cragan

**US Fish and Wildlife Service**

Jenny Marek

Tobias McBride

Damian Higgins

Colleen Grant

**University of California State Barbara**

David Hubbard

Jenifer Dugan

Cristina Sandoval

Barton Lounsbury

**California State Parks**

Nathaniel Cox

Laura Reimche

181

# Acknowledgements

The Trustees acknowledge and thank the following individuals for providing expertise during injury assessment and restoration planning:

**GOVERNMENT AGENCIES:**

**California Department of Fish and Wildlife**
Laird Henkel
April DaSilva
Julia Coates
Kenneth Oda
Kimberly Walker
Ryan Denton
Heather Gliniak
Otis Horning
Carlos Mireles
Marsa Morse
Derek Stein
Rebecca Flores-Miller
Michael Prall
Steven Gibson

**California Office of Environmental Health Hazard Assessment**
Beckye Stanton
Susan Klasing

**California State Lands Commission**
Sara Mongano

**California State Parks**
Alexis Frangis
Brooke Sheridan

**National Oceanic and Atmospheric Administration**
Amy MacFadyen
Stacie Smith
Bernadita Anulacion
Chris Barker
Gina Ylitalo
John Incardona
Adam Domanski

**National Oceanic and Atmospheric Administration**
Ben Shorr
Sarah Wilkin
Nick Kellar

**U.S. Fish and Wildlife Service**
Lena Chang
Colleen Draguesku
Kendra Chan
Cathy Johnson
Carolyn Marn
Janet Whitlock
Jeff Phillips
Lilian Carswell
Cat Darst
Chris Kofron
Eric Morrissette
Mary Root
Roger Root
Ashley Spratt
Hazel Rodriguez
Carol Roberts
Katie Zeeman
Annie Little

**Bureau of Land Management**
Dave Ledig
Bill Standley
Jim Weigand

**National Park Service**
Russell Galipeau
David Kushner
Joshua Sprague
Stephen Whitaker
Ken Convery
David Mazurkiewicz

182

**County of Santa Barbara**
Dianne Black
Kathryn Lehr

**City of Goleta**
Anne Wells
Andy Newkirk

**TRIBES:**
*Santa Ynez Band of Chumash Indians*
Freddie Romero
Armenta Rose

**UNIVERSITIES:**
**University of California Davis,**
**Oiled Wildlife Care Network**
Mike Ziccardi
Kirsten Gilardi

**University of California Santa Cruz**
Pete Raimondi

**Pepperdine University**
Karen Martin

**PRIVATE ORGANIZATIONS:**
**Environmental Defense Center**
Linda Krop
Kristen Hislop

**Santa Barbara Channelkeepers**
Kira Redmond
Ben Pitterle
Jenna Driscoll

**NewFields Government Services**
Scott Stout

**Makepeace Environmental Solutions**
Chris Reddy

**Valentine Scientific and Consulting Services**
David Valentine

**Tenera Environmental Services**
Scott Kimura
Jessie Altstatt

**Industrial Economics**
Chris Leggett
Eric Horsch
Mark Curry

183

**Appendix A.   Oil Fate and Transport**

**Appendix B.   Data Management and Access**

**Appendix C.   Resource Equivalency Analysis**

**Appendix D.   Shoreline Exposure and Injury Evaluation Studies**

**Appendix E.   Supplemental Bioassay Report Information**

**Appendix F.   Shoreline Habitat Equivalency Analysis**

**Appendix G-1. Fish, Invertebrate, and Other Mortality Observations**

**Appendix G-2. Field and Laboratory Assessment of Injury to Grunion**

**Appendix G-3. Assessment of Surfperch Exposure**

**Appendix G-4: Oil Exposure and Potential Effects to Fish, Invertebrate Early Life Stages, and Kelp**

**Appendix G-5: Changes in the Condition of Surfgrass and Macroalgae**

**Appendix G-6: Field Assessment of Subtidal Exposure**

**Appendix G-7: Polycyclic Aromatic Hydrocarbons in Nearshore Fish and Invertebrate Tissues**

**Appendix H.   Subtidal Injury Quantification and Habitat Equivalency Analysis**

**Appendix I.   Bird Injury Assessment**

**Appendix J.   Marine Mammal Exposure, Injury, and Restoration**

**Appendix K.   Recreational Camping Damages**

**Appendix L.   Recreational Shoreline Use Damages**

**Appendix M.   Recreational Boating and Offshore Use Damages**

**Appendix N.   Summary of Proposed Restoration Projects**

**Appendix O.   Response to Public Comments on the Draft Damage Assessment and Restoration Plan/Environmental Assessment (DARP/EA)**

184

# Exhibit B



# U.S. Department of Transportation

# Pipeline and Hazardous Materials Safety Administration

**Failure Investigation Report**

**Plains Pipeline, LP, Line 901**
**Crude Oil Release, May 19, 2015**
**Santa Barbara County, California**

**May 2016**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Table of Contents

Executive Summary ........................................................................................................... 3

Final Report Methodology ................................................................................................ 4

Facility Background ........................................................................................................... 4

Events Immediately Prior to and During the Crude Oil Release ....................................... 6

Plains' Field Response and National Response Center Notifications ................................ 7

PHMSA's Corrective Action Order .................................................................................... 9

Pipeline Alignment ........................................................................................................... 9

Las Flores Station to Gaviota Station Line 901 Elevation Description ......................... 9

Gaviota to Pentland Station Line 903 Elevation Description ...................................... 10

Post-Incident Investigation Results ................................................................................ 11

Metallurgical Evaluation of Failed Pipe .................................................................... 11

In-Line Inspection Survey Review .............................................................................. 12

Number of Anomalies ............................................................................................ 13

Cathodic Protection Findings .................................................................................... 13

Spill Volume Estimate from Plains' Third-Party Consultant ...................................... 13

Investigation Findings and Conclusions ......................................................................... 14

Proximate or Direct Cause ......................................................................................... 14

Contributory Causes .................................................................................................. 14

PHMSA Post-Incident Action Chronology ...................................................................... 18

Appendices ..................................................................................................................... 20

**Exhibits - Page 195**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Executive Summary

At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl) of heavy crude oil.[i]  An estimated 500 bbl of crude oil entered the Pacific Ocean.  Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station.  On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901.  Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release.  As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified.  On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan.[ii] No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.

PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

1) Ineffective protection against external corrosion of the pipeline

- The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.

- The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2) Failure by Plains to detect and mitigate the corrosion

- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

3) Lack of timely detection of and response to the rupture

- The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.

- Control room staff did not detect the abnormal conditions in regards to the release as they occurred.  This resulted in a delayed shutdown of the pipeline.

- The pipeline controller restarted the Line 901 pipeline after the release occurred.

- The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as

Page **3** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report.  PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage.  PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

## Final Report Methodology

PHMSA conducted relevant interviews, gathered and reviewed numerous historical documents and available records, and performed a thorough review of the Plains Control Room in Midland, TX. An ILI subject matter expert (SME) was hired to review the raw magnetic flux leakage (MFL) data and final vendor reports from the MFL surveys, and evaluated Plains actions as a result of their review of the vendor reports.  PHMSA issued a CAO which in part instructed Plains to have the failed pipe examined by a PHMSA-approved metallurgical laboratory and to have a root cause failure analysis (RCFA) performed by a third party independent consultant.

The factual evidence reviewed includes: the Plains Integrity Management Plan (IMP), CP records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures and reports obtained from the pipeline operator and PHMSA SMEs.

The arrangement of this report provides a general description of the pipeline system, the events that occurred on the day of the release, and acts or omissions of the operator that led to this failure and release of crude oil.  Specific evidence is supplied and pertinent statements from each report are excerpted where appropriate.

## Facility Background

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries.  Plains' pipeline is composed of two major  pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went  into crude oil service in 1992 and 1991, respectively.  The pipelines are coated with coal tar urethane and covered with  foam insulation which in turn is covered by a tape wrap over the insulation.   Shrink wrap sleeves, which provide a  barrier between the steel pipeline and soil for corrosion prevention, are present at all of the  pipeline joints on Line 901 and multiple locations on Line 903.  The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

(1) Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump  Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57).  There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles  downstream of the Las Flores Station.  All of Line 901 crude oil throughput enters Line  903.  Line 901 was manufactured of low carbon steel by Nippon Steel

Page **4** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam.  The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.



**Figure 1.** Map of Plains' Western Division Pipelines.  The arrow points to the approximate release site on Line 901.

At Sisquoc Station, crude oil can be pumped to one of two locations: a nearby refinery via a 12-inch diameter pipeline operated by Phillips 66, or continue down Line 903 to Pentland Station. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream.  At Emidio Station crude oil is delivered to above-ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.

Prior to the May 19, 2015 release, there had been four small releases meeting PHMSA reportable criteria at pump stations on Lines 901 and 903. No releases were reported to PHMSA on the pipelines outside of pump stations prior to 2015.  The  operator reported maximum operating pressure (MOP) of Line 901 is 1,341 psig.

At the time of the spill, Plains All American Pipeline (PAAPL) operated Line 901 and Line 903 under a Federal Energy Regulatory Commission (FERC) certificate  of economic regulatory jurisdiction that was issued in 1987.  Plains Pipeline, LP, is a subsidiary of PAAPL.  Based on the FERC filing, Lines 901 and 903 were classified as interstate  pipelines, pursuant to 49 U.S.C. § 60101(7), as facilities used to transport hazardous liquid in  interstate or foreign commerce, and as such, were regulated by PHMSA as interstate pipelines. Plains cancelled the FERC certificates for Lines 901 and 903 on February 12, 2016 and April 29, 2016,

Page **5** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

respectively, stating that the transportation service was no longer available in interstate commerce. Line 903 from Gaviota to Sisquoc to Pentland Stations was purged with nitrogen in accordance with Amendment No. 2 to the CAO, and remains shut down between these stations. The Pentland to Emidio segment of Line 903 is active and operating intermittently at low pressures. This section of pipe between Pentland and Emidio is not directly connected to the Gaviota to Pentland segment and is used to transport crude product from breakout tanks in Pentland Station.

## Events Immediately Prior to and During the Crude Oil Release

On the morning of May 19, 2015, Lines 901 and 903 were transporting crude oil with a flow rate setpoint of 1,240 bbl per hour (BPH) leaving the Las Flores Station, and the discharge pressure was approximately 575 psig.  Pumps were operating at the Las Flores Station on Line 901 and Sisquoc Station on Line 903.  A Plains instrumentation and electrical technician was dispatched that morning to disconnect and remove a motor from a non-operational pump at the Sisquoc Station.  While the technician was performing his work, the operational pump (Pump 401) at the Sisquoc Station was shut down unintentionally (i.e., "uncommanded").  When Pump 401 on Line 903 stopped operating, the pressure in Line 901 increased. The pressure rose to a maximum of 696 psig at the Las Flores Station discharge.  The controller shut down the pump at Las Flores Station and the pressure remained at 677 psig.  Approximately four minutes later, the pump at Las Flores Station was restarted.  At approximately 10:55 a.m. PDT, the flow rate at Las Flores Station climbed from zero to 2,042 BPH.  Concurrently, the line pressure rose to a high of 721 psig, then dropped to 199 psig, and then slightly increased to approximately 210 psig until the Las Flores pump was shut down a second and final time.  Generally, a sudden increase in flow rate accompanied by a decrease in pressure is indicative of a release. PHMSA has determined that Pump 401 going offline in an "uncommanded" manner on the morning of May 19, 2015, was an abnormal event, but that this in itself should not have caused Line 901 to rupture.

PHMSA performed a detailed review of the SCADA event and alarm logs, and pressure and flow records.  The review indicated that there was information reported by the SCADA system that indicated a release had occurred by approximately 10:58 a.m., and an alarm was generated on low pressure.  The alarm was not set at an appropriate value.  The alarm also did not have a major priority/severity or safety-related alarm status.  The controller did not recognize the information he received as indicative of an abnormal operation.  Evidence indicates that the controller was focused on the events at Sisquoc Station (i.e., restarting the Sisquoc pump that had gone down once uncommanded, and a second time on high case temperature along with other duties).[iii]

Due to the Sisquoc Station maintenance activity resulting in an unplanned pump shutdown, the controller anticipated alarms would be activated from the pipeline leak monitoring (PLM) system.  According to interviews and a review of the alarm log, the PLM inhibit was requested by the controller to the step-up shift supervisor between 11:15 and 11:22 a.m.[iv]  The step-up shift supervisor then inhibited (shut off) the PLM system alarms.[v]  Also, during this time, the controller started an investigation of the SCADA data in an attempt to understand the operational abnormalities that were occurring.  After attempting to restart the Sisquoc pump twice, the controller shut down the pipeline.  PHMSA requested the operator review the flow imbalance calculations and provide a time when the PLM system would have generated an alarm if not inhibited, and it was determined that  alarms would have been generated

Page 6 of 21

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

approximately two minutes before the controller shut down the pipeline.[vi]



**Figure 2**. Schematic of Plains Pipeline, LP, Line 901 and spill path.

## Plains' Field Response and National Response Center Notifications

The following is a timeline of Plains and emergency responder activities conducted immediately prior to locating the leak site:[vii]

- At 11:42 a.m. a call reporting a petroleum smell was received at Santa Barbara Fire Department (SBFD) Station 18.  Engine 18 left the station to investigate the odor complaint near Refugio State Beach.

- At approximately 12:15 p.m., prior to a scheduled tabletop spill drill required by federal regulations 49 C.F.R. §194, the pre-drill meeting was completed and adjourned.  A representative from the Santa Barbara Office of Emergency Management (SB-OEM) received a call from the SBFD reporting that there was oil on Refugio Beach.  The SB-OEM representative and the Plains representatives left the spill drill and drove separately to Highway 101 at Refugio Beach.

- The Santa Barbara Dispatch notified the National Response Center (NRC #1116950) at 12:43 p.m. PDT of an unknown sheen in the ocean at Highway 101 and Refugio Beach.[viii]

- At approximately 12:55 p.m., the two Plains representatives arrived at the south side of Highway 101 where the SBFD personnel were.  They noted oil in the ocean but could not determine the source of the oil.  One of the Plains representatives told the assembled group that he did not think the oil was coming from Line 901 because the pipeline is located on the other side of Highway 101, and there would be oil flowing across Highway 101 if Line 901 was leaking.

Page **7** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- The Plains representatives drove to the company's pipeline right-of-way (ROW).  At approximately 1:27 p.m., the Plains representatives located the leak site on the Plains ROW.  They called the controller to report the leak and to tell the controller to leave Line 901 shut down and to close the Refugio gate valve.  The Plains representatives used their cell phones to contact other Plains personnel, the landowner where the leak occurred, Plains' oil spill response contractors, and others.  The Plains representatives noted that crude oil from the release site had entered a culvert that crosses under the Highway 101 and railroad tracks and discharges to Refugio Beach.  The Plains representatives, along  with Fire Department personnel, attempted to stop the flow of oil into the culvert.  However, the culvert was too large to stop the flow with shovels, and sand bags were not  readily available, so their immediate efforts were unsuccessful.  At approximately 3:00 p.m., additional equipment and  personnel arrived, the culvert was dammed and oil was prevented from entering the  culvert.

- At 2:56 p.m., a representative from Plains called the NRC to report (NRC #1116972) the release of crude oil  at 2:56 p.m. PDT. This report indicated that the release was at Latitude: 34° 27' 43" N; and  Longitude: 120° 05' 24" W.  This NRC report was made 89 minutes after the release site was  found by Plains field personnel.[ix]



**Figure 3**. Spill location relative to Refugio Beach in Santa Barbara County, CA. Photo: John L. Wiley http://flickr.com/jw4pix

Federal pipeline safety regulations, (49 C.F.R. § 195.52), require that the NRC be notified at the earliest practicable moment following discovery of a release of a hazardous liquid, including "[a]ny failure that resulted in pollution of any stream, river, lake, reservoir, or other similar body of water that violated applicable water quality stands, caused a discoloration of the surface of the water or adjoining shoreline, or deposited a sludge or emulsion beneath the surface of the water or upon adjoining shorelines."  On January 30, 2013, PHMSA issued an

Page **8** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Advisory Bulletin clarifying that this was to be interpreted as within one hour of discovery.  Plains reported the rupture to the NRC approximately 89 minutes after discovery, thus notifying the NRC 29 minutes late.

The estimated costs reported by the operator as of December 23, 2015, were $142,931,884.  This figure includes all costs the operator spent as a result of this release through the date reported, including commodity lost, the operator's property damage and repairs, operator's emergency response, environmental remediation, and estimated other costs spent including government agency costs and media relations expenses.[x]

## PHMSA's Corrective Action Order

On May 21, 2015, PHMSA issued a CAO, CPF No. 5-2015-5011H, to Plains.    The  CAO required Plains to purge Line 901; review the pipeline's construction, operating,  maintenance, and integrity management history; expedite the review of data from the May 5,  2015, ILI tool run; conduct metallurgical evaluation of the failed pipe; repair any   integrity-threatening anomalies identified by the ILI survey; and conduct a root cause failure  analysis.  The CAO requires Plains to purge Line 901 and to keep Line 901 shut down until PHMSA approves the restart of the pipeline.  Plains' Line 901 was purged and filled with an inert nitrogen gas on June 18, 2015.

On June 3, 2015, PHMSA issued Amendment No. 1 to the CAO.  The amendment was issued to address preliminary findings from the early stages of PHMSA's investigation, and the possibility that the conditions on Line 901 also existed on Plains Line 903.   The amendment to the CAO  required Plains to conduct additional non-destructive testing of ILI anomalies on Lines 901 and  903; review the construction, operating, maintenance, integrity management, and ILI history of  Line 903; and reduce the operating pressure of Line 903 to 80% of the highest pressure sustained  for a continuous 8-hour period during the month before the May 19 failure.  This pressure  reduction was intended to enhance safety until all facets of the line's integrity could be evaluated.

On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO.  The amendment required Plains to empty and purge Line 903 between Gaviota and Pentland Stations and fill it with an inert gas.  Line 903 was purged between Gaviota and Pentland Stations and filled with inert nitrogen.  The complex purging operations began in December 2015, and were completed on April 18, 2016.  Both Line 901 and the purged sections of Line 903 will remain shut down until all actions required by PHMSA's CAO and subsequent amendments have been completed.  PHMSA may continue to issue additional amendments to the CAO as necessary.

## Pipeline Alignment

### Las Flores Station to Gaviota Station Line 901 Elevation Description

To fully understand the Line 901 release, it is vital to understand the elevation profile of Line 901 and Line 903 from the Las Flores Canyon to Pentland Station.  Line 901 starts at the Las Flores Station at an elevation of approximately 180 feet.  There are two large hills downstream of the originating pump station.  The first hill has a peak elevation of approximately 740 feet and the second hill has an elevation of approximately 600 feet.  The release occurred downstream of the second hill at an elevation of approximately 80 feet.  Immediately downstream of the release point, the pipeline rises slightly and then runs relatively level approaching the Gaviota station.  This fact is important because as soon as the pump at Las

Page **9** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Flores Pump Station was turned off the second time, the only crude oil that could be released was the height of oil in the pipeline above the release site and not the amount located between the two aforementioned hills.

### Gaviota to Pentland Station Line 903 Elevation Description

Line 903 receives all of the crude oil delivered by Line 901. The line elevation at Gaviota is approximately 150 feet.  The elevation at Sisquoc is approximately 880 feet.  Downstream of Sisquoc,  Line 903 rises to 2,420 feet and then to a height of approximately 2,750 feet and ultimately to an elevation of close to 3,000 feet before dropping into Pentland Station at an elevation of approximately 690 feet.  Line 903 exhibits many of the same construction and operation conditions as Line 901 and was addressed by the amendments to the CAO. Pump 401 at Sisquoc Station has adequate capacity to push the oil up and over the downstream hills and into Pentland Station but only if it has full suction pressure and full flow coming into the pump. Because of the release, the pump could not push the oil over the downstream hills, and so the oil in the pump became hot and the pump shut down to prevent overheating.

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Post-Incident Investigation Results

### Metallurgical Evaluation of Failed Pipe

The failed pipe segment has been analyzed by third-party metallurgical experts, Det Norske Veritas (U.S.A.), Inc.'s (DNV-GL) in Dublin, OH.  The failed pipe assessment and testing was witnessed  by PHMSA, the California Department of Fish and Wildlife, and the U.S. Department of Justice.



**Figure 4**. The failed pipe and surrounding insulation and coating.



**Figure 5**. Pipe External Surface at the Line 901 failure site after cleaning.

Page **11** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

DNV-GL's draft report was completed and disseminated to Plains and PHMSA on August 6, 2015.  The draft report was reviewed by PHMSA engineers, and a number of comments and clarification  requests were made.  DNV-GL reviewed the comments and revised the report.  The Final Report  was issued on September 18, 2015.

The Final Report provides a summary of findings, including the following excerpt:

"The results of the metallurgical analysis indicate that the leak occurred at an area of  external corrosion that ultimately failed in ductile overload under the imposed operating  pressure.  The morphology of the external corrosion observed on the pipe section is  consistent with corrosion under insulation facilitated by wet-dry cycling."[xi]

## In-Line Inspection Survey Review

Plains conducted ILI surveys on Line 901 (10.7 miles in length) to assess the integrity of the pipeline in accordance  with PHMSA regulations in 2007, 2012, and 2015.  According to 49 C.F.R. § 195.452(j)(3), the pipeline is required to be surveyed at  intervals commensurate with the pipeline's risk of integrity threats, but at least every 5 years.   Plains changed Line 901 from a 5-year assessment cycle to a 3-year assessment cycle after the 2012 ILI survey.

The data collected during these surveys must be fully evaluated within 180 days of the ILI, and an operator must take action upon discovery of any "immediate repair conditions" as defined in 49 C.F.R. § 195.452(h) unless the operator can demonstrate that the 180-day period is impracticable.

The most recent ILI survey for Line 901 was completed on May 6, 2015.  The 2015 ILI survey data for  the first 2 miles of Line 901, as measured from the Las Flores Station, was found to be incomplete and not useable for ILI analysis.   For the rest of the ILI survey, the correlation digs,  which are used to gauge survey data accuracy in the ILI vendor's preliminary report, had not been finished  at the time of the May 19, 2015 failure.

PHMSA's independent third-party ILI SME also performed an analysis of the data from past ILI surveys of  Line 901.  Preliminary data from the results of each of the ILI surveys are summarized below  and show a growing number of corrosion anomalies on Line 901.

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

**Number of Anomalies**

| Metal loss | June 19, 2007 | July 3, 2012 | May 6, 2015 |
|---|---|---|---|
| Greater than 80% | 0 | 0 | 2 |
| 60-79% | 2 | 5 | 12 |
| 40-59% | 12 | 54 | 80 |

The May 6, 2015 ILI survey data and subsequent analysis by the ILI vendor predicted external corrosion at the failure site with an area of 5.38 inches by 5.45 inches, and a maximum depth of 47% of the original pipe wall thickness.  After the failure, the DNV-GL metallurgical investigators physically measured external corrosion at the failure site to have a maximum depth of 89%.[xii]  The dimensions of the corrosion feature were 12.1 inches axially by 7.4 inches in circumference.  The maximum depth, as measured using laser scan data, was 0.318 inches or 89% of the measured wall thickness (0.359 inches).

The ILI summary report prepared by PHMSA's SME also examined the "as-called" (ILI-predicted) versus as-found (field measured) lengths, widths and area for the excavated anomalies on Line 901.  The report demonstrates that the lengths and widths of the anomalies were under-called (underestimated) in many cases, however many were also over-called.  Plains submitted little documentation concerning their analysis of how the field measured anomalies compared to the ILI vendor analysis.  Furthermore, Plains did not provide documentation showing that discrepancies between the originally reported anomaly sizes predicted by the ILI vendor and Plain's actual field-measured sizing of the corrosion anomalies were subsequently discussed with the ILI vendor, as required by Plains' IMP.[xiii]

## Cathodic Protection Findings

According to 49 C.F.R. § 195.563, CP is required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines.  Historical CP records for line 901 have been reviewed and reveal protection levels that typically are sufficient to protect non-insulated, coated steel pipe. Line 901 and Line 903, however, are insulated.  An increasing frequency and extent of corrosion anomalies were noted on both Lines 901 and 903 in ILI survey results, anomaly excavations, and repairs.  PHMSA inspectors noted moisture entrained in the insulation at four excavations performed by Plains on Line 901 after the May 19 spill and prior to the PHMSA-mandated purging of the pipelines.

## Spill Volume Estimate from Plains' Third-Party Consultant

Plains initially estimated the volume of spilled crude oil to be approximately 2,400 bbl, of which 500 bbl was estimated to have reached the ocean.   On  August 4, 2015, Plains reported to the Unified Command that the 2,400  bbl release estimate was still accurate.  However, after Plains completed the PHMSA-mandated purge, the  company's calculations indicated that up to 3,400 bbl had possibly been released from the  pipeline.   Plains notified the Unified Command

Page **13** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

that RPS Knowledge Reservoir (RPS), a third-party investigator hired by Plains, was still trying to reconcile the difference.

On November 24, 2015, Plains informed PHMSA that RPS had completed their analysis regarding the release volume and produced a report of findings. RPS used the OLGA simulation software tool to model the behavioral dynamics of the pipeline prior to, during, and immediately after the May 19, 2015 leak. The report concluded that the discharge leak volume was 2,934 bbl. The RPS report was dated November 11, 2015. Plains has reported 1,100 bbl of crude oil have been recovered.

## Investigation Findings and Conclusions

Line 901 pipeline ruptured at approximately 56% of the MOP. Although the operational events that occurred on the morning of the release were abnormal, this should not have caused the release if the pipeline's integrity had been maintained to federal standards.

### Proximate or Direct Cause

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated, 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.

PHMSA's investigation identified numerous contributory causes of the rupture. The contributory causes can be grouped into three categories: 1) ineffective protection against external corrosion of the pipeline; 2) failure by Plains to detect and mitigate the corrosion;, and 3) lack of timely detection of the rupture. Below is a summary of the key contributory causes:

### Contributory Causes

1) Ineffective protection against external corrosion of the pipeline

   - Plains' CP system was ineffective in protecting thermally insulated underground pipeline systems from external corrosion. Industry practices recognize that an impressed current system like the one utilized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised. The external coating in the area of the rupture had allowed moisture to enter the insulation adjacent to the steel pipe.[xiv] Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised.[xv]

2) Failure by Plains to detect and mitigate external corrosion

   - Plains did not identify CUI as a risk-driving threat in their federally-mandated integrity management program (IMP).

Page **14** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- Plains' did not fully implement their IMP.

  o Plains did not perform suitable analysis of the field measurements of the excavated corrosion anomalies that occurred after ILI surveys were completed in 2007 and 2012.

  o The data reported by the ILI vendor were inconsistent (and did not meet the published accuracy of the ILI tools of +/- 10%, 80% of the time for depth) when compared to the results of the field-measured corrosion anomalies.

  o Plains' as-found field measurements of corrosion anomalies were inconsistent with the as-called vendor-provided ILI data and analytical reports. ILI surveys conducted in 2007 and 2012 revealed inconsistencies in the character of the anomalies. In both of these cases, Plains did not consult the ILI vendor to help resolve the inconsistency.

  o Plains failed to follow written procedures directing the IMP group to perform appropriate statistical analysis after the anomaly dig reports were received from the field, and to discuss any inconsistencies with the ILI vendor.[xvi]

    ▪ Plains' Pipeline Integrity group created a unity plot for depth after the 2012 ILI survey and anomaly digs. There is no documentation detailing what was done with the information from the unity plot.

  o Plains incorrectly added the over-called anomalies in the close-out reports.

    ▪ The close-out reports should have only reported the anomalies that were within the reported accuracy of the ILI tool. The reported tool accuracy is +/- 10 %, 80 % of the time. Adding the overcalled anomalies outside of the tool accuracy skews the data.

- Plains' Pipeline Integrity group was historically focused on pitting corrosion under "shrink sleeves" at the pipeline girth welds (circumferential welds to join pipe segments).

  o The release location was within 6 feet of a corrosion anomaly that was exposed and repaired after the 2012 ILI survey. There was evidence of corrosion and degraded coating systems between the 2012 repair site and the 2015 rupture site.

  o The anomaly that ruptured was called out by the ILI tool at 45% depth in 2012. Plains' IMP specified adding 10% to all anomalies (55% depth in this case) then "growing them" to predicted failure using an anticipated corrosion growth rate. This analysis would provide a predicted failure time. Plains did not excavate the anomaly that failed.

3) Lack of timely detection of and response to the rupture

- The controller did not have information communicated from the SCADA system in such a manner to be successful in detecting abnormal operations. The pipeline SCADA system did not have safety-related alarms on low pressure configured at the

Page **15** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

correct value or priority to alert the control room staff of the rupture.  When this alarm was provided to the controller, the discharge pressure at Las Flores was 199 psig but, within a minute, pressure elevated above 210 psig, the alarm status cleared, and the discharge pressure remained above 200 psig (approximately  210-211 psig) until the pipeline was purged.  The pipeline was still leaking when the discharge pressure at Las Flores was above 200 psig, and continued to do so without additional alarm indications.  When the pipeline was down, isolated but still leaking, the minimum pipeline discharge pressure at Las Flores remained at 210-211 psig.  The low discharge pressure alarm setpoint value was not set properly as it should have been above 211 psig.  This type of alarm should be identified as a high priority safety related alarm.  While the controllers and shift supervisors can access historical trend data or continue to monitor a given pressure or flow, when the pipeline was ultimately shut down at 11:30 a.m., neither the controller nor step-up shift supervisor detected any drop of pressure at the specific failure location that would indicate that oil was being released.

- Neither the pipeline controller nor step-up shift supervisor detected the initial abnormal conditions as the release occurred.  There was an indication of decreased pressure and increased flow between 10:53 and 10:58 a.m., which is consistent with a pipeline release.  This resulted in a delayed shutdown of the pipeline.  Adequate alarm setpoint values with correct priorities are essential to controller and shift supervisor recognition of abnormal operations, especially when many pipeline systems are operated from the same console.

- The pipeline controller restarted Line 901 after the release occurred.

- The pipeline leak detection system lacked instrumentation and associated calculations to monitor line pack.

  o The function of the PLM system was a simple line balance calculation based on flow meter values without line pack considerations.  The PLM relies on comparing "meter in – meter out" calculations over time. This type of leak detection system without the use of safety-related, high-priority, low-pressure alarms does not provide the controller or shift supervisors with adequate information when the pipeline is down.

  o When the pipeline is not running, even if only due to scheduling and not required maintenance activities, flows will be close to zero and the imbalance calculation will provide little if any value as currently configured.  Leak detection on a down pipeline requires a robust system of planned and accurate high-priority alarm types and alarm setpoint values in order for response to occur on critical low pressures.

  o The leak detection system for Lines 901 and 903 consists of two leak detection segments.  Additional instrumentation such as pressure and temperature transmitters located at Refugio Gate and Cuyama valve settings (both transmitter types on each side of the valves) would allow additional information about the operating status of the pipeline to be presented and pack calculations pursued.

  o Plains utilizes the SimSuite application for other pipelines in the control

Page **16** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

center.  This application does allow for pack calculations to be utilized in the leak detection system.  According to information obtained during meetings with Plains hydraulic specialists, Lines 901 and 903 were pipeline systems with a low to medium priority defined for future modeling efforts compared to other assets in the Plains operations. The approach utilized by Plains for prioritizing which systems should be modeled first did not appear to take into account all appropriate consequence-based asset impacts (such as culverts providing a pathway to the ocean) associated with these two systems. Existing instrumentation and the need for added instrumentation would factor into this prioritization decision.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as alarms.

    o Interviews determined that the step-up shift supervisor and shift supervisor training lacked formalized and succinct requirements, including that for leak detection system functions such as "inhibit" options.  The interviews determined that different shift supervisors performed PLM inhibit functions without contacting the console supervisor first as required by procedure.

    o Step-up and shift supervisor responsibilities include emergency shutdown of any pipeline.  However, training does not cover a means by which to accomplish this for all relevant pipelines.  A general emergency shutdown provision has not been programed for supervisory use on all systems.

- The oil spill response plan required by 49 C.F.R. §194 did not account for a culvert near the release site that traversed the Pacific Coast Highway and Amtrak railroad tracks.  This culvert provided a quick flow path between the pipeline ROW and the Pacific Ocean, thereby allowing crude oil to flow easily towards Refugio State Beach and the ocean.  The response plan did not have a response strategy that considered the presence of the culverts.

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## PHMSA Post-Incident Action Chronology

Following the May 19, 2015 Plains Pipeline, LP, Line 901 rupture in Santa Barbara County, CA, PHMSA took the following actions:

- On May 19, 2015, PHMSA deployed inspectors to investigate the Plains Pipeline LP Line 901 pipeline failure in Santa Barbara County, CA.  PHMSA also provided information updates to the Unified Command (UC), US Coast Guard, the Federal on Scene Coordinator (FOSC), State Fish and Wildlife, and other agencies on site.
- On May 21, 2015:
  - PHMSA issued a Corrective Action Order (CAO), CPF No. 5-2015-5011H,  to Plains Pipeline LP ordering it to suspend operations and to specific safety actions to further protect the public, property, and the environment from potential hazards associated with the recent failure.  PHMSA staff reviewed the CAO with the operator and briefed the California State Attorney on the CAO and provided an overview of PHMSA's regulations.
  - PHMSA sent an inspector to Plains' control room in Midland, Texas to collect operational data and interview the control room operators on duty at the time of the incident and their supervisors.  The inspector gathered any pertinent logs and information, including electronic copies of relevant data from the Supervisory Control and Data Acquisition (SCADA) system.
  - PHMSA staff worked with the operator to review their plan to expose the pipe and to cold tap it to ensure there was no pressure or crude left in the line at a low spot immediately downstream of the release point. The plan was signed off by the UC at approximately 5 pm PDT.
- On May 22, 2015:
  - PHMSA staff met with representatives from the Assistant U.S. Attorney, DOT Inspector General, EPA Criminal Investigation Division, California Attorney General, and others to brief them on PHMSA's process for securing and transporting the failed pipe to a metallurgical lab for evaluation.
  - PHMSA staff remained on the scene as the operator exposed, tapped, removed any remaining product, and excavated the pipeline downstream of the release site.
- On May 25, 2015:
  - PHMSA issued an approval letter for Plains to excavate, remove and secure the failed joint of pipe under the supervision of two DNV metallurgists (third party contractor) but requested that the coating and insulation not be touched until the failed pipe has been removed because the DNV personnel were interested in in gathering available samples there as well.
  - A PHMSA inspector returned to Midland, TX to interview the controller and the Operations Control Center supervisor and to obtain any handwritten logs created by the controller on the morning of the release.
- On May 28, 2015:
  - A PHMSA investigator was on site when affected pipeline was removed, crated, and transported to secure location for metallurgical evaluation.  PHMSA retained a third-party ILI expert to examine the 2012 and 2015 ILI runs. DNV personnel took soil and insulation samples.
- On June 3, 2015, PHMSA amended the CAO to address preliminary findings from the early stages of the investigation (Amendment No. 1).  The amended CAO mandated

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

additional safety requirements on Line 901 and expanded the scope of the CAO to include the 128-mile long Line 903, which is located downstream of Line 901.  The amendment reduced the operating pressure of the Lone 903 by 80% of the highest 8 hour continuous pressure between April 19, 2015 and May 19, 2015.  On May 30, 2015, Plains voluntarily shutdown Line 903.

- On June 18, 2015, PHMSA staff monitored the Line 901 purge to ensure safety during the purging process. Plains completed the purge and injected inert gas in Line 901.
- On September 18, 2015, PHMSA received the DNV Final Mechanical and Metallurgical Report.  PHMSA staff reviewed the document and provided comments.
- On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO, which ordered Plains to purge and shutdown Line 903 from Gaviota to Pentland.
- On December 1, 2015, PHMSA staff monitored Plains moving Freeport McMoRan crude oil from their offshore platforms into Line 903 from Gaviota Station to Sisquoc Station.  Movement of the Freeport McMoRan oil was completed on December 10, 2015.
- On December 4, 2015, PHMSA staff received the DNV Root Cause Failure Analysis Report.  PHMSA reviewed and commented on the report.
- On December 14, 2015, PHMSA staff monitored the purge process on Line 903 from Gaviota Station to Sisquoc Station. The purge was completed on December 18, 2015 and the line was filled with inert gas.
- On February 17, 2016, PHMSA issued a Preliminary Factual Final Report.
- On April 2, 2016, PHMSA staff monitored the Line 903 Sisquoc to Pentland portion purge that was completed on April 18, 2016.  Line 901 and 903 are shutdown, except for the Pentland to Emidio section of Line 903, which is not connected to 903 any longer.

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## **APPENDICES**

   A. Investigation Summary Detail

   B. Supervisory Control and Data Acquisition (SCADA) Log Excerpts

   C. Pipeline Leak Monitoring Details

   D. Excerpts and Discussion of Plains Integrity Management Plan (IMP) Requirements

   E. Corrosion Control and Pipeline Conditions

   F. Industry Standards and General Requirements for In-Line Inspection

   G. In-Line Inspection Report

   H. PHMSA's Independent Analysis of In-Line Inspection Data

   I. Maps and Photographs

   J. National Response Center Report #1

   K. National Response Center Report #2

   L. Form PHMSA F 7000.1: Accident Report for Hazardous Liquid Pipeline Systems

   M. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Mechanical and Metallurgical Testing

   N. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Technical Root Cause Analysis

   O. NACE International: Effectiveness of Cathodic Protection on Thermally Insulated Underground Metallic Structures

---

[i] According to the *FRACTURE CONTROL TECHNOLOGY FOR NATURAL GAS PIPELINES CIRCA 2001* (the PRCI report superseding NG-18 Report 208): "The distinction between leak and rupture for the pipeline community is based on the size and configuration of the breach, not how it develops." Based on these calculations and visual observations, the length of the feature is consistent with a leak, arresting within the corrosion feature, and did not propagate outside of the feature into nominal wall-thickness pipe. According to the instructions for completing PHMSA Accident Form 7000-1, this type of accident would be classified as a rupture since PHMSA defines a "rupture" as a "loss of containment that immediate impairs the operation of the pipeline".

[ii] The remedial action plan requires: a) investigation and remediation of anomalies on Line 901 (including anomalies requiring repair per 49 C.F.R. § 195.452(h) and similar anomalies); b) analysis of field measurements taken from anomaly investigations; c) re-grade of previous in-line inspection (ILI) data from 2012 and 2015 ILI surveys using an expanded set of interaction criteria; d) additional integrity assessments using a circumferential magnetic flux leakage (MFL-C) ILI tool and integration of MFL-C ILI data with previous ILI survey results; e) investigation and remediation of anomalies that are identified in the MFL-C tool run (if any); f) based on information collected from remedial work plan and root cause analysis report released by Det Norske Veritas (U.S.A.), Inc., improving the integrity management program; and g) integrity studies to reduce spill volumes, including an emergency flow restriction device evaluation and a surge study. Completion of the remedial work plan is required prior to the PHMSA Western Region Director approving a restart plan and return to service for Line 901.

[iii] High case temperature refers to the oil temperature inside the pump cavity.  The case holds the pump impeller

Page **20** of **21**

where oil passes through.  This was a centrifugal pump that continues spinning whether there is product in the pump or not.  When the rupture occurred, there was not enough pressure or flow rate to allow the pump to continue pumping the oil over the hills and into Pentland Station.  Therefore, the oil that was in the pump remained in place and as the pump continued to spin, and temperature was reported to the SCADA system.  If the pump reaches the high temperature setpoint, the pump shuts itself off to protect itself from burning up.

[iv] The PCR utilizes two shift supervisors to cover the entire set of 22 consoles.  The California Console is handled by shift supervisor B.  The shift supervisor B position at the time of the failure was filled by a step-up shift supervisor.  A step-up shift supervisor is a controller who is currently qualified on a specific console in the PCR and has received some informal training by working on shift with other shift supervisors.  Step-up shift supervisors are used to cover the shift supervisor positions when additional personnel are needed due to illness, vacation, training, etc.  Plains has indicated that two step-up shift supervisors are not allowed to be on duty at the same time so one shift supervisor is paired with a step-up shift supervisor when additional personnel is needed.

[v] PLM is the SCADA vendor software tool that serves as the leak detection system for PCR.

[vi] *See* Appendix B.

[vii] SCADA Data/Plains Control Room time is local to the Central Time Zone.  A two-hour time difference separates Central Time from Pacific Time, with Central Time falling two hours ahead. The release occurred in the Pacific Time Zone which is two (2) hours earlier.  All times in this report have been adjusted to Pacific Time.

[viii] *See* Appendix J.

[ix] *See* Appendix K.

[x] *See* Appendix L.

[xi] *See* Appendix M.

[xii] PHMSA has access to this data through a view-only web portal.

[xiii] *See* Appendix G.

[xiv] The inability of an impressed cathodic protection system to protect insulated pipelines was most recently reaffirmed in the National Association of Corrosion Engineers (NACE) Publication 10A392 (2006 Edition) – "Effectiveness of Cathodic Protection (CP) on Thermally Insulated Underground Metallic Structures."

[xv] *See* NACE Report at Appendix O, Background section stating that "[o] n most thermally insulated oil and gas transmission pipelines installed prior to 1980 to 1981, a shop mold-formed thermal insulation was placed directly over the bare steel pipe, with an outer jacket applied to moisture-proof the system. At the field joint, preformed insulation half shells were applied over the joint area to fit between the ends of the shop-applied insulation. After the insulation was fitted, a heat shrink sleeve or a tape wrap was applied over the insulation. When the integrity of the outer moisture barrier was compromised, the space, gap, or void between the edges of the preformed half shells and the shop-applied insulation allowed oxygenated water to diffuse to the bare steel beneath. Damage to the outer moisture barrier has also occurred remote from the joint, allowing oxygenated ground water ingress.

"Thermally insulated pipelines have experienced relatively aggressive corrosion, with some failures occurring within three years of service, although acceptable industry standards of CP had been applied and maintained shortly after line construction. The most predominant failures have been those occurring at joints; however, moisture has migrated along the pipeline steel surface to create electrochemical corrosion cells remote from the field joint, culminating in extensive replacements of substantial lengths of line. An article titled 'Corrosion of Underground Insulated Pipelines' supports this committee's conclusions that sufficient CP current from an external source may not reach the insulated metallic surface in sufficient quantity to establish adequate corrosion control."

[xvi] *See* Appendix D.

Page **21** of 21

# Exhibit C

# Th8.1, Th8.2 & Th8.3

Staff:          Stephanie Cook –SF
Staff Report:   March 28, 2025
Hearing Date:   April 10, 2025

**STAFF REPORT: RECOMMENDATIONS AND FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY**

**Cease and Desist Order No.:**          **CCC-25-CD-01**

**Restoration Order No.:**               **CCC-25-RO-01**

**Administrative Penalty No.:**          **CCC-25-AP3-01**

**Related Violation File:**              **V-9-24-0152**

**Entity Subject to this Order:**        **Sable Offshore Corp.**

**Location:**          The properties that are subject to this proceeding are at various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Los Padres National Forest, and areas around those properties, that are being or could be impacted by the development activities at issue here, as described below, all within Santa Barbara County; as well as offshore locations in state waters, where the parties subject to this proceeding have undertaken unpermitted development in placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines, all as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.

**Violation Description:**          Activities onshore including, but not limited to, excavation with heavy equipment; removal of

**Exhibits - Page 216**

major vegetation; grading and widening of roads; installation of metal plates and other fill material within wetlands; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325; as well as offshore development including, but not necessarily limited to, placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines; all without the requisite Coastal Act authorization, as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.

**Substantive File Documents:**     1. Public documents in the files for Cease-and-Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-AP3-01

2. Exhibits 1 through 130 and Appendix A of this staff report.

---

## SUMMARY OF STAFF RECOMMENDATIONS

### Introduction

These proceedings pertain to several ongoing and extensive Coastal Act violations undertaken by Sable Offshore Corp. ("Sable") at various onshore locations along existing crude oil conveyance pipelines on the Gaviota coast in Santa Barbara County, as well as offshore, along sections of related oil and water pipelines, located within state waters, that connect the offshore Santa Ynez Unit oil production platforms to shore. All the violations are at sites along or offshore of the Gaviota Coast, in Santa Barbara County, and all of which have adversely impacted, and continue to adversely impact, coastal resources as a result of Sable's outright refusal to comply with the Coastal Act. Sable's development activities on the Pipelines have also been the concern of several other state environmental and natural resource agencies including the State Water Control Resources Board and Regional Water Quality Control Board, the California Department of Fish and Wildlife, and the Department of Parks and Recreation, all of which have similarly identified issues associated with Sable's lack of compliance with applicable environmental regulations. This issue has also generated concern from State legislators, culminating in a recent inter-agency Town Hall meeting where the aforementioned agencies, as well as some others, collectively met to discuss their respective roles, and interest, in this ongoing issue, as well as to answer questions from the public.

**Exhibits - Page 217**

Both the onshore portion of the Pipelines and the offshore oil and water pipelines are part of the larger Santa Ynez Unit, which consists of three offshore platforms (Hondo, Harmony, and Heritage), the Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil, water and natural gas transport pipelines. The Las Flores Pipelines CA-324 and CA-325 (previously Lines 901 and 903 respectively) ("Pipelines") are located onshore, with Line CA-324 following along the coastline between the Las Flores Canyon Plant processing facility and the Gaviota Pump Station, and line CA-325 extending inland from the pump station. Separate offshore oil and water pipelines extend from the Las Flores facility into state coastal waters and ultimately connect to the three platforms offshore in federal waters, mentioned above.

## Background

This specific pipeline system is of particular historical importance as it is the source of the 2015 Refugio Beach oil spill, which caused significant environmental damage to approximately 150 miles of coastline. The oil spill occurred when a corroded portion of the onshore pipeline Line CA-324 ruptured, releasing more than 123,000 gallons of oil. Much of this oil flowed into a storm drain which traveled under the adjacent highway, before reaching the coast of Refugio State Beach, and continuing outward into the ocean.[1] The spill had a severe effect on the coast, negatively impacting wildlife and ecosystems along the coast, and requiring hundreds of millions of dollars in clean-up costs. In addition, the spill caused an estimated 140,000 lost recreation user days between Santa Barbara, Ventura, and Los Angeles Counties.[2]  As a result of the oil spill, all production of oil was halted at the Santa Ynez Unit in 2015, and the pipelines have remained offline and out-of-service since that time.

The Las Flores Pipeline System was constructed in the 1980's after Celeron Pipeline Company ("Celeron") proposed to construct a pipeline that would transport crude oil produced from offshore platform locations to out-of-state refinery facilities. Celeron applied to Santa Barbara County and was granted a Conditional Use Permit ("CUP") and Final Development Permit ("FDP").  Additionally issued under the umbrella of the FDP were two coastal development permits, each of which incorporated by reference the language in the FDP. Celeron completed construction in 1990, and thereafter, the pipelines remained in service until the 2015 oil spill, at which point they were placed out of service.

Since that time, ownership of the Pipelines has been transferred from Plains Pipeline, L.P., owner and operator in 2015, when the lines were placed offline, to ExxonMobil Corporation ("Exxon") which purchased them on October 13, 2022. Exxon then entered into a purchase agreement with Sable one month later, on November 1, 2022. This purchase agreement between Exxon and Sable was finalized on February 14, 2024. Through this agreement, Sable purchased the entire Santa Ynez Unit ("SYU"), including the Pipelines, and all associated assets (the three offshore platforms, subsea pipelines and infrastructure, and Las Flores Canyon processing facility). As the new owner and operator of the Pipelines,

---

[1] https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline
[2] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 18 (June 2021) [hereinafter "NRDA"], available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.

**Exhibits - Page 218**

Sable began undertaking efforts to transfer necessary permits and to restart use of the Pipelines and SYU offshore oil production operations.

In brief, this case seeks to resolve Coastal Act violations where Sable, the current owner and operator of the SYU, including the Pipelines and other associated assets as described above, has undertaken, and continues to undertake, development activities onshore, along the Pipelines, and at locations at offshore pipelines, as well, all without prior Coastal Act authorization. Importantly, most of the activities undertaken at locations onshore, along the Pipelines, and which Sable has refused to suspend, have been carried out in direct violation of several Notice of Violation and Notice of Intent letters, and in direct violation of Commission staff warnings and even a formal Cease and Desist Order.

**Violation Description**

As described in greater detail below, Sable undertook development at locations onshore, along the Pipelines, as early as, if not before, September of 2024. Sable undertook such activities without prior communication or notification to the California Coastal Commission ("Commission") staff, and without Coastal Act authorization. More specifically, at locations onshore, Sable undertook development activities including the following: 1) excavation with heavy equipment; 2) removal of major vegetation; 3) grading and widening of roads; 4) installation of metal plates and other fill material within wetlands; 5) dewatering and discharge of water, including into coastal waterways; 6) pipeline removal, replacement, and reinforcement; 7) installation of shutoff valves; as well as other development associated with the inspection and anomaly correction work on Las Flores Pipelines CA-324 and CA-325. At locations offshore, Sable undertook development beginning on November 29, 2024, including the placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines.

After acquiring the Pipelines, Sable began conducting inspections along the Pipelines to assess the many sites where the pipeline had corroded and was at risk of rupture. These inspections showed over 100 locations along the Pipelines, and within the Coastal Zone, where Sable determined the pipeline was defective, and in need of repair. To complete these repairs, Sable brought in heavy equipment to excavate substantial areas, and began either, removing or replacing whole sections of pipe, or installing external sleeves or coatings to expand and reinforce the pipeline. With regard to the installation of shutoff valves, as mentioned above, 16 shutoff valves were installed at onshore locations of the Pipelines and of those 16 valves, a total of seven were located in the Coastal Zone. The shutoff valves are large structures with various apparatuses that are installed directly on the Pipelines. In certain locations, installation of this type of apparatus involved extensive grading and removal of vegetation. Importantly, the full extent of development undertaken in accordance with the above-listed Coastal Act violations, is not fully known by Commission staff as Sable has repeatedly declined requests from Commission staff to provide full-scale project plans and detailed information about the scope of work it carried out.

The onshore development along the Pipelines has resulted in adverse impacts to various sensitive habitat areas in order to create access routes and staging areas, and for the

excavations themselves. Although some of the work has been in areas of less sensitive habitat, they still raise some concerns.is pastureland, Some of these excavations extend for roughly 100 ft, with a depth of roughly 10 ft, and some occurred on steep slopes (Exh. 112 and Exh. 113 and in protected habitat areas including federal designated critical habitat for wildlife protected under the Endangered Species Act, or within streambed corridors and wetlands. Over the months in which Sable has continued to undertake this work, Commission staff received reports with concerning images depicting potential for damage of these critical habitats, including images of excavators staged in particularly sensitive areas, such as above a pool of water where a southwestern pond turtle was seen to be swimming, or alongside two southern California steelhead (See exhibit 67 for image of critical species in pool under excavator). Notably, the southwestern pond turtle is proposed for federal listing as a threatened species and designated as a species of special concern, and the southern California steelhead is listed as an endangered species under the federal Endangered Species Act and is a candidate for listing under California's Endangered Species Act.

Sable characterizes the work as routine maintenance and claims that it was authorized by the original entitlements received in the 1980s.  However, despite many discussions with both Sable and the County and extensive research into the history, Commission staff has found no support for this position.  Furthermore, the level of work conducted along the onshore portions of the Pipeline is extraordinary. A single campaign to excavate over 100 separate pipeline sections across a modest distance; sever, remove and replace some sections; and expose, reinforce, seal, and coat others goes beyond what could possibly have been considered by the original permit and supporting documents.  The only way for this level of activity to have been contemplated at the time of the original permit would be if it were presumed that required inspections would be incapable of detecting corrosion and degradation throughout the line to the point that the pipeline ruptured at one location and was in imminent risk of rupturing at over 100 other locations.  When a pipeline is operated legally and responsibly – as would have been assumed by the permit and supporting documents – this level of degradation and subsequent need for simultaneous and comprehensive remediation across the entire line would never happen.

The timing of Sable's onshore work is also problematic in that it has occurred during the breeding season for the federally listed southern California steelhead and the California red legged frog, a species which is listed as threatened under the federal Endangered Species Act.  The work also occurred during the nesting season for most bird species, as well as the time of year in which ground disturbance is most likely to result in erosion, scarring, and discharge of sediment into wetlands and watercourses. Moreover, several work sites are in or adjacent to environmentally sensitive habitat areas (ESHA), including coastal scrub and chaparral habitats, and in, or near, areas mapped as wetlands and riparian habitat. Other work sites are in annual or native grassland, and woodlands. Importantly, native grasslands are ESHA, while certain non-native habitats such as annual grasslands can also be ESHA if rare species are present, under Policy NS-4 (Coastal) of Santa Barbara County's Gaviota Coast Plan.[3] While there appears to have been damage

---

[3] *See* Gaviota Coast Plan ("GCP"), Santa Barbara County (Certified by CCC in 2018), Policy NS-4 (Coastal) at 2-16 to 2-18, available at https://cosantabarbara.app.box.com/s/67cui9hpdphz64ajtmbdndqwq1x8tr5h

to these areas, it is difficult for Commission staff to assess the full extent since vegetation was removed without first providing the Commission with adequate information, and without site-specific biological surveys taken by resource agency-approved independent experts at the appropriate times of year.

It also appears that Sable carried out work on the Pipelines without implementation of appropriate coastal resource protection measures. Images taken during the first week of October, after work had already commenced, demonstrate several erosion control measures had been installed improperly, and were therefore ineffective. Thus, not only was this work undertaken in areas which require critical measures in place to safeguard against degradation of environmental resources, it appears that even the measures which were observed to have been put in place were done so haphazardly.  While Sable has maintained that this work was done with thorough analysis, and consideration of potential environmental impacts, it is unclear how successful these measures were, and whether they had meaningful benefits. Without input from or review by the Commission or other independent biologists as to methods, parameters, and other critical components of any such measures, it is likely that such measures did not, in fact, provide appropriate protection to surrounding sensitive habitat areas. The limited information and photos available from the public regarding the work undertaken supports these conclusions.

Further, as noted above, Sable asserts that it can rely on permits issued nearly 40 years ago for the original construction and installation of the pipeline as authorization for the work undertaken now.  There are many reasons why this is not accurate, as discussed below, but it should be noted that any measures required decades ago simply could not incorporate protections for the current habitat and species on the site, as many sensitive resources have developed on the site or been identified or provided with legal protection in the time after that initial environmental review. These include the listing of several species under the federal Endangered Species Act that are present along the pipeline corridor, as well as the designation of Critical Habitat supporting them. No analysis or consideration of these species was made in the original permit and supporting documents from the 1980s. The Southern California Distinct Population Segment of steelhead ("Southern California steelhead") was federally listed Endangered in 1997 and state listed in 2022; tidewater goby was federally listed Endangered in 1994; California red legged frog was federally listed Threatened in 1996; southwestern pond turtle was proposed as federally Threatened in 2023.

In addition to the onshore violations described above, Sable has also conducted unpermitted development at locations offshore, along the oil pipeline that connects the offshore SYU platforms to shore and an adjacent produced water discharge pipeline. This development, as mentioned above, included deployment and positioning of sand and concrete bags to provide structural support below sections from which the seafloor had scoured or eroded. Reinforcement of these pipelines was also carried out as part of an effort to restart SYU oil production operations and bring the pipelines back into use. Specifically, the project deployed a remotely operated vehicle ("ROV") to place concrete bags along more than 750 linear feet of the pipelines to create support piers along 14 identified "spans" (sections of pipeline that are unsupported by the seabed), each measuring between 41 and 70 feet.

**Exhibits – Page 221**

Commission staff and the Coastal Act provisions regarding oil and gas facilities support the thorough, and prompt, remediation of any problems that have the potential to adversely affect the structural integrity of active oil and gas pipelines, and the Coastal Act has a variety of regulatory review mechanisms to help ensure such efforts can be expedited and carried out in a timely manner. It is notable in this case, however, that Sable's pipelines were purged of oil and cleaned nearly ten years ago and currently have no potential to release or spill oil, thus reducing the time sensitive nature of the work Sable undertook. Whether expedited or carried out on a regular timeline, it is crucial, for the protection of coastal resources, that regulatory review occur in advance of construction activities to ensure that those activities are designed and carried out in a manner that avoids, minimizes and mitigates any adverse effects on coastal resources.  For example, certain methods of pipeline inspection and installation present enhanced risks of disturbance and displacement of commercial and recreational fishing activities and gear, marine mammal entanglement, sensitive habitat damage and disturbance, and marine debris generation and release, while others present lower risks. However, in refusing to apply for a coastal development permit ("CDP") for this type of work, and thereby not engaging in the thorough analysis that would be afforded through the CDP application and review process and having the work conditioned to minimize harms to coastal resources, Sable has engaged in activities for which the aforementioned risks are high. In contrast, because those risks could probably be lowered to the point where the work would be consistent with the Coastal Act and the County's Local Coastal Program, through the conditions and mitigations that can be provided in a CDP, it is likely this work would be approvable, if a permit were to be sought. Yet, instead, Sable opted to move forward with this work without seeking a CDP, despite being informed that doing so would be in violation of the Coastal Act.

**Initial Enforcement Actions**

Since learning of the development activities undertaken at onshore locations along the Pipelines in September, Commission staff have made repeated, and extensive, attempts to work with Sable, and their counsel, in an effort to resolve both onshore and offshore Coastal Act violations. Throughout this time, Sable sporadically indicated willingness to comply and take steps toward resolving these violations, which prompted Commission staff to exert considerable resources, time, and efforts toward trying to reach an amicable resolution, including Coastal Act authorization for the work being undertaken. Ultimately, these efforts have proven unsuccessful.  Sable twice indicated an interest in settling in the context of a consent order and twice they ceased negotiations and ended up not agreeing to do so.

After Commission staff became aware of the activities taking place at onshore locations along the Pipeline in September of 2024, Commission staff immediately initiated conversations with Sable to discuss the activities, and a potential consent order to resolve the potential violations.  As described in greater detail below, Commission staff issued a Notice of Violation letter regarding these activities (Exh, 2), and then a Notice of Intent for an Executive Director Cease and Desist Order ("EDCDO"), (Exh, 3), followed by discussions to attempt to resolve this matter amicably.  When that was unsuccessful, the

Executive Director issued an EDCDO in November. (Exh.4) Importantly, after the issuance of the November EDCDO addressing the onshore work along the Pipelines, Sable did cease certain activities at those locations and complied with portions of the EDCDO. However, at this time, Sable also turned its focus to undertaking work at locations along its offshore pipelines, despite being advised by Commission permitting staff that such work would also require a CDP. In fact, mere weeks after the issuance of the November EDCDO, and after having been reminded that the planned offshore work also needed Coastal Act authorization, Sable undertook development activities at these offshore locations without Coastal Act authorization. Commission staff was unaware that they had undertaken this additional unpermitted work until January of the following year.

As noted, Commission staff have worked extensively with Sable in an attempt to resolve these issues, beginning with the activities conducted onshore along the Pipelines.  On September 18, 2024, after learning of the activities Sable was conducting at the onshore locations along the Pipelines, Commission staff initiated communications with Sable , to clarify, and confirm, that Sable was the current owner and operator of the Pipelines, as well as to confirm the specifics of the development undertaken at the onshore locations, and further to inform Sable that an application for an after the fact ("ATF") CDP would be required for the work undertaken, as well as a CDP application to address any future, proposed work. On September 20, 2024, Commission staff also initiated communications with Santa Barbara County Planning and Development Department ("County") staff, informing them of the development undertaken, the Commission's position that the development needed Coastal Act authorization and requesting that the County take enforcement action. These communications also noted that the Commission would assume jurisdiction under the Coastal Act provisions regarding enforcement jurisdiction if the County declined to act. The County responded that it would review and respond but no further response was received either indicating that the County was taking action or objecting to the Commission assuming jurisdiction over the matter. Exh.15)

On September 27, 2024, Commission staff issued Sable a Notice of Violation letter addressing the onshore Coastal Act violations and directing it to immediately cease any unpermitted activities within the coastal zone and to apply for both an ATF CDP for work undertaken, and a CDP for any future, planned work. Commission staff then met with Sable on October 1, 2024, to discuss the Notice of Violation letter, and actions to be taken. Commission staff, again, reiterated the imminent need to for Sable to immediately cease all work activities and, also asked for information as to the location and scale of Sable's work to date, as well as any additional planned work and requested full-scale project plans. At this time, Commission staff remained hopeful that Sable had undertaken the work without full understanding as to the requirements of the Coastal Act, and permit application processes. Commission staff discussed legal options, and discussed the potential permit options, as well as solicited input from Sable as to what measures they felt it was necessary to take to secure the open trench sites once work fully ceased.  Commission staff had hoped that they could work collaboratively to ensure the sites were secure, as Sable seemed receptive to applying to requisite CDPs, and finding an agreeable path forward to resolve the Coastal Act violations.

Despite this conversation, Commission staff received reports that Sable had not ceased work in the Coastal Zone. On October 2, Commission staff received an email from Sable, in response to the September 27, 2024, Notice of Violation letter, which started that all work "subject to interim measures" had ceased. (Exh. 9)  Despite this, Commission staff continued to receive reports that work had not ceased. On October 4, Commission staff requested written assurance that work had ceased, including what Sable referred to as "interim measures," to be provided no later than 2 pm that day.  Commission staff additionally requested that Sable provide responses to staff's information request, in accordance with the September 27, 2024, Notice of Violation letter, no later than 5pm, the following Monday. At 1:57. on October 2, Sable, again, sent an email to Commission staff asserting that work had ceased. Yet again, Commission staff received reports that no cessation of work had occurred, and therefore, again, asked for written assurance from Sable, which was ultimately provided that afternoon. (Exh 135)  Sable did not, however, provide a full response to the request for information regarding what had been done, and where, by the 5pm deadline the following Monday. Sable did provide some information after the deadline regarding locations where work had been conducted within the Coastal Zone but asserted that the full information request could not be answered at that time.

Therefore, since Sable failed to satisfactorily provide information requested and, further, failed to provide written confirmation of an intent to apply for both an ATF CDP for work undertaken, and a CDP for future, proposed work, the Executive Director issued an Executive Director Cease and Desist Order ("EDCDO") to Sable.  This EDCDO directed Sable to cease all unpermitted development activities, undertake steps to temporarily secure the sites where Sable's development had temporarily ceased, and apply for CDPs, as described above. After issuance of the EDCDO, Sable ceased operations at locations in the Coastal Zone and instead shifted its focus to operations outside of the Coastal Zone. During this time, Sable undertook steps, pursuant to the EDCDO, to secure the sites where work had ceased, and Commission staff maintained regular communication with Sable's counsel, who indicated openness to submitting applications for CDPs, once time was afforded to more fully analyze the Pipelines' permitting history. As an accommodation, Commission staff provided a longer deadline for the application for CDPs, which extended beyond the February 10, 2025, expiration of the EDCDO, and provided Sable an additional 30 days, with a deadline of March 12, 2025, to submit such applications.

Regrettably, within a few days of the February 10, 2025, expiration of the EDCDO, Sable quickly resumed work, despite having not submitted any application for a CDP.  On February 14, 2025, Commission staff began to receive several reports of equipment having been staged at construction sites, as well as reports that development was being undertaken into evening hours, and through the weekend. (Exh. 100) Two days prior to receiving these messages, on February 12, 2024, Commission staff received a letter from the County (Exh. 38), responding to Commission's staff's previous, January 10, 2024 request that the County agree to the Commission's review of a consolidated permit application.  In the County's February 12th response, as discussed in greater detail in this staff report, the County asserted that Sable needed no permit for the work it had undertaken onshore, along the Pipelines, because that work was authorized by existing permits. The County also provided Commission staff with a copy of an additional letter, which the County sent to Sable, similarly notifying Sable that the work Sable had

**Exhibits - Page 224**

undertaken onshore, along the Pipelines, which was the subject of the EDCDO issued in November, was, and is, covered by existing permits.

On February 14, Commission staff sent a letter to the County, objecting to the County's February 12 letter on procedural grounds and also explaining staff's disagreement with the County's position on the merits and asking for language in any permit that would support the County's position by potentially authorizing such development. (Exh, 40) This letter was also addressed to Sable. However, the County did not respond, and Sable continued its work and sent its own letter later that day defending the County's position. (Exh 38) Thus, on Sunday, February 16, Commission staff issued a notice of intent to issue a second EDCDO. (Exh. 6) In response to that notice, on February 17, 2025, Sable sent a letter to Commission staff challenging Commission staff's jurisdiction to proceed. The next day, the Commission's Executive Director issued the second EDCDO. (Exh. 7) The next day, Commission staff learned that Sable had sued the Commission over the actions to date, alleging that the Notices of Violation and the first EDCDO were illegal and effected a taking of Sable's property.

Commission staff have continued to attempt to reach an amicable settlement with Sable, including, in this instance, an offer to resolve the short-term issues with a consent EDCDO. While Sable chose to move forward with undertaking continued, unpermitted activities at the onshore locations along the Pipeline, Commission staff continued to engage in conversations with Sable, in hopes of finding an amicable resolution. In the weeks after issuance of the EDCDO, Sable, again, indicated willingness to engage in conversations with Commission staff that could lead to a potential consent agreement, in the form of a consent Cease and Desist Order, To this end, Commission staff spent extensive resources working to pull together proposed language for the potential orders, mentioned above, then spent days on intensive negotiations with Sable.

During a virtual meeting on March 11, 2025, Sable and Commission staff discussed the aforementioned language, and potential pathways forward. After this meeting, Sable provided language to be reviewed by Commission staff, which Commission staff worked late through that evening to provide. Unfortunately, before Commission staff had the opportunity to discuss this language with Sable, Sable informed Commission staff that they were terminating discussions.

To date, Sable has made no efforts to comply with this second EDCDO, has not submitted any application for a CDP, and has refused to cease operations despite being fully informed of the ongoing Coastal Act Violations and ongoing threats to coastal resources associated with its activities. Commission staff have worked exhaustively with Sable in an effort to find an agreeable path forward, and to achieve resolution of the numerous ongoing Coastal Act violations but, unfortunately, have been unable to reach any such agreement. Thus, Sable's actions, and inactions with regard to these violations have led to this action for the Commission to consider issuance of this unilateral Cease and Desist Order, Restoration Order, and Civil Administrative Penalty Order, as described below.

*Proposed Resolution*

**Exhibits - Page 225**

The unpermitted development Sable has undertaken at both onshore and offshore locations has resulted in damage to coastal resources, but the extent of this damage is not fully known because of Sable's continued refusal to provide complete and detailed information as to the work that it has undertaken, as well as proposed, future plans. Additionally, Sable has continued to undertake development activities at onshore locations along the Pipelines, despite issuance of two separate Cease and Desist Orders and in direct contravention of the resource protection provisions of the Coastal Act.

Commission staff recommends the Commission approve Cease and Desist Order No. CCC-25-CD-01 to ensure that Sable ceases any further development activities along the Pipelines, until a complete CDP[4] application has been submitted and addressed for future, proposed activities, as well as an ATF CDP application for all development activities already undertaken at the onshore locations along the Pipelines, and for all development activities undertaken along offshore sections of Sable's oil and water pipelines.

Commission staff also recommends that, in conjunction with the proposed Cease and Desist Order, the Commission approve Restoration Order No. CCC-25-RO-01 to address the effects of the unpermitted work.

Lastly, Commission staff recommends that the Commission issue Civil Administrative Penalty Order No. CCC-25-AP3-01. The Coastal Act provides five factors for the Commission to consider in imposing a penalty. Applying those factors here, and grouping and treating the violations as proposed herein, the Commission could justify imposing a penalty up to a maximum of $18,022,500 in this case. Commission staff recommends that a substantial fine be imposed, given the nature of the multiple violations at both onshore and offshore locations; the lengthy and substantial amount of Commission staff resources expended in attempting to resolve these violations; the unprecedented manner in which Sable has continually refused to comply with any such attempts to resolve these violations and even a valid administrative order issued, and other public and legal policies at issue here, including the need to secure compliance with the Coastal Act CDP process. Commission staff is recommending a penalty in the range of $12,000,000- $15,000,000. Within that range, Commission staff is recommending the Commission, in its discretion, specify a penalty of $14,987,250.

To address these violations, Commission staff recommends that the Commission approve issuance of Cease and Desist Order No. CCC-25-CD-01; Restoration Order No. CCC-25-RO-01; and Civil Administrative Penalty Order No. CCC-25-AP3-01 (collectively "the Orders"). The proposed Sable Orders are included as Appendix A to this Staff Report.

---

[4] Although the orders require the submittal of an application for a CDP, that does not preclude a more expeditious form of review.  Indeed, it is not uncommon for the Commission to approve such applications by issuing a waiver of the CDP requirement if the application materials demonstrate that the project is eligible for that form of Coastal Act authorization.  This requirement for a complete CDP application is to ensure that the Commission has the necessary information to make the correct determination and is not in any way prejudging the outcome, either substantively or procedurally."

Table of Contents

I.   MOTIONS AND RESOLUTIONS ............................................................ 16

II.  HEARING PROCEDURES ................................................................... 17

III. FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND
     ISSUANCE OF ADMINISTRATIVE PENALTIES .................................... 18

     A.   DESCRIPTION OF PROPERTY ..................................................... 18

     B.   DESCRIPTION OF COASTAL ACT VIOLATIONS ............................. 18

     C.   ENFORCEMENT ACTIVITIES AND ATTEMPTS AT RESOLUTION ............ 19

IV.  BASIS FOR ISSUING CEASE AND DESIST ORDER ............................. 25

     A.   STATUTORY PROVISION ........................................................... 25

     C.   APPLICATION TO FACTS .......................................................... 28

V.   BASIS FOR ISSUANCE OF RESTORATION ORDER .............................. 30

     A.   STATUTORY PROVISIONS ......................................................... 30

     B.   APPLICATION OF FACTS ........................................................... 30

     C.   JURISDICTION ........................................................................ 33

VI.  BASIS FOR IMPOSITION OF ADMINISTRTIVE PENALTIES ................. 35

     A.   STATUTORY PROVISIONS ......................................................... 35

     B.   APPLICATION TO THE FACTS .................................................... 36

     C.   PENALTY AMOUNT .................................................................. 38

VII. DEFENSES ALLEGED AND RESPONSES THERETO .............................. 55

     A.   SUMMARY ............................................................................. 55

     B.   DOCUMENTS ON WHICH SABLE RELIES FOR ITS PRE-AUTHORIZATION ARGUMENT 56

     A.   ONSHORE ............................................................................. 56

     I.   EIR/EIS ................................................................................ 56

     II.  FINAL DEVELOPMENT PLAN (FDP) (85-DP-66CZ)/CUP (MARCH, 1986) (SABLE SOD
          DOC. 5) ............................................................................... 58

     III. SANTA BARBARA COUNTY CDPS ............................................. 58

     IV.  CONDITIONS OF APPROVAL ..................................................... 59

     V.   SUMMARY WITH RESPECT TO THE AFOREMENTIONED ENTITLEMENT DOCUMENTS 59

     VI.  CONSENT DECREE .................................................................. 60

     VII. SANTA BARBARA COUNTY LETTERS .......................................... 60

     B.   OFFSHORE ............................................................................ 61

     I.   EIR/EIS ................................................................................ 61

     II.  DEVELOPMENT AND PRODUCTION PLAN (DPP) ........................... 61

     III. COASTAL DEVELOPMENT PERMIT CDP E-88-1 AND CONSISTENCY CERTIFICATION
          CC-64-87 ............................................................................. 61

     IV.  BSEE AND SLC LETTERS ........................................................ 62

     C.   OTHER THEMES IN SABLE'S SOD ............................................ 63

     A.   PREEMPTION ......................................................................... 63

     B.   JURISDICTION ........................................................................ 66

C.    BENEFITS AND HARMS OF THE WORK AT ISSUE .........................................................68
D.    ADDITIONAL ARGUMENTS...............................................................................................69
VIII.  **CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA)** ......................................**88**
IX.    **SUMMARY OF FINDINGS OF FACT** ..............................................................................**89**

**APPENDICES**

**Appendix A** – Cease and Desist Order No. CCC-25-CD-01; Restoration Order CCC-25-RO-01; Civil Administrative Penalty No. CCC-25-AP3-01

**EXHIBITS**

Exhibit 1: Facilities Map
Exhibit 2: 9/27/24 NOV Letter
Exhibit 3: 10/4/24 NOI Letter
Exhibit 4: 11/12/24 Sable EDCDO
Exhibit 5: 2/11/25 Offshore NOV
Exhibit 6: 2/16/25 Sable NOI for EDCDO 2/16/25
Exhibit 7: 2/18/25 EDCDO & NOI
Exhibit 8: 11/21/24 Commission Staff email with Steve Rusch
Exhibit 9: 10/2/24 CCC/Sable Email RE: Cease Work
Exhibit 10: 10/2/24 Letter to Sable re: onshore
Exhibit 11: 11/12/24 CCC EDCDO Cover Letter
Exhibit 12: NOV Letter 2/14/25 Extension Request Granted
Exhibit 13: 10/8/24 Sable Letter to CCC
Exhibit 14: Sable NOV Response
Exhibit 15: 9/20/24 Email between CCC and County
Exhibit 16: Sable 10/7/24 Chart of Locations
Exhibit 17: 9/23/24 Land Trust for Santa Barbara County FM Report
Exhibit 18: 9/24/24 Land Trust for Santa Barbara County FM Report
Exhibit 19: 9/25/24 Land Trust for Santa Barbara County FM Report
Exhibit 20: 9/26/24 Land Trust for Santa Barbara County FM Report
Exhibit 21: 9/27/24 Land Trust for Santa Barbara County FM Report
Exhibit 22: 9/28/24 Land Trust for Santa Barbara County FM Report
Exhibit 23: 9/29/24 Land Trust for Santa Barbara County FM Report
Exhibit 24: 9/30/24 Land Trust for Santa Barbara County FM Report
Exhibit 25: 10/1/14 Land Trust for Santa Barbara County FM Report
Exhibit 26: 10/2/24 Land Trust for Santa Barbara County FM Report
Exhibit 27: 10/03/24 Environmental Defense Center Report
Exhibit 28: 12/12/24 Letter to Newsom
Exhibit 29: 3/3/25 Congressional Letter to Newsom
Exhibit 30: 1/22/25 CA SWRB Informational Request
Exhibit 31: 12/19/24 Sable IRP Final Report
Exhibit 32: EDC Report 2/28/25
Exhibit 33: 2/12/25 SBC Letter to Sable
Exhibit 34: Sable Settlement Agreement (1988)

Exhibit 35: SLC letter re Span Remediation completion and dates
Exhibit 36: 12/06/24 Sable ZC Application
Exhibit 37: 11/22/24 Sable ZC Application
Exhibit 38: 2/12/25 SBC letter to CCC re: consolidated permit request
Exhibit 39: 2/17/25CCC letter to SBC request to initiate enforcement
Exhibit 40: 2/14/25 CCC letter to SBC and Sable
Exhibit 41: 2/17/25 CCC letter to SBC request to initiate enforcement
Exhibit 42: Letter to SBC 2/16/25 re: Dispute Resolution
Exhibit 43: 2/24/25 SBC letter to CCC re: Dispute Resolution
Exhibit 44: Sable Span Remediation letter
Exhibit 45: EDC Letter to CCC re: Dispute Resolution
Exhibit 46: Sable Offshore Corp. Response to Notice Prior to Issuance of Executive
           Director Cease and Desist Order
Exhibit 47: 11/20/24 CCC Approval of IRP
Exhibit 48: EDC Letter to CCC re: permit compliance
Exhibit 49: Celeron FDP 1986
Exhibit 50: Revised Celeron FDP
Exhibit 51: Permit E-88-1
Exhibit 52: Permit E-88-1 Exhibits
Exhibit 53: Consent Decree
Exhibit 54: 86-CDP-205
Exhibit 55: 86-CDP-189
Exhibit 56: 90-CDP-175
Exhibit 57: Oil and Gas Facilities Map
Exhibit 58: Sable SOD
Exhibit 59: Sable SOD appendices with docs
Exhibit 60: Draft EIR
Exhibit 61: Final EIR
Exhibit 62: Supplemental EIR
Exhibit 63: 1984 EIR for SYU; DPP
Exhibit 64: BSEE Email 12.17.24
Exhibit 65: CCC/Sable Offshore Work Communications (I, II, III)
Exhibit 66: CCC Email with SBC Communication 1/7/25
Exhibit 67: Critical Species, Southern Steelhead Swimming in Pool Below Excavator,
           2.20.25
Exhibit 68: Critical Species, Pond Turtle Swimming in Pool Below Excavator 2.20.25
Exhibit 69: Grease Fallen From Excavator, 2.18.25
Exhibit 70: Excavator Along Highway 101, 10.4.24
Exhibit 71: Backfilled Pit, No Erosion Control 2.19.2024
Exhibit 72: Backfilled Site, No Soil Compaction, 2.19.24
Exhibit 73: Excavator in Rain, 2.14.25
Exhibit 74: Construction at Pipeline, October
Exhibit 75: Construction on Safety Valve with Fence Covering Hole, October
Exhibit 76: Construction site at Land Trust Property, October
Exhibit 77: Construction site at Land Trust Property with Fencing, October
Exhibit 78: Cut Trees on Land Trust Property, October
Exhibit 79: Loose Rocks and Soil Near Stream, 2.19.25

Exhibit 80: Excavations in or Near Wetlands, 2.20.25

Exhibit 81: Excavations in Potentially Mapped Wetlands, 2.18.25

Exhibit 82: Excavator and New Grading Bed in Banks, 2.18.25

Exhibit 83: Excavator on Land Trust Property, October

Exhibit 84: Multiple Excavators on Land Trust Property, October

Exhibit 85: Excavator on Slope, October

Exhibit 86: Excavator Removing Shoring Trench Walls Near Coastal Sage Scrub, 2.18.2025

Exhibit 87: Excavator in Riparian Area of Arroyo Quemada Creek, 2.21.25

Exhibit 88: Excavators Near Coastal Sage Scrub, March

Exhibit 89: Exposed Pipe, October

Exhibit 90: Exposed Pipe Along Work Site, October

Exhibit 91: Exposed Pipe, October

Exhibit 92: Fencing on Land Trust Property, October

Exhibit 93: Grading on Work Site, October

Exhibit 94: Steel Plate, October

Exhibit 95: Native Grassland Damage, 3/13/25

Exhibit 96: Native Grassland Damage Coastal Sage Coyote Brush I, 3/13/25

Exhibit 97: Native Grassland Damage Coastal Sage Coyote Brush II, 3/13/25

Exhibit 98: Coyote Brush Remnants, 3.13.25

Exhibit 99: Coyote Brush Removal, 3.13.25

Exhibit 100: Heavy Machinery, October

Exhibit 101: Inside Fencing on Land Trust Property, October

Exhibit 102: Las Flores Canyon Standing Water Accumulation, 2.14.25

Exhibit 103: Extensive Staging by Creek, 2.14.25

Exhibit 104: Las Flores Canyon Staging Near ESHA, 2.14.25

Exhibit 105: Las Flores Canyon Staging by ESHA II, 2.24.25

Exhibit 106: Las Flores Canyon Staging by Willows, 2.14.25

Exhibit 107: Grading, October

Exhibit 108: Tree Fall on Land Trust Property, November

Exhibit 109: Exposed Pipe, October

Exhibit 110: Night Work, 2.18.25

Exhibit 111: Open Pit Site and Grading, October

Exhibit 112: Open Trench on Slope, October

Exhibit 113: Open Trench on Slope II, October

Exhibit 114: Open Trench with Fencing, October

Exhibit 115: Open Trench Site with BMP, October

Exhibit 116: Staged Pipeline Replacement, 2.14.25

Exhibit 117: Recently Graded Area, 3.24.25

Exhibit 118: Refugio Sable Site (Grading), 10.2.24

Exhibit 119: Machinery, October

Exhibit 120: Machinery II, October

Exhibit 121: Exposed Pipeline Section, October

Exhibit 122: Exposed Pipe 2, October

Exhibit 123: Partially Buried Exposed Pipe, October

Exhibit 124: SB County Property Scrub Vegetation Mowed, ESHA, Equipment in Riparian Area, March

**Exhibits - Page 230**

Exhibit 125: SB County Property Vegetation Removed, March
Exhibit 126: SB County Property Work in Adjacent Riparian Area, March
Exhibit 127: Exposed Pipe and Debris, October
Exhibit 128: Exposed Pipe Section with Enclosure, October
Exhibit 129: Staged Machinery, October
Exhibit 130: Open Pit with Enclosure, October
Exhibit 131: Work Conducted in Riparian Area, March
Exhibit 132: EDC letter to County Re: Permit Transfer
Exhibit 133: SBC Letter to Sable Re Zoning Clearance
Exhibit 134: IRP Completion Report
Exhibit 135: Sable Offshore Corp. Carolyn Bertrand 10/1/2024


I.    **MOTIONS AND RESOLUTIONS**

Motion1:  Cease and Desist Order

> *I move that the Commission issue Cease and Desist Order No. CCC-25-CD-01 to Sable Offshore Corp. pursuant to the staff recommendation.*

Staff recommends a YES vote on the foregoing motion. Passage of this motion will result in adoption of the resolution immediately below and issuance of the Cease and Desist Order. The motion passes only by an affirmative vote of the majority of Commissioners present.

Resolution to Issue a Cease and Desist Order:

> *The Commission hereby issues Cease and Desist Order No. CCC-25-CD-01, as set forth below in Appendix A, and adopts the findings set forth below on the ground that development has occurred without the requisite Coastal Development Permit, in violation of the Coastal Act and the Santa Barbara County Local Coastal Program; and that the requirements of the Cease and Desist Order are necessary to ensure compliance with the Coastal Act and the Coastal Development Permit.*

Motion 2: Restoration Order

> *I move that the Commission issue Restoration Order No. CCC-25-RO-01 to Sable Offshore Corp. pursuant to the staff recommendation.*

Staff recommends a YES vote on the foregoing motion. Passage of this motion will result in adoption of the resolution immediately below and issuance of the Restoration Order. The motion passes only by an affirmative vote of the majority of Commissioners present.

Resolution to Issue a Restoration Order:

*The Commission hereby issues Restoration Order No. CCC-25-RO-01, set forth below on the grounds that Sable Offshore Corp. has undertaken development without the requisite Coastal Act authorization, the development is inconsistent with the Coastal Act, and the development is causing continuing resource damage.*

Motion 3 Administrative Civil Penalty Action

*I move that the Commission find that the various actions and failure to act by Sable Offshore Corp., as described in the Commission's findings, are in violation of the resource protection provisions of the Coastal Act, and the Commission impose upon them an administrative penalty in the amount of $ 14,987,250.*

Staff recommends a YES vote on the foregoing motion. Passage of this motion will result in the assessment of an administrative penalty against Sable Offshore Corporation in the amount of $ *14,987,250.* The motion passes only by an affirmative vote of a majority of Commissioners present.

Resolution to Impose Administrative Penalties:

*The Commission hereby imposes an administrative civil penalty against Sable in the amount of $ 14,987,250 dollars and adopts the findings set forth below; on grounds that development has violated the resource protection provisions of the Coastal Act, and these activities have negatively impacted coastal resources and violated 30821.3 of the Coastal Act.*

## II.    HEARING PROCEDURES

The procedures for a hearing in which the Commission issues a Cease and Desist Order under Public Resources Code ("PRC") Section 30810 are described in the Commission's regulations at Section 13185 of Title 14 of the California Code of Regulations ("14 CCR") and the procedures for a hearing in which the Commission issues a Restoration Order under PRC Section 30811 are described in the regulations at Section 13195 of 14 CCR. Additionally, Section 30821(b) states that the imposition of administrative civil penalties by the Commission shall take place at a duly noticed public hearing in compliance with the requirements of Sections 30810, 30811, or 30812. Therefore, the procedures employed for a hearing to impose administrative penalties are the same as those for a Cease and Desist and Restoration Order, and the hearing on these Cease and Desist and Restoration Orders and Administrative Civil Penalty Actions shall proceed according to 14 CCR section 13185, including the following:

The Chair shall announce the matter and request that all parties or their representatives present at the hearing identify themselves for the record. The Chair shall announce the rules of proceeding, including time limits for presentations. The Chair shall also announce the right of any speaker to propose to the Commission, before the close of the hearing, any question(s) for any Commissioner, at his or her discretion to ask of any other party. Staff shall then present its report and recommendation to the Commission, after which the

**Exhibits – Page 232**

alleged violators, or their representatives, may present their positions with particular attention to those areas where actual controversy exists. The Chair may then recognize other interested persons, after which the chair may allow the alleged violators to use any reserved rebuttal time to respond to comments from interested persons and may then have staff respond to specific points raised by the alleged violators or any of the other speakers.

The Commission will receive, consider, and evaluate evidence in accordance with the same standards it uses in its other quasi-judicial proceedings, as specified in 14 CCR Section 13186, which incorporates, by reference, Section 13065. The Chair will close the public hearing after the presentations are completed. The Commissioners may ask questions of any speaker at any time during the hearing or deliberations, including if any Commissioner so chooses, any questions proposed by any speaker in the manner noted above. The Commission shall determine, by a majority vote of those present and voting, whether to issue the Cease and Desist and Restoration Orders and impose Administrative Penalties, either in the forms recommended by staff, or as amended by the Commission. Passage of the motions above, per the staff recommendations, or as amended by the Commission, will result in issuance of the Cease and Desist and Restoration Orders and imposition of Administrative Penalties.

## III.   FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND ISSUANCE OF ADMINISTRATIVE PENALTIES[5]

### A.  DESCRIPTION OF PROPERTY

The properties subject to this enforcement action are at various locations along the Las Flores Pipelines CA-324 and CA -325 (formerly Lines 901, and 903). The Las Flores Pipelines are part of the greater Santa Ynez Unit which consists of three offshore platforms (Hondo, Harmony, and Heritage), Las Flores Canyon processing facility, and associated electrical transmission facilities and lines, oil, natural gas and produced water transport pipelines, (including offshore pipelines as well as CA-325 and CA-325 onshore) and associated rights-of-way and easements. (Exh.1) All Santa Ynez Unit infrastructure is located along or offshore of the Gaviota Coast, within Santa Barbara County.

### B.  DESCRIPTION OF COASTAL ACT VIOLATIONS

The Coastal Act violations, and threatened violations, addressed by the proposed Commission Cease and Desist Order, Restorations Order and Administrative Penalty ("Orders") involve development that has occurred in the Coastal Zone without the requisite

---

[5] These findings also hereby incorporate by reference the Summary at the beginning of the March 28, 2025, staff report ("STAFF REPORT: Recommendations and Findings for Cease and Desist Order, Restoration Order, and Administrative Civil Penalty") in which these findings appear, which section is entitled "Summary of Staff Recommendations."

Coastal act authorization, including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; placement of fill in wetlands and coastal waters; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; any installation of shutoff valves; and other development along onshore locations of the Pipelines, as well as development, including but not limited to, placement of sand and cement bags on the seafloor below and adjacent to out-of-service oil and water pipelines.

### C.  ENFORCEMENT ACTIVITIES AND ATTEMPTS AT RESOLUTION

In mid-September of 2024, Commission staff became aware of development activities occurring at locations onshore, along the Las Flores Pipelines CA-324 and CA-325. On September 18, 2024, Commission staff initiated communications with Sable, through their representative Steve Rusch, to confirm Sable's position as owner and operator of the Pipelines, as well as to convey the need for Coastal Act authorization for any development activities on, or along, the Pipelines. After receiving confirmation of Sable's status as owner and operator, and that development activities were being undertaken at locations along the onshore Pipelines, on September 20, 2024 Commission staff sent an email to the County, providing notification that the Commission had learned of development activities being undertaken along the Pipelines, and informing the County of Commission staff's position that such work required Coastal Act Authorization. This email message further requested the County take formal enforcement action and provided "… the Commission will assume enforcement jurisdiction based on the understanding that you are declining this request unless you indicate otherwise by close of business on Sept. 23, 2024." In response, the County stated, in email, that they were looking into the issue, and would respond "ASAP". The County did not provide further response to this email, nor did the County affirmatively decline the Commission's request to take formal enforcement action, before the deadline provided. (Exh. 13)

Thus, on September 27, 2024, Commission staff sent a "Notice of Violation" letter regarding the unpermitted development activities taking place within the Coastal Zone, along the Pipelines. Commission staff requested Sable immediately cease all unpermitted development in state coastal waters, or elsewhere in the Coastal Zone.  Commission staff further detailed the need for Coastal Act authorization for any development in the Coastal Zone, which should be sought through the submittal of an application for an "after the fact" Coastal Development Permit ("ATF CDP"), and a Coastal Development Permit ("CDP") for any future, proposed development. The lack of a CDP with conditions to minimize adverse impacts to coastal resources was particularly concerning given the time of year in which the work was occurring was sensitive for a variety of protected wildlife species and also presented increased risks of erosion due to the pending start of the rainy season.

On October 1, 2024, Sable met with Commission staff on a video conference to discuss these Coastal Act violations. In this conversation, Commission staff conveyed to Sable that all unpermitted development activities along the Pipeline, must cease immediately. Recognizing that immediate cessation of all work would result in several open pit sites, where excavation activities had already begun, Commission staff discussed potential steps

necessary to safely, and temporarily, secure the sites. However, staff made it clear to Sable that all work must stop immediately, and that information must be provided so that staff could assess the full scope, nature and location of work before such measures to secure the sites could be evaluated and taken. Nonetheless, Commission staff received an email from Sable on the following day, October 2, 2024, stating that work had been suspended, "subject to taking interim measures." Images received after these communications and later on October 2, 2024, show an excavator, which appears to be actively excavating next to ESHA.[6](See. Exh.126 of excavator located adjacent to riparian area)

Despite receiving assurances from Sable that work had ceased, Commission staff continued to receive reports that work had continued and, again, met with Sable via video conference, on October 3, 2024, to reiterate that all work must fully cease, including any such "interim measures" which involved development requiring Coastal Act authorization.

However, Commission staff continued to receive reports that Sable had yet to cease all work, and, on October 4, 2024, Commission staff sent a letter ("EDCDO NOI") to Sable providing formal notice of the Executive Director's intent to issue an order to halt the ongoing work, and requested written assurances by 2:00 p.m. that day, that Sable had, in fact ceased work entirely. At 1:57 p.m., Sable sent an email to Commission staff asserting that all work, including the actions in which Sable characterized as "interim work measures", had ceased. Commission staff continued to receive messages, after receiving this confirmation from Sable, that work was ongoing. In response, Commission staff sent a second email to Sable, again, asking for assurance that work had completely stopped. In response, Sable, sent an email to Commission staff around 4 p.m. stating that all work had ceased.

In addition to the cessation of all work, the October 4, 2024 EDCDO NOI letter required Sable to provide information, as to work undertaken, or planned, along the Pipeline, including information regarding what work had been undertaken and where, as well as information about the project plans for the remainder of the work being done, and this information was to be provided no later than 5pm the following Monday, October 7, 2024. Additionally, the October 4, 2024, letter asked for written confirmation of intent to apply for a CDP(s) for ATF authorization for any work that had already occurred in the Coastal Zone and prospective authorization for any proposed future work. After 5 pm on October 7, 2024, Commission staff received an email from Sable's counsel, DJ Moore, which provided a spreadsheet as to locations where Sable had undertaken development, but they stated that the remainder of the information request could not be met by the deadline.

Because Sable did not provide a "satisfactory response", as required by PRC Section 30809, by not providing the information as requested in Commission staff's October 4 letter, and further, because it failed to provide written confirmation as to its commitment to apply for an ATF CDP for work previously undertaken within the Coastal Zone, the Executive Director issued a EDCDO on November 12, 2024.This EDCDO, directed Sable to complete an Interim Restoration Plan (the "Plan") to safely secure the open excavation

**Exhibits - Page 235**

sites in the interim period necessary for Sable to apply for both an ATF CDP for all work previously undertaken along the Pipeline as well as apply for a CDP for future, proposed work. As an accommodation, to allow them additional time to apply for these CDPs, this letter provided for 120 days from the issuance of the EDCDO for Sable to apply for requisite CDPs, which provided Sable an additional 30 days, beyond the expiration date of the EDCDO, to submit the requisite CDP applications. Staff offered to meet with Sable and its representatives to assist them in the application process and to make the permit process as streamlined and efficient as possible. Throughout November, commission staff worked extensively with Sable's counsel to ensure effective implementation of the Plan and, on December 20, 2024, Sable submitted a completion report for the Plan. However, Sable declined to submit any application for a CDP, even through the extended deadline provided.  Further, Commission staff had repeatedly requested information as to the development which Sable had already undertaken, or planned to undertake, including any full-scale work plans, but did not receive adequate responses to the information required in the EDCDO.

Given the lack of information from Sable about what work they had actually undertaken, and where, (such as whether it was in or adjacent to environmentally sensitive habitat areas ("ESHA") or wetlands) it was difficult to determine fully the potential for adverse impacts on resources.  Commission staff did, however, begin to receive reports from the public about the activities and the potential harm to coastal resources they had and were likely to result in.

While Sable has maintained that it conducted its work onshore along the Pipelines with measures in place to minimize environmental harms, the work was done without any coordination with Commission staff, and it is unclear the extent to which any measures it may have undertaken did, in fact, protect coastal resources. Without communication with Commission staff, or a complete CDP application, which would have provided an opportunity to fully analyze the potential impacts of the work, it is highly likely that the extent of work undertaken by Sable caused greater damage than what Commission staff are currently aware of. Images provided to Commission staff, that were taken during the first week of October, show erosion control measures in place improperly and ineffectively. Further, there are several images depicting excavation work occurring on steep slopes, in, or near, riparian wetlands, and near ESHA. All of this leads Commission staff to have serious doubts as to the effectiveness of any potential measures taken to safeguard against coastal resources damage.

Further, in its February 14 letter arguing that its work was authorized, Sable relied heavily on environmental review documents from the 1980s, which it claimed had analyzed the impacts of future "maintenance" work and provided mitigation measures to address those impacts.  But if Sable's basis for the development of protection measures is the environmental review conducted 40 years ago, it could not have fully incorporated appropriate considerations. since many sensitive resources have been identified or designated since that initial environmental review occurred in 1985. In particular, several species that are present along the pipeline corridor have since been listed and protected under the federal Endangered Species Act, and areas have been designated as Critical Habitat for them No analysis or consideration of these species was made in the original

**Exhibits - Page 236**

permit and supporting documents because these were drafted in the 1980s. In contrast, the Southern California Distinct Population Segment of Steelhead was federally listed as Endangered in 1997 under the Endangered Species Act and state listed in 2022; the tidewater goby was federally listed as Endangered in 1994; the California red legged frog was federally listed as Threatened in 1996; and the southwestern pond turtle was proposed as federally Threatened in 2023.[7]

Additionally, the manner of work currently being carried out on the Pipelines appears incompatible with the original design and construction authorized in 1987. Specifically, these Pipelines were designed, analyzed and permitted to be covered in a layer of insulation so they could transport heated oil that would otherwise be too viscous to transport by pipeline.  In fact, the Pipelines were one of the first of this kind to be constructed and operated. However, the work currently being carried out by Sable has resulted in the permanent removal of the pipeline's insulation from over 100 individual sections, some of which extend for close to 100 feet in length.  This is because we learned as a result of the 2015 spill that the original line's design was flawed.  The insulation layer, designed to keep the oil warm, also impaired the functioning of the cathodic protection system that was to prevent corrosion.  Sable is therefore actively removing insulation from the line as part of the current work – something that would have been unheard of as part of the original design and thus the authorizations provided for it.  Moreover, Sable has acknowledged, in its application to the Office of the State Fire Marshal (OSFM) for a "State Waiver" that the corrosion protection strategy described and approved in the original authorizations for the pipeline's construction and operation – namely, a cathodic protection system – cannot appropriately manage the risk of corrosion under the pipeline's insulation and an entirely new strategy and approach must be developed.  Sable proposes this new strategy and approach in its application to OSFM and in its December 17, 2024, letter in response to that application, OSFM provides Sable with 12 pages of specific protocols and conditions (67 in total) that must be added to further expand Sable's proposed approach. None of this was considered, analyzed, described or approved in the 1980s permits issued for the original construction of the pipeline. The removal of the pipeline's insulation and implementation of this new strategy for managing corrosion risk represents such a fundamental shift in the pipeline's design and operation that resuming operations under this new system would not be consistent with the existing permit and should necessitate an amendment to the original permit due to the significant deviation between what was analyzed, permitted and constructed and what Sable has been actively trying to transform the pipeline and its operation into through the current activities.

As also discussed here, several sites are in, or adjacent to, ESHA, including coastal sage scrub, lemonadeberry scrub, wetland or drainages, and are also in, or near, Mapped Wetlands. Other work sites are in annual or native grassland. Importantly, native grasslands are ESHA, while annual grasslands are ESHA if they support rare species, under Policy NS-4 (Coastal) of Santa Barabara County's Gaviota Coast Plan. While there appears to damage to these areas, the full extent of the damage is difficult for Commission staff to analyze fully as vegetation was removed, without first providing the Commission

with information, or biological surveys carried out by resource agency-approved independent experts at the appropriate times of year.

While Sable temporarily ceased operations on the onshore locations of the Pipeline after receiving the November EDCDO, the company quickly shifted operations offshore and carried out additional development activities, beginning on November 29, 2024, and without the benefit of a CDP. These activities include, but are not limited to, the deployment of an unspecified number of sand and concrete bags. Specifically, the project deployed a remotely operated vehicle ("ROV") to place concrete bags along more than 750 linear feet of the pipelines to create support piers along 14 identified spans of between 41 and 70 feet. These activities took place over three days from November 29, 2024, to December 1, 2024.

On December 13, 2024, Commission Staff met via video conference with Santa Barbara County Planning and Development staff ("County") staff. , Commission staff learned that during this conversation, instead of submitting application for CDPs for the onshore violations described in the EDCDO, Sable, instead, sought authorization for those onshore violations described above through the County's zoning clearance process. In this meeting, Commission staff were informed that Sable had submitted zoning clearance applications to the County on November 22, 2024, and December 5, 2024, requesting authorization for pipeline "anomaly repair work" conducted along the Las Flores Pipelines, CA-324 and CA-325. However, in this conversation, Commission staff were provided assurances that no such applications would be granted without follow up discussions with the Commission.

On January 10, 2025, Commission staff held a follow up video conference call with the County to, again, discuss Sable's pending zoning clearance applications, as well as the potential for a consolidated coastal development permit covering both onshore and offshore development activities. During this conversation, County staff agreed to follow up with information, including the citations and provisions within existing County issued permit(s) that the County believed might have pre-authorized the recently completed and proposed Pipeline work, as well as any other evidence Sable provided that the County found to be compelling. The parties to the call further confirmed that they would have a follow-up discussion before any County approval of Sable's Zoning Clearance applications. Despite this, however, no such information was received, and Commission staff, therefore, followed up on this conversation through email, on February 7, 2025, again requesting this information. (Exh 66)

On February 12, 2025, Commission staff received a letter from the County, in response to the prior request made by Commission staff that the County agree to the Commission's review of a consolidated permit application, pursuant to California Public Resources Code section 30601.3(a)(2). In this letter, the County stated that it had concluded that the "anomaly repair work" addressed in Sable's zoning clearance applications "is authorized by existing permits" and therefore no further application to, or action by, the County is required. However, the County expressed its support for the Commission's review of a consolidated permit application, if submitted by Sable.

In addition to this letter, the County provided Commission staff with copy of an additional letter, which the County sent to Sable, notifying Sable that work addressed in Sable's zoning clearance permits "is covered by prior permits," though neither letter provided any citation to or quotation of any language in any such permits to support this assertion.

In response to these two letters and a February 14, 2025, request from the Environmental Defense Center, (Exh, 48) on February 16, 2025, the Executive Director issued a letter to the County initiating a review of the County's determination, pursuant to Section 13569 of the Commission's regulations, and requesting a complete copy of any coastal development permit applications submitted by Sable and/or its predecessor(s) for the shutoff valve installation work on the Pipelines and Sable's application for the zoning clearance(s) for the repair anomaly work along the Pipelines.

Additionally, on February 16, 2025, the Executive Director, provided Sable with notice of her intent to issue a new EDCDO to Sable. In this letter, the Executive Director responded to arguments that Sable submitted on February 14, purporting to support the position the County had taken, and explained why, despite those arguments, based on the information Commission staff had received to date, she continued to believe that Sable's proposed activities lacked the necessary Coastal Act authorization. The Executive Director therefore directed Sable to confirm, in writing, by February 17, 2025, that Sable would cease all development as described in, and subject of, that letter unless and until Sable either: (a) demonstrates, to the Executive Director's satisfaction, that it already possesses the necessary Coastal Act authorization for the work, or (b) obtain a new, final, operative CDP or other valid Coastal Act authorization specifically covering the work at issue and comply with the terms of any final, validly issued CDPs. On February 17, 2025, Commission staff received a letter from Sable reiterating their position that Sable's work "does not constitute a violation of the Coastal Act or the County's LCP because it is authorized under the pipelines' existing CDPs and other approvals."

In the following weeks, Commission staff made a concerted effort to work with Sable to resolve both onshore, and offshore violations through numerous conversations. During these conversations, Sable indicated a willingness to submit ATF applications for the development undertaken at both onshore, and offshore locations, if such could be done under protest. Commission staff agreed to work with Sable, and assist in this application process, with hopes that this would be a productive step toward further fully resolving all violations. In addition, Commission staff spent a considerable amount of time engaging in several conversations with Sable as to terms for the proposed Cease and Desist, Restoration, and Administrative Penalty orders, as noticed in the February EDCDO. Over the course of these conversations, Sable continually indicated a willingness to find agreeable terms, and, to that end, Commission staff worked tirelessly to provide a mechanism that would provide resolution. Unfortunately, despite these efforts on the part of Commission staff, Sable ultimately refused to engage in any further productive conversations and declined to move forward with any potential consent order process.

## IV.    BASIS FOR ISSUING CEASE AND DESIST ORDER

### A.  Statutory Provision

The statutory authority for issuance of these Cease and Desist Orders is provided in Coastal Act Section 30810, which states, in relevant part:

> *(a) If the commission, after public hearing, determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing the permit, or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order directing that person or governmental agency to cease and desist.  The order may also be issued to enforce any requirements of a certified local coastal program*

Additionally, Section 30810 (b) provides that, in part

> (b) *The cease and desist order may be subject to such terms and conditions as the commission may determine are necessary to ensure compliance with this division, including immediate removal of any development material or the setting of a schedule within which steps shall be taken to obtain a permit pursuant to this division.*

### B.  Jurisdiction

Santa Barbara County's Local Coastal Program ("LCP") was adopted by the Board of Supervisors on January 7, 1980, and was partially certified by the Commission on March 17, 1981. After an LCP is certified by the Commission, review authority over new development within the coastal zone rests with the locality; development appealable to the Commission is defined in Section 35-58 of the LCP (and Section 30603 of the Coastal Act) to include development approved by the County between the sea and the first public road paralleling the sea.

Once the Commission has certified a locality's LCP, the locality has inherent authority, via its police power, to take enforcement actions for violations of its LCP. The Commission also retains enforcement authority including under Coastal Action section 30811 and in the specific circumstances enumerated in Coastal Act Sections 30810(a) to address violations of the LCP. Pursuant to Section 30810(a) of the Coastal Act, the Commission can issue a cease and desist order to address an LCP/Coastal Act violation within a certified area if 1) the local government requests the Commission assume enforcement responsibility; 2) the Commission requests that the local government take action and the local government declines to act or does not take action in a timely manner; or 3) if the local government is a party to the violation.

On September 20, 2024, Commission staff sent an email to the County, providing notification that the Commission learned of development activities being undertaken along the Pipelines and informing the County of Commission staff's position that such work

**Exhibits – Page 240**

required Coastal Act authorization. This email message further requested the County take formal enforcement action and provided "… the Commission will assume enforcement jurisdiction based on the understanding that you are declining this request unless you indicate otherwise by close of business on Sept. 23, 2024." In response, the County stated, in email, that they were looking into the issue, and would respond "ASAP". The County did not provide further response to this email, nor did the County affirmatively decline the Commission's request to take formal enforcement action, before the deadline provided.

Commission staff, additionally, addressed the issue of jurisdiction through the exchange of several letters in February of 2025. On February 12, 2024, the County sent a letter to Commission staff responding the Commission staff's request that the County consent to the Commission's processing of a consolidated CDP covering both Sable's onshore activities along the Pipelines and its offshore work. In this letter, the County asserted that the pending onshore work, referred to as "anomaly repair work" was "…authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement. Thus, no further application to or action by the County is required." However, the County further stated that, despite their position that Sable's work was authorized, the County would agree to a consolidated CDP process, if Sable also agreed. Commission staff responded explaining that they disagreed with the County's assertion regarding the existing permits, and found them problematic for multiple reasons, both procedural and substantive. Substantively, Commission staff had repeatedly asked both the County and Sable, for any such specific language or permit conditions that would support this proposition that future work was pre-authorized through existing permits issued nearly 40 years ago. Commission staff had additionally carried out extensive efforts to locate any such language or permit condition. The County has not, to this day, provided any citations to any evidence to supports its conclusion. On February 14, 2024, Sable provided its own analysis, which it then repeated and expanded in its March 10, 2024 Statement of Defense, and that analysis is discussed in detail below, in Section VII, and that discussion is incorporated herein by reference.

Notably, and as discussed above, Commission staff had also continuously asked for detailed work plans relating the work in which Sable has undertaken. Without a detailed work plan to provide specifics as to the scope, nature, and location of the completed work, and future work that is proposed to occur, it is unclear to us how the County could conclude that such work is covered by prior permits. In other words, without knowing what work is going to be carried out, how could the County determine it was included in existing permits.  Further, while its letter additionally asserts that the County fully conducted an analysis of review of all relevant permit history, as well as potential implications of the County's coastal zone ordinance, the letter provided no citations or actual permit language to support that assertion.

Moreover, Commission staff found this letter to be procedurally problematic as the County provided no forewarning as to the issuance of this letter. In fact, in a January 10, 2024, video conference meeting between Commission staff and the County, the County agreed to follow up with Commission staff with information, including relevant citations and

**Exhibits - Page 241**

provisions within existing County-issued permits that the County believed preauthorized the activities in which Sable conducted onshore, along the Pipelines, prior to taking action. In this conversation, Commission staff further confirmed the County and Commission staff, would have a follow-up discussion before any County approval of Sable's Zoning Clearance applications. The County provided no such citations or provisions, and Commission staff, therefore, followed up on this conversation through email, on February 7, 2025, again requesting this information. Unfortunately, Commission staff received no response before receiving the County's February 12, 2025, letters.

On February 14, 2024, Commission staff received a letter from the Environmental Defense Center requesting, pursuant to Section 13569(c) of the Commission's regulations, that Commission staff review the County's determinations regarding the activities undertaken by Sable at onshore locations, on the Pipeline, as asserted in the County's February 12, 2024, letter.

Thus, on February 16, 2024, Commission staff provided the County with a letter stating, pursuant to section 13569(c) of the Commission's regulations, the Executive Director was initiating a formal review process by requesting a copy of any coastal development permit applications submitted by Sable and/or its predecessor(s) for the safety valve installation work on the Pipeline and Sable's application the for the zoning clearance(s) for the repair anomaly work along the Pipelines, as well as the County's determinations on these matters, including the specific grounds for the determinations (and the permit files and records on which the County relies for its determinations. Further, Commission staff provided the County with an additional letter on February 17, 2024, again, requesting the County take formal enforcement action.

To date, Commission staff have not received a full response to this request. Though the County provided a follow up letter on February 24, 2025, asserting a claim that the Dispute Resolution process is inapplicable in this instance, Commission staff disagree and have attempted to obtain information from and have conversations with the County to resolve this interpretation. While the County has been responsive about providing documents to Commission staff, County staff continue to fail to respond to the core request, perpetuating a dynamic that has now persisted since at least January, 10, 2025, when Commission staff first asked County staff to identify the specific grounds for its determinations -- the exact section(s) within the County's 1987 coastal development permit and/or supporting documents that purportedly provide CDP authorization for the pipeline work at issue.

Commission staff have now requested this information from County staff on no less than seven separate occasions spanning nearly three months and have provided County staff with ample opportunity to provide it and demonstrate that a factual basis exists to support its position and determination regarding the scope of the County's 1987 coastal development permit. Commission staff have also thoroughly reviewed all of the documents County staff provided but have not located any basis for the County's position that there was prior CDP authorization for Sable's recent and current pipeline work.

**Exhibits - Page 242**

As such, the second prong of Section 30810(a), has been met in that the County has declined to act to enforce its LCP, despite two separate instances in which Commission staff has requested the County do so.

### C. Application to Facts

This section and this Staff Report set forth the basis for the issuance of the proposed Cease and Desist Order by providing substantial evidence that existing development meets all of the required grounds listed in Coastal Act Section 30810 for the Commission to issue a Cease and Desist Order.

*Violations of the Coastal Act*
Development, as described below, that required a CDP has occurred at onshore locations of the Pipelines, and at offshore locations along separate oil and water pipelines, in state coastal waters, without the required CDP. Section 30600(a) of the Coastal Act, state that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the Coastal Zone must obtain a coastal development Permit. "Development" is defined broadly by Section 30106 of the Coastal Act as follows, in relevant part:

> *""Development' means, <u>on land, in or under water, the placement or erection of any solid material or structure</u>; <u>discharge</u> or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; <u>grading, removing</u>, dredging, mining, <u>or extraction of any materials</u>; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; <u>change in the intensity of use of water, or of access thereto</u>; <u>construction, reconstruction, demolition, or alteration of the size of any structure</u>, including any facility of any private, public, or municipal utility…" (emphasis added)*

In this case, development was undertaken at onshore locations of the Pipelines including, but not limited to; excavation of underground pipeline; removal of major vegetation; grading and widening of roads; placement of fill in wetlands; installation of metal plates over water courses; dewatering and discharge of water; removal, replacement, and reinforcement of a pipeline and pipeline infrastructure; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-3214 and CA-325, Development also occurred at offshore locations including, but not limited to, deploying sand/cement fill materials on the seafloor adjacent to, and below, Sable's out-of-service offshore oil and water pipelines. Each of these activities clearly meets the definition of development under Section 30106 and each required a CDP as required under the Coastal Act.

As indicated above, one may not perform such development in the Coastal Zone unless it is authorized by a CDP.  No CDP has been issued for any of the work described above. Sable argues that the work was authorized by permits granted in the 1980s to authorize

the original construction of the pipeline system and the Santa Ynez Unit development and production plan.  However, those permits do not specifically authorize any of the work at issue here, and this issue is discussed in much greater detail in Section VII, below, in which the Commission responds to Sable's Statement of Defense.

Further, construction equipment and material related to the unpermitted development activities, as well as placement of solid fill and other materials in some locations, all remain and are therefore causing continued resource damage as defined in the Coastal Act, and the Commission regulations, and therefore constitutes an ongoing violation of the Coastal Act, and its resource protection provisions. Commission staff understand that while the unpermitted development activities undertaken offshore, along Sable's oil and water pipelines, have been completed, the materials remain in place. In addition, unpermitted development activities, at onshore locations along the Pipelines have continued, and the removal of vegetation and placement of solid materials in many places remain.

Lastly, Section 30610(d) of the Coastal Act enumerates categories of development that are exempt from the requirement to obtain a permit; the development undertaken by Sable does not fit within these exempt categories and therefore required a coastal development permit.

Sable's work offshore is subject to the Commission's jurisdiction, and Sable's work onshore is largely subject to Santa Barbara's permitting jurisdiction (with areas subject to the Commission's appeals jurisdiction), but the Commission's retained enforcement authority is predicated, in part, on Section 30810(a) of the Coastal Act, which states the following:

> *The order may also be issued to enforce any requirements of a certified local coastal program or port master plan, or any requirements of this division which are subject to the jurisdiction of the certified program, or plan, under and of the following circumstances…the commission requests and the local government or port governing body declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources…"*

As described above, the County has declined to take formal enforcement a, regarding violations undertaken, by Sable, at locations onshore, along the Pipelines. On September 20, 2024, after learning of Sable's development activities undertaken onshore, along the Pipelines, Commission staff-initiated communications with the County, informing them of the development undertaken, the Commission's position that the development needed Coastal Act authorization and requesting that the County take enforcement action. These communications also noted that the Commission would assume jurisdiction under the Coastal Act provisions regarding enforcement jurisdiction if the County declined to act. The County responded that it would review and respond but no further response was received objecting to the Commission assuming jurisdiction over the matter Further, despite several conversations between Commission staff and the County, the County has taken the position that the work Sable has conducted onshore, along the Pipelines, is covered by prior permits issued nearly 40 years ago for the initial construction and installation of the

Pipelines, though the County has declined to provide any citation to or quotation of any language in any such existing permits to support this assertion. The Commission has reviewed the materials and disagree with this position as further analyzed in the Statement of Defense section of this Staff Report, and maintain that Sable must submit complete CDP applications, for both onshore, and offshore development activities.

In sum, the activities at issue clearly meet the definition of development under Section 30106, and no permit has been issued for the work.

Therefore, the development required a CDP and no CDP was issued.
It is only necessary to find that development has been undertaken without a required permit or in violation of a previously issued permit in order for the Commission to issue a cease and desist order.

## V.    Basis for Issuance of Restoration Order

### A.  Statutory Provisions

The statutory authority for issuance of this Restoration Order is provided in Section 30811 of the Coastal Act, which states, in relevant part:

> *In addition to any other authority to order restoration, the commission… may, after a public hearing, order restoration of a site if it finds that [a] the development has occurred without a coastal development permit from the commission, local government, or port governing body, [b] the development is inconsistent with this division, and [c] the development is causing continuing resource damage.*

The following paragraphs and this Staff Report set forth the basis for the issuance of the Cease and Desist and Restoration Orders by providing substantial evidence that the development meets all of the required grounds listed in Section 30810 and 30811 for the Commission to issue a Cease and Desist and Restoration Order.

### B.  Application of Facts

The following paragraphs and this Staff Report set forth the basis for the issuance of the Cease and Desist and Restoration Orders by providing substantial evidence that the development meets all of the required grounds listed in Section 30810 and 30811 for the Commission to issue a Cease and Desist and Restoration Order

### 1.  Development Without a Permit

The statutory provision requires the Commission to demonstrate that Sable undertook or maintained development that requires a CDP from the Commission without first securing one.

This element for 30811 is the same as required for 30810 and is discussed above and incorporated here by reference.

## 2. Development Inconsistent with the Coastal Act

The unpermitted development described herein is inconsistent with several resource protection policies enumerated under the Coastal Act, including:

Section 30240 (requiring protection of environmentally sensitive habitat areas or ESHA);

Section 30233 (requiring protection of wetlands);

Section 30231 (requiring protection of biological productivity and water quality);

Section 30230 (protection of marine resources)

Section 30234 (protection of commercial fishing and recreational boating facilities).

The unpermitted development caused significant negative impacts to the above-listed coastal resources and was inconsistent with a number of Coastal Act policies including those mentioned above. The areas surrounding the Pipelines include ESHA in some locations including, but not limited to, coastal scrub, chaparral, riparian and wetland habitat, woodlands, and annual and native grasslands. Examples of specific sensitive plant species that have been adversely impacted by the development include but are not limited to: Lemonade berry scrub *(Rhus integrifolia)*, Red willow *(Salix laevigata)*, Coast Live Oak *(Quercus agrifolia)*, as well as other rare vegetation communities and alliances. Additionally, several development sites are within the known occurrence range of the Gaviota tarplant *(Deinandra increscens)*, a federally and state listed special-status plant species. These areas also provide habitat to support several rare species, including the California red legged frog *(Rana draytonii)*, southern California steelhead *(Oncorhynchus mykiss)*, southwestern pond turtle *(Actinemys pallida)*, as well as the Dusky-footed Woodrat *(Neotoma macrotis)*. Federally designated critical habitat for several of these species is also located within areas Sable has and/or proposes to carry out pipeline excavation, inspection and replacement or reinforcement activities.  The activities also had likely impacts on water quality and biological productivity and marine resources via things such as erosion into streams, given the location of the work and the proximity to such resources, as documented in the photos of the work in progress noted above. In addition, the activities undertaken offshore, along the separate oil and water pipelines in state waters, had the potential to result in adverse impacts to marine resources such as damage or disturbance to sensitive seafloor habitats, degradation of water quality, disruption to commercial and/or recreational fishing, and release of marine debris. The coastal waters in this are known to support several species of marine mammals, including Harbor seals *(Phoca vitulina)*, California sea lions *(Zalophus californianus)*, and several species of common dolphin and whales. Project offshore activities had the potential to adversely impact these species. Given the location and the activities, the violations offshore also had the potential to adversely impact marine resources, commercial fishing and recreational boating facilities.

## 3. Continuing Resource Damage

**Exhibits - Page 246**

The unpermitted development is causing 'continuing resource damage', as those terms are defined by 14 CCR Section 13190.

14 CCR Section 13190(a) defines the term 'resource' as it is used in Section 30811 of the Coastal Act as follows:

> *'Resource' means any resource that is afforded protection under the policies of Chapter 3 of the Coastal Act, including but not limited to public access, marine and other aquatic resources, environmentally sensitive wildlife habitat, and the visual quality of coastal areas. The unpermitted development here took place in and around environmentally sensitive habitat areas, wetlands, areas of scenic visual resources, and so coastal resources were affected here.*

The term 'damage' in the context of Restoration Order proceedings is defined in 14 CCR Section 13190(b) as follows:

> *Damage' means any degradation or other reduction in quality, abundance, or other quantitative or qualitative characteristic of the resource as compared to the condition the resource was in before it was disturbed by unpermitted development.*

In this case, the damage caused by the unpermitted development includes degradation of environmentally sensitive habitat area and impairing of water quality. Thus, damage to coastal resources did occur here.

The term 'continuing' is defined by 14 CCR Section 13190(c) as follows:

> *'Continuing', when used to describe 'resource damage', means such damage, which continues to occur as of the date of issuance of the Restoration Order.*

As of this time, the unpermitted development that is the subject of these proceedings and the results thereof is ongoing and in many cases the development remains in place, and the impacts of such development remain in place, with the result of continuing resource damage. As described above, the various types of unpermitted development result in a variety of impacts to coastal resources, as is discussed further below. For example, the removal of vegetation and the grading of environmentally sensitive habitat areas can continue to impact coastal resources by stimulating growth and establishment of invasive weedy species which can prevent native plants from returning and diminish the suitability of the area for rare and sensitive wildlife species. Fill in wetlands continues to impact the habitat and the species reliant thereon unless and until some restoration is successful. Because excavation occurred on steep slopes, without proper protections in place, can contribute to ongoing erosion and, with ineffective erosion controls in place, the potential for harm to coastal resources is even greater.

As described above, the unpermitted development is causing damage to resources protected by the Coastal Act that continue to occur as of the date of this proceeding, and therefore damage to resources is 'continuing' for purposes of Section 30811 of the Coastal

Act. The damage caused by the unpermitted development, which is described in the above paragraphs, satisfies the regulatory definition of 'continuing resource damage.' Thus, the third and final criterion for issuance of a Restoration Order is therefore satisfied.

### C. Jurisdiction

Santa Barbara County's Local Coastal Program ("LCP") was adopted by the Board of Supervisors on January 7, 1980, and was partially certified by the Commission on March 17, 1981. After an LCP is certified by the Commission, review authority over new development within the coastal zone rests with the locality; development appealable to the Commission is defined in Section 35-58 of the LCP (and Section 30603 of the Coastal Act) to include development approved by the County between the sea and the first public road paralleling the sea.

Once the Commission has certified a locality's LCP, the locality has inherent authority, via its police power, to take enforcement actions for violations of its LCP. The Commission also retains enforcement authority including under Coastal Action section 30811 and in the specific circumstances enumerated in Coastal Act Sections 30810(a) to address violations of the LCP. Pursuant to Section 30810(a) of the Coastal Act, the Commission can issue a cease and desist order to address an LCP/Coastal Act violation within a certified area if 1) the local government requests the Commission assume enforcement responsibility; 2) the Commission requests that the local government take action and the local government declines to act or does not take action in a timely manner; or 3) if the local government is a party to the violation.

On September 20, 2024, Commission staff sent an email to the County, providing notification that the Commission learned of development activities being undertaken along the Pipelines and informing the County of Commission staff's position that such work required Coastal Act authorization. This email message further requested the County take formal enforcement action and provided "… the Commission will assume enforcement jurisdiction based on the understanding that you are declining this request unless you indicate otherwise by close of business on Sept. 23, 2024." In response, the County stated, in email, that they were looking into the issue, and would respond "ASAP". The County did not provide further response to this email, nor did the County affirmatively decline the Commission's request to take formal enforcement action, before the deadline provided.

Commission staff, additionally, addressed the issue of jurisdiction through the exchange of several letters in February of 2025. On February 12, 2024, the County sent a letter to Commission staff responding the Commission staff's request that the County consent to the Commission's processing of a consolidated CDP covering both Sable's onshore activities along the Pipelines and its offshore work. In this letter, the County asserted that the pending onshore work, referred to as "anomaly repair work" was "…authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement. Thus, no further application to or action by the

**Exhibits - Page 248**

County is required." However, the County further stated that, despite their position that Sable's work was authorized, the County would agree to a consolidated CDP process, if Sable also agreed. Commission staff responded explaining that they disagreed with the County's assertion regarding the existing permits, and found them problematic for multiple reasons, both procedural and substantive. Substantively, Commission staff had repeatedly asked both the County and Sable, for any such specific language or permit conditions that would support this proposition that future work was pre-authorized through existing permits issued nearly 40 years ago. Commission staff had additionally carried out extensive efforts to locate any such language or permit condition.  Although the County has not, to this day, provided any citations to any evidence to supports its conclusion, on February 14, Sable provided its own analysis, which it then repeated and expanded in its March 10 Statement of Defense, and that analysis is discussed in detail below, in Section VII, and that discussion is incorporated herein by reference.

Notably, and as discussed above, Commission staff had also continuously asked for detailed work plants relating the work in which Sable has undertaken. Without a detailed work plan to provide details as to the scope, nature and location of the completed work and future work that is proposed to occur, it is unclear to us how the County could conclude that such work is covered by prior permits. In other words, without knowing what work is going to be carried out, how could the County determine it was included in existing permits.  Further, while its letter additionally asserts that the County fully conducted an analysis of review of all relevant permit history, as well as potential implications of the County's coastal zone ordinance, the letter provided no citations or actual permit language to support that assertion.

Moreover, Commission staff found this letter to be procedurally problematic as the County provided no forewarning as to the issuance of this letter. In fact, in a January 10, 2024, video conference meeting between Commission staff and the County, the County agreed to follow up with Commission staff with information, including relevant citations and provisions within existing County-issued permits that the County believed preauthorized the activities in which Sable conducted onshore, along the Pipelines, prior to taking action. In this conversation, Commission staff further confirmed the County and Commission staff, would have a follow-up discussion before any County approval of Sable's Zoning Clearance applications. The County provided no such citations or provisions, and Commission staff, therefore, followed up on this conversation through email, on February 7, 2025, again requesting this information. Unfortunately, Commission staff received no response before receiving the County's February 12, 2025, letters.

On February 14, 2024, Commission staff received a letter from the Environmental Defense Center requesting, pursuant to Section 13569(c) of the Commission's regulations, that Commission staff review the County's determinations regarding the activities undertaken by Sable at onshore locations, on the Pipeline, as asserted in the County's February 12, 2024, letter.

Thus, on February 16, 2024, Commission staff provided the County with a letter stating, pursuant to section 13569(c) of the Commission's regulations, the Executive Director was initiating a formal review process by requesting a copy of any coastal development permit

**Exhibits - Page 249**

applications submitted by Sable and/or its predecessor(s) for the safety valve installation work on the Pipeline and Sable's application the for the zoning clearance(s) for the repair anomaly work along the Pipelines, as well as the County's determinations on these matters, including the specific grounds for the determinations (and the permit files and records on which the County relies for its determinations. Further, Commission staff provided the County with an additional letter on February 17, 2024, again, requesting the County take formal enforcement action.

To date, Commission staff have not received a full response to this request. Though the County provided a follow up letter on February 24, 2025, asserting a claim that the Dispute Resolution process is inapplicable in this instance, Commission staff disagree and have attempted to obtain information from and have conversations with the County to resolve this interpretation. While the County has been responsive about providing documents to Commission staff, County staff continue to fail to respond to the core request, perpetuating a dynamic that has now persisted since at least January, 10, 2025, when Commission staff first asked County staff to identify the specific grounds for its determinations -- the exact section(s) within the County's 1987 coastal development permit and/or supporting documents that purportedly provide CDP authorization for the pipeline work at issue.

Commission staff have now requested this information from County staff on no less than seven separate occasions spanning nearly three months and have provided County staff with ample opportunity to provide it and demonstrate that a factual basis exists to support its position and determination regarding the scope of the County's 1987 coastal development permit. Commission staff have also thoroughly reviewed all of the documents County staff provided but have not located any basis for the County's position that there was prior CDP authorization for Sable's recent and current pipeline work.

As such, the second prong of Section 30810(a), has been met in that the County has declined to act to enforce its LCP, despite two separate instances in which Commission staff has requested the County do so.

## VI.   BASIS FOR IMPOSITION OF ADMINISTRTIVE PENALTIES

### A.  Statutory Provisions

The statutory authority for imposition of administrative penalties for violations of non-access provisions of the Coastal Act is provided in the Coastal Act in Public Resources Code Section 30821.3[8], which states, in relevant part:

(a) In addition to any other penalties imposed pursuant to this division, a person, including a landowner, who is in violation of any provision of this division other than public access, including, but not limited to, damage to archaeological and wetlands resources and damage to environmentally sensitive habitat areas, is subject to an

---

[8] All section references in this section, III.C, are to the California Public Resources Code, and as such, to the Coastal Act, unless otherwise indicated.

administrative civil penalty that may be imposed by the commission in an amount not to exceed 75 percent of the amount of the maximum penalty authorized pursuant to subdivision (b) of Section 30820 for each violation. The administrative civil penalty may be assessed for each day the violation persists, but for no more than five years.

Through the proposed Cease and Desist Order, Restoration Order, and Administrative Penalty Order, Sable Offshore Corp. would be required to pay penalties based on the Section 30821.3 as described above, and as detailed below.

## B. Application to the Facts

1. The Violations are Ongoing:

As the courts have consistently recognized, the Coastal Act should be interpreted broadly, since the Coastal Act and case law says that it is to be "liberally construed to accomplish [the act's] purposes and objectives." (See e.g., Pacific Palisades Bowl Mobile Estates, LLC. v. City of Los Angeles (2012) 55 Cal.4th 783, 796.) The various actions and inactions by Sable have led to ongoing adverse impacts to coastal resources and constitute ongoing violations of the Coastal Act's resources protection provisions generally. The impact to coastal resources from these actions and inactions is borne by the public every day and will be until this matter is resolved.

2. Exceptions Do Not Apply:

De Minimis Violations

There are some statutory conditions on when the Commission can impose administrative penalties. One such limit is in Section 30821.3(f) of the Coastal Act, which provides that:

> In enacting this section, it is the intent of the Legislature to ensure that unintentional, minor violations of this division that only cause de minimis harm will not lead to the imposition of administrative penalties if the violator has acted expeditiously to correct the violation.

This language establishes four criteria, all of which must be met for the violation to be deemed de minimis under 30821.3(f). The violation must: (1) be unintentional, (2) be "minor," (3) cause only de minimis harm, and (4) be corrected expeditiously.

None of the Section 30821.3(f) criteria is applicable to this case. Sable's actions in undertaking development, at both onshore and offshore locations, without requisite CDPs were not unintentional. While unlikely, if Sable were initially unaware of the Coastal Act implications of the development they undertook at onshore locations, along the Pipelines, they were directly informed, first informally and then through a Notice of Violation letter, in September 2024, yet Sable has continued to undertake these activities through today. With specific regard to the activities taken at locations offshore, Sable was informed of the

**Exhibits - Page 251**

need for Coastal Act authorization for proposed work, before it was undertaken, but chose to undertake the work without first securing a CDP, nonetheless. As such, the actions with regard to Coastal Act violations at both, onshore and offshore, locations have not been undertaken unintentionally. Moreover, these actions have resulted in ongoing harms to coastal resources, and although the full extent of this impact has not been fully disclosed to Commission staff, it is clear such impacts extend to the areas surrounding the onshore locations of the Pipelines and have potential to negatively impact important habitat areas which support rare and sensitive species, as more fully discussed above. These violations thus cannot be considered minor, nor have they resulted in *de minimis* harm. Lastly, Sable has declined to affirmative actions to correct the violations, at either onshore or offshore locations and further, has continued operations at onshore locations, along the Pipelines, despite an active Cease and Desist order.

Cure Period

In order to encourage quick and informal resolutions of violations, the Coastal Act also has a provision to allow, in certain limited circumstances, a period of time in which a party can "cure" the violation without penalties attaching.  This is set forth in Section 30821.3(h) of the Coastal Act, which lists circumstances in which a property owner can prevent the imposition of administrative penalties by correcting the violation within 30 days of receiving written notification from the Commission regarding the violation. Section 30821.3(h) is inapplicable to the matter at hand.

For 30821.3(h) to apply and prevent the issuance of an administrative penalty, there are several requirements, all of which must be met: 1) the violation must be remedied within 30 days of notice; and 2) the violation must be able to be resolved without needing to undertake additional development that would require Coastal Act authorization. In addition, opportunity for a cure does not apply to cases involving resolutions of violations of permit conditions, since the party with a permit would have had previous notice of the requirements of permits. This section does not apply here, for several reasons.

First, Sable did not resolve this within 30 days of receiving notice.  Sable received written notice of the onshore Coastal Act violations at issue in the form of a Notice of Violation letter dated September 27, 2024 (Exh. 2), which was followed up in the Notice of Intent to Issue an EDCDO on October 4, 2024 (Exh. 3), the issuance of the EDCDO on November 12, 2024 (Exh. 4), and by a second EDCDO issued on February 18, 2024 (Exh. 8) which additionally provided Notice of Intent to commence a formal proceeding before the Commission to consider issuance of a Commission Cease and Desist Order, Restoration Order and Administrative Penalty. Sable additionally received written notice of the offshore Coastal Act violations in the form of a Notice of Violation letter issued February 11, 2025 (Exh. 5). Sable was fully informed through all of these documents, and in numerous and extensive conversations over the course of multiple months, as detailed above. Sable has not fully complied with any of the above listed actions and has indicated their current position as continuing to refuse to comply in any manner. As such, the violations were not only not remedied in a period of 30 days, but remain unresolved, to date.

Second, the violations need legal authorization to  be resolved, as has been reiterated to Sable consistently, in numerous letters, and over the course of multiple conversations, through a full and complete application for ATF CDP for all development, both onshore and offshore, that has been conducted to date, (as well as needing an application for a CDP for any onshore, or offshore, proposed, future development).

In summary, the cure pursuant to Section 30821.3(h) is inapplicable in this matter.

### C.  Penalty Amount

Under section 30821.3(a) of the Coastal Act, the Commission may impose penalties in "an amount not to exceed 75 percent of the amount of the maximum penalty authorized pursuant to subdivision (b) of Section 30820 for each violation." Section 30820(b) authorizes civil penalties that "shall not be less than one thousand dollars ($1,000), nor more than fifteen thousand dollars ($15,000), per day for each day in which the violation persists." Therefore, the Commission may impose penalties of up to $11,250 per day (75% of $15,000) for each separate violation. 30821.3(a) also specifies that the "administrative civil penalty may be assessed for each day the violation persists, but for no more than five years." Section 30821.3 and Section 30820's use of daily penalties reflects the legislative intent in the Coastal Act to encourage quick resolution of violations and to deter lengthy, on-going violations and thereby provide greater protection of coastal resources. The daily penalty amounts are also intended to encourage prompt and effective compliance with the Coastal Act.

**Number of Violations**

In this case, staff grouped the violations into a total of 9 distinct categories or types of Coastal Act violations, based on what staff was able to identify, each of which they treated as one violation, even though each category arguably comprises many individual violations.  The Commission adopts this approach as a conservative approach to identifying the number of violations at issue. While the nature and extent of each separate violation may be slightly different, the cumulative impact of undertaking all of these actions, collectively, is considerable, especially as all actions were taken without specific, protective measures which could have been delineated through appropriate regulatory review processes, including by the Commission, California Department of Fish and Wildlife, California Department of Parks and Recreation and the Central Coast Regional Water Quality Control Board, all of which were avoided by Sable.

There are seven separate violations undertaken onshore along the Pipelines including, 1) excavation with heavy equipment; 2) removal of major vegetation; 3) grading and widening of roads; 4) installation of metal plates and fill in wetlands; 5) dewatering and discharge of water; 6) pipeline removal, replacement, and reinforcement; 7) installation of shutoff valves; as well as other development associated with the Las Flores Pipelines CA-324 and CA-325. There is an additional eighth violation which was undertaken at locations offshore in state waters: Sable undertook development including placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service oil and water pipelines. Lastly, the ninth violation arises from Sable's failures to comply with the EDCDOs issued in

**Exhibits - Page 253**

this matter.  Sable failed to fully comply with the first EDCDO, issued in November 2024, in that Sable did not submit any application for CDP for, either activities undertaken onshore, along the Pipelines, or at offshore locations of the pipeline. Moreover, Sable knowingly, and completely, refused to comply with the terms of the second EDCDO issued in February 2025. Recognizing that Sable complied with at least a portion of the first EDCDO, issued in November, and in order to be conservative, Commission staff recommend assessment of penalties for noncompliance with the second EDCDO, issued in February only. Thus, this would amount to an additional violation, with a cumulative amount of nine penalties in total.

**Number of Days**

Penalties under Section 30821.3 may be "assessed for each day the violation persists" up to a period of five years. In this case, the violations have persisted for varying amounts of time. With regard to the activities undertaken at locations onshore along the Pipelines, since we were not given notice of the activities, Commission staff are not aware of the exact date of when activities began. Images show an excavated trench, at location along the Pipelines, as early as June 2024. However, Commission staff first learned of these activities in a call with the County, on September 9, 2024. Thus, these activities were being undertaken, at the very least, by that date, and we have used that date as a conservative marker for calculation of the number of days of the violations.

Because these activities have been ongoing, the conservative date range for the activities undertaken onshore used to calculate penalties under 30821.3 would begin on September 9, 2024, and run through April 10, 2024, the date of today's hearing, or for 214 days.

However, the Commission staff recognizes that Sable did, temporarily comply with the directive to cease and desist activities, provided in the November EDCDO, (Exh. 4) and are therefore recommending the Commission apply a tolling period to the assessment of certain penalties, as described below. (though Sable did immediately resume operations on February 14, 2024). Thus, staff is recommending that the penalties under 30821.3 not be assessed for the period of time in which Sable was complying, at least in large part, with the first EDCDO, for certain, specified violations namely the dewatering and discharge or water, pipeline removal, replacement, and reinforcement, and installation of shutoff valves, as described in detail below, While Commission staff have concerns about whether the work was fully ceased during this time, and, and whether work actually commenced earlier than September 9, 2024, for purposes of calculated these specific activities, Commission staff have taken a conservative approach. It is important to note that these specified activities did negatively impact coastal resources greatly, as discussed below. However, Commission staff recognize that such impacts, while not corrected, were, at least, partially abated during the period of time in which Sable complied with the first EDCDO.

However, and as also described in greater detail, Commission staff do not feel this tolling of penalties should be applied to the full list of Coastal Act violations undertaken, since the impacts of other violations could not be abated by simply ceasing actively undertaking additional such activities. More specifically, this tolling period should not be applied to

**Exhibits – Page 254**

excavation with heavy equipment, installation of metal plates and fill in wetlands, removal of major vegetation, or grading and widening of roads, given that for these violations, coastal resource damage has been ongoing, despite temporary cessation of the additional activities itself.

There are 4 basic categories of violations: Onshore violations with tolling periods (as discussed above), Onshore violations without tolling periods, Offshore violations and violations of the Orders issued in this matter.  We discuss each in turn.

## Coastal Act Violations;
## Onshore, Along the Las Flores Pipelines CA-324 and CA-325

**Assessment of Penalties to Which Tolling Period is Applied:**

For those activities discussed above to which Commission staff believe it would be appropriate to toll the penalty period, the date range for assessment of penalties would be starting on December 19, 2024. On this date, Sable submitted to Commission staff an Interim Restoration Report, completed in compliance with the terms of the November EDCDO.  Commission staff recognize that the actions taken by Sable, in implementing the measures as required by the Interim Restoration Plan hopefully reduced the likelihood of certain environmental damage from worsening, and therefore believe this date is appropriate to begin the tolling period. However, once Sable resumed development activities on February 14, 2025, penalties should again be assessed after that date, as the damage to coastal resources would no longer be halted.

In sum, Commission staff recommend that three specified activities-- the, dewatering and discharge of water; pipeline removal, replacement, and reinforcement; and installation of shutoff valves, be assessed at lower penalty range, through tolling applied to the date range in which penalties are assessed. These activities, thus, would be assessed for a period of 156 days. The period of time between December 19, 2024, and February 14, 2025, amounts to a 58-day tolling period. Subtracting that tolling period (58 days) from the full date range in which violations would otherwise be assessed (which is period of 214 days, as described above), would result in a penalty assessment period, for these specific violations, of 156 days. For these three activities, Commission staff recommend that the penalty be assessed at $7,000 a day for a period of 156 days, (The full date range for violation, with tolling period of 58 days subtracted) for the three violations discussed above. In accordance with this calculation (156 days at $7,000/day), Commission staff specifically recommends a penalty in the amount of $1,092,000 for each of these three violations, or a total of $3,276,000.

**Assessment of Penalties to Which Tolling Period is Not Applied:**

For the remainder of the violations, as noted above, staff would not recommend applying a tolling period to the accrual of penalties. Again, in evaluating the severity of each violation and its impacts, it should be noted that even assuming there was a cessation of work during this time, certain activities and violations continued to have the potential to cause ongoing impacts to coastal resources, even when temporarily halted. Specifically, those

four activities are as follows: excavation with heavy equipment; removal of major vegetation; installation of metal plates and fill within wetlands, and the grading and widening of roads.  All of these activities caused significant environmental harms that temporary cessation of the physical activity does not alleviate. Without affirmative actions taken to correct these violations, their impacts are ongoing. Further, because of the extensive damage to coastal resources these activities caused, as described below, Commission staff recommend these three violations be assessed at the maximum daily penalty ($11,250) for the full period of 214 days, amounting to $2,407,500 for each of the violations or a total of $9,630,000.

## Coastal Act Violations;
## Offshore Locations of the Pipeline

In addition to the unpermitted development activities undertaken onshore, Sable has additionally undertaken unpermitted development activities at offshore locations of the pipeline, in state coastal waters, including the deployment of sand and cement bags on the seabed, along the pipeline, and span remediation work, as described above. After cessation of activities onshore, at areas covered by the EDCDO issued in November, Sable began undertaking activities at locations offshore, along the pipeline, commencing on November 29, 2025.

There were several communications between Commission permit staff and Sable, before these activities began. On September 24, 2024, Commission staff sent an email, as a follow-up to a phone call conversation on that day, informing Sable that work Sable intended to undertake, which was discussed during that phone call, would require a CDP, and encouraging Sable to work with the Commission before proceeding with any work. In fact, Commission staff specifically acknowledged in this email, that, though Sable intended to move quicky with the work, doing do would create a more complicated and challenging situation, and reiterated the need to coordination with Commission staff. Sable responded to this email and indicated, at least, a willingness to discuss the work further and planned to set up a future call. On November 7, 2024, Commission staff followed up with an email to Sable, in an effort to set up a phone call to, again, discuss Sable's plans for work at locations along the offshore pipelines. The following day, November 8, Commission staff and Sable shared email messages in a further attempt to set up a phone call and when they were unable to, Commission staff requested a written description of the work Sable planned to conduct. An email from Sable, sent on November 19, provided limited information as to the specifics of the work, and claimed that Sable was "committed to ensuring compliance with all necessary authorizations before proceeding with any work. In response, Commission staff reiterated that such work would require a complete CDP application. Further, Commission staff confirmed that, based on the previous conversations, Sable did not intend to proceed with work until Commission staff had the opportunity to more fully discuss the details of that work. Sable provided no response to this email, and thus, Commission staff sent a follow up email on January 10, 2024, again informing Sable of the need for CDP for the work Sable intended to undertake along the offshore locations of the pipeline and requested a status update as to any potential work. Sable provided no response to this email.

**Exhibits - Page 256**

Unfortunately, Commission staff instead received a letter from Sable's counsel on January 15, 2024, that Sable had conducted "inspections" along the offshore portions of the pipeline, then undertook the unpermitted activities discussed above. Again, this activity is one for which authorization, with appropriate conditions and mitigation if appropriate, likely could have been obtained through the Commission's CDP process, had they applied. In fact, the Commission has approved similar work on no less than seven separate occasions since 1996 as well as two emergency authorizations when expedited completion of the work was warranted. As discussed above, if Sable had secured a CDP for this work, the Commission would have had the opportunity to fully assess the proposed work, and ensure necessary measures were taken to prevent damage to coastal resources, such as limiting the fill material to sand rather than concrete (which can leach contaminants and degrade water quality), ensuring sensitive reef areas and marine habitats are avoided by the fill, coordinating the work to avoid conflicts with commercial and recreational fisheries, and including appropriately trained and independent on project vessels to minimize entanglement and ship strike risks.  Instead of working collaboratively with the Commission, Sable proceeded with these actions, with full knowledge that doing so would be a violation of the Coastal Act, and with blatant disregard for the jurisdiction of the Commission, and any potential damages that the work would inflict on coastal resources, including marine mammals, coastal water quality, fisheries and sensitive marine habitats. Moreover, the materials placed offshore as discussed here remain in place today and any impacts have not been reduced, conditioned to avoid, addressed or mitigated for. This flat refusal to comply with the Coastal Act warrants a high penalty, which would be assessed for a date range of 133 days which begins on November 29, 2024, the date in which these activities began, through April 10, 2024, the date of this hearing, at $11,250 daily, amounting to 1,496,250.

## Coastal Act Violation
## Failure to Comply with Executive Director Cease and Desist Order

Lastly, two separate EDCDOs have been issued to Sable, in this matter.
In November 2024, the Executive Director of the Commission issued an EDCDO directing Sable to, among other things, cease and desist all unpermitted development activities, temporarily secure the open trench work sites where work had ceased, and submit a complete CDP application for both works already undertaken as well as future, proposed work.  While Sable exhibited partial compliance with this order, it has, to date, not applied for any such CDP.  This is despite an extended deadline given for that requirement, as accommodation made by Commission staff in hopes of assisting Sable in successfully resolving all violations.

The second EDCDO, issued in February 2025, again directed Sable to cease and desist all unpermitted development activities, and, again, directed them to comply with the Coastal Act and submit a complete application for a CDP for both work already undertaken as well as any future, proposed work. In this instance, Sable blatantly, and egregiously, refused to comply with any aspect of this EDCDO. Sable, citing a variety of arguments described in fuller detail above and in the Response to the Statement of Defense section of this staff report, have refused to apply for any such CDP, and, instead restarted work

very quickly after expiration of the first EDCDO issued in November. They disregarded the EDCDO issued in February 2025 and not only restarted work, but they continued that work through evening hours, and weekends, at an alarmingly fast rate, before the action could be brought before this Commission. While Sable raised a number of arguments asserting that they have a reasoned basis for their outright refusal to comply with this EDCDO, as discussed above and at length in the Response to the Statement of Defense, this is not accurate and Commission staff repeatedly informed Sable of this and attempted to work with them to resolve the matter amicably, to no avail.

Despite Sable's lack of full compliance with the terms of the EDCDO, issued in November, Commission staff is only recommending assessment of penalties for Sable's noncompliance with the terms of the February EDCDO. The date range for this assessment would start on February 18, 2025, when the EDCDO was issued, and be assessed through April 10, 2025, the date of today's hearings. This date range amounts to 52 days. Because of the extreme nature Sable's actions in this instance, Commission staff recommend this penalty be assessed at the max daily penalty, $11,250, per day. Over 52 days this amounts to $585,000.

Thus, collectively, Commission staff recommend a penalty amount of $14,987,250.

Finally, we note that these penalty amounts were reached under an analysis of applying the factors set forth in the Coastal Act.  Under 30821.3(c), in determining the amount of administrative penalty to impose, "the commission shall take into account the factors set forth in subdivision (c) of Section 30820."

Section 30820(c) states:

> In determining the amount of civil liability, the following factors shall be considered:
>
> (1)    The nature, circumstance, extent, and gravity of the violation.
> (2)    Whether the violation is susceptible to restoration or other remedial measures
> (3)    The sensitivity of the resource affected by the violation
> (4)    The cost to the state of bringing the action.
> (5)    With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require

As is described in greater detail in accordance with these factors below, Sable's actions, and failures to acts constitute multiple violations and this analysis provides recommendations for the factors to be applied for each type of violation. Commission staff recommends that the Commission assess daily penalties for each of the categories of violations at a daily amount based on the factors in 30820(c) as analyzed below.

**Excavation and Grading with Heavy Equipment**

Note that these two violations are discussed together because we find that the five factors apply in the same manner to each of these violations.

<u>30820(c)(1)</u> *The nature, circumstance, extent, and gravity of the violation.*

Sable conducted extensive grading and excavation activities, some of which were conducted in, or adjacent to, riparian ESHA. (Exh. 87) Images provided to Commission staff by members of the public show several instances in which excavators are located in, or near, these sensitive resources, including excavators parked atop a pool where a southwestern pond turtle was documented to be swimming, as well as two southern California steelhead. (Exh. 68) Commission staff were provided a report with details of, at least, one damaged woodrat nest, which was impacted in coastal sage scrub – potentially from the dusky footed woodrat, a species of special concern due to its rarity and ecosystem role. The full extent to this damage, and potential species mortality, is not fully known and Sable has not been forthcoming with information as to the work, forcing Commission staff to make assessments as to this damage based on the imagery and information gathered from other sources. (see: Exh.69 of grease pool which as fallen from an excavator) That being said, the imagery reviewed by Commission staff shows particularly concerning, and extensive, damage leading Commission staff to believe the full extent of coastal resource harm is potentially, in fact, much greater than has been disclosed by Sable. There was no justification for not coordinating with the Commission in advance, and this factor in the aggregate weighs in favor of a high penalty amount.

<u>30820(c)(2)</u> *Whether the violation is susceptible to restoration or other remedial measures*

The topography can be restored and the earth compacted, but the habitat and water quality (such as sedimentation) impacts cannot be undone. Further, Commission staff have received images, taken in October, showing excavated sites which, at least in one instance, the recompaction was done loosely, and ineffectively. (See: Exh. 72 image of backfilled trench site that has no soil compaction) This factor weighs in favor of a medium penalty amount.

<u>30820(c)(3)</u> *The sensitivity of the resource affected by the violation*

As stated above, the resources affected here are particularly sensitive since the work was conducted in, or adjacent to, riparian ESHA, (See: Exh. 124 image of Scrub Vegetation that has been removed, and construction equipment in the background, in a riparian area) and with damage to important habitat which support species such as the southwestern pond turtle, California steelhead, dusky footed woodrat, as well as other critical species. As described previously in this staff report, the timing of this development is important to consider as the work has been undertaken during the breeding season for certain rare and sensitive wildlife species, as well as bird nesting season. The presence of project personnel and the operation of machinery and other equipment within these sensitive habitats during these periods had the potential to temporarily disrupt or more permanently impact the breeding and nesting of individual species. This factor weighs in favor of a high penalty

30820(c)(4) *The cost to the state of bringing the action.*

The cost to the state has been high, with respondent repeatedly starting negotiations only to back out later and refusing to comply with orders, and given the vast, dispersed, and complicated nature of the project and the way information has or has not been shared. Sable's nonfeasance and malfeasance has, and continues to be, varied and extensive, and has required an incredible amount of Commission resources to unravel, and address. Sable has been consistently obstinate with regard to informational requests, and efforts to resolve the ongoing Coastal Act violations, onshore and offshore. As a result, Commission staff have spent an unreasonably high amount of time assessing information from various sources, traveling to the locations in an effort to more fully understand the scope of work conducted, and poring over reports from the public in an effort to gain some understanding of the full scope of work. To date, Sable continues to fail to provide full information, or any full-scale project plans relating to the work. In addition, Commission staff has spent an inordinate amount of time communicating with Sable's counsel, through weekends and late into evenings, under the guise of seeking compromise, and, on more than one occasion Sable has indicated willingness to work with Commission staff, only to change positions, last minute, forcing Commission staff to expend even greater resources. In addition to the great amount of resources expended to try and resolve the violations, Sable's lack of transparency, and refusal to provide full information requested about what they have done and where and when, things which are basic to any project and to the ability to assess legal options, has resulted in a tremendous drain of resources, and has required  a continually laborious effort on the part of Commission staff. As such, the cost to State in bringing the action is very high, and the Commission therefore finds that consideration of Section 30820(c)(4) warrants application of a high penalty.

30820(c)(5) *With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

Sable Offshore Corp, a company created in 2024, has no known history of violation, however the other elements in the (c)(5) factor weigh heavily against them.  They undertook no voluntary restoration or remedial measures, having only done some restoration in response to the first EDCDO, and they proceeded with this work even after, and in defiance of, the second such order.  This also reveals a high degree of culpability. The entire project is designed for economic profit, which may be a significant part of the motivation to proceed very quickly, in defiance of the order, if they believe the economic benefits will outweigh the amount of penalties imposed. This factor weighs in favor of a high penalty.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250, for the full date range of 214 days, amounting to $2,407,500 per violation, or $4,815,000 for the two violations.

**Removal of Major Vegetation**

*30820(c)(1) The nature, circumstance, extent, and gravity of the violation.*

Several sites where activities were conducted are in or adjacent to potential ESHA, including coastal sage scrub, lemonadeberry scrub, wetland or drainages, and are also in, or near, mapped wetlands. Other work sites are in annual or native grassland, which is considered ESHA in certain situations. Many of the work sites are in, or near, coastal sage scrub. Construction equipment and other construction materials have been staged extensively near ESHA. (See. Exh 104 image of extensive construction equipment staged near EHSA, and Exh.106 image of staging of equipment near Willows.) Importantly, the violation involved a major amount of work at many different sites over a large area, with no justification for not coordinating with the Commission in advance and ensuring that the work was conditioned to protect these resources. Coordination with Commission staff would have allowed for full analysis of potential impacts, and safeguards to protect against coastal resource damage, yet this did not happen. Thus, so this factor weighs in favor of a medium-high penalty amount.

*30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

The vegetation can be restored, though much of the work was done in sensitive areas, which may require greater measures to fully restore the vegetation. Moreover, the use of heavy machinery and other equipment within, or around, sensitive riparian areas can result in serious adverse impacts via trimming or removal of vegetation, which can reduce the habitat value of these areas as a result of the altered vegetation structure, with loss of cover, feeding areas, nest sites, and other similar functions. (Exh. 78) In addition to all of these potential impacts, these activities have the potential for to contribute to the release and dispersion of sediment and or release of hazardous materials into waterways, or sensitive riparian and wetland habitat areas. This factor weighs in favor of a high penalty amount.

*30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is habitat, so this factor weighs in favor of a high penalty amount.

*30820(c)(4) The cost to the state of bringing the action.*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount**.**

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250 for the full date range of 214 days, amounting to $2,407,500

**Installation of Metal Plates and Fill Within Wetlands**

*30820(c)(1) The nature, circumstance, extent, and gravity of the violation*

Sable conducted extensive grading and excavation activities, some of which was conducted in, or adjacent to, riparian ESHA. Sable also applied an incorrect buffer of 50 feet from ESHA, instead of the requisite 100 foot buffer required by the County's Commission-certified Gaviota Coast Plan. Additionally, it does not appear that Sable delineated the locations of neighboring wetlands accurately, if at all. Without accurate ESHA mapping and wetland delineations mapping it is impossible to know the full extent of ESHA and wetlands at the development sites and it is unlikely that adequate protective measures were implemented to avoid or minimize adverse impacts to these habitats.  As such, there is a high potential for damage to those wetlands fill activities and thus, this factor weighs in favor of a high penalty amount

*30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

Violations, such as fill in wetlands, are difficult to remedy and, even if they are remedied successfully in the long run, the resource has been impacted in the interim, thus this factor weighs in favor of a high penalty amount. (See: Exh. 94 image of steel plate placed over installed culvert)

*30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is wetlands, so this factor weighs in favor of a high penalty amount

*30820(c)(4) The cost to the state of bringing the action.*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250, for the full date range of 214 days, amounting to $2,407,500

**Exhibits - Page 262**

**Dewatering and Discharge of Water**

*30820(c)(1) The nature, circumstance, extent, and gravity of the violation*

The dewatering and discharge or water, which occurred as part of excavation and work conducted on, and along, the offshore Pipelines, was done in riparian areas. and those with elevated water tables, which created potentially damaging impacts to both surrounding habitat as well as potential increased erosion damage. Again, this work was conducted with no justification for lack of coordination with Commission staff which could have avoided the adverse impacts, and has the potential to create serious damage to surrounding habitat, and erosion. Thus, this factor weighs in favor of a mid to high penalty amount.

*30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

Habitat can be restored, though the extent of the damage affects the measures  which may be needed to fully do so. Sable undertook these activities without coordination with Commission staff which could have ensured proper parameters were in place  that could have prevented potential habitat damage. Further, Commission staff have received images that show the BMPs that Sable did use to while doing the work in an apparent attempt to limit erosion or other damage to surrounding coastal resources, were installed ineffectively. Thus, the damage may be far greater than can be adequately assessed through the material which Sable has shared, which makes assessment of the susceptibility to restoration difficult to fully analyze. Thus, this factor weighs in favor of a mid to high penalty amount.

*30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is wetlands, so this factor weighs in favor of a high penalty amount.

*30820(c)(4) The cost to the state of bringing the action.*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the mid-high end of the possible range and apply a daily penalty amount of $7,000, with the tolling period of 58 days subtracted from the full date range of 214 days, amounting to 156 days, amounting to $1,092,000

**Exhibits - Page 263**

**Pipeline Removal, Replacement, and Reinforcement**

*30820(c)(1) The nature, circumstance, extent, and gravity of violation*

Sable brought in heavy equipment to excavate substantial areas, and began either, removing or replacing whole sections of pipe, or installing external sleeves or coatings to expand and reinforce the pipeline. These activities required extension excavation, and created the potential release of construction debris and hazardous materials into the surrounding environment. While these activities created damage to the surrounding environment, they may not necessarily present the same threat of ongoing damage as other violations here do. Thus, this factor weighs in favor of a mid-range penalty.

*30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

The vegetation and surrounding habitat damage can be restored, so this factor weighs in favor of a mid-range penalty amount

*30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is vegetation and habitat, so this factor weighs in favor of a high penalty amount

*30820(c)(4) The cost to the state of bringing the action.*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the mid to high end of the possible range and apply a daily penalty amount of $7,000 with the tolling period of 58 days subtracted from the full date range of 214 days, amounting to 156 days, amounting to $1,092,000.

**Installation of Shut off Valves**

30820(c)(1) The nature, circumstance, extent, and gravity of the violation

The installation of shutoff valves involved extensive grading, excavation, and removal of vegetation, as well as installation of an underground apparatus, all of which create a high potential to negatively impact surrounding coastal resources and important habitat areas. Many of these activities, such as the shutoff valve installation, could have been approved with a conditioned CDP and then accomplished in a manner that minimized the damage to

coastal resources that was created by Sable's refusal to apply for permits for these actions. This factor weighs in favor of a mid-range penalty.

*30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

The vegetation and surrounding habitat damage can be restored, so this factor weighs in favor of a mid-range penalty amount

*30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is vegetation and habitat, so this factor weighs in favor of a high penalty amount.

*30820(c)(4) The cost to the state of bringing the action.*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the mid to high end of the possible range and apply a daily penalty amount of $7,000 with the tolling period of 58 days subtracted from the full date range of 214 days, amounting to 156 days, amounting to $ with the tolling period of 58 days subtracted from the full date range of 214 days, amounting to 156 days, amounting to $1,092,000.

## Placing of Sand and Cement Bags on the Seafloor Below and Adjacent to Out-of-Service Offshore Oil and Water Pipelines

*30820(c)(1) The nature, circumstance, extent, and gravity of the violation*

Both the type of inspection activities, and the type of work undertaken, have the potential for temporary and permanent adverse impacts to marine resources. For example, offshore activities required the United States Coast Guard to issue a Notice to Mariners which may have precluded commercial and recreational fishing activities within the area of the project during project activities. Marine mammals and marine reptiles could have become entangled in cables, including the cables connecting remotely operated vehicles (ROVs) to project vessels and those used to lower equipment and material to the seafloor. Sable does not appear to have completed detailed benthic surveys prior to project operations so it is possible that sensitive benthic habitats such as rocky substrate, sand dollar beds and/or rocky reef could have been smothered or damaged by the development. Thus, this factor weighs in favor of a high penalty.

*30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

Without detailed Best Management Practices (BMPs) to govern project operations it is possible that construction debris and hazardous materials could have been released into the marine environment. Despite multiple communications with Commission staff before undertaking development activities offshore, in which Commission staff conveyed that an application for CDP was needed and that these activities could result in environmental harm, Sable proceeded to take these actions without such permit. As such, an analysis of environmentally superior alternatives could not be performed and no protective measures could be set in place by the Commission, such as qualified marine wildlife monitors, avoidance of rocky substrate, or other measures, in order to avoid or minimize adverse impacts. Importantly, because Sable used a cement/sand mixture in the bags that were deployed along the seabed, there is a potential for leaching of chemicals into the ocean and such potential increases over time. Because of this, remedial measures are likely much greater than they would otherwise be, if the work had been conducted with appropriate safeguards in place, and coordination with Commission staff. Therefore, this factor weighs in favor of a high penalty.

### _30820(c)(3) The sensitivity of the resource affected by the violation_

The resource affected by these violations is vegetation and habitat, so this factor weighs in favor of a high penalty amount.

### _30820(c)(4) The cost to the state of bringing the action_

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

### _30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require_

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250 for the date range in which the violation took place, beginning on November 29, 2024 when the activity began, through April 10, 2025, the date of this hearing, amounting to 133 days. A daily penalty of $11,250 for the period of 133 days amounts to $1,496,250.

## Failure to Comply with Executive Director Cease and Desist Order

### _30820(c)(1) The nature, circumstance, extent, and gravity of the violation_

The nature, gravity, and extent to which Sable flatly refused to comply with the EDCDO, issued in February, are very high and the degree of culpability to which they have exhibited with regard to the Coastal Act violations is extensive.  As has been described above, Sable continued to undertake work, after issuance of two separate Notice of Violation letters, and

two EDCDOs issued under Section 30809. Section 30821.3 applies to any violation of the division (other than public access), which includes Section 3089. With specific regard to Sable's refusal to comply with the terms of the EDCDO, issued in February, for purposes of this penalty assessment, Sable has indicated no intent to apply to complete CDP applications, as directed by the EDCDO, and after its issuance,  Sable continued unpermitted development activities, at the onshore locations, along the Pipelines. Further, it is relevant that Sable has not been forthcoming and reliable in its representations to Commission staff, throughout the course of their interactions with Commission staff.  In early conversations about the ongoing, onshore work, Sable indicated to Commission staff that work had ceased when, in fact, it had not. Despite an initial Notice of Violation, Sable continued to undertake development. Indeed, upon expiration of the November EDCDO, Sable resumed work within days and has done so with disregard to protection of surrounding coastal resources. Sable has continued to undertake activities at locations onshore. Moreover, it should be noted that the public policy implications are great. It is highly problematic, and very exceedingly rare, for an entity to refuse to comply with legal, validly issued orders.  To do so is to undercut the very tools available to protect valuable coastal resources, and the Coastal Act itself.  Such behavior from an entity that desires to operate multiple oil transport pipelines and production facilities in marine and coastal areas – some of which have already generated catastrophic spills and environmental damage - is troubling.  Thus, this factor weighs heavily in favor of a high penalty amount.

### 30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures

As stated in this staff report several times, the damage to coastal resources caused by Sable's actions, and inactions, and decision to violate the EDCDO altogether could have been minimized if Sable had first coordinated with Commission staff and complied with the Coastal Act, before undertaking development activities. These activities, which effect a broad area, and on a large scale, impacted several coastal resources, and many of those impacts could have been avoided. As such, the extent to which those measures are required to will likely be extensive. As also stated here, the extent to which remedial or restorative measures must be taken, is likely much higher than what is currently known by Commission staff, due to Sable's refusal to provide information that would allow Commission to provide a fully analysis of those effects. This factor weighs heavily in favor of a high penalty amount.

### 30820(c)(3) The sensitivity of the resource affected by the violation

The extent, and sensitivity of the resources affected by the failure to comply with the EDCDO is great, including ESHA, riparian areas, wetlands, and other important habitat areas, many of which support critical species, as has been discussed in this staff report. Therefore, this factor weighs heavily in favor of a high penalty amount. (See. Exh 81 image of excavator in potentially Mapped Wetlands on February 20, 2025, as well as Exh. Image of an excavator removing shoring trench walls near Coastal Sage Scrub on February 18, 2025)

### 30820(c)(4) The cost to the state of bringing the action.

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

As has been discussed in detail in this report, Sable's actions, and inactions, in this instance have been very problematic. It is unprecedented for a violator to ignore and violate an Order in this way.  As noted already, it is exceedingly rare that an entity acts in such an excessive, and repeated manner, and highly uncommon that and entity blatantly refuses, to comply with a legal, validly issued order.  Commission staff have made constant attempts to work with Sable,  and have repeatedly made themselves available to assist Sable in the CDP application process, and attempted to work with them to reach a consensual resolution of the whole situation, including trying to assist them in finding a path forward and a way to quickly resolve the enforcement and permitting cases.  Despite this, Sable has instead consistently wasted Commission resources by agreeing engage in discussions toward resolution of the violations discussed above, only to change course with little, to no, forewarning.  As discussed, Sable could have coordinated with Commission staff before undertaking activities at locations both onshore, and offshore, thereby ensuring appropriate parameters in place so as to prevent environmental damage, but instead, after direct communications with Commission staff informing them that work needed a permit and offering to work with them to obtain one, knowingly undertook work without such legal authorization and without conditions in place to ensure minimization and protection of coastal resources. This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250 applied to a date range beginning on February 18, 2025, when the EDCDO was issued, through April 10, 2025, the date of this hearing which amounts to 52 days. Thus, Commission staff recommends a total of $585,000.

### Conclusion

Aggregating the findings with respect to all 30820(c) the factors listed above, Commission staff believes the higher-range penalty would be appropriate. A high-range penalty of $12,000,000 - $15,000,000 is suggested. See table below:

| Violation | Days Assessed | $7,000 Daily Penalty | $11,250 Daily Penalty |
|---|---|---|---|
| Excavation and Grading with Heavy Equipment | 214 | | $2,407,500 |

| | | | |
|---|---|---|---|
| Grading and Widening of Roads | 214 | | $2,407,500 |
| Removal of Major Vegetation | 214 | | $2,407,500 |
| Installation of Metal Plates and Fill Within Wetlands | 214 | | $2,407,500 |
| Dewatering and Discharge of Water | 156* | $1,092,000 | |
| Pipeline Removal, Replacement, and Reinforcement | 156* | $1,092,000 | |
| Installation of Shutoff Valves | 156* | $1,092,000 | |
| Placing of Sand and Cement Bags on the Seafloor Below and Adjacent to Out-of-Service Offshore Oil and Water Pipelines | 133 days | | $1,496,250 |
| Failure to Comply with EDCDO | 52 | | $585,000 |

**Total:  $14,987,250**

*Note: Staff recommends that certain violations be assessed with a tolling period of 58 days, as described above.

## **Potential Efficiency Discount**

While the above-referenced penalty figures are factually and legally appropriate to the respective parties and violations at hand, to maximize the likelihood of compliance with these Orders and to rectify this matter in the most efficient manner possible, thereby limiting the costs to the state and increasing the potential for accelerated restoration and reduced impacts on resources, if Sable elects to proceed with consolidated CDP application[9], the Administrative Penalty will be reduced by 10% of the total amount (i.e., $1,498,725).  If however, at any point prior to the Commission staff filing the CDP application as complete, Sable takes any steps that would interfere with the processing of the CDP application, including any attempt to delay or avoid submittal of the CDP

[9] If Sable elects to proceed with a Consolidated CDP process, they must do so in accordance with Section 1.3.A of the Consent Cease and Desist Order CCC-25-CD-01. See: Appendix A

application, the penalty amount shall not be reduced, and Sable shall be required to pay any remaining penalty amount to bring the full payment up to $14,987,250

## VII.   DEFENSES ALLEGED AND RESPONSES THERETO

### A.  Summary

On March 10, 2025, Sable submitted a letter entitled "Statement of Defense and Response to Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order," which we will refer to simply as the "Statement of Defense," or "SOD."  This section provides responses to the arguments made in that SOD.

As an initial matter, although Sable makes many arguments in its Statement of Defense, a few recurrent themes stand out.  The most prominent argument running throughout the SOD is that the work at issue in this proceeding was anticipated, its impacts were evaluated, and it was authorized and even required through various actions taken in the 1980s.  Thus, Sable argues, the work required no further Coastal Act authorization and was not a violation of the Coastal Act.  In support of this argument, Sable points to several different documents, including combined Environmental Impact Reports (EIRs) and Environmental Impact Statements (EISs) that they claim reveal the evaluation of impacts and various types of approvals and permit conditions that they claim reveal the authorization and mandate for the work.

There are several problems with Sable's approach.  First, many of Sable's citations merely refer to ongoing operations, which Sable equates with maintenance.  However, assessments of the impacts of the "operation" of a facility do not necessarily include the impacts of maintenance projects.  Second, even where these documents discuss the need for future maintenance, none of them mentions the specific types of work at issue, nor do they imagine a project of this scope, so they could not have assessed or mitigated for its impacts.  Third, even if an EIR/EIS attempts to include a "life cycle assessment" of the impacts of a project by including an assessment of the impacts of future maintenance, and even if the EIR/EIS at issue here had done so and predicted work of this nature, that does not mean that the individual future maintenance projects whose impacts were evaluated were authorized as part of the approval that the EIR/EIS supports.  Such projects still require further review when they are proposed to occur, in order to ensure that they are performed in the least environmentally damaging fashion, especially where they are occurring decades in the future.  And finally, although some entitlements affirmatively require the maintenance of a system in perpetuity, that is not the same as authorizing each individual instance of maintenance work.  A maintenance requirement is to ensure that system integrity is maintained, but the recognition of the need for that and the requirement for that is totally independent of the question of whether the future work needed to achieve that will constitute development that will need to be reviewed to assess the potential that it will have its own impacts and then independently authorized. This is probably the primary recurrent theme throughout this document.

With that background, in Section B, we turn to an assessment of some of the individual documents upon which Sable relies in arguing that its work was pre-authorized, and we address each of these documents in turn.  We then address some other recurrent themes in the SOD in Section C.  Finally, in Section D, we address various other individual comments made throughout the Statement of Defense.

### B.  Documents on Which Sable Relies for its Pre-Authorization Argument

#### a.  Onshore

##### i.  EIR/EIS[10]

In the early 1980s, a pipeline project was proposed to construct and install an insulated underground pipeline – referred to as the Celeron/All American pipeline, after the two principal companies involved – to transport oil produced from the Santa Barbara Channel to refineries in Texas.  The California State Lands Commission was designated as the lead agency under the California Environmental Quality Act and the Bureau of Land Management was designated as the lead agency under the National Environmental Policy Act. These agencies coordinated to develop a joint Environmental Impact Report/Environmental Impact Statement (EIR/EIS) for the project, a public draft was released in August of 1984.  In its SOD, Sable contends that this 1984 EIR/EIS for construction of the Celeron/All American pipeline (Celeron project) also describes and analyzes the environmental impacts of the corrosion remediation and shut off valve installation work it began carrying out in late 2024 and continues to pursue.

Despite Sable's reliance on these documents, the EIR/EIS does not appear to cover the instances of "maintenance" development activities that have been observed and carried out by Sable over the past several months.  The EIR/EIS does not refer to the types of activities undertaken, and it does not include an analysis of the types of impacts that would likely flow from the types of development at issue here.

Instead, the Draft EIR/EIS includes a July 17, 1984, cover letter with a "Project Description" that refers only to the proposal to "construct" the pipeline, not to future maintenance activities, much less substantial pipeline replacement projects, removal of pipeline insulation or the potential for the installation of additional shutoff valves decades later.  Similarly, the "Abstract" at the beginning of the document, on page 2 (pdf page 8), states that the project proponents propose only to construct the pipeline.

Sable points out that the EIR/EIS goes on to say that the document analyzes the environmental effects of the proposed pipelines "through construction, operation, maintenance, and abandonment," but that does not mean that everything through abandonment was being pre-authorized.  Further, even if the intent was to pre-authorize everything in that list, the document doesn't define the term "maintenance" or even elaborate on what is contemplated by the term until section 2.2.4.  That section lists types of anticipated maintenance, but it doesn't mention any pipeline alteration, expansion,

---

[10] Sable cites to two versions of the combined EIR/EIS: (1) Final Environmental Impact Report Environmental Impact Statement; Proposed Celeron / All American and Getty Pipeline Projects; Calif. State Lands Comm'n and Bureau of Land Mgmt (DoI), January, 1985 (Sable SOD Doc. 3); and (2) the Draft of the same, from August, 1984 (Sable SOD Doc. 2).

**Exhibits – Page 271**

replacement or earth movement at all.  It lists five bullet points as constituting the maintenance activities associated with the pipeline and the right-of-way.  Most relate to observation and inspection.  The only references to maintenance are to maintenance of the cathodic protection system and the pipeline mile-post and road-crossing markers (see pdf page 128), neither of which was performed by Respondent, and both of which are simply not at issue here.  The "Summary" section of the EIR/EIS states that operational impacts "would result primarily from potential oil spills and leaks" (p. S-2), without any indication of any consideration of impacts from maintenance, or the types of development undertaken recently by Sable and presently at issue.

The section of the EIR/IES on the environmental consequences of the Celeron project (§ 4.2) is broken down into subsections for each type of resource that could be affected, and does not discuss maintenance.  The first subsection, on air quality (§ 4.2.1) has subsections, and each of those subsections, in turn has two subsections of its own – one on construction and one on operation.  There is no section on the impacts of maintenance activities.  Similarly, the third subsection, on impacts of the project to soils (§ 4.2.3) has three subsections – construction, operation, and abandonment.  There is no discussion of maintenance, and the subsections on operation do not cover maintenance.  The subsection on operations in section 4.2.3 limits its assessment of the impacts of operation to the impacts that "would result from oil pipeline leaks and ruptures" (4-24, pdf 328).  The same is true for the sections on impacts to surface waters (§ 4.2.4, 4-30 to 4-32, pdf 334-336) and groundwater (§ 4.2.5, see, in particular, 4-35, pdf 339 [operational impacts "would only occur in the case of a leak or rupture"].

The word maintenance is only mentioned a few times in the more than 120 pages discussing impacts of the pipeline construction project, and none of those references discusses the type of work at issue here, much less any mitigation measures to avoid or minimize potential impacts specifically from this type of work.   Two mentions of the word are in the section on impacts to terrestrial biology (§ 4.2.7).  In that section, there is one mention that operational maintenance could increase the risk of fire (p.4-47) and one mention that maintenance traffic could increase habitat destruction (p. 4-53, pdf 357).  There is no discussion of grading new roads or of excavating or stockpiling soils.  The only other mentions are in the sections on socioeconomics (§ 4.2.8), discussing the fact that the project would employ people to maintain the pipeline (pp. 4-60 & 4-67), the section on cultural resources (§ 4.2.11),  and, again, in discussing oil spills and leaks (§ 4.2.15), where is refers to the maintenance discussed in section 2.2 as a means of preventing impacts, but does not discuss the impacts *of* maintenance (see pp. 4-114 & 4-117, pdf 418 & 421). Regarding cultural resources, Section 4.2.11 acknowledges that not all portions of the pipeline route had been surveyed for cultural resources and many known sites had not been evaluated for their eligibility for National Register designation. For these reasons, the cultural resource impact assessment at the time that the time of preparation of the EIR/EIS was incomplete and the EIR/EIS required a compliance plan to mitigate for potential impacts to cultural resources for all aspects of the project proposal. As discussed above, since the type of maintenance undertaken by Sable was not envisioned, analyzed, or approved in the EIR/EIS as part of the project proposal, the approved compliance plan may not be sufficient to adequately prevent adverse impacts to coastal resources as a result of the work.

**Exhibits - Page 272**

The Final EIR/EIS released in 1985 contains no clear project description, but the section listing areas of environmental concern (§ 1.2) only discusses impacts from construction and spills (see p.1-3, pdf19).  Similarly, the section on impacts (§ 1.3) states only that the proposals have potential significant impacts from "construction and operation."  (p. 1-5, pdf21).  Otherwise, the discussion above regarding the Draft EIR/EIS pertains equally to the Final, and here again, there was no identification of additional development activities they are calling "maintenance" nor were there provisions to identify, reduce or mitigate such development activities. See, also, the discussion in the Summary of Staff Recommendations (on pages 5-6, above) and in Section III.C. (on pages 21-22), regarding changes in our understanding and listing of sensitive species and in the nature of the pipeline project's operation since these initial EIRs/EISs were produced

Finally, in any case, as Commission staff stated in the second half of the first paragraph on page 3 of the Notice of Intent for the second EDCDO (Exh. 8), even if an EIR is designed to do the equivalent of a "life cycle assessment" for a proposed project, to predict the impacts that will result over its full lifespan, including effects of future maintenance, that does not necessarily mean that the approval of the project includes advance approval of any and all maintenance that may be needed in the future, nor could it, without any way to know for sure what sort of maintenance will be needed, when and where it will be proposed, for how long into the future, or through what methods.

ii. <u>Final Development Plan (FDP) (85-DP-66cz)/CUP (March, 1986)</u> (Sable SoD Doc. 5)

Commission staff also reviewed and analyzed the Final Development Plan, upon which Sable relies for "authorization" of the development undertaken here.  This Final Development Plan was approved by Santa Barbara County in March of 1986 for construction activities in Santa Barbara County for the Celeron/All American pipeline, the same one for which the EIR/EIS discussed above was prepared.  Page 2 of the Final Development Plan includes a section entitled "Project Description," and it refers to the construction of the pipeline, which will require a construction corridor, and three pump stations, but not to future maintenance activities.  In fact, Commission staff ran a search for the string "maint" in the document, and although it appears eight times, and the references show that maintenance was anticipated and even required, never does the FDP say that this plan was providing the necessary review and approval of specific, future maintenance activities in advance, nor could it, given that the nature and scope of any required maintenance activities, especially decades into the future, could not be anticipated.  This is critical because this is really the key document given the nature of the documents in the next section.

iii. <u>Santa Barbara County CDPs</u>

The documents that provided Santa Barbara County's actual Coastal Act authorization for the Celeron pipeline project were two CDPs issued by the County in 1986 (CDPs number 86-CDP-189 and 86-CDP-205).[11] However, these documents are only two pages each and

---

[11] Sable SoD Doc. 6 and 7.

**Exhibits - Page 273**

say almost nothing relevant to the "pre-authorization of future maintenance activities" issue, as they simply define the project being authorized by referring back to the FDP (which itself refers back to the EIR/EIS discussed above), defining the approved project as "[c]learing, grading and trenching for [the pipeline project] as approved by 85-DP-66cz" and as the "[r]emainder of all construction activities for [same] as approved by 85-DP-66cz," respectively.  Still, neither of these documents states that it is authorizing development activities beyond the specific Celeron pipeline construction project before it, particularly not things such as actions to replace portions of the pipeline with new materials and new methods, much less actions taken forty years in the future.

### iv.  Conditions of Approval

In its SOD, Sable also points to several conditions that they claim show that maintenance was approved from the start.  While these conditions show that maintenance was anticipated, and in some instances even required, that is not the same as pre-authorizing the specific activities that would be involved or have been carried out by Sable nearly 40 years in the future.  For example, condition P-2 requires the creation of a Safety Inspection, Maintenance, and Quality Assurance Program "which shall be implemented during construction and operations."  But although that condition requires maintenance, the fact that this program did not yet exist shows that the impacts could not possibly have been evaluated at that point.  Rather, the condition creates a requirement to generate a plan that will have to be implemented, but that requirement to implement the plan does not relieve the operator of the independent obligation to go through the permitting process prior to implementing any aspect of that plan that would normally require Coastal Act authorization.  Further, the plan specifically relates to "operation" of the pipeline.  The pipeline has not been in operation for almost a decade now and thus would not be covered by the plan.

Sable also points to condition A-13, which identifies certain types of changes to the pipeline or its throughput that would require a new or modified permit.  However, first, that list is expressly not exhaustive, stating that the types of changes that would require permitting "could include but not be limited to" the enumerated changes.  Secondly, that list appears to be focused on types of changes to the pipeline and its throughput, which raises different issues from maintenance work.

### v.  Summary with respect to the Aforementioned Entitlement Documents

The permitting documents from the 1980s for the original construction of the pipeline say nothing about pre-approving future maintenance activities.  The EIR/EIS has some limited discussion of maintenance and some of the potential impacts of maintenance, but that does not justify the inference that such maintenance was being pre-approved, and even if it did, the maintenance discussion did not cover the sort of activities at issue now. Instead, that discussion was focused on maintenance of the cathodic protection system and the pipeline mile-post and road-crossing markers, with isolated mentions of the facts that maintenance activities could be required to cover up the pipeline if it becomes exposed, could increase risk of fire, and could disturb cultural resources, and that maintenance traffic could disturb terrestrial habitat.  None of these documents contains any analysis of, or indication that they attempted to predict, or mitigate in advance for, all of the different

types of impacts that would result from the operator having to repeatedly access sites, excavate, expose and reinforce or replace stretches of pipeline, in perpetuity, for whatever type of work might be required and however it might be accomplished.

### vi.   Consent Decree

Sable also cites to the existence of a Consent Decree (Exh. 60) reached between Sable and the local government as somehow providing authorization under the Coastal Act for development undertaken at the site.  It does not, for a variety of reasons:

- The Commission wasn't a party to that litigation or to the Consent Decree, and it specifically says it doesn't limit the rights of third parties.  § 79.
- It also specifically says it was designed to resolve the issues raised in that litigation (§ 69), which couldn't have and didn't include anything relating to compliance with requirements for the work envisioned in the consent decree.
- It clearly envisions that the pipeline operator will restart use of the pipeline, and it says that they can't restart until they do certain things, but nowhere does it say that those steps are the *only* things Sable would need to do or that if Sable does those things, Sable can restart, notwithstanding any other applicable requirements.
- Conversely, it specifically says it's not a permit, that Sable will still have to comply with state and local laws and permits, and that compliance with the Consent Decree is not a defense.  § 78.  *See also* § 84.

### vii.   Santa Barbara County Letters

Finally, Sable relies on the letters from Santa Barbara County Planning and Development Department staff to Commission staff as establishing that the existing permits authorize the subject work, arguing that the Commission lacks the "authority to override or otherwise nullify" the County's letter regarding the anomaly repairs.[12]  However, Sable cites nothing to indicate that the County's letters had any independent legal effect or significance such that the Commission would need to "override or otherwise nullify" them, much less that they create any sort of conclusive presumption.  In fact, Sable later acknowledges that the County's letter regarding the anomaly repairs is nothing more than an "informal . . . assessment."[13]  Thus, it has no binding effect.

Sable also argues that the County's letter is entitled to a substantial evidence standard of review and due deference because it represents the County's interpretation of its own permit.  However, the substantial evidence standard is for judicial challenges, and even if it were to apply, the County cited no specific evidence, so there would be no way to determine whether the conclusion was supported by substantial evidence.  And for the reasons stated above, the Commission finds that the evidence that Sable submitted did not support the conclusion.  Finally, as indicated above, Sable acknowledges that the letter is not a formal determination by the County at all, but merely an informal assessment.

---

[12] Sable SOD at 2.  See also Sable SOD at 37 (making a similar argument with respect to the County's September 4, 2024 letter regarding the installation of the safety valves).
[13] Sable SOD at 23.

Given both that fact and the fact that the assessment included no facts or analysis to support its conclusion, the Commission is entitled to reach a different conclusion.

### b. Offshore

#### i. EIR/EIS[14]

Similar to the EIR/EIS for the onshore work, the EIR/EIS Sable cites for the offshore work is focused on the construction of the system and not future maintenance. Its project descriptions in the Abstract and the Executive Summary do not mention future adjustments to the sea floor, and it never mentions the work currently at issue (span remediation) at all. Sable cites one line in a table that lists the following mitigation measure:  "Monitor seafloor disturbances after construction using side scan sonar or equivalent to assess need for remedial measures which could include smoothing of seafloor mounds."[15]  This mitigation measure does not even explicitly specify or discuss what sort of "remedial measures" might be warranted, much less analyze their impacts.  And in any case, as discussed with respect to the EIR/EIS for the onshore work, even if the document did discuss potential impacts of necessary future maintenance work, in an attempt to assess the full life cycle impacts of the project, that would not mean that the approval of the original project was authorizing all such future work in advance without the need for further review at the time.

#### ii. Development and Production Plan (DPP)

The DPP is equally devoid of any discussion of span remediation.  Sable argues that the DPP contains "a detailed discussion of the Offshore Pipelines that would be installed, maintained, and operated," but the only citation it provides is to a page that merely discusses the sizes and use of the pipes to be installed.[16]  Although the DPP has a section specifically on the pipelines, with subsections on construction and operation, Sable cites to nothing in that section about the need to adjust the seafloor (including for span remediation) in the future.  Sable cites one sentence in that 28-page section that states that the pipelines "will be maintained in good operating condition at all times."[17]  This general statement about the need for pipeline maintenance doesn't even mention the environment of the pipelines and is reasonably interpreted to refer to the integrity of the pipes themselves.  And while the DPP does discuss submerged weight and trenching in the context of establishing pipeline stability,[18] there is no indication that statement is intended to address activities beyond the initial deployment.

#### iii. Coastal Development Permit CDP E-88-1 and Consistency Certification CC-64-87

In 1988, the Commission issued a combined report for its CDP and its concurrence with Exxon's consistency certification for the Development and Production Plan.  The "Project Description" on the caption page of that report included the "[i]ntallation of" the offshore

---

[14] Final Environmental Impact Statement/Report for Santa Ynez Unit/Las Flores Canyon Development and Production Plan (June, 1984).
[15] Sable SOD at 47, citing Final EIR/EIS at 6-53, table 6.3.6-1.
[16] Sable SOD at 45, n.214, citing DPP at VIII-2.
[17] SOD at 45-46, n.215, citing DPP at VIII-24.
[18] DPP at VIII-14.

pipelines, The more detailed description on pages 18-23 includes the following statements (all on page 21):

- "Three principal pipelines will be installed from the onshore facilities to the SALM: a 48-inch diameter crude oil loading line and two 18-inch diameter vapor balance lines."

- "Exxon proposes to install another two pipelines: one 20-inch crude oil pipeline; one 12-inch produced water outfall pipeline . . ."

- "The construction method anticipated for pipeline installation is the conventional pipe lay barge stinger method.  Surf zone trenching operations may require the use of a trestle to prevent sanding in the trench.  Power cables will be installed in the same corridors as pipelines.  Nearshore pipeline construction is scheduled for late 1989 to early 1990, requiring about three months."

None of this, or anything else Sable has been able to cite in the report, says anything about future modifications to the sea floor to adjust for changes that may occur in the future, much less does it suggest that such actions were being approved in advance by this permit.

It is also worth noting that Sable argues that the County's interpretation of its own permit is binding on the Commission.  The obvious logical extension of that principle would require deference to the Commission's interpretation of its permit as well.  It is also worth re-emphasizing that, as indicated above, Commission staff provided such an interpretation to Sable personnel prior to the commencement of the offshore work, informing them that such work would require a Coastal Development Permit.

### iv.  BSEE and SLC Letters

Sable claims that the State Lands Commission "emailed approval to Sable to proceed with the work" in November of 2024, followed by "an official approval letter on December 4."[19] What Sable fails to note is that this approval letter specifically states (on page 2) that Sable must "obtain all necessary permits and approvals from other Federal, State, and local agencies having lawful authority and jurisdiction over the pipelines . . . before commencing the operations."  Nor would the fact that one agency approved work for purposes of its requirements insulate or immunize Sable from other regulatory requirements.  Sable also notes that in 2012, BSEE allowed Exxon to "conduct span remediation maintenance on the Santa Ynez Unit pipelines" without requiring any new approvals, and that the Commission did not object.[20]  BSEE's decision as to whether to allow this work to proceed, even if taken as an indication of how it interpreted the DPP, does not govern the Commission's interpretation of its permit.  As for the Commission's lack of objection, Sable presented no evidence indicating that the Commission was even asked to review the issue.  The only evidence Sable presented that the Commission was even aware of the matter is that it was listed as a cc on one letter.  Sable's attempt to draw inferences from the Commission's lack of response to that letter are entirely baseless and no evidence exists to indicate that the letter was ever received by Commission staff.  Moreover, even if Commission staff had affirmatively declined to object to that instance thirteen years ago, that would not constitute a waiver of its ability to enforce the Coastal Act with respect to similar development at a later time, nor would it bind the Commission to any particular interpretation of its permit.

---

[19] Sable SOD at 56
[20] Sable SOD at 60-61.

Further, the Commission has actively reviewed and required authorization for the same type of span remediation work that Sable recently completed.  On no fewer than seven occasions in recent years, the Commission has considered CDP or waiver applications for this type of work on other offshore oil or intake pipelines and on two additional occasions emergency permits have been issued to allow similar work to be expedited.

## C. Other Themes in Sable's SOD

### a. Preemption

Sable argues that CDP review authority for Sable's anomaly repair and valve installation work is entirely preempted under federal and state law.[21]  This overstates the preemptive effect of federal and state law.  As the Commission stated in its initial September 27, 2024 Notice of Violation, although the California Office of the State Fire Marshall ("OSFM") has authority over pipeline safety under the federal Pipeline Safety Act (49 U.S.C § 60101 *et seq.*), any resulting preemption is limited in scope. Other state agencies, as well as local governments, may review and impose requirements related to other issues. Thus, the Commission and the County have jurisdiction to review and impose requirements relating to the consistency of the development activity with the Coastal Act and the LCP, as that does not pertain directly to pipeline safety.

Under the federal Pipeline Safety Act, the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA") has authority to regulate both interstate and intrastate gas pipelines to protect against "risks to life and property posed by pipeline transportation and pipeline facilities."  (49 USC § 30101(a).)  Through a state certification program that PHMSA must approve, various states, including California, may regulate intrastate pipelines under PHMSA's regulations.

The federal Pipeline Safety Act has express preemption provisions for both interstate and intrastate pipeline safety.   For intrastate pipelines, a certified state authority may adopt "additional or more stringent safety standards . . . only if those standards are compatible with the minimum standards prescribed under [the federal Pipeline Safety Act]."  49 U.S.C. § 60104(c).  In turn, California law designates OSFM as having "exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines and . . . may act as agent for the United States Secretary of Transportation to implement [the federal Pipeline Safety Act]."  Cal. Govt Code § 51010.  *See also Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 (9th Cir. 2006) (finding express preemption of city's safety regulations of intrastate pipeline). Thus, any resulting preemption is limited in scope and does not encompass all pipeline-related "development" (as defined in Section 30106 of the Coastal Act and Section 35-58 of the LCP).  The Commission and the County retain CDP jurisdiction to review any development activity undertaken in connection with achieving the pipeline safety standards.  For example, for pipeline-related development associated with vegetation clearance, grading, excavation, and construction activities, the Coastal Act requires those activities be reviewed to determine their impacts of those activities on environmentally sensitive habitat areas.

---

[21]  It does not appear that Sable argues that preemption applies to CDP review authority for the span remediation work that occurred offshore.

Despite the limited scope of preemption, Sable argues that its predecessor's (Celeron) 1988 settlement agreement with the County creates a presumption that any CDP review of the valve installation work is entirely preempted.[22]  This is not accurate, nor is it supported by preemption law, for at least three reasons. First, the work putatively preempted in the settlement agreement isn't even that which is at issue here.  The 1988 settlement agreement purports to somehow preempt CDP review.  But the 1988 settlement agreement purports to create a "presumption" of preemption for work that is performed "one foot or more below the surface of the ground and related to the operation of the pipeline."[23]  Therefore, on its face, this term does not address any development activities aboveground or excavation above the one-foot depth threshold.[24]  Secondly, the Commission was not a party to this litigation or the settlement and is not bound by it or by the conclusion that the County's Coastal Act review authority is preempted.

Third, and more fundamentally, the scope of federal preemption cannot be contractually altered because "[f]ederal preemption is the allocation of power and decision-making authority between the federal government and state and local governments, based on the Supremacy Clause of the Constitution."  *Olympic Pipe Line Co. v.*, 437 F.3d 872 at 882-83.  Because "[p]reemption is the power of the federal government" (i*d.* at 883), the scope of preemption under the settlement agreement is not greater than that under federal law.  Thus, it is federal law – not the 1988 Settlement Agreement – that establishes the scope of any federal preemption.  Federal law does not contain the "one foot or more" standard for preemptive effect, nor does it support the broad reading of preemption that Sable advances.

Sable also argues that any CDP review for the work at issue is preempted by a conflict with federal PHMSA requirements and with OSFM requirements pursuant to OSFM's certified authority to regulate pipeline safety.  Again, this is simply not accurate.  In particular, Sable refers to 49 C.F.R. § 195.452(h), which contains integrity management provisions applicable to pipelines in "High Consequence Areas."[25]  Under PHMSA regulations, when an pipeline operator's assessment identifies a potential problem with the condition of the pipeline, it must evaluate and "discover" the issue within 180 days after the operator receives an assessment that identifies the problem.  49 C.F.R. § 195.452(h)(2).

[22]   Settlement Agreement between County of Santa Barbara and Celeron Pipeline Company (Feb. 8, 1988). The settlement agreement makes the presumption rebuttable if there is "clear language granting jurisdictional rights to the County under the terms of this Agreement . . . or by law binding upon the County and Celeron."  Settlement Agreement ¶ 3.2.

[23]   *Id*. ¶ 3.1.3.  The August 30, 2024 Conditional Settlement Agreement between Sable and the County referenced this presumption of preemption.

[24]   Furthermore, the settlement agreement also contains a presumption of preemption if it is covered by 49 C.F.R. Part 195, which are the federal pipeline safety regulations implemented under the federal Pipeline Safety Act.  As discussed above, the federal Pipeline Safety Act provide for express preemption of various pipeline safety requirements.

[25]   High Consequence Areas are defined in 49 C.F.R. § 195.450 to include "unusually sensitive areas" or certain population areas.  Unusually sensitive areas are defined in 49 C.F.R. § 195.6 as meeting certain ecological resource criteria.  In a 2024 report to OSFM, Sable indicated that Line 324 (10.86 miles from Las Flores Canyon to Gaviota) is a High Consequence Area because it is an "ecologically sensitive region (coastline)."  Pacific Pipeline Background Data, Attachment B of State Waiver Application, prepared by Pacific Pipeline Company (June 2023).

This 180-day discovery timeframe is not absolute, and the operator may notify PHMSA of any need for additional time if the 180 day timeframe is "impracticable." *Id*.

Even if this PHMSA provision, with its timing requirements, were to apply to a pipeline such as the one at issue, which was rendered inoperable and has sat inactive for a decade, Sable provides no reason why it could not both apply for a CDP and comply with these PHMSA requirements. For example, Sable could have applied for a CDP in advance of doing any discovery work, or it could have notified PHMSA of additional required time, if necessary. Or the Commission's permitting process could have simply taken less than 180 days. Indeed, the Commission has processed CDPs for other pipeline repair projects taken pursuant to PHMSA regulations.[26]

i. There is No Conflict Preemption Here

Federal conflict preemption applies only where a state law conflicts with federal law, either because it is impossible to comply with both laws or because state law stands as an obstacle to accomplishing the purposes of federal law. *English v. Gen. Elec. Co*., 486 U.S. 72, 79 (1990). In either case, there is a strong presumption against preemption. *Wyeth v. Levine*, 555 U.S. 555 n. 3 (2009). Conflict preemption is a demanding standard, as courts will not "seek[] out conflicts between state and federal regulation where none clearly exists." *English*, 496 U.S. at 90 (internal quotation marks omitted). In this case, there is no conflict between compliance with the safety requirements under PHMSA regulations in Part 195 and compliance with CDP requirements that do not directly pertain to those safety requirements. Likewise, there is no conflict between compliance with Gov. Code section 51013.1 (AB 864), which requires the use of best available technologies (such as shut-off valves) for pipelines near environmentally and ecologically sensitive areas in the coastal zone,[27] and compliance with CDP requirements that do not directly pertain to the safety issues within OSFM's review under AB 864. Finally, although the Consent Decree in the lawsuit arising out of the Refugio oil spill specified actions to be taken by the defendants (Sable's predecessors) in connection with proposed restart activities,[28] the Consent Decree does not relieve Sable from applying for a CDP for development activities that do not directly pertain to PHSMA and OSFM safety requirements. As the Consent Decree states:

> This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.[29]

---

[26]  *See, e.g.*, CDP No. E-11-031 (approved March 9, 2012). SoCalGas sought a CDP for development activities, including excavation and vegetation clearance, relating to pipeline testing required under PHMSA regulations in 49 C.F.R. Part 192 (which applies to natural gas pipelines).

[27]  AB 864 was enacted in 2015 after the Refugio oil spill, and it requires OSFM to develop implementing regulations requiring the use of best available technology.

[28]  Consent Decree in *United States, et al. v. Plains All American Pipeline, L.P.., et al.,* Case No. 2:20-cv-02415, (C.D. Cal. Mar. 13, 2020).

[29]  *Id.* at ¶ 78.

Finally, Sable points to no published caselaw demonstrating any preemption here. Although Sable cites *San Diego Gas & Electric Co. v. City of Carlsbad*, 64 Cal.App.4th 785 (1998), that case is distinguishable.  *Carlsbad* involved a city's floodplain ordinance that required the utility to obtain a permit to deposit sand from dredging operations.  In that case, the utility company applied for the permit.  The court held that the prescriptive requirements of the permit went into an area of state law that was "fully" occupied by the state.  *Id.* at 803.  *Carlsbad* did not involve the Pipeline Safety Act or its implementing regulations, nor did it involve AB 864, and it presents a different set of facts involving the deposition of dredging spoils under a different state law (Public Utilities Code § 701). Moreover, in *Carlsbad*, the utility company actually applied for and obtained a permit, which the court evaluated to determine whether the permit's scope entered an area occupied by state law.  As the *Carlsbad* court noted, "[t]his record does not present the abstract question of whether a local entity may regulate, within its jurisdiction, the disposal of dredging soils taken in the operation of a public opinion, and we express no opinion on that subject."  Thus, *Carlsbad* does not support Sable's conflict preemption argument.

> b.  Jurisdiction

Sable divides its SOD into three sections.  The first addresses the anomaly repair work, the second addresses the valve installations, and the third addresses the span remediation work.  Each of those three sections ends with a similar discussion of the Commission's jurisdiction.  Sable claims that the Commission has no jurisdiction to issue a CDO, an RO, or penalties.  However, Sable's arguments are mostly derivative of their earlier arguments, in the sense that they rely on the substantive arguments Sable made earlier and only apply if their earlier arguments are correct, as is explained in the next four paragraphs.

With respect to the Commission's authority to issue a cease-and-desist order, Sable begins by arguing that the first two bases listed in Section 30810 for such an order (that the work at issue required a permit from the Commission or violated a condition of an existing permit) do not apply. But with the exception of the span remediation work, the Commission is not asserting otherwise, and for the span remediation work, again, the issue of whether the work required Coastal Act authorization beyond what was provided for the original installation of the pipes in the 1980s is addressed above.  For the other two categories of development, the Commission's CDO is based on the third, alternative, and independently sufficient basis for the Commission's jurisdiction to issue a CDO, which is that the Commission is enforcing the County's LCP.  Here again, Sable argues that the work is not a violation of the County's LCP because it was already authorized, but that issue is addressed above. The Commission's analysis from above is incorporated by reference.

There are three bases on which the Commission can enforce an LCP, listed in section 30810(a)(1)-(3).  Here, as discussed above, the Commission is authorized to issue the CDO based on section 30810(a)(2), because the Commission requested that the County take enforcement action, and the County declined to act or did not act in a timely manner. Sable argues that it is not the case that the County declined to act, in that the County did issue letters, referring to the County letters asserting that the work at issue was authorized

**Exhibits - Page 281**

by prior permits.  Section 30810(a)(2) authorizes the Commission to act whenever a local government declines the Commission's request to pursue enforcement.  The County's letters may be a type of act, but they certainly do not count as the County pursuing enforcement.  If anything, they are the opposite, as they explain why the County has declined to act.  Sable also argues that section 30810(a)(2) only allows the Commission to enforce if the actions at issue "could cause significant damage to coastal resources."  But this is, again, an issue that was addressed above, in the Commission's findings to establish its *prima facie* case on the merits.

With respect to the restoration order, Sable points out that there are three criteria that must be satisfied to support the Commission's authority to issue such an order.  Sable again argues that first criterion is not satisfied because the work required no permit, but again, that is addressed above throughout this report.  Sable next argues that the work did not cause continuing, or even any, resource damage, but that issue is addressed above as well.  Again, the Commission's prior analyses are incorporated herein by reference.

Finally, with respect to penalties, Sable makes arguments with respect to PRC sections 30820, 30821.6, and 30822, but none of those sections is at issue here.  Those sections govern the imposition of penalties by the courts.  The NOI for this proceeding stated that the Commission could impose penalties pursuant to section 30821.3.  The NOI then merely went on to mention that the Coastal Act "*also* includes several *other* penalty provisions that may be applicable as well" (emphasis added), meaning they may be applicable to the activities at issue, not that they would form the basis for the Commission's administrative action.  As for section 30821.3, Sable returns to its derivative argument, claiming that the work was already authorized.  Again, since that issue is at the heart of this report, the Commission's prior analysis is incorporated herein by reference.

The County also makes two other arguments that could be characterized as being jurisdictional arguments.  With respect to the valve installation work, Sable argues that, because it has submitted additional information to the County for its review, it would be "premature" for the Commission to address that issue at this point.[30]  The Commission has always been, and continues to be, interested in considering any additional materials Sable can provide regarding the work that was done and is still planning to do, or regarding Coastal Act authorization for that work.  In fact, Commission staff asked repeatedly for information and evidence that any of the work was covered by prior coastal development permits.  However, although Sable asserts that it is now returning to the County and argues that this divests the Commission of authority to act, Sable provides no indication of what sorts of materials were submitted to the County or why Sable didn't begin this process six months earlier, given that it acknowledges that it is submitting these materials "in light of" the letters it received from the Commission six months ago.[31]  In addition, the Commission's orders provide for the possibility that Sable could produce new evidence of existing Coastal Act authorization.  The prohibition on development in Section 1.1 of the Orders does not apply if the Commission's Executive Director confirms that Coastal Act authorization has been received.  Thus, if the County responds to Sable's new

---

[30] SOD at 3, 30, 37, 41, and 42.
[31] *Id.* at 30 and 37.

**Exhibits - Page 282**

submittal by providing evidence of such authorization, the Orders will allow Sable to proceed.   At this point, however, since the County did not act in response to the Commission's request for enforcement, the Commission now has jurisdiction to proceed and need not wait for additional County review of this unspecified (and mysteriously timed) "new information." Second, Sable argues that the consolidated permitting process – which Commission staff mentioned in an attempt to help facilitate and expedite the process – does not apply because it requires that a permit be required from the local government. Based on its argument that no permit is required from the local government, Sable therefore argues that this process is not available.  Of course, this, too, is a derivative argument in the sense that, if that were true, the entire enforcement action would be improper, so the availability of this permitting approach would be irrelevant.  Conversely, however, assuming the Commission is correct that additional Coastal Act authorization is required, as is at the heart of this action, then this argument necessarily fails.  Sable also argues that the process is "procedurally improper" in that it has not consented to it (SOD at 27), but again, the process was offered as an accommodation, Commission staff and the County have agreed, and whether Sable provides the final consent to make the process available is within its control.  And finally, the orders merely provide this process as an option of which Sable may avail itself.

> c.  Benefits and Harms of the Work at Issue

Much of Sable's SOD contains arguments for the salutary nature of the work at issue, how it is consistent with industry standards,[32] how it promotes pipeline safety,[33] or how it is consistent with legislative mandates, such as AB 864[34].  All of this misses the point. Commission staff never stated that the work at issue does not improve the safety of the pipeline or that it should not ultimately be allowed.  Nor is the Commission taking that position now.  Indeed, it would be premature to do so without having received the normal application materials that would enable a complete review of the work.  Whether the work has benefits is beside the point.  Even if the work is ultimately found to be beneficial and approved, the question posed in this proceeding was a different one: whether the work must be approved through a permitting process that, if nothing else, allows the Commission to perform its responsibility of ensuring that the work is done in a manner that minimizes impacts to protected coastal resources.

Another significant portion of Sable's SOD argues that the various types of work it has been performing that are at issue here were performed in a safe and environmentally sensitive manner that protected the resources.  This is relevant to some of the analysis (for example with respect to the restoration order and the penalties), but it is not relevant to the cease-and-desist order, for the reason indicated in the prior paragraph.  I.e., the Commission's authority to issue a cease-and-desist order in this case is based on Sable's failure to secure the necessary Coastal Act authorization for the work, regardless of how it is performed and whether it harmed resources.  However, as is explained in the body of this report, the Commission also finds that it is not true that the work was all conducted in a manner that had no impacts, and the Coastal Act is designed such that it is through the permitting process that the Commission will obtain more detailed information in this regard.

---

[32] E.g., SOD at 11, n.33, and 48-49.
[33] E.g., SOD at 12, 32.
[34] E.g., SOD at 30-31.

### D. Additional Arguments

Respondent's Claim:

"the Coastal Commission does not have the authority to override or otherwise nullify either the County's determination or the County's interpretation of its own previously issued coastal development permits for the Onshore Pipelines"
- Statement of Defense at page 2

Response:

The County's interpretation may be due some deference, but we are unaware of any authority to suggest that a permitting agency's interpretation creates a conclusive presumption.  Commission staff reviewed the relevant documents to try to determine whether the County's reading is correct, and they reached out to the County to share their reading of the permits and other documents and attempt to coordinate with them, but the County did not engage in any meaningful dialogue or provide useful documentation to support their position, despite numerous requests from Commission staff over the span of over two months.

Staff also initiated a review process pursuant to section 13569 of the Commission's regulations, in an attempt to foster further coordination with the County, understand the factual basis for its position and attempt to resolve this disagreement.  However, the County continued to ignore requests to identify the sections and analysis in its historic CDPs for the pipeline that could be interpreted as pre-authorizing Sable's current work.

The County has ignored these requests and consistently failed to identify any such information, leading Commission staff to reach the conclusions described above that no such information exists.

We are also unaware of any authority to suggest that the County's letter has any independent legal significance such that we would need "authority to override or otherwise nullify" it.  It is simply their position, and as such, we are free to disagree with it. Our positions are based on a reading of the relevant documents as discussed herein.

Respondent's Claim:

"Commission staff appears to be asserting Commission jurisdiction over these already permitted activities in order to exert some influence over Sable's planned restart of the Santa Ynez Unit oil production operations."
- Statement of Defense at page 3

Response:

This speculation about the reasons for the Commission's assertion of jurisdiction is both baseless and irrelevant to the issues in this case.  The action being taken here, and those which were taken previously by the Executive Director of the Commission, were

taken to protect the coastal resources the Commission is charged with protecting and to ensure the integrity of the permit process.

In any event, the Commission has jurisdiction for the reasons stated in the body of this report, and as such, it can proceed regardless of Sable's speculation about motives or future issues.

Respondent's Claim:
"Jurisdiction over restart activities is entirely outside of the Commission's jurisdiction"
- Statement of Defense at page 3 and fn. 7, citing the Consent Decree with the parenthetical "requiring, in part, approval of a Restart Plan by the Office of the State Fire Marshal."

Response:

Sable cites to nothing in the Consent Decree or any other authority for the proposition that restart is in the exclusive jurisdiction of the agencies that are parties that that document, and we are aware of nothing that would support this, but this point is irrelevant to the present dispute in any event, as the activities identified as having taken place without the required permit do not include restart of the pipeline, and the action here is addressing the need for Coastal Development Permits for development activities, and the importance of the associated protection of coastal resources under the permitting processes.

Respondent's Claim:
"Since these facilities were constructed, the Coastal Commission has never asserted that any new or amended coastal development permits would be required for the type of anomaly repair and maintenance activities, safety valve installation work, or span remediation work described in the EDCDO/NOI."
- Statement of Defense at page 6

Response:

The Commission is unaware of any work of the nature or magnitude of the present project having occurred before. In fact, the Commission is unaware of being notified of any anomaly repair work or valve installation work having occurred previously, and Sable has only identified one instance, more than a decade ago, where the Commission was merely cc'd on a letter regarding offshore span remediation work. Thus, the fact that the Commission has never made an assertion regarding this sort of work before is indicative of nothing. Moreover, even if the Commission had been aware of similar work and had not affirmatively asserted that it required a permit, such silence would not and could not create a waiver of the applicable legal requirements.

Respondent's Claim:
"Sable's anomaly repair work is an important protective measure for coastal resources and part of exercising the "utmost caution" urged by Commission staff –

**Exhibits - Page 285**

not an activity that threatens coastal harm or increases the risk of a potential future oil spill.

- Statement of Defense at page 12

Response:

In addition to the general point made in the previous section, we note that here is no oil flowing through the pipelines at this time, so the only risk created by the current action is from the work being performed.  Leaving the anomalies unresolved while they seek a permit would create no risk as long as the pipeline is idle.  The Commission is merely saying that any such development activities need a CDP and with it a review of the methods, timing and impacts of work to determine whether the work can be conditioned to avoid or minimize impacts on coastal resources and made consistent with Coastal Act protections, and to determine what conditions and mitigations are appropriate and necessary.

Respondent's Claim:

"The Onshore EIR/EIS explains that its impact analysis extends through the Onshore Pipelines' entire lifetime, including both pipeline "operation" and "maintenance."

- Statement of Defense at page 13

Response:

That page of the Final EIR/EIS also refers to impacts through abandonment.  Thus, the logical extension of Sable's argument would be that abandonment was also pre-authorized, which is an untenable position, given the extensive regulation of that process.  That fact demonstrates that this reliance is a misreading of the provision.

In any case, as was stated on page 3 of the Notice of Intent for the second EDCDO, while it may be prudent and perhaps even required, as part of the CEQA and NEPA process, to predict the impacts that may occur down the line from a proposed project by taking into consideration future maintenance, that certainly is not the same as pre-authorizing all such maintenance.

Respondent's Claim:

"the Onshore EIR/EIS incorporates into the Pipeline Project's project description certain Oil Spill Contingency and Emergency Response Plans that address ongoing pipeline maintenance"

- Statement of Defense at page 13

Response:

Sable cites nothing in support of this claim, and it appears to be untrue.  The Draft EIR/EIS project description appears on pdf page 4 and says nothing about the oil spill contingency plan.  Section 2 provides more detail on the project, and section 2.2.4 (pdf pages 126-127) talks about maintenance, but it says nothing about the sort of work at issue now, or about the oil spill contingency plan as being incorporated.  It just says that such a plan would be prepared (2-12 & 2-33, pdf pages 108 & 129) and attaches a draft plan, but nothing in the document says that it was being incorporated as part of the project, and in fact, it is listed as being a preliminary draft.  Footnote 4 of the impacts table (S-13,

**Exhibits - Page 286**

pdf page 21) says that use of such a contingency plan "as part of the project description,
would" reduce the risk of an oil spill, but it doesn't say that such a plan is part of the project
description.  The Final EIR/EIS is even clearer that no such plan is incorporated.  It does
not even include such a plan as an exhibit, and it merely says that one will be prepared (2-
62, 2-133, pdf pages 130, 201).  This also makes Sable's arguments about the details of
the draft plan (discussed on pages 13-14 of the SOD) irrelevant.  Nor is it true, as Sable
claims at page 13 (and Sable cites nothing to support this claim) that the EIR/EIS
"incorporates [the oil spill contingency plan, which was still in draft form] into the Pipeline
Project's project description."

<u>Respondent's Claim</u>:

> "The Onshore EIR/EIS concludes that compliance with these plans would
> "substantially reduce the oil spill risk" and reduce any significant impacts that would
> result from a major oil spill, including impacts related to soils, surface water, aquatic
> biology, and land use and recreation."

> -    Statement of Defense at page 14

<u>Response</u>:

That doesn't mean that the impacts of all such work was addressed in the EIS/EIR.  This
statement (which appears on pdf page 174 of the FEIR/FEIS) was in response to a SCAG
comment saying that, in order to reduce the likelihood of failures, the pipeline should be
monitored and segments should be replaced as they age and deteriorate; and the
response was merely that faulty segments will be replaced as necessary.  In other words,
it was merely noting that monitoring and maintenance were anticipated.  But there is no
analysis of the impacts of repeatedly having to access sites and expose pipelines, much
less a suggestion that the impacts of all such future work, for all time, and however
accomplished, was being mitigated up front.

<u>Respondent's Claim</u>:

> "Significantly, in performing its analysis of future anomaly repairs along the
> pipelines' route, the Onshore EIR/EIS acknowledges that impacts to
> environmentally sensitive habitat areas (ESHA), such as oak woodlands, within the
> pipelines' right-of-way would be permanent (i.e., extending throughout the pipelines'
> lifetime due to anticipated and ongoing maintenance activities) and constitute a
> significant environmental impact."

> -    Statement of Defense at page 14

<u>Response</u>:

The project involved the destruction of the existing oak woodland, and the Draft EIR/EIS
recognized that this would be a permanent impact to an existing resource, but that doesn't

imply that all the other impacts that would result from repeated ground disturbance were also considered as part of the project. Moreover, it did not analyze or mitigate for other impacts to resources, nor did it anticipate or address the other resources that might exist or be impacted.

Respondent's Claim:

"The Anomaly Repair Work occurs within the boundaries of the right-of-way analyzed in the Onshore EIR/EIS, which was disturbed by Onshore Pipeline construction and has remained impacted."
- Statement of Defense at page 14

"the Onshore Pipelines' right-of-way has remained relatively devoid of mature vegetation."
- Statement of Defense at page 15

Response:

This only goes to the merits of whether the work is approvable, not whether it requires a CDP.  Moreover, the "Anomaly Repair Work" was done in a very significant number of places and habitats, and the claim that the areas were "disturbed by Onshore Pipeline construction" conducted over three decades ago and the claim that it" has remained impacted" is clearly not accurate. In many places, in the decades since the pipeline was constructed, the vegetation in the areas has grown back, and with it there have been animals and plants that have located in those areas, some of which are protected.  See the discussion regarding resources impacted.  This would mean that, in addition to not being legal or sufficient "preapproval" would also be not accurate or protective.

Respondent's Claim:
"an October 2020 Biological Resources Assessment confirmed that major work could be conducted in the Onshore Pipeline' maintenance corridor" without any substantial adverse effects on or significant impacts to biological, botanical, wetland or riparian habitat resources.
- Statement of Defense at page 15

Response:

There are several problems with reliance on this document.  First, there is no indication, nor could we find any evidence that this "biological resources assessment" was reviewed or approved by any regulatory agency, including the Commission.  It is impossible to verify that this was sufficient or accurate nor what it relied on.  Second, it is likely outdated and not reflective of current conditions, the field work having been conducted more than eight years ago.  Third, its conclusions are dependent on the implementation of certain "avoidance and mitigation measures" (see page 8), and without any regulatory oversight, it is impossible to confirm whether such measures were implemented.  Fourth, it appears to employ a definition of "short term and temporary" (in describing the work) that is not consistent with the Commission's understanding of how those terms apply to ecological impacts.  Moreover, it would be very difficult for such an assessment to predict any and all work that could be done, whatever the extent and

**Exhibits - Page 288**

location, and flatly determine that there would be no impacts. Further, it seems very unlikely to have no significant impacts to, for example wetlands habitat, since some of the areas in which work was done include Environmentally Sensitive Habitat Areas (ESHA) and wetlands.

In any event, this is not relevant to the question of whether the work required a permit, and moreover, if it is true that there would be and were not impacts at all, then securing such a permit it should be easy.

Respondent's Claim:

"[FDP] Condition J-11 acknowledges that the Onshore Pipelines' right-of-way will be used for 'operational maintenance'."

"Condition J-11 is broadly drafted to cover the varied types of repair and maintenance activities discussed in the Onshore EIR/EIS"

- Statement of Defense at page 16

Response:

This is misrepresentation of the record.  The provision at issue actually says that use will be "restricted to" operational maintenance, which is a <u>limitation</u> on what can be done in that area, not a pre-authorization of work. Nor does it say anything about encompassing everything discussed in the EIR/EIS, but even were it to do so, that would merely make this argument derivative of Sable's overly-broad reading of that EIR/EIS, which does not state that maintenance is pre-authorized.  And even if it were, there are no "varied types of repair and maintenance activities discussed in the Onshore EIR/EIS."  The Final contains no discussion, and the Draft discusses a very limited scope of maintenance activities, as indicated above.

Respondent's Claim:
"Condition P-2 similarly contemplates that the pipeline operator will conduct 'regular maintenance and safety inspections'."
- Statement of Defense at page 16

Response:
First, that condition requires implementation of its requirements "during construction and operations," and neither of those is occurring now.  Second, it provides no detail as to what sort of maintenance is envisioned.  And third, even if it were requiring this sort of maintenance at a time when the pipeline is inoperative, that does not mean that it is authorizing that work in advance without needing to get a permit to regulate the manner in which that work is done.

Respondent's Claim:
"Condition P-2 states that 'permits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195'."
- Statement of Defense at page 16

Response:

**Exhibits – Page 289**

This actually demonstrates that future permitting was, in fact, anticipated.  It also only applies to the County.  Third, the Commission is not proposing to withhold or suspend permits, but merely to be given the opportunity to conduct the permit review process.  And fourth, it's not clear that the cited regulation applies to an idle pipeline.

Respondent's Claim:
"Commission staff's interpretation is in direct conflict with the County's permitting history for the Onshore Pipelines over the past 30 years where the County consistently has authorized Anomaly Repair Work without requiring a new or amended coastal development permit"
- Statement of Defense at page 17

Response:
The County's past practices are not binding on the Commission or dispositive of the legal requirements of the Coastal Act. Further, the facts and circumstances of these alleged past activities have not been provided for review by Commission staff.  In certain locations and circumstances described in the Coastal Act and Commission's regulations, repair and maintenance activities may be exempt from Coastal Act review.  As such, past activities may legitimately not have required authorization.

Respondent's Claim:
"the Onshore EIR/EIS and Conditions of Approval addressed biological impacts from the installation of the Onshore Pipelines and their ongoing repair and maintenance, such as the Anomaly Repair Work and imposed mitigation to account for permanent impacts"
- Statement of Defense at page 17

Response:
Sable cites nothing to indicate that the sort of anomaly repair work at issue was ever contemplated, and the biological impacts envisioned in the EIR/EIS were only from the permanent removal of the oak woodlands, not from impacts to other sensitive habitats that might emerge over time nor any species they might support, or to water quality from runoff from work on steep slopes or being done during the rainy season.

Respondent's Claim:
"Similarly, Conditions H-10 and H-11 required the pipeline operator to, after construction, replace and revegetate any disturbed catalina mariposa lily and refugio manzanita in locations "in or near" the disturbed area, but "***exclusive of the operation [right-of-way]***.""
- Statement of Defense at page 18

Response:
This just shows that it was anticipated that the right-of-way would be disturbed again, so it would be pointless to plant sensitive species there.  That disturbance could be from driving directly on the area of the pipeline location, which has few (if any) of the significant adverse effects of grading whole new roads, excavating pipe, stockpiling dirt, etc.  In other words, this doesn't show that the current work was anticipated or mitigated, much less pre-authorized.

**Exhibits - Page 290**

<u>Respondent's Claim</u>:

"Sable also implemented several construction best management practices to ensure that impacts to coastal resources, biological resources, and archaeological resources were consistent with the Onshore Pipelines' prior impact analyses"
-   Statement of Defense at page 18

<u>Response</u>:

This shows that Sable in fact recognized that this work could have impacts to existing resources, and they did not cite anything to show that these BMPs were required by the original approvals, which shows that they recognize that the original approvals did not provide the necessary regulation for the current work.  Moreover, these BMPs were not reviewed and approved by Commission ecology staff, and we have no information proving that they were adequate or even implemented.  Since there was no permit sought or obtained for this work, there wasn't oversight or on site monitors.  And again, whether the work was done in a sufficiently protective manner is not relevant to whether Coastal Act authorization was legally required, and thus, to the Commission's authority to issue a cease-and-desist order.

<u>Respondent's Claim</u>:

"the County's Statement of Overriding Considerations concluded that the pipeline operator's compliance with the Conditions of Approval would 'mitigate[] as completely as possible' all 'potential oil spill impacts' and other potentially significant impacts"
-   Statement of Defense at page 18

<u>Response</u>:

Here again, the reliance is misplaced and misrepresents the document.  Tellingly, Sable *quotes* the phrase "oil spill impacts," but the reference to "other potentially significant impacts" is not a quote, because the Statement of Overriding Considerations doesn't use that phrasing, nor does the list on page 55 refer to impacts of future ground disturbance for maintenance.

<u>Respondent's Claim</u>:

"Anomaly Repair Work will serve as a protective measure for coastal resources and *reduce and avoid* any potential oil spill impacts."
-   Statement of Defense at page 19

<u>Response</u>:

Again, this refers to oil spill impacts.  That is simply not what's at issue here.

<u>Respondent's Claim</u>:

Condition A-13 lists the types of changes that would require a further permit, stating:

"[The pipeline operator] shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgement of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to 1)

major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above [noted as the outer continental shelf and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins], and 4) introduction of a different product from any source.79"
-    Statement of Defense at page 19

Response:
        This is about the sorts of changes in operations that require modifications to the existing permit (or a new permit), but (1) it does not say that it is intended to be an exhaustive list, and (2) it is focused on changes to the nature of the pipeline and its throughput, not to addressing significant maintenance work.

Respondent's Claim:
        The County's review of Sable's Zoning Clearance applications reflected the County's understanding "that Zoning Clearances should be used before commencing *initial* construction approved under a final development plan and that Zoning Clearances should not be used for each individual element of the approved development or use throughout the life of a project."
-    Statement of Defense at page 23

Response:
        This is not relevant.  Whether the Zoning Clearance process would be required <u>if</u> these activities were covered by the original permit is not the issue here.

Respondent's Claim:

        "The County's Anomaly Repair Confirmation Letter is not appealable under the CZO or LCP."

        "The County's confirmation that the work was authorized by the existing Onshore CDPs is 'not appealable to the … Coastal Commission'."

-    Statement of Defense at page 23

Response:
        This proceeding does not involve an appeal of this letter, so this is irrelevant.

Respondent's Claim:
        "Over the last 30 years, the County has employed different procedures to confirm that anomaly repair work complies with the pipelines' existing FDP and Onshore CDPs. These procedures have included using the County's Land Use Permit process, the Zoning Clearance process, as well as informal communications between the pipeline operator"
-    Statement of Defense at page 23

Response:

If, as Sable contends, it has always been understood that the intent of the County's original permit was to authorize all future anomaly repair work on the pipeline, the County shouldn't have needed to issue any sort of further authorization.  Thus, the fact that the County issued these additional permits shows that the work was not fully authorized in advance.  Moreover, the permits Sable cited (Sable SOD Doc. 19, 25, and 26) all included extensive conditions regulating the method of that work to protect natural resources, showing that, contrary to Sable's arguments, the County must have concluded that the original approvals did not adequately protect against the impacts of this future maintenance work.

Similarly, for the valve replacement work, as Sable notes, County staff initially issued an addendum to the EIR/EIS for that work.  Although it's true that the addendum proposed a conclusion that the work would not have significant new impacts, the fact that they concluded an addendum was needed at all shows that they did not view the original EIR/EIS as covering this work.  It's also notable that the Planning Commission rejected that addendum that staff had proposed, so it's conclusion that no significant adverse harm would occur was not adopted by the County

Respondent's Claim:

> In connection with the anomaly repairs, "Sable implemented several construction best management practices to ensure that impacts to coastal resources . . . were consistent with the Onshore Pipelines' prior impact analyses related to ongoing repair and maintenance, and subsequent ecological and archaeological resources analyses have confirmed that impacts resulting from such work remained within the scope of impacts previously analyzed and approved"
>
> - Statement of Defense at page 25

Response:

This is an unsupported, and vague assertion.  Although there is disagreement between Commission staff and Sable that the work undertaken was previously reviewed and authorized by the EIR/EIS and subsequent permits, Sable has provided no discussion or analysis of how the identified Best Management Practices (BMPs) comport with requirements of the mitigation measures and permit conditions. Second, given that there was no permit application, analysis, or regulatory review, and that the work took place without regulatory oversight, it is impossible to evaluate the veracity of Sable's statement much less the effectiveness of the BMPs they may have implemented to avoid or minimize adverse impacts to coastal resources as a result of field work. Third, Commission staff have received reports indicating that Sable may not be in compliance with required conditions and mitigation measures, including these listed BMPs. For example, a BMP in one of the references provided by Sable requires that "All oak tree impacts are to be

**Exhibits - Page 293**

avoided including no vehicles, equipment, or stockpile within the dripline of any oaks". Environmental Defense Center (EDC) shared a report with Commission staff dated March 24, 2025, for Sable work in Gaviota State Park (Exh. 27). Photos 8K and 8L of that report capture an excavator parked within the drip line of an oak tree on top of the west bank of Gaviota Creek.  This is clearly inconsistent with the relevant BMP and emphasizes the concern raised by Commission staff that without regulatory input on BMP development and regulatory and independent oversight of BMP implementation, BMPs may be inadequate, ignored or both.

Respondent's Claim:

"any dispute resolution process regarding the County's determination is not authorized by the Coastal Act Regulations.

- Statement of Defense at page 27

Response:

This proceeding does not involve the dispute resolution process established by section 13569 of the Commission's regulations

Respondent's Claim:

"Pipeline operators subject to AB 864 were required to submit a risk analysis and plan to retrofit existing pipelines with BAT by October 1, 2021."

- Statement of Defense at page 31

Response:

The section of the regulations that Sable cited in connection with this statement (19 C.C.R. § 2108(b)) just specifies when the regulations become enforceable. A subsequent section (section 2113(a)) requires submittal of an implementation plan "that outlines the time frame to implement the proposed best available technologies." It leaves it to the operator to propose a timeline and doesn't specify any maximum time.  Section 2113(c)(2) specifically says that the timeframe proposed must consider the time needed for "acquisition of permits." And 2113(d) provides for the possibility that the operator may have to provide "an explanation demonstrating good cause for delaying implementation past the deadline extensions."  Thus, the requirement Sable cites does not require that the work be completed by any particular time.

Respondent's Claim:

"OSFM anticipated that all pipeline BAT retrofits would be completed by April 1, 2023 – just eighteen months after operators were required to submit their plan for OSFM approval."

- Statement of Defense at page 31

Response:

Here too, Sable cites a regulation that does not support this statement.  However, even assuming it were true, "anticipated" is not the same as "required," so it would not mean that Sable was required to complete the valve installation by any particular time. However, again, the regulation does not say that OSFM anticipated all retrofits would be completed by April 1, 2023. Section 2108(c) says that's the date when OSFM must enforce the regulatory scheme "against an operator . . . that is required to complete retrofit of existing pipelines." In other words, if an operator is required to have completed the retrofit by that date, presumably per the schedule they proposed pursuant to 2113, then OSFM must enforce the regulatory scheme at that point. Sable presents no evidence that it had committed to complete the work by that date. And even if it did, again, section 2113 provides for the need for permits and for extensions for good cause.

Respondent's Claim:

"This timeline was based in part on an assumption that "[p]ermitting costs to install [AB 864's required safety valves] would be negligible" and that "'[i]n most cases, a permit [] may not be required'."

- Statement of Defense at page 31

Response:

This reinforces the fact that the regulatory system established by AB 864 envisioned that other permits would be necessary. In addition, any "assumption" the permitting costs would be negligible is not a requirement, nor could it be a requirement, that other agencies' permitting costs would be capped. And finally, even if this could somehow be a requirement that permitting costs be capped at some level reflective of negligibility and were, Sable has presented no evidence that this would not have been the case had it applied for a CDP.

In addition, the cited text says the determination of whether a permit would be required would be made on a case-by-case basis, but even if didn't say provide for that that, this is just a report of what OSFM was told in "[d]iscussions with local agency personnel."

Respondent's Claim:

"The Onshore EIR/EIS analyzed the installation of fifteen "[p]ipeline block and check valves"

"The Onshore Pipelines' FDP and CDPs also acknowledged that the operator would undertake certain safety valve installation work."

- Statement of Defense at page 32

Response:

These are different from the valves installed more recently, which are the subject of this matter, and any analysis of valves installed with the original project is irrelevant to the question of whether the <u>installation process</u> for new valves, that are almost certainly of a different sort, 40 years later, requires a permit.

Respondent's Claim:

"the additional valves were located within the Onshore Pipelines' already-disturbed operational right-of-way where permanent impacts to terrestrial biology were assumed to extend throughout the pipelines' lifetime.[163]"

-Statement of Defense at page 33

Response:

The cited page only says that "220 acres of oak woodlands would be removed for the life of the project," not that all terrestrial biology would be. And for all the reasons stated previously, it does not appear that the approval of the original project was intended to approve specific maintenance projects 40 years in the future without review of the methods, much less the installation of additional valves that was not contemplated as maintenance. And clearly, it did not analyze the impacts of such additional valves or means to best avoid adverse impacts in their installation.

Respondent's Claim:

"County staff's analysis confirmed that installing these valves would not result in any new or substantially more severe impacts"

-Statement of Defense at page 33

Response:

First, this was a staff-level determination that was overturned by the Planning Commission, so it is not binding.  Second, it was only comparing the impacts of the new valve installation work to the impacts of the original project, not assessing whether the new work would have its own impacts.  Third, if this work were truly pre-approved, as Sable argues, then County staff shouldn't have had to assess this question at all.  Fourth, impacts analyses are not the standard for whether a permit application is required. The

**Exhibits - Page 296**

requirement is based on the performance of development, not the resource impacts. Lack of resource impacts just means the permit will be approved, or that the permit requirement may be waived.  Here as elsewhere, Sable is jumping to a conclusion on what may be approvable with out the process leading to that.  And in fact, there are often minor tweaks as to timing or manner that can make a development activity much more protective of coastal resources.

Respondent's Claim:

"County staff initially opted to prepare discrete amendments to the Onshore Pipelines' FDP and Onshore CDPs related to the proposed safety valve installation work."

-Statement of Defense at page 33

Response:

This shows that even the County originally viewed this project as requiring an amendment to the existing approvals. In fact, it was only after Sable sued the County that the County reversed its position on this and found that the work was covered by the original permits and didn't need an amendment

Respondent's Claim:

To support the amendments, County staff prepared a draft addendum to the EIR/EIS, which "concluded that safety valve installation work "presents minor incremental impacts *that remain less than those identified for the originally approved*"

-Statement of Defense at page 33

Response:

This is all irrelevant to the issue at hand, as it once again conflates impacts with the need for a CDP.  However, as to the impacts analysis, although it's true that the staff's draft addendum to the EIR stated that the impacts of the proposed project would be minor and less than the impacts of the original project, if Sable were correct that the work was covered by the original EIR/EIS, no addendum would have been necessary at all.  In fact, that addendum explains that it was created to address "changes and additions from the project described in the certified SEIR to the proposed project." Page C1-2. Thus, far from supporting Sable's position, this actually shows that this was always seen as an expansion beyond the project described in the original EIR/EIS. See also page C1-4 ("The project is a request . . . for an amendment to the . . . [FDP] to allow for the installation of 16 new valves")

Respondent's Claim:

**Exhibits - Page 297**

"Sable undertook [the valve installation] work based on the County's . . . Letter, which confirmed that no further County authorization was required to complete this safety valve installation work. The County has delegated local permitting authority under the Coastal Act and therefore the County's prior authorization was understood by Sable to extend to Coastal Act permitting as well"

-Statement of Defense at page 37

Response:

The County issued its letter on September 4, 2024. That same month, Sable received a Notice of Violation letter from the Coastal Commission explaining Commission staff's contrary position, and the rationale therefor.  Thus, Sable was fully aware of the Commission's opposition to this analysis and of its concerns when Sabe undertook this work.

Respondent's Claim:

"Sable requested a two-day extension from Commission staff to submit this Statement of Defense, which would have allowed Sable to submit the valve installation materials to the County and provide those materials with the initial submission of the Statement of Defense. Commission staff rejected that request."

-Statement of Defense at page 37, fn.176

Response:

The Commission's Executive Director's issued a cease-and-desist order to, among other things, preserve the *status quo* until this matter could be brought before the full Commission. However, because Sable has disregarded that order and proceeded with its work, Commission staff had no choice but to rush this matter onto the next Commission meeting to obtain further relief. It would not have been possible to do that if Sable had been given an extension on the deadline for the Statement of Defense. Therefore, it was Sable's own refusal to comply with the ED-CDO that resulted in the denial of this extension request.

Respondent's Claim:

Sable claims that the Commission lacks jurisdiction because the County acted in a timely manner to the request from the Commission for enforcement action, as provided for in Section 30810, and cites, as evidence, that the "County issued the Safety Valve Confirmation Letter"

-Statement of Defense at page 38

**Exhibits - Page 298**

Response:

Again, that letter from the County was issued on September 4, 2024.  Commission staff requested the County act on September 20, 2024, and February 17, 2025.  Thus, the County's letter could not have been responsive to the Commission's requests.  Nor did it constitute taking action to address the violations that staff was alleging. To the contrary, it showed the County took a different perspective that precluded it from acting on Commission staff's request.  At most, the County's letter reveals *why* the County *declined* to take action.

Respondent's Claim:

Sable claims that the valve installation work "could not 'cause significant damage to coastal resources' as required for a cease and desist order."

-Statement of Defense at page 38

Response:

The work at hand was done over a broad area within the County's Gaviota Coast which is an incredibly diverse ecologically region with a variety of habitats and other coastal resources. The original valve installation project for the above ground safety valves was previously approved by the County zoning administrator and the zoning administrator's approval was appealed to the County Planning Commission. County Planning staff recommended that the Planning Commission deny the appeals, but the Planning Commission voted against County Planning staff and upheld the appeals. The Planning Commission decision was appealed to the County Board of Supervisors and the Board of Supervisors decision ended in a tied vote. Meaning no action was taken by the Board of Supervisors and the action by the Planning Commission stood. Next, Sable and the County entered litigation resulting in the above ground safety valve project being replaced with a proposal to install the safety valves below ground. No application was prepared for the below ground valves and the County provided no  regulatory oversight regarding the work.

What this history demonstrates is that although an application was filed for the original above ground valve installation project and County Planning staff made findings regarding that project, because the Planning Commission voted against staff and the Board of Supervisors decision resulted in no action, the County never formally adopted any findings demonstrating that the above ground valve installation project was consistent with the coastal resource protection policies and provisions of the County's certified Local Coastal Program. And since Sable undertook the belowground valve installation work without ever submitting an application to the County and the County never provided any regulatory review or oversight, it is impossible to know whether that project was sited,

**Exhibits - Page 299**

designed and constructed in a manner to avoid, minimize and mitigate any potential adverse impacts to coastal resources.

There were many different development activities undertaken, including some that presented the potential to have a very significant damage to coastal resources.  For example, the timing of Sable's work occurred during the breeding season for southern California steelhead and California red legged frog. The work also occurred during the nesting season for most bird species, as well as during the time of year in which ground disturbances would most likely result in erosion, scarring, and discharge of sediment into wetland and watercourses. It also appears that several work sites are in or adjacent to ESHA.

Section 30810(a)(2) does not require a showing that significant damage occurred. The operative phrase is that the alleged violation "**could** cause significant damage to coastal resources."  The phrase, as used in both Sections 30809 and 30810, reflects the precautionary nature of the Coastal Act and of these orders in particular.  The idea is not to have harm befall coastal resources before the Commission can act to prevent it.  Here Commission staff went to great lengths to determine what Sable was doing, and where, so that such potential harm could be evaluated, reduced and mitigated.  As the record reflects, Commission permit and enforcement staff reached out repeatedly to Sable for this information and offered to work collaboratively to resolve the situation in a legal way to find a way to evaluate impacts and minimize any potential harms, but this did not bear fruit. Sable has repeatedly claimed that the valve work remained within the scope of the impacts previously analyzed and approved. However, as discussed previously in this staff report, there is no evidence demonstrating that this valve installation work was considered, analyzed, mitigated or approved in the EIR/EIS or any of the County's permits.

Moreover, as we have stated in response to their other comments, even if the work, such as the valve installation, is not in and of itself a bad idea or even a good idea, it does not mean that it should not be done in a manner that is protective of coastal resources. This is the whole point of the permit process—to evaluate alternatives and find the one with the least impacts and to condition the work in a way that is protective.

Respondent's Claim:

"Commission staff also assert that Coastal Act sections 30820, 30821.3, 30821.6, and 30822 authorize penalties to be levied against Sable related to the safety valve installation work. None of those sections apply here and thus no penalties may be levied."

-Statement of Defense at page 39

Response:

To the extent Sable may be objecting to the idea of the Commission invoking these provisions as a basis for imposing an administrative penalty, that is not what the Commission is doing in this proceeding, as the Commission cannot impose penalties administratively pursuant to any of those sections other than 30821.3, and staff never suggested otherwise. The NOI raises those penalty provisions in saying that the "Coastal Act <u>also</u> includes several <u>other</u> penalty provisions that may be applicable" (emphasis added), meaning that these "other" penalty provisions may apply to the acts at issue, not that the Commission can invoke them to impose penalties administratively.

<u>Respondent's Claim</u>:

Sable claims that because the Commission "did not include the Span Remediation Work performed in federal waters" in this action, that "indicates staff's understanding that this work was in fact contemplated and authorized in the DPP"

-Statement of Defense at page 43, fn. 205, and 51

<u>Response</u>:

The inference Sable attempts to draw is not only unjustified, but absurd.  The reason Commission staff limited the seaward extent of its pursuit of this matter is that the "federal waters" to which Sable alludes are outside Coastal Zone and the Commission's enforcement jurisdiction.  Commission staff actually did inquire about this issue with the federal agency in charge; however, the Commission also has no enforcement jurisdiction over federal agencies.

<u>Respondent's Claim</u>:

Sable claims that the Commission's findings in support of its action on the CDP for the DPP and the related consistency certification "highlighted the importance of addressing potential geologic constraints through 'proper mitigation,' which included 'avoidance or … engineering design'," which Sable argues shows that the Commission authorized alterations to the seafloor.

-Statement of Defense at page 50, citing the findings at page 78

<u>Response</u>:

Not only is the language Sable cites much more general than Sable would suggest, but more importantly, Sable points to nothing to indicate that the language referred to any work beyond the initial deployment.

<u>Respondent's Claim</u>:

Sable claims the Commission's findings in support of its action on the CDP for the DPP and the related consistency certification "also recognized the need for flexibility in pipeline construction methods, acknowledging that '[p]ipeline construction

**Exhibits - Page 301**

methods are presently undefined' and allowing Exxon the latitude to 'propose their own design solutions,'" suggesting that this, too, "permits the adaptation of construction techniques," such as the span remediation work at issue.

-Statement of Defense at page 50, citing the findings at page 44

Response:

The very next sentence in the cited findings states that the range of possible alternatives and their impacts are nevertheless discussed below, showing that the Commission was not creating an open-ended authorization for any sort of work that could fit into this description.  In addition, again, the Commission is not saying that the approach at issue is not allowable, but only that it needs to be reviewed through the permit process.

Respondent's Claim:

Sable claims that a plan the Commission required in the CDP for the DPP, and which the Commission subsequently approved, "specifically approved future Span Remediation Work to (1) inspect the pipelines for unacceptable free spans, and (2) 'modify' the seafloor to remediate any identified unacceptable spans as part of the Offshore CDP."

-Statement of Defense at page 51, citing CDP condition 9 and the 1989 "Final Comprehensive Plan for Marine Biological Impact Reduction and Mitigation in Nearshore Waters off Las Flores Canyon, at 19.

Response:

The language quoted only reflected Exxon's proposal to "modify" certain "bedrock ridges" as part of its initial construction and then to identify unacceptable free spans "following pulling of the pipelines," meaning in the immediate aftermath of the deployment, not decades into the future.  Moreover, even if it were to have been referring to future work, the statement is only about "identify[ing]" those spans. It doesn't say they will be making additional modifications in response to those unacceptable free spans without further review and regulation

Respondent's Claim:

Sable notes that leases issued by the State Lands Commission require that the pipelines be kept 'in good order and repair and safe condition'" and "also require that should inspections on the pipeline 'show bridging…then further detailed inspections shall be made and corrective action taken, if necessary.'"

-Statement of Defense at page 52

Response:

One agency's requirement to take corrective action does not create immunity from other regulatory requirements.  In fact, the current leases specifically require compliance with all other regulatory requirements.

### VIII.    CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA)

The Commission finds that imposition and implementation of this Cease and Desist Order, to compel Sable Offshore Corporation to apply for Coastal Development Permits for, both, work undertaken at onshore locations along the Pipelines, as well as offshore locations of the pipeline located in state, coastal waters; as well as application for future, proposed work, among other things, is exempt from the requirements of the California Environmental Quality Act of 1970 (CEQA), Cal. Pub. Res. Code §§ 21000 *et seq.*, for the following reasons. First, the CEQA statue (section 21084) provides for the identification of "classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from [CEQA]." The CEQA Guidelines (which, like the Commission's regulations, are codified in 14 CCR) provide the list of such projects, which are known as "categorical exemptions," in Article 19 (14 CCR §§15300 *et seq.*). Because this is an enforcement action and because the Commission's process, as demonstrated above, involves ensuring that the environment is protected throughout the process, the exemption covering enforcement actions by regulatory agencies (14 CCR § 15321) applies here.

Secondly although the CEQA Guidelines provide for exceptions to the application of these categorical exemptions (14 CCR § 15300.2), the Commission finds that none of those exceptions applies here. Section 15300.2(c), in particular, states that:

> *A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.*

CEQA defines the phrase "significant effect on the environment" (in Section 21068) to mean "a substantial, or potentially substantial, adverse change in the environment." This Cease and Desist Order is designed to protect and enhance the coastal resources, and contain provisions to ensure, and to allow the Executive Director to ensure, that they are implemented in a manner that will protect the environment. Thus, this action will not have any significant effect on the environment, within the meaning of CEQA, and the exception to the categorical exemptions listed in 14 CCR § 15300.2(c) does not apply. An independent but equally sufficient reason why that exception in Section 15300.2(c) does not apply is that this case does not involve any "unusual circumstances" within the meaning of that section, in that it has not significant feature that would distinguish it from other activities in the exempt classes listed above. This case is a typical Commission enforcement action to protect and restore coastal resources.

Finally, it is not even clear that this order will not result in a physical change in the environment, as that concept is used in CEQA, rending the project exempt pursuant to 14

CCR § 15060(c)(2), and it may not constitute a project within the meaning of CEQA, rendering it exempt pursuant to 14 CCR § 15060(c)(3).

In sum, given the nature of this matter as an enforcement action to protect and restore coastal resources and the environment, and since there is no reasonable possibility that it will result in any significant adverse change in the environment, it is exempt and also categorically exempt for CEQA.

## IX.     SUMMARY OF FINDINGS OF FACT

1.  Sable Offshore Corp. ("Sable") is the owner and operator of the Santa Ynez Unit, and associated assets, consisting of three offshore platforms (Hondo, Harmony and Heritage), the Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil and gas transport pipelines including Las Flores Pipelines CA-324 and CA-325 (Formerly lies 901 and 903, respectively)
2.  On February 14, 2024, Sable finalized a purchase agreement with ExxonMobil Corporation, to which Sable purchased the entire Santa Ynez Unit ("SYU"), including the Las Flores Pipelines, and all associated assets (the three offshore platforms, subsea pipelines and infrastructure, and Las Flores Canyon processing facility).
3.  Coastal Act Section 30810 authorizes the Commission to issue a cease and desist order when the Commission determines that any person has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the Commission without securing a permit, or (2) is inconsistent with a permit previously issued by the Commission. It may also be issued to enforce any requirements of a certified local coastal program or port master plan.
4.  Coastal Act Section 30811 authorizes the Commission to issue a cease and desist order when the Commission determines that development has (1) occurred without a coastal development permit from the Commission or local government (2) is inconsistent with this division, and (3) and the development is causing continuing resource damage.
5.  Coastal Act Section 30921.3 provides for administrative civil penalties for violations of any provision of the Coastal Act other than public access.

**APPENDICES**

Appendix A – Cease and Desist Order No. CCC-25-CD-01; Restoration Order CCC-25-RO-01; Civil Administrative Penalty No. CCC-25-AP3-01

# Exhibit D



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0002**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (Sable CA-324) between Las Flores Canyon and Gaviota, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

**Exhibits - Page 306**

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

**PHMSA-2025-0002 – California Office of the State Fire Marshall**                     **Page 2 of 2**

# Exhibit E



**U.S. Department
of Transportation
Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0003**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

**Exhibits - Page 309**

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

**PHMSA-2025-0003 – California Office of the State Fire Marshall**          **Page 2 of 2**

**Exhibits - Page 310**

# Exhibit F





# Central Coast Regional Water Quality Control Board

April 15, 2025

Sable Offshore Corp.
Steven Rusch, Vice President
845 Texas Avenue, Ste 2920
Houston, Texas 77002
Email: SRusch@sableoffshore.com

**VIA CERTIFIED MAIL AND EMAIL
RETURN RECEIPT REQUESTED
9589 0710 5270 0883 4147 17**

Sable Offshore Corp.
Amanda Garcia
Agent for Service of Process
330 N Brand Blvd
Glendale, CA 91203

**VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED
9589 0710 5270 0883 4146 70**

Dear Steven Rusch and Amanda Garcia:

**ENFORCEMENT PROGRAM: SABLE OFFSHORE CORP. - NOTICE OF VIOLATION FOR UNAUTHORIZED DISCHARGES OF WASTE TO WATERS OF THE STATE AND UNITED STATES AND FAILURE TO REPORT, SANTA BARBARA AND SAN LUIS OBISPO COUNTIES**

The California Regional Water Quality Control Board, Central Coast Region (Central Coast Water Board) is a state regulatory agency with responsibility for protecting the quality of the waters of the state within its area of jurisdiction. The Central Coast Water Board has authority to require submission of information, direct action, establish regulations, levy penalties, and bring legal action when necessary to protect water quality.

The Central Coast Water Board has evidence of a series of unauthorized discharges of waste by Sable Offshore Corp. (Sable) to waters of the state and United States related to Sable's pipeline remediation and planned restart of Line 324 (formerly Line 901) and Line 325 (formerly Line 903). In addition, Sable has not reported all of the information required by the Central Coast Water Board's January 22, 2025 investigative order issued pursuant to California Water Code section 13267. The unauthorized discharges of waste and failure to submit the information required by the investigative order are potential violations of the California Water Code. This notice of violation describes the alleged violations, summarizes potential monetary liability, and provides direction on corrective actions.

**Exhibits - Page 312**

**Background**

In August 2024, Central Coast Water Board staff were made aware by the public of Sable's pipeline remediation work along the Gaviota Coast in Santa Barbara County. When contacted by Central Coast Water Board staff, Sable representative Steve Rusch confirmed his knowledge of the regulatory requirements and confirmed Sable had surveyed all work locations and found no project impacts to waters of the state, which he confirmed to understand includes intermittent and ephemeral streams. In October 2024, the Central Coast Water Board received a complaint from the public of multiple land disturbances across what appeared to be waters of the state on the Gaviota Coast at various Sable pipeline remediation project sites.  On November 4, 2024, Central Coast Water Board staff inspected various project work locations along the Gaviota Coast which led to the positive identification of unauthorized discharges to waters of the state.

On December 13, 2024, the Central Coast Water Board issued a notice of violation to Sable notifying it that any person discharging waste, or proposing to discharge waste, that could affect the quality of waters of the state is required to file a report of discharge prior to initiating the discharge; that Sable's activities observed at the November 4, 2024 inspection constituted a violation of the California Water Code; and that Sable's activities were likely also subject to stormwater permitting. On December 13, 2024, the Central Coast Water Board also issued a California Water Code section 13260 directive to Sable to submit a report of waste discharge for the unauthorized discharges of waste and a Notice of Non-Compliance notifying Sable that it had been identified as requiring a stormwater permit. On January 22, 2025, the Central Coast Water Board issued a second Notice of Non-Compliance for failure to apply for stormwater permitting.

Since the issuance of the December 13, 2024 notice of violation, Sable has continued to commit alleged violations of the California Water Code. For example, while Sable submitted an after-the-fact notice of intent to obtain coverage for work in waters of the state at the location cited in the December 13, 2024 notice of violation, it resumed unauthorized work at the subject site in mid-February prior to obtaining the permit and authorization for the work.

On January 22, 2025, the Central Coast Water Board issued an order, pursuant to California Water Code section 13267, requiring Sable to submit a technical report addressing discharges of waste to waters of the state (13267 Technical Report Order). Among other things, Sable was required to include in the technical report an inventory of all Sable land disturbance activities that were or are currently active in the Central Coast region pertaining to remediation of the Las Flores Pipeline System lines, a detailed assessment of the presence of waters of the state at inventoried land disturbance locations, and a detailed assessment of all waste discharges to waters of the state. While Sable submitted a report in response to the 13267 Technical Report Order on March 8, 2025, its report was deficient, lacking information in response to 13267 Technical Report Order item numbers 2.f and 3.

a.  13267 Technical Report Order number 2.f required submittal of a detailed assessment of the presence of any of the following in or adjacent to areas disturbed by Sable pipeline remediation activities: wetlands; perennial, intermittent, or ephemeral streams; rivers; lakes; swales; drainages; ditches; or any other depressional features with evidence of bed, bank, or channel. Sable's response refers to the October 5, 2020 Biological Resources Assessment (2nd Revised) prepared by SCS Engineers for Pacific Pipeline Company. This document does not include the required assessment. While the document identifies some waters of the state in the project area, it does not identify all of the waters of the state, nor does it assess the proximity of all waters of the state to areas disturbed by Sable's pipeline remediation activities. For example, the unnamed ephemeral drainage at approximately 34° 28' 6.4" N, 120° 06' 22.5" W, upstream of Hwy 101 at postmile 39, just east of Baron Ranch Trailhead, that was subject to the Central Coast Water Board's December 13, 2024 notice of violation, is not identified in the document.

b.  13267 Technical Report Order numbers 3.a-c required Sable to identify the locations and sizes of the areas of waters of the state and United States affected by the unauthorized waste discharges; estimate the amount of waste discharged to waters of the state; and assess the biology of areas of the waters of the state impacted by the waste discharges. Sable's response states this information will be submitted late, by April 15, 2025. Sable's response does not provide an explanation for the late submittal.

On February 21, 2025, in response to the December 13, 2024 Notice of Noncompliance, Pacific Pipeline Company submitted an application for construction stormwater general permit (CGP) enrollment for coverage under a facilty/site name of Sable Land Base, however the documents submitted as part of this application were incomplete. State Water Resources Control Board staff notified Pacific Pipeline Company that the application was deficient and instructed it to resubmit the application with a complete Stormwater Pollution Prevention Plan on March 12, 2025. Through phone conversation (on February 22, 2025) and via email (on March 18, 2025) with Central Coast Water Board staff, Sable representatives communicated that Sable intends to complete the CGP enrollment only if land disturbance activities outside the existing right-of-way exceed the permit applicability threshold of one acre.

In response to ongoing public complaints, on February 28, 2025, Central Coast Water Board staff made a second site visit to Sable pipeline remediation sites along the Gaviota Coast. Central Coast Water Board staff observed and documented unauthorized discharges of waste at various locations that could affect the quality of waters of the state and Untied States.

a.  Site 1, Venadito Canyon Road (34.4649° N, -120.052° W) – Riparian vegetation at this location had been cleared and grubbed, with loose bare soil and slash at the site. The loose bare soil and slash at the site are unauthorized discharges of waste that could affect the quality of waters of the state.

**Exhibits – Page 314**

b. Site 7, Arroyo Quemado (34.4734° N, -120.119° W) – An access road had been graded, leaving bare loose soil without erosion and sediment control in several locations. Riparian vegetation at this location had also been cleared and grubbed, with loose bare soil and slash at the site. Freshly cut tree branches and other vegetation, which appeared to have been generated from work conducted by Sable in the riparian area, was observed as dumped waste in the flowing stream. The loose bare soil and slash at the site are unauthorized discharges of waste that could affect the quality of waters of the state and waters of the United States. The cut tree branches and other vegetation into the flowing stream are unauthorized discharges of waste and pollutants to waters of the state and waters of the United States.

c. Site F7/F8, unnamed drainage (34.4737° N, -120.176° W) – At this location, the bed and banks of an unnamed drainage had been graded, with loose bare soil in the drainage bed. The disturbance of soil on the drainage bed and banks and loose bare soil left in the drainage bed are unauthorized discharges of waste that could affect the quality of waters of the state.

d. Site F10, unnamed drainage (34.4758° N, -120.196° W) – At this location, a slope had been graded, without erosion and sediment controls. Loose sediment was also discharged into the bank and bed of the unnamed drainage. Riparian vegetation had also been cleared. The loose bare soil and discharge of loose sediment into the drainage at the site are unauthorized discharges of waste that could affect the quality of waters of the state.

On March 12 and 13, 2025, Padre Associates, Inc., on behalf of Sable, submitted a series of after-the-fact notices of intent to obtain authorization for previously conducted unauthorized discharges of waste to waters of the state and waters of the United States and restoration at various locations. Sites R5-1 and R5-3 are within waters of the United States.

a. R4-1, tributary to Cuyama River (35.059463° N, -119.933144° W)

b. R5-2, tributary to Peterson Creek (34.627952° N, -120.200412° W)

c. R5-1, tributary to Nojoqui Creek (34.573883° N, -120.19567° W)

d. R5-3, tributary to Foxen Canyon (34.80723° N, -120.192° W)

On April 10, 2025, at a California Coastal Commission hearing, Sable confirmed it had placed sand and cement filled bags on the ocean floor below and adjacent to Sable's out-of-service offshore oil and water pipelines.

**Exhibits - Page 315**

**Alleged Violations**

1. Violation of California Water Code Section 13260
California Water Code section 13260 requires any person discharging waste, or proposing to discharge waste, within any region that could affect the quality of waters of the state, to file with the appropriate regional board a report of the discharge. The conditions at Sites 1, 7, F7/F8, F10, R4-1, R5-1, R5-2, and R5-3 represent violations of California Water Code section 13260, because Sable cleared vegetation and excavated and graded sediment at the sites within waters of the state, resulting in discharges of waste that could affect the quality of waters of the state, without having filed reports of waste discharge. Sable's discharge of waste by placing sand and cement filled bags on the ocean floor below and adjacent to Sable's out-of-service offshore oil and water pipelines without having filed a report of waste discharge is also a violation of California Water Code section 13260.

2. Violation of California Water Code Section 13264
California Water Code section 13264 states in part that no person shall initiate any new discharge of waste or make any material changes in any discharge prior to the filing of the report required by California Water Code section 13260. The conditions at the various sites represent violations of California Water Code section 13264, because Sable discharged waste that could affect the quality of waters of the state without obtaining waste discharge requirements from the Central Coast Water Board.

3. Violation of California Water Code Section 13267
California Water Code section 13267 authorizes the regional boards to require that any person who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge waste within its region shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires. Sable was required to submit a technical report to the Central Coast Water Board by March 10, 2025. Sable's submitted technical report did not include the information required by items 2.f and 3.a-c of the Central Coast Water Board's March 10, 2025 13267 Technical Report Order. Sable's failure to include the required information is a violation of California Water Code section 13267.

4. Violation of California Water Code Section 13376
Section 13376 of the California Water Code requires any person discharging pollutants or fill material, or proposing to discharge pollutants fill material, to waters of the United States to file a report of waste discharge. In addition, California Water Code section 13376 prohibits the discharge of pollutants or fill material to waters of the United States except as authorized by waste discharge requirements. Federal Clean Water Action section 301 also prohibits the discharge of pollutants or fill material to waters of the United States without a permit. Sable did not submit a report of waste discharge or obtain waste discharge requirements from the Central Coast Water Board for the discharge of pollutants at Site 7. Sable also did not submit a report of waste discharge or obtain waste discharge requirements from the

Central Coast Water Board prior to discharging fill material to waters of the United States at Sites R5-1 and R5-3. In addition, Sable did not submit a report of waste discharge or obtain waste discharge requirements from the Central Coast Water Board prior to discharging fill material (sand and cement filled bags) to waters of the United States (Pacific Ocean) on the ocean floor below and adjacent to Sable's out-of-service offshore oil and water pipelines. Conducting these activities in waters of the United States without submittal of a report of waste discharge and issuance of waste discharge requirements are violations of California Water Code section 13376 and Clean Water Act section 301.

5. <u>Violations of Prohibitions in Water Quality Control Plan for the Central Coastal Basin (Basin Plan)</u>, June 2019 Edition

The Basin Plan prohibits, pursuant to California Water Code section 13243, the following:

1) the discharge or threatened discharge of earthen and organic materials into any stream in the basin in quantities deleterious to beneficial uses; and,

2) unless otherwise authorized, waste discharges to all coastal surface streams and natural drainageways that flow directly to the ocean within the South Coast Hydrologic Units 1 except where discharge is associated with an approved wastewater reclamation program.

Sable may have violated one or both of these Basin Plan prohibitions as a result of its unauthorized work.

**Required Corrective Actions**

Sable must obtain all required authorizations for corrective restoration and compensatory mitigation activities and submit the missing information from the required technical report. Sable must control all threatened discharges of earthen and organic materials to prevent their discharge to waters of the state and United States. Sable must take action to correct the alleged violations as soon as possible.

To avoid further unauthorized discharges during any restoration and compensatory mitigation implementation in waters of the state or waters of the United States, pursuant to California Water Code sections 13260 and 13376, Sable must apply for and obtain waste discharge requirements from the Central Coast Water Board prior to discharging waste, or proposing to discharge waste, including prior to any material removal, new disturbance, or restoration activity, that could affect the quality of waters of the state or United States.

**Potential Enforcement Actions**

The alleged violations cited above may subject Sable to enforcement by the Central Coast Water Board for every day the violations continue. Sable must correct the violations as soon as possible. Sable's receipt of this notice of violation does not preclude the Central Coast Water Board from taking further enforcement action for the

alleged violations cited in this notice of violation, and the Central Coast Water Board reserves the right to take any enforcement action authorized by law. In making its determination of whether and how to proceed with further enforcement action regarding the alleged violations in this letter, the Central Coast Water Board will consider the information submitted in response to this notice of violation, the time it takes to correct the identified violations, and the adequacy of the corrections and actions taken.

California Water Code section 13268 provides that failure to submit technical or monitoring program reports required by subdivision (b) of California Water Code section 13267 by the specified compliance date, or falsifying any information provided therein, is a misdemeanor and may result in administrative civil liability of up to $1,000 for each day of violation.  California Water Code section 13385 provides that any person who violates Clean Water Act section 301 and/or California Water Code section 13376, and/or a prohibition issued pursuant to 13243, is subject to administrative civil liability of up to $10,000 per day of violation, and up to $10 per gallon of waste discharged but not cleaned up over 1,000 gallons. If the Central Coast Water Board elects to refer the matter to the Attorney General, the superior court may impose civil liability for up to $25,000 per day for each violation, and up to $25 per gallon of waste discharged but not cleaned up over 1,000 gallons. California Water Code sections 13261, 13265, and 13350 also provide for per day administrative liabilities or liability per gallon discharged, as specified in the California Water Code.

The Central Coast Water Board may also require cleanup or abatement of the effects of the unauthorized activities pursuant to California Water Code section 13304, that Sable immediately cease and desist from the activities pursuant to California Water Code section 13301, or may require other actions pursuant to other injunctive authorities. The Central Coast Water Board reserves the right to take any enforcement action authorized by law.

If you have questions about this letter, please contact April Woods at April.Woods@waterboards.ca.gov or Phil Hammer at Phillip.Hammer@waterboards.ca.gov.

Sincerely,


Angela V. Schroeter
Assistant Executive Officer

cc:

Nicole Granquist, Counsel for Sable, Nicole.Granquist@Stoel.com
Stephanie Cook, California Coastal Commission, Stephanie.Cook@coastal.ca.gov
Wesley Horn, California Coastal Commission, Wesley.Horn@coastal.ca.gov
Errin Briggs, Santa Barbara County Planning & Development, EBriggs@countyofsb.org


**Exhibits - Page 318**

Jim Hosler, CAL FIRE, Jim.Hosler@fire.ca.gov
Julie Vance, California Department of Fish and Wildlife, Julie.Vance@wildlife.ca.gov
Linda Connolly, California Department of Fish and Wildlife, Linda.Connolly@wildlife.ca.gov
Naomi Rubin, State Water Resources Control Board, Naomi.Rubin@waterboards.ca.gov
Ryan Lodge, Central Coast Water Board, Ryan.Lodge@waterboards.ca.gov
Angela Schroeter, Central Coast Water Board, Angela.Schroeter@waterboards.ca.gov
Todd Stanley, Central Coast Water Board, Todd.Stanley@waterboards.ca.gov
Harvey Packard, Central Coast Water Board, Harvey.Packard@waterboards.ca.gov
Phil Hammer, Central Coast Water Board, Phillip.Hammer@waterboards.ca.gov
Tamara Anderson, Central Coast Water Board, Tamara.Anderson@waterboards.ca.gov
Leah Lemoine, Central Coast Water Board, Leah.Lemoine@Waterboards.ca.gov
April Woods, Central Coast Water Board, April.Woods@waterboards.ca.gov
Jesse Woodard, Central Coast Water Board, Jesse.Woodard@waterboards.ca.gov
Jacqueline Tkac, Central Coast Water Board, Jacqueline.Tkac@waterboards.ca.gov


R:\RB3\Enforcement\Case Files\Sable Pipeline\NOVs\Second NOV\Sable Offshore Corp_NOV_4-15-2025.docx

# Exhibit G

Docusign Envelope ID: 87148E7A-FD76-4984-86B3-BCE5F180FFD7

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**  **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:    Sable Offshore Corp
             OPID# 40851
             845 Texas Avenue, # 2920
             Houston, Texas 77002

Pipeline:    OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

**Exhibits - Page 321**

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

**Exhibits - Page 323**

Docusign Envelope ID: 87148E7A-FB76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a)  Dates for integrity assessment

   b)  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 6

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)

d) Required tool specifications including operational specifications and anomaly sizing tolerances

e) Tool validation methodology

f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

g) Criteria used to identify locations for excavation and field verification

h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

 a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.
 b. USCD Performance Specification Requirements
   i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.
   ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.
   iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.
   iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].
41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.
[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 87148E7A-FB76-4884-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 13

    e. Evaluation methodology used

    f. Models used

    g. Direct in situ examination data

    h. All in-line inspection tool assessments information evaluated

    i. Pressure test data and results

    j. All in-the-ditch assessments performed on the pipeline segments

    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

    l. All finite element analysis results

    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    o. Safety factors used for fatigue life and/or predicted failure pressure calculations

    p. Reassessment time interval and safety factors

    q. The date of the review

    r. Confirmation of the results by qualified technical subject matter expert(s)

    s. Approval by responsible Sable management personnel

    t. Records of additional preventive and mitigative (P&M) measures performed

    u. Reports required by this State Waiver.

## Reporting

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:

    a. Tool type and run date

    b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

    c. Dig sheets

    d. Field contact information for Sable

    e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

**Exhibits - Page 333**

Docusign Envelope ID: 87148E7A-FB76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 14

   a. Tool type
   b. Run date
   c. Summary of Conditions Report[18]
   d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324.* At a minimum, the annual report shall contain the following, if applicable:
   a. A Closure Report for the previous calendar (CY) which contains:
      i. Features that were remediated in previous CY
         1. Provide documentation for the in-the-ditch assessments and repairs
      ii. Identify features that remain to be assessed
      iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
   c. The third-party ILI expert reviews in accordance with Condition 52
   d. AC and DC Interference surveys that are due in accordance with Condition 53
   e. A copy of the CGRA for prior year including:
      i. Mean corrosion growth rate for the pipeline
      ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

**Limitations**

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

**Exhibits - Page 335**

# Exhibit H

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                      Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov

### CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of
Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa
Barbara County, San Luis Obispo County, and Kern County, California as
described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under
insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

**Exhibits - Page 337**

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAED95600F3B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

**Exhibits - Page 339**

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.

14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.

16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.

18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

### In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to  meet  the  tool  accuracy specification  provided  by  the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 166BEEF3-241E-476E-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAED95600F3B

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

**Exhibits - Page 348**

Lance Yearwood
December 17, 2024
Page 13

    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    o. Safety factors used for fatigue life and/or predicted failure pressure calculations

    p. Reassessment time interval and safety factors

    q. The date of the review

    r. Confirmation of the results by qualified technical subject matter expert(s)

    s. Approval by responsible Sable management personnel

    t. Records of additional preventive and mitigative (P&M) measures performed

    u. Reports required by this State Waiver.

## **Reporting**

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:

    d. Tool type and run date

    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

    f. Dig sheets

    g. Field contact information for Sable

    h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

    i. Tool type

    j. Run date

    k. Summary of Conditions Report[18]

    l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEEF3-211E-476E-8D10-BAFD95600F3B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:

a. A Closure Report for the previous calendar (CY) which contains:
   i. Features that were remediated in previous CY
      1. Provide documentation for the in-the-ditch assessments and repairs
   ii. Identify features that remain to be assessed
   iii. Unity Plots for previous ILI runs
b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
c. The third-party ILI expert reviews in accordance with Condition 53
d. AC and DC Interference surveys that are due in accordance with Condition 54
e. A copy of the CGRA for prior year including:
   i. Mean corrosion growth rate for the pipeline
   ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## **Limitations**

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:   Doug Allen, Supervising Pipeline Safety Engineer, OSFM
      Andy Chau, Supervising Pipeline Safety Engineer, OSFM
      Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
      Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
      Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
      Tuan Tran, Pipeline Safety Engineer, OSFM
      Josh Cleaver, Staff Counsel, CAL FIRE
      Max Kieba, Engineering and Research Division, PHMSA
      Joshua Johnson, Engineering and Research Division, PHMSA

# Exhibit I

# DRAFT
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



# PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

## CALIFORNIA STATE LANDS COMMISSION
### AND
## BUREAU OF LAND MANAGEMENT
## DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



**ERT**

A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# AUGUST 1984

CALIFORNIA STATE LANDS COMMISSION AND
BUREAU OF LAND MANAGEMENT, DEPARTMENT OF THE INTERIOR

DRAFT

ENVIRONMENTAL IMPACT REPORT/ENVIRONMENTAL IMPACT
STATEMENT FOR THE CELERON/ALL AMERICAN AND
GETTY PIPELINE PROJECTS

Prepared by

ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.

Prepared for

STATE LANDS COMMISSION AND BUREAU OF LAND MANAGEMENT

August 1984

_____
Claire Dedrick, Executive Officer, State Lands Commission

_____
Edward Hastey, California State Director, Bureau of Land Management

State Clearing House Number 83110902
Contract Number R 8353

- 2 pumping stations,
- 1 heating station,
- 10 pumping and heating stations,
- 20-acre tank farm at Cadiz,
- 2 delivery stations.

No new access roads longer than 2,600 feet (ft) would be required to reach the pumping stations. Utility requirements (electricity and natural gas) for the Celeron/All American pipeline are shown in Table 2-4.

The Celeron/All American pipeline used for analysis in this EIR/EIS would have the following specifications: 30-inch outside diameter; 0.344 to 0.562-inch wall thicknesses, with corresponding maximum operating pressures of 991 to 1,618 psig, respectively. The entire Celeron pipeline segment and a minimum of 20 miles of pipe downstream from each heating station on the All American pipeline segment would be insulated. Inlet temperature of the crude oil would average 160°F. The pipelines would be insulated with 1.5 inches of polyurethane with a vinyl outer jacket to minimize heat loss from the line. The pipe coating, where not insulated, would be a double wrap of plastic tape; in selected areas, such as river crossings, the pipe would have a coal tar coating overlaid with a concrete jacket.

The entire pipeline would be protected from corrosion with cathodic protection systems consisting of groundbeds and rectifiers. The number and location of these systems would be based on tests of pipe-to-soil potential after construction. Corrosion protection test stations would be installed at least every 10 miles to test the performance of the cathodic protection system. These stations, which are about the size of a parking meter, would be within the ROW.

Pipeline block and check valves would be located at strategic locations along the route (see Map 1-2). Block valves at the pump stations and on the upstream (of oil flow) side of major stream crossings (Refugio Creek, Gaviota Creek, Santa Ynez River, Sisquoc River, La Brea Creek, Cuyama River, Mojave River, Colorado River, Gila River, Wild Cat Canyon Creek, Rio Grande, and Pecos River) would be remotely operated. Check valves would be installed on the downstream (of oil flow) side of all major river and stream crossings, and block valves would be installed on both sides of all pump stations. Each block valve setting would require a 10-ft by 20-ft area. Figure 2-1 shows a typical block valve installation.

Remote control block valves installed at the sensitive areas identified above would be operated in two basic ways. The more traditional way would be to use an electric motor to open and close the valve. This system requires both power and communications. The second method would use a pneumatic or hydraulic actuator and requires only communications. Energy would be supplied by bottled nitrogen gas or solar panels operating a small hydraulic pump. The second method would be used at block valve sites which are too remote to be supplied with line power.

2-5

**Exhibits - Page 355**

valves to minimize the volume of oil spilled from a failure. No violations of codes or standards were noted.

Corrosion Design Criteria and Corrosion Control Procedures. Protection of a pipeline from corrosion is of critical importance to the environment as well as the pipeline operator. Pitting of the pipeline can occur due to chemical reaction between the soil and the carbon steel pipe if it is not adequately protected. This pitting would eventually reduce the strength of the pipe sufficiently to cause a break and allow an oil leak. Therefore, Getty and Celeron/All American intend to wrap the pipelines in accordance with applicable regulations. Additionally, cathodic protection would be installed as required within 12 months of the pipeline installation dependent upon soil and chemical conditions. Corrosion control test stations would be installed with which to test the integrity of the corrosion protection. This is all in accordance with 49CFR-195.

Due to the low inlet concentrations of $H_2S$ (less than 15 ppm) and water allowed by the pipeline companies, internal corrosion is not anticipated to be a problem. During final design, detailed metallurgical studies would be conducted to confirm initial conclusions.

Pressure Relief and Relief Liquid Disposal System. Emergency shutdowns, valve closures, and other phenomena can cause the pressure in the pipeline to suddenly increase. This pressure must be relieved or the pipe could potentially burst. ANSI B31.4 guides the design of pressure relief systems. All applicants have incorporated pressure relief provisions into their respective pipelines as follows:

- Getty - pressure relief valves and disposal system at their terminus in the San Joaquin Valley.

- Celeron/All American - pressure relief valves and above-ground relief tanks at stations where elevation differences dictate (such as Emidio) as well as additional pressure relief devices and tankage as required at Cadiz, California and Wink, Texas.

On the basis of available information, the preliminary design appears adequate. Details and exact locations would be worked out during the final design phase of the project.

Control Logic and Soundness of Design for Leak Detection System. Getty and Celeron/All American have proposed to use a leak detection system using the volume balance method in conjunction with a mathematical pipeline model. This is a widely used and accepted method for leak detection in pipelines. Careful consideration must be given by all three companies to the setting of pipeline condition monitoring frequency and the short and long-term volume balance calculation periods. The short-term period is used to detect large leaks and the long-term period is used to detect small leaks. The response to the leak detection system is addressed in Section 4.2.15.

The supervisory control systems proposed, of which the leak detection system is a part, would have totally redundant computers and

**Exhibits - Page 356**

TABLE 4-25

CURRENT AND FUTURE PROBABILITIES OF TANK FARM SPILLS

| Spill Volume (bbls) | Spills/Barrel Year of Storage | 1,500,000 bbl (3 tanks)/Barrel Year of Storage | Spills Over Life of Project (30 years) |
|---|---|---|---|
| $\geq 10$ | $2.52 \times 10^{-7}$ | $3.8 \times 10^{-1}$ | 11.4 |
| $\geq 100$ | $5.7 \times 10^{-8}$ | $8.6 \times 10^{-2}$ | 2.58 |
| $\geq 1,000$ | $4.9 \times 10^{-9}$ | $7.5 \times 10^{-3}$ | 0.225 |
| $\geq 10,000$ | 0 | 0 | 0 |

Source: OIW (1978)

The pipe would be 0.344 to 0.562-inch wall thickness for Celeron/All American and 0.5-inch wall thickness for Getty. The pipe would be buried a minimum of 3 ft deep and its location would be marked by signs to DOT standards. All stream crossings would be analyzed for 100-year scour depth and the pipeline would be buried 4 ft below that depth. In bedrock the pipe would be buried to a depth of 18 inches. A concrete coating would also be applied at underwater crossings and a double casing used at road crossings.

Before burial, the welds would be subjected to nondestructive tests including radiography (x-ray), magnetic particle inspection, and dye penetrant or ultrasonic tests. A minimum of 10 percent of the welds made by each welder each day would be radiographically inspected. Hydrostatic testing of the pipeline would be completed at a pressure 1.25 times (or greater) than the maximum operating pressures.

The corrosion protection system includes special pipe coating on the exterior and a cathodic protection system. The pipeline coating would be tested before burial. The cathodic protection system would be inspected and maintained at 6-month intervals.

Block valve and check valve systems would be installed at sensitive water crossings to minimize oil losses into streams should the pipeline fail or be damaged (see individual resource sections for discussions of oil spill impacts).

4.2.15.5    Oil Spill Contingency and Cleanup Plans.    Despite the engineering design, specifications, and safeguards built into a pipeline system, the potential for oil spills still exist and additional containment and cleanup measures must be addressed. The conceptual oil spill contingency plans reviewed for Getty and Celeron/All American incorporate procedures for responding to an oil spill. These procedures begin with personnel training, an established communications network, standard reporting system, and defined responsibilities and lines of authority.

Appendix H of this EIS/EIR contains a preliminary draft of the applicants' oil spill contingency plan. The preliminary draft oil spill contingency plan incorporates much of the general information found in

Exhibits - Page 357

# Exhibit J

# FINAL
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



# PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

## CALIFORNIA STATE LANDS COMMISSION
### AND
## BUREAU OF LAND MANAGEMENT
## DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# JANUARY 1985

# COMMENT LETTER 18 (CONTINUED)

# RESPONSE TO COMMENT LETTER 18 (CONTINUED)

-5-

18-51 cont. now by the McCamey to Freeport route. The reviewer will not get concerns answered otherwise. This seems to us to be a major oversight. In addition you should list specific mitigation measures to show how each Federal and state sensitive species will be protected.

18-52  52.) On page 4-143 you need the information on cultural resources now. Later is not good enough.

18-53  53.) On page 4-153 where will low permeability backfill be used. Please name sites.

18-54  54.) On page 4-154 as mentioned before measure 11 should be done for all sections of the pipeline.

18-55  55.) On page 4-156, measure 17 needs to be utilized for all major stream crossings. Spill equipment must be in place at sensitive sites and pump stations.

18-56  56.) On page 4-162 it is absurd to say no additional oil spill mitigation is needed. Surely a more specific oil spill contingency plan is needed.

18-57  57.) On page 4-174, Table 4-33 since it is not clear how you will prevent groundwater contamination we feel it is premature to say short or long-term impacts are not anticipated..

18-58  58.) On page B-33 you list state species of concern but you still say nothing about how damage to each will be mitigated.

18-59  59.) On page G-1 you say nothing hear of the higher SO2, VOC, metals, and O3 levels that are expected in Houston as a result of this pipeline and loading and unloading barges and tankers. This is especially important because the entire area is nonattainment for O3 and because ship loading and unloading emissions of VOC's are not now controlled by Either TACB or EPA. In addition you need to explain how a heavy crude oil spill, like the one that happened about a month ago - the Alvenus, will react differently than lighter crude oil spills, how easy it will be to clean-up, its effects, etc.

18-60

18-61  60.) On page G-11 you again say most of the oil will be loaded on ships and barges to be taken to refineries from Corpus to Mississippi but you do not discuss air pollution and oil spill problems.

18-62  61.) On page H-34, Table 10-2 you fail to take into account the McCamey to Freeport route and its sensitive areas.

In summary we find that this document does not give sufficient information on different types of alternative, does not explore all alternatives equally, piecemeals the project, does not look adequately at oil spill prevention and control measures, does not give adequate coverage to state and Federal species of concern and minimizing the impacts of the project on them, and does not treat the problems of air pollution at the end of the pipeline, and does not look closely at impacts on groundwater and sensitive area and how to mitigate them. Finally the statement does not address the unequal and unfair Public participation program provided Texas as compared to all other states effected. We request that this document be redrafted and brought out again for Public comment.

Sincerely, Brandt Mannchen, Wildlife Chairperson, Lone Star Chapter, Sierra Club, 1822 Richmond #2, Houston, Texas 77098, H713-522-1489, W713-645-5316

18-27  Should Celeron of Texas proceed with construction of a McCamey to Freeport pipeline, they would need to complete geological studies to determine the vulnerability of the pipeline to surface faults and provide an appropriate design that would meet all Federal, state and local requirements. See Mitigation Measures 1, 2, and 3.

18-28  Slope instability is not a common failure for large diameter pipelines and documentation in the literature is limited. Thus, there are no statistics per se to estimate the frequency of this failure. The risk of such a break would be similar to other portions of the pipeline which is 0.0003 spill/mile/year for a new pipeline.

18-29  Based on your comment, text changes to page 3-123 in the DEIR/EIS are included in the Modifications and Corrections Section.

18-30  Although the risk of spills or leaks occurring is low (Section 4.2.15 of DEIR/EIS), the potential impacts from such a spill are significant. Potential aquifer contamination from oil spills or pipeline leaks would be a non-mitigable impact. Mitigation Measures 5, 6, 7, and 7a would reduce the potential impacts in identified sensitive groundwater basins by reducing the likelihood of pipeline breaks, providing for early leak detection and prompt spill response. These measures cannot, however, completely eliminate the potential for aquifer contamination.

Additional pipeline design criteria, construction procedures, and operational leak detection systems are described in Chapter 2 of the DEIR/EIS for the proposed pipelines. These are procedures used throughout the industry and are in accordance with D.O.T. regulations. They are included in the Applicants' proposals and are not listed as mitigation measures. These measures would be very effective in reducing the risk of groundwater contamination along the entire pipeline alignment. Among the procedures described in Chapter 2 are pipeline coating, hydrostatic testing, burial 4 feet below the 100-year, 24-hour storm stream scour depth, cathodic corrosion protection, welding and x-ray inspection of joints, leak detection by volumetric balance, pressure loss and flow measurements, and aerial reconnaissance during pipeline operation. All below-ground connections would be welded; there would be no flanged joints below ground.

18-31  Appropriate environmental documentation and agency approvals would be required and would consider sensitive fish, animal, and plant populations if the McCamey to Freeport Alternative is proposed by Celeron of Texas.

18-32  Golden-cheeked warblers are known to nest in the region where the pipeline could cross. Site-specific impacts and mitigation measures for this and other state-listed sensitive species would be evaluated as required.

18-33  See Mitigation Measure 30.



United States Department of the Interior

GEOLOGICAL SURVEY
RESTON, VA. 22092

In Reply Refer To:
WGS-Mail Stop 423

OCT 3 1984

Ms. Mary Griggs
State Lands Commission
1807 13th Street
Sacramento, California 95814

Dear Ms. Griggs:

We have reviewed the environmental impact report/statement for the Celeron/All American and Getty Pipeline projects and have the following comments:

**31-1**  The document indicates that in sensitive ground-water areas the bottom and sides of trenches will be covered with low-permeability backfill materials before the pipeline is laid (p. 4-153). We suggest that in especially sensitive situations the low-permeability materials should surround the pipeline to hinder lateral movement of contaminants from leaks or breaks in the pipe. For example, such a measure would be useful near the margins of valleys or prior to descending steep slopes into valleys where permeable materials such as alluvium can be anticipated. Other examples could be found in approaching features of high permeability in karstic terrains or when approaching a slope above a municipal water supply.

**31-2**  If any of the cathodic protection devices to be used (p. 2-35, 4-117) will be of the deep well type discussed by Ritchie (Ritchie, E.A., 1976, Cathodic protection wells and ground-water pollution: Ground Water, vol. 14, no. 3, p. 146-149), the statement should indicate how the aquifer(s) involved will be protected against pollutants traveling down the well annulus.

**31-3**  Heavy rainfall during or following an oilspill can increase greatly the infiltration rate and distance traveled by components of crude oil, particularly water-soluble components (Duffy, J.J., Mohtadi, M.F., and Peake, E., 1977, Subsurface persistence of crude oil spilled on land and its transport in groundwater: in Proceedings 1977 Oilspill Conference of American Petroleum Institute, Environmental Protection Agency, and U.S. Coast Guard, New Orleans, March 8-10, 1977, p. 475-478). This should be considered in evaluating the potential for impacts on ground water. Effects of petroleum

**31-1**  See response to Comment 8-1.

**31-2**  The cathodic protection system would be designed to minimize impacts on groundwater. The design would include a) locating the anode bed away from shallow groundwater aquifers; b) case the bore, grout between the case and the bore, and seal the annulus where an anode proceeds into a shallow groundwater aquifer; or c) install a shallowbed anode system.

**31-3**  These conditions have been considered in the evaluation of potential oil spills and associated impacts to groundwater as described in the DEIR/EIS. The adverse effects of taste and odor have also been addressed (page 4-35) and the broad significance criteron (page 4-34) defines any contamination of groundwater by crude oil to be a significant impact, even though toxic concentration levels might not be exceeded.

APPENDIX 4.3
SYSTEM SAFETY

The following table provides a summary of the major oil spill and system safety issues and concerns related to the Getty and Celeron/All American Pipeline Projects.  Column 1 of the table describes a series of events that are viewed as having some type of impact on the environment if the event were to occur.  Also included below each event listed are the possible causes of such an event.

Column 2 presents the probability that the event would occur, based on historical accident rate data throughout the industry.

Column 3 describes the environmental consequences that may result if the event took place.  A "worst-case" approach was taken when describing these environmental consequences.

Column 4 provides a summary of various design specifications that the Applicants have incorporated into their projects that would reduce the probability of an event occurring and/or would reduce the environmental consequences if an event had in fact occurred.  More detailed information is cross referenced to Appendices H and I and Chapter 2 of the DEIR/EIS.

Sub-columns 5 and 6, Mitigation Measures, summarize mitigation measures and stipulations presented in the Final EIR that would further reduce the probability or consequences resulting from an event.  Cross references are provided for locating detailed descriptions of the mitigation measures within the FEIR document.

Finally, the last column in the table evaluates the effectiveness of design specifications and mitigation measures.

4-52

Exhibits - Page 362

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures — Reduce Probability | Mitigation Measures — Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| Oil spill onto irrigated agricultural lands (see Tables 3-22, 3-25, and 4-5) caused by: seam failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio[1] 21 miles irrigated $6.3 \times 10^{-3}$ spills/yr ($\geq$ 50 bbl) $0.\overline{19}$ spills during life of project (30 yrs) | Contamination of soils, reduced productivity, maximum of 16 acres affected per spill. | Minimum cover 42 inches, cathodic protection, block and check values, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. Continuous manned monitoring and control of all data. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | | Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective. |
| | Las Flores to Blythe[1] 50 miles irrigated $1.5 \times 10^{-2}$ spills/yr ($\geq$ 50 bbl) $0.\overline{45}$ spills during life of project (30 yrs) | | | Pipeline location markers above ground. Buried cable or fluorescent plastic below ground just above pipeline. | | Increase awareness of pipeline location thereby reducing potential of mechanical damage occurring. |
| | Blythe to McCamey[1] 52.8 miles irrigated $1.6 \times 10^{-2}$ spills/yr ($\geq$ 50 bbl) $0.\overline{48}$ spills during life of project (30 yrs) | | | Periodic information contact with land owner. | | Same as above. |
| | | | | Provide extra pipeline depth in areas where deep plowing or ripping could result in damage to pipeline. Depth should be at least 1 ft below maximum plow depth. | | Will reduce risk of mechanical damage. |
| | | | | | Replace contaminated soil. | Decrease loss of productivity. |
| | | | | | Monetary compensation for lost product. | Eliminate financial loss to landowner/tenant. |
| Oil spill into a stream[2] (see Tables 3-11 and 3-12) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 11 miles $3.3 \times 10^{-3}$ spills/yr ($\geq$ 50 bbl) $0.\overline{09}$ spill during life of project (30 yrs) | Contamination of surface water lasting up to several weeks. Loss of aquatic life up to 2 years. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan (see Appendix H). Continuous manned monitoring and control of all operational data. | Monitor pipe burial depth at stream crossings (M-5). Periodic site inspections. Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | | Early indication of abnormal bottom scouring. Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective. |
| | Las Flores to Blythe 25 miles $7.5 \times 10^{-3}$ spills/yr ($\geq$ 50 bbl) $0.\overline{23}$ spill during life of project (30 yrs) | | | | | |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| | Blythe to McCamey<br>17 miles<br>$5.1 \times 10^3$ spills/yr (>50 bbl)<br>0.15 spill for life of project (30 yrs) | | | | | |
| Oil spill into a sensitive ground-water basin (see Table 3-14) caused by:<br>  seam failure<br>  weld failure<br>  corrosion<br>  excavation<br>   equipment<br>  natural causes<br>  flow control<br>   error. | Gaviota to Emidio<br>30 miles<br>$9.0 \times 10^{-3}$ spill/yr (> 50 bbl)<br>0.27 spill during life of project (30 yrs)<br><br>Las Flores to Blythe<br>42 miles<br>$1.3 \times 10^{-2}$ spill/year (> 50 bbl)<br>0.39 spill during life of project (30 yrs)<br><br>Blythe to McCamey<br>395 miles<br>$1.2 \times 10^{-1}$ spill/yr (> 50 bbl)<br>3.60 spills during life of project (30 yrs) | Contamination of groundwater by a small leak (less than 3 BPH). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | Identify areas to monitor in case of spill (M-6); use low permeability backfill in sensitive areas (M-7). | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. |
| Oil spill into a sensitive stream[2] (see Table 4-6) caused by:<br>  seam failure<br>  weld failure<br>  corrosion<br>  excavation<br>   equipment<br>  natural causes<br>  flow control<br>   error | Gaviota to Emidio<br>1 mile<br>$3.0 \times 10^{-4}$ spills/yr (> 50 bbl)<br>0.01 spill during life of project (30 yrs)<br><br>Las Flores to Blythe<br>3 miles<br>$9.0 \times 10^{-4}$ spills/yr (> 50 bbl)<br>0.03 spill during life of project (30 yrs)<br><br>Blythe to McCamey<br>4 miles<br>$1.2 \times 10^{-3}$ spills/yr (> 50 bbl)<br>0.04 spill during life of project (30 yrs) | Game and T&E fishes could be affected for several months to 2 years (see Appendix B). | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic tesing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accomodate geologic hazards (M-1, 2, and 3).<br><br>Monitor pipeline burial depths at crossings including periodic diving inspections of deep water crossings (M-S). | | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. Early indication of abnormal bottom scouring. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|-------|-------------|--------------|----------------------------------------------------------|---------------------|---|---------------|
| | | | | Reduce Probability | Reduce Consequences | |
| Oil spill into sensitive terrestrial habitats (see Table 4-8) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 50 miles sensitive habitat 1.5 x 10$^{-2}$ spills/yr 0.45 spill during life of project (30 yrs)  Las Flores to Blythe 314 miles sensitive habitat 9.5 x 10$^{-2}$ spills/yr (> 50 bbl) 2.85 spills during life of project (30 yrs)  Blythe to McCamey 15 miles sensitive habitat 4.5 x 10$^{-3}$ spills/yr (> 50 bbl) 0.14 spill during life of project (30 yrs) | Destruction of T&E species and/or their habitats (see Appendix B). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | Relocate pipeline out of sensitive habitats in the Cuyama Valley (M-15). | Eliminates potential exposure for sensitive wildlife and terrestrial habitats. |
| Oil spill into the Colorado River or Hot Springs Creek[2] caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American 6.0 x 10$^{-4}$ spills/yr (> 50 bbl) 0.02 spill during life of project (30 yrs) | Destruction of riparian habitat and possible effects on T&E species (see Appendix B); disruption of water recreational activities. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5). | Oil spill booms to redirect oil to skimmers and to block entry into backwaters of the Colorado River (M-17). | For the Colorado River this will protect nearby backwaters from contamination and aid in the clean-up downstream. For Hot Springs Creek the impacts will be minimized. The methods will not be 100% effective. |
| Oil spill into a coastal stream[3] (see Table 3-11) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American 2.4 x 10$^{-3}$ spills/yr (>50 bbl) 0.07 spill during life of project (30 yrs)  Getty 3.0 x 10$^{-4}$ spills/yr (> 50 bbl) 0.01 spill during life of project (30 yrs) | Oil spills could reach recreational beaches along the Gaviota coast. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5).  Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | | If all designs and plans are implemented properly, oil will not reach the coastal waters and impacts to the streams will be minimized. |

4-55

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Oil spill at the Cadiz tank farm (Celeron/All American) caused by: faulty valves overfilling tanks natural causes. | **Spills per Year** <br><br> $\geq$ 10 bbl  3.8 x $10^{-1}$ <br> $\geq$ 100 bbl  8.6 x $10^{-2}$ <br> $\geq$ 1,000 bbl 7.5 x $10^{-3}$ <br><br> **Spills During Life of Project** <br><br> $\geq$ 10 bbl    11.4 <br> $\geq$ 100 bbl    2.6 <br> $\geq$ 1,000 bbl   0.2 | Oil would be contained by the dike system surrounding each storage tank. | Leak detection system, automatic overflow alarm system, containment dikes for 125 percent of tank capacity, spill contingency plan. | Redundant sensor and control system to prevent tank overfilling (p J-2). | | No spilled oil would be released beyond the diked containment area, reducing environmental consequences. Sensors would reduce the probability of overflowing tanks. |
| Fire/explosion at a pump station with natural gas supply caused by: leak with an ignition source. | $3.8 \times 10^{-3}$ fire/ explosion per year[4] 0.11 fire/explosion during life of project | Possible damage to structures and injury to people Possible source of wildfire. | Block and bypass valves on both sides of station, fuel gas shutdown system, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automatic station shutdown system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around pump station. | At stations with gas-fired turbines and Waste Heat Recovery Units (WHRU), there will be extended purging of both units with interlocks to prevent starting before purging is complete. At stations without turbines, gas-fired heaters will also have extended purging before starting. | | Will effectively reduce the probability of explosion/fire. None of the proposed stations are close enough to dwellings or common areas for non-pipeline employees to be damaged. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|-------|-------------|--------------|----------------------------------------------------------|----------------------------------------|---------------------|---------------|
| Fire/explosion at a pump station without gas supply caused by: leak with an ignition source. | $3.8 \times 10^{-3}$ fire/ explosion per year[4] 0.11 fire/explosion during life of project | Possible damage to structures and injury to people. Possible wild-fire source | Block and bypass valves on both sides of station, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automatic station shut-down system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around pump station. | Explosions are caused by leaks coupled with an ignition source. Pumps are equipped with seal leak detectors that will stop unit if leak detected. Other leaks will be reduced by checking valve stem packing during regular visits to the site. | | Will effectively reduce the probability of explosion/fire. No human receptors or dwellings near proposed pump stations (except employees). |

4-57

Exhibits - Page 367

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Fire/explosion at the Cadiz tank farm caused by: personnel error equipment failure natural disaster fire outside facility externally caused fire (i.e., airplane crashes, sabotage, etc.). | See Note 5 | Possible damage to structures and injury to people. Possible source of wild fire. | Block and bypass valves on both sides of station, fuel gas shut-down system, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automatic station shutdown system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around tank farm, automatic overflow alarm system, open-top floating roof tanks, integrated tank farm control center. | Redundant sensor and control system to prevent tank overfilling (p J-2). | Automated foam extinguisher system for tank seal fires (p J-2). | Would reduce the probability of fire/explosion and reduce consequences if either should occur. If an event does occur, the proper authorities on control and containment would be notified. The system would not control a fire if a tank started by an airplane crash or sabotage. The system would prevent additional oil from flowing into the affected area. |
| | | | | Tank roof sensor to detect jammed roof. | | Provides immediate knowledge of potential vapor build-up that could lead to an explosion. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Loss of power at a pump station with natural gas supply. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS (Uninterruptable Power Supply) System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. The other pump stations will maintain flow until the down station is repaired. |
| Loss of power at a pump station without natural gas supply. Transmission line down or power plant down. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. The other pump stations will maintain flow until the down pumps are repaired. |
| Loss of power at the Cadiz tank farm. Transmission line down or power plant down. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. Oil will bypass tank farm. |
| Loss of communications to/from a pump station with natural gas supply. Telephone lines or microwave system failure because of human error, sabatage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |
| Loss of communications to/from a pump station without natural gas supply. Telephone lines or microwave system failure because of human error, sabotage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |

4-59

Exhibits - Page 369

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Loss of communication to/from Cadiz tank farm. Telephone lines or microwave system failure because of human error, sabotage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |

Note 1: Gaviota to Emidio = Getty pipeline; Las Flores to Blythe = Celeron/All American pipeline in California; Blythe to McCamey = Celeron/All American pipeline in Arizona, New Mexico, and Texas.

Note 2: Assumes spill would occur within one-half mile of a stream.

Note 3: Assumes a spill occurring anywhere within the 10-mile coastal segment would reach a coastal stream.

Note 4: Source: OIW, September 1979.

Note 5:

Fire/Explosion Damage Magnitude

| | | |
|---|---|---|
| > $ 1,000 | $1.6 \times 10^{-2}$ per year | (0.48 fires in 30 years) |
| $ 1,000 - $ 10,000 | $6.9 \times 10^{-3}$ per year | (0.21 fires in 30 years) |
| $ 10,000 - $ 100,000 | $3.4 \times 10^{-3}$ per year | (0.10 fires in 30 years) |
| $ 100,000 - $ 500,000 | $4.4 \times 10^{-3}$ per year | (0.13 fires in 30 years) |
| Over - $ 500,000 | $9.4 \times 10^{-4}$ per year | (0.03 fires in 30 years) |

Source: OIW, September 1979

Note 6: Oil fire emissions (lb/bbl)

| | |
|---|---|
| $SO_2$ (assumes 5% sulfur) | 30.6 |
| CO | 16.5 |
| Hydrocarbons | 16.5 |
| Particulates | 3.3 |
| $NO_x$ | 1.1 |

# Exhibit K

How may we help you?…

Select Language

Google Translate

# 901/903 Replacement Pipeline Project

## Overview Details

- **Project Title**: 901/903 Replacement Pipeline Project
- **Case Number(s)**: 17DVP-00000-00010; 17CUP-00000-00027; 17DRP-00000-00002; 17CDP-00000-00060
- **Project Location**: Santa Barbara County, San Luis Obispo County, Kern County
- **Assigned Staff and Division**: Jacquelynn Ybarra, Energy, Minerals and Compliance Division

## Status

On October 24, 2023, Pacific Pipeline Company formally withdrew their application for the proposed 901/903 Replacement Pipeline Project. No further work on this project will proceed. You may view the Withdrawal Letter for more information here.

## Project Description

The project includes the replacement of the existing 24- and 30-inch-diameter Lines 901 and 903 insulated pipeline system with a 12-, 14- and 16-inch-diameter uninsulated steel pipeline, referred to as Lines 901R and 903R. Line 901R would include two sections:  (1) a 12-inch-diameter, approximately 10.6-mile-long pipeline extending from the Las Flores Canyon Pump Station to the Gaviota Pump Station in Santa Barbara County; and (2) a 16-inch-diameter, approximately 38.4-mile-long pipeline extending from the Gaviota Pump Station to the Sisquoc Pump Station in Santa Barbara County. Line 903R would consist of a 14-inch-diameter, approximately 74-mile-long pipeline extending from the Sisquoc Pump Station in Santa Barbara County to the Pentland Delivery Point in Kern County.

The project would modify two existing pump stations in Santa Barbara County (Las Flores, Gaviota) and one pump station in Kern County (Pentland), upgrade and expand the Sisquoc Pump Station in Santa Barbara County, and add two new pump stations (West Cuyama and Russell Ranch) in San Luis Obispo County. Pipeline-related ancillary equipment would be updated or installed including: pipeline location markers,

**Exhibits - Page 372**

cathodic protection, fiber-optic lines, a Supervisory Control and Data Acquisition (SCADA) system, remote communication equipment, emergency battery systems, diesel-powered backup generators, and/or solar panels. Pipeline control valves would be operated along the length of the pipeline system and within the pump station facilities. The project also includes construction and operation of a new 3.8-mile-long natural gas pipeline between an existing Southern California Gas Company (SoCalGas) pipeline near the community of Garey and the Sisquoc Pump Station.

The pipeline route generally follows the existing alignment of Line 901 and Line 903 with a notable exception around the City of Buellton. Existing Lines 901 and 903 would be removed to the extent practicable during the installation of Lines 901R and 903R.

## Timeline

- **October 24, 2023** – Pacific Pipeline Company formerly withdrew their application regarding the proposed 901/903 replacement project.
- **November 1, 2022** – Pacific Pipeline Company submitted project application forms to change the Applicant from Plains Pipeline L.P. to Pacific Pipeline Company.
- **April 26, 2022** – A Revised Notice of Preparation was published to reflect: 1) a change from preparing an EIR to preparing a joint EIR/EIS; 2) a change in the baseline conditions used for the draft EIR/EIS from the baseline conditions described in the original EIR NOP; and 3) inclusion of minor revisions to the Project Description.
- **February 2022** – Existing efforts on the Draft EIR and Draft EIS were combined to prepare a joint EIR/EIS.
- **May 18, 2021** - The Board of Supervisors approved a Contract Amendment for work not included in the original Agreement for Services to complete the EIR and EIS.
- **April 3, 2020** - Plains submitted updated project documents due to several changes to the proposed project.
- **February 14, 2019** – The Notice of Preparation was published. Public scoping meetings were held on February 27, 2019 in Santa Barbara County, and February 28, 2019 in San Luis Obispo County.
- **April 20, 2018** - The application for a Development Plan, Conditional Use Permit, Demolition and Reclamation Plan, and Coastal Development Permit were determined to be complete.
- **August 15, 2017** - Plains submitted an application for the replacement of their existing, and currently shut down, Line 901 and 903 pipeline system.

## Documents
**CEQA Materials**

- Revised Notice of Preparation – April 26, 2020

- Scoping Reports

- Notice of Preparation - February 14, 2019

**Permit Application Materials**

Application Withdrawal Letter, October 24, 2023

Application Documents

**Exhibits - Page 373**

## Additional Information

If you have any comments or questions, please contact the project planner, Jacquelynn Ybarra

**Click Here To Apply!**

ReadySBC          Board of          Agendas          Employment          COVID-19          Public Record
                  Supervisors                                           Information          Requests

Government Websites by CivicPlus®

# Exhibit L

An official website of the United States government Here's how you know ⌄

United States Department of Transportation

Sign-up for Email Alerts      Newsroom

Search

Home  /  Pipeline  /  Special Permits and State Waivers

IN THIS SECTION                                                              +

Pipeline Standards & Rulemaking Overview

Pipeline Advisory Committees

Recently Published Rulemakings

Archived Rulemakings (pre-1995)

Special Permits and State Waivers

Interpretations

Notices and Advisory Bulletins

---

**Contact Us**

Pipeline Standards and Rulemaking

U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration

1200 New Jersey Avenue, SE

Washington, DC 20590

United States

**Phone:** 202-366-4595 ☎

**Fax:** 202-366-4566 🖷

**Business Hours:**

9:00am-5:00pm ET, M-F

If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

---

# Pipeline Special Permits and State Waivers Overview

## Special Permits

A special permit (previously called a waiver) is an order that waives or modifies compliance with a regulatory requirement if the pipeline operator requesting it demonstrates the need and PHMSA determines that granting a special permit would be consistent with pipeline safety. Special permits are authorized by statute in 49 USC § 60118(c) and the application process is set forth in 49 CFR 190.341. PHMSA performs extensive technical analysis on special permit applications and typically conditions a grant of a special permit on the performance of alternative measures that will provide an equal or greater level of safety. PHMSA is committed to public involvement and transparency in special permit proceedings and publishes notice of every special permit application received in the Federal Register for comment.

For assistance with pipeline special permits or the application process, send an email to PipelineSPEngineeringDirector@dot.gov. For inquiries related to hazardous materials special permits, send an email to specialpermits@dot.gov.

- Special Permits Issued
- Special Permits Denied
- Special Permits Withdrawn, Expired or Terminated

For background information on general and emergency special permits, please refer to the following documents:.

- OPS Special Permit Requirements (§190.341)
- Emergency Special Permit Information
- Guidelines Related to Special Permits for 192.611 (Change in Class Location)

## State Waivers

A state waiver is similar to a special permit, except that it waives or modifies compliance with a regulation adopted by the state pursuant to its participation in the pipeline safety program under a certification authorized by 49 USC § 60105 or an agreement authorized by 49 USC § 60106. Prior to issuing a state waiver, the state is required to provide PHMSA with a 60 day review period.

For assistance with state waivers or the application process, send an email to PHMSAOPSStateWaivers@dot.gov.

- Historical State Waivers (1970-Present)
- State Waivers Denial
- State Waivers Withdrawn, Expired or Terminated

## Federal Register Notices Related to Special Permit Applications

**Federal Register Notices Related to Special Permits Applications**

| Federal Register (FR) Notices | Description | Publish Date |
|---|---|---|
| PHMSA-2025-0011 | Class Location & MAOP | Apr 21, 2025 |
| PHMSA-2024-0055 | Class Location | Oct 15, 2024 |
| PHMSA-2024-0011 | Valve Spacing | Oct 30, 2024 |
| PHMSA-2023-0136 | Class Location | Apr 24, 2024 |
| PHMSA-2023-0126 | Class Location | Sept 4, 2024 |
| PHMSA-2023-0071 | Odorization | Mar 1, 2024 |

Last updated: Wednesday, May 7, 2025

U.S. DEPARTMENT OF TRANSPORTATION

**Pipeline and Hazardous Materials Safety Administration**

1200 NEW JERSEY AVENUE, SE
WASHINGTON, DC 20590
202-366-4433

HAZMAT Registration Help Desk: 202-366-4109
Hazardous Materials Information Center: 1-800-467-4922

Office of Pipeline Safety Hotline: 202-366-4595 or phmsa.pipelinesafety@dot.gov
Pipeline Safety Concerns or Feedback on our Performance and Conduct: 202-366-4595 or phmsa.pipelinesafety@dot.gov
Report Waste, Fraud, Abuse or Mismanagement: https://www.oig.dot.gov/hotline

Website Concerns or Feedback: phmsawebsitemanager@dot.gov

Subscribe To Email Updates



# Exhibit M

# Summary of State Regulation of Crude Oil Pipelines
# in Santa Barbara County
### May 14, 2025
### (Updates in red)

Sable Offshore Corporation is attempting to restart the Santa Ynez Unit oil and gas operation in Santa Barbara County. The Santa Ynez Unit includes three offshore platforms in federal waters connected to shore by offshore pipelines, onshore pipelines, the Ellwood Pier, mooring buoys, and the Las Flores Canyon Processing Facility.  The onshore pipelines include pipelines identified as CA-324 and CA-325 that were responsible for the 2015 Refugio Oil Spill.

This summary outlines the many state agencies that oversee the Santa Ynez Unit operations, including oil pipeline construction, maintenance and operations, which would need to approve various actions to allow these pipelines to restart. This summary has been assembled to build public understanding of the regulatory processes over these pipelines.

## Overview

California's lands and offshore waters have hosted significant crude oil extraction for well over a century. Since the mid-1980's, however, crude oil extraction has declined each year largely due to decreasing levels of easily accessible crude oil.

Today, the state has three active crude oil/petroleum extraction platforms off its coast in state waters and eight active platforms in federal waters. These platforms are connected to the shore via undersea pipelines that transport crude oil from the offshore platforms to onshore facilities that process the oil for sale. This oil is eventually transported to refineries to be converted into products such as gasoline and diesel fuel.

California state government enforces a broad set of laws and regulations over many aspects of crude oil infrastructure. This includes oversight of the extraction, transport, and refining of crude oil. These laws and regulations exist to protect public health and safety and to safeguard California's natural resources and environment.

## Oversight By Agency

Multiple state agencies regulate the pipelines owned and operated (pipelines CA-324 and CA-325) by Sable Offshore Corporation in Santa Barbara County that the company is attempting to restart. Each of these state entities has specific authorities and obligations over these pipelines that is detailed in state law and discharges these responsibilities through regulatory and oversight processes.

The state entities with oversight over these pipelines include (in alphabetical order):

1. California Coastal Commission
2. California Department of Conservation, California Geologic Energy Management Division (CalGEM)

**Exhibits - Page 379**

3. California Department of Fish and Wildlife (CDFW), including the Office of Oil Spill Prevention and Response (OSPR)
4. California Department of Forestry and Fire Protection (CAL FIRE), Office of the State Fire Marshal (OSFM)
5. California Department of Parks and Recreation (State Parks)
6. Central Coast Regional Water Quality Control Board
7. Central Valley Regional Water Quality Control Board
8. State Lands Commission

These state entities, with the exception of the two regional Water Quality Control Boards, exist within the California Natural Resources Agency. The regional Water Boards fall under the umbrella of the California Environmental Protection Agency.

Below is a short summary of the referenced state entities with regulatory oversight over these pipelines.

**CALIFORNIA COASTAL COMMISSION**
*Issues permits for approved development activity in coastal areas.*

- FOCUS: Environmental protection and public access to state coastal areas.
- ROLE & AUTHORITY: Under the California Coastal Act of 1976, the California Coastal Commission has permitting responsibility for non-exempt pipeline work and other development associated with the pipeline in the Coastal Zone, including any enforcement actions for permitting requirements. The Commission also has federal consistency review authority under the Coastal Zone Management Act of certain pipeline-related activities in federal waters.
- ACTIONS UNDERWAY: Commission staff is coordinating with Santa Barbara County, which shares the permitting jurisdiction, on permitting processes related to Sable's work along the pipeline.  Commission staff continues to direct Sable to apply for a Coastal Development Permit to resolve Coastal Act violations that occurred both onshore and offshore.
    - *On September 27, 2024*, Commission staff issued a Notice of Violation ~~and cease and desist~~ letter to Sable due to then recent and ongoing development activities that were occurring on and around the pipeline within the Coastal Zone without any Coastal Act authorization, requesting that Sable cease and desist.
    - *On October 4, 2024,* Commission staff issued a Notice of Intent to issue an Executive Director Cease and Desist Order and requested confirmation that all work on the pipeline had ceased and that Sable would apply for a Coastal Development Permit for the work that had already occurred.
    - *On November ~~11~~12, 2024,* the Commission's Executive Director issued a Cease and Desist Order to Sable, directing Sable, among other things, to submit an application for a Coastal Development Permit *"for any proposed future work to be undertaken along the Pipelines, as well as for after-the-fact ('ATF') authorization for unpermitted development that has already occurred."*
        - Sable temporarily ceased its onshore activities.  The Cease and Desist Order expired on February ~~9~~10, 2025.  The deadline established in the Order

**Exhibits - Page 380**

for Sable to apply for a Coastal Development Permit expired on March ~~11~~12, 2025.  Sable has not filed an application.

- *On February 18, 2025*, Sable filed a complaint against the Commission in Santa Barbara Superior Court, challenging two Notices of Violation and the Executive Director Cease and Desist Order issued on November ~~11~~12, 2024. Sable is seeking declaratory and injunctive relief and inverse condemnation damages.

o *On February 11, 2025*, Commission staff issued a Notice of Violation ~~and cease and desist~~ letter to Sable regarding unpermitted development activities which had taken place offshore, in state coastal waters. This letter ~~directed~~ asked Sable to cease any further unpermitted development activities and apply for after-the-fact authorization for those development activities already undertaken.

o *Around February 14, 2025*, Sable recommenced its onshore activities in the coastal zone, and *on February 18, 2025*, the Commission's Executive Director issued a second Executive Director Cease and Desist order addressing the unpermitted development activities Sable had recommenced onshore. This order ~~letter~~, among other things, directed Sable to, again, cease any further development activities at the onshore locations~~, and to apply for a Coastal Development Permit for both after-the-fact authorization for work previously undertaken at these locations and for proposed, future work~~. This Executive Director Cease and Desist Order also included notice of the Executive Director's intent to pursue a future Cease and Desist Order and other further enforcement actions from the Coastal Commission ~~and other further enforcement orders~~.  Sable did not cease its activities or comply with the order.

o On *April 10, 2025*, the Commission held a five-hour noticed, public hearing, at the conclusion of which it issued Sable a Cease and Desist Order and Restoration Order and imposed an administrative penalty.  The Cease and Desist Order required, among other things, that Sable cease operations until securing Coastal Act authorization or a formal, final exemption determination for any work it wished to pursue.  It also required that Sable seek after-the-fact Coastal Act authorization for work already completed and prospective authorization for anticipated work.  The administrative penalty requires Sable to pay approximately $18 million, with a potential reduction to approximately $15 million if Sable complies with the requirement to seek Coastal Act authorization and pursues the most expeditious permitting approach.  Sable continued its work and did not apply for authorization under the Coastal Act.

o *On April 16, 2025*, the Commission filed a cross-complaint and an application for a temporary restraining order (TRO) and preliminary injunction (PI) against Sable to enforce the April 10, 2025 Cease and Desist Order.

o *On April 17, 2025*, the trial court reversed its tentative ruling in favor of the Commission, denied the Commission's request for a TRO, and set a hearing for May 14, 2025, on an Order to Show Cause (OSC) why a PI should not issue.

o *On April 21, 2025*, the Commission filed a notice of appeal of the denial of the TRO, and on April 22, 2025, the Commission filed a writ petition with the Court of Appeal

seeking immediate injunctive relief.  To date, the Court of Appeal has issued no ruling on that petition.

- o *On May 6, 2025*, the trial court issued an order moving the OSC hearing to May 29, 2025, and requiring the parties to submit briefs by May 14, 2025, on the question of whether the trial court retains jurisdiction to consider the issuance of a PI at an OSC hearing, given the appeal.

- FOR MORE INFORMATION: Contact the California Coastal Commission at ExecutiveStaff@coastal.ca.gov or the Commission's Public Information Officer at (415) 200-8052.

## CALIFORNIA DEPARTMENT OF CONSERVATION: GEOLOGIC ENERGY MANAGEMENT DIVISION (CalGEM)
*Oversees and regulates oil processing and production facilities.*

- FOCUS: Public health and safety, environmental quality.
- ROLE & AUTHORITY: The Department of Conservation oversees compliance for oil production facility management. While the department has oversight of the Los Flores Canyon oil processing facility, CalGEM approval is not required prior to restarting the pipeline. CalGEM does, however, have a role in ensuring compliance with other regulatory partners in completing an oil spill plan, a pipeline management plan, various testing and maintenance requirements, bonding to cover decommissioning costs, and oversight of any potential oil production work happening near communities (called health protection zones).
- ACTIONS UNDERWAY:
  - o *On December 17, 2024*, the Department of Conservation sent a letter to Sable notifying them of the need for an additional inspection of facilities, and production and bonding requirements.
  - o On *May 9, 2025,* the Department of Conservation sent a letter to Sable notifying them that a bond in the amount of $31.9 million must be filed and outlining additional production facility requirements.
- FOR MORE INFORMATION: Contact Department of Conservation Public Affairs at PAO@conservation.ca.gov or the Office of the Director at (916) 322-1080.

## CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE/CDFW OFFICE OF SPILL PREVENTION AND RESPONSE
*Manages natural resources for their ecological value and for public use.*

- FOCUS: Protecting wildlife.
- ROLE & AUTHORITY:  Exercises oversight as a landowner, as well as through its authority to protect fish and wildlife, and separately through one of its offices that oversees prevention, preparation for, and response to oil spills. CDFW-OSPR reviews and approves oil spill response plans and works to ensure that facilities have the financial resources necessary to cover the costs of oil spill scenarios. Under the Endangered Species Act and other Fish and Game Code laws, CDFW also oversees the review and approval process for evaluating impacts to wildlife due to altering the adjacent landscape.

**Exhibits - Page 382**

- ACTIONS UNDERWAY:
  - *In October 2024*, CDFW-OSPR certified that Sable had the financial resources to cover the costs of a reasonable worst-case scenario oil spill.
  - *On November 22, 2024*, CDFW-OSPR sent a second notice to Sable sharing that its offshore contingency plan (C-Plan #CA-00-7239) was deficient.  On December 20, 2024, Sable submitted corrections to its plan.  CDFW-OSPR is reviewing these corrections and must respond by January 19, 2025.
    - Additional corrections were submitted by Sable on December 20, 2024 and January 17, 2025. CDFW-OSPR has reviewed the plan and found no deficiencies.
    - *On March 26, 2025*, following the completion of a formal review, CDFW OSPR issued an approval letter for the C-Plan and an updated COFR for #CA-00-7239.
  - *On December 17, 2024*, CDFW-OSPR sent a third notice to Sable sharing that its onshore contingency plan (C-Plan #CA-00-7217) was deficient.  On January 9, 2025, Sable submitted corrections to its plan.  CDFW-OSPR is reviewing these corrections and must respond by February 9, 2025.
    - OSPR has reviewed the plan and found no deficiencies.
    - On *March 26, 2025*, following the completion of a formal review, CDFW OSPR issued an approval letter for C-Plan #CA-00-7217
  - *On December 17, 2024,* CDFW also issued a notice of potential violation (NOPV) for Fish and Game Code violations.  This notice requests that Sable discontinue any work on CDFW properties and contact CDFW to discuss remedial measures and other actions to address impacts.  Specifically, the NOPV explained that Sable appeared to have: (a) violated Fish and Game Code section 1602(a)(1) by failing to notify CDFW prior to undertaking activities subject to that section, as well as sections 5650 and 5652; and (b) conducted work outside a 50-foot-wide pipeline easement on CDFW property. The NOPV requested Sable to discontinue any work on CDFW property inconsistent with the easement and to contact CDFW to discuss remedial measures and other actions to address impacts on fish and wildlife resources at the locations identified in the NOPV.
    - Sable submitted three notifications to CDFW under Fish and Game Code section 1602(a)(1), all to complete remediation work at the locations identified in the notifications.
      - *On February 18, 2025*, CDFW received a notification (No. EPIMS-SBA-57481-R5) pertaining to Sable's previous work at Site 280.65.19 (Unnamed Drainage East of Baron Ranch). *On March 18, 2025*, CDFW notified Sable that its notification was complete and because the project would not substantially adversely affect an existing fish or wildlife resource, a streambed alteration agreement was not required.
      - *On March 13, 2025*, CDFW received a second notification (No. EPIMS-SBA-58088-R5) pertaining to the three locations in Santa Barbara County that CDFW identified in the NOPV: Sites R5-1, R5-2, and R5-3. ~~CDFW is still reviewing the notification and has until April~~

**Exhibits - Page 383**

14, 2025, to notify Sable whether the notification is complete. *On April 14, 2025*, CDFW determined the notification was complete. CDFW also determined the work at the three locations identified in the notification will not substantially adversely affect an existing fish or wildlife resource, and therefore a streambed alteration agreement would not be needed for any of the work. CDFW explained this in a letter to Sable dated April 14, 2025.

- *On March 4, 2025*, CDFW received a third notification (No. EPIMS-SLO-57972-R4) pertaining to the location that CDFW identified in the NOPV: Site R4-1. *On April 3, 2025*, CDFW sent Sable a letter, explaining the notification was is incomplete. If Sable provides a corrected notification, CDFW will have 30 days to review the notification a second time to determine if the notification with additional information is complete. *On April 25, 2025*, Sable submitted additional information to CDFW in response to CDFW's April 3, 2025, letter. CDFW has 30 days to review the notification a second time to determine if the notification with additional information is complete.

  ▪ *On February 7, 2025*, one of Sable's contractors, SCS Engineers, requested a letter of permission from CDFW to access the Carrizo Plains Ecological Reserve. CDFW has not acted on the request.

- FOR MORE INFORMATION: Contact Department of Fish and Wildlife Public Information Officer at Steve.Gonzalez@wildlife.ca.gov or (916) 804-1714.

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION (CAL FIRE): OFFICE OF THE STATE FIRE MARSHAL**

*Oversees and regulates the safety and operation of intrastate pipelines moving hazardous liquid in California.*

- FOCUS: Protecting public safety and spill prevention.
- ROLE & AUTHORITY: With other regulatory partners, inspects, regulates, and oversees the overall safety of hazardous liquid pipelines. Prior to restarting any pipeline, the State Fire Marshal must approve a thorough list of requirements and regulations, including Sable's proposed plans for using technology to minimize oil spill impacts, a detailed risk analysis, safety compliance reports, pipeline integrity evaluations, field verifications and maintenance plans, start-up and safety inspection plans, and waiver applications proving equal or greater levels of safety than required regulations.
- ACTIONS UNDERWAY:
  o CAL FIRE Office of the State Fire Marshal (OSFM) approved a risk analysis and implementation plan for Sable's use of best available technologies in 2021.
  o *On December 17, 2024*, OSFM submitted waivers for federal review.
    ▪ *On February 11, 2025,* PHMSA provided its notification of non-objection.
  o Sable has completed most of the required pipeline repairs, and OSFM has inspected the field work and is verifying records of those repairs.

o   All remaining oversight items listed above, including pressure testing of lines and Sable's submission of an updated start-up plan, which OSFM must review and approve, remain open and must be completed prior to restarting the pipeline.

FOR MORE INFORMATION: Contact CAL FIRE Communications at calfire.dutypio@fire.ca.gov or (916) 651-FIRE (3473).

**CALIFORNIA DEPARTMENT OF PARKS AND RECREATION**
*Protecting and managing California state park land in areas where onshore pipelines are located.*

- FOCUS: Environmental protection, state-owned land stewardship.
- ROLE & AUTHORITY: The California Department of Parks and Recreation manages public land for public benefits in areas where onshore pipelines may cross. The Department may grant easements for pipelines on this property. Specifically, this would include an easement to accommodate a four-mile section for pipeline maintenance in Gaviota State Park. The previous 30-year easement expired in 2016. Since then, the Department has issued individual permits for accessing and maintaining the pipeline.
- ACTIONS UNDERWAY:
    o   *On December 20, 2024*, the Department of Parks and Recreation sent a letter to Sable requesting a full project description to evaluate their request for an easement.
    o   The Department of Parks and Recreation <u>evaluated</u> ~~is evaluating~~ a request to perform maintenance anomaly digs and associated repair work along a four-mile section of pipeline on State Parks property.
    o   *On May 9, 2025,* the Department of Parks and Recreation issued a Right of Entry Permit to Sable to perform the 18 anomaly digs within Gaviota State Park, with work to commence on May 12, 2025.
- FOR MORE INFORMATION: Contact Department of Parks and Recreation Communications at newsroom@parks.ca.gov or (916) 654-7538.

**CENTRAL COAST AND CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARDS**
*Protecting the state's water ways and drinking water.*

- FOCUS: Water quality and environmental public health.
- ROLE & AUTHORITY: The Central Coast and Central Valley Regional Water Quality Control Boards oversee water resources for the State of California within their respective jurisdictions, implementing the Clean Water Act and the Porter-Cologne Water Quality Control Act.  The Regional Water Boards regulate the discharge of waste, such as sediment, that could occur during pipeline repair or construction. This includes issuing permits for dredging and land disturbances, and discharges of waste and stormwater.
- ACTIONS UNDERWAY:
    o   *On December 13, 2024,* following an inspection, the Central Coast Regional Water Quality Control Board issued violation and non-compliance notices for unauthorized waste discharge into Santa Barbara County waterways, as well as a

**Exhibits - Page 385**

directive to seek permit coverage. Sable must take corrective action, submit a waste discharge report, and apply for appropriate permits.

- o *On January 22, 2025*, the Central Coast Regional Water Quality Control Board issued Sable a directive to submit a technical report describing Sable's activities at all pipeline work locations and associated potential discharges to waterways. The technical report was due March 10, 2025.
  - ▪ *On March 8, 2025,* Sable submitted an incomplete response to the Central Coast Regional Water Quality Control Board's January 22, 2025 directive to submit a technical report.
  - ▪ *On April 15, 2025*, Sable submitted additional incomplete information in response to the Central Coast Regional Water Quality Control Board's January 22, 2025 directive to submit a technical report.
- o *On January 31, 2025,* Sable submitted an application for waste discharge requirements for its work at one waterway location.
  - ▪ *On March 20, 2025,* the Central Coast Regional Water Quality Control Board issued authorization to Sable to restore the one waterway location identified in its January 31, 2025 application.
- o On *February 28, 2025*, the Central Coast Regional Water Quality Control Board inspected additional project work locations discovered as a result of public complaints.  Staff observed unauthorized work within waters of the state and discharges of waste to waters of the United States.
- o *On March 4, 2025,* Sable submitted two applications for coverage under the statewide permit for stormwater discharges associated with construction and land disturbing activities. The applications are under review.
- o *On March 13, 2025,* Sable submitted applications for waste discharge requirements for its work at four additional waterway locations.
- o *On April 7, 2025*, Central Coast Regional Water Quality Control Board staff notified Sable and the public that the Board will consider adopting a resolution to refer alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General at a public hearing on April 17, 2025.
- o *On April 17, 2025*, at a public hearing, the Central Coast Regional Water Quality Control Board adopted a resolution referring alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General.
- FOR MORE INFORMATION: Contact the State Water Resources Control Board at opa@waterboards.ca.gov or (916) 341-5252.

**STATE LANDS COMMISSION**
*Oversees and approves leases for offshore pipelines, piers, and buoys.*

- FOCUS: Safety of offshore pipelines to shore, spill prevention, environmental protection.
- ROLE & AUTHORITY: Under the Public Resources Code, the State Lands Commission must review and approve assignment of leases from the current owner (ExxonMobil) to Sable for

offshore pipelines from federal platforms to shore, piers, and mooring buoys. Per this role and overview, Sable could restart the pipelines only if the terms and requirements of the current lease and operating agreements are met. This includes Sable performing detailed inspections of the pipeline line (in-line inspections), pressure testing (called hydrotesting), and using remotely operated vehicles to monitor the pipeline.

- ACTIONS UNDERWAY:
    - Ongoing review of assignment of leases as of December 20, 2024, with the most recent discussion at the State Lands Commission on December 17, 2024.
    - *On May 9, 2025*, Staff issued a letter to Exxon and Sable stating that the inspections required by the Commission's leases, for the portion of the offshore pipelines in state waters, and under the Commission's jurisdiction, have been completed and reviewed. This is not directly related to the repair work on the onshore pipeline.
- FOR MORE INFORMATION: Contact the State Lands Commission External Affairs at ExternalAffairsChief.Public@slc.ca.gov or (916) 574-1992.

**Exhibits - Page 387**

POS-050/EFS-050

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:    STATE BAR NO:<br>NAME: Linda Krop (No. 118773); Jeremy Frankel (No. 344500); Tara Rengifo (No. 307670)<br>FIRM NAME: Environmental Defense Center<br>STREET ADDRESS: 906 Garden Street<br>CITY: Santa Barbara    STATE: CA    ZIP CODE: 93101<br>TELEPHONE NO.: (805) 963-1622    FAX NO. :<br>E-MAIL ADDRESS: lkrop@environmentaldefensecenter.org<br>ATTORNEY FOR (name): Petitioners/Plaintiffs Environmental Defense Center et al. | *FOR COURT USE ONLY*<br>ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>6/2/2025 10:18 AM<br>By: Narzralli Baksh , Deputy |

| |
|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SANTA BARBARA<br>  STREET ADDRESS: 1100 Anacapa Street<br>  MAILING ADDRESS: P.O. Box 21107<br>  CITY AND ZIP CODE:  Santa Barbara, CA 93121<br>    BRANCH NAME: Anacapa |

| | |
|---|---|
| PLAINTIFF/PETITIONER: Environmental Defense Center et al.<br><br>DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection et al. | CASE NUMBER:<br>25CV02247 |
| | JUDICIAL OFFICER:<br>Hon. Donna D. Geck |
| **PROOF OF ELECTRONIC SERVICE** | DEPARTMENT:<br>4 |

1.  I am at least 18 years old.

    a.  My residence or business address is *(specify):*
        906 Garden Street, Santa Barbara, CA 93101

    b.  My electronic service address is *(specify):*
        lkrop@environmentaldefensecenter.org

2.  I electronically served the following documents *(exact titles):*
    Ex Parte Application; Declaration of Linda Krop; Declaration of Richard Kuprewicz; Request for Judicial Notice; [Proposed] Order Granting Request for Judicial Notice; [Proposed] Order Granting Stay; [Proposed] Order Granting Temporary Restraining Order

    ☐ The documents served are listed in an attachment. *(Form POS-050(D)/EFS-050(D) may be used for this purpose.)*

3.  I electronically served the documents listed in 2 as follows:

    a.  Name of person served: DJ Moore; Jeffrey Dintzer; Matt Wickersham

        On behalf of *(name or names of parties represented, if person served is an attorney):*
        Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company

    b.  Electronic service address of person served *:*
        djmoore@paulhastings.com; jeffrey.dintzer@alston.com; matt.wickersham@alston.com

    c.  On *(date):* June 2, 2025

        ☒ The documents listed in item 2 were served electronically on the persons and in the manner described in an attachment.
        *(Form POS-050(P)/EFS-050(P) may be used for this purpose.)*

Date:  June 2, 2025

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Linda Krop
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶

_____
(SIGNATURE OF DECLARANT)

**Page 1 of 1**

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>POS-050/EFS-050 [Rev. February 1, 2017] | **PROOF OF ELECTRONIC SERVICE**<br>**(Proof of Service/Electronic Filing and Service)** | Cal. Rules of Court, rule 2.251<br>*www.courts.ca.gov* |

ROB BONTA
Attorney General of California
MYUNG PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3802
  Fax:  (415) 703-5480
  E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants
Department of Forestry and Fire Protection, by and
through the Office of the State Fire Marshal, an
agency of the State of California; Daniel Berlant, in
his official capacity as State Fire Marshal*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 11:26 PM
By: Gabriel Moreno , Deputy

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT
CODE SECTION 6103

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| **ENVIRONMENTAL DEFENSE CENTER; GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB; and SANTA BARBARA CHANNELKEEPER,**<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**<br><br>Respondents and Defendants,<br><br>**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**<br><br>Real Parties in Interest. | Case No. 25CV02247<br><br>**RESPONDENTS' OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date:  June 3, 2025<br>Time:  8:30 a.m.<br>Dept:  4<br>Judge:  Hon. Donna D. Geck<br><br>Trial Date:  Not Set<br>Action Filed: April 15, 2025 |

1

## INTRODUCTION

This morning, two groups of petitioners filed two applications for temporary restraining orders, supported by nine declaration and thousands of pages of evidence, asking the Court to evaluate these requests within 24 hours. But nowhere in these applications do the Petitioners justify the need for such expedited review. In fact, the alleged risk—the activation of the Las Flores Pipeline System—is at least several weeks away. Petitioners concede that Sable cannot restart the pipelines until after it receives approval of its restart plans for the lines, but ignores that a challenge to the restart plan is unripe and requires the Office of the State Fire Marshal (OSFM) to complete review of a proposed Restart Plan and physical inspections before work can resume. That is weeks away. (See Declaration of Jim Hosler, ¶¶ 5–6.)

It is Petitioners' burden to demonstrate immediate and irreparable harm to justify a temporary restraining order. They did not do so in their hundreds of pages of moving papers and supporting evidence. Accordingly, the Court should deny their applications for temporary restraining orders. Instead, the Court should set a briefing schedule for motions for preliminary injunctions, with hearing set in early August.

## BACKGROUND

Prior to 2015, Plains Pipeline, L.P., a subsidiary of Plains All American Pipeline, L.P., operated the pipelines formerly known as Line 901 and Line 903 in Santa Barbara County. These pipelines, collectively known as the Las Flores Pipeline System, formed a connection necessary to bring oil from offshore platforms to market. On May 19, 2015, Line 901 failed, resulting in the Refugio Oil Spill. Since the pipelines were deactivated in response to the Refugio Oil Spill, the Las Flores Pipeline System has remained offline.

In response to the Refugio Oil Spill, Plains entered into a consent decree, approved by the United States District Court for the Central District of California, governing the actions that it would be required to take prior to restart of the Las Flores Pipeline System. (ECF 6-1 pp. 73–74; see also p. 69 [CAL FIRE agreement to Consent Decree].) Sable, as successor in interest to Plains, is bound by the Consent Decree. (*Id.* at pp. 88–92, ¶¶ 53–55.)

The Consent Decree contains California-specific provisions that require Plains or its successor to apply for and receive a waiver from OSFM "for the limited effectiveness of cathodic protection on line 901 . . . [and] line 903." (*Id.* at p. 80, Parts 1A and 1B.). Failure to apply for a state waiver would result in a penalty. (*Id.* at p. 32, ¶28(a).)

Sable submitted its application for waivers on April 24, 2024, and CAL FIRE issued the waivers on December 17, 2024, with the federal Pipeline and Hazardous Materials Safety Division (PMSHA) providing its notices of non-objection to the waivers on February 11, 2025. Petitioners filed suit on April 15, 2025, alleging, *inter alia*, that CAL FIRE was required to prepare an Environmental Impact Report (EIR) prior to issuing the waivers. In recent days, counsel for Petitioners did reach out to express their concerns that Sable might restart the Las Flores Pipeline System, but until this morning—Monday, June 2, 2025—Petitioners did not indicate that they would be seeking ex parte relief on Tuesday, June 3, 2025.

## LEGAL STANDARDS

To obtain a preliminary injunction or temporary restraining order (TRO), a moving party must demonstrate (1) likely success on the merits of at least one cause of action and (2) that the interim harm that the moving party would suffer, absent an injunction, outweighs the harm the other parties would suffer from an injunction. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69–70.) "[T]he applicant must make a prima facie showing of entitlement to injunctive relief" by "demonstrate[ing] a real threat of immediate and irreparable injury due to the inadequacy of legal remedies." (*Choice-in-Education League v. Los Angeles Unified School Dist.* (1993) 17 Cal.App.4th 415, 422, cleaned up.) If the injunction is sought against a public entity, a more strenuous showing of irreparable injury is required because there is "a general rule against enjoining public officers or agencies from performing their duties." (*Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1471.) In cases concerning public rights, such as cases brought pursuant to the California Environmental Quality Act (CEQA), courts weigh not only the interests of the parties, but how the public interest would be served by granting or denying preliminary relief. (See *Tulare Lake Canal Company v. Stratford Public Utility District* (2023) 92 Cal.App.5th 380, 398.)

To obtain a TRO, the moving party must satisfy the requirements for a preliminary injunction and the additional requirement of an affirmative factual showing not only of interim harm (between the date of the motion and the trial) but of irreparable harm, immediate injury, or a statutory basis for immediate relief. (Cal. Rules of Court, rule 3.1202(c).) As set forth below, Petitioners fail to meet these standards, and the TRO cannot issue as a matter of law.

## ARGUMENT

**I.    Petitioners Have Not Demonstrated Immediate Harm Justifying Ex Parte Relief**

To obtain relief on an ex parte basis, the "applicant must make an affirmative factual showing in a declaration containing competent testimony based on personal knowledge of [1] irreparable harm, [2] immediate danger, or [3] any other statutory basis for granting relief ex parte." Cal. Rules of Court, rule 3.1202(c). Ex parte proceedings are designed to provide relief in emergency situations, and not merely when it is convenient for the applicant or as a means for gaining a tactical advantage. (See *Newsom v. Superior Court* (2020) 51 Cal.App.5th 1093, 1097.)

This is not an emergency situation.

Notably, Petitioner's motions are in effect a challenge to the approval of a restart plan—a decision that has not been made—and as a result are unripe. "[A] basic prerequisite to judicial review of administrative acts is the existence of a ripe controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 169.) OSFM has not received a viable restart plan to evaluate. (Hosler Decl., ¶ 5.) Neither OSFM nor this Court can prejudge whether the restart plan will be approved once it has been submitted. (*Id.* at ¶ 4.) But that prejudgment is a necessary condition for finding the immediate and irreparable harm that Petitioners claim supports a temporary restraining order.

**II.    Petitioners Have Not Established Likely Success on the Merits on CEQA**

Petitioners challenge the approval to operate the Las Flores Pipeline System—a system constructed in the 1980s—without meaningfully addressing the categorical exemption from CEQA for existing facilities. The existing facilities exemption, also known as the Class 1 Exemption, provides that an agency need not prepare an EIR for "the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private

4

structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use." (Cal. Code Regs., tit. 14, § 15301.) The size of the facility is not a reason that this exemption does not apply. (See *North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 840.) Petitioners' arguments appear to ignore the 2018 amendment, which made clear that an agency may "find that a project will not expand the level of use if that level is consistent with historic levels of operations." (1 Kostka & Zischke, Practice under the Cal. Environmental Quality Act (2d ed. 2008) § 5.77.) That is precisely the case here. The waivers issued by OSFM, if combined with the approval of a restart plan, will authorize Sable to restore the Las Flores Pipeline System to its former level of use.

To the extent that Petitioners view OSFM's waiver and the resulting construction as exceeding "repair" and "maintenance," it falls within the Class 2 Exemption for "replacement or reconstruction of existing structures and facilities where the new structure will be located on the same site as the structure replaced and will have substantially the same purpose and capacity as the structure replaced." Cal. Code Regs., tit. 14, § 15302.

In the two Petitioners' briefs, there is only a brief discussion relevant to exemptions. That discussion, in Center for Biological Diversity and Wishtoyo Foundation's brief, first asserts, without support, that restarting a pipeline does not fall within the existing facilities exemption. This is wrong and unsupported. The brief then argues that because the project is significant, the exemption does not apply. This misunderstands CEQA exemptions. CEQA exemptions are the rubric for determining significance. Under the existing facilities exemption, the question is whether the purported project is significant *as compared to former use*. (*Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 864 [finding compliance with CEQA when agency allowed greater discharge of pollutants because the increase in discharge was consistent with the original capacity].)

Petitioners' procedural arguments are similarly misguided. Petitioners allege that OSFM failed to comply with the controlling federal statute, 49 U.S.C. § 60118, subd. (c)(1)(B). This statute addresses the rights of "an owner or operator of a pipeline facility" and addresses their rights to apply for a waiver; there is no indication in the text that this is a public participation

statute.[1] (49 U.S.C. § 60118, subd. (c)(1)(A).) All notices, including publication on regulations.gov, were consistent with law. (State of California for Sable Pipeline CA-325 AB, https://www.regulations.gov/docket/PHMSA-2025-0003.) Petitioners have not cited and Respondents have not found any case treating this requirement as a public participation statute, nor any indication that federal law confers a private right of action to an unregulated party under this statute.

The claims under state law are similarly misguided. Again, Petitioners have pointed to no case applying these procedures as they seek to here. In light of California's adoption of the relevant federal regulations as its own, see Cal. Code Regs., tit. 19, § 2000, the Court should not create a never-before invoked state-law cause of action to issue a temporary restraining order.

**III.   Petitioners Seek Broader Relief Than They Are Entitled To**

"The scope of available preliminary relief is necessarily limited by the scope of the relief likely to be obtained at trial on the merits." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442.) Petitioners have not articulated a challenge to the approval of a restart plan— nor could they since no such plan has been approved. Instead, Petitioners contend that they do not have sufficient information about when a Restart Plan will be approved. If it was inclined to address Petitioners' concern, this Court could fashion far narrower and more targeted relief than the broad TROs sought by Petitioners. (See *Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322, 1351 [striking part of injunction as "more than necessary to maintain the status quo"].) Such an approach would represent a more judicious approach to a complicated matter.

**IV.   Complex Legal and Factual Questions Justify Setting a Briefing Schedule**

Petitioners have not presented grounds for a temporary restraining order, but the complexity of the facts of this case support setting a briefing schedule for their requests for preliminary injunctions. While Petitioners cannot make a case for immediate harm, it is true that Sable will likely seek to restart the Las Flores pipeline system before this case is resolved on the merits.

---

[1] Petitioners' only case on this subject, *In Re Midamerican Energy Co.* (Jan. 15, 2002) 2002 WL 31155601, is a decision of the Iowa Utilities Board over 20 years ago. The Iowa Utilities Board did not say that a person other than the applicant must be given an opportunity to comment, concluded that a notice would be "impracticable and unnecessary," and as a result provided no notice.

6

On a day's notice, the briefing is under-developed. Due to the limited time to review and digest Petitioners' voluminous briefing and exhibits, CAL FIRE/OSFM was not able to prepare evidence and complete thorough review and analysis of the entirety of Petitioners' briefing before filing its brief response with the Court. More, as noted in Part II, *supra*, Petitioners provide only a cursory discussion of whether the Las Flores Pipeline System falls within the existing facilities exception under CEQA. The Court should not truncate the opportunity to brief this important merits issue.

Court can easily address this underdevelopment. With a briefing schedule, the parties can present the Court with adequate legal argument and sufficient evidence to allow the Court to make an informed decision.

## CONCLUSION

Petitioners have not carried their burden to justify issuance of a temporary restraining order. But CAL FIRE/OSFM does not oppose their ability to have their request for a preliminary injunction considered with the benefit of complete briefing. Respondents and Real Parties should have an opportunity to consider their arguments and prepare their evidence and responsive briefing. The Court should set a briefing and hearing schedule to allow the Court to consider each side's fully-briefed arguments.

Dated: June 2, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG PARK
Supervising Deputy Attorney General

/s/ Michael S. Dorsi
MICHAEL S. DORSI
Deputy Attorney General
*Attorneys for Respondents and Defendants Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California; Daniel Berlant, in his official capacity as State Fire Marshal*

LA2025400827
44648391.docx

7

**DECLARATION OF SERVICE**

Case Name: **ENVIRONMENTAL DEFENSE CENTER et al. v CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al.**

Case No.:     **25CV02247**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter.

On June 2, 2025, I served the attached:
- **RESPONDENTS' OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER;**
- **DECLARATION OF JIM HOSLER IN SUPPORT OF RESPONDENTS' OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER**

by transmitting a true copy via electronic mail addressed as follows:

| | |
|---|---|
| Linda Krop lkrop@environmentaldefensecenter.org Jeremy M. Frankel jfrankel@environmentaldefensecenter.org Tara C. Rengifo trengifo@environmentaldefensecenter.org ENVIRONMENTAL DEFENSE CENTER | Julie Teel Simmonds jteelsimmonds@biologicaldiversity.org David Pettit dpettit@biologicaldiversity.org Talia Nimmer tnimmer@biologicaldiversity.org CENTER FOR BIOLOGICAL DIVERSITY |
| Moore, DJ djmoore@paulhastings.com Hanelin, Benjamin J. benjaminhanelin@paulhastings.com Rogers, Natalie C. natalierogers@paulhastings.com PAUL HASTINGS LLP | Bolender, Brooke Brooke.Bolender@alston.com Jeffrey Dintzer jeffrey.dintzer@alston.com ALSTON & BIRD |

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on June 2, 2025 at Los Angeles, California.

| J. Sissov | /s/ J. Sissov |
|---|---|
| Declarant | Signature |

ROB BONTA
Attorney General of California
MYUNG PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3802
  Fax:  (415) 703-5480
  E-mail:  Michael.Dorsi@doj.ca.gov
*Attorneys for Respondents and Defendants*
*Department of Forestry and Fire Protection, by and*
*through the Office of the State Fire Marshal, an*
*agency of the State of California; Daniel Berlant, in*
*his official capacity as State Fire Marshal*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/2/2025 11:26 PM
By: Gabriel Moreno , Deputy

EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT
CODE SECTION 6103

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

| | |
|---|---|
| **ENVIRONMENTAL DEFENSE CENTER; GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB; and SANTA BARBARA CHANNELKEEPER,**<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,**<br><br>Respondents and Defendants,<br><br>**SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,**<br><br>Real Parties in Interest. | Case No. 25CV02247<br><br>**DECLARATION OF JIM HOSLER IN SUPPORT OF RESPONDENTS' OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date:        June 3, 2025<br>Time:        8:30 a.m.<br>Dept:        4<br>Judge:       Hon. Donna D. Geck<br><br>Trial Date:  Not Set<br>Action Filed: April 15, 2025 |

1

I, Jim Hosler, declare:

1.    I have personal knowledge of the facts asserted in this Declaration, and if called as a witness, I could and would competently testify to these facts.

2.    I am the Assistant Deputy Director – Pipeline Safety, CUPA, PFAS Foams, at the Office of the State Fire Marshal (OSFM), a unit within the California Department of Forestry and Fire Protection (CAL FIRE).

3.    I am familiar with Sable Offshore Corp.'s applications and OSFM's policies, practices, and procedures related to restarting an oil pipeline.

4.    OSFM does not prejudge whether to approve a restart plan. It evaluates the submission on the merits and confers with the applicant when changes are needed.

5.    OSFM has received documents that Sable identified as a restart plan for lines 324 and 325. The presently-submitted documents are insufficient for approval by OSFM. OSFM expects to continue discussions with Sable and anticipates that Sable will submit a new or revised set of restart plans in the future, which OSFM will review in depth before making a decision to approve or deny those restart plans. Based on my personal experience, I estimate this review will take several weeks from the time OSFM receives the new or revised restart plans.

6.    In addition, before OSFM can approve a restart plan, pipeline safety engineers must complete inspections of the pipeline and associated infrastructure. Based on my experience, I estimate that these inspections will not be complete for several weeks.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 2nd Day of June, 2025.

/s/ Jim Hosler
JIM HOSLER

As the attorney responsible for the filing of this Declaration, I, Michael S. Dorsi, attest that on this 2nd day of June, 2025, declarant Jim Hosler authorized me to affix his electronic signature to this Declaration. */s/ Michael S. Dorsi*

LA2025400827 44648392.docx

Decl. of Jim Hosler ISO Respondents' Opposition to Application for Temporary Restraining Order (25CV02247)