# EXHIBIT H

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

Dated and Entered:   06/03/2025                          Time:   8:30 AM
Judicial Officer:      Donna D Geck
Deputy Clerk:        Maria Vidal                          Dept:   SB Dept 4
Deputy Sheriff:      Marco Diaz
Bailiff/Court Officer:                                    Case No: 25CV02247
Court Reporter:      Shelley Cockrell

---

**Environmental Defense Center et al vs California Department of Forestry and Fire Protection et al**

Parties Present:

Linda Krop            Petitioner's Attorney
Michael Dorsi         Respondent's Attorney (via Zoom)
Jeffrey Dintzer       Attorney for Real Party in Interest
Brooke Bolender       Attorney for Real Party in Interest

---

**NATURE OF PROCEEDINGS:  Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order**

Counsel presented argument.

The Court granted the relief requested.

The Court set a hearing on the OSC re Preliminary Injunction for July 18, 2025 at 10:00 a.m.

The briefing schedule shall be per code.

The Court is not requiring a bond.

This case was heard along with case #25CV02244, Center for Biological Diversity et al vs California Department of Forestry and Fire Protection et al. Counsel for Sable Offshore Corp requested that the cases be ordered coordinated. The Court ordered the cases coordinated. After the hearing concluded, the Court found that coordination may not be appropriate in this situation, as coordination brings to one court two or more civil actions that are pending in different courts. The Court hereby vacates the order coordinating the cases. Counsel shall be prepared to discuss this at the next hearing or file an appropriate motion to consolidate if that is what they are seeking.

DARREL E. PARKER, EXECUTIVE OFFICER          Minutes Prepared by:

                                        _____ , Deputy
                                                 Maria Vidal

SC-2411 (Revised July 1, 2013)          **MINUTE ORDER**

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 6/2/2025

Case 2:26-cv-05242-SVW-SSC    Document 4    Filed 05/14/26    Page 3 of 402    Page ID #:1512    NB

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

**F I L E D**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

**06/03/2025**

Darrel E. Parker, Executive Officer

BY _Chavez, Terri_____
Deputy Clerk

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> ~~[PROPOSED]~~ **ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** <br><br> Date: June 3, 2025 <br> Time: 8:30 a.m. <br> Dept.: 4 <br> Judge: Hon. Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

1
[Proposed] Order to Show Cause and Temporary Restraining Order

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

Upon consideration of the Verified Petition for Writ of Mandate and Complaint for Injunctive Relief filed in this action, the Ex Parte Application for an Order to Show Cause and Temporary Restraining Order, and the papers filed in support thereof, and good cause appearing:

**ORDER TO SHOW CAUSE**

**YOU ARE HEREBY ORDERED TO APPEAR AND SHOW CAUSE** at 10:00 a.m. on July 18 , 2025, or as soon thereafter as counsel may be heard in Department 4 of the above-entitled Court, located at 1100 Anacapa Street, Santa Barbara, CA 93121, why a preliminary injunction should not issue against Respondents California Department of Forestry and Fire Protection, Office of the State Fire Marshal, and Daniel Bermant (collectively, "Respondents"), and Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Real Parties"), prohibiting Respondents, Real Parties, their agents, their employees, or anyone acting in concert with proceeding with the restart and operation of the Las Flores Pipeline System, as challenged by the Verified Petition and Complaint on file in this action.

**TEMPORARY RESTRAINING ORDER**

PENDING HEARING on the above Order to Show Cause, Respondents, Real Parties, their agents, their employees, or anyone acting in concert with them ARE HEREBY TEMPORARILY RESTRAINED AND ENJOINED from proceeding with the restart and operation of the Las Flores Pipeline System, as challenged by the Verified Petition and Complaint on file in this action.

This Temporary Restraining Order is effective immediately, and will remain in full force and effect until the hearing on the Order to Show Cause, unless this Court orders otherwise.

IT IS SO ORDERED.

DATED: 06/03/2025 , 2025

JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

2
[Proposed] Order to Show Cause and Temporary Restraining Order

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 6/2/2025

**F I L E D**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

**06/03/2025**
Darrel E. Parker, Executive Officer
BY  Chavez, Terri
Deputy Clerk

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

**DENIED**

*Attorneys for Petitioners/Plaintiffs*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br>        Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br>        Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br>        Real Parties in Interest. | Case No.: 25CV02247 <br><br> **[PROPOSED] ORDER GRANTING REQUEST FOR JUDICIAL NOTICE** <br><br> Date:     June 3, 2025 <br> Time:    8:30 a.m. <br> Dept.:    4 <br> Judge:  Hon. Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

Upon consideration of the Verified Petition for Writ of Mandate and Complaint for Injunctive Relief filed in this action, the Ex Parte Application for a Stay or for an Order to Show Cause and Temporary Restraining Order ("Ex Parte Application"), and the papers filed in support thereof, and good cause appearing:

Petitioners' request for judicial notice ("RJN") filed with the Ex Parte Application is granted as to requests Nos. 1-13. Accordingly, the Court takes judicial notice of the following:

**RJN No. 1**    *Exhibit A* - California Department of Fish and Wildlife (CDFW), *et al.*, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment, dated June 2021

**RJN No. 2**    *Exhibit B* - U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, dated May 2016

**RJN No. 3**    *Exhibit C* - Staff Report Recommending that the California Coastal Commission (CCC) issue a Cease and Desist Order (CDO), Restoration Order, and Administrative Civil Penalty to Sable Offshore Corp. ("Sable"), dated March 28, 2025

**RJN No. 4**    *Exhibit D* - Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-324 by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025

**RJN No. 5**    *Exhibit E* - Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-325A/B by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025

**RJN No. 6**    *Exhibit F* - Notice of Violation from the RWQCB to Sable, dated April 15, 2025

**RJN No. 7**    *Exhibit G* - OSFM letter granting the waiver for CA-324, dated December 17, 2024

**RJN No. 8**    *Exhibit H* - OSFM letter granting the waiver for CA-325A/B, dated December 17, 2024

**RJN No. 9**    *Exhibit I* - Excerpts from Draft Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the Proposed Celeron/All American and Getty Pipeline Projects prepared by the California State Lands Commission (CSLC) and Bureau of Land Management, Department of the Interior (BLM) dated August 1984

**RJN No. 10**    *Exhibit J* - Excerpts from Final EIR and EIS for the Proposed Celeron/All American and Getty Pipeline Projects prepared by CSLC and BLM dated January 1985

**RJN No. 11**    *Exhibit K* - Santa Barbara County ("County") Webpage "901/903 Replacement Pipeline Project" (last accessed May 27, 2025)

**RJN No. 12**    *Exhibit L* - PHMSA Webpage "Pipeline Special Permits and State Waivers Overview" (last accessed May 30, 2025)

**RJN No. 13**    *Exhibit M* - California Natural Resources Agency's (CNRA) summary of state regulation of crude oil pipelines in the County prepared and maintained by CNRA, last updated on May 14, 2025 (last accessed May 28, 2025)

IT IS SO ORDERED.

**DENIED**

DATED: __06/03/2025__, 2025

JUDGE OF THE SUPERIOR COURT

---

3

[Proposed] Order Granting Request for Judicial Notice

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN (SBN 237595)
benjaminhanelin@paulhastings.com
NATALIE C. Rogers (SBN 301254)
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/3/2025 8:00 AM
By: Gabriel Moreno , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, | Case No. 25CV02247 <br><br> Assigned for all purposes to: Hon. Donna D. Geck <br><br> **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** <br><br> [Filed concurrently with Declarations of Steve Rusch, Jamie Shafer, and Jeffrey Dintzer] <br><br> Date:    June 3, 2025 <br> Time:    8:30 a.m. <br> Dept.:    4 <br><br> Complaint Filed:    April 15, 2025 <br> Trial Date:    None set |

1

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

2

## I.      **INTRODUCTION**

Petitioners have no basis for bringing these *ex parte* applications for a temporary restraining order (TRO).[1] No exigent risk to the public or environment exists to warrant the extraordinary relief Petitioners seek. Instead of pursuing a regularly noticed motion, which they have had months to do, Petitioners collectively filed 663 pages of materials in their applications at the last minute and have unnecessarily burdened this Court and all parties.

Petitioners' TRO applications are both too late and too early. To the extent Petitioners seek to enjoin physical construction associated with pipeline anomaly repairs, Petitioners are too late. Pipeline anomaly repair work is complete. To the extent Petitioners seek to enjoin the Office of State Fire Marshal ("OSFM") from issuing a permit to allow the Sable to restart the pipelines, they are too early. As Petitioners recognize, Sable still needs to obtain additional OSFM approval before it can restart the onshore Pipeline system (the "Restart Plan"). OSFM is currently reviewing materials related to Sable's Restart Plan, but no approvals have been issued. Petitioners cannot use their TRO applications to stop OSFM from considering or approving the Restart Plan.

Petitioners' TRO applications rest on a fundamental misunderstanding of the approvals Sable needs from OSFM to restart pipeline operations. Petitioners' lawsuits challenge OSFM's December 17, 2024, issuance of two waivers of certain pipeline safety regulatory requirements (the "State Waivers"). ***But the State Waivers do not allow oil to flow through the pipelines.*** Even if they did, Petitioners claims of potential future risks are overstated and wrong.

Petitioners' requests for a TRO must be denied for at least three reasons.

*First*, Petitioners fail to demonstrate why a TRO is justified now—almost six months after OSFM approved the State Waivers and before OSFM has approved the Restart Plan.

*Second*, Petitioners have not identified any irreparable harm stemming from OSFM's approval of the State Waivers. Rather, Petitioners allege speculative harms that they argue could occur upon restart of the pipelines – all of which were analyzed and disclosed in the more than 1,300-page joint

---

[1] Given the substantial overlap in the *ex parte* applications, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") provide an identical response to both applications.

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

Environmental Impact Report/Environmental Impact Statement ("EIR/EIS") that was certified before the pipelines were approved and built.

*Third*, Petitioners are not likely to succeed on the merits. OSFM did not violate applicable federal and state pipeline safety laws, and Petitioners read requirements into federal and state regulations that do not exist. OSFM also did not violate the California Environmental Quality Act ("CEQA"). OSFM's issuance of the State Waivers addressing repairs and improvements to long-existing pipelines was not required to undergo additional CEQA review, and any risk to the environment from pipeline repairs and operations already was analyzed in the pipelines' certified EIR/EIS.

*Finally*, given the substantial harms to Sable if extraordinary relief is issued, if the Court is inclined to issue such relief (which it should not), the Court should require Petitioners to post a bond of $75 million to ensure Sable is adequately compensated for the loss it will sustain while enjoined.

In sum, and for the foregoing reasons, this Court should deny Petitioners' requests for a TRO.

## II.    BACKGROUND

In January 1985, the California State Lands Commission and federal Bureau of Land Management certified a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for what was then known as the "Celeron Pipeline Project," which included the construction of what are now called the Las Flores Pipelines.[2] The EIR/EIS explains that its impact analysis extends through the pipelines' entire lifetime, including both "operation" and "maintenance." (See Final EIR/EIS, Abstract, p. 2.[3]) In 1986, after reviewing the EIR/EIS, the County of Santa Barbara's Planning Commission approved the construction of the Las Flores Pipelines and approved

---

[2] Two pipelines make up the Las Flores Pipelines. One is the Las Flores Pipeline CA-324 ("Line CA-324") (previously known as Line 901), which transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon to the existing Gaviota Pump Station. The other is Las Flores Pipeline CA-325 ("Line CA-325") (previously known as Line 903), which transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the existing Pentland Delivery Point in Kern County.

[3] The EIR/EIS assumed that the Pipelines' operational life would continue until the "availability of crude oil" for use in the Pipelines was exhausted. (Draft EIR/EIS, p. 2-35.)  The Draft EIR/EIS is available online at the following link: https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672.  The Final EIR/EIS is available online at this link: https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

a final development plan, conditional use permit, coastal development permits, and other entitlements. (See Declaration of Jeffrey D. Dintzer ("Dintzer Decl."), Ex. 4, [Planning Commission Action].)

Because the Las Flores Pipelines transport crude oil, a petroleum product, they are subject to the federal Hazardous Liquid Pipeline Safety Act ("HLPSA") (49 U.S.C. §§ 60101 et seq.), which is administered by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"). PHMSA has adopted detailed regulations governing the design, construction, pressure testing, operation, and maintenance of hazardous liquid pipelines. (See 49 C.F.R. Part 195.) The HLPSA also contemplates that some pipeline owners and operators may require modified standards based on the particular characteristics of a given pipeline facility. As such, the HLPSA grants PHMSA the authority to "waive compliance with any part of an applicable standard … on terms [PHMSA] considers appropriate if [PHMSA] determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118, subd. (c)(1)(a).)

The HLPSA also allows state agencies to apply and become certified to enforce equivalent or more stringent regulations with respect to intrastate pipelines. (See 49 U.S.C. § 60105.) In California, the State Legislature vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines and … to implement the [HLPSA] and federal pipeline safety regulations as to those portions of interstate pipelines located within [California] as necessary to obtain annual federal certification." (Cal. Gov't Code, § 51010.) In turn, OSFM adopted PHMSA's implementing regulations, and PHMSA certified OSFM to implement the HLPSA with respect to intrastate pipelines in California. (Cal. Code Regs., tit. 14, § 2000.)

Certified state agencies, like OSFM, also may "waive compliance with a safety standard" if the requested modification is not inconsistent with pipeline safety. (49 USC §§ 60118, subd. (d).) Any such "State Waiver" may become effective only after providing PHMSA with 60 days' notice and the opportunity to make a written objection to its issuance. (See *ibid.*)

On March 13, 2020, the prior owner and operator of the Las Flores Pipelines entered into a Consent Decree with the United States and the State of California on behalf of several federal and state regulatory agencies—including OSFM and PHMSA—in the United States District Court, Central

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

District of California (Civil Action No. 2:20-cv-02415) to resolve issues related to the 2015 Refugio oil spill that resulted from a leak in Line CA-324.

The Consent Decree imposes a series of prerequisites that the pipelines' operator must satisfy before restarting either of the Las Flores Pipelines. In particular, the Consent Decree requires that the operator must, with respect to both Lines CA-324 and CA-325, "apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection" "prior to restarting" the pipelines. (Dintzer Decl., Ex. 3 [Consent Decree], Appendix B, ¶¶ 1.A, 1.B.) In other words, the Consent Decree required Sable to apply for the waiver that Petitioners now challenge.

After Sable acquired the Las Flores Pipelines in February 2024, Sable submitted State Waiver applications to OSFM with respect to both Lines CA-324 and CA-325, as required under the Consent Decree. (See Declaration of Julie T. Simmonds in support of Petitioners' Application for a TRO ("Simmonds Decl."), Exs., 8, 9 [State Waivers].) .) In May 2024, Sable began repair and maintenance work on the pipelines as required under the Consent Decree and consistent with Sable's understanding that such work was authorized by the Pipeline's existing approvals and permits. The County of Santa Barbara expressly confirmed in writing that no further permits were required for Sable's anomaly repair work on February 12 and March 21, 2025.  (See Declaration of Steve Rusch ("Rusch Decl."), Exs. A, D.)

Following several months of consideration of Sable's State Waiver applications, OSFM granted both State Waivers on December 17, 2024, and imposed over sixty separate conditions on Sable's operation of the Las Flores Pipelines to reflect to the modified regulatory standards required under the Consent Decree. (See Simmonds Decl., Exs. 8, 9 [State Waivers].) On February 11, 2025, PHMSA notified OSFM that it had no objection to its issuance of the State Waivers, and the State Waivers became effective. (See Dintzer Decl., Exs., 1, 2 [PHMSA Letters].)  Importantly, Petitioners did not file suit challenging OSFM's approval of the State Waivers until April 15, 2025, and even once those lawsuits were filed, did not seek a TRO or other injunctive relief to stop any potential "harm" the State Waivers allegedly could cause.

The Consent Decree separately required Plains to submit and obtain OSFM's approval of a written "Restart Plan" before restarting either Line CA-324 or Line CA-325. (Dintzer Decl., Ex. 3

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

[Consent Decree], Appendix D, ¶¶ 1.b, 1.f.) Sable submitted a draft Restart Plan to OSFM on July 29, 2024. (See Dintzer Decl., Exs. 5, 6 [Restart Plan].) OSFM has taken no final action on that Plan and it remains under review.

While OSFM's review has been pending, Sable completed the anomaly repairs and pipeline hydrotesting last week under OSFM supervision.  (See Rusch Decl., ¶ 7.)

### III.   ARGUMENT

*Ex parte* relief is proper only if the moving party can show "irreparable harm, immediate danger, or any other statutory basis for granting relief *ex parte*." Cal. R. Ct. 3.1202(c). The Court must evaluate two interrelated factors when ruling on Petitioners' request for a TRO: (1) the interim harm that Petitioners would be likely to sustain if the TRO were denied as compared to the harm OSFM and Sable would be likely to sustain if the TRO were granted; and (2) the likelihood that Petitioners will prevail on the merits at trial. (*See Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286.) "The latter factor involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo." (*Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach* (2014) 232 Cal.App.4th 1171, 1177.)

The Court should balance "the respective equities of the parties." (*Cohen*, *supra*, 40 Cal.3d at p. 286.) The Court must balance the harm that will be suffered with the likelihood of success. (*Butt v. State of California* (1992) 4 Cal. 4th 668, 678.) "The trial court's determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction." (*Ibid*.) A party moving for injunctive relief bears the burden of showing the harm that would result if a preliminary injunction were not granted. (*Casmalia Resources, Ltd. v. County of Santa Barbara* (1987) 195 Cal. App. 827, 838.)

### A.   CCP Section 1094.5 Does Not Apply; An Administrative Stay Cannot Issue.

An administrative stay cannot issue under Code of Civil Procedure ("CCP") section 1094.5(g) because both actions are traditional mandamus actions under CCP section 1085. Section 1094.5 only applies to administrative orders where a hearing is required to be given and evidence is required to be taken. (CCP, § 1094.5(a).) OSFM's issuance of the State Waivers did not require a hearing or evidence to be taken. Therefore, section 1094.5(g) does not apply.

**B.      No Exigency Exists Warranting *Ex Parte* Relief.**

*Ex parte* relief is proper only if the moving party can show "irreparable harm, immediate danger, or any other statutory basis for granting relief *ex parte*." (Cal. R. Ct. 3.1202(c).) Irreparable harm is not speculative or remote; it is clear, impending and immediately likely. (See *E. Bay Mun. Util. Dist. v. Dep't of Forestry & Fire Prot.* (1996) 43 Cal.App.4th 1113, 1126; *City of Vernon v. Cent. Basin Mun. Water Dist.* (1999) 69 Cal.App.4th 508, 518 [upholding trial court's conclusion that plaintiff did not bear its burden of proving irreparable harm in a "clear, nonremote, nonspeculative manner"].) "Lawyers must understand that filing an *ex parte* motion . . . is the forensic equivalent of standing in a crowded theater and shouting, 'Fire!' There had better be a fire." (*Mission Power Eng'g Co. v. Cont'l Cas. Co.* (C.D. Cal. 1995) 883 F.Supp. 488, 492.)

Petitioners cannot demonstrate any exigent circumstances or non-speculative harms that warrant a TRO. OSFM issued the State Waivers almost six months ago, on December 17, 2024. (See CBD Pet., ¶ 1; EDC Pet., ¶ 115.) Not only did Petitioners wait until April 15, 2025, to file their lawsuits, but Petitioners waited *another* month-and-a-half to request extraordinary relief. Sable has now completed all of the anomaly repair work on the pipelines contemplated in the State Waivers.

Moreover, the State Waivers do not authorize restart of oil and gas production and transport. As Petitioners recognize, Sable still needs to obtain additional OSFM approval before it can restart the onshore Pipeline system. (EDC TRO, p. 13; see also EDC Pet., ¶ 88 ["the final step in the restart process would be [] submitting Restart Plans to OSFM for review and approval, and obtaining ultimate approval from OSFM to restart CA-324 and CA-325."].) The Consent Decree requires Sable to "develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan . . . to the OSFM for review and approval." (Dintzer Decl., Ex. 3 [Consent Decree], Appendix D, ¶ 1(b), (f).) Sable "shall not operate [the Pipelines] **until authorized to do so by the OSFM**." (See *id.*, Appendix D, ¶ 1(a); see also *id.*, ¶ 1(e).)

In addition, Petitioners' requested relief amounts to an injunction on OSFM's review and approval of the Restart Plan. This is not proper. Courts are "extremely cautious, and even hesitant and reluctant," when asked to enjoin public officials from exercising their official duties prior to a trial on

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

the merits. (See *Santa Monica v. Superior Court* (1964) 231 Cal.App.2d 223, 226-227.) No order should issue interfering with OSFM's official duties regarding the Restart Plan.

**C.      Petitioners Fail to Demonstrate They Would Suffer Irreparable Harm Absent Preliminary Relief.**

Petitioners' claims of irreparable harm are premised on the incorrect notion that the State Waivers authorize the Pipelines' restart. They do not. The State Waivers do not authorize restart, and the physical anomaly repair work to the pipelines pursuant to the State Waivers has been completed. As such, Petitioners have not—and cannot—show that they would suffer irreparable harm absent an injunction related to the State Waivers.

For example, Petitioners contend that an injunction is necessary because "[r]estart of the pipeline threatens the California coast with significant harm." (EDC TRO, p. 13; see also *id.*, p. 18 ["restarting SYU oil production and transport will cause other significant environmental impacts that have gone entirely unassessed."]; CBD TRO, p. 14 ["[t]he health and safety of Californians along the pipeline route and the area's sensitive resources are threatened by Cal Fire's decision to waive pipeline safety requirements and allow Sable to start transporting oil."].) Petitioners misunderstand what the State Waivers authorize—regulatory relief from certain requirements in Title 49 of the Code of Federal Regulations based on the imposition of alternative and more stringent safety standards (see 49 U.S.C. § 60118)—not restart of pipeline operations. Petitioners' lawsuits do not challenge OSFM's approval of the Restart Plan, and Petitioners' alleged harms resulting from the implementation of yet-to-be-approved Restart Plan are speculative. (See *City of Vernon*, *supra*, 69 Cal.App.4th at p. 518.)

Further, Petitioners argue that a TRO is warranted because the risk of pipeline rupture is substantial and, should an oil spill occur, it would "irreparably harm Petitioners and their members' interests in the environment and the wildlife that habits it." (CBD TRO, pp. 15-16; see also EDC TRO, p. 14 ["the Waivers are likely to result in additional pipeline spills and ruptures."].) Again, Petitioners' argument fails because the State Waivers do not authorize restart of operations. In reviewing the Sable's proposed Restart Plan, OSFM will consider the safety of operations and integrity of the pipelines to minimize potential safety risks. (See Dintzer Decl., Ex. 3 [Consent Decree], Appendix D.)

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

Moreover, the prior certified EIR/EIS considered the potential for oil spills with total volumes that substantially exceeded the 2015 Refugio oil spill and concluded such risks were significant and unavoidable. (See *id.*, Consent Decree, p. 1 [stating that the Refugio Oil Spill discharged approximately 2,900 barrels of crude oil]; Draft EIR/EIS, p. 4-121, Table 4-26 [estimating potential spill volumes along the Las Flores Pipelines to include as much as 8,370 barrels at a given location]; Dintzer Decl., Ex. 4 [finding the potential oil spill impacts identified in the EIR/EIS to be significant and unavoidable], p. 51].)   Upon installation of the valves required pursuant to California State Assembly Bill 864, the potential worst-case oil spill volume on Line CA-324, where the Refugio spill occurred, has been reduced to approximately 1,980 barrels—significantly less than the 2015 Refugio oil spill volume and the volumes analyzed under the EIR/EIS.  (See Dintzer Decl. Ex. 7, [2021 Line 901 Risk Assessment], p. 12, Table 4.A.1.)  Therefore, and contrary to Petitioners' claims, potential oil spill risk is within the scope of impacts already analyzed under CEQA and a Subsequent EIR is not required.  (See *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 949 [in order to require subsequent CEQA review, "[Pub. Res. Code] section 21166 and CEQA Guidelines section 15162 provide that an agency … must determine whether [] changes are 'substantial' and 'will require major revisions of the previous EIR [] due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects.'"])

Finally, Petitioners assert that a TRO is warranted, claiming that Sable has already begun oil production at the Santa Ynez Unit. (See CBD TRO, p. 18.) Petitioners are wrong. No oil will be pumped through the onshore pipelines until approved by OSFM. That OSFM may approve a Restart Plan at some point in the future, after considering materials submitted by Sable, is not a basis for issuing a TRO now. If that were the case, every administrative agency decision could be attacked collaterally before the agency acts, without any knowledge of the evidence the agency considered or the basis of its decision. Such a holding would subvert the entire administrative process.

Petitioners have not demonstrated that they would suffer irreparable harm if the State Waivers remained in place. Their alleged speculative harms stem from Sable's implementation of the Restart Plan—***if and when approved by OSFM***—which are not at issue here.

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

**D.      Petitioners Fail to Demonstrate They Are Likely to Succeed on the Merits of Their Petitions**

Petitioners' applications for a TRO should be denied because they are not likely to succeed on the merits of their petitions. In issuing the State Waivers, OSFM complied with applicable federal and state pipeline safety laws and did not violate CEQA.

***Alleged Violations of Pipeline Safety Laws.*** Petitioners have not demonstrated they are likely to prevail on the merits of their claims that OSFM violated federal and state pipeline safety laws. Although federal law authorizes certain states (including California) to waive compliance with a federal pipeline safety standard "in the same way and to the same extent" that the Pipeline and Hazardous Materials Safety Administration ("PHMSA") may waive compliance (see 49 U.S.C. § 60118(d)), Petitioners cite no authority for the proposition that OSFM must follow the exact same procedures as PHMSA does in issuing waivers.

For instance, Petitioners claim that OSFM failed to give the public notice of and an opportunity for hearing before acting on the State Waivers. Federal law does not, on its face, require PHMSA to provide an opportunity for "public" notice and hearing. (See 49 U.S.C. § 60118(c) [PHMSA may act on a waiver application "only after notice and an opportunity for hearing"].)  Where the phrase "notice and opportunity for hearing" is used elsewhere in the HLPSA, it refers to the applicant's entitlement to notice and an opportunity for hearing. (See, e.g., 49 U.S.C. §§ 60112(a), 60117(m), 60122(a)(1).) Nothing in Section 60118 entitles members of the public to notice of and a hearing on a pending state waiver application.

Indeed, it would be effectively impossible for OSFM to issue public notice "in the same way" that PHMSA does because OSFM cannot publish in the Federal Register, as it is not a federal agency. To that end, neither the HLPSA nor PHMSA's regulations specify how any "notice" is to be provided. Here, OSFM created a special website devoted to Sable's State Waiver applications and coordinated with PHMSA to establish a federal docket.[4] Thus, the public, including Petitioners, were put on notice that Sable had submitted the State Waiver applications. Petitioners in fact received that notice and

---

[4]  See OSFM, Pathways for Restarting CA-324 and CA-325, available at: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines (last accessed June 2, 2025).

submitted letters to OSFM in September 2024 before OSFM approved the State Waivers. (See, e.g., EDC Pet., Ex. C.)

Petitioners also argue that OSFM was required to issue a statement of reasons for granting the State Waivers. Nothing in the federal or state pipeline safety laws requires OSFM to issue written findings or a written justification for granting a waiver. Nor does federal or state law prescribe a specific form or manner in which a statement of reasons or similar discussion must be made. Nevertheless, OSFM issued 15-page State Waivers with detailed requirements and conditions that Sable must meet in order to operate the pipelines and do so safely. The factors that support OSFM's decision to approve the State Waivers are thus evident from the conditions of the State Waivers themselves.

***Alleged Violations of CEQA.*** Petitioners have not demonstrated that they are likely to prevail on the merits of their CEQA claims. As a preliminary matter, OSFM's issuance of the State Waivers is not a "project" subject to CEQA. A state waiver is merely an order that modifies compliance with a regulatory requirement (see 49 U.S.C. § 60118); there is no physical change to the environment. (See Pub. Res. Code, § 21065 ["Project" "means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect change in the environment"].)

To the extent the State Waivers are considered a "project," CEQA review is nonetheless not required because OSMF was implementing authority delegated to it pursuant to federal law. (See *City of Morgan Hill v. Bay Area Air Quality Management District* (2004) 118 Cal.App.4th 861 [holding that air district was not required to apply CEQA when issuing air permit pursuant to delegation from EPA].) Further, OSFM's issuance of the State Waivers would be categorically exempt from CEQA as the permitting of existing facilities that involve negligible or no expansion of existing or former use. (See 14 Cal. Code Regs., § 15301.) The State Waivers do not authorize any expansion of the pipelines' capacity or the permitted volume of oil that may flow through the pipelines.[5] The State Waivers simply impose safety measures.

---

[5] Further, the appropriate baseline against which to address potential environmental impacts here is historic operations. (See 14 Cal. Code Regs., § 15125(a)(1).)

10

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

Petitioners' allegations regarding cathodic protection similarly are unconvincing. Cathodic protection is one of many methods employed by pipeline operators to mitigate the risk of pipeline defects and any resulting environmental impacts. (Decl. of Jamie Shafer ("Shafer Decl."), ¶¶ 2-3.) OSFM's State Waivers impose over sixty different conditions requiring the implementation of various methods to limit potential oil spill impacts, including limiting maximum operating pressures and temperatures, completing anomaly repairs, hydrostatic pressure testing, and annual inspections for metal loss and cracks. (Simmonds Decl., Exs. 8, 9.) Many of these conditions are more stringent than imposed by applicable federal regulations for similar pipelines. (Shafer Decl., ¶ 5.) OSFM's issuance of these State Waivers—and PHMSA's non-objection to their issuance—confirms that the Pipelines will be operated in a safe manner even if the effectiveness of cathodic protection on the Pipelines were limited.

In any event, to the extent Petitioners are concerned with the potential environmental impacts of a future oil spill, such risks were previously considered and analyzed in the certified EIR/EIS. As described above, the EIR/EIS considered potential oil spill volumes along the Las Flores Pipelines totaling as much as 8,370 barrels at a given location. (See Draft EIR/EIS, p. 4-121, Table 4-26.) In its CEQA Findings and Statement of Overriding Considerations adopting the EIR/EIS, the County determined that such "[o]il spill-related impacts may still occur even after successful implementation of the identified mitigation measures." (Dintzer Decl., Ex. 4 [Planning Commission Action], p. 51].) Today, the any potential oil spill volume is substantially less than those volumes analyzed and approved under the EIR/EIS. (See Dintzer Decl., Ex. 7, [2021 Line 901 Risk Assessment], p. 12, Table 4.A.1.) Thus, the potential risks associated with oil pipeline operations, including possible spills, have already been analyzed under CEQA.

**E.    A Bond Should Be Required Given the Substantial Harm to Sable if Preliminary Relief Is Granted.**

Petitioners have not satisfied the standard for *ex parte* relief. But, if the Court were to issue a TRO or a stay order (it should not), that Order would not be effective unless and until Petitioners post a significant bond that could fairly compensate Real Parties for the damages they will sustain as a direct result of such an Order.

11

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

Code of Civil Procedure section 529, subdivision (a) provides that the court must require a bond when granting a preliminary injunction to pay any damages that any party "may sustain by reason of the injunction." This includes damages that a real party in interest suffers as a result of an injunction. (See *Venice Canals Resident Home Owners Assn. v. Superior Ct.* (1977) 72 Cal.App.3d 675, 683 [requiring bond where "real parties in interest spent considerable time and money in order to go through the required process of obtaining Coastal Commission approval . . . properly and in good faith."].) The purpose of this bond is to protect the enjoined party from the loss they will sustain while enjoined. (See *Cartt v. Superior Ct.* (1975) 50 Cal.App.3d 960, 975 ["[A] preliminary injunction does not become operative until a bond is furnished," and that "bond is expressly required." (*Condor Enters., Ltd. v. Valley View State Bank* (1994) 25 Cal.App.4th 734, 741.)

Petitioners should be required to post a bond as security against the damage the TRO or injuncton will inflict on Real Parties.  As set forth in the Rusch Declaration, a TRO or injunctive relief as requested by Petitioners would force Real Parties to immediately cease operations and production at the Platforms connected to the Pipelines.  (Rusch Decl., ¶ 13.)  Based on its current progress, Sable anticipates having the capacity to produce approximately 50,000 barrels per day, with a net margin to Sable of approximately $50 per barrel. (*Id.* at ¶ 16.) This means that a TRO or injunction will immediately cause Real Parties to lose at least $2.5 million in net margin per day, totaling $75 million in lost net margin for just one month. (*Ibid.*)

Courts routinely recognize the need for a bond where an injunction threatens to delay a real party in interest's good-faith efforts to obtain the necessary permits. For example, in Venice Canals Resident Home Owners Association, the Court of Appeal found that a bond was required because the "real parties in interest spent considerable time and money in order to go through the required process of obtaining Coastal Commission approval": they had "made investments and proceeded in good faith and relied on permits issued after complying with the requirements and satisfying the Regional and State Coastal Commissions that the construction being pursued was proper." (72 Cal.App.3d at pp. 680, 683.) As a result of the stay order, "are now faced with further delays and expense in connection with the within action challenging the permits which they duly sought." (*Id.* at p. 683.) "Without the

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

requireiton of a bond, which is imposed in virtually all similar situations, real parties stand to be greatly damaged and would be totally without recourse for compensation for their damages." (*Ibid*.)

Just so here. With the Order Petitioners request—whether styled as a stay order or injunction—Real Parties will be forced to hemorrhage at least $75 million in lost net margin over just one month, severely impacting their shareholders. This includes numerous members of the public, 401(k) plans, pension plans, and mutual funds—will immediately lose value in their investments. (Rusch Decl., ¶ 21.)  These quantifiable losses will be inevitable and immediate if a stay order or injunction issues. Furthermore, citizens of the State of California would suffer irreparable harm in the form of higher gasoline prices, lost jobs, lost tax revenues, lost royalty sharing, and increased regulatory uncertainty. (*Id.* ¶ 20.)

In requesting extraordinary *ex parte* injunctive relief on a preliminary basis, Petitioners are asking this Court to force Real Parties to bear the risk that Petitioners' case fails. In this case, that risk amounts to at least $75 million in lost net margin, share value loss, and harm to the general California public if Petitioner's requested relief is granted. On balance, the equities do not favor Petitioners' extraordinary position; at a minimum, they warrant protecting Real Parties' interests by ordering a bond that fully compensates them for the immediate harm they will sustain from being enjoined.

Accordingly, the Court should require Petitioners to post a $75-million bond before the relief they request is granted and should require that that the bond evergreen each month such that another $75-million undertaking be required to maintain any injunction ordered by the Court. This is the only amount that will fairly and equitably partially compensate Real Parties for the harm they will suffer as a direct result when this Court determines that the petitions and complaints lack merit.

## IV.    CONCLUSION

That Petitioners sat on their hands is reason enough to deny the *ex parte* applications. But beyond their dilatory actions, they have failed entirely to (i) show OSFM's actions cause any harm, let alone irreparable harm and (ii) that they are likely to succeed on their merits. OSFM must be permitted to fulfill its statutorily mandated role with respect to pipeline safety in the state. The applications must be denied.

DATED:   June 3, 2025          Respectfully submitted,

                              **ALSTON & BIRD**
                              JEFFREY D. DINTZER
                              GARRETT B. STANTON

                              **PAUL HASTINGS**
                              DUNCAN JOSEPH MOORE


                              _____
                                     Jeffrey D. Dintzer

                              Attorneys for Real Parties in Interest
                              **SABLE OFFSHORE CORP.**
                              **PACIFIC PIPELINE COMPANY**

OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR OSC AND TEMPORARY RESTRAINING ORDER

## PROOF OF SERVICE

I, Heather L. Thai, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 3, 2025, I served the document(s) **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 3, 2025, at Los Angeles, California.

/s/Heather Thai
Heather L. Thai

**SERVICE LIST**

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

**ATTORNEYS FOR PETITIONERS**
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:   (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
        jfrankel@environmentaldefensecenter.org
        trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

**ATTORNEYS FOR RESPONDENTS/ DEFENDANTS**
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:   (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

**ATTORNEYS FOR REAL PARTIES IN INTEREST**
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:   (310) 620-5879
Email: djmoore@paulhastings.com
        benjaminhanelin@paulhastings.com
        natalierogers@paulhastings.com

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:     (213) 576-1000
Facsimile:     (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
 djmoore@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:     (310) 620-5879
Facsimile:     (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/3/2025 8:00 AM
By: Gabriel Moreno , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

          Petitioners and Plaintiffs,

      v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,

          Respondents and Defendants,

      and

Case No. 25CV02247

Assigned for all purposes to:
Hon. Donna D. Geck

**DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

[Filed concurrently with Opposition and Declarations of Steve Rusch and Jamie Shafer]

Date:   June 3, 2025
Time:   8:30 a.m.
Dept.:  4

Complaint Filed:     April 15, 2025
Trial Date:          None set

1

DECLARATION OF JEFFREY D. DINTZER

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

DECLARATION OF JEFFREY D. DINTZER

### <u>DECLARATION OF JEFFREY D. DINTZER</u>

I, Jeffrey D. Dintzer, declare as follows:

1. I am an attorney duly licensed to practice law before all courts of the State of California. I am a partner at Alston & Bird LLP, counsel of record Real Parties in Interest Sable Offshore Corp. ("Sable") and Pacific Pipeline Company ("PPC") (together, "Real Parties"). I make this declaration in support of Real Parties' Opposition to the *Ex Parte* Application for an Administrative Stay or, in the Alternative, an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted and Temporary Restraining Order (the "Application"), submitted by Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (together, "Petitioners"). I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2. I am familiar with the case files for this matter. The file for this matter is kept at my shared direction in a secure electronic format at the offices of Alston & Bird LLP. Legal assistant Kim Niz and various associates maintain these files on a server at Alston & Bird.

3. A true and correct copy of Alan K. Mayberry's, Associate Administrator for Pipeline Safety at the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety administration, February 11, 2025 correspondence to Mr. James Hosler regarding "Docket No. PHMSA-2025-0002" is attached hereto as **Exhibit 1**.

4. A true and correct copy of Alan K. Mayberry's, Associate Administrator for Pipeline Safety at the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety administration, February 11, 2025 correspondence to Mr. James Hosler regarding "Docket No. PHMSA-2025-0003" is attached hereto as **Exhibit 2**.

5. A true and correct copy of the Consent Decree entered in Case No. 2:20-cv-02415, filed on March 13, 2020, is attached hereto as **Exhibit 3**.

6. A true and correct copy of the Planning Commission Action for the Celeron/All American Pipeline, dated March 3, 1986, is attached hereto as **Exhibit 4**.

7. A true and correct copy of the Pipeline Restart Plan for Line CA-324 to the Las Flores Pipelines, which is designated as currently under review, is attached hereto as **Exhibit 5**.

8.      A true and correct copy of the Pipeline Restart Plan for Line CA-325 to the Las Flores Pipelines, which is designated as currently under review, is attached hereto as **Exhibit 6**.

9.      A true and correct copy of the Risk Assessment for the State Assembly Bill 864, dated April 1, 2021, is attached hereto as **Exhibit 7**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed June 3, 2025, at Los Angeles, California.

_____
JEFFREY D. DINTZER

2
DECLARATION OF JEFFREY D. DINTZER

# EXHIBIT 1



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0002**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and
Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL
FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal
Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will
allow Sable to manage the risk of corrosion under insulation that may occur as a result of
inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation
and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree
between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State
of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and
remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter
pipeline (Sable CA-324) between Las Flores Canyon and Gaviota, California. The state waiver
requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested
using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be
inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection
in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation,
and cracking-type anomalies within seven days of achieving initial steady state operation of the
pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,


Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

# EXHIBIT 2



**U.S. Department
of Transportation
Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0003**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

# EXHIBIT 3

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | Civil Action No. 2:20-cv-02415 **CONSENT DECREE** |
| Plaintiffs, | |
| v. | |
| PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., | |
| Defendants. | |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05243-SVW-SSC   Document 4   Filed 05/14/26   Page 38 of 402   Page ID
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 2 of 102   Page ID #:35
#:1547

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast
Regional Water Quality Control Board, and California Department of Forestry
and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and
California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 4    Filed 05/14/26    Page 39 of 402    Page ID
#:1548
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 3 of 102    Page ID #:36

**TABLE OF CONTENTS**

I.      BACKGROUND ...................................................................................- 5 -

II.     JURISDICTION AND VENUE...........................................................- 6 -

III.    APPLICABILITY ...............................................................................- 7 -

IV.     DEFINITIONS ....................................................................................- 7 -

V.      CIVIL PENALTIES ..........................................................................- 13 -

VI.     NATURAL RESOURCE DAMAGES ...............................................- 17 -

VII.    TRUSTEES' MANAGEMENT AND APPLICABILITY
            OF JOINT NRD FUNDS ..............................................................- 21 -

VIII.   TRUSTEES' MANAGEMENT OF RECREATIONAL
            USE FUNDS .................................................................................- 22 -

IX.     INJUNCTIVE RELIEF .....................................................................- 23 -

X.      CORRECTIVE ACTION ORDER .....................................................- 27 -

XI.     STIPULATED PENALTIES ..............................................................- 27 -

XII.    FORCE MAJEURE............................................................................- 35 -

XIII.   DISPUTE RESOLUTION .................................................................- 37 -

XIV.    REPORTING .....................................................................................- 39 -

XV.     CERTIFICATION ..............................................................................- 40 -

XVI.    INFORMATION COLLECTION AND RETENTION.......................- 40 -

XVII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ...........- 43 -

XVIII.  TRANSFER AND ACQUISITION OF ASSETS ..............................- 49 -

XIX.    COSTS...............................................................................................- 50 -

XX.     NOTICES ..........................................................................................- 51 -

XXI.    EFFECTIVE DATE ...........................................................................- 54 -

XXII.   RETENTION OF JURISDICTION ...................................................- 54 -

XXIII.  MODIFICATION ...............................................................................- 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XXIV.     TERMINATION ..................................................................................- 55 -

XXV.      PUBLIC PARTICIPATION...............................................................- 56 -

XXVI.     SIGNATORIES/SERVICE ................................................................- 56 -

XXVII.    INTEGRATION ..................................................................................- 57 -

XXVIII. FINAL JUDGMENT ..........................................................................- 57 -

XXIX.     26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- ii -

A.      WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.      WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.      WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

D. WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E. WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F. WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G. WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves. The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected. Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H. WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned. As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts. Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

Case 2:26-cv-05242-SVW-SSC   Document 4   Filed 05/14/26   Page 43 of 402 #:Page ID
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 7 of 102   Page ID #:155
#:1552

I.      WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.      WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.      WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.      WHEREAS, pursuant to Section 1006 of the Oil Pollution Act ("OPA"), 33 U.S.C. 2701, *et seq.*, the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

40 C.F.R. § 300.600 and Executive Order 12777. CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980. In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*). CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California. CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.      WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages. As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources. By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.      WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.     WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.     WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.     WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.     WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.     WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree:  (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.     BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 5 -

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*  The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355.  This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367.  To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.     Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

does business in this District and the alleged claims occurred in this District.

3.      For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III.   APPLICABILITY

4.      Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5.      Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree.  Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV.   DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree.  For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H .html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

"Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley.  Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 11 -

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq.*, and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.    CIVIL PENALTIES

A.     Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment"). The Penalty Payment shall be allocated as follows:

8.     Penalty Payment to the United States (PHMSA). For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

a.     Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.     One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.     Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d.      At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al*., and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9.      Penalty Payment to the United States (EPA) shared with CDFW and RWQCB. The Penalty Payment shall be allocated as follows:

a.      As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

1)	To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn:  Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money as follows:  one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2)	To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

> State Water Resources Control Board
> Division of Administrative Services, ATTN: Civil Liability Payment
> P.O. Box 1888
> Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

Case 2:26-cv-05242-SVW-SSC Document 4 03/Filed 05/14/26 Page 57 of 402 Page ID
Case 2:20-cv-02415 Document 8-1 Filed 03/13/20 Page 21 of 102 Page ID #:194
#:1566

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10. <u>Penalty Payment to be Paid to CDFW</u>. For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11. Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.  NATURAL RESOURCE DAMAGES

12. Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961. The NRD Payment shall be allocated as follows:

a. To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment. Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds). Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention: Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C. 20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198. DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 18 -

Case 2:26-cv-05242-SVW-SSC   Document 4   Filed 05/14/26   Page 59 of 402   Page ID
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 23 of 102   Page ID #:116
#:1568

b.      To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
> > Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.      To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 19 -

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn:  Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California  95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account.  The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d.       To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account.  Payment shall be made by check payable to The Regents of the University of California.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

The Regents of the University of California
Attn: Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account. The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees. The projects shall address the research, education, and outreach missions of the University of California. UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13. The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants. To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.  TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14. DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident. DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15. DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16.     The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process.  The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17.     The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided.  Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein.  The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII.     TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18.     CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

19.    The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.    UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.    INJUNCTIVE RELIEF

21.    Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.    <u>Material Changes to Plains' IMP</u>.

a.    Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)    Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)    Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)    White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

4)      Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5)      Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6)      Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.      At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation.  The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 24 -

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.     <u>Material Changes in Control Room Management Plan and Control Center General Procedures</u>.

a.     Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.     At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 25 -

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.    In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.    In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days. Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.    Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 26 -

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.    CORRECTIVE ACTION ORDER

25.    Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.    STIPULATED PENALTIES

26.    Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.    <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.    If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.    If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.    If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. Stipulated Penalties for Non-Performance of Injunctive Relief. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

h.      For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.      For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.      For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.      For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.      For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.      For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.      For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.      For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.      For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.      For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 4   Filed 05/14/26   Page 70 of 402   Page ID
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 34 of 102   Page ID #:127
#:1579

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.      For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.      For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.      For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.      For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.      For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.      For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.      For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.      The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

29.     Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.  Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

a.     For operation of Line 901 in violation of paragraph 1.a of Appendix D;

b.     For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

c.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

d.     For operation of Line 903, in violation of paragraph 1.e of Appendix D;

e.     For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

f.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

g.     For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

h.     For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

i.     The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30.     Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31.     For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32.     For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33.     For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34.     For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

a.       Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.       Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.       Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.       If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.    For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.    For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 33 -

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

      a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

      b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

c. If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41. If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42. The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43. Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII. FORCE MAJEURE

44. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 35 -

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46. If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Case 2:26-cv-05242-SVW-SSC    Document 4    Filed 05/14/26    Page 77 of 402    Page ID
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 41 of 102   Page ID #:1584
#:1586

Plaintiffs for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47.    If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48.    If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice.  In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45.  If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII.  DISPUTE RESOLUTION

49.    Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 37 -

Case 2:26-cv-05242-SVW-SSC   Document 4   Filed 05/14/26   Page 78 of 402   Page ID
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 42 of 102   Page ID #:155
#:1587

Decree.

50.    Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement.  If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51.    Formal Dispute Resolution.  Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52.    Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position.  Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs.  Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53.    Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute.  The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 38 -

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54.     Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55.     Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56.     The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

### XIV.  REPORTING

57.     After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 4 03/15/20 Filed 05/14/26 Page 80 of 402 Page ID
Case 2:20-cv-02415 Document 6-1 Filed 03/15/20 Page 44 of 102 Page ID #:1597
#:1589

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV. CERTIFICATION

58. Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI. INFORMATION COLLECTION AND RETENTION

59. Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

    a. monitor the progress of activities required under this Consent Decree;

    b. verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

c.      obtain documentary evidence, including photographs and similar data; and

d.      assess Defendants' compliance with this Consent Decree.

60.      Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree.  At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61.      This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62.      For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2.  Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63.      The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.).  If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality.  In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64.    For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65.    State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.).  If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records.  If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66.    The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only.  Defendants shall produce all documents required

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 42 -

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67.    At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68.    [*Intentionally left blank.*]

## XVII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.    This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70.    Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

      a.    49 C.F.R. Part 194 Subpart B – Response Plans;

      b.    49 C.F.R. Part 195 Subpart B – Reporting;

      c.    49 C.F.R. Part 195 Subpart E – Pressure Testing;

      d.    49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

      e.    49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

      f.    49 C.F.R. Part 195 Subpart H – Corrosion Control;

      g.    49 C.F.R. Part 199 – Drug and Alcohol Testing; and

      h.    All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019.  OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 44 -

Case 2:26-cv-05242-SVW-SSC   Document 4   Filed 05/14/26   Page 85 of 402   Page ID
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 49 of 102   Page ID
#:1594
#:142

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

      a.    The Pipeline Safety Laws specified in Paragraph 70; and

      b.    California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 45 -

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 4    Filed 05/14/26    Page 87 of 402   Page ID
#:1596
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 51 of 102    Page ID #:144

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79.    This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81.    Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82.    By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83.    By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84.    Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder.  Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85.    Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86.    Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87. The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

**XVIII. TRANSFER AND ACQUISITION OF ASSETS**

88. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision. Those provisions of Appendix B are:

    a.    For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

    b.    For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

    c.    For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

    d.    For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer. Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.	In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.	For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92.	Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

### XX.   NOTICES

93.    Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:    eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-11340

As to the United States by mail:    EES Case Management Unit
Environment and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-1-1-1130

As to PHMSA:    James M. Pates
Assistant Chief Counsel
for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials
Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, DC. 20590

As to EPA:    Andrew Helmlinger
Attorney Advisor
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 51 -

Case 2:26-cv-05242-SVW-SSC    Document 4    Filed 05/14/26    Page 92 of 402    Page ID
#:1601
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 56 of 102    Page ID
#:1601

As to DOI:                          Clare Cragan
                                    U.S. Department of the Interior
                                    Office of the Solicitor
                                    755 Parfet St., Suite 151
                                    Lakewood, Colorado 80215

As to NOAA:                         National Oceanic and Atmospheric
                                        Administration
                                    Office of General Counsel
                                    Natural Resources Section
                                    ATTN:  Christopher J. Plaisted
                                    501 W. Ocean Blvd, Suite 4470
                                    Long Beach, California  90802

As to USCG:                         Patricia V. Kingcade
                                    Attorney Advisor
                                    National Pollution Funds Center,
                                        US Coast Guard
                                    2703 Martin Luther King Jr. Ave SE
                                    Washington, DC 20593-7605

As to the State Agencies:           Michael Zarro
                                    Deputy Attorney General
                                    Office of the Attorney General
                                    Natural Resources Law Section
                                    300 S. Spring St., Suite 11220
                                    Los Angeles, California 90013

As to CDFW:                         California Department of Fish
                                        and Wildlife
                                    Office of Spill Prevention and Response
                                    Attn: Katherine Verrue-Slater
                                    Senior Counsel
                                    P.O. Box 160362
                                    Sacramento, California  95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 52 -

As to CDPR:                    California Department of Parks and
                                  Recreation
                               Attn: Laura A. Reimche, Senior Counsel
                               1416 Ninth Street, Room 1404-6
                               Sacramento, California 95814

As to CSLC:                    California State Lands Commission
                               Attn: Patrick Huber, Legal Division
                               100 Howe Avenue, Suite 100-South
                               Sacramento, California 95825

As to OSFM:                    California Department of Forestry and
                                  Fire Protection
                               Legal Services Office
                               Attn: Joshua Cleaver, Staff Counsel
                               P.O. Box 944246
                               Sacramento, California 94244-2460

As to RWQCB:                   California Central Coast Regional Water
                               Quality Control Board
                               Attn: Naomi Rubin, Attorney III
                               801 K Street
                               Sacramento, California 95814

As to UC:                      Barton Lounsbury, Senior Counsel
                               University of California
                               Office of the General Counsel
                               1111 Franklin Street, 8th Floor
                               Oakland, California  94607

As to Defendants:              Megan Prout
                               Senior Vice President
                               Commercial Law and Litigation
                               333 Clay Street, Suite 1600
                               Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.    EFFECTIVE DATE

96.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.    RETENTION OF JURISDICTION

97.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.    MODIFICATION

98.    The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 54 -

99.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 55 -

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.    PUBLIC PARTICIPATION

103.    This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.    Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.    SIGNATORIES/SERVICE

105.    Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 56 -

## XXVII.  INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.     FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020
Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
     Division U.S. Department of Justice

3/13/2020
Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 58 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

_3 March 2020_

Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 59 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 60 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020

_____
Date

_____
AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
    Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____3/2/20_____          _____Lisa Ann L. Mangat_____
Date                                      LISA ANN L. MANGAT
                                               Director
                                               California Department of Parks
                                                    and Recreation

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 63 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 64 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
_____
Date

THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 65 -

Case 2:26-cv-05242-SVW-SSC    Document 43    Filed 05/14/26    Page 106 of 402    Page
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 70 of 102    Page ID #:1615
ID #:1615

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020

_____
Date

_____
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
   Quality Control Board

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____

Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

*3 March 2020*

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

Case 2:26-cv-05242-SVW-SSC   Document 4-3   Filed 05/14/26   Page 111 of 402   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 75 of 102   Page ID #:1620
ID #:1620

# APPENDIX A

## (*Set of maps that generally depict Lines 901, 903, and 2000*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*



*Appendix A – Line 901*

Scale: 1:100,000

Sheet No:  1/1

Owner:



*Appendix A – Line 903*

Scale: 1:700,000

Sheet No: 1/1

Owner:



*Appendix A – Line 2000*

Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 79 of 102   Page ID #:1624

# APPENDIX B

# *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A. Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B. Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C. Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D. Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E. To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A. Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a. Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b. Conduct a close interval survey (CIS) and AC/DC interference survey.

   c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

   1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

   2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

   3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

   4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

loss, within one year of discovery.  If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b.  Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c.  When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d.  Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e.  Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f.  Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g.  For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h.  Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i.  Integrate and analyze available data in its P&M process, including:

i.  Assessment data from ILI tool runs;

ii.  Dig and repair data;

4

-78-

iii. Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv. Operational data, such as pressure and flow data;

v. Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi. Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii. Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2. ILI Measures

a. <u>Initial ILI Runs</u>. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i. All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

ii.   In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run.  If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b.   Subsequent ILI Runs.  After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year.  Alternatively, Plains may run a UT tool each year.  If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c.   All ILI Runs.  Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.   **Valves**

A.   Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1.   Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2.   Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.   Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.   Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

-80-

6.      **Risk Analysis**

A.      For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

1.      Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

a.      The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

b.      Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis.  The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

c.      The risk analysis shall be due within one year from entry of the CD.

7.      **Leak Detection**

A.      For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

B.      Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8.      **Non-waiver**

A.      Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

**ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES**

9.      **Integrity Management**

A.      New Procedures for Interim Reviews and Assessments

7

1. Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2. Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3. Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B. Documentation for P&M Recommendations

1. Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

   a. What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

   b. The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

    c.     The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

    2.     In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

    3.     In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.    Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

## 10. **Valves and O&M**

A.    Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.    Within two years of entry of the CD, Plains shall develop and implement procedures to:

    1.     If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

    2.     Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

    3.     Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

    4.     Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.    Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

D.    For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

    1.    Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.    Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.    **Leak Detection**

A.    Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

    1.    Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.    For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.    Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

    1.    Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.    Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

    1.    Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.    Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F.    Instrumentation and Display

1.    To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.    Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.    Track these conditions through to resolution, including instrumentation relocation when necessary.

12.    **Control Room Management**

A.    For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.    Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.    Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.    Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.    Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

B.      For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.      Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

A.      California-Specific Provisions:

    1.    Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.      Company-Wide Provisions

    1.    Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

    2.    Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

    3.    Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

-86-

Plains.  Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills.  Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4.  Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter.  Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5.  Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment).  Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill.  Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6.  For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14.  **Safety Management System (SMS)**

A.  Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1.  Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173.  Plains shall direct the third party to transmit a copy of the final report to PHMSA.  Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B. Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15. **Drug and Alcohol Program**

A. Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

# APPENDIX C

# (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 95 of 102   Page ID #:1669

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

## APPENDIX D

1. All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

1) Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

2) Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

3) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

4) A specific day-light restart that includes advance communications with local emergency response officials;

5) Master Control Room enhancements, including:

a) Implementation of advanced leak-detection

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)      Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)      Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)      Installation of additional pressure sensors as a result of Plains' surge study;

9)      Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM.  The tool run shall be initiated during daylight hours.  If the tool run does not collect a complete data set, the UT tool shall be promptly re-run.  A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report.  Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)    **Corrosion Prevention.**  Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan.  Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)     Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)     Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)     Provisions for a daylight restart and advance communications with local emergency response officials.

g.  **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h.  **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)     The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)    The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction. Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)    The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)    Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3) The Appendix D Documentation Report shall include but not be limited to:

    A. Table of Contents;

    B. [*intentionally left blank.*]

    C. [*intentionally left blank.*]

    D. Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

    E. [*intentionally left blank.*]

    F. [*intentionally left blank.*]

    G. Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT 4

CELERON/ALL AMERICAN PIPELINE PROJECT

PLANNING COMMISSION ACTIONS

FINAL DEVELOPMENT PLAN
CONDITIONAL USE PERMIT

March 3, 1986

Santa Barbara County
Resource Management Department
Energy Division

Exhibit 59

CELERON/ALL AMERICAN PIPELINE PROJECT
FINAL DEVELOPMENT PLAN
PLANNING COMMISSION ACTIONS

## Table of Contents

1. Permit Information Summary ......................................... 1

2. Project Description ............................................... 2

3. Planning Commission Action ........................................ 2

4. Appeals Process ................................................... 6

5. Permit Conditions ................................................. 8
   A. General ....................................................... 8
   B. Permit Review ................................................ 12
   C. Management ................................................... 14
   D. Air Quality .................................................. 17
   E. Geology ...................................................... 18
   F. Surface and Groundwater ...................................... 21
   G. Aquatic Biology .............................................. 23
   H. Terrestrial Biology .......................................... 23
   I. Socioeconomics ............................................... 29
   J. Land Use and Recreation ...................................... 32
   K. Transportation ............................................... 35
   L. Cultural Resources ........................................... 36
   M. Visual Resources ............................................. 38
   N. Noise ........................................................ 39
   O. Abandonment .................................................. 40
   P. Systems Safety and Reliability ............................... 40
   Q. Facility Design .............................................. 44

6. Findings .......................................................... 46
      County Zoning Ordinances ..................................... 46
      CEQA ......................................................... 50
      Statement of Overriding Considerations ....................... 55
      Additional Findings .......................................... 56
      Impact Summary Tables ........................................ 57

Exhibit 59

EXHIBIT 3

CELERON/ALL AMERICAN PIPELINE PROJECT
FINAL DEVELOPMENT PLAN
PLANNING COMMISSION ACTIONS

The Santa Barbara County Planning Commission made a final decision to approve the Celeron/All American Pipeline Project Final Development Plan on February 18, 1986.  On February 28, 1986 the Board of Supervisors appeals period expired without any appeals filed.  Therefore the Planning Commission's action on this Final Development Plan and Conditional Use Permit is final.  This package details the Commission's actions.

1.   PERMIT INFORMATION SUMMARY

1.1  Applicant Information

Project Title:           Celeron/All American Pipeline Project

Project Location:        Las Flores Canyon, California to Emidio, California

Supervisorial Districts: Third, fourth, fifth

Applicant:        '      Celeron Pipeline Company of California

Applicant
Representative:          Mr. Ron Hinn, Vice President
                         Celeron Pipeline Company of California
                         4213 State St., P.O. Box 31029
                         Santa Barbara, CA  93130
                         805/683-5627

1.2  Case Processing Information

Celeron has filed, and the Planning Commission has acted upon, the following permit applications:

    Final Development Plan (Case # 85-DP-66cz)
        County permit for allowable projects which, because of the type, scale, or location of the development, require comprehensive review.  This permit covers all aspects of the project proposal.

    Major Conditional Use Permit (Case # 83-CP-97cz)
        County permit for permittable projects which, because of certain aspects of the proposal or of the proposed project location, require special consideration.  This permit is required because the proposed pipeline crosses Environmentally Sensitive Habitat areas.

Exhibit 59

## 2. PROJECT DESCRIPTION

Celeron proposes to construct a 30-inch diameter, insulated welded steel pipeline designed to transport up to a maximum of 425,000 barrels per day (BPD) with an optimal throughput of 300,00 BPD, of Outer Continental Shelf and other locally produced crude oils. The pipeline would extend approximately 135 miles from Las Flores Canyon to the Emidio pump station in the southern San Joaquin Valley. Three pump stations would be constructed, one at Las Flores Canyon, one at Gaviota, and one near the Sisquoc River in northern Santa Barbara County. The pipeline would be buried to a minimum cover depth of three feet throughout its length according to Department of Transportation specifications, with increased cover depth in selected areas.

The pipeline will require a 100-foot wide construction corridor and a 50-foot wide permanent easement. The proposed route parallels Highway 101 from Las Flores to Gaviota, turns north at Gaviota State Park west of Highway 101 and continues to the Sisquoc River. From the Sisquoc River the route follows Santa Maria then Suey Canyons north toward the Cuyama River. It crosses the river in the Western Cuyama Valley, and exits the County.

## 3. FINAL PLANNING COMMISSION ACTIONS

| Motion maker/Second | Vote | Action |
|---|---|---|
| February 13, 1986 | | |
| 1.  Wells/Hamister | 5-0 | Conceptual approval of Realignment 1, as presented in the February 6, 1986 Staff Report, including avoidance of the landslide. |
| 2.  Wells/Stillman | 5-0 | Conceptual approval of Realignment 2, as presented in the February 6, 1986 Staff Report, with the understanding that staff will work with the applicants to reduce the visual impacts along the corridor. |
| 3.  Sherman/Wells | 5-0 | Continue discussion of Realignment 3 until Tuesday February 18, 1986. |
| 4.  Wells/Hamister | 5-0 | Conceptual approval of a realignment near Realignment 4, as depicted on Page CE 004 of the January 1986 Realignment Request sheets, which follows the yellow line coming from the southern section of the map, and going across the top of the Giorgi property, and Moonshine Creek, and coming down the northern property line of |

Exhibit 59

EXHIBIT 3

Planning Commission Actions                                          Page 3
Celeron Pipeline Final Development Plan                       March 3, 1986

|  |  |  |  |
|---|---|---|---|
|  |  |  | Giorgi, to meet the original pipelne route, from whence it will meet Realignment 5, with the understanding that if there are any problems biologically with any minor adjustments to those corridors, or if there is any conflict between staff and Celeron on that segment, that it be brought back to the Commission for a final decision. |
| 5. | Wells/Sherman | 5-0 | Conceptual approval of Realignment 5, with the understanding that any landslides or environmental constraints will be mitigated by the applicant, to the satisfaction of staff. |
| 6. | Sherman/Wells | 5-0 | Conceptual approval of Realignment 6, as presented in the February 6, 1986 Staff Report. |
| 7. | Stillman/Hamister | 5-0 | Conceptual approval of Realignment 7, as presented in the February 6, 1986 Staff Report. |
| 8. | Stillman/Hamister | 5-0 | Conceptual approval of Realignment 8, as presented in the February 6, 1986 Staff Report. |
| 9. | Johnson/Stillman | 5-0 | Conceptual approval of Realignments 9 and 10, as presented in the February 6, 1986 Staff Report. |
| 10. | Johnson/Wells | 5-0 | Conceptual approval of Realignment 11, as presented in the February 6, 1986 Staff Report. |
| 11. | Johnson/Stillman | 5-0 | Conceptual approval of Realignment 12, as presented in the February 6, 1986 Staff Report, with the understanding that when the Forest Service chooses a route, the other alternative will fall away. |
| 12. | Johnson/Stillman | 5-0 | Conceptual approval of Realignment 13, as presented in the February 6, 1986 Staff Report. |
| 13. | Wells/Sherman | 5-0 | Approve the route changes conceptually approved in this hearing, with the exception of Realignment 3, and as part of the Final Development Plan approval, with the understanding that staff has discretion within the corridor analyzed in the EIR, and so long as no greater impacts arise from the alignment than the one originally approved by the Commission. |
| 14. | Sherman/Wells | 5-0 | Continue discussion of H-12, P-2, P-3, and P-5 until February 18, 1986. |

Exhibit 59

Planning Commission Actions                                                  Page 4
Celeron Pipeline Final Development Plan                               March 3, 1986

15. Johnson/Wells    4-0    That Condition H-1 and County policy requires
                            replacement of all trees removed, and that
                            Celeron will provide more detailed information
                            regarding the offsite tree-planting prior to
                            land use clearance.  ABSENT: Sherman

16. Wells/Hamister   4-0    That Condition H-1 be modified, and that staff
                            return on February 18 with wording to allow the
                            revegetation plan for Gaviota State Park to be
                            done prior to the issuance of the Coastal
                            Development Permit, in cooperation with the
                            State Parks Department.

February 18, 1986 (Sherman absent)

17. Wells/Stillman   4-0    Conceptual approval of new condition M-6 as
                            presented by staff with the unwritten
                            understanding that ant problems with that
                            condition can be brought before the Commission
                            for arbitration.

18. Wells/Hamister   4-0    Conceptual approval of new conditions B-7 and
                            B-8 as presented by staff.

19. Wells/Stillman   4-0    Conceptual approval of the February 18 revisions
                            to conditions H-12, P-2, P-3, and P-5, with the
                            understanding that language will be added to
                            each of the conditions to allow adequate time
                            for staff review.

20. Wells/Hamister   4-0    Conceptual approval of Condition C-1 with the
                            understanding that the criteria for shut down
                            come back to the Commission for review, and that
                            during construction monthly EQAP reports are
                            given to the County, and for the first three
                            months of operation, monthly reports will be
                            given to the County, with annual reports
                            thereafter.

21 - 37. These motions all gave conceptual approval to the various conditions,
         wording changes, and submittals as recommended by staff in the
         February 18 staff memo (motions 21 to 28, 38), and the February 6
         Staff Report (motions 29 to 37).  All votes were unanimous, 4-0.  The
         motion makers, seconds and appropriate conditions are listed below.

Exhibit 59

EXHIBIT B

Planning Commission Actions                                    Page 5
Celeron Pipeline Final Development Plan                    March 3, 1986

21. Wells/Hamister         E-1
22. Hamister/Stillman      F-1
23. Stillman/Hamister      F-5
24. Stillman/Hamister      F-8
25. Hamister/Stillman      F-11
26. Wells/Hamister         H-1; modify paragraph (j), replacing "plant" with
                           "reestablish," and approve four points in staff memo.
27. Wells/Hamister         I-2
28. Hamister/Stillman      P-9
29. Hamister/Stillman      E-4
30. Wells/Hamister         E-5
31. Wells/Stillman         E-6
32. Wells/Hamister         E-7
33. Hamister/Stillman      F-2
34. Stillman/Hamister      F-3
35. Hamister/Stillman      F-4
36. Stillman/Hamister      F-7
37. Wells/Hamister         All remaining conditions except L-1, P-10, P-11
38. Wells/Hamister         L-1

| Motion maker/Second | Vote | Action |
|---|---|---|
| 39. Wells/Stillman | 4-0 | Conceptual approval of Condition P-11, including the addition of Condition P-18, and the approval of the submittal for P-18, as outlined in the February 6 Staff Report. |
| 40. Wells/Stillman | 5-0 | Conceptual approval of Condition P-10, as modified in the discussions, including adding wording regarding the reporting provisions under C-1. |
| 41. Wells/Hamister | 5-0 | Adopt new condition B-9, as presented on the February 18 staff memo. |
| 42. Wells/Hamister | 4-0-1 | Approve the Final Development Plan as modified with the conceptual motions, and any of those items which were not specifically addressed would be as per the staff presentation; any changes not specifically made to the Preliminary Development Plan remain as originally passed. Approve the Findings and Overriding Considerations as per the February 18 memo, including the additional finding regarding "prior to start-up" condition timing. ABSTENTION: Sherman. |
| 43. Wells/Stillman | 4-0-1 | Approve the Conditional Use Permit and Findings for the Environmentally Sensitive Habitat areas. ABSTENTION: Sherman. |

Exhibit 59

4. APPEALS PROCESS

The following text is taken from the Santa Barbara County Coastal Zoning Ordinance, Section 35-182: Appeals.

Sec. 35-182.  Appeals.

Sec. 35-182.1. Purpose and Intent.

   The purpose of this section is to provide procedures for appeals to the Planning Commission and the Board of Supervisors and to establish the criteria for those developments that may be appealed to the State Coastal Commission.

Sec. 35-182.2. Appeals to the Planning Commission.

(Not applicable)
Sec.  35-182.3.  Appeals to the Board of Supervisors.

(Not applicable)


Sec. 35-182.4.  Appeals to the Coastal Commission.

1.  For developments which are subject to the appeals jurisdiction of the Coastal Commission under PRC Sec. 30603, appeal of an action on a Coastal Development Permit may be filed with the Coastal Commission provided, however, that local appeals have been exhausted on the County's action on the project permits (i.e., Development Plan, C.U.P., Special Use Permit, Oil and Gas Plan).

2.  In accordance with Public Resources Code Sec. 30603(a), an action taken by the County of Santa Barbara on a Coastal Development Permit application for any of the following may be appealed to the Coastal Commission.

    a.  Developments approved by the County between the sea and the first public road paralleling the sea or within 300 feet of the inland extent of any beach or of the mean high tide line of the sea where there is no beach, whichever is the greater distance, as indicated on the official County appeals zone maps.

    b.  Developments approved by the County not included within paragraph (a) of this section located on tidelands, submerged lands, public trust lands, within 100 feet of any wetland, estuary, stream, or within 300 feet of the top of the seaward face of any coastal bluff, as indicated on the official County appeals zone map or as determined by the State Lands Commission.

Exhibit 59

EXHIBIT 3

Planning Commission Actions                                     Page 7
Celeron Pipeline Final Development Plan                  March 3, 1986

    c.   Developments approved by the County that require a Conditional Use Permit (CUP).

    d.   Any development which constitutes a major public works project or a major energy facility. The phrase, "major public works project or a major energy facility," as used in Public Resources Code Sec. 30603(a) (5) and this Article shall mean any proposed public works project or energy facility exceeding $50,000 in estimated cost of construction.

3.  Grounds of Appeal.

    a.   The grounds of appeal for any development appealable under 2.a., of this Section shall be limited to one or more of the following:

        1)   The development fails to provide adequate physical access or public or private commercial use or interferes with such uses.

        2)   The development fails to provide public views from any road or from a recreation area to, and along, the coast.

        3)   The development is not compatible with the established physical scale of the area.

        4)   The development may significantly alter existing natural landforms.

        5)   The development does not comply with shoreline erosion and geologic setback requirements.

        6)   The development is not in conformity with the Local Coastal Program.

    b.   The grounds of appeal for any development appealable under 2.b.,c., and d. of this section shall be limited to whether development is in conformity with the Local Coastal Program.

5648e

Exhibit 59

Planning Commission Actions  
Celeron Pipeline Final Development Plan

Page 6  
March 3, 1986

5.  CELERON FINAL DEVELOPMENT PLAN CONDITIONS

A.  GENERAL

A-1.  Acceptance of this permit shall be deemed as acceptance of all final conditions of this permit, except that Celeron reserves the right to pursue any remedy for any legal violations imposed directly or indirectly by these permit conditions.

A-2.  Substantial failure to abide by and faithfully comply with any conditions for the granting of this permit shall constitute grounds for the modification or revocation of this permit.

A-3.  Celeron agrees as a condition of the issuance and use of this permit to defend at its sole expense any action brought against the County by a third party challenging either its decision to issue this permit or the manner in which the County is interpreting or enforcing the conditions of the permit.  Celeron will reimburse the County for any court costs and attorneys fees which the County may be required by a court to pay as a result of such action where Celeron defended or had control of the defense of the suit.  County may, at its sole discretion, participate in the defense of any such action, but such participation shall not relieve Celeron of its obligation under this condition.  County shall bear its own expenses for its participation in the action.

A-4.  Celeron shall make an initial deposit to a fund to permit the County to adequately implement and enforce the conditions imposed on Celeron by applicable County ordinances and/or the conditions of this permit if such a fund is established.  If the Board of Supervisors determines that a reasonable enforcement fund is needed, the Director of the Resource Management Department shall present to the Board of Supervisors and Celeron a plan for enforcement within one year from the effective date of this permit.  This plan shall set forth the staffing requirements and materials necessary for such enforcement and the estimated costs thereof.  This plan shall provide that all reasonable expenses incurred by the County or County contactors, for permit condition implementation, reasonable studies, and emergency response directly and necessarily related to enforcement of these permit conditions shall be reimbursed by Celeron within 30 days of invoicing by County.

A-5.  In the event that Celeron fails to comply with any order of the Administrative Officer or the Board of Supervisors issued hereunder or any injunction of the Superior Court, it shall be liable for a civil penalty for such violation to the extent imposition of such civil penalty is authorized by applicable laws, rules, or regulations.

Said civil penalty shall be in addition to Celeron's obligation, if any, to reimburse the County of Santa Barbara (and others) for actual damages suffered as a result of Celeron's failure to abide by the conditions of this permit or any the orders of the Administrative Officer, the Board of Supervisors, or any court of competent jurisdiction.

Exhibit 59

EXHIBIT 3

A-6.    As to any condition which requires for its effective enforcement the inspection of construction records or records pertaining to facility operations, or the facilities themselves by County or its duly authorized agents, Celeron will make all necessary records available or provide access to such facilities upon reasonable notice from County. County agrees to keep such information confidential where permitted by law and requested by Celeron in writing.

A-7.    The procedures, operating techniques, design, equipment and other descriptions (hereinafter procedures) described by Celeron in its application to the County 83-DP-25 cz, 83-CP-97 cz, and in subsequent clarifications and additions to that application and the Final Development Plan are incorporated herein as permit conditions and shall be required elements of the project. Since these procedures were part of the project description which received environmental analysis, a failure to include such procedures in the actual project could result in significant unanticipated environmental impacts. Therefore, modifications of these procedures will not be permitted without a determination of substantial conformity or a new or modified permit. The use of the property and the size, shape, arrangement and location of buildings, structures, walkways, parking areas and landscaped areas shall be in substantial conformity with the Approved Final Development Plan.

A-8.    In addition to the authority to enforce and secure compliance with the provisions of this permit under Division 12, Coastal Zoning Ordinance of the Santa Barbara County Code, Division 7, General Regulations, Article III Santa Barbara County Zoning Ordinance, the County Administrative Officer, or in his/her absence a designated appointee, may order that curtailment of activities which is required to protect the public health and safety. Said action may include, but is not limited to, ordering temporary, partial or total facility shutdown.

        Such an order shall be made only in the event that the Administrative Officer has reasonable and probable cause to believe that continued unrestrained activities of permittee will likely result in or threaten to result in danger to public health, welfare, or safety, or in the environment and provided such violations can be expected to continue or recur unless operations are in whole or in part shut down or reduced pending the necessary corrections.

        Before issuing any curtailment order, the County Administrative Officer shall set a time for hearing and shall give written notice of the time and place of the hearing and of the alleged violations. Such notice shall be received by the person in charge of the operation of the facility at least 24 hours before the hearing at which time there will be an opportunity for all concerned parties to present evidence regarding the alleged violations. The notice may be served in person or by certified mail.

Exhibit 59

In the event the Administrative Officer, or in his/her absence the designated appointee, determines that there is an imminent danger to the public health and safety resulting from violations, he/she may summarily order the necessary curtailment of activities without hearing and such order shall be obeyed upon notice of same, whether written or oral. At the same time that notice of the order is conveyed, the Administrative Officer shall set a date, time and place for a publically noticed hearing and review of said order as soon as possible which date shall be no later than 24 hours after such order is issued or served. Said hearing shall be conducted in the same manner as a hearing on prior notice. After such hearing, the Administrative Officer may modify, revoke, or retain the emergency curtailment order.

Any order of the Administrative Officer may be appealed to the Board of Supervisors within three working days after such order is made.

If such appeal is not filed with the Board of Supervisors, the Administrative Officer's order becomes final. If there is an appeal, the order of the Administrative Officer shall remain in full force and effect until action is taken by the Board of Supervisors. The decision of the Board of Supervisors shall be a final Administrative action. Such decision shall not preclude Celeron from seeking judicial relief.

Once Celeron has shown that the conditions of violation no longer exist and are not reasonably likely to recur, the Administrative Officer shall modify the curtailment order to account for such compliance and shall entirely dissolve the order when it is shown that all of the violations have been corrected and are not likely to recur.

A-9.   In the event that any condition contained herein is determined to be invalid, then all remaining conditions shall remain in force.

A-10.  In the event that any condition contained herein is determined to be in conflict with any other condition contained herein, then where principles of law do not provide to the contrary, the condition most ... of public health and safety and natural environmental ... shall prevail to the extent feasible.

In addition to any administrative remedies or enforcement provided hereunder, the County may seek and obtain temporary, preliminary, and permanent injunctive relief to prohibit violation of the conditions set forth herein or to mandate compliance with the conditions herein.

All remedies and enforcement procedures set forth herein shall be in addition to any other legal or equitable remedies provided by law.

Exhibit 59

Planning Commission Actions                                    Page 11
Celeron Pipeline Final Development Plan                    March 3, 1986

A-12.    The owner and the operator of the facility shall be jointly and
         severally liable without regard to fault for all legally compensable
         damages or injuries suffered by any property or person that result from
         or arise out of any oil, water spillage, fire, explosion, odor, or air
         pollution, in any way involving oil or gas or the impurities contained
         therein or removed therefrom and which arises out of construction or
         operation of Celeron's facilities.  For the purpose of this condition,
         the "facility" shall be deemed to include all facilities described and
         approved pursuant to 83-DP-25cz, 83-CP-97cz.  This condition shall not
         inure to the benefit of any of the owners of the pipeline, including
         the United States Government.  This declaration of strict liability and
         the limitations upon it shall be governed by the applicable law of
         California on strict liability.

A-13.    All facilities constructed under this permit shall be used only for the
         shipment of a maximum volume of heated crude oil demonstrated to be
         within the design parameters of the pipeline facilities as built. The
         subject volumes will be outer continental shelf (OCS) and other locally
         produced onshore and offshore petroleum from the Santa Barbara and
         Santa Maria Basins.  Celeron shall obtain a new or modified permit, or
         authority to continue operation under the existing permit prior to
         undertaking any of the following activities which may, in the judgement
         of the County, result in significant changes to the impacts on the
         County.  Such changes could include but not be limited to: 1) major
         pipeline or pump station modifications; 2) major changes in pipeline
         throughput; 3) introduction of production to the pipeline from sources
         other than those described above; and 4) introduction of a different
         product from any source.

         Other source volumes may be transported subject to a determination of
         substantial conformity by the Planning Commission and a finding of
         facts and determination that project impacts will not be increased by
         transporting and processing those other sources.

A-14.    Celeron shall align the pipeline corridor from the coastal starting
         point to the County exit point in the western Cuyama valley according
         to the route approved by the County.  Celeron shall locate and
         construct all isolation valves as identified by the final approved
         alignment.

A-15.    Any person, firm or corporation, whether as a principal, agent,
         employee, or otherwise, found to be in violation of any provisions or
         conditions of this ordinance or permits, shall be punishable as set
         forth in the applicable section of the Coastal Zoning Ordinance, and
         Article III of the Santa Barbara County Code.

         Each and every day during any portion of which any violation of this
         Article or the rules, regulations, orders, or permits issued
         thereunder, is committed, continued, or permitted by such person, firm
         or corporation shall be deemed a separate and distinct offense.

Exhibit 59

Planning Commission Actions                                            Page 12
Celeron Pipeline Final Development Plan                           March 3, 1986

A-16.   The Santa Barbara County Board of Supervisors in a noticed public
        hearing shall have the authority to specify or change the Santa Barbara
        County Department responsible for any conditions contained herein.

A-17.   Should circumstances, including legal or legislative action, cause the
        County to lose its authority or have its authority fundamentally
        reduced to assess fees as a method to mitigate project-related impacts,
        then other feasible mitigation measures shall be imposed which will
        substantially lessen the significant impact formerly mitigated by the
        imposition of fees.  Within six months of the County's loss of such
        authority, feasible alternative mitigation measures shall be imposed as
        replacement permit conditions.  Alternatively, the County in a noticed
        public hearing must find that no feasible mitigation measures are
        available and that the benefits of the project outweigh the significant
        environmental impacts.

A-18.   Should legal action be required by either party to enforce any rights
        in connection with this permit the prevailing party shall be entitled
        to reasonable attorney's fees and costs pursuant to Civil Code 1717.

A-19.   Unless otherwise specified, these permit conditions are intended to
        apply to Celeron during both the construction and the operation of the
        permitted facilities.


B.      PERMIT REVIEW

B-1.    Prior to initiation of construction activity (such as ROW preparation,
        river crossings or pump station construction), Celeron shall submit to
        the System Safety and Reliability Review Committee (established by
        condition P-1) relevant construction drawings and supporting text
        demonstrating compliance with the appropriate conditions.  Construction
        may not commence until County has approved this submittal.  Within 15
        days of submittal, County shall either give written notice to proceed
        with construction or indicate in writing conditions which have not been
        met.  When such conditions have been met construction approval shall be
        granted.

B-2.    If at any time County determines that these permit conditions are
        inadequate to effectively mitigate significant environmental impacts
        caused by the project, or that recent proven technological advances
        could provide substantial additional mitigation, then additional
        reasonable conditions shall be imposed to further mitigate these
        impacts.  Imposition of such conditions shall only be considered and
        imposed as part of the County's comprehensive review of the project
        conditions.  County shall conduct a comprehensive review of the project
        conditions and consider adding reasonable conditions which incorporate
        proven technological advances three years after permit issuance and at

Exhibit 59

Planning Commission Actions                                    Page 13
Celeron Pipeline Final Development Plan                       March 3, 1986

appropriate intervals thereafter.  A comprehensive review of conditions which are not effectively mitigating impacts may be conducted at any appropriate time.  Upon written request of Celeron, the Board of Supervisors shall determine whether the new condition required is reasonable considering the economic burdens imposed and environmental benefits to be derived.

8-3.    This permit is premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa Barbara County, will be substantially mitigated by the permit conditions.  Prior to approval of the Final Development Plan, County shall review any findings that identified certain mitigation measures as being in the primary jurisdiction of another agency but are also within County's jurisdiction.  County shall thereupon determine either (1) that such mitigation has or is being implemented by such other agency or (2) that such other agency and County determine such mitigation to be infeasible.  If County determines that no other agency is or may be implementing such feasible mitigation measures then County may impose those feasible measures within its jurisdiction to mitigate those environmental impacts in accordance with appropriate mitigation measures identified by the EIS/R.

8-4.    Prior to approval of the Final Development Plan, Celeron shall develop and submit to the Resource Management Department for approval a plan to co-ordinate the placement and timing of their pipeline with SCPS's pipeline (or other potential proposals for use of the same corridor for a pipeline).  Any agreements between Celeron and SCPS (or other applicant) necessary to implement this plan shall be subject to review and verification by the Resource Management Department to assure the purpose of the plan will be achieved.  The expressed purpose of this co-ordination plan shall be:

1) arrangement of simultaneous construction where practical;

2) engineering of pipe placement within the ROW to minimize incremental widening of the initial construction corridor during subsequent pipeline projects;

3) identification of segments where incremental widening of the ROW is constrained and alternative engineering techniques which may allow construction of subsequent pipelines (and potential limitations of future pipeline use of the ROW); and

4) timing and design of revegetation plans to promote effective revegetation but minimize unnecessary duplication of efforts.

Should SCPS or any other applicant abandon their pipeline project, or fail to submit a Final Development Plan prior to Celeron pipeline construction, this condition may be modified to reflect the existing situation but maintain the intent of this condition.

Exhibit 59

Planning Commission Actions                               Page 14
Celeron Pipeline Final Development Plan             March 3, 1986

B-5.    In the event that scheduling requirements among or between conditions
        in this permit (or with this permit and conditions imposed by other
        agencies) conflict with respect to timing, the Resource Management
        Department (in consultation with other agencies as appropriate) shall
        resolve such conflict.

B-6.    Applicant shall cooperate as necessary with San Luis Obispo County in
        the permitting, design, and construction of those segments of the
        pipeline which could affect Santa Barbara County.  The intent of this
        condition is to ensure that potential impacts to Santa Barbara County
        are mitigated to the maximum extent feasible by these permit
        conditions, regardless of the location of the source of the impact.

B-7.    Prior to commencing any construction activities in Santa Barbara
        County, Celeron shall obtain a letter from the Director of the
        Resource Management Department indicating that all conditions which
        require approval prior to construction, as specified by this permit,
        have been satisfied.

B-8.    Prior to start-up of the pipeline in Santa Barbara County, Celeron
        shall obtain a letter from the Director of the Resource Management
        Department indicating that all conditions which require approval
        prior to start-up, as specified by this permit, have been satisfied.

B-9.    In the event that Celeron and staff cannot reach an agreement on the
        adequacy of any submittal required by these conditions, the matter
        will be brought before the Planning Commission for resolution at the
        earliest possible date.


C.   MANAGEMENT

C-1.    Celeron shall prepare an Environmental Quality Assurance Program
        (EQAP) for Resource Management Department approval prior to the Final
        Development Plan.  This EQAP shall encompass both the construction
        and operation phases of the project, and shall describe the steps
        Celeron will take to assure compliance with these conditions.  This
        plan is intended to provide a framework for all other programs and
        plans specified by these conditions as required prior to approval of
        the Final Development Plan.  As such, it will become a comprehensive
        reference document for the County, other agencies, and the public
        regarding the Celeron project.

        This plan shall provide for the submission to the Resource Management
        Department semi-annual reports throughout construction and annual
        reports during operations.  These reports shall describe:

Exhibit 59

EXHIBIT 3

Planning Commission Actions                                    Page 15
Celeron Pipeline Final Development Plan                  March 3, 1986

a) Project status, including but not necessarily limited to:

   i)    extent to which construction has been completed,
   ii)   the rate of production/throughput during operation,
   iii)  environmental planning and implementation efforts, and
   iv)   any revised time schedules or timetables of construction
         and operation that will occur in the next one year period.

b) Permit condition compliance, including but not necessarily
   limited to the results of the specific mitigation requirements
   identified in these conditions.

c) Results and analyses of all data collection efforts being
   conducted by Celeron pursuant to these permit conditions.

The program shall include (or if separate plans exist, reference) all
plans relevant to construction and operations of the pipeline
facilities specified by these conditions.

## Construction

The program shall include all plans relevant to construction activites
such as the Restoration, Erosion Control and Revegetation Plan and the
Cultural Resources Mitigation Plan.

The program shall include provisions for at least one managing
environmental coordinator with overall responsibility, and if
necessary, one onsite environmental coordinator per construction site
during the construction phase.  These coordinators shall be approved by
and be responsible to the Resource Management Department.  Celeron
snall fund the coordinator(s).  The number of coordinators necessary
shall be determined according to the amount of simultaneous
construction activity occuring in geographically separate areas.  The
responsibilities of the coordinator(s) are to include:

a)    on-site, day-to-day monitoring of construction activities;

b)    ensuring contractor knowledge of and compliance with all
      appropriate permit conditions;

c)    evaluating the adequacy of construction impact mitigations, and
      proposing improvements to the contractors, Celeron, and County;

d)    having the authority to require correction of activities observed
      to violate project environmental conditions or that represent
      unsafe or dangerous conditions, and having the ability and
      authority to secure compliance with the conditions or standards
      through the County Administrative Officer as described in
      condition A-8, if necessary;

Exhibit 59

e)    performing as contact for affected property owners and any other affected persons that wish to register observation of environmental permit violations and/or unsafe conditions, receiving any complaints, immediately contacting Celeron's onsite construction representative, verifying any such observations and developing any necessary corrective actions in consultation with Celeron's onsite construction representative;

f)    maintaining prompt and regular communication with the Resource Management Department, Public Works Department, or other appropriate County agency, and with Celeron personnel responsible for contractor performance and permit compliance.

In the event that resolution of disputes between the public and/or governmental agencies and Celeron over adherence to permit conditions is not achieved by the managing environmental coordinator, an arbitration system shall be utilized to resolve such disputes in a timely manner in order to minimize the need to halt construction activities as per conditions A-2 or A-8.

The coordinator(s) shall be thoroughly familiar with all plans and requirements set forth in the permit conditions. Prior to construction start-up, the managing coordinator shall discuss with other agency inspectors or monitoring personnel, inspection programs, areas of jurisdiction, responsibility, and define methods of avoiding disputes or construction delay due to agency disagreements.

Selection of the necessary coordinators shall be made, and the person(s) available, prior to issuance of the Coastal Development Permit and Land Use Permit.

Operations

The program shall include all plans related to operations, such as the Emergency Response Plan, Oil Spill Contingency Plan, and Landscaping Plan, as well as specific conditions not required in formal plans. It may also include any procedures not specified by these conditions but relevant to environmental protection and safety.

C-2.    Prior to issuance of the Coastal Development Permit and Land Use Permit Celeron shall provide to the Resource Management Department and the Emergency Services Coordinator the current name and position, title, address, and 24-hour phone numbers of the field agent, person in charge of the facility, and other representatives who shall receive all orders and notices, as well as all communications regarding matters of condition and permit compliance at the site and who shall have authority to implement a facility shutdown pursuant to condition A-8 in this Ordinance. There shall always be such a contact person(s) designated by the permittee. One contact person shall be available 24 hours a day during all phases of the project in order to respond to inquiries received from the County, or from anyone in case of an emergency.

Exhibit 59

Planning Commission Actions                                         Page 17
Celeron Pipeline Final Development Plan                        March 3, 1986

If the address or phone number of Celeron's agent should change, or the
responsibility be assigned to another person or position, Celeron shall
provide to the Resource Management Department the new information
within seven days.

C-3.    Celeron shall furnish to the Resource Management Department copies of
all County permit applications relative to the project once submitted,
and of permits within 30 days of receipt by Celeron.


D.      AIR_QUALITY

D-1.    Nothing contained herein shall be construed to permit a violation of
any applicable air pollution law, rule, or regulation.

D-2.    Prior to initiation of construction, including grading, of any
facilities approved pursuant to this Development Plan, Celeron shall
obtain an Authority to Construct permit from the County Air Pollution
Control District.

D-3.    Celeron agrees to implement all air pollution control procedures as
required by APCD and identified in the Final Development Plan (such as
water sprays to reduce construction-related fugitive dust).

D-4.    Emissions from any project component that contribute to ozone standard
violations must be mitigated to the extent feasible.  Effectiveness of
mitigation will be confirmed by APCD.

D-5.    Deleted.

D-6.    Prior to approval of the Final Development Plan, Celeron shall submit
to the Resource Management Department updated estimates of the type and
size of helicopters, or other aircraft, to be used during pipeline
operations for the aerial surveys of the pipeline route.  The
information shall also include the estimated operating schedules,
frequency and duration of airport calls and other reasonable
information as required by APCD.  The County may require validation and
updating of this information as needed.  Should this information reveal
significant differences between the estimated air emissions and those
analyzed in the EIR/EIS, the APCD may modify air quality permit
conditions as necessary to assure consistency with the Air Quality
Attainment Plan and Reasonable Further Progress goals.

D-7     All facilities shall be designed, constructed, operated, and
maintained, such that the facilities approved under this Development
Plan shall not discharge quantities of air contaminants or other
materials in violation of Section 41700 of the Health and Safety Code.

Exhibit 59

Planning Commission Actions                                    Page 18
Celeron Pipeline Final Development Plan              March 3, 1986


D-8     Prior to the approval of the Final Development Plan, Celeron shall
        submit to the Director of the Resource Management Department a plan,
        approved by the APCD, which includes timing of construction, minimizing
        soil handling, and other measures to mitigate construction air quality
        impacts.  The plan shall include APCD approved analysis which
        demonstrates that local, state and federal air quality standards will
        not be violated as a result of construction activities.


E.      GEOLOGY

E-1.    Prior to the issuance of the Coastal Development Permit and Land Use
        Permit, Celeron will conduct a route-specific Geologic Investigation,
        Design, and Mitigation Program.  This program shall contain three basic
        components: 1) a detailed geologic investigation component which
        defines specific hazards, 2) an engineering design component which
        details specific engineering plans for each identified hazard along the
        route, and 3) a geohazards mitigation component which demonstrates how
        and to what extent each hazard is reduced.

        a) Detailed geologic investigation component:

            Where specific hazards have been identified or may occur along
            the pipeline route or at pump station locations, Celeron will
            conduct appropriate detailed geologic, seismic, and geotechnical
            studies to further characterize the specific geologic hazard.
            These studies will be conducted under the direction of a State of
            California registered geologist or engineering geologist and will
            be subject to approval by the Resource Management Department and
            Public Works Department.  These studies will include but not be
            limited to investigations of unstable slopes, erodable slopes,
            lurch/liquefaction susceptible substrate, surface rupture, and
            river scour characteristics (depth and lateral extent).  Methods
            of investigation shall conform to appropriate geotechnical
            techniques applicable to each specific hazard.  Draft results
            will be subject to review by County Public Works Department and
            Flood Control Agency as appropriate prior to finalization of the
            engineering design.  The final report will be submitted with the
            final engineering design component.

        b) Engineering design component:

            Celeron shall incorporate appropriate geotechnical information
            from component a) and other applicable recommendations into final
            engineering design of pipeline construction and facilities.  This
            includes but is not restricted to:  the development of
            appropriate ground motion parameters for use in seismic design of

Exhibit 59

Planning Commission Actions                                     Page 19
Celeron Pipeline Final Development Plan                     March 3, 1986

    critical structures and equipment, unstable slope construction or avoidance techniques, burial depth at all major river crossings, modification of instrumentation, or use of the dual contingency level/operating level earthquake concept, or its equivalent. The designs will be subject to review by the Department of Public Works and third party technical review as specified in Condition P-1. The final engineering design shall be approved by County Public Works and Flood Control Agency prior to the issuance of the Coastal Development Permit and Land Use Permit.

c) Geohazards mitigation component:

    Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron will submit to the Resource Management Department a detailed geologic hazard mitigation report. The report will outline the hazards identified in part a) of this program and will address how engineering designs as detailed in part b) of this program reduce each specific hazard. This component will also be submitted to the Department of Public Works and Flood Control Agency and will be subject to third party review as specified in Condition P-1.

E-2.    Celeron will develop a Monitoring Program for the operations phase to be funded by Celeron and staffed as necessary with at least one State of California registered engineer, or engineering geologist, in order to evaluate any hazards identified by routine monitoring. The program will be designed to verify adequate performance or condition of the project components in hazard areas such as river and active fault crossings, and will be subject to approval of the Resource Management Department prior to issuance of the Coastal Development Permit and Land Use Permit. The monitoring program may in part be incorporated into routine aerial and ground reconnaissance.

    If the monitoring indicates a potential or actual hazard, appropriate action including, but not limited to, operations curtailment and repairs, will be taken by Celeron to mitigate the hazard. Celeron will report to the Emergency Services Coordinator any potentially hazardous situations discovered during monitoring.

    In the case of river crossings at the Santa Ynez, Sisquoc and Cuyama Rivers, a yearly inspection of pipeline burial depth, subject to review by the Resource Management Department and Flood Control Agency, shall be performed. At crossing of the Santa Ynez and Sisquoc Rivers where channel degradation has reduced the depth of cover to less than four feet below the 100-year scour depth, or other hazardous levels as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency, or US D.O.T. specifications, relocation or reburial of the pipeline to adequate depth will be required. At the crossing of the Cuyama River, if the inspections reveal that hazardous conditions exist, mitigations such as reconstruction or relocation of the crossing will be required as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency.

Exhibit 59

Planning Commission Actions
Celeron Pipeline Final Development Plan

Page 20
March 3, 1986

E-3. Inspection of the pipeline trench or trench spoil to identify any potential geologic hazards shall be made by a professional geologist or soils engineer approved by the Resource Management Department prior to installation of the pipeline. If hazards not previously accounted for in the pipeline design are encountered, appropriate mitigation measures will be developed and must be instigated prior to installation of the pipeline. The results of the inspection will be reported to the engineering geologist of the Public Works Department who will approve prior to, and the supervising environmental coordinator who will insure, application of the necessary mitigation measures. The timing of such inspections shall not result in any unreasonable delays in installation of the pipeline.

E-4. At all places where the pipeline crosses an active fault, according to the Department of Geology and Mining definitions, Celeron will place isolation valves on either side, or design and construct appropriate devices or measures which more effectively mitigate the hazard of the fault crossing. Location and nature of these designs must be approved prior to the issuance of the Coastal Development Permit and Land Use Permit.

E-5. Prior to the issuance of the Coastal Development Permit and Land Use Permit Celeron shall submit final Grading and Erosion Control Plans for the Sisquoc pump staton approved by the Department of Public Works. These plans shall be consistent with or based on information contained in the geologic investigation required in Condition E-1.

Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall either submit Grading Erosion Control Plans for the Las Flores and Gaviota pump stations for approval by the Department of Public Works or show evidence that the plans are a part of the overall Grading and Erosion Control Plans for the consolidated processing facilities at those sites.

E-6. Celeron shall cooperate as necessary with San Luis Obispo County in the permitting, design and construction of the Cuyama River crossing.

Any pipeline crossing the Cuyama River shall be laid to a depth consistent with studies performed under Condition E-1 and subject to approval of the County Flood Control District.

E-7. Prior to approval of the Final Development Plan, Celeron shall commit to the location of their south coast pump stations to the satisfaction of the Planning Commission. If these stations are not within the boundaries of the approved Exxon, Gaviota Terminal Company, or Chevron facilities, Celeron shall submit grading and erosion control plans pursuant to Condition E-5.

Exhibit 59

EXHIBIT B

Planning Commission Actions                                        Page 21
Celeron Pipeline Final Development Plan                       March 3, 1986

F.      SURFACE AND GROUNDWATER

F-1.    During construction of the pipeline across all perennial stream
        crossings, stream flows, if any, shall be diverted around construction
        areas to maintain downstream flows. Baseline water flows shall be
        maintained in coastal streams in order to avoid adverse impacts to
        lagoon or other sensitive habitats.

F-2.    Sediment retention devices that allow continued streamflow shall be
        installed directly downstream of stream crossings during construction.

F-3.    For pipeline crossings at the following stream or river crossings:
        Tajiguas; Refugio; Gaviota; Nojoqui; Zaca; San Antonio Creeks, all
        additional perennial streams which the pipeline crosses: Santa Ynez;
        Sisquoc; and Cuyama Rivers, Celeron shall construct the buried
        pipelines during the months of low historical streamflow, in order to
        minimize erosion loss downstream and protect surface water quality. In
        the event of low winter rainfall, earlier construction may be approved
        by Resource Management Department and County Flood Control Agency.

F-4.    No staging areas shall be permitted within riparian habitat corridors.

F-5.    During pipeline construction at stream crossings, construction
        contractors will minimize time of disturbance, narrow the construction
        ROW to the extent feasible, stabilize the disturbed areas immediately
        following construction of the crossing, and divert runoff waters around
        construction areas to maintain downstream flows.

F-6.    Deleted.

F-7.    Celeron shall install isolation valves on either side of all perennial
        stream and river crossings, including the Cuyama River, and/or as
        required by the Coastal Zoning Ordinance, unless the applicant can
        demonstrate that alternative methods will further reduce the potential
        leak impacts at the crossing site. These locations shall be identified
        prior to the Final Development Plan.

F-8.    Prior to approval of the Final Development Plan, Celeron shall identify
        the freshwater source considered for supplying pipeline and facility
        construction activities including hydrostatic test water, and shall
        estimate the total quantity required. Any water obtained from coastal
        or inland sources shall not significantly disrupt streamflows,
        groundwater resources, or habitat resources. Water conserving devices
        shall be used where feasible. Any water used during construction,
        (exclusive of hydrostatic test water), shall contain no more than 5,000
        parts per million total dissolved solids. Disposal of hydrostatic test
        water within the County shall be according to a plan approved by the
        Regional Water Quality Control Board, or by the Flood Control Agency.
        This information shall be provided to and approved by the Resource
        Management Department as part of the Final Development Plan.

Exhibit 59

Planning Commission Actions
Celeron Pipeline Final Development Plan

Page 22
March 3, 1986

F-9.   Prior to approval of the Final Development Plan, Celeron will perform detailed hydrogeologic investigations for the sensitive areas identified in the the EIR/EIS, (Table 3-14).  These investigations will be conducted by a State of California registered geologist or engineer and will include but not be limited to:

a)   definition of groundwater depth, recharge sources, properties of overlying soils, hydraulic gradient, background water quality, and existing water uses.

b)   inventory of existing wells from State or County Flood Control Agency records in an area extending down-gradient from the pipeline in the aquifer equal to the distance groundwater would move in one year at a velocity calculated from the maximum hydraulic conductivity of the specific aquifer, hydraulic gradient, and porosity.  The down-gradient sensitive area will be determined by a registered geologist.

This information will be reviewed by the Resource Management Department and used by Celeron to formulate the Groundwater Contamination portion of an Oil Spill Contingency Plan, Condition P-5.  This portion of the Plan will include;

a)   plans for monitoring and early detection of groundwater contamination, including aerial and ground surveys, pipeline pressure monitoring, and water sampling of strategic wells;

b)   plans for notification of affected groundwater users, and the Emergency Services Coordinator;

c)   clean-up response, reparations, restorations, and methods to determine and correct the contamination source; and

d)   identification of emergency alternate water supplies.

F-10.  At the base of slopes where the ROW approaches sensitive aquifers as identified in the EIR/S that are at risk from oil spills and leaks, a dam or ditch plug will be used in the pipeline trench.  The sensitive areas are those where the ROW follows 1) topographic slopes toward basins with shallow depth to water, 2) high vertical permeabilities, and 3) a high degree of groundwater use as indicated by the hydrogeologic investigations required as per condition F-9.  These areas shall be identified in the Final Development Plan.

F-11.  Prior to the approval of the Final Development Plan, the System Safety and Reliability Committee shall review and approve submitted plans of all Creek and River crossings in Santa Barbara County.  Permitted development shall not cause or contribute to flood hazards or lead to the expenditure of public funds for flood control works.

Exhibit 59

Planning Commission Actions                                          Page 23
Celeron Pipeline Final Development Plan                          March 3, 1986

G.    AQUATIC BIOLOGY

G-1   Fueling and lubrication of construction equipment will not occur within
      0.25 miles of any flowing streams.  No more than 2 barrels of fuel
      shall be kept at construction sites, exclusive of pipeline construction
      equipment fuel tanks, within 0.25 miles of all perennial creeks.  As
      part of the oil spill response plan, Celeron will submit plans for
      clean-up and restoration of affected areas in the event of a
      construction fuel spill.

H.    TERRESTRIAL BIOLOGY

H-1.  Prior to issuance of the Coastal Development Permit and Land Use
      Permit, Celeron shall submit a Restoration, Erosion Control, and
      Revegetation plan for the final proposed pipeline route and the pump
      station sites.  The plan shall be submitted to the Resource Management
      Department for approval.  Once approved, the plan shall be implemented
      by Celeron.  Success of the restoration and revegetation plans shall be
      monitored by a qualified independent biologist who is in addition to
      the managing environmental coordinator (Condition C-1). The plan shall
      contain, but not be limited to, the following:

      (a)   Procedures for stockpiling and replacing topsoil, replacing and
            stabilizing backfill, such as at stream crossings, and steep or
            highly erodable slopes.  Additionally, provisions shall be made
            for recontouring to approximate the original topography.  Excess
            fill shall be disposed of off-site unless suitable arrangements
            are made with the property owner.  Excess fill shall not be
            deposited in any drainage, or on any unstable slope.

      (b)   Specific plans for control of erosion, gully formation, and
            sedimentation, including, but not limited to, sediment traps,
            check dams, diversion dikes, culverts and slope drains.  Plan
            shall identify areas with high erosion potential and the specific
            control measures for these sites.

      (c)   Procedures for containing sediment and allowing continued
            downstream flow at stream crossings, including scheduling
            construction activities during low-flow periods.

      (d)   Procedures for re-establishment of vegetation that replicates or
            is functionally equivalent to indigenous and naturalized
            communities along the alignment.  These shall include: measures
            preventing invasion and/or spread of undesired plant species;
            restoration of wildlife habitat value; and restoration of native
            plant species and communities.  Celeron shall consult with the
            County Farm Advisor and appropriate Ranch operators when
            developing procedures for revegetating areas used for cattle
            grazing and other agricultural uses;

Exhibit 59

Planning Commission Actions                                    Page 24
Celeron Pipeline Final Development Plan                    March 3, 1986

    (e)    Procedures for restoration of riparian corridor stream and river banks and stream bed substrates and elevation;

    (f)    Procedures for minimizing all tree removal or tree root and branch damage, such as, flagging the corridor, keeping all disturbance to no more than the 100-foot pipeline right-of-way, feathering the right-of-way edges, providing for onsite monitoring of construction by a qualified independent biologist. In addition, special procedures are required for oak woodlands since County policy requires that these trees must not be cut down if feasible. Special procedures for oaks include reducing the right-of-way to the minimum width possible and minimizing the impact to the root zone of these trees;

    (g)    Procedures for replacement of native trees and large shrubs removed from the 100-foot temporary easement during construction across riparian and woodland, in particular oak woodland, habitat, with saplings of the same species propagated from materials obtained from the same area, including provision for supplemental irrigation as necessary and feasible to ensure establishment, and provisions for protection of saplings from grazing animals;

    (h)    A soil conservation program, to be applied in areas of 20 percent or greater slopes along the pipeline corridor.

    (i)    Procedures for incorporating landowner concerns in the plan. Any changes to the plan instigated by such concerns shall be approved by the Resource Management Department.

    (j)    A plan for offsite re-establishment of oaks to mitigate impacts to oak savannahs and woodlands along the route.

The segment of the plan pertaining to Gaviota State Park shall be prepared in cooperation with the State Department of Parks and Recreation.

H-2.    One year after construction, a survey will be conducted, at Celeron's expense, to determine the actual impact caused by construction. This survey shall include aerial photography, and as appropriate color stereo and infrared photography and field studies. The report will identify areas with potential for further impact, e.g., high erosion areas, that will require immediate remedial measures. The survey shall also contain an examination of previous mitigation measures and present a list of additional feasible mitigations based on the impacts during construction and potential impacts caused by operation. Celeron and the Resource Management Department shall agree to additional feasible mitigations. This process shall be repeated as often as necessary by the Resource Management Department, but not more than annually.

Exhibit 59

EXHIBIT 3

Planning Commission Actions                                     Page 25
Celeron Pipeline Final Development Plan                    March 3, 1986

H-3.    In those areas where trees and other habitats such as riparian areas
        and oak woodlands are to be avoided within the approved corridor,
        Celeron shall assure contractor compliance with this condition by
        marking and/or fencing those habitats.

H-4.    Additional reasonable and feasible conditions of mitigation, consistent
        with condition H-1 and to the extent necessary, shall be identified and
        observed as developed during the archaeological mitigation program
        (conditions L-1, L-2, L-3, L-6), and as identified by the managing
        environmental coordinator in consultation with Celeron's Onsite
        Construction Representative (condition C-1).

H-5.    Deleted.

H-6.    Celeron shall not use herbicides in wetland and riparian areas, and
        along the rest of the pipeline corridor during construction.

H-7.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall receive a permit (1603) as required from the
        California Department of Fish and Game.  This permit should include
        provisions to ensure that the proposed construction schedule will not
        interfere with reproductive activities of regionally rare or rare,
        threatened or endangered bird, amphibian, and fish species or other
        species of special concern, in those environmentally sensitive habitats
        identified in the EIR/EIS and shall submit this confirmation to the
        Resource Management Department.  If the Department of Fish and Game
        determines that the construction schedule will have an impact then
        Celeron will adhere to directives of the Department of Fish and Game
        with respect to their permit requirements.

H-8.    Deleted.

H-9.    Celeron shall minimize impacts to the population of Hoffmann's
        nightshade (Solanum xanti var. hoffmannii) found in the Gaviota Pass
        area.  Celeron shall submit plans to enhance the recovery of this
        population to the Resource Management Department for approval prior to
        issuance of the Coastal Development Permit and Land Use Permit.  These
        plans shall include provisions for removing any individual plants that
        would be affected, place them in large tubs, and replant them as near
        as possible to the original location (exclusive of the operation
        Right-of-Way) after construction; and gathering seeds prior to issuance
        of the Coastal Development Permit and Land Use Permit from the
        population of Hoffmann's nightshade located in the Gaviota Pass area
        and planting them in and near the ROW after construction.  This shall
        be done under the supervision of a biologist approved by the Resource
        Management Department and in cooperation with the California Parks
        Department; this biologist may approve modifications to these
        techniques based on season of the year and state of dormancy.

Exhibit 59

H-10.   Celeron shall minimize impacts to the population of Catalina Mariposa
        lily (Calochortus catalinae) found in the Gaviota Pass area.  Celeron
        shall submit plans to enhance the recovery of this population to the
        Resource Management Department for approval prior to issuance of the
        Coastal Development Permit and Land Use Permit.  These plans shall
        include provisions for gathering of seeds from the population found in
        or near the ROW prior to construction, planting the seeds in or near
        the ROW after construction (exclusive of the operation ROW), conserving
        the upper 18-24 inches of heavy clay soil which contains the plant's
        bulb-like corms found in the vicinity of the plants prior to
        construction, and then, after construction, replacing this soil which
        holds the plants bulb-like corms.  This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;
        this biologist may approve modifications to these techniques based on
        season of the year and state of dormancy.

H-11.   Celeron shall minimize impacts to the population of Refugio Manzanita
        (Arcostaphylos refugioensis) found in Gaviota Pass area and affected by
        the proposed construction activities.  Celeron shall submit plans to
        enhance the recovery of this population to the Resource Management
        Department for approval prior to issuance of the Coastal Development
        Permit and Land Use Permit.  These plans shall include provisions for
        gathering seeds and taking cuttings from the population of Refugio
        Manzanita found in and adjacent to the ROW prior to construction, and
        provisions for the planting of the seeds and plants propagated from
        cuttings in the final construction alignment (exclusive of the
        operation ROW) after construction.  This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;
        this biologist may approve modifications to these techniques based on
        season of the year and state of dormancy.

H-12.   Celeron shall prepare a Restoration, Revegetation and Implementation
        section as part of the Oil Spill Contingency Plan (P-5).  The section
        shall be reviewed and accepted prior to start-up by the Resource
        Management Department and a biologist approved by the Resource
        Management Department.  The section shall be submitted sufficiently
        prior to Celeron's projected start-up date so as to allow reasonable
        time for staff review.  Reasonable costs of review shall be borne by
        the applicant.  The section shall contain site-specific restoration
        information for all habitat types including stream crossings,
        wetlands/lagoons, oak woodlands, grasslands, riparian zones, and other
        environmentally sensitive habitats.  The section shall be divided into
        three major areas: a) Coastal, b) Streams and Rivers and c) Terrestrial
        habitats.  Each of these sub-sections shall discuss the various
        habitats in the categories listed above.  Methods to achieve
        restoration of all affected areas to their prespill conditions shall be
        discussed.

Exhibit 59

EXHIBIT B

Planning Commission Actions                                                    Page 27
Celeron Pipeline Final Development Plan                               March 3, 1986

H-13.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall submit to the County Board of Architectural
        Review, and the Resource Management Department site-specific plans for
        landscaping of any pump station not within other required project
        vegetation screens.  This plan shall, at Celeron's expense, be reviewed
        by a qualified landscape architect and a biologist approved by the
        Resource Management Department to insure the proper plant materials and
        procedures identified in these conditions are implemented.  These plans
        shall be developed in consultation with the property owner.  The plan
        shall include:

        (a)    The specifications of any potential seed mixtures to be utilized,
               including the plant species in the mixture and the pounds of seed
               per acre to be applied;  type of mulch (fiber, chemical tackifier
               or straw);  the type and amount of fertilizer;  and any
               provisions for irrigation;

        (b)    Confirmation that all native or non-native plant materials
               proposed in the revegetation plan are compatible with indigenous
               vegetation and that none of the plans used is known to be weedy
               or invasive.  The plan shall provide for plantings that will
               screen facilities from view.  This vegetation screening shall
               also be designed to reduce nighttime lighting and noise.  Near
               chaparral or other high fire hazard areas, the seeds or seedlings
               will consist of native or non-native species, shown to contain
               fire retardant properties (such as toyon) and shown to be fast
               growing;

        (c)    The specifications for native seeds and seedlings that will have
               wildlife habitat and food value.  All perennial plants, and all
               woody plants are to be propagated from material obtained from the
               same area.  Native plant material is to be obtained from a
               revegetation contractor.  All native materials will be ordered
               from the contractor in advance of construction activities.

        (d)    Confirmation that non-native material is to be confined to
               disturbed areas immediately adjacent to structures needing visual
               screening.  Such screening is to include fast growing plants
               adequate to screen the facility from direct view;

        (e)    A detailed irrigation plan if feasible for all revegetated areas
               requiring irrigation for establishment of plant materials;

        (f)    Celeron's commitment for continual monitoring of the revegetaion
               so that weeds will be minimized.

H-14.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall post a bond or other security agreement approved
        by the County Counsel to ensure that all landscaping and revegetation
        programs are completed to the County's specifications.

Exhibit 59

Planning Commission Actions                                    Page 22
Celeron Pipeline Final Development Plan                   March 3, 1986

H-15.   Prior to issuing a release from the bond or other security agreement, a
        biologist and landscape architect hired by the County, at Celeron's
        expense, shall conduct a field review of all revegetated and landscaped
        areas, to insure consistency with the intent and specifications of the
        revegetation and landscape plan.  Necessary repairs or changes in
        landscaping or revegetation shall be made at Celeron's expense.

H-16.   Prior to approval of the Final Development Plan, a qualified biologist
        approved by the Resource Management Department will conduct
        site-specific field inventories for California state-listed species, as
        mandated by the intent and general provisions of Assembly Bill No.
        3309, the California Endangered Species Act.  The biologist will
        perform the surveys of the 100-foot ROW in areas suspected of having
        any of the species of special concern as identified in Appendix B Table
        B-6, DEIR/S, except for the peregrine falcon, least Bell's vireo, and
        Parish's sidalcea.  Surveys for these species will be conducted prior
        to construction.  The California Department of Fish and Game will be
        consulted concerning appropriate methods for survey as well as
        appropriate mitigation measures if these species are found on the ROW.
        Additional mitigation shall be developed and executed by Celeron based
        on these surveys if determined necessary by the Resource Management
        Department.

H-17.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, a wildlife biologist approved by the Resource Management
        Department will survey all potential raptor nesting habitats within 0.5
        miles of the pipeline, to identify active and inactive nests and
        potential perch sites cleared by ridge-top construction.  No
        construction will occur within 0.5 miles of active eyries during
        nesting season as determined by the biologist.  Construction may be
        permitted by the Resource Management Department in consultation with
        the biologist near inactive nests provided nest sites are not
        disturbed.  Where deemed necessary by the California Department of Fish
        and Game biologists, raptor perch or roost trees will be avoided and/or
        artifical roosts will be constructed on ridgelines to mitigate losses
        of such trees resulting from clearing the ROW on ridge tops.

H-18.   Celeron shall limit the width of the construction ROW through all
        riparian habitats to the extent feasible.  Celeron shall submit a plan
        indicating the location and size of the construction ROW through all
        riparian habitats.  These plans shall be approved by the Resource
        Management Department prior to the Final Development Plan.

H-19.   The construction ROW shall be routed to avoid trees to the maximum
        extent feasible.  When this is not possible, dying or diseased trees
        shall be removed preferentially over healthy trees.

Exhibit 59

Planning Commission Actions                                      Page 29
Celeron Pipeline Final Development Plan                    March 3, 1986

H-20.   Celeron shall minimize impacts to the oak woodland in the Suey Canyon
        area.  This shall be done by using existing disturbed areas and by
        narrowing the construction corridor to the extent feasible by working
        on top of the spoils pile or selectively removing spoils, selectively
        removing trees (e.g. dying, or diseased trees) and revegetating to
        enhance re-establishment of oak saplings and/or similar mitigation.

H-21.   Celeron shall align the pipeline route in the vicinity of the Los
        Alisos Creek crossing in order to minimize the amount of riparian
        habitat disrupted.


I.      SOCIOECONOMICS

I-1.    The cumulative impacts of oil and gas industry projects are expected to
        be significant to Santa Barbara County.  Therefore Celeron shall
        participate in an oil and gas industry wide monitoring and mitigation
        program to address socioeconomic impacts indentified as significant
        environmental impacts attributable to their project.  For projects such
        as pipelines, only the construction phase is expected to cause
        significant impacts, and Celeron's participation in the program shall
        be limited to that phase.  The criteria for allocating the costs of the
        monitoring and mitigation program and its mitigation requirements will
        be uniformly applied to all industry participants.

        The intent of this program is to obtain realistic information regarding
        impacts identified in the EIR/EIS, and to allow impacted jurisdictions
        to require mitigation for project-related impacts.  Mitigation of
        impacts through other planning programs, and/or through existing
        administrative infrastructure shall be taken into account.  The scope
        of this program is detailed below.  As subsequent details in the
        structure of the Program are developed by the County, such details
        shall supersede portions of this condition as appropriate.

        The purpose of the Monitoring and Mitigation Program is to accurately
        assess the impacts of the Celeron's proposed development, including
        those in the following socioeconomic areas:

        a.    Temporary housing needs, particularly demand for state and other
              park campsites, recreational vehicle parks, motel-hotel rooms and
              rental housing;

        b.    Longer term (more than one year) housing needs, particularly low
              moderate income housing needs, and associated water demands,
              south coast Santa Barbara County;

        c.    Public finance;

        d.    Transportation of workers and materials to and from the site.

Exhibit 59

Planning Commission Actions                                         Page 30
Celeron Pipeline Final Development Plan                    March 3, 1986

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County. Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

The Monitoring and Mitigation Program will be administered and staffed by the County of Santa Barbara, Department of Regional Programs. A Technical Advisory Committee will provide assistance and input in the documentation of significant adverse impacts and proposals to mitigate these significant impacts.

The Technical Advisory Committee will be composed of: two representatives from Santa Barbara's cities appointed by the Mayor's Select Committee and repesenting north and south county interests; one representative (each) from San Luis Obispo and Santa Barbara counties; and one representative from each affected oil and gas company (to the number of representatives agreed upon). Celeron will be included in the committee until Celeron submits its resignation.

In the event of unresolved technical issues in the area of methodology and calculation of socioeconomic impacts, there shall be a Technical Arbitration Group. The Technical Arbitration Group shall be composed of three individuals without ties to either the County or Celeron, one to be selected by the County Board of Supervisors, one selected by the oil and gas company representatives and the final member selected by the first two members. All Technical Arbitration Group decisions shall be appealable upon written request to the Board of Supervisors. Subsequent details on voting procedures and conflict resolution will be proposed by the Department of Regional Programs and reviewed by the Board of Supervisors in a noticed public hearing.

Prior to approval of the Final Development Plan for this project the monitoring and mitigation program will be refined. Based on information in the EIR/EIS and on other data as appropriate, practical thresholds which trigger the necessity for mitigation will be developed and adopted by the Department of Regional Programs with input from the Technical Advisory Committee. These thresholds will recognize the normal growth incorporated in county plans, prior and existing industry activity, and the decline of the industry if no further permitting is allowed. Methodologies used to establish thresholds and impacts will be developed in consultation with the Technical Advisory Committee.

The need for mitigation will be determined when threshold levels are exceeded as shown by monitored activities and other data as appropriate. The Department of Regional Programs will recommend a mitigation action to the County Board of Supervisors. The Technical Advisory Committee will assist in making the assessment and recommendations. The monitoring and mitigation program will continue through all stages of construction.

Exhibit 59

Planning Commission Actions                                          Page 31
Celeron Pipeline Final Development Plan                          March 3, 1986

The monitoring, impact and mitigation elements of the program would be equivalent to those described in the Chevron Gaviota Project conditions, but modified as appropriate for the nature of the pipeline project.

I-2.    Prior to approval of the Final Development Plan, Celeron shall submit to the County Department of Regional Programs a plan which details how they plan to house temporary construction workers for every month of construction.  This plan, to be implemented by Celeron, shall demonstrate how Celeron plans to reduce the housing impacts identified as part of the plan; e.g. exactly how much housing is needed, where it is needed and for how long; but not limited to, the following examples:

(a)    Use of existing under-utilized hotel/motel space during the months of September through May to provide for temporary living quarters for direct construction workers by month; identification of incentives to all the direct construction workers such as rent subsidies and/or shuttle service to the site.

(b)    Use of any available housing outside the South Coast area for all workers associated with the project during the summer months when visitor-serving facilities in the South Coast area are at capacity.  Incentives for workers shall be identified such as rent subsidies and shuttle service for all workers commuting to the job site.

(c)    Methods to limit worker use of public campgrounds as living quarters.  If it cannot be shown that the impact will be reduced from the estimate, Celeron shall make a donation to the California State Parks or to Santa Barbara County Parks for the development of new campsites to offset their worker use of campsites.  The donation shall be made prior to receipt of the building permit and determined by multiplying the estimated cost per developed campsite times 15.  If it is shown by the Regional Program Department and the Technical Advisory Committee that there is significant impact, the above-mentioned groups shall propose mitigation.  At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County.  Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

Exhibit 59

Planning Commission Actions                                    Page 32
Celeron Pipeline Final Development Plan                    March 3, 1986

I-3.    The pipeline construction period will be scheduled so as not to
        coincide with peak tourist seasons within each construction area in
        Santa Barbara County, provided that this scheduling does not interfere
        with any other conditions in this permit with respect to timing, in
        particular requirements regarding construction during stream and river
        low-flow.  If such a conflict is found, than additional measures must
        be taken to provide the temporary housing needs for construction
        workers.

I-4.    Deleted.

I-5.    Celeron shall include provisions in its contractor agreements
        specifically to encourage and promote employment from local labor so
        as to reduce the impacts associated with the in-migration of workers.

I-6.    Except as otherwise provided herein, if the Socioeconomic Monitoring
        Program shows that project related revenues will not compensate for
        needed capital or operating expenditures necessary to provide
        project-related utilities and services additional mitigation will be
        required.

I-7.    In the event that state and/or federal revenue sharing legislation
        directed at distributing oil related revenues to state or local
        governments is approved or Santa Barbara County levies a tax (special
        or otherwise) on oil and/or gas processed or transported under this
        permit, then any condition herein requiring payments or other items of
        value by Celeron to Santa Barbara County or any political subdivision
        thereof shall automatically be suspended pending a review by the County
        to determine the extent, if any, which the tax, revenue sharing, or any
        of the fees imposed are duplicative or unwarranted either as to the
        level of government services provided or the level of burdens imposed
        on the public.


J.      LAND USE AND RECREATION

J-1.    Prior to construction, the entire pipeline ROW corridor shall be
        prominently staked.  All affected property owners along the pipeline
        route shall be notified in writing at least 30 days prior to the
        commencement of any pipeline construction on their property, and at
        least 15 days in advance of any deviation from the staked corridor
        which crosses their property.

J-2.    All mainline pipeline construction activities except river, perennial
        coastal stream, and ESH area crossings as specified in condition H-7,
        once started, shall proceed in a diligent and expeditious manner and
        shall be completed within nine months after the starting date, subject
        to necessary and/or unanticipated time extensions approved by County,
        in consultation with affected property owners.

Exhibit 59

Planning Commission Actions                                Page 33
Celeron Pipeline Final Development Plan          March 3, 1986

J-3.    Pipeline construction activities shall be limited to the period between 7 a.m. and 7 p.m., Monday through Saturday.  Except for emergency services, construction activities shall not take place on Sundays, the dates generally recognized for Memorial Day, July 4, Labor Day, or any other similarly recognized holiday, unless previous arrangements have been made with the affected property owners.

J-4.    Prior to approval of the Final Development Plan, Celeron shall consult with affected property owners to develop reasonable and mutually satisfactory controls for maintaining the privacy and security of affected properties while construction is in progress.

J-5.    Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners, Celeron shall provide affected property owners written notice at least 48 hours prior to the start of construction on their property, which shall include:

   a)   Description of vehicles using roads on the property, including type, size, identification, proposed times of entry and departure, destinations, and the intended route to the destination.  (Fire, medical, or similar emergency vehicles can enter as necessary.)  Significant changes in the schedule of construction-related vehicular traffic shall be allowed within the 48-hour advance noticing subject to direct communication (e.g. telephone, personal communication) by Celeron with the affected property owners;

   b)   Description of estimated construction schedule across the property.  Any blasting necessary during construction shall be noticed to all property owners within a one mile radius of the blasting area;

   c)   Description of times of limited access through and across the property, such as road closures on the property, indicating specific location, time and duration of the limited access or closure.  Road closure is considered to include partial road blockage or disturbance.  Suitable vehicular by-pass shall be provided during all closures;

   d)   Description of any probably hazard or other unsafe condition during the pipeline construction period, indicating the nature of the hazard, the area in which the condition will occur, and the time and duration of the activity.  Celeron and its contractors shall take prompt and adequate action to correct any hazard or damage that does occur during construction, and shall provide appropriate noticing as per other parts of this condition;

Exhibit 59

Planning Commission Actions                                        Page 34
Celeron Pipeline Final Development Plan                      March 3, 1986

      e)    Description of helicopter and/or vehicle reconnaissance schedules
          for pipeline maintenance, indicating times, stops, and duration.
          Celeron shall establish and enforce appropriate rules for its
          personnel and its contractors to assure that they will not be in
          the area except when necessary to carry out construction,
          inspection, repair and maintenance activities, or emergency
          services;

      f)    Description of schedule for cutting any fences or similar
          barriers during pipeline construction.

J-6.    Deleted.

J-7.    Unless easements have been obtained from affected property owners or
       unless otherwise agreed to by affected property owners if and when
       fences or other similar barriers must be cut during pipeline
       construction, Celeron shall provide advance notice to the affected
       property owner, and shall replace the function of the cut fence before
       the cut is made to the satisfaction of the property owner, and Celeron
       and its contractors shall restore all fences that have been cut, moved,
       or damaged to at least their condition prior to pipeline construction,
       except that gates or similar structures may be added as approved to
       provide access.

J-8.    Interruption of telephone, electrical power, water or other utility
       services shall be minimized to the extent feasible  during the pipeline
       construction period.  Celeron, or its contractors, shall contact each
       property owner or the appropriate utility regarding the location of
       utility lines, and all such utility line locations shall be staked by
       Celeron or its contractors prior to the start of construction on the
       affected property.

J-9.    During the pipeline construction period in the County, Celeron and its
       contractors shall comply fully with all applicable statutes,
       ordinances, rules and regulations, including traffic regulations, of
       the County.

J-10.   Prior to entering upon any parcel of property for purposes of
       commencing construction, Celeron shall demonstrate to the Resource
       Management Department that it has obtained a right-of-way for such
       parcel or otherwise has obtained the right to enter the property for
       purposes of constructing the pipeline.

J-11    Following installation of the pipeline, use of the right-of-way is
       restricted to operational maintenance of the  pipeline except where
       expressly permitted by the easement or landowner and consistent with
       other regulations and conditions.

Exhibit 59

Planning Commission Actions                                    Page 35
Celeron Pipeline Final Development Plan                  March 3, 1986

### K.    TRANSPORTATION

K-1.    Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall submit to the Resource Management Department and the Department of Public Works, Road Division a worker transportation program designed to minimize traffic-related impacts. The plan shall identify on- and off-site parking areas, access routes, shuttle program to reduce number of working vehicles on and along pipeline construction corridor, measures to avoid traffic conflicts with residents using all roads affected, number of vehicles accessing the facilities sites and incentives for ride-pooling/van-pooling to the sites. Construction worker traffic and parking shall not interfere with normal and reasonable uses of private property or recreational areas. This Construction Traffic Mitigation Plan shall be submitted by Celeron and approved by County prior to initiation of construction. The program must consider both Celeron's employees and contractors.

K-2.    Any new permanent parking areas at the pump stations shall be screened from public view pursuant to the landscape plan approved by the Board of Architectural Review.

K-3.    The final engineering plans and procedures for all pipeline crossings of County roads must be approved prior to issuance of the Land Use Permit and Coastal Development Permit by the Department of Public Works. Notification of such approval must be submitted to the Resource Management Department prior to construction at the site.

K-4.    All pipeline construction activity, except ingress and egress along routes approved by the Resource Management Department and in consultation with affected property owners, shall be limited to the final staked right-of-way on the final approved pipeline route. Use of any private roads or other areas shall be allowed only after advance approval from the affected property owners.

K-5.    Prior to the Final Development Plan, Celeron must submit to the Public Works Department for approval a plan to mitigate impacts to all County roads which will be used during construction. This plan will include the type of vehicles and machinery which will traverse the roads, the frequency of road use for each piece of equipment and vehicle, and the gross vehicle weights loaded and unloaded. This includes the above information for trucks carrying pipe, fuel, construction supplies, or construction crews through the County to the construction spreads. This plan shall include an agreement with the County to repair any obvious damage to the satisfaction of the Public Works Director and any reasonable fees associated with eventual reconstruction caused by project-related damages of the public roads. Prior to drafting this agreement, County shall coordinate with Celeron in compiling a list of County roads which will be used for construction of the pipeline. Celeron shall demonstrate property owner (or Court) approval of private road maintenance plans or terms on privately owned parcels to the Resource Management and Public Works Department prior to entering upon said parcels for purposes of commencing construction.

Exhibit 59

L.    CULTURAL RESOURCES

L-1.    Prior to approval of the Final Development Plan, Celeron shall submit a
        plan detailing the methods for the Phase I (walkover) and Phase II
        (site importance assessment) cultural resources surveys.  In addition,
        Celeron shall submit all Phase I cultural work completed to date.
        These reports shall be approved by the Resource Management Department
        as part of the Final Development Plan.

        Prior to issuance of the Land Use Permit and Coastal Development
        Permit, Celeron shall complete Phase I and Phase II cultural resource
        surveys for the entire route.  The results of these surveys shall be
        approved by the Resource Management Department prior to issuance of
        said permits.  Celeron shall avoid to the maximum extent feasible all
        known cultural resource sites along the pipeline route unless safety
        (e.g. seismic or engineering practices) considerations or sensitive
        biological habitats preclude avoidance.

L-2.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron, in consultation with the Native American Community,
        shall commence the cultural resources mitigation plan, in accordance
        with CEQA Appendix K, County approved Prehistoric Archaeological
        Guidelines, and section 4.1.1.11, Cultural Resources, of the EIR/EIS.
        Implementation of the mitigation plan shall proceed on an expeditious
        and effective schedule in order to minimize or to avoid conflicts with
        other construction scheduling requirements delineated in other permit
        conditions.  The main components of the mitigation plan shall include:

        a)    Selection of a qualified archaeologist by the County Resource
              Management Department in consultation with Native American
              representatives.  The archaeologist shall be available on an
              as-needed basis through the completion of pipeline construction.
              The archaeologist shall be funded by Celeron and shall be
              responsible to the County Resource Management Department.
              Compensation shall cover all excavation, analysis, and report
              preparation for all areas investigated including those found
              during construction;

        b)    Avoidance of known sites wherever feasible;

        c)    Test excavations of known sites that cannot be avoided.  These
              test excavations will assess the importance of each site
              according to CEQA Appendix K criteria or other requirements and
              will result in appropriate data recovery as a mitigation measure;

        d)    Inclusion of Native American representatives in all field
              activities.

Exhibit 59

EXHIBIT B

Planning Commission Actions                                      Page 37
Celeron Pipeline Final Development Plan                      March 3, 1986

e) Additional sub-surface sampling (use of shovel test pits) in defined sensitive areas which will be affected by project construction to confirm the presence/absence of previously unknown (undiscovered) sites. This will include surveying of proposed construction access road areas, once identified by Celeron. Any new sites found shall be treated as per condition L-2(b,c);

f) Following the determination of site importance, Celeron shall inform the County of any additional plans for site avoidance. For those sites not avoided, the consulting archaeologist shall, in consultation with the Native American community, prepare site-specific mitigation (excavation/data recovery) plans; and

g) Implementation and completion of the field work aspects of the site-specific mitigation plans prior to construction in the vicinity of the resource.

L-3. Prior to pipeline installation activities, Celeron shall sponsor a workshop for its pipeline contractors and Native American consultants to review and explain the mutual concerns and activities of the parties during pipeline installation work.

L-4. During pipeline installation, a Resource Management Department approved archaeologist and Native American consultant(s) will work with the contractor during trenching to insure continued avoidance. Adequate monitors shall be provided pursuant to an agreement between the Native American representatives and Celeron, and the archaeologist retained.

L-5. If non-burial associated cultural resource artifacts are recovered during pipeline installation (the location of such artifacts being unknown prior to installation), ownership of such artifacts shall be the option of either Celeron, the Native American Community, or the archaeological community. In recognizing the origin of the materials, the Native American Community shall have the first option for ownership. The disposition of the artifacts shall be carried out as per the approved County guidelines.

L-6. If burials or burial associated artifacts are found during installation (that were unknown prior to excavation), and cannot be avoided because of safety considerations, there shall be no further excavation or disturbance of the site. Celeron, in conjunction with the Native American representatives and the Resource Management Department, shall adhere to the guidelines in CEQA Appendix K and the County Archaeological guidelines prior to continued construction activity in the site area.

L-7. If the County cultural resource guidelines for Phase II are modified and approved prior to November 19, 1985, Celeron shall abide by the requirements set forth in the guidelines in place at the time of Final Development Plan approval.

Exhibit 59

Planning Commission Actions                                    Page 38
Celeron Pipeline Final Development Plan                        March 3, 1986

M.    VISUAL RESOURCES

M-1.    All facility design (e.g. pump stations, landscaping and signs), shall
        be in accordance with a plan approved by the County Board of
        Architectural Review (BAR) including the criteria outlined in the
        Coastal Zoning Ordinance Section 35-87.9 and Section 35-184. Prior to
        the issuance of the Land Use Permit and Coastal Development Permit,
        Celeron shall submit to the BAR and the Resource Management Department
        and obtain their approval of a plan demonstrating that Conditions M-2
        through M-5 are met. For visual screening of surface equipment along
        the pipeline route, Celeron shall consult with each affected property
        owner during development of the associated landscaping plan.

M-2.    No unobstructed or unshielded beam of exterior lighting shall be
        directed towards any area outside the exterior boundaries of the
        Celeron's property or easement. Any lighting along roadways within the
        project shall utilize low intensity, ground level, shielded fixtures.
        The plan shall demonstrate that all feasible measures have been taken
        to reduce obtrusive night lighting and glow from the pump stations.

M-3.    To the extent feasible no glare or other radiation resulting from pump
        station facilities, other than lighting fixtures constructed pursuant
        to this Development Plan shall be detectable at any point along or
        outside the required screening along exterior boundaries of the pump
        stations.

M-4.    Prior to the pipeline operation, the Gaviota pump station, visible from
        Highway 101 and the Gaviota Village, the Sisquoc pump station visible
        from public viewshed, and all above ground portions of the pipeline
        shall be painted to harmonize with the surrounding area.

M-5.    No above-surface structures except necessary pipeline markers, pump
        stations, cathodic test stations, necessary fencing, and block valves
        shall be visible along this route after the completion of pipeline
        construction. Signs shall not detract from scenic areas or views from
        public roads to the extent feasible.

M-6.    Prior to construction, Celeron will review the feasibility of
        implementing mitigation measures and/or realignments in the Gaviota
        State Park area to avoid blasting of ridgetops and alteration of
        topography in a scenic area. Celeron shall submit a plan to the
        Resource Management Department, for review and approval, which
        identifies the feasibility of shifting the ROW alignment to the west,
        leaving the ridge profile undisturbed. The plan shall include an
        investigation of utilizing prefabicated pipeline bends to allow for
        alignment around ridgetops, the use of stepped benches in steep
        terrain, and the future use of such a corridor for additinal
        pipelines.

Exhibit 59

EXHIBIT 3

Planning Commission Actions                                    Page 39
Celeron Pipeline Final Development Plan            March 3, 1986

N.      NOISE

N-1.    Prior to issuance of the Costal Development Permit and Land Use Permit,
        Celeron shall file with the Resource Management Department a Noise
        Monitoring and Control Plan which has been approved previously by the
        the Department of Health Care Services and the Resource Management
        Department.  The plan shall describe the best efforts Celeron shall
        take to reduce the noise impacts of the project both during
        construction and operation of the project.  The approved plan shall be
        implemented by Celeron and shall be followed until temporarily
        suspended or deemed no longer necessary by the Resource Management
        Department.  The plan shall include provisions to ensure that items N-2
        through N-6 below are included.

N-2.    Except for motor vehicles and motorized construction equipment, all
        facilities shall be designed, constructed, operated and maintained such
        that sound levels during operation do not exceed 70 dbA at or beyond
        the property line or pipeline easement, as measured on the "A" weighted
        scale at slow response on approved sound level measuring instruments.
        Affected property owners along the pipeline route shall be notified by
        Celeron at least 48 hours in advance of any planned testing or
        maintenance of the line which may exceed noise standards.  The facility
        shall comply with all standards established in the Noise Element of the
        Comprehensive Plan and the Coastal Zoning Ordinance.  No residents,
        teachers, students and staff at the Vista del Mar School, shall be
        subjected to greater than a 9 dbA increment above the baseline ambient
        noise level, nor greater than a 3 dbA increase in day-night sound
        levels.  The best available technology, including but not limited to
        muffling equipment, sound barriers, and landscaping measures shall be
        used to minimize operational noise impacts.

N-3.    During the construction and operation phases, project related noise at
        the Gaviota State Park, Vista del Mar School, Buellton area, or other
        points which may be impacted (as determined by the Health Care Services
        Director), shall be limited to 65 dbA between the hours of 7:00 a.m.
        and 10:00 p.m., and 50 dbA between the hours of 10:00 p.m. and 7:00
        a.m., consistent with the County Noise Element and the Coastal Zoning
        Ordinance.  Blasting shall be limited to the hours between 7:00 a.m.
        and 7:00 p.m. and directional charges shall be used to minimize noise.

N-4.    As determined by the Resource Management Department, noise generating
        project activities (including delivery of construction equipment
        through residential areas) shall be restricted between the hours of
        10:00 p.m. and 7:00 a.m.  If complaints arise concerning activities
        occurring during these hours, Celeron shall take additional feasible
        steps to reduce the noise levels or further restrict the offending
        activity.

Exhibit 59

N-5.   Prior to approval of the Final Development Plan, Celeron shall submit
       to the Director of the Resource Management Department procedures that
       Celeron will take to minimize noise impacts from helicopters, or other
       aircraft during the aerial surveys of pipeline.  The procedures, to be
       approved by the Resource Management Department, shall specify
       overflight routes to be taken to minimize noise impacts to the
       community and other feasible measures.  Celeron shall direct its
       contractors to abide by the helicopter procedures and shall take
       reasonable corrective action if complaints arise concerning the use of
       helicopters.  Subject to flight safety considerations, Celeron shall
       avoid helicopter flights over residential areas.

N-6.   All construction and operation-related equipment shall be operated and
       maintained to minimize noise generation, ground vibration, and to avoid
       interference with radio or video communications.


O.     ABANDONMENT

O-1.   Immediately following permanent shut down of the pipeline, Celeron
       shall remove abandoned pump stations and unburied portions of the
       pipeline within Santa Barbara County constructed under this permit,
       recontour the site and revegetate the site in accordance with a County
       approved revegetation plan within one year of permanent shut down.
       Celeron shall post a performance bond to insure compliance, or continue
       to pay property taxes as assessed during project operation until site
       restoration is complete, as determined by the County.


P.     SYSTEMS SAFETY AND RELIABILITY

P-1.   Celeron shall submit all appropriate pump station, valve, and pipeline
       construction and process diagrams to a System Safety and Reliability
       Committee who may employ a third-party technical review in order to
       help identify and correct possible design hazards prior to
       construction.  This review shall evaluate the pipeline design and its
       implementation of System Safety and Reliability Conditions.  The System
       Safety and Reliability Review Committee shall consist of a
       representative from the County Public Works Department, Building and
       Safety Division, the APCD, the County Fire Department, County Flood
       Control District and the Resource Management Department.  Design
       recommendations resulting from the third party review shall be
       incorporated into the approved Final Development Plan.  All reasonable
       costs associated with any review shall be borne by Celeron.  Celeron
       shall be entitled to participate fully in the review process.

Exhibit 59

EXHIBIT B

Planning Commission Actions                                    Page 41
Celeron Pipeline Final Development Plan                     March 3, 1986

P-2.    Celeron shall submit a detailed safety Inspection, Maintenance and
        Quality Assurance Program for the pump stations, valves, and the
        pipeline which shall be implemented during construction and
        operations.  The Program shall include, but not be limited to,
        inspection of construction techniques, regular maintenance and safety
        inspections, periodic safety audits, corrosion monitoring and leak
        detection, inspections of all trucks carrying hazardous and/or
        flammable material.  The construction section of the Program shall be
        reviewed and approved by the System Safety and Reliability Review
        Committee and/or its consultants prior to issuance of the Coastal
        Development Permit and Land Use Permit.  The operations section of the
        Program shall be reviewed and approved by the System Safety and
        Reliability Review Committee and/or its consultants prior to start-up.
        The Program shall be submitted sufficiently prior to Celeron's
        projected start-up date so as to allow reasonable time for staff
        review.  Celeron shall implement the approved program and shall provide
        for involvement of the managing environmental coordinator (condition
        C-1), County staff or its consultants' involvement in the program.  All
        costs associated with this review process shall be borne by Celeron.

P-3.    Celeron shall submit an Emergency Response Plan detailing response
        procedures to be implemented by Celeron for accidental events affecting
        public safety and the environment.  This plan shall be based on a
        comprehensive risk analysis reviewed and approved by the System Safety
        and Reliability Committee (condition P-1).  The plan shall be reviewed
        and approved by the County Emergency Services Coordinator, the Fire
        Department, and the Resource Management Department prior to start-up.
        The Program shall be submitted sufficiently prior to Celeron's
        projected start-up date so as to allow reasonable time for staff
        review.  Celeron shall demonstrate the effectiveness of the Emergency
        Response Plan by responding to not more than one surprise drill each
        year which may be called by the County on the pump station property,
        along the pipeline route or along Highway 101.  If critical operations
        are underway, Celeron need not respond but shall explain the nature of
        the critical operations and why response is not possible.  Celeron
        shall demonstrate oil spill response capability by responding to not
        more than one surprise oil spill drill each year.

P-4.    In order to assure that County emergency response procedures adequately
        interface with the Celeron emergency response procedures, Celeron shall
        provide its reasonable pro-rata share of funds to the County, to
        develop and implement a feasible County Emergency Response Plan for oil
        and gas industry related emergencies.  As appropriate, the County shall
        request funds from other oil industry operators to aid in funding of
        the County Emergency Response Plan.  When available, the Resource
        Management Department shall provide Celeron with an estimate of the pro
        rata share of funds to be provided by Celeron and the method for
        allocating such costs among other operators.

Exhibit 59

Planning Commission Actions                                    Page 42
Celeron Pipeline Final Development Plan                  March 3, 1986

P-5.    Celeron shall submit an Oil Spill Contingency Plan detailing cleanup
        procedures and restoration procedures to be employed in the event of a
        spill.  This plan shall be reviewed and approved by the Resource
        Management Department and the County Emergency Services Coordinator
        prior to start-up.  The Program shall be submitted sufficiently prior
        to Celeron's projected start-up date so as to allow reasonable time for
        staff review.  Procedures and techniques shall be selected to augment
        the Emergency Response Plan.  The intent of the Oil Spill Contingency
        Plan is to detail spill site restoration subsequent to emergency
        response which may be called by the County on the pump station property
        or along the pipeline route.  If critical operations are underway,
        Celeron need not respond but shall explain the nature of the critical
        operations and why response is not possible.

P-6.    Prior to approval of the Final Development Plan, Celeron shall submit
        to the Santa Barbara County Sheriff's Department for review and
        approval a site security plan.  The plan shall describe procedures to
        be implemented by Celeron which will prevent intentional damage to
        facilities which may result in environmental damage or public safety
        hazards.

P-7.    Celeron shall cooperate with Chevron as necessary to facilitate the
        establishment of a temporary County fire company until the completion
        of the fire station (as specified in Chevron condition P-9).  Prior to
        issuance of the Coastal Development Permit and Land Use Permit, the
        County Emergency Response Coordinator and Fire Department must be
        satisfied that provisions have been made to establish an operational
        fire company in the project area.

P-8.    Prior to approval of the Final Development Plan, Celeron shall agree to
        participate in a plan to be submitted to the County Fire Department by
        Chevron USA Inc., for the construction, manning and equipping of a fire
        station in the Gaviota area.  Celeron shall contribute their pro rata
        share of the cost of implementing this plan.  When available, the
        Resource Management Department shall provide Celeron with an estimate
        of the pro rata share of funds to be provided by Celeron and the method
        for allocating such costs among other operators.

P-9.    Prior to Final Development Plan, Celeron shall submit to and obtain
        conceptual approval from the Fire Department, a Fire Protection Plan
        for the pump station locations.  Final approval shall be obtained prior
        to start-up.  Criteria to be addressed shall be obtained from the
        County Fire Department.

Exhibit 59

EXHIBIT B

Planning Commission Actions                                    Page 43
Celeron Pipeline Final Development Plan                     March 3, 1986

P-10.   Prior to approval of the Final Development Plan, Celeron shall assess
        the feasibility of transporting liquefied petroleum gases and natural
        gas liquids, (LPGs and NGLs) through the proposed pipeline by blending
        and/or batching, considering industry-wide projected volumes and market
        destinations of the gas liquids.  Celeron shall report to the Resource
        Management Department the results of this assessment, and this
        information shall include all technological and safety constraints
        involved, amount and type of additional storage facilities needed, and
        the degree to which LPGs and NGLs produced in the area can be
        transported through Celeron's pipeline.

        Celeron shall transport the NGLs through this pipeline, to the extent
        feasible within safety and legal constraints as identified by the
        report and as requested by the users.  In addition, under the reporting
        provisions of Condition C-1, Celeron shall inform the County of the
        types and amounts of gas liquids shipped in the pipeline during
        operations.

P-11.   If the Vista del Mar School has not been relocated or is located at a
        site where it could be impacted by construction activities, prior to
        approval of the Final Development Plan, Celeron and the Board Trustees
        of the Vista Del Mar School District shall develop a reasonable and and
        mutually agreeable construction plan for the pump station site and
        pipelines adjacent to the site that will minimize construction-related
        noise, air pollution, and visual disturbance to the School during
        school hours.  Said construction plan shall include the following:

        Pipeline construction noise near the School shall be held to ambient
        noise levels or construction shall occur only when school is not in
        session; to prevent exceedance of the California one-hour $NO_2$
        standard, construction schedules must be modified to minimize
        overlapping of equipment emissions; and, during construction of the
        pipeline, activities nearest the school shall be scheduled when school
        is not in session in accordance with Condition B-5 and temporary
        barriers shall be erected around noisiest activities.  No grading for
        the Gaviota pump station shall occur during School session hours.

        In the event that any agreements contained herein cannot be reached on
        the construction plan, the Board of Supervisors shall arbitrate any
        dispute.

P-12.   Deleted.

P-13.   Celeron will design the pipeline such that entire pipeline will have
        effective control communication between the operations control center
        and all remotely activated valves.  Any break, rupture, and/or damage
        to the pipeline shall result in the orderly shutdown of the pumping
        operations, and will activate the shut off valves, if appropriate, in a
        manner which will minimize environmental damage.

Exhibit 59

Planning Commission Actions                                                        Page 44
Celeron Pipeline Final Development Plan                                  March 3, 1986

P-14.   During construction of the pipeline in fire sensitive areas, Celeron
        shall meet or exceed applicable guidelines and requirements set forth
        in a Watershed Fire Protection Plan provided by the combined local fire
        protection agencies, Santa Barbara County Fire, U.S. Forest Service,
        and the California Department of Forestry. This shall include, but not
        be limited to:  modifications of welding operations, required fire
        patrolman position(s), firefighting equipment, and construction
        restrictions due to extreme fire weather.

P-15.   All facilitites, construction activities and equipment shall comply
        with National Fire Protection Assocition standards.

P-16.   Upon completion of pipeline construction, Celeron shall provide all
        jurisdictional agencies (S.B. County Fire, USFS, CDF) with at least two
        copies of maps showing the finished pipeline route and shall include
        locations accessible by fire department emergency response vehicles.
        Said maps shall be 7 1/2 minute quadrangle scale, (one inch equals
        24,000 inches), and shall represent topographical features.

P-17.   Celeron shall be subject to required fire department inspections during
        and after construction as set forth by the 1982 Uniform Fire Code and
        these conditions.

P-18.   Prior to approval of the Final Development Plan, Celeron shall
        designate alternative pipeline corridor alignments which avoid the two
        potentially impacted, proposed alternative permanent relocation school
        sites now under study by the Vista del Mar Union School District.
        These proposed alternative locations are the State Park at Las Cruces,
        and the Tajiguas Ranch property.  County shall review and approve said
        alternative alignments as part of the Final Development Plan and
        Celeron shall implement the appropriate alternative alignment depending
        on the permanent school relocation site chosen by the Vista del Mar
        School District.


Q.      FACILITY DESIGN

Q-1.    The Final Development Plan shall demonstrate compliance with Santa
        Barbara County Coastal Zoning Ordinance, and other applicable County
        Ordinances to the extent required by this permit.

Q-2.    Cost effective energy conservation techniques shall be incorporated
        into project design.

Q-3.    Celeron's facilities will be operated as a common carrier pipeline with
        access for use available on a nondiscriminatory basis.  County retains
        the right to verify that the use of the facilities is conforming with
        County policies on consolidation and to impose additional reasonable
        permit conditions where necessary to assure these policies are being
        fulfilled to the extent feasible.  The intent of this condition is to
        ensure the multi-company access of oil transportation facilities.

Exhibit 59

EXHIBIT B

Planning Commission Actions                                    Page 45
Celeron Pipeline Final Development Plan                   March 3, 1986

Q-4.    Celeron shall comply with all applicable policies in Section 25 of the
        Santa Barbara County Petroleum Ordinance No. 2795.

Q-5.    Celeron shall fund a pro-rata share of the costs to bury power
        transmission lines or of using environmentally and aesthetically
        preferred poles between the Goleta Substation and Gaviota in areas
        where the County and SCE determine it is not feasible to bury the
        lines.  Celeron's pro-rata share shall be based upon an equitable
        cost-sharing formula applied to all users of the grid power consistent
        with PAC rate setting and applicable regulations.

5668e

Exhibit 59

Planning Commission Actions                                    Page 46
Celeron Pipeline Final Development Plan              March 3, 1986

CELERON FINAL DEVELOPMENT PLAN
FINDINGS REQUIRED FOR APPROVAL

Upon approving the Preliminary Development Plan and Conditional Use Permit, the Planning Commission and Board of Supervisors adopted certain findings of approval pursuant to the County zoning ordinances and the California Environmental Quality Act. As the project has undergone no major changes since those findings were adopted, they are largely applicable to the Final Development Plan approval. The findings in this section have been modified to reflect new information and the nature of the Final Development Plan approval.

1.    Article III, County Zoning Ordinance

      The Santa Barbara County Zoning Ordinance, Article III, requires that certain findings of approval be made for all development plans, and that additional findings be made specifically for pipeline development.

1.1   Findings Required for Approval of a Development Plan - General

      A Preliminary or Final Development Plan shall be approved only if all of the following findings can be made:

      a)    That the site for the project is adequate in size, shape, location, and physical characteristics to accommodate the density and intensity of development proposed.

      The project "site" is in fact a 100-foot wide construction, 50-foot wide operations corridor covering approximately 70 miles in Santa Barbara County. The route is logical and appropriate for the transport of offshore processed crude to refineries outside of the County. The pipeline begins at Las Flores Canyon, where it will acquire processed crude from a consolidated oil processing facility, pass through the Gaviota consolidated processing facility, and traverse the environmentally preferred route out of the County. While the 100-foot construction right-of-way does encroach upon sensitive resources, the route was chosen and the project conditioned to minimize the disturbance of sensitive habitats and to restore all disturbance to the maximum feasible extent. The line will not displace any residents or structures.

      The chosen route can accommodate multiple pipelines, and has been designed to minimize the impacts of future construction in the corridor. The Celeron line will be a common-carrier, offering equitable access to all shippers.

      b)    That adverse impacts are mitigated to the maximum extent feasible.

      The construction and operation of this pipeline will have certain adverse impacts on Santa Barbara County. The California Environmental Quality Act requires that those impacts which can be feasibly lessened to a level of insignificance must be so mitigated. As detailed on the Class II Impact Summary Table, project conditions have been imposed to implement the mitigations. There are also impacts which cannot be mitigated to a level of insignificance. As required by CEQA, these impacts have been mitigated to the maximum extent feasible by the implementation of

Exhibit 59

EXHIBIT B

conditions, as noted on the Class I Impact Summary Table. In addition, mitigation measures which alleviate adverse but not significant impacts have been incorporated as suggested by the environmental document.

c)   That streets and highways are adequate and properly designed.

While pipeline construction will require the use of many County roads by heavy trucks and to a lesser degree, machinery, these roads should be able to accommodate this temporary increase in traffic and use without any decrease in service. Furthermore, condition K-5 requires Celeron to mitigate impacts to all County roads used during construction and to repair any obvious damage.

d)   That there are adequate public services, including but not limited to, fire protection, water supply, sewage disposal, and police protection to serve the project.

The project Environmental Impact Report does not identify any significant adverse impacts to public services due to the project. In order to help offset cumulative impacts on public services anticipated due to the increased offshore development, Celeron is required to participate in the establishment of a new County fire station in the Gaviota area (conditions P-7,8). Celeron must also adhere to the site security plan approved by the County Sheriff's Department (P-6). In addition, if project-related taxes do not compensate for needed capital or operating expenses necessary to provide for project-related utilities and services, additional mitigation will be required through the Socioeconomic Monitoring and Mitigation Program (I-1).

e)   That the project will not be detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and will not be incompatible with the surrounding areas.

During construction, the project may inconvenience a small number of residents near Buellton and in the Gaviota area due to increased noise levels. The project has been conditioned to limit construction activities to between the hours of 7:00 a.m. and 7:00 p.m., and will only impact any given area for approximately one week. The duration of this potential inconvenience is therefore limited, and the project has been conditioned to mitigate noise impacts to the extent feasible. Although processed oil is flammable, and therefore hazardous to transport, the risks of fire and spillage have been minimized through project conditions. Therefore, neither the elevated noise level nor the risk of an accident will be detrimental to the health, safety, comfort, convenience and general welfare of the neighborhood.

Pipelines are a permitted use in all zoning districts outside of the Coastal Zone, and are compatible with surrounding areas because there are very few above-ground facilities once construction is complete. The pump stations at Sisquoc is above ground, but will not conflict with the agricultural uses which surround it. The pump station at Las Flores Canyon is compatible with the other oil and gas facilities at

Exhibit 59

hearings do not create any new adverse impacts. Although there may be segments where a different alternative is less environmentally damaging, these isolated segments are infeasible because the pipeline must be continuous; each chosen segment must join to form the pipeline corridor. Overall, the route chosen is environmentally preferable to any complete alternative route, so that there are no feasible alternative routes which are less environmentally damaging.


2.0  County Coastal Zoning Ordinance

The Coastal Zoning Ordinance applies to all segments of the pipeline within the Coastal Zone as indicated on County maps. The CZO requires identical findings for Development Plans and pipelines as Article III, as well as findings for a Conditional Use Permit. As many of the findings for this section duplicate those for Article III, additional findings will be made here only where the facilities in the Coastal Zone pose special concerns or problems not applicable to the route as a whole.

2.1  Findings Required for Approval of a Development Plan - General

e)  That the project will not be detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and will not be incompatible with the surrounding area.

During construction, the project may inconvenience a small number of residents along the south coast due to increased noise levels. The project has been conditioned to limit construction activities to between the hours of 7:00 a.m. and 7:00 p.m., and will only impact any given area for approximately one week. The duration of this potential inconvenience is therefore limited, and the project has been conditioned to mitigate noise impacts to the extent feasible. Conditions N-2 and P-11 require the use of best available muffling technology to limit noise impacts to Vista del Mar school. Although processed oil is flammable, and therefore hazardous to transport, the risks of fire and spillage have been minimized through project conditions.

f)  That the project is in conformance with the applicable provisions of the Coastal Zoning Ordinance and the Coastal Land Use Plan.

As conditioned, the project is in conformance with the applicable provisions of the Coastal Zoning Ordinance and the Coastal Land Use Plan.

g)  That in designated rural areas the use is compatible with and subordinate to the scenic, agricultural and rural character of the area.

As mentioned above, the Gaviota pump station is surrounded by other oil and gas industry facilities. Because the station is sited adjacent to the approved Chevron facility, it will not add to the detraction from the scenic, agricultural and rural character of the area. The pipeline itself will be buried, so it will be compatible with the character of the area.

Exhibit 59

EXHIBIT B

Planning Commission Actions                                    Page 50
Celeron Pipeline Final Development Plan                  March 3, 1986

2.2  Findings Required for Approval of a Development Plan - Pipelines

Identical to those for Article III.

2.3  Findings Required for Approval of a Conditional Use Permit

Findings numbered 1 through 8 in this ordinance are identical to those
for Development Plans in the Coastal Zone and in Article III.

9)   That the proposed used is not inconsistent with the intent of the
     zone district.

Pipelines are permitted in every zoning district, but require a Major
Conditional Use Permit if Environmentally Sensitive Habitats are
crossed.  The line is therefore consistent with all applicable zoning
districts.

3.0  California Environmental Quality Act Findings

The California Environmental Quality Act requires that any agency which
approves a project with significant environmental effects identified in
an EIR must make one or more findings for each of those significant
effects, accompanied by a brief rationale for each finding.  The Class I
Impact Summary Table describes each of the adverse significant impacts
identified in the project EIR/S which are either unavoidable because no
known mitigation measures or project alternatives exist, or which are
only partially mitigated after implementation of the identified
mitigation measures.  The Class II Impact Summary Table describes the
adverse impacts which can be eliminated or reduced to a level of not
significant by the implementation of mitigation measures.  The impacts,
proposed mitigation measures and permit conditions are described more
specifically in the Preliminary Development Plan Staff Report and are
incorporated herein by reference.

Upon consideration of the evidence in the EIR/S, the evidence presented
at the hearings conducted before the Planning Commission, and the Staff
Reports prepared by the County Energy Division, the Planning Commission
makes the following findings:

3.1  Class I Impacts

          CEQA FINDING #1 :Certain impacts cannot be substantially lessened
                          or avoided.

There are certain unavoidable significant adverse impacts associated with
approval of the project.  The benefts of the project, described elsewhere
in these findings, outweigh the unavoidable environmental risks.

The following findings refer to specific impacts listed in the Class I
Impact Summary Table; the number in the "CEQA Findings" column in the
table corresponds to the numbers below.

Exhibit 59

1A.  Oil Spill Impacts

Oil spill-related impacts may still occur even after successful
implementation of the identified mitigation measures, due to natural
events and technical limitations that can hinder effective cleanup
and containment.  The risks of an unlikely oil spill, combined with
the risks of incomplete spill cleanup, are considered acceptable
because only denying the project would assure complete mitigation of
oil spill impacts.  The identified mitigation meausres represent the
best feasible techniques currently available.

1B.  Channel Degradation

Although the pipelines are to be buried a minimum of four feet below
the maximum storm scour depth below stream channels, or other
engineering measures used, degradation of these channels may result
in increased scour depth which could expose or seriously damage
pipelines.  The applicants have been required to conduct detailed
geotechnical studies prior to issuance of the Land Use Permitn and
Coastal Development Permit in order to create acceptable mitigations
to decrease the risk of such an occurrence.  In addition, the County
has coordinated a rigorous review of the final engineering plans for
the major river crossings.  The residual risk is considered
acceptable due to the level of mitigation imposed and the need for
the pipeline to cross major rivers.

1C.  Clearing of vegetation

Numerous sensitive plants will be removed to clear a 100-foot
right-of-way for construction vehicles; fifty feet of this
right-of-way will remain clear of larger vegetation during
operations for maintenance purposes.  The majority of the vegetation
removed will be recultivated after construction is complete.
Although it will take many years for certain types of vegetation to
regain their previous stature, this impact is nevertheless
temporary, and limited to the 100-foot ROW.  The residual impact is
considered acceptable due to the projects need for clear
construction and operation ROWs.

1D.  Disturbance of Cultural Resources

The approved pipeline route is conditioned to avoid to the extent
feasible all known archaeological sites.  Where specific sites or
sensitive resources are unavoidable, the pipeline corridor will be
narrowed to minimize impacts.  In addition, conditions in the L
section provide for the participation of Native Amercian
representatives and the proper recording of all sites to be
disturbed.  The residual disturbance impacts, while significant to
the Native Americans, are considered acceptable since all feasible
mitigations have been employed.

Exhibit 59

Planning Commission Actions                                    Page 52
Celeron Pipeline Final Development Plan                  March 3, 1986

1E.   Visual - Sisquoc Pump Station

The Sisquoc pump station will cover approximately 5 1/2 acres on a grassy plain on private lands near the town of Sisquoc. The facility will be visible from Foxen Canyon Road and a nearby ranch house. Conditions M-1 and M-4 have been included to assure adequate screening of the facility. The residual impact results primarily from the contrast between the existing flat grassy plain and the height of the necessary screening; it is acceptable because of the project's need for the pump station.

1F.   Construction-related noise impacts

Some residents along the route will experience noise levels of more than 60 dBA during construction. While such levels exceed County standards, the duration of the elevated noise levels will be approximately one to two weeks at any given location. In addition, construction activities will be limited to the hours of 7 a.m. to 7 p.m. The impacts are therefore considered acceptable because they are temporary and local in nature.

1G.   Cumulative Housing Impacts

The identified impact has been mitigated by the specified conditions to the extent that the project contributes to the impact. Many of these conditions have been placed on other oil and gas industry projects approved by Santa Barbara County, and require pro-rata participation. The residual impact is considered acceptable since denying these projects would have a worse overall effect, as stated in each project's Statements of Overriding Considerations.

1H.   Impacts Outside County Jurisdiction

Mitigation of these anticipated impacts is wholly within the responsibility and jurisdiction of the permitting agency(ies) identified in the Class I Impact Summary Table, and is not within the permit jurisdiction of the County. Mitigation measures should be included as permit conditions in the appropriate agency's permit which will follow County action on this project. Implementation of the mitigation measures must reduce the impact to the maximum feasible extent.

3.2   Class II Impacts

The numbers in the CEQA Findings column on the Class II Impact Summary Table refer to findings in this section.

Exhibit 59

Planning Commission Actions                                    Page 53
Celeron Pipeline Final Development Plan                    March 3, 1986

> CEQA FINDINGS #2 - 8: Impacts identified as Class II have
>                       been eliminated or substantially lessened
>                       where feasible.

The impacts identified have been eliminated or substantially lessened to
a level of insignificance through the incorporation of feasible
mitigation measures.  These measures have been incorporated as mandatory
permit conditions.

> CEQA FINDING #9: Certain impacts identified as Class II can be
>                  eliminated or substantially lessened by other
>                  agencies with jurisdiction outside the County.

Mitigation of these anticipated impacts is wholly or partially within the
responsibility and jurisdiction of the permitting agency(ies) identified
in the Class II Impact Summary Table, and is not within the permit
jurisdiction of the County.  The identified mitigation measure should be
included as a permit condition in the appropriate agency's permit which
will follow County action on this project.  Implementation of the
mitigation measure will eliminate and reduce the impact to a level of
insignificance.

If the permitting agency with authority to require the suggested
mitigation measure does not incorporate the measure as a permit
condition, or if the mitigation measure is determined to be infeasible by
the permitting agency, then the impact will remain significant.  The
County shall reexamine these conditions after consultation with the
permitting agencies prior to final action on the permit, and will modify
the mitigatiion measures or CEQA Findings as necessary.

Those impacts which are partially within the jurisdiction of Santa
Barbara County have been mitigated to the maximum extent feasible by the
County.


3.3  Project Alternatives

The EIR/S studied a number of different route segments which could be
combined to form a pipeline to the desired destination.  Two routes were
studied as proposed projects (one for each applicant) and numerous others
were studied on a project-alternative level.  This section addresses all
routes examined in the EIR which were not chosen.

> CEQA FINDING #10:  The project alternatives not chosen are either
>                    not feasible, not environmentally preferable or
>                    not as beneficial as the proposed project.

(a)  No-Project Alternative

The impacts presented for the Celeron proposal would be avoided by
the no-project alternative, in which no pipeline is constructed.
However, implementation of this alternative would cause additional

Exhibit 59

EXHIBIT 3

impacts as a result of the expanded marine tanker traffic which would necessarily occur without a pipeline.  Current County policy allows the use of marine tankers to transport crude to destinations not served by pipeline or until such a pipeline is operational.  Under the no-project alternative, virtually no destinations would be served by pipeline, so the vast majority of locally produced crude would be transported by tanker.

Tanker transport would have many adverse impacts, primarily in the areas of air quality, socioeconomics and oil spill risk.  These impacts are discussed more fully in the Getty Gaviota Consolidated Coastal Facility FEIR (ERT, 1985), the Santa Ynez Unit/Las Flores Canyon Development and Production Plan (SAI 1984) and the Oil Transportation Plan EIR (ADL, WCC, 1984).

County policy favors pipelines as the primary means for transporting crude oil, based on the relative impacts of pipelines and marine tankering.  The environmental benefits of pipeline use outweigh the environmental risks associated with the lack of a pipeline.

(b)  Segment alternatives

The approved pipeline right-of-way can be divided into five segments for which alternatives were studied.  Chapter 5 of the staff report includes a point-by-point comparison of the preferred and alternative routes for each of these segments; that discussion is incorporated herein by reference.  In addition, much shorter alternatives were considered during the course of the hearings, and the discussion of those alternatives is included in the record and in the EIR/S addendum.  Although there may be segments where a different alternative is less environmentally damaging, these isolated segments are infeasible because the pipeline must be continuous; each chosen segment must join to form the pipeline corridor.  Overall, the route chosen is environmentally preferable to any complete alternative route.

(c)  Buellton Alternatives

Two alternative corridors through the Buellton area were considered, but not chosen.  These are the eastern route (existing easement) and the McMurray Road route.  Construction of a pipeline along either of these corridors would involve extensive disruption of commercial areas, and would greatly inconvenience local residents.  In the case of an accidental oil spill on either of these two routes, contamination of the Buellton area water supply is more likely than if a spill occurred on the westerly approved route.  In addition, the habitats which will be disturbed on the western route are not particularly sensitive.  The Commission therefore finds that the two eastern routes through Buellton are more environmentally damaging than the western route.

Exhibit 59

3.4  Benefits of the Project

The primary benefit of the project is that it will provide a means of
transporting crude oil out of Santa Barbara County which is
environmentally preferable to marine tankering.  This preference is
supported in three recently certified environmental documents (OTP; Exxon
SYU FEIR/S; Texaco (Getty) CCF FEIR), and the documentation is
incorporated herein by reference.  In addition, the Overriding
Considerations described in Section 3.5 below identify benefits of the
project.

3.5  Statement of Overriding Considerations

CEQA FINDING 11:   The unavoidable significant impacts of the
                   project are found to be acceptable due to
                   overriding considerations.

We recognize the adverse significant impacts of the project represent
important concerns and that they have the potential to substantially
degrade the quality of the human and physical environment in parts of
Santa Barbara County unless substantial mitigation measures can be
implemented.  In particular, the project will cause:  the loss of many
mature oaks and riparian vegetation; loss of Hoffman's Nightshade,
Refugio Manzanita and Catalina Mariposa lillies; visual impacts at the
Sisquoc pump station and in the Los Padres National Forest; potential
disturbance to at least eight cultural resource sites; exceedances of
County noise standards during construction; potential oil spills impacts;
and a contribution to the housing shortage anticipated due to the
cumulative effect of development.

Although mitigation measures cannot completely eliminate the above
mentioned impacts, many conditions have been attached to approval to
ensure that they are mitigated as completely as possible.

The County recognizes that Federal policy regarding the leasing of
offshore oil requires action on the part of the County in order to
minimize the adverse impacts of that leasing on the County.  In its Oil
Transportation Plan, the County studied alternative methods of moving
locally produced crude oil from Santa Barbara County to various refinery
destinations.  The study concluded that pipelines should be the preferred
means of transporting crude oil.  The primary alternative to pipelines is
marine tankering.  Expanded marine transport would cause adverse
significant, long-term impacts to the County in the areas of air quality,
socioeconomics and oil spill risk (OTP, Exxon, SYU FEIS/R, Texaco GCCF
FEIR).  The County therefore amended and changed its coastal policies to
encourage the use of pipelines in an effort to minimize the overall
impacts of federal offshore leasing.

Exhibit 59

It is therefore the County's desire to permit pipelines which will serve local producers' refineries, thereby diverting oil from marine tankers to pipelines.  The proposed project does serve appropriate refineries located in Texas.  The Planning Commission finds that permitting the project will help minimize the adverse impacts of offshore production.

The Planning Commission has considered the unavoidable significant effects of the project described in Sections 3.1 and 3.2 above, and the benefits of the project described in Section 3.4 above.

The Commission finds that in balancing the projects benefits against its unavoidable environmental risks, the benefits outweigh the environmental risks.  Upon due reflection and consideration we find the substantial benefits provided by the project outweigh the significant environmental impacts.  In particular, we note that the pipeline will reduce the need for marine tankering of locally produced crude oil, thus satisfying County policies which favor the use of pipelines.


### 4.0   ADDITIONAL FINDINGS

The Planning Commission realizes that there are unique construction timing constraints associated with the Celeron pipeline project.  In approving this Final Development Plan, several conditions with prior to start-up compliance timing were approved.  The Planning Commission finds that the timing of these conditions is acceptable only because of these unique timing considerations.


EC:5521e

Exhibit 59

# EXHIBIT 5

**OSFM LINE ID NO. 0015**
**LINE 324 (LAS FLORES TO GAVIOTA 24")**
**RESTART PLAN**

## 1    Introduction

The following plan is intended to comply with the portions of Sections IX. (Injunctive Relief) and X. (Corrective Action Order) of the Consent Decree (Civil Action No. 2:20-cv-02415) applicable to the restart of Line 324[1] (California Office of the State Fire Marshal [OSFM] Line ID No. 0015 – Las Flores to Gaviota 24").  Section IX of the Consent Decree refers to Appendix B, which contains three requirements specific to a restart of Line 324:

- Article I, Section 1.A. concerning the application for a California State Waiver for Line 324;
- Article I, Section 2.B. allowing for the restart of Line 324 in accordance with the Consent Decree (including Appendix D) and applicable Law; and
- Article II, Section 12.A. Listing specific Control Room Management-related actions to be taken in the event of a restart.

Section X of the Consent Decree refers to Appendix D, which contains a section (1.b.) that requires the development of a Restart Plan specifically for Line 324, lists the required contents of the Plan and stipulates that the Plan must be submitted to the California OSFM at least 60-days in advance of a planned restart of Line 324.

Pacific Pipeline Company (PPC or the Operator) has prepared this Restart Plan and it is generally organized to follow the order of requirements in Appendix D of the Consent Decree.  The requirements of the sections of Appendix B applicable to a restart are included as appropriate within the Restart Plan elements. Consent Decree provisions related to pipeline restart are included here in *italic, underlined text* for reference.

## 2    Line 324 Restart Plan

Each of the required elements of the Restart Plan for Line 324 (found in Appendix D) are addressed below.

---

[1] The consent decree references Lines 901 and 903.  These line designations have since changed to Line 324 and 325 respectively and are referenced accordingly throughout this Restart Plan.

*2.1    Mandated Action Documentation and Management of Change Plan (**Appendix D, Section 1.b.1**)*

*Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into [the Operator's] operations and maintenance procedures manual*

For the purposes of this Restart Plan, PPC understands that "mandated actions" include:

- Those actions mandated by the Consent Decree that are applicable to the existing, non-operating Line 324 that is to be restarted;

- Those actions mandated by federal and state pipeline safety laws and regulations that are applicable to the existing, non-operating Line 324 that is to be restarted; and

- Documentation of procedural modifications to comply with the Consent Decree will be addressed in the operations and maintenance  (O&M) manual and integrity management plan (IMP) to comply with the management of change requirement of the Consent Decree.

2.1.a)    *Actions Mandated by the Consent Decree*

Those actions mandated by the Consent Decree that are applicable to the existing, non-operating Line 324 that is to be restarted.  These include:

- Consent Decree, Appendix B, Article I, Section 1.A.: Apply for and obtain a State Waiver for Line 324

- Consent Decree, Appendix B, Article I, Section 2.B.: Restart existing Line 324 in accordance with Appendix D and Applicable Law.

  This Restart Plan addresses all the restart requirements included in Appendix D to the Consent Decree.

- Consent Decree, Appendix D, Section 1.b.: Restart Plan for Line 324.

  This Restart Plan was prepared to comply with this requirement and addresses the restart requirements included in Appendix D to the Consent Decree

- Consent Decree, Appendix B, Section 12.A: Control Room Management provisions prior to restart.

  This Restart Plan includes documentation that the requirements of Section 12.A have been or will be implemented prior to restart, including point-to-point verification reviews for all components of the Pipeline's SCADA system, any necessary updates to piping and instrumentation diagrams, software, manuals, and operating procedures to reflect existing field configuration, confirmation that all "Lo-Lo" and "Hi-Hi" SCADA alarms are configured and programmed as critical safety-related alarms for pressures

and flows and that such notifications are correct and accurate, updating the names of all facilities, equipment, devices, measurement points, and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions, and implementation of the Control Room Management Plan measures and Control Center General Procedures referenced in Paragraph 23(a) of the Consent Decree.  See also further discussion of Control Room enhancements in Section 2.5 of this Restart Plan.

### 2.1.b)  *Actions Mandated by Federal and State Pipeline Safety Laws*

Those actions mandated by federal and state pipeline safety laws and regulations that are applicable to the existing, non-operating Line 324 that is to be restarted will be taken.

### 2.1.c)  *Management of Change Plan*

The "management of change plan" is understood to include those mandated actions that require procedural modifications to the O&M Manual and IMP to comply with the Consent Decree.  The list of O&M procedures and IMP modifications required as a result of the Consent Decree will be provided separately.

*2.2*   *Provisions for adequate patrolling of Line 324 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours (**Appendix D, Section 1.b.2**)*

The restart of Line 324 and Line 325 will take place in phases governed by the Start-Up Instructions in the Pipeline Specific Operating Manual for Line 324 and Line 325.  During flow restart, the pipelines will be brought up to operating pressure in stages.  Each stage will be a pressure increment which will be held for a minimum of two hours before proceeding to a higher-pressure increment. During the hold period between pressure increments, the line pressures will be monitored for any fluctuation.  Only once the pressure has remained steady for a minimum of two hours will the next pressure stage be initiated.

If at any time, there is any indication that either pipeline is not holding pressure, both will be shut in and the reason for the pressure drop investigated and corrected before continuing.  During this phase, the pressure restrictions for Line 324 and Line 325 set forth in the Consent Decree (Appendix D – 1.c. and 1.g.) will be followed.

A more detailed Surveillance Plan for the restart of Line 324 will be provided.

*2.3*   *Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes (**Appendix D, Section 1.b.3**)*

The specific actions planned for pipeline surveillance during the restart of Line 324 will be provided in the Surveillance Plan for the restart of Line 324.

*2.4*     *A specific day-light restart that includes advance communications with local emergency response officials (**Appendix D, Section 1.b.4**)*

Phased restart of Lines 324 and 325 will be initiated during daylight hours  and advance communications and as well as communications during the restart effort will be coordinated with local emergency response officials.  These communications and the list of local agencies that will be contacted are more completely described in the Surveillance Plan.

*2.5*     *Master Control Room enhancements (**Appendix D, Section 1.b.5**)*

Section 1.b.5 of Appendix D to the Consent Decree lists six Master Control Room Enhancements that must be completed and documented prior to restart.  The following is a list of those enhancements and the actions taken and documentation demonstrating compliance.

2.5.a)   *Implementation of advanced leak-detection capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:*

*2.5.a)1. Revised alarm threshold adjustments*

Prior to restart, PPC will complete installation of addition of pressure and temperature monitoring instrumentation, additional flow measurement meters, and implementation of a Real Time Transient Model (RTTM)-based Computational Pipeline Monitoring (CPM) system along with an automated shutoff system (ASOS) for leak detection and response.  The instrumentation along with the RTTM leak detection and ASOS systems will be installed prior to restart.  Alarm thresholds for the RTTM leak detection system will be determined using API TR 1149 and will be implemented prior to initiating the restart of Line 324.  The alarm thresholds will be revised using operational data after resumption of pipeline operations.  These efforts are further enhanced by the installation of a new flow meter (tied into SCADA) at the termination of the pipeline segment at Gaviota Station which along with the existing flow meter at Las Flores Station provides comparative data at each end of the Las Flores and Gaviota pipeline segment.

*2.5.a)2. Additional required instrumentation; installation of additional safety valves as a result of the 2021 EFRD evaluation*

PPC will install seven (7) new "safety" valves along Line 324.  The number, type, function, and locations of these safety valves were determined by an Emergency Flow Restricting Device (EFRD) evaluation in compliance with the Consent Decree.  PPC has so far, despite substantial efforts, been unable to obtain the land use authorizations from Santa Barbara County to install additional valves in the county.  PPC's efforts to obtain such authorizations continue, and PPC will install the valves as soon as practicable once necessary authorizations are obtained.  It is possible that authorizations may occur after restart, in which case, PPC will schedule valve installation on a reasonable timeline and in safe coordination with other ongoing operations and maintenance activities.

2.5.b) *Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;*

Prior to restart, offline hydraulic models of the pipeline will be used to configure alarm setpoints for pressures and flow transmitters at all locations along the pipeline.  Operational data will be used to tune these setpoints after resumption of pipeline operations.  All alarm setpoints will be validated and approved by a pipeline integrity engineer and control room manager prior to implementation.

2.5.c) *Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories*

All associated alarm set point values, alarm descriptors and alarm priorities will be reviewed during the alarm rationalization process.  Additionally, all Safety Related Alarm (SRA) setpoints will be validated and approved by a pipeline integrity engineer and control room manager prior to implementation.

2.5.d) *Implementation of emergency shutdown programming associated with Line 324 that can be executed by the Shift Supervisor or Controller*

An automated shut off system (ASOS) that will initiate a shutdown sequence on the pipeline segment, automatically upon receipt of a rupture alarm, without Operator action will be installed to safely shut down and isolate Line 324 in response to identified alarm criteria.  This will specifically include a rupture alarm from either the installed RTTM CPM system in the Pipeline Control Center or other rupture detection systems deployed on the pipeline, without Operator action.  The ASOS will consist of a sequence programmed in the SCADA system that will first automatically de-energize the pumping equipment and then close the remotely actuated valves to isolate the pipeline in response to a rupture alarm.  The sequence will also be available for activation by the pipeline controller or shift supervisor to rapidly shut down the system any time the controller or shift supervisor questions the integrity of the pipeline.

2.5.e) *Development and implementation of training associated with the emergency shutdown programming described above; and*

The ASOS training curriculum shall include the following: System Design & Operation; Alarm Response, including emergency notifications; Returning to Normal Operations; Drills & Testing.

2.5.f) *Provision of additional controller training that incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident*

Training procedures for the proper interpretation of operating parameters and alarms, abnormal operations scenarios, and consequences for incorrect operation for Line 324, including alarm set-point revisions for conditions similar to the Refugio Incident will be followed.

2.6    *Elimination and documentation of actions taken to prevent inappropriate un-commanded Valve 460 (Sisquoc Conoco) status and position changes (**Appendix D, Section 1.b.6**)*

This provision of the Consent Decree is not applicable to the Line 324 Restart Plan as Valve 460 (Sisquoc Conoco) is located at Sisquoc Pump Station, which is not part of the Line 324 pipeline segment (Las Flores to Gaviota).  The requirements of this provision of Appendix D to the Consent Decree are addressed in the Line 325 Restart Plan, as Sisquoc Station is part of the Line 325 pipeline segment (Gaviota to Sisquoc to Pentland).

2.7    *Installation of additional safety valves as a result of the Operator's EFRD evaluation (**Appendix D, Section 1.b.7**)*

Please refer to *Section 2.5.a)2.* above for a discussion of the EFRD evaluation and the installation of additional safety valves.

2.8    *Installation of additional pressure sensors as a result of the Operator's surge study (**Appendix D, Section 1.b.8**)*

Please refer to *Section 2.5.a)1.* above for a discussion of MOVs, fitted with pressure sensors on both the upstream and downstream ends, that will be installed.

2.9    *Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. The Operator shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run (**Appendix D, Section 1.b.9**)*

After completion of the restart activities, and within seven working days after steady-state operation is achieved in Line 324, an in-line inspection (ILI) of the pipeline will be conducted utilizing an Ultrasonic Tool (UT) in accordance with an ILI schedule approved by the OSFM.  The tool run will be conducted during daylight hours.

If, upon completion of the tool run, it is discovered that the tool failed to record the required data for all or a portion of the Line 324 pipeline segment, then the ILI tool run will be repeated as soon as possible after this discovery.  Once the tool run is determined to have produced a complete data set, the tool vendor will provide a preliminary report within 30 days.  The final preliminary report will be reviewed and analyzed within 15 days of receipt.  Any immediate repairs identified by the analysis of this data report will be addressed in accordance with 49 CFR 195.452(h)(4) and the Integrity Management Plan.

2.10    *Corrosion Prevention. The Operator shall include a long-term plan to address corrosion under insulation (CUI) on Line 324 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. The Operator may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c)* (**Appendix D, Section 1.b.10**)

This provision of Appendix D to the Consent Decree requires that a Corrosion Under Insulation (CUI) Prevention Plan be prepared and included in the Restart Plan.  The CUI Prevention plan shall meet the requirements of 49 CFR Part 195 Subpart H (Corrosion Control).  The Provision allows corrosion prevention via any method approved by the OSFM, including, but not limited to the provisions contained in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, Amendment Number 3, Section 2 (a) – (c), the relevant portions of which include:

*2b.  Repair or recoat the compromised portions of Line 324;*

This is not feasible because the presence of insulation and its associated shielding limits the effectiveness of cathodic protection (CP).  Repair or recoat won't address inadequate or ineffective CP on Line 324.

*2c.  Submit a request for a special permit in advance of a schedule start-up in accordance with 49 CFR 190.341.  It must include a long-term continuous monitoring plan to address the ineffective CP under insulation.  At a minimum, the plan must contain provisions to mitigate the threat of CUI including all of the following:*

- o *Accelerated reassessments;*
- o *Usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking;*
- o *Coordination of data from the appropriate alternating ILI technologies;*
- o *More stringent repair criteria targeted at CUI; and*
- o *Advanced data analysis techniques to account for potential growth of CUI including interaction criteria for anomaly assessment.*

Article I, Section 1.A. requires application for a State Waiver through the OSFM for the limited effectiveness of cathodic protection and receipt of the State Waiver prior to restarting Line 324. PPC submitted an application for a state waiver on July 10, 2023. The proposed waiver criteria

Line 324 Restart Plan
Page 7 of 8

will allow for identification of external metal loss and includes stringent repair criteria that requires repairs for any anomaly greater than or equal to 40%, taking into considerations ILI tool tolerance. Issuance by OSFM of a State Waiver for the limited effectiveness of cathodic protection on Line 324 will address this requirement of the Restart Plan.



# EXHIBIT 6

**OSFM LINE ID NO. 0001**
**LINE 325 (GAVIOTA TO SISQUOC 30" AND SISQUOC TO PENTLAND 30" SEGMENTS)**
**RESTART PLAN**

## 1    Introduction

The following plan is intended to comply with the portions of Sections IX. (Injunctive Relief) and X. (Corrective Action Order) of the Consent Decree (Civil Action No. 2:20-cv-02415) applicable to the restart of Line 325 A/B[1] (California Office of the State Fire Marshal [OSFM] Line ID No. 0001 – Gaviota to Sisquoc 30" and Sisquoc to Pentland 30" segments).  Section IX. of the Consent Decree refers to Appendix B, which contains three requirements specific to a restart of Line 325:

- Article I, Section 1.B. concerning the application for a California State Waiver for Line 325;
- Article I, Section 2.B. allowing for the restart of segments of Line 325 in accordance with the Consent Decree (including Appendix D) and applicable Law; and
- Article II, Section 12.A. Listing specific Control Room Management-related actions to be taken in the event of a restart.

Section X. of the Consent Decree refers to Appendix D, which contains a section (1.f.) that requires the development of a Restart Plan specifically for Line 325, lists the required contents of the Plan and stipulates that the Plan must be submitted to the California OSFM at least 60-days in advance of a planned restart of Line 325.

Pacific Pipeline Company (PPC or the Operator) has prepared this Restart Plan and it is generally organized to follow the order of requirements in Appendix D of the Consent Decree.  The requirements of the sections of Appendix B applicable to a restart are included as appropriate within the Restart Plan elements. Consent Decree provisions related to pipeline restart are included here in *italic, underlined text* for reference.

## 2    Line 325 Restart Plan

NOTE: As stated in Appendix D, Section 1.f. (Restart Plan for Line 325), "*In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include...*"  Subparagraphs 1.b.1)-11) [sic] refer the Restart Plan for Line 324 Las Flores to Gaviota 24" (OSFM Line ID No. 0015).  For simplicity, the required elements of the Restart Plan for Line 325 that are included in subparagraphs 1.b.1)-11) [sic] are listed in order and the subparagraph citations are left intact.  The requirement provided in subparagraph 1.b.6) is associated with Line 325 and is listed in order below.

---

[1] The consent decree references Lines 901 and 903.  These line designations have since changed to Line 324 and 325 respectively and are referenced accordingly throughout this Restart Plan.

Each of the required elements of the Restart Plan for Line 325 (found in Appendix D) are addressed below.

*2.1*    *Mandated Action Documentation and Management of Change Plan (**Appendix D, Section 1.b.1**)*

*Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into [the Operator's] operations and maintenance procedures manual*

For the purposes of this Restart Plan, PPC understands that "mandated actions" include:

- Those actions mandated by the Consent Decree that are applicable to the existing, non-operating Line 325 that is to be restarted;

- Those actions mandated by federal and state pipeline safety laws and regulations that are applicable to the existing, non-operating Line 325 that is to be restarted; and

- Documentation of procedural modifications to comply with the Consent Decree will be addressed in the operations and maintenance (O&M) manual and integrity management plan (IMP) to comply with the management of change requirement of the Consent Decree.

2.1.a)    *Actions Mandated by the Consent Decree*

Those actions mandated by the Consent Decree that are applicable to the existing, non-operating Line 325 that is to be restarted.  These include:

- Consent Decree, Appendix B, Article I, Section 1.B.: Apply for and obtain a State Waiver for Line 325

- Consent Decree, Appendix B, Article I, Section 2.B.: Restart existing Line 325 in accordance with Appendix D and Applicable Law.

  This Restart Plan addresses all the restart requirements included in Appendix D to the Consent Decree.

- Consent Decree, Appendix D, Section 1.f.: Restart Plan for Line 325.

  This Restart Plan was prepared to comply with this requirement and addresses the restart requirements included in Appendix D to the Consent Decree

- Consent Decree, Appendix B, Section 12.A: Control Room Management provisions prior to restart.

  This Restart Plan includes documentation that the requirements of Section 12.A have been or will be implemented prior to restart, including point-to-point verification reviews for all components of the Pipeline's SCADA system, any necessary updates to

piping and instrumentation diagrams, software, manuals, and operating procedures to reflect existing field configuration, confirmation that all "Lo-Lo" and "Hi-Hi" SCADA alarms are configured and programmed as critical safety-related alarms for pressures and flows and that such notifications are correct and accurate, updating the names of all facilities, equipment, devices, measurement points, and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions, and implementation of the Control Room Management Plan measures and Control Center General Procedures referenced in Paragraph 23(a) of the Consent Decree.  See also further discussion of Control Room enhancements in Section 2.5 of this Restart Plan.

### 2.1.b)  *Actions Mandated by Federal and State Pipeline Safety Laws*

Those actions mandated by federal and state pipeline safety laws and regulations that are applicable to the existing, non-operating Line 325 that is to be restarted will be taken.

### 2.1.c)  *Management of Change Plan*

The "management of change plan" is understood to include those mandated actions that require procedural modifications to the O&M Manual and IMP to comply with the Consent Decree.  The list of O&M procedures and IMP modifications required as a result of the Consent Decree will be provided separately.

### 2.2  *Provisions for adequate patrolling of Line 324 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours (Appendix D, Section 1.f.1)*

The restart of Line 324 and Line 325 will take place in phases governed by the Start-Up Instructions in the Pipeline Specific Operating Manual for Line 324 and Line 325.  During flow restart, the pipelines will be brought up to operating pressure in stages.  Each stage will be a pressure increment which will be held for a minimum of two hours before proceeding to a higher-pressure increment.  During the hold period between pressure increments, the line pressures will be monitored for any fluctuation.  Only once the pressure has remained steady for a minimum of two hours will the next pressure stage be initiated.

If at any time, there is any indication that either pipeline is not holding pressure, both will be shut in and the reason for the pressure drop investigated and corrected before continuing.  During this phase, the pressure restrictions for Line 324 and Line 325 set forth in the Consent Decree (Appendix D – 1.c. and 1.g.) will be followed.

A more detailed Surveillance Plan for the restart of Line 325 will be provided.

*2.3* *Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes (**Appendix D, Section 1.f.2**)*

The specific actions planned for pipeline surveillance during the restart of Line 325 will be provided in the Surveillance Plan for the restart of Line 325.

*2.4* *A specific day-light restart that includes advance communications with local emergency response officials (**Appendix D, Section 1.f.3**)*

Phased restart of Lines 324 and 325 will be initiated during daylight hours and advance communications as well as communications during the restart effort will be coordinated with local emergency response officials.  These communications and the list of local agencies that will be contacted are more completely described in the Surveillance Plan.

*2.5* *Master Control Room enhancements (**Appendix D, Section 1.b.5**)*

Section 1.b.5 of Appendix D to the Consent Decree lists six Master Control Room Enhancements that must be completed and documented prior to restart.  The following is a list of those enhancements and the actions taken and documentation demonstrating compliance.

2.5.a) *Implementation of advanced leak-detection capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:*

*2.5.a)1. Revised alarm threshold adjustments*

Prior to restart, PPC will complete installation of addition of pressure and temperature monitoring instrumentation, additional flow measurement meters, and implementation of a Real Time Transient Model (RTTM)-based Computational Pipeline Monitoring (CPM) system along with an automated shutoff system (ASOS) for leak detection and response.  The instrumentation along with the RTTM leak detection and ASOS systems will be installed prior to restart.  Alarm thresholds for the RTTM leak detection system will be determined using API TR 1149 and will be implemented prior to initiating the restart of Line 325.  The alarm thresholds will be revised using operational data after resumption of pipeline operations.  These efforts are further enhanced by the installation of a new flow meter (tied into SCADA) at the termination of the pipeline segment at Pentland Station which along with the existing flow meters at Sisquoc and Gaviota Stations provides comparative data at each end of the Gaviota to Sisquoc and Sisquoc to Pentland pipeline segments.

*2.5.a)2. Additional required instrumentation; installation of additional safety valves as a result of the 2021 EFRD evaluation*

PPC will install twenty (20) new "safety" valves along Line 325.  The number, type, function, and locations of these safety valves were determined by an Emergency Flow Restricting Device (EFRD) evaluation in compliance with the Consent Decree.  PPC has so far, despite

substantial efforts, been unable to obtain the land use authorizations from Santa Barbara County to install additional valves in the county.  PPC's efforts to obtain such authorizations continue, and PPC will install the valves as soon as practicable once necessary authorizations are obtained.  It is possible that authorizations may occur after restart, in which case, PPC will schedule valve installation on a reasonable timeline and in safe coordination with other ongoing operations and maintenance activities.

2.5.b)    *Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;*

Prior to restart, offline hydraulic models of the pipeline will be used to configure alarm setpoints for pressures and flow transmitters at all locations along the pipeline.  Operational data will be used to tune these setpoints after resumption of pipeline operations.  All alarm setpoints will be validated and approved by a pipeline integrity engineer and control room manager prior to implementation.

2.5.c)    *Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories*

All associated alarm set point values, alarm descriptors and alarm priorities will be reviewed during the alarm rationalization process.  Additionally, all Safety Related Alarm (SRA) setpoints will be validated and approved by a pipeline integrity engineer and control room manager prior to implementation.

2.5.d)    *Implementation of emergency shutdown programming associated with Line 325 that can be executed by the Shift Supervisor or Controller*

An automated shut off system (ASOS) that will initiate a shutdown sequence on the pipeline segment, automatically upon receipt of a rupture alarm, without Operator action will be installed to safely shut down and isolate Line 325 in response to identified alarm criteria.  This will specifically include a rupture alarm from either the installed RTTM CPM system in the Pipeline Control Center or other rupture detection systems deployed on the pipeline, without Operator action.  The ASOS will consist of a sequence programmed in the SCADA system that will first automatically de-energize the pumping equipment and then close the remotely actuated valves to isolate the pipeline in response to a rupture alarm.  The sequence will also be available for activation by the pipeline controller or shift supervisor to rapidly shut down the system any time the controller or shift supervisor questions the integrity of the pipeline.

2.5.e)  *Development and implementation of training associated with the emergency shutdown programming described above; and*

The ASOS training curriculum shall include the following: System Design & Operation; Alarm Response, including emergency notifications; Returning to Normal Operations; Drills & Testing.

2.5.f)  *Provision of additional controller training that incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident*

Training procedures for the proper interpretation of operating parameters and alarms, abnormal operations scenarios, and consequences for incorrect operation for Line 325, including alarm set-point revisions for conditions similar to the Refugio Incident will be followed.

2.6  *Elimination and documentation of actions taken to prevent inappropriate un-commanded Valve 460 (Sisquoc Conoco) status and position changes (**Appendix D, Section 1.b.6**)*

Per the process flow diagram for Sisquoc Station and internal verification, Valve 460 is not on the 30-inch diameter Line 325 pipeline, but rather it is on the 12-inch diameter Line 300 pipeline owned by Phillips 66 between Sisquoc Station and the Santa Maria refinery.  Given the closure of the Santa Maria refinery, this valve will not be used.  The Line 300 connection to Sisquoc Station has been disconnected (air-gapped and isolated) from both Sisquoc Station and Line 325.  Documentation of the isolation of this pipeline and valve is maintained in the station file.

2.7  *Installation of additional safety valves as a result of the Operator's EFRD evaluation (**Appendix D, Section 1.b.7**)*

Please refer to *Section 2.5.a)2.* above for a discussion of the EFRD evaluation and the installation of additional safety valves.

2.8  *Installation of additional pressure sensors as a result of the Operator's surge study (**Appendix D, Section 1.b.8**)*

Please refer to *Section 2.5.a)1.* above for a discussion of MOVs, fitted with pressure sensors on both the upstream and downstream ends, that will be installed.

*2.9*    *Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. The Operator shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run (**Appendix D, Section 1.b.9**)*

After completion of the restart activities, and within seven working days after steady-state operation is achieved in Line 325, an in-line inspection (ILI) of the pipeline will be conducted utilizing an Ultrasonic Tool (UT) in accordance with an ILI schedule approved by the OSFM.  The tool run will be conducted during daylight hours.

If, upon completion of the tool run, it is discovered that the tool failed to record the required data for all or a portion of the non-operating Line 325 pipeline segment, then the ILI tool run will be repeated as soon as possible after this discovery.  Once the tool run is determined to have produced a complete data set, the tool vendor will provide a preliminary report within 30 days.  The final preliminary report will be reviewed and analyzed within 15 days of receipt.  Any immediate repairs identified by the analysis of this data report will be addressed in accordance with 49 CFR 195.452(h)(4) and the Integrity Management Plan.

*2.10*    *Corrosion Prevention. The Operator shall include a long-term plan to address corrosion under insulation (CUI) on Line 325 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. The Operator may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c) (**Appendix D, Section 1.b.10**)*

This provision of Appendix D to the Consent Decree requires that a Corrosion Under Insulation (CUI) Prevention Plan be prepared and included in the Restart Plan.  The CUI Prevention plan shall meet the requirements of 49 CFR Part 195 Subpart H (Corrosion Control).  The Provision allows corrosion prevention via any method approved by the OSFM, including, but not limited to the provisions contained in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, Amendment Number 3, Section 2 (a) – (c), the relevant portions of which include:

- *2b.  Repair or recoat the compromised portions of Line 325;*

    This is not feasible because the presence of insulation and its associated shielding limits the effectiveness of cathodic protection (CP).  Repair or recoat won't address inadequate or ineffective CP on Line 325.

- *2c.  Submit a request for a special permit in advance of a schedule start-up in accordance with 49 CFR 190.341.  It must include a long-term continuous monitoring plan to address the ineffective CP under insulation.  At a minimum, the plan must contain provisions to mitigate the threat of CUI including all of the following:*

  - *Accelerated reassessments;*
  - *Usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking;*
  - *Coordination of data from the appropriate alternating ILI technologies;*
  - *More stringent repair criteria targeted at CUI; and*
  - *Advanced data analysis techniques to account for potential growth of CUI including interaction criteria for anomaly assessment.*

Article I, Section 1.B. requires application for a State Waiver through the OSFM for the limited effectiveness of cathodic protection and receipt of the State Waiver prior to restarting Line 325. Pacific Pipeline Company submitted an application for a state waiver on July 10, 2023. The proposed waiver criteria will allow for identification of external metal loss and includes stringent repair criteria that requires repairs for any anomaly greater than or equal to 40%, taking into considerations ILI tool tolerance.  Issuance by OSFM of a State Waiver for the limited effectiveness of cathodic protection on Line 325 will address this requirement of the Restart Plan.

# EXHIBIT 7



April 1, 2021

Andy Chau
Supervising Pipeline Safety Engineer
**State of California, Office of the State Fire Marshal**
Pipeline Safety Division
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

*Submitted via Overnight Mail and Electronically*

**Subject:   State of California Assembly Bill 864: Coastal Best Available Technology Regulation
               Section 2113 Implementation Plan to Retrofit with Best Available Technology
               OSFM Line ID No. 0015 (Plains Pipeline, L.P. Line 901 Las Flores to Gaviota 24")**

Dear Mr. Chau,

California Code of Regulations (CCR), Title 19, Article 7, Section 2113 requires operators of existing pipelines (located near an environmentally and ecologically sensitive area in the coastal zone) to submit a risk analysis and a plan to retrofit existing pipelines with Best Available Technology (BAT).

In compliance with Section 2113, Plains Pipeline, L.P. ("Plains") is submitting for your review, a risk analysis for the subject pipeline.  The risk analysis identifies BAT intended to limit and reduce the quantity of release in the event of a spill and describes the timetable for implementation and completion of the identified BAT plan.

If you have and questions, comments, concerns, or require additional information, please contact me at

Sincerely,



James Buchanan
HSE Senior Regulatory Specialist

Plains Pipeline, L.P. ■ 333 Clay Street, Suite 1600, Houston, Texas 77002 ■ (713) 646-4100

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 2 of 16

Enclosures:
- Registered Agent for Service Documentation
- Outer Continental Shelf Crude Oil Safety Data Sheet
- Flow Diagrams
- Vicinity Map
- BAT Location Map
- Timetable for Implementation Gantt Chart
- Confidentiality Justification and Redacted Copy


Cc:     Cory Thornton, Plains Pipeline, L.P.
        Erol Alavi, Plains Pipeline, L.P.
        Jon Van Reet, Plains Pipeline, L.P.
        Megan Prout, Plains Pipeline, L.P.
        Ngiabi Gicuhi, Plains Pipeline, L.P.
        Wm. Dean Gore, Jr., Plains Pipeline, L.P.

**Section 2113 Implementation Plan to Retrofit with Best Available Technology**

**OSFM Line ID No. 0015 (Plains Pipeline, L.P. Line 901 Las Flores to Gaviota 24")**

**1. Introductory Material, Certification Statement, and Confidentiality Request**

    a. Operator Information

| | |
|---|---|
| Plains Pipeline, L.P. (Operator) | OSFM ID No. 0015 |
| 333 Clay Street, Suite 1600 | Line 901 Las Flores to Gaviota 24" |
| Houston, Texas 77002 | |

List of contacts and contact information for persons within the operator's company, and any alternates, responsible for overseeing and conducting the risk analysis



Agent for Service of Process designated to receive legal documents on behalf of the operator

Corporation Service Company Which Will Do Business in California as CSC-
Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 4 of 16

b. Certification Statement by an executive within the operator's management structure authorized to fully implement the risk analysis

"*I certify, to the best of my knowledge and belief, under penalty of perjury under the laws of the State of California, that the information contained in this risk analysis is true and correct and that the plan is both effective and feasible.*"

| Signature / Date | Printed Name, Title |
|---|---|
| | Patrick D. Hodgins<br>Vice President, Health, Safety & Environmental |

Certification Statement by a person within the operator's management structure with the requisite training, knowledge, and experience to review a risk analysis for accuracy, effectiveness, and feasibility

"*I certify, to the best of my knowledge and belief, under penalty of perjury under the laws of the State of California, that the information contained in this risk analysis is true and correct and that the plan is both effective and feasible.*"

| Signature / Date | Printed Name, Title |
|---|---|
| | Wm. Dean Gore, Jr., PE<br>Director, Special Projects |

c. Confidentiality Request

The risk analysis, implementation plan, and enclosures contain confidential information exempt from disclosure under the California Public Records Act and other laws.  In accordance with 19 CCR 2119, Plains has attached 1) a document identifying the confidential information and providing legal authority for the exemptions, and 2) a complete copy of this submittal depicting the confidential information as redacted.

2. **Pipeline Description**

a. Relevant pipeline design, construction, and operation information for OSFM Line ID No. 0015 (Line 901 Las Flores to Gaviota 24")

| | |
|---|---|
| Year of Construction: | 1990 |
| Pipeline Diameter: | 24 inches |

Plains2021C-02_0000052

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 5 of 16

| | |
|---|---|
| Length of Pipeline: | 10.8 miles from Las Flores Pump Station to Gaviota Pump Station. Flow diagrams for the Las Flores and Gaviota Pump Stations are enclosed for reference. |
| Pipe Grade: | API 5L, Grade X-60, X-65 |
| Wall Thickness: | 0.344, 0.500 inches |
| Maximum Operating Pressure (MOP): | 1,025 psig |
| Normal Operating Pressure: | 650 psig |
| Pipe Seam: | High frequency electric resistance welded (HF-ERW) long seam manufactured in 1986 by Nippon Steel in Japan. |
| Valves: | 4 valves (3 MOV, 1 check) |
| Elevations: | Las Flores: 193 feet ASL |
| | Gaviota: 201 feet ASL |
| | Low point: 28 feet ASL |
| | High point: 764 feet ASL |
| Coating: | Coal Tar Urethane |
| Insulation: | 1.5 inch thick layer of rigid urethane foam insulation and an outer polyethylene tape. |
| Operating Status: | Line was initially purged on 06/18/2015. Line was cleaned, purged, and filled with nitrogen in the summer of 2017. |
| General Condition of the Pipeline: | Last ILI – DEF/HRMFL 05/06/2015. |



One external corrosion release in 2015.

| | |
|---|---|
| Oil Capacity of the Pipeline: | 30,275 BBLS |

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 6 of 16

| | |
|---|---|
| Product: | Crude Oil – OCS (Outer Continental Shelf); See enclosed SDS for characteristics. |
| Normal Operating Temperature: | 135 degrees Fahrenheit. |

b. Vicinity Map

The Vicinity Map is provided as a dynamic PDF electronic document.  Layers can be turned "on" or "off" and include the following features: distance from the coastal zone, vehicular or rail crossings along the pipeline, nearby residential, commercial, or other populated areas, physical geographic features such as soil and terrain, drainage systems such as small streams and other smaller waterways, potential natural forces inherent in the area, natural and manmade barriers, and potential physical pathways between the pipeline and environmentally and ecologically sensitive areas (EESAs).

c. Seasonal Hydrographic and Climatic Conditions

The risk analysis for Line 901 Las Flores to Gaviota 24" was completed with the inclusion of hydrographic and meteorological conditions specific to the pipeline location. Spill modelling was conducted utilizing United States Geologic Survey (USGS) digital elevation models (DEM) topographic data and water velocity factors (during potential periodic flooding events) to simulate worst-case release scenarios.  As illustrated in the following figure, the relatively short 10.8 mile length of Line 901 lies within a coastal terrace with relatively consistent topographic and climate conditions.  The course of the pipeline is bisected by gradually undulating coastal hills and predominantly intermittent drainages which constitute the southern face of the Santa Ynez mountain range. Average annual rainfall rates of 17.5 to 19.4 inches throughout this coastal terrace contribute to two (2) water courses, Refugio Creek and Arroyo Hondo Creek, which are capable of persistent flow throughout a majority of the year.

Plains2021C-02_0000054

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 7 of 16

**Figure 2.C.1: Regional Slope & Weather Data Map**



d.  Baseline Condition and Spill Analysis

19 CCR Section 2111(d)(4) requires the operator to conduct a spill analysis using the baseline condition of the pipeline segment.  The purpose of the spill analysis is to determine whether a release anywhere along the length of a pipeline segment could impact EESA in the Coastal Zone.  First the baseline condition of the pipeline segment must be identified with respect to leak detection system (LDS) technology, any automated shut-down technology present, and the number and location of any isolation valves and instrumentation needed to support the LDS.  Then the worst case release volume, based on the baseline condition of the pipeline segment, must be used to model the trajectory and physical extent of that release and its relationship to EESA in the Coastal Zone.

Since this entire pipeline segment lies within the boundaries of the Coastal Zone, Plains made the conservative assumption that any release from this pipeline segment will impact an EESA in the Coastal Zone.  Section 2111(d)(4) states that the spill analysis is intended to be used as the baseline for which best available technologies may be used to reduce the quantity of the release in the event of a release.  Thus, the focus of the Risk Analysis for the pipeline segment would be the evaluation of BAT additions to this

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 8 of 16

pipeline segment that would serve to reduce the quantity of release in the event of a release.

The following sections present the BAT additions proposed by Plains to reduce the quantity of release from this pipeline segment, and a Risk Analysis that compares the estimated worst case discharge for the current baseline condition of the pipeline to the BAT or retrofit condition of the pipeline with all of the proposed BAT elements installed.

3.  **Proposed Best Available Technology (BAT)**

a.  Introduction to and Definition of Proposed BAT

Plains has defined BAT for this pipeline segment as a combination of several elements working together.  These elements include:



Mr. Chau
Implementation Plan to Retrofit with BAT
Page 9 of 16



Plains2021C-02_0000057

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 10 of 16



Mr. Chau
Implementation Plan to Retrofit with BAT
Page 11 of 16

The proposed locations for each of the new valves proposed for this pipeline segment are listed in the following table and illustrated on the enclosed BAT Location Map.

**Table 3.A.1: Proposed BAT Valve Locations**

| Valve # | Type | Function | Longitude | Latitude |
|---------|------|----------|-----------|----------|
| █ | █ | █ | █ | █ |
| | █ | █ | █ | █ |
| | █ | █ | █ | █ |
| | █ | █ | █ | █ |
| | █ | █ | █ | █ |
| | █ | █ | █ | █ |
| █ | █ | █ | █ | █ |

Installation of these additional control valves will shorten the segment lengths between flow control and isolation points along the pipeline segment.  This will serve to limit the volume of potential drain-down resulting from a release and thus limit the worst case release volume for this pipeline segment.

## 4.  Summary of Risk Analysis

a.  Introduction and Risk Analysis Summary

As discussed in the previous section, Plains defines BAT for this pipeline segment to be



Plains is proposing to retrofit this pipeline segment with these BAT elements to bring it into conformance with Plain's definition of BAT for this pipeline segment.

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 12 of 16

The Risk Analysis presented below compares the baseline condition of this pipeline segment with the retrofit condition of the pipeline segment after installation of all of the proposed BAT elements.  The following table summarizes the results of the Risk Analysis for these two conditions.

**Table 4.A.1: Risk Analysis Summary Table**

|  | Baseline Condition Existing L901 Las Flores to Gaviota | Retrofit with BAT Proposed L901 Las Flores to Gaviota | **Reduction** in Time/Volume Resulting from BAT Retrofit |
|---|---|---|---|
| Maximum leak detection time, hours | ███████████████████████████████ | | |
| Maximum shut-down response time, hours | ███████████████████████████████ | | |
| Maximum flow rate, barrels/hour | 1,450 | 1,450 | 0 |
| Drain down volume, barrels | 2,776 | 1,726 | 1,050 |
| Reasonable worst-case discharge volume, barrels | 3,622 | 1,871 | 1,750 |

b.  Risk Analysis Methodology and Findings

The following describes how each of the risk analysis metrics included in the Risk Analysis Summary Table were determined:

- *Maximum Leak Detection Time*

Maximum Leak Detection Time is defined as the time from when the pipeline release begins to when it has been detected.  Detected in this case means when the LDS employed on that pipeline segment identifies a release and notifies the operator through an alarm.

The LDS employed on this pipeline segment when it last operated was a volume balance (VB) CPM system configured to balance it with the portion of Line 903 from Plains' Gaviota Station to Plains' Pentland Station.  While VB CPM is a tried and true technology that meets pipeline safety regulations, ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 13 of 16



Mr. Chau
Implementation Plan to Retrofit with BAT
Page 14 of 16

- *Maximum Flow Rate*

  Maximum flow rate was determined from historical flow data and the average maximum flow rate in that pipeline segment.  This maximum flowrate was used for both Risk Analysis conditions (baseline and BAT/retrofit).

- *Worst Case Drain-Down Volume and Worst Case Discharge Volume*

  Worst Case Volume is a quantity that can be theoretically calculated at any point along a pipeline based on several parameters.  These parameters include pipe diameter and wall thickness, product flow rate and valve closure response times (including both leak detection and shut-down response times) for a worst-case volume release, pipeline elevation data, and the existence and location of valves that can act to isolate individual sections of pipe.

  The following table provides a listing of the existing valves on this pipeline segment and the valves proposed as one of the BAT elements.  The table also provides the location of each valve based on the distance from the pipeline segment origination point at Plains' Las Flores Station, the location of each valve by its latitude and longitude, the valve type, and whether it is existing or proposed.  The location and number of valves was determined through an Emergency Flow Restriction Device assessment focused on minimizing the volume of a potential release and the potential impact to the Coastal Zone.

**Table 4.B.1: Existing and Proposed Valve Locations**

| Valve # | Current Status | Type | Function | Measure Location | Longitude | Latitude |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

The worst-case discharge volume can be calculated for any point along a pipeline segment and consists of the sum of two calculations: the volume of the initial loss occurring from the moment the release begins to the moment the isolation valves have closed, and the volume of drain down at a given point on the pipeline.  The calculation is as follows:

Plains2021C-02_0000062

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 15 of 16

- DD = Drain Down Volume

- MLDT = Maximum Leak Detection Time

- MSDRT = Maximum Shut-Down Response Time

- MFR = Maximum Flow Rate

- WCD = Worst Case Discharge (bbls)

- WCD = [(MLDT + MSDRT) x MFR] + DD

For the purposes of the Risk Assessment for this pipeline segment, a guillotine failure severing the pipeline completely was assumed.  The Risk Intelligence Platform (RIPL) model was used to calculate the Worst Case Discharge Volume and Drain-Down Volume every 30 meters along each portion of the pipeline segment defined by isolation valves.  The location along each isolation portion of the pipeline segment that yielded the largest worst case volume was then noted.

The following table lists each of the isolation portions for the BAT (or retrofit) condition of the pipeline segment, the location of the beginning and end of each isolation portion measured in feet downstream of the pipeline segment origination point at Plains' Las Flores Station, and the worst case discharge volume and drain-down volume for each isolation portion.

**Table 4.B.2: Isolation Segments and Worst-Case Volumes**

| Valve # From - To | Begin Measure Feet | End Measure Feet | Drain down Volume BBLS | Worst Case Volume BBLS |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

c.  Risk Analysis Conclusions

As the Risk Analysis Summary table clearly illustrates, installation of the BAT components proposed for this pipeline segment reduces the worst case discharge volume from the baseline case.  Installation of the proposed BAT elements on this

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 16 of 16

pipeline segment reduced the baseline worst case volume of 3,622.20 bbls to 1,871.40 bbls, a 48% reduction.

This analysis assumes that Plains can secure permits and access to install the proposed valves and associated power access, instrumentation, and communication devices as well as the additional flow measurement equipment at Plains' Gaviota Station.

5. **Timetable for Implementation**

    a. <u>Describe the timetable for implementation and completion of the identified BAT plan. This plan shall include key milestones and, at a minimum, consider the following: purchase of equipment, acquisition of permits, and securing qualified individuals for construction</u>

    Please reference the attached Gantt chart, which provides the estimated schedule and anticipated tasks involved to implement and complete the identified BAT plan.  Key milestones include receiving Office of the State Fire Marshal concurrence and acceptance of the risk analysis and supplemental implementation plan, obtaining regulatory permits and surface sites for BAT installation, procurement of BAT-related equipment, and the initiation and completion of construction to install the identified BAT. Delays in securing permits and access for BAT installation, among other factors, may result in delays to the BAT implementation schedule.  Should Plains experience significant delays it will notify the Office of the State Fire Marshall.  2113(c)(2)(B).

Plains2021C-02_0000064

# Enclosures

Plains2021C-02_0000065

# Registered Agent for Service Documentation

Plains2021C-02_0000066



**Secretary of State**

**1505**

**Registered Corporate Agent for Service of Process Certificate**

(Registered Corporations ONLY)



**FILED**

**Secretary of State**
**State of California**

A0852950

_____
Filing Number

02/10/2021

_____
Filing Date

**IMPORTANT — Read Instructions before completing this form.**

**Filing Fee –   $30.00**

**Copy Fees –** First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**Who Can File?** Any **active** corporation that is registered with the California Secretary of State can file this Form 1505 to become authorized to be a corporate agent for service of process for other business entities that are registered with the Secretary of State. To check the status of your corporation, and to ensure you are entering the **exact** name of the corporation and the **correct** 7-digit Secretary of State file number, go to BusinessSearch.sos.ca.gov.

**This Space For Office Use Only**

1. **Corporate Name**    (Enter the **exact** name of the corporation as it is recorded with the California Secretary of State.)

CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE

2. **7-Digit Secretary of State Entity Number**

C1592199

3. **Address for Service of Process**    (Enter the **complete** street address in California of the office where any entity that named your corporation as agent for service of process may be served with process.)
**Do not** enter a P.O. Box or "in care of" an individual or entity.

| Street Address - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 2710 Gateway Oaks Drive, Suite 150N | Sacramento | CA | 95833 |

4. **Authorized Employees**    (Enter the names of all persons employed by your corporation who are authorized to accept delivery of any copy of service of process, at the address entered in Item 3 above, on any entity who has designated your corporation as its agent for service of process. **Must** enter at least 1 person. If there are more than 3, **see Instructions**.)

| a. First Name of Authorized Employee | Middle Name | Last Name | Suffix |
|---|---|---|---|
| See attached list | | | |
| b. First Name of Authorized Employee | Middle Name | Last Name | Suffix |
| | | | |
| c. First Name of Authorized Employee | Middle Name | Last Name | Suffix |
| | | | |

5. **Statement of Consent** (Do not alter the Statement of Consent.)

This corporation consents that delivery of a copy of service of process to an authorized employee at the address designated in item 3 shall constitute delivery of any such copy to the corporation, as the agent for service of process.

6. **Read and Sign Below**    (**See Instructions**. Office or title not required. Do not use a computer generated signature.)

I am a corporate officer and am authorized to sign on behalf of the corporation.

_____
Signature

Jackie Smetana, Executive Vice President
_____
Type or Print Name

1505 (REV 12/2020)

Plains2021C-02_0000067
2020 California Secretary of State
bizfile.sos.ca.gov

A0852950

Kaitlyn Mannix

Becky DeGeorge

Koy Saechao

Lai Saevang

Nicole Stauss

Kevin Bautista

Trudy Desbiens

Susie Vang

Catherine Webb

Roxie Taylor

Fanny Xiong

Melissa Vang

Dona Niemeyer

Melissa DeKoven

Carolyn Valle

Kaci Ransom

Kan Pen

Kelli Shortte

Annette Kuhlman

Arrielle Garcia

Brejet Stephens

Crystal Chapman

Janette Mcintyre

Jerome Suarez

Jonel Yelverton-

Reis

Kayla Vue

Laurie Tolman

Mindy Fay

Rafael Munoz

Samantha Alterman

Samantha Wiltz

Sherie Hinton

Parid Kurbini

Vivien Mitchell

Plains2021C-02_0000068



# State of California
## Secretary of State

## FOREIGN LIMITED PARTNERSHIP
## AMENDMENT TO APPLICATION FOR REGISTRATION

A $30.00 filing fee must accompany this form.
**IMPORTANT--** Read instructions before completing this form.

**FILED**
In the office of the Secretary of State
of the State of California

**DEC 2 9 2006**

↖ This Space For Filing Use Only

| | |
|---|---|
| 1. SECRETARY OF STATE FILE NUMBER | |
| 199832700008 | |

2. NAME UNDER WHICH THIS FOREIGN LIMITED PARTNERSHIP IS CONDUCTING BUSINESS IN CALIFORNIA
PLAINS PIPELINE, L.P.

3. COMPLETE ONLY THE BOXES WHERE INFORMATION IS BEING CHANGED. ADDITIONAL PAGES MAY BE ATTACHED, IF NECESSARY. CONSULT THE INSTRUCTIONS BEFORE COMPLETING THIS FORM.

A. THE NAME UNDER WHICH THIS FOREIGN LIMITED PARTNERSHIP CONDUCTS BUSINESS IN CALIFORNIA (END NAME WITH THE WORDS "LIMITED PARTNERSHIP" OR THE ABBREVIATION "L.P.")

B. THE NAME OF THE FOREIGN LIMITED PARTNERSHIP HAS BEEN CHANGED AS FOLLOWS AND HAS BEEN RECORDED IN THE HOME STATE OR COUNTRY

| C. THE ADDRESS OF THE PRINCIPAL EXECUTIVE OFFICE | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

| D. THE ADDRESS OF THE PRINCIPAL OFFICE IN CALIFORNIA | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | CA | |

E. THE NAME OF THE AGENT FOR SERVICE OF PROCESS
Corporation Service Company which will do business in California as CSC-Lawyers Incorporating Service

F. ADDRESS OF THE AGENT FOR SERVICE OF PROCESS. **COMPLETE ONLY IF AN INDIVIDUAL.**

ADDRESS

| CITY | STATE | CA | - | ZIP CODE |
|---|---|---|---|---|

G. THE ADDRESS OF GENERAL PARTNER(S) (ATTACH ADDITIONAL PAGES IF NECESSARY)

NAME

ADDRESS

| CITY | STATE | ZIP CODE |
|---|---|---|

H. NAME CHANGE OF GENERAL PARTNER(S) (ATTACH ADDITIONAL PAGES IF NECESSARY)

| FROM: | TO: |
|---|---|

I. WITHDRAWAL OF GENERAL PARTNER(S)

NAME

NAME

NAME

J. ADDED GENERAL PARTNER(S) (ATTACH ADDITIONAL PAGES IF NECESSARY)

NAME

ADDRESS

| CITY | STATE | ZIP CODE |
|---|---|---|

K. STATE OR COUNTRY OF FORMATION OF THE FOREIGN LIMITED PARTNERSHIP

L. DATE ON WHICH THE FOREIGN LIMITED PARTNERSHIP WAS FORMED

4. NUMBER OF PAGES ATTACHED (IF ANY)

5. THE FOREIGN LIMITED PARTNERSHIP NAMED ABOVE IS, AS OF THE DATE THIS AMENDMENT IS EXECUTED, AUTHORIZED TO EXERCISE ITS POWERS AND PRIVILEGES AS A LIMITED PARTNERSHIP IN ITS HOME STATE OR COUNTRY OF FORMATION.

6. I CERTIFY THAT THE STATEMENTS CONTAINED IN THIS DOCUMENT ARE TRUE AND CORRECT TO MY OWN KNOWLEDGE. I DECLARE THAT I AM THE PERSON WHO IS EXECUTING THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

| SIGNATURE OF AUTHORIZED PERSON | TYPE OR PRINT NAME AND TITLE | DATE |
|---|---|---|
| | Tim Moore, VP on behalf of | 11/13/06 |

SEC/STATE (REV. 03/2005)

Plains Marketing GP Inc. - General Partner

FORM LP-6 ~ FILING FEE: $30.00
Approved by Secretary of State

Plains2021C-02_0000069

# Outer Continental Shelf Crude Oil Safety Data Sheet

Plains2021C-02_0000070

## EXXON COMPANY, U.S.A.
A DIVISION OF EXXON CORPORATION

*Use per Exxon 9/20/95*

**CRUDE OIL**

BEL
EMC
PNT
LAB
TLJ
BAO

DATE ISSUED: 08/09/95
SUPERSEDES DATE: 09/22/93

### MATERIAL SAFETY DATA SHEET

EXXON COMPANY, U.S.A.          P. O. BOX 2180          HOUSTON, TEXAS 77252-2180

---

## A.   IDENTIFICATION AND EMERGENCY INFORMATION

**PRODUCT NAME**
Crude Oil

**CHEMICAL NAME**
Crude Oil

**CAS NUMBER**
8002-05-9

**PRODUCT APPEARANCE AND ODOR**
Dark Liquid
Strong hydrocarbon solvent odor

**MEDICAL EMERGENCY TELEPHONE NUMBER**
(713) 656-3424

---

## B.   COMPONENTS AND HAZARD INFORMATION

| COMPONENTS | CAS No. OF COMPONENTS | APPROXIMATE CONCENTRATION |
|---|---|---|
| Crude oil - a naturally occurring combination of hydrocarbons. It consists predominately of paraffins, cyclo-paraffins, cyclic aromatic hydrocarbons having carbon numbers greater than C1. May also contain small amounts of benzene, hydrocarbons, sulfur and oxygenated compounds.<br>All components of this product are listed on the U. S. TSCA inventory. | 8002-05-9 | 100% |

See Section E for health and hazard information

See Section H for additional Environmental Information.

### HAZARDOUS MATERIALS IDENTIFICATION SYSTEM (HMIS)

| Health | Flammability | Reactivity | BASIS |
|---|---|---|---|
| 1 | 3 | 0 | Recommended by Exxon |

**EXPOSURE LIMIT FOR TOTAL PRODUCT**
Not established for total product

The airborne benzene level shall not exceed
1 ppm for an 8-hour workday; 5 ppm STEL          OSHA Regulation 29 CFR 1910.1028

mddccr/snared/msds/crudeoil

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000071

## C.   PRIMARY ROUTES OF ENTRY AND EMERGENCY AND FIRST AID PROCEDURES

**EYE CONTACT**

If hot product is splashed into eyes, flush with clear water and contact physician immediately. If splashed into eyes, flush with clear water for 15 minutes or until irritation subsides. If irritation persists, call a physician.

**SKIN CONTACT**

Immediately contact a physician for treatment of thermal burns. In case of skin contact with product under other conditions, wash thoroughly with soap and water. Removal of product from skin may be aided by use of waterless hand cleaner. If product is injected into or under the skin, or into any part of the body, regardless of the appearance of the wound or its size, the individual should be evaluated immediately by a physician as a surgical emergency. Even though initial symptoms from high pressure injection may be minimal or absent, early surgical treatment within the first few hours may significantly reduce the ultimate extent of injury.

**INHALATION**

If overcome by vapor, remove from exposure and call a physician immediately. If breathing is irregular or has stopped, start resuscitation; administer oxygen, if available.

**INGESTION**

If ingested, DO NOT induce vomiting; call a physician immediately.

## D.   FIRE AND EXPLOSION HAZARD INFORMATION

**FLASH POINT**
Less than 16°C (60°F) to greater
than 93°C (200°F) PMCC

**AUTOIGNITION TEMPERATURE**
Not Determined

**NATIONAL FIRE PROTECTION ASSOCIATION (NFPA) - HAZARD IDENTIFICATION**

| Health | Flammability | Reactivity | BASIS |
|--------|-------------|-----------|-------|
| 1 | 3 | 0 | NFPA |

**HANDLING PRECAUTIONS**
Keep product away from heat sparks, pilot lights, static electricity, and open flame.

**FLAMMABLE OR EXPLOSIVE LIMITS (APPROXIMATE PERCENT BY VOLUME IN AIR)**
Estimated Values:  Lower Flammable Limit: 0.6%    Upper Flammable Limit: 15%

**HOT CRUDE FLASH WARNING**
Studies have shown that relatively low flash point substances, such as low boiling hydrocarbons, may accumulate in the vapor space of crude tanks and bulk transport compartments. Such vapors may exhibit flammability characteristics of a significantly lower flash porduct than would be indicated by the flash test. As a precaution, keep ignition sources away from vents and openings, including prevention of accumulation of pyrophoric iron sulfide.

**EXTINGUISHING MEDIA AND FIRE FIGHTING PROCEDURES**
Foam, water spray (fog), dry chemical, carbon dioxide and vaporizing liquid type extinguishing agents may all be suitable for extinguishing fires involving this type of product, depending on size or potential size of fire and circumstances related to the situation. Plan fire protection and response strategy through consultation with local fire protection authorities or appropriate specialists.

Plains2021C-02_0000072

CRUDE OIL

The following procedures for this type of product are based on the recommendations in the National Fire Protection Association's "Fire Protection Guide on Hazardous Materials", Tenth Edition (1991):

Use water spray, dry chemical, foam, or carbon dioxide. Water or foam may cause frothing. Use water to keep fire-exposed containers cool. Water spray may be used to flush spills away from exposures. Minimize breathing gases, vapor, fumes or decomposition products. Use supplied-air breathing equipment for enclosed or confined spaces or as otherwise needed.

NOTE: The inclusion of the phrase "water may be ineffective" is to indicate that although water can be used to cool and protect exposed material, water may not extinguish the fire unless used under favorable conditions by experienced fire fighters trained in fighting all types of flammable liquid fires.

## DECOMPOSITION PRODUCTS UNDER FIRE CONDITIONS
Fumes, smoke, carbon monoxide, aldehydes and other decomposition products, in the case of incomplete combustion.

## "EMPTY" CONTAINER WARNING
"Empty" containers retain residue (liquid and/or vapor) and can be dangerous.
DO NOT PRESSURIZE, CUT, WELD, BRAZE, SOLDER, DRILL, GRIND OR EXPOSE SUCH CONTAINERS TO HEAT, FLAME, SPARKS, STATIC ELECTRICITY, OR OTHER SOURCES OF IGNITION; THEY MAY EXPLODE AND CAUSE INJURY OR DEATH. Do not attempt to clean since residue is difficult to remove. "Empty" drums should be completely drained, properly bunged and promptly returned to a drum reconditioner. All other containers should be disposed of in an environmentally safe manner and in accordance with governmental regulations. For work on tanks refer to Occupational Safety and Health Administration regulations, ANSI Z49.1, and other governmental and industrial references pertaining to cleaning, repairing, welding, or other contemplated operations.

## E.    HEALTH AND HAZARD INFORMATION

### VARIABILITY AMONG INDIVIDUALS
Health studies have shown that many petroleum hydrocarbons pose potential human health risks which may vary from person to person. As a precaution, exposure to liquids, vapors, mists or fumes should be minimized.

### EFFECTS OF OVEREXPOSURE (SIGNS AND SYMPTOMS OF EXPOSURE)
High vapor concentrations are irritating to the eyes and the respiratory tract, may cause headaches and dizziness, are anesthetic, may cause unconsciousness, and may have other central nervous system effects including death. CAUTION: Product sometimes shipped hot; protect against burns.

### NATURE OF HAZARD AND TOXICITY INFORMATION
Skin contact with hot product may cause thermal burns. Prolonged or repeated contact with this product at warm or ambient temperatures tends to remove skin oils, possibly leading to irritation and dermatitis.

Eye contact with hot product may cause thermal burns. Contact with this product at warm or ambient termperatures may cause eye irritation but will not damage eye tissue.

This product may contain benzene, CAS #71-43-2, as a natural constituent. Benzene can cause anemia and other blood diseases, including leukemia (cancer of the blood-forming system), after prolonged or repeated exposures at high concentrations (e.g., 50-500 ppm). It has also caused fetal defects in tests on laboratory animals.

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000073

Crude Oil has been shown to cause skin cancer in animal tests. In such lifetime skin painting tests the substance was applied to the shaved backs of mice at regular intervals without cleanup between applications. In view of these findings, there may be a potential risk of skin cancer in humans from prolonged and repeated skin contact with this product in the absence of good personal hygiene.

Limited studies on oils that are very active carcinogens have shown that washing the animal's skin with soap and water between applications greatly reduces tumor formation. These studies demonstrate the effectiveness of cleansing the skin after contact.

Potential risks to humans can be minimized by observing good work practices and personal hygiene procedures generally recommended for petroleum products. See Section I for recommended protection and precautions.

PRE-EXISTING MEDICAL CONDITIONS WHICH MAY BE AGGRAVATED BY EXPOSURE
Benzene - Individuals with liver disease may be more susceptible to toxic effects.
Petroleum Solvents/Petroleum Hydrocarbons - Skin contact may aggravate an existing dermatitis.

## F.    PHYSICAL DATA

THE FOLLOWING DATA ARE APPROXIMATE OR TYPICAL VALUES AND SHOULD NOT BE USED FOR PRECISE DESIGN PURPOSES

**BOILING POINT**
Gas to 550°C (1000°F +)

**VAPOR PRESSURE**
Not Available

**SPECIFIC GRAVITY ($H_2O = 1$)**
Greater than or equal to 0.7

**VAPOR DENSITY (AIR = 1)**
Not Available

**MOLECULAR WEIGHT**
Not Available

**PERCENT VOLATILE BY VOLUME**
Up to 50%

**pH**
Essentially Neutral

**EVAPORATION RATE @ ATM AND 25°C (77°F)**
(n-BUTYL ACETATE = 1)
Not Available

**POUR, CONGEALING OR MELTING POINT**
Not Available

**SOLUBILITY IN WATER**
Not Available

**VISCOSITY**
Not Available

## G.    REACTIVITY

This product is stable. Hazardous polymerization will not occur. Avoid contact with strong oxidants such as liquid chlorine, concentrated oxygen, sodium hypochlorite or calcium hypochlorite. Hot product in contact with water can cause foaming or sudden evolution of steam which could cause pressure build-up and possibly rupture a tank or vessel.

Plains2021C-02_0000074

## H.   ENVIRONMENTAL INFORMATION

"CLEAN WATER ACT/OIL POLLUTION ACT - This product may be classified as an oil under Section 311 of the Clean Water Act, and under the Oil Pollution Act. Discharges or spills into or leading to surface waters that cause a sheen must be reported to the National Response Center (1-800-424-8802)."

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED

Shut off and eliminate all ignition sources. Keep people away. Recover free liquid. Add sand, earth or other suitable absorbent to spill area. Minimize breathing vapors. Minimize skin contact. Ventilate confined spaces. Hot product may solidify when cooled. Keep product out of sewers and watercourses by diking or impounding. Advise authorities if product has entered or may enter sewers. watercourses. or extensive land areas.

Assure conformity with applicable governmental regulations. Continue to observe precautions for volatile, flammable vapors from absorbed material.

THE FOLLOWING INFORMATION MAY BE USEFUL IN COMPLYING WITH VARIOUS STATE AND FEDERAL LAWS AND REGULATIONS UNDER VARIOUS ENVIRONMENTAL STATUES:

REPORTABLE QUANTITY (RQ), EPA REGULATION 40 CFR 302 (CERCLA Section 102)

This product/stream is exempt from CERCLA Reporting Requirements. Refer to Clean Water Act/Oil Pollution Act.

THRESHOLD PLANNING QUANTITY (TPQ), EPA REGULATION 40 CFR 355 (SARA Sections 301-304)

No TPQ for product or any constituent greater than 1% or 0.1% (carcinogen).

TOXIC CHEMICAL RELEASE REPORTING, EPA REGULATION 40 CFR 372 (SARA Section 313)

This product may contain:

Approximately 0-1% benzene
Approximately 0-3% cumene
Approximately 0-2% cyclohexane
Approximately 0-5% ethylbenzene
Approximately 0-2% naphthalene
Approximately 10-20% toluene
Approximately 15-30% xylene

HAZARDOUS CHEMICAL REPORTING, EPA REGULATION 40 CFR 370 (SARA Sections 311-312)

EPA HAZARD CLASSIFICATION CODE:

| Acute Hazard | Chronic Hazard | Fire Hazard | Pressure Hazard | Reactive Hazard | |
|---|---|---|---|---|---|
| XXX | XXX | XXX | | | Not Applicable |

## I.   PROTECTION AND PRECAUTIONS

VENTILATION

Provide ventilation sufficient to prevent exceeding recommended exposure limit or build-up of explosive concentrations of vapor in air. Use explosion-proof equipment.

RESPIRATORY PROTECTION

Use supplied-air respiratory protection in confined or enclosed spaces. if needed.

PROTECTIVE GLOVES

Protect against hot liquid. Use chemical-resistant gloves to avoid skin contact.

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000075

**EYE PROTECTION**

Use splash goggles or face shield when eye contact may occur.

**OTHER PROTECTIVE EQUIPMENT**

Use chemical-resistant apron or other impervious clothing, if needed, to protect against hot liquid and to avoid skin contact.

**WORK PRACTICES / ENGINEERING CONTROLS**

Use explosion-proof equipment. No smoking or open lights.

**PERSONAL HYGIENE**

Minimize breathing vapor, mist or fumes. Avoid prolonged or repeated contact with skin. Remove contaminated clothing; launder or dry-clean before reuse. Remove contaminated shoes and thoroughly clean before reuse; discard if oil-soaked. Cleanse skin thoroughly after contact, before breaks and meals, and at end of work period. Product is readily removed from skin by waterless hand cleaners, followed by washing thoroughly with soap and water.

## J.   TRANSPORTATION AND OSHA RELATED LABEL INFORMATION

**TRANSPORTATION INCIDENT INFORMATION**

For further information relative to handling spills resulting from transportation incidents, refer to latest Department of Transportation Emergency Response Guidebook for Hazardous Materials Incidents (ERG).

**DOT IDENTIFICATION NUMBER**

Know the flash point for each shipment to accurately classify it into the right category.

Petroleum Crude Oil, 3, UN 1267, PG*
*PG I   - Initial Boiling Point =< 95°F (35°)
*PG II  - Initial Boiling Point > 95°F (35°), Flash Point <73°F (23°C)
*PG III - Initial Boiling Point > 95°F (35°), Flash Point ≤73°F (23°C)
         and =<141°F (60.5°C)
OR
Petroleum crude oil, combustible liquid, UN 1267, PG III
(Flash Point >141°F (60.5°F) and <200°F (93°)
OR
Not regulated if flash point = >200°F (93°)

**OSHA REQUIRED LABEL INFORMATION**

In compliance with hazard and right-to-know requirements, the following OSHA Hazard Warnings should be found on a label, bill of lading or invoice accompanying this shipment.

DANGER!

EXTREMELY FLAMMABLE

LONG-TERM, REPEATED EXPOSURE MAY CAUSE
CANCER, BLOOD AND NERVOUS SYSTEM DAMAGE

CONTAINS: BENZENE

OVEREXPOSURE MAY CAUSE EYE, SKIN OR
RESPIRATORY TRACT IRRITATION OR DAMAGE,
AND MAY CAUSE HEADACHES, DIZZINESS
OR OTHER ADVERSE NERVOUS SYSTEM
EFFECTS OR DAMAGE, INCLUDING DEATH

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000076

CRUDE OIL

This information and recommendations contained herein are, to the best of Exxon's knowledge and belief, accurate and reliable as of the date issued. Exxon does not warrant or guarantee their accuracy or reliability, and Exxon shall not be liable for any loss or damage arising out of use thereof.

The information and recommendations are offered for the user's consideration and examination, and it is the user's responsibility to satisfy itself that they are suitable and complete for its particular use. If buyer repackages this product, legal counsel should be consulted to insure proper health, safety and other necessary information is included on the container.

The Environmental Information included under Section H thereof as well as the National Fire Protection Association (NFPA) ratings have been included by Exxon Company, U.S.A. in order to provide additional health and hazard classification information. The ratings recommended are based upon the criteria supplied by the developers of these rating systems, together with Exxon's interpretation of the available data.

FOR ADDITIONAL INFORMATION ON HEALTH EFFECTS CONTACT:
Director of Industrial Hygiene
Exxon Company, USA
Room 3180, Exxon Building
P. O. Box 2180
Houston, Texas 77252-2180
(713) 656-2443

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000077

# Flow Diagrams

Plains2021C-02_0000078

SANTA BARBARA, CALIFORNIA
SECTION 27 - T5N - R30W

LAS FLORES
PUMP STATION
FLOW DIAGRAM

NOTES:

PLAINS ALL AMERICAN
PIPELINE L.P.

LAS FLORES PUMP STATION
BAKERSFIELD DISTRICT, WESTERN DIVISION
PROCESS FLOW DIAGRAM

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | JM | 09/13 | 0 | AS-BUILT PER FIELD WALKDOWN | | 09/27/13 |
| NAME | DATE | NAME | DATE | NAME | DATE | REV. NO. | REVISION | DATE |
| OPERATIONS | | ENGINEERING | | DRAFTING | | | | |

| DRAWN | BP | CHECKED | JM | DRFT. APPV. | MEO |
|---|---|---|---|---|---|
| DATE | 09/27/13 | SCALE | NONE | ENGR. APPV. | |

LSF1-D-F-1083

TITLE OF REFERENCE DRAWING | DRAWING NO.

SANTA BARBARA, CALIFORNIA
SECTION , T5N – R30W

GAVIOTA
PUMP STATION
FLOW DIAGRAM

NOTES:

PLAINS ALL AMERICAN
PIPELINE L.P.

GAVIOTA PUMP STATION
BAKERSFIELD DISTRICT, WESTERN DIVISION
PROCESS FLOW DIAGRAM

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | JM | 09/13 | 0 | AS-BUILT PER FIELD WALKDOWN | 09/27/13 |

| NAME | DATE | NAME | DATE | NAME | DATE | REV. NO. | REVISION | DATE |
|---|---|---|---|---|---|---|---|---|
| OPERATIONS | | ENGINEERING | | DRAFTING | | | | |

DRAWN BP    CHECKED JM    DRFT. APPV. MEO
DATE 09/27/13    SCALE NONE    ENGR. APPV.

GVT1–D–F–1084

TITLE OF REFERENCE DRAWING    DRAWING NO.

# Vicinity Map

Plains2021C-02_0000081



Santa Barbara

Gaviota

Las Flores

Source: Esri, Maxar, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community

0  0.15  0.3    0.6      0.9      1.2
Miles

**PLAINS**
ALL AMERICAN
PIPELINE, L.P.

**L901 LAS FLORES TO GAVIOTA - 24"**

1 in:1 miles

Sheet No.: 1/2

Plains2021C-02_0000082



**Centerline**

**Affecting Coastal Zone**

**NHDFlowline**

**Roads**

**Rail Roads**

**Affected Flowline**

Terrain Paths

Spray/Pooling Radius

CCC

EESACZ

**Seismic Shaking Intensity**

Extreme

Light

Moderate

Not Felt

Severe

Strong

Very Strong

Violent

**Mean Rainfall (in)**

**Rainfall (in)**

11.691000 - 24.980000

25.040000 - 36.446000

36.463000 - 47.333000

47.360000 - 60.091000

60.136000 - 75.645000

75.715000 - 92.636000

92.694000 - 109.416000

109.463000 - 130.010000

130.298000 - 162.604000

163.290000 - 216.127000

**Landslide Susceptibility**

High incidence

High susceptibility, moderate incidence

High susceptibility, low incidence

Moderate incidence

Moderate susceptibility, low incidence

Low incidence

No data

| Segment: | | Owner: | |
|---|---|---|---|
| L901 LAS FLORES TO GAVIOTA - 24" | *LEGEND* | | PLAINS ALL AMERICAN PIPELINE, L.P. |
| Sheet No:   2/2 | | | |

Plains2021C-02_0000083

# BAT Location Map

Plains2021C-02_0000084





| Line 901 BAT Location Map | |
|---|---|
| Implementation Plan | Scale: 1:75,000 |
| Santa Barbara, California | Sheet No: 1/1 |

This user generated map has been prepared from sources considered to be reliable. However, Plains Pipeline L.P. hasfurnished this copy for information only and assumes no responsibility for the accuracy or completeness of data shown.

0  1,750  3,500    7,000     10,500    14,000
Feet

N W E S

M:\CA-OSFM_AB 864\L901-L903\Map Files\2021_03_22_L901_BAT_LOCATIONS2.mxd

Plains2021C-02_0000085

# Timetable for Implementation Gantt Chart

Plains2021C-02_0000086



Plains2021C-02_0000087

**PROOF OF SERVICE**

I, Heather Thai, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 3, 2025, I served the document(s) **DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 3, 2025, at Los Angeles, California.

/s/Heather Thai
Heather Thai

**SERVICE LIST**

| | |
|---|---|
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | **ATTORNEYS FOR PETITIONERS**<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:   (510) 844-7100<br>Fax:   (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>        jfrankel@environmentaldefensecenter.org<br>        trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | **ATTORNEYS FOR RESPONDENTS/ DEFENDANTS**<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:   (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | **ATTORNEYS FOR REAL PARTIES IN INTEREST**<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:   (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN (SBN 237595)
benjaminhanelin@paulhastings.com
NATALIE C. Rogers (SBN 301254)
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/3/2025 8:00 AM
By: Gabriel Moreno , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SANTA BARBARA

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners and Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,

Respondents and Defendants,

Case No. 25CV02247

Assigned for all purposes to:
Hon. Donna D. Geck

**DECLARATION OF STEVE RUSCH IN SUPPORT OF OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

[Filed concurrently with Opposition and Declarations of Jamie Shafer and Jeffrey Dintzer]

Date:    June 3, 2025
Time:    8:30 a.m.
Dept.:    4

Complaint Filed:    April 15, 2025
Trial Date:    None set

1

DECLARATION OF STEVE RUSCH

and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

2

DECLARATION OF STEVE RUSCH

**<u>DECLARATION OF STEVE RUSCH</u>**

I, Steve Rusch, declare as follows:

1. I am the Vice President, Regulatory & Environmental Affairs of Sable Offshore Corp. ("Sable"). I have over 45 years of experience in the oil and gas industry. Before my current position with Sable, I was the Vice President, Environment, Health and Safety ("EHS") and Government Affairs at Freeport-McMoRan Oil & Gas, a Senior Staff Engineer at Exxon Mobil Corporation, and the Principal at Rusch Consulting. I have a Bachelor of Science degree in Civil Engineering from the University of California at Berkeley and have been licensed by the State of California as a Professional Engineer. I make this in support of Real Parties in Interest Sable Offshore Corp. ("Sable") and Pacific Pipeline Company ("PPC") (together, "Real Parties") Opposition to the *Ex Parte* Application for a Stay or Order to Show and Temporary Restraining Order (the "Application"), submitted by Petitioners Environmental Defense Center, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (together, "Petitioners"). I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2. Sable is a publicly traded oil and gas company focused on responsibly developing the Santa Ynez Unit ("SYU") and its Las Flores Pipelines and Santa Ynez Unit Pipelines in waters offshore California, which include portions that are within the Coastal Zone.

3. As detailed below, the injunctive relief Petitioners request will cause immediate and irreparable damage to Real Parties. Specifically, Real Parties will lose at least ***<u>$17.5 million in net margin per week, totaling $75 million for just one month</u>***. The business disruption will also decrease value for shareholders in Real Parties, which include members of the public, 401(k) plans, pension plans, and mutual funds.

**<u>Acquisition, Repair, and Maintenance of the Pipelines</u>**

4. I have been involved in Sable's acquisition, maintenance, and repair of the Pipelines. These assets were previously owned by Exxon Mobil Corporation ("Exxon") and Mobil Pacific Pipeline Company ("MPPC," and together with Exxon, "EM"). I am familiar with the permitting history covering Real Parties' maintenance activities to the Pipelines.

5. Real Parties began conducting repair and maintenance activities to the Las Flores

DECLARATION OF STEVE RUSCH

Pipelines in May 2024. These repair and maintenance activities were done pursuant previously granted Coastal Development Permits. Real Parties conducted repair and maintenance until receiving Notice of Violation File No. V-9-24-0152 and subsequent communications from Coastal Commission staff dated October 4, 2024. Real Parties thereafter suspended repair and maintenance activities. Real Parties resumed repair and maintenance activities despite our contention that we held valid permits on February 14, 2025, following confirmation from the County of Santa Barbara that the repair and maintenance activities were authorized pursuant to existing permits. On February 16, 2025, after discussions with the County and providing County Staff with additional requested documentation, the County wrote Sable a letter in which it confirmed "this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the ***existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS***." (emphasis added). A true and correct copy of the County's February 12, 2025 Correspondence to Real Parties is attached hereto as **Exhibit A**. Thereafter, Sable resumed pipeline repairs.

6.      Real Parties were granted a right of entry to perform the repair and maintenance activities from the California Department of Parks and Recreation, as well as a right of entry to the Land Trust for the County of Santa Barbara (the "County"). These rights of entry permitted Real Parties to complete anomaly repairs on the Las Flores Pipelines, cover the associated trenches, and complete (and pass) pressure tests on the entire line.

7.      Real Parties have completed repair and maintenance activities pursuant to existing Coastal Development Permits ("CDPs") for the Las Flores Pipelines, which were permitted by the County, not the Coastal Commission, under the County's Local Coastal Program pursuant to its delegated authority from the Coastal Commission. Specifically, with the completion of the Gaviota State Park anomaly repairs on May 18, 2025, Sable has now completed its anomaly repair program on the Las Flores Pipeline as specified by the Consent Decree, the governing document for the restart and operations of the Las Flores Pipeline. Real Parties have also completed the safety valve installation work on the Las Flores Pipelines, as required by Assembly Bill 864, and all span remediation work on the Santa Ynez Pipelines. A true and correct copy of a map depicting Real Parties' completed and outstanding repair activities to the Las Flores Pipelines is attached hereto as **Exhibit B**.

DECLARATION OF STEVE RUSCH

8.      On May 15, 2025, Sable initiated the flow of oil production from six wells on Platform Harmony of the Santa Ynez Unit to Las Flores Canyon, at a rate of ~6,000 barrels of oil per day.

9.      Sable has been testing wells on Platform Harmony throughout May 2025, and the well tests have performed consistently stronger than they did at the time of shut-in on May 19, 2015, when the Santa Ynez Unit produced approximately 45,000 barrels of oil equivalent per day.

10.     Approximately 30% of the 32 producing wells at Platform Harmony have been tested as of May 18, 2025.

11.     The Office of the State Fire Marshal ("OSFM") has not yet issued final approval to restart the flow of oil through the Las Flores Pipelines.

12.     As of May 19, 2025, updated 2H25 Guidance shows up to 50,000 barrels per day of anticipated net production.

**Real Parties Will Suffer Irreparable Harm and Significant Economic Damage If a TRO or Injunction Is Issued**

13.     Although Petitioners allege that irreparable harm will occur if a TRO is not issued, the Petitioners' allegations are baseless. If an administrative stay, TRO, or injunction is issued, Real Parties will be forced to immediately cease operations and production at the Platforms that are connected to the Pipelines—Pipelines which have been repaired in accordance with the requirements issued by OSFM.

14.     Indeed, Real Parties have spent approximately $45 million on its repair and maintenance activities occurring within the Coastal Zone through March 2025.

15.     Real Parties are required to meet specific deadlines in order to thereafter conduct operations at the Pipelines, which is critical to the livelihood of Real Parties' business. If a TRO or injunction is issued, Real Parties will be forced to immediately cease operations and production at the Platforms that are connected to the repaired Pipelines. This will effectively shut down the Platforms and stall the process of seeking to restart the Las Flores Pipelines. This will cause Real Parties to incur significant economic damages in the form of an immediate loss of net margin.

16.     Specifically, Real Parties will be forced to lose net margin of **_$2.5 million per day_**, totaling **_$75 million per month_**. As explained above, Sable will have the capacity to produce

approximately 50,000 barrels per day at $50 net per barrel. This means that a TRO or injunction will immediately cause Real Parties to lose at least ***$17.5 million in net margin per week, totaling $75 million for just one month***.

17.     Additionally, Real Parties must pay royalties to state and federal governments on this anticipated oil production, which is projected to exceed $15 million in royalties per month.

18.     The administrative stay, TRO, and/or injunction that Petitioners request, as written, asks the Court to restrain Sable from transporting oil onshore pending an injunction hearing and judgment on the case. If granted, this requested relief would require Real Parties to cease their production on the Platforms.

19.     If an administrative stay, TRO, or injunction is issued, then, Sable will lose at least $2.5 million in net margin from production per day. This will amount to nearly a loss of at least $17.5 million in net margin a week and $75 million over just one month.

20.     Furthermore, citizens of the State of California would suffer irreparable harm in the form of higher gasoline prices, lost jobs, lost tax revenues, lost royalty sharing, and increased regulatory uncertainty.

21.     What's more, Sable is a publicly traded company, and a business disruption of this magnitude would have significant effect on the value of the company. The shareholders of the company, including the numerous 401(k) plans, mutual funds, and pension that have invested in the company, will immediately lose quantifiable value as the company is forced to incur multimillion-dollar delay damages as a result of any stay or injunction.

22.     Effectively, Petitioners will force Real Parties to hemorrhage at least $75 million in lost net margin and exponential losses in shareholder value—all to enjoin a restart of the Las Flores Pipelines that has not yet been approved to restart.

**Authorization for Repair and Maintenance to the Las Flores Pipelines**

23.     The Las Flores Pipelines includes the pipeline segments CA-324 ("Line CA-324") (previously known as Line 901) and CA-325 ("Line CA-325") (previously known as Line 903) (collectively referred herein as the "Las Flores Pipelines"), portions of which are located within the coastal zone in an unincorporated area of the County of Santa Barbara ("County"). Line CA-324 is

DECLARATION OF STEVE RUSCH

designed to transport crude oil approximately 10.9 miles from Las Flores Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County. Line CA-325 is designed to transport crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County. Lines CA-324 and CA-325 are located onshore and carry a maximum permitted throughput capacity of 150,000 barrels of crude oil per day and 300,000-barrels of crude oil per day, respectively. The Celeron Pipeline Project (also referred to herein as the "Pipeline Project"), includes Lines CA-324 and CA-325.

24. The State Lands Commission and federal Bureau of Land Management and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Pipeline Project pursuant to California Environmental Quality Act ("CEQA") and National Environmental Policy Act ("NEPA"). During the Pipeline Project's environmental review under the CEQA and NEPA, the locations of Lines CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources (including topography, viewshed, watersheds, etc.). The State Lands Commission certified the EIR/EIS in January 1985.

25. After reviewing the EIR/EIS, the Santa Barbara County Planning Commission made a final decision to approve the Pipeline Project FDP on February 18, 1986. The approval was not challenged during the appeal period and the Planning Commission's approval action became final and effective. The Planning Commission's action included the FDP (Case # 85-DP-66cz) and a Major CUP (Case # 83-CP-97cz). The FDP was required because the Pipeline Project necessitated comprehensive review, and the CUP was required because the pipelines crossed environmentally sensitive habitat areas.

26. Consistent with the FDP approval and pursuant to the County's certified LCP, the County issued Coastal Development Permit CDP 86-CDP-189 for the Pipeline Project on July 27, 1986.

27. CDP 86-CDP-189 approved "[c]learing, grading and trenching activities for [the]

5

DECLARATION OF STEVE RUSCH

Celeron Pipeline Project as approved by 85-DP-66cz." The CDP incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz." CDP 86-CDP-189 also excluded "all activities related to pumpstations, river crossings, pipe stringing, welding, and any other activities not normally performed by the clearing, grading and trenching construction crews."

28.     On August 5, 1986, the County issued Coastal Development Permit CDP 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject as approved by 85-DP-66cz." CDP 86-CDP-205 also incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz."

29.     The CDPs were not appealed by any party, including the Coastal Commission. The CDPs are therefore final, valid, and not subject to further appeal. Accordingly, the Conditions of Approval for the Las Flores Pipelines' FDP, CUP, and CDPs are all governed under the same Conditions of Approval found in Case #85-DP-66cz, as amended by the County.

30.     The County has amended the Conditions of Approval from time to time, and as such identifies the Conditions of Approval with reference to each of the following case numbers: 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85 DP-66cz, and 88DP-25cz. Although the County has issued separate CDPs for major pipeline improvements such as relocations and realignments since the Las Flores Pipelines' CDPs were first issued, the County has not required new or amended CDPs for the anomaly work and all of the enumerated conditions relevant to the anomaly repairs at issue and have remained unaltered.

31.     The Pipeline Project's EIR/EIS explains that its impact analysis extends through the pipelines' entire lifetime, including both pipeline "operation" and "maintenance" and specifically acknowledges that routine maintenance activities, including the anomaly repair work, would occur during the pipelines' ongoing operation.

32.     The Pipeline Project's EIR/EIS incorporates into the Pipeline Project's project description certain Oil Spill Contingency and Emergency Response Plans that address ongoing pipeline maintenance activities. The EIR/EIS concludes that compliance with these plans would

"substantially reduce the oil spill risk" and reduce any significant impacts that would result from a major oil spill, including impacts related to soils, surface water, aquatic biology, and land use and recreation. The County's Statement of Overriding Considerations also concluded that compliance with these plans, identified mitigation measures, and the Conditions of Approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project. These plans (which were directly attached to the Draft EIR/EIS and were available for public review and comment) acknowledged the pipelines' ongoing inspection requirements, including by using inspection pipeline integrity gauges ("PIGs") to "measure the severity of corrosion and to inspect pipeline defects." If required, identified pipeline defects (i.e., anomalies), once detected, would be repaired, "cleaned and recoated" or "removed and replaced," and "faulty … sections of pipe would be replaced as necessary.

33. The Pipeline Project's EIR/EIS imposes no limitation on the number of sites where anomaly repairs may be undertaken at any one time or over the Las Flores Pipelines' lifetime, and thus, anomaly pipeline repairs contemplated under the Pipeline Project's EIR/EIS for the Las Flores Pipelines may be undertaken where such work is necessary at the same time or over a condensed period without constituting a new project under CEQA.

34. Additionally, the Las Flores Pipelines' Conditions of Approval, which were incorporated by reference into the Las Flores Pipelines' FDP, CUP, and CDPs, encompassed the same operational and maintenance components of the Pipeline Project as described in the Pipeline Project's EIR/EIS, and thus, specifically contemplated and approved ongoing repair and maintenance activities, including the anomaly repair work. For example, Condition J-11 acknowledges that the pipelines' right-of-way will be used for "operational maintenance" after construction is completed. Further, Condition P-2 contemplates that the pipeline operator will conduct "regular maintenance and safety inspections," "corrosion monitoring and leak detection," and "periodic safety audits. Condition P-2 also acknowledges that federal regulations require the Pipelines' operator to undertake certain repair and maintenance activities such as the anomaly repair work at issue. The County later amended this Condition in 1987 to expressly state that "[p]ermits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids

7

DECLARATION OF STEVE RUSCH

by Pipeline), with the exception of areas/issues agreed to by the permittee and the County." Condition P-2 confirms that required repair and maintenance activities like the anomaly repair work would be undertaken pursuant to the Las Flores Pipelines' Conditions of Approval, FDP, and CDPs rather than requiring new or modified permits. As described above, the County's Statement of Overriding Considerations concluded that the Pipelines operator's compliance with Condition P-2 and other Conditions of Approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project.

35.     The Conditions of Approval contemplate that biological impacts within the Las Flores Pipelines' operational right-of-way would be permanent, allowing for ongoing repair and maintenance activities like the anomaly repair work. For example, Condition H-1(j) originally required the pipeline operator to develop a "plan for off-site reestablishment of oaks to mitigate impacts to oak savannahs and woodlands along the route."

36.     The County later modified this condition to require the pipeline operator to endow an Alternative Oak Mitigation Program to reestablish oak savannahs and woodlands in Santa Barbara County at an off-site location to mitigate for the Project's permanent on-site oak tree impacts. Similarly, Conditions H-10 and H-11 required the pipeline operator to, after construction, replace and revegetate any disturbed catalina mariposa lily and refugio manzanita in locations "in or near" the disturbed area, but "exclusive of the operation [right-of-way]." Erosion control was the key objective for any required revegetation along the pipelines' operational right-of-way—not the long-term reestablishment of sensitive species—because it was clearly understood that the pipeline's right-of-way would continue to be disturbed by pipeline operation and maintenance. These Conditions confirm that any biological impacts along the pipelines' operational right-of-way resulting from the anomaly repair work are within the scope of impacts previously approved by the County.

37.     The Conditions of Approval do not impose any limit or require new permits based on the number of sites where anomaly repairs may be necessary or undertaken at the same time or over a condensed period. Repair and maintenance activities, including the anomaly repair work, fail to trigger any of the narrow circumstances under which the Conditions of Approval would require Sable to obtain a new or modified permit. Condition A-13 provides:

[The pipeline operator] shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgement of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above [noted as the outer continental shelf and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins], and 4) introduction of a different product from any source.

38.    The anomaly repair work falls within the scope of approved repair and maintenance activities contemplated by the pipelines' Conditions of Approval, and as analyzed under the Pipeline Project's EIR/EIS, to be undertaken without any subsequent or modified permit or subsequent environmental review because the work does not involve: (1) "major pipeline or pump station modifications," as the anomaly repair work is a standard repair and maintenance activity required by 49 C.F.R. § 195.452(h)(1); (2) "major changes in pipeline throughput," because the anomaly repair work will not alter the pipelines' capacity; (3) "introduction of production . . . from [new] sources"; or (4) "introduction of a different product."

**The County's Confirmations that the Repair and Maintenance Is Already Authorized**

39.    On February 12, 2025, the County confirmed in a letter to Sable that the future and ongoing anomaly repair work conducted by Real Parties to the Las Flores Pipelines is "authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement. Thus, no further application to or action by the County is required." The County reached its conclusion after review of detailed descriptions, plans, and assessments provided to the County by Sable included in Zoning Clearance applications submitted to the County concerning future and ongoing anomaly repair work in the coastal zone. The County's letter further confirms that it is "not appealable to the Planning Commission [or] Board of Supervisors." Although Sable's Zoning Clearance applications allowed the County to confirm that ongoing and future anomaly repair work falls within the scope of the Pipeline Project's existing CDPs, the County also concluded that such work does not actually require Zoning Clearances. As the County explained, its "assessment is

9

DECLARATION OF STEVE RUSCH

consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits." Therefore, based on its review the County concluded that "no further application to or action by the County is required." This reflects a County understanding that Zoning Clearances should be used before commencing initial construction approved under a final development plan and that Zoning Clearances should not be used for each individual element of the approved development or use throughout the life of a project. Accordingly, the County offered to return the Zoning Clearance applications without taking any action on them other than confirming "that the pipeline anomaly repair work is authorized by the existing permits." *See* Exhibit A.

40.    On March 6, 2025, SCS Engineers, on behalf of Real Parties, submitted "information regarding 48 anomaly repairs previously conducted on portions of the [Las Flores Pipelines] [], and in one County right-of-way . . . ." On March 21, 2025, the County confirmed that it had "reviewed the information [Real Parties] provided and [] determined that this work fits within[] the conclusions/directives of our February 12, 2025 letter to Steve Rusch []. No permits will be required [for the previous anomaly repair work to the Las Flores Pipelines]." A true and correct copy of the exchange of correspondence with the County staff's regarding prior repair and maintenance work performed in 2024 is attached hereto as **Exhibit C**.

41.    On April 9, 2025, the County sent the Coastal Commission a correspondence addressing the County's determination that the repair and maintenance activities to the Las Flores Pipelines were authorized under existing CDPs. In its correspondence, the County noted that the Coastal Commission claimed "that the County has 'failed to provide the requested information regarding the basis for the County staff's determination.'" The County explained, "[p]lease note that we have provided all requested documents in response to Coastal Commission inquiries[,]" and explained that "Commission staff has all the information that the County considered prior to concluding that the pipeline anomaly repair work identified in the February 12, 2025 letter is authorized by the existing permits and was analyzed in the prior environmental review." The County's April 9, 2025 correspondence further provides that, "[t]he County did not allow activity without a permit, nor did the County take an action on a permit or development application that may be

appealable to the Coastal Commission." A true and correct copy of the County's April 9, 2025 correspondence is attached hereto as **Exhibit D**.

42.     On February 8, 1988, the Las Flores Pipelines' original proponent, the Celeron Pipeline Company of California (Celeron), and the County entered into a Settlement Agreement regarding the County's jurisdiction over certain project components. As part of the Settlement Agreement, the County agreed that it was preempted from regulating the Las Flores Pipelines' design, construction, and operation covered under 49 C.F.R. Part 195. The Settlement Agreement also creates a presumption of preemption where the activity is: (1) covered by 49 C.F.R. Part 195 (PHMSA's implementing regulations), (2) deals with the design, construction, or operation of the pipeline even if not expressly specified under 49 C.F.R. Part 195, or (3) performed a foot or more below the ground surface. The County reserved the authority, however, to confirm that the Las Flores Pipelines comply with the Conditions of Approval, allowing the County to ensure that the Las Flores Pipelines were constructed and operated consistent with the Pipeline Project's EIR/EIS and original County approvals, including the CDPs. The Settlement Agreement further details that the County lacks authority, however, to require additional permits or authorizations for any work that is expressly or impliedly covered 49 C.F.R. Part 195, related to pipeline design, construction, or operation, or is performed a foot or more below the ground surface.

43.     In 2015, the California Legislature enacted AB 864, which requires pipeline operators in environmentally sensitive areas to use best available technology including, but not limited to, "leak detection technologies, automatic shut-off systems, or remote controlled sectionalized block valves, or any combination of these technologies" to reduce the volume of potential oil spills. AB 864 charged the OSFM with drafting and implementing its regulations and granted OSFM the exclusive authority to enforce them.

44.     In April 2021, Real Parties' predecessor-in-interest, Plains Pipeline, L.P. ("Plains"), secured approval from OSFM to retrofit the Pipelines with 16 above-ground safety valves as required under AB 864, including seven valves in the Coastal Zone. The proposal included both motor-operated valves ("MOVs"), which are equipped with an electrical shut-off system connected to utility lines or a solar power source, and check valves ("CHKs"), which involve an automatic shut-off system with

one-way flow closure.

45.     Like Real Parties' anomaly repair work, the Pipelines' original environmental review contemplated safety valve installation work, including the installation of 15 "block and check" valves that operate in the same way as the MOVs and CHKs approved by OSFM in April 2021.

46.     In December 2021, Plains submitted applications to the County for approval to complete the safety valve installation work. As a result of litigation related to the County's review of those applications, Real Parties revised the proposal such that all safety valves would be installed underground.

47.     On August 30, 2024, Real Parties and the County also entered into a settlement agreement in litigation regarding the safety valves on the Las Flores Pipelines. The August 30, 2024 settlement agreement addresses Real Parties' revised plan regarding proposed safety valves as well as additional surveillance and response enhancements that will be added to the Las Flores Pipelines. In the August 30, 2024 settlement agreement, followed by a subsequent letter from the County on September 4, 2024, the County confirmed that "it does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment because they are safety valves required by state law [AB 864], related to the operation of an interstate pipeline, and one foot or more underground. [The County] understands the [Las Flores Pipelines] remain[] subject to regulation by the Office of State Fire Marshal and that [Real Parties] will be working closely with that office on installation and testing of the safety valves, as well as implementing a number of integrity-related improvements required by that office." As the August 30, 2024 settlement agreement also details, State law AB 864 and the Office of State Fire Marshal require installation of safety valves on the Las Flores Pipelines before the Las Flores Pipelines may be restarted. Pursuant to a consent decree, the Office of the State Fire Marshal holds authority over the restart of the Las Flores Pipelines, oversees installation and testing of the safety valves and implementation of several integrity-related improvements before resumption of production transportation through the Las Flores Pipelines may take place.

48.     On September 4, 2024, in light of Plaintiff's revision to the proposed safety valve installation work, the County confirmed that the County "does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment as currently proposed because they

are safety valves required by state law [AB 864], related to the operation of a Pipeline, and one foot or more underground. Because the County has delegated LCP authority under the Coastal Act, Real Parties understood the County's confirmation to extend to Coastal Act permitting as well. Real Parties began the safety valve installation work only after receiving this confirmation that no further County authorization was required.

49.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed June 3, 2025, at City, State.

THOUSAND OAKS, CA

_____
STEVE RUSCH

13

DECLARATION OF STEVE RUSCH

# EXHIBIT A



**Planning and Development**
Lisa Plowman, Director
Jeff Wilson, Assistant Director
Elise Dale, Assistant Director

February 12, 2025

Mr. Steve Rusch
Sable Offshore Corporation/Pacific Pipeline Corporation
12000 Calle Real
Goleta, CA 93117

*Sent via email:* srusch@sableoffshore.com

SUBJECT:   Zoning Clearance Applications - 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096

Mr. Rusch,

On November 22, 2024 and December 6, 2024, Santa Barbara County Planning and Development received four Zoning Clearance applications for pipeline "anomaly repair work" to Lines 324 and 325a. These applications stated that they sought to permit anomaly repair work in the enclosed descriptions of work for case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096. Sable's position is that the Zoning Clearance process meets the requirements of the County's Local Coastal Program because it is a means for the County to determine if the activities fall within an existing Coastal Development Permit or if a new Coastal Development Permit is required.

The County conducted a detailed review of pipeline permitting history and the Coastal Zoning Ordinance. Planning and Development concludes that this pipeline anomaly repair work is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement (EIR/EIS). The County previously exercised its authority under its Local Coastal Program and delegated Coastal Act authority in approving the permits and the requested anomaly repair work is within the scope of those approved permits. (Pub. Resources Code § 30519.) The County's assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits. Planning and Development will be returning the Zoning Clearance applications to Sable without taking action on them. Alternatively, Sable can choose to withdraw the applications.

This conclusion is related to the requested pipeline anomaly repair work in case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096 and the information supplied with those applications and does not speak to permitting or jurisdiction on any other past or future work on or changes to the Pipeline and associated equipment.

This is not a: 1) permit exemption; 2) Director determination on the meaning or applicability of the provisions of the Coastal Zoning Ordinance; 3) decision on an application for a Coastal Development Permit; or 4) any other ground set forth in Article II Section 35-182. Rather, this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS. Thus, no further application to or action by the County is required. This conclusion is not appealable to the Planning Commission, Board of Supervisors, or Coastal Commission and it does not require a Notice of Final Action. (Article II §§ 35-182; 35-181.4.)

Planning and Development encourages and requests that Sable continue to provide information to the County about any future anomaly repair work consistent with what was supplied in the above-referenced application. Such information will allow the County to evaluate whether particular anomaly repair work results in any different conclusions than those set forth in this letter. That information can be directed to my attention.

Sincerely,

Errin Briggs
Deputy Director, Energy, Minerals, Compliance & Cannabis Division

Enclosures:    24ZCI-00090 Description of Work
               24ZCI-00091 Description of Work
               24ZCI-00095 Description of Work
               24ZCI-00096 Description of Work

CC:            Mickey Johnson, ExxonMobil Upstream Company, via email
               mickey.d.johnson@exxonmobil.com

Sable – Anomaly Repair Work Zoning Clearance Applications

24ZCI-00090 + 91

## Zoning Clearance Applications for
## CA-324 Pipeline Routine Anomaly Repair Work – Description of Work

**Scope of Work**

In order to repair an anomaly, Sable must undertake the following steps: (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

Sable previously commenced the Anomaly Repair Work in compliance with Sable's obligation under federal regulations to take "prompt action" to address pipeline anomalies. (See 49 C.F.R., § 195.452, subd. (h)(1).) On September 27, 2024, the California Coastal Commission issued Sable Notice of Violation V-9-24-0152 ("NOV") and required Sable to immediately stop all Anomaly Repair Work. In accordance with the NOV, Sable stopped undertaking the Anomaly Repair Work. On November 12, 2024, Commission staff issued Executive Director Cease and Desist Order No. ED-24-CD-02 ("EDCDO"), which required Sable to submit an Interim Restoration Plan to secure and backfill the open anomaly sites without completing the Anomaly Repair Work. Commission staff approved Sable's proposed Interim Restoration Plan on November 20, 2024 with respect to the remedial grading and BMP segment of the Interim Restoration Plan. As of November 21, 2024, Sable and Commission staff were continuing to coordinate regarding the hydroseeding segment of the plan. Consistent with the Interim Restoration Plan, each anomaly site will be backfilled and restored to original grade without completing the Anomaly Repair Work.

As such, Sable's Zoning Clearance applications seek *both*:

1. After-the-fact Zoning Clearances for the Anomaly Repair Work previously undertaken at each anomaly site identified in the applications; and
2. Zoning Clearances to complete the Anomaly Repair Work at each such anomaly site in the future (including by excavating the anomaly site again after it is backfilled and restored in compliance with the EDCDO and Interim Restoration Plan).

---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.

[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.

## Location

45 anomaly sites require Anomaly Repair Work.  As discussed above, these sites are located along existing pipeline CA-324 in APNs 081-140-019, 081-140-025, 081-150-002, 081-150-006, 081-150-007, 081-150-028, 081-150-032, 081-150-033, and 081-230-021. Table 1 details each anomaly site.  Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
|---|---|
| | Application #1 |
| | Application #2 |





The proposed work would utilize the existing roads to access each site. No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements. All material will be balanced onsite, and no material will be imported or exported. Shoring boards will be utilized to stabilize the excavation walls prior to entry. Equipment needed to complete the Anomaly Repair Work includes the following:

- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)
- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

## Fire Protection
If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of

water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

**Construction Best Management Practices**

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

**Conclusion**

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325 in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

Sable – Anomaly Repair Work Zoning Clearance Applications

24 8C1-00095 °, 96

# Zoning Clearance Applications for
# CA-324 and CA-325A Pipeline Routine Anomaly Repair Work –
# Description of Work

## Scope of Work

In order to repair an anomaly, Sable must undertake the following steps: (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

## Location

28 anomaly sites require Anomaly Repair Work. As discussed above, these sites are located along existing pipeline CA-324 and CA-325A in APNs 081-130-068, 081-140-023, 081-150-002, 081-150-028, 081-150-032, 081-270-011, 083-590-003, 083-650-008, 083-650-009, and 083-650-011. Table 1 details each anomaly site. Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
|---|---|
| | Application #1 |
| | Application #2 |



---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.

[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.



The proposed work would utilize the existing roads to access each site. No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements. All material will be balanced onsite, and no material will be imported or exported. Shoring boards will be utilized to stabilize the excavation walls prior to entry. Equipment needed to complete the Anomaly Repair Work includes the following:

- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)

---

[3] F-9 is associated with two anomaly numbers from separate investigatory tool runs but is associated with one anomaly.

- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

## Fire Protection

If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

## Construction Best Management Practices

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

### Conclusion

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325A in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

# EXHIBIT B



# EXHIBIT C

## Niz, Kim

| | |
|---|---|
| **From:** | Briggs, Errin <ebriggs@countyofsb.org> |
| **Sent:** | Friday, March 21, 2025 10:52 AM |
| **To:** | Thompson, James; Ybarra, Jacquelynn; Plowman, Lisa |
| **Cc:** | Rusch, Steve; Yearwood, Lance; Surmeier, Patrice; Alcock, Lee; Lauren.Paull@lw.com |
| **Subject:** | RE: Sable – Completed Anomaly Repairs |
| **Attachments:** | Feb 12, 2025, Letter from Errin Briggs to Steve Rusch.pdf |

**CAUTION:** External Sender

Hi James,

Thank you for the informational package regarding anomaly repair activities completed on Line 324 in 2024.

We have reviewed the information you provided and have determined that this work fits withing the conclusions/directives of our February 12, 2025 letter to Steve Rusch (attached). No permits will be required.

Thank you for the continued cooperation on these matters, we would appreciate if you could continue to provide similar information in advance for future projects of this type.

Sincerely,



**Errin Briggs**

**Deputy Director, Energy Minerals & Compliance**

Planning & Development
County of Santa Barbara
123 E. Anapamu St.
Santa Barbara, CA 93101
805-568-2047
ebriggs@countyofsb.org
https://www.countyofsb.org/160/Planning-Development

**From:** Thompson, James <JSThompson@scsengineers.com>
**Sent:** Thursday, March 6, 2025 11:34 AM
**To:** Briggs, Errin <ebriggs@countyofsb.org>; Ybarra, Jacquelynn <jybarra@countyofsb.org>
**Cc:** Rusch, Steve <srusch@sableoffshore.com>; Yearwood, Lance <lyearwood@sableoffshore.com>; Surmeier, Patrice <psurmeier@sableoffshore.com>; Alcock, Lee <lalcock@sableoffshore.com>; Lauren.Paull@lw.com
**Subject:** Sable - Completed Anomaly Repairs

**Caution: This email originated from a source outside of the County of Santa Barbara. Do not click links or open attachments unless you verify the sender and know the content is safe.**

Good Morning Errin,
On behalf of Sable Offshore Corp. – Pacific Pipeline Company (Sable), SCS Engineers is providing information regarding 48 anomaly repairs previously conducted on portions of the existing pipeline CA-324 located on APNs 081-140-019, 081-140-025, 081-150-006, 081-150-028, 081-150-032, 081-150-033,

081-150-041, 081-150-042, 081-200-033, 081-210-047, 081-210-050, 081-210-051, 081-230-021, and in one County right-of-way not associated with an APN.

Please use the links below to download the cover letter and associated attachments. Let me know if you have any questions or comments.



**1 - Sable Completed Anomaly Cover Letter.pdf (113k)**

**Completed Anomaly - Attachments.zip (17M)**

File links in this email will be active until April 5, 2025

Thanks,
James

**James Thompson**
Project Manager
SCS ENGINEERS
316-250-1224 (cell)
661-606-6001 (office)
jsthompson@scsengineers.com

2

# EXHIBIT D



**Planning and Development**
Lisa Plowman, Director
Jeff Wilson, Assistant Director
Elise Dale, Assistant Director

April 9, 2025

Mr. Cassidy Teufel
Deputy Director
California Coastal Commission
455 Market Street, Suite 300
San Francisco, CA 94105
*Sent via email:* *Cassidy.Teufel@Coastal.ca.gov*

SUBJECT:    Sable Offshore Corp. – Authorization for Anomaly Repair Work

Dear Mr. Teufel,

The purpose of this letter is to respond to your April 7, 2025 letter to me which details your disagreement with our determinations regarding the ongoing anomaly repair work along Sable's Lines 324 and 325a located in the coastal zone.

In your April 7th letter you assert that the County has "failed to provide the requested information regarding the basis for County staff's determination." Please note that we have provided all requested documents in response to Coastal Commission inquiries.

- Initially, on September 9, 2024 and September 24, 2024, Celeron Pipeline Co. settlement-related documents were provided upon request to Cassidy Teufel, Wesley Horn and Jonathan Bishop.
- Following, in response to the Commission's request for the permit documents associated with the original construction of the pipelines, on December 10, 2024 a comprehensive set of printed permit history documents was provided to Wesley Horn in person.
- Then, a complete set of anomaly repair description documents were provided to Commission staff on February 24, 2025 in our letter to Cassidy Teufel.
- And finally, the most recent set of anomaly repair description documents were provided via email to Commission staff on March 24, 2025.

Commission staff has all of the information that the County considered prior to concluding that the pipeline anomaly repair work identified in the February 12, 2025 letter is authorized by the existing permits and was analyzed in the prior environmental review.

We understand the Coastal Commission has reached a different conclusion considering the provided documents, but the County continues to assert the dispute resolution process in Section 13569 is not applicable here because it only applies when: 1) the local government determines a project is exempt or categorically excluded; or 2) a decision on whether a proposal would be appealable to the Coastal Commission. The County did not allow activity without a permit, nor did the County take an action on a permit or development application that may be appealable to the Coastal Commission.

Best,

Lisa Plowman
Director, Planning & Development


Enclosure:     Letter from County to Cassidy Teufel dated February 12, 2025
               Letter from County to Cassidy Teufel dated February 24, 2025

**PROOF OF SERVICE**

I, Heather Thai, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 3, 2025, I served the document(s) **DECLARATION OF STEVE RUSCH IN SUPPORT OF OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 3, 2025, at Los Angeles, California.

/s/Heather Thai
                                     Heather Thai

# SERVICE LIST

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

**ATTORNEYS FOR PETITIONERS**
ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
           jfrankel@environmentaldefensecenter.org
           trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

**ATTORNEYS FOR RESPONDENTS/ DEFENDANTS**
California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

**ATTORNEYS FOR REAL PARTIES IN INTEREST**
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
           benjaminhanelin@paulhastings.com
           natalierogers@paulhastings.com

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN (SBN 237595)
benjaminhanelin@paulhastings.com
NATALIE C. Rogers (SBN 301254)
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/3/2025 8:00 AM
By: Gabriel Moreno , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

ENVIRONMENTAL DEFENSE CENTER et al.,

      Petitioners and Plaintiffs,

  v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al.,

      Respondents and Defendants,

    and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

      Real Parties in Interest.

Case No. 25CV02247

Assigned for all purposes to:
Hon. Donna G. Geck

**DECLARATION OF JAMIE SHAFER IN SUPPORT OF OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Complaint Filed:    April 15, 2025
Trial Date:    None set

---

DECLARATION OF JAMIE SHAFER

## <u>DECLARATION OF JAMIE SHAFER</u>

I, Jamie Shafer, declare as follows:

1. I am an integrity engineer for Sable Offshore Corp. ("Sable") and am responsible for developing integrity management systems for Las Flores Pipelines CA-324 and CA-325 ("Las Flores Pipelines") in Santa Barbara County, California. I have over 35 years of experience in integrity engineering with a specific focus on corrosion along hazardous materials pipelines. I have a Bachelor of Science Degree in Metals Science and Engineering from The Pennsylvania State University. I make this declaration in support of Real Party in Interest Sable's and Pacific Pipeline Company's (collectively, "Sable") Preliminary Opposition to Petitioners' *Ex Parte* Application for a Temporary Restraining Order. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2. Cathodic protection is an electrochemical process used to limit the extent to which a metal surface, like a pipeline, experiences corrosion. Cathodic protection is one method used to mitigate the risk of pipeline defects and resulting impacts.

3. Pipeline operators also rely upon several other methods to mitigate the risk of pipeline defects and any resulting impacts. For example, operators also may rely upon regular or targeted in-line pipeline inspections, physical pipeline inspections, mandatory repair protocols, pressure testing, corrosion growth modeling, motor-operated or automatic safety valves, and alarm systems to prevent and limit the impacts of a pipeline defect or failure due to corrosion.

4. Where one such method is anticipated to be less effective, pipeline operators can implement more stringent standards with respect to other risk mitigation methods to account that risk.

5. Sable will be required to operate the Las Flores Pipelines in compliance with a federal Consent Decree that sets forth exacting requirements related to integrity management, mandatory pipeline defect (i.e., anomaly) repairs, safety valves, control room management, and emergency response and oil spill response plans. Many of these requirements exceed applicable federal and state regulations that would otherwise govern the Pipelines or similar facilities.

6. The Las Flores Pipelines' cathodic protection systems are functioning, and impressed currents are being monitored and maintained along the majority of the 125-mile-long pipeline system. In those areas where the electrochemical cell is functioning at less than full capacity, Sable employs the alternative means discussed above to ensure the Pipelines' integrity is monitored and maintained.

7. The Las Flores Pipelines are also subject to California State Assembly Bill AB 864 ("AB 864"), which requires that the Pipelines implement best available technology including leak detection technology, automatic shutoff systems, or remote-controlled motor-operated valves to reduce the amount of oil released in a potential oil spill. Further, Line CA-324 would operate at very low pressure, which significantly reduces potential failure risks.

8. In addition, the Las Flores Pipelines must comply with over sixty different conditions, many with multiple sub-parts and internal requirements, imposed by the Office of the State Fire Marshal in response to Sable's applications for a waiver of certain regulatory requirements contained in Title 49 of the Code of Federal Regulations (the "State Waivers").

9. The conditions contained in the State Waivers address multiple aspects of pipeline safety to minimize the risk of pipeline corrosion, including pressure testing, in-line inspection assessments and their frequency, repair thresholds and requirements, corrosion growth rate analyses, in-field direct examination of pipelines, integrity management, recordkeeping, and reporting.

10. As a result, the Las Flores Pipelines are the most highly regulated pipelines in the country, if not the world.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this __3rd__ day of June, 2025, in ___Goleta___, California.

_Jamie Shafer_
Jamie Shafer

DECLARATION OF JAMIE SHAFER ISO REAL PARTIES IN INTEREST'S OPPOSITION TO PETITIONERS' *EX PARTE* APPLICATION

**PROOF OF SERVICE**

I, Heather Thai, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 3, 2025, I served the document(s) **DECLARATION OF JAMIE SHAFER IN SUPPORT OF OPPOSITON TO *EX PARTE* APPLICATION FOR STAY OR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒  BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 3, 2025, at Los Angeles, California.

/s/Heather Thai
Heather Thai

**SERVICE LIST**

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

**ATTORNEYS FOR PETITIONERS**
ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
          jfrankel@environmentaldefensecenter.org
          trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

**ATTORNEYS FOR RESPONDENTS/ DEFENDANTS**
California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

**ATTORNEYS FOR REAL PARTIES IN INTEREST**
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
          benjaminhanelin@paulhastings.com
          natalierogers@paulhastings.com

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/3/2025 4:04 PM
By: Narzralli Baksh , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **NOTICE OF ENTRY OF ORDER** <br><br> Judge: Hon. Donna D. Geck <br> Dept.: 4 <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT,** on June 3, 2025, the Court entered the following orders in the above-entitled action:

- An Order to Show Cause directing Respondents and Real Parties in Interest to appear on Friday, July 18, 2025, at 10:00 a.m. and show cause why a preliminary injunction should not be ordered enjoining Respondents and Real Parties from taking any further steps to restart the Las Flores Pipeline System during the pendency of this action.

- A Temporary Restraining Order enjoining Respondents and Real Parties in Interest from taking any further steps to restart the Las Flores Pipeline System pending the July 18, 2025, hearing on the Order to Show Cause.

- An Order Denying Petitioners' Request for Judicial Notice, which was submitted in support of Petitioners' ex parte application for injunctive relief.

Copies of the orders are attached hereto and incorporated into this notice by this reference.

Dated: June 3, 2025                         Respectfully Submitted,



Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 6/2/2025

Case 2:26-cv-05242-SVW-SSC    Document 4    Filed 05/14/26    Page 300 of 402    Page ID #:1809    NB

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

**06/03/2025**

Darrel E. Parker, Executive Officer

BY  Chavez, Terri
_____
Deputy Clerk

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF SANTA BARBARA

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

           Petitioners and Plaintiffs,

    vs.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,

           Respondents and Defendants,

    and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

           Real Parties in Interest.

Case No.: 25CV02247

~~[PROPOSED]~~ **ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Date:     June 3, 2025
Time:    8:30 a.m.
Dept.:    4
Judge:   Hon. Donna ░. Geck

Action Filed: April 15, 2025
Trial: None Set

---

1

[Proposed] Order to Show Cause and Temporary Restraining Order

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

Upon consideration of the Verified Petition for Writ of Mandate and Complaint for Injunctive Relief filed in this action, the Ex Parte Application for an Order to Show Cause and Temporary Restraining Order, and the papers filed in support thereof, and good cause appearing:

<b>ORDER TO SHOW CAUSE</b>

**YOU ARE HEREBY ORDERED TO APPEAR AND SHOW CAUSE** at 10:00 a.m. on July 18 , 2025, or as soon thereafter as counsel may be heard in Department 4 of the above-entitled Court, located at 1100 Anacapa Street, Santa Barbara, CA 93121, why a preliminary injunction should not issue against Respondents California Department of Forestry and Fire Protection, Office of the State Fire Marshal, and Daniel Bermant (collectively, "Respondents"), and Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Real Parties"), prohibiting Respondents, Real Parties, their agents, their employees, or anyone acting in concert with proceeding with the restart and operation of the Las Flores Pipeline System, as challenged by the Verified Petition and Complaint on file in this action.

<b>TEMPORARY RESTRAINING ORDER</b>

PENDING HEARING on the above Order to Show Cause, Respondents, Real Parties, their agents, their employees, or anyone acting in concert with them ARE HEREBY TEMPORARILY RESTRAINED AND ENJOINED from proceeding with the restart and operation of the Las Flores Pipeline System, as challenged by the Verified Petition and Complaint on file in this action.

This Temporary Restraining Order is effective immediately, and will remain in full force and effect until the hearing on the Order to Show Cause, unless this Court orders otherwise.

IT IS SO ORDERED.

DATED: **06/03/2025** , 2025

JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

[Proposed] Order to Show Cause and Temporary Restraining Order

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 6/2/2025

NB

**F I L E D**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

**06/03/2025**
Darrel E. Parker, Executive Officer
BY ___Chavez, Terri_____
Deputy Clerk

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

**<span style="color:red">DENIED</span>**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **[PROPOSED] ORDER GRANTING REQUEST FOR JUDICIAL NOTICE** <br><br> Date:      June 3, 2025 <br> Time:      8:30 a.m. <br> Dept.:      4 <br> Judge:     Hon. Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

1
[Proposed] Order Granting Request for Judicial Notice

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

Upon consideration of the Verified Petition for Writ of Mandate and Complaint for Injunctive Relief filed in this action, the Ex Parte Application for a Stay or for an Order to Show Cause and Temporary Restraining Order ("Ex Parte Application"), and the papers filed in support thereof, and good cause appearing:

Petitioners' request for judicial notice ("RJN") filed with the Ex Parte Application is granted as to requests Nos. 1-13. Accordingly, the Court takes judicial notice of the following:

**RJN No. 1**  *Exhibit A* - California Department of Fish and Wildlife (CDFW), *et al.*, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment, dated June 2021

**RJN No. 2**  *Exhibit B* - U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, dated May 2016

**RJN No. 3**  *Exhibit C* - Staff Report Recommending that the California Coastal Commission (CCC) issue a Cease and Desist Order (CDO), Restoration Order, and Administrative Civil Penalty to Sable Offshore Corp. ("Sable"), dated March 28, 2025

**RJN No. 4**  *Exhibit D* - Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-324 by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025

**RJN No. 5**  *Exhibit E* - Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-325A/B by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025

**RJN No. 6**  *Exhibit F* - Notice of Violation from the RWQCB to Sable, dated April 15, 2025

**RJN No. 7**  *Exhibit G* - OSFM letter granting the waiver for CA-324, dated December 17, 2024

**RJN No. 8**    *Exhibit H* - OSFM letter granting the waiver for CA-325A/B, dated December 17, 2024

**RJN No. 9**    *Exhibit I* - Excerpts from Draft Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the Proposed Celeron/All American and Getty Pipeline Projects prepared by the California State Lands Commission (CSLC) and Bureau of Land Management, Department of the Interior (BLM) dated August 1984

**RJN No. 10**    *Exhibit J* - Excerpts from Final EIR and EIS for the Proposed Celeron/All American and Getty Pipeline Projects prepared by CSLC and BLM dated January 1985

**RJN No. 11**    *Exhibit K* - Santa Barbara County ("County") Webpage "901/903 Replacement Pipeline Project" (last accessed May 27, 2025)

**RJN No. 12**    *Exhibit L* - PHMSA Webpage "Pipeline Special Permits and State Waivers Overview" (last accessed May 30, 2025)

**RJN No. 13**    *Exhibit M* - California Natural Resources Agency's (CNRA) summary of state regulation of crude oil pipelines in the County prepared and maintained by CNRA, last updated on May 14, 2025 (last accessed May 28, 2025)

IT IS SO ORDERED.

**DENIED**

DATED: ___06/03/2025___, 2025

JUDGE OF THE SUPERIOR COURT

[Proposed] Order Granting Request for Judicial Notice

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On June 3, 2025, I served the above document(s) described as **NOTICE OF ENTRY OF ORDER** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒     **By e-mail or electronic transmission.** On the date below, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 3, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEY FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

Dated and Entered:   06/03/2025                          Time:   8:30 AM
Judicial Officer:      Donna D Geck
Deputy Clerk:        Maria Vidal                          Dept:   SB Dept 4
Deputy Sheriff:       Marco Diaz
Bailiff/Court Officer:                                    Case No: 25CV02247
Court Reporter:       Shelley Cockrell

---

**Environmental Defense Center et al vs California Department of Forestry and Fire Protection et al**

Parties Present:

Linda Krop            Petitioner's Attorney
Michael Dorsi         Respondent's Attorney (via Zoom)
Jeffrey Dintzer       Attorney for Real Party in Interest
Brooke Bolender       Attorney for Real Party in Interest

---

**NATURE OF PROCEEDINGS***:* **Petitioners' Ex Parte Application for Stay or Order to Show Cause and Temporary Restraining Order**

Counsel presented argument.

The Court granted the relief requested.

The Court set a hearing on the OSC re Preliminary Injunction for July 18, 2025 at 10:00 a.m.

The briefing schedule shall be per code.

The Court is not requiring a bond.

This case was heard along with case #25CV02244, Center for Biological Diversity et al vs California Department of Forestry and Fire Protection et al. Counsel for Sable Offshore Corp requested that the cases be ordered coordinated. The Court ordered the cases coordinated. After the hearing concluded, the Court found that coordination may not be appropriate in this situation, as coordination brings to one court two or more civil actions that are pending in different courts. The Court hereby vacates the order coordinating the cases. Counsel shall be prepared to discuss this at the next hearing or file an appropriate motion to consolidate if that is what they are seeking.

DARREL E. PARKER, EXECUTIVE OFFICER          Minutes Prepared by:

                                             _____ , Deputy
                                                      Maria Vidal

SC-2411 (Revised July 1, 2013)          **MINUTE ORDER**

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA<br>STREET ADDRESS:  1100 Anacapa Street<br>CITY AND ZIP CODE:  Santa Barbara CA  93101<br>BRANCH NAME:  Anacapa | FOR COURT USE ONLY<br>**FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**06/04/2025**<br>Darrel E. Parker, Executive Officer<br>BY  Vidal, Maria<br>_____<br>Deputy Clerk |
|---|---|
| CAPTION:<br>**Environmental Defense Center et al vs California Department of Forestry and Fire Protection  et al** | |
| **CLERK'S CERTIFICATE OF MAILING** | CASE NUMBER:<br>**25CV02247** |

I certify that I am not a party to this cause and that a true copy of the **Minute Order dated 06/03/25** was mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the mailing of such and execution of this certificate occurred at (*place*) Santa Barbara, California, on (*date*): 06/04/2025

Darrel E. Parker, Executive Officer

Dated:    06/04/2025

By  _____Maria Vidal_____  , Deputy

Linda J Krop
Environmental Defense Center
906 Garden St
Santa Barbara        , CA  93101

_____

Michael S Dorsi
Office of the Attorney General of California
455 Golden Gate Avenue Suite 11000
San Francisco, CA  94102-7004

_____

Jeffrey D Dintzer
Alston & Bird LLP
350 South Grand Avenue  51st Floor
Los Angeles, CA  90071

_____

SC-1009 [Rev. July 1, 2013]                    CLERK'S CERTIFICATE OF MAILING

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/26/2025 4:52 PM
By: Narzralli Baksh , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, | Case No.: 25CV02247 |
| | **PETITIONERS AND PLAINTIFFS' REQUEST FOR HEARING AND NOTICE OF REQUEST** |
| Petitioners and Plaintiffs, | [Pub. Res. Code § 21167.4] |
| vs. | Dept.:    4<br>Judge:    Honorable Donna D. Geck |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, | Action Filed: April 15, 2025<br>Trial: None Set |
| Respondents and Defendants, | |
| and | |
| SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, | |
| Real Parties in Interest. | |

**REQUEST FOR HEARING AND NOTICE OF REQUEST**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Public Resources Code section 21167.4, Petitioners and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (collectively, "Petitioners") will and hereby do request a hearing on the merits of Petitioners' Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief, which alleges violations of, *inter alia*, the California Environmental Quality Act (CEQA), Public Resources Code section 21000 *et seq*.

This request is being filed with the Court and served on all parties. Following the filing of this Request for Hearing and Notice of Request, any party may apply to the Court to establish a briefing schedule and hearing date for the hearing. (Pub. Res. Code § 21167.4(c).) Upon such application, the court shall establish a briefing schedule and hearing date. (*Id*.)

Dated: June 26, 2025                    Respectfully submitted,



Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Attorneys for Petitioners/Plaintiffs

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On June 26, 2025, I served the above document(s) described as **PETITIONERS AND PLAINTIFFS' REQUEST FOR HEARING AND NOTICE OF REQUEST** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒       **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

☒       **By United States mail.** On the date above, I enclosed a copy of the document(s) described above in a sealed envelope or package addressed to the recipients designated in the attached Service List, postage fully prepaid, with the United States Postal Service at Santa Barbara, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 26, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

1
Proof of Service

**SERVICE LIST**

Michael S. Dorsi
Michael.Dorsi@doj.ca.gov
California Attorney General's Office
55 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

ATTORNEY FOR
RESPONDENTS/DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal; and
Daniel Berlant, in his official capacity as State Fire
Marshal

Duncan Joseph Moore
djmoore@paulhastings.com
Benjamin J. Hanelin
benjaminhanelin@paulhastings.com
Natalie C. Rogers
natalierogers@paulhastings.com
PAUL HASTINGS, LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp. and Pacific Pipeline
Company

Jeffrey D. Dintzer
Jeffrey.dintzer@alston.com
Matthew C. Wickersham
Matt.wickersham@alston.com
Garrett B. Stanton
Garrett.stanton@alston.com
ALSTON & BIRD LLP
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp. and Pacific Pipeline
Company

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
DarreE. Parker, Executive Officer
6/26/2025 4:51 PM
By: Sarah Sisto , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,<br><br>      Petitioners and Plaintiffs,<br><br>    vs.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>      Respondents and Defendants,<br><br>    and<br><br>SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,<br><br>      Real Parties in Interest. | Case No.: 25CV02247<br><br>**PETITIONERS AND PLAINTIFFS' NOTICE OF MOTION AND MOTION TO QUASH REAL PARTIES' DEPOSITION SUBPOENA, QUASH REAL PARTIES' CROSS-NOTICE OF DEPOSITION, AND STAY THE TAKING OF RICHARD B. KUPREWICZ'S DEPOSITION; MEMORANDUM OF POINTS AND AUTOHRITIES IN SUPPORT THEREOF**<br><br>[*Filed concurrently with Declaration of Jeremy M. Frankel; [Proposed] Order Granting Plaintiff and Petitioners' Motion*]<br><br>Date:    October 24, 2025<br>Time:    10:00 a.m.<br>Dept.:    4<br>Judge:   Honorable Donna G. Geck<br><br>Action Filed: April 15, 2025<br>Trial: None Set |

Petitioners and Plaintiffs' Notice of Motion and Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................... 2

TABLE OF AUTHORITIES ............................................................................................................. 3

NOTICE OF MOTION AND MOTION ........................................................................................... 4

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................... 5

I.      INTRODUCTION ................................................................................................................. 5

II.     FACTUAL AND PROCEDURAL BACKGROUND............................................................ 6

    A.    Real Parties' Efforts to Restart the Defective Las Flores Pipeline System ............................... 6

    B.    Petitioners' Ex Parte Application for Preliminary Relief and Order to Show Cause ................. 6

    C.    Real Parties' Discovery Attempts and Petitioners' Efforts to Meet and Confer ....................... 7

III.    APPLICABLE LAW ............................................................................................................. 9

IV.     ARGUMENT ......................................................................................................................... 9

    A.    Expert Discovery is Generally Prohibited before Experts are Formally Designated ................. 9

    B.    The Limited Exception in Summary Judgment Proceedings Is Inapplicable Here ................... 10

    C.    Additional, Equitable Factors Require that the Subpoena be Quashed ................................... 13

V.      CONCLUSION.................................................................................................................... 14

Petitioners and Plaintiffs' Notice of Motion and Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

# TABLE OF AUTHORITIES

**Cases**

*County of Los Angeles v. Superior Court* (1990) 224 Cal.App.3d 1446 .............................................. 9, 10

*DeLuca v. State Fish Co., Inc.* (2013) 217 Cal.App.4th 671 ........................................................ 10

*Greyhound Corp.. v. Superior Court* (1961) 56 Cal.2d 355 ........................................................... 9

*Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285........................................................ 14

*St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531 ....................................... passim

**Statutes**

Code Civ. Proc. § 437c ................................................................................................ 12

Code Civ. Proc. § 1987.1 ............................................................................................... 9

Code Civ. Proc. § 2025.290 ........................................................................................... 14

Code Civ. Proc. § 2025.410 ............................................................................................. 9

Code of Civ. Proc. § 2034.010, *et seq.* ............................................................................... 5

Code Civ. Proc. § 2034.210............................................................................................. 9

Petitioners and Plaintiffs' Notice of Motion and Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 26, 2025, at 10:00 a.m., or as soon thereafter as this matter may be heard, in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbra, CA 93101, Petitioners and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (collectively, "Petitioners") will and hereby do move this Court for an order quashing Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Companys' (collectively, "Real Parties") deposition subpoena, quashing Real Parties' cross-notice of deposition, and staying the taking of Richard B. Kuprewicz's deposition.

Mr. Kuprewicz is Petitioners' retained expert consultant in this matter, but he has not been designated as an expert pursuant to Code of Civil Procedure section 2034.010, *et seq*. Unless and until he is so designated, Real Parties are precluded from deposing Mr. Kuprewicz. Moreover, the deposition of Mr. Kuprewicz would be unnecessary, manifestly unjust to Petitioners, and potentially set the stage for the upcoming July 18, 2025, hearing to devolve into a "mini-trial" of the ultimate issues in this case.

Petitioners bring this motion pursuant to Code of Civil Procedure sections 1987.1 and 2025.410. Petitioner's request is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Jeremy M. Frankel filed herewith, the pleadings and papers on file in this action, and such other and further evidence as the Court may consider at the hearing on this Motion.

This Motion is made following the meeting and conferring of counsel. (Declaration of Jeremy M. Frankel, ¶ 10.)

Dated: June 26, 2025                    Respectfully

Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners and Plaintiffs

Petitioners and Plaintiffs' Notice of Motion and Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.        <u>INTRODUCTION</u>

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Real Parties") served a deposition subpoena for personal appearance and production of documents and things (the "Subpoena") on Richard B. Kuprewicz, Petitioners' retained expert consultant in this matter. They also served Petitioners with a cross-notice of deposition, noticing Mr. Kuprewicz's deposition for July 1, 2025 (the "Notice").

While Petitioners filed a declaration from Mr. Kuprewicz in support of their ex parte application for a stay, temporary restraining order, and order to show cause, Mr. Kuprewicz has not been designated as an expert in this matter pursuant to Code of Civil Procedure section 2034.010, *et seq*. Unless and until he is so designated, Real Parties are precluded from deposing him.

The *only* recognized exception to this standard prohibition is limited to summary judgment proceedings. (*See St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531.) However, even assuming, arguendo, that Real Parties could invoke that exception here, Mr. Kuprewicz's deposition would only be appropriate upon an affirmative showing by Real Parties of "objective facts . . . which create a significant question regarding the validity of [Mr. Kuprewicz's declaration] which, if successfully pursued, will impeach the foundational basis of the [declaration]." (*Id.* at 1540-41.) Real Parties have not provided any such facts, and Petitioners are aware of none.

Lastly, aside from unnecessarily burdening Petitioners and Mr. Kuprewicz, who is currently experiencing severe health issues, Real Parties' attempt to depose Mr. Kuprewicz seeks to impermissibly tip the scales in Real Parties' favor. In the likely event that Real Parties submit expert declarations in support of their opposition to Petitioners' ex parte application, Petitioners, under the current briefing schedule, will not have an equal opportunity to depose Real Parties' experts.

Accordingly, Petitioners respectfully request that this Court quash the Notice and Subpoena. Alternatively, should the Court find that the limited exception in *St. Mary* applies here, Petitioners request that the Court issue an order appropriately limiting the scope of Mr. Kuprewicz's deposition and, if it has not yet occurred, continuing the July 18, 2025, hearing to allow time for Petitioners to depose Real Parties' experts.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Real Parties' Efforts to Restart the Defective Las Flores Pipeline System

This case arises from Real Parties' efforts to restart the Las Flores Pipeline System — a defective pipeline system that ruptured in 2015 at Refugio State Beach, causing one of the worst oil disasters in California history.

As was discovered after the spill, the pipeline system suffers from a critical design defect that leaves it vulnerable to pervasive corrosion and, consequently, another catastrophic rupture. Importantly, the 120-mile long pipeline system does not just threaten coastal resources; it passes through major sources of water supply, renowned parks and ecological reserves, and a populated suburban neighborhood in Buellton, California, complete with schools, parks, and dozens of residential homes.

Rather than replacing the pipeline system or retrofitting it with an effective means of corrosion prevention, Real Parties intend to simply restart the existing pipeline system under State Waivers issued by the Office of the State Fire Marshal (OSFM). The State Waivers, which excuse Real Parties from complying with critical corrosion prevention requirements, were approved without a public process, environmental review, or any analysis as to why the pipeline system can be safely restarted. The Petition and Complaint on file in this action challenges these State Waivers.

### B.    Petitioners' Ex Parte Application for Preliminary Relief and Order to Show Cause

When Real Parties began publicly claiming that they were on the precipice of restarting the defective Las Flores Pipeline System, Petitioners applied ex parte for an administrative stay, a temporary restraining order, and a preliminary injunction (the "Ex Parte Application") to prevent Real Parties from doing so. In support of Petitioners' Ex Parte Application, Petitioners submitted a declaration from Richard B. Kuprewicz, Petitioners' retained expert consultant in this matter. Mr. Kuprewicz's declaration, and the two reports attached thereto, explain the systemic issues with the defective pipeline system, why the State Waivers do not ensure that the pipeline system is safe to operate, and why the pipeline system continues to pose a significant threat of rupturing.

On June 3, 2025, the Court granted Petitioners' request for a temporary restraining order, and it issued an order to show cause why a preliminary injunction and/or stay should not issue (the "OSC"). The hearing on the OSC is set for July 18, 2025. The Court ordered that briefing be completed per code,

Petitioners and Plaintiffs' Notice of Motion and Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

meaning that Real Parties' opposition is due by July 7, 2025, and Petitioners' reply by July 11, 2025.

### C.   Real Parties' Discovery Attempts and Petitioners' Efforts to Meet and Confer

On June 5, 2025, counsel for Real Parties served Mr. Kuprewicz with a deposition subpoena for personal appearance and production of documents and things. (Declaration of Jeremy M. Frankel, ¶ 6 [hereinafter the "Frankel Declaration"].)

That same day, counsel for Real Parties served Petitioners in the related case *Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.*, 25CV0244 (the "CBD Petitioners") with a notice of deposition of Mr. Kuprewicz. (Frankel Declaration, ¶ 6.) Real Parties similarly served Petitioners in this case with a "cross-notice" of deposition, noticing Mr. Kuprewicz's deposition for June 24, 2025. (Frankel Declaration, ¶ 6.) A true and accurate copy of the cross-notice that Petitioners received, with Mr. Kuprewicz's subpoena attached, is attached as **Exhibit A** to the Declaration of Jeremy M. Frankel, filed herewith.

Because counsel for Real Parties had unilaterally scheduled the deposition without discerning availability and were also seemingly unaware of Mr. Kuprewicz's substantial health issues, there was an immediate need to meet and confer regarding the deposition date and reasonable accommodations for Mr. Kuprewicz. (Frankel Declaration, ¶ 7.) Thus, on June 10, 2025, counsel for the CBD Petitioners requested that the deposition be moved to July 1, 2025, to accommodate their schedule. (Frankel Declaration, ¶ 7.) Counsel also asked for reasonable accommodations for Mr. Kuprewicz, including that the deposition take place remotely, and that it be split into two, 3.5-hour sessions. (Frankel Declaration, ¶ 7.)

Counsel for Real Parties agreed to move the deposition to July 1, 2025, but refused the requests to accommodate Mr. Kuprewicz's health issues. (Frankel Declaration, ¶ 7.) When undersigned counsel for Petitioners clarified that Mr. Kuprewicz was unable to travel, counsel for Real Parties continued to demand that the deposition proceed in-person. (Frankel Declaration, ¶ 7.)

Counsel for Petitioners then secured outside counsel for Mr. Kuprewicz, Mr. Tom Stolpman, and set up a teleconference meeting with counsel for Real Parties to discuss Mr. Kuprewicz's health issues and possible accommodations for him. (Frankel Declaration, ¶ 8.) At the June 12, 2025, meeting, Mr. Stolpman volunteered to drive Mr. Kuprewicz to the deposition, but warned that his various health

conditions could prevent him from meaningfully participating. (Frankel Declaration, ¶ 8.) Mr. Stolpman also informed Real Parties that, in response to some concerning cognitive symptoms, Mr. Kuprewicz's doctor had ordered imaging for his brain, and an MRI was scheduled for June 23, 2025. (Frankel Declaration, ¶ 8.)

On June 20, 2025, counsel for Real Parties issued Mr. Kuprewicz a new deposition subpoena for personal appearance and production of documents and things — the Subpoena at issue. (Frankel Declaration, ¶ 9.) Also on June 20, 2025, counsel for Real Parties served Petitioners with an amended cross-notice of deposition, noticing Mr. Kuprewicz's deposition for July 1, 2025 — the Notice at issue. (Frankel Declaration, ¶ 9.) A true and accurate copy of the Notice, with the Subpoena attached, is attached as **Exhibit C** to the Declaration of Jeremy M. Frankel, filed herewith.

The next business day, undersigned counsel for Petitioners reached out to counsel for Real Parties to explain that their continuing research had revealed Real Parties are not currently entitled to depose Mr. Kuprewicz, and offered to meet and confer regarding the instant motion. (Frankel Declaration, ¶ 10.) Opposing counsel accused Petitioners of acting in bad faith and in a sanctionable fashion, and asserted they would not have moved the deposition date if they had been aware of Petitioners' objection. (Frankel Declaration, ¶ 10.) The undersigned counsel explained that (1) the only reason the deposition was moved was because Real Parties had unilaterally noticed it for a time when Petitioners' cocounsel was unavailable; (2) while the parties had discussed accommodations for Mr. Kuprewicz's health issues, at no time did Petitioners wave their right to object to his deposition; (3) Petitioners ultimately raised the objection before the date Mr. Kuprewicz's deposition was initially noticed for; and (4) this is an unusual situation involving premature expert discovery and, based on counsels' continuing research, it had become apparent that the proposed deposition exceeded the scope of permissible discovery. (Frankel Declaration, ¶ 10.)

The parties were unable to resolve the issue informally, necessitating that Petitioners bring this Motion. (Frankel Declaration, ¶ 11.)  Petitioners also properly served a formal objection to the deposition in the time required by the code (*see* Code Civ. Proc. § 2025.410(a)), a true and accurate copy of which is attached as **Exhibit E** to the Declaration of Jeremy M. Frankel, filed herewith. (Frankel Declaration, ¶ 11.)

## III.  APPLICABLE LAW

Code of Civil Procedure[1] section 1987.1 provides as follows:

If a subpoena requires the attendance of a witness or the production of books, documents, electronically stored information, or other things . . . at the taking of a deposition, the court, upon motion reasonably made by. . . [any party], may make an order quashing the subpoena entirely, modifying it, or directing compliance with it upon those terms or conditions as the court shall declare, including protective orders.

(Code Civ. Proc. § 1987.1(a); *see also id.* at 1987.1(b)(1) (any party can bring a motion to quash under Section 1987.1.) "In addition, the court may make any other order as may be appropriate to protect the person from unreasonable and oppressive demands . . . ." (Code Civ. Proc. § 1987.1(a).)

Similarly, any party served with an improper deposition notice "may . . . move for an order staying the taking of the deposition and quashing the deposition notice." (Code Civ. Proc. § 2025.410(c).) Notably, "[t]he taking of the deposition is stayed pending the determination of this motion." (*Id.*)

"Whether to grant discovery in a given case falls within the sound discretion of the trial court based upon all of the facts presented." (*St Mary*, 50 Cal.App.4th 1531, 1540; *see also Greyhound Corp.. v. Superior Court* (1961) 56 Cal.2d 355, 378 ("Undoubtedly the discovery statutes vest a wide discretion in the trial court in granting or denying discovery."), *superseded on other grounds by statute*.)

## IV.  <u>ARGUMENT</u>

### A.  **Expert Discovery is Generally Prohibited before Experts are Formally Designated**

Section 2034.210, *et seq.* provides "a carefully crafted legislative scheme for the regulation of discovery of the identity, qualifications[,] and opinions of expert witnesses," including "the times and conditions for such discovery." (*County of Los Angeles v. Superior Court* (1990) 224 Cal.App.3d 1446, 1456-57.)

As set forth in Section 2034.210, the door to expert discovery opens only when a party formally makes a demand to exchange expert witness information, and the parties subsequently designate expert witnesses for trial. (*See* Code Civ. Proc. § 2034.210(a), (b).) Expert discovery is generally "not

---

[1] All references are to the Code of Civil Procedure unless otherwise specified.

Petitioners and Plaintiffs' Notice of Motion and Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

appropriate until and unless there is such a designation." (*County of Los Angeles*, 224 Cal.App.3d at 1456; *see also id.* at 1456-57 (recognizing that information related to an expert's identity, qualifications, or opinion(s) is not discoverable before designation and therefore reversing a trial court's order compelling expert testimony at a deposition).)

This limitation on expert discovery — of which Real Parties run afoul — exists for good reason. As the court in *County of Los Angeles* explained, there are at least four substantial justifications for strictly controlling pretrial expert discovery:

> In the first place, access to the conclusions of an adversary's experts often provides strong clues to the theories, thoughts, and tactics of opposing counsel, . . . [¶] Second, a limitless right to ascertain and probe the views of opposing experts could easily lead to an expensive and delay-producing round of discovery that would tend to feed on itself: . . . [¶] Third, unrestricted discovery as to an adversary's experts enables "the stupid or lazy practitioners" to sit back secure in the knowledge that at the appropriate time they will be able "to 'ride free' on the opponent's industry." Since 1963, recognition of this "free ride" as a discovery evil has been articulated in the Discovery Act itself: "It is the policy of the state . . . to prevent attorneys from taking undue advantage of their adversary's industry and efforts." Finally, . . . discovery as of right with respect to an adversary's experts is bound to have the dreaded "chilling effect" on the willingness of attorneys to use objective, fair-minded consultants who will honestly and frankly point out the weaknesses and deficiencies of their side.

(*Id.* at 1457 (quoting 2 Modern California Discovery § 13.12, pp. 250-51(4th ed. 1988)).) On top of that, premature expert discovery would appear to be in direct tension with protections afforded by the attorney client privilege and attorney work product doctrine. (*See DeLuca v. State Fish Co., Inc.* (2013) 217 Cal.App.4th 671, 688 (a party's communications with their *consulting* expert, and any information prepared by the expert at the party's request, is protected by attorney-client privilege and/or the attorney work product doctrine).)

That the parties here have not designated experts pursuant to Section 2034.210 is undisputed. Accordingly, Real Parties' Notice and Subpoena exceed the scope of permissible discovery, and they expose Petitioners to the potential abuses of premature expert discovery described above.

**B.     The Limited Exception in Summary Judgment Proceedings Is Inapplicable Here**

There is only one recognized exception to the above-described prohibition on premature expert discovery, which originates from *St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531. However, this limited exception has only been held to apply in the context of summary judgment

proceedings and, as explained below, is otherwise inapplicable here.

### 1.    The *St. Mary* Exception

*St. Mary* involved a medical malpractice action that defendants sought to resolve on summary judgment. In response to defendants' summary judgment motion, plaintiffs produced a declaration from a medical expert whom they had retained but not yet designated as an expert pursuant to the discovery code. (*Id.* at 1534-35.) The expert's declaration and opinion were based on the premise that defendants — two medical doctors — had improperly performed a particular procedure. (*Id.* at 1534.) However, according to defendants, one of the doctors was not actually involved in that procedure, raising "a serious question . . . about whether or not [the expert's] declaration may have been factually incorrect." (*Id.* at 1540.)

When defendants took their motion off calendar and attempted to depose plaintiffs' expert, plaintiffs objected, arguing that the expert could not be deposed until the parties exchanged expert witness lists. (*Id.* at pp. 1534–1535.) Defendants, in turn, moved to compel the expert's deposition, arguing that the deposition was necessary to "establish that the [expert's] opinions are not based on the facts which are the basis of this lawsuit" and prepare "an adequate reply to [plaintiffs'] opposition." (*Id.* at 1535.) They also represented that it was "defendants' intention to limit the deposition solely to [the expert's] opinions as they are reflected in his declaration." (*Id.*) The trial court denied defendants' motion, concluding that "you're not entitled to depose an expert until there's an expert designation done right before the first trial date," as "there is no provision in the law to depose somebody who *might* be an expert." (*Id.* at 1536 (emphasis added).) Defendants appealed. (*Id.* at 1537.)

The appellate court acknowledged that, generally, the standard way for defendants to proceed would not be by deposing plaintiffs' expert, but by presenting a reply declaration challenging the factual foundation of the expert's opinion. (*See id.* at 1540.) However, the court recognized the unique shortcomings of that approach in the summary judgment context. (*Id.*) As the court pointed out, "[w]hile counsel could have presented a reply declaration . . . it would have been contradictory to the declaration of [plaintiffs' expert] and the trial court would have been required to conclude that a triable issue of fact existed." (*Id.*) In other words, by submitting a reply declaration, defendants would create a factual ambiguity that would actually preclude the court from granting their summary judgment motion. (*See*

*id.*; *see also* Code Civ. Proc. § 437c(c), (g) (summary judgment is only appropriate where there is no triable issue of material fact).) The court was uncomfortable with that result given that "[i]t [was] possible that upon deposition of [plaintiffs' expert], confronted with proof that he may have been mistaken in his belief that [both defendants were] involved in the procedure, he may concede his mistake." (*St. Mary*, 50 Cal.App.4th at 1540.)

Persuaded that some sort of limited discovery was justified under the circumstances, the court grappled with where to draw the line: on the one hand, "[i]t would defeat the purpose of the summary procedure were we to recognize an absolute right of party involved in the process to depose any person who provides evidence in support of or opposition to the proceedings," but on the other, "it would defeat the concept of a summary procedure if the opposition party were to be allowed to defeat the motion by less than candid declarations or affidavits in opposition." (*Id.* at 1538.) Ultimately, the court held that, "under the proper circumstances, the parties should be allowed to depose an expert who supplies a declaration or affidavit in support of or in opposition to summary judgment or summary adjudication where there is a legitimate question regarding the foundation of the opinion of the expert." (*Id.* at 1540.) Specifically, **"[t]here must be objective facts presented which create a significant question regarding the validity of the affidavit or declaration which, if successfully pursued, will impeach the foundational basis of the affidavit or declaration in question."** (*Id.* at 1540-41 (emphasis added).) The court concluded that because defendants had presented such information, the court abused its discretion by not allowing defendants to conduct a deposition that "would cover no more than the opinions rendered in the declaration of [plaintiffs' expert]." (*Id.* at 1540.)

### 2. *St. Mary* Is Plainly Inapplicable Here

Of course, we are not dealing with summary proceedings here; the only hearing on calendar concerns the Court's OSC. No court has applied the exception from *St. Mary* outside of summary judgment proceedings. Nor would it be appropriate do so: the underlying reasoning for the exception — that it would be unjust to force a party moving for summary judgment to create a triable issue of fact to challenge a suspect declaration — only applies in the summary judgment context.

In any event, even if the exception could be invoked outside of the summary judgment context, it nonetheless would not apply here. The court in *St. Mary* suggested that the exception should be used

sparingly so as not to turn proceedings into "mini-trials." (*Id.* at 1540.) Hence, it is limited to cases where "*objective facts* [are] presented which create a *significant question* regarding the validity of [a] declaration which, if successfully pursued, *will* impeach the foundational basis of the . . . declaration in question." (*Id.* at 1540-41 (emphasis added).) Real Parties have not presented any such facts as to Mr. Kuprewicz's declaration. Nor are Petitioners aware of any.

Finally, the exception, where applicable, only permits a party to inquire into the factual underpinnings of the opinion(s) expressed in the expert's declaration. (*Id.* at 1540 (permitting a deposition that "would cover no more than the opinions rendered in the declaration of [the expert]").) Neither Real Parties' Notice nor Subpoena so limit the scope of Mr. Kuprewicz's proposed deposition. Additionally, Real Parties' production demands are incredibly broad, encompassing a host of documents that have no bearing on the foundation of the opinions expressed in Mr. Kuprewicz's declaration.

In sum, the exception from *St. Mary* is patently inapplicable here. Plus, even assuming (1) the exception could be invoked outside of summary judgment proceedings, and (2) Real Parties presented the "objective facts" required thereunder, Real Parties' Notice and Subpoena, which are not properly limited to the foundation of Mr. Kuprewicz's opinion, would still exceed the scope of permissible discovery.

### C. Additional, Equitable Factors Require that the Subpoena be Quashed

As separate and further grounds for this motion, the proposed deposition of Mr. Kuprewicz would be unnecessary, manifestly unjust to Petitioners, and potentially lead to exactly the type of "mini-trial" that the *St. Mary* court warned about. Thus, in the interest of equity and efficient case management, the Court should exercise its broad discretion over discovery matters to quash the Notice and Subpoena.

First, the deposition of Mr. Kuprewicz is not necessary for Real Parties to challenge his opinion. As suggested in *St Mary*, the standard way to challenge an expert declaration in pre-trial law and motion practice is by submitting a reply declaration from an opposing expert. That option remains available to them.

Second, aside from unnecessarily burdening Petitioners and Mr. Kuprewicz, Real Parties' attempt to depose Mr. Kuprewicz seeks to improperly tip the scales in Real Parties' favor. In the likely

event that Real Parties submit expert declarations of their own in support of their opposition to Petitioners' Ex Parte Application, Petitioners, under the current briefing schedule, will not be afforded the same opportunity to depose Real Parties' experts in advance of the July 18, 2025, hearing given that Petitioners will only have five days to prepare their reply brief. Petitioners would be put on unequal footing with Real Parties, further underscoring the importance of sticking to the carefully crafted discovery procedures in the code. (*See Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 297 ("In general, fairness demands adherence to the statutory procedures, since they were designed to place the parties 'on roughly equal footing.'" (quoting *Kalaba v. Gray* (2002) 95 Cal.App.4th 1416, 1422).)

Third, and relatedly, permitting the deposition to proceed at this stage "could easily lead to an expensive and delay-producing round of discovery that would tend to feed on itself." (*County of Los Angeles*, 224 Cal.App.3d at 1457.) Petitioners would, in the interest of equity, seek to continue the OSC hearing to depose Real Parties' experts — an effort that may be challenged by Real Parties and cause additional discovery motions to be brought before the Court. And extensive expert discovery would all but set the stage for the OSC hearing to become a "mini-trial" on the safety of the Las Flores Pipeline System and the ultimate merits of this case, complete with live expert testimony, which is entirely inappropriate at the preliminary relief stage of these proceedings.

Accordingly, even if the deposition of Mr. Kuprewicz was not prohibited at this stage in the proceedings — which it *is* — the Court should nonetheless grant Petitioners' request in the interest of equity and efficiency.

## V.    CONCLUSION

For the above reasons, Petitioners respectfully request that this Court issue an order quashing Real Parties' Subpoena and Notice. However, should the Court find the exception from *St. Mary* applies here, and that Mr. Kuprewicz's deposition is otherwise appropriate, Petitioners request that the Court issue an order limiting and conditioning his deposition. Specifically, subject to Mr. Kuprewicz's ongoing health conditions permitting him to participate in a deposition, Petitioners request that the Court: (1) restrict Real Parties from deposing Mr. Kuprewicz for more than seven hours, and from noticing any further depositions of Mr. Kuprewicz during these proceedings (*see* Code Civ. Proc. § 2025.290(a)); (2) limit the scope of Mr. Kuprewicz's deposition to testing the factual foundation of the

opinions expressed in his declaration (*see St. Mary*, 50 Cal.App.4th at 1540); and, (3) if it has not yet occurred, continuing the July 18, 2025, OSC hearing, as well as Petitioners' reply brief deadline, to allow Petitioners sufficient opportunity to depose any experts on whom Real Parties rely in their opposition.

Dated: June 26, 2025                    Respectfully submitted,

_____
Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners

Petitioners and Plaintiffs' Notice of Motion and Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On June 26, 2025, I served the above document(s) described as **PETITIONERS AND PLAINTIFFS' NOTICE OF MOTION AND MOTION TO QUASH REAL PARTIES' DEPOSITION SUBPOENA, QUASH REAL PARTIES' CROSS-NOTICE OF DEPOSITION, AND STAY THE TAKING OF RICHARD B. KUPREWICZ'S DEPOSITION; MEMORANDUM OF POINTS AND AUTOHRITIES IN SUPPORT THEREOF** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒ **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

☒ **By United States mail.** On the date above, I enclosed a copy of the document(s) described above in a sealed envelope or package addressed to the recipients designated in the attached Service List, postage fully prepaid, with the United States Postal Service at Santa Barbara, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 26, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

# SERVICE LIST

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEY FOR<br>RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
6/26/2025 4:51 PM
By: Sarah Sisto , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

          Petitioners and Plaintiffs,

     vs.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,

          Respondents and Defendants,

     and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

          Real Parties in Interest.

Case No.: 25CV02247

**DECLARATION OF JEREMY M. FRANKEL IN SUPPORT OF PETITIONERS AND PLAINTIFFS' NOTICE OF MOTION AND MOTION TO QUASH REAL PARTIES' DEPOSITION SUBPOENA, QUASH REAL PARTIES' CROSS-NOTICE OF DEPOSITION, AND STAY THE TAKING OF RICHARD B. KUPREWICZ'S DEPOSITION**

[*Filed concurrently with Petitioners and Plaintiffs' Notice of Motion and Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition*]

Date:     October 24, 2025
Time:    10:00 a.m.
Dept.:    4
Judge:   Honorable Donna D. Geck

Action Filed: April 15, 2025
Trial: None Set

---

1

Declaration of Jeremy M. Frankel in support of Petitioners and Plaintiffs' Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

## DECLARATION OF JEREMY M. FRANKEL

I, Jeremy M. Frankel, hereby declare as follows:

1.      I am a staff attorney employed by the non-profit, public interest law firm Environmental Defense Center (EDC) and am counsel for Petitioners in this action. I am duly licensed to practice law before this Court. I have personal knowledge of the following and, if called as a witness, would and could testify competently thereto.

2.      Richard Kuprewicz is one of the nation's leading pipeline safety experts. Petitioners retained Mr. Kuprewicz as an expert consultant to advise them during their advocacy to various state and federal agencies overseeing Sable Offshore Corp.'s ("Sable") proposed restart of the Santa Ynez Unit and attendant infrastructure, including the Las Flores Pipeline System. As relevant here, Mr. Kuprewicz's contractual scope of work included evaluating the Las Flores Pipeline System's defects and systemic issues, and reviewing Sable's applications for State Waivers for the limited effectiveness of cathodic protection on the pipeline system.

3.      At Petitioners' request, Mr. Kuprewicz prepared two reports: (1) a report generally outlining the dangers of restarting the Las Flores Pipeline System, and (2) a report addressing the deficiencies of the State Waivers that the Office of the State Fire Marshal (OSFM) ultimately issued to Sable. Both reports were submitted to OSFM during the administrative stage of these proceedings. Together, the reports explain the systemic issues with the pipeline system, why the State Waivers will not ensure that the pipeline system is safe to operate, and why the pipeline system continues to pose a significant threat of rupturing.

4.      After Petitioners filed this action, Sable and Pacific Pipeline Company (together, "Real Parties") began publicly claiming that they were on the precipice of restarting the Las Flores Pipeline System. Accordingly, Petitioners applied ex parte for an administrative stay, a temporary restraining order, and a preliminary injunction (the "Ex Parte Application") to prevent them from doing so. In support of Petitioners' Ex Parte Application, Petitioners submitted a declaration from Mr. Kuprewicz, with his two reports attached thereto.

5.      On June 3, 2025, the Court granted Petitioners' request for a temporary restraining order, and it issued an order to show cause why a preliminary injunction and/or stay should not issue (the

Declaration of Jeremy M. Frankel in support of Petitioners and Plaintiffs' Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

"OSC"). The hearing on the OSC is set for July 18, 2025. The Court ordered that briefing be completed per code, meaning that Real Parties' opposition is due by July 7, 2025, and Petitioners' reply by July 11, 2025.

6.      On June 5, 2025, Real Parties served Mr. Kuprewicz with a deposition subpoena for personal appearance and production of documents and things. That same day, Real Parties served Petitioners in the related case *Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.*, 25CV0244 (the "CBD Petitioners") with a notice of deposition of Mr. Kuprewicz. Real Parties similarly served Petitioners in this case with a "cross-notice" of deposition, noticing Mr. Kuprewicz's deposition for June 24, 2025. A true and accurate copy of the cross-notice that Petitioners received, with Mr. Kuprewicz's subpoena attached, is attached hereto as **Exhibit A**.

7.      Because counsel for Real Parties had unilaterally scheduled the deposition and were seemingly unaware of Mr. Kuprewicz's substantial health issues, there was an immediate need to meet and confer regarding the deposition date and reasonable accommodations for Mr. Kuprewicz. Thus, on June 10, 2025, counsel for the CBD Petitioners requested via email that the deposition be moved to July 1, 2025, to accommodate their schedule. Counsel also asked for reasonable accommodations for Mr. Kuprewicz, including that the deposition take place remotely, and that it be split into two, 3.5-hour sessions. Counsel for Real Parties agreed to move the deposition to July 1, 2025, but refused the requests to accommodate Mr. Kuprewicz's health issues. When I chimed in to clarify that Mr. Kuprewicz was unable to travel, counsel for Real Parties continued to demand that the deposition proceed in-person. A true and accurate copy of this email exchange is attached hereto as **Exhibit B**.

8.      I then secured outside counsel for Mr. Kuprewicz, Mr. Tom Stolpman, and set up a teleconference meeting with counsel for Real Parties to discuss Mr. Kuprewicz's health issues and possible accommodations for him. At the June 12, 2025, meeting, Mr. Stolpman volunteered to drive Mr. Kuprewicz to the deposition, but warned that his various health conditions, including impaired vision, could prevent him from meaningfully participating. Mr. Stolpman also informed Real Parties that, in response to some concerning cognitive symptoms, Mr. Kuprewicz's doctor had ordered imaging for his brain, and an MRI was scheduled for June 23, 2025.

9.      On June 20, 2025, counsel for Real Parties issued Mr. Kuprewicz a new deposition

Declaration of Jeremy M. Frankel in support of Petitioners and Plaintiffs' Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

subpoena for personal appearance and production of documents and things — the subpoena at issue. Also on June 20, 2025, counsel for Real Parties served Petitioners with an amended cross-notice of deposition, noticing Mr. Kuprewicz's deposition for July 1, 2025 — the notice at issue. A true and accurate copy of the amended notice, with Mr. Kuprewicz's subpoena attached, is attached hereto as **Exhibit C**.

10.     The next business day, I reached out to counsel for Real Parties via email to explain that our continuing research had revealed Real Parties were not entitled to depose Mr. Kuprewicz, and to meet and confer regarding a motion to quash. Opposing counsel accused Petitioners of acting in bad faith, and claimed they would not have moved the deposition date if they were aware of Petitioners' objection. In response, I explained that (1) the only reason the deposition was moved was because Real Parties had unilaterally noticed it for a time when counsel for CBD Petitioners was unavailable; (2) while the parties had discussed accommodations for Mr. Kuprewicz's health issues, at no time did Petitioners wave their right to object to his deposition; (3) Petitioners ultimately raised the objection before the date Mr. Kuprewicz's deposition was initially noticed for; and (4) this is an unusual situation involving premature expert discovery and, based on counsels' continuing research, it had become apparent that the proposed deposition exceeded the scope of permissible discovery. A true and accurate copy of this email exchange is attached hereto as **Exhibit D**.

11.     The parties were unable to resolve the issue informally, necessitating that Petitioners bring the instant motion. I properly and timely served a formal objection to Mr. Kuprewicz's deposition on all interested parties on June 24, 2024. A true and accurate copy of Petitioners' objection is attached as **Exhibit E**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 26th day of June, 2025, in Santa Barbara, California.

_____
Jeremy M. Frankel

4

Declaration of Jeremy M. Frankel in support of Petitioners and Plaintiffs' Motion to Quash Real Parties' Deposition Subpoena, Quash Real Parties' Cross-Notice of Deposition, and Stay the Taking of Richard B. Kuprewicz's Deposition

# EXHIBIT A

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN (SBN 237595)
benjaminhanelin@paulhastings.com
NATALIE C. Rogers (SBN 301254)
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,<br><br>        Petitioners and Plaintiffs,<br><br>        v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>        Respondents and Defendants, | Case No. 25CV02247<br>Coordinated with Case No. 25CV02244<br><br>Assigned for all purposes to:<br>Hon. Donna G. Geck<br><br>**REAL PARTIES IN INTEREST'S CROSS-NOTICE OF DEPOSITION OF RICHARD B. KUPREWICZ**<br><br>**Date**:  June 24, 2025<br>**Time**:  9:00 a.m.<br>**Place**:  1605 Calle Joaquin, San Luis Obispo, California 93405<br><br>Complaint Filed:    April 15, 2025<br>Trial Date:    None set |

1

REAL PARTIES IN INTEREST'S NOTICE OF ISSUANCE OF SUBPOENA TO AND
DEPOSITION OF RICHARD B. KUPREWICZ

and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

    Real Parties in Interest.

REAL PARTIES IN INTEREST'S NOTICE OF ISSUANCE OF SUBPOENA TO AND DEPOSITION OF RICHARD B. KUPREWICZ

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") hereby cross-notice the deposition set forth in the Deposition Subpoena for Personal Appearance and Production of Documents and Things to Richard B. Kuprewicz (the "Deponent") issued by Real Parties in the coordinated action (Case No. 25CV02244), attached hereto as **Exhibit 1** (the "Deposition Subpoena").

**PLEASE TAKE FURTHER NOTICE** that the deposition of Deponent will take place on **June 24, 2025** at the Marriott, 1605 Calle Joaquin, San Luis Obispo, California 93405. The deposition will be coordinated by Veritext Legal Solutions, with a business address of 707 Wilshire Boulevard, Suite 3500, Los Angeles, California 90017. The deposition will be taken before an officer authorized to administer the oath to the deponent and will be recorded by stenographic means by a court reporter certified to record depositions and authorized to administer the oath and serve as the deposition officer in the State of California.

Real Parties intend to (1) record the deposition utilizing audio and video technology; (2) use instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in real time; (3) use Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that, in lieu of a paper set, exhibits may be provided and displayed digitally to the deposition officer, deponent, parties, and counsel. The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.

Please contact the noticing attorney at least five (5) calendar days prior to the deposition to advise of those who intend to appear via this remote participating means so that the necessary credentials, call-in numbers, firm name, email address, services, testing and information, if necessary, can be arranged and provided to you prior to the deposition.

///

///

REAL PARTIES IN INTEREST'S NOTICE OF ISSUANCE OF SUBPOENA TO AND
DEPOSITION OF RICHARD B. KUPREWICZ

DATED:　June 4, 2025

Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE

_____
　　　Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

REAL PARTIES IN INTEREST'S NOTICE OF ISSUANCE OF SUBPOENA TO AND
DEPOSITION OF RICHARD B. KUPREWICZ

# EXHIBIT 1

SUBP-020

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | *FOR COURT USE ONLY* |
|---|---|
| Jeffrey D. Dintzer (Cal. Bar No. 139056); Matthew C. Wickersham (Cal. Bar No. 241733); Garrett B. Stanton (Cal. Bar No. 324775)<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51ˢᵗ Floor, Los Angeles, CA 90071<br>     TELEPHONE NO.: (213) 576-1000     FAX NO. *(Optional):* (213) 576-1100<br>E-MAIL ADDRESS *(Optional):* jeffrey.dintzer@alston.com; matt.wickersham@alston.com; garrett.stanton@alston.com<br>     ATTORNEY FOR *(Name):* Real Parties in Interest | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**
 STREET ADDRESS: 1100 Anacapa Street
 MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, CA 93121-1107
 BRANCH NAME:

PLAINTIFF/ PETITIONER: Center for Biological Diversity and Wishtoyo Foundation

DEFENDANT/ RESPONDENT: California Department of Forestry and Fire Protection, et al.

| **DEPOSITION SUBPOENA**<br>**FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS** | CASE NUMBER:<br>25CV02244 |
|---|---|

**THE PEOPLE OF THE STATE OF CALIFORNIA, TO** *(name, address, and telephone number of deponent, if known):*
Richard B. Kuprewicz, 1783 Trilogy Pkwy, Nipomo, CA 93444-6621

1. **YOU ARE ORDERED TO APPEAR IN PERSON TO TESTIFY AS A WITNESS in this action at the following date, time, and place:**

| Date: June 24, 2025 | Time: 9:00 a.m. | Address: Marriott, 1605 Calle Joaquin, San Luis Obispo, CA 93405 |
|---|---|---|

    a. ☐    As a deponent who is not a natural person, you are ordered to designate one or more persons to testify on your behalf as to the matters described in item 4. (Code Civ. Proc, § 2025.230.)

    b. ☒    You are ordered to produce the documents and things described in item 3.

    c. ☒    This deposition will be recorded stenographically    ☐    through the instant visual display of testimony
        and by    ☐    audiotape    ☒    videotape.

    d. ☒    This videotape deposition is intended for possible use at trial under Code of Civil Procedure section 2025.620(d).

2. The personal attendance of the custodian or other qualified witness and the production of the original records are required by this subpoena. The procedure authorized by Evidence Code sections 1560(b), 1561, and 1562 will not be deemed sufficient compliance with this subpoena.

3. The documents and things to be produced and any testing or sampling being sought are described as follows:
   See Attachment 3
   ☒    Continued on Attachment 3.

4. If the witness is a representative of a business or other entity, the matters upon which the witness is to be examined are described as follows:

   ☐    Continued on Attachment 4.

5. **IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.**

6. *At the deposition, you will be asked questions under oath. Questions and answers are recorded stenographically at the deposition; later they are transcribed for possible use at trial. You may read the written record and change any incorrect answers before you sign the deposition. You are entitled to receive witness fees and mileage actually traveled both ways. The money must be paid, at the option of the party giving notice of the deposition, either with service of this subpoena or at the time of the deposition. Unless the court orders or you agree otherwise, if you are being deposed as an individual, the deposition must take place within 75 miles of your residence or within 150 miles of your residence if the deposition will be taken within the county of the court where the action is pending. The location of the deposition for all deponents is governed by Code of Civil Procedure section 2025.250.*

---

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF $500 AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

---

Date issued: June 4, 2025

▶ _____
      (SIGNATURE OF PERSON ISSUING SUBPOENA)

Jeffrey D. Dintzer             Attorney for Real Parties in Interest
   (TYPE OR PRINT NAME)                 (TITLE)

(Proof of service on reverse)         **Page 1 of 2**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUBP-020 [Rev. January 1, 2009] | **DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE**<br>**AND PRODUCTION OF DOCUMENTS AND THINGS** | Code of Civil Procedure §§ 2020.510,<br>2025.220, 2025.230, 2025.250, 2025.620;<br>Government Code, § 68097.1<br>*www.courts.ca.gov* |
|---|---|---|

**SUBP-020**

| | |
|---|---|
| PLAINTIFF/PETITIONER: Center for Biological Diversity and Wishtoyo Foundation<br><br>DEFENDANT/RESPONDENT: California Department of Forestry and Fire Protection, et al. | CASE NUMBER:<br>25CV02244 |

## PROOF OF SERVICE OF DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS

1. I served this *Deposition Subpoena for Personal Appearance and Production of Documents and Things* by personally delivering a copy to the person served as follows:

    a. Person served *(name)*: Richard B. Kuprewicz

    b. Address where served:

    c. Date of delivery:

    d. Time of delivery:

    e. Witness fees and mileage both ways *(check one)*:

    (1) ☐    were paid. Amount: ....................$ _____

    (2) ☐    were not paid.

    (3) ☐    were tendered to the witness's public entity employer as required by Government Code section 68097.2. The amount tendered was *(specify)*:................$ _____

    f. Fee for service: .........................................$ _____

2. I received this subpoena for service on *(date):*

3. Person serving:

    a. ☐    Not a registered California process server

    b. ☐    California sheriff or marshal

    c. ☐    Registered California process server.

    d. ☐    Employee or independent contractor of a registered California process server

    e. ☐    Exempt from registration under Business and Professions Code section 22350(b)

    f. ☐    Registered professional photocopier

    g. ☐    Exempt from registration under Business and Professions Code section 22451

    h.    Name, address, telephone number, and, if applicable, county of registration and number:

**I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

**(For California sheriff or marshal use only)**
**I certify** that the foregoing is true and correct.

Date:

▶ _____
(SIGNATURE)

| | |
|---|---|
| SUBP-020 [Rev. January 1, 2009] | Page 2 of 2 |

**PROOF OF SERVICE**
**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE**
**AND PRODUCTION OF DOCUMENTS AND THINGS**

**ATTACHMENT 3**

**DEFINITIONS**

1.     "YOU" and "YOUR" mean to Richard B. Kuprewicz, his agents, attorneys, and other representatives acting on his behalf.

2.     "SABLE" shall mean Sable Offshore Corp.

3.     "PPC" shall mean Pacific Pipeline Company.

4.     "PETITIONERS" shall mean Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Center for Biological Diversity, and Wishtoyo Foundation, as well as their agents, attorneys, and other representatives acting on their behalf

5.     "ACTION" shall mean the civil lawsuits filed by PETITIONERS entitled *Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV02244, and the coordinated action entitled *Environmental Defense Center et al. v. California Department of Forestry and Fire Protection et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV02247.

6.     "SYU PIPELINE" shall refer to the Santa Ynez Unit Pipelines located in waters offshore California.

7.     "LAS FLORES PIPELINE" shall refer to the Las Flores Pipelines located in waters offshore California.

8.      "DOCUMENTS" means all data, papers, and books, transcriptions, pictures, drawings or diagrams or every nature, whether transcribed by hand or by some mechanical, electronic, photographic or other means, as well as sound reproductions of oral statements or conversations by whatever means made, including written papers or memoranda which summarize

oral conversations, whether in your actual or constructive possession or under your control or not, relating to or pertaining to or in any way to the subject matters in connection which it is used and includes originals, all file copies, all other copies, no matter how prepared and all drafts prepared in connection with such writing, whether used or not, including by way of illustration and not by way of limitation, the following: books; records; reports; contracts; agreements; video, audio and other electronic recordings; memoranda (including written memoranda of telephone conversations, other conversations, discussions, agreements, acts and activities); minutes; diaries; calendars; desk pads; scrapbooks; notes; notebooks; correspondence; drafts; bulletins; electronic mail; facsimiles; circulars; forms; pamphlets; notice; statements; journals; postcards; letters; telegrams; publications; inter and intra- office communications; photocopies; microfilm; maps; drawings; diagrams; sketches; analyses; transcripts; electronically stored information (ESI) and any other documents within defendant's possession, custody or control from which information can be obtained or translated, if necessary, by detection devices into reasonably usable form, i.e. typed in English. DOCUMENTS does not include DOCUMENTS protected by the attorney-client and/or work product privileges.

9. "COMMUNICATION" means any attempt by one or more persons or entities to communicate, including but not limited to written communications, including memoranda, letters, notes, telegrams, telexes and any other documents; oral communications including face-to-face meetings and telephone conversations; and, electronic or computerized communications, including emails (electronic mailings), Internet postings, word processing systems, magnetic tapes, disks and diskettes.

10. "RELATE TO" or "RELATING TO" means directly or indirectly mentioning or describing, pertaining to, being connected with, or reflecting upon a stated subject matter.

## **INSTRUCTIONS**

1.      Produce all DOCUMENTS in your possession, custody, or control, as well as all DOCUMENTS in the possession, custody, or control of your agents, representatives, attorneys, investigators, consultants, independent contractors, or experts at least one (1) week before the deposition date reflected in the Subpoena. (As used herein, the term "DOCUMENT" means all original writings of any nature whatsoever and all copies thereof which are not identical to the original or which contain any commentary or notation that does not appear on the original, whether written, printed, recorded or graphic matter, photographic matter, or sound reproduction of any kind in any form whatsoever (including, but not limited to, reports, studies, charts, statistical compilations, letters, correspondence, telegrams, memoranda, ledgers, books of accounts, bookkeeping and accounting records, minutes, contracts, leases, notes, electronic transcriptions or tapings of conversations conducted by any means, work papers, schedules, computer printouts, computer files, e-mails, financial statements, and reports, calculations, diaries, appointment calendars or records, manuals, brochures, invoices, desk calendars, work sheets, tapes, records of telephone calls) of which you have knowledge, whether or not such documents are in YOUR possession, custody or control, and irrespective of who prepared or signed such documents. In all cases where originals and/or non-identical copies are not available, "DOCUMENTS" also means identical copies of original documents and copies of non-identical copies.)

2.      Produce each and every copy where such copy contains any commentary or notation that does not appear on the original. ESI should be produced in its Native Format, meaning the form that it is ordinarily maintained on your systems, including any metadata associated therewith. (As used herein, the term "ESI" means electronically stored information as defined in California Code of Civil Procedure section 2016.020(e), and shall include, but is not limited to, e-mails and text messages.) Should you choose to produce electronic images of paper DOCUMENTS instead of paper copies, you must product them in single-page TIFF FORMAT imaged at not less than 300 dpi resolution that shows all text and images that would be visible to

a user of the paper DOCUMENT. Color DOCUMENTS must be produced in color TIFF images. Each image should have a unique filename. If a paper DOCUMENT is more than one page, the unitization of the paper DOCUMENT and any attachments or affixed notes shall be maintained as it existed when collected, including, for example, emails or letters with their attachments.

3.    Produce all drafts, as well as the final version, of all responsive DOCUMENTS.

4.    Produce, where possible, originals of the DOCUMENTS requested, whether signed or unsigned, for inspection and copying.

5.    For each DOCUMENT requested which is sought to be withheld under a claim of privilege, provide the following information:

a.    The number of the request to which the DOCUMENT is responsive;

b.    A statement of the basis upon which the privilege is claimed and whether or not the subject matter of the contents of the DOCUMENT is limited to legal advice or information provided for the purpose of securing legal advice;

c.    The name and title of the sender and the name and title of the recipient of the DOCUMENT, if applicable;

d.    The place, approximate date, and manner of recording or otherwise preparing the DOCUMENT;

e.    The name of each person or persons participating in the preparation of the DOCUMENT; and

f.    The name and title, if any, of each person to whom the contents of the DOCUMENT has been communicated by copy, exhibition, reading or substantial summarization.

**DOCUMENTS TO BE PRODUCED**

**REQUEST FOR PRODUCTION NO. 1**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing YOUR declaration in support of PETITIONERS' *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 2**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit B to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 3**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit C to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 4**:

YOUR COMMUNICATIONS with PETITIONERS RELATED TO the ACTION.

**REQUEST FOR PRODUCTION NO. 5**:

YOUR COMMUNICATIONS discussing SABLE.

**REQUEST FOR PRODUCTION NO. 6**:

YOUR COMMUNICATIONS discussing PPC.

**REQUEST FOR PRODUCTION NO. 7**:

All DOCUMENTS reflecting any work YOU have performed RELATED TO the SYU PIPELINE.

**REQUEST FOR PRODUCTION NO. 8**:

All DOCUMENTS reflecting any work YOU have performed RELATED TO the LAS FLORES PIPELINE.

**REQUEST FOR PRODUCTION NO. 9**:

All contracts and agreements YOU have with PETITIONERS.

**REQUEST FOR PRODUCTION NO. 10**:

DOCUMENTS sufficient to show YOUR work in "consult[ing] for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design," as stated in paragraph 3 of YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 11**:

All drafts and versions of YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 12**:

All drafts and versions of Exhibit B to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 13**:

All drafts and versions of Exhibit C to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 14**:

All of YOUR COMMUNICATIONS RELATED TO the civil action entitled *Sable Offshore Corp v. California Coastal Commission et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV00974.

| **ALSTON & BIRD LLP**  (213) 576-1000 | |
| :--- | :--- |
| Jeffrey D. Dintzer (Cal. Bar 139056); Matthew C. Wickersham (Cal. Bar No 241733); | |
| Garrett B. Stanton (Cal. Bar No. 327775) | |
| **350 South Grand Avenue, Suite 5100 , Los Angeles, CA 90071** | |
| ATTORNEY FOR *(Name):* **Real Parties in Interest** | |

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SANTA BARBARA - ANACAPA DIVISON**

PLAINTIFF/PETITIONER:   **Center for Biological Diversity and Wishtoyo Foundation**
DEFENDANT/RESPONDENT:   **California Department of Forestry and Fire Protection, et al.**

| **PROOF OF SERVICE** | HEARING DATE: **June 24, 2025** | TIME: **9:00 AM** | CASE NUMBER: **25CV02244** |
| :--- | :--- | :--- | :--- |

1.   At the time of service I was 18 years of age and not a party to this action, and   **I served copies**  of the *(specify document(s)):*

**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS**

2.   a. Party Served:        **Richard B. Kuprewicz**

    b. Person Served:        **Same as party in item 2a.**

    c. Address:        **1783 Trilogy Parkway**
                        **Nipomo, CA 934446621**

3.   I served the party in item 2

    a. **By personally delivering the copies.**

                        (1) on *(date):*        **6/5/2025**
                        (2) at *(time):*        **7:00 AM**

4.   **Witness fees were not demanded and were not paid.**

5.   Person Serving *(name, address, and telephone No.):*

**Joseph P. Stetz III**
Ace Attorney Service, Inc.
800 S. Figueroa Street, Suite 900
Los Angeles, CA 90017
(213) 623-3979

f. **Fee** for service: $
c. Registered California Process Server.
(1) Employee or independent contractor.
(2) Registration No.: **270**
(3) County : **SANTA BARBARA**

6.   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct

Date:   **June 5, 2025**

_____
*(signature)*

SUBP-020 [Rev. January 1,2009]                                                                                                   Order#: 2455263/POS2

**PROOF OF SERVICE**

**PROOF OF SERVICE**

I, Heather Thai, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 5, 2025, I served the document(s) **REAL PARTIES IN INTEREST'S NOTICE OF ISSUANCE OF SUBPOENA TO AND DEPOSITION OF RICHARD B. KUPREWICZ** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒   (BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by UPS for overnight delivery.

☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 5, 2025, at Los Angeles, California.

Heather Thai
_____
Heather Thai

**SERVICE LIST**

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

**ATTORNEYS FOR PETITIONERS**
ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
        jfrankel@environmentaldefensecenter.org
        trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

**ATTORNEYS FOR RESPONDENTS/ DEFENDANTS**
California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

**ATTORNEYS FOR REAL PARTIES IN INTEREST**
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
        benjaminhanelin@paulhastings.com
        natalierogers@paulhastings.com

# EXHIBIT B

| | |
|---|---|
| **From:** | Dintzer, Jeffrey |
| **To:** | Jeremy Frankel; Stanton, Garrett |
| **Cc:** | djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Wickersham, Matt; Talia Nimmer; Thai, Heather; Julie Teel Simmonds; David Pettit; Michael.dorsi@doj.ca.gov; Linda Krop; Tara Rengifo; Bolender, Brooke; Niz, Kim; tom@stolpmanlawgroup.com |
| **Subject:** | Re: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247) |
| **Date:** | Thursday, June 12, 2025 1:44:48 PM |

Ok

_____

From: Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
Sent: Thursday, June 12, 2025 1:40:10 PM
To: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; Stanton, Garrett <Garrett.Stanton@alston.com>
Cc: djmoore@paulhastings.com <djmoore@paulhastings.com>; benjaminhanelin@paulhastings.com <benjaminhanelin@paulhastings.com>; natalierogers@paulhastings.com <natalierogers@paulhastings.com>; Wickersham, Matt <Matt.Wickersham@alston.com>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Thai, Heather <Heather.Thai@alston.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; David Pettit <dpettit@biologicaldiversity.org>; Michael.dorsi@doj.ca.gov <Michael.dorsi@doj.ca.gov>; Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; Bolender, Brooke <Brooke.Bolender@alston.com>; Niz, Kim <Kim.Niz@alston.com>; tom@stolpmanlawgroup.com <tom@stolpmanlawgroup.com>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

EXTERNAL SENDER – Proceed with caution

_____

How does 3 pm sound?

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<http://www.EnvironmentalDefenseCenter.org>

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

-----Original Message-----
From: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>

Sent: Thursday, June 12, 2025 1:38 PM
To: Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Stanton, Garrett <Garrett.Stanton@alston.com>
Cc: djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Wickersham, Matt <Matt.Wickersham@alston.com>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Thai, Heather <Heather.Thai@alston.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; David Pettit <dpettit@biologicaldiversity.org>; Michael.dorsi@doj.ca.gov; Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; Bolender, Brooke <Brooke.Bolender@alston.com>; Niz, Kim <Kim.Niz@alston.com>; tom@stolpmanlawgroup.com
Subject: Re: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Yes, that will work. Please send a teams or zoom link. Jeffrey.

_____

From: Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
Sent: Thursday, June 12, 2025 1:28:19 PM
To: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; Stanton, Garrett <Garrett.Stanton@alston.com>
Cc: djmoore@paulhastings.com <djmoore@paulhastings.com>; benjaminhanelin@paulhastings.com <benjaminhanelin@paulhastings.com>; natalierogers@paulhastings.com <natalierogers@paulhastings.com>; Wickersham, Matt <Matt.Wickersham@alston.com>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Thai, Heather <Heather.Thai@alston.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; David Pettit <dpettit@biologicaldiversity.org>; Michael.dorsi@doj.ca.gov <Michael.dorsi@doj.ca.gov>; Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; Bolender, Brooke <Brooke.Bolender@alston.com>; Niz, Kim <Kim.Niz@alston.com>; tom@stolpmanlawgroup.com <tom@stolpmanlawgroup.com>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

EXTERNAL SENDER - Proceed with caution

_____


Hi Jeffrey,


Are you available for a phone call this afternoon with myself and Tom Stolpman, cc'ed here, who will be serving as counsel for Mr. Kuprewicz? Any time before 4:30 would work for us.


Thanks,


[cid:image001.jpg@01DBDB9D.DA252F20]

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<http://www.EnvironmentalDefenseCenter.org>
<http://www.environmentaldefensecenter.org>>

[Facebook icon] <https://www.facebook.com/EnvironmentalDefenseCenter>> [Instagram icon] <https://www.instagram.com/environmentaldefensecenter>> [LinkedIn icon] <https://www.linkedin.com/company/environmental-defense-center>> [Youtube icon] <https://www.youtube.com/user/EnviroDefenseCenter>>

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

From: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>
Sent: Wednesday, June 11, 2025 5:07 PM
To: Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Stanton, Garrett <Garrett.Stanton@alston.com>
Cc: djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Wickersham, Matt <Matt.Wickersham@alston.com>; Talia Nimmer <tnimmer@biologicaldiversity.org>; Thai, Heather <Heather.Thai@alston.com>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; David Pettit <dpettit@biologicaldiversity.org>; Michael.dorsi@doj.ca.gov; Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; Bolender, Brooke <Brooke.Bolender@alston.com>; Niz, Kim <Kim.Niz@alston.com>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Thank you, I look forward to hearing from him/her tomorrow. Regards, Jeffrey.

From: Jeremy Frankel <jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>
Sent: Wednesday, June 11, 2025 5:05 PM
To: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>; benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>; natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Wickersham, Matt <Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer <tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather <Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit <dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>; Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop

<lkrop@environmentaldefensecenter.org<[mailto:lkrop@environmentaldefensecenter.org](mailto:lkrop@environmentaldefensecenter.org)>>; Tara Rengifo <trengifo@environmentaldefensecenter.org<[mailto:trengifo@environmentaldefensecenter.org](mailto:trengifo@environmentaldefensecenter.org)>>; Bolender, Brooke <Brooke.Bolender@alston.com<[mailto:Brooke.Bolender@alston.com](mailto:Brooke.Bolender@alston.com)>>; Niz, Kim <Kim.Niz@alston.com<[mailto:Kim.Niz@alston.com](mailto:Kim.Niz@alston.com)>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)


EXTERNAL SENDER - Proceed with caution

_____


We are working on obtaining outside counsel for Mr. Kuprewicz, which should be resolved some time tomorrow. Counsel for Mr. Kuprewicz will follow up with you about appropriate accommodations.


Thanks,


[cid:image001.jpg@01DBDB9D.DA252F20]

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<[http://www.EnvironmentalDefenseCenter.org](http://www.EnvironmentalDefenseCenter.org)>
<[http://www.environmentaldefensecenter.org>>](http://www.environmentaldefensecenter.org)




[Facebook icon] <https://www.facebook.com/EnvironmentalDefenseCenter>> [Instagram icon] <https://www.instagram.com/environmentaldefensecenter>> [LinkedIn icon] <https://www.linkedin.com/company/environmental-defense-center>> [Youtube icon] <https://www.youtube.com/user/EnviroDefenseCenter>>



We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.


CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

From: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>
Sent: Wednesday, June 11, 2025 3:53 PM
To: Jeremy Frankel
<jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>; Stanton, Garrett
<Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Wickersham, Matt
<Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer
<tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather
<Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds
<jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit
<dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop
<lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Tara Rengifo
<trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>; Bolender, Brooke
<Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim
<Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Mr. Frankel you have not answered my question, which is very simple, can Mr. Kuperwicz travel the short distance
to a local hotel to attend the deposition? You will have to answer this question if you intend to seek a protective
order. Please advise. If he is truly housebound then we can discuss other accommodations, but a remote deposition
is not one of them. Finally, please advise whether your offices are representing Mr. Kuperwicz as his personal
counsel in this matter. Regards, Jeffrey Dintzer.

From: Jeremy Frankel
<jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>
Sent: Wednesday, June 11, 2025 3:43 PM
To: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Stanton, Garrett
<Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Wickersham, Matt
<Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer
<tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather
<Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds
<jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit
<dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop
<lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Tara Rengifo
<trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>; Bolender, Brooke
<Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim
<Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

EXTERNAL SENDER - Proceed with caution

_____

Hi Jeffrey,


It is my understanding that Mr. Kuprewicz is unable to travel. But he is able to participate remotely, so long as the sessions are limited to half-days.


Again, if you are not willing to make reasonable accommodations for Mr. Kuprewicz's health issues, we will seek appropriate relief.


Thanks,


[cid:image001.jpg@01DBDB9D.DA252F20]

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<http://www.EnvironmentalDefenseCenter.org>
<http://www.environmentaldefensecenter.org>>


[Facebook icon] <https://www.facebook.com/EnvironmentalDefenseCenter>> [Instagram icon] <https://www.instagram.com/environmentaldefensecenter>> [LinkedIn icon] <https://www.linkedin.com/company/environmental-defense-center>> [Youtube icon] <https://www.youtube.com/user/EnviroDefenseCenter>>


We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.


CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

From: Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>
Sent: Wednesday, June 11, 2025 3:09 PM
To: Jeremy Frankel
<jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>; Stanton, Garrett
<Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Wickersham, Matt
<Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer
<tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather
<Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds
<jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit
<dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop
<lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Tara Rengifo
<trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>; Bolender, Brooke
<Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim
<Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Mr. Frankel, we have agreed to move the deposition date and are going to travel to a location near Mr. Kuprewicz's home. We are prepared to take reasonable breaks to accommodate the witness so that he can rest between questioning sessions. We are not willing to conduct the deposition remotely. Is it your representation that he cannot leave his home and come to a local hotel and give live testimony? Please advise. Regards, Jeffrey Dintzer.

From: Jeremy Frankel
<jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>
Sent: Wednesday, June 11, 2025 2:53 PM
To: Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Dintzer, Jeffrey
<Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Wickersham, Matt
<Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Talia Nimmer
<tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather
<Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds
<jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit
<dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop
<lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Tara Rengifo
<trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>; Bolender, Brooke
<Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim
<Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No.
25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

EXTERNAL SENDER - Proceed with caution

_____

Hi Garrett,

Mr. Kuprewicz is experiencing severe health issues that, among other things, prevent him from traveling. If you want to proceed with his deposition, it will have to be conducted remotely, and it will have to be split up between two, 3.5 hour sessions. Otherwise, we will be forced to seek a protective order and stay the deposition until the court can hear the issue.

We see these as very reasonable requests, and I'm sure the court would as well.

Thanks,

[cid:image001.jpg@01DBDB9D.DA252F20]

JEREMY FRANKEL (he/him/his)
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org<http://www.EnvironmentalDefenseCenter.org>
<http://www.environmentaldefensecenter.org>>

[Facebook icon] <https://www.facebook.com/EnvironmentalDefenseCenter>> [Instagram icon] <https://www.instagram.com/environmentaldefensecenter>> [LinkedIn icon] <https://www.linkedin.com/company/environmental-defense-center>> [Youtube icon] <https://www.youtube.com/user/EnviroDefenseCenter>>

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

From: Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>
Sent: Tuesday, June 10, 2025 5:36 PM
To: Talia Nimmer <tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Thai, Heather <Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit <dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>; Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>; Linda Krop <lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>; Tara Rengifo <trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>; benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>; natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Wickersham, Matt <Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Bolender, Brooke <Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim <Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: RE: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)


Hi Talia,


We are agreeable rescheduling the deposition for July 1st to accommodate calendar conflicts. While the Code allows for remote depositions by agreement, the rules also permit "any party or attorney of record" to be "physically present at the deposition at the location of the deponent," as long as requisite notice is given. (Cal. Rules of Court, rule 3.1010(a)(3).)


As such, the deposition will be noticed to go forward in-person, and will need to take place in a single, 7-hour session as allowed by the Code since the deposition will require us to undertake substantial travel. We, of course, are agreeable to taking more frequent breaks during the deposition to accommodate the witness.


Thanks,


Garrett B. Stanton

Senior Associate

ALSTON & BIRD

350 South Grand Avenue, 51st Floor

Los Angeles, CA 90071

garrett.stanton@alston.com<mailto:garrett.stanton@alston.com> | t: 213.576.1151

From: Talia Nimmer <tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>
Sent: Tuesday, June 10, 2025 4:54 PM
To: Thai, Heather <Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit <dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>;
Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>;
lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>;
jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>;
trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>;
benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>;
natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>; Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Wickersham, Matt <Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>; Bolender, Brooke <Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim <Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: Re: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

EXTERNAL SENDER - Proceed with caution

_____

Counsel,

Given scheduling conflicts, we would like to request that the deposition be rescheduled for the following week (June 30-July 3). Additionally, because the witness is currently experiencing health issues, we would like to further request that the deposition take place remotely and that should the deposition run more than 3.5 hours, it be split into two morning sessions.

Please advise whether this is amenable. Thank you for your anticipated cooperation.

Talia Nimmer (she/her)

Staff Attorney

Climate Law Institute

Center for Biological Diversity

(213) 341-1426

[cbd.circle.tag.rgb]

The information contained in this email message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please notify the sender by reply email and delete the message and any attachments.

_____

From: Thai, Heather <Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>>
Sent: Thursday, June 5, 2025 12:32 PM
To: Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org<mailto:jteelsimmonds@biologicaldiversity.org>>; David Pettit <dpettit@biologicaldiversity.org<mailto:dpettit@biologicaldiversity.org>>; Talia Nimmer <tnimmer@biologicaldiversity.org<mailto:tnimmer@biologicaldiversity.org>>; Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov> <Michael.dorsi@doj.ca.gov<mailto:Michael.dorsi@doj.ca.gov>>; lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org> <lkrop@environmentaldefensecenter.org<mailto:lkrop@environmentaldefensecenter.org>>; jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org> <jfrankel@environmentaldefensecenter.org<mailto:jfrankel@environmentaldefensecenter.org>>; trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org> <trengifo@environmentaldefensecenter.org<mailto:trengifo@environmentaldefensecenter.org>>
Cc: djmoore@paulhastings.com<mailto:djmoore@paulhastings.com> <djmoore@paulhastings.com<mailto:djmoore@paulhastings.com>>; benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com> <benjaminhanelin@paulhastings.com<mailto:benjaminhanelin@paulhastings.com>>; natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com> <natalierogers@paulhastings.com<mailto:natalierogers@paulhastings.com>>; Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com<mailto:Jeffrey.Dintzer@alston.com>>; Wickersham, Matt <Matt.Wickersham@alston.com<mailto:Matt.Wickersham@alston.com>>; Stanton, Garrett <Garrett.Stanton@alston.com<mailto:Garrett.Stanton@alston.com>>; Bolender, Brooke <Brooke.Bolender@alston.com<mailto:Brooke.Bolender@alston.com>>; Niz, Kim <Kim.Niz@alston.com<mailto:Kim.Niz@alston.com>>
Subject: Center for Biological Diversity v. California Department of Forestry, et al. (Case No. 25CV02244)/Environmental Defense Center v. California Department of Forestry, et al. (Case No. 25CV02247)

Electronically Served:

Dear Counsel:

Please see the attached documents listed documents:

Center for Biological Diversity v. California Department of Forestry, et al.

· Real Parties in Interest's Notice of Issuance of Subpoena to and Deposition of Richard B. Kuprewicz

Environmental Defense Center v. California Department of Forestry, et al.

· Real Parties in Interest's Notice of Issuance of Subpoena to and Deposition of Richard B. Kuprewicz

Thank you,

Heather L. Thai
ABassist Specialist
ALSTON & BIRD
350 South Grand Avenue

51st Floor
Los Angeles, CA 90071
+1 213 576 1017 (O)
Heather.Thai@alston.com<mailto:Heather.Thai@alston.com>

_____

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

# EXHIBIT C

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:     (213) 576-1000
Facsimile:     (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN (SBN 237595)
benjaminhanelin@paulhastings.com
NATALIE C. Rogers (SBN 301254)
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:     (310) 620-5879
Facsimile:     (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

|  |  |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, | Case No. 25CV02247<br>Coordinated with Case No. 25CV02244<br><br>Assigned for all purposes to:<br>Hon. Donna G. Geck |
| Petitioners and Plaintiffs, | **REAL PARTIES IN INTEREST'S AMENDED CROSS-NOTICE OF DEPOSITION OF RICHARD B. KUPREWICZ** |
| v. | **Date**: July 1, 2025<br>**Time**: 9:00 a.m.<br>**Place**: 1605 Calle Joaquin, San Luis Obispo, California 93405 |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, |  |
| Respondents and Defendants, | Complaint Filed:     April 15, 2025<br>Trial Date:     None set |
| and |  |

1

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

REAL PARTIES IN INTEREST'S AMENDED NOTICE OF
DEPOSITION OF RICHARD B. KUPREWICZ

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Real Parties in Interest Sable Offshore Cop. and Pacific Pipeline Company ("Real Parties") hereby cross-notice the deposition set forth in the Amended Deposition Subpoena for Personal Appearance and Production of Documents and Things to Richard B. Kuprewicz (the "Deponent") issued by Real Parties in the Coordinated Action (Case No. 25CV02244), attached hereto as **Exhibit 1** (the "Deposition Subpoena").

**PLEASE TAKE FURTHER NOTICE** that the deposition of Deponent will take place on **July 1, 2025** at the Marriott, 1605 Calle Joaquin, San Luis Obispo, California 93405. The deposition will be coordinated by Veritext Legal Solutions, with a business address of 707 Wilshire Boulevard, Suite 3500, Los Angeles, California 90017. The deposition will be taken before an officer authorized to administer the oath to the deponent and will be recorded by stenographic means by a court reporter certified to record depositions and authorized to administer the oath and serve as the deposition officer in the State of California.

Real Parties intend to (1) record the deposition utilizing audio and video technology; (2) use instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in real time; (3) use Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) conduct this deposition utilizing a paperless exhibit display process called Exhibit Share or a similar paperless virtual display platform. The parties are advised that, in lieu of a paper set, exhibits may be provided and displayed digitally to the deposition officer, deponent, parties, and counsel. The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.

Please contact the noticing attorney at least five (5) calendar days prior to the deposition to advise of those who intend to appear via this remote participating means so that the necessary credentials, call-in numbers, firm name, email address, services, testing and information, if necessary, can be arranged and provided to you prior to the deposition.

/ / /

/ / /

DATED:   June 20, 2025

Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE

_____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

# Exhibit 1

**SUBP-020**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | *FOR COURT USE ONLY* |
|---|---|
| Jeffrey D. Dintzer (SBN 139056); Garrett B. Stanton (SBN 324775)<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071<br>    TELEPHONE NO.: (213) 576-1000     FAX NO. *(Optional):* (213) 576-1100<br>E-MAIL ADDRESS *(Optional):* jeffrey.dintzer@alston.com; garrett.stanton@alston.com<br>    ATTORNEY FOR *(Name):* Real Parties in Interest | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**
 STREET ADDRESS: 1100 Anacapa Street
 MAILING ADDRESS: P.O. Box 21107
 CITY AND ZIP CODE: Santa Barbara, CA 93121-1107
 BRANCH NAME:

     PLAINTIFF/ PETITIONER: Environmental Defense Center, et al.

 DEFENDANT/ RESPONDENT: California Department of Forestry and Fire Protection, et al.

| **DEPOSITION SUBPOENA**<br>**FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS** | CASE NUMBER:<br>25CV02247 |
|---|---|

**THE PEOPLE OF THE STATE OF CALIFORNIA, TO** *(name, address, and telephone number of deponent, if known):*
Richard B. Kuprewicz, 1783 Trilogy Pkwy, Nipomo, CA 93444-6621

1. **YOU ARE ORDERED TO APPEAR IN PERSON TO TESTIFY AS A WITNESS in this action at the following date, time, and place:**

| Date: July 1, 2025 | Time: 9:00 a.m. | Address: 1605 Calle Joaquin, San Luis Obispo, California 93405 |
|---|---|---|

   a. ☐   As a deponent who is not a natural person, you are ordered to designate one or more persons to testify on your behalf as to the matters described in item 4. (Code Civ. Proc, § 2025.230.)

   b. ☒   You are ordered to produce the documents and things described in item 3.

   c. ☒   This deposition will be recorded stenographically   ☐   through the instant visual display of testimony
      and by   ☐   audiotape   ☒   videotape.

   d. ☒   This videotape deposition is intended for possible use at trial under Code of Civil Procedure section 2025.620(d).

2. The personal attendance of the custodian or other qualified witness and the production of the original records are required by this subpoena. The procedure authorized by Evidence Code sections 1560(b), 1561, and 1562 will not be deemed sufficient compliance with this subpoena.

3. The documents and things to be produced and any testing or sampling being sought are described as follows:
 See Attachment 3
   ☒   Continued on Attachment 3.

4. If the witness is a representative of a business or other entity, the matters upon which the witness is to be examined are described as follows:

   ☐   Continued on Attachment 4.

5. **IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.**

6. *At the deposition, you will be asked questions under oath. Questions and answers are recorded stenographically at the deposition; later they are transcribed for possible use at trial. You may read the written record and change any incorrect answers before you sign the deposition. You are entitled to receive witness fees and mileage actually traveled both ways. The money must be paid, at the option of the party giving notice of the deposition, either with service of this subpoena or at the time of the deposition. Unless the court orders or you agree otherwise, if you are being deposed as an individual, the deposition must take place within 75 miles of your residence or within 150 miles of your residence if the deposition will be taken within the county of the court where the action is pending. The location of the deposition for all deponents is governed by Code of Civil Procedure section 2025.250.*

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF $500 AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: June 20, 2025

                                          ▶
                                              (SIGNATURE OF PERSON ISSUING SUBPOENA)

Jeffrey D. Dintzer                                    Attorney for Real Parties in Interest
          (TYPE OR PRINT NAME)                                       (TITLE)

(Proof of service on reverse)                            **Page 1 of 2**

**DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS**

Code of Civil Procedure §§ 2020.510,
2025.220, 2025.230, 2025.250, 2025.620;
Government Code, § 68097.1
www.courts.ca.gov

# Attachment 3

ATTACHMENT 3

## DEFINITIONS

1.      "YOU" and "YOUR" mean to Richard B. Kuprewicz, his agents, attorneys, and other representatives acting on his behalf.

2.      "SABLE" shall mean Sable Offshore Corp.

3.      "PPC" shall mean Pacific Pipeline Company.

4.      "PETITIONERS" shall mean Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Center for Biological Diversity, and Wishtoyo Foundation, as well as their agents, attorneys, and other representatives acting on their behalf

5.      "ACTION" shall mean the civil lawsuits filed by PETITIONERS entitled *Center for Biological Diversity et al. v. California Department of Forestry and Fire Protection et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV02244, and the coordinated action entitled *Environmental Defense Center et al. v. California Department of Forestry and Fire Protection et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV02247.

6.      "SYU PIPELINE" shall refer to the Santa Ynez Unit Pipelines located in waters offshore California.

7.      "LAS FLORES PIPELINE" shall refer to the Las Flores Pipelines located in waters offshore California.

8.      "DOCUMENTS" means all data, papers, and books, transcriptions, pictures, drawings or diagrams or every nature, whether transcribed by hand or by some mechanical, electronic, photographic or other means, as well as sound reproductions of oral statements or conversations by whatever means made, including written papers or memoranda which summarize

Page **1** of **6**

oral conversations, whether in your actual or constructive possession or under your control or not, relating to or pertaining to or in any way to the subject matters in connection which it is used and includes originals, all file copies, all other copies, no matter how prepared and all drafts prepared in connection with such writing, whether used or not, including by way of illustration and not by way of limitation, the following: books; records; reports; contracts; agreements; video, audio and other electronic recordings; memoranda (including written memoranda of telephone conversations, other conversations, discussions, agreements, acts and activities); minutes; diaries; calendars; desk pads; scrapbooks; notes; notebooks; correspondence; drafts; bulletins; electronic mail; facsimiles; circulars; forms; pamphlets; notice; statements; journals; postcards; letters; telegrams; publications; inter and intra- office communications; photocopies; microfilm; maps; drawings; diagrams; sketches; analyses; transcripts; electronically stored information (ESI) and any other documents within defendant's possession, custody or control from which information can be obtained or translated, if necessary, by detection devices into reasonably usable form, i.e. typed in English. DOCUMENTS does not include DOCUMENTS protected by the attorney-client and/or work product privileges.

9.     "COMMUNICATION" means any attempt by one or more persons or entities to communicate, including but not limited to written communications, including memoranda, letters, notes, telegrams, telexes and any other documents; oral communications including face-to-face meetings and telephone conversations; and, electronic or computerized communications, including emails (electronic mailings), Internet postings, word processing systems, magnetic tapes, disks and diskettes.

10.     "RELATE TO" or "RELATING TO" means directly or indirectly mentioning or describing, pertaining to, being connected with, or reflecting upon a stated subject matter.

## INSTRUCTIONS

1.      Produce all DOCUMENTS in your possession, custody, or control, as well as all DOCUMENTS in the possession, custody, or control of your agents, representatives, attorneys, investigators, consultants, independent contractors, or experts at least one (1) week before the deposition date reflected in the Subpoena. (As used herein, the term "DOCUMENT" means all original writings of any nature whatsoever and all copies thereof which are not identical to the original or which contain any commentary or notation that does not appear on the original, whether written, printed, recorded or graphic matter, photographic matter, or sound reproduction of any kind in any form whatsoever (including, but not limited to, reports, studies, charts, statistical compilations, letters, correspondence, telegrams, memoranda, ledgers, books of accounts, bookkeeping and accounting records, minutes, contracts, leases, notes, electronic transcriptions or tapings of conversations conducted by any means, work papers, schedules, computer printouts, computer files, e-mails, financial statements, and reports, calculations, diaries, appointment calendars or records, manuals, brochures, invoices, desk calendars, work sheets, tapes, records of telephone calls) of which you have knowledge, whether or not such documents are in YOUR possession, custody or control, and irrespective of who prepared or signed such documents. In all cases where originals and/or non-identical copies are not available, "DOCUMENTS" also means identical copies of original documents and copies of non-identical copies.)

2.      Produce each and every copy where such copy contains any commentary or notation that does not appear on the original. ESI should be produced in its Native Format, meaning the form that it is ordinarily maintained on your systems, including any metadata associated therewith. (As used herein, the term "ESI" means electronically stored information as defined in California Code of Civil Procedure section 2016.020(e), and shall include, but is not limited to, e-mails and text messages.) Should you choose to produce electronic images of paper DOCUMENTS instead of paper copies, you must product them in single-page TIFF FORMAT imaged at not less than 300 dpi resolution that shows all text and images that would be visible to

a user of the paper DOCUMENT. Color DOCUMENTS must be produced in color TIFF images. Each image should have a unique filename. If a paper DOCUMENT is more than one page, the unitization of the paper DOCUMENT and any attachments or affixed notes shall be maintained as it existed when collected, including, for example, emails or letters with their attachments.

3.      Produce all drafts, as well as the final version, of all responsive DOCUMENTS.

4.      Produce, where possible, originals of the DOCUMENTS requested, whether signed or unsigned, for inspection and copying.

5.      For each DOCUMENT requested which is sought to be withheld under a claim of privilege, provide the following information:

a.      The number of the request to which the DOCUMENT is responsive;

b.      A statement of the basis upon which the privilege is claimed and whether or not the subject matter of the contents of the DOCUMENT is limited to legal advice or information provided for the purpose of securing legal advice;

c.      The name and title of the sender and the name and title of the recipient of the DOCUMENT, if applicable;

d.      The place, approximate date, and manner of recording or otherwise preparing the DOCUMENT;

e.      The name of each person or persons participating in the preparation of the DOCUMENT; and

f.      The name and title, if any, of each person to whom the contents of the DOCUMENT has been communicated by copy, exhibition, reading or substantial summarization.

**DOCUMENTS TO BE PRODUCED**

**REQUEST FOR PRODUCTION NO. 1**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing YOUR declaration in support of PETITIONERS' *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 2**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit B to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 3**:

All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit C to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 4**:

YOUR COMMUNICATIONS with PETITIONERS RELATED TO the ACTION.

**REQUEST FOR PRODUCTION NO. 5**:

YOUR COMMUNICATIONS discussing SABLE.

**REQUEST FOR PRODUCTION NO. 6**:

YOUR COMMUNICATIONS discussing PPC.

**REQUEST FOR PRODUCTION NO. 7**:

All DOCUMENTS reflecting any work YOU have performed RELATED TO the SYU PIPELINE.

**REQUEST FOR PRODUCTION NO. 8**:

All DOCUMENTS reflecting any work YOU have performed RELATED TO the LAS FLORES PIPELINE.

**REQUEST FOR PRODUCTION NO. 9**:

All contracts and agreements YOU have with PETITIONERS.

**REQUEST FOR PRODUCTION NO. 10**:

DOCUMENTS sufficient to show YOUR work in "consult[ing] for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design," as stated in paragraph 3 of YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 11**:

All drafts and versions of YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 12**:

All drafts and versions of Exhibit B to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 13**:

All drafts and versions of Exhibit C to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

**REQUEST FOR PRODUCTION NO. 14**:

All of YOUR COMMUNICATIONS RELATED TO the civil action entitled *Sable Offshore Corp v. California Coastal Commission et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV00974.

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 20, 2025, I served the document(s) AEMNDED DEPOSITION SUBPOENA **FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS TO RICHARD B. KUPREWICZ** on the interested parties stated below, by the following means of service:

☐   (BY U.S. MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐   (BY FACSIMILE) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐   (BY OVERNIGHT MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 20, 2025, at Los Angeles, California.

*/s/ Kim Niz*
Kim Niz

**SERVICE LIST**

Tom Stolpman                                    **Counsel for Robert Kuperwicz**
Stolpman Law Group                              **tom@stolpmanlawgroup.com**

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 20, 2025, I served the document(s) **REAL PARTIES IN INTEREST'S AMENDED NOTICE OF ISSUANCE OF SUBPOENA TO AND DEPOSITION OF RICHARD B. KUPREWICZ** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☐ (BY U.S. MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐ (BY FACSIMILE)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 20, 2025, at Los Angeles, California.

/s/ *Kim Niz*
Kim Niz

**SERVICE LIST**

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

**ATTORNEYS FOR PETITIONERS**
ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
           jfrankel@environmentaldefensecenter.org
           trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

**ATTORNEYS FOR RESPONDENTS/ DEFENDANTS**
California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

**ATTORNEYS FOR REAL PARTIES IN INTEREST**
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
           benjaminhanelin@paulhastings.com
           natalierogers@paulhastings.com

# EXHIBIT D

| | |
|---|---|
| **From:** | Jeremy Frankel |
| **To:** | Dintzer, Jeffrey; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Stanton, Garrett; Daniel, Madeline; Seabolt, Dan; Vreeland, Shannon; Rusek, Vickie; Oberst, Brett; Brown, Frankie |
| **Cc:** | Linda Krop; Tara Rengifo; Julie Teel Simmonds; dpettit@biologicaldiversity.org; michael.dorsi@doj.ca.gov |
| **Subject:** | RE: Re Mr. Kuprewicz"s Deposition |
| **Date:** | Tuesday, June 24, 2025 5:25:00 PM |
| **Attachments:** | 2025_06_24_Objection to Deposition of Richard Kuprewicz.pdf<br>image002.png<br>image003.png<br>image004.png<br>image005.png |

Hi Jeffrey,

Again, our previous discussions were borne of an obvious and immediate need to reschedule the date of the proposed deposition, and to inform you of Mr. Kuprewicz's ongoing health issues. At no time did Petitioners waive their right to object to Mr. Kuprewicz's deposition on the grounds that it exceeds the scope of permissible discovery, which our ongoing research has since revealed.

We respectfully disagree with your below contentions, including that it is unreasonable or prejudicial to quash an improper deposition subpoena/notice. Our review of the law indicates that, under the circumstances, Real Parties are not entitled to take Mr. Kuprewicz's deposition at this time. Accordingly, should Real Parties' not withdraw their deposition subpoena/notices by 5:00 p.m. tomorrow, we will proceed with a motion to quash.

Attached please find the EDC Petitioners' formal objection to Real Parties deposition subpoena and cross-notice of deposition. A copy is also being served by mail.

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org

  

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

**From:** Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>
**Sent:** Tuesday, June 24, 2025 3:51 PM
**To:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Stanton, Garrett <Garrett.Stanton@alston.com>; Daniel, Madeline <Madeline.Daniel@alston.com>; Seabolt, Dan <Dan.Seabolt@alston.com>; Vreeland, Shannon <Shannon.Vreeland@alston.com>; Rusek, Vickie <Vickie.Rusek@alston.com>; Oberst, Brett <Brett.Oberst@alston.com>; Brown, Frankie <Frankie.Brown@alston.com>

**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; Julie Teel Simmonds <jteelsimmonds@biologicaldiversity.org>; dpettit@biologicaldiversity.org; michael.dorsi@doj.ca.gov
**Subject:** Re Mr. Kuprewicz's Deposition

Mr. Frankel,

It is true that we noticed the deposition for June 24th, and we moved the deposition date to July 1st to accommodate the schedules of counsel, *at counsel's request*. In that request, there was no objection for the deposition going forward, and that would have been the appropriate time to raise such objection. Such would have afforded the Real Parties with an opportunity to have the court compel the deposition in due time before Real Parties' opposition will be due on July 7th. On June 12th, we discussed Real Parties' need to take the deposition in time for our July 7th opposition, which is why we agreed upon July 1st. *At no time did any counsel object to the deposition going forward during this discussion either*. On the call, we all reached an agreement regarding the date, time, and location of the deposition to accommodate the witness. Mr. Stolpman further agreed to accept service on behalf of his client. Why would we discuss all of these topics and agree on them only to "make any deposition less burdensome" for Mr. Kuprewicz but not agree on a deposition going forward? That logically makes no sense. And based on the parties' agreement, Real Parties have reasonably had to incur necessary costs to reserve space for the deposition and for travel.

Further, waiting to move to quash the deposition only just before Real Parties' opposition is due is highly prejudicial for obvious reasons. Such prejudice cannot simply ensue because "it has come to [y]our attention that Real Parties are not entitled to proceed with Mr. Kuprewicz's deposition at this time" – offering no basis to prevent necessary cross-examination of evidence offered in support of an application for preliminary injunction that will greatly impact Real Parties' rights. The parties reached a clear agreement on June 12th to proceed with the deposition, and the law does not support your newfound position. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 413 ["A meaningful hearing requires an opportunity to examine evidence and cross-examine witnesses."]; 5 California Trial Guide § 100.20 [discussing depositions are appropriate for use in pretrial proceedings "such as a motion for a preliminary injunction"]; *Fleishman v. Superior Court* (2002)102 Cal. App. 4th 350, 356 ["Before issuing a preliminary injunction, the trial court must 'carefully weigh the evidence and decide whether the facts require . . . such relief. The court evaluates the credibility of witnesses and makes factual findings on disputed evidence."]; see also *St. Mary Med. Ctr. v. Sup.Ct. (Mennella)* (1996) 50 Cal.App.4th 1531, 1539 [holding § 2034.010 et seq. procedure for deposing expert witnesses does not bar earlier depositions of experts whose opinions are filed in support of or in opposition to a motion for summary judgment or summary adjudication].)

Preventing the deposition of Mr. Kuprewicz, without removing his declaration from the record, is highly unreasonable, highly prejudicial to Real Parties, violates their due process rights, and certainly serves as a strong basis for sanctions. We expect your declarant to appear at his deposition on July 1, 2025, as noticed. Regards, Jeffrey.

Jeffrey Dintzer
ALSTON & BIRD

350 S. Grand Avenue, 51st Floor
Los Angeles, CA 90071
Office: 213-576-1063
Cell: 213-393-8664

---

**From:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
**Sent:** Tuesday, June 24, 2025 10:20 AM

**To:** Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Stanton, Garrett <Garrett.Stanton@alston.com>; Niz, Kim <Kim.Niz@alston.com>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; tnimmer@biologicaldiversity.or; jteelsimmonds@biologicaldiversity.or; dpettit@biologicaldiversity.org; michael.dorsi@doj.ca.gov
**Subject:** RE: Service Docs - Case Nos.: 25CV02244 and 25CV02247

**EXTERNAL SENDER – Proceed with caution**

---

Hi Jeffrey,

Thank you for your response.

We certainly appreciate your willingness to move the deposition date, but the only reason it was moved was because you unilaterally scheduled the deposition without consulting counsel for petitioners, and you noticed it for a date when counsel for CBD and Wishtoyo was unavailable. The only reason the date was moved was to accommodate counsel's schedule.

When we previously met and conferred, we did so to discuss a different issue: Mr. Kuprewicz's severe health issues, and possible accommodations for him to make any deposition less burdensome. Any "agreement" we reached at our previous meeting was strictly related to that issue. Notably, we are not seeking to quash the subpoena on the basis of Mr. Kuprewicz's health issues.

We are not proceeding in bad faith. This is an unusual situation, and based on our continuing research, it has come to our attention that Real Parties are not entitled to proceed with Mr. Kuprewicz's deposition at this time. Because, as explained in our previous email, the deposition exceeds the scope of permissible discovery, it remains reasonable for us to pursue a motion to quash, regardless of when the deposition was re-noticed for.

Moreover, it's not clear to us how pushing the deposition to July 1 – which, again, was necessary to accommodate counsel's schedule – resulted in any prejudice to Real Parties. We ultimately reached out to meet and confer *before* the date Mr. Kuprewicz's deposition was initially noticed for (June 24), and our formal objections will be served imminently.

Please let us know what times you are available today for a call.

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org

 

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

---

**From:** Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>
**Sent:** Monday, June 23, 2025 5:29 PM
**To:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Stanton, Garrett <Garrett.Stanton@alston.com>; michael.dorsi@doj.ca.gov; Niz, Kim <Kim.Niz@alston.com>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; tnimmer@biologicaldiversity.or; jteelsimmonds@biologicaldiversity.or; dpettit@biologicaldiversity.org
**Subject:** RE: Service Docs - Case Nos.: 25CV02244 and 25CV02247

Mr. Frankel, we are happy to meet and confer with you tomorrow over the deposition of Mr. Kuprewicz.  But please know that if you file a motion to block the deposition from going forward, we will seek monetary sanctions against you. We agreed to move Mr. Kuprewicz's deposition to July 1 in good faith, with the understanding after *reaching an agreement with you and his independent counsel, Mr. Stolpman,* that deposition would proceed on July 1. The record reflects as much.

You never once mentioned any objection to the taking of his deposition before we agreed to move the deposition to July 1st, knowing our opposition is due on July 7th after a holiday weekend. The email below is the first we have heard of any objection to proceeding with this deposition as scheduled.  In fact, we met and conferred on June 12th, and all agreed that the deposition would proceed on July 1st at the location we selected near the witnesses' residence to accommodate his travel restrictions.  Had we been advised of such an objection, which could have been made at that time, we would not have moved the date to accommodate you and the witness.

Requesting a delay in the deposition of a declarant supporting an application for preliminary injunction so you can have additional time to file a motion for protective order or to quash the subpoena without advising opposing counsel of your intentions is bad faith and sanctionable.  Jeffrey

---

**From:** Jeremy Frankel <jfrankel@environmentaldefensecenter.org>
**Sent:** Monday, June 23, 2025 4:57 PM
**To:** djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; Stanton, Garrett <Garrett.Stanton@alston.com>; michael.dorsi@doj.ca.gov; Niz, Kim <Kim.Niz@alston.com>
**Cc:** Linda Krop <lkrop@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; tnimmer@biologicaldiversity.or;

jteelsimmonds@biologicaldiversity.or; dpettit@biologicaldiversity.org

**Subject:** RE: Service Docs - Case Nos.: 25CV02244 and 25CV02247

**EXTERNAL SENDER – Proceed with caution**

---

Counsel,

After further consideration, we believe that Real Parties' attempt to depose Mr. Kuprewicz – Petitioners' retained expert consultant – exceeds the scope of permissible discovery. Generally, parties are not entitled to engage in expert discovery (including depositions) unless and until experts have been designated pursuant to CCP § 2034.210. (*See, e.g., County of Los Angeles v. Superior Court* (1990) 224 Cal.App.3d 1446, 1456-57 (recognizing that information related to an expert's identity, qualifications, or opinion(s) is not discoverable before designation).) The only recognized exception to that rule is limited to summary judgment proceedings and is inapplicable here. (*See St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531, 1540-41.)

Accordingly, at this point, petitioners in both 25CV02244 and 25CV02247 intend to file motions to quash Mr. Kuprewicz's deposition subpoena and related notices of deposition. Filing the motions will automatically stay Mr. Kuprewicz's deposition until they can be heard. (CCP § 2025.410(b).)

That said, we welcome the opportunity to first attempt to resolve this informally. Please let us know your availability to meet and confer in the next few days.

(This effort to meet and confer is joined by counsel for petitioners in 25CV02244, cc'ed here.)

Thanks,



**JEREMY FRANKEL (he/him/his)**
STAFF ATTORNEY
906 Garden Street
Santa Barbara, CA 93101
805.963.1622 x100
www.EnvironmentalDefenseCenter.org

  

We recognize that EDC sits on occupied, unceded, stolen lands of the Chumash Peoples, on Shmuwich Territory, who have called this area home for time immemorial. We commit today to make space to elevate indigenous voices and support our local Chumash and indigenous communities in our work to protect our environment.

CONFIDENTIALITY NOTE: The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.

---

**From:** Niz, Kim <Kim.Niz@alston.com>
**Sent:** Friday, June 20, 2025 4:41 PM
**To:** Linda Krop <lkrop@environmentaldefensecenter.org>; Jeremy Frankel <jfrankel@environmentaldefensecenter.org>; Tara Rengifo <trengifo@environmentaldefensecenter.org>; michael.dorsi@doj.ca.gov; djmoore@paulhastings.com; benjaminhanelin@paulhastings.com; natalierogers@paulhastings.com; jteelsimmonds@biologicaldiversity.or; dpettit@biologicaldiversity.org; tnimmer@biologicaldiversity.or

**Cc:** Dintzer, Jeffrey <Jeffrey.Dintzer@alston.com>; Stanton, Garrett <Garrett.Stanton@alston.com>
**Subject:** Service Docs - Case Nos.: 25CV02244 and 25CV02247

**Electronic Service:**

Dear Counsel,

Please find attached electronic service documents:

- EDC v. Sable - Real Party in Interest's Amended Cross-Notice of Deposition of Richard B. Kuprewicz
- CBD v. Sable - Real Party in Interest's Amended Cross-Notice of Deposition of Richard B. Kuprewicz

Thank you,


Kim S. Niz | Legal Administrative Assistant
**ALSTON & BIRD**
Jeffrey D. Dintzer | Brett Oberst | Krista Hernandez
Jeff Carlin | Matthew C. Wickersham | Garrett Stanton

350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Direct:  213 576 1096 | Office:  213 576 1000
Kim.Niz@alston.com

---

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

# **<u>EXHIBIT E</u>**

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF SANTA BARBARA — ANACAPA DIVISION

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br><br> **PETITIONERS AND PLAINTIFFS' OBJECTION TO REAL PARTIES' DEPOSITION SUBPOENA OF RICHARD B. KUPREWICZ AND AMENDED CROSS-NOTICE OF DEPOSITION OF RICHARD B. KUPREWICZ** <br><br> Dept.:    4 <br> Judge:    Honorable Donna D. Geck <br><br> Petition Filed: April 15, 2025 <br> Trial: None Set |

Pursuant to California Code of Civil Procedure section 2025.010 et seq., Petitioner and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (collectively, "Petitioners") object to Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's (collectively, "Real Parties") Deposition Subpoena of Richard B. Kuprewicz (the "Subpoena"), Petitioners' consultant in this matter, and Amended Cross-Notice of Deposition of Richard B. Kuprewicz (the "Notice") as follows:

### GENERAL OBJECTIONS

1. Petitioners object to the Subpoena and Notice on the grounds that they exceed the scope of permissible discovery. Mr. Kuprewicz is Petitioners' retained expert consultant in this matter. While Petitioners filed a declaration from Mr. Kuprewicz in support of their ex parte application for a stay, temporary restraining order, and order to show cause, Mr. Kuprewicz has not been designated as an expert pursuant to Code of Civil Procedure section 2034.210 *et seq*. Unless and until he is so designated, Real Parties are precluded from deposing Mr. Kuprewicz or subpoenaing his records. (*County of Los Angeles v. Superior Court* (1990) 224 Cal.App.3d 1446, 1456-57 (recognizing that information related to an expert's identity, qualifications, or opinion(s) is not discoverable before designation and therefore reversing a trial court's order compelling expert testimony at a deposition).) Moreover, even assuming, arguendo, that Real Parties are not summarily precluded from deposing Mr. Kuprewicz in light of Petitioners' reliance on his declaration, his deposition would only be appropriate upon an affirmative showing by Real Parties of "objective facts . . . which create a significant question regarding the validity of [Mr. Kuprewicz's declaration] which, if successfully pursued, will impeach the foundational basis of the [declaration]." (*St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531, 1540-41.) Real Parties have not provided any such facts, and Petitioners are aware of none. Lastly, even if Real Parties were to make the requisite showing of such facts, any deposition of Mr. Kuprewicz must be limited to inquiring into the foundation of the opinions expressed in his declaration. (*See id.*) The Subpoena and Notice are not so limited.

2. Petitioners object to the Subpoena and Notice on the grounds that they seek to elicit information protected by the attorney-client privilege and/or information that constitutes attorney work

product. As noted, Mr. Kuprewicz is Petitioners' consultant in this matter, but he has not been designated as an expert pursuant to Code of Civil Procedure section 2034.210 *et seq*. Thus, all communications by and between Petitioners, their attorneys, and Mr. Kuprewicz remain privileged. (*DeLuca v. State Fish Co., Inc.* (2013) 217 Cal.App.4th 671, 688 ("[T]he attorney-client privilege . . . clearly includes communications to a consulting expert.").) Likewise, any documents, opinions, or other information prepared by Mr. Kuprewicz at Petitioners' request and not already disclosed constitute attorney work product. (*See id.*) Moreover, save for Mr. Kuprewicz's declaration, all of Mr. Kuprewicz's services to date have been rendered purely in an advisory capacity; accordingly, even if Petitioners' *were* to designate Mr. Kuprewicz as an expert, communications with Mr. Kuprewicz and information developed by Mr. Kuprewicz at Petitioners' request would remain protected as attorney work product. (*National Steel Products Co. v. Superior Court* (1985) 164 Cal.App.3d 476, 542-43 (holding that any information or opinions rendered by an expert in an advisory capacity remain subject to the work product limitation on discovery even after expert designation).)

### OBJECTIONS TO REQUESTS FOR PRODUCTION

1. **REQUEST FOR PRODUCTION NO. 1:**

Request: All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing YOUR declaration in support of PETITIONERS' *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.
- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

2. **REQUEST FOR PRODUCTION NO. 2:**

Request: All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit B

to YOUR declaration in support of PETITIONERS' *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.

- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

3. **REQUEST FOR PRODUCTION NO. 3:**

Request: All DOCUMENTS and COMMUNICATIONS YOU relied on in preparing Exhibit C to YOUR declaration in support of PETITIONERS' *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.

- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

4. **REQUEST FOR PRODUCTION NO. 4:**

Request: YOUR COMMUNICATIONS with PETITIONERS RELATED TO the ACTION.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.

- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

5. **REQUEST FOR PRODUCTION NO. 5:**

Request: YOUR COMMUNICATIONS discussing SABLE.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.

- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

- Petitioners object to this request on the grounds that it is not reasonably particularized.

- Petitioners object to this request on the grounds that it is so broad as to be unjustly burdensome.

- Petitioners object to this request on the grounds that it seeks documents not relevant to the issues in this case.

6. **REQUEST FOR PRODUCTION NO. 6:**

Request: YOUR COMMUNICATIONS discussing PPC.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.

- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

- Petitioners object to this request on the grounds that it is not reasonably particularized.

- Petitioners object to this request on the grounds that it is so broad as to be unjustly burdensome.

- Petitioners object to this request on the grounds that it seeks documents not relevant to the issues in this case.

7. **REQUEST FOR PRODUCTION NO. 7:**

Request: All DOCUMENTS reflecting any work YOU have performed RELATED TO the SYU PIPELINE.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.
- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.
- Petitioners object to this request on the grounds that it is so broad as to be unjustly burdensome.
- Petitioners object to this request on the grounds that it seeks documents not relevant to the issues in this case.

8. **REQUEST FOR PRODUCTION NO. 8:**

Request: All DOCUMENTS reflecting any work YOU have performed RELATED TO the LAS FLORES PIPELINE.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.
- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.
- Petitioners object to this request on the grounds that it is so broad as to be unjustly burdensome.
- Petitioners object to this request on the grounds that it seeks documents not relevant to the issues in this case.

9. **REQUEST FOR PRODUCTION NO. 9:**

Request: All contracts and agreements YOU have with PETITIONERS.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.
- Petitioners object to this request on the grounds that it calls for documents and

Petitioners and Plaintiffs' Objection to Deposition of Richard B. Kuprewicz

information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

- Petitioners object to this request on the grounds that it seeks documents not relevant to the issues in this case.

10. **REQUEST FOR PRODUCTION NO. 10:**

Request: DOCUMENTS sufficient to show YOUR work in "consult[ing] for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design," as stated in paragraph 3 of YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.
- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.
- Petitioners object to this request on the grounds that it is so broad as to be unjustly burdensome.
- Petitioners object to this request on the grounds that it seeks documents not relevant to the issues in this case.

11. **REQUEST FOR PRODUCTION NO. 11:**

Request: All drafts and versions of YOUR declaration in support of  PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.
- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work

Petitioners and Plaintiffs' Objection to Deposition of Richard B. Kuprewicz

product, as set forth in General Objection 2 above.

12. **<u>REQUEST FOR PRODUCTION NO. 12:</u>**

Request: All drafts and versions of Exhibit B to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.
- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

13. **<u>REQUEST FOR PRODUCTION NO. 13:</u>**

Request: All drafts and versions of Exhibit C to YOUR declaration in support of PETITIONER's *ex parte* application for a stay, order to show cause and temporary restraining order in the ACTION.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.
- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.

14. **<u>REQUEST FOR PRODUCTION NO. 14:</u>**

Request: All of YOUR COMMUNICATIONS RELATED TO the civil action entitled *Sable Offshore Corp. v. California Coastal Commission et al.*, Superior Court for the State of California, Santa Barbara County Case No. 25CV00974.

Response:

- Petitioners object to this request on the grounds that it exceeds the scope of permissible discovery, as set forth in General Objection 1 above.

Petitioners and Plaintiffs' Objection to Deposition of Richard B. Kuprewicz

- Petitioners object to this request on the grounds that it calls for documents and information protected by the attorney-client privilege and/or constitutes attorney work product, as set forth in General Objection 2 above.
- Petitioners object to this request on the grounds that it seeks documents not relevant to the issues in this case.

Dated: June 24, 2025

Respectfully

Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners

Petitioners and Plaintiffs' Objection to Deposition of Richard B. Kuprewicz

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On June 24, 2025, I served the above document(s) described as **PETITIONERS AND PLAINTIFFS' OBJECTION TO REAL PARTIES' DEPOSITION SUBPOENA OF RICAHRD B. KUPREWICZ AND AMENDED CROSS-NOTICE OF DEPOSITION OF RICHARD B. KUPREWICZ** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒　　**By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

☒　　**By United States mail.** On the date above, I enclosed a copy of the document(s) described above in a sealed envelope or package addressed to the recipients designated in the attached Service List, postage fully prepaid, with the United States Postal Service at Santa Barbara, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 24, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

Michael S. Dorsi
Michael.Dorsi@doj.ca.gov
California Attorney General's Office
55 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

ATTORNEY FOR
RESPONDENTS/DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal; and
Daniel Berlant, in his official capacity as State Fire
Marshal

Duncan Joseph Moore
djmoore@paulhastings.com
Benjamin J. Hanelin
benjaminhanelin@paulhastings.com
Natalie C. Rogers
natalierogers@paulhastings.com
PAUL HASTINGS, LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp. and Pacific Pipeline
Company

Jeffrey D. Dintzer
Jeffrey.dintzer@alston.com
Matthew C. Wickersham
Matt.wickersham@alston.com
Garrett B. Stanton
Garrett.stanton@alston.com
ALSTON & BIRD LLP
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp. and Pacific Pipeline
Company

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On June 26, 2025, I served the above document(s) described as **DECLARATION OF JEREMY M. FRANKEL IN SUPPORT OF PETITIONERS AND PLAINTIFFS' NOTICE OF MOTION AND MOTION TO QUASH REAL PARTIES' DEPOSITION SUBPOENA, QUASH REAL PARTIES' CROSS-NOTICE OF DEPOSITION, AND STAY THE TAKING OF RICHARD B. KUPREWICZ'S DEPOSITION** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒ **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

☒ **By United States mail.** On the date above, I enclosed a copy of the document(s) described above in a sealed envelope or package addressed to the recipients designated in the attached Service List, postage fully prepaid, with the United States Postal Service at Santa Barbara, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 26, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

Michael S. Dorsi
Michael.Dorsi@doj.ca.gov
California Attorney General's Office
55 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

ATTORNEY FOR
RESPONDENTS/DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal; and
Daniel Berlant, in his official capacity as State Fire
Marshal

Duncan Joseph Moore
djmoore@paulhastings.com
Benjamin J. Hanelin
benjaminhanelin@paulhastings.com
Natalie C. Rogers
natalierogers@paulhastings.com
PAUL HASTINGS, LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp. and Pacific Pipeline
Company

Jeffrey D. Dintzer
Jeffrey.dintzer@alston.com
Matthew C. Wickersham
Matt.wickersham@alston.com
Garrett B. Stanton
Garrett.stanton@alston.com
ALSTON & BIRD LLP
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp. and Pacific Pipeline
Company