# EXHIBIT P

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>Respondents and Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>Real Parties in Interest. | Case No. 25CV02247<br>[Coordinated with Case No. 25CV02244]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION**<br><br>[*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Steve Rusch, Bart Leininger, Brien Vierra, and Michael J. Rosenfeld*]<br><br>Date:        July 18, 2025<br>Time:       10:00 AM<br>Dept.:       4<br><br>Complaint Filed:        April 15, 2025<br>Trial Date:               None Set |

1

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.      INTRODUCTION AND QUALIFICATIONS ....................................................... 6

        A.      Assignment and Scope of Work Performed................................... 6

        B.      Qualifications and Background ....................................................... 8

        C.      Materials and Evidence Considered .............................................. 9

        D.      Compensation ............................................................................... 10

II.     SUMMARY OF CONCLUSIONS .......................................................... 10

III.    ANALYSIS ............................................................................................. 13

        A.      Understanding Petroleum ............................................................. 13

        B.      Economic Role & Impact .............................................................. 15

                i.      Global .................................................................................. 15

                ii.     United States ....................................................................... 21

        C.      California Petroleum...................................................................... 22

                i.      Economic Contributions ..................................................... 22

                ii.     Employment........................................................................ 25

                iii.    Production........................................................................... 27

                iv.     Movement & Transportation .............................................. 31

                v.      California Consumption....................................................... 35

                vi.     California Imports................................................................ 38

        D.      Crude Oil Pricing........................................................................... 45

                i.      Commodity Pricing & Volatility......................................... 45

                ii.     California Crude Pricing...................................................... 49

        E.      Sable Offshore Corp. .................................................................... 50

                i.      Sable Oil Reserves, Capacity and Platforms (wells) ........... 50

                ii.     Sable Production Operational Analysis ............................... 52

                iii.    Sable Customers and Selling Markets ................................. 53

                iv.     Sable's Pipelines ................................................................. 54

                v.      Potential Economic Impact on State, Santa Barbara & Adjacent Counties ............................................................................ 55

                vi.     Potential Economic Implications of Sable Production on Employment and Personal Income........................................................ 58

                vii.    Potential Implications of Sable Production on California Oil Prices.... 60

2

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

IV.    SUMMARY CONCLUSIONS ........................................................................ 61

     A.    Summary and General Conclusion ....................................................... 61

     B.    Pertinent Findings ................................................................................ 61

     C.    Key Conclusions .................................................................................. 63

**EXHIBIT A** ........................................................................................................ 66

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**LIST OF FIGURES**

Figure 1:    California Sources, Grades, & Transportation Methods for Crude Oil (2018-2024)

Figure 2:    Global Production & Consumption - Top 10 Nations (2022-2023)

Figure 3:    Comparison: Crude Oil Price to Food Price Index (1990-2018)

Figure 4:    Brent Crude & Gasoline Prices Relative to Food Staples (2019-2023)

Figure 5:    Percent Change in CA GDP to Percent Change in U.S. GDP (1982-2023)

Figure 6:    Percent Change in CA GDP to Percent Change in CA Oil Field Production (1998-2022)

Figure 7:    California: Gross Domestic Product from Oil & Gas Extraction (1998-2022)

Figure 8:    Percent of Oil Production by Top Producing U.S. State (2023)

Figure 9:    California Sees Four-Decade Decline in Crude Production

Figure 10:    Comparison: Annual Percentage Change in Oil Field Production for PADD 5 - CA and U.S. (1991-2022)

Figure 11:    Comparison: Percentage Composition of PADD 5 & CA Oil Field Production to Total U.S. Oil Field Production (1990-2022)

Figure 12:    Comparison of Product Types Per Barrel - CA to U.S.

Figure 13:    CDTFA Net Taxable Gasoline Sales by Calendar Year (2001-2024(e))

Figure 14:    Annual Percentage Change in CA Gasoline Consumption as Compared to Annual Percentage Change in Total U.S. Gasoline Consumption (1971-2022)

Figure 15:    California Alaska Oil Imports (1982-2023)

Figure 16:    California: Changes in Foreign Oil Imports, U.S. Alaska Imports & CA Filed Production (1990-2023)

Figure 17:    California Imports: Percentage Composition by Source (1982-2023)

4

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

Figure 18:       Comparison: Selected Ranking for Social, Economic & Corruption for California Oil Imports (2023/2024)

Figure 19:       Fragile States Index Ranking (Selected CA Sources of Foreign Imports)

Figure 20:       Human Rights Index

Figure 21:       World Crude Oil Prices (2008-2024)

Figure 22:       Average Brent Crude Oil Prices by Year (2015-2024)

Figure 23:       Crude Oil Prices and Key Geopolitical and Economic Events (1970-2024)

Figure 24:       California Crude Oil Cost as a Percent of Avg. Retail Gasoline Price (1999-2023)

Figure 25:       Estimated Sable Platform Production Capacity

Figure 26:       Estimated Sable Breakeven Cost of Production Comparison

Figure 27:       Sable Customers and Selling Markets

Figure 28:       Sable Pipelines and Capacities

Figure 29:       Estimated Economic Impact of Sable Production on CA State, County & Local Revenues

Figure 30:       Estimated Economic Impact of Sable Production on Employment, Wages, and Earnings

Figure 31:       Estimated Potential influence on California oil refinery prices of crude stock oil

Exhibit A:       Resume of Michael A. Mische

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

## I.    INTRODUCTION AND QUALIFICATIONS

### A.    Assignment and Scope of Work Performed

1.    I have been retained as an expert on certain aspects of the oil and gas industry for Sable Offshore Corp., a Delaware corporation, and its three offshore platforms, and Pacific Pipeline Company, a Delaware corporation ("Plaintiffs" or collectively, "Sable") with specific reference to Las Flores Pipelines CA-324 and CA-325 (collectively the "Las Flores Pipeline System") in matters  regarding the Center for Biological Diversity and Wishtoyo Foundation's efforts to challenge the California Office of the State Fire Marshal's approval of modified regulatory requirements, known as "State Waivers," to Sable.[1] I have based my analysis and have formulated my conclusions and opinions on my academic and professional training and experiences, and would and could testify in court on my analysis and to these conclusions and opinions.  I make this declaration and provide the opinions stated below based upon my experience and my personal knowledge and would and could testify to the matters contained herein.

2.    The scope of work for which I was retained involved the collection, assessment, and structuring of data necessary to perform an economic analysis to determine why the production of oil from Sable's offshore platforms and use of its Las Flores Pipeline System would not irreparably harm the public and why preventing the use of the Las Flores Pipeline System to carry Sable's production to market will instead irreparably harm the citizens of California, including the residents of Santa Barbara County. In addressing the scope and performing the work of this assignment, I interrogated data and various literature and analyzed a series of pertinent issues, including but not limited to:

a.    Describing the general economic behavior of the oil and gas industry.

b.    Describing the historical and current status of oil production in the state of California.

---

[1] *Center for Biological Diversity and Wishtoyo Foundation v. California Department of Forestry and Fire Protection, et al.* (Santa Barbara Sup. Ct. April 15, 2025), Case No. 25CV02244.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

c. Describing California's in-state oil production and its dependency on foreign, non-U.S. oil sources.

d. Estimating the costs of imports of non-U.S. oil from foreign sources to California.

e. Determining the potential economic impact that the addition of Sable oil production from its three offshore platforms and the use of its Las Flores Pipeline System could potentially have on in-state oil production and overall California oil supplies.

f. Comparing the potential breakeven of Sable oil production from its three offshore platforms and the use of its Las Flores Pipeline System at variable production scale, as compared to other California in-state producers and offshore producers.

g. Determining to which markets Sable oil production from its three offshore platforms and the use of its Las Flores Pipeline System could potentially represent the most viable for Sable to sell or trade its oil.

h. Assessing the capacity and capacity utilization of each of Sable's pipelines (Line CA-324 and Line CA-325) for the transporting of oil produced by Sable's three offshore platforms to its potential markets.

i. Estimating the reserves, capacities, and long-term viability of each of Sable's platforms (wells) for oil production.

j. Comparing the total estimated aggregated GHG emissions by Sable from the production of oil from its three offshore platforms to other comparable in-state sources and to comparable non-U.S. crude oil sources, inclusive of maritime vessel transportation.

k. Estimating and describing the potential direct and indirect economic impact of oil production based on Sable's three offshore platforms and

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

the use of its Las Flores Pipeline System on California state revenues, and Santa Barbara, Kern, and San Luis Obispo Counties.

l.    Estimating and describing the potential direct and indirect employment impact of oil production based on Sable's three offshore platforms and the use of its Las Flores Pipeline System, on Santa Barbara, Kern, and San Luis Obispo Counties.

My work and the opinions expressed herein are restricted to the performance of this assignment and of the scope of work performed described above, and I express no opinion on any other matters that are external to the purview of this Assignment and Scope of Work Performed.

**B.**    **Qualifications and Background**

3.    I am an Associate Professor of Management and Professional Practice at the Marshall School of Business, University of Southern California ("USC") in Los Angeles, CA. I am currently also a Co-Founder and Chairman of the Board of Synergy Consulting Group, Inc., a management consulting firm. I hold a B.S. degree with honors in finance and economics from New York University and an MBA from Stern School of Business, New York University. I also hold an MS degree in Federal Taxation from Golden Gate University and a certification in AI from the Massachusetts Institute of Technology.

4.    I have over 40 years of experience in the management consulting industry and 28 years in higher education.  Prior to joining the USC faculty, I had two decades of experience in the management consulting industry. From 1983 to 1992, I worked at KPMG, one of the largest global accounting and consulting firms in the world, and eventually became one of the youngest consulting partners (*i.e.*, "Principals") elected in the history of KPMG. At KPMG, I was a member of the Practices & Methods Review Committee. My practice focused on, among other things, strategy and transformation, transaction management services, and innovation and advanced technologies. From 1991 to 1993, I also served as a Principal of Management Consulting Services at A.T. Kearney, one of the leading

8

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

management consulting firms in the world. From 1995 to 1997, I served as a consultant to the senior leadership of Andersen Consulting (now Accenture) for the development of several practice methodologies related to process transformation and innovation. I have served as Chairman of the Board since 1993 and CEO from 1995 through 2016 for Synergy Consulting Group, Inc. Throughout my consulting career, I have led and managed numerous consulting projects for a variety of clients in the private, public, and non-profit sectors, many of which involved benefit analysis and economic impact of strategies and strategic investments. I have consulted with a variety of industries and organizations, including Fortune 100 companies, elite management consulting firms and investment banks, national, state, and local governments, foreign governments, and heads of state and key policymakers.

5.      Since becoming a faculty member at USC in 1997, I have taught numerous MBA courses on the management consulting industry and strategic change, including, among others, The Business of Energy in the 21st Century, Strategic Innovation & Change, Management Consulting, Strategic Transformation & Renewal, Case Analysis for Consultants, Organizational Behavior, and Leading High-Performance Teams. I am also responsible for USC's Certificate in Management Consulting Program and am a senior advisor to USC Management Consulting and Strategy Club, the largest club in the MBA program. I have received the Management and Organization Department Service Excellence Award and the Marshall Golden Apple Teaching Award. I have published eight books on management, organization, and consulting and have been cited in over 300 articles, interviews, reviews, and studies. I have also served as a material or expert witness several times. My academic and research interests in the oil and gas industry span over 50 years and began in October 1973 with the Arab Oil Embargo of the United States when I was a student at New York University.

6.      A detailed list of my experience, publications, interviews, and prior expert work, including a list of my testimony in the past four years is included, as a true and correct copy, as **Exhibit A** to this report.

9

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

### C.      Materials and Evidence Considered

7.      Addressing the objectives required extensive analysis of data and comparative analytical methods. The research involved in this work and in supporting the opinions expressed herein is widely available and includes but is not limited to verifiable sources such as the California Energy Commission, U.S. Energy Information Agency, Bloomberg, U.S. Department of Energy, Sable SEC filings, International Energy Agency, Plains All American Reports Fourth-Quarter and Full-Year 2023 Results; Announces 2024 Guidance, Oil & Gas Journal, American Petroleum Institute, the California Department of Tax and Fee Administration, the U.S. EPA, California Air Resources Board, Statista, The Federal Reserve Bank, the California Attorney General's Office, the California Legislative Analyst's Office, U.S. Department of Interior, Rystad Energy, Bureau of Labor Statistics, the U.S. Oil and Gas Association, and a number of scholarly research articles and papers.

8.      In addition to the public materials, I relied upon the evidential and supporting documents associated with this action. By example and without limitation, these materials included Sable Investor Presentation, Cultivation Cap & Eligible Business License Applicants Lists|Santa Barbara County, CA., "Oil & Gas | CA State Lands Commission" found at https://www.slc.ca.gov/oil-gas/.

### D.      Compensation

9.      Fee and compensation arrangements for this work are based on time and materials. My hourly rate for this assignment is $1,000.00, and payment for my services does not depend in any way on the opinions that I form or on the outcome of this matter. I have no equity interests in Sable Offshore Corp. or any of its affiliates. Furthermore, I have no interests or conflicts that may be related to any other oil and gas producer or any nation-state that drives most of its income from oil and gas. Like many people who have professionally managed pension plans, including those who are members of CalPERS, one of my pension funds may own the stock of one or several petroleum or petroleum-related companies. In this regard, I may have a distant and indirect interest, but in all situations, any interests are immaterial and

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

are not pertinent, and do not have any influence on my work and the opinions expressed in this declaration.

## II.    SUMMARY OF CONCLUSIONS

10.    Based on the data, research into prevailing literature, and my analysis, my conclusion is that the production of oil from Sable's offshore platforms and the associated use of its Las Flores Pipeline System to carry Sable's production to market will not irreparably harm the public and will instead benefit the public. For the same reasons, preventing the use of the Las Flores Pipeline System from carrying Sable's production to market would irreparably harm consumers of gasoline, diesel and other byproducts of crude oil.

11.    California is facing an energy crisis and has the highest retail gasoline and aviation fuel costs in the United States. On July 1, retail gasoline prices increased, further stressing consumers who live and work in a state with the highest housing and general cost of living. The addition of Sable's production oil from its three offshore platforms and the use of its Las Flores Pipeline System would increase in-state oil production to 360,000 barrels a day at a time when California is facing extreme uncertainty and price hikes in its fossil fuel energy sector.  The addition of Sable's production and the use of its Las Flores Pipeline System would provide the foundation energy security and price certainty. California's current in-state crude production is just about 310,000[2] barrels per day, which provides less than a quarter of the state's total daily crude demand. The remaining supply, close to 950,000 barrels, is imported from foreign nations including Ecuador, Iraq, and Saudi Arabia.[3] Raising in-state output to a 360,000 barrels a month, which could be achieved through SYU production and operation of the Las Flores Pipelines, would allow California to operate more independently

---

[2] Commission, C. E. (n.d.). Annual Oil Supply Sources To California Refineries. California Energy Commission.    https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california

[3] Commission, C. E. (n.d.-b). Foreign Sources of Crude Oil Imports to California 2020. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

and would reduce the State's exposure to geopolitical risks and moderate exposures to spot market price hikes that adversely affect California consumers.

12.    The production of oil from Sable's three offshore platforms and the use of Sable's Las Flores Pipeline System to transport its offshore production to market would have a favorable economic impact on California's overall energy situation, as well as have a favorable influence on local employment and tax revenues and consumer retail gasoline, diesel, and aviation fuel prices, and would improve and strengthen California's energy and economic security. Furthermore, the addition of Sable oil production to the market would have ancillary benefits reaching across state lines into Nevada and Arizona and would, in effect, strengthen and improve national defense readiness for U.S. military forces stationed in California, Nevada, and Arizona that are reliant on California refineries for aviation, gasoline and diesel fuels.

13.    Allowing Sable to transport SYU-produced crude to market through the Las Flores Pipeline System would significantly benefit the public by serving as the economic "backbone" while navigating the economic uncertainties and risks associated dependency on non-U.S. foreign oil suppliers of energy transformation in support of California's ambitions for energy transformation.

12

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**III.    ANALYSIS**

   **A.        Understanding Petroleum**

14.        Petroleum is derived from crude oil. Crude oil, or simply 'crude,' is a fossil fuel and the product of millions of years of geological activity and organic decay. Oil deposits are found in the ground, either onshore or offshore, at the bottom of an ocean, lake, or river. To locate deposits, oil producers expend considerable effort and funds to explore and "discover" petroleum deposits, which are reservoirs, pockets or patches of oil, or oil fields. Once located, the oil must be extracted, usually via drilling.[4] The extracted oil is then transported via maritime vessels, pipelines, trucks, or rail tankers to a processing facility, which prepares the petroleum for refinement. The refining process turns crude oil into various products, such as gasoline, diesel fuel, aviation fuels, heating oils, and other derivatives.

15.        The standard measure for crude oil is a barrel, which contains 42 gallons or 159 liters. As a general rule and as an informal estimate, one gallon of oil produces between .47 and .67 gallons of refined gasoline. Stated differently, one barrel of oil (42 gallons) yields 17-28 gallons of gasoline. On average, a barrel of oil, once refined, will yield 45 gallons of total product or about 1.1 times the original volume.[5] Additionally, a single barrel of crude oil typically produces 138,095 Btu of energy.[6]

16.        Not all oil is alike, and there are multiple types of crude that define its quality and grade. Therefore, no two barrels of oil are exactly identical. Petroleum is characterized by its origin and its API rating.[7] A combination of factors — including geology, location,

[4] *Petroleum*. (n.d.). https://education.nationalgeographic.org/resource/petroleum

[5] EIA, Petroleum Supply Monthly, April 2019

[6]  *Facts    about    Oil*.    (2020).    Www3.Uwsp.edu.    https://www3.uwsp.edu/cnr-ap/KEEP/Documents/Activities/ Energy%20Fact%20Sheets/FactsAboutOil.pdf

[7] API Definition: According to the American Petroleum Institute, the API rating is "An arbitrary scale expressing the gravity or density of liquid petroleum products." The higher the API gravity (rating), the lighter the oil. In general, light oil crude has an API rating of 38 degrees or more. Intermediate or medium grade oil has an API gravity rating of 22 to 38 degrees. Crude oil with API ratings of 38 and above are considered heavy and extra heavy. The characterization of oil crude as "sweet" or "sour" is related to its sulfur content. See, *Table Definitions, Sources, and Explanatory Notes*. (n.d.). Www.eia.gov. https://www.eia.gov/dnav/pet/TblDefs/pet_pnp_crq_tbldef2.asp

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

chemistry, and climate — makes each type of oil unique, possessing specific properties that can be refined for intended uses. For example, oil found in Texas can and will be different than oil in California. The predominant method for assigning a quality rating to crude oil is "gravity" (viscosity) as defined, measured, and rated using the standard established by the American Petroleum Institute (API).[8] Crude oils that rate 35-45 on the API scale are called "light crude" and are considered the highest quality and yield the highest value products from refining. Some crude oils are "sour and heavy to extra heavy," making them more costly to produce and refine into end products. In contrast, other crudes are "sweet and light/lite," which are less expensive to refine.

17.    Crude oils rated at 15 or lower are characterized as "extra-heavy" and typically require more refining processes, are more costly to refine, and yield lower outputs. Extra heavy crudes are typically used for purposes other than gasoline, diesel, and jet fuel production. Crude oils with high sulfur content are generally referred to as "sour," while those with lower sulfur content are characterized as "sweet." Hence, in discussing oil, the term "Light sweet crude" would be used to describe an oil that has a high API rating and low sulfur content. The quality and origin of oil also influence the amounts of greenhouse emissions, as do extraction processes, transportation and distribution methods, and refining efficiencies associated with the oil and the production of end products, such as gasoline. **California generally produces, and its refineries use, heavier crudes.**

---

[8] *Oil categories*. (n.d.). https://www.api.org/products-and-services/engine-oil/eolcs-categories-and-classifications/oil-categories

14

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Figure 1**

| California Sources, Grades & Transportation Methods for Crude Oil- 2018 to 2024 | | |
|---|---|---|
| **Crude Oil Source** | **Crude Grade Characteristic** | **Transportation Method to CA** |
| **U.S. DOMESTIC** | | |
| CA- Kern | Very Heavy | Pipeline |
| CA- Midway Sunset | Very Heavy | Pipeline |
| CA- Berridge | Very Heavy | Pipeline |
| CA- San Ardo | Very Heavy | Pipeline |
| CA- Lost Hills | Light Heavy | Pipeline |
| CA- Offshore | Heavy | Pipeline |
| CA- Ventura | Light Heavy | Pipeline |
| CA- Elk Hills | Light Heavy | Pipeline |
| Alaska- North Slope | Medium | Tanker |
| Washington State | Gasoline | Tanker |
| **FOREIGN** | | |
| Canada | Heavy | Tanker & Rail |
| Ecuador | Heavy | Tanker |
| Guyana | Medium/Heavy | Tanker |
| Russia | Heavy | Tanker |
| Saudia Arbia | Heavy | Tanker |
| Iraq | Heavy | Tanker |

(Source: https://www.californiaenergyatlas.com/copy-of-crude-oil)

18.    Generally, oil produced offshore in the Santa Ynez region (Santa Barbara Channel) is heavier crude with low API gravity and consistent with other California crudes. This grade of crude is typically used by California refineries in the production of fuels. Summarized above is a representative sample of the crudes produced in California as compared to the foreign oil imported by California to meet its daily needs.

**B.    Economic Role & Impact**

**i.    Global**

19.    From heating, cooking, and lighting to the manufacturing of cellular telephones, agricultural production, electrical power generation, plastics, asphalt, concrete, medical

15

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

devices and pharmaceutical products, and alternative energy production, petroleum is essential to any economy and modern society. Although oil is universally known as a source of energy, petroleum is used in the manufacturing of fibers, such as polyester and nylon, certain types of medical devices, the screens that are used in monitors, televisions, cell phones, computers, cement, asphalt, wind turbines, steel, herbicides, and fertilizers.[9] Petroleum, in the form of gasoline, diesel, and aviation fuels, is essential to transportation and the movement of people, products, and food.

20.    Globally, the amount of oil in the world fluctuates based predominantly on three factors: (1) consumption (demand), (2) production from existing proven sources, and (3) the discovery of new oil sources (reserves). For example, in 1960, crude oil reserves were estimated to be around 291 billion barrels.[10] In 2023, world crude reserves were estimated to range between 1.5 to 1.73 trillion barrels of oil.[11] [12] [13]  Reserve oil is petroleum that has been discovered and properly approximated (proven) but  not yet been harvested (produced). The majority of proven reserves, around 79%, are located in OPEC member countries.[14]

21.    In 2023, around 101.81 million barrels of oil were produced globally per day.[15] For perspective, around <u>1.2 million barrels of oil are consumed on Earth per second</u>.[16] For

---

[9]    IOGP.    (2022,    October    11).    *Oil    and    gas    in    everyday    life*. https://www.iogp.org/workstreams/advocacy/oil-natgas-in-everyday-life/

[10]    Statista.    (2024,    July    23).    *Global    crude    oil    reserves    1960-2023*. https://www.statista.com/statistics/236657/global-crude-oil-reserves-since-1990/

[11] Ibid.

[12] Chen, J. (2024, July 25). Oil reserves. Investopedia. https://www.investopedia.com/terms/o/oil reserves.asp#:~:text=Oil%20reserves%20are%20an%20estimate,oil%20reserves%20in%20the%20 world.

[13] *World Oil Statistics - Worldometer*. (n.d.). https://www.worldometers.info/oil/

[14] OPEC. (2024). *OPEC : OPEC Share of World Crude Oil Reserves*. Opec.org; Organization of the Petroleum Exporting Countries. https://www.opec.org/opec_web/en/data_graphs/330.htm

[15] *Frequently Asked Questions (FAQs) - U.S. Energy Information Administration (EIA)*. (2024, April 11). Www.eia.gov. https://www.eia.gov/tools/faqs/faq.php?id=709&t=6.

[16] Calculation based on 86,400 seconds per day and 2023 consumption of 100.3 million barrels of oil a day.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

2024, world production increased by around 1.2% to 103 million barrels a day.[17] According to the IEA, the energy sector, including the oil and gas industry, employs 65 million people worldwide (2019 est.), or about 2% of all global employment.[18] Oil represents the largest employment sector, with 8 million or 12% of total employment in the industry.[19] On a comparative basis, the energy sector has more highly skilled labor as a percentage of its labor force, 45%, than the overall average of all industries, which is 25% for highly skilled labor.[20]

22.    According to the U.N., in 2023, a total of 12.3 billion tons of cargo was transported using maritime vessels, which represents around 80% of all global trade.[21] [22] **Maritime tankers burn bunker (heavy oil) fuels for propulsion, airplanes burn aviation fuels, trucks are powered by diesel fuels, mass-scale agricultural production is based on fossil fuels, and over 60% of automotive transportation is reliant on fossil fuels**. Around 49% to 50% of electrical power generation in the U.S. is derived from fossil fuels.[23]

**Figure 2**

---

[17] *Frequently Asked Questions (FAQs) - U.S. Energy Information Administration (EIA)*. (2024, April 11). Www.eia.gov. https://www.eia.gov/tools/faqs/faq.php?id=709&t=6.

[18] *World Energy Employment*. (n.d.). https://iea.blob.core.windows.net/assets/a0432c97-14af-4fc7-b3bf-c409fb7e4ab8/WorldEnergyEmployment.pdf

[19] *World Energy Employment*. (n.d.). https://iea.blob.core.windows.net/assets/a0432c97-14af-4fc7-b3bf-c409fb7e4ab8/WorldEnergyEmployment.pdf

[20] *World Energy Employment*. (n.d.). https://iea.blob.core.windows.net/assets/a0432c97-14af-4fc7-b3bf-c409fb7e4ab8/WorldEnergyEmployment.pdf

[21] UNCTAD. (2024, October 22). *Review of Maritime Transport 2024*. UNCTAD. https://unctad.org/publication/review-maritime-transport-2024.

[22] statista. (2017). *Topic: Ocean Shipping.* Www.statista.com; Statista. https://www.statista.com/topics/1728/ocean-shipping/

[23] U.S. Energy Information Administration. (2024, July 15). *U.S. Energy Facts Explained*. Eia.gov; U.S. Energy Information Administration. https://www.eia.gov/energyexplained/us-energy-facts/

17

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

| 2022/23- GLOBAL PRODUCTION & CONSUMPTION- TOP 10 NATIONS | | | | | |
| WORLD PRODUCTION- 2023 | | | WORLD CONSUMPTION- 2022 | | |
| Nation | Million of Barrels per day | Percent of World Total | Nation | Million of Barrels per day | Percent of World Total |
|---|---|---|---|---|---|
| United States | 21.91 | 22% | United States | 20.01 | 20% |
| Saudi Arabia | 11.13 | 11% | China | 15.15 | 15% |
| Russia | 10.75 | 11% | India | 5.05 | 5% |
| Canada | 5.76 | 6% | Russia | 3.68 | 4% |
| China | 5.76 | 6% | Saudi Arabia | 3.65 | 4% |
| Iraq | 4.42 | 4% | Japan | 3.38 | 3% |
| Brazil | 4.28 | 4% | Brazil | 3.03 | 3% |
| United Arab Emirates | 4.16 | 4% | South Korea | 2.55 | 3% |
| Iran | 3.99 | 4% | Canada | 2.41 | 2% |
| Kuwait | 2.91 | 3% | Germany | 2.18 | 2% |
| Total Top 10 | 74.59 | 73% | Total Top 10 | 61.08 | 61% |
| World Total-Production | 101.81 | | World Total-Consumption | 99.95 | |

(Source: EIA. https://www.eia.gov/tools/faqs/faq.php?id=709&t=6)

23.     Petroleum products, such as gasoline and diesel fuels, are significant components in the determination of the cost of food production and retail grocery prices. As indicated in the Figure below, as gasoline prices increased, the cost of staples such as milk, ground beef, and sugar also increased. As was indicated during the inflationary period of 2021 to 2024, when general inflation outpaced real wages and peaked at 9.1%, and crude oil and gasoline prices peaked at a 40-year high, food prices for consumers increased.

**Figure 3**



DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

(Source: https://extension.psu.edu/fuel-ethanol-hero-or-villain#:~:text=Gasoline%20is%20not%20water%20soluble,performance%20if%20not%20dealt%20with)

24.     Crude oil prices have a casual correlation to food prices. When crude prices increase and stay elevated for protracted periods, as they were during the 2020 to 2024 period, food prices, as well as overall costs, tend to also increase. As the research literature indicates, "oil and food price volatility causes macroeconomic instability and deteriorates the living conditions, particularly in developing countries where poor people spend most of their income to buy food."[24] Thus, when the price of crude oil and its related products, such as gasoline, increases, the price increases have a regressive and disproportionate impact on lower and fixed-income groups, as well as working-class families.

25.     Longitudinal studies of the influence of crude oil on food prices indicate "statistically significant evidence in favor of the existence of a long-run causal relationship, solely running from oil prices to food prices."[25] One study calculated that a 1% increase in the crude oil price index results in food prices increasing by .08%.[26]

**Figure 4**

---

[24] Z. Zhang, L. Luanne, E. Cesar, W. Michael Food versus fuel: What do prices tell us? Energy Policy, 38 (1) (2010), pp. 445-451.

[25] Karakotsios, Achillefs, et al. "The Dynamic Linkages between Food Prices and Oil Prices. Does Asymmetry Matter?" *The Journal of Economic Asymmetries*, vol. 23, June 2021, p. e00203, https://doi.org/10.1016/j.jeca.2021.e00203. Accessed 9 June 2021.

[26] *Asymmetries*, vol. 23, June 2021, p. e00203, https://doi.org/10.1016/j.jeca.2021.e00203. Accessed 9 June 2021.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

| BRENT CRUDE & GASOLINE PRICES RELATIVE TO FOOD STAPLES | |
|---|---|
| **Household Expenditures on Gasoline, Energy & Utilities** | **2019-23 % Change** |
| **Average Price of Brent Crude Oil** | **29.08%** |
| **Average Retail Gasoline Price-** | **20.77%** |
| **Average Price for #2 Diesel Fuel- CA.** | 37.36% |
| **Average Retail Price of Gasoline- CA.** | 33.06% |
| Average Cost of Electricity- Residential Kilowatt | 23.83% |
| Average Cost of Milk - July | 41.78% |
| Average Price of Ground Beef- 1 lbs. - July | 34.26% |
| Average Cost of Butter | 12.27% |
| Average Cost of Ice Cream (.5 Gallon) | 25.05% |
| Average Cost of Sugar- Per lbs. | 107.42% |

(Source: Author)

26.     Increases in crude oil and crude oil product prices are of particular concern in California. Gasoline prices are highly correlated with crude oil prices, and in California, the costs are amplified by tight supplies and regulations. California's average retail gasoline prices, which are correlated to the price of crude oil, are routinely 40% to 50% higher than the national average. Not surprisingly, California retail gasoline prices are also considerably higher than its neighboring states. **Californians pay the highest gasoline prices in the United States**, and they went up on July 1, 2025, as a result of the state excise tax, new Low Carbon Fuel Standard, and ABX2-1, requiring refineries to maintain stock of finished gasoline, in addition to crude oil. Significantly, any disruption or interruption of crude oil supplies to the surviving California refineries will have a detrimental effect on consumer prices and a regressive and disproportionately harsh impact on lower and fixed income Californians.

27.     . At 18.9% of its 39 million inhabitants, California has the highest poverty rate in the U.S. and has 24%, or over 187,000, of the total estimated 771,500 homeless people in the U.S. [27] [28]   Furthermore, California's cost of living is around 12% than all other states,

[27] Torres, Mauricio. "New Census Data Show California Poverty Soared to Alarmingly High Levels in 2023." *California Budget and Policy Center*, 10 Sept. 2024, calbudgetcenter.org/news/new-census-data-show-california-poverty-soared-to-alarmingly-high-levels-in-2023/.

[28] Cremin, Sean. "Homelessness Hits Record High in California, Jumps Dramatically in Rest of US." *Public Policy Institute of California, 25 Mar. 2025*, www.ppic.org/blog/homelessness-hits-record-high-in-california-jumps-dramatically-in-rest-of-us/.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

making it the highest cost of living in the U.S.[29] It's not just gasoline that Californians pay a premium for. According to California's own Legislative Analyst's Office ("LAO"), greenhouse emissions policies have contributed to the second highest monthly electricity rates for residential service in the U.S.[30] For the 2019 to 2024 period, the LAO reports that residential electrical utility rates in California increased by 47%. In the Golden State, Californians monthly utility bills average $438.[31] [32]

### ii.    United States

28.    The U.S. oil and gas industry is an extensive, integral, and critical part of the U.S. economy and is vital to national defense and economic security. At $1.7 trillion, the oil and gas industry comprises around **8% of the U.S. GDP** and employs around 11.3 million people, representing 5.6% of total U.S. employment.[33] An additional 3.4 million jobs are

[29] Pino, Ivana. "This Map Compares the Cost of Living in Every State." *Yahoo Finance*, 28 Feb. 2025, finance.yahoo.com/personal-finance/banking/article/cost-of-living-by-state-164246058.html.

[30] Spady, A. (2025, January 8). California's "ambitious" policies to reduce greenhouse gases drive surge in electricity costs: report. *Fox Business*. https://www.foxbusiness.com/fox-news-politics/californias-policies-greenhouse-gases-electricity-surge

[31]    https://www.foxbusiness.com/fox-news-politics/californias-policies-greenhouse-gases-electricity-surge

[32] Carey, R. (n.d.). *How much does it cost to live in California? Housing, utilities, and more*. Unbiased. https://www.unbiased.com/discover/banking/what-is-the-cost-of-living-in-california#:~:text=California's%20average%20cost%20of%20living,on%20top%20of%20your%20finances.

[33] American Petroleum Institute. (2019). *Oil & Natural Gas Contribution to U.S. Economy Fact Sheet*. Api.org.    https://www.api.org/news-policy-and-issues/taxes/oil-and-natural-gas-contribution-to-us-economy-fact-sheet
See also, *New analysis: American-Made natural gas and oil drives U.S. economic recovery, Strengthens all industries*. (2021b, July 20). https://www.api.org/news-policy-and-issues/news/2021/07/20/2021-pwc-analysis

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

associated with oil and gas affiliated industries and businesses.[34] In the U.S., the oil and gas industry hourly wages, on average, are around 85% higher than the national average.[35]

29.    The oil and gas industry accounts for around 16% of total capital expenditures annually in the U.S.[36] In contrast, the transportation and healthcare sectors account for 5.3% and 6.3% of capital expenditures, respectively.[37] In the U.S., the EIA estimates that Americans spent around $1.0 trillion on energy, of which $503 million was related to gasoline, jet fuel, and diesel fuels in 2020, which collectively accounts for 4.8% of the U.S. GDP.[38] According to a Stanford University report, between 2020 and 2023, the global energy sector attracted around $9.8 billion in private investment in AI, with over half of that investment occurring in the United States.[39]

30.    For 2022, the EIA reports that the U.S. has proven reserves of at least 48.3 billion barrels of oil.[40] Comparatively, **the United States has the 9th largest proven oil reserves in the world**. However, U.S. technologies and the opening of previously closed areas could significantly increase U.S.- proven reserves. Based on current and planned consumption rates

---

[34] *New analysis: American-Made natural gas and oil drives U.S. economic recovery, Strengthens all industries*. (2021, July 20). https://www.api.org/news-policy-and-issues/news/2021/07/20/2021-pwc-analysis

[35] American Petroleum Institute. (2019). *Oil & Natural Gas Contribution to U.S. Economy Fact Sheet*. Api.org.    https://www.api.org/news-policy-and-issues/taxes/oil-and-natural-gas-contribution-to-us-economy-fact-sheet

[36] American Petroleum Institute. (2019). *Oil & Natural Gas Contribution to U.S. Economy Fact Sheet*. Api.org.    https://www.api.org/news-policy-and-issues/taxes/oil-and-natural-gas-contribution-to-us-economy-fact-sheet

[37] American Petroleum Institute. (2019). *Oil & Natural Gas Contribution to U.S. Economy Fact Sheet*. Api.org.    https://www.api.org/news-policy-and-issues/taxes/oil-and-natural-gas-contribution-to-us-economy-fact-sheet

[38] *2020 inflation-adjusted U.S. energy expenditures lowest since 2002*. (n.d.). Www.eia.gov. https://www.eia.gov/todayinenergy/detail.php?id=53620

[39] Stanford University. (2024). *The 2024 AI Index Report | Stanford HAI*. Stanford.edu. https://hai.stanford.edu/ai-index/2024-ai-index-report

[40] U.S. Energy Information Administration. (2017). *U.S. Crude Oil, Natural Gas, and Natural Gas Proved Reserves, Year-end 2017*. Eia.gov. https://www.eia.gov/naturalgas/crudeoilreserves/

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

and EIA current estimates, the U.S. has about 290 years of proven and technically recoverable oil reserves.[41]

### C. California Petroleum

#### i. Economic Contributions

31. With a $3.9 trillion economy (GDP), California comprises 14% of the U.S. GDP, is the nation's largest state economy, and ranks 4th (nominal) as the largest economy globally.[42] [43] On a per capita basis, California would be the second-largest economy in the world.[44] In dollar terms, California's GDP exceeds the GDPs of Italy, the U.K., Canada, and France.[45] For the 1982 to 2023 period, and on a percentage change basis, California's GDP outgrew that of the overall U.S. by 1.06 times.[46] As California is the largest state economy in the nation, it stands to reason that the behavior of California's state economy is highly correlated with that of the overall U.S. GDP on an annual percentage change basis.[47]

---

[41] Ier. (2022, June 22). *Global Oil and Gas proved reserves increase in 2021 - IER*. IER. https://www.instituteforenergyresearch.org/fossil-fuels/gas-and-oil/global-oil-and-gas-proved-reserves-increase-in-2021/

[42] Duan, J., & Bohn, S. (2024, October 14). *California's Economy*. Public Policy Institute of California. https://www.ppic.org/publication/californias-economy/

[43] *California is now the 4th largest economy in the world | Governor of California*. (2025, April 24). Governor of California. https://www.gov.ca.gov/2025/04/23/california-is-now-the-4th-largest-economy-in-the-world/

[44] Duan, J., & Bohn, S. (2024, October 14). *California's Economy*. Public Policy Institute of California. https://www.ppic.org/publication/californias-economy/

[45] Hughes, R. A. (2025, January 6). *If California were a country*. Bull Oak. https://bulloak.com/blog/if-california-were-a-country/

[46] Author calculation.

[47] Author calculation.

23

**Figure 5**



(Source: EIA, Fed. Reserve, author)

32. Over the 1998 to 2023 period, although there is some similarity in movement between California's oil field production to its GDP, based on the annual percentage change, the correlation is very low (.11). The low correlation is not unexpected, as oil and gas production has become less significant over the years in California's economy, as in-state production declines.[48].

**Figure 6**



(Source: EIA, Fed. Reserve, author)

---

[48] *Gross Domestic Product: Oil and Gas Extraction (211) in California.* (2023). Stlouisfed.org. https://fred.stlouisfed.org/series/CAOILGASNGSP#

24

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

33.    For 2022, the oil and gas industry generated around **$338 billion in total economic contribution, which comprised around 8% of the Golden State's GDP**.[49] For perspective, professional, financial, and information services at $520 billion are the largest.[50] As indicated in the chart below, oil production contribution to California's GDP reached a historical peak, in absolute dollars, in 2008. Since the 2008 peak, oil production's contribution to California's GDP, in absolute dollar terms, has declined by 76%, indicating a lesser role in the State's overall economy.[51]

**Figure 7**
**California: Gross Domestic Product from Oil & Gas Extraction**



(Source: https://fred.stlouisfed.org/series/CAOILGASNGSP#)

### ii.    Employment

34.    Total direct employment affiliated with the oil and gas industry in California is estimated to be around **148,700, with indirect employment associated with California's oil**

---

[49] https://wspa.app.box.com/s/2v30dlvt0fbez09irhav001rw19tfh48

[50] *What is the gross domestic product (GDP) in California? | USAFacts*. (n.d.). USAFacts. https://usafacts.org/answers/what-is-the-gross-domestic-product-gdp/state/california/

[51] *Gross Domestic Product: Oil and Gas Extraction (211) in California*. (2023). Stlouisfed.org. https://fred.stlouisfed.org/series/CAOILGASNGSP#

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**and gas industry estimated to be around 536,770**.[52] Collectively, total salaries and wages of California workers and employees directly affiliated with the oil and gas industry have generated over $23 billion in personal income and over $53 billion as related to indirect personal income associated with those employed in related industries and businesses.[53] In aggregate, the oil and gas industry has generated over $47.9 billion in state and local and $16.3 billion in federal tax revenues for 2022 (collectively $64.2 billion).[54]

35.    Specifically, in California, the oil and gas industry creates and sustains premium-paying jobs across a broad spectrum of job classes, including union, non-union, professional, and skilled workers. For example, petroleum system pump operators, refinery operators, and gaugers earn, on average, $95,610, while gas and processing facility operators earn $105,000 annually.[55] In comparison, the typical wages for a construction worker in California average $44,310 annually, according to the California Department of Tax and Fee Administration (CDTFA).[56]

36.    As of December 2023, California holds around 3.1% of all U.S.-proven reserves, ranks fifth largest oil reserves in the U.S., ranks 7th in oil production among 32 oil-producing states, and is home to the Monterey Shale Reserve.[57] Comparatively, California's in-state oil production is dwarfed by Texas, North Dakota, New Mexico, and Alaska. For perspective, Texas produced almost 18 times the amount of oil than California in 2022.

[52]    *Statewide_LAEDC_2025_factsheet-1.pdf    |    Powered    by    Box*.    (2025).    Box.com. https://wspa.app.box.com/s/2v30dlvt0fbez09irhav001rw19tfh48

[53]    *Statewide_LAEDC_2025_factsheet-1.pdf    |    Powered    by    Box*.    (2025).    Box.com. https://wspa.app.box.com/s/2v30dlvt0fbez09irhav001rw19tfh48

[54]    *Statewide_LAEDC_2025_factsheet-1.pdf    |    Powered    by    Box*.    (2025).    Box.com. https://wspa.app.box.com/s/2v30dlvt0fbez09irhav001rw19tfh48

[55] *Oil & Gas In California – Los Angeles County Economic Development Corporation*. (2025, March 16). Laedc.org. https://laedc.org/research/reports/oil-gas-in-california/

[56] *Fuel Taxes Statistics & Reports*. (n.d.). Www.cdtfa.ca.gov. https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts.htm

[57]    *California    State    Energy    Profile.    California    Profile*.    (n.d.). https://www.eia.gov/state/print.php?sid=CA#89

26

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

27

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Figure 8**



(Source: Top 11 Oil-Producing States in 2023, ROBERT RAPIER, as cited in https://oilandgaspress.com/top-11-u-s-oil-producing-states/. See also, https://www.investopedia.com/financial-edge/0511/top-6-oil-producing-states.aspx#citation-21)

### iii.    Production

37.    Once a global leader and ranking fourth in the world in oil production, today, California accounts for only around 2.5% to 2.7% of all U.S. crude production and is producing only 23.7% of its own in-state needs. California's oil production has consistently fallen since 1992. In 1992, California produced 320,888,000 barrels of oil.[58] In contrast, in 2022, California produced 124,727,000 million barrels of oil or only 39% of 1992 production. On a comparative basis for the 1990 to 2022 period, California's oil field production declined while overall U.S. oil field production grew. In 2012, the Golden State's in-state oil production was 197 million barrels a day, and California's population was 37.5 million. However, by 2022/23, with California's population at 38.95 million, in-state oil production

---

[58] California Energy Commission. (n.d.-a). *Annual oil supply sources to California refineries.* https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

had fallen by 35% to 127 million barrels. Meanwhile, California imports of non-U.S. foreign oil grew by 1,102% from its historic low in 1991 of 31 million barrels to 369 million barrels its peak high in 2018.[59]

38.    Since 1990, while overall U.S. field production has increased 66%, California's field production declined 61%, and 68% decline from its peak production in 1985. From 2018, California's field production has declined 26.4%. Since 1982, California's ability to meet its demand for petroleum through in-state production has fallen from over 68% internally sourced to about 21% in 2023.

**Figure 9**



---

[59] Based on CEC data.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

39.    California's oil fields, production, and refineries are assigned to PADD Region 5.[60] The Petroleum Administration Defense Districts, or "PADDs," were established during World War II as a means of managing and allocating petroleum resources and production to the war effort. The structure worked so well that it has been retained for reporting purposes today. The PADD 5 region includes Alaska, Arizona, California, Hawaii, Oregon, and Washington. On an annual percentage change basis, for the 1991 to 2022 period, while U.S. oil field production increased and overall PADD 5 production moderated, California production fell.

**Figure 10**



40.    Notwithstanding the increase in California's population, GDP, and motor vehicle registrations, for the 1990 to 2022 period, PADD 5 and **California oil field production as a percentage of total U.S. production has declined due to decreased in-state field production**.

---

[60] Petroleum Administration Defense District. The PADDs were created in 1942 by Presidential Executive Order during WW-II as a method for managing petroleum resources. It is currently used to collect data and for data analysis.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 11**



(Source: EIA)

41.     California refineries use oil to produce a slightly different product mix and yields on a barrel-to-barrel basis compared to a "typical" barrel of oil products. Below is a chart comparing the "typical" barrel product or "slate" mix of California petroleum products to typical U.S. refineries for California in 2024.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 12[61]**

| Comparison of Product Types Per Barrel-CA. to U.S. | | |
|---|---|---|
| Product Type | Typical U.S. Product Types | California Product Types |
| CA. CARB Gasoline | 0.00% | 42.40% |
| Aviation (Jet) Fuel | 9.00% | 15.30% |
| CA CARB Diesel Fuel | 25.00% | 10.00% |
| Conventional Gasoline | 45.00% | 5.20% |
| EPA Diesel Fuel | 0.00% | 5.80% |
| Other RBOB | 0.00% | 2.40% |
| Other Diesel | 0.00% | 0.20% |
| **Total All Fuels** | **79.00%** | **81.30%** |
| All Other Products | 21% | 18.70% |
| **Grand Total:** | **100.00%** | **100.00%** |

(Source: CDTFA_CEC joint report 2024 review of the gasoline in ... (n.d.-b)

42.     Significantly, the addition of Sable oil production from its three offshore platforms and the use of its existing Las Flores Pipeline System will change the supply dynamics in the State by creating not only more viable and more cost effective alternatives to non-U.S. foreign oil supplies, but will also work to help stabilize consumer gasoline prices by reducing the uncertainties and insecurities related to the crude oil supplies necessary to support California's refineries in their production of combustible fuels such as gasoline, diesel and aviation, as well as asphalt and distillates used in the manufacturing of mobile phones, medical devices, and other essential products.

### iv.     Movement & Transportation

43.     Petroleum products, such as oil and gasoline, are moved from point to point using various transportation methods, including marine vessels, barges, pipelines, rail tankers, and truck tankers. The movement of gasoline and oil is supported by storage tanks for short-term product storage.

---

[61]   CDTFA_CEC   joint   report   2024   review   of   the   gasoline   in   ...   (n.d.-b). https://seuc.senate.ca.gov/sites/seuc.senate.ca.gov/files/cdtfa_cec_joint_report_2024_review_of_the_gasoline_in_california_and_relate.pdf

32

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

44.     **California has no inbound pipelines** for petroleum or gasoline. However, the State has an extensive in-state (intrastate) network of pipelines for moving oil and gasoline from ports to refineries to distribution points (racks), as well as end-users such as airports. **California pipelines carry fuels to 60 distribution points within the state**. Proprietary pipelines are owned and operated by companies such as Crimson and PBF Logistics and were owned by Chevron and ExxonMobil. The sole private common carrier in California is Kinder Morgan.[62]   Kinder Morgan owns, has an interest in, and operates over 79,000 miles of pipelines and 139 terminals throughout the U.S.[63] For perspective, according to the U.S. Department of Transportation, the U.S. has over 2.6 million miles of installed petroleum and petroleum-related pipelines.[64]

45.     **California has two major outbound pipelines** to supply gasoline to Nevada and Arizona. California's pipeline network is composed of common carrier arteries that transport products from multiple producers and proprietary pipelines.

46.     According to the **U.S. Department of Transportation, pipelines are the safest method to transport petroleum products**.[65] A modern pipeline integrates advanced safety technologies with continuous operations to constantly monitor safety and environmental impacts. In the U.S., pipelines and pipeline operations are highly regulated and fall under the purview of various federal, state, and local agencies, including the Pipeline and Hazardous Materials Safety Administration. In California, the California Department of Conservation's Geologic Energy Management Division (CalGEM) and the California Office of the State Fire

---

[62] Schremp, G. (2016). *PADD 5 & California Transportation Fuel Overview Western Regional Emergency Fuel Coordination Meeting California Energy Commission Sacramento, CA*. https://www.naseo.org/Data/Sites/1/schremp-1.pdf

[63] *Home - Kinder Morgan*. (n.d.). Www.kindermorgan.com. https://www.kindermorgan.com

[64] *General Pipeline FAQs*. (n.d.). PHMSA. https://www.phmsa.dot.gov/faqs/general-pipeline-faqs

[65] *General Pipeline FAQs*. (n.d.). PHMSA. https://www.phmsa.dot.gov/faqs/general-pipeline-faqs

33

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

Marshal (OSFM) oversee oil and gas pipelines.[66] **California has the strictest standards for oil and gasoline pipeline construction, testing, and maintenance in the world**.

47.    Since California has no inbound pipelines and its in-state production has fallen considerably, nearly 100% of California's non-U.S. sourced imported oil is delivered to its refineries via maritime vessels, which are significant contributors to GHG emissions.[67] For 2023, California received 61% of its crude oil stocks from foreign sources and 16% from Alaska. Oil imports from these sources are delivered to California using maritime oil tanker vessels (limited barge).[68] Tankers that move oil among and between U.S. ports must comply with the Jones Act.[69] Passed in 1920 as the Merchant Marine Act of 1920, the Jones Act, as amended in 2006, prohibits foreign-flagged vessels from carrying cargo, including petroleum products between U.S. maritime ports in the contiguous states. Under the Jones Act, cargo, including crude oil, must be transported on U.S. flagged ships, built in the U.S. and crewed U.S. crew members. As of 2024, there are only 55 to 58 U.S. tankers that are compliant with the Jones Act and the majority, if not all, are deployed between the Gulf Coast and East Coast markets. The lack of available Jones Act compliant tankers compromises California's ability to move crude from other U.S. sources and strengthens the need for Sable production and the use of the Las Flores Pipeline System.

---

[66]    California Department of Conservation. (n.d.). *Pipelines and facilities*. https://www.conservation.ca.gov/calgem/for_operators/Pages/Facilities.aspx#:~:text=Generally%2C%20CalGEM%20regulates%20all%20pipelines,used%20for%20transportation%20to%20refineries.

[67]    California Energy Commission. (2022). *2022-07_Petroleum_Watch*. California Energy Commission. https://www.energy.ca.gov/media/7138

[68]    Commission, C. E. (n.d.). *Foreign Sources of Crude Oil Imports to California 2020*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[69]    Section 27 of the Merchant Marine Act of 1920 (P.L. 66-261). See, also: https://crsreports.congress.gov/product/pdf/R/R45725

34

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

48.     California has only a minimal amount (less than 1% in 2015) of inbound oil transported using rail tankers.[70][71]  In 2024, California received no inbound crude from Canada via rail but did import 468,000 barrels from North Dakota by rail tanker.[72] In the U.S., a DOT-117 certified rail tanker can hold up to 286,000 gallons or 6,809 barrels of product and must be designated with NA1993 identification.[73][74]  With respect to rail transport, one of the controlling factors is the capacity of the rail tracks and routes. Rail tracks are rated for speed and weight and, therefore, have restrictions. Similar restrictions are associated with tunnels, bridges, curves, incline grades, declines, and urban areas.

49.     **California relies extensively on over-the-road tanker trucks for the local shipping** of finished gasoline products from refineries to distributors (racks) and onward for delivery to retail gasoline stations. In 2015, tanker trucks averaged approximately 4,980 deliveries per day, representing 39.84 million gallons of gasoline.[75] In California, **94% of all trucks are fueled by either diesel (67%) or gasoline (25%)**.[76]

---

[70] Schremp, G. & California Energy Commission. (2016). California transportation fuel overview. In *Western Regional Emergency Fuel Coordination Meeting*. https://www.naseo.org/Data/Sites/1/schremp-1.pdf

[71] Commission, C. E. (n.d.). *Foreign Sources of Crude Oil Imports to California 2020*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[72] California Energy Commission. (2024). *Crude Oil Imports By Rail*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california/crude

[73] *More Rail Tank Cars Meet DOT-117 Safety Standards in 2022 | Bureau of Transportation Statistics*. (2022). Bts.gov. https://www.bts.gov/newsroom/more-rail-tank-cars-meet-dot-117-safety-standards-2022

[74] *Economics of Rail versus Pipeline*. (n.d.-b). Welcome to Altex Energy. https://www.altex-energy.com/economics-of-rail-versus-pipeline/#1501828266955-2913a69d-c276

[75] Crockett, & Schremp, G. (2015). *California Transportation of Petroleum Second Northern California Refinery Safety Forum*. https://calepa.ca.gov/wp-content/uploads/sites/6/2016/10/Refinery-Documents-2015yr-Petroleum.pdf

[76] California. (n.d.). *Large Entity Fleet Reporting STATEWIDE AGGREGATED DATA*. Retrieved February 23, 2025, from https://ww2.arb.ca.gov/sites/default/files/2022-02/Large_Entity_Reporting_Aggregated_Data_ADA.pdf

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

50.     Two factors combine to make oil and fuel production a critical concern in California. First, California is virtually completely dependent on foreign, non-U.S.-sourced oil to produce its fuels. Second, California has had restrictions and is losing refinery capacity to produce fuels. The combination of these two factors is potentially fatal to the State's economic vitality, growth, and long-term security. Significantly, any disruption of this very tight and delicate balance of supply and demand could have debilitating consequences for the State.

### v.     California Consumption

51.     Gasoline, diesel, and aviation fuels are made from crude oil. California is the 2nd largest consumer of petroleum and the largest consumer of aviation fuel in the U.S.[77] In 2023, Californians consumed over 500 million barrels of oil (1.8 million per day), 13.119 billion gallons of gasoline, 3.6 billion gallons of diesel fuel, and over 216 million gallons of aviation fuel, based on CEC and CDTFA revenue data. [78] [79] [80]

52.     The largest consumer of crude oil in California is gasoline production. Diesel fuel consumption is the second largest and represents about 17% of all crude oil consumption in the Golden State.[81] Californians consume between **30 to 33 million gallons of gasoline a day and around 9.9 million gallons a day of diesel fuels**. According to the CEC, 97% of all

[77] U.S. EIA, Crude Oil Production, Annual, Thousand Barrels, 2023.

[78] California Department of Tax and Fee Administration. (n.d.-b). Fuel Taxes Division Statistics & Reports – 2010. https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts10.htm

[79] California's Refinery Capacity Stretched to the Limit | California Policy Center. (2025, April 11). California Policy Center |. https://californiapolicycenter.org/californias-refinery-capacity-stretched-to-the-limit/

[80] Fuel Taxes Statistics & Reports. (n.d.). Www.cdtfa.ca.gov. https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts.htm

[81] Commission, C. E. (n.d.). *Diesel Fuel Data, Facts, and Statistics*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/transportation-energy/diesel-fuel-data-facts-and-statistics

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

gasoline in California is consumed by automobiles, SUVs, and light-duty trucks.[82] The CEC further notes that "Nearly all heavy-duty trucks, delivery vehicles, buses, trains, ships, boats and barges, farm, construction and heavy-duty military vehicles and equipment have diesel engines. **Diesel is the fuel of choice because it has 12 percent more energy per gallon** than gasoline and has fuel properties that prolong engine life, making it ideal for heavy-duty vehicle applications."[83]

53.    In general, long-term oil and gasoline consumption demonstrate relative inelasticity to price. That is, price increases do not have a correspondingly equal impact on consumption as consumers and incomes adjust to higher prices over the long term. However, studies do indicate the presence of elasticity in the short-term, particularly in California.[84] The consequence of oil, gasoline, and diesel fuel price increases, as well as aviation fuels, generally results in a change in consumer behavior in other expenditure areas; that is, consumers may reduce spending on entertainment, for example, in order to compensate for higher energy costs.

54.    **Oil and gasoline consumption in California has not declined significantly over a twenty-five-year period**. Despite nearly a 100% improvement in miles per gallon due to engine and drive train efficiencies since 1975, and irrespective of California's considerable efforts to encourage and force (and 2035 mandate) the adoption of EVs and Zero Emissions Vehicles (ZEVs), California's demand for oil and gasoline have moderated only slightly over the 2001 to 2024 period. Furthermore, 2025 EV and ZEV adoption rates are significantly lower than CARB estimates and, according to recent sales figures, have slowed

---

[82] Commission, C. E. (n.d.). *California Gasoline Data, Facts, and Statistics*. California Energy Commission.                https://www.energy.ca.gov/data-reports/energy-almanac/transportation-energy/california-gasoline-data-facts-and-statistics

[83] Commission, C. E. (n.d.). *Diesel Fuel Data, Facts, and Statistics*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/transportation-energy/diesel-fuel-data-facts-and-statistics

[84] Colina, Armando R., et al. "Estimates of Gasoline Demand Elasticity Using California Refinery Outages." SSRN Electronic Journal, 2023, https://doi.org/10.2139/ssrn.4629611.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

considerably.[85] From 2001 to 2024, overall, CDTFA reported gasoline sales had fallen 11.12 % or less than one-half of one percent per year.[86]

**Figure 13**



(Source: https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts10.htm)

55.    The annual percentage change in CDTFA gasoline sales is relatively consistent. It shows only a modest annual variance of -.46% and is highly correlated to the annual percentage change in overall U.S. gasoline consumption.

---

[85]    "New ZEV Sales in California." *Www.energy.ca.gov*, www.energy.ca.gov/data-reports/energy-almanac/zero-emission-vehicle-and-infrastructure-statistics-collection/new-zev.

[86] *Fuel Taxes Division Statistics & Reports – 2020*. (2020). Ca.gov. https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts20.htm

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 14**



Annual Percentage Change in CA. Gasoline Consumption as Compared to Annual Percentage Change in Total U.S. Gasoline Consumption (DOT-FHA-MF-226 Data) 1971 to 2022 (correlaztion =.926)

(Source: https://www.fhwa.dot.gov/policyinformation/statistics/2022/mf226.cfm)

56.     Given California's economic profile and growth rate, there is no indication that the demand for crude oil, gasoline, diesel fuels, and aviation fuels will decline significantly over the forthcoming ten-year period. Declines in fossil fuel usage are anticipated as alternative fuels are perfected and scaled, but various agencies and researchers expect the demand for oil to peak sometime between 2035 and 2055.[87] Notwithstanding the inevitable and future peak in fossil fuel production, crude oil is and will remain a vital component of any economy as it is used in so many other applications, such as asphalt and concrete.

### vi.     California Imports

57.     California is the most dependent of all fifty states on foreign, non-U.S. oil as a source for refineries to produce gasoline, diesel, and aviation fuels. Since the 1980s, California's in-state oil production has fallen, and its reliance on foreign-sourced oil increased. By 2023, California's in-state oil production was only able to supply around 23% of its needs, and its dependency on foreign-sourced oil grew by over 850%.

---

[87] Kimani, Alex. "IEA Predicts End to Oil & Gas Demand Growth before 2030." *OilPrice.com*, 18 Oct. 2024, oilprice.com/Energy/Energy-General/IEA-Predicts-End-to-Oil-Gas-Demand-Growth-Before-2030.html.

39

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

58.     As California's in-state oil field production declined, the Golden State turned to foreign <u>petrostates</u> to meet its in-state crude demands.[88] [89]  For 2023, **60.7% of California's oil was imported from foreign sources, including the petrostates of Iraq (21.7%) and Saudi Arabia (15.7%)**. South America's Brazil and Ecuador represented the third and fourth largest sources of California import sources at 15.1% and 14.6%, respectively. Collectively, and based on CEC data, the three largest sources (Iraq, Saudi Arabia, and Brazil) represented 52.4% of all California foreign imports.[90] Middle Eastern oil from OPEC members Saudi Arabia, Iraq, and the U.A.E., in aggregate, represented 39.25% of all California oil imports for 2023.

59.     According to various independent estimates, **California ranks #1 in payments to foreign sources of oil** and pays more than $61.8 million per day, or $22.5 billion annually, based on Brent market prices, or $54.41 million a day, or $19.8 billion annually, based on WTI market prices, to foreign countries such as Iraq, U.A.E., and Saudi Arabia, and others for its oil imports.[91]

---

[88] Fox News. (2015, December 21). *Shale oil deposit a possible boon to struggling California, but state wary, enviros opposed*. https://www.foxnews.com/politics/shale-oil-deposit-a-possible-boon-to-struggling-california-but-state-wary-enviros-opposed

[89] Jones, J. (2024, March). *States With the Most Oil Reserves [2024] - Construction Coverage*. Construction Coverage. https://constructioncoverage.com/research/states-with-the-most-oil-reserves

[90] California Energy Commission. (n.d.-h). *Foreign sources of crude oil imports to California*. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[91] Based on WTI and Brent crude prices as of 3/14/25, and CA. imports are reported by CEC. See also, Ed, C. (2018, October 9). *California ranks #1 in sending dollars abroad for Energy*. https://www.cfact.org/2018/10/09/california-ranks-1-in-sending-dollars-abroad-for-energy/    .    See also, *FACTS - Californians for energy independence*. (2023, July 31). Californians for Energy Independence.
  https://www.energyindependenceca.com/facts/#:~:text=California%20now%20imports%2075%25%20of,use%2C%20mostly%20from%20foreign%20countries.&text=California%20spends%20$25%20Billion%20dollars,to%20meet%20our%20energy%20needs.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

60.    In 1982, California produced 61% of its oil needs in the State.[92] Commencing in the mid-1990s, as California's imports of domestically produced oil from Alaska and in-state oil production began a long-term decline, its need for foreign-produced oil began to accelerate. While imports of non-U.S. domestically sourced oil from OPEC and other states increased by 850%, California imports of U.S. domestically produced oil from Alaska plummeted by 57.32%.[93]

**Figure 15**



(Source: https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california)

---

[92] California Energy Commission. (n.d.-a). *Annual oil supply sources to California refineries.* https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california

[93] Alaska North Slope oil field production declined but accounted for 15% of California's oil in 2021. Today, the Alaskan Pipeline operates at 20-25% of its original capacity due to lower field production. However, both field production and pipeline capacity utilization are expected to increase in 2025. See, https://www.californiaenergyatlas.com/crude-oil

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

61.    While imports from foreign sources increased, domestically sourced 'imports' from other U.S. petroleum-producing states, Alaska and California's in-state production have declined.

**Figure 16**



(Source: CEC)

62.    While imports of non-U.S. domestically sourced oil from OPEC and other states increased by 857%, California imports of U.S. domestically produced oil, predominantly supplied from Alaska, plummeted by 57.32%.[94]

---

[94] Alaska North Slope oil field production declined but accounted for 15% of California's oil in 2021. Today, the Alaskan Pipeline operates at 20-25% of its original capacity due to lower field production. However, both field production and pipeline capacity utilization are expected to increase in 2025. See, https://www.californiaenergyatlas.com/crude-oil

42

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**California Imports: Percentage Composition by Source 1982-2023**

**Figure 17**

(Source, CEC, EIA, and Author)

63.     Compared to all U.S. oil imports, for 2024, California has a significantly greater dependency on and a higher percentage of non-U.S. foreign oil from petrostates such as Iraq, as well as high dependency on South America's Brazil and Ecuador than the overall U.S. Since 1982, California's reliance on foreign oil imports has increased by 857%, or 20 times greater than that of the overall U.S.' importing of foreign oil.[95]

64.     **No state in the U.S. imports more foreign-sourced oil for its use than California**. In 2023, California imported 321.153 million barrels of oil from non-U.S. sources. Since 1982, California's imports of foreign oil have increased by 857%. In 2024, California imports increased slightly to 321.831 million barrels of oil, or .21%. In 2024, as

---

[95] Alternative Fuels Data Center: Maps and Data - U.S. Production, Consumption, and Trade of Petroleum Products. (n.d.). Afdc.energy.gov. https://afdc.energy.gov/data/10324

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

U.S. imports of foreign oil hit a thirty-year low, California imports of crude came within 13% of its thirty-year high (2018).[96]

66. In 2024, California's mix of non-U.S. foreign imports changed due to the emergence of Guyana filed production. Iraq, which provided 68,406 barrels of oil, composed 21.26% of its non-U.S. oil imports. Brazilian oil imports increased to 20.41%, and as production scaled in Guyana, imports from that South American country increased exports to California to 50,840 barrels or 15.80% of the total 321,831 barrels of non-U.S. imported oil.[97] Additionally, throughout its history, California has also imported oil from Russia, Angola, Oman, and other national providers.[98]

66. California's oil dependency on imports from various petrostates, such as Iraq and Saudi Arabia, as well as various other Middle Eastern sources, have both intended and unintended economic consequences and directly and indirectly support the sourcing countries' economies, governing policies and structures, political agendas, and societal initiatives. Summarized in the Figure below are some pertinent social, political, and human freedom rankings for various sources such as Transparency International and Global Finance of California crude oil imports.[99]    Iraq, which is California's largest provider of foreign in

[96] Roberts, K. (2024, August 19). *2024 U.S. oil imports from Middle East hit new record low*. Forbes. https://www.forbes.com/sites/kenroberts/2024/08/16/2024-us-oil-imports-from-middle-east-hit-new-record-low/. See also, EIA and CEC import data.

[97] California Energy Commission. (n.d.-d). *Foreign sources of crude oil imports to California*. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[98] *California 2019 crude average carbon intensity up*. (2019). Green Car Congress. https://www.greencarcongress.com/2020/06/20200616-carbci.html

[99] Sources include Transparency International. (2024, September 12). 2023 *Corruption Perceptions Index: Explore the results*. Transparency.org. https://www.transparency.org/en/cpi/2023; Vásquez, I., Mcmahon, F., Murphy, R., & Schneider, G. (2023). *HUMAN FREEDOM INDEX 2023 A Global Measurement of Personal, Civil, and Economic Freedom*. https://www.cato.org/sites/cato.org/files/2023-12/human-freedom-index-2023-full-revised.pdf; *Age of conflict*. (n.d.). https://pages.eiu.com/rs/753-RIQ-438/images/Democracy-Index-2023-Final-report.pdf?version=0; Ventura, L. (2024, October 20). *Poorest Countries in the world 2024*. Global Finance Magazine. https://gfmag.com/data/economic-data/poorest-country-in-the-world/; *Human*

44

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

2023, is ranked 27th out of 179 as a "Fragile/Failed State Index" by the Fund for Peace. For perspective, North Korea and Rwanda rank "better." The U.S. is ranked 141st.[100]

**Figure 18**

| Comparison: Selected Rankings for Social, Economic & Corruption for California Oil Imports (2023/2024) | | | | | |
|---|---|---|---|---|---|
| | Iraq | Saudia Arabia | Brazil | Ecuador | United States |
| Percent of California Total Imports | 21.70% | 15.70% | 15.10% | 14.60% | NA |
| Corruption Perception Ranking | 154 | 53 | 104 | 115 | 24 |
| Human Freedom Ranking | 156 | 157 | 70 | 72 | 17 |
| Media/Press Freedom Ranking | 169 | 166 | 82 | 110 | 55 |
| Democracy Ranking | 128 | 150 | 51 | 85 | 29 |
| Economic Freedom Ranking/Score | Not Ranked | 61.9 | 53.2 | 55 | 70.1 |
| Poorest County Ranking | 71 | 173 | 107 | 79 | 182 |
| Government Integrity | 18.3 | 43.9 | 36.9 | 34.9 | 76.4 |

**Figure 19**

| FRAGILE STATES INDEX RANKING Selected CA Sources of Foreign Imports | |
|---|---|
| California Oil Source | Overall Ranking Out of 179 |
| Iraq | 27 |
| Brazil | 71 |
| Ecuador | 87 |
| Saudi Arabia | 100 |
| U.S.A. | 141 |
| Note: Lower number = more unfavorable. | |

(Source: https://fragilestatesindex.org/excel/)

67.    California's sources of foreign oil rank considerably lower in terms of human rights compared to domestically available sources from the U.S., including California.

---

*rights index*. (2024, March 7). Our World in Data. https://ourworldindata.org/grapher/human-rights-index-vdem?tab=chart&country=BRA~ECU~IRQ~SAU~USA; and The Heritage Foundation. (n.d.). *Index of Economic Freedom: All Country Scores | The Heritage Foundation*. Index of Economic Freedom | the Heritage Foundation. https://www.heritage.org/index/pages/all-country-scores.

[100] Energyskeptic. (n.d.). *Peak everything, overshoot, & collapse - preservation of knowledge*. Peak Everything, Overshoot, & Collapse - Preservation of Knowledge. https://energyskeptic.com/

45

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 20**



### D.  Crude Oil Pricing

#### i.  Commodity Pricing & Volatility

68.  Crude oil is a commodity, and the price of crude oil is highly volatile and subject to dramatic swings and shifts, which, in turn, influence retail gasoline and aviation and diesel fuel prices. Crude oil prices swing wildly by the day, hour, and even the minute and, as such, are notoriously difficult to predict. Any major geopolitical event, weather disruption, labor situation, maritime tanker issues, etc., influence the price of oil.

69.  As a global commodity, crude oil prices are set and traded on various international markets. Oil and gasoline pricing are very complex and subject to wide variations from day to day, even by the hour to hour, and in some instances, by the minute. The price of crude oil is primarily driven by the basic economic laws of supply and demand. When demand is strong and supply is low, the prices of oil, diesel, aviation fuels, and gasoline escalate.

46

70.    As petroleum is a global commodity, its **pricing is subject to extreme volatility**. Geopolitical, domestic, political, and regulatory actions conflate the basic market powers of supply and demand. Five factors influence the spot price of oil: **1-** supply (production), **2-** demand (consumption), **3-** geo-political events, **4-** national and local government policies and regulations, and **5-** trading/financial markets. Notably, any significant disturbance to any of these influencing factors will have an impact on the price of oil and, ultimately, the price of diesel and aviation fuels, as well as retail gasoline prices.

71.    Oil is traded using long-term contracts and spot pricing in multiple markets, with the New York Mercantile (NYMEX) and Intercontinental Exchange (ICE) being predominant. Gasoline is also traded on global markets and in California on spot markets in San Francisco and Los Angeles. The trading prices of various oil types and grades are highly correlated and generally move in the same direction with similar degrees in magnitude of movement. Future oil prices are speculative and can fluctuate wildly. For example, on April 20, 2020, the price of oil fell 306% from its May 2020 futures crude contract price to a negative price of $37.63 a barrel on the New York Mercantile Exchange.[101] Technically, this type of inversion between current and future prices implies that the seller would have to pay the buyer to purchase the seller's oil contract. Under those circumstances, producers have little incentive to produce more products. Illustrated in the chart below are the various crude oil prices for various grades for the 2008 to 2024 period. As indicated, oil prices in various markets tend to move in correlation with one another.

[101] Saefong, M. P. (2021, April 19). Oil prices went negative a year ago: Here's what traders have learned since. MarketWatch. https://www.marketwatch.com/story/oil-prices-went-negative-a-year-ago-heres-what-traders-have-learned-since-11618863839

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 21**



(Source:
https://www.eia.gov/finance/markets/crudeoil/spot_prices.php#:~:text=Crude%20oil%20is%20traded%20in,that%20are%20lower%20in%20quality)

72.    As indicated, the price of crude oil swings radically from period to period. For example, in the mid-2015 period, the WTI price of crude, which is typically a bit lower than Brent, was $108 a barrel. Within about 7 months, the WTI price dropped 70% to $32 a barrel. In 2019, the average price of Brent crude was $64.30 a barrel. However, with the onset of COVID, the average price of Brent fell by almost 35% in 2020 and shot back up 141% in 2022.

**Figure 22**

48

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8



(Sources: EIA, Macrotrends, Statista, OilPrice.com)

73.    Illustrated below are oil price movements for the 1970 to 2023 period as related to major political, economic, and business events.

**Figure 23**

(Source: Author and
https://www.eia.gov/finance/markets/crudeoil/spot_prices.php#:~:text=Crude%20oil%20is%20traded%20in,that%20are%20lower%20in%20quality)

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

74.     During the 1970s, the U.S. experienced two **episodic** events or oil "shocks." The first occurred in 1973, and the second was in 1978. On October 6, 1973, the Fourth Arab-Israeli war broke out between Israel and a collation of Arab nations, including Saudi Arabia, Egypt, and Syria.[102] [103]   The U.S., which had and continues to maintain formal defense alliances with Israel, supported Israel with a $2.8 billion (equivalent to $20.2 billion in 2024) defense aid package.

75.     In retaliation to the U.S. support of Israel, the Arab members of OPEC lowered oil production by 5% and initiated an oil embargo on the U.S. Overall, global oil supplies fell by 14%. Within days of the onset of hostilities, the reduction in production, and the embargo, petroleum prices surged by 71%, rising from $3.01 to $5.12 per barrel. The rapid and unexpected surge in prices dealt a severe, almost debilitating blow to the U.S. economy. Less than three months later, in December 1973, Arab member OPEC oil producers again cut production by 25% from its September levels. In reaction, the price to the U.S. for OPEC-sourced oil rocketed to $11.65 a barrel — an increase of 287% in about 90 days. What followed were gasoline shortages, price spikes, and high inflation. By March 1974, the oil embargo was formally ended by the Arab nations, but its influence on the U.S. economy lasted well into the 1980s. Recognizing its vulnerability to foreign sources and spot market prices, the U.S. Congress established the Strategic Petroleum Reserve (SPR) in December 1975.[104]

76.     Due to its high dependency on non-U.S. foreign-sourced crude oil, California is extremely vulnerable to "oil shocks," shortages, and price hikes that may be perpetrated by foreign actors. California has experienced supply shocks due to refinery closures, port disruptions, and global price surges linked to events thousands of miles away. Brent crude, which serves as the benchmark for many of these imports, tends to be more volatile than West

---

[102] The Editors of Encyclopedia Britannica. (2018). Yom Kippur War | Summary, Causes, Combatants, & Facts. In *Encyclopedia Britannica*. https://www.britannica.com/event/Yom-Kippur-War

[103] Also known as the Yom Kippur War, or Ramadan War.

[104] 42 U.S. Code § 6231 and 42 U.S. Code § 6234

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

Texas Intermediate. When California's supply is driven by international markets, price spikes happen faster and last longer.[105]

### ii.    California Crude Pricing

77.    In California, environmental factors such as earthquakes, fires, blizzards, heat, and flooding can cause disruptions in crude oil, gasoline, diesel, and aviation fuel production and distribution (transportation). Furthermore, refinery shutdowns, transitions, and decommissions adversely affect the supply of retail gasoline stocks, which rely on crude petroleum as a raw material (feedstock). When those events occur, the spot prices for crude oil stock can spike and are ultimately reflected in higher prices for retail gasoline and other fuels. The price of oil can also be further affected by events such as labor disputes and strikes involving rail and trucking, maritime terminal operational efficiencies, the supply of maritime tankers, employment rates, truck and rail transport, government lockdowns, such as COVID-19, and geopolitical events far from California.

78.    The majority of raw material in the production of gasoline is crude oil, which in California has historically averaged 48.25%.

**Figure 24**



---

[105] Johnson, J. (2025, April 18). California could lose a large chunk of its refining capacity in a year. San Francisco Chronicle. https://www.sfchronicle.com/california/article/refinery-closures-gas-prices-20279856.php

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

79.    On the West Coast, and particularly in California, refiners tend to pay slightly more for 'first purchase' crude oil than the rest of the U.S. due to low in-state production and the need to import oil from distant sources such as the Middle East.[106] [107]

### E.    Sable Offshore Corp.

#### i.    Sable Oil Reserves, Capacity and Platforms (wells)

80.    According to the company's latest reserve assessments, the total net estimated contingent resources across all platforms amount to 646 million barrels of oil equivalent (MMBoe). This includes a low estimate of 179 MMBoe and a best estimate of 467 MMBoe, with the resource base comprising 86% oil, 13% gas, and 1% natural gas liquids (NGLs).[108] These figures underscore the long-term strategic value of the asset base, not only in terms of short-term output but also in terms of **reserve longevity**, development flexibility, and potential for **scalable economic impact**. With a phased restart strategy already underway and robust reserve validation, Sable's offshore system is positioned for both operational reliability and multi-decade resource contribution to California's economic future.

**Figure 25**

| Sable Platform Capacity | | | | |
|---|---|---|---|---|
| Platform | Existing Wells | Available well slots | Est. Net Production Per Day | Est. Restart Date |
| Harmony | 32 | 23-27 | 15.0-19.0 MBOE | 15-May-25 |
| Heritage | 44 | 15-17 | 19.0-23.0 MBOE | Jul-25 |
| Hondo | 26 | 10 | 6.0-8.0 MBOE | Aug-25 |

81.    Sable's offshore oil recovery infrastructure comprises three key production platforms- Harmony, Heritage, and Hondo- all part of SYU (Santa Ynez Unit). These platforms are designed for high-volume, multi-well production and together **represent one**

---

[106] *California law and refinery closure reflect ongoing challenges for the state's fuel market - U.S. Energy Information Administration (EIA)*. (n.d.). https://www.eia.gov/todayinenergy/detail.php?id=63944

[107] California Crude Oil First Purchase Price (Dollars per Barrel). Eia.gov. https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?f=M&n=PET&s=F005006__3&utm

[108] *Sable Offshore Corp. - Events & Presentations*. (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**of the most robust offshore systems along the California coast**. As of the second half of 2025 (2H25), Sable anticipates a total production capacity between 40,000 and 50,000 barrels of oil equivalent per day (BOE/D), with near-term output poised to rival the historical 2015 peak of 45,000 BOE/D.[109]

82.    Platform Harmony, which resumed production on May 15, 2025, includes 32 existing wells and up to 27 available well slots, targeting a 2H25 production rate of 15,000 to 19,000 BOE/D. Platform Heritage, scheduled to restart in July 2025, features 44 existing wells with 15–17 additional well slots and is expected to deliver 19,000 to 23,000 BOE/D.[110] Platform Hondo, with 26 existing wells and 10 available slots, is projected to come online in August 2025, contributing 6,000 to 8,000 BOE/D..

### ii.    Sable Production Operational Analysis

83.    Operationally, Sable is currently configured to produce between 30,000 to 35,000 barrels of crude oil daily. However, because of its multiple well capabilities, longer-term production yields could be considerably higher. In general, larger producers with 10,000 barrels a day or more in crude oil production require a realized price of $31.00 a barrel to cover fully loaded operating expenses for existing wells.[111] For perspective, the breakeven for a new drilled well ranges between $61.00 to $71.00 a barrel.

84.    Based on Sable's estimates and compared to those generated in my analysis as well as those associated with external benchmarks, Sable's operating breakeven is favorable and competitive and falls within the range of other offshore shallow-water producers. Accordingly, there is an "economic" market for Sable's production, which is cost-competitive on a comparable basis based on current and expected Brent prices.

---

[109]    *Sable Offshore Corp. - Events & Presentations.* (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

[110]    *Sable Offshore Corp. - Events & Presentations.* (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

[111] "Oil and Gas Activity Edges Higher; Uncertainty Rising, Costs Increase." *Dallasfed.org*, 2025, www.dallasfed.org/research/surveys/des/2025/2501#tab-questions.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Figure 26**

| Estimated Sable Breakeven Costs as Compared to CA Sources | | |
|---|---|---|
| Source | Estimated Breakeven Cost Range | Current CA Source of Oil |
| Middle East | $9.00 to $11.00 | Yes |
| South America | $7.00 to $28.00 | Yes |
| Offshore-Shallow | $37.00 to $47.00 | |
| Offshore- Deep | $43.00 to $53.00 | |
| Offshore-Shallow- Rystad | $37.00 | |
| Offshore- Deep- Rystad | $43.00 | |
| North American Shale- Rustad | $45.00 | |
| Oil Sands- Rystad | $57.00 to $75.00 | Yes- Canada |
| Sable Offshore- Estimated | $29.00 to $41.30 | |
| Note: Ranges vary based on production volumes and regulatory costs. | | |
| Sources: Various and calculated. | | |

As noted by Rystad, costs for offshore shallow shelf, as well as deepwater producers, declined around 35%. [112] Given Sable's technology, further cost reductions are possible.

### iii.    Sable Customers and Selling Markets

85.    Oil and gas producers sell their output (production) predominantly to refineries, which, in turn, create products such as gasoline, diesel, and aviation fuels and distillates. As crude oil is a global commodity, there are a number of different markets that Sable could potentially sell its production on and to. In California, there are only three major in-state refinery customers representing a combined daily capacity of around 781,000 barrels a day remaining as customers for Sable oil production. All three of these in-state refineries are **heavily dependent on non-U.S. foreign oil** as feedstock to its fuel production process and are **essential to California's economic growth and national security.**

**Figure 27**

| Sable CA. Refinery Customers | | | |
|---|---|---|---|
| Refinery | Operator | Location | Approx. Capacity (bpd) |
| Chevron | El Segundo | Southern CA | 269,000 |
| PBF Energy | Torrance | Southern CA | 149,000 |
| Marathon Petroleum | Carson/Wilmington | Southern CA | 363,000 |
| **Total Capacity** | | | **781,000** |

(Source: Statewide Economic Impacts of Resuming Production at the Santa Ynez Unit (SYU))

---

[112] *Shale project economics still reign supreme as cost of new oil production rises further*. (2024, October). Rystad Energy. https://www.rystadenergy.com/news/upstream-breakeven-shale-oil-inflation

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

86.     Significantly, any disruption to the crude oil feedstocks in these refineries or any unplanned interruptions to the operations of these refineries will have a detrimental impact on consumer prices. To maintain a viable operational profile, especially in consideration of increased regulatory costs and the profit restrictions imposed upon the refineries by ABX2-1, the **surviving California refineries would benefit from the security and cost advantages of additional in-state oil production**.[113]

87.     Sable's oil production will most likely be sold to refineries under long-term contracts, with pricing indexed to the Brent spot market and adjusted for sulfur content, gravity, and California location differential (typically a $2-$5/bbl. discount). As is customary with production, while some portions of Sable's production may be sold on the spot market, Sable is expected to prioritize volume stability and cash flow predictability through structured contracts long-term contracts (6–36 months) with California refineries to **help create price and volume certainty for both Sable and the California consumer**. Spot market sales, which are relatively common in the industry, would most likely cover incremental volumes or provide a hedge for price movement, especially during high and peak demand periods (e.g., summer driving season). Importantly, the **marketability of Sable crude oil is high and lively. California currently imports over 75% of its oil needs, and the decline in local production creates a significant supply gap that Sable is well-positioned to fill with minimal transportation costs and overhead**.[114]

### iv.     Sable's Pipelines

88.     Sable's offshore crude oil production is expected to enter California's intrastate pipeline and refining market, where it is particularly well-suited due to its medium-sour

---

[113] "Governor Newsom Signs Legislation to Prevent Gas Price Spikes and Save Californians Money | Governor of California." *Governor of California*, 14 Oct. 2024, www.gov.ca.gov/2024/10/14/governor-newsom-signs-legislation-to-prevent-gas-price-spikes-and-save-californians-money/.

[114] EIA. (2025). *Short-Term Energy Outlook - U.S. Energy Information Administration (EIA)*. Eia.gov. https://www.eia.gov/outlooks/steo/

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

quality. Production from the Santa Ynez Unit (SYU) is processed and delivered via the Las Flores Canyon (LFC) facility into **existing infrastructure serving major California refineries** (consumers of Sable production). The consuming refineries are linked to offshore Sable's California production via the Sable-owned Las Flores Pipeline system and connected third-party pipelines and are configured to process medium to heavy sour-grade crude like that produced from SYU and consistent with other oil fields in Kern and San Luis Obispo counties. Collectively, Sable's pipelines have a design throughput capacity of 240,000 barrels a day.

**Figure 28**

| Sable Pipelines | | | | |
|---|---|---|---|---|
| Pipeline | Known As | Design Capacity (bpd) | Estimated Utilization | Potential Daily Throughput |
| Line 324 | Line 901 | 150,000 | 85% to 100% | 127,500 to 150,000 |
| Line 325 | Line 903 | 300,000 | 85% to 100% | 255,000 to 300,00 |

89.     Lines CA-324 and CA-325 were historically used to transport Santa Ynez Unit (SYU) crude from the onshore Las Flores Canyon Processing Facility to Pentland Station south of Bakersfield and then to connected inland pipeline networks. Pending final clearance under California and federal oversight, Sable intends to open the recommissioned lines to deliver crude to the inland networks for eventual refining into fuels. If both lines are recommissioned and operated near estimated utilization, combined throughput could support ~200,000 bpd, which is more than sufficient for the combined peak output of the Hondo, Harmony, and Heritage platforms.[115] **Assuming Sable produces 31,500 to 40,000 barrels per day, Sable would comprise 10% to 15% of California's daily in-state production for 2024.**

90.     Line CA-324 (previously known as Line 901) and Line CA-325 (previously known as Line 903), collectively known as the Las Flores Pipeline System, are critical components of the oil transportation infrastructure associated with Sable's offshore assets.

---

[115] *Sable Offshore Corp. - Events & Presentations.* (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

These pipelines historically moved SYU crude from onshore Las Flores Canyon treatment facility to Pentland Station south of Bakersfield and then to connected inland California markets. Line 324 has a maximum permitted throughput capacity of 150,000 barrels per day (bpd), while Line 325 is permitted at 300,000 bpd.  **The recommissioning of Sable Lines 324 and 325 would reduce the need for marine tanker transport, reduce emissions risk, and help restore a critical energy corridor within the state's coastal infrastructure network.**[116]

> **v.      Potential Economic Impact on State, Santa Barbara & Adjacent Counties**

91.      Sable projects daily production of 45,000 BOE or 31,500 barrels of crude oil, with multiple scenarios modeled and developed extending to higher volumes to test potential economic impact. Assuming a stable Brent benchmark oil price of $70 per barrel, the gross revenue impact of operations can be scaled accordingly over a full year (365 days) and estimated to be $804,825,000.

92.      The analysis assumes a conservative 8% net profit margin, which reflects the high capital and operating costs associated with offshore oil production. California levies an 8.84% corporate income tax, which would apply to any taxable income generated in-state. Additionally, property taxes, estimated at $5 million annually for the Las Flores Canyon facility and related infrastructure, along with employment taxes from a workforce of roughly 340 full-time employees (averaging $118,000 per year), provide further contributions to state and local revenue.

**Figure 29**

---

[116] *Plains All American Reports Fourth-Quarter and Full-Year 2023 Results; Announces 2024 Guidance - Fri, 02/09/2024 - 08:00*. (2023). Plains All American Pipeline. https://ir.plains.com/news-releases/news-release-details/plains-all-american-reports-fourth-quarter-and-full-year-2023

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

| Sable Production & Potential Contribution to CA State & Local Revenues | | | | | | | |
|---|---|---|---|---|---|---|---|
| Daily BOE Production | Employee Count | Est. Annual Gross Revenue | Est. Net Profit | Est. Sales Tax | Est. CA. Corporate Tax | Actual Property Tax | Est. Payroll Tax | Estimated Contribution to Total State Revenue |
| 45000 | 340 | $1,314,000,000 | $105,120,000 | $4,763,250 | $9,292,608 | $5,000,000 | $2,407,200 | $21,463,058 |
| 100000 | 758 | $2,920,000,000 | $233,600,000 | $10,585,000 | $20,650,240 | $5,000,000 | $5,363,636 | $41,598,876 |
| 250000 | 1894 | $7,300,000,000 | $584,000,000 | $26,462,500 | $51,625,600 | $5,000,000 | $13,409,091 | $96,497,191 |
| 500000 | 3788 | $14,600,000,000 | $1,168,000,000 | $52,925,000 | $103,251,200 | $5,000,000 | $26,818,182 | $187,994,382 |
| 1000000 | 7576 | $29,200,000,000 | $2,336,000,000 | $105,850,000 | $206,502,400 | $5,000,000 | $53,636,364 | $370,988,764 |

Assumes $80/BOE, 8% net margin, 7.25% sales tax on 5% taxable spend of revenue, 8.84% corporate tax, $5.0 property tax, and 6% payroll tax on $118K average salary for 550 FTEs)

(Source: author's calculation)

93.     Offshore oil infrastructure, such as platforms, pipelines, and the onshore treatment facility, is subject to local property taxation, which directly contributes to county-level general funds. Sable's offshore platform operations, maintenance, and transportation via pipelines, the potential economic contributions to the local communities are substantial. The three offshore platforms are estimated to produce approximately 31,500 to 50,000 barrels per day- totaling around 11 million barrels annually of crude California oil. Assuming this level of output could potentially generate an estimated **$21.5 to $41.6 million per year in combined local and state revenues**, including sales tax, corporate tax, property tax, and payroll taxes. This includes contributions to Santa Barbara County for hosting the LFC treatment facility and onshore pipeline infrastructure, San Luis Obispo County for service logistics and marine jurisdiction, and Kern County through indirect participation in the regional energy supply chain.

94.     Santa Barbara County, in particular, stands to benefit economically the most from Sable operations. Historically, oil-related revenues in the county have funded essential public services such as fire protection districts, law enforcement staffing, road maintenance, and local school districts. The return of Sable's offshore activity, coupled with the rehabilitation of pipelines and treatment facility assets, will likely help restore and expand Santa Barbara's revenue flows, enabling the county to address long-standing infrastructure gaps and growing public service needs.

95.     In San Luis Obispo County, where marine service operators and support logistics for offshore operations are based, Sable's activities will contribute to business tax bases, vendor income, and contractor employment, particularly in port services, environmental

58

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

compliance, and vessel support. While Kern County may see more limited direct benefits due to its inland location, increased activity at Pentland Station as the terminus of the Las Flores Pipeline, supply chain links, such as heavy equipment vendors, staffing agencies, and technical services, could nonetheless generate income and modest revenue benefits tied to Sable's restart.

96.     The potential fiscal contributions associated with the recommissioning and operations of Sable's three platforms primarily benefit Santa Barbara County, which hosts Sable's offshore infrastructure and the LFC treatment facility; San Luis Obispo County, through its proximity to offshore jurisdiction and logistical support activities; and to a lesser extent, Kern County, which may participate indirectly through the supply chain and remote platform, processing, and pipeline support services. [117] [118]

### vi.     Potential Economic Implications of Sable Production on Employment and Personal Income

97.     The restart of offshore oil production by Sable will potentially deliver a substantial and sustained employment and income boost to the Central Coast region of California, particularly to Santa Barbara County. Sable projects a steady-state offshore workforce of approximately 220 full-time California-based employees, supported by an additional 120 steady-state contractors, collectively **totaling around 340 personnel**.

**Figure 30**

| Estimated Impact of Sable Production on Employment, Wages & Earnings | | | |
|---|---|---|---|
| Job Type | Estimated Headcount | Avg. Salary | Total Payroll Impact |
| Sable Employees (CA-based) | ~220 | $120K–$150K/year | ~$30M–$33M/year |
| Steady-State Contractors | ~120 | $90K–$110K/year (blended) | ~$10M–$13M/year |
| **Total Annual Offshore Payroll** | **~340** | | **~$40M–$46M/year** |

(Source: Calculated)

---

[117] *Oil & Gas | CA State Lands Commission*. (n.d.). https://www.slc.ca.gov/oil-gas/

[118] *Cultivation Cap & Eligible Business License Applicants Lists | Santa Barbara County, CA - Official Website*. (2025). Countyofsb.org. https://www.countyofsb.org/1175/Energy-Division

59

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

98.     As indicated, wages and salaries in the oil and gas industry are higher than overall national and California averages. Based on Sable's production scale-up and estimates, the average salaries for direct employees are estimated to range between $120,000 and $150,000 per year, and indirect contractors' wages and salaries are estimated to average between $90,000 and $110,000. Collectively, the combined annual direct employee and indirect contractor payroll is estimated to potentially **range between $40 million and $46 million**.

99.     The economic ripple effect from Sable's offshore operations is potentially significant and multidimensional. The direct payroll infusion of $40M[119] annually translates into high-value job creation and regional income growth. Public sector revenues will similarly rise, supporting core community functions and offsetting fiscal pressures in counties historically tied to the energy economy. Santa Barbara County, as the principal host of offshore and treatment facility infrastructure, will be the primary recipient of both direct economic stimulus and long-term public finance benefits, while San Luis Obispo and Kern Counties will also share in employment, procurement, and service-related gains.

100.    Due to the nature of Sable's production profile, as well as its considerable operational standards, both direct and indirect jobs are high-paying, skilled positions in platform operations, marine logistics, environmental safety, and pipeline maintenance. The majority of these jobs will most likely be concentrated in Santa Barbara County, where the offshore platforms and the Las Flores Canyon (LFC) treatment facility and Las Flores Pipeline System control center are located. Many of these employees will live, spend, and pay taxes locally, contributing significantly to the region's labor income base and consumer-driven economic activity. Moreover, the presence of such high-wage positions stimulates secondary employment effects, including induced demand for housing, transportation, education, healthcare, and local services. Based on various production volumes and labor

---

[119] *Sable Offshore Corp. - Events & Presentations*. (2023). Sableoffshore.com. https://sableoffshore.com/events-and-presentations/default.aspx

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

multipliers in the energy and marine logistics sector, Sable could generate between 1,150 to 25,500 in indirect and induced (contractor and affiliated employees) employment in Santa Barbara, Kern, and San Luis Obispo counties and statewide as a result of Sable's offshore restart. The high average salaries associated with these direct roles also imply elevated household purchasing power, further driving economic multipliers in retail, hospitality, and professional services within the local economy. **Sable's activities, therefore, represent not only direct income generation but also a mechanism for broader economic revitalization, particularly in post-pandemic coastal California regions with high service-sector dependence**.

101. Scaling from Sable's benchmark of 31,500 bpd, supported by approximately 340 direct offshore personnel, the **expansion to a 60,000-bpd production** level would support an estimated 508 to 652 direct workers, assuming a consistent ratio of 1 employee per 92 barrels produced daily. Of this projected workforce, the majority would be full-time employees concentrated in platform operations, marine logistics, environmental oversight, and pipeline maintenance. Applying industry-standard compensation levels, employees earning $120,000 to $150,000 annually with contractors averaging $90,000 to $110,000 annually, the total direct payroll would be $78.24 to $97.8 million per year. This would represent one of the largest wage-driven energy operations in California and likely the United States, injecting massive purchasing power into local economies through increased housing demand, service consumption, and tax contributions.

102. Coastal counties such as Santa Barbara, Ventura, and San Luis Obispo would see the most immediate impact due to proximity to offshore infrastructure, marine terminals, and workforce housing demand. Meanwhile, inland counties like Kern would benefit from increased activity at Pentland Station as the terminus of the Las Flores Pipeline, expanded supply chains and service contracts tied to energy logistics, environmental services, and oilfield technology. In aggregate, Sable's production could have transformative economic implications, generating billions in direct revenue, thousands of high-wage jobs, and

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

significant fiscal resources for public infrastructure and local governments, making it one of the most economically consequential energy projects in California's modern history.

### vii.    Potential Implications of Sable Production on California Oil Prices

103.    Many factors, such as contract terms and negotiation, macroeconomic activity, work and lifestyle habits, and choice of transportation play into the demand for fuels, and prices paid for crude oil and refined products. The most significant determinant, as was so cruelly learned in the 1970s and 1980s, is petroleum supply security. California is virtually at the mercy and held captive to crude supplies from foreign petrostates and is, therefore, highly vulnerable to any disruptions in the supply chain and geopolitical events. Furthermore, California's use of foreign oil from various sources furthers the political ambitions of those nations, which may be contradictory to the interests of the U.S. and, through the constant use of maritime vessels, contributes significantly to greenhouse gas emission.

104.    Despite California's efforts, the demand for fossil fuels is not declining as quickly as CARB had projected, and in fact, has only declined 11% over a twenty-plus year period. The addition of Sable production from its three offshore platforms and the use of its two existing pipelines would have a favorable impact on California's energy needs and would help alleviate stresses associated with its dependency on foreign sources. The introduction of Sable production into the California refinery system could have a **favorable economic impact ranging between $3.283 to $3.456 a barrel** over imports, depending on the final terms of trade.

### Figure 31

| POTENTIAL INFLUENCE ON CALIFORNIA OIL REFINERY PRICES OF CRUDE STOCK OIL | | | | | | |
|---|---|---|---|---|---|---|
| Sable Production at Scale (Barrel/day) | Sable Annual Volume(In Barrels) | Share of California In-State Production | Price to Refiners (5%) ($) | Brent Discount (5%) ($) | Production-Weighted Average Price with Sable Production | Potential Savings ($) with Sable Per Barrel |
| 31500 | 11.50M | 10% | 65.65 | 62.37 | 65.33 | 3.28 |
| 40000 | 14.60M | 12% | 65.65 | 62.37 | 65.12 | 3.28 |
| 55000 | 20.08M | 15% | 65.65 | 62.37 | 65.01 | 3.28 |

(Source: Calculated)

62

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

## IV.    SUMMARY CONCLUSIONS

### A.    Summary and General Conclusion

105.    Based on the data, research into prevailing literature, and my analysis, my conclusion is that the production of oil from Sable's three offshore platforms and the associated use of its Las Flores Pipeline System to transport Sable's production to market will not irreparably harm the public.

106.    The addition of production of oil from Sable's three offshore platforms and the associated use of its Las Flores Pipeline System to transport its offshore production would benefit the public because it will have a **favorable economic impact on California's overall energy situation**, as well as have a favorable influence on local employment and tax revenues.  Furthermore, the addition of production from Sable's three offshore platforms and the use of Sable's Las Flores Pipeline System to transport its production to market would have a positive influence on consumer retail gasoline, diesel, and aviation fuel prices, would **improve and strengthen California's energy and economic security and avoid irreparable harm to consumers**.

### B.    Pertinent Findings

107.    With the continuing decline of in-state oil production, the pending permanent shutdown of two major oil refineries collectively representing the loss of 10.5 million gallons of gasoline per day, growing dependencies on non-U.S. sources for oil and, now gasoline, as well as the highest retail gasoline prices in the U.S., California is confronting a potential energy crisis.

- While overall U.S. field production has increased 66% from 1990 levels, California's field production declined 61%, and 68% decline from its peak production in 1985.

- California is the 2nd largest consumer of petroleum and the largest consumer of aviation fuel in the U.S.[120]  In 2023, Californians consumed over 500 million

_____

[120] U.S. EIA, Crude Oil Production, Annual, Thousand Barrels, 2023.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

barrels of oil (1.8 million per day), 13.119 billion gallons of gasoline, 3.6 billion gallons of diesel fuel, and over 216 million gallons of aviation fuel.

- Nearly 100% of California's non-U.S.-sourced imported oil is delivered to its refineries via maritime vessels, which are significant contributors to GHG emissions.

- California is highly vulnerable to oil supplies and prices of foreign providers. Since 2005, California's dependency on non-U.S. foreign oil has increased by 19.43%, while its in-state oil production has fallen by 55.22%.

- California is virtually completely dependent on maritime vessel transportation for the importing of oil from non-U.S. foreign sources.

- California's retail gasoline prices routinely average 50% greater than the U.S. national average.

- California's oil and gas industry represents around 8% of its total GDP and employs over 148,000 workers directly and over 536,000 indirectly, and generates around **$47.9 billion in state and local tax revenues for 2022**.

- Californians consume between **30 to 33 million gallons of gasoline a day and around 9.9 million gallons a day of diesel fuels. Oil and gasoline consumption in California has not declined significantly over a twenty-five-year period**.

- California oil and gasoline consumption is relatively inelastic. Since 2001, the consumption of gasoline has decreased by only 11%; total oil consumption has decreased by 22% (mostly due to the switch to renewables for power generation).

- California is highly dependent on foreign, non-U.S. oil imports to meet its demand for petroleum-based fuels and other products; California imports of foreign, non-U.S. sourced oil have increased 69%.

64

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- California's dependency on foreign oil sourced from petrostates such as Iraq, Saudi Arabia, and the U.A.E, as well as Brazil, Ecuador, and Guyana, is expected to increase in the coming years, making the State more vulnerable to geopolitical events and swings in Brent oil market prices.

- California's dependency on foreign gasoline and diesel fuels sourced from Singapore, India, Japan, South Korea, and China is expected to increase in the coming years, making the State more vulnerable to geopolitical events and disruptions in the supply chain.

## C.    Key Conclusions

108.    Based on my findings and analysis of Sable and its two existing onshore pipelines, the following conclusions are offered. The use of the Las Flores Pipeline System to carry Sable's production to market will not irreparably harm the public. **Indeed, to the contrary, as is summarized in this declaration, allowing the use of the Las Flores Pipeline System to carry Sable's production to market –would benefit the public and avoid irreparable harm to consumers** for the reasons articulated in this declaration and summarized below.

- As configured, Sable is capable of producing 30,000 to 50,000 barrels of oil per day from its three offshore platforms. At this level, Sable's production would represent approximately **10 to 15% of all California in-state production** based on 2024 levels.

- Sable's existing Las Flores Pipeline System provides adequate transportation for its offshore production.

- The addition of Sable production using its three offshore platforms and the associated use of its existing Las Flores Pipeline System, indicates that Sable would be **cost competitive** with oil sourced from land-based wells, as well as a number of foreign sources, at various production levels (scale).

65

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

- Sable has immediate and long-term oil reserves that, if placed into production, would create significant economic value to the state of California, as well as Santa Barbara, Kern, and San Luis Obispo counties. The potential impact of production is estimated to range between **$21.5 to $41.6 million a year** over a multi-year period depending on production scale.

- The addition of Sable production using its three offshore platforms and the associated use of its existing Las Flores Pipeline System would have a favorable impact and contribution to local employment. Based on various production volumes and labor multipliers in the energy and marine logistics sectors, Sable could generate between **340 to over 7,500** in direct employment, and between 1,150 to 25,500 in indirect (contractor and affiliated employees) employment in Santa Barbara, Kern, and San Luis Obispo counties and statewide as a result of Sable's offshore restart.

- The addition of Sable production using its three offshore platforms and the associated use of its existing Las Flores Pipeline System would **enhance California's energy security** through the use of steady-streamed California sourced oil to the remaining California refineries.

- The addition of Sable production using its three offshore platforms and the associated use of its existing Las Flores Pipeline System would introduce **more California oil into the State's refinery system.**

- **The introduction of Sable production into the California refinery system through the Las Flores Pipeline System could have a favorable economic impact ranging between $3.283 to $3.456 a barrel over imports**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of July, 2025, in Los Angeles, California.

66

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

Michael A. Mische

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

LEGAL02/46287064v8

**Exhibit A**

**MICHAEL A. MISCHE**
**MBA, MS, Cert-AI.**
**Associate Professor of Professional Practice**

**INTRODUCTION**

Widely quoted in the media, including, The Wall Street Journal, Business Insider, The Washington Examiner, San Jose Mercury News, The Irish Business Post, FOX News, FOX Business, KNX-LA, KFI-LA, CBS and NBC, Professor Michael A. Mische is recognized as one of the world's foremost authorities on the management consulting oil and gas industries. He has testified as an expert before the Senate, in high-profile litigation and criminal cases involving management consulting, and has been cited in over 1,100 mainstream publications, interviews, reviews, and research papers. He is highly regarded for his Management Consulting Annual Outlook Report, his published research on oil in Venezuela, and for his major publication on Bidenomics, which was the most comprehensive comparative examination of the U.S. economy for the 2019 to 2023 period, and *A Study of California Gasoline Prices* (2025) which is a fifty-year study of the price determinants in the Golden State. In 2023, Michael released his eighth book, *"CasePro: The Consultant's Critical Thinking Approach to Case Analysis,"* and is the author of seven other books, including a world-wide best-seller with co-author, the late Warren G. Bennis.

Mische joined USC in 1997 as an adjunct professor. Since 2016, Michael has been a fulltime faculty member of the Marshall School of Business, University of Southern California while maintaining an exceptionally high-profile presence as a thought leader in the consulting industry. He is the 2018 recipient of USC's Golden Apple Award for Teaching Excellence and a co-recipient of the 2019 Service Excellence Award. Mische maintains a highly active consulting profile among elite consulting firms and governments with projects spanning major consulting issues, oil & gas prices, the economy, AI in consulting, and issues related to national economic security.

**POSITIONS HELD (ACADEMIA)**

- **University of Southern California**, Marshall School of Business. Los Angeles, CA. (1997-Present).

  o Associate Professor of Professional Practice & Curriculum Leader: Management Consulting.

    o Faculty Lead for the Certificate in Strategy & Management Consulting.

    o Redesigned consulting curriculum to be more relevant and competitive with Harvard.

    o Designed & implemented a new MOR course offering, *Case Analysis for Consultants: A Critical Thinking Approach*, MOR 499, which provided for interactions between MBAs from the MOR 557 class with UGs from MOR 462.

    o Co-designed & co-teach a new MBA course offering with Prof. Shon Hiatt titled, *" MOR 599-The Business of Energy in the 21st Century."* Scheduled for Spring 2025.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- o Co-designed & co-taught, with Jerry Giaquinta, a new course in 2020, (BUCO/MOR 499), a cross-cultural, project-based course; simultaneously taught via Zoom with ICU in Tokyo, Japan.

- o Redesigned and upgraded USC's Certificate in Strategy & Management Consulting. (2023).

- o Instituted a quantitative national ranking system for MBA consulting programs:

  - Helped to shift USC 2022 Ranking to 9th, compared to 2015 which was not in the Top 30.

  - Helped increase MBA placement in consulting from 16% to 30%. 2015 to 2022.

- o **USC Service Activities**

  - o Conducted recruiting bootcamps for both MBA and MS students for placement into consulting. (2023-2024).

  - o Co-hosted KPMG CEO Paul Knoop on campus for recruiting purposes. (2024).

  - o Co-leading, with Paul Adler, Deloitte Sustainability Consulting Case. (2024).

  - o Authored new Experiential Learning Center (ELC) exercise based on an actual management consulting situation. (2023).

  - o Faculty recruiter, USC Football. Speak with non-committed football recruits and their families about USC academics and the "life of a student athlete." (2022-present).

  - o Faculty Adviser, MCSC, the largest MBA student club at Marshall. (2022-present).

  - o Implemented career coaching services for MBAs with USC's Career Resources Center. (2023).

  - o Faculty coach (informal) USC Marshall MBA Black Students Case Competition Team. (2022).

  - o Co-coached (with Carl Voigt) USC Marshall Case Competition Team. (1999 – 2001).

- o **USC Teaching Awards**

  - o USC Golden Apple Teaching Award. (2018).

  - o MOR Service Award. Co-recipient. (2019).

- • **USC Marshall School of Business- Teaching Responsibilities:**

  - o **MBA-Graduate**                    **Course**                    **Year**

69

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| MOR 599 | The Business of Energy in the 21st Century | 2025 |
| MOR 554 | Strategy Innovation & Change | 2015- Present |
| MOR 557 | Management Consulting | 2015- Present |
| MOR 559 | Strategic Transformation & Renewal | 1997- Present |

- o **Undergraduate**          **Course**          **Year**

| MOR 499 | *New-* Case Analysis for Consultants | 2022, 2023 |
| MOR/BUCO 499 | Cross Cultural Collaboration- Project Based | 2020 |
| MOR 473 | Leading High-Performance Teams | 2016- Present |
| MOR 462 | Management Consulting | 2014- Present |
| BUAD 497 | Strategy- Case Based | 2014 -2016 |
| MOR 463 | Organizational Behavior | 2013- 2018 |

**POSITIONS HELD- PRIVATE SECTOR (FOR PROFIT)**

- **Synergy Consulting Group, Inc.** (1993-Present). *CEO & Chairperson of the Board*. Scottsdale, AZ and State College, PA.

  - o Significant clients include United States, Kingdom of Saudi Arabia, several Fortune 50s and several Elite 8 management consulting firms.

  - o Special consultant to HRH, Kingdom of Saudi Arabia. (2020-2022).

  - o Special consultant to U.S. Government. (Ongoing).

  - o Practice specializations include:

    - Strategic Assessment & Positioning.

    - Organizational Performance.

    - Strategic Innovation .

    - Energy Policy as Related to Oil & Gas.

- **Andersen Consulting (Accenture).** (1995-2000). *Special Consultant to Senior Practice Leadership & Management Committee of the Firm*. Chicago & Los Angeles.

  - o Advisor on Global Repositioning & Practice Lines Restructuring relating to "Process Transformation."

  - o Co-authored "Building Process Excellence: Lessons from the Leaders."

  - o Co-developed/Contributor to the AC Reengineering & Strategic Planning Methodology.

  - o Keynote Speaker: Andersen Partners & Consultants Innovation & Software Spectacular Meeting, San Antonio. (1996).

  - o Designated "Associate Partner" for administrative, NDA, and confidentiality purposes.

70

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- **AT Kearney.** (1991 to 1993). *Principal, Management Consulting Services.* Chicago, IL.

  o Special Project- Internal Restructuring and Cost Reduction.

  o Special Project- Repositioning Strategic Technology Services for Sale.

- **KPMG.** (1983 to 1992). *Principal, Management Consulting Services.* Montvale, NJ.
  o One of the youngest consulting partners elected in the history of the Firm.

  o PIC & Practice responsibilities included leading/co-leading national services in:

    ▪ Strategy & Transformation Consulting.

    ▪ Transactions Management Services (M&A).

    ▪ Innovation & Advanced Technologies.

  o Instructor, SDLC and Project Management.

  o Co-led/managed over $58 million in direct engagement billings (Over $100 million in aggregate).

  o Maintained one of the highest Net to Gross ratios in the firm.

  o Member, KPMG Practices & Methods Review Committee.

  o Member, AICPA Peer Review Committee for PwC.

**NOTABLE CONSULTING ACTIVITIES (Partial)**
- **2025.** U.S. Energy Production as Related to Oil & Gasoline Independence.
- **2024.** Lead Consultant & Expert Witness on behalf of BCG in BCG v. GameStop litigation. (2023-2024).
- **2024.** Lead Consultant. Bidenomics: Facts, Figures & Everything that Americans Should Know. (February 2024).
- **2023.** Lead Consultant. Analysis of the Implications of the Strategic Petroleum Reserve on U.S. War Readiness. Classified. (2023).
- **2023.** Analysis of California's Profit Gouging Tax. (January 2023).
- **2023.** Analysis of Biden Administration's Oil & Gas Policies. (November 2022).
- **2023.** Analysis of U. S. Oil & Gas Prices. Oil & Gas Association. Distributed to U.S. Congress. (October 2022).
- **2018-2021.** Kingdom of Saudi Arabia. Lead Advisor for the development of the strategic plan for the "Innovation Superhighway" linked to Vision 2030. https://www.vision2030.gov.sa/media/rc0b5oy1/saudi_vision203.pdf.
- **2018-2021.** Kingdom of Saudi Arabia. Appointed Senior Advisor to the Saudi Public Investment Fund (Taqnia), a $925 billion investment fund for the design and implementation of co-innovation and co-investment funding and investment selection processes and organization capable of supporting 13 different economic sectors. https://www.pif.gov.sa.

71

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- **1997.** Reengineering Government Initiative for Vice President Al Gore. (May- August 1997).

**EXPERT TESTIMONY & PANEL PARTICIPATION (Partial)**

- **2023/2024.** Expert Witness. U.S. Federal District Court. For and on behalf of BCG (Boston Consulting Group) v. GameStop. https://law.justia.com/cases/federal/district-courts/delaware/dedce/1:2022cv00363/78379/76/.
- **2024.** Opined (informal comments) on draft Senate Bill *"To prohibit conflict of interests among consulting firms that simultaneously contract with the Government of the People's Republic of China and the United States Government, and for other purposes."* https://www.hawley.senate.gov/sites/default/files/2024-02/Hawley-Time-to-Choose-Act.pdf.
- **2023.** Expert Witness. Testimony before California Senate on California Oil & Gas Price Gouging. (February 22, 2023). See, Mische at 2-hour, 3 min. mark. https://www.senate.ca.gov/media/senate-energy-utilities-communications-committee-20230222/video
- **2023.** Opined on the "Effects of a Windfall Profit Tax" on U.S. Oil & Gas Competitiveness. United States House of Representatives. Washington, D.C. (January 2023).
- **2023.** Expert Witness. Presentation before the California Foundation on The Environment and The Economy on why California gasoline prices are higher than national averages and the accretive costs of a windfall profit tax. February 10, 2023. Napa, California.
- **2023.** Moderator. "Innovation Factories, Unicorns and Competitive Positioning." Featuring Linda K. Yates, Author and CEO, Mach 49. (November 2022).
- **2023.** Expert Witness, California Senate.  "Why Are Oil & Gas Prices So High in California?" Californians Against Higher Taxes Press Conference. Carried live and covered by AP. (November 28, 2022).
- **Prior 2022 (partial).**
  - Material Witness, FARA case. Subpoenaed for and on behalf of the U.S. Government, Southern District of New York (U. S. v. Zuberi). Los Angeles, CA.
  - Subpoenaed as material witness on behalf of the U.S. Government in a political financial and foreign influence investigation (FARA).
  - Testified before United States Grand Jury, 2019/20.
  - Testimony contributed to a conviction and 12-year sentencing in a federal penitentiary on FARA violations. https://www.justice.gov/usao-cdca/pr/political-donor-sentenced-12-years-prison-lobbying-and-campaign-contribution-crimes-tax
  - Expert Witness, for and behalf of major Fortune 500. Witness in the analysis of movie theater operations as related to the Supreme Court Consent Decree of 1948, 2016/17. Los Angeles, CA.
  - Expert Witness, for and behalf of Plaintiff, Magic Chef (Owned by Berkshire Hathaway).
  - Expert Witness, for and on behalf of a Private Client. Witness in the analysis of management consulting services, project management and the application of AICPA Code of Professional Ethics as related to management advisory services, 1988. Miami, FLA.

**MEDIA COVERAGE & CITATIONS: 2022-2025** (partial list)
- Quoted or cited over **1,225** times in academic and research works (Academia.com).
- Quoted over **300** times in the media in 2022 - 2025.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- **2025.** Mische interviewed. ***Fox Business.*** *University of Southern California Professor Michael Mische explains his study on gas prices being driven up due to high taxes and policies*. (2025, April 4). https://www.foxbusiness.com/video/6370989691112.

- **2025.** Mische interviewed. ***John Kobylt Show; KFI AM 640.*** (2025, April 8). *Why Are CA Gas Prices So High?* https://kfiam640.iheart.com/featured/the-john-kobylt-show/content/2025-04-08-1119-the-john-kobylt-show-why-are-ca-gas-prices-so-high-0408/.

- **2025.** Mische quoted. ***Washington Examiner***. Faria, Z. (2025, April). *California Democrats are responsible for high gas prices*. https://www.washingtonexaminer.com/opinion/beltway-confidential/3366221/california-democrats-responsible-high-gas-prices/.

- **2025.** Mische quoted. ***California Globe***. (April 3, 2025). *California's High Gas Prices Climbing Over $5.00 Per Gallon – Again*. https://californiaglobe.com/fr/californias-high-gas-prices-climbing-over-5-00-per-gallon-again/.

- **2025.** Mische quoted. ***Business Insider.*** Thompson, P. (2025, April 8). *5 consulting contracts cut by DOGE show what government is targeting*. https://www.businessinsider.com/doge-consulting-crackdown-what-contracts-are-being-cut-2025-4.

- **2025.** Mische quoted. ***Pleasanton Weekly.*** Hunt, T. (2025, April 10). *USC study confirms state policies drive up gas prices*. https://www.pleasantonweekly.com/blogs/tim-talk/2025/04/10/usc-study-confirms-state-policies-drive-up-gas-prices/.

- **2025.** Mische quoted. ***Daily New****s*. Board, T. E. (2025, April 6). *Can California get real about high gas prices?*  https://www.dailynews.com/2025/04/06/can-california-get-real-about-high-gas-prices/

- **2025.** Mische quoted. ***KTLA.*** Turner, A., & Sternfield, M. (2025, March 31). *Policies, not greed, driving California's sky-high gas prices, study finds*. https://ktla.com/news/california/policies-not-price-gouging-to-blame-for-californias-soaring-gas-prices-study-finds/.

- **2024.** Mische quoted. ***Washington Examiner,*** "USC estimates California fuel could rise by up to 90 cents per gallon next year." (11/20/24). https://www.washingtonexaminer.com/news/3235752/usc-estimates-california-fuel-could-rise-by-up-to-90-cents-per-gallon-next-year/.

- 2024. Mische quoted. *The Irish Business Post,* "Grant Thornton Irish Partners Mull Debt Deal in Growth Plan" (July 21, 2024). https://www.businesspost.ie/news/debt-deal-on-table-as-grant-thornton-mulls-overhaul-of-partnership-structure/.

- 2024. Mische quoted. *The Wall Street Journal,* "Consultants Are Paid to Fix Businesses. Why Can't They Fix Their Own? (March 16, 2024). https://www.wsj.com/lifestyle/careers/consultants-are-paid-to-fix-businesses-why-cant-they-fix-their-own-1ed9bb04?st=6lijni2puvf4t7s&reflink=desktopwebshare_permalink.

- 2024. Mische quoted. *Newsweek, "Californians Need $1,000 More To Pay 2025 Gas Prices."* (11/21/24). https://www.newsweek.com/california-2025-gas-prices-increase-1989321.

- 2024. Mische quoted. *Institute of Energy Research.* "California Gasoline Prices Will Skyrocket." (11/29/24). https://www.instituteforenergyresearch.org/fossil-fuels/gas-and-oil/california-gasoline-prices-will-skyrocket/.

73

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- 2024. Mische quoted. *CBS 8, San Diego*. (11/21/24.) https://www.cbs8.com/article/news/local/california-drivers-gas-costs-2025/509-0ec7e8d0-8d2e-4540-9235-c6620628fcdb.

- **2024.** Mische quoted. *FOX 11, LA*. (11/20/24).  https://www.foxla.com/news/californians-will-pay-much-more-next-year-keep-up-2025-gas-prices-study

- **2024.** Mische interviewed. *860 AM, LA*. (12/26/24). https://860amtheanswer.com/news/regional/1f1b8870-c3bd-11ef-8dfd-d3251992d201

- 2024. Mische quoted. *Arizona Daily Sun*. "USC estimates California fuel could rise by up to $1.15 cents per gallon next year." (11/20/24). https://azdailysun.com/usc-estimates-california-fuel-could-rise-by-up-to-1-15-cents-per-gallon-next/article_7aa9d45c-a75d-11ef-aee1-df0e25f64341.html.

- **2024.** Mische quoted. *Courthouse News Services*. "California Lawmakers Consider Newsom's Oil Profit Penalty." (2/23/23). https://www.mresearch.com/wp-content/uploads/California-lawmakers-consider-Newsoms-oil-profit-penalty-plan-_-Courthouse-News-Service.pdf

- 2023. Mische quoted. *The Wall Street Journal*, "For Once, Rookie Consultants Don't Have Enough to Do." (August 4, 2023). https://www.wsj.com/articles/consultants-bain-kmpg-ernst-young-boston-consulting-bcg-recruits-layoffs-1a2629fd.

- 2023. Mische quoted. *ExtractingFact.com*, "Three Things Governor Newsom Should Learn from the Special Hearing Session." (March 14, 2023). As University of Southern California professor Michael Mische put it:  *"The fact is, we haven't proven any cases of price gouging by oil companies or refiners ... As recently as November 2022, we had a court case in the U.S. District Court in San Diego tossed out. The list goes on and on."*  https://www.extractingfact.com/news/statewide/three-things-newsom-should-learn-from-the-special-session-hearing/.

- 2022. Mische quoted. *Seattle Times*, "California Eyes Penalties for Oil Companies Big Profits." (December 4, 2022). https://www.seattletimes.com/business/california-lawmakers-to-meet-eye-big-oils-high-gas-prices/.

- 2022. Mische quoted. *San Jose Mercury News*, "Should California Tax Oil Profits." (November 29, 2022). https://www.mercurynews.com/2022/11/29/should-california-tax-oil-profits-gas-spike-hearing-sets-stage-for-contentious-debate/.

- 2022. Mische quoted. *Consumer Watchdog,* "Should California Tax Oil Profits: Gas Spike Hearing Sets Stage for Contentious Debate." (November 29, 2022). https://consumerwatchdog.org/news-story/should-california-tax-oil-profits-gas-spike-hearing-sets-stage-contentious-debate.

- 2022. Mische quoted. *East Bay Times,* on oil and gas prices in California. (November 2022). https://www.eastbaytimes.com/2022/11/29/should-california-tax-oil-profits-gas-spike-hearing-sets-stage-for-contentious-debate/.

- 2022. Mische quoted. *ArcaMax Business,* on oil and gas taxes. (November 29. 2022). https://www.arcamax.com/business/businessnews/s-2755516-p2.

- 2021. Mische quoted. *Politico*, on political pay for play. (February 2021). https://www.politico.com/news/2021/02/12/imaad-zuberi-biden-inner-circle-468816.

- 2021. Mische quoted. *Washington Examiner*, on FARA conviction. (February 2021). https://www.washingtonexaminer.com/news/donor-ties-biden-trump-clinton-obama-sentenced-12-years-prison.

**BOOKS BY MICHAEL MISCHE**

74

- **2025.** Pending & Under Contract: *Management Consulting: Professional Practice, Responsibility & Ethics.* Target publication date August 2025.
- **2023.** *CasePro! The Consultant's Critical Thinking Approach to Case Analysis.* Author. ISBN: 978-1-7935-1400-4. (Cognella Publications, January 2023).
- **2017.** *Management Consulting: Today & Tomorrow.* Contributing Author. ISBN: 978-1-138-12428-8 (Routledge, 2017).
- **2000.** *Strategic Renewal: Becoming a High-Performance Organization.* Author. ISBN: 0-13-021919-3. (Prentice Hall, 2000). Adopted for use by 8 MBA programs.
- **1996.** *The 21st Century Organization: Reinventing Through Reengineering.* Co-Authors- Warren Bennis & Michael Mische. ISBN: 0-89384-273-7. (Jossey-Bass, 1996). Reached Top-25 on both U.S. and international best seller's list, published in 5 languages.
- **1996.** *Reengineering Systems Integration Success, Volumes 1 & 2.* Editor. ISBM: 1-8493-9952-1. (Auerbach, 1997- 1999).
- **1996.** *Step-by-Step Reengineering: The Comprehensive Guide to Process Change.* Author. ISBM: 0-8839-0476-4. (Jossey-Bass, 1996). This book was adopted by virtually every major consulting firm and has served as a foundation for many firms' proprietary methodologies. Also used by President Clinton & Vice President Al Gore in their "Reinventing Government," initiative. (1992-94). See, https://www.govexec.com/management/2013/04/what-reinvention-wrought/62836/
- Contributing author and/or editor to 3 other books (Auerbach) on process and system integration.

**PAPERS BY MICHAEL MISCHE (partial)**

- **2025.** *"A Study of California Gasoline Prices and The Potential Implications of The California Gasoline Reserve."* USC Business of Energy Transition Initiative (BET). (March 16, 2025).
- **2024.** *"Not All Oil is Created Equally: Understanding the Venezuela Petrostate."* USC Business of Energy Transition Initiative (BET). (September 2024).
- **2024.** *"Bidenomics…Facts, Figures and Everything Americans Should Know."* Co-authored with Torri Kyes. Over 40,000 reads as of September 1, 2024. (February 2024).
- **2024.** *"Is Venezuela the Answer to U.S. Oil Woes?"* USC Business of Energy Transition Initiative. (May 2024) (BET).
- **2024.** *"Understanding the Implications of Iranian Oil & U.S. Sanctions: What the Facts, Figures & Data Tell Us."* Oil & Gas Association. (April 2024).
- **2024.** *"2024 Management Consulting Annual Outlook."* Over 40,000 reads. (January 2024).
- **2024.** *"Management Consulting Annual Outlook & Firm Rankings: 2024."* Over 40,000 reads. (January 2024).
- 2023. *"The Fiction, Fallacy, Facts & Realities of California's Profit Gouging Tax."* (January 2023).
- 2023. *"When it Comes to Energy the Stupidity of Biden Administration Knows No End."* (Feb. 2023).
- 2023. *"Twenty-five Questions that all Americans Should Ask About Oil & Gas Prices."* Oil & Gas Association. (Oct. 2022).
- **Prior Papers: 1984 to 2022** (Partial List)
  - "Ranking the Top MBA Programs for Management Consulting." (2018, 2019, 2020, 2021).
  - "A Comparative Survey of Top Twenty MBA Management Consulting Programs." (2018).

75

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- o "Federal Tax Implications of Unclaimed Property," (TAF, 2014).

- o "Alternative Asset Class Investments: The Case for Classic Cars." (SCG, 2013).

- o "The Contagion Effect of Greek Default & It's Impact on the Eurozone: A Working Paper," (2013).
- o "Innovation: The Engine of Strategic Renewal." (Accenture, 1996).
- o "Symptoms of a Terminally Ill Integration Project," (Auerbach, 1997- 1999).
- o "Transnational IT Architecture," (Auerbach 1997- 1999).
- o "Building Process Excellence: Lessons from The Leaders." (The Economist/EIU, 1996).
- o "Remedies to Wrongful Seizure: A Discussion of IRS Liens & Levies." Jerome Horvitz and Michael Mische. (Warren Gorham & Lamont, 1984.)

**EDUCATION**
- **Massachusetts Institute of Technology,** Sloan School of Management. MA. (August 2020).
  - o Certificate, Executive Education Program, AI: Implications for Business Strategy.
  - o Modules completed included:
    - ▪ Introduction to AI
    - ▪ Machine Learning in Business
    - ▪ Natural Language Processing in Business
    - ▪ Robotics in Business
    - ▪ AI in Business and Society
    - ▪ The Future of AI

- **New York University**, Stern School of Business. NY, NY. (February 1978).

  - o Master of Business Administration, Finance. Minor: Management.

  - o Completed both BS & MBA is less than 5 years.

  - o Thesis: "Business Cycles & Capital Investment Theory." Advisor, Prof. Robert Kavesh, Chairman, NYU Economics Dept.

  - o Honors Paper: "Price Level Adjusted Financial Statements." Advisor, Prof. Barbara Marino.

  - o NYU Graduate Assistant to Prof. Alexander Melamid & Prof. Rolf E. Wubbles.

- **Golden Gate University**, Graduate School of Taxation.  San Francisco, CA. (June 1984)

  - o Master of Science, Federal Taxation.

  - o Publications: "Remedies to Wrongful Seizure." (Warren, Gorham & Lamont. 1984).

- **New York University**, Stern School of Business. NY, NY. (October 1976).

  - o Bachelor of Science, with Honors in Banking & Finance.

  - o Double Major: Finance & Economics.

  - o Minor: Political Science (Soviet Economic System).

76

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- o Honors Thesis: "Industry Analysis of Nonferrous Metals," Advisor, Prof. Rolf E. Wubbles.

- o Five-year accelerated BS/MBA degree program (Awarded MBA at age of 23).

- o Recipient: Jules Bachman & Boris Kostelanetz Academic Scholarships - Economics.

- o Beta Gamma Sigma & Phi Alpha Kappa, national academic honors societies.

- o Student Athlete. NYU Men's Varsity Swimming Team.
- o Vice President, NYU Finance Society.
- o Member, Phi Gamma Delta.

**COMMUNITY SERVICE ACTIVITIES (Partial)**

- Active in sexual assault prevention initiatives and counseling young men. (On-going.)
- Active financial supporter, LA Catholic Good Shepard Shelter for Battered & Abused Women. (On-going).
- Active financial supporter, USC Women's Basketball. (On-going).
- Active financial supporter, Phi Gamma Delta Educational Scholarship Fund. (1980 to present).
- Passionate supporter of Title IX initiatives for women athletics. (1977-present).
- Past Member, City of Pasadena, "We Must Breathe Task Force," for police reform and underrepresented economic opportunity programs. Chaired by the late Council Member, John J. Kennedy. (2020).

**MISCELLANEOUS AWARDS (Partial)**

- "Man, of the Year," elected by the NYU Chapter. (1992).

- Nominated for "Who's Who in America." (2001, 2024).

- Nominated for "Who's Who in American Business." (2011, 2024).

- "Most Influential Graduate Brother of the Year." (2023).

**BOARD MEMBERSHIPS**

- Due to the potential for conflicts of interest and publicity, Michael restricts his for-profit board affiliations to private organizations.
- Past non-profit board affiliations include, but are not limited to:
    - o NYU-Stern, Annual Alumni Fund. Co-Chairman. (1990-91).
    - o NYU-Stern, Haskins Fund. Board Member. (1992).
    - o NYU-Stern, Dean's Advisory Board. Board Member. (1988-1992).
    - o NYU-Stern, New Building Fund Board. Fundraiser. (1990-1992).
    - o Phi Gamma Delta Educational Foundation. Board Member. (1990-1994).
    - o Gamma Phi House Corporation. Board Member. (1990-2001).

**PERSONAL INTERESTS**

77

- Lifetime Member: International Fraternity of Phi Gamma Delta. Member. (1973 – present).

- Interesting Fact: Former elite-level two-sport athlete. (1969-1975).

- Passions: Classic American muscle cars, Formula 1 racing, writing, American military history, architecture, classical music, weightlifting, boxing, developing consulting talent, and PSU & USC football.

- Most notable influences: NYU Profs. Alexander Melamid, Rolf. E. Wubbels, Wassily Leontief (Nobel Recipient), & Ed Altman; KPMG Partners CEO Larry D. Horner & Hilliard M. Eure-III; my incredible athletic coaches & trainers; and most of all, my mother, Jane and father, Albert.

**LINKS**

- https://www.linkedin.com/in/michael-a-mische-987b30a/
- https://www.youtube.com/watch?v=dC5lLcSK-1I&t=13s
- https://www.youtube.com/watch?v=HvP2ELGHdjQ
- https://www.youtube.com/watch?v=2Rv7l2qhCSw&t=12s

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒ BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT: On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒ [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/ Josie Cisneros*

_____
Josie Cisneros

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
      dpettit@biologicaldiversity.org
      tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
      jfrankel@environmentaldefensecenter.org
      trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/
DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
      benjaminhanelin@paulhastings.com
      natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY
LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (805) 966-7000
Email: TLarge@FLASllp.com

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

*Additional Counsel Listed on Signature Page*

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al.<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et. al<br><br>Respondents and Defendants.<br><br>and<br><br>SABLE OFFSHORE CORP., et al.<br><br>Real Parties in Interest. | Case No. 25CV02247 [Coordinated with Case No. 25CV02244]<br><br>Assigned for all purposes to the Honorable Judge Donna D. Geck<br><br>**REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION**<br><br>Date:       July 18, 2025<br>Time:       10:00 a.m.<br>Location:   Department 4<br><br>Complaint Filed:   June 3, 2025<br>Trial Date:         None set |

- 1 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

## INTRODUCTION

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") hereby object to the evidence submitted by Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") in support of their *Ex Parte Application For Order to Show Cause and Temporary Restraining Order*. On June 3, 2025, the Court heard the *ex parte* application, and set a hearing for July 18, 2025, on the order to show cause regarding the preliminary injunction.

In support of their preliminary injunction, Petitioners submit declarations from witnesses Richard Kuprewicz, Kara Clauser, Brady Bradshaw, Blake Kopcho, Jeffrey Miller, Tevin Schmitt, and Julie Teel Simmonds. But in doing so, Petitioners rely heavily on declarants who offer legal conclusions disguised as facts, speculative risk assessments unsupported by data, and statements hypothesizing about pipeline conditions and regulatory actions outside the scope of their personal or expert knowledge. (*See, e.g.*, Kuprewicz Decl. ¶¶ 8-10.)  Petitioners, however, bear the burden of producing evidence that supports both a likelihood of success on the merits and a showing of irreparable harm.  Declarations that support these showings must be based on personal knowledge, may only set forth admissible evidence, and must affirmatively show that the declarant is competent to testify to the matters stated in the declaration.  Consequently, affidavits or declarations (or any portion thereof) that are not based on personal knowledge or that assert only inadmissible conclusions, opinions, or ultimate facts must be disregarded by the Court. (Cal. Evid. Code § 702(a); *Floveyor v. Internat., Ltd. v. Superior Court* (1997) 59 Cal.App.4th 789, 796; *Hayman v. Block* (1986) 176 Cal.App.3d 629, 638-39 ["Personal knowledge and competency must be shown in the supporting and opposing affidavits and declarations. The affidavits must cite evidentiary facts, not legal conclusions or 'ultimate facts.'"].)  The bulk of Petitioners' evidence fails to satisfy the foregoing requirements.

- 2 -

LEGAL02/46314995v1

## MR. KUPREWICZ'S DECLARATION DOES NOT MEET *SARGON*'S ADMISSIBILITY STANDARD

Under California law, the trial court has the duty to act as a "gatekeeper" in determining whether to exclude expert testimony from trial.  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770.)  An expert must "state on direct examination the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Cal. Evid. Code § 802.) "[T]he trial court must exclude speculative or irrelevant expert opinion." (*Garner v. BNSF Railway Co.* (2024) 98 Cal.App.5th 660, 675.) Further, an expert's opinion "may not be based 'on assumptions of fact without evidentiary support, or on speculative or conjectural factors." (*Sargon*, *supra*, 55 Cal.4th at pp. 769-770 [internal citations omitted].)

Here, Mr. Kuprewicz repeatedly runs afoul of the *Sargon* standard by offering sweeping conclusions about pipeline safety without any reliable basis or explanation.  For example, he asserts that the pipeline's design renders its corrosion protection "ineffective," that inspection technology "cannot adequately" detect certain corrosion, and he even asserts that the pipeline system is "not safe to operate" at all. (*See* Kuprewicz Decl. ¶¶ 8 & 10.)  Yet nowhere in his declaration does he explain how he reached these grave conclusions.  He cites no data, performs no analysis particularized to the Pipelines at issue, and fails to detail any accepted methodology linking the facts to his opinions.  (*See Lowery v. Kindred Healthcare Operating, Inc.* (2020) 49 Cal.App.5th 119, 122 [explaining that expert opinions which "include conclusory statements without any foundation for their reasoning" are inadmissible].)  In fact, one of his hearsay reports admits that certain tracking process are "not specially required" in industry standard "pipeline safety regulations," or in the applicable State waivers.  (Kuprewicz Decl. Exhibit C at 7; *see also Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 ["An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based."])

- 3 -

LEGAL02/46314995v1

Mr. Kuprewicz further opines that higher operating temperatures will "significantly accelerate" corrosion without quantifying "significant" or citing any study of these pipelines, much less studying the Pipelines himself.  (*See* Kuprewicz Decl. ¶ 8(c).)  He declares that the Pipelines "cannot be made as safe as new pipelines," a categorical claim unsupported by any engineering analysis or industry standard, and flatly contradicted by state and federal permits and waivers issued by regulatory agencies that actually have performed the requisite analyses. (*See* Kuprewicz Decl. ¶ 8(e).)   He also does not claim that his expertise extends to the specific corrosion history of the Pipelines at issue here; thus, his testimony offers nothing beyond what any layperson could read in a report.  (*See* Cal. Evid. Code § 801, subds. (a) & (b) [explaining that expert evidence must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates"].)

Despite admitting that he is missing critical information necessary to form an opinion about the Pipelines, Mr. Kuprewicz opines upon the Pipelines' safety and functionality.  But many of his purportedly factual assertions reflect generalized beliefs or worst-case scenarios, not evidence-based statements supported by direct observation or verifiable experience with the Pipelines.  (*See* Kuprewicz Decl. ¶ 10 [opining that certain tools "***can***" miss cracks; that the State Waivers do not ***guarantee*** cracks will be identified; and that Mr. Kuprewicz's lack of information prevents him from drawing further conclusions].)  But "an expert's opinion that something *could* be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist" is not admissible.  (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 [emphasis in original]; *see also Geffcken v. D'Andrea* (2006) 137 Cal.4th 1298, 1311 [holding that an expert's conclusions based on assumptions unsupported by record have no evidentiary value and should be excluded].)  Mr. Kuprewicz even admits that he cannot be sure whether certain testing parameters or corrosion tracking processes mandated by the State Waivers are inadequate. (*See*

- 4 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

Kuprewicz Decl. ¶ 10(c)-(d).)  Yet, he still advances opinions about them.  (*See* Kuprewicz Decl. ¶¶ 8-10; *see also Sargon*, 55 Cal.4th at 770 [mandating "[e]xclusion of expert opinions that rest on guess, surmise or conjecture"].)  This is not expert testimony, but unsubstantiated speculation dressed in technical language.

In short, Mr. Kuprewicz seems to argue that the Pipelines are *de facto* too unsafe to operate just because they are pipelines.  But that argument is inconsistent with the complex state and federal regulatory regimes relevant to this matter, and under *Sargon*, it is inadmissible.  This Court should reject it.

### MR. KUPREWICZ RELIES UPON INADMISSIBLE HEARSAY

While the Evidence Code allows expert witnesses to rely on hearsay evidence when forming their opinions, it does not authorize expert witnesses to launder otherwise inadmissible hearsay. (*I-CA Enterprises. Inc. v. Palram Americas. Inc.* (2015) 235 Cal.App.4th 257, 266 ["[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay"].)  Here, Mr. Kuprewicz repeatedly cites his own unsworn reports without ever adopting the conclusions in those reports. (*See* Kuprewicz Decl. ¶¶ 8 & 10.)  Mr. Kuprewicz merely summarizes the reports' opinions, failing to offer any sworn testimony as to the truth of their conclusions. (Kuprewicz Decl. at ¶¶ 8 & 10.) This alone renders the reports hearsay. (*See People v. Campos* (1995) 32 Cal.App.4th 304 [holding that unsworn expert reports are inadmissible hearsay].)

Further, while an expert may rely on otherwise inadmissible hearsay to provide background information and context (*see People v. Veamatahau* (2020) 9 Cal. 5th 16, 21), "[w]hat an expert cannot do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.)  Here, Mr. Kuprewicz repeatedly relies upon his own unsworn reports, not as sources of background information or context, but as the factual bases for his submission as a whole.  He is simply serving as a conduit for hearsay. (*See Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1044

- 5 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

["There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception."].)   Because the materials upon which Mr. Kuprewicz relies for his testimony are hearsay, neither the testimony nor the materials should be admitted.

## THE FAILURE TO PRODUCE MR. KUPREWICZ FOR CROSS-EXAMINATION VIOLATED REAL PARTIES' DUE PROCESS RIGHTS

Petitioners ask the Court to impose extraordinary relief by allowing Mr. Kuprewicz's testimony without allowing Real Parties the opportunity to cross-examine him.  But the law does not permit this.  The "confrontation of witnesses against him in noncriminal proceedings is a part of procedural due process guaranteed by the Fifth Amendment and the Fourteenth Amendment to the federal Constitution." (*August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60 [finding hearing met requirements of due process where sworn statement was considered but there was no subsequent request to cross-examine the declarant]; *see also* CAL. CONST. ART. I. § 7.)

In fact, "[b]ecause it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an 'absolute right,' not merely a privilege," (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733 [noting the rule applies in "either a criminal or a civil case" and if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony"].) Further, "[t]he lack of an opportunity to cross-examine the declarant deprives the opposing party of important evidence concerning the credibility of the declarant and the reliability of testimony in the declaration." (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 841-842 [relying on *Fost* and holding it was error for trial court to rely on declaration on motion for preliminary relief where declarant was not made available for cross-examination or live testimony].)

- 6 -

LEGAL02/46314995v1

Injunctive relief cannot rest on untested expert assertions shielded from scrutiny. Despite subpoenaing Mr. Kuprewicz for deposition, and despite this Court ordering Mr. Kuprewicz to sit for that deposition, Petitioners have failed to produce him. His testimony should therefore be stricken as a result. (*Fost*, *supra*, 80 Cal.App.4th at p. 733.)

**IMPROPER LEGAL CONCLUSION**

An expert may not opine on legal standards, draw conclusions about the legal effect of regulatory documents, or tell the Court which outcome the law requires. *Hayman v. Block*, 176 Cal. App. 3d 629, 638-39 (1986) [explaining that "affidavits must cite evidentiary facts, not legal conclusions or 'ultimate' facts"]; *see also* Evidence Code § 801.) Yet Petitioners' supporting declarations are replete with improper legal conclusions that exceed the permissible scope of expert opinion under California law. (*See Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 530 [holding that a declaration containing only legal conclusions and ultimate facts "has no evidentiary value"].) Here, Mr. Kuprewicz opines not only that the Pipelines are unsafe, but that they ***cannot be made*** safe. (*See* Kuprewicz Decl. at ¶¶ 8.)  That opinion is a legal conclusion about ***the*** ultimate fact in this case, and it should be excluded. (*See Hayman*, *supra*.)

**IMPROPER EXPERT OPINION**

Evidence Code § 801 requires expert testimony to be based upon matters "perceived by or personally known" by the expert. As explained above, because a substantial amount of his testimony is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, and is instead based upon his speculation about what might happen under certain circumstances. Thus, his testimony does not meet Evidence Code § 801's requirements and should be excluded.

**SPECULATION AND CONJECTURE**

Again, Evidence Code § 801 requires expert testimony to be based upon matters "perceived by or personally known" by the expert. As explained above, because a substantial

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

portion of Mr. Kuprewicz's declaration is based on speculation and conjecture, his testimony does not meet Evidence Code § 801's requirements and should be excluded.

### RELEVANCE

Under Evidence Code § 210, admissible evidence must have "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." In one of Mr. Kuprewicz's hearsay reports, he admits that certain tracking processes he prefers are "not specially required" in industry standard "pipeline safety regulations," or the applicable State waivers.  (Kuprewicz Decl. Exhibit C at 7; *see also Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 ["An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based."]) In other words, it has no bearing on industry standards or the relevant standards in this case, and does not have any tendency to prove or disprove a fact of consequence. It, and any testimony that relies upon it, is therefore irrelevant under Evidence Code § 210 and should be excluded.

### OBJECTIONS TO PETITIONERS' DECLARATIONS

Below are point-by-point objections to the declarations of Richard Kuprewicz and Linda Krop.

- 8 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

## OBJECTIONS TO THE DECLARATION OF RICHARD B. KUPREWICZ

Real Parties hereby object to the Declaration of Richard B. Kuprewicz ("Kuprewicz Decl.") as follows:

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 1. | Kuprewicz Decl., Ex. B (*Evaluation of Las Flores Pipeline System Startup Proposal (Dec. 20, 2024))*. | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. As explained above, Kuprewicz's Exhibit B is hearsay because it is unsworn expert testimony, and because it is not offered to provide background information or context.<br><br>**Due Process.** *Fost*, *supra*, 80 Cal.App.4th at p. 733. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. As explained above, the failure to produce Mr. Kuprewicz violates the Real Parties' Due Process Rights because it deprives the Real Parties of the opportunity to cross-examine the witness.<br><br>***Sargon.*** The admission of speculative expert testimony that amounts to conjecture should not be admitted. *See Sargon*, supra. As explained above, Exhibit B does not meet *Sargon*'s admissibility standard because it is based on speculation and conjecture; thus, it should be excluded. | ☐ Sustained<br>☐ Overruled |

- 9 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
|     |                        | **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, his testimony does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Relevance**. As explained above, because a substantial portion of this evidence is irrelevant to the Pipelines at issue, it should be excluded under Evidence Code § 210. | |
| 2. | Kuprewicz Decl., Ex. C (*Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart (Feb. 21, 2025)*). | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. As explained above, Kuprewicz's Exhibit C is hearsay because it is unsworn expert testimony.<br><br>**Due Process.** *Fost*, *supra*, 80 Cal.App.4th at p. 733. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>***Sargon***. The admission of speculative expert testimony that amounts to conjecture should not be admitted. *See Sargon*, supra. As explained above, Exhibit B does | ☐ Sustained<br>☐ Overruled |

- 10 -

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|----------------------|--------|
| | | not meet *Sargon*'s admissibility standard because it is based on speculation and conjecture; thus, it should be excluded.<br><br>**Improper expert testimony.** As explained above, because a substantial amount of his testimony is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, his testimony does not meet Evidence Code § 801's requirements and should be excluded. | |
| 3. | Kuprewicz Decl., Page 3, Paragraph 7, Lines 9-13: "I was asked by the Environmental Defense Center (EDC) and Center for Biological Diversity (CBD) to utilize my experience and expertise to evaluate safety and integrity issues regarding the proposal to restart the Las Flores Pipeline System, which includes CA-324 and CA-325A/B ("the Pipelines"). A true and correct copy of my report, titled *Evaluation of Las Flores Pipeline System Startup Proposal*, dated December 20, 2024, is attached to this declaration as **Exhibit B**." | **Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 | ☐ Sustained<br><br>☐ Overruled |

- 11 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|----------------------|--------|
| | | Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. **Improper expert testimony.** As explained above, because a substantial amount of his testimony is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, his testimony does not meet Evidence Code § 801's requirements and should be excluded. **Relevance**. As explained above, because a substantial portion of this evidence is irrelevant to the Pipelines at issue, it should be excluded under Evidence Code § 210. **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, his testimony does not meet Evidence Code § 801's requirements and should be excluded. | |
| 4. | Kuprewicz Decl., Page 3, Paragraph ¶ 8.a., Lines 27-28: "The design of the Pipelines renders the federal mandated cathodic protection system, | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise | ☐ Sustained<br>☐ Overruled |

- 12 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | intended to help address pipeline external corrosion, ineffective." | inadmissible hearsay."); *Sanchez, supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: [¶ 8.a].")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon, supra*, 55 Cal.4th at 770; *Lowery, supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost, supra*, 80 Cal.App.4th at p. 733; *August, supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross- | |

- 13 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | examine the expert violates Real Parties' due process rights. | |
| 5. | Kuprewicz Decl., Page 4, Paragraph 8.b, Lines 1-2: "Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: . . . [¶ 8.b].") <br><br> **Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion | ☐ Sustained <br><br> ☐ Overruled |

- 14 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|------------------------|--------|
| | | constitutes mere speculation rather than reliable expert testimony. **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. **Relevance**. Because this evidence is based on conjecture, it is irrelevant to the Pipelines at issue, and should be excluded under Evidence Code § 210. | |
| 6. | Kuprewicz Decl., Page 4, Paragraph 8.c, Lines 3-5: "The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: . . . [¶ 8.c].") **Inadmissible Expert Testimony** | ☐ Sustained ☐ Overruled |

- 15 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | (**Sargon**): Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Improper expert testimony.** Because this testimony is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, it does not meet Evidence Code § 801's requirements and should be excluded. | |

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Relevance**. Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| 7. | Kuprewicz Decl., Page 4, Paragraph 8.d, Lines 6-7: "Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: . . . [¶ 8.d].") **Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 | ☐ Sustained ☐ Overruled |

- 17 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay | |

- 18 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | under Evid. Code, § 1200 and should be excluded.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |
| 8. | Kuprewicz Decl., Page 4, Paragraph 8.e, Line 8: "The poorly designed Pipelines cannot be made as safe as new pipelines." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 3, ¶ 8, Line 15 & 26-27 "The report sets forth my opinion . . . In summary, I identified the following technical issues concerning the proposed restart of the Pipelines: . . . [¶ 8.e].")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis | ☐ Sustained<br><br>☐ Overruled |

- 19 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay | |

- 20 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
|  |  | under Evid. Code, § 1200 and should be excluded. |  |
| 9. | Kuprewicz Decl., Page 4, Paragraph 9, Line 9: "Following the preliminary approval of the State Waivers for the pipelines, . . ." | **Hearsay.** Evid. Code, § 1200. The statement is a reference to an out of court statement offered for the truth of the matter asserted.<br><br>**Due Process.** *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture.** Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay | ☐ Sustained<br><br>☐ Overruled |

- 21 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | under Evid. Code, § 1200 and should be excluded. | |
| 10. | Kuprewicz Decl., Page 4, Paragraph 10.a, Lines 26-28: "The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my report, is as follows: [¶ 10.a]")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. | ☐ Sustained<br><br>☐ Overruled |

- 22 -

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. <br><br> **Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. <br><br> **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. <br><br> **Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay under Evid. Code, § 1200 and should be excluded. | |
| 11. | Kuprewicz Decl., Page 5, Paragraph 10.b, Lines 1-3: "The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true | ☐ Sustained <br><br> ☐ Overruled |

- 23 -

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | forming potential on the Pipelines." | case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my report, is as follows: . . . [¶ 10.b]")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |

- 24 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
|  |  | **Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture.** Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay under Evid. Code, § 1200 and should be excluded. |  |
| 12. | Kuprewicz Decl., Page 5, Paragraph 10.c, Lines 4-10: "The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my | ☐ Sustained<br>☐ Overruled |

- 25 -

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B." | report, is as follows: . . . [¶ 10.c]") **Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. **Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. | |

- 26 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| | | **Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay under Evid. Code, § 1200 and should be excluded. | |
| 13. | Kuprewicz Decl., Page 5, Paragraph 10.d, Lines 11-14: "A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, 235 Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my report, is as follows: . . . [¶ 10.d]")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. | ☐ Sustained<br><br>☐ Overruled |

- 27 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony.<br><br>**Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |

- 28 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | **Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay under Evid. Code, § 1200 and should be excluded. | |
| 14. | Kuprewicz Decl., Page 5, Paragraph 10.e, Lines 15-20: "The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez, supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statement of opinion is a summary of the inadmissible expert report (*See* Page. 4, ¶ 10, Line 18 & 26-27 "The report sets forth my opinion . . . My opinion, as set forth in my report, is as follows: . . . [¶ 10.e]")<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz | ☐ Sustained<br><br>☐ Overruled |

- 29 -

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|-----------------------|--------|
| | | provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. | |
| | | **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |
| | | **Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210. | |
| | | **Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded. | |
| | | **Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay | |

- 30 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | under Evid. Code, § 1200 and should be excluded. | |
| 15. | Kuprewicz Decl., Page 5, Paragraph 11, Lines 21-23: "Based on the facts I reviewed and my professional analysis, in my opinion the Las Flores Pipeline System is not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled." | **Hearsay**: Evid. Code, § 1200; *I-CA Enterprises. Inc.*, *supra*, *235* Cal.App.4th at 266 ("[T]he expert may not serve as a mere conduit for the admission of otherwise inadmissible hearsay."); *Sanchez*, *supra*, 63 Cal.4th at 686 ("What an expert cannot do is relate as true case-specific facts asserted in hearsay statements.") The statements of opinion are mere summaries of the inadmissible expert reports.<br><br>**Inadmissible Expert Testimony (*Sargon*)**: Evid. Code §§ 402, 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770; *Lowery*, *supra*, 49 Cal.App.5th at 124. Mr. Kuprewicz's conclusion lacks methodological transparency and proper foundation. The expert opinion fails to articulate the analytical process, technical approach, or evidentiary basis supporting the stated conclusion. Furthermore, Mr. Kuprewicz provides no substantive explanation of the reasoning or factual predicates applied to reach this determination. Absent such foundational elements, the opinion constitutes mere speculation rather than reliable expert testimony. | ☐ Sustained<br><br>☐ Overruled |

- 31 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
|  |  | **Due Process**. *Fost*, *supra*, 80 Cal.App.4th at p. 733; *August*, *supra*, 264 Cal.App.2d at p. 60. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights.<br><br>**Improper expert testimony.** Because this evidence is based on conjecture and speculation, it is not based upon matters "perceived by or personally known" to Mr. Kuprewicz, does not meet Evidence Code § 801's requirements, and should be excluded.<br><br>**Relevance.** Because this evidence is based on conjecture and speculation, it is irrelevant to the Pipelines at issue and should be excluded under Evidence Code § 210.<br><br>**Speculation and conjecture**. Because a substantial portion of this evidence is based on speculation and conjecture, it does not meet Evidence Code § 801's requirements and should be excluded.<br><br>**Hearsay.** Because it is based on unsworn expert testimony, and because it is not offered to provide background information or context, this evidence is hearsay |  |

- 32 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|-----|------------------------|-----------------------|--------|
|     |                        | under Evid. Code, § 1200 and should be excluded. |        |

- 33 -

LEGAL02/46314995v1

**OBJECTIONS TO THE DECLARATION OF LINDA KROP**

In addition to the discussions above, Real Parties hereby object to the Declaration of attorney Linda Krop ("Krop Decl.") as follows:

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 16. | Krop Decl., Ex. A. | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 17. | Krop Decl., Ex. B. | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 18. | Krop Decl., Ex. C. | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have | ☐ Sustained<br>☐ Overruled |

- 34 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | |
| 19. | Krop Decl., Ex. D. | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 20. | Krop Decl., Ex. E. | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained<br>☐ Overruled |
| 21. | Krop Decl., Ex. F. | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted.<br><br>**Authentication/Personal Knowledge.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the | ☐ Sustained<br>☐ Overruled |

- 35 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | | document purportedly attached. | |
| 22. | Krop Decl., Ex. G. | **Hearsay.** Evid. Code, § 1200. The exhibit is an out of court statement offered for the truth of the matter asserted. **Authentication/Personal Knowledge.** Evid. Code, §§ 702, 1400-1401. The witness has not established that they have personal knowledge that the exhibit attached is an authentic, true, and accurate copy of the document purportedly attached. | ☐ Sustained  ☐ Overruled |
| 23. | Krop Decl., Page 3, Paragraph 4, Lines 1-5: "The public has submitted multiple requests for environmental review and public hearings regarding Sable's proposal to restart the Pipeline System. For example, on March 1, 2024, several environmental organizations sent a letter to OSFM, requesting public review and hearings. A true and correct copy of the letter is attached hereto as **Exhibit A**. Another request was submitted on September 10, 2024. A true and correct copy of the letter is attached hereto as **Exhibit B**." | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge. | ☐ Sustained  ☐ Overruled |
| 24. | Krop Decl., Page 3, Paragraph 5, Lines 6-10: "On September 27, 2024, EDC submitted a letter to OSFM, requesting environmental and public review of Sable's application for a waiver for the limited effectiveness of the cathodic protection system on CA-324 | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge. | ☐ Sustained  ☐ Overruled |

- 36 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | and CA-325A/B. A true and correct copy of the letter is attached hereto as **Exhibit C**. OSFM did not respond to this request. A similar request was submitted by thirteen members of the State Legislature. A true and correct copy of the letter is attached hereto as **Exhibit D**." | | |
| 25. | Krop Decl., Page 3, Paragraph 6, Lines 11-21: "EDC and Center for Biological Diversity (CBD) then retained a pipeline safety expert, Richard B. Kuprewicz, to evaluate the proposed waivers. Mr. Kuprewicz provided his report on or about December 20, 2024. (See *Evaluation of the Las Flores Pipeline System Startup Proposal*, attached to Declaration of Richard B. Kuprewicz.) In his report, Mr. Kuprewicz explained why inline inspection (ILI) technologies "cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the pipelines." He also pointed out that segments of the pipeline at risk for "corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure" and the existing pipeline "cannot be made as safe as new pipelines." He concluded that the same problem that caused the 2015 pipeline rupture – external corrosion – cannot be avoided by | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge.<br><br>**Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted.<br><br>**Unreliable Expert Testimony:** Evid. Code §§ 801, 802; *Sargon*, *supra*, 55 Cal.4th at 770. Reference to Mr. Kuprewicz testimony is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative.<br><br>**Due Process.** *Fost*, *supra*, 80 Cal.App.4[th] at p. 733. The admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | ☐ Sustained<br><br>☐ Overruled |

- 37 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | the terms and conditions of the proposed waivers. Specifically, he noted that both ILI tools and hydrotests are inadequate to detect all types of corrosion." | | |
| 26. | Krop Decl., Page 3, Paragraph 7, Lines 22-23: "On or about December 23, 2024, EDC and CBD submitted Mr. Kuprewicz's report to Joe Tyler, California Fire Chief. Neither the Fire Chief nor any other staff at OSFM responded to the report." | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge. | ☐ Sustained<br>☐ Overruled |
| 27. | Krop Decl., Pages 3-4, Paragraph 8, Lines 24-7: "When EDC learned that OSFM had granted preliminary approval of the requested State Waivers, EDC again retained Mr. Kuprewicz to evaluate the Waivers for compliance with State and Federal pipeline safety standards. Mr. Kuprewicz provided his report to EDC and CBD on or about February 21, 2025. (See *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*, attached to Declaration of Richard B. Kuprewicz.) In his report, Mr. Kuprewicz identified "[m]ajor" deficiencies, including reliance on ILI tools that "can miss a lot of cracks" in the pipelines, and are ineffective to detect pit corrosion and corrosion within dents; lack of a key corrosion tracking process; inadequate | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge.<br><br>**Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted.<br><br>**Unreliable Expert Testimony:** Evid. Code §§ 801, 802; *Sargon, supra*, 55 Cal.4th at 770. Reference to Mr. Kuprewicz testimony is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative.<br><br>**Due Process.** *Fost, supra*, 80 Cal.App.4th at p. 733. The | ☐ Sustained<br>☐ Overruled |

- 38 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | hydrotest pressure to screen for corrosion cracking; and lack of hydrotesting for CA-325B. He also noted that ILI runs failed to adequately identify pipe wall loss prior to the 2015 spill. He concluded that there is insufficient justification to find that the Waivers will provide an equal or greater level of safety as a pipeline with an effective corrosion prevention system." | admission of expert opinion without an opportunity to cross-examine the expert violates Real Parties' due process rights. | |
| 28. | Krop Decl., Page 4, Paragraph 9, Lines 8-9: "On or about March 2, 2025, CBD submitted Mr. Kuprewicz's report to OSFM. OSFM did not respond to this report." | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge. | ☐ Sustained<br>☐ Overruled |
| 29. | Krop Decl., Page 4, Paragraph 10, Lines 10-14: "**Exhibit E**, attached hereto, is a true and correct copy of excerpts from the County of Santa Barbara's Administrative Draft Environmental Impact Report/Environmental Impact Statement for the Plains Rp, dated February 2022. The excerpt includes a Risk of Upset analysis regarding the potential restart of the Pipeline System. EDC obtained this document through a Public Records Act request." | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge.<br><br>**Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted. | ☐ Sustained<br>☐ Overruled |
| 30. | Krop Decl., Page 4, Paragraph 11, Lines 15-20: "On May 19, 2025, Sable filed a Form 8-K report with the Securities and Exchange Commission (SEC). The report, which included a | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with | ☐ Sustained<br>☐ Overruled |

- 39 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| | press release and presentation materials, states that Sable began producing oil from Platform Harmony on May 15, 2025, and expects to fill the storage facilities at Las Flores Canyon by the middle of June, 2025. **Exhibit F**, attached hereto is a true and correct copy of the report and attachments that I downloaded from SEC's website on May 27, 2025, at https://www.sec.gov/Archives/edgar/data/1831481/000119312 525122079/d943067d8k.htm." | personal knowledge.<br><br>**Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted. | |
| 31. | Krop Decl., Page 4, Paragraph 12, Lines 21-28: "On May 27, 2025, Sable filed a Form 8-K report with the SEC. The report states that Sable "has now successfully hydrotested all segments of Line 324 and Line 325 (collectively, the "Onshore Pipeline"), satisfying the final operational condition to restart of the Onshore Pipeline in the Consent Decree. Therefore, no more repairs are required to the Onshore Pipelines prior to restart." **Exhibit G**, attached hereto is a true and correct copy of the report and that I downloaded from SEC's website on May 28, 2025, at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148125000042/socc-20250527.htm." | **Lacks Foundation/Personal Knowledge.** Evid. Code, § 702. The witness has failed to establish foundation to support a finding that the statement is made with personal knowledge.<br><br>**Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted. | ☐ Sustained<br>☐ Overruled |

- 40 -

| No. | Objectionable Material | Grounds for Objection | Ruling |
|---|---|---|---|
| 32. | Krop Decl., Page 5, Paragraph 13, Lines 3-4: "Later that day, Mr. Cleaver informed me via email that there would be no opportunity for public review and comment regarding the Restart Plans." | **Hearsay.** Evid. Code, § 1200. The declarant's testimony contains out of court statements offered for the truth of the matter asserted. | ☐ Sustained<br>☐ Overruled |

Dated:  July 7, 2025

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHIBALD & SPRAY LLP**
TREVOR D. LARGE

By: _____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

- 41 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 333 South Hope Street, Sixteenth Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows:

See Attached Service List

☐    BY MAIL:  I am readily familiar with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service.  In the ordinary course of business, the correspondence would be deposited with the United States Postal Service with postage fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm.  Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at Alston & Bird LLP, 333 South Hope Street, Los Angeles, California 90071.

☐    By ☐ UPS NEXT DAY AIR   ☐ OVERNIGHT DELIVERY:  I deposited such envelope in a facility regularly maintained by ☐ UPS     ☐ Overnight Delivery [specify name of service:  ] with delivery fees fully provided for or delivered the envelope to a courier or driver of  ☐ UPS   ☐ OVERNIGHT DELIVERY [specify name of service:] authorized to receive documents at Alston & Bird LLP, 333 South Hope Street, Los Angeles, California 90071.

☐    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

Josie Cisneros

- 42 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
           dpettit@biologicaldiversity.org
           tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
           jfrankel@environmentaldefensecenter.org
           trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/
DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
           benjaminhanelin@paulhastings.com
           natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY
LLP
820 State Street, 4th Floor

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

- 43 -

REAL PARTIES IN INTEREST'S OBJECTIONS TO EVIDENCE SUBMITTED IN
SUPPORT OF PETITIONER'S REQUEST FOR PRELIMINARY INJUNCTION

LEGAL02/46314995v1

Santa Barbara, CA 93101                          Tel.:    (805) 966-7000
                                                 Email: TLarge@FLASllp.com

- 44 -

LEGAL02/46314995v1

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:     (213) 576-1000
Facsimile:     (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:     (310) 620-5879
Facsimile:     (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

*Additional Counsel Listed on Signature Page*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>Respondents and Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>Real Parties in Interest. | Case No. 25CV02247<br>[Coordinated with Case No. 25CV02244]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION**<br><br>[*Filed concurrently with Declarations of Steve Rusch, Michael A. Mische, Bart Leininger, Brien Vierra, and Michael Rosenfeld; Objections to Evidence*]<br>Date:          July 18, 2025<br>Time:          10:00 AM<br>Dept.:          4<br><br>Complaint Filed:     April 15, 2025<br>Trial Date:          None set |

1

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................7

II.    BACKGROUND .................................................................................................7

III.   ARGUMENT......................................................................................................9

      A.    Petitioners Have No Likelihood of Success on the Merits. ........................10

          1.    Petitioners' Lawsuits Do Not Present a Live and Justiciable Controversy. ........................................................................................10

          2.    OSFM Complied with Applicable Federal Pipeline Safety Laws in Issuing the State Waivers. .................................................................11

          3.    OSFM Did Not Violate CEQA. ......................................................14

      B.    Petitioners Fail to Demonstrate That They Will Suffer Irreparable Harm Absent Preliminary Relief. .........................................................................17

          1.    The Federal Consent Decree Precludes Petitioners from Asserting That They Will Be Irreparably Harmed by the Restart of the Pipelines. .................18

          2.    Petitioners Have Not Demonstrated Significant Harm to Themselves or the Environment........................................................................19

          3.    Preventing the Transport of the Supply of Oil Through the Las Flores Pipelines Will Significantly Harm Sable and the Public. ...............20

IV.    CONCLUSION.................................................................................................21

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

**STATE CASES**

*Butt v. State of California*
    (1992) 4 Cal.4th 668 ..................................................................................................10

*Casmalia Resources, Ltd. v. County of Santa Barbara*
    (1987) 195 Cal.App.3d 827 .......................................................................................17

*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.*
    (1998) 60 Cal.App.4th 1053 ......................................................................................18

*City of Morgan Hill v. Bay Area Air Quality Mgmt. Dist.*
    (2004) 118 Cal.App.4th 861 ......................................................................................14

*City of Vernon v. Cent. Basin Mun. Water Dist.*
    (1999) 69 Cal.App.4th 508 ........................................................................................19

*Cohan v. City of Thousand Oaks*
    (1994) 30 Cal.App.4th 547 ........................................................................................13

*Cohen v. Board of Supervisors*
    (1985) 40 Cal.3d 277 .................................................................................................10

*Fowler v. City of Lafayette*
    (2020) 46 Cal.App.5th 360 ........................................................................................13

*Friends of Juana Briones House v. City of Palo Alto*
    (2010) 190 Cal.App.4th 286 ......................................................................................15

*Galbiso v. Orosi Pub. Util. Dist.*
    (2010) 182 Cal.App.4th 652 ......................................................................................13

*Gates v. Superior Court*
    (1986) 178 Cal.App.3d 301 .......................................................................................18

*Hutnick v. U.S. Fiduciary & Guarantee Co.*
    (1988) 47 Cal.3d 456 .................................................................................................10

*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*
    (2007) 41 Cal.4th 372 ................................................................................................15

*People ex rel. Sneddon v. Torch Energy Services, Inc.*
    (2002) 102 Cal.App.4th 181 ......................................................................................11

*Placer Foreclosure, Inc. v. Aflalo*
    (2018) 23 Cal.App.5th 1109 ......................................................................................10

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

*San Diego Navy Broadway Complex Coalition v. City of San Diego*
  (2010) 185 Cal.App.4th 924 ...................................................................................16

*San Lorenzo Valley Community Advocates for Responsible Educ. v. San Lorenzo Valley*
    *Unified School Dist.*
  (2006) 139 Cal.App.4th 1356 .................................................................................16

*Sargon Enterprises, Inc. v. University of Southern California*
  (2012) 55 Cal.4th 747 .............................................................................................19

*SB Liberty, LLC v. Isla Verde Assn., Inc.*
  (2013) 217 Cal.App.4th 272 ...................................................................................10

*Sierra Club v. County of Sonoma*
  (2017) 11 Cal.App.5th 11 ........................................................................................15

**FEDERAL CASES**

*City & County of San Francisco v. U.S. Dept. of Transp.*
  (9th Cir. 2015) 796 F.3d 993 ..................................................................................12

*IBP, Inc. v. Alvarez*
  (2005) 546 U.S. 21 ..................................................................................................13

*In re MidAmerican Energy Company*
  (Jan. 15, 2002) 2002 WL 31155601 .......................................................................12

*Olympic Pipe Line Co. v. City of Seattle*
  (9th Cir. 2006) 437 F.3d 872 ..................................................................................11

*United States of America et al. v. Plains All American Pipeline, L.P. et al.,*
  Case No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020)................................................8

**STATE STATUTES**

Code Civ. Proc., § 464, subd. (a) ...............................................................................10

Gov. Code, § 51010 ....................................................................................................11

Gov. Code, § 51011 ....................................................................................................11

Gov. Code, § 51011(b).........................................................14Pub. Resources Code, §§ 21000 et.
    seq. ........................................................................................................................20

Pub. Resources Code, § 21065 ...................................................................................15

Pub. Resources Code, § 21080(b)...............................................................................15

Pub. Resources Code, § 21108 ...................................................................................16

Pub. Resources Code, § 21152 ...................................................................................16

4

Pub. Resources Code, § 21166 ...............................................................................................16, 17

Pub. Res. Code, § 21167.2 ..........................................................................................................17

**FEDERAL STATUTES**

49 U.S.C. §§ 60101 et seq..........................................................................................................11

49 U.S.C. § 60102.......................................................................................................................11

49 U.S.C. § 60104(c) ..................................................................................................................11

49 U.S.C. § 60105.......................................................................................................................11

49 U.S.C. § 60112(a) ..................................................................................................................13

49 U.S.C. § 60117(p) ..................................................................................................................13

49 U.S.C. § 60118..................................................................................................12, 13, 15, 16

49 U.S.C. § 60118(c) ..................................................................................................................11

49 U.S.C. § 60118(c)(1)(A) ........................................................................................................14

49 U.S.C. § 60118(d) ..................................................................................................................11

49 U.S.C. § 60119(a)(1)...............................................................................................................12

49 U.S.C. § 60122(a)(1)...............................................................................................................13

Federal Hazardous Liquid Pipeline Safety Act.............................................................11, 12, 13

**STATE REGULATIONS**

Cal. Code Regs., tit. 14, §§ 15000 et seq. ("Guidelines") ........................................................15

Guidelines, § 15062 ...............................................................................................................16

Guidelines, § 15125(a)(1) ......................................................................................................16

Guidelines, § 15126.4(a)........................................................................................................20

Guidelines, § 15162 ...............................................................................................................17

Guidelines, § 15268 ...............................................................................................................15

Guidelines, § 15300.2(c)........................................................................................................16

Guidelines, § 15301 ...............................................................................................................16

Cal. Code Regs., tit. 19, § 2000 . .............................................................................................11

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

**FEDERAL REGULATIONS**

49 C.F.R. pt. 195 ................................................................................................................11

49 C.F.R. pt. 195, subpt. E ..............................................................................................8

49 C.F.R. § 190.3 ...............................................................................................................13

49 C.F.R. § 190.341(d)(1) ...............................................................................................12

49 C.F.R. § 190.341(d)(2) ...............................................................................................13

74 Fed. Reg. 2893 .............................................................................................................13

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

## I. <u>INTRODUCTION</u>

Petitioners' applications for a preliminary injunction have no basis in law or fact.[1]

Petitioners are not likely to succeed on the merits. As detailed in Sable's demurrers and motions to strike, Petitioners' pleadings are deficient. Petitioners' lawsuits challenge the Office of State Fire Marshal's ("OSFM") December 17, 2024 approval of alternative safety requirements (the "State Waivers").  To the extent Petitioners seek to enjoin physical construction, they are too late. Sable has already completed pipeline anomaly repair work.  To the extent Petitioners seek to prevent restart of the Las Flores Pipelines ("Pipelines"), they are too early. The State Waivers do not allow oil to flow through the Pipelines. These deficiencies alone are reason to deny Petitioners' applications. Even if Petitioners' claims were timely, they would still fail.  OSFM did not violate federal pipeline safety laws or CEQA.

Petitioners also fail to identify any concrete harm stemming from OSFM's approval of the State Waivers. Instead, Petitioners allege purely speculative harms they argue could occur upon restart of the Pipelines—all of which were analyzed in the Pipelines' certified Environmental Impact Report/Environmental Impact Statement ("EIR/EIS").  On the other hand, injunctive relief will cause significant and concrete harm to Sable, the public, and the environment. Any injunctive relief that prevents restart of the Pipelines will increase California's reliance on foreign oil, thereby causing significantly higher greenhouse gas emissions and consumer gasoline prices.

The Court should deny Petitioners' requests for a preliminary injunction.

## II. <u>BACKGROUND</u>

In January 1985, the California State Lands Commission and federal Bureau of Land Management certified a joint EIR/EIS for what was then known as the "Celeron Pipeline Project," which included the construction of what are now called the Las Flores Pipelines.[2] The EIR/EIS analyzed the Pipelines' construction, "operation," and "maintenance." (See Declaration of Bart Leininger ["Leininger

---

[1] Given the substantial overlap in the applications, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") provide an identical response to both applications.

[2] Two pipelines make up the Las Flores Pipelines. One is the Las Flores Pipeline CA-324 ("Line CA-324") (previously known as Line 901), which transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon to the existing Gaviota Pump Station. The other is Las Flores Pipeline CA-325 ("Line CA-325") (previously known as Line 903), which transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the existing Pentland Delivery Point in Kern County.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

Decl."], Ex. B [Final EIR/EIS], Abstract, p. 2.[3]) In 1986, the County of Santa Barbara ("County") approved construction of the Pipelines and approved a final development plan, conditional use permit, coastal development permits, and other entitlements. (See *id.*, Ex. D [Planning Commission Action].)

On March 13, 2020, the prior owner and operator of the Pipelines entered into a federal Consent Decree with the United States and the State of California on behalf of several federal and state regulatory agencies—including OSFM—to resolve issues related to the 2015 Refugio oil spill that resulted from a leak in Line CA-324.[4] The Consent Decree imposes a series of prerequisites that the operator must satisfy before restarting the Pipelines, including "apply[ing] for a State Waiver through the OSFM" for safety enhancements to the Pipelines. (Declaration of Steve Rusch ["Rusch Decl."], Ex. N[Consent Decree], Appendix B, ¶¶ 1.A, 1.B.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines CA-324 and CA-325. (See EDC Pet., Ex. B.) In May 2024, Sable separately began anomaly[5] repair and maintenance work on the pipelines per the Consent Decree and under the County's 1986 approvals and permits that authorized ongoing pipeline maintenance. On February 12 and March 21, 2025, in response to Sable's request to address claims from the California Coastal Commission that the maintenance work was not authorized, the County confirmed that no further permits were required for Sable's anomaly repair work. (See Rusch Decl., ¶¶ 5, 40, Exs. A and O.) Sable completed the anomaly repairs and pipeline hydrotesting under OSFM supervision. (*Id.*, ¶ 11; see 49 C.F.R. Part 195, Subpart E [Pressure Testing].)

Petitioners fully participated in the State Waiver process. "Since learning of [Sable's plans to restart the pipelines], Petitioners have repeatedly put [OSFM] on notice of their concerns." (CBD Pet., ¶ 68.) For instance, on September 27, 2024, Petitioners submitted letters to OSFM as part of its review

---

[3] The EIR/EIS assumed that the Pipelines' operational life would continue until the "availability of crude oil" for use in the Pipelines was exhausted. (Leininger Decl., Ex. C [Draft EIR/EIS], at p. 2-35.)

[4] *United States of America et al. v. Plains All American Pipeline, L.P. et al.*, Case No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020).

[5] A pipeline "anomaly" refers to a pipeline segment with some deviation from its original configuration. If an anomaly requires repair, Sable accesses the affected pipeline segment via existing roadways and rights-of-way, excavates the anomaly site, exposes the pipeline segment by removing insulation and sandblasting, repairs the affected pipeline segment, sandblasts the repaired segment, applies an epoxy coating, pipe tape, and rockguard wrap, backfills the anomaly site, and conducts final site cleanup including erosion control and revegetation work.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

of the State Waiver applications. (See, e.g., EDC Pet., Ex. C; see also CBD Pet., ¶¶ 68-69.) As part of its public process, OSFM created a webpage devoted to Sable's plans, including the State Waivers.[6]

On December 17, 2024, OSFM granted both State Waivers and imposed over sixty separate conditions on Sable's operation of the Pipelines to reflect the enhanced regulatory standards required under the Consent Decree. (EDC Pet., Exs. F &G.) Pursuant to federal law, OSFM notified the federal Pipeline and Hazardous Materials Safety Administration ("Safety Administration") of its decision to approve the State Waivers, giving the Safety Administration an opportunity to review and object to the decision. (CBD Pet., ¶¶ 72, 78.) Upon receiving the State Waivers, the Safety Administration established a federal docket open for public comment.[7] (CBD Pet., ¶ 78.) On December 23, 2024, Petitioners submitted comment letters to the Safety Administration. (See CBD Pet., ¶¶ 73-74.) The Safety Administration reviewed the applications, the State Waivers, and all comments received and, on February 11, 2025, notified OSFM that it had no objection to its issuance of the State Waivers. (See Rusch Decl., Exs. C and D [PHMSA Letters].)

Over two months later, Petitioners filed suit challenging the State Waivers. On June 2, 2025, Petitioners applied *ex parte* for a TRO to stop any potential "harm" the State Waivers allegedly could cause. The Court granted the TRO on June 3, temporarily enjoining Sable and OSFM "from proceeding with the restart and operation of the Las Flores Pipeline System." (TRO, p. 2.)

The Consent Decree separately requires Sable to submit and obtain OSFM's approval of a written "Restart Plan" before restarting either Line CA-324 or Line CA-325. (Rusch Decl., Ex. N[Consent Decree], Appendix D, ¶¶ 1.b, 1.f.) Sable submitted a Restart Plan to OSFM on July 29, 2024. (See Rusch Decl., ¶ 3.) OSFM has taken no final action on the Restart Plan, which remains under review. (*Ibid.*)

III.    **ARGUMENT**

In deciding whether to issue the preliminary injunction, the Court must weigh two interrelated factors: (1) the likelihood that the moving party will prevail on the merits at trial and (2) the *relative*

---

[6] The website is available at: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

[7] The docket for CA-324 is available at: https://www.regulations.gov/docket/PHMSA-2025-0002. The docket for CA-325 is available at: https://www.regulations.gov/docket/PHMSA-2025-0003.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

interim harm to the parties from issuance or non-issuance of the injunction.  (*Butt v. State of California* (1992) 4 Cal.4th 668, 677-678.) The Court should balance "the respective equities of the parties." (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286.)  The Court's determination "must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction." (*Butt*, 4 Cal.4th at p. 678.)

### A.    Petitioners Have No Likelihood of Success on the Merits.

The Court "must deny a motion for a preliminary injunction if there is no reasonable likelihood the moving party will prevail on the merits." (*SB Liberty, LLC v. Isla Verde Assn., Inc.* (2013) 217 Cal.App.4th 272, 280 [citing *Common Cause v. Bd. of Supervisors* (1989) 49 Cal.3d 432, 447].) Petitioners fail to show they are reasonably likely to prevail on the merits here. As a threshold matter, Petitioners' claims challenging the State Waivers are moot, and the injunctive relief they seek regarding the hypothetical future approval of a Restart Plan is unripe.  Moreover, OSFM complied with all federal pipeline safety laws and CEQA.

### 1.    Petitioners' Lawsuits Do Not Present a Live and Justiciable Controversy.

Petitioners' lawsuits challenge OSFM's issuance of the State Waivers, but Sable already completed the anomaly repair work that Petitioners are attempting to stop through their collateral attack. As a result, Petitioners' claims are moot.  (*Placer Foreclosure, Inc. v. Aflalo* (2018) 23 Cal.App.5th 1109, 1113.)

Petitioners' lawsuits also improperly seek injunctive relief "prohibiting [OSFM] and [Sable] from conducting any further activity in furtherance of the Project" (CBD Pet., Prayer for Relief, ¶ 2) and "preventing restart of the [Pipelines] under the State Waivers" (EDC Pet., Prayer for Relief, ¶ 2). However, ***the State Waivers do not control a restart of the Pipelines***. A Restart Plan must be approved before the Pipelines may restart, and none has been approved at this time.  Petitioners' requests for injunctive relief are thus unripe.[8]

/ / /

/ / /

---

[8] If a Restart Plan is later approved, Petitioners must seek leave to file a supplemental pleading if they wish to challenge it. (Code Civ. Proc., § 464, subd. (a); *Hutnick v. U.S. Fiduciary & Guarantee Co.* (1988) 47 Cal.3d 456, 464, fn. 6.)

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

**2.    OSFM Complied with Applicable Pipeline Safety Laws in Issuing the State Waivers.[9]**

In addition to being unripe, Petitioners' claims also fail on the merits.

The Pipelines are subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") administered by the federal Pipeline and Hazardous Materials Safety Administration ("Safety Administration"). (49 U.S.C. §§ 60101 *et seq.*)[10] The Pipeline Safety Act's singular purpose is to ensure the safe operation of hazardous liquid pipelines. (49 U.S.C. § 60102; *Olympic Pipe Line Co. v. City of Seattle* (9th Cir. 2006) 437 F.3d 872, 877.) The Safety Administration adopted detailed standards governing the design, construction, pressure testing, operation, and maintenance of hazardous liquid pipelines. (See 49 C.F.R. Part 195.)

The Act also provides that state agencies may apply to and become certified by the Safety Administration to enforce equivalent or more stringent intrastate pipeline safety regulations. (49 U.S.C. § 60105.) In California, the State Legislature vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines and … to implement the [Pipeline Safety Act] and federal pipeline safety regulations as to those portions of interstate pipelines located within [California]." (Gov. Code, § 51010.) OSFM adopted the Safety Administration's regulations, and the Safety Administration certified OSFM to implement the Pipeline Safety Act. (Cal. Code Regs., tit. 19, § 2000.) Like the Safety Administration, OSFM may "waive compliance with a safety standard" if the requested modification "is not inconsistent with pipeline safety." (49 U.S.C. §§ 60118(c), (d).) Any such "State Waiver" may become effective only after OSFM provides the Safety Administration with 60 days' notice and the opportunity to make a written objection to its issuance. (*Ibid.*)

In challenging OSFM's issuance of the State Waivers, Petitioners argue that OSFM can issue

---

[9] The Petitions assert violations of federal and state pipeline safety laws. Because the state pipeline safety laws are derivative of and incorporate applicable standards from federal law. (See Gov. Code, § 51011; Cal. Code Regs., tit. 19, § 2000), Petitioners' challenges to the State Waivers under state law fail for the same reasons they fail under federal law.

[10] The Pipeline Safety Act "clearly expresses the intent of Congress to fully occupy the field of oil and gas operations and interstate pipeline safety so that any state law that touches upon the area, even consistent state law, is preempted." (*People ex rel. Sneddon v. Torch Energy Services, Inc.* (2002) 102 Cal.App.4th 181, as modified (Oct. 4, 2002).) The Pipeline Safety Act is unequivocal: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." (49 U.S.C. § 60104(c).) The Pipeline Safety Act's preemptive effect applies to Sable's anomaly repair work.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

waivers only "in the same way and the same extent" that the Safety Administration may waive compliance under federal regulations. (See EDC TRO App., pp. 15-16; CBD TRO App., p. 20.) Petitioners contend that OSFM was required to (1) provide public notice of and a public hearing before issuing the State Waivers, and (2) adopt a detailed statement of reasons for granting the State Waivers. Petitioners are incorrect as to both.

***Petitioners cannot maintain their procedural Pipeline Safety Act claims.*** As an initial matter, "[t]he Pipeline Safety Act, by its plain language, allows only a very limited private right of action." (*City & County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993, 998 [citing 49 U.S.C. § 60121(a)(A)].) The Act "***does not authorize a mandamus-type action to compel the [relevant] Agency to perform non-discretionary regulatory duties.***" (*City & County of San Francisco*, *supra*, 796 F.3d at pp. 998-999 [emphasis added].)[11] Therefore, Petitioners are barred from pursuing a writ of mandate to compel OSFM to comply with its alleged mandatory duties under the Pipeline Safety Act, which is the relief Petitioners have sought under the Act. (See EDC Pet., ¶¶ 19, 150-166 [First through Third Causes of Action] & Prayer for Relief No. 5(c), (d); CBD Pet., ¶¶ 98, 100, 115-120 [First Cause of Action].)

***OSFM's process complied with the law.*** Moreover, nothing in 49 U.S.C. section 60118 entitles members of the public, including Petitioners, to notice of and a hearing on a state waiver application pending with OSFM.[12] Although federal regulations provide that the Safety Administration "will provide notice to the public of its intent to consider the application [on the Federal Register] and invite comment" (49 C.F.R. § 190.341(d)(1)), OSFM cannot publish in the Federal Register. Nevertheless, OSFM created a special website devoted to Sable's State Waiver applications providing the public with notice while OSFM considered them.[13] OSFM also coordinated with the Safety Administration to establish publicly accessible federal dockets for the State Waivers, where members of the public could submit comments

---

[11] To the extent Petitioners claim that the Pipeline Safety Act's citizen suit provision does not apply, the only other avenue for judicial review under the Act is Section 60119, which requires a petition for review filed in a federal Court of Appeal not later than 89 days after the order is issued. (49 U.S.C. § 60119(a)(1).) The Petitions fail both requirements as they were filed in California state court 119 days after OSFM issued the State Waivers.

[12] EDC's reliance on *In re MidAmerican Energy Company* (Jan. 15, 2002) 2002 WL 31155601 is misplaced. (EDC TRO App., pp. 15-16.) There, the Iowa Utilities Board did not conclude that a person other than the applicant must be given notice and an opportunity to comment.

[13] See https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

and view information submitted to the Safety Administration.[14] Importantly, OSFM's public outreach worked—***Petitioners and others actively participated in OSFM's (and the Safety Administration's) consideration of the State Waiver applications***. Petitioners submitted letters critiquing the applications to OSFM in September 2024 before OSFM approved the State Waivers in December 2024. (See, e.g., CBD Pet., ¶ 68; EDC Pet., Ex. C.) Petitioners then submitted letters to the Safety Administration when it considered its concurrence in the State Waivers. (E.g., CBD Pet., ¶ 73.) Petitioners, therefore, have suffered no prejudice.[15] (See *Fowler v. City of Lafayette* (2020) 46 Cal.App.5th 360, 371 [requiring a showing of prejudice to set aside an agency's action]; see also *Galbiso v. Orosi Pub. Util. Dist.* (2010) 182 Cal.App.4th 652, 670-671; *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 556.)

Further, while public notice was provided, no formal hearing was required for OSFM to act. The use of the term "hearing" in section 60118 refers to the ***applicant's*** opportunity for hearing on its application. Where the phrase "opportunity for hearing" is used throughout the Pipeline Safety Act, it refers to the applicant's opportunity for hearing—not the general public's right. (See, e.g., 49 U.S.C. §§ 60112(a), 60117(p), 60122(a)(1).) Section 60118 should be read consistently with those provisions. (*IBP, Inc. v. Alvarez* (2005) 546 U.S. 21, 23-24 ["identical words used in different parts of the same statute are generally presumed to have the same meaning"].) Petitioners cite no authority demonstrating their or the public's entitlement to a public hearing on the State Waivers. In addition, any such "hearing" for the applicant does not refer to a formal public hearing at which testimony may be presented on the record. (See 49 C.F.R. § 190.3; see also 74 Fed. Reg. 2893 (Jan. 2009) [waivers "already involve extensive informal (technical) consultations between PHMSA and the applicant and . . . there is also an opportunity for (paper) hearing in the [waiver] process"].)

Nor does the law require OSFM to adopt a detailed statement of decision containing specific findings in support of the State Waivers. The federal regulations simply provide that a decision will be provided *to the applicant*. (See 49 C.F.R. § 190.341(d)(2) [whenever a decision is made to grant or deny an application, "***notice of the decision will be provided to the applicant***"] [emphasis added].)I In

[14] Docket ID PHMSA-2025-002 for CA-324 and Docket ID PHMSA-2025-003 for CA-325, on January 28, 2025, on www.Regulations.gov.

[15] Further, Petitioners do not allege that any members of the public who would have participated in OSFM's process on the State Waivers were precluded from doing so.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

granting Sable's applications, OSFM issued detailed, 15-page State Waivers with comprehensive requirements and conditions that Sable must meet. (See EDC Pet., Exs. F & G.) The State Waivers represent OSFM's ultimate decision on the applications, including the factors supporting its decision.

***Substantial evidence supports the State Waivers' issuance.*** For the same reasons, Petitioners' claims that OSFM abused its discretion in issuing the State Waivers fail. (See CBD TRO App., p. 20; EDC TRO App., p. 15.) OSFM did not abuse its discretion in deciding to grant the State Waivers because the enhanced standards OSFM applied in its approval are as or more protective of pipeline safety than the regulations require. (49 U.S.C. § 60118(c)(1)(A); Gov. Code, § 51011(b).)

As the State Waivers explain, Sable "provided the OSFM information from the completed in-line inspections and additional data requested by [OSFM]." (EDC Pet., Exs. F & G.) OSFM's Pipeline Safety Engineers closely reviewed the information and coordinated with the Safety Administration's Engineering and Research Division throughout the process "to incorporate [the Safety Administration's] recommended conditions into the state waiver." (*Ibid*.) Thus, the State Waivers represented the culmination of OSFM's and Safety Administration staff's careful and coordinated review and consideration of Sable's applications.

After OSFM granted the State Waivers, the Safety Administration again reviewed Sable's State Waiver applications and supporting materials, and OSFM's proposed State Waivers. (Rusch Decl., Exs. C and D.) In confirming that it did not object to OSFM's issuance of the State Waivers, the Safety Administration explained that Sable "must comply with over 60 conditions," including that the pipelines "be hydrostatically tested . . . prior to putting the pipeline into operation . . . [and] inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies." (*Ibid*.) In addition, Sable must reassess the pipelines "at least every year." (*Ibid*.) Thus, substantial evidence supports OSFM's determination that Sable's requested modifications are as protective of pipeline safety as federal law requires. (See also Section III.B.2, *infra*.)

### 3. OSFM Did Not Violate CEQA.

***The State Waivers are federal authorizations not subject to CEQA.*** CEQA does not apply to OSFM's issuance of the State Waivers because OSFM was implementing a *federal* safety program

pursuant to its delegated authority under *federal* law. (See *City of Morgan Hill v. Bay Area Air Quality Mgmt. Dist.* (2004) 118 Cal.App.4th 861, 871 ["the conclusion that the [air] permit is a federal one would seem to preclude the application of any state law such as CEQA. The [Air] District issued the permit acting on behalf of federal authorities who are not bound by state law"].) Just as the Safety Administration is not subject to CEQA in issuing a waiver under section 60118, OSFM is not subject to CEQA in implementing its federally delegated authority to modify pipeline safety standards.[16]

***The State Waivers are a safety program to which CEQA does not apply.*** Even if state law applied to OSFM's actions implementing federal law (it does not), the State Waivers are merely a program ensuring pipelines operate safely within the boundaries of established law—not a "project" that triggers CEQA review. (See CBD TRO App., p. 22; *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 ["An activity that is not a 'project' . . . is not subject to CEQA."].) CEQA defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect change in the environment." (Pub. Resources Code, § 21065.) A state waiver, by contrast, is an order that modifies compliance with a regulatory requirement. (49 U.S.C. § 60118). Thus, the State Waivers merely confirmed that what Sable proposed by way of pipeline protection was consistent with established federal pipeline safety standards. (See Section III.A.2, *supra*.) OSFM's determination that the State Waivers are consistent with pipeline safety standards does not have the potential to result in a physical change in the environment.[17]

Moreover, OSFM's issuance of the State Waivers is ministerial and therefore not subject to CEQA. (Pub. Resources Code, § 21080(b); Guidelines,[18] § 15268.) OSFM assessed Sable's State Waiver applications pursuant to the requirements set forth in applicable federal and state regulations. (See EDC Pet., Exs. F & G.) This is no different than a local agency's issuance of building permit or other similar permits, which are typically ministerial. A local agency may allow a deviation from applicable codes or

---

[16] To support their pipeline safety law claims, Petitioners argue that OSFM must issue waivers to "in the same way and the same extent" as the Safety Administration. (See EDC TRO App., pp. 15-16; CBD TRO App., p. 20.) While OSFM did comply with federal pipeline safety laws, consistent with Petitioners' own logic, OSFM need not undertake CEQA review in implementing those laws.

[17] If anything, Petitioners' dispute lies with the County, which approved the physical construction work on the Pipelines through the issuance of the final development plan, conditional use permit, coastal development permits, and other entitlements over 30 years ago.

[18] The CEQA Guidelines are codified at 14 Cal. Code Regs., tit. 14, §§ 15000 *et seq.*

15

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

impose conditions without transforming the permit into a discretionary action. (See, e.g., *Sierra Club v. County of Sonoma* (2017) 11 Cal.App.5th 11, 24-31 [issuance of erosion control permit with conditions held ministerial]; *Friends of Juana Briones House v. City of Palo Alto* (2010) 190 Cal.App.4th 286, 300 [issuance of demolition permit held ministerial].) Here, too, OSFM may allow a deviation from applicable safety regulations through a state waiver without triggering CEQA. (See 49 U.S.C. § 60118.)

***The State Waivers are categorically exempt from CEQA.***[19] Even if the State Waivers are a discretionary project triggering CEQA (see CBD TRO App., pp. 22-23; EDC TRO App., pp. 18-19), they are categorically exempt because they address an existing facility with no expansion of its former use. (Guidelines, § 15301.) The CEQA Guidelines exempt "[r]estoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety." (See *id*., subd. (d).) Here, the State Waivers do not authorize any expansion of the pipelines' capacity or the permitted volume of oil that may flow through the pipelines.[20] The State Waivers do not even authorize physical construction. They merely impose safety measures to ensure the pipelines "meet current standards of public health and safety." No unusual circumstance exists because potential harms from a pipeline rupture or spill already were analyzed under CEQA. (See *id.*, § 15300.2(c).)

***Potential environmental impacts were previously analyzed in the certified EIR/EIS.*** Although the State Waivers do nothing more than implement a federal safety program, Petitioners claim that OSFM was required to conduct additional environmental review. (See EDC TRO App., pp. 18, 20; CBD TRO App., p. 23.) Not so. "After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project, and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928 [internal citations omitted]; Pub. Resources Code, § 21166.)

Here, none of CEQA's statutory triggers for further environmental review are met. Rather,

---

[19] "[T]here is no requirement that [an] agency put its exemption decision in writing." (*San Lorenzo Valley Community Advocates for Responsible Educ. v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1385; see Pub. Resources Code, §§ 21108, 21152; Guidelines, § 15062.)

[20] The appropriate baseline against which to address potential environmental impacts here is historic operations. (See Guidelines, § 15125(a)(1).)

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

Petitioners appear concerned with the potential environmental impacts of a future oil spill. (EDC TRO App., pp. 18, 20; CBD TRO App., p. 23.) *But the EIR/EIS—which is beyond challenge and therefore "conclusively presumed to comply with [CEQA]"—already considered and mitigated these potential impacts, among others, to the maximum extent feasible.*[21] (Pub. Res. Code, § 21167.2.)  Indeed, the Pipeline's entitlements included mitigation measures from the EIR/EIS as mandatory permit conditions. For instance, the County required "[a]utomatic block and check valves at sensitive habitat" and the implementation of an "oil spill contingency plan" to minimize the impact of a potential oil spill. (Leininger Decl., ¶ 27; *id.*, Ex. D [Planning Commission Actions] at p. 53 and Table of Celeron Class I Impacts at p. 3.)  The County specifically found that compliance with these (and other) mitigation measures, conditions of approval, and certain Oil Spill Contingency and Emergency Response Plans incorporated into the project description would *"mitigate[] as completely as possible" all "potential oil spill impacts"* and other potentially significant impacts. (*Id.* at pp. 55-56, emphasis added.)

Petitioners have not identified any Project changes, changed circumstances, or significant new information that call into question the validity of the prior EIR/EIS's analysis of potential oil spill risks and impacts. (See Pub. Resources Code, § 21166.) That a spill occurred in 2015 (the volume of which was *less* than the worst-case scenario studied in the EIR/EIS[22]) is not a new circumstance requiring further study, and the State Waivers and their robust conditions ensure that any potential oil spill in the future would be even smaller. A subsequent EIR is not required. (Guidelines, § 15162.)

**B.    Petitioners Fail to Demonstrate That They Will Suffer Irreparable Harm Absent Preliminary Relief.**

Petitioners fail to meet their burden of showing the harm that would result if a preliminary injunction were not granted. (*Casmalia Resources, Ltd. v. County of Santa Barbara* (1987) 195 Cal.App.3d 827, 838.) Petitioners, the public, and the environment would suffer no harm if no injunction is issued.  On the other hand, significant harm will befall Sable, the public, and the environment if the Court grants injunctive relief.

---

[21] In fact, the EIR/EIS considered potential oil spill volumes along the Pipelines far exceeding the volume of any hypothetical spill with implementation of the State Waivers. (Compare Leininger Decl., Ex. C [Draft EIR/EIS] at p. 4-121, Table 4-26 [8,370 barrels] with Rusch Decl., Ex. Q [2021 Line 901 Risk Assessment] at p. 12, Table 4.A.1 [1,980 barrels].)

[22] The 2015 oil spill discharged approximately 2,900 barrels of crude oil. (See Rusch Decl., Ex. N [Consent Decree], p. 1.)

**1.      The Federal Consent Decree Precludes Petitioners from Asserting That They Will Be Irreparably Harmed by the Restart of the Pipelines.**

A litigant is precluded from raising an issue already decided by a consent decree where "1) the issues decided in the prior adjudication are identical with those presented in the later action; 2) there was a final judgment on the merits in the prior action; and 3) the party against whom the plea is raised was a party or was in privity with a party to the prior adjudication." (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1065 ["*Citizens for Open Access*"].) Each of these factors are met here.

*First*, the issues resolved in the Consent Decree and raised in this action are identical. (*Citizens for Open Access*, *supra*, 60 Cal.App.4th at pp. 1068-1069 ["the application of the doctrine of res judicata depends on whether the issue in both actions is the same, not whether the issue arises in the same context."].)  Petitioners seek to prevent "great and irreparable harm to unique, irreplaceable natural resources" and "ensur[e] meaningful environmental and pipeline safety review." (EDC TRO App., p. 21; CBD TRO App., p. 19.) But the Consent Decree already resolved issues relevant to "further the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws." (Rusch Decl., Ex. N [Consent Decree], ¶¶ R, S, Appendix B.) In fact, the Consent Decree expressly contemplated the conditions of the State Waivers challenged here and outlined obligations for State Waivers and ultimately restart of the Pipelines. (*Id.*, ¶ N, § I. Background, Appendix B.)

*Second*, the Consent Decree constitutes a final judgment on the merits. (Rusch Decl., Ex. N [Consent Decree] ¶ 108; see *Citizens for Open Access*, *supra*, 60 Cal.App.4th at p. 1065 ["A judgment entered . . . by consent or stipulation, is as conclusive a . . . bar as a judgment rendered after trial."]; see also *Gates v. Superior Court* (1986) 178 Cal.App.3d 301, 311.)

*Third*, Petitioners and "the public as a whole" were adequately represented by the United States, which entered into the Consent Decree "***on behalf of . . . the People of the State of California***" and "in the public interest." (Rusch Decl., Ex. N [Consent Decree] ¶ N, § I. Background, emphasis added.) "[W]hen a party acts in a representative capacity, and as such is lawfully authorized to litigate the questions at issue for those whom he represents, they as well as he are bound by the judgment." (*Citizens for Open Access*, *supra*, 60 Cal.App.4th at p. 1072 [finding plaintiffs, "along with the public as a whole," were barred from seeking injunctive relief because they were "adequately represented by the state

18

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

agencies vested with authority to litigate the [same] issue" in a prior action]; see *Gates v. Superior Court*, *supra*, 178 Cal.App.3d at pp. 307-308 [where a plaintiff commences an action "to determine the same matter of public interest" as a prior action, "there is identity of parties within  the requirement under the doctrine of res judicata."].)  Petitioners are therefore bound by the Consent Decree and precluded from arguing that they will suffer significant harm if injunctive relief is not granted.

### 2.    Petitioners Have Not Demonstrated Significant Harm to Themselves or the Environment.

Even if Petitioners were not precluded from arguing that they would suffer harm resulting from issuance of the State Waivers or restart of the Pipelines, Petitioners have not and cannot demonstrate any concrete harm to themselves or the environment.[23]

Petitioners' alleged harm from restart of the Pipelines (see, e.g., EDC TRO, p. 13; CBD TRO, p. 14) is ***purely speculative*** due to the additional approval Sable must obtain before the Pipelines are operational. (See *City of Vernon v. Cent. Basin Mun. Water Dist.* (1999) 69 Cal.App.4th 508, 517 ["Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative."].) As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. (EDC TRO, p. 13; EDC Pet., ¶ 88; Rusch Decl., Ex. N [Consent Decree], Appendix D, ¶ 1(b), (f).) When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks. (See *ibid.*)

Given the extensive regulatory and compliance framework governing the Pipelines, approval of the Restart Plan will ensure there will be no harm to the public (including Petitioners) or the

---

[23] As detailed in Sable's Motion to Strike Declaration of Richard B. Kuprewicz Filed in Support of OSC Re Preliminary Injunction and Objections to Evidence Submitted in Support of Order to Show Cause Re Preliminary Injunction, the evidence Petitioners rely upon is legally insufficient and inadmissible. Trial courts have a "substantial gatekeeping" responsibility to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772.) The Kuprewicz Declaration fails this test, providing no substantive analysis of the factual foundation for his opinions, explanation of his methodology, or articulation of how he arrived at his conclusions. These deficiencies are compounded by Petitioners' failure to produce Mr. Kuprewicz for cross-examination in violation of Sable's due process rights. The Kuprewicz Declaration is critically reviewed in the concurrently filed Declaration of Michael J. Rosenfeld ("Rosenfeld Decl."). The Declarations of Blake Kopcho, Jeffrey Miller, Tevin Schmitt, and Julie Teel Simmonds are likewise inadmissible.

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

environment. Contrary to Petitioners' assertions that OSFM "failed to even consider the impacts of the project or allow for public input" (EDC TRO, p. 21; CBD TRO, p. 18), the Pipelines underwent rigorous environmental review pursuant to NEPA and CEQA, which mandates that all significant impacts associated with a project be mitigated or avoided to the maximum extent feasible. (Pub. Resources Code, §§ 21000 *et. seq.*; Guidelines §15126.4(a); see Leininger Decl., Exs. B & C [Draft EIR/EIS and Final EIR/EIS].) The Pipelines' EIR/EIS analyzed potential impacts to environmental resources, including oil spill potential (see *id.*, Ex. B [Final EIR/EIS] at pp. 4-1 through 4-174; *id.*, Ex. C [Draft EIR/EIS] at pp. 4-1 through 4-174), and the Project's entitlements incorporated mitigation measures from the EIR/EIS (see, e.g., *id.*, Ex. D [Planning Commission Actions] at pp. 50-53, Table of Celeron Class I Impacts, Table of Celeron Class II Impacts).

The State Waivers ensure that the Pipelines comply with all applicable pipeline safety laws and that any risks would fall within the EIR/EIS's analysis.[24]  In particular, Sable integrated increased technological safety standards throughout the pipeline system, implemented heightened personnel training, completed over 200 corrosion-related excavations, installed 27 new block valves for enhanced sectional control, and built a new control center with real-time leak detection and automated shutdown capabilities. (See Declaration of Brien ["Vierra Decl."], §§ (IV)(A)(1), (IV)(A)(4).)  As a result, the Pipelines can be operated at a minimal risk to the environment. (See *id.*, § (IV)(A)(2).)

### 3.   Preventing the Transport of the Supply of Oil Through the Las Flores Pipelines Will Significantly Harm Sable and the Public.

On the other hand, preventing the supply of oil from Sable's offshore production through the Pipelines to market will cause Sable and the public to suffer immense harm. If Sable's oil production cannot be supplied through the Pipelines, California will become increasingly reliant on foreign oil, resulting in significantly higher greenhouse gas and associated criteria pollutant emissions. (Leininger Decl., ¶¶ 10-19.) Because environmental justice communities are disproportionately impacted by ship, truck, and rail emissions, increasing foreign crude oil imports will create particularly harmful impacts

---

[24] The Kuprewicz Declaration incorrectly states that the Pipelines are unusually dangerous due to their age and design flaws—but this is an unfounded statement made without supporting data that should be disregarded as nonfactual and noncredible. (See Rosenfeld Decl. at ¶ 6 ["This opinion was built on an aggregation of preceding claims each made without supporting data or even contrary to known or knowable facts."].)

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

to these communities. (*Id.*, ¶¶ 20-21.) Additionally, the lost production from Sable's offshore platforms may exacerbate California's ongoing oil crisis, leading to higher gasoline prices, lost jobs, lost tax revenue, lost royalties, and higher prices across California's economy. (Declaration of Michael A. Mische ["Mische Decl."], ¶¶ 105-108.) Sable (as a publicly traded company), its employees and shareholders, and local and state governments (that desperately need tax revenue) also will suffer immense and irreparable economic harm. (*Id.*, ¶¶ 93, 98-99, 101, 107, 108; Rusch Decl., ¶¶ 66-72.)

Conversely, allowing Sable to transport oil to market through the Pipelines will significantly improve California's energy and economic security. (Mische Decl., ¶¶ 11-12.) Safe local oil production will serve as an economic "backbone" for California, generating an estimated **$21.5 to $41.6 million per year in combined local and state revenues**. (*Id.*, ¶¶ 10-13, 93, 106-108.) Further, the consistent addition of Sable's oil production into the California refinery system will improve the supply dynamics in the State by creating more viable and cost-effective alternatives to foreign oil supplies, resulting in savings of at least $3.28 per barrel over imported oil. (*Id.*, ¶¶ 104, 108.) It also will help stabilize consumer gasoline prices by reducing the uncertainties and insecurities related to the crude oil supplies necessary to support California's refineries in their production of combustible fuels such as gasoline, diesel and aviation, as well as asphalt and distillates used in the manufacturing of mobile phones, medical devices, and other essential products. (*Id.*, ¶ 42.)

In sum, the significant harms to Sable and the public outweigh the speculative harm alleged by Petitioners.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Petitioners' applications.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

DATED:   July 7, 2025          Respectfully submitted,

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**
TREVOR D. LARGE

_____
          Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 3, 2025, I served the document(s) **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITON TO APPLICATION FOR PRELIMINARY INJUNCTION** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 3, 2025, at Los Angeles, California.

/s/ Josie Cisneros
Josie Cisneros

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>         tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a<br>California non-profit corporation; GET OIL<br>OUT!, a California non-profit corporation;<br>SANTA BARBARA COUNTY ACTION<br>NETWORK, a California non-profit corporation;<br>SIERRA CLUB, a national non-profit<br>corporation; and SANTA BARBARA<br>CHANNELKEEPER, a California non-profit<br>corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>         jfrankel@environmentaldefensecenter.org<br>         trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire<br>Protection, Office of the State Fire Marshal;<br>Daniel Berlant, in his official capacity as State<br>Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>         benjaminhanelin@paulhastings.com<br>         natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY<br>LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al., <br><br> Petitioners and Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al., <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., et al., <br><br> Real Parties in Interest. | Case No. 25CV02247 <br> [Coordinated with Case No. 25CV02244] <br><br> Assigned for all purposes to: <br> Hon. Donna D. Geck <br><br> **DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 1 OF 4)** <br><br> [*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Steve Rusch, Michael A. Mische, Brien Vierra, and Michael Rosenfeld*] <br><br> Date:        July 18, 2025 <br> Time:        10:00 AM <br> Dept.:        4 <br><br> Complaint Filed:        April 15, 2025 <br> Trial Date:        None Set |

1

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## DECLARATION OF BART LEININGER

I, Bart Leininger, declare as follows:

## I.    Introduction

1.    My name is Bart Leininger and I am an environmental engineer.  I have been engaged by Alston & Bird LLP, counsel to Sable Offshore Corp. (Sable) and Pacific Pipeline Company,[1] to provide my expert opinions as to whether it would harm the public or the environment to allow Sable to restart and operate Pacific Pipeline Company's crude oil pipeline system, known as the "Las Flores Pipelines". Below, I provide my qualifications to provide these expert opinions.  I have personal knowledge of the matters set forth in this Declaration, and if called as a witness, I could and would testify competently thereto.

2.    It is my opinion that allowing Sable to restart and operate the Las Flores Pipelines would not harm the public or the environment.  The restart and ongoing operation of the Las Flores Pipelines would be controlled by permit terms and conditions that were developed through a rigorous California Environmental Quality Act (CEQA) review process that imposed all feasible measures to mitigate environmental harm related to the pipelines' construction and ongoing operation – including pipeline repair and maintenance activities. I have reviewed these measures and agree that they mitigate to the maximum extent possible any potential environmental risks from restarting and operating the Las Flores Pipelines, including potential oil spill risks.

3.    It is my further opinion that preventing the restart of the pipelines will materially harm the environment as a result of the undesirable consequences of the need for California to rely on foreign oil to meet consumer demand.  Safely operating the Las Flores Pipelines to deliver local Santa Ynez Unit (SYU) crude oil to market will result in a reduction in greenhouse gas (GHG) emissions that would otherwise be required to produce imported oil and transport it from foreign nations to California.

## II.    Qualifications

---

[1] Pacific Pipeline Company (PPC) is a wholly owned subsidiary of Sable Offshore Corp.  For the purpose of this declaration, references to Sable or PPC as owner/operator of the pipeline system have the same meaning and may be used interchangeably.

2

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

4.      I have worked as an environmental engineer in both industry and consulting for my entire career.  Prior to becoming a consulting engineer, I worked in various environmental permitting and compliance roles at Exxon Company U.S.A. (now under the umbrella of ExxonMobil Corporation).  I was involved in the original permitting efforts for the SYU facilities and readied the facilities for start-up in late 1993.  My responsibilities on the project varied and included air quality, land use, and water quality compliance matters.  After SYU began operations, I was promoted into a corporate environmental role serving as an air quality specialist at the company's headquarters in Houston, Texas.  Although I am not on staff at SYU today, I have continued to provide strategic environmental support to SYU over the last three decades as a consulting engineer.  My main focus has been related to air quality permitting and compliance matters.

5.      In 1996, I founded Ashworth Leininger Group (ALG), an environmental engineering and consulting company headquartered in Camarillo, California.  ALG provides environmental consulting services to a broad spectrum of clients, including government agencies, trade associations, and industry.

6.      I have advised industrial clients and government agency staff on environmental permitting and compliance matters for more than 30 years.  I have provided strategic consulting and prepared numerous analyses to support environmental reviews under CEQA and the National Environmental Policy Act (NEPA).  I specialize in air permitting and compliance matters, which include emission characterization, quantification, permitting, and compliance.  My work also includes auditing facilities to ensure compliance with federal, state, and local regulatory requirements.  My clients include manufacturing facilities, petroleum and petrochemical facilities, oil and gas development operations, renewable fuels facilities, and power generation facilities.

7.      I also provide Greenhouse Gas (GHG) verification services under the California GHG Mandatory Reporting Rule (MRR) and Low Carbon Fuel Standard (LCFS).  I hold certifications from the California Air Resources Board (CARB) as a Lead Verifier under the MRR and LCFS programs.  ALG has been an approved Verification Body under the MRR and LCFS programs since each program's inception.

3

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

8.    I have testified as an expert witness in litigation and compliance matters for the Department of Justice, petroleum refineries, chemical plants, and manufacturing operations.  These litigation and administrative matters have included testimony related to local, state, and federal air permitting and compliance programs.

9.    I received my B.S. in Mechanical Engineering from Brigham Young University in 1989, graduating Summa Cum Laude.  I received my M.B.A. from the University of California at Los Angeles in 1993.  I am a registered professional engineer in the states of Florida, Louisiana, Texas, and Utah.  As noted above, I am certified as a Lead Verifier under the California MRR and LCFS programs.

### III.    Preventing the Supply of SYU Crude Oil to the California Market Will Harm the Public

10.    It is my opinion that it will harm the environment if Sable is not allowed to restart and operate the Las Flores Pipelines and provide increased local crude oil production to California.  Sable's restart and operations would be in compliance with its ongoing regulatory obligations, which include critical protections for the environment.  The safe and consistent operation of the Las Flores Pipelines will displace foreign crude oil imports that cause potential environmental harm.  Below, I explain the environmental consequences of not allowing locally produced crude oil to displace foreign-based crude supplies.

### A.    Air Quality Impacts

11.    Importing crude oil from foreign sources instead of producing crude locally results in significantly higher GHG emissions, and associated criteria pollutant emissions,[2] which numerous experts agree causes environmental harm.  Several studies prepared by California state and county agencies support this opinion.[3]

---

[2] Criteria pollutants include nitrogen oxides (NOx), volatile organic compounds (VOC).  Both of these criteria pollutants contribute to ozone pollution.  Other criteria pollutants are carbon monoxide, sulfur dioxide, and particulate matter in all of its forms (PM, PM-10, PM-2.5).

[3] See LCFS Crude Oil Life Cycle Assessment prepared by the California Air Resources Boards,  https://ww2.arb.ca.gov/resources/documents/lcfs-crude-oil-life-cycle-assessment  (accessed 6/5/2025); Final Environmental Impact Report for SB 4, prepared by CalGEM,  June 2015; Section 4.12 of the Final Environmental Impact Report for the Ventura County 2040 General Plan, prepared by County of Ventura, September 2020.

4

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

12. Since 2012, CARB has been calculating the Carbon Intensity (CI) of crude oils produced from various parts of the world to establish the GHG life cycle emissions from such crude oils. CI is a comparative tool that can be used to assess potential GHG emission impacts among energy choices -- the higher the CI, the greater the potential impacts from GHG emissions. CI is expressed as the mass of GHG released per unit of energy provided by the specific fuel or feedstock, such as crude oil. CARB uses the units of Megajoules (MJ) to express the energy value in the CI score.

13. According to CARB, the average CI score for all crude oil produced and transported to refineries in California is, on average, 11 to 12 grams of carbon dioxide equivalent per megajoule (g CO2e/MJ). This CI score for crude oil has remained relatively steady since CARB began calculating and tracking the CI for various crude oils in 2012. Foreign crude oils have been calculated by CARB to have a CI score around this same average value of 11 to 12 g CO2e/MJ.

14. For the three years SYU operated just prior to the pipeline shutdown in 2015 (Calendar Years 2012-2014), SYU crude had CI scores of between 2.33 and 4.27 g CO2e/MJ. These scores are significantly lower than the CI scores of foreign-based crude oils.[4] Assuming annual oil production from SYU of approximately 12 million barrels, I estimate that approximately 500,000 metric tons per year of GHG emissions are avoided by displacing imported foreign-based crudes with SYU crude.

15. The CI score and resultant GHG emissions are lower for several reasons. It is lower in part due to the methods of production employed at SYU. SYU has electrified much of its equipment used for processing. Additionally, the transportation methods for a specific crude oil affects its CI score. SYU crude has been and will be delivered via pipeline to market. Pipeline transportation is an efficient means of transporting crude oil with minimal associated GHG emissions. Foreign-based crude oil must be delivered to the California market by tanker vessels. Tanker vessels contribute to much higher emissions due to long distances traveled from around the world.

16. Emissions from pipeline transportation are significantly less than the emissions and impacts to the public from crude oil transportation by other means, such as tankers. Pumps delivering crude are largely electric with no direct combustion emissions affecting nearby communities where

---

[4] See LCFS Crude Oil Lifecycle Assessment referenced above.

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

the pipelines pass.  The pipelines and associated pump stations have fewer combustion sources.  Pump stations may include emergency engines and natural gas-fired heaters, which are intermittently operated.

17.    Importing foreign crude results in significantly higher pollutant emissions than delivering crude oil more efficiently via a pipeline system.  The emissions are higher because tankers delivering crude oil to California come from many distant locations across the world.  In 2022, CARB estimated that over 184 tons per day of nitrogen oxide compounds (NOx) (67,160 tons per year), and over 2.8 tons per day of particulate matter (1,022 tons per year) are emitted from Ocean-Going Vessels (OGVs) when operating within 100-nautical miles of the California coastline.[5]   Of these OGVs, tankers carrying crude oil represent a significant proportion of these pollutant emissions (~20%).  These emissions harm the public interest because NOx emissions contribute to ozone pollution, and state and federal agencies and international health organizations have found that particulate matter emissions increase health risks.[6]

18.    The negative emissions impacts of importing crude oil are supported by a 2015 Environmental Impact Report (EIR) prepared by the California Geologic Energy Management Division (CalGEM).  This EIR examined the environmental effects of oil well stimulation and development in the State of California, pursuant to Senate Bill 4 (Pavley).  In the 2015 EIR, CalGEM examined a "no project alternative."  That alternative would have disallowed all future oil well stimulation throughout the state.  This alternative has direct parallels to the SYU facilities and associated pipelines.  Both have the same consequence of curtailing production.  That is, more crude oil must be imported to California to meet demand.

19.    The 2015 EIR made the following observations relative to imports of foreign crude into the state:

[5] See 2021 California Ocean-Going Vessels Emissions Inventory, California Air Resources Board, March 3, 2022.

[6] California has imposed regulations to reduce criteria pollutant, greenhouse gas, and air toxic emissions from OGVs.   In 2020, CARB promulgated "At-Berth" regulations with the aim of further reducing air pollution from vessels.  Emissions from support tugboats are regulated by the Harborcraft Rule.

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- Without further development of California oil resources, foreign imports of crude oil would increase by about 15 percent;

- The increase in foreign crude oil imports via tankers would increase NOx emissions by 1,200 tons per year in the coastal waters near the South Coast/Los Angeles and San Francisco Bay Areas;

- Tanker emissions from importing foreign oil would "contribute substantially to an existing projected air quality violation" in coastal communities; and

- The emissions from marine and rail terminals engaged in transporting imported crude oil would negatively affect sensitive receptors (e.g., children, the elderly, and persons with respiratory conditions).[7]

**B.    Other Environmental Impacts**

20.    In addition to GHG and criteria pollutant emissions impacts from transporting foreign-based crude oils to California, the transportation of crude via tankers potentially causes other environmental impacts from wastewater discharges, noise pollution, and increased oil spill risk, to name a few.  The 2015 EIR, noted above, pointed to an additional impact from importing crude oil into the state.  The EIR stated that Environmental Justice (EJ) communities are disproportionately impacted from ship, truck, and rail emissions.  Increasing foreign crude oil imports would only exacerbate environmental impacts to EJ communities. [8]

21.    Given the negative environmental impacts noted above, it is my opinion that the operation of the Las Flores Pipelines, including compliance with ongoing obligations to complete repairs based on the results of regularly required inspections and other increased safety standards required by the California Office of State Fire Marshal ("OSFM"), will help avoid the potentially negative environmental consequences of imported crude oil.  Reducing environmental impacts to communities in California benefits the public.

---

[7] See Section 12.2.3 of the State's Final Environmental Impact Report for SB 4, prepared by CalGEM, June 2015. A true and correct copy of Chapter 12 of the Final Environmental Impact Report is attached hereto as **Exhibit A**.

[8] See Section 12.2.10.2 of the Final Environmental Impact Report for SB 4, prepared by CalGEM, June 2015.

7

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## IV.    <u>Allowing the Las Flores Pipelines to Restart Would Not Harm the Environment</u>

22.    Finally, I have been asked to opine as to whether allowing Sable to restart and operate the Las Flores Pipelines would harm the environment.  I believe this is not the case because restarting and operating the Las Flores Pipelines in compliance with applicable federal regulations and OSFM-approved plans will maintain critical protections for the environment.  This opinion is supported by the thorough process by which the original permits were developed and issued, which included a complete environmental review prepared in compliance with both CEQA and NEPA.

23.    Prior to the issuance of the permits for what is now called the Las Flores Pipelines in the 1980s, the pipelines were subject to environmental review under CEQA and NEPA.  In January 1985, the California State Lands Commission and federal Bureau of Land Management certified the Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for what was then known as the "Celeron Pipeline Project," which included the construction of what is now called the Las Flores Pipelines.[9]  Because the validity of the EIR/EIS was not challenged, it is "conclusively presumed to comply with [CEQA]."[10]

24.    The EIR/EIS assumed that the Las Flores Pipelines' operational life would continue until the "availability of crude oil" for use in the Las Flores Pipelines was exhausted.[11]  The EIR/EIS and subsequent agency evaluations considered all aspects of the Las Flores Pipelines' project life, including the construction, operation, and maintenance/repair associated with the equipment.  In particular, the EIR/EIS evaluated potential impacts to air quality, geology, soils, surface water, groundwater, aquatic biology, terrestrial biology, socioeconomics, land use and recreation, transportation, cultural resources, visual resources, noise, system safety and reliability, and oil spill

---

[9] Reference Environmental Impact Report/Environmental Impact Statement Prepared for the Celeron All American and Getty Pipeline (SCH Number 1983110902) by the State Lands Commission, 1984.  A true and correct copy of relevant portions of the Final EIR/EIS is attached hereto as **Exhibit B**.  The complete Final EIR/EIS is available online at this link: https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.

[10] See Pub. Resources Code, § 21167.2.

[11] See Draft EIR/EIS at p. 2-35. A true and correct copy of relevant portions of the Draft EIR/EIS is attached hereto as **Exhibit C**. The complete Draft EIR/EIS is available online at the following link:  https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672.

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

potential.   The EIR/EIS also identified and discussed various project alternatives, including a "no project" alternative and alternative pipeline routes.  The County of Santa Barbara (County) found that "[t]he project alternatives not chosen are either not feasible, not environmentally preferable or not as beneficial as the proposed project."[12]

25.   CEQA mandates that all significant impacts associated with a project must be mitigated or avoided to the maximum extent feasible.[13] Additionally, the agency must make specific findings for each significant environmental impact identified in the EIR, accompanied by a brief rationale for each finding.[14] The County's findings in support of its project approval are set forth in the Planning Commission Actions for the Celeron Pipeline Final Development Plan (FDP), dated March 3, 1986.[15] For example, the County made many specific CEQA findings concerning construction, operation, and maintenance of the pipelines, including that "adverse impacts are mitigated to the maximum extent feasible."[16] The FDP also includes impact-specific CEQA findings, including:

    a. "The risks of an unlikely oil spill, combined with the risks of incomplete spill cleanup, are considered acceptable because only denying the project would assure complete mitigation of the oil spill impacts.

    b. "Numerous sensitive plants will be removed to clear a 100-foot right-of-way for construction vehicles; fifty feet of this right-of-way will remain clear of larger vegetation during operation for maintenance purposes. … The residual impact is considered acceptable due to the projects need for clear construction and operation ROWs."[17]

    c. "The residual disturbance impacts [to cultural resources], while significant to the

---

[12] County Planning Commission Actions (March 3, 1986), a true and correct copy of which is attached as here to as **Exhibit D**, at pp. 54-55.

[13] See Pub. Resources Code, §§ 21000 *et. seq.*; Cal Code Regs, tit. 14, §15126.4(a).

[14] Pub. Resources Code, § 21081; Cal. Code Regs, tit. 14, § 15091.

[15] See Exhibit D.

[16] *Id.* at p. 46, at 1.1.(b).

[17] *Id.* at p. 51, at 1C. Clearing Vegetation.

9

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Native Americans, are considered acceptable since all feasible mitigations have been employed."[18]

       d. "[Certain geology, aquatic biology, and terrestrial biology i]mpacts identified as Class II have been eliminated or substantially lessened where feasible."[19]

26.     CEQA also requires the balancing of economic, legal, social, technological, or other benefits of a proposed project against any unavoidable significant environmental impacts identified in an EIR.[20]  When an agency decides to approve a project notwithstanding unavoidable significant environmental impacts, it must prepare a "statement of overriding considerations" explaining its rationale.  As set forth in the County's Statement of Overriding Considerations, the County found "that in balancing the project's benefits against its unavoidable environmental risks, the benefits outweigh the environmental risks."[21]  In particular, the County found that "the pipeline[s] will reduce the need for marine tankering of locally produced crude oil, thus satisfying County policies which favor the use of pipelines."[22]  The County's Statement of Overriding Considerations also concluded that compliance with certain Oil Spill Contingency and Emergency Response Plans incorporated into the project description, identified mitigation measures, and conditions of approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the project.[23]

27.     The regulatory agencies with jurisdiction over the pipeline project incorporated conditions of approval based on the certified EIR/EIS's analysis and mitigation measures as mandatory permit terms and conditions applicable to the project, including activities related to maintenance and repairs.  For example, to minimize the impact of a potential oil spill, the County imposed conditions requiring "[a]utomatic block and check valves at sensitive habitat" and the implementation of an "oil

---

[18] *Id.* at p. 51, at 1D. Disturbance of Cultural Resources.

[19] *Id.* at p. 53, CEQA Findings 2-8.

[20] Pub. Resources Code, § 21081; Cal. Code Regs, tit. 14, § 15093.

[21] Exhibit D at p. 56.

[22] *Ibid.*

[23] *Id.* at pp. 55-56.

10

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

spill contingency plan."[24] Indeed, the County's Conditions of Approval were "premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS [], which occur in Santa Barbara County, will be substantially mitigated by the permit conditions."[25] The regulatory agencies with jurisdiction over the operation of the Las Flores Pipelines provided oversight to ensure all permit conditions are followed to minimize potentially significant environmental impacts. This oversight will continue, and, if Sable does not fulfill its obligations under the existing permits, remedies are available to the regulatory agencies with jurisdiction to enforce compliance.

28. It is my opinion that the compliance verification methods used by regulatory agencies (e.g., enforcement and inspection rights) provide the public assurances that all appropriate environmental mitigations are fully implemented. The process of environmental review under CEQA, permit processing and issuance, and compliance with permit terms and conditions ensures that potential environmental harm is mitigated to the maximum extent feasible during all associated pipeline activities, including required maintenance and repair.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 7th day of July, 2025, in Camarillo, California.

_____
Bart Leininger

---

[24] *Id.* at p. 53 and Table of Celeron Class I Impacts at p. 3.

[25] *Id.* at p. 13, Condition 8-3.

11

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

# VOLUME 1 OF 4 (EXHIBIT A)

# TO DECLARATION OF BART LEININGER

# Exhibit A

# 12. Environmental Analysis of the Alternatives

## 12.1 Introduction

EIR Section 8.1 (Description of the Alternatives, Introduction) provides the statutory background and requirements of an EIR's evaluation of alternatives to a proposed project. EIR Section 8.2 (Alternatives Evaluation Process) describes the method by which alternatives to the project were identified, and why they were or were not carried forward for evaluation in this EIR. EIR Section 8.3 (Alternatives Retained for Evaluation) describes the alternatives to the project evaluated in this EIR.

Six alternatives to the project are considered in this EIR. Table 12.1-1 identifies these alternatives and where they are described and evaluated within this EIR.

**Table 12.1-1. Location of EIR Alternatives Descriptions and Impact Evaluations**

| Alternative | Alternative Description (EIR Section) | Alternative Impact Evaluation (EIR Section) |
|---|---|---|
| No Future Well Stimulation Treatments Alternative (Alternative 1) | 8.3.1 | 12.2 |
| No Future Well Stimulation Treatments Outside of Existing Oil and Gas Field Boundaries Alternative (Alternative 2) | 8.3.2 | 12.3 |
| Well Pad Consolidation Alternative (Alternative 3) | 8.3.3 | 12.4 |
| Urbanized Area Protection Alternative (Alternative 4) | 8.3.4 | 12.5 |
| Active Fault Zone Restrictions Alternative (Alternative 5) | 8.3.5 | 12.6 |
| No Project Alternative (Alternative 6) | 8.3.6 | 12.7 |

The six alternatives have been evaluated in less detail than the project. However, consistent with CEQA case law and State CEQA Guidelines Section 15126.6(d), the analysis of the alternatives includes sufficient information about each one of them to allow for a meaningful evaluation and comparison with the project. A comparison of the effects of all of the alternatives is provided in EIR Chapter 14 (Comparison of the Alternatives). Additionally, the discussion of each alternative includes some consideration of the extent to which the alternative meets the project objectives, which are presented in EIR Section 7.2 (Project Objectives).

For each subject evaluated, the analysis of the alternatives relies on the same impact criteria used for analysis of the project itself. (See EIR Chapters 10 (Programmatic Level Analysis of the Project) and 11 (Programmatic Level Analysis of Specific Oil and Gas Fields).) To reduce redundancy, the technical parameters related to these impact criteria are not repeated here. Similarly, for the purposes of calibrating the potential impacts of each alternative, the same impact significance classification system used for the project has been applied to the alternatives, as follows:

■ **Class I: Significant and Unavoidable Impact.** Class I impacts are significant adverse environmental effects that cannot be mitigated to a level of less than significant through the application of feasible mitigation measures.

■ **Class II: Less Than Significant Impact With Mitigation Incorporated.** Class II Impacts are significant adverse environmental effects that can be reduced to a level of less than significant with the application of feasible mitigation measures.

■ **Class III: Less Than Significant Impact.** Class III impacts are adverse environmental effects that have been determined to be comparatively minor in the sense that they do not meet or exceed the subject-specific criteria established to gauge significance.

■ **Class IV: No Impact.** Class IV impacts do not have any adverse or beneficial environmental effects.

■ **Class V: Beneficial Impact.** Class V impacts result in favorable environmental effects.

In addition, the same regulatory setting and existing conditions (i.e., "Affected Environment") have been applied to each of the subjects evaluated in the alternatives analysis. To avoid repetition these descriptions are not duplicated here. Please refer to EIR Chapters 10 (Programmatic Level Analysis of the Project) and 11 (Programmatic Level Analysis of Specific Oil and Gas Fields) for these descriptions.

For each alternative's subject-specific evaluation, programmatic effects are identified first to parallel EIR Chapter 10 (Programmatic Level Analysis of the Project), followed by a programmatic level analysis of the Wilmington, Inglewood, and Sespe Oil and Gas Fields (Study Regions 1 and 2) to mirror EIR Chapter 11 (Programmatic Level Analysis of Specific Oil and Gas Fields).

At the end of each alternative's evaluation there is a summary table of all impacts identified and their significance. Additionally, each table includes a listing of the mitigation measures that have been applied to each impact that has been identified as significant and unavoidable (Class I) and mitigable to a level of less than significant (Class II).

## 12.2    No Future Well Stimulation Treatments Alternative (Alternative 1)

The No Future Well Stimulation Treatments Alternative (Alternative 1) would prohibit all current well stimulation activities and prohibit future use of well stimulation treatments anywhere within the State on lands that are under State jurisdiction. This alternative would not apply to lands solely under federal or tribal jurisdiction, unless appropriate interagency agreements were either revised or put into effect regarding well stimulation treatments. A full description of Alternative 1 is provided in EIR Chapter 8 (Description of the Alternatives). The environmental baseline and impact criteria used for the analysis of this alternative are the same as those described in EIR Chapters 10 and 11. Potential impacts on federal or tribal lands due to proposed future well stimulation treatments would be the same as those described in EIR Chapter 10, and are not discussed further in this analysis of Alternative 1. Development on federal and tribal lands would be subject to the permitting and environmental review requirements of the federal or tribal government, as well as to applicable laws and regulations. This analysis is focused on lands that are not under federal or tribal jurisdiction and authority, though impacts to lands not under State jurisdiction are briefly discussed in the sections below.

To be implemented, Alternative 1 would require new legislation to amend or repeal PRC Section 3106(b), which currently authorizes well stimulation treatments, and 3160(b), which was enacted as part of Senate Bill 4. The new legislation would need to specify that all current or future well stimulation treatments were prohibited. A law to this effect would need to be considered and enacted by the Legislature and signed by the Governor. Typically, an alternative that requires independent legislative action is not considered in an EIR because it is legally infeasible for the Lead Agency to pursue the alternative under current law. Nonetheless, because of the interest expressed by many members of the public in understanding the potential consequences of either a moratorium or ban on well stimulation, this EIR considers such an alternative in order to examine how a moratorium or ban on well stimulation treatments would affect oil production in California and what would be the environmental benefits and impacts of implementing this alternative. For such an outcome to occur, however, action by the California Legislature would be necessary.

Under the No Future Well Stimulation Alternative, the direct impacts associated with well stimulation activities would not occur, either inside or outside of existing oil and gas fields. Prohibiting well stimulation reasonably could be expected to result in indirect effects. Various scenarios could occur. Under one scenario, some existing oil and gas fields could become economically unviable without well stimulation because they would not have a rate of production sufficient to justify their continued operation. In this case, some existing fields would be abandoned or shut in. Under a second scenario, owners/operators of existing oil and gas fields may drill more wells than otherwise would have been the case, and increase the intensity of operations such as enhanced recovery, to maintain production levels and compensate for the loss of prospective additional production that would have occurred had well stimulation treatments been used. Under a third scenario, the amount of oil and gas production foregone because of a ban on well stimulation treatments could require importation of an offsetting amount of oil and gas resources from either domestic or foreign supplies, or both. Such supplies typically would be imported either by ship (e.g., from Alaska, Saudi Arabia or Iraq) or by train (e.g., from North Dakota). The assumptions inherent in these indirect effects scenarios are described in EIR Section 8.3.1. The following analysis is focused on both the direct and indirect effects of implementing Alternative 1.

In addition to an analysis of the alternative itself, the analysis of Alternative 1 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

## 12.2.1    Aesthetics

### 12.2.1.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.1.2    Programmatic Level Analysis of the Project

If Alternative 1 were implemented, stimulation treatments would cease to be performed on any oil and gas wells under state jurisdiction in California. Consequently, visual impacts associated with well stimulation would not occur on lands under state jurisdiction. This would be true in all six study regions. Any potential hydrocarbon production that would have resulted from stimulation treatments would not occur.

Alternative 1 avoids direct impacts associated with well stimulation because existing wells would not be stimulated and new wells that would require stimulation to produce oil would not be drilled. However, given continuing demand for oil, prohibiting well stimulation would have direct and indirect effects of a different sort. A ban could lead to abandonment of wells and fields that become uneconomical in the absence of well stimulation, potentially increasing the amount of conventional well drilling and the use of enhanced recovery techniques in existing fields and requiring the importation of increased quantities of oil from foreign or other domestic sources to meet demand. Activity as some fields could decrease or cease, while increasing at other fields. Importation of more oil would result in direct and indirect impacts from transportation by tanker and rail, and subsequent handling, particularly in Los Angeles, Long Beach, and the San Francisco Bay Area, where extensive refining facilities are located.

| Impact AES-1    Substantially adversely affect scenic vistas |
| --- |

Under this alternative, any ground disturbance or clearing associated with well stimulation would not occur in areas under State jurisdiction. Equipment, material, and vehicles would not be assembled at a well pad in preparation for well stimulation. Consequently, prohibiting well stimulation would result in no alteration to existing scenic vistas and there would be no impact attributed to well stimulation (Class IV).

Some oil and gas fields may be abandoned because of a lack of sufficient production from unstimulated wells; this would result in wells being abandoned or shut in. Depending on local regulations, equipment may or may not be required to be removed and the landscape restored. Overall, abandonment and removals would be a positive visual effect if the field is within a scenic vista and the site is restored (Class V). Without restoration, the visual environment would be similar to existing conditions at the field, with roads, pipes, and tanks abandoned in place. Essentially, this would perpetuate the existing visual conditions but facilities would age and deteriorate, but this would be a less than significant impact (Class III) as compared to the existing conditions of the site.

If, as a result of not being permitted to stimulate wells, owner/operators increased drilling and the use of enhanced recovery activities in areas under State jurisdiction, this would increase the density of well heads, pumps, and pipes in the oil and gas field. Similarly, the density of apparatus in fields on federal and tribal lands could also increase if stimulation activities increase on those lands under this alternative. However, given the density of existing activities, this would not be expected to significantly alter the existing scenic vista, which is already affected by the presence of the field. The impact would be less than significant (Class III).

To meet demand, the potential supply of oil foregone by not allowing well stimulation in California would have to be made up by importing oil from foreign or domestic U.S. sources. This would increase deliveries of imported crude oil, natural gas, or petroleum products to refineries. This increase would be achieved by increasing the number of oilers, tanker trucks, or rail cars arriving at these destinations, and/or by increasing the volume of oil and gas delivered via pipeline, if line capacity were available. The movement of additional vessels, tankers, and railcars would present a short-term visual impact to a viewer as these modes of transportation passed by, but this would be a transient effect and would be less than significant in terms of impact on vistas (Class III). Any construction or expansion of terminals to accommodate deliveries could have an adverse effect on vistas at the locality where this would occur. Depending on local visual conditions, this impact could range from significant and unmitigable (Class I) to less than significant (Class III).

By comparison, under the project, Impact AES-1 could be Class III at existing fields. In the absence of well stimulation, impacts outside of existing fields identified for the project would not occur. Because of the potential need for new or expanded terminals specifically to handle increase imports to address the shortfall of oil, Alternative I could create significant impacts in the viewsheds where facilities would locate. A site-specific analysis would be required to confirm the level of impact, which could range from Class I to Class III.

| **Impact AES-2    Substantially alter or damage scenic resources** |
|---|

If new areas outside of existing oil and gas fields are not explored and developed for hydrocarbon recovery, impacts on scenic resources would not occur and there would be no impact (Class IV).

As described for Impact AES-1, if any existing fields are abandoned due to uneconomic productivity, equipment could be removed and the landscape restored to some degree. The degree of equipment removal and site restoration would be subject to local regulations that apply, if any. Removal and restoration would ameliorate existing adverse impacts that might exist with regard to scenic resources and this would be a beneficial impact (Class V). However, if site restoration is not required or is limited, visual conditions would remain similar to those already existing at the locality, which would be less than significant (Class III).

The indirect effects described for increased drilling and activity at existing fields lands under State, federal or tribal government jurisdiction, and from increased imports, would be as described above for Impact AES-1 and would be less than significant (Class III) in most cases, except at some localities, such as at and near new or expanded terminals, where the impact could range from significant and unmitigable (Class I) to less than significant (Class III) if new or expanded facilities are needed.

By comparison, Impact AES-2 could be Class III under the project in existing fields and Class I or II in new areas. However, the project did not require expanded or new terminals for imports, which could be the case under Alternative 1.

| **Impact AES-3** | **Substantially degrade the existing visual character or quality of a site and its surroundings** |
|---|---|

If new areas outside of existing oil and gas fields are not explored and developed for hydrocarbon recovery, impacts on the existing visual character or quality of a site and its surrounding would not occur, resulting in no impact (Class IV).

At existing fields, field abandonment and restoration would improve the visual character of the site (Class V), assuming that local regulations required equipment removal and site restoration. In the absence of such requirements, the site would remain visually similar to existing conditions, and abandonment would have a less than significant on visual character or quality (Class III). Increasing activity within the field would not likely be noticeably different from existing conditions and would not lead to a substantial degradation of the existing character of the location. This would be a less than significant impact (Class III). Increased deliveries to refineries of imported oil would somewhat increase ship, road, and rail traffic, but this would not substantially degrade the visual character of the routes used, as rail and road systems already exist and already carry traffic. This would be a less than significant impact (Class III). However, at some localities, such as at and near new or expanded terminals, the impact could range from significant and unmitigable (Class I) to less than significant (Class III).

By comparison, Impact AES-3 could be Class III under the project in existing fields and Class I or II in new areas.

| **Impact AES-4** | **Create new sources of substantial light and glare** |
|---|---|

With a prohibition on well stimulation, few new areas outside of existing oil and gas fields are likely to be explored and developed for hydrocarbon recovery. The absence of these activities would avoid conditions in which there could be new sources of substantial light and glare; this would result in no impact (Class IV).

Field abandonment would not create new sources of light and glare, except to the extent they occurred during decommission and site restoration. The impact would be less than significant (Class III).

Increasing drilling activity at an existing field would increase the number of drill rigs and vehicles on site during the year. This would potentially create additional sources of light and glare, similar in nature to those already occurring. If well drilling were to increase substantially, the frequency and duration of working rigs being present at a field would increase, increasing the number of nighttime hours when rigs would be operating. This could increase the number of nighttime hours in which lighted rigs are visible from offsite. However, any potential sources of light and glare at a site would be present for a limited time and would be removed at the conclusion of the operation. Therefore, increased activities at existing fields would present a less than substantial new source of light and glare. The impact would be less than significant impact (Class III).

Increased deliveries to refineries of imported oil would increase ship, road, and rail traffic, but this traffic would occur along routes already used for deliveries and any viewer light and glare that could result would be transitory. This would be a less than significant impact (Class III). However, at some localities, such as at and near new or expanded terminals, the impact from light and glare could range from significant and unmitigable (Class I) to less than significant (Class III), depending on site conditions and viewer locations.

By comparison, Impact AES-4 could be Class III under the project in existing fields and Class I or II in new areas.

### 12.2.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

The programmatic discussion for direct and indirect impacts provided in EIR Section 12.2.1.2 above would apply to visual resources associated with the Wilmington, Inglewood, and Sespe Oil and Gas Fields because Alternative 1 would eliminate the presence of vehicles and equipment associated with stimulation work.

### 12.2.1.4    Impact Significance Summary

None of the potential impacts to visual resources identified for the project would occur, as there would be no stimulation activity undertaken. At existing fields, field abandonment and restoration would improve the visual character of the site (Class V), assuming that local regulations required equipment removal and site restoration. There would be secondary impacts attributable to any abandonment of fields, increase in activity at fields, or increase in ship, rail, and tank truck traffic delivering imported oil and gas. Impacts would vary from no impact (Class IV) to less than significant (Class III). However, if increased imports required expanded or new terminals, this could range from a significant unmitigable impact on visual resources at an affected locality (Class I) to a less than significant impact (Class III), depending on site-specific conditions and circumstances.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.2    Agriculture and Forestry Resources

### 12.2.2.1    Introduction

This section provides an evaluation of the potential impacts to agricultural and forestry resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agricultural and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agricultural and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agricultural and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.2.2    Programmatic Level Analysis of the Project

Alternative 1, which would ban well stimulation on lands under State jurisdiction, would directly reduce overall impacts on agricultural and forestry resources as compared to the project, which would allow stimulation statewide. There would be no impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments. There also would be none of the

potential impacts on agricultural water quality or water supplies that could occur under the project, but there would be greater indirect impacts from additional conventional wells.

The indirect impacts to agriculture and forestry resources associated with Alternative 1 would have beneficial and potentially significant effects when viewed programmatically. Although oil and gas operations can be compatible with agriculture and forest land, any abandonment of oil and gas wells would remove potential operational conflicts and allow additional land to be used for agriculture or forest land (Class V). On the other hand, owners/operators of existing oil and gas fields may drill more wells and increase the intensity of operations to maintain production levels and compensate for the loss of prospective additional production that would have occurred by using well stimulation treatments. Wells could also be developed in new areas, but would be prohibited from using well stimulation, except on lands under federal or tribal jurisdiction. This could result in the following indirect impacts to agricultural or forest lands, which would be similar to the analysis and impact conclusions in EIR Section 10.2 (Agriculture and Forestry Resources):

- **Impact AGF-1.** Convert a substantial amount of Prime Farmland, Unique Farmland, or Farmland of statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use

- **Impact AGF-2.** Conflict with existing zoning for agricultural use or with Williamson Act contracts

- **Impact AGF-3.** Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production

- **Impact AGF-4.** Result in the loss of forest land or conversion of forest land to non-forest use

- **Impact AGF-5.** Directly or indirectly impair the use of agricultural land or forest land

Similar to the discussion in EIR Section 10.2, implementation of the following or more stringent mitigation measures for the drilling of wells on new well pads located in agricultural or forest lands would reduce all of the aforementioned impacts related to agriculture and forest land to a less than significant level (Class II). While impacts to agriculture and forest land would be less than significant with mitigation applied under both the project and Alternative 1, increased conventional drilling and enhanced recovery that may occur under Alternative 1 as a result of banning well stimulation treatments would result is an increased level of impacts than under the project. While more severe, these would still be less than significant with mitigation (Class II). There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. The relevant model mitigation measures include the following:

**MM AGF-1a**    **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-1b**    **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-1c**    **Compensate for Loss of Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-2a**    **Ensure Compatibility with Agricultural Zoning.** (Full text in EIR Section 10.2.5.)

**MM AGF-2b**    **Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts.** (Full text in EIR Section 10.2.5.)

**MM AGF-3a**      **Ensure Compatibility with Zoning for Forest and Timberland.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**      **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**      **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**      **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**       **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**     **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a**      **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

**MM GW-4b**       **Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~. (Full text in EIR Section 10.14.5.)

**MM SWR-1a**      **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-2a**      **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a**      **Ensure Adequate Water Availability.** (Full text in EIR Section 10. 15.5.)

**MM TR-1a**       **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

## 12.2.2.3    Programmatic Level Analysis of Specific Oil and Gas Fields

The No Future Well Stimulation Treatments Alternative would reduce overall impacts on agricultural and forestry resources as compared to the project.

***Wilmington Oil and Gas Field***

There would be no impacts under this alternative because there is no forested land or designated Farmland within the Wilmington Oil and Gas Field (Class IV).

***Inglewood Oil and Gas Field***

The Inglewood Oil and Gas Field does not contain any mapped farmland so no direct or indirect impacts would occur to agriculture (Impacts AGR-1 and AGF-2) (Class IV). Likewise, The Inglewood Oil and Gas Field is not zoned for forest land or timberland, therefore, Impact AGF-3 would not occur (Class IV).

| **Impact AGF-4    Result in the loss of forest land or conversion of forest land to non-forest use** |
|---|

There are 7.6 acres of forest land within a 0.25-mile buffer surrounding the Inglewood Oil and Gas Field. This forest land would not be directly impacted construction of new well pads and associated facilities for projects dependent on well stimulation treatments (Class V).

However, a greater number of wells may be drilled to replace lost production that might otherwise have been available with well stimulation. Depending on well locations, this could result in a loss of forest lands within the Inglewood Oil and Gas Field buffer area. There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 10.2 (Agriculture and Forestry Resources), it is anticipated that the majority of potential environmental impacts, including conversion of forest land to a non-forest use, would be reduced to a less than significant level, and therefore, associated impacts to agricultural or forest land would likewise be less than significant (Class II). The relevant model mitigation measures include the following:

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**    **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

| |
|---|
| **Impact AGF-5**    **Directly or indirectly impair the use of agricultural land or forest land** |

The Inglewood Oil and Gas Field does not contain any farmland, but it does have forest land within its 0.25-mile buffer area that could be directly or indirectly adversely affected (see also Impact AGF-4). If a greater number of wells are drilled to replace lost production, and depending on the well locations, this could impair the use of the forest lands within the field buffer area.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 10.2 (Agriculture and Forestry Resources), it is anticipated that the majority of potential environmental impacts, including conversion of forest land to a non-forest use, would be reduced to a less than significant level, and therefore, associated impacts to use of forest land would likewise be less than significant (Class II).

The relevant model mitigation measures include the following:

**MM AGF-1a**    **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-1b**    **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**    **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**    **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a**    **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities,~~

~~**Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.**~~ (Full text in EIR Section 10.13.5.)

**MM GW-4b**     **Install a** <u>**Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**</u>~~**Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin**~~**.** (Full text in EIR Section 10.14.5.)

**MM SWR-1a**     **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-2a**     **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a**     **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

**MM TR-1a**     **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

*Sespe Oil and Gas Field*

| | |
|---|---|
| **Impact AGF-1** | **Convert Prime Farmland, Unique Farmland, or Farmland of statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use** |

The No Future Well Stimulation Treatments Alternative would likely reduce overall direct impacts on agricultural and forestry resources within the portion of the Sespe Oil and Gas Field under State jurisdiction. There would be no impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments. There would also be none of the potential impacts on agricultural water quality or water supplies that could occur under the project (Class IV).

However, there are 73 acres of FMMP-designated Farmland of Local Importance and 3,724 acres of Grazing Land located throughout the field. If a greater number of wells are drilled to replace lost production that could have resulted from well stimulation treatments, or if operators increase drilling and stimulation activities on the portion of the field that is under federal jurisdiction, depending on well locations, these wells could convert Grazing Land or Farmland of Local Importance to a non-agricultural use. There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 11.2.5.3 (Agriculture and Forestry Resources, Study Region 2: Sespe Oil and Gas Field), impacts associated with the conversion of agricultural land to a non-agricultural use would be reduced to a less than significant level (Class II). The relevant model mitigation measures include the following:

**MM AGF-1a**     **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-1b**     **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-1c**     **Compensate for Loss of Important Farmland.** (Full text in EIR Section 10.2.5.)

---

| **Impact AGF-2    Conflict with existing zoning for agricultural use or Williamson Act contracts** |
| --- |

Under the Los Padres National Forest Plan, the portion of the Sespe Oil and Gas Field under federal control is designated for oil and gas exploration. Therefore, there would be no conflict with existing agricultural zoning or an equivalent designation. Lands under County jurisdiction are zoned as Open Space, subject to conditional use permit requirements and the Non-Coastal Zone Ordinance, which has oil and gas standards.

There are 594 acres of Non-Prime Williamson Act lands located throughout the field (the Williamson Act does not apply to federal lands). If a greater number of wells are drilled to replace lost production, depending on well locations, these wells could conflict with existing Williamson Act contracts. There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of a mitigation measure similar to Mitigation Measure AGF-2b, drilling of these new wells would be compatible with Williamson Act contracts, or the Williamson Act contracts would be terminated before those activities are initiated. Therefore, impacts related to Williamson Act conflicts would be less than significant (Class II).

**MM AGF-2b    Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts.** (Full text in EIR Section 10.2.5.)

| **Impact AGF-3    Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production** |
| --- |

Under the Los Padres National Forest Plan, the Sespe Oil and Gas Field is designated for oil and gas exploration. Lands under County jurisdiction are zoned as Open Space, subject to conditional use permit requirements and the Non-Coastal Zone Ordinance, which has oil and gas standards. Therefore, there would be no conflict with existing forestry zoning (Class IV).

| **Impact AGF-4    Result in the loss of forest land or conversion of forest land to non-forest use** |
| --- |

The No Future Well Stimulation Treatments Alternative would reduce overall direct impacts on forestry resources within the Sespe Oil and Gas Field because there would be no impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments (Class IV). However, there is forest land located throughout the field. If a greater number of wells are drilled to replace production that may have derived from stimulation had it been allowed, these wells could convert forest land to a non-forest use, depending on their location.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 11.2.5.3 (Agriculture and Forestry Resources, Study Region 2: Sespe Oil and Gas Field), conversion of forest land to a non-forest use would be reduced to a less than significant level (Class II). The relevant model mitigation measures include the following:

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**    **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

---

**Impact AGF-5**    **Directly or indirectly impair the use of agricultural land or forest land**

---

Any direct or indirect impacts to agriculture or forestry resources related to new wells drilled and stimulated or well stimulation treatments in areas under State jurisdiction would not occur (Class IV). However, if a greater number of wells are drilled to replace lost production and depending on the location of these wells, project activities adversely affect surrounding forest land or agricultural land. Direct impacts would include conversion of timberland or agricultural land to non-timber or non-agricultural use (covered under Impact AGF-1); mortality or injury of livestock animals; interference with agricultural or timber operations; and disturbance of livestock animals or damage to crops or timber trees from noise, dust, or accidental releases of hazardous materials. Indirect impacts may include effects from erosion, sedimentation, introduction of invasive exotic species, or increased competition for water resources.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. With the implementation of the mitigation measures similar to those described in EIR Section 11.2.5.3 (Agriculture and Forestry Resources, Study Region 3: Sespe Oil and Gas Field), direct or indirect impacts that would impair the use of agriculture or forestry resources would be less than significant (Class II). The relevant model mitigation measures include the following:

**MM AGF-1a**    **Minimize Impacts to Important Farmland.** (Full text above.)

**MM AGF-1b**    **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**    **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**    **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a**    **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~. (Full text in EIR Section 10.13.5.)

**MM GW-4b**    **Install a** **Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~. (Full text in EIR Section 10.14.5.)

**MM SWR-1a**    **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-2a**    **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a**    **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

**MM TR-1a**    **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

### 12.2.2.4    Impact Significance Summary

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.3    Air Quality

### 12.2.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.3.2    Programmatic Level Analysis of the Project

| Impact AQ-1    Conflict with or obstruct implementation of an applicable air quality plan |
| --- |

By halting well stimulation activities in areas under State jurisdiction, this alternative would restrict future oil and gas activity in California. This would avoid emissions that otherwise would occur during well stimulation treatments in areas under State jurisdiction, and it would also lead to a decrease in California oil production. To replace the decrease in California production, an additional 57 million barrels of crude per year would need to be supplied from fields outside of California (EIR Section 8.3.1), which currently supply about 380 million barrels annually (ARB, 2014c). The replacement supply would cause California import receipts to increase by about 15 percent. This would increase the activity of tanker ships delivering Alaskan and foreign oil to California via ports and marine terminals in Los Angeles, Long Beach, and the San Francisco Bay Area, and it would increase the activity of rail trains hauling crude oil primarily from North Dakota and Canada. In-state emissions from oil and gas production could occur at lower levels; however, these lowered emissions would be offset by increasing levels of emissions from tanker ships and locomotives delivering crude to California and from terminal facilities necessary to offload and handle the imports. The vast majority (more than 95 percent) of California's crude oil imports arrive by marine vessels at proprietary marine terminals in Los Angeles, Long Beach, and the San Francisco Bay Area. Emissions from ocean-going vessels that visit California seaports are subject to emissions control requirements and low-sulfur fuel requirements, when operating near the coast; and newer locomotive engines are subject to emission standards, and fuel requirements provide some level of control over these sources. Tanker vessels, as a subset of ocean-going vessels, produce about 22 tons NOx per average day according to the statewide inventory (ARB, 2013a). For tanker vessels, an increase of 15 percent could add over 3 tons NOx per day statewide or about 1,200 tons NOx per year, primarily in the coastal waters leading to the South Coast and San Francisco Bay Area air basins. The resulting levels of NOx and other emissions from tanker ships, locomotives, and terminal facilities would remain at levels potentially inconsistent with the forecasts of air quality plans, resulting in a potential conflict with

local air quality plans. Each local air district, especially SCAQMD and BAAQMD, would need to assess the potential growth in activity and emissions from ocean-going vessels and trains to ensure that these mobile sources are accurately reflected in inventories.

Mitigation identified for the project would need to be either replaced or adapted for the increased emissions from marine vessels and trains that import oil and gas and for new facilities to deliver imports (Mitigation Measure AQ-1a, Improve Air Quality Planning Inventories and Local Control Measures). Mitigation regarding well stimulation treatments would not be applicable (Mitigation Measure AQ-1b. Improve the Methodologies and Emission Factors Used in Inventory Development). The mobile sources and facilities that handle imports fall under the jurisdiction of the ARB, local air districts, and counties and cities with land use authority, and these agencies would need to identify any necessary mitigation. Because DOGGR cannot require local air districts to update planning inventories or establish specific rules for sources related to oil and gas importation, this impact would be a Class I: Significant and Unavoidable Impact.

Alternative 1 is worse than the project for Air Quality impacts. Increased levels of emissions would occur from tanker ships and locomotives delivering crude to California and from terminal facilities necessary to offload and handle the imports (Class I). Indirect impacts associated with additional conventional wells and abandonment activities could also cause growth in emissions due to an increase the intensity of operations to make up for lost production.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measure in this context is the following:

**MM AQ-1a**   **Improve Air Quality Planning Inventories and Local Control Measures.** (Full text in EIR Section 10.3.5.)

| | |
|---|---|
| **Impact AQ-2** | **Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation** |

The increased levels of criteria air pollutant emissions caused by tanker ships, rail transport, and terminals for offloading crude may exceed general mass-based emission thresholds of a local air district. Mitigation regarding well stimulation treatments would not be applicable (Mitigation Measure AQ-2a, Reduce Hydrocarbon Emissions from Well Stimulation Treatments). Mitigation similar to that identified for the project would need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce emissions from marine and rail terminals (Mitigation Measure AQ-2b, Reduce Emissions from Portable Equipment and Mobile Sources; AQ-2c, Reduce Emissions from Dust-causing Activities). The mobile sources and facilities that handle imports fall under the jurisdiction of the ARB, local air districts, and counties and cities with land use authority, and these agencies would need to identify any necessary mitigation. Because DOGGR cannot be certain that the degree of mitigation would reduce emissions to levels that would not exceed local air district thresholds, this impact would be a Class I: Significant and Unavoidable Impact.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-2b**     **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM AQ-2c**     **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

| Impact AQ-3     Expose sensitive receptors to substantial pollutant concentrations |
|---|

Emissions from marine and rail terminals would have the potential to expose sensitive receptors to substantial pollutant concentrations depending on local conditions. Mitigation similar to that identified for the project would need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce the levels of TACs from marine and rail terminals. Because DOGGR cannot be certain that feasible mitigation would subject the facilities to sufficient controls so that activities would not expose sensitive receptors to substantial pollutant concentrations, this is a Class I: Significant and Unavoidable Impact. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-3a**     **Comply with Local Air District Protocols Relating to the Preparation of** ~~Prepare a~~ **Health Risk Assessment and Implement Emission Controls.** (Full text in EIR Section 10.3.5.)

**MM AQ-3b**     **Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility.** (Full text in EIR Section 10.3.5.)

| Impact AQ-4     Create objectionable odors affecting a substantial number of people |
|---|

Emissions from marine and rail terminals would have the potential to create objectionable odors depending on local conditions. Mitigation similar to that identified for the project would need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce potential odor impacts from marine and rail terminals. Because site-specific conditions may result in occasionally unavoidable odor annoyances and universal implementation of odor minimization strategies would not be certain, this impact would be a Class I: Significant and Unavoidable Impact. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-4a**     **Prepare and Implement an Odor Minimization Plan.** (Full text in EIR Section 10.3.5.)

**MM AQ-4b**     **Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility.** (Full text in EIR Section 10.3.5.)

### 12.2.3.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the existing Wilmington, Inglewood, or Sespe fields. Therefore, emissions associated with well stimulation treatments would not occur. The indirect effects of additional conventional wells and abandonment activities could also increase the intensity of operations at these fields to make up for lost pro-

duction, within the limits of existing entitlements. As a result, oil and gas production emissions would continue as in the setting or be reduced somewhat (Class III).

### 12.2.3.4    Impact Significance Summary

Alternative 1 is worse than the project for Air Quality impacts. Although emissions related to well stimulation treatments would be avoided, emission increases would occur due to crude transport and offloading or an increase in the intensity of operations in fields to maintain production levels. Emissions associated with these indirect effects would cause air quality impacts described above.

## 12.2.4    Biological Resources: Terrestrial Environment

### 12.2.4.1    Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources–Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources–Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected environment for biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.4.2    Programmatic Level Analysis of the Project

Under the No Future Well Stimulation Practices Alternative no surface or subsurface disturbances associated with well stimulation treatments would occur in areas under State jurisdiction. Therefore, no direct impacts from stimulation activities to biological resources would occur within or outside of existing oil and gas fields that are under State jurisdiction (Class IV).

Special-status biological resources may be found within existing oil and gas fields, but tend to be more abundant elsewhere. There is a potential for adverse impacts from oil and gas production both within and outside of existing fields, even without well stimulation treatments. Most of the potential impacts to terrestrial biological resources described in EIR Section 10.4 result from land use alterations and other surface impacts of oil and gas production. These impacts may result from well siting, drilling, and operation, regardless whether well stimulation treatments are applied.

There are greater indirect temporary and permanent impacts of additional conventional wells. But there are reduced operational impacts from well abandonment.

Indirect impacts to terrestrial biological resources associated with Alternative 1 would be potentially significant when viewed programmatically. In particular, potential increases in well drilling to maintain production levels would impact biological resources, possibly to a greater extent than similar production levels obtained through well stimulation, due to greater number of wells and consequent surface disturbance. Alternately, if existing wells or entire oil and gas fields are abandoned, current operation impacts of those facilities to biological resources would be reduced. However, at the programmatic level of analysis, it is not possible to know precisely the location, extent and particular characteristics of the impacts to these resources. Either the abandonment of existing oil and gas fields per existing State, federal, and local regulatory requirements for site restoration, or the drilling and operation of new wells

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 180 of 689   Page ID #:5127

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

would be expected to cause substantial surface and subsurface disturbances that would create impacts that may be significant and unavoidable (Class I). This would apply to biological resources impact criteria BIOT-1 through BIOT-6 and BIOT-10, below. In contrast, Impact BIOT-8 and Impact BIOT-9 are Class II impacts under the project.

- Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species

- Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels

- Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species

- Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS

- Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS

- Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means

- Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites

- Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance

- Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan

- Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. Mitigation measures similar to Mitigation Measures BIOT-1a through BIOT-9a (adapted for applicability for projects other than well stimulation activities) would reduce impacts, but would not necessarily reduce impacts to a less than significant level. Additional mitigation measures or other conditions may be required under other regulatory programs including but not limited to CESA, ESA, state and federal regulation of waters of the State and waters of the U.S.

**MM BIOT-1a**   **Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat.** (Full text in EIR Section 10.4.5.)

**MM BIOT-1b**   **Minimize Impacts to Native Vegetation and Habitat.** (Full text in EIR Section 10.4.5.)

**MM BIOT-1c**   **Replace or Offset Loss of Sensitive Habitat.** (Full text in EIR Section 10.4.5.)

**MM BIOT-2a**   **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM BIOT-3a**   **Minimize and Mitigate Impacts to Special-status Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM BIOT-3b**   **Minimize and Mitigate Impacts to Special-status Plants.** (Full text in EIR Section 10.4.5.)

**MM BIOT-4a**   **Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS.** (Full text in EIR Section 10.4.5.)

**MM BIOT-4b**   **Minimize Impacts to Protected Birds.** (Full text in EIR Section 10.4.5.)

**MM BIOT-6a**   **Protect Jurisdictional Waters.** (Full text in EIR Section 10.4.5.)

**MM BIOT-7a**   **Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement.** (Full text in EIR Section 10.4.5.)

**MM BIOT-8a**   **Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans.** (Full text in EIR Section 10.4.5.)

**MM BIOT-9a**   **Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans.** (Full text in EIR Section 10.4.5.)

**MM AQ-2a**   **Reduce Hydrocarbon Emissions from Well Stimulation Treatments.** (Full text in EIR Section 10.3.5.)

**MM AQ-2b**   **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM AQ-2c**   **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM GHG-1a**   **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

**MM GHG-1b**   **Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies.** (Full text in EIR Section 10.12.5.)

**MM HAZ-1a**   **<u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~.** (Full text in EIR Section 10.13.5.)

**MM GW-1a**   **Use Alternative Water Sources <u>to the Extent Feasible</u>.** (Full text in EIR Section 10.14.5.)

**MM GW-1b**   **<u>Minimize Groundwater Impacts</u>~~Prepare a Third-Party Technical Report to Analyze Overdraft Impacts~~.** (Full text in EIR Section 10.14.5.)

**<u>MM GW-4a</u>**   **<u>Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.</u>** (Full text in EIR Section 10.14.5.)

**MM GW-4b**   **Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u>~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~.** (Full text in EIR Section 10.14.5.)

**MM SWR-1a**    **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-1b**    **Surface Water Protection.** (Full text in EIR Section 10.15.5.)

~~**MM SWR-1c**    **Protect Surface Water Reservoirs.** (Full text in EIR Section 10.15.5.)~~

**MM SWR-2a**    **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a**    **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

**MM TR-1a**    **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

### 12.2.4.3    Programmatic Level Analysis of Specific Oil and Gas Fields

The programmatic level analysis contained in EIR Chapter 10 for terrestrial biological resources addresses the same impact criteria referenced above. The restriction[1] of well stimulation treatments in the Wilmington, Inglewood, and Sespe Oil and Gas Fields would result in no direct impacts of well stimulation activities to biological resources (Class IV). Indirect impacts (described above) to biological resources would largely affect surface resources, in much the same manner as described for the impacts of the project. Thus, the indirect effects of Alternative 1 to biological resources in California could be reduced by Mitigation Measures BIOT-1a through BIOT-9a or by similar measures imposed by approving agencies other than DOGGR with respect to projects that do not involve well stimulation or oil and gas development. However, these impacts would be Class II for the Wilmington and Inglewood Oil and Gas Fields. The Sespe Oil and Gas Field (in contrast with the Wilmington field) contains extensive natural habitat areas, and is surrounded by additional important habitat areas. For the Sespe Oil and Gas Field, impacts may be Class I even with the implementation of recommended mitigation. Within the Sespe field, Mitigation Measures BIOT-2b and BIOT-2c would also apply:

**MM BIOT-2b**    **California Condor Protection Measures.** (Full text in EIR Section 10.4.5.)

**MM BIOT-2c**    **Nelson's Bighorn Sheep Protection Measures.** (Full text in EIR Section 10.4.5.)

### 12.2.4.4    Impact Significance Summary

Alternative 1 would reduce the potential direct impacts to terrestrial biological resources in all study regions at the programmatic level because there would be no surface or subsurface disturbances associated with well stimulation in areas under State jurisdiction. However, indirect effects associated with either existing oil and gas field abandonment or intensified well drilling and production would be potentially significant and unavoidable (Class I). Mitigation measures similar to Mitigation Measures BIOT-1a through BIOT-9a listed above would reduce these effects but cannot guarantee they would be entirely avoided.

Direct impacts in the Wilmington, Inglewood, and Sespe Oil and Gas Fields also would be reduced under Alternative 1. However, indirect biological resources effects of either existing oil and gas field abandonment or intensified well drilling and production, or stimulation on the portions of the Sespe field under federal jurisdiction, would be potentially significant and unavoidable (Class I) in all three fields, particularly in the Sespe field due to greater extent of sensitive biological resources.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

---

[1]    Parts of the Sespe field are under federal jurisdiction, where stimulation activities may be allowed.

## 12.2.5    Biological Resources: Coastal and Marine Environment

### 12.2.5.1    Introduction

This section provides an evaluation of the potential impacts to coast and marine biological resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.5 (Biological Resources–Coastal and Marine Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.5 (Biological Resources–Coastal and Marine Environment). For the purposes of this analysis please refer to EIR Sections 10.5.2 and 11.5.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.5.3 and 11.5.3 for a description of the affected environment for biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.5.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.5.2    Programmatic Level Analysis of the Project

This Programmatic Level Analysis of Impacts focuses on specific impacts to coastal and marine biological resources from Alternative 1 (No Future Well Stimulation Practices). Under this alternative, program-level impacts are discussed (if applicable) and potential mitigation measures developed.

- **Impact BIOCM-1:** Substantially affect any species identified as a candidate, sensitive, or special status species or their habitat

- **Impact BIOCM-2:** Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites

- **Impact BIOCM-3:** Have a substantial adverse effect on federally protected wetlands as defined by Section 404 of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means

Under Alternative 1, well stimulation activities would not be conducted in any coastal or marine areas under State jurisdiction. There would be no direct impacts to coastal and marine biological resources, including sensitive habitats and species at offshore facilities in Study Region 1 because no well stimulation activities would occur (Class IV) in State waters and tidelands. Moreover, no additional barge trips would be required to transport well stimulation equipment to the THUMS Islands, so there would be no potential for an accidental spill due to increased well stimulation vessel traffic in the vicinity of the THUMS Islands or offshore platform. In addition, migratory routes for biological resources would not be affected. There could be some indirect impacts on coastal and marine resources from intensification of oil and gas drilling that would not utilize well stimulation techniques, or from increased stimulation activities in federal waters. However, with the implementation of current regulations, indirect impacts would be less than significant (Class III).

### 12.2.5.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portion of the Wilmington field that is under State jurisdiction. Therefore, potential impacts to coastal and marine biological resources associated with well stimulation treatments, such as removal as a result of HDD operations would not occur, and no mitigation measures would be required (Class IV). There could be some indirect impacts on coastal and marine resources from intensification of oil and gas

drilling. With the implementation of current regulations, indirect impacts would be less than significant (Class III).

### 12.2.5.4    Impact Significance Summary

Direct impacts for Impacts BIOCM-1, BIOCM-2, and BIOCM-3 would be Class IV. Indirect impacts from potential intensification of oil and gas development that does not involve well stimulation activities would be Class III.

## 12.2.6    Coastal Processes and Marine Water Quality

### 12.2.6.1    Introduction

This section provides an evaluation of the potential impacts to coastal processes and marine water quality associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.6 (Coastal Processes and Marine Water Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.6 (Coastal Processes and Marine Water Quality). For the purposes of this analysis please refer to EIR Sections 10.6.2 and 11.6.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.6.3 and 11.6.3 for a description of the affected environment for coastal processes and marine water quality (as applicable at either a study region or field-specific scale), and EIR Section 10.6.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.6.2    Programmatic Level Analysis of the Project

Under the No Future Well Stimulation Treatments Alternative there would be no direct impacts from well stimulation treatments (Class IV) in areas under State jurisdiction.

However, there may be indirect impacts from intensification of oil and gas drilling. ~~Alternative 1 reduces direct risk of tsunami, but there remain indirect tsunami risks from conventional offshore well drilling or an increase in well stimulation on waters under federal management.~~ Indirect impacts could ~~also~~ result in hydrocarbon spills due to the additional conventional wells and increased importation of oil by ship.

Impacts addressed for coastal processes and marine water quality are:

- **Impact CPMWQ-1:** Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity

- **Impact CPMWQ-2:** Change the velocity or direction of ocean currents

- **Impact CPMWQ-3:** Change the velocity or direction of coastal and ocean winds

- **Impact CPMWQ-4:** Change the direction, size, or period of ocean waves

- **Impact CPMWQ-5:** Increase the risk of tsunamis

While the exact nature of the indirect impacts is unknown and would be based on market conditions, indirect impacts may be Class II for water quality (Impact CPMWQ-1), <u>and</u> ocean currents (Impact CPMWQ-2)~~, and tsunami risk (Impact CPMWQ-5)~~. This is because Alternative 1 would have no effect on conventional well drilling, and many of the projects currently proposed but not yet implemented involve horizontal or "slant" drilling from an onshore base to an offshore field. Therefore, there is still potential for indirect impacts to marine water quality (from accidents and leaks), <u>and</u> marine currents (from shore

protection structures to protect land-side assets), and an increase to the risk of tsunami (due to subsidence of the ocean floor as offshore fields are tapped). Due to the potential for increased importation of oil by ship, hydrocarbon spills could also occur.

There are potentially feasible and effective strategies for mitigating the adverse indirect effects of Alternative 1 to less than significant (Class II), though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM CPMWQ-1a**   **Protect Marine Water Quality.** (Full text in EIR Section 10.6.5.)

**MM CPMWQ-2a**   **Prepare and Implement Marine Current Plan.** (Full text in EIR Section 10.6.5.)

~~**MM CPMWQ 5a**   **Conduct Offshore Geotechnical and Tsunami Investigation.** (Full text in EIR Section 10.6.5.)~~

~~**MM CPMWQ 5b**   **Modify the Drilling of Disposal Wells Offshore or Near Shore.** (Full text in EIR Section 10.6.5.)~~

As with the project, the impacts related to ocean winds (Impact CPMWQ-3) would be Class III, and impacts related to ocean waves (Impact CPMWQ-4) would be Class IV.

### 12.2.6.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Since the Inglewood and Sespe Oil and Gas Fields are inland and well away from the coast, the analysis of the alternative on Coastal Processes and Marine Water Quality does not apply and no further discussion of these fields appears in this section.

***Wilmington Oil and Gas Fields***

The programmatic discussion for indirect impacts provided in EIR Section 12.2.6.2, above, would apply to coastal processes and marine water quality associated with the Wilmington Oil and Gas Field because Alternative 1 would have no effect on conventional well drilling, and between 80 to 100 conventional wells could be drilled on any given year. Impacts from new wells for which well stimulation would not occur could range from less than significant with mitigation (Class II) to no impact (Class IV). Mitigation would have to be imposed through mechanisms other than well stimulation treatment permits.

### 12.2.6.4    Impact Significance Summary

Direct impacts from Alternative 1 would be reduced for all study regions. However, indirect impacts may occur from intensified drilling and production activities that do not involve well stimulation, or in areas under state or tribal jurisdiction. ~~The severity of these impacts is unknown and difficult to quantify, because some of the impacts of the project (e.g. tsunami risk) are also difficult to quantify.~~ But impacts from Alternative 1 would likely be similar to a general order of magnitude to those of the project.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.7    Commercial and Recreational Fishing

### 12.2.7.1    Introduction

This section provides an evaluation of the potential impacts to commercial and recreational fishing associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.7 (Commercial and Recreational Fishing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.7 (Commercial and Recreational Fishing). For the purposes of this analysis please refer to EIR Sections 10.7.2 and 11.7.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.7.3 and 11.7.3 for a description of the affected environment for commercial and recreational fishing (as applicable at either a study region or field-specific scale), and EIR Section 10.7.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.7.2    Programmatic Level Analysis of the Project

This Programmatic Level Analysis of Impacts focuses on specific impacts to commercial and recreational fishing from Alternative 1 (No Future Well Stimulation Practices). Under this alternative, program-level impacts are discussed (if applicable) and potential mitigation measures developed.

■ **Impact CRF-1:** Cause long-term exclusion of important commercial and recreational fishing areas.

■ **Impact CRF-2:** Result in substantial loss of total catch to commercial and recreational fishing industries.

Under Alternative 1, well stimulation activities would not be conducted for wells under state jurisdiction. There would be no direct interference or displacement of commercial or recreational fishing activity (Class IV) in State waters and tidelands. Because well stimulation would not occur in State waters or tidelands, no accidental spills would be likely as a result of vessel collision due to increased barge traffic from transporting well stimulation equipment to the THUMS Islands or offshore platforms. No long-term exclusions from important fishing grounds or substantial loss in commercial or recreational catch would occur. There could be some indirect impacts on commercial and recreational fishing resources from intensification of oil and gas drilling that would not utilize well stimulation techniques. With the implementation of current regulations (existing Title 14 regulations and the existing State and federal regulations, as described in EIR Section 10.6.2) and DOGGR's proposed permanent regulations (Sections 1782, 1783.1, 1784.1 and 1784.2, 1785 as described in EIR Section 2.2.2), indirect impacts would be less than significant (Class III).

### 12.2.7.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the Wilmington field under State jurisdiction. Therefore, potential direct impacts to commercial or recreational fishing associated with well stimulation treatments, such as temporary displacement from small fishing grounds on shore or near offshore platforms would not occur, and no mitigation measures would be required (Class IV). There could be some indirect impacts on commercial and recreational fishing resources from intensification of oil and gas drilling that would not utilize well stimulation techniques, or in waters under federal jurisdiction. With the implementation of current regulations (existing Title 14 regulations and the existing State and federal regulations, as described in EIR Section 10.6.2) and DOGGR's proposed permanent regulations (Sections 1782, 1783.1, 1784.1 and 1784.2, 1785 as described in EIR Section 2.2.2), indirect impacts would be less than significant (Class III).

### 12.2.7.4    Impact Significance Summary

Direct impacts for Impacts CRF-1 and CRF-2 would be Class IV. Indirect impacts from potential intensification of oil and gas development that does not involve well stimulation activities would be Class III.

## 12.2.8    Cultural Resources

### 12.2.8.1    Introduction

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.8.2    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impacts are addressed:

■ **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

■ **Impact CUL-2:** Affect prehistoric resources

■ **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

■ **Impact CUL-4:** Affect cultural landscapes

Under the No Future Well Stimulation Practices Alternative no surface or subsurface disturbances associated with well stimulation treatments would occur in areas under State jurisdiction. Therefore, no direct impacts to cultural resources would occur on State jurisdiction lands within or outside of existing oil and gas fields (Class IV).

The indirect impacts to cultural resources associated with Alternative 1 would have a potentially significant effect when viewed programmatically. Should the lack of well stimulation treatments cause additional new conventional wells to be drilled and operated to compensate for lost production, either within or outside of existing oil and gas fields, or cause increased stimulation activities on lands under federal or tribal jurisdiction, corresponding surface and subsurface disturbances to cultural resources could occur. At a programmatic level of analysis, it is not possible to know precisely the location, extent and particular characteristics of the impacts to these resources. Impacts could, however, be significant and unavoidable (Class I) at a site-specific scale.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. Mitigation measures similar to Measures CUL-1a through CUL-1j, as listed below, would reduce these effects but cannot guarantee they would be entirely avoided.

**MM CUL-1a** ~~Inventory~~ **Require Information and Evaluate Cultural Resources.** (Full text in EIR Section 10.8.5.)

**MM CUL-1b** **Complete Native American Coordination.** (Full text in EIR Section 10.8.5.)

**MM CUL-1c** **Prepare and Implement Cultural Resources Management and Treatment Plan.** (Full text in EIR Section 10.8.5.)

**MM CUL-1d** **Prepare Plan for the Inadvertent Discovery of Human Remains.** (Full text in EIR Section 10.8.5.)

**MM CUL-1e** **Provide Cultural Resources Specialist with the Authority to Halt Well Stimulation Activities.** (Full text in EIR Section 10.8.5.)

**MM CUL-1f** **Conduct a Cultural Resources Worker Environmental Awareness Program.** (Full text in EIR Section 10.8.5.)

**MM CUL-1g** **Monitor Earth Disturbing Activities for Cultural Resources.** (Full text in EIR Section 10.8.5.)

**MM CUL-1h** **Provide Native American Monitors during Earth Disturbing Activities.** (Full text in EIR Section 10.8.5.)

**MM CUL-1i** **Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities.** (Full text in EIR Section 10.8.5.)

**MM CUL-1j** **Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities.** (Full text in EIR Section 10.8.5.)

The scale of oil and gas development, the constraints imposed by other environmental resources, and the possibility that some buried resources would remain unidentified until ground disturbance begins makes avoidance of all significant effects unlikely. Therefore, Impacts CUL-1 through CUL-4 would remain significant and unavoidable (Class I).

### 12.2.8.3 Programmatic Level Analysis of Specific Oil and Gas Fields

While Alternative 1 would likely reduce overall impacts to cultural resources outside of existing oil and gas fields, this alternative may result in increased conventional oil and gas development within existing fields. Therefore cultural resources within existing fields may be subject to increased impacts when compared to the project. The potential increase in development may also increase the indirect impacts to cultural resources. Overall, impacts are still considered significant and unavoidable (Class I).

***Wilmington Oil and Gas Field***

The elimination of well stimulation treatments in the portions of the Wilmington Oil and Gas Field that are under State jurisdiction would result in no direct impacts to cultural resources (Class IV) because there would be no surface or subsurface disturbances associated with such treatments. However, it is possible that to accommodate for the oil and gas production lost from well stimulation treatments, additional new conventional wells could be constructed and operated, or additional stimulation projects could occur on lands under federal jurisdiction. For this scenario, site-specific mitigation measures, imposed through a mechanism other than a well stimulation treatment permit, would have to be developed after a full inventory of the cultural resources present within the field is complete. Mitigation measures similar to Mitigation Measures CUL-1a through CUL-1j, as listed above in EIR Section 12.2.8.1,

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 189 of 689   Page ID #:5136

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

would likely reduce some of these effects to less than significant (Class II), but cannot guarantee they would be entirely avoided. Indirect impacts to cultural resources are therefore considered significant and unavoidable (Class I).

### *Inglewood Oil and Gas Field*

Based upon available information, there are at least 15 previously recorded resources within a one-half mile radius of the Inglewood Oil and Gas Field. Additionally, seven other possible historic resources have been noted in existing documentation but not recorded. Oil activity in the Inglewood Oil and Gas Field has been constant since 1924 and oil infrastructure and equipment older than 50 years old are considered potentially eligible as historic-era resources as well. As noted above, the elimination of well stimulation treatments in areas under State jurisdiction in this field would result in no direct impacts to cultural resources (Class IV). However, if the field is drilled more intensively to maintain production throughput without well stimulation treatments, or if the federal portion of the field is more intensely drilled and stimulated, construction, operation and/or stimulation of the additional wells would be expected to result in the same indirect effects as noted above. It is likely that some of these indirect impacts could potentially be mitigated to a level of less than significant (Class II) with implementation of mitigation measures similar to Mitigation Measures CUL-1a through CUL-1j, as listed above, through a mechanism other than a well stimulation treatment permit; however, the possibility that some buried resources would remain unidentified until ground disturbance begins makes avoidance of all significant effects unlikely. Therefore, this impact would remain significant and unavoidable (Class I).

### *Sespe Oil and Gas Field*

The cultural resources impact conclusions and mitigation measures for Alternative 1 in the Sespe Oil and Gas Field would be the same as those identified for the Wilmington and Inglewood Oil and Gas Fields, as addressed above. No direct impacts specific to well stimulation treatments would occur on lands under state jurisdiction (Class IV); however, indirect effects could be significant and unavoidable (Class I). Mitigation based on Mitigation Measures CUL-1a through CUL-1j, as listed above in EIR Section 12.2.8.1, would likely reduce some of these effects to less than significant, but cannot guarantee they would be entirely avoided without site-specific information and a cultural resources inventory. Indirect impacts to cultural resources are therefore considered significant and unavoidable (Class I).

## 12.2.8.4    Impact Significance Summary

Alternative 1 would reduce the potential direct impacts to cultural resources at the programmatic level analysis for the Wilmington, Inglewood, and Sespe Oil and Gas Fields because there would be no surface or subsurface disturbances associated with well stimulation in areas under State jurisdiction. However, indirect effects associated with the disturbances from intensified well drilling and production and/or stimulation (for federal lands and waters) would be considered significant and unavoidable (Class I). Mitigation measures similar to Measures CUL-1a through CUL-1j, as listed above in EIR Section 12.2.8.1, would reduce these effects but cannot guarantee they would be entirely avoided. Impacts are considered significant and unavoidable (Class I).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.9    Paleontological Resources

### 12.2.9.1    Introduction

This section provides an evaluation of the potential impacts to paleontological resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.9.2    Programmatic Level Analysis of the Project

The No Future Well Stimulation Treatments Alternative (Alternative 1) would prohibit all future well stimulation activities in areas under State jurisdiction. For the purposes of this analysis, the following impact is addressed:

■ **Impact PALEO-1:** Destroy or disturb surface or near-surface significant paleontological resources

Table 10.9-8 in EIR Section 10.9 provides a summary table of the geologic units in each study region that have the potential to bear significant paleontological resources.

Under the No Future Well Stimulation Treatments Alternative, no new ground disturbing activities associated with well stimulation treatments would occur in areas under State jurisdiction, and thus no direct impacts to paleontological resources would occur (Class IV). However, within existing oil and gas fields, earth disturbing activities associated with either abandonment or subsequent restoration of a field, or the increased drilling or stimulation (on lands under federal or tribal jurisdiction) of new wells would potentially adversely affect paleontological resources.

There are potentially feasible and effective strategies for mitigating these adverse indirect effects of Alternative 1, though these strategies would have to be imposed through mechanisms other than well stimulation treatment permits. Some of the mitigation measures developed in this EIR, though written for such permits, also provide guidance for fashioning similar mitigation strategies for other types of project approvals contributing to the indirect impacts. Implementation of measures similar to Mitigation Measures PALEO-1a through PALEO-1h, as listed below and detailed in EIR Section 10.9, would be expected to reduce these impacts to less than significant (Class II), because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery.

**MM PALEO-1a** ~~Inventory~~ Require Information and Evaluate Paleontological Resources. (Full text in EIR Section 10.9.5.)

**MM PALEO-1b   Develop Paleontological Resource Mitigation Plan.** (Full text in EIR Section 10.9.5.)

**MM PALEO-1c   Retain Qualified Paleontological Resources Staff.** (Full text in EIR Section 10.9.5.)

**MM PALEO-1d   Conduct a Paleontological Resources Worker Environmental Awareness Program.** (Full text in EIR Section 10.9.5.)

**MM PALEO-1e  Monitor Earth Disturbing Activities for Paleontological Resources.** (Full text in EIR Section 10.9.5.)

**MM PALEO-1f  Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities.** (Full text in EIR Section 10.9.5.)

**MM PALEO-1g  Paleontological Resources Report for the Monitoring of Earth Disturbing Activities.** (Full text in EIR Section 10.9.5.)

**MM PALEO-1h  Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities.** (Full text in EIR Section 10.9.5.)

### 12.2.9.3    Programmatic Level Analysis of Specific Oil and Gas Fields

*Wilmington Oil and Gas Field*

Published geologic maps indicate the Wilmington field is underlain by three sedimentary rock units of Pleistocene to Holocene age. Museum records contained eight previously recorded vertebrate localities directly within project boundaries, which were recovered from the Early Pleistocene age San Pedro Formation and Quaternary older deposits. In addition, museum records indicated that at least 23 vertebrate fossil localities have been recorded nearby. These localities were discovered from within the San Pedro Formation and Pleistocene age Quaternary alluvial deposits, including the Palos Verdes Sand. Portions of the Wilmington field are determined to have a paleontological resource potential (i.e., sensitivity) ranging from low to high. However, under Alternative 1 no new ground disturbing activities associated with well stimulation would occur in areas under State jurisdiction and therefore no direct impacts to paleontological resources would occur in those areas (Class IV). If, though, the field was to be more intensively drilled to make up for production lost from no future well stimulation, or if stimulation activities increased in waters under federal jurisdiction, implementation of measures similar to Mitigation Measures PALEO-1a through PALEO-1h would be necessary to reduce impacts to less than significant (Class II).

*Inglewood Oil and Gas Field*

Much of the Inglewood Oil and Gas Field is underlain at depth by geologic units proven to yield significant paleontological resources, and the likelihood to encounter them at shallow depths ranges between low to high, depending on the location of earth disturbing activities. As with the programmatic level analysis of the project, within the Inglewood field implementation of Alternative 1 would preclude any future earth disturbances associated with well stimulation and thus no direct impacts would occur (Class IV) under Impact PALEO-1. However, if the field is drilled more intensively to maintain existing production rates in lieu of well stimulation treatments, the construction and operation of the additional wells would be expected to result in the same indirect effects as noted above. With application of measures similar to Mitigation Measures PALEO-1a through PALEO-1h, as listed in EIR Section 12.2.9.2, impacts would be less than significant (Class II).

*Sespe Oil and Gas Field*

Published geologic maps indicate that the Sespe field is underlain by 11 sedimentary rock units of Eocene to Holocene age. Museum records contained one previously recorded vertebrate locality directly within project boundaries, which was recovered from the early Miocene age Vaqueros Formation. In addition, museum records indicated that at least 33 vertebrate fossil localities have been recorded nearby. These localities were discovered within the Coldwater, Sespe, Rincon, and Monterey Formations, as well as deposits of Quaternary older alluvium. As a result of this study, portions of the Sespe

field are determined to have a paleontological resource potential (i.e., sensitivity) ranging from low to very high. However, under Alternative 1 no new ground disturbing activities associated with well stimulation would occur in areas under State jurisdiction and therefore no direct impacts to paleontological resources would occur in those areas (Class IV). Conversely, if additional new wells, beyond those currently considered for probable future production (see EIR Chapter 7), were drilled to make up for production lost from no future well stimulation, or if stimulation activities increased on the portions of the field under federal jurisdiction, implementation of measures similar to Mitigation Measures PALEO-1a through PALEO-1h would be necessary to reduce impacts to less than significant (Class II).

### 12.2.9.4    Impact Significance Summary

The No Future Well Stimulation Treatments Alternative would reduce potential direct and adverse impacts to paleontological resources in all study regions because there would be no earth disturbing activities associated with well stimulation treatments in areas under State jurisdiction (Class IV). However, if this alternative caused the abandonment of existing oil and gas fields, an increase in their production via newly drilled wells, or increased stimulation activities on lands under federal or tribal jurisdiction, the associated earth disturbing activities would be expected to cause adverse impacts to paleontological resources. These impacts could be mitigated to a level of less than significant (Class II) with implementation of Mitigation Measures similar to PALEO-1a through PALEO-1h.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.10    Environmental Justice

### 12.2.10.1   Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.10.2   Programmatic Level Analysis of the Project

Alternative 1 would prohibit all current and future well stimulation activities in areas under State jurisdiction. As a result, there would be no potential for the well stimulation treatment impacts to occur that would disproportionately affect minority or low-income populations that would be in the vicinity of oil and gas well stimulation activities in areas under State jurisdiction. No direct environmental justice impacts would occur in those areas.

Prohibiting well stimulation could result in some fields having low production levels being abandoned. To make up for potential production foregone from not conducting well stimulation, some existing fields could increase their amount of convention drilling and production, and additional oil and gas imports from out of state could occur or increased stimulation activities could occur on lands under federal or tribal jurisdiction. Field abandonment would not adversely affect populations of concern. Increasing the

density of wells in an existing field and increasing enhanced recovery activities could increase impacts to nearby populations. However, the increased level of activity would be expected to not be substantial, because wells in existing fields typically are already spaced to effectively recover reserves and new wells would likely locate on or between existing pads. In which case, the impact of additional activity would have less than significant impacts for nearby populations, which would translate there being no environmental justice impact.

There would be potential indirect impacts from additional conventional wells drilled to compensate for lost production, but some existing wells would also be abandoned. And there would be potentially significant and unmitigable indirect impacts associated with transport of oil by rail, which would increase in the absence of well stimulation being used in California. Increased ship, rail, and truck traffic hauling imported oil and gas to refineries would increase traffic through communities located on existing transportation corridors. The increased rail traffic would increase use of rail corridors between the source fields and California refineries. Although not analyzed, communities along these lines maybe disproportionately comprised of minority and low-income populations. Affected communities would be affected by the diesel emissions coming from all of these trains and from risk of upset. Increased rail imports of oil likely would increase the risk of accidents and leaks occurring in these communities. This is a significant new environmental justice impact when compared to the project. Unlike the project, strategies could not be developed and implemented by DOGGR to address ship, rail, and truck traffic hauling imported oil and gas to refineries. These refinery facilities and transportation infrastructure and routes are already in place and thus cannot be sited differently or in ways to avoid disproportionate impacts to minority or low-income populations. DOGGR would have no authority over what is transported and by what means.

### 12.2.10.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Under this alternative, no well stimulation treatments would occur in areas under State jurisdiction that would disproportionately affect minority or low-income populations adjacent to the Wilmington, Inglewood, or Sespe Oil and Gas Fields. No environmental justice impacts would occur in the immediate area, either because there would be no stimulation activities in areas under State jurisdiction, or because there are no residents living near the portions of the Wilmington or Sespe fields that are under federal jurisdiction.

### 12.2.10.4  Impact Significance Summary

As discussed, there would be no potential for well stimulation treatments and any environmental affects to occur disproportionately within areas containing minority or low-income populations under Alternative 1. However, in response to prohibiting well stimulation, oil imports by ship, rail, and truck are likely to increase substantially, creating an adverse impact in communities through which transportation corridors pass carrying oil would pass. In particular, populations living in close proximity to rail lines maybe minority or low income people. This would be a significant impact and no mitigation is identified that would make it less than significant.

## 12.2.11  Geology, Soils and Mineral Resources

### 12.2.11.1  Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral

Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections 10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.11.2  Programmatic Level Analysis of the Project

Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, as described in EIR Chapter 7 (Description of the Project). This alternative would require new legislation to revise or repeal PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments. The new legislation would need to specify that, as of its effective date, all future well stimulation treatments would not allowable in areas under State jurisdiction.

This alternative could cause the following indirect effects, abandonment of existing oil and gas fields or otherwise an increase in the intensity of an existing oil and gas field's production, or an increase in stimulation activities on lands under federal or tribal jurisdiction. This alternative could also cause an increase in activities associated with the importation of oil and gas products.

| Impact GEO-1 | Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure |
|---|---|

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction so it would not expose people or structures to potential effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure. No impact would occur (Class IV). If existing oil and gas fields are abandoned, this would have no impact associated with exposing people or structures to ruptures of a known fault, seismically induced groundshaking, and/or ground failure. An increase in the intensity of an existing oil and gas field production or stimulation (on lands under federal or tribal jurisdiction), or an increase in activities associated with the importation of oil and gas products, could require new infrastructure and could result in impacts similar to those described in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures) because existing oil and gas field production areas are crossed by active faults and near seismically active areas. Infrastructure required for the import of oil and gas would similarly be required to cross areas that are seismically active given the large number of active faults in California, described in EIR Section 10.11.3 (Affected Environment). See EIR Figures 10.11-4, 10.11-16, and 10.11-22 for the regional faults and 10.21-2 for the location of Class I rail lines and rail terminals.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. Standard regulations and mitigation measures similar to Mitigation Measures GEO-1a, GEO-1b, and GEO-1f provided in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures) would reduce this impact to less than significant (Class II). Rupture of a known fault or seismically induced groundshaking could also result in oil or nat-

ural gas spills or upsets, and is addressed in EIR Section 12.2.21 (Risk of Upset/Public and Worker Safety).

**MM GEO-1a**    **Avoid Active Fault~~s~~ ~~Zones~~ if Necessary.** (Full text in EIR Section 10.11.5.)

**MM GEO-1b**    **Implement an Appropriate Setback if Necessary.** (Full text in EIR Section 10.11.5.)

**MM GEO-1c~~f~~**    **Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan.** (Full text in EIR Section 10.11.5.)

| Impact GEO-2 | Result in substantial soil erosion or the loss of topsoil |
|---|---|

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction so it would not result in substantial soil erosion of the loss of topsoil in those areas. No impact would occur (Class IV). Any of the potential indirect effects of this alternative are likely to require additional ground disturbing activities, either during closure of an existing oil and gas field, when drilling new oil wells to increase existing oil and gas field's production, when drilling and/or stimulating additional new oil wells on federal lands, or if an increase in importation of oil and gas products is such that it required additional rail or port facilities. Disturbed areas will have a relatively high potential for erosion and loss of topsoil. Existing regulation, in particular the NPDES Stormwater program would be required for any construction sites one acre or larger (including smaller sites that are part of a larger common plan of development). This program includes provisions to control runoff and minimize soil erosion for any construction sites one acre or larger. However, where sites are smaller than one acre, erosion or loss of topsoil could still occur. Mitigation similar to Mitigation Measure SWR-1a (Require Stormwater Pollution Prevention Plan) would reduce the effects to less than significant in such instances (Class II).

**MM SWR-1a**    **Require Stormwater Pollution Prevention Plan if Necessary.** (Full text in EIR Section 10.11.5.)

| Impact GEO-3 | Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse |
|---|---|

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction, so no impact would occur in those areas as a result of stimulation-related infrastructure being located on an unstable geologic unit or soil. If existing oil and gas fields are abandoned due to this alternative, this would have no impact associated with unstable units or soil (Class IV). Removal of infrastructure would occur over a short time frame and the risk of a landslide, lateral spreading, subsidence, or collapse during such a short time frame is low. An increase in the intensity of an existing oil and gas field production, an increase in well stimulation on federally managed lands, or an increase in activities associated with the importation of oil and gas products could require new infrastructure such as new ports and railroad facilities and could result in impacts similar to those described in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures) for this impact because existing oil and gas field production areas include areas where there is landslide risk, or risk of subsidence or collapse, described in EIR Section 10.11.3 (Affected Environment). Standard regulations and mitigation measures similar to Mitigation Measure GEO-3a provided in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures) would reduce this impact to less than significant (Class II). Landslides, lateral spreading, subsidence, or collapse of soil could result in oil or natural gas spills or upsets, addressed in EIR Section 12.2.21 (Risk of Upset/Public and Worker Safety).

**MM GEO-3a**    **Prepare Geotechnical Report if Necessary.** (Full text in EIR Section 10.11.5.)

| **Impact GEO-4    Be located on expansive soil creating substantial risks to life or property** |
| :--- |

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction, so no stimulation infrastructure would be located on expansive soil and no direct impact would occur in those areas (Class IV). Indirect effects caused by the alternative would be unlikely to create a substantial risk to life or property from being located on expansive soil. This is because the well owner/ operators and owner/operators of the infrastructure associated with the importation of oil and gas products would have already taken into consideration the soil within their fields or where the importation infrastructure is located. The owner/operators would have either avoided expansive and unstable soils or included this consideration into the engineering of the projects to reduce risk to their investment. This impact is adverse but less than significant (Class III).

| **Impact GEO-5    Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems** |
| :--- |

A moratorium on well stimulation activities in areas under State jurisdiction, including the indirect effects of this alternative, would not allow or result in the construction of septic tanks or other non-portable waste disposal systems. Therefore, the alternative would have no impact on soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems (Class IV).

| **Impact GEO-6    Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan** |
| :--- |

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction, so no direct impact would result in the loss of non-fuel mineral resources (Class IV). Indirect effects resulting from this alternative would be unlikely to create a substantial loss of non-fuel minerals because they would not eliminate a large amount of land available for mineral recovery. This impact is adverse but less than significant (Class III).

However, the impacts to oil and gas resources would be significant and unmitigable. This alternative would result in the loss of an estimated 25 percent of the current oil and gas production and a loss of all future production from the Monterey Formation and its plays. At this time, there is no method of reaching this known mineral resource other than by use of hydraulic fracturing. Due to the large percentage of loss of known oil and gas resources, indirect impacts under this alternative would be significant and unmitigable for loss of oil and gas resources (Class I). In contrast, Impact GEO-6 is Class III under the project.

This alternative would have no impact to geothermal resources (Class IV).

| **Impact GEO-7    Cause an induced seismic event including ground shaking and ground failure** |
| :--- |

Under this alternative, there would be no activities associated with well stimulation in areas under State jurisdiction, so no impact would occur in those areas due to induced seismic events (Class IV). Neither abandonment of existing oil and gas fields nor an increase in activities associated with the importation of oil and gas products would cause induced seismic events. An increase in the intensity of an existing oil and gas field production could result in an induced seismic event due to an increase in fluid injection for disposal of wastewater. However, injection wells in areas under State jurisdiction are regulated by DOGGR and the main features of DOGGR's Underground Injection Control program include permitting, inspection, enforcement, mechanical integrity testing, plugging and abandonment oversight, data management, and public outreach. Similar regulation applies to injection wells on federal and tribal lands. Because the

underground injection wells are already being used for oil and gas production and are already regulated by DOGGR or the applicable federal agency, the risk of an induced seismic event due to the increase in intensity of existing oil and gas field production is considered adverse but less than significant (Class III).

### 12.2.11.3   Programmatic Level Analysis of Specific Oil and Gas Fields

For the programmatic level analysis for the Wilmington, Inglewood, and Sespe Oil and Gas Fields, see EIR Section 11.11 (Geology, Soils, and Mineral Resources) which addresses Impacts GEO-1 through GEO-7.

***Wilmington Oil and Gas Field***

The potential impacts and mitigation measures presented in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures) apply to the Wilmington Oil and Gas Field, with the exception of Impact GEO-1, Impact GEO-3, and Impact GEO-6.

| Impact GEO-1 | Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure |
|---|---|

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.1 (Study Region 1: Wilmington Oil and Gas Field) would not occur in those areas.

It cannot be predicted if any portion of the Wilmington Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field and would not expose people or structures to adverse effects due to seismic events. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. Because there are no active faults that cross the Wilmington field, the probability of damage from surface fault rupture is not considered to be likely. Mitigation measures modeled on Mitigation Measures GEO-1a, GE0-1b, GEO-1c, and GEO-1e would not be required. Impacts caused by ground shaking, including lurching or cracking of the ground surface as a result of nearby seismic events is possible and mitigation measures similar to Mitigation Measures GEO-1d and GEO-1f would be recommended to reduce the impacts to less than significant (Class II).

Increased importation of oil and gas as a specific function of reduced production of the field would not be expected to occur given overall oil and gas production rates of the State. No impacts would occur (Class IV).

| Impact GEO-3 | Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse |
|---|---|

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.1 (Study Region 1: Wilmington Oil and Gas Field) would not occur in those areas.

It cannot be predicted if the Wilmington Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field and would not result in impacts due to unstable geologic units or soil. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure

at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground distur-bance. Because the risk of landsliding is considered low for the Wilmington Oil and Gas Field, there would be no indirect impacts caused by landslides. However, a mitigation measure modeled on Mitigation Measure GEO-3a would be required to address lateral spreading, subsidence, or collapse at this field (Class II).

| | |
|---|---|
| **Impact GEO-6** | **Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan.** |

As mentioned in EIR Section 11.11.3.1 (Study Region 1: Wilmington Oil and Gas Field), the potential for loss of mineral deposits due to further development of the study area is considered low (Class III). How-ever, this alternative would reduce the amount of known oil and gas resource that could be extracted from the field. Given overall oil and gas production rates of the State, loss of this known resource would be adverse but less than significant (Class III).

### Inglewood Oil and Gas Field

Under Alternative 1 all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5 (Impact Analysis and Mitigation Measures) for the Inglewood Oil and Gas Field would not occur. The potential impacts and mitigation measures presented in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures) apply to the Inglewood Oil and Gas Field, with the exception of Impact GEO-1 and Impact GEO-3.

It cannot be predicted if the Inglewood Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field. Impacts of these activities would be the same as described for the programmatic level analysis. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. Impacts of these activities would be the same as described for the project analysis.

The potential impacts and mitigation measures similar to those presented in EIR Section 12.2.11.2 (Pro-grammatic Level Analysis of Impacts and Mitigation Measures) apply to the Inglewood Oil and Gas Field, with the exception of Impact GEO-1, Impact GEO-3, and Impact GEO-6.

| | |
|---|---|
| **Impact GEO-1** | **Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure** |

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.2 (Study Region 1: Inglewood Oil and Gas Field) would not occur.

It cannot be predicted if the Inglewood Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field and would not expose people or structure to adverse effects due to seismic events. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil

due to ground disturbance. Because there are no active faults that cross the Wilmington field, the probability of damage from surface fault rupture is not considered to be likely. Mitigation measures similar to Mitigation Measures GEO-1a, GE0-1b, GEO-1c, and GEO-1e would not be required. Impacts caused by ground shaking, including lurching or cracking of the ground surface as a result of nearby seismic events is possible and mitigation measures similar to Mitigation Measures GEO-1d and GEO-1f would be recommended to reduce the impacts to less than significant (Class II).

Increased importation of oil and gas as a specific function of reduced production of the field would not be expected to occur given overall oil and gas production rates of the State. No impacts would occur (Class IV).

| Impact GEO-3 | Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse |
|---|---|

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.1 (Study Region 1: Inglewood Oil and Gas Field) would not occur.

It cannot be predicted if the Inglewood Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field and would not result in impacts due to unstable geologic units or soil. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. Because the risk of landsliding is considered low for the Inglewood Oil and Gas Field, there would be no indirect impacts caused by landslides. However, a mitigation measure similar to Mitigation Measure GEO-3a would be required to address lateral spreading, subsidence, or collapse at this field (Class II).

| Impact GEO-6 | Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan. |
|---|---|

As mentioned in EIR Section 11.11.3.2 (Study Region 1: Inglewood Oil and Gas Field), the potential for loss of mineral deposits due to further development of the study area is considered low (Class III). However, this alternative would reduce the amount of known oil and gas resource that could be extracted from the field. Given overall oil and gas production rates of the State, loss of this known resource would be adverse but less than significant (Class III).

### *Sespe Oil and Gas Field*

The potential impacts and mitigation measures presented in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures) apply to the Sespe Oil and Gas Field, with the exception of Impact GEO-1 and Impact GEO-3.

| Impact GEO-1 | Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure |
|---|---|

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.3 (Study Region 2: Sespe Oil and Gas Field) would not occur in those areas.

It cannot be predicted if any portion of the Sespe Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field. If Sespe Oil and Gas Field were not abandoned, there may be an increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation. This would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. Portions of the field have known faults and are located within a State of California Earthquake Fault Zone. Mitigation measures similar to Mitigation Measures GEO-1a, GEO-1b, and GEO-1c would be required. Impacts caused by ground shaking, including lurching or cracking of the ground surface as a result of nearby seismic events is possible and measures similar to Mitigation Measures GEO-1d, GEO-1e, and GEO-1f would be recommended to reduce the impacts to less than significant (Class II).

Increased importation of oil and gas as a specific function of reduced production of the field would not be expected to occur given overall oil and gas production rates of the State. No impacts would occur (Class IV).

| **Impact GEO-3** | **Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse** |
|---|---|

Under Alternative 1, all activities associated with well stimulation practices would be prohibited in areas under State jurisdiction. Therefore, the impacts described in EIR Section 11.11.5.3 (Study Region 3: Sespe Oil and Gas Field) would not occur in those areas.

It cannot be predicted if the Sespe Oil and Gas Field would be abandoned if well stimulation were prohibited; however, abandonment of all existing facilities, equipment and activities would require the removal of some infrastructure and closure of the field. An increase in the intensity of existing operations within the field to accommodate for the loss of production associated with well stimulation would result in some additional infrastructure at the field and associated risk of impacts due to seismic concerns and loss of soil due to ground disturbance. The Ventura County General Plan policies pertain to natural hazards including landslides and other seismic risks. The Ventura County policies require geotechnical and geologic investigations to address the natural hazards. Owner/operators would be required to design their projects consistent with the applicable guidelines. As such, the impacts would be adverse but less than significant (Class III).

### 12.2.11.4  Impact Significance Summary

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.12  Greenhouse Gas Emissions

### 12.2.12.1  Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific

scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

## 12.2.12.2  Programmatic Level Analysis of the Project

| Impact GHG-1 | Generate greenhouse gas emissions that may have a significant impact on the environment |
| --- | --- |

This alternative would restrict future oil and gas activity by halting well stimulation activities in areas under State jurisdiction. This would avoid GHG emissions that occur in areas under State jurisdiction as a result of oil and natural gas production made possible by well stimulation, and it would also lead to a decrease in California oil production. Therefore, there would be no direct impacts (Class IV). But there are greater indirect impacts from increased oil and gas imports that cause significant and unavoidable GHG emissions from out-of-state oil and gas producers (Class I). There are also indirect impacts associated with additional conventional wells and abandonment activities, or stimulation activities on lands under federal or tribal jurisdiction, to make up for lost production.

Under this alternative, an additional 57 million barrels of crude per year would need to be supplied from fields outside of California (EIR Section 8.3.1), which currently supply about 380 million barrels annually (ARB, 2014c). Oil and natural gas producers outside of California would need to increase production in response, and this would increase GHG emissions from the oil and gas industry outside of California.

Sources of GHG at oil and gas fields outside of California are not subject to California's regulatory setting (EIR Section 10.12.2), which ensures that GHG sources in the business of oil and gas production in California are subject to multiple programs aimed at reducing GHG. Emissions of GHG that occur at a point of oil and gas extraction outside of California are not subject to the Cap-and-Trade Program, and by increasing the activity of oil and gas extraction outside of California, this alternative would cause increased GHG from sources that are not required to offset the GHG to comply with California's cap, resulting in an overall net increase in GHG emissions compared with both existing conditions and the project. Although the oil and gas extraction and associated GHG emissions would occur outside California, California would continue to experience the adverse environmental effects of global climate change driven by GHG emissions worldwide. This impact would occur from GHG sources that are not covered by California's regulatory setting and outside of the potential control of DOGGR to feasibly mitigate. As a result of increasing GHG emissions from sources beyond California's control, no feasible mitigation would be available. This alternative would increase GHG emissions from sources that could not be prevented, reduced, offset, or otherwise mitigated by DOGGR or another California agency tasked with reducing GHG emissions. The GHG emissions increase would cause a potentially significant impact on the environment, and because these emissions would occur beyond California's control, Impact GHG-1 would be Class I: Significant and Unavoidable.

Some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-2b**      **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM GHG-1a**    **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

| **Impact GHG-2** | **Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases** |
|---|---|

Because this alternative would cause some future oil and gas production to be lost, California end users of oil and gas would need to rely on a replacement supply. Using a replacement crude supply could result in an incremental change in life-cycle GHG emissions of California's crude supply, which could be an increase or decrease depending the carbon intensity of the replacement supply. The carbon intensity for production and transport of an average unit of crude oil used in California (about 11.4 g CO2e/MJ) is lower than that of an average crude produced in California (12.9 g CO2e/MJ) (ARB, 2012). Life-cycle GHG from the production and transport of 57 million barrels of crude at the average carbon intensity for crude produced in California are around 4,600,000 MTCO2e, and depending on the field-specific factors of the replacement supply imported, life-cycle GHG for the same amount of average supply used in California is around 4,100,000 MTCO2e. Although this implies that replacing in-state production with average imports could incrementally reduce life-cycle GHG emissions, all crude produced for use in California is subject to the LCFS, regardless of the location of the supply.

Despite the greater average carbon intensity of crude oil produced in California compared with oil produced in places that would export their oil to California, an increase in imports into California would still result in an overall net increase in GHG emissions compared with both existing conditions and the project. This is ~~alternative could conflict with California's existing programs to reduce GHG~~ because in-state production is not only subject to the LCFS but also subject to the Cap-and-Trade Program. These programs require oil and gas production to operate within an overall statewide cap, which is lowered over time. The Cap-and-Trade Program limits in-state GHG emissions to ensure that the AB 32 goals will be achieved and the statewide emission target of 431 MMTCO2e by 2020 will not be exceeded (ARB, 2007; ARB, 2014b). Producers of the replacement supply of oil and gas under this alternative if outside of California would not be subject to California's statewide GHG cap. Out-of-state oil and gas producers create GHG emissions during extraction that are uncovered and not limited by the Cap-and-Trade Program. These emissions will not be captured by California's cap, but would be in addition to it. As a result, in addition to total statewide emissions of 431 MMTCO2e by 2020 allowed by the Cap-and-Trade Program, this alternative would also increase GHG from out-of-state crude oil recovery and transport activities by around 4.1 MMTCO2e, depending on the replacement supply. The ARB is directed to take steps to "minimize leakage" in implementing AB 32 regulations [HSC Section 38562(b)(8))], and this alternative would conflict with that requirement by potentially offsetting an in-state reduction of GHG emissions with an increase in GHG emissions outside the state. By increasing these uncovered emissions at sources that are beyond the control of California's regulations and any recommended mitigation, this alternative would conflict with California's programs aimed at reducing GHG, and Impact GHG-2 would be would be Class I: Significant and Unavoidable.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM AQ-2b**      **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM GHG-1a**     **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

### 12.2.12.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the existing Wilmington, Inglewood, or Sespe fields that are under State jurisdiction. Therefore, emissions associated with well stimulation treatments would not occur in those areas. The indirect effects of additional conventional wells and abandonment activities could also increase the intensity of operations at these fields to make up for lost production, within the limits of existing entitlements. As a result, oil and gas production emissions would continue as in the setting (Class III).

### 12.2.12.4  Impact Significance Summary

Alternative 1 is worse than the project for GHG impacts. Indirect impacts from increased oil and gas imports would cause significant and unavoidable GHG emissions from out-of-state oil and gas producers that could not be prevented, reduced, offset, or otherwise mitigated by DOGGR or another California agency tasked with reducing GHG emissions. Although emissions related to well stimulation treatments would be avoided, emission increases would occur due to an increase in crude transport and offloading, including GHG emissions from increased oil and gas production outside of California, or an increase in the intensity of operations in fields to maintain production levels. These indirect effects would cause impacts due to increasing greenhouse gas emissions as described above.

## 12.2.13   Hazards and Hazardous Materials

### 12.2.13.1  Introduction

This section provides an evaluation of the potential impacts to hazards and hazardous materials associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

As summarized in EIR Section 10.13.6, impacts from hazardous materials associated with well stimulation treatments were determined to be potentially significant. However, the impacts analysis indicated that with the incorporation of existing and proposed regulations, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. This includes the mitigation measure identified specifically for Hazards and Hazardous Waste in EIR Section 10.13.5 as well as measures developed for other affected environmental resources, including air quality (10.3), biological resources (10.4), geology and soils (10.11), groundwater resources (10.14), surface water resources (10.15), and risk of upset/public and worker safety (10.21).

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 204 of 689   Page ID #:5151
Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

The mitigation measures in EIR Section 10.13.5, which are summarized on Table 10.13-12, focus on spill/leak prevention by including a <u>comprehensive Spill Contingency Plan and, at DOGGR's discretion, may also require a</u> physical containment barrier for site pads <u>to prevent any spills that do occur from reaching site soils or groundwater</u>. The mitigation measure from EIR Section 10.13.5 reduces the project impacts from hazards and hazardous materials to a less than significant level.

### 12.2.13.2  Programmatic Level Analysis of the Project

| Impact HAZ-1    Release hazardous materials into the environment from a spill or leak |
| --- |

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in California on land under State jurisdiction. Therefore, hazards and hazardous materials associated with well stimulation treatments would have no impact on any of the study regions, and mitigation measures would not be necessary (Class IV).

Alternative 1 eliminates direct impacts from well stimulation activities and all associated hazardous materials. Hydrocarbon spills could still occur with indirect impacts of additional conventional wells.

If some fields are abandoned because of low production in the absence of stimulation, wells would be shut in or abandoned and equipment removed. Some spills could occur during this activity, but the sites would be cleaned up and restored in accordance with DOGGR, DTSC, and other agency requirements. This would be a beneficial outcome with regard to the presence of hazards and hazardous materials (Class V).

Should a ban on well stimulation occur, some owner/operators may increase the number of new conventional wells in a field and intensify use of enhanced recovery techniques; similarly, some may increase stimulation activities on lands under federal or tribal jurisdiction. This could lead to additional spills; however, these would be similar in nature to existing spills and leaks that may occur in a field and would be addressed through DOGGR, DTSC and Regional Water Board requirements such as hazardous materials management and response plans. Consequently, increased activity would have a less than significant impact on hazardous material events (Class III) in the area of a well stimulation.

Increased transport of imported oil to refineries to offset supplies that would not materialize through well stimulation would increase the opportunities for spills or accidents. In addition, hazardous materials would not be transported to and from a well stimulation site. These situations are addressed in EIR Sections 12.2.21 (Risk of Upset/Public and Worker Safety) and 12.2.23 (Transportation and Traffic). Increased ship, rail, and truck traffic hauling imported oil and gas to refineries would increase traffic through communities located on traffic corridors. Rail traffic importing oil to the State would increase use of rail corridors between the source fields and California refineries. This would greatly increase the amount of oil hauled on these lines. Therefore, it is likely that increased rail imports of oil would increase the risk of accidents and leaks. This would be a significant impact (Class I) and no mitigation is identified that would make it less than significant. In contrast Impact HAZ-1 would be Class II under the project because mitigation measures would reduce impacts of released hazardous materials from well stimulation into the environment from a spill or leak to a less than significant level.

### 12.2.13.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the Wilmington, Inglewood or Sespe Oil and Gas Fields that are under State jurisdiction. Therefore, hazards and hazardous materials associated with well stimulation treatments would have no impact in those areas. The absence of well stimulation materials would be a beneficial

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 205 of 689   Page ID #:5152

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

outcome (Class V) in the vicinity of the fields. Some owner/operators may increase the number of new conventional wells in a field and intensify use of enhanced recovery techniques, and some may increase stimulation activities on lands under federal or tribal jurisdiction. This could lead to additional spills; however, these would be similar in nature to existing spills and leaks that may occur in a field and would be addressed through applicable regulatory requirements. Consequently, increased activity would have a less than significant impact on hazardous material events (Class III) in the area of a well stimulation.

However, elsewhere in the State, an increase in oil imports by rail to make up for production lost because of a prohibition on well stimulation would increase rail tank car traffic along rail lines. Communities along railroad lines would be adversely affected by the rail traffic and any accidents or leaks that may occur. This would be a significant impact (Class I) that could not be mitigated.

### 12.2.13.4  Impact Significance Summary

The No Future Well Stimulation Treatments Alternative would result in no impact for the Programmatic Level Analysis of the Project and the Programmatic Level Analysis of Specific Oil and Gas Fields. The absence of well stimulation materials would be a beneficial outcome (Class V) in the vicinity of fields. However, increased rail tank car traffic to import oil to the state would have a significant impact along the rail corridors (Class I).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.14  Groundwater Resources

### 12.2.14.1  Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

As summarized in EIR Section 10.14.6, impacts from well stimulation treatments were determined to be potentially significant to groundwater quantity and groundwater quality. Further analysis indicated that the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures, which are summarized on Table 10.14-20, focus on preventing exacerbation of groundwater overdraft or subsidence, maintaining existing use of water supply wells, and mitigating possible pathways that might allow well stimulation fluids including gas to reach Protected Water.

## 12.2.14.2  Programmatic Level Analysis of the Project

| Impact GW-1 | Cause or contribute to overdraft conditions |
| --- | --- |

Under Alternative 1, well stimulation would not occur in areas under State jurisdiction; therefore, water that would be used in well stimulation in those areas would not be required and the potential for well stimulation to contribute to groundwater overdraft in critically impacted groundwater basins would not occur. There would be no impact (Class IV).

If some oil and gas fields are abandoned because of a lack of sufficient production, this would result in wells being abandoned or shut, equipment being removed, and land surfaces restored. This would not affect critically impacted groundwater basins (Class IV).

If owner/operators increased drilling and enhanced recovery activities in existing fields, or increased stimulation activities on lands under federal or tribal jurisdiction, this would increase the amount of water used. Compared to stimulation throughout the state, this well drilling and stimulation would require substantially reduced amounts of water, which would come from existing sources and could include recycled water. The impact would be less than significant (Class III). However, if there were increased well stimulation on tribal or federally managed lands, this would increase the amount of water used at those locations. Impacts on tribal or federally managed lands would be the same as those of the project (Class II with mitigation).

Importing oil from foreign or domestic sources would increase deliveries of crude oil, natural gas, or petroleum products to refineries, increasing the number of oilers, tanker trucks, or rail cars to these destinations, or increase the volume of oil and gas delivered via pipeline, if line capacity is available. This would not affect critically impacted California groundwater basins because it would not result in additional pumping (Class IV).

In contrast, Impact GW-1 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater under federal or tribal lands, though any such strategy would have to be imposed by the federal or tribal government. DOGGR's relevant revised model mitigation measure in this context is the following:

**MM GW-1a    Use Alternative Water Sources to the Extent Feasible.** (Full text in EIR Section 10.14.5.)

| Impact GW-2 | Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water |
| --- | --- |

If some oil and gas fields are abandoned because of a lack of sufficient production, this would result in wells being abandoned or shut, equipment being removed, and land surfaces restored. This would require little if any groundwater and would have no impact (Class IV).

Should owner/operators increase drilling and enhanced recovery activities at existing fields to compensate for not being able to use well stimulation, this could lead to a local increase in groundwater use. However, the amount of water used would represent only a marginal increase over current use and would be less than significant (Class III). If this alternative led to increased well stimulation on federal or tribal lands, this would require more water use and impacts at these locations would be similar to those of the project (Class II with mitigation).

If oil and gas imports increase to compensate for any foregone production due to a prohibition on well stimulation, this would not affect critically impacted groundwater basins because it would not result in additional pumping (Class IV).

In contrast, Impact GW-2 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant <u>revised</u> model mitigation measure in this context is the following:

**MM GW-<u>1b</u>~~2a~~**    **Minimize Groundwater Impacts**~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping~~**.** (Full text in EIR Section 10.14.5.)

| | |
|---|---|
| **Impact GW-3** | **Adversely impact groundwater quality through surface spills or leaks during well stimulation** |

Under Alternative 1, chemicals used in well stimulation would not be used. As a result, the potential for well stimulation to introduce well stimulation fluids into Protected Water would not occur. This would be a beneficial outcome (Class IV).

Impact GW-3 is specific to a spill or leak of stimulation treatment fluids or products that can enter the protected groundwater zone of a formation. In the absence of stimulation activity, this possibility would not arise. There would be no impact on protected groundwater from stimulation fluids or products under three scenarios: abandoning an oil and gas field; increasing activity in a field; or increasing oil imports (Class IV). If the alternative led to an increase in stimulation activities on federally managed lands, this would result in a similar impact as with the project because similar chemicals would be used. The locations where this could occur would be limited compared with the project, but the impact would remain Class II on federal lands.

In contrast, Impact GW-3 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater quality under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant model mitigation measure <u>(as amended)</u> in this context is the following:

**MM HAZ-1a**    **<u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous</u>**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~**.** (Full text in EIR Section 10.14.5.)

| | |
|---|---|
| **Impact GW-4** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals** |

If well stimulation fluids are not introduced into wells or fractures, they would not be available in the environment to bypass non-existent or ineffective well seals that may exist in a field. There would be no impact, as there would be no stimulation fluids introduced into the field (Class IV).

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 208 of 689   Page
ID #:5155
Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

Abandoning a field, increasing activity in a field, or increasing imports of oil would have no impact on whether stimulation fluids could migrate through annular spaces since additional stimulation fluids would not be used. There would be no migration of stimulation fluids caused by any of these three scenarios (Class IV). If the alternative led to an increase in stimulation activities on federally managed lands, this would result in a similar impact as with the project because similar stimulation fluids or formation fluids could migrate through non-existent or ineffective annular well seals. The locations where this could occur would be limited compared with the project, but the impact would remain Class II on federal lands.

In contrast, Impact GW-4 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant <u>revised</u> model mitigation measures in this context are the following:

**MM GW-4a**    **Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.** (Full text in EIR Section 10.14.5.)

**MM GW-4b**    **Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u>~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~.** (Full text in EIR Section 10.14.5.)

**MM GW-4c**    **Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u>.** (Full text in EIR Section 10.14.5.)

| | |
|---|---|
| **Impact GW-5** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells** |

The absence of well stimulation fluids as a result of Alternative 1 being implemented would mean that any damaged or improperly abandoned wells located in the vicinity of a well that would have been a candidate for stimulation would not become pathways for well stimulation fluid to reach Protected Water. This would be a positive outcome (Class IV).

Abandoning a field, increasing activity in a field, or increasing imports of oil would have no impact on whether stimulation fluids could migrate to Protected Water through damaged or improperly abandoned wells. There would be no migration of stimulation fluids caused by any of the three scenarios (Class IV). If the alternative led to an increase in stimulation activities on federally managed lands, this would result in a similar impact as with the project because similar stimulation fluids or formation fluids could migrate through damaged or improperly abandoned wells. The locations where this could occur would be limited compared with the project, but the impact would remain Class II on federal lands.

In contrast, Impact GW-5 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater quality under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant <u>revised</u> model mitigation measure in this context is the following:

**MM GW-5a**    **Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

| Impact GW-6 | Improper disposal of flowback in injection wells could potentially impact groundwater quality |
|---|---|

In the absence of well stimulation, there would be no disposal of flowback associated with well stimulation unless this alternative resulted in an increase in stimulation activities on federal lands where such actions were not prohibited. On federal lands, impacts would be the same as for the project (Class II with mitigation). Off of federal land, there would be no impact (Class IV). There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater quality under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant _revised_ model mitigation measure in this context is the following:

MM GW-6a    **Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater**~~Install a Cement Seal across Protected Groundwater~~. (Full text in EIR Section 10.14.5.)

| Impact GW-7 | Inability to identify specific impacts to groundwater quality from well stimulation activities |
|---|---|

In the absence of well stimulation, there would be no injected fluids and, therefore, no need to use tracers to identify whether a stimulation fluid has migrated. There would be no impact (Class IV).

Impact GW-7 is specific to stimulation treatment fluids or products that could migrate to undesired locations. In the absence of stimulation activity, there would be no injection of stimulation fluids or products under Alternative 1 except on federally managed lands. If this alternative led to an increase in stimulation on federal lands, impacts would be the same as for the project (Class II with mitigation). On lands not under federal management, there would be no impact (Class IV).

In contrast, Impact GW-7 is Class II under the project.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the potential adverse indirect effects of Alternative 1 on groundwater quality under federal lands, though any such strategy would have to be imposed by the federal government. DOGGR's relevant _revised_ model mitigation measure in this context is the following:

MM GW-7a    **Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

## 12.2.14.3  Programmatic Level Analysis of Specific Oil and Gas Fields

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the Wilmington, Inglewood or Sespe Oil and Gas Fields that are under State jurisdiction. Therefore, potential impacts associated with well stimulation treatments on groundwater resources would not occur at these fields (Class IV). Portions of the Wilmington and Sespe Oil and Gas Fields are under federal jurisdiction; well stimulation treatments could continue within those locations. Impacts caused by well stimulation at the Wilmington and Sespe fields would be the same as described in EIR Section 11.

### 12.2.14.4  Impact Significance Summary

The No Future Well Stimulation Treatments Alternative would result in no impact on groundwater resources under both the Programmatic project and the Programmatic Specific Oil and Gas Fields Analyses.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.15  Surface Water Resources

### 12.2.15.1  Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 1. This evaluation is based on the same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.15.2  Programmatic Level Analysis of the Project

Under Alternative 1, well stimulation treatments would not occur in areas under State jurisdiction, and there would be no new wells constructed for the purpose of hydraulic fracturing or acid well stimulation treatment in those areas. Under this alternative, none of the impacts associated with hydraulic fracturing and acid well stimulation treatments, and the construction of new oil and gas wells intended for stimulation, would occur in areas under State jurisdiction in any of the study regions.

| | |
|---|---|
| **Impact SWR-1** | **Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality** |

Under Alternative 1, existing wells in areas under State jurisdiction would continue in operation using existing conventional drilling and operation methods. However, no stimulation activities would occur, eliminating any risk of violations of water quality standards as a result of stimulation. Existing regulations applicable to existing wells would continue to protect water quality as described in EIR Section 10.15.5 through reporting, best management practices, and clean-up requirements. This alternative would have no direct impact on surface water quality (Class IV).

If fields are abandoned, non-stimulation field activity increased, or oil imports increased as a result of prohibiting stimulation, these outcomes could have an effect on water quality if they lead to spills or discharges. However, all the activities associated with these scenarios are managed and regulated under existing programs designed to address spill prevention, erosion control, site clean-up, and material disposal. These regulatory programs are the same or similar to those described in EIR Chapter 7, EIR Chapter 2, and EIR Section 10.15 and are assumed to be in place and followed. Therefore, while these scenarios could increase somewhat the chance of an upset or accident, applicable existing requirements and protocols would make the impact overall less than significant (III) for similar reasons as described in EIR Section 10.15.5. However, if Alternative 1 leads to increased well stimulation activities on federally

managed land, this impact on federal land would be similar to that of the project, described in EIR Section 10.15.5 and would likely require mitigation to reduce the impacts to less than significant (Class II). The impact would occur on a more limited acreage than under the project.

In contrast, Impact SWR-1 is Class II under the project.

---

**Impact SWR-2**   **Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site**

---

Erosion and siltation impacts to surface water as a result of well stimulation would not occur under Alternative 1. Potential impacts to existing drainages through activities related to well stimulation are principally associated with the construction of new wells for the purpose of well stimulation, and these wells would not be constructed. No existing wells would be subject to stimulation. Existing regulations would continue to protect surface waters. With a prohibition on stimulation, there would be no impact to drainage patterns resulting in substantial erosion or siltation (Class IV).

Field abandonment and an increase in imported oil would not substantially affect existing drainage patterns. Increased drilling of conventional wells and other activities at a field could potentially affect existing drainage patterns. However, owner/operators would be unlikely to alter the course of a stream or river to drill additional wells, which could be spudded in areas outside of drainageways. Therefore, there would be no impact under the three scenarios (Class IV). However, if Alternative 1 leads to increased well stimulation activities on federally managed land, this impact on federal land would be similar to that of the project, described in EIR Section 10.15.5 and would likely require mitigation to reduce the impacts to less than significant (Class II).

In contrast, Impact SWR-2 is Class II under the project.

---

**Impact SWR-3**   **Substantially diminish surface water quantity**

---

Surface water would have been used for well stimulation, but under this alternative that use would not occur. This alternative would result in no impact on surface water quality (Class IV).

If fields are abandoned, field activity increased, or oil imports increased as a result of prohibiting stimulation, they would require little or no water. Therefore, no impact would occur resulting in a diminution of the quantity of surface water in a water body (Class IV). However, if Alternative 1 leads to increased well stimulation activities on federally managed land, this impact on federal land would be similar to that of the project, described in EIR Section 10.15.5 and would likely require mitigation to reduce the impacts to less than significant (Class II).

In contrast, Impact SWR-3 is Class II under the project.

---

**Impact SWR-4**   **Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding.**

---

In the absence of any stimulation activities, wells developed for stimulation would not be developed and existing wells would not be stimulated. No project-related flood hazard would be created. Portions of existing fields would remain in floodplains, as described in EIR Section 10.15.4, but this is an existing, non-project condition. There would be no impact on flood hazards (Class IV).

Three of the indirect scenarios, abandonment of fields, and increase in conventional oil drilling, and an increase in oil imports that could result from implementing Alternative 1 would not require altering drainage patterns in such a way that flood-related risks would be increased. Therefore, there would be no impact with regard to floods under all three scenarios (Class IV). However, if Alternative 1 leads to increased well stimulation activities on federally managed land, this impact on federal land would be similar to that of the project, described in EIR Section 10.15.5 and would likely require mitigation to reduce the impacts to less than significant (Class II).

In contrast, Impact SWR-4 is Class II under the project.

### 12.2.15.3  Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur on the portions of the Wilmington, Inglewood, or Sespe Oil and Gas Fields that are under State jurisdiction. Therefore, no impact on surface water resources in from well stimulation would occur in those areas (Class IV). If banning well stimulation leads to an increase in construction of new convention wells, or increased stimulation activities on lands under federal jurisdiction, there could be a potential increase in effects on water quality, erosion, and siltation. Additional drilling would increase the amount of water required by the fields and would likely require new pads and associated earthwork. There also could be an increase in water use for enhanced recovery, such a steam or water flooding. However, the amount of water used would not increase dramatically compared to current use and as a proportion of water use in general in the region, development of well pads and associated work would be subject to existing regulations and impact control requirements. Therefore, increased conventional activity in Wilmington and Sespe Oil and Gas Fields, or increased stimulation activities in the portions of those fields that are under federal jurisdiction, would have a less than significant impact (Class III).

### 12.2.15.4  Impact Significance Summary

The No Future Well Stimulation Treatments Alternative would result in no impact to surface water resources for the programmatic level analysis.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.16   Land Use and Planning

### 12.2.16.1  Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.16 (Land Use and Planning). For the purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

## 12.2.16.2  Programmatic Level Analysis of the Project

Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, as described in EIR Chapter 7 (Description of the Project). Therefore, there would be no disruptions to existing and permitted land uses from well stimulation activities in those areas. But there are indirect impacts associated with additional conventional wells, or increased stimulation activities on lands under federal or tribal jurisdiction; also, indirect impacts of well abandonment may free up areas of existing oil and gas wells for other uses. Prohibiting well stimulation in areas under State jurisdiction would require importing oil from other sources to meet demand, thus increasing ship, rail, and tanker truck traffic to the State from the foreign and domestic suppliers. It is assumed that imports would be transported by way of existing transportation routes and no new rail lines or roads would be required, except locally at any new or expanded terminals that might be developed to handle the imports.

This alternative would require new legislation to revise or repeal PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments. The new legislation would need to specify that all current or future well stimulation treatments are not allowable in areas under State jurisdiction.

| **Impact LU-1** | **Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses** |
|---|---|

Implementation of Alternative 1 would prohibit all current and future well stimulation activities in areas under State jurisdiction, which would decrease the amount of oil and gas produced in California as compared to allowing well stimulation in those areas. Under this alternative there would be no direct activities associated with well stimulation and thus no related disruptions that would preclude or diminish an existing or permitted land use or diminish the function of land uses. No impacts would occur (Class IV).

However, this alternative could both decrease activity at some existing fields through the abandonment of oil and gas fields that become unproductive, or increase the intensity of activities an existing oil and gas field where additional conventional wells are developed and/or enhanced recovery methods are employed or their use increased, or if stimulation activities increase on lands under federal or tribal jurisdiction. Because these activities are within existing fields, they would have less than significant impacts (Class III) on surrounding land uses. Prohibiting well stimulation would cause an increase in activities associated with the importation of oil and gas products into the State. Increased importation would be along existing transportation routes; with regard to land uses, this would be primarily rail and highway routes. The volume of traffic passing any point along a route may be substantially greater than current conditions, but this would depend on the volume of the imports. Absent detailed information on specific routes and nearby land uses, it is not feasible to determine the degree of impact. In some situations the volume of traffic on the route could disrupt traffic and site access (e.g., at rail crossings) or create increased noise, air quality emissions, and other conditions that could diminish a land use's function. In this situations theses impacts would be significant and unavoidable and their effect on land use and planning would significant and unavoidable (Class I).

Therefore, under Alternative 1, for Impact LU-1, direct impacts would be avoided at potential well stimulation locations by prohibiting the practice in areas under State jurisdiction (Class IV). Impacts resulting from the prohibition could be less than significant (Class III) at existing fields where increased levels of conventional drilling and enhanced recovery occur, or where stimulation activities are increased on lands under federal or tribal jurisdiction. Along transportation corridors impacts could be significant and unavoidable (Class I) at some locations, depending on the volume of imports and the nature and location of land uses near the transportation corridor.

Under the project well stimulation would be allowed and certain significant and unavoidable impacts could occur to some resources (see EIR Sections 10.1 (Aesthetics); 10.3 (Air Quality); 10.13 (Hazards and Hazardous Materials); 10.17 (Noise and Vibration); 10.21 (Risk of Upset/Public and Worker Safety); and 10.22 (Transportation and Traffic). In turn, these impacts could have significant and unavoidable impacts on land use by precluding certain uses or diminishing the function of certain land uses. Therefore, the impact to Land Use is consider significant and unavoidable (Class I) for the project.

| **Impact LU-2** | **Physically divide an established community** |
|---|---|

Under the No Future Well Stimulation Treatments Alternative all activities associated with hydraulic fracturing, acid fracturing, and acid matrix treatments would be prohibited in areas under State jurisdiction. Therefore, there would be no physical mechanism or action attributed to well stimulation that could divide an established community. No impacts would occur (Class IV). This alternative could cause some existing oil and gas fields to be abandoned and others to increase the intensity of production activities. It also could increase the importation of oil and gas resources into the State. The abandonment of an existing oil and gas field would not physically divide or alter an established community. An increase in the intensity of an existing oil and gas field would be assumed to occur within its existing boundaries and therefore would not have the potential to physically divide an existing community. Increased importation would be assumed to use existing infrastructure and thus would not have the potential to physically divide an established community. No impacts would occur (Class IV). If new or expanded terminals are required to handle increased imports, these likely would be extension of existing facilities or be located near existing refineries or in existing rail yards. Whether this would physically divide and established community is unknown in the absence of a specific proposal. However, such facilities typically would be located in existing industrial areas or adjacent to industrial facilities, and would not divide an existing community.

With regard to well stimulation, Impact LU-2 is Class III under the project and Class IV under Alternative 1.

| **Impact LU-3** | **Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect** |
|---|---|

As discussed in EIR Section 10.16 (Land Use and Planning), two permits are usually required to drill a well on private land in California. The well owner/operator typically needs to obtain a drilling permit from DOGGR and a Conditional Use Permit (or similar discretionary land use permit) from the local land use authority (i.e., a city or county), although some jurisdictions, such as Kern County, allow well drilling on a ministerial basis. However, because implementation of Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, compliance with the existing land use plans, policies and regulations that are in place for oil drilling would be required, and there would be no need to analyze whether well stimulation complies with applicable land use plans, policies or regulations. Increased stimulation activities in areas under federal or tribal jurisdiction would also be subject to a regulatory process with similar requirements. Therefore, there would be no impact under Impact LU-2 (Class IV).

In contrast, Impact LU-3 is less than significant with mitigation (Class II) under the project.

### 12.2.16.3   Programmatic Level Analysis of Specific Oil and Gas Fields

The discussion provided in EIR Section 12.2.16.2 for Impacts LU-1 through LU-3 also applies to the Wilmington, Inglewood, and Sespe Oil and Gas Fields, because implementation of Alternative 1 would prohibit all future well stimulation treatment activities in areas under State jurisdiction, including in existing fields, while stimulation would remain allowable on lands under federal or tribal jurisdiction.

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

| Impact LU-1 | Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses |
|---|---|

With well stimulation prohibited in areas under State jurisdiction, no direct impacts would occur (Class IV).

| Impact LU-2 | Physically divide and established community. |
|---|---|

The discussion and conclusions for Impact LU-2 provided in EIR Section 12.2.16.2 would be the same for the Wilmington, Inglewood, and Sespe Oil and Gas Fields. At a State, regional and local level no impacts would occur (Class IV).

| Impact LU-3 | Conflict with applicable land use plans, policies, programs, ordinances or other land sue regulations adopted for the purpose of avoiding or mitigating an environmental effect |
|---|---|

While implementation of Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, compliance with the existing land use plans, policies and regulations that are in place for oil drilling would be required. However, there would be no need to analyze whether well stimulation complies with applicable land use plans, policies or regulations. Therefore, there would be no impact under this criterion for the Wilmington, Inglewood, and Sespe Oil and Gas Fields (Class IV).

### 12.2.16.4   Impact Significance Summary

Land use and planning impacts associated with the No Future Well Stimulation Treatments Alternative would range from no direct impact (Class IV) to significant and unavoidable indirect impacts (Class I) due to disruptions, such as increased traffic, that would potentially occur if the production lost from well stimulation treatments caused an increase in the intensity of production in existing oil and gas fields and greater imports. No mitigation measures specific to land use and planning have been identified to reduce these indirect effects to a level of less than significant.

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.17   Noise and Vibration

### 12.2.17.1   Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3

and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.17.2  Programmatic Level Analysis of the Project

Under Alternative 1, direct noise impacts from well stimulation activities in areas under State jurisdiction would be avoided (Class IV). But there are indirect impacts associated with additional conventional wells drilled to make up for lost production, or increased stimulation activities in areas under federal or tribal jurisdiction, and there is the potential for well abandonment when wells become uneconomical. Pressure to increase shipping to make up for loss production would increase noise levels along railroad routes and at ports due to increased import volumes. Vibration from well stimulation would be eliminated and direct vibration impacts would be Class V.

| Impact NOI-1 | Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels |
|---|---|

| Impact NOI-2 | Cause exposure of persons to or generation of excessive groundborne vibration |
|---|---|

Since this alternative includes no well stimulation treatments in areas under State jurisdiction, no noise or vibration impacts will occur in those areas as a result of that activity, and no mitigation measures would be required. Thus Impacts NOI-1 and NOI-2 are Class IV under circumstances where there are no well stimulation activities.

In all regions where well stimulation treatments are occurring, the resulting noise and vibration impact would be beneficial since noise and vibration caused by well stimulation treatments would be eliminated (Class V).

As noted in EIR Section 8.3.1, a number of indirect effects could occur depending upon market and field conditions.

1.  **Additional Drilling on Lands under Federal Jurisdiction.** Because well stimulation in areas under State jurisdiction would be prohibited, it is likely that some additional drilling and stimulation on federal lands would occur. The noise created by drilling a well would be similar to that occurring within these fields; however, under this scenario more wells could be drilled per year to make up for lost production. The close proximity of these new wells to noise sensitive receivers could result in noise impacts. Drilling operations within approximately 1,000 feet of a noise sensitive land use would result in Ldn levels exceeding 70 dBA. Drill rig noise mitigation can be implemented to reduce the Ldn 70 dBA impact zone to approximately 100-foot radius (Class II).

    To mitigate impacts of this kind, the federal government would need to impose a mitigation measure similar to Mitigation Measure NOI-1a:

**MM NOI-1a**    **Control Noise Levels near Sensitive Land Uses.** (Full text in EIR Section 10.17.5.)

2.  **Well Abandonment.** Some existing oil and gas fields could become economically unviable because, without well stimulation, they would not have a rate of production sufficient to justify their continued operation. In this case, some existing fields could be abandoned if they become uneconomical and noise from these wells would cease (Class V).

3.  **Increased Shipping via Rail and Tanker Ships.** The increased shipping via rail and tanker ships would result in some increase in noise and vibration along the railroad routes and at the ports due to increased traffic volume. A doubling of total rail, truck, or shipping traffic would result in a 3 dB increase in noise emission from these shipping modes, and it is unlikely that the increased oil shipping would double the total rail and port activity in California and the United States. In some cases where existing noise levels at noise sensitive receivers adjacent to these modes of shipping are at the level of significance or greater as defined by the agency with jurisdiction, the impacts may result in Class II or Class I impacts. The agency with jurisdiction over these activities would ensure they abide by existing regulations, apply the appropriate mitigation and thereby reducing the effects. The resulting impacts (Impacts NOI-1 and NOI-2) would be less than significant (Class III) in most situations but higher levels of impact (Class II or Class I) for Impact NOI-1 are possible depending upon the proximity of the noise sensitive receiver and the existing ambient noise. Quantifying how additional oil would make up the shortfall due to a ban on stimulations is not possible as it would be dictated by market conditions. Since vibration is evaluated on a maximum value, no increase in impact from vibration would occur (Class IV) unless rail, highway or terminal demands required expanded the existing infrastructure and these facilities moved closer to noise sensitive receivers. In this case impacts could vary from no impact (Class IV) to significant (Class I).

In contrast, Impact NOI-1 is Class II and NOI-2 is Class IV under the project.

### 12.2.17.3  Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Under the No Future Well Stimulation Treatments Alternative, well stimulation treatments would not occur in the portions of the Wilmington, Inglewood, or Sespe fields that are under State jurisdiction. Therefore, noise and vibration associated with well stimulation treatments would not occur in those areas, and no mitigation measures would be required (Class IV). Where well stimulation treatments presently occur or are planned, the resulting impact under Alternative 2 would be beneficial since noise and vibration from well stimulation treatments would be eliminated (Class V).

Indirect effects as described above would also apply to the Wilmington, Inglewood, and Sespe Oil and Gas Fields.

### 12.2.17.4  Impact Significance Summary

Potential noise and vibration impacts related to well stimulation treatments would be avoided under this alternative; however, indirect noise and vibration may occur from crude transport and offloading or an increase in the intensity of operations in fields to maintain production levels. The agency with jurisdiction over these activities would ensure they abide by existing regulations, reducing the effects and impacts would vary from no impact (Class IV) to less than significant with mitigation (Class II). Since vibration is evaluated on a maximum value, no increase in impact from vibration would occur (Class IV) unless rail, highway or terminal demands required expanded the existing infrastructure and these facilities moved closer to noise sensitive receivers. In this case impacts could vary from no impact (Class IV) to significant (Class I). The agency with jurisdiction over these activities would ensure they abide by existing regulations, reducing the effects to Less Than Significant Impact With Mitigation (Class II).

## 12.2.18   Population and Housing

### 12.2.18.1  Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for population and housing (as applicable at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.18.2  Programmatic Level Analysis of the Project

Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction after the date of enactment of any required new legislation. Alternative 1 would not generate any potential for population increases or residential displacements from well stimulations. There are indirect impacts associated with additional conventional wells and abandonment activities to make up for lost production.

As a result, no additional employees would be required for well stimulations and there would be no potential for temporary or permanent population growth from well stimulations (Impact POP-1, Induce substantial population growth) or displacement of housing (Impact POP-2, Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere). If owners/operators of existing oil and gas fields propose to increase the intensity of a field's operations to compensate for the production that would be lost through the inability to apply well stimulation treatments, then there could be a minimal indirect impact. However, it is assumed that existing workers/contractors at active oil and gas fields would be sufficient for such an increase. Under this scenario, Impacts POP-1 and POP-2 are considered Class III. Impacts on population and housing under Alternative 1 would be less when compared to the project because Alternative 1 would not bring workers or new wells into areas outside existing oil and gas fields.

### 12.2.18.3  Programmatic Level Analysis of Specific Oil and Gas Fields

It is assumed production at the Wilmington, Inglewood, and Sespe Oil and Gas Fields would continue to decline if well stimulation treatments do not occur. There would be no potential for employment for well stimulation treatments that would induce population growth or result in housing displacement within the three fields. These fields likely would develop additional conventional wells to compensate for resources not recovered through well stimulations, if the field operator found additional wells could extract more oil and gas. If additional conventional wells are drilled in the fields, any net increase in drilling would not likely result in a substantial increase in employees at the field. Drilling and stimulation activities could also increase in areas under federal or tribal jurisdiction to compensate for lost production. Similar to the discussion above under the programmatic level analysis and in EIR Section 11.18 (Population and Housing), it is assumed that existing workers/contractors at active oil and gas fields would be sufficient for such an increase in conventional well drilling or stimulation projects. Therefore, impacts POP-1 (Induce substantial population growth) and POP-2 (Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere) related to population and housing would be less than significant at both fields and no mitigation is required (Class III).

### 12.2.18.4  Impact Significance Summary

As discussed, there would be no potential for well stimulation treatments to generate temporary or permanent population growth or displace housing under Alternative 1. Any indirect population growth from increased drilling of conventional wells without stimulation would be less than significant (Class III).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.19  Public Services

### 12.2.19.1  Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.19.2  Programmatic Level Analysis of the Project

| Impact PUB-1 | Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools |
|---|---|

Alternative 1 would not generate any potential for population increases or increased demands to public service providers from well stimulations. But there are indirect impacts associated with additional conventional wells to compensate for potential production lost through the prohibition of well stimulation. Alternative 1 indirectly reduces the need for public services in areas of well abandonment.

The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels. As analyzed within EIR Section 12.2.18 (Population and Housing), Alternative 1 would not directly generate growth from new employment. Because there would be no potential for well stimulation activities to affect existing public service levels or performance objectives, no impacts would occur (Class IV).

However, if owners/operators of existing oil and gas fields propose to drill more wells outside of existing fields and/or increase the intensity of a field's operations to compensate for the potential production that would be lost by not allowing well stimulation treatments in areas under State jurisdiction, then there could be indirect public services impacts. In particular, increased ship, rail, and truck traffic hauling imported oil and gas to refineries would likely occur under Alternative 1, including an increase use of rail corridors between the source fields and California refineries. This would greatly increase the amount of oil hauled on these lines and could result in increased emergency service calls in the event of an accident or spill. This is a significant new public services impact when compared to the project, which was found to be less than significant with the incorporation of mitigation (Class II). Unlike the project, mitigation cannot be included at this time to offset use of ship, rail, and truck traffic hauling imported oil and gas to refineries as more detailed information would be required.

### 12.2.19.3  Programmatic Level Analysis of Specific Oil and Gas Fields

It is assumed production at the Wilmington, Inglewood, and Sespe fields would decline if well stimulation treatments were prohibited in areas under State jurisdiction. There would be no potential for well stimulation treatments to induce population growth. If more conventional wells that do not require stimulation are drilled in these fields, or if stimulation activities increase in areas under federal jurisdiction, then any net increase in drilling would likely not result in a substantial increase in employees at the field, which could impact public service ratios in the areas. As noted in the discussion in EIR Section 11.19 (Public Services), impacts to existing public service levels or performance objectives for those providers serving the fields would be less than significant with mitigation (Class II) under the project. Under Alternative 1, they would be minor and would be less than significant (Class III).

### 12.2.19.4  Impact Significance Summary

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.20  Recreation

### 12.2.20.1  Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.20.2  Programmatic Level Analysis of the Project

Alternative 1 would prohibit all future well stimulation activities in areas under State jurisdiction, as described in EIR Chapter 7 (Description of the Project). Under Alternative 1, there would be no physical deterioration of recreational resources from well stimulation activities and no disruptions to designated recreation areas from well stimulation activities in or near areas under State jurisdiction. But there would be indirect impacts associated with additional conventional wells or increased stimulation activities in areas under federal or tribal jurisdiction, and indirect impacts of well abandonment, which may allow areas of existing oil and gas wells to be converted to a recreational use.

This alternative would require new legislation to revise PRC Section 3106(b), which currently authorizes well stimulation treatments in areas under State jurisdiction. The new legislation would need to specify that all future well stimulation treatments are prohibited.

| |
|---|
| **Impact REC-1**  ~~Increase the usage of recreation areas or facilities which would r~~<u>R</u>esult in the physical deterioration of recreational resources |

Under Impact REC-1, impacts would occur if future operations would lead to increased use of existing neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated. This type of impact would typically occur when a

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 221 of 689    Page ID #:5168

Analysis of Oil and Gas Well Stimulation Treatments in California
**12. E**NVIRONMENTAL **A**NALYSIS OF THE **A**LTERNATIVES

project induces population growth, such as a new housing development or a large business that would require new employees, which would then increase the use of nearby recreation areas. However, implementation of Alternative 1 would prohibit all future well stimulation activities in in areas under State jurisdiction. Therefore, the level of employment for oil and gas workers would likely decrease rather than increase under this alternative. Based on this assumption, Alternative 1 would not induce any population growth that could cause an increase or subsequent deterioration of recreational resources. No direct impacts would occur (Class IV). The abandonment of an existing field could cause a slight reduction in a local population that would correspond to lost employment. Intensifying the production of an existing oil and gas field would likely be accomplished by that operation's existing employee base and subcontractors and thus would not be expected to increase the local population. Therefore, no indirect impacts related to the deterioration of recreation facilities would occur (Class IV) under Alternative 1. For the project, Impact REC-1 is Class III.

---

**Impact REC-2    Cause disruptions in designated recreation areas**

---

For the purpose of this EIR, recreation areas are considered sensitive receptors as they tend to be areas where children are present, and depending on the available facilities, they can be used for intense physical activities. In addition, recreation users often value the recreation experience based on the quality of the surrounding (i.e., lack of industrial activities, natural spaces, low noise levels, high scenic quality, etc.). As shown in Figures 10.20-1 through 10.20-3, there are existing oil fields within and adjacent to established recreation areas throughout the State. Well stimulation treatments may cause disruptions to these recreation areas. However, implementation of Alternative 1 would prohibit future well stimulation activities in areas under State jurisdiction. As a result, there would be no direct activities or disruptions to designated recreation areas. No Impacts would occur (Class IV). As with Impact REC-1, the abandonment of an existing field could cause a slight reduction in a local population that would correspond to lost employment. Intensifying the production of an existing oil and gas field would likely be accomplished by that operation's existing employee base and subcontractors and thus would not be expected to increase the local population. Therefore, no indirect impacts related to the disruption of a designated recreation area would occur (Class IV) under Alternative 1. For the project, Impact REC-2 is Class II.

### 12.2.20.3  Programmatic Level Analysis of Specific Oil and Gas Fields

The programmatic impact discussion provided in EIR Section 12.2.20.2 would also apply to recreational facilities and resources associated with the Wilmington, Inglewood, and Sespe Oil and Gas Fields because no well stimulation treatments would be allowed in areas under State jurisdiction; thus there would be no substantive increase in the local or regional population that could trigger the overuse and deterioration of recreational resources or otherwise disrupt them. No impacts would occur (Class IV).

### 12.2.20.4  Impact Significance Summary

No direct or indirect impacts related to recreational facilities and opportunities would occur under the No Future Well Stimulation Treatments Alternative (Class IV).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.21   Risk of Upset/Public and Worker Safety

### 12.2.21.1  Introduction

This section provides an evaluation of the potential impacts for risk of upset/public and worker safety associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.21.2  Programmatic Level Analysis of the Project

| Impact RSK-1 | Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases |
|---|---|

Increased rail deliveries of crude oil to California could increase the potential for accidents and releases. With the decrease in oil production from the implementation of restricting or banning well stimulation treatments, imports of crude oil by rail could occur and increase. The risk of accidents will be most substantial in areas that are projected to have the most rail traffic (Study Regions 1, 4, 5, and 6). A discussion of potentially affected areas is presented in EIR Sections 10.21.3.8 and 10.21.4.1.

This impact is considered a significant and unavoidable impact that could not be mitigated to a level of less than significant through the application of feasible mitigation measures. Implementation of recommended Mitigation Measures RSK-1a through 1h would be appropriate to decrease the risk of crude oil transport and reasonably foreseeable accidents and releases. Because DOGGR cannot require other agencies to implement suggested mitigation, Impact RSK-1 would be a Class I: Significant and Unavoidable Impact.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect safety effects of Alternative 1, though these strategies would have to imposed or implemented by agencies other than DOGGR, as the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. DOGGR's relevant model mitigation measures in this context include the following:

**MM RSK-1a**    **Increase the Number of CPUC Rail Inspectors.** (Full text in EIR Section 10.21.5.)

**MM RSK-1b**    **Expedite the Phase-out of Older Tank Cars.** (Full text in EIR Section 10.21.5.)

**MM RSK-1c**    **Implement New Accident Prevention Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1d**    **Monitor and Enforce New Speed Limits.** (Full text in EIR Section 10.21.5.)

**MM RSK-1e**    **Monitor the Implementation of Trackside Safety Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1f**     **Improve Emergency Preparedness and Response Programs.** (Full text in EIR Section 10.21.5.)

**MM RSK-1g**     **Provide Real-Time Shipment Information to Emergency Responders.** (Full text in EIR Section 10.21.5.)

**MM RSK-1h**     **Provide Additional Accident and Injury Data to the State.** (Full text in EIR Section 10.21.5.)

In summary, there are greater impacts under Alternative 1 than under the project from increased oil and gas imports with significant and unavoidable hazard due to crude imports by rail (Class I). Thus, Impact RSK-1 would be Class I. There are also indirect impacts associated with additional conventional wells, and for increased stimulation activities in areas under federal or tribal jurisdiction. However, Alternative 1 avoids impacts on workers during well stimulation treatments in areas under State jurisdiction, and impacts due to proppant deliveries, silica exposure, and overpressure events would be avoided.

Impacts RSK-2 through RSK-7 are the same as under the project. Thus, Impact~~s RSK-2 and~~ RSK-6 ~~are~~is Class I. Impacts <u>RSK-2,</u> RSK-4, RSK-5, and RSK-7 are Class II. Impact RSK-3 is Class III.

### *Study Region 1*

Since all well stimulation treatment activities in areas under State jurisdiction would be eliminated for this alternative, risks to oil workers performing support activities for oil and gas operations, such as hydraulic fracturing, would be eliminated in those areas. Indirect impacts from intensified activity at existing oil and gas fields to compensate for loss of production could occur, but would be minor compared to allowing stimulation statewide.

The number of accidents from increased crude oil rail imports may increase with crude oil shipments to Long Beach, Vernon, Bakersfield-Kern Oil, and Carson. The number of accidents projected for this study region would increase from one accident per year (approximately 25 over 25 years) for the project to four per year (approximately 100 for 25 years) for Alternative 1, based on the increased rail traffic that would result in more train miles, and therefore, potentially more accidents. These accidents are expected to be minor and could include trespassers instead of rail to rail or rail to highway interactions.

### *Study Region 2*

No additional recordable injuries to oil workers are forecast under this alternative for this study region. An accident is not likely in this region given the comparatively small of rail traffic compared to the other regions (Table 10.21-5).Study Region 3

### *Study Region 3*

The risk of upset in Study Region 3 for this alternative is similar to that of Study Region 2. An accident is not likely in this region given the comparatively small of rail traffic compared to the other regions (Table 10.21-5).

### *Study Region 4*

Study Region 4 would have the biggest reduction in oil worker accidents under this alternative. Under the assumptions in EIR Section 10.21.3.7, this study region would be impacted by rail crude oil imports with the construction of the Alon crude facility and the completion of the Plains All America facility. Risks relating to hydraulic fracturing activities would be eliminated, including rail impacts from proppant

deliveries to Bakersfield. Using the average annual crude oil import volume from 2015 to 2040 (75 million barrels/year instead of 15 million barrels per year for the project), the number of accidents projected for this region would increase from one accident per year (approximately 25 for 25 years) for the project case to four per year (approximately 100 for 25 years) for Alternative 1. These accidents are expected to be minor and could include trespassers instead of rail to rail or rail to highway interactions.

### Study Region 5

Similar to Study Region 4, this study region would be affected by rail crude oil imports with rail shipments through Study Region 5 to the Alon crude facility and the Plains All America facility. Using the average annual crude oil import volume from 2015 to 2040 for this alternative, the number of rail accidents projected for this region would increase from one accident per year for the project (approximately 25 for 25 years) to three per year (approximately 75 over 25 years) for Alternative 1. These accidents are expected to be minor and could include trespassers instead of rail to rail or rail to highway interactions.

### Study Region 6

Under this alternative, there would be significant rail traffic in Study Region 6 by importing crude oil. Using the assumptions in EIR Section 10.21.3.7, significant numbers of crude oil rail cars would travel through this study region enroute to Bakersfield and Santa Maria. Also, increased operation of the Richmond Kinder Morgan facility, and the potential for Benicia and Pittsburg to be operational was assumed. Using the average annual crude oil import volume from 2015 to 2040, the number of accidents projected for this region would increase from one accident per year for the project case (approximately 25 over 25 years) to four per year (approximately 100 over 25 years) for Alternative 1 from crude oil.

## 12.2.21.3   Programmatic Level Analysis of Specific Oil and Gas Fields

### Wilmington Oil and Gas Field

Since all well stimulation treatment activities would be eliminated in areas under State jurisdiction, risks to oil workers from these activities would be limited. Drilling would still continue, but an estimated 25 percent of the wells would be not be drilled. Therefore, there would be an estimated 25 percent reduction in number of accidents to extraction workers for the project compared to those for Alternative 1 (Class V).

### Inglewood Oil and Gas Field

Well stimulation treatments would not occur at Inglewood Oil and Gas Field under Alternative 1. In the absence of these activities, impacts related to risk of upset and safety would continue as in the setting (Class III), and the mitigation identified for the project would not be required at Inglewood.

### Sespe Oil and Gas Field

Risks to oil workers from well stimulation treatment activities would be eliminated in areas under State jurisdiction. Since all wells drilled at Sespe are forecasted to involve treatments, drilling would be expected to be curtailed at this field, though stimulation activities could increase in areas under federal jurisdiction (Class V).

### 12.2.21.4  Impact Significance Summary

As this alternative would halt all future well stimulation activities in areas under State jurisdiction, risks from hydraulic fracturing activities would be reduced. Overall, Alternative 1 would result in a reduction in accidents to workers when compared to the project case. The estimated number of accidents to workers would decrease from 85 for the project case to 61 for Alternative 1.

Foreign imports of crude oil by ship are expected to decline, but could maintain their levels if hydraulic fracturing was banned and additional supplies are needed. There could be additional risk of accidental release; however, the release rate is 2.1 barrels/billion barrel miles (API, 2009). Therefore maintaining current import levels by ship would not add any significant risk for Alternative 1.

However, this alternative would require the largest amount of imported oil by rail to compensate from the lost production. To compensate for the reduced supply, crude oil imports by rail are projected to substantially increase to make up for the crude oil supply reductions. This alternative will pose the greatest risk of accident from rail transport. Based on Table 10.21-16, which shows the greatest number of potential rail accidents an average forecast of 15 rail accidents per year for all study regions (375 over 25 years) compared to four accidents per year (100 over 25 years) for the project for all study regions.

With the increase in rail traffic, an increased likelihood of accidental crude oil releases would occur. As EIR Section 10.21.4.1 discusses, the average crude oil release rate for 2011 through 2013 was 3.6 releases of crude oil per million barrels of crude oil imported by rail. If Alternative 1 is implemented, there could potentially approximately 270 crude oil releases per year by rail cars.

As discussed in EIR Section 10.21.4.1, most of the known releases listed on the California Office of Emergency Services (CalOES) Historical HazMat Spill Notifications website (CalOES, 2014) were from faulty mechanical equipment or human error and were often vapor or liquid that did not reach the ground. Only about 30 percent of releases that reached the ground were greater than 5 gallons. Some of the causes of the releases were unknown, but no derailments or other accidents were noted.

## 12.2.22  Transportation and Traffic

### 12.2.22.1  Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.22.2  Programmatic Level Analysis of the Project

| Impact TR-1     Generate additional truck traffic and disrupt traffic operations |
| --- |

The No Future Well Stimulation Treatments Alternative (Alternative 1) would halt all current and future well stimulation activities in areas under State jurisdiction. Approximately 25 percent of wells in California are hydraulically fractured. Therefore, traffic that is currently generated by well stimulation activ-

ities would be reduced and no new traffic would be generated due to future well stimulation activities. In order to meet current oil demand, this restriction would potentially lead to more oil import from foreign countries and Alaska. Increased oil import would add to traffic in terms of ships and rail and a limited number of truck trips. Any additional conventional wells that do not require stimulation would also add truck trips, but the number of truck trips per conventional well is less than for a well that is both drilled and stimulated, so there would be a net reduction in truck traffic under Alternative 1. This overall reduction in truck traffic would reduce existing roadway traffic and improve the level of service (LOS) on local roadways, which would be a beneficial programmatic level impact (Class V).

With no hydraulic fracturing is allowed, developers may choose to increase development of conventional wells outside of existing oil and gas fields. A substantial increase in drilling activities outside of existing oil and gas fields would add additional truck traffic in those areas. Although there would be an overall net reduction in the number of truck trips under this alternative, on a site-specific basis there could be an increase in roadway traffic that could impact LOS. Fewer truck trips would be required for drilling a conventional well than for drilling and stimulating a deeper new well that could require transport of up 5-10 million gallons of water to the site. Therefore, indirect operational LOS traffic impacts would be less than significant (Class III).

In contrast, Impact TR-1 is Class II under the project.

| Impact TR-2 | Inadvertently damage road rights-of-way |
|---|---|

Depending on the capacity and availability of oil and gas production infrastructure in place, trucks would still be needed to transport some oil to refineries, which are located in the Los Angeles, Bakersfield and San Francisco Bay areas. The refineries are located nearby to major roadways that are designed to handle heavy trucks. With an overall reduced number of truck trips and a concentration of trips on major roadways under this alternative, impacts from the deterioration of roadway pavement on a programmatic level would be reduced as well (Class V).

If substantial increased drilling without stimulation activities occur outside existing oil and gas fields near rural communities, or if stimulation activities increase in areas under federal or tribal jurisdiction, then on a site-specific basis the condition of some rural roadways may be adversely affected by increased truck traffic.

There are potentially feasible and effective strategies for mitigating, at least to some degree, the adverse indirect effects of Alternative 1, though these strategies would in most instances have to imposed or implemented by agencies other than DOGGR, as most of the effects would be caused by activities beyond DOGGR's control. Even so, some of the mitigation measures developed in this EIR, though usually written for implementation by DOGGR through the issuance of well stimulation treatment permits, provide guidance that other agencies could follow in fashioning their own mitigation strategies for relevant project approvals coming under their jurisdiction. Implementation of a mitigation measure such as Mitigation Measure TR-2a (Repair Roadway Damage) is recommended to ensure that roadways would be restored to original or near-original condition and undertaken in a timely manner, in consultation with and to the satisfaction of the city or county with jurisdiction over affected roadways, the local transportation agency, and/or Caltrans, as appropriate. With the implementation of a measure modeled on Mitigation Measure TR-2a, any potential indirect impacts to roadway pavement would be reduced to a less than significant level (Class II).

**MM TR-2a    Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

---

| Impact TR-3 | Cause traffic safety hazards for vehicles, bicyclists, and pedestrians |
|---|---|

As discussed under Impact TR-1 (Generate additional truck traffic and disrupt traffic operations), there would be a net reduction in truck traffic and an improvement in the level of service (LOS) on local roadways with Alternative 1. As a result, the potential for traffic safety hazards for vehicles, bicyclists, and pedestrians would likewise be reduced from the baseline conditions due to an improvement in traffic operations (Class V).

Indirect impacts to LOS from any increased drilling without stimulation, or increased stimulation in areas under federal or tribal jurisdiction, would be less than significant (see Impact TR-1) and thus the potential for indirect traffic safety hazards for vehicles, bicyclists, and pedestrians would be less than significant as well (Class III).

In contrast, Impact TR-3 is Class II under the project.

| Impact TR-4 | Transport hazardous materials |
|---|---|

Since this alternative involves a ban on existing and future well stimulation treatments in areas under State jurisdiction, accidents from truck traffic and associated traffic hazards (Impact TR-4, Transport hazardous materials) would decrease due to improved LOS on roadways. In addition, less chemical additives associated with well stimulation treatments would be transported by tanker truck. However, Alternative 1 would still require the transport of hydrocarbon product due to increased oil imports. Any hazardous materials would be transported in accordance to State and federal regulations. In addition, the Hazardous Materials Transportation Act requires that carriers report accidental releases of hazardous materials to the Department of Transportation at the earliest practical moment. Regardless, the transportation of hydrocarbon product poses a potential for fires and spills. An accidental spill of hydrocarbon product on a roadway could potentially create a safety hazard and traffic delays for other motorists. Implementation of a mitigation measure similar to Mitigation Measure TR-4a (Know Spill Prevention Procedures) would not be feasible to implement given the large number of oil transport companies, none of which is regulated by DOGGR. Therefore, although potential traffic hazard impacts would be reduced compared to the project, the potential for an accidental spill that could cause a roadway hazard would be a significant and unmitigable traffic hazard impact under Alternative 1 (Class I).

| Impact TR-5 | Change air traffic patterns |
|---|---|

New drilling of deeper wells to be stimulated would not be allowed in areas under State jurisdiction, so there would a reduced potential for drill rigs or other equipment to cause a potential hazard to airspace navigation or affect air traffic patterns. In addition, due to a decline in oil and gas production in California, there may be an associated reduced potential for oil and gas development and stimulation to interfere with air traffic patterns than under the existing baseline conditions (Class V).

On a site-specific basis, the drilling of new wells may trigger FAA air space hazard notification requirements for the drill rig in the vicinity of an airport. Assuming the owner/operator would submit Form 7460-1, as necessary, and comply with any FAA-required hazard markers or lighting, impacts to air traffic patterns would be less than significant (Class III).

| Impact TR-6 | Temporarily interfere with emergency response |
|---|---|

As discussed under Impact TR-1 (Generate additional truck traffic and disrupt traffic operations), there would be a net reduction in truck traffic and an improvement in the LOS on local roadways with Alterna-

tive 1. As a result, interference with emergency response would likewise be programmatically reduced from the baseline conditions due to an improvement in traffic operations (Class V).

Indirect impacts to LOS from any increased drilling without stimulation would be less than significant (see Impact TR-1) and thus interference with emergency response would be less than significant as well (Class III).

In contrast, Impact TR-6 is Class II under the project.

### 12.2.22.3   Programmatic Level Analysis of Specific Oil and Gas Fields

The No Future Well Stimulation Treatments Alternative would reduce overall impacts on transportation and traffic as compared to the project and to existing baseline conditions at the Wilmington, Inglewood, and Sespe Oil and Gas Fields. Under Alternative 1, even if some additional conventional wells are drilled and not stimulated, production at the fields would decline. Thus there would be a reduction in vehicle trips generated within the field study areas. Impacts would be similar to the programmatic level analysis described in EIR Section 12.2.22.2 for Impacts TR-1 (Generate additional truck traffic and disrupt traffic operations), TR-2 (Inadvertently damage road rights-of-way), TR-3 (Cause traffic safety hazards for vehicles, bicyclists, and pedestrians), and TR-6 (Temporarily interfere with emergency response).

With no well stimulation treatment activities allowed in the portions of the Wilmington, Inglewood, and Sespe fields that are under State jurisdiction, and with a corresponding reduction in oil and gas production at the fields, there would be reduced transport of chemical additives associated with well stimulation or hydrocarbon product to or from the fields. However, elsewhere in the State, trucks would still be needed to transport some oil to the refineries, which are located in the Los Angeles, Bakersfield and San Francisco Bay areas. An explosion or an accidental spill of hydrocarbon product on a roadway could potentially create a safety hazard and traffic delays for other motorists. Implementation of a measure such as Mitigation Measure TR-4a (Know Spill Prevention Procedures) discussed in EIR Section 10.22 (Transportation and Traffic) would not be feasible to implement given the number of oil transport companies, none of which would be regulated by DOGGR. Therefore, although potential traffic hazard impacts would be reduced compared to the project, the potential for an accidental spill that could cause a roadway hazard would be a significant and unmitigable traffic hazard impact under Alternative 1 (Class I).

Given a reduction of production and of the drilling of new deeper wells with taller drill rigs at the Wilmington and Inglewood fields, there would be corresponding reduced potential for oil and gas development and stimulation at the field to interfere with air traffic patterns at nearby airports (Impact TR-5, Change air traffic patterns) (Class V).

There are no airports in the vicinity of the Sespe field so there would be no impacts to air traffic patterns (Class IV).

### 12.2.22.4   Impact Significance Summary

All direct impacts to transportation and traffic would be beneficial (Class V), except the potential for traffic hazards related to the transport of hazardous materials would remain significant and unmitigable (Class I).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion.

## 12.2.23   Utilities and Service Systems

### 12.2.23.1  Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.2.23.2  Programmatic Level Analysis of the Project

The need for new or expanded utilities and service systems is influenced by population levels and the needs of individual projects. As analyzed in EIR Section 12.2.18 (Population and Housing), Alternative 1 would not generate new employment leading to new related to drilling of wells to be stimulated or well stimulation activities.

Alternative 1 eliminates the potential for population increases or increased demands for utilities and services that could potentially result from conducting well stimulation treatments, which would be prohibited. But there are indirect impacts associated with drilling of additional conventional wells to make up for lost production, as further discussed below. Alternative 1 indirectly reduces need for utilities in areas of well abandonment. This is a decrease in potential impacts when compared to the project.

Alternative 1 would require new legislation to revise or repeal PRC Sections 3106(b) and 3160(b) to prohibit all future well stimulation activities after the date of the enactment of such legislation. With a prohibition on well stimulation treatments, the utility and service requirements of well stimulation would not occur. There would be no potential for well stimulation activities to generate wastewater or solid waste or affect the capacity levels of municipal wastewater treatment plants or solid waste facilities. Loss of access to the petroleum resources that may have derived from well stimulation would be made up for by importing oil from outside the state. Increased ship, rail, and truck traffic hauling imported oil and gas to refineries likely would occur under Alternative 1, including an increase use of rail corridors between the source fields and California refineries. This could lead to a need for expanded or new terminals and yards to handle the imports. Except for security and safety lighting, such facilities have relatively minimal demands for electric power and would generate relatively small amounts of solid waste. They would not be expected to create a high demand for natural gas service wastewater disposal beyond what is needed to heat buildings and service sanitary requirements of the few buildings associated with terminals. Existing facilities (assumed to be adequately served by existing utilities and service systems) and any new or expanded facilities (assumed to be in near-refinery locations with adequate services and with adequate capacity) would not require new or expanded utilities or service systems. If owners/operators of existing oil and gas fields propose to drill increased numbers of conventional wells and increase the intensity of a field's operations overall to compensate to some degree for the production that would be lost if well stimulation treatments are banned, there could be an increase in utility and service system demands. However, with banning of well stimulation, some uneconomical wells likely would be abandoned or shut in. Overall, any increase in conventional well drilling is not anticipated to be dramatic, and there would be minimal indirect less than significant (Class III) impacts to the capacities of

existing utilities and service systems, as discussed in EIR Section 10.23 (Utilities and Service Systems) for the following impacts:

■ **Impact UTL-1:** Adversely affect utilities and service systems due to population growth from project-related development

■ **Impact UTL-2:** Require new or expanded electrical or natural gas infrastructure

■ **Impact UTL-3:** Exceed existing municipal wastewater treatment provider capacities

■ **Impact UTL-4:** Exceed permitted solid waste capacity of landfills

By comparison, the project impacts are Class III (less than significant) for the first two impacts, and Class II (less than significant with mitigation) for the last two impacts. For Alternative 1, all four impacts are Class III (less than significant).

### 12.2.23.3  Programmatic Level Analysis of Specific Oil and Gas Fields

It is assumed that production at the Wilmington, Inglewood, and Sespe Oil and Gas Fields would decline in the future, with or without well stimulation treatments. If additional conventional wells are drilled to compensate for not being allowed to stimulate wells under Alternative 1, this may contribute to slowing the decline in production, but would not increase production overall compared to existing and past production. Under Alternative 1, because well stimulation treatments would be banned in areas under State jurisdiction, there would be no potential for them to affect existing utilities, including the capacities of electricity or natural gas providers, municipal wastewater treatment providers, or existing landfills.

As discussed under the programmatic level analysis of these fields presented in EIR Section 11.23, under the project, which would permit well stimulation, impacts to utilities and service systems from these three fields would be less than significant (Class III) for Impacts UTL-1 and 2 and less than significant with mitigation (Class II) for Impacts UTL-3 and UTL-4.

Under Alternative 1, in the absence of being able to use well stimulation, operators would be unlikely to develop many wells in the Monterey Formation or complete wells in conditions where well stimulation would be required to make a well economically productive. Therefore, future demand for utilities and wastewater treatment would be expected to be similar to existing demand. The utilities and service system demands for the Wilmington, Inglewood, and Sespe Oil and Gas Fields would be less than significant (Class III), as they essentially would continue existing baseline conditions and modes of operation.

### 12.2.23.4  Impact Significance Summary

As discussed, there would be no potential for well stimulation treatments to affect existing utility service capacities or require the need for new or expanded facilities under Alternative 1. Any indirect population growth that could affect public services from increased drilling of conventional wells without stimulation would be less than significant (Class III).

Please refer to Table 12.2.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.2.24  Impact Summary Table for Alternative 1

Table 12.2.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 1.

**Programmatic Level Analysis of the Project**

Under Alternative 1, the direct impacts associated with well stimulation activities would not occur, either inside or outside of existing oil and gas fields.

However, this prohibition would result in a new significant and unmitigable (Class I) impact from the loss of known mineral (oil and gas) resources in the Monterey Formation and its plays (Impact GEO-6: Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan).

In addition, prohibiting well stimulation reasonably could result in indirect effects. As discussed in EIR Section 8.3.1 (No Future Well Stimulation Treatments Alternative), approximately 25 percent of drilled oil wells in California use hydraulic fracturing. A loss of 25 percent of the California-produced oil would require an additional 57 million barrels per year be purchased produced from another source. Under one scenario, some existing oil and gas fields could become economically unviable because, without well stimulation, they would not have a rate of production sufficient to justify their continued operation. In this case, some existing fields would be abandoned. Under a second scenario, owners/operators of existing oil and gas fields may drill more wells and increase the intensity of operations to maintain production levels and compensate for the loss of prospective additional production that would have occurred by using well stimulation treatments. Under a third scenario, the oil and gas production foregone through a lack of well stimulation treatments could require importation of offsetting oil and gas resources from either domestic or foreign supplies, or both.

The additional importation of oil and gas would create much greater significant and unmitigable (Class I) impacts to greenhouse gas emissions compared to the project.

Alternative 1 would also create new significant and unmitigable (Class I) impacts to:

- Risk of upset/public health and worker safety (Impact RSK-1: Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases) and

- Environmental justice (Impact EJ-1: Significant impacts would disproportionately affect minority or low-income populations).

In summary, Alternative 1 would be worse than the project for the following issue areas: Aesthetics, Agriculture and Forestry Resources, Air Quality, Biological Resources–Terrestrial Environments, Cultural, Environmental Justice, Geology, Greenhouse Gas Emissions, and Risk.

Alternative 1 would be better than the project for the following issue areas: Biological Resources–Coastal Marine Environments, Coastal and Marine Processes and Water Quality, Fishing, Hazardous Materials, Groundwater, Surface Water, Land Use, Noise, Population and Housing, Public Services, Recreation, Transportation and Traffic, and Utilities.

Environmental impacts related to oil and gas production to make up for lost production (approximately 57 million barrels per year) would still occur, but they would be transferred out of the State where mitigation measures similar to those included in this EIR may not be implemented.

**Programmatic Level Analysis of Specific Oil and Gas Fields**

The Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields. Alternative 1 would prohibit all future well stimulation treatments within existing fields, which would eliminate all direct environmental impacts, including all surface and subsurface disturbances, associated with well stimulation activities. Although additional conventional wells would likely be drilled to make up for lost production, some wells may also be abandoned within the fields, which would partially offset this indirect impact.

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **AESTHETICS** | | | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. |
| Impact AES-2. Substantially alter or damage scenic resources. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. |
| Impact AES-4. Create new sources of substantial light and glare. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. | Class IV and V (Direct) Class I, II, III, and IV (Indirect) None available for new or expanded terminals. |
| **AGRICULTURE AND FORESTRY RESOURCES** | | | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class IV (Direct) Class V and II (Indirect) AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland | Class IV None required. | Class IV None required. | Class II and IV AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland |
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class IV (Direct) Class V and II (Indirect) AGF-2a: Ensure Compatibility with Agricultural Zoning AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Class IV None required. | Class IV None required. | Class II AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class IV (Direct)<br>Class V and II (Indirect)<br>AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class IV (Direct)<br>Class V and II (Indirect)<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Class IV<br>None required. | Class II<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Class II and IV<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class IV (Direct) Class V and II (Indirect) AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-4a: Minimize Impacts to Forest Land AGF-4b: Develop a Forest Land Protection Plan AQ-2c: Reduce Emissions from Dust-Causing Activities BIOT-2a: Prevent Hazards to Fish and Wildlife HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | Class IV None required. | Class II AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-4a: Minimize Impacts to Forest Land AGF-4b: Develop a Forest Land Protection Plan AQ-2c: Reduce Emissions from Dust-Causing Activities BIOT-2a: Protect Jurisdictional Waters HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | Class IV and II AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-4a: Minimize Impacts to Forest Land AGF-4b: Develop a Forest Land Protection Plan AQ-2c: Reduce Emissions from Dust-Causing Activities BIOT-2a: Protect Jurisdictional Waters HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact AGF-5, *continued* | SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability<br><br>TR-1a: Prepare Traffic Plan | | SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability<br><br>TR-1a: Prepare Traffic Plan | SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability<br><br>TR-1a: Prepare Traffic Plan |
| **AIR QUALITY** | | | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Indirect)<br>AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I (Indirect)<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I (Indirect)<br>AQ-3a: <u>Comply with Local Air District Protocols Relating to the Preparation of</u><s>Prepare </s>a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I (Indirect)<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class II (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| | | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| Impact | Project | Wilmington | Inglewood | Sespe |
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class II (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat |
| | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat |
| | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife |
| | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-2b: California Condor Protection Measures |
| | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-2c: Nelson's Bighorn Sheep Protection Measures |
| | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife |
| | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation | BIOT-4b: Minimize Impacts to Protected Birds |
| | GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments | GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments | GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |
| | HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials | HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials | HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation |
| | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments |
| | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan | HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials |
| | | | | SWR-1a: Require Stormwater Pollution Prevention Plan |
| | | | | SWR-2a: Implement Erosion Control Plan |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1**[1]

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class II (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat |
| | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat |
| | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife |
| | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife |
| | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants |
| | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds |
| | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |
| | AQ-2c: Reduce Emissions from Dust-Causing Activities | AQ-2c: Reduce Emissions from Dust-Causing Activities | AQ-2c: Reduce Emissions from Dust-Causing Activities | AQ-2c: Reduce Emissions from Dust-Causing Activities |
| | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class II (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat |
| | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat |
| | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife |
| | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife |
| | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants | BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants |
| | BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS | BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS | BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS | BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS |
| | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds | BIOT-4b: Minimize Impacts to Protected Birds |
| | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class II (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class IV (Direct)<br>Class I (Indirect)<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class II (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat | BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat | BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat | BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat |
| | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat | BIOT-1b: Minimize Impacts to Native Vegetation and Habitat |
| | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat | BIOT-1c: Replace or Offset Loss of Sensitive Habitat |
| | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife | BIOT-2a: Prevent Hazards to Fish and Wildlife |
| | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife | BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife |
| | BIOT-6a: Protect Jurisdictional Waters | BIOT-6a: Protect Jurisdictional Waters | BIOT-6a: Protect Jurisdictional Waters | BIOT-6a: Protect Jurisdictional Waters |
| | GW-1a: Use Alternative Water Sources to the Extent Feasible | GW-1a: Use Alternative Water Sources to the Extent Feasible | GW-1a: Use Alternative Water Sources to the Extent Feasible | GW-1a: Use Alternative Water Sources to the Extent Feasible |
| | GW-1b: Minimize Groundwater Impacts | GW-1b: Minimize Groundwater Impacts | GW-1b: Minimize Groundwater Impacts | GW-1b: Minimize Groundwater Impacts |
| | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation | GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation |
| | GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ | GW-4b Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments ~~a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~ |
| | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan | SWR-1a: Require Stormwater Pollution Prevention Plan |
| | SWR-1b: Surface Water Protection | SWR-1b: Surface Water Protection | SWR-1b: Surface Water Protection | SWR-1b: Surface Water Protection |
| | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan | SWR-2a: Implement Erosion Control Plan |
| | SWR-3a: Ensure Adequate Water Availability | SWR-3a: Ensure Adequate Water Availability | SWR-3a: Ensure Adequate Water Availability | SWR-3a: Ensure Adequate Water Availability |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class IV (Direct) Class I (Indirect) BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class IV (Direct) Class III (Indirect) BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class IV (Direct) Class III (Indirect) BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class IV (Direct) Class I (Indirect) BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class IV (Direct) Class I (Indirect) BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class IV (Direct) Class II (Indirect) BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class IV (Direct) Class III (Indirect) BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class IV (Direct) Class II (Indirect) BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class IV (Direct) Class I (Indirect) BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class IV (Direct) Class II (Indirect) BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class IV (Direct) Class III (Indirect) BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class IV (Direct) Class II (Indirect) BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans |
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class IV (Direct) Class I (Indirect) AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class IV (Direct) Class II (Indirect) AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class IV (Direct) Class II (Indirect) AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class IV (Direct) Class II (Indirect) AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **BIOLOGICAL RESOURCES – COASTAL AND MARINE ENVIRONMENT** | | | | |
| Impact BIOCM-1. Substantially affect rare, threatened, or endangered coastal/marine species or their habitat | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| Impact BIOCM-2. Interfere with migration or movement of coastal/marine fish or wildlife | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| Impact BIOCM-3. Result in substantial loss or alteration of coastal/marine habitat | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| Impact BIOCM-4. Substantially disrupt or affect local coastal/marine biological communities or habitats | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| **COASTAL PROCESSES AND MARINE WATER QUALITY** | | | | |
| Impact CPMWQ-1. Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity | Class II CPMWQ-1a: Protect Marine Water Quality | Class IV (Direct) Class II (Indirect) CPMWQ-1a: Protect Marine Water Quality | Not applicable | Not applicable |
| Impact CPMWQ-2. Change the velocity or direction of ocean currents | Class II CPMWQ-2a: Prepare and Implement Marine Current Plan | Class IV (Direct) Class II (Indirect) CPMWQ-2a: Prepare and Implement Marine Current Plan | Not applicable | Not applicable |
| Impact CPMWQ-3. Change the velocity or direction of coastal and ocean winds | Class III None required. | Class IV (Direct) Class III (Indirect) None required. | Not applicable | Not applicable |
| Impact CPMWQ-4. Change the direction, size, or period of ocean waves | Class IV (Direct and Indirect) None required. | Class IV (Direct and Indirect) None required. | Not applicable | Not applicable |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CPMWQ-5. Increase the risk of a tsunami | Class IV (Direct)<br>Class III (Indirect)<br>~~CPMWQ 5a: Conduct Offshore Geotechnical and Tsunami Investigation~~<br>~~CPMWQ-5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~None required. | Class IV (Direct)<br>Class III (Indirect)<br>~~CPMWQ 5a: Conduct Offshore Geotechnical and Tsunami Investigation~~<br>~~CPMWQ-5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~None required. | Not applicable | Not applicable |
| **COMMERCIAL AND RECREATIONAL FISHING** | | | | |
| Impact CRF-1. Cause long-term exclusion of important commercial and recreational fishing areas | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Not applicable | Not applicable |
| Impact CRF-2. Result in substantial economic losses to local commercial and recreational fishing industries | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Not applicable | Not applicable |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **CULTURAL RESOURCES** | | | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class IV (Direct)<br>Class I (Indirect)<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-2. Affect prehistoric resources | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class I (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Well Stimulation Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Well Stimulation Activities |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class I (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-4. Affect cultural landscapes. | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) | Class IV (Direct) |
| | Class I (Indirect) | Class I (Indirect) | Class I (Indirect) | Class I (Indirect) |
| | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| | | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| **Impact** | **Project** | **Wilmington** | **Inglewood** | **Sespe** |
| **PALEONTOLOGICAL RESOURCES** | | | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class IV (Direct) Class II (Indirect) PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources PALEO-1b: Develop Paleontological Resource Mitigation Plan PALEO-1c: Retain Qualified Paleontological Resources Staff PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class IV (Direct) Class II (Indirect) PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources PALEO-1b: Develop Paleontological Resource Mitigation Plan PALEO-1c: Retain Qualified Paleontological Resources Staff PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class IV (Direct) Class II (Indirect) PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources PALEO-1b: Develop Paleontological Resource Mitigation Plan PALEO-1c: Retain Qualified Paleontological Resources Staff PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Well Earth Disturbing Activities PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class IV (Direct) Class II (Indirect) PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources PALEO-1b: Develop Paleontological Resource Mitigation Plan PALEO-1c: Retain Qualified Paleontological Resources Staff PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities |
| **ENVIRONMENTAL JUSTICE** | | | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I (Indirect) EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect) EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect) EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect) EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **GEOLOGY, SOILS AND MINERAL RESOURCES** | | | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class IV (Direct) Class II (Indirect) GEO-1a: Avoid Active Faults ~~Zones~~ if Necessary GEO-1b: Implement an Appropriate Setback if Necessary GEO-1e~~f~~: Include ~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class IV (Direct) Class II and IV (Indirect) GEO-1d: Implement Industry Accepted Practices GEO-1e~~f~~: Include ~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class IV (Direct) Class II (Indirect) GEO-1d: Implement Industry Accepted Practices GEO-1e~~f~~: Include ~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class IV (Direct) Class II and IV (Indirect) GEO-1d: Implement Industry Accepted Practices GEO-1e: Conduct Ground Monitoring GEO-1e~~f~~: Include ~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class IV (Direct) Class II (Indirect) SWR-1a: Require Stormwater Pollution Prevention Plan | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class IV (Direct) Class II (Indirect) GEO-3a: Prepare Geotechnical Report if Necessary | Class IV (Direct) Class II (Indirect) GEO-3a: Prepare Geotechnical Report if Necessary | Class IV (Direct) Class II (Indirect) GEO-3a: Prepare Geotechnical Report if Necessary | Class III None required. |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV None required. | Class IV None required. | Class IV None required. | Class IV None required. |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class IV (Direct) Class I (loss of fossil fuels) (Indirect) Class III (loss of non-fuel resources) (Indirect) None available. | Class III None required. | Class III None required. | Class IV (Direct) Class I (loss of fossil fuels) (Indirect) Class III (loss of non-fuel resources) (Indirect) None available. |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. | Class IV (Direct) Class III (Indirect) None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| **GREENHOUSE GAS EMISSIONS** | | | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class IV (Direct) Class I (Indirect) AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas | Class III None required. | Class III None required. | Class III None required. |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas | Class III None required. | Class III None required. | Class III None required. |
| **HAZARDS AND HAZARDOUS MATERIALS** | | | | |
| Impact HAZ-1. Hazardous materials associated with well stimulation fluids could be released to the environment from a spill or leak | Class IV and V (Direct) Class I and III (Indirect) None available. | Class V (Direct) Class I and III (Indirect) None available. | Class V (Direct) Class I and III (Indirect) None available. | Class V (Direct) Class I and III (Indirect) None available. |
| **GROUNDWATER RESOURCES** | | | | |
| Impact GW-1. Contribute to overdraft conditions in critically impacted groundwater basins | Class II (federal lands), III, and IV GW-1a: Use Alternative Water Sources to the Extent Feasible | Class II (federal lands), III, and IV GW-1a: Use Alternative Water Sources to the Extent Feasible | Class IV None required. | Class II (federal lands), III, and IV GW-1a: Use Alternative Water Sources to the Extend Feasible |
| Impact GW-2. Lower groundwater levels through pumping, resulting in subsidence or impacts to nearby water wells | Class II (federal lands), III, and IV GW-1b2a: Minimize Groundwater Impacts~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping~~ | Class II (federal lands), III, and IV GW-1b2a: Minimize Groundwater Impacts~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping.~~ | Class IV None required. | Class II (federal lands), III, and IV GW-1b2a: Minimize Groundwater Impacts~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping~~ |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact GW-3. Water quality in the Protected Water zone is adversely affected through surface spill or leak during well stimulation treatment | Class II (federal lands)<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Class II (federal lands)<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ | Class IV<br>None required. | Class II (federal lands)<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ |
| Impact GW-4. Non-existent or ineffective well seals in annular space resulting in migration of fluids | Class II (federal lands) and IV<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u>~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>GW-4c: <u>Install Methane Sensors on Wells Subject to Well Stimulation Treatments.</u> | Class II (federal lands) and IV<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.<br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u>~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>GW-4c: Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u>. | Class IV<br>None required. | Class II (federal lands) and IV<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.<br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>GW-4c: Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u>. |
| Impact GW-5. Fluids introduced to Protected Water through damaged or improperly abandoned wells within area of influence of new well. | Class II (federal lands) and IV<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Class II (federal lands) and IV<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate. | Class IV<br>None required. | Class II (federal lands) and IV<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| | | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| Impact | Project | Wilmington | Inglewood | Sespe |
| Impact GW-6. Improper Disposal of Flowback in Injection Wells could potentially impact groundwater quality ~~Inability to identify whether any observed adverse effects in groundwater are from well stimulation activity~~. | Class II (federal lands) and IV GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~ | Class II (federal lands) and IV GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~. | Class IV None required. | Class II (federal lands) and IV GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~. |
| Impact GW-7 Inability to identify specific impacts to groundwater quality from well stimulation activities. | Class II (federal lands) and IV GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Class II (federal lands) and IV GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment. | Class IV None required. | Class II (federal lands) and IV GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment. |
| **SURFACE WATER RESOURCES** | | | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class IV (Direct) Class II (federal lands) and III (Indirect) SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1c~~b~~: Provide Adequate Flood Protection SWR-1d~~e~~: Protect Surface Water Reservoirs BIOT-2a: Prevent Hazards to Fish and Wildlife | Class III (federal lands) and IV None required. | Class IV None required. | Class III (federal lands) and IV None required. |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class IV (Direct) Class II (federal lands) and IV (Indirect) SWR-2a: Implement Erosion Control Plan | Class III (federal lands) and IV None required. | Class IV None required. | Class III (federal lands) and IV None required. |
| Impact SWR-3. Substantially diminish surface water quantity. | Class IV (Direct) Class II (federal lands) and IV (Indirect) SWR-3a: Ensure Adequate Water Availability. | Class III (federal lands) and IV None required. | Class IV None required. | Class III (federal lands) and IV None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class IV (Direct) Class II (federal lands) and IV (Indirect) SWR-1cb: Provide Adequate Flood Protection | Class III (federal lands) and IV None required. | Class IV None required. | Class III (federal lands) and IV None required. |
| **LAND USE AND PLANNING** | | | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class IV (Direct) Class I or III (Indirect) None available for impacts associated with Risk of Upset/Public and Worker Safety | Class IV (Direct) Class I or III (Indirect) None available for impacts associated with Risk of Upset/Public and Worker Safety | Class IV (Direct) Class I or III (Indirect) None available for impacts associated with Risk of Upset/Public and Worker Safety | Class IV (Direct) Class I or III (Indirect) None available for impacts associated with Risk of Upset/Public and Worker Safety |
| Impact LU-2. Physically divide an established community. | Class IV None required. | Class IV None required. | Class IV None required. | Class IV None required. |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class IV None required. | Class IV None required. | Class IV None required. | Class IV None required. |
| **NOISE AND VIBRATION** | | | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class IV and V (Direct) Class II (federal lands) and V (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses NOI-1b: Control Noise Levels from Well Drilling Near Noise Sensitive Land Uses | Class IV and V (Direct) Class II (federal lands) and V (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses NOI-1b: Control Noise Levels from Well Drilling Near Noise Sensitive Land Uses | Class IV and V (Direct) Class II (federal lands) and V (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses NOI-1b: Control Noise Levels from Well Drilling Near Noise Sensitive Land Uses | Class IV and V (Direct) Class II (federal lands) and V (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses NOI-1b: Control Noise Levels from Well Drilling Near Noise Sensitive Land Uses |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class IV and V (Direct) Class II and V (Indirect) Mitigation may be required if new infrastructure is closer to noise sensitive receivers. | Class IV and V (Direct) Class II and V (Indirect) Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class IV and V (Direct) Class II and V (Indirect) Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class IV and V (Direct) Class II and V (Indirect) Mitigation may be required if new infrastructure is closer to noise sensitive receivers |
| **POPULATION AND HOUSING** | | | | |
| Impact POP-1. Induce substantial population growth | Class III None required. | Class III None required. | Class III None required. | Class III None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| **PUBLIC SERVICES** | | | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class IV (Direct)<br>Class II (Indirect)<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Class III<br>None required | Class III<br>None required | Class III<br>None required |
| **RECREATION** | | | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Class V | Class III<br>None required. | Class V |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation | Class V | Class III<br>None required. | Class V |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required. | Class V | Class III<br>None required. | Class V |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Class V | Class III<br>None required. | Class V |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Class V | Class III<br>None required. | Class V |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve SpacingNone available. | Class V | Class III<br>None required. | Class V |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Class V | Class III<br>None required. | Class V |
| **TRANSPORTATION AND TRAFFIC** | | | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V (Direct)<br>Class III (Indirect)<br>None required. |
| Impact TR-2. Inadvertently damage road rights-of-way | Class V (Direct)<br>Class II (Indirect)<br>TR-2a: Repair Roadway Damage | Class V (Direct)<br>Class II (Indirect)<br>TR-2a: Repair Roadway Damage | Class V (Direct)<br>Class II (Indirect)<br>TR-2a: Repair Roadway Damage | Class V (Direct)<br>Class II (Indirect)<br>TR-2a: Repair Roadway Damage |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V (Direct)<br>Class III (Indirect)<br>None required. |
| Impact TR-4. Transport hazardous materials | Class I | Class I | Class I | Class I |
| Impact TR-5. Change air traffic patterns | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V<br>None required. | Class V<br>None required. | Class IV<br>None required. |
| Impact TR-6. Temporarily interfere with emergency response | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V (Direct)<br>Class III (Indirect)<br>None required. | Class V (Direct)<br>Class III (Indirect)<br>None required. |

**Table 12.2.24-1. Summary of Impacts and Mitigation Measures for Alternative 1[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **UTILITIES AND SERVICE SYSTEMS** | | | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from project-related development | Class III None required. | Class III None required. | Class III None required. | Class III None required. |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III None required. | Class III None required. | Class III None required. | Class III None required. |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class III None required. | Class III None required. | Class III None required. | Class III None required. |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class III None required. | Class III None required. | Class III None required. | Class III None required. |

1 - Mitigation measures recommended herein are addressed at indirect impacts not caused by well stimulation. The identified measures thus are only model measures that could be followed, likely with some modification, in connection with approvals of other projects contributing to indirect effects.

## 12.3    No Future Well Stimulation Practices Outside of Existing Oil and Gas Field Boundaries (Alternative 2)

Under the No Future Well Stimulation Practices Outside of Existing Oil and Gas Boundaries (Alternative 2), no hydraulic fracturing, acid fracturing, or acid matrix stimulation treatments would be permitted in areas under State jurisdiction outside of the boundaries of existing oil and gas fields and their buffer areas, as shown in Figures 5-4, 5-6, and 5-8. While Alternative 2 would prohibit well stimulation in areas outside of existing fields and their buffers, it would not prohibit conventional oil and gas exploration and development in these areas. ~~Under this alternative, the project standards for resource protection (see EIR Section 7.5) would not be implemented.~~

As with Alternative 1, this alternative assumes that any action taken by the State to restrict or limit well stimulation activities would not be applicable in areas under federal or tribal jurisdiction. Any activity that is currently allowed in areas under federal or tribal jurisdiction would continue to be allowed, and could increase, stay the same, or decrease in intensity. The current permitting and environmental review processes applicable to stimulation activities in areas under federal and tribal jurisdiction would continue to apply to new well stimulation projects in those areas, and therefore impacts are assumed to be mitigated as appropriate and feasible. The analysis below for this alternative focuses only on activities in areas under State jurisdiction, and includes the assumption that the analysis of effects in areas under federal or tribal jurisdiction would be the same as with Alternative 1. Therefore, effects in areas under federal or tribal jurisdiction are not considered in the analysis of this alternative.

This alternative would require new legislation to revise PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments in the State without any requirement that such activities only occur within established fields. The probable fields where future well stimulations treatments are likely to occur under Alternative 2 are in Study Regions 1, 2, and 4. In Study Region 1, well stimulation treatments would likely occur only at existing oil fields even without new legislation; therefore, there would be no loss of potential production in Study Region 1 due to implementation of this alternative. In Study Regions 2 and 4, a portion of the anticipated well stimulation would occur within existing oil and gas fields; however, it is possible that some new wells outside of existing fields would be prohibited from using well stimulation. Because of this, some potential oil and gas resources would not be accessed with implementation of this alternative. It is not possible to quantify the precise amount of oil and gas resources that could go untapped. However, because well stimulation would be allowed within existing oil and gas fields and their buffers, the amount of resource left untapped would be less than under a Statewide ban imposed by the No Future Well Stimulation Treatments Alternative (Alternative 1). As a consequence, the amount of oil that would need to be imported to offset any production foregone would be less than under Alternative 1; therefore, the indirect effects of Alternative 2 would be less than under Alternative 1.

In addition to an analysis of the alternative itself, the analysis of Alternative 2 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

## 12.3.1    Aesthetics

### 12.3.1.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.1.2    Programmatic Level Analysis of the Project

Under Alternative 2, use of well stimulation technologies would be limited to wells in existing fields; wells outside of existing fields in areas under State jurisdiction would be prohibited from using stimulation technologies. As a result, the visual impacts identified for well stimulation would occur only in existing fields. Under Alternative 2, direct impacts are reduced because wells requiring stimulation to produce would not be drilled outside of existing fields. In general, Alternative 2 eliminates potential impacts associated with well stimulation in areas outside of existing fields. However, wells could still be developed in these areas, but well stimulation would be prohibited. Prohibiting well stimulation in these areas would have other direct and indirect effects. It could increase conventional well drilling and the use of enhanced recovery techniques in existing fields and require the increased importation of oil from foreign or other domestic sources to meet demand. This could increase the intensity of activity at some fields. Importation of additional oil would result in direct and indirect impacts from transportation by tanker and rail, particularly in Los Angeles, Long Beach, and the San Francisco Bay Area, where extensive refining facilities are located.

For areas outside of existing oil and gas fields, Alternative 2 would be similar to Alternative 1, with stimulation prohibited. Inside of existing fields, Alternative 2 would be similar to the project, with stimulation permitted under existing and proposed regulations. This would be true in all six study regions. The out-of-field well stimulation prohibition under Alternative 2 would reduce the geographic areas where the visual impacts from stimulation activities would occur. Procedures and impact mitigation measures applicable to the project in areas outside of existing fields would not need to be implemented.

In Study Region 1, well stimulation treatments likely would occur only at existing oil fields, so there would be no loss of potential production resulting from prohibiting stimulation outside of existing fields as compared to the project. In Study Regions 2, 3, and 4, well stimulation would occur within existing oil and gas fields as well; however, development of wells in areas outside of existing fields would be less likely if stimulation is prohibited there. This would translate to loss of potential oil and gas reserves that may have been recovered had stimulation occurred. The prohibition on out-of-field stimulation also could cause indirect effects such as increasing the intensity of activities in existing oil and gas fields. Overall, Alternative 2 also could result in a reduction in in-state production and an increase in importation of oil and gas supplies and products from out of state as compared to the project. Because well stimulation would still be allowed in existing oil and gas fields, potential lost future production would be less under Alternative 2 than under the No Future Well Stimulation Treatments Alternative (Alternative 1), which would ban well stimulation statewide.

---

| Impact AES-1 | Substantially adversely affect scenic vistas |
|---|---|

Under this alternative, any ground disturbance or clearing associated with well stimulation and the mobilization of equipment, material, vehicles, and crews would occur only in existing fields and their buffers. Prohibiting well stimulation outside of existing fields would result in no alteration to existing scenic vistas in these locations and there would be no impact (Class IV) outside of fields.

In the analysis of the project (see EIR Section 10.1, Aesthetics) it was determined that well stimulation activity in an existing field would have a less than significant impact (Class III). This is because well stimulation is a temporary short-term activity, typically does not require earthwork or vegetation removal, and at the conclusion of the operation the site would be left largely unchanged from pre-stimulation conditions. If the prohibition on stimulation work occurring outside of existing fields leads to an increase of such activity within an existing field, this would be a nominal change in the visual environment and would be a less than significant impact as well (Class III).

Banning well stimulation in areas where well stimulation could lead to recovery oil resources would result in such potential supplies not being available to meet demand. To meet demand, imports of oil would be required to offset the lack of these unrecovered resources. Enroute ship, truck, and rail shipments could adversely affect scenic vistas as they pass by, but this would be a transitory effect and would be considered less than significant (Class III). However, if the volume of imports were such that expanded or new terminals would be required at refineries or transfer points, this could adversely affect the localities where the terminals are located. Depending on local conditions, this could result in impacts to scenic vistas ranging from significant and unmitigable (Class I) to less than significant (Class III). By comparison, Impact AES-1 could be Class III under the project in existing fields and, depending on circumstances, Class I or II outside of existing fields.

| Impact AES-2 | Substantially alter or damage scenic resources |
|---|---|

With stimulation banned outside of existing fields, new areas likely would see little oil and gas development activity. This level of activity would likely result in no substantial alteration or damage occurring to scenic resources. With the level of drilling outside of existing fields substantially less if well stimulation were banned, it is expected that scenic resources could be readily avoided and no impact not occur (Class IV). But, because these impacts are site-specific, depending on the location, impacts could range from significant and unmitigable (Class I) to less than significant (Class III).

The indirect effects described for increased drilling and activity at existing fields and from increased imports would be as described above for Impact AES-1 and would be less than significant (Class III). If expanded or new terminals would be required for increased imports, potential impacts on scenic resources could range from significant and unmitigable (Class I) to less than significant with mitigation (Class II).

By comparison, Impact AES-2 could be Class III under the project. However, the project did not require expanded or new terminals for imports, which could be the case under Alternative 2.

| Impact AES-3 | Substantially degrade the existing visual character or quality of a site and its surroundings |
|---|---|

If areas outside of existing oil and gas fields are not explored and developed for hydrocarbon recovery, impacts on the existing visual character or quality of a site and its surrounding would not occur, resulting in no impact (Class IV). At existing fields, equipment, materials, and vehicles would be mobilized to a well pad to conduct stimulation work. As noted, this well stimulation is a short-term activity and the site

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 262 of 689   Page ID #:5209

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

is left essentially as it appeared prior to stimulation. Consequently, well stimulation activity in an existing field would have a less than significant impact (Class III).

If the inability to conduct well stimulation elsewhere led to increasing activity within a field, this would not likely be noticeably different from existing conditions and would not lead to a substantial degradation of the existing character of the location. This would be a less than significant impact (Class III). Increased deliveries to refineries of imported oil would somewhat increase ship, road, and rail traffic, but this would not substantially degrade the visual character of the routes used or the refinery vicinity, as rail and road systems already exist and already carry traffic. This would be a less than significant impact (Class III). However, at localities near any new or expanded terminals that may be required by increased imports, the impact on the visual character or quality of a site could range from significant and unmitigable (Class I) to less than significant (Class III).

By comparison, Impact AES-3 could be Class III under the project.

| **Impact AES-4    Create new sources of substantial light and glare** |
| --- |

With a prohibition on well stimulation outside of existing fields, few new areas outside of existing oil and gas fields are likely to be explored and developed for hydrocarbon recovery. The absence of these activities would avoid conditions under which there could be new sources of substantial light and glare; there would be no impact (Class IV). Within existing fields, vehicles and equipment used during a stimulation job could result in reflected light and glare. This would be from surfaces such as windshields or unpainted stainless steel tankers, if on site. The distance between off-site viewers and the work site, the need for the sun angle and to reflective surface to align in a way that directs light to a viewer, and the infrequency with which stimulation would occur result in this being a less than significant impact (Class III).

Increasing drilling and stimulation activity at an existing field would increase the number of drill rigs and vehicles on site. This would potentially create additional sources of light and glare, similar in nature to those already occurring. If well drilling were to increase substantially, the frequency and duration of working rigs being present at a field would increase, increasing the number of nighttime hours when rigs would be operating. This could increase the number of nighttime hours in which lighted rigs are visible from offsite. However, any potential sources of light and glare at a site would be present for a limited time and would be removed at the conclusion of the operation. Therefore, increased activities at existing fields would present a less than substantial new source of light and glare. The impact would be less than significant impact (Class III).

If increased imports required expansion or development of terminals, this would introduce additional or new sources of light and glare at those locations. With mitigation measures such as those recommended in Chapter 10 for Aesthetics, these impacts would be less than significant with mitigation (Class II).

By comparison, Impact AES-4 could be Class III under the project. However, the analysis of the project did not consider a need for new or expanded terminals, whose impact from light and glare would be less than significant with mitigation (Class II).

### 12.3.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

The programmatic discussion for direct and indirect impacts provided in EIR Section 12.3.1.2 above would apply to visual resources associated with the Wilmington, Inglewood, and Sespe Oil and Gas Fields because

Alternative 2 would allow stimulation work in existing fields, which would include the presence of vehicles and equipment associated with stimulation work.

### 12.3.1.4    Impact Significance Summary

None of the potential impacts to visual resources identified for the project would occur outside of existing oil and gas fields. Within existing fields, stimulation activities are temporary and leave a site similar to how it appeared before the work was conducted. The potential direct impacts in a field vary from less than significant (Class III) to no impact (Class IV).

However, there would be a secondary impact attributable increases in activity at fields, or increases in ship, rail, and tank truck traffic delivering imported oil and gas. Impacts would vary from no impact (Class IV) to less than significant (Class III).

At localities near any new or expanded terminals that may be required by increased imports, the impact on the visual character or quality of a site could range from significant and unmitigable (Class I) to less than significant (Class III).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. For indirect effects of this alternative not associated with well stimulation treatment (e.g., those caused by increased importation of oil into California by tanker or rail), the mitigation measures proposed herein do not apply directly, but provide models that could be followed during project approval processes for various kinds of projects causing or contributing to indirect effects.

## 12.3.2    Agriculture and Forestry Resources

### 12.3.2.1    Introduction

This section provides an evaluation of the potential impacts to agriculture and forestry resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agriculture and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agriculture and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agriculture and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

~~Under this alternative the project standards for resource protection (see EIR Section 7.5) would not be implemented, which would result in greater indirect impacts on agricultural and forestry resources (Impact AGF-5, Directly or indirectly impair the use of agricultural land or forest land). Without the Water Recycling Standards, there would be an increase in competition for agricultural water supplies, because less water would be recycled. In addition, the potential for contamination of agricultural water supplies would be increased without implementation the Surface Water Protection Standards and Groundwater Protection Standards.~~

### 12.3.2.2    Programmatic Level Analysis of the Project

By prohibiting well stimulation treatments in areas outside of existing fields and their buffers, while allowing treatments inside these areas, there would likely be some loss of oil and gas reserves under Alternative 2 compared with the project. This would be because out-of-field areas in the Monterey For-

mation would not be developed and brought into production. This could cause indirect effects, including an increase in the intensity of production at existing oil and gas fields, as well as an increase in activities associated with the importation of oil and gas products. However, because well stimulation would be allowed within existing oil and gas fields, potential lost future production would be less than would be the case under the No Future Well Stimulation Treatments Alternative (Alternative 1) but more than under the project.

Under Alternative 2, impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.2 (Programmatic Level Analysis of Impacts and Mitigation Measures, Agriculture and Forestry Resources) for Impacts AGR-1 through AGF-5. No direct impacts would occur (Class IV) and indirect impacts would be both beneficial in areas where fewer agriculture and forestry resources would be affected (Class V), or potentially significant if additional conventional wells are drilled as a result of not using well stimulation techniques in areas outside of existing fields and their buffers. Implementation of the mitigation measures below would reduce all impacts to a less than significant level (Class II). Where mitigation would be imposed on oil and gas drilling operations outside of existing oil and gas fields, the measures developed in this EIR would have to be adapted to project approvals other than well stimulation treatment permits.

Under Alternative 2, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.2 (Agriculture and Forestry Resources). As explained in that section, implementation of the mitigation measures below would reduce all impacts to a less than significant level (Class II). However, were conventional well drilling and enhanced recovery to occur more extensively in existing fields, the severity of impacts would be greater under Alternative 2 than under the project, even though the impacts remain Class II. Where impacts are the result of intensified drilling rather than well stimulation, the mitigation measures set forth below would have to be adapted to project approvals other than well stimulation treatment permits. This would not apply at Wilmington Oil and Gas Field, where there are no agricultural or forest lands, and would apply only nominally at Inglewood Oil and Gas Field, where forest resources are located in a part of the field buffer. Applicable mitigation measures include:

**MM AGF-1a**    **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-1b**    **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-1c**    **Compensate for Loss of Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-2a**    **Ensure Compatibility with Agricultural Zoning.** (Full text in EIR Section 10.2.5.)

**MM AGF-2b**    **Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts.** (Full text in EIR Section 10.2.5.)

**MM AGF-3a**    **Ensure Compatibility with Zoning for Forest and Timberland.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**    **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**    **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**    **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a**  **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

**MM GW-4b**  **Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin.~~ (Full text in EIR Section 10.14.5.)

**MM SWR-1a**  **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-2a**  **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-3a**  **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

**MM TR-1a**  **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

### 12.3.2.3  Programmatic Level Analysis of Specific Oil and Gas Fields

#### 12.3.2.3.1  *Wilmington Oil and Gas Field*

Because the Wilmington Oil and Gas Field is an existing field, well stimulation activities would be allowed.

#### *Inglewood Oil and Gas Field*

The Inglewood Oil and Gas Field does not contain any mapped farmland, so no direct or indirect impacts would occur to agriculture (Impacts AGR-1 and AGF-2)(Class IV). Likewise, the Inglewood Oil and Gas Field is not zoned for forest land or timberland, therefore, Impact AGF-3 would not occur (Class IV).

Because the Inglewood Oil and Gas Field is an existing field, well stimulation activities would be allowed and there are 7.6 acres of forest land within a 0.25-mile buffer surrounding the field. Impacts associated with stimulation activities for the Inglewood Oil and Gas Field for Alternative 2 would be the same as those described in EIR Section 10.2 (Agriculture and Forestry Resources) for Impacts AGF-4 (Result in the loss of forest land or conversion of forest land to non-forest use) and AGF-5 (Directly or indirectly impair the use of agricultural land or forest land). Implementation of Mitigation Measures AGF-4a, AGF-4b, AGF-4c, AQ-2c, BIO-2a, HAZ-1a, GW-4b, SWR-1a, SWR-2a, SWR-3a, and TR-1a would reduce the majority of potential environmental impacts, including conversion of forest land to a non-forest use, to a less than significant level through resource protection measures and compensation (Class II).

#### 12.3.2.3.2  *Sespe Oil and Gas Field*

Because the Sespe Oil and Gas Field is an existing field, well stimulation activities would be allowed. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project, because other oil and gas areas that require well stimulation for production would no longer be available to developers. Therefore, the Alternative 2 would not reduce impacts on agricultural and forestry resources within the Sespe Oil and Gas Field. There would be impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments. There would also be potential impacts on agricultural water quality or water supplies. See EIR Section 11.2 (Agriculture and Forestry Resources) for a detailed discussion.

#### 12.3.2.4    Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts are the result of intensified drilling rather than well stimulation, the mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

### 12.3.3    Air Quality

#### 12.3.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

#### 12.3.3.2    Programmatic Level Analysis of Impacts and Mitigation Measures

| Impact AQ-1      Conflict with or obstruct implementation of an applicable air quality plan |
|---|

This alternative would restrict future oil and gas activity by halting well stimulation activities except for within existing oil and gas fields. This would avoid the emissions during well stimulation treatments that could otherwise occur outside of existing fields, and it would also lead to a decrease in California oil production. This could lead to fewer indirect impacts of new conventional wells and less well abandonment than Alternative 1, as existing fields could use well stimulation treatments.

The decrease in California production is not quantifiable (EIR Section 8.3.2). The replacement supply would increase the activity of tanker ships delivering foreign oil to California via ports and marine terminals in Los Angeles, Long Beach, and the San Francisco Bay Area, and it would increase the activity of rail trains hauling crude oil primarily from North Dakota and Canada. In-state emissions from oil and gas production would could occur at lower levels; however, these emissions would be offset by increasing levels of emissions from tanker ships and locomotives delivering crude to California and from terminal facilities necessary to offload and handle the imports. The resulting levels of emissions from tanker ships, locomotives, and terminal facilities in Alternative 2 would remain at levels potentially inconsistent with the forecasts of air quality plans, as with the project, resulting in a potential conflict with local air quality plans. Each local air district, especially SCAQMD and BAAQMD, would need to assess the potential growth in activity and emissions from ocean-going vessels and trains to ensure that these mobile sources are accurately reflected in inventories.

Mitigation identified for the project would apply to well stimulation treatments within existing fields, and comparable mitigation would also need to be developed or adapted for the increased emissions marine vessels and trains that import oil and gas and for new facilities to deliver imports. The mobile sources and facilities that handle imports fall under the jurisdiction of the ARB, local air districts, and counties and cities with land use authority, and these agencies would need to identify any necessary mitigation. Because DOGGR cannot require local air districts to update planning inventories or establish specific rules for sources related to oil and gas importation, this impact would be a Class I: Significant and Unavoidable Impact.

Alternative 2 is worse than the project for Air Quality impacts. Increased levels of emissions would occur from tanker ships and locomotives delivering crude to California and from terminal facilities necessary to offload and handle the imports (Class I). Fewer indirect impacts would be associated with new conventional wells and abandonment activities than in Alternative 1.

**MM AQ-1a**    **Improve Air Quality Planning Inventories and Local Control Measures.** (Full text in EIR Section 10.3.5.)

**MM AQ-1b**    **Improve the Methodologies and Emission Factors Used in Inventory Development.** (Full text in EIR Section 10.3.5.)

| | |
|---|---|
| **Impact AQ-2** | **Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation** |

The increased levels of criteria air pollutant emissions caused by tanker ships, rail transport, and terminals for offloading crude may exceed general mass-based emission thresholds of a local air district. Mitigation regarding well stimulation treatments would be applicable within existing fields, and comparable mitigation would also need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce emissions from marine and rail terminals. The mobile sources and facilities that handle imports fall under the jurisdiction of the ARB, local air districts, and counties and cities with land use authority, and these agencies would need to identify any necessary mitigation. Because DOGGR cannot be certain that the degree of mitigation would reduce emissions to levels that would not exceed local air district thresholds, this impact would be a Class I: Significant and Unavoidable Impact.

**MM AQ-2a**    **Reduce Hydrocarbon Emissions from Well Stimulation Treatments.** (Full text in EIR Section 10.3.5.)

**MM AQ-2b**    **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM AQ-2c**    **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

| | |
|---|---|
| **Impact AQ-3** | **Expose sensitive receptors to substantial pollutant concentrations** |

Emissions from marine and rail terminals would have the potential to expose sensitive receptors to substantial pollutant concentrations depending on site-specific conditions. Mitigation identified for well stimulation treatments would be applicable, and comparable mitigation would also need to be developed or adapted for mobile sources and facilities that import oil and gas to reduce the levels of TACs from marine and rail terminals. Because DOGGR cannot be certain that feasible mitigation would need to subject the sources to sufficient controls so that activities would not expose sensitive receptors to substantial pollutant concentrations. However, because there is no way of knowing how marine and rail terminals would implement the mitigation, this impact would remain Class I: Significant and Unavoidable.

**MM AQ-3a**    **Comply with Local Air District Protocols Relating to the Preparation of ~~Prepare a~~ Health Risk Assessment and Implement Emission Controls.** (Full text in EIR Section 10.3.5.)

**MM AQ-3b**    **Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility.** (Full text in EIR Section 10.3.5.)

| Impact AQ-4 | Create objectionable odors affecting a substantial number of people |
|---|---|

Emissions from marine and rail terminals would have the potential to create objectionable odors depending on site-specific conditions. Mitigation identified for well stimulation treatments would be applicable, and comparable mitigation would also need to be developed or adapted for mobile sources and facilities that important oil and gas to reduce potential odor impacts from marine and rail terminals. Because site-specific conditions may result in occasionally unavoidable odor annoyances and universal implementation of odor minimization strategies would not be certain, this impact would be a Class I: Significant and Unavoidable Impact.

**MM AQ-4a** **Prepare and Implement an Odor Minimization Plan.** (Full text in EIR Section 10.3.5.)

**MM AQ-4b** **Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility.** (Full text in EIR Section 10.3.5.)

### 12.3.3.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 2, these existing fields would be subject to the same potential impacts and mitigation measures as described for the project (EIR Section 11.3.5). Emissions associated with existing well stimulation treatments at the Wilmington and Sespe would occur at a similar or slightly reduced level and would be within the level of activity assumed by the air quality plan. New well stimulation treatments at the Inglewood Oil and Gas Field would be subject to the same potential air quality impacts and would require the same mitigation measures as described for the project (EIR Section 11.3.5). Because each new well stimulation treatment operation creates "new" emissions, which could be potentially significant, mitigation would be necessary. Although Impact AQ-1 would be a Class III: Less Than Significant Impact, the remaining air quality impacts would occur as shown in EIR Section 10.3.5 (Impacts Common to All Study Regions). Mitigation measures identified for Impact AQ-2, Impact AQ-3, and Impact AQ-4 would be applicable within each field, and the resulting impacts after implementing mitigation would be significant and unavoidable (Class I).

### 12.3.3.4    Impact Significance Summary

Alternative 2 is worse than the project for Air Quality impacts. Although some emissions related to well stimulation treatments would be avoided outside of existing fields, emission increases would occur due to crude transport and offloading. Each of the air quality impacts due to well stimulation treatments would be as described for the project, although new areas would limited. Additional emission increases would occur due to crude importation or an increase in the intensity of operations in fields to maintain production levels. Emissions associated with these indirect effects would cause air quality impacts described above.

## 12.3.4    Biological Resources: Terrestrial Environment

### 12.3.4.1    Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources: Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources–Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected

environment for terrestrial biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, compared to the project, there would be the potential for an increase in oil and gas development and associated well stimulation in biologically sensitive areas, slightly greater habitat loss without setbacks from perennial surface water, an increase in water usage that could affect fish and wildlife habitat (due to less water recycling), and an increase in the potential for contamination of water supplies that could affect biological resources.~~

### 12.3.4.2    Programmatic Level Analysis of the Project

Under Alternative 2, direct impacts within existing oil and gas fields would be the same as under the project. Indirect impacts would be similar to, but less than, indirect impacts under Alternative 1. Impact criteria and mitigation measures for Alternative 2 are the same as those listed in EIR Section 12.2.4 for Alternative 1.

Special-status biological resources may be found within existing oil and gas fields, but tend to be more abundant elsewhere. There is a potential for adverse impacts from oil and gas production both within and outside of existing fields, even without well stimulation treatments. Most of the potential impacts to terrestrial biological resources result from land use alterations and other surface impacts of oil and gas production. These impacts may result from well siting, drilling, and operation, regardless whether well stimulation treatments are applied. Depending on specific locations of future well stimulation activities within or outside existing oil and gas fields, the potential impacts to biological resources may be significant and unavoidable. Depending on specific locations of future well stimulation activities, even with these activities located on consolidated well pads, the potential impacts to biological resources may range from Class I (significant and unavoidable) to Class III (less than significant). Due to the unknown locations of future well stimulation activities, this analysis presumes a "reasonable worst case" level of statewide impacts from well stimulation, which generally are Class I or Class II. However, Alternative 2 would substantially reduce the expected overall impacts of well stimulation activities statewide by limiting those activities to existing oil and gas fields. Future well stimulation would not occur outside the existing fields; thus the overall direct effects to biological resources would more limited than under the project.

Under Alternative 2, both direct and indirect impacts to biological resources may be significant and unavoidable (Class I). This would apply to all the biological resources impact criteria BIOT-1 through BIOT-6 (addressing impacts to plants, fish, and wildlife and their habitats and natural communities) and BIOT-10 (greenhouse gas effects and consequent impacts to biological resources) below. In contrast, Impacts BIOT-8 and BIOT-9 (addressing conflicts with conservation policies and planning) are Class II impacts under this alternative (and under the project). Where the projects causing indirect effects do not require well stimulation treatment permits, similar measures would have to be imposed on other types of project approvals.

Mitigation Measures BIOT-1a through BIOT-9a would reduce these impacts, but some impacts may remain significant even after mitigation. <u>Mitigation Measures GW-1a, GW-1b, GW-4a, GW-4b, SWR-1a, SWR-2a and SWR-3a</u> ~~Additional mitigation measures~~ or other conditions may be required under other regulatory programs including but not limited to CESA, ESA, state and federal regulation of waters of the State and waters of the U.S.

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 270 of 689    Page ID #:5217

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

### 12.3.4.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 2, well stimulation treatments within existing oil and gas fields, including the Wilmington, Inglewood, and Sespe fields would be permitted, subject to DOGGR regulation. The impacts and mitigation measures for the Wilmington, Inglewood, and Sespe fields would be the same as described in EIR Section 11.4. Several impacts that would remain Class I for the presumed "reasonable worst case." Potential "reasonable worst-case" impacts to biological resources would be Class I for Impacts BIOT-1 through BIOT-6 and BIOT-7 (Sespe field only); Class II for Impacts BIOT-8 and BIOT-9; and Class III for Impacts BIOT-7 (for the Wilmington and Inglewood fields) and BIOT-10 (as they would be under the project). The indirect impacts described in Alternative 1 would be reduced under Alternative 2. Impacts would be reduced by Mitigation Measures BIOT-1a through BIOT-9a. Additional mitigation measures or other conditions may be required under other regulatory programs.

### 12.3.4.4    Impact Significance Summary

Alternative 2 would reduce the potential direct impacts to terrestrial biological resources in all study regions outside of existing oil and gas fields compared with the project. Within existing oil and gas fields, impacts would be essentially the same as those of the project. Under Alternative 2 there may be some indirect impacts associated with either existing oil and gas field abandonment or intensified well drilling and production that would be considered significant and unavoidable. Programmatic Impacts may still be significant even with the implementation of recommended mitigation (Class I). As with Alternative 1, some impacts to the Inglewood Oil and Gas Field and the Sespe Oil and Gas Field would also be Class I. Some Impacts to the Wilmington Oil and Gas Field would be Class II.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts are the result of intensified drilling rather than well stimulation, the mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.5    Biological Resources: Coastal and Marine Environment

### 12.3.5.1    Introduction

This section provides an evaluation of the potential impacts to marine biological resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.5 (Biological Resources: Coastal and Marine Environment). For the purposes of this analysis please refer to EIR Sections 10.5.2 and 11.5.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.5.3 and 11.5.3 for a description of the affected environment for marine biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.5.4 for details regarding the impact methodology and significance criteria that have been used.

Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, well stimulation activities would potentially be allowed in Marine Protected Areas, as well as closer to waterways, which would increase the potential for spills to enter waterways and impact water quality and associated marine biological resources.

### 12.3.5.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Under Alternative 2, there are potential impacts to coastal and marine biological resources could occur due to accidental spill or well stimulation activities, but such impacts would be limited to existing oil and gas boundaries.

Offshore well stimulation activities in Study Region 1 are mainly from the THUMS Islands and offshore platforms. Horizontal directional drilling (HDD) activities associated with well stimulation could affect some marine resources within the sediment, such as polycheate worms, by crushing them during drilling operations, but these species are high in abundance and widespread. In addition, there would be an increase in barge trips to transport hydraulic fracturing equipment to the THUMS Islands, so there could be an increase in the potential for accidental spills from a collision due to increased vessel traffic in the vicinity of the THUMS Islands. However, with the implementation of current regulations (existing Title 14 regulations and the existing State and federal regulations, as described in EIR Section 10.6.2) and DOGGR's proposed permanent regulations (Sections 1782, 1783.1, 1784.1 and 1784.2, 1785 as described in EIR Section 2.2.2), these impacts would be less than significant (Class III). Indirect impacts related to intensification of oil and gas activities without well stimulation would also be Class III, but would be reduced compared with Alternative 1.

### 12.3.5.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Impacts for the Wilmington Oil and Gas Field would be the same as described above for general coastal and marine impacts of Alternative 2.

### 12.3.5.4    Impact Significance Summary

Under Alternative 2, direct impacts would only potentially occur within existing oil and gas fields, compared to Alternative 1 (No Future Well Stimulation Treatments), where no impacts would occur due to no well stimulation activity. The types of indirect impacts described under Alternative 1 would be reduced, but may still occur. Both direct and indirect impacts would be Class III.

## 12.3.6    Coastal Processes and Marine Water Quality

### 12.3.6.1    Introduction

This section provides an evaluation of the potential impacts to coastal processes and marine water quality associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.6 (Coastal Processes and Marine Water Quality). For the purposes of this analysis please refer to EIR Sections 10.6.2 and 11.6.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.6.3 and 11.6.3 for a description of the affected environment for coastal processes and marine water quality (as applicable at either a study region or field-specific scale), and EIR Section 10.6.4 for details regarding the impact methodology and significance criteria that have been used.

Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, well stimulation activities would potentially be allowed in Marine Protected Areas, as well as closer to waterways, which would increase the potential for spills to enter waterways and impact marine water quality.

### 12.3.6.2    Programmatic Level Analysis of the Project

Under the No Future Well Stimulation Treatments Outside Existing Oil and Gas Fields Alternative, direct impacts within existing oil and gas fields would be the same as those of the project. Outside of existing oil and gas fields there may be indirect impacts from intensification of oil and gas drilling that does not use well stimulation and an intensification of impacts due to transportation of imported petroleum by ship.

Under Alternative 2, there is no risk of impacts from well stimulation activities outside of existing fields. But hydrocarbon spills could still occur with indirect impacts of additional conventional wells. ~~Tsunami risks resulting from intensified conventional wells would also accrue.~~ Impacts are the same as for the project.

The impacts addressed for coastal processes and marine water quality are:

- **Impact CPMWQ-1:** Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity

- **Impact CPMWQ-2:** Change the velocity or direction of ocean currents

- **Impact CPMWQ-3:** Change the velocity or direction of coastal and ocean winds

- **Impact CPMWQ-4:** Change the direction, size, or period of ocean waves

- **Impact CPMWQ-5:** Increase the risk of tsunamis

Direct and indirect impacts would be roughly similar to those discussed for the project in EIR Section 10.6.5. These impacts were Class II for water quality (Impact CPMWQ-1), and ocean currents (Impact CPMWQ-2), ~~and tsunami risk (Impact CPMWQ-5)~~ with the implementation of recommended mitigation (listed in EIR Section 10.6.5). The potential severity of impacts under Alternative 2 is the same as with the project. However, because Alternative 2 mandates that new projects originate only from existing boundaries, and offshore petroleum fields in Southern California are known to be in a state of production decline, the implication is that fewer petroleum operations in the future would take place offshore under this alternative. With fewer operations offshore, the likelihood and quantities of impacts to coastal and marine waters would decrease. Therefore, Alternative 2 would have fewer impacts to coastal processes and marine water quality compared with the project. However, the predicted intensification of non-fracturing projects and of imports would still occur, and therefore it is likely more impacts would occur inland away from the coast.

Like the project, Alternative 2 Impacts related to ocean winds (Impact CPMWQ-3) would be Class III, and impacts related to ocean waves (Impact CPMWQ-4) would be Class IV, as discussed in EIR Section 10.6.5. ~~Impacts related to tsunami risk are difficult to quantify, as explained in EIR Section 10.6.5. Since some offshore operations not involving well stimulation would continue under Alternative 2, the risk of tsunami damage would still be present, and as explained in EIR Section 10.6.5, it would be very difficult to assess or compare this risk numerically. The risk is estimated to be less for Alternative 2 than for the project, but because of the difficulties in trying to quantify this risk, the impact conclusion is the same as for the project.~~

### 12.3.6.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields and well stimulation activities would be allowed at these wells under Alternative 2. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project. Because other oil and gas areas outside of existing fields that would require well stimulation for production would no longer be

available to developers, there could be an increase in drilling and stimulation in existing fields. As mature fields, the number of new wells under Alternative 2 would not be expected to increase dramatically over existing levels of activity.

Since the Inglewood and Sespe Oil and Gas Fields are inland and well away from the coast, the analysis of the alternative on coastal processes and marine water quality does not apply. Impacts to coastal processes and marine water quality at the Wilmington Oil and Gas Field would be the same as for the project, see EIR Section 11.6.5.

#### 12.3.6.4    Impact Significance Summary

Direct impacts from Alternative 1 would be reduced outside of existing oil and gas fields compared with the project. Within existing oil and gas fields, direct impacts would the same as for the project. Indirect impacts triggered by possible intensification of drilling and production activities that do not involve well stimulation outside of existing oil and gas fields, including transportation impacts resulting from intensified imports, would be less than, but similar to, those of Alternative 1.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts are the result of projects other than well stimulation, the mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.7    Commercial and Recreational Fishing

### 12.3.7.1    Introduction

This section provides an evaluation of the potential impacts to commercial and recreational fishing associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.7 (Commercial and Recreational Fishing). For the purposes of this analysis please refer to EIR Sections 10.7.2 and 11.7.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.7.3 and 11.7.3 for a description of the affected environment for commercial and recreational fishing (as applicable at either a study region or field-specific scale), and EIR Section 10.7.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, well stimulation activities would potentially be allowed in Marine Protected Areas, as well as closer to waterways, which would increase the potential for spills to enter waterways and impact water quality and fisheries.~~

### 12.3.7.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Under Alternative 2, well stimulation actions would continue to be conducted at existing oil and gas facilities, including offshore platforms located in State waters. As described in EIR Section 10.5.5, HDD techniques would be used for well stimulation and some interference with commercial and recreation al fishing could occur. For example, some recreational anglers could be temporarily precluded from shore fishing by the HDD staging location. In addition, because well stimulation at the THUMS Islands would require adding more barge traffic to transport equipment and personnel, the chance of an accidental spill as a result of a vessel collision may be increased. However, safety protocols in the Ports within Study Region 1 are in place to prevent an accidental collision and subsequent spills from occurring. DOGGR's proposed regulations also address these potential impacts (i.e., Sections 1782, 1783.1, 1784.1 and

1784.2, 1785 as described in EIR Section 2.2.2). Therefore, under Alternative 2, no direct significant impacts would occur to commercial or recreational fishing in Study Region 1 (Class III). Indirect impacts related to intensification of oil and gas activities without well stimulation would also be Class III, but would be reduced compared with Alternative 1.

In Study Regions 2 and 3, well stimulation activities could displace recreational anglers from accessing a small portion of shore-based fishing grounds, as well as areas near offshore platforms. The impact of the activities could last hours to days with a temporary and localized effect over a discrete area and the amount of available areas to fish is considerable compared to the small excluded fishing area. Therefore, under Alternative 2, no direct significant impacts would occur to commercial or recreational fishing in Study Region 2 (Class III).

### 12.3.7.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Impacts for the Wilmington Oil and Gas Field would be the same as described above for general recreational and commercial fishing impacts of Alternative 2.

### 12.3.7.4   Impact Significance Summary

Direct and indirect impacts would be Class III.

## 12.3.8   Cultural Resources

### 12.3.8.1   Introduction

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.8.2   Programmatic Level Analysis of the Project

For purposes of this analysis the following impacts are addressed:

- **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

- **Impact CUL-2:** Affect prehistoric resources

- **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

- **Impact CUL-4:** Affect cultural landscapes

Under Alternative 2 potential surface and subsurface disturbances associated with well stimulation treatments would be limited to existing oil and gas fields and their buffer areas. Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would be expected to reduce these effects, but cannot guarantee that they would be entirely avoided. Where similar impacts would be the result of new drilling activities outside existing fields

rather than well stimulation within existing fields, these measures would have to be adapted to project approvals other than well stimulation treatment permits. The scale of oil and gas development within existing fields, the constraints imposed by other environmental resources, and the possibility that some buried resources would remain unidentified until ground disturbance begins, makes avoidance of all significant effects unlikely. Therefore, these impacts would be considered significant and unavoidable (Class I). It is noted, however, that the geographic extent of these impacts would be substantially lessened in comparison to the project. The number of cultural resources affected by Alternative 2 would likely be fewer than for the project, due to the reduced geographic extent of surface and subsurface disturbances.

~~While the footprint of Alternative 2 is smaller than that of the project in areas that are likely to be sensitive for cultural resources, Alternative 2 does not incorporate the project standards for Resource Protection (see EIR Section 7.5 (Description of the Project, project standards for Resource Protection)) that restrict well stimulation activities from operating near surface water or critical habitats. Thus, it could potentially increase impacts to cultural resources inside of existing oil and gas fields (see Appendix F).~~

### 12.3.8.3    Programmatic Level Analysis of Specific Oil and Gas Fields

While Alternative 2 would likely reduce impacts to cultural resources outside of existing oil and gas fields, this alternative may result in increased development with existing fields. Therefore cultural resources within existing fields may be subject to increased impacts when compared to the project.

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

The cultural resources associated with the Wilmington, Inglewood, and Sespe Oil and Gas Fields are detailed in EIR Section 11.8 (Cultural Resources). Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would likely reduce these effects to less than significant but cannot guarantee they would be entirely avoided. Therefore, impacts to cultural resources are considered significant and unavoidable (Class I).

### 12.3.8.4    Impact Significance Summary

Alternative 2 would reduce the potential impacts to cultural resources in all study regions because the overall footprint of well stimulation disturbances would be reduced in comparison to the project. Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) and EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), or similar measures adapted to approvals other than well stimulation treatment permits, would reduce these effects, but cannot guarantee they would be entirely avoided. Potential impacts are therefore considered significant and unavoidable (Class I).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.3.9    Paleontological Resources

### 12.3.9.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the

purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.9.2    Programmatic Level Analysis of the Project

The impact criterion applicable to Alternative 2 is:

■ **Impact PALEO-1:** Destroy or disturb surface or near-surface significant paleontological resources

Table 10.9-8 in EIR Section 10.9 provides a summary table of the geologic units in each study region that have the potential to bear significant paleontological resources.

Under Alternative 2, no new ground disturbing would occur in areas of the State that do not already have disturbances associated with oil and gas development. Therefore, the geographic extent of potential impacts to paleontological resources would be substantially lessened in comparison to the project, and the risk of adverse impacts would be correspondingly reduced. Within existing oil and gas fields, new earth disturbing associated with oil and gas well stimulation treatments would have the potential to impact paleontological resources; however, Alternative 2 reduces the overall amount of ground disturbance that could result in Class II impacts to paleontological resources. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Practices Alternative (Alternative 1), programmatic level analysis for paleontological resources) and detailed in EIR Section 10.9.5 would be expected to reduce Impact PALEO-1 to less than significant (Class II) because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery. Where similar impacts would be the result of new drilling activities either inside or outside existing fields rather than well stimulation within existing fields, these measures would have to be adapted to project approvals other than well stimulation treatment permits.

### 12.3.9.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington and Sespe Oil and Gas Fields***

Paleontological resources associated with the Wilmington and Sespe Oil and Gas Fields are summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Treatments Alternative, Paleontological Resources). Portions of both fields have been determined to have a paleontological resource potential (i.e., sensitivity) ranging from low to high, and the likelihood of impacting scientifically significant vertebrate fossils is therefore high. However, with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Practices Alternative (Alternative 1)) and detailed in EIR Section 10.9.5, impacts would be less than significant (Class II).

***Inglewood Oil and Gas Field***

Much of the Inglewood Field is underlain at depth by geologic units with a proven potential to yield significant paleontological resources, and the likelihood to encounter significant fossils at relatively shallow depth as a result of Alternative 2 would be low to high, contingent on the location of ground disturbing activities. Under Alternative 2, future well stimulation treatments within the field's boundaries and its buffer areas would be continue to be allowed and there would be a continued risk of adverse impacts.

With application of Mitigation Measures PALEO-1a through PALEO-1h, impacts would be less than significant (Class II).

### 12.3.9.4    Impact Significance Summary

The No Future Well Stimulation Practices Outside of Existing Oil and Gas Field Boundaries Alternative would reduce the potential impacts to paleontological resources in all study regions because the overall footprint of well stimulation earth disturbances would be reduced compared to the project. Any new ground disturbances related to future oil and gas well stimulation treatments that would result in adverse impacts to paleontological resources in existing oil and gas fields would be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures). For similar impacts occurring either outside or inside existing fields due to new drilling activities, similar measures would have to be adapted to approvals other than well stimulation treatment permits.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.3.10    Environmental Justice

### 12.3.10.1   Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.10.2   Programmatic Level Analysis of the Project

Alternative 2 would prohibit well stimulation in areas outside of existing fields and a buffer area immediately around them. This would eliminate possible environmental justice impacts related to well stimulation impacts in areas with minority or low-income populations of concern are located in areas outside of existing fields. However, well stimulation treatments would continue to be allowed within existing oil and gas fields. Therefore, the potential would exist for impacts from well stimulations to disproportionately affect minority or low-income populations living in or adjacent to existing fields. This would be similar to the project.

At existing fields, the project would not introduce new types of environmental impacts not already occurring from current well drilling, extraction, and stimulation treatments. However, Alternative 2 would concentrate and increase the number of wells stimulated within existing oil fields that may contain a disproportionate number of minority or low-income populations living adjacent.

Should a disproportionate amount of well stimulation activities occur adjacent to minority or low-income populations and if these activities result in significant environmental impacts, environmental justice impacts could be significant and unavoidable. The likelihood of this occurring is unknown at this time. Therefore, the potential for environmental justice impacts from well stimulation occurring within the

field remains, and Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) is proposed for Alternative 2. The implementation of Mitigation Measure EJ-1a would allow DOGGR and/or the local jurisdiction to track the locations of well stimulation applications and identify whether there are significant impacts and whether these are disproportionately falling on populations of concern.

**MM EJ-1a      Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments.** (Full text in EIR Section 10.10.5.)

Limiting well stimulation to existing fields may result in less oil and gas being produced in-state, as existing reserves dwindle. To make up for potential production foregone by not conducting well stimulation, some existing fields could increase their amount of conventional drilling and production, and additional oil and gas imports from out of state would occur. Field abandonment would not adversely affect populations of concern. Increasing the density of wells in an existing field and increasing enhanced recovery activities could increase impacts to nearby populations. However, the increased level of activity would not be expected to be substantial, because wells in existing fields typically are already spaced to effectively recover reserves and new wells would be expected to be located on or between existing pads.

Increased ship, rail, and truck traffic hauling imported oil and gas to refineries would increase traffic through communities located on transportation corridors. In particular, the increased rail traffic would increase use of rail corridors between the source fields and California refineries. There are potentially significant indirect impacts associated with transport of oil by rail. Communities along these may be disproportionately comprised of minority and low-income populations. It is likely that increased rail imports of oil would increase the risk of accidents and leaks occurring in these communities. This would be a significant impact and no mitigation is identified that would make it less than significant. This is a significant new environmental justice impact when compared to the project. Unlike the project, mitigation could not be included to avoid siting of ship, rail, and truck traffic hauling imported oil and gas to refineries. These refinery facilities and transportation infrastructure are already in place and thus cannot be sited differently or in ways to avoid disproportionate impacts to minority or low-income. DOGGR would have no authority over transportation corridors and what is shipped on them or by what means.

### 12.3.10.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 2, well stimulation would be allowed in Wilmington, Inglewood, and Sespe Oil and Gas Fields. Because the location of all future well stimulation is not known, the potential for environmental justice impacts from well stimulation occurring within the field remains, and Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply. Implementation of this measure, in conjunction with other mitigation measures identified in this EIR, would reduce the environmental justice impact if there is any.

### 12.3.10.4   Impact Significance Summary

Alternative 2 would eliminate only any possible environmental justice impacts related to siting new oil and gas fields in areas outside of existing fields. Environmental justice impacts could occur at and in the vicinity of existing fields and could be significant. However, implementation Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply, providing DOGGR a means to collect data and assess the environmental justice implications of well stimulation projects. However, in response to prohibiting well stimulation, oil imports by rail are likely to increase substantially, creating an adverse impact in communities through which rail lines carrying oil would pass. Populations living in close proximity to rail lines may be disproportionately minority or

low income. This would be a significant impact and no mitigation is identified that would make it less than significant.

## 12.3.11   Geology, Soils and Mineral Resources

### 12.3.11.1   Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections 10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.11.2   Programmatic Level Analysis of the Project

Alternative 2 would prohibit all future well stimulation activities outside of existing oil and gas boundaries. This alternative would require new legislation to revise PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments without limiting the activity to existing fields. The new legislation would need to specify that all current or future well stimulation treatments outside of existing oil and gas boundaries are not allowable.

In Study Region 1, well stimulation treatments would likely only occur at existing oil fields, so there would be no loss of production in Study Region 1. In Study Regions 2 and 4, a portion of the well stimulation would occur within existing oil and gas fields; however, it is possible that some new wells outside of existing fields would be prohibited from using well stimulation. There would likely be some loss of oil and gas reserves due to implementation of this alternative. This could cause indirect effects, including abandonment of existing oil and gas fields or otherwise an increase in the intensity of an existing oil and gas field's production. This alternative could also cause an increase in activities associated with the importation of oil and gas products. However, because well stimulation would still be allowable within existing oil and gas fields, potential lost future production would not be anticipated to be as great as under the No Future Well Stimulation Treatments Alternative (Alternative 1).

| Impact GEO-1 | Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure |
|---|---|

Under this alternative, direct impacts associated with well stimulation outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. An increase in the intensity of an existing oil and gas field production or an increase in activities associated with the importation of oil and gas products could require new infrastructure and could result in impacts similar to those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures) because existing oil and gas field production areas are crossed by active faults and near seismically active areas. Infrastructure required for

the import of oil and gas would similarly be required to cross areas that are seismically active given the large number of active faults in California, described in EIR Section 10.11.3 (Geology, Soils, and Mineral Resources, Affected Environment). See EIR Figures 10.11-4, 10.11-16, and 10.11-22 for the regional faults and 10.21-2 for the location of Class I rail lines and rail terminals. Standard regulations and Mitigation Measures GEO-1a, GEO-1b, and GEO-1f provided in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures) would reduce this impact to less than significant (Class II). Where indirect impacts are the result of projects not involving well stimulation treatment, these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits. Rupture of a known fault or seismically induced groundshaking could also result in oil or natural gas spills or upsets, addressed in EIR Section 12.3.21 (Risk of Upset/Public and Worker Safety).

Under this alternative, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). Impact GEO-1 would be less than significant with implementation of Mitigation Measures GEO-1a through GEO-1f (Class II).

**MM GEO-1a**     **Avoid Active Fault~~s Zones~~s if Necessary.** (Full text in EIR Section 10.11.5.)

**MM GEO-1b**     **Implement an Appropriate Setback if Necessary.** (Full text in EIR Section 10.11.5.)

**MM GEO-1e~~f~~**     **Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan.** (Full text in EIR Section 10.11.5.)

| **Impact GEO-2**     **Result in substantial soil erosion or the loss of topsoil** |
| --- |

Under this alternative, direct impacts associated with well stimulation outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. The indirect effects are also described in EIR Section 12.2.11.2 and would result in less than significant impacts (Class III).

Under this alternative, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). Because of the existing requirements of the NPDES Stormwater Program, the impact would be less than significant for any construction sites one acre or larger. However, where sites are smaller than one acre, erosion or loss of topsoil could still occur. Mitigation Measure SWR-1a (Require Stormwater Pollution Prevention Plan) would reduce the effects to less than significant in such instances (Class II).

**MM SWR-1a**     **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.11.5.)

| **Impact GEO-3**     **Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse** |
| --- |

Under this alternative, direct impacts associated with well stimulation outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in

the importation of oil and gas. The indirect effects are also described in EIR Section 12.2.11.2 and would result in less than significant impacts with mitigation (Class II).

Under this alternatives, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). The impact would be less than significant with implementation of Mitigation Measure GEO-3a (Class II).

**MM GEO-3a    Prepare Geotechnical Report _if Necessary_.** (Full text in EIR Section 10.11.5.)

| Impact GEO-4   Be located on expansive soil creating substantial risks to life or property |
|---|

Under this alternative, direct impacts associated with well stimulation outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. The indirect effects are also described in EIR Section 12.2.11.2 and would result in less than significant impacts (Class III).

Under this alternatives, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). The impact would be less than significant (Class III).

| Impact GEO-5   Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems |
|---|

Neither a moratorium on well stimulation activities, including the indirect effects, nor a well stimulation program would allow or result in the construction of septic tanks or other non-portable waste disposal systems. Therefore, the alternative would have no impact on soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems (Class IV, No Impact).

| Impact GEO-6   Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan |
|---|

Under this alternative, direct impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures). There would be no direct impacts to known non-fuel minerals (Class IV). However, direct impacts to oil and gas resources would result in a substantial loss resulting in a significant and unmitigable impact (Class I).

While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. The indirect effects are also described in EIR Section 12.2.11.2 and would result in less than significant impacts (Class III).

Under this alternative, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). The impact would be less than significant (Class III).

> **Impact GEO-7    Cause an induced seismic event including ground shaking and ground failure**

Under this alternative, direct impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.11.2 (Programmatic Level Analysis of Impacts and Mitigation Measures), no impact would occur (Class IV). While the indirect effects caused by this alternative would be reduced, there would still be a potential abandonment of oil and gas fields, an increase in the intensity of an existing oil and gas field production, or an increase in the importation of oil and gas. An increase in the intensity of an existing oil and gas field production could result in an induced seismic event due to an increase in fluid injection for disposal of wastewater. However, injection wells are regulated by DOGGR and the main features of DOGGR's Underground Injection Control program include permitting, inspection, enforcement, mechanical integrity testing, plugging and abandonment oversight, data management, and public outreach. Because the underground injection wells are already being used for oil and gas production and are already regulated by DOGGR, the risk of an induced seismic event due to the increase in intensity of existing oil and gas field production is considered adverse but less than significant (Class III).

Under this alternative, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.11.5 (Geology Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). The impact would be less than significant (Class III).

### 12.3.11.3    Programmatic Level Analysis of Specific Oil and Gas Fields

For specific oil and gas fields, Impacts GEO-1 through GEO-7 under Alternative 2 are the same as those described in EIR Section 11.11 (Geology, Soils, and Mineral Resources).

#### *Wilmington Oil and Gas Field*

Because the Wilmington Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore impacts associated with stimulation activities for the Wilmington Oil and Gas Field for Alternative 2 would be the same as those described in EIR Section 11.11.5.1 (Geology Soils, and Mineral Resources, Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field).

#### *Inglewood Oil and Gas Field*

Because the Inglewood Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore impacts associated with stimulation activities for the Inglewood Oil and Gas Field for Alternative 2 would be the same as those described in EIR Section 11.11.5.2 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures: Study Region 1: Inglewood Oil and Gas Field).

#### *Sespe Oil and Gas Field*

Because the Sespe Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore impacts associated with stimulation activities for the Sespe Oil and Gas Field for Alternative 2 would be the same as those described in EIR Section 11.11.5.3 (Geology Soils, and Mineral Resources, Impact Analysis and Mitigation Measures: Study Region 2: Sespe Oil and Gas Field).

### 12.3.11.4    Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.12    Greenhouse Gas Emissions

### 12.3.12.1    Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.12.2    Programmatic Level Analysis of Impacts and Mitigation Measures

| Impact GHG-1    Generate greenhouse gas emissions that may have a significant impact on the environment |
| --- |

This alternative would restrict future oil and gas activity by halting well stimulation activities except for within existing oil and gas fields. This could lead to fewer indirect impacts of new conventional wells and less well abandonment than Alternative 1, as existing fields could use well stimulation treatments. To the extent that this alternative would cause an increase in activity to produce or transport a replacement supply, the emissions of GHG that occur as a result of oil and gas extraction or transport for the replacement supply would be likely to occur outside of California. This alternative could increase GHG from sources that are not covered by California's regulatory setting and outside of the potential control of DOGGR to feasibly mitigate, resulting in an overall net increase in GHG emissions compared with both existing conditions and the project. As a result of increasing GHG emissions from sources beyond California's control, no feasible mitigation would be available for GHG emissions due to the replacement supply. This alternative would increase GHG emissions from sources that could not be prevented, reduced, offset, or otherwise mitigated by DOGGR or another California agency tasked with reducing GHG emissions. The GHG emissions increase would cause a potentially significant impact on the environment, and because a portion of these emissions would occur beyond the control of recommended mitigation, Impact GHG-1 would be Class I: Significant and Unavoidable. Mitigation identified for well stimulation treatments would apply, as recommended for the project (EIR Section 10.12.5). For well stimulation treatments occurring under this alternative, the following mitigation measures apply.

**MM GHG-1a**    **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

**MM GHG-1b**    **Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies.** (Full text in EIR Section 10.12.5.)

**MM GHG-1c**    **Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide.** (Full text in EIR Section 10.12.5.)

| Impact GHG-2    Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases |
| --- |

Because this alternative would cause some future oil and gas production to be lost, California end users of oil and gas would need to rely on a replacement supply. Using a replacement crude supply could

result in an incremental change in life-cycle GHG emissions of California's crude supply, which could be an increase or decrease depending the carbon intensity of the replacement supply. Despite the greater average carbon intensity of crude oil produced in California compared with oil produced in places that would export their oil to California, an increase in imports into California would still result in an overall net increase in GHG emissions compared with both existing conditions and the project. Although all crude produced for use in California is subject to the LCFS, regardless of the location of the supply, out-of-state oil and gas producers create GHG emissions during extraction that are uncovered and not limited by the Cap-and-Trade Program. The Cap-and-Trade Program limits in-state GHG emissions to ensure that the AB 32 goals will be achieved and the statewide emission target of 431 MMTCO2e by 2020 will not be exceeded (ARB, 2007; ARB, 2014b). Producers of the replacement supply of oil and gas under this alternative if outside of California would not be subject to California's statewide GHG cap. Out-of-state oil and gas producers create GHG emissions during extraction that are uncovered and not limited by the Cap-and-Trade Program. These emissions will not be captured by California's cap, but would be in addition to it. As a result, in addition to total statewide emissions of 431 MMTCO2e by 2020 allowed by the Cap-and-Trade Program, this alternative would also increase GHG from out-of-state crude oil recovery and transport activities by some amount less than 4.1 MMTCO2e, depending on the replacement supply. The ARB is directed to take steps to "minimize leakage" in implementing AB 32 regulations [HSC Section 38562(b)(8))], and this alternative would conflict with that requirement by potentially offsetting an in-state reduction of GHG emissions with an increase in GHG emissions outside the state. By increasing these uncovered emissions at sources that are beyond the control of California's regulations and any recommended mitigation, this alternative would conflict with California's programs aimed at reducing GHG, and Impact GHG-2 would be Class I: Significant and Unavoidable. Mitigation identified for well stimulation treatments would apply, as recommended for the project (EIR Section 10.12.5).

**MM AQ-2a** **Reduce Hydrocarbon Emissions from Well Stimulation Treatments.** (Full text in EIR Section 10.3.5.)

**MM AQ-2b** **Reduce Emissions from Portable Equipment and Mobile Sources.** (Full text in EIR Section 10.3.5.)

**MM GHG-1a** **Prevent Methane Emissions from Associated Gas and Casinghead Gas.** (Full text in EIR Section 10.12.5.)

**MM GHG-2a** **Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program.** (Full text in EIR Section 10.12.5.)

### 12.3.12.3 Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 2, well stimulation treatments would occur in the Wilmington and Sespe fields as expected under the project. Therefore, as described in EIR Section 11.12.5, GHG emissions associated with well stimulation treatments at Wilmington and Sespe would continue, and the extent of Impact GHG-1 is uncertain, ranging from a less than significant impact (Class III) to a significant, unavoidable impact (Class I). New well stimulation treatments at the Inglewood Oil and Gas Field would be subject to the same potential impacts (Class I) and would require the same mitigation measures as described for the project (EIR Section 11.12.5).

### 12.3.12.4 Impact Significance Summary

Alternative 2 is worse than the project for GHG impacts. Indirect impacts from increased oil and gas imports would cause significant and unavoidable GHG emissions from out-of-state oil and gas producers

that could not be prevented, reduced, offset, or otherwise mitigated by DOGGR or another California agency tasked with reducing GHG emissions. Although some emissions related to well stimulation treatments would be avoided, emission increases would occur due to an increase in crude transport and off-loading. Each of the GHG impacts due to well stimulation treatments would be as described for the project. Additional GHG emission increases would occur due to crude importation, including GHG emissions from increased oil and gas production outside of California, or from an increase in the intensity of operations in fields to maintain production levels. Emission increases associated with these indirect effects would cause impacts due to increasing GHG emissions as described above.

## 12.3.13   Hazards and Hazardous Materials

### 12.3.13.1   Introduction

This section provides an evaluation of the potential impacts to hazards and hazardous materials associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.13.2   Programmatic Level Analysis of the Project

**Impact HAZ-1    Release hazardous materials into the environment from a spill or leak**

Alternative 2 would prohibit well stimulation treatments outside of existing oil and gas fields. This would result in fewer well stimulation treatments because the practice would be prohibited in some regions where fields do not currently exist. Thus, Alternative 2 may result in less exposure of hazardous substances in new geographic areas.

However, impacts would remain potentially significant for well stimulation treatments within existing fields. The impacts and associated mitigation measures for the programmatic level analysis would apply in existing fields under Alternative 2. They would not apply outside of existing fields, as there would be no well stimulation treatments outside of existing fields. As stated in the description of Alternative 2 (EIR Section 8.3.2), well stimulation treatments in Study Region 1 are expected to occur only in existing fields. Accordingly, Alternative 2 is not expected to affect Study Region 1 conditions. In other areas with Monterey Formation (Study Regions 2 through 5) or Monterey Formation plays (Study Regions 2, 3, and 4), the impacts under Alternative 2 would be similar.

As discussed in EIR Section 10.13.5 (Hazards and Hazardous Waste), if a well stimulation fluid release were to occur, it is difficult to anticipate the fate of the released chemicals in the environment because many individual chemical compounds within well stimulation fluids lack sufficient mobility and toxicity information. California drinking water maximum contaminant levels (MCLs) do not exist for many of the chemicals known to be used in hydraulic fracturing. Available data indicate that many hydraulic fracturing chemical compounds are either highly soluble or miscible in water and/or have densities greater than water. Certain constituent mixtures are considered either proprietary or are described only as chemical classes, hindering a more complete understanding of potential transport/fate of some fluid constituents.

In addition, some chemicals may be transformed (degraded) by hydrolysis and, in some cases, degradation ("daughter") products are not known. Daughter products may be more hazardous than the parent chemicals.

Given these conditions, impacts from a spill or release could be significant. Therefore a mitigation measure is proposed.

**MM HAZ-1a** **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

Mitigation Measure HAZ-1a (as amended) is recommended to be required at any well stimulation occurring at an existing field. Additional discussion of the mitigation measure is found in EIR Section 10.13.5. Because stimulation would not occur outside of existing fields under this alternative, the measure would not apply outside of fields. Where similar impacts would be the result of new drilling activities outside or inside existing fields rather than well stimulation within existing fields, these measures would have to be adapted to project approvals other than well stimulation treatment permits.

Protective measures for prevention of spills or releases of hazardous materials are provided in both existing and proposed regulations. A summary of the key measures in the proposed SB 4 Well Stimulation Treatment Regulations is provided in EIR Section 10.13.5. Collectively, with implementation of MM HAZ-1a~~inclusion of a barrier for all production facilities, regardless of the amount of time they are in place,~~ and ~~with~~ surface water management, and implementation/enforcement of all of the existing and proposed regulations regarding the transport, handling, storage, conveyance, and management of hazardous materials, including the Spill Contingency Plan, which accounts for spills that may occur at pipes, valves, or supply lines, the impact of well stimulation materials on the environment in the event of a release is considered less than significant with mitigation (Class II). The project impacts are also less than significant with mitigation (Class II) but Alternative 2 may have a slight advantage by resulting in less exposure of hazardous substances to new geographic areas.

### 12.3.13.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As summarized in EIR Section 11.13.6 and Table 11.13-1, impacts from hazards and hazardous materials associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. In addition to the mitigation measure in the Programmatic Level Analysis, additional mitigation measures were added for Wilmington, Inglewood, and Sespe Oil and Gas Fields, as summarized in Table 11.13-1. With mitigation, the impact under Alternative 2 would be less than significant (Class II).

### 12.3.13.4   Impact Significance Summary

Based on the programmatic level analysis of the project and the programmatic level analysis of specific oil and gas fields, impacts from Alternative 2 are considered to be the same at all existing oil and gas fields: less than significant with mitigation (Class II).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve

well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.14   Groundwater Resources

### 12.3.14.1   Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative, which would result in greater potential for use of groundwater with no water recycling standards in place, and less protection of both groundwater resources as well as surface water resources that could recharge groundwater.~~

As summarized in <u>Draft</u> EIR Section 10.14.6, impacts from well stimulation treatments were determined to be potentially significant to groundwater quantity and groundwater quality. Further analysis indicated that with appropriate mitigation measures the significant impacts could be mitigated to a less than significant level. The mitigation measures, which are summarized on Table 10.14-20, focus on preventing exacerbation of groundwater overdraft or subsidence, maintaining existing use of water supply wells, and mitigating possible pathways that might allow well stimulation fluids including gas to reach protected groundwater.

### 12.3.14.2   Programmatic Level Analysis of the Project

Alternative 2 would prohibit well stimulation treatments outside of existing oil and gas fields but would allow them within existing fields. This alternative would result in fewer well stimulation treatments overall, because they would be prohibited in many regions, including the Monterey Formation and Monterey plays located outside of existing oil and gas fields. However, impacts to groundwater quantity and quality would remain potentially significant for well stimulation treatments conducted in existing fields unless mitigated. Stimulation activity in existing fields would have the same impacts as discussed in EIR Section 10.14.5 for the Programmatic Level Analysis of the Project in all study regions. These are briefly summarized below, with proposed mitigation. Except where noted, the full text of the mitigation measures is found in EIR Section 10.14.5 (Groundwater Resources, Impact Analysis and Mitigation Measures).

| Impact GW-1    Cause or contribute to overdraft conditions |
|---|

The potential exists for water to be taken from groundwater basins for use in well stimulation that could cause or contribute to overdraft conditions at existing oil fields. This would be a significant impact. Two <u>revised</u> mitigation measures would address this impact. With implementation of these <u>revised</u> mitigation measures, Impact GW-1 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on groundwater (Class IV).

Impact GW-1 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-1a**   **Use Alternative Water Sources to the Extent Feasible.** (Full text in EIR Section 10.14.5.)

**MM GW-1b**   **Minimize Groundwater Impacts~~Prepare a Third-Party Technical Report to Analyze Overdraft Impacts.~~** (Full text in EIR Section 10.14.5.)

| Impact GW-2 | Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water |
|---|---|

Depending on geologic conditions, groundwater pumping could result in land subsidence at existing oil and gas fields. It could also interfere with nearby water wells, including lowering the water level in the well to a point that they no longer function as intended. These would be significant impacts, which would be addressed by the recommended <u>revised</u> mitigation measure below. With implementation of this <u>revised</u> mitigation measure, Impact GW-2 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on water wells or subsidence (Class IV).

Impact GW-2 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-<u>1b</u>~~2a~~**  **Minimize Groundwater Impacts~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping~~.** (Full text in EIR Section 10.14.5.)

| Impact GW-3 | Adversely impact groundwater quality through surface spills or leaks during well stimulation |
|---|---|

Well stimulation could result in a spill on the work site or a leak that could allow the stimulation fluids or material to reach the protected groundwater zone under a site. This would occur at existing oil and gas fields and would be a significant impact. The <u>revised</u> mitigation measure proposed in Hazards and Hazardous Waste would address this impact. The full description of this <u>revised</u> mitigation measure is found in <u>Draft</u> EIR Section 10.13.5. With implementation of this mitigation measure, Impact GW-3 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on protected groundwater (Class IV).

Impact GW-3 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM HAZ-1a**   **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~.** (Full text in EIR Section 10.13.5.)

| **Impact GW-4** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals** |
| --- | --- |

Some wells in existing oil and gas fields have non-existent or ineffective well seals, particularly if they are old or were improperly abandoned. This situation could result in the migration of stimulation fluids including gas through these pathways into protected groundwater. To address this significant impact, three revised mitigation measures are identified. With implementation of these revised mitigation measures, Impact GW-4 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on existing wells (Class IV).

Impact GW-4 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-4a**      **Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation Treatment.** (Full text in EIR Section 10.14.5.)

**MM GW-4b**      **Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~.** (Full text in EIR Section 10.14.5.)

**MM GW-4c**      **Install Methane Sensors on Wells ~~in the ADSA~~Subject to Well Stimulation Treatments.** (Full text in EIR Section 10.14.5.)

| **Impact GW-5** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells** |
| --- | --- |

Some existing and abandoned wells in oil and gas fields may have damaged, non-existent, or ineffective well seals. This could create pathways for stimulation fluids injected in one well to migrate into protected groundwater by way of the annular space in another well within the zone of influence of the stimulated well. This would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-5 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on existing wells (Class IV).

Impact GW-5 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-5a**      **Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

| **Impact GW-6** | **Improper disposal of flowback in injection wells could potentially impact groundwater quality** |
| --- | --- |

Class II injection wells are required under the UIC program regulations to have an isolating cement seal above the injection zone as well as a minimum 100-foot seal across the base of the fresh water zone. If injected flowback water migrates to protected groundwater, this would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-6 would be reduced to a less than significant level (Class II).

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact on existing wells (Class IV).

In contrast, Impact GW-6 is Class II under the project but the impacted geographic area would be less in Alternative 2.

**MM GW-6a**    **Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater**~~Install a Cement Seal across Protected Groundwater.~~ (Full text in EIR Section 10.14.5.)

| | |
|---|---|
| **Impact GW-7** | **Inability to identify specific impacts to groundwater quality from well stimulation activities** |

Many chemicals and compounds can be introduced to groundwater by various pathways. The origin of these materials is difficult to ascertain under many circumstances. Groundwater monitoring may identify a chemical or compound, but would be unable to identify its source. If well stimulation fluids reach protected groundwater, this would be a significant impact. To ensure that stimulation fluids can be more readily distinguished from other compounds that may be naturally occurring or have been introduced into the groundwater, a <u>revised</u> mitigation measure is proposed to address this. With implementation of this <u>revised</u> mitigation measure, Impact GW-~~6~~7 would be reduced to a less than significant level (Class II).

Impact GW-7 is also Class II under the project but the impacted geographic area would be less in Alternative 2.

If the implementation of Alternative 2 leads to field abandonments, or increased importing of oil, these indirect impacts would be expected to have no impact to groundwater (Class IV).

**MM GW-7a**    **Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

### 12.3.14.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As summarized in EIR Section 11.13.6, impacts on groundwater resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for the onshore and offshore Wilmington, Inglewood, and Sespe Oil and Gas Fields are presented in EIR Section 11.14.5 and summarized on Table 11.14-5. With mitigation, the impact under Alternative 2 would be less than significant (Class II).

### 12.3.14.4   Impact Significance Summary

Based on the analysis of the project and the programmatic level analysis of specific oil and gas fields, impacts on groundwater resources from Alternative 2 are considered to be the same at all existing oil and gas fields, less than significant with mitigation (Class II).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.15   Surface Water Resources

### 12.3.15.1   Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, there would be a greater potential for use of surface water without water recycling standards in place, as well as an increase in potential impacts to waterbodies and streams without implementation of habitat protection standards or a buffer requirement from perennial waters.~~

As summarized in EIR Section 10.15.6, impacts from well stimulation treatments were determined to be potentially significant to surface water. Further analysis indicated that with appropriate mitigation measures the significant impacts could be mitigated to a less than significant level.

### 12.3.15.2   Programmatic Level Analysis of the Project

Under Alternative 2, hydraulic fracturing and acid well stimulation treatments would occur only within existing oil and gas fields and on lands under federal or tribal management. Impacts to surface water from well stimulation would not occur in areas outside of existing fields because well stimulation itself would not be permitted in those areas. A number of impacts have been identified as significant. These can be mitigated to a less than significant level with implementation of mitigation measures. These impacts and mitigation measures are described below. The impacts are summarized here and discussed in detail in EIR Section 10.15.5. The full text of mitigation measures for surface water impacts is provided in EIR Section 10.15.5 as well.

| | |
|---|---|
| **Impact SWR-1** | **Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality** |

Water quality impacts could be significant if they would introduce pollutants to surface waters sufficient to violate waste discharge requirements outlined in RWQCB regional Basin Plans, damage beneficial uses of surface water, or introduce pollutants into designated impaired water bodies. Projects with land disturbance greater than one acre are required to prepare a Stormwater Pollution Prevention Plan. Because stimulation fluids may contain chemicals and compounds that would have adverse effects on surface water, to reduce the potential impact of a release of stimulation fluids or chemicals that could be mobilized by runoff to reach surface water, three mitigation measures are proposed. These are discussed in detail in EIR Section 10.15.5.

Mitigation Measure SWR-1a would apply to all well stimulation jobs, regardless of the amount of ground disturbed. If a stimulation project is in an area where it would be at risk of flooding, SWR-1b would be required. SWR-1c would prohibit well stimulation in watersheds draining to municipal water supply reservoirs, except with approval of DOGGR and the reservoir's operating agency.

With implementation of these mitigation measures, the Impact SWR-1 would be less than significant (Class II). The project would also result in a Class II impact.

**MM SWR-1a**    **Require Stormwater Pollution Prevention Plan.** (Full text in EIR Section 10.15.5.)

**MM SWR-1b**    **Surface Water Protection.** (Full text in EIR Section 10.15.5.)

**MM SWR-1~~b~~c**    **Provide Adequate Flood Protection.** (Full text in EIR Section 10.15.5.)

**MM SWR-1~~c~~d**    **Protect Surface Water Reservoirs.** (Full text in EIR Section 10.15.5.)

| | |
|---|---|
| **Impact SWR-2** | **Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site** |

If a new well is drilled in an existing field for the purposes of well stimulation, and the drilling of the well requires substantially altering existing drainage or the course of a stream or river, the activity could result in a significant impact to surface water. This would be addressed by the adoption of a mitigation measure.

An erosion control plan would identify appropriate erosion and siltation management structures and measures and their long-term inspection, maintenance, and operation. With implementation of this measure, the this impact would be less than significant (Class II). The project would also result in a Class II impact.

**MM SWR-2a**    **Implement Erosion Control Plan.** (Full text in EIR Section 10.15.5.)

| | |
|---|---|
| **Impact SWR-3** | **Substantially diminish surface water quantity** |

Use of surface water in well stimulation could diminish the amount of surface water in waterbodies, including streams and rivers, as well as increase competition for diminishing water supplies. This could be a significant impact. To address this, Mitigation Measure SWR-3a (Ensure Adequate Water Availability) is required.

By adopting a mitigation measure ensuring adequate water availability used for well stimulation to sources where the withdrawal would not adversely affect water supplies or cause the need for new infrastructure, this impact would be reduced to a less than significant level (Class II). The project would also result in a Class II impact.

**MM SWR-3a**    **Ensure Adequate Water Availability.** (Full text in EIR Section 10.15.5.)

| | |
|---|---|
| **Impact SWR-4** | **Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding.** |

There is a potential to increase the rate or volume of surface runoff through clearing and grading for new wells, access roads and other infrastructure. This could lead to flooding of nearby properties down gradient. This could be a significant impact. To address this hazard, a mitigation measure is required.

With Mitigation Measure SWR-1b in place, flood hazard impacts are less than significant (Class II). The project would also result in a Class II impact.

**MM SWR-1~~c~~b**    **Provide Adequate Flood Protection.** (Full text in EIR Section 10.15.5.)

### 12.3.15.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Because the Wilmington, Inglewood, and Sespe Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore impacts associated with stimulation activities for these fields for Alternative 2 would be the same as those described in EIR Section 11.11.5.

As discussed in EIR Section 11.15.5 and summarized in EIR Section 11.15.6, impacts to surface water resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for Wilmington, Inglewood, and Sespe Oil and Gas Fields are the same as for the Programmatic Level Analysis. With implementation of these measures, the impact to surface water under Alternative 2 would be less than significant (Class II).

### 12.3.15.4   Impact Significance Summary

Based on the programmatic level analysis of surface water resources, impacts from Alternative 2 are considered to be the same at all existing oil and gas fields, less than significant with mitigation (Class II).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.16   Land Use and Planning

### 12.3.16.1   Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.16 (Land Use and Planning). For the purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.16.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 2 would prohibit any future stimulation treatments outside of the existing oil and gas field boundaries and their buffer areas. Therefore, the geographic extent of the impacts associated with this alternative would be limited to existing fields and their buffers, substantially less area than under the project.

| | |
|---|---|
| **Impact LU-1** | **Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses** |

For Impact LU-1, implementation of Alternative 2 would result in the same type of impacts as discussed under the project for existing and permitted land uses surrounding existing oil and gas fields (see EIR Section 10.16.5 (Land Use and Planning, Impact Analysis and Mitigation Measures)).

Under Alternative 2 potential disruptions related to well stimulation would affect only existing or permitted land uses that are currently in the vicinity of an existing oil or gas field. Therefore, because the project would allow well stimulation statewide, the potential for disruptions would be more widespread under the project in comparison to Alternative 2. However, because some impacts associated with Risk of Upset and Public and Worker Safety cannot be mitigated to a level of less than significant, and these can adversely affect land uses and their functions, these impacts could would be considered to have corresponding significant and unavoidable impact (Class I) for Impact LU-1 as well.

| | |
|---|---|
| **Impact LU-2** | **Physically divide an established community** |

For Impact LU-2, the activities associated with Alternative 2 would be limited to existing oil and gas fields and their buffer areas. Although there are existing communities in or in close proximity to some existing fields, impacts from well stimulation treatments would be similar to those for the project~~, with Mitigation Measure LU-2a (Ensure That Established and Planned Communities Are Not Divided) being implemented~~. Therefore, Impact LU-2 is Class II<u>I</u> under both Alternative 2 and the project. The geographic extent of potential impacts to established communities would be substantially less in comparison to the project because future well stimulation activities would be limited to existing oil and gas fields.

| | |
|---|---|
| **Impact LU-3** | **Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect** |

For Impact LU-3, the impact under Alternative 2 would be the same for the project because agency coordination required for the project also would be required under Alternative 2. This is spelled out by the proposed permanent regulations, SB 4, and the mitigation measures set forth in this EIR to avoid potential impacts and conflicts with any established, designated, or planned land use areas on federal, State, or locally regulated lands. With this level of coordination and the implementation of the mitigation measures specified in this EIR, impacts related to conflicts with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect would be less than significant with implementation of the mitigation measures contained in the EIR (Class II). Impacts under both the project and Alternative 2 would be Class II, but impacts would be less widespread under the alternative, which would limit stimulation to existing fields.

### 12.3.16.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington and Inglewood Oil and Gas Fields***

For Impact LU-1, the impact discussion provided for the programmatic level analysis in EIR Section 12.3.16.2 also applies to the Wilmington and Inglewood Oil and Gas Fields. Both fields are in urban settings, and well stimulation in these existing fields would be allowed under both the project and Alternative 2. Under the project well stimulation would be allowed and certain significant and unavoidable impacts could occur to some resources (see EIR Section 10.21 (Risk of Upset/Public and Worker Safety)).

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 295 of 689    Page
ID #:5242

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

In turn, these impacts could have significant and unavoidable impacts on land use by precluding certain uses or diminishing the function of certain land uses. Therefore, the impact to Land Use is considered significant and unavoidable (Class I) for the project and for Alternative 2.

For Impact LU-2, impacts from well stimulation treatments in the Wilmington and Inglewood Oil and Gas Fields would be the same as under the project with application of Mitigation Measure LU-2a.

For Impact LU-3, the impact under Alternative 2 would be the same for the project because agency coordination required for the project also would be required under Alternative 2. This is spelled out by the proposed permanent regulations, SB 4, and the mitigation measures set forth in this EIR to avoid potential conflicts with any established, designated, or planned land uses. With this level of coordination and implementation of the mitigation measures specified in this EIR, impacts related to conflicts with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect would be less than significant with implementation of the mitigation measures contained in the EIR (Class II).

***Sespe Oil and Gas Field***

Under Impact LU-1, the activities involved with well stimulation treatment activities could result in the same types of potential disruptions to existing land uses as outlined under the programmatic level analysis contained in EIR Section 12.3.16.2. However, within the Sespe Oil and Gas Field, potential disruptions to existing land uses from well stimulation treatments would be unlikely due to field's the mountainous terrain and isolation. Therefore, this impact would be less than significant (Class III). The Neighbor Notification requirements specified by the proposed permanent regulations would apply, but no further land use mitigation measures would be necessary.

Under Impact LU-2, the Sespe Oil and Gas Field would not physically divide an established community for the same reasons as provided for the Wilmington and Inglewood Oil and Gas Fields, above. No impact would occur (Class IV).

For Impact LU-3, impacts from Alternative 2 would the same as outlined for the Wilmington and Inglewood Oil and Gas Fields. Impacts related to conflicts with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect would be less than significant with implementation of the mitigation measures contained in the EIR (Class II).

## 12.3.16.4   Impact Significance Summary

Implementation of the No Future Well Stimulation Practices Outside of Existing Oil and Gas Field Boundaries Alternative would result in a significant and unavoidable impact (Class I) programmatically as well as for the Inglewood and Wilmington Oil and Gas Fields because not all potentially adverse conditions (such as risk of upset and public and worker safety impacts) that could affect existing land uses can be mitigated to less than significant. The impacts are thus significant and unavoidable (Class I). This impact is considered less than significant (Class III) for the Sespe Oil and Gas Field due to its isolated location. Implementation of Alternative 2 would have no impact (Class IV) on an established community by physically dividing it. Implementation of Alternative 2 would not conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect with implementation of the mitigation measures contained in the EIR (Class II).

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.17    Noise and Vibration

### 12.3.17.1    Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3 and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.17.2    Programmatic Level Analysis of the Project

> **Impact NOI-1    Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels**

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 10.17. Noise mitigation would be required, as with the project. In all regions, Impact NOI-1 within existing fields would be less than significant with mitigation incorporation (Class II), and Impact NOI-2 would be less than significant with mitigation (Class III). Limiting the area of well stimulation reduces the population potentially exposed to noise from well stimulation. Noise impacts outside the buffer areas will be reduced from Class II next to the buffer area to Class IV at further distances. This compares to the project that allows well stimulation in all areas not prohibited by other agreements (Class II).

The prohibition on out-of-field stimulation could cause indirect effects, as described for Alternative 2, including abandoning of some existing marginal oil and gas fields, increasing the intensity of activities in other existing oil and gas fields and increase the importation of oil and gas products from out of state. However, because well stimulation would still be allowable within existing oil and gas fields, potential lost future production would not be anticipated to be as great as under the project. As a consequence, the indirect effects would largely be diminished under Alternative 2. Impact NOI-1 from increasing intensity of activities would be less than significant with mitigation incorporated (Class II).

**MM NOI-1a    Control Noise Levels near Sensitive Land Uses.** (Full text in EIR Section 10.17.5.)

As with Alternative 1, indirect noise and vibration may occur from increase crude transport and offloading or an increase in the intensity of operations in fields to maintain production levels. The agency with jurisdiction over these activities would ensure they abide by existing regulations, reducing the effects and impacts would vary from no impact (Class IV) to less than significant with mitigation (Class II) as described under Alternative 1.

| Impact NOI-2 | Cause exposure of persons to or generation of excessive groundborne vibration |
|---|---|

Since vibration is evaluated on a maximum value, no increase in impact from vibration would occur (Class IV) unless rail, highway or terminal demands required expanded the existing infrastructure and these facilities moved closer to noise sensitive receivers. In this case impacts could vary from no impact (Class IV) to significant (Class I). The agency with jurisdiction over these activities would ensure they abide by existing regulations, reducing the effects to Less Than Significant Impact With Mitigation (Class II).

### 12.3.17.3  Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Since this alternative includes well stimulation treatments in these fields, noise and vibration impacts would occur as described in EIR Section 11.17. Noise mitigation would be required in all existing fields where well stimulation treatments would occur in Alternative 2. As with the project, Impact NOI–1 would be less than significant with implementation of mitigation (Class II) and vibration levels (Impact NOI-2) would be less than significant (Class III).

As described above, prohibition on out-of-field stimulation could cause indirect effects, as described for Alternative 1, including abandoning of some existing marginal oil and gas fields, increasing the intensity of activities in other existing oil and gas fields and increase the importation of oil and gas products from out of state. Impact NOI–1 would vary from no impact (Class IV) to less than significant with mitigation (Class II). Likewise, Impact NOI–2 would vary from no impact (Class IV) to less than significant with mitigation (Class II).

### 12.3.17.4  Impact Significance Summary

Based on the project and specific oil and gas field programmatic level analysis of noise and vibration, impacts from Alternative 2 would be the same as under the project at all existing oil and gas fields. Areas outside the buffer areas will have reduced impacts due to prohibition of stimulation outside the buffer areas. Indirect noise impacts may arise from increased shipping to make up for potential loss in production as a result of this prohibition.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.18  Population and Housing

### 12.3.18.1  Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for population and housing (as applic-

able at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.18.2   Programmatic Level Analysis of Impacts and Mitigation Measures

There likely would be some loss of potential oil and gas reserves with implementation of this alternative. This could cause indirect effects, including abandonment of some existing oil and gas fields and an increase in an existing oil and gas field's production through increased conventional drilling and use of enhanced recovery techniques, as well as an increase in the importation of oil and gas. However, because well stimulation still would be allowed within existing oil and gas fields, the loss of potential future production would not be as great as under the No Future Well Stimulation Treatments Alternative (Alternative 1).

Under Alternative 2, impacts outside of existing oil and gas fields would be the same as described for Alternative 1 because well stimulation would be prohibited in both alternatives. Under Alternative 2, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.18 (Population and Housing).

Indirectly, to compensate for potential production not realized, Alternative 2 could increase the number of well abandonments, the numbers of wells drilled and stimulated within existing fields, and/or the number of new wells drilled but not stimulated outside of existing fields. Since well stimulation only would occur in existing fields, the need for well stimulations elsewhere would not exist and existing employees are expected to perform the required stimulation treatments. Any temporary worker in-migration to the area due to increased drilling would have the greatest impact on population within smaller communities. However, overall worker in-migration is expected to be nominal in comparison to the planned growth and the overall population of areas serving existing fields. Impacts from population growth (Impact POP-1) would be less than significant (Class III). Impacts under Alternative 2 would be less than under the project because Alternative 2 would not bring workers into areas outside of areas serving existing oil and gas fields.

It is unlikely that residential relocations, if any, associated with Alternative 2 would necessitate construction of new housing (Impact POP-2). Therefore, any necessary relocations of housing or persons associated with Alternative 2 activities would be less than significant and would not necessitate the construction of new housing elsewhere (Class III). Impacts under Alternative 2 would be less than under the project because Alternative 2 would not result in extensive numbers of new wells in areas outside existing oil and gas fields.

### 12.3.18.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project, because other potential oil and gas areas that require well stimulation for production (such as in the Monterey Formation and plays) would no longer be available. The impacts associated with well stimulation treatment activities for the three fields for Alternative 2 would be similar to those described in EIR Section 11.18 (Population and Housing).

### 12.3.18.4   Impact Significance Summary

Overall, worker in-migration from Alternative 2 is expected to be nominal in comparison to the already anticipated growth and overall existing population in areas serving existing fields. There would be no potential for housing displacement from well stimulations under Alternative 2 within communities adjacent to existing oil and gas fields.

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.19   Public Services

### 12.3.19.1   Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.19.2   Programmatic Level Analysis of Impacts and Mitigation Measures

| **Impact PUB-1** | **Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools** |
|---|---|

Under Alternative 2, impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.19 (Programmatic Level Analysis of Impacts and Mitigation Measures, Public Services). Under Alternative 2, impacts associated with stimulation activities within existing oil and gas fields would be the same as those described in EIR Section 10.19 (Public Services). Increased ship, rail, and truck traffic hauling imported oil and gas to refineries would likely occur under Alternative 2, including an increase use of rail corridors between the source fields and California refineries. This would greatly increase the amount of oil hauled on these lines and could result in increased emergency service calls in the event of an accident or spill. This is a significant new public services impact when compared to the project, which was found to be less than significant with the incorporation of mitigation (Class II). Unlike the project, mitigation could not be included at this time to offset use of ship, rail, and truck traffic hauling imported oil and gas to refineries as more detailed information would be required.

Indirectly, this alternative could increase well abandonment, the numbers of wells drilled and stimulated within existing fields, and/or the number of new wells drilled but not stimulated outside of existing fields to make up for lost production. The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels and needs of indi-

vidual well sites. As discussed within EIR Section 12.3.18 (Population and Housing), Alternative 2 would not have significant population growth and in most areas any growth would be nominal. Since well stimulation would occur only in existing fields, existing employees are expected to perform well stimulation treatments. It is assumed the public service providers serving existing fields would have adequate levels to continue serving existing fields.

Implementation of Mitigation Measure PUB-1a (Assess Public Service Ratios and Ensure Adequate Compensation) is proposed as part of Alternative 2 and would require DOGGR to coordinate with the applicable local land use agency to determine whether new well development and stimulations at existing fields would place a burden on public services, and ensure that appropriate compensation is provided to the local agency through its local land use permit(s). With implementation of this measure, Impact PUB-1 (Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools) would be less than significant (Class II). Impacts would be less than compared to the project because Alternative 2 would allow well stimulation in existing oil and gas fields which are already served by public service providers, while the project would allow well stimulation statewide, including areas where public services may be adversely affected., Overall, impacts could be increased when compared to the project due to the increased import of oil and gas and the resulting potential need for increased emergency response services.

**MM PUB-1a     Assess Public Service Ratios and Ensure Adequate Compensation.** (Full text in EIR Section 10.19.5.)

### 12.3.19.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. It is expected the level of drilling and stimulation within these three fields would be similar or slightly greater at the fields than what would occur under the project, because other potential oil and gas areas that would require well stimulation for production would no longer be available to developers.

### 12.3.19.4   Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.20   Recreation

### 12.3.20.1   Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific

scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

~~Without implementation of project standards for resource protection under this alternative, oil and gas development and associated well stimulation may occur in open space areas and areas near water resources used for recreation.~~

### 12.3.20.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 2 would prohibit any future stimulation treatments except for within the existing oil and gas field boundaries and their buffer areas. This alternative would require new legislation to revise PRC Sections 3106(b) and 3160(b), which currently authorize well stimulation treatments but do not limit the activity to existing fields. The new legislation would need to specify that future well stimulation treatments would be limited to existing oil and gas field boundaries and their buffer areas.

Under Impact REC-1, impacts would occur if new well stimulation treatments would increase the use of existing neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated. This type of impact would typically occur when a project induces population growth, such as a new housing development or a large business that would require new employees, which would then increase the usage of nearby recreation areas.

Under Alternative 2 there would be no appreciable loss of existing oil and gas production due to this alternative. Therefore, the impacts under Alternative 2 would be the same as those of the project, under which there would be little if any in-migration from new workers compared to the existing populations. Similarly, any increased use of existing recreational areas or facilities as a result of new employment for well stimulation treatments would be minimal when considering the numerous recreation opportunities within each study region. As such, Impact REC-1 would be less than significant under Alternative 2 (Class III).

As discussed in EIR Section 10.20.5 (Recreation), recreation areas can be considered sensitive receptors as they tend to be areas where children are present, and depending on the available facilities, they can be used for intense physical activities. As shown in Figures 10.20-1 through 10.20-3, there are existing oil fields within or adjacent to established recreation areas. Under Alternative 2 the effects associated with Impact LU-2 would be the similar to those provided for the analysis of the project, which states that well stimulation treatments may cause disruptions to the recreation areas described above in the affected environment, which would diminish the recreation experience. However, under Alternative 2, potential disruptions would affect only the recreation areas that are currently in the vicinity of existing oil or gas fields. Under the project, potential disruptions could occur also occur as a result of new wells or fields; so the potential for disruptions would be greater under the project in comparison to Alternative 2.

The potential disturbances to recreational resources are listed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures). Each of the potential disruptions types are discussed in detail in EIR Sections 10.1 (Aesthetics), 10.3 (Air Quality), 10.6 (Coastal Processes and Marine Water Quality), 10.7 (Commercial and Recreational Fishing), 10.13 (Hazards and Hazardous Materials), 10.15 (Surface Water Resources), 10.16 (Land Use and Planning), 10.17 (Noise and Vibration), 10.21 (Risk of Upset/Public and Worker Safety), and 10.22 (Transportation and Traffic).

Mitigation Measures REC-2a and REC-2b, as summarized in EIR Section 12.2.20.2 (No Future Well Stimulation Practices Alternative [Alternative 1], programmatic level analysis for recreation) and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures), specifically address coordination and notification requirements that would provide communities with advanced notice of potential

disruptions to affected recreation areas (refer to EIR Section 10.20.5 for the full text of these mitigation measures). These notification measures are intended to help ensure the public can have sufficient warning in order to make other arrangements for their recreation activities. With implementation of these measures, Impact REC-2 would be less than significant (Class II) under alternative 2, which is similar to the impact under the project.~~.~~

**MM REC-2a**    **Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas.** (Full text in EIR Section 10.20.5.)

**MM REC-2b**    **Provide Noticing of Closures and Identify Alternative Recreation Areas.** (Full text in EIR Section 10.20.5.)

### 12.3.20.3   Programmatic Level Analysis of Specific Oil and Gas Fields

For Impact REC-1, and as discussed in the setting for the Wilmington and Inglewood Oil and Gas Fields (EIR Section 11.20.3, Recreation), the Wilmington and Inglewood fields are located within a high-density urban area, and numerous regional and local recreation areas surround it. As well stimulation already occurs in this area, it is unlikely that well stimulation treatments would increase the use of existing neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of facilities would occur or be accelerated. This type of impact would typically occur when a project induces population growth, such as a new housing development or a large business that would require new employees. This is not the case for the Wilmington and Inglewood fields, which consists of existing oil and gas operators that currently employ permanent staff.

Implementation of Alternative 2 would prohibit any future stimulation treatments except for within the existing oil and gas field boundaries and their buffer areas. In Study Region 1, well stimulation treatments would be likely only at existing oil fields so there would be no loss in resource due to this alternative, which means oil development activities within the Wilmington and Inglewood fields would continue. Therefore, the impacts under Alternative 2 would be the same as those of the project, the impact analysis for which states that any in-migration from new workers due to well stimulation activities would be nominal compared to the existing population surrounding the Wilmington field. Similarly, the increased use of existing recreational areas or facilities as a result of new employment for well stimulation treatments would be nominal in considering the numerous recreation opportunities within and surrounding the Wilmington and Inglewood fields. As such, Impact REC-1 would be less than significant under Alternative 2 (Class III).

Under Impact REC-2, disruptions to recreation areas could occur in areas where active oil and gas fields are close to designated recreation areas or facilities. Alternative 2 would prohibit any future stimulation treatments except for within the existing oil and gas field boundaries and their buffer areas. In Study Region 1, well stimulation treatments would be likely only at existing oil fields so there would be no loss in resource due to this alternative. It is assumed that oil development in the Wilmington and Inglewood fields could increase under this alternative, but not so much as to change the recreation impacts of the project. As such, well stimulation treatments may cause disruptions to these recreation areas, which would diminish the recreation experience. Potential types of disturbances to recreational resources may include aesthetics, air quality, coastal processes and marine water quality, commercial and recreational fishing, hazards and hazardous materials, surface water resources), land use and planning, noise and vibration, risk of upset, and transportation and traffic). The mitigation measures provided for these issue areas would minimize potential impacts to recreational resources to the maximum extent feasible.

Mitigation Measures REC-2a and REC-2b, as summarized above in EIR Section 12.3.20.2 and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures), specifically address coordination and notification requirements that would provide the community with advanced notice of potential disruptions to affected recreation areas and provide alternative recreation opportunities. These notification measures are intended to help ensure the public can have sufficient warning in order to make other arrangements for their recreation activities. With implementation of these measures, Impact REC-2 would be less than significant under Alternative 2 (Class II).

***Sespe Oil and Gas Field***

Within Study Region 2 a portion of well stimulation treatments would occur within existing oil fields; however, it is possible that some new wells outside of existing fields would be proposed, and these would prohibited from using well stimulation. Because of this, there would likely be some loss of oil reserves due to implementation of this alternative. It is not possible at this time to quantify the precise amount of oil resources that would be lost.

In regard to Impact REC-1, considering there would likely be a decline in oil development in Study Region 2, and possibly within the Sespe Oil and Gas Field, the level of employment for oil and gas workers would likely decrease rather than increase under this alternative. Based on this assumption, Alternative 2 would not include population growth and there would be ~~no~~ little impact to recreational resources under Impact REC-1 (Class ~~IV~~III).

~~Under Impact REC-2, despite the possible decline in oil development in Study Region 2 and in the Sespe field, there would still be the potential for disruptions as a result of well stimulation treatments within existing oil and gas fields. As such, the same impact analysis would apply as provided for the Wilmington and Inglewood Oil and Gas Fields. Mitigation Measures REC-2a and REC-2b specifically address coordination and notification requirements that would provide the community with advanced notice of potential disruptions to affected recreation areas (refer to EIR Section 10.20.5 for the full text of these mitigation measures). These notification measures are intended to help ensure the public can have sufficient warning in order to make other arrangements for their recreation activities. With implementation of these measures, Impact REC-2 would be less than significant under Alternative 2 (Class II)~~ The majority of the trails are 5 miles north of the Sespe field, but the closest trail, Alder Creek, is approximately one mile north of the northern boundary of the Sespe field. The potential disruptions to recreation users from well stimulation treatments would likely be concealed or less obvious due to the mountainous terrain within the Sespe field. In addition, considering the majority of the surrounding trails are five miles north of the Sespe field, the potential disruptions would affect only recreation users at the south end of the Alder Creek Trail. However, these impacts would be temporary. Therefore, this Impact REC-2 would be less than significant (Class III).

### 12.3.20.4   Impact Significance Summary

Implementation of the No Future Well Stimulation Practices Outside of Existing Oil and Gas Field Boundaries Alternative would result in less than significant impacts (Class III) as related to Impact REC-1 for the programmatic level analysis and the Wilmington, ~~and~~ Inglewood, and Sespe Oil and Gas Fields~~, and no impact (Class IV) for the Sespe Oil and Gas Field~~. As related to Impact REC-2, Alternative 2 would result in impacts that can be mitigated to a level of less than significant with implementation of Mitigation Measures REC-2a and REC-2b, as summarized above in EIR Section 12.3.20.2 and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures), for both the programmatic level analysis and the analyses for the Wilmington and~~,~~ Inglewood~~, and Sespe~~ Oil and Gas Fields. For Sespe Oil and Gas Field, the impact would be less than significant (Class III).

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.21   Risk of Upset/Public and Worker Safety

### 12.3.21.1   Introduction

This section provides an evaluation of the potential impacts to risk of upset/public and worker safety associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.21.2   Programmatic Level Analysis of the Project

| **Impact RSK-1** | **Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases** |
|---|---|

With the decrease in oil production from the implementation of restricting or banning well stimulation treatments, imports of crude oil by rail will most likely occur and increase. The risk of accidents will be most substantial in areas that have existing and potential rail terminals for importing crude oil (Study Regions 1, 4, and 6) and regions through which the crude oil travels (Study Region 5). Potentially impacted areas are discussed in EIR Section 10.21.3.8 and the potential for accidents in different regions is discussed in EIR Section 10.21.4.1.

This impact is considered a significant and unavoidable impact that could not be mitigated to a level of less than significant through the application of feasible mitigation measures. Implementation of recommended Mitigation Measures RSK-1a through RSK-1h would be appropriate to decrease the frequency of crude oil transport and reasonably foreseeable accidents and releases. Because DOGGR cannot require other agencies to implement suggested mitigation, Impact RSK-1 would be a Class I: Significant and Unavoidable Impact.

**MM RSK-1a**     **Increase the Number of CPUC Rail Inspectors.** (Full text in EIR Section 10.21.5.)

**MM RSK-1b**     **Expedite the Phase-out of Older Tank Cars.** (Full text in EIR Section 10.21.5.)

**MM RSK-1c**     **Implement New Accident Prevention Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1d**     **Monitor and Enforce New Speed Limits.** (Full text in EIR Section 10.21.5.)

**MM RSK-1e**     **Monitor the Implementation of Trackside Safety Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1f     Improve Emergency Preparedness and Response Programs.** (Full text in EIR Section 10.21.5.)

**MM RSK-1g     Provide Real-Time Shipment Information to Emergency Responders.** (Full text in EIR Section 10.21.5.)

**MM RSK-1h     Provide Additional Accident and Injury Data to the State.** (Full text in EIR Section 10.21.5.)

Impacts RSK-2 through RSK-7 are the same as under the project. Thus, Impact~~s RSK-2 and~~ RSK-6 ~~are~~is Class I. Impacts _RSK-2,_ RSK-4, RSK-5, and RSK-7 are Class II. Impact RSK-3 is Class III.

***Study Region 1***

A reduction in well stimulation treatment activities would be enacted under this alternative. Since this alternative will not apply to the Inglewood and Wilmington fields, a change in the worker accident rate when compared to the project case is not expected.

To determine the number of accidents for each alternative, crude oil by rail projections from 2015-2040 were used as a basis to estimate the number of rail cars. The maximum annual amount of 110 million barrels per year in Alternative 1 was used as a baseline to develop the crude oil rail accident rates (see EIR Section 10.21.3.8). For each alternative, the average crude oil import rate over 25 years was used as a basis to estimate the accident rate.

Table 10.21-14 has been used to define the average crude oil import rate for Alternative 1. The average of the domestic crude oil supply corresponds to 75 million barrels per year.

Table 10.21-16 provides an estimate of the maximum projected annual number of accidents based on the mean crude oil imports. Thus, the accident rate estimated for Alternative 1 would be reduced based on the ratio between the maximum (110 million bbl/yr) and the average (75 bbl/yr) imports. The accident rates for the other alternatives were estimated by the reduction in rail crude oil imports that would be offset by California production with hydraulically fractured wells.

A 30 percent increase of crude oil production from the No project case (Alternative 6) was assumed for Alternative 2 to make up for lost production from hydraulically fractured wells. The difference between the maximum average (75 million bbl/yr) and the No project case (8.5 million bbl/yr) is 66.5 bbl/yr. 30 percent of this number was added to the No project case to arrive at 28 million bbl/yr. This number was used to scale the number of accidents from the maximum presented on Table 10.21-16. As stated in EIR Section 10.21.4.1, given the relatively very low number of derailments compared to the number of shipments of oil in the U.S. since 2005, the occurrence of a major rail accident is expected to be very low and nearly all of the potential accidents that may occur are expected to be minor.

The number of accidents from increased crude oil rail imports may rise with crude oil shipments to Long Beach, Vernon, and Carson. A discussion of crude oil routes is presented in EIR Section 10.21.3.8. Crude rail traffic may travel by way of the Tehachapi Pass through Bakersfield, or from the east (Texas), before heading to the metro Los Angeles area. Using the methodology stated above, the number of accidents projected for this region would remain about equal at one accident per year (25 accidents in 25 years), since there is a relatively small difference between the project (15 million bbl/yr) and Alternative 2 (28 million bbl/yr) volume compared to the maximum volume (75 million bbl/yr).

The volume of proppant is proportional to the number of wells hydraulically fractured, which in turn will require more rail cars. The maximum number of accidents corresponding to the highest volume of

proppant is shown in Table 10.21-15. Since the number of wells for Alternative 2 is approximately 30 percent less than that of the maximum case, the number of accidents is approximately 30 percent less as well. The Regions at higher risk for accidents are Regions 1 and 4, with a lesser potential in Regions 5 and 6.

Proppant is sent by rail into Bakersfield in Study Region 4 and can travel through the western portion of this study region enroute. Six rail accidents for 2015-2040 are forecast for this region based on the FRA accident rates for Class I railroads from 2011-2013 (FRA, 2014). This is a slight reduction from seven accidents for the project case for the same period.

***Study Region 2***

The level of well stimulation treatment activities in Study Region 2 is very small, and no increase in the injury rate is forecast for Study Region 2.

No rail facilities are expected to be constructed in this region. The small segment of rail that could be used enroute to Region 1 terminals (see Figure 10.21-3) is not expected to pose a significant risk of an accident in this Region. Proppant is sent by rail into Bakersfield in Study Region 4 and these shipments do not travel through this region. Therefore there is no expected additional rail risk in Study Region 2.

***Study Region 3***

Study Region 3 is expected to maintain the same recordable injury rate as the project case. Proppant is sent by rail into Bakersfield in Study Region 4. Given the comparatively smaller amount of rail traffic to a potential terminal in Santa Maria compared to other Regions, the potential for an accident is not forecasted for this Region using the volume of crude oil in this scenario.

***Study Region 4***

Study Region 4 would have a smaller increase in the number of in oil worker recordable injuries from the limitation on well stimulation treatments. The number of recordable injuries to oil workers would reduce from an additional 73 per year for the project compared to 60 per year for Alternative 2.

Under the assumptions in EIR Section 10.21.3.7, this study region would be impacted by rail crude oil imports with the construction of the Alon crude facility and the increase to the full capacity of the Plains All America facility. Proppant will be shipped and offloaded in Bakersfield, which can increase the risk of accidents. Using the average annual crude oil import volume from 2015 to 2040 for this alternative, the number of accidents projected for this region would increase from one accidents per year (25 over 25 years) for the project to two per year (50 over 25 years) from crude oil shipments. Four additional accidents for the 25-year period are forecast from proppant deliveries compared to five over the same period for the project case.

Since this Region has the largest number of wells, it will have the most truck traffic. The vehicle traffic included both trucks and passenger vehicles. As demonstrated in EIR Section 10.21.3.10, the majority of vehicles are passenger cars for site workers. Tables 10.21-7 through 10.21-9 in EIR Section 10.21.3.10 detail the assumptions on the number of vehicles and roundtrip miles. The estimate was built up using the number of wells for each alternative. The number of miles over 25 years (in millions) was applied to accident rates for truck and passenger vehicles from National Highway Traffic Safety Administration (NHTSA) data for California averaged from 2007-2009. (NHTSA, 2014), The accident rate for trucks was eight accidents per 100 million vehicle miles traveled. The passenger car accident rate was 172 accidents per 100 million vehicle miles traveled. For Alternative 2, there were 403 vehicle accidents predicted in Region 4, 390 of which were passenger vehicles.

### Study Region 5

The increase in oil worker recordable injuries is expected to be the same for both the project case and Alternative 2 in Study Region 5. Similar to Study Region 4, this study region would be affected by rail crude oil imports through Study Region 5 to the Alon Crude facility and the Plains All America facility. Using the average annual crude oil import volume from 2015 to 2040, the number of rail accidents projected for this region would remain the same compared to the project case at one accident per year (25 over 25 years. Proppant is expected to be shipped from Wisconsin that could pass through this study region. Two accidents are forecast to occur because of proppant shipments through this study region for both the project case and Alternative 2 over the 25-year period.

### Study Region 6

No well stimulation treatment activities or drilling are projected in Study Region 6. Therefore, there is no impact on the injury rate to oil workers. Similar to Study Region 4, this study region would be impacted by rail crude oil imports with shipments through Study Region 6 to the proposed Alon crude facility and the Plains All America facility, or to the proposed Santa Maria facility. There is also potential for shipments to the Benicia and Pittsburg facilities if they are built. Crude oil could pass through Sacramento enroute to these facilities. Using the average annual crude oil import volume from 2015 to 2040, the number of accidents projected for this region would increase from one accident per year (25 over 25 years) for the project case to approximately two per year (50 for 25 years) for Alternative 2. Proppant is expected to be shipped from Wisconsin that could pass through this study region. One accident is forecast to occur because of proppant shipments through this study region over the period from 2015-2040 for Alternative 2 and two for the project case.

## 12.3.21.3   Programmatic Level Analysis of Specific Oil and Gas Fields

### Wilmington Oil and Gas Field

As stated in the introduction for this section, there are no anticipated impacts from Alternative 2 on activities in the Wilmington field. Therefore the recordable injury rate from well stimulation treatment and production activities is expected to be similar to that for the project (EIR Section 11.21). No impacts from increased rail traffic or truck traffic are anticipated for Wilmington. The train accident rates from the Federal Railroad Association (FRA) are based on millions of train miles. The truck and NHTSA (National Highway Traffic Safety Administration) accident rates are based on 100 million truck miles. Therefore, forecasting accidents within a field is applicable only to a larger, regional area.

### Inglewood Oil and Gas Field

Well stimulation treatments would occur at Inglewood Oil and Gas Field under Alternative 2 as they would for the project (EIR Section 11~~10~~.21). As a result, the mitigation identified for the project <u>within Inglewood</u> would apply <u>for Alternative 2</u> within Inglewood.

### Sespe Oil and Gas Field

Similar to the Wilmington Oil and Gas Field, there are no anticipated impacts from Alternative 2 on activities in the Sespe field. Therefore the injury rate from well stimulation treatment and production activities is expected to be similar to that for the project (EIR Section 11.21). No impacts from increased truck traffic are anticipated for Sespe. The accident rates are based on millions of train miles or 100 million truck miles and that magnitude of travel is applicable only to an analysis of effects in a larger region.

#### 12.3.21.4    Impact Significance Summary

Risks from crude oil production activities would be reduced when compared with the project case, but the difference would be notable only in Study Region 4. Overall, Alternative 2 would result in a reduction in injuries to workers and truck accidents when compared to the project case. Truck and passenger car accidents would decrease from 530 for the project to 413 for Alternative 2 over 25 years. The vast majority of these accidents would be from passenger vehicles.

As with Alternative 1, there will be an increase in crude oil rail accidents (Impact RSK-1) from approximately four per year (100 for 25 years) for the project case to six per year (150 for 25 years) for Alternative 2. In addition, there may be accidents from proppant deliveries by rail, but at a reduced rate from the project case. The forecast for rail accidents from proppant deliveries over 25 years is 13 compared to 16 for the project case.

Aside from Impact RSK-1 regarding transport of imported crude, each of the remaining impacts related to risk of upset and safety would be as described for the project.

### 12.3.22    Transportation and Traffic

#### 12.3.22.1    Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

#### 12.3.22.2    Programmatic Level Analysis of Impacts and Mitigation Measures

| Impact TR-1    Generate additional truck traffic and disrupt traffic operations |
| --- |

Because well stimulation would occur only within existing fields, there would also be an overall direct reduction in truck trips. Within existing oil and gas fields, the total number of trips generated per well due to well stimulation and associated traffic impacts would be the same as those described in EIR Section 10.22 (Transportation and Traffic). Direct impacts outside of existing oil and gas fields would be the same as described for Alternative 1 in EIR Section 12.2.22 (No Future Well Stimulation Practices Alternative, Transportation and Traffic). Combined together there would be an overall reduction of truck trips. Therefore, direct impacts to transportation and traffic (Impacts TR-1 through TR-6) would be beneficial overall on a programmatic level (Class V), except the potential for traffic hazards related to the transport of hazardous materials would remain significant and unmitigable (Class I), as discussed in EIR Section 12.2.22.

| Impact TR-2    Inadvertently damage road rights-of-way |
| --- |

Under the indirect effects scenario for Alternative 2 (EIR Section 8.3.2), any increased drilling without stimulation to make up for lost production would also add truck trips. Although the net number of truck trips is expected to be reduced under Alternative 2, if substantial increased drilling and well production

activities occur outside existing oil and gas fields near rural communities, then on a site-specific basis the condition of some rural roadways may be adversely affected. Implementation of Mitigation Measure TR-2a (Repair Roadway Damage) is recommended to ensure that roadways would be restored to original or near-original condition and undertaken in a timely manner, in consultation with and to the satisfaction of city or county with jurisdiction over affected roadways, the local transportation agency, and/or Caltrans, as appropriate. With the implementation of Mitigation Measure TR-2a, Impact TR-2 (any potential indirect impacts to roadway pavement) would be reduced to a less than significant level (Class II).

**MM TR-2a**    **Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

| Impact TR-3 | Cause traffic safety hazards for vehicles, bicyclists, and pedestrians |
|---|---|

Indirect traffic impacts to level of service (LOS) of local roadways (Impact TR-1), bicyclists and pedestrians (Impact TR-3), and interference with emergency response (Impact TR-6) would all be less than significant (Class III), as discussed under Alternative 1 (EIR Section 12.2.22). In contrast Impacts TR-1, TR-3, and TR-6 are Class II under the project.

| Impact TR-4 | Transport hazardous materials |
|---|---|

The potential for traffic hazards related to the transport of hazardous materials would be significant and unmitigable, even with implementation of Mitigation Measure TR-4a for well stimulation treatments within existing fields. This measure would ensure that truck drivers transporting chemical additives are aware of the emergency spill procedures, but the possibility remains that significant and unmitigable roadway hazard impacts could still occur during an accidental spill, so Impact TR-4 would be significant and unavoidable (Class I).

**MM TR-4a**    **Know Spill Prevention Measures.** (Full text in EIR Section 10.22.5.)

| Impact TR-5 | Change air traffic patterns |
|---|---|

On a site-specific basis, the drilling of new wells, especially deeper wells to be stimulated within existing fields, may trigger FAA air space hazard notification requirements for the drill rig in the vicinity of an airport. Assuming the owner/operator would submit Form 7460-1, as necessary, and comply with any required hazard markers or lighting, Impact TR-5 (Change air traffic patterns) would be less than significant (Class III).

### 12.3.22.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project, because other oil and gas areas that require well stimulation for production would no longer be available to developers. The impacts associated with well stimulation treatment activities for the two fields for Alternative 2 would be similar to those described in EIR Section 11.22 (Transportation and Traffic).

### 12.3.22.4   Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.23   Utilities and Service Systems

### 12.3.23.1   Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 2. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.3.23.2   Programmatic Level Analysis of the Project

Alternative 2 represents an intermediate level of well stimulation between the project, which would allow stimulation anywhere in the state, and Alternative 1, which would prohibit well stimulation activities anywhere in the state. Alternative 2 would prohibit any future stimulation treatments outside of existing oil and gas field boundaries and their buffer areas, but allow such treatments within existing fields and their buffers.

Therefore, potential impacts from any electrical or natural gas interconnections that would have been required for wells drilled outside of existing fields with the intent of stimulating them would not be required, and any solid waste and wastewater disposal needs associated with these types of wells would be avoided. Wells could still be drilled outside of existing fields, but they could not be stimulated. Loss of access to the petroleum resources that may have derived from well stimulation activities outside of existing fields would be made up for by importing oil from outside the state. Increased ship, rail, and truck traffic hauling imported oil and gas to refineries likely would occur under Alternative 2, including an increase use of rail corridors between the source fields and California refineries. As with Alternative 1, this could lead to a need for expanded or new terminals and yards to handle the imports. Except for security and safety lighting, such facilities have relatively minimal demands for electric power and would generate relatively small amounts of solid waste. They would not be expected to create a high demand for natural gas service or wastewater disposal beyond what is needed to heat buildings and service sanitary requirements of the few buildings associated with terminals. Indirectly this alternative could increase well abandonment, the numbers of wells drilled and stimulated within existing fields, and/or the number of new conventional wells drilled but not stimulated outside of existing fields to make up for lost production. The need for new or expanded utilities and service systems is strongly influenced by population levels and the interconnection needs of individual well sites. As discussed within EIR Section 12.3.18 (Population and Housing), Alternative 2 would not have significant population growth and in most areas any growth would be nominal and could be handled by the capacity of existing utilities and service providers.

Four impacts were identified for utilities and services:

- **Impact UTL-1:** Adversely affect utilities and service systems due to population growth from project-related development

- **Impact UTL-2:** Require new or expanded electrical or natural gas infrastructure

- **Impact UTL-3:** Exceed existing municipal wastewater treatment provider capacities

- **Impact UTL-4:** Exceed permitted solid waste capacity of landfills

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 311 of 689   Page ID #:5258

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

Under Alternative 2, because no well stimulation would occur outside of existing fields, Impacts UTL-1 through UTL-4 in these areas would be the same as described for Alternative 1 in EIR Section 12.2.23 (Programmatic Level Analysis of Impacts and Mitigation Measures, Utilities and Service Systems). Impacts associated with stimulation activities within existing oil and gas fields and their buffers would be the same as those described for the project in EIR Section 10.23 (Utilities and Service Systems). To ensure all utilities and service systems would have adequate capacities under Alternative 2, Mitigation Measures UTL-3a and UTL-4a also are proposed for Alternative 2. With the inclusion of these two mitigation measures, impacts UTL-1 and UTL-2 would be Class II and impacts UTL-3 and UTL-4 would be Class III in existing fields. Outside of existing fields, these impacts would be Class III, less than significant.

Utility and service impacts under Alternative 2 would be slightly decreased as compared to the project because Alternative 2 would not bring workers or stimulation activities into areas outside existing oil and gas fields, and the existing fields are already served by utilities and service systems.

**MM UTL-3a**     **Assess Wastewater Quality and Ensure Adequate Compensation to Municipal and Private Wastewater Treatment Plants.** (Full text in EIR Section 10.23.5.)

**MM UTL-4a**     **Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Compensation to Municipal and Private Solid Waste Facilities.** (Full text in EIR Section 10.23.5.)

### 12.3.23.3   Programmatic Level Analysis of Specific Oil and Gas Fields

The Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields and well stimulation activities would be allowed under Alternative 2. It is expected the level of drilling and stimulation would be similar or slightly greater than what would occur under the project. Because other oil and gas areas outside of existing fields that would require well stimulation for production would no longer be available to developers, there could be an increase in drilling and stimulation in existing fields. Because these are mature oil and gas fields, the number of new wells under Alternative 2 would not be expected to increase dramatically over existing levels of activity. The impacts associated with well stimulation treatment activities for these three fields under Alternative 2 would be less than significant (Class III) for Impacts UTL-1 and UTL-2 and less than significant with mitigation (Class II) for Impacts UTL-3 and UTL-4. This is similar the significance of impacts described for the project in EIR Section 11.23 (Utilities and Service Systems).

### 12.3.23.4   Impact Significance Summary

Please refer to Table 12.3.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where indirect impacts would result from projects not involving well stimulation treatment (e.g., increased drilling activity either within or outside existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.3.24   Impact Summary Table for Alternative 2

Table 12.3.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 2.

**Programmatic Level Analysis of the Project**

Under Alternative 2 all environmental impacts associated with well stimulation activities at locations outside of existing fields would be eliminated. Impacts within fields would still occur, but they would be

localized largely to disturbed well pad areas, and fields would already have established water and oil and gas production infrastructure in place.

Additional wells may still be developed and stimulated within existing fields, which would reduce the need to drill new conventional wells or import oil and gas from out of State compared to Alternative 1. There might also be new drilling, though without well stimulation, in areas outside existing oil and gas fields in order to make up for the lack of well stimulation opportunities outside existing fields. These indirect effects would be less severe, though, than those that would occur under Alternative 1 (No Future Well Stimulation). Therefore, indirect environmental impacts would be reduced compared to those described under Alternative 1 above.

However, because many of the mature oil fields in California are in decline and Alternative 2 would prohibit developing new fields that require well stimulation, there would be some loss of oil reserves and production due to implementation of this alternative, which would result in similar indirect impacts to Alternative 1. In addition, the prohibition of well stimulation treatments outside of existing fields would result in a new significant and unmitigable (Class I) impact from the loss of known mineral (oil and gas) resources in the Monterey Formation and its plays (Impact GEO-6).

In summary, Alternative 2 would be worse than the project for the following issue areas: Air Quality, Environmental Justice, Geology, Greenhouse Gas Emissions, and Risk.

Alternative 2 would be better than the project for the following issue areas: Aesthetics, Agriculture and Forestry Resources, Biological Resources–Terrestrial Environments, Biological Resources–Coastal Marine Environments, Coastal and Marine Processes and Water Quality, Fishing, Cultural Resources, Paleontological Resources, Hazardous Materials, Groundwater, Surface Water, Land Use, Noise, Population and Housing, Public Services, Recreation, Transportation and Traffic, and Utilities.

### Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. Therefore, impacts associated with well stimulation activities at the fields would be the same as those described for the project.

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| **AESTHETICS** | | | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. |
| Impact AES-2. Substantially alter or damage scenic resources. | Class I, II, III, or IV (Direct) Class III (Indirect) Class I or II for new or expanded terminals. None available for new or expanded terminals. | Class I, II, III, or IV (Direct) Class III (Indirect) Class I or II for new or expanded terminals. None available for new or expanded terminals. | Class I, II, III, or IV (Direct) Class III (Indirect) Class I or II for new or expanded terminals. None available for new or expanded terminals. | Class I, II, III, or IV (Direct) Class III (Indirect) Class I or II for new or expanded terminals. None available for new or expanded terminals. |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class I, II, III for new or expanded terminals. None available for new or expanded terminals. |
| Impact AES-4. Create new sources of substantial light and glare. | Class III or IV (Direct) Class III (Indirect) Class II for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class II for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class II for new or expanded terminals. None available for new or expanded terminals. | Class III or IV (Direct) Class III (Indirect) Class II for new or expanded terminals. None available for new or expanded terminals. |
| **AGRICULTURE AND FORESTRY RESOURCES** | | | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class IV (Direct) Class II or V (Indirect) AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland | Class IV None required. | Class IV None required. | Class II AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class IV (Direct)<br>Class II or V (Indirect)<br>AGF-2a: Ensure Compatibility with Agricultural Zoning<br>AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Class IV<br>None required. | Class IV<br>None required. | Class II<br>AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class IV (Direct)<br>Class II or V (Indirect)<br>AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Class IV<br>None required. | Class IV<br>None required. | Class IV<br>None required. |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class IV (Direct)<br>Class II or V (Indirect)<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Class IV<br>None required. | Class II<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Class II<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class IV (Direct)<br>Class II or V (Indirect)<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical~~ | Class IV<br>None required. | Class II<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site~~ | Class II<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site~~ |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| | ~~Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability<br><br>TR-1a: Prepare Traffic Plan | | ~~Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability<br><br>TR-1a: Prepare Traffic Plan | ~~Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><br>SWR-2a: Implement Erosion Control Plan<br><br>SWR-3a: Ensure Adequate Water Availability<br><br>TR-1a: Prepare Traffic Plan |
| **AIR QUALITY** | | | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Indirect)<br>AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures<br>AQ-1b: Improve the Methodologies and Emission Factors Used in Inventory Development | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I (Indirect)<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I (Indirect)<br>AQ-3a: Comply with Local Air District Protocols Relating to the Preparation of ~~Prepare~~ a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Class I<br>AQ-3a: Comply with Local Air District Protocols Relating to the Preparation of ~~Prepare~~ a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Class I<br>AQ-3a: Comply with Local Air District Protocols Relating to the Preparation of ~~Prepare~~ a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Class I<br>AQ-3a: Comply with Local Air District Protocols Relating to the Preparation of ~~Prepare~~ a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I (Indirect)<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Class I<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Class I<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Class I<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Wilmington | Inglewood | Sespe |
|---|---|---|---|---|
| | | **Specific Oil and Gas Fields** | | |
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-2b: California Condor Protection Measures<br>BIOT-2c: Nelson's Bighorn Sheep Protection Measures<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a<u>:</u> Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br>GW-4b: <u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u> ~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability |
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class I<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Class III<br>None required. | Class III<br>None required. | Class I<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans |
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program |
| **BIOLOGICAL RESOURCES – COASTAL AND MARINE ENVIRONMENT** | | | | |
| Impact BIOCM-1. Substantially affect rare, threatened, or endangered coastal/marine species or their habitat | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |
| Impact BIOCM-2. Interfere with migration or movement of coastal/marine fish or wildlife | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |
| Impact BIOCM-3. Result in substantial loss or alteration of coastal/marine habitat | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |
| Impact BIOCM-4. Substantially disrupt or affect local coastal/marine biological communities or habitats | Class III<br>None required. | Class III<br>None required. | Not applicable. | Not applicable. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **COASTAL PROCESSES AND MARINE WATER QUALITY** | | | | |
| Impact CPMWQ-1. Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity | Class II CPMWQ-1a: Protect Marine Water Quality | Class II CPMWQ-1a: Protect Marine Water Quality | Not applicable. | Not applicable. |
| Impact CPMWQ-2. Change the velocity or direction of ocean currents | Class II CPMWQ-2a: Prepare and Implement Marine Current Plan | Class II CPMWQ-2a: Prepare and Implement Marine Current Plan | Not applicable. | Not applicable. |
| Impact CPMWQ-3. Change the velocity or direction of coastal and ocean winds | Class III None required. | Class III None required. | Not applicable. | Not applicable. |
| Impact CPMWQ-4. Change the direction, size, or period of ocean waves | Class IV None required. | Class IV None required. | Not applicable. | Not applicable. |
| Impact CPMWQ-5. Increase the risk of a tsunami | Class III ~~CPMWQ 5a: Conduct Offshore Geotechnical and Tsunami Investigation~~ ~~CPMWQ 5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~None Required. | Class III ~~CPMWQ 5a: Conduct Offshore Geotechnical and Tsunami Investigation~~ ~~CPMWQ 5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~None Required. | Not applicable. | Not applicable. |
| **COMMERCIAL AND RECREATIONAL FISHING** | | | | |
| Impact CRF-1. Cause long-term exclusion of important commercial and recreational fishing areas | Class III None required. | Class III None required. | Not applicable. | Not applicable. |
| Impact CRF-2. Result in substantial economic losses to local commercial and recreational fishing industries | Class III None required. | Class III None required. | Not applicable. | Not applicable. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **CULTURAL RESOURCES** | | | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class I<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class I<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Class I<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-2. Affect prehistoric resources | Class I | Class I | Class I | Class I |
| | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I | Class I | Class I | Class I |
| | CUL-1a: ~~Require Information~~ ~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ ~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ ~~Inventory~~ and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ ~~Inventory~~ and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CUL-4. Affect cultural landscapes. | Class I | Class I | Class I | Class I |
| | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources | CUL-1a: ~~Require Information~~ Inventory and Evaluate Cultural Resources |
| | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination | CUL-1b: Complete Native American Coordination |
| | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan | CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan |
| | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains | CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains |
| | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities | CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities |
| | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program | CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program |
| | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources | CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources |
| | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities | CUL-1h: Provide Native American Monitors during Earth Disturbing Activities |
| | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities | CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities |
| | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **PALEONTOLOGICAL RESOURCES** | | | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class II<br>PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class II<br>PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class II<br>PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Class II<br>PALEO-1a: ~~Require Information Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities |
| **ENVIRONMENTAL JUSTICE** | | | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **GEOLOGY, SOILS AND MINERAL RESOURCES** | | | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class IV (Direct) Class II GEO-1a: Avoid Active Faults ~~Zones~~if Necessary GEO-1b: Implement an Appropriate Setback if Necessary GEO-1~~e~~f: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class II GEO-1b: Implement an Appropriate Setback if Necessary ~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~ GEO-1~~c~~d: Implement Industry Accepted Practices GEO-1~~d~~e: Conduct Ground Monitoring GEO-1~~e~~f: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class II GEO-1a: Avoid Active Faults ~~Zones~~ if Necessary GEO-1b: Implement an Appropriate Setback if Necessary ~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~ GEO-1~~c~~d: Implement Industry Accepted Practices GEO-1~~d~~e: Conduct Ground Monitoring GEO-1~~e~~f: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Class II GEO-1a: Avoid Active Faults ~~Zones~~ if Necessary GEO-1b: Implement an Appropriate Setback if Necessary ~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~ GEO-1~~c~~d: Implement Industry Accepted Practices GEO-1~~e~~f: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class IV outside of existing fields (Direct) Class II within existing fields (Direct) SWR-1a: Require Stormwater Pollution Prevention Plan Class III (Indirect) | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-2a: Implement Erosion Control Plan |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class IV outside of existing fields (Direct) Class II within existing fields (Direct) GEO-3a: Prepare Geotechnical Report if Necessary Class III (Indirect) | Class II GEO-3a: Prepare Geotechnical Report if Necessary | Class II GEO-3a: Prepare Geotechnical Report if Necessary | Class II GEO-3a: Prepare Geotechnical Report if Necessary |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class IV outside of existing fields (Direct) Class III within existing fields (Direct) Class III (Indirect) None required. | Class III None required. | Class III None required. | Class III None required. |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV None required. | Class IV None required. | Class IV None required. | Class IV None required. |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class IV (loss of non-fuel resources) (Direct) Class I (loss of fossil fuels) (Direct) Class III (Indirect) None available. | Class III None required. | Class III None required. | Class III None required. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | **Wilmington** | **Inglewood** | **Sespe** |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| **GREENHOUSE GAS EMISSIONS** | | | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Class I<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Class I<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide. | Class I<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) strategies<br>GHG-1c. Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide. |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class III<br>None required. | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas.<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Class III<br>None required. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Wilmington | Inglewood | Sespe |
|---|---|---|---|---|
| | | **Specific Oil and Gas Fields** | | |
| **HAZARDS AND HAZARDOUS MATERIALS** | | | | |
| Impact HAZ-1. Hazardous materials associated with well stimulation fluids could be released to the environment from a spill or leak | Class II<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices | Class II<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices<br><br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR | Class II<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices<br><br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR | Class II<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices<br><br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR |
| **GROUNDWATER RESOURCES** | | | | |
| Impact GW-1. Contribute to overdraft conditions in critically impacted groundwater basins | Class II (Direct)<br>Class IV (Indirect)<br>GW-1a: Use Alternative Water Sources to the Extent Feasible<br>GW-1b: Minimize Groundwater Impacts Prepare a Third Party Technical Report to Analyze Overdraft Impacts | Class II<br>GW-1a: Use Alternative Water Sources to the Extent Feasible<br>GW-1b: Minimize Groundwater Impacts Prepare a Third Party Technical Report to Analyze Overdraft Impacts | Class II<br>GW-1a: Use Alternative Water Sources to the Extent Feasible<br>GW-1b: Minimize Groundwater Impacts Prepare a Third Party Technical Report to Analyze Overdraft Impacts | Class III<br>None required |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class II (Direct)<br>Class IV (Indirect)<br>GW-2a1b: Minimize Groundwater Impacts: Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping | Class II<br>GW-2a1b: Minimize Groundwater Impacts: Prepare a Third Party Technical Report to Analyze Local Impacts of Pumping | Class II<br>GW-2a1b: Minimize Groundwater Impacts: Prepare a Third Party Technical Report to Analyze Local Impacts of Pumping | Class III<br>None required |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact GW-3. Adversely impact groundwater quality through surface spills or leaks during well stimulation | Class II (Direct) Class IV (Indirect) HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices | Class II HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices | Class II HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices | Class II HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices |
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals. | Class II (Direct) Class IV (Indirect) GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin GW-4c: Install Methane Sensors on Wells in the ADSA Subject to Well Stimulation Treatments | Class II GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin GW-4c: Install Methane Sensors on Wells in the ADSA Subject to Well Stimulation Treatments | Class II GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin GW-4c: Install Methane Sensors on Wells in the ADSA Subject to Well Stimulation Treatments | Class II GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin GW-4c: Install Methane Sensors on Wells in the ADSA Subject to Well Stimulation Treatments |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells. | Class II (Direct) Class IV (Indirect) GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Class II GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Class II GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Class II GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate |
| Impact GW-6: Improper disposal of flowback in injection wells could potentially impact groundwater quality. | Class II (Direct) Class IV (Indirect) GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater Install a Cement Seal across Protected Groundwater | Class II GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater Install a Cement Seal across Protected Groundwater | Class II GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater Install a Cement Seal across Protected Groundwater | Class II GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater Install a Cement Seal across Protected Groundwater |
| Impact GW-7. Inability to identify whether any observed adverse effects in groundwater are from well stimulation activity. | Class II (Direct) Class IV (Indirect) GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Class II GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Class II GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Class II GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment |
| **SURFACE WATER RESOURCES** | | | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1bc: Provide Adequate Flood Protection SWR-1cd: Protect Surface Water Reservoirs | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1bc: Provide Adequate Flood Protection SWR-1cd: Protect Surface Water Reservoirs | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1bc: Provide Adequate Flood Protection SWR-1cd: Protect Surface Water Reservoirs | Class II SWR-1a: Require Stormwater Pollution Prevention Plan SWR-1b: Surface Water Protection SWR-1bc: Provide Adequate Flood Protection SWR-1cd: Protect Surface Water Reservoirs SWR-1d: Protect Surface Water |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class II SWR-2a: Implement Erosion Control Plan | Class II SWR-2a: Implement Erosion Control Plan | Class II SWR-2a: Implement Erosion Control Plan | Class II SWR-2a: Implement Erosion Control Plan SWR-1d: Protect Surface Water |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact SWR-3. Substantially diminish surface water quantity. | Class II<br>SWR-3a: Ensure Adequate Water Availability | Class II<br>SWR-3a: Ensure Adequate Water Availability | Class II<br>SWR-3a: Ensure Adequate Water Availability | Class II<br>SWR-3a: Ensure Adequate Water Availability |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection |
| **LAND USE AND PLANNING** | | | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I<br>None available for impacts associated with Risk of Upset/Public and Worker Safety | Class I<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>~~RSK 2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2<u>a</u>~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK 2c: Install an Upgraded SCADA System~~<br>RSK-2<u>b</u>~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided~~ | Class I<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u> ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of Its Well Stimulation Equipment and Report of the Aged Infrastructure and Its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>~~RSK 2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2<u>a</u>~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK 2c: Install an Upgraded SCADA System~~<br>RSK-2<u>b</u>~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided~~ | Class III<br>None required. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | **Wilmington** | **Inglewood** | **Sespe** |
| | | ~~with a Protective Outer Shell or a Double Containment Storage System~~ RSK-2~~c~~f: Ensure Mechanical Integrity Through Compliance with Permanent Program ~~Complies with~~ Regulation RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | ~~with a Protective Outer Shell or a Double Containment Storage System~~ RSK-2~~c~~f: Ensure Mechanical Integrity Through Compliance with Permanent Program ~~Complies with~~ Regulation RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | |
| Impact LU-1, *continued* | | RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents RSK-5c: Prepare and Implement a Control of Ignition Sources Plan RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System RSK-7b: Reduce Emissions from Dust-Causing Activities | RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents RSK-5c: Prepare and Implement a Control of Ignition Sources Plan RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System RSK-7b: Reduce Emissions from Dust-Causing Activities | |
| Impact LU-2. Physically divide an established community. | Class III None required.~~LU-2a: Ensure That Established and Planned Communities Are Not Divided~~ | Class ~~II~~IV None required.~~LU-2a: Ensure That Established and Planned Communities Are Not Divided~~ | Class ~~II~~IV None required.~~LU-2a: Ensure That Established and Planned Communities Are Not Divided~~ | Class IV None required. |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class II SB 4 regulation requiring "Neighbor Notification" (Section 1783.2) All mitigation measures prescribed in this EIR | Class II SB 4 regulation requiring "Neighbor Notification" (Section 1783.2) All mitigation measures prescribed in this EIR | Class II SB 4 regulation requiring "Neighbor Notification" (Section 1783.2) All mitigation measures prescribed in this EIR | Class II SB 4 regulation requiring "Neighbor Notification" (Section 1783.2) All mitigation measures prescribed in this EIR |
| **NOISE AND VIBRATION** | | | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class II (Direct) Class II to Class IV (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses | Class II (Direct) Class II to Class IV (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses | Class II (Direct) Class II to Class IV (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses | Class II (Direct) Class II to Class IV (Indirect) NOI-1a: Control Noise Levels near Sensitive Land Uses |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class IV (Direct)<br>Class I to IV (Indirect)<br>Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class III (Direct)<br>Class II to IV (Indirect)<br>Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class III (Direct)<br>Class II to IV (Indirect)<br>Mitigation may be required if new infrastructure is closer to noise sensitive receivers | Class III (Direct)<br>Class II to IV (Indirect)<br>Mitigation may be required if new infrastructure is closer to noise sensitive receivers |
| **POPULATION AND HOUSING** | | | | |
| Impact POP-1. Induce substantial population growth | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| **PUBLIC SERVICES** | | | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class II<br>PUB 1a: Assess Public Service Ratios and Ensure Adequate Compensation | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>TR-1a: Prepare Traffic Plan | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>TR-1a: Prepare Traffic Plan | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices<br>HAZ-1b: Require the Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR<br>TR-1a: Prepare Traffic Plan |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **RECREATION** | | | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III~~IV~~<br>None required. |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas<br>~~SWR-1a: Require Stormwater Pollution Prevention Plan~~<br>SWR-1b: Surface Water Protection<br>~~SWR-1b: Provide Adequate Flood Protection~~<br>~~SWR-1c: Protect Surface Water Reservoirs~~<br>~~SWR 2a: Implement Erosion Control Plan~~<br>~~SWR-3a: Ensure Adequate Water Availability~~<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas<br>~~SWR-1a: Require Stormwater Pollution Prevention Plan~~<br>SWR-1b: Surface Water Protection<br>~~SWR-1b: Provide Adequate Flood Protection~~<br>~~SWR-1c: Protect Surface Water Reservoirs~~<br>~~SWR 2a: Implement Erosion Control Plan~~<br>~~SWR-3a: Ensure Adequate Water Availability~~<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Class III<br>None required~~REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas~~<br>~~REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas~~<br>~~SWR-1a: Require Stormwater Pollution Prevention Plan~~<br>~~SWR-1b: Surface Water Protection~~<br>~~SWR-1b: Provide Adequate Flood Protection~~<br>~~SWR-1c: Protect Surface Water Reservoirs~~<br>~~SWR 2a: Implement Erosion Control Plan~~<br>~~SWR-3a: Ensure Adequate Water Availability~~ |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact REC-2. continued | | HAZ-1b: Require Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR | HAZ-1b: Require Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR | HAZ-1b: Require Operator to Conduct an Annual Inventory of its Well Stimulation Equipment and Report of the Aged Infrastructure and its Likelihood of Failure Leading to Spills or Leaks to DOGGR |
| | | RSK-2a: Conduct a Reactive Hazard Assessment (RHA) | RSK-2a: Conduct a Reactive Hazard Assessment (RHA) | RSK-2a: Conduct a Reactive Hazard Assessment (RHA) |
| | | RSK-2b: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals | RSK-2b: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals | RSK-2b: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals |
| | | RSK-2c: Install an Upgraded SCADA System | RSK-2c: Install an Upgraded SCADA System | RSK-2c: Install an Upgraded SCADA System |
| | | RSK-2d: Conduct a Facility Siting Study | RSK-2d: Conduct a Facility Siting Study | RSK-2d: Conduct a Facility Siting Study |
| | | RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System | RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System | RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System |
| | | RSK-2f: Ensure Mechanical Integrity Program Complies with Regulation | RSK-2f: Ensure Mechanical Integrity Program Complies with Regulation | RSK-2f: Ensure Mechanical Integrity Program Complies with Regulation |
| | | RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks |
| | | RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities | RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities | RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities |
| | | RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents | RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents | RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents |
| Impact REC-2. continued | | RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | RSK-5c: Prepare and Implement a Control of Ignition Sources Plan |
| | | RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) | RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) | RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) |
| | | RSK-7b: Reduce Emissions from Dust Causing Activities | RSK-7b: Reduce Emissions from Dust Causing Activities | RSK-7b: Reduce Emissions from Dust Causing Activities |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| | | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| Impact | Project | Wilmington | Inglewood | Sespe |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Class V~~I~~<br>None required<br>~~RSK-1a: Increase the Number of CPUC Rail Inspectors~~<br>~~RSK-1b: Expedite the Phase-out of Older Tank Cars~~<br>~~RSK-1c: Implement New Accident Prevention Technology~~<br>~~RSK-1d: Monitor and Enforce New Speed Limits~~<br>~~RSK-1e: Monitor the Implementation of Trackside Safety Technology~~<br>~~RSK-1f: Improve Emergency Preparedness and Response Programs~~<br>~~RSK-1g: Provide Real-Time Shipment Information to Emergency Responders~~<br>~~RSK-1h: Provide Additional Accident and Injury Data to the State~~ | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State |
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2a~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2b~~d~~: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2c~~f~~: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required. | Class III<br>None required. | Class IV~~I~~<br>None required. | Class IV~~I~~<br>None required. |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan |
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I<br>~~None available.~~RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing<br>~~None available.~~ | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing<br>~~None available.~~ | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing<br>~~None available.~~ |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities |
| **TRANSPORTATION AND TRAFFIC** | | | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class I (transport of hazardous materials) or V<br>None available. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |

**Table 12.3.24-1. Summary of Impacts and Mitigation Measures for Alternative 2[1]**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact TR-2. Inadvertently damage road rights-of-way | Class II<br>TR-2a: Repair Roadway Damage | Class III<br>None required. | Class III<br>None required. | Class II in the City of Fillmore<br>TR-2a: Repair Roadway Damage |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact TR-4. Transport hazardous materials | Class I<br>TR-4a: Know Spill Prevention Measures | Class I<br>TR-4a: Know Spill Prevention Measures | Class I<br>TR-4a: Know Spill Prevention Measures | Class I<br>TR-4a: Know Spill Prevention Measures |
| Impact TR-5. Change air traffic patterns | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class IV<br>None required. |
| Impact TR-6. Temporarily interfere with emergency response | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| **UTILITIES AND SERVICE SYSTEMS** | | | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from Project-related development | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class IV (Direct)<br>Class III (Indirect)<br>None required. | Class III<br>None required. | Class III<br>None required. | Class III<br>None required. |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class IV (Direct)<br>Class II (Indirect)<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate ~~Compensation to~~Capacity to Process Wastewater at Municipal and Private Wastewater Treatment Plants | Class II<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate Capacity to Process Wastewater at ~~Compensation to~~ Municipal and Private Wastewater Treatment Plants | Class II<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate Capacity to Process Wastewater at ~~Compensation to~~ Municipal and Private Wastewater Treatment Plants | Class II<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate Capacity to Process Wastewater at ~~Compensation to~~ Municipal and Private Wastewater Treatment Plants |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class IV (Direct)<br>Class II (Indirect)<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate ~~Compensation to~~Capacity to Accept Solid Waste at Municipal and Private Solid Waste Facilities | Class II<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Capacity to Accept Solid Waste at ~~Compensation to~~Municipal and Private Solid Waste Facilities | Class II<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Capacity to Accept Solid Waste at ~~Compensation to~~Municipal and Private Solid Waste Facilities. | Class II<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Capacity to Accept Solid Waste at ~~Compensation to~~Municipal and Private Solid Waste Facilities. |

1 - Mitigation measures recommended herein are addressed to well stimulation treatment activities, but sometimes are also relevant to indirect impacts not caused by well stimulation but by other activities (e.g., increased drilling either within or outside of existing oil and gas fields). In the latter situation, the identified measures thus are only model measures that could be followed, likely with some modification, in connection with approvals of other projects contributing to indirect effects.

## 12.4    Well Pad Consolidation Alternative (Alternative 3)

The Well Pad Consolidation Alternative (Alternative 3) is to reduce the amount of land used for drilling in new areas of the State opened up by well stimulation technologies. It would not limit the amount of well stimulation in the future. This alternative has been developed primarily for consideration by local and State agencies with jurisdiction over sensitive surface resources, and would not be implemented by DOGGR by itself. As applied in particular counties and incorporated cities, this alternative would likely require local legislative actions amending existing general plans and zoning, and possibly grading ordinances. ~~Under this alternative the project standards for resource protection (see EIR Section 7.5) would not be implemented.~~ EIR Section 8.3.3 provides the details of this alternative.

As with Alternative 1, this alternative assumes that any action taken by the State to restrict or limit well stimulation activities would not be applicable in areas under federal or tribal jurisdiction. Any activity that is currently allowed in areas under federal or tribal jurisdiction would continue to be allowed, and could increase, stay the same, or decrease in intensity. The current permitting and environmental review processes applicable to stimulation activities in areas under federal and tribal jurisdiction would continue to apply to new well stimulation projects in those areas, and therefore impacts are assumed to be mitigated as appropriate and feasible. The analysis below for this alternative focuses only on activities in areas under State jurisdiction, and includes the assumption that the analysis of effects in areas under federal or tribal jurisdiction would be the same as with Alternative 1. Therefore, effects in areas under federal or tribal jurisdiction are not considered in the analysis of this alternative.

The Well Pad Consolidation Alternative would apply primarily outside of existing oil and gas fields, in areas where resources would potentially become recoverable due to advances in well stimulation technologies and increased understanding of California's geology. The goal of the Well Pad Consolidation Alternative is to reduce the amount of land used for drilling in new areas that may be opened to oil and gas development by well stimulation technologies. It would not limit the amount of well stimulation in the future, but would try to minimize surface impacts by minimizing the number of separate drilling pads needed to conduct multiple drilling operations. For existing fields, it is anticipated that most future drilling would rely on existing roads and pads, therefore substantially negating the need for or benefit of consolidation.

This alternative has been developed primarily for consideration by local and State agencies having jurisdiction over land development and sensitive surface resources, and would not be implemented by DOGGR by itself. However, as part of this alternative, DOGGR could develop Field Rules specific to an oil and gas field with the goal of reducing the disturbance footprint associated with well drilling and stimulation. If applied in particular counties and incorporated cities, this alternative could require local legislative actions amending existing general plans and zoning, and possibly grading and other ordinances. In order to allow wells to be drilled less than 150 feet apart; however, legislative action might be necessary to modify the current language of PRC Section 3606. That statute generally provides, in pertinent part, that "where a parcel of land contains one acre or more and where all or substantially all of the surface of such parcel of land is unavailable for the surface location of oil or gas wells, *there may be drilled or produced not more than one well into each acre of such parcel of land*[.]" In applying the statute as currently written, uncertainty is created by the need to show, before more than one well per acre can be permitted, that, within a parcel considered for drilling, "substantially all of the surface of the land is unavailable for surface location" of wells. Absent legislative clarification or modification of this requirement, disputes over its meaning in particular circumstances could create challenges for local agencies seeking to implement this alternative in a form that permits more than one well per acre.

At the State level, the primary agency involved would be the Department of Fish and Wildlife, which has authority over actions affecting the bed and banks of water bodies and over the incidental take of endangered and threatened species. Regional Water Quality Control Boards would also be concerned about potential water quality impacts, and the State Historic Preservation Officer and the Native American Heritage Commission would be interested in possible impacts to cultural resources. At the federal level, the USACE could be involved in the issuance of dredge and fill (404) permits for wetlands or other aquatic features subject to federal jurisdiction. (Wet features beyond federal jurisdiction would be subject to state regulation by Regional Water Quality Control Boards.) The U.S. Fish and Wildlife Service would work with the USACE to ensure compliance with the federal Endangered Species Act or could approve habitat conservation plans (HCPs) proposed by entities or persons other than federal agencies.

Under this alternative, ground disturbance for exploratory wells would be limited to the minimum feasible amounts. If exploratory wells do not identify future viable resources, ground disturbance would be rehabilitated to pre-disturbance conditions, as feasible.

The Well Pad Consolidation Alternative would require well owners/operators to use multi-well pads (i.e., individual pads that serve multiple wells) to recover oil and gas resources, thereby reducing the number of pads needed. Horizontal drilling would be preferable whenever feasible to allow additional wells to be reached from one access point. This alternative also would require well owners/operators to use existing infrastructure wherever possible, in particular existing access roads. In areas outside of existing fields where new infrastructure would be needed, well owners/operators would be required to share access roads to the greatest extent feasible, minimize the ground disturbance during construction, and rehabilitate temporary ground disturbance to pre-disturbance conditions.

In addition to an analysis of the alternative itself, the analysis of Alternative 2 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

## 12.4.1    Aesthetics

### 12.4.1.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.1.2    Programmatic Level Analysis of the Project

Increasingly, multiple wells are being completed from a single well pad. While drill rigs required for directional drilling are larger than rigs required for conventional drilling, they are present only for the several months needed to complete the well. Because of their height, they would be visible from a greater distance, but given the relatively short time a rig would be at a site, this is a less than significant impact. Pads supporting multiple wells typically are larger than pads for single wells; however, there

would be fewer pads needed in a field to achieve the same level of resource recovery from the target formations. Fewer pads also would reduce the number of access roads or spur roads in a field. Overall, this alternative would reduce land disturbance by clustering wells at fewer location and by reducing access road requirements.

In locations outside of existing fields, development of new wells for stimulation could be a significant impact. Depending on site location, amount and type of existing development, distance from viewer, view duration, and other factors affecting visibility and visual quality, this impact would be reduced to less than significant with mitigation (Class II) or would remain significant (Class I). The full text of mitigation measures is found in EIR Section 10.1.5. Where impacts could result from projects not involving well stimulation treatment, these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

| Impact AES-1 | Substantially adversely affect scenic vistas |

Well stimulation itself is a short duration, temporary activity and typically does not require earthwork or vegetation removal. At the conclusion of the operation the site would be left largely unchanged from pre-stimulation conditions. Creation of new fields in new areas would require development of access roads and well pads, use of drill rigs, delivery of materials (drill pipe, drilling mud, well casing, cement, and other materials), installation of pumps and piping, and development of storage tanks and production facilities. Under the project, more well pads would be developed as compared to Alternative 3, which requires consolidation of pads. The requirement to consolidate wells in new fields would reduce the number of pads and likely result in them being farther apart. This would reduce the number of access roads and spurs to pads as well. Overall, under Alternative 3, well consolidation would result in less impact to vistas in areas outside of existing fields as compared to the project, where consolidation would not be required. However, depending on local conditions, if the new field is visible to a vantage point from which a scenic vista is observed, the impact could be significant even with well pad consolidation. Implementation of Mitigation Measures AES-1a and AES-1b, or similar measures by agencies having jurisdiction over land site surface alterations and facility development, would reduce the severity of the impact.

**MM AES-1a**    **Prepare and Implement a Site Plan to Reduce Visual Impacts.** (Full text in EIR Section 10.1.5.)

**MM AES-1b**    **Minimize Lighting Visibility Offsite.** (Full text in EIR Section 10.1.5.)

Because of the wide variability in California's visual landscapes, a project-specific analysis would be required to determine if these or similar measures would reduce a particular project's impact to a less than significant level with mitigation (Class II) or if the impact would remain significant (Class I).

| Impact AES-2 | Substantially alter or damage scenic resources |

Scenic resources include scenic highways, notable rock formations, historic structures, noteworthy trees, and similar elements.

In new fields, well pads, access roads, and infrastructure would need to be developed. If there are scenic resources at or near the site, these could be altered or damaged or their value substantially diminished even with well pad consolidation. Implementation of Mitigation Measure AES-1a, or a similar measure by agencies having jurisdiction, would reduce the severity of the impact.

**MM AES-1a**    **Prepare and Implement a Site Plan to Reduce Visual Impacts.** (Full text in EIR Section 10.1.5.)

As with Impact AES-1 on vistas, consolidation of wells in new areas under Alternative 3 would reduce the impact on scenic resources as compared to the project, where consolidation is not required. However, a project-specific analysis would be required to determine if these or similar measures would reduce the impact to a less than significant level with mitigation (Class II) or if the impact would remain significant (Class I).

| Impact AES-3    Substantially degrade the existing visual character or quality of a site and its surroundings |
| --- |

The visual character or quality of a site represents a composite impression of a site as perceived by an observer. Equipment, vehicles, and materials used during well stimulation work would likely introduce colors, forms, and lines that contrast with existing conditions at and around the site, degrading the visual character and quality of the site. Depending on viewer location, these introduced elements could block views, further contributing to the adverse visual change.

In new oil and gas fields, the infrastructure associated with an oil and gas field would have to be developed, introducing visual changes in the existing character of the site and locality. The impact could be significant. Implementation of Mitigation Measures AES-1a and AES-1b, or similar measures by agencies having jurisdiction, would reduce the severity of the impact.

**MM AES-1a**    **Prepare and Implement a Site Plan to Reduce Visual Impacts <u>to Sensitive Receptors</u>.** (Full text in EIR Section 10.1.5.)

**MM AES-1b**    **Minimize Lighting Visibility Offsite.** (Full text in EIR Section 10.1.5.)

By reducing the number of pads, increasing their spacing, and reducing the number of access and spur roads, consolidation of wells in new areas under Alternative 3 would reduce impacts on the existing visual character of an area as compared to the project, where consolidation would not be required. However, because of the wide variability in existing visual environments, a project-specific analysis would be required to determine if these or similar measures would reduce the impact to a less than significant level with mitigation (Class II) or if the impact would remain significant (Class I).

| Impact AES-4    Create new sources of substantial light and glare |
| --- |

Night work during well stimulation would be unusual because a stimulation typically is a short duration activity and can be stopped between stimulations. If it night work did occur, temporary lighting would be required for safety during the night hours. During the day, equipment or vehicles with reflective surfaces, such as stainless steel tanks or windshields, can create glare as seen from various vantage points as the sun transits the sky or as vehicles move.

In new fields, if stimulation proves successful and wells are economically viable, infrastructure would be developed and operated. This would introduce new light sources into an area. For example, once underway, well drilling typically is a 24-hour operation, with derricks and nearby work areas lit during the night for safety. If a field is established, the presence of wells, pipelines, tank farms and other necessary facilities and equipment may require night lighting for safety and security, although this would be limited. During the day, glare could be created by reflected light off of vehicle windshields or any highly reflective surface. Implementation of Mitigation Measures AES-1a and AES-1b, or similar measures by agencies having jurisdiction, would reduce the severity of the impact.

MM AES-1a    **Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors.** (Full text in EIR Section 10.1.5.)

MM AES-1b    **Minimize Lighting Visibility Offsite.** (Full text in EIR Section 10.1.5.)

By reducing the number of pads and increasing their spacing, consolidation of wells in new areas under Alternative 3 would reduce impacts from light and glare as compared to the project, where consolidation would not be required. A project-specific analysis would be required to determine if these or similar measures would reduce the impact to a less than significant level with mitigation (Class II) or if the impact would remain significant (Class I).

### 12.4.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

*Wilmington, Inglewood, and Sespe Oil and Gas Fields*

Alternative 3 would cause consolidation of wells in new fields, but would not have an effect on existing fields such as the Wilmington, Inglewood, and Sespe Oil and Gas Fields, which are largely developed and where consolidation opportunities are limited.

Well stimulation in the Wilmington Oil and Gas Field is anticipated to be limited to the THUMS artificial islands off Long Beach. This already represents a consolidation of wells and adoption of an alternative that requires multiple wells be developed from a well pad would not apply. Onshore, wells in the Wilmington field are drilled from available locations, which are limited, given the high level of development in the Los Angeles-Long Beach area and applicable local regulations. Impacts of stimulation under Alternative 3 would be less than significant (Class III).

Under the Baldwin Hills Community Standards, Inglewood Oil and Gas Field would minimize impacts and be required to meet certain standards. This would encourage the consolidation of wells if this would achieve the same level of resource recover as wells scattered on individual pads. With implementation of the Community Standards requirements, impacts of stimulation under Alternative 3 would be less than significant (Class III).

In the Sespe Oil and Gas Field, the cost of preparing well pads in the rugged terrain encourages the development of multiple wells from single pads. Likewise, the topography constrains the ability to create new access roads. As a result, wells have tended to be clustered. In addition, restrictions on surface development on federal lands within the field have encouraged the use of directional drilling to access resources. This is expected to be the situation going into the future as well. Therefore, this alternative is likely to have little effect on how the field is developed and maintained, since the range of alternative approaches is limited by existing land use constraints, ownership, and topography. Impacts of stimulation under Alternative 3 would be less than significant (Class III).

### 12.4.1.4    Impact Significance Summary

Under Alternative 3, similar potential impacts similar to those identified for the project would occur to visual resources at existing fields. Consolidation of wells on fewer pads in new fields would reduce the amount of ground disturbance, but industrial visual elements would still be introduced into the landscape. The significance of the changes in the visual landscape would depend on the location of the field and the vantage points from which it would be visible. These can be determined only after a field is discovered and development plans prepared. Therefore, the same mitigation measures as recommended for the project would apply to Alternative 3.

Case 2:26-cv-05242-SVW-SSC     Document 12     Filed 05/14/26     Page 347 of 689   Page ID #:5294

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from projects not involving well stimulation treatment, these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.2    Agriculture and Forestry Resources

### 12.4.2.1    Introduction

This section provides an evaluation of the potential impacts to agriculture and forestry resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agriculture and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agriculture and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agriculture and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

~~Under this alternative the project standards for resource protection (see EIR Section 7.5) would not be implemented, which would result in greater indirect impacts on agricultural and forestry resources (Impact AGF-5, Directly or indirectly impair the use of agricultural land or forest land). Without the Water Recycling Standards, there would be an increase in competition for agricultural water supplies, because less water would be recycled. In addition, the potential for contamination of agricultural water supplies would be increased without implementation the Surface Water Protection Standards and Groundwater Protection Standards.~~

### 12.4.2.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 3 would apply primarily to areas outside of existing oil and gas fields and their buffers, with the goal of reducing the amount of land used for drilling in new areas opened by well stimulation techniques. Therefore, Alternative 3 would reduce overall impacts on agricultural and forestry resources. There would be reduced impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments by reducing the extent of disturbance and the amount of land occupied.

Although overall impacts would be reduced, on a site-specific basic there could still be the following potential impacts to agriculture and forest land if either is present at the location of a new well pad:

- **Impact AGF-1.** Convert Prime Farmland, Unique Farmland, or Farmland of statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use

- **Impact AGF-2.** Conflict with existing zoning for agricultural use or with Williamson Act contracts

- **Impact AGF-3.** Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production

- **Impact AGF-4.** Result in the loss of forest land or conversion of forest land to non-forest use

- **Impact AGF-5.** Directly or indirectly impair the use of agricultural land or forest land

As explained in EIR Section 10.2 (Agriculture and Forestry Resources), implementation of the mitigation measures below or equally or more stringent measures by the local Lead Agency would reduce all Agriculture and Forestry Resources impacts to a less than significant level (Class II). While impacts under the project and Alternative 3 would be Class II, they would be somewhat less severe under Alternative 3 because well pad consolidation would result in less land disturbance.

**MM AGF-1a**    **Minimize Impacts to Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-1b**    **Develop an Agricultural Resources Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-1c**    **Compensate for Loss of Important Farmland.** (Full text in EIR Section 10.2.5.)

**MM AGF-4a**    **Minimize Impacts to Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AGF-4b**    **Develop a Forest Land Protection Plan.** (Full text in EIR Section 10.2.5.)

**MM AGF-4c**    **Compensate for Loss of Forest Land.** (Full text in EIR Section 10.2.5.)

**MM AQ-2c**    **Reduce Emissions from Dust-Causing Activities.** (Full text in EIR Section 10.3.5.)

**MM BIOT-2a**    **Prevent Hazards to Fish and Wildlife.** (Full text in EIR Section 10.4.5.)

**MM HAZ-1a**    **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~. (Full text in EIR Section 10.13.5.)

**MM GW-4b**    **Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments**~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~. (Full text in EIR Section 10.14.5.)

### 12.4.2.3    Programmatic Level Analysis of Specific Oil and Gas Fields

The Well Pad Consolidation Alternative would mainly reduce impacts outside of existing fields. However, it could be used in existing fields and their buffers. Project-level impacts would be essentially the same as discussed in EIR Section 11.2 (Agriculture and Forestry Resources).

***Wilmington Oil and Gas Field***

There would be no impacts under this alternative or under the project because there is no forested land or designated Farmland within the Wilmington Oil and Gas Field (Class IV).

***Inglewood Oil and Gas Field***

The Inglewood Oil and Gas Field does not contain any mapped farmland so no direct or indirect impacts would occur to agriculture (Impacts AGR-1 and AGF-2 [Class IV]). Likewise, The Inglewood Oil and Gas Field is not zoned for forest land or timberland, therefore, Impact AGF-3 would not occur (Class IV).

Because the Inglewood Oil and Gas Field is an existing field, it is anticipated that most future drilling would use existing roads and pads. However, there are 7.6 acres of forest land within a 0.25-mile buffer surrounding the Inglewood field. Impacts associated with stimulation activities for the Inglewood Oil and

Gas Field for Alternative 3 would be the same as those described in EIR Section 10.2 (Agriculture and Forestry Resources) for Impacts AGF-4 (Result in the loss of forest land or conversion of forest land to non-forest use) and AGF-5 (Directly or indirectly impair the use of agricultural land or forest land). Implementation of Mitigation Measures AGF-4a, AGF-4b, AGF-4c,AQ-2c, and BIO2a would reduce the majority of potential environmental impacts, including conversion of forest land to a non-forest use, to a less than significant level through resource protection measures and compensation (Class II).

***Sespe Oil and Gas Field***

The Well Pad Consolidation Alternative would not substantially reduce impacts on agricultural and forestry resources within the Sespe Oil and Gas Field. Although it is anticipated that most future drilling would use existing roads and pads, there would be impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments. There would also be potential impacts on agricultural water quality or water supplies. See EIR Section 11.2 for a detailed discussion (Agriculture and Forestry Resources).

### 12.4.2.4    Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), these mitigation measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.3    Air Quality

### 12.4.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.3.2    Programmatic Level Analysis of Impacts and Mitigation Measures

| **Impact AQ-1** | **Conflict with or obstruct implementation of an applicable air quality plan** |
|---|---|

| **Impact AQ-2** | **Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation** |
|---|---|

| **Impact AQ-3** | **Expose sensitive receptors to substantial pollutant concentrations** |
|---|---|

| Impact AQ-4 | Create objectionable odors affecting a substantial number of people |
|---|---|

This alternative would restrict future oil and gas activity in certain areas and would facilitate sharing of ancillary infrastructure, like access roads, to minimize ground disturbance. The Well Pad Consolidation Alternative would not limit the amount of well stimulation in the future, but would try to minimize surface impacts by minimizing the number of separate drilling pads needed to conduct multiple drilling operations. Therefore, the intensification of traditional drilling and the importation of oil expected under Alternatives 1 and 2 would not occur under this alternative.

Because using existing infrastructure where possible and minimizing ground disturbance would avoid some sources of dust and other emissions, emissions would occur at similar or slightly reduced levels when compared with the project. Emissions from oil and gas activity could occur at levels exceeding the forecasts of air quality plans, as they would with the project, which may cause a potential conflict with local air quality plans.

The levels of criteria air pollutant emissions caused by equipment and sources typical of well stimulation treatments, hauling product by truck, and new well drilling would be similar to those described for the project and may exceed general mass-based emission thresholds of a local air district. This alternative would retain the potential to expose sensitive receptors to substantial pollutant concentrations and create objectionable odors as with the project. Although some sources of emissions may be avoided, each of the air quality impacts would be as described for the project, and the mitigation identified for the project (EIR Section 10.3.5) would be applicable.

### 12.4.3.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 3, these existing fields would be subject to the same potential impacts and mitigation measures as described for programmatic level analyses of the project (EIR Section 11.3.5). Emissions associated with existing well stimulation treatments at the Wilmington and Sespe would occur at a similar or slightly reduced level and would be within the level of activity assumed by the air quality plan. New emissions at the Inglewood Oil and Gas Field under this alternative would be subject to the same potential air quality impacts and mitigation measures as described for the project (EIR Section 11.3.5). Because each new well stimulation treatment operation creates "new" emissions, which could be potentially significant, mitigation would be necessary. Although Impact AQ-1 would be a Class III: Less Than Significant Impact, the remaining air quality impacts would occur as shown in EIR Section 10.3.5 (Impacts Common to All Study Regions). Mitigation measures identified for Impact AQ-2, Impact AQ-3, and Impact AQ-4 would be applicable within each field, and the resulting impacts after implementing mitigation would be significant and unavoidable (Class I).

### 12.4.3.4    Impact Significance Summary

Although some emissions related to well stimulation treatments would be avoided under Alternative 3, emissions from oil and gas activity would occur at levels comparable to those of the project. Each of the air quality impacts due to well stimulation treatments would be as described for the project. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.3 for air quality effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.4    Biological Resources: Terrestrial Environment

### 12.4.4.1    Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources: Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources–Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected environment for terrestrial biology (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, compared to the project, there would be the potential for an increase in oil and gas development and associated well stimulation in biologically sensitive areas, slightly greater habitat loss without setbacks from perennial surface water, an increase in water usage that could affect fish and wildlife habitat (due to less water recycling), and an increase in the potential for contamination of water supplies that could affect biological resources.~~

### 12.4.4.2    Programmatic Level Analysis of the Project

Alternative 3, the Well Pad Consolidation Alternative, would generally reduce overall impacts to terrestrial biological resources, but the actual reduction cannot be quantified. Alternative 3 would reduce and consolidate overall acreage of surface disturbance from well stimulation technology. This would reduce impacts to native vegetation and habitat, jurisdictional waters of the State and waters of the U.S., and special-status plants, fish, and wildlife using that habitat or surrounding areas. Well pad consolidation also would generally reduce impacts to fish and wildlife movement and biological connectivity by reducing the number of disturbed areas, although individual disturbance sites may be larger.

The impacts to terrestrial biological resources under Alternative 3 would be reduced in overall extent, but the impacts themselves, and where they would occur, would be similar to those described in EIR Sections 10.4 and 11.4. Depending on specific locations of future well stimulation activities, even with these activities located on consolidated well pads, the potential impacts to biological resources may range from Class I (significant and unavoidable) to Class III (less than significant). Due to the unknown locations of future well stimulation activities, this analysis presumes the "reasonable worst case" statewide impacts of well stimulation, which generally are Class I or Class II. However, Alternative 3 could substantially reduce the expected overall impacts of well stimulation activities statewide, by consolidating those activities.

Under Alternative 3, impacts to biological resources may be significant and unavoidable (Class I). This would apply to all the biological resources impact criteria BIOT-1 through BIOT-6 (addressing impacts to plants, fish, and wildlife and their habitats and natural communities) and BIOT-10 (greenhouse gas effects and consequent impacts to biological resources), below. In contrast, Impacts BIOT-8 and BIOT-9 (addressing conflicts with conservation policies and planning) are Class II impacts under the this alternative (and under the project).

Mitigation Measures BIOT-1a through BIOT-9a would reduce these impacts, but some impacts may remain significant even after mitigation. <u>Mitigation Measures GW-1a, GW-1b, GW-4a, GW-4b, SWR-1a, SWR-2a and SWR-3a</u> ~~Additional mitigation measures~~ or other conditions may be required under other regulatory programs including but not limited to CESA, ESA, state and federal regulation of waters of the State and waters of the U.S. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.4 for effects on terrestrial biological resources would have to be adapted to project approvals other than well stimulation treatment permits.

### 12.4.4.3     Programmatic Level Analysis of Specific Oil and Gas Fields

Although the Well Pad Consolidation Alternative would be primarily aimed at reducing surface impacts in new oil and gas fields outside existing fields, the Alternative could also reduce the footprints of future well drilling and well stimulation treatment operations in the Wilmington, Inglewood, and Sespe Oil and Gas Fields. The actual extent of reduction cannot be quantified. In qualitative terms, the potential loss or degradation of terrestrial biological resources would be as described in EIR Section 11.4, and would be dependent on season and location of any particular production activity (i.e., site preparation, drilling, and ancillary activities), and generally may range from Class I to Class III. The likely extent of oil and gas production in biologically sensitive areas would probably be reduced under Alternative 3, but the impacts themselves, and where they occur, would be similar to those described in EIR Section 11.4. The mitigation measures in EIR Section 11.4 would be applicable to these well-stimulation treatment projects, and could be adapted to projects directly involving exploration and drilling rather than well stimulation. While the extent of impacts may be reduced, the categories for each biological resource impact within the Wilmington, Inglewood, and Sespe Oil and Gas Fields would be unchanged from the project, including several that would remain Class I for the presumed "reasonable worst case." Potential "reasonable worst-case" impacts to biological resources would be Class I for Impacts BIOT-1 through BIOT-6 and BIOT-7 (Sespe field only); Class II for Impacts BIOT-8 and BIOT-9; and Class III for Impacts BIOT-7 (for the Wilmington and Inglewood fields) and BIOT-10 (as they would be under the project).

### 12.4.4.4     Impact Significance Summary

Under Alternative 3 (Well Pad Consolidation), impacts to biological resources would generally be reduced compared with the project. However, the magnitude of reduced impacts cannot be determined, so significance conclusions would remain the same as those for the project.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.4 for effects on terrestrial biological resources would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.5     Biological Resources: Coastal and Marine Environment

Alternative 3 (Well Pad Consolidation) does not apply to coastal and marine biological resources. Impacts would be the same as those of the project.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.4.6    Coastal Processes and Marine Water Quality

Alternative 3 (Well Pad Consolidation) does not apply to coastal processes and marine water quality. Impacts would be the same as those of the project.

## 12.4.7    Commercial and Recreational Fishing

Alternative 3 (Well Pad Consolidation) does not apply to commercial and recreational fishing. Impacts would be the same as those of the project.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.4.8    Cultural Resources

### 12.4.8.1    Introduction

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.8.2    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impacts are addressed:

■ **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

■ **Impact CUL-2:** Affect prehistoric resources

■ **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

■ **Impact CUL-4:** Affect cultural landscapes

Under Alternative 3, the geographic extent of impacts to cultural resources would be substantially lessened in comparison to the project, and the risk of adverse impacts to cultural resources would be correspondingly reduced. At a programmatic level of analysis, it is not possible to know precisely the location, extent and particular characteristics of potential impacts to these resources.

Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would reduce these effects but cannot guarantee they would be entirely avoided. Therefore, cultural resources impacts would remain significant and unavoidable (Class I). Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.8 for cultural resource effects would have to be adapted to project approvals other than well stimulation treatment permits.

The area of disturbance associated with Alternative 3 would be smaller than that of the project, including areas that are likely to be sensitive for cultural resources. ~~However, Alternative 3 does not incorporate the project standards for Resource Protection (see EIR Section 7.5 (Description of the Project, project standards for Resource Protection)) that restrict well stimulation activities from operating near surface water or critical habitats. Thus, while Alternative 3 would likely impact a smaller number of cultural resources, it would impact a larger number of other types of cultural resources associated with the project's protected areas (see Appendix F).~~

### 12.4.8.3    Programmatic Level Analysis of Specific Oil and Gas Fields

*Wilmington, Inglewood, and Sespe Oil and Gas Fields*

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Impacts within fields would be the same as what is described in EIR Section 11.8 (Cultural Resources). Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would likely reduce these effects to less than significant but cannot guarantee they would be entirely avoided. Therefore, impacts to cultural resources are considered significant and unavoidable (Class I).

### 12.4.8.4    Impact Significance Summary

Alternative 3 would reduce the potential impacts to cultural resources in all study regions because the overall footprint of well stimulation disturbances would be reduced in comparison to the project. Implementation of Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) and EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would reduce these effects, but cannot guarantee they would be entirely avoided. Potential impacts are therefore considered significant and unavoidable (Class I).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.9    Paleontological Resources

### 12.4.9.1    Introduction

This section provides an evaluation of the potential impacts to paleontological resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for relevant State, federal, and local regulations and standards (as Applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.9.2    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impact is addressed:

Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

■ **Impact PALEO-1:** Destroy or disturb surface or near-surface significant paleontological resources

Table 10.9-8 in EIR Section 10.9 provides a summary table of the geologic units in each study region that have the potential to bear significant paleontological resources. Alternative 3 reduces the overall amount of ground disturbing activities that could result in Class II impacts to paleontological resources.

The Well Pad Consolidation Alternative would reduce the amount of land used for drilling in new areas of the State that could be developed with the advancement of new well stimulation technologies. This alternative would reduce the overall amount of new ground disturbance in a number of ways, including setting limitations on the width of new access roads to no more than 25 feet, utilizing multi-well pads, and using existing infrastructure such as existing access roads. Therefore, the geographic extent of potential impacts to paleontological resources would be substantially lessened in comparison to the project, and thus the risk of adverse impacts would be correspondingly reduced. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 Paleontological Resources, Impact Analysis and Mitigation Measures) would be expected to reduce Impact PALEO-1 to less than significant (Class II) because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery. ~~However, in those areas where earth disturbing activities could occur, Alternative 3 would not provide for the project's standards for resource protection, and thus would be expected to result in a greater overall number of impacts to paleontological resources in comparison to the project. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.9 for paleontological effects would have to be adapted to project approvals other than well stimulation treatment permits.~~

### 12.4.9.3    Programmatic Level Analysis of Specific Oil and Gas Fields

*Wilmington and Sespe Oil and Gas Fields*

Portions of the Wilmington and Sespe Oil and Gas Fields have paleontological resources potential (i.e., sensitivity) ranging from low to high (Wilmington) and very high (Sespe) and the likelihood of impacting scientifically significant vertebrate fossils is high. Because the Wilmington and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. However, this is an assumption of the programmatic level analysis for these two fields. Therefore, potential impacts within the fields would be the same as what is described in EIR Section 11.9 (Paleontological Resources). Potential impacts would be mitigable to a level of less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures).

*Inglewood Oil and Gas Field*

Because the Inglewood Oil and Gas Field is an existing field, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Impacts within the field would be the same as what is described in EIR Section 10.9 (Paleontological Resources). Potential impacts would be mitigable to a level of less than significant (Class II) with implementation of

Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures).

~~Within these three fields, the Well Pad Consolidation Alternative could result in greater earth disturbing activities in comparison to the project because no standards for resource protection would be implemented. Therefore, Alternative 3 would have the potential to disturb a greater overall number of paleontological resources in comparison to the project.~~

### 12.4.9.4    Impact Significance Summary

At a programmatic level of analysis, the Well Pad Consolidation Alternative would reduce the potential impacts to paleontological resources in all study regions because the overall construction footprint associated with well stimulation treatments would be reduced when compared to the project. However, any new ground disturbances related to future oil and gas well stimulation treatments that would result in adverse impacts to paleontological resources would be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as defined in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures). Site-specific impacts would also be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h. ~~However, because no standards for resource protection would apply, in those areas where ground disturbing activities could occur under Alternative 3, the overall number of impacts to paleontological resources at a site-specific level would be anticipated to be greater in comparison to the project.~~

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.10   Environmental Justice

### 12.4.10.1   Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.10.2   Programmatic Level Analysis of the Project

Under Alternative 3, wells in areas outside of existing fields would be required to be consolidated on pads. This would reduce the amount of disturbance overall in areas outside of existing fields, but likely would have minimal effect in existing fields. The goal of Alternative 3 is to reduce the amount of land used for drilling in new areas opened up by well stimulation technologies by consolidating well sites. Therefore, Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would

potentially become recoverable due to advances in well stimulation technologies, most notably within the Monterey Formation and plays.

When compared to the project, Alternative 3 has the potential for both increasing and decreasing environmental justice issues. While it would reduce the total area possibly developed, should the selected new concentrated development areas be located adjacent to disproportionate numbers of minority or low-income populations, environmental justice impacts would be increased. Because of this uncertainty, Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) is proposed for Alternative 3. The location of all future well stimulation is not known. Therefore, the potential for environmental justice impacts from well stimulation occurring remains, and Mitigation Measure EJ-1a would apply throughout all study regions, including existing fields. The implementation of Mitigation Measure EJ-1a would allow DOGGR and/or the local jurisdiction to track the locations of well stimulation applications and develop strategies to address environmental justice issues should the arise. Implementation of this measure, in conjunction with other mitigation measures identified in this EIR, would reduce the environmental justice impact, but the degree to which this would occur cannot be determined at a programmatic level. It would require data on specific well locations, their impacts, and the location of affected populations.

**MM EJ-1a        Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments.** (Full text in EIR Section 10.10.5.)

### 12.4.10.3  Programmatic Level Analysis of Specific Oil and Gas Fields

At Wilmington, Inglewood, and Sespe Oil and Gas Fields, the location of most well pads is established, so Alternative 3 would have little effect. However, given that the location of future well stimulations is unknown, the potential for environmental justice impacts from well stimulation occurring remains, and Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply. This would allow DOGGR or local authorities to consider what additional actions it may require or take. Implementation of this measure, in conjunction with other mitigation measures identified in this EIR, would reduce the environmental justice impact.

### 12.4.10.4  Impact Significance Summary

Alternative 3 has the potential for creating potential environmental justice issues should selected new well stimulation areas be clustered and located adjacent to disproportionate numbers of minority or low-income populations. Alternative 3 would require mitigation similar to Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply and would reduce the environmental justice impact. Where this measure would be imposed on projects that do not involve well stimulation treatment, the measure would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.11  Geology, Soils and Mineral Resources

### 12.4.11.1  Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 358 of 689   Page ID #:5305

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.11.2    Programmatic Level Analysis of the Project

This alternative would restrict future oil and gas activity in certain areas and would facilitate sharing of ancillary infrastructure, like access roads, to minimize ground disturbance. This alternative is similar to the project, but reduces ground disturbance and associated erosion and soil impacts.

Minimizing ground disturbance would reduce Impact GEO-2 (Result in substantial soil erosion or the loss of topsoil), Impact GEO-3 (Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse), and Impact GEO-4 (Be located on expansive soil creating substantial risks to life or property) because some of the soil erosion or unstable and expansive soils would not be impacted. However, the overall reduction of ground disturbance would not be such as to reduce these impacts beyond their current significance levels (Class II, Class II, and Class III respectively). This is because, even with an overall reduction of ground disturbance, the potential for soil erosion, unstable units, and expansive soils to result in impacts still occurs and would require mitigation to be reduced to less than significant (for Impacts GEO-2 and GEO-3).

All other impacts associated with geology, soils, and mineral resources would remain the same as with the project described in EIR Section 10.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures). Thus, GEO-1 is Class II, GEO-5 is Class IV, GEO-6 is Class III or Class I, and GEO-7 is Class III.

### 12.4.11.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Geology, soils, and mineral resources settings for Study Regions 1 and 2 are discussed in EIR Section 11.11.3. Impacts and mitigation measures are discussed in EIR Section 11.11.5.

***Study Region 1: Wilmington and Inglewood Oil and Gas Field and Study Region 2: Sespe Oil and Gas Field***

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would use existing roads and pads and would require minimal new ground disturbance, therefore negating the need for or benefit of consolidation. Impacts would be as described for the Programmatic Level Analysis, see EIR Section 11.11.5 (Geology, Soils, and Mineral Resources, Impact Analysis and Mitigation Measures).

### 12.4.11.4    Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where such measures would be imposed on projects that do not involve well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the measures would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.12   Greenhouse Gas Emissions

### 12.4.12.1   Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.12.2   Programmatic Level Analysis of Impacts and Mitigation Measures

This alternative would not involve a change in the amount of potential oil and gas production in California. California end users of oil and gas would continue to rely on the established supply as in the baseline. There would be no change in life-cycle GHG emissions of California's crude supply because the supply itself would not change. Each of the GHG impacts would be as described for the project (EIR Section 10.12.5). Mitigation identified for well stimulation treatments would apply, as recommended for the project.

### 12.4.12.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 3, well stimulation treatments would occur in the Wilmington and Sespe fields as expected under the project. Therefore, as described in EIR Section 11.12.5, GHG emissions associated with well stimulation treatments at Wilmington and Sespe would continue, and the extent of Impact GHG-1 is uncertain, ranging from a less than significant impact (Class III) to a significant, unavoidable impact (Class I). New well stimulation treatments at the Inglewood Oil and Gas Field would be subject to the same potential impacts (Class I) and would require the same mitigation measures as described for the project (EIR Section 11.12.5).

### 12.4.12.4   Impact Significance Summary

Some emissions related to well stimulation treatments would be limited by consolidating activities at well pads. However, each of the GHG impacts due to well stimulation treatments would be as described for the project. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.12 for effects related to greenhouse gas emissions would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.13   Hazards and Hazardous Materials

### 12.4.13.1   Introduction

This section provides an evaluation of the potential impacts to hazards and hazardous materials associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards

and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.13.2   Programmatic Level Analysis of the Project

The Well Pad Consolidation Alternative (Alternative 3) would apply primarily to areas outside of existing oil and gas fields and would require operators to have multiple wells on each well pad. Well pad consolidation may increase the number of horizontal wells, which could tend to consolidate hazardous chemical use to fewer sites, but increase the volume of this material at individual well pads. The key mitigation measure for hazards and hazardous materials impacts ~~is~~ involves preparation and implementation of a spill contingency plan, which, at DOGGR discretion, may include a requirement for the installation of a surface barrier between the ground and piping or flow lines that transmit pressurized well stimulation fluids (including hazardous materials). This mitigation measure covers equipment for which secondary containment is not currently required by existing regulations. Further, by being able to conduct multiple well stimulation activities from the same surface well pad, investments in permanent spill prevention systems such as a surface barrier (e.g., pavement) may be more cost effective and potentially more reliable than temporary barriers.

---

**Impact HAZ-1    Release hazardous materials into the environment from a spill or leak**

---

Alternative 3 would consolidate stimulation treatments to fewer, larger pads from which multiple wells would be drilled. This would occur in areas outside of existing fields. Alternative 3 may support investment in infrastructure to better contain hazardous substances.

However, hazards and hazardous materials impacts would remain potentially significant for well stimulation treatments even with pad consolidation. As discussed in EIR Section 10.13.5 (Hazards and Hazardous Materials, Impact Analysis and Mitigation Measures), it is difficult to anticipate the fate of the released chemicals in the environment because many individual chemical compounds within well stimulation fluids lack sufficient mobility and toxicity information. Available data indicate that many hydraulic fracturing chemical compounds are either highly soluble or miscible in water and/or have densities greater than water. Some chemicals may be transformed (degraded) by hydrolysis and, in some cases, degradation ("daughter") products are not known. Daughter products may be more hazardous than the parent chemicals.

Given these conditions, impacts from a spill or release could be significant. Therefore a <u>revised</u> mitigation measure is proposed.

**MM HAZ-1a**     <u>**Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**</u>~~**Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.**~~ (Full text in EIR Section 10.13.5.)

Revised Mitigation Measure HAZ-1a is recommended to be required at any well stimulation occurring inside or outside of an existing field. Additional discussion of the mitigation measure is found in Draft EIR Section 10.13.5.

Protective measures for prevention of spills or releases of hazardous materials are provided in both existing and proposed regulations. A summary of the key measures in the proposed SB 4 Well Stimulation Treatment Regulations is provided in EIR Section 10.13.5. Collectively, with implementation of revised MM HAZ-1a~~with inclusion of a barrier for all production facilities, regardless of the amount of time they are in place, and with~~ and surface water management, and implementation/enforcement of all of the existing and proposed regulations regarding the transport, handling, storage, conveyance, and management of hazardous materials, including the Spill Contingency Plan, which accounts for spills that may occur at pipes, valves, or supply lines, the impact of well stimulation materials on the environment in the event of a release, is considered less than significant with mitigation (Class II). Impact HAZ-1 is also Class II under the project, but Alternative 3 has a slight advantage by supporting investment in infrastructure that better contains hazardous substances.

### 12.4.13.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would use existing roads and pads and the overall number of well stimulation treatments within the fields would be the same as for the project. As summarized in EIR Section 11.13.10, impacts from hazards and hazardous materials associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate revised mitigation measures. In addition to the mitigation measure in the Programmatic Level Analysis, additional mitigation measures were added for onshore and offshore Wilmington, Inglewood, and Sespe Oil and Gas Fields, as summarized in Table 11.13-1. With mitigation, the impact under Alternative 3 would be less than significant (Class II).

### 12.4.13.4   Impact Significance Summary

Based on the programmatic level analysis of the project and programmatic level analysis of specific oil and gas fields, impacts from Alternative 3 are considered to be less than significant with mitigation (Class II).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the revised mitigation measures developed in EIR Section 10.13 for effects related to hazards and hazardous materials would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.14   Groundwater Resources

### 12.4.14.1   Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, fed-

eral, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative, which would result in greater potential for use of groundwater with no water recycling standards in place, and less protection of both groundwater resources as well as surface water resources that could recharge groundwater.~~

### 12.4.14.2   Programmatic Level Analysis of the Project

The Well Pad Consolidation Alternative would apply primarily to areas outside of existing oil and gas fields. This alternative would result in a preference for horizontal drilling to allow additional wells to be reached from one access point. As described in EIR Section 10.14.5, horizontal wells require more water for hydraulic fracturing than vertical wells, due to a larger number of stimulation stages per well. Therefore, this alternative may increase the quantity of water used for hydraulic fracturing. However, Alternative 3 impacts to groundwater quantity would also be mitigated through the <u>revised</u> mitigation measures associated with the project. Alternative 3 would not change the water quality impacts described in EIR Section 10.14.5. Groundwater quantity and quality impacts would be mitigated to a less than significant level by incorporating the <u>revised</u> mitigation measures identified below and summarized in Table 10.14-20.

Well pad consolidation could have some potential benefits for implementation of a mitigation measure proposed for preventing surface spills or leaks from impacting groundwater. The mitigation measure addresses equipment that is not currently included in the secondary containment regulations. By being able to conduct multiple well stimulation activities from the same surface well pad, investments in permanent spill prevention systems such as a surface barrier (e.g., pavement) may be more cost effective and potentially more reliable.

The impacts identified below (Impacts GW-1, GW-2, GW-3, GW-4, GW-5, GW-6, GW-7), with application of the indicated <u>revised</u> mitigation measures, would be reduced to a less than significant level for each impact (Class II) in all study regions. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits. The project would result in the same levels of impacts (Class II).

| Impact GW-1    Cause or contribute to overdraft conditions |
|---|

With implementation of these <u>revised</u> mitigation measures, Impact GW-1 would be reduced to a less than significant level (Class II). Impact GW-1 is also Class II under the project; however, Alternative 3 may result in more horizontal wells that require more groundwater than the project.

**MM GW-1a**     **Use Alternative Water Sources <u>to the Extent Feasible.</u>** (Full text in EIR Section 10.14.5.)

**MM GW-1b**     **<u>Minimize Groundwater</u>~~Prepare a Third-Party Technical Report to Analyze Overdraft~~ Impacts.** (Full text in EIR Section 10.14.5.)

| | |
|---|---|
| **Impact GW-2** | **Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water** |

Depending on geologic conditions, groundwater pumping could result in land subsidence. It could also interfere with nearby water wells, including lowering the water level in the well to a point that they no longer function as intended. These would be significant impacts, which would be addressed by the rec-ommended <u>revised</u> mitigation measure below. With implementation of this <u>revised</u> mitigation measure, Impact GW-2 would be reduced to a less than significant level (Class II). Impact GW-2 is also Class II under the project.

**MM GW-<u>1b</u>2a** <u>Minimize Groundwater Impacts</u>~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping.~~ (Full text in EIR Section 10.14.5.)

| | |
|---|---|
| **Impact GW-3** | **Adversely impact groundwater quality from surface spills or leaks during well stimulation** |

Well stimulation could result in a spill on the work site or a leak that could allow the stimulation fluids or material to reach the protected water zone under a site. This would be a significant impact. The <u>revised</u> mitigation measures proposed in Hazards and Hazardous Waste would address this impact. The full description of this mitigation measure is found in EIR Section 10.13.5. With implementation of this <u>revised</u> mitigation measure, Impact GW-3 would be reduced to a less than significant level (Class II). Impact GW-3 is also Class II under the project.

**MM HAZ-1a** **<u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Dis-charges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physi-cal Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~.** (Full text in EIR Section 10.13.5.)

| | |
|---|---|
| **Impact GW-4** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals** |

Some wells in existing oil and gas fields may have non-existent or ineffective well seals, particularly if they are old or were improperly abandoned. This situation could result in the migration of stimulation fluids including gas through these pathways into protected water. To address this significant impact, three <u>revised</u> mitigation measures are identified. With implementation of these <u>revised</u> mitigation mea-sures, Impact GW-4 would be reduced to a less than significant level (Class II). Impact GW-4 is also Class II under the project.

**MM GW-4a** **Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Mon-itor Wells during Well Stimulation.** (Full text in EIR Section 10.14.5.)

**MM GW-4b** **<u>Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimu-lation Treatments</u>~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~.** (Full text in EIR Section 10.14.5.)

**MM GW-4c** **Install Methane Sensors on Wells ~~in the ADSA~~<u>Subject to Well Stimulation Treatments</u>.** (Full text in EIR Section 10.14.5.)

| **Impact GW-5** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells** |
|---|---|

Some existing and abandoned wells in oil and gas fields may have damaged, non-existent, or ineffective well seals. This could create pathways for stimulation fluids injected in one well to migrate into Protected Water by way of the annular space in another well within the zone of influence of the stimulated well. This would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-5 would be reduced to a less than significant level (Class II). Impact GW-5 is also Class II under the project.

**MM GW-5a**    **Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

| **Impact GW-6** | **Improper disposal of flowback in injection wells could potentially impact groundwater quality** |
|---|---|

Class II injection wells are required under the UIC program regulations to have an isolating cement seal above the injection zone as well as a minimum 100-foot seal across the base of the fresh water zone. If injected flowback water migrates to Protected Water, this would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-6 would be reduced to a less than significant level (Class II). Impact GW-6 is also Class II under the project.

**MM GW-6a**    **Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~.** (Full text in EIR Section 10.14.5.)

| **Impact GW-7** | **Inability to identify specific impacts to groundwater quality from well stimulation activities** |
|---|---|

Many chemicals and compounds can be introduced to groundwater by various pathways. The origin of these materials is difficult to ascertain under many circumstances. Groundwater monitoring may identify a chemical or compound, but would be unable to identify its source. If well stimulation fluids reach Protected Water, this would be a significant impact. To ensure that stimulation fluids can be more readily distinguished from other compounds that may be naturally occurring or have been introduced into the groundwater, a revised mitigation measure is proposed to address this. With implementation of this revised mitigation measure, Impact GW-7 would be reduced to a less than significant level (Class II). Impact GW-7 is also Class II under the project.

**MM GW-7a**    **Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

### 12.4.14.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are already used for oil and gas drilling and well-stimulation, much of the required ancillary infrastructure addressed by this impact already exists and would be used for new oil wells and stimulation activities reducing the effectiveness of this alternative. The mitigation measures for onshore and offshore Wilmington, Inglewood, and Sespe Oil and Gas Fields are presented in EIR Section 11.14.5 and summarized on Table 11.14-5. With mitigation, the impact under Alternative 2 would be less than significant (Class II).

### 12.4.14.4  Impact Significance Summary

Revised ~~M~~mitigation measures proposed in the program-level analyses remain appropriate for the conditions associated with Alternative 3. With implementation of identified <u>revised</u> mitigation, these impacts would be reduced to less than significant (Class II).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding revised mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the revised mitigation measures developed in EIR Section 10.14 for groundwater effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.15  Surface Water Resources

### 12.4.15.1  Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, there would be a greater potential for use of surface water without water recycling standards in place, as well as an increase in potential impacts to waterbodies and streams without implementation of habitat protection standards or a buffer requirement from perennial waters.~~

As summarized in EIR Section 10.15.6, impacts from well stimulation treatments were determined to be potentially significant to surface water. Further analysis indicated that with appropriate mitigation measures the significant impacts could be mitigated to a less than significant level.

All of the water quality impacts described in EIR Section 10.15.4 would still occur, but the magnitude would be reduced due to the smaller construction area and fewer well pads. The reduced construction footprint would allow less opportunity for construction-related contaminants to reach surface waters. Flood hazard impacts would be the same as described in EIR Sections 10.15.4 and 10.15.4.1, but the potential would be reduced due to the smaller construction area and fewer well pads providing fewer opportunities for this impact to occur.

### 12.4.15.2  Programmatic Level Analysis of the Project

Under Alternative 3, consolidation of well pads would lead to less ground disturbance and would make it easier to manage impacts to surface water, as there would be fewer pads overall. Alternative 3 reduces the area of new wells and associated erosion and sedimentation impacts. Although the impacts would be reduced, because new wells and well stimulation would still occur, the same impacts as with the project would occur. The impacts are listed in EIR Section 12.2.15.2. Applicable mitigation measures would reduce the impacts to less than significant (Class II) as they would for the project. The applicable

mitigation measures are listed in EIR Section 12.2.15.2. Where such measures would be imposed on projects that do not involve well stimulation treatment, the measures would have to be adapted to project approvals other than well stimulation treatment permits.

### 12.4.15.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

As discussed in EIR Section 11.15.5 and summarized in EIR Section 11.15.6, impacts to surface water resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for Wilmington, Inglewood, and Sespe Oil and Gas Fields are the same as for the project. With implementation of these measures, the impact to surface water under Alternative 3 would be less than significant (Class II).

### 12.4.15.4   Impact Significance Summary

Based on the programmatic level analysis of surface water resources, impacts from Alternative 3 are considered to be the same at all existing oil and gas fields, less than significant with mitigation (Class II).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.3 for air quality effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.16   Land Use and Planning

### 12.4.16.1   Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.16 (Land Use and Planning). For the purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.16.2   Programmatic Level Analysis of Impacts and Mitigation Measures

The goal of Alternative 3 is to reduce the amount of land used for drilling and well stimulation in areas outside of existing fields. Alternative 3 applies primarily outside of existing oil and gas fields in areas where oil and gas could potentially become recoverable due to advances in well stimulation technologies, most notably within the boundary of the Monterey Formation and plays. This alternative would require developing multiple wells from a single pad rather than individual pads being used for one or two wells.

For Impact LU-1 (Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses), the consolidation of wells on fewer pads under Alternative 3 would result in a decreased potential for land disturbances in areas outside of existing oil and gas fields as compared to the project. Nonetheless, well stimulation activities could still result in disruptions to surrounding land uses. Section 1783.2 of the proposed permanent regulations explicitly define "Neighbor Notification" requirements, which include the radius for property owner notifications, the information that is to be provided, and the timing and methods of the notifications. Although the "Neighbor Notification" requirements would be effective at minimizing potential conflicts with existing land uses, because of the other resource-specific impacts that cannot be mitigation to a level of less than significant, significant impacts that can affect land uses would remain.

These impacts are from across a variety of resource impact topics, as analyzed in detail in EIR Sections 10.1 (Aesthetics), 10.3 (Air Quality), 10.13 (Hazards and Hazardous Materials), 10.17 (Noise and Vibration), 10.21 (Risk of Upset/Public and Worker Safety), and 10.22 (Transportation and Traffic).

Under Alternative 3, potential disruptions could affect a wide variety of land use settings, ranging from remote and undeveloped areas to rural areas to and suburban and highly urbanized areas. In comparison to the project, the consolidation required under Alternative 3 would reduce potential surface disturbances and related disruptions; however, some of the impacts associated with them cannot be mitigated to less than significant and would remain significant and unavoidable (Class I); therefore, their corresponding effects on land use and planning would be Class I.

For Impact LU-2 (Physically divide an established community), the Well Pad Consolidation Alternative would reduce future land disturbances associated with well stimulation and thus would be expected have less severe impacts in those areas where existing communities occur. ~~With application of Mitigation Measure LU-2a,~~ Impact LU-2 would be less than significant (Class I~~I~~I) for both the project and Alternative ~~2~~3. However, in comparison to the project, this impact would be less severe under Alternative 3 because well consolidation would be required under the alternative, but not required under the project.

**~~MM LU-2a      Ensure That Established and Planned Communities Are Not Divided.~~** ~~(Full text in EIR Section 10.16.5.)~~

Impact LU-3 addresses potential conflicts with applicable land use plans, policies, programs, ordinances and other regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. As noted in EIR Section 10.16 (Land Use and Planning), a consistency analysis of the activities associated with well stimulation treatments outside of existing oil and gas fields involves the review and assessment of applicable local agency plans, policies and regulations, which is not possible to complete at the statewide/programmatic level of analysis given the extensive number of jurisdictions affected, the extent of oil and gas regulations of each jurisdiction, the vast array of potential conditions that would be imposed on projects based on specific jurisdictions conditional use permit application processes, the fact that land use and zoning regulation implementation is the legal responsibility of local jurisdictions, and the fact that this EIR is required by law to be completed within a very limited time period that cannot accommodate such an extensive effort. Nonetheless, the impact analysis under the project found that the ~~information and~~ mitigation measures set forth in this EIR would reduce potential conflicts with any established, designated, or planned land use areas on federal, State, or locally regulated lands to a less than significant level (Class II). Alternative 3, to which all of the EIR's mitigation measures would apply, would be Class II as well.

### 12.4.16.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Although intended for well development outside of existing fields, the consolidation requirements of Alternative 3 could be used inside existing oil and gas fields. It is anticipated that most future drilling in existing fields would use existing pads and roads to the maximum extent feasible, thereby minimizing new ground disturbances. With increased use of directional drilling, development of multiple wells from a single pad is becoming increasingly common and used in existing fields where it is feasible and economically prudent. As the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing uses, impacts would be less than significant for Impacts LU-1 and LU-3 (Class III), and none for Impact LU-2 (Class IV) under Alternative 3.

### 12.4.16.4    Impact Significance Summary

At a programmatic level of analysis for the project, Alternative 3 (Well Pad Consolidation) would still result in significant and unavoidable impacts (Class I) related to Impact LU-1, less than significant with mitigation (II) for Impact LU-2, and less than significant impact (Class III) for Impact LU-3.

At a programmatic level of analysis for specific fields, the Well Pad Consolidation Alternative would result in less than significant impacts (Class III) for Impacts LU-1 and LU-3 and no impact (Class IV) for Impact LU-2.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.16 for land use effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.17    Noise and Vibration

### 12.4.17.1    Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3 and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.17.2    Programmatic Level Analysis of the Project

| Impact NOI-1 | Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels |
|---|---|

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 10.17. Consolidating multiple wells on individual pads under Alternative 3 could result in shorter mobilization and demobilization times. However, the duration of actual activity at the well pad would increase to accommodate the multiple number of wells. Consequently, duration of the noise impacts would increase as a result of simultaneous activity at each well pad.

Noise mitigation would be required, as with the project. In all regions the resulting impact would be less than significant with mitigation incorporated (Class II).

Impact NOI-2 would be less than significant (Class III).

**MM NOI-1a      Control Noise Levels near Sensitive Land Uses.** (Full text in EIR Section 10.17.5.)

| **Impact NOI-2    Cause exposure of persons to or generation of excessive groundborne vibration** |
| --- |

As with the project, Impact NOI-2 would be less than significant (Class III).

Although the duration of well stimulation on a well pad may increase, the noise and vibration levels and impacts would be the same as the project and Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

### 12.4.17.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Since this alternative includes well stimulation treatments, noise and vibration impacts will occur as described in EIR Section 11.17. Noise mitigation would be required.

*Wilmington Oil and Gas Field*

Although the duration of well stimulation on a well pad may increase, the noise levels and impacts would be the same as the project and Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

*Inglewood Oil and Gas Field*

Because the Inglewood field is adjacent to residential areas and other urban land uses including sensitive receptors, Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

*Sespe Oil and Gas Field*

Although the duration of well stimulation on a well pad may increase, the noise levels and impacts would be the same as the project and Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

### 12.4.17.4   Impact Significance Summary

Based on the programmatic level analysis of noise and vibration for the project and for specific oil and gas fields, impacts from Alternative 3 would be the same as under the project except at limited outside of existing oil and gas fields.

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.17 for noise and vibration effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.18   Population and Housing

### 12.4.18.1   Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for population and housing (as applicable at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.18.2   Programmatic Level Analysis of Impacts and Mitigation Measures

The goal of Alternative 3 is to use well consolidation to reduce the amount of land used for drilling in new areas that may be developed through the use of well stimulation technologies. Alternative 3 would apply primarily to areas outside of existing oil and gas fields and likely would have a minimal effect on the overall number of well stimulation treatments being performed.

Alternative 3 would require a similar number of new employees as the project. Alternative 3 has the potential to result in fewer, but somewhat larger, well pads to accommodate multiple wells. This would not appreciably affect the number of employees needed. Therefore, while some worker in-migration is expected to occur, population increases are expected to be less than significant (Impact POP-1 [Class III]), as described in EIR Section 10.18 (Population and Housing), with impacts being similar for the project and Alternative 3.

As with the project, it is unlikely that any residential relocation (Impact POP-2) would be associated with Alternative 3 that would necessitate construction of new housing. Therefore, any necessary relocations of housing or persons associated with Alternative 3 activities would be less than significant and would not necessitate the construction of new housing elsewhere (Class III), as with the project.

### 12.4.18.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would already use existing roads and pads, so Alternative 3 would be similar to the project. Likewise, the overall level of well stimulation treatments within the fields would be the same as for the project. Impacts would be similar to what is described in EIR Section 11.21 (Population and Housing).

While some in-migration is possible, any population increase would be nominal in comparison to the total population and planned growth of the communities serving the Wilmington, Inglewood, and Sespe fields. Less than significant population growth impacts would occur (Class III). There would be no expected need for housing displacement from well stimulations within the communities adjacent to the Wilmington, Inglewood, or Sespe fields under Alternative 3. No impacts related to housing displacement (Impact POP-2) would occur (Class IV).

### 12.4.18.4   Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion.

## 12.4.19   Public Services

### 12.4.19.1   Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.19.2   Programmatic Level Analysis of Impacts and Mitigation Measures

The goal of Alternative 3 is to reduce the amount of land used by consolidating well sites in new areas opened up by well stimulation technologies. Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would potentially become recoverable due to advances in well stimulation technologies and it would not affect the overall number of well stimulation treatments being performed.

The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels. As discussed within EIR Section 12.4.18 (Population and Housing), Alternative 3 has a small potential for increasing population in-migration impacts. Consolidation of wells does not reduce the number of wells or employees, and is not expected to alter the level of services required as compared to the project, which would not require consolidation.

Implementation of Mitigation Measure PUB-1a (Assess Public Service Ratios and Ensure Adequate Compensation) is proposed as part of Alternative 3 and would require DOGGR to coordinate with the applicable local land use agency to determine whether new well development and stimulations would place a burden on public services, and ensure that appropriate compensation is provided to the local agency through its local land use permit(s). With implementation of this measure, Impact PUB-1 (Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools) would be less than significant (Class II), which would be the same as the project.

**MM PUB-1a**      **Assess Public Service Ratios and Ensure Adequate Compensation.** (Full text in EIR Section 10.19.5.)

### 12.4.19.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would use existing roads and pads and the overall number of well stimulation treatments within the fields would be the same as for the project. Impacts would be the same as what is described in EIR Section 11.19 (Public Services). While some limited new demand to public services providers may occur from well stimulations within the fields (Impact PUB-1), any demand increases to public service providers is expected to be less than significant (Class III).

#### 12.4.19.4 Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.19 for public service effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.20 Recreation

#### 12.4.20.1 Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

~~Without implementation of project standards for resource protection under this alternative, oil and gas development and associated well stimulation may occur in open space areas and areas near water resources used for recreation.~~

#### 12.4.20.2 Programmatic Level Analysis of Impacts and Mitigation Measures

The goal of Alternative 3 is to reduce the amount of land used for drilling in new areas opened up by well stimulation technologies by consolidating well sites. Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would potentially become recoverable due to advances in well stimulation technologies, most notably within the boundaries of the Monterey Formation and its plays. However, this alternative would necessitate concentrating new wells together.

As stated in EIR Section 8.3.3, the Well Pad Consolidation Alternative would not limit the amount of well stimulation in the future. Therefore, Alternative 3 would likely result in the same level of well stimulation activities as discussed under the project. As such, well stimulation treatments would likely result in some minor growth from new employment; however, any in-migration from new workers would be nominal compared to the existing populations. Similarly, the increased use of existing recreational areas or facilities as a result of new employment for well stimulation treatments would be minimal when considering the numerous recreation opportunities within Study Regions 1 through 6, as shown in Figures 10.20.1 through 10.20-3.

As such, Impact REC-1 would be less than significant under Alternative 3 (Class III). Impact REC-1 is related to the increase in usage of recreation areas or facilities which would result in the physical deterioration of recreational resources.

Impact REC-2 addresses disruptions in designated recreation areas. For the purpose of this EIR, recreation areas are considered sensitive receptors as they tend to be areas where children are present, and depending on the available facilities, they can be used for intense physical activities. In addition, recrea-

tion users often value the recreation experience based on the quality of the surrounding (i.e., lack of industrial activities, natural spaces, low noise levels, high scenic quality, etc.). Potential disruptions to recreational resources are listed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures). Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would potentially become developed for oil and gas recovery due to advances in well stimulation technologies. The goal of Alternative 3 is to reduce the amount of land used for drilling in new areas. Therefore, in comparison to the project, Alternative 3 would decrease the potential for disturbances to recreation areas located outside of existing oil and gas fields.

Each of the potential disruption types is discussed in detail in the EIR Sections 10.1 (Aesthetics), 10.3 (Air Quality), 10.6 (Coastal Processes and Marine Water Quality), 10.7 (Commercial and Recreational Fishing), 10.13 (Hazards and Hazardous Materials), 10.15 (Surface Water Resources), 10.16 (Land Use and Planning), 10.17 (Noise and Vibration), 10.21 (Risk of Upset/Public and Worker Safety), and 10.22 (Transportation and Traffic). The mitigation measures provided in these sections would also effectively mitigate potential impacts to recreational resources to the maximum extent feasible.

Mitigation Measures REC-2a and REC-2b, as detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures) specifically address the coordination and notification requirements that would provide communities with advanced notice of potential disruptions to affected recreation areas. These notification measures are intended to help ensure the public can have sufficient warning in order to make other arrangements for their recreation activities. With implementation of these measures, Impact REC-2 would be less than significant under Alternative 3 (Class II). Under the project, Impact REC-2 is also Class II; however, as noted above, the potential for disturbances to recreation areas would decrease somewhat under Alternative 3 because somewhat less land would be disturbed.

### 12.4.20.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As stated in EIR Section 8.3.3, some of the consolidation requirements could be used inside existing oil and gas fields; however, it is anticipated that most future drilling in existing fields would use existing roads and pads to the maximum extent, thereby minimizing new ground disturbances and negating the need for or benefit of consolidation. As the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, Impacts REC-1 and REC-2 would be less than significant under Alternative 3 (Class III).

### 12.4.20.4   Impact Significance Summary

At a programmatic level of analysis, Alternative 3 would result in less than significant impacts (Class III) as related to Impact REC-1 and impacts that are mitigable to a level of less than significant (Class II) regarding Impact REC-2. At a project level of analysis, the Well Pad Consolidation Alternative would result in impacts that are less than significant (Class III).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.20 for recreational effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.21   Risk of Upset/Public and Worker Safety

### 12.4.21.1   Introduction

This section provides an evaluation of the potential impacts for risk of upset/public and worker safety associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.21.2   Programmatic Level Analysis of the Project

| Impact RSK-1 | Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases |
|---|---|

Under this alternative there would not be a reduction in well stimulation treatment activities. Therefore, the forecast number of accidents for Alternative 3 is the same as the project case.

Alternative 3 and the project case will have lower annual average projected crude oil imports compared to Alternatives 1 and 2, and imports of crude oil by rail will occur under Alternative 3 as with the project case. The number of accidents projected for this region is four accidents per year (approximately 100 over 25 years). The number of accidents is based on the train miles traveled, which is directly related to the volume of crude imported. Since volume of imported crude oil is approximately 25 percent of highest import case (Alternative 1, Table 10.21-16), the number of accidents is approximately 25 percent of those on that Table. Study regions that may be at slightly greater risk of a rail accident include Regions 1, 4, 5, and 6. Given the relatively very low number of derailments compared to the number of shipments of oil, the occurrence of a major accident is expected to be very low.

Regardless, this impact is considered a significant and unavoidable impact that could not be mitigated to a level of less than significant through the application of feasible mitigation measures. Implementation of recommended Mitigation Measures RSK-1a through RSK-1h would be appropriate to decrease the frequency of crude oil transport and reasonably foreseeable accidents and releases. Because DOGGR cannot require other agencies to implement the suggested mitigations, Impact RSK-1 would be a Class I: Significant and Unavoidable Impact.

**MM RSK-1a**     **Increase the Number of CPUC Rail Inspectors.** (Full text in EIR Section 10.21.5.)

**MM RSK-1b**     **Expedite the Phase-out of Older Tank Cars.** (Full text in EIR Section 10.21.5.)

**MM RSK-1c**     **Implement New Accident Prevention Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1d**     **Monitor and Enforce New Speed Limits.** (Full text in EIR Section 10.21.5.)

**MM RSK-1e**     **Monitor the Implementation of Trackside Safety Technology.** (Full text in EIR Section 10.21.5.)

**MM RSK-1f**      **Improve Emergency Preparedness and Response Programs.** (Full text in EIR Section 10.21.5.)

**MM RSK-1g**      **Provide Real-Time Shipment Information to Emergency Responders.** (Full text in EIR Section 10.21.5.)

**MM RSK-1h**      **Provide Additional Accident and Injury Data to the State.** (Full text in EIR Section 10.21.5.)

### 12.4.21.3   Programmatic Level Analysis of Specific Oil and Gas Fields

**Wilmington Oil and Gas Field.** The recordable injury rate from well stimulation treatment and drilling activities is expected to be similar to that for the project. No impacts from increased rail traffic or truck traffic are anticipated for Wilmington. The impacts and mitigation identified for the project would apply within Wilmington.

**Inglewood Oil and Gas Field.** The recordable injury rate from well stimulation treatment and drilling activities is expected to be similar to that for the project. No impacts from increased rail traffic or truck traffic are anticipated for Inglewood. The impacts and mitigation identified for the project would apply within Inglewood.

**Sespe Oil and Gas Field.** The recordable injury rate from well stimulation treatment and drilling activities is expected to be similar to that for the project. No impacts from increased rail traffic or truck traffic are anticipated for Sespe. The impacts and mitigation identified for the project would apply within Sespe.

### 12.4.21.4   Impact Significance Summary

Overall, Alternative 3 is projected to have a truck accident rate and an oil worker injury rate similar to those for the project.

The crude oil rail accident rate for Alternative 3 is approximately four per year (100 over 25 years), as with the project case. In addition, there may be accidents from proppant deliveries by rail at a rate of 16 over 25 years, as with the project case. The volume of proppant is proportional to the number of wells hydraulically fractured, which in turn will require more rail cars. The maximum number of accidents corresponding to the highest volume of proppant is shown in Table 10.21-15. Since the number of wells for Alternative 3 is approximately 10 percent less than that of the maximum case, the number of accidents is approximately 10 percent less as well. The Regions at higher risk for accidents are Regions 1 and 4, with a lesser potential in Regions 5 and 6.

Because this alternative does not reduce the level of well stimulation treatment activities, from a risk standpoint, there is no substantial difference between this alternative and the project case. Therefore, the degree of risk of upset for Alternative 3 is the same as the project case.

Impacts RSK-2 through RSK-7 are the same as under the project. Thus, Impact~~s RSK-2 and~~ RSK-6 ~~are~~is Class I. Impacts RSK-2~~3~~, RSK-4, RSK-5 and RSK-7 are Class II, and impact RSK-3 is Class III.

## 12.4.22   Transportation and Traffic

### 12.4.22.1   Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic

evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.22.2   Programmatic Level Analysis of the Project

The Well Pad Consolidation Alternative would reduce the amount of land used for drilling in the new areas opened up by well stimulation technologies. This alternative would require field developers to use well pads and access roads more efficiently, thus reducing the distance vehicles would need to travel between sites. The overall number of trips generated by Well Pad Consolidation Alternative would be similar to those of the project, though the average trip would be shorter, and therefore impacts to transportation and traffic would be reduced compared to the project.

However, with consolidation of sites, traffic would be more concentrated in certain areas, which could potentially affect the level of service on local roadways (LOS), damage roadways, and increase the potential for traffic hazards. As with the project (see EIR Section 10.22, Transportation and Traffic), in areas of new oil and gas well development and stimulation outside of existing oil and gas fields, Mitigation Measure TR-1a is recommended to ensure that any roadways that may exceed an established LOS standard as a result of the project would be identified and traffic controls would be implemented through a Traffic Plan (Impact TR-1). Implementation of Mitigation Measure TR-1a would reduce Impact TR-1 to less than significant (Class II).

Implementation of Mitigation Measure TR-2a (Repair Roadway Damage) is recommended to ensure that roadways would be restored to original or near-original condition and undertaken in a timely manner, in consultation with and to the satisfaction of the city or county with jurisdiction over affected roadways, the local transportation agency, and/or Caltrans, as appropriate (Impact TR-2 [Class II]).

Implementation of the measures in the Traffic Plan required by Mitigation Measure TR-1a would also ensure that project activities would not impact access or movement of emergency service vehicles (Impact TR-6) or create traffic safety hazards for pedestrians, bicyclists or other vehicles (Impact TR-3 [Class II]).

However, the potential for traffic hazards related to the transport and potential spill of hazardous materials would be significant and unmitigable, even with implementation of Mitigation Measure TR-4a, which ensures that truck drivers are aware of the emergency spill procedures (Class I).

On a site-specific basis, the drilling of new wells, especially deeper wells to be stimulated, may trigger FAA air space hazard notification requirements for the drill rig if located in the vicinity of an airport. Assuming the owner/operator would submit Form 7460-1, as necessary, and comply with any FAA-required hazard markers or lighting, Impact TR-5 (Change air traffic patterns) would be less than significant (Class III).

**MM TR-1a**      **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

**MM TR-2a**      **Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

**MM TR-4a**      **Know Spill Prevention Measures.** (Full text in EIR Section 10.22.5.)

### 12.4.22.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling would already use existing roads and pads. The overall level of well stimulation treatments within the fields would be the same as for the project, with similar number of truck trips per stimulation project, but the average trip would be shorter. Impacts would be similar but reduced compared to what is described in EIR Section 11.22 (Transportation and Traffic).

### 12.4.22.4   Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.22 for transportation-related effects would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.23   Utilities and Service Systems

### 12.4.23.1   Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 3. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.4.23.2   Programmatic Level Analysis of the Project

The goal of Alternative 3 is to reduce the amount of land used per well by consolidating wells in new areas opened up by well stimulation technologies to fewer pads. Therefore, Alternative 3 would apply primarily to areas outside of existing oil and gas fields that would potentially become developed as oil and gas fields through use of well stimulation technologies. The extension of utilities to such areas might in some instances be necessary in order for oil and gas production to proceed. Alternative 3 would not affect the overall number of well stimulation treatments being performed or the number of wells drilled, but would co-locate more wells at individual sites. Wells developed at such sites would use directional drilling (as compared to straight vertical drilling) to reach target areas. As a result, well drilling and stimulation sites might be larger than conventional sites, but there would be fewer of them.

Four impacts were identified for utilities and services:

- **Impact UTL-1:** Adversely affect utilities and service systems due to population growth from project-related development

- **Impact UTL-2:** Require new or expanded electrical or natural gas infrastructure

- **Impact UTL-3:** Exceed existing municipal wastewater treatment provider capacities

- **Impact UTL-4:** Exceed permitted solid waste capacity of landfills

The need for new or expanded utilities and service systems is strongly influenced by population levels. As discussed within EIR Section 12.4.18 (Population and Housing), Alternative 3 has a similar potential as the project for increasing population in-migration impacts because, while the alternative would encourage concentrating well sites together as compared to the project, it would not reduce the number of wells or stimulations. In general, minor population growth from any new employment that might occur would have a less than significant impacts to utility and service systems, including their existing and projected capacities (Impact UTL-1).

Alternative 3 reduces somewhat new electrical or gas infrastructure required to serve new wells and fields created through well stimulation outside of existing oil and gas field boundaries by consolidating wells nearer to one another. This would allow new wells to share any new natural gas and electricity connections required to serve the consolidated pad, thus reducing potential environmental impacts from constructing new infrastructure. This is a decrease in potential impacts when compared to the project. Outside of existing fields, Alternative 3 would reduce potential impacts from electrical and natural gas interconnections by consolidating new well sites. This would allow for consolidated wells to use the same primary interconnection lines, though in some instances facilities might have to be extended to new oil and gas production areas, subject to rules favoring the use of existing rights-of-way and requiring the minimization of environmental impacts. Impacts would be less than significant (Impact UTL-2). The electricity providers are assumed to have sufficient capacity to serve any well stimulation needs. Consolidating new wells that would be developed outside of existing oil and gas fields would not increase potential impacts from wastewater and solid waste generation when compared to the project as this alternative would only result in fewer but larger pads in a new field. Impacts would be potentially significant but less than significant with mitigation (Impacts UTL-3 and UTL-4).

To ensure all utilities and service systems would have adequate capacities under Alternative 3, Mitigation Measures UTL-3a and UTL-4a are also proposed for Alternative 3. With the inclusion of these measures, impacts UTL-1 and UTL-2 would be Class III and impacts UTL-3 and UTL-4 would be Class II. Impacts on utilities and service systems would be similar for both the project and Alternative 3, because the number of wells drilled and stimulated would be similar.

**MM UTL-3a**    **Assess Wastewater Quality and Ensure Adequate Compensation to Municipal and Private Wastewater Treatment Plants.** (Full text in EIR Section 10.23.5.)

**MM UTL-4a**    **Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Compensation to Municipal and Private Solid Waste Facilities.** (Full text in in EIR Section 10.23.5.)

### 12.4.23.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling here would use existing roads and pads, and there would be little opportunity for well consolidation given the developed nature of the existing fields. Therefore, Alternative 3 would have minimal effect on the overall level of drilling and well stimulation treatments as compared to the project and impacts related to utilities and service systems (Impacts UTL-1 through UTL-4) would be the same for these three fields, as described in EIR Section 11.23 (Utilities and Service Systems). Impacts related to utilities and service systems at the fields would be less than significant (Class III) for Impacts UTL-1 and UTL-2 and less than significant with mitigation (Class II) for Impacts UTL-3 and UTL-4.

### 12.4.23.4   Impact Significance Summary

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures. Where impacts would result from project approvals not involving well

stimulation treatment (e.g., authorizations for oil and gas drilling operations on consolidated well pads outside of existing oil and gas fields), the mitigation measures developed in EIR Section 10.23 for effects relating to utilities and service systems would have to be adapted to project approvals other than well stimulation treatment permits.

## 12.4.24  Impact Summary Table for Alternative 3

Table 12.4.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 3.

### Programmatic Level Analysis of the Project

Under the Well Pad Consolidation Alternative, the consolidation of wells would generally reduce ground disturbance in comparison to the project. The level of oil and gas production in the State would remain the same as for the project.

When compared to the project, Alternative 3 would reduce impacts to geology, soils and mineral resources, agriculture and forestry resources, cultural resources, paleontological resources, terrestrial biological resources, hazards and hazardous materials, groundwater resources, surface water resources, land use and planning, recreation, and utilities and service systems.

Due to the consolidation of well sites, which would concentrate certain impacts into a smaller geographic area, Alternative 3 would not be preferred to the project aesthetics, environmental justice, noise and vibration, population and housing, public services or transportation and traffic.

Alternative 3 would be similar to the project for all other issue areas and it would not create any new significant and unmitigable (Class I) impacts.

### Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 3 would be similar to the project, but would reduce impacts to specific resources. Ground disturbance and associated impacts would be reduced through well consolidation under Alternative 3; however, this impact is not expected to be substantial because existing fields already have disturbed well pad areas and established access roads and water and oil and gas production infrastructure in place.

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AESTHETICS** | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | New well pad: Class I or Class II; Existing well pad: Class III AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-2. Substantially alter or damage scenic resources. | New well pad: Class I or Class II; Existing well pad: Class III AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors | Same as those listed in Table 11.1-1 |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | New well pad Class I or Class II; Existing well pad: Class III AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-4. Create new sources of substantial light and glare. | New well pad: Class I or Class II; Existing well pad: Class III AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| **AGRICULTURE AND FORESTRY RESOURCES** | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class II AGF-1a: Minimize Impacts to Important Farmland AGF-1b: Develop an Agricultural Resources Protection Plan AGF-1c: Compensate for Loss of Important Farmland | Same as those listed in Table 11.2-1 |
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class II AGF-2a: Ensure Compatibility with Agricultural Zoning AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Same as those listed in Table 11.2-1 |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class II AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Same as those listed in Table 11.2-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class II on forest land<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Same as those listed in Table 11.2-1 |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class II for well stimulation activities on or within 1,500 feet of agricultural or forest land<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u><s>Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices</s><br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u><s>Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Adequate Water Availability<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.2-1 |
| **AIR QUALITY** | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Statewide)<br>Class III (in SCAQMD)<br>AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures<br>AQ-1b: Improve the Methodologies and Emission Factors Used in Inventory Development | Same as those listed in Table 11.3-1 |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.3-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I<br>AQ-3a: Comply with Local Air District Protocols Relating to the Preparation of:Prepare a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class I, II or III<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class I, II or III<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.4-8 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I, II or III<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR 1a: Require Stormwater Pollution Prevention Plan | Same as those listed in Table 11.4-8 |
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I, II or III<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I, II or III<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br><u>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation</u><br><u>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I, II or III<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br><u>GW-1a: Use Alternative Water Sources to the Extent Feasible</u><br><u>GW-1b: Minimize Groundwater Impacts</u><br><u>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation</u><br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u><s>Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br><u>SWR-1b: Surface Water Protection</u><br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class II or III<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class II or III<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Same as those listed in Table 11.4-8 |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class II or III<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Same as those listed in Table 11.4-8 |
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.4-8 |
| **CULTURAL RESOURCES** | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-2. Affect prehistoric resources | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-4. Affect cultural landscapes. | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| **PALEONTOLOGICAL RESOURCES** | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class II if fossil bearing geologic units are present<br>Class IV if no fossil bearing units are present<br>PALEO-1a: Require Information ~~Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities | Same as those listed in Table 11.9-4 |
| **ENVIRONMENTAL JUSTICE** | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I (Indirect)<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Same as those listed in Table 11.10-4 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **GEOLOGY, SOILS, AND MINERAL RESOURCES** | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class II<br>GEO-1a: Avoid Active Faults ~~Zones~~if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~<br>GEO-1~~d~~e: Conduct Ground Monitoring<br>GEO-1~~e~~f: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class III<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class II<br>GEO-3a: Prepare Geotechnical Report if Necessary | Same as those listed in Table 11.11-4 |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class III<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class III in most instances; Class I in some instances<br>None available | Same as those listed in Table 11.11-4 |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class III<br>None required | Same as those listed in Table 11.11-4 |
| **GREENHOUSE GAS EMISSIONS** | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Same as those listed in Table 11.12-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.12-1 |
| **HAZARDS AND HAZARDOUS MATERIALS** | | |
| Impact HAZ-1. Hazardous materials associated with well stimulation fluids could be released to the environment from a spill or leak | Class II<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Same as those listed in Table 11.13-1 |
| **GROUNDWATER RESOURCES** | | |
| Impact GW-1. Cause or contribute to overdraft conditions | Class II<br>GW-1a: Use Alternative Water Sources <u>to the Extent Feasible</u><br>GW-1b: <u>Minimize Groundwater Impacts</u>~~Prepare a Third-Party Technical Report to Analyze Overdraft Impacts~~ | Same as those listed in Table 11.14-6 |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class II<br>GW-<u>1b</u>~~2a~~: <u>Minimize Groundwater Impacts</u> ~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping~~ | Same as those listed in Table 11.14-6 |
| Impact GW-3. Adversely impact groundwater quality from surface spills or leaks during well stimulation | Class II<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u>~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Same as those listed in Table 11.14-6 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals | Class II<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>GW-4c: Install Methane Sensors on Wells ~~in the ADSA~~Subject to Well Stimulation Treatments | Same as those listed in Table 11.14-6 |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells | Class II<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Same as those listed in Table 11.14-6 |
| Impact GW-6. Improper disposal of flowback in injection wells could potentially impact groundwater quality | Class II<br>GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater ~~Install a Cement Seal across Protected Groundwater~~ | Same as those listed in Table 11.14-6 |
| Impact GW-7: Inability to identify specific impacts to groundwater quality from well stimulation activities | GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Same as those listed in Table 11.14-6 |
| **SURFACE WATER RESOURCES** | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-1~~b~~c: Provide Adequate Flood Protection<br>SWR-1~~c~~d: Protect Surface Water Reservoirs | Same as those listed in Table 11.15-1 |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class II<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.15-1 |
| Impact SWR-3. Substantially diminish surface water quantity. | Class II<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.15-1 |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection | Same as those listed in Table 11.15-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **LAND USE AND PLANNING** | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I<br>None available for impacts associated with Risk of Upset/Public and Worker Safety | Same as those listed in Table 11.16-3 |
| Impact LU-2. Physically divide an established community. | Class III<br>None required ~~LU-2a: Ensure That Established and Planned Communities Are Not Divided~~ | Same as those listed in Table 11.16-3 |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class III<br>All mitigation measures prescribed in this EIR ~~None required~~ | Same as those listed in Table 11.16-3 |
| **NOISE AND VIBRATION** | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class II<br>NOI-1a: Control Noise Levels near Sensitive Land Uses | Same as those listed in Table 11.17-10 |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class III<br>None required | Same as those listed in Table 11.17-10 |
| **POPULATION AND HOUSING** | | |
| Impact POP-1. Induce substantial population growth | Class III<br>None required | Same as those listed in Table 11.18-4 |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required | Same as those listed in Table 11.18-4 |
| **PUBLIC SERVICES** | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class II outside of existing oil and gas fields where 10 or more wells are drilled by a single applicant within 1 square mile;<br>Otherwise, Class III<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.19-4 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **RECREATION** | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III<br>None required | Same as those listed in Table 11.20-3 |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas | Same as those listed in Table 11.20-3 |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Same as those listed in Table 11.21-1 |
| Impact RSK-2. Create a hazard to the public<u>, workers,</u> or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2<u>a</u>~~b~~: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2<u>b</u>~~d~~: Conduct a Facility Siting Study <u>or Quantitative Risk Assessment</u><br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2<u>c</u>~~f~~: Ensure Mechanical Integrity <u>Through Compliance with Permanent</u> ~~Program Complies with~~ Regulation | Same as those listed in Table 11.21-1 |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required | Same as those listed in Table 11.21-1 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Same as those listed in Table 11.21-1 |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Same as those listed in Table 11.21-1 |
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing None available | Same as those listed in Table 11.21-1 |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.21-1 |
| **TRANSPORTATION AND TRAFFIC** | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1–5 where 10 or more wells are drilled by a single applicant within 1 square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-2. Inadvertently damage road rights-of-way | Class III for project activities in Study Region 6 and in existing oil and gas fields<br>Class II outside of existing oil and gas fields in Study Regions 1–5 where 10 or more wells are drilled by a single applicant within 1 square mile<br>TR-2a: Repair Roadway Damage | Same as those listed in Table 11.22-9 |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1–5 where 10 or more wells are drilled by a single applicant within 1 square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |

**Table 12.4.24-1. Summary of Impacts and Mitigation Measures for Alternative 3[1]**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact TR-4. Transport hazardous materials | Class I<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| Impact TR-5. Change air traffic patterns | Class IV if no airports are nearby<br>Class III if FAA notification under 14 CFR-77 is required<br>None required | Same as those listed in Table 11.22-9 |
| Impact TR-6. Temporarily interfere with emergency response | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Same as those listed in Table 11.22-9 |
| **UTILITIES AND SERVICE SYSTEMS** | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from Project-related development | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Same as those listed in Table 11.23-6 |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class III<br>None required | Same as those listed in Table 11.23-6 |

1 - Mitigation measures recommended herein are addressed to well stimulation treatment activities, but sometimes are also relevant to indirect impacts not caused by well stimulation but by other activities (e.g., new oil and gas drilling activities on consolidated well pads outside existing oil and gas fields). In the latter situation, the identified measures thus are only model measures that could be followed, likely with some modification, in connection with approvals of other projects.

## 12.5 Urbanized Area Protection Alternative (Alternative 4)

The Urbanized Area Protection Alternative (Alternative 4) would prohibit future oil and gas well drilling for the purposes of well stimulation within the boundaries of any established Urbanized Area that is not included within an existing oil and gas field boundary or its buffer area. Urbanized Areas are those areas with a population over 50,000 as defined by the U.S. Census Bureau using 2010 estimated Census populations. This alternative would apply only to areas outside of existing oil and gas fields.

As with Alternative 1, this alternative assumes that any action taken by the State to restrict or limit well stimulation activities would not be applicable in areas under federal or tribal jurisdiction. Any activity that is currently allowed in areas under federal or tribal jurisdiction would continue to be allowed, and could increase, stay the same or decrease in intensity. The current permitting and environmental review processes applicable to stimulation activities in areas under federal and tribal jurisdiction would continue to apply to new well stimulation projects in those areas, and therefore impacts are assumed to be mitigated as appropriate and feasible. The analysis below for this alternative focuses only on activities in areas under State jurisdiction, and includes the assumption that the analysis of effects in areas under federal or tribal jurisdiction would be the same as with Alternative 1. Therefore, effects in areas under federal or tribal jurisdiction are not considered further in the analysis of this alternative.

This alternative has been developed primarily for consideration by local agencies and would not be implemented by DOGGR by itself. As applied in particular counties and incorporated cities, this alternative would likely require local legislative actions such as amendments to existing general plans and zoning ordinances and possibly grading and other ordinances.

It is likely that an undetermined amount of oil and gas resources that might have been accessed would not be accessed with implementation of this alternative. However, the majority of the Monterey Formation and plays are outside of the Urbanized Areas affected by this alternative. Therefore, most of the Monterey Formation's hydrocarbon resources could still be accessed under this alternative.

In addition to an analysis of the alternative itself, the analysis of Alternative 4 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

### 12.5.1 Aesthetics

#### 12.5.1.1 Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.1.2    Programmatic Level Analysis of the Project

The Urbanized Area Protection Alternative would prohibit well drilling outside of established oil and gas fields with the intention of conducting well stimulation in defined Urbanized Areas. This would reduce the amount of land potentially available for oil and gas development in areas outside of existing fields. With the exception of Los Angeles and Orange Counties (in Study Region 1), few Urbanized Areas occur in areas identified as Monterey Formation or plays. In Study Region 1, prohibiting well stimulation outside of existing fields in Urbanized Areas would place the formation and play located here off limits except to the extent it is accessed from existing fields. This would have minimal effect on visual resources, as the area is extensively built out and any oil and gas development in new areas would have to conform to existing land use requirements and would likely be screened. In any event, oil and gas work would not be a significant visual change from the already altered state of the environment as compared to natural conditions.

Under Alternative 4, Urbanized Areas in Study Regions 2 through 6 would not be developed for oil and gas recovery if well stimulation were a necessary part of the development process. However, much of the land area in these regions would remain available for conventional oil and gas activities without well stimulation. In particular, areas identified as oil and gas plays would remain available over much of their extent. A slight reduction in the overall area available for potential oil and gas development could result is less land disturbance overall, reducing visual impacts. In areas where development would occur, mitigation measures as described in EIR Section 10.1.5 likely would be required.

Overall, visual impacts would be similar to those under the project. By not allowing wells requiring stimulation to be located in Urbanized Areas, and there would have a somewhat smaller number of viewers than would be the case for developed in Urbanized Areas. However, as noted, few Monterey plays are in Urbanized Areas except in Study Region 2, and in this region well stimulations would be in existing fields, which would be allowed under this alternative. All impacts identified in EIR Sections 10.1 and 11.1 would occur under Alternative 4 and the same mitigation measures would apply as for the project. In areas outside of existing fields, impacts would be either significant (Class I) or less than significant with mitigation (Class II), depending on the actual location of the oil and gas activity and its visual setting. This is similar to impacts under the project for areas outside of existing oil and gas fields.

### 12.5.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

This alternative applies only to areas outside of existing fields, and would not apply to Wilmington, Inglewood, and Sespe Oil and Gas Fields. However, mitigation measures as described for the project would apply.

### 12.5.1.4    Impact Significance Summary

Prohibiting well stimulation in Urbanized Areas outside of existing fields would not have a substantial effect on the visual environment, as extensive areas would remain available for exploration and development. Overall, visual impacts would be similar to those of the project, and similar mitigation would apply.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.2     Agriculture and Forestry Resources

### 12.5.2.1     Introduction

This section provides an evaluation of the potential impacts to agriculture and forestry resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agriculture and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agriculture and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agriculture and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

~~Under this alternative the project standards for resource protection (see EIR Section 7.5) would not be implemented, which would result in greater indirect impacts on agricultural and forestry resources (Impact AGF-5, Directly or indirectly impair the use of agricultural land or forest land). Without the Water Recycling Standards, there would be an increase in competition for agricultural water supplies, because less water would be recycled. In addition, the potential for contamination of agricultural water supplies would be increased without implementation the Surface Water Protection Standards and Groundwater Protection Standards.~~

### 12.5.2.2     Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 (Urbanized Area Protection) would prohibit well stimulation treatments being used in Urbanized Areas outside of existing oil and gas fields. Agriculture and forestry resources are generally not located within Urbanized Areas; therefore, Alternative 4 would not reduce or substantially change the following impacts to agriculture and forestry:

- **Impact AGF-1.** Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use

- **Impact AGF-2.** Conflict with existing zoning for agricultural use or with Williamson Act contracts

- **Impact AGF-3.** Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production

- **Impact AGF-4.** Result in the loss of forest land or conversion of forest land to non-forest use

- **Impact AGF-5.** Directly or indirectly impair the use of agricultural land or forest land

Although some areas would be limited, much of the area outside of existing fields would remain available for stimulation activities, and this alternative would minimally impact future oil and gas production. Impacts on agricultural and forestry resources would be the same as under the project (see EIR Section 10.2, Agriculture and Forestry Resources).

### 12.5.2.3     Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington Oil and Gas Field***

There would be no impacts under Alternative 4, because there is no forested land or designated Farmland within the Wilmington Oil and Gas Field.

*Inglewood Oil and Gas Field*

The Inglewood field does not contain any mapped farmland so no direct or indirect impacts would occur to agriculture (Impacts AGR-1 and AGF-2)(Class IV). Likewise, The Inglewood Oil and Gas Field is not zoned for forest land or timberland, therefore, Impact AGF-3 would not occur (Class IV).

Because the Inglewood Oil and Gas Field is an existing field, well stimulation activities would be allowed. Therefore, impacts associated with stimulation activities for the Inglewood Oil and Gas Field for Alternative 4 (Impacts AGF-4 and AGF-5) would be the same as those described in EIR Section 11.2 (Agriculture and Forestry Resources).

*Sespe Oil and Gas Field*

Because the Sespe Oil and Gas Field is an existing field, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Sespe field for Alternative 4 would be the same as those described in EIR Section 11.2 (Agriculture and Forestry Resources).

### 12.5.2.4    Impact Significance Summary

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.3    Air Quality

### 12.5.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.3.2    Programmatic Level Analysis of Impacts and Mitigation Measures

This alternative would limit future oil and gas activity within established Urbanized Areas (population over 50,000). Although some areas outside of existing oil and gas fields would not be available for well stimulation treatments, areas outside of existing fields and outside of Urbanized Areas would be available, including areas that may contain rural residences or other non-urban land uses that are sensitive to air quality such as schools. Therefore, the intensification of traditional drilling and the increased importation of oil expected under Alternatives 1 and 2 would not occur under this alternative.

Emissions from oil and gas production would occur at similar or slightly reduced levels, and sources would be less likely to cause substantial pollutant concentrations in Urbanize Areas. Well stimulation treatment activities would be farther from population centers and outside of Urbanized Areas. Emissions from oil and gas activity could occur at levels exceeding the forecasts of air quality plans, as they would with the project, which may cause a potential conflict with local air quality plans.

The levels of criteria air pollutant emissions caused by equipment and sources typical of well stimulation treatments, hauling product by truck, and new well drilling may exceed general mass-based emission thresholds of a local air district. Near existing fields and outside of Urbanized Areas, this alternative would retain the potential to expose sensitive receptors to substantial pollutant concentrations and create objectionable odors, as with the project.

Although localized air quality impacts in Urbanized Areas may be reduced, each of the air quality impacts would be as described for the project, and the mitigation identified for the project (EIR Section 10.3) would be applicable. This alternative would avoid some air quality impacts from future oil and gas well drilling near Urbanized Areas, but the impacts of well stimulation treatments in existing fields would remain unchanged by this alternative.

With the implementation of mitigation measures, air quality impacts would be Class I under the project. With the implementation of mitigation measures, air quality impacts would remain Class I under Alternative 4.

### 12.5.3.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 4, these existing fields would be subject to the same potential impacts and mitigation measures as described for the project (EIR Section 11.3.5). Because each new well stimulation treatment operation creates "new" emissions, which could be potentially significant, mitigation would be necessary. Although Impact AQ-1 would be a Class III: Less Than Significant Impact, the remaining air quality impacts would occur as shown under Impacts Common to All Study Regions (EIR Section 10.3.5). Mitigation measures identified for Impact AQ-2, Impact AQ-3, and Impact AQ-4 would be applicable within each field, and the resulting impacts after implementing mitigation would be significant and unavoidable (Class I).

### 12.5.3.4    Impact Significance Summary

Although emissions and activities related to well stimulation treatments would be limited near Urbanized Areas under Alternative 4, emissions from oil and gas activity would occur at levels comparable to those of the project and non-urban areas would experience the same impacts as with the project. Each of the air quality impacts due to well stimulation treatments would be as described for the project.

## 12.5.4    Biological Resources: Terrestrial Environment

### 12.5.4.1    Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources: Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources: Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected environment for terrestrial biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, compared to the project, there would be the potential for an increase in oil and

~~gas development and associated well stimulation in biologically sensitive areas, slightly greater habitat loss without setbacks from perennial surface water, an increase in water usage that could affect fish and wildlife habitat (due to less water recycling), and an increase in the potential for contamination of water supplies that could affect biological resources.~~

### 12.5.4.2    Programmatic Level Analysis of the Project

Alternative 4 would exclude oil and gas drilling for the purpose of well stimulation within the boundaries of established Urbanized Areas and outside existing oil and gas fields. This alternative could reduce impacts to terrestrial biological resources, but the actual reduction cannot be quantified. In general, Urbanized Areas support fewer special-status biological resources than other areas. Oil and gas production in Urbanized Areas is often within industrial areas, rather than native habitats. However, in some jurisdictions, oil and gas resources may be present in natural open space areas supporting significant biological resources. To the extent that Alternative 4 may reduce potential impacts to natural open space within Urbanized Areas, its impacts to biological resources would be reduced from the project. Depending on specific locations of future well stimulation activities, the potential impacts to biological resources may range from Class I (significant and unavoidable) to Class III (less than significant). Due to the unknown locations of future well stimulation activities, this analysis presumes the "reasonable worst case" statewide impacts of well stimulation, which generally are Class I or Class II.

The majority of adverse biological resource impacts from well stimulation are expected to take place outside established Urbanized Areas, and thus would not be reduced under this alternative. Under Alternative 4, impacts to biological resources may be significant and unavoidable (Class I). This would apply to all the biological resources impact criteria BIOT-1 through BIOT-6 (addressing impacts to plants, fish, and wildlife and their habitats and natural communities) and BIOT-10 (greenhouse gas effects and consequent impacts to biological resources), below. In contrast, Impacts BIOT-8 and BIOT-9 (addressing conflicts with conservation policies and planning) are Class II impacts under the this alternative (and under the project).

### 12.5.4.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 4 would not apply to existing oil and gas fields, and thus would allow well stimulation activities in the Wilmington, Inglewood, and Sespe Oil and Gas Fields. Potential impacts to terrestrial biological resources in the Wilmington, Inglewood, and Sespe Oil and Gas Fields would be as described in EIR Section 11.4. Potential "reasonable worst-case" impacts to biological resources would be Class I for Impacts BIOT-1 through BIOT-6 and BIOT-7 (Sespe field only); Class II for Impacts BIOT-8 and BIOT-9; and Class III for Impacts BIOT-7 (for the Wilmington and Inglewood fields) and BIOT-10 (as they would be under the project).

### 12.5.4.4    Impact Significance Summary

Under Alternative 4 (Urbanized Area Protection) some impacts to habitat in Urbanized Areas may be reduced. However, overall impacts in all study regions would be essentially the same as the project, given that the Alternative permits well stimulation in more biologically sensitive rural areas outside Urbanized Areas.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.5    Biological Resources: Coastal and Marine Environment

Alternative 4 (Urbanized Area Protection) does not apply to coastal and marine biological resources. Impacts would be the same as those of the project.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.6    Coastal Processes and Marine Water Quality

Alternative 4 (Urbanized Area Protection) does not apply to coastal processes and marine water quality. Impacts would be the same as those of the project.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.7    Commercial and Recreational Fishing

Alternative 4 (Urbanized Area Protection) does not apply to commercial and recreational fishing. Impacts would be the same as those of the project.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.8    Cultural Resources

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 4 (Urbanized Area Protection). This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.8.1    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impacts are addressed:

- **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

- **Impact CUL-2:** Affect prehistoric resources

- **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

- **Impact CUL-4:** Affect cultural landscapes

Under Alternative 4, the geographic extent of impacts to cultural resources would be lessened within Urbanized Areas in comparison to the project, and the risk of adverse impacts to cultural resources in these areas would be correspondingly reduced. At a programmatic level of analysis, it is not possible to know precisely the location, extent and particular characteristics of potential impacts to these

resources. The Alternative permits well stimulation treatments in more sensitive rural areas outside Urbanized Areas, where cultural resources would remain subject to impacts from treatment-related activities.

Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would reduce these effects, but cannot guarantee they would be entirely avoided. Therefore, cultural resources impacts would remain significant and unavoidable (Class I).

The area of disturbance associated with Alternative 4 would be smaller than that of the project, including areas that are likely to be sensitive for cultural resources. ~~However, Alternative 4 does not incorporate the project standards for Resource Protection (see EIR Section 7.5, project standards for Resource Protection), which restrict well stimulation activities from operating near surface water or critical habitats. Thus, while Alternative 4 would likely impact a smaller number of cultural resources, it would impact a larger number of other types of cultural resources associated with the project's protected areas (see Appendix F).~~

### 12.5.8.2    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Impacts within fields would be the same as what is described in EIR Section 11.8 (Cultural Resources). Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would likely reduce these effects to less than significant but cannot guarantee they would be entirely avoided. Therefore, impacts to cultural resources are considered significant and unavoidable (Class I).

### 12.5.8.3    Impact Significance Summary

Alternative 4 would reduce the potential impacts to cultural resources in all study regions because the overall footprint of well stimulation disturbances would be reduced in comparison to the project within Urbanized Areas. Implementation of Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) and EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would reduce these effects, but cannot guarantee they would be entirely avoided. Potential impacts are therefore considered significant and unavoidable (Class I).

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.9    Paleontological Resources

### 12.5.9.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 4 (Urbanized Area Protection). This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for rel-

evant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.9.2    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impact is addressed:

■ **Impact PALEO-1:** Destroy or disturb surface or near-surface significant paleontological resources

Table 10.9-8 in EIR Section 10.9 provides a summary table of the geologic units in each study region that have the potential to bear significant paleontological resources. Alternative 4 reduces the overall amount of ground disturbing activities that could result in Class II impacts to paleontological resources.

The Urbanized Area Protection Alternative would reduce the amount of land used for drilling in new areas of the State that could be developed with the advancement of new well stimulation technologies. Therefore, the geographic extent of potential impacts to paleontological resources would be lessened in comparison to the project, and thus the risk of adverse impacts would be correspondingly reduced. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures) would be expected to reduce Impact PALEO-1 to less than significant (Class II) because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery. ~~However, in those areas where earth disturbing activities could occur, including sensitive areas outside Urbanized Areas, Alternative 4 would not provide for the project's standards for resource protection, and thus would be expected to result in a greater overall number of impacts to paleontological resources in comparison to the project.~~

### 12.5.9.3    Specific Oil and Gas Fields: Programmatic Level Analysis of Impacts and Mitigation Measures

*Wilmington and Sespe Oil and Gas Fields*

Portions of the Wilmington and Sespe Oil and Gas Fields have paleontological resources potential (i.e., sensitivity) ranging from low to high (Wilmington) and very high (Sespe) and the likelihood of impacting scientifically significant vertebrate fossils is high. Because the Wilmington and Sespe Oil and Gas Fields are existing fields, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Therefore, potential impacts within the fields would be the same as what is described in EIR Section 11.9 (Paleontological Resources). Potential impacts would be mitigable to a level of less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures).

*Inglewood Oil and Gas Field*

Because the Inglewood Oil and Gas Field is an existing field, it is anticipated that most future drilling and well stimulation activities would use existing roads and pads to the greatest extent possible. Impacts within the field would be the same as what is described in EIR Section 10.9 (Paleontological Resources).

Potential impacts would be mitigable to a level of less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9 (No Future Well Stimulation Treatments Alternative (Alternative 1)) and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures).

~~Within these three fields, the Urbanized Area Protection Alternative could result in greater earth disturbing activities in comparison to the project because no standards for resource protection would be implemented. Therefore, Alternative 4 would have the potential to disturb a greater overall number of paleontological resources in comparison to the project.~~

### 12.5.9.4    Impact Significance Summary

At a programmatic level of analysis, the Urbanized Area Protection Alternative would reduce the potential impacts to paleontological resources in all study regions because the overall construction footprint associated with well stimulation treatments would be reduced within Urbanized Areas when compared to the project. Moreover, any new ground disturbances related to future oil and gas well stimulation treatments that would result in adverse impacts to paleontological resources would be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h, as defined in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures). Site-specific impacts would also be less than significant (Class II) with implementation of Mitigation Measures PALEO-1a through PALEO-1h. ~~However, because no standards for resource protection would apply, in those areas where ground disturbing activities could occur under Alternative 4, including sensitive rural areas outside Urbanized Areas, the overall number of impacts to paleontological resources at a site-specific level would be anticipated to be approximately the same in comparison to the project.~~

Please refer to Table 12.4.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.10   Environmental Justice

### 12.5.10.1   Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.10.2   Programmatic Level Analysis of the Project

Alternative 4 would ban well stimulation in Urbanized Areas that are not already within an oil and gas field or buffer. It would not prohibit conventional oil and gas activity in Urbanized Areas. New wells requiring stimulation would be located outside of Urbanized Areas, so wells would be farther from population centers. This would reduce the potential to affect populations of concern for experiencing disproportionate significant impacts.

While this alternative would reduce potential impacts in Urbanized Areas, it would have no effect in and around existing fields. Because the amount of land designated as Urbanized Areas over the Monterey Formation and plays is limited, this alternative would have a similar potential as the project to affect minority and low-income populations. As with the project, because of uncertainty, Alternative 4 still would require implementation of Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments). However, this would have to be a local requirement, as DOGGR would not be implementing Alternative 4. Because CEQA does not require an analysis of environmental justice, it would be at the discretion of local authorities whether to implement this or a similar measure.

The location of all future well stimulation activity is not known and the protection of certain Urbanized Areas would not change the potential for impacts from well stimulation itself. The potential for environmental justice impacts from well stimulation occurring remains, and Mitigation Measure EJ-1a is proposed for Alternative 4 to the extent that DOGGR will be issuing well stimulation treatment permits for areas not put off-limits by local governments within their Urbanized Areas. The implementation of Mitigation Measure EJ-1a would allow DOGGR to track the locations of well stimulation applications and assess its impacts on environmental justice, and to devise strategies to address these impacts should they arise. Impacts would be reduced somewhat when compared to those of the project, as well stimulations would not be located within Urbanized Areas. However, this is a relatively small area compared to the area available in California for potential oil and gas well development and stimulation.

**MM EJ-1a      Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments.** (Full text in EIR Section 10.10.5.)

### 12.5.10.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 4 would not apply at Wilmington, Inglewood, or Sespe Oil and Gas Fields, as they are existing fields and this alternative would apply only in areas outside of existing fields.

### 12.5.10.4   Impact Significance Summary

Alternative 4 would have a minor effect in reducing the area where well stimulation could occur. This alternative would not be implemented by DOGGR. It could be considered by local jurisdictions where their authority applies. However, other impacts associated with well stimulation would remain both in and outside of existing fields, and Alternative 4 would require mitigation similar to Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) would apply and would reduce the environmental justice impact.

## 12.5.11   Geology, Soils and Mineral Resources

### 12.5.11.1   Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections 10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 406 of 689    Page ID #:5353

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.11.2   Programmatic Level Analysis of the Project

This alternative would limit future oil and gas activity within established Urbanized Areas (population over 50,000) if they are not within existing oil and gas fields. Some areas outside of existing oil and gas fields would not be available for well stimulation treatments, in particular areas near the greater Los Angeles region, Bakersfield, Modesto, greater Bay Area region, and the greater Sacramento region. Areas outside of Urbanized areas would be available for well stimulation activities, including many rural towns and residences. Although some areas would be limited, much of the area outside of existing fields would remain available for stimulation activities, and this alternative would minimally impact future oil and gas production. Impacts associated with geology, soils, and mineral resources would remain the same as with the project, described in EIR Section 10.11 (Geology, Soils, and Mineral Resources), although confined to a slightly reduced area.

### 12.5.11.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Geology, soils and mineral resources settings for Study Regions 1 and 2 are discussed in EIR Section 11.11.3. Impacts and mitigation measures are discussed in EIR Section 11.11.5.

#### *Wilmington, Inglewood, and Sespe Oil and Gas Fields*

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed and would not be limited by the Urbanized Areas restriction. Therefore, impacts associated with stimulation activities for the Wilmington, Inglewood, and Sespe Oil and Gas Fields for Alternative 4 would be the same as those described in EIR Section 11.11.5.1 (Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field) and EIR Section 11.11.5.2 (Impact Analysis and Mitigation Measures: Study Region 1 Inglewood Oil and Gas Field) and in EIR Section 11.11.5.3 (Impact Analysis and Mitigation Measures: Study Region 2 Sespe Oil and Gas Field), with the exceptions noted in those Chapters.

### 12.5.11.4   Impact Significance Summary

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.12   Greenhouse Gas Emissions

### 12.5.12.1   Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.12.2   Programmatic Level Analysis of Impacts and Mitigation Measures

This alternative would not involve a change in the amount of potential oil and gas production in California. California end users of oil and gas would continue to rely on the established supply as in the baseline. There would be no change in life-cycle GHG emissions of California's crude supply because the supply itself would not change. Each of the GHG impacts would be as described for the project (EIR Section 10.12.5). Mitigation identified for well stimulation treatments would apply, as recommended for the project.

### 12.5.12.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 4, well stimulation treatments would occur in the Wilmington and Sespe Oil and Gas Fields as expected under the project. Therefore, as described in EIR Section 11.12.5, GHG emissions associated with well stimulation treatments at Wilmington and Sespe would continue, and the extent of Impact GHG-1 is uncertain, ranging from a less than significant impact (Class III) to a significant, unavoidable impact (Class I). New well stimulation treatments at the Inglewood Oil and Gas Field would be subject to the same potential GHG impacts (Class I) and would require the same mitigation measures as described for the project (EIR Section 11.12.5).

### 12.5.12.4   Impact Significance Summary

Some emissions related to well stimulation treatments would be limited near Urbanized Areas, However, each of the GHG impacts due to well stimulation treatments would be as described for the project.

## 12.5.13   Hazards and Hazardous Materials

### 12.5.13.1   Introduction

This section provides an evaluation of the potential impacts for hazards and hazardous materials associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.13.2   Programmatic Level Analysis of the Project

As stated in EIR Section 8.3.4, extensive area outside of Urbanized Areas would remain available for exploration and development. All impacts identified for the use of hazardous materials would still occur under this alternative, as it would affect only the location of some wells and would not affect activities associated with well stimulation itself.

| Impact HAZ-1    Release hazardous materials into the environment from a spill or leak |

In general, Alternative 4 would apply to all the Urbanized Areas in the study regions within the State. Study Region 1 is highly urbanized, but also has extensive oil and gas fields, and the prohibition on well stimulation in Urbanized Areas under Alternative 4 would not apply in existing fields.

Hazards and hazardous materials impacts would remain potentially significant for well stimulation treatments in existing oil and gas fields. As discussed in EIR Section 10.13.5, it is difficult to anticipate the fate of the released chemicals in the environment because many individual chemical compounds within well stimulation fluids lack sufficient mobility and toxicity information. Available data indicate that many hydraulic fracturing chemical compounds are either highly soluble or miscible in water and/or have densities greater than water. Some chemicals may be transformed (degraded) by hydrolysis and, in some cases, degradation ("daughter") products are not known. Daughter products may be more hazardous than the parent chemicals.

Given these conditions, impacts from a spill or release could be significant. Therefore a mitigation measure is proposed.

**MM HAZ-1a**      **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials** ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

<u>Revised</u> Mitigation Measure HAZ-1a is recommended to be required at any well stimulation occurring in existing oil and gas fields. Additional discussion of the mitigation measure is found in EIR Section 10.13.5.

Protective measures for prevention of spills or releases of hazardous materials are provided in both existing and proposed regulations. A summary of the key measures in the proposed SB 4 Well Stimulation Treatment Regulations is provided in EIR Section 10.13.5. Collectively, <u>with implementation of revised MM HAZ-1a</u>~~with inclusion of a barrier for all production facilities, regardless of the amount of time they are in place, and with~~ <u>and</u> surface water management<u>,</u> and implementation/enforcement of all of the existing and proposed regulations regarding the transport, handling, storage, conveyance, and management of hazardous materials, including the Spill Contingency Plan, which accounts for spills that may occur at pipes, valves, or supply lines, the impact of well stimulation materials on the environment in the event of a release, is considered less than significant with mitigation (Class II).

Therefore, the Programmatic level impacts and mitigation that apply to the project apply to Alternative 4. Impacts for Alternative 4 would be reduced to less than significant with implementation of <u>revised</u> Mitigation Measure HAZ-1a (Class II). Impact HAZ-1 would also be Class II under the project.

### 12.5.13.3  Programmatic Level Analysis of Specific Oil and Gas Fields

This alternative applies only to areas outside of existing fields, and would not apply to Wilmington, Inglewood, and Sespe Oil and Gas Fields.

### 12.5.13.4  Impact Significance Summary

Prohibiting well stimulation in Urbanized Areas would not have a substantial effect on the impacts from hazards and hazardous materials, as extensive areas would remain available for exploration and development. Overall, impacts would be similar to those of the project, and similar mitigation would apply.

Section 12.5.24 (Summary of Impacts and Mitigation Measures for Alternative 4), Table 12.5.24-1, lists by resource all impacts and mitigation measures applicable to Alternative 4.

## 12.5.14   Groundwater Resources

### 12.5.14.1   Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative, which would result in greater potential for use of groundwater with no water recycling standards in place, and less protection of both groundwater resources as well as surface water resources that could recharge groundwater.~~

As summarized in EIR Section 10.14.6, impacts from well stimulation treatments were determined to be potentially significant to both the quantity and quality of groundwater. Further analysis indicated that the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures, which are summarized on Table 10.14-20, focus on preventing exacerbation of groundwater overdraft or subsidence, maintaining existing use of water supply wells, and mitigating possible pathways that might allow well stimulation fluids including gas to reach protected groundwater.

### 12.5.14.2   Programmatic Level Analysis of the Project

As stated in EIR Section 8.4.2, the Urbanized Area Protection Alternative would prohibit well stimulation treatments within Urbanized Areas outside of existing oil and gas fields. This alternative would lead to a decrease in areas outside of existing fields where well stimulation could occur. Thus, Alternative 4 reduces area within which mitigation measures are required.

However, impacts to groundwater quantity and quality would remain potentially significant outside of Urbanized Areas, because well stimulation treatments may occur in the future in the available areas.

Impacts and mitigation that would continue to apply under Alternative 4 are listed below.

| Impact GW-1    Cause or contribute to overdraft conditions |
|---|

Because the alternative would allow for well stimulation outside of Urbanized Areas, it would cause or contribute to overdraft conditions as described in EIR Section 10.14.5. With implementation of these mitigation measures, Impact GW-1 would be reduced to a less than significant level (Class II). Impact GW-1 is also Class II under the project but there would be fewer locations where this impact could occur under the alternative.

**MM GW-1a       Use Alternative Water Sources <u>to the Extent Feasible</u>.** (Full text in EIR Section 10.14.5.)

**MM GW-1b       <u>Minimize Groundwater Impacts</u> ~~Prepare a Third Party Technical Report to Analyze Overdraft Impacts.~~** (Full text in EIR Section 10.14.5.)

| Impact GW-2 | Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water |
|---|---|

Depending on geologic conditions, groundwater pumping could result in land subsidence. It could also interfere with nearby water wells, including lowering the water level in the well to a point that they no longer function as intended. These would be significant impacts, which would be addressed by the recommended mitigation measure below. With implementation of this mitigation measure, Impact GW-2 would be reduced to a less than significant level (Class II). Impact GW-2 is also Class II under the project, but there would be fewer locations where this impact could occur under the alternative.

**MM GW-1b2a**   Minimize Groundwater Impacts~~Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping.~~ (Full text in EIR Section 10.14.5.)

| Impact GW-3 | Adversely impact groundwater quality from surface spills or leaks during well stimulation |
|---|---|

The full description of this mitigation measure is found in EIR Section 10.13.5. With implementation of this revised mitigation measure, Impact GW-3 would be reduced to a less than significant level (Class II). Impact GW-3 is also Class II under the project but there would be fewer locations where this impact could occur under the alternative.

**MM HAZ-1a**   Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

| Impact GW-4 | Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals |
|---|---|

Some wells in existing oil and gas fields may have non-existent or ineffective well seals, particularly if they are old or were improperly abandoned. This situation could result in the migration of stimulation fluids including gas through these pathways into protected groundwater. To address this significant impact, three revised mitigation measures are identified. With implementation of these revised mitigation measures, Impact GW-4 would be reduced to a less than significant level (Class II). Impact GW-4 is also Class II under the project but there would be fewer locations where this impact could occur under the alternative.

**MM GW-4a**   Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation. (Full text in EIR Section 10.14.5.)

**MM GW-4b**   Install a Well Seal across Protected Groundwater for New Wells Subject to Well Stimulation Treatments.~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin.~~ (Full text in EIR Section 10.14.5.)

**MM GW-4c**   Install Methane Sensors on Wells ~~in the ADSA~~Subject to Well Stimulation Treatments. (Full text in EIR Section 10.14.5.)

| **Impact GW-5** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells** |
|---|---|

Some existing and abandoned wells in oil and gas fields may have damaged, non-existent, or ineffective well seals. This could create pathways for stimulation fluids injected in one well to migrate into protected groundwater by way of the annular space in another well within the zone of influence of the stimulated well. This would be a significant impact. To address this, a <u>revised</u> mitigation measure is proposed. With implementation of this <u>revised</u> mitigation measure, Impact GW-5 would be reduced to a less than significant level (Class II). Impact GW-5 is also Class II under the project.

**MM GW-5a**      **Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

| **Impact GW-6** | **Improper disposal of flowback in injection wells could potentially impact groundwater quality** |
|---|---|

Class II injection wells are required under the UIC program regulations to have an isolating cement seal above the injection zone as well as a minimum 100-foot seal across the base of the fresh water zone. If injected flowback water migrates to protected groundwater, this would be a significant impact. To address this, a mitigation measure is proposed. With implementation of this <u>revised</u> mitigation measure, Impact GW-6 would be reduced to a less than significant level (Class II). Impact GW-6 is Class II under the project.

**MM GW-6a**      <u>**Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater**</u>~~**Install a Cement Seal across Protected Groundwater.**~~ (Full text in EIR Section 10.14.5.)

| **Impact GW-7** | **Inability to identify specific impacts to groundwater quality from well stimulation activities** |
|---|---|

Many chemicals and compounds can be introduced to groundwater by various pathways. The origin of these materials is difficult to ascertain under many circumstances. Groundwater monitoring may identify a chemical or compound, but would be unable to identify its source. If well stimulation fluids reach protected groundwater, this would be a significant impact. To ensure that stimulation fluids can be more readily distinguished from other compounds that may be naturally occurring or have been introduced into the groundwater, a <u>revised</u> mitigation measure is proposed to address this. With implementation of this <u>revised</u> mitigation measure, Impact GW-7 would be reduced to a less than significant level (Class II). Impact GW-7 is also Class II under the project.

**MM GW-7a**      **Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

### 12.5.14.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed and would not be limited by the Urbanized Areas restriction. Therefore, impacts associated with stimulation activities for the Wilmington, Inglewood, and Sespe Oil and Gas Fields for Alternative 4 would be the same as those described in EIR Section 11.14.5.1 (Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field) and EIR Section 11.14.5.2 (Impact Analysis and Mitigation Measures: Study Region 1 Inglewood Oil and Gas Field) and in EIR Section 11.14.5.3 (Impact Analysis and Mitigation Measures: Study Region 2 Sespe Oil and Gas Field).

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

### 12.5.14.4   Impact Significance Summary

Prohibiting well stimulation in Urbanized Areas would not have a substantial effect on reducing impacts to groundwater, as extensive areas would remain available for exploration and development. Overall, impacts would be similar to those of the project, and similar mitigation would apply.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.15   Surface Water Resources

### 12.5.15.1   Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, there would be a greater potential for use of surface water without water recycling standards in place, as well as an increase in potential impacts to waterbodies and streams without implementation of habitat protection standards or a buffer requirement from perennial waters.~~

### 12.5.15.2   Programmatic Level Analysis of the Project

Alternative 4 applies only to well stimulation in Urbanized Areas and does not prohibit other conventional oil and gas-related activities from occurring within these areas. Similarly, Alternative 4 would continue to allow well stimulation outside Urbanized Areas. For these reasons, Alternative 4 would have similar impacts to surface water quality and quantity as the project. These impacts and mitigation measures needed are listed in EIR Section 10.15.

With implementation of the identified mitigation measures, these impacts to surface water would be less than significant (Class II).

### 12.5.15.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Alternative 4 does not apply to existing fields. Under this alternative, activities on these fields would occur as described for the oil fields described EIR Section 11.15.5 and summarized in EIR Section 11.15.6, in which impacts to surface water resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts would be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for Wilmington, Inglewood, and Sespe Oil and Gas Fields would be the same as for the project. With implementation of these measures, the impact to surface water under Alternative 4 would be less than significant (Class II).

#### 12.5.15.4   Impact Significance Summary

Based on the programmatic level analysis of surface water resources, impacts from Alternative 4 are considered to be the same, less than significant with mitigation (Class II).

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

### 12.5.16   Land Use and Planning

#### 12.5.16.1   Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning). For the purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

#### 12.5.16.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 would prohibit future oil and gas well drilling for the purposes of stimulation within the boundaries of established Urbanized Areas, but would allow it Urbanized Areas within existing oil and gas field boundaries and their buffer areas. In comparison to the project, well stimulation treatment activities under Alternative 4 would be outside of certain defined population centers.

Urbanized Areas are areas with a population over 50,000 as defined by the U.S. Census Bureau. Figures 8-7 through 8-9 illustrate the Urbanized Areas within each study region. Because this alternative would apply only to areas outside of existing oil and gas fields, the Inglewood, Sespe, and Wilmington Oil and Gas Fields are not part of this alternative.

Impact LU-1 addresses potential disruptions and preclusions to existing and permitted land uses. In comparison to the project, Alternative 4 would result in a decrease of land disturbances inside of Urbanized Areas. It would apply to wells drilled with the intent of stimulating them, but not to all oil and gas wells. Well stimulation activities would still result in disruptions to land uses outside of these areas, as listed in EIR Section 10.16.5 (Land Use and Planning, Impact Analysis and Mitigation Measures). These potential disruptions that also relate to land use and planning are analyzed in detail in EIR Section 10.21 (Risk of Upset/Public and Worker Safety).

Alternative 4 would reduce potential surface disturbances and related disruptions specific Urbanized Areas, which are a relatively small portion of the Monterey Formation and plays. While prohibited in these Urbanized Areas, impacts that would still occur in other areas under the alternative and many cannot be mitigated to less than significant. Therefore, as with the project, corresponding effects to risk of upset and public and worker safety on land use and planning would also be considered significant and unavoidable (Class I) under Alternative 4.

Section 1783.2 of the ~~proposed~~ permanent regulations explicitly define the "Neighbor Notification" requirements, which include the radius for property owner notifications, the information that is to be provided, and the timing and methods of the notifications. Although the "Neighbor Notification"

Case 2:26-cv-05242-SVW-SSC   Document 12   Filed 05/14/26   Page 414 of 689   Page ID #:5361

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

requirements would be effective at minimizing potential conflicts with existing land uses, because of the other resource-specific impact that cannot be mitigation to a level of less than significant, Impact LU-1 (impacts related to land use disruption) would also be significant and unavoidable (Class I). Although Impact LU-1 is also a Class I impact under the project, these impacts under Alternative 4 would be less severe because well stimulation treatment activities would be located farther from population centers and existing residential land uses.

For Impact LU-2, Alternative 4 would reduce future land disturbances associated with well stimulation in Urbanized Areas outside of existing fields. ~~However, outside of these specific areas this alternative would apply to an established or planned community that may be found in a rural area. With implementation of Mitigation Measure LU-2a,~~ Impact LU-2 (impacts related to the physical division of an established community) within these areas would be less than significant (Class II<u>)</u> <u>for the alternative</u>. Impact LU-2 is also Class II<u>I</u> under the project.

~~**MM LU-2a**~~       ~~**Ensure That Established and Planned Communities Are Not Divided.**~~ ~~(Full text in EIR Section 10.16.5.)~~

Impact LU-3 addresses potential conflicts with applicable land use plans, policies, programs, ordinances and other regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. As noted in EIR Section 10.16 (Land Use and Planning), a consistency analysis of the activities associated with well stimulation treatments outside of existing oil and gas fields involves the review and assessment of applicable local agency plans, policies and regulations, which is not possible to complete at the statewide/programmatic level of analysis given the extensive number of jurisdictions affected, the extent of oil and gas regulations of each jurisdiction, the vast array of potential conditions that would be imposed on projects based on specific jurisdictions conditional use permit application processes, the fact that land use and zoning regulation implementation is the legal responsibility of local jurisdictions, and the fact that this EIR is required by law to be completed within a very limited time period that cannot accommodate such an extensive effort. Nonetheless, the impact analysis under the project found that the information and mitigation measures set forth in this EIR would reduce potential conflicts with any established, designated, or planned land use areas on federal, State, or locally regulated lands to a less than significant level (Class II). Alternative 4, to which all of the EIR's mitigation measures would apply, would be Class II as well.

### 12.5.16.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As referenced above, Alternative 4 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not part of this alternative. Mitigation measures applicable to the project would apply, however.

### 12.5.16.4   Impact Significance Summary

Alternative 4 would reduce the geographic extent of potential land use impacts within Urbanized Areas, which would be considered a net benefit. However, outside of these areas land use impacts at a programmatic level of analysis would still be the same as for the project. Significant and unavoidable impacts related to Impact LU-1 would occur (Class I). Effects related to Impact LU-2 and Impact LU-2 would be mitigable to a level of less than significant (Class II).

## 12.5.17  Noise and Vibration

### 12.5.17.1  Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3 and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.17.2  Programmatic Level Analysis of the Project

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 10.17. Noise mitigation would be required, as with the project. Well stimulation treatment activities would be farther from noise sensitive receptors in and near urbanized areas. But residences outside urbanized areas would be impacted as in the project.

In all regions, with the implementation of mitigation measures in EIR Section 10.17, Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

#### 12.5.17.2.1  Study Region 1

The active oil and gas fields and the Monterey Formation and its plays overlap Urbanized Areas for much of Study Region 1. This alternative would greatly reduce the number of well pads that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the urbanized areas. As a result the potential for noise impacts to residential land uses in urbanized areas with population of over 50,000 would be reduced. However, areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 would be the same as for the project.

#### 12.5.17.2.2  Study Region 2

The active oil and gas fields and the Monterey Formation and its plays overlap or are adjacent to Urbanized Areas for some of Study Region 2. This alternative would reduce the areas that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the urbanized areas. As a result, the potential for noise impacts to residential land uses would be reduced in urbanized areas with population of over 50,000. However, areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### *12.5.17.2.3   Study Region 3*

Active oil and gas fields and the Monterey Formation and its plays overlap or are adjacent to Urbanized Areas for some of Study Region 3. This alternative would reduce the areas that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the urbanized areas. As a result, the potential for noise impacts to residential land uses would be reduced in urbanized areas with population of over 50,000. However, areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### *12.5.17.2.4   Study Region 4*

Active oil and gas fields and the Monterey Formation and its plays overlap or are adjacent to Urbanized Areas for some of Study Region 4. This alternative would reduce the areas that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the urbanized areas. Existing wells in and around Bakersfield would continue to be candidates for well stimulation treatments. Areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will remain candidates for well stimulation. Only urbanized areas that do not have existing active oil and gas fields would be protected under this alternative. As a result, the potential for noise impacts to residential land uses would be reduced. However, areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### *12.5.17.2.5   Study Region 5*

Active oil and gas fields and the Monterey Formation and its plays overlap or are adjacent to a few Urbanized Areas in Study Region 5. This alternative would reduce the areas that would be candidates for well stimulation treatments outside the existing oil and gas field boundaries and buffer areas and within the Urbanized Areas. As a result, the potential for noise impacts to residential land uses would be reduced. However, areas outside these Urbanized Areas and areas where active oil and gas fields over-lap the Urbanized Areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### *12.5.17.2.6   Study Region 6*

Active oil and gas fields overlap or are adjacent to a few Urbanized Areas in Study Region 6. This alterna-tive would reduce the areas that would be candidates for well stimulation treatments outside the exist-ing oil and gas field boundaries and buffer areas and within urbanized areas with population of over 50,000. As a result the potential for noise impacts to residential land uses would be reduced. However,

areas outside these urbanized areas and areas where active oil and gas fields overlap the urbanized areas will experience the same noise and vibration impacts as for the project, described in EIR Section 10.17.

Impacts NOI-1 and NOI-2 within active oil and gas fields (both inside and outside Urbanized Areas) and areas outside Urbanized Areas would be the same as for the project. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

### 12.5.17.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Since this alternative includes well stimulation treatments, noise and vibration impacts will occur as described in EIR Section 11.17. Noise mitigation would be required. Only areas within Urbanized Areas and not within active oil and gas fields would be potentially benefited by implementation of Alternative 4.

#### 12.5.17.3.1    *Wilmington Oil and Gas Field*

The active oil and gas wells in the Wilmington Oil and Gas Field occur within Urbanized Areas or urban buffer areas. This alternative would not reduce the number of well pads that would be candidates for well stimulation treatments in this field. As a result, the potential for noise and vibration impacts to residential land uses would not be reduced significantly and would be as with the project. Impact MOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

#### 12.5.17.3.2    *Inglewood Oil and Gas Field*

Because the Inglewood field is adjacent to residential areas and other urban land uses including sensitive receptors, Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

#### 12.5.17.3.3    *Sespe Oil and Gas Field*

The active oil and gas wells in the Sespe Oil and Gas Field are outside Urbanized Areas. As a result, the potential for noise and vibration impacts to residential land uses is unchanged and remains low, as with the project. Impacts NOI-1 and NOI-2 for stimulation of future wells within active oil and gas fields and for areas beyond active oil and gas fields and outside Urbanized Areas would be the same as for the project. Impact NOI-1 would be less than significant with mitigation (Class II), and Impact NOI-2 would be less than significant (Class III).

### 12.5.17.4    Impact Significance Summary

Based on the programmatic level analyses of noise and vibration for the project and for specific oil and gas fields, impacts from Alternative 4 would be the same as under the project, except as limited for future drilling near Urbanized Areas. Although the potential for noise impacts to residential land uses within Urbanized Areas would be reduced, there remains the potential for isolated residents outside urbanized areas to be adversely affected by noise from well stimulation treatment activities, and Impacts NOI-1 and NOI-2 would be the same as for the project for noise sensitive land uses bordering and within active oil and gas fields.

## 12.5.18   Population and Housing

### 12.5.18.1   Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for population and housing (as applicable at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.18.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 would prohibit well stimulations from being conducted in established Urbanized Areas (those with a population over 50,000) where these areas are outside of existing fields and their buffers. Although some areas would be off limits for wells requiring stimulation, much of the area outside of existing fields would remain available for well stimulation activities.

The Monterey Formation and its plays contain a number of large communities with significant existing population and planned growth (see Figure 5-9 and EIR Section 10.18, Population and Housing). The exclusion of stimulation work from Urbanized Areas may result in a somewhat increased the level of drilling and stimulation that would occur elsewhere. However, because there are numerous existing cities and towns throughout each study region, this is not anticipated to greatly increase the population and to create a "boom and bust" condition, in which the in-migration of temporary workers can occur at a level that overwhelms a community. The oil and gas industry is well established in California and workers frequently live in one area and commute to work sites. During well drilling, some crew members may temporarily relocate to be near the drill site. Stimulation work itself is a short-term activity occurring over a matter of days or a few weeks and workers would not relocate. It is expected that any temporarily relocating workers would use hotels or long-stay accommodations, if needed. Impact POP-1 would be a less than significant impact (Class III), with impacts increased only somewhat when compared to the project is additional drilling occurred in rural areas under Alternative 4 that would bring workers into rural areas outside existing oil and gas fields.

When compared to the project, it is possible that prohibiting well stimulations within designated Urbanized Areas with populations greater than 50,000 persons outside of existing fields could reduce the potential for housing and resident displacement. This is due to new wells being located in less dense and populated areas. Should any residential displacement occur under Alternative 4, it is unlikely to necessitate construction of new housing in any of the study regions. Therefore, any necessary relocations of housing or persons associated with Alternative 4 activities (Impact POP-2) would be less than significant and would not necessitate the construction of new housing elsewhere (Class III), with impacts decreased somewhat when compared to the project because Alternative 4 would prohibit well stimulations in Urbanized Areas, where the potential for residential relocations is greater.

### 12.5.18.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 4 would be the same as those described in EIR Section 11.18 (Population and Housing).

### 12.5.18.4   Impact Significance Summary

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.19   Public Services

### 12.5.19.1   Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.19.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 is intended to reduce potential well stimulation impacts to designated Urbanized Areas (those with a population over 50,000) outside of existing oil and gas fields. Although some areas would be off limits for wells requiring stimulation, much of the area outside of existing fields would remain available for well stimulation activities.

| Impact PUB-1 | Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools |
| --- | --- |

The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels. As discussed in EIR Section 12.5.18 (Population and Housing), Alternative 4 has some potential for increasing population in-migration impacts.

The primary public service providers by study region are listed in EIR Section 10.19 (Public Services). Because new wells developed for stimulation would not be allowed in Urbanized Areas outside of existing fields, there could be a slight increase in wells developed in areas outside of Urbanized Areas. However, the amount of Urbanized Area land meeting this criterion is only a small part of the area underlain by the Monterey Formation and plays.

Implementation of Mitigation Measure PUB-1a (Assess Public Service Ratios and Ensure Adequate Compensation) is proposed as part of Alternative 4, and would require DOGGR to coordinate with the applicable local land use agency to determine whether new well development and stimulations would place a burden on public services, and to ensure that appropriate compensation is provided to the local agency.

With implementation of this measure, Impact PUB-1 (Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools) would be less than significant (Class II). Impacts on public services would be nearly the same under the project and Alternative 4.

**MM PUB-1a**   **Assess Public Service Ratios and Ensure Adequate Compensation.** (Full text in EIR Section 10.19.5.)

### 12.5.19.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Field are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 4 would be the same as those described in EIR Section 11.19 (Public Services).

### 12.5.19.4   Impact Significance Summary

As discussed, the potential for impacts to public service providers under Alternative 4 would be similar or identical to that provided for the project.

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.20   Recreation

### 12.5.20.1   Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

~~Without implementation of project standards for resource protection under this alternative, oil and gas development and associated well stimulation may occur in open space areas and areas near water resources used for recreation.~~

### 12.5.20.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 4 would not allow future oil and gas well drilling for the purposes of stimulation outside of existing oil and gas fields boundaries and their buffer areas within the boundaries of an designated Urbanized Areas. Because well stimulation treatment activities would be outside of Urbanized Areas, Alternative 4 may put well stimulation activities closer to recreational open space areas.

Urbanized Areas are areas with a population over 50,000 and are defined by the U.S. Census Bureau 2010 estimated Census populations. Figures 8-1 through 8-3 illustrate the Urbanized Areas within each study region. Because this alternative would apply only to areas outside of existing oil and gas fields, the Inglewood, Sespe, and Wilmington Oil and Gas Fields are not part of this alternative.

This alternative has been developed primarily for consideration by local agencies and would not be implemented by DOGGR itself. As applied in particular counties and incorporated cities, this alternative would likely require local legislative actions amending existing general plans and zoning and possibly grading ordinances.

Implementation of Alternative 4 would not allow future oil and gas well drilling for the purposes of stimulation outside of existing oil and gas field boundaries and their buffer areas within the boundaries of established Urbanized Areas. The analysis for the project focuses on areas where the existing oil and gas fields are located. As illustrated in Figures 10.20-1 through 10.20-3, there are numerous recreational areas outside of Urbanized Areas. Under Alternative 4, it is possible that prohibitions on well stimulate treatments in Urbanized Areas could trigger increased well stimulation activities outside of their boundaries. However, any in-migration from new workers in these areas would be nominal compared to the existing populations. Similarly, the increased use of existing recreational areas or facilities as a result of new employment for well stimulation treatments would be nominal in considering the numerous recreation opportunities within the State. As such, Impact REC-1 would be less than significant (Class III).

Impact REC-2 addresses disruptions in designated recreation areas. For the purpose of this EIR, recreation areas are considered sensitive receptors as they tend to be areas where children are present, and depending on the available facilities, they can be used for intense physical activities. In addition, recreation users often value the recreation experience based on the quality of the surrounding (i.e., lack of industrial activities, natural spaces, low noise levels, high scenic quality, etc.). Potential types of disruptions to recreational resources are listed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures). Alternative 4 would require that well stimulation treatment activities be located farther from population centers and existing land uses. Therefore, in comparison to the project, Alternative 4 would decrease the potential for disturbances to local recreation facilities and areas found in Urbanized Areas. However, the potential for disturbance to large federal, state and regional recreation areas that are located outside of Urbanized Areas would be the same as for the project.

Each of the potential disruption types is discussed in detail in the EIR Sections 10.1 (Aesthetics), 10.3 (Air Quality), 10.6 (Coastal Processes and Marine Water Quality), 10.7 (Commercial and Recreational Fishing), 10.13 (Hazards and Hazardous Materials), 10.15 (Surface Water Resources), 10.16 (Land Use and Planning), 10.17 (Noise and Vibration), 10.21 (Risk of Upset/Public and Worker Safety), and 10.22 (Transportation and Traffic). The mitigation measures provided in these sections would also effectively mitigate potential impacts to recreational resources to the maximum extent feasible.

Mitigation Measures REC-2a and REC-2b, detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures), would reduce effects associated with Impact REC-2 to a level of less than significant (Class II). Under the project, Impact REC-2 is also Class II; however, as noted above, the potential for disturbances to local recreation facilities and areas within Urbanized Areas would decrease under Alternative 4.

### 12.5.20.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As referenced above, Alternative 4 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not considered as part of this alternative.

### 12.5.20.4   Impact Significance Summary

At a programmatic level of analysis, the impacts associated with Alternative 4 would be less than significant for Impact REC-1 (Class III) and mitigable to a level of less than significant for Impact REC-2 (Class II). Mitigation Measures REC-2a and REC-2b, as summarized in EIR Section 12.2.20.2 (No Future Well Stimu-

lation Practices Alternative [Alternative 1], programmatic level analysis for recreation) and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures).

## 12.5.21   Risk of Upset/Public and Worker Safety

### 12.5.21.1   Introduction

This section provides an evaluation of the potential impacts for risk of upset/public and worker safety associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.5.21.2   Programmatic Level Analysis of the Project

Under this alternative, there would be no substantial reduction in well stimulation treatment activities. Therefore, the forecast number of accidents for Alternative 4 is approximately the same as for the project case. However, well stimulation activities would be outside of Urbanized Areas and farther from sensitive receptors. The remainder of impacts from well stimulation activities occur as in the project.

Alternative 4 and the project case will have lower annual average projected crude oil imports compared to Alternatives 1 and 2, and imports of crude oil by rail will occur under Alternative 4 the same as with the project case.

With the implementation of mitigation measures (if any) from EIR Section 10.21, Impacts RSK-1, ~~RSK-2,~~ and RSK-6 are ~~all~~ Class I under the project and under Alternative 4; Impacts RSK-2, RSK-4, RSK-5, and RSK-7 are all Class II under the project and under Alternative 4; Impact RSK-3 is Class III. ~~With the implementation of mitigation measures, Impacts RSK 1, RSK 2, and RSK 6 would be Class I under Alternative 4; Impacts RSK-4, RSK-5, and RSK-7 are all Class II under Alternative 4; Impact RSK-3 is Class III.~~

### 12.5.21.3   Programmatic Level Analysis of Specific Oil and Gas Fields

#### 12.5.21.3.1   Wilmington Oil and Gas Field

The recordable injury rate from well stimulation treatment and drilling activities is expected to be similar to that for the project. No impacts from increased rail traffic or truck traffic are anticipated for Wilmington Oil and Gas Field. The impacts and mitigation identified for the project would apply within the field.

#### 12.5.21.3.2   Inglewood Oil and Gas Field

Well stimulation treatments would occur at Inglewood Oil and Gas Field under Alternative 4 as they would for the project. As a result, the mitigation identified for the project would apply within Inglewood.

*12.5.21.3.3  Sespe Oil and Gas Field*

No accidents are expected from well stimulation treatment activities in Sespe Oil and Gas Field. No impacts from increased truck traffic are anticipated for Sespe. The impacts and mitigation identified for the project would apply within the field.

### 12.5.21.4   Impact Significance Summary

Overall Alternative 4 is projected to have a truck accident rate and an oil worker injury rate similar to those for the project.

The crude oil rail accident rate for Alternative 4 is approximately four per year (100 over 25 years) as with the project case. The number of accidents is based on the train miles traveled, which is directly related to the volume of crude imported. Since volume of imported crude oil is approximately 25 percent of highest import case (Alternative 1, Table 10.21-16), the number of accidents is approximately 25 percent of those on that Table. Study regions that may be at slightly greater risk of a rail accident include Study Regions 1, 4, 5, and 6. Given the relatively very number of derailments compared to the number of shipments of oil, the occurrence of a major accident is expected to be very low and nearly all of the potential accidents that may occur are expected to be minor.

In addition, there may be accidents from proppant deliveries by rail at a rate of 16 over 25 years, as with the project case. The volume of proppant is proportional to the number of wells hydraulically fractured, which in turn will require more rail cars. The maximum number of accidents corresponding to the highest volume of proppant is shown in Table 10.21-15. Since the number of wells for Alternative 4 is approximately 10 percent less than that of the maximum case, the number of accidents is approximately 10 percent less as well. The Regions at higher risk for accidents are Regions 1 and 4, with a lesser potential in Regions 5 and 6.

Truck traffic from drilling activities and hydraulic fracturing activities is estimated at approximately 8 million truck miles from 2015-2040 with a forecast of one accident for Alternative 4 and the project case. The total passenger accidents forecast from 297 million vehicle miles traveled is 511. Since the project and Alternative 4 have approximately 10 percent less wells to be hydraulically fractured than the maximum case on Table 10.21-18, the number of accidents also decreases by approximately the same amount. Almost all of the impact will be in Region 4.

Each of the impacts related to risk of upset and safety would be as described for the project, although the consequences of accidents may be slightly reduced because well stimulation activities would be outside of Urbanized Areas and farther from sensitive receptors.

## 12.5.22   Transportation and Traffic

### 12.5.22.1   Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and

traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

The transportation and traffic regulatory setting, affected environment, methodology, and impact criteria for Alternative 4 are the same as those presented in EIR Section 10.22 (Transportation and Traffic) and EIR Section 11.22 (Transportation and Traffic). Transportation and traffic analysis for alternatives are based on the number of trips generated by per well and the total number of the wells, which would be the same as for the project.

### 12.5.22.2   Programmatic Level Analysis of the Project

This alternative would prevent future oil and gas exploratory, stimulation and production activity within established Urbanized Areas (population over 50,000) if they are not within existing oil and gas fields. Well stimulation treatments would not be allowed in some areas outside of existing oil and gas fields, particularly in areas near the greater Los Angeles region, Bakersfield, Modesto, greater Bay Area region, and the greater Sacramento region. Areas outside of Urbanized Areas would be available for well stimulation activities, including many rural areas and smaller towns. Although well stimulation in some areas would be limited, much of the area outside of existing fields would remain available for stimulation activities, and this alternative would minimally affect future oil and gas production.

Under Alternative 4, well stimulation treatment activities would be farther from population centers and on more rural roadways that could be subject to pavement damage from truck trips. But these rural roads would have less existing traffic compared to those in Urbanized Areas. As with the project and all alternatives, traffic safety hazard impacts from the transport of hazardous materials (Impact TR-4) is significant and unmitigable (Class I).

Metropolitan areas and cities in general experience greater congestion than rural areas. Restricting well drilling and stimulation activity in Urbanized Areas would alleviate traffic operation impacts associated with well sites located in cities. However, haul routes may still cross within urbanized areas and the overall number of trips generated per well in Alternative 4 would remain same as for the project. The average trip length for development or stimulation of a rural well would depend on the availability of water nearby, but would likely also be similar to that for urban wells. Therefore, traffic impacts (Impacts TR-1 through TR-6) and recommended mitigation measures below would be essentially identical to those of the project (see EIR Section 10.22). Impacts TR-1, TR-2, TR-3, and TR-6 would all be Class II. Impact TR-5 would be Class III. And Impact TR-4 would be Class I.

**MM TR-1a**    **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

**MM TR-2a**    **Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

**MM TR-4a**    **Know Spill Prevention Measures.** (Full text in EIR Section 10.22.5.)

### 12.5.22.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington and Sespe fields for Alternative 4 would be the same as those described in EIR Section 11.22 (Transportation and Traffic).

#### 12.5.22.4   Impact Significance Summary

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

### 12.5.23   Utilities and Service Systems

#### 12.5.23.1   Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

#### 12.5.23.2   Programmatic Level Analysis of the Project

Alternative 4 is intended to reduce potential well stimulation impacts to established Urbanized Areas (those with a population over 50,000) outside of existing oil and gas fields. The need for new or expanded utilities and service systems is strongly influenced by population levels. As discussed within EIR Section 12.4.18 (Population and Housing), Alternative 4 has the potential for increasing population in-migration impacts because it would site wells outside urbanized areas with higher population levels when compared to the project. In general, however, minor population growth from new employment would have a less than significant impacts to utility and service systems, including their existing and projected capacities. These impacts would be less than significant (Impact UTL-1).

Under Alternative 4, there is an increased potential for new electrical/gas infrastructure and demands to wastewater treatment providers to serve new wells outside of existing fields because this alternative requires well stimulation to occur only within more rural areas or existing fields. Assuming a similar number of wells would be developed under Alternative 4 and the project, restricting well development in Urban Areas would simply displace some well drilling from within Urban Areas outside of existing fields to nearby areas outside of the urban designation. In general, this alternative would not substantially increase potential impacts of utilities when compared to those of the project. Providers of electricity and natural gas are assumed to have sufficient supplies to meet demand, though the extension of utilities to rural areas might in some instances be necessary in order for oil and gas production to proceed. These extensions would be subject to rules favoring the use of existing rights-of-way and requiring the minimization of environmental impacts. Outside of existing fields, Alternative 4 thus would not substantially increase potential impacts from electrical and natural gas interconnections by requiring new well sites to be developed outside protected urbanized areas. Impacts would not be significant. (Impact UTL-2). Requiring new wells to be developed outside of urbanized areas would not increase potential project impacts from wastewater and solid waste generation when compared to the project as areas outside of Urban Areas would still be served by wastewater and solid waste facilities. Impact would be potentially significant, but less than significant after mitigation (Impacts UTL-3 and UTL-4).

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 426 of 689   Page
ID #:5373
Analysis of Oil and Gas Well Stimulation Treatments in California
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

To ensure all utilities and service systems would have adequate capacities under Alternative 4, Mitigation Measures UTL-3a and UTL-4a are also proposed for Alternative 4. With the inclusion of these measures, impacts UTL-1 and UTL-2 are Class III and impact UTL-3 and UTL-4 are Class II.

**MM UTL-3a**    **Assess Wastewater Quality and Ensure Adequate Compensation to Municipal and Private Wastewater Treatment Plants.** (Full text in EIR Section 10.23.5.)

**MM UTL-4a**    **Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Compensation to Municipal and Private Solid Waste Facilities.** (Full text in EIR Section 10.23.5.)

**12.5.23.3   Programmatic Level Analysis of Specific Oil and Gas Fields**

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 4 would be the same as those described in EIR Section 11.23 (Utilities and Service Systems).

**12.5.23.4   Impact Significance Summary**

Please refer to Table 12.5.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.5.24   Impact Summary Table for Alternative 4

Table 12.5.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 4.

**Programmatic Level Analysis of the Project**

The Urbanized Area Protection Alternative would not allow future oil and gas well drilling for the purposes of stimulation outside of existing oil and gas fields' boundaries and their buffer areas within the boundaries of an established Urbanized Area. Given the amount of land outside of urbanized areas that would be available for well stimulation treatments, the overall levels of oil and gas production and ground disturbance would be similar to those of the project. By restricting well stimulation treatments in the vicinity of population centers and sensitive receptors, Alternative 4 would be better than the project for the following impacts: aesthetics, air quality, environmental justice, hazards and hazardous materials, groundwater resources, land use and planning, noise and vibration, and risk of upset/public and worker safety.

Although the extent of the Monterey Formation is somewhat unknown, should well development not be allowed in these urban areas and instead be pushed into smaller cities and communities, depending on (i) site-specific geologic conditions, (ii) the level of well development, and (iii) the availability of nearby transient lodging, the potential for population in-migration would be greater, although it would still be less than significant (Class III). Similarly, Alternative 4 would also have greater (Class II) impacts than the project for public services, recreation, transportation and traffic, and utilities and service systems. Alternative 4 would be similar to the project for all other issue areas.

**Programmatic Level Analysis of Specific Oil and Gas Fields**

Alternative 4 does not apply to existing fields. Because the Inglewood Oil and Gas Field, Wilmington Oil and Gas Field, and Sespe Oil and Gas Field are existing fields, well stimulation activities would be allowed. Therefore, impacts associated with well stimulation activities at the fields would be the same as those described for the project.

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AESTHETICS** | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-2. Substantially alter or damage scenic resources. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-4. Create new sources of substantial light and glare. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| **AGRICULTURE AND FORESTRY RESOURCES** | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class II on or adjacent to Important Farmland<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-1c: Compensate for Loss of Important Farmland | Same as those listed in Table 11.2-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class II on land zoned for agricultural use or enrolled in Williamson Act contracts<br>AGF-2a: Ensure Compatibility with Agricultural Zoning<br>AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Same as those listed in Table 11.2-1 |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class II on land zoned as forestland, timberland, or Timberland Production<br>AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Same as those listed in Table 11.2-1 |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class II on forest land<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Same as those listed in Table 11.2-1 |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class II for well stimulation activities on or within 1,500 feet of agricultural or forest land<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.2-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AIR QUALITY** | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Statewide)<br>Class III (in SCAQMD)<br>AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures<br>AQ-1b: Improve the Methodologies and Emission Factors Used in Inventory Development | Same as those listed in Table 11.3-1 |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>AQ-2c: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.3-1 |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I<br>AQ-3a: <u>Comply with Local Air District Protocols Relating to the Preparation of:</u>~~Prepare~~ a Health Risk Assessment and Implement Emission Controls<br>AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I<br>AQ-4a: Prepare and Implement an Odor Minimization Plan<br>AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.4-8 |
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan | Same as those listed in Table 11.4-8 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br>GW-1a: Use Alternative Water Sources to the Extent Feasible<br>GW-1b: Minimize Groundwater Impacts<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class I<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Same as those listed in Table 11.4-8 |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Same as those listed in Table 11.4-8 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.4-8 |
| **CULTURAL RESOURCES** | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-2. Affect prehistoric resources | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-4. Affect cultural landscapes. | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| **PALEONTOLOGICAL RESOURCES** | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class II if fossil bearing geologic units are present<br>Class IV if no fossil bearing units are present<br>PALEO-1a: Require Information and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.9-4 |
| **ENVIRONMENTAL JUSTICE** | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Same as those listed in Table 11.10-4 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **GEOLOGY, SOILS AND MINERAL RESOURCES** | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class II<br>GEO-1a: Avoid Active Faults ~~Zones~~ if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~<br>GEO-1c~~d~~: Implement Industry Accepted Practices<br>GEO-1d~~e~~: Conduct Ground Monitoring<br>GEO-1e~~f~~: ~~Prepare~~ Include an Earthquake Response Plan with the Spill Contingency Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class II<br>GEO-3a: Prepare Geotechnical Report if Necessary | Same as those listed in Table 11.11-4 |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class III<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class III in most instances; Class I in some instances<br>None available | Same as those listed in Table 11.11-4 |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class III<br>None required | Same as those listed in Table 11.11-4 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **GREENHOUSE GAS EMISSIONS** | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Same as those listed in Table 11.12-1 |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.12-1 |
| **HAZARDS AND HAZARDOUS MATERIALS** | | |
| Impact HAZ-1. Release hazardous materials into the environment from a spill or leak | Class II<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u><s>Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices</s> | Same as those listed in Table 11.13-1 |
| **GROUNDWATER RESOURCES** | | |
| Impact GW-1. Cause or contribute to overdraft conditions | Class II<br>GW-1a: Use Alternative Water Sources <u>to the Extent Feasible</u><br>GW-1b: <u>Minimize Groundwater Impacts</u><s>Prepare a Third-Party Technical Report to Analyze Overdraft Impacts</s> | Same as those listed in Table 11.14-6 |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class II<br>GW-1<u>b</u><s>2a</s>: <u>Minimize Groundwater Impacts</u><s>Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping</s> | Same as those listed in Table 11.14-6 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GW-3. Adversely impact groundwater quality from surface spills or leaks during well stimulation | Class II<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Same as those listed in Table 11.14-6 |
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals | Class II<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>GW-4c: Install Methane Sensors on Wells ~~in the ADSA~~Subject to Well Stimulation Treatments | Same as those listed in Table 11.14-6 |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells | Class II<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Same as those listed in Table 11.14-6 |
| Impact GW-6. Improper disposal of flowback in injection wells could potentially impact groundwater quality | Class II<br>GW-6a: Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~ | Same as those listed in Table 11.14-6 |
| Impact GW-7. Inability to identify specific impacts to groundwater quality from well stimulation activities | Class II<br>GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Same as those listed in Table 11.14-6 |
| **SURFACE WATER RESOURCES** | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-1~~b~~c: Provide Adequate Flood Protection<br>SWR-1~~c~~d: Protect Surface Water Reservoirs<br>BIOT-2a: Prevent Hazards to Fish and Wildlife | Same as those listed in Table 11.15-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class II<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.15-1 |
| Impact SWR-3. Substantially diminish surface water quantity. | Class II<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.15-1 |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class II<br>SWR-1~~b~~c: Provide Adequate Flood Protection | Same as those listed in Table 11.15-1 |
| **LAND USE AND PLANNING** | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I<br>None available for impacts associated with Risk of Upset/Public and Worker Safety | Same as those listed in Table 11.16-3 |
| Impact LU-2. Physically divide an established community. | Class III<br>None Required~~LU-2a: Ensure That Established and Planned Communities Are Not Divided~~ | Same as those listed in Table 11.16-3 |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class II<br>SB 4 regulation requiring "Neighbor Notification" (Section 1783.2)<br>All mitigation measures prescribed in this EIR | Same as those listed in Table 11.16-3 |
| **NOISE AND VIBRATION** | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class II<br>NOI-1a: Control Noise Levels near Sensitive Land Uses | Same as those listed in Table 11.17-10 |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class III<br>None required | Same as those listed in Table 11.17-10 |
| **POPULATION AND HOUSING** | | |
| Impact POP-1. Induce substantial population growth | Class III<br>None required | Same as those listed in Table 11.18-4 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required | Same as those listed in Table 11.18-4 |
| **PUBLIC SERVICES** | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Same as those listed in Table 11.19-4 |
| **RECREATION** | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III<br>None required | Same as those listed in Table 11.20-3 |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas | Same as those listed in Table 11.20-3 |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Same as those listed in Table 11.21-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>RSK-2a: Conduct a Reactive Hazard Assessment (RHA)<br>RSK-2ab: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>RSK-2c: Install an Upgraded SCADA System<br>RSK-2bd: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System<br>RSK-2cf: Ensure Mechanical Integrity Through Compliance with Permanent Program Complies with Regulation | Same as those listed in Table 11.21-1 |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required | Same as those listed in Table 11.21-1 |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Same as those listed in Table 11.21-1 |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Same as those listed in Table 11.21-1 |
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing None available | Same as those listed in Table 11.21-1 |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.21-1 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **TRANSPORTATION AND TRAFFIC** | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-2. Inadvertently damage road rights-of-way | Class III for project activities in Study Region 6 and in existing oil and gas fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-2a: Repair Roadway Damage | Same as those listed in Table 11.22-9 |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-4. Transport hazardous materials | Class I<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| Impact TR-5. Change air traffic patterns | Class IV if no airports are nearby<br>Class III if FAA notification under 14 CFR 77 is required<br>None required | Same as those listed in Table 11.22-9 |
| Impact TR-6. Temporarily interfere with emergency response | Class III for project activities in Study Region 6 and for existing fields<br>Class II in Study Regions 1-5 outside of existing oil and gas fields where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan<br>TR-2a: Repair Roadway Damage<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| **UTILITIES AND SERVICE SYSTEMS** | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from Project-related development | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III<br>None required | Same as those listed in Table 11.23-6 |

**Table 12.5.24-1. Summary of Impacts and Mitigation Measures for Alternative 4**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class II<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate ~~Compensation to~~Capacity to Process Wastewater at Municipal and Private Wastewater Treatment Plants | Same as those listed in Table 11.23-6 |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class II<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate ~~Compensation to~~Capacity Accept Solid Waste at Municipal and Private Solid Waste Facilities | Same as those listed in Table 11.23-6 |

# 12.6    Active Fault Zone Restrictions Alternative (Alternative 5)

The Active Fault Zone Restrictions Alternative (Alternative 5) would prohibit future oil and gas well stimulation treatments within the earthquake study zone boundaries of a known active earthquake faults occurring outside of existing oil and gas field boundaries and their buffer areas. Earthquake fault zones are delineated on the most recent Alquist-Priolo Earthquake Fault Zoning Map issued by the State Geologist, or are otherwise based on other substantial evidence of a known fault. As shown in Figures 8-4 through 8-6, portions of all of the study regions would be excluded from stimulation treatments under this alternative.

Cities, counties, and State agencies use the Earthquake Fault Zones maps in planning and controlling new or renewed construction. This alternative would be implemented by local governments, which would modify their general plans, zoning codes, and other planning documents to exclude well stimulation treatment activities from within the Earthquake Fault Zones.

As with Alternative 1, this alternative assumes that any action taken by the State to restrict or limit well stimulation activities would not be applicable in areas under federal or tribal jurisdiction. Any activity that is currently allowed in areas under federal or tribal jurisdiction would continue to be allowed, and could increase, stay the same or decrease in intensity. The current permitting and environmental review processes applicable to stimulation activities in areas under federal and tribal jurisdiction would continue to apply to new well stimulation projects in those areas, and therefore impacts are assumed to be mitigated as appropriate and feasible. The analysis below for this alternative focuses only on activities in areas under State jurisdiction, and includes the assumption that the analysis of effects in areas under federal or tribal jurisdiction would be the same as with Alternative 1. Therefore, effects in areas under federal or tribal jurisdiction are not considered further in the analysis of this alternative.

Alternative 5 is similar to Alternative 4 in that both would excluded well stimulation treatments from specific geographic areas. In particular, Alternative 5 would exclude well stimulation treatments from mapped fault zones, but this prohibition would not apply to existing fields or their buffers. As a result of implementing Alternative 5, limited areas outside of the existing oil and gas fields would not be available for well stimulation. Fault zones are relatively narrow linear features and much of a region would remain available; therefore, this alternative is likely to minimally impact the use of well stimulation techniques and future oil and gas production.

In addition to an analysis of the alternative itself, the analysis of Alternative 5 highlights how impacts under this alternative would be different from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

## 12.6.1    Aesthetics

### 12.6.1.1    Introduction

This section provides an evaluation of the potential impacts to visual resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.1 (Aesthetics) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.1 (Aesthetics). For the purposes of this analysis please refer to EIR Sections 10.1.2 and 11.1.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.1.3 and 11.1.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.1.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.1.2    Programmatic Level Analysis of the Project

Banning well stimulation on wells falling within the boundaries of active faults outside of existing fields would nominally reduce the area within which stimulation activities could occur, but this would be a minor reduction and would have little or no effect on visual impacts resulting from oil and gas development. Overall, the amount of land disturbance would not be reduced and visual impacts would not be reduced. Mitigation measures as described in EIR Section 10.1.5 likely would still be required outside of the fault zones in most circumstances. In the absence of specific project sites and known vantage points from which a new field would be viewed, it is not possible to determine if impacts, even with mitigation, would be less than significant (Class II) or significant and unmitigable (Class I). A determination would need to be made on a case-by-case basis. This is true in all six study regions. Impacts under Alternative 5 would be similar to those for the project in areas outside of existing fields.

### 12.6.1.3    Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

This alternative would apply only to areas outside of existing oil and gas fields; therefore, it would not apply at the Wilmington, Inglewood, and Sespe Oil and Gas Fields.

### 12.6.1.4    Impact Significance Summary

The areas of identified active faults are limited and follow the linear fault traces. Prohibiting oil and gas wells in these mapped areas may nominally alter what would have been the configuration of a field, but this would have little effect on reducing overall changes introduced into the visual environment. The visual impact of this alternative would be similar that for the project and similar mitigation would be required.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.2    Agriculture and Forestry Resources

### 12.6.2.1    Introduction

This section provides an evaluation of the potential impacts to agriculture and forestry resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.2 (Agriculture and Forestry Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.2 (Agriculture and Forestry Resources). For the purposes of this analysis please refer to EIR Sections 10.2.2 and 11.2.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.2.3 and 11.2.3 for a description of the affected environment for agriculture and forestry resources (as applicable at either a study region or field-specific scale), and EIR Section 10.2.4 for details regarding the impact methodology and significance criteria that have been used.

~~Under this alternative, the project standards for resource protection (see EIR Section 7.5) would not be implemented, which would result in greater indirect impacts on agricultural and forestry resources (Impact AGF-5, Directly or indirectly impair the use of agricultural land or forest land). Without the Water Recycling Standards, there would be an increase in competition for agricultural water supplies, because less water would be recycled. In addition, the potential for contamination of agricultural water supplies would be increased without implementation the Surface Water Protection Standards and Groundwater Protection Standards.~~

### 12.6.2.2    Programmatic Level Analysis of Impacts and Mitigation Measures

As shown on Figures 8-10 through 8-12, portions of all the study regions would be excluded from stimulation treatments under Alternative 5. Therefore, Alternative 5 would reduce overall impacts on agricultural and forestry resources only where Important Farmland and forest land overlap with active fault zones outside established oil and gas fields and their buffer zones. In these areas, there would be reduced impacts related to construction of new well pads and associated facilities for projects dependent on well stimulation treatments; however, potential impacts (Impacts AGF-1 through AGF-5) would still occur if there is agriculture or forest land present at a well site outside of an active fault zone. In all other areas, impacts and recommended mitigation measures would be similar to those for the project, as described in EIR Section 10.2 (Agriculture and Forestry Resources).

### 12.6.2.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation treatment activities would be allowed under this alternative. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe Oil and Gas Fields for Alternative 5 would be the same as those described in EIR Section 11.2 (Agriculture and Forestry Resources).

### 12.6.2.4    Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.3    Air Quality

### 12.6.3.1    Introduction

This section provides an evaluation of the potential impacts to air quality associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.3 (Air Quality) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.3 (Air Quality). For the purposes of this analysis please refer to EIR Sections 10.3.2 and 11.3.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.3.3 and 11.3.3 for a description of the affected environment for air quality (as applicable at either a study region or field-specific scale), and EIR Section 10.3.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.3.2    Programmatic Level Analysis of Impacts and Mitigation Measures

Active Fault Zone Restrictions Alternative (Alternative 5) would restrict future oil and gas activity in certain zones. Although some areas in fault zones would not be available for well stimulation treatments, abundant areas outside of fault zones would still be available. Therefore, the intensification of traditional drilling and the increased importation of oil expected under Alternatives 1 and 2 would not occur under this alternative.

Emissions from oil and gas production would occur at similar or slightly reduced levels. Emissions from oil and gas activity could occur at levels exceeding the forecasts of air quality plans, as they would with the project, which may cause a potential conflict with local air quality plans. The levels of criteria air pollutant emissions caused by equipment and sources typical of well stimulation treatments, hauling product by truck, and new well drilling may exceed general mass-based emission thresholds of a local air

district. This alternative would retain the potential to expose sensitive receptors to substantial pollutant concentrations and create objectionable odors as with the project. Although emissions and activities would be limited in some areas, each of the air quality impacts would be as described for the project, and the mitigation identified for the project (EIR Section 10.3) would be applicable.

### 12.6.3.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 5, these existing fields would be subject to the same potential impacts and mitigation measures as described for the project (EIR Section 11.3.5). Because each new well stimulation treatment operation creates "new" emissions, which could be potentially significant, mitigation would be necessary. Although Impact AQ-1 would be a Class III: Less Than Significant Impact, the remaining air quality impacts would occur as shown under Impacts Common to All Study Regions (EIR Section 10.3.5). Mitigation measures identified for Impact AQ-2, Impact AQ-3, and Impact AQ-4 would be applicable within each field, and the resulting impacts after implementing mitigation would be significant and unavoidable (Class I).

### 12.6.3.4    Impact Significance Summary

Although emissions and activities related to well stimulation treatments would be limited in some areas under Alternative 5, emissions from oil and gas activity would occur at levels comparable to those of the project. Each of the air quality impacts due to well stimulation treatments would be as described for the project.

## 12.6.4    Biological Resources: Terrestrial Environment

### 12.6.4.1    Introduction

This section provides an evaluation of the potential impacts to terrestrial biological resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.4 (Biological Resources: Terrestrial Environment) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.4 (Biological Resources: Terrestrial Environment). For the purposes of this analysis please refer to EIR Sections 10.4.2 and 11.4.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.4.3 and 11.4.3 for a description of the affected environment for terrestrial biological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.4.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, compared to the project, there would be the potential for an increase in oil and gas development and associated well stimulation in biologically sensitive areas, slightly greater habitat loss without setbacks from perennial surface water, an increase in water usage that could affect fish and wildlife habitat (due to less water recycling), and an increase in the potential for contamination of water supplies that could affect biological resources.~~

### 12.6.4.2    Programmatic Level Analysis of the Project

Alternative 5 would exclude well stimulation within the special studies zone boundaries of known earthquake faults and outside existing oil and gas fields. This alternative could reduce impacts to terrestrial biological resources, but the actual reduction cannot be quantified. Statewide, special studies zones provide habitats that are comparable to other lands, ranging from urbanized and industrial land uses to nat-

ural open space. Outside of special studies zones, the impacts to terrestrial biological resources would be the same as described in EIR Section 10.4. To the extent that Alternative 5 may reduce potential impacts to natural open space within the study zones, its impacts to biological resources would be reduced from the project. Depending on specific locations of future well stimulation activities, the potential impacts to biological resources may range from Class I (significant and unavoidable) to Class III (less than significant). Due to the unknown locations of future well stimulation activities, this analysis presumes the "reasonable worst case" statewide impacts of well stimulation, which generally are Class I or Class II.

Under Alternative 5, impacts to biological resources may be significant and unavoidable (Class I). This would apply to all the biological resources impact criteria BIOT-1 through BIOT-6 (addressing impacts to plants, fish, and wildlife and their habitats and natural communities) and BIOT-10 (greenhouse gas effects and consequent impacts to biological resources), below. In contrast, Impacts BIOT-8 and BIOT-9 (addressing conflicts with conservation policies and planning) are Class II impacts under the this alternative (and under the project).

### 12.6.4.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 5 would not apply to existing oil and gas fields, and thus would not exclude well stimulation treatments in the Wilmington, Inglewood, or Sespe Oil and Gas Fields. Potential impacts to terrestrial biological resources in each field would be as described in EIR Section 11.4. Potential "reasonable worst-case" impacts to biological resources would be Class I for Impacts BIOT-1 through BIOT-6 and BIOT-7 (Sespe field only); Class II for Impacts BIOT-8 and BIOT-9; and Class III for Impacts BIOT-7 (for the Wilmington and Inglewood fields) and BIOT-10 (as they would be under the project).

### 12.6.4.4    Impact Significance Summary

Alternative 5 (Active Fault Zone Restrictions) may reduce some impacts to biological resources within special studies zones, but would not affect biological resources impacts outside of these areas. Impacts would be essentially the same as those of the project.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.5    Biological Resources: Coastal and Marine Environment

Alternative 5 (Active Fault Zone Restrictions) may place limited areas off limits for well stimulation in the coastal area. Impacts would be the same as those of the project (Class III).

Please refer to Table 12.6.24-1 for a summary of impacts by each impact criterion.

## 12.6.6    Coastal Processes and Marine Water Quality

### 12.6.6.1    Introduction

This section provides an evaluation of the potential impacts to coastal processes and marine water quality associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.6 (Coastal Processes and Marine Water Quality). For the purposes of this analysis please refer to EIR Sections 10.6.2 and 11.6.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.6.3 and 11.6.3 for a description of the affected environ-

ment for coastal processes and marine water quality (as applicable at either a study region or field-specific scale), and EIR Section 10.6.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, well stimulation activities would potentially be allowed in Marine Protected Areas, as well as closer to waterways, which would increase the potential for spills to enter waterways and impact marine water quality.~~

### 12.6.6.2    Programmatic Level Analysis of the Project

~~Alternative 5 may reduce the risk of well stimulation activities triggering seismic activity onshore, but, for several reasons, may not affect the risk of tsunamis. Fault Zones offshore, generally speaking, are less well-mapped, well-known and characterized than fault zones onshore (Legg et.al., 2001). Although researchers are capable of mapping earthquake faults even in deep water, it is more difficult, uncertain, and expensive than mapping them on land. As discussed in EIR Section 10.6.3, areas of "perched" sediment underwater, and other geologic risks such as subsidence associated with removal of petroleum product, would also have to be investigated and geologically analyzed. Until these factors are thoroughly investigated and analyzed for all areas near well stimulation treatments — a very expensive and lengthy investigation — there will remain a risk, however small, that a minor seismic event could trigger a disproportionately large tsunami, as discussed in that earlier Section.~~

~~The California Seafloor Mapping project could eventually assist in mapping and reducing these factors of tsunami risk (see USGS, 2014). However, at present the project is charting only bathymetry, not earthquake faults or perched sediment. Therefore, the~~P~~p~~rogrammatic impacts of Alternative 5 would be essentially the same as those for the project. <u>Alternative 5 may further reduce the risk of well stimulation activities triggering seismic activity offshore, but since this risk is already considered low (Class III), it would neither be superior nor inferior to the project in this respect.</u> See EIR Section 12.2.6.2 for a list of the impacts and mitigation measures.

### 12.6.6.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Because this alternative would apply only to areas outside of existing oil and gas fields, the Inglewood, Sespe, and Wilmington oil and gas fields are not part of this alternative.

### 12.6.6.4    Impact Significance Summary

Compared with the project, this alternative does not implicate any of the impact criteria for coastal processes except for Impact CPMWQ-5 (Increase the risk of tsunami). As discussed above, Alternative 5 would not substantially affect this impact. Therefore, impact classifications would be the same as those for the project.

Please refer to Table 12.6.24-1 for a summary of impacts by each impact criterion.

## 12.6.7    Commercial and Recreational Fishing

Alternative 5 (Active Fault Zone Restrictions) does not vary from the project in a way that affects commercial and recreational fishing. Impacts would be the same as those of the project (Class III).

Please refer to Table 12.6.24-1 for a summary of impacts by each impact criterion.

## 12.6.8    Cultural Resources

### 12.6.8.1    Introduction

This section provides an evaluation of the potential impacts to cultural resources associated with Alternative 1. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.8 (Cultural Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.8 (Cultural Resources). For the purposes of this analysis please refer to EIR Sections 10.8.2 and 11.8.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.8.3 and 11.8.3 for a description of the affected environment for cultural resources (as applicable at either a study region or field-specific scale), and EIR Section 10.8.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.8.2    Programmatic Level Analysis of the Project

For the purposes of this analysis, the following impacts are addressed:

- **Impact CUL-1:** Affect historic-era archaeological and built-environment resources

- **Impact CUL-2:** Affect prehistoric resources

- **Impact CUL-3:** Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony

- **Impact CUL-4:** Affect cultural landscapes

Alternative 5 would prohibit future oil and gas well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the special studies zone boundaries of a known active earthquake fault. Portions of all the study regions would be excluded from stimulation treatments under this alternative.

Due to restrictions in Alternative 5 on the geographic extent of future well stimulation disturbances, this alternative would reduce potential site-specific disturbances to cultural resources. However, conventional well activity may increase under Alternative 5, and thus impacts to cultural resources at a programmatic level of analysis would likely be similar to those of the project.

Mitigation Measures CUL-1a through CUL-1j, as detailed in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures), would likely reduce these effects but cannot guarantee they would be entirely avoided. Therefore, impacts would remain significant and unavoidable (Class I).

### 12.6.8.3    Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 5 does not apply to existing oil and gas fields; therefore it does not apply to the Wilmington, Inglewood, and Sespe Oil and Gas Fields.

### 12.6.8.4    Impact Significance Summary

Alternative 5 would reduce the potential impacts to cultural resources in all study regions at the programmatic level because the geographic extent of potential effect would be somewhat reduced. ~~However, outside of active fault zones, impacts to cultural resources would be expected to increase in comparison to the project because the Standards for Resource Protection included within the project but not the alternative would not be implemented.~~ Mitigation Measures CUL-1a through CUL-1j, as detailed

in EIR Section 10.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) and EIR Section 11.8.5 (Cultural Resources, Impact Analysis and Mitigation Measures) would reduce these effects, but cannot guarantee they would be entirely avoided. Potential impacts are therefore considered significant and unavoidable (Class I).

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.9    Paleontological Resources

### 12.6.9.1    Introduction

This section provides an evaluation of the potential impacts to paleontological resources associated with Alternative 4. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.9 (Paleontological Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.9 (Paleontological Resources). For the purposes of this analysis please refer to EIR Sections 10.9.2 and 11.9.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.9.3 and 11.9.3 for a description of the affected environment for paleontological resources (as applicable at either a study region or field-specific scale), and EIR Section 10.9.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.9.2    Programmatic Level Analysis of Impacts and Mitigation Measures

For the purposes of this analysis, the following impact is evaluated:

■ **Impact PALEO-1:** Destroy or disturb significant surface or near-surface paleontological resources

Alternative 5 would reduce somewhat the amount of land used for used for well stimulation treatments. Therefore, the geographic extent of potential impacts to paleontological resources would be less in comparison to the project, and the risk of adverse impacts would be correspondingly reduced, which would be considered a net benefit. However, the potential to unearth paleontological resources outside of active fault zones would still remain. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as summarized in EIR Section 12.2.9.2 (No Future Well Stimulation Practices Alternative (Alternative 1), and detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures) would be expected to reduce these impacts to less than significant (Class II), because the mitigation measures would allow for the recovery, preparation, analysis, and curation of the paleontological resources that may be made available for future scientific studies, which may result in important taphonomic, taxonomic, phylogenetic, paleoecologic, stratigraphic, or biochronological discovery. ~~Additionally, under Alternative 5 the project's standards for resource protection would not be applied. As a consequence, in those areas where well stimulation could still occur, it would be expected that the total number of paleontological resources impacted would be greater than what would occur with the project because there could be a greater total area of ground disturbance.~~

### 12.6.9.3    Programmatic Level Analysis of Specific Oil and Gas Fields

*Wilmington, Inglewood, and Sespe Oil and Gas Fields*

Alternative 5 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not considered.

### 12.6.9.4   Impact Significance Summary

The Active Fault Zone Restrictions Alternative would reduce somewhat the potential impacts to paleontological resources in all study regions because the overall footprint of well stimulation activities would be restricted. Implementation of Mitigation Measures PALEO-1a through PALEO-1h, as detailed in EIR Section 10.9.5 (Paleontological Resources, Impact Analysis and Mitigation Measures), would be expected to reduce these impacts to less than significant (Class II).

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.10   Environmental Justice

### 12.6.10.1   Introduction

This section provides an evaluation of the potential impacts to environmental justice associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.10 (Environmental Justice) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.10 (Environmental Justice). For the purposes of this analysis please refer to EIR Sections 10.10.2 and 11.10.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.10.3 and 11.10.3 for a description of the affected environment for environmental justice (as applicable at either a study region or field-specific scale), and EIR Section 10.10.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.10.2   Programmatic Level Analysis of the Project

Alternative 5 would apply only to areas outside of existing oil and gas fields and would require owner/operators to avoid active fault zone areas when drilling wells for the purpose of performing stimulation. Because mapped fault zones are long linear features with a fairly narrow width, not siting well stimulations in active fault zones would only marginally reduce land available for exploration and development using well stimulation.

While this alternative would reduce potential impacts in fault zones in new areas, such as the Monterey Formation and plays, it would not affect lands in and around existing fields. Because the amount of land that is in both a fault zone and the Monterey Formation and plays is limited, this alternative would have a similar potential as the project to affect minority and low-income populations. As with the project, Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments) is proposed for Alternative 5.

The location of all future well stimulation is not known and the prohibition of drilling in fault zones would not change the potential for impacts from well stimulation itself. The potential for environmental justice impacts from well stimulation occurring remains, and Mitigation Measure EJ-1a would apply throughout all study regions. The implementation of Mitigation Measure EJ-1a would allow DOGGR to track the locations of well stimulation applications and develop appropriate strategies to address environmental justice issues should they arise. Impacts would be slightly reduced when compared to the project as well stimulations would not be located within active fault zones, thus reducing any potential impacts to adjacent communities from performing well stimulations within an active fault zone.

**MM EJ-1a**        **Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments.** (Full text in EIR Section 10.10.5.)

### 12.6.10.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 5 would not apply at Wilmington, Inglewood, or Sespe Oil and Gas Fields.

### 12.6.10.4   Impact Significance Summary

Alternative 5 would have a minor effect in reducing the area wherein well stimulation could occur. However, other impacts associated with well stimulation would remain both in and outside of existing fields, and Alternative 5 would require mitigation similar to Mitigation Measure EJ-1a (Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments), which would address the environmental justice impact.

## 12.6.11   Geology, Soils and Mineral Resources

### 12.6.11.1   Introduction

This section provides an evaluation of the potential impacts to geology, soils and mineral resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.11 (Geology, Soils and Mineral Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.11 (Geology, Soils and Mineral Resources). For the purposes of this analysis please refer to EIR Sections 10.11.2 and 11.11.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.11.3 and 11.11.3 for a description of the affected environment for geology, soils and mineral resources (as applicable at either a study region or field-specific scale), and EIR Section 10.11.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.11.2   Programmatic Level Analysis of the Project

Excluding stimulation activities to areas outside of existing oil and gas fields that are not within active fault zones would reduce Impact GEO-1 (Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure) and Impact GEO-3 (Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse) because new stimulation activities would not be located on known faults so rupture of a fault would not occur. Seismically induced groundshaking, ground failure, landslide, lateral spreading, subsidence, or collapse may be reduced somewhat because of the added distance to a fault. Due to the seismic nature of California, and because stimulation activities could still occur in proximity to a fault, the alternative would not reduce the impacts beyond their current significance levels (Class II for both impacts). Mitigation Measure GEO-1a would not be required because active fault zones would already be avoided. However, Mitigation Measures GEO-1b, GEO-1c, GEO-1d, and GEO-1e~~, and GEO-1f~~ still would be required to reduce the impact, in particular to require a setback from the fault zones and to limit the number of wells that can be hydraulically fractured simultaneously if they are within a certain distance of fault zone. All other impacts associated with geology, soils, and mineral resources would remain the same as with the project described in EIR Section 10.11.5 (Impact Analysis and Mitigation Measures).

### 12.6.11.3   Programmatic Level Analysis of Specific Oil and Gas Fields

The Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields; therefore, well stimulation activities would be allowed, and this alternative would not apply. Impacts associated with stimulation activities for the fields for Alternative 5 would be the same as those described in EIR Section 11.11.5.1

(Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field), EIR Section 11.11.5.2 (Impact Analysis and Mitigation Measures: Study Region 1 Inglewood Oil and Gas Field) and in EIR Section 11.11.5.3 (Impact Analysis and Mitigation Measures: Study Region 2 Sespe Oil and Gas Field).

### 12.6.11.4   Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.12   Greenhouse Gas Emissions

### 12.6.12.1   Introduction

This section provides an evaluation of the potential impacts to greenhouse gas emissions associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.12 (Greenhouse Gas Emissions) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.12 (Greenhouse Gas Emissions). For the purposes of this analysis please refer to EIR Sections 10.12.2 and 11.12.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.12.3 and 11.12.3 for a description of the affected environment for greenhouse gas emissions (as applicable at either a study region or field-specific scale), and EIR Section 10.12.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.12.2   Programmatic Level Analysis of Impacts and Mitigation Measures

This alternative would not involve a change in the amount of potential oil and gas production in California. California end users of oil and gas would continue to rely on the established supply as in the baseline. There would be no change in life-cycle GHG emissions of California's crude supply because the supply itself would not change. Each of the GHG impacts would be as described for the project (EIR Section 10.12.5). Mitigation identified for well stimulation treatments would apply, as recommended for the project.

### 12.6.12.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 5, well stimulation treatments would occur in the Wilmington and Sespe Oil and Gas Fields as expected under the project. Therefore, as described in EIR Section 11.12, GHG emissions associated with well stimulation treatments at Wilmington and Sespe would continue, and the extent of Impact GHG-1 is uncertain, ranging from a less than significant impact (Class III) to a significant, unavoidable impact (Class I). The new well stimulation treatments at the Inglewood Oil and Gas Field would result in the same potential GHG impacts and would require the same mitigation measures as described for the project at Inglewood (EIR Section 11.12.5).

### 12.6.12.4   Impact Significance Summary

Some emissions related to well stimulation treatments would be avoided. However, each of the GHG impacts due to well stimulation treatments would be as described for the project.

## 12.6.13   Hazards and Hazardous Materials

### 12.6.13.1   Introduction

This section provides an evaluation of the potential impacts for hazards and hazardous materials associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.13 (Hazards and Hazardous Materials) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.13 (Hazards and Hazardous Materials). For the purposes of this analysis please refer to EIR Sections 10.13.2 and 11.13.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.13.3 and 11.13.3 for a description of the affected environment for hazards and hazardous materials (as applicable at either a study region or field-specific scale), and EIR Section 10.13.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.13.2   Programmatic Level Analysis of the Project

As stated in EIR Section 8.3.5, the Active Fault Zone Restrictions Alternative would restrict future well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the special studies zone boundaries of a known active earthquake fault. This alternative somewhat reduces the area in which surface equipment containing hazardous substances could be damaged from seismic events. Hazards and hazardous materials impacts would remain potentially significant outside of these restricted zones, where well stimulation treatments may occur in the future.

| Impact HAZ-1   Release hazardous materials into the environment from a spill or leak |
| --- |

Seismic events have the potential to damage drums, tanks and pipework that hold well stimulation fluids. This alternative is more protective than the project by restricting future well stimulation treatments near known active earthquake faults. However, drums, tanks, and pipework outside of a special studies zone can still potentially be damaged by a seismic event within the special studies zone. Given these conditions, impacts from a spill or release could be significant. Therefore a mitigation measure is proposed.

**MM HAZ-1a**     **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials** ~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

Protective measures for prevention of spills or releases of hazardous materials are provided in both existing and proposed regulations. A summary of the key measures in the proposed SB 4 Well Stimulation Treatment Regulations is provided in EIR Section 10.13.5. Collectively, ~~with inclusion of a barrier for all production facilities, regardless of the amount of time they are in place, and~~ with implementation of the revised MM HAZ-1a ~~with~~ and surface water management, and implementation/enforcement of all of the existing and proposed regulations regarding the transport, handling, storage, conveyance, and management of hazardous materials, including the Spill Contingency Plan, which accounts for spills that may occur at pipes, valves, or supply lines, the impact of well stimulation materials on the environment in the event of a release, is considered less than significant with mitigation (Class II).

With the implementation of mitigation measures summarized on Table 10.13-11, Impact HAZ-1 under Alternative 5 would be less than significant with mitigation (Class II) in all study regions. Impact HAZ-1 is also Class II under the project. Alternative 5 would slightly reduce the area in which surface equipment containing hazardous substances could be damaged from seismic events.

### 12.6.13.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Under Alternative 5, well stimulation treatments would occur in the Wilmington, Inglewood, and Sespe Oil and Gas Fields as under the project. Therefore, the impacts and mitigation described in EIR Sections 11.13.3.1, 11.13.3.2, and 11.13.3.3 for these fields would apply. With mitigation, the impact from hazards and hazardous materials would be less than significant (Class II).

### 12.6.13.4   Impact Significance Summary

Prohibiting well stimulation within the earthquake study zone boundaries of a known active earthquake fault outside of existing oil and gas field boundaries and their buffer areas would not have a substantial effect on the impacts from hazards and hazardous materials, as extensive areas would remain available for exploration and development. Overall, impacts would be similar to those of the project, and similar mitigation would apply.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.14   Groundwater Resources

### 12.6.14.1   Introduction

This section provides an evaluation of the potential impacts to groundwater resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.14 (Groundwater Resources). For the purposes of this analysis please refer to EIR Sections 10.14.2 and 11.14.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.14.3 and 11.14.3 for a description of the affected environment for groundwater resources (as applicable at either a study region or field-specific scale), and EIR Section 10.14.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative, which would result in greater potential for use of groundwater with no water recycling standards in place, and less protection of both groundwater resources as well as surface water resources that could recharge groundwater.~~

As summarized in EIR Section 10.14.6, impacts from well stimulation treatments were determined to be potentially significant to groundwater quantity and groundwater quality. Further analysis indicated that the significant impacts could be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures, which are summarized on Table 10.14-20, focus on preventing exacerbation of groundwater overdraft or subsidence, maintaining existing use of water supply wells, and mitigating possible pathways that might allow well stimulation fluids including gas to reach protected groundwater.

### 12.6.14.2  Programmatic Level Analysis of the Project

As stated in EIR Section 8.7.5, the Active Fault Zone Restrictions Alternative would restrict future well stimulation treatments near known active earthquake faults outside of existing oil and gas field boundaries and their buffer areas. This alternative reduces the area in which well casings may be damaged by an earthquake. Impacts to groundwater quantity and quality would remain potentially significant where well stimulation treatments may occur in the future outside of these restricted zones.

As noted in EIR Sections 10.14.5 and 11.14.5.1, even small seismic events can damage well casings and seals. This alternative is more protective than the project by restricting future well stimulation treatments near known active earthquake faults. However, well casings outside of these areas, as well as within existing fields, can still potentially be damaged by a seismic event. Therefore, the mitigation measures for the project would still be required under this alternative. With mitigation, the alternative and the project would have essentially the same groundwater impacts resulting from seismic events.

| **Impact GW-1** | **Cause or contribute to overdraft conditions** |
|---|---|

While this alternative would reduce some of the areas where well stimulation could occur, it would still allow for stimulation activities throughout much of Study Areas 1 through 6. With implementation of these mitigation measures, Impact GW-1 would be reduced to a less than significant level (Class II). Impact GW-1 is also Class II under the project.

**MM GW-1a**    **Use Alternative Water Sources.** (Full text in EIR Section 10.14.5.)

**MM GW-1b**    ~~**Prepare a Third-Party Technical Report to Analyze Overdraft Impacts**~~**Minimize Groundwater Impacts.** (Full text in EIR Section 10.14.5.)

| **Impact GW-2** | **Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water** |
|---|---|

Depending on geologic conditions, groundwater pumping could result in land subsidence. It could also interfere with nearby water wells, including lowering the water level in the well to a point that they no longer function as intended. These would be significant impacts, which would be addressed by the recommended mitigation measure below. With implementation of this mitigation measure, Impact GW-2 would be reduced to a less than significant level (Class II). Impact GW-2 is also Class II under the project.

**MM GW-2a**    ~~**Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping**~~**Minimize Groundwater Impacts.** (Full text in EIR Section 10.14.5.)

| **Impact GW-3** | **Adversely impact groundwater quality through surface spills or leaks during well stimulation** |
|---|---|

The full description of this mitigation measure is found in EIR Section 10.13.5. With implementation of this <u>revised</u> mitigation measure, Impact GW-3 would be reduced to a less than significant level (Class II). Impact GW-3 is also Class II under the project.

**MM HAZ-1a**    **Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials**~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices.~~ (Full text in EIR Section 10.13.5.)

| **Impact GW-4** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals** |
|---|---|

Some wells in existing oil and gas fields may have non-existent or ineffective well seals, particularly if they are old or were improperly abandoned. This situation could result in the migration of stimulation fluids, including gas through these pathways into protected groundwater. To address this significant impact, three revised mitigation measures are identified. With implementation of these revised mitigation measures, Impact GW-4 would be reduced to a less than significant level (Class II). Impact GW-4 is also Class II under the project.

**MM GW-4a**     **Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation.** (Full text in EIR Section 10.14.5.)

**MM GW-4b**     **Install a Well Seal across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~.** (Full text in EIR Section 10.14.5.)

**MM GW-4c**     **Install Methane Sensors on Wells Subject to Well Stimulation Treatments~~in the ADSA~~.** (Full text in EIR Section 10.14.5.)

| **Impact GW-5** | **Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells** |
|---|---|

Some existing and abandoned wells in oil and gas fields may have damaged, non-existent, or ineffective well seals. This could create pathways for stimulation fluids injected in one well to migrate into protected groundwater by way of the annular space in another well within the zone of influence of the stimulated well. This would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-5 would be reduced to a less than significant level (Class II). Impact GW-5 is also Class II under the project.

**MM GW-5a**     **Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate.** (Full text in EIR Section 10.14.5.)

| **Impact GW-6** | **Improper disposal of flowback in injection wells could potentially impact groundwater quality** |
|---|---|

Class II injection wells are required under the UIC program regulations to have an isolating cement seal above the injection zone as well as a minimum 100-foot seal across the base of the fresh water zone. If injected flowback water migrates to protected groundwater, this would be a significant impact. To address this, a revised mitigation measure is proposed. With implementation of this revised mitigation measure, Impact GW-6 would be reduced to a less than significant level (Class II). Impact GW-6 is also Class II under the project.

**MM GW-6a**     **Require Wastewater Disposal Wells to Inject Only into Exempted Aquifers to Protect Groundwater~~Install a Cement Seal across Protected Groundwater~~.** (Full text in EIR Section 10.14.5.)

| **Impact GW-7** | **Inability to identify specific impacts to groundwater quality from well stimulation activities** |
|---|---|

Many chemicals and compounds can be introduced to groundwater by various pathways. The origin of these materials is difficult to ascertain under many circumstances. Groundwater monitoring may identify a chemical or compound, but would be unable to identify its source. If well stimulation fluids reach protected groundwater, this would be a significant impact. To ensure that stimulation fluids can be more readily distinguished from other compounds that may be naturally occurring or have been introduced into the groundwater, a revised mitigation measure is proposed to address this. With implementation of this revised mitigation measure, Impact GW-7 would be reduced to a less than significant level (Class II). Impact GW-7 is also Class II under the project.

**MM GW-7a**    **Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment.** (Full text in EIR Section 10.14.5.)

### 12.6.14.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed and would not be limited by the active fault zone restriction. Therefore, impacts associated with stimulation activities for the Wilmington, Inglewood, and Sespe Oil and Gas Fields for Alternative 4 would be the same as those described in EIR Section 11.14.5.1 (Impact Analysis and Mitigation Measures: Study Region 1 Wilmington Oil and Gas Field) and EIR Section 11.14.5.2 (Impact Analysis and Mitigation Measures: Study Region 1 Inglewood Oil and Gas Field) and in EIR Section 11.14.5.3 (Impact Analysis and Mitigation Measures: Study Region 2 Sespe Oil and Gas Field).

### 12.6.14.4   Impact Significance Summary

The areas around identified active faults are limited and follow linear fault traces. Prohibiting oil and gas well stimulation in these mapped areas may nominally alter what would have been the configuration of a future field, but this would have little effect on reducing overall changes exploration and development would introduce with regard to impacts on groundwater. The effects on groundwater of this alternative would be similar to those for the project and similar mitigation would be required.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.15   Surface Water Resources

### 12.6.15.1   Introduction

This section provides an evaluation of the potential impacts to surface water resources associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.15 (Surface Water Resources) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.15 (Surface Water Resources). For the purposes of this analysis please refer to EIR Sections 10.15.2 and 11.15.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.15.3 and 11.15.3 for a description of the affected environment for surface water resources (as applicable at either a study region or field-specific scale), and EIR Section 10.15.4 for details regarding the impact methodology and significance criteria that have been used.

~~Project standards for resources protection (see EIR Section 7.5) would not be implemented under this alternative. Therefore, there would be a greater potential for use of surface water without water recycling standards in place, as well as an increase in potential impacts to waterbodies and streams without implementation of habitat protection standards or a buffer requirement from perennial waters.~~

Alternative 5 would prohibit well stimulation from occurring in proximity to known faults outside of existing oil and gas fields. As summarized in EIR Section 10.15.6, impacts from well stimulation treatments were determined to be potentially significant to surface water. All of the water quality impacts described in EIR Section 10.15.4 would still occur under Alternative 5, except in the restricted area around active faults. With this exception, impacts under Alternative 5 would be similar to impacts for the project. Flood hazard impacts would be the same as described in EIR Sections 10.15.4 and 10.15.4.1, except that stimulation the area around active faults occurring outside of existing fields.

### 12.6.15.2   Programmatic Level Analysis of the Project

Alternative 5 applies only to well stimulation near active faults occurring outside of existing oil and gas fields. It does not prohibit other conventional oil and gas-related activities from occurring within these areas. Nor does it prohibit well stimulation outside of known fault zones. Although the impacts would be located on reduced acreage, because new wells and well stimulation would still occur, the same impacts as with the project would occur. The impacts are listed in EIR Section 12.2.15.2. The same mitigation measures identified for the project would also apply under Alternative 5, and would reduce the impacts to less than significant (Class II).

### 12.6.15.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Alternative 5 does not apply to existing fields. Under this alternative, activities would occur as described for the project, in which impacts to surface water resources associated with well stimulation treatments were determined to be potentially significant. However, the significant impacts would be mitigated to a less than significant level with appropriate mitigation measures. The mitigation measures for Wilmington, Inglewood, and Sespe Oil and Gas Fields are the same as described in EIR Section 10.12.5. With implementation of these measures, the impact to surface water under Alternative 5 would be less than significant (Class II).

### 12.6.15.4   Impact Significance Summary

Based on the programmatic level analysis of surface water resources, impacts from Alternative 5 are considered to be the same, less than significant with mitigation (Class II).

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.16   Land Use and Planning

### 12.6.16.1   Introduction

This section provides an evaluation of the potential impacts to land use and planning associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.16 (Land Use and Planning) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.16 (Land Use and Planning). For the

purposes of this analysis please refer to EIR Sections 10.16.2 and 11.16.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.16.3 and 11.16.3 for a description of the affected environment for land use and planning (as applicable at either a study region or field-specific scale), and EIR Section 10.16.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.16.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 5 would restrict future oil and gas well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the special studies zone boundaries of a known active earthquake fault.

Under this alternative, the effects of Impacts LU-1, LU-2 and LU-3 would be similar to those of the Urbanized Area Protection Alternative (Alternative 4) as described in EIR Section 12.5.16 because it would partially restrict future well stimulation activities only in certain areas of the State, depending on actions by local governments. Figures 8-10 through 8-12 illustrate those areas of the State within fault zone mapping. Relatively little land would fall under this restriction, as compared to the extent of the Monterey Formation and plays and existing oil and gas fields. Impact LU-1 would be significant and unavoidable (Class I), ~~and~~ Impact LU-2 <u>would be less than significant (Class III),</u> and Impact LU-3 would be mitigable to a level of less than significant (Class II). Overall, the level of impacts would be similar to those for the project; however, implementation of development restrictions near active fault zones (Alternative 5) would limit potential for disruptions to land uses in those areas. Therefore, impacts to land use would be slightly less under Alternative 5 in comparison to the project.

### 12.6.16.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As referenced above, Alternative 5 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not part of this alternative.

### 12.6.16.4   Impact Significance Summary

Alternative 5 would reduce the geographic extent of potential land use impacts within Urbanized Areas, which would be considered a net benefit. However, outside of these areas land use impacts at a programmatic level of analysis would still be the same as for the project. Significant and unavoidable impacts related to Impact LU-1 would occur (Class I). Effects related to Impact LU-2 and Impact LU-3 would be mitigable to a level of less than significant (Class II).

## 12.6.17   Noise and Vibration

### 12.6.17.1   Introduction

This section provides an evaluation of the potential impacts to noise and vibration associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.17 (Noise and Vibration) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.17 (Noise and Vibration). For the purposes of this analysis please refer to EIR Sections 10.17.2 and 11.17.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.17.3 and 11.17.3 for a description of the affected environment for noise and vibration (as applicable at either a study region or field-specific scale), and EIR Section 10.17.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.17.2   Programmatic Level Analysis of the Project

Two impacts have been identified for noise and vibration: Impact NOI-1: Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels; and Impact NOI-2: Cause exposure of persons to or generation of excessive groundborne vibration.

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 10.17. Small portions within each region would be excluded from well stimulation treatments under this alternative. As such, the potential for additional population exposed to noise and vibration may increase if well pads are located nearer residential communities so as to avoid areas of a known active earthquake fault. Noise mitigation would be required, as with the project. In all regions the resulting impact would be Class II: Less Than Significant Impact With Mitigation Incorporated, and Impact NOI-2 would be a Class III: Less Than Significant Impact.

**MM NOI-1a      Control Noise Levels near Sensitive Land Uses.** (Full text in EIR Section 10.17.5.)

### 12.6.17.3   Programmatic Level Analysis of Specific Oil and Gas Fields

***Wilmington, Inglewood, and Sespe Oil and Gas Fields***

Since this alternative includes well stimulation treatments, noise and vibration impacts would occur as described in EIR Section 11.17. Noise mitigation would be required. In all existing fields where well stimulation treatments would occur in Alternative 5, noise levels (Impact NOI-1) would be Class II: Less Than Significant Impact With Mitigation Incorporated, and vibration levels (Impact NOI-2) would be a Class III: Less Than Significant Impact.

### 12.6.17.4   Impact Significance Summary

Based on the programmatic level analysis of noise and vibration for the project and for specific oil and gas fields, impacts from Alternative 5 would be the same as under the project except as well stimulation activities may be limited near active fault zones.

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.18   Population and Housing

### 12.6.18.1   Introduction

This section provides an evaluation of the potential impacts to population and housing associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.18 (Population and Housing) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.18 (Population and Housing). For the purposes of this analysis please refer to EIR Sections 10.18.2 and 11.18.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.18.3 and 11.18.3 for a description of the affected environment for visual resources (as applicable at either a study region or field-specific scale), and EIR Section 10.18.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.18.2   Programmatic Level Analysis of Impacts and Mitigation Measures

As shown on Figures 8-4 through 8-6, active fault zones are found in portions of all the study regions. Under Alternative 5, these mapped areas would be excluded from stimulation treatments in areas outside of existing oil and gas fields. Although use of some areas would be prohibited for well stimulation work, much of the area outside of existing fields would be available, and this alternative would minimally impact future oil production and the number of well stimulation treatments.

When compared to the project, Alternative 5 would require a similar number of employees; and the locations of well development on a programmatic level would not be substantially different than under the project. Overall population and housing impacts (Impacts POP-1 and POP-2) under Alternative 5 would be similar to those for the project, as described in EIR Section 10.18 (Population and Housing).

### 12.6.18.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 5 would be the same as those described in EIR Section 11.18 (Population and Housing).

### 12.6.18.4   Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.19   Public Services

### 12.6.19.1   Introduction

This section provides an evaluation of the potential impacts to public services associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.19 (Public Services) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.19 (Public Services). For the purposes of this analysis please refer to EIR Sections 10.19.2 and 11.19.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.19.3 and 11.19.3 for a description of the affected environment for public services (as applicable at either a study region or field-specific scale), and EIR Section 10.19.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.19.2   Programmatic Level Analysis of Impacts and Mitigation Measures

Alternative 5 would apply only to areas outside of existing oil and gas fields, and it would require new wells and stimulation activities to occur outside of mapped active fault zone areas. This would be a localized impact and is not expected to affect public service providers serving existing oil and gas fields as compared to the project.

The need for new or expanded public services, including applicable performance objectives and service ratios, is strongly influenced by population levels, as well as the needs of wells sites and well stimulation activities. Implementation of Mitigation Measure PUB-1a (Assess Public Service Ratios and Ensure Adequate Compensation) is proposed as part of Alternative 5 and would require DOGGR to coordinate with the applicable local land use agency to determine whether new well development and stimulations

would place a burden on public services, and ensure that appropriate compensation is provided to the local agency. With implementation of this measure, Impact PUB-1 (Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools) would be less than significant (Class II). The siting of well stimulations outside fault zones would reduce potential emergency service calls should a well be upset during a seismic event. This level of change is not expected to result in any discernible need for services between Alternative 5 and the project; they would have similar impacts overall.

**MM PUB-1a      Assess Public Service Ratios and Ensure Adequate Compensation.** (Full text in EIR Section 10.19.5.)

### 12.6.19.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 5 would be the same as those described in EIR Section 11.19 (Public Services).

### 12.6.19.4   Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.20   Recreation

### 12.6.20.1   Introduction

This section provides an evaluation of the potential impacts to recreation associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.20 (Recreation) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.20 (Recreation). For the purposes of this analysis please refer to EIR Sections 10.20.2 and 11.20.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.20.3 and 11.20.3 for a description of the affected environment for recreation (as applicable at either a study region or field-specific scale), and EIR Section 10.20.4 for details regarding the impact methodology and significance criteria that have been used.

~~Without implementation of project standards for resource protection under this alternative, oil and gas development and associated well stimulation may occur in open space areas and areas near water resources used for recreation.~~

### 12.6.20.2   Programmatic Level Analysis of the Project

Alternative 5 would restrict future oil and gas well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the special studies zone boundaries of a known active earthquake fault.

Figures 8-10 through 8-12 illustrate those areas of the State that would not be developed for the purposes of well stimulating activities. These areas are limited in extent and would not likely reduce the overall level of development of wells using well stimulation. Impact REC-1 would be less than significant (Class III), and Impact REC-2 would be less than significant with mitigation (Class II). Overall the level of

impacts would be similar that of the project; however, implementation of development restrictions near active fault zones (Alternative 5) would limit potential for disruptions to any recreation areas that may occur in the vicinity of a restricted area. Therefore, in comparison to the project, impacts to recreation areas would be slightly less under Alternative 5.

### 12.6.20.3   Programmatic Level Analysis of Specific Oil and Gas Fields

As referenced above, Alternative 5 only applies to areas outside of existing oil and gas fields; therefore, the Wilmington, Inglewood, and Sespe Oil and Gas Fields are not considered as part of this alternative.

### 12.6.20.4   Impact Significance Summary

At a programmatic level of analysis, the impacts associated with Alternative 5 would be less than significant for Impact REC-1 (Class III) and less than significant with mitigation for Impact REC-2 (Class II). Mitigation Measures REC-2a and REC-2b, as summarized in EIR Section 12.2.20.2 (No Future Well Stimulation Practices Alternative [Alternative 1]) and detailed in EIR Section 10.20.5 (Recreation, Impact Analysis and Mitigation Measures).

## 12.6.21   Risk of Upset/Public and Worker Safety

### 12.6.21.1   Introduction

This section provides an evaluation of the potential impacts for risk of public upset/public and worker safety associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.21 (Risk of Upset/Public and Worker Safety) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.21 (Risk of Upset/Public and Worker Safety). For the purposes of this analysis please refer to EIR Sections 10.21.2 and 11.21.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.21.3 and 11.21.3 for a description of the affected environment for risk of public upset/public and worker safety (as applicable at either a study region or field-specific scale), and EIR Section 10.21.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.21.2   Programmatic Level Analysis of the Project

Under this alternative, there would not be a reduction in well stimulation treatment activities. Therefore, the forecast number of accidents for Alternative 5 is the same as the project case.

Alternative 5 and the project case will have lower annual average projected crude oil imports compared to Alternatives 1 and 2. The number of accidents projected for this region is four accidents per year (approximately 100 over 25 years). The number of accidents is based on the train miles traveled, which is directly related to the volume of crude imported. Since volume of imported crude oil is approximately 25 percent of highest import case (Alternative 1, Table 10.21-16), the number of accidents is approximately 25 percent of those on that Table. Study regions that may be at slightly greater risk of a rail accident include Study Regions 1, 4, 5, and 6. Given the relatively very low frequency of the number of derailments compared to the number of shipments of oil, the occurrence of a major accident is expected to be very low.

### 12.6.21.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Alternative 5 would not apply to the Wilmington, Inglewood, and Sespe Oil and Gas Fields as they are existing fields.

### 12.6.21.4   Impact Significance Summary

Each of the impacts related to risk of upset and safety for Alternative 5 would be as described for the project.

The crude oil rail accident rate for Alternative 5 is approximately four per year (100 over 25 years), as with the project case. In addition, there may be accidents from proppant deliveries by rail at a rate of 16 over 25 years, as with the project case. The volume of proppant is proportional to the number of wells hydraulically fractured, which in turn will require more rail cars. The maximum number of accidents corresponding to the highest volume of proppant is shown in Table 10.21-15. Since the number of wells for Alternative 5 is approximately 10 percent less than that of the maximum case, the number of accidents is approximately 10 percent less as well. The Regions at higher risk for accidents are Regions 1 and 4, with a lesser potential in Regions 5 and 6.

## 12.6.22   Transportation and Traffic

### 12.6.22.1   Introduction

This section provides an evaluation of the potential impacts to transportation and traffic associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.22 (Transportation and Traffic) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.22 (Transportation and Traffic). For the purposes of this analysis please refer to EIR Sections 10.22.2 and 11.22.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.22.3 and 11.22.3 for a description of the affected environment for transportation and traffic (as applicable at either a study region or field-specific scale), and EIR Section 10.22.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.22.2   Programmatic Level Analysis of the Project

Alternative 5 would apply only to areas outside of existing oil and gas fields and haul routes would not be restricted. Although oil and gas development would be restricted in areas within active fault zones, much of the area outside of existing fields would still be available, and this alternative would minimally affect future oil production and the number of well stimulation treatments.

Therefore, the number of trips generated per well and the number of wells in Alternative 5 would be similar to that for the project. Likewise, associated traffic impacts (TR-1 through TR-6) and recommended mitigation measures below would remain same as for the project (see EIR Section 10.22, Transportation and Traffic).

**MM TR-1a**       **Prepare Traffic Plan.** (Full text in EIR Section 10.22.5.)

**MM TR-2a**       **Repair Roadway Damage.** (Full text in EIR Section 10.22.5.)

**MM TR-4a**       **Know Spill Prevention Measures.** (Full text in EIR Section 10.22.5.)

### 12.6.22.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington and Sespe Oil and Gas Fields are existing fields, well stimulation activities would continue to be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 5 would be the same as those described in EIR Section 11.22 (Transportation and Traffic).

### 12.6.22.4    Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.23    Utilities and Service Systems

### 12.6.23.1    Introduction

This section provides an evaluation of the potential impacts to utilities and service systems associated with Alternative 5. This evaluation is based on the exact same technical approach used for the programmatic evaluation of the project addressed in EIR Section 10.23 (Utilities and Service Systems) and the programmatic evaluation of specific oil and gas fields addressed in EIR Section 11.23 (Utilities and Service Systems). For the purposes of this analysis please refer to EIR Sections 10.23.2 and 11.23.2 for relevant State, federal, and local regulations and standards (as applicable at either a study region or field-specific scale), EIR Sections 10.23.3 and 11.23.3 for a description of the affected environment for utilities and service systems (as applicable at either a study region or field-specific scale), and EIR Section 10.23.4 for details regarding the impact methodology and significance criteria that have been used.

### 12.6.23.2    Programmatic Level Analysis of the Project

Alternative 5 would apply only to areas outside of existing oil and gas fields, and would require new wells and stimulation activities to locate outside of active fault zone areas. Mapped active fault zones represent a small fraction of the Monterey Formation and plays. Therefore, the potential for impacts to utilities and service systems serving existing oil and gas fields would be similar or identical to that of the project (see EIR Section 10.23, Utilities and Service Systems).

Although activities in some areas would be banned, most of the area outside of existing fields would not be restricted, and this alternative would minimally impact future oil production and the number of well stimulation treatments. The need for new or expanded utilities and service systems is strongly influenced by population levels. As discussed within EIR Section 12.9.18 (Population and Housing), Alternative 5 has the potential to slightly increase population in-migration with future well stimulation treatments in smaller communities, because there would be somewhat less land available for new well sites and wells may be consolidated. In general, however, minor population growth from new employment would have a less than significant impacts to utility and service systems, including their existing and projected capacities (Impact UTL-1).

Avoiding active fault zone areas could result in some clustering of new wells that would be developed outside of existing oil and gas fields. Similar to Alternative 3 (Well Pad Consolidation), Alternative 5 reduces new electrical or gas infrastructure required to serve new wells/fields created through well stimulation outside of existing oil and gas field boundaries by consolidating well sites near one another. This would allow new wells to share any new natural gas and electricity connections, thus reducing potential environmental impacts from constructing new infrastructure. This is a minor decrease in impacts when compared to those of the project. Outside of existing fields, Alternative 5 would reduce potential impacts from electrical and natural gas interconnections by consolidating new well sites developed outside of existing fields. This would allow for consolidated wells to use the same primary interconnection lines (Impact UTL-2). The potential clustering of wells to avoid active fault zone areas would not increase potential impacts from wastewater (Impact UTL-3) and solid waste (Impact UTL-4) generation when compared to the project. Faults are linear features. Mapped faults may have a long

Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 468 of 689   Page
ID #:5415

**Analysis of Oil and Gas Well Stimulation Treatments in California**
**12. ENVIRONMENTAL ANALYSIS OF THE ALTERNATIVES**

linear extent but are not exceptionally wide; therefore, wells would be banned in a relatively small extent of any area of drilling interest.

To ensure all utilities and service systems would have adequate capacities under Alternative 5, Mitigation Measures UTL-3a and UTL-4a are also proposed. With the inclusion of these measures, Impacts UTL-1 and UTL-2 are Class III and impact UTL-3 and UTL-4 are Class II.

**MM UTL-3a**      **Assess Wastewater Quality and Ensure Adequate Compensation to Municipal and Private Wastewater Treatment Plants.** (Full text in EIR Section 10.23.5.)

**MM UTL-4a**      **Assess Non-Hazardous Solid Waste Generation and Ensure Adequate Compensation to Municipal and Private Solid Waste Facilities.** (Full text in EIR Section 10.23.5.)

### 12.6.23.3   Programmatic Level Analysis of Specific Oil and Gas Fields

Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. The impacts associated with well stimulation treatment activities for the Wilmington, Inglewood, and Sespe fields for Alternative 5 would be the same as those described in EIR Section 11.23 (Utilities and Service Systems).

### 12.6.23.4   Impact Significance Summary

Please refer to Table 12.6.24-1 for a summary of these impacts by each impact criterion and their corresponding mitigation measures.

## 12.6.24   Impact Summary Table for Alternative 5

Table 12.6.24-1 provides a summary of impacts and recommended mitigation measures for the project and specific oil and gas files for all issue areas under Alternative 5.

**Programmatic Level Analysis of the Project**

The Active Fault Zone Restrictions Alternative would restrict future oil and gas well stimulation treatments outside of existing oil and gas field boundaries and their buffer areas within the earthquake study zone boundaries of a known active earthquake fault. While some areas outside of the existing oil and gas fields would not be available for well stimulation, given the remaining area available for oil and gas development and well stimulation within the State, this alternative would minimally impact future oil and gas production or ground disturbance compared to the project. Alternative 5 would be largely similar to the project for most issue areas. However, because it would locate the wellbore, well site equipment, and stimulation activities farther from an active fault zone, there would be a reduced potential for impacts to hazards and hazardous materials and groundwater resources as a result of a seismic event, which are both less than significant impacts for the project with the implementation of mitigation (Class II). Compared to the project, Alternative 5 would also result in reduced impacts to Environmental Justice. Alternative 5 would not create any new significant and unmitigable (Class I) impacts.

**Programmatic Level Analysis of Specific Oil and Gas Fields**

Alternative 5 does not apply to existing fields. Because the Wilmington, Inglewood, and Sespe Oil and Gas Fields are existing fields, well stimulation activities would be allowed. Therefore, impacts associated with well stimulation activities at the fields would be the same as those described for the project.

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AESTHETICS** | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-2. Substantially alter or damage scenic resources. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| Impact AES-4. Create new sources of substantial light and glare. | Class III in existing fields<br>Class I or II in new areas<br>Existing Fields: None required<br>New Areas:<br>AES-1a: Prepare and Implement a Site Plan to Reduce Visual Impacts to Sensitive Receptors<br>AES-1b: Minimize Lighting Visibility Offsite | Same as those listed in Table 11.1-1 |
| **AGRICULTURE AND FORESTRY RESOURCES** | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class II on or adjacent to Important Farmland<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-1c: Compensate for Loss of Important Farmland | Same as those listed in Table 11.2-1 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class II on land zoned for agricultural use or enrolled in Williamson Act contracts<br>AGF-2a: Ensure Compatibility with Agricultural Zoning<br>AGF-2b: Ensure Compatibility with Williamson Act Contracts or Terminate Williamson Act Contracts | Same as those listed in Table 11.2-1 |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class II on land zoned as forestland, timberland, or Timberland Production<br>AGF-3a: Ensure Compatibility with Zoning for Forest and Timberland | Same as those listed in Table 11.2-1 |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class II on forest land<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AGF-4c: Compensate for Loss of Forest Land | Same as those listed in Table 11.2-1 |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class II for well stimulation activities on or within 1,500 feet of agricultural or forest land<br>AGF-1a: Minimize Impacts to Important Farmland<br>AGF-1b: Develop an Agricultural Resources Protection Plan<br>AGF-4a: Minimize Impacts to Forest Land<br>AGF-4b: Develop a Forest Land Protection Plan<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>HAZ-1a: <u>Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials</u><s>Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices</s><br>GW-4b: Install a <u>Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments</u><s>Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin</s><br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.2-1 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **AIR QUALITY** | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Statewide) <br> Class III (in SCAQMD) <br> AQ-1a: Improve Air Quality Planning Inventories and Local Control Measures <br> AQ-1b: Improve the Methodologies and Emission Factors Used in Inventory Development | Same as those listed in Table 11.3-1 |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I <br> AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments <br> AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources <br> AQ-2c: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.3-1 |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I <br> AQ-3a: <u>Comply with Local Air District Protocols Relating to the Preparation of</u>~~Prepare~~ a Health Risk Assessment and Implement Emission Controls <br> AQ-3b: Avoid Unnecessary Exposure to Air Pollutants by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I <br> AQ-4a: Prepare and Implement an Odor Minimization Plan <br> AQ-4b: Avoid Unnecessary Exposure to Odors by Improving Local Land Use Compatibility | Same as those listed in Table 11.3-1 |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | |
| Impact BIOT-1. Substantially reduce the habitat of a fish or wildlife species | Class I <br> BIOT-1a: Evaluate Impacts to Native Vegetation and <u>Fish and Wildlife</u> Habitat <br> BIOT-1b: Minimize Impacts to Native Vegetation and Habitat <br> BIOT-1c: Replace or Offset Loss of Sensitive Habitat <br> AQ-2c: Reduce Emissions from Dust-Causing Activities <br> SWR-1a: Require Stormwater Pollution Prevention Plan <br> SWR-2a: Implement Erosion Control Plan <br> SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-2. Cause a fish or wildlife population to drop below self-sustaining levels | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.4-8 |
| Impact BIOT-3. Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>SWR-1a: Require Stormwater Pollution Prevention Plan | Same as those listed in Table 11.4-8 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-4. Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-3b: Minimize and Mitigate Impacts to Special-status Plants<br>BIOT-4a: Minimize and Mitigate Impacts to All Species Identified as a Candidate, Sensitive, or Special-status Species in Local or Regional Plans, Policies, or Regulations, or by CDFW or USFWS<br>BIOT-4b: Minimize Impacts to Protected Birds<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-5. Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>AQ-2c: Reduce Emissions from Dust-Causing Activities<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-6. Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I<br>BIOT-1a: Evaluate Impacts to Native Vegetation and Fish and Wildlife Habitat<br>BIOT-1b: Minimize Impacts to Native Vegetation and Habitat<br>BIOT-1c: Replace or Offset Loss of Sensitive Habitat<br>BIOT-2a: Prevent Hazards to Fish and Wildlife<br>BIOT-3a: Minimize and Mitigate Impacts to Special-status Fish and Wildlife<br>BIOT-6a: Protect Jurisdictional Waters<br>GW-1a: Use Alternative Water Sources to the Extent Feasible<br>GW-1b: Minimize Groundwater Impacts<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~Install a Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-2a: Implement Erosion Control Plan<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.4-8 |
| Impact BIOT-7. Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class I<br>BIOT-7a: Prevent or Mitigate Habitat Fragmentation and Impacts to Fish and Wildlife Movement | Same as those listed in Table 11.4-8 |
| Impact BIOT-8. Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class II<br>BIOT-8a: Coordinate with Local Agencies and Jurisdictions Regarding Local Policies and Conservation Plans | Same as those listed in Table 11.4-8 |
| Impact BIOT-9. Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class II<br>BIOT-9a: Coordinate with CDFW, USFWS, and Permittees Regarding NCCPs, HCPs, and Other Conservation Plans | Same as those listed in Table 11.4-8 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact BIOT-10. Contribute to global climate change and consequent impacts to biodiversity | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.4-8 |
| **BIOLOGICAL RESOURCES – COASTAL AND MARINE ENVIRONMENT** | | |
| Impact BIOCM-1. Substantially affect rare, threatened, or endangered coastal/marine species or their habitat | Class III<br>None required | Wilmington: Same as those listed in Table 11.5-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact BIOCM-2. Interfere with migration or movement of coastal/marine fish or wildlife | Class III<br>None required | Wilmington: Same as those listed in Table 11.5-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact BIOCM-3. Result in substantial loss or alteration of coastal/marine habitat | Class III<br>None required | Wilmington: Same as those listed in Table 11.5-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact BIOCM-4. Substantially disrupt or affect local coastal/marine biological communities or habitats | Class III<br>None required | Wilmington: Same as those listed in Table 11.5-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| **COASTAL PROCESSES AND MARINE WATER QUALITY** | | |
| Impact CPMWQ-1. Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity | Class II<br>CPMWQ-1a: Protect Marine Water Quality | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CPMWQ-2. Change the velocity or direction of ocean currents | Class II<br>CPMWQ-2a: Prepare and Implement Marine Current Plan | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact CPMWQ-3. Change the velocity or direction of coastal and ocean winds | Class III<br>None required | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact CPMWQ-4. Change the direction, size, or period of ocean waves | Class IV<br>None required | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact CPMWQ-5. Increase the risk of a tsunami | Class III<br>None required<br>~~CPMWQ-5a: Conduct Offshore Geotechnical and Tsunami Investigation~~<br>~~CPMWQ-5b: Modify the Drilling of Disposal Wells Offshore or Near-Shore~~ | Wilmington: Same as those listed in Table 11.6-1<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| **COMMERCIAL AND RECREATIONAL FISHING** | | |
| Impact CRF-1. Cause long-term exclusion of important commercial and recreational fishing areas | Class III<br>None required | Wilmington: Same as those listed in Table 11.7-4<br>Inglewood: Not applicable<br>Sespe: Not applicable |
| Impact CRF-2. Result in substantial economic losses to local commercial and recreational fishing industries | Class III<br>None required | Wilmington: Same as those listed in Table 11.7-4<br>Inglewood: Not applicable<br>Sespe: Not applicable |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **CULTURAL RESOURCES** | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I or Class II if historic or built-environment resources are present<br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| Impact CUL-2. Affect prehistoric resources | Class I or Class II if prehistoric resources are present<br>Class III or Class IV if prehistoric resources are present are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I or II if human remains or cultural items are present<br>Class III or Class IV if cultural items are not considered significant or are not present<br>Class IV if human remains are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |
| Impact CUL-4. Affect cultural landscapes. | Class I or II if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present<br>CUL-1a: Require Information ~~Inventory~~ and Evaluate Cultural Resources<br>CUL-1b: Complete Native American Coordination<br>CUL-1c: Prepare and Implement Cultural Resources Management and Treatment Plan<br>CUL-1d: Prepare Plan for the Inadvertent Discovery of Human Remains<br>CUL-1e: Provide Cultural Resources Specialist with the Authority to Halt Earth Disturbing Activities<br>CUL-1f: Conduct a Cultural Resources Worker Environmental Awareness Program<br>CUL-1g: Monitor Earth Disturbing Activities for Cultural Resources<br>CUL-1h: Provide Native American Monitors during Earth Disturbing Activities<br>CUL-1i: Prepare Cultural Resources Documents for the Monitoring of Earth Disturbing Activities<br>CUL-1j: Curate all Discovered Cultural Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.8-5 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **PALEONTOLOGICAL RESOURCES** | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class II if fossil bearing geologic units are present<br>Class IV if no fossil bearing units are present<br>PALEO-1a: Require Information ~~Inventory~~ and Evaluate Paleontological Resources<br>PALEO-1b: Develop Paleontological Resource Mitigation Plan<br>PALEO-1c: Retain Qualified Paleontological Resources Staff<br>PALEO-1d: Conduct a Paleontological Resources Worker Environmental Awareness Program<br>PALEO-1e: Monitor Earth Disturbing Activities for Paleontological Resources<br>PALEO-1f: Provide Qualified Paleontological Resources Monitor with Authority to Halt Earth Disturbing Activities<br>PALEO-1g: Prepare Paleontological Resources Report for the Monitoring of Earth Disturbing Activities<br>PALEO-1h: Curate all Discovered Paleontological Resources Associated with Earth Disturbing Activities | Same as those listed in Table 11.9-4 |
| **ENVIRONMENTAL JUSTICE** | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown, possibly Class I<br>EJ-1a: Track Characteristics of Affected Populations in the Vicinity of Well Stimulation Treatments | Same as those listed in Table 11.10-4 |
| **GEOLOGY, SOILS, AND MINERAL RESOURCES** | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class II<br>GEO-1a: Avoid Active Faults if Necessary<br>GEO-1b: Implement an Appropriate Setback if Necessary<br>~~GEO-1c: Limit the Number of Hydraulically Fractured Wells~~<br>GEO-1c~~d~~: Implement Industry Accepted Practices<br>GEO-1d~~e~~: Conduct Ground Monitoring<br>GEO-1e~~f~~: Include~~Prepare~~ an Earthquake Response Plan within the Spill Contingency Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.11-4 |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class II<br>GEO-3a: Prepare Geotechnical Report if Necessary | Same as those listed in Table 11.11-4 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class III<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV<br>None required | Same as those listed in Table 11.11-4 |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class III in most instances; Class I in some instances<br>None available | Same as those listed in Table 11.11-4 |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class III<br>None required | Same as those listed in Table 11.11-4 |
| **GREENHOUSE GAS EMISSIONS** | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1a: Prevent Methane Emissions from Associated Gas and Casinghead Gas<br>GHG-1b: Reduce Emissions by Implementing Clean Development Mechanism (CDM) Strategies<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide | Same as those listed in Table 11.12-1 |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I<br>AQ-2a: Reduce Hydrocarbon Emissions from Well Stimulation Treatments<br>AQ-2b: Reduce Emissions from Portable Equipment and Mobile Sources<br>GHG-1c: Detect and Quantify Fugitive and Vented Methane and Carbon Dioxide<br>GHG-2a: Require Applicant to Enter into Mitigation Programs or Agreements for GHG Emissions not Covered by or Exempt from ARB's Cap and Trade Program | Same as those listed in Table 11.12-1 |
| **HAZARDS AND HAZARDOUS MATERIALS** | | |
| Impact HAZ-1. Release hazardous materials into the environment from a spill or leak | Class II<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Same as those listed in Table 11.13-1 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **GROUNDWATER RESOURCES** | | |
| Impact GW-1. Cause or contribute to overdraft conditions | Class II<br>GW-1a: Use Alternative Water Sources<br>GW-1b: Prepare a Third-Party Technical Report to Analyze Overdraft Impacts | Same as those listed in Table 11.14-6 |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class II<br>GW-2a: Prepare a Third-Party Technical Report to Analyze Local Impacts of Pumping | Same as those listed in Table 11.14-6 |
| Impact GW-3. Adversely impact groundwater quality through surface spills or leaks during well stimulation | Class II<br>HAZ-1a: Ensure that Spill Contingency Plan Provides Adequate Protection Against Leaks or Discharges of Dangerous Fluids and Other Potentially Dangerous Materials~~Provide a Physical Barrier on the Ground Surface at the Site Pad for All Production Facilities, Regardless of the Amount of Time They Are in Place, Prior to Moving in Hazardous Materials and Manage Surface Water Runoff and Drainage on the Barrier Using Best Management Practices~~ | Same as those listed in Table 11.14-6 |
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals | Class II<br>GW-4a: Demonstrate that Wells within the ADSA Have Effective Cement Well Seals and Monitor Wells during Well Stimulation<br>GW-4b: Install a Well Seal Across Protected Groundwater for New Wells Subject to Well Stimulation Treatments~~Full Length Seal Between the Casing String and the Wellbore for Wells within the Boundaries of a DWR Groundwater Basin~~<br>GW-4c: Install Methane Sensors on Wells in the ADSA | Same as those listed in Table 11.14-6 |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells | Class II<br>GW-5a: Conduct Surface Geophysical Surveys or Apply Other Field Methods to Locate Improperly Abandoned Wells and Mitigate | Same as those listed in Table 11.14-6 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact GW-6: Improper disposal of flowback in injection wells could potentially impact groundwater quality | Class II<br>GW-6a: Install a Cement Seal across Protected Groundwater | Same as those listed in Table 11.14-6 |
| Impact GW-7. Inability to identify specific impacts to groundwater quality from well stimulation activities. | Class II<br>GW-7a: Add a Tracer to Well Stimulation Fluids or Develop a Reasonable Method to Distinguish These Fluids in the Environment | Same as those listed in Table 11.14-6 |
| **SURFACE WATER RESOURCES** | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class II<br>SWR-1a: Require Stormwater Pollution Prevention Plan<br>SWR-1b: Surface Water Protection<br>SWR-1bc: Provide Adequate Flood Protection<br>SWR-1cd: Protect Surface Water Reservoirs<br>BIOT-2a: Prevent Hazards to Fish and Wildlife | Same as those listed in Table 11.15-1 |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class II<br>SWR-2a: Implement Erosion Control Plan | Same as those listed in Table 11.15-1 |
| Impact SWR-3. Substantially diminish surface water quantity. | Class II<br>SWR-3a: Ensure Adequate Water Availability | Same as those listed in Table 11.15-1 |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class II<br>SWR-1bc: Provide Adequate Flood Protection | Same as those listed in Table 11.15-1 |
| **LAND USE AND PLANNING** | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I<br>None available for impacts associated with Risk of Upset/Public and Worker Safety | Same as those listed in Table 11.16-3 |
| Impact LU-2. Physically divide an established community. | Class III<br>None required LU-2a: Ensure That Established and Planned Communities Are Not Divided | Same as those listed in Table 11.16-3 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class II<br>SB 4 regulation requiring "Neighbor Notification" (Section 1783.2)<br>All mitigation measures prescribed in this EIR | Same as those listed in Table 11.16-3 |
| **NOISE AND VIBRATION** | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class II<br>NOI-1a: Control Noise Levels near Sensitive Land Uses | Same as those listed in Table 11.17-10 |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class III<br>None required | Same as those listed in Table 11.17-10 |
| **POPULATION AND HOUSING** | | |
| Impact POP-1. Induce substantial population growth | Class III<br>None required | Same as those listed in Table 11.18-4 |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class III<br>None required | Same as those listed in Table 11.18-4 |
| **PUBLIC SERVICES** | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class II<br>PUB-1a: Assess Public Service Ratios and Ensure Adequate Compensation | Same as those listed in Table 11.19-4 |
| **RECREATION** | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III<br>None required | Same as those listed in Table 11.20-3 |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class II<br>REC-2a: Coordinate Well Stimulation Treatment Schedule with Managing Officer(s) for Affected Recreation Areas<br>REC-2b: Provide Noticing of Closures and Identify Alternative Recreation Areas | Same as those listed in Table 11.20-3 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I<br>RSK-1a: Increase the Number of CPUC Rail Inspectors<br>RSK-1b: Expedite the Phase-out of Older Tank Cars<br>RSK-1c: Implement New Accident Prevention Technology<br>RSK-1d: Monitor and Enforce New Speed Limits<br>RSK-1e: Monitor the Implementation of Trackside Safety Technology<br>RSK-1f: Improve Emergency Preparedness and Response Programs<br>RSK-1g: Provide Real-Time Shipment Information to Emergency Responders<br>RSK-1h: Provide Additional Accident and Injury Data to the State | Same as those listed in Table 11.21-1 |
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class II<br>~~RSK-2a: Conduct a Reactive Hazard Assessment (RHA)~~<br>RSK-2ab: Reduce the Inventory/Volumes Handled with the Hazardous Chemicals<br>~~RSK-2c: Install an Upgraded SCADA System~~<br>RSK-2bd: Conduct a Facility Siting Study or Quantitative Risk Assessment<br>~~RSK-2e: Use Totes or Hazardous Materials Storage Containers Provided with a Protective Outer Shell or a Double Containment Storage System~~<br>RSK-2cf: Ensure Mechanical Integrity Through Compliance with Permanent ~~Program Complies with~~ Regulation | Same as those listed in Table 11.21-1 |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III<br>None required | Same as those listed in Table 11.21-1 |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class II<br>RSK-4a: Conduct a Process Hazard Analysis (PHA) Followed by a Layer of Protection Analysis (LOPA) to Ensure Installation of Proper Safety Interlocks | Same as those listed in Table 11.21-1 |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class II<br>RSK-5a: Prepare and Implement the Procedures to Avoid Pump Cavitation during all Well Stimulation Activities<br>RSK-5b: Verify the Need of Installation of Flame Arresters on the Tank Vents<br>RSK-5c: Prepare and Implement a Control of Ignition Sources Plan | Same as those listed in Table 11.21-1 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact RSK-6. Increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I<br>RSK-6a: Increase Inspection of Mechanical Integrity<br>RSK-6b: Improve Leak Detection Capability<br>RSK-6c: Reduce Mainline Valve Spacing ~~None available~~ | Same as those listed in Table 11.21-1 |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class II<br>RSK-7a: Use Alternative Proppant (e.g., Sintered Bauxite, Ceramics, Resins) or Use Alternative Proppant Delivery System<br>RSK-7b: Reduce Emissions from Dust-Causing Activities | Same as those listed in Table 11.21-1 |
| **TRANSPORTATION AND TRAFFIC** | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-2. Inadvertently damage road rights-of-way | Class III for project activities in Study Region 6 and in existing oil and gas fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-2a: Repair Roadway Damage | Same as those listed in Table 11.22-9 |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class III for project activities in Study Region 6 and for existing fields<br>Class II outside of existing oil and gas fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan | Same as those listed in Table 11.22-9 |
| Impact TR-4. Transport hazardous materials | Class I<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| Impact TR-5. Change air traffic patterns | Class IV if no airports are nearby<br>Class III if FAA notification under 14 CFR 77 is required<br>None required | Same as those listed in Table 11.22-9 |

**Table 12.6.24-1. Summary of Impacts and Mitigation Measures for Alternative 5**

| Impact | Project | Specific Oil and Gas Fields (Wilmington, Inglewood, Sespe) |
|---|---|---|
| Impact TR-6. Temporarily interfere with emergency response | Class III for project activities in Study Region 6 and for existing fields<br>Class II in Study Regions 1-5 outside of existing oil and gas fields where 10 or more wells are drilled by a single applicant within one square mile<br>TR-1a: Prepare Traffic Plan<br>TR-2a: Repair Roadway Damage<br>TR-4a: Know Spill Prevention Measures | Same as those listed in Table 11.22-9 |
| **UTILITIES AND SERVICE SYSTEMS** | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from Project-related development | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III<br>None required | Same as those listed in Table 11.23-6 |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class II<br>UTL-3a: Assess Wastewater Quality and Ensure Adequate ~~Compensation to~~Capacity to Process Wastewater at Municipal and Private Wastewater Treatment Plants | Same as those listed in Table 11.23-6 |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class II<br>UTL-4a: Assess Non-Hazardous Solid Waste Generation and Ensure Adequate ~~Compensation to~~Capacity to Accept Solid Waste at Municipal and Private Solid Waste Facilities | Same as those listed in Table 11.23-6 |

## 12.7    No Project Alternative (Alternative 6)

EIRs are required to include a "No Project Alternative," which must "discuss the existing conditions at the time the notice of preparation is published, …as well as what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services" (State CEQA Guidelines Section 15162.6 (e)(2)). Typically, "[w]hen the project is the revision of an existing land use or regulatory plan, policy or ongoing operation, the 'no project' alternative will be the continuation of the existing plan, policy or operation into the future" (State CEQA Guidelines Section 15126.6(e)(3)(A)).

For this EIR, the No Project Alternative (Alternative 6) assumes that the proposed permanent regulations regarding well stimulation adopted on or before January 1, 2015, will be enforced without amendment, and that the proposed mitigation measures identified for the project in this EIR ~~and the project standards for water recycling, habitat protection, surface water protection, and groundwater protection (see EIR Section 5.5.1)~~ would not be adopted or implemented. In other words, well stimulation treatments would be allowed and would be subject to requirements in DOGGR's proposed permanent regulations or existing requirements imposed by other state and local agencies, but specific measures identified in the EIR to address various impacts would not be implemented.

In addition to an analysis of the No Project Alternative itself, the analysis of Alternative 6 highlights how impacts under the No Project Alternative would differ from impacts under the project. Where no difference is specifically noted, the significance of impacts under the alternative are the same as the impacts under the project.

### 12.7.1    Introduction

The No Project Alternative (Alternative 6) assumes that the permanent regulations adopted on or before January 1, 2015, will be left in place without supplements or amendments and no additional measures to reduce the environmental effects of well stimulation treatments will be adopted.

PRC Section 3161(b)(3)(A), which had been signed into law in a slightly different form at the time the Notice of Preparation was published, states that DOGGR is required to conduct:

> "an environmental impact report (EIR) pursuant to the California Environmental Quality Act (Division 13 (commencing with Section 21000)), to provide the public with detailed information regarding any potential environmental impacts of well stimulation in the state."

The No Project Alternative assumes that this EIR is finalized, because it is required by law. However, because Senate Bill 4 requires an analysis of "well stimulation in the state" as opposed to any specific proposed project, there is no express requirement that DOGGR or other agencies adopt any feasible mitigation measures identified in the EIR for identified significant environmental effects. Therefore, the No Project Alternative assumes a scenario in which this EIR's proposed mitigation measures would not be adopted or implemented. For those activities over which they have jurisdiction, local authorities could and should impose measures that address significant impacts of their own approval actions; however, it is unknown whether and what measures would be imposed. Therefore, to be conservative, the No Project Alternative assumes no additional local measures would be imposed.

## 12.7.2    Analysis of Impacts and Mitigation Measures

For all issue areas analyzed in the EIR, the type of impacts under the No Project Alternative would be similar to those identified, in the absence of mitigation, in the programmatic level analysis in EIR Sections 10.1 through 10.23 for the project and in EIR Sections 11.1 through 11.23 for the existing Wilmington, Inglewood, and Sespe Oil and Gas Fields.

Feasible mitigation measures that would lessen the impacts of the project are available and are identified throughout EIR Chapters 10 and 11. Impacts that were identified for the project as being significant and unmitigable (Class I), less than significant (Class III), no impact (Class IV), or beneficial (Class V) would remain the same under the No Project Alternative.

The key difference between the project and the No Project Alternative is that under the No Project Alternative the mitigation measures identified for significant project impacts would not be implemented. In the absence of mitigation, impacts identified as less than significant with mitigation (Class II) for the project would become significant and unmitigated (Class I).

As shown in Table 12.7.3-1, there would be numerous significant impacts under the No Project Alternative. These include significant and unmitigable impacts (Class I) that would occur under both the project and the No Project Alterative and significant impacts for which mitigation is not adopted under the No Project Alternative (but which would apply to the project). Some impacts may be double counted because they are considered in more than one resource topic (e.g., Transportation and Risk).

## 12.7.3    Impact Summary Table for Alternative 6

Table 12.7.3-1 provides a summary of impacts for the project and specific oil and gas fields for all issue areas under Alternative 6.

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **AESTHETICS** | | | | |
| Impact AES-1. Substantially adversely affect scenic vistas. | Class III in existing fields; Class I in new areas | Class III | Class III | Class III |
| Impact AES-2. Substantially alter or damage scenic resources. | Class III in existing fields; Class I in new areas | Class III | Class III | Class III |
| Impact AES-3. Substantially degrade the existing visual character or quality of a site and its surroundings. | Class III in existing fields; Class I in new areas | Class III | Class III | Class III |
| Impact AES-4. Create new sources of substantial light and glare. | Class III in existing fields; Class I in new areas | Class III | Class III | Class III |
| **AGRICULTURE AND FORESTRY RESOURCES** | | | | |
| Impact AGF-1. Convert Prime Farmland, Unique Farmland, or Farmland of Statewide Importance (Important Farmland), as designated by the Farmland Mapping and Monitoring Program, to non-agricultural use | Class I on or adjacent to Important Farmland | Class IV | Class IV | Class I |
| Impact AGF-2. Conflict with existing zoning for agricultural use or with Williamson Act contracts | Class I on land zoned for agricultural use or enrolled in Williamson Act contracts | Class IV | Class IV | Class I |
| Impact AGF-3. Conflict with existing zoning for, or cause rezoning of, forest land, timberland, or timberland zoned Timberland Production | Class I on land zoned as forestland, timberland, or Timberland Production | Class IV | Class IV | Class IV |
| Impact AGF-4. Result in the loss of forest land or conversion of forest land to non-forest use | Class I on forest land | Class IV | Class I | Class I |
| Impact AGF-5. Directly or indirectly impair the use of agricultural land or forest land | Class I for well stimulation activities on or within 1,500 feet of agricultural or forest land | Class IV | Class I for well stimulation activities on or within 1,500 feet of forest land | Class I |
| **AIR QUALITY** | | | | |
| Impact AQ-1. Conflict with or obstruct implementation of an applicable air quality plan | Class I (Statewide) Class III (in SCAQMD) | Class III | Class III | Class III |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact AQ-2. Increase criteria pollutants or precursor pollutants to levels that violate an air quality standard or contribute substantially to an existing or projected air quality violation | Class I | Class I | Class I | Class I |
| Impact AQ-3. Expose sensitive receptors to substantial pollutant concentrations | Class I | Class I | Class I | Class I |
| Impact AQ-4. Create objectionable odors affecting a substantial number of people | Class I | Class I | Class I | Class I |
| **BIOLOGICAL RESOURCES – TERRESTRIAL ENVIRONMENT** | | | | |
| Impact BIOT-1: Substantially reduce the habitat of a fish or wildlife species | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-2: Cause a fish or wildlife population to drop below self-sustaining levels | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-3: Substantially reduce the number or restrict the range of an endangered, rare, or threatened species | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-4: Have a substantial adverse effect, either directly or through habitat modifications, on any species identified as a candidate, sensitive, or special-status species in local or regional plans, policies, or regulations, or by CDFW or USFWS | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-5: Have a substantial adverse effect on any riparian habitat or other sensitive natural community identified in local or regional plans, policies, regulations, or by CDFW or USFWS | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-6: Have a substantial adverse effect on federally protected wetlands as defined by Section 404, of the Clean Water Act (including, but not limited to, marsh, vernal pool, coastal, etc.) through direct removal, filling, hydrological interruption, or other means | Class I or III | Class I or III | Class I or III | Class I or III |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact BIOT-7: Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites | Class I or III | Class III | Class III | Class I or III |
| Impact BIOT-8: Conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance | Class I or III | Class I or III | Class III | Class I or III |
| Impact BIOT-9: Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan | Class I or III | Class I or III | Class I or III | Class I or III |
| Impact BIOT-10: Contribute to global climate change and consequent impacts to biodiversity | Class I | Class I or III | Class I or III | Class I or III |
| **BIOLOGICAL RESOURCES – COASTAL AND MARINE ENVIRONMENT** | | | | |
| Impact BIOCM-1. Substantially affect rare, threatened, or endangered coastal/marine species or their habitat | Class III | Class III | N/A | N/A |
| Impact: BIOCM-2. Interfere with migration or movement of coastal/marine fish or wildlife | Class III | Class III | N/A | N/A |
| Impact BIOCM-3. Result in substantial loss or alteration of coastal/marine habitat | Class III | Class III | N/A | N/A |
| Impact BIOCM-4. Substantially disrupt or affect local coastal/marine biological communities or habitats | Class III | Class III | N/A | N/A |
| **COASTAL PROCESSES AND MARINE WATER QUALITY** | | | N/A | N/A |
| Impact CPMWQ-1. Change marine water chemical composition with respect to known hazardous substances; or the measured water temperature, salinity, conductivity, or turbidity | Class I | Class I | N/A | N/A |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact CPMWQ-2. Change the velocity or direction of ocean currents | Class I | Class I | N/A | N/A |
| Impact CPMWQ-3. Change the velocity or direction of coastal and ocean winds | Class III | Class III | N/A | N/A |
| Impact CPMWQ-4. Change the direction, size, or period of ocean waves | Class IV | Class IV | N/A | N/A |
| Impact CPMWQ-5. Increase the risk of a tsunami | Class III | Class III | N/A | N/A |
| **COMMERCIAL AND RECREATIONAL FISHING** | | | | |
| Impact CRF-1. Cause long-term exclusion of important commercial and recreational fishing areas | Class III | Class III | N/A | N/A |
| Impact CRF-2. Result in substantial economic losses to local commercial and recreational fishing industries | Class III | Class III | N/A | N/A |
| **CULTURAL RESOURCES** | | | | |
| Impact CUL-1. Affect historic-era archaeological and built-environment resources | Class I if historic or built-environment resources are present<br><br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present | Class I if historic or built-environment resources are present;<br><br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present | Class I if historic or built-environment resources are present;<br><br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present | Class I if historic or built-environment resources are present;<br><br>Class III or Class IV if historic or built-environment resources are not considered significant or are not present |
| Impact CUL-2. Affect prehistoric resources | Class I if prehistoric resources are present<br><br>Class III or Class IV if prehistoric resources are not considered significant or are not present | Class I if prehistoric resources are present;<br><br>Class III or Class IV if prehistoric resources are not considered significant or are not present | Class I if prehistoric resources are present;<br><br>Class III or Class IV if prehistoric resources are not considered significant or are not present | Class I if prehistoric resources are present;<br><br>Class III or Class IV if prehistoric resources are not considered significant or are not present |
| Impact CUL-3. Disturb human remains or cultural items, including funerary objects, sacred objects, and objects of cultural patrimony. | Class I if human remains or cultural items are present<br><br>Class III or Class IV if cultural items are not considered significant or are not present<br><br>Class IV if human remains are not present | Class I if human remains or cultural items are present;<br><br>Class III or Class IV if cultural items are not considered significant or are not present<br><br>Class IV if human remains are not present | Class I if human remains or cultural items are present;<br><br>Class III or Class IV if cultural items are not considered significant or are not present<br><br>Class IV if human remains are not present | Class I if human remains or cultural items are present;<br><br>Class III or Class IV if cultural items are not considered significant or are not present<br><br>Class IV if human remains are not present |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | **Wilmington** | **Inglewood** | **Sespe** |
| Impact CUL-4. Affect cultural landscapes. | Class I if cultural landscapes are present<br>Class III or Class IV if cultural landscapes are not considered significant or are not present | Class I if cultural landscapes are present;<br>Class III or Class IV if cultural landscapes are not considered significant or are not present | Class I if cultural landscapes are present;<br>Class III or Class IV if cultural landscapes are not considered significant or are not present | Class I if cultural landscapes are present;<br>Class III or Class IV if cultural landscapes are not considered significant or are not present |
| **PALEONTOLOGICAL RESOURCES** | | | | |
| Impact PALEO-1. Well stimulation treatments would destroy or disturb surface or near-surface significant paleontological resources | Class I if fossil bearing geologic units are present | Class I if fossil bearing geologic units are present;<br>Class IV if no fossil bearing units are present | Class I if fossil bearing geologic units are present;<br>Class IV if no fossil bearing units are present | Class I if fossil bearing geologic units are present;<br>Class IV if no fossil bearing units are present |
| **ENVIRONMENTAL JUSTICE** | | | | |
| Impact EJ-1. Significant impacts would disproportionately affect minority or low-income populations | Unknown | Unknown | Unknown | Unknown |
| **GEOLOGY, SOILS AND MINERAL RESOURCES** | | | | |
| Impact GEO-1. Expose people or structures to potential substantial adverse effects as a result of rupture of a known fault, seismically induced groundshaking, and/or ground failure | Class I | Class I | Class I | Class I |
| Impact GEO-2. Result in substantial soil erosion or the loss of topsoil | Class I | Class I | Class I | Class I |
| Impact GEO-3. Be located on a geologic unit or soil that is unstable and result in on- or off-site landslide, lateral spreading, subsidence or collapse | Class I | Class III | Class III | Class I |
| Impact GEO-4. Be located on expansive soil creating substantial risks to life or property | Class III | Class III | Class III | Class III |
| Impact GEO-5. Have soils incapable of adequately supporting the use of septic tanks or alternative wastewater disposal systems | Class IV | Class IV | Class IV | Class IV |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| Impact GEO-6. Result in the loss of availability of known mineral resource loss of a locally important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan | Class I or III | Class III | Class III | Class III |
| Impact GEO-7. Cause an induced seismic event including ground shaking and ground failure | Class III | Class III | Class III | Class III |
| **GREENHOUSE GAS EMISSIONS** | | | | |
| Impact GHG-1. Generate greenhouse gas emissions that may have a significant impact on the environment | Class I | Class I | Class I | Class I |
| Impact GHG-2. Conflict with an applicable plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases | Class I | Class III | Class I | Class III |
| **HAZARDS AND HAZARDOUS MATERIALS** | | | | |
| Impact HAZ-1. Release Hhazardous materials ~~associated with well stimulation fluids could be released~~ into the environment from a spill or leak | Class I | Class I | Class I | Class I |
| **GROUNDWATER RESOURCES** | | | | |
| Impact GW-1. Cause or contribute to overdraft conditions | Class I | Class I | Class I | Class III |
| Impact GW-2. Lower groundwater levels through pumping, resulting in significant and unreasonable inelastic land subsidence or significant and unreasonable impacts to nearby water wells or interconnected surface water | Class I | Class I | Class I | Class III |
| Impact GW-3. Adversely impact groundwater quality through surface spills or leaks during well stimulation | Class I | Class I | Class I | Class I |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
|---|---|---|---|---|
| | | Wilmington | Inglewood | Sespe |
| Impact GW-4. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through non-existent or ineffective annular well seals | Class I | Class I | Class I | Class I |
| Impact GW-5. Migration of well stimulation fluids or formation fluids including gas to protected groundwater through damaged or improperly abandoned wells | Class I | Class I | Class I | Class I |
| Impact GW-6. Improper disposal of flowback in injection wells could potentially impact groundwater quality | Class I | Class I | Class I | Class I |
| Impact GW-7: Inability to identify specific impacts to groundwater quality from well stimulation activities | Class I | Class I | Class I | Class I |
| **SURFACE WATER RESOURCES** | | | | |
| Impact SWR-1. Violate water quality standards or waste discharge requirements, provide substantial additional sources of polluted runoff, or otherwise substantially degrade or diminish surface water quality. | Class I | Class I | Class I | Class I |
| Impact SWR-2. Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion or siltation on- or off-site. | Class I | Class I | Class I | Class I |
| Impact SWR-3. Substantially diminish surface water quantity. | Class I | Class I | Class I | Class I |
| Impact SWR-4. Create flood hazard by substantially altering existing drainage patterns, substantially increasing the rate or amount of surface runoff, impeding or redirecting flood flows, or exposing people or structures to flooding. | Class I | Class I | Class I | Class I |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **LAND USE AND PLANNING** | | | | |
| Impact LU-1. Preclude existing or permitted land uses, or create a disturbance that would diminish the function of land uses. | Class I | Class I | Class I | Class III |
| Impact LU-2. Physically divide an established community. | Class III | Class IV | Class IV | Class IV |
| Impact LU-3. Conflict with applicable land use plans, policies, programs, ordinances or other land use regulations of agencies with jurisdiction over a project adopted for the purpose of avoiding or mitigating an environmental effect. | Class I | Class I | Class I | Class I |
| **NOISE AND VIBRATION** | | | | |
| Impact NOI-1. Cause exposure of persons to or generation of excessive noise levels or a substantial increase in ambient noise levels | Class I | Class I | Class I | Class I |
| Impact NOI-2. Cause exposure of persons to or generation of excessive groundborne vibration | Class III | Class III | Class III | Class III |
| **POPULATION AND HOUSING** | | | | |
| Impact POP-1. Induce substantial population growth | Class III | Class III | Class III | Class III |
| Impact POP-2. Displace substantial numbers of people or existing housing, necessitating the construction of replacement housing elsewhere | Class I | Class IV | Class III | Class III |
| **PUBLIC SERVICES** | | | | |
| Impact PUB-1. Require new or physically altered governmental facilities in order to maintain acceptable service ratios, response times, or to other performance objectives for fire, police, or schools | Class I for Increased Need for Fire or Police Services Due to Project Activities<br>Class III for Increased Need for Public Services Due to Population Growth | Class I | Class I | Class I |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | Wilmington | Inglewood | Sespe |
| **RECREATION** | | | | |
| Impact REC-1. ~~Well stimulation treatment activities would increase the usage of recreation areas or facilities which would r~~Result in the physical deterioration of recreational resources | Class III | Class III | Class III | Class III |
| Impact REC-2. ~~Well stimulation treatment activities would c~~Cause disruptions in designated recreation areas | Class I | Class I | Class I | Class III |
| **RISK OF UPSET / PUBLIC AND WORKER SAFETY** | | | | |
| Impact RSK-1. Create a hazard to the public or environment through crude oil transport and reasonably foreseeable accidents and releases | Class I | Class I | Class I | Class I |
| Impact RSK-2. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental release hazardous materials due to a hose leak or connection leak while pumping well stimulation treatment fluids | Class I | Class I | Class I | Class I |
| Impact RSK-3. Substantially increase the potential for major oil spills due to ship groundings and collisions | Class III | Class III | Class III | Class III |
| Impact RSK-4. Create a hazard to the public, workers, or environment through a reasonably foreseeable accidental pressure changes during flowback activity caused by blocked pump discharge, sudden change in downhole condition, or human error | Class I | Class I | Class I | Class I |
| Impact RSK-5. Generate risks to public safety by causing a flammable atmosphere in the flowback tank | Class I | Class I | Class I | Class I |
| Impact RSK-6. Substantially increase risks to public safety by exposing the public to accidental crude oil or produced gas releases from pipelines | Class I | Class I | Class I | Class I |

**Table 12.7.3-1. Summary of Impacts and Mitigation Measures for Alternative 6**

| Impact | Project | Specific Oil and Gas Fields | | |
| --- | --- | --- | --- | --- |
| | | **Wilmington** | **Inglewood** | **Sespe** |
| Impact RSK-7. Expose workers and public to hazardous levels of airborne silica during the use of proppant | Class I | Class I | Class I | Class I |
| **TRANSPORTATION AND TRAFFIC** | | | | |
| Impact TR-1. Generate additional truck traffic and disrupt traffic operations | Class I outside of existing fields in Study Regions 1-5 where 10 or more wells are drilled by a single applicant within 1 square mile<br>Class III in existing fields and Study Region 6 | Class III | Class III | Class III |
| Impact TR-2. Inadvertently damage road rights-of-way | Class I (as above for TR-1)<br>Class III (as above for TR-1) | Class III | Class III | Class I in City of Fillmore |
| Impact TR-3. Cause traffic safety hazards for vehicles, bicyclists, and pedestrians | Class I (as above for TR-1)<br>Class III (as above for TR-1) | Class III | Class III | Class III |
| Impact TR-4. Transport hazardous materials | Class I | Class I | Class I | Class I |
| Impact TR-5. Change air traffic patterns | Class IV if no airports nearby | Class III | Class III | Class IV |
| Impact TR-6. Temporarily interfere with emergency response | Class I (as above for TR-1)<br>Class III (as above for TR-1) | Class III | Class III | Class III |
| **UTILITIES AND SERVICE SYSTEMS** | | | | |
| Impact UTL-1. Adversely affect utilities and service systems due to population growth from project-related development | Class III | Class III | Class III | Class III |
| Impact UTL-2. Require new or expanded electrical or natural gas infrastructure | Class III | Class III | Class III | Class III |
| Impact UTL-3. Exceed existing municipal wastewater treatment provider capacities | Class I | Class I | Class I | Class I |
| Impact UTL-4. Exceed permitted solid waste capacity of landfills | Class I | Class I | Class I | Class I |

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 1 OF 4)** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒   BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒   [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

_____

Josie Cisneros

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>          tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a<br>California non-profit corporation; GET OIL<br>OUT!, a California non-profit corporation;<br>SANTA BARBARA COUNTY ACTION<br>NETWORK, a California non-profit corporation;<br>SIERRA CLUB, a national non-profit<br>corporation; and SANTA BARBARA<br>CHANNELKEEPER, a California non-profit<br>corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>          jfrankel@environmentaldefensecenter.org<br>          trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire<br>Protection, Office of the State Fire Marshal;<br>Daniel Berlant, in his official capacity as State<br>Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>          benjaminhanelin@paulhastings.com<br>          natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY<br>LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>Respondents and Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>Real Parties in Interest. | Case No. 25CV02247<br>[Coordinated with Case No. 25CV02244]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 2 OF 4)**<br><br>[*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Steve Rusch, Michael A. Mische, Brien Vierra, and Michael Rosenfeld*]<br><br>Date:        July 18, 2025<br>Time:        10:00 AM<br>Dept.:        4<br><br>Complaint Filed:        April 15, 2025<br>Trial Date:        None Set |

1

DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

# VOLUME 2 OF 4 (EXHIBIT B)
# TO DECLARATION OF BART LEININGER

# Exhibit B

# FINAL
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



## PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

### CALIFORNIA STATE LANDS COMMISSION
AND
### BUREAU OF LAND MANAGEMENT
### DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# JANUARY 1985

COVER SHEET

CELERON/ALL AMERICAN AND GETTY PIPELINE PROJECT

() DRAFT                                          (X) FINAL

Joint Review Panel                California State Lands Commission
                                  Sacramento, CA  (CEQA Lead)

                                  U.S. Department of the Interior
                                  Bureau of Land Management (NEPA Lead)
                                  California Desert District, Riverside, CA

                                  Santa Barbara County
                                  Resource Management Department
                                  Santa Barbara, CA

Cooperating Agencies              U.S. Department of Agriculture
                                  Forest Service

                                  U.S. Department of the Interior
                                  Fish and Wildlife Service

                                  U.S. Department of Transportation
                                  Federal Highway Administration

                                  California Secretary of Environmental
                                  Affairs
                                  Sacramento, CA

EIS Contact
Comments on this EIR/EIS should be directed to:
    Mary Griggs
    State Lands Commission
    1807 - 13th Street
    Sacramento, California  95814
    (916) 322-0354

Dates EIR/EIS Made Available to the Public
Draft:  August 1, 1984
Final:  January 9, 1985

ABSTRACT

    The Celeron and All American Pipeline Companies propose to
construct a 1,200-mile pipeline that would transport Outer Continental
Shelf and other locally produced crude oils from the Santa Barbara and
Santa Maria Basins through Emidio station, CA, to McCamey, TX.  The
122-mile Celeron segment would extend from Las Flores, CA to Emidio, CA
and the 1,084-mile All American segment would extend from Emidio, CA to
McCamey, TX; both would transport heated crude oil.  Getty Trading and
Transportation Company (Getty) proposes to construct a 113-mile buried
pipeline that would transport heated crude oil from Getty's existing

marine terminal facility at Gaviota, CA, to Emidio station, CA. The Celeron/All American pipeline proposal and the Getty pipeline proposal are not dependent upon each other. Both projects could be approved or either project could be approved independently of the other.

The Celeron/All American and Getty Pipeline Projects Environmental Impact Report/Environmental Impact Statement (EIR/EIS) addresses both applications to construct pipelines from the Santa Barbara coast to Emidio in Kern County. The EIR/EIS also addresses Celeron/All American's application for a pipeline from Emidio to McCamey, Texas.

The EIR/EIS analyzes the environmental effects of the proposed pipelines; pump, heating, and delivery stations; and a tank farm through construction, operation, maintenance, and abandonment. This report analyzes the impacts of the Celeron/All American and Getty Proposals and four routing alternatives that have been identified. These are the Santa Maria Canyon, Desert Plan Utility Corridor, Brenda, and McCamey to Freeport Alternatives. The Santa Maria Canyon Alternative crosses a portion of the Los Padres National Forest in Santa Barbara County; the Desert Plan Alternative is in the Mojave Desert in eastern California; the Brenda Alternative is in western Arizona near the Kofa National Wildlife Refuge; and the McCamey to Freeport Alternative extends from West Texas to the Gulf Coast. These alternatives were identified to provide optional locations for the pipelines in sensitive areas. The No Project Alternative is also analyzed.

The EIR/EIS has been prepared according to the requirements of the National Environmental Policy Act of 1969 (NEPA), the Council of Environmental Quality's regulations for implementing NEPA, effective July 30, 1979, and the California Environmental Quality Act (CEQA) as amended. Based on the issues and concerns identified during the scoping process, the EIR/EIS focuses on the impacts to river crossings, access, hydrology, restoration, employment, and oil spills.

# 4.0 APPENDICES

APPENDIX 4.1

MITIGATION MEASURES, AGENCY STIPULATIONS, AND RECOMMENDED
MITIGATION MEASURES

4.1.1 Mitigation Measures

The following mitigation measures have been developed to mitigate the significant impacts that were identified in Chapter 4 of the Draft EIR/EIS. Since the draft, mitigation measures have modified based on agency and public comments; however, the numbering system used in the draft has been retained. Where impacts were deemed to be not significant, no mitigation measures were developed. The measures contained in this section have been committed to by the California State Lands Commission, BLM, Forest Service, and Santa Barbara County, and these agencies will be responsible for their enforcement. Thus, the mitigation measures will not be just suggestions but will be specific requirements of both Getty and Celeron/All American as part of their ROW grants or permits. As noted in several of the following measures, the federal authorized officer will direct the detailed implementation of certain measures.

In addition to the mitigation measures contained in this EIS, the BLM will attach standard and special ROW stipulations to its ROW grant (see Section 4.1.2). These stipulations will contain generic measures that are applied to all ROWs as well as site-specific measures whose need may be identified at the time the pipeline centerline is surveyed. The required surveys for cultural resources and protected animals, for example, will likely identify the need for site-specific stipulations.

Federal agencies (BLM, Forest Service, FWS, and Department of Defense) can consider impacts on Federal and private land. Reasonable mitigation measures can be enforced on Federal land, but authority is limited on private land. The California State Lands Commission in its role as CEQA lead agency has identified Recommended Mitigation Measures in Section 4.1.3 of this document which reduce significant impacts. At the time that the Commission certifies the document it will determine the appropriate public agency responsible for implementation of such measures pursuant to the California Environmental Quality Act, Section 15091. The California State Lands Commission has no direct enforcement authority other than on state-owned lands; however, it can require certain measures as a condition of the permit it will issue and rely on other state agencies, such as the Department of Fish and Game, to enforce these conditions. Mitigation measures and stipulations contained in the conditional use permit issued by Santa Barbara and other Counties will be required and enforceable on private land as well as public land.

4-1

4.1.1.1  <u>Air Quality</u>  (none required)

4.1.1.2  <u>Geology</u>

<u>Measure 1</u>:  Appropriately detailed geologic, seismologic, and geotechnical studies will be conducted to identify and characterize geologic hazards and to provide information for design of earthwork and foundations along the pipeline route and at pump and heater stations, tank farms, and delivery stations.

For much of the pipeline alignment, a reconnaissance-level geologic study will be sufficient to identify those areas, if any, requiring more detailed investigation.  The scope of the reconnaissance-level study will vary with the degree of potential geologic hazards identified in Sections 4.2.2, 4.3.2, 4.4.2, 4.5.2, and 4.6.2 of the DEIR/EIS.  For those portions of the proposed alignment adjacent to an existing pipeline, a review of maintenance problems or structural failures related to ground conditions may be sufficient.  If necessary, this review should be supplemented by examination of aerial photographs or aerial reconnaissance.  For new portions of the routes, the reconnaissance studies should include literature review and interpretation of stereo aerial photos, if available.  Aerial reconnaissance could be substituted where photos are unavailable.

Specific geologic hazard areas identified during the reconnaissance studies may require further investigation.  This may involve aerial reconnaissance, ground reconnaissance/mapping, and/or some subsurface exploration (drilling, text pits).  At pump and heater stations, tank farms, and delivery stations, a program of standard geotechnical exploration and design will be performed.

<u>Effectiveness</u>:  Such studies are standard for major civil structures and will identify with an acceptable degree of completeness existing signficant geologic and seismologic hazards such as landslides, subsidence scarps and fissures, karstic sinkholes, Holocene faults, and areas susceptible to liquefaction.  Special attention to further evaluating potential for damaging movement on the Quaternary faults listed on Tables 3-3 and 3-5 in the DEIS/EIR, particularly the South Cuyama and White Wolf Faults, will result in appropriate treatment of these crossings, if required (see Measure 3).  Areas with moderate to high potential for future development of geologic hazards will be identified.

<u>Application</u>:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

<u>Measure 1-A</u>:  Geologic hazards identified and characterized as a result of Measure 1 will be dealt with by specific mitigation which may involve avoidance by re-routing, remedial earthwork, or special structural or foundation design.  In some cases, a program of surveillance and/or monitoring will be established to verify adequate performance (e.g., at a crossing of an inactive landslide), or warn of developing hazards (e.g., in proximity to an active karst feature or a slope judged susceptible to failure during an extremely wet year).

4-2

Recommendations and design criteria for earthwork and foundations will be developed by pump and heater stations, tank farms, delivery stations, and selected pipeline segments (e.g., fault crossings, major river crossings, etc.).

Effectiveness:  These mitigation measures are standard and are very effective, being based on adequate investigations as specified in Measure 1.   The particular measure selected to accommodate a geologic hazard or geotechnical condition will be site and problem specific, further enchancing the effectiveness of the measure.

Application:   This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 2:  Appropriate ground motion parameters will be developed for use in seismic design of critical structures and equipment, including  pumps,  valves,  piping,  communications  systems,  and instrumentation.  Use of the dual contingency level/operating level earthquake concept, or equivalent, is recommended.

The development of seismic design parameters will involve the following elements:

- selection and characterization of significant potential seismic sources (active faults, unassociated earthquakes, etc.), including evaluation of the magnitude of contingency and operating level earthquakes.

- estimation of attenuated ground motions at sites from each potential source.

- assessment of the likelihood of experiencing the design earthquakes and resulting site ground motions (at least in terms of defining the contingency and operating level earthquakes).

The estimated site ground motions will then be used in structural design of critical elements (see Section 4.2.14 in the DEIR/EIS).

Effectiveness:  Appropriate seismic design, especially for the Las Flores to Blythe portion of the route, will minimize the potential for serious damage leading to oil spillage as a result of strong ground shaking.  Earthquake-resistant design is sufficiently advanced so that this measure should prove very effective.

Application:   This measure will be applied to the Celeron/All American and Getty facilities and all alternatives within California. Studies to determine the need for such measures along the remainder of the route will be conducted as part of Measure 1.

Measure 3:  Special geologic/seismologic studies will be conducted to characterize potential surface offset at the South Branch Santa Ynez, San Andreas, and Garlock faults, and appropriate crossings will be designed.  Similar studies will be conducted for any other faults that show evidence of Holocene offset (within approximately the last 11,000 years) at the pipeline crossing.

Effectiveness:  Adequate historical and geologic data exist to characterize an appropriate design fault offset event for the San Andreas Fault.  Some field study may be necessary to delineate the limits of the zone across which movement could occur.  Historical data are less abundant for the South Branch Santa Ynez and Garlock faults, but geologic data and comparison to other similar known active faults provide a basis for developing design events.  Again, some field study may be required.  Having selected an appropriate offset, design techniques are available to minimize the potential for pipe rupture and/or to minimize the amount of oil spillage if a rupture occurs. These include:

- Pipe burial in V-shaped ditch with loose backfill.

- Use of extra-strength steel pipe.

- Placement of block valves on either side of fault in conjunction with seismic detection.

- Construction of earth dike to contain spillage; use of earthen or synthetic liner in holding basin.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and alternatives at crossings of Holocene faults.

4.1.1.3  Soils  (none required)

4.1.1.4  Surface Water

Measure 4:  During pipeline construction at stream crossings, construction contractors will minimize time of disturbance and area disturbed, stabilize disturbed areas promptly, and divert runoff waters into settlement areas prior to discharge into a watercourse.  Where construction activities are necessary in the channel, particularly La Brea Creek, the channel will be disturbed as little as possible and for as short a time as possible.

Effectiveness:  An increase in sediment loadings during construction of stream crossings is unavoidable.  Application of this measure will minimize the impact of construction at stream crossings.

Application:  The measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 5: Pipeline operators will check the pipeline burial depth yearly at major crossings identified in this report.  At crossings where channel degradation has reduced the depth of fill to less than the 100-year scour depth, reburial of the pipeline to the proper depth will be required.

Effectiveness:  The burial depth of 4 ft below the scour of the 100-year, 24-hour storm runoff event is required by DOT regulations. This requirement minimizes the chances of possible pipeline breaks during large runoff events.  Some of the major streams crossed by the pipeline have been disturbed and the channels are degrading in the vicinity of the pipeline crossing.  Maintaining deep enough pipeline burial is important to minimizing the risk of an oil spill.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.1.1.5  Groundwater

Measure 6:  Detailed hydrogeologic investigations will be conducted for each sensitive area along the alignment as indicated in Table 3-14. These investigations will include definition of groundwater depth, recharge sources, properties of overlying soils, hydraulic gradient, background water quality, and existing water uses.  Existing wells will be inventoried in an area extending hydrogeologically down gradient from the pipeline for 2 miles or for a distance downgradient in the aquifer equal to the distance groundwater would move in one-year at a velocity (V) calculated from the maximum hydraulic conductivity (K) of the specific aquifer, hydraulic gradient (i), and porosity ($\Phi$).  The formula for this calculation is $V = \frac{Ki}{\Phi}$.  For example, if K = 1000 ft/day, i = 25 ft/mile, and $\Phi$ = 25 percent, then V = 19 ft/day or 1.3 miles per year.  This information will be used to formulate an Oil Spill Contingency Plan that will include plans for monitoring and early detection of groundwater contamination, notification of affected groundwater users and appropriate governmental agencies, site-specific cleanup and response, and identification of emergency alternate water supplies.

Effectiveness:  These hydrogeologic investigations and contingency plans will make appropriate information available in sensitive areas to allow for early detection and response to spills or leaks rather than attempting to get this information after a spill has occurred.  This is particularly important in populated areas where groundwater is extensively used for municipal or domestic supplies.

Application:  This measure will be applied to sensitive groundwater basins along the Celeron/All American and Getty proposals and all alternatives.

Measure 7:  Low permeability backfill will be used in the bottom and sides of 20-ft sections of pipeline trench where the ROW approaches sensitive aquifers that are at risk from oil spills and leaks.  This measure will be implemented at each side of selected sensitive areas

where the ROW follows topographic slopes toward basins with shallow depth to water, high vertical permeabilities, and a high degree of groundwater use as indicated by hydrogeologic investigations performed in Measure 6 above.

Effectiveness:  This method of trench backfill will force leaking oil to the surface rather than permitting lateral or downward seepage along the trench downslope toward alluvial aquifers.  This will facilitate early leak detection and simplify cleanup procedures.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.1.1.6  Aquatic Biology

Measure 8:  Fueling and lubrication of construction equipment will not occur within 0.25 miles of streams.  No more than 2 barrels of fuel (about 84 gallons) should be kept at construction sites within 0.5 mile of sensitive streams (Table 4-6).  Equipment will be periodically checked for leakage to avoid spills.  If a spill does occur, it should be reported to the Authorized Officer immediately.

Effectiveness:  Refueling away from streams and periodic maintenance should reduce the risk of construction-related spills.

Application:  The measure would be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.1.1.7  Terrestrial Biology

Measure 9:  Development will avoid, to the maximum extent possible, disturbance to sensitive and valuable plant communities including riparian areas, oak woodlands, Coulter pine, live oaks, Joshua tree woodlands, desert dunes, and ironwood washes.  Locations to be avoided will be determined by the land owner, land manager, or applicable regulatory agency.  The construction ROW will be reduced to 50-ft wide in these sensitive communities.  The land owner, land manager, or regulatory agency may reduce the construction ROW in specific locations to minimize impacts to other sensitive plant or wildlife communities. Staging areas will not be located in sensitive communities.

Effectiveness:  Avoiding and minimizing disturbance to sensitive areas and unique plant communities will minimize loss of vegetation and wildlife habitat by 50 percent.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Mitigation Measure 9-A:  Clearing of vegetation and wildlife habitat in riparian and oak woodland communities (in the Las Padres National Forest) will be minimized by:

4-6

- Using the existing La Brea Canyon Road to the greatest extent practical to minimize clearing,

- Limiting the maximum construction ROW to 50 feet for <u>both</u> pipelines,

- Not cutting trees greater than 6 inches dbh (diameter at breast height) without prior authorization by the Forest Service.

- Including native riparian zone species for revegetation to encourage regeneration and restoration of wildlife habitat.

<u>Effectiveness</u>:  Avoidance of large trees and construction of both pipelines in one 50-foot ROW will minimize loss of vegetation and wildlife habitat by at least 50 percent.  Some clearing of riparian habitat will still occur and disturbance during construction will discourage use of the area by wildlife.

<u>Application</u>:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives across the Los Padres National Forest.

<u>Measure 10</u>:  During construction in creosote scrub and alkali scrub areas of the desert, ROW clearing will be limited to trimming or crushing whenever possible.  The new ROW will be located immediately adjacent to existing disturbance, especially roads.

<u>Effectiveness</u>:  This measure will limit the amount of shrub vegetation disturbed and reduce erosion.  By not disturbing the root system, many crushed or clipped shrubs will resprout and revegetate the ROW more quickly.  This will reduce soil erosion and speed re-establishment of wildlife habitat.

<u>Application</u>:  This measure will be applied to the desert portions of the Celeron/All American proposal, the Desert Plan, and Brenda Alternatives.

<u>Measure 11</u>:  During construction in desert areas, some of the cleared or clipped vegetation will be piled in small thickets off the ROW (where acceptable to the landowner or land manager) to provide cover for displaced animals.

<u>Effectiveness</u>:  Providing cover for displaced small mammals and reptiles, especially small desert tortoise, will decrease heat stress and minimize exposure to predators.

<u>Application</u>:  This measure will be applied to the desert portions of the Celeron/All American proposal, the Desert Plan, and Brenda Alternatives.

4-7

<u>Measure 12</u>:  Vehicle operation off the ROW by construction workers will be prohibited except where specified by the landowner or land management agency.

<u>Effectiveness</u>:  Limiting vehicle use off the ROW will minimize the risk of impacting livestock, wildlife habitat, small mammals, reptiles, and important or sensitive vegetation in surrounding habitats.  This will be especially important in desert dune areas and in desert bighorn sheep range.

<u>Application</u>:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

<u>Measure 13</u>:  During construction the open pipeline trench will be limited to 0.5 mile in desert bighorn sheep areas or areas where the pipeline could limit wildlife access to water, such as in La Brea Canyon in California, and Hot Springs Creek in Arizona.  Skip sections or temporary bridges across the pipeline trench will also be used if more than 0.5 mile of trench must remain open for an extended period. Backfilling of the trench, especially at skip sections, will be a gentle grade to allow escape of animals from the trench.

<u>Effectiveness</u>:  This will minimize impacts caused by water stress and disruption of movement patterns.  Not all animals are accustomed to crossing skip sections, however it will provide an opportunity for wildlife (like deer and coyotes) accustomed to human presence to cross the pipeline trench.

<u>Application</u>:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

<u>Measure 14</u>:  A competent wildlife biologist will survey all potential raptor nesting habitat within 0.5 mile of the pipeline prior to construction.  Active and inactive nests will be identified.  No construction will occur within 0.5 mile of active eyries during the nesting season (generally between March 15 to July 15, site-specific timing constraints may vary based on biologist recommendations). Construction will be permitted near inactive nests; however, no nest sites will be disturbed.  Potential perch sites cleaned by ridge-top construction will also be identified by the Applicants.  Where deemed necessary by local California Fish and Game biologists, raptor perch or roost trees will be avoided and/or artificial roosts will be constructed on ridgelines to mitigate losses of such trees resulting from clearing the ROW on ridgetops.

<u>Effectiveness</u>:  This measure will prevent nest abandonment resulting from pipeline construction and minimize loss of perch sites. It will also help provide flexibility for construction scheduling.

<u>Application</u>:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

4-8

Measure 15:   Blunt-nosed leopard lizard and San Joaquin kit fox habitat in the Cuyama and San Joaquin Valleys will be evaluated. Where suitable habitat occurs, attempts to relocate the pipeline (primarily to agricultural lands) will be considered.  In habitat that must be affected, the construction disturbance on the ROW will be limited to 50 ft or less.  If kit fox dens are found in the ROW, the pipeline ROW will be altered 100 feet to miss dens.  Revegetation plans will include measures to encourage re-establishment of suitable habitat.  In addition, all measures included in Appendix 4.2 will apply to the Celeron route in T11N, R24W, Sections 18, 7, 8 and 9 (about 3.2 miles for blunt-nosed leopard lizard habitat); T10N, R24W, Sections 9, 4, 3, and 34, and T11N, R24W, Sections 27, 26, 23, 24, 13, 18, 7, 8, and 9 (about 10 miles for San Joaquin kit fox habitat).

Along the Getty route, the measures will apply from Milepost 94 to 103 for San Joaquin kit fox habitat, and from milepost 100 to 103 for blunt-nosed leopard lizard habitat.

Effectiveness:  Avoiding leopard lizard and kit fox habitat will be the most effective measure of ensuring that these animals are not affected.  Where construction must occur in their habitat, some lizards will still be impacted by vehicles and trenching equipment; however, the population may be able to survive the loss of a few individuals if the habitat is restored and land use practices on the ROW do not change. Avoiding kit fox dens will minimize significant impacts to kit fox; however, kit fox will still be displaced to other areas as a result of construction and operation activities.  Minimizing the construction ROW width will minimize loss of blunt-noise leopard lizard habitat by 50 percent.  Moving the pipeline to agricultural areas will impact crop lands, resulting in a trade-off of impacts.  Impacts to croplands can be minimized by seasonal restrictions and double trenching techniques.

Application:  This measure would apply to the Celeron/All American and Getty proposals.

## Mitigation Measure 15A:

For California state-listed species, site-specific field inventories should be conducted prior to construction.  This requirement will be consistent with the intent and general provisions of Assembly Bill No. 3309, the California Endangered Species Act which will become effective January 1, 1985.

A qualified biologist will survey the Applicants' 50- and 100-foot ROWs in areas suspected of having threatened and endangered state-listed species.  Potential areas where these species may occur were identified in Appendix B of the DEIR/EIS.  The California Fish and Game Department will be consulted concerning appropriate methods for survey as well as appropriate mitigation measures if these species are found on the ROW.

Effectiveness:  This measure will eliminate significant impacts to state-listed species.

Application:    This    measure    will    apply    to    the    Getty    and Celeron/All American proposals, the Santa Maria Canyon, and the Desert Plan Alternatives.

Measure 16:    All construction across desert tortoise habitat will occur between October and March when tortoises are hibernating.    A desert tortoise expert will be present during construction.    Any active desert tortoises will be removed from the construction ROW ahead of construction equipment and moved to habitat within 100 yds of the capture site.    Burrows within the ROW will be carefully opened using hand tools and hibernating tortoises removed.    Injured tortoises will be turned over to the Department of Fish and Game.    Adequate funds for costs involved in rehabilitating injured tortoises and returning them to their home sites (within 100 yds of capture site) will be paid by the applicant.

Effectiveness:    Injuries and deaths of tortoises will be minimized if construction occurs when tortoises are inactive (i.e., only tortoises hibernating right on the ROW would be impacted).    Removal of active tortoises from the construction area will ensure survival of these individuals.    Burrows can be successfully constructed with hand tools and plywood (Berry 1984, personal communication).

Application:    This measure would apply to the Celeron/All American proposal, the Desert Plan, and Brenda Alternative.

Measure 17:    Oil spill booms will be located as near as possible to the man-made wetlands downstream of the Colorado River crossing.    In the event of a spill these booms would be used to prevent oil from entering backwater wetlands from the river, or reaching Yuma clapper rail habitat 20 miles downstream.

Effectiveness:    Booms have been used effectively for many years in containing oil and directing it to areas for cleanup.    Locating booms near the crossing will minimize response time and minimize the possibility of oil reaching sensitive habitats (such as Cibola and Imperial NWR and Yuma clapper rail habitat) downstream.

Application:    This measure will be applied to the Celeron/All American proposal.

Measure 18:    No construction will be allowed in the Copper Bottom Pass area during January to March (lambing) and May to October (water stress) periods.    Barriers to block unauthorized access along the ROW will be erected by the applicant in consultation with BLM.    Any effects on bighorn sheep water resources will be mitigated through avoidance or construction of new wells, or collectors.

Effectiveness:    This measure will reduce impacts on bighorn sheep in the Dome Rock Mountains, but will not be completely effective because pipeline maintenance and access into this remote area would eventually disturb bighorns.

4-10

Application:  This measure will be applied to the Celeron/All American proposal.

Measure 19:  No pipeline construction in the Kofa NWR will be allowed during bighorn use of the migratory corridors.  Avoidance periods and formal restrictions will be determined by FWS.

Effectiveness:  This measure will not limit existing disturbance because the route through the NWR follows an existing pipeline, transmission line, and access road.  It will eliminate impacts related directly to disturbance of bighorn sheep due to pipeline construction activity.

Application:  This measure will be applied to the Celeron/All American proposal.

Measure 20:  At the Muleshoe Ranch Preserve, construction will occur between August 30 and April 1.  Revegetation will be in accordance with plans determined by the Nature Conservancy, BLM, and Forest Service.  The ROW will utilize the existing El Paso ROW to the extent possible.  Large sycamores in Bass Canyon will not be removed.

Effectiveness:  Seasonal construction restrictions (i.e., no activity during the April to August nesting season) will prevent nest abandonment by nesting raptors resulting from construction activity.  Reseeding with native vegetation and minimizing impacts to riparian communities will decrease impacts on wildlife and wildlife habitat.

Application:  This measure will be applied to the Celeron/All American proposal.

Measure 21:  Where the pipeline ROW follows the existing El Paso Natural Gas ROW or other existing ROWs, the old ROW will be used as part of the construction ROW and new disturbance will be limited to the area needed for trenching and stockpiling backfill.

Effectiveness:  Using the existing ROW for construction will minimize the total area cleared, wildlife habitat lost, and area to be revegetated.  Using the existing ROW would significantly minimize the total acres disturbed.

Application:  This measure will be applied to the Celeron/All American proposal.

### 4.1.1.8  Socioeconomics

Measure 22:  The pipeline construction period will be scheduled so as not to coincide with peak tourist seasons.  The areas affected by tourism include:  Santa Barbara County Coastal Area - June thru August; recreation areas in the LPNF - August thru November; Colorado River Crossing area, California - April thru September; Quartzsite, Arizona - November thru April.

4-11

Effectiveness:  This action will minimize competition for temporary housing and camping sites between tourists and construction workers.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and the Brenda Alternative.

Measure 23:  Between Barstow and Blythe, and Blythe and Phoenix, workers will be accommodated in areas where housing is available, and transportation to and from the job site will be provided.

Effectiveness:  This measure will centralize the impact on housing demand in areas that have sufficient resources to accommodate the construction work force.

Application:  This measure will be applied to the Celeron/All American proposal, the Desert Plan, and Brenda Alternative.

Measure 24:  Temporary accommodations for construction workers, such as mobile home units equipped with bunkbed and trailers providing kitchen facilities and leisure activities such as television, will be provided at locations where housing is limited (eastern California, and western Arizona).

Effectiveness:  This action will reduce conflicting demands for limited temporary housing between construction workers, tourists, and other travelers.  It will also reduce commuting distances in areas where little or no temporary housing is available near the pipeline corridor.

Application:  This measure will be applied to the Celeron/All American proposal, the Desert Plan, and Brenda Alternatives.

### 4.1.1.9  Land Use and Recreation

Measure 25:  After construction has been completed motorized vehicle access to public lands crossed by the ROW will be restricted on federal lands (as requested by the agency) by gates or other barriers.

Effectiveness:  This measure will enhance revegetation efforts and limit the proliferation of spur roads in sensitive resource areas. Agency regulations limit development of new roads in these areas.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

Measure 27:  The All American Pipeline ROW will be moved from the west side to the east side of the dirt road that forms the Palen to McCoy WSA boundary from milepost 260 to milepost 270.

Effectiveness:  This measure would remove the ROW from within the boundary of the WSA and ensure compliance with WSA Interim Management Policy.

Application:  This measure will be applied to the Celeron/All American proposal.

Measure 28:  Within the section from Las Flores to Emidio, the Celeron and Getty Pipelines will be constructed within the same ROW as designated by the Authorized Officer.  This could be accomplished by phasing of construction, and laying one pipe as close as practicable from the ROW edge and then later placing the next pipeline as close as practicable from the other side of the ROW, resulting in a minimum distance between pipe centers.

Effectiveness:  This measure would reduce by one half the amount of disturbance and land use impacts associated with construction of two pipelines.

Application:  This measure would apply to whatever ROW is found to be preferred.

Measure 29:  Important historic areas and structures will be avoided at Patton's Camp ACEC.

Effectiveness:  Impacts to protected areas will be avoided.

Application:  This measure will apply to the Desert Plan Alternative.

4.1.1.10  Transportation  (none required)

4.1.1.11  Cultural Resources

Measure 30:  Mitigation of adverse impacts to cultural resources will occur in the following manner:

Prior to construction an intensive (100%) cultural resource survey will be conducted on all affected Federal land surfaces that have not previously been surveyed.  Survey on non-Federal lands will be conducted as specified by the Authorized Officer after consultaton with the State Historic Preservation Officer (SHPO) in all states.  During the survey, information will be gathered on all newly discovered and previously recorded archaeological sites to determine their potential eligibility to the National Register of Historic Places.  Limited testing of some sites may be necessary in order to determine their eligibility.  Sites located on non-Federal lands in California will be evaluated using criteria defined in CEQA Appendix K.  Following the survey, an inventory report will be prepared and submitted to the Authorized Officer for review and comment.  The report will contain the results of the inventory, and all sites will be evaluated for potential eligibility to the National Register.  Justifications will be given for the rationale. The report will include a proposed mitigation plan for all sites that are considered to be potentially eligible for inclusion on the National Register.  The mitigation plan may include avoidance of sites, data collection, site-specific control of access and construction, monitoring recommendations, and salvage excavation.

Based on the above mitigation plan, the Authorized Officer will submit a treatment plan to the SHPO in each state and to the Advisory Council on Historic Preservation. Following the consultation period, the treatment plan will be implemented. All field work must be completed before construction can begin in a given area. Monitoring will be implemented during construction where required by the treatment plan.

Any sites located during construction or as the result of monitoring will be evaluated and a treatment plan will be developed as needed.

Contact will be maintained with appropriate Native American groups to determine the nature and extent of concerns regarding specific cultural resources. Native Americans will participate in data recovery consistent with federal agency requirements and where appropriate, with tribal policies.

Effectiveness: Cultural resources will be protected wherever prudent and feasible. These actions and Section 106 Consultation will ensure that the effects of the pipeline construction and operation on cultural resources are fully considered as required by law.

Application: This measure will be applied to the Celeron/All American and Getty proposals and all alternatives.

### 4.1.1.12 Visual Resources

Measure 31: The Gaviota pump station, Sisquoc pump station, Essex pump station and tank farm, and Tom Mix pump station will be screened with native shrubs and trees and/or naturalized masses of evergreen shrubs and trees as is appropriate for location and climatic conditions.

Effectiveness: The placement of trees and shrubs between the facility and existing sensitive receptors will eliminate the intrusive character of the facility. The FVC for all locations where such screening is proposed is indicated below.

Celeron Segment:

- Gaviota pump station - to screen from US 101 and the Gaviota Store and Restaurant (FVC II).

- Sisquoc pump station at La Brea Canyon - to screen from Foxen Canyon Road and La Brea Canyon Road (FVC II).

All American Segment:

- Twelve-Gauge Lake pump station - to screen from Highway 58 (FVC IV).

- Tom Mix pump station - to screen from US 89 (FVC III).

4-14

Desert Plan Alternative:

● Essex pump station and tank farm - to screen from US 66 (FVC IV).

Application:  This measure will be applied to the Celeron/All American proposal and Desert Plan Alternative.

Measure 32:  In the pipeline segments on the LPNF, the Applicants will utilize a 50-ft wide construction corridor, protect existing large diameter trees, feather the edges of the cleared ROW, and reseed cleared areas as determined by the Authorized Officer.

Effectiveness:  The smaller construction corridor will provide selective protection for large trees in forested areas. Feathering the edges of the clearing will soften and partially disguise the visual impact resulting from cutting a path through the trees and brush.  The effectiveness of this measure will depend on the pre-project visual condition of the specific site:  areas previously characterized as "untouched landscape" (EVC I) or "unnoticed alterations" (EVC II) will be deteriorated to the category of "minor visual disturbance" (FVC III). Areas of existing visual disturbance ranging from minor to drastic can all be restored to "major visual disturbance" (FVC V) by scalloping edges of vegetative clearings.

Application:  This measure will be applied to the Celeron/All American and Getty proposals and the Santa Maria Canyon Alternative.

Measure 33:  The La Paz heating/pumping station will be moved 1,500 ft to the east behind topographic screening.

Effectiveness:  Relocation of the proposed facility will allow for natural topographic screening thereby improving the future visual condition from the "visual disturbance" (FVC IV) to "unnoticed alterations" (FVC II).

Application:  This measure will be applied to the Celeron/All American proposal.

4.1.1.13 Noise

Because of the short duration of constructed impacts in any one area (2 weeks or less), limiting construction to daytime hours (as described in the Project Description), and the low probability of accomplishing effective mitigation of high noise levels associated with construction activities, mitigation beyond the standard requirements for use of equipment mufflers and similar OSHA requirements is not considered to be warranted.

Measure 34:   The Gaviota pump station(s) will be shielded from Vista del Mar Union School by a noise barrier, such as a berm or structural enclosure.

Effectiveness:   The barrier will be designed and built to reduce project operation related noise below the 60 dBA significance threshold of the school.

Application:   This measure will apply to any pump station built by Celeron/All American or Getty within 1,500 ft of the Vista del Mar Union School.

4.1.1.14   Oil Spills (none required)

### 4.1.2  Additional Agency Right-of-Way Stipulations

In addition to the mitigation measures presented in Section 4.1.1, various agencies will require stipulations as part of their right-of-way (ROW) grants.  While these stipulations are not designed to mitigate specific significant impacts, they will function to reduce the overall impacts of the project.  Listed below are the stipulations that have been identified by the affected agencies at the time the Final EIR/EIS was published.  Additional stipulations will be developed as the environmental review process progresses, and these will be incorporated into the final ROW grants.

#### General

a)   Compaction of back-filled material will be required on all refuge lands.  (FWS).

b)   Pipe depth will be a minimum of 4 ft below the surface on the Kofa National Wildlife Refuge (NWR) and constructed so that future use of the area by heavy equipment will not require further modification of the landscape.  (FWS).

#### Aquatic Biology

a)   Staging areas for stream crossing equipment will be located outside of the stream's riparian zone to minimize the amount of sediment entering streams and to reduce disturbance to riparian vegetation.  A maximum construction ROW of 50 ft will be used in riparian areas to reduce disturbance.  (Forest Service, BLM, and FWS).

b)   Stream bank and bottom protection measures including rip-rapping, upland storage of excavated riverbed materials, importing clean backfill, natural backfilling, and revegetation will be evaluated by the Authorized Officer and implemented on a case-by-case basis.  These techniques will reduce the construction related sediment load to the stream and minimize alterations of important aquatic habitats.  (Forest Service, BLM, and FWS).

c)   Construction activities will be timed to avoid spawning periods of important fish species (Appendix B, Table B-2).  Construction of stream crossings during low flow will minimize habitat degradation by reducing the amount of suspended solids and turbidity.  Avoidance of critical fish spawning periods will eliminate potential impacts to eggs and juveniles, which are considered the most sensitive life stages.  (Forest Service, BLM, and FWS).

d)   As requested by Arizona Game and Fish and enforced by BLM, a check valve will be added to the pipeline on the downstream side of Centennial Wash, Arizona.  The check valve would minimize the effects of a possible oil spill resulting from a flood event.

Terrestrial Biology

a)  If possible, no sensitive plants will be removed or affected by the ROW on the Kofa NWR. (FWS).

   Such plants will be fully protected and avoided during construction; sensitive plants will be transplanted only if it is impossible to avoid them. (FWS).

b)  No desert tortoise mortalities will be accepted due to pipeline construction or operation on the Kofa NWR. (FWS).

c)  Surface disturbance will be kept to an absolute minimum on the Kofa NWR. All terrain will be restored to original grade after construction. Unnecessary blading of desert pavement will not be performed. (FWS).

d)  Harrowing or discing will be used along the disturbed areas of the Mojave Desert. Revegetation will not be attempted because of extremely low levels of precipitation. (BLM).

d)  Federal, state, and county laws and regulations pertaining to sensitive vegetation and wildlife (i.e., T&E species, game species) will be posted in conspicuous places at the job site and included in pipeline contractor's contract. (BLM).

Soils

a)  Construction activities will avoid or minimize disturbances to sensitive soil units as determined by the authorized officer. Sensitive soils are characterized by major potential problems associated with erosion control and revegetation (i.e., steep slopes, slump-prone areas, shallow soils, highly saline-alkaline soils, sand dunes). (BLM and Forest Service).

b)  Construction activities will not occur on fragile soils during periods of high or saturated soils moisture conditions. (BLM and Forest Service).

c)  Vehicle travel routes on the Kofa NWR will be watered down during construction to prevent movement of soil by vehicles, wind, etc. All disturbed areas will be restored to original grade with rocks replaced in a natural-appearing way. Improvements will be made to minimize soil erosion. (FWS).

d)  Construction activities will not occur from March through May in the Mojave Desert in order to minimize wind erosion. (BLM).

Land Use and Recreation

a)  The disturbed area of the Pacific Crest National Scenic Trail will be reconstructed following construction and rehabilitation of the pipeline ROW. (BLM).

4-18

Transportation

The following stipulations will be required within the State of California and will be enforced by Caltrans.

a)   Pipelines parallel to a highway should be placed, where possible, outside the State highway ROW. Longitudinal encroachments within a freeway ROW are permitted only under special circumstances, primarily where no feasible alternative exists.

b)   Transverse lines should preferably cross a highway at right angles.

c)   Encroachment permits will be needed wherever the pipelines cross the State highway ROW. At these locations the project Applicants may have to present satisfactory evidence of surveys for archaeologically and botanically sensitive resources.

d)   The inside diameter of casings for pipeline crossings should exceed the outside diameter of the pipeline by 4 inches.

e)   This project falls in the category of a "high risk" facility (over 6 inches in diameter and over 60 psig operating pressures) and will be governed by Caltrans' "Policy on High and Low Risk Underground Facilities". The Caltrans ROW Utility Department must be notified of all high risk installations.

f)   Detailed plans depicting the exact locations of crossings, with permit applications for the anticipated pipeline, should be submitted a minimum of four months ahead of construction. This would allow for field review and approval of site and crossing elevations.

System Safety and Reliability

a)   At the Cadiz tank farm, an automated, foam solution, fire extinguisher system for the seal area of each tank will be installed. The system should provide sufficient foam (about 310 gallons) and water (about 10,000 gallons) to extinguish a seal fire on one tank. (California SLC).

b)   At the Cadiz tank farm, a redundant sensor and control system to prevent overfilling of the oil tanks will be installed. Overfilling is a primary contributor to tank fires. (California SLC).

c)   At the Cadiz tank farm, a tank roof sensor will be installed on all tanks to detect a jammed roof. (California SLC).

d)   At stations with gas-fired turbines and Waste Heat Recovery Units (WHRU), there will be extended purging of both units with interlocks to prevent starting before purging is complete.  At stations without turbines, gas-fired heaters will also have extended purging before starting (i.e. all pump stations with natural gas supply).  (California SLC).

e)   Explosions are caused by leaks coupled with an ignition source.  Pumps are equipped with seal leak detectors that will stop a unit if a leak is detected.  Other leaks will be reduced by checking valve stem packing during regular visits to the site.  (California SLC).

f)   Extra pipeline burial depth will be provided in areas where deep plowing or ripping could result in damage to the pipeline.  Depth will be at least 1 ft below maximum plow depth in these areas.  (California SLC).

g)   In agricultural areas, pipeline location markers will be placed above ground and buried cable or fluorescent plastic, below ground just above the pipeline to mark the pipelines location.  (California SLC).

h)   Irrigated agricultural land owners will be periodically contacted and provided information to increase and maintain awareness of the pipeline to reduce the probability of pipeline rupture through plowing, ripping, or excavation. (California, SLC).

i)   In the event of an oil spill onto irrigated agricultural lands, contaminated soil will be replaced and monetary compensation will be made for any lost production. (California SLC).

### 4.1.3  Recommended Mitigation Measures

The following mitigation measures have been suggested to further minimize impacts to rare species and sensitive plant and animal communities.

<u>Recommended Mitigation Measure 1</u>:

The Applicants should prepare site-specific Construction and Use Plans that describe by construction spread:

- specific centerline location;
- specific construction techniques including proposed erosion control measures such as use of water bars, sedimentation ponds, and straw bales;
- disposal plans for excess backfill;
- revegetation techniques including mulching, fertilizing, and seed mixtures.

In sensitive habitats such as riparian areas, oak woodlands, desert washes, and rare species habitat, the Applicants will work with local state Fish and Game and U.S. Fish and Wildlife Service personnel in determining use of measures to minimize impacts on wildlife.

These measures may include but are not limited to:

- development of water sources,
- location of trench skip sections,
- avoidance of raptor nest and perch trees,
- location of ORV signs and barriers
- minimize loss of mature trees,
- prepare seed mixtures that provide food and/or cover for wildlife.

<u>Effectiveness</u>:  Site-specific planning with local agencies interested in protecting wildlife resources (primarily sensitive habitat) will minimize impacts on the resource and help the Applicants and authorizing officers understand the terms of the ROW grant.

<u>Application</u>:  This measure will apply to the Getty and Celeron/All American proposal and all alternatives.

4-21

Recommended Mitigation Measure 2:

No guns or dogs should be allowed on the ROW.

Effectiveness:  Eliminating guns and dogs from the ROW will discourage indiscriminate shooting and harassment of game and nongame wildlife.

Application:  This measure will apply to the Getty and Celeron/ All American proposals and all alternatives.

Recommended Mitigation Measure 3:

The Applicants should provide basic educational materials concerning wildlife laws and regulations as well as the required mitigation measures designed to minimize impacts.

Effectiveness:  Posting laws and regulations and educating field crews on the intent of mitigation measures will at least eliminate the violators's excuse for ignorance of the law or ROW grant provisions.

Application:  This measure will apply to the Getty and Celeron/ All American proposals and all alternatives.

Recommended Mitigation Measure 4:

The Applicants should work with BLM and Arizona Game and Fish biologists in evaluating potential opportunities to minimize impacts to bighorn sheep, such as developing water sources in other parts of their habitat to encourage movement away from disturbed areas, and ORV access points.

Effectiveness:  Although Mitigation Measure 18 requires replacement of affected water resources, developing new water resources away from development may reduce future man/bighorn conflicts especially in areas where ORV use is difficult to control.

Application:  This measure should apply to the All American proposal and the Brenda Alternative.

4-22

APPENDIX 4.2

U.S. Fish and Wildlife Service and National Marine Fisheries Service
Biological Opinion Regarding Federally Protected
Threatened and Endangered Species


and


Recommended Actions and Measures
to Minimize Impacts
(Excerpts from the Biological Assessment)

4-23

Biological Opinion



**United States**
# Department of the Interior

**Fish and Wildlife Service**
Lloyd 500 Building, Suite 1692
500 N.E. Multnomah Street
Portland, Oregon 97232

In Reply Refer To:          Your Reference:
AFA-SE          1-RO-84-F-62

November 23, 1984

Memorandum

TO:     State Director, Bureau of Land Management,
        2800 Cottage Way, Sacramento, California 95825

FROM:   Acting Regional Director, Fish and Wildlife Service, Portland, OR
        (AFA-SE)

SUBJECT: Formal Endangered Species Act Consultation on the Getty and
         Celeron/All American Pipelines (1-RO-84-F-62)

This responds to your August 23, 1984, request which was clarified by your
November 21, 1984 letter for formal consultation pursuant to Section 7(a)
of the Endangered Species Act of 1973, as amended, on the proposed
Celeron/All American and Getty oil pipeline projects.  The Celeron/All
American pipeline would transport oil from Gaviota, California to McCamey,
Texas.  The Getty pipeline would transport oil from Gaviota to Emidio,
California.  The two pipeline projects are independent of each other,
and either one or both could be approved.  Therefore, we will render one
Opinion for both projects.

The Bureau of Land Management (BLM) is the lead Federal agency for
issuing a right-of-way grant across all Federal lands.  Hence, the
Bureau will be the lead agency in the Section 7 formal consultation
process pursuant to Interagency Cooperation Regulations for Section 7
consultation.

Your consultation request was accompanied by The Threatened and
Endangered Species Biological Assessment for the Celeron/All American
and Getty Pipeline Projects prepared for BLM by Environmental Research
and Technology, Inc.  This document identifies the following listed
species that may be affected by the two pipelines:  the endangered blunt-nosed
leopard lizard (Gambelia silus), the endangered Yuma clapper rail (Rallus
longirostris yumanensis), the endangered American peregrine falcon (Falco
peregrinus anatum), the endangered bald eagle (Haliaeetus leucocephalus),
the endangered California condor (Gymnogyps californianus), and the endangered
San Joaquin kit fox (Vulpes macrotis muctica).

The Biological Assessment also discusses impacts to the proposed threatened
Thornber's fishook cactus (Mammiliaria thornberi).

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page two

Based on review of the Biological Assessment and draft EIS, we have
determined that the bald eagle will not be affected by the proposed projects.
Therefore, the bald eagle will not be discussed further in this Opinion.

The two pipelines are not independent from the expansion of the Getty
marine terminal at Gaviota.  However, the impacts of the marine terminal
expansion and associated increase in oil tanker traffic will not be addressed
in this Biological Opinion as stipulated in your November 21, 1984 letter.
Since BLM does not have authority for regulating this part of the project.
The affect of terminal expansion and increased tanker traffic should be
addressed in future consultation with the Corps of Engineers (COE) which is
responsible for permitting development in navigable waters.  Thus the
following species will not be addressed in the Opinion:  Salt marsh bird's
beak (Cordylanthus maritimus), California least tern (Sterna antillarum
(=albifrons) browni), California brown pelican (Pelecanus occidentalis
californicus), light footed clapper rail (Rallus longirostris levipes), or
souther sea otter (Enhydralutris nereis).

The Biological Assessment, the August 1984 draft Environmental Impact
Statement on the subject projects, communications with your staff and
consultant, and information in our files provide the basis for this
consultation.

Summary of Biological Opinion

Based on our review of the following information, the project's Biological
Assessment and draft EIS, and information in our files, it is our
Biological Opinion that the proposed Getty and Celeron/All American
pipelines are not likely to jeopardize the continued existence of the
blunt-nosed leopard lizard, Yuma clapper rail, American peregrine falcon,
California condor, or San Joaquin kit fox or result in the destruction or
adverse modification of critical habitat.  Terms and conditions required
to reduce the incidental take of listed species and recommendations to
promote the conservation of listed species are given.

Section 7 of the ESA does not require formal consultation on the possible
effects of a Federal action on a species that is proposed for listing as
endangered or threatened since proposed species are not protected by the
ESA of 1973, as amended.  For proposed species, you must confer when you
determine your actions may jeopardize the continued existence of the
species.  We stress consideration of proposed species because they may
become listed during later planning or construction phases of a project.
As such, the determination of jeopardy or non-jeopardy to such species
will not be addressed in this biological opinion.

4-26

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page three

Project Descriptions

Both the Getty and Celeron/All American pipelines would transport crude oil produced in the Outer Continental Shelf and other locally produced oil from the Santa Barbára and Santa Maria basins.  The projects would link into existing oil pipeline transportation systems.  The purpose of both projects is to transport oil to refineries that have the necessary capability and capacity to refine heavy crude oil.  A complete description of these projects is given in Appendix B of the Biological Assessment and in the draft EIS.

Getty Project.  Getty Trading and Transportation Company proposes to transport up to 400,000 barrels per day of oil in a buried pipeline from Getty's existing pump station at Emidio, California.  The 20 to 30-inch pipeline would cover a distance of about 113 miles and include 17 block and check valves, 2 to 3 pump stations, and a delivery station at Emidio.  No new roads would be required.  However, several utility taps would be needed.

The Getty pipeline is part of Getty's proposed Gaviota Consolidated Coastal Facility.  The two projects have no independent utility.  The project would include the pipeline, and crude oil storage facilities.  The purpose is to receive, store and distribute crude oil produced in the Santa Barbara Channel and Santa Maria Basin.  Oil stored at the facility could be transported to refineries either by tankers through the marine terminal or by the Getty pipeline.

Currently, Getty has an existing marine terminal at Gaviota.  The proposal is to modify the existing facility with a new consolidated facility.  The project has the following features that are germane to this consultation (taken from the Biological Assessment):

--    A phased development of crude oil storage facilities with ultimate tank capacities of approximately 2.74 million bbl to support the existing marine terminal and the crude oil pipeline to the San Joaquin Valley.

--    A pipeline connection from Gaviota to the San Joaquin Valley refinery/transportation network with a crude oil throughput in the range of 100,000 to 400,000 BPD.

4-27

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page four


Celeron/All American Pipeline.  Celeron/All American proposes to
transport up to 300,000 barrels per day of oil from the Santa Barbara
coast near Gaviota to McCamey, Texas.  An additional alternative may
continue the pipeline to Freeport, Texas.  The 24- to 30-inch buried
pipeline would be about 1,200 miles long and include 78 block and check
valves, 5 pumping stations, 10 pumping and heating stations, 1 heating
station, 3 delivery stations and a 20-acre tank farm at Cadiz,
California.  No new roads would be required, however, utility taps would
be required.

Pipeline Construction.  Construction methods will be similar for both
pipelines.  Construction of the Getty pipeline would require about six
months, while the Celeron/All American pipeline would require about two
years.  A construction right-of-way (ROW) would be 100 feet wide for
either line, except where a smaller ROW is feasible.  Permanent ROW's
would be 20 feet for Getty and 50 feet for Celeron/All American.  Laying
of the pipeline would progress at an average of 1.5 to 2 miles per day
per "spread", slowing to about 0.5 miles per day in rough terrain.  A
"spread" is each construction crew cleaning, digging, placing, and
covering the pipeline.  Getty plans to use 3 spreads, and Celeron/All
American plans to use 6 spreads.

Ditching would be accomplished by mechanical excavation.  In some areas,
blasting will be used.  The ROW will be cleaned up after pipeline
burial.  The most common methods of surface restoration are:  removal of
debris, surface contouring, water control structures, surface
cultivation, mulching, application of soil amendments, and replanting.

Operation and Maintenance of Pipelines.  Operation of the pipeline is
primarily automated.  Maintenance of the pipelines and ROW's would
include observation for construction activities in the ROW's; inspection
and maintenance of cathodic protection systems; inspection of block
valves; inspection of pipeline mile-post and road-crossing markers; and
inspection of crossings at highways, utilities and other pipelines.  An
aerial reconnaissance of the pipeline ROW's would be made at least every
two weeks of the Celeron/All American pipeline, and twice weekly of the
Getty pipeline.

Species Accounts

The Biological Assessment for Threatened and Endangered Species for the
Proposed Celeron/All American and Getty Pipeline projects thoroughly
covers the biology and ecology of the species discussed in this Opinion.
Only minor discrepancies were noted by our staff, and these will be
discussed where needed in the section describing effects of the action.


4-28

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page five

Associated Effects of Future Federal Actions. As previously recognized, there will be direct and indirect impacts to threatened and endangered species in the coastal ecosystems should the marine terminal be expanded. The actual degree of effect is unknown because of the lack of information on the oil spill risks associated with anticipated increase in tanker traffic along the coast. Any future Section 7 consultation request by the responsible agency permitting an expansion of the terminal will have to provide a risk analysis of increased tanker traffic so that we can adequately assess the impacts.

Blunt-nosed leopard lizard (BNLL). The Biological Assessment presents a reasonable analysis of project effects on leopard lizards. The pipeline skirts what we consider to be the southern edge of BNLL range. The question of hybrid lizards arises in the Cuyama Valley, but has never received sufficient scientific study to resolve specific ranges of pure BNLL and hybrids (or overlaps thereof).

Trenching and other construction activities result in the loss of individual BNLL (including eggs and young) and the rodent burrows in which they seek shelter. Traffic is likely to cause road kill, but it is difficult, if not impossible, to reduce this factor through any reasonable means. These impacts are most likely in the Cuyama Valley and from the foothills to the Highway 166 junction near Pentland, California, for an estimated disturbance of 63 - 84 acres of BNLL Habitat (Biological Assessment).

The alignment along Highway 166 is probably the least damaging route alignment for BNLL although it is not uncommon to see leopard lizards at the road edge.

Disturbances from pipeline trenching and backfilling are not the most significant threats to BNLL in the south San Joaquin Valley. Pipeline projects offer very minimal long term adverse impacts to BNLL. Minimizing the ROW width to 50 feet through BNLL habitats through the Cuyama Valley and near Pentland at elevations below about 2000 feet, as suggested in the Biological Assessment, is a reasonable recommendation that we believe will reduce impacts to BNLL.

Yuma clapper rail (YCR). Habitat for the Yuma clapper rail occurs in the marshes of the Colorado River and some habitat would be lost due to construction of the river crossing for the pipeline. These effects would not be significant since there is very little habitat present in that area and the disturbance would not be permanent.

Of far greater potential adverse impact is the possibility of an oil spill into the Colorado River. The Biological Assessment provides several proposed actions to minimize these impacts, notably contingency plans, storage of booms and other containment devices and changing water

4-29

State Director, Bureau of Land Management, Sacramento, CA  1-RO-84-F-62
Page six

flow rates.  The Fish and Wildlife Service (FWS) concurs with these measures to protect the marsh habitat of the rails.  Oil that gets into the river could easily destroy many acres of essential rail nesting areas and may necessitate removal of the vegetation to adequately remove the oil, thus destroying rail habitat for a longer period of time.

American peregrine falcon (APF).  Peregrine falcons could be impacted by the proposed projects by the loss of foraging habitat or by disturbance to nesting falcons.  Peregrine falcons feed almost exclusively on birds that they catch in flight.  Prey species range in size from swifts and hummingbirds to gulls.  Generally they feed on shorebirds, jays, woodpeckers, mourning doves and pigeons.  The territories of hunting peregrine falcons may cover large expanses of landscape.  The hunting territory of a male peregrine tracked during a breeding season in Alaska was determined to be 120 square miles (White 1974).  A female peregrine, which was followed by radio-telemetry during the period when she was feeding small young, frequently ranged within 3.12 miles of her nest, but occasionally traveled as far as 11.5 miles (Enderson et al. 1977).  Since peregrines forage over such a large area, and are capable of obtaining a wide variety of prey, the loss of habitat due to pipeline construction should be minor and primarily temporary.

Although peregrine falcons tend to be fairly tolerant of human activities, prolonged disturbances near nest sites during the critical nesting period from about February 1 through August 1 may lead to a loss of productivity and/or site abandonment.  Photographers, rock climbers, construction, and timber harvest, are examples of disturbances that, if in close proximity to a nest site, can lead to interference with incubation or parental care.  Short-term disturbances such as explosions also may lead to a loss of productivity.  Cade (1960) observed several instances where incubating peregrines were startled and bolted off the nest, kicking eggs out of the scrape in the process.

Currently, peregrines are not nesting at Gaviota Pass.  If, however, they do begin breeding prior to the construction of the pipelines, then disturbances from construction could impact nesting success.

California condor (CC).  Condors could be impacted by the proposed projects due to the temporary loss of foraging habitat, the disturbance of foraging activities during construction, and the disturbance of aircraft flights for ROW surveillance after construction.  Much of the pipeline routes from Gaviota to near Tehachapi are within the condor range.  Hence, condors may fly over the construction sites anywhere within their range.  Flying condors show little fear of humans and will often fly close to investigate a person who may be on top of a ridge or

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page seven

mountain, or in an open area.  In some places, the pipeline routes are close to flight corridors, especially where these routes cross ridges or foothill grasslands.  Condors fly sometimes at low altitude along the Sierra Madre Mountains where the pipelines may cross.  Another area where condors may fly low over the route is where it crosses the Tejon Ranch critical habitat near Cummings Mountain.  In such situations, condors can be vulnerable to shooting.

The condor requires fairly open grassland habitat for feeding.  This ensures easy takeoff and approach, and makes food finding easier for this species that apparently depends on sight rather than smell for locating its food.  The condor eats only dead animals.  Historically, these probably included deer, elk, pronghorn, whales, sea lions, and smaller mammals.  Because of availability, dead cattle are now the primary food source, but other animals are eaten when present.

The foothills of southwestern Kern County and eastern San Luis Obispo County have been the most important condor foraging area in recent years. Virtually the entire population concentrates in the area during the late summer and fall months, particularly on Hudson and Snedden ranches in the Bitter Creek drainage.  A portion of the population feeds there all year, including 2 or 3 nesting pairs.

Construction of the pipeline from where it leaves the Cuyama Valley floor to where it drops to the San Joaquin Valley floor near Maricopa could render portions of this important condor foraging habitat unusable during the period of construction.  The proposed alignment of the Celeron/All American pipeline follows Highway 166 more closely than the Getty route.  Since the highway is a permanent disturbance, the Celeron/All American should merely introduce more activity in an area where condors are already accustomed to activity.

Since the Getty route crosses foraging habitat that is less frequently disturbed by ongoing activity, its construction could have a greater impact to condors.  In either case, the disturbance due to construction will be relatively short term.

Some information is available on condor response to aircraft.  Wilbur (1978) reported that two condors flushed from a roost tree when a fixed-wing airplane passed within 1,000 feet of them.  Sibley (1969) observed a pair of courting condors on a tree whose activities were temporarily interrupted whenever aircraft flew over.  He felt that condors may equate the sound of the aircraft to that of an approaching vehicle.  Condors in flight appear to react to aircraft in a manner

State Director, Bureau of Land Management, Sacramento, CA  1-RO-84-F-62
Page eight

similar to their behavior towards large soaring birds.  Sibley (1969)
reports that condors ignore gliders below or to their side, but react
violently to one approaching from above.  He also reports that pilots
claim condors sometimes will fly towards an approaching helicopter.  The
effects on fixed-wing aircraft activity related to pipeline inspection
should be minimal since these flights will only occur in areas where
condors are flying or feeding.  Implementation of the recommendations in
the Biological Assessment should insure that project impacts are
minimal.

San Joaquin kit fox (SJKF).  As for BNLL, the pipeline routes traverse
the very southern edge of currently recognized SJKF range.  Trenching is
the most serious threat to the species due to loss of dens.  No
information is presented in the Biological Assessment as to likely
losses of dens.  Some dens were located along the ROW during field
reviews (Biological Assessment) although no quantitative estimate of
impacts to the species is presented, or even possible at this stage.

In general, impacts from pipeline construction will not be significant
over the long term, provided that den losses are few.  In this regard we
endorse the recommendation in the Biological Assessment that the ROW be
surveyed after it is staked and prior to construction.  If SJKF dens, or
even suspected dens, are located, the ROW should be relocated at least
100 feet from the den to avoid destruction.  This action is the most
workable recommendation possible and if followed, can eliminate
significant project impacts to kit fox.

Cumulative Effects

Cumulative effects are those impacts of future State and private actions
which are reasonably certain to occur prior to completion of the subject
Federal action.  A non-Federal action is "reasonably certain" to occur
if the action requires the approval of a State or local resource or land
use control agency, and such agencies have approved the action, and the
project is ready to proceed.

Cummulative effects for this opinion are limited to species found along
the pipelines.  Coastal ecosystem listed species will be considered in a
future Biological Opinion.  We know of no such State or private actions
that should be considered in the evaluation to listed species found along
the pipelines.

State Director, Bureau of Land Management, Sacramento, CA  1-RO-84-F-62
Page nine

## Biological Opinion

This Biological Opinion is limited to only the pipeline.  Based on our review of the above information, the project's Biological Assessment and draft EIS, and information in our files, it is our Biological Opinion that the proposed Getty project and Celeron/All American pipelines are not likely to jeopardize the continued existence of the BNLL, YCR, APF, CC, or SJKF, or result in the destruction or adverse modification of critical habitat.

## Incidental Take

Section 9 of the ESA prohibits any taking (harm, harassment, mortality, etc.) of listed species without specific exemption.  Under the terms of Section 7(b)(4)iii and 7(O)(2), taking that is incidental to and not intended as part of the agency action (in this case, providing rights-of-way for the Getty and Celeron/All American pipelines) is not considered taking within the bounds of the Act provided that such taking is in compliance with the terms and conditions of this Biological Opinion.

Along the ROW, trenching and other construction activities may result in the loss of all BNLL when the ROW crosses BNLL habitat (63-84 acres). Construction traffic is likely to cause road kills of BNLL but it is impossible to assess the numbers.  The SJKF probably can avoid the construction area and some individual foxes have tolerated construction noise and disturbances at natal den sites until forced to move.  Thus, SJKF may be harassed but none should be killed due to construction.  However, SJKF den sites may be lost.  The chances of oil spill from the pipeline along the Colorado River would be approximately 1 in 2,000 years.  A spill of as much as 3,506 bbl of oil could enter the river and reach the Cibola or Imperial NWR.  Some oil would enter rail habitat.  If the spill occurred during nesting season when there are eggs or flightless young from 2 to 14 YCR could be impacted.  However, it is anticipated that the oil can be contained before it reaches these nesting areas in the Cibola or Imperial NWR.  No YCR are known to nest between the pipeline crossing and Cibola NWR but rails may wander through the area.  APF and CC currently only forage in the area and because of high mobility none should be taken incidentally from construction activities.

As such we have determined that the impacts of incidental take on the species in question are:  BNLL-all individuals within the 100 foot ROW, none outside the ROW; YCR-one; CC-zero; SJKF-zero; and APF-zero.

4-33

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page ten


To minimize such incidental take we specify the following reasonable and prudent measures:

1.    To control a spill from a pipeline break in the Colorado River, the applicant shall develop an oil spill contingency plan in consultation with the BLM and the Service.

2.    Insure that, prior to construction, a competent zoological survey shall be undertaken of the ROW and adjacent areas of disturbance for the presence of APF and SJKF.  If APFs are determined to be nesting within $\frac{1}{2}$ mile of the ROW, then "spread" construction within this $\frac{1}{2}$ mile radius shall not occur between February 1 and July 1.  If SJKF dens are located within the ROW, subject dens shall be avoided by at least 100 feet.

We hereby establish such terms and conditions on incidental take:

1.    If more than the specified level of incidental take identified above for BNLL, YCR, CC, SJKF, and APF (all of those inhabitaing the ROW – none outside, 1, 0, 0, or 0 respectively) occurs, BLM shall require that the causitive action of such take cease immediately, and shall initiate consultation to reevaluate the incidental take impacts.

2.    All dead or injured individuals of any endangered or threatened species shall be retrieved for scientific purposes and turned over to the California Department of Fish and Game.

3.    The Project Officer, BLM, shall immediately telephone the Sacramento Endangered Species Office if incidental take occurs as a result of the project and prepare a written report to include date, location, and circumstances surrounding the taking and the disposition of the individual(s) taken.  Written and telephone reports should be directed to Project Leader, USFWS, Sacramento Endangered Species Office, 2800 Cottage Way, Room E-1823, Sacramento, CA 95825 (916- 484-4935).

These terms and conditions constitute reasonable and prudent measures that are considered to be necessary or appropriate to minimize the impacts of incidental take discussed in this opinion.

Conservation Recommendations

To assist you in exercising your responsibilities under Sections 2(c) and 7(a)(1) which directs Federal agencies to utilize their authorities in furtherance of the conservation of endangered and threatened species, we recommend that BLM:

State Director, Bureau of Land Management, Sacramento, CA   1-RO-84-F-62
Page eleven

1) Require the applicants to use the Santa Maria Canyon route alternative. This alternative route does not cross the Sierra Madre Ridge. Therefore, there is less chance of disturbance to low flying condors using the ridge as a flyway.

2) Require that the Getty pipeline route follow the Celeron/All American route near Hudson Ranch. The Celeron route follows Highway 166 more closely and will likely cause less disturbance to foraging condors during construction.

3) Reduce the size of the construction right-of-way in sensitive habitats to the extent possible, particularly in the Cuyama Valley, Santa Barbara County, and Kern County, California.

4) Adopt all recommendations to minimize impacts listed in the Biological Assessment (See Sections 3.5.6, 3.7.6, 3.8.6, 3.9.6, and 3.10.6). We believe these measures are reasonable and implementable.

5) Insure that, prior to construction, a competent botanical survey of the ROW be conducted to determine the presence of and impacts to Thornber's fishook cactus. If the species is found to be impacted, the project should be modified in these areas to minimize the impacts.

6) Prior to construction, the BLM should provide the FWS the opportunity to review and provide comments on any ROW grants or temporary use permits issued for the proposed projects. Specifically, this Service should be involved in formulating stipulations for the protection of threatened and endangered species during construction, operation, maintenance and abandonment of the pipeline.

This concludes formal consultation on this project. If the proposal is significantly modified in a manner not discussed above, or if new information becomes available on listed species, or impacts to listed species changes, or should new species be listed which are not addressed in this opinion, reinitiation of the consultation should be considered.

For additional information regarding these issues, please call Mr. Gail Kobetich, Project Leader of our Sacramento Endangered Species Office, at 916-484-4935 or FTS 468-4935. We thank the BLM and ERT staff for their assistance in this consultation process.

Attachment

4-35

## Literature Cited

Cade, T. J.  1960.  Ecology of the peregrine falcon and gyrfalcon populations in Alaska.  Univ. of Calif. Publ. in Zool., Berkeley. 63:151-290.

Enderson, J. H., J. Craig, and W. Burnham.  1977.  Peregrines in the Rocky Mountains:  status, biological assessment and management. Presented at the Raptor Research Foundation 1977 annual meeting. Tempe, Arizona.

Sibley, F.C.  1969.  Effects of the Sespe Creek project on the California condor.  U.S. Fish and Wildlife Service, Patuxent Wildlife Research Center, Laurel, Maryland.  19 pp.

Siniff, D.B., T.D. Williams, A.M. Johnson, and D.L. Garshelis.  1982. Experiments on the response of sea otters (Enhydra lutris) to oil contamination.  Biological Conservation 23:261-272.

White, C. M.  1974.  Hunting range of a breeding peregrine falcon on the Sugavanirktok River.  Unpublished report.  Brigham Young University, Provo, Utah.

Wilbur, S. R.  1978.  The California condor, 1966-1976:  a look at its past and future.  U.S. Fish and Wildlife Service, North American Fauna No. 72.

Williams, T.D.  1978.  Chemical Immobilization, Baseline Hematological Parameters and Oil Contamination in the sea otter.  Final Report to U.S. Marine Mammal Commission in Fulfillment of Contract MM7ADO94. Report No. MMC-77/06.  U.S. Department of Commerce, National Technical Information Service PB-283 969.  27 p.

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Washington, D.C. 20235

NOV. 23 1984

| | To | | Initial | Date |
|---|---|---|---|---|
| | F/M412 | PSOC | | |
| | 2 | ASD | | |
| | | ADMIN | | |
| | 3 | RES | | |
| | | | | |

Action by ___3___
Surname by _____
Return to _____

Mr. Ed Hastey
State Director
Bureau of Land Management
California State Office
2800 Cottage Way
Sacramento, California 95825

Dear Mr. Hastey:

Enclosed are the Biological Opinion and Statement Regarding Incidental Taking prepared by the National Marine Fisheries Service (NMFS) pursuant to Section 7 of the Endangered Species Act of 1973 (ESA) concerning the impacts of the proposed Celleron/All American and Getty Pipeline Projects near Santa Barbara, California on endangered whales and threatened and endangered sea turtles.

The NMFS has received a petition to list the Guadalupe fur seal (Arctocephalus townsendi) as an endangered species and a petition to list the northern fur seal (Callorhinus ursinus) as a threatened species under the ESA. The NMFS has determined that these petitions present substantial information indicating that the petitioned listings may be warranted, and has initiated a review of these species' status. Based upon the findings of these reviews, a determination will be made as to the appropriateness of proposing either of these species for listing. Section 7(a)(4) of the ESA requires Federal agencies to confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed for listing. While the Guadalupe fur seal and the northern fur seal have not yet been proposed for listing, we believe that these species should be considered during this consultation to avoid future complications and delays. Therefore, with the concurrence of your staff, we have included our conclusions on the impacts of the proposed pipelines to Guadalupe and northern fur seals in an Appendix to the enclosed Biological Opinion. Any recommended protective measures offered with respect to these species are contingent upon listing.

Based on our review of the available information on the proposed activities and on the biology and ecology of endangered and threatened species in the area, we have determined that the proposed activities are not likely to jeopardize the continued existence of any endangered or threatened species. New information on the timing, location, and nature of proposed activities should be reviewed by the Bureau of Land Management on a case-by-case basis to determine if additional consultation pursuant to Section 7 is required.

Consultation must be reinitiated if there is subsequent modification to the proposed action, if a species other than the Guadalupe or northern fur



2

seal is subsequently listed or proposed for listing, if critical habitat is designated in the area covered by your program, or if new information reveals impacts of identified activities that may affect listed species.

The enclosed Biological Opinion in no way permits the taking of endangered whales. Such taking, unless properly permitted, is prohibited under Section 9 of the ESA and under Section 102 of the Marine Mammal Protection Act (MMPA). Section 17 of the ESA states that unless otherwise provided, no provision of the ESA shall take precedence over any more restrictive provision of the MMPA. Under Section 101(a)(3)(B) of the MMPA, the taking of depleted species of marine mammals can be permitted only for scientific purposes. Therefore, the appended statement concerning incidental taking of endangered species pursuant to Section 7(b)(4) of the ESA does not include whales.

No sea turtle mortality has been reported incidental to offshore oil and gas development or associated land based activities off California, and we do not anticipate any. Therefore, we have not provided an estimate, pursuant to Section 7(b)(4), of an acceptable level of mortality. Our appended statement concerning incidental taking contains the following conditions: any mortality of sea turtles due to activities associated with this project must be reported to the Southwest Regional Office as soon as practical, and that your State Office staff cooperate with the Southwest Region staff in reviewing the circumstances to determine if measures need to be developed to prevent or mitigate additional mortality.

I look forward to continued cooperation during future consultations.

Sincerely,

William G. Gordon
Assistant Administrator
for Fisheries

Enclosure

4-38

Endangered Species Act
Section 7 Consultation - Biological Opinion

AGENCY:  Bureau of Land Management

ACTIVITY:  Proposed Celleron/All American and Getty Pipeline Projects

CONSULTATION CONDUCTED BY:  National Marine Fisheries Service

DATE OF ISSUANCE: _____

BACKGROUND:  On September 20, 1984, the Bureau of Land Management (BLM) requested initiation of formal consultation on a proposed plan for construction of the Celleron/All American and Getty Pipelines and an associated marine terminal at Gaviota, California.  The purpose of this consultation is to consider potential impacts of the proposed activities on endangered whales and threatened and endangered sea turtles.  In addition, we have incorporated into an Appendix, information concerning two candidates for listing, the Guadalupe fur seal and northern fur seal.

Complete, updated reviews of listed species' biology and potential impacts due to the construction and operation of a marine terminal and associated pipelines at Gaviota and Los Flores Canyon were included in the Biological Opinions issued for oil and gas development and production activities in the Point Arguello field (May 31, 1984) and Santa Ynez Unit (March 7, 1984) respectively.  The conclusions reached in those opinions remain valid and are incorporated into this opinion by reference (NMFS, 1984a,b).

This opinion is based on information acquired through consultation with BLM, information in the Biological Assessment prepared for the project, and a review of published and unpublished information.

PROPOSED ACTIVITY:  Celleron/All American and Getty Oil each have proposed pipeline projects to transport oil from offshore Gaviota, California through a marine terminal, into a consolidated coastal facility, and overland pipelines to processing areas.  The Celleron/All American pipeline would transport up to 300,000 barrels per day (BPD).  The 1,200 mile, 24 to 30 inch pipeline would travel from the area west of Santa Barbara, California, across the Sierra Madre Mountains to the Bakersfield area, then to Blythe, and across Arizona and New Mexico to the Midland, Texas area.  One alternative of this route would extend this pipeline to Freeport, on the Gulf coast of Texas.  The Getty pipeline would transport up to 400,000 BPD in a 20 to 30 inch pipeline from the area west of Santa Barbara to the Bakersfield area (about 113 miles).

Getty Trading and Transportation Company (Getty) has submitted an application to Santa Barbara County for construction and operation of a consolidated coastal facility at Gaviota, California.  The Gaviota site is on

the coastline of the Santa Barbara Channel, 31 miles west of downtown Santa Barbara.  Getty's consolidated coastal facility is proposed to serve all of the offshore oil and gas producers in the western Santa Barbara Channel and the Santa Maria Basin, accepting oil from nearby proposed oil treatment plants, marine tankers, and tank trucks.

Under the Proposed Project, Getty would replace the existing Gaviota marine terminal with a new consolidated coastal facility with the following characteristics:

° A phased marine terminal expansion at the present location with an initial throughput capacity of 200,000 barrels per day (BPD) and the ability to handle one marine tanker between 30,000 and 300,000 dead weight tons (DWT).

° A supply and crew base designed to support peak offshore exploration, development, and production needs with a supply and crew boat pier, onshore storage, warehouses, offices, parking, and logistical and communications support.

° A phased development of crude oil storage facilities with ultimate tank capacities of approximately 2.74 million bbl to support the marine terminal and the crude oil pipeline to the San Joaquin Valley.

° A pipeline connection from Gaviota to the San Joaquin Valley refinery/transportation network with a crude oil throughput in the range of 100,000 to 400,000 BPD.

° A maximum buildout capacity, should market conditions support it, of marine terminal throughput capacity of 400,000 BPD.  Two mooring systems would allow two tankers to load simultaneously.

### Status of Species Considered in this Opinion

| Common Name | Scientific Name | Status |
|---|---|---|
| Gray whale | Eschrichtius robustus | Endangered |
| Right whale | Eubalaena glacialis | Endangered |
| Blue whale | Balaenoptera musculus | Endangered |
| Fin whale | B. physalus | Endangered |
| Sei whale | B. borealis | Endangered |
| Humpback whale | Megaptera novaeangliae | Endangered |
| Sperm whale | Physeter catodon | Endangered |
| Green sea turtle | Chelonia mydas | Endangered |
| Leatherback sea turtle | Dermochelys coriacea | Endangered |
| Pacific Ridley sea turtle | Lepidochelys olivacea | Endangered |
| Loggerhead sea turtle | Caretta caretta | Threatened |

BIOLOGICAL INFORMATION:  Basic information pertaining to the population levels and trends, migration patterns, and behavior of the seven cetacean and four sea turtle species listed as endangered or threatened is contained in the Biological Opinions issued for the development and production activities of

4-40

the Santa Ynez Unit on March 7, 1984, (NMFS, 1984a) and the Pt. Arguello field on May 31, 1984 (NMFS, 1984b).  That information is incorporated herein by reference.

ASSESSMENT OF IMPACTS:  Impacts to listed species could originate from two aspects of the proposed project:  (1) events associated with the placement and operation of the marine terminal and consolidated onshore facility or (2) from oil spilled from the rupture of an onshore pipeline with subsequent marine contamination.

The NMFS assessed the potential for impacts to listed species from construction and operation of a marine terminal and associated pipelines proposed to be located at Gaviota in the Biological Opinion issued for the Point Arguello field (NMFS, 1984b).  The discussion and conclusions reached in that opinion remain valid and are incorporated herein by reference.

Listed marine species could be affected by oil spilled from a major pipeline rupture at a coastal stream crossing, provided the spill could not be contained onshore.  The Biological Assessment (BA) for the proposed project, prepared under contract for BLM, states that "the probability of an oil spill is very low;  0.0013 yr/mi or less than one chance in 2,000 years."  (BLM, 1984)  The BA states

> "it is not probable that a spill will occur at
> a stream crossing in the life of the project.
> It is also unlikely a spill would occur when
> whales were in the project area or reach distant
> offshore areas" (BLM 1984).

In general, the conclusions of research completed to date indicate that whales are likely to suffer only minor impacts if they contact oil spills and that they are likely to recover from those effects.  In some cases, conclusions have been based on calculations and theories that are presently unverified and we believe that they should be interpreted conservatively. However, the fact that no marine mammal mortalities were reported during the Ixtoc spill (Hooper, 1981) or the 1969 Santa Barbara spill (Brownell, 1971) tends to support these conclusions.

CONCLUSIONS:

Cetaceans other than gray whales.

Based on our assessments of impacts for this and previous projects in the vicinity (NMFS, 1984a,b), the wide distributions and broad migration corridors of the North Pacific populations of right, blue, fin, sei, humpback, and sperm whales, and the fact that only a small portion of any population is likely to be in the project area, the NMFS concludes that the activities associated with the proposed Celleron/All American pipeline project are not likely to jeopardize the continued existence of these species.

4-41

Gray whales.

The gray whale population may experience impacts from the construction and operation of the marine terminal (NMFS, 1984a,b) or from oil spilled into the marine environment due to an onshore pipeline rupture. However, due to the extremely low probability of such an event, the distance offshore and seasonality of the gray whale migration, and the persistent increase in the gray whale population, despite ongoing oil and gas activities we conclude that the potential impacts of activities associated with the proposed Celleron/All American pipeline project are not likely to jeopardize the continued existence of the gray whale.

Cumulative effects: In view of the relatively restricted migration patterns of gray whales, and the extensive Outer Continental Shelf (OCS) development that is scheduled to take place within the range of the gray whale in the next five years (NMFS, 1984a,b), we are concerned that the cumulative effects of these activities may have adverse impacts on the gray whale population. Since information on the cumulative effects on the gray whale from OCS activities throughout its range is sparse, we are unable to identify a threshold of OCS activities that would result in significant impacts to the gray whale population. We believe that sufficient information is available to conclude that current levels of offshore and associated onshore OCS activities, are below these critical thresholds. We expect that impacts associated with the proposed pipelines and associated activities also will be below these thresholds, but this does not release involved agencies from their responsibility to continue to investigate cumulative effects from all OCS activities, including those of other agencies, or of Canada and Mexico, to ensure that they are not likely to jeopardize, collectively, the continued existence of the gray whale population.

Sea turtles.

The NMFS also concludes that these activities are not likely to jeopardize the continued existence of any listed sea turtle population because most individuals generally are distributed in warm tropical or subtropical waters far to the south of the project area (NMFS, 1984a,b). Only a few individuals have been encountered in the colder temperate waters off California; these are probably vagrants at the extreme northern limits of their ranges.

RECOMMENDATIONS: The recommendations made in the Biological Opinion for the Santa Ynez Unit (NMFS, 1984a) relating to listed species remain valid and are incorporated herein by reference. One of these recommendations that warrants particular attention is repeated below.

We recommend that the BLM instruct Getty that any blasting for offshore pipeline placement or marine terminal construction should be limited to periods when gray whales are not observed in the vicinity of the project. Most of the eastern north Pacific population of gray whales migrate through the project area twice annually. In this area, the southern migration occurs from mid-December through mid-February and the return migration occurs from

4-42

early February through April. Limiting blasting to periods when gray whales are not present will reduce the potential for adverse effects associated with startle responses or direct physical injury that could occur due to the detonation of an explosive charge.

REINITIATION OF CONSULTATION:  Consultation must be reinitiated if (1) new information reveals additional impacts of the identified activity not considered in this Opinion that may affect listed species or their habitat, (2) the proposed activities are modified in a manner not considered herein, or (3) a new species (other than the Guadalupe or northern fur seal) is listed or critical habitat is designated that may be affected by the proposed activity.  The NMFS suggests that the agencies involved in this consultation continue to discuss the information concerning future OCS activities so that, if needed, consultation can be reinitiated in a timely manner.  This in no way would preclude any involved agency from making an independent determination of the need for reinitiating consultation.

4-43

STATEMENT REGARDING INCIDENTAL TAKING PURSUANT TO
SECTION 7(b)(4) OF THE
ENDANGERED SPECIES ACT OF 1973, AS AMENDED

Section 7(b)(4) of the ESA requires that when an agency action is found to be consistent with Section 7(a)(2) the NMFS will issue a statement specifying the impact of incidental taking of endangered species, providing reasonable and prudent measures that are necessary to minimize impacts, and setting forth the terms and conditions with which the action agency must comply in order to implement the reasonable and prudent measures.

No sea turtle mortality has been reported incidental to OCS activities off California, and we do not anticipate any mortalities incidental to the proposed activity.  As a condition of this statement, if a sea turtle is killed as a result of an interaction with activities associated with construction and operation of the marine terminal or the onshore pipeline, the incident must be reported to the Director, Southwest Region, NMFS as soon after the taking as possible, and the Southwest Region will cooperate with the California State Office, BLM in the review of the incident to determine the need for developing mitigation measures and assess the need for reinitiating consultation.

Any marine mammal population listed pursuant to the ESA is considered depleted under the Marine Mammal Protection Act of 1972 (MMPA).  According to Section 17 of the ESA, no provision of the ESA is to take precedence over a more restrictive, conflicting provision of the MMPA.  The MMPA is more restrictive than the ESA because the MMPA prohibits taking from depleted stocks except for scientific research.  Therefore, Section 7(b)(4) of the ESA is not applicable to endangered whale populations and no statement specifying impact is provided.

Appendix
Potential Impacts on the Northern and Guadalupe Fur Seals


BACKGROUND:  The National Marine Fisheries Service (NMFS) has accepted petitions to list the northern fur seal (Callorhinus ursinus) as a threatened species and to list the Guadalupe fur seal (Arctocephalus townsendi) as an endangered species pursuant to the Endangered Species Act (ESA).  The NMFS is currently undertaking status reviews of these species to determine whether or not they should be listed under the ESA, and anticipates making decisions on these proposed actions in early 1985 and late 1984, respectively.  Section 7(a)(4) of the ESA requires Federal agencies to confer with NMFS on agency actions likely to jeopardize the continued existence of any species proposed for listing.  While neither of these candidate species has been proposed for listing, the NMFS and Bureau of Land Management (BLM) agreed to consider them in the conference process for the proposed Celleron/All American and Getty pipeline projects (telephone conversation between D. Seagars, NMFS and Bill Haigh, BLM, October 4, 1984).  Early consideration of these species through conferences could provide for protection from potential impacts of proposed projects and potentially eliminate the need to reinitiate consultation should either of these species be listed.  Any recommended protective measures offered in this Appendix are contingent upon listing.  We have incorporated information made available during our October 4, 1984, conference concerning these species.


Status of Species Considered by this Appendix

| Common Name | Scientific Name | Status |
|---|---|---|
| Northern fur seal | Callorhinus ursinus | Candidate |
| Guadalupe fur seal | Arctocephalus townsendi | Candidate |


BIOLOGICAL INFORMATION:  Basic information pertaining to the population levels and trends, migration patterns, behavior, and sensitivity to oil spills is contained in an Appendix to the Biological Opinion issued for the development and production activities of the Point Arguello field on May 31, 1984 (NMFS, 1984b).  That information is incorporated herein by reference.


POTENTIAL IMPACTS:  Potential impacts to northern and Guadalupe fur seals could occur as a result of contact with oil spilled from the offshore marine terminal, the onshore consolidated facility, or an uncontained onshore pipeline rupture.

   Impact from oil spills.  The potential impacts to northern fur seals from contact with spilled oil were described by Kooyman, Gentry, and McAllister (1976).  Although this study examined only the northern fur seal, the results are applicable to both species as the thick pelage of fur seals constitutes the principal element of their thermoregulatory mechanism, a system that carefully regulates heat loss to the cold, surrounding environment.  The authors found that a light oiling of about 30 percent of the pelt surface resulted in a 1.5 fold increase in the metabolic rate of seals in water.

While the study could not verify that death would inevitably follow such contact, it did predict that the health of oiled individuals was in serious jeopardy because the stress of greatly increased metabolic rates generally leads to death by disease or starvation.

Overwintering northern fur seals are widely dispersed far offshore and well west and south of the project area. During the summer breeding season, northern fur seals concentrate on the breeding grounds in the western North Pacific, the Pribilofs, and at San Miguel Island. In the event that an oil spill contacts San Miguel Island during this breeding period, approximately 4,000 northern fur seals could be adversely impacted. However, there is only a very remote probability that a spill from this project would contact the island.

Little specific information is available concerning at-sea distribution of Guadalupe fur seals. We believe that the few individuals present in the Southern California Bight are most likely to occur far to the south of the project area, such as around haulouts on the far western Channel Islands and over the more southern offshore ridges and continental slope. There is only a remote probability that a spill associated with this project would reach the island regions.

CONCLUSIONS:  We conclude that the proposed activities are not likely to jeopardize the continued existence of the northern fur seal because:  there is only a remote probabilty of an oil spill; the majority of the population is located well to the south of the project area; fur seals are widely dispersed and far offshore when pelagically overwintering; and that portion of the population present on San Miguel Island during the spring and summer breeding season constitutes less than 0.2 percent of the total world population. We further conclude that the proposed activities are not likely to jeopardize the continued existence of the Guadalupe fur seal because the majority of the population is located on or near Guadalupe Island. Only a few non-breeding individuals occur in the Southern California Bight and the chance that they would be contacted or otherwise disturbed by an oil spill is low.

## REFERENCES

BLM, 1984.  Biological assessment, threatened and endangered species. Proposed Celleron/All American and Getty pipeline projects.  Prepared by Environmental Research and Technology, Inc.

Brownell, R.L. Jr., 1971.  Whales, dolphins, and oil pollution.  In: Biological and oceanographical survey of the Santa Barbara Channel oil spill, 1964-1970.  (D. Stranghan, ed.).  Vol. I.  Biology and bacteriology, p. 255-276.  Allan Hancock Found., Univ. So. Calif., Los Angeles, CA.

Hooper, C.H.  1981.  The Ixtoc Oil Spill:  the federal scientific response. NOAA Special Report.  201 pp.

Kooyman, G.L., R.L. Gentry, W.B. McAllister.  1976.  The physiological impact of oil on pinnipeds.  Processed Rept. 23.  Northwest and Alaska Fisheries Center, NMFS, NOAA, Seattle, WA.

NMFS.  1984a.  Biological opinion for development and production of the Santa Ynez Unit, offshore California.  34 pp.

NMFS.  1984b.  Biological opinion for development and production of oil and gas offshore California between Point Arguello and Point Conception.  22 pp.

Excerpts from Biological Assessment

The following actions and measures to minimize impacts to federally-listed Threatened or Endangered species that could be affected by the proposed pipeline projects are proposed by the BLM and recommended by FWS. These measures were taken from the Biological Assessment (Sections 3.5.6, 3.7.6, 3.8.6, 3.9.6, 3.10.6) submitted by BLM to the FWS in August 1984.

## American Peregrine Falcon

The proposed project should have no immediate significant impact on peregrine falcons in the Gaviota area. Peregrines occur at Gaviota Pass and the mouth of Gaviota Creek from March through July. Construction impacts would be insignificant if construction between the Gaviota tank farm and an area 2 mi west of Gaviota Pass occurred between late July and late February. This would reduce potential impacts to faclons foraging at the mouth of Gaviota Creek and birds attempting to establish nesting territories at Gaviota Pass. Cooperation between oil companies in the future concerning scheduling of construction, joint use of similar facilities, and restricting shore facilities to smaller geographic locations would greatly reduce any cumulative impacts.

## California Condor

- The ROW will be routed to avoid crossing the Hudson Ranch to the degree possible in order to minimize future conflicts with any special management plans.

- The ROW will parallel Highway 166 and other existing roads to the degree possible in order to minimize disturbance in condor foraging areas.

- No guns will be allowed on the construction spread in condor essential habitat. This measure can be added to pipeline contractor contracts by the Applicants (Celeron/All American and Getty).

- Blasting in the Cummings Mountain area will use small charges and debris blankets to muffle and minimize noise levels.

- Aerial flight reconnaissances will approach on line with the ROW and remain on the ROW over condor essential habitat.

- The pilot responsible for the aerial reconnaissance of the ROW will consult with the National Audubon Society's condor research pilot concerning avoidance measures and flying techniques to avoid condor collisions.

- Oil spill contingency plans will include notifying FWS in the event of a spill in essential habitat.

- The applicants will review site specific revegetation plans for the Hudson Ranch area with FWS.

4-49

- If construction of either pipeline is delayed, the applicants will consult with FWS concerning timing of construction to avoid potential conflicts with the condor captive-release program.

San Joaquin Kit Fox

In order to minimize the effects of construction and operation of the proposed pipelines on the San Joaquin Kit fox and its habitat the following recommendations are made:

- The ROW will be surveyed between the upper Cuyama Valley and Pentland (about 50 miles) immediately prior to construction. Any kit fox den sites on the ROW will be flagged and the ROW moved at least 100 ft to avoid the den site.

- The ROW will be revegetated with native species to encourage reestablishment of habitat.

- No ORV use will be allowed off the ROW during construction.

- Where the ROW crosses existing roads, locked gates will be erected to discourage ORV use after construction.

- Pipeline company personnel driving the ROW for inspection will not be allowed off the ROW except as specified by the land owner or land manager.

Blunt-nosed Leopard Lizard

In order to minimize the effects of construction and operation of the proposed pipelines on the Blunt-nosed leopard lizard and its habitat, the following recommendations are made:

- The construction ROW will be limited to 50 ft (where feasible) in BNLL habitat near Maricopa; this will reduce habitat loss by about 20 ac to about 40 ac.

- No ORV use will be allowed off the ROW during construction. This will minimize road kills and destruction of habitat.

- No dumping of trash or waste oils will occur in sandy washes or in other suitable habitats.

- The ROW will be revegetated with native species to encourage reestablishment of habitat and to discourage weed invasion.

- Where the ROW crosses existing roads, locked gates will be erected to discourage ORV use after construction.

- Pipeline personnel driving the ROW for inspection will not be allowed off the ROW except as specified by the land owner or land manager.

4-50

Yuma Clapper Rail
================

No proposed alternative actions are recommended for protection of the YCR. However, several conservation measures are recommended to reduce the potential for impact due to oil spills and construction. Spill contingency plans should be established for the Colorado River crossing to reduce impacts to rail habitat if a spill occurs. Boom devices and cleanup equipment should be stored at important rail habitats (e.g., Cibola National Wildlife Refuge-Colorado River backwater area). If a rupture occurs, crews could quickly move these booms into place. A system should be devised to alert upstream dam operators to reduce flows immediately if a pipeline rupture occurs.

4-51

APPENDIX 4.3
SYSTEM SAFETY

The following table provides a summary of the major oil spill and system safety issues and concerns related to the Getty and Celeron/All American Pipeline Projects. Column 1 of the table describes a series of events that are viewed as having some type of impact on the environment if the event were to occur. Also included below each event listed are the possible causes of such an event.

Column 2 presents the probability that the event would occur, based on historical accident rate data throughout the industry.

Column 3 describes the environmental consequences that may result if the event took place. A "worst-case" approach was taken when describing these environmental consequences.

Column 4 provides a summary of various design specifications that the Applicants have incorporated into their projects that would reduce the probability of an event occurring and/or would reduce the environmental consequences if an event had in fact occurred. More detailed information is cross referenced to Appendices H and I and Chapter 2 of the DEIR/EIS.

Sub-columns 5 and 6, Mitigation Measures, summarize mitigation measures and stipulations presented in the Final EIR that would further reduce the probability or consequences resulting from an event. Cross references are provided for locating detailed descriptions of the mitigation measures within the FEIR document.

Finally, the last column in the table evaluates the effectiveness of design specifications and mitigation measures.

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| Oil spill onto irrigated agricultural lands (see Tables 3-22, 3-25, and 4-5) caused by: seam failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio[1] 21 miles irrigated 6.3 x 10[-3] spills/yr (> 50 bbl) 0.19 spills during life of project (30 yrs) | Contamination of soils, reduced productivity, maximum of 16 acres affected per spill. | Minimum cover 42 inches, cathodic protection, block and check values, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. Continuous manned monitoring and control of all data. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | | Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective. |
| | Las Flores to Blythe[1] 50 miles irrigated 1.5 x 10[-2] spills/yr (> 50 bbl) 0.45 spills during life of project (30 yrs) | | | Pipeline location markers above ground. Buried cable or fluorescent plastic below ground just above pipeline. | | Increase awareness of pipeline location thereby reducing potential of mechanical damage occurring. |
| | Blythe to McCamey[1] 52.8 miles irrigated 1.6 x 10[-2] spills/yr (> 50 bbl) 0.48 spills during life of project (30 yrs) | | | Periodic information contact with land owner. | | Same as above. |
| | | | | Provide extra pipeline depth in areas where deep plowing or ripping could result in damage to pipeline. Depth should be at least 1 ft below maximum plow depth. | | Will reduce risk of mechanical damage. |
| | | | | | Replace contaminated soil. | Decrease loss of productivity. |
| | | | | | Monetary compensation for lost product. | Eliminate financial loss to landowner/tenant. |
| Oil spill into a stream[2] (see Tables 3-11 and 3-12) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 11 miles 3.3 x 10[-3] spills/yr (> 50 bbl) 0.09 spill during life of project (30 yrs) | Contamination of surface water lasting up to several weeks. Loss of aquatic life up to 2 years. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan (see Appendix H). Continuous manned monitoring and control of all operational data. | Monitor pipe burial depth at stream crossings (M-5). Periodic site inspections. Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | | Early indication of abnormal bottom scouring. Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective. |
| | Las Flores to Blythe 25 miles 7.5 x 10[-3] spills/yr (> 50 bbl) 0.23 spill during life of project (30 yrs) | | | | | |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Mitigation Measures Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| | Blythe to McCamey 17 miles $5.1 \times 10^3$ spills/yr (>50 bbl) 0.15 spill for life of project (30 yrs) | | | | | |
| Oil spill into a sensitive ground-water basin (see Table 3-14) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 30 miles $9.0 \times 10^{-3}$ spill/yr (> 50 bbl) 0.27 spill during life of project (30 yrs)  Las Flores to Blythe 42 miles $1.3 \times 10^{-2}$ spill/year (> 50 bbl) 0.39 spill during life of project (30 yrs)  Blythe to McCamey 395 miles $1.2 \times 10^{1}$ spill/yr (> 50 bbl) 3.60 spills during life of project (30 yrs) | Contamination of groundwater by a small leak (less than 3 BPH). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | Identify areas to monitor in case of spill (M-6); use low permeability backfill in sensitive areas (M-7). | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. |
| Oil spill into a sensitive stream[2] (see Table 4-6) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error | Gaviota to Emidio 1 mile $3.0 \times 10^{-4}$ spills/yr (> 50 bbl) 0.01 spill during life of project (30 yrs)  Las Flores to Blythe 3 miles $9.0 \times 10^{-4}$ spills/yr (> 50 bbl) 0.03 spill during life of project (30 yrs)  Blythe to McCamey 4 miles $1.2 \times 10^{-3}$ spills/yr (> 50 bbl) 0.04 spill during life of project (30 yrs) | Game and T&E fishes could be affected for several months to 2 years (see Appendix B). | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic tesing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accomodate geologic hazards (M-1, 2, and 3).  Monitor pipeline burial depths at crossings including periodic diving inspections of deep water crossings (M-S). | | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. Early indication of abnormal bottom scouring. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|-------|-------------|--------------|----------------------------------------------------------|---------------------|---|---------------|
| | | | | Reduce Probability | Reduce Consequences | |
| Oil spill into sensitive terrestrial habitats (see Table 4-8) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 50 miles sensitive habitat $1.5 \times 10^{-2}$ spills/yr 0.45 spill during life of project (30 yrs)<br><br>Las Flores to Blythe 314 miles sensitive habitat $9.5 \times 10^{-2}$ spills/yr (> 50 bbl) 2.85 spills during life of project (30 yrs)<br><br>Blythe to McCamey 15 miles sensitive habitat $4.5 \times 10^{-3}$ spills/yr (> 50 bbl) 0.14 spill during life of project (30 yrs) | Destruction of T&E species and/or their habitats (see Appendix B). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | Relocate pipeline out of sensitive habitats in the Cuyama Valley (M-15). | Eliminates potential exposure for sensitive wildlife and terrestrial habitats. |
| Oil spill into the Colorado River or Hot Springs Creek[2] caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American $6.0 \times 10^{-4}$ spills/yr (> 50 bbl) 0.02 spill during life of project (30 yrs) | Destruction of riparian habitat and possible effects on T&E species (see Appendix B); disruption of water recreational activities. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5). | Oil spill booms to redirect oil to skimmers and to block entry into backwaters of the Colorado River (M-17). | For the Colorado River this will protect nearby backwaters from contamination and aid in the clean-up downstream. For Hot Springs Creek the impacts will be minimized. The methods will not be 100% effective. |
| Oil spill into a coastal stream[3] (see Table 3-11) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American $2.4 \times 10^{-3}$ spills/yr (>50 bbl) 0.07 spill during life of project (30 yrs)<br><br>Getty $3.0 \times 10^{-4}$ spills/yr (> 50 bbl) 0.01 spill during life of project (30 yrs) | Oil spills could reach recreational beaches along the Gaviota coast. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5).<br><br>Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | | If all designs and plans are implemented properly, oil will not reach the coastal waters and impacts to the streams will be minimized. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Oil spill at the Cadiz tank farm (Celeron/All American) caused by: faulty valves overfilling tanks natural causes. | Spills per Year<br><br>$\geq$ 10 bbl   3.8 x $10^{-1}$<br>$\geq$ 100 bbl 8.6 x $10^{-2}$<br>$\geq$ 1,000 bbl 7.5 x $10^{-3}$<br><br>Spills During Life of Project<br><br>$\geq$ 10 bbl    11.4<br>$\geq$ 100 bbl    2.6<br>$\geq$ 1,000 bbl   0.2 | Oil would be contained by the dike system surrounding each storage tank. | Leak detection system, automatic overflow alarm system, containment dikes for 125 percent of tank capacity, spill contingency plan. | Redundant sensor and control system to prevent tank overfilling (p J-2). | | No spilled oil would be released beyond the diked containment area, reducing environmental consequences. Sensors would reduce the probability of overflowing tanks. |
| Fire/explosion at a pump station with natural gas supply caused by: leak with an ignition source. | 3.8 x $10^{-3}$ fire/explosion per year[4]<br>0.11 fire/explosion during life of project | Possible damage to structures and injury to people Possible source of wildfire. | Block and bypass valves on both sides of station, fuel gas shutdown system, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automatic station shutdown system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around pump station. | At stations with gas-fired turbines and, Waste Heat Recovery Units (WHRU), there will be extended purging of both units with interlocks to prevent starting before purging is complete. At stations without turbines, gas-fired heaters will also have extended purging before starting. | | Will effectively reduce the probability of explosion/fire. None of the proposed stations are close enough to dwellings or common areas for non-pipeline employees to be damaged. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Fire/explosion at a pump station without gas supply caused by: leak with an ignition source. | $3.8 \times 10^{-3}$ fire/ explosion per year[4] 0.11 fire/explosion during life of project | Possible damage to structures and injury to people. Possible wild-fire source | Block and bypass valves on both sides of station, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system in-cluding smoke detectors and fire sensors, remote data integration and station control system, automatic station shut-down system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around pump station. | Explosions are caused by leaks coupled with an ignition source. Pumps are equipped with seal leak detectors that will stop unit if leak detected. Other leaks will be reduced by checking valve stem packing during regular visits to the site. | | Will effectively reduce the probability of explosion/fire. No human receptors or dwellings near proposed pump stations (except employees). |

4-57

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|-------|-------------|--------------|----------------------------------------------------------|----------------------------------------|---------------------|---------------|
| Fire/explosion at the Cadiz tank farm caused by: personnel error equipment failure natural disaster fire outside facility externally caused fire (i.e., airplane crashes, sabotage, etc.). | See Note 5 | Possible damage to structures and injury to people. Possible source of wild fire. | Block and bypass valves on both sides of station, fuel gas shutdown system, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automatic station shutdown system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around tank farm, automatic overflow alarm system, open-top floating roof tanks, integrated tank farm control center. | Redundant sensor and control system to prevent tank overfilling (p J-2). | Automated foam extinguisher system for tank seal fires (p J-2). | Would reduce the probability of fire/explosion and reduce consequences if either should occur.<br><br>If an event does occur, the proper authorities on control and containment would be notified. The system would not control a fire if a tank started by an airplane crash or sabotage. The system would prevent additional oil from flowing into the affected area. |
| | | | | Tank roof sensor to detect jammed roof. | | Provides immediate knowledge of potential vapor build-up that could lead to an explosion. |

4-58

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| Loss of power at a pump station with natural gas supply. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS (Uninterruptable Power Supply) System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. The other pump stations will maintain flow until the down station is repaired. |
| Loss of power at a pump station without natural gas supply. Transmission line down or power plant down. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. The other pump stations will maintain flow until the down pumps are repaired. |
| Loss of power at the Cadiz tank farm. Transmission line down or power plant down. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. Oil will bypass tank farm. |
| Loss of communications to/from a pump station with natural gas supply. Telephone lines or microwave system failure because of human error, sabatage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |
| Loss of communications to/from a pump station without natural gas supply. Telephone lines or microwave system failure because of human error, sabotage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |

4-59

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Loss of communication to/from Cadiz tank farm. Telephone lines or microwave system failure because of human error, sabotage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |

Note 1: Gaviota to Emidio = Getty pipeline; Las Flores to Blythe = Celeron/All American pipeline in California; Blythe to McCamey = Celeron/All American pipeline in Arizona, New Mexico, and Texas.

Note 2: Assumes spill would occur within one-half mile of a stream.

Note 3: Assumes a spill occurring anywhere within the 10-mile coastal segment would reach a coastal stream.

Note 4: Source: OIW, September 1979.

Note 5:

Fire/Explosion Damage Magnitude

| | | |
|---|---|---|
| > $ 1,000 | $1.6 \times 10^{-2}$ per year | (0.48 fires in 30 years) |
| $ 1,000 - $ 10,000 | $6.9 \times 10^{-3}$ per year | (0.21 fires in 30 years) |
| $ 10,000 - $ 100,000 | $3.4 \times 10^{-3}$ per year | (0.10 fires in 30 years) |
| $ 100,000 - $ 500,000 | $4.4 \times 10^{-3}$ per year | (0.13 fires in 30 years) |
| Over - $ 500,000 | $9.4 \times 10^{-4}$ per year | (0.03 fires in 30 years) |

Source: OIW, September 1979

Note 6: Oil fire emissions (lb/bbl)

| | |
|---|---|
| $SO_2$ (assumes 5% sulfur) | 30.6 |
| CO | 16.5 |
| Hydrocarbons | 16.5 |
| Particulates | 3.3 |
| $NO_x$ | 1.1 |

## APPENDIX 4.4

## COLORADO RIVER OIL SPILL CONTINGENCY PLAN

### Introduction

The following <u>Draft</u> Oil Spill Contingency Plan for the Colorado River is presented here as a guide for the preparation of a finalized site-specific oil spill contingency plan. Additional information that should be incorporated into a final plan includes:

- Individual names and phone numbers of persons within federal, state, and local governments that are to be contacted.

- Names, phone numbers, and job description of the operator's personnel who would be responsible for coordinating cleanup efforts.

- Lists of local contractors who may be called upon to assist in containment or cleanup.

- Agencies and persons <u>upstream</u> of the spill site who may be called upon to reduce water deliveries from impounded/ controlled areas (e.g., Parker Reservoir).

Selection of equipment location, staging areas, booming locations, diversion areas, etc. was based on examination of topographic maps, sensitive resources identified in the EIR, and logistical analysis. The following aerial photos were also used to develop the draft contingency plan, and provide the rationale for some of the "logistical" site selections.

4-61



PHOTO I

STAGING AREA AND BOAT LAUNCH JUST NORTH OF THE PROPOSED PIPELINE CROSSING.



PHOTO 2

SPILL CONTROL SITE NUMBER I, APPROXIMATELY I MILE BELOW THE PROPOSED PIPELINE CROSSING

4-62



PHOTO 3

SPILL CONTROL SITE NUMBER 2 SHOWING LOCATION OF DIVERSION BOOM:
APPROXIMATELY 2.5 MILES BELOW THE PROPOSED PIPELINE CROSSING.
AS CAN BE SEEN IN THIS PHOTO, THE WETLANDS ON EITHER SIDE OF
THE RIVER WOULD BE PROTECTED FROM SPILLED OIL BY THE LEVEES.



PHOTO 4

SPILL CONTROL SITES 3 AND 4, APPROXIMATELY 5 MILES BELOW THE
PROPOSED PIPELINE CROSSING.

4-63

DRAFT

Colorado Oil Spill Contingency Plan

The operator shall have its Immediate Response Team on location of a spill (leak) within 1-2 hours of notification. Immediately upon receiving notification of a potential spill, the Pipeline Dispatcher will alert the International Boundary and Water Commission, Vic Vickers of the Arizona Department of Emergency Services, and _____. The operator proposes to locate sufficient spill containment equipment at its LaPaz Pump Station, approximately 9 miles east of the Colorado River crossing.

A full line rupture at the center of the Colorado River crossing would release approximately 3,506 (maximum) barrels of oil. The river, depending upon the amount of water being released from upstream dams and local precipitation, travels at rates between 2 and 6 feet per second. It will take a spill between 1 and 14 hours to reach the location of these actions. Based upon an on-site assessment, the operator's District Superintendent will either contain the spill with booms at locations SCS-1, SCS-2, and SCS-4 or initiate additional actions at SCS-5, SCS-6, and SCS-7.

**AREA**  Colorado River    **COUNTY**  Riverside Co., CA  **MAP REF.** A-1,A-2, B
Yuma Co.,  AZ

**MAXIMUM SPILL SIZE**  3506 bbl

**NEAREST EQUIPMENT SITE**  La Paz pump station (approximately 9 miles from the location of the river crossing)

## SPILL CONTROL RECOMMENDATIONS

| LOCATION | RESPONSE | | REMARKS |
|---|---|---|---|
| | HIGH FLOW | LOW FLOW | |
| SCS-1 | B,C | B,D | 300ft booms high flow, 100ft booms low flow |
| SCS-2 | A | A | |
| SCS-3 | B,C | B,D | |
| SCS-4 | B,C | B,D | |
| SCS-5 | B,C | B,D | |
| SCS-6 | B,C | B,D | |
| SCS-7 | B,C | B,D | |

## SPECIAL FEATURES/SPILL CONTROL PROCEDURES

o  Boom deployment may be aided by use of existing bridge structures (SCS-5,6)
o  River velocity during moderate to peak flow may preclude effective booming. During lower flow periods bury boom skirt on banks and bars.

## ENVIRONMENTAL INVENTORY REFERENCE

Cleanup Techniques 1,2,3 ,4

WATER CROSSING/HYDROLOGIC CHARACTERISTICS

| Max. Discharge | Min. Discharge | Ave. Discharge |
|---|---|---|
| 39,900 cfs (August 17, 1983) | 1060 cfs (November 25, 1972) | 7,586 cfs |



Map A—1. Colorado River Oil Spill Contingency

Plan—-Logistics and Deployment

**Map A-2 Colorado River**

**Oil Spill Contingency Plan--Logistics and Deployment**



**Map B Colorado River**

## Oil Spill Contingency Plan—Logistics and Deployment

## RESPONSE MAP KEY

### FACILITIES

 Pipeline Location
(terrestrial showing mileposts)

⋈ Block Value

И Check Valve

■ Pump Station

☐ Equipment Location

### ENVIRONMENTAL FACTORS

 Overland Oil Flow Direction

 Access (vehicular, unimproved, boat launch)

⊗ Helicopter Landing Site

### RESPONSE ACTIONS

☆ Special Feature or
Spill Control Procedure

SCS-1 Spill Control/Containment
Site Number

 Suggested Boom Locations

✳ Possible Staging Area

4-69

# OIL SPILL CONTAINMENT

A.   River Diversion Booming

Use.   Booms are deployed on rivers at an angle to divert oil away from environmentally sensitive areas when currents are too great for containment.

Limitations.   Accessibility, implementation time, currents over 2 knots, and water depths less than 1 foot below bottom of boom skirt.

General Instructions.   Anchor one end of the boom to the shoreline just upstream of the area to be protected.   Tow free end by boat to a point which angles the boom downstream and towards the opposite shore. Optimum deployment angle is dependent on the current speed and the length and type of boom used.   The angle must be smaller in strong currents speed and the length and type of boom used.   The angle must be smaller in strong currents than in weak currents.   The same relation is true with regard to boom length.   If the spill is large or continuing, the boom should be anchored in place at the optimum angle.   Figure A-1 illustrates this technique.

Equipment Required.   Boat, anchors, and hand tools.

Maintenance.   Periodically check boom for leakage and adjust angle if necessary.   Also check boom for broken, deflated, or submerged sections and anchor points for security.

Cleanup.   Contaminated shorelines can be cleaned by techniques discussed in 3. Sorbent Recovery.

Variations.   If the area to be protected is large, additional diversion booms may be deployed downstream in the same manner.



**Figure A.1   RIVER DIVERSION BOOMING**

B.   River Containment Booming

Use.   Booms are deployed at an angle across a waterway to contain oil floating downstream for subsequent recovery.

Limitations.   Accessibility, implementation time, currents in excess of 2 knots, and water depths less than 1 foot below bottom of boom skirt.

General Instructions.   Anchor one boom end to the shoreline and use a boat or winch to pull the free end across the river and anchor it slightly upstream.   The optimum deployment angle depends on current velocity, boom length, and boom stability.   As currents and boom length increase the deployment angle decreases.   The boom may be anchored in several places to improve stability.   Figure B.1 shows cross sections of three stable booms and their optimum deployment angles under different current speeds.

Recover oil from downstream end of boom by skimming, pumping, or with vacuum trucks.   A containment pit dug into the shoreline aids containment and recovery (see Figure B.2).

Equipment Required.   Boat or winch, anchors, backhoe (to dig containment pit), and hand tools.

Maintenance.   Periodically check boom for leakage and adjust angle if necessary.   Also check boom for twisted, damaged, or submerged sections and anchors for security.

Cleanup.   Remaining sheens are recovered with sorbents.   Shorelines are cleaned using techniques described in 3. Sorbent Recovery, and booms are removed.

Variations.   For wide rivers, deploy booms from each side with one slightly downstream of the other.   Anchor the free ends to overlap somewhat past mid-stream.   If sufficient boom is unavailable, deploy a single boom from the side of the river with the heaviest concentration of oil or from the outside shore of a bend in the river where oil concentrates naturally.   Both variations are shown in Figure B.3.

4-73



4-74

**Figure B.1   CROSS SECTIONS OF 3 HIGH-STABILITY BOOM TYPES AND OPTIMUM DEPLOYMENT ANGLES UNDER VARIOUS CURRENTS**



**Figure B.2   RIVER CONTAINMENT BOOMING**



**Figure B.3  WIDE RIVER CONTAINMENT BOOMING**

C.  Cascading Booming

Use.  A series of booms deployed in a cascading formation are used to direct oil to the shore for recovery on rivers where currents are too strong for standard containment booming.

Limitations.  Accessibility, implementation time, currents over 2.5 knots, and soft stream bottoms.

General Instructions.  Tow lead boom to opposite shore or some point mid-stream and anchor at an angle to the current.  Deploy a second boom such that the leading end is anchored 25 to 30 feet downstream and somewhat overlapping the trailing end of the lead boom and angled toward the shoreline.  Successive booms are deployed in the same manner until the shoreline is reached.  Oil diverted to this point is recovered by skimming, pumping, or with vacuum trucks.  A containment pit can be dug into the river bank to assist recovery.  This technique is illustrated in Figure C.1.  Optimum boom deployment angel decreases as currents and boom length increases unless several anchor points are utilized along the boom.

Equipment Required.  Deployment boat, anchors, backhoe (to dig containment pit), and hand tools.

Maintenance.  Periodically check boom for leakage and adjust deployment angle if necessary.  Also check boom for damaged, twisted, or submerged sections and anchors for security.

Cleanup.  Remaining sheens are recovered with sorbents, shorelines are cleaned using techniques described in 3. Sorbent Recovery, and boom are removed.

Variations.  If booms are unavailable or water is too shallow, berms may be constructed with streambed or nearsite materials in the same cascading configuration (see Figure C.2).  Typically, cascading can utilize existing stream bed bars.



Figure C.1  PLACEMENT CONFIGURATION OF 3 LENGTHS OF BOOM
(cascading deflection booms)



**Figure C.2  CASCADING BERMING**

D. <u>Blocking Dam</u>

<u>Use</u>. Dams are constructed across streambeds, ditches, or other dry drainage courses to block and contain any flowing oil.

<u>Limitations</u>. Accessibility, implementation time, adequate storage behind dam, flowing water, and availability of construction materials.

<u>General Instructions</u>. Dam location should have high banks on upstream side with dam well keyed into banks.

Construct dam with on/near site earthen materials, sandbags, plywood sheets, or any material that blocks flow (Figure D.1). Excavate earthen materials from upstream side to increase storage capacity. Oil is recovered from behind the dam by pumping or vacuum trucks.

<u>Equipment Required</u>. Bulldozer, front-end loader, backhoe, or hand tools.

<u>Maintenance</u>. Periodically check dam for leaks, structural integrity, and excessive oil buildup.

<u>Cleanup</u>. Recover remaining oil concentrations or sheens with sorbents, remove or treat contaminated sediments, and dismantle dam or replace earthen materials to excavation site.

<u>Variations</u>. Containment area behind dam can be water flooded to limit oil penetration into sediments.



**Figure D.1  SANDBAG BLOCKING DAM**

4-81

# OIL SPILL CLEANUP TECHNIQUES

1.  <u>Vacuum Trucks</u>

<u>Objectives</u>.  To recover oil from land and water surfaces by using suction generated by the vacuum truck to draw oil from concentrated areas into the truck for transport to reprocessing or disposal facilities.

<u>Limitations</u>.  Access to spill site, high viscosity oils, thinness of oil concentration, and heavy debris.

<u>General Instructions</u>.  Position truck adjacent to area of heaviest oil concentration such as behind booms, berms, trenches, sumps, etc. Suction hose nozzle is placed in the oil and maneuvered manually until recovery becomes inefficient.  Light sheens should be recovered with sorbents.  Screens should be fitted over nozzle to prevent ingestion of sediments or debris.  When recovering oil on water, a duck bill or manta ray type skimmer head should be attached to the suction nozzle.  This technique is illustrated in Figure 1.1.

<u>Logistics</u>.  The primary logistical requirements for the vacuum truck techniques are given in Table 1.1.

<u>Variations</u>.  Vacuum truck may be left onsite with recovered oil pumped periodically to tank trucks (can improve turn-around time in some cases, and vacuum truck acts as a primary oil-water separator).



**Figure 1.1   VACUUM TRUCK OIL RECOVERY**

## TABLE 1.1

## LOGISTICAL REQUIREMENTS FOR THE VACUUM TRUCK TECHNIQUE

| | Typical Suction Rate for Pooled Oil | Typical Suction Rate for Oil on Water | Fill Time for 110-Barrel Truck |
|---|---|---|---|

**Equipment**

- Vacuum truck w/3" suction hose — 100 gpm (75% oil) — 50 gpm (5% oil) — 3/4 hr @ 100 gpm  1 1/2 hr 50 gpm

- Number of vacuum trucks required — Dependent on quantity of oil and number of pools present — Dependent on quantity of oil and number of recovery sites. Also on oil/water ratio.

**Personnel** - 1 person per suction hose and 1 to 2 persons for manual skimming and concentrating of oil, and 1 supervisor.

**Support**                                                    **Range of Capacities**

- Vacuum truck
  - 6" suction hose
  - 4" suction hose
  - 3" suction hose

- 6 to 140 barrel @ 42 gallons/barrel[a]
  - 700 to 800-900 gpm max.[a]
  - 500 to 600 pgm max.[a]
  - 300 to 400 gpm max.[a]

- Devices for concentrating oil on water

- Booms, skimming boards, low-pressure water hoses

**Access requirements** - heavy equipment

[a]Intake completely submerged, drawing water with little or no suction lift.

2.  <u>Portable Skimmers/Pumps</u>

<u>Objectives</u>.  To  recover  small  to  moderate  concentrations  of  oil from  terrestrial  or  aquatic  areas,  where  larger  equipment  cannot  be brought in.

<u>Limitations</u>.  Accessibility,  high  viscosity  oils,  sheens,  adequate means  of  storage  or  disposal,  and  adverse  environmental  conditions (excessive wave heights or currents).

<u>General Instructions</u>.  Position the skimmer or pump suction hose in the area of heaviest oil concentration behind booms, berms, trenches, etc., or where water currents will drive the oil to the skimmer or hose intake.  Continually reposition the intake into area of thickest oil concentration.  Duck bill type skimmer heads should be fitted to suction hose  for  aquatic  spills  or  screens  for  terrestrial  spills.  Pump recovered oil to a temporary storage facility such as a tank truck, 55-gallon  drums,  pillow  tanks,  or  lined  pit.  This  technique  is illustrated in Figure 2.1.

When using portable skimmers in shallow water a hole may have to be excavated in the bottom of the shallow waterway if the skimmer draft is greater than the water depth.  Oil can now be herded or forced to the skimmer location by low pressure water flushing or by deploying a boom around a floating slick and pulling it to the floating skimmer.

<u>Logistics</u>.  The primary logistical requirements for using portable skimmers or pumps are given in Table 2.1.

<u>Variations</u>.  Portable skimmers can also be deployed from boats to recover open water spills contained by booms.  Skimmer is operated as described previously and may be used with a floating bladder tank for oil  storage  as  illustrated  in  Figure 2.2.  Portable  endless  rope skimmers  have  particular  application  in  shallow  water  areas  such  as wetlands  or  creeks.  A  typical  configuration  is  shown  in  Figure 2.3.

4-86



**Figure 2.1   OIL RECOVERY USING PORTABLE PUMP, SKIMMER HEAD, AND TANK TRUCK**

4-87

TABLE 2.2

LOGISTICAL REQUIREMENTS FOR PORTABLE SKIMMERS/PUMPS

| Logistics | Typical Recovery Rate for Thick Oil Layer (2 mm) | Typical Recovery Rate for Thin Oil Layer (.1 mm) |
|---|---|---|
| **Equipment** | | |
| ● High capacity trash pump w/3" suction hose | 75 gpm (50% oil) | 50 gpm (5% oil) |
| ● Portable wier skimmer | _____ | _____ |
| ● Portable disc skimmer | _____ | _____ |
| ● Number of pumps or skimmers | Dependent upon quantity of oil and rate of introduction to skimmer or pump. | |

**Personnel** - 1 person per pump suction hose, 1 to 2 persons for skimming and concentrating of oil, and 1 supervisor.

| Support | | Range of Capacities |
|---|---|---|
| ● Vacuum truck | | 6 to 140 barrels |
| ● Tank truck | | 20 to 160 barrels |
| ● 3" Suction hose | | 300 to 400 gpm max. |
| ● Pillow tanks | | 2 to 2,500 barrels |

4-88



Figure 2.2  CONTAINED OIL SKIMMING
WITH PORTABLE SKIMMER



Case 2:26-cv-05242-SVW-SSC    Document 12    Filed 05/14/26    Page 598 of 689    Page ID #:5545

Figure 2.3  ENDLESS ROPE SKIMMER

4-90

3.    Sorbent Recovery

Objectives.  To recover small quantities of oil from terrestrial or aquatic areas, especially films or sheens remaining after skimming or pumping operations have been completed.

Limitations.  Solidified or highly weathered oil, recovery and disposal of oiled sorbents, and possible interference by granular sorbents may be difficult to control on water surface collecting agents, if used simultaneously.

General Instructions.  Place sorbents directly on the oil and turn continually until completely oiled.  Put oiled sorbents in plastic bags or leak proof containers and replace with clean ones.  Inert substrates can be wiped clean with sorbent pads or sheets.  Sorbent sweeps or booms may be pulled between two boats across aquatic areas or anchored across slow moving streams to recover sheens.

Logistics.  The logistical requirements are heavily dependent on the type and degree of oil contamination and therefore cannot be accurately quantified prior to a spill.  Some of the basic equipment and materials required for sorbent recovery are pitchforks, rakes, shovels, boats (if needed), and plastic bags, drums, debris boxes, or other leakproof containers.

Variations.  Sorbents can be placed on the ground in areas of heavy spill activities to prevent contamination of facilities, paths, work areas, etc.

4-91

4.  Soil Removal

In cases where oils have penetrated the soil, excavation may be the only means for removing the contamination and preparing the area for restoration.

No standard instructions can be given regarding soil removal. This is a costly procedure with environmental damaging potential and must be confined to the smallest possible area. However, any soil contaminated will require removal.

Any area undergoing substrate removal will require restoration. A preliminary step prior to attempting restoration procedures involves returning the substrate surface to its original elevation.

APPENDIX 4.5

AIR QUALITY ADDENDUM

## 1.0 <u>Introduction</u>

This addendum replaces Section 4.2.1 and Appendix A of the Draft EIR/EIS. Air quality related comments on the DEIR/EIS that were not addressed in the Response to Comments are addressed herein. The general feeling of the reviewers of the DEIR/EIS was that more backup information was needed. This addendum provides that information.

The air quality modeling results have also been updated to reflect changes in the design of the Celeron/All American Pipeline since the preparation of the DEIR/EIS. The principal design change is for the Cadiz pump/heater station and tank farm. The current plan calls for five 300,000 bbl tanks rather than three 500,000 bbl tanks. The number of valves has been reduced from about 320 to about 140. Additionally, current plans call for the pumps at Cadiz to be natural gas turbine driven rather than electric. The other important change is that new emission factors are now being used for the natural gas heaters and gas turbine pump/heaters. These emission factors, based on manufacturer's specifications, are lower than those used in the DEIR/EIS.

## 2.0 APPLICABLE AIR QUALITY STANDARDS AND REGULATIONS

The National Ambient Air Quality Standards (NAAQS) and the California Ambient Air Quality Standards are shown in Table 2-1. State ambient air quality standards in Arizona and Texas are identical to the NAAQS. The New Mexico ambient standards, which differ from the NAAQS, are shown in Table 2-2.

The Federal Prevention of Significant Deterioration (PSD) increments for $SO_2$ and TSP are shown in Table 2-3. The newly adopted air quality increments for Santa Barbara County are shown in Table 2-4.

It is also relevant to note that the San Bernardino County Air Pollution Control District's New Source Review Rule (Regulation XIII) applies to any new source or modification to an existing source that would result in a net emission increase of any air contaminant of 250 lbs/day (except CO, which is 750 lbs/day).

4-94

TABLE 2-1

(REVISED DEIR/EIS TABLE A-1)

NATIONAL AND CALIFORNIA AMBIENT AIR QUALITY STANDARDS

| Pollutant | Averaging Time | California Standards[1,3,6] | National Standards[2] Primary[3,4] | National Standards[2] Secondary[3,5] |
|---|---|---|---|---|
| $O_3$ | 1-hour | 0.10 ppm (200 µg/m³) | 235 µg/m³ (0.12 ppm) | Same as Primary |
| CO | 8-hour | 9 ppm (10 mg/m³) | 10 mg/m³ (9 ppm) | Same as Primary |
| | 1-hour | 20 ppm (23 mg/m³) | 40 mg/m³ (35 ppm) | Same as Primary |
| $NO_2$ | Annual average | NS[7] | 100 µg/m³ (0.05 ppm) | Same as Primary |
| | 1-hour | 0.25 ppm (470 µg/m³) | NS | NS |
| $SO_2$ | Annual average | NS | 80 µg/m³ (0.03 ppm) | NS |
| | 24-hour | 0.05 ppm[8] (131 µg/m³) | 365 µg/m³ (0.14 ppm) | NS |
| | 3-hour | NS | NS | 1,300 µg/m³ |
| | 1-hour | 0.5 ppm (1,310 µg/m³) | NS | NS |
| TSP | Annual Geometric mean | 60 µg/m³ (30 µg/m³) | 75 µg/m³ | 60 µg/m³ |
| (PM10) | 24-hour | 100 µg/m³ (50 µg/m³) | 260 µg/m³ | 150 µg/m³ |
| Sulfates | 24-hour | 25 µg/m³ | NS | NS |
| Lead | 30-day | 1.5 µg/m³ | NS | NS |

TABLE 2-1

(REVISED DEIR/EIS TABLE A-1  CONTINUED)

| Pollutant | Averaging Time | California Standards[1,3,6] | National Standards[2] Primary[3,4] | Secondary[3,5] |
|---|---|---|---|---|
| | Calendar quarter | NS | 1.5 µg/m$^3$ | NS |
| $H_2S$ | 1-hour | 0.03 ppm (42 µg/m$^3$) | NS | NS |
| Ethylene | 8-hour | 0.1 ppm | NS | NS |
| | 1-hour | 0.5 ppm | | |
| Visibility-Reducing Particles | One observation | In sufficient amounts to reduce the prevailing visibility to less than 70 percent | | |

Source:  California Air Quality Data, Summary of Air Quality Data Gaseous and Particulate Pollutant, Annual Summary, Vol XII, 1980.

[1]California standards, other than CO, $SO_2$ (1-hour), and PM10, are values that are not to be equaled or exceeded. The CO, $SO_2$ (1-hour), and PM10 standards are not to be exceeded.  PMID represent particulate matter less than 10µ in diameter.

[2]National standards, other than those based on annual averages or annual geometric means, are not to be exceeded more than once per year.

[3]Concentration is in units in which it was promulgated.  Equivalent units given in parentheses are based upon a reference temperature of 25°C and a reference pressure of 760 mm of mercury.  All measurements of air quality are to be corrected to a reference temperature of 25°C and a reference pressure of 760 mm Hg (1,013.2 millibars).  In this table, ppm refers to ppm by volume, or micromoles of pollutant/mole of gas.

[4]The levels of air quality necessary, with an adequate margin of safety, to protect public health.  Each state must attain the primary standards no later than 3 years after the state implementation plan is approved by EPA.

[5]The levels of air quality necessary to protect the public welfare from any known or anticipated adverse effects of a pollutant.  Each state must attain the secondary standards within a "reasonable time" after the implementation plan is approved by the EPA.

[6]Prevailing visibility is defined as the greatest visibility attained or surpassed around at least half of the horizon circle, but not necessarily in continous sectors.

[7]NS = No Standard

[8]This state standard is violated if there is also a simultaneous violation of the state 1-hour oxidant standard or the state 24-hour suspended particulate matter standards.

TABLE 2-2

(REVISED DEIR/EIS TABLE A-2)

NEW MEXICO AIR QUALITY STANDARDS

| | New Mexico Standard | Federal Standards | |
| | | Primary | Secondary |
|---|---|---|---|
| **TSP** | | | |
| 24-hour average | 150 µg/m³ | 260 µg/m³ | 150 µg/m³ |
| Annual geometric mean | 60 µg/m³ | 74 µg/m³ | 60 µg/m³ |
| **SO₂** | | | |
| 24-hour average | 0.10 ppm (260 µg/m³) | 0.14 ppm | NS |
| Annual arithmetic mean | 0.02 ppm (52 µg/m³) | 0.03 ppm | NS |
| 3-hour average | NS[1] | NS | 0.50 ppm |
| **CO** | | | |
| 8-hour average | 8.7 ppm (9.7 mg/m³) | 9 ppm | 9 ppm |
| 1-hour average | 13.1 ppm (14.5 mg/m³) | 35 ppm | 35 ppm |
| **O₃** | | | |
| 1-hour average | 0.06 ppm (120 (µg/m³) | 0.12 ppm | 0.12 ppm |
| **NO₂** | | | |
| 24-hour average | 0.10 ppm (200 µg/m³) | NS | NS |
| Annual arithmetic mean | 0.05 ppm (100 µg/m³) | 0.05 ppm | 0.05 ppm |
| **Lead** | | | |
| Calendar quarterly Arithmetic average | NS | 1.50 µg/m³ | NS |

Source:  Air Quality Bureau Annual Report, State of New Mexicio Health and Environmental Department,
Environmental Improvement Division, 1981-1982.

[1]NS = No Standard

TABLE 2-3

(REVISED DEIR/EIS TABLE A-3)

PSD INCREMENT CEILINGS

$(\mu g/m^3)$

| | Area Classification | |
|---|---|---|
| Pollutant and Averaging Time | Class I | Class II |
| $SO_2$ | | |
| Annual | 2 | 20 |
| 24-hour | 5 | 91 |
| 3-hour | 25 | 512 |
| TSP | | |
| Annual | 5 | 19 |
| 24-hour | 10 | 37 |

Source:   EPA 40 CFR 52.21

TABLE 2-4

(REVISED DEIR/EIS TABLE A-4)

SANTA BARBARA COUNTY RULE 205.C AIR QUALITY INCREMENTS

| | Maximum Allowable Increase $(\mu g/m^3)$ | | Baseline Date | Air Quality Standard |
|---|---|---|---|---|
| | Class I | Class II | | |
| CO: | | | | |
| 8-hour maximum | 200 | 2,500 | 1/1/84 | 10,000 |
| 1-hour maximum | 800 | 10,000 | | 40,000 |
| $NO_2$: | | | | |
| Annual Arithmetic Mean | 2 | 25 | 1/1/84 | 100 |
| 1-hour maximum | 10 | 100 | | 470 |
| Reactive Organic Compounds | | | | |
| 3-hour maximum | 3 | 40 | 1/1/84 | 160 |
| Particulate Matter 10: | | | | |
| 24-hour maximum | 2 | 12 | 1/1/84 | 50 |

Source:   Santa Barbara County Air Pollution Control District, Air
          Quality Rules and Regulations, 1984.

4-98

## 3.0  BASELINE AIR QUALITY

The relevant air quality data for 1980, 1981, and 1982 for Santa Barbara County, San Luis Obispo County, Kern County, and the Southeast Desert Air Basin of California are summarized in Tables 3-1, 3-2, 3-3, and 3-4, respectively.  The stations shown are those nearest the pipeline route.  Similar data for Arizona, New Mexico, and Texas are given in Tables 3-5, 3-6, and 3-7, respectively.

In assembling this data, preference was given to stations with relatively complete data during the 3-year period.  If additional data were used to establish the background pollutant concentration at a specific point along the pipeline for use in comparing predicted total concentrations to standards, the specific data are identified in Section 6.0 of this addendum.

TABLE 3-1

(REVISED DEIR/EIS TABLE A-5)

SUMMARY OF RELEVANT SANTA BARBARA COUNTY AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) | | $NO_2$ ($\mu g/m^3$) | | $SO_2$ ($\mu g/m^3$) | | TSP ($\mu g/m^3$) | |
| | | Maximum 1-Hour | Mean Daily Maximum 1-Hour | Maximum 1-Hour | Annual Average | Maximum 1-Hour | Annual Average | Maximum 24-Hour | Annual Geometric Mean |
|---|---|---|---|---|---|---|---|---|---|
| El Capitan | 1980 | 0.12 | 0.061 | NA[1] | NA | 26 | 0 | 302* | 103 |
| | 1981 | 0.11 | 0.056 | NA | NA | 26 | 0 | 295 | 98 |
| | 1982 | 0.15 | 0.052 | NA | NA | 26 | 0 | 202 | 84 |
| Santa Ynez | 1980 | 0.09 | 0.039 | NA | NA | NA | NA | NA | NA |
| | 1981 | 0.11 | 0.048 | NA | NA | NA | NA | NA | NA |
| | 1982 | 0.11 | 0.053 | NA | NA | NA | NA | NA | NA |
| Santa Maria | 1980 | 0.09[2] | 0.044 | NA | NA | 183 | 5 | 293[4] | 98 |
| | 1981 | 0.10[2] | 0.043 | 75[3] | 17 | 183 | 5 | 416[4] | 92 |
| | 1982 | 0.10[5] | 0.031 | 94[3] | 17 | 314 | 3 | 260[4] | 65 |
| Maricopa | 1981 | NA | NA | NA | NA | NA | NA | 187 | 64 |
| | 1982 | NA | NA | NA | NA | NA | NA | 106 | 27 |

Source:  California Air Quality Data Summary of Air Quality Data Gaseous and Particulate Pollutants, Annual Summary, Vols. XII-XIV, 1980-1982.

Sampling Stations:

[1]Not Available

[2]East Main

[3]Glacier

[4]Library

[5]McClelland

*See note in Section 3.2.1.2 regarding El Capitan TSP.

TABLE 3-2

SUMMARY OF RELEVANT SAN LUIS OBISPO COUNTY AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) | | $NO_2$ ($\mu g/m^3$) | | $SO_2$ ($\mu g/m^3$) | | TSP ($\mu g/m^3$) | |
|---|---|---|---|---|---|---|---|---|---|
| | | Maximum 1-Hour | Mean Daily Maximum 1-Hour | Maximum 1-Hour | Annual Average | Maximum 1-Hour | Annual Average | Maximum 24-Hour | Annual Geometric Mean |
| Nipomo | 1980 | 0.10 | 0.044 | 188 | 17 | 445 | 10 | 139 | 59 |
| | 1981 | 0.10 | 0.041 | 94 | 23 | 707 | 10 | 135 | 56 |
| | 1982 | 0.10 | 0.043 | 75 | 17 | 210 | 5 | 90 | 43 |

Source:   California Air Quality Data Summary of Air Quality Data Gaseous and Particulate Pollutants, Annual Summary, Vols. XII-XIV, 1980-1982.

4-101

TABLE 3-3

(REVISED DEIR/EIS TABLE A-6)

SUMMARY OF RELEVANT KERN COUNTY AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $O_3$ (ppm) Mean Daily Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Annual Average | $SO_2$ ($\mu g/m$) Maximum 1-Hour | $SO_2$ ($\mu g/m$) Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | TSP ($\mu g/m^3$) Annual Geometric Mean | CO ($mg/m^3$) Maximum 1-Hour | CO ($mg/m^3$) Maximum 8-Hour |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bakersfield | 1980 | 0.17[1] | 0.057 | 244 | 68 | 498 | 29 | 470[1] | 143 | 19 | 14.1 |
|  | 1981 | 0.18[2] | 0.069 | 301 | 64 | 655 | 26 | 405[1] | 135 | 16 | 11.6 |
| 1982 |  | 0.18[2] | 0.058 | 0.11[1] | 207 | 56 | 236 | 16 | 250[1] | 116 | 16 | 12.9 |
| Taft | 1980 | NA[3] | NA | NA | NA | NA | NA | 287 | 146 | NA | NA |
|  | 1981 | NA | NA | NA | NA | NA | NA | 411 | 112 | NA | NA |
|  | 1982 | NA | NA | NA | NA | NA | NA | 278 | 88 | NA | NA |

Source:  California Air Quality Data Summary of Air Quality Data Gaseous and Particulate Pollutants, Annual Summary, Vols. XII-XIV, 1980-1982.

Sampling Stations:

[1]Chester

[2]Edison

[3]Not Available

TABLE 3-4

(REVISED DEIR/EIS TABLE A-7)

SUMMARY OF RELEVANT AIR QUALITY DATA IN SOUTHEAST DESERT AIR BASIN

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $O_3$ (ppm) Mean Daily Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | TSP ($\mu g/m^3$) Annual Geometric Mean | CO ($mg/m^3$) Maximum 1-Hour | CO ($mg/m^3$) Maximum 8-Hour |
|---|---|---|---|---|---|---|---|---|---|
| Barstow | 1980 | 0.19 | 0.057 | 226 | 49 | 224 | 71 | 7 | 5.6 |
|  | 1981 | 0.16 | 0.063 | 564 | 47 | 300 | 71 | 7 | 2.4 |
|  | 1982 | 0.16 | 0.056 | 376 | 47 | 116 | 46 | 6 | 3.8 |
| Twentynine Palms | 1980 | 0.12 | 0.051 | NA[1] | NA | 244 | 50 | 9 | 8.9 |
|  | 1981 | 0.15 | 0.060 | NA | NA | 160 | 53 | 9 | 8.4 |
|  | 1982 | 0.13 | 0.062 | NA | NA | 96 | 41 | 3 | 2.1 |
| Boron | 1980 | NA | NA | NA | NA | 426 | 73 | NA | NA |
|  | 1981 | NA | NA | NA | NA | 129 | 52 | NA | NA |
|  | 1982 | NA | NA | NA | NA | 140 | 43 | NA | NA |
| Mojave | 1980 | NA | NA | NA | NA | 195 | 73 | NA | NA |
|  | 1981 | NA | NA | NA | NA | 213 | 66 | NA | NA |
|  | 1982 | NA | NA | NA | NA | 186 | 68 | NA | NA |

Source:  California Air Quality Data Summary of Air Quality Data Gaseous and Particulate Pollutants, Annual Summary, Vols. XII-XIV, 1980-1982.

[1]Not Available

4-103

TABLE 3-5

(REVISED DEIR/EIS TABLE A-8)

SUMMARY OF RELEVANT ARIZONA AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 24-Hour[1] | $NO_2$ ($\mu g/m^3$) Annual Average | $SO_2$ ($\mu g/m^3$) Maximum 24-Hour | $SO_2$ ($\mu g/m^3$) Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | TSP ($\mu g/m^3$) Annual Average | CO ($mg/m^3$) Maximum 1-Hour | CO ($mg/m^3$) Maximum 8-Hour |
|---------|------|------|------|------|------|------|------|------|------|------|
| Buckeye (Phoenix)[2] | 1980 | 0.06 (0.12) | (324) | (75) | 16 | 3 | 600 | 127 | (18.3) | (10.3) |
| | 1981 | (0.16) | (176) | (75) | 14 | 2 | 409 | 127 | (19.4) | (11.4) |
| | 1982 | (0.11) | (141) | (67) | 11 | 1 | 196 | 96 | (18.3) | (11.4) |
| Coolidge | 1980 | 0.07 | 86 | 10 | 22 | 1 | 220 | 87 | NA | NA |
| | 1981 | NA[3] | 40 | 13 | 74 | 4 | 253 | 92 | NA | NA |
| | 1982 | NA | 28 | 16 | 49 | 4 | 185 | 76 | NA | NA |
| Maricopa | 1980 | 0.05 | 94 | 10 | NA | NA | 219 | 55 | 6 | 1 |
| | ±1981 | NA | 33 | 7 | 17 | 2 | 155 | 54 | 16 | 9 |
| | 1982 | NA | 19 | 7 | 32 | 3 | 110 | 54 | NA | NA |
| Willcox | 1980 | NA | 27 | 18 | 24 | 13 | 160 | 44 | NA | NA |
| | 1981 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| | 1982 | NA | NA | NA | NA | NA | NA | NA | NA | NA |

Source:  1982 Air Quality Control for Arizona, Arizona Department of Health Services 1982.

[1]For information only.  Arizona does not have a 24-hour $NO_2$ standard.

[2]The Phoenix E. Monroe station $NO_2$ and S. Central Station $O_3$ and CO concentrations are given in brackets.

[3]Not Available

TABLE 3-6

(REVISED DEIR/EIS TABLE  A-9)

SUMMARY OF RELEVANT NEW MEXICO AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 24-Hour | $NO_2$ ($\mu g/m^3$) Annual Average | $SO_2$ ($\mu g/m^3$) Maximum 24-Hour | $SO_2$ ($\mu g/m^3$) Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | TSP ($\mu g/m^3$) Annual Geometric Mean | CO ($mg/m^3$) Maximum 1-Hour | CO ($mg/m^3$) Maximum 8-Hour |
|---|---|---|---|---|---|---|---|---|---|---|
| Lordbury | 1980 | NA[1] | 56 | 19 | 26 | 0 | 200 | 56 | NA | NA |
|  | 1981 | NA | 38 | 19 | 26 | 0 | 110 | 62 | NA | NA |
|  | 1982 | NA | 38 | 19 | 26 | 0 | 193 | 55 | NA | NA |
| Denning | 1980 | NA | 56 | 38 | 0 | 0 | 178 | 70 | NA | NA |
|  | 1981 | NA | 38 | 38 | 26 | 0 | 134 | 70 | NA | NA |
|  | 1982 | NA | 38 | 19 | 26 | 0 | 262 | 60 | NA | NA |
| Anthony | 1980 | (0.10)[2] | 56 | 19 | 0 | 0 | 391 | 114 | (13.0) | (6.3) |
|  | 1981 | (0.14) | 75 | 19 | 26 | 0 | 470 | 122 | NA | NA |
|  | 1982 | (0.10) | 38 | 19 | 26 | 0 | 369 | 107 | NA | NA |

Source:  Air Quality Bureau Annual Report, State of New Mexico Health and Environmental Department, Environmental Improvement Division 1981-1982.

[1]Not Available

[2]()Las Cruces station (#6W) substituted for CO, La Union station (#60) for ozone.

4-105

TABLE 3-7

(REVISED DEIR/EIS TABLE A-10)

SUMMARY OF RELEVANT TEXAS AIR QUALITY DATA

| Station | Year | $O_3$ (ppm) Maximum 1-Hour | $NO_2$ ($\mu g/m^3$) Maximum 24-Hour | $NO_2$ ($\mu g/m^3$) Annual Average | $SO_2$ ($\mu g/m^3$) Maximum 24-Hour | $SO_2$ ($\mu g/m^3$) Annual Average | TSP ($\mu g/m^3$) Maximum 24-Hour | TSP ($\mu g/m^3$) Annual Geometric Mean | CO ($mg/m^3$) Maximum 1-Hour | CO ($mg/m^3$) Maximum 8-Hour |
|---|---|---|---|---|---|---|---|---|---|---|
| Odessa | 1980 | 0.11 | NS[1] | 19 | 26 | 0 | 201 | 58 | 20.9 | 10.8 |
|  | 1981 | 0.10 | NS | 19 | 0 | 0 | 250 | 59 | 18.6 | 5.8 |
|  | 1982 | 0.13 | NS | 19 | 26 | 0 | 402 | 71 | 6.3 | NA |
| San Antonio | 1980 | 0.12 | NS | 38 | 26 | 0 | 188 | 98 | 21.2 | 11.6 |
|  | 1981 | 0.14 | NS | 38 | 26 | 0 | 143 | 76 | 20.4 | 9.0 |
|  | 1982 | 0.14 | NS | 19 | 26 | 0 | 217 | 112 | 15.9 | 9.0 |

Sources:   Summary of Total Suspended Particulate Data, Texas Air Control Board 1980-1982.
Summary of Total Gaseous Pollutant Data Taxes Air Control Board 1980-1982.

[1]No standard in Texas.

[2]Not Available.

## 4.0 DEVELOPMENT OF PROJECT EMISSION ESTIMATES

The emissions inventory was developed for the construction and operational phases of the Getty and Celeron/All American pipelines. Input data to the emission estimations were suppled by Getty and All American. Emissions were calculated from manufacturer's specifications and emission factors from AP-42 and California Air Resources Board (CARB). The following sections provide the methods used to calculate the emissions for each phase.

### 4.1 Construction Emissions

Construction emissions were calculated for a pipeline spread that would construct a portion of the pipeline. It was assumed that Getty would use three spreads to construct its pipeline and Celeron/All American would use five spreads for its construction. Since each spread was identical, construction emissions were calculated for one spread and were assumed to be the same for the other spreads. Pollutants were projected in our typical pipeline spread to be emitted from several types of sources. These include: emissions from heavy-duty construction equipment, secondary emissions from passenger vehicles for transportation of workers to the site, dust and smoke from bush clearing and burning, and fugitive dust from the disturbed areas along the ROW. Tables 4-1 and 4-2 provide the parameters and emission factors used in the calculations of the Getty and Celeron/All American construction emissions, respectively. Table 4-3 shows the estimated emissions per spread using the information provided by Getty and Celeron/All American and emission factors from AP-42 and CARB vehicle emission factors.

### 4.2 Operational Emissions

Operational emissions consisted of the pollutants being emitted from natural gas-fired heaters and/or compressors from several pumping stations along the pipeline route; evaporative and fugitive hydrocarbon losses from valves, flanges and seals; and evaporative losses from the oil storage tank farm in Cadiz, California.

### Heaters and Compressors

$NO_x$, HC, and CO emission estimates for the heaters and compressors were based upon manufacturers specifications for the heating requirement at each station. $SO_2$ and TSP emissions were based upon emission factors found in AP-42, Section 1.4. These emission factors were 0.6 lb/MMSCF and 10.0 lb/MMSCF, respectively. The conversion factor of 1,000 BTU/SCF was used to determine the amount of fuel used based upon the heat requirements at each pumping station. The operational characteristics for the heaters/compressors at each pump station are shown in Table 4-4. Table 4-5 presents the emissions for each pump station along the proposed route.

TABLE 4-1

OPERATIONAL PARAMETERS USED TO CALCULATE CONSTRUCTION EMISSIONS
FOR THE PROPOSED GETTY PIPELINE

| Source Type[1] | Number of[1] Equipment | Operational[1] Parameter | CO | HC | NO$_x$ | SO$_2$ | PM | Units |
|---|---|---|---|---|---|---|---|---|
| Tractors[2] | 21 @ 105 HP | 7.2 hrs/day | 2.39 | 0.69 | 9.08 | 0.85 | 0.69 | gm/HP-hr |
| Bulldozers[2] | 6 @ 200 HP | 7.2 hrs/day | 1.83 | 0.57 | 12.5 | ,0.87 | 0.41 | gm/HP-hr |
| Heavy Duty Gasoline Vehicles[2] | 10 @ 50 HP | 7.2 hrs/day | 198.0 | 6.49 | 4.79 | 0.26 | 0.30 | gm/HP-hr |
| Light Duty Gasoline Vehicles[3] | 16 | 68 mi/day | 12.25 | 1.3 | 2.44 | 0.13 | 0.35 | gm/mi |
| Miscellaneous Equipment – Diesel[2] | 3 @ 250 HP | 7.2 hrs/day | 2.82 | 1.04 | 14.8 | 0.93 | 0.90 | gm/HP-hr |
| Miscellaneous Equipment – Gasoline[2] | 8 @ 85 HP | 7.2 hrs/day | 198.0 | 6.49 | 4.79 | 0.26 | 0.30 | gm/HP-hr |
| Graders[2] | 6 @ 135 HP | 7.2 hrs/day | 2.19 | 0.49 | 10.5 | 0.87 | 0.63 | gm/HP-hr |
| Secondary Vehicle Emissions[3] | 129 | 68 mi/day | 12.25 | 1.3 | 2.44 | 0.13 | 0.35 | gm/mi |
| Burning (Weeds)[4] | 9.1 acres | 3.2 tons/acre | 85 | 12 | NA | NA | 15 | lb/ton |
| Disturbed Areas[5] | 9.1 acres | NA[6] | NA | NA | 1.2 | NA | NA | ton/acre-mos. |

*Construction Parameters (per spread) — Emission Factors[1]*

[1]Source:  Getty Permit Application.

[2]Emission Factor:  AP-42, Sec. 3.2.7.2.

[3]Emission Factor:  Composite Emission Factors (45 mph); light duty passenger vehicles, cars, 1979.

[4]Emission Factor:  AP-42, Sec. 2.4.3.

[5]Emission Factor:  AP-42, Sec. 3.2.7.2.

[6]Not Applicable

TABLE 4-2

OPERATIONAL PARAMETERS USED TO CALCULATE CONSTRUCTION EMISSIONS
FOR THE PROPOSED CELERON/ALL AMERICAN PIPELINE

| Source Type[1] | Number of[1] Equipment | Operational[1] Parameter | $CO$ | $HC$ | $NO_x$ | $SO_2$ | $PM$ | Units |
|---|---|---|---|---|---|---|---|---|
| | | | Emission Factors[2] | | | | | |
| Tractors | 28 | 10 hrs/day | 0.386 | 0.110 | 1.47 | 0.137 | 0.112 | lb/hr |
| Farm Tractors | 22 | 10 hrs/day | 0.355 | 0.172 | 0.996 | 0.093 | 0.136 | lb/hr |
| Heavy Duty Diesel Vehicles | 57 | 108.4 mi/day | 28.7 | 4.6 | 20.9 | 2.8 | 1.3 | gm/mi |
| Heavy Duty Gasoline Vehicles | 5 | 108.4 mi/day | 188 | 19.4 | 12.5 | NA[3] | NA | gm/mi |
| Light Duty Gasoline Vehicles | 28 | 108.4 mi/day | 42.8 | 6.5 | 5.3 | NA | NA | gm/mi |
| Miscellaneous Equipment – Diesel | 18 | 10 hrs.day | 0.414 | 0.157 | 2.27 | 0.143 | 0.133 | lb/hr |
| Miscellaneous Equipment – Gasoline | 33 | 10 hrs/day | 17.0 | 0.728 | 0.412 | 0.023 | 0.026 | lb/hr |
| Graders | 2 | 10 hrs/day | 0.215 | 0.054 | 1.05 | 0.086 | 0.061 | lb/hr |
| Secondary Vehicle Emissions | 335 | 22 mi/day | 29.8 | 4.7 | 8.0 | 0.23 | 0.60 | gm/mi |
| Burning (Weeds) | 18.18 acres | 3.2 tons/acre | 85 | 12 | NA | NA | 15 | lb/ton |
| Disturbed Areas | 18.18 acres | NA | NA | NA | 1.2 | NA | NA | ton/acre-mo. |

[1]Source:  All American Pipeline Company.

[2]AP-42, Secs. 2.4.3, 3.1.1.1, 3.1.4.2, 3.1.4.3, 3.1.5.1, 3.1.5.2, 3.2.6.2, 3.2.7.2, 11.2.4.3.

[3]Not Applicable

TABLE 4-3

EMISSIONS INVENTORY FOR CONSTRUCTION PHASE FOR THE
GETTY AND CELERON/ALL AMERICAN PIPELINE

| | Emissions (lb/day) | | | | |
|---|---|---|---|---|---|
| | $NO_x$ | $SO_2$ | TSP | CO | HC |
| **PIPELINE CONSTRUCTION[1]** | | | | | |
| **Celeron/All American** | | | | | |
| Tractors | 630.7 | 58.9 | 61.3 | 186.2 | 68.6 |
| Graders | 21.0 | 1.7 | 1.2 | 4.3 | 1.1 |
| Misc. Equipment-Diesel | 408.6 | 25.7 | 25.0 | 74.5 | 28.3 |
| Misc. Equipment-Gasoline | 136.0 | 7.6 | 8.6 | 5,610.0 | 240.2 |
| Heavy Duty Diesel Vehicles | 284.7 | 38.1 | 17.7 | 390.9 | 62.7 |
| Heavy Duty Gasoline Vehicles | 14.9 | 0.0 | 0.0 | 224.6 | 23.2 |
| Light Duty Gasoline Vehicles | 35.5 | 0.0 | 0.0 | 286.4 | 43.5 |
| Secondary Vehicle Emissions | 130.0 | 3.7 | 9.7 | 484.2 | 76.4 |
| Weed Burning | 0.0 | 0.0 | 872.7 | 4,945.5 | 698.2 |
| Wind Erosion | 0.0 | 0.0 | 1,454.5 | 0.0 | 0.0 |
| TOTAL | 1,661.4 | 135.7 | 2,450.7 | 9,206.6 | 1,242.20 |
| **Getty** | | | | | |
| Tractors | 273.0 | 25.2 | 21.0 | 71.4 | 21.0 |
| Bulldozers | 204.0 | 14.4 | 6.6 | 30.0 | 9.0 |
| Heavy Duty Gasoline Vehicles | 32.0 | 2.1 | 2.4 | 1,340.0 | 44.0 |
| Light Duty Gasoline Vehicles | 4.8 | 0.3 | 0.6 | 25.6 | 3.2 |
| Misc. Equipment-Diesel | 150.9 | 9.6 | 9.3 | 28.8 | 10.5 |
| Misc. Equipment-Gasoline | 44.0 | 2.8 | 3.2 | 1,829.6 | 60.0 |
| Graders | 115.8 | 9.6 | 6.6 | 24.0 | 5.4 |
| Secondary Vehicle Emissions | 40.5 | 2.2 | 5.0 | 202.8 | 21.5 |
| Weed Burning | | | 436.8 | 2,475.2 | 349.4 |
| Disturbed Areas | 0.0 | 0.0 | 727.2 | 0.0 | 0.0 |
| TOTAL | 865.0 | 66.2 | 1,218.7 | 6,027.4 | 524.0 |

Source:  Emission Factors = AP-42, Sec. 2.4, Sec. 3.1, Sec. 3.2, and Sec. 11.2.

TABLE 4-4

OPERATIONAL PARAMETERS USED TO CALCULATE PUMP STATION EMISSIONS
FOR THE PROPOSED CELERON/ALL AMERICAN PROJECT

| Pump Station | Number of Heaters | Number of Pump Seals | Number of Valves-Flanges | Heat Requirement (MMBTU/hr) | Throughput (BPD) |
|---|---|---|---|---|---|
| Cuyama | 1 | 2 | 30 | 51.5 | 300,000 |
| Emidio[2] | 0 | 4 | 35 | 0 | 230,000 |
| Tejon | 0 | 4 | 30 | 0 | 230,000 |
| Twelve-Gauge | 2 | 4 | 30 | 52.7 | 230,000 |
| Cadiz[3] | 2 | 4 | 138 | 75.9 | 300,000 |
| La Paz[3] | 2 | 4 | 40 | 75.3 | 300,000 |
| Gila[3] | 2 | 4 | 40 | 86.1 | 300,000 |
| Coolidge[3] | 2 | 4 | 40 | 68.1 | 300,000 |
| Tom Mix[4] | 2 | 4 | 40 | 0 | 300,000 |
| Hot Springs[3] | 2 | 4 | 40 | 75.9 | 300,000 |
| Lordsburg | 2 | 4 | 40 | 90.7 | 300,000 |
| Anthony | 2 | 4 | 40 | 88.2 | 300,000 |
| Salt Flats | 2 | 4 | 40 | 83.1 | 300,000 |
| Wink | 2 | 4 | 54 | 89.9 | 300,000 |
| McCamey | 0 | 0 | 54 | 0 | 300,000 |

[1]$NO_x$ emission estimates were manufacturer's specifications, G.C. Branch Co., Tulsa, Oklahoma, July, 1984. $SO_2$ emissions were calculated using AP-42, Sec. 1.4-1; 0.6 lb-$SO_2$/$10^6$ SCF and 1000 BTU/scf; TSP emissions were calculated using AP-42, Sec. 1.4-1; 10 lb-TSP/$10^6$ scf and 1000 Btu/scf; HC emissions for pump seals were calculated using AP-42, Sec. 9.1.2; 3 lb-HC/seal-day; HC emissions for valves and flanges were calculated using AP-42, Sec. 9.1.2; 0.15 lb/valve-day.

[2]Two heaters will be in place at Emidio and will be used in the start-up (low throughput) phase. However, once the actual throughput approaches the maximum throughput consistently, these heaters will not be used.

[3]Heaters and compressors will be combined in a waste heat recovery process.

[4]Compressors only.

4-111

TABLE 4-5

EMISSIONS INVENTORY FOR THE OPERATION PHASE
FOR THE GETTY AND CELERON/ALL AMERICAN PIPELINE

| | Emissions (lb/day) | | | | |
|---|---|---|---|---|---|
| | $NO_x^1$ | $SO_2^2$ | $TSP^2$ | $CO^1$ | $HC^{1,3}$ |
| **PIPELINE OPERATION** | | | | | |
| **Las Flores - Emidio** | | | | | |
| Cuyama Pumping Station | | | | | |
| Heaters | 192.0 | 0.6 | 1.1 | 48.0 | 8.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| **Emidio - Blythe** | | | | | |
| Emidio Pump Station | | | | | |
| Heaters | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 17.3 |
| Tejon Pump Station | | | | | |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 16.5 |
| Twelve-Gauge Pump Station | | | | | |
| Heaters | 197.3 | 0.8 | 12.6 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 16.5 |
| Cadiz Pump Station | | | | | |
| Heaters-Compressors | 480.4 | 1.1 | 18.2 | 0.0 | 0.0 |
| Tanks | 0.0 | 0.0 | 0.0 | 0.0 | 75.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 32.7 |
| **Blythe - McCamey** | | | | | |
| La Paz Pump Station | | | | | |
| Heaters-Compressors | 480.0 | 1.1 | 18.1 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| Gila Pump Station | | | | | |
| Heaters-Compressors | 483.4 | 1.2 | 20.7 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| Coolidge Pump Station | | | | | |
| Heaters-Compressors | 481.4 | 1.0 | 16.3 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| Tom Mix Pump Station | | | | | |
| Compressors | 479.6 | 0.0 | 0.0 | 168.4 | 48.9 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |

4-112

TABLE 4-5 (continued)

EMISSIONS INVENTORY FOR THE OPERATION PHASE
FOR THE GETTY AND CELERON/ALL AMERICAN PIPELINE

| | Emissions (lb/day) | | | | |
|---|---|---|---|---|---|
| | $NO_x^1$ | $SO_2^2$ | $TSP^2$ | $CO^1$ | $HC^{1,3}$ |
| **Hot Springs Pump Station** | | | | | |
| Heaters-Compressors | 477.6 | 1.1 | 18.2 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| **Lordsburg Pump Station** | | | | | |
| Heaters | 185.2 | 1.3 | 21.8 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| **Anthony Pump Station** | | | | | |
| Heaters | 232.3 | 1.3 | 21.2 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| **Salt Flats Pump Station** | | | | | |
| Heaters | 173.2 | 1.2 | 19.7 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 18.0 |
| **Wink Pump Station** | | | | | |
| Heaters | 236.7 | 1.3 | 21.6 | 0.0 | 0.0 |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 20.1 |
| **McCamey Delivery Station** | | | | | |
| Fugitive | 0.0 | 0.0 | 0.0 | 0.0 | 8.1 |

Source:  [1]$NO_x$, HC, CO Heater/Compressor Emissions- Manufacturer's Specification, The G.C. Broach Co., Tulsa, Oklahoma, July 1984.

Source:  [2]$SO_2$ and TSP Emissions-AP-42, Sec. 1.4-1.

Source:  [3]Fugitive HC Emissions-AP-42, Sec. 9.1.2.

## Valves, Flanges, and Pump Seals

Evaporative HC emissions are emitted due to leaks from miscellaneous valves, flanges, and seals. AP-42 emission factors of 0.15 lb/day-valve (for valves and flanges) and 3.0 lb/day-seal (for pump seals) were used to calculate the fugitive HC losses due to these sources at each pump station. Table 4-4 gives the number of valves and flanges at each site. It is assumed that 6 pump seals would be installed at each pump station. The fugitive emissions are given in Table 4-5 and are broken down for each station.

## Oil Storage Tanks

The hydrocarbon emissions from the crude oil storage tanks at Cadiz, shown in Table 4-5, were determined as the sum of the standing storage loss, $L_s$, and the working loss, $L_w$. The standing storage loss was calculated from the formula (AP-42, Supplement 12)

$$L_s = K_s \, V^N \, P^* \, D \, M_v K_c E_f$$

where,

$K_s$ = seal factor = 0.2 $[\text{lb-mole}]/[\text{ft(mph)}^N \text{ yr}]$

$V$ = average wind speed at tank site = 10 mph
    (mean of annual averages for Daggett and Rice)

$N$ = seal-related wind speed experiment = 1.0

$P^*$ = vapor pressure function = 0.160
    (assume product true vapor pressure of 7.0 psia)

$D$ = tank diameter = 183 ft

$M_v$ = average vapor molecular weight = 50 lb/lb mole

$K_c$ = product factor = 0.4

$E_f$ = secondary seal factor = 0.25 (tank and seal in good condition)

The annual standing storage loss thus calculated is 293 lbs/year per tank; the 5-tank total is, therefore, 0.7 tons/year (4 lbs/day). The working loss was calculated from the formula

$$L_w = \frac{0.943 \, QCW}{D}$$

where,

$Q$ = annual throughput = 300,000 x 365 barrels

$C$ = drainage factor = 0.0060 bbl/1,000 ft$^2$

$W$ = density of the crude oil = 7.67 lb/gal

$D$ = tank diameter = 183 ft

4-114

The working loss is 5,190 lbs/year tank; the 5-tank total is 13 tons/year (71 lb/day).

### Relief Tank

The plan for both the Getty pipeline and Celeron/All-American pipeline is to have a relief tank at Emidio to handle temporary and infrequent surges in the pipeline pressure, such as would result after the closing of a block valve (before the pumps shut down). As a worst case, it is estimated that one day per year it would be necessary to divert 5,000 bbl of oil into the relief tank. Since it is necesssary that the tank be able to fill quickly, a fixed-roof tank without an internal floater is best suited to this application. However, the HC emissions resulting from a worst-case surge, though short term in nature ($\leq$ 1 hour), can be sizable for a fixed-roof tank. The emission factor for the working losses from a fixed-roof tank is calculated from the formula (AP-42, Supplement 12):

$$L_w = 0.024\ M_v P K_N K_C$$

where,

$M_v$ = molecular weight of the vapor = 50 lb/lb-mole

$P$ = true vapor pressure of the crude oil  7.0 psia

$K_N$ = turnover factor = 1.0

$K_C$ = crude oil factor = 0.84

The resulting emission factor is 7.1 lbs/1000 gals. Therefore, the working loss for a 5,000 bbl surge is 1,490 lbs of HC. It should be stressed that such a release does not occur during normal pipeline operation and represents a worst-case estimate.

## 5.0  MODELING METHODOLOGY

### 5.1  Nonreactive Modeling

In order to calculate maximum project concentrations from the construction phase of the pipeline, the Industrial Source Complex (ISC) model was used. This model was selected because of its ability to simulate a line source, which is most appropriate for the construction phase. The construction emissions were assumed to be distributed over a 5-mile by 100-ft rectangle. Receptors were assumed to be placed along the pipeline length every 100 meters downwind from the line source. Only short-term concentrations were calculated since construction occurs for a relatively short period of time at any location. One-hour average concentrations were calculated using the ISC model for two meteorological conditions. Table 5-1 shows the model inputs used in the calculations. Since the construction workers would be working 10-hour days (during daylight hours), it was assumed (worst case) that a maximum of 1 hour would occur during stable, low wind speed conditions. Thus, maximum 1-hour concentrations were derived from the results of the ISC model for the stable case (stability class F). However, since the stable condition could occur only during the first hour of construction each day, the remaining hours would probably be unstable to neutral. Under worst-case conditions, it was assumed that the remainder of the hours would be neutral. (Neutral, low wind speed conditions could occur during cloudy conditions.) Thus, maximum 3- and 8-hour average concentrations were calculated by allowing 1 hour of stable conditions and having the remainder of the hours be neutral stability and light wind speeds. Maximum 24-hour concentrations were computed assuming 1 hour of stable conditions and 9 hours of neutral conditions. The remaining 14 hours would have no effect on the 24-hour average concentrations, due to the planned 10-hour workday.

For the operational phase, the Environmental Protection Agency (EPA) PTPLU and VALLEY models were used to determine the maximum project concentrations at each pump station. The PTPLU model was used to model flat-terrain, short-term situations. The VALLEY model was used for complex terrain, short-term scenarios and annual average modeling.

In the near-field and in relatively smooth terrain, the PTPLU model was used to calculate maximum short-term concentrations from the operation of the proposed pipeline. Since no source orientations have been finalized, all point sources at each station were conservatively assumed to be omitted from a single location. For each pumping/heating station, 1-hour concentrations were computed for a series of meteorological conditions in order to determine the 1-hour maximum concentration. The worst-case, 3-hour concentration was conservatively determined by allowing the 1-hour concentration to persist for 3 hours. Maximum 8-hour concentrations were calculated for three scenarios. First, the maximum 1-hour concentration during unstable conditions was assumed to persist for 4 hours in the worst-case direction. The remaining hours were assumed to be from a direction that would have no effect on the maximum concentration. Secondly, the maximum 1-hour neutral stability concentration was allowed to persist for 8 hours. Thirdly, the maximum 1-hour concentration during stable conditions persisted for 6 hours with the remaining hours having no effect. The

4-116

## TABLE 5-1

## MODEL INPUTS USED IN THE ISC MODEL FOR
## CONSTRUCTION ANALYSIS

### Volume Source Data[1]

| | |
|---|---|
| Length | = 30.5 m |
| Width | = 30.5 m |
| Height | = 10.0 m |
| Elevation | = 0.0 m |
| Temperature | = 293.0°K (ambient) |
| Emission Rate[2] | = 1 g/sec |

### Meteorological Data

| | |
|---|---|
| Wind Direction | = 0° |
| Wind Speed | = 1.0 m/sec |
| Mixing Height | = 10,000 m |
| Temperature | = 293.0°K |
| Stability | = 4,6 |

Source:   ERT

[1]Source data represent data for a single box.  Using a series of those boxes next to each other would then represent a line source.  As suggested in the ISC Manual, 132 boxes would be required to represent a 5-mile line source.

[2]Concentrations for each pollutant would be computed by using the ratio of the actual emissions (Table 4-3) to the generic emission rate (1 g/sec).

4-117

maximum concentration derived from these three scenarios was assumed to be worst case. The maximum 24-hour concentration was determined using the same technique as in the 8-hour determination, with one exception. Neutral conditions were allowed to persist for 12 hours rather than 8 hours. As in the construction phase, maximum background values in the vicinity of each pumping station were obtained to determine total ambient concentrations. Table 5-2 presents the inputs used to model the short-term worst-case impacts.

The VALLEY model was used to compute maximum short-term concentrations in complex terrain and annual concentrations. Short-term concentrations were modeled assuming stable conditions and allowing the plume to impact on surrounding high terrain. These results were then compared with the PTPLU results to determine maximum short-term concentrations. Table 5-3 displays the model inputs used in the VALLEY modeling analysis. Due to the paucity of summarized wind data near the pump stations, annual modeling was performed for three locations along the pipeline route that would represent the worst case impacts. Daggett, Tucson, and El Paso Star windroses were used as input into the VALLEY model along with the source emissions from Cadiz, Hot Springs, and Anthony stations, respectively, to determine maximum annual project concentrations. It should be noted that the sector-averaging VALLEY model is appropriate for determining annual average concentrations from a windrose because the wind direction data are reported on a 16-point compass system, i.e., in 22.5° sectors. Therefore, by using sector averaging one only assumes that on an annual basis the wind blows with equal frequency from all directions within each sector.

## 5.2 Reactive Modeling

ERT's PLMSTAR model was used to assess the impact of the reactive pollutant emissions from the proposed Cadiz pumping/heating station and tank farm on the ozone levels in the Southeast Desert Air Basin. The PLMSTAR trajectory model is described in Attachment I of this addendum. The emission rates for HC and $NO_x$ from the proposed Cadiz facility are given in Section 4.3 above. These rates were used in the photochemical modeling with one exception. The rate of standing storage loss of HC from the tanks was adjusted down to correspond to the wind speed of the modeling scenario (i.e., 1 m/s) that is lower than the annual average wind speed. This results in HC emissions of 105 lbs/day to go along with the operational $NO_x$ emissions of 480 lbs/day.

Simulations were made for one trajectory, with meteorological conditions conducive to high ozone concentrations. The meteorological inputs were developed from data available from past studies in the high desert area of California [e.g., SCE (1979), Hovind (1968)]. The assumed date was June 21, the summer solstice. Wind speeds were assumed to be light when the parcel passes over the Cadiz site, heading toward the northeast. It was assumed that the only significant emissions into the parcel were due to the proposed Cadiz facility; therefore, there is actually no directional dependence to the simulation inputs.

TABLE 5-2

MODEL INPUTS USED IN THE PTPLU MODEL FOR

OPERATIONAL ANALYSIS

| Source Data | Heaters |
|---|---|
| Stack Height (m) | 9.1 |
| Stack Diameter (m) | 1.1 |
| Stack Velocity (m/sec) | 6.9 |
| Stack Temperature ($^\circ$K) | 450.0 |
| Emission Rate (g/sec)[1] | 1.0 |

| Stability | Wind Speed (m/sec) | Temperature ($^\circ$K) | Wind Direction (degrees) | Mixing Height (meters) |
|---|---|---|---|---|
| 1 | 0.5 | 293 | 180 | 400 |
| 1 | 0.8 | 293 | 180 | 400 |
| 1 | 1.0 | 293 | 180 | 400 |
| 1 | 1.5 | 293 | 180 | 400 |
| 1 | 2.0 | 293 | 180 | 400 |
| 1 | 2.5 | 293 | 180 | 400 |
| 1 | 3.0 | 293 | 180 | 400 |
| 2 | 0.5 | 293 | 180 | 400 |
| 2 | 0.8 | 293 | 180 | 400 |
| 2 | 1.0 | 293 | 180 | 400 |
| 2 | 1.5 | 293 | 180 | 400 |
| 2 | 2.0 | 293 | 180 | 400 |
| 2 | 2.5 | 293 | 180 | 400 |
| 2 | 3.0 | 293 | 180 | 400 |
| 2 | 4.0 | 293 | 180 | 400 |
| 2 | 5.0 | 293 | 180 | 400 |
| 3 | 2.0 | 293 | 180 | 400 |
| 3 | 2.5 | 293 | 180 | 400 |
| 3 | 3.0 | 293 | 180 | 400 |
| 3 | 4.0 | 293 | 180 | 400 |
| 3 | 5.0 | 293 | 180 | 400 |
| 3 | 5.0 | 293 | 180 | 400 |
| 3 | 7.0 | 293 | 180 | 400 |
| 3 | 10.0 | 293 | 180 | 400 |
| 4 | 0.5 | 293 | 180 | 400 |
| 4 | 0.8 | 293 | 180 | 400 |
| 4 | 1.0 | 293 | 180 | 400 |
| 4 | 1.5 | 293 | 180 | 400 |
| 4 | 2.0 | 293 | 180 | 400 |
| 4 | 2.5 | 293 | 180 | 400 |
| 4 | 3.0 | 293 | 180 | 400 |
| 4 | 4.0 | 293 | 180 | 400 |
| 4 | 5.0 | 293 | 180 | 400 |
| 4 | 7.0 | 293 | 180 | 400 |
| 4 | 10.0 | 293 | 180 | 400 |

TABLE 5-2 (CONTINUED)

| Stability | Wind Speed (m/sec) | Temperature (°K) | Wind Direction (degrees) | Mixing Height (meters) |
|---|---|---|---|---|
| 4 | 12.0 | 293 | 180 | 400 |
| 4 | 15.0 | 293 | 180 | 400 |
| 5 | 2.0 | 293 | 180 | 400 |
| 5 | 2.5 | 293 | 180 | 400 |
| 5 | 3.0 | 293 | 180 | 400 |
| 5 | 4.0 | 293 | 180 | 400 |
| 5 | 5.0 | 293 | 180 | 400 |
| 6 | 2.0 | 293 | 180 | 400 |
| 6 | 2.5 | 293 | 180 | 400 |
| 6 | 3.0 | 293 | 180 | 400 |
| 6 | 4.0 | 293 | 180 | 400 |
| 6 | 5.0 | 293 | 180 | 400 |

Source:  ERT

[1]See note 2, Table 5-1.

TABLE 5-3

MODEL INPUTS USED IN THE VALLEY MODEL FOR
OPERATIONAL ANALYSIS

| Source Data | Heaters |
|---|---|
| Stack Height (m) | 9.1 |
| Stack Diameter (m) | 1.1 |
| Stack Velocity (m/sec) | 6.9 |
| Stack Temperature ($^\circ$K) | 450.0 |
| Emission Rate (g/sec)[1] | 1.0 |

| Meteorological Data | Stability | Wind Speed (m/sec) | Temperature ($^\circ$K) | Wind Direction (degrees) | Mixing Height (meters) |
|---|---|---|---|---|---|
| | 6 | 2.5 | 293 | 180 | 10,000 |

Source:  ERT

[1]See note 2, Table 5-1.

4-121

The meteorological inputs along the trajectory are summarized in Table 5-4. Clear sky conditions were assumed for the simulation. Deposition velocities of about 0.25 cm/sec were used for ozone only.

The initial concentrations used in the simulations are shown in Table 5-5. The concentrations are based on measurements taken at Cadiz beginning in September 1984. The hydrocarbon speciation is based on gas chromatograph (GC) analysis of a grab sample taken in October at Cadiz. The reactive hydrocarbons (RHC) concentration of that sample was 213 ppb C; this was assumed to be a typical ozone season value. As an estimate of high initial conditions, an RHC concentration of 50 percent higher (320 ppb C) was assumed; the speciation by class was assumed to be the same.

The dimensions of the "wall-of-cells" air parcel are given in Table 5-6. The pump/heater $NO_x$ emissions and the fugitive HC emissions (storage tanks, pump seals, valves, etc.) are introduced into the center column of the air parcel. The pump/heater emissions, due to their considerable plume rise, are introduced into the second row of cells, whereas the fugitive emissions are added in the first (lowest) row. The pollutants are emitted into the parcel shortly after 0600 PST.

## 5.3 Visibility

A Level-1 visibility screening analysis (Latimer and Ireson 1980) was performed to assess the impact of operation-phase impacts of the proposed All American pipeline on visibility at Edwards Air Force Base in California. This is a simple calculation procedure designed for EPA to identify emission sources that have little potential for adversely affecting visibility in a Class I area. According to normal regulatory policy, if a source "passes" the Level-1 tests, it would not be likely to cause adverse visibility impairment and further analysis is considered unnecessary.

The Level-1 visibility screening analysis is designed to evaluate two types of potential visibility impairment that can be caused by pollutant plumes from emission sources. The pollutants of concern in these analyses are $SO_2$, $NO_x$, and PM. The first type of impairment which is caused principally by $NO_2$ gas formed from $NO_x$ emissions, is discoloration of a bright horizon sky caused by a dark plume. The other type of adverse effect is a bright plume observed against a dark terrain viewing background. This effect is caused principally by particle emissions and sulfate aerosol formed from $SO_2$ emissions.

The Level-1 analysis consists of calculating three contrast parameters, defined as follows:

$C_1$ = plume contrast against the sky

$C_2$ = plume contrast against the terrain

$C_3$ = change in sky/terrain contrast caused by primary and secondary aerosol.

TABLE 5-4

SCHEDULE OF METEOROLOGICAL INPUTS USED IN THE
CADIZ OZONE MODELING

| Time (PST) | Wind Speed (m/s) | Mixing Height (m) | Stability Class |
|---|---|---|---|
| 6 | 1.0 | 50 | B |
| 7 | 1.0 | 70 | B |
| 8 | 1.0 | 120 | B |
| 9 | 1.0 | 200 | B |
| 10 | 1.0 | 310 | A |
| 11 | 1.0 | 590 | A |
| 12 | 1.0 | 730 | A |
| 13 | 1.0 | 870 | A |
| 14 | 1.0 | 960 | B |
| 15 | 1.0 | 1,000 | B |
| 16 | 1.0 | 1,000 | B |
| 17 | 1.0 | 1,000 | B |
| 18 | 1.0 | 1,000 | B |

Source:   ERT

4-123

**TABLE 5-5**

## INITIAL POLLUTANT CONCENTRATIONS (ppb) USED IN THE REACTIVE MODELING

| Species | Typical | High |
|---|---|---|
| NO | 1 | 1 |
| $NO_2$ | 4 | 6 |
| $O_3$ | 40 | 40 |
| CO | 20 | 20 |
| Formaldehyde (HCHO) | 6.4 | 9.6 |
| Other Aldehydes (ALD2) | 2.1 | 3.2 |
| >$C_3$ Alkanes (ALKA) | 33.1 | 49.7 |
| Ethylene (ETHE) | 0.05 | 0.075 |
| Terminal Alkenes (PRPE) | 0.73 | 1.10 |
| Internal Alkenes (BUTE) | 0.79 | 1.19 |
| Monoalkyl Benzenes (TOLU) | 4.2 | 6.3 |
| Di- and Tri-alkyl Benzenes (XYLE) | 1.25 | 1.88 |

Source:   ERT

### TABLE 5-6

### DIMENSIONS OF CELLS IN PLMSTAR AIR PARCEL

| Row No.[1] | Height, width (m) Column No. | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 5 | 500, 4,000 | 500, 2,500 | 500, 1,000 | 500, 500 | 500, 1,000 | 500, 2,500 | 500, 4,000 |
| 4 | 250, 4,000 | 250, 2,500 | 250, 1,000 | 250, 500 | 250, 1,000 | 250, 2,500 | 250, 4,000 |
| 3 | 150, 4,000 | 150, 2,500 | 150, 1,000 | 150, 500 | 150, 1,000 | 150, 2,500 | 150, 4,000 |
| 2 | 50, 4,000 | 50, 2,500 | 50, 1,000 | 50, 500 | 50, 1,000 | 50, 2,500 | 50, 4,000 |
| 1 | 50, 4,000 | 50, 2,500 | 50, 1,000 | 50, 500 | 50, 1,000 | 50, 2,500 | 50, 4,000 |

[1]Row 1 is the lowest (surface-based) cell.

The analysis requires as input only the $SO_2$, $NO_x$, and PM emission rates of the source in question and the distance of the source from the area of interest. If the absolute values for any of the three calculated indices exceed 0.10, then further analysis is recommended. If the absolute values of all indices are below 0.10, then no significant visibility degradation is expected.

The emission rates for the Twelve-Gauge Lake Heat Station for $NO_x$, $SO_2$, and TSP are 197.3, 0.8, and 12.6 lbs/day, respectively. The heat station is approximately 15 miles east of Edwards. The results of the analysis are presented in Section 6.3.

## 6.0 RESULTS OF IMPACT ASSESSMENT

This section presents the air quality impacts from the proposed Celeron/All American and Getty pipelines due to the construction and operation of the pipeline, pumping stations, and delivery stations. During each phase, various pollutants would be emitted into the atmosphere including sulfur dioxide ($SO_2$), oxides of nitrogen ($NO_x$), total suspended particulates (TSP), carbon monoxide (CO), and hydrocarbons (HC). Maximum concentrations of $NO_2$, TSP, CO, and $O_3$ were estimated to determine air quality impacts resulting from the Celeron/All American and Getty proposals.

The analytical techniques used to generate the results (Section 5) varied slightly depending upon averaging time, location, and operation being modeled. These variations necessitated the use of several models. Due to the lack of available data near the proposed pipeline route, assumed worst-case scenarios were developed for the short-term (24 hours or less) averaging times.

The project emissions were compared with applicable Federal, state, and county emissions thresholds (e.g., New Source Review), and project emission control devices were evaluated in terms of applicable BACT and LAER requirements. Air quality modeling using EPA-approved models was performed for sources emitting pollutants in excess of the significance thresholds. The modeling results were then compared with allowable pollutant concentrations as specified in county, state, and Federal ambient standards and increments, including those for Class I areas.

Air quality impacts were judged significant or not significant based on regulatory standards, and the best professional judgement of the resource specialists. The National Ambient Air Quality Standards (NAAQS), and the ambient air quality standards for California, Arizona, New Mexico, and Texas are all important benchmarks for significant impacts. Primary and secondary NAAQS and state standards have been issued for $SO_2$, $NO_2$, TSP, CO, ozone ($O_3$), and HC. These standards are summarized in Section 2. Primary standards are designed to protect public health, while secondary standards are designed to protect public welfare. Annual average standards are never to be exceeded. Short-term standards (24 hours or less) cannot be exceeded more than once per year, except in California and New Mexico where no standards can be exceeded.

New large pollutant sources in attainment areas (areas where the NAAQS are met) are also subject to prevention of significant deterioration (PSD) review. PSD regulations further control pollutant emissions by allowing the maximum predicted concentrations from a new major source and any other nearby previously permitted PSD sources to be a fraction of the NAAQS. PSD regulations in California, Arizona, New Mexico, and Texas establish air quality increments for $SO_2$ and TSP that restrict deterioration by major sources. The applicable $SO_2$ and TSP PSD increments are shown in Section 2. The PSD increments are much smaller than corresponding NAAQS and state standards; therefore, the increments are often more limiting in determining the size of new projects that may be built. Since no new emission sources would be located in Santa Barbara County, Santa Barbara Air Pollution Control District PSD regulations, which are stricter, would not apply.

4-127

The amount of deterioration by new sources is determined by the classification of the area. Presently, the entire area surrounding the proposed projects is designated as PSD Class II, which allows for moderate air quality deterioration. Little air quality deterioration is allowed in PSD Class I areas. The closest existing Class I areas are the Guadelupe Mountains National Park (Texas) located within 2.5 miles of the All American pipeline route, and the San Rafael Wilderness (California) located approximately 8.5 miles east of Getty's proposed Sisquoc pump station. The PSD increments apply not only to routinely operating sources such as the pump stations and tank farms, but also to temporary sources located near Class I areas [40 CFR 52.21(i)(6)]. Examples of temporary sources in the Celeron/All American and Getty proposals would include the construction of the pump stations and pipelines. No significant air quality impacts in Class I areas have been predicted by modeling results.

The following sections summarize the predicted maximum air quality impacts for reactive ($O_3$ formation) and non-reactive pollutants from the proposed construction and operational activities and compare the impacts to applicable significance criteria. The results are described for each pollutant for the construction phase of the pipeline as well as the operational phase of the pump/heater stations.

## 6.1 Non-Reactive Impacts

This section summarizes the air quality impacts for $NO_2$, $SO_2$, TSP, and CO from the construction and operational activities and compares the impacts to applicable significance criteria. Due to the lack of PM-10 data and because no estimation method has been developed to adjust TSP emissions and short-term background concentrations to PM-10, TSP concentrations were compared only to the Federal primary and secondary standards in California. The results are described for each of the pipeline segments and include the maximum concentrations for each pollutant due to the construction of the pipeline as well as the operational phase of the pump/heater stations.

### 6.1.1 Las Flores to Emidio

#### Construction

The Getty and Celeron construction emissions (Table 4-3) were used to determine maximum $NO_2$, $SO_2$, TSP, and CO impacts due to the construction of this segment of the pipelines. Since these sources are mobile in nature, the Industrial Source Complex (ISC) model described in Section 5 was used. The maximum 1-hour concentrations occurred within 500 meters of the construction activities while the maximum multi-hour concentrations occurred within 200 meters of the construction site. Table 6-1 presents the summary of worst-case impacts resulting from the construction of the Celeron and Getty pipelines. As seen from the table, the project contributions are very low (less than 3 percent of the standards for all pollutants from Celeron and less than 2 percent from Getty). However, the existing background concentrations violate the California 1-hour $SO_2$ standard and the federal 24-hour TSP secondary standard.

4-128

TABLE 4-1

SUMMARY OF AIR QUALITY IMPACTS FROM THE CONSTRUCTION OF THE PROPOSED CELERON
AND GETTY PIPELINES FROM LAS FLORES TO EMIDIO

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | California/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| Celeron | | | | | |
| $SO_2$ | | | | | |
| 1-Hour | 0.6 | 655 | Bakersfield/20 | 655.6 | 655/NA[3] |
| 3-Hour | 0.6 | 262 | Bakersfield/20 | 262.6 | NA/1300 |
| 24-Hour | 0.2 | 125/100 | Bakersfield/20 | 125.2/100.2 | 131/365 |
| $NO_2$ | | | | | |
| 1-Hour | 7.3 | 301 | Bakersfield/20 | 308.3 | 470/NA |
| TSP | | | | | |
| 24-Hour | 4.3 | 244 | Taft/10 | 248.3 | NA/260-150 |
| CO[4] | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |
| Getty | | | | | |
| $SO_2$ | | | | | |
| 1-Hour | 0.3 | 655/NA | Bakersfield/20 | 655.3 | 655/NA |
| 3-Hour | 0.3 | NA/262 | Bakersfield/20 | 262.3 | NA/1300 |
| 24-Hour | 0.1 | 125/100 | Bakersfield/20 | 125.1/100.1 | 131/365 |
| $NO_2$ | | | | | |
| 1-Hour | 3.8 | 301 | Bakersfield/20 | 304.8 | 470/NA |
| TSP | | | | | |
| 24-Hour | 2.2 | 244 | Taft/10 | 246.2 | NA/260-150 |
| CO[4] | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |

[1]When two values are shown, the first value is the maximum background concentration for comparison to the California Standard. The second value is highest second-highest concentration for comparison to the federal short-term standard.

[2]Values separated by a "-" represent the federal primary and secondary standard.

[3]Not Applicable

[4]Carbon monoxide concentrations are shown in $mg/m^3$.

The maximum 1-hour background value for $SO_2$ (located in Bakersfield) is equal to the California 1-hour $SO_2$ standard (655 µg/m³, respectively). In addition, Bakersfield (the closest $SO_2$ monitor to this segment of the pipeline) is located in a highly urbanized area, approximately 25 miles away. Thus, the background concentration along the pipeline route is expected to be considerably less, and therefore, the pipeline construction would not be expected to cause a violation.

The background concentration also violates the Federal TSP (24-hour) secondary standard. The contribution from the construction emissions would account for less than 2 percent of the ambient concentration. In addition, since the emissions from construction activities are temporary and transient in nature, EPA (Diggs 1984, and Harper 1984) and county permitting agencies (Goff 1984, and Stroman 1984) believe that no significant long-term or permanent impacts would occur.

The maximum 24-hour TSP and the 3-hour $SO_2$ concentrations are estimated to be less than 1 µg/m³ at the San Rafael Wilderness which is the nearest Class I area (located approximately 8.5 miles from the pipeline). Thus no significant impacts are expected in the Class I area.

Operation

The operation of the initial pipeline segment from Las Flores to Emidio would consist of three pumping stations. All of the pump stations would be operated by electric-powered pumps. Only the pump station at Cuyama would have natural gas-fired oil heaters to meet possible heating requirements. The emissions from the Cuyama pump station can be found in Table 4-5. Due to the source configuration, maximum impacts from the PTPLU model (described in Section 5) were predicted within 100 meters of the source. Table 6-2 summarizes the impacts from the Cuyama station.

Similar to the situation during pipeline construction, the maximum 1-hour background value for $SO_2$ (located in Bakersfield, the nearest $SO_2$ monitor to the Cuyama pump station) is equal to the California 1-hour $SO_2$ standard (655 µg/m³), which is a violation. However, the maximum project contribution from Cuyama is less than one-tenth of 1 percent of the total ambient concentration (655.2 µg/m³). In addition, Bakersfield is located in a highly urbanized area, more than 50 miles away. Again, the background concentration near Cuyama is expected to be considerably less, and therefore, the pipeline operation would not be expected to cause a violation.

The background concentration also violates the Federal TSP (24-hour) secondary standard. The contribution from the Cuyama pump emissions would account for less than 1 percent of the ambient concentration. Thus, considering this along with discussions of the respective background values (above), no significant impacts are expected to occur from the operation of the pump/heater station at Cuyama (Ronyecz, 1984).

### TABLE 6-2

### SUMMARY OF AIR QUALITY IMPACTS FROM THE OPERATON OF THE
### PROPOSED PIPELINES FROM LAS FLORES TO BLYTHE

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | California/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| **LAS FLORES TO EMIDIO (Getty)** | | | | | |
| **Cuyama** | | | | | |
| **$SO_2$** | | | | | |
| 1-Hour | 0.2 | 655 | Bakersfield/30 | 655.2 | 655/NA[3] |
| 3-Hour | 0.2 | 262 | Bakersfield/30 | 262.2 | NA/1300 |
| 24-Hour | 0.1 | 125/100 | Bakersfield/30 | 125.1/100.1 | 131/365 |
| **$NO_2$** | | | | | |
| 1-Hour | 66.1 | 301 | Bakersfield/30 | 367.1 | 470/NA |
| **TSP** | | | | | |
| 24-Hour | 0.4 | 187/170 | Maricopa/10 | 187.4/170.4 | NA/260-150 |
| **$CO$[4]** | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |
| **EMIDIO TO BLYTHE (All American)** | | | | | |
| **Twelve-Gauge** | | | | | |
| **$SO_2$** | | | | | |
| 1-Hour | 0.3 | 78 | Trona/60 | 78.3 | 655/NA |
| 3-Hour | 0.3 | 52 | Trona/60 | 52.3 | NA/1300 |
| 24-Hour | 0.1 | 26/26 | Trona/60 | 26.1/26.1 | 131/365 |
| **$NO_2$** | | | | | |
| 1-Hour | 68.0 | 564 | Barstow/12 | 632.0 | 470/NA |
| **TSP** | | | | | |
| 24-Hour | 1.1 | 161 | Barstow/12 | 162.1 | NA/260-150 |
| **EMIDIO TO BLYTHE (All American)** | | | | | |
| **Cadiz** | | | | | |
| **$SO_2$** | | | | | |
| 1-Hour | 0.4 | 78 | Trona/150 | 78.4 | 655/NA |
| 8-Hour | 0.4 | 52 | Trona/150 | 52.4 | NA/1300 |
| 24-Hour | 0.1 | 26/26 | Trona/150 | 26.1/26/1 | 131/365 |
| Annual | 0.0 | NA | NA | NA | NA |
| **$NO_2$** | | | | | |
| 1-Hour | 165.4 | 56[5] | Cadiz/8 | 211.4 | 470/NA |
| Annual | 10.5 | 48.9 | Barstow/110 | 59.4 | 100/100 |
| **TSP** | | | | | |
| 24-Hour | 1.6 | 109 | Twentynine Palms/45 | 110.6 | NA/260-150 |
| Annual | 0.4 | 70.9 | Twentynine Palms/45 | 71.3 | NA/75-60 |

[1]When two values are shown, the first value is the maximum background concentration for comparison to the California Standard. The second value is highest second-highest concentration for comparison to the federal short-term standard.

[2]Values separated by a "-" represent the federal primary and secondary standard.

[3]Not Applicable

[4]Carbon monoxide concentrations are shown in $mg/m^3$.

[5]No representative data available; maximum background concentration was taken from on-site monitoring program data which started September 8, 1984.

## 6.1.2 Emidio to Blythe

### Construction

The All American construction emissions for this segment, found in Table 4-3, were used to determine maximum impacts due to the construction activities. As in the previous section, maximum 1-hour concentrations occurred within 500 meters of the construction activities while the maximum multi-hour concentrations occurred within 200 meters of the construction site. Table 6-3 presents the summary of worst-case impacts resulting from the construction of the All American pipeline. Again the project contributions are very low (less than 3 percent of the standards for all pollutants). However, existing background concentrations again violate the California 1-hour $NO_2$ standard and the federal 24-hour TSP primary and secondary standards.

The maximum 1-hour background value for $NO_2$ (located in Barstow) is 564 $\mu g/m^3$ and exceeds the California 1-hour $NO_2$ standard (470 $\mu g/m^3$) by 20 percent. However, the maximum project contribution from All American is less than 2 percent of the total ambient concentrations (571.3 $\mu g/m^3$). In addition, this standard has only been violated once in a three-year period (1980 through 1982) in Barstow, and since the construction period of the pipeline through this area is very short (10 to 14 days), the likelihood of the maximum background concentration occurring simultaneously with the construction phase through Barstow is small. Thus, the background concentration is expected to be considerably less during the construction phase, and therefore, the pipeline construction impact would not be significant.

The Federal TSP (24-hour) background concentration (at Boron) violates the Federal primary and secondary standards. Although the value is 423.3 $\mu g/m^3$, the contribution from the construction emissions would account for less than 1 percent of the ambient concentration. Also, since the emissions from construction activities are temporary and transient in nature, the Southeast Desert Air Pollution Control District would not consider either the TSP or $NO_x$ concentrations as significant impacts (Hubbard 1984). The short-term increase in TSP along the ROW is also not expected to significantly decrease visibility in the area around Edwards Air Force Base.

### Operation

The operation of the 294-mile pipeline segment from Emidio to Blythe would consist of four pumping/heating stations as well as an oil storage facility at Cadiz. Except at Cadiz, electric-powered pumping would be used between Emidio and Blythe; thus only emissions from natural gas-fired oil heaters at the Twelve-Gauge Lake station and fugitive HC emissions from pump seals and valves would be generated. At Cadiz, natural gas-fired turbine pumps and heaters would be in operation along with the oil storage facility. The operational emissions can be found in Table 4-5.

TABLE 6-3

SUMMARY OF AIR QUALITY IMPACTS FROM THE CONSTRUCTION OF THE PROPOSED ALL AMERICAN
PIPELINE FROM EMIDIO TO BLYTHE

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | California/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| EMIDIO TO BLYTHE | | | | | |
| $SO_2$ | | | | | |
| 1-Hour | 0.1 | 78 | Trona/60 | 78.6 | 655/NA[3] |
| 3-Hour | 0.6 | 52 | Trona/60 | 52.6 | NA/1300 |
| 24-Hour | 0.2 | 26/26 | Trona/60 | 26.2/26.2 | 131/365 |
| $NO_2$ | | | | | |
| 1-Hour | 7.3 | 564 | Barstow/1 | 571.3 | 470/NA |
| TSP | | | | | |
| 24-Hour | 4.3 | 419 | Boron/1 | 423.3 | NA/260-150 |
| CO[4] | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |

[1]When two values are shown, the first value is the maximum background concentration for comparison to the
California Standard.  The second value is highest second-highest concentration for comparison to the federal
short-term standard.

[2]Values separated by a "-" represent the federal primary and secondary standard.

[3]Not Applicable

[4]Carbon monoxide concentrations are shown in mg/m$^3$.

Due to the source configuration, maximum impacts from the PTPLU model (described in Section 5) were predicted within 100 meters of the source.  Table 6-2 summarizes the impacts from Emidio to Blythe.  Due to limited representative wind data for each site, annual modeling was performed only at Cadiz, which is expected to have maximum impacts.  The nearest maximum background values exceed the California 1-hour $NO_2$ standard and the Federal TSP (24-hour) and annual secondary standard.

The maximum 1-hour $NO_2$ backgound concentration measured in Barstow was 564 $\mu g/m^3$ (0.3 ppm) and was the only violation of the 1-hour standard in the three-year period (1980-1982).  This indicates that the meteorological conditions associated with this unusually high value are extremely rare.  In addition, the predicted maximum concentration from the project alone would not be the same meteorological conditions that generated the maximum background concentrations.  Typically, high background $NO_2$ concentrations are associated with light wind speeds (less than 2 m/s) and low mixing heights.  However, the meteorological condition associated with the maximum project concentrations were 10 m/s and a relative high mixing height.  Maximum project concentrations from 2 m/s wind speeds (or less) range from 15 $\mu g/m^3$ to 25 $\mu g/m^3$, which is only 3 to 5 percent of the California 1-hour $NO_2$ standard.

Furthermore, the predicted project concentration is actually $NO_x$ rather than $NO_2$.  A sufficient amount of $O_3$ would be necessary to convert the $NO_x$ to $NO_2$.  For the worst case concentration (165.4 $\mu g/m^3$), the $O_3$ concentration would need to be 0.08 ppm.  Although the ambient $O_3$ concentration is missing for the same day at Barstow, a nearby station (Lancaster) had a similar $NO_2$ peak 2 days earlier.  The maximum $NO_2$ concentration was 0.22 ppm while the daily maximum 1-hour $O_3$ concentration was 0.04 ppm.  Even though the hourly data was not readily available, the $O_3$ concentration during the peak $NO_2$ hour was most likely less than the maximum concentration of 0.04 ppm for the day, since peak hour $NO_2$ concentrations and peak $O_3$ concentrations usually do not occur simultaneously.  Thus, a high project concentration would not be likely to occur during a peak $NO_2$ background episode.

The maximum TSP background values (161 $\mu g/m^3$ for 24-hour and 70 $\mu g/m^3$ for annual) barely exceeded the national 24-hour and annual secondary standards of 150 $\mu g/m^3$ and 60 $\mu g/m^3$, respectively.  However, the maximum project contributions of 1.1 $\mu g/m^3$ and 0.4 $\mu g/m^3$ are less than 1 percent of the secondary standards.  Thus no significant impacts are expected to occur.

6.1.3  Blythe to McCamey

Construction

The All American construction emissions for this segment can be found in Table 4-3.  These values were used to determine maximum impacts due to the construction activities.  As in the previous sections, maximum 1-hour concentrations occurred within 500 meters of the construction activities while the maximum multi-hour concentrations occurred within 200 meters of the construction site.  Table 6-4 presents the summary of worst-case impacts resulting from the construction of the

TABLE 6-4

SUMMARY OF AIR QUALITY IMPACTS FROM THE CONSTRUCTION OF THE PROPOSED ALL AMERICAN
PIPELINE FROM BLYTHE TO McCAMEY

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | State/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| **Arizona** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.6 | 3518 | San Manuel/2 | 3518.6 | 1300 |
| 24-Hour | 0.2 | 360 | San Manuel/2 | 360.2 | 365 |
| TSP | | | | | |
| 24-Hour | 4.3 | 151 | Coolidge/4 | 155.3 | 260-150 |
| $CO^3$ | | | | | |
| 1-Hour | 0.0 | NA[4] | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |
| **New Mexico** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.6 | 1022 | Ft. Bayard/6 | 1022.6 | NA/1300 |
| 24-Hour | 0.2 | 314/183 | Ft. Bayard/6 | 314.2/183.2 | 262/365 |
| $NO_2$ | | | | | |
| 24-Hour | 2.9 | 75.2 | Lordsburg/1 | 78.1 | 188/NA |
| TSP | | | | | |
| 24-Hour | 4.3 | 470.364 | Anthony/1 | 474.3/364.3 | 150/260-150 |
| $CO^3$ | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |
| **Texas** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.6 | 1179 | El Paso/30 | 1179.6 | 1300 |
| 24-Hour | 0.2 | 314 | El Paso/30 | 314.2 | 260-150 |
| TSP | | | | | |
| 24-Hour | 4.3 | 197 | El Paso/30 | 201.3 | 260-150 |
| $CO^3$ | | | | | |
| 1-Hour | 0.0 | NA | NA | NA | NA |
| 8-Hour | 0.0 | NA | NA | NA | NA |

[1]When two values are shown, the first value is the maximum background concentration for comparison to the New Mexico Standard. The second value is highest second-highest concentration for comparison to the federal short-term standard.

[2]When only one value is shown, the state and federal standards are the same. Values separated by a "-" represent the federal primary and secondary standard.

[3]Carbon monoxide concentrations are shown in $mg/m^3$.

[4]Not Applicable

All American pipeline. Again the project contributions are very low (less than 3 percent of the standards for all pollutants). However, the existing background concentrations violate the New Mexico 24-hour TSP standard, the Federal 3-hour $SO_2$ standard in Arizona, and the Federal 24-hour TSP standards in Arizona, New Mexico, and Texas.

The maximum 3-hour $SO_2$ background concentration near the pipeline construction segment in Arizona is 3518 $\mu g/m^3$ (located near San Manuel). This value is nearly 3 times the federal and state standard of 1300 $\mu g/m^3$. The maximum 3-hour project concentration, however, is only 0.6 $\mu g/m^3$, which is less than one-tenth of 1 percent of the Federal standard.

The appropriate TSP (24-hour) background concentrations violate the Federal primary and secondary standards in all three states as well as the New Mexico state standard. Although the total ambient concentrations range from 474.3 $\mu g/m^3$ in New Mexico to 155.3 $\mu g/m^3$ in Arizona, the project contribution is less than 3 percent of the total. In addition, since the construction emissions are temporary and transient, it is highly unlikely that worst case construction concentrations would occur simultaneously with the maximum background conditions. The New Mexico Health and Environment Department (Dhawan, 1984), the Arizona Department of Health Services (Leverock, 1984), and the Texas Air Control Board (Willis, 1984) were contacted and agreed that the predicted project concentrations would not constitute significant impacts. The maximum 24-hour TSP concentration is estimated to be 2.8 $\mu g/m^3$ at the nearest point of the Guadalupe Mountains National Park in Texas. Thus no significant impacts are expected in the Class I area.

## Operation

The operation of the final pipeline segment from Blythe to McCamey would consist of nine pumping/heating stations located through Arizona, New Mexico, and Texas. Except in Arizona, electric-powered pumping would be used between Blythe and McCamey; thus, only emissions from natural gas-fired oil heaters would be generated. In Arizona, natural gas-fired turbine pumps and heaters would be in operation. The operational emissions for one heater station can be found in Table 4-5.

Again, maximum impacts from the PTPLU model (described in Section 5) were predicted within 100 meters of the source. Table 6-5 summarizes the impacts from Blythe to McCamey. Due to limited representative wind data for each site, annual modeling was performed only at Hot Springs, Arizona, and Anthony, New Mexico, which were expected to have maximum impacts. From Table 6-5, the closest maximum background values exceed the Federal 24-hour and annual TSP secondary standards in all three states, as well as the New Mexico and Federal primary 24-hour and annual TSP standards. Although the total ambient 24-hour concentrations range from 471.9 $\mu g/m^3$ in New Mexico to 152.4 $\mu g/m^3$ in Arizona, the project contribution is less than 1 percent of any total ambient concentration. The annual contributions are also less than 1 percent of the total ambient concentrations in Arizona, New Mexico, and Texas. Thus no significant impact is expected to occur.

TABLE 6-5

SUMMARY OF AIR QUALITY IMPACTS FROM THE OPERATION OF THE PROPOSED
ALL AMERICAN PIPELINE FROM BLYTHE TO MCCAMEY

| Pollutant | Maximum Project Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | State/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| **ARIZONA** | | | | | |
| **LaPaz** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 148 | Phoenix/135 | 148.4 | 1300 |
| 24-Hour | 0.1 | 105 | Phoenix/135 | 105.1 | 365 |
| TSP | | | | | |
| 24-Hour | 1.6 | 228 | Phoenix/135 | 229.6 | 260-150 |
| **Gila** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 148 | Phoenix/45 | 148.4 | 1300 |
| 24-Hour | 0.1 | 105 | Phoenix/45 | 105.1 | 365 |
| TSP | | | | | |
| 24-Hour | 1.8 | 228 | Phoenix/45 | 229.8 | 260-150 |
| **Coolidge** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.3 | 148 | Coolidge/9 | 148.3 | 1300 |
| 24-Hour | 0.1 | 49 | Coolidge/9 | 49.1 | 365 |
| TSP | | | | | |
| 24-Hour | 1.4 | 151 | Coolidge/9 | 152.4 | 260-150 |
| **Hot Springs** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 191 | Tucson/50 | 191.4 | 1300 |
| 24-Hour | 0.1 | 49 | Tucson/50 | 49.1 | 365 |
| Annual | 0.0 | NA[3] | NA | NA | NA |
| $NO_2$ | | | | | |
| Annual | 6.3 | 68 | Tucson/50 | 74.3 | 100 |
| TSP | | | | | |
| 24-Hour | 1.6 | 141 | Tucson/50 | 142.6 | 260-150 |
| Annual | 0.2 | 62 | Tucson/50 | 62.2 | 75-60 |
| **TEXAS** | | | | | |
| **Wink** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 132 | Odessa/A5 | 132.4 | 1300 |
| 24-Hour | 0.1 | 26 | Odessa/45 | 26.1 | 365 |
| TSP | | | | | |
| 24-Hour | 1.9 | 231 | Odessa/45 | 232.9 | 260-150 |
| **NEW MEXICO** | | | | | |
| **Lordsburg** | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 1022 | Ft. Bayard/35 | 1022.4 | NA/1300 |
| 24-Hour | 0.1 | 26/26 | Lordsburg/3 | 26.1/26.1 | 262/365 |

4-137

TABLE 6-5 (CONTINUED)

| Pollutant | Maximum Protect Concentration ($\mu g/m^3$) | Maximum Background[1] Concentration ($\mu g/m^3$) | Background Monitoring Site/ Distance Away (mi) | Total Ambient Concentration ($\mu g/m^3$) | California/Federal[2] Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| $NO_2$ | | | | | |
| 24-Hour | 15.9 | 56 | Lordsburg/3 | 71.9 | 188/NA |
| TSP | | | | | |
| 24-Hour | 1.9 | 200/134 | Lordsburg/3 | 201.9/135.9 | 150/260-150 |
| Anthony | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 288 | Anthony/3 | 288.4 | NA/1300 |
| 24-Hour | 0.1 | 26/26 | Anthony/3 | 26.1/26.1 | 262/365 |
| Annual | 0.0 | NA | NA | NA | NA |
| $NO_2$ | | | | | |
| 24-Hour | 20.0 | 75 | Anthony/3 | 95.0 | 188/NA |
| Annual | 2.2 | 19 | Anthony/3 | 21.2 | 100/100 |
| TSP | | | | | |
| 24-Hour | 1.9 | 470/364 | Anthony/3 | 471.9/365.9 | 150/260-150 |
| Annual | 0.2 | 122 | Anthony/3 | 122.2 | 60/75-60 |
| TEXAS | | | | | |
| Salt Flats | | | | | |
| $SO_2$ | | | | | |
| 3-Hour | 0.4 | 1,179 | El Paso/85 | 1179.4 | 1300 |
| 24-Hour | 0.1 | 314 | El Paso/85 | 314.1 | 365 |
| TSP | | | | | |
| 24-Hour | 1.7 | 197 | El Paso/85 | 198.7 | 260-150 |

[1]When two values are shown, the first value is the maximum background concentration for comparison to the New Mexico Standard.  The second value is highest second-highest concentration for comparison to the federal short-term standard.

[2]When only one value is shown, the state and federal standards are the same.  Values separated by a "-" represent the federal primary and secondary standard.

[3]Not Applicable

4-138

## 6.2  Reactive Modeling

The results of the reactive modeling are given in Table 6-6, which shows the predicted ozone concentration versus time for the background and for background-plus-project for the typical and high initial concentration cases. In the typical initial concentration case, the background achieves an ozone concentration of 0.107 ppm, which is somewhat lower than the maximum one-hour average concentration of 0.117 ppm measured in the Cadiz area by SCE in 1979. For the high initial concentration case, the background achieves a maximum ozone level of 0.120 ppm, which equals the Federal one-hour standard.

With the project emissions included, the maximum ozone concentration predicted for the typical initial concentration case is 0.109 ppm, which is only 0.002 ppm above the corresponding baseline value. Similarly, with a value of 0.122 ppm, the maximum plus project predicted ozone concentration in the high initial concentration case is also only 0.002 ppm higher than the maximum in the corresponding baseline simulation.

Although the maximum predicted plus-project ozone concentration is only 0.002 ppm higher than the maximum predicted baseline ozone concentration, it should be pointed out that incremental difference between the plus-project and the background-only concentrations is as large as 0.008 ppm for the typical initial condition case and 0.010 ppm for the high initial condition case. This maximum incremental impact occurs at 1000 PST and is only seen in the three center columns of the wall-of-cells air parcel.

The reactive modeling indicates that the emissions from the proposed pump/heater station and tank farm at Cadiz would not cause a significant impact beyond travel times of about six hours. In the near field, the project is not expected to contribute appreciably to any violations of the Federal one-hour ozone standard and is not expected to cause additional violations of the state one-hour ozone standard.

## 6.3  Visibility

The results of the Level-1 screening analysis indicate that there would not be any significant visibility impact at Edwards Air Force Base due to the operation of the Twelve-Gauge Lake Heater Station. The values of the three contrast parameters described in Section 5.3 are as follows:

$$C_1 = -0.0017$$

$$C_2 = 0.0007$$

$$C_3 = 0.0000$$

The absolute values of $C_1$, $C_2$, and $C_3$ are well below the 0.1 significance limit.

TABLE 6-6

PREDICTED OZONE CONCENTRATION (ppm) OF BACKGROUND ONLY AND
BACKGROUND-PLUS PROJECT FOR TYPICAL AND HIGH INITIAL
CONCENTATIONS

| Time (PST) | Typical Initial Conditions | | High Initial Conditions | |
|---|---|---|---|---|
| | Background | Plus-Project | Background | Plus-Project |
| 0600 | 0.040 | 0.040 | 0.040 | 0.040 |
| 0630 | 0.040 | 0.040 | 0.042 | 0.042 |
| 0700 | 0.042 | 0.042 | 0.045 | 0.045 |
| 0730 | 0.048 | 0.041 | 0.054 | 0.047 |
| 0800 | 0.054 | 0.046 | 0.063 | 0.055 |
| 0830 | 0.062 | 0.057 | 0.073 | 0.070 |
| 0900 | 0.070 | 0.069 | 0.083 | 0.085 |
| 0930 | 0.076 | 0.080 | 0.090 | 0.097 |
| 1000 | 0.080 | 0.088 | 0.095 | 0.105 |
| 1030 | 0.085 | 0.091 | 0.100 | 0.108 |
| 1100 | 0.089 | 0.094 | 1.104 | 0.110 |
| 1130 | 0.091 | 0.096 | 0.107 | 0.112 |
| 1200 | 0.093 | 0.098 | 0.109 | 0.114 |
| 1230 | 0.095 | 0.100 | 0.111 | 0.115 |
| 1300 | 0.098 | 0.101 | 0.114 | 0.117 |
| 1330 | 0.100 | 0.102 | 0.115 | 0.118 |
| 1400 | 0.101 | 0.104 | 0.116 | 0.119 |
| 1430 | 0.102 | 0.105 | 0.117 | 0.120 |
| 1500 | 0.104 | 0.106 | 0.118 | 0.120 |
| 1530 | 0.105 | 0.107 | 0.119 | 0.121 |
| 1600 | 0.106 | 0.108 | 0.119 | 0.121 |
| 1630 | 0.106 | 0.108 | 0.120 | 0.122 |
| 1700 | 0.107 | 0.109 | 0.120 | 0.122 |
| 1730 | 0.107 | 0.109 | 0.120 | 0.122 |
| 1800 | 0.107 | 0.109 | 0.120 | 0.121 |

Source:   ERT

4-140

## 7.0  SUMMARY

### 7.1  Summary of Results

#### 7.1.1  Nonreactive Pollutants

##### Construction

The pipeline ROW passes through several areas where violations of state and/or Federal air quality standards have occurred in the past few years.  There is, therefore, no way to positively ensure that pipeline construction emissions would not contribute, albeit in a small way, to future violations.  It can only be said that 1) the pipeline construction emissions are "temporary and transient" in nature and, therefore, would not impact any single area longer than a period of several weeks; 2) the magnitude of construction-related impacts is very small relative to the background concentrations; and 3) the best available background concentrations are generally unrepresentative of the pipeline ROW because the monitors are located considerable distances away ($\geq 20$ miles) and/or in a more industrial/urbanized area.  Therefore, the construction-related emissions are expected to have no significant long-term air quality impacts.

##### Operation

The operation-phase emissions of TSP, $SO_2$, and CO are sufficiently small that no significant impacts are expected, even though in a few cases the best available background data indicate that violations of state and/or Federal air quality standards have occurred in the general vicinity of some of the pump/heater stations.  The $NO_x$ emissions, however, are considerable at many of the pipeline pump stations. Nevertheless, the $NO_x$ emissions threaten only one $NO_2$ standard (1-hour California) at one location (Barstow, where a single violation occurred during the 1980-82 baseline period).  As indicated in Section 6.2, the meteorological conditions for which the high project-related impact was predicted are different from those associated with regional $NO_2$ buildup. Also, Barstow is 12 miles west of the Twelve-Gauge Lake Heater Station, and the maximum predicted project impact occurred within 200 meters of the source.  For these reasons, the Twelve-Gauge Lake Heater Station is not expected to cause future violations of the California one-hour average $NO_2$ standard.  Therefore, no significant $NO_2$ impacts would be expected from either the Getty or the Celeron/All American proposals.

#### 7.1.2  Reactive Pollutants

The application of the PLMSTAR photochemical trajectory model to a conservative set of modeling conditions indicates that the operation phase emissions from the proposed pump/heater station and tank farm at Cadiz would not result in future violations of the Federal ozone standard and would not cause any additional future violations of the state ozone standard.

### 7.1.3 Visibility

No significant degradation of visibility at the Edwards Air Force Base is expected as a result of operation-phase emissions from the nearby Twelve-Gauge Lake Heater Station.

### 7.2 Mitigation

As summarized above and shown in Section 6.0, the Getty and Celeron/All American projects are expected to cause no long-term significant air quality impacts. Therefore, no mitigation measures would be required.

# REFERENCES

Dhawan, R.   1984.   New Mexico Health and Environmental Department. Environmental Improvement Division, Santa Fe.   June 6, 1984. Personal communication with Dan Kringel, ERT.

Diggs, T.   1984.   Environmental Protection Agency, Revion VIII, San Francisco, California.   June 7, 1984.   Personal communication with Dan Kringel, ERT.

Goff, T.   1984.   Kern County Air Pollution Control District, Kern County, California.   June 7, 1984.   Personal communication with Dan Kringel, ERT.

Harper, M.   1984.   Environmental Protection Agency, Region X, Dallas, Texas.   June 7, 1984.   Personal communication with Dan Kringel, ERT.

Hovind, Einar L.   1968.   Meteorological analysis of SCE Mohave Power Plant site.   Report No. 15-10, North American Weather Consultants for Southern California Edison.

Hubbard, O.   1984.   Southeast Desert Air Pollution Control District, San Bernardino, California.   June 6, 1984.   Personal communication with Dan Kringel, ERT.

Latimer, D. A. and R. G. Ireson.   1980.   Workbook for estimating visibility impairment.   Report No. EPA-450/4-80-031.   U.S. Environmental Protection Agency, Research Triangle Park, North Carolina.

Leverock, A.   1984.   Arizona Department of Health Services, Phoenix. June 6, 1984.   Personal communication with Dan Kringel, ERT.

Ronyecz, A.   1984.   San Luis Opispo Air Pollution Control District, San Luis Obispo, California.   June 8, 1984.   Personal communication with Dan Kringel, ERT.

Southern California Edison Co. (SCE).   1979.   Notice of Intention.   Cal Coal Project, submitted to California Energy Commission by Southern California Edison Company, Rosemead, California.

Stroman, C.   1984.   Santa Barbara County Air Pollution Control District, Santa Barbara, California.   June 7, 1984.   Personal communication with Dan Kringel, ERT.

Willis, D.   1984.   Texas Air Control Board, Austin.   May 24, 1984. Personal communication with Dan Kringel, ERT.

ATTACHMENT I

PLMSTAR MODEL DESCRIPTION

PLMSTAR MODEL DESCRIPTION

### I.1  Conceptual Formulation

In PLMSTAR (Godden and Lurmann 1983), the Lagrangian modeling concept is applied to a moving wall of computational cells. The wall is advected along a trajectory by the mean horizontal winds at a user-selected elevation that is usually selected to coincide with major point source plume centerline elevations. Backward or forward trajectories are determined by interpolation from a divergence-free, three-dimensional wind field (generated hourly). Lateral and vertical diffusion, photochemistry, and entrainment of emissions along the trajectory are accounted for in each cell. In addition, dry deposition removal processes are included in the surface cells. The extent of the wall in the crosswind and vertical directions is held fixed during a simulation; however, individual cells have different dimensions, as shown in Figure I-1, in order to maximize resolution of the individual point source plume(s) under consideration.

In the Lagrangian framework (i.e., moving in the x-direction with wind speed u), the governing conservation of mass equation for PLMSTAR reduces to:

$$\frac{\partial C_i}{\partial t} = \frac{\partial}{\partial y} K_y \frac{\partial C_i}{\partial y} + \frac{\partial}{\partial z} K_z \frac{\partial C_i}{\partial z} + R_i + S_i + D_i \quad (I-1)$$

Where: $C_i$ = concentration of the $i^{th}$ species,

$K_y$, $K_z$ = eddy diffusivity coefficients in the crosswind (y) and vertical (z) directions,

$R_i$ = rate of chemical transformation of the $i^{th}$ species,

$S_i$ = rate of emissions of the $i^{th}$ species, and

$D_i$ = rate of deposition of the $i^{th}$ species.

This equation is solved numerically in PLMSTAR to provide concentration-versus-time profiles for each species in each cell along the trajectory.

This formulation represents the most complete form of the Lagrangian equation. Yet in simplifying the equation to this point, it is assumed that vertical and horizontal wind shear is small. This

4-145



Figure I-1.   Front view of typical PLMSTAR computation cell
              configuration (not to scale).

typically is not true at night or in the daytime under stagnation conditions. Hence, to ensure that the model is applied under conditions for which the Lagrangian concept is valid, one of PLMSTAR's algorithms calculates the wind speed and direction shear when interpolating trajectories from the three-dimensional wind field. A warning message is printed if conditions of excessive shear are encountered.

The alternative to this formulation is an Eulerian model which can account for wind shear and multi-day pollutant accumulation. These are significant advantages. However, Eulerian photochemical models are far more expensive computationally, and are generally applied without sufficient spatial resolution to address plume dispersion and chemistry in the detail possible in a Lagrangian model. Both modeling concepts have utility: the Lagrangian framework is effective for assessing maximum impacts from individual source clusters, and the Eulerian concept is useful for investigation of multi-day regional impacts. In addition, a Lagrangian model such as PLMSTAR could be incorporated into a Eulerian model to provide subgrid resolution of major point source plumes.

## I .2  Overview of Data Processing Procedures

The PLMSTAR model consists of five processing modules to assemble data needed to solve Equation I-1 and one module to execute the solution. The six processing modules are:

- MIXMOD   - Dispersion Characterization Module;

- WINDMOD  - Wind field Generator,

- TRAJMOD  - Trajectory and Meteorological Data Schedule Generator,

- AREASORC - Area Source Emissions Module,

- TALSORC  - Point Source Emissions Module, and

- SOLMOD   - Numerical Integration/Solution Module.

The inputs, outputs, and data transfers between modules are illustrated in Figure I-2.

4-147



Figure I-2.  PLMSTAR Data Processing Diagram.

Before describing the essential function of the modules, it is important to point out the approach used in PLMSTAR to generate meteorological and emission inputs along a trajectory. The selected approach involves first establishing the regional fields of parameters and reviewing the fields for reasonableness and consistency, and, second, calculating the specific conditions along the trajectory.

The first module executed is the MIXMOD. MIXMOD utilizes surface data for winds, roughness heights, temperature, cloud cover or incoming solar radiation, and vertical temperature profiles or user specified mixing heights to generate hourly fields of $K_y$ and $K_z$ coefficients, deposition velocities, vertically averaged temperatures, stability class, and inversion heights and temperature gradients. WINDMOD utilizes vertical stability profiles provided by MIXMOD and surface wind data, elevated wind data, and topographic data to compute hourly three-dimensional divergence-free wind fields. Given the output from WINDMOD and MIXMOD and user inputs for start location and advection level, TRAJMOD interpolates backward or forward trajectories. (The user may also input predetermined trajectories.) TRAJMOD then assembles all other schedules of meteorological parameters along the trajectories. The two emission modules are then executed to compile the regional inventories and retrieve schedules of trajectory-specific emissions rates for all 14 emission species. Lastly, user-supplied initial and background pollutant concentrations are combined with the meteorological outputs from TRAJMOD and the emission schedules to allow SOLMOD to compute the time profiles of concentration along the trajectory. The background concentrations may be updated at any time along the trajectory; between specified updates, the background concentraitons are updated internally through integration of chemistry.

## I.3.  Meteorological Formulations

### I.3.1 Vertical Diffusivities

In the unstable planetary boundary layer (PBL) over land, the following formulations for vertical eddy diffusivity ($K_z$) were adopted for PLMSTAR:

$$K_z = 1.35 \, ku_* z \, (1 - 9 \tfrac{z}{L})^{1/2}, \, z \leq L \, ; \qquad (I\text{-}2a)$$

$$= Bku_* z \, (- \tfrac{z}{L})^{1/3}, \qquad L \leq z \leq 0.1 \, z_i \, ; \qquad (I\text{-}2b)$$

$$= A \, w_* z \, (1 - \tfrac{z}{z_i}) \, , \, 0.1 \, z_i \leq z \leq z_i \qquad (I\text{-}2c)$$

where $k$ is the von Karman constant (= 0.4); $u_*$ is the surface friction velocity; $z$ is the height above ground; $L$ is the Monin-Obukhov length; $z_i$ is the height of the PBL; and $w_*$ is the convective velocity scale. Equation I-2a is the familiar surface layer formulation, $K_z = ku_* \, z/\phi_m$, with the Businger et al. (1971) representation of the nondimensional wind shear $\phi_m$. Equation I-2b was suggested by Venkatram (1981). A value of 2 is used for the coefficient B to match Equation I-2b with Equation I-2a at $z = L$. Equation I-2c was suggested by Wyngaard (1981). By equating I-2b and I-2c at $z = 0.1z_i$, a value of 0.25 was determined for the coefficient A.

For the stable over land PBL, the $K_z$ formulation of Brost and Wyngaard (1978) was adopted:

$$K_z = ku_* z \, (1 - \tfrac{z}{z_i})^{3/2} / \, (0.74 + 4.7 \tfrac{z}{L}) \qquad (I\text{-}3)$$

Above the PBL an arbitrarily small value of 0.01 m²/s is assigned to $K_z$ for both stable and unstable boundary layers.

During stable conditions, the PBL height, $z_i$, is determined from the commonly used formulation suggested by Zilitinkevich (1972):

$$z_i = C \, (u_* \, \tfrac{L}{f})^{1/2} \qquad (I\text{-}4)$$

A value of 0.4 is used for C after Brost and Wyngaard (1978). During unstable conditions the inversion height is assumed to represent the PBL height. The inversion height is determined from hourly temperature profiles or by interpolation from periodic (i.e., about every six hours) vertical temperature profiles and hourly surface temperatures. A mechanical mixing height is also calculated during unstable conditions using Equation I-4 with L = 50. This value serves as the minimum PBL

4-150

height when the convective PBL is very shallow. As an option in MIXMOD, an externally-determined schedule of PBL height, e.g., from acoustic sounder data, may also be input and used.

Micrometeorological variables, $L$, $u_*$, and $w_*$ were determined as follows. For unstable conditions, $u_*$ is determined from wind speed and surface roughness ($z_0$) as suggested by Wang and Chen (1980). The Monin-Obukhov length is given by:

$$L \equiv \;=\; u_*^3 T/(gkQ_0) \tag{I-5}$$

where $T$ is temperature, $g$ is the acceleration of gravity, and $Q_0$ is the surface kinematic heat flux, determined as reported by Briggs (1975):

$$Q_0 \;=\; AS_I \tag{I-6}$$

where $S_I$ is incoming solar radiation and $A$ is a function of ground cover that varies from 0.25 for a crop canopy to 0.55 for a dry surface. The convective velocity scale is given by:

$$w_* \;=\; (g\, Q_0\, z_i/T)^{1/3} \tag{I-7}$$

For stable conditions, $u_*$ is determined from wind speed and surface roughness, and $L$ is determined by:

$$L \;=\; 1.1 \times 10^3\, u_*^{\,2} \tag{I-8}$$

as suggested by Venkatram (1980).

In the marine boundary layer of height $z_m$, the vertical eddy diffisivities, $K_z$, are determined as follows:

$$K_z \;=\; \frac{ku_* z}{\phi_h(\frac{z}{L})}\,, \quad \text{for } z \le 0.1\, z, \tag{I-9a}$$

$$K_z \;=\; \frac{ku_* z}{\phi_h(\frac{z}{L})} \cdot \frac{(1 - \frac{z}{z_m})}{0.9}\,, \quad \text{for } 0.1\, z_m < z < z_m. \tag{I-9b}$$

$$K_z \;=\; 0.01\ \text{m}^2/\text{sec}, \quad \text{for } z \ge z_m. \tag{I-9c}$$

In the above equations, $k$ is the von Karmann constant (= 0.4), $u_*$ is the friction velocity, $z$ is the height above the surface, $L$ is the Monin-

4-151

Obukhov length, and $\phi_h$ is the non-dimensional surface layer temperature gradient. The above formulation for $z > 0.1\, z_m$ includes a rolloff function so that values of $K_z$ will be very small at the top of the marine boundary layer. The forms of $\phi_h$ are taken from Businger et al. (1971).

Overwater, Monin-Obukhov length, L, is determined from the wind speed (u) and vertical potential temperature ($\theta_v$) at 10 m above the water surface and the vertical potential temperature ($\theta_{vs}$) of the water surface, using a modified form of the Schacher et al. (1982) technique.

$$L = \frac{\theta_v\, C_{uN}}{0.141}\;\frac{u^2}{\theta_v - \theta_{vs}} \qquad\qquad (I\text{-}10)$$

$C_{uN}$ is the neutral momentum drag coefficient which in turn is a function of 10 m wind speed as follows (Kondo 1975):

| 10 m Wind Speed (m/sec) | $C_{uN}$ |
|---|---|
| 0.1 - 2.2 | $1.08\,u - 0.15\; \cdot 10^{-3}$ |
| 2.2 - 5.0 | $(0.77 + 0.086u) \cdot 10^{-3}$ |
| 5 - 8 | $(0.87 + 0.067u) \cdot 10^{-3}$ |
| 8 - 25 | $(1.2 \; + 0.025u) \cdot 10^{-3}$ |

The friction velocity, $u_*$, is determined from wind speed, surface roughness, and stability:

$$u_* = \frac{k \cdot u}{\ln \frac{z}{z_o} - \psi_m \frac{z}{L}} \qquad\qquad (I\text{-}11)$$

where $z_o$ is the roughness height and $\psi_m$ is the diabatic correction to the netural logarithmic wind profile. These terms are evaluated as follows:

$$z_o = 2.0 \cdot 10^{-6}\, u^{2.5}\ (m/s) \qquad\qquad (I\text{-}12)$$

$$\psi_m\left(\frac{z}{L} < o\right) = 2 \ln \left(\frac{1 + \phi_m^{-1}}{2}\right) + \ln \left(\frac{1 + \phi_m^{-2}}{2}\right) - 2 \tan^{-1} \left(\phi_m^{-1} + \frac{\pi}{2}\right) \ (I\text{-}13a)$$

4-152

$$\psi_m \left(\frac{z}{L} \geq 0\right) = -4.7 \frac{z}{L}$$

$$\psi_m \left(\frac{z}{L} \geq 0\right) = \left(1 - 15 \frac{z}{L}\right)^{-1/4} \tag{I-13b}$$

The above relationship for $z_o$ is valid only for wind speeds at 10 m (Hosker 1974).

### I.3.2   Horizontal Diffusivities

The horizontal diffusivity, $K_y$, can be determined by two methods in PLMSTAR. First, $K_y$ can be determined as a function of $K_z$. That is:

$$K_y = r K_z \tag{I-14}$$

where r is a stability dependent coefficient that has the values shown in Table I-1. This calculation is performed in MIXMOD.

Alternatively, $K_y$ may be determined as a function of $\sigma_y$:

$$K_y = \frac{1}{2} \frac{d\sigma_y^2}{dt} \tag{I-15}$$

where t is time along a trajectory. This is calculated in TRAJMOD. Over land, the Brookhaven National Laboratory (Smith, 1968) curves are used to determine the horizontal diffusion parameter $\sigma_y$. That is,

$$\sigma_y = ax^b \tag{I-16}$$

where a and b are stability-dependent coefficients and x is distance along the trajectory. The values of a and b used for rural and urban applications are given in Table I-2. A separate value of $\sigma_y$, and therefore $K_y$, is determined for each vertical layer of the model and is a function of the weighted stability of the layer. To evaluate $\sigma_y$ overwater, the following equation is used:

$$\sigma_y = i_y \times S_y(x) \tag{I-17}$$

4-153

TABLE  I-1

RATIO OF $K_y$ to $K_z$ USED IN MIXMOD

| Stability (Class) | $K_y/K_z$[1] |
|---|---|
| Very unstable (A or 1) | 1.00 |
| Unstable (B or 2) | 1.05 |
| Slightly Unstable (C or 3) | 1.10 |
| Neutral (D or 4) | 1.45 |
| Slightly Stable (E or 5) | 1.70 |
| Stable (F or 6) | 2.00 |
| Very Stable (G or 7) | 2.00 |

[1]These ratios were symthesized from ratios of $\sigma_y$ to $\sigma_z$ (at 10 km) from the Brookhaven curves (Smith 1968) and from the ratios of $K_y$ to $K_z$ employed in the IMPACT grid model (Fabrick et al. 1977).

4-154

## TABLE I-2

### COEFFICIENTS USED TO CALCULATE $\sigma_y$ FOR RURAL AND URBAN SETTINGS

| Stability (Class) | Rural | | Urban | |
|---|---|---|---|---|
| | a | b | a | b |
| Very unstable (A or 1) | 0.40 | 0.91 | 0.40 | 0.91 |
| Unstable (B or 2) | 0.36 | 0.86 | 0.40 | 0.91 |
| Slightly unstable (C or 3) | 0.32 | 0.78 | 0.36 | 0.86 |
| Neutral (D or 4) | 0.32 | 0.78 | 0.32 | 0.78 |
| Slightly stable (E or 5) | 0.31 | 0.71 | 0.32 | 0.78 |
| Stable (E or 6) | 0.31 | 0.71 | 0.31 | 0.71 |
| Very stable (G or 7) | 0.31 | 0.71 | 0.31 | 0.71 |

where $x$ is the distance downwind from the point source, $i_y$ is the horizontal turbulence intensity, and $S_y$ is a function of $x$, such that (Cramer et al. 1964):

$$S_y(x) = \frac{x}{x_o}^{-0.1} \quad \text{for } x_o = 1 \text{ m.} \tag{I-18}$$

Values of $i_y$ v are calculated from the relationship (Hanna 1981):

$$i_y = (u_{*/u}) F_y (z_m/L) \tag{I-19}$$

where (Panofsky et al. 1977):

$$F_y = 1.7, \frac{z_m}{L} > 0 \tag{I-20a}$$

$$F_y = (4.9 - 0.5 \frac{z_m}{L})^{1/3}, \frac{z_m}{L} < 0. \tag{I-20b}$$

The surface stability used in the calculation of $K_y$ over land may be determined by either the Pasquill (1961) or Turner (1964) method. Stability aloft is determined by lapse rate as presented in U.S. Nuclear Regulatory Commission (1972). Over water, stability category is determined from L and using the Golder (1971) nomograph as analytically approximated by Shir and Shieh (1974).

It should be noted that the calculation of $K_y$ from the rate of change of $\sigma_y$ is the recommended procedure for applications involving major point source emissions. The option for calculating $K_y$ from $K_z$ is recommended for applications involving area source emissions only. For applications involving both point and area source emission, the former method is recommended primarily because of short-comings of the latter method. The physical processes that govern horizontal and vertical dispersion are not identical, so in general, the assumption of proportionality between $K_y$ and $K_z$ is a poor one. Vertical mixing is inhibited by the ground from below and by stable layers aloft, whereas lateral dispersion has no corresponding restrictions. Therefore, except in cases of unlimited mixing, the values of $K_y$ determined from $K_z$ are probably unrealistically small. It also should be pointed out that when $K_y$ coefficients are calculated from $\sigma_y$, they are keyed to one particular source location. Since $K_y$ values for a point source increase with

travel distance downwind, the $K_y$ values determined in this manner may overestimate dispersion from point sources encountered at significant distances downwind of the primary source locations.

## I.3.3  Surface Deposition

Deposition velocity is determined in PLMSTAR's MIXMOD module. Specifically, the deposition velocity for $SO_2$ is calculated using the approach suggested by Wesely and Hicks (1977).  The deposition velocity is assumed to be the inverse sum of a series of resistances to transfer:

$$V_d = (r_a + r_s + r_c)^{-1} \qquad\qquad (I-21)$$

where $r_a$ is the aerodynamic resistance, $r_s$ is the surface resistance, and $r_c$ is the canopy stomatal resistance.

The Wesely and Hicks parameterization of Equation  I-21 is

$$V_d = ku_* [\ln (z/z_o) + 2.6 + ku_* r_c - \psi_c]^{-1} \qquad (I-22)$$

where $\psi_c$ is the diabatic correction.  Wesely and Hicks indicated the range of $r_c$ is from 0 s $cm^{-1}$ to about 2 s $cm^{-1}$ and used 0.7 s $cm^{-1}$ for a surface of actively growing dry vegetation.

A simplified approach has been adopted for the deposition velocities of other species: their deposition velocities are assumed to be proportional to the deposition velocity for $SO_2$.  $SO_2$ has been chosen as the baseline species because more canopy resistance data is available for it than other species and because its canopy resistance is generally small.  Given the sparsity of resistance data for other gases and the difficulty in extrapolating the data to the composite of surfaces present in the real world, this approach is justified.  The proportionality factors for the deposition velocities of $O_3$, $NO_2$, PAN, $SO_4^=$, and $HNO_3$ to the $SO_2$ deposition velocity are shown in Table I-3.  Dry deposition of gases with large canopy resistances such as NO, CO, and reactive hydrocarbons is ignored since its effect on pollutant concentrations on the mesoscale is very small.

4-157

## TABLE I-3

### COEFFICIENTS APPLIED TO $SO_2$ DEPOSITION VELOCITIES

### FOR TREATMENT OF OTHER POLLUTANTS

| Species | Coefficient |
|---|---|
| $O_3$ | 0.35 (1) |
| $NO_2$ | 0.7 (1) |
| PAN | 0.25 (2) |
| $SO_4^=$ | 0.5 (3) |
| $HNO_3$ | 1.0 (3) |

(1)  Hill and Chamberlain, 1976.
(2)  Garland and Penkett, 1976.
(3)  Hicks, 1976.

### I.3.4  Interpolation Procedures in MIXMOD

As indicated in Section I.2, the MIXMOD module of PLMSTAR produces gridded fields of quantities (mixing coefficients, deposition velocities, etc.) that are used as input to other PLMSTAR Modules. To facilitate the accurate representation of sudden changes in surface characteristics, the interpolation routine was formulated to allow the specification of barriers to interpolation. With this feature, only parameters calculated at points on the same side of a specified barrier of a particular grid square are used in interpolating a value for that grid square. The result is that an abrupt change in gridded parameter values can be achieved at a coastline, for example, with representative over water values on one side of the barrier and over land values on the other.

### I.4  Wind Field Generation

WINDMOD is a diagnostic wind model capable of generating a three-dimensional, nondivergent wind field from a set of input wind measurements. The model is applicable to both moderately complex and flat terrain situation. The objective analysis procedure implemented in WINDMOD has been conceptually adapted from the scheme described by Goodin, McRae and Seinfeld (1980), but WINDMOD's treatment of the input data differs somewhat from that of Goodin et al. (1980).

The wind field algorithm consists of three basic steps. As a starting point, the modeling grid location and dimensions must be selected by the user. Once the grid geometry has been established, the input wind measurements are interpolated to obtain initial values at each grid point and the surface field is adjusted for topographic effects. The final step adjusts the interpolated flow field iteratively to reduce the anomalous divergence to an acceptable level.

### I.5.  Trajectory Generation

The trajectory generation module TRAJMOD works as follows. Starting from an initial position and time, the TRAJMOD calculates a wind vector interpolated (using inverse-distance-squared weighting) from the four closest grid points of a wind field to obtain the position of

the air parcel at either a previous or subsequent time. The backward calculations require an iterative loop wherein the upwind position from which to interpolate the prior hour's wind data is sought. This process generally converges in two or three iterations. The feature which distinguishes the TRAJMOD procedures from other models is that the user can select the elevation in a three-dimensional wind field for which to generate the trajectory. The wind vector is interpolated to the center of the selected model air parcel layer.

Another feature of TRAJMOD is that at specific time intervals it calculates the mean wind vector for each vertical layer of the air parcel. It also interpolates wind components (u, v, w) to all cells in the wall. The corresponding wind speeds and directions can be printed out for each trajectory segment to enable the user to assess the degree of horizontal and vertical shear in the wind field along the trajectory. Also a warning message is printed when TRAJMOD finds a wind vector for a particular cell which differs by more than a factor of 2 in speed or ±90° in direction from the average wind vector for the parcel.

TRAJMOD generates a new set of wind vectors at time intervals that are dependent on the wind speed. This occurs because the air parcel travel distance must be limited to approximately one grid square length in each interval to ensure that the wind field for the selected elevation is properly represented by the trajectory.

TRAJMOD also interpolates other data, such as $K_z$ and $K_y$, along the trajectory for use by the TALSORC and SOLMOD modules of PLMSTAR.

## I.6   The Emissions Processing Program

Two separate computer programs, AREASORC and TALSORC, were developed to perform the emissions inventory bookkeeping for PLMSTAR. The programs are suitable for compilation of urban emission inventories as well as less complex rural inventories. Two basic functions are performed by each program: (1) compilation of the spatially and temporally resolved regional emissions inventory, and (2) calculation of emission rate schedules along specific trajectories.

Inputs to the programs for the regional inventory consist of daily THC, $NO_x$, $SO_x$, and CO emission rates by category and grid square for

AREASORC, and by category and UTM coordinates for TALSORC. Each area source category and individual point source is keyed to user specified profiles for diurnal (i.e., hour-by-hour) emission rate variation, THC partitioning (to 8 RHC classes), $NO_x$ partitioning (to NO and $NO_2$), and $SO_x$ partitioning (to $SO_2$ and $SO_4^=$). In addition, each point source requires stack height, effluent temperature, and effluent flow rate data, as well as meteorological data along the trajectory.

Once AREASORC has compiled the regional inventory, the trajectory data and the wall-of-cell geometry are input. From this data, it generates area source emission schedules for each surface cell within the wall of cells along the trajectory. Similarly, TALSORC calculates point source emissions entrained into cells of the moving wall based on the time increment for the wall to pass the source at the prevailing wind speed. The plume rise of each source passed on the trajectory is calculated (Briggs 1969, 1975) from the stack parameters and meteorology (i.e., wind speed, stability, inversion height, inversion temperature gradient, and ambient temperature) within the parcel at the time of passing. Point source emissions may be entrained at any point along the trajectory, so that one may examine urban trajectories where plumes from major point sources passed early in the trajectory may interact with other major point source plumes entrained later in the day. Also, the wall of cells approach allows entrainment of emissions from sources located 5 to 10 kilometers from the trajectory centerline in the cross-wind direction.

### I.7   Chemical Mechanism

A somewhat condensed version of the ERT photochemical reaction mechanism (Atkinson et al. 1982) is incorporated in PLMSTAR to account for chemical transformations in $RHC/NO_x/SO_x/air$ mixtures. This mechanism was developed in 1980 concurrently with a survey of kinetic and mechanistic data for photochemical reactions performed for EPA (Atkinson and Lloyd 1980).

The mechanism, shown in Table I-4, incorporates the inorganic and organic reactions believed to be important in smog formation. Many reactions in the mechanism represent the condensation of multiple reactions into one rate-limiting reaction. Organic precursor species

4-161

## TABLE I-4

### THE CONDENSED ERT PHOTOCHEMICAL MECHANISM

| Reaction | Rate Constant (ppm min units) |
|---|---|

**Inorganics**

1. $NO_2 + h\nu \xrightarrow{O_2} NO + O_3$ — radiation dependent

2. $NO + O_3 \rightarrow NO_2 + O_2$ — $1.0 \times 10^6\ T^{-1}\ e^{-1450/T}$

3. $O_3 + h\nu \rightarrow 2\ OH$ — $\beta_1 k_1 \times 7.5 \times 10^{-6}\ [H_2O]$

4. $OH + NO \xrightarrow{M} HONO$ — $8.7 \times 10^8\ T^{-2}$

5. $OH + NO_2 \xrightarrow{M} HNO_3$ — $1.5 \times 10^9\ T^{-2}$

6. $HONO + h\nu \rightarrow OH + NO$ — radiation dependent

7. $HO_2 + NO \rightarrow OH + NO_2$ — $3.7 \times 10^6\ T^{-1}$

8. $HO_2 + NO_2 \xrightarrow{M} HO_2NO_2$ — $1.5 \times 10^8\ T^{-2}$

9. $HO_2NO_2 \xrightarrow{M} HO_2 + NO_2$ — $7.8 \times 10^{-15}\ e^{-10420/T}$

10. $HO_2 + HO_2 \rightarrow H_2O_2 + O_2$ — $3.4 \times 10^4\ T^{-1}\ e^{1100/T}$

11. $HO_2 + HO_2 + H_2O \rightarrow H_2O_2 + O_2 + H_2O$ — $5.8 \times 10^{-5}\ T^{-2}\ e^{5800/T}$

12. $OH + CO \xrightarrow{O_2} HO_2$ — $1.3 \times 10^5\ T^{-1}$

13. $NO_2 + O_3 \rightarrow NO_3$ — $5.3 \times 10^4\ T^{-1}\ e^{-2450/T}$

14. $NO + NO_3 \rightarrow 2NO_2$ — $8.4 \times 10^6\ T^{-1}$

15. $NO_2 + NO_3 \xrightarrow{M} N_2O_5$ — $3.1 \times 10^7\ T^{-1}\ e^{-1100/T}$

16. $N_2O_5 \xrightarrow{M} NO_2 + NO_3$ — $3.5 \times 10^{18}\ e^{-12230/T}$

17. $N_2O_5 + H_2O \rightarrow 2\ HNO_3$ — $1.33 \times 10^{-3}\ T^{-1}$

18. $NO_3 + h\nu \rightarrow 0.3\ NO + 0.7\ NO_2 + 0.7\ O_3$ — radiation dependent

19. $OH + O_3 \rightarrow HO_2$ — $7.0 \times 10^5\ T^{-1}\ e^{-940/T}$

20. $HO_2 + O_3 \rightarrow OH$ — $4.8 \times 10^3\ T^{-1}\ e^{-580/T}$

4-162

TABLE I-4   (CONTINUED)

| Reaction | Rate Constant (ppm min units) |
|---|---|

**Formaldehyde**

21. $HCHO + h\nu \xrightarrow{O_2} HO_2 + HO_2 + CO$ — radiation dependent

22. $HCHO + h\nu \rightarrow CO + H_2$ — radiation dependent

23. $OH + HCHO \xrightarrow{O_2} HO_2 + CO$ — $4.4 \times 10^6 \ T^{-1}$

**Acetaldehyde**

24. $CH_3CHO + h\nu \xrightarrow{O_2} CH_3O_2 + HO_2 + CO$ — radiation dependent

25. $OH + CH_3CHO \xrightarrow{O_2} CH_3CO_3$ — $3.0 \times 10^6 \ T^{-1} \ e^{250/T}$

26. $CH_3CO_3 + NO_2 \rightarrow PAN$ — $2.1 \times 10^6 \ T^{-1}$

27. $PAN \rightarrow CH_3CO_3 + NO_2$ — $1.2 \times 10^{18} \ e^{-13543/T}$

28. $CH_3CO_3 + NO \xrightarrow{O_2} NO_2 + CH_3O_2$ — $3.1 \times 10^6 \ T^{-1}$

29. $CH_3O_2 + NO \rightarrow HCHO + HO_2 + NO_2$ — $3.1 \times 10^6 \ T^{-1}$

**Alkanes**

30. $OH + Alkane \rightarrow AO_2$ — $6.6 \times 10^6 \ T^{-1} \ e^{-400/T}$

31. $AO_2 + NO \rightarrow - .8 \ NO + 1.7 \ NO_2 + .9 \ HO_2$ — $3.1 \times 10^6 \ T^{-1}$
$\qquad + .4 \ CH_3CHO + .45 \ MEK$
$\qquad + .3 \ CH_3COCH_3$

32. $OH + MEK \xrightarrow{O_2} - NO + NO_2 + CH_3CHO$ — $4.4 \times 10^6 \ T^{-1} \ e^{-330/T}$
$\qquad + CH_3CO_3$

33. $MEK + h\nu \rightarrow CH_3CO_3 + C_2H_5O_2$ — radiation dependent

34. $C_2H_5O_2 + NO \rightarrow NO_2 + CH_3CHO + HO_2$ — $3.1 \times 10^6 \ T^{-1}$

**Alkenes**

35. $OH + Ethene \xrightarrow{O_2} 2HCHO + NO_2 - NO + HO_2$ — $9.7 \times 10^5 \ T^{-1} \ e^{380/T}$

36. $OH + Propene \xrightarrow{O_2} HCHO + CH_3CHO + HO_2$ — $1.8 \times 10^6 \ T^{-1} \ e^{540/T}$
$\qquad + NO_2 - NO$

37. $OH + Butene \xrightarrow{O_2} 1.8 \ CH_3CHO + 0.9 \ NO_2$ — $5.0 \times 10^6 \ T^{-1} \ e^{540/T}$
$\qquad + 0.9 \ HO_2 - NO$

4-163

TABLE I-4 (CONTINUED)

| Reaction | Rate Constant (ppm min units) |
|---|---|

**Alkenes (continued)**

38. $O_3$ + Ethene → HCHO + 0.4 $\overset{\bullet}{C}H_2\overset{\bullet}{O}_2$ + 0.4 CO + 0.12 $HO_2$    $4.2 \times 10^3 \, T^{-1} \, e^{-2560/T}$

39. $O_3$ + Propene → 0.5 HCHO + 0.5 $CH_3CHO$ + 0.2 $\overset{\bullet}{C}H_2\overset{\bullet}{O}_2$ + 0.2 $CH_3\overset{\bullet}{C}H\overset{\bullet}{O}\overset{\bullet}{O}$ + 0.3 CO + 0.2 $HO_2$ + 0.1 OH + 0.2 $CH_3O_2$    $3.1 \times 10^3 \, T^{-1} \, e^{-1900/T}$

40. $O_3$ + Butenes → $CH_3CHO$ + 0.4 $CH_3\overset{\bullet}{C}H\overset{\bullet}{O}\overset{\bullet}{O}$ + 0.3 $HO_2$ + 0.2 OH + 0.45 $CH_3O_2$ + 0.2 CO    $3.3 \times 10^3 \, T^{-1} \, e^{-1050/T}$

41. $\overset{\bullet}{C}H_2\overset{\bullet}{O}_2$ + NO → HCHO + $NO_2$    $3.1 \times 10^3 \, T^{-1}$

42. $\overset{\bullet}{C}H_2\overset{\bullet}{O}_2$ + $NO_2$ → HCHO + $NO_3$    $3.1 \times 10^5 \, T^{-1}$

43. $\overset{\bullet}{C}H_2\overset{\bullet}{O}_2$ + $H_2O$ → Product    $1.5 \, T^{-1}$

44. $CH_3\overset{\bullet}{C}H\overset{\bullet}{O}\overset{\bullet}{O}$ + NO → $CH_3CHO$ + $NO_2$    $3.1 \times 10^6 \, T^{-1}$

45. $CH_3\overset{\bullet}{C}H\overset{\bullet}{O}\overset{\bullet}{O}$ + $NO_2$ → $CH_3CHO$ + $NO_3$    $3.1 \times 10^5 \, T^{-1}$

46. $CH_3\overset{\bullet}{C}H\overset{\bullet}{O}\overset{\bullet}{O}$ + $H_2O$ → Product    $1.5 \, T^{-1}$

**Aromatics**

47. OH + Toluene → 0.15 $ARO_2$ + 0.20 Cresol + 0.20 $HO_2$ + 0.65 ADD    $2.7 \times 10^6 \, T^{-1}$

48. OH + Xylene → 0.25 Cresol + 0.25 $HO_2$ + 0.75 ADD    $7.9 \times 10^6 \, T^{-1}$

49. ADD + NO → 0.75 $NO_2$ + 0.75 $HO_2$ + 0.75 DIAL + $\alpha_1$ $(CHO)_2$ + $\alpha_2$ $CH_3COCHO$    $3.1 \times 10^6 \, T^{-1}$

50. OH + DIAL → El    $1.3 \times 10^7 \, T^{-1}$

51. EL + $NO_2$ → El $NO_2$    $2.1 \times 10^6 \, T^{-1}$

4-164

TABLE I-4 (CONTINUED)

| Reaction | Rate Constant (ppm min units) |
|---|---|

**Aromatics (continued)**

52. $EL\ NO_2 \rightarrow El + NO_2$    $1.2 \times 10^{18}\ e^{-13543/T}$

53. $El + NO \rightarrow 3\ NO_2\ -2\ NO + \alpha_3\ HO_2$    $3.1 \times 10^6\ T^{-1}$

$\quad + \alpha_3(CHO)_2 + \alpha_4\ CH_3CO_3 + \alpha_4$

$\quad CH_3COCHO + \alpha_3\ CO$

54. $OH + (CHO)_2 \xrightarrow{O_2} HO_2 + CO$    $8.8 \times 10^6\ T^{-1}$

55. $(CHO)_2 + h\nu \rightarrow HCHO + CO$    radiation dependent

56. $OH + CH_3COCHO \xrightarrow{O_2} CH_3CO_3 + CO$    $6.6 \times 10^6\ T^{-1}$

57. $CH_3COCHO + h\nu \xrightarrow{O_2} CH_3CO + HO_2 + CO$    radiation dependent

58. $OH + Cresol \rightarrow -NO + .75\ NO_2$    $1.9 \times 10^7\ T^{-1}$

$\quad + .75\ HO_2 + .75\ DIAL$

59. $NO_3 + Cresol \rightarrow - NO_2 + HNO_3$    $k = 6.6 \times 10^6\ T^{-1}$

**$SO_x$**

60. $SO_2 + OH \xrightarrow{M} SO_4^=$    $1.5 \times 10^{13}\ T^{-4}$

61. $SO_2 + \dot{C}H_2\dot{O}_2 \rightarrow HCHO + SO_4^=$    $3 \times 10^4\ T^{-1}$

62. $SO_2 + CH_3\dot{C}HOO \rightarrow CH_3CHO + SO_4^=$    $3 \times 10^4\ T^{-1}$

**Notes**

$\alpha_1 = .075\ k_{48}\ [xylene]/(k_{47}\ [toluene] + k_{49}\ [xylene])$

$\alpha_2 = .75 - \alpha_1$

$\alpha_3 = k_{47}\ [toluene] + .5\ k_{48}\ [xylene]/(k_{47}\ [toluene] + k_{48}\ [xylene])$

$\alpha_4 = 1 - \alpha_3$

$HNO_3$ is the total inorganic nitrate (e.g., the sum of $HNO_3$ (g) and $NH_4NO_3$ aerosol).

4-165

are partitioned into reactivity classes in the mechanism to minimize the number of chemical species and reactions. However, there is less "lumping" of HC species in this mechanism than in other mechanisms typically used in photochemical models. The rational for the partitioning of the organics is based on differences in OH rate constants, $O_3$ rate constants (for alkenes), reaction products, and photolytic reaction rates (for oxygenated HC). Based on our analysis, the full mechanism, which includes slowly reacting organics, requires 13 classes and the condensed mechanism, which excludes slowly reacting organics and treats $\geq C_3$ aldehydes and ketones as acetaldehydes, requires eight classes, as shown in Table I-5. The elimination of propane, benzene and acetone as well as the less refined treatment of aldehydes and ketones in the condensed mechanism results in very small differences (<3%) in maximum ozone and $NO_2$ in one-day simulations (Atkinson et al. 1982).

The mechanism was tested against smog chamber irradiations of individual HC/$NO_x$ and surrogate urban HC/$NO_x$ mixtures from the University of California, Riverside's evacuable and all-glass chambers (Pitts, and Grosjean 1978; Pitts, et al. 1979; Carter, et al. 1979; Atkinson, et al. 1978). Additional testing was performed on irradiations of RHC/$NO_x$/$SO_x$/air mixture from the Battelle chamber (Miller 1978) to assess the model's performance with respect to sulfate. Further testing on individual HC/$NO_x$ mixtures was performed using the University of North Carolina's outdoor smog chamber data (Jefferies, 1981; Lloyd et al. 1982). The mechanism was found to predict $NO_x$ and HC decay rates accurately and peak $NO_2$, $O_3$, PAN, and $SO_4^=$ within ± 20% over a broad range of HC/$NO_x$ ratios and concentrations. In particular, the mechanism is believed to more accurately simulate the aromatic and alkene oxidation processes than previous mechanisms. The growing proportion of aromatic hydrocarbons in urban areas (Grosjean et al. 1981) makes it very important to predict aromatic hydrocarbon photooxidation as accurately as possible.

For all chemical reactions with rates that vary significantly with temperature, the updated mechanism accounts for this effect. This feature represents an important advancement over previous mechanisms. As shown in Hendry et al. (1977, 1978), the chemistry of nitrogen oxides

## TABLE I-5

## HYDROCARBON CLASSES IN THE CHEMICAL MECHANISM

| Compound Group | Full Mechanism | Condensed Mechanism |
|---|---|---|
| Methane | 0* | 0 |
| Ethane | 0 | 0 |
| Propane | 1 | 0 |
| $\geq C_4$ Alkanes | 2 | 1 |
| Ethene | 3 | 2 |
| Propene and Other Terminal Alkenes | 4 | 3 |
| Butene and Other Internal Alkenes | 5 | 4 |
| Benzene | 6 | 0 |
| Toluene and Other Monoalkylbenzenes | 7 | 5 |
| Xylene and Other Di- and Tri-alkylbenzenes | 8 | 6 |
| Formaldehyde | 9 | 7 |
| Acetaldehyde | 10 | 8 |
| $\geq C_3$ Aldehydes | 11 | 8 |
| Acetone | 12 | 0 |
| Methylethylketone and Other Ketones | 13 | 8 |

*Class 0 is nonreactive

is particularly sensitive to temperature variations. This model feature is obviously important for application in areas that have significant diurnal variations in temperature.

### I.8    Solution of Governing Equations

The solution module (SOLMOD) assembles all the trajectory-specific input data, performs integration of the governing differential equations to obtain concentrations at successive times and locations, and updates the data used in the equations from temporal schedules. The inputs required by SOLMOD, in addition to those provided by the meteorological and emissions preprocessors, are the initial pollutant concentrations in the parcel and initial background concentrations. If desired, the background concentrations can be externally updated at any time during a sumulation. Here, background concentrations refer to the pollutant concentrations specified at the lateral boundaries of the parcel that are used in the horizontal diffusion calculation. Photochemical models are generally quite sensitive to the initial and background values, so these must be specified carefully.

The numerical integration of Equation I-1 is accomplished by splitting the equation into three equations solved sequentially. Thus, the problem is reduced to the solution of

$$\frac{\partial c}{\partial t} = \frac{\partial}{\partial y} \left( K_y \frac{\partial c}{\partial y} \right) \quad \text{for lateral diffusion,} \qquad \text{(I-23a)}$$

$$\frac{\partial c}{\partial t} = \frac{\partial}{\partial z} \, K_z \frac{\partial c}{\partial z} \quad \text{for vertical diffusion, and} \qquad \text{(I-23b)}$$

$$\frac{\partial c}{\partial t} = R + S + D \quad \text{for chemistry, emissions, and dry deposition.} \qquad \text{(I-23c)}$$

Splitting the problem in this manner allows one to employ numerical integration techniques appropriate for each type of equation. Integration of the lateral and vertical diffusion equations is accomplished using finite difference approximations. For small and moderate size eddy diffusivity coefficient (K), the Crank-Nicolson approximation (Crank and Nicolson 1947) is employed. For large mixing

4-168

coefficients, a fully implicit time integration technique, which over-comes the small time step limitation of the Crank-Nicolson method at large values of K without sacrificing accuracy, is used. The ordinary differential equations for chemistry, emissions, and deposition are integrated by a linear multi-step predictor-corrector scheme developed by Young and Boris (1977). When accompanied by an error control/time step selection procedure suitable for photochemical systems, this algorithm is several times more efficient than Gear-type algorithms (used in ELSTAR, EKMA, etc.) at comparable accuracy levels.

The complete solution for concentrations at time $t + \Delta t$, starting at time $t$, is produced by integrating, in order,

1) lateral diffusion from $t$ to $(t + \Delta t/2)$,
2) vertical diffusion from $t$ to $(t + \Delta t/2)$,
3) chemistry, emissions, and deposition from $t$ to $(t + \Delta t)$,
4) vertical diffusion from $(t + \Delta t/2)$ to $(t + \Delta t)$, and
5) lateral diffusion from $(t + \Delta t/2)$ to $(t + \Delta t)$.

Ordering the individual time steps in this manner allows the model to perform the integration of the chemistry for longer periods than in conventional time splitting techniques (i.e., lateral diffusion, vertical diffusion and chemistry for $\Delta t/2$). This improves the overall computational efficiency of the model without loss of accuracy (McRae 1981). Within a given integration cycle of length $\Delta t/2$ or $\Delta t$, each solver takes one or more steps (usually more) to generate a solution at the specified output time. Nevertheless, the integration cycle size ($\Delta t$) is kept small (10 to 20 minutes) to prevent numerical artifacts of times splitting.

# REFERENCES FOR ATTACHMENT I

Atkinson, R. and A. C. Lloyd. 1980. Evaluation of Kinetic and Mechanistic Data for Photochemical Swag Chamber Modeling, ERT Document No. P-A040, Environmental Research and Technology, Inc., Westlake Village, California.

Atkinson, R., A. C. Lloyd and L. Winges. 1982. An Updated Chemical Mechanism for Hydrocarbon/$NO_x$/$SO_x$ Photooxidation Suitable for Inclusion in Atmospheric Simulation Models. Atmos. Environ., 16, 1341-1355.

Atkinson, R., W. P. L. Carter, K. R. Darnall, A. M. Winer and J. N. Pitts, Jr. 1980. A Smog Chamber and Modeling Study of the Gas-Phase $NO_x$-air Photooxidation of Toluene and the Cresols. Int. J. Chem. Kinet., 12, 779-836.

Briggs, G. A. 1969. Plume Rise. USAFEC Critical Review Series, TID-25075, Clearinghouse for Federal Scientific and Technical Information.

Briggs, G. A. 1975. Plume Rise Predictions, In Lectures on Air Pollution and Environmental Impact Analyses, 59-105. American Meteorlogical Society, Boston, Massachusetts.

Brost, R. A. and J. C. Wyngaard. 1978. A model study of the stably stratified planetary boundary layer. J. Atmos. Sci., 35, 1427-1440.

Businger, J. A., J. C. Wyngaard, Y. Izumi and E. F. Bradley. 1971. "Flux-profile Relationships in the Atmospheric Surface Layer", J. Atmos. Sci., 28, 181-189.

Carter, W. P. L., A. C. Lloyd, J. L Sprung, and J. N. Pitts, Jr. 1979. Computer modelings of smog chamber data: progress in validation of a detailed mechanism for the photooxidation of propene and n-butane in photochemical smog. Int. J. Chem. Kinet., 11, 45-101.

Cramer, H. E., G. M. DeSanto, K. R. Dumbauld, P. Morgenstern and R. N. Swanson. 1964. Meteorological Prediction Techniques and Data System, GCA Tech. Rep. No. 64-3-G.

Crank, J. and P. Nicolson. 1947. A Practical Method for Numerical Evaluation of Solutions of Partial Differential Equations of the Heat-Conduction Type, Proceedings of the Cambridge Philosophical Society, 43, No. 50, 50-67.

Godden, D. and F. Lurmann. 1983. Development of the PLMSTAR Model and Its Application to Ozone Episode Conditions in the South Coast Air Basin. ERT Document No. P-A702-200, Environmental Research & Technology, Inc., Westlake Village, CA.

REFERENCES (CONTINUED)

Golden, D.  1972.  Relations Among Stability Parameters in the Surface Layer, Boundary Layer Meteorology 3, 47-58.

Goodin, W. R., G. J. McRae and J. H. Seinfeld.  1980.  An objective analysis technqiue for constructing three-dimensional urban-scale wind fields.  J. Appl. Meteorol., 19, 98-108.

Grosjean, D., R. Countess, K. Fung, K. Ganesan, A. Lloyd and F. Lurmann. 1981.  Deriving EKMA Isopleths from Experimental Data:  The Los Angeles Captive Air Study, Presented at the EKMA Workshop, December 15-17, EPA-ESRL, Research Triangle Park, North Carolina.

Hanna, S. R.  1981.  Turbulent Energy and Lagrangian Time Scales in the Planetary Boundary Layer.   Fifth Symposium on Turbulence, Diffusion, and Air Pollution, American Meteorological Society, Boston, Massachusetts.

Hendry, D. G. and R. A. Kenley.  1977.  Generation of peroxy radicals from peroxy nitrate ($RO_2$ $NO_2$).  Decomposition of peroxyacyl nitrates.  J. Am. Chem. Soc., 99, 3198-3199.

Hendry, D. G., A. C. Baldwin, J. R. Barker and D. M. Golden.  1978. Computer Modeling of Simulated Photochemical Smog, EPA-600/3-78-059.  U.S. Environmental Protection Agency, Research Triangle Park, North Carolina.

Hosker, R. P.  1974.  A Comparison of Estimation Procedures for Overwater Plume Dispersion.  Proceedings of the Symposium on Atmospheric Diffusion and Air Pollution, American Meterological Society, Boston, MA.

Jefferies, H.  1981.  Personal Communication of smog chamber data from University of North Carolina Outdoor Chamber.

Kondo, J.  1975.  Air-Sea Bulk Transfer Conditions in Diabatic Conditions, Bound. Lay. Meteorol., 9:91-112.

Lloyd, A. C., R. A. Atkinson, F. W. Lurmann and B. Nitta.  1982. Modeling Potential Ozone Impacts From Natural Hydrocarbons, Part I: Development and Testing of a Chemical Mechanism for the Photo-oxidation of Isoprene and $\alpha$_Pinene Under Ambient Conditions.  (in press).

McRae, G. J.  1981.  Mathematical Modeling of Photochemical Air Pollution, Ph.D. Thesis California Institute of Technology, Pasadena, California.

Miller, D. F.  1978.  Precursor effects on $SO_2$ oxidation.  Atmos. Environ. 12, 273-280.

Panofsky, H. A., H. Tennekes, D. H. Lenschow and J. C. Wyngaard.  1977. The Characteristics of Turbulent Velocity Components in the Surface Layer Under Convective Conditions, Bound. Lay. Meteorol., 11-: 355-361.

4-172

## REFERENCES (CONTINUED)

Pasquill, F.  1961.  The Estimation of the Dispersion of Windborne Materials. Meteorol. Mag., 90, 33-49.

Pitts, J. N. and D. Grosjean.  1978.  Detailed Characterization of Gaseous and Size-resolved Particulate Pollutants at a South Coast Air Basin Smog Receptor Site.  Report to California Air Resources Board on Contract No. ARB-5-384 and A6-171-30.  Statewide Air Pollution Research Center, Riverside, California.

Pitts, J. N., Jr., K. Darnall, W. P. L. Carter, A. M. Winer and R. Atkinson.  1979.  Mechanisms of Photochemical Reactions in Urban Air.  Final Report, EPA-600/3-79-110, November.

Schacher, G. E., K. C. Davidson and C. W. Fairall. 1982.  Atmospheric Marine Boundary Layer Convective Mixing Velocities in the California Coastal Region, Atmos. Environ., 16, 1183-1192.

Shir, C. C. and L. J. Shieh.  1974.  A Generalized Urban Air Pollution Model and Its Application to the Study of the $SO_2$ Distributions in the St. Louis Metropolitan Area, J. Appl. Meteorol, 13, 185-204.

Smith, M. E.  1968.  Recommended Guide for the Prediction of Dispersion From Airborne Effluents, Amer. Soc. Mech. Engineers.

Turner, D. B.  1964.  A Diffusion Model for an Urban Area.  J. Appl. Meteorological 3, 83-91.

U.S. Nuclear Regulatory Commission.  1972.  Regulatory Guide 1.23: Onsite Meteorological Programs.

Venkatram, A.  1980.  Estimation of turbulence velocity scales in the stable and the unstable boundary layer for dispersion applications. In Eleventh NATO-CCMS International Technical Meetings on Air Pollution Modeling and Its Application.  54-64.

Venkatram, A.  1981.  Personal communication.  Environmental Research & Technology, Inc., Concord, Massachusetts.

Wang, I. T. and P. C. Chen.  1980.  Estimations of Heat and Momentum Fluxes Near the Ground.  2nd Joint Conf. on Applications of Air Poll. Meteorology, 764-769, American Meteorological Society, Boston, Massachusetts.

Wesely, M. L. and B. B. Hicks.  1977.  Some Factors That Affect the Deposition Rates of Sulfur Dioxide and Similar Gases on Vegetation. J. Air Poll. Control Assoc., 27, 1110-1116.

Wyngaard, J. C.  1981.  Wind shear in the baroclinic convective PBL. In Fifth Symposium on Turbulence, Diffusion, and Air Pollution, 78-79. American Meteorological Society, Boston, Massachusetts.

## REFERENCES (CONTINUED)

Young, T. R. and J. P. Boris. 1977. A Numerical Technique for Solving Stiff Ordinary Differential Equations Associated with the Chemical Kinetics of Reactive Flow Problems. J Phys. Chemic, 81, 25.

Zilitinkevich, S. A. 1972. On the determination of the height of the Ekman boundary layer. Boundary Layer Meteorol., 3, 141-145.

APPENDIX 4.6

VISUAL RESOURCES ANALYSIS ON

LOS PADRES NATIONAL FOREST
(Revision of Appendix E in the DEIR/EIS)

INTRODUCTION

Impacts of pipeline construction and operation on visual resources are of particular concern in the Las Padres National Forest (LPNF).  The following analysis of the differences in impacts among the routing alternatives is limited to the segments of the alternatives on LPNF. The following are definitions of the visual classifications used in this discussion:

- Variety Class - A particular level of visual variety or diversity of landscape character.
  A = Distinctive
  B = Common
  C = Minimal.

- Sensitivity Level - A particular degree or measure of viewer interest in the scenic qualities of the landscape.
  1 = Highest concern
  2 = Average concern
  3 = Lowest concern or seldom seen.

- Viewing Distance - Areas of landscapes denoted by specified distances from the observer.  Used as a form of reference in which to discuss landscape characteristics or activities.
  Fg = Foreground, 0 to 0.5 mile
  Mg = Middleground, 0.25 to 5 miles
  Bg = Background, 3 or more miles.

- Visual Quality Objective (FS VQO) - A desired level of excellence based on physical and sociological characteristics of an area. Refers to acceptable alteration of the landscape (see Table 3-28).

- Visual Absorption Capability (VAC) - The ability of a landscape to absorb a human activity or facility without significantly altering the natural appearance.
  H = High
  M = Moderate
  L = Low.

- Existing Visual Condition (EVC) - The current state of naturalness or alteration that exists at a particular site or landscape area (see Table 3-28).

- Future Visual Condition (FVC) A prediction of the expected future state of the landscape as it would appear after the Celeron/All American or Getty proposals were implemented (see Table 3-28).

4-174

CELERON PROPOSAL

Affected Environment

The Celeron route in La Brea Canyon would affect a total of 184 acres of land within the LPNF. Landscape variety is common (variety Class B) and typical of the Coastal Mountain Ranges within 73 percent of the corridor. The remainder of the corridor contains landscape variety that is minimal (variety Class C). Ninety-three percent of the corridor is visible from the La Brea Canyon Road and other travelways that contain significant numbers of aesthetically concerned viewers and is classified as high in sensitivity (sensitivity level 1). Approximately 85 percent of this route is viewed from critical viewing distance zones (foreground and middleground).

Approximately 18 percent of this corridor is presently untouched by human activities. Human activities remain subordinate to the natural landscape on 23 percent of the corridor (EVC Classes II & III) and dominate the natural landscape on the remaining 59 percent (EVC Classes IV and V).

The relative ability of the landscape to absorb pipeline development without loss of its natural character is low on approximately 85 percent of this route.

Under current Forest management direction, approximately 89 percent of the corridor is managed, as a minimum, to meet the Retention and Partial Retention visual quality objectives (VQOs). The remainder of the corridor is managed to meet the modification and maximum modification VQOs. Presently, these objectives are met on only 34 percent of the corridor due primarily to the impacts associated with the La Brea Canyon Road and fuel break construction.

Environmental Consequences

Development of the pipeline under the Celeron proposal would result in visual disturbances that would appear dominant over the natural landscape (visual condition Classes IV and V) on approximately 89 percent of the corridor. Pipeline activities would remain visually subordinate to the natural landscape on the remainder of the corridor.

Existing visual conditions would decline on approximately 39 percent of the corridor. Pipeline activities would not be consistent with LPNF visual quality objectives on approximately 89 percent of the corridor (a significant impact). Present VQO achievement levels would decline by 68 percent under this alternative.

GETTY PROPOSAL

Affected Environment

The Getty route in La Brea Canyon would affect a total of 92 acres of land within the LPNF. Landscape variety is common or typical of that found within the coastal mountains of southern California on 73 percent

4-175

of the corridor. The remainder of the corridor contains minimal landscape variety. Ninety-six percent of the corridor is visible from the La Brea Canyon Road and other travelways that are classified as high in sensitivity to the viewing public. Approximately 92 percent of the corridor is viewed from critical viewing distance zones (Fg & Mg).

Virtually the entire corridor has been disturbed by human activities. These disturbances remain visually subordinate to the natural landscape (EVC Classes I, II and III) on 31 percent of the corridor and are visually dominant on the remainder.

The relative ability of the landscape to absorb pipeline development activities without loss of natural character is low on 61 percent of the corridor, moderate on 37 percent, and high on 2 percent.

Under current Forest management direction, approximately 92 percent of the corridor is managed to meet, as a minumum, the Retention and Partial Retention VQOs. The remainder of the corridor is managed to meet the Modification and Maximum Modification VQOs. Presently these VQOs are met on approximately 17 percent of the corridor due to impacts associated with the La Brea Canyon Road and fuel break construction activities.

## Environmental Consequences

Development of the pipeline under the Getty proposal would result in visual disturbances that would dominate the natural landscape (visual condition Classes IV and V) on 92 percent of the corridor. Pipeline activities would remain visually subordinate to the natural landscape on the remainder of the corridor.

Existing visual conditions would decline on approximately 30 percent of the corridor. Pipeline activities would not be consistent with the Forest's inventoried visual quality objectives on approximately 92 percent of the corridor (a significant impact). Present VQO achievement levels would decline by approximately 54 percent.

## SANTA MARIA CANYON ALTERNATIVE A

### Affected Environment

Santa Maria Canyon Alternative A would affect approximately 50 acres of land within the LPNF. Landscape variety is unique or distinctive (variety Class A) on approximately 7 percent of the corridor. Landscape variety is common or typical of that found within the coastal mountains of southern California on 78 percent of the land, and there is minimal variety on the remainder of the corridor. Approximately 58 percent of the corridor is visible from State Highway 166 at critical viewing distance zones. The remainder of the corridor is seldom seen by the public.

Approximately 46 percent of the corridor is untouched by human activities. On the remainder of the corridor, disturbances from human

activities remain visually subordinate to the natural landscape on approximately 44 percent of the corridor and are visually dominant on the remaining 10 percent.

The relative ability of the landscape to absorb pipeline activities without loss of natural character (VAC) is low on approximately 64 percent of the corridor and moderate on the remaining 36 percent.

Under current Forest management direction, approximately 58 percent of the corridor is managed, as a minimum, to meet the Retention and Partial Retention VQOs. The remainder of the corridor is managed to meet the modification VQO. Presently these objectives are met on approximately 84 percent of the corridor. Underachievement of VQOs on the remainder of the corridor is due to impacts associated with Highway 166 cuts and fills.

## Environmental Consequences

Development of the pipeline under Santa Maria Canyon Alternative A would result in visual disturbances that would appear dominant over the natural landscape on approximately 24 percent of the corridor. Pipeline activities on the remainder of the corridor would remain visually subordinate to the natural landscape.

Existing visual conditions would decline on approximately 52 percent of the corridor. Pipeline activities would not be consistent with LPNF visual quality objectives on approximately 35 percent of the corridor (a significant impact). This under achievement would occur mostly within those portions of the corridor that are highly visible from Highway 166. Present VQO achievement levels would decline by 19 percent under this alternative.

## SANTA MARIA CANYON ALTERNATIVE B

## Affected Environment

Santa Maria Alternative B would affect approximately 29 acres of land within the LPNF. Landscape variety is common or typical of that found in the coastal mountains on 56 percent of the corridor, with minimal variety on the remaining 44 percent. Approximately 60 percent of the corridor is visible from State Highway 166 and the Sierra Madre Road of critical viewing distance zones. The remaining 40 percent of the corridor is seldom seen by the public.

Approximately 10 percent of the corridor is untouched by human activities. On 76 percent of the corridor, existing roads and fuelbreaks are unnoticed alterations. Only in the Sierra Madre Mountains are existing conditions noticeable, where fuelbreaks are visually dominant on 14 percent of the corridor.

The relative ability of the landscape to absorb pipeline activities without loss of natural character (VAC) is low on approximately 79 percent of the corridor and moderate on 21 percent.

4-177

Under current Forest management direction, approximately 60 percent of the corridor is managed, as a minimum, to meet the Retention and Partial Retention VQOs. The remainder of the corridor is managed to meet the modification VQO. Presently these objectives are met on approximately 86 percent of the corridor. Underachievement of VQOs on the remainder of the corridor is due to impacts associated with the existing fuelbreak on the Sierra Madre Mountains.

Environmental Consequences

Development of the pipeline under Santa Maria Canyon Alternative B would remain visually subordinate to the natural landscape. The corridor utilizes existing fuelbreaks and roads and would not be evident.

Existing visual conditions would not decline if this pipeline were constructed. Pipeline activities would be consistent with LPNF visual quality objectives on 100 percent of the corridor and would not be noticeable from high sensitivity travel routes. Present VQO achievement levels would not decline under this alternative.

COMPARISON AND EVALUATION OF ALTERNATIVES

Table 4.6 summarizes some of the differences among the routing alternatives. The visual quality index provides a measure of the overall visual quality that would result under each alternative. The index is a product of variety classes and future visual conditions. Highest possible visual quality (all acres = Variety Class A and Visual Condition Class I) would be indicated by an index of 100. The lowest possible visual quality would be indicated by an index of zero (all acres = variety Class C and visual condition Class VI). According to the calculations, the Santa Maria Canyon Alternative A would produce the highest overall visual quality index among the alternatives, and the Getty La Brea proposal would produce the lowest.

Existing visual conditions are significantly lower because of existing fuel breaks and roads preferred along the Celeron and Getty proposals. However, the pipeline development would offer little potential for enhancement or rehabilitation of visual resources in these corridors due to the large scale of the pipeline development proposals. The highly scenic, small scale character of La Brea Canyon, in particular, would undergo major changes in its existing natural character if one or both pipelines were constructed.

The Santa Maria Canyon Alternative B would have significantly higher future visual conditions and VQO achievement levels, would affect fewer acres of National Forest land, and would offer greater potential for concealing the pipeline development from public view than either the Celeron or Getty La Brea proposals, or Santa Maria Canyon Alternative A.

TABLE 4.6

COMPARISON OF ALTERNATIVES

|  | Celeron Proposal | Getty Proposal | Santa Maria Canyon Alternative A | Santa Maria Canyon Alternative B |
|---|---|---|---|---|
| **Future Visual Conditions** |  |  |  |  |
| Condition Class I | 0 | 0 | 0 | 0 |
| Condition Class II | 5 percent | 4 percent | 57 percent | 86 |
| Condition Class III | 6 percent | 4 percent | 19 percent | 0 |
| Condition Class IV | 34 percent | 35 percent | 0 | 0 |
| Condition Class V | 55 percent | 57 percent | 24 percent | 14 |
| Condition Class VI | 0 | 0 | 0 | 0 |
| **Decline in Existing Visual Conditions** | 39 percent | 30 percent | 52 percent | 10 |
| VQO Achievement Levels | 11 percent | 8 percent | 65 percent | 86 |
| Visual Quality Index | 28.32 | 27.71 | 47.87 | 35.80 |

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF BART LEININGER IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION (VOL. 2 OF 4)** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒    BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

Josie Cisneros

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
dpettit@biologicaldiversity.org
        tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
        jfrankel@environmentaldefensecenter.org
        trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/
DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
        benjaminhanelin@paulhastings.com
        natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY
LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (805) 966-7000
Email: TLarge@FLASllp.com