# EXHIBIT R

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
  jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
  garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et. al, <br><br> Petitioners and Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al., <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., et al., <br><br> Real Parties in Interest. | Case No. 25CV02247 <br> [Coordinated with Case No. 25CV02244] <br><br> Assigned for all purposes to: <br> Hon. Donna D. Geck <br><br> **DECLARATION OF STEVE RUSCH IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTON** <br><br> [*Filed concurrently with Opposition to Application for Preliminary Injunction; Declarations of Michael A. Mische, Bart Leininger, Brien Vierra, and Michael J. Rosenfeld*] <br><br> Date:      July 18, 2025 <br> Time:     10:00 AM <br> Dept.:     4 <br><br> Complaint Filed:     April 15, 2025 <br><br> Trial Date:     None set |

**<u>DECLARATION OF STEVE RUSCH</u>**

I, Steve Rusch, declare as follows:

1.      I am the Vice President, Regulatory & Environmental Affairs of Sable Offshore Corp. ("Sable").  I have over 45 years of experience in the oil and gas industry.  Before my current position with Sable, I was the Vice President, Environment, Health and Safety ("EHS") and Government Affairs at Freeport-McMoRan Oil & Gas, a Senior Staff Engineer at Exxon Mobil Corporation, and the Principal at Rusch Consulting.  I have a Bachelor's Degree in Civil Engineering from the University of California at Berkeley and have been licensed by the State of California as a Professional Engineer.   I make this declaration in support of Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's (collectively "Real Parties") Opposition to Application for Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2.      Sable is a publicly traded oil and gas company focused on responsibly developing the Santa Ynez Unit ("SYU") in waters offshore of Santa Barbara County, California, as well as the connected onshore Las Flores Pipelines system that includes portions that are within the Coastal Zone (collectively the SYU Pipelines and the Las Flores Pipelines are referred to as the "Pipelines").

3.      As detailed below, Real Parties have completed the anomaly repair work contemplated under the December 17, 2024 "State Waivers" issued by the Office of State Fire Marshal ("OSFM"). The State Waivers do not allow oil to flow through the Las Flores Pipelines. Rather, Real Parties are required to submit and obtain OSFM's approval of a "Restart Plan" before restarting the Las Flores Pipelines. Real Parties submitted a Restart Plan to OSFM on July 29, 2024, and it remains under OSFM's review.

**<u>Acquisition And Completion of Repair and Maintenance to the Pipelines</u>**

4.      I have been involved in Sable's acquisition, maintenance, and repair of the Pipelines. These assets were previously owned by Exxon Mobil Corporation ("Exxon") and Mobil Pacific Pipeline Company ("MPPC," and together with Exxon, "EM").  I am familiar with the permitting history covering Real Parties' maintenance activities to the Pipelines.

5.      Real Parties began conducting repair and maintenance activities to the Las Flores

Pipelines in May 2024. These repair and maintenance activities were completed pursuant to the previously granted Coastal Development Permits ("CDPs") for the Las Flores Pipelines, which were permitted by the County of Santa Barbara under its Local Coastal Program pursuant to its delegated authority from the Coastal Commission. On February 12, 2025, after discussion with the County and providing County Staff with additional requested documentation, the County wrote Sable a letter in which it confirmed "this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the *existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS*." (emphasis added). A true and correct copy of the County's February 12, 2025 Correspondence to Real Parties is attached hereto as **Exhibit A**.

6.      Real Parties were granted a right of entry to perform the repair and maintenance activities from the California Department of Parks and Recreation, as well as a right of entry to the Land Trust for the County of Santa Barbara. These rights of entry permitted Real Parties to complete anomaly repairs on the Las Flores Pipelines, cover the associated trenches, and complete (and pass) pressure tests on the entire line.

7.      In April 2024, Sable submitted State Waiver applications to OSFM for Las Flores Pipeline Lines CA-324 and CA-325. On December 17, 2024, OSFM issued the State Waivers for Lines CA-324 and CA-325 and imposed over sixty separate conditions on Sable's operation of the Las Flores Pipelines. True and correct copies of the State Waivers are attached hereto as **Exhibits B and C**.

8.      On February 11, 2025, Alan K. Mayberry, an associate administrator for pipeline safety for the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA") sent to OSFM a letter that stated, in relevant part, "[t]he OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (CA-324) between Las Flores Canyon and Gaviota, California.  The state waiver requires Sable comply

DECLARATION OF STEVE RUSCH

with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline in operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline.  Thereafter, the pipeline must be reassessed at least every year.  Pursuant to 49 USC § 60118(d), PHMSA does not object to the granting of this waiver by the OSFM for the Sable CA-324 pipeline."  A true and correct copy of PHMSA's letter dated February 11, 2025, concerning the OSFM's State Waiver for Line CA-324 of the Las Flores Pipeline is attached hereto as **Exhibit D**

9.        Also on February 11, 2025, Alan K. Mayberry, on behalf of PHMSA sent a letter to the OSFM that also indicated that PHMSA would not object to the OSFM's issuance of a State Waiver for Las Flores Pipelines Line CA-325.  It stated, in relevant part, "[t]he OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California…. Pursuant to 49 USC § 60118(d), PHMSA does not object to the granting of this waiver by the OSFM for the Sable CA-325A&B pipeline."  The letter further described the measures Sable is required to undertake to operate and maintain Line CA-325, which are identical to the requirements addressed with respect to Line CA-324.  A true and correct copy of PHMSA's letter dated February 11, 2025, concerning the OSFM's state waiver for Line CA-325A/B of the Las Flores Pipelines is attached hereto as **Exhibit E**.

10.        On April 2, 2025, the OSFM issued two letters concerning PHSMA's February 11, 2025 letters describing PHSMA's decision to state it does not have any objections to the OSFM's issuance of State Waivers for Lines CA-324 and CA-325A/B.  True and correct copies of the OSFM's April 2, 2025 letters concerning PHSMA's decision to not object to the OSFM's issuance of state waivers for Lines CA-324 and CA-325A/B, are attached hereto as **Exhibits F and G**, respectively.

DECLARATION OF STEVE RUSCH

11. Real Parties have now completed repair and maintenance activities pursuant to existing CDPs and in conformance with the State Waivers for the Las Flores Pipelines. Specifically, with the completion of the Gaviota State Park anomaly repairs on May 18, 2025, Sable has now completed its anomaly repair program on the Las Flores Pipelines as specified by the Consent Decree, the governing document for the restart and operations of the Las Flores Pipelines. Real Parties have also completed the safety valve installation work on the Las Flores Pipelines, as required by Assembly Bill 864, and all span remediation work on the SYU Pipelines. A true and correct copy of a map depicting Real Parties' completed and outstanding repair activities to the Las Flores Pipelines is attached hereto as **Exhibit H**.

12. On May 15, 2025, Sable initiated the flow of oil production from six wells on Platform Harmony of the Santa Ynez Unit to Las Flores Canyon via the SYU Pipelines, at a rate of ~6,000 barrels of oil per day. Critically, this does not consist of any oil transport through the Las Flores Pipelines.

13. Sable tested wells on Platform Harmony throughout May 2025, and the well tests have performed consistently stronger than they did at the time of shut-in on May 19, 2015, when the Santa Ynez Unit produced approximately 45,000 barrels of oil equivalent per day.

14. Approximately 30% of the 32 producing wells at Platform Harmony have been tested as of May 18, 2025.

15. OSFM has not yet issued final approval to restart the flow of oil through the Las Flores Pipelines through approval of the Restart Plan.

16. As of May 19, 2025, updated 2H25 Guidance shows up to 50,000 barrels per day of anticipated net production.

**Authorization for Pipeline Maintenance and Repair Work on the Las Flores Pipelines**

17. The Las Flores Pipelines includes the pipeline segments CA-324 ("Line CA-324") (previously known as Line 901) and CA-325 ("Line CA-325") (previously known as Line 903) (collectively referred herein as the "Las Flores Pipelines"), portions of which are located within the coastal zone in an unincorporated area of the County. Line CA-324 is designed to transport crude oil approximately 10.9 miles from Las Flores Pump Station in Las Flores Canyon, west along the Gaviota

4

DECLARATION OF STEVE RUSCH

Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County.  Line CA-325 is designed to transport crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County. Lines CA-324 and CA-325 are located onshore and carry a maximum permitted throughput capacity of 150,000-barrels of crude oil per day and 300,000-barrels of crude oil per day, respectively.  The Celeron Pipeline Project (also referred to herein as the "Pipeline Project"), includes Lines CA-324 and CA-325.

18.    The State Lands Commission and federal Bureau of Land Management and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Pipeline Project pursuant to California Environmental Quality Act ("CEQA") and National Environmental Policy Act ("NEPA"). During the Pipeline Project's environmental review under the CEQA and NEPA, the locations of Lines CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources (including topography, viewshed, watersheds, etc.). The State Lands Commission certified the EIR/EIS in January 1985. A true and correct copy of relevant excerpts from the draft EIR is attached to the concurrently filed Declaration of Bart Leininger as **Exhibit C**.  A complete version of the draft EIR is available at the following link: https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672. A true and correct copy of relevant excerpts from the final EIR is attached to the concurrently filed Declaration of Bart Leininger as **Exhibit B**.  A true and accurate copy of the final EIR is available at the following link: https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.  Real Parties will provide full hard copies of the draft and final EIRs upon the Court's request.

19.    After reviewing the EIR/EIS, the Santa Barbara County Planning Commission made a final decision to approve the Pipeline Project FDP on February 18, 1986.  The approval was not challenged during the appeal period and the Planning Commission's approval action became final and effective.  The Planning Commission's action included the FDP (Case # 85-DP-66cz) and a Major CUP (Case # 83-CP-97cz).  The FDP was required because the Pipeline Project necessitated

DECLARATION OF STEVE RUSCH

comprehensive review, and the CUP was required because the pipelines crossed environmentally sensitive habitat areas.  A true and correct copy of the FDP, approved on February 18, 1986 is attached hereto as **Exhibit I**.

20.   Consistent with the FDP approval and pursuant to the County's certified LCP, the County issued Coastal Development Permit CDP 86-CDP-189 for the Pipeline Project on July 27, 1986.  CDP 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project as approved by 85-DP-66cz."  The CDP incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz."  CDP 86-CDP-189 also excluded "all activities related to pumpstations, river crossings, pipe stringing, welding, and any other activities not normally performed by the clearing, grading and trenching construction crews."  A true and correct copy of Coastal Development Permit CDP 86-CDP-189 is attached hereto as **Exhibit J**.

21.   On August 5, 1986, the County issued Coastal Development Permit CDP 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject as approved by 85-DP-66cz."  CDP 86-CDP-205 also incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz." A true and correct copy of Coastal Development Permit CDP 86-CDP-205 is attached hereto as **Exhibit K**.

22.   The CDPs were not appealed by any party.  The CDPs are therefore final, valid, and not subject to further appeal. Accordingly, the Conditions of Approval for the Las Flores Pipelines' FDP, CUP, and CDPs are all governed under the same Conditions of Approval found in Case #85-DP-66cz, as amended by the County.

23.   The County has amended the Conditions of Approval from time to time, and as such identifies the Conditions of Approval with reference to each of the following case numbers:  88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85 DP-66cz, and 88DP-25cz.  Although the County has issued separate CDPs for major pipeline improvements such as relocations and realignments since the Las Flores Pipelines' CDPs were first issued, the County has not required new or amended CDPs for routine maintenance and repair work on the Las Flores Pipelines.

DECLARATION OF STEVE RUSCH

24.     The Pipeline Project's EIR/EIS explains that its impact analysis extends through the pipelines' entire lifetime, including both pipeline "operation" and "maintenance" and specifically acknowledges that routine maintenance activities, including the anomaly repair work, would occur during the Pipelines' ongoing operation.

25.     The Pipeline Project's EIR/EIS incorporates into the Pipeline Project's project description certain Oil Spill Contingency and Emergency Response Plans. The EIR/EIS concludes that compliance with these plans would "substantially reduce the oil spill risk" and reduce significant impacts that would result from a major oil spill, including impacts related to soils, surface water, aquatic biology, and land use and recreation.  However, even with mitigation, the EIR/EIS concluded that oil spill risks would remain significant and unavoidable. Nevertheless, the County adopted a Statement of Overriding Considerations in which it concluded that compliance with these plans, identified mitigation measures, and the Conditions of Approval would "mitigate[] as completely as possible" "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project.  These plans (which were directly attached to the Draft EIR/EIS and were available for public review and comment) acknowledged the pipelines' ongoing inspection requirements, including by using inspection pipeline integrity gauges ("PIGs") to "measure the severity of corrosion and to inspect pipeline defects."  If required, identified pipeline defects (i.e., anomalies), once detected, would be repaired, "cleaned and recoated" or "removed and replaced," and "faulty … sections of pipe would be replaced as necessary.

26.     The Pipeline Project's EIR/EIS imposes no limitation on the number of sites where anomaly repairs may be undertaken at any one time or over the Las Flores Pipelines' lifetime, and thus, anomaly pipeline repairs contemplated under the Pipeline Project's EIR/EIS for the Las Flores Pipelines may be undertaken *where such work is necessary* at the same time or over a condensed period without constituting a new project under CEQA.

27.     Additionally, the Las Flores Pipelines' Conditions of Approval, which were incorporated by reference into the Las Flores Pipelines' FDP, CUP, and CDPs, encompassed the same operational and maintenance components of the Pipeline Project as described in the Pipeline Project's EIR/EIS.  For example, Condition J-11 acknowledges that the pipelines' right-of-way will be used for

DECLARATION OF STEVE RUSCH

"operational maintenance" after construction is completed. Further, Condition P-2 contemplates that the pipeline operator will conduct "regular maintenance and safety inspections," "corrosion monitoring and leak detection," and "periodic safety audits. Condition P-2 also acknowledges that federal regulations require the pipelines' operator to undertake certain repair and maintenance activities.  The County later amended this Condition in 1987 to expressly state that "[p]ermits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by the permittee and the County."  Condition P-2 confirms that required repair and maintenance activities would be undertaken pursuant to the Las Flores Pipelines' Conditions of Approval, FDP, and CDPs rather than requiring new or modified permits. As described above, the County's Statement of Overriding Considerations concluded that the Pipelines operator's compliance with Condition P-2 and other Conditions of Approval would "mitigate[] as completely as possible" "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project. The County has amended the Conditions of Approval from time to time, and as such identifies the Conditions of Approval with reference to each of the following case numbers:  88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85 DP-66cz, and 88DP-25cz.  Although the County has issued separate CDPs for major pipeline improvements such as relocations and realignments since the Las Flores Pipelines' CDPs were first issued, the County has not required new or amended CDPs for the anomaly work and all of the enumerated conditions relevant to the anomaly repairs at issue and have remained unaltered.   A true and correct copy of the Conditions of Approval in effect in 1987 are attached hereto as **Exhibit L**.  A true and correct copy of the Conductions of Approval, currently in effect, are attached hereto as **Exhibit M**.

28.     The Conditions of Approval contemplate that biological impacts within the Las Flores Pipelines' operational right-of-way would be permanent, allowing for ongoing repair and maintenance activities like the anomaly repair work.  For example, Condition H-1(j) originally required the pipeline operator to develop a "plan for off-site reestablishment of oaks to mitigate impacts to oak savannahs and woodlands along the route."

29.     The County later modified this condition to require the pipeline operator to endow an

DECLARATION OF STEVE RUSCH

Alternative Oak Mitigation Program to reestablish oak savannahs and woodlands in Santa Barbara County at an off-site location to mitigate for the Project's permanent on-site oak tree impacts. Similarly, Conditions H-10 and H-11 required the pipeline operator to, after construction, replace and revegetate any disturbed catalina mariposa lily and refugio manzanita in locations "in or near" the disturbed area, but "exclusive of the operation [right-of-way]." Erosion control was the key objective for any required revegetation along the pipelines' operational right-of-way—not the long-term reestablishment of sensitive species—because it was clearly understood that the pipeline's right-of-way would continue to be disturbed by pipeline operation and maintenance. These Conditions confirm that any biological impacts along the pipelines' operational right-of-way resulting from repair and maintenance activities are within the scope of impacts previously approved by the County.

30. The Conditions of Approval further demonstrate that repair and maintenance activities fail to trigger any of the narrow circumstances under which the Conditions of Approval would require Sable to obtain a new or modified permit. Nor do the Conditions of Approval impose any limit or require new permits based on the number of sites where anomaly repairs may be necessary or undertaken at the same time or over a condensed period. Condition A-13 provides:

> [The pipeline operator] shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgement of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above [noted as the outer continental shelf and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins], and 4) introduction of a different product from any source.

30. Real Parties' completed anomaly repair work therefore fell within the scope of approved activities contemplated by the pipelines' Conditions of Approval, and as analyzed under the Pipeline Project's EIR/EIS, to be undertaken without any subsequent or modified permit or subsequent environmental review because the work did not involve: (1) "major pipeline or pump station modifications," as such work is a standard repair and maintenance activity required by 49 C.F.R.

9

DECLARATION OF STEVE RUSCH

§ 195.452(h)(1); (2) "major changes in pipeline throughput," because such work will not alter the pipelines' capacity; (3) "introduction of production … from [new] sources"; or (4) "introduction of a different product."

**Real Parties' Repair and Maintenance Activities, and the Restart of the Pipelines Are Governed by a Framework of Consent Decree, Existing CDPs, and Federal Regulations**

31.    On February 8, 1988, the Las Flores Pipelines' original proponent, the Celeron Pipeline Company of California (Celeron), and the County entered into a Settlement Agreement regarding the County's jurisdiction over certain project components.  As part of the Settlement Agreement, the County agreed that it was preempted from regulating the Las Flores Pipelines' design, construction, and operation covered under 49 C.F.R. Part 195.  The Settlement Agreement also creates a presumption of preemption where the activity is: (1) covered by 49 C.F.R. Part 195 (PHMSA's implementing regulations), (2) deals with the design, construction, or operation of the pipeline even if not expressly specified under 49 C.F.R. Part 195, or (3) performed a foot or more below the ground surface. The County reserved the authority, however, to confirm that the Las Flores Pipelines comply with the Conditions of Approval, allowing the County to ensure that the Las Flores Pipelines were constructed and operated consistent with the Pipeline Project's EIR/EIS and original County approvals, including the CDPs.  The Settlement Agreement further details that the County lacks authority, however, to require additional permits or authorizations for any work that is expressly or impliedly covered 49 C.F.R. Part 195, related to pipeline design, construction, or operation, or is performed a foot or more below the ground surface.

32.    In 2015, the California Legislature enacted Assembly Bill 864 ("AB 864"), which requires pipeline operators in environmentally sensitive areas to use best available technology including, but not limited to, "leak detection technologies, automatic shut-off systems, or remote controlled sectionalized block valves, or any combination of these technologies" to reduce the volume of potential oil spills. AB 864 charged the Office of the State Fire Marshal ("OSFM") with drafting its implementing regulations and granted OSFM the exclusive authority to enforce them.

33.    On March 13, 2020, a Consent Decree was filed in a case entitled *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains*

10

DECLARATION OF STEVE RUSCH

*Pipeline, L.P.*, Case No. 2-20-cv-02415.   The Consent Decree attaches specific steps that must be undertaken to restart the Las Flores Pipelines and detailed steps to obtain OSFM approval of the Restart Plan. Pursuant to the Consent Decree, the OSFM holds authority over the restart of the Las Flores Pipelines and oversees installation and testing of the safety valves and implementation of several integrity-related improvements before resumption of production transportation through the Las Flores Pipelines may take place.  The Consent Decree was executed by representatives of the United States's Department of Justice, Environment and Natural Resources Division, PHMSA, United States EPA, United States Department of Interior, the National Oceanic and Atmospheric Administration, the National Pollution Funds Center (United States Coast Guard), California state agencies represented by the Office of Attorney General, Natural Resources Law Section, the California Department of Fish and Wildlife (Office of Spill Prevention and Response), the California Department of Parks and Recreation, the California State Lands Commission, the California Department of Forestry and Fire Protection, the California Central Coast Regional Water Quality Control Board, and the University of California.  A true and correct copy of the Consent Decree filed on March 13, 2020 is attached hereto as **Exhibit N**.

34.    In April 2021, Real Parties' predecessor-in-interest, Plains Pipeline, L.P. ("Plains"), secured approval from OSFM to retrofit the Las Flores Pipelines with 16 above-ground safety valves as required under AB 864, including seven valves in the Coastal Zone.  The proposal included both motor-operated valves ("MOVs"), which are equipped with an electrical shut-off system connected to utility lines or a solar power source, and check valves ("CHKs"), which involve an automatic shut-off system with one-way flow closure. A true and correct copy of the Risk Assessment performed by Plains Pipeline, L.P. pursuant to State Assembly Bill 864 and submitted to OSFM, dated April 1, 2021, is attached hereto as **Exhibit Q**.

35.    Like Real Parties' completed anomaly repair work, the Las Flores Pipelines' original environmental review contemplated safety valve installation work, including the installation of 15 "block and check" valves that operate in the same way as the MOVs and CHKs approved by OSFM in April 2021.

36.    In December 2021, Plains submitted applications to the County for approval to

DECLARATION OF STEVE RUSCH

complete the safety valve installation work.  As a result of litigation related to the County's review of those applications, Real Parties revised the proposal such that all safety valves would be installed underground.

37.   On August 30, 2024, Real Parties and the County also entered into a settlement agreement in litigation regarding the safety valves on the Las Flores Pipelines.  The August 30, 2024 settlement agreement addresses Real Parties' revised plan regarding proposed safety valves as well as additional surveillance and response enhancements that will be added to the Las Flores Pipelines.  In the August 30, 2024 settlement agreement, followed by a subsequent letter from the County on September 4, 2024, the County confirmed that "it does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment because they are safety valves required by state law [AB 864], related to the operation of an interstate pipeline, and one foot or more underground. [The County] understands the [Las Flores Pipelines] remain[] subject to regulation by the Office of State Fire Marshal and that [Real Parties] will be working closely with that office on installation and testing of the safety valves, as well as implementing a number of integrity-related improvements required by that office."  As the August 30, 2024 settlement agreement also details, State law AB 864 and the OSFM require installation of safety valves on the Las Flores Pipelines before the Las Flores Pipelines may be restarted.

38.   On September 4, 2024, in light of Real Parties' revision to the proposed safety valve installation work, the County confirmed that the County "does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment as currently proposed because they are safety valves required by state law [AB 864], related to the operation of  a Pipeline, and one foot or more underground. Because the County has delegated LCP authority under the Coastal Act, Real Parties understood the County's confirmation to extend to Coastal Act permitting as well.  Real Parties began the safety valve installation work only after receiving this confirmation that no further County authorization was required.

39.   On February 12, 2025, the County confirmed in a letter to Sable that the future and ongoing anomaly repair work conducted by Real Parties to the Las Flores Pipelines is "authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal

12

DECLARATION OF STEVE RUSCH

Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement. Thus, no further application to or action by the County is required." The County reached its conclusion after review of detailed descriptions, plans, and assessments provided to the County by Sable included in Zoning Clearance applications submitted to the County concerning future and ongoing anomaly repair work in the coastal zone. The County's letter further confirms that it is "not appealable to the Planning Commission [or] Board of Supervisors." Although Sable's Zoning Clearance applications allowed the County to confirm that ongoing and future anomaly repair work falls within the scope of the Pipeline Project's existing CDPs, the County also concluded that such work does not actually require Zoning Clearances. As the County explained, its "assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits." Therefore, based on its review the County concluded that "no further application to or action by the County is required." This reflects a County understanding that Zoning Clearances should be used before commencing initial construction approved under a final development plan and that Zoning Clearances should not be used for each individual element of the approved development or use throughout the life of a project. Accordingly, the County offered to return the Zoning Clearance applications without taking any action on them other than confirming "that the pipeline anomaly repair work is authorized by the existing permits." (See **Exhibit A**.)

40. On March 6, 2025, SCS Engineers, on behalf of Real Parties, submitted "information regarding 48 anomaly repairs previously conducted on portions of the [Las Flores Pipelines] [], and in one County right-of-way…." On March 21, 2025, the County confirmed that it had "reviewed the information [Real Parties] provided and [] determined that this work fits within[] the conclusions/directives of our February 12, 2025 letter to Steve Rusch []. No permits will be required [for the previous anomaly repair work to the Las Flores Pipelines]." A true and correct copy of the exchange of correspondence with the County staff's regarding prior repair and maintenance work performed in 2024 is attached hereto as **Exhibit O**.

41. On April 9, 2025, the County sent the Coastal Commission a correspondence addressing the County's determination that the repair and maintenance activities to the Las Flores

DECLARATION OF STEVE RUSCH

Pipelines were authorized under existing CDPs.  In its correspondence, the County noted that the Coastal Commission claimed "that the County has 'failed to provide the requested information regarding the basis for the County staff's determination.'"  The County explained, "[p]lease note that we have provided all requested documents in response to Coastal Commission inquiries[,]" and explained that "Commission staff has all the information that the County considered prior to concluding that the pipeline anomaly repair work identified in the February 12, 2025 letter is authorized by the existing permits and was analyzed in the prior environmental review."  The County's April 9, 2025 correspondence further provides that, "[t]he County did not allow activity without a permit, nor did the County take an action on a permit or development application that may be appealable to the Coastal Commission."  A true and correct copy of the County's April 9, 2025 correspondence is attached hereto as **Exhibit P**.

**<u>Real Parties Will Suffer Irreparable Harm and Significant Economic Damage if the</u>**

**<u>Preliminary Injunction is Issued</u>**

66.     If the preliminary injunction is issued, Real Parties will be delayed in commencing the sale of oil to California refineries through the Pipelines—Pipelines which have been repaired in accordance with the requirements issued by OSFM in the State Waivers.

67.     Specifically, Real Parties have spent approximately $45 million on repair and maintenance activities occurring within the Coastal Zone through March 2025, not including the cost of repairs outside of the Coastal Zone. Real Parties are required to perform specific tasks to meet specific deadlines in order to comply with their permit requirements and obligations under federal law to thereafter conduct operations at the Pipelines, which is critical to the livelihood of Real Parties' business. If a preliminary injunction is issued, Real Parties will be delayed in commencing the sale of oil to California refineries. This will cause Real Parties to incur significant economic damages in the form of an immediate loss of net margin.

68.     Specifically, Real Parties will be forced to lose net margin of at least ***<u>$2.5 million per day</u>***, totaling ***<u>$75 million per month</u>***. As explained above, Sable will have the capacity to produce approximately 50,000 barrels per day at $50 net per barrel. This means that if Real Parties cannot restart and operate the Las Flores Pipelines, such idleness at the Pipelines will cause Real Parties to

<div align="center">14</div>

<div align="center">DECLARATION OF STEVE RUSCH</div>

lose at least ***$17.5 million in net margin per week, totaling $75 million for just one month***.

69.     Additionally, Real Parties must pay royalties to state and federal governments on this anticipated oil production, which is projected to exceed $15 million in royalties per month.

70.     Sable is a publicly traded company, and a business disruption of this magnitude would have significant effect on the value of the company. The shareholders of the company, including the numerous 401(k) plans, mutual funds, and pension that have invested in the company, will immediately lose quantifiable value as the company is forced to incur multimillion-dollar delay damages in the event enforcement of the CDO is not stayed.

71.     Real Parties' inability to complete, or any delay in, the restart and operation of the pipelines, will exacerbate California's ongoing energy crisis. Citizens of the State of California would therefore also suffer irreparable harm in the form of higher gasoline prices, lost jobs, lost tax revenues, lost royalty sharing, and increased regulatory uncertainty.

72.     On the other hand, given the extensive regulatory and compliance framework governing the Pipelines, approval of the Restart Plan will ensure there will be no harm to the public or the environment. As previously stated, Real Parties' Restart Plan remains under OSFM's review. A grant of Petitioners' preliminary injunction would therefore force Real Parties to hemorrhage at least $75 million in lost net margin and exponential losses in shareholder value to enjoin the restart of the Las Flores Pipelines, which has not yet been approved to restart.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 7, 2025, in Thousand Oaks, California.

_____
Steve Rusch

15
DECLARATION OF STEVE RUSCH

# EXHIBIT A



## Planning and Development
Lisa Plowman, Director
Jeff Wilson, Assistant Director
Elise Dale, Assistant Director

February 12, 2025

Mr. Steve Rusch
Sable Offshore Corporation/Pacific Pipeline Corporation
12000 Calle Real
Goleta, CA 93117

*Sent via email:* [srusch@sableoffshore.com](mailto:srusch@sableoffshore.com)

SUBJECT:     Zoning Clearance Applications - 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096

Mr. Rusch,

On November 22, 2024 and December 6, 2024, Santa Barbara County Planning and Development received four Zoning Clearance applications for pipeline "anomaly repair work" to Lines 324 and 325a. These applications stated that they sought to permit anomaly repair work in the enclosed descriptions of work for case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096. Sable's position is that the Zoning Clearance process meets the requirements of the County's Local Coastal Program because it is a means for the County to determine if the activities fall within an existing Coastal Development Permit or if a new Coastal Development Permit is required.

The County conducted a detailed review of pipeline permitting history and the Coastal Zoning Ordinance. Planning and Development concludes that this pipeline anomaly repair work is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement (EIR/EIS). The County previously exercised its authority under its Local Coastal Program and delegated Coastal Act authority in approving the permits and the requested anomaly repair work is within the scope of those approved permits. (Pub. Resources Code § 30519.) The County's assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits. Planning and Development will be returning the Zoning Clearance applications to Sable without taking action on them. Alternatively, Sable can choose to withdraw the applications.

This conclusion is related to the requested pipeline anomaly repair work in case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096 and the information supplied with those applications and does not speak to permitting or jurisdiction on any other past or future work on or changes to the Pipeline and associated equipment.

This is not a: 1) permit exemption; 2) Director determination on the meaning or applicability of the provisions of the Coastal Zoning Ordinance; 3) decision on an application for a Coastal Development Permit; or 4) any other ground set forth in Article II Section 35-182. Rather, this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS. Thus, no further application to or action by the County is required. This conclusion is not appealable to the Planning Commission, Board of Supervisors, or Coastal Commission and it does not require a Notice of Final Action. (Article II §§ 35-182; 35-181.4.)

Planning and Development encourages and requests that Sable continue to provide information to the County about any future anomaly repair work consistent with what was supplied in the above-referenced application. Such information will allow the County to evaluate whether particular anomaly repair work results in any different conclusions than those set forth in this letter. That information can be directed to my attention.

Sincerely,

Errin Briggs
Deputy Director, Energy, Minerals, Compliance & Cannabis Division

Enclosures:     24ZCI-00090 Description of Work
                24ZCI-00091 Description of Work
                24ZCI-00095 Description of Work
                24ZCI-00096 Description of Work

CC:             Mickey Johnson, ExxonMobil Upstream Company, via email
                mickey.d.johnson@exxonmobil.com

Sable – Anomaly Repair Work Zoning Clearance Applications

24ZC1-00090 + 91

## Zoning Clearance Applications for
## CA-324 Pipeline Routine Anomaly Repair Work – Description of Work

### Scope of Work

In order to repair an anomaly, Sable must undertake the following steps:  (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

Sable previously commenced the Anomaly Repair Work in compliance with Sable's obligation under federal regulations to take "prompt action" to address pipeline anomalies. (See 49 C.F.R., § 195.452, subd. (h)(1).)  On September 27, 2024, the California Coastal Commission issued Sable Notice of Violation V-9-24-0152 ("NOV") and required Sable to immediately stop all Anomaly Repair Work.  In accordance with the NOV, Sable stopped undertaking the Anomaly Repair Work.  On November 12, 2024, Commission staff issued Executive Director Cease and Desist Order No. ED-24-CD-02 ("EDCDO"), which required Sable to submit an Interim Restoration Plan to secure and backfill the open anomaly sites without completing the Anomaly Repair Work.  Commission staff approved Sable's proposed Interim Restoration Plan on November 20, 2024 with respect to the remedial grading and BMP segment of the Interim Restoration Plan.  As of November 21, 2024, Sable and Commission staff were continuing to coordinate regarding the hydroseeding segment of the plan.  Consistent with the Interim Restoration Plan, each anomaly site will be backfilled and restored to original grade without completing the Anomaly Repair Work.

As such, Sable's Zoning Clearance applications seek *both*:

1. After-the-fact Zoning Clearances for the Anomaly Repair Work previously undertaken at each anomaly site identified in the applications; and
2. Zoning Clearances to complete the Anomaly Repair Work at each such anomaly site in the future (including by excavating the anomaly site again after it is backfilled and restored in compliance with the EDCDO and Interim Restoration Plan).

---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.

[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.

## Location

45 anomaly sites require Anomaly Repair Work. As discussed above, these sites are located along existing pipeline CA-324 in APNs 081-140-019, 081-140-025, 081-150-002, 081-150-006, 081-150-007, 081-150-028, 081-150-032, 081-150-033, and 081-230-021. Table 1 details each anomaly site. Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
|---|---|
| | Application #1 |
| | Application #2 |





The proposed work would utilize the existing roads to access each site. No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements. All material will be balanced onsite, and no material will be imported or exported. Shoring boards will be utilized to stabilize the excavation walls prior to entry. Equipment needed to complete the Anomaly Repair Work includes the following:

- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)
- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

## Fire Protection
If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of

water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

**Construction Best Management Practices**

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

**Conclusion**

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325 in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

Sable – Anomaly Repair Work Zoning Clearance Applications

24 9C1-00095 ; 96

# Zoning Clearance Applications for
# CA-324 and CA-325A Pipeline Routine Anomaly Repair Work –
# Description of Work

### Scope of Work

In order to repair an anomaly, Sable must undertake the following steps: (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

### Location

28 anomaly sites require Anomaly Repair Work. As discussed above, these sites are located along existing pipeline CA-324 and CA-325A in APNs 081-130-068, 081-140-023, 081-150-002, 081-150-028, 081-150-032, 081-270-011, 083-590-003, 083-650-008, 083-650-009, and 083-650-011. Table 1 details each anomaly site. Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
| --- | --- |
|  | Application #1 |
|  | Application #2 |



---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.

[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.



The proposed work would utilize the existing roads to access each site. No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements. All material will be balanced onsite, and no material will be imported or exported. Shoring boards will be utilized to stabilize the excavation walls prior to entry. Equipment needed to complete the Anomaly Repair Work includes the following:

- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)

---

[3] F-9 is associated with two anomaly numbers from separate investigatory tool runs but is associated with one anomaly.

- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

## Fire Protection

If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

## Construction Best Management Practices

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

## Conclusion

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325A in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

# EXHIBIT B

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY | Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Docusign Envelope ID: 87418E7A-ED76-4801-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**<u>General Conditions</u>**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 87418E7A-ED76-4884-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

## In-Line Inspection (ILI) Assessment and Frequency

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

    a)  Dates for integrity assessment

    b)  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 6

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)

d) Required tool specifications including operational specifications and anomaly sizing tolerances

e) Tool validation methodology

f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

g) Criteria used to identify locations for excavation and field verification

h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

**180-Day Repair Conditions**[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Docusign Envelope ID: 87418E7A-ED76-4801-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Lance Yearwood
December 17, 2024
Page 13

      e. Evaluation methodology used
      f. Models used
      g. Direct in situ examination data
      h. All in-line inspection tool assessments information evaluated
      i. Pressure test data and results
      j. All in-the-ditch assessments performed on the pipeline segments
      k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
      l. All finite element analysis results
      m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
      n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
      o. Safety factors used for fatigue life and/or predicted failure pressure calculations
      p. Reassessment time interval and safety factors
      q. The date of the review
      r. Confirmation of the results by qualified technical subject matter expert(s)
      s. Approval by responsible Sable management personnel
      t. Records of additional preventive and mitigative (P&M) measures performed
      u. Reports required by this State Waiver.

## Reporting

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:
      a. Tool type and run date
      b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
      c. Dig sheets
      d. Field contact information for Sable
      e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 14

       a. Tool type
       b. Run date
       c. Summary of Conditions Report[18]
       d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:

       a. A Closure Report for the previous calendar (CY) which contains:
           i. Features that were remediated in previous CY
              1. Provide documentation for the in-the-ditch assessments and repairs
           ii. Identify features that remain to be assessed
           iii. Unity Plots for previous ILI runs
       b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
       c. The third-party ILI expert reviews in accordance with Condition 52
       d. AC and DC Interference surveys that are due in accordance with Condition 53
       e. A copy of the CGRA for prior year including:
           i. Mean corrosion growth rate for the pipeline
           ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 15

> failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs


Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT C

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                          Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:    LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:    Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline:    OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.

14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.

16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.

18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

## In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 7

      any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.
46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 13

      n.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
      o.  Safety factors used for fatigue life and/or predicted failure pressure calculations
      p.  Reassessment time interval and safety factors
      q.  The date of the review
      r.  Confirmation of the results by qualified technical subject matter expert(s)
      s.  Approval by responsible Sable management personnel
      t.  Records of additional preventive and mitigative (P&M) measures performed
      u.  Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification*.[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B*. The email notification shall include, if applicable:
      d.  Tool type and run date
      e.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
      f.  Dig sheets
      g.  Field contact information for Sable
      h.  Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:
      i.  Tool type
      j.  Run date
      k.  Summary of Conditions Report[18]
      l.  Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:
  a. A Closure Report for the previous calendar (CY) which contains:
      i. Features that were remediated in previous CY
          1. Provide documentation for the in-the-ditch assessments and repairs
      ii. Identify features that remain to be assessed
      iii. Unity Plots for previous ILI runs
  b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
  c. The third-party ILI expert reviews in accordance with Condition 53
  d. AC and DC Interference surveys that are due in accordance with Condition 54
  e. A copy of the CGRA for prior year including:
      i. Mean corrosion growth rate for the pipeline
      ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT D



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0002**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (Sable CA-324) between Las Flores Canyon and Gaviota, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

ALAN KRAMER MAYBERRY
Digitally signed by ALAN KRAMER MAYBERRY
Date: 2025.02.11 12:30:07 -05'00'

Alan K. Mayberry,
Associate Administrator for Pipeline Safety

# EXHIBIT E



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0003**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

ALAN KRAMER MAYBERRY
Digitally signed by ALAN KRAMER MAYBERRY
Date: 2025.02.11 12:30:44 -05'00'

Alan K. Mayberry,
Associate Administrator for Pipeline Safety

# EXHIBIT F

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



---

**CERTIFIED MAIL No: 9589-0710-5270-1475-5352-23**

April 2, 2025

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

SUBJECT:    **PHMSA DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:    Sable Offshore Corp
             OPID# 40851
             845 Texas Avenue, Suite 2920
             Houston, Texas 77002

Pipeline:    OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 223F7302-047A-4CD5-9174-E8596773E829

Lance Yearwood
April 2, 2025
Page 2

On December 17, 2024, the OSFM issued a Letter of Decision (LOD) which allows Sable to manage the risk of corrosion under the insulation and requires Sable to comply with over 60 safety conditions which were in addition to the minimum safety standards mandated under federal and State laws.

This letter is to inform you that on February 11, 2025, the OSFM received a decision from the Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to granting the state waiver.

Therefore, the effective date of the state waiver is **February 11, 2025**.

The state waiver is a limited-term agreement that may be revoked for non-compliance and may continue for no more than ten (10) years from the effective date. The waiver must follow the renewal process to allow it to be extended.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) PHMSA Letter of Decision Docket No. PHMSA-2025-0002

cc:    Wendy Collins, Division Chief, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Max Kieba, Engineering and Research Division, PHMSA

# EXHIBIT G

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5352-16

April 2, 2025

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **PHMSA DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

**Operator:**   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**Pipeline:**   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
April 2, 2025
Page 2

On December 17, 2024, the OSFM issued a Letter of Decision (LOD) which allows Sable to manage the risk of corrosion under the insulation and requires Sable to comply with over 60 safety conditions which are in addition to the minimum safety standards mandated under federal and State laws.

This letter is to inform you that on February 11, 2025, the OSFM received a decision from the Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to granting the state waiver.

Therefore, the effective date of the state waiver is **February 11, 2025**.

The state waiver is a limited-term agreement that may be revoked for non-compliance and may continue for no more than ten (10) years from the effective date. The waiver must follow the renewal process to allow it to be extended.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) PHMSA Letter of Decision Docket No. PHMSA-2025-0003

cc:     Wendy Collins, Division Chief, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Max Kieba, Engineering and Research Division, PHMSA

# EXHIBIT H



# EXHIBIT I

CELERON/ALL AMERICAN PIPELINE PROJECT

PLANNING COMMISSION ACTIONS

FINAL DEVELOPMENT PLAN
CONDITIONAL USE PERMIT

March 3, 1986

Santa Barbara County
Resource Management Department
Energy Division

CELERON/ALL AMERICAN PIPELINE PROJECT
FINAL DEVELOPMENT PLAN
PLANNING COMMISSION ACTIONS

## Table of Contents

1. Permit Information Summary ............................................... 1

2. Project Description .......................................................... 2

3. Planning Commission Action ............................................. 2

4. Appeals Process ............................................................. 6

5. Permit Conditions ........................................................... 8
   A. General .................................................................... 8
   B. Permit Review .......................................................... 12
   C. Management .............................................................. 14
   D. Air Quality .............................................................. 17
   E. Geology ................................................................... 18
   F. Surface and Groundwater ........................................... 21
   G. Aquatic Biology ....................................................... 23
   H. Terrestrial Biology ................................................... 23
   I. Socioeconomics ......................................................... 29
   J. Land Use and Recreation ............................................ 32
   K. Transportation ........................................................ 35
   L. Cultural Resources .................................................... 36
   M. Visual Resources ...................................................... 38
   N. Noise ..................................................................... 39
   O. Abandonment ........................................................... 40
   P. Systems Safety and Reliability .................................. 40
   Q. Facility Design ........................................................ 44

6. Findings ....................................................................... 46
   County Zoning Ordinances ............................................. 46
   CEQA ......................................................................... 50
   Statement of Overriding Considerations ......................... 55
   Additional Findings ..................................................... 56
   Impact Summary Tables ................................................ 57

EXHIBIT 3

CELERON/ALL AMERICAN PIPELINE PROJECT
FINAL DEVELOPMENT PLAN
PLANNING COMMISSION ACTIONS

The Santa Barbara County Planning Commission made a final decision to approve the Celeron/All American Pipeline Project Final Development Plan on February 18, 1986.  On February 28, 1986 the Board of Supervisors appeals period expired without any appeals filed.  Therefore the Planning Commission's action on this Final Development Plan and Conditional Use Permit is final.  This package details the Commission's actions.


1.    PERMIT INFORMATION SUMMARY

1.1  Applicant Information

Project Title:            Celeron/All American Pipeline Project

Project Location:         Las Flores Canyon, California to Emidio, California

Supervisorial Districts:  Third, fourth, fifth

Applicant:         ·      Celeron Pipeline Company of California

Applicant
Representative:           Mr. Ron Hinn, Vice President
                          Celeron Pipeline Company of California
                          4213 State St., P.O. Box 31029
                          Santa Barbara, CA   93130
                          805/683-5627


1.2  Case Processing Information

Celeron has filed, and the Planning Commission has acted upon, the following permit applications:

    Final Development Plan (Case # 85-DP-66cz)
         County permit for allowable projects which, because of the type,
         scale, or location of the development, require comprehensive
         review.  This permit covers all aspects of the project proposal.

    Major Conditional Use Permit (Case # 83-CP-97cz)
         County permit for permittable projects which, because of certain
         aspects of the proposal or of the proposed project location, require
         special consideration.  This permit is required because the proposed
         pipeline crosses Environmentally Sensitive Habitat areas.

Planning Commission Actions                                        Page 2
Celeron Pipeline Final Development Plan                      March 3, 1986

## 2. PROJECT DESCRIPTION

Celeron proposes to construct a 30-inch diameter, insulated welded steel
pipeline designed to transport up to a maximum of 425,000 barrels per day
(BPD) with an optimal throughput of 300,00 BPD, of Outer Continental Shelf and
other locally produced crude oils.  The pipeline would extend approximately
135 miles from Las Flores Canyon to the Emidio pump station in the southern
San Joaquin Valley.  Three pump stations would be constructed, one at Las
Flores Canyon, one at Gaviota, and one near the Sisquoc River in northern
Santa Barbara County.  The pipeline would be buried to a minimum cover depth
of three feet throughout its length according to Department of Transportation
specifications, with increased cover depth in selected areas.

The pipeline will require a 100-foot wide construction corridor and a 50-foot
wide permanent easement.  The proposed route parallels Highway 101 from Las
Flores to Gaviota, turns north at Gaviota State Park west of Highway 101 and
continues to the Sisquoc River.  From the Sisquoc River the route follows
Santa Maria then Suey Canyons north toward the Cuyama River.  It crosses the
river in the Western Cuyama Valley, and exits the County.

## 3. FINAL PLANNING COMMISSION ACTIONS

| Motion maker/Second | Vote | Action |
|---|---|---|
| February 13, 1986 | | |
| 1.  Wells/Hamister | 5-0 | Conceptual approval of Realignment 1, as presented in the February 6, 1986 Staff Report, including avoidance of the landslide. |
| 2.  Wells/Stillman | 5-0 | Conceptual approval of Realignment 2, as presented in the February 6, 1986 Staff Report, with the understanding that staff will work with the applicants to reduce the visual impacts along the corridor. |
| 3.  Sherman/Wells | 5-0 | Continue discussion of Realignment  3 until Tuesday February 18, 1986. |
| 4.  Wells/Hamister | 5-0 | Conceptual approval of a realignment near Realignment 4, as depicted on Page CE 004 of the January 1986 Realignment Request sheets, which follows the yellow line coming from the southern section of the map, and going across the top of the Giorgi property, and Moonshine Creek, and coming down the northern property line of |

EXHIBIT B

Planning Commission Actions                                                    Page 3
Celeron Pipeline Final Development Plan                                   March 3, 1986

|   |   |   |   |
|---|---|---|---|
|   |   |   | Giorgi, to meet the original pipelne route, from whence it will meet Realignment 5, with the understanding that if there are any problems biologically with any minor adjustments to those corridors, or if there is any conflict between staff and Celeron on that segment, that it be brought back to the Commission for a final decision. |
| 5. | Wells/Sherman | 5-0 | Conceptual approval of Realignment 5, with the understanding that any landslides or environmental constraints will be mitigated by the applicant, to the satisfaction of staff. |
| 6. | Sherman/Wells | 5-0 | Conceptual approval of Realignment 6, as presented in the February 6, 1986 Staff Report. |
| 7. | Stillman/Hamister | 5-0 | Conceptual approval of Realignment 7, as presented in the February 6, 1986 Staff Report. |
| 8. | Stillman/Hamister | 5-0 | Conceptual approval of Realignment 8, as presented in the February 6, 1986 Staff Report. |
| 9. | Johnson/Stillman | 5-0 | Conceptual approval of Realignments 9 and 10, as presented in the February 6, 1986 Staff Report. |
| 10. | Johnson/Wells | 5-0 | Conceptual approval of Realignment 11, as presented in the February 6, 1986 Staff Report. |
| 11. | Johnson/Stillman | 5-0 | Conceptual approval of Realignment 12, as presented in the February 6, 1986 Staff Report, with the understanding that when the Forest Service chooses a route, the other alternative will fall away. |
| 12. | Johnson/Stillman | 5-0 | Conceptual approval of Realignment 13, as presented in the February 6, 1986 Staff Report. |
| 13. | Wells/Sherman | 5-0 | Approve the route changes conceptually approved in this hearing, with the exception of Realignment 3, and as part of the Final Development Plan approval, with the understanding that staff has discretion within the corridor analyzed in the EIR, and so long as no greater impacts arise from the alignment than the one originally approved by the Commission. |
| 14. | Sherman/Wells | 5-0 | Continue discussion of H-12, P-2, P-3, and P-5 until February 18, 1986. |

Planning Commission Actions                                                    Page 4
Celeron Pipeline Final Development Plan                                  March 3, 1986

15. Johnson/Wells     4-0     That Condition H-1 and County policy requires
                              replacement of all trees removed, and that
                              Celeron will provide more detailed information
                              regarding the offsite tree-planting prior to
                              land use clearance.  ABSENT: Sherman

16. Wells/Hamister    4-0     That Condition H-1 be modified, and that staff
                              return on February 18 with wording to allow the
                              revegetation plan for Gaviota State Park to be
                              done prior to the issuance of the Coastal
                              Development Permit, in cooperation with the
                              State Parks Department.

February 18, 1986 (Sherman absent)

17. Wells/Stillman    4-0     Conceptual approval of new condition M-6 as
                              presented by staff with the unwritten
                              understanding that ant problems with that
                              condition can be brought before the Commission
                              for arbitration.

18. Wells/Hamister    4-0     Conceptual approval of new conditions B-7 and
                              B-8 as presented by staff.

19. Wells/Stillman    4-0     Conceptual approval of the February 18 revisions
                              to conditions H-12, P-2, P-3, and P-5, with the
                              understanding that language will be added to
                              each of the conditions to allow adequate time
                              for staff review.

20. Wells/Hamister    4-0     Conceptual approval of Condition C-1 with the
                              understanding that the criteria for shut down
                              come back to the Commission for review, and that
                              during construction monthly EQAP reports are
                              given to the County, and for the first three
                              months of operation, monthly reports will be
                              given to the County, with annual reports
                              thereafter.

21 - 37. These motions all gave conceptual approval to the various conditions,
         wording changes, and submittals as recommended by staff in the
         February 18 staff memo (motions 21 to 28, 38), and the February 6
         Staff Report (motions 29 to 37).  All votes were unanimous, 4-0.  The
         motion makers, seconds and appropriate conditions are listed below.

EXHIBIT B

Planning Commission Actions                                      Page 5
Celeron Pipeline Final Development Plan                     March 3, 1986

| 21. | Wells/Hamister | E-1 |
| 22. | Hamister/Stillman | F-1 |
| 23. | Stillman/Hamister | F-5 |
| 24. | Stillman/Hamister | F-8 |
| 25. | Hamister/Stillman | F-11 |
| 26. | Wells/Hamister | H-1; modify paragraph (j), replacing "plant" with "reestablish," and approve four points in staff memo. |
| 27. | Wells/Hamister | I-2 |
| 28. | Hamister/Stillman | P-9 |
| 29. | Hamister/Stillman | E-4 |
| 30. | Wells/Hamister | E-5 |
| 31. | Wells/Stillman | E-6 |
| 32. | Wells/Hamister | E-7 |
| 33. | Hamister/Stillman | F-2 |
| 34. | Stillman/Hamister | F-3 |
| 35. | Hamister/Stillman | F-4 |
| 36. | Stillman/Hamister | F-7 |
| 37. | Wells/Hamister | All remaining conditions except L-1, P-10, P-11 |
| 38. | Wells/Hamister | L-1 |

| Motion maker/Second | Vote | Action |
| --- | --- | --- |
| 39. Wells/Stillman | 4-0 | Conceptual approval of Condition P-11, including the addition of Condition P-18, and the approval of the submittal for P-18, as outlined in the February 6 Staff Report. |
| 40. Wells/Stillman | 5-0 | Conceptual approval of Condition P-10, as modified in the discussions, including adding wording regarding the reporting provisions under C-1. |
| 41. Wells/Hamister | 5-0 | Adopt new condition B-9, as presented on the February 18 staff memo. |
| 42. Wells/Hamister | 4-0-1 | Approve the Final Development Plan as modified with the conceptual motions, and any of those items which were not specifically addressed would be as per the staff presentation; any changes not specifically made to the Preliminary Development Plan remain as originally passed. Approve the Findings and Overriding Considerations as per the February 18 memo, including the additional finding regarding "prior to start-up" condition timing. ABSTENTION: Sherman. |
| 43. Wells/Stillman | 4-0-1 | Approve the Conditional Use Permit and Findings for the Environmentally Sensitive Habitat areas. ABSTENTION: Sherman. |

Planning Commission Actions                                    Page 6
Celeron Pipeline Final Development Plan                    March 3, 1986

4.  APPEALS PROCESS

The following text is taken from the Santa Barbara County Coastal Zoning
Ordinance, Section 35-182:  Appeals.

Sec.  35-182.  Appeals.

Sec. 35-182.1. Purpose and Intent.

   The purpose of this section is to provide procedures for appeals to the
   Planning Commission and the Board of Supervisors and to establish the
   criteria for those developments that may be appealed to the State Coastal
   Commission.

Sec. 35-182.2. Appeals to the Planning Commission.

(Not applicable)
Sec.  35-182.3.  Appeals to the Board of Supervisors.

(Not applicable)


Sec. 35-182.4.  Appeals to the Coastal Commission.

1.  For developments which are subject to the appeals jurisdiction of the
    Coastal Commission under PRC Sec. 30603, appeal of an action on a Coastal
    Development Permit may be filed with the Coastal Commission provided,
    however, that local appeals have been exhausted on the County's action on
    the project permits (i.e., Development Plan, C.U.P., Special Use Permit,
    Oil and Gas Plan).

2.  In accordance with Public Resources Code Sec. 30603(a), an action taken by
    the County of Santa Barbara on a Coastal Development Permit application
    for any of the following may be appealed to the Coastal Commission.

    a.  Developments approved by the County between the sea and the first
        public road paralleling the sea or within 300 feet of the inland
        extent of any beach or of the mean high tide line of the sea where
        there is no beach, whichever is the greater distance, as indicated on
        the official County appeals zone maps.

    b.  Developments approved by the County not included within paragraph (a)
        of this section located on tidelands, submerged lands, public trust
        lands, within 100 feet of any wetland, estuary, stream, or within 300
        feet of the top of the seaward face of any coastal bluff, as
        indicated on the official County appeals zone map or as determined by
        the State Lands Commission.

EXHIBIT 3

c.  Developments approved by the County that require a Conditional Use Permit (CUP).

d.  Any development which constitutes a major public works project or a major energy facility. The phrase, "major public works project or a major energy facility," as used in Public Resources Code Sec. 30603(a) (5) and this Article shall mean any proposed public works project or energy facility exceeding $50,000 in estimated cost of construction.

3.  Grounds of Appeal.

a.  The grounds of appeal for any development appealable under 2.a., of this Section shall be limited to one or more of the following:

1)  The development fails to provide adequate physical access or public or private commercial use or interferes with such uses.

2)  The development fails to provide public views from any road or from a recreation area to, and along, the coast.

3)  The development is not compatible with the established physical scale of the area.

4)  The development may significantly alter existing natural landforms.

5)  The development does not comply with shoreline erosion and geologic setback requirements.

6)  The development is not in conformity with the Local Coastal Program.

b.  The grounds of appeal for any development appealable under 2.b.,c., and d. of this section shall be limited to whether development is in conformity with the Local Coastal Program.

5648e

Planning Commission Actions                                         Page 6
Celeron Pipeline Final Development Plan                          March 3, 1986

5.   CELERON FINAL DEVELOPMENT PLAN CONDITIONS

A.   GENERAL

A-1.     Acceptance of this permit shall be deemed as acceptance of all final
         conditions of this permit, except that Celeron reserves the right to
         pursue any remedy for any legal violations imposed directly or
         indirectly by these permit conditions.

A-2.     Substantial failure to abide by and faithfully comply with any
         conditions for the granting of this permit shall constitute grounds
         for the modification or revocation of this permit.

A-3.     Celeron agrees as a condition of the issuance and use of this permit
         to defend at its sole expense any action brought against the County
         by a third party challenging either its decision to issue this permit
         or the manner in which the County is interpreting or enforcing the
         conditions of the permit.  Celeron will reimburse the County for any
         court costs and attorneys fees which the County may be required by a
         court to pay as a result of such action where Celeron defended or had
         control of the defense of the suit.  County may, at its sole
         discretion, participate in the defense of any such action, but such
         participation shall not relieve Celeron of its obligation under this
         condition.  County shall bear its own expenses for its participation
         in the action.

A-4.     Celeron shall make an initial deposit to a fund to permit the County
         to adequately implement and enforce the conditions imposed on Celeron
         by applicable County ordinances and/or the conditions of this permit
         if such a fund is established.  If the Board of Supervisors
         determines that a reasonable enforcement fund is needed, the Director
         of the Resource Management Department shall present to the Board of
         Supervisors and Celeron a plan for enforcement within one year from
         the effective date of this permit.  This plan shall set forth the
         staffing requirements and materials necessary for such enforcement
         and the estimated costs thereof.  This plan shall provide that all
         reasonable expenses incurred by the County or County contactors, for
         permit condition implementation, reasonable studies, and emergency
         response directly and necessarily related to enforcement of these
         permit conditions shall be reimbursed by Celeron within 30 days of
         invoicing by County.

A-5.     In the event that Celeron fails to comply with any order of the
         Administrative Officer or the Board of Supervisors issued hereunder
         or any injunction of the Superior Court, it shall be liable for a
         civil penalty for each violation to the extent imposition of such
         civil penalty is authorized by applicable laws, rules, or regulations.

         Said civil penalty shall be in addition to Celeron's obligation, if
         any, to reimburse the County of Santa Barbara (and others) for actual
         damages suffered as a result of Celeron's failure to abide by the
         conditions of this permit or the orders of the Administrative
         Officer, the Board of Supervisors, or any court of competent
         jurisdiction.

EXHIBIT B

Planning Commission Actions                                      Page 9
Celeron Pipeline Final Development Plan                          March 3, 1986

A-6.    As to any condition which requires for its effective enforcement the
        inspection of construction records or records pertaining to facility
        operations, or the facilities themselves by County or its duly
        authorized agents, Celeron will make all necessary records available
        or provide access to such facilities upon reasonable notice from
        County.  County agrees to keep such information confidential where
        permitted by law and requested by Celeron in writing.

A-7.    The procedures, operating techniques, design, equipment and other
        descriptions (hereinafter procedures) described by Celeron in its
        application to the County 83-DP-25 cz, 83-CP-97 cz, and in subsequent
        clarifications and additions to that application and the Final
        Development Plan are incorporated herein as permit conditions and
        shall be required elements of the project.  Since these procedures
        were part of the project description which received environmental
        analysis, a failure to include such procedures in the actual project
        could result in significant unanticipated environmental impacts.
        Therefore, modifications of these procedures will not be permitted
        without a determination of substantial conformity or a new or
        modified permit.  The use of the property and the size, shape,
        arrangement and location of buildings, structures, walkways, parking
        areas and landscaped areas shall be in substantial conformity with
        the Approved Final Development Plan.

A-8.    In addition to the authority to enforce and secure compliance with
        the provisions of this permit under Division 12, Coastal Zoning
        Ordinance of the Santa Barbara County Code, Division 7, General
        Regulations, Article III Santa Barbara County Zoning Ordinance, the
        County Administrative Officer, or in his/her absence a designated
        appointee, may order that curtailment of activities which is required
        to protect the public health and safety.  Said action may include,
        but is not limited to, ordering temporary, partial or total facility
        shutdown.

        Such an order shall be made only in the event that the Administrative
        Officer has reasonable and probable cause to believe that continued
        unrestrained activities of permittee will likely result in or
        threaten to result in danger to public health, welfare, or safety, or
        in the environment and provided such violations can be expected to
        continue or recur unless operations are in whole or in part shut down
        or reduced pending the necessary corrections.

        Before issuing any curtailment order, the County Administrative
        Officer shall set a time for hearing and shall give written notice of
        the time and place of the hearing and of the alleged violations.
        Such notice shall be received by the person in charge of the
        operation of the facility at least 24 hours before the hearing at
        which time there will be an opportunity for all interested parties to
        present evidence regarding the alleged violations.  The notice may be
        served in person or by certified mail.

Planning Commission Actions                                    Page 10
Celeron Pipeline Final Development Plan                        March 3, 1986

In the event the Administrative Officer, or in his/her absence the designated appointee, determines that there is an imminent danger to the public health and safety resulting from violations, he/she may summarily order the necessary curtailment of activities without hearing and such order shall be obeyed upon notice of same, whether written or oral.  At the same time that notice of the order is conveyed, the Administrative Officer shall set a date, time and place for a publically noticed hearing and review of said order as soon as possible which date shall be no later than 24 hours after such order is issued or served.  Said hearing shall be conducted in the same manner as a hearing on prior notice.  After such hearing, the Administrative Officer may modify, revoke, or retain the emergency curtailment order.

Any order of the Administrative Officer may be appealed to the Board of Supervisors within three working days after such order is made.

If such appeal is not filed with the Board of Supervisors, the Administrative Officer's order becomes final.  If there is an appeal, the order of the Administrative Officer shall remain in full force and effect until action is taken by the Board of Supervisors.  The decision of the Board of Supervisors shall be a Final Administrative Action.  Such decision shall not preclude Celeron from seeking judicial relief.

Once Celeron has shown that the conditions of violation no longer exist and are not reasonably likely to recur, the Administrative Officer shall modify the curtailment order to account for such compliance and shall entirely dissolve the order when it is shown that all of the violations have been corrected and are not likely to recur.

A-9     In the event that any condition contained herein is determined to be invalid, then all remaining conditions shall remain in force.

A-10.   In the event that any condition contained herein is determined to be in conflict with any other condition contained herein, then where principles of law do not provide to the contrary, the condition must ... of public health and safety and natural environmental ... shall prevail to the extent feasible.

In addition to any administrative remedies or enforcement provided hereunder, the County may seek and obtain temporary, preliminary, and permanent injunctive relief to prohibit violation of the conditions set forth herein or to mandate compliance with the conditions herein.

All remedies and enforcement procedures set forth herein shall be in addition to any other legal or equitable remedies provided by law.

Planning Commission Actions                                    Page 11
Celeron Pipeline Final Development Plan                    March 3, 1986

A-12.   The owner and the operator of the facility shall be jointly and
        severally liable without regard to fault for all legally compensable
        damages or injuries suffered by any property or person that result from
        or arise out of any oil, water spillage, fire, explosion, odor, or air
        pollution, in any way involving oil or gas or the impurities contained
        therein or removed therefrom and which arises out of construction or
        operation of Celeron's facilities.  For the purpose of this condition,
        the "facility" shall be deemed to include all facilities described and
        approved pursuant to 83-DP-25cz, 83-CP-97cz.  This condition shall not
        inure to the benefit of any of the owners of the pipeline, including
        the United States Government.  This declaration of strict liability and
        the limitations upon it shall be governed by the applicable law of
        California on strict liability.

A-13.   All facilities constructed under this permit shall be used only for the
        shipment of a maximum volume of heated crude oil demonstrated to be
        within the design parameters of the pipeline facilities as built. The
        subject volumes will be outer continental shelf (OCS) and other locally
        produced onshore and offshore petroleum from the Santa Barbara and
        Santa Maria Basins.  Celeron shall obtain a new or modified permit, or
        authority to continue operation under the existing permit prior to
        undertaking any of the following activities which may, in the judgement
        of the County, result in significant changes to the impacts on the
        County.  Such changes could include but not be limited to: 1) major
        pipeline or pump station modifications; 2) major changes in pipeline
        throughput; 3) introduction of production to the pipeline from sources
        other than those described above; and 4) introduction of a different
        product from any source.

        Other source volumes may be transported subject to a determination of
        substantial conformity by the Planning Commission and a finding of
        facts and determination that project impacts will not be increased by
        transporting and processing those other sources.

A-14.   Celeron shall align the pipeline corridor from the coastal starting
        point to the County exit point in the western Cuyama valley according
        to the route approved by the County.  Celeron shall locate and
        construct all isolation valves as identified by the final approved
        alignment.

A-15.   Any person, firm or corporation, whether as a principal, agent,
        employee, or otherwise, found to be in violation of any provisions or
        conditions of this ordinance or permits, shall be punishable as set
        forth in the applicable section of the Coastal Zoning Ordinance, and
        Article III of the Santa Barbara County Code.

        Each and every day during any portion of which any violation of this
        Article or the rules, regulations, orders, or permits issued
        thereunder, is committed, continued, or permitted by such person, firm
        or corporation shall be deemed a separate and distinct offense.

Planning Commission Actions                                    Page 12
Celeron Pipeline Final Development Plan                 March 3, 1986

A-16.   The Santa Barbara County Board of Supervisors in a noticed public
        hearing shall have the authority to specify or change the Santa Barbara
        County Department responsible for any conditions contained herein.

A-17.   Should circumstances, including legal or legislative action, cause the
        County to lose its authority or have its authority fundamentally
        reduced to assess fees as a method to mitigate project-related impacts,
        then other feasible mitigation measures shall be imposed which will
        substantially lessen the significant impact formerly mitigated by the
        imposition of fees.  Within six months of the County's loss of such
        authority, feasible alternative mitigation measures shall be imposed as
        replacement permit conditions.  Alternatively, the County in a noticed
        public hearing must find that no feasible mitigation measures are
        available and that the benefits of the project outweigh the significant
        environmental impacts.

A-18.   Should legal action be required by either party to enforce any rights
        in connection with this permit the prevailing party shall be entitled
        to reasonable attorney's fees and costs pursuant to Civil Code 1717.

A-19.   Unless otherwise specified, these permit conditions are intended to
        apply to Celeron during both the construction and the operation of the
        permitted facilities.


B.      PERMIT REVIEW

B-1.    Prior to initiation of construction activity (such as ROW preparation,
        river crossings or pump station construction), Celeron shall submit to
        the System Safety and Reliability Review Committee (established by
        condition P-1) relevant construction drawings and supporting text
        demonstrating compliance with the appropriate conditions.  Construction
        may not commence until County has approved this submittal.  Within 15
        days of submittal, County shall either give written notice to proceed
        with construction or indicate in writing conditions which have not been
        met.  When such conditions have been met construction approval shall be
        granted.

B-2.    If at any time County determines that these permit conditions are
        inadequate to effectively mitigate significant environmental impacts
        caused by the project, or that recent proven technological advances
        could provide substantial additional mitigation, then additional
        reasonable conditions shall be imposed to further mitigate these
        impacts.  Imposition of such conditions shall only be considered and
        imposed as part of the County's comprehensive review of the project
        conditions.  County shall conduct a comprehensive review of the project
        conditions and consider adding reasonable conditions which incorporate
        proven technological advances three years after permit issuance and at

Planning Commission Actions                                    Page 13
Celeron Pipeline Final Development Plan                   March 3, 1986

appropriate intervals thereafter.  A comprehensive review of conditions
which are not effectively mitigating impacts may be conducted at any
appropriate time.  Upon written request of Celeron, the Board of
Supervisors shall determine whether the new condition required is
reasonable considering the economic burdens imposed and environmental
benefits to be derived.

8-3.     This permit is premised upon findings that where feasible, all
         significant environmental effects of the project identified in the
         EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa
         Barbara County, will be substantially mitigated by the permit
         conditions.  Prior to approval of the Final Development Plan, County
         shall review any findings that identified certain mitigation measures
         as being in the primary jurisdiction of another agency but are also
         within County's jurisdiction.  County shall thereupon determine either
         (1) that such mitigation has or is being implemented by such other
         agency or (2) that such other agency and County determine such
         mitigation to be infeasible.  If County determines that no other agency
         is or may be implementing such feasible mitigation measures then County
         may impose those feasible measures within its jurisdiction to mitigate
         those environmental impacts in accordance with appropriate mitigation
         measures identified by the EIS/R.

8-4.     Prior to approval of the Final Development Plan, Celeron shall develop
         and submit to the Resource Management Department for approval a plan to
         co-ordinate the placement and timing of their pipeline with SCPS's
         pipeline (or other potential proposals for use of the same corridor for
         a pipeline).  Any agreements between Celeron and SCPS (or other
         applicant) necessary to implement this plan shall be subject to review
         and verification by the Resource Management Department to assure the
         purpose of the plan will be achieved.  The expressed purpose of this
         co-ordination plan shall be:

         1) arrangement of simultaneous construction where practical;

         2) engineering of pipe placement within the ROW to minimize incremental
         widening of the initial construction corridor during subsequent
         pipeline projects;

         3) identification of segments where incremental widening of the ROW is
         constrained and alternative engineering techniques which may allow
         construction of subsequent pipelines (and potential limitations of
         future pipeline use of the ROW); and

         4) timing and design of revegetation plans to promote effective
         revegetation but minimize unnecessary duplication of efforts.

     Should SCPS or any other applicant abandon their pipeline project, or fail
     to submit a Final Development Plan prior to Celeron pipeline construction,
     this condition may be modified to reflect the existing situation but
     maintain the intent of this condition.

Planning Commission Actions                                    Page 14
Celeron Pipeline Final Development Plan                        March 3, 1986

B-5.    In the event that scheduling requirements among or between conditions
        in this permit (or with this permit and conditions imposed by other
        agencies) conflict with respect to timing, the Resource Management
        Department (in consultation with other agencies as appropriate) shall
        resolve such conflict.

B-6.    Applicant shall cooperate as necessary with San Luis Obispo County in
        the permitting, design, and construction of those segments of the
        pipeline which could affect Santa Barbara County.  The intent of this
        condition is to ensure that potential impacts to Santa Barbara County
        are mitigated to the maximum extent feasible by these permit
        conditions, regardless of the location of the source of the impact.

B-7.    Prior to commencing any construction activities in Santa Barbara
        County, Celeron shall obtain a letter from the Director of the
        Resource Management Department indicating that all conditions which
        require approval prior to construction, as specified by this permit,
        have been satisfied.

B-8.    Prior to start-up of the pipeline in Santa Barbara County, Celeron
        shall obtain a letter from the Director of the Resource Management
        Department indicating that all conditions which require approval
        prior to start-up, as specified by this permit, have been satisfied.

B-9.    In the event that Celeron and staff cannot reach an agreement on the
        adequacy of any submittal required by these conditions, the matter
        will be brought before the Planning Commission for resolution at the
        earliest possible date.


C.  MANAGEMENT

C-1.    Celeron shall prepare an Environmental Quality Assurance Program
        (EQAP) for Resource Management Department approval prior to the Final
        Development Plan.  This EQAP shall encompass both the construction
        and operation phases of the project, and shall describe the steps
        Celeron will take to assure compliance with these conditions.  This
        plan is intended to provide a framework for all other programs and
        plans specified by these conditions as required prior to approval of
        the Final Development Plan.  As such, it will become a comprehensive
        reference document for the County, other agencies, and the public
        regarding the Celeron project.

        This plan shall provide for the submission to the Resource Management
        Department semi-annual reports throughout construction and annual
        reports during operations.  These reports shall describe:

Planning Commission Actions                                      Page 15
Celeron Pipeline Final Development Plan                     March 3, 1986

    a)  Project status, including but not necessarily limited to: .

        i)    extent to which construction has been completed,
        ii)   the rate of production/throughput during operation,
        iii)  environmental planning and implementation efforts, and
        iv)   any revised time schedules or timetables of construction
              and operation that will occur in the next one year period.

    b)  Permit condition compliance, including but not necessarily
       limited to the results of the specific mitigation requirements
       identified in these conditions.

    c)  Results and analyses of all data collection efforts being
       conducted by Celeron pursuant to these permit conditions.

The program shall include (or if separate plans exist, reference) all
plans relevant to construction and operations of the pipeline
facilities specified by these conditions.

## Construction

The program shall include all plans relevant to construction activites
such as the Restoration, Erosion Control and Revegetation Plan and the
Cultural Resources Mitigation Plan.

The program shall include provisions for at least one managing
environmental coordinator with overall responsibility, and if
necessary, one onsite environmental coordinator per construction site
during the construction phase.  These coordinators shall be approved by
and be responsible to the Resource Management Department.  Celeron
snall fund the coordinator(s).  The number of coordinators necessary
shall be determined according to the amount of simultaneous
construction activity occuring in geographically separate areas.  The
responsibilities of the coordinator(s) are to include:

    a)    on-site, day-to-day monitoring of construction activities;

    b)    ensuring contractor knowledge of and compliance with all
         appropriate permit conditions;

    c)    evaluating the adequacy of construction impact mitigations, and
         proposing improvements to the contractors, Celeron, and County;

    d)    having the authority to require correction of activities observed
         to violate project environmental conditions or that represent
         unsafe or dangerous conditions, and having the ability and
         authority to secure compliance with the conditions or standards
         through the County Administrative Officer as described in
         condition A-8, if necessary;

Planning Commission Actions                              Page 16
Celeron Pipeline Final Development Plan                  March 3, 1986

e)    performing as contact for affected property owners and any other
      affected persons that wish to register observation of
      environmental permit violations and/or unsafe conditions,
      receiving any complaints, immediately contacting Celeron's onsite
      construction representative, verifying any such observations and
      developing any necessary corrective actions in consultation with
      Celeron's onsite construction representative;

f)    maintaining prompt and regular communication with the Resource
      Management Department, Public Works Department, or other
      appropriate County agency, and with Celeron personnel responsible
      for contractor performance and permit compliance.

In the event that resolution of disputes between the public and/or
governmental agencies and Celeron over adherence to permit conditions
is not achieved by the managing environmental coordinator, an
arbitration system shall be utilized to resolve such disputes in a
timely manner in order to minimize the need to halt construction
activities as per conditions A-2 or A-8.

The coordinator(s) shall be thoroughly familiar with all plans and
requirements set forth in the permit conditions.  Prior to construction
start-up, the managing coordinator shall discuss with other agency
inspectors or monitoring personnel, inspection programs, areas of
jurisdiction, responsibility, and define methods of avoiding disputes
or construction delay due to agency disagreements.

Selection of the necessary coordinators shall be made, and the
person(s) available, prior to issuance of the Coastal Development
Permit and Land Use Permit.

Operations

The program shall include all plans related to operations, such as the
Emergency Response Plan, Oil Spill Contingency Plan, and Landscaping
Plan, as well as specific conditions not required in formal plans.  It
may also include any procedures not specified by these conditions but
relevant to environmental protection and safety.

C-2.    Prior to issuance of the Coastal Development Permit and Land Use Permit
        Celeron shall provide to the Resource Management Department and the
        Emergency Services Coordinator the current name and position, title,
        address, and 24-hour phone numbers of the field agent, person in charge
        of the facility, and other representatives who shall receive all orders
        and notices, as well as all communications regarding matters of
        condition and permit compliance at the site and who shall have
        authority to implement a facility shutdown pursuant to condition A-8 in
        this Ordinance.  There shall always be such a contact person(s)
        designated by the permittee.  One contact person shall be available 24
        hours a day during all phases of the project in order to respond to
        inquiries received from the County, or from anyone in case of an
        emergency.

Planning Commission Actions                                         Page 17
Celeron Pipeline Final Development Plan                      March 3, 1986

        If the address or phone number of Celeron's agent should change, or the
        responsibility be assigned to another person or position, Celeron shall
        provide to the Resource Management Department the new information
        within seven days.

C-3.    Celeron shall furnish to the Resource Management Department copies of
        all County permit applications relative to the project once submitted,
        and of permits within 30 days of receipt by Celeron.

D.      AIR QUALITY

D-1.    Nothing contained herein shall be construed to permit a violation of
        any applicable air pollution law, rule, or regulation.

D-2.    Prior to initiation of construction, including grading, of any
        facilities approved pursuant to this Development Plan, Celeron shall
        obtain an Authority to Construct permit from the County Air Pollution
        Control District.

D-3.    Celeron agrees to implement all air pollution control procedures as
        required by APCD and identified in the Final Development Plan (such as
        water sprays to reduce construction-related fugitive dust).

D-4.    Emissions from any project component that contribute to ozone standard
        violations must be mitigated to the extent feasible.  Effectiveness of
        mitigation will be confirmed by APCD.

D-5.    Deleted.

D-6.    Prior to approval of the Final Development Plan, Celeron shall submit
        to the Resource Management Department updated estimates of the type and
        size of helicopters, or other aircraft, to be used during pipeline
        operations for the aerial surveys of the pipeline route.  The
        information shall also include the estimated operating schedules,
        frequency and duration of airport calls and other reasonable
        information as required by APCD.  The County may require validation and
        updating of this information as needed.  Should this information reveal
        significant differences between the estimated air emissions and those
        analyzed in the EIR/EIS, the APCD may modify air quality permit
        conditions as necessary to assure consistency with the Air Quality
        Attainment Plan and Reasonable Further Progress goals.

D-7     All facilities shall be designed, constructed, operated, and
        maintained, such that the facilities approved under this Development
        Plan shall not discharge quantities of air contaminants or other
        materials in violation of Section 41700 of the Health and Safety Code.

Planning Commission Actions                                     Page 18
Celeron Pipeline Final Development Plan                    March 3, 1986

D-8    Prior to the approval of the Final Development Plan, Celeron shall
       submit to the Director of the Resource Management Department a plan,
       approved by the APCD, which includes timing of construction, minimizing
       soil handling, and other measures to mitigate construction air quality
       impacts.  The plan shall include APCD approved analysis which
       demonstrates that local, state and federal air quality standards will
       not be violated as a result of construction activities.


E.     GEOLOGY

E-1.   Prior to the issuance of the Coastal Development Permit and Land Use
       Permit, Celeron will conduct a route-specific Geologic Investigation,
       Design, and Mitigation Program.  This program shall contain three basic
       components: 1) a detailed geologic investigation component which
       defines specific hazards, 2) an engineering design component which
       details specific engineering plans for each identified hazard along the
       route, and 3) a geohazards mitigation component which demonstrates how
       and to what extent each hazard is reduced.

       a) Detailed geologic investigation component:

            Where specific hazards have been identified or may occur along
            the pipeline route or at pump station locations, Celeron will
            conduct appropriate detailed geologic, seismic, and geotechnical
            studies to further characterize the specific geologic hazard.
            These studies will be conducted under the direction of a State of
            California registered geologist or engineering geologist and will
            be subject to approval by the Resource Management Department and
            Public Works Department.  These studies will include but not be
            limited to investigations of unstable slopes, erodable slopes,
            lurch/liquefaction susceptible substrate, surface rupture, and
            river scour characteristics (depth and lateral extent).  Methods
            of investigation shall conform to appropriate geotechnical
            techniques applicable to each specific hazard.  Draft results
            will be·subject to review by County Public Works Department and
            Flood Control Agency as appropriate prior to finialization of the
            engineering design.  The final report will be submitted with the
            final engineering design component.

       b) Engineering design component:

            Celeron shall incorporate appropriate geotechnical information
            from component a) and other applicable recommendations into final
            engineering design of pipeline construction and facilities.  This
            includes but is not restricted to:  the development of
            appropriate ground motion parameters for use in seismic design of

Planning Commission Actions                                         Page 19
Celeron Pipeline Final Development Plan                        March 3, 1986

critical structures and equipment, unstable slope construction or avoidance techniques, burial depth at all major river crossings, modification of instrumentation, or use of the dual contingency level/operating level earthquake concept, or its equivalent. The designs will be subject to review by the Department of Public Works and third party technical review as specified in Condition P-1. The final engineering design shall be approved by County Public Works and Flood Control Agency prior to the issuance of the Coastal Development Permit and Land Use Permit.

c) Geohazards mitigation component:

Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron will submit to the Resource Management Department a detailed geologic hazard mitigation report. The report will outline the hazards identified in part a) of this program and will address how engineering designs as detailed in part b) of this program reduce each specific hazard. This component will also be submitted to the Department of Public Works and Flood Control Agency and will be subject to third party review as specified in Condition P-1.

E-2.    Celeron will develop a Monitoring Program for the operations phase to be funded by Celeron and staffed as necessary with at least one State of California registered engineer, or engineering geologist, in order to evaluate any hazards identified by routine monitoring. The program will be designed to verify adequate performance or condition of the project components in hazard areas such as river and active fault crossings, and will be subject to approval of the Resource Management Department prior to issuance of the Coastal Development Permit and Land Use Permit. The monitoring program may in part be incorporated into routine aerial and ground reconnaissance.

If the monitoring indicates a potential or actual hazard, appropriate action including, but not limited to, operations curtailment and repairs, will be taken by Celeron to mitigate the hazard. Celeron will report to the Emergency Services Coordinator any potentially hazardous situations discovered during monitoring.

In the case of river crossings at the Santa Ynez, Sisquoc and Cuyama Rivers, a yearly inspection of pipeline burial depth, subject to review by the Resource Management Department and Flood Control Agency, shall be performed. At crossing of the Santa Ynez and Sisquoc Rivers where channel degradation has reduced the depth of cover to less than four feet below the 100-year scour depth, or other hazardous levels as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency, or US D.O.T. specifications, relocation or reburial of the pipeline to adequate depth will be required. At the crossing of the Cuyama River, if the inspections reveal that hazardous conditions exist, mitigations such as reconstruction or relocation of the crossing will be required as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency.

Planning Commission Actions                              Page 20
Celeron Pipeline Final Development Plan                  March 3, 1986

E-3.  Inspection of the pipeline trench or trench spoil to identify any
      potential geologic hazards shall be made by a professional geologist or
      soils engineer approved by the Resource Management Department prior to
      installation of the pipeline.  If hazards not previously accounted for
      in the pipeline design are encountered, appropriate mitigation measures
      will be developed and must be instigated prior to installation of the
      pipeline.  The results of the inspection will be reported to the
      engineering geologist of the Public Works Department who will approve
      prior to, and the supervising environmental coordinator who will
      insure, application of the necessary mitigation measures.  The timing
      of such inspections shall not result in any unreasonable delays in
      installation of the pipeline.

E-4.  At all places where the pipeline crosses an active fault, according to
      the Department of Geology and Mining definitions, Celeron will place
      isolation valves on either side, or design and construct appropriate
      devices or measures which more effectively mitigate the hazard of the
      fault crossing.  Location and nature of these designs must be approved
      prior to the issuance of the Coastal Development Permit and Land Use
      Permit.

E-5.  Prior to the issuance of the Coastal Development Permit and Land Use
      Permit Celeron shall submit final Grading and Erosion Control Plans for
      the Sisquoc pump staton approved by the Department of Public Works.
      These plans shall be consistent with or based on information contained
      in the geologic investigation required in Condition E-1.

      Prior to issuance of the Coastal Development Permit and Land Use
      Permit, Celeron shall either submit Grading Erosion Control Plans for
      the Las Flores and Gaviota pump stations for approval by the Department
      of Public Works or show evidence that the plans are a part of the
      overall Grading and Erosion Control Plans for the consolidated
      processing facilities at those sites.

E-6.  Celeron shall cooperate as necessary with San Luis Obispo County in
      the permitting, design and construction of the Cuyama River crossing.

      Any pipeline crossing the Cuyama River shall be laid to a depth
      consistent with studies performed under Condition E-1 and subject to
      approval of the County Flood Control District.

E-7.  Prior to approval of the Final Development Plan, Celeron shall commit
      to the location of their south coast pump stations to the satisfaction
      of the Planning Commission.  If these stations are not within the
      boundaries of the approved Exxon, Gaviota Terminal Company, or Chevron
      facilities, Celeron shall submit grading and erosion control plans
      pursuant to Condition E-5.

Planning Commission Actions                                    Page 21
Celeron Pipeline Final Development Plan                      March 3, 1986

F.      SURFACE AND GROUNDWATER

F-1.    During construction of the pipeline across all perennial stream
        crossings, stream flows, if any, shall be diverted around construction
        areas to maintain downstream flows.  Baseline water flows shall be
        maintained in coastal streams in order to avoid adverse impacts to
        lagoon or other sensitive habitats.

F-2.    Sediment retention devices that allow continued streamflow shall be
        installed directly downstream of stream crossings during construction.

F-3.    For pipeline crossings at the following stream or river crossings:
        Tajiguas; Refugio; Gaviota; Nojoqui; Zaca; San Antonio Creeks, all
        additional perennial streams which the pipeline crosses: Santa Ynez;
        Sisquoc; and Cuyama Rivers, Celeron shall construct the buried
        pipelines during the months of low historical streamflow, in order to
        minimize erosion loss downstream and protect surface water quality.  In
        the event of low winter rainfall, earlier construction may be approved
        by Resource Management Department and County Flood Control Agency.

F-4.    No staging areas shall be permitted within riparian habitat corridors.

F-5.    During pipeline construction at stream crossings, construction
        contractors will minimize time of disturbance, narrow the construction
        ROW to the extent feasible, stabilize the disturbed areas immediately
        following construction of the crossing, and divert runoff waters around
        construction areas to maintain downstream flows.

F-6.    Deleted.

F-7.    Celeron shall install isolation valves on either side of all perennial
        stream and river crossings, including the Cuyama River, and/or as
        required by the Coastal Zoning Ordinance, unless the applicant can
        demonstrate that alternative methods will further reduce the potential
        leak impacts at the crossing site.  These locations shall be identified
        prior to the Final Development Plan.

F-8.    Prior to approval of the Final Development Plan, Celeron shall identify
        the freshwater source considered for supplying pipeline and facility
        construction activities including hydrostatic test water, and shall
        estimate the total quantity required.  Any water obtained from coastal
        or inland sources shall not significantly disrupt streamflows,
        groundwater resources, or habitat resources.  Water conserving devices
        shall be used where feasible.  Any water used during construction,
        (exclusive of hydrostatic test water), shall contain no more than 5,000
        parts per million total dissolved solids.  Disposal of hydrostatic test
        water within the County shall be according to a plan approved by the
        Regional Water Quality Control Board, or by the Flood Control Agency.
        This information shall be provided to and approved by the Resource
        Management Department as part of the Final Development Plan.

Planning Commission Actions
Celeron Pipeline Final Development Plan

Page 22
March 3, 1986

F-9.   Prior to approval of the Final Development Plan, Celeron will perform detailed hydrogeologic investigations for the sensitive areas identified in the the EIR/EIS, (Table 3-14). These investigations will be conducted by a State of California registered geologist or engineer and will include but not be limited to:

   a)   definition of groundwater depth, recharge sources, properties of overlying soils, hydraulic gradient, background water quality, and existing water uses.

   b)   inventory of existing wells from State or County Flood Control Agency records in an area extending down-gradient from the pipeline in the aquifer equal to the distance groundwater would move in one year at a velocity calculated from the maximum hydraulic conductivity of the specific aquifer, hydraulic gradient, and porosity. The down-gradient sensitive area will be determined by a registered geologist.

   This information will be reviewed by the Resource Management Department and used by Celeron to formulate the Groundwater Contamination portion of an Oil Spill Contingency Plan, Condition P-5. This portion of the Plan will include;

   a)   plans for monitoring and early detection of groundwater contamination, including aerial and ground surveys, pipeline pressure monitoring, and water sampling of strategic wells;

   b)   plans for notification of affected groundwater users, and the Emergency Services Coordinator;

   c)   clean-up response, reparations, restorations, and methods to determine and correct the contamination source; and

   d)   identification of emergency alternate water supplies.

F-10.  At the base of slopes where the ROW approaches sensitive aquifers as identified in the EIR/S that are at risk from oil spills and leaks, a dam or ditch plug will be used in the pipeline trench. The sensitive areas are those where the ROW follows 1) topographic slopes toward basins with shallow depth to water, 2) high vertical permeabilities, and 3) a high degree of groundwater use as indicated by the hydrogeologic investigations required as per condition F-9. These areas shall be identified in the Final Development Plan.

F-11.  Prior to the approval of the Final Development Plan, the System Safety and Reliability Committee shall review and approve submitted plans of all Creek and River crossings in Santa Barbara County. Permitted development shall not cause or contribute to flood hazards or lead to the expenditure of public funds for flood control works.

Planning Commission Actions                                    Page 23
Celeron Pipeline Final Development Plan                    March 3, 1986

### G.    AQUATIC BIOLOGY

G-1    Fueling and lubrication of construction equipment will not occur within 0.25 miles of any flowing streams. No more than 2 barrels of fuel shall be kept at construction sites, exclusive of pipeline construction equipment fuel tanks, within 0.25 miles of all perennial creeks. As part of the oil spill response plan, Celeron will submit plans for clean-up and restoration of affected areas in the event of a construction fuel spill.

### H.    TERRESTRIAL BIOLOGY

H-1.   Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall submit a Restoration, Erosion Control, and Revegetation plan for the final proposed pipeline route and the pump station sites. The plan shall be submitted to the Resource Management Department for approval. Once approved, the plan shall be implemented by Celeron. Success of the restoration and revegetation plans shall be monitored by a qualified independent biologist who is in addition to the managing environmental coordinator (Condition C-1). The plan shall contain, but not be limited to, the following:

(a)   Procedures for stockpiling and replacing topsoil, replacing and stabilizing backfill, such as at stream crossings, and steep or highly erodable slopes. Additionally, provisions shall be made for recontouring to approximate the original topography. Excess fill shall be disposed of off-site unless suitable arrangements are made with the property owner. Excess fill shall not be deposited in any drainage, or on any unstable slope.

(b)   Specific plans for control of erosion, gully formation, and sedimentation, including, but not limited to, sediment traps, check dams, diversion dikes, culverts and slope drains. Plan shall identify areas with high erosion potential and the specific control measures for these sites.

(c)   Procedures for containing sediment and allowing continued downstream flow at stream crossings, including scheduling construction activities during low-flow periods.

(d)   Procedures for re-establishment of vegetation that replicates or is functionally equivalent to indigenous and naturalized communities along the alignment. These shall include: measures preventing invasion and/or spread of undesired plant species; restoration of wildlife habitat value; and restoration of native plant species and communities. Celeron shall consult with the County Farm Advisor and appropriate Ranch operators when developing procedures for revegetating areas used for cattle grazing and other agricultural uses;

(e)   Procedures for restoration of riparian corridor stream and river banks and stream bed substrates and elevation;

(f)   Procedures for minimizing all tree removal or tree root and branch damage, such as, flagging the corridor, keeping all disturbance to no more than the 100-foot pipeline right-of-way, feathering the right-of-way edges, providing for onsite monitoring of construction by a qualified independent biologist. In addition, special procedures are required for oak woodlands since County policy requires that these trees must not be cut down if feasible. Special procedures for oaks include reducing the right-of-way to the minimum width possible and minimizing the impact to the root zone of these trees;

(g)   Procedures for replacement of native trees and large shrubs removed from the 100-foot temporary easement during construction across riparian and woodland, in particular oak woodland, habitat, with saplings of the same species propagated from materials obtained from the same area, including provision for supplemental irrigation as necessary and feasible to ensure establishment, and provisions for protection of saplings from grazing animals;

(h)   A soil conservation program, to be applied in areas of 20 percent or greater slopes along the pipeline corridor.

(i)   Procedures for incorporating landowner concerns in the plan. Any changes to the plan instigated by such concerns shall be approved by the Resource Management Department.

(j)   A plan for offsite re-establishment of oaks to mitigate impacts to oak savannahs and woodlands along the route.

The segment of the plan pertaining to Gaviota State Park shall be prepared in cooperation with the State Department of Parks and Recreation.

H-2.   One year after construction, a survey will be conducted, at Celeron's expense, to determine the actual impact caused by construction. This survey shall include aerial photography, and as appropriate color stereo and infrared photography and field studies. The report will identify areas with potential for further impact, e.g., high erosion areas, that will require immediate remedial measures. The survey shall also contain an examination of previous mitigation measures and present a list of additional feasible mitigations based on the impacts during construction and potential impacts caused by operation. Celeron and the Resource Management Department shall agree to additional feasible mitigations. This process shall be repeated as often as necessary by the Resource Management Department, but not more than annually.

Planning Commission Actions                                         Page 25
Celeron Pipeline Final Development Plan                         March 3, 1986

H-3.    In those areas where trees and other habitats such as riparian areas
        and oak woodlands are to be avoided within the approved corridor,
        Celeron shall assure contractor compliance with this condition by
        marking and/or fencing those habitats.

H-4.    Additional reasonable and feasible conditions of mitigation, consistent
        with condition H-1 and to the extent necessary, shall be identified and
        observed as developed during the archaeological mitigation program
        (conditions L-1, L-2, L-3, L-6), and as identified by the managing
        environmental coordinator in consultation with Celeron's Onsite
        Construction Representative (condition C-1).

H-5.    Deleted.

H-6.    Celeron shall not use herbicides in wetland and riparian areas, and
        along the rest of the pipeline corridor during construction.

H-7.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall receive a permit (1603) as required from the
        California Department of Fish and Game.  This permit should include
        provisions to ensure that the proposed construction schedule will not
        interfere with reproductive activities of regionally rare or rare,
        threatened or endangered bird, amphibian, and fish species or other
        species of special concern, in those environmentally sensitive habitats
        identified in the EIR/EIS and shall submit this confirmation to the
        Resource Management Department.  If the Department of Fish and Game
        determines that the construction schedule will have an impact then
        Celeron will adhere to directives of the Department of Fish and Game
        with respect to their permit requirements.

H-8.    Deleted.

H-9.    Celeron shall minimize impacts to the population of Hoffmann's
        nightshade (Solanum xanti var. hoffmannii) found in the Gaviota Pass
        area.  Celeron shall submit plans to enhance the recovery of this
        population to the Resource Management Department for approval prior to
        issuance of the Coastal Development Permit and Land Use Permit.  These
        plans shall include provisions for removing any individual plants that
        would be affected, place them in large tubs, and replant them as near
        as possible to the original location (exclusive of the operation
        Right-of-Way) after construction; and gathering seeds prior to issuance
        of the Coastal Development Permit and Land Use Permit from the
        population of Hoffmann's nightshade located in the Gaviota Pass area
        and planting them in and near the ROW after construction.  This shall
        be done under the supervision of a biologist approved by the Resource
        Management Department and in cooperation with the California Parks
        Department; this biologist may approve modifications to these
        techniques based on season of the year and state of dormancy.

Planning Commission Actions                                         Page 26
Celeron Pipeline Final Development Plan                             March 3, 1986

H-10.   Celeron shall minimize impacts to the population of Catalina Mariposa
        lily (Calochortus catalinae) found in the Gaviota Pass area.  Celeron
        shall submit plans to enhance the recovery of this population to the
        Resource Management Department for approval prior to issuance of the
        Coastal Development Permit and Land Use Permit.  These plans shall
        include provisions for gathering of seeds from the population found in
        or near the ROW prior to construction, planting the seeds in or near
        the ROW after construction (exclusive of the operation ROW), conserving
        the upper 18-24 inches of heavy clay soil which contains the plant's
        bulb-like corms found in the vicinity of the plants prior to
        construction, and then, after construction, replacing this soil which
        holds the plants bulb-like corms.  This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;
        this biologist may approve modifications to these techniques based on
        season of the year and state of dormancy.

H-11.   Celeron shall minimize impacts to the population of Refugio Manzanita
        (Arcostaphylos refugioensis) found in Gaviota Pass area and affected by
        the proposed construction activities.  Celeron shall submit plans to
        enhance the recovery of this population to the Resource Management
        Department for approval prior to issuance of the Coastal Development
        Permit and Land Use Permit.  These plans shall include provisions for
        gathering seeds and taking cuttings from the population of Refugio
        Manzanita found in and adjacent to the ROW prior to construction, and
        provisions for the planting of the seeds and plants propagated from
        cuttings in the final construction alignment (exclusive of the
        operation ROW) after construction.  This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;
        this biologist may approve modifications to these techniques based on
        season of the year and state of dormancy.

H-12.   Celeron shall prepare a Restoration, Revegetation and Implementation
        section as part of the Oil Spill Contingency Plan (P-5).  The section
        shall be reviewed and accepted prior to start-up by the Resource
        Management Department and a biologist approved by the Resource
        Management Department.  The section shall be submitted sufficiently
        prior to Celeron's projected start-up date so as to allow reasonable
        time for staff review.  Reasonable costs of review shall be borne by
        the applicant.  The section shall contain site-specific restoration
        information for all habitat types including stream crossings,
        wetlands/lagoons, oak woodlands, grasslands, riparian zones, and other
        environmentally sensitive habitats.  The section shall be divided into
        three major areas: a) Coastal, b) Streams and Rivers and c) Terrestrial
        habitats.  Each of these sub-sections shall discuss the various
        habitats in the categories listed above.  Methods to achieve
        restoration of all affected areas to their prespill conditions shall be
        discussed.

Planning Commission Actions                                  Page 27
Celeron Pipeline Final Development Plan                      March 3, 1986

H-13.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall submit to the County Board of Architectural
        Review, and the Resource Management Department site-specific plans for
        landscaping of any pump station not within other required project
        vegetation screens.  This plan shall, at Celeron's expense, be reviewed
        by a qualified landscape architect and a biologist approved by the
        Resource Management Department to insure the proper plant materials and
        procedures identified in these conditions are implemented.  These plans
        shall be developed in consultation with the property owner.  The plan
        shall include:

        (a)   The specifications of any potential seed mixtures to be utilized,
              including the plant species in the mixture and the pounds of seed
              per acre to be applied;  type of mulch (fiber, chemical tackifier
              or straw);  the type and amount of fertilizer;  and any
              provisions for irrigation;

        (b)   Confirmation that all native or non-native plant materials
              proposed in the revegetation plan are compatible with indigenous
              vegetation and that none of the plans used is known to be weedy
              or invasive.  The plan shall provide for plantings that will
              screen facilities from view.  This vegetation screening shall
              also be designed to reduce nighttime lighting and noise.  Near
              chaparral or other high fire hazard areas, the seeds or seedlings
              will consist of native or non-native species, shown to contain
              fire retardant properties (such as toyon) and shown to be fast
              growing;

        (c)   The specifications for native seeds and seedlings that will have
              wildlife habitat and food value.  All perennial plants, and all
              woody plants are to be propagated from material obtained from the
              same area.  Native plant material is to be obtained from a
              revegetation contractor.  All native materials will be ordered
              from the contractor in advance of construction activities.

        (d)   Confirmation that non-native material is to be confined to
              disturbed areas immediately adjacent to structures needing visual
              screening.  Such screening is to include fast growing plants
              adequate to screen the facility from direct view;

        (e)   A detailed irrigation plan if feasible for all revegetated areas
              requiring irrigation for establishment of plant materials;

        (f)   Celeron's commitment for continual monitoring of the revegetaion
              so that weeds will be minimized.

H-14.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall post a bond or other security agreement approved
        by the County Counsel to ensure that all landscaping and revegetation
        programs are completed to the County's specifications.

Planning Commission Actions                                    Page 22
Celeron Pipeline Final Development Plan                        March 3, 1986

H-15.   Prior to issuing a release from the bond or other security agreement, a
        biologist and landscape architect hired by the County, at Celeron's
        expense, shall conduct a field review of all revegetated and landscaped
        areas, to insure consistency with the intent and specifications of the
        revegetation and landscape plan.  Necessary repairs or changes in
        landscaping or revegetation shall be made at Celeron's expense.

H-16.   Prior to approval of the Final Development Plan, a qualified biologist
        approved by the Resource Management Department will conduct
        site-specific field inventories for California state-listed species, as
        mandated by the intent and general provisions of Assembly Bill No.
        3309, the California Endangered Species Act.  The biologist will
        perform the surveys of the 100-foot ROW in areas suspected of having
        any of the species of special concern as identified in Appendix B Table
        B-6, DEIR/S, except for the peregrine falcon, least Bell's vireo, and
        Parish's sidalcea.  Surveys for these species will be conducted prior
        to construction.  The California Department of Fish and Game will be
        consulted concerning appropriate methods for survey as well as
        appropriate mitigation measures if these species are found on the ROW.
        Additional mitigation shall be developed and executed by Celeron based
        on these surveys if determined necessary by the Resource Management
        Department.

H-17.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, a wildlife biologist approved by the Resource Management
        Department will survey all potential raptor nesting habitats within 0.5
        miles of the pipeline, to identify active and inactive nests and
        potential perch sites cleared by ridge-top construction.  No
        construction will occur within 0.5 miles of active eyries during
        nesting season as determined by the biologist.  Construction may be
        permitted by the Resource Management Department in consultation with
        the biologist near inactive nests provided nest sites are not
        disturbed.  Where deemed necessary by the California Department of Fish
        and Game biologists, raptor perch or roost trees will be avoided and/or
        artifical roosts will be constructed on ridgelines to mitigate losses
        of such trees resulting from clearing the ROW on ridge tops.

H-18.   Celeron shall limit the width of the construction ROW through all
        riparian habitats to the extent feasible.  Celeron shall submit a plan
        indicating the location and size of the construction ROW through all
        riparian habitats.  These plans shall be approved by the Resource
        Management Department prior to the Final Development Plan.

H-19.   The construction ROW shall be routed to avoid trees to the maximum
        extent feasible.  When this is not possible, dying or diseased trees
        shall be removed preferentially over healthy trees.

Planning Commission Actions                                    Page 29
Celeron Pipeline Final Development Plan                    March 3, 1986

H-20.    Celeron shall minimize impacts to the oak woodland in the Suey Canyon
         area.  This shall be done by using existing disturbed areas and by
         narrowing the construction corridor to the extent feasible by working
         on top of the spoils pile or selectively removing spoils, selectively
         removing trees (e.g. dying, or diseased trees) and revegetating to
         enhance re-establishment of oak saplings and/or similar mitigation.

H-21.    Celeron shall align the pipeline route in the vicinity of the Los
         Alisos Creek crossing in order to minimize the amount of riparian
         habitat disrupted.


I.       SOCIOECONOMICS

I-1.     The cumulative impacts of oil and gas industry projects are expected to
         be significant to Santa Barbara County.  Therefore Celeron shall
         participate in an oil and gas industry wide monitoring and mitigation
         program to address socioeconomic impacts indentified as significant
         environmental impacts attributable to their project.  For projects such
         as pipelines, only the construction phase is expected to cause
         significant impacts, and Celeron's participation in the program shall
         be limited to that phase.  The criteria for allocating the costs of the
         monitoring and mitigation program and its mitigation requirements will
         be uniformly applied to all industry participants.

         The intent of this program is to obtain realistic information regarding
         impacts identified in the EIR/EIS, and to allow impacted jurisdictions
         to require mitigation for project-related impacts.  Mitigation of
         impacts through other planning programs, and/or through existing
         administrative infrastructure shall be taken into account.  The scope
         of this program is detailed below.  As subsequent details in the
         structure of the Program are developed by the County, such details
         shall supersede portions of this condition as appropriate.

         The purpose of the Monitoring and Mitigation Program is to accurately
         assess the impacts of the Celeron's proposed development, including
         those in the following socioeconomic areas:

         a.    Temporary housing needs, particularly demand for state and other
               park campsites, recreational vehicle parks, motel-hotel rooms and
               rental housing;

         b.    Longer term (more than one year) housing needs, particularly low
               moderate income housing needs, and associated water demands,
               south coast Santa Barbara County;

         c.    Public finance;

         d.    Transportation of workers and materials to and from the site.

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County. Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

The Monitoring and Mitigation Program will be administered and staffed by the County of Santa Barbara, Department of Regional Programs. A Technical Advisory Committee will provide assistance and input in the documentation of significant adverse impacts and proposals to mitigate these significant impacts.

The Technical Advisory Committee will be composed of:  two representatives from Santa Barbara's cities appointed by the Mayor's Select Committee and repesenting north and south county interests; one representative (each) from San Luis Obispo and Santa Barbara counties; and one representative from each affected oil and gas company (to the number of representatives agreed upon). Celeron will be included in the committee until Celeron submits its resignation.

In the event of unresolved technical issues in the area of methodology and calculation of socioeconomic impacts, there shall be a Technical Arbitration Group. The Technical Arbitration Group shall be composed of three individuals without ties to either the County or Celeron, one to be selected by the County Board of Supervisors, one selected by the oil and gas company representatives and the final member selected by the first two members. All Technical Arbitration Group decisions shall be appealable upon written request to the Board of Supervisors. Subsequent details on voting procedures and conflict resolution will be proposed by the Department of Regional Programs and reviewed by the Board of Supervisors in a noticed public hearing.

Prior to approval of the Final Development Plan for this project the monitoring and mitigation program will be refined. Based on information in the EIR/EIS and on other data as appropriate, practical thresholds which trigger the necessity for mitigation will be developed and adopted by the Department of Regional Programs with input from the Technical Advisory Committee. These thresholds will recognize the normal growth incorporated in county plans, prior and existing industry activity, and the decline of the industry if no further permitting is allowed. Methodologies used to establish thresholds and impacts will be developed in consultation with the Technical Advisory Committee.

The need for mitigation will be determined when threshold levels are exceeded as shown by monitored activities and other data as appropriate. The Department of Regional Programs will recommend a mitigation action to the County Board of Supervisors. The Technical Advisory Committee will assist in making the assessment and recommendations. The monitoring and mitigation program will continue through all stages of construction.

Planning Commission Actions                                            Page 31
Celeron Pipeline Final Development Plan                            March 3, 1986

The monitoring, impact and mitigation elements of the program would be
equivalent to those described in the Chevron Gaviota Project
conditions, but modified as appropriate for the nature of the pipeline
project.

I-2.    Prior to approval of the Final Development Plan, Celeron shall submit
        to the County Department of Regional Programs a plan which details how
        they plan to house temporary construction workers for every month of
        construction.  This plan, to be implemented by Celeron, shall
        demonstrate how Celeron plans to reduce the housing impacts identified
        as part of the plan; e.g. exactly how much housing is needed, where it
        is needed and for how long; but not limited to, the following examples:

        (a)    Use of existing under-utilized hotel/motel space during the
               months of September through May to provide for temporary living
               quarters for direct construction workers by month; identification
               of incentives to all the direct construction workers such as rent
               subsidies and/or shuttle service to the site.

        (b)    Use of any available housing outside the South Coast area for all
               workers associated with the project during the summer months when
               visitor-serving facilities in the South Coast area are at
               capacity.  Incentives for workers shall be identified such as
               rent subsidies and shuttle service for all workers commuting to
               the job site.

        (c)    Methods to limit worker use of public campgrounds as living
               quarters.  If it cannot be shown that the impact will be reduced
               from the estimate, Celeron shall make a donation to the
               California State Parks or to Santa Barbara County Parks for the
               development of new campsites to offset their worker use of
               campsites.  The donation shall be made prior to receipt of the
               building permit and determined by multiplying the estimated cost
               per developed campsite times 15.  If it is shown by the Regional
               Program Department and the Technical Advisory Committee that
               there is significant impact, the above-mentioned groups shall
               propose mitigation.  At any point when the Board of Supervisors
               determines that the monitoring program demonstrates that previous
               mitigation funds paid by Celeron exceed the valuation of the
               impacts at issue, Celeron shall be granted a credit against any
               other current or future mitigation fees imposed on Celeron for
               this permit by the County.  Celeron shall be entitled to accrued
               interest at the prevailing legal rate which shall continue to
               accrue until the credit is used.

Planning Commission Actions                                          Page 32
Celeron Pipeline Final Development Plan                          March 3, 1986

I-3.    The pipeline construction period will be scheduled so as not to
        coincide with peak tourist seasons within each construction area in
        Santa Barbara County, provided that this scheduling does not interfere
        with any other conditions in this permit with respect to timing, in
        particular requirements regarding construction during stream and river
        low-flow.  If such a conflict is found, than additional measures must
        be taken to provide the temporary housing needs for construction
        workers.

I-4.    Deleted.

I-5.    Celeron shall include provisions in its contractor agreements
        specifically to encourage and promote employment from local labor so
        as to reduce the impacts associated with the in-migration of workers.

I-6.    Except as otherwise provided herein, if the Socioeconomic Monitoring
        Program shows that project related revenues will not compensate for
        needed capital or operating expenditures necessary to provide
        project-related utilities and services additional mitigation will be
        required.

I-7.    In the event that state and/or federal revenue sharing legislation
        directed at distributing oil related revenues to state or local
        governments is approved or Santa Barbara County levies a tax (special
        or otherwise) on oil and/or gas processed or transported under this
        permit, then any condition herein requiring payments or other items of
        value by Celeron to Santa Barbara County or any political subdivision
        thereof shall automatically be suspended pending a review by the County
        to determine the extent, if any, which the tax, revenue sharing, or any
        of the fees imposed are duplicative or unwarranted either as to the
        level of government services provided or the level of burdens imposed
        on the public.

J.      LAND USE AND RECREATION

J-1.    Prior to construction, the entire pipeline ROW corridor shall be
        prominently staked.  All affected property owners along the pipeline
        route shall be notified in writing at least 30 days prior to the
        commencement of any pipeline construction on their property, and at
        least 15 days in advance of any deviation from the staked corridor
        which crosses their property.

J-2.    All mainline pipeline construction activities except river, perennial
        coastal stream, and ESH area crossings as specified in condition H-7,
        once started, shall proceed in a diligent and expeditious manner and
        shall be completed within nine months after the starting date, subject
        to necessary and/or unanticipated time extensions approved by County,
        in consultation with affected property owners.

EXHIBIT B

Planning Commission Actions                                        Page 33
Celeron Pipeline Final Development Plan                         March 3, 1986

J-3.   Pipeline construction activities shall be limited to the period between 7 a.m. and 7 p.m., Monday through Saturday.  Except for emergency services, construction activities shall not take place on Sundays, the dates generally recognized for Memorial Day, July 4, Labor Day, or any other similarly recognized holiday, unless previous arrangements have been made with the affected property owners.

J-4.   Prior to approval of the Final Development Plan, Celeron shall consult with affected property owners to develop reasonable and mutually satisfactory controls for maintaining the privacy and security of affected properties while construction is in progress.

J-5.   Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners, Celeron shall provide affected property owners written notice at least 48 hours prior to the start of construction on their property, which shall include:

       a)   Description of vehicles using roads on the property, including type, size, identification, proposed times of entry and departure, destinations, and the intended route to the destination.  (Fire, medical, or similar emergency vehicles can enter as necessary.)  Significant changes in the schedule of construction-related vehicular traffic shall be allowed within the 48-hour advance noticing subject to direct communication (e.g. telephone, personal communication) by Celeron with the affected property owners;

       b)   Description of estimated construction schedule across the property.  Any blasting necessary during construction shall be noticed to all property owners within a one mile radius of the blasting area;

       c)   Description of times of limited access through and across the property, such as road closures on the property, indicating specific location, time and duration of the limited access or closure.  Road closure is considered to include partial road blockage or disturbance.  Suitable vehicular by-pass shall be provided during all closures;

       d)   Description of any probably hazard or other unsafe condition during the pipeline construction period, indicating the nature of the hazard, the area in which the condition will occur, and the time and duration of the activity.  Celeron and its contractors shall take prompt and adequate action to correct any hazard or damage that does occur during construction, and shall provide appropriate noticing as per other parts of this condition;

Planning Commission Actions                                      Page 34
Celeron Pipeline Final Development Plan                    March 3, 1986

    e)    Description of helicopter and/or vehicle reconnaissance schedules for pipeline maintenance, indicating times, stops, and duration. Celeron shall establish and enforce appropriate rules for its personnel and its contractors to assure that they will not be in the area except when necessary to carry out construction, inspection, repair and maintenance activities, or emergency services;

    f)    Description of schedule for cutting any fences or similar barriers during pipeline construction.

J-6.    Deleted.

J-7.    Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners if and when fences or other similar barriers must be cut during pipeline construction, Celeron shall provide advance notice to the affected property owner, and shall replace the function of the cut fence before the cut is made to the satisfaction of the property owner, and Celeron and its contractors shall restore all fences that have been cut, moved, or damaged to at least their condition prior to pipeline construction, except that gates or similar structures may be added as approved to provide access.

J-8.    Interruption of telephone, electrical power, water or other utility services shall be minimized to the extent feasible during the pipeline construction period. Celeron, or its contractors, shall contact each property owner or the appropriate utility regarding the location of utility lines, and all such utility line locations shall be staked by Celeron or its contractors prior to the start of construction on the affected property.

J-9.    During the pipeline construction period in the County, Celeron and its contractors shall comply fully with all applicable statutes, ordinances, rules and regulations, including traffic regulations, of the County.

J-10.    Prior to entering upon any parcel of property for purposes of commencing construction, Celeron shall demonstrate to the Resource Management Department that it has obtained a right-of-way for such parcel or otherwise has obtained the right to enter the property for purposes of constructing the pipeline.

J-11    Following installation of the pipeline, use of the right-of-way is restricted to operational maintenance of the pipeline except where expressly permitted by the easement or landowner and consistent with other regulations and conditions.

EXHIBIT B

Planning Commission Actions                                      Page 35
Celeron Pipeline Final Development Plan                      March 3, 1986

K.    TRANSPORTATION

K-1.   Prior to issuance of the Coastal Development Permit and Land Use
       Permit, Celeron shall submit to the Resource Management Department and
       the Department of Public Works, Road Division a worker transportation
       program designed to minimize traffic-related impacts.  The plan shall
       identify on- and off-site parking areas, access routes, shuttle program
       to reduce number of working vehicles on and along pipeline construction
       corridor, measures to avoid traffic conflicts with residents using all
       roads affected, number of vehicles accessing the facilities sites and
       incentives for ride-pooling/van-pooling to the sites.  Construction
       worker traffic and parking shall not interfere with normal and
       reasonable uses of private property or recreational areas.  This
       Construction Traffic Mitigation Plan shall be submitted by Celeron and
       approved by County prior to initiation of construction.  The program
       must consider both Celeron's employees and contractors.

K-2.   Any new permanent parking areas at the pump stations shall be screened
       from public view pursuant to the landscape plan approved by the Board
       of Architectural Review.

K-3.   The final engineering plans and procedures for all pipeline crossings
       of County roads must be approved prior to issuance of the Land Use
       Permit and Coastal Development Permit by the Department of Public
       Works.  Notification of such approval must be submitted to the Resource
       Management Department prior to construction at the site.

K-4.   All pipeline construction activity, except ingress and egress along
       routes approved by the Resource Management Department and in
       consultation with affected property owners, shall be limited to the
       final staked right-of-way on the final approved pipeline route.  Use of
       any private roads or other areas shall be allowed only after advance
       approval from the affected property owners.

K-5.   Prior to the Final Development Plan, Celeron must submit to the Public
       Works Department for approval a plan to mitigate impacts to all County
       roads which will be used during construction.  This plan will include
       the type of vehicles and machinery which will traverse the roads, the
       frequency of road use for each piece of equipment and vehicle, and the
       gross vehicle weights loaded and unloaded.  This includes the above
       information for trucks carrying pipe, fuel, construction supplies, or
       construction crews through the County to the construction spreads.
       This plan shall include an agreement with the County to repair any
       obvious damage to the satisfaction of the Public Works Director and any
       reasonable fees associated with eventual reconstruction caused by
       project-related damages of the public roads.  Prior to drafting this
       agreement, County shall coordinate with Celeron in compiling a list of
       County roads which will be used for construction of the pipeline.
       Celeron shall demonstrate property owner (or Court) approval of private
       road maintenance plans or terms on privately owned parcels to the
       Resource Management and Public Works Department prior to entering upon
       said parcels for purposes of commencing construction.

Planning Commission Actions                                              Page 36
Celeron Pipeline Final Development Plan                             March 3, 1986


L.      CULTURAL RESOURCES

L-1.    Prior to approval of the Final Development Plan, Celeron shall submit a
        plan detailing the methods for the Phase I (walkover) and Phase II
        (site importance assessment) cultural resources surveys.  In addition,
        Celeron shall submit all Phase I cultural work completed to date.
        These reports shall be approved by the Resource Management Department
        as part of the Final Development Plan.

        Prior to issuance of the Land Use Permit and Coastal Development
        Permit, Celeron shall complete Phase I and Phase II cultural resource
        surveys for the entire route.  The results of these surveys shall be
        approved by the Resource Management Department prior to issuance of
        said permits.  Celeron shall avoid to the maximum extent feasible all
        known cultural resource sites along the pipeline route unless safety
        (e.g. seismic or engineering practices) considerations or sensitive
        biological habitats preclude avoidance.

L-2.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron, in consultation with the Native American Community,
        shall commence the cultural resources mitigation plan, in accordance
        with CEQA Appendix K, County approved Prehistoric Archaeological
        Guidelines, and section 4.1.1.11, Cultural Resources, of the EIR/EIS.
        Implementation of the mitigation plan shall proceed on an expeditious
        and effective schedule in order to minimize or to avoid conflicts with
        other construction scheduling requirements delineated in other permit
        conditions.  The main components of the mitigation plan shall include:

        a)    Selection of a qualified archaeologist by the County Resource
              Management Department in consultation with Native American
              representatives.  The archaeologist shall be available on an
              as-needed basis through the completion of pipeline construction.
              The archaeologist shall be funded by Celeron and shall be
              responsible to the County Resource Management Department.
              Compensation shall cover all excavation, analysis, and report
              preparation for all areas investigated including those found
              during construction;

        b)    Avoidance of known sites wherever feasible;

        c)    Test excavations of known sites that cannot be avoided.  These
              test excavations will assess the importance of each site
              according to CEQA Appendix K criteria or other requirements and
              will result in appropriate data recovery as a mitigation measure;

        d)    Inclusion of Native American representatives in all field
              activities.

Planning Commission Actions                                        Page 37
Celeron Pipeline Final Development Plan                          March 3, 1986

> e)  Additional sub-surface sampling (use of shovel test pits) in defined sensitive areas which will be affected by project construction to confirm the presence/absence of previously unknown (undiscovered) sites. This will include surveying of proposed construction access road areas, once identified by Celeron. Any new sites found shall be treated as per condition L-2(b,c);
>
> f)  Following the determination of site importance, Celeron shall inform the County of any additional plans for site avoidance. For those sites not avoided, the consulting archaeologist shall, in consultation with the Native American community, prepare site-specific mitigation (excavation/data recovery) plans; and
>
> g)  Implementation and completion of the field work aspects of the site-specific mitigation plans prior to construction in the vicinity of the resource.

L-3.  Prior to pipeline installation activities, Celeron shall sponsor a workshop for its pipeline contractors and Native American consultants to review and explain the mutual concerns and activities of the parties during pipeline installation work.

L-4.  During pipeline installation, a Resource Management Department approved archaeologist and Native American consultant(s) will work with the contractor during trenching to insure continued avoidance. Adequate monitors shall be provided pursuant to an agreement between the Native American representatives and Celeron, and the archaeologist retained.

L-5.  If non-burial associated cultural resource artifacts are recovered during pipeline installation (the location of such artifacts being unknown prior to installation), ownership of such artifacts shall be the option of either Celeron, the Native American Community, or the archaeological community. In recognizing the origin of the materials, the Native American Community shall have the first option for ownership. The disposition of the artifacts shall be carried out as per the approved County guidelines.

L-6.  If burials or burial associated artifacts are found during installation (that were unknown prior to excavation), and cannot be avoided because of safety considerations, there shall be no further excavation or disturbance of the site. Celeron, in conjunction with the Native American representatives and the Resource Management Department, shall adhere to the guidelines in CEQA Appendix K and the County Archaeological guidelines prior to continued construction activity in the site area.

L-7.  If the County cultural resource guidelines for Phase II are modified and approved prior to November 19, 1985, Celeron shall abide by the requirements set forth in the guidelines in place at the time of Final Development Plan approval.

Planning Commission Actions                                        Page 38
Celeron Pipeline Final Development Plan                          March 3, 1986

M.    VISUAL RESOURCES

M-1.    All facility design (e.g. pump stations, landscaping and signs), shall be in accordance with a plan approved by the County Board of Architectural Review (BAR) including the criteria outlined in the Coastal Zoning Ordinance Section 35-87.9 and Section 35-184.  Prior to the issuance of the Land Use Permit and Coastal Development Permit, Celeron shall submit to the BAR and the Resource Management Department and obtain their approval of a plan demonstrating that Conditions M-2 through M-5 are met.  For visual screening of surface equipment along the pipeline route, Celeron shall consult with each affected property owner during development of the associated landscaping plan.

M-2.    No unobstructed or unshielded beam of exterior lighting shall be directed towards any area outside the exterior boundaries of the Celeron's property or easement.  Any lighting along roadways within the project shall utilize low intensity, ground level, shielded fixtures. The plan shall demonstrate that all feasible measures have been taken to reduce obtrusive night lighting and glow from the pump stations.

M-3.    To the extent feasible no glare or other radiation resulting from pump station facilities, other than lighting fixtures constructed pursuant to this Development Plan shall be detectable at any point along or outside the required screening along exterior boundaries of the pump stations.

M-4.    Prior to the pipeline operation, the Gaviota pump station, visible from Highway 101 and the Gaviota Village, the Sisquoc pump station visible from public viewshed, and all above ground portions of the pipeline shall be painted to harmonize with the surrounding area.

M-5.    No above-surface structures except necessary pipeline markers, pump stations, cathodic test stations, necessary fencing, and block valves shall be visible along this route after the completion of pipeline construction.  Signs shall not detract from scenic areas or views from public roads to the extent feasible.

M-6.    Prior to construction, Celeron will review the feasibility of implementing mitigation measures and/or realignments in the Gaviota State Park area to avoid blasting of ridgetops and alteration of topography in a scenic area.  Celeron shall submit a plan to the Resource Management Department, for review and approval, which identifies the feasibility of shifting the ROW alignment to the west, leaving the ridge profile undisturbed.  The plan shall include an investigation of utilizing prefabicated pipeline bends to allow for alignment around ridgetops, the use of stepped benches in steep terrain, and the future use of such a corridor for additinal pipelines.

Planning Commission Actions                                      Page 39
Celeron Pipeline Final Development Plan                      March 3, 1986

N.    NOISE

N-1.   Prior to issuance of the Costal Development Permit and Land Use Permit,
       Celeron shall file with the Resource Management Department a Noise
       Monitoring and Control Plan which has been approved previously by the
       the Department of Health Care Services and the Resource Management
       Department.  The plan shall describe the best efforts Celeron shall
       take to reduce the noise impacts of the project both during
       construction and operation of the project.  The approved plan shall be
       implemented by Celeron and shall be followed until temporarily
       suspended or deemed no longer necessary by the Resource Management
       Department.  The plan shall include provisions to ensure that items N-2
       through N-6 below are included.

N-2.   Except for motor vehicles and motorized construction equipment, all
       facilities shall be designed, constructed, operated and maintained such
       that sound levels during operation do not exceed 70 dbA at or beyond
       the property line or pipeline easement, as measured on the "A" weighted
       scale at slow response on approved sound level measuring instruments.
       Affected property owners along the pipeline route shall be notified by
       Celeron at least 48 hours in advance of any planned testing or
       maintenance of the line which may exceed noise standards.  The facility
       shall comply with all standards established in the Noise Element of the
       Comprehensive Plan and the Coastal Zoning Ordinance.  No residents,
       teachers, students and staff at the Vista del Mar School, shall be
       subjected to greater than a 9 dbA increment above the baseline ambient
       noise level, nor greater than a 3 dbA increase in day-night sound
       levels.  The best available technology, including but not limited to
       muffling equipment, sound barriers, and landscaping measures shall be
       used to minimize operational noise impacts.

N-3.   During the construction and operation phases, project related noise at
       the Gaviota State Park, Vista del Mar School, Buellton area, or other
       points which may be impacted (as determined by the Health Care Services
       Director), shall be limited to 65 dbA between the hours of 7:00 a.m.
       and 10:00 p.m., and 50 dbA between the hours of 10:00 p.m. and 7:00
       a.m., consistent with the County Noise Element and the Coastal Zoning
       Ordinance.  Blasting shall be limited to the hours between 7:00 a.m.
       and 7:00 p.m. and directional charges shall be used to minimize noise.

N-4.   As determined by the Resource Management Department, noise generating
       project activities (including delivery of construction equipment
       through residential areas) shall be restricted between the hours of
       10:00 p.m. and 7:00 a.m.  If complaints arise concerning activities
       occurring during these hours, Celeron shall take additional feasible
       steps to reduce the noise levels or further restrict the offending
       activity.

Planning Commission Actions                                    Page 40
Celeron Pipeline Final Development Plan                        March 3, 1986

N-5.    Prior to approval of the Final Development Plan, Celeron shall submit
        to the Director of the Resource Management Department procedures that
        Celeron will take to minimize noise impacts from helicopters, or other
        aircraft during the aerial surveys of pipeline.  The procedures, to be
        approved by the Resource Management Department, shall specify
        overflight routes to be taken to minimize noise impacts to the
        community and other feasible measures.  Celeron shall direct its
        contractors to abide by the helicopter procedures and shall take
        reasonable corrective action if complaints arise concerning the use of
        helicopters.  Subject to flight safety considerations, Celeron shall
        avoid helicopter flights over residential areas.

N-6.    All construction and operation-related equipment shall be operated and
        maintained to minimize noise generation, ground vibration, and to avoid
        interference with radio or video communications.


O.      ABANDONMENT

O-1.    Immediately following permanent shut down of the pipeline, Celeron
        shall remove abandoned pump stations and unburied portions of the
        pipeline within Santa Barbara County constructed under this permit,
        recontour the site and revegetate the site in accordance with a County
        approved revegetation plan within one year of permanent shut down.
        Celeron shall post a performance bond to insure compliance, or continue
        to pay property taxes as assessed during project operation until site
        restoration is complete, as determined by the County.


P.      SYSTEMS SAFETY AND RELIABILITY

P-1.    Celeron shall submit all appropriate pump station, valve, and pipeline
        construction and process diagrams to a System Safety and Reliability
        Committee who may employ a third-party technical review in order to
        help identify and correct possible design hazards prior to
        construction.'  This review shall evaluate the pipeline design and its
        implementation of System Safety and Reliability Conditions.  The System
        Safety and Reliability Review Committee shall consist of a
        representative from the County Public Works Department, Building and
        Safety Division, the APCD, the County Fire Department, County Flood
        Control District and the Resource Management Department.  Design
        recommendations resulting from the third party review shall be
        incorporated into the approved Final Development Plan.  All reasonable
        costs associated with any review shall be borne by Celeron.  Celeron
        shall be entitled to participate fully in the review process.

EXHIBIT B

Planning Commission Actions                                  Page 41
Celeron Pipeline Final Development Plan                  March 3, 1986

P-2.  Celeron shall submit a detailed safety Inspection, Maintenance and
      Quality Assurance Program for the pump stations, valves, and the
      pipeline which shall be implemented during construction and
      operations.  The Program shall include, but not be limited to,
      inspection of construction techniques, regular maintenance and safety
      inspections, periodic safety audits, corrosion monitoring and leak
      detection, inspections of all trucks carrying hazardous and/or
      flammable material.  The construction section of the Program shall be
      reviewed and approved by the System Safety and Reliability Review
      Committee and/or its consultants prior to issuance of the Coastal
      Development Permit and Land Use Permit.  The operations section of the
      Program shall be reviewed and approved by the System Safety and
      Reliability Review Committee and/or its consultants prior to start-up.
      The Program shall be submitted sufficiently prior to Celeron's
      projected start-up date so as to allow reasonable time for staff
      review.  Celeron shall implement the approved program and shall provide
      for involvement of the managing environmental coordinator (condition
      C-1), County staff or its consultants' involvement in the program.  All
      costs associated with this review process shall be borne by Celeron.

P-3.  Celeron shall submit an Emergency Response Plan detailing response
      procedures to be implemented by Celeron for accidental events affecting
      public safety and the environment.  This plan shall be based on a
      comprehensive risk analysis reviewed and approved by the System Safety
      and Reliability Committee (condition P-1).  The plan shall be reviewed
      and approved by the County Emergency Services Coordinator, the Fire
      Department, and the Resource Management Department prior to start-up.
      The Program shall be submitted sufficiently prior to Celeron's
      projected start-up date so as to allow reasonable time for staff
      review.  Celeron shall demonstrate the effectiveness of the Emergency
      Response Plan by responding to not more than one surprise drill each
      year which may be called by the County on the pump station property,
      along the pipeline route or along Highway 101.  If critical operations
      are underway, Celeron need not respond but shall explain the nature of
      the critical operations and why response is not possible.  Celeron
      shall demonstrate oil spill response capability by responding to not
      more than one surprise oil spill drill each year.

P-4.  In order to assure that County emergency response procedures adequately
      interface with the Celeron emergency response procedures, Celeron shall
      provide its reasonable pro-rata share of funds to the County, to
      develop and implement a feasible County Emergency Response Plan for oil
      and gas industry related emergencies.  As appropriate, the County shall
      request funds from other oil industry operators to aid in funding of
      the County Emergency Response Plan.  When available, the Resource
      Management Department shall provide Celeron with an estimate of the pro
      rata share of funds to be provided by Celeron and the method for
      allocating such costs among other operators.

Planning Commission Actions                                    Page 42
Celeron Pipeline Final Development Plan                        March 3, 1986

P-5.    Celeron shall submit an Oil Spill Contingency Plan detailing cleanup
        procedures and restoration procedures to be employed in the event of a
        spill.  This plan shall be reviewed and approved by the Resource
        Management Department and the County Emergency Services Coordinator
        prior to start-up.  The Program shall be submitted sufficiently prior
        to Celeron's projected start-up date so as to allow reasonable time for
        staff review.  Procedures and techniques shall be selected to augment
        the Emergency Response Plan.  The intent of the Oil Spill Contingency
        Plan is to detail spill site restoration subsequent to emergency
        response which may be called by the County on the pump station property
        or along the pipeline route.  If critical operations are underway,
        Celeron need not respond but shall explain the nature of the critical
        operations and why response is not possible.

P-6.    Prior to approval of the Final Development Plan, Celeron shall submit
        to the Santa Barbara County Sheriff's Department for review and
        approval a site security plan.  The plan shall describe procedures to
        be implemented by Celeron which will prevent intentional damage to
        facilities which may result in environmental damage or public safety
        hazards.

P-7.    Celeron shall cooperate with Chevron as necessary to facilitate the
        establishment of a temporary County fire company until the completion
        of the fire station (as specified in Chevron condition P-9).  Prior to
        issuance of the Coastal Development Permit and Land Use Permit, the
        County Emergency Response Coordinator and Fire Department must be
        satisfied that provisions have been made to establish an operational
        fire company in the project area.

P-8.    Prior to approval of the Final Development Plan, Celeron shall agree to
        participate in a plan to be submitted to the County Fire Department by
        Chevron USA Inc., for the construction, manning and equipping of a fire
        station in the Gaviota area.  Celeron shall contribute their pro rata
        share of the cost of implementing this plan.  When available, the
        Resource Management Department shall provide Celeron with an estimate
        of the pro rata share of funds to be provided by Celeron and the method
        for allocating such costs among other operators.

P-9.    Prior to Final Development Plan, Celeron shall submit to and obtain
        conceptual approval from the Fire Department, a Fire Protection Plan
        for the pump station locations.  Final approval shall be obtained prior
        to start-up.  Criteria to be addressed shall be obtained from the
        County Fire Department.

EXHIBIT B

Planning Commission Actions                                    Page 43
Celeron Pipeline Final Development Plan                     March 3, 1986

P-10.   Prior to approval of the Final Development Plan, Celeron shall assess
        the feasibility of transporting liquefied petroleum gases and natural
        gas liquids, (LPGs and NGLs) through the proposed pipeline by blending
        and/or batching, considering industry-wide projected volumes and market
        destinations of the gas liquids.  Celeron shall report to the Resource
        Management Department the results of this assessment, and this
        information shall include all technological and safety constraints
        involved, amount and type of additional storage facilities needed, and
        the degree to which LPGs and NGLs produced in the area can be
        transported through Celeron's pipeline.

        Celeron shall transport the NGLs through this pipeline, to the extent
        feasible within safety and legal constraints as identified by the
        report and as requested by the users.  In addition, under the reporting
        provisions of Condition C-1, Celeron shall inform the County of the
        types and amounts of gas liquids shipped in the pipeline during
        operations.

P-11.   If the Vista del Mar School has not been relocated or is located at a
        site where it could be impacted by construction activities, prior to
        approval of the Final Development Plan, Celeron and the Board Trustees
        of the Vista Del Mar School District shall develop a reasonable and and
        mutually agreeable construction plan for the pump station site and
        pipelines adjacent to the site that will minimize construction-related
        noise, air pollution, and visual disturbance to the School during
        school hours.  Said construction plan shall include the following:

        Pipeline construction noise near the School shall be held to ambient
        noise levels or construction shall occur only when school is not in
        session; to prevent exceedance of the California one-hour $NO_2$
        standard, construction schedules must be modified to minimize
        overlapping of equipment emissions; and, during construction of the
        pipeline, activities nearest the school shall be scheduled when school
        is not in session in accordance with Condition B-5 and temporary
        barriers shall be erected around noisiest activities.  No grading for
        the Gaviota pump station shall occur during School session hours.

        In the event that any agreements contained herein cannot be reached on
        the construction plan, the Board of Supervisors shall arbitrate any
        dispute.

P-12.   Deleted.

P-13.   Celeron will design the pipeline such that entire pipeline will have
        effective control communication between the operations control center
        and all remotely activated valves.  Any break, rupture, and/or damage
        to the pipeline shall result in the orderly shutdown of the pumping
        operations, and will activate the shut off valves, if appropriate, in a
        manner which will minimize environmental damage.

Planning Commission Actions                                      Page 44
Celeron Pipeline Final Development Plan                    March 3, 1986

P-14.   During construction of the pipeline in fire sensitive areas, Celeron
        shall meet or exceed applicable guidelines and requirements set forth
        in a Watershed Fire Protection Plan provided by the combined local fire
        protection agencies, Santa Barbara County Fire, U.S. Forest Service,
        and the California Department of Forestry. This shall include, but not
        be limited to: modifications of welding operations, required fire
        patrolman position(s), firefighting equipment, and construction
        restrictions due to extreme fire weather.

P-15.   All facilitites, construction activities and equipment shall comply
        with National Fire Protection Assocition standards.

P-16.   Upon completion of pipeline construction, Celeron shall provide all
        jurisdictional agencies (S.B. County Fire, USFS, CDF) with at least two
        copies of maps showing the finished pipeline route and shall include
        locations accessible by fire department emergency response vehicles.
        Said maps shall be 7 1/2 minute quadrangle scale, (one inch equals
        24,000 inches), and shall represent topographical features.

P-17.   Celeron shall be subject to required fire department inspections during
        and after construction as set forth by the 1982 Uniform Fire Code and
        these conditions.

P-18.   Prior to approval of the Final Development Plan, Celeron shall
        designate alternative pipeline corridor alignments which avoid the two
        potentially impacted, proposed alternative permanent relocation school
        sites now under study by the Vista del Mar Union School District.
        These proposed alternative locations are the State Park at Las Cruces,
        and the Tajiguas Ranch property. County shall review and approve said
        alternative alignments as part of the Final Development Plan and
        Celeron shall implement the appropriate alternative alignment depending
        on the permanent school relocation site chosen by the Vista del Mar
        School District.


Q.      FACILITY DESIGN

Q-1.    The Final Development Plan shall demonstrate compliance with Santa
        Barbara County Coastal Zoning Ordinance, and other applicable County
        Ordinances to the extent required by this permit.

Q-2.    Cost effective energy conservation techniques shall be incorporated
        into project design.

Q-3.    Celeron's facilities will be operated as a common carrier pipeline with
        access for use available on a nondiscriminatory basis. County retains
        the right to verify that the use of the facilities is conforming with
        County policies on consolidation and to impose additional reasonable
        permit conditions where necessary to assure these policies are being
        fulfilled to the extent feasible. The intent of this condition is to
        ensure the multi-company access of oil transportation facilities.

EXHIBIT B

Planning Commission Actions                                          Page 45
Celeron Pipeline Final Development Plan                        March 3, 1986

Q-4.   Celeron shall comply with all applicable policies in Section 25 of the
       Santa Barbara County Petroleum Ordinance No. 2795.

Q-5.   Celeron shall fund a pro-rata share of the costs to bury power
       transmission lines or of using environmentally and aesthetically
       preferred poles between the Goleta Substation and Gaviota in areas
       where the County and SCE determine it is not feasible to bury the
       lines.  Celeron's pro-rata share shall be based upon an equitable
       cost-sharing formula applied to all users of the grid power consistent
       with PAC rate setting and applicable regulations.

5668e

Planning Commission Actions                                    Page 46
Celeron Pipeline Final Development Plan                  March 3, 1986

CELERON FINAL DEVELOPMENT PLAN
FINDINGS REQUIRED FOR APPROVAL

Upon approving the Preliminary Development Plan and Conditional Use Permit, the Planning Commission and Board of Supervisors adopted certain findings of approval pursuant to the County zoning ordinances and the California Environmental Quality Act. As the project has undergone no major changes since those findings were adopted, they are largely applicable to the Final Development Plan approval. The findings in this section have been modified to reflect new information and the nature of the Final Development Plan approval.

1.    Article III, County Zoning Ordinance

The Santa Barbara County Zoning Ordinance, Article III, requires that certain findings of approval be made for all development plans, and that additional findings be made specifically for pipeline development.

1.1   Findings Required for Approval of a Development Plan – General

A Preliminary or Final Development Plan shall be approved only if all of the following findings can be made:

a)    That the site for the project is adequate in size, shape, location, and physical characteristics to accommodate the density and intensity of development proposed.

The project "site" is in fact a 100-foot wide construction, 50-foot wide operations corridor covering approximately 70 miles in Santa Barbara County. The route is logical and appropriate for the transport of offshore processed crude to refineries outside of the County. The pipeline begins at Las Flores Canyon, where it will acquire processed crude from a consolidated oil processing facility, pass through the Gaviota consolidated processing facility, and traverse the environmentally preferred route out of the County. While the 100-foot construction right-of-way does encroach upon sensitive resources, the route was chosen and the project conditioned to minimize the disturbance of sensitive habitats and to restore all disturbance to the maximum feasible extent. The line will not displace any residents or structures.

The chosen route can accommodate multiple pipelines, and has been designed to minimize the impacts of future construction in the corridor. The Celeron line will be a common-carrier, offering equitable access to all shippers.

b)    That adverse impacts are mitigated to the maximum extent feasible.

The construction and operation of this pipeline will have certain adverse impacts on Santa Barbara County. The California Environmental Quality Act requires that those impacts which can be feasibly lessened to a level of insignificance must be so mitigated. As detailed on the Class II Impact Summary Table, project conditions have been imposed to implement the mitigations. There are also impacts which cannot be mitigated to a level of insignificance. As required by CEQA, these impacts have also been mitigated to the maximum extent feasible by the implementation of

Planning Commission Actions                                                Page 47
Celeron Pipeline Final Development Plan                               March 3, 1986

conditions, as noted on the Class I Impact Summary Table. In addition,
mitigation measures which alleviate adverse but not significant impacts
have been incorporated as suggested by the environmental document.

c)   That streets and highways are adequate and properly designed.

While pipeline construction will require the use of many County roads by
heavy trucks and to a lesser degree, machinery, these roads should be
able to accommodate this temporary increase in traffic and use without
any decrease in service. Furthermore, condition K-5 requires Celeron to
mitigate impacts to all County roads used during construction and to
repair any obvious damage.

d)   That there are adequate public services, including but not limited
     to, fire protection, water supply, sewage disposal, and police
     protection to serve the project.

The project Environmental Impact Report does not identify any significant
adverse impacts to public services due to the project. In order to help
offset cumulative impacts on public services anticipated due to the
increased offshore development, Celeron is required to participate in the
establishment of a new County fire station in the Gaviota area
(conditions P-7,8). Celeron must also adhere to the site security plan
approved by the County Sheriff's Department (P-6). In addition, if
project-related taxes do not compensate for needed capital or operating
expenses necessary to provide for project-related utilities and services,
additional mitigation will be required through the Socioeconomic
Monitoring and Mitigation Program (I-1).

e)   That the project will not be detrimental to the health, safety,
     comfort, convenience, and general welfare of the neighborhood and
     will not be incompatible with the surrounding areas.

During construction, the project may inconvenience a small number of
residents near Buellton and in the Gaviota area due to increased noise
levels. The project has been conditioned to limit construction
activities to between the hours of 7:00 a.m. and 7:00 p.m., and will only
impact any given area for approximately one week. The duration of this
potential inconvenience is therefore limited, and the project has been
conditioned to mitigate noise impacts to the extent feasible. Although
processed oil is flammable, and therefore hazardous to transport, the
risks of fire and spillage have been minimized through project
conditions. Therefore, neither the elevated noise level nor the risk of
an accident will be detrimental to the health, safety, comfort,
convenience and general welfare of the neighborhood.

Pipelines are a permitted use in all zoning districts outside of the
Coastal Zone, and are compatible with surrounding areas because there are
very few above-ground facilities once construction is complete. The pump
stations at Sisquoc is above ground, but will not conflict with the
agricultural uses which surround it. The pump station at Las Flores
Canyon is compatible with the other oil and gas facilities at the site.

hearings do not create any new adverse impacts. Although there may be segments where a different alternative is less environmentally damaging, these isolated segments are infeasible because the pipeline must be continuous; each chosen segment must join to form the pipeline corridor. Overall, the route chosen is environmentally preferable to any complete alternative route, so that there are no feasible alternative routes which are less environmentally damaging.

## 2.0 County Coastal Zoning Ordinance

The Coastal Zoning Ordinance applies to all segments of the pipeline within the Coastal Zone as indicated on County maps. The CZO requires identical findings for Development Plans and pipelines as Article III, as well as findings for a Conditional Use Permit. As many of the findings for this section duplicate those for Article III, additional findings will be made here only where the facilities in the Coastal Zone pose special concerns or problems not applicable to the route as a whole.

2.1   Findings Required for Approval of a Development Plan — General

e)   That the project will not be detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and will not be incompatible with the surrounding area.

During construction, the project may inconvenience a small number of residents along the south coast due to increased noise levels. The project has been conditioned to limit construction activities to between the hours of 7:00 a.m. and 7:00 p.m., and will only impact any given area for approximately one week. The duration of this potential inconvenience is therefore limited, and the project has been conditioned to mitigate noise impacts to the extent feasible. Conditions N-2 and P-11 require the use of best available muffling technology to limit noise impacts to Vista del Mar school. Although processed oil is flammable, and therefore hazardous to transport, the risks of fire and spillage have been minimized through project conditions.

f)   That the project is in conformance with the applicable provisions of the Coastal Zoning Ordinance and the Coastal Land Use Plan.

As conditioned, the project is in conformance with the applicable provisions of the Coastal Zoning Ordinance and the Coastal Land Use Plan.

g)   That in designated rural areas the use is compatible with and subordinate to the scenic, agricultural and rural character of the area.

As mentioned above, the Gaviota pump station is surrounded by other oil and gas industry facilities. Because the station is sited adjacent to the approved Chevron facility, it will not add to the detraction from the scenic, agricultural and rural character of the area. The pipeline itself will be buried, so it will be compatible with the character of the area.

Planning Commission Actions                                    Page 50
Celeron Pipeline Final Development Plan               March 3, 1986

2.2  Findings Required for Approval of a Development Plan — Pipelines

Identical to those for Article III.

2.3  Findings Required for Approval of a Conditional Use Permit

Findings numbered 1 through 8 in this ordinance are identical to those for Development Plans in the Coastal Zone and in Article III.

9)  That the proposed used is not inconsistent with the intent of the zone district.

Pipelines are permitted in every zoning district, but require a Major Conditional Use Permit if Environmentally Sensitive Habitats are crossed.  The line is therefore consistent with all applicable zoning districts.

3.0  California Environmental Quality Act Findings

The California Environmental Quality Act requires that any agency which approves a project with significant environmental effects identified in an EIR must make one or more findings for each of those significant effects, accompanied by a brief rationale for each finding.  The Class I Impact Summary Table describes each of the adverse significant impacts identified in the project EIR/S which are either unavoidable because no known mitigation measures or project alternatives exist, or which are only partially mitigated after implementation of the identified mitigation measures.  The Class II Impact Summary Table describes the adverse impacts which can be eliminated or reduced to a level of not significant by the implementation of mitigation measures.  The impacts, proposed mitigation measures and permit conditions are described more specifically in the Preliminary Development Plan Staff Report and are incorporated herein by reference.

Upon consideration of the evidence in the EIR/S, the evidence presented at the hearings conducted before the Planning Commission, and the Staff Reports prepared by the County Energy Division, the Planning Commission makes the following findings:

3.1  Class I Impacts

CEQA FINDING #1 :Certain impacts cannot be substantially lessened or avoided.

There are certain unavoidable significant adverse impacts associated with approval of the project.  The benefts of the project, described elsewhere in these findings, outweigh the unavoidable environmental risks.

The following findings refer to specific impacts listed in the Class I Impact Summary Table; the number in the "CEQA Findings" column on the table corresponds to the numbers below.

1A.   Oil Spill Impacts

Oil spill-related impacts may still occur even after successful
implementation of the identified mitigation measures, due to natural
events and technical limitations that can hinder effective cleanup
and containment.  The risks of an unlikely oil spill, combined with
the risks of incomplete spill cleanup, are considered acceptable
because only denying the project would assure complete mitigation of
oil spill impacts.  The identified mitigation meausres represent the
best feasible techniques currently available.

1B.   Channel Degradation

Although the pipelines are to be buried a minimum of four feet below
the maximum storm scour depth below stream channels, or other
engineering measures used, degradation of these channels may result
in increased scour depth which could expose or seriously damage
pipelines.  The applicants have been required to conduct detailed
geotechnical studies prior to issuance of the Land Use Permitn and
Coastal Development Permit in order to create acceptable mitigations
to decrease the risk of such an occurrence.  In addition, the County
has coordinated a rigorous review of the final engineering plans for
the major river crossings.  The residual risk is considered
acceptable due to the level of mitigation imposed and the need for
the pipeline to cross major rivers.

1C.   Clearing of vegetation

Numerous sensitive plants will be removed to clear a 100-foot
right-of-way for construction vehicles; fifty feet of this
right-of-way will remain clear of larger vegetation during
operations for maintenance purposes.  The majority of the vegetation
removed will be recultivated after construction is complete.
Although it will take many years for certain types of vegetation to
regain their previous stature, this impact is nevertheless
temporary, and limited to the 100-foot ROW.  The residual impact is
considered acceptable due to the projects need for clear
construction and operation ROWs.

1D.   Disturbance of Cultural Resources

The approved pipeline route is conditioned to avoid to the extent
feasible all known archaeological sites.  Where specific sites or
sensitive resources are unavoidable, the pipeline corridor will be
narrowed to minimize impacts.  In addition, conditions in the L
section provide for the participation of Native Amercian
representatives and the proper recording of all sites to be
disturbed.  The residual disturbance impacts, while significant to
the Native Americans, are considered acceptable since all feasible
mitigations have been employed.

Planning Commission Actions                                    Page 52
Celeron Pipeline Final Development Plan               March 3, 1986

1E.  Visual - Sisquoc Pump Station

The Sisquoc pump station will cover approximately 5 1/2 acres on a grassy plain on private lands near the town of Sisquoc.  The facility will be visible from Foxen Canyon Road and a nearby ranch house.  Conditions M-1 and M-4 have been included to assure adequate screening of the facility.  The residual impact results primarily from the contrast between the existing flat grassy plain and the height of the necessary screening; it is acceptable because of the project's need for the pump station.

1F.  Construction-related noise impacts

Some residents along the route will experience noise levels of more than 60 dBA during construction.  While such levels exceed County standards, the duration of the elevated noise levels will be approximately one to two weeks at any given location.  In addition, construction activities will be limited to the hours of 7 a.m. to 7 p.m.  The impacts are therefore considered acceptable because they are temporary and local in nature.

1G.  Cumulative Housing Impacts

The identified impact has been mitigated by the specified conditions to the extent that the project contributes to the impact.  Many of these conditions have been placed on other oil and gas industry projects approved by Santa Barbara County, and require pro-rata participation.  The residual impact is considered acceptable since denying these projects would have a worse overall effect, as stated in each project's Statements of Overriding Considerations.

1H.  Impacts Outside County Jurisdiction

Mitigation of these anticipated impacts is wholly within the responsibility and jurisdiction of the permitting agency(ies) identified in the Class I Impact Summary Table, and is not within the permit jurisdiction of the County.  Mitigation measures should be included as permit conditions in the appropriate agency's permit which will follow County action on this project.  Implementation of the mitigation measures must reduce the impact to the maximum feasible extent.

3.2  Class II Impacts

The numbers in the CEQA Findings column on the Class II Impact Summary Table refer to findings in this section.

Planning Commission Actions                                    Page 53
Celeron Pipeline Final Development Plan                    March 3, 1986

> CEQA FINDINGS #2 - 8: Impacts identified as Class II have
>                       been eliminated or substantially lessened
>                       where feasible.

The impacts identified have been eliminated or substantially lessened to
a level of insignificance through the incorporation of feasible
mitigation measures.  These measures have been incorporated as mandatory
permit conditions.

> CEQA FINDING #9: Certain impacts identified as Class II can be
>                  eliminated or substantially lessened by other
>                  agencies with jurisdiction outside the County.

Mitigation of these anticipated impacts is wholly or partially within the
responsibility and jurisdiction of the permitting agency(ies) identified
in the Class II Impact Summary Table, and is not within the permit
jurisdiction of the County.  The identified mitigation measure should be
included as a permit condition in the appropriate agency's permit which
will follow County action on this project.  Implementation of the
mitigation measure will eliminate and reduce the impact to a level of
insignificance.

If the permitting agency with authority to require the suggested
mitigation measure does not incorporate the measure as a permit
condition, or if the mitigation measure is determined to be infeasible by
the permitting agency, then the impact will remain significant.  The
County shall reexamine these conditions after consultation with the
permitting agencies prior to final action on the permit, and will modify
the mitigatiion measures or CEQA Findings as necessary.

Those impacts which are partially within the jurisdiction of Santa
Barbara County have been mitigated to the maximum extent feasible by the
County.


3.3  Project Alternatives

The EIR/S studied a number of different route segments which could be
combined to form a pipeline to the desired destination.  Two routes were
studied as proposed projects (one for each applicant) and numerous others
were studied on a project-alternative level.  This section addresses all
routes examined in the EIR which were not chosen.

> CEQA FINDING #10:  The project alternatives not chosen are either
>                    not feasible, not environmentally preferable or
>                    not as beneficial as the proposed project.

(a)  No-Project Alternative

The impacts presented for the Celeron proposal would be avoided by
the no-project alternative, in which no pipeline is constructed.
However, implementation of this alternative would cause additional

impacts as a result of the expanded marine tanker traffic which would necessarily occur without a pipeline. Current County policy allows the use of marine tankers to transport crude to destinations not served by pipeline or until such a pipeline is operational. Under the no-project alternative, virtually no destinations would be served by pipeline, so the vast majority of locally produced crude would be transported by tanker.

Tanker transport would have many adverse impacts, primarily in the areas of air quality, socioeconomics and oil spill risk. These impacts are discussed more fully in the Getty Gaviota Consolidated Coastal Facility FEIR (ERT, 1985), the Santa Ynez Unit/Las Flores Canyon Development and Production Plan (SAI 1984) and the Oil Transportation Plan EIR (ADL, WCC, 1984).

County policy favors pipelines as the primary means for transporting crude oil, based on the relative impacts of pipelines and marine tankering. The environmental benefits of pipeline use outweigh the environmental risks associated with the lack of a pipeline.

(b)   Segment alternatives

The approved pipeline right-of-way can be divided into five segments for which alternatives were studied. Chapter 5 of the staff report includes a point-by-point comparison of the preferred and alternative routes for each of these segments; that discussion is incorporated herein by reference. In addition, much shorter alternatives were considered during the course of the hearings, and the discussion of those alternatives is included in the record and in the EIR/S addendum. Although there may be segments where a different alternative is less environmentally damaging, these isolated segments are infeasible because the pipeline must be continuous; each chosen segment must join to form the pipeline corridor. Overall, the route chosen is environmentally preferable to any complete alternative route.

(c)   Buellton Alternatives

Two alternative corridors through the Buellton area were considered, but not chosen. These are the eastern route (existing easement) and the McMurray Road route. Construction of a pipeline along either of these corridors would involve extensive disruption of commercial areas, and would greatly inconvenience local residents. In the case of an accidental oil spill on either of these two routes, contamination of the Buellton area water supply is more likely than if a spill occurred on the westerly approved route. In addition, the habitats which will be disturbed on the western route are not particularly sensitive. The Commission therefore finds that the two eastern routes through Buellton are more environmentally damaging than the western route.

3.4   Benefits of the Project

The primary benefit of the project is that it will provide a means of
transporting crude oil out of Santa Barbara County which is
environmentally preferable to marine tankering.  This preference is
supported in three recently certified environmental documents (OTP; Exxon
SYU FEIR/S; Texaco (Getty) CCF FEIR), and the documentation is
incorporated herein by reference.  In addition, the Overriding
Considerations described in Section 3.5 below identify benefits of the
project.

3.5   Statement of Overriding Considerations

   CEQA FINDING 11:   The unavoidable significant impacts of the
                       project are found to be acceptable due to
                       overriding considerations.

We recognize the adverse significant impacts of the project represent
important concerns and that they have the potential to substantially
degrade the quality of the human and physical environment in parts of
Santa Barbara County unless substantial mitigation measures can be
implemented.  In particular, the project will cause:  the loss of many
mature oaks and riparian vegetation; loss of Hoffman's Nightshade,
Refugio Manzanita and Catalina Mariposa lillies; visual impacts at the
Sisquoc pump station and in the Los Padres National Forest; potential
disturbance to at least eight cultural resource sites; exceedances of
County noise standards during construction; potential oil spills impacts;
and a contribution to the housing shortage anticipated due to the
cumulative effect of development.

Although mitigation measures cannot completely eliminate the above
mentioned impacts, many conditions have been attached to approval to
ensure that they are mitigated as completely as possible.

The County recognizes that Federal policy regarding the leasing of
offshore oil requires action on the part of the County in order to
minimize the adverse impacts of that leasing on the County.  In its Oil
Transportation Plan, the County studied alternative methods of moving
locally produced crude oil from Santa Barbara County to various refinery
destinations.  The study concluded that pipelines should be the preferred
means of transporting crude oil.  The primary alternative to pipelines is
marine tankering.  Expanded marine transport would cause adverse
significant, long-term impacts to the County in the areas of air quality,
socioeconomics and oil spill risk (OTP, Exxon, SYU FEIS/R, Texaco GCCF
FEIR).  The County therefore amended and changed its coastal policies to
encourage the use of pipelines in an effort to minimize the overall
impacts of federal offshore leasing.

It is therefore the County's desire to permit pipelines which will serve
local producers' refineries, thereby diverting oil from marine tankers to
pipelines.  The proposed project does serve appropriate refineries
located in Texas.  The Planning Commission finds that permitting the
project will help minimize the adverse impacts of offshore production.

The Planning Commission has considered the unavoidable significant
effects of the project described in Sections 3.1 and 3.2 above, and the
benefits of the project described in Section 3.4 above.

The Commission finds that in balancing the projects benefits against its
unavoidable environmental risks, the benefits outweigh the environmental
risks.  Upon due reflection and consideration we find the substantial
benefits provided by the project outweigh the significant environmental
impacts.  In particular, we note that the pipeline will reduce the need
for marine tankering of locally produced crude oil, thus satisfying
County policies which favor the use of pipelines.

## 4.0  ADDITIONAL FINDINGS

The Planning Commission realizes that there are unique construction timing
constraints associated with the Celeron pipeline project.  In approving this
Final Development Plan, several conditions with prior to start-up compliance
timing were approved.  The Planning Commission finds that the timing of these
conditions is acceptable only because of these unique timing considerations.

EC:5521e

# EXHIBIT J

**RECEIVED**
COUNTY OF SANTA BARBARA

JUL 29 1986

RESOURCE MANAGEMENT DEPT.
ENERGY DIVISION

Coastal Devel. Permit No. __86-CDP-189__
Building Permit No. __# 114386__

COASTAL DEVELOPMENT PERMIT

On __July 27, 1986__, The Resource Management Department of the
County of Santa Barbara granted to __Celeron Pipeline Company of California__
this permit, VALID FOR ONE YEAR, for the development described below, subject
to the attached standard conditions, and the listed special conditions, if any.

Approved project: __Clearing, grading and trenching activities for Celeron Pipeline__
Project as approved by 85-DP-66cz, in the area described below.
Parcel # and Project Address: __Gaviota State Park (survey station #1725+40) to Gaviota__
pump station.
Special conditions: __1. The project description, pipeline route, conditions, and plans__
required pursuant to those conditions described by the approved Final Development Plan
85-DP-66cz are incorporated herein by reference as terms of this permit.

2. This permit excludes all activities relating to pumpstations, river crossings, pipe
stringing, welding, and any other activity not normally performed by the clearing,
grading and trenching construction crews.

Note:

1. The approval of this project shall not be held to permit or to be an
   approval of a violation of any provision of any County Ordinance or State
   Law.

2. Action of the Resource Management Department on this Coastal Development
   Permit shall become final after ten (10) calendar days of the approval
   date during which time an appeal may be filed in accordance with Sec.
   35-182.2 (Appeals) of the Coastal Zoning Ordinance.

*see over*

IMPORTANT: THIS PERMIT IS NOT VALID UNLESS AND UNTIL WHITE COPY OF THE PERMIT
WITH THE SIGNED ACKNOWLEDGEMENT HAS BEEN RETURNED TO RESOURCE MANAGEMENT. PINK
COPY MUST BE POSTED IN A PROMINENT PLACE ON THE SUBJECT PROPERTY

Approved By:

_____     7/27/86
(Signature)                         (Date)

Acknowledgement: The undersigned permittee acknowledges receipt of this
permit and agrees to abide by all terms and conditions thereof.

_____     7/27/86
(Signature)                         (Date)

RESOURCE MANAGEMENT DEPARTMENT  123 E. ANAPAMU ST.  SANTA BARBARA  93101
                                963-7135

8146R

White-return  Yellow-file copy  Pink-post on property  Goldenrod-applicant copy

PL-114

## STANDARD CONDITIONS

1. Notice of Receipt and Acknowledgement: The permit is not valid and construction shall not commence until a copy of the permit, signed by the permittee or authorized agent acknowledging receipt of the permit and acceptance of the terms and conditions, is returned to the Resource Management Department.

2. Expiration: If construction has not commenced, the permit will expire one year from the date on which the Resource Management Department issued the permit. Construction shall be pursued in a diligent manner and completed in a reasonable period of time. Application for extension of the permit must be made prior to the expiration date.

3. Compliance: All construction must occur in strict compliance with the proposal set forth in the application for permit, subject to any special conditions as listed. Any deviation from the approved plans must be reviewed and approved by the staff.

4. Interpretation: Any question of intent or interpretation of any condition will be resolved by the Director of Resource Management. The permit may be assigned to any qualified person provided assignee files with the Resource Management Department an affidavit accepting all terms and conditions of the permit.

5. Terms and Conditions Run with the Land: These terms and conditions shall be perpetual, and it is the intention of the Resource Management Department and the permittee to bind all future owners and possessors of the subject property to the terms and conditions.

**WARNING**

THE ISSUANCE OF THIS LAND USE PERMIT IS SUBJECT TO APPEAL TO THE PLANNING COMMISSION/BOARD OF SUPERVISORS BY ANY INTERESTED PERSON ADVERSELY AFFECTED BY THE DECISION FOR A PERIOD OF TEN (10) CALENDAR DAYS FOLLOWING THE ISSUANCE OF THIS PERMIT. ANY CONSTRUCTION OR OTHER USE OF THIS PERMIT IS AT THE SOLE RISK AND EXPENSE OF THE APPLICANT IN THE EVENT THAT AN APPEAL OR LAWSUIT ULTIMATELY RESULTS IN DENIAL OR RECONDITION OF THE PROJECT.

# EXHIBIT K

EXHIBIT B

Coastal Devel. Permit No. <u>86-CDP-205</u>
Building Permit No. <u>#114386</u>

## COASTAL DEVELOPMENT PERMIT

On <u>August 5, 1986</u>, The Resource Management Department of the County of Santa Barbara granted to <u>Celeron Pipeline Company of California</u> this permit, VALID FOR ONE YEAR, for the development described below, subject to the attached standard conditions, and the listed special conditions, if any.

Approved project:<u>Remainder of all construction activities for the Celeron Pipeline</u> project as approved by 85-DP-66cz, in the area described below.
Parcel # and Project Address: <u>Gaviota State Park (survey station #1725+40)to the</u> Gaviota pump station.
Special conditions: <u>The project description, pipeline route, conditions and plans</u> required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz are incorporated herein by reference as terms of this permit.

No <u>construction activities are allowed in the area of the Refugio Manzanita until</u> an approved revegetation plan is obtained.

---

### Note:

1. The approval of this project <u>shall not</u> be held to permit or to be an approval of a violation of any provision of any County Ordinance or State Law.

*See over* ↗ 2. Action of the Resource Management Department on this Coastal Development Permit shall become final after ten (10) calendar days of the approval date during which time an appeal may be filed in accordance with Sec. 35-182.2 (Appeals) of the Coastal Zoning Ordinance.

IMPORTANT: THIS PERMIT IS NOT VALID UNLESS AND UNTIL WHITE COPY OF THE PERMIT WITH THE SIGNED ACKNOWLEDGEMENT HAS BEEN RETURNED TO RESOURCE MANAGEMENT. PINK COPY MUST BE POSTED IN A PROMINENT PLACE ON THE SUBJECT PROPERTY

Approved By:
_____          _____
(Signature)                                   (Date) August 5, 1986

Acknowledgement: The undersigned permittee acknowledges receipt of this permit and agrees to abide by all terms and conditions thereof.
_____          _____
(Signature) William Bennett                   (Date) 8/5/86

RESOURCE MANAGEMENT DEPARTMENT  123 E. ANAPAMU ST.  SANTA BARBARA  93101
963-7135

8146R

White-return  Yellow-applicant copy  Pink-post on property  Goldenrod-file copy

PL-114  REV. 5-86

## STANDARD CONDITIONS

1. <u>Notice of Receipt and Acknowlegement</u>: The permit is not valid and construction shall not commence until a copy of the permit, signed by the permittee or authorized agent, acknowledging receipt of the permit and acceptance of the terms and conditions, is returned to the Resource Management Department.

2. <u>Expiration</u>: If constuction has not commenced, the permit will expire one year from the date on which the Resource Management Department issued the permit. Construction shall be pursued in a diligent manner and completed in a reasonable period of time. Application for extension of the permit must be made prior to the expiration date.

?. <u>Compliance</u>: All construction must occur in strict compliance with the proposal set forth in the application for permit, subject to any special conditions as listed. Any deviation from the approved plans must be reviewed and approved by the staff.

4. <u>Interpretation</u>: Any question of intent or interpretation of any condition will be resolved by the Director of Resource Management. The permit may be assigned to any qualified person provided assignee files with the Resource Management Department an affidavit accepting all terms and conditions of the permit.

5. <u>Terms and Conditions Run with the Land</u>: These terms and conditions shall be perpetual, and it is the intention of the Resource Management Department and the permittee to bind all future owners and possessors of the subject property to the terms and conditions.

---

**-WARNING-**

THE ISSUANCE OF THIS LAND USE PERMIT IS SUBJECT TO APPEAL TO THE PLANNING COM-MISSION/BOARD OF SUPERVISORS BY ANY INTERESTED PERSON ADVERSELY AFFECTED BY THE DECISION FOR A PERIOD OF TEN (10) CALENDAR DAYS FOLLOWING THE ISSUANCE OF THIS PERMIT. ANY CONSTRUCTION OR OTHER USE OF THIS PERMIT IS AT THE SOLE RISK AND EXPENSE OF THE APPLICANT, IN THE EVENT THAT AN APPEAL OR LAWSUIT ULTI-MATELY RESULTS IN DENIAL OR RECONDITION OF THE PROJECT.

# EXHIBIT L

EXHIBIT D



# County of Santa Barbara

## RESOURCE MANAGEMENT DEPARTMENT

Dianne Guzman, AICP, Director

November 23, 1987

Timothy J. Cohen
Celeron Pipeline Company of California
P.O. Box 31029
Santa Barbara, CA  93130

RE: Planning Commission Actions at November 23, 1987 Hearing

Dear Mr. Cohen:

At the Planning Commission hearing on November 23, 1987, the Commission approved revisions to Conditions B-1, E-1, P-1, P-2, P-3, and P-5 of Celeron's Final Development Plan (85-DP-66cz); revisions to Celeron's Environmental Quality Assurance Plan (EQAP) and to the Restoration, Erosion Control, and Revegetation Plan (including the Suey Canyon Revegetation Plan and the Offsite Oak Mitigation Plan); and a determination of substantial conformity for pipe storage on the Sisquoc Ranch until November 1989.  Specific Planning Commission actions are summarized below:

1. <u>Motionmaker/Second:</u>  Johnson/Stillman

   <u>Vote:</u>  4-1 to approve, No:  Commissioner Wack

   <u>Action:</u>    Motion to approve modifications to Celeron's Final Development Plan conditions B-1, E-1, P-1, P-2, P-3, and P-5 as presented in the staff report dated November 20, 1987 and as discussed at the public hearing, with any amendments made during the hearing.

2. <u>Motionmaker/Second:</u>  Johnson/Maschke

   <u>Vote:</u>  4-1 to approve, No:  Commissioner Wack

   <u>Action:</u>    Motion to approve modifications to:  the Environmental Quality Assurance Plan required by Final Development Plan Condition C-1; the Restoration, Erosion Control, and Revegetation Plan; the Suey Canyon Revegetation Plan; and the Offsite Oak Mitigation Plan required by Final Development Plan Condition H-1, as presented in the November 6 staff report, as discussed in Attachment 1 to the November 20 supplemental staff report, and as amended during the November 23, 1987 hearing.

123 E. Anapamu-Street,  Santa Barbara, CA  93101
PHONE (805) 568-2000        FAX (805) 568-2522

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Letter to Tim Cohen
November 23, 1987
Page 2


3. <u>Motionmaker/Second:</u>   Johnson/Stillman

   <u>Vote:</u>  5-0 to approve

   <u>Action:</u>    Motion to approve the request for a determination of
            substantial conformity for pipe storage at the existing pipe
            storage area on the Sisquoc Ranch, adjacent to the Sisquoc
            River for a period of two years, with the understanding that
            Celeron will provide a letter acceptable to County Counsel
            specifying that Celeron will (a) retrieve any pipe, should it
            be washed away in a flood event; and, (b) repair any damage
            that may be caused by such "renegade" pipe.

4. <u>Motionmaker/Second:</u>   Johnson/Wack

   <u>Vote:</u>  5-0 to approve

   <u>Action:</u>    Motion to adopt the findings for approval of the Final
            Development Plan modifications, including Compliance Plan
            modifications, and the substantial conformity determination
            for temporary pipe storage as presented in the supplemental
            staff report dated November 20, 1987.


These actions by the Planning Commission are final unless appealed in writing
to the Santa Barbara County Board of Supervisors within ten (10) calendar days
of the date (November 23, 1987) of the actions by the Planning Commission.

If any portion of these actions are appealed, a filing fee of $403.00 must be
delivered to the Clerk of the Board.  To file an appeal, this letter should be
taken to the Clerk of the Board of Supervisors in order to determine that the
appeal is filed within the allowed appeals period and to collect the required
appeal fee.


Sincerely,

Albert J. McCurdy, Secretary to the Planning Commission

AJM:NLM:4102E
cc: Energy Division (Permanent File:  85-DP-66cz)
    Ken Nelson, County Counsel
    Glenn Odell, County Fire Dept.
    Phil Demery, County Flood Control District
    Peggy O'Halloran, Environmental Health Services
    Frank Breckenridge, County Public Works Dept.
    Jim Norris, County Public Works Dept.
    Jeff Harris, Division of Environmental Review

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

CELERON PIPELINE PROJECT
FINAL DEVELOPMENT PLAN CONDITIONS
November 23, 1987

A.  GENERAL

A-1.   Acceptance of this permit shall be deemed as acceptance of all final conditions of this permit, except that Celeron reserves the right to pursue any remedy for any legal violations imposed directly or indirectly by these permit conditions.

A-2.   Substantial failure to abide by and faithfully comply with any conditions for the granting of this permit shall constitute grounds for the modification or revocation of this permit.

A-3.   Celeron agrees as a condition of the issuance and use of this permit to defend at its sole expense any action brought against the County by a third party challenging either its decision to issue this permit or the manner in which the County is interpreting or enforcing the conditions of the permit.  Celeron will reimburse the County for any court costs and attorneys fees which the County may be required by a court to pay as a result of such action where Celeron defended or had control of the defense of the suit.  County may, at its sole discretion, participate in the defense of any such action, but such participation shall not relieve Celeron of its obligation under this condition.  County shall bear its own expenses for its participation in the action.

A-4.   Celeron shall make an initial deposit to a fund to permit the County to adequately implement and enforce the conditions imposed on Celeron by applicable County ordinances and/or the conditions of this permit, if such a fund is established.  If the Board of Supervisors determines that a reasonable enforcement fund is needed, the Director of the Resource Management Department shall present to the Board of Supervisors and Celeron a plan for enforcement within one year from the effective date of this permit.  This plan shall set forth the staffing requirements and materials necessary for such enforcement and the estimated costs thereof.  This plan shall provide that all reasonable expenses incurred by the County or County contactors, for permit condition implementation, reasonable studies, and emergency response directly and necessarily related to enforcement of these permit conditions shall be reimbursed by Celeron within 30 days of invoicing by County.

A-5.   In the event that Celeron fails to comply with any order of the Administrative Officer or the Board of Supervisors issued hereunder or any injunction of the Superior Court, it shall be liable for a civil penalty for each violation to the extent imposition of such civil penalty is authorized by applicable laws, rules, or regulations.

Said civil penalty shall be in addition to Celeron's obligation, if any, to reimburse the County of Santa Barbara (and others) for actual

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                        Page 2
Final Development Plan Conditions                       November 23, 1987

damages suffered as a result of Celeron's failure to abide by the conditions of this permit or by the orders of the Administrative Officer, the Board of Supervisors, or any court of competent jurisdiction.

A-6.  As to any condition which requires for its effective enforcement the inspection of construction records or records pertaining to facility operations, or the facilities themselves by County or its duly authorized agents, Celeron will make all necessary records available or provide access to such facilities upon reasonable notice from County.  County agrees to keep such information confidential where permitted by law and requested by Celeron in writing.

A-7.  The procedures, operating techniques, design, equipment and other descriptions (hereinafter procedures) described by Celeron in its application to the County 83-DP-25 cz, 83-CP-97 cz, and in subsequent clarifications and additions to that application and the Final Development Plan are incorporated herein as permit conditions and shall be required elements of the project.  Since these procedures were part of the project description which received environmental analysis, a failure to include such procedures in the actual project could result in significant unanticipated environmental impacts. Therefore, modifications of these procedures will not be permitted without a determination of substantial conformity or a new or modified permit.  The use of the property and the size, shape, arrangement and location of buildings, structures, walkways, parking areas and landscaped areas shall be in substantial conformity with the approved Final Development Plan.

A-8.  In addition to the authority to enforce and secure compliance with the provisions of this permit under Division 12, Coastal Zoning Ordinance of the Santa Barbara County Code, Division 7, General Regulations, Article III Santa Barbara County Zoning Ordinance, the County Administrative Officer, or in his/her absence a designated appointee, may order that curtailment of activities which is required to protect the public health and safety.  Said action may include, but is not limited to, ordering temporary, partial or total facility shutdown.

Such an order shall be made only in the event that the Administrative Officer has reasonable and probable cause to believe that continued unrestrained activities of permittee will likely result in or threaten to result in danger to public health, welfare, or safety, or in the environment and provided such violations can be expected to continue or recur unless operations are in whole or in part shut down or reduced pending the necessary corrections.

Before issuing any curtailment order, the County Administrative Officer shall set a time for hearing and shall give written notice of the time and place of the hearing and of the alleged violations.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project
Final Development Plan Conditions

Page 3
November 23, 1987

Such notice shall be received by the person in charge of the operation of the facility at least 24 hours before the hearing at which time there will be an opportunity for all concerned parties to present evidence regarding the alleged violations. The notice may be served in person or by certified mail.

In the event the Administrative Officer, or in his/her absence the designated appointee, determines that there is an imminent danger to the public health and safety resulting from violations, he/she may summarily order the necessary curtailment of activities without hearing and such order shall be obeyed upon notice of same, whether written or oral. At the same time that notice of the order is conveyed, the Administrative Officer shall set a date, time and place for a publically noticed hearing and review of said order as soon as possible which date shall be no later than 24 hours after such order is issued or served. Said hearing shall be conducted in the same manner as a hearing on prior notice. After such hearing, the Administrative Officer may modify, revoke, or retain the emergency curtailment order.

Any order of the Administrative Officer may be appealed to the Board of Supervisors within three working days after such order is made.

If such appeal is not filed with the Board of Supervisors, the Administrative Officer's order becomes final. If there is an appeal, the order of the Administrative Officer shall remain in full force and effect until action is taken by the Board of Supervisors. The decision of the Board of Supervsiors shall be a final Administrative Action. Such decision shall not preclude Celeron from seeking judicial relief.

Once Celeron has shown that the conditions of violation no longer exist and are not reasonably likely to recur, the Administrative Officer shall modify the curtailment order to account for such compliance and shall entirely dissolve the order when it is shown that all of the violations have been corrected and are not likely to recur.

A-9.   In the event that any condition contained herein is determined to be invalid, then all remaining conditions shall remain in force.

A-10.   In the event that any condition contained herein is determined to be in conflict with any other condition contained herein, then where principles of law do not provide to the contrary, the condition most protective of public health and safety and natural environmental resources shall prevail to the extent feasible.

A-11.   In addition to any administrative remedies or enforcement provided hereunder, the County may seek and obtain temporary, preliminary, and

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                    Page 4
Final Development Plan Conditions                    November 23, 1987

permanent injunctive relief to prohibit violation of the conditions set forth herein or to mandate compliance with the conditions herein.

All remedies and enforcement procedures set forth herein shall be in addition to any other legal or equitable remedies provided by law.

A-12.   The owner and the operator of the facility shall be jointly and severally liable without regard to fault for all legally compensable damages or injuries suffered by any property or person that result from or arise out of any oil, water spillage, fire, explosion, odor, or air pollution, in any way involving oil or gas or the impurities contained therein or removed therefrom and which arises out of construction or operation of Celeron's facilities. For the purpose of this condition, the "facility" shall be deemed to include all facilities described and approved pursuant to 83-DP-25cz, 83-CP-97cz. This condition shall not inure to the benefit of any of the owners of the pipeline, including the United States Government. This declaration of strict liability and the limitations upon it shall be governed by the applicable law of California on strict liability.

A-13.   All facilities constructed under this permit shall be used only for the shipment of a maximum volume of heated crude oil demonstrated to be within the design parameters of the pipeline facilities as built. The subject volumes will be outer continental shelf (OCS) and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins. Celeron shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgment of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to: 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above; and 4) introduction of a different product from any source.

Other source volumes may be transported subject to a determination of substantial conformity by the Planning Commission and a finding of facts and determination that project impacts will not be increased by transporting and processing those other sources.

A-14.   Celeron shall align the pipeline corridor from the coastal starting point to the County exit point in the western Cuyama valley according to the route approved by the County. Celeron shall locate and construct all isolation valves as identified by the final approved alignment.

A-15.   Any person, firm or corporation, whether as a principal, agent, employee, or otherwise, found to be in violation of any provisions or

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                    Page 5
Final Development Plan Conditions                    November 23, 1987

conditions of this ordinance or permits, shall be punishable as set forth in the applicable section of the Coastal Zoning Ordinance, and Article III of the Santa Barbara County Code.

Each and every day during any portion of which any violation of this Article or the rules, regulations, orders, or permits issued thereunder, is committed, continued, or permitted by such person, firm or corporation shall be deemed a separate and distinct offense.

A-16.    The Santa Barbara County Board of Supervisors in a noticed public hearing shall have the authority to specify or change the Santa Barbara County Department responsible for any conditions contained herein.

A-17.    Should circumstances, including legal or legislative action, cause the County to lose its authority or have its authority fundamentally reduced to assess fees as a method to mitigate project-related impacts, then other feasible mitigation measures shall be imposed which will substantially lessen the significant impact formerly mitigated by the imposition of fees. Within six months of the County's loss of such authority, feasible alternative mitigation measures shall be imposed as replacement permit conditions. Alternatively, the County in a noticed public hearing must find that no feasible mitigation measures are available and that the benefits of the project outweigh the significant environmental impacts.

A-18.    Should legal action be required by either party to enforce any rights in connection with this permit the prevailing party shall be entitled to reasonable attorney's fees and costs pursuant to Civil Code 1717.

A-19.    Unless otherwise specified, these permit conditions are intended to apply to Celeron during both the construction and the operation of the permitted facilities.

B.  PERMIT REVIEW

B-1.    Prior to initiation of construction activity (such as ROW preparation, river crossings or pump station construstion), Celeron shall submit to the System Safety and Reliability Review Committee (established by condition P-1) relevant construction drawings and supporting text demonstrating compliance with the appropriate conditions. Construction may not commence until County has reviewed and/or approved this submittal, consistent with the SSRRC review specified in Conditions P-1 and P-2. Within 15 days of submittal, County shall either give written notice to proceed with construction or indicate in writing conditions which have not been met. When such conditions have been met construction approval shall be granted.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 6
Final Development Plan Conditions                        November 23, 1987

B-2.    If at any time County determines that these permit conditions are
        inadequate to effectively mitigate significant environmental impacts
        caused by the project, or that recent proven technological advances
        could provide substantial additional mitigation, then additional
        reasonable conditions shall be imposed to further mitigate these
        impacts.  Imposition of such conditions shall only be considered and
        imposed as part of the County's comprehensive review of the project
        conditions.  County shall conduct a comprehensive review of the
        project conditions and consider adding reasonable conditions which
        incorporate proven technological advances three years after permit
        issuance and at appropriate intervals thereafter.  A comprehensive
        review of conditions which are not effectively mitigating impacts may
        be conducted at any appropriate time.  Upon written request of
        Celeron, the Board of Supervisors shall determine whether the new
        condition required is reasonable considering the economic burdens
        imposed and environmental benefits to be derived.

B-3.    This permit is premised upon findings that where feasible, all
        significant environmental effects of the project identified in the
        EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa
        Barbara County, will be substantially mitigated by the permit
        conditions.  Prior to approval of the Final Development Plan, County
        shall review any findings that identified certain mitigation measures
        as being in the primary jurisdiction of another agency but are also
        within County's jurisdiction.  County shall thereupon determine
        either (1) that such mitigation has or is being implemented by such
        other agency or (2) that such other agency and County determine such
        mitigation to be infeasible.  If County determines that no other
        agency is or may be implementing such feasible mitigation measures
        then County may impose those feasible measures within its
        jurisdiction to mitigate those environmental impacts in accordance
        with appropriate mitigation measures identified by the EIS/R.

B-4.    Prior to approval of the Final Development Plan, Celeron shall
        develop and submit to the Resource Management Department for approval
        a plan to co-ordinate the placement and timing of their pipeline with
        SCPS's pipeline (or other potential proposals for use of the same
        corridor for a pipeline).  Any agreements between Celeron and SCPS
        (or other applicant) necessary to implement this plan shall be
        subject to review and verification by the Resource Management
        Department to assure the purpose of the plan will be achieved.  The
        expressed purpose of this co-ordination plan shall be:

        1)  arrangement of simultaneous construction where practical;

        2)  engineering of pipe placement within the ROW to minimize
            incremental widening of the initial construction corridor
            during subsequent pipeline projects;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                           Page 7
Final Development Plan Conditions                          November 23, 1987

      3) identification of segments where incremental widening of the
ROW is constrained and alternative engineering techniques
which may allow construction of subsequent pipelines (and
potential limitations of future pipeline use of the ROW); and

      4) timing and design of revegetation plans to promote effective
revegetation but minimize unnecessary duplication of efforts.

Should SCPS or any other applicant abandon their pipeline project, or
fail to submit a Final Development Plan prior to Celeron pipeline
construction, this condition may be modified to reflect the existing
situation but maintain the intent of this condition.

B-5.     In the event that scheduling requirements among or between conditions
in this permit (or with this permit and conditions imposed by other
agencies) conflict with respect to timing, the Resource Management
Department (in consultation with other agencies as appropriate) shall
resolve such conflict.

B-6.     Applicant shall cooperate as necessary with San Luis Obispo County in
the permitting, design, and construction of those segments of the
pipeline which could affect Santa Barbara County.  The intent of this
condition is to ensure that potential impacts to Santa Barbara County
are mitigated to the maximum extent feasible by these permit
conditions, regardless of the location of the source of the impact.

B-7.     Prior to commencing any construction activities in Santa Barbara
County, Celeron shall obtain a letter from the Director of the
Resource Management Department indicating that all conditions which
require approval prior to construction, as specified by this permit,
have been satisfied.

B-8.     Prior to start-up of the pipeline in Santa Barbara County, Celeron
shall obtain a letter from the Director of the Resource Management
Department indicating that all conditions which require approval
prior to start-up, as specified by this permit, have been satisfied.

B-9.     In the event that Celeron and staff cannot reach an agreement on the
adequacy of any submittal required by these conditions, the matter
will be brought before the Planning Commission for resolution at the
earliest possible date.

C. MANAGEMENT

C-1.     Celeron shall prepare an Environmental Quality Assurance Program
(EQAP) for Resource Management Department approval prior to the Final
Development Plan.  This EQAP shall encompass both the construction
and operation phases of the project, and shall describe the steps

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron will take to assure compliance with these conditions. This plan is intended to provide a framework for all other programs and plans specified by these conditions as required prior to approval of the Final Development Plan. As such, it will become a comprehensive reference document for the County, other agencies, and the public regarding the Celeron project.

This plan shall provide for the submission to the Resource Management Department semi-annual reports throughout construction and annual reports during operations. These reports shall describe:

a) Project status, including but not necessarily limited to:

    i)    extent to which construction has been completed,
    ii)   the rate of production/throughput during operation,
    iii)  environmental planning and implementation efforts, and
    iv)   any revised time schedules or timetables of construction and operation that will occur in the next one year period.

b) Permit condition compliance, including but not necessarily limited to the results of the specific mitigation requirements identified in these conditions.

c) Results and analyses of all data collection efforts being conducted by Celeron pursuant to these permit conditions.

The program shall include (or if separate plans exist, reference) all plans relevant to construction and operations of the pipeline facilities specified by these conditions.

Construction

The program shall include all plans relevant to construction activities such as the Restoration, Erosion Control and Revegetation Plan and the Cultural Resources Mitigation Plan.

The program shall include provisions for at least one managing environmental coordinator with overall responsibility, and if necessary, one onsite environmental coordinator per construction site during the construction phase. These coordinators shall be approved by and be responsible to the Resource Management Department. Celeron shall fund the coordinator(s). The number of coordinators necessary shall be determined according to the amount of simultaneous construction activity occuring in geographically separate areas. The responsibilities of the coordinator(s) are to include:

a)    on-site, day-to-day monitoring of construction activities;

b)    ensuring contractor knowledge of and compliance with all appropriate permit conditions;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                                     Page 9
Final Development Plan Conditions                               November 23, 1987

c)   evaluating the adequacy of construction impact mitigations, and proposing improvements to the contractors, Celeron, and County;

d)   having the authority to require correction of activities observed to violate project environmental conditions or that represent unsafe or dangerous conditions, and having the ability and authority to secure compliance with the conditions or standards through the County Administrative Officer as described in condition A-8, if necessary;

e)   performing as contact for affected property owners and any other affected persons that wish to register observation of environmental permit violations and/or unsafe conditions, receiving any complaints, immediately contacting Celeron's onsite construction representative, verifying any such observations and developing any necessary corrective actions in consultation with Celeron's onsite construction representative;

f)   maintaining prompt and regular communication with the Resource Management Department, Public Works Department, or other appropriate County agency, and with Celeron personnel responsible for contractor performance and permit compliance.

In the event that resolution of disputes between the public and/or governmental agencies and Celeron over adherence to permit conditions is not achieved by the managing environmental coordinator, an arbitration system shall be utilized to resolve such disputes in a timely manner in order to minimize the need to halt construction activities as per conditions A-2 or A-8.

The coordinator(s) shall be thoroughly familiar with all plans and requirements set forth in the permit conditions. Prior to construction start-up, the managing coordinator shall discuss with other agency inspectors or monitoring personnel, inspection programs, areas of jurisdiction, responsibility, and define methods of avoiding disputes or construction delay due to agency disagreements.

Selection of the necessary coordinators shall be made, and the person(s) available, prior to issuance of the Coastal Development Permit and Land Use Permit.

Operations

The program shall include all plans related to operations, such as the Emergency Response Plan, Oil Spill Contingency Plan, and Landscaping Plan, as well as specific conditions not required in formal plans. It may also include any procedures not specified by these conditions but relevant to environmental protection and safety.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                    Page 10
Final Development Plan Conditions              November 23, 1987

C-2.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit Celeron shall provide to the Resource Management Department
        and the Emergency Services Coordinator the current name and position,
        title, address, and 24-hour phone numbers of the field agent, person
        in charge of the facility, and other representatives who shall
        receive all orders and notices, as well as all communications
        regarding matters of condition and permit compliance at the site and
        who shall have authority to implement a facility shutdown pursuant to
        condition A-8 in this Ordinance.  There shall always be such a
        contact person(s) designated by the permittee.  One contact person
        shall be available 24 hours a day during all phases of the project in
        order to respond to inquiries received from the County, or from
        anyone in case of an emergency.

        If the address or phone number of Celeron's agent should change, or
        the responsibility be assigned to another person or position, Celeron
        shall provide to the Resource Management Department the new
        information within seven days.

C-3.    Celeron shall furnish to the Resource Management Department copies of
        all County permit applications relative to the project once
        submitted, and of permits within 30 days of receipt by Celeron.


D.  AIR QUALITY

D-1.    Nothing contained herein shall be construed to permit a violation of
        any applicable air pollution law, rule, or regulation.

D-2.    Prior to initiation of construction, including grading, of any
        facilities approved pursuant to this Development Plan, Celeron shall
        obtain an Authority to Construct permit from the County Air Pollution
        Control District.

D-3.    Celeron agrees to implement all air pollution control procedures as
        required by APCD and identified in the Final Development Plan (such
        as water sprays to reduce construction-related fugitive dust).

D-4.    Emissions from any project component that contribute to ozone
        standard violations must be mitigated to the extent feasible.
        Effectiveness of mitigation will be confirmed by APCD.

D-5.    Deleted.

D-6.    Prior to approval of the Final Development Plan, Celeron shall submit
        to the Resource Management Department updated estimates of the type
        and size of helicopters, or other aircraft, to be used during
        pipeline operations for the aerial surveys of the pipeline route.
        The information shall also include the estimated operating schedules,

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D



frequency and duration of airport calls and other reasonable information as required by APCD. The County may require validation and updating of this information as needed. Should this information reveal significant differences between the estimated air emissions and those analyzed in the EIR/EIS, the APCD may modify air quality permit conditions as necessary to assure consistency with the Air Quality Attainment Plan and Reasonable Further Progress goals.

D-7. All facilities shall be designed, constructed, operated, and maintained, such that the facilities approved under this Development Plan shall not discharge quantities of air contaminants or other materials in violation of Section 41700 of the Health and Safety Code.

D-8. Prior to the approval of the Final Development Plan, Celeron shall submit to the Director of the Resource Management Department a plan, approved by the APCD, which includes timing of construction, minimizing soil handling, and other measures to mitigate construction air quality impacts. The plan shall include APCD approved analysis which demonstrates that local, state and federal air quality standards will not be violated as a result of construction activities.

## E. GEOLOGY

E-1. Prior to the issuance of the Coastal Development Permit and Land Use Permit, Celeron will conduct a route-specific Geologic Investigation, Design, and Mitigation Program. This program shall contain three basic components: 1) a detailed geologic investigation component which defines specific hazards, 2) an engineering design component which details specific engineering plans for each identified hazard along the route, and 3) a geohazards mitigation component which demonstrates how and to what extent each hazard is reduced.

a) Detailed geologic investigation component:

Where specific hazards have been identified or may occur along the pipeline route or at pump station locations, Celeron will conduct appropriate detailed geologic, seismic, and geotechnical studies to further characterize the specific geologic hazard. These studies will be conducted under the direction of a State of California registered geologist or engineering geologist who will be mutually agreed to by Celeron, the Resource Management Department, the Public Works Department, and the Flood Control District. These studies will include but not be limited to investigations of unstable slopes, erodable slopes, lurch/liquefaction susceptible substrate, surface rupture, and river scour characteristics (depth and lateral extent). Methods of investigation shall conform to appropriate geotechnical techniques applicable to each specific hazard. Draft results

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                             Page 12
Final Development Plan Conditions                            November 23, 1987

will be subject to review by County Public Works Department and Flood Control Agency as appropriate prior to finialization of the engineering design.  The final report will be submitted with the final engineering design component.

b)   Engineering design component:

Celeron will demonstrate that appropriate geotechnical information from component a) and other applicable recommendations are incorporated into final engineering design of pipeline construction and facilities.  This includes but is not restricted to:  the development of appropriate ground motion parameters for use in seismic design of critical structures and equipment, unstable slope construction or avoidance techniques, burial depth at all major river crossings, modification of instrumentation, or use of the dual contingency level/operating level earthquake concept, or its equivalent.  The designs will be subject to review by the Department of Public Works and third party technical review as specified in Condition P-1.

c) Geohazards mitigation component:

Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron will submit to the Resource Management Department a detailed geologic hazard mitigation report.  The report will outline the hazards identified in part a) of this program and will address how engineering designs as detailed in part b) of this program reduce each specific hazard.  This component will also be submitted to the Department of Public Works and Flood Control Agency and will be subject to third party review as specified in Condition P-1.

E-2.   Celeron will develop a Monitoring Program for the operations phase to be funded by Celeron and staffed as necessary with at least one State of California registered engineer, or engineering geologist, in order to evaluate any hazards identified by routine monitoring.  The program will be designed to verify adequate performance or condition of the project components in hazard areas such as river and active fault crossings, and will be subject to approval of the Resource Management Department prior to issuance of the Coastal Development Permit and Land Use Permit.  The monitoring program may in part be incorporated into routine aerial and ground reconnaissance.

If the monitoring indicates a potential or actual hazard, appropriate action including, but not limited to, operations curtailment and repairs, will be taken by Celeron to mitigate the hazard.  Celeron will report to the Emergency Services Coordinator any potentially hazardous situations discovered during monitoring.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                                        Page 13
Final Development Plan Conditions                                        November 23, 1987

In the case of river crossings at the Santa Ynez, Sisquoc and Cuyama Rivers, a yearly inspection of pipeline burial depth, subject to review by the Resource Management Department and Flood Control Agency, shall be performed. At crossings of the Santa Ynez and Sisquoc Rivers where channel degradation has reduced the depth of cover to less than four feet below the 100-year scour depth, or other hazardous levels as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency, or US D.O.T. specifications, relocation or reburial of the pipeline to adequate depth will be required. At the crossing of the Cuyama River, if the inspections reveal that hazardous conditions exist, mitigations such as reconstruction or relocation of the crossing will be required as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency.

E-3.    Inspection of the pipeline trench or trench spoil to identify any potential geologic hazards shall be made by a professional geologist or soils engineer approved by the Resource Management Department prior to installation of the pipeline. If hazards not previously accounted for in the pipeline design are encountered, appropriate mitigation measures will be developed and must be instigated prior to installation of the pipeline. The results of the inspection will be reported to the engineering geologist of the Public Works Department who will approve prior to, and the supervising environmental coordinator who will insure, application of the necessary mitigation measures. The timing of such inspections shall not result in any unreasonable delays in installation of the pipeline.

E-4.    At all places where the pipeline crosses an active fault, according to the Department of Geology and Mining definitions, Celeron will place isolation valves on either side, or design and construct appropriate devices or measures which more effectively mitigate the hazard of the fault crossing. Location and nature of these designs must be approved prior to the issuance of the Coastal Development Permit and Land Use Permit.

E-5.    Prior to the issuance of the Coastal Development Permit and Land Use Permit, Celeron shall submit final Grading and Erosion Control Plans for the Sisquoc pump station approved by the Department of Public Works. These plans shall be consistent with or based on information contained in the geologic investigation required in Condition E-1.

Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall either submit Grading and Erosion Control Plans for the Las Flores and Gaviota pump stations for approval by the Department of Public Works or show evidence that the plans are a part of the overall Grading and Erosion Control Plans for the consolidated processing facilities at those sites.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 14
Final Development Plan Conditions                          November 23, 1987

E-6.    Celeron shall cooperate as necessary with San Luis Obispo County in the permitting, design and construction of the Cuyama River crossing.

        Any pipeline crossing the Cuyama River shall be laid to a depth consistent with studies performed under Condition E-1 and subject to approval of the County Flood Control District.

E-7.    Prior to approval of the Final Development Plan, Celeron shall commit to the location of their south coast pump stations to the satisfaction of the Planning Commission.  If these stations are not within the boundaries of the approved Exxon, Gaviota Terminal Company, or Chevron facilities, Celeron shall submit grading and erosion control plans pursuant to Condition E-5.


F.  SURFACE AND GROUNDWATER

F-1.    During construction of the pipeline across all perennial stream crossings, stream flows, if any, shall be diverted around construction areas to maintain downstream flows.  Baseline water flows shall be maintained in coastal streams in order to avoid adverse impacts to lagoon or other sensitive habitats.

F-2.    Sediment retention devices that allow continued streamflow shall be installed directly downstream of stream crossings during construction.

F-3.    For pipeline crossings at the following stream or river crossings: Tajiguas; Refugio; Gaviota; Nojoqui; Zaca; San Antonio Creeks, all additional perennial streams which the pipeline crosses: Santa Ynez; Sisquoc; and Cuyama Rivers, Celeron shall construct the buried pipelines during the months of low historical streamflow, in order to minimize erosion loss downstream and protect surface water quality. In the event of low winter rainfall, earlier construction may be approved by Resource Management Department and County Flood Control Agency.

F-4.    No staging areas shall be permitted within riparian habitat corridors.

F-5.    During pipeline construction at stream crossings, construction contractors will minimize time of disturbance, narrow the construction  ROW to the extent feasible, stabilize the disturbed areas immediately following construction of the crossing, and divert runoff waters around construction areas to maintain downstream flows.

F-6.    Deleted.

F-7.    Celeron shall install isolation valves on either side of all perennial stream and river crossings, including the Cuyama River,

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project
Final Development Plan Conditions

**EXHIBIT D**
Page 15
November 23, 1987

and/or as required by the Coastal Zoning Ordinance, unless the applicant can demonstrate that alternative methods will further reduce the potential leak impacts at the crossing site. These locations shall be identified prior to the Final Development Plan.

F-8.    Prior to approval of the Final Development Plan, Celeron shall identify the freshwater source considered for supplying pipeline and facility construction activities including hydrostatic test water, and shall estimate the total quantity required. Any water obtained from coastal or inland sources shall not significantly disrupt streamflows, groundwater resources, or habitat resources. Water conserving devices shall be used where feasible. Any water used during construction, (exclusive of hydrostatic test water), shall contain no more than 5,000 parts per million total dissolved solids. Disposal of hydrostatic test water within the County shall be according to a plan approved by the Regional Water Quality Control Board, or by the Flood Control Agency. This information shall be provided to and approved by the Resource Management Department as part of the Final Development Plan.

F-9.    Prior to approval of the Final Development Plan, Celeron will perform detailed hydrogeologic investigations for the sensitive areas identified in the the EIR/EIS, (Table 3-14). These investigations will be conducted by a State of California registered geologist or engineer and will include but not be limited to:

    a)    definition of groundwater depth, recharge sources, properties of overlying soils, hydraulic gradient, background water quality, and existing water uses.

    b)    inventory of existing wells from State or County Flood Control Agency records in an area extending down-gradient from the pipeline in the aquifer equal to the distance groundwater would move in one year at a velocity calculated from the maximum hydraulic conductivity of the specific aquifer, hydraulic gradient, and porosity. The down-gradient sensitive area will be determined by a registered geologist.

This information will be reviewed by the Resource Management Department and used by Celeron to formulate the Groundwater Contamination portion of an Oil Spill Contingency Plan, Condition P-5. This portion of the Plan will include;

a)    plans for monitoring and early detection of groundwater contamination, including aerial and ground surveys, pipeline pressure monitoring, and water sampling of strategic wells;

b)    plans for notification of affected groundwater users, and the Emergency Services Coordinator;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 16
Final Development Plan Conditions                        November 23, 1987

        c)   clean-up response, reparations, restorations, and methods to determine and correct the contamination source; and

        d)   identification of emergency alternate water supplies.

F-10.     At the base of slopes where the ROW approaches sensitive aquifers as identified in the EIR/S that are at risk from oil spills and leaks, a dam or ditch plug will be used in the pipeline trench. The sensitive areas are those where the ROW follows 1) topographic slopes toward basins with shallow depth to water, 2) high vertical permeabilities, and 3) a high degree of groundwater use as indicated by the hydrogeologic investigations required as per condition F-9. These areas shall be identified in the Final Development Plan.

F-11.     Prior to the approval of the Final Development Plan, the System Safety and Reliability Committee shall review and approve submitted plans of all Creek and River crossings in Santa Barbara County. Permitted development shall not cause or contribute to flood hazards or lead to the expenditure of public funds for flood control works.

G.   AQUATIC BIOLOGY

G-1.     Fueling and lubrication of construction equipment will not occur within 0.25 miles of any flowing streams. No more than 2 barrels of fuel shall be kept at construction sites, exclusive of pipeline construction equipment fuel tanks, within 0.25 miles of all perennial creeks. As part of the oil spill response plan, Celeron will submit plans for clean-up and restoration of affected areas in the event of a construction fuel spill.

H.   TERRESTRIAL BIOLOGY

H-1.     Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall submit a Restoration, Erosion Control, and Revegetation plan for the final proposed pipeline route and the pump station sites. The plan shall be submitted to the Resource Management Department for approval. Once approved, the plan shall be implemented by Celeron. Success of the restoration and revegetation plans shall be monitored by a qualified independent biologist who is in addition to the managing environmental coordinator (Condition C-1). The plan shall contain, but not be limited to, the following:

        (a)  Procedures for stockpiling and replacing topsoil, replacing and stabilizing backfill, such as at stream crossings, and steep or highly erodable slopes. Additionally, provisions shall be made for recontouring to approximate the original topography. Excess fill shall be disposed of off-site unless suitable arrangements are made with the property owner. Excess fill shall not be deposited in any drainage, or on any unstable slope.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                    Page 17
Final Development Plan Conditions                     November 23, 1987

(b)    Specific plans for control of erosion, gully formation, and
       sedimentation, including, but not limited to, sediment traps,
       check dams, diversion dikes, culverts and slope drains.  Plan
       shall identify areas with high erosion potential and the
       specific control measures for these sites.

(c)    Procedures for containing sediment and allowing continued
       downstream flow at stream crossings, including scheduling
       construction activities during low-flow periods.

(d)    Procedures for re-establishment of vegetation that replicates or
       is functionally equivalent to indigenous and naturalized
       communities along the alignment.  These shall include:  measures
       preventing invasion and/or spread of undesired plant species;
       restoration of wildlife habitat value; and restoration of native
       plant species and communities.  Celeron shall consult with the
       County Farm Advisor and appropriate Ranch operators when
       developing procedures for revegetating areas used for cattle
       grazing and other agricultural uses;

(e)    Procedures for restoration of riparian corridor stream and
       river  banks and stream bed substrates and elevation;

(f)    Procedures for minimizing all tree removal or tree root and
       branch damage, such as, flagging the corridor, keeping all
       disturbance to no more than the 100-foot pipeline right-of-way,
       feathering the right-of-way edges, providing for onsite
       monitoring of construction by a qualified independent
       biologist.  In addition, special procedures are required for oak
       woodlands since County policy requires that these trees must not
       be cut down if feasible.  Special procedures for oaks include
       reducing the right-of-way to the minimum width possible and
       minimizing the impact to the root zone of these trees;

(g)    Procedures for replacement of native trees and large shrubs
       removed from the 100-foot temporary easement during construction
       across riparian and woodland, in particular oak woodland,
       habitat, with saplings of the same species propagated from
       materials obtained from the same area, including provision for
       supplemental irrigation as necessary and feasible to ensure
       establishment, and provisions for protection of saplings from
       grazing animals;

(h)    A soil conservation program, to be applied in areas of 20
       percent or greater slopes along the pipeline corridor.

(i)    Procedures for incorporating landowner concerns in the plan.
       Any changes to the plan instigated by such concerns shall be
       approved by the Resource Management Department.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                           Page 18
Final Development Plan Conditions                         November 23, 1987

  (j) A plan for offsite re-establishment of oaks to mitigate impacts
    to oak savannahs and woodlands along the route.

  The segment of the plan pertaining to Gaviota State Park shall be
  prepared in cooperation with the State Department of Parks and
  Recreation.

H-2. One year after construction, a survey will be conducted, at Celeron's
expense, to determine the actual impact caused by construction.  This
survey shall include aerial photography, and as appropriate color
stereo and infrared photography and field studies.  The report will
identify areas with potential for further impact, e.g., high erosion
areas, that will require immediate remedial measures.  The survey
shall also contain an examination of previous mitigation measures and
present a list of additional feasible mitigations based on the
impacts during construction and potential impacts caused by
operation.  Celeron and the Resource Management Department shall
agree to additional feasible mitigations.  This process shall be
repeated as often as necessary by the Resource Management Department,
but not more than annually.

H-3. In those areas where trees and other habitats such as riparian areas
and oak woodlands are to be avoided within the approved corridor,
Celeron shall assure contractor compliance with this condition by
marking and/or fencing those habitats.

H-4. Additional reasonable and feasible conditions of mitigation,
consistent with condition H-1 and to the extent necessary, shall be
identified and observed as developed during the archaeological
mitigation program (conditions L-1, L-2, L-3, L-6), and as identified
by the managing environmental coordinator in consultation with
Celeron's Onsite Construction Representative (condition C-1).

H-5. Deleted.

H-6. Celeron shall not use herbicides in wetland and riparian areas, and
along the rest of the pipeline corridor during construction.

H-7. Prior to issuance of the Coastal Development Permit and Land Use
Permit, Celeron shall receive a permit (1603) as required from the
California Department of Fish and Game.  This permit should include
provisions to ensure that the proposed construction schedule will not
interfere with reproductive activities of regionally rare or rare,
threatened or endangered bird, amphibian, and fish species or other
species of special concern, in those environmentally sensitive
habitats identified in the EIR/EIS and shall submit this confirmation
to the Resource Management Department.  If the Department of Fish and
Game determines that the construction schedule will have an impact
then Celeron will adhere to directives of the Department of Fish and
Game with respect to their permit requirements.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 19
Final Development Plan Conditions                       November 23, 1987

H-8.    Deleted.

H-9.    Celeron shall minimize impacts to the population of Hoffmann's
        nightshade (Solanum xanti var. hoffmannii) found in the Gaviota Pass
        area.  Celeron shall submit plans to enhance the recovery of this
        population to the Resource Management Department for approval prior
        to issuance of the Coastal Development Permit and Land Use Permit.
        These plans shall include provisions for removing any individual
        plants that would be affected, place them in large tubs, and replant
        them as near as possible to the original location (exclusive of the
        operation Right-of-Way) after construction; and gathering seeds prior
        to issuance of the Coastal Development Permit and Land Use Permit
        from the population of Hoffmann's nightshade located in the Gaviota
        Pass area and planting them in and near the ROW after construction.
        This shall be done under the supervision of a biologist approved by
        the Resource Management Department and in cooperation with the
        California Parks Department; this biologist may approve modifications
        to these techniques based on season of the year and state of dormancy.

H-10.   Celeron shall minimize impacts to the population of Catalina Mariposa
        lily (Calochortus catalinae) found in the Gaviota Pass area.  Celeron
        shall submit plans to enhance the recovery of this population to the
        Resource Management Department for approval prior to issuance of the
        Coastal Development Permit and Land Use Permit.  These plans shall
        include provisions for gathering of seeds from the population found
        in or near the ROW prior to construction, planting the seeds in or
        near the ROW after construction (exclusive of the operation ROW),
        conserving the upper 18-24 inches of heavy clay soil which contains
        the plant's bulb-like corms found in the vicinity of the plants prior
        to construction, and then, after construction, replacing this soil
        which holds the plants bulb-like corms.  This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;
        this biologist may approve modifications to these techniques based on
        season of the year and state of dormancy.

H-11.   Celeron shall minimize impacts to the population of Refugio Manzanita
        (Arctostaphylos refugioensis) found in Gaviota Pass area and affected
        by the proposed construction activities.  Celeron shall submit plans
        to enhance the recovery of this population to the Resource Management
        Department for approval prior to issuance of the Coastal Development
        Permit and Land Use Permit.  These plans shall include provisions for
        gathering seeds and taking cuttings from the population of Refugio
        Manzanita found in and adjacent to the ROW prior to construction, and
        provisions for the planting of the seeds and plants propagated from
        cuttings in the final construction alignment (exclusive of the
        operation ROW) after construction.  This shall be done under the
        supervision of a biologist approved by the Resource Management
        Department and in cooperation with the California Parks Department;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                    Page 20
Final Development Plan Conditions               November 23, 1987

> this biologist may approve modifications to these techniques based on season of the year and state of dormancy.

H-12.   Celeron shall prepare a Restoration, Revegetation and Implementation section as part of the Oil Spill Contingency Plan (P-5). The section shall be reviewed and accepted prior to start-up by the Resource Management Department and a biologist approved by the Resource Management Department. The section shall be submitted sufficiently prior to Celeron's projected start-up date so as to allow reasonable time for staff review. Reasonable costs of review shall be borne by the applicant. The section shall contain site-specific restoration information for all habitat types including stream crossings, wetlands/lagoons, oak woodlands, grasslands, riparian zones, and other environmentally sensitive habitats. The section shall be divided into three major areas: a) Coastal, b) Streams and Rivers and c) Terrestrial habitats. Each of these sub-sections shall discuss the various habitats in the categories listed above. Methods to achieve restoration of all affected areas to their prespill conditions shall be discussed.

H-13.   Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall submit to the County Board of Architectural Review, and the Resource Management Department site-specific plans for landscaping of any pump station not within other required project vegetation screens. This plan shall, at Celeron's expense, be reviewed by a qualified landscape architect and a biologist approved by the Resource Management Department to insure the proper plant materials and procedures identified in these conditions are implemented. These plans shall be developed in consultation with the property owner. The plan shall include:

(a) The specifications of any potential seed mixtures to be utilized, including the plant species in the mixture and the pounds of seed per acre to be applied; type of mulch (fiber, chemical tackifier or straw); the type and amount of fertilizer; and any provisions for irrigation;

(b) Confirmation that all native or non-native plant materials proposed in the revegetation plan are compatible with indigenous vegetation and that none of the plants used is known to be weedy or invasive. The plan shall provide for plantings that will screen facilities from view. This vegetation screening shall also be designed to reduce nighttime lighting and noise. Near chaparral or other high fire hazard areas, the seeds or seedlings will consist of native or non-native species, shown to contain fire retardant properties (such as toyon) and shown to be fast growing;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                          Page 21
Final Development Plan Conditions                        November 23, 1987

(c) The specifications for native seeds and seedlings that will have
    wildlife habitat and food value.  All perennial plants, and all
    woody plants are to be propagated from material obtained from the
    same area.  Native plant material is to be obtained from a
    revegetation contractor.  All native materials will be ordered
    from the contractor in advance of construction activities.

(d) Confirmation that non-native material is to be confined to
    disturbed areas immediately adjacent to structures needing visual
    screening.  Such screening is to include fast growing plants
    adequate to screen the facility from direct view;

(e) A detailed irrigation plan if feasible for all revegetated areas
    requiring irrigation for establishment of plant materials;

(f) Celeron's commitment for continual monitoring of the revegetaion
    so that weeds will be minimized.

H-14.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall post a bond or other security agreement
        approved by the County Counsel to ensure that all landscaping and
        revegetation programs are completed to the County's specifications.

H-15.   Prior to issuing a release from the bond or other security agreement,
        a biologist and landscape architect hired by the County, at Celeron's
        expense, shall conduct a field review of all revegetated and
        landscaped areas, to insure consistency with the intent and
        specifications of the revegetation and landscape plan.  Necessary
        repairs or changes in landscaping or revegetation shall be made at
        Celeron's expense.

H-16.   Prior to approval of the Final Development Plan, a qualified
        biologist approved by the Resource Management Department will conduct
        site-specific field inventories for California state-listed species,
        as mandated by the intent and general provisions of Assembly Bill No.
        3309, the California Endangered Species Act.  The biologist will
        perform the surveys of the 100-foot ROW in areas suspected of having
        any of the species of special concern as identified in Appendix B
        Table B-6, DEIR/S, except for the peregrine falcon, least Bell's
        vireo, and Parish's sidalcea.  Surveys for these species will be
        conducted prior to construction.  The California Department of Fish
        and Game will be consulted concerning appropriate methods for survey
        as well as appropriate mitigation measures if these species are found
        on the ROW.  Additional mitigation shall be developed and executed by
        Celeron based on these surveys if determined necessary by the
        Resource Management Department.

H-17.   Prior to issuance of the Coastal Development Permit and Land Use
        Permit, a wildlife biologist approved by the Resource Management

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 22
Final Development Plan Conditions                           November 23, 1987

Department will survey all potential raptor nesting habitats within 0.5 miles of the pipeline, to identify active and inactive nests and potential perch sites cleared by ridge-top construction.  No construction will occur within 0.5 miles of active eyries during nesting season as determined by the biologist.  Construction may be permitted by the Resource Management Department in consultation with the biologist near inactive nests provided nest sites are not disturbed.  Where deemed necessary by the California Department of Fish and Game biologists, raptor perch or roost trees will be avoided and/or artifical roosts will be constructed on ridgelines to mitigate losses of such trees resulting from clearing the ROW on ridge tops.

H-18.    Celeron shall limit the width of the construction ROW through all riparian habitats to the extent feasible.  Celeron shall submit a plan indicating the location and size of the construction ROW through all riparian habitats.  These plans shall be approved by the Resource Management Department prior to the Final Development Plan.

H-19.    The construction ROW shall be routed to avoid trees to the maximum extent feasible.  When this is not possible, dying or diseased trees shall be removed preferentially over healthy trees.

H-20.    Celeron shall minimize impacts to the oak woodland in the Suey Canyon area.  This shall be done by using existing disturbed areas and by narrowing the construction corridor to the extent feasible by working on top of the spoils pile or selectively removing spoils, selectively removing trees (e.g. dying, or diseased trees) and revegetating to enhance re-establishment of oak saplings and/or similar mitigation.

H-21.    Celeron shall align the pipeline route in the vicinity of the Los Alisos Creek crossing in order to minimize the amount of riparian habitat disrupted.

H-22.    Prior to the issuance of the Land Use Permit, a qualified biologist approved by the Resource Management Department shall conduct a site-specific field survey for the Parish's checkermallow along the approved right-of-way in potential habitat areas in the North County.  Should any individuals be found along the right-of-way, Celeron shall employ mitigation measures approved by the Resource Management Department to enhance the reestablishment of the species along the ROW (e.g., transplanting individuals).

I.   SOCIOECONOMICS

I-1.    The cumulative impacts of oil and gas industry projects are expected to be significant to Santa Barbara County.  Therefore Celeron shall participate in an oil and gas industry wide monitoring and mitigation program to address socioeconomic impacts indentified as significant

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project
Final Development Plan Conditions

environmental impacts attributable to their project.  For projects such as pipelines, only the construction phase is expected to cause significant impacts, and Celeron's participation in the program shall be limited to that phase.  The criteria for allocating the costs of the monitoring and mitigation program and its mitigation requirements will be uniformly applied to all industry participants.

The intent of this program is to obtain realistic information regarding impacts identified in the EIR/EIS, and to allow impacted jurisdictions to require mitigation for project-related impacts. Mitigation of impacts through other planning programs, and/or through existing administrative infrastructure shall be taken into account. The scope of this program is detailed below.  As subsequent details in the structure of the Program are developed by the County, such details shall supersede portions of this condition as appropriate.

The purpose of the Monitoring and Mitigation Program is to accurately assess the impacts of the Celeron's proposed development, including those in the following socioeconomic areas:

a.    Temporary housing needs, particularly demand for state and other park campsites, recreational vehicle parks, motel-hotel rooms and rental housing;

b.    Longer term (more than one year) housing needs, particularly low and moderate income housing needs, and associated water demands, south coast Santa Barbara County;

c.    Public finance;

d.    Transportation of workers and materials to and from the site.

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County. Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

The Monitoring and Mitigation Program will be administered and staffed by the County of Santa Barbara, Department of Regional Programs.  A Technical Advisory Committee will provide assistance and input in the documentation of significant adverse impacts and proposals to mitigate these significant impacts.

The Technical Advisory Committee will be composed of:  two representatives from Santa Barbara's cities appointed by the Mayor's Select Committee and repesenting north and south county interests;

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                              Page 24
Final Development Plan Conditions                           November 23, 1987

one representative (each) from San Luis Obispo and Santa Barbara counties; and one representative from each affected oil and gas company (to the number of representatives agreed upon). Celeron will be included in the committee until Celeron submits its resignation.

In the event of unresolved technical issues in the area of methodology and calculation of socioeconomic impacts, there shall be a Technical Arbitration Group. The Technical Arbitration Group shall be composed of three individuals without ties to either the County or Celeron, one to be selected by the County Board of Supervisors, one selected by the oil and gas company representatives and the final member selected by the first two members. All Technical Arbitration Group decisions shall be appealable upon written request to the Board of Supervisors. Subsequent details on voting procedures and conflict resolution will be proposed by the Department of Regional Programs and reviewed by the Board of Supervisors in a noticed public hearing.

Prior to approval of the Final Development Plan for this project, the monitoring and mitigation program will be refined. Based on information in the EIR/EIS and on other data as appropriate, practical thresholds which trigger the necessity for mitigation will be developed and adopted by the Department of Regional Programs with input from the Technical Advisory Committee. These thresholds will recognize the normal growth incorporated in county plans, prior and existing industry activity, and the decline of the industry if no further permitting is allowed. Methodologies used to establish thresholds and impacts will be developed in consultation with the Technical Advisory Committee.

The need for mitigation will be determined when threshold levels are exceeded as shown by monitored activities and other data as appropriate. The Department of Regional Programs will recommend a mitigation action to the County Board of Supervisors. The Technical Advisory Committee will assist in making the assessment and recommendations. The monitoring and mitigation program will continue through all stages of construction.

The monitoring, impact and mitigation elements of the program would be equivalent to those described in the Chevron Gaviota Project conditions, but modified as appropriate for the nature of the pipeline project.

I-2.    Prior to approval of the Final Development Plan, Celeron shall submit to the County Department of Regional Programs a plan which details how they plan to house temporary construction workers for every month of construction. This plan, to be implemented by Celeron, shall demonstrate how Celeron plans to reduce the housing impacts identified as part of the plan; e.g. exactly how much housing is needed, where it is needed and for how long; but not limited to, the following examples:

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                              Page 25
Final Development Plan Conditions                          November 23, 1987

(a) Use of existing under-utilized hotel/motel space during the months of September through May to provide for temporary living quarters for direct construction workers by month; identification of incentives to all the direct construction workers such as rent subsidies and/or shuttle service to the site.

(b) Use of any available housing outside the South Coast area for all workers associated with the project during the summer months when visitor-serving facilities in the South Coast area are at capacity. Incentives for workers shall be identified such as rent subsidies and shuttle service for all workers commuting to the job site.

(c) Methods to limit worker use of public campgrounds as living quarters. If it cannot be shown that the impact will be reduced from the estimate, Celeron shall make a donation to the California State Parks or to Santa Barbara County Parks for the development of new campsites to offset their worker use of campsites. The donation shall be made prior to receipt of the building permit and determined by multiplying the estimated cost per developed campsite times 15. If it is shown by the Regional Programs Department and the Technical Advisory Committee that there is significant impact, the above-mentioned groups shall propose mitigation. At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by Celeron exceed the valuation of the impacts at issue, Celeron shall be granted a credit against any other current or future mitigation fees imposed on Celeron for this permit by the County. Celeron shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

I-3.    The pipeline construction period will be scheduled so as not to coincide with peak tourist seasons within each construction area in Santa Barbara County, provided that this scheduling does not interfere with any other conditions in this permit with respect to timing, in particular requirements regarding construction during stream and river low-flow. If such a conflict is found, than additional measures must be taken to provide the temporary housing needs for construction workers.

I-4.    Deleted.

I-5.    Celeron shall include provisions in its contractor agreements specifically to encourage and promote employment from local labor so as to reduce the impacts associated with the in-migration of workers.

I-6.    Except as otherwise provided herein, if the Socioeconomic Monitoring Program shows that project related revenues will not compensate for needed capital or operating expenditures necessary to provide project-related utilities and services additional mitigation will be required.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                      Page 26
Final Development Plan Conditions                    November 23, 1987

I-7.     In the event that state and/or federal revenue sharing legislation
         directed at distributing oil related revenues to state or local
         governments is approved or Santa Barbara County levies a tax (special
         or otherwise) on oil and/or gas processed or transported under this
         permit, then any condition herein requiring payments or other items
         of value by Celeron to Santa Barbara County or any political
         subdivision thereof shall automatically be suspended pending a review
         by the County to determine the extent, if any, which the tax, revenue
         sharing, or any of the fees imposed are duplicative or unwarranted
         either as to the level of government services provided or the level
         of burdens imposed on the public.


J.   LAND USE AND RECREATION

J-1.     Prior to construction, the entire pipeline ROW corridor shall be
         prominently staked.  All affected property owners along the pipeline
         route shall be notified in writing at least 30 days prior to the
         commencement of any pipeline construction on their property, and at
         least 15 days in advance of any deviation from the staked corridor
         which crosses their property.

J-2.     All mainline pipeline construction activities except river, perennial
         coastal stream, and ESH area crossings as specified in condition H-7,
         once started, shall proceed in a diligent and expeditious manner and
         shall be completed within nine months after the starting date,
         subject to necessary and/or unanticipated time extensions approved by
         County, in consultation with affected property owners.

J-3.     Pipeline construction activities shall be limited to the period
         between 7 a.m. and 7 p.m., Monday through Saturday.  Except for
         emergency services, construction activities shall not take place on
         Sundays, the dates generally recognized for Memorial Day, July 4,
         Labor Day, or any other similarly recognized holiday, unless previous
         arrangements have been made with the affected property owners.

J-4.     Prior to approval of the Final Development Plan, Celeron shall
         consult with affected property owners to develop reasonable and
         mutually satisfactory controls for maintaining the privacy and
         security of affected properties while construction is in progress.

J-5.     Unless easements have been obtained from affected property owners or
         unless otherwise agreed to by affected property owners, Celeron shall
         provide affected property owners written notice at least 48 hours
         prior to the start of construction on their property, which shall
         include:

         a)  Description of vehicles using roads on the property, including
             type, size, identification, proposed times of entry and

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                   Page 27
Final Development Plan Conditions                              November 23, 1987

departure, destinations, and the intended route to the destination.  (Fire, medical, or similar emergency vehicles can enter as necessary.)  Significant changes in the schedule of construction-related vehicular traffic shall be allowed within the 48-hour advance noticing subject to direct communication (e.g. telephone, personal communication) by Celeron with the affected property owners;

b)  Description of estimated construction schedule across the property.  Any blasting necessary during construction shall be noticed to all property owners within a one mile radius of the blasting area;

c)  Description of times of limited access through and across the property, such as road closures on the property, indicating specific location, time and duration of the limited access or closure.  Road closure is considered to include partial road blockage or disturbance.  Suitable vehicular by-pass shall be provided during all closures;

d)  Description of any probably hazard or other unsafe condition during the pipeline construction period, indicating the nature of the hazard, the area in which the condition will occur, and the time and duration of the activity.  Celeron and its contractors shall take prompt and adequate action to correct any hazard or damage that does occur during construction, and shall provide appropriate noticing as per other parts of this condition;

e)  Description of helicopter and/or vehicle reconnaissance schedules for pipeline maintenance, indicating times, stops, and duration. Celeron shall establish and enforce appropriate rules for its personnel and its contractors to assure that they will not be in the area except when necessary to carry out construction, inspection, repair and maintenance activities, or emergency services;

f)  Description of schedule for cutting any fences or similar barriers during pipeline construction.

J-6.    Deleted.

J-7.    Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners if and when fences or other similar barriers must be cut during pipeline construction, Celeron shall provide advance notice to the affected property owner, and shall replace the function of the cut fence before the cut is made to the satisfaction of the property owner, and Celeron and its contractors shall restore all fences that have been cut, moved, or damaged to at least their condition prior to pipeline construction, except that gates or similar structures may be added as approved to provide access.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                     Page 28
Final Development Plan Conditions                    November 23, 1987

J-8.    Interruption of telephone, electrical power, water or other utility services shall be minimized to the extent feasible during the pipeline construction period. Celeron, or its contractors, shall contact each property owner or the appropriate utility regarding the location of utility lines, and all such utility line locations shall be staked by Celeron or its contractors prior to the start of construction on the affected property.

J-9.    During the pipeline construction period in the County, Celeron and its contractors shall comply fully with all applicable statutes, ordinances, rules and regulations, including traffic regulations, of the County.

J-10.   Prior to entering upon any parcel of property for purposes of commencing construction, Celeron shall demonstrate to the Resource Management Department that it has obtained a right-of-way for such parcel or otherwise has obtained the right to enter the property for purposes of constructing the pipeline.

J-11.   Following installation of the pipeline, use of the right-of-way is restricted to operational maintenance of the pipeline except where expressly permitted by the easement or landowner and consistent with other regulations and conditions.


K.  TRANSPORTATION

K-1.    Prior to issuance of the Coastal Development Permit and Land Use Permit, Celeron shall submit to the Resource Management Department and the Department of Public Works, Road Division a worker transportation program designed to minimize traffic-related impacts. The plan shall identify on- and off-site parking areas, access routes, shuttle program to reduce number of working vehicles on and along pipeline construction corridor, measures to avoid traffic conflicts with residents using all roads affected, number of vehicles accessing the facilities sites and incentives for ride-pooling/van-pooling to the sites. Construction worker traffic and parking shall not interfere with normal and reasonable uses of private property or recreational areas. This Construction Traffic Mitigation Plan shall be submitted by Celeron and approved by County prior to initiation of construction. The program must consider both Celeron's employees and contractors.

K-2.    Any new permanent parking areas at the pump stations shall be screened from public view pursuant to the landscape plan approved by the Board of Architectural Review.

K-3.    The final engineering plans and procedures for all pipeline crossings of County roads must be approved prior to issuance of the Land Use

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

**EXHIBIT D**

Celeron Pipeline Project                                          Page 29
Final Development Plan Conditions                      November 23, 1987

Permit and Coastal Development Permit by the Department of Public Works.  Notification of such approval must be submitted to the Resource Management Department prior to construction at the site.

K-4.    All pipeline construction activity, except ingress and egress along routes approved by the Resource Management Department and in consultation with affected property owners, shall be limited to the final staked right-of-way on the final approved pipeline route.  Use of any private roads or other areas shall be allowed only after advance approval from the affected property owners.

K-5.    Prior to the Final Development Plan, Celeron must submit to the Public Works Department for approval a plan to mitigate impacts to all County roads which will be used during construction.  This plan will include the type of vehicles and machinery which will traverse the roads, the frequency of road use for each piece of equipment and vehicle, and the gross vehicle weights loaded and unloaded.  This includes the above information for trucks carrying pipe, fuel, construction supplies, or construction crews through the County to the construction spreads.  This plan shall include an agreement with the County to repair any obvious damage to the satisfaction of the Public Works Director and any reasonable fees associated with eventual reconstruction caused by project-related damages of the public roads.  Prior to drafting this agreement, County shall coordinate with Celeron in compiling a list of County roads which will be used for construction of the pipeline.  Celeron shall demonstrate property owner (or Court) approval of private road maintenance plans or terms on privately owned parcels to the Resource Management and Public Works Department prior to entering upon said parcels for purposes of commencing construction.


L.  CULTURAL RESOURCES

L-1.    Prior to approval of the Final Development Plan, Celeron shall submit a plan detailing the methods for the Phase I (walkover) and Phase II (site importance assessment) cultural resources surveys.  In addition, Celeron shall submit all Phase I cultural work completed to date.  These reports shall be approved by the Resource Management Department as part of the Final Development Plan.

Prior to issuance of the Land Use Permit and Coastal Development Permit, Celeron shall complete Phase I and Phase II cultural resource surveys for the entire route.  The results of these surveys shall be approved by the Resource Management Department prior to issuance of said permits.  Celeron shall avoid to the maximum extent feasible all known cultural resource sites along the pipeline route unless safety (e.g. seismic or engineering practices) considerations or sensitive biological habitats preclude avoidance.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                    Page 30
Final Development Plan Conditions                   November 23, 1987

L-2.       Prior to issuance of the Coastal Development Permit and Land Use
           Permit, Celeron, in consultation with the Native American Community,
           shall commence the cultural resources mitigation plan, in accordance
           with CEQA Appendix K, County approved Prehistoric Archaeological
           Guidelines, and section 4.1.1.11, Cultural Resources, of the
           EIR/EIS.  Implementation of the mitigation plan shall proceed on an
           expeditious and effective schedule in order to minimize or to avoid
           conflicts with other construction scheduling requirements delineated
           in other permit conditions.  The main components of the mitigation
           plan shall include:

           a)  Selection of a qualified archaeologist by the County Resource
               Management Department in consultation with Native American
               representatives.  The archaeologist shall be available on an
               as-needed basis through the completion of pipeline construction.
               The archaeologist shall be funded by Celeron and shall be
               responsible to the County Resource Management Department.
               Compensation shall cover all excavation, analysis, and report
               preparation for all areas investigated including those found
               during construction;

           b)  Avoidance of known sites wherever feasible;

           c)  Test excavations of known sites that cannot be avoided.  These
               test excavations will assess the importance of each site
               according to CEQA Appendix K criteria or other requirements and
               will result in appropriate data recovery as a mitigation measure;

           d)  Inclusion of Native American representatives in all field
               activities.

           e)  Additional sub-surface sampling (use of shovel test pits) in
               defined sensitive areas which will be affected by project
               construction to confirm the presence/absence of previously
               unknown (undiscovered) sites.  This will include surveying of
               proposed construction access road areas, once identified by
               Celeron.  Any new sites found shall be treated as per condition
               L-2(b, c);

           f)  Following the determination of site importance, Celeron shall
               inform the County of any additional plans for site avoidance.
               For those sites not avoided, the consulting archaeologist shall,
               in consultation with the Native American community, prepare
               site-specific mitigation (excavation/data recovery) plans; and

           g)  Implementation and completion of the field work aspects of the
               site-specific mitigation plans prior to construction in the
               vicinity of the resource.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

EXHIBIT D

Celeron Pipeline Project                                              Page 31
Final Development Plan Conditions                         November 23, 1987

L-3.    Prior to pipeline installation activities, Celeron shall sponsor a workshop for its pipeline contractors and Native American consultants to review and explain the mutual concerns and activities of the parties during pipeline installation work.

L-4.    During pipeline installation, a Resource Management Department approved archaeologist and Native American consultant(s) will work with the contractor during trenching to insure continued avoidance. Adequate monitors shall be provided pursuant to an agreement between the Native American representatives and Celeron, and the archaeologist retained.

L-5.    If non-burial associated cultural resource artifacts are recovered during pipeline installation (the location of such artifacts being unknown prior to installation), ownership of such artifacts shall be the option of either Celeron, the Native American Community, or the archaeological community.  In recognizing the origin of the materials, the Native American Community shall have the first option for ownership.  The disposition of the artifacts shall be carried out as per the approved County guidelines.

L-6.    If burials or burial associated artifacts are found during installation (that were unknown prior to excavation), and cannot be avoided because of safety considerations, there shall be no further excavation or disturbance of the site.  Celeron, in conjunction with the Native American representatives and the Resource Management Department, shall adhere to the guidelines in CEQA Appendix K and the County Archaeological guidelines prior to continued construction activity in the site area.

L-7.    If the County cultural resource guidelines for Phase II are modified and approved prior to November 19, 1985, Celeron shall abide by the requirements set forth in the quidelines in place at the time of Final Development Plan approval.


M.  VISUAL RESOURCES

M-1.    All facility design (e.g. pump stations, landscaping and signs), shall be in accordance with a plan approved by the County Board of Architectural Review (BAR) including the criteria outlined in the Coastal Zoning Ordinance Section 35-87.9 and Section 35-184.  Prior to the issuance of the Land Use Permit and Coastal Development Permit, Celeron shall submit to the BAR and the Resource Management Department and obtain their approval of a plan demonstrating that Conditions M-2 through M-5 are met.  For visual screening of surface equipment along the pipeline route, Celeron shall consult with each affected property owner during development of the associated landscaping plan.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                    Page 32
Final Development Plan Conditions                   November 23, 1987

M-2.    No unobstructed or unshielded beam of exterior lighting shall be
        directed towards any area outside the exterior boundaries of
        Celeron's property or easement.  Any lighting along roadways within
        the project shall utilize low intensity, ground level, shielded
        fixtures.  The plan shall demonstrate that all feasible measures have
        been taken to reduce obtrusive night lighting and glow from the pump
        stations.

M-3.    To the extent feasible no glare or other radiation resulting from
        pump station facilities, other than lighting fixtures constructed
        pursuant to this Development Plan shall be detectable at any point
        along or outside the required screening along exterior boundaries of
        the pump stations.

M-4.    Prior to the pipeline operation, the Gaviota pump station, visible
        from Highway 101 and the Gaviota Village, the Sisquoc pump station
        visible from public viewshed, and all above ground portions of the
        pipeline shall be painted to harmonize with the surrounding area.

M-5.    No above-surface structures except necessary pipeline markers, pump
        stations, cathodic test stations, necessary fencing, and block valves
        shall be visible along this route after the completion of pipeline
        construction.  Signs shall not detract from scenic areas or views
        from  public roads to the extent feasible.

M-6.    Prior to construction, Celeron will review the feasibility of
        implementing mitigation measures and/or realignments in the Gaviota
        State Park area to avoid blasting of ridgetops and alteration of
        topography in a scenic area.  Celeron shall submit a plan to the
        Resource Management Department, for review and approval, which
        identifies the feasibility of shifting the ROW alignment to the west,
        leaving the ridge profile undisturbed.  The plan shall include an
        investigation of utilizing prefabicated pipeline bends to allow for
        alignment around ridgetops, the use of stepped benches in steep
        terrain, and the future use of such a corridor for additional
        pipelines.

N.  NOISE

N-1.    Prior to issuance of the Coastal Development Permit and Land Use
        Permit, Celeron shall file with the Resource Management Department a
        Noise Monitoring and Control Plan which has been approved previously
        by the the Department of Health Care Services and the Resource
        Management Department.  The plan shall describe the best efforts
        Celeron shall take to reduce the noise impacts of the project both
        during construction and operation of the project.  The approved plan
        shall be implemented by Celeron and shall be followed until

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project
Final Development Plan Conditions

temporarily suspended or deemed no longer necessary by the Resource Management Department. The plan shall include provisions to ensure that items N-2 through N-6 below are included.

N-2.   Except for motor vehicles and motorized construction equipment, all facilities shall be designed, constructed, operated and maintained such that sound levels during operation do not exceed 70 dbA at or beyond the property line or pipeline easement, as measured on the "A" weighted scale at slow response on approved sound level measuring instruments. Affected property owners along the pipeline route shall be notified by Celeron at least 48 hours in advance of any planned testing or maintenance of the line which may exceed noise standards. The facility shall comply with all standards established in the Noise Element of the Comprehensive Plan and the Coastal Zoning Ordinance. No residents, teachers, students and staff at the Vista del Mar School shall be subjected to greater than a 9 dbA increment above the baseline ambient noise level, nor greater than a 3 dbA increase in day-night sound levels. The best available technology, including but not limited to muffling equipment, sound barriers, and landscaping measures shall be used to minimize operational noise impacts.

N-3.   During the construction and operation phases, project-related noise at the Gaviota State Park, Vista del Mar School, Buellton area, or other points which may be impacted (as determined by the Health Care Services Director), shall be minimized between the hours of 7:00 a.m. and 10:00 p.m. Prior to construction in the impacted areas, Celeron will notify all residents within 1200 feet of the pipeline that noise impacts may occur during specific construction periods. Noise shall be limited to 50 dbA between the hours of 10:00 p.m. and 7:00 a.m., consistent with the County Noise Element and the Coastal Zoning Ordinance. Blasting shall be limited to the hours between 7:00 a.m. and 7:00 p.m. and directional charges shall be used to minimize noise.

N-4.   As determined by the Resource Management Department, noise generating project activities (including delivery of construction equipment through residential areas) shall be restricted between the hours of 10:00 p.m. and 7:00 a.m. If complaints arise concerning activities occurring during these hours, Celeron shall take additional feasible steps to reduce the noise levels or further restrict the offending activity.

N-5.   Prior to approval of the Final Development Plan, Celeron shall submit to the Director of the Resource Management Department procedures that Celeron will take to minimize noise impacts from helicopters, or other aircraft during the aerial surveys of pipeline. The procedures, to be approved by the Resource Management Department, shall specify overflight routes to be taken to minimize noise impacts to the community and other feasible measures. Celeron shall direct its contractors to abide by the helicopter procedures and shall take

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                    Page 34
Final Development Plan Conditions                     November 23, 1987

reasonable corrective action if complaints arise concerning the use of helicopters. Subject to flight safety considerations, Celeron shall avoid helicopter flights over residential areas.

N-6.    All construction and operation-related equipment shall be operated and maintained to minimize noise generation, ground vibration, and to avoid interference with radio or video communications.

O.  ABANDONMENT

O-1.    Immediately following permanent shut down of the pipeline, Celeron shall remove abandoned pump stations and unburied portions of the pipeline within Santa Barbara County constructed under this permit, recontour the site and revegetate the site in accordance with a County approved revegetation plan within one year of permanent shut down. Celeron shall post a performance bond to insure compliance, or continue to pay property taxes as assessed during project operation until site restoration is complete, as determined by the County.

P.  SYSTEMS SAFETY AND RELIABILITY

P-1.    Celeron shall submit all appropriate pump station, valve, and pipeline construction and process diagrams to a System Safety and Reliability Review Committee (SSRRC) who may employ a third-party technical review in order to evaluate pipeline design and help identify possible design hazards prior to construction. The System Safety and Reliability Review Committee shall consist of a representative from the County Public Works Department, the APCD, the County Fire Department, County Flood Control District and the Resource Management Department. All reasonable costs associated with any County review shall be borne by Celeron. Celeron shall be entitled to participate fully in the review process. If the review reveals a concern, the SSRRC shall share its findings with Celeron. If Celeron does not agree with the findings, the County's recourse is with the Department of Transportation, Office of Pipeline Safety for areas of pipeline construction under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by Celeron and the County.

P-2.    Celeron shall submit a detailed Safety Inspection, Maintenance and Quality Assurance Program for the pump stations, valves, and the pipeline which shall be implemented during construction and operations. The Program shall include, but not be limited to, inspection of construction techniques, regular maintenance and safety inspections, periodic safety audits, corrosion monitoring and leak detection, inspections of all trucks carrying hazardous and/or flammable material. The construction section of the Program shall be

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 35
Final Development Plan Conditions                       November 23, 1987

reviewed by the System Safety and Reliability Review Committee and/or its consultants prior to issuance of the Coastal Development Permit and Land Use Permit.  Celeron shall fund a full-time U.S. Department of Transportation (or designated representative) pipeline inspector during pipeline construction phase activities.  The operations section of the Program shall be reviewed by the System Safety and Reliability Review Committee and/or its consultants prior to start-up.  The Program shall be submitted sufficiently prior to Celeron's projected start-up date so as to allow reasonable time for staff review.  All costs associated with this review process shall be borne by Celeron.  Should the Committee find fault with these submissions, it will indicate its concerns to Celeron.  If Celeron decides not to modify its plans to meet these concerns, the County's recourse is with the Department of Transportation, Office of Pipeline Safety for all areas under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline).  In such a case, County shall timely notify DOT of review findings.  Permits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by Celeron and the County.

P-3.   Celeron shall submit an Emergency Response Plan detailing response procedures to be implemented by Celeron for accidental events affecting public safety and the environment.  This plan shall be based on a comprehensive risk analysis reviewed by the System Safety and Reliability Committee (condition P-1).  The plan shall be reviewed and approved by the County Emergency Services Coordinator, the Fire Department, and the Resource Management Department prior to start-up.  Approval of the Plan shall be based on its consistency with the County's Area-Wide Oil and Gas Emergency Response Plan.  The Program shall be submitted sufficiently prior to Celeron's projected start-up date so as to allow reasonable time for staff review. Celeron shall demonstrate the effectiveness of the Emergency Response Plan by responding to one emergency response drill prior to or immediately after start-up.

P-4.   In order to assure that County emergency response procedures adequately interface with the Celeron emergency response procedures, Celeron shall provide its reasonable pro-rata share of funds to the County, to develop and implement a feasible County Emergency Response Plan for oil and gas industry related emergencies.  As appropriate, the County shall request funds from other oil industry operators to aid in funding of the County Emergency Response Plan.  When available, the Resource Management Department shall provide Celeron with an estimate of the pro rata share of funds to be provided by Celeron and the method for allocating such costs among other operators.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                           Page 36
Final Development Plan Conditions                          November 23, 1987

P-5.      Celeron shall submit an Oil Spill Contingency Plan detailing cleanup
          procedures and restoration procedures to be employed in the event of
          a spill.  This plan shall be reviewed and approved by the Resource
          Management Department and the County Emergency Services Coordinator
          prior to start-up.  The Program shall be submitted sufficiently prior
          to Celeron's projected start-up date so as to allow reasonable time
          for staff review.  Procedures and techniques shall be selected to
          augment the Emergency Response Plan.  The intent of the Oil Spill
          Contingency Plan is to detail spill site restoration subsequent to
          emergency response.  The plan shall be approved based on its
          consistency with the intent of the condition "to detail site
          restoration subsequent to emergency response."

P-6.      Prior to approval of the Final Development Plan, Celeron shall submit
          to the Santa Barbara County Sheriff's Department for review and
          approval a site security plan.  The plan shall describe procedures to
          be implemented by Celeron which will prevent intentional damage to
          facilities which may result in environmental damage or public safety
          hazards.

P-7.      Celeron shall cooperate with Chevron as necessary to facilitate the
          establishment of a temporary County fire company until the completion
          of the fire station (as specified in Chevron condition P-9).  Prior
          to issuance of the Coastal Development Permit and Land Use Permit,
          the County Emergency Response Coordinator and Fire Department must
          be  satisfied that provisions have been made to establish an
          operational fire company in the project area.

P-8.      Prior to approval of the Final Development Plan, Celeron shall agree
          to participate in a plan to be submitted to the County Fire
          Department by Chevron USA Inc., for the construction, manning and
          equipping of a fire station in the Gaviota area.  Celeron shall
          contribute their pro rata share of the cost of implementing this
          plan.  When available, the Resource Management Department shall
          provide Celeron with an estimate of the pro rata share of funds to be
          provided by Celeron and the method for allocating such costs among
          other operators.

P-9.      Prior to Final Development Plan, Celeron shall submit to and obtain
          conceptual approval from the Fire Department, a Fire Protection Plan
          for the pump station locations.  Final approval shall be obtained
          prior to start-up.  Criteria to be addressed shall be obtained from
          the County Fire Department.

P-10.     Prior to approval of the Final Development Plan, Celeron shall assess
          the feasibility of transporting liquefied petroleum gases and natural
          gas liquids, (LPGs and NGLs) through the proposed pipeline by
          blending and/or batching, considering industry-wide projected volumes
          and market destinations of the gas liquids.  Celeron shall report to

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                          Page 37
Final Development Plan Conditions                        November 23, 1987

the Resource Management Department the results of this assessment, and this information shall include all technological and safety constraints involved, amount and type of additional storage facilities needed, and the degree to which LPGs and NGLs produced in the area can be transported through Celeron's pipeline.

Celeron shall transport the NGLs through this pipeline, to the extent feasible within safety and legal constraints as identified by the report and as requested by the users.  In addition, under the reporting provisions of Condition C-1, Celeron shall inform the County of the types and amounts of gas liquids shipped in the pipeline during operations.

P-11.    If the Vista del Mar School has not been relocated or is located at a site where it could be impacted by construction activities, prior to approval of the Final Development Plan, Celeron and the Board Trustees of the Vista Del Mar School District shall develop a reasonable and and mutually agreeable construction plan for the pump station site and pipelines adjacent to the site that will minimize construction-related noise, air pollution, and visual disturbance to the School during school hours.  Said construction plan shall include the following:

Pipeline construction noise near the School shall be held to ambient noise levels or construction shall occur only when school is not in session; to prevent exceedance of the California one-hour $NO_2$ standard, construction schedules must be modified to minimize overlapping of equipment emissions; and, during construction of the pipeline, activities nearest the school shall be scheduled when school is not in session in accordance with Condition B-5 and temporary barriers shall be erected around noisiest activities.  No grading for the Gaviota pump station shall occur during School session hours.

In the event that any agreements contained herein cannot be reached on the construction plan, the Board of Supervisors shall arbitrate any dispute.

P-12.    Deleted.

P-13.    Celeron will design the pipeline such that the entire pipeline will have effective control communication between the operations control center and all remotely activated valves.  Any break, rupture, and/or damage to the pipeline shall result in the orderly shutdown of the pumping operations, and will activate the shut off valves, if appropriate, in a manner which will minimize environmental damage.

P-14.    During construction of the pipeline in fire sensitive areas, Celeron shall meet or exceed applicable guidelines and requirements set forth

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

in a Watershed Fire Protection Plan provided by the combined local fire protection agencies, Santa Barbara County Fire, U.S. Forest Service, and the California Department of Forestry. This shall include, but not be limited to: modifications of welding operations, required fire patrolman position(s), firefighting equipment, and construction restrictions due to extreme fire weather.

P-15.    All facilities, construction activities and equipment shall comply with National Fire Protection Association standards.

P-16.    Upon completion of pipeline construction, Celeron shall provide all jurisdictional agencies (S.B. County Fire, USFS, CDF) with at least two copies of maps showing the finished pipeline route and shall include locations accessible by fire department emergency response vehicles. Said maps shall be 7 1/2 minute quadrangle scale, (one inch equals 24,000 inches), and shall represent topographical features.

P-17.    Celeron shall be subject to required fire department inspections during and after construction as set forth by the 1982 Uniform Fire Code and these conditions.

P-18.    Prior to approval of the Final Development Plan, Celeron shall designate alternative pipeline corridor alignments which avoid the two potentially impacted, proposed alternative permanent relocation school sites now under study by the Vista del Mar Union School District. These proposed alternative locations are the State Park at Las Cruces, and the Tajiguas Ranch property. County shall review and approve said alternative alignments as part of the Final Development Plan and Celeron shall implement the appropriate alternative alignment depending on the permanent school relocation site chosen by the Vista del Mar School District.

Q.  FACILITY DESIGN

Q-1.    The Final Development Plan shall demonstrate compliance with Santa Barbara County Coastal Zoning Ordinance, and other applicable County Ordinances to the extent required by this permit.

Q-2.    Cost effective energy conservation techniques shall be incorporated into project design.

Q-3.    Celeron's facilities will be operated as a common carrier pipeline with access for use available on a nondiscriminatory basis. County retains the right to verify that the use of the facilities is conforming with County policies on consolidation and to impose additional reasonable permit conditions where necessary to assure these policies are being fulfilled to the extent feasible. The intent of this condition is to ensure the multi-company access of oil transportation facilities.

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Celeron Pipeline Project                                                    Page 39
Final Development Plan Conditions                              November 23, 1987

Q-4.    Celeron shall comply with all applicable policies in Section 25 of
        the Santa Barbara County Petroleum Ordinance No. 2795.

Q-5.    Celeron shall fund a pro-rata share of the costs to bury power
        transmission lines or of using environmentally and aesthetically
        preferred poles between the Goleta Substation and Gaviota in areas
        where the County and SCE determine it is not feasible to bury the
        lines.  Celeron's pro-rata share shall be based upon an equitable
        cost-sharing formula applied to all users of the grid power
        consistent with PUC rate setting and applicable regulations.

4150E

*DISCLAIMER: PLAINS MAKES NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

# EXHIBIT M

# LAS FLORES PIPELINE SYSTEM
# FINAL DEVELOPMENT PLAN CONDITIONS
### 88-DPF-033 (RV01)z, 88-CP-60 (RV01)
### (88-DPF-25cz; 85-DP-66cz; 83-DP-25cz)
### December 12, 1988
### Modified May 2003
### (Modified on September 19, 2023 with the Change of Ownership, Change of Guarantor, and Change of Operator for the Las Flores Pipeline System [Lines 901/903])
### (Modified on October 30, 2024 with the Change of Guarantor and Operator to Sable Offshore Corp)

*These conditions of approval have been revised to list the new owner, guarantor, and operator, and remove all previous owners, guarantors, and operators that no longer serve such role. Text that has been added is shown in <u>underline</u>, and text that has been removed is shown in ~~strikeout~~.*

# Table of Contents

A.    GENERAL ........................................................................................................................... 1
    A-1.    Acceptance of Permit Conditions ................................................................... 1
    A-2.    Grounds for Permit Modification or Revocation ........................................... 1
    A-3.    Court Costs ...................................................................................................... 1
    A-4.    Costs of Implementing and Enforcing Conditions ......................................... 2
    A-5.    Civil Penalties ................................................................................................. 2
    A-6.    Access to Records and Facilities .................................................................... 2
    A-7.    Substantial Conformity ................................................................................... 2
    A-8.    Authority for Curtailment ............................................................................... 3
    A-9.    Conditions Separately Remain in Force ......................................................... 3
    A-10.    Conflicts Between Conditions ....................................................................... 4
    A-11.    Injunctive Relief ........................................................................................... 4
    A-12.    Owner/Operator Liability ............................................................................. 4
    A-13.    Facility Throughput and Source Limits ........................................................ 4
    A-14.    Pipeline Alignment ....................................................................................... 4
    A-15.    Permit Violations .......................................................................................... 5
    A-16.    Board of Supervisors Authority to Change County Department Responsible for Condition ........................... 5
    A-17.    Fees as Mitigation Measures ........................................................................ 5
    A-18.    Payment of Attorney's Fees and Costs ......................................................... 5
    A-19.    Applicability of Conditions to Construction and Operation ......................... 5
    A-20    Project Description ........................................................................................ 5
    A-21 .............................................................................................................................. 6
    A-22 .............................................................................................................................. 6
    A-23 .............................................................................................................................. 6
    A-24 .............................................................................................................................. 6
    A-25 .............................................................................................................................. 7
    A-26 .............................................................................................................................. 7
    A-27 .............................................................................................................................. 7
    A-28 .............................................................................................................................. 7
    A-29 .............................................................................................................................. 7
    A-30 .............................................................................................................................. 7
    A-31 .............................................................................................................................. 8
B.    PERMIT REVIEW ........................................................................................................... 8
    B-1.    System Safety and Reliability Review Committee (SSRRC) Review Prior to Construction ........................ 8
    B-2.    Imposition of New and Comprehensive Review of Conditions ..................... 8
    B-3.    Authority to Impose Feasible Mitigations ..................................................... 8
    B-4.    Coordination Plan for the Use of a Shared Pipeline Corridor ....................... 9
    B-5.    Resolution of Scheduling Conflicts Among Conditions of Approval ............ 9
    B-6.    Cooperation with San Luis Obispo County for Pipeline Permitting .............. 9
    B-7.    P&D Authorization Prior to Construction ...................................................... 9

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page TOC 2

| | | |
|---|---|---|
| B-8. | P&D Authorization Prior to Start-Up | 9 |
| B-9. | Adequacy of Submittals to be Determined by the Planning Commission | 10 |
| **C.** | **MANAGEMENT** | **10** |
| C-1. | Environmental Quality Assurance Program (EQAP) | 10 |
| C-2. | 24-Hour Emergency Contact | 11 |
| C-3. | Provide Copies of Permits to P&D | 12 |
| **D.** | **AIR QUALITY** | **12** |
| D-1. | Statement of Scope | 12 |
| D-2. | Authority to Construct | 12 |
| D-3. | Agreement to Implement All Air Pollution Control Procedures | 12 |
| D-4. | Emissions Mitigation | 12 |
| D-5. | Deleted | 12 |
| D-6. | Validation Information | 12 |
| D-7. | Discharge Limitations | 12 |
| D-8. | Mitigation Plan for Construction Air Quality Impacts | 13 |
| D-9. | | 13 |
| D-10. | | 13 |
| D-11. | | 13 |
| D-12. | | 13 |
| D-13. | | 13 |
| **E.** | **GEOLOGY** | **14** |
| E-1. | Geologic Investigation, Design and Mitigation Program | 14 |
| E-2. | Geologic Hazard Monitoring Program | 15 |
| E-3. | Inspection of Trench Prior to Pipeline Installation | 15 |
| E-4. | Isolation Valves at Active Fault Crossings | 15 |
| E-5. | Sisquoc Pump Station Grading and Erosion Control Plan | 16 |
| E-6. | Cooperation with San Luis Obispo County for Cuyama River Crossing | 16 |
| E-7. | South Coast Pump Stations Location | 16 |
| E-8. | Stockpiling of Earth Materials During Construction | 16 |
| E-9. | Storage of Pipe During Construction | 16 |
| E-10 | | 16 |
| E-11 | | 16 |
| E-12 | | 17 |
| E-13 | | 17 |
| **F.** | **SURFACE AND GROUNDWATER** | **17** |
| F-1. | Downstream Flows During Construction | 17 |
| F-2. | Sediment Retention Devices During Construction | 17 |
| F-3. | Stream and River Crossings During Construction | 17 |
| F-4. | Riparian Habitat Corridors During Construction | 18 |
| F-5. | Construction Contractors at Stream Crossings During Construction | 18 |
| F-6. | Deleted | 18 |
| F-7. | Isolation Valves at Perennial Stream and River Crossings | 18 |
| F-8. | Freshwater Source During Construction | 18 |
| F-9. | Hydrogeologic Investigations for Sensitive Areas | 18 |
| F-10. | Dam and Ditch Plugs in Pipeline Trenches by Aquifers | 19 |
| F-11. | SSRRC Approval for All Creek and River Crossing Plans | 19 |
| **G.** | **AQUATIC BIOLOGY** | **19** |
| G-1. | Oil Spill Response Plan | 19 |
| G-2. | | 19 |
| G-3. | | 19 |
| **H.** | **TERRESTRIAL BIOLOGY** | **20** |
| H-1. | Restoration, Erosion Control and Revegetation Plan | 20 |
| H-2. | Impact Survey One Year After Construction | 21 |
| H-3. | Sensitive Habitat Areas | 21 |
| H-4. | Additional Mitigation | 21 |
| H-5. | Deleted | 21 |
| H-6. | Herbicides During Construction | 21 |

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page TOC 3

| | | |
|---|---|---|
| H-7. | Fish and Game Permit (1603) | 21 |
| H-8. | Deleted. | 22 |
| H-9. | Hoffman's Nightshade Plan | 22 |
| H-10. | Catalina Mariposa Lily Plan | 22 |
| H-11. | Refugio Manzanita Plan | 22 |
| H-12. | Restoration, Revegetation and Implementation Plan | 23 |
| H-13. | Pump Station Landscaping | 23 |
| H-14. | Landscaping and Revegetation Bonds | 23 |
| H-15. | Release of Landscaping and Revegetation Bonds | 24 |
| H-16. | California Endangered Species Inventory | 24 |
| H-17. | Raptor Nesting Habitat Survey | 24 |
| H-18. | Construction ROW Through Riparian Habitats | 24 |
| H-19. | Construction ROW Designed to Avoid Trees | 24 |
| H-20. | Suey Canyon Oak Woodland | 24 |
| H-21. | Los Alisos Creek Crossing | 25 |
| H-22. | Parish's Checkermallow Field Survey | 25 |
| H-23. | Gaviota Tarplant Plan | 25 |
| H-24. | Restoration of Construction Work Areas | 25 |
| H-25. | | 25 |
| H-26. | | 26 |
| **I.** | **SOCIOECONOMICS** | 26 |
| I-1. | Oil and Gas Industry-Wide Monitoring and Mitigation Program | 26 |
| I-2. | Housing for Temporary Construction Workers | 28 |
| I-3. | Construction During Peak Tourist Seasons | 28 |
| I-4. | Deleted. | 28 |
| I-5. | Utlization of Local Labor | 28 |
| I-6. | Project-Related Utilities and Services | 29 |
| I-7. | Distributing Oil Related Revenues | 29 |
| **J.** | **LAND USE AND RECREATION** | 29 |
| J-1. | Property Owner Notification of Construction | 29 |
| J-2. | Mainline Pipeline Construction Time Lines | 29 |
| J-3. | Pipeline Construction Work Hours | 29 |
| J-4. | Privacy and Security of Property Owners During Construction | 29 |
| J-5. | Property Owner Notification of Construction Within 48 Hours | 30 |
| J-6. | Deleted. | 30 |
| J-7. | Property Owner's Fences/Barriers During Construction | 30 |
| J-8. | Utility Lines and Services During Construction | 30 |
| J-9. | Compliance with All Applicable County Statutes, Etc. | 31 |
| J-10. | Proof of ROW Prior to Construction | 31 |
| J-11. | Restricted Use of ROW After Construction | 31 |
| J-12. | | 31 |
| **K.** | **TRANSPORTATION** | 31 |
| K-1. | Worker Transportation Program | 31 |
| K-2. | Permanent Parking Areas at the Pump Stations | 31 |
| K-3. | Engineering Plans for All Pipeline Crossings of County Roads | 31 |
| K-4. | Pipeline Construction Activity Limited to ROW | 32 |
| K-5. | Mitigation Plan for Impacted County Roads | 32 |
| K-6. | | 32 |
| K-7. | | 32 |
| **L.** | **CULTURAL RESOURCES** | 32 |
| L-1. | Cultural Resources Surveys Plan | 32 |
| L-2. | Cultural Resources Mitigation Plan | 33 |
| L-3. | Pre-Construction Workshop with Native Americans | 33 |
| L-4. | Archaeologist and Native American On-Site During Construction | 33 |
| L-5. | Ownership of Non-Burial Associated Cultural Resource Artifacts | 33 |
| L-6. | Burial Associated Artifacts Found During Construction | 34 |
| L-7. | Phase II Cultural Resource Guidelines | 34 |

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page TOC 4

| | | |
|---|---|---|
| L-8 | | 34 |
| L-9 | | 34 |
| L-10 | | 34 |
| L-11 | | 35 |
| L-12 | | 35 |
| **M.** | **VISUAL RESOURCES** | 35 |
| M-1. | Board of Architectural Review Approval | 35 |
| M-2. | Exterior Lighting | 35 |
| M-3. | Pump Station Facilities Lighting | 36 |
| M-4. | Painting of Pump Stations Prior to Pipeline Operation | 36 |
| M-5. | Visibility of Above-Surface Structures | 36 |
| M-6. | Determination of ROW in Gaviota State Park | 36 |
| M-7 | | 36 |
| **N.** | **NOISE** | 36 |
| N-1. | Noise Monitoring and Control Plan | 36 |
| N-2. | Sound Levels During Operation | 37 |
| N-3. | Project-Related Noise During Construction | 37 |
| N-4. | Noise Generating Activities During Construction | 37 |
| N-5. | Helicopter and Aircraft Noise | 37 |
| N-6. | Operation-Related Equipment Noise | 37 |
| N-7 | | 38 |
| **O.** | **ABANDONMENT** | 38 |
| O-1. | Removal of Pipeline and Pump Stations Upon Permanent Shut Down | 38 |
| **P.** | **SYSTEMS SAFETY AND RELIABILITY** | 38 |
| P-1. | SSRRC Review of Diagrams | 38 |
| P-2. | Safety Inspection, Maintenance and Quality Assurance Program | 38 |
| P-3. | Emergency Response Plan | 39 |
| P-4. | Funding the County Emergency Response Plan | 39 |
| P-5. | Oil Spill Contingency Plan | 39 |
| P-6. | Site Security Plan | 39 |
| P-7. | Temporary County Fire Company | 40 |
| P-8. | Cooperation with Chevron for Gaviota Area Fire Station | 40 |
| P-9. | Fire Protection Plan for the Pump Stations | 40 |
| P-10 | Transporting LPGs and NGLs Through Pipelines | 40 |
| P-11. | Vista del Mar School Accommodation | 40 |
| P-12. | Deleted | 41 |
| P-13. | Communication at the Operations Control Center and Activated Valves | 41 |
| P-14. | Compliance with the Watershed Fire Protection Plan | 41 |
| P-15. | Compliance with the National Fire Protection Association Standards | 41 |
| P-16. | Map of Finished Pipeline Route | 41 |
| P-17. | Compliance with the 1982 Uniform Fire Code | 41 |
| P-18. | Alternative Pipeline Corridor Alignments | 41 |
| P-19. | PCB Contamination at Canada de la Huerta | 42 |
| P-20. | Soil Tests at the Booster Pump Site | 42 |
| P-21. | Texaco's Emergency Access Road | 42 |
| P-22 | | 42 |
| P-23 | | 42 |
| P-24 | | 42 |
| P-25 | | 42 |
| P-26 | | 43 |
| P-27 | | 43 |
| P-28 | | 43 |
| P-29 | | 43 |
| P-30 | | 43 |
| P-31 | | 43 |
| **Q.** | **FACILITY DESIGN** | 43 |
| Q-1. | Demonstration of Compliance | 43 |

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page TOC 5

Q-2.    Energy Conservation Techniques ................................................................................... 44
Q-3.    Common Carrier Pipeline ............................................................................................. 44
Q-4.    Compliance with County Petroleum Ordinance No. 2795............................................ 44
Q-5.    Power Transmission Lines............................................................................................ 44

# LAS FLORES PIPELINE SYSTEM
## FINAL DEVELOPMENT PLAN CONDITIONS
### 88-DPF-033 (RV01)z, 88-CP-60 (RV01)
### (88-DPF-25cz; 85-DP-66cz; 83-DP-25cz)
### December 12, 1988
### Modified May 2003
### (Modified on September 19, 2023 with the Change of Ownership, Change of Guarantor, and Change of Operator for the Las Flores Pipeline System [Lines 901/903])
### (Modified on October 9, 2024 with the Change of Guarantor and Operator to Sable Offshore Corp.

~~The current owner and operator of record for the Las Flores Pipeline System (previously the All American Pipeline) is Pacific Pipeline Company, referred to herein as PPC. ExxonMobil Pipeline Company (EMPCo) serves as the pipeline operator. ExxonMobil Corporation is identified as sole guarantor and carries in excess of $100 million insurance coverage, as required by the Office of Oil Spill Prevention and Response. PPC is directly wholly owned by Mobil Pacific Pipeline Company, and indirectly wholly owned by Exxon Mobil Corporation. EMPCo is directly wholly owned by Exxon Pipeline Holdings LLC, and indirectly wholly owned by ExxonMobil Corporation.~~

## A.    GENERAL

**Owner:**    Pacific Pipeline Company, a wholly owned subsidiary of Sable Offshore Corporation (Sable), is the currently listed Owner of the Las Flores Pipeline System.

**Operator:**    Sable is the currently listed Operator of the Las Flores Pipeline System.

**Guarantor:**    Sable is the currently listed Guarantor of the Las Flores Pipeline System.

### A-1.    Acceptance of Permit Conditions

Acceptance of this permit shall be deemed as acceptance of all final conditions of this permit, except that PPC reserves the right to pursue any remedy for any legal violations imposed directly or indirectly by these permit conditions.

### A-2.    Grounds for Permit Modification or Revocation

If the Planning Commission determines at a noticed public hearing that PPC is not in compliance with any permit condition(s), pursuant to the provisions of Sec. 35-185 of Article II and/or Sec. 35-330 of Article III of the Santa Barbara County Code, the Planning Commission is empowered, in addition to revoking the permit pursuant to said section, to amend, alter, delete, or add conditions to this permit. *(modified by the Planning Commission on September 6, 2000)*

### A-3.    Court Costs

PPC agrees as a condition of the issuance and use of this permit to defend at its sole expense any action brought against the County by a third party challenging either its decision to issue this permit or the manner in which the County is interpreting or enforcing the conditions of the permit. PPC will reimburse the County for any court costs and attorneys fees which the County may be required by a court to pay as a result of such action where PPC defended or had control of the defense of the suit.  County may, at its sole discretion, participate in the defense of any such

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 2

action, but such participation shall not relieve PPC of its obligation under this condition. County shall bear its own expenses for its participation in the action.

**A-4.   Costs of Implementing and Enforcing Conditions**

The permittee shall make an initial deposit to a fund to permit the County to adequately implement and enforce the conditions imposed by this permit and applicable County ordinances and/or the conditions of this permit, if such a fund is established. If the Board of Supervisors determines that a reasonable enforcement fund is needed, the Director of the Planning and Development Department shall present to the Board of Supervisors and the permittee a plan for enforcement within one year from the effective date of this permit. This plan shall set forth the staffing requirements and materials necessary for such enforcement and the estimated costs thereof. This plan shall provide that all reasonable expenses incurred by the County or County contractors, for permit condition implementation, reasonable studies, and emergency response directly and necessarily related to enforcement of these permit conditions shall be reimbursed by PPC/Sable within 30 days of invoicing by County.

**A-5.   Civil Penalties**

In the event that PPC fails to comply with any order of the Administrative Officer or the Board of Supervisors issued hereunder or any injunction of the Superior Court, it shall be liable for a civil penalty for each violation to the extent imposition of such civil penalty is authorized by applicable laws, rules, or regulations.

Said civil penalty shall be in addition to PPC's obligation, if any, to reimburse the County of Santa Barbara (and others) for actual damages suffered as a result of PPC's failure to abide by the conditions of this permit or by the orders of the Administrative Officer, the Board of Supervisors, or any court of competent jurisdiction.

**A-6.   Access to Records and Facilities**

As to any condition which requires for its effective enforcement the inspection of construction records or records pertaining to facility operations, or the facilities themselves by County or its duly authorized agents, PPC will make all necessary records available or provide access to such facilities upon reasonable notice from County. County agrees to keep such information confidential where permitted by law and requested by PPC in writing.

**A-7.   Substantial Conformity**

The procedures, operating techniques, design, equipment and other descriptions (hereinafter procedures) described in 83-DP-25 cz, 83-CP-97 cz, and in subsequent clarifications and additions to that application and the Final Development Plan are incorporated herein as permit conditions and shall be required elements of the project. Since these procedures were part of the project description which received environmental analysis, a failure to include such procedures in the actual project could result in significant unanticipated environmental impacts. Therefore, modifications of these procedures will not be permitted without a determination of substantial conformity or a new or modified permit. The use of the property and the size, shape, arrangement and location of buildings, structures, walkways, parking areas and landscaped areas shall be in substantial conformity with the approved Final Development Plan.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 3

## A-8.    Authority for Curtailment

In addition to the authority to enforce and secure compliance with the provisions of this permit under Division 12, Coastal Zoning Ordinance of the Santa Barbara County Code and Division 7, General Regulations, Article III Santa Barbara County Zoning Ordinance, the County Administrative Officer, or in his/her absence a designated appointee, may order that curtailment of activities which is required to protect the public health and safety.  Said action may include, but is not limited to, ordering temporary, partial or total facility shutdown.

Such an order shall be made only in the event that the Administrative Officer has reasonable and probable cause to believe that continued unrestrained activities of permittee will likely result in or threaten to result in danger to public health, welfare, or safety, or in the environment and provided such violations can be expected to continue or recur unless operations are in whole or in part shut down or reduced pending the necessary corrections.

Before issuing any curtailment order, the County Administrative Officer shall set a time for hearing and shall give written notice of the time and place of the hearing and of the alleged violations.  Such notice shall be received by the person in charge of the operation of the facility at least 24 hours before the hearing at which time there will be an opportunity for all concerned parties to present evidence regarding the alleged violations.  The notice may be served in person or by certified mail.

In the event the Administrative Officer, or in his/her absence the designated appointee, determines that there is an imminent danger to the public health and safety resulting from violations, he/she may summarily order the necessary curtailment of activities without hearing and such order shall be obeyed upon notice of same, whether written or oral.  At the same time that notice of the order is conveyed, the Administrative Officer shall set a date, time and place for a publicly noticed hearing and review of said order as soon as possible which date shall be no later than 24 hours after such order is issued or served.  Said hearing shall be conducted in the same manner as a hearing on prior notice.  After such hearing, the Administrative Officer may modify, revoke, or retain the emergency curtailment order.

Any order of the Administrative Officer may be appealed to the Board of Supervisors within three working days after such order is made.

If such appeal is not filed with the Board of Supervisors, the Administrative Officer's order becomes final.  If there is an appeal, the order of the Administrative Officer shall remain in full force and effect until action is taken by the Board of Supervisors.  The decision of the Board of Supervisors shall be a final Administrative Action.  Such decision shall not preclude ~~AAPLP~~ PPC from seeking judicial relief.

Once PPC has shown that the conditions of violation no longer exist and are not reasonably likely to recur, the Administrative Officer shall modify the curtailment order to account for such compliance and shall entirely dissolve the order when it is shown that all of the violations have been corrected and are not likely to recur.

## A-9.    Conditions Separately Remain in Force

In the event that any condition contained herein is determined to be invalid, then all remaining conditions shall remain in force.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 4

## A-10.  Conflicts Between Conditions

In the event that any condition contained herein is determined to be in conflict with any other condition contained herein, then where principles of law do not provide to the contrary, the condition most protective of public health and safety and natural environmental resources shall prevail to the extent feasible.

## A-11.  Injunctive Relief

In addition to any administrative remedies or enforcement provided hereunder, the County may seek and obtain temporary, preliminary, and permanent injunctive relief to prohibit violation of the conditions set forth herein or to mandate compliance with the conditions herein.

All remedies and enforcement procedures set forth herein shall be in addition to any other legal or equitable remedies provided by law.

## A-12.  Owner/Operator Liability

The owner and the operator of the facility shall be jointly and severally liable without regard to fault for all legally compensable damages or injuries suffered by any property or person that result from or arise out of any oil, water spillage, fire, explosion, odor, or air pollution, in any way involving oil or gas or the impurities contained therein or removed therefrom and which arises out of construction or operation of PPC's facilities.  For the purpose of this condition, the "facility" shall be deemed to include all facilities described and approved pursuant to 83-DP-25cz, 83-CP-97cz.

This condition shall not inure to the benefit of any of the owners of the pipeline, including the United States Government.  This declaration of strict liability and the limitations upon it shall be governed by the applicable law of California on strict liability.

## A-13.  Facility Throughput and Source Limits

All facilities constructed under this permit shall be used only for the shipment of a maximum volume of heated crude oil demonstrated to be within the design parameters of the pipeline facilities as built. The subject volumes will be outer continental shelf (OCS) and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins.  PPC shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgment of the County, result in significant changes to the impacts on the County.  Such changes could include but not be limited to: 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above; and 4) introduction of a different product from any source.

Other source volumes may be transported subject to a determination of substantial conformity by the Planning Commission and a finding of facts and determination that project impacts will not be increased by transporting and processing those other sources.

## A-14.  Pipeline Alignment

The permittee shall align the pipeline corridor from the coastal starting point to the County exit point in the western Cuyama valley according to the route approved by the County. The permittee shall locate and construct all isolation valves as identified by the final approved alignment.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 5

**A-15.  Permit Violations**

Any person, firm or corporation, whether as a principal, agent, employee, or otherwise, found to be in violation of any provisions or conditions of this ordinance or permits, shall be punishable as set forth in the applicable section of the Coastal Zoning Ordinance, and Article III of the Santa Barbara County Code.

Each and every day during any portion of which any violation of this Article or the rules, regulations, orders, or permits issued thereunder, is committed, continued, or permitted by such person, firm or corporation shall be deemed a separate and distinct offense.

**A-16.  Board of Supervisors Authority to Change County Department Responsible for Condition**

The Santa Barbara County Board of Supervisors in a noticed public hearing shall have the authority to specify or change the Santa Barbara County Department responsible for any conditions contained herein.

**A-17.  Fees as Mitigation Measures**

Should circumstances, including legal or legislative action, cause the County to lose its authority or have its authority fundamentally reduced to assess fees as a method to mitigate project-related impacts, then other feasible mitigation measures shall be imposed which will substantially lessen the significant impact formerly mitigated by the imposition of fees.  Within six months of the County's loss of such authority, feasible alternative mitigation measures shall be imposed as replacement permit conditions.  Alternatively, the County in a noticed public hearing must find that no feasible mitigation measures are available and that the benefits of the project outweigh the significant environmental impacts.

**A-18.  Payment of Attorney's Fees and Costs**

Should legal action be required by either party to enforce any rights in connection with this permit the prevailing party shall be entitled to reasonable attorney's fees and costs pursuant to Civil Code 1717.

**A-19.  Applicability of Conditions to Construction and Operation**

Unless otherwise specified, these permit conditions are intended to apply during both the construction and the operation of the permitted facilities.

**A-20  Project Description**

The Development Plan Revision (88-DP-33) and Conditional Use Permit Revision (88-CP-60) are based upon and limited to compliance with the project description and conditions of approval adopted for the Gaviota Creek Pipeline Lowering and Relocation Project, as documented in 00-ND-21 and the September 6, 2000 staff report.  Any deviations from the project description, exhibits or conditions must be reviewed and approved by the County for conformity with this approval.  Deviations may require approved changes to the permit and/or further environmental review.  Deviations without the above described approval will constitute a violation of permit approval. The project description is summarized as follows:

- Relocate the existing Gaviota Creek pipeline crossing by re-burying the 30" crude oil pipeline at least 10 feet into bedrock immediately upstream from their existing crossing;

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 6

- Remove the existing, exposed pipeline segment in Gaviota Creek;

- Restore and revegetate the disturbed area; and

- Monitor the crossing to ensure erosion control and revegetation efforts are successful.

The grading, development, use, and maintenance of the property, the size, shape, arrangement, and location of structures, parking areas and landscape areas, and the protection and preservation of resources shall conform to the project description and the associated hearing exhibits and conditions of approval. The property and any portions thereof shall be sold, leased or financed in compliance with this project description and the approved hearing exhibits and conditions of approval hereto. All plans must be submitted for review and approval and shall be implemented as approved by the County. *(adopted by the Planning Commission on September 6, 2000)*

**A-21**

Any use authorized Conditional Use Permit Revision (88-CP-060 RV01) shall immediately cease upon expiration or revocation of this Conditional Use Permit. Any Coastal Development issued pursuant to this Conditional Use Permit shall expire upon expiration or revocation of the Conditional Use Permit. Conditional Use Permit renewals must be applied for prior to expiration of the Conditional Use Permit. *(adopted by the Planning Commission on September 6, 2000)*

**A-22**

Within 18 months after the effective date of Conditional Use Permit Revision (88-CP-060 RV01), construction and/or the use shall commence. Construction or use cannot commence until a Coastal Development Permit has been issued. Failure to commence the construction and/or use pursuant to a valid Coastal Development Permit shall render the Conditional Use Permit null and void. All time limits may be extended by the Planning Commission for good cause shown, provided a written request, including a statement of reasons for the time limit extension request is filed with Planning and Development prior to the expiration date. *(adopted by the Planning Commission on September 6, 2000)*

**A-23**

Approval of the Final Development Plan Revision (88-DP-33 RV01) shall expire five (5) years after approval by the Planning Commission, unless prior to the expiration date, substantial physical construction has been completed on the development or a time extension has been applied for by the applicant. The decisionmaker with jurisdiction over the project may, upon good cause shown, grant a time extension for one year. *(adopted by the Planning Commission on September 6, 2000)*

**A-24**

Before using any land or structure, or commencing any work pertaining to the erection, moving, alteration, enlarging, or rebuilding of any building, structure, or improvement, the applicant shall obtain a Coastal Development and Building Permit from Planning and Development. These Permits are required by ordinance and are necessary to ensure implementation of the conditions required by the Planning Commission. Before any Permit will be issued by Planning and Development, the applicant must obtain written clearance from all departments having conditions; such clearance shall indicate that the applicant has satisfied all pre-construction conditions. A form for such clearance is available from Planning and Development. *(adopted by the Planning Commission on September 6, 2000)*

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 7

**A-25**

All applicable final conditions of approval shall be printed in their entirety on applicable pages of grading/construction or building plans submitted to P&D or Building and Safety Division. These shall be graphically illustrated where feasible. *(adopted by the Planning Commission on September 6, 2000)*

**A-26**

The applicant shall ensure that the project complies with all approved plans and all project conditions including those which must be monitored after the project is built and occupied. To accomplish this the applicant agrees to:

1. Contact the Energy Division as soon as possible after project approval to provide the name and phone number of the future contact person for the project and give estimated dates for future project activities.
2. Contact the Energy Division at least two weeks prior to commencement of construction activities to schedule an on-site pre-construction meeting with the owner, planner, other agency personnel and with key construction personnel.
3. Contact the State Parks archaeologist one week prior to commencement of any project activities on the site, including pre-construction activities.
4. Pay fees to cover full costs of consultants and staff time and monitoring (EQAP program). In the event of a dispute, the decision of the Director of P&D shall be final. *(adopted by the Planning Commission on September 6, 2000)*

**A-27**

Developer shall defend, indemnify and hold harmless the County or its agents, officers and employees from any claim, action or proceeding against the County or its agents, officers or employees, to attack, set aside, void, or annul, in whole or in part, the County's approval of the Final Development Plan Revision (88-DP-33 RV01) and Conditional Use Permit Revision (88-CP-060 RV01). In the event that the County fails promptly to notify the applicant of any such claim, action or proceeding, or that the County fails to cooperate fully in the defense of said claim, this condition shall thereafter be of no further force or effect. *(adopted by the Planning Commission on September 6, 2000)*

**A-28**

In the event that any condition imposing a fee, exaction, dedication or other mitigation measure is challenged by the project sponsors in an action filed in a court of law or threatened to be filed therein which action is brought within the time period provided for by law, this approval shall be suspended pending dismissal of such action, the expiration of the limitation period applicable to such action, or final resolution of such action. If any condition is invalidated by a court of law, the entire project shall be reviewed by the County and substitute conditions may be imposed. *(adopted by the Planning Commission on September 6, 2000)*

**A-29**

Within 60 days of completion of the Gaviota Creek Pipeline Lowering and Relocation project, the permittee shall submit as-built drawings to the Energy and Building and Safety Divisions. *(adopted by the Planning Commission on September 6, 2000)*

**A-30**

Within 60 days of completion of the Gaviota Creek Pipeline Lowering and Relocation project, the permittee shall revise their Operations and Maintenance Manual to reflect the changes to the pipeline. Revisions shall be copied to the Energy and Building and Safety Divisions. *(adopted by the Planning Commission on September 6, 2000)*

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 8

**A-31**

The Gaviota Creek Pipeline Lowering and Relocation project is estimated to take a maximum of 5 weeks. If earthmoving work extends past November 1, the Energy Division shall convene a meeting between the permittee and all responsible agencies to decide on–the appropriate action. If the Planning Director determines that work cannot continue due to impacts on sensitive resources (e.g., steelhead migration, red-legged frog breeding season), or the potential for increased sedimentation and erosion, work shall be suspended.

## B.    PERMIT REVIEW

### B-1.    System Safety and Reliability Review Committee (SSRRC) Review Prior to Construction

Prior to initiation of construction activity (such as ROW preparation, river crossings or pump station construction), the permittee shall submit to the System Safety and Reliability Review Committee (established by condition P-1) relevant construction drawings and supporting text demonstrating compliance with the appropriate conditions. Construction may not commence until County has reviewed and/or approved this submittal, consistent with the SSRRC review specified in Conditions P-1 and P-2. Within 15 days of submittal, County shall either give written notice to proceed with construction or indicate in writing conditions which have not been met. When such conditions have been met construction approval shall be granted.

### B-2.    Imposition of New and Comprehensive Review of Conditions

If at any time County determines that these permit conditions are inadequate to effectively mitigate significant environmental impacts caused by the project, or that recent proven technological advances could provide substantial additional mitigation, then additional reasonable conditions shall be imposed to further mitigate these impacts. Imposition of such conditions shall only be considered and imposed as part of the County's comprehensive review of the project conditions. County shall conduct a comprehensive review of the project conditions and consider adding reasonable conditions which incorporate proven technological advances three years after permit issuance and at appropriate intervals thereafter. A comprehensive review of conditions which are not effectively mitigating impacts may be conducted at any appropriate time. Upon written request of PPC, the Board of Supervisors shall determine whether the new condition required is reasonable considering the economic burdens imposed and environmental benefits to be derived.

### B-3.    Authority to Impose Feasible Mitigations

This permit is premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa Barbara County, will be substantially mitigated by the permit conditions. Prior to approval of the Final Development Plan, County shall review any findings that identified certain mitigation measures as being in the primary jurisdiction of another agency but are also within County's jurisdiction. County shall thereupon determine either (1) that such mitigation has or is being implemented by such other agency or (2) that such other agency and County determine such mitigation to be infeasible. If County determines that no other agency is or may be implementing such feasible mitigation measures then County may impose those feasible measures within its jurisdiction to mitigate those environmental impacts in accordance with appropriate mitigation measures identified by the EIS/R.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 9

**B-4.    Coordination Plan for the Use of a Shared Pipeline Corridor**

Prior to approval of the Final Development Plan, the permittee shall develop and submit to the Planning and Development Department for approval a plan to co-ordinate the placement and timing of their pipeline with SCPS's pipeline (or other potential proposals for use of the same corridor for a pipeline). Any agreements between the permittee and SCPS (or other applicant) necessary to implement this plan shall be subject to review and verification by the Planning and Development Department to assure the purpose of the plan will be achieved. The expressed purpose of this co-ordination plan shall be:

1)    arrangement of simultaneous construction where practical;
2)    engineering of pipe placement within the ROW to minimize incremental widening of the initial construction corridor during subsequent pipeline projects;
3)    identification of segments where incremental widening of the ROW is constrained and alternative engineering techniques which may allow construction of subsequent pipelines (and potential limitations of future pipeline use of the ROW); and
4)    timing and design of revegetation plans to promote effective revegetation but minimize unnecessary duplication of efforts.

Should SCPS or any other applicant abandon their pipeline project, or fail to submit a Final Development Plan prior to pipeline construction, this condition may be modified to reflect the existing situation but maintain the intent of this condition.

**B-5.    Resolution of Scheduling Conflicts Among Conditions of Approval**

In the event that scheduling requirements among or between conditions in this permit (or with this permit and conditions imposed by other agencies) conflict with respect to timing, the Planning and Development Department (in consultation with other agencies as appropriate) shall resolve such conflict.

**B-6.    Cooperation with San Luis Obispo County for Pipeline Permitting**

Applicant shall cooperate as necessary with San Luis Obispo County in the permitting, design, and construction of those segments of the pipeline which could affect Santa Barbara County. The intent of this condition is to ensure that potential impacts to Santa Barbara County are mitigated to the maximum extent feasible by these permit conditions, regardless of the location of the source of the impact.

**B-7.    P&D Authorization Prior to Construction**

Prior to commencing any construction activities in Santa Barbara County, the permittee shall obtain a letter from the Director of the Planning and Development Department indicating that all conditions which require approval prior to construction, as specified by this permit, have been satisfied.

**B-8.    P&D Authorization Prior to Start-Up**

Prior to start-up of the pipeline in Santa Barbara County, the permittee shall obtain a letter from the Director of the Planning and Development Department indicating that all conditions which require approval prior to start-up, as specified by this permit, have been satisfied.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 10

**B-9.    Adequacy of Submittals to be Determined by the Planning Commission**

In the event that PPC and staff cannot reach an agreement on the adequacy of any submittal required by these conditions, the matter will be brought before the Planning Commission for resolution at the earliest possible date.

**C.    MANAGEMENT**

**C-1.    Environmental Quality Assurance Program (EQAP)**

The permittee shall prepare an Environmental Quality Assurance Program (EQAP) for Resource Management Department approval prior to the Final Development Plan.  This EQAP shall encompass both the construction and operation phases of the project, and shall describe the steps the permittee will take to assure compliance with these conditions.  This plan is intended to provide a framework for all other programs and plans specified by these conditions as required prior to approval of the Final Development Plan.  As such, it will become a comprehensive reference document for the County, other agencies, and the public regarding the project.

This plan shall provide for the submission to the Planning and Development Department semi-annual reports throughout construction and annual reports during operations.  These reports shall describe:

a)    Project status, including but not necessarily limited to:
    i)    extent to which construction has been completed,
    ii)    the rate of production/throughput during operation,
    iii)    environmental planning and implementation efforts, and
    iv)    any revised time schedules or timetables of construction and operation that will occur in the next one year period.
b)    Permit condition compliance, including but not necessarily limited to the results of the specific mitigation requirements identified in these conditions.
c)    Results and analyses of all data collection efforts being conducted pursuant to these permit conditions.

The program shall include (or if separate plans exist, reference) all plans relevant to construction and operations of the pipeline facilities specified by these conditions.

Construction

The program shall include all plans relevant to construction activities such as the Restoration, Erosion Control and Revegetation Plan and the Cultural Resources Mitigation Plan.

The program shall include provisions for at least one managing environmental coordinator with overall responsibility, and if necessary, one onsite environmental coordinator per construction site during the construction phase.  These coordinators shall be approved by and be responsible to the Planning and Development Department.  PPC shall fund the coordinator(s).  The number of coordinators necessary shall be determined according to the amount of simultaneous construction activity occurring in geographically separate areas.  The responsibilities of the coordinator(s) are to include:

a)    on-site, day-to-day monitoring of construction activities;
b)    ensuring contractor knowledge of and compliance with all appropriate permit conditions;
c)    evaluating the adequacy of construction impact mitigations, and proposing improvements to the contractors, the permittee, and County;

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 11

> d) having the authority to require correction of activities observed to violate project environmental conditions or that represent unsafe or dangerous conditions, and having the ability and authority to secure compliance with the conditions or standards through the County Administrative Officer as described in condition A-8, if necessary;
>
> e) performing as contact for affected property owners and any other affected persons that wish to register observation of environmental permit violations and/or unsafe conditions, receiving any complaints, immediately contacting the permittee's onsite construction representative, verifying any such observations and developing any necessary corrective actions in consultation with the permittee's onsite construction representative;
>
> f) maintaining prompt and regular communication with the Planning and Development Department, Public Works Department, or other appropriate County agency, and with permittee personnel responsible for contractor performance and permit compliance.

In the event that resolution of disputes between the public and/or governmental agencies and the permittee over adherence to permit conditions is not achieved by the managing environmental coordinator, an arbitration system shall be utilized to resolve such disputes in a timely manner in order to minimize the need to halt construction activities as per conditions A-2 or A-8.

The coordinator(s) shall be thoroughly familiar with all plans and requirements set forth in the permit conditions. Prior to construction start-up, the managing coordinator shall discuss with other agency inspectors or monitoring personnel, inspection programs, areas of jurisdiction, responsibility, and define methods of avoiding disputes or construction delay due to agency disagreements.

Selection of the necessary coordinators shall be made, and the person(s) available, prior to issuance of the Coastal Development Permit and Land Use Permit.

Operations

The program shall include all plans related to operations, such as the Emergency Response Plan, Oil Spill Contingency Plan, and Landscaping Plan, as well as specific conditions not required in formal plans. It may also include any procedures not specified by these conditions but relevant to environmental protection and safety. Operational Compliance Plans shall be updated as necessary to reflect any approved change of operator within six months after assuming operations in accordance with County Code Section 25B-10(a)(6).

**C-2. 24-Hour Emergency Contact**

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall provide to the Planning and Development Department and the Emergency Services Coordinator the current name and position, title, address, and 24-hour phone numbers of the field agent, person in charge of the facility, and other representatives who shall receive all orders and notices, as well as all communications regarding matters of condition and permit compliance at the site and who shall have authority to implement a facility shutdown pursuant to condition A-8 in this Ordinance.

There shall always be such a contact person(s) designated by the permittee. One contact person shall be available 24 hours a day during all phases of the project in order to respond to inquiries received from the County, or from anyone in case of an emergency.

If the address or phone number of the agent should change, or the responsibility be assigned to another person or position, PPC shall provide to the Planning and Development Department the new information within seven days.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 12

**C-3.    Provide Copies of Permits to P&D**

PPC shall furnish to the Planning and Development Department copies of all County permit applications relative to the project once submitted, and of permits within 30 days of receipt by PPC.

**D.    AIR QUALITY**

**D-1.    Statement of Scope**

Nothing contained herein shall be construed to permit a violation of any applicable air pollution law, rule, or regulation.

**D-2.    Authority to Construct**

Prior to initiation of construction, including grading, of any facilities approved pursuant to this Development Plan, the permittee shall obtain an Authority to Construct permit from the County Air Pollution Control District.

**D-3.    Agreement to Implement All Air Pollution Control Procedures**

PPC agrees to implement all air pollution control procedures as required by APCD and identified in the Final Development Plan (such as water sprays to reduce construction-related fugitive dust).

**D-4.    Emissions Mitigation**

Emissions from any project component that contribute to ozone standard violations must be mitigated to the extent feasible.  Effectiveness of mitigation will be confirmed by APCD.

**D-5.    Deleted.**

**D-6.    Validation Information**

Prior to approval of the Final Development Plan, the permittee shall submit to the Planning and Development Department updated estimates of the type and size of helicopters, or other aircraft, to be used during pipeline operations for the aerial surveys of the pipeline route.  The information shall also include the estimated operating schedules, frequency and duration of airport calls and other reasonable information as required by APCD.  The County may require validation and updating of this information as needed.  Should this information reveal significant differences between the estimated air emissions and those analyzed in the EIR/EIS, the APCD may modify air quality permit conditions as necessary to assure consistency with the Air Quality Attainment Plan and Reasonable Further Progress goals.

**D-7.    Discharge Limitations**

All facilities shall be designed, constructed, operated, and maintained, such that the facilities approved under this Development Plan shall not discharge quantities of air contaminants or other materials in violation of Section 41700 of the Health and Safety Code.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 13

**D-8.    Mitigation Plan for Construction Air Quality Impacts**

Prior to the approval of the Final Development Plan, the permittee shall submit to the Director of the Planning and Development Department a plan, approved by the APCD, which includes timing of construction, minimizing soil handling, and other measures to mitigate construction air quality impacts. The plan shall include APCD approved analysis which demonstrates that local, state and federal air quality standards will not be violated as a result of construction activities.

**D-9**

For the Gaviota Creek Pipeline Lowering and Relocation project, during clearing, grading, earth moving, excavation or transportation of cut or fill materials, water trucks or sprinkler systems are to be used to minimize dust leaving the site and to create a crust after each day's activities cease. During construction, water trucks or sprinkler systems shall be used to keep all areas of vehicle movement damp enough to prevent dust from leaving the site. At a minimum, this would include wetting down such areas in the later morning and after work is completed for the day and whenever wind exceeds 15 miles per hour. Soil stockpiled for more than two days shall be covered, kept moist or treated with soil binders to prevent dust generation. **Plan Requirements:** All requirements shall be shown on construction drawings. **Timing:** Condition shall be adhered to throughout all grading and construction periods. **MONITORING:** Planning and Development shall ensure measures are on plans. Planning and Development's EQAP monitor shall spot check and ensure compliance on-site. APCD inspectors shall respond to any nuisance complaints. *(Mitigation Measure A-1) (adopted by the Planning Commission on September 6, 2000)*

**D-10**

During construction of the Gaviota Creek Pipeline Lowering and Replacement project, use water trucks to keep all areas of vehicle movement damp enough to reduce dust from leaving the site. At a minimum, this should include wetting down such areas in the late morning and after work is completed for the day. Increased watering frequency should be required whenever the wind speed exceeds 15 mph. Reclaimed water should be used whenever possible. **Plan Requirements:** This condition shall be printed on all construction drawings. **MONITORING**: EQAP monitor to spot check in the field. *(Mitigation Measure A-2) (adopted by the Planning Commission on September 6, 2000)*

**D-11**

During the Gaviota Creek Pipeline Lowering and Replacement project, the permittee shall minimize the amount of disturbed area and ensure that on site vehicle speeds do not exceed 15 miles per hour. **Plan Requirements:** This condition shall be printed on all construction drawings. **MONITORING**: EQAP monitor to spot check in the field. *(Mitigation Measure A-3) (adopted by the Planning Commission on September 6, 2000)*

**D-12**

For the Gaviota Creek Pipeline Lowering and Replacement project, soil stockpiled for more than two days shall be covered, kept moist or treated with soil binders to prevent dust generation. Trucks transporting fill material to and from the site shall be tarped from the point of origin. **Plan Requirements:** This condition shall be printed on all construction plans. **MONITORING**: EQAP monitor to spot check in the field. *(Mitigation Measure A-4) (adopted by the Planning Commission on September 6, 2000)*

**D-13**

For the Gaviota Creek Pipeline Lowering and Replacement project, heavy-duty diesel-powered construction equipment manufactured after 1996 (with federally mandated "clean" diesel

engines) shall be utilized wherever feasible. *(Mitigation Measure A-5) (adopted by the Planning Commission on September 6, 2000)*

    a. The engine size of construction equipment shall be the minimum practical size.
    b. The number of construction equipment operating simultaneously shall be minimized through efficient management practices to ensure that the smallest practical number are operating at any one time.
    c. Construction equipment shall be maintained in tune per the manufacturer's specifications.
    d. Construction equipment operating onsite shall be equipped with two to four degree engine timing retard or precombustion chamber engines.
    e. Catalytic converters shall be installed on gasoline-powered equipment, if feasible.
    f. Diesel catalytic converters shall be installed, if available.
    g. Diesel powered equipment should be replaced by electric equipment whenever feasible.
    h. Construction worker trips should be minimized by requiring carpooling and by providing for lunch onsite.

**MONITORING:** EQAP monitor to spot check in field. *(Mitigation Measure A-5) (adopted by the Planning Commission on September 6, 2000)*

## E.    GEOLOGY

### E-1.    Geologic Investigation, Design and Mitigation Program

Prior to the issuance of the Coastal Development Permit and Land Use Permit, the permittee will conduct a route-specific Geologic Investigation, Design, and Mitigation Program. This program shall contain three basic components: 1) a detailed geologic investigation component which defines specific hazards, 2) an engineering design component which details specific engineering plans for each identified hazard along the route, and 3) a geohazards mitigation component which demonstrates how and to what extent each hazard is reduced.

    a)    Detailed geologic investigation component:
    Where specific hazards have been identified or may occur along the pipeline route or at pump station locations, the permittee will conduct appropriate detailed geologic, seismic, and geotechnical studies to further characterize the specific geologic hazard. These studies will be conducted under the direction of a State of California registered geologist or engineering geologist who will be mutually agreed to by the permittee, the Planning and Development, the Public Works Department, and the Flood Control District. These studies will include but not be limited to investigations of unstable slopes, erodable slopes, lurch/liquefaction susceptible substrate, surface rupture, and river scour characteristics (depth and lateral extent). Methods of investigation shall conform to appropriate geotechnical techniques applicable to each specific hazard. Draft results will be subject to review by County Public Works Department and Flood Control Agency as appropriate prior to finalization of the engineering design. The final report will be submitted with the final engineering design component.

    b)    Engineering design component:
    The permittee will demonstrate that appropriate geotechnical information from component a) and other applicable recommendations are incorporated into final engineering design of pipeline construction and facilities. This includes but is not restricted to: the development of appropriate ground motion parameters for use in seismic design of critical structures and equipment, unstable slope construction or avoidance techniques, burial depth at all major river crossings, modification of instrumentation, or use of the dual contingency level/operating level earthquake concept, or its equivalent. The designs will be subject to

review by the Department of Public Works and third party technical review as specified in Condition P-1.

c) Geohazards mitigation component:
Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee will submit to the Planning and Development Department a detailed geologic hazard mitigation report. The report will outline the hazards identified in part a) of this program and will address how engineering designs as detailed in part b) of this program reduce each specific hazard. This component will also be submitted to the Department of Public Works and Flood Control Agency and will be subject to third party review as specified in Condition P-1.

## E-2.    Geologic Hazard Monitoring Program

PPC will develop a Monitoring Program for the operations phase to be funded by PPC and staffed as necessary with at least one State of California registered engineer, or engineering geologist, in order to evaluate any hazards identified by routine monitoring. The program will be designed to verify adequate performance or condition of the project components in hazard areas such as river and active fault crossings, and will be subject to approval of the Planning and Development Department prior to issuance of the Coastal Development Permit and Land Use Permit. The monitoring program may in part be incorporated into routine aerial and ground reconnaissance. If the monitoring indicates a potential or actual hazard, appropriate action including, but not limited to, operations curtailment and repairs, will be taken by PPC to mitigate the hazard. PPC will report to the Emergency Services Coordinator any potentially hazardous situations discovered during monitoring. In the case of river crossings at the Santa Ynez, Sisquoc and Cuyama Rivers, a yearly inspection of pipeline burial depth, subject to review by the Planning and Development Department and Flood Control Agency, shall be performed. At crossings of the Santa Ynez and Sisquoc Rivers where channel degradation has reduced the depth of cover to less than four feet below the 100-year scour depth, or other hazardous levels as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency, or US D.O.T. specifications, relocation or reburial of the pipeline to adequate depth will be required. At the crossing of the Cuyama River, if the inspections reveal that hazardous conditions exist, mitigations such as reconstruction or relocation of the crossing will be required as determined by a professional engineer on the staff of or under supervision of the County Flood Control Agency.

## E-3.    Inspection of Trench Prior to Pipeline Installation

Inspection of the pipeline trench or trench spoil to identify any potential geologic hazards shall be made by a professional geologist or soils engineer approved by the Planning and Development Department prior to installation of the pipeline. If hazards not previously accounted for in the pipeline design are encountered, appropriate mitigation measures will be developed and must be instigated prior to installation of the pipeline. The results of the inspection will be reported to the engineering geologist of the Public Works Department who will approve prior to, and the supervising environmental coordinator who will insure, application of the necessary mitigation measures. The timing of such inspections shall not result in any unreasonable delays in installation of the pipeline.

## E-4.    Isolation Valves at Active Fault Crossings

At all places where the pipeline crosses an active fault, according to the Department of Geology and Mining definitions, the permittee will place isolation valves on either side, or design and construct appropriate devices or measures which more effectively mitigate the hazard of the fault crossing. Location and nature of these designs must be approved prior to the issuance of the Coastal Development Permit and Land Use Permit.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 16

**E-5.    Sisquoc Pump Station Grading and Erosion Control Plan**

Prior to the issuance of the Coastal Development Permit and Land Use Permit, the permittee shall submit final Grading and Erosion Control Plans for the Sisquoc pump station approved by the Department of Public Works.  These plans shall be consistent with or based on information contained in the geologic investigation required in Condition E-1. Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall either submit Grading and Erosion Control Plans for the Las Flores and Gaviota pump stations for approval by the Department of Public Works or show evidence that the plans are a part of the overall Grading and Erosion Control Plans for the consolidated processing facilities at those sites.

**E-6.    Cooperation with San Luis Obispo County for Cuyama River Crossing**

The permittee shall cooperate as necessary with San Luis Obispo County in the permitting, design and construction of the Cuyama River crossing. Any pipeline crossing the Cuyama River shall be laid to a depth consistent with studies performed under Condition E-1 and subject to approval of the County Flood Control District.

**E-7.    South Coast Pump Stations Location**

Prior to approval of the Final Development Plan, the permittee shall commit to the location of their south coast pump stations to the satisfaction of the Planning Commission.  If these stations are not within the boundaries of the approved Exxon, Gaviota Terminal Company, or Chevron facilities, the permittee shall submit grading and erosion control plans pursuant to Condition E-5.

**E-8.    Stockpiling of Earth Materials During Construction**

Stockpiling of large volumes of earth materials in temporary (for construction only) work space areas in excess of those volumes needed locally for construction shall not occur except as approved by the Planning and Development Department. The permittee shall not stockpile materials on landslide prone slopes during the rainy season.

**E-9.    Storage of Pipe During Construction**

Storage of pipe in temporary (for construction only) extra work spaces shall not occur except as approved by the Planning and Development Department.

**E-10**

The permittee shall implement a project specific Restoration, Erosion Control and Revegetation Plan for the Gaviota Creek Pipeline Lowering and Replacement Project in order to minimize erosion. In addition, grading shall be minimized within the creek and along the creek bank and grading on slopes greater than 5:1 shall be designed to minimize surface water runoff. **Plan Requirements:** This requirement shall be noted on construction drawings prior to approval of CDP.  The applicant shall notify the Energy Division at least 48 hours prior to commencement of grading.  **MONITORING:**  EQAP monitor shall inspect the site during grading work to verify that erosion control measures are properly implemented. *(Mitigation Measure G-1) (adopted by the Planning Commission on September 6, 2000)*

**E-11**

The permittee shall limit excavation and grading to the driest season of the year to avoid the breeding season for California red-legged frog, tidewater goby, and the Southern steelhead migration season (July 1 to November 1) for the Gaviota Creek Pipeline Lowering and Replacement project, unless granted permission by the Energy Division.  All exposed graded

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 17

surfaces shall be reseeded with ground cover vegetation to minimize erosion. **Plan Requirements:** This requirement shall be noted on construction drawings. **MONITORING:** EQAP monitor shall inspect the site during grading to monitor dust generation and after grading to verify reseeding. *(Mitigation Measure G-2) (adopted by the Planning Commission on September 6, 2000)*

**E-12**

At Gaviota Creek, the permittee shall perform an as-built profile survey of the pipeline and creek bed and develop a profile drawing showing the pipeline and creek bottom. For the first two years after installation of the new pipeline crossing, the creek bed shall be surveyed each year at the end of the rainy season. After the first two years, PPC shall re-survey after every significant flood event (i.e., 100-year event or more serious), but not less than every three years. After each creek bed profile survey, the creek bed profile shall be shown on the original as-built profile survey. **Plan Requirements:** PPC shall submit surveys to Planning and Development's geologist for review and approval. **MONITORING:** Planning and Development shall review creek elevation records and site inspect as necessary. (*Mitigation Measure G-3) (adopted by the Planning Commission on September 6, 2000)*

**E-13**

At Gaviota Creek, the permittee shall visually inspect the status of restoration efforts and the erosion at the pipeline crossing at least quarterly, and as requested by State Parks or Planning and Development, after installation of the new pipeline crossing. (These surveys shall be conducted at ground level, not from the air.) **Plan Requirements:** Written inspection reports shall be submitted to the Energy Division within 30 days of the inspections and surveys. PPC shall take any necessary corrective actions required to stabilize disturbed areas, as approved by the Energy Division. **MONITORING:** EQAP monitor to periodically inspect the restoration effort. *(Mitigation Measure G-4) (adopted by the Planning Commission on September 6, 2000)*

**F.    SURFACE AND GROUNDWATER**

**F-1.    Downstream Flows During Construction**

During construction of the pipeline across all perennial stream crossings, stream flows, if any, shall be diverted around construction areas to maintain downstream flows. Baseline water flows shall be maintained in coastal streams in order to avoid adverse impacts to lagoon or other sensitive habitats.

**F-2.    Sediment Retention Devices During Construction**

Sediment retention devices that allow continued streamflow shall be installed directly downstream of stream crossings during construction.

**F-3.    Stream and River Crossings During Construction**

For pipeline crossings at the following stream or river crossings: Tajiguas; Refugio; Gaviota; Nojoqui; Zaca; San Antonio Creeks, all additional perennial streams which the pipeline crosses: Santa Ynez; Sisquoc; and Cuyama Rivers, the permittee shall construct the buried pipelines during the months of low historical streamflow, in order to minimize erosion loss downstream and protect surface water quality. In the event of low winter rainfall, earlier construction may be approved by the Planning and Development Department and County Flood Control Agency.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 18

**F-4.    Riparian Habitat Corridors During Construction**

No staging areas shall be permitted within riparian habitat corridors.

**F-5.    Construction Contractors at Stream Crossings During Construction**

During pipeline construction at stream crossings, construction contractors will minimize time of disturbance, narrow the construction ROW to the extent feasible, stabilize the disturbed areas immediately following construction of the crossing, and divert runoff waters around construction areas to maintain downstream flows.

**F-6.    Deleted.**

**F-7.    Isolation Valves at Perennial Stream and River Crossings**

The permittee shall install isolation valves on either side of all perennial stream and river crossings, including the Cuyama River, and/or as required by the Coastal Zoning Ordinance, unless the applicant can demonstrate that alternative methods will further reduce the potential leak impacts at the crossing site. These locations shall be identified prior to the Final Development Plan.

**F-8.    Freshwater Source During Construction**

Prior to approval of the Final Development Plan, the permittee shall identify the freshwater source considered for supplying pipeline and facility construction activities including hydrostatic test water, and shall estimate the total quantity required. Any water obtained from coastal or inland sources shall not significantly disrupt streamflows, groundwater resources, or habitat resources. Water conserving devices shall be used where feasible. Any water used during construction, (exclusive of hydrostatic test water), shall contain no more than 5,000 parts per million total dissolved solids. Disposal of hydrostatic test water within the County shall be according to a plan approved by the Regional Water Quality Control Board, or by the Flood Control Agency. This information shall be provided to and approved by the Planning and Development Department as part of the Final Development Plan.

**F-9.    Hydrogeologic Investigations for Sensitive Areas**

Prior to approval of the Final Development Plan, the permittee will perform detailed hydrogeologic investigations for the sensitive areas identified in the EIR/EIS, (Table 3-14). These investigations will be conducted by a State of California registered geologist or engineer and will include but not be limited to:

a)    definition of groundwater depth, recharge sources, properties of overlying soils, hydraulic gradient, background water quality, and existing water uses.

b)    inventory of existing wells from State or County Flood Control Agency records in an area extending down-gradient from the pipeline in the aquifer equal to the distance groundwater would move in one year at a velocity calculated from the maximum hydraulic conductivity of the specific aquifer, hydraulic gradient, and porosity. The down-gradient sensitive area will be determined by a registered geologist.

This information will be reviewed by the Planning and Development Department and used by the permittee to formulate the Groundwater Contamination portion of an Oil Spill Contingency Plan, Condition P-5. This portion of the Plan will include;

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 19

a)    plans for monitoring and early detection of groundwater contamination, including aerial and ground surveys, pipeline pressure monitoring, and water sampling of strategic wells;

b)    plans for notification of affected groundwater users, and the Emergency Services Coordinator;

c)    clean-up response, reparations, restorations, and methods to determine and correct the contamination source; and

d)    identification of emergency alternate water supplies.

## F-10.    Dam and Ditch Plugs in Pipeline Trenches by Aquifers

At the base of slopes where the ROW approaches sensitive aquifers as identified in the EIR/S that are at risk from oil spills and leaks, a dam or ditch plug will be used in the pipeline trench. The sensitive areas are those where the ROW follows 1) topographic slopes toward basins with shallow depth to water, 2) high vertical permeabilities, and 3) a high degree of groundwater use as indicated by the hydrogeologic investigations required as per condition F-9. These areas shall be identified in the Final Development Plan.

## F-11.    SSRRC Approval for All Creek and River Crossing Plans

Prior to the approval of the Final Development Plan, the System Safety and Reliability Review Committee shall review and approve submitted plans of all creek and river crossings in Santa Barbara County. Permitted development shall not cause or contribute to flood hazards or lead to the expenditure of public funds for flood control works.

## G.    AQUATIC BIOLOGY

## G-1.    Oil Spill Response Plan

Fueling and lubrication of construction equipment will not occur within 0.25 miles of any flowing streams. No more than 2 barrels of fuel shall be kept at construction sites, exclusive of pipeline construction equipment fuel tanks, within 0.25 miles of all perennial creeks. As part of the oil spill response plan, the permittee will submit plans for clean-up and restoration of affected areas in the event of a construction fuel spill.

## G-2

For the Gaviota Creek Pipeline Lowering and Relocation project, all construction and grading plans shall show the precise location of the environmentally sensitive habitats within the project vicinity. **Timing:** The ESH areas should be designated on all plans prior to CDP approval. **MONITORING:** Planning and Development staff to check plans. *(adopted by the Planning Commission on September 6, 2000)*

## G-3

For the Gaviota Creek Pipeline Lowering and Relocation project, during construction, washing of concrete, paint or equipment shall occur only in areas where polluted water and materials can be contained for subsequent removal from the site. Washing shall not be allowed near sensitive biological resources. An area designated for washing functions shall be identified. **Plan Requirements:** The applicant shall designate a wash off area, acceptable to Planning and Development, on the construction drawings. **Timing:** The wash off area shall be designated on all plans prior to CDP. The washoff area shall be in place throughout construction. **MONITORING:** Planning and Development staff shall check plans prior to approval of CDP

and the EQAP monitor shall site inspect throughout the construction period to ensure proper use. *(Mitigation Measure B-2) (adopted by the Planning Commission on September 6, 2000)*

## H.  TERRESTRIAL BIOLOGY

### H-1.  Restoration, Erosion Control and Revegetation Plan

### H-1(j) modified 12/16/92

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall submit a Restoration, Erosion Control, and Revegetation plan for the final proposed pipeline route and the pump station sites.  The plan shall be submitted to the Planning and Development Department for approval.  Once approved, the plan shall be implemented by the permittee. Success of the restoration and revegetation plans shall be monitored by a qualified independent biologist who is in addition to the managing environmental coordinator (Condition C-1).  The plan shall contain, but not be limited to, the following:

(a)  Procedures for stockpiling and replacing topsoil, replacing and stabilizing backfill, such as at stream crossings, and steep or highly erodable slopes.  Additionally, provisions shall be made for recontouring to approximate the original topography. Excess fill shall be disposed of off-site unless suitable arrangements are made with the property owner. Excess fill shall not be deposited in any drainage, or on any unstable slope.

(b)  Specific plans for control of erosion, gully formation, and sedimentation, including, but not limited to, sediment traps, check dams, diversion dikes, culverts and slope drains.  Plan shall identify areas with high erosion potential and the specific control measures for these sites.

(c)  Procedures for containing sediment and allowing continued downstream flow at stream crossings, including scheduling construction activities during low-flow periods.

(d)  Procedures for re-establishment of vegetation that replicates or is functionally equivalent to indigenous and naturalized communities along the alignment.  These shall include: measures preventing invasion and/or spread of undesired plant species; restoration of wildlife habitat value; and restoration of native plant species and communities.  The permittee shall consult with the County Farm Advisor and appropriate Ranch operators when developing procedures for revegetating areas used for cattle grazing and other agricultural uses;

(e)  Procedures for restoration of riparian corridor stream and river banks and stream bed substrates and elevation;

(f)  Procedures for minimizing all tree removal or tree root and branch damage, such as, flagging the corridor, keeping all disturbance to no more than the 100-foot pipeline right-of-way, feathering the right-of-way edges, providing for onsite monitoring of construction by a qualified independent biologist.  In addition, special procedures are required for oak woodlands since County policy requires that these trees must not be cut down if feasible.  Special procedures for oaks include reducing the right-of-way to the minimum width possible and minimizing the impact to the root zone of these trees;

(g)  Procedures for replacement of native trees and large shrubs removed from the 100-foot temporary easement during construction across riparian and woodland, in particular oak woodland, habitat, with saplings of the same species propagated from materials obtained from the same area, including provision for supplemental irrigation as necessary and feasible to ensure establishment, and provisions for protection of saplings from grazing animals;

(h)  A soil conservation program, to be applied in areas of 20 percent or greater slopes along the pipeline corridor.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 21

    (i)    Procedures for incorporating landowner concerns in the plan. Any changes to the plan instigated by such concerns shall be approved by the Planning and Development Department.

    (j)    The permittee shall provide an endowment in the amount of $841,000 to fund implementation of the Alternative Oak Mitigation Program to reestablish oak savannahs and woodlands in Santa Barbara County. (Modified 12/16/92)

    (k)    The segment of the plan pertaining to Gaviota State Park shall be prepared in cooperation with the State Department of Parks and Recreation.

## H-2.  Impact Survey One Year After Construction

One year after construction, a survey will be conducted, at the permittee's expense, to determine the actual impact caused by construction. This survey shall include aerial photography, and as appropriate color stereo and infrared photography and field studies. The report will identify areas with potential for further impact, e.g., high erosion areas, that will require immediate remedial measures. The survey shall also contain an examination of previous mitigation measures and present a list of additional feasible mitigations based on the impacts during construction and potential impacts caused by operation. The permittee and the Planning and Development Department shall agree to additional feasible mitigations. This process shall be repeated as often as necessary by the Planning and Development Department, but not more than annually.

## H-3.  Sensitive Habitat Areas

In those areas where trees and other habitats such as riparian areas and oak woodlands are to be avoided within the approved corridor and temporary (for construction only) extra work spaces, the permittee shall assure contractor compliance with this condition by marking and/or fencing those resources. These areas include, but are not limited to, the sensitive resources identified by the permittee and depicted on the 1" = 400' color aerial print photographs provided by the permittee and the Environmentally Sensitive Habitat (ESH) areas identified by the Planning and Development Department. The permittee shall avoid disturbance to the tarplant restoration site established by Texaco on State Park property.

## H-4.  Additional Mitigation

Additional reasonable and feasible conditions of mitigation, consistent with condition H-1 and to the extent necessary, shall be identified and observed as developed during the archaeological mitigation program (conditions L-1, L-2, L-3, L-6), and as identified by the managing environmental coordinator in consultation with the permittee's Onsite Construction Representative (condition C-1).

## H-5.  Deleted.

## H-6.  Herbicides During Construction

The permittee shall not use herbicides in wetland and riparian areas, and along the rest of the pipeline corridor during construction.

## H-7.  Fish and Game Permit (1603)

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall receive a permit (1603) as required from the California Department of Fish and Game. This permit should include provisions to ensure that the proposed construction schedule will not

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 22

interfere with reproductive activities of regionally rare or rare, threatened or endangered bird, amphibian, and fish species or other species of special concern, in those environmentally sensitive habitats identified in the EIR/EIS and shall submit this confirmation to the Planning and Development Department.  If the Department of Fish and Game determines that the construction schedule will have an impact then the permittee will adhere to directives of the Department of Fish and Game with respect to their permit requirements.

**H-8.    Deleted.**

**H-9.    Hoffman's Nightshade Plan**

The permittee shall minimize impacts to the population of Hoffmann's nightshade (*Solanum xanti var. hoffmannii*) found in the Gaviota Pass area.  The permittee shall submit plans to enhance the recovery of this population to the Planning and Development Department for approval prior to issuance of the Coastal Development Permit and Land Use Permit.

These plans shall include provisions for removing any individual plants that would be affected, place them in large tubs, and replant them as near as possible to the original location (exclusive of the operation Right-of-Way) after construction; and gathering seeds prior to issuance of the Coastal Development Permit and Land Use Permit from the population of Hoffmann's nightshade located in the Gaviota Pass area and planting them in and near the ROW after construction.  This shall be done under the supervision of a biologist approved by the Planning and Development Department and in cooperation with the California Parks Department; this biologist may approve modifications to these techniques based on season of the year and state of dormancy.

**H-10.   Catalina Mariposa Lily Plan**

The permittee shall minimize impacts to the population of Catalina Mariposa lily (*Calochortus catalinae*) found in the Gaviota Pass area.  The permittee shall submit plans to enhance the recovery of this population to the Planning and Development Department for approval prior to issuance of the Coastal Development Permit and Land Use Permit.  These plans shall include provisions for gathering of seeds from the population found in or near the ROW prior to construction, planting the seeds in or near the ROW after construction (exclusive of the operation ROW), conserving the upper 18-24 inches of heavy clay soil which contains the plant's bulb-like corms found in the vicinity of the plants prior to construction, and then, after construction, replacing this soil which holds the plant's bulb-like corms. This shall be done under the supervision of a biologist approved by the Planning and Development Department and in cooperation with the California Parks Department; this biologist may approve modifications to these techniques based on season of the year and state of dormancy.

**H-11.   Refugio Manzanita Plan**

The permittee shall minimize impacts to the population of Refugio Manzanita (*Arctostaphylos refugioensis*) found in Gaviota Pass area and affected by the proposed construction activities.  The permittee shall submit plans to enhance the recovery of this population to the Planning and Development Department for approval prior to issuance of the Coastal Development Permit and Land Use Permit.  These plans shall include provisions for gathering seeds and taking cuttings from the population of Refugio Manzanita found in and adjacent to the ROW prior to construction, and provisions for the planting of the seeds and plants propagated from cuttings in the final construction alignment (exclusive of the operation ROW) after construction.  This shall be done under the supervision of a biologist approved by the Planning and Development Department and in cooperation with the California Parks Department; this biologist may approve modifications to these techniques based on season of the year and state of dormancy.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 23

## H-12.  Restoration, Revegetation and Implementation Plan

The permittee shall prepare a Restoration, Revegetation and Implementation section as part of the Oil Spill Contingency Plan (P-5).  The section shall be reviewed and accepted prior to start-up by the Planning and Development Department and a biologist approved by the Planning and Development Department.  The section shall be submitted sufficiently prior to the permittee's projected start-up date so as to allow reasonable time for staff review.  Reasonable costs of review shall be borne by the applicant.  The section shall contain site-specific restoration information for all habitat types including stream crossings, wetlands/lagoons, oak woodlands, grasslands, riparian zones, and other environmentally sensitive habitats.  The section shall be divided into three major areas: a) Coastal, b) Streams and Rivers and c) Terrestrial habitats.  Each of these sub-sections shall discuss the various habitats in the categories listed above.  Methods to achieve restoration of all affected areas to their prespill conditions shall be discussed.

## H-13.  Pump Station Landscaping

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall submit to the County Board of Architectural Review, and the Planning and Development site-specific plans for landscaping of any pump station not within other required project vegetation screens.  This plan shall, at the permittee's expense, be reviewed by a qualified landscape architect and a biologist approved by the Planning and Development Department to insure the proper plant materials and procedures identified in these conditions are implemented.  These plans shall be developed in consultation with the property owner.  The plan shall include:

(a)     The specifications of any potential seed mixtures to be utilized, including the plant species in the mixture and the pounds of seed per acre to be applied; type of mulch (fiber, chemical tackifier or straw); the type and amount of fertilizer; and any provisions for irrigation;

(b)     Confirmation that all native or non-native plant materials proposed in the revegetation plan are compatible with indigenous vegetation and that none of the plants used is known to be weedy or invasive.  The plan shall provide for plantings that will screen facilities from view.  This vegetation screening shall also be designed to reduce nighttime lighting and noise.  Near chaparral or other high fire hazard areas, the seeds or seedlings will consist of native or non-native species, shown to contain fire retardant properties (such as toyon) and shown to be fast growing;

(c)     The specifications for native seeds and seedlings that will have wildlife habitat and food value. All perennial plants, and all woody plants are to be propagated from material obtained from the same area.  Native plant material is to be obtained from a revegetation contractor. All native materials will be ordered from the contractor in advance of construction activities.

(d)     Confirmation that non-native material is to be confined to disturbed areas immediately adjacent to structures needing visual screening.  Such screening is to include fast growing plants adequate to screen the facility from direct view;

(e)     A detailed irrigation plan if feasible for all revegetated areas requiring irrigation for establishment of plant materials;

(f)     The permittee's commitment for continual monitoring of the revegetation so that weeds will be minimized.

## H-14.  Landscaping and Revegetation Bonds

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall post a bond or other security agreement approved by the County Counsel to ensure that all landscaping and revegetation programs are completed to the County's specifications.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 24

### H-15.  Release of Landscaping and Revegetation Bonds

Prior to issuing a release from the bond or other security agreement, a biologist and landscape architect hired by the County, at the permittee's expense, shall conduct a field review of all revegetated and landscaped areas, to insure consistency with the intent and specifications of the revegetation and landscape plan.  Necessary repairs or changes in landscaping or revegetation shall be made at the permittee's expense.

### H-16.  California Endangered Species Inventory

Prior to approval of the Final Development Plan, a qualified biologist approved by the Planning and Development Department will conduct site-specific field inventories for California state-listed species, as mandated by the intent and general provisions of Assembly Bill No. 3309, the California Endangered Species Act.  The biologist will perform the surveys of the 100-foot ROW in areas suspected of having any of the species of special concern as identified in Appendix B Table B-6, DEIR/S, except for the peregrine falcon, least Bell's vireo, and Parish's sidalcea.  Surveys for these species will be conducted prior to construction.  The California Department of Fish and Game will be consulted concerning appropriate methods for survey as well as appropriate mitigation measures if these species are found on the ROW.  Additional mitigation shall be developed and executed by the permittee-based on these surveys if determined necessary by the Planning and Development Department.

### H-17.  Raptor Nesting Habitat Survey

Prior to issuance of the Coastal Development Permit and Land Use Permit, a wildlife biologist approved by the Planning and Development Department will survey all potential raptor nesting habitats within 0.5 miles of the pipeline, to identify active and inactive nests and potential perch sites cleared by ridge-top construction.  No construction will occur within 0.5 miles of active eyries during nesting season as determined by the biologist. Construction may be permitted by the Planning and Development Department in consultation with the biologist near inactive nests provided nest sites are not disturbed.  Where deemed necessary by the California Department of Fish and Wildlife biologists, raptor perch or roost trees will be avoided and/or artificial roosts will be constructed on ridgelines to mitigate losses of such trees resulting from clearing the ROW on ridge tops.

### H-18.  Construction ROW Through Riparian Habitats

The permittee shall limit the width of the construction ROW through all riparian habitats to the extent feasible. The permittee shall submit a plan indicating the location and size of the construction ROW through all riparian habitats.  These plans shall be approved by the Planning and Development Department prior to the Final Development Plan.

### H-19.  Construction ROW Designed to Avoid Trees

The construction ROW shall be routed to avoid trees to the maximum extent feasible.  When this is not possible, dying or diseased trees shall be removed preferentially over healthy trees.

### H-20.  Suey Canyon Oak Woodland

The permittee shall minimize impacts to the oak woodland in the Suey Canyon area.  This shall be done by using existing disturbed areas and by narrowing the construction corridor to the extent feasible by working on top of the spoils pile or selectively removing spoils, selectively removing

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 25

trees (e.g. dying, or diseased trees) and revegetating to enhance re-establishment of oak saplings and/or similar mitigation.

**H-21.  Los Alisos Creek Crossing**

The permittee shall align the pipeline route in the vicinity of the Los Alisos Creek crossing in order to minimize the amount of riparian habitat disrupted.

**H-22.  Parish's Checkermallow Field Survey**

Prior to the issuance of the Land Use Permit, a qualified biologist approved by the Planning and Development Department shall conduct a site-specific field survey for the Parish's checkermallow along the approved right-of-way in potential habitat areas in the North County.  Should any individuals be found along the right-of-way, the permittee shall employ mitigation measures approved by the Planning and Development Department to enhance the reestablishment of the species along the ROW (e.g., transplanting individuals).

**H-23.  Gaviota Tarplant Plan**

The permittee shall minimize impacts to the population of Gaviota tarplant (*Hemizonia increscens* ssp. *villosa*) found in the Gaviota area. The permittee shall submit a plan to enhance the recovery of this population to the Planning and Development Department for approval prior to issuance of the Coastal Development Permit. This plan shall include provisions for ensuring the preservation of the current seed crop and seed stored in topsoil (seed bank) onsite. This shall be done under the supervision of a biologist approved by the Planning and Development Department.

**H-24.  Restoration of Construction Work Areas**

Impacts to existing vegetation within the temporary (for construction only) extra work space areas shall be minimized to the extent feasible.  All disturbed areas, including temporary extra work spaces, shall be restored and revegetated pursuant to the permittee's approved Restoration, Erosion Control, and Revegetation Plan (Condition H-1).  Any grading of the temporary extra work space areas will require a separate Coastal Development Permit.

Use of the temporary (for construction only) extra work space areas on slopes greater than 30 percent shall be limited to spoil placement.  Right-of-way restoration and revegetation on slopes greater than 30 percent shall be initiated immediately upon completion of pipeline installation.

**H-25**

The permittee shall implement a project specific revegetation and restoration plan for the Gaviota Creek Pipeline Lowering and Replacement project. The plan shall include, but not be limited to the following measures:

- Landscaping in the riparian corridor shall consist of native riparian species including willow (*Salix lasiolepis, S. laevigata*), mule fat (*Baccharis salicifolia*), wild blackberry (*Rubus ursinius*), California wild rosa (*Rosa californica*) at a minimum density of 3 feet on-center. Planting stock shall be obtained from the Gaviota Creek drainage.
- The new plantings shall be irrigated as necessary to promote establishment.
- Plantings shall be fenced or otherwise protected from browsers as deemed necessary by the EQAP monitor.
- Non-native species including tree tobacco (*Nicotiana glauca*), castor bean (*Ricinus comunis*), mustard (*Brassica sp.*), star thistle (*Centaurea sp.*) shall be removed from the creek within the project area.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 26

- Upland areas disturbed by construction shall be recontoured to pre-existing conditions (to the extent feasible) and revegetated consistent with the Restoration, Erosion Control and Revegetation Plan approved for the original pipeline project.

The plan shall include pre-established performance criteria to be used in final evaluation for bond release. **Plan Requirements:** Prior to CDP approval, the applicant shall submit the revegetation and restoration plan, prepared by a Planning and Development approved biologist, to Planning and Development for review and approval. The $350,000 performance bond already in place for the original project shall cover performance security for the project. **Timing:** The plan must be approved prior to CDP approval. Revegetation and removal of non-natives shall be done so as to coincide with the onset of seasonal rainfall. **MONITORING:** Planning and Development staff shall site inspect for restoration. Maintenance shall be confirmed through site inspections. *(Mitigation Measure B- 1 and V-1) (adopted by the Planning Commission on September 6, 2000)*

**H-26**

The permittee shall comply with the mitigative provisions of the following documents:

- NMFS Biological Opinion, December 31, 1998
- USFWS Biological Opinion, January 15, 1999
- ACOE Nationwide Permit, February 22, 1999
- CDF<u>WG</u> Streambed Alteration Agreement, March 26, 1999
- NMFS Biological Opinion, May 31, 2000

These permits and mitigation measures are considered part of the project description. **Plan Requirements:** These conditions shall be printed on all construction plans. **MONITORING:** P&D staff to ensure compliance with other agency permits. EQAP monitor to spot check in the field. *(Mitigation Measure B-3) (adopted by the Planning Commission on September 6, 2000)*

**I.   SOCIOECONOMICS**

**I-1.   Oil and Gas Industry-Wide Monitoring and Mitigation Program**

The cumulative impacts of oil and gas industry projects are expected to be significant to Santa Barbara County. Therefore, the permittee shall participate in an oil and gas industry wide monitoring and mitigation program to address socioeconomic impacts identified as significant environmental impacts attributable to their project. For projects such as pipelines, only the construction phase is expected to cause significant impacts, and the permittee's participation in the program shall be limited to that phase. The criteria for allocating the costs of the monitoring and mitigation program and its mitigation requirements will be uniformly applied to all industry participants.

The intent of this program is to obtain realistic information regarding impacts identified in the EIR/EIS, and to allow impacted jurisdictions to require mitigation for project-related impacts. Mitigation of impacts through other planning programs, and/or through existing administrative infrastructure shall be taken into account. The scope of this program is detailed below. As subsequent details in the structure of the Program are developed by the County, such details shall supersede portions of this condition as appropriate.

The purpose of the Monitoring and Mitigation Program is to accurately assess the impacts of the permittee's proposed development, including those in the following socioeconomic areas:

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 27

a.    Temporary housing needs, particularly demand for state and other park campsites, recreational vehicle parks, motel-hotel rooms and rental housing;
b.    Longer term (more than one year) housing needs, particularly low and moderate income housing needs, and associated water demands, south coast Santa Barbara County;
c.    Public finance;
d.    Transportation of workers and materials to and from the site.

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by the permittee exceed the valuation of the impacts at issue, the permittee shall be granted a credit against any other current or future mitigation fees imposed on the permittee for this permit by the County. The permittee shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

The Monitoring and Mitigation Program will be administered and staffed by the County of Santa Barbara, Department of Regional Programs. A Technical Advisory Committee will provide assistance and input in the documentation of significant adverse impacts and proposals to mitigate these significant impacts.

The Technical Advisory Committee will be composed of:  two representatives from Santa Barbara's cities appointed by the Mayor's Select Committee and representing north and south county interests; one representative (each) from San Luis Obispo and Santa Barbara counties; and one representative from each affected oil and gas company (to the number of representatives agreed upon). The permittee will be included in the committee until the permittee submits its resignation.

In the event of unresolved technical issues in the area of methodology and calculation of socioeconomic impacts, there shall be a Technical Arbitration Group.  The Technical Arbitration Group shall be composed of three individuals without ties to either the County or the permittee, one to be selected by the County Board of Supervisors, one selected by the oil and gas company representatives and the final member selected by the first two members.  All Technical Arbitration Group decisions shall be appealable upon written request to the Board of Supervisors.  Subsequent details on voting procedures and conflict resolution will be proposed by the Department of Regional Programs and reviewed by the Board of Supervisors in a noticed public hearing.

Prior to approval of the Final Development Plan for this project, the monitoring and mitigation program will be refined.  Based on information in the EIR/EIS and on other data as appropriate, practical thresholds which trigger the necessity for mitigation will be developed and adopted by the Department of Regional Programs with input from the Technical Advisory Committee.  These thresholds will recognize the normal growth incorporated in County plans, prior and existing industry activity, and the decline of the industry if no further permitting is allowed. Methodologies used to establish thresholds and impacts will be developed in consultation with the Technical Advisory Committee.

The need for mitigation will be determined when threshold levels are exceeded as shown by monitored activities and other data as appropriate.  The Department of Regional Programs will recommend a mitigation action to the County Board of Supervisors. The Technical Advisory Committee will assist in making the assessment and recommendations. The monitoring and mitigation program will continue through all stages of construction.

The monitoring, impact and mitigation elements of the program would be equivalent to those described in the Chevron Gaviota Project conditions, but modified as appropriate for the nature of the pipeline project.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 28

**I-2.    Housing for Temporary Construction Workers**

Prior to approval of the Final Development Plan, the permittee shall submit to the County Department of Regional Programs a plan which details how they plan to house temporary construction workers for every month of construction.  This plan, to be implemented by the permittee, shall demonstrate how the permittee plans to reduce the housing impacts identified as part of the plan; e.g. exactly how much housing is needed, where it is needed and for how long; but not limited to, the following examples:

(a)    Use of existing under-utilized hotel/motel space during the months of September through May to provide for temporary living quarters for direct construction workers by month; identification of incentives to all the direct construction workers such as rent subsidies and/or shuttle service to the site.

(b)    Use of any available housing outside the South Coast area for all workers associated with the project during the summer months when visitor-serving facilities in the South Coast area are at capacity.  Incentives for workers shall be identified such as rent subsidies and shuttle service for all workers commuting to the job site.

(c)    Methods to limit worker use of public campgrounds as living quarters.  If it cannot be shown that the impact will be reduced from the estimate, the permittee shall make a donation to the California State Parks or to Santa Barbara County Parks for the development of new campsites to offset their worker use of campsites.  The donation shall be made prior to receipt of the building permit and determined by multiplying the estimated cost per developed campsite times 15.  If it is shown by the Regional Programs Department and the Technical Advisory Committee that there is significant impact, the above-mentioned groups shall propose mitigation.

At any point when the Board of Supervisors determines that the monitoring program demonstrates that previous mitigation funds paid by the permittee exceed the valuation of the impacts at issue, the permittee shall be granted a credit against any other current or future mitigation fees imposed on the permittee for this permit by the County. The permittee shall be entitled to accrued interest at the prevailing legal rate which shall continue to accrue until the credit is used.

**I-3.    Construction During Peak Tourist Seasons**

The pipeline construction period will be scheduled so as not to coincide with peak tourist seasons within each construction area in Santa Barbara County, provided that this scheduling does not interfere with any other conditions in this permit with respect to timing, in particular requirements regarding construction during stream and river low-flow.  If such a conflict is found, than additional measures must be taken to provide the temporary housing needs for construction workers.

**I-4.    Deleted.**

**I-5.    Utlization of Local Labor**

The permittee shall include provisions in its contractor agreements specifically to encourage and promote employment from local labor so as to reduce the impacts associated with the in-migration of workers.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 29

**I-6.    Project-Related Utilities and Services**

Except as otherwise provided herein, if the Socioeconomic Monitoring Program shows that project-related revenues will not compensate for needed capital or operating expenditures necessary to provide project-related utilities and services additional mitigation will be required.

**I-7.    Distributing Oil Related Revenues**

In the event that state and/or federal revenue sharing legislation directed at distributing oil related revenues to state or local governments is approved or Santa Barbara County levies a tax (special or otherwise) on oil and/or gas processed or transported under this permit, then any condition herein requiring payments or other items of value by the permittee to Santa Barbara County or any political subdivision thereof shall automatically be suspended pending a review by the County to determine the extent, if any, which the tax, revenue sharing, or any of the fees imposed are duplicative or unwarranted either as to the level of government services provided or the level of burdens imposed on the public.

**J.    LAND USE AND RECREATION**

**J-1.    Property Owner Notification of Construction**

Prior to construction, the entire pipeline ROW corridor shall be prominently staked.  All affected property owners along the pipeline route shall be notified in writing at least 30 days prior to the commencement of any pipeline construction on their property, and at least 15 days in advance of any deviation from the staked corridor which crosses their property.

**J-2.    Mainline Pipeline Construction Time Lines**

All mainline pipeline construction activities except river, perennial coastal stream, and ESH area crossings as specified in condition H-7, once started, shall proceed in a diligent and expeditious manner and shall be completed within nine months after the starting date, subject to necessary and/or unanticipated time extensions approved by County, in consultation with affected property owners.

**J-3.    Pipeline Construction Work Hours**

Pipeline construction activities shall be limited to the period between 7 a.m. and 7 p.m., Monday through Saturday.  Except for emergency services, construction activities shall not take place on Sundays, the dates generally recognized for Memorial Day, July 4, Labor Day, or any other similarly recognized holiday, unless previous arrangements have been made with the affected property owners.

**J-4.    Privacy and Security of Property Owners During Construction**

Prior to approval of the Final Development Plan, the permittee shall consult with affected property owners to develop reasonable and mutually satisfactory controls for maintaining the privacy and security of affected properties while construction is in progress.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 30

**J-5.    Property Owner Notification of Construction Within 48 Hours**

Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners, the permittee shall provide affected property owners written notice at least 48 hours prior to the start of construction on their property, which shall include:

a)    Description of vehicles using roads on the property, including type, size, identification, proposed times of entry and departure, destinations, and the intended route to the destination.   (Fire, medical, or similar emergency vehicles can enter as necessary.) Significant changes in the schedule of construction-related vehicular traffic shall be allowed within the 48-hour advance noticing subject to direct communication (e.g. telephone, personal communication) by the permittee with the affected property owners;

b)    Description of estimated construction schedule across the property.   Any blasting necessary during construction shall be noticed to all property owners within a one mile radius of the blasting area;

c)    Description of times of limited access through and across the property, such as road closures on the property, indicating specific location, time and duration of the limited access or closure.   Road closure is considered to include partial road blockage or disturbance.  Suitable vehicular by-pass shall be provided during all closures;

d)    Description of any probable hazard or other unsafe condition during the pipeline construction period, indicating the nature of the hazard, the area in which the condition will occur, and the time and duration of the activity. The permittee and its contractors shall take prompt and adequate action to correct any hazard or damage that does occur during construction, and shall provide appropriate noticing as per other parts of this condition;

e)    Description of helicopter and/or vehicle reconnaissance schedules for pipeline maintenance, indicating times, stops, and duration. The permittee shall establish and enforce appropriate rules for its personnel and its contractors to assure that they will not be in the area except when necessary to carry out construction, inspection, repair and maintenance activities, or emergency services;

f)    Description of schedule for cutting any fences or similar barriers during pipeline construction.

**J-6.    Deleted.**

**J-7.    Property Owner's Fences/Barriers During Construction**

Unless easements have been obtained from affected property owners or unless otherwise agreed to by affected property owners if and when fences or other similar barriers must be cut during pipeline construction, the permittee shall provide advance notice to the affected property owner, and shall replace the function of the cut fence before the cut is made to the satisfaction of the property owner, and the permittee and its contractors shall restore all fences that have been cut, moved, or damaged to at least their condition prior to pipeline construction, except that gates or similar structures may be added as approved to provide access.

**J-8.    Utility Lines and Services During Construction**

Interruption of telephone, electrical power, water or other utility services shall be minimized to the extent feasible during the pipeline construction period. The permittee, or its contractors, shall contact each property owner or the appropriate utility regarding the location of utility lines, and all such utility line locations shall be staked by the permittee or its contractors prior to the start of construction on the affected property.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 31

**J-9.    Compliance with All Applicable County Statutes, Etc.**

During the pipeline construction period in the County, the permittee and its contractors shall comply fully with all applicable statutes, ordinances, rules and regulations, including traffic regulations, of the County.

**J-10.   Proof of ROW Prior to Construction**

Prior to entering upon any parcel of property for purposes of commencing construction, the permittee shall demonstrate to the Planning and Development Department that it has obtained a right-of-way for such parcel or otherwise has obtained the right to enter the property for purposes of constructing the pipeline.

**J-11.   Restricted Use of ROW After Construction**

Following installation of the pipeline, use of the right-of-way is restricted to operational maintenance of the pipeline except where expressly permitted by the easement or landowner and consistent with other regulations and conditions.

**J-12**

The permittee shall implement the sign plan approved by State Parks, and dated August 11, 2000, prior to beginning work on the Gaviota Creek Pipeline Lowering and Relocation project. **MONITORING:** EQAP monitor to check in field. *(adopted by the Planning Commission on September 6, 2000)*

**K.    TRANSPORTATION**

**K-1.    Worker Transportation Program**

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall submit to the Planning and Development Department and the Department of Public Works, Road Division a worker transportation program designed to minimize traffic-related impacts. The plan shall identify on- and off-site parking areas, access routes, shuttle program to reduce number of working vehicles on and along pipeline construction corridor, measures to avoid traffic conflicts with residents using all roads affected, number of vehicles accessing the facilities sites and incentives for ride-pooling/van-pooling to the sites. Construction worker traffic and parking shall not interfere with normal and reasonable uses of private property or recreational areas. This Construction Traffic Mitigation Plan shall be submitted by the permittee and approved by County prior to initiation of construction. The program must consider both the permittee employees and contractors.

**K-2.    Permanent Parking Areas at the Pump Stations**

Any new permanent parking areas at the pump stations shall be screened from public view pursuant to the landscape plan approved by the Board of Architectural Review.

**K-3.    Engineering Plans for All Pipeline Crossings of County Roads**

The final engineering plans and procedures for all pipeline crossings of County roads must be approved prior to issuance of the Land Use Permit and Coastal Development Permit by the Department of Public Works. Notification of such approval must be submitted to the Planning and Development Department prior to construction at the site.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 32

### K-4.  Pipeline Construction Activity Limited to ROW

All pipeline construction activity, except ingress and egress along routes approved by the Planning and Development Department and in consultation with affected property owners, shall be limited to the final staked right-of-way on the final approved pipeline route.  Use of any private roads or other areas shall be allowed only after advance approval from the affected property owners.

### K-5.  Mitigation Plan for Impacted County Roads

Prior to the Final Development Plan, the permittee must submit to the Public Works Department for approval a plan to mitigate impacts to all County roads which will be used during construction. This plan will include the type of vehicles and machinery which will traverse the roads, the frequency of road use for each piece of equipment and vehicle, and the gross vehicle weights loaded and unloaded. This includes the above information for trucks carrying pipe, fuel, construction supplies, or construction crews through the County to the construction spreads.  This plan shall include an agreement with the County to repair any obvious damage to the satisfaction of the Public Works Director and any reasonable fees associated with eventual reconstruction caused by project-related damages of the public roads. Prior to drafting this agreement, County shall coordinate with the permittee in compiling a list of County roads which will be used for construction of the pipeline. The permittee shall demonstrate property owner (or Court) approval of private road maintenance plans or terms on privately owned parcels to the Planning and Development and Public Works Department prior to entering upon said parcels for purposes of commencing construction.

### K-6

If repairs are necessary to roads used by construction equipment for the Gaviota Creek Pipeline Lowering and Relocation project, the permittee shall either complete the repairs or provide funding as determined by State Parks, County Public Works or Caltrans. **MONITORING:** EQAP monitor to visually inspect roads before and after the construction period. *(adopted by the Planning Commission on September 6, 2000)*

### K-7

The permittee shall provide workers at the access road gate and the work site to manage traffic by radio for the duration of the Gaviota Creek Pipeline Lowering and Relocation project.  The permittee shall coordinate with PAPCO/PANGL and any subcontractor normally requiring access to the site. **MONITORING:** EQAP monitor to check in field. *(adopted by the Planning Commission on September 6, 2000)*

### L.  CULTURAL RESOURCES

### L-1.  Cultural Resources Surveys Plan

Prior to approval of the Final Development Plan, the permittee shall submit a plan detailing the methods for the Phase I (walkover) and Phase II (site importance assessment) cultural resources surveys.  In addition, the permittee shall submit all Phase I cultural work completed to date.  These reports shall be approved by the Planning and Development Department as part of the Final Development Plan. Prior to issuance of the Land Use Permit and Coastal Development Permit, the permittee shall complete Phase I and Phase II cultural resource surveys for the entire route.  The results of these surveys shall be approved by the Planning and Development Department prior to issuance of said permits. The permittee shall avoid to the maximum extent feasible all known cultural resource sites along the pipeline route unless safety (e.g. seismic or engineering practices) considerations or sensitive biological habitats preclude avoidance.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 33

## L-2.  Cultural Resources Mitigation Plan

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee, in consultation with the Native American Community, shall commence the cultural resources mitigation plan, in accordance with CEQA Appendix K, County approved Prehistoric Archaeological Guidelines, and section 4.1.1.11, Cultural Resources, of the EIR/EIS. Implementation of the mitigation plan shall proceed on an expeditious and effective schedule in order to minimize or to avoid conflicts with other construction scheduling requirements delineated in other permit conditions.  The main components of the mitigation plan shall include:

a)  Selection of a qualified archaeologist by the County Resource Management Department in consultation with Native American representatives.  The archaeologist shall be available on an as-needed basis through the completion of pipeline construction.  The archaeologist shall be funded by the permittee and shall be responsible to the County Planning and Development Department.  Compensation shall cover all excavation, analysis, and report preparation for all areas investigated including those found during construction;

b)  Avoidance of known sites wherever feasible;

c)  Test excavations of known sites that cannot be avoided.  These test excavations will assess the importance of each site according to CEQA Appendix K criteria or other requirements and will result in appropriate data recovery as a mitigation measure;

d)  Inclusion of Native American representatives in all field activities;

e)  Additional sub-surface sampling (use of shovel test pits) in defined sensitive areas which will be affected by project construction to confirm the presence/absence of previously unknown (undiscovered) sites.  This will include surveying of proposed construction access road areas, once identified by the permittee.  Any new sites found shall be treated as per condition L-2(b, c);

f)  Following the determination of site importance, the permittee shall inform the County of any additional plans for site avoidance.  For those sites not avoided, the consulting archaeologist shall, in consultation with the Native American community, prepare site-specific mitigation (excavation/data recovery) plans; and

g)  Implementation and completion of the field work aspects of the site-specific mitigation plans prior to construction in the vicinity of the resource.

## L-3.  Pre-Construction Workshop with Native Americans

Prior to pipeline installation activities, the permittee shall sponsor a workshop for its pipeline contractors and Native American consultants to review and explain the mutual concerns and activities of the parties during pipeline installation work.

## L-4.  Archaeologist and Native American On-Site During Construction

During pipeline installation, a Planning and Development Department approved archaeologist and Native American consultant(s) will work with the contractor during trenching to insure continued avoidance. Adequate monitors shall be provided pursuant to an agreement between the Native American representatives and the permittee, and the archaeologist retained.

## L-5.  Ownership of Non-Burial Associated Cultural Resource Artifacts

If non-burial associated cultural resource artifacts are recovered during pipeline installation (the location of such artifacts being unknown prior to installation), ownership of such artifacts shall be the option of either the permittee, the Native American Community, or the archaeological community.  In recognizing the origin of the materials, the Native American Community shall

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 34

have the first option for ownership. The disposition of the artifacts shall be carried out as per the approved County guidelines.

**L-6.    Burial Associated Artifacts Found During Construction**

If burials or burial associated artifacts are found during installation (that were unknown prior to excavation), and cannot be avoided because of safety considerations, there shall be no further excavation or disturbance of the site. The permittee, in conjunction with the Native American representatives and the Planning and Development Department, shall adhere to the guidelines in CEQA Appendix K and the County Archaeological guidelines prior to continued construction activity in the site area.

**L-7.    Phase II Cultural Resource Guidelines**

If the County cultural resource guidelines for Phase II are modified and approved prior to November 19, 1985, the permittee shall abide by the requirements set forth in the guidelines in place at the time of Final Development Plan approval.

**L-8**

For the Gaviota Creek Pipeline Lowering and Relocation project, construction envelopes shall be restricted to those areas shown on the site plans dated 8/4/99, in order to avoid impacts to the cultural resources. No construction, earth disturbance or construction equipment shall occur or operate outside of these areas. Subsurface structures including septic systems and utilities and accessways including roads, driveways and utilities shall not be placed outside the envelopes. Envelope boundaries shall be staked in the field. Prior to vegetation removal, the proposed easternmost staging area must be delineated and an archaeologist must verify that the staging area is not located over either of CA-SBA-2067/H's recorded historic adobe foundations or that adequate matting (as determined by the Gaviota State Park's archaeologist) is placed over the foundations. **Plan Requirements:** Construction envelopes shall be shown on all grading and building plans. This condition shall be noted on all final plans to describe the activities disallowed outside the approved envelopes. **Timing:** Construction drawings shall be submitted to Planning and Development prior to CDP. Envelopes shall be staked prior to start of grading or structural development. **MONITORING:** During plan check, the planner shall ensure that all construction is to occur within approved envelopes. Staking shall be checked during pre-construction meeting. Planning and Development's EQAP monitor and planners shall inspect and photo document during all construction phases to ensure development is confined to construction envelopes and that staking remains in place during site grading and construction. *(Mitigation Measure AR-1) (adopted by the Planning Commission on September 6, 2000)*

**L-9**

At the commencement of project construction for the Gaviota Creek Pipeline Lowering and Replacement Project, the archaeological monitor shall give all workers associated with earth-disturbing procedures an orientation regarding the possibility of exposing unexpected cultural remains and directions as to what steps are to be taken if such a find is encountered. **MONITORING:** EQAP monitor to verify orientation is conducted at meeting. *(Mitigation Measure AR-2) (adopted by the Planning Commission on September 6, 2000)*

**L-10**

For the Gaviota Creek Pipeline Lowering and Replacement project, all earth disturbances including scarification and placement of fill within the archaeological site area shall be monitored by a Planning and Development-qualified archaeologist and a Native American Consultant pursuant to County Archaeological Guidelines. **Plan Requirements and Timing:**

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 35

Prior to commencing work, a contract or Letter of Commitment between the applicant and the archaeologist, consisting of a project description and scope of work, shall be prepared. The scope of work must be submitted to Planning and Development for review and comment. **MONITORING:** Planning and Development planners shall confirm monitoring by archaeologist and Planning and Development's EQAP monitor shall spot check field work. *(Mitigation Measure AR-3) (adopted by the Planning Commission on September 6, 2000)*

**L-11**

In the event archaeological remains are encountered during grading for the Gaviota Creek Pipeline Lowering and Replacement project, work shall be stopped immediately or redirected until a Planning and Development qualified archaeologist and Native American representative are retained by the applicant to evaluate the significance of the find pursuant to Phase 2 investigations of the County Archaeological Guidelines. If remains are found to be significant, they shall be subject to a Phase 3 mitigation program consistent with County Archaeological Guidelines and funded by the applicant. **Plan Requirements/Timing:** This condition shall be printed on construction drawings and submitted to Planning and Development prior to CDP. **MONITORING:** EQAP monitor shall spot check in the field. *(Mitigation Measure AR-4) (adopted by the Planning Commission on September 6, 2000)*

**L-12**

If human remains are unearthed during the Gaviota Creek Pipeline Lowering and Replacement project, State Health and Safety Code Section 7050.5 requires that no further disturbance shall occur until the County Coroner has made the necessary findings as to origin and disposition pursuant to Public Resources Code Section 5097.98. If the remains are determined to be of Native American descent, the coroner has 24 hours to notify the Native American Heritage Commission (NAHC). The NAHC will then contact the most likely descendent of the deceased Native American. **Plan Requirements/Timing:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor shall spot check in the field. *(Mitigation Measure AR-5) (adopted by the Planning Commission on September 6, 2000)*

**M.    VISUAL RESOURCES**

**M-1.   Board of Architectural Review Approval**

All facility design (e.g. pump stations, landscaping and signs), shall be in accordance with a plan approved by the County Board of Architectural Review (BAR) including the criteria outlined in the Coastal Zoning Ordinance Section 35-87.9 and Section 35-184. Prior to the issuance of the Land Use Permit and Coastal Development Permit, the permittee shall submit to the BAR and the Planning and Development Department and obtain their approval of a plan demonstrating that Conditions M-2 through M-5 are met. For visual screening of surface equipment along the pipeline route, the permittee shall consult with each affected property owner during development of the associated landscaping plan.

**M-2.   Exterior Lighting**

No unobstructed or unshielded beam of exterior lighting shall be directed towards any area outside the exterior boundaries of PPC's property or easement. Any lighting along roadways within the project shall utilize low intensity, ground level, shielded fixtures. The plan shall demonstrate that all feasible measures have been taken to reduce obtrusive night lighting and glow from the pump stations.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 36

**M-3.    Pump Station Facilities Lighting**

To the extent feasible no glare or other radiation resulting from pump station facilities, other than lighting fixtures constructed pursuant to this Development Plan, shall be detectable at any point along or outside the required screening along exterior boundaries of the pump stations.

**M-4.    Painting of Pump Stations Prior to Pipeline Operation**

Prior to the pipeline operation, the Gaviota pump station, visible from Highway 101 and the Gaviota Village, the Sisquoc pump station visible from public viewshed, and all above ground portions of the pipeline shall be painted to harmonize with the surrounding area.

**M-5.    Visibility of Above-Surface Structures**

No above-surface structures except necessary pipeline markers, pump stations, cathodic test stations, necessary fencing, and block valves shall be visible along this route after the completion of pipeline construction.  Signs shall not detract from scenic areas or views from public roads to the extent feasible.

**M-6.    Determination of ROW in Gaviota State Park**

Prior to construction, the permittee will review the feasibility of implementing mitigation measures and/or realignments in the Gaviota State Park area to avoid blasting of ridgetops and alteration of topography in a scenic area. The permittee shall submit a plan to the Planning and Development Department, for review and approval, which identifies the feasibility of shifting the ROW alignment to the west, leaving the ridge profile undisturbed.  The plan shall include an investigation of utilizing prefabricated pipeline bends to allow for alignment around ridgetops, the use of stepped benches in steep terrain, and the future use of such a corridor for additional pipelines.

**M-7**

Any exterior night lighting installed on the project site for the Gaviota Creek Pipeline Lowering and Replacement project shall be of low intensity, low glare design, and shall be hooded to direct light downward onto the project site and prevent spill-over onto adjacent areas, especially U.S. Highway 101. In addition, the permittee shall consult with Caltrans on the location and type of lighting to be used to ensure it does not present a traffic hazard. **Plan Requirements and Timing:**  This requirement shall be printed on all construction drawings prior to issuance of Coastal Development Permit (CDP). The permittee shall provide Planning and Development with a letter documenting their coordination efforts with Caltrans prior to CDP. **MONITORING**: EQAP monitor to confirm no impacts from night lighting. *(Mitigation Measure V-2) (adopted by the Planning Commission on September 6, 2000)*

**N.     NOISE**

**N-1.    Noise Monitoring and Control Plan**

Prior to issuance of the Coastal Development Permit and Land Use Permit, the permittee shall file with the Planning and Development Department a Noise Monitoring and Control Plan which has been approved previously by the Department of Health Care Services and the Planning and Development Department.  The plan shall describe the best efforts the permittee shall take to reduce the noise impacts of the project both during construction and operation of the project.  The approved plan shall be implemented by the permittee and shall be followed until temporarily

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 37

suspended or deemed no longer necessary by the Planning and Development Department. The plan shall include provisions to ensure that items N-2 through N-6 below are included.

**N-2.  Sound Levels During Operation**

Except for motor vehicles and motorized construction equipment, all facilities shall be designed, constructed, operated and maintained such that sound levels during operation do not exceed 70 dbA at or beyond the property line or pipeline easement, as measured on the "A" weighted scale at slow response on approved sound level measuring instruments. Affected property owners along the pipeline route shall be notified by PPC at least 48 hours in advance of any planned testing or maintenance of the line which may exceed noise standards. The facility shall comply with all standards established in the Noise Element of the Comprehensive Plan and the Coastal Zoning Ordinance. No residents, teachers, students and staff at the Vista del Mar School shall be subjected to greater than a 9 dbA increment above the baseline ambient noise level, nor greater than a 3 dbA increase in day-night sound levels. The best available technology, including but not limited to muffling equipment, sound barriers, and landscaping measures shall be used to minimize operational noise impacts.

**N-3.  Project-Related Noise During Construction**

During the construction and operation phases, project-related noise at the Gaviota State Park, Vista del Mar School, Buellton area, or other points which may be impacted (as determined by the Health Care Services Director), shall be minimized between the hours of 7:00 a.m. and 10:00 p.m. Prior to construction in the impacted areas, the permittee will notify all residents within 1200 feet of the pipeline that noise impacts may occur during specific construction periods. Noise shall be limited to 50 dbA between the hours of 10:00 p.m. and 7:00 a.m., consistent with the County Noise Element and the Coastal Zoning Ordinance. Blasting shall be limited to the hours between 7:00 a.m. and 7:00 p.m. and directional charges shall be used to minimize noise.

**N-4.  Noise Generating Activities During Construction**

As determined by the Planning and Development Department, noise generating project activities (including delivery of construction equipment through residential areas) shall be restricted between the hours of 10:00 p.m. and 7:00 a.m. If complaints arise concerning activities occurring during these hours, the permittee shall take additional feasible steps to reduce the noise levels or further restrict the offending activity.

**N-5.  Helicopter and Aircraft Noise**

Prior to approval of the Final Development Plan, the permittee shall submit to the Director of the Planning and Development Department procedures that the permittee will take to minimize noise impacts from helicopters, or other aircraft during the aerial surveys of pipeline. The procedures, to be approved by the Planning and Development Department, shall specify overflight routes to be taken to minimize noise impacts to the community and other feasible measures. The permittee shall direct its contractors to abide by the helicopter procedures and shall take reasonable corrective action if complaints arise concerning the use of helicopters. Subject to flight safety considerations, the permittee shall avoid helicopter flights over residential areas.

**N-6.  Operation-Related Equipment Noise**

All construction and operation-related equipment shall be operated and maintained to minimize noise generation, ground vibration, and to avoid interference with radio or video communications.

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 38

**N-7**

For the Gaviota Creek Pipeline Lowering and Replacement project, construction activity for site preparation and for future development shall be limited to the hours between 7:00 a.m. and 5:00 p.m.  No construction shall occur on State holidays (e.g. Thanksgiving, Labor Day). Construction equipment maintenance shall be limited to the same hours. Non-noise generating construction activities are not subject to these restrictions. For the final pipeline segment tie in activities, work may continue beyond these hours as authorized by State Parks. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor shall spot check and respond to complaints. *(Mitigation Measure N-1) (adopted by the Planning Commission on September 6, 2000)*

**O.    ABANDONMENT**

**O-1.    Removal of Pipeline and Pump Stations Upon Permanent Shut Down**

Immediately following permanent shut down of the pipeline, PPC/Sable shall remove abandoned pump stations and unburied portions of the pipeline within Santa Barbara County constructed under this permit, recontour the site and revegetate the site in accordance with a County approved revegetation plan within one year of permanent shut down. PPC/Sable shall post a performance bond to insure compliance, or continue to pay property taxes as assessed during project operation until site restoration is complete, as determined by the County.

**P.    SYSTEMS SAFETY AND RELIABILITY**

**P-1.    SSRRC Review of Diagrams**

The permittee shall submit all appropriate pump station, valve, and pipeline construction and process diagrams to a System Safety and Reliability Review Committee (SSRRC) who may employ a third-party technical review in order to evaluate pipeline design and help identify possible design hazards prior to construction. The System Safety and Reliability Review Committee shall consist of a representative from the County Public Works Department, the APCD, the County Fire Department, County Flood Control District and the Planning and Development Department. All reasonable costs associated with any County review shall be borne by the permittee.  The permittee shall be entitled to participate fully in the review process.  If the review reveals a concern, the SSRRC shall share its findings with the permittee.  If the permittee does not agree with the findings, the County's recourse is with the Department of Transportation, Office of Pipeline Safety for areas of pipeline construction under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by the permittee and the County.

**P-2.    Safety Inspection, Maintenance and Quality Assurance Program**

The permittee shall submit a detailed Safety Inspection, Maintenance and Quality Assurance Program for the pump stations, valves, and the pipeline which shall be implemented during construction and operations.  The Program shall include, but not be limited to, inspection of construction techniques, regular maintenance and safety inspections, periodic safety audits, corrosion monitoring and leak detection, inspections of all trucks carrying hazardous and/or flammable material.

The construction section of the Program shall be reviewed by the System Safety and Reliability Review Committee and/or its consultants prior to issuance of the Coastal Development Permit and Land Use Permit. The permittee shall fund a full-time U.S. Department of Transportation (or designated representative) pipeline inspector during pipeline construction phase activities.  The

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated September 19, 2023 October 30, 2024
Page 39

operations section of the Program shall be reviewed by the System Safety and Reliability Review Committee and/or its consultants prior to start-up. The Program shall be submitted sufficiently prior to the permittee's projected start-up date so as to allow reasonable time for staff review. All costs associated with this review process shall be borne by the permittee. Should the Committee find fault with these submissions, it will indicate its concerns to the permittee. If the permittee decides not to modify its plans to meet these concerns, the County's recourse is with the Department of Transportation, Office of Pipeline Safety for all areas under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline). In such a case, County shall timely notify DOT of review findings. Permits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by the permittee and the County.

**P-3.    Emergency Response Plan**

The permittee shall submit an Emergency Response Plan detailing response procedures to be implemented by the permittee for accidental events affecting public safety and the environment. This plan shall be based on a comprehensive risk analysis reviewed by the System Safety and Reliability Committee (condition P-1). The plan shall be reviewed and approved by the County Emergency Services Coordinator, the Fire Department, and the Planning and Development Department prior to start-up. Approval of the Plan shall be based on its consistency with the County's Area-Wide Oil and Gas Emergency Response Plan. The Program shall be submitted sufficiently prior to the permittee projected start-up date so as to allow reasonable time for staff review. The permittee shall demonstrate the effectiveness of the Emergency Response Plan by responding to one emergency response drill prior to or immediately after start-up.

**P-4.    Funding the County Emergency Response Plan**

In order to assure that County emergency response procedures adequately interface with the permittee's emergency response procedures, the permittee shall provide its reasonable pro-rata share of funds to the County, to develop and implement a feasible County Emergency Response Plan for oil and gas industry related emergencies. As appropriate, the County shall request funds from other oil industry operators to aid in funding of the County Emergency Response Plan. When available, the Planning and Development Department shall provide the permittee with an estimate of the pro rata share of funds to be provided by the permittee and the method for allocating such costs among other operators.

**P-5.    Oil Spill Contingency Plan**

The permittee shall submit an Oil Spill Contingency Plan detailing cleanup procedures and restoration procedures to be employed in the event of a spill. This plan shall be reviewed and approved by the Planning and Development Department and the County Emergency Services Coordinator prior to start-up. The Program shall be submitted sufficiently prior to the permittee projected start-up date so as to allow reasonable time for staff review. Procedures and techniques shall be selected to augment the Emergency Response Plan. The intent of the Oil Spill Contingency Plan is to detail spill site restoration subsequent to emergency response. The plan shall be approved based on its consistency with the intent of the condition "to detail site restoration subsequent to emergency response."

**P-6.    Site Security Plan**

Prior to approval of the Final Development Plan, the permittee shall submit to the Santa Barbara County Sheriff's Department for review and approval a site security plan. The plan shall describe

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 40

procedures to be implemented by the permittee which will prevent intentional damage to facilities which may result in environmental damage or public safety hazards.

**P-7.    Temporary County Fire Company**

The permittee shall cooperate with Chevron as necessary to facilitate the establishment of a temporary County fire company until the completion of the fire station (as specified in Chevron condition P-9).  Prior to issuance of the Coastal Development Permit and Land Use Permit, the County Emergency Response Coordinator and Fire Department must be satisfied that provisions have been made to establish an operational fire company in the project area.

**P-8.    Cooperation with Chevron for Gaviota Area Fire Station**

Prior to approval of the Final Development Plan, the permittee shall agree to participate in a plan to be submitted to the County Fire Department by Chevron USA Inc., for the construction, manning and equipping of a fire station in the Gaviota area.  The permittee shall contribute their pro rata share of the cost of implementing this plan. When available, the Planning and Development Department shall provide the permittee with an estimate of the pro rata share of funds to be provided by the permittee and the method for allocating such costs among other operators.

**P-9.    Fire Protection Plan for the Pump Stations**

Prior to Final Development Plan, the permittee shall submit to and obtain conceptual approval from the Fire Department, a Fire Protection Plan for the pump station locations.  Final approval shall be obtained prior to start-up.  Criteria to be addressed shall be obtained from the County Fire Department.

**P-10    Transporting LPGs and NGLs Through Pipelines**

Prior to approval of the Final Development Plan, the permittee shall assess the feasibility of transporting liquefied petroleum gases and natural gas liquids, (LPGs and NGLs) through the proposed pipeline by blending and/or batching, considering industry-wide projected volumes and market destinations of the gas liquids. The permittee shall report to the Planning and Development Department the results of this assessment, and this information shall include all technological and safety constraints involved, amount and type of additional storage facilities needed, and the degree to which LPGs and NGLs produced in the area can be transported through the pipeline. PPC/Sable shall transport the NGLs through this pipeline, to the extent feasible within safety and legal constraints as identified by the report and as requested by the users. In addition, under the reporting provisions of Condition C-1, PPC shall inform the County of the types and amounts of gas liquids shipped in the pipeline during operations.

**P-11.    Vista del Mar School Accommodation**

If the Vista del Mar School has not been relocated or is located at a site where it could be impacted by construction activities, prior to approval of the Final Development Plan, the permittee and the Board Trustees of the Vista Del Mar School District shall develop a reasonable and mutually agreeable construction plan for the pump station site and pipelines adjacent to the site that will minimize construction-related noise, air pollution, and visual disturbance to the School during school hours.  Said construction plan shall include the following: Pipeline construction noise near the School shall be held to ambient noise levels or construction shall occur only when school is not in session; to prevent exceedance of the California one-hour $NO_2$ standard, construction schedules must be modified to minimize overlapping of equipment emissions; and, during construction of

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 41

the pipeline, activities nearest the school shall be scheduled when school is not in session in accordance with Condition B-5 and temporary barriers shall be erected around noisiest activities. No grading for the Gaviota pump station shall occur during School session hours.

In the event that any agreements contained herein cannot be reached on the construction plan, the Board of Supervisors shall arbitrate any dispute.

**P-12. Deleted.**

**P-13. Communication at the Operations Control Center and Activated Valves**

The permittee will design the pipeline such that the entire pipeline will have effective control communication between the operations control center and all remotely activated valves. Any break, rupture, and/or damage to the pipeline shall result in the orderly shutdown of the pumping operations, and will activate the shut off valves, if appropriate, in a manner which will minimize environmental damage.

**P-14. Compliance with the Watershed Fire Protection Plan**

During construction of the pipeline in fire sensitive areas, the permittee shall meet or exceed applicable guidelines and requirements set forth in a Watershed Fire Protection Plan provided by the combined local fire protection agencies, Santa Barbara County Fire, U.S. Forest Service, and the California Department of Forestry. This shall include, but not be limited to: modifications of welding operations, required fire patrolman position(s), firefighting equipment, and construction restrictions due to extreme fire weather.

**P-15. Compliance with the National Fire Protection Association Standards**

All facilities, construction activities and equipment shall comply with National Fire Protection Association standards.

**P-16. Map of Finished Pipeline Route**

Upon completion of pipeline construction, the permittee shall provide all jurisdictional agencies (S.B. County Fire, USFS, CDF) with at least two copies of maps showing the finished pipeline route and shall include locations accessible by fire department emergency response vehicles. Said maps shall be 7 1/2 minute quadrangle scale, (one inch equals 24,000 inches), and shall represent topographical features.

**P-17. Compliance with the 1982 Uniform Fire Code**

The permittee shall be subject to required fire department inspections during and after construction as set forth by the 1982 Uniform Fire Code and these conditions.

**P-18. Alternative Pipeline Corridor Alignments**

Prior to approval of the Final Development Plan, the permittee shall designate alternative pipeline corridor alignments which avoid the two potentially impacted, proposed alternative permanent relocation school sites now under study by the Vista del Mar Union School District. These proposed alternative locations are the State Park at Las Cruces, and the Tajiguas Ranch property. County shall review and approve said alternative alignments as part of the Final Development Plan and the permittee shall implement the appropriate alternative alignment depending on the permanent school relocation site chosen by the Vista del Mar School District.

**P-19.  PCB Contamination at Canada de la Huerta**

Prior to initiation of any pipeline construction at Canada de la Huerta, the permittee shall demonstrate to the satisfaction of Environmental Health Services that either: (1) no PCB contamination exists in the road and fill area across which the pipeline alignment is proposed; or, (2) that any PCB contamination detected has been adequately remediated. The permittee shall submit verification of Environmental Health Services' approval for construction to the Planning and Development Department prior to issuance of the Coastal Development Permit for pipeline construction in the Canada de la Huerta area.

**P-20.  Soil Tests at the Booster Pump Site**

To determine the potential for hazardous materials contamination, ~~AAPLP~~ the permittee shall conduct soil tests at the booster pump site prior to construction, in coordination with the County Environmental Health Services Division.

**P-21.  Texaco's Emergency Access Road**

The permittee shall not operate construction equipment on Texaco's emergency access road except to gain access to and from the construction site.

**P-22**

The permittee shall coordinate with PAPCO/PANGL to stake their pipelines prior to any excavation work for the Gaviota Creek Pipeline Lowering and Relocation project. Also, the permittee shall stake their existing 30" crude oil line prior to any excavation work. **Plan Requirements**: This condition shall be printed on construction drawings. **MONITORING:** The EQAP monitor shall verify that the pipelines have been staked prior to construction. *(Mitigation Measure R-2) (adopted by the Planning Commission on September 6, 2000)*

**P-23**

For the Gaviota Creek Pipeline Lowering and Relocation project, if necessary, equipment needed within the creekbed should access the site from the west side so as not to cross the existing oil and gas lines. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to verify compliance in the field. *(Mitigation Measure R-3)(adopted by the Planning Commission on September 6, 2000)*

**P-24**

If any discolored or contaminated soil is encountered during construction of the Gaviota Creek Pipeline Lowering and Relocation project, the permittee shall suspend work activities in the immediate area and report to Protection Services Division (PSD) and the Energy Division immediately. PSD shall inspect the site with the permittee and shall determine the extent of the contamination. The permittee shall proceed as directed by PSD and the Energy Division should contamination be found. Such direction may include preparation of a Site Assessment and Work Plan, and site remediation if deemed necessary. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to verify compliance in the field. *(Mitigation Measure R-4) (adopted by the Planning Commission on September 6, 2000)*

**P-25**

Portable catch basins shall be placed beneath cut points prior to and for the duration of cutting activities for the Gaviota Creek Pipeline Lowering and Relocation project. A vacuum truck shall be onsite until all pipeline drainage and repair operations are completed. **Plan Requirements:** These requirements shall be printed on construction drawings. **MONITORING:** EQAP

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 43

monitor to verify compliance in the field. *(Mitigation Measure R-5) (adopted by the Planning Commission on September 6, 2000)*

**P-26**

Following installation of the new pipeline segment at Gaviota Creek, use of the right-of –way shall be restricted to the pipeline easement. **MONITORING:** EQAP monitor to spot check in the field. *(adopted by the Planning Commission on September 6, 2000)*

**P-27**

The permittee shall, at all times during construction of the new pipeline segment at Gaviota Creek, provide onsite fire protection (water tanker, shovels and fire extinguishers). **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to spot check in the field. *(Mitigation Measure F-1) (adopted by the Planning Commission on September 6, 2000)*

**P-28**

For the Gaviota Creek Pipeline Lowering and Replacement project, a fire watch shall be maintained for at least one half hour after completion of cutting or welding operations to detect and extinguish smoldering fires if operations occur within 10 feet of combustibles. Hot work permits and fire watch operations shall be coordinated through County Fire. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to monitor in the field. *(Mitigation Measure F-2) (adopted by the Planning Commission on September 6, 2000)*

**P-29**

If welding trucks are used for the Gaviota Creek Pipeline Lowering and Replacement project, the vehicles shall be inspected and a permit issued at Fire Station 18. This would ensure that all hoses are adequate, a fire extinguisher is available, and a spark arrester is installed on any motor. **Plan Requirements:** The permittee to acquire a permit from Station 18. **MONITORING:** EQAP monitor to verify permit received prior to construction. *(Mitigation Measure F-3) (adopted by the Planning Commission on September 6, 2000)*

**P-30**

The permittee shall notify the Fire Department at least 48 hours before construction may begin for the Gaviota Creek Pipeline Lowering and Replacement project. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to verify prior to construction. *(Mitigation Measure F-4) (adopted by the Planning Commission on September 6, 2000)*

**P-31**

The permittee shall clear vegetation 10 feet on each side of the PAPCO/PANGL vault access road, staging areas, and along access portions of the pipeline right-of-way to 6 inches prior to construction of the Gaviota Creek Pipeline Lowering and Replacement Project. Vegetation near the cultural site at the Road 28 gate shall be hand cut to avoid adverse impacts to the site. **Plan Requirements:** This condition shall be printed on construction drawings. **MONITORING:** EQAP monitor to field check prior to construction. *(Mitigation Measure F-5) (adopted by the Planning Commission on September 6, 2000)*

**Q.    FACILITY DESIGN**

**Q-1.    Demonstration of Compliance**

Las Flores Pipeline System Conditions of Approval
88-DP-33 RV01, 88-CP-060 RV01, Updated ~~September 19, 2023~~ October 30, 2024
Page 44

The Final Development Plan shall demonstrate compliance with Santa Barbara County Coastal Zoning Ordinance, and other applicable County Ordinances to the extent required by this permit.

**Q-2.    Energy Conservation Techniques**

Cost effective energy conservation techniques shall be incorporated into project design.

**Q-3.    Common Carrier Pipeline**

PPC's facilities will be operated as a common carrier pipeline with access for use available on a nondiscriminatory basis. County retains the right to verify that the use of the facilities is conforming with County policies on consolidation and to impose additional reasonable permit conditions where necessary to assure these policies are being fulfilled to the extent feasible. The intent of this condition is to ensure the multi-company access of oil transportation facilities.

**Q-4.    Compliance with County Petroleum Ordinance No. 2795**

PPC shall comply with all applicable policies in Section 25 of the Santa Barbara County Petroleum Ordinance No. 2795.

**Q-5.    Power Transmission Lines**

The permittee shall fund a pro-rata share of the costs to bury power transmission lines or of using environmentally and aesthetically preferred poles between the Goleta Substation and Gaviota in areas where the County and SCE determine it is not feasible to bury the lines. The permittee's pro-rata share shall be based upon an equitable cost-sharing formula applied to all users of the grid power consistent with PUC rate setting and applicable regulations.

# EXHIBIT N

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Civil Action No. <br><br> 2:20-cv-02415 <br><br> **CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 14    Filed 05/14/26    Page 233 of 1123    Page
ID #:6365
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 2 of 102   Page ID #:95

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

## TABLE OF CONTENTS

I.       BACKGROUND .................................................................- 5 -

II.      JURISDICTION AND VENUE.........................................- 6 -

III.     APPLICABILITY ...............................................................- 7 -

IV.      DEFINITIONS ....................................................................- 7 -

V.       CIVIL PENALTIES .........................................................- 13 -

VI.      NATURAL RESOURCE DAMAGES .............................- 17 -

VII.     TRUSTEES' MANAGEMENT AND APPLICABILITY
         OF JOINT NRD FUNDS ................................................- 21 -

VIII.    TRUSTEES' MANAGEMENT OF RECREATIONAL
         USE FUNDS ....................................................................- 22 -

IX.      INJUNCTIVE RELIEF ....................................................- 23 -

X.       CORRECTIVE ACTION ORDER ..................................- 27 -

XI.      STIPULATED PENALTIES ............................................- 27 -

XII.     FORCE MAJEURE...........................................................- 35 -

XIII.    DISPUTE RESOLUTION ................................................- 37 -

XIV.     REPORTING .....................................................................- 39 -

XV.      CERTIFICATION ............................................................- 40 -

XVI.     INFORMATION COLLECTION AND RETENTION......- 40 -

XVII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ...........- 43 -

XVIII.   TRANSFER AND ACQUISITION OF ASSETS .............- 49 -

XIX.     COSTS ..............................................................................- 50 -

XX.      NOTICES ..........................................................................- 51 -

XXI.     EFFECTIVE DATE ..........................................................- 54 -

XXII.    RETENTION OF JURISDICTION ..................................- 54 -

XXIII.   MODIFICATION ..............................................................- 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XXIV.    TERMINATION ..................................................................................- 55 -

XXV.     PUBLIC PARTICIPATION...............................................................- 56 -

XXVI.    SIGNATORIES/SERVICE ................................................................- 56 -

XXVII.   INTEGRATION ..................................................................................- 57 -

XXVIII.  FINAL JUDGMENT ..........................................................................- 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

A.    WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.    WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.    WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

D.      WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.      WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.      WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.      WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.      WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

I.     WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.     WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.     WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.     WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq.*, the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.      WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.      WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.    WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.    WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.    WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.    WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.    WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree:  (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.    BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 5 -

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*., and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq*., and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.    Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

does business in this District and the alleged claims occurred in this District.

3. For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III. APPLICABILITY

4. Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5. Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV. DEFINITIONS

7. Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree. For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H .html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 244 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 13 of 102 Page ID #:106
ID #:6376

"Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley.  Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Case 2:26-cv-05242-GW-SSC    Document 14-3    Filed 05/14/26    Page 246 of 1123   Page
Case 2:20-cv-02415-GW-SSC    Document 6-1    Filed 03/13/20    Page 15 of 102    Page ID #:108
ID #:6378

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq.*, and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.    CIVIL PENALTIES

A.    Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment").  The Penalty Payment shall be allocated as follows:

8.    <u>Penalty Payment to the United States (PHMSA)</u>.  For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

a.    Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.    One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.    Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d. At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9. Penalty Payment to the United States (EPA) shared with CDFW and RWQCB. The Penalty Payment shall be allocated as follows:

a. As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

Case 2:26-cv-05242-GVW-SSC Document 14-3 Filed 05/14/26 Page 250 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 19 of 102 Page ID #:112
ID #:6382

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1) To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2) To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil
Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)        To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 252 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 21 of 102   Page ID #:114
ID #:6384

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10.     Penalty Payment to be Paid to CDFW.  For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11.     Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.   NATURAL RESOURCE DAMAGES

12.     Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961.  The NRD Payment shall be allocated as follows:

a.  To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment.  Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds).  Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention:  Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C.  20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198.  DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 18 -

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 254 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 23 of 102   Page ID #:116
ID #:6386

b.      To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>       Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.      To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 19 -

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn:  Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California  95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account.  The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d.      To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account.  Payment shall be made by check payable to The Regents of the University of California.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

The Regents of the University of California
Attn:  Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account.  The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees.  The projects shall address the research, education, and outreach missions of the University of California.  UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.     The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants.  To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.     DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident.  DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.     DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16.     The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process.  The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17.     The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided.  Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein.  The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII.     TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18.     CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 22 -

19.     The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.     UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.   INJUNCTIVE RELIEF

21.     Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.     Material Changes to Plains' IMP.

a.     Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)     Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)     Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)     White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

4)      Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5)      Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6)      Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.      At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation.  The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 24 -

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.     Material Changes in Control Room Management Plan and Control Center General Procedures.

a.     Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.     At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 25 -

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.    In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.    In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days.  Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.    Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 26 -

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

<div align="center">

**X.   CORRECTIVE ACTION ORDER**

</div>

25.   Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

<div align="center">

**XI.   STIPULATED PENALTIES**

</div>

26.   Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.   <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.   If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.   If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.   If Defendants fail to pay any portion of the NRD Payments

<div align="center">

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

</div>

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28.    Stipulated Penalties for Non-Performance of Injunctive Relief. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a.    For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b.    For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c.    For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d.    For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e.    For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f.    For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g.    For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

h.     For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.     For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.     For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.     For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.     For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.     For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.     For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.     For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.     For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.     For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.    For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.    For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.    For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.    For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.    For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.    For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.    For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.    The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

Case 2:26-cv-05242-GW-SSC Document 14-3 Filed 05/14/26 Page 266 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 35 of 102 Page ID #:128
ID #:6398

29. <u>Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.</u> Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

 a. For operation of Line 901 in violation of paragraph 1.a of Appendix D;

 b. For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

 c. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

 d. For operation of Line 903, in violation of paragraph 1.e of Appendix D;

 e. For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

 f. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

 g. For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

 h. For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

 i. The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 31 -

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30. Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31. For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32. For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33. For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34. For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-GVW-SSC    Document 14-3    Filed 05/14/26    Page 268 of 1123   Page
Case 2:20-cv-02415   Document 6-1    Filed 03/13/20    Page 37 of 102    Page ID #:130
ID #:6400

a.      Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.      Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.      Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.      If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.     For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.     For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 33 -

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

        a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

        b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

c. If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41. If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42. The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43. Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII. FORCE MAJEURE

44. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 35 -

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46.    If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 37 -

Decree.

50. <u>Informal Dispute Resolution</u>.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement.  If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. <u>Formal Dispute Resolution</u>.  Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position.  Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs.  Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute.  The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 38 -

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

the injunctive relief requirements set forth in Appendices B and D.  The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV.  CERTIFICATION

58.    Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI.  INFORMATION COLLECTION AND RETENTION

59.    Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

a.    monitor the progress of activities required under this Consent Decree;

b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

c.     obtain documentary evidence, including photographs and similar data; and

d.     assess Defendants' compliance with this Consent Decree.

60.     Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree.  At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62.     For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2.  Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63.     The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 41 -

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67.     At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68.     [*Intentionally left blank.*]

### XVII.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.     This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70.     Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 43 -

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

      a.     49 C.F.R. Part 194 Subpart B – Response Plans;

      b.     49 C.F.R. Part 195 Subpart B – Reporting;

      c.     49 C.F.R. Part 195 Subpart E – Pressure Testing;

      d.     49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

      e.     49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

      f.     49 C.F.R. Part 195 Subpart H – Corrosion Control;

      g.     49 C.F.R. Part 199 – Drug and Alcohol Testing; and

      h.     All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71. The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72. This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 44 -

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019.  The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

> a.    The Pipeline Safety Laws specified in Paragraph 70; and
>
> b.    California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73.    For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident.  Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74.    The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75.    The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 45 -

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239.  The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76.     This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77.     In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations.  Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 46 -

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 282 of 1123    Page
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 51 of 102    Page ID #:144
ID #:6414

commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79.     This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81.     Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82.     By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree.  However, the allegations of violations set forth in the Complaint may be:  (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83. By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84. Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder. Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85. Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86. Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87.   The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII.   TRANSFER AND ACQUISITION OF ASSETS

88.   In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision.  Those provisions of Appendix B are:

       a.   For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

       b.   For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

       c.   For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

       d.   For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89.   In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.    In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.    For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

### XIX.  COSTS

92.    Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 50 -

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

<div align="center">

**XX.   NOTICES**

</div>

93.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email: eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-11340

As to the United States by mail: EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-1-1-1130

As to PHMSA: James M. Pates
Assistant Chief Counsel for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, DC. 20590

As to EPA: Andrew Helmlinger
Attorney Advisor
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 287 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 96 of 102   Page ID #:149
ID #:6419

As to DOI:                        Clare Cragan
                                  U.S. Department of the Interior
                                  Office of the Solicitor
                                  755 Parfet St., Suite 151
                                  Lakewood, Colorado 80215

As to NOAA:                       National Oceanic and Atmospheric
                                      Administration
                                  Office of General Counsel
                                  Natural Resources Section
                                  ATTN:  Christopher J. Plaisted
                                  501 W. Ocean Blvd, Suite 4470
                                  Long Beach, California  90802

As to USCG:                       Patricia V. Kingcade
                                  Attorney Advisor
                                  National Pollution Funds Center,
                                      US Coast Guard
                                  2703 Martin Luther King Jr. Ave SE
                                  Washington, DC 20593-7605

As to the State Agencies:         Michael Zarro
                                  Deputy Attorney General
                                  Office of the Attorney General
                                  Natural Resources Law Section
                                  300 S. Spring St., Suite 11220
                                  Los Angeles, California 90013

As to CDFW:                       California Department of Fish
                                      and Wildlife
                                  Office of Spill Prevention and Response
                                  Attn: Katherine Verrue-Slater
                                  Senior Counsel
                                  P.O. Box 160362
                                  Sacramento, California  95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

As to CDPR:                       California Department of Parks and
                                    Recreation
                                  Attn: Laura A. Reimche, Senior Counsel
                                  1416 Ninth Street, Room 1404-6
                                  Sacramento, California 95814


As to CSLC:                       California State Lands Commission
                                  Attn: Patrick Huber, Legal Division
                                  100 Howe Avenue, Suite 100-South
                                  Sacramento, California 95825


As to OSFM:                       California Department of Forestry and
                                    Fire Protection
                                  Legal Services Office
                                  Attn: Joshua Cleaver, Staff Counsel
                                  P.O. Box 944246
                                  Sacramento, California 94244-2460


As to RWQCB:                      California Central Coast Regional Water
                                  Quality Control Board
                                  Attn: Naomi Rubin, Attorney III
                                  801 K Street
                                  Sacramento, California 95814


As to UC:                         Barton Lounsbury, Senior Counsel
                                  University of California
                                  Office of the General Counsel
                                  1111 Franklin Street, 8th Floor
                                  Oakland, California  94607


As to Defendants:                 Megan Prout
                                  Senior Vice President
                                  Commercial Law and Litigation
                                  333 Clay Street, Suite 1600
                                  Houston, Texas  77002


*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.    EFFECTIVE DATE

96.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.    RETENTION OF JURISDICTION

97.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.   MODIFICATION

98.     The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 54 -

99.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.  PUBLIC PARTICIPATION

103.  This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.  Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.  SIGNATORIES/SERVICE

105.  Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.  This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## XXVII.  INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.     FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

Case 2:26-cv-05242-SVW-SSC Document 143 Filed 05/14/26 Page 293 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 62 of 202 Page ID #:155
ID #:6425

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
  Division U.S. Department of Justice

3/13/2020

Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 58 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
    Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020

Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 61 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____3/2/20_____
Date

_____Lisa Ann L. Mangat_____
LISA ANN L. MANGAT
Director
California Department of Parks
and Recreation

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 299 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 68 of 102   Page ID #:161
ID #:6431

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
Date

THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
Date

_____
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
     Quality Control Board

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

*3 March 2020*
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.


2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 68 -

Case 2:26-cv-05242-SVW-SSC   Document 143   Filed 05/14/26   Page 305 of 1123   Page
ID #:6437
Case 2:20-cv-02415 Document 6-1   Filed 03/13/20   Page 74 of 102   Page ID #:167

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

Case 2:26-cv-05242-GW-SSC    Document 14-3   Filed 05/14/26    Page 306 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 75 of 102   Page ID #:165
ID #:6438

# APPENDIX A

*(Set of maps that generally depict Lines 901, 903, and 2000)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*





*Appendix A – Line 903*

Owner:

**PLAINS ALL AMERICAN PIPELINE, L.P.**

Scale: 1:700,000

Sheet No: 1/1



*Appendix A – Line 2000*

Scale: 1:966,574

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Case 2:26-cv-05242-GW-SSC    Document 14-3    Filed 05/14/26    Page 310 of 1123   Page
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 79 of 102    Page ID #:172
ID #:6442

# APPENDIX B

# *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1.  **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

    A.  Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901.  Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

    B.  Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

    C.  Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

    D.  Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

    E.  To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver.  Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received.  Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver.  Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2.  **Replacement, Restart, or Abandonment of Lines 901 and 903:**

    A.  Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners.  Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

1.   On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

    a.   Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

    b.   Conduct a close interval survey (CIS) and AC/DC interference survey.

    c.   Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B.   As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C.   As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3.   **Third-Party Analysis of Line 2000 ILI Data**

A.   Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B.   The consultant shall:

1.   Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

2.   Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

3.   Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

4.   Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

> 5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;
>
> 6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

> 1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.
>
> 2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.
>
> 3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.
>
> 4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

> 1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:
>
>> a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b. Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c. When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d. Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e. Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f. Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g. For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i. Integrate and analyze available data in its P&M process, including:

i. Assessment data from ILI tool runs;

ii. Dig and repair data;

4

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 315 of 1123 Page
ID #:6447
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 84 of 102 Page ID #:177

iii.    Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.    Operational data, such as pressure and flow data;

v.    Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.    Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.    Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.    ILI Measures

a.    <u>Initial ILI Runs</u>.  Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU).  Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data.  If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.    All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

<div align="center">5</div>

ii.    In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run.  If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b.    <u>Subsequent ILI Runs</u>.  After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year.  Alternatively, Plains may run a UT tool each year.  If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c.    <u>All ILI Runs</u>.  Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.    **<u>Valves</u>**

A.    Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1.    Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2.    Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.    Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.    Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

6. **Risk Analysis**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1.    Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a.    The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b.    Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis.  The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c.    The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B.    Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

    A.    Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9. **Integrity Management**

    A.    New Procedures for Interim Reviews and Assessments

<div align="center">7</div>

Case 2:26-cv-05242-GW-SSC Document 14-3 Filed 05/14/26 Page 318 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 87 of 102 Page ID #:180
ID #:6450

1. Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment.  If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment.  Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2. Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review.  Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3. Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD.  If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B. Documentation for P&M Recommendations

1. Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

   a. What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

   b. The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

      c.      The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

2.     In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3.     In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.     Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10.    **Valves and O&M**

A.     Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.     Within two years of entry of the CD, Plains shall develop and implement procedures to:

1.     If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2.     Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3.     Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4.     Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.     Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

D.      For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

1.      Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room.  Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.      Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.   **Leak Detection**

A.      Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

1.      Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.      For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.      Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

1.      Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.      Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

1.      Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 321 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 90 of 102   Page ID #:185
ID #:6453

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E. Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F. Instrumentation and Display

1. To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a. Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b. Track these conditions through to resolution, including instrumentation relocation when necessary.

12. **Control Room Management**

A. For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1. Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2. Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3. Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4. Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 322 of 1123   Page
ID #:6454
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 91 of 102   Page ID #:184

B.      For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.      Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.     **Emergency Response and Oil Spill Response Plans**

A.      California-Specific Provisions:

1.      Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.      Company-Wide Provisions

1.      Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.      Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.      Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

-86-

Case 2:26-cv-05242-GW-SSC Document 14-3 Filed 05/14/26 Page 323 of 1123 Page
ID #:6455
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 92 of 102 Page ID #:185

Plains.  Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills.  Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4.  Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter.  Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5.  Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment).  Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill.  Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6.  For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14.  **Safety Management System (SMS)**

A.  Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1.  Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173.  Plains shall direct the third party to transmit a copy of the final report to PHMSA.  Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B.    Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.    **Drug and Alcohol Program**

A.    Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

# APPENDIX C

# (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

## APPENDIX D

1.      All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

   a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

   b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

   1)      Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

   2)      Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

   3)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

   4)      A specific day-light restart that includes advance communications with local emergency response officials;

   5)      Master Control Room enhancements, including:

   a) Implementation of advanced leak-detection

- 1 -

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running.  Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 329 of 1123   Page
Case 2:20-cv-02415-W    Document 6-1    Filed 03/13/20    Page 98 of 102    Page ID #:191
ID #:6461

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)      Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)      Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)      Installation of additional pressure sensors as a result of Plains' surge study;

9)      Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM.  The tool run shall be initiated during daylight hours.  If the tool run does not collect a complete data set, the UT tool shall be promptly re-run.  A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report.  Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)      **Corrosion Prevention.**  Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan.  Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)      Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)      Provisions for a daylight restart and advance communications with local emergency response officials.

g.  **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h.  **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)      The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)      The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)      The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)      Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:26-cv-05242-SVW-SSC   Document 14   Filed 05/14/26   Page 333 of 1123   Page
ID #:6465
Case 2:20-cv-02425   Document 6-1   Filed 03/15/20   Page 102 of 102   Page ID #:195

3)      The Appendix D Documentation Report shall include but not be limited to:

    A.   Table of Contents;

    B.   [*intentionally left blank.*]

    C.   [*intentionally left blank.*]

    D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

    E.   [*intentionally left blank.*]

    F.   [*intentionally left blank.*]

    G.   Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT O

## Niz, Kim

| | |
|---|---|
| **From:** | Briggs, Errin <ebriggs@countyofsb.org> |
| **Sent:** | Friday, March 21, 2025 10:52 AM |
| **To:** | Thompson, James; Ybarra, Jacquelynn; Plowman, Lisa |
| **Cc:** | Rusch, Steve; Yearwood, Lance; Surmeier, Patrice; Alcock, Lee; Lauren.Paull@lw.com |
| **Subject:** | RE: Sable – Completed Anomaly Repairs |
| **Attachments:** | Feb 12, 2025, Letter from Errin Briggs to Steve Rusch.pdf |

**CAUTION:** External Sender

Hi James,

Thank you for the informational package regarding anomaly repair activities completed on Line 324 in 2024.

We have reviewed the information you provided and have determined that this work fits withing the conclusions/directives of our February 12, 2025 letter to Steve Rusch (attached). No permits will be required.

Thank you for the continued cooperation on these matters, we would appreciate if you could continue to provide similar information in advance for future projects of this type.

Sincerely,



**Errin Briggs**

**Deputy Director, Energy Minerals & Compliance**

Planning & Development
County of Santa Barbara
123 E. Anapamu St.
Santa Barbara, CA 93101
805-568-2047
ebriggs@countyofsb.org
https://www.countyofsb.org/160/Planning-Development

**From:** Thompson, James <JSThompson@scsengineers.com>
**Sent:** Thursday, March 6, 2025 11:34 AM
**To:** Briggs, Errin <ebriggs@countyofsb.org>; Ybarra, Jacquelynn <jybarra@countyofsb.org>
**Cc:** Rusch, Steve <srusch@sableoffshore.com>; Yearwood, Lance <lyearwood@sableoffshore.com>; Surmeier, Patrice <psurmeier@sableoffshore.com>; Alcock, Lee <lalcock@sableoffshore.com>; Lauren.Paull@lw.com
**Subject:** Sable - Completed Anomaly Repairs

**Caution: This email originated from a source outside of the County of Santa Barbara. Do not click links or open attachments unless you verify the sender and know the content is safe.**

Good Morning Errin,
On behalf of Sable Offshore Corp. – Pacific Pipeline Company (Sable), SCS Engineers is providing information regarding 48 anomaly repairs previously conducted on portions of the existing pipeline CA-324 located on APNs 081-140-019, 081-140-025, 081-150-006, 081-150-028, 081-150-032, 081-150-033,

081-150-041, 081-150-042, 081-200-033, 081-210-047, 081-210-050, 081-210-051, 081-230-021, and in one County right-of-way not associated with an APN.

Please use the links below to download the cover letter and associated attachments. Let me know if you have any questions or comments.



**1 - Sable Completed Anomaly Cover Letter.pdf (113k)**

**Completed Anomaly - Attachments.zip (17M)**

File links in this email will be active until April 5, 2025

Thanks,
James


**James Thompson**
Project Manager

SCS ENGINEERS

316-250-1224 (cell)
661-606-6001 (office)
jsthompson@scsengineers.com

# EXHIBIT P



## Planning and Development

Lisa Plowman, Director
Jeff Wilson, Assistant Director
Elise Dale, Assistant Director

April 9, 2025

Mr. Cassidy Teufel
Deputy Director
California Coastal Commission
455 Market Street, Suite 300
San Francisco, CA 94105
*Sent via email:* Cassidy.Teufel@Coastal.ca.gov

SUBJECT:    Sable Offshore Corp. – Authorization for Anomaly Repair Work

Dear Mr. Teufel,

The purpose of this letter is to respond to your April 7, 2025 letter to me which details your disagreement with our determinations regarding the ongoing anomaly repair work along Sable's Lines 324 and 325a located in the coastal zone.

In your April 7th letter you assert that the County has "failed to provide the requested information regarding the basis for County staff's determination." Please note that we have provided all requested documents in response to Coastal Commission inquiries.

- Initially, on September 9, 2024 and September 24, 2024, Celeron Pipeline Co. settlement-related documents were provided upon request to Cassidy Teufel, Wesley Horn and Jonathan Bishop.
- Following, in response to the Commission's request for the permit documents associated with the original construction of the pipelines, on December 10, 2024 a comprehensive set of printed permit history documents was provided to Wesley Horn in person.
- Then, a complete set of anomaly repair description documents were provided to Commission staff on February 24, 2025 in our letter to Cassidy Teufel.
- And finally, the most recent set of anomaly repair description documents were provided via email to Commission staff on March 24, 2025.

Commission staff has all of the information that the County considered prior to concluding that the pipeline anomaly repair work identified in the February 12, 2025 letter is authorized by the existing permits and was analyzed in the prior environmental review.

Sable Offshore Corp – Authorization for Anomaly Repair Work
Page 2

We understand the Coastal Commission has reached a different conclusion considering the provided documents, but the County continues to assert the dispute resolution process in Section 13569 is not applicable here because it only applies when: 1) the local government determines a project is exempt or categorically excluded; or 2) a decision on whether a proposal would be appealable to the Coastal Commission. The County did not allow activity without a permit, nor did the County take an action on a permit or development application that may be appealable to the Coastal Commission.

Best,

Lisa Plowman
Director, Planning & Development

Enclosure:     Letter from County to Cassidy Teufel dated February 12, 2025
               Letter from County to Cassidy Teufel dated February 24, 2025

# EXHIBIT Q



April 1, 2021

Andy Chau
Supervising Pipeline Safety Engineer
**State of California, Office of the State Fire Marshal**
Pipeline Safety Division
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

*Submitted via Overnight Mail and Electronically*

**Subject:  State of California Assembly Bill 864: Coastal Best Available Technology Regulation
Section 2113 Implementation Plan to Retrofit with Best Available Technology
OSFM Line ID No. 0015 (Plains Pipeline, L.P. Line 901 Las Flores to Gaviota 24")**

Dear Mr. Chau,

California Code of Regulations (CCR), Title 19, Article 7, Section 2113 requires operators of existing pipelines (located near an environmentally and ecologically sensitive area in the coastal zone) to submit a risk analysis and a plan to retrofit existing pipelines with Best Available Technology (BAT).

In compliance with Section 2113, Plains Pipeline, L.P. ("Plains") is submitting for your review, a risk analysis for the subject pipeline.  The risk analysis identifies BAT intended to limit and reduce the quantity of release in the event of a spill and describes the timetable for implementation and completion of the identified BAT plan.

If you have and questions, comments, concerns, or require additional information, please contact me at ██████████████████████████████████████

Sincerely,



James Buchanan
HSE Senior Regulatory Specialist

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 2 of 16

Enclosures:

- Registered Agent for Service Documentation
- Outer Continental Shelf Crude Oil Safety Data Sheet
- Flow Diagrams
- Vicinity Map
- BAT Location Map
- Timetable for Implementation Gantt Chart
- Confidentiality Justification and Redacted Copy


Cc:   Cory Thornton, Plains Pipeline, L.P.
      Erol Alavi, Plains Pipeline, L.P.
      Jon Van Reet, Plains Pipeline, L.P.
      Megan Prout, Plains Pipeline, L.P.
      Ngiabi Gicuhi, Plains Pipeline, L.P.
      Wm. Dean Gore, Jr., Plains Pipeline, L.P.

## Section 2113 Implementation Plan to Retrofit with Best Available Technology

## OSFM Line ID No. 0015 (Plains Pipeline, L.P. Line 901 Las Flores to Gaviota 24")

**1.  Introductory Material, Certification Statement, and Confidentiality Request**

    a.  Operator Information

Plains Pipeline, L.P. (Operator)         OSFM ID No. 0015
333 Clay Street, Suite 1600             Line 901 Las Flores to Gaviota 24"
Houston, Texas 77002

<u>List of contacts and contact information for persons within the operator's company, and any alternates, responsible for overseeing and conducting the risk analysis</u>



<u>Agent for Service of Process designated to receive legal documents on behalf of the operator</u>

Corporation Service Company Which Will Do Business in California as CSC-
Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833

Plains2021C-02_0000051

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 4 of 16

b.  Certification Statement by an executive within the operator's management structure authorized to fully implement the risk analysis

"*I certify, to the best of my knowledge and belief, under penalty of perjury under the laws of the State of California, that the information contained in this risk analysis is true and correct and that the plan is both effective and feasible.*"

| Signature / Date | Printed Name, Title |
|---|---|
| | Patrick D. Hodgins<br>Vice President, Health, Safety & Environmental |

Certification Statement by a person within the operator's management structure with the requisite training, knowledge, and experience to review a risk analysis for accuracy, effectiveness, and feasibility

"*I certify, to the best of my knowledge and belief, under penalty of perjury under the laws of the State of California, that the information contained in this risk analysis is true and correct and that the plan is both effective and feasible.*"

| Signature / Date | Printed Name, Title |
|---|---|
| | Wm. Dean Gore, Jr., PE<br>Director, Special Projects |

c.  Confidentiality Request

The risk analysis, implementation plan, and enclosures contain confidential information exempt from disclosure under the California Public Records Act and other laws.  In accordance with 19 CCR 2119, Plains has attached 1) a document identifying the confidential information and providing legal authority for the exemptions, and 2) a complete copy of this submittal depicting the confidential information as redacted.

2.  **Pipeline Description**

a.  Relevant pipeline design, construction, and operation information for OSFM Line ID No. 0015 (Line 901 Las Flores to Gaviota 24")

Year of Construction:                    1990

Pipeline Diameter:                        24 inches

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 5 of 16

| | |
|---|---|
| Length of Pipeline: | 10.8 miles from Las Flores Pump Station to Gaviota Pump Station.  Flow diagrams for the Las Flores and Gaviota Pump Stations are enclosed for reference. |
| Pipe Grade: | API 5L, Grade X-60, X-65 |
| Wall Thickness: | 0.344, 0.500 inches |
| Maximum Operating Pressure (MOP): | 1,025 psig |
| Normal Operating Pressure: | 650 psig |
| Pipe Seam: | High frequency electric resistance welded (HF-ERW) long seam manufactured in 1986 by Nippon Steel in Japan. |
| Valves: | 4 valves (3 MOV, 1 check) |
| Elevations: | Las Flores: 193 feet ASL |
| | Gaviota: 201 feet ASL |
| | Low point: 28 feet ASL |
| | High point: 764 feet ASL |
| Coating: | Coal Tar Urethane |
| Insulation: | 1.5 inch thick layer of rigid urethane foam insulation and an outer polyethylene tape. |
| Operating Status: | Line was initially purged on 06/18/2015. Line was cleaned, purged, and filled with nitrogen in the summer of 2017. |
| General Condition of the Pipeline: | Last ILI – DEF/HRMFL 05/06/2015. |



One external corrosion release in 2015.

| | |
|---|---|
| Oil Capacity of the Pipeline: | 30,275 BBLS |

Plains2021C-02_0000053

|  |  |
|---|---|
| Product: | Crude Oil – OCS (Outer Continental Shelf); See enclosed SDS for characteristics. |
| Normal Operating Temperature: | 135 degrees Fahrenheit. |

b. <u>Vicinity Map</u>

The Vicinity Map is provided as a dynamic PDF electronic document.  Layers can be turned "on" or "off" and include the following features: distance from the coastal zone, vehicular or rail crossings along the pipeline, nearby residential, commercial, or other populated areas, physical geographic features such as soil and terrain, drainage systems such as small streams and other smaller waterways, potential natural forces inherent in the area, natural and manmade barriers, and potential physical pathways between the pipeline and environmentally and ecologically sensitive areas (EESAs).

c. <u>Seasonal Hydrographic and Climatic Conditions</u>

The risk analysis for Line 901 Las Flores to Gaviota 24" was completed with the inclusion of hydrographic and meteorological conditions specific to the pipeline location. Spill modelling was conducted utilizing United States Geologic Survey (USGS) digital elevation models (DEM) topographic data and water velocity factors (during potential periodic flooding events) to simulate worst-case release scenarios.  As illustrated in the following figure, the relatively short 10.8 mile length of Line 901 lies within a coastal terrace with relatively consistent topographic and climate conditions.  The course of the pipeline is bisected by gradually undulating coastal hills and predominantly intermittent drainages which constitute the southern face of the Santa Ynez mountain range. Average annual rainfall rates of 17.5 to 19.4 inches throughout this coastal terrace contribute to two (2) water courses, Refugio Creek and Arroyo Hondo Creek, which are capable of persistent flow throughout a majority of the year.

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 7 of 16

**Figure 2.C.1: Regional Slope & Weather Data Map**

d.  Baseline Condition and Spill Analysis

19 CCR Section 2111(d)(4) requires the operator to conduct a spill analysis using the baseline condition of the pipeline segment.  The purpose of the spill analysis is to determine whether a release anywhere along the length of a pipeline segment could impact EESA in the Coastal Zone.  First the baseline condition of the pipeline segment must be identified with respect to leak detection system (LDS) technology, any automated shut-down technology present, and the number and location of any isolation valves and instrumentation needed to support the LDS.  Then the worst case release volume, based on the baseline condition of the pipeline segment, must be used to model the trajectory and physical extent of that release and its relationship to EESA in the Coastal Zone.

Since this entire pipeline segment lies within the boundaries of the Coastal Zone, Plains made the conservative assumption that any release from this pipeline segment will impact an EESA in the Coastal Zone.  Section 2111(d)(4) states that the spill analysis is intended to be used as the baseline for which best available technologies may be used to reduce the quantity of the release in the event of a release.  Thus, the focus of the Risk Analysis for the pipeline segment would be the evaluation of BAT additions to this

pipeline segment that would serve to reduce the quantity of release in the event of a release.

The following sections present the BAT additions proposed by Plains to reduce the quantity of release from this pipeline segment, and a Risk Analysis that compares the estimated worst case discharge for the current baseline condition of the pipeline to the BAT or retrofit condition of the pipeline with all of the proposed BAT elements installed.

3. **Proposed Best Available Technology (BAT)**

   a. Introduction to and Definition of Proposed BAT

Plains has defined BAT for this pipeline segment as a combination of several elements working together.  These elements include:



Mr. Chau
Implementation Plan to Retrofit with BAT
Page 9 of 16



Plains2021C-02_0000057

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 10 of 16



Mr. Chau
Implementation Plan to Retrofit with BAT
Page 11 of 16

The proposed locations for each of the new valves proposed for this pipeline segment are listed in the following table and illustrated on the enclosed BAT Location Map.

**Table 3.A.1: Proposed BAT Valve Locations**

| Valve # | Type | Function | Longitude | Latitude |
|---------|------|----------|-----------|----------|
| █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ |

Installation of these additional control valves will shorten the segment lengths between flow control and isolation points along the pipeline segment.  This will serve to limit the volume of potential drain-down resulting from a release and thus limit the worst case release volume for this pipeline segment.

## 4.  <u>Summary of Risk Analysis</u>

a.  <u>Introduction and Risk Analysis Summary</u>

As discussed in the previous section, Plains defines BAT for this pipeline segment to be



Plains is proposing to retrofit this pipeline segment with these BAT elements to bring it into conformance with Plain's definition of BAT for this pipeline segment.

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 12 of 16

The Risk Analysis presented below compares the baseline condition of this pipeline segment with the retrofit condition of the pipeline segment after installation of all of the proposed BAT elements.  The following table summarizes the results of the Risk Analysis for these two conditions.

**Table 4.A.1: Risk Analysis Summary Table**

|  | Baseline Condition Existing L901 Las Flores to Gaviota | Retrofit with BAT Proposed L901 Las Flores to Gaviota | **Reduction** in Time/Volume Resulting from BAT Retrofit |
|---|---|---|---|
| Maximum leak detection time, hours | ███████ | ███████ | ███████ |
| Maximum shut-down response time, hours | ███████ | ███████ | ███████ |
| Maximum flow rate, barrels/hour | 1,450 | 1,450 | 0 |
| Drain down volume, barrels | 2,776 | 1,726 | 1,050 |
| Reasonable worst-case discharge volume, barrels | 3,622 | 1,871 | 1,750 |

b.  Risk Analysis Methodology and Findings

The following describes how each of the risk analysis metrics included in the Risk Analysis Summary Table were determined:

- *Maximum Leak Detection Time*

Maximum Leak Detection Time is defined as the time from when the pipeline release begins to when it has been detected.  Detected in this case means when the LDS employed on that pipeline segment identifies a release and notifies the operator through an alarm.

The LDS employed on this pipeline segment when it last operated was a volume balance (VB) CPM system configured to balance it with the portion of Line 903 from Plains' Gaviota Station to Plains' Pentland Station.  While VB CPM is a tried and true technology that meets pipeline safety regulations, ███████
███████████████████████████
███████████████████████████████
████████████████████████████
████████████████████████
███████████████████████████
██████████████████████████

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 13 of 16



Mr. Chau
Implementation Plan to Retrofit with BAT
Page 14 of 16

- *Maximum Flow Rate*

  Maximum flow rate was determined from historical flow data and the average maximum flow rate in that pipeline segment.  This maximum flowrate was used for both Risk Analysis conditions (baseline and BAT/retrofit).

- *Worst Case Drain-Down Volume and Worst Case Discharge Volume*

  Worst Case Volume is a quantity that can be theoretically calculated at any point along a pipeline based on several parameters.  These parameters include pipe diameter and wall thickness, product flow rate and valve closure response times (including both leak detection and shut-down response times) for a worst-case volume release, pipeline elevation data, and the existence and location of valves that can act to isolate individual sections of pipe.

  The following table provides a listing of the existing valves on this pipeline segment and the valves proposed as one of the BAT elements.  The table also provides the location of each valve based on the distance from the pipeline segment origination point at Plains' Las Flores Station, the location of each valve by its latitude and longitude, the valve type, and whether it is existing or proposed.  The location and number of valves was determined through an Emergency Flow Restriction Device assessment focused on minimizing the volume of a potential release and the potential impact to the Coastal Zone.

### Table 4.B.1: Existing and Proposed Valve Locations

| Valve # | Current Status | Type | Function | Measure Location | Longitude | Latitude |
|---------|----------------|------|----------|------------------|-----------|----------|
|         |                |      |          |                  |           |          |
|         |                |      |          |                  |           |          |
|         |                |      |          |                  |           |          |
|         |                |      |          |                  |           |          |
|         |                |      |          |                  |           |          |
|         |                |      |          |                  |           |          |
|         |                |      |          |                  |           |          |
|         |                |      |          |                  |           |          |
|         |                |      |          |                  |           |          |
|         |                |      |          |                  |           |          |

The worst-case discharge volume can be calculated for any point along a pipeline segment and consists of the sum of two calculations: the volume of the initial loss occurring from the moment the release begins to the moment the isolation valves have closed, and the volume of drain down at a given point on the pipeline.  The calculation is as follows:

- DD = Drain Down Volume

- MLDT = Maximum Leak Detection Time

- MSDRT = Maximum Shut-Down Response Time

- MFR = Maximum Flow Rate

- WCD = Worst Case Discharge (bbls)

- WCD = [(MLDT + MSDRT) x MFR] + DD

For the purposes of the Risk Assessment for this pipeline segment, a guillotine failure severing the pipeline completely was assumed.  The Risk Intelligence Platform (RIPL) model was used to calculate the Worst Case Discharge Volume and Drain-Down Volume every 30 meters along each portion of the pipeline segment defined by isolation valves.  The location along each isolation portion of the pipeline segment that yielded the largest worst case volume was then noted.

The following table lists each of the isolation portions for the BAT (or retrofit) condition of the pipeline segment, the location of the beginning and end of each isolation portion measured in feet downstream of the pipeline segment origination point at Plains' Las Flores Station, and the worst case discharge volume and drain-down volume for each isolation portion.

**Table 4.B.2: Isolation Segments and Worst-Case Volumes**

| Valve # From - To | Begin Measure Feet | End Measure Feet | Drain down Volume BBLS | Worst Case Volume BBLS |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

c. Risk Analysis Conclusions

As the Risk Analysis Summary table clearly illustrates, installation of the BAT components proposed for this pipeline segment reduces the worst case discharge volume from the baseline case.  Installation of the proposed BAT elements on this

Mr. Chau
Implementation Plan to Retrofit with BAT
Page 16 of 16

pipeline segment reduced the baseline worst case volume of 3,622.20 bbls to 1,871.40 bbls, a 48% reduction.

This analysis assumes that Plains can secure permits and access to install the proposed valves and associated power access, instrumentation, and communication devices as well as the additional flow measurement equipment at Plains' Gaviota Station.

5. **Timetable for Implementation**

    a. Describe the timetable for implementation and completion of the identified BAT plan. This plan shall include key milestones and, at a minimum, consider the following: purchase of equipment, acquisition of permits, and securing qualified individuals for construction

    Please reference the attached Gantt chart, which provides the estimated schedule and anticipated tasks involved to implement and complete the identified BAT plan. Key milestones include receiving Office of the State Fire Marshal concurrence and acceptance of the risk analysis and supplemental implementation plan, obtaining regulatory permits and surface sites for BAT installation, procurement of BAT-related equipment, and the initiation and completion of construction to install the identified BAT. Delays in securing permits and access for BAT installation, among other factors, may result in delays to the BAT implementation schedule. Should Plains experience significant delays it will notify the Office of the State Fire Marshall. 2113(c)(2)(B).

Plains2021C-02_0000064

# Enclosures

Plains2021C-02_0000065

# Registered Agent for Service Documentation

Plains2021C-02_0000066



## Secretary of State
## Registered Corporate Agent for Service of Process Certificate

(Registered Corporations ONLY)

**1505**



**FILED**

Secretary of State
State of California

A0852950

Filing Number

02/10/2021

Filing Date

**IMPORTANT** — **Read Instructions** before completing this form.

**Filing Fee** – **$30.00**

**Copy Fees** – First page $1.00; each attachment page $0.50; Certification Fee - $5.00 plus copy fees

**Who Can File?**  Any **active** corporation that is registered with the California Secretary of State can file this Form 1505 to become authorized to be a corporate agent for service of process for other business entities that are registered with the Secretary of State. To check the status of your corporation, and to ensure you are entering the **exact** name of the corporation and the **correct** 7-digit Secretary of State file number, go to BusinessSearch.sos.ca.gov.

This Space For Office Use Only

**1.   Corporate Name**   (Enter the **exact** name of the corporation as it is recorded with the California Secretary of State.)

CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - LAWYERS INCORPORATING SERVICE

**2.   7-Digit Secretary of State Entity Number**

C1592199

**3.   Address for Service of Process**   (Enter the **complete** street address in California of the office where any entity that named your corporation as agent for service of process may be served with process.)
**Do not** enter a P.O. Box or "in care of" an individual or entity.

| Street Address - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 2710 Gateway Oaks Drive, Suite 150N | Sacramento | CA | 95833 |

**4.   Authorized Employees**   (Enter the names of all persons employed by your corporation who are authorized to accept delivery of any copy of service of process, at the address entered in Item 3 above, on any entity who has designated your corporation a as its agent for service of process.  **Must** enter at least 1 person.  If there are more than 3, **see Instructions**.)

| a. First Name of Authorized Employee | Middle Name | Last Name | Suffix |
|---|---|---|---|
| See attached list | | | |
| b. First Name of Authorized Employee | Middle Name | Last Name | Suffix |
| | | | |
| c. First Name of Authorized Employee | Middle Name | Last Name | Suffix |
| | | | |

**5.   Statement of Consent** (Do not alter the Statement of Consent.)

This corporation consents that delivery of a copy of service of process to an authorized employee at the address designated in item 3 shall constitute delivery of any such copy to the corporation, as the agent for service of process.

**6.   Read and Sign Below**   (**See Instructions**.  Office or title not required.  Do not use a computer generated signature.)

I am a corporate officer and am authorized to sign on behalf of the corporation.

Signature

Jackie Smetana, Executive Vice President
Type or Print Name

1505 (REV 12/2020)

Plains2021C-02_0000067
2020 California Secretary of State
bizfile.sos.ca.gov

A0852950

Kaitlyn Mannix

Becky DeGeorge

Koy Saechao

Lai Saevang

Nicole Stauss

Kevin Bautista

Trudy Desbiens

Susie Vang

Catherine Webb

Roxie Taylor

Fanny Xiong

Melissa Vang

Dona Niemeyer

Melissa DeKoven

Carolyn Valle

Kaci Ransom

Kan Pen

Kelli Shortte

Annette Kuhlman

Arrielle Garcia

Brejet Stephens

Crystal Chapman

Janette Mcintyre

Jerome Suarez

Jonel Yelverton-

Reis

Kayla Vue

Laurie Tolman

Mindy Fay

Rafael Munoz

Samantha Alterman

Samantha Wiltz

Sherie Hinton

Parid Kurbini

Vivien Mitchell

Plains2021C-02_0000068



# State of California
## Secretary of State

## FOREIGN LIMITED PARTNERSHIP
## AMENDMENT TO APPLICATION FOR REGISTRATION

A $30.00 filing fee must accompany this form.
**IMPORTANT--** Read instructions before completing this form.

**FILED**
In the office of the Secretary of State
of the State of California

**DEC 2 9 2006**

↖ This Space For Filing Use Only

---

1. SECRETARY OF STATE FILE NUMBER
   199832700008

2. NAME UNDER WHICH THIS FOREIGN LIMITED PARTNERSHIP IS CONDUCTING BUSINESS IN CALIFORNIA
   PLAINS PIPELINE, L.P.

3. COMPLETE ONLY THE BOXES WHERE INFORMATION IS BEING CHANGED. ADDITIONAL PAGES MAY BE ATTACHED, IF NECESSARY. CONSULT THE INSTRUCTIONS BEFORE COMPLETING THIS FORM.

   A. THE NAME UNDER WHICH THIS FOREIGN LIMITED PARTNERSHIP CONDUCTS BUSINESS IN CALIFORNIA (END NAME WITH THE WORDS "LIMITED PARTNERSHIP" OR THE ABBREVIATION "L.P.")

   B. THE NAME OF THE FOREIGN LIMITED PARTNERSHIP HAS BEEN CHANGED AS FOLLOWS AND HAS BEEN RECORDED IN THE HOME STATE OR COUNTRY

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| C. THE ADDRESS OF THE PRINCIPAL EXECUTIVE OFFICE | | | |
| D. THE ADDRESS OF THE PRINCIPAL OFFICE IN CALIFORNIA | | CA | |

   E. THE NAME OF THE AGENT FOR SERVICE OF PROCESS
   Corporation Service Company which will do business in California as CSC-Lawyers Incorporating Service

   F. ADDRESS OF THE AGENT FOR SERVICE OF PROCESS. **COMPLETE ONLY IF AN INDIVIDUAL.**

   ADDRESS

| CITY | STATE | CA | - | ZIP CODE |
|---|---|---|---|---|

   G. THE ADDRESS OF GENERAL PARTNER(S) (ATTACH ADDITIONAL PAGES IF NECESSARY)

   NAME

   ADDRESS

| CITY | STATE | ZIP CODE |
|---|---|---|

   H. NAME CHANGE OF GENERAL PARTNER(S) (ATTACH ADDITIONAL PAGES IF NECESSARY)

   FROM:                                          TO:

   I. WITHDRAWAL OF GENERAL PARTNER(S)

   NAME

   NAME

   NAME

   J. ADDED GENERAL PARTNER(S) (ATTACH ADDITIONAL PAGES IF NECESSARY)

   NAME

   ADDRESS

| CITY | STATE | ZIP CODE |
|---|---|---|

   K. STATE OR COUNTRY OF FORMATION OF THE FOREIGN LIMITED PARTNERSHIP

   L. DATE ON WHICH THE FOREIGN LIMITED PARTNERSHIP WAS FORMED

4. NUMBER OF PAGES ATTACHED (IF ANY)

5. THE FOREIGN LIMITED PARTNERSHIP NAMED ABOVE IS, AS OF THE DATE THIS AMENDMENT IS EXECUTED, AUTHORIZED TO EXERCISE ITS POWERS AND PRIVILEGES AS A LIMITED PARTNERSHIP IN ITS HOME STATE OR COUNTRY OF FORMATION.

6. I CERTIFY THAT THE STATEMENTS CONTAINED IN THIS DOCUMENT ARE TRUE AND CORRECT TO MY OWN KNOWLEDGE. I DECLARE THAT I AM THE PERSON WHO IS EXECUTING THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

| SIGNATURE OF AUTHORIZED PERSON | Tim Moore, VP on behalf of | 11/13/06 |
|---|---|---|
| | TYPE OR PRINT NAME AND TITLE | DATE |

SEC/STATE (REV. 03/2005)

Plains Marketing GP Inc. - General Partner

FORM LP-6 -- FILING FEE: $30.00
Approved by Secretary of State

Plains2021C-02_0000069

# Outer Continental Shelf Crude Oil Safety Data Sheet

Plains2021C-02_0000070

*[handwritten]* Oac 526/495 5/pages
Use per Exxon 9/20/95

**EXXON COMPANY, U.S.A.**
A DIVISION OF EXXON CORPORATION

**CRUDE OIL**

*[handwritten]* BEL EMC PNT LAB TLJ BAO

DATE ISSUED: 08/09/95
SUPERSEDES DATE: 09/22/93

## MATERIAL SAFETY DATA SHEET

EXXON COMPANY, U.S.A.          P. O. BOX 2180          HOUSTON, TEXAS 77252-2180

---

## A. IDENTIFICATION AND EMERGENCY INFORMATION

**PRODUCT NAME**
Crude Oil

**CHEMICAL NAME**
Crude Oil

**CAS NUMBER**
8002-05-9

**PRODUCT APPEARANCE AND ODOR**
Dark Liquid
Strong hydrocarbon solvent odor

**MEDICAL EMERGENCY TELEPHONE NUMBER**
(713) 656-3424

---

## B. COMPONENTS AND HAZARD INFORMATION

| COMPONENTS | CAS No. OF COMPONENTS | APPROXIMATE CONCENTRATION |
|---|---|---|
| Crude oil - a naturally occurring combination of hydrocarbons. It consists predominately of paraffins, cyclo-paraffins, cyclic aromatic hydrocarbons having carbon numbers greater than C1. May also contain small amounts of benzene, hydrocarbons, sulfur and oxygenated compounds. All components of this product are listed on the U. S. TSCA inventory. | 8002-05-9 | 100% |

See Section E for health and hazard information

See Section H for additional Environmental Information.

**HAZARDOUS MATERIALS IDENTIFICATION SYSTEM (HMIS)**

| Health | Flammability | Reactivity | BASIS |
|---|---|---|---|
| 1 | 3 | 0 | Recommended by Exxon |

**EXPOSURE LIMIT FOR TOTAL PRODUCT**
Not established for total product

The airborne benzene level shall not exceed
1 ppm for an 8-hour workday; 5 ppm STEL          OSHA Regulation 29 CFR 1910.1028

---

mddccr/snared/msds/crudeoil

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000071

CRUDE OIL

## C.   PRIMARY ROUTES OF ENTRY AND EMERGENCY AND FIRST AID PROCEDURES

**EYE CONTACT**
If hot product is splashed into eyes, flush with clear water and contact physician immediately.  If splashed into eyes, flush with clear water for 15 minutes or until irritation subsides. If irritation persists. call a physician.

**SKIN CONTACT**
Immediately contact a physician for treatment of thermal burns.  In case of skin contact with product under other conditions, wash thoroughly with soap and water.  Removal of product from skin may be aided by use of waterless hand cleaner.  If product is injected into or under the skin. or into any part of the body, regardless of the appearance of the wound or its size, the individual should be evaluated immediately by a physician as a surgical emergency.  Even though initial symptoms from high pressure injection may be minimal or absent, early surgical treatment within the first few hours may significantly reduce the ultimate extent of injury.

**INHALATION**
If overcome by vapor, remove from exposure and call a physician immediately.  If breathing is irregular or has stopped, start resuscitation; administer oxygen, if available.

**INGESTION**
If ingested, DO NOT induce vomiting; call a physician immediately.

## D.   FIRE AND EXPLOSION HAZARD INFORMATION

**FLASH POINT**
Less than 16°C (60°F) to greater
than 93°C (200°F) PMCC

**AUTOIGNITION TEMPERATURE**
Not Determined

**NATIONAL FIRE PROTECTION ASSOCIATION (NFPA) - HAZARD IDENTIFICATION**

| Health | Flammability | Reactivity | BASIS |
|--------|--------------|------------|-------|
| 1 | 3 | 0 | NFPA |

**HANDLING PRECAUTIONS**
Keep product away from heat sparks, pilot lights. static electricity, and open flame.

**FLAMMABLE OR EXPLOSIVE LIMITS (APPROXIMATE PERCENT BY VOLUME IN AIR)**
Estimated Values: Lower Flammable Limit: 0.6%    Upper Flammable Limit: 15%

**HOT CRUDE FLASH WARNING**
Studies have shown that relatively low flash point substances, such as low boiling hydrocarbons, may accumulate in the vapor space of crude tanks and bulk transport compartments.  Such vapors may exhibit flammability characteristics of a significantly lower flash porduct than would be indicated by the flash test. As a precaution. keep ignition sources away from vents and openings, including prevention of accumulation of pyrophoric iron sulfide.

**EXTINGUISHING MEDIA AND FIRE FIGHTING PROCEDURES**
Foam, water spray (fog), dry chemical, carbon dioxide and vaporizing liquid type extinguishing agents may all be suitable for extinguishing fires involving this type of product. depending on size or potential size of fire and circumstances related to the situation.  Plan fire protection and response strategy through consultation with local fire protection authorities or appropriate specialists.

Date Issued : 8/9/95
Supersedes:  9/22/93

Plains2021C-02_0000072

CRUDE OIL

The following procedures for this type of product are based on the recommendations in the National Fire Protection Association's "Fire Protection Guide on Hazardous Materials", Tenth Edition (1991):

Use water spray, dry chemical, foam, or carbon dioxide. Water or foam may cause frothing. Use water to keep fire-exposed containers cool. Water spray may be used to flush spills away from exposures. Minimize breathing gases, vapor, fumes or decomposition products. Use supplied-air breathing equipment for enclosed or confined spaces or as otherwise needed.

NOTE: The inclusion of the phrase "water may be ineffective" is to indicate that although water can be used to cool and protect exposed material, water may not extinguish the fire unless used under favorable conditions by experienced fire fighters trained in fighting all types of flammable liquid fires.

## DECOMPOSITION PRODUCTS UNDER FIRE CONDITIONS
Fumes, smoke, carbon monoxide, aldehydes and other decomposition products, in the case of incomplete combustion.

## "EMPTY" CONTAINER WARNING
"Empty" containers retain residue (liquid and/or vapor) and can be dangerous.
DO NOT PRESSURIZE, CUT, WELD, BRAZE, SOLDER, DRILL, GRIND OR EXPOSE SUCH CONTAINERS TO HEAT, FLAME, SPARKS, STATIC ELECTRICITY, OR OTHER SOURCES OF IGNITION; THEY MAY EXPLODE AND CAUSE INJURY OR DEATH. Do not attempt to clean since residue is difficult to remove. "Empty" drums should be completely drained, properly bunged and promptly returned to a drum reconditioner. All other containers should be disposed of in an environmentally safe manner and in accordance with governmental regulations. For work on tanks refer to Occupational Safety and Health Administration regulations, ANSI Z49.1, and other governmental and industrial references pertaining to cleaning, repairing, welding, or other contemplated operations.

## E.   HEALTH AND HAZARD INFORMATION
### VARIABILITY AMONG INDIVIDUALS
Health studies have shown that many petroleum hydrocarbons pose potential human health risks which may vary from person to person. As a precaution, exposure to liquids, vapors, mists or fumes should be minimized.

### EFFECTS OF OVEREXPOSURE (SIGNS AND SYMPTOMS OF EXPOSURE)
High vapor concentrations are irritating to the eyes and the respiratory tract, may cause headaches and dizziness, are anesthetic, may cause unconsciousness, and may have other central nervous system effects including death. CAUTION: Product sometimes shipped hot; protect against burns.

### NATURE OF HAZARD AND TOXICITY INFORMATION
Skin contact with hot product may cause thermal burns. Prolonged or repeated contact with this product at warm or ambient temperatures tends to remove skin oils, possibly leading to irritation and dermatitis.

Eye contact with hot product may cause thermal burns. Contact with this product at warm or ambient temperatures may cause eye irritation but will not damage eye tissue.

This product may contain benzene, CAS #71-43-2, as a natural constituent. Benzene can cause anemia and other blood diseases, including leukemia (cancer of the blood-forming system), after prolonged or repeated exposures at high concentrations (e.g., 50-500 ppm). It has also caused fetal defects in tests on laboratory animals.

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000073

Crude Oil has been shown to cause skin cancer in animal tests. In such lifetime skin painting tests the substance was applied to the shaved backs of mice at regular intervals without cleanup between applications. In view of these findings, there may be a potential risk of skin cancer in humans from prolonged and repeated skin contact with this product in the absence of good personal hygiene.

Limited studies on oils that are very active carcinogens have shown that washing the animal's skin with soap and water between applications greatly reduces tumor formation. These studies demonstrate the effectiveness of cleansing the skin after contact.

Potential risks to humans can be minimized by observing good work practices and personal hygiene procedures generally recommended for petroleum products. See Section I for recommended protection and precautions.

**PRE-EXISTING MEDICAL CONDITIONS WHICH MAY BE AGGRAVATED BY EXPOSURE**
Benzene - Individuals with liver disease may be more susceptible to toxic effects.
Petroleum Solvents/Petroleum Hydrocarbons - Skin contact may aggravate an existing dermatitis.

## F.   PHYSICAL DATA

**THE FOLLOWING DATA ARE APPROXIMATE OR TYPICAL VALUES AND SHOULD NOT BE USED FOR PRECISE DESIGN PURPOSES**

**BOILING POINT**
Gas to 550°C (1000°F +)

**VAPOR PRESSURE**
Not Available

**SPECIFIC GRAVITY ($H_2O = 1$)**
Greater than or equal to 0.7

**VAPOR DENSITY (AIR = 1)**
Not Available

**MOLECULAR WEIGHT**
Not Available

**PERCENT VOLATILE BY VOLUME**
Up to 50%

**pH**
Essentially Neutral

**EVAPORATION RATE @ ATM AND 25°C (77°F)**
**(n-BUTYL ACETATE = 1)**
Not Available

**POUR, CONGEALING OR MELTING POINT**
Not Available

**SOLUBILITY IN WATER**
Not Available

**VISCOSITY**
Not Available

## G.   REACTIVITY

This product is stable. Hazardous polymerization will not occur. Avoid contact with strong oxidants such as liquid chlorine, concentrated oxygen, sodium hypochlorite or calcium hypochlorite. Hot product in contact with water can cause foaming or sudden evolution of steam which could cause pressure build-up and possibly rupture a tank or vessel.

Plains2021C-02_0000074

CRUDE OIL

## H.   ENVIRONMENTAL INFORMATION

"CLEAN WATER ACT/OIL POLLUTION ACT - This product may be classified as an oil under Section 311 of the Clean Water Act, and under the Oil Pollution Act. Discharges or spills into or leading to surface waters that cause a sheen must be reported to the National Response Center (1-800-424-8802)."
STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED
Shut off and eliminate all ignition sources. Keep people away. Recover free liquid. Add sand, earth or other suitable absorbent to spill area. Minimize breathing vapors. Minimize skin contact. Ventilate confined spaces. Hot product may solidify when cooled. Keep product out of sewers and watercourses by diking or impounding. Advise authorities if product has entered or may enter sewers, watercourses, or extensive land areas.

Assure conformity with applicable governmental regulations. Continue to observe precautions for volatile, flammable vapors from absorbed material.

THE FOLLOWING INFORMATION MAY BE USEFUL IN COMPLYING WITH VARIOUS STATE AND FEDERAL LAWS AND REGULATIONS UNDER VARIOUS ENVIRONMENTAL STATUES:

REPORTABLE QUANTITY (RQ), EPA REGULATION 40 CFR 302 (CERCLA Section 102)
This product/stream is exempt from CERCLA Reporting Requirements. Refer to Clean Water Act/Oil Pollution Act.

THRESHOLD PLANNING QUANTITY (TPQ), EPA REGULATION 40 CFR 355 (SARA Sections 301-304)
No TPQ for product or any constituent greater than 1% or 0.1% (carcinogen).

TOXIC CHEMICAL RELEASE REPORTING, EPA REGULATION 40 CFR 372 (SARA Section 313)
This product may contain:
   Approximately 0-1% benzene
   Approximately 0-3% cumene
   Approximately 0-2% cyclohexane
   Approximately 0-5% ethylbenzene
   Approximately 0-2% naphthalene
   Approximately 10-20% toluene
   Approximately 15-30% xylene

HAZARDOUS CHEMICAL REPORTING, EPA REGULATION 40 CFR 370 (SARA Sections 311-312)

EPA HAZARD CLASSIFICATION CODE:

| Acute Hazard | Chronic Hazard | Fire Hazard | Pressure Hazard | Reactive Hazard | Not Applicable |
|---|---|---|---|---|---|
| XXX | XXX | XXX | | | |

## I.   PROTECTION AND PRECAUTIONS

VENTILATION
Provide ventilation sufficient to prevent exceeding recommended exposure limit or build-up of explosive concentrations of vapor in air. Use explosion-proof equipment.

RESPIRATORY PROTECTION
Use supplied-air respiratory protection in confined or enclosed spaces, if needed.

PROTECTIVE GLOVES
Protect against hot liquid. Use chemical-resistant gloves to avoid skin contact.

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000075

CRUDE OIL

**EYE PROTECTION**
Use splash goggles or face shield when eye contact may occur.

**OTHER PROTECTIVE EQUIPMENT**
Use chemical-resistant apron or other impervious clothing, if needed, to protect against hot liquid and to avoid skin contact.

**WORK PRACTICES / ENGINEERING CONTROLS**
Use explosion-proof equipment. No smoking or open lights.

**PERSONAL HYGIENE**
Minimize breathing vapor, mist or fumes. Avoid prolonged or repeated contact with skin. Remove contaminated clothing; launder or dry-clean before reuse. Remove contaminated shoes and thoroughly clean before reuse; discard if oil-soaked. Cleanse skin thoroughly after contact, before breaks and meals, and at end of work period. Product is readily removed from skin by waterless hand cleaners, followed by washing thoroughly with soap and water.

## J.    TRANSPORTATION AND OSHA RELATED LABEL INFORMATION

**TRANSPORTATION INCIDENT INFORMATION**
For further information relative to handling spills resulting from transportation incidents, refer to latest Department of Transportation Emergency Response Guidebook for Hazardous Materials Incidents (ERG).

**DOT IDENTIFICATION NUMBER**
Know the flash point for each shipment to accurately classify it into the right category.

Petroleum Crude Oil, 3, UN 1267, PG*
*PG I   - Initial Boiling Point =< 95°F (35°)
*PG II  - Initial Boiling Point > 95°F (35°), Flash Point <73°F (23°C)
*PG III - Initial Boiling Point > 95°F (35°), Flash Point ≤73°F (23°C)
          and =<141°F (60.5°C)
OR
Petroleum crude oil, combustible liquid, UN 1267, PG III
(Flash Point >141°F (60.5°F) and <200°F (93°)
OR
Not regulated if flash point = >200°F (93°)

**OSHA REQUIRED LABEL INFORMATION**
In compliance with hazard and right-to-know requirements, the following OSHA Hazard Warnings should be found on a label, bill of lading or invoice accompanying this shipment.

DANGER!

EXTREMELY FLAMMABLE

LONG-TERM, REPEATED EXPOSURE MAY CAUSE
CANCER, BLOOD AND NERVOUS SYSTEM DAMAGE

CONTAINS: BENZENE

OVEREXPOSURE MAY CAUSE EYE, SKIN OR
RESPIRATORY TRACT IRRITATION OR DAMAGE,
AND MAY CAUSE HEADACHES, DIZZINESS
OR OTHER ADVERSE NERVOUS SYSTEM
EFFECTS OR DAMAGE, INCLUDING DEATH

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000076

CRUDE OIL

This information and recommendations contained herein are, to the best of Exxon's knowledge and belief, accurate and reliable as of the date issued. Exxon does not warrant or guarantee their accuracy or reliability, and Exxon shall not be liable for any loss or damage arising out of use thereof.

The information and recommendations are offered for the user's consideration and examination, and it is the user's responsibility to satisfy itself that they are suitable and complete for its particular use. If buyer repackages this product, legal counsel should be consulted to insure proper health, safety and other necessary information is included on the container.

The Environmental Information included under Section H thereof as well as the National Fire Protection Association (NFPA) ratings have been included by Exxon Company, U.S.A. in order to provide additional health and hazard classification information. The ratings recommended are based upon the criteria supplied by the developers of these rating systems, together with Exxon's interpretation of the available data.

FOR ADDITIONAL INFORMATION ON HEALTH EFFECTS CONTACT:
Director of Industrial Hygiene
Exxon Company, USA
Room 3180, Exxon Building
P. O. Box 2180
Houston, Texas 77252-2180
(713) 656-2443

Date Issued : 8/9/95
Supersedes: 9/22/93

Plains2021C-02_0000077

# Flow Diagrams

Plains2021C-02_0000078

SANTA BARBARA, CALIFORNIA
SECTION 27 – T5N – R30W

LAS FLORES
PUMP STATION
FLOW DIAGRAM

NOTES:

TITLE OF REFERENCE DRAWING | DRAWING NO.

PLAINS ALL AMERICAN PIPELINE L.P.

LAS FLORES PUMP STATION
BAKERSFIELD DISTRICT, WESTERN DIVISION
PROCESS FLOW DIAGRAM

| | | | | | | JM | 09/13 | 0 | AS—BUILT PER FIELD WALKDOWN | | 09/27/13 |
| NAME | DATE | NAME | DATE | NAME | DATE | REV. NO. | | | REVISION | | DATE |
| OPERATIONS | | ENGINEERING | | DRAFTING | | | | | | | |

DRAWN BP   CHECKED JM   DRFT. APPV. MEO
DATE 09/27/13   SCALE NONE   ENGR. APPV.

LSF1—D—F—1083

Plains2021C-02_0000079

SANTA BARBARA, CALIFORNIA
SECTION , T5N – R30W

GAVIOTA
PUMP STATION
FLOW DIAGRAM

NOTES:

PLAINS ALL AMERICAN
PIPELINE L.P.

GAVIOTA PUMP STATION
BAKERSFIELD DISTRICT, WESTERN DIVISION
PROCESS FLOW DIAGRAM

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | JM | 09/13 | 0 | AS–BUILT PER FIELD WALKDOWN | | 09/27/13 |
| NAME | DATE | NAME | DATE | NAME | DATE | REV. NO. | REVISION | | DATE |
| OPERATIONS | | ENGINEERING | | DRAFTING | | | | | |

| DRAWN | BP | CHECKED | JM | DRFT. APPV. | MEO |
|---|---|---|---|---|---|
| DATE | 09/27/13 | SCALE | NONE | ENGR. APPV. | |

GVT1–D–F–1084

TITLE OF REFERENCE DRAWING | DRAWING NO.

Plains2021C-02_0000080

# Vicinity Map

Plains2021C-02_0000081



Santa Barbara

Gaviota

Las Flores

Source: Esri, Maxar, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community

0  0.15  0.3    0.6    0.9    1.2
Miles

N W E S

**PLAINS**
ALL AMERICAN
PIPELINE, L.P.

**L901 LAS FLORES TO GAVIOTA - 24"**

1 in:1 miles

Sheet No.: 1/2

Plains2021C-02_0000082



| Centerline |
| Affecting Coastal Zone |
| NHDFlowline |
| Roads |
| Rail Roads |
| Affected Flowline |
| Terrain Paths |
| Spray/Pooling Radius |
| CCC |
| EESACZ |

**Landslide Susceptibility**

- High incidence
- High susceptibility, moderate incidence
- High susceptibility, low incidence
- Moderate incidence
- Moderate susceptibility, low incidence
- Low incidence
- No data

**Seismic Shaking Intensity**

- Extreme
- Light
- Moderate
- Not Felt
- Severe
- Strong
- Very Strong
- Violent

**Mean Rainfall (in)**

**Rainfall (in)**

- 11.691000 - 24.980000
- 25.040000 - 36.446000
- 36.463000 - 47.333000
- 47.360000 - 60.091000
- 60.136000 - 75.645000
- 75.715000 - 92.636000
- 92.694000 - 109.416000
- 109.463000 - 130.010000
- 130.298000 - 162.604000
- 163.290000 - 216.127000

| Segment: | | Owner: |
| L901 LAS FLORES TO GAVIOTA - 24" | *LEGEND* | PLAINS ALL AMERICAN PIPELINE, L.P. |
| Sheet No:   2/2 | | |

Plains2021C-02_0000083

# BAT Location Map

Plains2021C-02_0000084





**Line 901 BAT Location Map**

| Implementation Plan | Scale: 1:75,000 |
| Santa Barbara, California | Sheet No:  1/1 |

This user generated map has been prepared from sources considered to be reliable. However, Plains Pipeline L.P. hasfurnished this copy for information only and assumes no responsibility for the accuracy or completeness of data shown.

0  1,750  3,500  7,000  10,500  14,000
Feet

M:\CA-OSFM_AB 864\L901-L903\Map Files\2021_03_22_L901_BAT_LOCATIONS2.mxd

Plains2021C-02_0000085

# Timetable for Implementation Gantt Chart

Plains2021C-02_0000086



Plains2021C-02_0000087

## PROOF OF SERVICE

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On June 3, 2025, I served the document(s) **DECLARATION OF STEVE RUSCH IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTON** on the interested parties stated below, by the following means of service:

### See Attached Service List

☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 3, 2025, at Los Angeles, California.

/s/ Josie Cisneros
Josie Cisneros

**SERVICE LIST**

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
dpettit@biologicaldiversity.org
          tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:    (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
          jfrankel@environmentaldefensecenter.org
          trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/
DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:    (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (310) 620-5879
Email: djmoore@paulhastings.com
          benjaminhanelin@paulhastings.com
          natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY
LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:    (805) 966-7000
Email: TLarge@FLASllp.com

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
MATTHEW C. WICKERSHAM, SBN 241733
matt.wickersham@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>        Petitioners and Plaintiffs,<br><br>   v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>        Respondents and Defendants,<br><br>   and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>        Real Parties in Interest. | Case No. 25CV02247<br>[Coordinated with Case No. 25CV02244]<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION**<br><br>[*Filed concurrently with Opposition to Preliminary Injunction; Declarations of Michael A. Mische, Michael J. Rosenfeld, Steve Rusch, and Bart Leininger*]<br><br>Date:      July 18, 2025<br>Time:     10:00 AM<br>Dept.:    4<br><br>Complaint Filed:    April 15, 2025<br>Trial Date:      None Set |

1

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.      **INTRODUCTION AND QUALIFICATIONS** ........................................................**5**

      A.      Assignment and Scope of Work Performed................................................5

      B.      Qualifications and Background ..................................................................5

      C.      Materials and Evidence Considered ..........................................................5

      D.      Compensation ............................................................................................6

II.      **SUMMARY OF OPINIONS** ............................................................................**7**

      A.      In my opinion, the Pipelines have been inspected, repaired, coated and tested per the Consent Decree (CD), State Waivers, State Regulations, PHMSA Regulations, and PHMSA Waiver Approvals. ...........................................................................7

      B.      In my opinion, the Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards in place today. .................................................7

      C.      In my opinion, the Pipelines can be operated and maintained in a safe manner based on the inspection requirements outlined in the State Waiver conditions as well as PHMSA Advisory Bulletin (ADB-2016-04). ..............................7

      D.      In my opinion, the information provided in the Declaration of Richard B. Kuprewicz for Case No, 25CV02247 is misleading, overgeneralized or inaccurate. .............................................7

III.      **BACKGROUND** ............................................................................................**8**

IV.      **ANALYSIS** ....................................................................................................**9**

      A.      In my opinion, the Pipelines have been inspected, repaired, coated and tested per the Consent Decree (CD), State Waivers, State Regulations, PHMSA Regulations, and PHMSA Waiver Approvals. ...........................................................................9

      B.      In my opinion, the Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards in place today. .................................................14

      C.      In my opinion, the Pipelines can be operated and maintained in a safe manner based on the inspection

2

requirements outlined in the State Waiver conditions as well as PHMSA Advisory Bulletin (ADB-2016-04). ........................... 17

D.  In my opinion, the information provided in the Declaration of Richard B. Kuprewicz for Case No, 25CV02247 is misleading, overgeneralized or inaccurate. .......................... 47

Appendix A – Consent Decree Table – Summary with Status to Article I, II, and Appendix D of Case 2:20-CV-02415 ........................................................................... 63

Appendix B – CA-324 State Waiver Summary with Status ........................................ 98

Appendix C – CA-325A and CA-325B State Waiver Summary with Status .................... 126

Exhibit A - CV ........................................................................... 150

Exhibit B – Consent Decree ........................................................................... 151

Exhibit C – CA-324 State Waiver ........................................................................... 152

Exhibit D – CA-325A and CA-325B State Waiver ........................................................... 153

Exhibit E - Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable for CA-324 Pipeline ..................................... 154

Exhibit F - Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable for CA-325A/B Pipeline .............................. 155

Exhibit G – AVEVA Product Datasheet – Pipeline Operations for Liquids...................... 156

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## LIST OF FIGURES

Figure 1:        Pacific Pipeline System – Block Flow Diagram

Figure 2:        ILI Tool Example

Figure 3:        ILI Tool Example – Illustration inside of pipe

Figure 4:        ILI Tool Example – Illustration inside of pipe

Figure 5:        Composite Sleeve Repair

Figure 6:        Type B Sleeve Repair

Figure 7:        Pipe Removal

Figure 8:        Pipe Installation with EFRD

Figure 9:        Example of Coating Repair – Prior to coating

Figure 10:       Example of Coating Repair – After coating

## LIST OF TABLES

Table 1:        PHMSA Findings and Sable Response

Table 2:        Las Flores Pipeline Information

Table 3:        Distance Between Flow Meters - Reduction

Table 4:        Valve Installations

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## I.    INTRODUCTION AND QUALIFICATIONS

### A.    Assignment and Scope of Work Performed

1.    I, Brien Vierra, am a professional engineer with FJ Technologies, Inc. I have been retained to provide an opinion on the fitness for service of the Las Flores Pipeline system, which is owned by Pacific Pipeline Company and operated by Sable Offshore Corp ("the Pipelines"). The Pipelines are designed to transport crude oil from Las Flores Canyon (Santa Barbara County) to Pentland Station (Kern County), where crude oil is transported by other carriers to the end user. The lines are known as CA-324 (10.86 miles of 24-inch pipe, Las Flores to Gaviota), CA-325A (38.72 miles of 30-inch pipe, Gaviota to Sisquoc) and CA-325B (74.85 miles of 30-inch pipe, Sisquoc to Pentland).

### B.    Qualifications and Background

2.    I have over 35 years of experience in the pipeline industry, and I established my consulting company in 1997. I have worked in several capacities from permitting and design of cross country pipelines, pressure vessel modifications, permitting and design of process and pumping facilities, design and installation of directional drill crossings, field construction observation, project management, project design, hydraulic analysis, pipe stress analysis (Caesar II/Coade), vessel design/fatigue analysis (Compress/Codeware), risk analysis, tank, vessel and pipeline internal/external inspection analysis, preparation of weld procedures and conceptual planning. I have a Bachelor's Degree in Mechanical Engineering Technology from California Polytechnic State University, San Luis Obispo and have been licensed by the State of California as a Professional Engineer.

### C.    Materials and Evidence Considered

3.    To form the below Opinions, I relied on direct field observations obtained by personally observing work being completed in compliance with State and Federal requirements, and I reviewed the following documents:

   a.  Design documents both historical and current, as described below;

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

b. Hydrostatic Spike Test Reports and Hydrotest Strength Reports, as described below;

c. Corrosion Under Insulation Plan per State Waivers and Consent Decree, as described below;

d. Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, entered in Case No. 2:20-cv-02415, filed on March 13, 2020 and attached as Exhibit B;

e. State Waiver for CA-324 issued by Department of Forestry and Fire Protection, Office of the State Fire Marshal issued December 17, 2024, attached as Exhibit C;

f. State Waiver for CA-325A/B issued by Department of Forestry and Fire Protection, Office of the State Fire Marshal issued December 17, 2024, attached as Exhibit D;

g. U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable in which PHMSA states "Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline," dated February 11, 2025 and signed by Alan K. Mayberry, Associate Administrator for Pipeline Safety, attached as Exhibit E; and

h. U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Docket No. PHMSA-2025-0003 letter responding to Office of the State Fire Marshal granting a waiver to Sable in which PHMSA states "Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A/B pipeline," dated February 11, 2025 and signed by Alan K. Mayberry, Associate Administrator for Pipeline Safety, attached as Exhibit F.

**D.     Compensation**

6

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

4.    I have been compensated at a rate of $150 per hour.

**II.    SUMMARY OF OPINIONS**

**A.    In my opinion, the Pipelines have been inspected, repaired, coated and tested per the Consent Decree (CD), State Waivers, State Regulations, PHMSA Regulations, and PHMSA Waiver Approvals.**

**B.    In my opinion, the Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards in place today.**

**C.    In my opinion, the Pipelines can be operated and maintained in a safe manner based on the inspection requirements outlined in the State Waiver conditions as well as PHMSA Advisory Bulletin (ADB-2016-04).**

**D.    In my opinion, the information provided in the Declaration of Richard B. Kuprewicz for Case No, 25CV02247 is misleading, overgeneralized or inaccurate.**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

## III.    BACKGROUND

1. In May 2016, PHMSA issued a Failure Investigation Report on the Plains Pipeline

   LP (Plains) Line 901 Crude Oil Release that occurred on May 19, 2015.[1]

   The Executive Summary reads as follows:

   At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl.) of heavy crude oil. An estimated 500 bbl. of crude oil entered the Pacific Ocean. Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station. On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901. Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release. As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified. On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan. No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.
   PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

   1) Ineffective protection against external corrosion of the pipeline

   ---

   [1] https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf. The lines at the time of the release were under federal jurisdiction (see 49 CFR Part 195) because they were considered interstate pipelines. As part of the Consent Decree signed by Plains in 2020, Lines CA-324, CA-325A and CA-325B (formerly Lines 901 and 903) are now under the regulatory oversight of the Office of the State Fire Marshal (OSFM).

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

- The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.
- The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2) Failure by Plains to detect and mitigate the corrosion
- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

3) Lack of timely detection of and response to the rupture
- The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.
- Control room staff did not detect the abnormal conditions in regards to the release as they occurred. This resulted in a delayed shutdown of the pipeline.
- The pipeline controller restarted the Line 901 pipeline after the release occurred.
- The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.
- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report. PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage. PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

## IV.  ANALYSIS

**A.    In my opinion, the Pipelines have been inspected, repaired, coated and tested per the Consent Decree (CD), State Waivers, State Regulations, PHMSA Regulations, and PHMSA Waiver Approvals.**

9

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

1. Sable has completed over 200 repairs, installed over twenty-seven new valves, installed a new control center with Real Time Transient Modelling (RTTM) for leak detection with automated shutdowns, and implemented several procedures and processes to ensure the lines are safe to operate.

2. The Pipelines can be operated at a minimal risk to the environment due to the increased safety items that Sable has integrated into the pipeline system both technologically and training of personnel in conjunction with the significant Federal and State mitigation requirements.

3. In addition to other State and Federal regulations, OSFM has issued specific Waivers with which Sable is required to comply with prior to restart and during operations.

4. Sable acquired lines CA-324, CA-325A and CA-325B in early 2024, and they began making repairs as soon as doing so was allowed. In response to the PHMSA findings, the Consent Decree, and the State Waivers, Sable has completed all of the following items:

| PHMSA FINDING | CHANGES COMPLETED BY SABLE |
|---|---|
| 1) Ineffective protection against external corrosion of the pipeline<br><br>• The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.<br>• The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system. | Sable has completed over 200 repairs to remove or repair areas of corrosion that were reported by the latest ILI tool runs that were 40% or greater. Two ILI tools were run through CA-324 and one tool through CA-325A and 325B.<br><br>As per the State Waiver, Sable will continue inspecting the lines at routine time intervals for metal loss, twice annually for first 2 years of operation. Sable will utilize techniques |

10

| | |
|---|---|
| | such as ultrasonic wall thickness for wall loss detection, quantification of data, and ultrasonic shear wave for crack detection. Data analysis will take into consideration tool tolerance, growth rate, and mitigation techniques to enhance the probability of success in effectively mitigating any external corrosion that occurs on the lines. |
| 2) Failure by Plains to detect and mitigate the corrosion <br><br> • The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately. | In 2022 and 2023, additional ILI tools were ran through CA-324 and CA-325A/B to characterize the extent and depth of the external corrosion accurately. Sable based their repair program on these new tool runs as well as field review of actual conditions during the repair process. <br><br> Sable is currently planning the next ILI tool runs through the system within the first seven days of steady state operation in which the State Waiver Conditions require that Sable account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used as well as demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If |

11

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.  In addition, under condition 28, prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013). |
|---|---|
| 3) Lack of timely detection of and response to the rupture<br><br>• The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location. | Sable has taken comprehensive steps to enhance its pipeline monitoring, detection, and emergency response capabilities. These improvements are designed to prevent a recurrence of the incident and ensure the highest standards of operational safety. Key actions include:<br>•       Enhanced Detection Infrastructure - |
| • Control room staff did not detect the abnormal conditions in regards to the release as they occurred. This resulted in a delayed shutdown of the pipeline. | New meters have been installed at Gaviota and Sisquoc, along with additional meters at Las Flores and Pentland. These upgrades, combined with improved pressure and temperature monitoring, significantly increase detection capabilities across all pipeline segments. |
| • The pipeline controller restarted the Line 901 pipeline after the release occurred. | |
| • The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down. | •       Advanced SCADA and Alarm Systems -<br><br>A new SCADA system has been deployed, featuring safety-related alarms calibrated to detect abnormal operating conditions. These alarms are designed to alert control room |
| • Control room staff training lacked formalized and succinct requirements, including emergency | staff promptly and can automatically initiate a system shutdown using a Real-Time Transient Model (RTTM) for rapid response. |

12

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| shutdown and leak detection system functions such as alarms. | •     SCADA Simulator for Realistic Training -<br><br>A comprehensive SCADA simulator has been developed to replicate the CA-324, CA-325A, and CA-325B pipeline segments. This simulator is used to train controllers in leak recognition, emergency response, and operational procedures under realistic conditions, significantly improving preparedness and decision-making.<br><br>•     Targeted Training, Procedures, and Empowered Safety Culture –<br><br>Sable is implementing specialized training programs focused on the specific circumstances of the previous release. These include formalized protocols for emergency shutdowns, alarm response, and use of the leak detection system. In addition, the company has fostered a safety culture that empowers controllers to act decisively—prioritizing safety and enabling them to initiate shutdowns based on their training and judgment without hesitation.<br><br>•     Revised Restart Protocols –<br><br>Sable is incorporating standard operating procedures to prohibit pipeline restarts following any suspected release until a full assessment is completed. This ensures that safety is prioritized over operational continuity and that no restart occurs without a verified safe operating condition.<br><br>In my opinion, these measures reflect Sable's commitment to continuous improvement, environmental stewardship, and the safety of its operations.<br><br>•     See section 5.a.5) SCADA and Appendix E for additional details on the |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | | RTTM system as well as other items to enhance the capabilities of the systems. |

**Table 1 – Sable Response to Findings**

**B.      In my opinion, the Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards in place today.**

1.      The Pipelines can be operated at a minimal risk to the environment due to the increased safety items that Sable has integrated into the pipeline system both technologically and training of personnel in conjunction with the significant Federal and State mitigation requirements.

2.      Installation Construction Specifications - Table 2 below provides a summary of the basic system design:

| | CA-324: Las Flores Canyon to Gaviota | CA-325A: Gaviota to Sisquoc | CA-325B: Sisquoc to Pentland |
|---|---|---|---|
| *Year of Construction:* | 1990 | 1986 | 1986 |
| *Pipeline Diameter:* | 24 inches | 30 inches | 30 inches |
| *Length of Pipeline:* | 10.8 miles from Las Flores Pump Canyon Station to Gaviota Station. Flow diagrams for the Las Flores Canyon and Gaviota Stations are enclosed for reference in | 38.7 miles in length from Gaviota Station to Sisquoc Pump Station. Flow diagrams for the Gaviota and Sisquoc Stations are enclosed for reference in | 74.8 miles in length from Sisquoc Pump Station to Pentland Station. Flow diagrams for the Sisquoc and Pentland Stations are enclosed for reference in |

14

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | CA-324: Las Flores Canyon to Gaviota | CA-325A: Gaviota to Sisquoc | CA-325B: Sisquoc to Pentland |
|---|---|---|---|
| | *Attachment A – Flow Diagrams.* | *Attachment A – Flow Diagrams.* | *Attachment A – Flow Diagrams.* |
| *Predominant Pipe Grade:* | API 5L, Grade X-65 | API 5L, Grade X-65, X-70 | API 5L, Grade X-65, X-70 |
| *Predominant Wall Thickness:* | 0.344 inches | 0.281, 0.344 inches | 0.281, 0.344, 0.375, 0.438 inches |
| *Maximum Operating Pressure (MOP):* | 1003 psig at low point | 1000 psig at low point | 1292 psig at low point up to CHK 37, then 1170 PSIG at low point between CHK 37 to Pentland |
| *Normal Operating Pressure (NOP):* | 250 to 600 psig | 500 to 650 psig | 940 to 1150 psig |
| *Pipe Seam:* | High frequency electric resistance welded (HF-ERW) manufactured in 1985 and 1986. | Double submerged arc welded (DSAW) manufactured between 1984 and 1986. | Double submerged arc welded (DSAW) manufactured between 1984 and 1986. |
| *Existing and New Valves:* | 4 valves (3 MOV, 1 check)  7 new valves (6 MOV, 1 Check) | 8 valves (5 MOV, 3 check)  6 new valves (4 MOV, 2 Check) | 8 valves (4 MOV, 3 check, 1 manual)  14 new valves (4 MOV, 10 check) |

15

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | CA-324: Las Flores Canyon to Gaviota | CA-325A: Gaviota to Sisquoc | CA-325B: Sisquoc to Pentland |
|---|---|---|---|
| *Elevations:* | Las Flores: 193 feet ASL<br><br>Gaviota: 201 feet ASL<br><br>Low point: 28 feet ASL<br><br>High point: 764 feet ASL | Gaviota: 192 feet ASL<br><br>Sisquoc: 832 feet ASL<br><br>Low point: 42 feet ASL<br><br>High point: 1,425 feet ASL | Sisquoc: 895 feet ASL<br><br>Pentland: 694 feet ASL<br><br>Low point: 668 feet ASL<br><br>High Point: 3,004 feet ASL |
| *Original Coating:* | Coal Tar Urethane | Coal Tar Urethane | Coal Tar Urethane |
| *Insulation:* | 1.5-inch-thick layer of rigid urethane foam insulation and an outer polyethylene tape.<br><br>Replacement pipe and repairs coated with RD6 tape wrap system or Denso 7200 Protal | 1.5-inch-thick layer of rigid urethane foam insulation and an outer polyethylene tape.<br><br>Replacement pipe and repairs coated with RD6 tape wrap system or Denso 7200 Protal | 1.5-inch-thick layer of rigid urethane foam insulation and an outer polyethylene tape.<br><br>Replacement pipe and repairs coated with RD6 tape wrap system or Denso 7200 Protal |
| *General Condition of the Pipeline:* | The pipeline has been repaired as well as hydrotested per the State Waiver Requirements. The pipeline will be in compliance with all integrity | The pipeline has been repaired as well as hydrotested per the State Waiver Requirements. The pipeline will be in compliance with all integrity | The pipeline has been repaired as well as hydrotested per the State Waiver Requirements. The pipeline will be in compliance with all integrity |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | CA-324: Las Flores Canyon to Gaviota | CA-325A: Gaviota to Sisquoc | CA-325B: Sisquoc to Pentland |
|---|---|---|---|
| | requirements set forth by the Consent Decree, State Waiver, and applicable regulations prior to recommissioning. | requirements set forth by the Consent Decree, State Waiver, and applicable regulations prior to recommissioning. | requirements set forth by the Consent Decree, State Waiver, and applicable regulations prior to recommissioning. |
| *Linefill Capacity in barrels (bbls):* | 30,263 | 171,216.5 | 328,832.5 |
| *Operating Temperature:* | The maximum operating temperature of this segment is 140°F. The system is expected to operate between 60°F and 130°F during steady state operation. | The maximum operating temperature of this segment is 125°F. The system is expected to operate between 60°F and 125°F during steady state operation. | The maximum operating temperature of this segment is 110°F. The system is expected to operate between 60°F and 110°F during steady state operation. |

**Table 2 – Las Flores Pipeline Information**

C.    In my opinion, the Pipelines can be operated and maintained in a safe manner based on the inspection requirements outlined in the State Waiver conditions as well as PHMSA Advisory Bulletin (ADB-2016-04).

1.  **Hydraulic Design per OSFM and PHMSA**

---

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

i.   The hydraulic reports reviewed show the pipeline will operate below the maximum operating pressures established during the hydrotesting of the pipeline segments, and the temperatures will be below the maximum levels set by the OSFM State Waivers, which means that the Pipelines will be operating more safely than industry standards today.

2.   **Supervisory Control and Data Acquisition System (SCADA) System Design**

i.   The CPM – Computational Pipeline Monitoring system that Sable is implementing is "State of the Art," meaning that it incorporates all of the latest requirements for Leak Detection Systems (LDS) as outlined in API RP 1130 (American Petroleum Institute,) and implements rigid training requirements for all controllers. Additional details of the system are described below.

3.   **RTTM – Real Time Transient Modeling leak detection system**

i.   PPC has installed a new control center with an enhanced leak detection system using Real Time Transient Model Computational Pipeline Monitoring ("RTTM CPM") for the entire Las Flores Pipeline system integrated into the Supervisory Control and Data Acquisition ("SCADA") system and Operations Control Center ("OCC"), located in Santa Maria, CA. RTTM CPM will enable the shortest release detection time, thereby, minimizing release volume compared to other LDS technologies.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

ii.    RTTM CPM systems are recognized in the midstream industry as an effective Leak Detection System (LDS) in terms of sensitivity, accuracy, reliability, and robustness, and the operational aspects of CA-324 and CA-325A/B make RTTM CPM a feasible LDS.  RTTM CPM provides the greatest degree of protection of the LDS technologies available.

iii.    Here, the RTTM CPM will be configured with multiple balance periods from short (5 minutes) to long (>1 day) to limit the quantity of release over a range of potential release rates from small to large.  RTTM CPM is used extensively in similar liquid pipeline applications around the world with multiple reputable applications available on the market to implement.  RTTM CPM is compatible with the geographic conditions along the Las Flores Pipeline System, particularly the elevation profile, and maintains the ability to accurately model and maintain detection, even during abnormal operating conditions.

iv.    RTTM CPM is compatible with the SCADA, measurement, and communications technology in use on this pipeline segment.  RTTM CPM systems also maintain roughly equal performance from end to end of the pipeline regardless of operating pressure so long as the fluid in the line is kept in the liquid state, which is ensured by PPC operating procedures.

v.    By employing RTTM CPM, the system here will be more sensitive due to its advanced capabilities to model line-pack and consider hydraulic

19

gradient sensitivities compared to the previous system used by the previous owner.  In particular, it will react much faster (lower leak detection time) to large rate releases characterized by rapid depressurization of the pipeline due to its higher sensitivity and ability to anticipate how the pipeline system hydraulics should behave versus reality.

vi. Installing RTTM CPM on CA-324 and CA-325A/B will limit the volume of a release by detecting the event and alerting PPC's OCC to initiate response, including pipeline shut down.  By using multiple balance periods, the system will respond appropriately to different release rates, alerting high-rate releases (rupture scenarios) very quickly with the capability to tie-in automatic commanded actions within the application, while still being sensitive enough to detect low-rate releases. Lastly, RTTM CPM fidelity will benefit from the corroborative effect of multiple field instruments, as detailed further in item 2 below.

vii. PPC has installed additional pressure and temperature transmitters at existing and new motor-operated valve ("MOV") sites, as required for RTTM CPM LDS, to achieve reliable detection within performance standards.  Generally, this will consist of installation of pressure and temperature sensors on both the upstream and downstream sides of MOV sites.  Data from these sensors will be transmitted via SCADA to PPC's OCC and to the RTTM CPM.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

viii.  Additional pressure transmitters for surveillance will limit the volume of release because they will confer advanced capability to model pipeline volumes and consider changes in hydraulic sensitivities, thereby alerting PPC's control center to initiate response to abnormal operating conditions, including pipeline shut down. While analog point analysis can identify full line ruptures very quickly and alert the OCC to an anomalous event, it does not support an accepted performance estimation methodology and, as a result, the performance may vary with position along the line.  Nonetheless, analog point analysis via pressure and temperature transmitters have been included in the leak detection deployment for this line.

ix.  Installation of additional pressure instruments coupled with RTTM CPM, as described above, meet or exceed all criteria in 19 CCR § 2110.

x.  PPC has installed new flow meters at all of the stations in which Gaviota Station and Sisquoc Station did not have meters before. The additional meters will help to increase detection resolution of the LDS by providing flow data via SCADA to PPC's OCC.  These will work in conjunction with RTTM CPM and existing flow meters.  A map showing the location of the new and existing flow meters is shown below in figure 1.

21

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Figure 1**

| 10. Distance Between Flow Meters used for Surveillance | Baseline Condition, *miles* | New Plan, *miles* | Reduction in Distance, % |
|---|---|---|---|
| CA-324 | 124.4 | 10.9 | 91% |
| CA-325A | 124.4 | 38.7 | 69% |
| CA-325B | 124.4 | 74.8 | 40% |

**Table 3: Distance Between Flow Meters**

xi.    PPC has installed an automatic shutoff system ("ASOS") that will automatically initiate a pump shutdown sequence along with

commanding MOV closures on the pipeline segment, upon receipt of a rupture alarm without human intervention.

a. The ASOS will safely shut off and isolate the pipeline system in response to identified alarm criteria, specifically a rupture alarm, from either the RTTM CPM system or other rupture detection systems deployed on the pipeline. The ASOS will consist of a sequence program using local Programmable Logic Controllers ("PLCs") and SCADA software that will automatically de-energize the pumping equipment and initiate remote closure of MOVs to isolate the pipeline in response to the alarm condition. This includes automated closure of new and retrofitted MOVs as well as existing MOVs. The sequence will also be available for activation by the OCC controller to rapidly shut off the system any time the controller questions the integrity of the Pipelines.

b. For ASOS to be effective, it requires reliable communications equipment and specialized logic programs to shutoff consistently and in a manner that maintains static leak detection and line pack in the event of a false alarm, as the ASOS will be unique to the particular pipeline operating parameters and physical characteristics. Technology advancements within the last decade have made a retrofit implementation on a hydraulically complex system such as the Las Flores Pipeline possible, with step changes in site-to-site satellite communications and quicker data transmittal protocols.

c. PPC has installed redundant communications (two modes of communications) to each of the stations as well as the valve sites to meet the quicker communication requirements. ASOS will provide

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

the greatest degree of protection by not only reducing shutoff response time, but by supplementing human response with automation.

## 4. The Consent Decree – Compliance

i. The Consent Decree between Plains Pipeline, L.P. and the United States of America and the People of the State of California, Case No. 2:20-cv-02415, filed on March 13, 2020 requires Plains or Sable to comply with nineteen (19) conditions in Article 1, twenty-six (26) conditions in Article 2 and ten (10) conditions in Appendix D.

ii. These conditions vary in length and breadth in which have several sub-requirements or conditions. A majority of these conditions are caried over to the State Waivers for CA-324, CA-325A and CA-325B to ensure compliance. Sable has complied with, is in the process of complying with, or is prepared to comply with all of the Consent Decree conditions.

iii. I have reviewed or been involved with a majority of the items required prior to operation of which in my opinion have met, meet or will meet the conditions outlined in the Consent Decree. Specifically, I was personally engaged with Sable staff and OSFM during the repair program in identifying anomalies and determining, with OSFM approval, methods of appropriate repair.

## 5. State Waiver CA-324 - Compliance

i. The CA-324 State Waivers have sixty-seven (67) conditions. Twelve (12) of those conditions also carry subsections.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

ii.     Sable has met, is in the process of meeting, or will be required to meet, all the State Waiver conditions per the OSFM.

iii.    I have reviewed or been involved with a majority of the items required prior to operation of which in my opinion have met or meet the conditions outlined in the Waiver. Specifically, I was personally engaged with Sable staff and OSFM during the repair program in identifying anomalies and determining, with OSFM approval, methods of appropriate repair.

iv.    The items required during operations will be an ongoing compliance requirement per the terms of the waiver.

**6.  State Waiver CA-325 – Compliance**

i.     The CA-325A/B State Waivers have sixty-eight (68) conditions. Sixteen (16) of those conditions also carry subsections.

ii.    Sable has met, is in the process of meeting, or will be required to meet, all of the State Waiver conditions per the OSFM.

iii.   I have reviewed or been involved with a majority of the items required prior to operation of which in my opinion have met or meet the conditions outlined in the Waiver. Specifically, I was personally engaged with Sable staff and OSFM during the repair program in identifying anomalies and determining, with OSFM approval, methods of appropriate repair. The items required during operations will be an ongoing compliance requirement per the terms of the waiver.

**7.  PHMSA Approval of State Waivers - Compliance**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

i.    U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Docket No. PHMSA-2025-0002 wrote letter in response to Office of the State Fire Marshal granting a waiver to Sable.

ii.   In this letter, PHMSA stated that, "[p]ursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline." The referenced waiver will allow Sable to manage the risk of corrosion. The letter also specifically explains the following:

The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

iii.  Sable has successfully completed the "spike" hydrotest as well as the "Strength" Hydrotest and is in the process of planning the ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tool runs which they will complete as soon as steady state operation of the pipeline is achieved.

26

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

### 8. In-Line Inspection - Compliance with Consent Decree

i.  Sable utilized Inline Inspection Reports from 2022 and 2023 as well as historical data to establish the minimum number of pipeline repairs required per the Consent Decree.

ii.  During the repair process, if additional anomalies were found in the area of exposed pipe, they were also repaired, in addition to the identified anomaly even though they did not meet the repair criteria threshold.

iii.  Examples of various In Line Inspection (ILI) tools commonly called "pigs." These are only examples and not photos of the tools used.



**Figure 2 – ILI tool**



**Figure 3 – ILI tool inside of pipe**



**Figure 4 – ILI tool illustration inside of pipe**

9. **Repair & Hydrotest - Compliance with Consent Decree & State Waivers**

   i.    Sable has performed over 200 pipeline repairs from composite repairs to type B weld sleeves to complete pipe replacements in the last year.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

ii.    Each repair has been documented and inspected per OSFM & PHMSA requirements.

i.    Examples of each repair type are shown below:



**Figure 5 – Composite Sleeve Repair**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**CSNRI®**

**Repair System Definition:**

The ASME PCC-2 Article 401 and ISO 42817 each defined a "Repair System" as a combination or function of the following elements. The Repair System definition for the A+ Wrap™ repair system is provided according to this definition as follows:

| Repair System Element | A+ Wrap System Definition |
|---|---|
| Substrate | Carbon Steel |
| Surface Preparation | Preferred: NACE 2 / SSPC-SP10 near white metal blast<br>Minimum: SSPC-SP 11 – power tool clean to bare metal |
| Load Transfer Material | EPN-101 or EPN-242 or ESN-202 |
| Primer | PPR-220 or PPR-290 |
| Composite Wrap<br>(saturated in factory) | FEB-530 Fiberglass<br>with<br>SPU-210 Moisture-cured Urethane Resin |
| Application Method | Per Detailed Installation Guide – Offset, Spiral, Layer-over-Layer (i.e., straight/weld wraps), and "Brick Stack" options |
| Curing Protocol | Approximately 24 hours at 75°F (24°C) |

CSNRI Composite repair sleeves were used by Sable on CA-324 and CA-325A/B repairs in which the CSNRI repair definition is shown below:



**Figure 6 – Type B Sleeve (Welded)**

A Type B sleeve is comprised of two pieces of steel rolled to fit the outside of the existing pipe. The two sleeves are fit up tight over the pipe then the longitudinal welds are made. Once the longitudinal welds are completed,

30

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

the one end fillet weld is completed, then the last end fillet weld is completed to create a "pressure containing" repair.



**Figure 7 – Pipe Removal**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Figure 8 – Pipe Installation with EFRD**

Process of starting a repair to completion of repair shown in Photos 1 through 11 below.



DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Photo 1 - Excavation with spotter**



**Photo 2 – Pipe Stripped of Insulation after Excavation**



**Photo 3 – Pipe Blasted and Ready for Evaluation**

33

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Photo 4 – Cutout Repair Complete with Markings and Inspection Data**



**Photo 5 – Pipeline Repair – Composite A+ Wrap**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Photo 6 – Pipeline Repair – Composite A+ Wrap Cured and Initial Coating**



**Photo 7 – Coating Inspection using a Holiday Detector "jeep"**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



**Photo 8 – A+ Wrap with final wrap post-final coating inspection prior to backfill**



DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Photo 9 – Backfill operation with rock guard applied to pipe to protect coating**



**Photo 10 – Final Grading prior to revegetation with Pipeline Marker per 49 CFR 192.707**



DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Photo 11 – Final Grading with revegetation and erosion control in place**



**Photo 12 – Final Grading with vegetation started and erosion control in place**

10. **Existing Mainline Valve Replacements and New Valve Installations**

    i. A total of forty-seven (47) valves have been replaced, serviced or installed along the pipeline route with twenty-seven (27) of them being new. A full description of the valves is shown in Table 4 below.

    ii. The installation of the new valves has allowed the lines to be split into smaller segments thus minimizing potential drain down as well as provided additional monitoring along the line.

| Valve ID | Description |
|---|---|
| MOV-109C - LFC | MOV - Existing - Replaced |
| 324-MOV1 | MOV-New |
| 324-MOV2 | MOV-New |
| 324-MOV3-Refugio | MOV -Existing - Replaced |
| 324-CHK4-Refugio | Chec - Replaced |

38

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| 324-MOV5 | MO    -New |
| 324-CHK6 | Check - New |
| 324-MOV7 | MOV - New |
| 324-MOV8 | MOV - New |
| 324-MOV9 | MOV - New |
| MOV-208C - Gav | MOV - Existing - Replaced |
| MOV-209C - Gav | MOV - Existing - Replaced |
| 325A-MOV10-GC | MOV - Existing - Replaced |
| 325A-CHK11-GC | Check - Existing |
| 325A-CHK12 | Check - New |
| 325A-MOV13 | MOV - New |
| 325A-MOV14-SYR | MOV - Existing - Replaced |
| 325A-CHK15-SYR | Check - Existing |
| 325A-MOV16 | MOV - New |
| 325A-CHK17 | Check - New |
| 325A-MOV18 | MOV - New |
| 325A-MOV19 | MOV - New |
| 325A-MOV20 - SR | MOV - Existing - Replaced |
| 325A-CHK21-SR | Check - Existing |
| MOV-408C - Sisq | MOV - Existing - Replaced |
| MOV-409C - Sisq | MOV - Existing - Replaced |
| 325B-CHK22 | Check - New |
| 325B-MOV23 | MOV - New |
| 325B-CHK24-PCC | Check - Existing |
| 325B-CHK25 | Check - New |
| 325B-MOV26-CR | MOV-Existing |
| 325B-CHK27-CR | Check - Existing |
| 325B-MOV28 | Valve - Existing Rep. MOV |
| 325B-CHK29 | Check - New |
| 325B-CHK30 | Check - New |
| 325B-CHK31 | Check - New |
| 325B-CHK32-SER | Check - Existing - Replaced |
| 325B-CHK33 | Check - New |
| 325B-CHK34 | Check - New |
| 325B-CHK35 | Check - New |
| 325B-CHK36 | Check - New |
| 325B-CHK37 | Check - New |
| 325B-MOV38-SA | MOV - Existing |
| 325B-MOV39-SA | New |
| 325B-MOV40-SA | New |
| 325B-MV41 -Pent | Valve - Replaced |
| MOV4A08C - Pent | MOV-Existing - Replaced |

**Table 4 – Valve Installations**

39

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**11. Coating Repair Details**

    i.    Specifications for the various repairs were reviewed in which the following details are provided as an example of how the coating was repaired or replaced:

Appendix A:   Coating Guideline for Insulated Pipe

Step 1:    Prepare bare steel section to SSPC SP-10 Near White Metal Blast. Bare steel shall be prepared up to existing coal tar primer.

Step 2:    Adjacent coal tar primer shall be SSPC SP-7 Brush Blasted to be exposed for a minimum of two (2) inches from adjoining polyurethane foam. Exposed coal tar primer shall be tightly adhered per SSPC SP-2 Hand Tool Cleaning. Tightly adhered is defined as "cannot be removed by scraping with a dull putty knife".

Step 3:    Bevel polyurethane foam at a minimum 1:1 slope to allow for proper transition of pipe wrap.

Step 4:    Perform SSPC SP-7 brush blast of beveled polyurethane foam and minimum six (6) inches of existing polyethylene tape. Can be done with SSPC SP-2 or SSPC SP-3 if hand or power tooling is more practical.



Image-1 Insulated Pipe Example

**Figure 9 – Example of Coating Repair Methodology Prior to Coating from Sable Specifications**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Application Sequence
1. Apply high solids epoxy to prepared bare steel.
    a. High solids shall be applied over 100% of bare steel. Epoxy should not overlap existing coal tar primer, but should be as close as practical.
2. Allow high solids epoxy cure to minimum recoat window. See Denso Protol 7200 Technical Data Sheet for more information.
3. Apply Polyguard RD-6™ over the entire existing coating interface.
    a. High solids epoxy, polyurethane foam, and polyethylene tape. Approx. 18" per side.
    b. See Polyguard RD-6™ Technical Data Sheet for more information. See visual on next page.
4. Apply Polyguard SP-6™ Outer Wrap over Polyguard RD-6™.
    a. Polyguard SP-6™ Outerwrap should extend to a ¼" from end of Polyguard RD-6™..
    b. See Polyguard SP-6™ Technical Data Sheet for more information
    c. See Polyguard 606 Filler Compound for irregular shapes as well as for application information



Image-2 Insulated Pipe Example with tape wrap

**Figure 10 – Example of Coating Repair Methodology
from Sable Specifications**
Reference also Photo 8 above regarding final installation prior to back fill.

**12. Hydrostatic Spike Test Reports and Hydrotest Strength Reports**

i.    The pipeline system was broken up into eight (8) test segments. Hydrostatic and spike test values provide confidence well in excess of the expected operating pressures and provides confidence that failure is unlikely to occur between ILI runs, particularly with the much-shortened ILI timing set forth by OSFM (twice per year for the first 2 years).

ii.   With the successful hydrotest and spike tests on 324 and 325A as well as the successful hydrotest of 325B, Sable has demonstrated that the

41
DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

repaired pipelines have the required integrity needed to operate without failure.

iii.    A copy of OSFM Report CA-324 (Test ID#25-07317) is pasted in below as reference to one of the eight completed tests.

**Clear Form**



OFFICE OF THE STATE FIRE MARSHAL
PIPELINE SAFETY DIVISION
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

Appendix D – Test Results Form HYD-3
Revision Date: 04/2020

## HYDROSTATIC TEST RESULTS/ PIPELINE DATA

| Test Date: | | CSFM Test ID # | |
|---|---|---|---|
| 05/12/2025 | | 25-07317 | |
| Pipeline Operator: | | Independent Testing Firm: | |
| Sable Offshore Corp/Pacific Pipeline Company | | Milbar Hydro-Test Inc. | |

**Type of Test and Pipeline Identification (description, line number, name, pre-tested pipe, etc.)**

☐1 Year ☐2 Year ☐3 Year ☑5 Year ☐IMP (Part 195.452) ☐OSFM High Risk ☐ Pre-tested pipe
☐New Construction ☐ Relocation ☐ Facility (includes: Valves, Receivers, In-plant Piping)

Comment: Testing Segment #1 from MP 0 to MP 10.87 (324-Sta. 0+00 (Lat. 34.478972, Long. -120.041829) to Sta. 573+75 (Lat. 34.476017, Lat. -120.198202). Test pressures shown are for the low point in the line and need to be adjusted for the test site. MOP at the low point in CA-324 is 1003 psig.

| Pipeline Location (mile post, street, station, etc.) | |
|---|---|
| From: | Sta. 0+00 (Lat. 34.478972, Long. -120.041829) |
| To: | Sta. 573+75 (Lat. 34.476017, Lat. -120.198202) |
| CSFM  Line ID#: | 0015 CA-324 -- 0445A -- Pacific Pipeline Company |
| Product Normally Transported: | Crude Oil |
| Test Medium : | ☑Water        ☐Other (Specify) |

| Location of Deadweight Tester: * | | Deadweight Elevation (ft):* |
|---|---|---|
| 12000 Calle Real, Goleta, CA (Lat. 34.478972, Long. -120.041829) | | 223 |

| Elevation of Pipeline | High Point (ft):* | 817' | Low Point (ft):* | 12' |
|---|---|---|---|---|
| Test Pressure | High Point (psig):* | 1166 - Spike | 916 - Test | Low Point (psig):* | 1514 - Spike | 1264 - Test |
| Maximum Operating Pressure (psig):* | | MOP at the low point in CA-324 is 1003 psig. | | |

## PIPE DATA

| Pipe O.D. (in.) | Wall Thickness (in.) | Specification & Grade (SMYS) | Length of test segment (ft) | Volume (Barrels) |
|---|---|---|---|---|
| 24" | .344 | X-65 | 57,375' | ~30,000 |
| 2" | .218 | GRD. B | 28.5' | |
| 4" | .237 | Grd. B | 3' | |
| 12" | .375 | X-52 | 14.5' | |
| 20" | .500 | X-52 | 41.5' | |
| | | | | |
| | | | | |

## TEST EQUIPMENT

| Make of Deadweight Tester | Serial # | Date Last Calibrated |
|---|---|---|
| Chandler | 6106 | 03/06/2025 |

| Make of Pressure Chart Recorder (1) / Gauge (2) | | Serial # | Date Last Calibrated |
|---|---|---|---|
| 1) Recorder: | SignalFire | 004199 | 12/18/2024 |
| 2) Gauge: | SignalFire | 004199 | 12/18/2024 |

| Make of Temperature Recorder (1) / Gauge (2) | | Serial # | Date Last Calibrated |
|---|---|---|---|
| 1) Recorder: | SignalFire | 004199, 004175, 004327 | 12/18/2024 |
| 2) Gauge: | SignalFire | 004191 | 12/18/2024 |

| GPS | Beginning Location: | Ending Location: |
|---|---|---|
| Latitude: | 34.478972 | 34.476017 |
| Longitude: | -120.041829 | -120.198202 |

\* N/A is not acceptable in these fields.

42

| TEST DATA FOR CSFM TEST ID # | | | | | | | 25-07317 |
|---|---|---|---|---|---|---|---|
| Date | Time | Dead weight (psig) | Chart Pressure (psig) | Pipe Wall Temp. °F | Ambient Temp °F | Test Medium Change (+) Add/ (-) Drain (Gal.) | Comments |
| 5/12/25 | 5:09AM | 401 | 400 | 65 | 59 | | Start Pump |
| 5/12/25 | 5:12 | 418 | 400 | 65 | 59 | | Stop Pump |
| 5/12/25 | 5:25 | 417 | 400 | 65 | 58 | | Start Pump |
| 5/12/25 | 5:56 | 710 | 700 | 65 | 58 | | Leak Check |
| 5/12/25 | 6:46 | 708 | 700 | 65.4 | 58 | | Start Pump |
| 5/12/25 | 7:09 | 1000 | 1000 | 65.4 | 60 | | Leak Check |
| 5/12/25 | 7:26 | 1000 | 1000 | 65.4 | 60 | | Start Pump |
| 5/12/25 | 7:36 | 1130 | 1125 | 65.4 | 61 | | Start Plot |
| 5/12/25 | 7:59 | 1423 | 1420 | 65.4 | 61 | | Stop Plot |
| 5/12/25 | 8:05 | 1423 | 1420 | 65.4 | 62 | | On Spike Test |
| 5/12/25 | 8:10 | 1423 | 1420 | 65.4 | 63 | | |
| 5/12/25 | 8:15 | 1423 | 1420 | 65.4 | 62 | | |
| 5/12/25 | 8:20 | 1423 | 1420 | 65.4 | 63 | | Off Spike Test |
| 5/12/25 | 8:25 | 1423 | 1420 | 65.5 | 63 | | Bleed to Strength Test |
| 5/12/25 | 8:39 | 1173 | 1165 | 65.5 | 65 | | Stop Bleed |
| 5/12/25 | 8:45 | 1173 | 1165 | 65.5 | 65 | | |
| 5/12/25 | 9:00 | 1173 | 1165 | 65.5 | 68 | | On Test |
| 5/12/25 | 9:15 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 9:30 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 9:45 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 10:00 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 10:15 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 10:30 | 1173 | 1165 | 65.5 | 72 | | |
| 5/12/25 | 10:45 | 1173 | 1165 | 65.5 | 68 | | |
| 5/12/25 | 11:00 | 1173 | 1165 | 65.5 | 68 | | |
| 5/12/25 | 11:15 | 1173 | 1165 | 65.5 | 71 | | |
| 5/12/25 | 11:30 | 1173 | 1165 | 65.5 | 70 | | |
| 5/12/25 | 11:45 | 1173 | 1165 | 65.5 | 71 | | |
| 5/12/25 | 12:00PM | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 12:15 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 12:30 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 12:45 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 1:00 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 1:15 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 1:30 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 1:45 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 2:00 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 2:15 | 1173 | 1165 | 65.5 | 73 | | |
| 5/12/25 | 2:30 | 1173 | 1165 | 65.5 | 74 | | |
| 5/12/25 | 2:45 | 1173 | 1165 | 65.4 | 73 | | |
| 5/12/25 | 3:00 | 1173 | 1165 | 65.5 | 73 | | |
| Net Change: | | | | | | | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| TEST DATA FOR CSFM TEST ID # | | | | | | 25-07317 |
|---|---|---|---|---|---|---|
| Date | Time | Dead weight (psig) | Chart Pressure (psig) | Pipe Wall Temp. °F | Ambient Temp °F | Test Medium Change (+) Add/ (-) Drain (Gal.) | Comments |
| 5/12/25 | 3:15PM | 1173 | 1165 | 65.5 | 72 | | |
| 5/12/25 | 3:30 | 1172 | 1165 | 65.4 | 73 | | |
| 5/12/25 | 3:45 | 1172 | 1165 | 65.4 | 74 | | |
| 5/12/25 | 4:00 | 1172 | 1165 | 65.4 | 73 | | |
| 5/12/25 | 4:15 | 1172 | 1165 | 65.4 | 72 | | |
| 5/12/25 | 4:30 | 1172 | 1165 | 65.4 | 73 | | |
| 5/12/25 | 4:45 | 1172 | 1165 | 65.4 | 72 | | |
| 5/12/25 | 5:00 | 1172 | 1165 | 65.4 | 73 | | Off Test |
| 5/12/25 | 5:15 | 1172 | 1165 | 65.4 | 71 | | |
| 5/12/25 | 5:24 | 1172 | 1165 | 65.4 | 70 | | Depressure |
| 5/12/2025 | 5:50 | 0 | 0 | | | | |
| Net Change: | | | | | | | |

## 13. Direct Field Observations

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

i.     During the field repairs and replacements, FJ Technologies, Inc. provided construction observation services periodically on an as needed basis. During all field observations, the field crews completing the work as well as all of the Non-Destructive Testing (NDT) crews provided full access to the sites and were following all repair/replacement requirements outlined and provided by Sable.

14. **Corrosion Under Insulation Plan per State Waivers and Consent Decree**

i.     Sable has submitted a plan to the OSFM to address the Corrosion Under Insulation (CUI).

ii.    Cathodic protection systems have been found to have reduced effectiveness on insulated pipelines like the Las Flores Pipeline.

iii.   However, in 2006 the National Association of Corrosion Engineers ("NACE") issued a technical committee report that highlighted how to manage the reduced effectiveness with the following recommended. This report explained that, "[w]hen practical, the thermally insulated metallic surfaces need to be inspected at routine time intervals for metal loss (e.g., an internal pipeline inspection tool could be used)."

iv.    This is the approach mandated within the current OSFM waiver documents, with an emphasis that the shortened intervals (twice annually for first 2 years of operation), techniques (Ultrasonic wall thickness for wall loss detection and quantification and Ultrasonic shear wave for crack detection and quantification) data analysis (consideration of tool

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

tolerance and growth rate) and mitigation techniques enhance the probability of success in effectively mitigating any external corrosion that occurs on the lines.

v.   PHMSA has also provided guidance [Docket No. PHMSA-2016-0071, ADB-2016-04] such as the following:

Taking other special precautions if an operator suspects that adequate cathodic protection cannot be provided due to shielding resulting from insulated coatings that have become disbonded. Such precautions may include:

1.  More frequent reassessments; (Waiver requires two ILI runs per year)
2.  Usage of the appropriate assessment tools for all threats including stress corrosion cracking; (At least one of the ILI tools has to be a "crack" detection tool)
3.  Coordination of data from the appropriate ILI technologies;
4.  More stringent repair criteria targeted at CUI or corrosion under disbonded coatings for insulated and buried pipelines;
5.  Usage of a leak detection system with instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it is operating or shut down. To this point Sable has installed new metering at each station to monitor flow and line pack along with pressure and temperature monitoring at each valve site. Sable has also installed a RTTM CPM leak detection system to detect changes in the system then alarm or shutdown in the event there is an abnormal condition.
6.  Valve spacing to limit any possible spill volumes with remotely operated valves and pressure monitoring at the valves. (Sable has installed seven new remotely operated block valves on Line 324, four new remotely operated block valves and two new check valves on Line 325A and  four new remotely operated block valves and  ten new check valves on Line 325B as per Sable's Best Available Technology (BAT) plan (Compliance with AB864)
7.  (3) Advanced ILI data analysis techniques to account for the potential growth of CUI, including interaction criteria for anomaly assessment.
8.  (4) ILI data, subsequent analysis of the data, and pipeline excavations that:

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

    a. Confirm the accuracy of the ILI data to characterize the extent and depth of the external corrosion and ILI tolerances and unity charts;

    b. Follow the ILI guidelines of API Standard 1163, "In-Line Inspection Systems Qualification Standard" 2nd edition, April 2013, (API Std. 1163) for ILI assessments;

    c. Use additional or more frequent reassessment intervals and confirmations when the insulated and buried pipeline external coating shields the pipeline from CP, retains moisture on insulated coating systems, and operates at higher operating temperatures; and

    d. Assess and mitigate operational and environmental conditions in shielded and insulated coatings that lead to excessive corrosion growth rates, pipe steel cracking, and all other threats." (Sable has implemented procedures to include subsequent analysis of the data to confirm accuracy of the ILI data as well as increased frequency of assessments)

    e. In addition to the above, an operator's operating and maintenance processes and procedures should be reviewed and updated at least annually, unless operational inspections for integrity warrant shorter review periods." (End of Guidance data pulled from Docket No. PHMSA-2016-0071, ADB-2016-04)

    vi. Sable follows this guidance as required, just as Sable does with all of the foregoing.

**D.  In my opinion, the information provided in the Declaration of Richard B. Kuprewicz for Case No, 25CV02247 is misleading, overgeneralized or inaccurate.**

1. Mr. Kuprewicz has not taken into account the Consent Decree, State Waivers, PHMSA Guidance Documents for ineffective cathodic protection, or the work that Sable has completed to date.

2. The Center for Biological Diversity & The Environmental Defense Center asked Accufacts Inc. ("Accufacts" or "Richard B Kuprewicz") to review documents related to the Las Flores Pipeline System for possible restart. In response, Mr.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Kuprewicz prepared a report called "Evaluation of Las Flores Pipeline System Startup Proposal," dated December 20, 2024.

3. The Center for Biological Diversity & The Environmental Defense Center also asked Mr. Kuprewicz to provide an opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A and CA-325B.

4. In response, Mr. Kuprewicz prepared a report called "Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart," dated February 21, 2024.

5. Both of these documents were then incorporated into Mr. Kuprewicz's Declaration, which dated June 3, 2025.

6. I have reviewed the above and formed the opinion that Mr. Kuprewicz's reports and Declaration are misleading and inaccurate.

7. Exhibit A of the Declaration is Mr. Kuprewicz's Curriculum Vitae. Exhibit B is a report prepared by Mr. Kuprewicz titled "Evaluation of Las Flores Pipeline System Startup Proposal, (Dec. 20, 2024)." Exhibit C is a report prepared by Mr. Kuprewicz titled "Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart (Feb. 21, 2025)."

8. All of the reports were prepared for "The Center for Biological Diversity" and "The Environmental Defense Center."

9. Point-by-point rebuttals to Mr. Kuprewicz's statements follow below. The statements within the body of the declaration are shown in the center column with

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

its reference point shown in the left column and my opinion/response is shown in the right column. It should be noted that declarations provided, are pulled directly from the reports, so my opinion applies to both the declaration document and the reports prepared by Mr. Kuprewicz.

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| Page 3, Line 27, Item 8.a. | The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective. | The Las Flores Pipeline System was built to industry standards at the time of construction and adheres to the standards today. Cathodic protection systems, however, have been found to have reduced effectiveness on insulated pipelines like the Las Flores Pipeline. However, in 2006 the National Association of Corrosion Engineers, "NACE," issued a technical committee report that highlighted how to manage the reduced effectiveness with the following recommended, as follows:<br><br>"When practical, the thermally insulated metallic surfaces need to be inspected at routine time intervals for metal loss (e.g., an internal pipeline inspection tool could be used)."<br><br>This is the approach mandated within the current OSFM waiver documents, with an emphasis that the shortened intervals (twice annually for first 2 years of operation), techniques (Ultrasonic wall thickness for wall loss detection and quantification and |

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | Ultrasonic shear wave for crack detection and quantification) data analysis (consideration of tool tolerance and growth rate) and mitigation techniques enhance the probability of success in effectively mitigating any external corrosion that occurs on the lines. PHMSA has also provided guidance [Docket No. PHMSA-2016-0071] such as: "Taking other special precautions if an operator suspects that adequate cathodic protection cannot be provided due to shielding resulting from insulated coatings that have become disbonded. Such precautions may include: - More frequent reassessments; (Waiver requires two ILI runs per year) - Usage of the appropriate assessment tools for all threats including stress corrosion cracking; (At least one of the ILI tools has to be a "crack" detection tool) - Coordination of data from the appropriate ILI technologies; - More stringent repair criteria targeted at CUI or corrosion under disbonded coatings for insulated and buried pipelines; |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
|  |  | - Usage of a leak detection system with instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it is operating or shut down. (To this point, Sable has installed new metering at each station to monitor flow and line pack along with pressure and temperature monitoring at each valve site. Sable has also installed a RTTM CPM leak detection system to detect changes in the system then alarm or shutdown in the event there is an abnormal condition.) <br> - Valve spacing to limit any possible spill volumes with remotely operated valves and pressure monitoring at the valves. (Sable has installed seven new remotely operated block valves on Line 324, four new remotely operated block valves and two new check valves on Line 325A and four new remotely operated block valves and ten new check valves on Line 325B as per Sable's Best Available |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | Technology (BAT) plan (Compliance with AB864)<br>- Advanced ILI data analysis techniques to account for the potential growth of CUI, including interaction criteria for anomaly assessment.<br>- ILI data, subsequent analysis of the data, and pipeline excavations that:<br>   - Confirm the accuracy of the ILI data to characterize the extent and depth of the external corrosion and ILI tolerances and unity charts;<br>   - Follow the ILI guidelines of API Standard 1163, "In-Line Inspection Systems Qualification Standard" 2nd edition, April 2013, (API Std. 1163) for ILI assessments;<br>   - Use additional or more frequent reassessment intervals and confirmations when the insulated and buried pipeline external coating, shields the pipeline from CP, retains moisture on insulated coating |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | systems, and operates at higher operating temperatures; and<br><br>- Assess and mitigate operational and environmental conditions in shielded and insulated coatings that lead to excessive corrosion growth rates, pipe steel cracking, and all other threats." (Sable has implemented procedures to include subsequent analysis of the data to confirm accuracy of the ILI data as well as increased frequency of assessments). |
| Page 4, Line 1, Item 8.b. | Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines. | This statement is wholly inaccurate; there are multiple ILI tools available within the industry that are suited to measure different potential defects depending on the tool that is run due to the difference in measurement techniques.<br><br>No single ILI tool can detect all potential defects and as such the selection of ILI tools must include a technical evaluation of the most appropriate tool based on the potential anomalies to be identified. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | Circumferential Magnetic Flux (C-MFL) tools can be used to determine wall loss defects but are not as reliable as Ultrasonic Shear Wave tools to detect potential cracks. Prior to 2015 the Las Flores Pipeline only had MFL ILI tool runs compared to the specified Ultrasonic ILI tools specified in the OSFM waivers.<br><br>The ILI tool selection recommendations are based on the corrosion/cracking mechanisms per CFR Title 49 Subtitle B Chapter I Subchapter D Part 195.452.C.(1).(i).(A). The waivers granted by OSFM further define the tool detection and sizing limitations for the tools used to detect and quantify corrosion and cracks including requiring different types of ILI tools to be run within short time intervals to ensure all potential defects can be identified accurately.<br><br>Furthermore, they apply conservative tool tolerances in the related repair criteria to ensure that potential repairs can be addressed well before reaching potential failure points. |
| Page 4, Line 3, Item 8.c. | The high operating temperatures needed to reduce the viscosity of the heavy crude oil | This statement is an overgeneralization of the impact of temperature on the external corrosion rate. The relationship is not linear. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation. | Corrosion rates generally hold to an Arrhenius relationship governing the effect of chemical reactions due to temperature changes. This statement could only be shown to be true after determining the macroscopic reaction-specific parameters in the Arrhenius equation which has not been presented. |
| Page 4, Line 6, Item 8.d. | Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. | Previous C-MFL and Ultrasonic Shear Wave ILI tools have showed no indication of cracking in the pipeline. While Sable would agree that cracking consequences are higher than wall loss for external corrosion, the probability of cracking related failures is quite low in these pipelines. |
| Page 4, Line 8, Item 8.e. | The poorly designed Pipelines cannot be made as safe as new pipelines. | This statement is not only misleading; it is inaccurate. Due to the OSFM waiver conditions, the Las Flores Pipeline System will be operated safer compared to any new pipeline operated in accordance with normal industry standards. Industry and regulatory standards require immediate repair at 80% wall loss. At the growth rates reported in the PHMSA failure analysis of the Refugio spill, a corrosion rate of approximately 16 mils per year (MPY) was observed. Repairing at 25% wall loss for the .344" wall CA- |

55

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
|  |  | 324, accelerates the repair by approximately 11 years based on OSFM requirements compared to industry standards. Any potential defects that could exist in the Las Flores Pipeline System will be identified faster due to increased ILI frequency and repaired sooner due to more stringent repair requirements. |
| Page 4, Line 26, Item 10.a. | The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them. | Response - This statement is wholly inaccurate; there are multiple ILI tools available within the industry that are suited to measure different potential defects depending on the tool that is run due to the difference in measurement techniques. No single ILI tool can detect all potential defects and as such the selection of ILI tools must include a technical evaluation of the most appropriate tool based on the potential anomalies to be identified. Circumferential Magnetic Flux (C-MFL) tools can be used to determine wall loss defects but are not as reliable as Ultrasonic Shear Wave tools to detect potential cracks. Prior to 2015 the Las Flores Pipeline only had MFL ILI tool runs compared to the specified Ultrasonic ILI tools specified in the OSFM waivers.

The ILI tool selection recommendations are based on the |

56

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | corrosion/cracking mechanisms per CFR Title 49 Subtitle B Chapter I Subchapter D Part 195.452.C.(1).(i).(A).  The waivers granted by OSFM further define the tool detection and sizing limitations for the tools used to detect and quantify corrosion and cracks including requiring different types of ILI tools to be run within short time intervals to ensure all potential defects can be identified accurately.<br><br>Furthermore, they apply conservative tool tolerances in the related repair criteria to ensure that potential repairs can be addressed well before reaching potential failure points. |
| Page 5, Line 1, Item 10.b. | The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack forming potential on the Pipelines. | This statement is misleading, performing hydrotests never directly detect corrosion—in effect, they use stress generated within the pipe to ensure that potentially damaged areas will not fail at the hydrostatic or spike test pressures.  If corrosion exists within the pipeline that weakens its ability to contain pressure below the Maximum Allowable Operating Pressure (MAOP) the hydrotest will fail indicating the pipeline is no longer fit for service.<br><br>With hydrostatic and spike test values well in excess of the expected |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | operating pressures, it provides confidence that failure is unlikely to occur between ILI runs, particularly with the much-shortened ILI timing set forth by OSFM.<br><br>With the successful hydrotest and spike tests on 324 and 325A as well as the successful hydrotest of 325B, Sable has demonstrated that the repaired pipelines have the required integrity needed to operate without failure |
| Page 5, Line 4, Item 10.c. | The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, whether the testing parameters are adequate for Line | State Waivers for Line 324 (line items 12 through 17) and Line 325A/325B (line items 12 through 18) provide specific language as to pressure testing the pipeline segments as well as utilizing an OSFM approved independent testing firm to certify the tests. All testing per the State Waivers and 49 C.F.R., Part 195 Subpart E – Pressure Testing was successfully completed. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B. | |
| Page 5, Line 11, Item 10.d. | A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines. | State Waivers for Line 324 (line items 18 through 28) and Line 325A/325B (line items 19 through 29) provide specific language as to In-Line Inspection (ILI) Assessment and Frequency. Under condition 27 and 28 (line 324) or 28 and 29 (line 325A/B):<br><br>28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently |

| Reference | Statement by Mr. Kuprewicz | Response |
|-----------|----------------------------|----------|
|  |  | over-calling or under-calling, the remaining ILI features must be re-graded accordingly.<br><br>29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).<br><br>Following receipt of the final report, additional validation exercises are identified by the Pipeline Integrity Manager and NDE is applied to prove up these areas. Another unity plot is generated in accordance with a Level II or III assessment in API 1163. Following this second validation of the tool run, corrosion growth estimation is performed in accordance with PRCI's PR-331-063525, "PRCI EC 1-2: Development of Detailed Procedures for Comparing Successive ILI Runs to Establish Corrosion Growth Rates". The Corrosion Growth Rate Analysis (CGRA) procedures include data matching methods to analyze data from successive ILI's, methodologies for growth rate |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
| | | calculations and take into consideration any potential errors from comparing ILI data. |
| Page 5, Line 15, Item 10.e. | The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate. | No single corrosion mitigation technique (cathodic protection, chemical treatment, materials selection, etc.) results in a comprehensive elimination of corrosion risk individually. Because of this, in all pipelines operated world-wide a number of mitigation techniques must be used. Relying solely on cathodic protection will not protect pipelines under all conditions, pipeline operators must validate the effectiveness of the corrosion control methodology via inspection, direct assessment, corrosion modelling, etc. The OSFM took account of the elevated operating temperatures when developing the waiver conditions. |
| Exhibits - Page 32, first Paragraph, line 8 and 9 (Exhibit C) | "Without effective cathodic protections, the pipeline is at particularly high risk of spilling again. (Kuprewicz Decl., ¶¶ 8, 10.) | Per the reasons discussed above, this statement is both misleading and not accurate. The risk of leakage from the Las Flores Pipeline System will be dramatically reduced due the OSFM waiver conditions compared to its prior operation under normal |

61

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| Reference | Statement by Mr. Kuprewicz | Response |
|---|---|---|
|  |  | industry and regulatory standards. While corrosion is unavoidable in any pipeline, the conservative and comprehensive approach that the OSFM waiver conditions specify in responding to inspection results will result in an extremely low probability of leakage from the Las Flores Pipeline System. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Appendix A – Consent Decree Table – Summary with Status to Article I, II, and Appendix D of Case 2:20-CV-02415**

| Consent Decree (Case 2:20-CV-02415) | | |
|---|---|---|
| **Article I – California Specific Provisions (Case 2:20-CV-02415)** | | |
| **Item #** | **Consent Decree Wording** | **Sable Status** |
| **1.** | **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):** | |
| A. | Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901. | Sable has acknowledged the requirement of this waiver and taken all necessary steps to secure it, including coordination with OSFM and PHMSA. The applicable waiver was granted following the appropriate agency process, and Sable understands that no further approvals are outstanding with respect to Line 901's cathodic protection. |
| B. | Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903. | Sable has similarly obtained the requisite State Waiver for non-operational segments of Line 903 through coordination with the relevant oversight agencies. Sable understands that no further approvals are outstanding with respect to Line 903's cathodic protection. |
| C. | Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the | This requirement pertains solely to infrastructure operated by Plains and does not implicate any portion of the Pipelines at issue here. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  | | |
|---|---|---|
|  | currently operational segment of Line 903 from Pentland to Emidio. | |
| D. | Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000. | This requirement pertains solely to infrastructure operated by Plains and does not implicate any portion of the Pipelines at issue here. |
| E. | To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD. | Sable has acknowledged and complied with this condition. |
| **2.** | **Replacement, Restart, or Abandonment of Lines 901 and 903:** | |
| A. | Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of | Sable has acknowledged this condition but does not presently plan to pursue replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of way, and any other rights necessary for replacement is the sole responsibility of Plains. | |
| 1. | On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s): | Refer to above. |
| a. | Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines. | Refer to above. |
| b. | Conduct a close interval survey (CIS) and AC/DC interference survey. | Refer to above. |
| c. | Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations. | Refer to above. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| B. | As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law. | Sable has acknowledged and complied with this condition. |
|---|---|---|
| C. | As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations. | Sable has acknowledged this condition but does not presently plan to pursue abandonment of any sections of CA-324 or CA-325A/B. |
| **3.** | **Third-Party Analysis of Line 2000 ILI Data** | Because this line is not part of the Sable system, Sable takes no position on the corresponding requirement. |
|  | Conditions of text omitted being they only apply to Line 2000 which is not part of the Sable System |  |
| **4.** | **Integrity Management** | Sable has acknowledged the requirement of an Integrity Management Plan and it is available for inspection and comment by OSFM. |
| A. | For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines): | Refer to above. |
| 1. | Plains shall implement the following measures and amend its IMP, as needed, to include the requirements | Refer to above. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | of this section for the applicable lines: | |
| a. | In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM). | Sable has acknowledged and complied with this condition. |
| b. | Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called. | Sable has acknowledged and complied with this condition. |
| c. | When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools; | Sable has acknowledged and complied with this condition. |
| d. | Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance; | Sable has acknowledged and complied with this condition. |

67

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| e. | Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy; | Sable has acknowledged and complied with this condition. |
|---|---|---|
| f. | Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance; | Sable has acknowledged and will comply with this condition. |
| g. | For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade; | Sable has acknowledged and complied with this condition. |
| h. | Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, rerun the ILI tool to cover the area of failure; | Sable has acknowledged and will comply with this condition as necessary. |
| i. | Integrate and analyze available data in its P&M process, including: | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| i. | Assessment data from ILI tool runs; | Refer to above |
|---|---|---|
| ii. | Dig and repair data; | Refer to above |
| iii. | Corrosion data, such as survey results, chemical treatments, and cleaning-pig results; | Refer to above |
| iv. | Operational data, such as pressure and flow data; | Refer to above |
| v. | Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans; | Refer to above |
| vi. | Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results; | Refer to above |
| vii. | Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government | Refer to above |

69

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume. | |
| 2. | ILI Measures | |
| a. | Initial ILI Runs. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability). | Sable has acknowledged and complied with this condition. |
| i. | All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents. | Sable has acknowledged and will comply with this condition as necessary. |
| ii. | In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run. | |
| b. | Subsequent ILI Runs. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year. | Sable has acknowledged and complied with this condition. |
| c. | All ILI Runs. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains. | Sable has acknowledged and complied with this condition. |
| **5.** | **Valves** | |
| A. | Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of: | Sable has acknowledged and complied with this condition. |

71

| 1. | Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size. | Refer to above |
|---|---|---|
| 2. | Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds). | Refer to above |
| B. | Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD. | Refer to above |
| C. | Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures. | Sable has acknowledged and complied with this condition. |
| **6.** | **Risk Analysis** | |
| A. | For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines): | Plains completed item prior to Sable ownership. |
| 1. | Plains shall submit a risk analysis under proposed regulation 19 CCR§ 2111(c) to OSFM (dated January 17, | Refer to above |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  | | |
|---|---|---|
| | 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations. | |
| a. | The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c). | Refer to above |
| b. | Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq. | Refer to above |
| c. | The risk analysis shall be due within one year from entry of the CD. | Refer to above |
| 7. | **Leak Detection** | |
| A. | For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130. | Sable has acknowledged and complied with this condition. |

73

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| B. | Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information. | Sable has acknowledged and is complying with this condition. |
| 8. | **Non-waiver** | |
| A. | Nothing in this CD shall excuse Plains from otherwise complying with the AB864 regulations when they are promulgated. | Sable has acknowledged and complied with this condition. |
| **ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES (Case 2:20-CV-02415)** | | |
| 9. | **Integrity Management** | |
| A. | New Procedures for Interim Reviews and Assessments | Sable has an approved IMP plan in place and will update as needed to comply with the CD and State Waivers. |
| 1. | Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that | Refer to above. |

|   | | |
|---|---|---|
|   | could significantly impact already-identified threats<br><br>or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be<br><br>included in the information analysis conducted under 49 CFR §195.452(g). | |
| 2. | Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP. | Refer to above. |
| 3. | Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be | Refer to above. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | completed within 18 months from entry of the CD. | |
| B. | Documentation for P&M Recommendations | Refer to above. |
| 1. | Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum: | Refer to above. |
| a. | What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.); | Refer to above. |
| b. | The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and | Refer to above. |
| c. | The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern. | Refer to above. |
| 2. | In the new forms for the Interim Review procedure described in | Refer to above. |

76

| | | |
|---|---|---|
| | Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures. | |
| 3. | In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date." | Refer to above. |
| C. | Tracking of P&M Measures<br><br>Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l). | Refer to above. |
| **10.** | **Valves and O&M** | |
| A. | Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis. | This requirement pertains solely to other infrastructure operated by Plains and does not implicate any portion of the Pipelines at issue here. |
| B. | Within two years of entry of the CD, Plains shall develop and implement procedures to: | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| 1. | If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues. | Sable has acknowledged and complied with this condition. |
| 2. | Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times. | Sable has acknowledged and complied with this condition. |
| 3. | Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room. | Sable has acknowledged and will comply with this condition as necessary. |
| 4. | Verify that personnel assigned to operator qualification tasks for valve maintenance are qualified to perform those tasks. | Sable has acknowledged and complied with this condition. |
| C. | Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable. | Sable has acknowledged and complied with this condition. |
| D. | For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training: | Sable has acknowledged and complied with this condition. |
| 1. | Within two years of entry of the CD, that addresses the importance of complying with Plains' policy | Sable has acknowledged and is in compliance with this condition. |

78

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering. | |
| E. | Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance. | Sable has acknowledged and complied with this condition. |
| **11.** | **Leak Detection** | |
| A. | Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm. | Sable has acknowledged and complied with this condition. |
| 1. | Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does | This condition is specific to the Plains system at the time of the CD. |

| | | |
|---|---|---|
| | not utilize at least one of the three rupture detection methods, Plains shall implement at least one. | |
| B. | For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change. | Sable has acknowledged and complied with this condition. |
| C. | Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours. | Sable has acknowledged and complied with this condition. |
| 1. | Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis. | Sable has acknowledged and will comply with this condition as required. |
| D. | Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines. | This condition is specific to the Plains system at the time of the CD. |
| 1. | Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be responsible for the final content and implementation of the Selection of Leak Detection Method procedure. | This condition is specific to the Plains system at the time of the CD. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| E. | Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented. | This condition is specific to the Plains system at the time of the CD. |
|---|---|---|
| F. | Instrumentation and Display | |
| 1. | To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations: | This condition is specific to the Plains system at the time of the CD. |
| a. | Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities. | This condition is specific to the Plains system at the time of the CD. |
| b. | Track these conditions through to resolution, including instrumentation relocation when necessary. | This condition is specific to the Plains system at the time of the CD. |
| **12.** | **Control Room Management** | |

| A. | For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall: | Sable has acknowledged this condition, which will completed prior to operation. |
|---|---|---|
| 1. | Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors; | Refer to above. |
| 2. | Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration; | Refer to above. |
| 3. | Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and | Refer to above. |
| 4. | Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names). | Refer to above. |
| B. | For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm | This is a Plains specific condition and does not apply to CA-324, CA-325A/B |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  |  | Descriptors on the control console are accurate. |  |
| --- | --- | --- | --- |
| C. |  | Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD. | This is a Plains specific condition and does not apply to CA-324, CA-325A/B |
| **13.** |  | **Emergency Response and Oil Spill Response Plans** |  |
| A. |  | California-Specific Provisions: |  |
|  | 1. | Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill. | Sable has an Integrated Contingency Plan that has been approved by CA OSPR. |
| B. |  | Company-Wide Provisions |  |
|  | 1. | Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at | Sable has acknowledged and complied with this condition. |

83

| | | |
|---|---|---|
| | least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts. | |
| 2. | Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request. | Sable has acknowledged and complied with this condition. |
| 3. | Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein. | |
| 4. | Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request. | Sable has acknowledged and complied with this condition. |
| 5. | Plains shall notify PHMSA (and, for California Lines, California OSPR | Sable has acknowledged and is in compliance with this condition. |

85

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after action reports and shall consider such lessons learned for incorporation into future drills or exercises. | |
| 6. | For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel. | Sable has acknowledged and will comply with this condition as necessary. |
| **14.** | **Safety Management System (SMS)** | |
| A. | Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)). | This is a Plains specific condition. |
| 1. | Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS | This is a Plains specific condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD. | |
| B. | Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173. | This is a Plains specific condition. |
| **15.** | **Drug and Alcohol Program** | |
| A. | Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time. | |
|---|---|---|
| **Appendix D – Remaining Corrective Actions from PHMSA CAO (Case 2:20-CV-02415)** | | |
| 1. | All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM. | Sable has acknowledged and complied with this condition. |
| a. | Line 901 Shutdown. Plains shall not operate Line 901 until authorized to do so by the OSFM. | Sable has acknowledged and will comply with this condition when necessary. |
| b. | Restart Plan for Line 901. If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this | Sable has acknowledged and is complying with this condition. |

88

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  | | |
|---|---|---|
|  | Consent Decree. The Restart Plan shall include: | |
| 1) | Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual; | Sable has acknowledged and is complying with this condition. |
| 2) | Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two<br><br>hours; | Sable has acknowledged and is complying with this condition. |
| 3) | Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; | Sable has acknowledged and is complying with this condition. |
| 4) | A specific day-light restart that includes advance communications with local emergency response officials; | Sable has acknowledged and is complying with this condition. |
| 5) | Master Control Room enhancements, including:<br><br>a) Implementation of advanced leak-detection capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include: | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown

programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training

90

| | | |
|---|---|---|
| | associated with the emergency shutdown programming described above; and<br><br>f) Provision of additional controller training that incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident. | |
| 6) | Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes; | Sable has acknowledged and complied with this condition. |
| 7) | Installation of additional safety valves as a result of Plains' EFRD evaluation; | Sable has acknowledged and complied with this condition. |
| 8) | Installation of additional pressure sensors as a result of Plains' surge study; | Sable has acknowledged and complied with this condition. |
| 9) | Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and | |
| 10) | Corrosion Prevention. Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, | A Corrosion Under Insulation plan (CUI) has been submitted to the OSFM, which is part of the State Waivers. |
| | in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in | |
| | CAO Amendment No. 3, Section 2(a)-(c). | |
| c. | Return to Service of Line 901. After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the | Sable has acknowledged and will comply with this condition. |
| | actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015. | |
| d. | Removal of Pressure Restriction of Line 901. The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that | Sable has acknowledged and will comply with this condition. |

92

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM<br><br>may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that<br><br>temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's<br><br>determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary<br><br>removal or modification of the pressure restriction. | |
| e. | Line 903 Shutdown. After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM. | Sable has acknowledged and complied with this condition. |
| f. | Restart Plan for Line 903. If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line 903 to the OSFM | Sable has acknowledged and is complying with this condition. |

93

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference<br><br>into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:<br><br>1) Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two<br><br>hours;<br><br>2) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and<br><br>3) Provisions for a daylight restart and advance<br><br>communications with local emergency response officials. | |
| g. | Line 903 Return to Service. After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating<br><br>pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line | Sable has acknowledged and will comply with this condition. |

94

| | | |
|---|---|---|
| | 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments). | |
| h. | Removal of Pressure Restriction for Line 903. After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903. | Sable has acknowledged and will comply with this condition. |
| 1) | The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. | Sable has acknowledged and will comply with this condition. |
| 2) | The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction. Requests for | Sable has acknowledged and is complying with this condition. |

95

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | removal of the pressure restriction may be submitted by pipeline segment. | |
| i. | Notifications. Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates. | Sable has acknowledged and will comply with this condition. |
| j. | Reporting Requirements for Lines 901 and 903. If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval. | Sable has acknowledged and will comply with this condition. |
| 1) | The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety. | Sable has acknowledged this condition. |
| 2) | Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree. | Sable has acknowledged this condition. |
| 3) | The Appendix D Documentation Report shall include but not be limited to:<br><br>A. Table of Contents;<br><br>B. [intentionally left blank.]<br><br>C. [intentionally left blank.]<br><br>D. Summary of all tests, inspections, assessments, evaluations, and | Sable has acknowledged this requirement. |

96

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | analysis to the extent required under this Appendix D;<br><br>E. [intentionally left blank.]<br><br>F. [intentionally left blank.]<br><br>G. Lessons learned while fulfilling the requirements of this Appendix D. | |
| | | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Appendix B – CA-324 State Waiver Summary with Status**

| CA-324 State Waiver Summary Chart | |
|---|---|
| Date of Letter: | 12/17/24 |
| Subject: | LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324) |
| Pipeline: | OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024 |

| Item | State Waiver Condition | Sable Status |
|---|---|---|
| **General Conditions** | | |
| 1 | The pipeline can only be used to transport crude oil as stated in the application. | Sable has acknowledged and will comply with this condition. |
| 2 | The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig). | Sable has acknowledged and will comply with this condition. |
| 3 | The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours. | Sable has acknowledged and will comply with this condition. |
| 4 | Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver. | Sable has acknowledged and will comply with this condition. |
| 5 | This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the | Sable has acknowledged this condition. |

98

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | Elder California Pipeline Safety Act of 1981 other than contained herein. | |
| 6 | This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415). | Sable has acknowledged this condition. |
| 7 | In-line inspection must include:<br><br>a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:<br><br>i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.<br><br>ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.<br><br>b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).<br><br>c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI. | Sable has acknowledged and is complying with this condition. |
| 8 | Prior to placing CA-324 in operation, Sable must perform | Sable has acknowledged and is in |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | | |
|---|---|---|---|
| | | fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2] | compliance with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 9 | All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions. | Sable has acknowledged and complied with this condition. |
| 10 | Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G Manual for Determining the Remaining Strength of Corroded Pipelines. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch | Sable has acknowledged and complied with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1. | |
|---|---|---|
| 11 | Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324. | Sable has acknowledged and will comply with this condition as necessary. |
| **Pressure Testing** | | |
| 12 | Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324: | Sable has acknowledged and complied with this condition. |
| | a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss. | Sable has acknowledged and complied with this condition. |
| | b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP. | Sable has acknowledged and complied with this condition. |
| 13 | Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the | Sable has acknowledged and complied with this condition. |

102

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | state waiver pipeline segments at a minimum of 1.25 times the MOP. | |
| 14 | Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM. | Sable has acknowledged and complied with this condition. |
| 15 | Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies. | Sable has acknowledged and complied with this condition. |
| 16 | Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov | Sable has acknowledged and complied with this condition. |
| 17 | Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated. | Sable has acknowledged and complied with this condition. |
| **In-Line Inspection (ILI) Assessment and Frequency** | | |

103

| 18 | At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information: | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| | a) Dates for integrity assessment | |
| | b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications | |
| | c) In-line inspection tool vendor(s) | |
| | d) Required tool specifications including operational specifications and anomaly sizing tolerances | |
| | e) Tool validation methodology | |
| | f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications | |
| | g) Criteria used to identify locations for excavation and field verification | |
| | h) Non-destructive examination | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Case 2:26-cv-05242-SVW-SSC    Document 14    Filed 05/14/26    Page 486 of 1123   Page ID #:6618

| 19 | Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance. | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| 20 | Metal Loss Tool(s)<br><br>a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU). | |
| 21 | Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks. | |
| | b. USCD Performance Specification Requirements | |
| | i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks. | |
| | ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material. | |
| | iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld. | |
| | iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks. | |
| 22 | Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM. | Sable has acknowledged and will comply with this condition. |
| 23 | Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range. | |
| 24 | All ILI tool runs must obtain the Test ID from the OSFM prior to run. | Sable has acknowledged and will comply with this condition. |
| 25 | Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance. | Sable has acknowledged and will comply with this condition. |
| 26 | Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 27 | Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly. | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| 28 | Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013). | Sable has acknowledged and will comply with this condition. |
| **Discovery of Condition** | | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 29 | The discovery date must be within 180 days of any ILI tool run for each type of ILI tool. | Sable has acknowledged and will comply with this condition as necessary. |
|---|---|---|
| **Immediate Repair Conditions** | | |
| 30 | A crack or crack-like anomaly that meets any of the following criteria: | Sable has acknowledged and will comply with this condition as necessary. |
| | a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness. | |
| | b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1. | |
| 31 | Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP. | Sable has acknowledged and will comply with this condition as necessary. |
| 32 | Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8] | Sable has acknowledged and will comply with this condition as necessary. |
| **180-Day Repair Conditions[9]** | | |
| 33 | A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP. | Sable has acknowledged and will comply with this condition as necessary. |
| 34 | Internal or external metal loss anomalies where the remaining strength of pipe shows a | Sable has acknowledged and will |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | predicted failure pressure less than 1.5 times the MOP. | comply with this condition as necessary. |
|---|---|---|---|
| 35 | | All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth. | Sable has acknowledged and will comply with this condition as necessary. |
| 36 | | For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline. | Sable has acknowledged and will comply with this condition as necessary. |
| **Corrosion Growth Rate Analysis (CGRA)** | | | |
| 37 | | Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates. | Sable has acknowledged and will comply with this condition. |
| 38 | | The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies | Sable has acknowledged and will comply with this condition. |

111

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | for growth rate calculations and errors from comparing ILI data. | |
|---|---|---|
| 39 | Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss. | Sable has acknowledged and will comply with this condition. |
| 40 | When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13]. | Sable has acknowledged and will comply with this condition. |
| 41 | All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI. | Sable has acknowledged and will comply with this condition. |
| **Pressure Reduction** | | |
| 42 | If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired. | Sable has acknowledged and will comply with this condition as necessary. |
| **In Field Direct Examination of Pipe** | | |

112

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 43 | Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths. | Sable has acknowledged and will comply with this condition as necessary. |
|---|---|---|
| 44 | Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies: | Sable has acknowledged and will comply with this condition as necessary. |
| | a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld. | |
| | b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5. | |
| | c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. | |
| 45 | Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. | Sable has acknowledged and will comply with this condition as necessary. |
| 46 | Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16] | Sable has acknowledged and is complying with this condition. |
| 47 | All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap. | Sable has acknowledged and is complying. |
| **Integrity Management** | | |

114

| 48 | A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools. | Sable has acknowledged and is complying with this condition. |
|---|---|---|
|  | a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1). |  |
|  | b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2). |  |
| 49 | Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called. | Sable has acknowledged and is complying with this condition. |
| 50 | When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s). | Sable has acknowledged and is complying with this condition. |
| 51 | Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned. | |
| 52 | Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected. | Sable has acknowledged and is complying with this condition. |
| 53 | Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert. | Sable has acknowledged and is complying with this condition. |
| **Data Requirements for Predicted Failure Analysis** | | |

116

| 54 | Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses. | Sable has acknowledged and is complying with this condition. |
| --- | --- | --- |
| 55 | The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records. | Sable has acknowledged and is complying with this condition. |
| **Recordkeeping** | | |
| 56 | Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days. | Sable has acknowledged and will comply with this condition. |

117

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 57 | Sable must maintain the following records: | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| | a. Technical approach used for the analysis | |
| | b. All data used and analyzed | |
| | c. Pipe and longitudinal weld seam properties | |
| | d. Procedures used to implement state waiver conditions | |
| | e. Evaluation methodology used | |
| | f. Models used | |
| | g. Direct in situ examination data | |
| | h. All in-line inspection tool assessments information evaluated | |
| | i. Pressure test data and results | |
| | j. All in-the-ditch assessments performed on the pipeline segments | |
| | k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results | |
| | l. All finite element analysis results | |
| | m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology | |
| | n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | o. Safety factors used for fatigue life and/or predicted failure pressure calculations | |
| | p. Reassessment time interval and safety factors | |
| | q. The date of the review | |
| | r. Confirmation of the results by qualified technical subject matter expert(s) | |
| | s. Approval by responsible Sable management personnel | |
| | t. Records of additional preventive and mitigative (P&M) measures performed | |
| | u. Reports required by this State Waiver. | |
| **Reporting** | | |
| 58 | Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17] | Sable has acknowledged and will comply with this condition as necessary. |
| 59 | An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable: | Sable has acknowledged and will comply with this condition. |
| | a. Tool type and run date | |

119

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type) | |
| | c. Dig sheets | |
| | d. Field contact information for Sable | |
| | e. Time and location of the field evaluation and repair. | |
| 60 | Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include: | Sable has acknowledged and will comply with this condition. |
| | a. Tool type | |
| | b. Run date | |
| | c.  Summary of Conditions Report[18] | |
| | d. Final Vendor Report and Pipe Tally | |
| 61 | Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, Subject: OSFM State Waiver – Annual Report CA-324. At a minimum, the annual report shall contain the following, if applicable: | Sable has acknowledged and will comply with this condition. |

120
DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | a. A Closure Report for the previous calendar (CY) which contains: | |
| | i. Features that were remediated in previous CY | |
| | 1. Provide documentation for the in-the-ditch assessments and repairs | |
| | ii. Identify features that remain to be assessed | |
| | iii. Unity Plots for previous ILI runs | |
| | b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48 | |
| | c. The third-party ILI expert reviews in accordance with Condition 52 | |
| | d. AC and DC Interference surveys that are due in accordance with Condition 53 | |
| | e. A copy of the CGRA for prior year including: | |
| | i. Mean corrosion growth rate for the pipeline | |
| | ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy) | |
| **Limitations** | | |
| 62 | This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a | Sable has acknowledged and will comply with this condition as necessary. |

| | | |
|---|---|---|
| | justification for continuation of the waiver. | |
| 63 | Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements. | Sable has acknowledged this condition. |
| 64 | The OSFM may order the pipeline shutdown at any time. | Sable has acknowledged this condition. |
| 65 | The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver. | Sable has acknowledged this condition. |
| 66 | In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail. | Sable has acknowledged this condition. |
| 67 | If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event | Sable has acknowledged this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| | of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver. |
| **Footnotes:** | 1 The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam. |
| | 2 Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline. |
| | 3 In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements. |
| | 4 Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified. |
| | 5 Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval. |
| | 6 A minimum of four (4) independent direct examination excavations must be used for unity plots. |
| | 7 The criteria outlined in the state waiver is supplemental to the requirements set forth in §195.452(h)(4)(i) Immediate repair conditions and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method. |
| | 8 Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area. |
| | 9 The criteria outlined in the state waiver is supplemental to the requirements set forth in §195.452(h)(4)(iii) 180-day conditions and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | |
|---|---|
| | 10 For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM. |
| | 11 At a minimum, Sable must include signal matching between ILI data sets. |
| | 12 If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets. |
| | 13 Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value. |
| | 14 Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs. |
| | 15 Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing. |
| | 16 The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver. |
| | 17 This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations. |
| | 18 The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | Reports, Closure Report and Annual Reports if information provided is not deemed sufficient. |
|---|---|

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Appendix C – CA-325A and CA-325B State Waiver Summary with Status**

| *CA-325A/B State Waiver Summary Chart* | |
|---|---|
| Date of Letter: | 12/17/24 |
| Subject : | LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B) |
| Pipeline: | OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024 |

| Item | State Waiver Condition | Sable Status |
|---|---|---|
| **General Conditions** | | |
| 1 | The pipeline can only be used to transport crude oil as stated in the application. | Sable has acknowledged and is in compliance with this condition. |
| 2 | The maximum operating pressure (MOP) cannot exceed:<br>    a. 1000 pounds per square inch gauge (psig) for CA-325A.<br>    b. 1292 pounds per square inch gauge (psig) for CA-325B. | Sable has acknowledged and is in compliance with this condition. |
| 3 | The maximum operating temperature of the crude oil that transports must not exceed:<br>    a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota Station to monitor the temperature of CA-325A/B at this facility.<br>    b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A at Sisquoc Station to monitor the temperature of CA-325A/B at this facility. | Sable has acknowledged and is in compliance with this condition. |
| 4 | Prior to startup, Sable must develop and implement procedures for the conditions and | Sable has acknowledged and will comply with this condition. |

126

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | requirements described in the state waiver. | |
| 5 | This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein. | Sable has acknowledged this condition. |
| 6 | This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415). | Sable has acknowledged this condition. |
| 7 | In-line inspection must include:<br><br>a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:<br><br>i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.<br><br>General corrosion means uniform or gradually varying loss of wall thickness over an area.<br><br>b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).<br><br>c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI. | Sable has acknowledged and is complying with this condition. |

127

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 8 | Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications: a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s. b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.<br><br>At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts. | Sable has acknowledged and is in compliance with this condition. |

128

| 9 | All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions. | Sable has acknowledged and is in compliance with this condition. |
| --- | --- | --- |
| 10 | Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G Manual for Determining the Remaining Strength of Corroded Pipelines. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw | Sable has acknowledged this condition, is in compliance with it, and will comply in the future as necessary. |

| | | |
|---|---|---|
| | evaluation method ASME FFS-1/API 579-1. | |
| 11 | Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B. | Sable has acknowledged and will comply with this condition. |
| **Pressure Testing** | | |
| 12 | Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A: | Sable has acknowledged and is in compliance with this condition. |
| | a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss. | Sable has acknowledged and is in compliance with this condition. |
| | b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP. | Sable has acknowledged and is in compliance with this condition. |
| 13 | Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment CA-325A at a minimum of 1.25 times the MOP. | Sable has acknowledged and is in compliance with this condition. |
| 14 | Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the | Sable has acknowledged and is in compliance with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | state waiver pipeline segment CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B: | |
| | a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss. | Sable has acknowledged and is in compliance with this condition. |
| | b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP. | Sable has acknowledged and is in compliance with this condition. |
| 15 | Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM. | Sable has acknowledged and is in compliance with this condition. |
| 16 | Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies. | Sable has acknowledged and is in compliance with this condition. |
| 17 | Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov Subject: OSFM State Waiver - Hydrotest Failure. | Sable has acknowledged and is in compliance with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 18 | Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated. | Sable has acknowledged and is in compliance with this condition. |
|---|---|---|
| **In-Line Inspection (ILI) Assessment and Frequency** | | |
| 19 | At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information: | Sable has acknowledged and will comply with this condition. |
| | a) Dates for integrity assessment | |
| | b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications | |
| | c) In-line inspection tool vendor(s) | |
| | d) Required tool specifications including operational specifications and anomaly sizing tolerances | |
| | e) Tool validation methodology | |
| | f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

|  |  |  |
|---|---|---|
|  | corrosion, cracks, and crack-like indications |  |
|  | g) Criteria used to identify locations for excavation and field verification |  |
|  | h) Non-destructive examination |  |
| 20 | Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance. | Sable has acknowledged and will comply with this condition. |
| 21 | Metal Loss Tool(s)<br><br>a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If, any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU). | |
| 22 | Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval. | Sable has acknowledged and will comply with this condition. |
| | a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks. | |
| | b. USCD Performance Specification Requirements | |

134

| | | |
|---|---|---|
| | i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks. | |
| | ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material. | |
| | iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld. | |
| | iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks. | |
| 23 | Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM. | Sable has acknowledged and is in compliance with this condition. |
| 24 | Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range. | Sable has acknowledged this condition and will comply as necessary. |
| 25 | All ILI tool runs must obtain the Test ID from the OSFM prior to run. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 26 | Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance. | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| 27 | Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable. | Sable has acknowledged and will comply with this condition. |
| 28 | Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly. | Sable has acknowledged and will comply with this condition. |

136

| 29 | Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013). | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| **Discovery of Condition** | | |
| 30 | The discovery date must be within 180 days of any ILI tool run for each type of ILI tool. | Sable has acknowledged this condition and will comply as necessary. |
| **Immediate Repair Conditions[7]** | | |
| 31 | A crack or crack-like anomaly that meets any of the following criteria:<br><br>a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.<br><br>b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1. | Sable has acknowledged this condition and will comply as necessary. |
| 32 | Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP. | Sable has acknowledged this condition and will comply as necessary. |
| 33 | Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP. | Sable has acknowledged this condition and will comply as necessary. |
| **180-Day Repair Conditions[9]** | | |

137

| 34 | A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP. | Sable has acknowledged this condition and will comply as necessary. |
|---|---|---|
| 35 | Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP. | Sable has acknowledged this condition and will comply as necessary. |
| 36 | All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth. | Sable has acknowledged this condition and will comply as necessary. |
| 37 | For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline. | Sable has acknowledged this condition and will comply as necessary. |
| **Corrosion Growth Rate Analysis (CGRA)** | | |
| 38 | Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates. | Sable has acknowledged and will comply with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 39 | The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data. | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| 40 | Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss. | Sable has acknowledged and will comply with this condition. |
| 41 | When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13]. | Sable has acknowledged and will comply with this condition. |
| 42 | All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI. | Sable has acknowledged and will comply with this condition. |
| **Pressure Reduction** | | |
| 43 | If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired. | Sable has acknowledged this condition and will comply as necessary. |
| **In Field Direct Examination of Pipe** | | |
| 44 | Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection | Sable has acknowledged this condition and will comply as necessary. |

139

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths. | |
| 45 | Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies: | Sable has acknowledged this condition and will comply as necessary. |
| | a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld. | |
| | b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5. | |
| | c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. | |
| 46 | Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack | Sable has acknowledged this condition and will comply as necessary. |

140

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. | |
| 47 | Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure. | Sable has acknowledged and complied with this condition, and will comply in the future as necessary. |
| 48 | All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap. | Sable has acknowledged and complied with this condition. |
| **Integrity Management** | | |
| 49 | A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools. | Sable has acknowledged and complied with this condition, and will comply in the future as necessary. |
| | a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1). | |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2). | |
| 50 | Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called. | Sable has acknowledged and is complying with this condition. |
| 51 | When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s). | Sable has acknowledged and complied with this condition, and will comply in the future as necessary. |
| 52 | Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned. | Sable has acknowledged and is complying with this condition. |
| 53 | Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | expert must be approved by the OSFM prior to being selected. | |
| 54 | Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert. | Sable has acknowledged and is complying with this condition. |
| **Data Requirements for Predicted Failure Analysis** | | |
| 55 | Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses. | Sable has acknowledged and is complying with this condition. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| 56 | The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records. | Sable has acknowledged and is complying with this condition. |
|---|---|---|
| **Recordkeeping** | | |
| 57 | Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days. | Sable has acknowledged and will comply with this condition as necessary. |
| 58 | Sable must maintain the following records:<br><br>a. Technical approach used for the analysis<br><br>b. All data used and analyzed<br><br>c. Pipe and longitudinal weld seam properties<br><br>d. Procedures used to implement state waiver conditions<br><br>e. Evaluation methodology used<br><br>f. Models used<br><br>g. Direct in situ examination data<br><br>h. All in-line inspection tool assessments information evaluated<br><br>i. Pressure test data and results<br><br>j. All in-the-ditch assessments performed on the pipeline segments | Sable has acknowledged and will comply with this condition. |

144

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results | |
| | l. All finite element analysis results | |
| | m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology | |
| | n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods | |
| | o. Safety factors used for fatigue life and/or predicted failure pressure calculations | |
| | p. Reassessment time interval and safety factors | |
| | q. The date of the review | |
| | r. Confirmation of the results by qualified technical subject matter expert(s) | |
| | s. Approval by responsible Sable management personnel | |
| | t. Records of additional preventive and mitigative (P&M) measures performed | |
| | u. Reports required by this State Waiver. | |
| **Reporting** | | |
| 59 | Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17] | Sable has acknowledged and will comply with this condition as necessary. |

145

| 60 | An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable: | Sable has acknowledged and will comply with this condition. |
|---|---|---|
| | d. Tool type and run date | |
| | e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type) | |
| | f. Dig sheets | |
| | g. Field contact information for Sable | |
| | h. Time and location of the field evaluation and repair. | |
| 61 | Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov , *Subject: OSFM State Waiver – Summary of Conditions CA-325A/B* and include: | Sable has acknowledged and will comply with this condition. |
| | i. Tool type | |
| | j. Run date | |
| | k.  Summary of Conditions Report[18] | |
| | l. Final Vendor Report and Pipe Tally | |
| 62 | Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-325A/B*. At a minimum, the annual report shall | Sable has acknowledged and will comply with this condition as necessary. |

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | contain the following, if applicable: | |
|---|---|---|
| | a. A Closure Report for the previous calendar (CY) which contains: | |
| | i. Features that were remediated in previous CY | |
| | 1. Provide documentation for the in-the-ditch assessments and repairs | |
| | ii. Identify features that remain to be assessed | |
| | iii. Unity Plots for previous ILI runs | |
| | b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49 | |
| | c. The third-party ILI expert reviews in accordance with Condition 53 | |
| | d. AC and DC Interference surveys that are due in accordance with Condition 54 | |
| | e. A copy of the CGRA for prior year including: | |
| | i. Mean corrosion growth rate for the pipeline | |
| | Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy) | |
| **Limitations** | | |
| 63 | This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a | Sable has acknowledged and will comply with this condition as necessary. |

147

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

| | | |
|---|---|---|
| | justification for continuation of the waiver. | |
| 64 | Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements. | Sable has acknowledged and will comply with this condition as necessary. |
| 65 | The OSFM may order the pipeline shutdown at any time. | Sable has acknowledged this condition. |
| 66 | The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver. | Sable has acknowledged this condition. |
| 67 | In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail. | Sable has acknowledged this condition. |
| 68 | If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver. | Sable has acknowledged this condition. |

148

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of July, 2025, in Los Angeles, California.

_____

**FJ Technologies, Inc.**

Brien Vierra, President

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

**Exhibit A - CV**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION


TECHNOLOGIES, INC.

## *Statement of Services and Qualifications*

FJ Technologies is a full service consulting firm serving the pipeline, telecommunications and petroleum industries. The company received its corporation status in the State of California and is based in Atascadero, CA.

FJ Technologies, Inc. offers a full range of services specializing in the following areas:

- Project Management

- Technical Support (drafting, exhibit drawings, graphics,)

- Design Services (hydraulics, piping, directional drill, facility layout, stress analysis, etc.)

- Mechanical Engineering (Civil and Structural Engineering provided through partnering program)

- Construction Observation and Management

- Consulting

- Conceptual Planning

- Procurement

### Experience Summary

Mr. Vierra is registered mechanical engineer in the State of California and has over 32 years of experience in the petroleum industry. His experience includes a diverse area such as; permitting and design of cross country pipelines, pressure vessel modifications, permitting and design of process and pumping facilities, design and installation of directional drill crossings, field construction monitoring, project management, project design, hydraulic analysis, pipe stress analysis (Caesar II/Coade), vessel design/fatigue analysis (Compress/Codeware), risk analysis, tank, vessel and pipeline internal/external inspection analysis, preparation of weld procedures and conceptual planning.

### Representative Experience

*4.1 mile Natural Gas Pipeline Project with High Pressure Meter Stations and Facilities - California*

Involved in the planning, engineering, installation and operation of a new 10-inch natural gas pipeline to transport natural gas from an existing major supplier to the end user. This project included facility design, pipeline design, facility tie-ins, pig launching and receiving traps, material specifications, material inspections, bid specifications, procurement and field construction support.

*Pipeline Directional Drill Project - Alaska*

P. O. Box 926
Atascadero, CA 93423
805-235-7943 Phone/ 805-460-9123 FAX



*TECHNOLOGIES, INC.*

## *Statement of Services and Qualifications*

Provide permitting assistance, engineering, design, specifications and tie-in procedures for a 20-inch crude oil pipeline relocation. The design involved a 5600 foot directional drill through muskeg and moraine material in the Kenai Burrough of Alaska.

*1.2 Mile Products Pipeline - California*

Involved in the planning, engineering, installation of a new 16" products pipeline to transport jet fuel from an existing major supplier to the end user. This project included pipeline design, a 5,200 foot directional drill, pig launcher and receiver facilities, facility tie-ins, material specifications, bid specifications and field construction support.

*Pipeline Repair/Replacement Project - Alaska*

Provide engineering design, project management and hydraulic analysis to retrofit existing 30-inch tanker loading lines for internally inspecting the two lines. The project involved revising the existing onshore piping and platform piping. The onshore piping required a new pig trap design with the offshore piping requiring extensive piping modifications to allow temporary pipe spools to be installed. A review and analysis of the internal inspection report was performed, then recommendations for further investigation/repairs were provided.

*Pipeline Repair/Replacement Project - Alaska*

Provide engineering design, specifications, bid preparation, project management and construction support to replace one mile of 20-inch pipe via two directional drills and repair 30 other sites via standard open cut methods.  All construction work was conducted during winter conditions which required building over 18 miles of ice roads to access the sites.

*Pipeline Close Interval Survey - Alaska*

Perform close interval surveys (pipe to soil) for 41.5 miles of 20-inch pipeline and 2.5 miles of 12-inch pipe. Survey included providing a written report discussing potential areas of concern with graphical printout of survey.

*Relocation of two 8-Inch Pipelines Across Highway 101 - California*

This project involved installing two directional drilled casings under Highway 101 as well as the nearby creek. Mr. Vierra provided engineering and permitting services to facilitate the construction of the pipeline replacement. Permitting services included Caltrans Encroachment permit, San Luis Obispo County Encroachment permit, DFG Streambed Alteration Permit, Army Corp. of Engineer Permit and RWQCB Permit.

*23 mile Pipeline and Facility Design Project - Louisiana*

Involved the planning, engineering, installation and operation of 23 miles of 6" pipe to transport crude oil from Offshore Louisiana to tie-in with an existing pipe system. Project included facility design, three directionally drilled crossings, offshore pipelaying in approximately 45 feet of water, inshore pipelaying through marsh and tying in pipeline to existing system. Responsibilities included complete project management, environmental compliance, material acquisition, contracts, permitting, acquisition of right of way, overall final design, training of personnel for operations and startup troubleshooting. Total overall cost of the project was approximately $7.5 MM.

P. O. Box 926
Atascadero, CA 93423
805-235-7943 Phone/ 805-460-9123 FAX


*TECHNOLOGIES, INC.*

## *Statement of Services and Qualifications*

*10.2 mile Pipeline Project with High Pressure Meter Stations and Facilities - California*

Project involved preparing and submitting permit requests to Santa Barbara County and various other agencies. Overseeing the planning, engineering, environmental review of the project with various consultants and field construction. Writing of several manuals for Operations, Emergency Response, Oil Spill Response, Environmental Manuals, Etc.. Designated on-site engineer during construction and startup. Total overall cost of the project was approximately $7.2 MM.

*20-inch Pipeline Replacement Project – Alaska*

This project involved installing approximately 1800 feet of 20-inch pipe via a directional drilled crossing under a river where the old pipe had been damaged. Mr. Vierra provided preliminary engineering, directional drill layout and permitting services as well as construction support during the installation of the pipe replacement. Once the project was complete as-built drawings were provided to the client.

*Crude & Product Storage Tank Retrofits – Alaska, California, Illinois, Louisiana, and Texas*

Projects performed involved preparing specifications for cleaning, coating, installing double bottoms, and performing API 653 inspections. Additional work to complete tank repairs involved preparation of procedures to repair tank floors, replace nozzles not in compliance with API 650/653 and verification of weld procedures.

*1.2-mile Transmission Line Renewal - California:*

Mr. Vierra was the project manager responsible for overseeing this 1.2-mile, 12-inch steel oil transmission line renewal through the main business district of a beach community.  He prepared preliminary hydraulic calculations, as well as hired and managed outside engineering, environmental and risk analysis consultants.  Mr. Vierra worked with consultants and agencies to obtain permits and agency approvals from the City, Department of Fish and Game, and the Regional Water Quality Control Board. Construction costs on the project were approximately $1 million.

*3.5-mile Transmission Line Replacement - California:*

Mr. Vierra was the project manager responsible for overseeing the replacement of a 3.5-mile section of two, 8 inch-steel oil transmission lines located near the town of Santa Margarita.  These lines were located adjacent to a perennial stream and crossed it in four locations.  Each of these crossings required permit approval by the Army Corps of Engineers, RWQCB and the Department of Fish and Game. The project involved preparing engineering packages, environmental documents (archaeological and biological), permit packages, field monitoring for compliance and updating of response plans.  Construction costs on the project were approximately $1.5 million.

*Heating, Separating & Pumping Facility Retrofit and Upgrade - California*

Install new 8.9 MM BTU Burners in existing heater treaters for compliance with new NOx and SOx emission requirements. Source test equipment and demonstrate compliance with regulating agency. Work involved replacing heat exchanger's with updated more efficient models. Install new water shipping pumps capable of handling higher flow rates and injection pressures.



TECHNOLOGIES, INC.

## *Statement of Services and Qualifications*

*Crude and Product Pipeline Installation, Operation and Relocation Work – Alaska, California, Illinois, Louisiana, and Texas*

Work involved modifying existing operations, troubleshooting mechanical/electrical problems, pipeline tie-ins, writing of procedures, compliance plans, directional drilling plans, response plans and project specifications. Field engineering and installation of various pieces of equipment. Hydrotesting of lines for DOT and State Fire Marshall compliance. Running of internal inspection tools on various pipeline's to determine remaining wall thickness and operational safety of the entire system.

*Corrosion Control and Repair of CP System at VAFB*

Mr. Vierra reviewed site data and prepared design drawings/specifications/cost benefit analysis to repair an existing cathodic protection system as well as control existing surface corrosion on various pieces of equipment subject to a harsh environment.

### Education

**Colorado School of Mines**, Golden, CO
*Economic Evaluation and Investment Decision Methods Certificate - September, 1996*

**California Polytechnic State University**, San Luis Obispo, CA
*Bachelor of Science in Mechanical Engineering Technology - June, 1990*

- Registered Professional Engineer (Lic. # M 32330 California)
- Incident Command System. Emergency Management Training
- Fire Protection Training Academy. University of Nevada-Reno
- Confined Space Entry Supervisor
- Hazard Analysis Training Course
- Hazmat 40 Hour Training Certified May 1995, Refresher  Oct. 1997
- Threatened and Endangered Species Preliminary Survey Protocols Training Class, LFR - 1999
- Storm Water Regulations, Erosion and Sediment Control Training Class, RWQCB - 2000

For additional information contact Brien Vierra at 805-235-7943.

P. O. Box 926
Atascadero, CA 93423
805-235-7943 Phone/ 805-460-9123 FAX

**Exhibit B – Consent Decree**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>   Plaintiffs,<br><br>     v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>   Defendants. | Civil Action No.<br><br>2:20-cv-02415<br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 14    Filed 05/14/26    Page 539 of 1123   Page
Case 2:20-cv-02415-Document 6-1   Filed 03/13/20   Page 3 of 102   Page ID #:96
ID #:6671

## TABLE OF CONTENTS

I.     BACKGROUND .................................................................................. - 5 -

II.    JURISDICTION AND VENUE............................................................. - 6 -

III.   APPLICABILITY ................................................................................ - 7 -

IV.    DEFINITIONS .................................................................................... - 7 -

V.     CIVIL PENALTIES ........................................................................... - 13 -

VI.    NATURAL RESOURCE DAMAGES ................................................ - 17 -

VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY
       OF JOINT NRD FUNDS .................................................................. - 21 -

VIII.  TRUSTEES' MANAGEMENT OF RECREATIONAL
       USE FUNDS ...................................................................................... - 22 -

IX.    INJUNCTIVE RELIEF ...................................................................... - 23 -

X.     CORRECTIVE ACTION ORDER ..................................................... - 27 -

XI.    STIPULATED PENALTIES ............................................................... - 27 -

XII.   FORCE MAJEURE............................................................................ - 35 -

XIII.  DISPUTE RESOLUTION .................................................................. - 37 -

XIV.   REPORTING ..................................................................................... - 39 -

XV.    CERTIFICATION .............................................................................. - 40 -

XVI.   INFORMATION COLLECTION AND RETENTION....................... - 40 -

XVII.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........... - 43 -

XVIII. TRANSFER AND ACQUISITION OF ASSETS ............................. - 49 -

XIX.   COSTS............................................................................................... - 50 -

XX.    NOTICES ........................................................................................... - 51 -

XXI.   EFFECTIVE DATE ........................................................................... - 54 -

XXII.  RETENTION OF JURISDICTION .................................................... - 54 -

XXIII. MODIFICATION ............................................................................... - 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XXIV.      TERMINATION ........................................................................................- 55 -

XXV.       PUBLIC PARTICIPATION...................................................................- 56 -

XXVI.      SIGNATORIES/SERVICE ....................................................................- 56 -

XXVII.     INTEGRATION ......................................................................................- 57 -

XXVIII.   FINAL JUDGMENT ..............................................................................- 57 -

XXIX.      26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

A.      WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.      WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.      WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

D.      WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.      WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.      WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.      WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.      WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

I.    WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.    WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.    WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.    WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.    WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.    WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.      WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.      WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.      WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.      WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.      WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree:  (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.      BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 5 -

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.    Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

does business in this District and the alleged claims occurred in this District.

3. For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III. APPLICABILITY

4. Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5. Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV. DEFINITIONS

7. Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 548 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 12 of 102   Page ID #:105
ID #:6680

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree.  For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H .html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 549 of 1123    Page
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 13 of 102  Page ID #:106
ID #:6681

"Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley. Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 10 -

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 11 -

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq*., and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016. RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC. The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 12 -

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.    CIVIL PENALTIES

A.    Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment").  The Penalty Payment shall be allocated as follows:

8.    Penalty Payment to the United States (PHMSA).  For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

a.    Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.    One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.    Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants.  Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d.      At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al*., and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9.      Penalty Payment to the United States (EPA) shared with CDFW and RWQCB.  The Penalty Payment shall be allocated as follows:

a.      As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1) To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2) To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

> State Water Resources Control Board
> Division of Administrative Services, ATTN: Civil Liability Payment
> P.O. Box 1888
> Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)     To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

Case 2:26-cv-05242-GW-SSC Document 143 Filed 05/14/26 Page 557 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 21 of 102 Page ID #:114
ID #:6689

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10. Penalty Payment to be Paid to CDFW. For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11. Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI. NATURAL RESOURCE DAMAGES

12. Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961. The NRD Payment shall be allocated as follows:

     a. To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment. Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds). Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention: Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C. 20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198. DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

b.     To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>    Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.     To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn:  Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California  95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account.  The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d.      To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account.  Payment shall be made by check payable to The Regents of the University of California.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

Case 2:26-cv-05242-GVW-SSC    Document 14-3   Filed 05/14/26    Page 561 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20    Page 25 of 102    Page ID #:116
ID #:6693

The Regents of the University of California
Attn:  Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account.  The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees.  The projects shall address the research, education, and outreach missions of the University of California.  UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.    The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants.  To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.    DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident.  DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.    DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Case 2:26-cv-05242-GW-SSC Document 14-3 Filed 05/14/26 Page 562 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 26 of 102 Page ID #:115
ID #:6694

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 22 -

19.    The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.    UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.    INJUNCTIVE RELIEF

21.    Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.    Material Changes to Plains' IMP.

a.    Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)    Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)    Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)    White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

Case 2:26-cv-05242-GW-SSC    Document 14-3    Filed 05/14/26    Page 564 of 1123   Page ID #:12...

Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 28 of 102   Page ID #:6696

4)     Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5)     Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6)     Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.     At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.     In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.     In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation.  The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 24 -

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.   Material Changes in Control Room Management Plan and Control Center General Procedures.

a.   Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.   At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 25 -

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days.  Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.      Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 143   Filed 05/14/26   Page 567 of 1123   Page ID #:...

Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 31 of 102   Page ID #:6699

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X. CORRECTIVE ACTION ORDER

25. Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect. All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI. STIPULATED PENALTIES

26. Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below. A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27. <u>Late Payment of Civil Penalties and NRD Payment</u>.

a. If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b. If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c. If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-GVW-SSC Document 143 Filed 05/14/26 Page 568 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 32 of 102 Page ID #:125
ID #:6700

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. <u>Stipulated Penalties for Non-Performance of Injunctive Relief</u>. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

h.      For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.      For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.      For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.      For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.      For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.      For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.      For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.      For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.      For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.      For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 29 -

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.      For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.      For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.      For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.      For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.      For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.      For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.      For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.      The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 571 of 1123   Page
Case 2:20-cv-02415-W-SSC   Document 6-1   Filed 03/13/20   Page 35 of 102   Page ID #:128
ID #:6703

29.     <u>Stipulated Penalties for Non-Compliance with Corrective Action
Order Terms.</u>  Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

    a.     For operation of Line 901 in violation of paragraph 1.a of Appendix D;

    b.     For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

    c.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

    d.     For operation of Line 903, in violation of paragraph 1.e of Appendix D;

    e.     For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

    f.     For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

    g.     For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

    h.     For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

    i.     The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 31 -

| Penalty Per Violation | Per Day Period of Noncompliance |
| --- | --- |
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30.     Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31.     For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32.     For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33.     For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34.     For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 573 of 1123    Page
ID #:6705
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 37 of 102    Page ID #:130

a.      Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.      Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.      Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.      If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.     For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.     For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

      a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

      b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

Case 2:26-cv-05242-GVW-SSC Document 14-3 Filed 05/14/26 Page 575 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 39 of 102 Page ID #:132
ID #:6707

c. If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41. If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42. The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43. Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII. FORCE MAJEURE

44. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46. If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 37 -

Case 2:26-cv-05242-GW-SSC Document 14-3 Filed 05/14/26 Page 578 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 42 of 102 Page ID #:135
ID #:6710

Decree.

50.     <u>Informal Dispute Resolution</u>.  Any dispute subject to Dispute
Resolution under this Consent Decree shall first be the subject of informal
negotiations.  The dispute shall be considered to have arisen when Defendants
send the relevant Plaintiff(s) a written Notice of Dispute.  Such Notice of Dispute
shall state clearly the matter in dispute.  The period of informal negotiations shall
not exceed thirty (30) Days from the date the dispute arises, unless that period is
modified by written agreement.  If the parties cannot resolve a dispute by
informal negotiations, then the position advanced by Plaintiffs shall be
considered binding unless, within forty-five (45) Days after the conclusion of the
informal negotiation period, Defendants invoke formal Dispute Resolution
procedures as set forth below.

51.     <u>Formal Dispute Resolution</u>.  Defendants shall invoke formal Dispute
Resolution procedures, within the time period provided in the preceding
Paragraph, by serving on Plaintiffs a written Statement of Position regarding the
matter in dispute.  The Statement of Position shall include, but need not be
limited to, any factual data, analysis, or opinion supporting Defendants' position
and any supporting documentation relied upon by Defendants.

52.     Plaintiffs shall serve their Statement of Position within forty-five
(45) Days of receipt of Defendants' Statement of Position.  Plaintiffs' Statement
of Position shall include, but need not be limited to, any factual data, analysis, or
opinion supporting that position and any supporting documentation relied upon
by Plaintiffs.  Plaintiffs' Statement of Position shall be binding on Defendants,
unless Defendants file a motion for judicial review of the dispute in accordance
with the following Paragraph.

53.     Defendants may seek judicial review of the dispute by filing with the
Court and serving on the relevant Plaintiff(s), in accordance with Section XX
(Notices), a motion requesting judicial resolution of the dispute.  The motion

<p align="center">*United States of America and the People of the State of California v.*<br>
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*<br>
Consent Decree</p>

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV. CERTIFICATION

58. Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI. INFORMATION COLLECTION AND RETENTION

59. Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 40 -

  c.  obtain documentary evidence, including photographs and similar data; and

  d.  assess Defendants' compliance with this Consent Decree.

60. Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree. At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62. For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2. Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63. The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 583 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 47 of 102   Page ID #:140
ID #:6715

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67.    At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68.    [*Intentionally left blank.*]

## XVII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.    This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70.    Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

      a.     49 C.F.R. Part 194 Subpart B – Response Plans;

      b.     49 C.F.R. Part 195 Subpart B – Reporting;

      c.     49 C.F.R. Part 195 Subpart E – Pressure Testing;

      d.     49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

      e.     49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

      f.     49 C.F.R. Part 195 Subpart H – Corrosion Control;

      g.     49 C.F.R. Part 199 – Drug and Alcohol Testing; and

      h.     All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

      a.      The Pipeline Safety Laws specified in Paragraph 70; and

      b.      California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81. Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82. By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83. By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84. Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder. Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85. Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86. Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87.     The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII.   TRANSFER AND ACQUISITION OF ASSETS

88.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision.  Those provisions of Appendix B are:

a.     For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

b.     For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

c.     For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

d.     For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89.     In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.     In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.     For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92.     Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

<div align="center">

**XX.  NOTICES**

</div>

93.    Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:   eescdcopy.enrd@usdoj.gov
                                    Re: DJ # 90-5-1-1-11340

As to the United States by mail:    EES Case Management Unit
                                    Environment and Natural Resources
                                        Division
                                    U.S. Department of Justice
                                    P.O. Box 7611
                                    Washington, D.C.  20044-7611
                                    Re: DJ # 90-5-1-1-1130

As to PHMSA:                        James M. Pates
                                    Assistant Chief Counsel
                                        for Pipeline Safety
                                    U.S. Department of Transportation
                                    Pipeline and Hazardous Materials
                                        Safety Administration
                                    1200 New Jersey Ave. SE. E-26
                                    Washington, DC. 20590

As to EPA:                          Andrew Helmlinger
                                    Attorney Advisor
                                    U.S. EPA Region IX
                                    75 Hawthorne Street (ORC-3)
                                    San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

As to DOI:       Clare Cragan
U.S. Department of the Interior
Office of the Solicitor
755 Parfet St., Suite 151
Lakewood, Colorado 80215

As to NOAA:      National Oceanic and Atmospheric
  Administration
Office of General Counsel
Natural Resources Section
ATTN:  Christopher J. Plaisted
501 W. Ocean Blvd, Suite 4470
Long Beach, California  90802

As to USCG:      Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center,
 US Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, DC 20593-7605

As to the State Agencies:  Michael Zarro
Deputy Attorney General
Office of the Attorney General
Natural Resources Law Section
300 S. Spring St., Suite 11220
Los Angeles, California 90013

As to CDFW:      California Department of Fish
 and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater
Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 593 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 57 of 102   Page ID #:150
ID #:6725

As to CDPR:                    California Department of Parks and
                                  Recreation
                               Attn: Laura A. Reimche, Senior Counsel
                               1416 Ninth Street, Room 1404-6
                               Sacramento, California 95814

As to CSLC:                    California State Lands Commission
                               Attn: Patrick Huber, Legal Division
                               100 Howe Avenue, Suite 100-South
                               Sacramento, California 95825

As to OSFM:                    California Department of Forestry and
                                  Fire Protection
                               Legal Services Office
                               Attn: Joshua Cleaver, Staff Counsel
                               P.O. Box 944246
                               Sacramento, California 94244-2460

As to RWQCB:                   California Central Coast Regional Water
                               Quality Control Board
                               Attn: Naomi Rubin, Attorney III
                               801 K Street
                               Sacramento, California 95814

As to UC:                      Barton Lounsbury, Senior Counsel
                               University of California
                               Office of the General Counsel
                               1111 Franklin Street, 8th Floor
                               Oakland, California  94607

As to Defendants:              Megan Prout
                               Senior Vice President
                               Commercial Law and Litigation
                               333 Clay Street, Suite 1600
                               Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.   EFFECTIVE DATE

96.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.   RETENTION OF JURISDICTION

97.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.   MODIFICATION

98.    The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 54 -

99.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.    After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.    Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.    If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 55 -

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.    PUBLIC PARTICIPATION

103.    This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.    Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.    SIGNATORIES/SERVICE

105.    Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## XXVII.   INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.     FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 598 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 62 of 102   Page ID #:155
ID #:6730

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

**BRUCE S. GELBER**
Deputy Assistant Attorney General
Environment and Natural Resources
    Division U.S. Department of Justice

3/13/2020

Date

**BRADLEY R. O'BRIEN**
**ANGELA MO**
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 58 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
    Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

_____

Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020
_____
Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
        Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

_____
THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____3/2/20_____
Date

_____Lisa Ann L. Mangat_____
LISA ANN L. MANGAT
Director
California Department of Parks
and Recreation

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 63 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

__2/28/2020__

Date

_____

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 64 -

Case 2:26-cv-05242-GW-SSC Document 14-3 Filed 05/14/26 Page 605 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 69 of 102 Page ID #:162
ID #:6737

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
Date

THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 65 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
_____
Date

_____
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
Quality Control Board

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____

Date
BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

3 March 2020
Date
PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 A -

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 609 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 73 of 102 Page ID #:166
ID #:6741

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 68 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.


__2/25/2020__
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 69 -

Case 2:26-cv-05242-GVW-SSC    Document 14-3    Filed 05/14/26    Page 611 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 75 of 102   Page ID #:165
ID #:6743

# APPENDIX A

## *(Set of maps that generally depict Lines 901, 903, and 2000)*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.
Consent Decree*

-70-



*Appendix A – Line 901*

Scale: 1:100,000

Sheet No: 1/1

Owner:

**PLAINS**
ALL AMERICAN
PIPELINE, L.P.

Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community



Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community.

*Appendix A – Line 903*

Scale: 1:700,000

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.



*Appendix A – Line 2000*

| | |
|---|---|
| Scale: 1:966,574 | |
| Sheet No: 1/1 | |

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 615 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 79 of 102   Page ID #:172
ID #:6747

# APPENDIX B

## *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 616 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 80 of 102 Page ID #:173
ID #:6748

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A. Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B. Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C. Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D. Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E. To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A. Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a. Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b. Conduct a close interval survey (CIS) and AC/DC interference survey.

   c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

   1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

   2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

   3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

   4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b.   Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c.   When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d.   Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e.   Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f.   Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g.   For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h.   Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i.   Integrate and analyze available data in its P&M process, including:

  i.   Assessment data from ILI tool runs;

  ii.   Dig and repair data;

4

-78-

iii.     Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.      Operational data, such as pressure and flow data;

v.       Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.      Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.     Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.     ILI Measures

a.     Initial ILI Runs. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.      All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 621 of 1123   Page
Case 2:20-cv-02415  Document 6-1   Filed 03/13/20   Page 85 of 102   Page ID #:176
ID #:6753

      ii.    In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run.  If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

    b.    <u>Subsequent ILI Runs</u>.  After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year.  Alternatively, Plains may run a UT tool each year.  If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

    c.    <u>All ILI Runs</u>.  Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.    **<u>Valves</u>**

A.    Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

    1.    Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

    2.    Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.    Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.    Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

6. **Risk Analysis**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1.    Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a.    The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b.    Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis.  The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c.    The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B.    Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

    A.    Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9. **Integrity Management**

    A.    New Procedures for Interim Reviews and Assessments

7

1. Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2. Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3. Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B. Documentation for P&M Recommendations

1. Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

    a. What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

    b. The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

      c.     The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

    2.     In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

    3.     In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.     Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10.    **Valves and O&M**

A.     Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.     Within two years of entry of the CD, Plains shall develop and implement procedures to:

    1.     If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

    2.     Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

    3.     Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

    4.     Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.     Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

D. For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

1. Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room.  Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E. Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11. **Leak Detection**

A. Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

1. Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B. For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C. Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

1. Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D. Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

1. Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.    Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection.  The results of the meetings will be documented and shared with appropriate personnel.  The recommendations will be evaluated and documented.

F.    Instrumentation and Display

1.    To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.    Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.    Track these conditions through to resolution, including instrumentation relocation when necessary.

12.   **Control Room Management**

A.    For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.    Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.    Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.    Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.    Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 627 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 91 of 102   Page ID #:184
ID #:6759

B.     For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.     Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

A.     California-Specific Provisions:

1.    Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05.  Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.     Company-Wide Provisions

1.    Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.    Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response.  Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.    Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

<div align="center">12</div>

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **Safety Management System (SMS)**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B.      Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.     **Drug and Alcohol Program**

A.      Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors.  Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures.  Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

# APPENDIX C

## (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

# APPENDIX D

*(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

Case 2:26-cv-05242-SVW-SSC  Document 14-3  Filed 05/14/26  Page 632 of 1123  Page
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 96 of 102  Page ID #:185
ID #:6764

# <u>APPENDIX D</u>

1.　　　All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

     a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

     b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

        1)　　Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

        2)　　Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

        3)　　Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

        4)　　A specific day-light restart that includes advance communications with local emergency response officials;

        5)　　Master Control Room enhancements, including:

            a) Implementation of advanced leak-detection

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 633 of 1123   Page
Case 2:20-cv-02415 Document 6-1   Filed 03/13/20   Page 97 of 102   Page ID #:190
ID #:6765

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running.  Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)     Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)     Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)     Installation of additional pressure sensors as a result of Plains' surge study;

9)     Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM.  The tool run shall be initiated during daylight hours.  If the tool run does not collect a complete data set, the UT tool shall be promptly re-run.  A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report.  Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)    **Corrosion Prevention.**  Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan.  Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 635 of 1123   Page
ID #:6767
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 99 of 102   Page ID #:192

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)      Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)      Provisions for a daylight restart and advance communications with local emergency response officials.

g.  **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h.  **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)      The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)    The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)    The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)    Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3)    The Appendix D Documentation Report shall include but not be limited to:

    A.    Table of Contents;

    B.    [*intentionally left blank.*]

    C.    [*intentionally left blank.*]

    D.    Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

    E.    [*intentionally left blank.*]

    F.    [*intentionally left blank.*]

    G.    Lessons learned while fulfilling the requirements of this Appendix D.

**Exhibit C – CA-324 State Waiver**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Docusign Envelope ID: 87118E7A-E976-4881-86B3-BCE5F180FFD7

STATE OF CALIFORNIA — NATURAL RESOURCES AGENCY                                Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



### CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.   All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10.  Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11.  Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12.  Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

a) Dates for integrity assessment

b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 87118E7A-FD76-4881-86B3-BCF5F180FFD7

Lance Yearwood
December 17, 2024
Page 6

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)

d) Required tool specifications including operational specifications and anomaly sizing tolerances

e) Tool validation methodology

f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

g) Criteria used to identify locations for excavation and field verification

h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

  a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

  b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Docusign Envelope ID: 87118E7A-E976-4881-86B3-BCE5F1805FD7

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## **Discovery of Condition**

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## **Immediate Repair Conditions**[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F1805FD7

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F1805FD7

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
   a. Technical approach used for the analysis
   b. All data used and analyzed
   c. Pipe and longitudinal weld seam properties
   d. Procedures used to implement state waiver conditions

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 13

       e. Evaluation methodology used

       f. Models used

       g. Direct in situ examination data

       h. All in-line inspection tool assessments information evaluated

       i. Pressure test data and results

       j. All in-the-ditch assessments performed on the pipeline segments

       k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

       l. All finite element analysis results

       m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

       n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

       o. Safety factors used for fatigue life and/or predicted failure pressure calculations

       p. Reassessment time interval and safety factors

       q. The date of the review

       r. Confirmation of the results by qualified technical subject matter expert(s)

       s. Approval by responsible Sable management personnel

       t. Records of additional preventive and mitigative (P&M) measures performed

       u. Reports required by this State Waiver.

**Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:

       a. Tool type and run date

       b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

       c. Dig sheets

       d. Field contact information for Sable

       e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Lance Yearwood
December 17, 2024
Page 14

        a. Tool type
        b. Run date
        c. Summary of Conditions Report[18]
        d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324.* At a minimum, the annual report shall contain the following, if applicable:
    a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
            1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
    c. The third-party ILI expert reviews in accordance with Condition 52
    d. AC and DC Interference surveys that are due in accordance with Condition 53
    e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs


Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

**Exhibit D – CA-325A and CA-325B State Waiver**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95609F3B

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



### CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
    a. 1000 pounds per square inch gauge (psig) for CA-325A.
    b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
    a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
    b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
    a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
    b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
    c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5


## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

## In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a)  Dates for integrity assessment
    b)  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c)  In-line inspection tool vendor(s)
    d)  Required tool specifications including operational specifications and anomaly sizing tolerances
    e)  Tool validation methodology
    f)  Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g)  Criteria used to identify locations for excavation and field verification
    h)  Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a.  Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b.  Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to  meet  the  tool  accuracy specification  provided  by  the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**Discovery of Condition**

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**Immediate Repair Conditions**[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

### 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

### Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## **Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Lance Yearwood
December 17, 2024
Page 13

     n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

     o. Safety factors used for fatigue life and/or predicted failure pressure calculations

     p. Reassessment time interval and safety factors

     q. The date of the review

     r. Confirmation of the results by qualified technical subject matter expert(s)

     s. Approval by responsible Sable management personnel

     t. Records of additional preventive and mitigative (P&M) measures performed

     u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:

     d. Tool type and run date

     e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

     f. Dig sheets

     g. Field contact information for Sable

     h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

     i. Tool type

     j. Run date

     k. Summary of Conditions Report[18]

     l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:
   a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
             1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
   c. The third-party ILI expert reviews in accordance with Condition 53
   d. AC and DC Interference surveys that are due in accordance with Condition 54
   e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

**Exhibit E - Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable for CA-324 Pipeline**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0002**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (Sable CA-324) between Las Flores Canyon and Gaviota, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

**Exhibit F - Docket No. PHMSA-2025-0002 letter responding to Office of the State Fire Marshal granting a waiver to Sable for CA-325A/B Pipeline**

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0003**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

**PHMSA-2025-0003 – California Office of the State Fire Marshall**     **Page 2 of 2**

**Exhibit G – AVEVA Product Datasheet – Pipeline Operations for Liquids**

AVEVA is part of the new control system and is providing the tools/software for the RTTM LDS system. The below brochures provide a glimpse of what the software/system will provide.

DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION



PRODUCT DATASHEET

# AVEVA™ Pipeline Operations for Liquids

## Powerful tools for real-time operations of any pipeline

AVEVA Pipeline Operations for Liquids provides everything needed to efficiently manage real-time pipeline operations using both non-simulation and simulation-based applications.

To say the least, it's a challenge to move petroleum liquids through miles of pipeline; you need to optimize schedules, power usage, staffing, and other critical factors. Even the most skilled personnel require sophisticated tools to front-end their efforts. Where can you find the robust, flexible solutions you need to do the job?

AVEVA offers a broad range of software available for crude oil, refined products, and natural gas pipeline engineering, as well as operational, measurement, and business processes. AVEVA suite of pipeline applications is used by many of the largest operators in the industry in North, Latin, and South America; Western and Eastern Europe; Asia; the Middle East; North Africa; and Australia. All applications are rich, robust, and flexible – and can be cost-effectively integrated into existing corporate IT infrastructures to provide highly accessible information.

## Focus on your business

AVEVA Pipeline Operations for Liquids provides comprehensive tools to maximize operational efficiency and the bottom line. We enable you to make decisions in real time for a competitive advantage that can improve every aspect of your business. To meet your unique needs, the applications are available à la carte or are easily combined to provide a robust, integrated system.

AVEVA Pipeline Operations for Liquids neatly organizes major portions of your business into functional areas that are drawn into a powerful, centralized platform. Each application runs on well-known operating systems and provides an industry-leading combination of proven functionality, flexibility, redundancy, historical record keeping, enterprise integration, and assured security to ensure consistent performance.

## Non-simulation-based applications

AVEVA Pipeline Operations for Liquids is a comprehensive set of tools for real-time management of scheduling and measurement. Using a standards-based open architecture, it is easily adopted to meet your unique needs.

- Pipeline Operations determines net metered volumes and flow rates for each point of measurement in the pipeline system using API calculations as part of its Virtual Flow Computer functionality.

- Pipeline Operations provides the ability to store, view, and edit pending, active, and completed tickets as part of its Batch Transfer Management functionality.

- Pipeline Operations calculates net and gross volumes of fluid within tanks based on telemetered tank levels as part of its tank management functionality.

- Other functionalities for pump management, product transfer, line blockage and action sequence are also available as part of Pipeline Operations.

## Simulation-based applications

AVEVA Pipeline Operations for Liquids is a transient pipeline modeling and simulation system for gas and liquids pipelines. It is the most technologically advanced and dependable pipeline simulation system in the industry. AVEVA Pipeline Operations for Liquids optimizes management of your pipeline operations for greater efficiency, effectiveness, and an improved bottom line.

Use Pipeline Operations simulation-based capabilities to create simple or advanced pipeline environment simulations to aid a plethora of functionality.

- Pipeline Operations calculates and displays a number of hydraulic profiles in real time, e.g. pressure, head, flow, density, viscosity, diameter, etc. along the pipeline.

- Pipeline Operations tracks the movement and predicts the estimated time of arrival for products, batches, scrapers (pigs), transmix, quality, and anomalies through a pipeline system.

- Pipeline Operations calculates the inventory either very accurately using the advanced real-time transient model or using API 2005 standards for changes in volume due to temperature and pressure.

## An integrated approach

AVEVA Pipeline Operations for Liquids is one of the offerings based upon a common advanced application development environment for building advanced software applications for the pipeline industry. This allows Pipeline Operations to have common configuration tools, common database, common pipeline model connectivity, and common runtime environment with other offerings from AVEVA creating a unique integrated solution.

## An easy choice to make

Leading energy companies worldwide can attest to the power and proven performance of AVEVA systems. In North America alone, AVEVA systems manage over 60 percent of all hydrocarbon movements. Choose the industry leader – AVEVA's AVEVA Pipeline Operations for Liquids.



© 2020 AVEVA Group plc and its subsidiaries. All rights reserved.
AVEVA and the AVEVA logo are a trademark or registered trademark of AVEVA Group plc in the U.S. and other countries.
All product names mentioned are the trademarks of their respective holders.

aveva.com



PRODUCT DATASHEET

# AVEVA™ Pipeline Integrity Monitor

## Tools to prevent, detect, and mitigate pipeline commodity releases

AVEVA Pipeline Integrity Monitor offers pipeline companies a holistic view toward preventing, detecting, and mitigating the impact of commodity releases.

Oil and gas pipelines are considered critical assets of economic development for any country and the pipeline companies operating the pipelines are generally required to ensure the safety of the population and environment where these pipelines runeither due to regulatory compliance or internal company policies.

Additionally, unauthorized and dangerous extractions (theft) in the middle of the pipeline are not uncommon in some parts of the world. In these cases, leak detection is not strictly about protecting the environment and pipeline property, but includes protection of the safety of the thieves themselves.

### Focus on pipeline integrity

As a result of the above complexities, pipeline companies are putting a greater emphasis on utilizing pipeline integrity management. The purpose of pipeline integrity management is to ensure that pipelines do not cause harm to people or the environment, while at the same time provide reliable and secure service to pipeline operators and customers. Pipeline Integrity can coarsely be divided into preventing the leak from occurring, detecting the leak if it occurs, and mitigating the impact of the leak after it has occurred. AVEVA Pipeline Integrity Monitor is perfectly positioned to assist pipeline operators in this respect.

### Prevent it from occurring

AVEVA Pipeline Integrity Monitor assists the pipeline operator with preventive features like over/ under pressure detection analysis.

### Mitigate the impact

AVEVA Pipeline Integrity Monitor assists the pipeline operator with impact assessment analysis tools like giving an estimate as to the amount of volume lost and performing a location analysis.

### Detect it

AVEVA Pipeline Integrity Monitor offers a number of methodologies for detecting a leak:

- Computational Pipeline Monitoring (CPM) based around Real-Time. Transient Model methodology as outlined in API RP 1130.
- CPM based around Volume Balance methodology as outlined in API RP 1130.
- CPM based around Compensated Volume Balance methodology as outlined in API RP 1130.
- Rate of Change (ROC) and Rate of Change Combination (ROCC) monitoring for rupture detection.
- Pressure loss leak detection for pinhole (theft) or rupture detection dependent on implementation.
- Shut-in detection taking into account pressure and temperature changes in a closed off section.
- Additionally, AVEVA Pipeline Integrity Monitor has the following functionality available:
  - Dynamic thresholds allow thresholds to be automatically raised and lowered due to activities being performed physically on the pipeline.
  - Leak location capability is available either based to nearest milepost or to identified operating section.
  - Intelligent voting mechanism (alarm layer) for analyzing output from various leak detection methodologies to consolidate to one leak/ no leak alarm.



### An integrated approach

AVEVA Pipeline Integrity Monitor is one of the offerings based upon a common advanced application development environment for building advanced simulation software applications for the pipeline industry. This allows AVEVA Pipeline Integrity Monitor to have common configuration tools, common database, common pipeline common pipeline model connectivity, and common runtime environment with other offerings from AVEVA creating a unique integrated solution.

### Trust the experts with the large customer base

AVEVA has been designing leak detection systems for pipelines for 20+ years and is recognized in the industry as experts in their field. During this time it has become apparent that there is no one leak detection methodology that fits every pipeline, there is no one-size-fits-all; each pipeline should be evaluated independently and recommendations made accordingly. AVEVA Pipeline Integrity Monitor continues the trend of providing leak detection fit for purpose while allowing the customer to take a holistic view of the why, where, and when associated with pipeline commodity releases.

To learn more, please contact your AVEVA representative or visit us online at aveva.com



© 2020 AVEVA Group plc and its subsidiaries. All rights reserved.
AVEVA and the AVEVA logo are a trademark or registered trademark of AVEVA Group plc in the U.S. and other countries.
All product names mentioned are the trademarks of their respective holders.

aveva.com

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

July 7, 2025, I served the document(s) described as **DECLARATION OF BRIEN VIERRA IN SUPPORT OF REAL PARTIES' OPPOSITION TO PRELIMINARY INJUNCTION** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

[State]    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/ Josie Cisneros*

_____
Josie Cisneros

## SERVICE LIST

Julie Teel Simmons, Esq.
David Pettit, Esq.
Talia Nimmer, Esq.
Center for Biological Diversity
2011 Franklin Street, Suite 375
Oakland, CA 94612

ATTORNEYS FOR PETITIONERS
CENTER FOR BIOLOGICAL DIVERSITY and
WISHTOYO FOUNDATION

Tel.:   (510) 844-7100
Fax:    (510) 844-7150
Email: jteelsimmonds@biologicaldiversity.org
       dpettit@biologicaldiversity.org
       tnimmer@biologicaldiversity.org

Linda Krop, Esq.
Jeremy M. Frankel, Esq.
Tara C. Regnifo, Esq.
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

ATTORNEYS FOR PETITIONERS
ENVIRONMENTAL DEFENSE CENTER, a
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit corporation;
SIERRA CLUB, a national non-profit
corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation

Tel.:   (510) 844-7100
Fax:    (510) 844-7150
Email: lkrop@environmentaldefensecenter.org
       jfrankel@environmentaldefensecenter.org
       trengifo@environmentaldefensecenter.org

Michael S. Dorsi, Esq.
California Attorney General's Office
55 Golden Gate Ave, Ste 11000,
San Francisco, CA 94102

ATTORNEYS FOR RESPONDENTS/
DEFENDANTS
California Department of Forestry and Fire
Protection, Office of the State Fire Marshal;
Daniel Berlant, in his official capacity as State
Fire Marshal

Tel.:   (415) 510-3802
Email: Michael.dorsi@doj.ca.gov

Duncan Joseph Moore, Esq.
Benjamin J. Hanelin, Esq.
Natalie C. Rogers, Esq.
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:   (310) 620-5879
Email: djmoore@paulhastings.com
       benjaminhanelin@paulhastings.com
       natalierogers@paulhastings.com

Trevor D. Large, Esq.
FAUVER, LARGE, ARCHBALD & SPRAY
LLP
820 State Street, 4th Floor
Santa Barbara, CA 93101

ATTORNEYS FOR REAL PARTIES IN
INTEREST
Sable Offshore Corp.; Pacific Pipeline Company

Tel.:   (805) 966-7000
Email: TLarge@FLASllp.com

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 12:18 PM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

*Additional Counsel Listed on Signature Page*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>Respondents and Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>Real Parties in Interest. | Case No. 25CV02247<br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br>**REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION; DECLARATION OF JEFFREY D. DINTZER**<br>*[Concurrently filed with [Proposed] Order; and Declaration of Michael J. Rosenfeld.]*<br><br>Date:          July 18, 2025<br>Time:         10:00 AM<br>Dept.:         4<br><br>Complaint Filed:     April 15, 2025<br>Trial Date:              None Set |

1

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 18, 2025 at 10:00 a.m., in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, California 93121-1107, before the honorable Donna D. Geck, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") will and hereby do move the Court for an order striking the declaration of Richard B. Kuprewicz, which was filed in support of Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Netwrok, Sierra Club, and Santa Barbara Channelkeeper's (together, the "Petitioners") Order to Show Cause re Preliminary Injunction.

This Motion is made pursuant to Evidence Code sections 402, 801, 802, and the California Supreme Court ruling in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 ("*Sargon*"), and is based on the following grounds:

1.      On June 2, 2025, Petitioners filed an *Ex Parte* Application for an Administrative Stay or, in the alternative, an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted and Temporary Restraining Order against Defendants and Real Parties to stay the operation of the approval of State Waivers for CA-324 and CA-325A/B pending judgment of the Court.

2.      Petitioners filed the Declaration of Mr. Kuprewicz in support of their *Ex Parte* Application, which also supports their Order to Show Cause re preliminary injunction (the "Preliminary Injunction"). Mr. Kuprewicz serves as Petitioners' key witness supporting their Preliminary Injunction request, offering purported expert opinions regarding effects of corrosion on the Pipelines, including that they are "not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled." The Court scheduled the hearing on the Preliminary Injunction for July 18, 2025, and Real Parties' opposition to the Preliminary Injunction is due July 7, 2025, and filed concurrently herewith.

3.      Consistent with Real Parties' right to cross-examine Mr. Kuprewicz to oppose the Preliminary Injunction, Real Parties served a deposition subpoena on Mr. Kuprewicz on June 5, 2025. Despite the Real Parties' diligence, agreements with opposing counsel, motion work, and a Court order, Mr. Kuprewicz has not, and for medical reasons, will not, be made available for deposition.

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

4.      Mr. Kuprewicz's declaration must be stricken pursuant to Evidence Code sections 402, 801, and 802, as well as the California Supreme Court's *Sargon* decision, under which trial courts have a substantial gatekeeping responsibility to exclude expert testimony that lack foundation or a reliable methodology. This Court cannot determine whether the information cited by Mr. Kuprewicz adequately supports his conclusions without cross-examination. (See *Sargon*, *supra*, 55 Cal.4th at pp. 755-767 [reciting and relying upon testimony of the expert taken by opposing counsel at deposition to support the ruling of the Court.].) Further, Mr. Kuprewicz's declaration is inadmissible under *Sargon* if his opinions are not based on a generally accepted scientific methodology or an adequate foundation. (See *ibid*.)

5.      Additionally, Real Parties have a fundamental due process right to cross-examine Mr. Kuprewicz and will be severely prejudiced if his expert declaration is admitted without any opportunity for cross-examination.  The right to confront opposing witnesses "in noncriminal proceedings is a part of procedural due process guaranteed by the Fifth Amendment and the Fourteenth Amendment to the federal Constitution." (*August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60 [finding hearing met requirements of due process where sworn statement was considered but there was no subsequent request to cross-examine the declarant]; see also Cal. Const. Art. I. § 7.) "Because it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an 'absolute right,' not merely a privilege." (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733 [noting the rule applies in "either a criminal or a civil case" and if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony"].)

The Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed declarations of Jeffrey D. Dintzer and Michael J. Rosenfeld, the concurrently lodged [Proposed] Order, the records and documents on file in this action, and on such other evidence and argument as may properly come before the Court at the time of hearing.

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

Dated: July 7, 2025

Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**
TREVOR D. LARGE

By: _____
          Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE
COMPANY

- 4 -

**Table Of Contents**

**Page**

I.  Introduction .................................................................................................................. 8

II. Statement Of Facts ..................................................................................................... 9

    A.  Petitioners Filed the Declaration of Richard B. Kuprewicz in Support of Their Preliminary Injunction Request. ................................................................ 9

    B.  Real Parties Personally Served Mr. Kuprewicz With a Deposition Subpoena for Personal Appearance, and Mr. Kuprewicz Agreed to Appear. ................................. 10

    C.  Nearly Two Weeks After Agreeing to His Rescheduled Deposition, Petitioners Suddenly Refused to Produce Mr. Kuprewicz for Deposition. ................................. 10

    D.  Mr. Kuprewicz Is Unable to Testify Due to His Medical Condition. .......................... 11

III. Argument .................................................................................................................... 11

    A.  Mr. Kuprewicz's Declaration Should Be Excluded Based on the Court's Substantial Gatekeeping Responsibility Under *Sargon* .................................................... 11

        1.  *Sargon* Requires Judicial Gatekeeping of Proffered Expert Opinions. ................................................................................................................... 11

        2.  The Kuprewicz Declaration Fails to Identify any Accepted Methodology. ................................................................................................ 13

        3.  The Kuprewicz Declaration Lacks Foundation and is Speculative. ... 15

        4.  The Expert Opinion of Michael Rosenfeld Highlights Additional Material Flaws in the Kuprewicz Declaration ................................... 16

    B.  Mr. Kuprewicz's Declaration Should Be Excluded Based On His Unavailability and Real Parties' Due Process Right to Cross Examine Mr. Kuprewicz. ......................... 18

        1.  Fundamental Fairness Requires an Opportunity to Examine an Expert Witness. .................................................................................................... 18

        2.  The Function of Cross-Examination is Not Served by Responsive Expert Opinions, and the Sole Remedy is Exclusion of the Kuprewicz Declaration. ................................................................................................ 19

IV. Conclusion .................................................................................................................. 22

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Alexander v. Scripps Memorial Hospital La Jolla*
(2018) 23 Cal.App.5th 206 .................................................................................13, 16

*August v. Department of Motor Vehicles*
(1968) 264 Cal.App.2d 52 ........................................................................................18

*Continental Airlines. Inc. v. McDonnell Douglas Corp.*
(1981) 216 Cal.App.3d 388 ......................................................................................15

*Fleishman v. Superior Court*
(2002) 102 Cal.App.4th 350 .....................................................................................19

*Fost v. Marin County Superior Court*
(2000) 80 Cal.App.4th 724 .......................................................................9, 18, 19, 21

*Fuller v. Department of Transportation*
(2019) 38 Cal.App.5th 1034 .....................................................................................15

*Hope v. Arrowhead & Puritas Waters, Inc.*
(1959) 174 Cal.App.2d 222 ......................................................................................20

*I-CA Enterprises. Inc. v. Palram Americas. Inc.*
(2015) 235 Cal.App.4th 257 .....................................................................................14

*In re Crystal J.*
(1993) 12 Cal.App.4th 407 .......................................................................................19

*In re Marriage of Swain*
(2018) 21 Cal.App.5th 830 .......................................................................................18

*Jay v. Mahaffey*
(2013) 218 Cal.App.4th 1522 .....................................................................................9

*Jennings v. Palomar Pomerado Health Systems, Inc.*
(2003) 114 Cal.App.4th 1108 ...................................................................................12

*Lowery v. Kindred Healthcare Operating, Inc.*
(2020) 49 Cal.App.5th 119 ............................................................................. passim

*Lynn v. Tatitlek Support Services, Inc.*
(2017) 8 Cal.App.5th 1096 .......................................................................................13

*People v. Moore*
(2011) 51 Cal.4th 386 ...............................................................................................12

- 6 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

*People v. Richardson*
      (2008) 43 Cal.4th 959 .................................................................................................12

*People v. Sanchez*
      (2016) 63 Cal.4th 665 .................................................................................................15

*People v. Wright*
      (2016) 4 Cal.App.5th 537 ......................................................................................13, 16

*Powell v. Kleinman*
      (2007) 151 Cal.App.4th 112 ...............................................................................8, 13, 16

*San Francisco Print Media Co. v. The Hearst Corp.*
      (2020) 44 Cal.App.5th 952 .....................................................................................13, 14

*Sargon Enterprises, Inc. v. University of Southern California*
      (2012) 55 Cal.4th 747 ...................................................................................... passim

**RULES**

Cal. R. Ct. 3.1306.............................................................................................................15

**STATUTES**

Code Civ. Proc., § 1872 ....................................................................................................20

Code Civ. Proc., § 2015.5 .................................................................................................15

Evid. Code, § 1200............................................................................................................14, 15

Evidence Code section 701 ...............................................................................................19

Evidence Code, § 801 .......................................................................................................12

Evidence Code sections 801 .............................................................................................12

Evidence Code, § 802 .......................................................................................................12

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

<div align="center">**MEMORANDUM OF POINTS AND AUTHORITIES**</div>

## I.    <u>INTRODUCTION</u>

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") ask the Court to strike the declaration of Richard B. Kuprewicz ("Kuprewicz Declaration"), which was filed June 2, 2025 in support of Petitioners Center for Biological Diversity ("Center") and Wishtoyo Foundation's ("Wishtoyo") (together, the "Petitioners") Order to Show Cause re Preliminary Injunction.

There are several reasons why the Kuprewicz Declaration should be stricken. First, it fundamentally fails the test for admissibility under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 ("*Sargon*"), which provides that trial courts have a "substantial gatekeeping" responsibility to ***exclude*** proffered expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Ibid*. at pp. 771-772.) Throughout the declaration, Mr. Kuprewicz merely recites conclusory statements drawn from his own unsworn, unpublished and non-peer-reviewed hearsay comment letters. He provides no explanation of his methodology, no substantive analysis of the factual foundation for his opinions, and no articulation of how he arrived at his conclusions. California courts have consistently held that an "expert opinion is worth no more than the reasons and facts on which it is based." (E.g., *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123.) The complete absence of supportive reasoning and information renders the Kuprewicz Declaration legally insufficient and inadmissible.

Second, the inability to cross-examine Mr. Kuprewicz constitutes a clear violation of Real Parties' due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. Mr. Kuprewicz serves as Petitioners' key witness supporting their Preliminary Injunction request, offering purported expert opinions regarding the safety of the Pipelines. Consistent with Real Parties' right to cross-examine Mr. Kuprewicz to oppose the Preliminary Injunction, Real Parties served a deposition subpoena on Mr. Kuprewicz on June 5, 2025. Despite the Real Parties' diligence, agreements with opposing counsel, motion work, and a Court order, Mr. Kuprewicz has not, and for

<div align="center">- 8 -</div>

medical reasons, will not, be made available for deposition. (See *Notice of Update Regarding Richard B. Kuprewicz*.)

The opportunity to cross-examine an expert witness is not merely a procedural formality but an "absolute right" that is essential to fundamental fairness in both criminal and civil proceedings. (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733.) The denial of Real Parties' right to cross-examine Mr. Kuprewicz materially prejudices their ability to challenge the basis of his opinions, test his qualifications and methodology, obtain material admissions regarding limitations or gaps in his analysis, and generally present a complete defense to the requested preliminary injunction. Courts have clearly articulated that "if a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony."[1] (*Ibid*.)

For these reasons, and those stated below, Real Parties request that the Court strike the declaration of Mr. Kuprewicz.

## II.   STATEMENT OF FACTS

### A.   Petitioners Filed the Declaration of Richard B. Kuprewicz in Support of Their Preliminary Injunction Request.

On June 2, 2025, Petitioners filed an *ex parte* Application for Stay or Order to Show Cause re Preliminary Injunction and Temporary Restraining Order. In support of their Application, Petitioners filed the Declaration of Richard B. Kuprewicz, a purported pipeline safety expert, who opined that Real Parties' pipelines cannot be safely operated and the State Waivers issued by the Office of the State Fire Marshal would not ensure the integrity and safety of the pipelines or prevent another oil spill. On June 3, 2025, the Court granted Petitioners' temporary restraining order and scheduled for July 18, 2025, an Order to Show Cause why a preliminary injunction should not issue against

---

[1] It is of no consequence that Petitioners offered not to take the depositions of Real Parties' experts or file a "reply" declaration for Mr. Kuprewicz; assuming such a "reply" declaration is even admissible. (See, e.g., *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537 ["The general rule of motion practice, which applies here, is that new evidence is not permitted with reply papers."].) Real Parties were prepared to present their experts for cross examination should Petitioners have timely noticed their depositions. Real Parties never waived their constitutional rights to confront Mr. Kuprewicz with cross examination and should not have to rely upon their own experts to establish the inadmissibility of his testimony, especially when a deposition will produce admissions from the witness that his opinions proffered in his declaration are not based on any generally accepted methodology and lack an adequate foundation.

- 9 -

Defendants and Real Parties prohibiting them from proceeding with the restart and operation of the Las Flores Pipeline System.

**B.      Real Parties Personally Served Mr. Kuprewicz With a Deposition Subpoena for Personal Appearance, and Mr. Kuprewicz Agreed to Appear.**

On June 5, 2025, Real Parties personally served a Deposition Subpoena for Personal Appearance and Production of Documents on Mr. Kuprewicz for June 24, 2025, and paid witness fees of $41.00. (See Declaration of Jeffrey Dintzer ["Dintzer Decl."], ¶ 2.) On June 10, 2025, counsel for Center for Biological Diversity agreed that Mr. Kuprewicz would appear for deposition but asked that the deposition be rescheduled to a later date, taken remotely, and split into two sessions due to Mr. Kuprewicz's health issues. (*Id.* at ¶ 3.) The parties met and conferred about deposition logistics and Real Parties worked in good faith to provide accommodations for Mr. Kuprewicz's stated health issues. (*Id.* at ¶ 4.)

On June 12, 2025, all parties (including Mr. Kuprewicz's personal counsel) agreed to a July 1, 2025, deposition date, time, and location close to Mr. Kuprewicz, as well as certain accommodations for his health conditions. (*Ibid.*) On June 20, 2025, Real Parties timely served on Mr. Kuprewicz's counsel (who agreed to accept service) an Amended Deposition Subpoena for Personal Appearance and Production of Documents on Mr. Kuprewicz for July 1, 2025. (*Ibid.*)

**C.      Nearly Two Weeks After Agreeing to His Rescheduled Deposition, Petitioners Suddenly Refused to Produce Mr. Kuprewicz for Deposition.**

On June 23, 2025, nearly two weeks after the parties agreed to a rescheduled July 1, 2025 deposition and Mr. Kuprewicz' counsel had accepted service of the Amended Deposition Subpoena on his behalf, counsel for Environmental Defense Center emailed Real Parties for the first time stating that "[a]fter further consideration," they would not produce Mr. Kuprewicz for deposition, without any valid basis for their newfound position. (Dintzer Decl., ¶ 5.) Neither Petitioners nor Mr. Kuprewicz ever objected to his appearing for deposition during the meet and confer process in which all parties agreed to a new date, time, and location for Mr. Kuprewicz's deposition. (*Ibid.*) Moreover, Real Parties explained that they were entitled to cross-examine a witness whose testimony is offered in support of a preliminary injunction, and that if Mr. Kuprewicz refused to appear, they would seek monetary

sanctions. (*Ibid*.) On June 24, 2025, counsel for Petitioners served formal objections to the deposition. (*Ibid*.)

On the evening of June 26, 2025, roughly two business days before Mr. Kuprewicz's deposition (and over two weeks after agreeing to produce Mr. Kuprewicz for deposition), Petitioners filed a motion to quash the subpoena. On June 27, 2025, Real Parties filed an Application for Ex Parte Relief seeking an order for Mr. Kuprewicz to appear at his scheduled July 1, 2025 deposition, or in the alternative, to strike his declaration.

**D.       Mr. Kuprewicz Is Unable to Testify Due to His Medical Condition.**

On Sunday June 29, 2025, Petitioners filed an opposition to Real Parties' *Ex Parte* Application and notified Real Parties for the first time that Mr. Kuprewicz had a brain mass pressing on his optic nerve. On July 1, 2025, Petitioners' counsel notified Real Parties that Mr. Kuprewicz's neurologist advised him he could not sit for a deposition due to his brain mass. Petitioners filed a *Notice of Update Regarding Richard B. Kuprewicz* stating Mr. Kuprewicz was medically unfit to sit through a deposition. As a result, Real Parties will be unable to depose Mr. Kuprewicz.

**III.      ARGUMENT**

**A.       Mr. Kuprewicz's Declaration Should Be Excluded Based on the Court's Substantial Gatekeeping Responsibility Under *Sargon*.**

1.   *Sargon* Requires Judicial Gatekeeping of Proffered Expert Opinions.

The California Supreme Court set a clear standard that trial courts have a ***gatekeeping*** responsibility related to the admission of proffered expert testimony.[2] (*Sargon Enterprises, Inc. v. University of Southern California* ("*Sargon*") (2012) 55 Cal.4th 747.) *Sargon* mandates that "under

---

[2]      Notably, the *Sargon* framework is not an evidence weighing function, but a circumscribed determination ***on admissibility***. (*Sargon*, *supra*, 55 Cal.4th at p. 772 ["The trial court's preliminary determination whether the expert opinion is founded on sound logic ***is not a decision on its persuasiveness. The court must not weigh an opinion's probative value*** . . . ." (emphasis added)].) The trial court must conduct a "'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusions that the expert's general theory of technique is valid.'" (*Ibid*.) The goal "***is simply to exclude 'clearly invalid and unreliable' expert opinion***." (*Ibid*. [emphasis added])

- 11 -

Evidence Code sections 801, subdivision (b),[3] and 802,[4] the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Id.* at 771-772.) An expert's opinion "may not be based 'on assumptions of fact without evidentiary support, or on speculative or conjectural factors." (*Id.* at 769-770 [internal citations omitted].) "Exclusion of expert opinions that rest on guess, surmise or conjecture is an inherent corollary to the foundational predicate for admission of the expert testimony." (*Id*. at p. 770; citing *People v. Moore* (2011) 51 Cal.4th 386, 405; *People v. Richardson* (2008) 43 Cal.4th 959, 1008; and *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)The matter that an expert relies on must provide a reasonable basis for the particular opinion offered and cannot be based on speculation or conjecture, otherwise it is ***inadmissible***. (*Id*. at p. 770.)

Subsequent case law affirms the important role trial courts serve as gatekeepers. In *Lowery v. Kindred Healthcare Operating, Inc.* ("*Lowery*"), the Court of Appeal affirmed a trial court's exclusion of an expert declaration that ***"include[d] conclusory statements without any foundation for their reasoning."*** (*Lowery v. Kindred Healthcare Operating, Inc.*, (2020) 49 Cal.App.5th 119, 122.) The Court of Appeal found the trial court "correctly observed that [the expert] failed to provide any basis

---

3  Evidence Code, § 801 provides:

> If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:
>
> * * *
>
> (b) Based on matter (including his special knowledge, skill, experience, training, and education)     perceived by or personally known to the witness or made known to him at or before the hearing, whether     or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion  upon  the  subject  to  which  his  testimony relates, unless an expert is precluded by law from using such     matter  as  a  basis  for  his opinion.

4  Evidence Code, § 802 provides:

> A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based.

- 12 -

for his opinions." (*Id*. at p. 124; citing *Lynn v. Tatitlek Support Services, Inc.* (2017) 8 Cal.App.5th 1096, 1115 ["The trial court may strike or dismiss an expert declaration filed in connection with a summary judgment motion when the declaration states expert opinions that are speculative [or] lack foundation."]; *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 ["'An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.' [Citations.]"].)

The *Lowery* Court noted that the expert's "brief two-page declaration" provided only a "vague" description of "documented medical literature," which stands in contrast with a proper declaration that "identifies the specific medical literature and the specific contents of that literature on which he relied." (*Lowery*, *supra*, 49 Cal.App.5th at pp. 124-125; citing *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 964 ["The plain language of Sargon dictates that a trial court exercise its gatekeeping function by considering the matter or information an expert actually relied on in reaching an opinion."]; *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 229 ["Without at least some minimal basis, explanation, or reasoning, [medical expert's] conclusions as to causation in his May declaration had no evidentiary value."].)

Similarly, the court in *People v. Wright*, noted that "an expert's opinion cannot rest on his or her qualifications alone: 'even when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence.'" (*People v. Wright* (2016) 4 Cal.App.5th 537, 545 ["California courts have been particularly chary of expert testimony based on assumptions that are not supported by the evidentiary record."].)

### 2. The Kuprewicz Declaration Fails to Identify any Accepted Methodology.

The Kuprewicz Declaration follows this format: (1) Mr. Kuprewicz opines about his background and qualifications (¶¶ 2-6); (2) Mr. Kuprewicz attaches his own hearsay comment letter, *Evaluation of Las Flores Pipeline System Startup Proposal* (the "Evaluation Report") (¶ 7 & Exh. B); (3) Mr. Kuprewicz summarizes the conclusions set forth in the hearsay Evaluation Report, which

- 13 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

conclusions are unadorned by any explanation (¶ 8); (4) Mr. Kuprewicz attaches another self-written hearsay comment letter entitled *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart* (the "Observation Report") (¶ 9 & Exh. C); (5) Mr. Kuprewicz summarizes the conclusions "set forth in [the Observation Report]," which conclusions are unadorned by any explanation or analysis (¶ 10); and (6) Mr. Kuprewicz concludes "based on the facts I reviewed"—which facts are not identified—and his "professional analysis"—which analysis is not provided— that the Las Flores Pipeline System is not safe to operate . . . ." (¶ 11). Notably, neither the Evaluation Report nor the Observation Report can be found in the public literature, nor was either paper peer reviewed or published in any recognized scientific or engineering publication. Rather, both reports are hearsay statements submitted by Mr. Kuprewicz to the Office of State Fire Marshal as comment letters.

In performing its gatekeeping function, the trial court is directed to focus "solely on principles and methodology, and not on the conclusions they generate." (*Lowery*, *supra*, at p. 124; *see also San Francisco Print Media Co.*, *supra*, 44 Cal.App.5th at p. 962 ["the gatekeeper must focus on principles and methodology to determine whether the opinion is founded on sound logic, i.e., "whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture."].)

Here, Mr. Kuprewicz wholly fails to identify any reliable methodology in arriving at his purported conclusions. (*See generally* Kuprewicz Decl.) Instead, this Court is impliedly asked to fill the analytical gaps in Mr. Kuprewicz's analysis with the unsworn, hearsay evidence contained in the Evaluation and Observation Reports, which separately do not provide a sufficient basis for his opinions.[5] This Petitioners cannot do. The reports are prime examples of hearsay—i.e., "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter asserted." (Evid. Code, § 1200.) The Evidence Code does not authorize expert witnesses to launder their own otherwise inadmissible hearsay statements before the trier of fact. (*I-CA Enterprises. Inc. v. Palram Americas. Inc.* (2015) 235 Cal.App.4th 257, 266 ["[T]he expert may

---

[5] Notably, Mr. Kuprewicz fails even to cite the relevant sections of his hearsay reports that support his conclusions, leaving it to the Court to sift through the reports to determine whether they reach the conclusions offered, or whether that conclusion is supported.

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

not serve as a mere conduit for the admission of otherwise inadmissible hearsay."].) An expert may *rely* on hearsay and restate on direct examination *the materials* upon which he relied; however, in doing so the expert cannot merely relay the *details* of the hearsay, which is exactly what Mr. Kuprewicz attempts to do here. (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1044 ["Evidence Code section 1200 bars an expert from reciting parts of a hearsay document for the truth of the matter stated. There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception."]; *Continental Airlines. Inc. v. McDonnell Douglas Corp.* (1981) 216 Cal.App.3d 388, 415.) "What an expert cannot do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.)

Setting aside the evidentiary issues, Mr. Kuprewicz also fails to explain how his conclusory opinions are supported by the Evaluation and Observation Reports, or what analysis he performed to arrive at his conclusions. Because Mr. Kuprewicz identifies no reliable methodology in support of his conclusions and is based wholly on his own hearsay statements, his opinions are based on nothing more than speculation and conjuncture and must be excluded. (*Sargon*, 55 Cal.4th at 772.)

<p style="text-align:center">3.    <u>The Kuprewicz Declaration Lacks Foundation and is Speculative.</u></p>

Expert opinions based on nothing more than speculative and conclusory statements lacking foundation must be excluded. (*See Lowery*, 49 Cal.App.5th at 122.) Mr. Kuprewicz' declaration cites repeatedly to his self-written Evaluation and Observation reports. (*See* Kuperwicz Decl., ¶¶8 & 10.) However, Mr. Kuprewicz does not actually adopt the conclusions in those hearsay reports, but merely *summarizes* the opinions *stated in the reports* without any sworn testimony as to the truth of his conclusions. (Kuprewicz Decl., at ¶¶ 8 & 10.) A sworn *summary* of conclusions reached in an *unsworn* report is categorically not, and cannot serve as, a sworn affirmation under penalty of perjury that those conclusions are true and correct. (See Cal. R. Ct. 3.1306(a) ["Evidence Received at a law and motion hearing must be by declaration or request for judicial notice without testimony or cross-examination, unless the court orders otherwise for good cause shown."]; *see also* Code Civ. Proc., § 2015.5 [Requiring declarations to be "declared . . . true under penalty of perjury . . ."].)

Regardless, even if the summarized conclusions constituted sworn testimony (and they do not) they are still inadmissible under *Sargon* and its progeny. As in *Lowery*, Mr. Kuprewicz's declaration simply "includes conclusory statements without any foundation for their reasoning." (*Lowery*, *supra*, 49 Cal.App.5th at p. 124; see also *Powell*, *supra*, 151 Cal.App.4th at p. 123 ["'An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.' [Citations.]"].) Mr. Kuprewicz categorically fails to identify the facts leading to his ultimate conclusions, instead relying on summary conclusions of his own hearsay evidence, which are insufficient to support his conclusions. The most that can be said for his declaration is that he has identified his qualifications, but, as in *People v. Wright*, noted that "an expert's opinion cannot rest on his or her qualifications alone." (*Wright*, *supra,* 4 Cal.App.5th at p. 545.)

The *Sargon* framework requires that "the trial court act[] as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Sargon*, *supra*, 55 Cal.4th at pp. 771-772.) Mr. Kuprewicz has not identified the bases for his opinions, only vaguely referencing the "facts [he] considered." (Kuprewicz Decl., ¶ 11.) "Without at least some minimal basis, explanation, or reasoning [Mr. Kuprewicz's] conclusions . . . ha[ve] no evidentiary value." (See *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 229.) Mr. Kuprewicz' Declaration therefore lacks any foundation, is entirely speculative, and must be excluded. (*See Sargon*, *supra*, 55 Cal.4th at p. 770 ["exclusion of expert opinions that rest on guess, surmise or conjecture is an inherent corollary to the foundational predicate for admission of the expert testimony."].)

    4.  The Expert Opinion of Michael Rosenfeld Highlights Additional Material Flaws in the Kuprewicz Declaration

Even if Mr. Kuprewicz' opinions were admissible (they are not), they are insufficient to show the Pipelines are unsafe to operate because they suffer from significant factual defects. Real Parties submit in further support of this Motion the declaration of Michael J. Rosenfeld, Chief Engineer at RSI Pipeline Solutions, LLC. (Declaration of Michael J. Rosenfeld ("Rosenfeld Decl."), ¶ 3.) Mr.

- 16 -

Rosenfeld identifies many specific problems with the Kuprewicz Declaration that further reveal the factual gaps in the proffered opinions, including that Mr. Kuprewicz failed to account for:

(1) known facts about the 2015 Line 901 incident, which are essential to drawing any conclusion about the risk of a future incident (*id.,* ¶ 4.a.);

(2) known contributing factors and deficiencies related to the operation and integrity management of the former Line 901 under the previous owner and operator, which are critical differences that Mr. Kuprewicz completely ignores (*id.,* ¶ 4.b.);

(3) the substantial requirements of the Corrective Action Order (CAO) and Consent Decree (CD) issued by the Pipeline and Hazardous Materials Safety Administration (an agency within the U.S. Department of Transportation) and additional requirements imposed by the Office of the State Fire Marshall (OSFM) that correct the operational and integrity management deficiencies that were causal or contributed to the 2015 incident (*id.,* ¶ 4.c.; and

(4) other known facts that are contrary to the positions stated in Mr. Kuprewicz's opinions (*id.,* ¶ 4.d.).

Mr. Rosenfeld ultimately concludes that because of Mr. Kuprewicz's failure to account for and address these additional facts and details, Mr. Kuprewicz's opinions are unfounded, uninformed, speculative, and not based upon accepted standards of engineering practice, biased, or deceptive. (*Id.,* ¶ 5.)

As one example, Mr. Kuprewicz purports to conclude: "The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them." (Kuprewicz Decl., ¶ 10.a.) Mr. Rosenfeld points out *several* problems with just this one statement:

(1) The first is that Mr. Kuprewicz states a logical inconsistency: that "because ILI tools can miss a lot of cracks", reliance on ILI to find corrosion is misplaced. This is illogical because crack detection tools and corrosion detection tools are not the same tools and use different technologies. Corrosion tools indeed will "miss a lot of cracks" because they are not designed to detect cracks – ultrasonic crack detection tools specified for use by the OSFM in the state waiver are the appropriate tools for crack detection. ILI tools targeting corrosion on the other hand, specifically the magnetic and ultrasonic metal loss tools specified in the state waiver, are designed to detect corrosion and are effective for that purpose. Informed pipeline operators understand these differences and select the tool type(s) appropriate for the condition(s) they must manage. The OSFM state waiver specifies that magnetic and ultrasonic metal loss tools, and ultrasonic crack detection, tools be used. Neither of the

- 17 -

ultrasonic technologies were used by the prior operator. The state waiver introduces significant additional diversity to the inspection capabilities. Industry experience has been that using multiple tool technologies and integrating the ILI data significantly improves the probability of detecting, characterizing, and sizing features of interest in the pipeline. (Rosenfeld Decl., ¶ 17.)

(2) The second is Mr. Kuprewicz states that multiple forms of corrosion are present on the pipeline(s) but does not describe the different forms of corrosion he claims are present. The Line 901 failure analysis [Ref: DNV-GL, Appendix M to PHMSA FIR] and PHMSA's incident investigation [Ref: PHMSA FIR] did not identify different forms of corrosion contributing to the failure, nor differing forms of corrosion being present on other parts of the pipeline. Mr. Kuprewicz has not reviewed the results of field digs to investigate corrosion analysis already performed by Sable, in response to ILI, to determine what different types of corrosion are present. His statement is entirely speculative without reviewing any factual data. (*Id*. at ¶ 18.)

(3) The third point is that Mr. Kuprewicz states that ILI is inadequate to detect some forms of corrosion though he does not state what those undetectable forms of corrosion are. All ILI tools have lower thresholds of detectable flaw size; detection and sizing performance differ with the size and orientation of the flaws. Taken together, the different tool technologies to be used by Sable are capable of detecting various forms of corrosion if they are present and of detectable size, including pitting corrosion, general corrosion, corrosion along or adjacent to seams, narrow axially aligned corrosion, and other forms of corrosion. Furthermore, tool performance improves with large pipe such as Lines 324 and 325 because more sensors and supporting components can be fitted in the larger circumference, and defects of concern are proportionally larger and easier to detect, compared with small pipe sizes. [Ref: Nestleroth & Rosenfeld] (*Id*. at ¶ 19.)

Mr. Rosenfeld's analysis concludes none of Mr. Kuprewicz's conclusions are adequately supported, especially his overall conclusion that the Pipelines are "not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled." (*Id*. ¶ 6 [Referring to Paragraph 11 and stating: "These are pejorative statements built on an aggregation of claims made without supporting data, and which should be disregarded as nonfactual and noncredible. He has provided no data, scientific or engineering analysis, or factual evidence that supports these opinions"]; *see also id.,* ¶¶ 7-29 & 30-48.) Mr. Kuprewicz' opinions are therefore insufficient, unreliable, and must be excluded.

**B.      Mr. Kuprewicz's Declaration Should Be Excluded Based On His Unavailability and Real Parties' Due Process Right to Cross Examine Mr. Kuprewicz.**

      1.      <u>Fundamental Fairness Requires an Opportunity to Examine an Expert Witness.</u>

Mr. Kuprewicz' unavailability for cross-examination serves as an independent basis to strike his declaration. The right to confront opposing witnesses "in noncriminal proceedings is a part of procedural due process guaranteed by the Fifth Amendment and the Fourteenth Amendment to the

- 18 -

federal Constitution." (*August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60 [finding hearing met requirements of due process where sworn statement was considered but there was no subsequent request to cross-examine the declarant]; see also Cal. Const. Art. I. § 7.) "Because it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an 'absolute right,' not merely a privilege." (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733 [noting the rule applies in "either a criminal or a civil case" and if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony"].) Further, "[t]he lack of an opportunity to cross-examine the declarant deprives the opposing party of important evidence concerning the credibility of the declarant and the reliability of testimony in the declaration." (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 841-842 [relying on *Fost* and holding it was error for trial court to rely on declaration on motion for preliminary relief in family law case where declarant was not made available for cross-examination or live testimony].)

Real Parties' right to cross examine applies to the current Preliminary Injunction request. A preliminary injunction hearing requires the court to carefully weigh the evidence and decide whether the facts require such relief. (*Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356.) During a preliminary injunction hearing, the court evaluates the credibility of witnesses and makes factual findings on disputed evidence. (*Id.*) Parties are therefore entitled to cross-examine witnesses who submit statements in support of a preliminary injunction. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 413 ["A meaningful hearing requires an opportunity to examine evidence and cross-examine witnesses."]; 5 California Trial Guide § 100.20 [discussing depositions are appropriate for use in pretrial proceedings "such as a motion for a preliminary injunction"].) Real Parties have a fundamental right to depose Mr. Kuprewicz, who is the key witness offering testimony in support of Petitioners' Preliminary Injunction request.

   2. <u>The Function of Cross-Examination is Not Served by Responsive Expert Opinions, and the Sole Remedy is Exclusion of the Kuprewicz Declaration.</u>

In their *Notice of Update* Petitioners offer a "compromise" wherein (1) Real Parties can challenge the Kuprewicz Declaration with a responsive expert declaration; (2) Petitioners will not

depose said responsive expert; and (3) Petitioners will not submit a declaration with their reply brief. Petitioners' proposal is insufficient.

The "compromise" is insufficient. While Real Parties submit the responsive expert declaration of Mr. Rosenfeld, it is not Real Parties' burden to do so. Petitioners bear the burden of proof on their claims and Preliminary Injunction request, which they must support with both admissible and credible evidence. Refusing cross-examination that would allow Real Parties to test the admissibility and credibility of Mr. Kuprewicz' testimony and instead requiring responsive expert testimony is a burden-shifting mechanism that lacks support in any California authority.

Evidence Code section 701 provides that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, *in addition, may be fully cross-examined as to* (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion." (Emphasis added.) Courts have long opined that "[o]nce an expert offers his opinion, however, he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based (Code Civ. Proc. § 1872), and which he took into consideration; and *he may be 'subjected to the most rigid cross examination*' concerning his qualifications, and his opinion and its sources." (*Hope v. Arrowhead & Puritas Waters, Inc.* (1959) 174 Cal.App.2d 222, 230, emphasis added.)

Cross-examination serves as an irreplaceable due process protection that cannot be substituted by merely allowing competing expert testimony. The ability to present contradictory expert opinions—creating a "war of experts"—falls significantly short of the constitutional safeguards afforded by rigorous cross-examination. Through effective cross-examination, defendants can systematically expose qualification deficiencies that may render an expert's testimony inadmissible, methodological flaws in the expert's analytical approach, and underlying biases that compromise the expert's objectivity and credibility.

Importantly, cross-examination provides Real Parties with a critical procedural tool that operates independently of financial constraints. Unlike the potentially prohibitive costs associated with

- 20 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

retaining competing expert witnesses, cross-examination enables a defendant to challenge the foundation of a plaintiff's claims directly. This distinction is crucial, as it ensures that due process protections remain accessible to all defendants, not merely those with sufficient means to engage in costly expert battles. When defendants are deprived of the opportunity to cross-examine expert witnesses, they lose an essential mechanism for testing evidence that may be dispositive to the outcome of their case, potentially rendering them unable to mount an effective defense against unsubstantiated claims.

For instance, in this case, Real Parties should have a full and fair opportunity to question Mr. Kuprewicz on all of the issues presented by his Declaration, including:

1. the method he applied in forming his opinions (or lack thereof), which is not identified in his declaration;

2. his basis for considering any applied method to be scientifically accepted, which is not identified in his declaration;

3. all the factual information he considered to form each of his opinions (including whether that collection was based on his own, independent research or selectively provided to him from any source), which is not identified in his declaration;

4. all the factual information that was <u>not</u> considered by him, either because it was not available or rejected by him as not reliable or convincing for any reason (including all the information considered by the County and federal court in each of their evaluations of the steps needed to permit the restart of the Pipelines), which is not identified and addressed in his declaration;

5. any prior work by Mr. Kuprewicz in which he reached similar or opposing conclusions about the safety of any pipeline (including whether he used a consistent or different methodology, or relied on similar or different types of information), none of which are identified in his declaration; and

6. any prior relationship with Petitioners and the details of that work, which could reveal sources of bias.

The answers to these questions would likely further illuminate failures within the Kuprewicz Declaration that further render his opinions entirely inadmissible or, at the very least, uncredible. The denial of Real Parties' opportunity to cross-examine Mr. Kuprewicz is prejudicial and cannot be remedied by shifting the burden to Real Parties to provide a competing expert declaration. Instead, as discussed above, if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony." (*Fost v. Marin County Superior Court*, *supra*, 80 Cal.App.4th at p. 733.)

- 21 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

IV.   **CONCLUSION**

For the foregoing reasons, Real Parties request an order striking the Kuprewicz Declaration in its entirety.


Dated: July 7, 2025                         Respectfully submitted,

                                            **ALSTON & BIRD**
                                            JEFFREY D. DINTZER
                                            GARRETT B. STANTON

                                            **PAUL HASTINGS**
                                            DUNCAN JOSEPH MOORE

                                            **FAUVER, LARGE, ARCHBALD & SPRAY LLP**
                                            TREVOR D. LARGE



                                            By: _____
                                                     Jeffrey D. Dintzer

                                            Attorneys for Real Parties in Interest
                                            SABLE OFFSHORE CORP.; PACIFIC PIPELINE
                                            COMPANY

- 22 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

## DECLARATION OF JEFFREY D. DINTZER

I, Jeffrey Dintzer, declare as follows:

1.     I am an attorney licensed to practice law before all courts in the State of California and am a partner at the law firm of Alston & Bird LLP, counsel for Real Parties in Interest Sable Offshore Corp and Pacific Pipeline Company ("Real Parties"). I make this declaration in support of Real Parties' Motion to Strike the Declaration of Richard B. Kuprewicz ("Kuprewicz" or "Kuprewicz Declaration"). I have personal knowledge of the facts stated in this declaration and, if called upon to do so, I could and would competently testify to them.

2.     On June 5, 2025, at 7:00 a.m., Real Parties personally served Mr. Kuprewicz with a Deposition Subpoena for Personal Appearance and Production of Documents and Things for June 24, 2025, at 9:00 a.m. at the Marriott, 1605 Calle Joaquin, San Luis Obispo, California 93405. At the time that Real Parties served Mr. Kuprewicz, his witness fees in the amount of $41.00 were also paid.

3.     On June 10, 2025, counsel for Center for Biological Diversity agreed that Mr. Kuprewicz would appear for deposition but asked that the deposition be rescheduled for a date during the week of June 30 through July 3, 2025. Counsel also requested that the deposition be taken remotely and split between two days due to certain health issues. On the same day, Real Parties agreed to reschedule the deposition to July 1, 2025. Between June 10 and June 11, the parties exchanged several emails related to deposition logistics.

4.     On June 12, 2025, I participated in a telephone call with Petitioners' counsel and the parties agreed that Mr. Kuprewicz would appear for deposition on July 1, 2025 at 9:00 a.m. at a Courtyard hotel located at 1605 Calle Joaquin, San Luis Obispo, CA 93405, which is a short distance from Mr. Kuprewicz's residence. Mr. Kuprewicz's personal counsel, Mr. Stolpman, who was on the telephone call, agreed to accept service of the amended deposition subpoena. It was also agreed that the deposition would be in person at the Courtyard hotel and that we would take sufficient breaks to accommodate Mr. Kuprewicz's specified health concerns, but conclude the deposition on that day. On June 20, 2025, Real Parties served Mr. Stolpman with an Amended Deposition Subpoena for Personal Appearance and Production of Documents and Things for July 1, 2025, at 9:00 a.m. at the agreed upon location.

- 23 -

5.    On June 23, 2025, counsel for Environmental Defense Center emailed Real Parties for the first time stating that "[a]fter further consideration," they would not produce Mr. Kuprewicz for deposition. We exchanged additional emails on June 23 and June 24, 2025, in which I noted that the parties already reached an agreement that the deposition would proceed on July 1, and that if Mr. Kuprewicz refused to appear, Real Parties would seek monetary sanctions. On June 24, 2025, counsel for Environmental Defense Center served formal objections to the deposition.

6.    On July 1, 2025, Petitioners' counsel notified me that Mr. Kuprewicz's neurologist advised Mr. Kuprewicz that he cannot sit for a deposition due to his brain mass. Thereafter, Petitioners filed a *Notice of Update Regarding Richard B. Kuprewicz* wherein Petitioners indicate that Mr. Kuprewicz is medically unfit to sit through a deposition. As a result, Real Parties are not able to depose Mr. Kuprewicz.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 7th day of July 2025, at Los Angeles, California.

_____
Jeffrey Dintzer

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) **REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION; DECLARATION OF JEFFREY D. DINTZER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

/s/ Josie Cisneros
Josie Cisneros

LEGAL02/46305502v6

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>           tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a<br>California non-profit corporation; GET OIL<br>OUT!, a California non-profit corporation;<br>SANTA BARBARA COUNTY ACTION<br>NETWORK, a California non-profit corporation;<br>SIERRA CLUB, a national non-profit<br>corporation; and SANTA BARBARA<br>CHANNELKEEPER, a California non-profit<br>corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>           jfrankel@environmentaldefensecenter.org<br>           trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire<br>Protection, Office of the State Fire Marshal;<br>Daniel Berlant, in his official capacity as State<br>Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>           benjaminhanelin@paulhastings.com<br>           natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY<br>LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN<br>INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 2:29 PM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
LISA L. GARCIA, SBN 301362
lisa.garcia@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners and Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,

Case No. 25CV02247

Assigned for all purposes to:
Hon. Donna G. Geck

**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

*[Filed concurrently with Motion to Strike; Notice of Motion and Motion to Strike; Stanton Declaration in Support of Demurrer; Request for Judicial Notice and Dintzer Declaration in Support of Motion to Strike; Proposed Order]*

i

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

| | |
|---|---|
| Respondents and Defendants, | Date:          September 19, 2025 |
| | Time:          10:00 a.m. |
| and | Department:    4 |
| | |
| SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, | Complaint Filed:    April 15, 2025 |
| | Trial Date:         None set |
| Real Parties in Interest. | |

ii

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 19, 2025 at 10:00 a.m., or as soon thereafter as this matter may be heard, in Department 4 of the above-entitled Court, located at 1100 Anacapa Street, Santa Barbara, CA 93101, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") will and hereby do demur to the Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Petition") filed by Petitioners and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper ("Petitioners"). This Demurrer is made pursuant to Code of Civil Procedure section 430.10, subsection (e) on the grounds that the Petition's First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action fail to state facts sufficient to constitute a cause of action.

This Motion is based upon this Notice, the following Demurrer, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Garrett B. Stanton, all pleadings, papers and records in this action, and/or such further oral and documentary evidence presented before or at the hearing on this Motion.

## **DEMURRER**

Sable demurs to the Petition's First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action on the following bases:

1. Sable demurs to the First, Second, Third, and Fourth Causes of Action on the basis that each of these claims, made pursuant to 49 U.S.C. section 60118, subsection d, fails to allege facts sufficient to constitute a cause of action. (See Code Civ. Proc. § 430.10(e); 49 U.S.C. §§ 60118 (c) and (d).) Specifically, the First Cause of Action for "failure to provide a public process" pursuant to 49 U.S.C. section 60118 fails because that statute does not impose a "public process" requirement as a matter of law. (See Code Civ. Proc. § 430.10(e); 49 U.S.C. §§ 60118 (c) and (d); Petition at ¶¶ 149-155.) The Second Cause of Action for "failure to provide a statement of reasons" pursuant to 49 U.S.C. section 60118 fails because that statute does not require a state authority to "provide a statement of reasons" as a matter of law. (See Code Civ.

iii

LEGAL02/46305086v3

Proc. § 430.10(e); 49 U.S.C. §§ 60118 (c) and (d); Petition at ¶¶ 156-162.) Likewise, the Third and Fourth Causes of Action for declaratory relief and abuse of discretion, which are derivative of and reliant on the First and Second Causes of Action, each fail as a matter of law as well. (See Code Civ. Proc. § 430.10(e); 49 U.S.C. §§ 60118 (c) and (d); Petition at ¶¶ 167-197.)

2. Sable demurs to the Fifth, Sixth, and Seventh Causes of Action on the basis that each of these claims fails to allege facts sufficient to constitute a cause of action. (See Code Civ. Proc. § 430.10(e).) Specifically, the Fifth Cause of Action for "failure to provide a discussion of significant factors" pursuant to Government Code section 51011(c) fails as a matter of law because the State Waivers – which are attached to the Petition as Exhibits F and G and incorporated by reference thereto – actually contain 15 pages of information and factors OSFM considered in issuing the waivers. (See Code Civ. Proc. § 430.10(e); Gov. Code § 51011(C); Petition at ¶¶188 – 197 and Exs. F and G.) Likewise, the Sixth and Seventh Causes of action for abuse of discretion and declaratory relief, which are derivative of and reliant on the Fifth Cause of Action, each fail as a matter of law. (See Code Civ. Proc. § 430.10(e); Gov. Code § 51011(C); Petition at ¶¶188 – 212 and Exs. F and G.)

3. Sable demurs to the Eighth Cause of Action on the basis that it fails to allege facts sufficient to constitute a cause of action. Specifically, the Eighth Cause of Action for "failure to prepare a subsequent EIR" fails because the "State Waivers" were issued pursuant to delegated federal authority, not subject to CEQA as a matter of law, and otherwise not a "project" requiring an EIR as a matter of law. (See Code Civ. Proc. § 430.10(e).)

4. Sable additionally demurs to the Third and Seventh Causes of Action for declaratory relief on the basis that each is wholly derivative of a substantive claim that is invalid as a matter law (*City of Lancaster v. Netflix, Inc.* (2024) 99 Cal.App.5th 1093, 1114), and that each impermissibly seeks declaratory relief that would violate the doctrine of separation of powers (*Bautista v. State of California* (2011) 201 Cal.App.4th 716, 735). (See Code Civ. Proc. § 430.10(e).)

iv

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

Based on the foregoing, Sable respectfully requests that (i) the Court sustain this Demurrer in its entirety and (ii) dismiss the Petition in its entirety with prejudice.

DATED:   July 3, 2025

Respectfully submitted,

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER
LISA L. GARCIA
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE

_____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

v

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...........................................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND..............................................2

     A.    The Las Flores Pipeline ..............................................................................2

     B.    The Petition and Meet and Confer Efforts ................................................5

III.  LEGAL STANDARD......................................................................................................5

IV.   ARGUMENT .....................................................................................................................6

     A.    First Cause of Action:  OSFM Provided Public Notice and Was Not Required to Hold a Public Hearing..............................................................6

     B.    Second and Fifth Causes of Action: OSFM Provided a Written Justification and Discussion of Factors Considered in its Approval of the State Waivers. ..............8

     C.    Eighth Cause of Action: State Waivers Do Not Constitute a Project Under CEQA................................................................................................9

     D.    The Abuse of Discretion and Declaratory Relief Claims Are Derivative of and Reliant on Causes of Action That Fail as a Matter of Law.........................................12

     E.    The Declaratory Relief Claims Are Not Justiciable. ...................................15

V.    CONCLUSION...............................................................................................................16

LEGAL02/46305086v3

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen v. San Diego Convention Center Corp., Inc.*
(2022) 86 Cal.App.5th 589 ............................................................................................13

*Bautista v. State of California*
(2011) 201 Cal.App.4th 716 .......................................................................................6, 15

*Blank v. Kirwan*
(1985) 39 Cal.3d 311 .......................................................................................................6

*Boyle v. City of Redondo Beach*
(1999) 70 Cal.App.4th 1109 ............................................................................................5

*City of Lancaster v. Netflix, Inc.*
(2024) 99 Cal.App.5th 1093 ...............................................................................6, 12, 15

*City of Morgan Hill v. Bay Area Air Quality Management District*
(2004) 118 Cal.App.4th 861 .......................................................................................9, 10

*Cohan v. City of Thousand Oaks*
(1994) 30 Cal.App.4th 547 ..............................................................................................7

*Fowler v. City of Lafayette*
(2020) 46 Cal.App.5th 360 ..............................................................................................7

*Fox Paine & Co., LLC v. Twin City Fire Ins. Co.*
(2024) 104 Cal.App.5th 1034 ......................................................................................9, 12

*Friends of Juana Briones House v. City of Palo Alto*
(2010) 190 Cal.App.4th 286 ..........................................................................................11

*Galbiso v. Orosi Pub. Util. Dist.*
(2010) 182 Cal.App.4th 652 ............................................................................................7

*IBP, Inc. v. Alvarez*
(2005) 546 U.S. 21...........................................................................................................8

*Kilgore v. Younger*
(1982) 30 Cal. 3d 770 ......................................................................................................6

*Monterey Coastkeeper v. California Regional Water Quality Control Bd., etc.*
(2022) 76 Cal.App.5th 1 ...................................................................................................6

*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*
(2007) 41 Cal.4th 372 .....................................................................................................10

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

*Olympic Pipe Line Co. v. City of Seattle*
    (9th Cir. 2006) 437 F.3d 872 ...........................................................................3

*San Diego Navy Broadway Complex Coalition v. City of San Diego*
    (2010) 185 Cal.App.4th 924 .........................................................................12

*Serrano v. Priest*
    (1971) 5 Cal.3d 584 .......................................................................................6

*Sierra Club v. County of Sonoma*
    (2017) 11 Cal.App.5th 11 .............................................................................11

*Zetterberg v. State Dept. of Public Health*
    (1974) 43 Cal.App.3d 657 ............................................................................15

**STATUTES**

49 U.S.C. §§ 60101 et seq.......................................................................................3

49 U.S.C. § 60102....................................................................................................3

49 U.S.C. § 60105.................................................................................................3, 10

49 U.S.C. § 60112....................................................................................................7

49 U.S.C. § 60117....................................................................................................7

49 U.S.C. § 60118............................................................................................. passim

49 U.S.C. § 60122....................................................................................................7

Cal. Code Civ. Proc. § 430.10 ................................................................................6

Cal. Code Civ. Proc. § 430.41 ................................................................................5

Cal. Gov. Code § 51010...................................................................................3, 10

Cal. Gov. Code § 51011.................................................................................. passim

Cal. Pub. Resources Code § 21065 .......................................................................10

Cal. Pub. Resources Code § 21080 .......................................................................11

Cal. Pub Resources Code § 21166 ......................................................................9, 12

**OTHER AUTHORITIES**

49 C.F.R. § 195 .......................................................................................................3

49 C.F.R. § 190.3 ....................................................................................................8

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

49 C.F.R. § 190.233 ...........................................................................................................7

49 C.F.R. § 190.341 ........................................................................................................7, 8

74 Fed. Reg. 2889, 2892 (Jan. 2009) ..............................................................................8

74 Fed. Reg. 2893 (Jan. 2009) .........................................................................................8

CEQA Guidelines § 15125 ..............................................................................................12

CEQA Guidelines § 15162 ...........................................................................................9, 12

CEQA Guidelines § 15268 ..............................................................................................11

CEQA Guidelines § 15301 ..............................................................................................11

ix

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The Petition rests on a fundamental misunderstanding of the approvals Sable needs from OSFM to restart pipeline operations.[1] Petitioners' lawsuits challenge OSFM's December 17, 2024, issuance of two waivers of certain pipeline safety regulatory requirements (the "State Waivers"). But the State Waivers do not allow oil to flow through the pipelines. Even if they did, Petitioners' claims each fail to state a claim as a matter of law and should be dismissed with prejudice.

*First*, Petitioners' First, Second, Third, and Fourth causes of action fail to state a claim that OSFM's approval of the State Waivers violated 49 U.S.C. section 60118, or that the approval was an abuse of discretion. Petitioners allege that section 60118 imposed public process and disclosure requirements on OSFM, but it does not. (Petition, ¶¶ 149 – 187.)

*Second*, Petitioners' Fifth, Sixth, and Seventh causes of action fail to state a claim that OSFM's approval of the State Waivers violated Government Code section 51011(c), or that the approval was an abuse of discretion. (*Id.*, ¶¶ 188 – 212.) Petitioners allege that OSFM failed to disclose "a discussion of the factors they considered significant to the decision" (*Id.*, ¶ 189), however, the Petition attaches and incorporates by reference the State Waivers, which include the factors OSFM considered across the 15 pages and over 60 conditions and requirements for the waivers. (*Id.*, Exs. F and G.) The inclusion of these factors on the face of the Petition overrides Petitioners' conclusory allegations to the contrary.

*Third*, Petitioners' Eighth cause of action fails to state a claim that OSFM failed to comply with CEQA when it approved the State Waivers without preparing an EIR because the waivers implement federal law and thus are not subject to CEQA, are not a "project" requiring CEQA review, and otherwise are exempt from CEQA. (*Id.*, ¶¶ 213 – 227.)

---

[1]    The Petition seeks "temporary, preliminary, and permanent injunctive relief preventing restart of the Las Flores Pipeline System under the State Waivers" (Petition, Prayer for Relief, ¶ 2), however, State Waivers do not permit restart of the pipeline. A Restart Plan must be approved prior to restart, and none has been approved at this time. Accordingly, the Petition's prayer for injunctive relief "preventing restart" is unripe and should be stricken, as set forth in the Motion to Strike filed concurrently with this Demurrer.

1

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

*Fourth*, Petitioners' Third, Fourth, Sixth, and Seventh claims fail to state a claim as they are derivative of and reliant on substantive statute-based claims that fail as a matter of law. (*Id*., ¶¶ 163-187 and 198-212.)

Finally, Petitioners' Third and Seventh causes of action for declaratory relief impermissibly seek to use the courts to direct an administrative agency in violation of the separation of powers doctrine. (*Id*., ¶¶ 163-166 and 208-212.)

Accordingly, Sable respectfully requests that the Court sustain this Demurrer in its entirety and dismiss the Petition in its entirety with prejudice.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Las Flores Pipeline

In January 1985, the California State Lands Commission and federal Bureau of Land Management certified a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for what was then known as the "Celeron Pipeline Project," which included the construction of what are now called the Las Flores Pipelines.[2] The EIR/EIS explains that its impact analysis extends through the pipelines' entire lifetime, including both "operation" and "maintenance." (See Petition, ¶ 54, n. 1 [Final EIR/EIS] at Abstract, p. 2.)[3] After certification of the EIR/EIS, "all necessary approvals for construction and operation of the Las Flores Pipeline" were received, the pipeline was constructed, and it "went into service in or around 1992." (Petition, ¶ 67.)

---

[2]   Two pipelines make up the Las Flores Pipelines. One is the Las Flores Pipeline CA-324 ("Line CA-324") (previously known as Line 901), which transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon to the existing Gaviota Pump Station. The other is Las Flores Pipeline CA-325 ("Line CA-325") (previously known as Line 903), which transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the existing Pentland Delivery Point in Kern County.

[3]   For background information purposes, the Draft and Final EIR/EIS are referenced by the Petition and are publicly available: "The Draft EIR/EIS is available on the County's website, at *https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672*.

The    Final    EIR/EIS    is    likewise    available    at: *https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt*." (Petition, ¶ 54, emphasis added.)

2

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

Because the Las Flores Pipelines transport crude oil, a petroleum product, they are subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") (codified at 49 U.S.C. §§ 60101 et seq.), which is administered by the Pipeline and Hazardous Materials Safety Administration ("Safety Administration"). The Pipeline Safety Act's singular purpose is to ensure the safe operation of hazardous liquid pipelines. (49 U.S.C. § 60102; *Olympic Pipe Line Co. v. City of Seattle* (9th Cir. 2006) 437 F.3d 872, 877.) The Safety Administration has adopted detailed regulations governing the design, construction, pressure testing, operation, and maintenance of hazardous liquid pipelines. (See 49 C.F.R. Part 195.) The Act also grants the Safety Administration the authority to "waive compliance with any part of an applicable standard … on terms [the Safety Administration] considers appropriate if [it] determines that the waiver is not inconsistent with pipeline safety." (49 U.S.C. § 60118, subd. (c)(1)(a).)

The Pipeline Safety Act also allows state agencies to apply and become certified to enforce equivalent or more stringent regulations with respect to intrastate pipelines. (See 49 U.S.C. § 60105.) In California, the State Legislature vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines and … to implement the [Pipeline Safety Act] and federal pipeline safety regulations as to those portions of interstate pipelines located within [California] as necessary to obtain annual federal certification." (Gov. Code, § 51010.) OSFM adopted the Safety Administration's regulations, and the Safety Administration certified OSFM to implement the Pipeline Safety Act. (Cal. Code Regs., tit. 19, § 2000.)

Like the Safety Administration, OSFM may "waive compliance with a safety standard" if the requested modification is not inconsistent with pipeline safety. (49 USC § 60118, subd. (c), (d).) Any such "State Waiver" may become effective only after OSFM provides the Safety Administration with 60 days' notice and the opportunity to make a written objection to its issuance. (See *ibid*.)

On March 13, 2020, the prior owner and operator of the Las Flores Pipelines entered into a Consent Decree with the United States and the State of California on behalf of several federal and state regulatory agencies—including OSFM and the Safety Administration—in the United States District Court, Central District of California (Civil Action No. 2:20-cv-02415) to resolve issues related

3

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

to the 2015 Refugio oil spill that resulted from a leak in Line CA-324. (Petition, ¶ 85 n. 3 [incorporating the Consent Decree by reference].)[4]

The Consent Decree imposes a series of prerequisites that the pipelines' operator must satisfy before restarting either of the Las Flores Pipelines. In particular, the Consent Decree requires that the operator must, with respect to both Lines CA-324 and CA-325, "apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection" "prior to restarting" the pipelines. (Petition, ¶ 85 n. 3 [Consent Decree], Appendix B, ¶¶ 1.A, 1.B.) In other words, the Consent Decree required Sable to apply for the waivers that Petitioners now challenge as a condition precedent to restart.

After Sable acquired the Las Flores Pipelines in February 2024, Sable submitted State Waiver applications to OSFM with respect to both Lines CA-324 and CA-325, as required under the Consent Decree. (See Petition, Ex. B [April 24, 2024 Sable letter to OSFM and July 10, 2023 Pacific Pipeline State Waiver Application materials].) In May 2024, Sable began repair and maintenance work on the pipelines as required under the Consent Decree and consistent with Sable's understanding that such work was authorized by the Pipeline's existing approvals and permits.

Following several months of consideration of Sable's State Waiver applications, OSFM granted both State Waivers on December 17, 2024, and imposed over sixty separate conditions on Sable's operation of the Las Flores Pipelines to reflect the modified regulatory standards required under the Consent Decree. (Petition, Exs. F and G [State Waivers].)[5] This grant was conditioned on the Safety Administration either issuing an Order approving the State Waivers or taking no action within 60 days after receiving the OSFM's Letter of Decision on the State Waivers. On February 11, 2025, the Safety Administration notified OSFM that it had no objection to its issuance of the State Waivers, and the State Waivers became effective. (Petition, ¶ 117.) The Safety Administration's notice did not identify any procedural deficiencies with OSFM's grant of the State Waivers.

---

[4] For background information purposes, the Consent Decree is referenced by the Petition and is publicly available: "The Consent Decree is available on the U.S. Environmental Protection Agency's website, at *https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf*." (Petition, ¶ 85, n. 3, emphasis added.)

[5] The Petition attaches State Waivers, making them part of the face of the complaint.

4

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

Petitioners filed suit challenging OSFM's approval of the State Waivers over two months later, on April 15, 2025.

The Consent Decree separately requires Sable to submit and obtain OSFM's approval of a written "Restart Plan" before restarting either Line CA-324 or Line CA-325. (Petition, ¶ 85 n. 3 [Consent Decree], Appendix D, ¶¶ 1.b, 1.f.) Sable submitted a draft Restart Plan to OSFM on July 29, 2024.[6] OSFM has taken no final action on the Restart Plan and it remains under review.

**B.     The Petition and Meet and Confer Efforts**

On April 15, 2025, Petitioners filed their Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief challenging OSFM's approval of the State Waivers. The First, Second, Third, and Fourth causes of action seek to enforce purported requirements for public process and disclosure of a statement of reasons pursuant to 49 U.S.C. section 60118, subsections c and d. (Petition, ¶¶ 149-187.) The Fifth, Sixth, and Seventh causes of action seek to enforce a purported requirement for disclosure of "a discussion of significant factors" pursuant to Government Code section 51011(c). (*Id.*, ¶¶ 188 – 212.) The Eighth cause of action alleges that OSFM "failed to comply with CEQA when it approved the State Waivers without preparing a subsequent EIR." (*Id.*, ¶¶ 213 – 227.)

On June 11, 2025, the parties telephonically met and conferred regarding Sable's intent to file a demurrer based on Petitioners' failure to state a cause of action. (Stanton Declaration, ¶ 3; see Code Civ. Proc., § 430.41.) Having failed to reach a resolution, Sable hereby brings this Demurrer.

**III.     LEGAL STANDARD**

A demurrer tests the legal sufficiency of the factual allegations in the complaint. (*Boyle v. City of Redondo Beach* (1999) 70 Cal.App.4th 1109, 1114.) In deciding a demurrer, the court should "treat

---

[6]   For background information purposes, the Restart Plan is publicly available at a website referenced in the Petition: "OSFM has consistently construed this standard to mean that a State Waiver can only be granted where the operator's 'proposed alternative measures can provide an equal or greater level of safety than the required regulation.' (Pathways for Restarting Pipelines, OSFM, *https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines*)." (Petition, ¶ 171, emphasis added.) The Restart Plan is accessible at the website under "#6: Startup Plan."

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.) The court may also consider matters that are judicially noticeable. (*Ibid*.) The court must determine whether the complaint, in this light, states facts sufficient to support a cause of action. (Code Civ. Proc. § 430.10, subd. (e); *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) If the court finds that the demurrer should be sustained, it should dismiss the plaintiff's case without leave to amend where it finds there is no reasonable possibility that the defect can be cured by amendment. (*Kilgore v. Younger* (1982) 30 Cal. 3d 770, 783.)

A declaratory relief claim is subject to demurrer where it relates to a statutory claim that is invalid as a matter of law. (*City of Lancaster v. Netflix, Inc.* (2024) 99 Cal.App.5th 1093, 1114 ["Where a trial court has concluded the plaintiff did not state sufficient facts to support a statutory claim and therefore sustained a demurrer as to that claim, a demurrer is also properly sustained as to a claim for declaratory relief which is 'wholly derivative' of the statutory claim."].) "Declaratory relief generally is not available to use the courts to tell an administrative agency how to do its job." (*Monterey Coastkeeper v. California Regional Water Quality Control Bd., etc.* (2022) 76 Cal.App.5th 1, 18.) "An action for declaratory relief does not confer upon the court the authority to make pronouncements in a field reserved to other branches of government." (*Id*.) Accordingly, a "difference of opinion as to the interpretation of a statute [does] not present a justiciable controversy." (*Bautista v. State of California* (2011) 201 Cal.App.4th 716, 735.)

## IV.    ARGUMENT

### A.    First Cause of Action:  OSFM Provided Public Notice and Was Not Required to Hold a Public Hearing.

In the First Cause of Action, Petitioners claim OSFM violated the Pipeline Safety Act by failing to provide the public with notice and an opportunity for a hearing prior to granting the State Waivers. (Petition, ¶¶ 150-152.) Petitioners have failed to state a claim because nothing under federal law entitles members of the public to notice and an opportunity for hearing on a state waiver application pending with OSFM.  Although federal regulations provide that the Safety Administration "will provide notice to the public of its intent to consider the application [on the Federal Register] and

6

LEGAL02/46305086v3

invite comment" (49 C.F.R. § 190.341(d)(1)), OSFM cannot publish in the Federal Register.

Nevertheless, OSFM created a special website devoted to Sable's State Waiver applications providing the public with notice while OSFM considered them. (See Petition, ¶ 171 [referencing OSFM's public notice website that posts the State Waivers and related materials].)[7] Importantly, OSFM's public outreach worked – *Petitioners and others actively participated in OSFM's (and the Safety Administration's) consideration of the State Waiver applications*. Indeed, Petitioners submitted letters critiquing the applications to OSFM in September 2024 before OSFM approved the State Waivers in December 2024. (See, e.g., Petition, Ex. C.) Petitioners, therefore, have suffered no prejudice.[8] (*Fowler v. City of Lafayette* (2020) 46 Cal.App.5th 360, 371 ["We do not set aside an agency's action unless the appellants show the violation caused prejudice"]; see also *Galbiso v. Orosi Pub. Util. Dist.* (2010) 182 Cal.App.4th 652, 670-671; *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 556.) Hence, any allegations by Petitioners that OSFM provided no notice are contradicted by references to OSFM's public notice website (e.g., Petition, ¶ 171) and by Petitioners' attached public comment letter (*id.*, Ex. C).

Further, while public notice was provided, no formal hearing was required for OSFM to act. The use of the term "hearing" in section 60118 refers to the applicant's entitlement to an opportunity for hearing on its pending application. Where the phrase "opportunity for hearing" is used elsewhere in the Pipeline Safety Act, it primarily refers to the *applicant's* opportunity for hearing – not the general public's. (See, e.g., 49 U.S.C. §§ 60112, subd. (a), 60117, subd. (m), 60122, subd. (a)(1).)[9]

---

[7] OSFM also coordinated with the Safety Administration to establish publicly accessible federal dockets for the State Waivers, where members of the public (including Petitioners) could submit comments to the Safety Administration: Docket ID PHMSA-2025-002 for CA-324 and Docket ID PHMSA-2025-003 for CA 3-325 are publicly available on www.Regulations.gov.

[8] Further, Petitioners do not allege that any members of the public who would have participated in OSFM's process on the State Waivers were precluded from doing so.

[9] These provisions are implemented by PHMSA through 49 C.F.R. Sections 190.233(c) (noting notice and opportunity for hearing of corrective action order only to operator); 190.239(b) (noting notice and opportunity for hearing of proposed safety orders only to operator); 190.221 and 190.211 (noting notice of proposed violations and opportunity for hearing only to operator). Moreover, the Pipeline Safety Act only requires that hearings under these sections be noticed to the public through [the Safety Administration's] website. (See 49 U.S.C. Section 60117, subd. (b)(2).) Here, OSFM did not just make mere mention of Sable's State Waiver application; it

---

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

Section 60118 should be read consistently with those provisions. (See *IBP, Inc. v. Alvarez* (2005) 546 U.S. 21, 23-24 ["identical words used in different parts of the same statute are generally presumed to have the same meaning"].)  Petitioners cite no authority demonstrating their or the public's entitlement to a public hearing on the State Waivers. In addition, any such "hearing" for the applicant does not refer to a formal public hearing at which testimony may be presented on the record. (See 49 C.F.R. § 190.3; see also 74 Fed. Reg. 2893 (Jan. 2009) [waivers "already involve extensive informal (technical) consultations between PHMSA and the applicant and . . . there is also an opportunity for (paper) hearing in the [waiver] process"].)[10]

**B.      Second and Fifth Causes of Action: OSFM Provided a Written Justification and Discussion of Factors Considered in its Approval of the State Waivers.**

Similarly, the Second and Fifth Causes of Action fail to state a claim because nothing in the federal or state pipeline safety laws requires OSFM to adopt a detailed statement of decision containing specific findings in support of the State Waivers—but even if it did, OSFM detailed its reasons for approval. Petitioners seek to elevate form over substance. (Petition at ¶¶ 156-159, 189.) The federal regulations simply provide that a decision will be provided *to the applicant*. (See 49 C.F.R. § 190.341(d)(2) [whenever a decision is made to grant or deny an application, "***notice of the decision will be provided to the applicant***."] [emphasis added].) Government Code section 51011(c) requires that "[n]otification of exemptions … include a discussion of the factors that [OSFM] considers significant to the granting of the exemption."

_____

created a distinct, special website devoted to Sable's State Waiver applications and coordinated with PHMSA to establish a federal docket. (Petition, ¶ 171.)

[10] Although the Pipeline Safety Act does not require that the public be afforded an opportunity for hearing, either in the context of special permits or state waivers, or in the context of enforcement (such as corrective action orders, safety orders, or notices of probable violation), even if it were construed in such manner, here, the public was given the opportunity to be heard, through submission of comments.  In fact, in the federal docket that the Safety Administration created, public comments were submitted as part of the Safety Administration's consideration of the grant of the State Waivers.  Moreover, Petitioners submitted correspondence to OSFM regarding its consideration of the pending State Waiver applications.  The Safety Administration uses "paper hearings" in consideration of special permits, although as noted above (see, e.g., 74 Fed. Reg. 2889, 2892, Jan. 16, 2009), such procedures are not strictly required under the Pipeline Safety Act to be public-facing for it to grant special permits, with the focus instead on consultation with the applicant.

LEGAL02/46305086v3

Here, OSFM satisfied both requirements. In granting Sable's applications, OSFM issued 15-page State Waivers to Sable with detailed requirements and conditions that Sable must meet. (See Petition, Exs. F & G.) These factors include, but are not limited to, "that [Sable's] goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap," that Sable "provided the OSFM information from the completed in-line inspections and additional data requested by our office," that [t]he OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver" (*id.*, Ex. F at p. 2, Ex. G at pp. 1-2), as well as the over 60 requirements and conditions imposed on Sable as part of the State Waivers (*id*., Ex. F at pp. 3-14, Ex. G at pp. 3-14).

Courts "assume the attachments to the complaint are true, and they take precedence over any conflicting allegations." (*Fox Paine & Co., LLC v. Twin City Fire Ins. Co.* (2024) 104 Cal.App.5th 1034, 1045.) The State Waivers (and the extensive factors discussed therein) therefore take precedence over any of the Petition's conclusory allegations to the contrary.

Accordingly, Petitioners' Second and Fifth Causes of Action fail to state sufficient facts to state a claim and are subject to demurrer.

**C.     Eighth Cause of Action: State Waivers Do Not Constitute a Project Under CEQA**

In the Eighth Cause of Action, Petitioners allege OSFM failed to comply with CEQA when it approved the State Waivers without preparing a subsequent EIR pursuant to Public Resources Code section 21166 and CEQA Guidelines section 15162(a). (Petition, ¶¶ 215-224.) However, as a matter of law, CEQA does not apply to OSFM's issuance of the State Waivers because OSFM was implementing a federal safety program pursuant to its delegated authority under federal law.

***The State Waivers are federal authorizations not subject to CEQA.***

CEQA does not apply to OSFM's issuance of the State Waivers because OSFM was implementing a *federal* safety program. (See *City of Morgan Hill v. Bay Area Air Quality Management*

9

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

*District* (2004) 118 Cal.App.4th 861, 871 ["the conclusion that the [air] permit is a federal one would seem to preclude the application of any state law such as CEQA. The [Air] District issued the permit acting on behalf of federal authorities who are not bound by state law"].)

The Pipeline Safety Act authorizes the Safety Administration to certify state agencies enforce pipeline safety within their jurisdictional borders. (49 U.S.C. § 60105.) OSFM has the "exclusive safety[,] regulatory and enforcement authority … to implement the [Safety Administration's] and federal pipeline safety regulations." (Gov. Code, § 51010; see also Cal. Code Regs., tit. 19, § 2000.) Thus, instead of applying to the Safety Administration for a waiver of federal pipeline safety standards, California pipeline owners and operators apply to OSFM. OSFM, pursuant to its delegated authority, then issues State Waivers as a federal authorization, and the Safety Administration has 60 days' notice to object. (49 U.S.C. § 60118(d).) Just as the Safety Administration is not subject to CEQA in issuing a waiver under section 60118, OSFM is not subject to CEQA in implementing its federally delegated authority to waive pipeline safety standards. (*City of Morgan Hill*, *supra*, 118 Cal.App.4th at p. 871.)

Indeed, Petitioners cannot have it both ways. To support their pipeline safety law claims, Petitioners argue that OSFM must issue waivers to "in the same way and the same extent" as the Safety Administration. (See Petition, ¶ 133.) While OSFM did comply with federal pipeline safety laws, consistent with Petitioners' own logic, OSFM need not undertake CEQA review in implementing those laws.

### *The State Waivers are a safety program to which CEQA does not apply.*

Even if state law applied to OSFM's actions implementing federal law (it does not), the State Waivers are merely a program ensuring pipelines operate safely within the boundaries of established law. Thus, CEQA still would not apply.

The State Waivers are not a "project" that triggers CEQA review. (See *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 ["[a]n activity that is not a 'project' . . . is not subject to CEQA."].) "Project" "means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect change in the environment." (Pub. Resources Code, § 21065.) A state waiver is an order that modifies compliance with a regulatory

10

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

requirement. (49 U.S.C. § 60118.) Thus, the State Waivers merely confirmed that what Sable proposed by way of pipeline protection is consistent with established federal pipeline safety standards. OSFM's determination that the State Waivers would be consistent with pipeline safety standards does not have the potential to result in a physical change in the environment.[11] Physical repair and maintenance work on the Pipelines was not contingent on OSFM's approval of the State Waivers, and began in May 2024 under separate authorization from the County.

Moreover, OSFM's issuance of the State Waivers is ministerial. (Pub. Resources Code, § 21080(b); CEQA Guidelines, § 15268.) OSFM assessed Sable's State Waiver applications pursuant the requirements set forth in applicable federal and state regulations. (See Petition, Exs. F & G.) This is no different than a local agency's issuance of building permit or other similar permits, which are typically ministerial. A local agency may allow a deviation from applicable codes or impose conditions without transforming the permit into a discretionary action. (See, e.g., *Sierra Club v. County of Sonoma* (2017) 11 Cal.App.5th 11, 24-31 [issuance of erosion control permit with conditions held ministerial]; *Friends of Juana Briones House v. City of Palo Alto* (2010) 190 Cal.App.4th 286, 300 [issuance of demolition permit held ministerial].) Here, too, OSFM may allow a deviation from applicable safety regulations through a state waiver without triggering CEQA. (49 U.S.C. § 60118.)

### *The State Waivers are categorically exempt from CEQA.*

Even if the State Waivers are a discretionary project triggering CEQA, the State Waivers are categorically exempt because they address an existing facility with no expansion of its former use. (CEQA Guidelines, § 15301.) The CEQA Guidelines specifically identify "[r]estoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety" as exempt. (See *id.*, subd. (d).) Here, the State Waivers do not authorize any expansion of the pipelines' capacity or the permitted volume of oil that may flow

---

[11] If anything, Petitioners' dispute lies with the County, which approved the physical construction work on the Pipelines through the issuance of the final development plan, conditional use permit, coastal development permits, and other entitlements over 30 years ago.

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

through the pipelines.[12] The State Waivers do *not* authorize physical construction. They merely impose safety measures to ensure the pipelines "meet current standards of public health and safety." No unusual circumstance exists because potential harms from a pipeline rupture or spill already were analyzed under CEQA. (See *id.*, § 15300.2(c).)

*Potential environmental impacts were previously analyzed in the certified EIR/EIS.*

Although the State Waivers do nothing more than implement a federal safety program, Petitioners claim that OSFM was required to conduct additional environmental review. (See Petition, ¶¶ 213-226.) Not so. "After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project, and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928 [internal citations omitted]; Pub. Resources Code, § 21166.)

Here, Petitioners fail to allege that any of CEQA's statutory triggers for further environmental review have been met. (See Petition, generally.) That a spill occurred in 2015 is not a new circumstance requiring further study. A subsequent EIR is not required. (CEQA Guidelines, § 15162.) Hence, the Eighth cause of action for "failure to prepare a subsequent EIR" fails as a matter of law and is subject to demurrer.

**D.     The Abuse of Discretion and Declaratory Relief Claims Are Derivative of and Reliant on Causes of Action That Fail as a Matter of Law.**

The Third, Fourth, Sixth, and Seventh Causes of Action are subject to demurrer because each "relates to a substantive claim that is invalid as a matter law." (*See City of Lancaster v. Netflix, Inc.* (2024) 99 Cal.App.5th 1093, 1114.) For example, where a "plaintiff did not state sufficient facts to support a statutory claim and therefore sustained a demurrer as to that claim, a demurrer is also properly sustained as to a claim for declaratory relief which is 'wholly derivative' of the statutory claim." (*Id.*; also see *Fox Paine & Co., LLC v. Twin City Fire Ins. Co.* (2024) 104 Cal.App.5th 1034,

---

[12]   The appropriate baseline against which to address potential environmental impacts here is historic operations. (See CEQA Guidelines, § 15125(a)(1).)

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

1053 ["The object of the [declaratory relief] statute is to afford a new form of relief where needed and not to furnish a litigant with a second cause of action for the determination of identical issues."].)

Claims that are purely derivative of dismissed claims are not viable (see *Allen v. San Diego Convention Center Corp., Inc.* (2022) 86 Cal.App.5th 589, 596 [affirming that dismissal of "meal and rest break violations . . . at the demurrer stage" rendered derivative class certification claims "no longer viable"]) and are subject to demurrer.

***The Third and Fourth Causes of Action are Derivative of and Reliant on the First and Second Causes of Action.***

The Third Cause of Action for "Declaratory relief . . . under the Federal PSA" and Fourth Cause of Action for "Abuse of discretion under the Federal PSA" are both derivative of the substantive First and Second causes of action, both of which allege "Violation of the Federal PSA." (Compare Petition, ¶¶ 149–162 [First and Second causes of action] with ¶¶ 163–166 [Third cause of action] and ¶¶ 167–187 [Fourth cause of action].)

The Third cause of action alleges that "As noted [in the First and Second causes of action], OSFM did not offer any cognizable public process . . . has a pattern and practice of granting such waivers without providing the public with notice, and opportunity for a hearing, or a statement of reasons for its decision, as required by the Federal PSA." (Petition, ¶ 164.) The remaining allegations in the Third cause of action do not expand beyond the scope of the First and Second causes of action. (See Petition, ¶¶ 163-166.)

The Fourth cause of action alleges that "[t]he State Waivers . . . constitute final administrative decisions" and that "OSFM abused its discretion by failing to comply with the mandatory State Waiver procedures outlined in the Federal PSA, as explained in Petitioners' First and Second Causes of Action." (Petition, ¶¶ 168, 169.) The remaining allegations in the Fourth cause of action simply expand on the purported violation by discussing "the merits of OSFM's decisions," without alleging any further act by OSFM that constitutes an abuse of discretion. (See Petition, ¶¶ 167-187.) In other words, the Fourth cause of action claims is derivative because it claims the purported statutory violations alleged in the First and Second causes of action also constitute an abuse of discretion.

13

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

As discussed above in sections IV(A) and (B), the First and Second causes of action fail as a matter of law because nothing under federal law requires public notice and an opportunity for hearing on a state waiver application pending with OSFM. Since the allegations in the Third and Fourth causes of action are derivative and reliant on the First and Second causes of action – and the First and Second fail – so too do the Third and Fourth causes of action.

***The Sixth and Seventh Causes of Action are Derivative of and Reliant on the Fifth Cause of Action.***

Similarly, the Sixth Cause of Action for "Abuse of Discretion under the State PSA" and Seventh Cause of Action for "Declaratory relief . . . under the State PSA" are derivative of the Fifth Cause of Action for "Violation of the State PSA." (Compare Petition, ¶¶ 188–197 [Fifth cause of action] with ¶¶ 198–207 [Sixth cause of action] and ¶¶ 208–212 [Seventh cause of action].)

The Sixth cause of action alleges that "neither OSFM nor the State Fire Marshal provided any analysis in support of its decisions to grant the State Waivers," "determine[d] that the risk of the Waivers to public safety is slight and the probability of injury or damage remote" pursuant to "Government Code section 51011(b)," or made "any specific findings to support such a determination." (Petition, ¶ 202.) The Sixth cause of action further alleges that "for the same reasons that the [State] Waivers failed to meet the Federal PSA standard – outlined above in Petitioners' [Fifth] Cause of Action – they fail to meet the more onerous standard imposed by the State PSA." (Petition, ¶¶ 203 & 188-197 [Fifth Cause of Action for "Violation of the State PSA"].) The Sixth cause of action does not allege any further act by the OSFM that constitutes an abuse of discretion. (See Petition, ¶¶198–207.) Accordingly, the Sixth cause of action relies on and is derivative of the Fifth cause of action.

The Seventh cause of action alleges "As noted, in granting the State Waivers, Respondents apparently did not consider the relevant requirements of the State PSA . . . ignored the standard set forth in Government Code section 51011(b)" and "failed to provide a discussion of factors that were significant to the decisions to grant the waivers, as required by Government Code section 51011(c). (Petition ¶ 209.) The Seventh cause of action's allegations are wholly derivative because they

14

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

effectively seek the same statutory findings required to resolve the substantive Fifth cause of action for violation of the same statute: Government Code section 51011.

As discussed in section IV(B), the Fifth cause of action fails as a matter of law, hence, the derivative Sixth and Seventh causes of action also fail and are also subject to demurrer.

### E. The Declaratory Relief Claims Are Not Justiciable.

The Petition's declaratory relief claims also impermissibly seeks to "use the courts to tell an administrative agency how to do its job." (*City of Lancaster v. Netflix, Inc.* (2024) 99 Cal.App.5th 1093, 1114; *Bautista v. State of California* (2011) 201 Cal.App.4th 716, 735 ["plaintiffs' difference of opinion as to the interpretation of a statute did not present a justiciable controversy."].)

The Third and Seventh Causes of Action impermissibly seek declaratory relief that "would violate the doctrine of separation of powers . . . under the guise of declaratory relief" by seeking to make "pronouncements in a field reserved to legislative or executive discretion." (*Bautista v. State of California* (2011) 201 Cal.App.4th 716, 735.) Since the declaratory relief claims are "essentially a thinly veiled request" that the Court impose additional requirements on OSFM before it can issue waivers, the declaratory relief claims fail as a matter of law. (See *Zetterberg v. State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 662 ["the judicial branch of government is not the overseer of the other two. A citizen's mere dissatisfaction with the performance of either the legislative or executive branches, or disagreement with their policies does not constitute a justiciable controversy."].)

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

## V.    CONCLUSION

For the foregoing reasons, Sable respectfully requests that the Court sustain this Demurrer in its entirety and dismiss the Petition with prejudice.

DATED:   July 3, 2025                        Respectfully submitted,

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER
LISA L. GARCIA
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE



_____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

---

16

REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

LEGAL02/46305086v3

**PROOF OF SERVICE**

I, Heather Thai, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 S. Grand Avenue, 51st Floor, Los Angeles, California 90071.

On July 8, 2025, I served the document(s) **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF DEMURRER AND DEMURRER TO VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☐ (BY U.S. MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐ (BY FACSIMILE) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 8, 2025, at Los Angeles, California.

*/s/ Heather Thai*
_____
Heather Thai

17
PROOF OF SERVICE

LEGAL02/46305086v3

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>         tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>         jfrankel@environmentaldefensecenter.org<br>         trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/ DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>         benjaminhanelin@paulhastings.com<br>         natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

*Additional Counsel Listed on Signature Page*

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 12:18 PM
By: Terri Chavez , Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>Respondents and Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>Real Parties in Interest. | Case No. 25CV02247<br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br>**REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION; DECLARATION OF JEFFREY D. DINTZER**<br>*[Concurrently filed with [Proposed] Order; and Declaration of Michael J. Rosenfeld.]*<br><br>Date:          July 18, 2025<br>Time:         10:00 AM<br>Dept.:         4<br><br>Complaint Filed:          April 15, 2025<br>Trial Date:                   None Set |

1

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 18, 2025 at 10:00 a.m., in Department 4 of the California Superior Court for the County of Santa Barbara, Anacapa Division, located at 1100 Anacapa Street, Santa Barbara, California 93121-1107, before the honorable Donna D. Geck, Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") will and hereby do move the Court for an order striking the declaration of Richard B. Kuprewicz, which was filed in support of Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Netwrok, Sierra Club, and Santa Barbara Channelkeeper's (together, the "Petitioners") Order to Show Cause re Preliminary Injunction.

This Motion is made pursuant to Evidence Code sections 402, 801, 802, and the California Supreme Court ruling in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 ("*Sargon*"), and is based on the following grounds:

1.      On June 2, 2025, Petitioners filed an *Ex Parte* Application for an Administrative Stay or, in the alternative, an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted and Temporary Restraining Order against Defendants and Real Parties to stay the operation of the approval of State Waivers for CA-324 and CA-325A/B pending judgment of the Court.

2.      Petitioners filed the Declaration of Mr. Kuprewicz in support of their *Ex Parte* Application, which also supports their Order to Show Cause re preliminary injunction (the "Preliminary Injunction"). Mr. Kuprewicz serves as Petitioners' key witness supporting their Preliminary Injunction request, offering purported expert opinions regarding effects of corrosion on the Pipelines, including that they are "not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled." The Court scheduled the hearing on the Preliminary Injunction for July 18, 2025, and Real Parties' opposition to the Preliminary Injunction is due July 7, 2025, and filed concurrently herewith.

3.      Consistent with Real Parties' right to cross-examine Mr. Kuprewicz to oppose the Preliminary Injunction, Real Parties served a deposition subpoena on Mr. Kuprewicz on June 5, 2025. Despite the Real Parties' diligence, agreements with opposing counsel, motion work, and a Court order, Mr. Kuprewicz has not, and for medical reasons, will not, be made available for deposition.

- 2 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

4.      Mr. Kuprewicz's declaration must be stricken pursuant to Evidence Code sections 402, 801, and 802, as well as the California Supreme Court's *Sargon* decision, under which trial courts have a substantial gatekeeping responsibility to exclude expert testimony that lack foundation or a reliable methodology. This Court cannot determine whether the information cited by Mr. Kuprewicz adequately supports his conclusions without cross-examination. (See *Sargon*, *supra*, 55 Cal.4th at pp. 755-767 [reciting and relying upon testimony of the expert taken by opposing counsel at deposition to support the ruling of the Court.].) Further, Mr. Kuprewicz's declaration is inadmissible under *Sargon* if his opinions are not based on a generally accepted scientific methodology or an adequate foundation. (See *ibid*.)

5.      Additionally, Real Parties have a fundamental due process right to cross-examine Mr. Kuprewicz and will be severely prejudiced if his expert declaration is admitted without any opportunity for cross-examination.  The right to confront opposing witnesses "in noncriminal proceedings is a part of procedural due process guaranteed by the Fifth Amendment and the Fourteenth Amendment to the federal Constitution." (*August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60 [finding hearing met requirements of due process where sworn statement was considered but there was no subsequent request to cross-examine the declarant]; see also Cal. Const. Art. I. § 7.) "Because it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an 'absolute right,' not merely a privilege." (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733 [noting the rule applies in "either a criminal or a civil case" and if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony"].)

The Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed declarations of Jeffrey D. Dintzer and Michael J. Rosenfeld, the concurrently lodged [Proposed] Order, the records and documents on file in this action, and on such other evidence and argument as may properly come before the Court at the time of hearing.

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

Dated: July 7, 2025

Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE

**FAUVER, LARGE, ARCHBALD & SPRAY LLP**
TREVOR D. LARGE

By: _____

        Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP.; PACIFIC PIPELINE
COMPANY

- 4 -

## Table Of Contents

**Page**

I.      Introduction ...................................................................................................... 8

II.     Statement Of Facts ............................................................................................ 9

     A.      Petitioners Filed the Declaration of Richard B. Kuprewicz in Support of Their Preliminary Injunction Request. ....................................................................... 9

     B.      Real Parties Personally Served Mr. Kuprewicz With a Deposition Subpoena for Personal Appearance, and Mr. Kuprewicz Agreed to Appear. ................................. 10

     C.      Nearly Two Weeks After Agreeing to His Rescheduled Deposition, Petitioners Suddenly Refused to Produce Mr. Kuprewicz for Deposition. ................................. 10

     D.      Mr. Kuprewicz Is Unable to Testify Due to His Medical Condition. .......................... 11

III.    Argument ........................................................................................................ 11

     A.      Mr. Kuprewicz's Declaration Should Be Excluded Based on the Court's Substantial Gatekeeping Responsibility Under *Sargon* .................................................... 11

          1.      *Sargon* Requires Judicial Gatekeeping of Proffered Expert Opinions. ................................................................................... 11

          2.      The Kuprewicz Declaration Fails to Identify any Accepted Methodology. ..................................................................... 13

          3.      The Kuprewicz Declaration Lacks Foundation and is Speculative. ... 15

          4.      The Expert Opinion of Michael Rosenfeld Highlights Additional Material Flaws in the Kuprewicz Declaration ................................. 16

     B.      Mr. Kuprewicz's Declaration Should Be Excluded Based On His Unavailability and Real Parties' Due Process Right to Cross Examine Mr. Kuprewicz. ......................... 18

          1.      Fundamental Fairness Requires an Opportunity to Examine an Expert Witness. ................................................................................ 18

          2.      The Function of Cross-Examination is Not Served by Responsive Expert Opinions, and the Sole Remedy is Exclusion of the Kuprewicz Declaration. ................................................................ 19

IV.     Conclusion ..................................................................................................... 22

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Alexander v. Scripps Memorial Hospital La Jolla*
(2018) 23 Cal.App.5th 206 ...............................................................................................13, 16

*August v. Department of Motor Vehicles*
(1968) 264 Cal.App.2d 52 ......................................................................................................18

*Continental Airlines. Inc. v. McDonnell Douglas Corp.*
(1981) 216 Cal.App.3d 388 ....................................................................................................15

*Fleishman v. Superior Court*
(2002) 102 Cal.App.4th 350 ...................................................................................................19

*Fost v. Marin County Superior Court*
(2000) 80 Cal.App.4th 724 ................................................................................9, 18, 19, 21

*Fuller v. Department of Transportation*
(2019) 38 Cal.App.5th 1034 ...................................................................................................15

*Hope v. Arrowhead & Puritas Waters, Inc.*
(1959) 174 Cal.App.2d 222 ....................................................................................................20

*I-CA Enterprises. Inc. v. Palram Americas. Inc.*
(2015) 235 Cal.App.4th 257 ...................................................................................................14

*In re Crystal J.*
(1993) 12 Cal.App.4th 407 .....................................................................................................19

*In re Marriage of Swain*
(2018) 21 Cal.App.5th 830 .....................................................................................................18

*Jay v. Mahaffey*
(2013) 218 Cal.App.4th 1522 ...................................................................................................9

*Jennings v. Palomar Pomerado Health Systems, Inc.*
(2003) 114 Cal.App.4th 1108 .................................................................................................12

*Lowery v. Kindred Healthcare Operating, Inc.*
(2020) 49 Cal.App.5th 119 ............................................................................................ passim

*Lynn v. Tatitlek Support Services, Inc.*
(2017) 8 Cal.App.5th 1096 .....................................................................................................13

*People v. Moore*
(2011) 51 Cal.4th 386 .............................................................................................................12

- 6 -

*People v. Richardson*
    (2008) 43 Cal.4th 959 .........................................................................................................12

*People v. Sanchez*
    (2016) 63 Cal.4th 665 .........................................................................................................15

*People v. Wright*
    (2016) 4 Cal.App.5th 537 ...............................................................................................13, 16

*Powell v. Kleinman*
    (2007) 151 Cal.App.4th 112 .......................................................................................8, 13, 16

*San Francisco Print Media Co. v. The Hearst Corp.*
    (2020) 44 Cal.App.5th 952 ...........................................................................................13, 14

*Sargon Enterprises, Inc. v. University of Southern California*
    (2012) 55 Cal.4th 747 ................................................................................................. passim

**RULES**

Cal. R. Ct. 3.1306.................................................................................................................15

**STATUTES**

Code Civ. Proc., § 1872 .......................................................................................................20

Code Civ. Proc., § 2015.5 ....................................................................................................15

Evid. Code, § 1200................................................................................................................14, 15

Evidence Code section 701 ..................................................................................................19

Evidence Code, § 801 ...........................................................................................................12

Evidence Code sections 801 ................................................................................................12

Evidence Code, § 802 ...........................................................................................................12

- 7 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

<div align="center">

**MEMORANDUM OF POINTS AND AUTHORITIES**

</div>

## I.    <u>INTRODUCTION</u>

Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company ("Real Parties") ask the Court to strike the declaration of Richard B. Kuprewicz ("Kuprewicz Declaration"), which was filed June 2, 2025 in support of Petitioners Center for Biological Diversity ("Center") and Wishtoyo Foundation's ("Wishtoyo") (together, the "Petitioners") Order to Show Cause re Preliminary Injunction.

There are several reasons why the Kuprewicz Declaration should be stricken. First, it fundamentally fails the test for admissibility under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 ("*Sargon*"), which provides that trial courts have a "substantial gatekeeping" responsibility to ***exclude*** proffered expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Ibid*. at pp. 771-772.) Throughout the declaration, Mr. Kuprewicz merely recites conclusory statements drawn from his own unsworn, unpublished and non-peer-reviewed hearsay comment letters. He provides no explanation of his methodology, no substantive analysis of the factual foundation for his opinions, and no articulation of how he arrived at his conclusions. California courts have consistently held that an "expert opinion is worth no more than the reasons and facts on which it is based." (E.g., *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123.) The complete absence of supportive reasoning and information renders the Kuprewicz Declaration legally insufficient and inadmissible.

Second, the inability to cross-examine Mr. Kuprewicz constitutes a clear violation of Real Parties' due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. Mr. Kuprewicz serves as Petitioners' key witness supporting their Preliminary Injunction request, offering purported expert opinions regarding the safety of the Pipelines. Consistent with Real Parties' right to cross-examine Mr. Kuprewicz to oppose the Preliminary Injunction, Real Parties served a deposition subpoena on Mr. Kuprewicz on June 5, 2025. Despite the Real Parties' diligence, agreements with opposing counsel, motion work, and a Court order, Mr. Kuprewicz has not, and for

<div align="center">

- 8 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

</div>

medical reasons, will not, be made available for deposition. (See *Notice of Update Regarding Richard B. Kuprewicz*.)

The opportunity to cross-examine an expert witness is not merely a procedural formality but an "absolute right" that is essential to fundamental fairness in both criminal and civil proceedings. (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733.) The denial of Real Parties' right to cross-examine Mr. Kuprewicz materially prejudices their ability to challenge the basis of his opinions, test his qualifications and methodology, obtain material admissions regarding limitations or gaps in his analysis, and generally present a complete defense to the requested preliminary injunction. Courts have clearly articulated that "if a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony."[1] (*Ibid*.)

For these reasons, and those stated below, Real Parties request that the Court strike the declaration of Mr. Kuprewicz.

## II.    STATEMENT OF FACTS

### A.    Petitioners Filed the Declaration of Richard B. Kuprewicz in Support of Their Preliminary Injunction Request.

On June 2, 2025, Petitioners filed an *ex parte* Application for Stay or Order to Show Cause re Preliminary Injunction and Temporary Restraining Order. In support of their Application, Petitioners filed the Declaration of Richard B. Kuprewicz, a purported pipeline safety expert, who opined that Real Parties' pipelines cannot be safely operated and the State Waivers issued by the Office of the State Fire Marshal would not ensure the integrity and safety of the pipelines or prevent another oil spill. On June 3, 2025, the Court granted Petitioners' temporary restraining order and scheduled for July 18, 2025, an Order to Show Cause why a preliminary injunction should not issue against

---

[1] It is of no consequence that Petitioners offered not to take the depositions of Real Parties' experts or file a "reply" declaration for Mr. Kuprewicz; assuming such a "reply" declaration is even admissible. (See, e.g., *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537 ["The general rule of motion practice, which applies here, is that new evidence is not permitted with reply papers."].) Real Parties were prepared to present their experts for cross examination should Petitioners have timely noticed their depositions. Real Parties never waived their constitutional rights to confront Mr. Kuprewicz with cross examination and should not have to rely upon their own experts to establish the inadmissibility of his testimony, especially when a deposition will produce admissions from the witness that his opinions proffered in his declaration are not based on any generally accepted methodology and lack an adequate foundation.

Defendants and Real Parties prohibiting them from proceeding with the restart and operation of the Las Flores Pipeline System.

**B.      Real Parties Personally Served Mr. Kuprewicz With a Deposition Subpoena for Personal Appearance, and Mr. Kuprewicz Agreed to Appear.**

On June 5, 2025, Real Parties personally served a Deposition Subpoena for Personal Appearance and Production of Documents on Mr. Kuprewicz for June 24, 2025, and paid witness fees of $41.00. (See Declaration of Jeffrey Dintzer ["Dintzer Decl."], ¶ 2.) On June 10, 2025, counsel for Center for Biological Diversity agreed that Mr. Kuprewicz would appear for deposition but asked that the deposition be rescheduled to a later date, taken remotely, and split into two sessions due to Mr. Kuprewicz's health issues. (*Id*. at ¶ 3.) The parties met and conferred about deposition logistics and Real Parties worked in good faith to provide accommodations for Mr. Kuprewicz's stated health issues. (*Id*. at ¶ 4.)

On June 12, 2025, all parties (including Mr. Kuprewicz's personal counsel) agreed to a July 1, 2025, deposition date, time, and location close to Mr. Kuprewicz, as well as certain accommodations for his health conditions. (*Ibid*.) On June 20, 2025, Real Parties timely served on Mr. Kuprewicz's counsel (who agreed to accept service) an Amended Deposition Subpoena for Personal Appearance and Production of Documents on Mr. Kuprewicz for July 1, 2025. (*Ibid*.)

**C.      Nearly Two Weeks After Agreeing to His Rescheduled Deposition, Petitioners Suddenly Refused to Produce Mr. Kuprewicz for Deposition.**

On June 23, 2025, nearly two weeks after the parties agreed to a rescheduled July 1, 2025 deposition and Mr. Kuprewicz' counsel had accepted service of the Amended Deposition Subpoena on his behalf, counsel for Environmental Defense Center emailed Real Parties for the first time stating that "[a]fter further consideration," they would not produce Mr. Kuprewicz for deposition, without any valid basis for their newfound position. (Dintzer Decl., ¶ 5.) Neither Petitioners nor Mr. Kuprewicz ever objected to his appearing for deposition during the meet and confer process in which all parties agreed to a new date, time, and location for Mr. Kuprewicz's deposition. (*Ibid*.) Moreover, Real Parties explained that they were entitled to cross-examine a witness whose testimony is offered in support of a preliminary injunction, and that if Mr. Kuprewicz refused to appear, they would seek monetary

sanctions. (*Ibid*.) On June 24, 2025, counsel for Petitioners served formal objections to the deposition. (*Ibid*.)

On the evening of June 26, 2025, roughly two business days before Mr. Kuprewicz's deposition (and over two weeks after agreeing to produce Mr. Kuprewicz for deposition), Petitioners filed a motion to quash the subpoena. On June 27, 2025, Real Parties filed an Application for Ex Parte Relief seeking an order for Mr. Kuprewicz to appear at his scheduled July 1, 2025 deposition, or in the alternative, to strike his declaration.

**D.      Mr. Kuprewicz Is Unable to Testify Due to His Medical Condition.**

On Sunday June 29, 2025, Petitioners filed an opposition to Real Parties' *Ex Parte* Application and notified Real Parties for the first time that Mr. Kuprewicz had a brain mass pressing on his optic nerve. On July 1, 2025, Petitioners' counsel notified Real Parties that Mr. Kuprewicz's neurologist advised him he could not sit for a deposition due to his brain mass. Petitioners filed a *Notice of Update Regarding Richard B. Kuprewicz* stating Mr. Kuprewicz was medically unfit to sit through a deposition. As a result, Real Parties will be unable to depose Mr. Kuprewicz.

**III.      ARGUMENT**

**A.      Mr. Kuprewicz's Declaration Should Be Excluded Based on the Court's Substantial Gatekeeping Responsibility Under *Sargon*.**

1.      *Sargon* Requires Judicial Gatekeeping of Proffered Expert Opinions.

The California Supreme Court set a clear standard that trial courts have a ***gatekeeping*** responsibility related to the admission of proffered expert testimony.[2] (*Sargon Enterprises, Inc. v. University of Southern California* ("*Sargon*") (2012) 55 Cal.4th 747.) *Sargon* mandates that "under

---

[2]      Notably, the *Sargon* framework is not an evidence weighing function, but a circumscribed determination ***on admissibility***. (*Sargon*, *supra*, 55 Cal.4th at p. 772 ["The trial court's preliminary determination whether the expert opinion is founded on sound logic ***is not a decision on its persuasiveness. The court must not weigh an opinion's probative value*** . . . ." (emphasis added)].) The trial court must conduct a "'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusions that the expert's general theory of technique is valid.'" (*Ibid*.) The goal "***is simply to exclude 'clearly invalid and unreliable' expert opinion***." (*Ibid*. [emphasis added])

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

Evidence Code sections 801, subdivision (b),[3] and 802,[4] the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Id.* at 771-772.) An expert's opinion "may not be based 'on assumptions of fact without evidentiary support, or on speculative or conjectural factors." (*Id.* at 769-770 [internal citations omitted].) "Exclusion of expert opinions that rest on guess, surmise or conjecture is an inherent corollary to the foundational predicate for admission of the expert testimony." (*Id*. at p. 770; citing *People v. Moore* (2011) 51 Cal.4th 386, 405; *People v. Richardson* (2008) 43 Cal.4th 959, 1008; and *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)The matter that an expert relies on must provide a reasonable basis for the particular opinion offered and cannot be based on speculation or conjecture, otherwise it is ***inadmissible***. (*Id*. at p. 770.)

Subsequent case law affirms the important role trial courts serve as gatekeepers. In *Lowery v. Kindred Healthcare Operating, Inc.* ("*Lowery*"), the Court of Appeal affirmed a trial court's exclusion of an expert declaration that ***"include[d] conclusory statements without any foundation for their reasoning."*** (*Lowery v. Kindred Healthcare Operating, Inc.*, (2020) 49 Cal.App.5th 119, 122.) The Court of Appeal found the trial court "correctly observed that [the expert] failed to provide any basis

---

3 Evidence Code, § 801 provides:

> If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:
>
> * * *
>
> (b) Based on matter (including his special knowledge, skill, experience, training, and education)      perceived by or personally known to the witness or made known to him at or before the hearing, whether      or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion  upon the subject to which his testimony relates, unless an expert is precluded by law from using such      matter as a basis for his opinion.

4 Evidence Code, § 802 provides:

> A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based.

- 12 -

for his opinions." (*Id.* at p. 124; citing *Lynn v. Tatitlek Support Services, Inc.* (2017) 8 Cal.App.5th 1096, 1115 ["The trial court may strike or dismiss an expert declaration filed in connection with a summary judgment motion when the declaration states expert opinions that are speculative [or] lack foundation."]; *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 ["'An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.' [Citations.]"].)

The *Lowery* Court noted that the expert's "brief two-page declaration" provided only a "vague" description of "documented medical literature," which stands in contrast with a proper declaration that "identifies the specific medical literature and the specific contents of that literature on which he relied." (*Lowery*, *supra*, 49 Cal.App.5th at pp. 124-125; citing *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 964 ["The plain language of Sargon dictates that a trial court exercise its gatekeeping function by considering the matter or information an expert actually relied on in reaching an opinion."]; *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 229 ["Without at least some minimal basis, explanation, or reasoning, [medical expert's] conclusions as to causation in his May declaration had no evidentiary value."].)

Similarly, the court in *People v. Wright*, noted that "an expert's opinion cannot rest on his or her qualifications alone: 'even when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence.'" (*People v. Wright* (2016) 4 Cal.App.5th 537, 545 ["California courts have been particularly chary of expert testimony based on assumptions that are not supported by the evidentiary record."].)

### 2. The Kuprewicz Declaration Fails to Identify any Accepted Methodology.

The Kuprewicz Declaration follows this format: (1) Mr. Kuprewicz opines about his background and qualifications (¶¶ 2-6); (2) Mr. Kuprewicz attaches his own hearsay comment letter, *Evaluation of Las Flores Pipeline System Startup Proposal* (the "Evaluation Report") (¶ 7 & Exh. B); (3) Mr. Kuprewicz summarizes the conclusions set forth in the hearsay Evaluation Report, which

- 13 -

conclusions are unadorned by any explanation (¶ 8); (4) Mr. Kuprewicz attaches another self-written hearsay comment letter entitled *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart* (the "Observation Report") (¶ 9 & Exh. C); (5) Mr. Kuprewicz summarizes the conclusions "set forth in [the Observation Report]," which conclusions are unadorned by any explanation or analysis (¶ 10); and (6) Mr. Kuprewicz concludes "based on the facts I reviewed"—which facts are not identified—and his "professional analysis"— which analysis is not provided— that the Las Flores Pipeline System is not safe to operate . . . ." (¶ 11). Notably, neither the Evaluation Report nor the Observation Report can be found in the public literature, nor was either paper peer reviewed or published in any recognized scientific or engineering publication. Rather, both reports are hearsay statements submitted by Mr. Kuprewicz to the Office of State Fire Marshal as comment letters.

In performing its gatekeeping function, the trial court is directed to focus "solely on principles and methodology, and not on the conclusions they generate." (*Lowery*, *supra*, at p. 124; *see also San Francisco Print Media Co.*, *supra*, 44 Cal.App.5th at p. 962 ["the gatekeeper must focus on principles and methodology to determine whether the opinion is founded on sound logic, i.e., "whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture."].)

Here, Mr. Kuprewicz wholly fails to identify any reliable methodology in arriving at his purported conclusions. (*See generally* Kuprewicz Decl.) Instead, this Court is impliedly asked to fill the analytical gaps in Mr. Kuprewicz's analysis with the unsworn, hearsay evidence contained in the Evaluation and Observation Reports, which separately do not provide a sufficient basis for his opinions.[5] This Petitioners cannot do. The reports are prime examples of hearsay—i.e., "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter asserted." (Evid. Code, § 1200.) The Evidence Code does not authorize expert witnesses to launder their own otherwise inadmissible hearsay statements before the trier of fact. (*I-CA Enterprises. Inc. v. Palram Americas. Inc.* (2015) 235 Cal.App.4th 257, 266 ["[T]he expert may

---

[5] Notably, Mr. Kuprewicz fails even to cite the relevant sections of his hearsay reports that support his conclusions, leaving it to the Court to sift through the reports to determine whether they reach the conclusions offered, or whether that conclusion is supported.

- 14 -

not serve as a mere conduit for the admission of otherwise inadmissible hearsay."].) An expert may *rely* on hearsay and restate on direct examination **the materials** upon which he relied; however, in doing so the expert cannot merely relay the **details** of the hearsay, which is exactly what Mr. Kuprewicz attempts to do here. (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1044 ["Evidence Code section 1200 bars an expert from reciting parts of a hearsay document for the truth of the matter stated. There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception."]; *Continental Airlines. Inc. v. McDonnell Douglas Corp.* (1981) 216 Cal.App.3d 388, 415.) "What an expert cannot do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.)

Setting aside the evidentiary issues, Mr. Kuprewicz also fails to explain how his conclusory opinions are supported by the Evaluation and Observation Reports, or what analysis he performed to arrive at his conclusions. Because Mr. Kuprewicz identifies no reliable methodology in support of his conclusions and is based wholly on his own hearsay statements, his opinions are based on nothing more than speculation and conjuncture and must be excluded. (*Sargon*, 55 Cal.4th at 772.)

3.   The Kuprewicz Declaration Lacks Foundation and is Speculative.

Expert opinions based on nothing more than speculative and conclusory statements lacking foundation must be excluded. (*See Lowery*, 49 Cal.App.5th at 122.) Mr. Kuprewicz' declaration cites repeatedly to his self-written Evaluation and Observation reports. (*See* Kuperwicz Decl., ¶¶8 & 10.) However, Mr. Kuprewicz does not actually adopt the conclusions in those hearsay reports, but merely *summarizes* the opinions *stated in the reports* without any sworn testimony as to the truth of his conclusions. (Kuprewicz Decl., at ¶¶ 8 & 10.) A sworn *summary* of conclusions reached in an *unsworn* report is categorically not, and cannot serve as, a sworn affirmation under penalty of perjury that those conclusions are true and correct. (See Cal. R. Ct. 3.1306(a) ["Evidence Received at a law and motion hearing must be by declaration or request for judicial notice without testimony or cross-examination, unless the court orders otherwise for good cause shown."]; *see also* Code Civ. Proc., § 2015.5 [Requiring declarations to be "declared . . . true under penalty of perjury . . ."].)

- 15 -

Regardless, even if the summarized conclusions constituted sworn testimony (and they do not) they are still inadmissible under *Sargon* and its progeny. As in *Lowery*, Mr. Kuprewicz's declaration simply "includes conclusory statements without any foundation for their reasoning." (*Lowery*, *supra*, 49 Cal.App.5th at p. 124; see also *Powell*, *supra*, 151 Cal.App.4th at p. 123 ["'An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.' [Citations.]"].) Mr. Kuprewicz categorically fails to identify the facts leading to his ultimate conclusions, instead relying on summary conclusions of his own hearsay evidence, which are insufficient to support his conclusions. The most that can be said for his declaration is that he has identified his qualifications, but, as in *People v. Wright*, noted that "an expert's opinion cannot rest on his or her qualifications alone." (*Wright*, *supra,* 4 Cal.App.5th at p. 545.)

The *Sargon* framework requires that "the trial court act[] as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. (*Sargon*, *supra*, 55 Cal.4th at pp. 771-772.) Mr. Kuprewicz has not identified the bases for his opinions, only vaguely referencing the "facts [he] considered." (Kuprewicz Decl., ¶ 11.) "Without at least some minimal basis, explanation, or reasoning [Mr. Kuprewicz's] conclusions . . . ha[ve] no evidentiary value." (See *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 229.) Mr. Kuprewicz' Declaration therefore lacks any foundation, is entirely speculative, and must be excluded. (*See Sargon*, *supra*, 55 Cal.4th at p. 770 ["exclusion of expert opinions that rest on guess, surmise or conjecture is an inherent corollary to the foundational predicate for admission of the expert testimony."].)

4. <u>The Expert Opinion of Michael Rosenfeld Highlights Additional Material Flaws in the Kuprewicz Declaration</u>

Even if Mr. Kuprewicz' opinions were admissible (they are not), they are insufficient to show the Pipelines are unsafe to operate because they suffer from significant factual defects. Real Parties submit in further support of this Motion the declaration of Michael J. Rosenfeld, Chief Engineer at RSI Pipeline Solutions, LLC. (Declaration of Michael J. Rosenfeld ("Rosenfeld Decl."), ¶ 3.) Mr.

<div align="center">- 16 -</div>

Rosenfeld identifies many specific problems with the Kuprewicz Declaration that further reveal the factual gaps in the proffered opinions, including that Mr. Kuprewicz failed to account for:

(1) known facts about the 2015 Line 901 incident, which are essential to drawing any conclusion about the risk of a future incident (*id.,* ¶ 4.a.);

(2) known contributing factors and deficiencies related to the operation and integrity management of the former Line 901 under the previous owner and operator, which are critical differences that Mr. Kuprewicz completely ignores (*id.,* ¶ 4.b.);

(3) the substantial requirements of the Corrective Action Order (CAO) and Consent Decree (CD) issued by the Pipeline and Hazardous Materials Safety Administration (an agency within the U.S. Department of Transportation) and additional requirements imposed by the Office of the State Fire Marshall (OSFM) that correct the operational and integrity management deficiencies that were causal or contributed to the 2015 incident (*id.,* ¶ 4.c.; and

(4) other known facts that are contrary to the positions stated in Mr. Kuprewicz's opinions (*id.,* ¶ 4.d.).

Mr. Rosenfeld ultimately concludes that because of Mr. Kuprewicz's failure to account for and address these additional facts and details, Mr. Kuprewicz's opinions are unfounded, uninformed, speculative, and not based upon accepted standards of engineering practice, biased, or deceptive. (*Id.*, ¶ 5.)

As one example, Mr. Kuprewicz purports to conclude: "The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them." (Kuprewicz Decl., ¶ 10.a.) Mr. Rosenfeld points out *several* problems with just this one statement:

(1) The first is that Mr. Kuprewicz states a logical inconsistency: that "because ILI tools can miss a lot of cracks", reliance on ILI to find corrosion is misplaced. This is illogical because crack detection tools and corrosion detection tools are not the same tools and use different technologies. Corrosion tools indeed will "miss a lot of cracks" because they are not designed to detect cracks – ultrasonic crack detection tools specified for use by the OSFM in the state waiver are the appropriate tools for crack detection. ILI tools targeting corrosion on the other hand, specifically the magnetic and ultrasonic metal loss tools specified in the state waiver, are designed to detect corrosion and are effective for that purpose. Informed pipeline operators understand these differences and select the tool type(s) appropriate for the condition(s) they must manage. The OSFM state waiver specifies that magnetic and ultrasonic metal loss tools, and ultrasonic crack detection, tools be used. Neither of the

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

ultrasonic technologies were used by the prior operator. The state waiver introduces significant additional diversity to the inspection capabilities.  Industry experience has been that using multiple tool technologies and integrating the ILI data significantly improves the probability of detecting, characterizing, and sizing features of interest in the pipeline. (Rosenfeld Decl., ¶ 17.)

(2) The second is Mr. Kuprewicz states that multiple forms of corrosion are present on the pipeline(s) but does not describe the different forms of corrosion he claims are present. The Line 901 failure analysis [Ref: DNV-GL, Appendix M to PHMSA FIR] and PHMSA's incident investigation [Ref: PHMSA FIR] did not identify different forms of corrosion contributing to the failure, nor differing forms of corrosion being present on other parts of the pipeline.  Mr. Kuprewicz has not reviewed the results of field digs to investigate corrosion analysis already performed by Sable, in response to ILI, to determine what different types of corrosion are present.  His statement is entirely speculative without reviewing any factual data. (*Id*. at ¶ 18.)

(3) The third point is that Mr. Kuprewicz states that ILI is inadequate to detect some forms of corrosion though he does not state what those undetectable forms of corrosion are.  All ILI tools have lower thresholds of detectable flaw size; detection and sizing performance differ with the size and orientation of the flaws.  Taken together, the different tool technologies to be used by Sable are capable of detecting various forms of corrosion if they are present and of detectable size, including pitting corrosion, general corrosion, corrosion along or adjacent to seams, narrow axially aligned corrosion, and other forms of corrosion.  Furthermore, tool performance improves with large pipe such as Lines 324 and 325 because more sensors and supporting components can be fitted in the larger circumference, and defects of concern are proportionally larger and easier to detect, compared with small pipe sizes. [Ref: Nestleroth & Rosenfeld] (*Id*. at ¶ 19.)

Mr. Rosenfeld's analysis concludes none of Mr. Kuprewicz's conclusions are adequately supported, especially his overall conclusion that the Pipelines are "not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled." (*Id*. ¶ 6 [Referring to Paragraph 11 and stating: "These are pejorative statements built on an aggregation of claims made without supporting data, and which should be disregarded as nonfactual and noncredible. He has provided no data, scientific or engineering analysis, or factual evidence that supports these opinions"]; *see also id.,* ¶¶ 7-29 & 30-48.) Mr. Kuprewicz' opinions are therefore insufficient, unreliable, and must be excluded.

**B.      Mr. Kuprewicz's Declaration Should Be Excluded Based On His Unavailability and Real Parties' Due Process Right to Cross Examine Mr. Kuprewicz.**

1.      Fundamental Fairness Requires an Opportunity to Examine an Expert Witness.

Mr. Kuprewicz' unavailability for cross-examination serves as an independent basis to strike his declaration. The right to confront opposing witnesses "in noncriminal proceedings is a part of procedural due process guaranteed by the Fifth Amendment and the Fourteenth Amendment to the

- 18 -

federal Constitution." (*August v. Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60 [finding hearing met requirements of due process where sworn statement was considered but there was no subsequent request to cross-examine the declarant]; see also Cal. Const. Art. I. § 7.) "Because it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an 'absolute right,' not merely a privilege." (*Fost v. Marin County Superior Court* (2000) 80 Cal.App.4th 724, 733 [noting the rule applies in "either a criminal or a civil case" and if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony"].) Further, "[t]he lack of an opportunity to cross-examine the declarant deprives the opposing party of important evidence concerning the credibility of the declarant and the reliability of testimony in the declaration." (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 841-842 [relying on *Fost* and holding it was error for trial court to rely on declaration on motion for preliminary relief in family law case where declarant was not made available for cross-examination or live testimony].)

Real Parties' right to cross examine applies to the current Preliminary Injunction request. A preliminary injunction hearing requires the court to carefully weigh the evidence and decide whether the facts require such relief. (*Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356.) During a preliminary injunction hearing, the court evaluates the credibility of witnesses and makes factual findings on disputed evidence. (*Id*.) Parties are therefore entitled to cross-examine witnesses who submit statements in support of a preliminary injunction. (See *In re Crystal J*. (1993) 12 Cal.App.4th 407, 413 ["A meaningful hearing requires an opportunity to examine evidence and cross-examine witnesses."]; 5 California Trial Guide § 100.20 [discussing depositions are appropriate for use in pretrial proceedings "such as a motion for a preliminary injunction"].) Real Parties have a fundamental right to depose Mr. Kuprewicz, who is the key witness offering testimony in support of Petitioners' Preliminary Injunction request.

### 2. The Function of Cross-Examination is Not Served by Responsive Expert Opinions, and the Sole Remedy is Exclusion of the Kuprewicz Declaration.

In their *Notice of Update* Petitioners offer a "compromise" wherein (1) Real Parties can challenge the Kuprewicz Declaration with a responsive expert declaration; (2) Petitioners will not

- 19 -

depose said responsive expert; and (3) Petitioners will not submit a declaration with their reply brief. Petitioners' proposal is insufficient.

The "compromise" is insufficient. While Real Parties submit the responsive expert declaration of Mr. Rosenfeld, it is not Real Parties' burden to do so. Petitioners bear the burden of proof on their claims and Preliminary Injunction request, which they must support with both admissible and credible evidence. Refusing cross-examination that would allow Real Parties to test the admissibility and credibility of Mr. Kuprewicz' testimony and instead requiring responsive expert testimony is a burden-shifting mechanism that lacks support in any California authority.

Evidence Code section 701 provides that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, ***in addition, may be fully cross-examined as to*** (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion." (Emphasis added.) Courts have long opined that "[o]nce an expert offers his opinion, however, he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based (Code Civ. Proc. § 1872), and which he took into consideration; and ***he may be 'subjected to the most rigid cross examination'*** concerning his qualifications, and his opinion and its sources." (*Hope v. Arrowhead & Puritas Waters, Inc.* (1959) 174 Cal.App.2d 222, 230, emphasis added.)

Cross-examination serves as an irreplaceable due process protection that cannot be substituted by merely allowing competing expert testimony. The ability to present contradictory expert opinions—creating a "war of experts"—falls significantly short of the constitutional safeguards afforded by rigorous cross-examination. Through effective cross-examination, defendants can systematically expose qualification deficiencies that may render an expert's testimony inadmissible, methodological flaws in the expert's analytical approach, and underlying biases that compromise the expert's objectivity and credibility.

Importantly, cross-examination provides Real Parties with a critical procedural tool that operates independently of financial constraints. Unlike the potentially prohibitive costs associated with

- 20 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

retaining competing expert witnesses, cross-examination enables a defendant to challenge the foundation of a plaintiff's claims directly. This distinction is crucial, as it ensures that due process protections remain accessible to all defendants, not merely those with sufficient means to engage in costly expert battles. When defendants are deprived of the opportunity to cross-examine expert witnesses, they lose an essential mechanism for testing evidence that may be dispositive to the outcome of their case, potentially rendering them unable to mount an effective defense against unsubstantiated claims.

For instance, in this case, Real Parties should have a full and fair opportunity to question Mr. Kuprewicz on all of the issues presented by his Declaration, including:

1. the method he applied in forming his opinions (or lack thereof), which is not identified in his declaration;

2. his basis for considering any applied method to be scientifically accepted, which is not identified in his declaration;

3. all the factual information he considered to form each of his opinions (including whether that collection was based on his own, independent research or selectively provided to him from any source), which is not identified in his declaration;

4. all the factual information that was <u>not</u> considered by him, either because it was not available or rejected by him as not reliable or convincing for any reason (including all the information considered by the County and federal court in each of their evaluations of the steps needed to permit the restart of the Pipelines), which is not identified and addressed in his declaration;

5. any prior work by Mr. Kuprewicz in which he reached similar or opposing conclusions about the safety of any pipeline (including whether he used a consistent or different methodology, or relied on similar or different types of information), none of which are identified in his declaration; and

6. any prior relationship with Petitioners and the details of that work, which could reveal sources of bias.

The answers to these questions would likely further illuminate failures within the Kuprewicz Declaration that further render his opinions entirely inadmissible or, at the very least, uncredible. The denial of Real Parties' opportunity to cross-examine Mr. Kuprewicz is prejudicial and cannot be remedied by shifting the burden to Real Parties to provide a competing expert declaration. Instead, as discussed above, if "a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony." (*Fost v. Marin County Superior Court*, *supra*, 80 Cal.App.4th at p. 733.)

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

## IV.   CONCLUSION

For the foregoing reasons, Real Parties request an order striking the Kuprewicz Declaration in its entirety.


Dated: July 7, 2025                    Respectfully submitted,

                                       **ALSTON & BIRD**
                                       JEFFREY D. DINTZER
                                       GARRETT B. STANTON

                                       **PAUL HASTINGS**
                                       DUNCAN JOSEPH MOORE

                                       **FAUVER, LARGE, ARCHBALD & SPRAY LLP**
                                       TREVOR D. LARGE


                                       By: _____
                                                Jeffrey D. Dintzer

                                       Attorneys for Real Parties in Interest
                                       SABLE OFFSHORE CORP.; PACIFIC PIPELINE
                                       COMPANY

- 22 -

## DECLARATION OF JEFFREY D. DINTZER

I, Jeffrey Dintzer, declare as follows:

1.      I am an attorney licensed to practice law before all courts in the State of California and am a partner at the law firm of Alston & Bird LLP, counsel for Real Parties in Interest Sable Offshore Corp and Pacific Pipeline Company ("Real Parties"). I make this declaration in support of Real Parties' Motion to Strike the Declaration of Richard B. Kuprewicz ("Kuprewicz" or "Kuprewicz Declaration"). I have personal knowledge of the facts stated in this declaration and, if called upon to do so, I could and would competently testify to them.

2.      On June 5, 2025, at 7:00 a.m., Real Parties personally served Mr. Kuprewicz with a Deposition Subpoena for Personal Appearance and Production of Documents and Things for June 24, 2025, at 9:00 a.m. at the Marriott, 1605 Calle Joaquin, San Luis Obispo, California 93405. At the time that Real Parties served Mr. Kuprewicz, his witness fees in the amount of $41.00 were also paid.

3.      On June 10, 2025, counsel for Center for Biological Diversity agreed that Mr. Kuprewicz would appear for deposition but asked that the deposition be rescheduled for a date during the week of June 30 through July 3, 2025. Counsel also requested that the deposition be taken remotely and split between two days due to certain health issues. On the same day, Real Parties agreed to reschedule the deposition to July 1, 2025. Between June 10 and June 11, the parties exchanged several emails related to deposition logistics.

4.      On June 12, 2025, I participated in a telephone call with Petitioners' counsel and the parties agreed that Mr. Kuprewicz would appear for deposition on July 1, 2025 at 9:00 a.m. at a Courtyard hotel located at 1605 Calle Joaquin, San Luis Obispo, CA 93405, which is a short distance from Mr. Kuprewicz's residence. Mr. Kuprewicz's personal counsel, Mr. Stolpman, who was on the telephone call, agreed to accept service of the amended deposition subpoena. It was also agreed that the deposition would be in person at the Courtyard hotel and that we would take sufficient breaks to accommodate Mr. Kuprewicz's specified health concerns, but conclude the deposition on that day. On June 20, 2025, Real Parties served Mr. Stolpman with an Amended Deposition Subpoena for Personal Appearance and Production of Documents and Things for July 1, 2025, at 9:00 a.m. at the agreed upon location.

- 23 -

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF
RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

5. On June 23, 2025, counsel for Environmental Defense Center emailed Real Parties for the first time stating that "[a]fter further consideration," they would not produce Mr. Kuprewicz for deposition. We exchanged additional emails on June 23 and June 24, 2025, in which I noted that the parties already reached an agreement that the deposition would proceed on July 1, and that if Mr. Kuprewicz refused to appear, Real Parties would seek monetary sanctions. On June 24, 2025, counsel for Environmental Defense Center served formal objections to the deposition.

6. On July 1, 2025, Petitioners' counsel notified me that Mr. Kuprewicz's neurologist advised Mr. Kuprewicz that he cannot sit for a deposition due to his brain mass. Thereafter, Petitioners filed a *Notice of Update Regarding Richard B. Kuprewicz* wherein Petitioners indicate that Mr. Kuprewicz is medically unfit to sit through a deposition. As a result, Real Parties are not able to depose Mr. Kuprewicz.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 7th day of July 2025, at Los Angeles, California.

_____
Jeffrey Dintzer

REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) **REAL PARTIES' NOTICE OF MOTION AND MOTION TO STRIKE DECLARATION OF RICHARD B. KUPREWICZ FILED IN SUPPORT OF OSC RE PRELIMINARY INJUNCTION; DECLARATION OF JEFFREY D. DINTZER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒     BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

/s/ *Josie Cisneros*
Josie Cisneros

LEGAL02/46305502v6

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>        tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>        jfrankel@environmentaldefensecenter.org<br>        trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/ DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |

LEGAL02/46305502v6

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
LISA L. GARCIA, SBN 301362
lisa.garcia@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:     (213) 576-1000
Facsimile:     (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com

BENJAMIN J. HANELIN, SBN 237595

benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:     (310) 620-5879
Facsimile:     (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 2:29 PM
By: Terri Chavez , Deputy

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,<br><br>　　　　　Petitioners and Plaintiffs,<br><br>　　　v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERMANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, | Case No. 25CV02247<br><br>Assigned for all purposes to:<br>Hon. Donna G. Geck<br><br>**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO STRIKE CERTAIN REQUESTS FOR RELIEF IN PLAINTIFFS' VERIFIED PETITION** |

1

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO STRIKE; DECLARATION OF JEFFREY D. DINTZER

Respondents and Defendants,

and

SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO STRIKE; DECLARATION OF JEFFREY D. DINTZER

# REQUEST FOR JUDICIAL NOTICE

Pursuant to Evidence Code sections 452 and 453, Real Parties in Interest Sable Offshore Corp. ("Sable") and Pacific Pipeline Company ("PPC") (collectively, "Real Parties") hereby request this Court to take judicial notice of the following document in support of Real Parties' Motion to Strike Certain Requests for Relief in Plaintiffs' Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Motion to Strike").

1.      Attached hereto as **Exhibit 1** is a true and correct copy of the Consent Decree entered in *United States of America, et al. v. Plains All American Pipeline, L.P., et al.* (C.D. Cal. Civil Action No. 2:20-cv-02415) on March 13, 2020.

2.      Attached hereto as **Exhibit 2** is a true and correct copy of a letter from the County of Santa Barbara to Sable, dated February 12, 2025.

The basis of admission of Exhibit 1 is that it constitutes court records within the meaning of Evidence Code section 452, subdivision (d).  The basis of admission for Exhibit 2 is that it constitutes an "official act" of executive departments of the United States and agencies within the meaning of Evidence Code section 452, subdivision (c). Further, the documents attached as Exhibits 1 and 2 are relevant to the Motion to Strike because they demonstrate the required approval remaining before restart of the Pipelines, rendering Plaintiffs' requested relief unripe. Accordingly, the Court may take judicial notice of this document.  (See Evidence Code section 437 ["The grounds for a motion to strike shall appear on the face of the challenged pleading or from any matter of which the court is required to take judicial notice"].)

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO STRIKE; DECLARATION OF JEFFREY D. DINTZER

In accordance with Evidence Code section 453, Real Parties have given Petitioners sufficient notice of this request to enable them to meet the request, and Real Parties have also furnished the Court with sufficient information to take judicial notice of **Exhibits 1-2**.

DATED:  July 3, 2025                                    Respectfully Submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
LISA L. GARCIA
GARRETT B. STANTON

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE

_____
Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO STRIKE; DECLARATION OF JEFFREY D. DINTZER

## DECLARATION OF JEFFREY D. DINTZER

I, Jeffrey D. Dintzer, declare as follows:

I am an attorney duly licensed to practice law before all courts of the State of California. I am a partner at Alston & Bird LLP, counsel of record for Real Parties in Interest Sable Offshore Corp.'s ("Sable") and Pacific Pipeline Company's ("PPC") (collectively, "Real Parties"). I make this declaration in support of Real Parties' Motion to Strike Certain Requests for Relief in Plaintiffs' Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief ("Motion to Strike").

1. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2. I am familiar with the case files for these matters. The files for these matters are kept at my shared direction in a secure electronic format at the offices of Alston & Bird LLP. Legal assistant Kim Niz and various associates maintain these files on a server at Alston & Bird.

3. In preparing this declaration, I, or others at my direction, retrieved the true and correct copies of the documents and correspondence described below from the secure electronic folder at Alston & Bird and prepared them for inclusion in my declaration.

4. Attached hereto as **Exhibit 1** is a true and correct copy of the Consent Decree entered in *United States of America, et al. v. Plains All American Pipeline, L.P., et al.* (C.D. Cal. Civil Action No. 2:20-cv-02415) on March 13, 2020.

5. Attached hereto as **Exhibit 2** is a true and correct copy of a letter from the County of Santa Barbara to Sable, dated February 12, 2025.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 3rd day of July, 2025, in Los Angeles, California.

_____
Jeffrey D. Dintzer

5

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO STRIKE; DECLARATION OF JEFFREY D. DINTZER

# EXHIBIT 1

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | Civil Action No. 2:20-cv-02415 **CONSENT DECREE** |
| Plaintiffs, | |
| v. | |
| PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., | |
| Defendants. | |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 14    Filed 05/14/26    Page 771 of 1123    Page
ID #:6903
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 2 of 102    Page ID #:95

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast
Regional Water Quality Control Board, and California Department of Forestry
and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and
California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

**TABLE OF CONTENTS**

I.    BACKGROUND .................................................................................... - 5 -

II.   JURISDICTION AND VENUE ............................................................. - 6 -

III.  APPLICABILITY ................................................................................ - 7 -

IV.  DEFINITIONS ..................................................................................... - 7 -

V.    CIVIL PENALTIES ............................................................................. - 13 -

VI.  NATURAL RESOURCE DAMAGES .................................................. - 17 -

VII.  TRUSTEES' MANAGEMENT AND APPLICABILITY
      OF JOINT NRD FUNDS ..................................................................... - 21 -

VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL
      USE FUNDS ........................................................................................ - 22 -

IX.  INJUNCTIVE RELIEF ........................................................................ - 23 -

X.    CORRECTIVE ACTION ORDER ...................................................... - 27 -

XI.  STIPULATED PENALTIES ................................................................ - 27 -

XII.  FORCE MAJEURE .............................................................................. - 35 -

XIII. DISPUTE RESOLUTION .................................................................... - 37 -

XIV. REPORTING ....................................................................................... - 39 -

XV.  CERTIFICATION ................................................................................ - 40 -

XVI. INFORMATION COLLECTION AND RETENTION ...................... - 40 -

XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........... - 43 -

XVIII. TRANSFER AND ACQUISITION OF ASSETS ............................. - 49 -

XIX. COSTS ................................................................................................ - 50 -

XX.  NOTICES ............................................................................................ - 51 -

XXI. EFFECTIVE DATE ............................................................................ - 54 -

XXII. RETENTION OF JURISDICTION ..................................................... - 54 -

XXIII. MODIFICATION ............................................................................... - 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- i -

XXIV.    TERMINATION ........................................................................................ - 55 -

XXV.    PUBLIC PARTICIPATION..................................................................... - 56 -

XXVI.    SIGNATORIES/SERVICE ...................................................................... - 56 -

XXVII.    INTEGRATION ........................................................................................ - 57 -

XXVIII. FINAL JUDGMENT ............................................................................... - 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION ................. - 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- ii -

A.    WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.    WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.    WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

D.      WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.      WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.      WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.      WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.      WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

I.      WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.      WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.      WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.      WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

40 C.F.R. § 300.600 and Executive Order 12777. CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980. In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*). CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California. CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M. WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages. As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources. By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N. WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.      WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.      WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.      WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.      WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.      WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree:  (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.      BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 5 -

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*., and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq*., and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq*., and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.   JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355.  This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367.  To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.      Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

Case 2:26-cv-05242-GVW-SSC   Document 143   Filed 05/14/26   Page 780 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 21 of 102   Page ID #:104
ID #:6912

does business in this District and the alleged claims occurred in this District.

3.      For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

## III.   APPLICABILITY

4.      Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5.      Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree.  Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.   DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree. For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H.html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

Case 2:26-cv-05242-GW-SSC    Document 14-3    Filed 05/14/26    Page 782 of 1123   Page
Case 2:20-cv-02415 Document 6-1   Filed 03/13/20   Page 13 of 102   Page ID #:106
ID #:6914

"Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

 "Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

 "Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley. Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 785 of 1123   Page
Case 2:20-cv-02415-SVW-SSC    Document 6-1    Filed 03/13/20    Page 16 of 102    Page ID #:105
ID #:6917

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq*., and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 12 -

Case 2:26-cv-05242-GVW-SSC   Document 143   Filed 05/14/26   Page 786 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 17 of 102   Page ID #:110
ID #:6918

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.    CIVIL PENALTIES

A.    Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment").  The Penalty Payment shall be allocated as follows:

8.    Penalty Payment to the United States (PHMSA).  For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

a.    Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.    One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.    Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d.      At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9.      <u>Penalty Payment to the United States (EPA) shared with CDFW and RWQCB</u>. The Penalty Payment shall be allocated as follows:

a.      As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1) To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2) To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

> State Water Resources Control Board
> Division of Administrative Services, ATTN: Civil Liability Payment
> P.O. Box 1888
> Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

Case 2:26-cv-05242-GW-SSC Document 14-3 Filed 05/14/26 Page 790 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 21 of 102 Page ID #:114
ID #:6922

> U.S. Environmental Protection Agency
> Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, Ohio 45268
>
> and
>
> Patricia V. Kingcade
> Attorney Advisor
> National Pollution Funds Center
> U.S. Coast Guard
> 2703 Martin Luther King Jr. Avenue SE
> Washington, D.C. 20593-7605

10. <u>Penalty Payment to be Paid to CDFW</u>. For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11. Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI. NATURAL RESOURCE DAMAGES

12. Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961.  The NRD Payment shall be allocated as follows:

      a.    To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment.  Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds).  Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention:  Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C.  20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198.  DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 792 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 23 of 102 Page ID #:116
ID #:6924

b.       To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>       Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.       To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 19 -

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d. To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> The Regents of the University of California
> Attn:  Michael Kisgen, Associate Director
> Natural Reserve System
> University of California, Office of the President
> 1111 Franklin Street, 6th Floor
> Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account.  The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees.  The projects shall address the research, education, and outreach missions of the University of California.  UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.     The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants.  To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.     DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident.  DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.     DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-GW-SSC Document 143 Filed 05/14/26 Page 796 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 27 of 102 Page ID #:120
ID #:6928

19.     The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.     UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.    INJUNCTIVE RELIEF

21.     Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.     <u>Material Changes to Plains' IMP</u>.

a.     Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)     Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)     Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)     White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

4)      Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5)      Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6)      Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.      At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation.  The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 24 -

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.    <u>Material Changes in Control Room Management Plan and Control Center General Procedures</u>.

a.    Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.    At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 25 -

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days. Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24. Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.     CORRECTIVE ACTION ORDER

25.     Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.     STIPULATED PENALTIES

26.     Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.     <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.     If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.     If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.     If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. <u>Stipulated Penalties for Non-Performance of Injunctive Relief</u>. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

h. For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i. For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j. For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k. For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l. For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m. For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n. For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o. For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p. For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q. For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.      For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.      For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.      For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.      For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.      For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.      For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.      For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.      The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC   Document 143   Filed 05/14/26   Page 804 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 35 of 102   Page ID #:126
ID #:6936

29.  Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.  Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

    a.  For operation of Line 901 in violation of paragraph 1.a of Appendix D;

    b.  For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

    c.  For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

    d.  For operation of Line 903, in violation of paragraph 1.e of Appendix D;

    e.  For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

    f.  For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

    g.  For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

    h.  For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

    i.  The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 31 -

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30. Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31. For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32. For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33. For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34. For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-GVW-SSC    Document 143    Filed 05/14/26    Page 806 of 1123    Page
Case 2:20-cv-02415 Document 6-1   Filed 03/13/20   Page 37 of 102   Page ID #:130
ID #:6938

a.      Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.      Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.      Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.      If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.     For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.     For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

        a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

        b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

c.       If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41.       If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42.       The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43.       Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.   FORCE MAJEURE

44.       "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46. If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Decree.

50. <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. <u>Formal Dispute Resolution</u>. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position. Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs. Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute. The motion

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 38 -

Case 2:26-cv-05242-GVW-SSC    Document 143    Filed 05/14/26    Page 812 of 1123   Page
Case 2:20-cv-02415   Document 6-1    Filed 03/13/20    Page 43 of 102    Page ID #:136
ID #:6944

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 39 -

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV. CERTIFICATION

58. Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI. INFORMATION COLLECTION AND RETENTION

59. Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 40 -

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 814 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 45 of 102   Page ID #:138
ID #:6946

c.     obtain documentary evidence, including photographs and similar data; and

d.     assess Defendants' compliance with this Consent Decree.

60.     Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree. At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62.     For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2. Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63.     The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 815 of 1123   Page
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 46 of 102    Page ID #:135
ID #:6947

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.).  If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality.  In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64.     For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65.     State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.).  If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records.  If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66.     The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only.  Defendants shall produce all documents required

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 42 -

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67.     At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68.     [*Intentionally left blank.*]

## XVII.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.     This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70.     Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 43 -

Case 2:26-cv-05242-GVW-SSC    Document 143    Filed 05/14/26    Page 817 of 1123    Page
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 48 of 102    Page ID #:141
ID #:6949

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

a.  49 C.F.R. Part 194 Subpart B – Response Plans;

b.  49 C.F.R. Part 195 Subpart B – Reporting;

c.  49 C.F.R. Part 195 Subpart E – Pressure Testing;

d.  49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

e.  49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

f.  49 C.F.R. Part 195 Subpart H – Corrosion Control;

g.  49 C.F.R. Part 199 – Drug and Alcohol Testing; and

h.  All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.  The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.  This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 44 -

Case 2:26-cv-05242-GW-SSC   Document 143   Filed 05/14/26   Page 818 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 49 of 102   Page ID #:142
ID #:6950

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019.  The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

        a.     The Pipeline Safety Laws specified in Paragraph 70; and

        b.     California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73.    For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident.  Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74.    The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75.    The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 45 -

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239.  The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76.     This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77.     In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations.  Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 820 of 1123   Page ID #:...

Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 51 of 102   Page ID #:6952

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79.     This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81.     Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82.     By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83. By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84. Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder. Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85. Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86. Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87. The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII.   TRANSFER AND ACQUISITION OF ASSETS

88. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision.  Those provisions of Appendix B are:

> a. For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;
>
> b. For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;
>
> c. For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and
>
> d. For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 49 -

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements. Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree. Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90. In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree. Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer. Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91. For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX. COSTS

92. Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 50 -

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

### XX.  NOTICES

93.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:   eescdcopy.enrd@usdoj.gov
                                    Re: DJ # 90-5-1-1-11340

As to the United States by mail:    EES Case Management Unit
                                    Environment and Natural Resources
                                        Division
                                    U.S. Department of Justice
                                    P.O. Box 7611
                                    Washington, D.C.  20044-7611
                                    Re: DJ # 90-5-1-1-1130

As to PHMSA:                        James M. Pates
                                    Assistant Chief Counsel
                                        for Pipeline Safety
                                    U.S. Department of Transportation
                                    Pipeline and Hazardous Materials
                                        Safety Administration
                                    1200 New Jersey Ave. SE. E-26
                                    Washington, DC. 20590

As to EPA:                          Andrew Helmlinger
                                    Attorney Advisor
                                    U.S. EPA Region IX
                                    75 Hawthorne Street (ORC-3)
                                    San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

As to DOI:      Clare Cragan
U.S. Department of the Interior
Office of the Solicitor
755 Parfet St., Suite 151
Lakewood, Colorado 80215

As to NOAA:     National Oceanic and Atmospheric
              Administration
Office of General Counsel
Natural Resources Section
ATTN:  Christopher J. Plaisted
501 W. Ocean Blvd, Suite 4470
Long Beach, California  90802

As to USCG:     Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center,
 US Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, DC 20593-7605

As to the State Agencies:  Michael Zarro
Deputy Attorney General
Office of the Attorney General
Natural Resources Law Section
300 S. Spring St., Suite 11220
Los Angeles, California 90013

As to CDFW:     California Department of Fish
 and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater
Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 52 -

As to CDPR:                 California Department of Parks and
                               Recreation
                            Attn: Laura A. Reimche, Senior Counsel
                            1416 Ninth Street, Room 1404-6
                            Sacramento, California 95814

As to CSLC:                 California State Lands Commission
                            Attn: Patrick Huber, Legal Division
                            100 Howe Avenue, Suite 100-South
                            Sacramento, California 95825

As to OSFM:                 California Department of Forestry and
                               Fire Protection
                            Legal Services Office
                            Attn: Joshua Cleaver, Staff Counsel
                            P.O. Box 944246
                            Sacramento, California 94244-2460

As to RWQCB:                California Central Coast Regional Water
                            Quality Control Board
                            Attn: Naomi Rubin, Attorney III
                            801 K Street
                            Sacramento, California 95814

As to UC:                   Barton Lounsbury, Senior Counsel
                            University of California
                            Office of the General Counsel
                            1111 Franklin Street, 8th Floor
                            Oakland, California  94607

As to Defendants:           Megan Prout
                            Senior Vice President
                            Commercial Law and Litigation
                            333 Clay Street, Suite 1600
                            Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

<div align="center">

**XXI.    EFFECTIVE DATE**

</div>

96.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

<div align="center">

**XXII.    RETENTION OF JURISDICTION**

</div>

97.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

<div align="center">

**XXIII.   MODIFICATION**

</div>

98.     The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

99.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 55 -

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.   PUBLIC PARTICIPATION

103.   This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.   Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.   SIGNATORIES/SERVICE

105.   Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.   This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 56 -

## XXVII.  INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.     FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020
Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
  Division U.S. Department of Justice

3/13/2020
Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 58 -

Case 2:26-cv-05242-SVW-SSC   Document 14   Filed 05/14/26   Page 832 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 63 of 102   Page ID #:156
ID #:6964

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
_____
Date

_____
PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
     Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 59 -

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 833 of 1123   Page
ID #:6965
Case 2:20-cv-02415 Document 6-1   Filed 03/13/20   Page 64 of 102   Page ID #:157

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
        Assurance

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020

Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
    Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 61 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____3/2/20_____

Date

_____Lisa Ann L. Mangat_____

LISA ANN L. MANGAT
Director
California Department of Parks
and Recreation

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 63 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020

Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 64 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
_____
Date

_____
THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

Case 2:26-cv-05242-GVW-SSC    Document 14-3  Filed 05/14/26    Page 839 of 1123  Page
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 70 of 102   Page ID #:165
ID #:6971

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
_____
Date

_____
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
    Quality Control Board

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

3 March 2020
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020

Date

HARRY PEFANIS

President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 69 -

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 844 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 75 of 102   Page ID #:165
ID #:6976

# APPENDIX A

## (*Set of maps that generally depict Lines 901, 903, and 2000*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*



*Appendix A – Line 901*

Scale: 1:100,000

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.



*Appendix A – Line 903*

Scale: 1:700,000

Sheet No:   1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.



Appendix A – Line 2000

Scale:  1:966,574

Sheet No:  1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 848 of 1123   Page
Case 2:20-cv-02415  Document 6-1   Filed 03/13/20   Page 79 of 102   Page ID #:172
ID #:6980

# APPENDIX B

# *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

Case 2:26-cv-05242-SVW-SSC   Document 143   Filed 05/14/26   Page 849 of 1123   Page
ID #:6981
Case 2:20-cv-02415-SVW   Document 6-1   Filed 03/13/20   Page 80 of 102   Page ID #:175

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A. Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B. Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C. Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D. Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E. To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A. Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a. Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b. Conduct a close interval survey (CIS) and AC/DC interference survey.

   c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

   1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

   2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

   3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

   4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b. Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c. When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d. Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e. Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f. Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g. For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i. Integrate and analyze available data in its P&M process, including:

    i. Assessment data from ILI tool runs;

    ii. Dig and repair data;

4

    iii.    Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

    iv.    Operational data, such as pressure and flow data;

    v.    Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

    vi.    Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

    vii.    Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.    ILI Measures

    a.    <u>Initial ILI Runs</u>.  Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU).  Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data.  If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

    i.    All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

-79-

ii.    In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b.    <u>Subsequent ILI Runs</u>. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c.    <u>All ILI Runs</u>. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.    **<u>Valves</u>**

A.    Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1.    Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2.    Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.    Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.    Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

6. **Risk Analysis**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1.    Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a.    The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b.    Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c.    The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B.    Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

    A.    Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9. **Integrity Management**

    A.    New Procedures for Interim Reviews and Assessments

7

-81-

Case 2:26-cv-05242-GVW-SSC Document 14-3 Filed 05/14/26 Page 856 of 1123 Page
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 87 of 102 Page ID #:180
ID #:6988

1.  Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2.  Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3.  Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B.  Documentation for P&M Recommendations

1.  Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

    a.  What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

    b.  The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

c. The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

2. In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3. In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C. Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10. **Valves and O&M**

A. Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B. Within two years of entry of the CD, Plains shall develop and implement procedures to:

1. If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2. Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3. Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4. Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C. Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 858 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 89 of 102   Page ID #:182
ID #:6990

D.     For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

  1.     Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room.  Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.     Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.   **Leak Detection**

A.     Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

  1.     Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.     For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.     Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

  1.     Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.     Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

  1.     Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E. Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F. Instrumentation and Display

1. To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a. Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b. Track these conditions through to resolution, including instrumentation relocation when necessary.

12. **Control Room Management**

A. For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1. Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2. Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3. Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4. Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

B.  For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.  Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.  **Emergency Response and Oil Spill Response Plans**

A.  California-Specific Provisions:

1.  Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05.  Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.  Company-Wide Provisions

1.  Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.  Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response.  Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.  Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

-86-

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **Safety Management System (SMS)**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B.      Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.      **Drug and Alcohol Program**

A.      Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 863 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 94 of 102   Page ID #:187
ID #:6995

# APPENDIX C

# (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 864 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 95 of 102   Page ID #:185
ID #:6996

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

Case 2:26-cv-05242-GW-SSC   Document 14-3   Filed 05/14/26   Page 865 of 1123   Page
Case 2:20-cv-02415-W   Document 6-1   Filed 03/13/20   Page 96 of 102   Page ID #:185
ID #:6997

## <u>APPENDIX D</u>

1.      All outstanding corrective actions in PHMSA's closed Corrective
Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into
this Consent Decree, as outlined below, and subject to the sole regulatory oversight
of the OSFM.

    a. **Line 901 Shutdown.** Plains shall not operate Line 901 until
authorized to do so by the OSFM.

    b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901,
Plains shall develop and submit, at least 60 days in advance of a
scheduled restart, a written Restart Plan for Line 901 to the
OSFM for review and approval. Once approved by the OSFM,
the Restart Plan shall be incorporated by reference into this
Consent Decree. The Restart Plan shall include:

      1)      Documentation of the completion of all mandated
actions, and a management of change plan to ensure that all
procedural modifications are incorporated into Plains'
operations and maintenance procedures manual;

      2)      Provisions for adequate patrolling of Line 901 during the
restart process and shall include incremental pressure increases
during start-up, with each increment to be held for at least two
hours;

      3)      Sufficient surveillance of the pipeline during each
pressure increment to ensure that no leaks are present when
operation of the line resumes;

      4)      A specific day-light restart that includes advance
communications with local emergency response officials;

      5)      Master Control Room enhancements, including:

        a) Implementation of advanced leak-detection

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1.  Revised alarm threshold adjustments;

2.  Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b)  Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running.  Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c)  Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d)  Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e)  Development and implementation of training associated with the emergency shutdown programming described above; and

f)  Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

Case 2:20-cv-02415-VW-SSC   Document 6-1   Filed 03/15/20   Page 100 of 102   Page ID #:193

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)      Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)      Provisions for a daylight restart and advance communications with local emergency response officials.

g.  **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h.  **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)      The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)       The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)       The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)       Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:26-cv-05242-SVW-SSC   Document 14-1   Filed 05/14/26   Page 871 of 1123   Page
Case 2:20-cv-02415   Document 6-1   Filed 03/15/20   Page 102 of 102   Page ID #:195
ID #:7003

3)      The Appendix D Documentation Report shall include but not be limited to:

A.   Table of Contents;

B.   [*intentionally left blank.*]

C.   [*intentionally left blank.*]

D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

E.   [*intentionally left blank.*]

F.   [*intentionally left blank.*]

G.   Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT 2



**Planning and Development**
Lisa Plowman, Director
Jeff Wilson, Assistant Director
Elise Dale, Assistant Director

February 12, 2025

Mr. Steve Rusch
Sable Offshore Corporation/Pacific Pipeline Corporation
12000 Calle Real
Goleta, CA 93117

*Sent via email:* srusch@sableoffshore.com

SUBJECT:    Zoning Clearance Applications - 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096

Mr. Rusch,

On November 22, 2024 and December 6, 2024, Santa Barbara County Planning and Development received four Zoning Clearance applications for pipeline "anomaly repair work" to Lines 324 and 325a. These applications stated that they sought to permit anomaly repair work in the enclosed descriptions of work for case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096. Sable's position is that the Zoning Clearance process meets the requirements of the County's Local Coastal Program because it is a means for the County to determine if the activities fall within an existing Coastal Development Permit or if a new Coastal Development Permit is required.

The County conducted a detailed review of pipeline permitting history and the Coastal Zoning Ordinance. Planning and Development concludes that this pipeline anomaly repair work is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement (EIR/EIS). The County previously exercised its authority under its Local Coastal Program and delegated Coastal Act authority in approving the permits and the requested anomaly repair work is within the scope of those approved permits. (Pub. Resources Code § 30519.) The County's assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits. Planning and Development will be returning the Zoning Clearance applications to Sable without taking action on them. Alternatively, Sable can choose to withdraw the applications.

This conclusion is related to the requested pipeline anomaly repair work in case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096 and the information supplied with those applications and does not speak to permitting or jurisdiction on any other past or future work on or changes to the Pipeline and associated equipment.

This is not a: 1) permit exemption; 2) Director determination on the meaning or applicability of the provisions of the Coastal Zoning Ordinance; 3) decision on an application for a Coastal Development Permit; or 4) any other ground set forth in Article II Section 35-182. Rather, this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS. Thus, no further application to or action by the County is required. This conclusion is not appealable to the Planning Commission, Board of Supervisors, or Coastal Commission and it does not require a Notice of Final Action. (Article II §§ 35-182; 35-181.4.)

Planning and Development encourages and requests that Sable continue to provide information to the County about any future anomaly repair work consistent with what was supplied in the above-referenced application. Such information will allow the County to evaluate whether particular anomaly repair work results in any different conclusions than those set forth in this letter. That information can be directed to my attention.

Sincerely,

Errin Briggs
Deputy Director, Energy, Minerals, Compliance & Cannabis Division

Enclosures:    24ZCI-00090 Description of Work
               24ZCI-00091 Description of Work
               24ZCI-00095 Description of Work
               24ZCI-00096 Description of Work

CC:            Mickey Johnson, ExxonMobil Upstream Company, via email
               mickey.d.johnson@exxonmobil.com

Sable – Anomaly Repair Work Zoning Clearance Applications

24ZCl-00090 + 91

## Zoning Clearance Applications for
## CA-324 Pipeline Routine Anomaly Repair Work – Description of Work

### Scope of Work

In order to repair an anomaly, Sable must undertake the following steps:  (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

Sable previously commenced the Anomaly Repair Work in compliance with Sable's obligation under federal regulations to take "prompt action" to address pipeline anomalies. (See 49 C.F.R., § 195.452, subd. (h)(1).)  On September 27, 2024, the California Coastal Commission issued Sable Notice of Violation V-9-24-0152 ("NOV") and required Sable to immediately stop all Anomaly Repair Work.  In accordance with the NOV, Sable stopped undertaking the Anomaly Repair Work.  On November 12, 2024, Commission staff issued Executive Director Cease and Desist Order No. ED-24-CD-02 ("EDCDO"), which required Sable to submit an Interim Restoration Plan to secure and backfill the open anomaly sites without completing the Anomaly Repair Work.  Commission staff approved Sable's proposed Interim Restoration Plan on November 20, 2024 with respect to the remedial grading and BMP segment of the Interim Restoration Plan.  As of November 21, 2024, Sable and Commission staff were continuing to coordinate regarding the hydroseeding segment of the plan.  Consistent with the Interim Restoration Plan, each anomaly site will be backfilled and restored to original grade without completing the Anomaly Repair Work.

As such, Sable's Zoning Clearance applications seek *both*:

1. After-the-fact Zoning Clearances for the Anomaly Repair Work previously undertaken at each anomaly site identified in the applications; and
2. Zoning Clearances to complete the Anomaly Repair Work at each such anomaly site in the future (including by excavating the anomaly site again after it is backfilled and restored in compliance with the EDCDO and Interim Restoration Plan).

---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.

[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.

## Location

45 anomaly sites require Anomaly Repair Work.  As discussed above, these sites are located along existing pipeline CA-324 in APNs 081-140-019, 081-140-025, 081-150-002, 081-150-006, 081-150-007, 081-150-028, 081-150-032, 081-150-033, and 081-230-021.  Table 1 details each anomaly site.  Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
| --- | --- |
| | Application #1 |
| | Application #2 |





The proposed work would utilize the existing roads to access each site. No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements. All material will be balanced onsite, and no material will be imported or exported. Shoring boards will be utilized to stabilize the excavation walls prior to entry. Equipment needed to complete the Anomaly Repair Work includes the following:

- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)
- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

## Fire Protection

If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of

water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

**Construction Best Management Practices**

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

**Conclusion**

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325 in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

Sable – Anomaly Repair Work Zoning Clearance Applications

24 ZC1-00095 ; 96

# Zoning Clearance Applications for
# CA-324 and CA-325A Pipeline Routine Anomaly Repair Work – Description of Work

## Scope of Work

In order to repair an anomaly, Sable must undertake the following steps: (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

## Location

28 anomaly sites require Anomaly Repair Work. As discussed above, these sites are located along existing pipeline CA-324 and CA-325A in APNs 081-130-068, 081-140-023, 081-150-002, 081-150-028, 081-150-032, 081-270-011, 083-590-003, 083-650-008, 083-650-009, and 083-650-011. Table 1 details each anomaly site. Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
|---|---|
| | Application #1 |
| | Application #2 |



---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.

[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.



The proposed work would utilize the existing roads to access each site. No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements. All material will be balanced onsite, and no material will be imported or exported. Shoring boards will be utilized to stabilize the excavation walls prior to entry. Equipment needed to complete the Anomaly Repair Work includes the following:

- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)

---

[3] F-9 is associated with two anomaly numbers from separate investigatory tool runs but is associated with one anomaly.

- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

## Fire Protection

If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

## Construction Best Management Practices

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

## Conclusion

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325A in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

## PROOF OF SERVICE

I, Heather Thai, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 S. Grand Avenue, 51st Floor, Los Angeles, California 90071.

On July 8, 2025, I served the document **REAL PARTIES' REQUEST FOR JUDICIAL NOTICE IN SUPPORT MOTION TO STRIKE CERTAIN REQUESTS FOR RELIEF IN PLAINTIFFS' VERIFIED PETITION; DECLARATION OF JEFFREY D. DINTZER** on the interested parties in this action addressed as follows:  **See Attached Service List**

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 8, 2025, at Los Angeles, California.

/s/ *Heather Thai*
———————————————
Heather Thai

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and<br>WISHTOYO FOUNDATION<br><br>Tel.:   (510) 844-7100<br>Fax:   (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>          tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:   (510) 844-7100<br>Fax:   (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>          jfrankel@environmentaldefensecenter.org<br>          trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/<br>DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:   (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:   (310) 620-5879<br>Email: djmoore@paulhastings.com<br>          benjaminhanelin@paulhastings.com<br>          natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:   (805) 966-7000<br>Email: TLarge@FLASllp.com |

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

<div align="right">

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

</div>

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>       Petitioners and Plaintiffs,<br><br>   v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>       Respondents and Defendants,<br><br>   and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>       Real Parties in Interest. | Case No. 25CV02247<br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br>**DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES' MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ**<br><br>[*Filed concurrently with Notice of Motion and Motion to Strike Declaration of Richard B. Kuprewicz; [Proposed] Order*]<br><br>Date:      July 18, 2025<br>Time:     10:00 AM<br>Dept.:     4<br><br>Complaint Filed:    April 15, 2025<br>Trial Date:      None Set |

<div align="center">

1

DECLARATION OF MICHAEL J. ROSENFELD

</div>

## Table of Contents

I.    Introduction ............................................................................................................. 3

II.   Conclusions ............................................................................................................ 4

III.  Review and Interpretation of the Kuprewicz Declaration ............................................. 5

  A.    Declaration Review Process   5

  B.    Mr. Kuprewicz's Technical Issues and Opinions        5

    1.    Kuprewicz Technical Issues in Paragraph 8 ................................................. 5
    2.    Kuprewicz Opinions in Paragraph 10 ........................................................ 8

  C.    Positions Stated in Kuprewicz's Declaration Exhibit B        13

    1.    Section V. TIMP Regulations Are Not Working........................................ 14
    2.    Section VI. The Greatest Threat … Is From External Corrosion ............................. 18
    3.    Section VII. High Pipeline Operating Temperatures Accelerate All Forms of Corrosion ....... 18
    4.    Section VIII. The CD Fails to Required Adequate IM Processes to Prevent Another Rupture 19
    5.    Section IX. The Pipelines Cannot Be Made as Safe as New Pipelines ................................... 19
    6.    Section X. Conclusion ................................................................ 19

  D.    Positions Stated in Kuprewicz's Declaration Exhibit C        20

IV.  Exhibits .............................................................................................................. 20

DECLARATION OF MICHAEL J. ROSENFELD

## DECLARATION OF MICHAEL J. ROSENFELD

I, Michael J. Rosenfeld, declare as follows:

1.      My name is Michael J. Rosenfeld and I am a mechanical engineer.  I have been engaged by Alston & Bird LLP, counsel to Sable Offshore Corp. (Sable) and Pacific Pipeline Company,[1] to provide my expert opinions as to the Declaration of Richard Kuprewicz submitted to the Superior Court of the State of California, County of Santa Barbara, in the matter of Case Nos. 25CV02244 and 25CV02247. Below, I provide my qualifications to provide these expert opinions.  I have personal knowledge of the matters set forth in this Declaration, and if called as a witness, I could and would testify competently thereto.

### I.   Introduction

2.      The purpose of this report is to critically review and interpret the Declaration of Richard Kuprewicz submitted to the Superior Court of the State of California, County of Santa Barbara, in the matter of Case Nos. 25CV02244 and 25CV02247.  These cases concern the return to service of Lines 324 and 325A/B of the Las Flores Pipeline System, operated by Sable Offshore (Sable) and Pacific Pipeline Company (PPC).  I was asked to perform this review and prepare this report by Alston & Bird, LLP on behalf of Sable and PPC.

3.      I am qualified to give my professional opinion in this matter by education and experience. My current position is Chief Engineer at RSI Pipeline Solutions, LLC, a pipeline engineering consulting firm.  I am a mechanical engineer by training receiving a Bachelor of Science in Engineering from the University of Michigan in 1979, and Master of Science in Engineering from Carnegie-Mellon University in 1981.  I have been involved with petroleum and natural gas pipelines since the late 1980s.  My experience includes performing numerous metallurgical failure analyses having direct causes including but not limited to pipe seam defects, girth weld defects, corrosion of various types, stress-corrosion cracking, hydrogen assisted cracking, fatigue cracking due to the effects of cyclic pressure or vibration, and excessive loading due to geohazards.  I have also performed numerous root cause failure investigations

---

[1] Pacific Pipeline Company (PPC) is a wholly owned subsidiary of Sable Offshore Corp.  For the purpose of this declaration, references to Sable or PPC as owner/operator of the pipeline system have the same meaning and may be used interchangeably.

DECLARATION OF MICHAEL J. ROSENFELD

in which various management gaps such as inadequate specifications or procedural errors were causal. My experience also includes analysis of pipeline stresses, evaluation of pipeline fitness for service, analysis of in-line inspection (ILI) data, development of technical procedures and integrity management plans, regulatory compliance, and training in codes and standards. I have also been principal investigator in several research projects funded by pipeline interest groups including PHMSA, ASME, API, and GRI. I also have held executive positions in pipeline safety standards development committees. A true and correct copy of my curriculum vitae is attached hereto as **Exhibit A**.

**II.  Conclusions**

4.       As will be demonstrated in the sections that follow, Mr. Kuprewicz fails to take into account:

    a)       Known facts about the 2015 Line 901 incident;

    b)       Known contributing factors and deficiencies related to the operation and integrity management of the former Line 901 under the previous owner and operator of the facility;

    c)       Requirements of the Corrective Action Order (CAO) and Consent Decree (CD) issued by the Pipeline and Hazardous Materials Safety Administration and additional requirements imposed by the Office of the State Fire Marshall (OSFM) that correct the operational and integrity management deficiencies that were causal or contributed to the 2015 incident; and

    d)       Other known facts that are contrary to the positions stated in Mr. Kuprewicz's opinions.

5.       By not accounting for these important facts Mr. Kuprewicz has set forth positions that are unfounded. To the extent that opinions were made without relevant information, they are uninformed and speculative. To the extent that relevant facts were knowable from information available to anyone in the public domain but were not considered or accounted for, his opinions were not based on evaluation performed to a reasonable standard of engineering practice. To the extent that such facts were known by him and deliberately omitted, or positions were stated to the contrary, Mr. Kuprewicz's opinions are biased or deceptive.

DECLARATION OF MICHAEL J. ROSENFELD

6.      Mr. Kuprewicz concludes in Paragraph 11 of his Declaration that the Las Flores Pipeline System is not safe to operate even if it meets the OSFM state waivers.  He also states in Section X of his Exhibit B that the Las Flores Pipeline System is unusually dangerous due to its age and design flaws.  These are pejorative statements built on an aggregation of claims made without supporting data, and which should be disregarded as nonfactual and noncredible.  He has provided no data, scientific or engineering analysis, or factual evidence that supports these opinions.

## III. Review and Interpretation of the Kuprewicz Declaration

### A.      Declaration Review Process

7.      This review steps through the Declaration prepared by Mr. Richard Kuprewicz and supporting Appendices point by point.  His positions are interpreted and critically evaluated to assess whether they are based on fact and science.

8.      Documents that I have reviewed and relied on in addition to Mr. Kuprewicz's Declaration are listed in the references attached hereto (See Section IV Below).

### B.      Mr. Kuprewicz's Technical Issues and Opinions

#### 1.      Kuprewicz Technical Issues in Paragraph 8

9.      Mr. Kuprewicz identified five technical issues with the proposed restart of the San Flores Pipelines in Paragraph 8 of his Declaration.  They are repeated here verbatim:

a.  The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective.

b.  Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines.

c.  The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation.

d.  Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure.

e.  The poorly designed Pipelines cannot be made as safe as new pipelines.

DECLARATION OF MICHAEL J. ROSENFELD

### a.    Technical Issue (a)

10.    Mr. Kuprewicz reports that the electrical insulating nature of the thermal insulation and polyethylene tape outer wrap defeats the effectiveness of the cathodic protection (CP) system that is required by pipeline safety regulations.  This is correct, although Sable recoated repairs made during field investigations with a non-shielding coating system, so the technical issue does not apply there.  Mr. Kuprewicz did not note that the Las Flores Pipelines are not the only pipelines in the US that have shielded CP in portions of their systems.  Many thousands of miles of pipelines are also shielded from effective CP due to installation of popular external coating types (mainly polyethylene tape and extruded polyethylene) that electrically insulate the pipe from CP electrical current much as with Las Flores.  The effectiveness of CP in thousands of miles of other pipelines can be reduced or impaired for a variety of other reasons unrelated to the type of coating such as:  inadequate design, inadequate maintenance, external electrical interference from foreign pipelines or high-voltage AC power lines, shorting due to contact between the pipe and road crossing casings, or the pipeline being installed in high-resistivity soils (dry, sandy or rocky, sloped, well-drained).  CP is one of several barriers against corrosion but it is a porous barrier even where it might be expected to be effective.  It is not a panacea for corrosion protection; there are several other mitigation tools that pipeline operators use to assess internal and external corrosion so that timely repairs can be affected long before any leaks occur.  Performing ILI frequently enough to indicate and size corrosion is an important alternative risk mitigation and barrier against corrosion failure in areas of a pipeline where CP may be ineffective.

### b.    Technical issue (b)

11.    Mr. Kuprewicz reports that the ILI technologies to be used in Lines 324 and 325A/B are inadequate to detect all forms of corrosion most likely (emphasis added) to be present on the pipelines.  First, he does not state what undetectable forms of corrosion are most likely to be present.  Second, he has not considered the multiple ILI technologies specified by the OSFM state waiver that significantly enhance Sable's ability to detect virtually any type of corrosion over the single ILI technology (magnetic flux leakage, or MFL) used by the previous operator Plains.  One important technology addition is the use of ultrasonic (UT) wall thickness measurement.  Unlike MFL, UT thickness measurement is a direct physical measurement that is less affected by rate of wall change and is unaffected by the presence of

6

DECLARATION OF MICHAEL J. ROSENFELD

magnetic corrosion product.  A second ILI technology to be used is the transverse-field MFL (also called circumferential MFL or MFL-C), specifically designed and configured to detect selective seam weld corrosion (SSWC) in the ERW seams (although, as will be discussed later, there is a low probability of SSWC in Line 324), as well as narrow axial external corrosion if it is present in Line 325A/B.  A third ILI technology is UT crack detection, which is capable of detecting stress-corrosion cracking (SCC) colonies, although as will be discussed later there is a low probability of SCC being present.  Industry experience has been that multiple tool technologies significantly increases the probability of detection of many conditions of interest in the pipeline. [Ref: Thompson, et al; Harris]

12.    Corrosion management is about more than ILI detection, since detection capabilities are generally good even when an ILI tool is performing sub-optimally.  Three other important enhancements specified by the OSFM state waiver, that Mr. Kuprewicz fails to account for in an apparent attempt to bias the reader of his statement, are the frequency of ILI inspections, the required ILI field validation, and run-to-run comparisons to identify changes and rates of change in the condition of the pipeline.  Notably, Sable will be required to run each ILI tool type *twice per year in the first two years and annually thereafter*.  This is far more often than almost any other pipeline in the US.  *The current regulations call for ILI surveillance to take place once every five years.*  The frequent ILI will give Sable multiple opportunities to assess the tool performance, work with the ILI vendor to regrade the results based on field findings, and multiple chances to understand the condition of the pipeline before serious corrosion can occur.  The previous operator's practices in these areas were not anywhere nearly as robust.

### c.    Technical issue (c)

13.    Mr. Kuprewicz is concerned about the elevated operating temperature of the pipeline causing high corrosion rates.  This is a well-known phenomenon.  Mr. Kuprewicz has not considered the frequent ILI and corrosion growth rate assessments required by the OSFM state waiver will make it possible to become aware of corrosion rates and corrosion growth often enough to respond with repairs on a timely basis.

### d.    Technical issue (d)

14.    Mr. Kuprewicz states that segments at risk of environmental cracking are at the highest risk of failure.  He is referring to SCC and apparently SSWC.  As will be discussed later, these are the

DECLARATION OF MICHAEL J. ROSENFELD

least likely forms of degradation to affect the pipelines. The 2015 failure was not due to environmental cracking, no environmental cracks were observed in the investigation of that failure, and ILI tools capable of detecting these conditions will be used on a much more aggressive schedule in the future by Sable. Mr. Kuprewicz is opining about occurrences of environmental cracking that are not and have never been identified or found by any inspection or report, as reflected in the publicly available materials relative to the 2015 failure. This is an effort to fabricate facts concerning the integrity of the Pipeline which Mr. Kuprewicz knows are baseless.

### e.    Technical issue (e)

15.    Mr. Kuprewicz asserts that the pipelines cannot be made as safe as a new pipeline. He provides no technical information to back this statement. The pipelines have been pressure tested to prove strength and frequently inspected using various technologies to monitor their condition. All new pipelines become old pipelines, the question is how those pipelines are monitored and maintained. Here the monitoring and maintenance program required by the regulators and the Consent Decree are state of the art. Again Mr. Kuprewicz's statement with respect to the need for a new pipeline is without any foundation or justification.

### 2.    Kuprewicz Opinions in Paragraph 10

16.    Mr. Kuprewicz expressed five opinions in Paragraph 10 of his Declaration. They are repeated verbatim as follows:

a)    The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them.

b)    The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, Maximum Operating Pressure ("MOP") hydrotests are not adequate to test for crack forming potential on the Pipelines.

c)    The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes.

8

DECLARATION OF MICHAEL J. ROSENFELD

It is unclear, however, whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B.

d)    A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines.

e)    The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate.

### a.    Opinion (a)

17.    There are multiple components of this opinion to examine. The first is that Mr. Kuprewicz states a logical inconsistency: that "because ILI tools can miss a lot of cracks", reliance on ILI to find corrosion is misplaced.  This is illogical because crack detection tools and corrosion detection tools are not the same tools and use different technologies.  Corrosion tools indeed will "miss a lot of cracks" because they are not designed to detect cracks – ultrasonic crack detection tools specified for use by the OSFM in the state waiver are the appropriate tools for crack detection. ILI tools targeting corrosion on the other hand, specifically the magnetic and ultrasonic metal loss tools specified in the state waiver, are designed to detect corrosion and are effective for that purpose.  Informed pipeline operators understand these differences and select the tool type(s) appropriate for the condition(s) they must manage.  The OSFM state waiver specifies that magnetic and ultrasonic metal loss tools, and ultrasonic crack detection, tools be used.  Neither of the ultrasonic technologies were used by the prior operator. The state waiver introduces significant additional diversity to the inspection capabilities.  Industry experience has been that using multiple tool technologies and integrating the ILI data significantly improves the probability of detecting, characterizing, and sizing features of interest in the pipeline.

DECLARATION OF MICHAEL J. ROSENFELD

18.     The second is Mr. Kuprewicz states that multiple forms of corrosion are present on the pipeline(s) but does not describe the different forms of corrosion he claims are present.  The Line 901 failure analysis [Ref: DNV-GL, Appendix M to PHMSA FIR] and PHMSA's incident investigation [Ref: PHMSA FIR] did not identify different forms of corrosion contributing to the failure, nor differing forms of corrosion being present on other parts of the pipeline.  Mr. Kuprewicz has not reviewed the results of field digs to investigate corrosion analysis already performed by Sable, in response to ILI, to determine what different types of corrosion are present.  His statement is entirely speculative without reviewing any factual data.

19.     The third point is that Mr. Kuprewicz states that ILI is inadequate to detect some forms of corrosion though he does not state what those undetectable forms of corrosion are.  All ILI tools have lower thresholds of detectable flaw size; detection and sizing performance differ with the size and orientation of the flaws.  Taken together, the different tool technologies to be used by Sable are capable of detecting various forms of corrosion if they are present and of detectable size, including pitting corrosion, general corrosion, corrosion along or adjacent to seams, narrow axially aligned corrosion, and other forms of corrosion.  Furthermore, tool performance improves with large pipe such as Lines 324 and 325 because more sensors and supporting components can be fitted in the larger circumference, and defects of concern are proportionally larger and easier to detect, compared with small pipe sizes. [Ref: Nestleroth & Rosenfeld]

### b.     Opinion (b)

20.     Mr. Kuprewicz states that the hydrotests are insufficient to address certain types of corrosion but does not state which types of corrosion are at issue. To identify all potential corrosion leaks, Sable has been required by the OSFM state waiver to significantly enhance its computational leak detection technology, an area in which the prior operator was grossly deficient.  The frequency of inspections specified by the OSFM state waiver will give multiple opportunities to identify such features versus the prior operator.

21.     Mr. Kuprewicz also states that the MOP hydrotests are not adequate to test for crack forming potential.  He seems confused about the purpose of the hydrostatic pressure tests, which is to demonstrate that no defects, whether corrosion, cracks (of any type), or other degradation is present and

DECLARATION OF MICHAEL J. ROSENFELD

having a severity significant enough to threaten the safe operation *at the time of the test,* which holds the pressure at 1.5 X MOP for a period of fifteen minutes, followed by an eight hour test at 1.25 X MOP. In other words, the purpose is to demonstrate the current condition of the pipeline is safe with a known factor of safety. Mr. Kuprewicz does not demonstrate by any rational engineering analysis why the pressure tests performed are inadequate for a plausible postulated crack growth scenario.

### c.    Opinion (c)

22.    Mr. Kuprewicz makes several statements in his Opinion (c) that merit examination. Firstly, he states that the State Waivers do not assure adequate spike hydrotesting (in Line 324), which he describes as "a method to address various forms of crack forming potential". Mr. Kuprewicz seems confused about the purpose of the spike hydrostatic test. It is a technique for mitigating stress corrosion cracking (SCC) or manufacturing defects in certain older vintage seam types having low ductility, where effective ILI for cracks is unavailable (which was the case in 1979 when the spike test concept was first proposed). [Ref: Baker Engineering & Kiefner & Assoc., TTO-6; Rosenfeld]. The test concept presumes that unknown cracks are present and recognizes that holding a crack at the near-failure point could cause damage during the test leading to failure even if the crack is not a threat at the operating pressure. The spike test is conducted by taking the pipeline to a very high pressure for a short period of time (just a few minutes is sufficient) to force any significant cracks to fail while minimizing subcritical crack growth in those that do not fail, then lowering pressure to no more than 90% of the high level to avoid further damage to surviving cracks and holding at the reduced pressure to confirm a lack of leaks. The test has nothing to do with the potential to form cracks – if conditions are favorable to cracks forming, they could form just as easily after the hydrotest is completed. Since crack detection ILI has been and will be performed, a spike test is really unnecessary. The ILI will be more sensitive than the pressure test. However, OSFM has made the spike test a condition of its state waiver for Line 324 out of an abundance of caution as the responsible regulatory authority, which is their public duty and prerogative.

23.    Related to the above point, Mr. Kuprewicz states that the spike hydrostatic test is too low for "corrosion cracking screening and evaluation". Presumably by "corrosion cracking", which is not an industry-standard term, he is referring to stress-corrosion cracking (SCC). Even though SCC cracking was not identified in the course of the Line 901 failure investigation, consistent with the PHMSA Advisory

DECLARATION OF MICHAEL J. ROSENFELD

Bulletin the OSFM has required an ultrasonic crack detection ILI and transverse field magnetic ILI, which together or individually can indicate the presence of SCC large enough to pose a future threat. The spike hydrostatic test to 1.5X MOP is adequate to prove the current integrity of the pipeline with a factor of safety of 1.5, and demonstrate that significant SCC that is a current threat at the MOP is not present. If less significant SCC is present, it will not be revealed by the test, though it can be expected to be revealed by the crack detection ILI.

24. Mr. Kuprewicz notes that due to elevation changes along the route, the pipeline must be pressure tested in multiple test segments. Had Mr. Kuprewicz reviewed the hydrotest plans he would have noted that the hydrotest of the pipelines was broken up into eight different segments to conform to the elevation changes associated with the pipeline. This is a common aspect for any and all pipelines installed in anything but flat terrain and must be accounted for in the test plan. It can increase testing cost, but it is not unique to the Las Flores Valley Pipeline System, pipeline engineers understand how to test in hilly terrain, and it is not a reason to object to the testing.

25. He also states that it is unclear whether the testing is adequate for Line 325A due to his lack of data. In that case, Mr. Kuprewicz is speculating and has no basis in fact for objecting.

**d.    Opinion (d)**

26. Mr. Kuprewicz states that a key corrosion tracking process is missing from OSFM's state waiver for identifying corrosion "hot spots". He does not describe the corrosion tracking process that is missing, nor does he define "hot spot" though presumably he means it as a localized area of corrosion having a growth rate that is greater by a vague, undefined amount than is typical of other parts of the pipeline. The OSFM state waiver requires aggressive ILI run frequencies and dig response criteria in order to produce a robust corrosion tracking process. ILI for corrosion must be performed twice annually the first 2 years and annually thereafter, which is far more frequently than every 5 years practiced with most pipelines. ILI for cracks must be performed annually, which is also far more frequent than the 5 year interval practiced with most other pipelines. Metal loss of 40% of the wall thickness or more, accounting for tool performance, must be investigated within 6 months. This is also unusually stringent and accounts for potential growth during the interval between running ILI and responding in the field. OSFM also requires a procedure for estimating corrosion growth rates from comparisons of multiple ILI runs and for

12

DECLARATION OF MICHAEL J. ROSENFELD

making projections for when each corrosion feature will attain a depth of concern.  As the regulatory authority, the OSFM will have the right to review all such information at any time and perform its own analysis.  OSFM's conditions appear to be designed to make it highly unlikely that a corrosion "hot spot" will go unnoticed for long.

### e. Opinion (e)

27. Mr. Kuprewicz objects that the OSFM state waiver will not provide the same level of safety as a pipeline with effective cathodic protection (CP), due to the characteristics of the coating system.  The OSFM has taken this into consideration — performing ILI frequently enough to indicate and size corrosion is an important alternative risk mitigation and barrier against corrosion failure where CP will be ineffective.  Mr. Kuprewicz provides no risk assessment showing that frequent ILI cannot offset risk due to ineffective CP.

28. Moreover, Mr. Kuprewicz provides no risk analysis accounting for the numerous improvements and upgrades to the facility and operating practices that demonstrates that the pipeline will be inadequately safe.  The OSFM, as a regulatory agency having responsibility in risk-critical subject areas, understands risk analysis and applies risk models to its decisions. Moreover, OSFM has performed extensive fact-based analysis of the pipelines at issue and has personally inspected the repairs and upgrades to the pipelines in conformance with the state waivers.

29. Mr. Kuprewicz also objects that due to the elevated operating temperatures, corrosion rates will be "seriously increased".  This was observed to be the case with the former Line 901 failure.  It is an understood phenomenon and is not unique to the Las Flores Pipeline system.  Other heated oil pipelines are operated in the US.  The OSFM requires measures be in place to ensure the pipelines are operated safely under these conditions.  The fact that the previous operator applied inadequate methods to estimate corrosion rates does not mean that it cannot be done.  In fact, pipeline operators do this often, and the OSFM state waiver requires a process to do that, accounting for tool performance and measurement uncertainty.

### C. Positions Stated in Kuprewicz's Declaration Exhibit B

30. Mr. Kuprewicz supplements his five technical concerns in Paragraph 8 and five main opinions in Paragraph 10 with additional statements in his Declaration and Exhibits B and C.  These will

<div align="center">13</div>

<div align="center">DECLARATION OF MICHAEL J. ROSENFELD</div>

also be critically examined.  The following discussion refers to Sections V though X from his Exhibit B "Evaluation of Las Flores Pipeline System Startup Proposal", Dec. 20, 2024.

### 1.    Section V. TIMP Regulations Are Not Working

### a.    Inadequacy of TIMP Regulations

31.    Mr. Kuprewicz states that transmission integrity management planning (TIMP) regulations are not working to protect the public.  This is demonstrably false.  PHMSA's own data available to anyone with an internet connection [Ref: www.phmsa.dot.gov] shows that TIMP along with improved technology and operator focus is gradually reducing the running average incident metrics for hazardous liquid pipelines over the past 20 years:

| Reference period | Avg. Annual Incident Count | Avg. Annual Barrels Spilled | Avg. Annual Barrels Lost |
|---|---|---|---|
| 3-yr Avg (2022-2024) | 294 | 63,300 | 32,618 |
| 5-yr Avg (2020-2024) | 312 | 81,959 | 48,946 |
| 10-yr Avg (2015-2024) | 364 | 85,502 | 51,394 |
| 20-yr Avg (2005-2024) | 367 | 89,261 | 51,450 |

32.    It should be noted that approximately 80% of the reported incidents occurred within facilities such as pump stations, terminals, and tankage farms, rather than on the pipeline right-of-way, with valves and equipment being the largest component.  Those causes are not managed by a TIMP program.  Essentially, Mr. Kuprewicz's complaint is with PHMSA, not Sable, and his complaint is understood as TIMP not reducing incidents enough to suit him personally.  Mr. Kuprewicz also seems to be confusing regulatory compliance with actual safety, a common thought bias.

33.    Mr. Kuprewicz states "pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity."  This statement is biased and misleading in that it gives a very incomplete picture of the TIMP process.  TIMP is a structured approach to managing pipeline risk, consisting broadly of the following steps: 1) analyze and integrate data about the pipeline including design and operating history; 2) identify integrity threats; 3) perform risk assessment to determine consequences of failure and identify high risk locations; 4) perform an assessment of the condition of the pipeline (this is the only TIMP process step Mr. Kuprewicz acknowledges) with

14

DECLARATION OF MICHAEL J. ROSENFELD

respect to the integrity threats, prioritized by risk in accordance with the risk assessment; 4) respond to the condition assessment results with repairs prioritized by severity and location-based risk; 5) develop preventive and mitigative measures consisting of facility and procedural improvements to avoid or prevent occurrence of threats throughout the system; and 6) evaluate performance against the plan commitments, verify that risk is reduced, and identify process improvements. [Ref: API RP 1160]  The process is continually repeated.  TIMP is a complex process; not all elements work perfectly and not all operators perform equivalently, but that does not mean the process is unable to lower risk.

### b.    Hydrostatic Testing Assessments

34.    Mr. Kuprewicz states "For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats *that likely exist* (emphasis added) along the Las Flores Pipeline System—a subpart E hydrotest is inadequate."  This statement is incorrect on several levels.

35.    To state that something could exist, or even is likely to exist, does not mean that it has existed, does now exist, or will exist.  As will be discussed below, Mr. Kuprewicz fails to account for known factual information to support his assertion that certain conditions are likely.  In my opinion, they are unlikely.

36.    Firstly, "selective seam cracking (SSC)" is not a generally recognized condition.  Based on my subject matter knowledge, I believe that Mr. Kuprewicz is referring to "selective seam weld corrosion" (SSWC), a condition that can affect older varieties of pipe manufactured with electric resistance welded (ERW) seams or flash welded (FW) seams.  Line 324 is modern ERW seam pipe.  Extensive testing and research over the years has concluded that susceptibility to SSWC is influenced by composition of the pipe steel and other factors associated with pipe manufactured prior to 1985, the two most significant influences being carbon content greater than 0.10% and sulfur content greater than 0.007%.  According to the metallurgical failure analysis of the Line 901 failure [Ref: DNV-GL] published with PHMSA's public failure investigation report, the composition of the steel in the failure pipe and upstream and downstream pipes exhibited carbon content of 0.078-0.083% and sulfur content of 0.007%. [Ref: McMahon, et al]  The subject pipe was manufactured in 1986.  Thus susceptibility to SSWC should be very low, and in fact no SSWC was observe in the Line 901 failure investigation.  In the *unlikely* event

that SSWC was to occur, the transverse field magnetic ILI tool used by Sable, as required by the OSFM state waiver, was developed to detect SSWC.

37.    Secondly, Mr. Kuprewicz considers SCC to be *likely*.  SCC requires specific stress and environmental condition.  SCC in pipelines has two forms: near-neutral-pH (NNpH) or high-pH (HPH), with differing necessary environments. [Ref: NEB Inquiry]  NNpH SCC requires shielding from CP and anaerobic conditions.  Although the CP-shielding conditions exist, evidently conditions were only intermittently anaerobic or favorable to NNpH SCC, resulting instead in pitting metal loss.  Applied stress is also a promoting factor.  While there is no theoretical lower stress at which SCC cannot occur, it is rarely observed at applied stresses below 50% Specified Minimum Yield Strength ("SMYS") absent other sources of stress such as external forces or residual stress.  At the pipeline MOP of 1,003 psig, the hoop stress is 54% of SMYS.  However, normal operating pressure is in the range of 250 to 600 psig, resulting in prevalent stress levels of 15-33% SMYS.  At such stress levels, the driving force for SCC is weak, cracking colonies will be sparse, crack growth rates will be low, and the condition is more likely to go dormant or be overtaken by pitting during intermittent periods that are environmentally not conducive to SCC.  Thus NNpH severe enough to threaten the pipeline is *unlikely*.  HpH SCC has differing environmental conditions from the NNpH type.  While temperatures above 100 deg F are favorable to HpH SCC, the condition only develops within a narrow range of cathodic potentials indicative of partially impaired but not shielded CP.  Thus HpH SCC is also *unlikely*.  The ultrasonic crack detection ILI tools specified by the OSFM state waiver are designed to detect SCC if it is present in a detectable size.

38.    Thirdly, Mr. Kuprewicz states that a 49 CFR Part 195, Subpart E test to a test pressure ratio of 1.25 is "inadequate" in connection with his postulated SSWC or SCC.  Any pressure test above 1.1xMOP (the maximum allowed surge condition) demonstrates the present safety of the pipeline.  No test pressure proves an absence of flaws no matter how high the test pressure.  The higher the test pressure, the smaller will be any undiscovered flaws that survive the test.  All things being equal, larger flaws, if they can enlarge in service, grow to failure in less time than smaller flaws, so higher tests are more effective for demonstrating some positive factor of safety >1.0 for a longer period of time.  But certainly if significant SSWC or SCC did exist of a size that could be caused to fail at a TPR of 1.25, the Subpart E test is adequate, and certainly the spike test required by OSFM is adequate.  Later in the same paragraph

16

DECLARATION OF MICHAEL J. ROSENFELD

he states that it is not clear whether hydrotesting, if performed with be a Subpart E test or a different test to a higher pressure level. Clearly then he lacks necessary information to form an opinion and is speculating.

39. Mr. Kuprewicz states that "Current ILI technology cannot reliably identify if such cracking threats are present." This is patently false, biased, and misleading. In fact, ILI is more effective than hydrostatic testing, a point which Mr. Kuprewicz acknowledges in the very next section of this Exhibit. The industry has for the past 25 or more years relied on ILI to detect and characterize threats such as SSWC and SCC, as well as other types of cracks such as seam fatigue cracks and pipe manufacturing defects in seams.[Ref: Krieg, et al] Although no inspection process is perfect, ILI has proven over and over to be an effective integrity management tool. Frequent ILI intervals with robust validation, and use of multiple tool technologies, will reduce the chances of completely missing something important.

### c.    ILI Assessments

40. In this section, Mr. Kuprewicz makes numerous negative statements about ILI:

- Some ILI tools are more suitable than others depending on the threat. … Operators don't always select the ILI technology best suited to help identify threats on their system.

- The previous operator failed to share ILI tool performance data with the ILI service provider that could have enabled them to regrade the ILI more accurately.

- Some conditions can be more challenging as ILI tools have technical limitations. ILI tool vendors have limits or restrictions on tool operation to get valid results.

- Some pipeline operators make biased interpretations of the ILI data or fail to account for tool error.

41. His point seems to be "it's complicated and has to be done right". That applies to all 228,000 miles of hazardous liquid transmission pipelines not to mention all 298,000 miles of onshore natural gas transmission pipelines. He has not shown through any rational, data-based analysis that it is somehow *more true* for Las Flores than any of those other systems.

DECLARATION OF MICHAEL J. ROSENFELD

**2.      Section VI. The Greatest Threat … Is From External Corrosion**

42.     Mr. Kuprewicz questions whether the reliance of the Consent Decree and the OSFM state waiver on ILI to manage the external corrosion threat can prevent another failure.  He points to the failure of the previous operator, Plains, to rigorously validate the performance of the ILI tools and account for the tool performance when establishing appropriate field response to conclude that "…current ILI technology does not … reliably identify all forms of external corrosion most likely present on much of the pipeline".  Mr. Kuprewicz leaps to this conclusion without recognizing several significant facts. Firstly, Sable is not Plains, and will be held to higher standards of performance.  Secondly, different tools with differing technology will be used (most importantly, ultrasonic metal loss tools), and will be run more frequently.  Third, he does not identify what kind of corrosion will be present on much of the pipeline that he claims will be undetectable.  His position are biased and misleading, being based on pejorative sentiments intended to be alarming while ignoring important facts.

43.     Later in this section he discusses the relationship between the insulation and coating system and the inability of cathodic protection to function effectively.  As I have pointed out earlier, ineffective CP is a common occurrence for pipelines for a variety of reasons.  ILI, implemented correctly and with due understanding of its limitations, can be used to monitor the condition of the pipeline in an absence of effective CP.  Mr. Kuprewicz has not provided factual proof that ILI as specified by the OSFM state waiver cannot effectively be used for that purpose.

**3.      Section VII. High Pipeline Operating Temperatures Accelerate All Forms of Corrosion**

44.     Mr. Kuprewicz claims that due to the elevated temperatures, the corrosion rate will be 32 times faster than under normal conditions.  There is little doubt that corrosion rates will be higher than for many other pipelines that don't operate at elevated temperatures. But Mr. Kuprewicz is speculating as to the corrosion rate being 32 times faster, nevertheless the OSFM has implemented in the state waiver an accelerated detection and protection program as discussed above in my analysis of Mr. Kuprewicz's Opinion (e).  This was established by PHMSA's third party consultants.  The OSFM has specified that corrosion rates be established to assure that response times for repairs and maintenance are appropriate with a high margin of safety.

18

DECLARATION OF MICHAEL J. ROSENFELD

**4.    Section VIII. The CD Fails to Required Adequate IM Processes to Prevent Another Rupture**

45.    Mr. Kuprewicz complains that the Consent Decree does not address important technical issues, such as "cracking threats most likely to to exist on major segments of the pipeline". The Line 901 failure was not due to cracking, no cracking was identified in the failure investigation, and in my opinion as discussed previously, cracking is unlikely to be significant. In any case, the OSFM state waiver, which he does not discuss in this section of his Declaration, does address numerous important technical issues including requiring running crack detection ILI tools. This appears to be a deliberate omission by Mr. Kuprewicz to bias the reader.

**5.    Section IX. The Pipelines Cannot Be Made as Safe as New Pipelines**

46.    Mr. Kuprewicz summarizes the design aspects of the pipelines that contribute to corrosion occurring readily and quickly. He states that it will be impossible to return the pipeline to a corrosion-free as-new condition. Actually, all pipelines, even a newly constructed pipeline, will require condition assessment by ILI surveillance and subsequent repairs and maintenance, and will require an ongoing TIMP program to remain safe (all of which is being done on this pipeline system as per the OSFM). Almost every pipeline has some corrosion on it, even modern pipelines. Testing has shown that at the common maximum operating stress levels of 72% SMYS, it is virtually impossible for a pipeline to fail with corrosion up to 50% wall loss. Sable's planned operating pressure combined with OSFM requirements that they repair up to 40% wall losses further enhances pipeline integrity. This provides many opportunities to discover the pipeline conditions that may require repairs. Using differing ILI technologies on a frequent basis can be relied on to discover that, in my opinion and experience. Mr. Kuprewicz's opinion is based on an incomplete recognition of the facts concerning this pipeline.

**6.    Section X. Conclusion**

47.    Mr. Kuprewicz states in his Conclusion that hydrostatic testing and ILI will be ineffective to address the possible threats, and it would imprudent to rely on such assessments. He has not critically evaluated whether the specific and multiple ILI technologies specified by the OSFM state waiver are in fact inadequate and, if so, why. He also states that using the wrong ILI tools can make the risk of an oil spill orders of magnitude worse, though he has not stated why the specified ILI technology is of the wrong

19

DECLARATION OF MICHAEL J. ROSENFELD

type, nor presented a risk assessment quantifying the increased magnitude of the postulated oil spill. He concludes that the Las Flores Pipeline System is unusually dangerous due to its age and design flaws. This opinion was built on an aggregation of preceding claims each made without supporting data or even contrary to known or knowable facts. As such it is nonfactual and noncredible.

### D. Positions Stated in Kuprewicz's Declaration Exhibit C

48. Mr. Kuprewicz supplements the technical issues and the opinions in his Declaration with additional positions stated in his Exhibit C "Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart", February 21, 2025. For the most part, he relies on the same erroneous positions taken without supporting data or analysis, or half-truths presented in an incomplete way to bias the reader, as have been discussed above. Therefore, a detailed point by point evaluation of Exhibit C is already addressed in this declaration and need not be repeated here.

## IV. Exhibits

49. In forming the opinions stated herein, I reviewed and considered the following documents and the facts stated therein:

    a. Declaration of Richard B. Kuprewicz in Support of Petitioners' *Ex Parte* Application for Stay, Order to Show Cause and Temporary Restraining order, June 3, 2025, a true and correct copy of which is attached hereto as **Exhibit B.**

    b. US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety, Corrective Action Order, CPF NO. 5-2015-5011H, May 21, 2015, a true and correct copy of which is attached hereto as **Exhibit C.**

    c. United States District Court, Central District of California, Civil Action NO. 2:20-cv-02415, CONSENT DECREE, Filed 03/13/20, a true and correct copy of which is attached hereto as **Exhibit D.**

    d. Department of Forestry and Fire Protection, Office of the State Fire Marshal, Letter of Decision on the state Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324), Dec. 17, 2024, a true and correct copy of which is attached hereto as **Exhibit E.**

<div align="center">20</div>

<div align="center">DECLARATION OF MICHAEL J. ROSENFELD</div>

e. Department of Forestry and Fire Protection, Office of the State Fire Marshal, Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B), Dec. 17, 2024, a true and correct copy of which is attached hereto as **Exhibit F.**

f. US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2025, Santa Barbara California", May 2016, a true and correct copy of which is attached hereto as **Exhibit G.**

g. Norfleet, D.M., "Line 901 Release (5/19/25): Mechanical and Metallurgical Testing", DNV-GL, Final Report No. OAPUS309DNOR (PP136049), September 18, 2015, Appendix M to PHMSA FIR, a true and correct copy of which is attached hereto as **Exhibit H.**

h. US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Advisory Bulletin ADB 17-01, 82 FR 14106, Thursday, March 16, 2017, a true and correct copy of which is attached hereto as **Exhibit I.**

i. Kiefner, J.F., "Defect assessment – 1: Modified equation aids integrity management", Oil & Gas Journal, Oct. 6, 2008 and "Defect assessment – 2: Modified Ln-Secant equation improves failure prediction", Oil & Gas Journal, Oct. 13, 2008, a true and correct copy of which is attached hereto as **Exhibit J.**

j. McMahon, T.P., Amend, B., Harper, W., Bubenik, T., Evans, K., Rosenfeld, M., and Li, Y., "Evaluation of Selective Seam Weld Corrosion Susceptibility", 14th International Pipeline Conference, IPC2024-121806, Calgary, 2024, a true and correct copy of which is attached hereto as **Exhibit K.**

k. National Energy Board, "Stress Corrosion Cracking on Canadian Oil and Gas Pipelines", Report of the Inquiry, MH-2-05, December 1996, a true and correct copy of which is attached hereto as **Exhibit L.**

l. Michael Baker Jr. Engineering and Kiefner & Associates, Inc., "Spike Hydrostatic Test Evaluation", Final Report to Department of Transportation, Research and Special

DECLARATION OF MICHAEL J. ROSENFELD

Programs Administration, Office of Pipeline Safety, Technical Task Order No. 6 (TTO-6), Delivery Order DTRS56-02-D-70036, July 2004, a true and correct copy of which is attached hereto as **Exhibit M.**

m. Rosenfeld, M.J., "Hydrostatic pressure spike testing of pipelines: why and when?", Journal of Pipeline Engineering, 2013, a true and correct copy of which is attached hereto as **Exhibit N.**

n. US Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Advisory Bulletin ADB 17-01, 82 FR 14106, Thursday, March 16, 2017, a true and correct copy of which is attached hereto as **Exhibit O.**

o. Kiefner, J.F., and Vieth, P.H., "Project PR 3-805, A Modified Criterion for Evaluating the Remaining Strength of Corroded Pipe", American Gas Association, Cat. No. L51609, Dec. 22, 1989, a true and correct copy of which is attached hereto as **Exhibit P.**

p. American Petroleum Institute, "Managing System Integrity for Hazardous Liquid Pipelines", API Recommended Practice 1160, Third Edition, February 2019, a true and correct copy of which is attached hereto as **Exhibit Q.**

q. Nestleroth, J.B. and Rosenfeld, M.J., "Changes to In-Line Inspection Approaches to Consider with Changing Regulations", Pipeline Pigging and Integrity Management Conference, Houston, 2020, a true and correct copy of which is attached hereto as **Exhibit R.**

r. Harris, C. "Assessing Mechanical Damage Using Multiple Data Sets in Inline Inspection", Pipeline Technology Conference, Berlin, 2013, a true and correct copy of which is attached hereto as **Exhibit S.**

s. Thompson, R., Gardner, R., Dwyer, K., Gonzales, R., Corbett, A., Solano, G., "Pipeline Integrity Management of CSCC using multiple ILI technologies", Pipeline Pigging and Integrity Management Conference, Houston, 2021, a true and correct copy of which is attached hereto as **Exhibit T.**

t. Krieg, M., Nestleroth, J.B., Hennig, T., and Haines, H., "In-Line Inspection in Lieu of Hydrostatic Testing for Low Frequency Electric Resistance Welded Pipe", 12th

22

DECLARATION OF MICHAEL J. ROSENFELD

International Pipeline Conference, IPC2018-78522, Calgary, 2018, a true and correct copy of which is attached hereto as **Exhibit U.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 7th day of July, 2025, in Granville, Ohio.

_____

Michael J. Rosenfeld

23

DECLARATION OF MICHAEL J. ROSENFELD

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On July 7, 2025, I served the document(s) described as **DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES' MOTION TO STRIKE THE DECLARATION OF RICHARD B. ROSENFELD** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows: *See* Attached Service List.

☒    BY ELECTRONIC MAIL TRANSMISSION WITH ATTACHMENT:  On this date, I transmitted the above-mentioned document by electronic mail transmission with attachment to the parties at the electronic mail transmission address set forth on the attached service list.

☒    [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 7, 2025, at Los Angeles, California.

*/s/Josie Cisneros*

LEGAL02/46314888v2

# SERVICE LIST

| | |
|---|---|
| Julie Teel Simmons, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>        tnimmer@biologicaldiversity.org |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Regnifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Phone: (805) 963-1622; Fax: (805) 962-3152 | ATTORNEYS FOR PETITIONERS<br>ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation<br><br>Tel.:    (510) 844-7100<br>Fax:    (510) 844-7150<br>Email: lkrop@environmentaldefensecenter.org<br>        jfrankel@environmentaldefensecenter.org<br>        trengifo@environmentaldefensecenter.org |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000,<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/ DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; Daniel Berlant, in his official capacity as State Fire Marshal<br><br>Tel.:    (415) 510-3802<br>Email: Michael.dorsi@doj.ca.gov |
| Duncan Joseph Moore, Esq.<br>Benjamin J. Hanelin, Esq.<br>Natalie C. Rogers, Esq.<br>PAUL HASTINGS LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, California, 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (310) 620-5879<br>Email: djmoore@paulhastings.com<br>        benjaminhanelin@paulhastings.com<br>        natalierogers@paulhastings.com |
| Trevor D. Large, Esq.<br>FAUVER, LARGE, ARCHBALD & SPRAY LLP<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp.; Pacific Pipeline Company<br><br>Tel.:    (805) 966-7000<br>Email: TLarge@FLASllp.com |

LEGAL02/46314888v2

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/8/2025 8:00 AM
By: Terri Chavez , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:  (213) 576-1100

**PAUL HASTINGS LLP**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone: (310) 620-5879
Facsimile: (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>Petitioners and Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, et al.,<br><br>Respondents and Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP., et al.,<br><br>Real Parties in Interest. | Case No. 25CV02247<br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br>**DECLARATION OF MICHAEL J. ROSENFELD IN SUPPORT OF REAL PARTIES' MOTION TO STRIKE THE DECLARATION OF RICHARD B. KUPREWICZ - VOLUME 1 OF 4 (EXHIBITS A - F)**<br><br>[*Filed concurrently with Notice of Motion and Motion to Strike Declaration of Richard B. Kuprewicz; [Proposed] Order*]<br>Date:        July 18, 2025<br>Time:        10:00 AM<br>Dept.:        4<br><br>Complaint Filed:        April 15, 2025<br>Trial Date:        None Set |

1

DECLARATION OF MICHAEL J. ROSENFELD

# VOLUME 1 OF 4

# (EXHIBITS A – F)

# TO DECLARATION OF MICHAEL ROSENFELD

# EXHIBIT A

## Michael J. Rosenfeld, PE

Chief Engineer, Managing Member
RSI Pipeline Solutions, LLC
740-398-9543, mrosenfeld@rsi-ps.com
or mjrosenfeld57@gmail.com



## Summary

Experienced consultant in the subject of oil and gas pipeline fitness-for-service; pipeline integrity; pipeline design, materials, construction, and maintenance; and pipeline regulations and standards.

## Education

Bachelor of Science in Engineering – Mechanical Engineering, University of Michigan, 1979
Master of Science in Mechanical Engineering, Carnegie-Mellon University, 1981

## Areas of Competency

Pipeline defects, fitness for service assessment
Metallurgical failure analysis
Root cause failure analysis
Pipeline integrity management
Pipeline risk analysis
ASME B31.4, B31.8, B31.8S and related standards
API 1104, 1160, 1176, and related standards
49 CFR Parts 192 and 195
Pipeline design, materials, and construction
Pipeline maintenance and repair
Research and development
Training and seminars

## Work Experience

**RSI Pipeline Solutions LLC**
**Chief Engineer, 2019-Present**
Co-founder of RSI Pipeline Solutions LLC, 2019 and Managing Member.  Providing technical services in support of the oil and gas pipeline industry in matters such as pipeline fitness for service, pipeline integrity management, pipeline failure root cause analysis, regulatory compliance, pipeline codes and standards development, research, and training.  Recently completed an industry-funded landmark study on the integrity threat of pipe body hard spots in vintage line pipe.

**Kiefner Applus-RTD**

**Chief Engineer, 2012-2019**

Developed company practice for conducting root cause failure analysis. Developed process for determining the most probable grade of undocumented line pipe based on measured material strength and steel chemistry.  Developed processes for establishing the probable design pressure of undocumented pipelines. Provided expert testimony or opinions in support of litigation.

**Kiefner & Associates, Inc.**

**President, 2002-2011**

Conducted research on the effects of pressure cycle fatigue in pipelines, and the effects of pipe diameter expansion due to material yielding.  Worked with pipeline operators to improve their processes for evaluating pipeline fitness for service, risk assessment, and other integrity management practices. Effectively doubled the size of Kiefner & Associates with the addition of a dedicated material testing facility, a corrosion group, and other service areas such as geotechnical and in-line inspection analysis.

**Senior Structural Engineer, 1991-2002**

Performed stress analyses of pipelines subjected to external loadings. Developed monitoring and mitigation plans for pipelines affected by longwall mining subsidence. Performed qualifications testing of welding procedures and welder performance. Conducted research on the effects of mechanical damage on pipelines and originated the concept of evaluating severity of pipeline indentations based on strains of deformation. Authored revised allowable stress limits and revise repair requirements for ASME B31.8. Performed several dozen pipeline failure investigations.

**Battelle Memorial Institute, Senior Research Engineer, 1984-1991**

Performed stress analysis, fracture mechanics analysis, and design engineering for various industrial and military equipment applications. Patented an innovative design to reduce material usage and improve performance in a household appliance motor housing. Performed failure analysis of high-pressure piping. Conducted industry funded research on effectiveness of gas pipeline in-line inspection and on structural behavior of piping components affected by corrosion.

**EDS Nuclear / Impel Corporation, Engineer II, 1981-1984**
Performed stress analysis of nuclear power plant piping, piping supports, building structures, and electrical components for seismic and other loadings using finite element analysis and traditional calculation methods. Performed field engineering in support of plant turnovers.

## Industry Activity

Past Vice Chair, Interim Chair, ASME B31.8 Committee

Past Chair, ASME B31.8 Subgroup on Design, Materials, and Construction

Member, B31.8 Task Groups on Hydrogen and $CO_2$ pipelines

Member, ASME B31 Standards Committee

Member, ASME B31 Mechanical Design Technical Committee

Instructor, ASME Continuing Education Short Courses on ASME B31.4, B31.8, B31.8S, B31.12

Former Member at Large, ASME Board of Pressure Technology Codes and Standards

Former Member, Joint ASCE-ASME Task Group on Design of Buried Pipe

Former Member, API RP 1117 Task Force on In-Service Relocation of Pipelines, 1st Edition

Former Member, Work Group on API RP 1176 Assessment and Management of Cracking in Pipelines, 1st Edition

Former Member, Work Group on API RP 1160 Managing System Integrity for Hazardous Liquid Pipelines, 3rd Edition

International Pipeline Conference 2006, Session Chair, Mechanical Damage

International Pipeline Conference 2010, Session Chair, Structural Integrity I

ASME Fellow, awarded January 2012

ASME B31 Forever Award for Excellence in Piping Engineering, awarded September 2020

Registered Professional Engineer, State of Ohio, License No. E-55441

## Publications

Authored or coauthored over 130 published articles and public conference presentations. List available upon request.

June 2023

# EXHIBIT B

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **DECLARATION OF RICHARD B. KUPREWICZ IN SUPPORT OF PETITIONERS' EX PARTE APPLICATION FOR STAY, ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** <br><br> [*Filed concurrently with Ex Parte Application for Stay, Order to Show Cause and Temporary Restraining Order*] <br><br> Date:      June 3, 2025 <br> Time:      8:30 a.m. <br> Dept.:      4 <br> Judge:   Hon. Donna G. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

1

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

**DECLARATION OF RICHARD KUPREWICZ**

I, Richard B. Kuprewicz, hereby declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called as a witness, would and could testify competently thereto.

2. I am a chemical engineer with over fifty years of experience in the energy industry. For over twenty-five years, I have worked as the president of Accufacts, Inc., which provides independent expert consulting services to assist decision makers in making informed decisions concerning oil and gas pipelines. I provide pipeline safety expertise in areas including (but not limited to): pipeline failure investigation; risk management and risk analysis; pipeline siting, construction, design, operation, and maintenance, training, and control room management, including Supervisory Control and Data Acquisition (SCADA) approaches; leak/rupture detection; integrity management; emergency and spill response; and pipeline safety regulatory development and compliance. Much of my background is grounded in conducting numerous pipeline incident investigations following pipeline rupture tragedies spanning several decades.

3. I have developed and performed safety and risk management and analysis for chemical plants, liquefied natural gas facilities, refineries, and pipelines. I have also consulted for various local, state, and federal agencies, nonprofit organizations, and members of the public on pipeline regulation, operation, and design.

4. For the past two decades I have been involved as a representative of the public in advancing pipeline safety regulations at the federal and various state levels. From 2004 to 2018, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee (LPAC), to advise the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) on improvements to pipeline safety regulations. After a brief hiatus, the Secretary of Transportation reappointed me in late 2024 to represent the public again on the LPAC. In the early 2000s while serving on the LPAC, I played a significant role representing the public in developing federal integrity management pipeline safety regulations for both liquid and gas transmission pipelines.[1] These regulatory approaches emulated safety process approaches

---

[1] *See generally* 49 C.F.R. §§ 195.551-195.591, 192.901-192.951.

---

2

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

that I instituted and developed for the City of Bellingham, Washington, to assure that a ruptured pipeline there could be restarted and operated safely. I also served for seven years as a member of the Washington State Citizens Committee on Pipeline Safety ("CCOPS").  Positions to CCOPS are appointed by the Governor.

5.    I am an expert in oil and gas pipeline safety and risk management analysis based on my training, education, and experience. Attached as **Exhibit A** is my curriculum vitae.

6.    I have investigative expertise in the topic of various forms of seam corrosion, such as selective seam corrosion, stress corrosion cracking, and am a recognized expert in early vintage cracking having investigated pipeline ruptures associated with these types of cracking threats.

7.    I was asked by the Environmental Defense Center (EDC) and Center for Biological Diversity (CBD) to utilize my experience and expertise to evaluate safety and integrity issues regarding the proposal to restart the Las Flores Pipeline System, which includes CA-324 and CA-325A/B ("the Pipelines"). A true and correct copy of my report, titled *Evaluation of Las Flores Pipeline System Startup Proposal*, dated December 20, 2024, is attached to this declaration as **Exhibit B**.

8.    The report sets forth my opinion, based on my review of the Consent Decree and other documents, references, and regulations related to the Pipelines, including: the "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016); DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing – Report No.: OAPUS309DNOR (PP136049)" (September 18, 2015); PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H;" CA Code CCR 19 § 2111 – Risk Analysis (2) Pipeline Description (A); 49 CFR § 195.304 Test Pressure; and Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx. In summary, I identified the following technical issues concerning the proposed restart of the Pipelines:

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

a.   The design of the Pipelines renders the federal mandated cathodic protection system, intended to help address pipeline external corrosion, ineffective.

b.   Current inline inspection (ILI) technologies cannot adequately assess all forms of external corrosion threats that most likely exist on the Pipelines.

c.   The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective cathodic protection system once the Pipelines go into operation.

d.   Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure.

e.   The poorly designed Pipelines cannot be made as safe as new pipelines.

9.   Following the preliminary approval of the State Waivers for the pipelines, EDC and CBD asked me to review and evaluate the Letters of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld for CA-324 and CA-325A/B ("State Waivers"). A true and correct copy of my report, titled *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*, dated February 21, 2025, is attached to this declaration as **Exhibit C**.

10.   The report sets forth my opinion based on my review of the State Waivers and related documents, references, and regulations, including: Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run; 49 CFR § 452(h)(4)(iii)(H); PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview; Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022; and "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County," prepared by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (May 2016). My opinion, as set forth in my report, is as follows:

---

4

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

a.    The reliance on ILI technology to identify corrosion threats before failure is misplaced because such tools can miss a lot of cracks. There are multiple forms of corrosion on the Pipelines, and ILI is insufficient to detect some of them.

b.    The proposed hydrotests are also insufficient to address certain types of corrosion or predict corrosion growth. For example, MOP hydrotests are not adequate to test for crack forming potential on the Pipelines.

c.    The State Waivers do not assure adequate spike hydrotesting, which is a method to address various forms of crack forming potential. The values for the spike test on Line 324 are too low for corrosion cracking screening and evaluation. Hydrotesting for Lines 325 A and B must be conducted in segments given the elevation changes. It is unclear, however, whether the testing parameters are adequate for Line 325A due to missing information. In addition, the Waivers do not appear to require any hydrotesting for Line 325B.

d.    A key corrosion performance tracking process set in the State Waivers for the Pipelines is missing. This information, which helps identify possible corrosion "hot spots," is especially important given the history of extensive corrosion on the Pipelines.

e.    The State Waivers will not provide an equal or greater level of safety as if the Pipelines were equipped with an effective cathodic protection system to avoid pipeline failure due to external corrosion. The current design of the Pipeline renders the cathodic protection system ineffective. External corrosion on the Pipelines is exacerbated by operation of the Pipelines at elevated temperatures, which seriously increases the corrosion rate.

11.    Based on the facts I reviewed and my professional analysis, in my opinion the Las Flores Pipeline System is not safe to operate, even if the conditions in the Fire Marshal's State Waivers are fulfilled.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of May 2025, in Nipomo, California.

_Richard B. Kuprewicz_

Richard B. Kuprewicz

Declaration of Richard B. Kuprewicz in Support to Petitioners' Application for Stay, TRO, Preliminary Injunction

## Exhibit Index

*[Exhibits Supporting Declaration of Richard B. Kuprewicz in Support of Petitioners' Ex Parte Application for Stay, Order to Show Cause and Temporary Restraining Order]*

| Exhibit | Description | Page No. |
|:---:|---|:---:|
| A | Curriculum vitae of Richard B. Kuprewicz | 7-16 |
| B | Evaluation of Las Flores Pipeline System Startup Proposal, dated December 20, 2024 | 17-43 |
| C | Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart, dated February 21, 2025 | 44-55 |

# Exhibit A

## Curriculum Vitae.

# Richard B. Kuprewicz

8151 164th Ave NE
Redmond, WA   98052

Tel:  425-802-1200 (Office)
E-mail: kuprewicz@comcast.net

**Profile:**

As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity.

**Employment:**

**Accufacts Inc.**                                **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

**Position:**      President
**Duties:**        > Full business responsibility
                   > Technical Expert

**Alaska Anvil Inc.**                             **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

**Position:**      Process Team Leader
**Duties:**        > Led process engineers group
                   > Review process designs
                   > Perform hazard analysis
                   > HAZOP Team leader
                   > Assure regulatory compliance in pipeline and process safety management

**ARCO Transportation Alaska, Inc.**             **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

**Position:**      Senior Technical Advisor
**Duties:**        > Access to all Alaska operations with partial Arco ownership
                   > Review, analysis of major Alaska pipeline projects

**ARCO Transportation Co.**                       **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

**Position:**      Manager Gas Pipeline Projects
**Duties:**        > Project management
                   > Oil pipeline conversion to gas transmission
                   > New distribution pipeline installation
                   > Full turnkey responsibility for new gas transmission pipeline, including FERC filing

10-22-24

**Exhibits -Page 8**

**Four Corners Pipeline Co.**                                      **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**      Vice President and Manager of Operations
**Duties:**        > Full operational responsibility
                   > Major ship berth operations
                   > New acquisitions
                   > Several thousand miles of common carrier and private pipelines

**Arco Product CQC Kiln**                                          **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**      Plant Manager
**Duties:**        > Team building of new facility that had been failing
                   > Plant design modifications and troubleshooting
                   > Setting expense and capital budgets, including key gas supply negotiations
                   > Modification of steam plant, power generation, and environmental controls

**Arco Products Co.**                                             **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**      Operations Manager of Process Services
**Duties:**        > Modernize refinery utilities and storage/blending operations
                   > Develop hydrocarbon product blends, including RFGs
                   > Modification of steam plants, power generation, and environmental controls
                   > Coordinate new major cogeneration installation, 400 MW plus

**Arco Products Co.**                                             **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**      Manager of Refinery Planning and Evaluation
**Duties:**        > Establish monthly refinery volumetric plans
                   > Develop 5-year refinery long range plans
                   > Perform economic analysis for refinery enhancements
                   > Issue authorization for capital/expense major expenditures

**Arco Products Co.**                                             **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**      Operations Supervisor/Process Engineer
**Duties:**        > FCC Complex Supervisor
                   > Hydrocracker Complex Supervisor
                   > Process engineer throughout major integrated refinery improving process yield and energy efficiency

10-22-24

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.
Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).
Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

**Publications in the Public Domain:**

1.  "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2.  "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3.  "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4.  "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5.  "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6.  "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7.  "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8.  "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9.  "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

10-22-24

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA.  Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267.   Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac.  Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel.  Final testimony to the docket submitted May 19, 2023.  This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June 15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

# Exhibit B

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Evaluation of Las Flores Pipeline System Startup Proposal*

**Prepared For**

# The Center for Biological Diversity
# &
# The Environmental Defense Center

**December 20, 2024**

Accufacts Inc. 12-20-24

**Exhibits -Page 18**

## Table of Contents

I.   *Executive summary and major findings* ...............................................................*1*

II.  *Accufacts experience qualifying me as an expert in this matter.*...............................*3*

III. *A brief historical perspective*.........................................................................*4*

IV.  *The Las Flores Pipeline System.* ...................................................................*5*

V.   *TIMP regulations are not working to protect the public or the environment.* .........*8*

    1) **Hydrotesting assessments.** .....................................................................**8**

    2) **ILI assessments.** ....................................................................................**10**

VI.  *The greatest threat on the Las Flores Pipeline System is from external corrosion.* ...........................................................................................**11**

VII.  *High pipeline operating temperatures accelerate all forms of corrosion.*...........**13**

VIII. *The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.*.....................................**14**

IX.  *The poorly designed Pipelines cannot be made as safe as new pipelines.*..............**14**

X.   *Conclusion.* ........................................................................................**15**

Accufacts Inc. 12-20-24                                                    i

## I.    Executive summary and major findings

Accufacts Inc. ("Accufacts") was asked to review the documents related to the Las Flores Pipeline System ("Pipelines") for possible restart.  A Consent Decree signed in March, 2020 places responsibility for approving processes related to the onshore pipeline system restart on the California Office of the State Fire Marshal, or OSFM, the agency responsible for intrastate hazardous liquid pipeline safety.[1]  The Consent Decree replaces various Corrective Action Orders issued on the Pipelines by the Pipeline and Hazardous Materials Safety Administration, or PHMSA, the federal agency responsible for pipeline safety.[2]  PHMSA is the federal agency responsible for establishing minimum pipeline safety regulations for many pipelines operating in the U.S., including intrastate hazardous liquid transmission pipelines.  States meeting certain conditions can impose pipeline safety standards for intrastate pipelines beyond PHMSA regulations as long as such state regulations are not in conflict with PHMSA regulations.  By agreement, the Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed wavier alternative measures "provide an equal or greater level of safety."[3, 4]  The Consent Decree is inadequate, missing many corrosion threats to the Pipelines that can result in rupture.

Accufacts finds that the main technical issues concerning the restart of the Pipelines are:

1. **The poorly designed pipeline system renders required federal mandated cathodic protection ("CP"), intended to help address pipeline external corrosion, ineffective.**
2. **Current inline inspection ("ILI") technologies cannot adequately allow the assessment of all forms of external corrosion threats that most likely exist on the Pipelines.**
3. **The high operating temperatures needed to reduce the viscosity of the heavy crude oil significantly accelerate all forms of external pipeline corrosion that will not be mitigated by the ineffective CP system once the Pipelines go into operation.**
4. **Segments at risk of corrosion related cracking (i.e., stress corrosion cracking or selective seam corrosion cracking) are at the highest risk of failure. The poorly designed Pipelines cannot be made as safe as new pipelines.**

---

[1] Such state responsibility is dependent on whether the state agency meets certain qualifications required by PHMSA and whether the state Legislature has granted such state authority, as California has.

[2] UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, ex rel. DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, ex rel. CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, ex rel. CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, ex rel. CALIFORNIA STATE LANDS COMMISSION, ex rel. CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARCHALL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (Plaintiffs) v. PLAINS ALL AMERICAN PIPELINE L.P. and PLAINS PIPELINE, L.P. (Defendants), Consent Decree, Civil Action No. 2:20-cv-20415 signed March 2020 ("Consent Decree").

[3] *Ibid.,* Appendix B & Appendix D, paragraph 1.

[4] PHMSA website, " Special Permits and State Waivers Overview," at https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

Accufacts Inc. 12-20-24                                                                                         Page 1 of 15

Oil spills are catastrophic events, and operation of any pipeline carries a risk of spill. At best, good pipeline design and pipeline integrity management tools can reduce—but not eliminate—the risk. The Consent Decree is replacing incomplete integrity management ("IM") approaches implemented by Plains that failed to prevent a pipeline rupture from the poor design of the Pipelines, with another incomplete IM approach expecting a change in the outcome.

The Pipelines have been sitting shut down for over nine years at ambient temperatures without effective CP protection.  While external corrosion rates in this shutdown mode are significantly reduced because of lower temperatures as discussed later in this report, **the risk of external corrosion is not eliminated**.  The Consent Decree requires the OSFM to seek a waiver of the federal pipeline safety CP requirements defined under Subpart H, subject to the approval of PHMSA, to permit the Pipelines to restart.[5, 6]  Complicating this matter is the incorporation of risk analysis by the state into the Consent Decree that is under the control of the pipeline operator and is not made fully public, but subject only to the "review and comment" of the OSFM.  To be fair, the OSFM must meet certain state legislated risk analysis requirements that though well-meaning, are incomplete, such as, for example, how to define what a reasonable worst-case discharge is to prudently evaluate the risk of a pipeline failure.[7]  This is a problem I often see abused in federal pipeline oil spill response plans that doesn't adequately capture pipeline rupture hydraulics.[8]  One of the major problems with risk analysis, a determination of the likelihood of an event occurring, and why it is not codified into federal pipeline safety regulations, is that such approaches are usually not complete or representative of the true risks of a specific pipeline operation.  The impacts of any pipeline failure are significant and long-lasting, causing destruction of habitats, death of wildlife, and even human fatalities. It is impossible to predict a pipeline failure, and decision-making based on the perceived probability of failure does not adequately account for the severe consequences that will ensue, particularly if those decisions fail to capture pipeline rupture hydraulics. I call this "Space Shuttle Syndrome," because, in the rush to launch the space shuttle program, NASA decisionmakers understated its true risks and dismissed well established safety culture protocols, resulting in the loss of two space shuttles and their crews and ending the space shuttle program.

The Consent Decree is placing undue responsibilities on the OSFM which might not appreciate the limits of current inline inspection technical capabilities.  The Consent Decree overly relies on ILI technologies and their associated engineering critical assessments that are not capable of prudently addressing many forms of external corrosion, especially interactive forms such as Stress Corrosion Cracking, or SCC, whose time to failure is difficult, if not impossible, to predict as discussed later in this report.  The current poorly designed Pipelines do not permit CP protection to mitigate external corrosion on the Pipelines that must operate at uniquely high temperatures. The required high temperatures accelerate all forms of external corrosion.  New pipelines would incorporate proper design such as non-insulated pipe and newer forms of pipeline coating technology, that would permit CP to be effective in addressing external corrosion even at high temperatures to help assure pipeline safety.  No pipeline waiver issued under the conditions addressed in the Consent Decree is consistent with pipeline safety nor can ensure the same level

---

[5] 49CFR§195 Subpart H - Corrosion Control.
[6] Consent Decree, Appendix B, "State Waivers for Line 901, 903 …..,".
[7] CA Code CCR 19§2111 – Risk Analysis.
[8] 49CFR§194 Response Plans for Onshore Oil Pipelines.

Accufacts Inc. 12-20-24                                                      Page 2 of 15

of safety as that associated with a prudently designed pipeline system. Neither Plains, the pipeline operator at the time of the May 19, 2015 failure, nor the new owner, Sable, designed or built the present Pipelines with their serious deficiencies, but as a pipeline operator Sable bears the ultimate responsibilities should the Pipelines fail.

## II.   Accufacts experience qualifying me as an expert in this matter.

Accufacts Inc. ("Accufacts") was asked to review the Line 901/903 pipelines, now renamed Lines CA-324/CA-325 ("Pipelines"), and related documents such as those produced by the OSFM on their website.  A Consent Decree places responsibility for approving processes related to the onshore pipeline system restart first on the OSFM, then on PHMSA.[9]  The Center for Biological Diversity and The Environmental Defense Center asked Accufacts to provide an independent evaluation of documents related to a possible restart of the Pipelines to safely move heavy oil production from offshore platforms in the Santa Barbara Channel into the Pipelines.  It should be noted that the OSFM has recently issued a waiver on PHMSA's CP obligations for the Pipelines. I have not seen the details related to OSFM's decision on the granting of such a waiver.

I am a chemical engineer with over fifty years of experience in the energy industry, including over 25 years as president of Accufacts Inc. ("Accufacts").  Accufacts provides independent expert consulting services to assist decision makers in making informed decisions concerning pipelines. Pipeline safety expertise is provided in areas including, but not limited to: pipeline failure investigation, risk management/risk analysis, siting, construction, design, operation, maintenance, training, control room management including Supervisory Control and Data Acquisition ("SCADA") approaches, leak/rupture detection, integrity management, emergency and spill response, and pipeline safety regulatory development and compliance.  Much of my background is grounded in pipeline incident investigations following numerous pipeline rupture tragedies spanning several decades.

For the past two decades I have been involved as a representative of the public, which carries special obligations to avoid a conflict of interest, in advancing pipeline safety regulations at the federal and various state levels as demonstrated by my CV that is included as Attachment 1.  For example, I played a significant role representing the public in developing integrity management federal pipeline safety regulations in the early 2000s for both liquid and gas transmission pipelines. These regulatory approaches emulated safety process approaches that I instituted and developed for the City of Bellingham, WA to assure that a ruptured pipeline there could be restarted and operated safely.  This safety process approach, identified as the Pipeline Safety Immediate Action Plan, or PSIAP, identified steps that the pipeline operator was to complete following the Bellingham rupture tragedy of June 10, 1999, before that pipeline could be permitted to safely return to service.  The PSIAP is a matter of public record compliments of Washington State's Right-to-Know laws.  PSIAP formed a template for the integrity management safety regulations developed by the Office of Pipeline Safety, which morphed into PHMSA in 2003.

---

[9] Consent Decree, Appendix B & Appendix D.

Accufacts Inc. 12-20-24                                                                 Page 3 of 15

For approximately fifteen years, through the development of federal standards for Transmission Integrity Management Programs ("TIMP") for both liquid and gas integrity regulations, control room management ("CRM"), and Operator Qualification ("OQ") rulemaking efforts, to cite a few pipeline safety rulemaking efforts, I served on the Technical Hazardous Liquid Pipeline Safety Standards Committee, also referred to as the Liquid Pipeline Advisory Committee, or LPAC, to advise PHMSA on possible pipeline safety regulation advancement. After a brief hiatus of several years, I have recently been reappointed by the Secretary of Transportation to represent the public again on LPAC, which carries numerous obligations to avoid a conflict of interest. I believe I am more than qualified to comment as an expert on the various issues related to CA-324/CA-325 pipeline system possible restart.

## III.    A brief historical perspective



**Figure 1 – Overview of Pipelines**

Since the May 19, 2015 onshore pipeline rupture and oil release that spilled into the Santa Barbara Channel and beyond, the pipeline system known at the time as Lines 901/903, and offshore oil platforms feeding this system have been shut down. Lines 901/903 have recently been renumbered CA-324 and CA-325, respectively. These pipelines, which were classified as interstate pipelines at the time of the release, were ordered to be shut down and oil purged from the Pipelines and placed under nitrogen atmospheres under Corrective Action Orders instituted by PHMSA. Line 901 experienced an onshore pipeline rupture failure caused by massive external corrosion and released on the late morning of May 19, 2015 near Refugio State Beach that placed a considerable amount of oil into the sensitive waters of the Santa Barbara Channel and beyond. While the years since 2015 involved discussions for possible construction of new pipelines to replace the poorly

Accufacts Inc. 12-20-24                                                      Page 4 of 15

designed Lines 901/903, recent activities shifting ownership of the pipelines and associated infrastructure to Sable Offshore Corp. ("Sable"), are now focused on restarting the existing pipelines under new ownership and conditions stated under a Consent Decree.

The May 19, 2015 Line 901 rupture failure occurred at approximately 4 miles (MP 4) downstream of the Las Flores Canyon Pump Station due to extensive external corrosion.  The Line 901 ruptured at approximately 56 % of the maximum operating pressure ("MOP") of 1341 pounds per square inch gauge ("psig") (which is 72 % specified minimum yield strength ("SMYS")).[10]  In addition, further metallurgical forensic reports attached to the PHMSA Final Report, indicate that pipeline ruptured at a pressure of 737 psig, which was 39.6% of SMYS.[11]  This pipeline failed at very low stress levels, not a surprise given that the depth of the corrosion failure was 89% of the measured wall thickness, and the ILI tools significantly mis indicated the size of the corrosion threats.[12]

**Figure 2 – Overview of Pipelines route with MPs estimated**



## IV.    The Las Flores Pipeline System.

The following is based on information readily in the public domain, as demonstrated by the footnote references.  Because of many variations in MP numbers in various documents, MP numbers referenced in this report should be considered approximate with slight variations that don't really impact my findings/conclusions/recommendations.

---

[10] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.14 of 23.
[11]  DNV-G Final Report, "Line 901 Release (5/15/15) Mechanical and Metallurgical Testing, - Report No: OAPUS309DNOR (PP136049)," September 18, 2015, p. iii.
[12] *Ibid.,* "Summary of Observations," p. vi.

Accufacts Inc. 12-20-24                                                          Page 5 of 15

The Pipelines, formerly identified as Line 901/903 operated by Plains (aka Plains All American Pipeline L.P. and Plains Pipeline L.P.), represent a pipeline system of approximately 125 miles in length running from the Las Flores Canyon Pump Station (milepost 0) to the Pentland Metering (and Storage) facility (at Milepost 125.3).  Figure 1 is a general overview of the Pipelines routing. CA-224 (old Line 901) that runs from the Las Flores Canyon Pump Station (Milepost 0) to the Gaviota Meter Station (Milepost 10.7).  Note that I have reversed the Milepost reported in PHMSA's Final Report to follow more conventional milepost numbering, increasing from the pipeline inlet at the Las Flores Canyon Pump Station (MP 0), to the pipeline outlet of the 24-inch diameter Line 901/CA-224 pipeline, the Gaviota Metering Station (MP 10.7).  CA-324 is the sole feed into the 30-inch pipeline, CA-325A.  CA-325A runs from the Gaviota Metering Station to the Sisquoc pump station (MP 49.2).  CA-325B, also a 30-inch diameter pipeline, runs from the Sisquoc pump station (MP 49.2) to the Pentland metering station (~MP 125.3).  Figure 2 shows the general route adding approximate MP numbers following this similar MP increasing numbering all the way to Pentland.

According to the PHMSA Final Report on the 2015 rupture:

> Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.
>
> Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.  There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-

Accufacts Inc. 12-20-24                                                      Page 6 of 15

ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.[13]

**Figure 3 - Approximate Elevation Profile - Las Flores Canyon Pump Station (MP 0) to Pentland Station (MP ~125.3)**



PHMSA provided additional information related to Line 903:

> (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). [14]

> Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds similar to the Affected Pipeline {Line 901}.[15]

It is not clear from the documents produced if Line 903 insulation is also tape wrapped like Line 901, that would further shield the CP system from the Pipelines, assuring that CP is ineffective.

Figure 3 is an approximate elevation profile (approximate elevation of pipeline in feet versus pipeline milepost) for the Las Flores Pipeline System developed by the Center for Biological Diversity's Geographic Information System, or GIS, specialist using information readily available in the public domain. Pipeline elevation profiles play a critical role in understanding liquid transmission pipeline operation and risks, such as evaluating ILI runs, valve placement/actuator decisions, emergency and oil spill actions, and spill response planning. In addition, if a pipeline hydraulic profile, also referred to as a hydraulic gradient, is superimposed on an elevation profile, much information about pipeline risk can be gained. A hydraulic gradient is required of the pipeline operator under California Risk Analysis regulation.[16] A pipeline hydraulic gradient includes a plot of operating pressure versus milepost for a specified crude oil gravity and flow rate, but for this unique system, a crude oil viscosity and temperature should also be included on the

---

[13] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016, pp. 4 & 5 of 21.
[14] *Ibid.,* p. 4 of 21.
[15] PHMSA – In the Matter of Plains Pipeline, LP, Respondent, "Amendment No. 1 to the Corrective Action Order – CPF No. 5-2015-5011H," p. 2.
[16] CA Code CCR 19§2111 – Risk Analysis (2) Pipeline Description (A).

Accufacts Inc. 12-20-24                                                  Page 7 of 15

hydraulic gradient as these parameters seriously impact the hydraulic gradient evaluation. Such hydraulic gradient information is important in evaluating the risks of a pipeline restart program, especially on the Pipelines given their highly unique elevation profile among other factors (See Figure 3). This information is probably not likely to be made public, though a competent experienced engineer can develop an approximate hydraulic profile for a pipeline system if they understand certain crude oil blended properties and temperatures.

## V. TIMP regulations are not working to protect the public or the environment.

In the passage of the federal pipeline safety regulations setting standards for Transmission Integrity Management Programs, or TIMP, first for liquid, then gas, in 2002 and 2003, respectively, the use of performance-based approaches versus more prescriptive based regulations were agreed to as a compromise to advance important needed pipeline safety regulation in this area. Until the passage of TIMP regulations, pipeline operators were under no obligation to periodically assess the condition of their mainline pipelines. Performance-based regulation, in theory, allows a pipeline operator to choose between various alternatives that may work best for their pipeline. Prescriptive-based pipeline safety regulations historically have been imposed in federal pipeline safety regulatory efforts. Prescriptive regulations impose certain conditions that pipeline operators must, or shall, follow.

TIMP efforts for liquid pipelines define four basic approaches permitted in pipeline integrity assessment, depending on the pipeline threat that a pipeline segment might experience. Briefly, the major assessment methods most appropriate for this pipeline system are hydrostatic pressure testing ("hydrotesting") and inline inspection ("ILI") also known as smart pigging. As the Line 901 onshore oil release that flowed into sensitive waterway areas has clearly demonstrated, TIMP regulation is not working for many pipeline operators, even after the operator had run multiple ILI corrosion tool runs which I will expand on further below. Another unexpected outcome of TIMP performance-based regulation is that such less than clear regulation efforts are harder to enforce.

It's important to note that pipeline integrity management tools are not a substitute for proper pipeline design or effective cathodic protections. Their purpose is simply to monitor the condition of pipelines over time and identify threats to the pipeline's integrity.

### 1) Hydrotesting assessments.

Properly performed hydrotesting can be an important pipeline integrity assessment tool that proofs a pipeline's fitness for service to safely operate at MOP at the time of the hydrotest. Hydrotesting involves shutting down a pipeline and filling a pipeline segment with water. Proof of pipeline integrity or fitness for service testing is verified by carefully increasing water pressure with a water injection pump after air has been removed and the pipeline segment temperature stabilized. While federal pipeline safety regulations for liquid transmission pipelines define a "Subpart E" hydrotest to establish or verify maximum operating pressure, or MOP, a term having specific meaning in regulation, the regulations are not specific on important parameters to ensure a quality hydrotest that doesn't damage the pipe. Minimum hydrotest pressures are established to verify the MOP at the time of the hydrotest, with

sufficient pressure safety margin at the time of the hydrotest.  A Subpart E hydrotest is a proof for fitness test that the pipeline, at the time of the test, can withstand pressures above the MOP with a certain margin of pressure safety.[17]

One important caveat is needed regarding Subpart E hydrotests, which are often called strength tests.  For a pipeline experiencing certain cracking threats such as selective seam cracking (SSC) or stress corrosion cracking (SCC)—corrosion threats that likely exist along the Las Flores Pipeline System—**a subpart E hydrotest is inadequate**.  Current ILI technology cannot reliably identify if such cracking threats are present.  More importantly, nor can associated engineering critical assessments provide prudent evaluation of such threats due to the inability to reliably predict corrosion colonies that can interact or link together in unpredictable ways.  SCC colonies can be associated with disbonded coatings such as that occurring on the Pipelines where CP current is prevented from reaching the outer pipewall steel.  A much higher pressure (higher % Specified Minimum Yield Strength, or SMYS) hydrotest is warranted.  A prudent risk analysis should clearly demonstrate if such external corrosion cracking threats from environmental factors are possible around the Pipelines**.  I need to note that it is not clear whether hydrotesting, if performed, will be a Subpart E test or a higher % SMYS hydrotest intended to address cracking threats such as SCC**.  The Consent Decree strangely makes no mention of corrosion cracking threats or hydrotesting.

While considerable discussion in the Consent Decree has focused on the use of ILI to identify possible general wall loss corrosion threats well before failure, this agreement makes no mention of other forms of corrosion related threats such as corrosion cracking SCC or SSC.  These forms of corrosion cracking are very challenging to identify via ILI, and more importantly, engineering critical assessments associated with ILI to predict time to failure can be highly unreliable, given the inactive threat nature of these type of corrosion cracking threats.  The corrosion cracking threats tend to fail as pipeline ruptures.  It is important that the cracking threat potentials on the Pipelines be prudently addressed and proposed solution be made public and transparent.

For pipeline segments that undergo large elevation changes, like the Line 325A/B segments, the pipeline must be cut up into segments to assure hydrotesting pressure ranges do not permanently deform the pipe.  Hydrotesting can be more expensive than other pipeline integrity assessments such as ILI, but there are no built-in assumptions about the quality and thoroughness of the assessment that can be mismanaged such as that which can and often does occur with ILI approaches resulting in numerous pipeline ruptures after ILI assessments, as the May 19, 2015 release has clearly demonstrated.  Hydrotesting is much more reliable than other pipeline integrity assessment approaches, such as ILI, at verifying a pipeline's fitness for service at the time of the test.  Hydrotesting is usually performed by contractor firms experienced and qualified to perform a proper hydrotest for specific types of threats.  The Consent Decree requires certain threshold general corrosion threats if identified by ILI be remediated before restart.[18]

---

[17] 49CFR§195.304 Test pressure
[18] Consent Decree, Appendix B (4) Integrity Management.

Hydrotesting is warranted, justified, and vastly appropriate for the Pipelines which have been sitting for over nine years without effective CP.  I also need to mention that the use of nitrogen gas to idle the pipeline was meant to avoid internal corrosion attack and plays no role in preventing external corrosion attacks to keep the Pipelines in a "corrosion-free state" as mentioned by Steve Rusch, Sable's vice president of environmental and regulatory affairs.[19] The external corrosion sites experience reduced corrosion rates from the lower ambient soil temperatures as no hot oil was passing through the system, but the corrosion sites are not inactive, especially if CP systems are ineffective, such as on the Pipelines.

**2)  ILI assessments.**

In the U.S., ILI or smart pig tool efforts started to develop in the early 1980s depending on the threat a pipeline operator was trying to address.  ILI tools are usually multi-ton devices run inside a pipeline while the pipeline is operating to ascertain the condition of the pipeline depending on the type of threats trying to be analyzed.  Given the advancements in technology including shrinking the equipment, ultrasonic, or UT, approaches that focus on direct anomaly measurement has historically proven superior for general wall thinning corrosion evaluation to approaches using inferred software-based algorithms, such as magnetic flux leakage ("MFL") testing.  Some ILI tools are more suitable than others depending on the threat.  There is a wide spectrum of ILI tools and different technological approaches to select from depending on the type of threat trying to be reviewed.   Operators don't always select the ILI technology best suited to help identify threats on their system.  Even with the advances in tool development and approaches there can still be a wide variation as to whether a specific ILI tool or vendor can properly identify a specific pipe threat and permit it to be further properly characterized after an ILI run.  This is why pipeline operators will incorporate ILI tool tolerances and perform field verification digs to produce "unity plots" for a specific ILI run, to verify ILI vendor claims about their technology and its specific performance.  This field verification data was not shared by Plains with the ILI vendor, a serious deficiency in ILI utilization.  It is worth noting the PHMSA made it a point in their Failure Analysis of the Line 901 release, that the pipeline operator had not provided field dig verification feedback to the ILI vendor to confirm ILI capability.[20]  For example, corrosion attacks can take on many forms such as general pipewall thinning (usually the easiest to determine depending on the ILI technology), various forms of corrosion cracking such as stress corrosion cracking ("SCC"), selective seam corrosion cracking ("SSC"), and pit corrosion.  All such corrosion threats can lead to a pipeline failure and release.  Based on my experience involving investigations of liquid transmission pipeline ruptures from SCC and SSC after ILI runs, some segments of the Pipelines exhibit the potential for SCC or SSC.  Such external corrosion cracking threats are often found on pipelines with disbonded coating that are exposed to corrosion environments such as that introduced by the Pipeline's insulation.  It is incumbent on the new Pipeline operator, Sable, to demonstrate to the OSFM, and to the public and various regulatory agencies that SCC/SSC external cracking environments do not exist.

---

[19] Los Angeles Times article by Tony Briscoe, "*Plan to restart pipeline sparks anger*," Front page, October 20, 2024.
[20] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara County, California," May 2016. p.13 of 21.

Some forms of ILI technology to identify certain pipeline threats, if properly managed, can be superior to hydrotesting as they may identify some threats well before they go to failure.  As too clearly demonstrated, however, in the May19, 2015 Line 901 rupture, ILI cannot address all forms of external corrosion threat that are likely to exist on the Pipelines because of their poor design, their unique high temperature operation, and ineffectiveness of CP.  If a corrosion ILI tool can be utilized within the limits of the pig vendor specification (i.e., such as maintaining pig speed within the operating pipeline), and if the ILI tool run is independently field verified, some ILI tools can be a superior form of assessment for many types of pipeline threats, such as general internal and external corrosion (i.e. wall-thinning) if prudently managed.  The more specialized forms of corrosion, cracking and pitting, or corrosion within dents, however, can be much more challenging as ILI tools and their related engineering critical assessments still have technical limits.  ILI tool vendors place specific limitations on their various tools, and it is important that the pipeline operator follow such restrictions that can easily invalidate an ILI tool run reading or result.  ILI runs in hilly terrain, such as that which exist with the Pipelines (See Figure 3) can be quite challenging for ILI tools that can easily exceed multiple tons in weight as gravity never shuts off.

In investigating numerous pipeline rupture failures after ILI tool runs, I consistently see failures on the part of the pipeline operators to perform sufficient field verification digs to determine if bias is being introduced in a specific ILI tool approach on a specific pipeline segment, for a specific pipeline threat, and that the ILI tool selected is really appropriate to identify certain pipeline threats.  Some pipeline operators repeatedly fail to recognize or even consider ILI tool capabilities and tolerances, especially as ILI vendors and pipeline engineers have tried to improve technologies and assessment techniques.  It is worth noting that no one markets ILI tools claiming they don't work.  An important consideration in integrity management approaches is whether the right ILI technology has been selected and is being prudently utilized by the pipeline operator.  It is further worth noting that while running an ILI tool is not inexpensive, the cost of running such a tool is relatively less expensive compared to the overall quality of the field integrity verification program to assure the ILI tool is doing its job for a specific type of pipeline threat, on a specific pipeline segment.

Part of the problem is that many forms of interactive external corrosion pipeline cracking threats cannot be accurately characterized to allow meaningful engineering critical assessments that are reliable.  Such assumptions or inability to properly engineer and predict interactive threats introduce significant margins of error to fitness for service predictions using ILI assessments.  Just doing ILI reassessments when they really aren't capable of dealing with interactive corrosion threats is an illusion of safety.  Basically, performing an inappropriate ILI assessment more often is not the solution as further explained below.

## VI. The greatest threat on the Las Flores Pipeline System is from external corrosion.

It should not take a pipeline failure to identify that the greatest pipeline integrity threat on the Pipelines is from various forms of external corrosion due to poor design of these Pipelines rendering CP systems ineffective at reducing or preventing external corrosion failure.

Accufacts Inc. 12-20-24                                                      Page 11 of 15

The PHMSA Final Report stated:

**Proximate or Direct Cause**

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.[21]

PHMSA goes on to list numerous contributory causes, among them a significant observation, "Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised."[22]  This important fact should also play a major role into any decision to restart the Las Flores Pipeline System as explained in further detail in this report.  This critically important PHMSA observation should not come as a surprise to any pipeline operator.  Bottom line, Plains acquired a poorly designed set of Pipelines in the early 1990s that rendered the CP system ineffective at preventing or mitigating external corrosion on a pipeline system operating at high temperatures.  Some years after acquiring the Pipelines and after TIMP regulations were promulgated in late 2002, Plains did not implement an appropriate integrity management program to prevent the pipeline failure from external corrosion attack.  The question now is whether Sable's compliance with the Consent Decree under the approval of the OSFM relying on the capabilities of ILI tools can prevent another failure on the Pipelines? **<u>Clearly, current ILI technology does not meet an obligation to reliably identify all forms of external corrosion most likely present on much of the Pipelines.</u>**  The CP systems required by PHMSA regulations will not be effective on most of the pipeline mileage in the Las Flores Pipeline System as previously discussed, and from my perspective there is serious doubt as to whether these poorly designed pipelines can be made as safe as new pipelines that have properly functioning cathodic protections.

Regarding the Las Flores Pipeline restart decision and related integrity assessments, it is important to understand how CP systems are supposed to work.  In layman's terms, a CP system impresses a weak current into a pipeline turning the pipeline into a cathode in an electrochemical corrosion cell on the outside of a buried pipeline, to control or reduce external corrosion.  Older nonconducting pipeline coatings such as that which exists on the Pipelines do not allow for CP current to pass through them.  The purpose of the CP system is thus to introduce current to the outer pipewall where the older coatings have been penetrated, such as with holes or tears in the outer coating.  Unfortunately, older pipeline external coatings such as the urethane coal tar outer coatings, like those on the Pipelines, are also well known to not adhere tightly to a pipeline over time, causing coating separation or disbondment.  Such disbondment can result in external

---

[21] *Ibid*, p. 14 of 21.
[22] *Ibid.,* p. 14 of 21.

Accufacts Inc. 12-20-24 <span style="float:right">Page 12 of 15</span>

pipewall corrosion cells under the coating, generating many different forms of corrosion, especially SCC and SSC cracking in the wrong environments, that are not protected by CP.  To add to this threat of external corrosion, the Las Flores Pipeline System's external insulation traps and serves as a water conduit further increasing external corrosion as a water fed corrosion attack. And lastly, the Polyken tape wrap installed during pipeline installation around the outside of the insulation is also well known to not be conductive, further shielding and preventing CP current from reaching the outer pipe wall.  **This is a perfect storm or combination of factors all working to render CP ineffective.** Without effective cathodic protections, the pipeline is at particularly high risk of spilling again.  To further underscore the lack of a proper integrity management program, this pipeline operates at elevated temperature that accelerates external corrosion as explained further below.  New types of pipeline coatings now allow the passage of CP current through such coating to mitigate external corrosion even if the coating disbonds from the pipeline.

## VII. High pipeline operating temperatures accelerate all forms of corrosion.

**Figure 4  Los Flores Temperature Data from DNV Line 901 Release (5/19/15) Technical Root Cause Analysis included in PHMSA Final Report.[23]**



If one is experienced in handling/refining the heavy crude oils produced offshore that feed into the Las Flores Pipeline System, this crude oil not only needs to be diluted with natural gas liquids, or NGLs, but the pipeline must be operated at high pipeline temperatures, approximately 135 °F, that also is required to reduce the blended oil viscosity to get the fluid over the main hill beyond the Sisquoc Pump Station to Pentland.  While the PHMSA Final Report mentions 135 °F as a pipeline operating temperature, Figure 4 represents a temperature graph indicting 135 °F was not unusual, but higher fluid temperature to improve the flow and capacity of the Pipelines did occur.

Chemical engineers experienced in reaction kinetics are familiar with the Arrhenius equation which indicates that chemical reaction rates, such as that for corrosion, essentially double for every 10 °C (18 °F) increase in temperature.  This means that the rate of corrosion at 140 °F is about 32

---

[23] *Ibid.,* "Figure 23, L901 Las Flores Station Temperature Data," p. 375 of 510.

Accufacts Inc. 12-20-24                                                      Page 13 of 15

times that for a pipeline operating at 60 °F, a typical ambient soil condition.  Because of the higher viscosity of unblended offshore oil there probably is little opportunity to reduce the Las Flores Pipeline System temperature to help reduce corrosion rates on a pipeline system where the CP system is ineffective. If the Pipelines are returned to operation, all forms of external corrosion will remain a primary threat of concern for pipeline failure.

## VIII.  The Consent Decree agreement fails to require adequate IM processes to prevent another rupture of the poorly designed Pipelines.

It is important to understand that the Consent Decree is just a compromise agreement between the signature parties and may be missing important technical matters related to the Pipelines.  I find it odd that many of the technical issues discussed above were not identified or addressed in the Consent Decree.  External corrosion cracking risk was well known for many decades to be a threat of concern for pipelines exhibiting disbonded external coating where CP systems are ineffective.

I find it especially strange that Plains the pipeline operator at the time of the Line 901 rupture got itself into serious trouble by failing to understand that the poor design of the Pipelines could not be adequately addressed by ILI.  It appears that the Consent Decree continues to foster the illusion that ILI can adequately permit assessment of corrosion risks, especially cracking threats most likely to exist on major segments of the Pipelines (see Figure 3, for example).  The Consent Decree doesn't even mention corrosion cracking threats for this system operating at high temperature that exacerbates all forms of external corrosion as previously discussed.

And lastly, I would caution that the Consent Decree gives authority to the OSFM on certain pipeline safety related decisions. These OSFM decisions, however, cannot violate federal pipeline safety regulations and that I believe require a public decision process for PHMSA approval to assure any waiver meets or exceeds the level of safety had the wavier not been requested.

## IX.  The poorly designed Pipelines cannot be made as safe as new pipelines.

Sable's website implies that the Pipelines will be repaired, stating "PPC undertook a comprehensive repair and maintenance program to restore the pipeline to "as-new" condition."[24] As referenced in footnote 19 above, this isn't the only time that a Sable representative has suggested the Pipelines will be restored to "as-new" condition or a "corrosion free" state.  A new pipeline would be properly designed such that the federal pipeline safety regulations requiring a CP system would be effective and do its job, while allowing CP monitoring to assure the new pipelines were adequately protected from external corrosion attack by an effective CP design.  A new pipeline would not be trying to utilize CP on a pipeline improperly coated, that seriously disbonds from the pipe, with a system insulated to assist in water reaching the outer pipe steel, while operating at higher temperature.  All these poor design factors accelerate all forms of external corrosion including cracking.  It is a misguided illusion that relying on ILI can attempt to stay ahead of pipeline failure on such a poorly designed system.  A cursory review of the PHMSA Final

---

[24] See Sable's website concerning, "Sable Offshore Corp. Provides Update on Pacific Pipeline Company Operations," October 28, 2024, at: https://www.sableoffshore.com/news/news-details/2024/Sable-Offshore-Corp.-Provides-Update-on-Pacific-Pipeline-Company-Operations/default.aspx.

Accufacts Inc. 12-20-24                                              Page 14 of 15

Report, Appendix G In-Line Inspection report will indicate that even running ILI tools, it is impossible to return Line 901 to an "as new" condition given the numerous corrosion anomalies.[25] The idea that running ILI tools should be sufficient to assure an "as-new" pipeline condition and safe operation of these poorly designed Pipelines with ineffective CP protection is a false premise, as the Pipelines are far from being in a new condition, with numerous anomalies, given their poor design approach and operating history.

## X.    Conclusion.

Given the ineffectiveness of the CP system to protect against external corrosion and the fact that the Pipelines have sat for over nine years without effective CP, and the failure of the Consent Decree to address these possible threats via proper hydrotesting and ILI, it is imprudent to expect that such limited assessment techniques can adequately protect against corrosion failure.  Poor pipeline design and using the wrong set of integrity management tools (i.e., tools that do not adequately detect and permit the prudent evaluation of the type of corrosion threats specific to a given pipeline) can make the risk of an oil spill orders of magnitude worse. The Las Flores Pipeline System is unusually dangerous given its age and inherent design flaws.

The above represents my opinions based on experience with too many pipeline rupture investigations.  I reserve the right to update this report if more relevant information is made available.


Richard B. Kuprewicz
President
Accufacts Inc.

---

[25] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration, "Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015 Santa Barbara Country, California, - Appendix G In-Line Inspection Report by Lamontagne for the Oak Ridge National Laboratory" May 2016, pp. 44 – 138 of 510.

Accufacts Inc. 12-20-24                                                    Page 15 of 15

## Curriculum Vitae.

# Richard B. Kuprewicz

**8151 164th Ave NE**
**Redmond, WA   98052**

**Tel:  425-802-1200 (Office)**
**E-mail: kuprewicz@comcast.net**

---

| | |
|---|---|
| **Profile:** | As president of Accufacts Inc., I specialize in gas and liquid pipeline investigation, auditing, risk management, siting, construction, design, operation, maintenance, training, SCADA, leak detection, management review, emergency response, and regulatory development and compliance.  I have consulted for various local, state and federal agencies, NGOs, the public, and pipeline industry members on pipeline regulation, operation and design, with particular emphasis on operation in unusually sensitive areas of high population density or environmental sensitivity. |

---

**Employment:**

**Accufacts Inc.**                                             **1999 – Present**

Pipeline regulatory advisor, incident investigator, and expert witness on all matters related to gas and liquid pipeline siting, design, operation, maintenance, risk analysis, and management.

**Position:**   President
**Duties:**       > Full business responsibility
                      > Technical Expert

**Alaska Anvil Inc.**                                          **1993 – 1999**

Engineering, procurement, and construction (EPC) oversight for various clients on oil production facilities, refining, and transportation pipeline design/operations in Alaska.

**Position:**   Process Team Leader
**Duties:**       > Led process engineers group
                      > Review process designs
                      > Perform hazard analysis
                      > HAZOP Team leader
                      > Assure regulatory compliance in pipeline and process safety management

**ARCO Transportation Alaska, Inc.**           **1991 - 1993**

Oversight of Trans Alaska Pipeline System (TAPS) and other Alaska pipeline assets for Arco after the Exxon Valdez event.

**Position:**   Senior Technical Advisor
**Duties:**       > Access to all Alaska operations with partial Arco ownership
                      > Review, analysis of major Alaska pipeline projects

**ARCO Transportation Co.**                          **1989 – 1991**

Responsible for strategic planning, design, government interface, and construction of new gas pipeline projects, as well as gas pipeline acquisition/conversions.

**Position:**   Manager Gas Pipeline Projects
**Duties:**       > Project management
                      > Oil pipeline conversion to gas transmission
                      > New distribution pipeline installation
                      > Full turnkey responsibility for new gas transmission pipeline, including FERC filing

**Exhibits -Page 35**

**Four Corners Pipeline Co.**                    **1985 – 1989**

Managed operations of crude oil and product pipelines/terminals/berths/tank farms operating in western U.S., including regulatory compliance, emergency and spill response, and telecommunications and SCADA organizations supporting operations.

**Position:**   Vice President and Manager of Operations
**Duties:**   > Full operational responsibility
> Major ship berth operations
> New acquisitions
> Several thousand miles of common carrier and private pipelines

**Arco Product CQC Kiln**                    **1985**

Operations manager of new plant acquisition, including major cogeneration power generation, with full profit center responsibility.

**Position:**   Plant Manager
**Duties:**   > Team building of new facility that had been failing
> Plant design modifications and troubleshooting
> Setting expense and capital budgets, including key gas supply negotiations
> Modification of steam plant, power generation, and environmental controls

**Arco Products Co.**                    **1981 - 1985**

Operated Refined Product Blending, Storage and Handling Tank Farms, as well as Utility and Waste Water Treatment Operations for the third largest refinery on the west coast.

**Position:**   Operations Manager of Process Services
**Duties:**   > Modernize refinery utilities and storage/blending operations
> Develop hydrocarbon product blends, including RFGs
> Modification of steam plants, power generation, and environmental controls
> Coordinate new major cogeneration installation, 400 MW plus

**Arco Products Co.**                    **1977 - 1981**

Coordinated short and long-range operational and capital planning, and major expansion for two west coast refineries.

**Position:**   Manager of Refinery Planning and Evaluation
**Duties:**   > Establish monthly refinery volumetric plans
> Develop 5-year refinery long range plans
> Perform economic analysis for refinery enhancements
> Issue authorization for capital/expense major expenditures

**Arco Products Co.**                    **1973 - 1977**

Operating Supervisor and Process Engineer for various major refinery complexes.

**Position:**   Operations Supervisor/Process Engineer
**Duties:**   > FCC Complex Supervisor
> Hydrocracker Complex Supervisor
> Process engineer throughout major integrated refinery improving process yield and energy efficiency

10-22-24

**Exhibits -Page 36**

**Qualifications:**

Served for over fifteen years as a member representing the public on the federal Technical Hazardous Liquid Pipeline Safety Standards Committee (THLPSSC), a technical committee established by Congress to advise PHMSA on pipeline safety regulations.

Committee members are appointed by the Secretary of Transportation.

Served seven years, including position as its chairman, on the Washington State Citizens Committee on Pipeline Safety (CCOPS).

Positions are appointed by the governor of the state to advise federal, state, and local governments on regulatory matters related to pipeline safety, routing, construction, operation and maintenance.

Served on Executive subcommittee advising Congress and PHMSA on a report that culminated in new federal rules concerning Distribution Integrity Management Program (DIMP) gas distribution pipeline safety regulations.

As a representative of the public, advised the Office of Pipeline Safety on proposed new liquid and gas transmission pipeline integrity management rulemaking following the pipeline tragedies in Bellingham, Washington (1999) and Carlsbad, New Mexico (2000).

Member of Control Room Management committee assisting PHMSA on development of pipeline safety Control Room Management (CRM) regulations.

Certified and experienced HAZOP Team Leader associated with process safety management and application.

**Education:**

| | |
|---|---|
| MBA (1976) | Pepperdine University, Los Angeles, CA |
| BS Chemical Engineering (1973) | University of California, Davis, CA |
| BS Chemistry (1973) | University of California, Davis, CA |

**Publications in the Public Domain:**

1. "An Assessment of First Responder Readiness for Pipeline Emergencies in the State of Washington," prepared for the Office of the State Fire Marshall, by Hanson Engineers Inc., Elway Research Inc., and Accufacts Inc., and dated June 26, 2001.

2. "Preventing Pipeline Failures," prepared for the State of Washington Joint Legislative Audit and Review Committee ("JLARC"), by Richard B. Kuprewicz, President of Accufacts Inc., dated December 30, 2002.

3. "Pipelines - National Security and the Public's Right-to-Know," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated May 14, 2003.

4. "Preventing Pipeline Releases," prepared for the Washington City and County Pipeline Safety Consortium, by Richard B. Kuprewicz, dated July 22, 2003.

5. "Pipeline Integrity and Direct Assessment, A Layman's Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated November 18, 2004.

6. "Public Safety and FERC's LNG Spin, What Citizens Aren't Being Told," jointly authored by Richard B. Kuprewicz, President of Accufacts Inc., Clifford A. Goudey, Outreach Coordinator MIT Sea Grant College Program, and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated May 14, 2005.

7. "A Simple Perspective on Excess Flow Valve Effectiveness in Gas Distribution System Service Lines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated July 18, 2005.

8. "Observations on the Application of Smart Pigging on Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated September 5, 2005.

9. "The Proposed Corrib Onshore System - An Independent Analysis," prepared for the Centre for Public Inquiry by Richard B. Kuprewicz, dated October 24, 2005.

10. "Observations on Sakhalin II Transmission Pipelines," prepared for The Wild Salmon Center by Richard B. Kuprewicz, dated February 24, 2006.

11. "Increasing MAOP on U.S. Gas Transmission Pipelines," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2006. This paper was also published in the June 26 and July 1, 2006 issues of the Oil & Gas Journal and in the December 2006 issue of the UK Global Pipeline Monthly magazines.

12. "An Independent Analysis of the Proposed Brunswick Pipeline Routes in Saint John, New Brunswick," prepared for the Friends of Rockwood Park, by Richard B. Kuprewicz, dated September 16, 2006.

13. "Commentary on the Risk Analysis for the Proposed Emera Brunswick Pipeline Through Saint John, NB," by Richard B. Kuprewicz, dated October 18, 2006.

14. "General Observations On the Myth of a Best International Pipeline Standard," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated March 31, 2007.

15. "Observations on Practical Leak Detection for Transmission Pipelines – An Experienced Perspective," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated August 30, 2007.

16. "Recommended Leak Detection Methods for the Keystone Pipeline in the Vicinity of the Fordville Aquifer," prepared for TransCanada Keystone L.P. by Richard B. Kuprewicz, President of Accufacts Inc., dated September 26, 2007.

17. "Increasing MOP on the Proposed Keystone XL 36-Inch Liquid Transmission Pipeline," prepared for the Pipeline Safety Trust by Richard B. Kuprewicz, dated February 6, 2009.

18. "Observations on Unified Command Drift River Fact Sheet No 1: Water Usage Options for the current Mt. Redoubt Volcano threat to the Drift River Oil Terminal," prepared for Cook Inletkeeper by Richard B. Kuprewicz, dated April 3, 2009.

19. "Observations on the Keystone XL Oil Pipeline DEIS," prepared for Plains Justice by Richard B. Kuprewicz, dated April 10, 2010.

20. "PADD III & PADD II Refinery Options for Canadian Bitumen Oil and the Keystone XL Pipeline," prepared for the Natural Resources Defense Council (NRDC), by Richard B. Kuprewicz, dated June 29, 2010.

21. "The State of Natural Gas Pipelines in Fort Worth," prepared for the Fort Worth League of Neighborhoods by Richard B. Kuprewicz, President of Accufacts Inc., and Carl M. Weimer, Executive Director Pipeline Safety Trust, dated October, 2010.

22. "Accufacts' Independent Observations on the Chevron No. 2 Crude Oil Pipeline," prepared for the City of Salt Lake, Utah, by Richard B. Kuprewicz, dated January 30, 2011.

23. "Accufacts' Independent Analysis of New Proposed School Sites and Risks Associated with a Nearby HVL Pipeline," prepared for the Sylvania, Ohio School District, by Richard B. Kuprewicz, dated February 9, 2011.

24. "Accufacts' Report Concerning Issues Related to the 36-inch Natural Gas Pipeline and the Application of Appleview, LLC Premises:  7009 and 7010 River Road, North Bergen, NJ," prepared for the Galaxy Towers Condominium Association Inc., by Richard B. Kuprewicz, dated February 28, 2011.

25. "Prepared Testimony of Richard B. Kuprewicz Evaluating PG&E's Pipeline Safety Enhancement Plan," submitted on behalf of The Utility Reform Network (TURN), by Richard B. Kuprewicz, Accufacts Inc., dated January 31, 2012.

26. "Evaluation of the Valve Automation Component of PG&E's Safety Enhancement Plan," extracted from full testimony submitted on behalf of The Utility Reform Network (TURN), by Richard B.Kuprewicz, Accufacts Inc., dated January 31, 2012, Extracted Report issued February 20, 2012.

27. "Accufacts' Perspective on Enbridge Filing to NEB for Modifications on Line 9 Reversal Phase I Project," prepared for Equiterre Canada, by Richard B. Kuprewicz, Accufacts Inc., dated April 23, 2012.

28. "Accufacts' Evaluation of Tennessee Gas Pipeline 300 Line Expansion Projects in PA & NJ," prepared for the Delaware RiverKeeper Network, by Richard B. Kuprewicz, Accufacts Inc., dated June 27, 2012.

29. "Impact of an ONEOK NGL Pipeline Release in At-Risk Landslide and/or Sinkhole Karst Areas of Crook County, Wyoming," prepared for landowners, by Richard B. Kuprewicz, Accufacts Inc., and submitted to Crook County Commissioners, dated July 16, 2012.

30. "Impact of Processing Dilbit on the Proposed NPDES Permit for the BP Cherry Point Washington Refinery," prepared for the Puget Soundkeeper Alliance, by Richard B. Kuprewicz, Accufacts Inc., dated July 31, 2012.

31. "Analysis of SWG's Proposed Accelerated EVPP and P70VSP Replacement Plans, Public Utilities Commission of Nevada Docket Nos. 12-02019 and 12-04005," prepared for the State of Nevada Bureau of Consumer Protection, by Richard B. Kuprewicz, Accufacts Inc., dated August 17, 2012.

32. "Accufacts Inc. Most Probable Cause Findings of Three Oil Spills in Nigeria," prepared for Bohler Advocaten, by Richard B. Kuprewicz, Accufacts Inc., dated September 3, 2012.

33. "Observations on Proposed 12-inch NGL ONEOK Pipeline Route in Crook County Sensitive or Unstable Land Areas," prepared by Richard B. Kuprewicz, Accufacts Inc., dated September 13, 2012.

34. "Findings from Analysis of CEII Confidential Data Supplied to Accufacts Concerning the Millennium Pipeline Company L.L.C. Minisink Compressor Project Application to FERC, Docket No. CP11-515-000," prepared by Richard B. Kuprewicz, Accufacts Inc., for Minisink Residents for Environmental Preservation and Safety (MREPS), dated November 25, 2012.

35. "Supplemental Observations from Analysis of CEII Confidential Data Supplied to Accufacts Concerning Tennessee Gas Pipeline's Northeast Upgrade Project," prepared by Richard B. Kuprewicz, Accufacts Inc., for Delaware RiverKeeper Network, dated December 19, 2012.

36. "Report on Pipeline Safety for Enbridge's Line 9B Application to NEB," prepared by Richard B. Kuprewicz, Accufacts Inc., for Equiterre, dated August 5, 2013.

37. "Accufacts' Evaluation of Oil Spill Joint Investigation Visit Field Reporting Process for the Niger Delta Region of Nigeria," prepared by Richard B. Kuprewicz for Amnesty International, September 30, 2013.

38. "Accufacts' Expert Report on ExxonMobil Pipeline Company Silvertip Pipeline Rupture of July 1, 2011 into the Yellowstone River at the Laurel Crossing," prepared by Richard B. Kuprewicz, November 25, 2013.

39. "Accufacts Inc. Evaluation of Transco's 42-inch Skillman Loop submissions to FERC concerning the Princeton Ridge, NJ segment," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated June 26, 2014, and submitted to FERC Docket No. CP13-551.

40. Accufacts report "DTI Myersville Compressor Station and Dominion Cove Point Project Interlinks," prepared by Richard B. Kuprewicz for Earthjustice, dated August 13, 2014, and submitted to FERC Docket No. CP13-113-000.

41. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz for the Princeton Ridge Coalition, dated September 3, 2014, and submitted to FERC Docket No. CP13-551.

42. Accufacts' "Evaluation of Actual Velocity Critical Issues Related to Transco's Leidy Expansion Project," prepared by Richard B. Kuprewicz for Delaware Riverkeeper Network, dated September 8, 2014, and submitted to FERC Docket No. CP13-551.

43. "Accufacts' Report to Portland Water District on the Portland – Montreal Pipeline," with Appendix, prepared by Richard B. Kuprewicz for the Portland, ME Water District, dated July 28, 1014.

44. "Accufacts Inc. Report on EA Concerning the Princeton Ridge, NJ Segment of Transco's Leidy Southeast Expansion Project," prepared by Richard B. Kuprewicz and submitted to FERC Docket No. CP13-551.

45. Review of Algonquin Gas Transmission LLC's Algonquin Incremental Market ("AIM Project"), Impacting the Town of Cortlandt, NY, FERC Docket No. CP14-96-0000, Increasing System Capacity from 2.6 Billion Cubic Feet (Bcf/d) to 2.93 Bcf/d," prepared by Richard B. Kuprewicz, and dated Nov. 3, 2014.

46. Accufacts' Key Observations dated January 6, 2015 on Spectra's Recent Responses to FERC Staff's Data Request on the Algonquin Gas Transmission Proposal (aka "AIM Project"), FERC Docket No. CP 14-96-000) related to Accufacts' Nov. 3, 2014 Report and prepared by Richard B. Kuprewicz.

47. Accufacts' Report on Mariner East Project Affecting West Goshen Township, dated March 6, 2015, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

48. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing on the Proposed System Integrity Projects ("SIP") to the Mississippi Public Service Commission ("MPSC") under Docket No. 15-UN-049 ("Docket"), prepared by Richard B. Kuprewicz, dated June 12, 2015.

49. Accufacts' Report to the Shwx'owhamel First Nations and the Peters Band ("First Nations") on the Trans Mountain Expansion Project ("TMEP") filing to the Canadian NEB, prepared by Richard B. Kuprewicz, dated April 24, 2015.

50. Accufacts Report Concerning Review of Siting of Transco New Compressor and Metering Station, and Possible New Jersey Intrastate Transmission Pipeline Within the Township of Chesterfield, NJ ("Township"), to the Township of Chesterfield, NJ, dated February 18, 2016.

51. Accufacts Report, "Accufacts Expert Analysis of Humberplex Developments Inc. v. TransCanada Pipelines Limited and Enbridge Gas Distribution Inc.; Application under Section 112 of the National Energy Board Act, R.S.C. 1985, c. N-7," dated April 26, 2016, filed with the Canadian Nation Energy Board (NEB).

52. Accufacts Report, " A Review, Analysis and Comments on Engineering Critical Assessments as proposed in

PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for Pipeline Safety Trust by Richard B. Kuprewicz, dated May 16, 2016.

53. Accufacts' Report on Atmos Energy Corporation ("Atmos") filing to the Mississippi Public Utilities Staff, "Accufacts Review of Atmos Spending Proposal 2017 – 2021 (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 15, 2016.

54. Accufacts Report, "Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")," prepared for Earthjustice by Richard B. Kuprewicz, dated October 28, 2016.

55. Accufacts' Report on Mariner East 2 Expansion Project Affecting West Goshen Township, dated January 6, 2017, to Township Manager of West Goshen Township, PA, and prepared by Richard B. Kuprewicz.

56. Accufacts Review of Puget Sound Energy's Energize Eastside Transmission project along Olympic Pipe Line's two petroleum pipelines crossing the City of Newcastle, for the City of Newcastle, WA, June 20, 2017.

57. Accufacts Review of the Draft Environmental Impact Statement for the Line 3 Pipeline Project Prepared for the Minnesota Department of Commerce, July 9, 2017, filed on behalf of Friends of the Headwaters, to Minnesota State Department of Commerce for Docket Nos. CN-14-916 & PPL-15-137.

58. Testimony of Richard B. Kuprewicz, president of Accufacts Inc., in the matter West Goshen Township and Concerned Citizens of West Goshen Township v. Sunoco Pipelines, L.P. before the Pennsylvania Public Utilities Commission, Docket No. C-2017-2589346, on July 18, 2017, on Behalf of West Goshen Township and Concerned Citizens of West Goshen Township.

59. Direct Testimony of Richard B. Kuprewicz, president of Accufacts Inc., on Behalf of Friends of the Headwaters regarding Enbridge Energy, Limited Partnership proposal to replace and reroute an existing Line 3 to the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission (MPUC PL-9/CN-14-916 and MPUC PL-9/PPL-15-137), September 11, 2017 and October 23, 2017.

60. Direct Testimony of Richard B. Kuprewicz On Behalf of The District of Columbia Government, before the Public Service Commission of the District of Columbia, in the matter of the merger of AltaGas Ltd. and WGL Holdings, Inc., Formal Case No. 1142, September 29, 2017.

61. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2018 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated December 4, 2017.

62. Report to Hugh A. Donaghue, Esquire, Concord Township Solicitor, "Accufacts Comments on Adelphia Project Application to FERC (Docket No. CP18-46-000) as it might impact Concord Township," dated May 30, 2018.

63. Report to Mississippi Public Utilities Staff ("MPUS"), "Accufacts Review on Atmos Energy Corporation's Proposed Capital Budget for Fiscal Year 2019 related to System Integrity Program Spending (Docket N. 2015-UN-049)," prepared by Richard B. Kuprewicz, dated August 20, 2018.

64. Report to West Goshen Township Manager, PA, "Accufacts report on the repurposing of an existing 12-inch Sunoco pipeline segment to interconnect with the Mariner East 2 and Mariner East 2X crossing West Goshen Township," dated November 8, 2018.

65. Report to West Whiteland Township Manager, PA, "Accufacts Observations on Possible Pennsylvania State Pipeline Safety Regulations," prepared by Richard B. Kuprewicz, dated March 22, 2019.

66. Accufacts Public Comments on the Proposed Joint Settlement, BI&E v. Sunoco Pipeline L.P. ("SPLP"), Docket No. C-2018-3006534 ("Proposed Settlement"), submitted on August 15, 2019 to the Pennsylvania Public Utility Commission on the behalf of West Goshen Township as an intervener.

67. Report to West Whiteland Township Manager, Ms. Mimi Gleason, "Accufacts Perspective on Two Questions from West Whiteland's Board of Supervisors on Proposed Changes to ME 2 and ME 2X Construction/Operational Activities within West Whiteland," dated September 5, 2019."

10-22-24                                                                                                    Page 7 of 9

**Exhibits -Page 41**

68. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the episode on the evening of 8-5-19 at the Mariner East Boot Road Pump Station ("Event"), Boot Road, West Goshen Township, PA," dated September 16, 2019.

69. Provided direct testimony before the Arizona Corporation Commission, In the Matter of the Application of Southwest Gas Corporation for the Establishment of Just and Reasonable Rates and Charges Designed to Realize a Reasonable Rate of Return on Fair Value of the Properties of Southwest Gas Corporation Devoted to its Arizona Operations (Docket No. G-01551A-19-0055), testified on behalf of Utilities Division Arizona Corporation Commission, February 19, 2020.

70. Report to West Goshen Township Manager, Mr. Casey LaLonde, "Accufacts Report on the Mariner East 2X Pipeline Affecting West Goshen Township," dated July 23, 2020.

71. Assisted the Commonwealth of Massachusetts, Office of the Attorney General in developing pipeline safety processes to be incorporated into the settlement agreement related to Columbia Gas' sale of Assets to Eversource following the Merrimack Valley, Massachusetts overpressure event of September 13, 2018.

72. Report to Natural Resources Defense Council, Inc., "Accufacts' Observations on the Use of Keystone XL Pipeline Pipe Exhibiting External Coating Deterioration Issues from Long Term Storage Exposure to the Elements," October 1, 2020.

73. Report to Pennsylvania Public Utilities Commission ("PAPUC"), "Accufacts Comments on Proposed Pennsylvania Intrastate Liquid Pipeline Safety Regulations," dated October 29, 2021, prepared for West Whiteland Township Board of Supervisors, West Whiteland Township, PA.  Filed to PAPUC public web docket November 5, 2021 by West Whiteland Township under Reference Docket Number L-2019-3010267.   Addresses suggested improvements in proposed pipeline safety rules for PA intrastate liquid transmission pipelines.

74. Submitted written testimony of Richard B. Kuprewicz on Behalf of Bay Mills Indian Community to ALJ Dennis Mack, dated December 14, 2021, in the matter of the Application of Enbridge Energy, Limited Partnership for Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac, before the State of Michigan Public Service Commission, U-20763.

75. Public presentation to New York State Indian Point Nuclear Facility Decommissioning Oversight Board on Holtec removal activities in proximity to Enbridge three Natural Gas Transmission Pipelines, March 17, 2022.

76. Report to Pipeline Safety Trust and Bold Alliance, "Accufacts' Perspectives on the State of Federal Carbon Dioxide Transmission Pipeline Safety Regulations as it Relates to Carbon Capture, Utilization, and Sequestration within the U.S.," March 23, 2022.

77. Accufacts Inc., Public Presentation for the National Academies of Science Engineering Medicine and The Transportation Research Board, "To Committee on Criteria for Installing Automatic and Remote-Controlled Shutoff Valves on Existing Gas and Hazardous Liquid Transmission Pipelines," 4/27/22.

78. Accufacts Inc, "6/13/22 Webinar to Illinois Emergency Responders, Healthcare Providers, & Local Officials on Responses to $CO_2$ Transmission Pipeline Releases," 6/13/22.

79. Accufacts Report for Pipeline Safety Trust, "Safety of Hydrogen Transportation by Gas Pipelines," 11/28/22.

80. Completed a series of testimonies related to Enbridge's Line 5 proposal to replace 2 – 20-inch diameter existing submerged pipelines currently lying across the bottom of the Straits of Mackinac with a 30-inch diameter grade X-70 pipeline, proposed to be installed in a 21-foot diameter concrete tunnel to be installed across the approximate 4-mile span of the Straits of Mackinac.  Testified on Behalf of the Bay Mill Indian Community before the State of Michigan Public Service Commission, Docket U-20763, in opposition to this very poorly designed proposal/installation allowing for movement of the pipeline on rollers within the tunnel.  Final testimony to the docket submitted May 19, 2023.  This is the only pipeline proposal I am aware of in the world that would place a crude oil and liquid propane pipeline, especially a 30-inch diameter pipeline, within a tunnel.

81. Issued to Ms. Niroop Srivatsa, City Manager, "Accufacts Report for the City of Lafayette on the Status of the Tree Assessment Process with PG&E," indicating most of the trees identified for removal by PG&E risk management

10-22-24                                                                                                      Page 8 of 9

approach have nothing to do with gas pipeline safety, June 15, 2023.

82. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the Navigator Heartland Greenway LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0161, on behalf of Citizens Against Heartland Pipeline ("CAHGP"), McDonough County, Christian County and Hancock County (the "Counties") (jointly, "Citizen and County Intervenors" of "CCI"), raising serious questions as to PHMSA's recent assertions of pipeline safety jurisdiction, and underscoring the ICC's authority for pipeline siting jurisdiction of said pipeline proposal in the State of Illinois, filed June15, 2023.  Applicant has terminated their application.

83. Issued Direct Testimony to Illinois Commerce Commission ("ICC") on the WOLF Carbon Solutions US LLC Application for a Carbon Dioxide Transportation and Sequestration pipeline, under Docket 23-0475, for a certificate of authority to construct and operate a carbon dioxide pipeline and when necessary to take interest in property as provided by law of eminent domain, testifying on Behalf of Citizens Against Predatory Pipelines ("CAPP"): 1) identifying serious inadequacies in PHMSA's pipeline safety regulations, 2) explaining why the Commission should require pipeline temperature profiles 3) detailing why DNV-RP-F104 is not relevant to this filing and 4) underscoring the ICC's authority to require additional critical information from the Applicant in this matter, filed October 24, 2023.  Applicant has withdrawn their submission to the Commission.

84. Provided general summary, main observations/concerns, on "Draft Environmental Impact Statement: Otter Tail to Wilkin Carbon Dioxide Pipeline Project" submitted to Minnesota Public Utilities Commission regarding Summit Carbon Solutions, LLC proposed 28 mile long 4-inch diameter $CO_2$ liquid transmission pipeline ("Otter Tail Pipeline") within Minnesota, PUC Docket No. IP-7093/PPL-22-422, provided to Clean Up the River Environment ("CURE") on 1/29/2024.

85. Issued to EarthJustice, "Observations concerning Kern County's Draft Environmental Impact Report ("DEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated February 26, 2024, "Observations concerning Kern County's Recent Recirculated Draft Environmental Impact Report ("RDEIR") on the TerraVault I Carbon Capture and Storage Project ("Project")," dated July 17, 2024, and "Evaluation of Kern County Response to Comments and Final Recirculated Environmental Impact Report on the TerraVault I Carbon Capture and Storage Project, dated October 15, 2024.  The Project situated in Kern County is proposed by the California Resources Corporation to separate a portion of the pre-combustion Elk Hills field gas production, treat and inject via liquid transmission pipelines, $CO_2$ into two sequestration injection wells within the Elk Hill oil field.  The reports identify many technical gaps in filings to Kern County.

86. Issued for the Tribal Partnerships Program, "Observations on the U.S. Army Corps of Engineers Draft Environmental Assessment, Clean Water Act Section 404(b)(1) Guidelines Evaluation, and Public Interest Review (collectively referenced as "DCDD") for the Enbridge Line 5 Wisconsin Segment Relocation Project ("Project"), dated May 2024," report dated July 31, 2024 affecting the Bad River Band of the Lake Superior Tribe of Chippewa Indians reservation.

10-22-24                                                                                                              Page 9 of 9

**Exhibits -Page 43**

# Exhibit C

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

# *Observations on OSFM Letters of Decision for State Waiver Requests on Line CA-324 and CA-325A/B Related to Possible Restart*

**Prepared For**

## The Center for Biological Diversity
## &
## The Environmental Defense Center

**February 21, 2025**

Accufacts Inc. Final

## Table of Contents

I.      *Summary*..................................................................................................................*1*

II.     *The current installation renders the CP system ineffective.*.......................................*2*

III.    *Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.*..................................*3*

IV.     *This is more than simple corrosion under installation (CUI) issue.* ..........................*3*

V.      *External corrosion on buried pipelines falls into four major categories.*................*4*

      1. Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.................................................................................................................4

      2. Cracking or crack-like corrosion is usually an environmental threat difficult to assess...............................................................................................................4

      3. Pitting corrosion is a special form of wall loss that is difficult to identify via ILI. ..............................................................................................................5

      4. Corrosion within dents is a special form of dent threat...........................................5

VI.     *Types of ILI technology.* ..........................................................................................*5*

      1. General wall loss corrosion. ...............................................................................5

      2. Cracking corrosion................................................................................................6

VII.    *What is the purpose of hydrotesting?*......................................................................*6*

VIII.   *The illusion that corrosion growth rate can be accurately predicted needs to be explained.* ...............................................................................................................*7*

IX.     *Major state waiver deficiencies:*.............................................................................*7*

      1. A key corrosion performance tracking process step in the state waivers for the Pipelines is missing. ...........................................................................................7

      2. A major state waiver deficiency for Line 324. .................................................8

      3. Major state waiver deficiencies for Line 325A/B. ...........................................9

X.      *Conclusions.* ............................................................................................................*9*

## I.       Summary.

Accufacts Inc. ("Accufacts") was asked to provide my expert opinion on the Letters of Decision on the State Waivers for the startup of Line CA-324, CA-325A, and CA-325B ("Pipelines") made public in mid-January 2025 by the Office of the State Fire Marshal ("OSFM").[1]  This report builds on a previous Accufacts report issued on December 20, 2024."[2]  By agreement, a Consent Decree gives the OSFM main pipeline safety approval authority of the Pipelines if the OSFM's actions are not in conflict with PHMSA pipeline safety regulations, and if PHMSA decides the proposed state waiver alternative measures "provide an equal or greater level of safety."[3]  It is my understainding that PHMSA can choose to: 1) Not comment on this matter allowing the State Waiver to occur and startup to proceed, 2) Not approve the waiver preventing the startup, or 3) Impose additional requirements to assure an equal or greater level of safety to current minimum federal pipeline safety regulations occurs.

The current coating installations do not provide "limited effectiveness of the cathodic protection system," as mentioned by the Decision letters issued by the OSFM.  This I believe is a poor choice of words that understates the fact that the CP system is ineffective on most of the Pipelines' mileage.  The OSFM is thus being asked to grant a state waiver on federal pipeline safety minimum requirements intended to address external pipeline corrosion from an ineffective CP installation, while relying on hydrotesting and various forms of inline inspection, ILI or smart pigging, to avoid pipeline failure from the resulting external corrosion.

The waivers attempt to allow startup of the Pipelines relying mainly on ILI technology to identify corrosion threats before failure.  In addition, the Application by the Pipeline's operator appears to be relying on a circumferential magnetic flux leakage (MFL-C tool) approach run in February 2022 to argue for the removal of federal regulation requiring the 180 day condition for scheduling remediation of "corrosion of or along a longitudinal seam weld."[4, 5]  Our experience with MFL-C tools is that if certain parameters are not incorporated, such ILI tools can miss a lot of cracks.  I see no mention of such important conditions in the referenced letter that would demonstrate that this ILI run is reliable.  I do not see sufficient justification to waive 49CFR452(h)(4)(iii)(H) as such a waiver would not provide an equal or greater level of safety as no carbon steel pipeline, even new modern steel pipelines, are invincible to corrosion attack.

---

[1] OSFM letter to Sable/PPC Offshore Corp, "Letter of Decision on the Sate Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324) ("Decision Letter 324") and Letter of Decision on the State Waiver Request for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-325A/B) ("Decision Letter 325A/B")", dated 12/17/24.

[2] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024.

[3] PHMSA website: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

[4] Pacific Pipeline Company (Aka now as Sable/PPC) letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115)," July 10, 2023, p. 5 related to MFL-C February 2020 ILI run.

[5] 49CFR452(h)(4)(iii)(H).

Accufacts Inc. Final                                                                                             Page 1 of 9

A simple plot of the type and approximate milepost location of external corrosion such as wall loss or cracking, including field as well as ILI indications along the Pipelines, will underscore how challenging the operation of the present Pipelines will be without effective CP. Such a plot will clearly demonstrate that the Pipelines are not "like new" as indicated by some recent Sable/PPC representatives. Further explanation is also warranted as to why the pipeline operator assumes there is no SCC or SSC risks associated with water on the Pipelines.

A proposal to replace the Pipelines with a new smaller diameter heated pipeline that would be uninsulated and built with modern unshielding coatings was aborted.[6] This proposal would have permitted the CP system to do its job addressing external corrosion, while complying with federal pipeline regulation.

## II.    The current installation renders the CP system ineffective.

The construction of Line 324 in the late 1980s utilized coal tar urethane coating applied to the bare steel pipeline, covered by sprayed on insulation to assure the pipeline was operated at higher temperatures. The insulation was then wrapped with a non-conductive polyethylene tape coating.[7] While there may be some confusion as to the coating installation on what is now named 325A/B, information leads us to believe this coating installation is similar on these pipelines as that on Line 324. To anyone vaguely familiar with pipeline external corrosion protection and cathodic protection ("CP") intent, this approach is a fundamental failure of design/installation reflecting much inexperience in pipelines. The polyethylene tape shields and prevents CP current from getting to the external pipeline steel, and the insulation system works to shield while increasing the likelihood of water in close proximity to the pipe, especially in areas where the coal tar coating directly on the pipeline steel has separated, or disbonded, from the pipe.[8] With such heavy shielding there is thus no way for any CP system current to ever reach the pipeline to reduce/prevent external corrosion.

With the exception of a few feet of buried pipe that has undergone repairs, replacing the existing poor design and coating installations with a few feet of dual epoxy coatings, the shielded CP system is ineffective. The various threats of external corrosion on the Pipelines are exacerbated by the elevated temperature, the potential for water to accumulate along the Pipelines via the insulation, the application of non-conducting tape wrap around the insulation, and the use of older coal tar coating directly on the pipeline that exhibits separation (aka disbondment) from the pipe steel. Disbonded coating in the wrong environments is especially conducive to cracking threats, such as SCC or SSC as discussed in this report. I have seen no convincing arguments that water environments conducive to corrosion cracking are not around or under the coating on the Pipelines.

---

[6] Plains Administrative Draft EIR, "Plains Replacement Pipeline Project," February 2022.

[7] U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), "Failure Investigation Report Plains Pipeline LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, May 2016, Appendix E: Corrosion Control and Pipeline Conditions, page 1 of 4.

[8] *Ibid.,* Page 3 of 21, and Mechanical and Metallurgical Testing, Photos Figure 1 through 20.

Accufacts Inc. Final                                                                 Page 2 of 9

## III.    Compliance with CP regulatory requirements is ineffective, making performance with this regulatory requirement meaningless.

The Pipelines thus have ineffective CP protection from external corrosion that is exacerbated by operation of the Pipelines at elevated temperatures, seriously increasing corrosion rate as discussed in my previous report.[9]  Attempts to gauge the effectiveness of the CP system utilizing CP performance measures identified in PHMSA regulations are meaningless in such heavily shielded installations.  Just operating the Pipeline with CP "on" to meet federal minimum regulatory requirements will not prevent external corrosion attacks that can take on various forms on the Pipelines.  It should be noted that the OSFM has required "Where the operator discovers external corrosion in combination with coating deterioration, the operator must recoat with a two-part epoxy.  Sable must recoat in accordance with their repair procedure." which does allow repair replacing with the existing installation approach, given its many shortcomings to prevent external corrosion.[10]  This requirement places the responsibility on the pipeline operator to identify when or if any, field digs should occur to confirm coating degradation.  The operator should be primarily focused on identifying environments around the pipeline that are precursors to various forms of external corrosion attack, given the many conditions related to the pipeline design/installation conducive to external corrosion attack.

It is on the limited repaired sections, measured in feet, that the CP should be effective as such short length repairs replace the poorly designed shielding original coating installations.  For the vast majority of the Pipelines mileage, however, the CP remains ineffective.  The requirements to measure CP performance stated in 49CFR§195.2 (NACE SP 0169 – 2007 edition, paragraph 6.2.2) are meaningless when heavy shielding, such as that which occurs on CA-324 and CA-325A/B, prevents CP current from reaching the pipeline.

## IV.    This is more than simple corrosion under installation (CUI) issue.

Considerable past discussions have suggested that this is a corrosion under installation (or CUI") problem implying that this is the only controlling issue.  While CUI is certainly a contributing factor, the corrosion threats go well beyond CUI.  As previously discussed, heavy shielding, the tape coating around the insulation, the vintage/type of coating directly on the Pipelines prone to disbondment, the operating temperature, and the environment around the Pipelines, work in concert to create external corrosion in its various forms.  The Consent Decree is an agreement based on the premise that higher risks of external corrosion can be mainly addressed by ILI tools.  The multiple forms of external corrosion which can occur on the Pipelines require various different approaches, beyond ILI, as discussed further in this report.

---

[9] Accufacts, "Evaluation of Las Flores Pipeline System Startup Proposal," prepared for The Center for Biological Diversity & The Environmental Defense Center, December 20, 2024, p. 13.
[10] OS OSFM letter to Sable/PPC Offshore Corp, "Decision Letter 324 and Decision Letter 325A/B")," dated 12/17/24, pp. 11 and 11 respectively.

Accufacts Inc. Final                                                                                          Page 3 of 9

## V.    External corrosion on buried pipelines falls into four major categories.

External corrosion on buried steel pipelines falls into four general categories:  1) wall loss or thinning of the pipe wall, 2) cracking or crack-like, 3) pitting, and 4) corrosion within dents.

1.  **Pipe wall loss corrosion is generally understood to occur over larger areas of the pipe.**

    Internal or external corrosion can cause pipe wall thinning.  Such thinning differs from pit corrosion discussed below, in that pipe wall loss thinning tends to occur over a wider area of the pipe.  Despite previous multiple ILI runs, external corrosion pipe wall loss, or thinning, was the condition that resulted in the May 19, 2015 pipeline rupture failure.  External corrosion on the shielded pipe allowed general corrosion thinning of the pipeline until the pipe failed under pressure.  It should be worth noting that wall loss in excess of 0.8 wall thickness (actually 0.91) which occurred in the May 19, 2015 rupture, places the operator at great risks.  Ironically, pipe wall loss is generally one pipeline failure threat that advances in the ILI technology over recent decades was intended to address, either with ILI mag flux or ultrasonic approaches which are different technical methods.

2.  **Cracking or crack-like corrosion is usually an environmental threat difficult to assess.**

    This is associated with various forms of pipeline cracking, such as selective seam corrosion or stress corrosion cracking.  While engineers like to think they can calculate time to failure, such time to failure estimates for these forms of corrosions are hard to reliably predict.  Given the probability that such cracking, especially if in clusters, can interact with other cracks, or weaknesses in the pipe body near/at welds, makes prediction to failure highly unreliable.  Such pipe weaknesses can occur at weld heat affected zones, at girth welds, or at manufacturing related pipe seams, in unpredictable ways that can quickly negate time to failure calculation/estimates, even if cracking potential is identified.

    Sable/PPC has requested an exemption from 49CFR452(h)(4)(iii)(H) explaining this is usually a SSC threat related to earlier vintage manufacturing processes such as LF-ERW which tends to exhibit lower pipe toughness. There are other related risks to the manufacturing process of modern steels such as DSAW and HF-ERW concerning cracking potential from poor coating/ineffective CP approaches.  Because of the nature of disbonded coating in proximity to water, coating can tent at weld seams creating potential for cracking corrosion attack, such as SSC.  Even modern pipe steels are not invincible to such cracking corrosion potential, especially on pipelines operating at elevated temperatures.  Unless the operator can show why such environments don't exist, their request to be exempted from 49CFR452(h)(4)(iii)(H) should be denied.  These explanations should go well beyond a MAG-C pig run the pipeline operator has provided.

3. **Pitting corrosion is a special form of wall loss that is difficult to identify via ILI.**

This is the loss of pipe steel in concentrated small areas, forming localized small holes or pits, usually at girth welds, that can weaken the pipeline and cause a release.  Pit corrosion identification via ILI, even newer generations of ILI tools, can be very challenging.  Pit corrosion threats are usually verified via field digs or pipeline releases.  While this threat can be a bona fide threat on the Pipelines that are heavily shielded rendering CP ineffective, there has been no mention that this threat has been identified.

4. **Corrosion within dents is a special form of dent threat.**

Corrosion or cracking within a dent, also known as "dents with stress concentrators" are hard to identify via ILI, and almost impossible to reliably predict time to failure.  Such threats are usually identified by high-definition geometric ILI dent tools, the location around the pipeline, and field dig verification assessments.  The ILI determination using high resolution caliper or geo pigs, have proven reliable at identifying dents and their location on a pipeline.

## VI.      Types of ILI technology.

Given the possible types of external corrosion on the Pipelines, I now focus on a simple high-level discussion of corrosion ILI technical approaches.

1. **General wall loss corrosion.**

After the advancement of geometric or deformation ILI technology, the next early phase of ILI use focused on general corrosion wall loss, or pipeline thinning along the axis or flow direction of the pipeline.  In this field, technology split into two different approaches, magnetic flux leakage and ultrasonic.  Magnetic flux leakage (or mag flux) approaches utilized software algorithms to characterize changes in magnetic flux to identify wall loss aligned in the axial, or direction of flow, usually the most insidious and common corrosion flaws for pipe.  Mag flux ILIs fall into two general categories: low resolution (usually associated with earlier generation) and high resolution (usually more complex and more expensive).  Mag flux technology shifted from low resolution to the more sophisticated high resolution approaches where corrosion is problematic.  There are still pipelines that utilize low resolution mag flux because of cost, so care should be exercised in the application of this form of ILI on liquid pipelines.  The waivers specifically require UT ILI the first two years of operation, but are moot, indicating magnetic flux ILI in the future could be allowed without clarification as to high res or low res ILI.

Ultrasonic ILI approaches use beams of ultrasonic energy to identify both external and internal corrosion wall loss.  While a simplification, ultrasonic approaches are analogous to radar, where reflected energy readings are utilized to measure changes in pipe wall thickness.  Originally, ultrasonic approaches, focusing on wall loss evaluation, directed UT energy directly into the pipe in the radial direction for wall thickness and resulting wall loss corrosion sizing determinations.

Accufacts Inc. Final                                                    Page 5 of 9

**2.  Cracking corrosion.**

Pipeline ruptures from cracking threats drove a need for ILI tool cracking development.  Thus, a next generation of ultrasonic ILI approaches advanced by changing the angle of the UT beam from radial into the pipe to at an angle to help spot cracks that might be developing.  This form of UT approach is identified as shear wave.  As more pipeline failures from cracking were uncovered, additional advances known as phased array ultrasonic (PAUT) have recently developed, though such measurements are currently focused on field measurement of uncovered pipeline, as ILI in this area I would categorize as still under development.

I have investigated too many pipeline ruptures that occurred after an ILI run which indicates more regulatory work is needed in ILI regulations related to applications of ILI.  No ILI vendor provides such tools claiming they will not work.  It is the pipeline operator's responsibility to ensure ILI runs meet the restrictions placed by the tool vendor (such as speed) and to verify the tool vendor's claimed capability with a proper number of field verification digs.

## VII.    What is the purpose of hydrotesting?

There are basically two types of hydrotesting mentioned in federal pipeline safety: 1) What I call a subpart E, or proof of MOP test, and 2) a crack hydrotest, what is referred to as a "spike hydrotest" that is performed at much higher test pressures as a %SMYS.  Both forms of hydrotesting are proof test, good at the time of the test, and don't characterize time dependent pipeline threats such as corrosion.

The purpose of an MOP hydrotest is to proof the fitness for service of a pipeline at the time of the test, with a certain margin of pressure safety that usually deteriorates with time.  Subpart E MOP tests are not crack integrity test.  If a pipeline system has crack forming potential an MOP test is not appropriate.

Spike hydrotests are meant to avoid pressure reversals associated with crack threats on pipelines.  Pressure reversals are where cracks remaining after MOP hydrotest tests can enlarge for various reasons to result in possible failure during operation, usually at lower pressures.  It is my experience that spike hydrotests are meant to deal with cracking threats if such a threat exists.  The performance metric for the suitability of a spike hydrotest is the range of %SMYS for the specific test segment.  For pipeline elevation changes like that associated with 325A/B, a spike hydrotest requires the pipeline be segmented to keep test pressures within reasonable ranges that don't produce permanent yielding of the pipe.  The information made public to date indicates that the previous hydrotests performed in 1986, because of elevation changes, required Line 325A to undergo hydrotesting in 9 segments and in Line 325B in 11 segments.  Unfortunately, the hydrotest segments in the public record application are identified by station number and not by approximate milepost.  Since there is usually no correlation between station number and milepost, I thus cannot evaluate whether the Decision Letter 325A/B pressure testing parameters are adequate for Line 325A.[11]   It is worth noting that the Decision Letter 325A/B makes no mention of a subpart E

---

[11] Decision Letter 325A/B, "Pressure Testing," page 5.

Accufacts Inc. Final                                                                               Page 6 of 9

hydrotest or spike hydrotest on Line 325B.  The proposed segments for hydrotests on 325A need to be identified by approximate milepost to permit evaluation as to whether the waiver requirements are appropriate.  The reasons for hydrotesting exclusion on Line 325B need to be properly justified and made public by the OSFM.

## VIII.    The illusion that corrosion growth rate can be accurately predicted needs to be explained.

One of the critical parameters that I have observed in too many pipeline rupture investigations is that ILI can be utilized to accurately predict corrosion growth rates ("CGR") to help set a critical ILI run timing, for example.  The Pipelines essentially have no effective CP, operate as a higher temperature system, contain disbonded coating, incorporate heavy shielding which prevents CP from reaching the Pipelines and operate with insulation that moves water on/near the outside of the pipe.  Such a combination of factors can provide a wide variation in types of external corrosion as well as corrosion rate estimates.  CGR estimates can be especially problematic if CGR approaches miss possible corrosion interaction threats that can considerably shorten time to failure estimates.  I advise that CGR be utilized with extreme caution given this possible variation, especially for corrosion threats that can interact, such as SCC, whose time to failure can be highly unpredictable.  Corrosion growth rate estimates can vary considerably given the various form of external corrosion, especially related to cracking in combination with its location near sensitive pipe locations such as seam or girth welds.

## IX.    Major state waiver deficiencies:

Key observation on the state waivers for the Pipelines:

1. **A key corrosion performance tracking process step in the state waivers for the Pipelines is missing.**

    While not specially required in minimum pipeline safety regulations or the waivers, a prudent pipeline operator on a pipeline system highly susceptible to corrosion will plot or graph corrosion indications by type and severity, by approximate milepost.  This is especially important on the Pipelines given their history of extensive corrosion caused by the lack of CP effectiveness, poor coating types causing disbondment or shielding, increased temperature, insulation that tends to wick water, and poor performance of ILI.  Such graphing aids a pipeline operator in understanding possible corrosion "hot spot" segments whose threats on a pipeline increase because of environmental factors that merit additional assessment, and maybe even pipeline segment replacement from a corrosion point of view.

    Care also needs to be taken that all corrosion sites are prudently evaluated for possible interactive threats, such as general wall loss in combination with cracking, or near pipe welds, such as that which can occur with cluster corrosion.  I see no mention in the Letters of Decision and waivers requiring such important corrosion tracking on the Pipelines.

Accufacts Inc. Final                                                                                   Page 7 of 9

2.  **A major state waiver deficiency for Line 324.**

Given the pipeline properties stated for Line 324 (a single grade X65, 0.344 in wall thickness, 24-inch diameter, HF-ERW), I can calculate the various % SMYS for the spike (minimum and maximum test pressures, and MOP hydrotests) based on an estimated approximate elevation profile by milepost as Line 324 can be hydrotested as one segment given its limited elevation profile.

A critical condition in the OSFM Decision letter 324 is:

"12.  Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after the spike hydrotest is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
   b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP."[12]

For the 24-inch diameter pipe, wall thickness and grade stated in the Decision Letter 324, 100% SMYS calculates to 1863 psig.  1.5 times the stated MOP of 1003 psig calculates to 1504 psig, at the highest elevation point.  Thus, the spike test at the highest elevation point as required above is likely to be the lower maximum test pressure of 1504 psig which calculates to about 81% SMYS**, a value I believe is too low for corrosion cracking screening and evaluation**.  The OSFM needs to explain why the proposed spike hydrotest of Line 324 is so low.

The bottom line is that Sable/PPCs should demonstrate whether there are environmental conditions around Line 324 that are conducive to cracking either SCC or SSC, and these conditions should go well beyond a Mag-C tool run (such as sufficient field digs to verify the ILI tool's claimed capability).  I see no such important conditions in Sable/PPCs application that instill confidence that Line 324 does not have environments favoring external cracking.  While it is true that certain pipe manufactured before 1970 is more prone to SSC, or SSWC, for various reasons, there is no modern pipe, even HF-ERW located in Line 324 or DSAW located in 325 A/B, that is invincible to such corrosion cracking threats, especially if the coating directly applied to the pipe has "tented" on the weld seam, allowing water to enter between the coating and the pipe to create a corrosion cell.  There is no carbon steel pipeline, even new modern manufactured steel pipelines, invincible to such corrosion attack.

---

[12] Decision Letter 324, "Pressure Testing," pages 4 – 5.

Accufacts Inc. Final                                                                 Page 8 of 9

3. **Major state waiver deficiencies for Line 325A/B.**

Decision Letter 325 states that Line 325A and 325B is composed of 30-inch diameter of two pipe grades (X65 with a thickness of mainly 0.344 inch and X70 with a wall thickness mainly of 0.281 inches composed of DSAW, with one small segment of 0.03 miles containing HF-ERW). I used the term "mainly" as Sable's/PPC's application indicates these two lines are also largely composed of these grades with a small percentage of varying thicknesses.[13] For these two pipe grades, and thicknesses, 100 % SMYS calculates to 1490 psig for X65 and 1311 psig for X70. Since the location of the various pipe grades by approximate mileposts within CA-325A/B are not indicated, and given the dramatic elevation profiles for 325A/B the proposed hydrotest segments, if any, by milepost and elevation segments need to be made public. Without such information, I cannot calculate the % SMYS range for hydrotests given the OSFM conditions. Hydrotest segments are identified by station number which don't necessarily sync with milepost or MP.[14] **These important test segment parameters, by approximate MP, and elevation need to be made public to assure prudent hydrotesting is being required to address the possible general corrosion and cracking risks on Line 325A/B**.

It is worth noting that the OSFM does not require a MOP and spike hydrotest of 325B which has very significant elevation changes. This would suggest that Line 325B is not being evaluated by hydrotesting. The reason(s) for this decision needs to be made public.

## X.    Conclusions.

Hydrotest segments proposed for the Pipelines need to be made transparent and include approximate MP, given the major role that elevation change plays on this system. Critical parameters related to location by milepost of the varying grades and thicknesses of pipe on 325 A/B and their associated hydrotest segments need to be identified by approximate MP as well, to verify if the OSFM parameters are sufficient for the specific types of corrosion threat. The reason as to why a spike hydrotest on 324 and 325 A are limited needs to be explained, as well as to why 325B hydrotesting has not been included in either a subpart E or spike hydrotest,

The incompleteness of the waivers lead me to conclude that I cannot determine the waivers provide sufficient information to assure an equal or greater level of safety for the Pipelines had the operator had an unshielded coating design that complied with federal minimum pipeline CP protection intended to avoid pipeline failure from external corrosion.

Richard B. Kuprewicz
President
Accufacts Inc.

*Richard B Kuprewicz*

---

[13] Sable/PPC letter to OSFM, "Subject Pacific Pipeline Company (OPID 40475) State Waiver Application for the Las Flores Pipeline CA-324 (OSFM #00115). Pipeline System Background Data Attachment B of State Application Table B-3 Line Pipe Specifications," July 2023, p. 4.

[14] *Ibid.*, "Table B-6 Historic Hydrotest Summary," p. 6.

# EXHIBIT C



U.S. Department
of Transportation

**Pipeline and Hazardous
Materials Safety
Administration**

MAY 2 1 2015

1200 New Jersey Avenue SE
Washington, DC  20590

**VIA CERTIFIED MAIL AND FAX TO: 713-646-4378**

Troy Valenzuela
Vice President EHS
Plains Pipeline, LP
333 Clay Street, Suite 1600
Houston, TX 77002

**Re: CPF No.  5-2015-5011H**

Dear Mr. Valenzuela:

Enclosed is a Corrective Action Order issued in the above-referenced case.  It requires Plains
Pipeline, LP to take certain corrective actions with respect to Line 901 of your pipeline system
that failed on May 19, 2015, near Santa Barbara, CA.  Service is being made by certified mail
and facsimile.  Service of the Corrective Action Order by electronic transmission is deemed
complete upon transmission and acknowledgement of receipt, or as otherwise provided under 49
C.F.R. § 190.5.  The terms and conditions of this Order are effective upon completion of service.

Thank you for your cooperation in this matter.

Sincerely,

Jeffrey D. Wiese
Associate Administrator
for Pipeline Safety

Enclosure

cc:    Ms. Linda Daugherty, Deputy Associate Administrator for Field Operations, OPS
       Mr. Chris Hoidal, Director, Western Region, OPS

U.S. DEPARTMENT OF TRANSPORTATION
PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
OFFICE OF PIPELINE SAFETY
WASHINGTON, D.C. 20590

In the Matter of                              )
                                              )
                                              )
Plains Pipeline, LP,                          )          CPF No. 5-2015-5011H
                                              )
Respondent.                                   )
                                              )

## CORRECTIVE ACTION ORDER

### Purpose and Background:

This Corrective Action Order (Order) is being issued, under the authority of 49 U.S.C. § 60112, to require Plains Pipeline, LP (Plains or Respondent), to take the necessary corrective action to protect the public, property, and the environment from potential hazards associated with the recent failure on your pipeline in Santa Barbara County, California.

On May 19, 2015, a reportable accident occurred on Plains' Line 901 pipeline, resulting in the release of approximately 1700 to 2500 barrels of heavy crude oil (Failure). Line 901 is a 24-inch diameter pipeline approximately 10.6 miles in length that transports crude oil from Exxon Mobil's breakout storage tanks in Las Flores Canyon to Plains' Gaviota Pump Station. The cause of the Failure has not yet been determined. Pursuant to 49 U.S.C. § 60117, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), initiated an investigation of the accident. The preliminary findings of the ongoing investigation are as follows:

### Preliminary Findings:

- Plains Pipeline, LP (Plains), is a publicly traded master limited partnership that operates approximately 17,800 miles of crude oil and natural gas liquids pipelines and gathering systems throughout the United States, including California and Texas.[1]

- The failed pipeline is a 24-inch diameter line that transports crude oil and runs from Exxon Mobil's breakout storage tanks in Las Flores Canyon to Plains' Gaviota Pump Station, a distance of approximately 10.6 miles (Affected Pipeline). The Failure occurred near milepost 4 near Goleta, California (Failure Site).

---

[1] https://www.plainsallamerican.com/what-we-do/transportation (last accessed May 20, 2015)

CPF No. 5-2015-5011H
Page 2

- The Affected Pipeline was constructed from 1987-1990, and consists of .344 wall thickness, X-65 high frequency electric resistance welded (ERW) pipe manufactured by Nippon Steel.

- The Affected Pipeline has a Maximum Operating Pressure (MOP) of 1025 psig and the normal operating pressure is 650 psig. Plains initially reported that the line pressure was approximately 700 psig immediately prior to failure.

- The initial hydrostatic test on the Affected Pipeline was conducted in October 1990, to a pressure of 1719 psig held for 8 hours.

- The Affected Pipeline is insulated and operates at up to 120 degrees Fahrenheit. There are shrink wrap sleeves at some of the pipeline's girth welds.

- The Affected Pipeline was recently smart-pigged on May 5, 2015. Complete in-line inspection (ILI) data was collected but the operator has not yet received a formal report from the ILI vendor regarding the analysis of the data and identification of any anomalies requiring further investigation according to the Federal pipeline safety regulations.

- Previous ILIs were performed in June 2007 and July 2012. In 2007 and 2012, there were 13 and 41 excavations of ILI-identified anomalies on the pipeline, respectively. These anomalies were mostly due to external corrosion, frequently located near the pipeline's girth welds.

- The Failure was discovered by the operator on May 19, 2015 around 1:30 p.m. PST, and reported to the National Response Center (NRC Report No. 1116972) at 2:56 p.m. PST. The operator reported an estimated spill of more than 500 BBLs of crude oil in their NRC report, but stated there was limited information available at that time.

- Prior to the discovery of the Failure, the controller of Line 901 noticed anomalies in the operating pressure, shut down and isolated the line around 11:30 am PST, and called field personnel to investigate.

- Another NRC report (No. 1116950) was received by the National Response Center at 12:43 p.m. from the Santa Barbara Dispatch reporting an unknown oil sheen at Refugio Beach.

- The release occurred on the north side of the Pacific Coast Highway. The released product traveled southward through a nearby water drainage culvert approximately ¼ mile to Refugio State Beach, where the product entered the Pacific Ocean. It is estimated that product has spread several miles down the coast.

- The estimated release amount was reported to have increased to 1700 to 2500 BBLs by the Unified Command center on the afternoon of May 20th.

- Refugio State Beach and camp grounds have been closed due to the oil spill. There were no reports of injuries.

- Several areas of environmental sensitivity are located near the Failure Site, including Bell Canyon, Tecolote Canyon, the City of Gaviota, and Coal Oil Point Reserve.

- Various state and federal agencies responded to the scene, including the U.S. Coast Guard, U.S. Environmental Protection Agency, California County Office of Emergency Services, and local fire department(s). Private oil spill response organizations under contract with Plains and Exxon Mobil personnel are also responding. Clean-up operations are underway.

- The cause of the Failure is unknown and the investigation is ongoing.

**Determination of Necessity for Corrective Action Order and Right to Hearing:**

Section 60112 of Title 49, United States Code, provides for the issuance of a Corrective Action Order, after reasonable notice and the opportunity for a hearing, requiring corrective action, which may include the suspended or restricted use of a pipeline facility, physical inspection, testing, repair, replacement, or other action, as appropriate. The basis for making the determination that a pipeline facility is or would be hazardous, requiring corrective action, is set forth both in the above-referenced statute and 49 C.F.R. § 190.233, a copy of which is enclosed.

Section 60112 and the regulations promulgated thereunder provide for the issuance of a Corrective Action Order, without prior notice and opportunity for hearing, upon a finding that failure to issue the Order expeditiously would result in the likelihood of serious harm to life, property, or the environment. In such cases, an opportunity for a hearing and expedited review will be provided as soon as practicable after the issuance of the Order.

After evaluating the foregoing preliminary findings of fact, I find that continued operation of the pipeline without corrective measures is or would be hazardous to life, property, or the environment. Additionally, having considered the uncertainties as to the cause of the Failure, the location of the Failure, the material being transported, and the proximity of the pipeline to the Pacific Ocean and environmentally sensitive areas, I find that a failure to issue this Order expeditiously to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment.

Accordingly, this Corrective Action Order mandating immediate corrective action is issued without prior notice and opportunity for a hearing. The terms and conditions of this Order are effective upon receipt.

Within 10 days of receipt of this Order, Respondent may contest its issuance and obtain expedited review either by answering in writing or requesting a hearing under 49 C.F.R. § 190.211, to be held as soon as practicable under the terms of such regulation, by notifying the Associate Administrator for Pipeline Safety in writing, with a copy to the Director, Western Region, OPS (Director). If Respondent requests a hearing, it will be held telephonically or in-person in Denver, Colorado, or Washington, D.C.

**After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken on the Affected Pipeline or Plains' Line 903.** In that event, PHMSA will notify Respondent of any additional measures that are required and an amended Order will be issued, if necessary. To the extent consistent with safety, Respondent will be afforded notice and an opportunity for a hearing prior to the imposition of any additional corrective measures.

## Required Corrective Actions:

Pursuant to 49 U.S.C. § 60112, I hereby order Plains to immediately take the following corrective actions for the Affected Pipeline:

1. *Shutdown.* Plains must not operate the Affected Pipeline until authorized to do so by the Director.

2. *Empty and Purge the Affected Pipeline.* Plains must empty and purge the Affected Pipeline and fill with an inert gas until Items 3 through 8 of this Order are completed. This purging must be done as soon as practicable after repairing the Failure Site, but no longer than 10 days after receipt of this Order.

   a. Plains must notify the Director and local and State responders prior to conducting the purging operations.

   b. Plains must conduct the purging operations during daylight hours and monitor the pipeline right of way continually to quickly identify and contain any releases should they occur.

3. *Review of Affected Pipeline.* Within 45 days of receipt of this Order, Plains must review the Affected Pipeline for conditions similar to those of the Failure. Plains must address any findings that require remedial measures to be implemented prior to restart. This review must include:

   a. All construction, operating and maintenance (O&M) and integrity management records, such as hydrostatic tests, root cause failure analysis of prior failures, aerial and ground patrols, corrosion protection, One Call tickets, excavations and exposed pipe records, and pipe replacements;

   b. Identification of all areas of the Affected Pipeline that have insulated pipe and girth welds with "shrink wrap" sleeves;

   c. All ILI results from the past 10 calendar years, including a followup review of the ILI vendors' raw data and analysis from pre-2015 ILI surveys and a first time review of the data from the ILI survey conducted on May 5, 2015. Determine whether any anomalies were present in the failed pipe joint and any other pipe removed near the Failure Site. Determine whether any anomalies with similar characteristics are present elsewhere on the Affected Pipeline. Plains must submit documentation of this ILI review to the Director within 45 days of receipt of this Order as follows:

      i.   List all ILI tool runs, tool types, and the calendar years of the tool runs conducted on Line 901.

      ii.  Provide all ILI data from the past 10 years to the Director for review by a 3rd party ILI data analyst.

iii. Explain the process that was used to review the past ILI results, and the process that will be used during the reevaluation.

iv. List and describe (type, size, wall loss, etc.) the specific locations of all ILI features from the ILI surveys conducted prior to the May 5, 2015 survey. Include the disposition of those requiring investigation per 49 CFR Part 195.452(h) or Plains's remediation criteria.

v. List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the May 5, 2015 ILI survey that are present in the failed joint and other pipe removed near the Failure Site.

vi. List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the May 5, 2015 ILI survey that require investigation per 49 CFR Part 195.452(h) elsewhere on the Affected Pipeline. If an ILI feature or anomaly is identified to be associated with the Failure Site, all features with similar characteristics elsewhere on the Affected Pipeline must be investigated and remediated.

4. **Records Verification.** As recommended in PHMSA Advisory Bulletin 2012-06, Plains must verify the records for the Affected Pipeline to confirm the Maximum Operating Pressure (MOP). Plains must submit documentation of this records verification to the Director within 45 days of receipt of this Order.

5. **Mechanical and Metallurgical Testing.** Within 45 days of receipt of this Order, complete mechanical and metallurgical testing and failure analysis of the failed pipe, including an analysis of soil samples and any foreign materials. Complete the testing and analysis as follows:

   a. Document the chain-of-custody when handling and transporting the failed pipe section and other evidence from the Failure Site. The removal and protection of the failed pipe section shall be done in the presence a PHMSA representative, and all failure surfaces shall be protected from damage or contamination during removal and subsequent storage prior to testing.

   b. Within 10 days of receipt of this Order, develop and submit the testing protocol and the proposed testing laboratory to the Director for prior approval.

   c. Prior to beginning the mechanical and metallurgical testing, provide the Director with the scheduled date, time, and location of the testing to allow for an OPS representative to witness the testing.

   d. Ensure the testing laboratory distributes all reports, whether draft or final, in their entirety to the Director at the same time they are made available to Plains.

6. **Root Cause Failure Analysis.** Within 60 days following receipt of this Order, complete a root cause failure analysis (RCFA) and submit a final report of this RCFA to the Director. The RCFA must be facilitated by an independent third-party acceptable to the Director and must document the decision-making process and all factors contributing to the Failure. The final report must include findings and any lessons learned and whether the findings and any lessons learned are applicable to other locations within Plains' pipeline system.

7. **Remedial Work Plan.** Within 90 days following receipt of this Order, provide a plan to the Director for his approval to investigate and remediate all actionable anomalies per 49 CFR

Part 195.452(h) and anomalies similar to those that may have led to the release at the Failure site.

8. **Restart Plan.** Prior to resuming operation of the Affected Pipeline, Plains must develop and submit a written Restart Plan to the Director for prior approval.

    a. The Restart Plan may only be requested after completion of Items 2 through 7 of this Order.

    b. The Restart Plan must also include documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual.

    c. The Restart Plan must provide for adequate patrolling of the Affected Pipeline during the restart process and must include incremental pressure increases during start-up, with each increment to be held for at least 2 hours.

    d. The Restart Plan must include sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes.

    e. The Restart Plan must specify a day-light restart and include advance communications with local emergency response officials.

    f. Once approved by the Director, the Restart Plan will be incorporated by reference into this Order.

9. **Return to Service.** After the Director approves the Restart Plan, Plains may return the Affected Pipeline to service but the operating pressure must not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Failure on May 19, 2015.

10. **Removal of Pressure Restriction.**

    a. The Director may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-failure operating pressure is justified based on a reliable engineering analysis showing that the pressure increase is safe considering all known defects, anomalies, and operating parameters of the pipeline.

    b. The Director may allow the temporary removal or modification of the pressure restrictions upon a written request from Plains demonstrating that temporary mitigative and preventive measures are implemented prior to and during the temporary removal or modification of the pressure restriction. The Director's determination will be based on the failure cause and provision of evidence that preventive and mitigative actions taken by the operator provide for the safe operation of the Affected Segment during the temporary removal or modification of the pressure restriction.

11. **Emergency Response Plan and Training Review.** Plains must review and assess the effectiveness of its emergency response plan and Bakersfield Spill Response Plan – Sequence 0107 with regards to the Failure. Include in the assessment a detailed review of the on-scene response and support activities (including timeline), coordination with all parties (including regulatory requests and proceeding with work), site security (including all phases of the response), procedures for improvements, lessons learned, and communication with the National Response Center, emergency responders, third party contractors, public officials, and internal resources. Include a review and assessment of the effectiveness of its emergency training program. Plains must amend its emergency response plan and

emergency training, if necessary, to reflect the results of this review. Documentation of this *Emergency Response Plan and Training Review* must be provided to the Director. Revisions to the Bakersfield Spill Response Plan must be submitted to the Director, Emergency Support and Security Division, for review and approval in accordance with 49 C.F.R. Part 194.

12. ***CAO Documentation Report (CDR).*** Plains must create and revise, as necessary, a Corrective Action Order Documentation Report (CDR). When Plains has concluded all the items in this Order, the company will submit the final CDR in its entirety to the Director. This will allow the Director to complete a thorough review of all actions taken by Plains according to this Order prior to approving the closure of this Order. The intent is for the CDR to summarize all activities and documentation associated with this Order in one document.

    a.  The Director may approve the CDR incrementally without approving the entire CDR.

    b.  Once approved by the Director, the CDR will be incorporated by reference into this Order.

    c.  The CDR must include but not be limited to:

        i.  Table of Contents;

        ii.  Summary of the Failure and all response activities;

        iii.  Summary of pipe data/properties and all prior assessments of the Affected Pipeline;

        iv.  Summary of all tests, inspections, assessments, evaluations, and analysis required by this Order;

        v.  Summary of the Mechanical and Metallurgical Testing, as required by this Order;

        vi.  Summary of the RCFA with all root causes, as required by this Order;

        vii.  Lessons learned while completing this Order;

        viii.  A path forward describing specific actions Plains will take on its entire pipeline system as a result of the lessons learned from work on this Order

## Other Requirements:

1. ***Reporting.*** Submit monthly reports to the Director that: (1) include all available data and results of the testing and evaluations required by this Order; and (2) describe the progress of the repairs or other remedial actions being undertaken. The first report is due on June 21. The Director may change the interval for the submission of these reports.

2. ***Documentation of Costs.*** It is requested but not required that Plains maintain documentation of the costs associated with implementation of this Order. Include in each monthly report the to-date total costs associated with: (1) preparation and revision of procedures, studies and analyses; (2) physical changes to pipeline infrastructure, including repairs, replacements and other modifications; and (3) environmental remediation, if applicable.

3. ***Approvals.*** With respect to each submission requiring the approval of the Director, the Director may: (a) approve the submission in whole or in part; (b) approve the submission

on specified conditions; (c) modify the submission to cure any deficiencies; (d) disapprove the submission in whole or in part and direct Plains to modify the submission; or (e) any combination of the above. In the event of approval, approval upon conditions, or modification by the Director, Plains must proceed to take all actions required by the submission, as approved or modified by the Director. If the Director disapproves all or any portion of a submission, Plains must correct all deficiencies within the time specified by the Director and resubmit it for approval.

4. **Extensions of Time.** The Director may grant an extension of time for compliance with any of the terms of this Order upon a written request timely submitted and demonstrating good cause for an extension.

The actions required by this Corrective Action Order are in addition to and do not waive any requirements that apply to Respondent's pipeline system under 49 C.F.R. Part 195, under any other order issued to Respondent under authority of 49 U.S.C. § 60101, *et seq.*, or under any other provision of Federal or State law. **After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken on the Affected Pipeline or Plains' Line 903.**

Respondent may appeal any decision of the Director to the Associate Administrator for Pipeline Safety. Decisions of the Associate Administrator shall be final.

Be advised that all material you submit in response to this enforcement action is subject to being made publicly available. If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), along with the complete original document you must provide a second copy of the document with the portions you believe qualify for confidential treatment redacted and an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

Failure to comply with this Order may result in the assessment of civil penalties and in referral to the Attorney General for appropriate relief in United States District Court pursuant to 49 U.S.C. § 60120.

In your correspondence on this matter, please refer to CPF No. 5-2015-5011H and for each document you submit, please provide a copy in electronic format whenever possible.

The terms and conditions of this Corrective Action Order are effective upon receipt.

MAY 2 1 2015

Jeffrey D. Wiese
Associate Administrator
for Pipeline Safety

Date Issued



U.S. Department
of Transportation

**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue SE
Washington, DC 20590

**JUN 0 3 2015**

<u>**VIA CERTIFIED MAIL AND FAX TO: 713-646-4378**</u>

Mr. Troy Valenzuela
Vice President EHS
Plains Pipeline, LP
333 Clay Street, Suite 1600
Houston, TX 77002

**Re: CPF No. 5-2015-5011H**

Dear Mr. Valenzuela:

Enclosed is Amendment No. 1 to the Corrective Action Order issued in the above-referenced case on May 21, 2015. It requires Plains Pipeline, LP to take additional corrective actions with respect to Line 901 and Line 903 of its pipeline system. Service is being made by certified mail and facsimile. Service of the Amendment to the Corrective Action Order by electronic transmission is deemed complete upon transmission and acknowledgement of receipt, or as otherwise provided under 49 C.F.R. § 190.5. The terms and conditions of this Order are effective upon completion of service.

Thank you for your continued cooperation in this matter.

Sincerely,



Jeffrey D. Wiese
Associate Administrator
 for Pipeline Safety

Enclosure

cc:   Ms. Linda Daugherty, Deputy Associate Administrator for Field Operations, OPS
      Mr. Chris Hoidal, Director, Western Region, OPS

U.S. DEPARTMENT OF TRANSPORTATION
PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
OFFICE OF PIPELINE SAFETY
WASHINGTON, D.C.  20590

|  |  |
|---|---|
| In the Matter of | ) |
|  | ) |
| Plains Pipeline, LP, | )  CPF No. 5-2015-5011H |
|  | ) |
| Respondent. | ) |

## AMENDMENT NO. 1 TO THE CORRECTIVE ACTION ORDER

**Purpose and Background:**

On May 21, 2015, the Associate Administrator issued a Corrective Action Order (CAO) under the authority of 49 U.S.C. § 60112, to require Plains Pipeline, LP (Plains or Respondent), to take certain corrective actions to protect the public, property, and the environment from potential hazards associated with Line 901 (Affected Pipeline) in Santa Barbara County, California.  The CAO was issued in response to a May 19, 2015, failure on the Affected Pipeline that caused the release of approximately 1700 to 2500 barrels of heavy crude oil (Failure).  The cause of the Failure has not yet been determined.  Pursuant to 49 U.S.C. § 60117, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), initiated an investigation of the accident.

**Additional Preliminary Findings:**

- The results of Plains' May 5, 2015 In-Line Inspection (ILI) survey revealed four areas on the Affected Pipeline with pipe anomalies requiring immediate investigation and remediation in accordance with 49 CFR § 195.452(h) or Plains' own criteria for investigation under its integrity management plan.  Examination and measurements of three of these areas indicated extensive external corrosion, primarily on the bottom quadrant of the pipe.  The deepest metal loss at each area, as measured by Plains non-destructive testing contractors, ranged between 54 and 74% of the original pipe wall thickness.  The anomalies were not limited to being near the girth welds, but also occurred at other locations along the length of the pipe.  The fourth area to be investigated has not yet been completed.

- The Affected Pipeline is experiencing active external corrosion, as follows:

- o Plains has reported to PHMSA that the May 5th ILI survey revealed metal loss of approximately 45% of the original wall thickness in the area of the pipe that failed on May 19.
- o PHMSA inspectors noted general external corrosion of the pipe body during field examination of the failed pipe segment.
- o The rupture characteristics at the Failure site indicate a longitudinally oriented opening approximately 6 inches in length and located in the bottom quadrant of the pipe. Third-party metallurgists in the field estimated that corrosion at the Failure site had degraded the wall thickness to an estimated 1/16 of an inch (.0625"). This thinning of the pipe wall is greater than the 45% metal loss which was indicated by the recent ILI survey.
- o PHMSA inspectors observed three repairs to the Affected Pipeline in the area near the Failure site that had been made due to external corrosion. These repairs were made after the 2012 ILI survey.

- Plains uses an impressed current cathodic protection (CP) system to protect the Affected Pipeline from external corrosion. After the Failure, PHMSA inspectors witnessed Plains measuring CP levels near the Failure site and at the three anomaly digs that were completed after May 22. The CP levels appeared to be adequate according to 49 CFR § 195.571. External corrosion with CP at this level would not be expected.

- Plains' Line 903 is a 30-inch diameter pipeline which transports crude oil 128 miles from the Gaviota Pump Station in Santa Barbara County to the Emidio Pump Station in Kern County, California.

- Plains has informed PHMSA that Line 903 has insulation and shrink wrap sleeves on the girth welds, similar to the Affected Pipeline.

- Line 903 was completely surveyed by ILI during 2013 and 2014. These ILI results revealed:
    - o The 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station was inspected on April 29, 2013, and the report was provided to Plains in June 2013. The ILI vendor reported that this segment had 99 metal loss anomalies requiring investigation.
    - o The 75-mile segment of Line 903 between Sisquoc Station and Pentland Station was inspected on June 12, 2013. The report was provided to Plains in August 2013, and a corrected report was provided in September 2013. This segment had no anomalies requiring investigation. However, the ILI vendor reported there were a number of metal loss anomalies that may indicate general corrosion.
    - o The 15-mile segment of Line 903 between Pentland Station and Emidio Station was inspected on February 19, 2014, and the report was provided to Plains in May 2014. This segment had no anomalies requiring immediate investigation. However, based on the ILI vendor report, this segment had two girth weld anomalies requiring investigation.
    - o The data collected by the ILI surveys for the different segments of Line 903 appear to be inconsistent, requiring immediate review and analysis.

- Plains voluntarily shut down Line 903 on May 19, restarted the line on May 29, and shut the line back down on May 30. Line 903 is currently shut down.

**<u>Determination of Necessity for Amendment to the Corrective Action Order and Right to Hearing</u>:**

Section 60112 of Title 49, United States Code, provides for the issuance of a Corrective Action Order, after reasonable notice and the opportunity for a hearing, requiring corrective action, which may include the suspended or restricted use of a pipeline facility, physical inspection, testing, repair, replacement, or other action, as appropriate. The basis for making the determination that a pipeline facility is or would be hazardous, requiring corrective action, is set forth both in the above-referenced statute and 49 C.F.R. § 190.233, a copy of which is enclosed.

Section 60112 and the regulations promulgated thereunder provide for the issuance of a Corrective Action Order, without prior notice and opportunity for hearing, upon a finding that failure to issue the Order expeditiously would result in the likelihood of serious harm to life, property, or the environment. In such cases, an opportunity for a hearing and expedited review will be provided as soon as practicable after the issuance of the Order.

After evaluating the preliminary findings in the CAO and the foregoing additional preliminary findings of fact, I find that continued operation of Line 901 and Line 903 without corrective measures is or would be hazardous to life, property, or the environment. Additionally, having considered the uncertainties as to the cause of the Failure, the location of the Failure, the similarities between the characteristics of the Affected Pipeline and Line 903, the material being transported, and the proximity of the pipelines to the Pacific Ocean and environmentally sensitive areas, I find that a failure to issue this Order expeditiously to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment.

Accordingly, this Amendment to the Corrective Action Order mandating immediate corrective action is issued without prior notice and opportunity for a hearing. The terms and conditions of this Order are effective upon receipt.

**The actions required by this Amendment No. 1 to the Corrective Action Order are in addition to the requirements that apply to Respondent's Affected Pipeline under the CAO issued on May 21, 2015.**

Within 10 days of receipt of this Amendment, Respondent may contest its issuance and obtain expedited review either by answering in writing or requesting a hearing under 49 C.F.R. § 190.211, to be held as soon as practicable under the terms of such regulation, by notifying the Associate Administrator for Pipeline Safety in writing, with a copy to the Director, Western Region, OPS (Director). If Respondent requests a hearing, it will be held telephonically or in-person in Lakewood, Colorado, or Washington, D.C.

After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken on the Affected Pipeline or Plains' Line 903. In that event, PHMSA will notify Respondent of any additional measures that are required

and another Amendment Order will be issued, if necessary. To the extent consistent with safety, Respondent will be afforded notice and an opportunity for a hearing prior to the imposition of any additional corrective measures.

**Required Corrective Actions:**

Pursuant to 49 U.S.C. § 60112, I hereby order Plains to immediately take the following corrective actions:

*With respect to the Affected Pipeline (Line 901):*

1. *Paragraph 3(c)(vi) of the Required Corrective Actions of the CAO is amended, in its entirety, as follows:* List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the May 5, 2015 ILI survey elsewhere on the Affected Pipeline that require investigation according to 49 CFR § 195.452(h) or the criteria for investigation under Plains' own integrity management plan, whichever is more stringent. All ILI features and anomalies that satisfy the criteria in either 49 CFR § 195.452(h) or the criteria for investigation under Plains' integrity management plan must be investigated and remediated. Provide the Director with a report detailing the results of the investigations and remediations that have been completed, and a proposed schedule for the remaining investigations.

2. *Non-destructive testing.* Plains must use a third-party, American Society of Non-Destructive Testing (ASNT) Level III certified, non-destructive testing field contractor to complete a non-destructive testing analysis at the specific location of each ILI feature or anomaly that requires investigation according to 49 CFR § 195.452(h) or the criteria for investigation under Plains' own integrity management plan, whichever is more stringent. If the ILI feature or anomaly is identified as being located at a girth weld with shrink sleeves, the contractor must perform a magnetic particle inspection, or other appropriate technology, of the weld area to check for stress corrosion cracking (SCC). Provide the Director with five business days' notice of the excavation of each pipe section requiring investigation. A summary of the investigations, test results, and remediations must be included in the monthly report required by Item 12 of the CAO, and the test records must be made available for inspection by PHMSA.

*With respect to Line 903:*

3. *Pressure Restriction.* The operating pressure of Line 903 must not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8 hour period between April 19, 2015, and May 19, 2015. This pressure restriction must remain in effect until the Director provides written approval to resume normal operation of Line 903.

4. *Review of Line 903.* Within 60 days of receipt of this Amendment, Plains must review Line 903 and address any findings that require remedial measures. This review must include:

   a. All construction, operating and maintenance (O&M) and integrity management records, such as hydrostatic tests, root cause failure analysis of prior failures, aerial and ground patrols, corrosion protection, One Call tickets, excavations and exposed pipe records, and pipe replacements;

b. Identification of all areas of Line 903 that have insulated pipe and girth welds with shrink wrap sleeves;

c. List and describe (type, size, wall loss, etc.) the specific location of all ILI features identified by the most recent ILI survey that require investigation according to 49 CFR § 195.452(h) or the criteria for investigation under Plains' own integrity management plan, whichever is more stringent.  All ILI features and anomalies that satisfy the criteria in either § 195.452(h) or the criteria for investigation under Plains' integrity management plan must be investigated and remediated.  Provide the Director with a report detailing the results of the investigations and remediations that have been completed, and a proposed schedule for the remaining anomalies.

5.    ***ILI Data for Line 903.***  Plains must provide the following documentation of previous ILI surveys on Line 903 to the Director within 15 days of receipt of this Amendment:

   i.    List all ILI tool runs, tool types, and the calendar years of the tool runs conducted on Line 903 over the past 10 calendar years.

   ii.   Provide all ILI data from surveys of Line 903 over the past 10 calendar years to the Director for review by PHMSA's 3rd party ILI data analyst.

6.    ***Non-destructive testing.***  Plains must use a third-party, American Society of Non-Destructive Testing (ASNT) Level III certified, non-destructive testing field contractor to complete a non-destructive testing analysis at the specific location of each ILI feature or anomaly on Line 903 identified in Item 4(c) above.  If the ILI feature or anomaly is identified to be at a girth weld with shrink sleeves, the contractor must perform a magnetic particle inspection, or other appropriate technology, of the weld area to check for stress corrosion cracking (SCC).  Provide the Director with five business days' notice of the excavation of each pipe section requiring investigation.  A summary of the investigations, test results, and remediations must be included in the monthly report required by Item 12 of the CAO, and the test records must be made available for inspection by PHMSA.

***With respect to both the Affected Pipeline and Line 903:***

7.    ***Enhanced preventive and mitigative measures.***  Plains must take additional preventive and mitigative measures on the Affected Pipeline and Line 903 while each pipeline is subject to a pressure restriction under the CAO or this Amendment.  These measures must include, but are not limited to:

   a. Patrol inspections of surface conditions of the pipeline right-of-way at intervals not exceeding one week;

   b. Daily inspections of pump stations to identify leaks and abnormal conditions;

   c. Establishment of pump pressure set points and use of pressure limiting devices to match the required pressure reduction;

   d. Training of Plains field personnel regarding awareness of abnormal operating conditions that may result from the pressure reduction on the pipeline.

   e. Plains must maintain all documentation related to the pressure restriction and preventive and mitigative measures, including all inspections, training documents, and management of change (MOC) records.

8.    ***CAO Documentation Report:*** The Corrective Action Order Documentation Report
      required under Item 12 of the CAO must include a summary of all inspections,
      assessments, evaluations, and analysis required by this Amendment No. 1 to the CAO.

The actions required by this Amendment No. 1 to the Corrective Action Order are in addition to
and do not waive any requirements that apply to Respondent's pipeline system under the CAO,
49 C.F.R. Part 195, under any other order issued to Respondent under authority of 49 U.S.C.
§ 60101, *et seq.*, or under any other provision of Federal or State law.

Respondent may appeal any decision of the Director to the Associate Administrator for Pipeline
Safety. Decisions of the Associate Administrator shall be final.

Be advised that all material you submit in response to this enforcement action is subject to being
made publicly available. If you believe that any portion of your responsive material qualifies for
confidential treatment under 5 U.S.C. 552(b), along with the complete original document you
must provide a second copy of the document with the portions you believe qualify for
confidential treatment redacted and an explanation of why you believe the redacted information
qualifies for confidential treatment under 5 U.S.C. 552(b).

Failure to comply with this Order may result in the assessment of civil penalties and in referral to
the Attorney General for appropriate relief in United States District Court pursuant to 49 U.S.C.
§ 60120.

In your correspondence on this matter, please refer to CPF No. 5-2015-5011H and for each
document you submit, please provide a copy in electronic format whenever possible.

The terms and conditions of this Amendment No. 1 to the Corrective Action Order are effective
upon receipt.

June 3, 2015

Jeffrey D. Wiese                                              Date Issued
Associate Administrator
 for Pipeline Safety

# EXHIBIT D

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>        Plaintiffs,<br><br>                  v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>        Defendants. | Civil Action No.<br><br>2:20-cv-02415<br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 14    Filed 05/14/26    Page 991 of 1123    Page
ID #:7123
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 2 of 102    Page ID #:95

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast
Regional Water Quality Control Board, and California Department of Forestry
and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and
California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## TABLE OF CONTENTS

I.    BACKGROUND ..........................................................................................- 5 -

II.   JURISDICTION AND VENUE.................................................................- 6 -

III.  APPLICABILITY .......................................................................................- 7 -

IV.   DEFINITIONS ...........................................................................................- 7 -

V.    CIVIL PENALTIES ..................................................................................- 13 -

VI.   NATURAL RESOURCE DAMAGES ...................................................- 17 -

VII.  TRUSTEES' MANAGEMENT AND APPLICABILITY
      OF JOINT NRD FUNDS ........................................................................- 21 -

VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL
      USE FUNDS ............................................................................................- 22 -

IX.   INJUNCTIVE RELIEF ............................................................................- 23 -

X.    CORRECTIVE ACTION ORDER .........................................................- 27 -

XI.   STIPULATED PENALTIES ....................................................................- 27 -

XII.  FORCE MAJEURE..................................................................................- 35 -

XIII. DISPUTE RESOLUTION .......................................................................- 37 -

XIV.  REPORTING ............................................................................................- 39 -

XV.   CERTIFICATION ....................................................................................- 40 -

XVI.  INFORMATION COLLECTION AND RETENTION......................- 40 -

XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ...........- 43 -

XVIII. TRANSFER AND ACQUISITION OF ASSETS ..............................- 49 -

XIX.  COSTS ......................................................................................................- 50 -

XX.   NOTICES ..................................................................................................- 51 -

XXI.  EFFECTIVE DATE .................................................................................- 54 -

XXII. RETENTION OF JURISDICTION ........................................................- 54 -

XXIII. MODIFICATION ....................................................................................- 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC    Document 14    Filed 05/14/26    Page 993 of 1123   Page
ID #:7125
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 4 of 102   Page ID #:97

XXIV.    TERMINATION ................................................................................- 55 -

XXV.    PUBLIC PARTICIPATION................................................................- 56 -

XXVI.    SIGNATORIES/SERVICE ..............................................................- 56 -

XXVII.    INTEGRATION ...............................................................................- 57 -

XXVIII. FINAL JUDGMENT .........................................................................- 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- ii -

A.     WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.     WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.     WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

D.      WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.      WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.      WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.      WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.      WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

I.     WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.     WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.     WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.     WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.    WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities.  These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.    WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O. WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P. WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q. WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R. WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S. WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree: (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.  BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 5 -

Case 2:26-cv-05242-SVW-SSC    Document 14-3    Filed 05/14/26    Page 999 of 1123   Page
Case 2:20-cv-02415    Document 6-1    Filed 03/13/20    Page 10 of 102    Page ID #:105
ID #:7131

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.    Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

does business in this District and the alleged claims occurred in this District.

3. For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III. APPLICABILITY

4. Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5. Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV. DEFINITIONS

7. Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree.  For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H.html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

"Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley.  Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Case 2:26-cv-05242-SVW-SSC Document 143 Filed 05/14/26 Page 1004 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 15 of 102 Page ID #:108
Page ID #:7136

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 11 -

Case 2:26-cv-05242-SWW-SSC  Document 143  Filed 05/14/26  Page 1005 of 1123
Case 2:20-cv-05215  Document 6-1  Filed 05/13/20  Page 16 of 102  Page ID #:109
Page ID #:7137

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq.*, and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 12 -

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.     CIVIL PENALTIES

A.     Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment"). The Penalty Payment shall be allocated as follows:

8.     Penalty Payment to the United States (PHMSA). For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

a.     Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b.     One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c.     Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 1007 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 16 of 102 Page ID #:111
Page ID #:7139

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d.      At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9.      Penalty Payment to the United States (EPA) shared with CDFW and RWQCB. The Penalty Payment shall be allocated as follows:

a.      As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1) To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2) To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

Case 2:26-cv-05242-SVW-SSC Document 6-1 Filed 05/13/20 Page 20 of 102 Page ID #:113
Case 2:20-cv-52415 Document 141-3 Filed 05/14/26 Page 1009 of 1123
Page ID #:7141

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil
Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10.    Penalty Payment to be Paid to CDFW.  For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11.    Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.    NATURAL RESOURCE DAMAGES

12.    Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961. The NRD Payment shall be allocated as follows:

     a.    To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment. Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds). Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention: Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C. 20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198. DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 18 -

b.　　To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>         Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.　　To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn:  Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California  95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account.  The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d.     To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account.  Payment shall be made by check payable to The Regents of the University of California.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 20 -

The Regents of the University of California
Attn: Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account. The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees. The projects shall address the research, education, and outreach missions of the University of California. UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13. The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants. To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII. TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14. DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident. DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15. DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

19.     The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.     UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.    INJUNCTIVE RELIEF

21.     Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.     <u>Material Changes to Plains' IMP</u>.

a.     Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)     Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)     Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)     White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

Case 2:26-cv-05242-SVW-SSC Document 14-13 Filed 05/14/26 Page 1017 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 26 of 102 Page ID #:121
Page ID #:7149

> 4) Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"
>
> 5) Section 11.4, "Documentation of P&M Evaluation Meetings;" and
>
> 6) Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b. At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30)

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.     Material Changes in Control Room Management Plan and Control Center General Procedures.

a.     Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.     At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

Case 2:26-cv-05242-SVW-SSC Document 14-13 Filed 05/14/26 Page 1019 of 1123
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 30 of 102 Page ID #:123
Page ID #:7151

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days. Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24. Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 26 -

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.    CORRECTIVE ACTION ORDER

25.    Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.    STIPULATED PENALTIES

26.    Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.    <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.    If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.    If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.    If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. <u>Stipulated Penalties for Non-Performance of Injunctive Relief</u>. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

    a.    For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

    b.    For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

    c.    For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

    d.    For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

    e.    For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

    f.    For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

    g.    For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

h.      For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.      For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.      For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.      For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.      For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.      For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.      For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.      For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.      For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.      For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.     For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.     For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.     For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.     For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.     For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.     For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.     For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.     The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

29. <u>Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.</u> Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

a. For operation of Line 901 in violation of paragraph 1.a of Appendix D;

b. For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

c. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

d. For operation of Line 903, in violation of paragraph 1.e of Appendix D;

e. For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

f. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

g. For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

h. For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

i. The penalties stipulated in this Section shall accrue as follows:

Case 2:26-cv-05242-SVW-SSC Document 13 Filed 05/14/26 Page 1025 of 1123 Page ID #:129
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 36 of 102 Page ID #:123
Page ID #:7157

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30. Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31. For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32. For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33. For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34. For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

a.      Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.      Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.      Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.      If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.      For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.      For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 33 -

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

      a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

      b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

c.     If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41.     If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42.     The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43.     Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.   FORCE MAJEURE

44.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 6-1 Filed 05/14/26 Page 1029 of 1123
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 40 of 102 Page ID #:153
Page ID #:7161

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46.     If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Case 2:26-cv-05242-SVW-SSC Document 34-3 Filed 05/14/26 Page 1030 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 41 of 102 Page ID #:154
Page ID #:7162

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 1031 of 1123
Page ID #:7163
Case 2:20-cv-05242   Document 6-1   Filed 05/13/20   Page 42 of 102   Page ID #:155
Page ID #:7163

Decree.

50.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement.  If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51.     Formal Dispute Resolution.  Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52.     Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position.  Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs.  Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53.     Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute.  The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 38 -

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 39 -

Case 2:26-cv-05242-SVW-SSC Document 13 Filed 05/14/26 Page 1033 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 44 of 102 Page ID #:157
Page ID #:7165

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV. CERTIFICATION

58. Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI. INFORMATION COLLECTION AND RETENTION

59. Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

c.      obtain documentary evidence, including photographs and similar data; and

d.      assess Defendants' compliance with this Consent Decree.

60.      Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree.  At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61.      This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62.      For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2.  Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63.      The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq.*). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq.*). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 42 -

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67. At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68. [*Intentionally left blank.*]

## XVII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69. This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70. Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-05242-SVW-SSC Document 14-13 Filed 05/14/26 Page 1037 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 46 of 102 Page ID #:141
Page ID #:7169

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

    a.    49 C.F.R. Part 194 Subpart B – Response Plans;

    b.    49 C.F.R. Part 195 Subpart B – Reporting;

    c.    49 C.F.R. Part 195 Subpart E – Pressure Testing;

    d.    49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

    e.    49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

    f.    49 C.F.R. Part 195 Subpart H – Corrosion Control;

    g.    49 C.F.R. Part 199 – Drug and Alcohol Testing; and

    h.    All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

      a.     The Pipeline Safety Laws specified in Paragraph 70; and

      b.     California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 45 -

Case 2:26-cv-05242-SVW-SSC Document 14-13 Filed 05/14/26 Page 1039 of 1123
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 50 of 102 Page ID #:143
Page ID #:7171

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 46 -

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81. Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82. By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83. By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84. Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder. Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85. Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86. Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

Case 2:26-cv-05242-SVW-SSC Document 14-13 Filed 05/14/26 Page 1042 of 1123 Page ID #:146
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 53 of 102 Page ID #:7174
Page ID #:7174

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87. The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII. TRANSFER AND ACQUISITION OF ASSETS

88. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision. Those provisions of Appendix B are:

a. For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

b. For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

c. For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

d. For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer. Defendants shall

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.     In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.     For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92.     Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## XX.   NOTICES

93.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:     eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-11340

As to the United States by mail:     EES Case Management Unit
Environment and Natural Resources
    Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-1-1-1130

As to PHMSA:     James M. Pates
Assistant Chief Counsel
    for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials
    Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, DC. 20590

As to EPA:     Andrew Helmlinger
Attorney Advisor
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 51 -

Case 2:26-cv-05242-SVW-SSC Document 13 Filed 05/14/26 Page 1045 of 1123
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 56 of 102 Page ID #:149
Page ID #:7177

As to DOI:                    Clare Cragan
                              U.S. Department of the Interior
                              Office of the Solicitor
                              755 Parfet St., Suite 151
                              Lakewood, Colorado 80215

As to NOAA:                   National Oceanic and Atmospheric
                                  Administration
                              Office of General Counsel
                              Natural Resources Section
                              ATTN:  Christopher J. Plaisted
                              501 W. Ocean Blvd, Suite 4470
                              Long Beach, California  90802

As to USCG:                   Patricia V. Kingcade
                              Attorney Advisor
                              National Pollution Funds Center,
                                  US Coast Guard
                              2703 Martin Luther King Jr. Ave SE
                              Washington, DC 20593-7605

As to the State Agencies:     Michael Zarro
                              Deputy Attorney General
                              Office of the Attorney General
                              Natural Resources Law Section
                              300 S. Spring St., Suite 11220
                              Los Angeles, California 90013

As to CDFW:                   California Department of Fish
                                  and Wildlife
                              Office of Spill Prevention and Response
                              Attn: Katherine Verrue-Slater
                              Senior Counsel
                              P.O. Box 160362
                              Sacramento, California  95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 52 -

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 1046 of 1123
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 37 of 102 Page ID #:150
Page ID #:7178

As to CDPR:      California Department of Parks and
              Recreation
            Attn: Laura A. Reimche, Senior Counsel
            1416 Ninth Street, Room 1404-6
            Sacramento, California 95814

As to CSLC:      California State Lands Commission
            Attn: Patrick Huber, Legal Division
            100 Howe Avenue, Suite 100-South
            Sacramento, California 95825

As to OSFM:      California Department of Forestry and
              Fire Protection
            Legal Services Office
            Attn: Joshua Cleaver, Staff Counsel
            P.O. Box 944246
            Sacramento, California 94244-2460

As to RWQCB:     California Central Coast Regional Water
            Quality Control Board
            Attn: Naomi Rubin, Attorney III
            801 K Street
            Sacramento, California 95814

As to UC:       Barton Lounsbury, Senior Counsel
            University of California
            Office of the General Counsel
            1111 Franklin Street, 8th Floor
            Oakland, California  94607

As to Defendants:    Megan Prout
            Senior Vice President
            Commercial Law and Litigation
            333 Clay Street, Suite 1600
            Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI. EFFECTIVE DATE

96. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII. RETENTION OF JURISDICTION

97. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII. MODIFICATION

98. The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 54 -

Case 2:26-cv-05242-SVW-SSC   Document 1   Filed 05/14/26   Page 1048 of 1123   Page ID #:152
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 55 of 102   Page ID #:
Page ID #:7180

99.   Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 55 -

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.    PUBLIC PARTICIPATION

103.   This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.   Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.   SIGNATORIES/SERVICE

105.   Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.   This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## XXVII.  INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.     FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.


_____
UNITED STATES DISTRICT JUDGE


*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 1051 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 62 of 102 Page ID #:155
Page ID #:7183

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
   Division U.S. Department of Justice

3/13/2020

Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 1052 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 63 of 102 Page ID #:156
Page ID #:7184

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
 Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20
Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 1054 of 1123
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 63 of 102   Page ID #:158
Page ID #:7186

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020

Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
        Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 61 -

Case 2:26-cv-05242-SVW-SSC Document 6-1 Filed 05/14/26 Page 1055 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 66 of 102 Page ID #:159
Page ID #:7187

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020

Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

Case 2:26-cv-05242-SVW-SSC  Document 6-1  Filed 05/14/26  Page 1056 of 1123
Case 2:20-cv-52415 Document 6-1  Filed 03/13/20  Page 67 of 102  Page ID #:163
Page ID #:7188

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

___3/2/20_____
Date

_____*Lisa Ann Mangat*_____
LISA ANN L. MANGAT
Director
California Department of Parks
and Recreation

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 63 -

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 1057 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 66 of 102 Page ID #:161
Page ID #:7189

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

_____
JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 64 -

Case 2:26-cv-05242-SVW-SSC Document 14 Filed 05/14/26 Page 1058 of 1123
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 65 of 102 Page ID #:162
Page ID #:7190

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
Date

THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

Case 2:26-cv-05242-SVW-SSC Document 14-3 Filed 05/14/26 Page 1059 of 1123
Page ID #:7191
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 70 of 102 Page ID #:163

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
_____
Date

_____
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
        Quality Control Board

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
_____
Date

_____
BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel


_____
Date

_____
PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

Case 2:26-cv-05242-SVW-SSC   Document 1413   Filed 05/14/26   Page 1061 of 1123
Case 2:20-cv-52415-SVW-SSC   Document 6-1   Filed 03/13/20   Page 72 of 102   Page ID #:165
Page ID #:7193

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____

Date                                    BARTON LOUNSBURY
                                        Senior Counsel
                                        Office of the General Counsel

*3 March 2020*

Date                                    PEGGY FIEDLER
                                        Executive Director
                                        UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 68 -

Case 2:26-cv-05242-SVW-SSC Document 41-3 Filed 05/14/26 Page 1068 of 1123
Case 2:20-cv-05242-SVW-SSC Document 6-1 Filed 09/13/20 Page 74 of 102 Page ID #:1673
Page ID #:7195

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 69 -

Case 2:26-cv-05242-SVW-SSC   Document 14-1   Filed 05/14/26   Page 1064 of 1123
Case 2:20-cv-52415   Document 6-1   Filed 05/13/20   Page 75 of 102   Page ID #:168
Page ID #:7196

# APPENDIX A

## (*Set of maps that generally depict Lines 901, 903, and 2000*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 1065 of 1123
Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 72 of 1123 Page 1065 of 1123
Page ID #:7197



California

Santa Barbara

L901 LAS
FLORES TO
GAVIOTA - 24"

Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

*Appendix A – Line 901*

Owner:

**PLAINS**
ALL AMERICAN
PIPELINE, L.P.

Scale: 1:100,000

Sheet No: 1/1



*Appendix A – Line 903*

Scale: 1:700,000

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.



Appendix A – Line 2000

Scale: 1:966,574

Sheet No:  1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Case 2:26-cv-05242-SVW-SSC   Document 14-13   Filed 05/14/26   Page 1068 of 1123
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 75 of 102   Page ID #:172
Page ID #:7200

# APPENDIX B

# *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

Case 2:26-cv-05242-SVW-SSC Document 14-13 Filed 05/14/26 Page 1069 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 80 of 102 Page ID #:173
Page ID #:7201

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A. Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B. Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C. Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D. Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E. To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A. Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

Case 2:26-cv-05242-SVW-SSC Document 34-13 Filed 05/14/26 Page 1070 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 81 of 102 Page ID #:174
Page ID #:7202

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a. Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b. Conduct a close interval survey (CIS) and AC/DC interference survey.

   c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

   1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

   2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

   3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

   4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

Case 2:26-cv-05242-SVW-SSC Document 34-13 Filed 05/14/26 Page 1071 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 82 of 102 Page ID #:175
Page ID #:7203

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

-77-

Case 2:26-cv-05242-SVW-SSC Document 141-3 Filed 05/14/26 Page 1072 of 1123
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 83 of 102 Page ID #:176
Page ID #:7204

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b.    Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c.    When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d.    Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e.    Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f.    Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g.    For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h.    Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i.    Integrate and analyze available data in its P&M process, including:

        i.    Assessment data from ILI tool runs;

        ii.    Dig and repair data;

4

Case 2:26-cv-05242-SVW-SSC   Document 1   Filed 05/14/26   Page 1073 of 1123
Case 2:20-cv-52415   Document 6-1   Filed 05/13/20   Page 84 of 102   Page ID #:1773
Page ID #:7205

iii.     Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.     Operational data, such as pressure and flow data;

v.     Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.     Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.     Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.     ILI Measures

a.     Initial ILI Runs. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.     All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

ii. In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b. <u>Subsequent ILI Runs</u>. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c. <u>All ILI Runs</u>. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5. **<u>Valves</u>**

A. Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1. Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2. Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B. Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C. Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

6. **Risk Analysis**

    A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1. Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a. The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b. Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c. The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

    A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B. Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

    A. Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

**ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES**

9. **Integrity Management**

    A. New Procedures for Interim Reviews and Assessments

7

Case 2:26-cv-05242-SVW-SSC Document 6-1 Filed 05/14/26 Page 1076 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 82 of 102 Page ID #:180
Page ID #:7208

1. Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2. Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3. Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B. Documentation for P&M Recommendations

1. Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

   a. What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

   b. The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

      c.     The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

    2.     In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

    3.     In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.     Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10.    **Valves and O&M**

A.     Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.     Within two years of entry of the CD, Plains shall develop and implement procedures to:

    1.     If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

    2.     Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

    3.     Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

    4.     Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.     Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

Case 2:26-cv-05242-SVW-SSC Document 41-3 Filed 05/14/26 Page 1078 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 85 of 102 Page ID #:182
Page ID #:7210

D. For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

 1. Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E. Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11. **Leak Detection**

A. Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

 1. Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B. For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C. Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

 1. Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D. Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

 1. Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

Case 2:26-cv-05242-SVW-SSC Document 6-1 Filed 05/14/26 Page 1079 of 1123
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 90 of 102 Page ID #:163
Page ID #:7211

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.  Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection.  The results of the meetings will be documented and shared with appropriate personnel.  The recommendations will be evaluated and documented.

F.  Instrumentation and Display

1.  To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.  Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.  Track these conditions through to resolution, including instrumentation relocation when necessary.

12.  **Control Room Management**

A.  For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.  Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.  Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.  Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.  Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

<div align="center">11</div>

Case 2:26-cv-05242-SVW-SSC   Document 14-13   Filed 05/14/26   Page 1080 of 1123
Case 2:20-cv-02415   Document 6-1   Filed 05/13/20   Page 91 of 102   Page ID #:164
Page ID #:7212

B.      For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.      Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

A.      California-Specific Provisions:

1.      Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05.  Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.      Company-Wide Provisions

1.      Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.      Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response.  Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.      Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

Case 2:26-cv-05242-SVW-SSC   Document 14-13   Filed 05/14/26   Page 1081 of 1123
Case 2:20-cv-02415   Document 6-1   Filed 05/13/20   Page 92 of 102   Page ID #:185
Page ID #:7213

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **Safety Management System (SMS)**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B. Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15. **<u>Drug and Alcohol Program</u>**

A. Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

Case 2:26-cv-05242-SVW-SSC   Document 14-3   Filed 05/14/26   Page 1083 of 1123
Case 2:20-cv-02415   Document 6-1   Filed 05/13/20   Page 94 of 102   Page ID #:167
Page ID #:7215

# APPENDIX C

## (*Intentionally left blank*)

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:26-cv-05242-SVW-SSC   Document 14-13   Filed 05/14/26   Page 1084 of 1123
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 95 of 102   Page ID #:166
Page ID #:7216

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

Case 2:26-cv-05242-SVW-SSC   Document 41-3   Filed 05/14/26   Page 1085 of 1123
Case 2:20-cv-05242-SVW-SSC   Document 6-1   Filed 05/13/20   Page 96 of 102   Page ID #:169
Page ID #:7217

## APPENDIX D

1.     All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

   a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

   b. **Restart Plan for Line 901.**  If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  The Restart Plan shall include:

   1)     Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

   2)     Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

   3)     Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

   4)     A specific day-light restart that includes advance communications with local emergency response officials;

   5)     Master Control Room enhancements, including:

   a) Implementation of advanced leak-detection

Case 2:26-cv-05242-SVW-SSC Document 141-3 Filed 05/14/26 Page 1086 of 1123
Case 2:20-cv-52415 Document 6-1 Filed 05/13/20 Page 97 of 102 Page ID #:190
Page ID #:7218

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

Case 2:26-cv-05242-SVW-SSC Document 13 Filed 05/14/26 Page 1087 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 05/13/20 Page 96 of 102 Page ID #:151
Page ID #:7219

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

Case 2:26-cv-05242-SVW-SSC   Document 141-3   Filed 05/14/26   Page 1088 of 1123
Case 2:20-cv-02415   Document 6-1   Filed 05/13/20   Page 95 of 102   Page ID #:192
Page ID #:7220

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

Case 2:26-cv-05242-SMW-SSC Document 143 Filed 05/14/26 Page 1089 of 1123
Case 2:20-cv-02415-SMW-SSC Document 6-1 Filed 03/13/20 Page 100 of 1029 Page ID #:133
Page ID #:7221

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1) Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3) Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1) The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

Case 2:26-cv-05242-SMW-SSC   Document 143   Filed 05/14/26   Page 1090 of 1123
Case 2:20-cv-02415-SMW-SSC   Document 6-1   Filed 03/13/20   Page 101 of 1029   Page ID #:134
Page ID #:7222

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)      The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)      The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)      Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:26-cv-05242-SMW-SSC Document 143 Filed 05/14/26 Page 1091 of 1123
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 102 of 1029 Page ID #:135
Page ID #:7223

3)      The Appendix D Documentation Report shall include but not be limited to:

      A.   Table of Contents;

      B.   [*intentionally left blank.*]

      C.   [*intentionally left blank.*]

      D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

      E.   [*intentionally left blank.*]

      F.   [*intentionally left blank.*]

      G.   Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT E

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



<u>**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08**</u>

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

**Operator:**   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

**Pipeline:**   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.)*,* § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Docusign Envelope ID: 87118E7A-ED76-4881-86B2-BCE5E180FFD7

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at
PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to
PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a) Dates for integrity assessment

   b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 6

       segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)

d) Required tool specifications including operational specifications and anomaly sizing tolerances

e) Tool validation methodology

f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

g) Criteria used to identify locations for excavation and field verification

h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Docusign Envelope ID: 87118E7A-ED76-4881-86B2-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**<u>Pressure Reduction</u>**

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**<u>In Field Direct Examination of Pipe</u>**

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a.  Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 87118E7A-ED76-4881-86B2-BCE5E180FFD7

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

**Data Requirements for Predicted Failure Analysis**

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

**Recordkeeping**

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Lance Yearwood
December 17, 2024
Page 13

e.  Evaluation methodology used
f.  Models used
g.  Direct in situ examination data
h.  All in-line inspection tool assessments information evaluated
i.  Pressure test data and results
j.  All in-the-ditch assessments performed on the pipeline segments
k.  All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
l.  All finite element analysis results
m.  The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
n.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
o.  Safety factors used for fatigue life and/or predicted failure pressure calculations
p.  Reassessment time interval and safety factors
q.  The date of the review
r.  Confirmation of the results by qualified technical subject matter expert(s)
s.  Approval by responsible Sable management personnel
t.  Records of additional preventive and mitigative (P&M) measures performed
u.  Reports required by this State Waiver.

## Reporting

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:
    a.  Tool type and run date
    b.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c.  Dig sheets
    d.  Field contact information for Sable
    e.  Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Docusign Envelope ID: 87118E7A-ED76-4881-86B2-BCE5E180FFD7

Lance Yearwood
December 17, 2024
Page 14

  a. Tool type
  b. Run date
  c. Summary of Conditions Report[18]
  d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:

  a. A Closure Report for the previous calendar (CY) which contains:
     i. Features that were remediated in previous CY
        1. Provide documentation for the in-the-ditch assessments and repairs
     ii. Identify features that remain to be assessed
     iii. Unity Plots for previous ILI runs
  b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
  c. The third-party ILI expert reviews in accordance with Condition 52
  d. AC and DC Interference surveys that are due in accordance with Condition 53
  e. A copy of the CGRA for prior year including:
     i. Mean corrosion growth rate for the pipeline
     ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 15

       failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT F

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



<u>**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**</u>

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR**
             **LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON**
             **THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG**
             **A LONGITUDINAL SEAM WELD (CA-325A/B)**

**Operator:**   Sable Offshore Corp
              OPID# 40851
              845 Texas Avenue, Suite 2920
              Houston, Texas 77002

**Pipeline:**   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of
              Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa
              Barbara County, San Luis Obispo County, and Kern County, California as
              described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under
insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Docusign Envelope ID: 166BFFF3-211E-4765-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8.  Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
    a.  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
    b.  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
    At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5


## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

## In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

    a) Dates for integrity assessment

    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

    c) In-line inspection tool vendor(s)

    d) Required tool specifications including operational specifications and anomaly sizing tolerances

    e) Tool validation methodology

    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    g) Criteria used to identify locations for excavation and field verification

    h) Non-destructive examination

20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

21. Metal Loss Tool(s)

    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

Docusign Envelope ID: 166BEFF3-211E-4765-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
   b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
   c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 166BEFF3-211E-4765-8D10-BAEB95600F3B

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.
56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.
58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BFFF3-211E-4765-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 13

    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    o. Safety factors used for fatigue life and/or predicted failure pressure calculations

    p. Reassessment time interval and safety factors

    q. The date of the review

    r. Confirmation of the results by qualified technical subject matter expert(s)

    s. Approval by responsible Sable management personnel

    t. Records of additional preventive and mitigative (P&M) measures performed

    u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification*.[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B*. The email notification shall include, if applicable:

    d. Tool type and run date

    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

    f. Dig sheets

    g. Field contact information for Sable

    h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

    i. Tool type

    j. Run date

    k. Summary of Conditions Report[18]

    l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:

a. A Closure Report for the previous calendar (CY) which contains:
  i. Features that were remediated in previous CY
    1. Provide documentation for the in-the-ditch assessments and repairs
  ii. Identify features that remain to be assessed
  iii. Unity Plots for previous ILI runs
b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
c. The third-party ILI expert reviews in accordance with Condition 53
d. AC and DC Interference surveys that are due in accordance with Condition 54
e. A copy of the CGRA for prior year including:
  i. Mean corrosion growth rate for the pipeline
  ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Lance Yearwood
December 17, 2024
Page 15

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline
Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA