# EXHIBIT S

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 5:12 PM
By: Terri Chavez , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **PETITIONERS AND PLAINTIFFS' COMBINED REPLY TO RESPONDENTS' AND REAL PARTIES IN INTERESTS' OPPOSITIONS TO APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** <br><br> *[Filed concurrently with Request for Judicial Notice; [Proposed] Order on Request for Judicial Notice; supporting Declarations; Objections to Evidence Submitted in Support of Real Parties in Interests' Opposition; Response to Real Parties in Interests' Evidentiary Objections]* <br><br> Date:    July 18, 2025 <br> Time:    10:00 a.m. <br> Dept.:    4 <br> Judge:    Honorable Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

---

1

Petitioners and Plaintiffs' Combined Reply to Respondents' and Real Parties in Interests' Oppositions to Application for Stay or Preliminary Injunction

## I.    **<u>INTRODUCTION</u>**

There is a reason this pipeline system has been out of service for ten years now — the status quo. It caused a catastrophic oil spill due to a defect that *still exists* in the system today. The Court need look no further than the 2015 spill to see, conclusively, the potential harm it can cause. Consider, too, that the pipeline system does not just threaten coastal resources; it passes through a suburban neighborhood, major groundwater sources, and dozens of recreation areas. The potential harm to the public of a premature and inadequately considered restart is immense, and the need for preliminary relief could not be greater, as Real Parties announced, today, that they plan to restart the pipelines on August 1, 2025.

Indeed, to date, the Office of State Fire Marshal (OSFM) has not provided *any* analysis as to why the pipeline system will be safe. Not only should that gravely concern the Court, but by failing to provide a statement of reasons for its waiver decisions, OSFM unequivocally failed to comply with the State and Federal Pipeline Safety Acts. It likewise did so by failing, over Petitioners' objections, to provide adequate notice and a public hearing. Respondents and Real Parties' interpretation that OSFM did not have to provide a public process defies basic principles of statutory interpretation, the legislative history and intent of the Federal PSA, and guidance from PHMSA and myriad sister jurisdictions.

Compounding those concerns is OSFM's failure to conduct clearly required environmental review. The Waivers it issued fundamentally alter the project that was initially envisioned and approved and render useless the original EIS/EIR, which was expressly premised on the pipelines having effective cathodic protection. The potential risks of operating the pipelines without their foremost means of corrosion prevention have simply never been evaluated.

This was a major decision that will affect thousands of people. Petitioners urge the Court to stay the Waivers for the pendency of these proceedings and/or grant Petitioners' requested injunctive relief.

## II.    **<u>PETITIONERS' REQUEST FOR AN ADMINISTRATIVE STAY</u>**

Petitioners seek, first and foremost, an administrative stay of the Waivers under Code of Civil Procedure section 1094.5 — the basis of their substantive Federal PSA claims. As relevant here, Respondents and Real Parties misinterpret the rights afforded to the public under the Federal PSA: OSFM *was* required to hold a public hearing. OSFM's waiver decisions thus fall under the purview of section 1094.5, Petitioners can properly seek the relief afforded thereunder, and Petitioners have plainly

Petitioners and Plaintiffs' Combined Reply to Respondents' and Real Parties in Interests' Oppositions to Application for Stay or Preliminary Injunction

met their burden to show that a stay should issue. (*See* Code Civ. Proc. §1094.5(a), (g).)

### A.      Applicability of 1094.5: Section 60118 *is* a Public Participation Statute

*Plain language.* 49 U.S.C. section 60118 provides that state authorities may issue a State Waiver "only after notice and an opportunity for a hearing." (49 U.S.C. § 60118(c), (d).) Respondents and Real Parties contend that this process is intended solely for the benefit of the pipeline operator, and a hearing need not occur unless requested by the operator. *But the statute does not have any such qualification.* It is axiomatic that "[w]e cannot add limiting language to [a statute] when the Legislature did not." (*Pacific Gas & Elec. Co. v. Superior Court* (2017) 10 Cal.App.5th 563, 571.) Indeed, it is a "cardinal rule that courts may not add provisions to a statute or rewrite it to conform to an assumed intent that does not appear from its plain language." (*People v. Conner* (2004) 115 Cal.App.4th 669, 692.)

If Congress wanted to so qualify the hearing requirement, it knew how to do so. (*See* 49 U.S.C. § 31141(d)(2) ("Before deciding whether to grant or deny a petition for a waiver under this subsection, the Secretary [of Transportation] shall give *the petitioner* an opportunity for a hearing on the record." (emphasis added)).) Thus, it must be presumed that Congress intentionally chose *not* to impose the limitation now proffered by Respondents and Real Parties, which, again, is not found in the language of the statute. (*See Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 342 ("[W]hen the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning.").)

*Statutory construction.* Further undermining Respondents and Real Parties' interpretation is that it cannot be reconciled with other provisions and language of Section 60118.

Take subsection (c)(2), for example, which allows a state authority to bypass standard waiver procedures in the case of emergency. As relevant here, the provision refers to those standard procedures as including "notice and comment" — i.e., a public process. Guidance from PHMSA further explains that, for emergencies, the standard "notice and hearing *requirements* may be omitted if . . . notice is impracticable, unnecessary, or not in the *public interest*." (RJN, Exhibit ___, at ___ (emphasis added).) In other words, PHMSA recognizes that a hearing is not only generally required, but that it is fundamentally intended to be for the benefit of the public.

Moreover, the statute requires notice. (49 U.S.C. § 60118(c)(1)(B).) Because a waiver applicant

---

3

does not need notice of its own application, the notice requirement would only seem to be for the public's benefit and, more specifically, to ensure meaningful public participation. (*See Laupheimer v. State of California* (1988) 200 Cal.App.3d 440, 453 (suggesting that the purpose of notice is to apprise interested parties of the action and afford them an opportunity to be heard).) By construing the statute to not require a public process, the notice requirement would be rendered all but meaningless. (*See San Diego Police Officers' Assn. v. City of San Diego Civil Service Com.* (2002) 104 Cal.App.4th 275, 284 (Courts must "avoid an interpretation that makes any part of a statute meaningless.").) Further, the requirement for notice and hearing appear in the *same exact phrase*; it is nonsensical to suggest that, without any qualifying language, one is intended for the public (notice), but the other is not (hearing).

       ***Legislative history and purpose.*** Respondents and Real Parties' interpretation also runs contrary to the history and purpose of the statute. Section 60118 was initially enacted as Section 3 of the Natural Gas Pipeline Safety Act of 1968. As relevant here, the first iteration of the Act — introduced in Senate Bill 1166 — did not envision a public process for waivers, providing only that "[t]he Secretary may, *under procedures established by him*, provide for the waiver of any gas safety regulations prescribed by him under this section." (*Hearing on S. 1166 Before the S. Comm. on Com.*, 90th Cong. 2 (1967) (emphasis added).) However, when the bill came before the Senate Commerce Committee, a number of witnesses testified regarding the need for public transparency and public hearings. (*See, e.g., id.* at 200 ("Also useful would be a public report justifying any waiver after appropriate procedures for hearing the various contestants to the waiver application.").) The bill was thereafter amended to expressly include "notice and an opportunity for a hearing" in the waiver process. (*Hearing on H.R. 6551, S. 1166 Before the H. Comm. on Interstate and Foreign Com.*, 90th Cong. 3 (1967).) Thus, it appears Section 60118's hearing requirement was intended to address calls for a *public* hearing in the waiver process.

       Moreover, multiple provisions of the Federal PSA confirm that public transparency is a central tenet of its statutory scheme. (*See* 49 U.S.C. § 60117(b)(2) (enforcement hearings must be public); 49 U.S.C. § 60135 (requiring public summaries of enforcement actions); 49 U.S.C. 60116 (requiring public education programs).) Thus, to the extent it is ambiguous who is afforded an "opportunity for a hearing" under Section 60118, any ambiguity ought to be resolved to further the statute's interest in public transparency. (*See Torres v. Parkhouse Tire Serv., Inc.* (2001) 26 Cal.4th 995, 1003 (The court "must

select the construction that comports most closely with the apparent intent of the Legislature, with a view toward promoting rather than defeating the general purpose of the statute . . . ." (citation omitted)).)

*Persuasive authorities.* Lastly, any doubt as to whether Section 60118 requires a public hearing has been resolved by PHMSA and myriad authorities from other jurisdictions. As noted, PHMSA construes the hearing requirement in Section 60118 as one that is intended to be for the public's benefit. (RJN, Exhibit N, p. 3.) And Section 60118 is roundly and routinely interpreted by state authorities across the country as requiring a public hearing. (*See, e.g., Application of Roanoke Gas Co.*, 2005 WL 7853357 (Virginia) (procedures must "provid[e] an opportunity for the public to comment or request a hearing"); *In Re Petition of Sw. Gas Corp.*, 2010 WL 1436213 (Nevada) ("[A] request for comments was issued, and a hearing was set."); *In Re Application of Nashville Gas Co.*, 2002 WL 35082034 (Tennessee) ("matter came before the [state authority] at a public hearing"); *In Re Northern Utilities, Inc.*, 2013 WL 6073101 (Maine) (state authority "held a public hearing in this matter"); *In Re Consumers Energy Co.,* 2002 WL 31501335 (Michigan) (interested persons were invited to submit comments or petitions to intervene); *In Re Spire Missouri Inc.*, 2020 WL 2791367 (Missouri) (same).)

In sum, then, Section 60118 *did* require OSFM to hold a public hearing on the State Waivers. Accordingly, Petitioners have properly invoked section 1094.5 and the relief afforded thereunder.

### B.    A Stay Is *in* the Public's Interest, Not Against

In considering a stay, the Court need not consider the relative harms to the parties or even the likelihood that Petitioners will prevail. The sole inquiry before the court is whether granting a stay is not "against the public interest." (Code. Civ. Proc. § 1094.5(g).) As discussed in Part III.C, *infra*, maintaining the status quo of the last ten years would be *in* the public's interest, not against.

## III.    PETITIONERS ARE ENTITLED TO A PRELIMINARY INJUNCTION

### A.    Petitioners are All but Certain to Prevail on Their Pipeline Safety Act Claims.

Petitioners are all but certain to prevail on their State and Federal Pipeline Safety Act claims for the simple fact that OSFM failed to provide a statement of reasons.[1] The question for the Court in this matter is really, on remand, what process OSFM must apply. As explained below, OSFM must provide

---

[1] Neither Respondents nor Real Parties address Petitioners' State PSA claims, which OSFM was acting pursuant to, and which separately required it to provide a statement of reasons. (Gov. Code § 51011(c).)

Petitioners and Plaintiffs' Combined Reply to Respondents' and Real Parties in Interests' Oppositions to Application for Stay or Preliminary Injunction

the public with adequate notice and an opportunity for a hearing, which it failed to do here.

<u>1.    Petitioners Have Properly Sought Mandamus Relief.</u>

Both Respondents and Real Parties cite *City and County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993, for the proposition that Petitioners cannot seek mandamus relief to compel OSFM to comply with the Federal PSA. The case is inapposite.

In *San Francisco*, the city alleged that PHMSA violated the Federal PSA by approving California's Section 60105 certification. (*Id.* at 996.) At issue on appeal was whether the city could challenge PHMSA's decision under the Federal PSA's citizen suit provision, 49 U.S.C. section 60121, and the Administrative Procedure Act (APA). (*Id.*) The court held merely that (1) the Federal PSA's *citizen suit provision* — which allows private citizens to enforce safety standards where PHMSA fails to do so — does not allow a mandamus-type action *against PHMSA* (*id.* at 998–99); and (2) PHMSA's certification decision was discretionary and therefore unreviewable under the APA (*id.* at 1002).

Petitioners' suit is not against PHMSA; it is against OSFM, a state agency empowered to act by state law. (*See* Gov. Code § 51010.) And Petitioners have not proceeded under the Federal PSA's citizen suit provision. Nor must they do so. Instead, Petitioners bring their procedural claims under Code of Civil Procedure section 1085, which is a proper mechanism to compel state agencies to perform mandatory duties required by federal law. (*See, e.g., Mission Hosp. Reg'l Med. Ctr. v. Shewry* (2008) 168 Cal.App.4th 460, 479 ("In California, a party who may not have standing to enforce [a federal law] under [42 U.S.C. § 1983] may still be entitled to enforce the act by means of a writ of mandate under [Section] 1085.").

<u>2.    OSFM Unequivocally Failed to Comply with the State and Federal PSA.</u>

OSFM failed to comply with three distinct procedural requirements of the State and Federal PSAs: providing (1) a statement of reasons, (2) adequate notice, and (3) an opportunity for a hearing.

***Statement of Reasons.*** An order issuing a State Waiver "shall state . . . the reasons for granting the waiver" — i.e., include an explanation of *why* the state authority is granting the Waiver, and, more specifically, why the governing standard was met. (49 U.S.C. § 60118(c)(3); *see also* Gov. Code § 51011(c).) The Waivers at issue, however, merely include the following: a perfunctory recital of Sable's requests, a statement of OSFM's regulatory jurisdiction, and the conditions of each approved Waiver.

Petitioners and Plaintiffs' Combined Reply to Respondents' and Real Parties in Interests' Oppositions to Application for Stay or Preliminary Injunction

(*See* RJN, Exhibits G and H.) Neither Waiver includes *any* justification, supporting analysis, or reasons for OSFM's decision. (*Id.*) In fact, neither Waiver so much as references the applicable legal standard. (*Id.*) Thus, OFSM has, unequivocally, failed to provide a "statement of reasons" for either Waiver.

*Notice.* Respondents and Real Parties make much of the fact that Petitioners were seemingly aware of Real Parties' applications, and thus adequate notice was provided. True, Petitioners, who have been following this issue for ten years, were uniquely aware of the applications, and thus informally emailed comments to OSFM. But no other members of the public did so, presumably because they were *not* aware of the applications. (*See Pillsbury v. South Coast Regional Com.* (1977) 71 Cal.App.3d 740, 754 (notice was inadequate where persons were not effectively made aware of action).) Moreover, OSFM did not make the applications available to the public until *after* it had granted the Waivers, leaving the public unapprised of what OSFM was actually considering, and making it impossible to weigh in on the merits of the applications. Thus, under any measure, any notice OSFM purportedly provided was inadequate. (*See Laupheimer*, 200 Cal.App.3d at 453 (to be adequate, notice must apprise interested parties of an action such that they are afforded an opportunity to meaningfully participate).)

*Hearing.* As explained at length in Part II.A, OSFM was required to hold a public hearing.

Accordingly, Petitioners are all but certain to prevail on one or more of their PSA claims.

**B.    Petitioners Will Likewise Prevail on Their CEQA Claim.**

As explained in Petitioners' Ex Parte Application, OSFM must conduct subsequent environmental review due to substantial changes in the Project (elimination of the requirement for an effective cathodic protection system), changes in the circumstances under which the Project is undertaken (systemic corrosion from the failure of the pipelines' cathodic protection system), and new information (the unexpected deficiencies in the cathodic protection system and evidence that such systems are not effective on buried insulated pipelines) that cause new significant environmental effects or a substantial increase in previously identified significant effects. (CEQA Guidelines § 15162(a).[2])

Respondents and Real Parties argue that the approval of the Waivers did not constitute a project subject to CEQA. In this case, the Project was already subject to CEQA review; thus, the primary

---

[2] This requirement applies to responsible agencies, such as OSFM, after a lead agency has approved a project. (CEQA Guidelines § 15162(c).)

Petitioners and Plaintiffs' Combined Reply to Respondents' and Real Parties in Interests' Oppositions to Application for Stay or Preliminary Injunction

question is whether subsequent environmental review is required. The cases cited by Respondents are irrelevant. (*See Committee for a Progressive Gilroy v. State Water Resources Control Board* (1987) 192 Cal.App.3d 847 ("*Gilroy*") (reestablishment of discharge requirements was not a "project" under CEQA because the agency's action simply restored a previous approval); *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455 (ballot measure continuing same use at same location was not a "project"). Those cases did not involve approval of changes to a project that increased environmental impacts. Real Parties also cite *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, but there the court held that the action — approval of a land use compatibility plan — *was* a project under CEQA, albeit exempt. (*Id*. at 385, 389.)

Second, Real Parties argue that approval of the Waivers was a federal action and thus not subject to CEQA. They cite *City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, which involved an air district's authority to approve a federal permit pursuant to federal law. The court held that although CEQA did not apply to the district's approval of a *federal* permit, it did apply as a matter of state law pursuant to district regulations. (*Id*. at 874-876.) The court found that the district complied with CEQA by relying on a CEQA equivalent document. (*Id*. at 876.) Here, OSFM issued *State* Waivers pursuant, in part, to Government Code section 51011. As in *Morgan Hill*, CEQA applies to the state action taken by OSFM.

Third, Respondents and Real Parties argue, for the first time, that the Project is exempt from CEQA under the "existing facilities" exemption. Again, this inquiry is not relevant where an EIR was prepared, and the question is whether a subsequent EIR is required. Regardless, the cases cited by Respondents and Real Parties differ from this case because they dealt with minor actions that would not cause significant impacts. (See *Gilroy*, 192 Cal.App.3d 847 (action did not increase previously approved discharge levels); *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810 (minor changes to interior of office building did not require CEQA review). Even if the Project were subject to an exemption, environmental review would nevertheless be required because the corroded condition of the pipelines, risk of a major oil spill, and lack of an effective cathodic protection system are all unusual circumstances that will cause a significant effect on the environment. (CEQA Guidelines § 15300.2(c).)

Petitioners and Plaintiffs' Combined Reply to Respondents' and Real Parties in Interests' Oppositions to Application for Stay or Preliminary Injunction

Fourth, Real Parties claim that approval of the Waivers was ministerial and thus exempt from CEQA. As explained in Petitioners' Ex Parte Application, OSFM "may" approve a waiver, and retains discretion to deny or modify the proposal. The process is replete with discretion. (*See* CEQA Guidelines § 15357; *Protecting our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 459, 467; *Friends of Westwood v. City of Los Angeles* (1987) 191 Cal.App.3d 259, 272-73.)

Finally, Respondents and Real Parties assert that the 1985 EIR covered the existing Waivers. The impact assessment in that EIR, however, was expressly premised on the pipelines being equipped with an effective cathodic protection system that would prevent corrosion and reduce the risk of an oil spill (RJN, Exhibit I, pp. 2-5, 4-106, 4-117; Exhibit J, pp. 2-57, 2-94, Appendix 4-3, pp. 4-53-55); the EIR thus necessarily underestimated the severity and frequency of impacts should the pipeline not operate with such a system. It did not, and could not, consider that the system would fail so spectacularly, causing one of the worst oil spills in the State's history. Respondents cite *Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041 in support of their argument that a SEIR is not required, but the court in that case found that new information regarding the project's impacts on water supply and coastal cutthroat trout required preparation of an EIR. (*Id*. at 1058-61, 1066.)

**C.    A Balancing of the Relative Interim Harms Strongly Favors Petitioners.**

1.    Petitioners' Likelihood of Success Requires a Lesser Showing of Harm.

Because, as set forth above, Petitioners have a great likelihood of prevailing, "the less severe must be the harm that they allege will occur if the injunction does not issue." (*Right Site Coalition v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 336, 342 (quoting *King v. Meese* (1987) 43 Cal.3d 1217, 1226).)  This is especially true when granting the injunction will preserve the status quo. (*Id*.)

2.    Petitioners and the Public will be Harmed if an Injunction is not Issued.

The public has two interests here: (1) protection of the environment and public health and safety; and (2) a process that allows public input and ensures consideration of public concerns. Neither were addressed. At a minimum, the public has been severely harmed by the lack of any formal environmental or public review process. (*See* Declarations of Katz, Lyons, Hough, Ellenberger, and Morton.) The status quo must be maintained to retain the possibility of public and environmental review *before* action is taken in reliance on the Waivers. Petitioners are also concerned about the threat to the environment

and public health and safety should the pipelines be restarted in reliance on the Waivers. (*Id.*)

The threat that Respondents will rely on the approved State Waivers to allow restart of the Pipeline System is imminent. According to Real Parties' own Securities Exchange Commission filing — submitted *today* — they are expecting "first oil sales . . . August 1, 2025." (Krop Dec., Exhibit A.)

Real Parties claim that approval of a Restart Plan will ensure there is no harm to the public; however, OSFM has not agreed to provide any environmental or public review of such Plan, and consideration of a Restart Plan will not address or cure the deficiencies with the Waivers or the process by which they were approved. Real Parties' claim that Petitioners' concerns were addressed in the 1985 EIR/EIS ignores the fact that the EIR/EIS did not consider a project with a defective cathodic protection system or a waiver from state pipeline safety requirements. Although Real Parties go to extraordinary lengths to challenge the opinion of Petitioners' expert consultant, Richard Kuprewicz, they have not — and cannot — escape the fact that the defect that caused the 2015 spill *still exists*. To date, OSFM has not provided any analysis or explanation as to why the Waivers will somehow make the pipeline safe to operate. The severity of harm to the public from another spill cannot be overstated.

### 3. The Harm to Respondents and Real Parties is Less Severe.

Issuing the injunction merely maintains the status quo and leaves open the possibility for public and environmental review. It does not stop Sable's Project. Even if Petitioners prevail on the merits, the only harm to Real Parties is that they must go through the normal permitting review process.

Respondents argue that they will be harmed because an injunction will interfere with their ability to implement state law for the public benefit. In fact, the opposite is true. Requiring Respondents to conduct a public process and evaluate potential impacts *before* taking action will benefit the public more than upholding a decision made behind closed doors, without public review.

Respondents and Real Parties also complain that an injunction would undermine the Consent Decree (CD). Nothing in the CD, however, *requires* Sable to apply for, or OSFM to approve, a Waiver. The CD simply provides guidance "if" Sable desires to restart the existing pipelines (Respondents' RJN 2, Exhibit D, ¶ 1(b), (f)), and ensures that Sable will not do so unless it receives a waiver from OSFM (*id.*, Exhibit B, ¶ 1(A), (B)). The agreement also requires compliance with all applicable laws, including pipeline safety laws and other federal or state laws. (*Id.*, ¶¶ 78, 84.) Therefore, issuing an injunction will

not obstruct Respondents from exercising their discretionary authority under the CD.

Finally, Real Parties claim that the public will suffer harm if they cannot supply oil to the California market. Again, granting the injunction simply maintains the status quo and ensures a valid public process. In any event, restart of the SYU will not benefit California's energy market. According to Dr. Mahdavi, an expert in energy economics and global energy policy, restarting SYU production will not significantly reduce foreign imports; nor will not restarting the SYU have significant impacts on consumer markets over time. (See Mahdavi Dec., ¶ 6.) In fact, the SYU shutdown in 2015 has not significantly impacted changes in foreign imports. (*Id*., Exhibit B.) On the other hand, the public will be harmed because production from the SYU would dramatically increase greenhouse gas emissions. (*Id*.)

Given the respective harms — the potential for another catastrophic oil spill and lack of a public process, compared to a requirement for environmental and public review — it is clear that the harm to Petitioners if the injunction is denied far outweighs any potential harm to Respondents and Real Parties if it is granted.

## IV.    BONDING

Neither Respondents nor Real Parties address whether a bond is required or the appropriate amount. A bond is not required for an administrative stay and, as the Court noted at the June 2, 2025, ex parte hearing, would not be appropriate in this case. Should the Court see fit to impose a bond for Petitioners' requested injunction, the bond should be nominal considering Petitioners' likelihood of success. (*Oive v. Fox* (2012) 211 Cal.App.4th 1036, 1062 ("The greater the likelihood of plaintiff prevailing, the less likely a preliminary injunction will have been found to be wrongfully issued. That factor may not be *controlling* of the amount of the bond, but we consider it relevant.") (emphasis added).) A bond in the amount previously suggested by Real Parties ($75M) would be an impossibility, effectively precluding Petitioners from obtaining deserved preliminary relief and preventing harm to the public. (*See Conover v. Hall* (1974) 11 Cal.3d 842, 851 (courts have inherent power to waive a bond for indigency).)

## V.    CONCLUSION

For the above reasons, Petitioners respectfully request that this Court grant their request for an administrative stay and/or a preliminary injunction.

Petitioners and Plaintiffs' Combined Reply to Respondents' and Real Parties in Interests' Oppositions to Application for Stay or Preliminary Injunction

Dated: July 11, 2025

Respectfully submitted,



Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
Counsel for Petitioners

Petitioners and Plaintiffs' Combined Reply to Respondents' and Real Parties in Interests' Oppositions to Application for Stay or Preliminary Injunction

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On July 11, 2025, I served the above document(s) described as **PETITIONERS AND PLAINTIFFS' COMBINED REPLY TO RESPONDENTS' AND REAL PARTIES IN INTERESTS' OPPOSITIONS TO APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒ **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 11, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEY FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 5:12 PM
By: Terri Chavez , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,<br><br>       Petitioners and Plaintiffs,<br><br>  vs.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive,<br><br>       Respondents and Defendants,<br><br>  and<br><br>SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,<br><br>       Real Parties in Interest. | Case No.: 25CV02247<br><br>**PETITIONERS AND PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLICATION FOR STAY OR PRELIMINARY INJUNCTION, VOLUME 1**<br><br>Date:    July 18, 2025<br>Time:   10:00 a.m.<br>Dept.:   4<br>Judge:  Hon. Donna D. Geck<br><br>Action Filed: April 15, 2025<br>Trial: None Set |

---

1

Petitioners and Plaintiffs' Request for Judicial Notice in support of Application for Stay or Preliminary Injunction, Volume 1

### REQUEST FOR JUDICIAL NOTICE[1]

PLESE TAKE NOTICE THAT Petitioners and Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, and Santa Barbara Channelkeeper (collectively, "Petitioners") request that, pursuant to California Rule of Court 3.1306(c) and Evidence Code sections 452(c), 452(h), and 453, this Court take judicial notice of the following documents, true and correct copies of which are attached hereto:

| Exhibit | Description |
| --- | --- |
| Exhibit A | California Department of Fish and Wildlife (CDFW), *et al.*, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment, dated June 2021 |
| Exhibit B | U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, dated May 2016 |
| Exhibit C | Staff Report Recommending that the California Coastal Commission (CCC) issue a Cease and Desist Order (CDO), Restoration Order, and Administrative Civil Penalty to Sable Offshore Corp. ("Sable"), dated March 28, 2025 |
| Exhibit D | Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-324 by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 |
| Exhibit E | Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-325A/B by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 |
| Exhibit F | Notice of Violation from the Regional Water Quality Control Board to Sable, dated |

---

[1] This request for judicial notice was originally filed with Petitioner's June 1, 2025, Ex Parte Application for a Stay or Order to Show Cause. Since that request was apparently denied by the Court, Petitioners are refiling the request out of an abundance of caution, with the addition of Exhibit N.

|  |  | April 15, 2025 |
|---|---|---|
| **Exhibit G** | | OSFM letter granting the waiver for CA-324, dated December 17, 2024 |
| **Exhibit H** | | OSFM letter granting the waiver for CA-325A/B, dated December 17, 2024 |
| **Exhibit I** | | Excerpts from Draft Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the Proposed Celeron/All American and Getty Pipeline Projects prepared by the California State Lands Commission (CSLC) and Bureau of Land Management, Department of the Interior (BLM) dated August 1984 |
| **Exhibit J** | | Excerpts from Final EIR and EIS for the Proposed Celeron/All American and Getty Pipeline Projects prepared by CSLC and BLM dated January 1985 |
| **Exhibit K** | | Santa Barbara County ("County") Webpage "901/903 Replacement Pipeline Project" (last accessed July 11, 2025) |
| **Exhibit L** | | PHMSA Webpage "Pipeline Special Permits and State Waivers Overview" (last accessed July 11, 2025) |
| **Exhibit M** | | California Natural Resources Agency's (CNRA) summary of state regulation of crude oil pipelines in the County prepared and maintained by CNRA, last updated on June 4, 2025 (last accessed July 11, 2025) |
| **Exhibit N** | | Excerpt of PHMSA's "Guidelines for State Participating in the Pipeline Safety Program" |

The above-referenced exhibits concern the waivers from regulatory requirements granted by OSFM to Sable for its activities to restart the pipeline system, consisting of CA-324 and CA-325A/B. The exhibits without any environmental or public review and despite the failure of the cathodic protection system, which led to one of the largest oil spills in California history in 2015.

This Request for Judicial Notice is made on the grounds that the above-referenced exhibits are relevant to the Court's review of Petitioners' Ex Parte Application for Stay, Temporary Restraining Order, and Order to Show Cause and will aid this Court in determining the same. As explained more fully in the attached Memorandum of Points and Authorities, each of the Exhibits is a document subject to judicial notice pursuant to the California Evidence Code.

//

Dated:  July 11, 2025

ENVIRONMENTAL DEFENSE CENTER



LINDA KROP
JEREMY FRANKEL
TARA C. RENGIFO
Attorneys for Petitioners and Plaintiffs

4

Petitioners and Plaintiffs' Request for Judicial Notice in support of Application for Stay or Preliminary Injunction, Volume 1

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**     **INTRODUCTION AND LEGAL STANDARD**

Pursuant to California Evidence Code section 453, the Court shall take judicial notice of any matter specified in section 452, provided that the requesting party (1) gives adequate notice to the adverse party and (2) includes sufficient information to enable the Court to take judicial notice of the matter. The documents referenced in this request are directly within the category of matters appropriate for judicial notice under the Evidence Code.

**II.**     **ARGUMENT**

   **A.**     **Exhibits A through J, and Exhibit N, are Official Records of State and Federal Agencies.**

Petitioners respectfully request, pursuant to California Evidence Code section 452(c), that the Court take judicial notice of public state and federal agency records attached hereto as Exhibits A through J.

Evidence Code section 452(c) provides that judicial notice may be taken of "[o]fficial acts of the legislative, executive, and judicial departments of the United States and of any state of the United States." The Court is entitled to take judicial notice of the records and files of state administrative agencies. (*See, e.g., Hogen v. Valley Hospital* (1983) 147 Cal.App.3d 119, 125 (taking judicial notice of records of the Board of Medical Quality Assurance); *Chas. L. Harney, Inc. v. State of California* (1963) 217 Cal.App.2d 77, 85-86 (taking judicial notice of records of the State Board of Control and Office of State Controller).)

**Exhibit A** is a report prepared and published by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife Service, and National Oceanic and Atmospheric Administration, which are state and federal agencies. The report quantifies and describes the injuries to natural resources resulting from the 2015 Refugio Oil Spill and outlines the restoration projects intended to compensate the public for those injuries. Exhibit A is probative of the potential harm of a future spill from the Las Flores Pipeline System.

5

Plaintiffs and Petitioners' Request for Judicial Notice in support of Application for Stay or Preliminary Injunction, Volume 1

**Exhibit B** is an investigative report prepared and published by the Pipeline and Hazardous Materials Safety Administration (PHMSA), which is a federal administrative agency. This report discusses the cause of the 2015 Refugio Oil Spill and the extent of the corrosion issues in the Las Flores Pipeline System, which is the impetus for the project at issue.

**Exhibit C** is a report dated March 28, 2025 prepared by California Coastal Commission (CCC) staff to the Commission setting forth staff's recommendations and findings for issuance of a Cease and Desist Order (CDO), Restoration Order, and Administrative Civil Penalty against Sable Offshore Corp. ("Sable") related to its efforts to restart the Santa Ynez Unit oil production operations and bring the pipeline system back into use. In Section V.B.2, entitled "Development Inconsistent with the Coastal Act," the report describes the areas surrounding the pipeline system, which include, but are not limited to, environmentally sensitive habitats that provide habitat to support several rare, threatened and endangered species.

**Exhibit D** is a formal letter dated February 11, 2025 from PHMSA declaring its non-objection pursuant to 49 U.S.C. § 60118(d) to the approved waiver for CA-324 by CAL FIRE – Office of the State Fire Marshal (OSFM). The official decision by PHMSA set forth in Exhibit D rendered the waiver for CA-324 final and effective, which is the subject of this action.

**Exhibit E** is a formal letter dated February 11, 2025 from PHMSA declaring its non-objection pursuant to 49 U.S.C. § 60118(d) to the approved waiver for CA-325A/B by OSFM. The official decision by PHMSA set forth in Exhibit E rendered the waiver for CA-325A/B final and effective, which is the subject of this action.

**Exhibit F** is a Notice of Violation issued to Sable for continuous violations of state law associated with its construction work on the Las Flores Pipeline System. This Notice was an official act by the Central Coast Regional Water Quality Control Board (RWQCB). The Notice discloses several locations along the pipeline system route where RWQCB "staff observed and documented unauthorized discharges of waste [] that could affect the quality of waters of the state and Untied States," including, but not limited to, Arroyo Quemado Creek, a water of the United States, as well as tributaries to Cuyama River, Peterson Creek, Nojoqui Creek, and Foxen Canyon.

**Exhibit G** is a formal letter dated December 17, 2024, from OSFM granting preliminary approval of the waiver requested for CA-324, and is the subject of this action. It is an official agency document that was sent via certified mail to Sable.

**Exhibit H** is a formal letter dated December 17, 2024, from OSFM granting preliminary approval of the waiver requested for CA-325A/B, and is the subject of this action. It is an official agency document that was sent via certified mail to Sable.

**Exhibit I** are excerpts from the Draft Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the Proposed Celeron/All American and Getty Pipeline Projects prepared by the California State Lands Commission (CSLC) and Bureau of Land Management, Department of the Interior (BLM) dated August 1984. The Project Description in the Draft EIR/EIS is for an oil and gas pipeline system that would be protected, in its entirety, by cathodic protection, and the Draft EIR/EIS relied on this assumption when it evaluated the potential impacts of the project.

**Exhibit J** are excerpts from the Final EIR and EIS for the Proposed Celeron/All American and Getty Pipeline Projects prepared by CSLC and BLM dated January 1985. The Final EIR/EIS describes the project as an oil and gas pipeline system that would be wholly protected by cathodic protection, and the analysis relied upon the pipelines' "very effective" cathodic protection system in examining the potential impacts of the project.

**Exhibit N** is an excerpt from guidelines published by PHMSA entitled "Guidelines for States Participating in the Pipeline Safety Program," which is available on their official website at https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2024-06/2024-State-Guidelines-with-Appendices-2023-12-18.pdf. The excerpt is the entirety of Section 3 of the Guidelines, "State Regulatory Responsibility."

**B.    Exhibits K, L, and M are Agency Records and/or include Facts not Reasonably Subject to Dispute.**

Petitioners respectfully request, pursuant to California Evidence Code section 452(c) and (h), that the Court take judicial notice of text from the websites of various relevant state and federal agencies, which are attached hereto as Exhibits K, L, and M.

As noted above, the Court is entitled to take judicial notice of the records and files of federal and state administrative agencies. (*See, e.g., Hogen* (1983) 147 Cal.App.3d at 125.) Judicially noticeable agency records can include information published on an agency's website. (*See City of Alameda v. Sheehan* (2024) 105 Cal.App.5th 447, n. 7 (taking judicial notice of business search on Secretary of State website); (*Kilker v. Stillman* (2015) 233 Cal.Ap.4th 320, 328 (taking judicial notice of pages from the official website of the United States Social Security Administration).)

Moreover, the Court may take notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).) This includes text from the websites of various governmental agencies and entities. (*See Moehring v. Thomas* (2005) 126 Cal.App.4th 1515, 1524, fn. 5 (taking judicial notice of a management plan and "other information" found on the United States Department of Agriculture Forest Service's website pursuant to Evidence Code section 452); *Scott v. JPMorgan Chase Bank, N.A.*, 214 Cal.App.4th 743, 753 (2013) (court took judicial notice of information on FDIC website that was not subject to dispute).)

**Exhibit K** is information downloaded from a County of Santa Barbara ("County") webpage dedicated to the 901/903 Replacement Pipeline Project. It summarizes the timeline for that proposed project, which was initiated after an application for the replacement of the existing Line 901 and 903 pipeline system (now known as CA-324 and CA-325A/B) was submitted to the County on August 15, 2017. https://www.countyofsb.org/3801/901903-Replacement-Pipeline-Project.

**Exhibit L** is information downloaded from a PHMSA webpage that provides an overview of special permits (the federal equivalent of state waivers). Exhibit L summarizes PHMSA's guidance requiring that waivers must "provide an equal or greater level of safety." https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview.

**Exhibit M** is a California Natural Resources Agency (CNRA) record prepared and maintained by CNRA that summarizes state regulations for crude oil pipelines in Santa Barbara County. Exhibit M outlines the state agencies that oversee the pipeline system, including oil pipeline construction, maintenance and operations. Exhibit M details the required approvals and other actions necessary to

allow the pipeline system to restart. This document is available for public viewing and was downloaded from the CNRA website. https://resources.ca.gov/-/media/CNRA-Website/Files/NewsRoom/Educational-Portal/Pipeline-Summary-060425.pdf.

**III.    CONCLUSION**

Based on the foregoing, Petitioners respectfully request that this Court take judicial notice of the documents identified in this request.

Dated:  July 11, 2025                     ENVIRONMENTAL DEFENSE CENTER

_____
LINDA KROP
JEREMY FRANKEL
TARA C. RENGIFO
Attorneys for Petitioners and Plaintiffs

9

Plaintiffs and Petitioners' Request for Judicial Notice in support of Application for Stay or Preliminary Injunction, Volume 1

**EXHIBIT INDEX**

| Exhibit | Description | Vol. | Page No. |
|---------|-------------|------|----------|
| A | California Department of Fish and Wildlife (CDFW), *et al.*, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment, dated June 2021 | 1 | 3-186 |
| B | U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, dated May 2016 | 2 | 189-699 |
| C | Staff Report Recommending that the California Coastal Commission (CCC) issue a Cease and Desist Order (CDO), Restoration Order, and Administrative Civil Penalty to Sable Offshore Corp. ("Sable"), dated March 28, 2025 | 3 | 702-791 |
| D | Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-324 by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 | 3 | 792-794 |
| E | Letter from PHMSA stating it has no objection to the waiver for CA-325A/B by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 | 3 | 795-797 |
| F | Notice of Violation from the Regional Water Quality Control Board to Sable, dated April 15, 2025 | 3 | 798-806 |
| G | OSFM letter granting the waiver for CA-324, dated December 17, 2024 | 3 | 807-822 |
| H | OSFM letter granting the waiver for CA-325A/B, dated December 17,2024 | 3 | 823-838 |
| I | Excerpts from Draft Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the Proposed Celeron/All American and Getty Pipeline Projects prepared by the California State Lands Commission (CSLC) and Bureau of Land Management, Department of the Interior (BLM) dated August 1984 | 3 | 839-844 |
| J | Excerpts from Final EIR and EIS for the Proposed Celeron/All American and Getty Pipeline Projects prepared by CSLC and BLM dated January 1985 | 3 | 845-857 |
| K | Santa Barbara County ("County") Webpage "901/903 Replacement Pipeline Project" (last accessed July 11, 2025) | 3 | 858-861 |
| L | PHMSA Webpage "Pipeline Special Permits and State Waivers Overview" (last accessed July 11, 2025) | 3 | 862-864 |
| M | California Natural Resources Agency's (CNRA) summary of state regulation of crude oil pipelines in the County prepared and maintained by CNRA, last updated on June 4, 2025 (last accessed July 11, 2025) | 3 | 865-875 |
| N | Excerpt of PHMSA's "Guidelines for State Participating in the Pipeline Safety Program" | 3 | 876-879 |

**EXHIBIT SEGMENT COVER PAGE**

Volume 1 of 3

Pages 1-186

# EXHIBIT A



   

# Refugio Beach Oil Spill
## Final Damage Assessment and Restoration Plan/Environmental Assessment

Prepared by:
California Department of Fish and Wildlife
California State Lands Commission
California Department of Parks and Recreation
University of California
The Department of Interior, U.S. Fish and Wildlife Service
National Oceanic and Atmospheric Administration

      

# Refugio Beach Oil Spill

# FINAL

# Damage Assessment and Restoration Plan/Environmental Assessment

June 2021

**On the Cover:**
Oiled Beach by U.S. Coast Guard
Oiled octopus and invertebrates by Natural Resource Damage Assessment Trustees
Dolphins by Natural Resource Damage Assessment Trustees
Pelicans by Natural Resource Damage Assessment Trustees
Harbor seal by Santa Barbara Channelkeeper

**Suggested Citation:**
Refugio Beach Oil Spill Trustees. 2021. *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment.* Prepared by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife Service, and National Oceanic and Atmospheric Administration.

2

# Refugio Beach Oil Spill Natural Resource Damage Assessment Summary:

## Shoreline Habitats
### $5.5 million

**Injury:** Approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.

## Subtidal and Fish Habitats
### $6.1 million

**Injury:** Approximately 2,200 acres of benthic subtidal habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, remove Ellwood seawall, restore sand dwelling kelp offshore of Goleta Beach.

## Birds
### $2.2 million

**Injury:** 558 birds were estimated killed, representing over 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.

## Marine Mammals
### $2.3 million

**Injury:** 156 pinnipeds and 76 cetaceans were estimated injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbra and Ventura County, and Increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.

## Human Uses
### $3.9 million

**Injury:** The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

**Restoration:**
Restoration funds (53%) will be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach.

Restoration funds (46%) will be administered by State Trustees for use on projects benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach.

Restoration funds (approximately 1%) will be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

## Restoration Planning, Implementation, and Oversight
### $2 million

## Public Input

Full Document: https://go.usa.gov/xvWEg

Administrative Record: https://go.usa.gov/xvWEc

Submit Questions: RefugioRestoration@fws.gov

Exhibits Pg. 006

## Executive Summary

On May 19, 2015 a 24-inch diameter on-shore pipeline (Line 901) that extends approximately 10.7 miles along the Santa Barbara County coastline in California ruptured resulting in the release of approximately 2,934 barrels (123,228 gallons) of heavy crude oil (U.S. DOT 2016, hereafter referred to as "the spill"). Line 901 is a buried, insulated pipeline that transported heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station. The pipeline is owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains). The Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that the cause of the Line 901 failure was external corrosion under insulation that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. Crude oil from the buried pipeline saturated the soil and flowed into a culvert that crosses under Highway 101 and railroad tracks, and ultimately discharged into the Pacific Ocean at Refugio State Beach.

The crude oil that entered the ocean posed a significant risk to and injured marine plants and wildlife, including seagrasses, kelp, invertebrates, fish, birds, and mammals. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend, resulting in losses for local businesses and lost opportunities for the public to visit and enjoy the shore and offshore areas. Tar balls attributable to the Line 901 release were carried by southerly ocean currents and eventually reached some beaches in Los Angeles County (California Department of Fish and Wildlife 2016).

The response (cleanup) to this significant spill brought together a number of federal, state, local agencies, and Native American tribes operating under a Unified Command. For the spill response, Incident Commanders consisted of representatives of the United States Coast Guard (USCG), California Department of Fish and Wildlife, Office of Spill Prevention and Response (CDFW-OSPR), Santa Barbara County, and Plains[1]. The Refugio Beach oil spill cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard, 2016). Phase III monitoring activities were largely concluded on May 26, 2016 and the Unified Command disestablished on March 10, 2017 (U.S. Coast Guard 2017).

In parallel with the response and cleanup effort, the natural resources trustee agencies (Trustees) conducted a Natural Resource Damage Assessment (NRDA) to quantify the injuries to natural resources from the spill and assess natural resource damages. In this case, the Trustees for the natural resources injured by the spill include the United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the United States Fish and Wildlife Service

---

[1] The National Contingency Plan calls for the Responsible Party to be a member of the Unified Command; ref. 40 CFR 300.135(d)

5

(USFWS), National Park Service (NPS) and Bureau of Land Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California (the Trustees). As a designated Trustee, each of these agencies is authorized to act on behalf of the public under state and/or federal laws to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured as a result of a discharge of oil.

In accordance with the Oil Pollution Act (OPA) NRDA regulations (33 U.S.C. 2706(e)), the Trustees have cooperatively gathered information and prepared this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA). This document describes the injuries resulting from the spill and the restoration projects selected to compensate the public for those injuries. This document is also an Environmental Assessment intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the proposed restoration projects under the National Environmental Policy Act (NEPA) and is therefore called a DARP/EA. Prior to releasing this Final DARP/EA, the Trustees released a Draft DARP/EA for public review and comment.  After considering the public comments received, the Trustees prepared this Final DARP/EA.  A full environmental review would be premature for some of the selected projects in this Final DARP/EA, as well as projects that were deemed "second tier" or of lower priority. The need for additional NEPA review will be determined once detailed engineering design work or operational plans are developed for selected projects. Additional review may also be required if any second tier projects are implemented.

This document describes the restoration projects selected by the Trustees to address the various resources impacted by the spill, as well as a process to identify appropriate human use projects for funding. All of the selected projects are designed to restore, replace, or acquire the equivalent of the lost resources and/or their services through restorative on-the-ground actions. Furthermore, several of the projects address multiple resources. The projects were selected based upon the biological needs of the injured species and the feasibility of restoring the resources.

Under OPA, the responsible party is liable for the cost of implementing restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees settled their claim for natural resource damages with Plains. A summary of the injury to each resource category, the approximate allocation of damages and selected restoration projects are shown below. Web links to data used in the injury assessment can be found in Appendix B of the DARP/EA.

6

SHORELINE HABITATS                                                                    $5.5 million

**Injury:** Trustees estimate that approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.



SUBTIDAL AND FISH HABITATS                                                            $6.1 million

**Injury:** Trustees estimate that approximately 2,200 acres of benthic subtidal and fish habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, restore sand-dwelling kelp offshore of Goleta Beach, and remove Ellwood seawall.

7



BIRDS                                                                                                      $2.2 million

**Injury:** Trustees estimate 558 birds were killed, representing approximately 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.



MARINE MAMMALS                                                                                  $2.3 million

**Injury:** Trustees estimate 156 pinnipeds and 76 cetaceans were injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties, and increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.

8



HUMAN USE $3.9 million

**Injury:** Trustees estimate over 140,000 recreational user days were lost.

**Restoration:** Various projects to improve human recreation, to be administrated as follows - 53% to State Parks for projects benefitting camping or shore-based recreation including and upcoast of El Capitan State Beach; 46% for a grants program for projects downcoast of El Capitan State Beach, on non-State Parks lands benefitting coastal recreation as well as boating and off-shore recreation in Santa Barbara, Ventura, and Los Angeles Counties; and approximately 1% to Coal Oil Point Reserve for projects benefitting research, education, and outreach.



RESTORATION PLANNING, IMPLEMENTATION, AND OVERSIGHT $2.0 million

9

The Trustees have prepared this Final DARP/EA to inform the public about the natural resource damage assessment (NRDA) and restoration planning efforts that have been conducted following the spill. This document is also an Environmental Assessment (EA) intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects, and the alternatives considered, under NEPA. As environmental review would be premature for some of the projects in the document, additional review may be required in some instances. This will be determined once recreational use projects are identified and/or when more detailed engineering design work or operational plans for the selected projects are available. To coordinate and oversee implementation of this DARP/EA, the Trustees have formed a Trustee Council comprised of representatives from each of the Trustee agencies. To submit questions or contact the Trustee Council, please use the following contact information:

## Electronic Mail:

RefugioRestoration@fws.gov

## U.S. Mail:

Refugio Beach Oil Spill Natural Resource Trustees
C/O Ventura Fish and Wildlife Office
2493 Portola Road, Suite B
Ventura, California 93003

Attn:
Michael Anderson, California Department of Fish and Wildlife
Jennifer Boyce, National Oceanic and Atmospheric Administration
Colleen Grant, U.S. Fish and Wildlife Service

10

# Abbreviations

| | | | | |
|---|---|---|---|---|
| BLM | Bureau of Land Management | | RP | Responsible Party |
| CDFW | California Department of Fish and Wildlife | | SCAT | Shoreline Cleanup and Assessment Team |
| CESA | California Endangered Species Act | | USFWS | United States Fish and Wildlife Service |
| CEQA | California Environmental Quality Act | | UV | Ultraviolet light |
| CFR | Code of Federal Regulations | | | |
| CSLC | California State Lands Commission | | | |
| CSSC | California Species of Special Concern | | | |
| CWA | Clean Water Act | | | |
| CZMA | Coastal Zone Management Act | | | |
| DARP | Damage Assessment and Restoration Plan | | | |
| DOC | United States Department of Commerce | | | |
| DOI | United States Department of the Interior | | | |
| EA | Environmental Assessment | | | |
| EFH | Essential Fish Habitat | | | |
| EIR | Environmental Impact Report | | | |
| EIS | Environmental Impact Statement | | | |
| ESA | Endangered Species Act | | | |
| FLAT | Federal Lead Administrative Trustee | | | |
| FONSI | Finding of No Significant Impact | | | |
| FWCA | Fish and Wildlife Coordination Act | | | |
| GNOME | General NOAA Operation Modeling Environment | | | |
| HEA | Habitat Equivalency Analysis | | | |
| IBA | Important Bird Area | | | |
| IEc | Industrial Economics, Inc. | | | |
| LAT | Lead Administrative Trustee | | | |
| MBTA | Migratory Bird Treaty Act | | | |
| MMPA | Marine Mammal Protection Act | | | |
| NCP | National Contingency Plan | | | |
| NEPA | National Environmental Policy Act | | | |
| NMFS | National Marine Fisheries Service | | | |
| NMSA | National Marine Sanctuaries Act | | | |
| NOAA | National Oceanic and Atmospheric Administration | | | |
| NOI | Notice of Intent | | | |
| NPDES | National Pollution Discharge Elimination System | | | |
| NPFC | National Pollution Funds Center | | | |
| NPS | National Park Service | | | |
| NRDA | Natural Resource Damage Assessment | | | |
| NWR | National Wildlife Refuge | | | |
| ONMS | Office of National Marine Sanctuaries | | | |
| OPA | Oil Pollution Act of 1990 | | | |
| OSPR | Office of Spill Prevention and Response | | | |
| PAHs | Polycyclic aromatic hydrocarbons | | | |
| REA | Resource Equivalency Analysis | | | |
| RFP | Request for Proposals | | | |

11

Exhibits Pg. 013

# Common and Scientific Names

**Mammals and Other Vertebrates**

Blue whale (*Balaenoptera musculus*)
California red-legged frog (*Rana draytonii*)
California sea lion (*Zalophus californianus*)
Common bottlenose dolphin (*Tursiops truncatus*)
Fin whale (*Balaenoptera physalus*)
Gray whale (*Eschrichtius robustus*)
Green turtle (*Chelonia mydas*)
Guadalupe fur seal (*Arctocephalus townsendi*)
Hawksbill turtle (*Eretmochelys imbricate*)
Humpback whale (*Megaptera novaeangliae*)
Leatherback turtle (*Dermochelys coriacea*)
Loggerhead turtle (*Dermochelys coriacea*)
Long-beaked common dolphin (*Delphinus capensis*)
Northern elephant seal (*Mirounga angustirostris*)
Northern fur seal (*Callorhinus ursinus*)
Pacific harbor seal (*Phoca vitulina*)
Pacific white-sided dolphin (*Lagenorhynchus obliquidens*)
Short-beaked common dolphin (*Delphinus delphis*)
Southern sea otter (*Enhydra lutris nereis*)
Steller sea lion (*Eumetopias jubatus*)

**Birds**

American pipit (*Anthus rubescens*)
Ashy storm-petrel (*Oceanodroma homochroa*)
Belding's savannah sparrow (*Passerculus sandwichensis beldingi*)
Black-bellied plover (*Pluvialis squatarola*)
Black-crowned night heron (*Nycticorax nycticorax*)
Black phoebe (*Sayornis nigricans*)
Brandt's cormorant (*Phalacrocorax penicillatus*)
Brown pelican (*Pelecanus occidentalis*)
California gull (*Larus californicus*)
California least tern (*Sterna antillarum browni*)
Common loon (*Gavia immer*)
Ducks (Anatidae)
Forster's tern (*Sterna forsteri*)
Glaucous-winged gull (*Larus glaucescens*)
Horned grebe (*Podiceps auritus*)
Horned lark (*Eremophila alpestris*)
Light-footed Ridgeway's rail (*Rallus obsoletus levipes*)
Long-billed curlew (*Numenius americanus*)
Long-billed dowitcher (*Limnodromus scolopaceus*)
Marbled godwit (*Limosa fedoa*)
Mew gull (*Larus brachyrynchus*)
Red-throated loon (*Gavia stellata*)
Ring-billed gull (*Larus delawarensis*)

Royal tern (Thalasseus maximus)
Sanderling (*Calidris alba*)
Say's phoebe (*Sayornis saya*)
Scripp's murrelet (*Synthliboramphus scrippsi*)
Short-billed dowitcher (*Limnodromus griseus*)
Surf scoter (*Melanitta perspicillata*)
Western grebe (*Aechmorphorus occidentalis*)
Western gull (*Larus occidentalis*)
Western snowy plover (*Charadrius nivosus nivosus*)
Whimbrel (*Numenius phaeopus*)
White-winged scoter (*Melanitta fusca*)
Willet (*Tringa semipalmata*)
Yellow-rumped warbler (*Setophaga coronate*)

**Fish**

Anchovy (Engraulidae)
Barred surfperch (*Amphistichus argenteus*)
Blenny (*Blennioidei*)
Broomtail grouper (*Mycteroperca xenarcha*)
Cabezon (*Scorpaenichthys marmoratus*)
California corbina (*Menticirrhus undulates*)
California grunion (*Leuresthes tenuis*)
California sheephead (*Semicossyphus pulcher*)
Chinook "King" salmon (*Oncorhynchus tshawytscha*)
Coho "Silver" salmon (*Oncorhynchus kisutch*)
Croaker (Sciaenidae)
Garibaldi (Hypsypops rubicundus)
Giant "Black" sea bass (*Stereolepis gigas*)
Giant kelpfish (Heterostichus rostratus)
Gopher rockfish (*Sebastes carnatus*)
Grass rockfish (*Sebastes rastrelliger*)
Guitarfish (Rhinobatidae)
Halfmoon fish (*Medialuna californiensis*)
Kelp bass (*Paralabrax clathratus*)
Kelp rockfish (*Sebastes atrovirens*)
Leopard shark (*Triakis semifasciata*)
Northern anchovy (*Engraulis mordax*)
Opaleye (*Girella nigricans*)
Pacific halibut (*Hippoglossus stenolepis*)
Painted greenling (*Oxylebius pictus*)
Plainfin midshipman (*Porichthys notatus*)
Ray (Batoidea)
Sandab (*Citharichthys* spp.)
Scorpion fish (Scorpaenidae)
Señorita (*Oxyjulis californica*)
Silverside (Atherinidae)
Skate (Rajidae)
Smooth-hound shark (*Mustelus* spp.)

12

Sole (Soleidae)
Starry flounder (*Platichthys stellatus*)
Steelhead trout (*Oncorhynchus mykiss*)
Surfperch (Embiotocidae)
Tidepool sculpin (*Oligocottus maculosus*)
Tidewater goby (*Eucyclogobius newberryi*)
Topsmelt (*Atherinops affinis*)
Walleye surfperch (*Hyperprosopon argentuem*)
White seabass (*Atractoscion nobilis*)
White shark (*Carcharodon carcharias*)

**Invertebrates**
Acorn barnacle (*Balanus* spp.)
Bat star (Patiria miniata)
Beach hopper (*Megalorchestia* spp.)
Bean clam (*Donax gouldii*)
Black abalone (*Haliotis cracherodii*)
Bloodworm (*Thoracophelia mucronata*)
Bryozoan (Bryozoa)
California mussel (*Mytilus californianus*)
California spiny lobster (*Panulirus interruptus*)
Chiton (Polyplacophora)
Clam (Bivalvia)
Cup coral (*Balanophyllia elegans*)
Decorator crab (Majoidea)
Feather duster worm (Sabellidae)
Gastropod (Gastropoda)
Globose dune beetle (*Coelus globosus*)
Gooseneck barnacle (*Pollicipes polymerus*)
Hermit crab (Paguroidea)
Inshore "Market" squid (*Loligo opalescens*)
Isopod (Alloniscus perconvexus and Tylos punctatus)
Kelp fly (Diptera)
Keyhole limpet (Fissurellidae)
Limpet (Gastropoda)
Lined shore crab (*Pachygrapsus crassipes*)
Mole crab (*Emerita* spp.)
Nemertean worm (Nemertea)
Nudibranch (Nudibranchia)
Ochre sea star (*Pisaster ochraceus*)
Octopus (Cephalopoda)
Olive snail (*Olivella biplicata*)
Opheliid polychaete worm (Ophelia)
Pacific purple sea urchin (*Strongylocentrotus purpuratus*)
Periwinkle snail (*Littorina littorea*)
Pismo clam (Tivela stultorum)
Polychaete worm (Polychaeta)
Red abalone (*Haliotis rufescens*)
Red sea urchin (*Mesocentrotus franciscanus*)
Rock crab (*Cancer productus*)

Rove beetle (Staphylinidae)
Salp (Salpidae)
Sand castle "Honeycomb" worm (*Phragmatopoma californica*)
Sand crab (*Emerita analoga*)
Sand dollar (Echinodermata)
Sea anemone (Actiniaria)
Sea cucumber (Holothuroidea)
Sea hare (Anaspidea)
Sheep crab (*Loxorhynchus grandis*)
Shrimp (Dendrobranchiata and Caridea)
Sponge (Porifera)
Talitrid amphipod (*Megalorchestia* spp.)
Top snail (Trochidae)
Tunicate (Tunicata)
Turban snail (*Tegula funebralis*)
Whelk (Gastropoda)
White abalone (*Haliotis sorenseni*)
Plants and algae
Bladder chain kelp (*Stephanocystis osmundacea*)
Bladder kelp (*Sargassum muticum*)
Cape ivy (*Delairea odorata*)
Coast live oak (*Quercus agrifolia*)
Coralline algae (Corallina/Bossiella/Calliarthron spp.)
Cordgrass (*Spartina alterniflora* and *Spartina densiflora*)
Eelgrass (*Zostera pacifica*)
Feather boa kelp (*Egregia menziesii*)
Gaviota tarplant (*Deinandra increscens ssp. villosa*)
Giant kelp (*Macrocystis pyrifera*)
Grapestone seaweed (*Mastocarpus papillatus*)
Nailbrush seaweed (*Endocladia muricata*)
Palm tree (Arecaceae)
Red algae (*Prionitis* spp. and *Porphyra* spp.)
Rockweed (*Fucus distichus* and *Silvetia compressa*)
Sea lettuce (*Ulva lactuca*)
Surfgrass (*Phyllospadix* spp.)
Turkish-towel seaweed (*Chondracanthus* spp.)
Western sycamore (*Platanus racemose*)

13

## Table of Contents

**1.0    Introduction and Purpose** ................................................................................................ 15

   1.1    Overview of the Incident ........................................................................................... 16

   1.2    NRDA Overview ........................................................................................................ 22

   1.3    Summary of Natural Resource Injuries ...................................................................... 23

   1.4    Summary of Selected Restoration Projects ................................................................. 24

**2.0    Affected Environment** ..................................................................................................... 27

   2.1    Physical Environment ................................................................................................ 27

   2.2    Marine and Coastal Managed and Protected Areas .................................................... 30

   2.3    Biological Resources ................................................................................................. 32

   2.4    Archeological and Cultural Resources ........................................................................ 38

   2.5    Recreational Services ................................................................................................. 42

**3.0    Coordination and Compliance** ....................................................................................... 43

   3.1    Federal and State Trustee Agencies ........................................................................... 43

   3.2    Coordination ............................................................................................................. 43

   3.3    Compliance with Environmental Laws, Regulations, and Policies ............................. 45

**4.0    Injury Quantification and Restoration Planning Methods** ......................................... 58

   4.1    Quantification of Damages ........................................................................................ 58

   4.2    Restoration Project Selection Criteria ........................................................................ 60

**5.0    Injury Quantification and Restoration Alternatives** .................................................... 59

   5.1    Shoreline Habitats ..................................................................................................... 65

   5.2    Subtidal and Fish Habitats ......................................................................................... 94

   5.3    Birds ......................................................................................................................... 117

   5.4    Marine Mammals ...................................................................................................... 140

   5.5    Human Uses .............................................................................................................. 152

**6.0    NEPA Alternatives Analysis** ......................................................................................... 163

   6.1    Preferred Alternatives ............................................................................................... 163

   6.2    Non-Preferred Alternatives ....................................................................................... 165

   6.3    No Action Alternative ............................................................................................... 165

   6.4    Cumulative Impacts .................................................................................................. 166

References ..................................................................................................................................... 174

Preparers ...................................................................................................................................... 174

Acknowledgements ....................................................................................................................... 182

14

# List of Appendices

Appendix A          Oil Fate and Transport

Appendix B          Data Management and Access

Appendix C          Resource Equivalency Analysis

Appendix D          Shoreline Exposure and Injury Evaluation Studies

Appendix E          Supplemental Bioassay Report Information

Appendix F          Shoreline Habitat Equivalency Analysis

Appendix G-1        Fish and Invertebrate Mortality Observations

Appendix G-2        Field and Laboratory Assessment of Injury to Grunion

Appendix G-3        Assessment of Surfperch Exposure

Appendix G-4        Oil Exposure and Potential Effects to Fish, Invertebrate Early Life Stages, and Kelp

Appendix G-5        Changes in the Condition of Surfgrass and Macroalgae

Appendix G-6        Field Assessment of Subtidal Exposure

Appendix G-7        Polycyclic Aromatic Hydrocarbons in Nearshore Fish and Invertebrate Tissues

Appendix H          Subtidal Injury Quantification and Habitat Equivalency Analysis

Appendix I          Bird Injury Assessment

Appendix J          Marine Mammal Exposure, Injury, and Restoration

Appendix K          Recreational Camping Damages

Appendix L          Recreational Shoreline Use Damages

Appendix M          Recreational Boating and Offshore Use Damages

Appendix N          Summary of Proposed Restoration Projects

Appendix O          Response to Public Comments on the Draft Damage Assessment and Restoration Plan/Environmental Assessment

## 1.0    Introduction and Purpose

The purpose of this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA) is to provide information to the public about the results of the Natural Resource Damage Assessment (NRDA) that was conducted to assess injuries to natural resources that were caused by the Refugio Beach Oil Spill. This document further describes the selected restoration projects to restore habitats and natural resources affected by the spill and compensate for interim losses of natural resources and their services from the date of the incident until recovery.  A list of second tier restoration projects are also identified, should any selected restoration projects become infeasible or funded by other entities. The document incorporates feedback provided through the public comment process. A full summary of public comments received on the Draft DARP/EA and the Trustees' responses to those comments can be found in Appendix O. The document also serves as an Environmental Assessment under the National Environmental Policy Act (NEPA) evaluating the potential effects to the environment from implementing the selected restoration projects.

## 1.1    Overview of the Incident

On May 19, 2015, a 24-inch diameter buried pipeline known as Line 901, owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains), ruptured in Santa Barbara County, California, in the vicinity of Refugio State Beach. Line 901 transported heated crude oil extracted from deep subsea formations at several offshore platforms. As a result of the rupture, an estimated 2,934 barrels (123,228 gallons) of heavy crude oil were released from the pipeline (U.S. DOT 2016). A significant portion of the oil reached the Pacific Ocean at Refugio State Beach after flowing through culverts and across several upland areas (Figure 1). The incident is referred to throughout this document as the Refugio Beach Oil Spill or the "spill."

Plains initially estimated that approximately 2,400 barrels (100,800 gallons), of crude oil were spilled and that 500 barrels (21,000 gallons) reached the ocean (U.S. DOT 2016). The total volume released from the pipeline was later revised to 2,934 barrels (123,228 gallons) (U.S. DOT 2016). Subsequently, consultants for Plains increased the estimate of oil reaching the ocean to 598 barrels (25,116 gallons). An analysis on behalf of the Trustees concluded that as much as 1,262 barrels (53,000 gallons) of oil reached the ocean (Baker 2018).

Within hours of the spill, based on recommendations from the California Office of Environmental Health Hazard Assessment (OEHHA), the California Department of Fish and Wildlife (CDFW) initiated a fishery closure in the vicinity of the spill. The following day, Governor Edmund G. Brown, Jr., declared a state of emergency for Santa Barbara County. Several beaches in Santa Barbara County were closed to the public, including Refugio and El Capitan State Beaches (described further in Section 5.5). On May 21, 2015, the fishery closure was expanded along the shore and offshore out to 6 miles, encompassing a total area of 138 square miles, based on aerial observations and National Oceanic and Atmospheric

16

Administration (NOAA) oil spill trajectory models of where the oil was likely to move (OEHHA 2015). The fishery closure ended on June 29, 2015 (OEHHA 2015).



**Figure 1.** Flow path of the Line 901 pipeline rupture into culverts under Highway 101 and railroad tracks and ultimately into the Pacific Ocean at Refugio State Beach. Credit: John Wiley (http://flickr.com/jw4pix)

The crude oil smothered and soaked into terrestrial areas along the pathway from the pipeline rupture to the site where the oil entered the ocean, a short distance west of Refugio Cove (Figure 1). The shorelines from the release point, within Refugio State Beach to El Capitan State Beach, received the heaviest coastal oiling. Shorelines downcoast as far as Long Beach were intermittently oiled with tarballs and subject to beach closures, with the level of oiling generally decreasing farther away from the release point. Subtidal habitats in the vicinity of the release point also experienced oil exposure.

In the days after the spill, ocean surface currents and strong afternoon winds carried oil mostly downcoast, although some oil was deposited on beaches upcoast of the release site.

Marine organisms, including plants, invertebrates, fish, birds, and mammals, were exposed to oil. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend resulting in lost opportunities for the public to visit and enjoy the shore and offshore areas after the spill. Floating oil attributed to Line 901 was identified 17 km southwest of the release site, and more than 8 miles offshore (Valentine 2017). Tarballs attributed to the Line 901 release were identified as far south as Los Angeles County, more than 100 miles from the release site, where there were additional beach closures.

### 1.1.1   Cleanup Operations

The spill brought together many federal, state, and local agencies for cleanup operating under a Unified Command. For the spill response, the Incident Commanders consisted of representatives

17

of the USCG, CDFW-OSPR, Santa Barbara County, and Plains[2]. Throughout the response, the incident received high interest from news media, legislators, non-governmental organizations, members of the public, and other stakeholders.

The Unified Command conducted a phased approach to oil spill cleanup, in accordance with the National Oceanic and Atmospheric Administration's Shoreline Assessment Manual that provides for defined cleanup processes and goals for each cleanup phase. The cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard 2016). Phase III monitoring activities were largely concluded on May 26, 2016, and the Unified Command was disestablished on March 10, 2017 (U.S. Coast Guard 2017).

The majority of the response effort was focused on minimizing environmental and cultural site damage and maximizing the recovery of discharged oil. Oil spill response operations were divided into three areas including an Inland Branch, Shoreline Branch, and On-water Branch.

The Inland Branch included the discharge site and pathway of oil to the Pacific Ocean. Inland branch response operations included oil recovery and removal, pipeline excavation, contaminated soil removal, contaminated vegetation removal, community and responder air monitoring, and oil sampling from the source of discharge.

The Shoreline Branch addressed oil in the path of discharge from the top of a cliff down to the beach and along 96 miles of affected shoreline. Response teams applied manual and mechanical recovery methods, primarily removal and disposal of oiled sand, wrack, and marine organisms. Removal of oil from rock was accomplished with scrapers or wire brushes. In some areas, dry ice was also used in conjunction with compressed air to freeze oil on rocks, allowing it to flake off more easily. In other areas, oiled cobble was placed in the surf zone to be scrubbed clean by wave action and tumbling amongst other cobble. Other operations included community and responder air monitoring, oil sampling, and wildlife recovery, rehabilitation, and release.

The On-water Branch addressed recoverable oil in offshore waters affected by the spill. On-water response operations included the use of oil containment and protection boom, skimmers, and oil recovery vessels. Local private vessels were also enlisted to assist with removal of oil from the marine environment.

---

[2] The National Contingency Plan calls for the Responsible Party, in this case Plains, to be a member of the Unified Command; ref. 40 CFR 300.135(d).

18

Staff responsible for conducting reconnaissance, recovery, and rehabilitation for wildlife exposed to Line 901 oil throughout the response area were organized and deployed through a Wildlife Branch that operated throughout the spill-affected area.

## 1.1.2   Transport and Fate of the spilled Oil

Line 901 oil coated shores predominantly downcoast for several miles from the release site within hours of the spill, primarily due to along-shore transport of the oil by currents, surge and surf action. While there are known active natural off-shore oil seeps in the spill vicinity, virtually all oil observed in the area from the release point to El Capitan in the days immediately after the spill, was from the Refugio Beach Oil Spill. Oil was also transported offshore by currents, surge action and wind drift and was observed during Unified Command overflights between May 20 and June 3 (Figure 3). Over time, oil from the spill spread farther offshore and downcoast, and in the days and weeks after the spill, light to moderate shoreline oiling, largely in the form of tarballs, occurred much farther away from the spill site. By May 28 unusually heavy tar ball stranding was reported in Ventura County near Oxnard. Soon after, unusually heavy depositions of tar balls were reported at several beaches near Redondo and Manhattan Beaches in Los Angeles County. The presence of stranded oil along some Los Angeles County beaches was heavy enough that several beach closures were declared by County officials, and a separate Unified Command was established in Los Angeles to respond to the oiling.



**Figure 2.** Results of hindcast modeling that shows the simulated oil transport trajectory based on the spill origin, winds, and currents that occurred between May 19, 2015 and May 29, 2015. The colors represent particle density, with red/orange being the highest density, yellow moderate density, and blue low density. See Appendix B for data associated with this figure.

To further understand and illustrate the transport and fate of spilled Line 901 oil, NOAA performed hindcast modeling using the General NOAA Operation Modeling Environment (GNOME). GNOME is an oil spill trajectory model in which the surface oil is divided into a

19

large number of small particles of equal mass that move under the influence of surface ocean currents, wind drift, and horizontal mixing from the time of the spill. GNOME also includes algorithms that simulate surface oil weathering, e.g., evaporation and dispersion. GNOME modeling snapshots (Figure 2) show Line 901 oil moving into the Santa Barbara Channel May 20, 2015 and May 21, 2015, transiting the waters of the Channel Islands National Marine Sanctuary, but no particles reached the Channel Island shores. Rather, the particles move east, making landfall on the Ventura coast about May 25, 2015 with subsequent deposition by May 29, 2015 in Los Angeles County. More information on the GNOME modeling can be found in Appendix A.



**Figure 3.** Map showing total U.S. Coast Guard overflight observations of surface oil over a 14 day period between May 21, 2015 and June 3, 2015. Note that the representations of sheen in this graphic are cumulative, i.e., oil was not in all of these locations at any given time. See Appendix B for data associated with this figure.

Line 901 oil was also transported downward through the water column due to mixing in the nearshore environment and the surf zone. Submerged oil was observed at several locations between May 22, 2015 and June 2, 2015 by UCSB and other entities. Of the oil observed, seven samples were collected and analyzed forensically, five of the samples matched Line 901 oil (Valentine 2019). The Unified Command undertook a submerged oil survey on May 29, 2015 through May 30, 2015 and reported no recoverable submerged oil. Oil may have been mixed with sediment through the surf action and was subsequently redistributed along the bottom and surface through sinking, tidal action, and surf transport. Based on general oceanographic conditions in the area vertical mixing of oil droplets and dissolved oils is estimated to occur to a depth of approximately 14 meters (Appendix A).

20

### 1.1.3   Forensic Identification of Line 901 Oil in the Environment

There are active, well-studied natural oil seeps in the region where the Refugio Beach Oil Spill occurred (Lorenson et al. 2009; Lorenson et al. 2011). These seafloor seeps release oil and gas that float to the ocean surface and periodically strand on regional shorelines, generally in the form of tar balls. Thus, not all of the oil evident in the region in the aftermath of the initial spill came from the Line 901 pipeline.

Spilled Line 901 oil can be distinguished from natural seep oil by using specialized chemical fingerprinting techniques[3]. In the days after the spill, hundreds of oil samples were collected from Santa Barbara, Ventura, Los Angeles, and Orange Counties. Selected samples were analyzed and forensically interpreted by experts working on behalf of the Natural Resource Trustees (Trustees), as well as by several other laboratories and experts engaged by the Unified Command and independently by Plains (Valentine 2015; Jeffrey 2016; Stout 2016; Stout et al. 2018). Oil samples collected from the ocean surface and from beaches were determined in some cases to be from Line 901, in other cases to be from known natural seeps, and in some cases to have characteristics of both, implying they were mixtures of natural seep and spilled oil.

After careful investigation, the Trustees concluded that oil from the Refugio Beach Oil Spill was deposited intermittently on shores from Gaviota State Park in Santa Barbara County to Los Angeles County (Figure 4). For purposes of the NRDA, the furthest southern extent of the spill was determined to be Long Beach based on beach closures.



**Figure 4.** Geographic extent of Line 901 oil. This Figure shows oil samples collected and analyzed on behalf of the Trustees through June 2, 2015 when the Trustees' trajectory modeling suggests that oil would have moved through the impacted area. This does not include samples collected by the response and analyzed for the criminal investigation. In People of the State of California v Plains All American Pipeline, L.P., Sup. Court of State of California, County of Santa Barbara, Case No. 1495091, People's Trial Exhibit 078.0001 oil was documented as far south as Seal Beach in Orange County. See Appendix B for data associated with this figure.

---

[3] Plains does not agree.

21

## 1.2 NRDA Overview

There are typically four types of claims that are made against responsible parties in an oil spill such as this one:
1. reimbursement for cleanup costs;
2. natural resource damages (including the costs of assessment);
3. fines and penalties under various laws; and
4. third-party claims (e.g. from non-government parties, such as commercial fisheries and affected businesses).

This document is only concerned with the second item, natural resource damages. This Damage Assessment and Restoration Plan and Environmental Assessment (DARP/EA) has been prepared by state and federal natural resource Trustee agencies responsible for restoring natural resources[4] and resource services[5] injured by the release of oil from the May 19, 2015, Refugio Beach Oil Spill. This document provides details regarding:
- Environment affected by the spill (Section 2);
- Coordination and compliance among the government agencies and responsible party (Section 3);
- Injury quantification and restoration planning methods (Section 4);
- Nature and scope of injuries and the quantification of those injuries (Section 5);
- Selected restoration projects to address the injuries (Section 5); and
- NEPA alternatives analysis (Section 6).

Consistent with the Oil Pollution Act (OPA) and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq., the purpose of restoration planning is to identify and evaluate restoration alternatives and to provide the public with an opportunity for review and comment on the proposed restoration alternatives. Restoration planning provides the link between injury and restoration. The purpose of restoration, as stated in this DARP/EA, is to make the environment and the public whole for injuries resulting from the spill by implementing restoration actions that return injured natural resources and services to baseline conditions and compensate for interim losses.

United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the U.S. Fish and Wildlife Service (USFWS), National Park Service (NPS), and Bureau of Land

---

[4] Natural resources are defined under the Oil Pollution Act as "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any State or local government or Indian tribe, or any foreign government." 33 U.S.C. §2701(20).

[5] Services (or natural resources services) means the functions performed by a natural resource for the benefit of another natural resource and/or the public.

22

Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California are the Trustees who are addressing the natural resources injured by the spill. As a designated Trustee, each agency is authorized to act on behalf of the public under state and/or federal law to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured by a discharge of oil. For purposes of coordination and compliance with OPA and NEPA, NOAA is designated as the lead federal Trustee.

The Trustees have prepared this DARP/EA to inform the public about the NRDA and restoration planning efforts that have been conducted following the spill. This document is also an EA intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects under NEPA. As full environmental review would be premature for some of the selected projects in the document pending development of sufficient project-level detail. This will be determined once detailed engineering design work or operational plans are developed for those projects.

## 1.3 Summary of Natural Resource Injuries

The injuries from the oil spill can be divided into the following categories: shoreline habitats, subtidal and fish habitats, birds, marine mammals, and human uses. The injuries to each category are summarized here (Figure 5) and presented in greater detail in Section 5.

- **Shoreline Habitats**: The Trustees estimate approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.
- **Subtidal and Fish Habitats**: The Trustees estimate approximately 2,200 acres of benthic subtidal habitat were impacted.
- **Birds:** The Trustees estimate 558 birds were killed, representing over 28 different species. The primary species impacted were brown pelicans, representing 57% of the total estimated mortality. Western snowy plovers were also impacted through effects to reproduction the year after the spill, following oil exposure.
- **Marine Mammals**: The Trustees estimate that 156 pinnipeds (94% California sea lions, 5% northern elephant seals and 1% Pacific harbor seals) and 76 cetaceans (95% long-beaked common dolphins and 5% common bottlenose dolphins) were injured or killed by the spill.
- **Human Uses**: The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

23



**Figure 5.** Refugio Beach Oil Spill fingerprint matches (red circles) along with the habitats and resources that were injured by the spill. See Appendix B for data associated with this figure.

## 1.4    Summary of Selected Restoration Projects

The Trustees' mandate under OPA (see 33 U.S.C. 2706(b)) is to make the environment and the public whole for injuries to natural resources and natural resource services resulting from the discharge of oil. This requirement must be achieved through the restoration, rehabilitation, replacement, or acquisition of equivalent natural resources and/or services. Thus, for a project to be considered there must be a connection, or nexus, between the natural resource injuries and the proposed restoration actions.

Compensatory restoration is any action taken to compensate for interim losses of natural resources and services pending recovery to baseline conditions. The scale, or amount, of the required compensatory restoration will depend on the extent and severity of the initial resource injury and how quickly each resource and associated service returns to baseline. Primary restoration actions that speed resource recovery will reduce the amount of required compensatory restoration.

The Trustees considered restoration concepts and alternatives with the potential to provide compensatory restoration. These were evaluated based on selection criteria developed by the Trustees, consistent with the legal guidelines provided in the OPA regulations (15 C.F.R. 990.54(a)). Section 4.2 presents OPA-based selection criteria developed by the Trustees for the spill. Based on the Trustees' evaluation, and after considering public comments on the Draft DARP/EA, a suite of preferred restoration projects were selected and are summarized below.

24

Additional details on all projects that met the threshold screening criteria are presented in Section 5.

The Trustees have grouped the injuries into categories, sometimes combining impacts to similar species. In this way, one restoration project, benefiting a suite of species or one primary species, may address all injuries for that category. In accordance with OPA, all of the selected projects have been "scaled" in size, such that the benefits of the restoration offset the injuries caused by the spill. Summaries of the selected restoration projects are provided below. More details on the projects are provided in Section 5.

Under OPA, the responsible party is liable for the cost of the compensatory restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees have settled this claim for natural resource damages with the responsible party for $22.3 million. The following amounts are allocated to fund the projects described in this document:

**Shoreline Habitats**                                                  $5.5 million
- Remove the Ellwood seawall that is currently constraining natural functioning condition of sandy beach and subtidal habitats;
- Restore black abalone populations to enhance the overall health of rocky intertidal habitats; and
- Restore degraded sand dune habitats by removing invasive/non-native vegetation, and/or precluding disturbance to sensitive areas to allow native dune vegetation to regrow.

**Subtidal and Fish Habitats**                                          $6.1 million
- Restore abalone populations in Marine Protected Areas along the Gaviota coast to enhance the overall health of subtidal habitats;
- Restore eelgrass beds on the Gaviota Coast to enhance overall health of subtidal habitat; and
- Extend a pilot project for restoring sand-dwelling kelp offshore of Goleta Beach to determine the feasibility of this novel method for restoring kelp forests.

**Birds**                                                              $2.2 million
- Remove invasive plants from brown pelican nesting colonies on Anacapa Island to prevent these important breeding sites from becoming unsuitable for nesting;
- Reduce seabird injuries from recreational fishing; and
- Implement conservation actions for western snowy plovers at Coal Oil Point Reserve to protect and enhance breeding success.

25

**Marine Mammals**                                                      $2.3 million

- Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties to increase survivorship of pinnipeds; and
- Expand the capacity to respond to instances of cetacean entanglement in the Santa Barbara Channel to increase survivorship of entangled cetaceans.

**Human Use**                                                          $3.9 million

- Restoration funds (53%) to be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach;
- Restoration funds (46%) to be administered by State Trustees for use on projects outside of State Park property benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach; and
- Restoration funds (approximately 1%) to be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

The remaining funds will be used by the Trustees for restoration planning and oversight. Any unused funds will be allocated toward one or more projects described in this document, or identified through further project scoping.

26

## 2.0   Affected Environment

This section presents a brief description of the physical, biological, and cultural environment affected by the oil spill.

The physical environment considered in the NRDA encompasses approximately 155 miles of shoreline from Gaviota to Long Beach, as well as the Santa Barbara Channel, and supports a rich diversity of coastal and marine species[6]. Many areas within the affected environment are protected by state or federal designations to preserve the biological integrity of the habitat, while other areas are available to the public for recreation. The affected environment also is home to a wide variety of culturally and historically important resources.

This section also provides information on the affected environment for the preferred restoration projects which are located within the general spill-affected area. For restoration projects that occur outside of the spill-affected area, information on the affected environment is provided along with the project descriptions in Section 5.

## 2.1   Physical Environment

This subsection describes the physical setting of the coastal areas affected by the Refugio Beach Oil Spill, including areas where restoration projects are proposed. The geographical extent of the physical environment described herein extends from Gaviota to Long Beach.

### 2.1.1  Climate

The atmospheric climate in the region is generally, consistently mild and considered Mediterranean-like. Winters are rainy and summers are dry, and predominant coastal breezes suppress wide air temperature changes. Air temperatures generally range between the mid-60s and mid-70s (16-21°C). The years 2015 and 2016 were characterized by El Niño conditions, officially beginning in March 2015. El Niño conditions in southern California typically mean increased precipitation in the winter and higher sea surface temperatures (NOAA 2016; SCCOOS 2019).

### 2.1.2  Land Use and Geology

The spill originated at Refugio State Beach, in an area known as the "Gaviota Coast" which is one of southern California's largest remaining continuous stretches of undeveloped rural coastline. As described in the Gaviota Coast Plan, the Gaviota Coast includes the shoreline between Vandenberg Air Force Base to the west and Coal Oil Point to the east (Figure 6). It is world renowned as a biodiversity hotspot and one of the most ecologically diverse regions on the planet. The Gaviota Coast Plan, developed by Santa Barbara County, describes natural resources in the area. The Plan is intended to preserve the rural character of Gaviota by protecting and

---

[6] Not all areas within this physical environment were impacted by the spill.

27

enhancing its varied and unique natural and cultural resources, agricultural productivity, and by enhancing public recreation and access consistent with the capacity of its resources. Downcoast from Gaviota, beginning with the cities of Goleta and Santa Barbara and extending into Ventura County, the majority of the land use is residential, light commercial, and agricultural, with areas of undeveloped open space. The spill-affected area extends into Los Angeles County, from Santa Monica to Long Beach, which is heavily populated, developed, and industrialized.

The coastal terrestrial landscapes are equally significant, diverse, and rare, representing a high degree of endemism. They include such diverse vegetation alliances as active coastal fore dunes, coastal terrace prairie, and northern coastal salt marsh. The shoreline and offshore physical environment are typically sandy beaches and submerged sandy seabed, but also include boulder cobble fields and rock bench platforms in the intertidal and subtidal rocky reefs in the nearshore area. The Gaviota Coast also includes tidally influenced lagoons, harbors, and jetties. Because of the range of habitats, the marine biodiversity in the region is high.



**Figure 6.** The location of the spill origin and various Trustee post-spill study sites along the Santa Barbara Coastline.

## 2.1.3  Ocean Waters

The waters offshore of the mainland comprise the Santa Barbara Channel with surface seawater temperatures typically ranging from about 54°F (12°C) in spring to about 66°F (19°C) in fall. The Channel is oriented east-west, extending from Point Conception to Ventura and bounded on the north side by the mainland coast and on the south side by the northern Channel Islands (San Miguel, Santa Rosa, Santa Cruz, Santa Barbara, and Anacapa). The Santa Barbara Channel is where the California Current of cold water flowing south meets and mixes with the warmer water of the Davidson Current flowing north. The convergence and mixing in the marine region tends to occur as a counterclockwise gyre or eddy in the Channel (Nishimoto and Washburn 2002). As a result, the Santa Barbara Channel is a transition zone where the composition of many groups of marine species (fishes, invertebrates, and algae) shifts from species typically associated with the cooler waters north of Point Conception to species typically associated with the warmer waters south of Point Conception. The Channel area can thus be recognized as a dividing line between two bioregions that represent geographically distinct

28

ecological systems, the Oregonian Province from Point Conception northward and the San Diegan Province from Point Conception southward (Stephens, et.al. 2016). The fact that the affected area overlaps with the transition region in the Santa Barbara Channel underscores the importance of this section of the California coastline being unique for its diversity and sensitivity to environmental changes.

Unusual ocean weather and climate patterns were observed throughout 2014 and 2015 across the North Pacific basin. An area of the North Pacific from Alaska into California was as much as 5°C (9° F) warmer than average. This atmospheric anomaly nicknamed "the blob," due to its amoeba-like form, impacted oceanic productivity and food availability for marine life in some areas. In addition, El Niño conditions, which strengthened in early March 2015, are also associated with warmer sea surface temperatures.

## 2.1.4  Petroleum Seeps

Natural oil seeps are common in the area (Hornafius et al. 1999; Lorenson et al. 2009). For example, the seep field just offshore from Coal Oil Point in Goleta extends over approximately one square mile. These seeps slowly release weathered oil from fractures in the ocean floor. Because of the slow nature of seep oil traveling through the ocean floor substrate before making its way into the water column, some of the volatile, more toxic, components of seep oil dissipate before the oil reaches the ocean surface. At the surface, the oil continues to weather, forming tarballs generally less than one centimeter (0.4 inches) in diameter that may be moved by winds and currents to strand on the shoreline (Del Sontro 2007). The weathered nature and pattern of slow release of seep oil poses a lower exposure risk to marine life and has a lower acute toxicity than fresh oil that contains more toxic fractions. In contrast, during an oil spill, the amount of more toxic fresh oil released from a point source in a short time can overwhelm an ecosystem (National Research Council 2003).

In 1969, an oil spill occurred five miles off the coast of Summerland from a blow-out at Union Oil Platform A. Over 3,000,000 gallons (11 million liters) of crude oil was released that mainly affected the area from Gaviota to Carpinteria. Some oil from the spill was detected as far north as Pismo Beach, located approximately 75 miles (121 km) north from the spill point (straight line distance), and as far south as Mexico located approximately 200 miles (322 km) south from the spill point (straight line distance). At that time, this was the largest oil spill in U.S. history, and is credited as having catalyzed the U.S. environmental movement.

29

## 2.2    Marine and Coastal Managed and Protected Areas

Several Marine Protected Areas (MPAs) occur near or within the general area affected by the spill from Point Conception to Ventura. MPAs are protected areas of ocean where human activity, such as fishing, is restricted for conservation purposes. MPAs come in a variety of forms that include National Marine Sanctuaries and State Marine Protected Areas. MPAs are a versatile management tool for helping to maintain biological diversity and productivity, rebuild fishery stocks, support sustainable fisheries, and conserve and protect historical and cultural artifacts. In addition, the Channel Islands National Park and portions of the California Coastal National Monument provide protected habitat for resources in the area. Finally, public beaches, including high use beaches were affected by the spill (Figure 7).



**Figure 7.** Public lands and protected areas in the vicinity of the Refugio Beach Oil Spill origin. Additional public lands managed by Counties and Cities occur in the area but are not shown on this map. See Appendix B for data associated with this figure.

### 2.2.1   County and City Beaches

Several County and City beaches were affected by the spill within Santa Barbara, Ventura, and Los Angeles Counties. For example, Goleta Beach Park is a day use facility managed by the Santa Barbara County Parks. It is located on a section of sand beach east of the University of California, Santa Barbara (UCSB). Amenities include a fishing pier, picnic tables, BBQs, trails, grass park, play areas, restaurant, and launch/hoist for small boats at the end of the pier. Isla Vista Beach at Isla Vista is used extensively by UCSB students and the community. Haskell's Beach (previously known as Tecolote Canyon Beach) is a high public use beach and surfing area in the City of Goleta. City and County beaches within Ventura and Los Angeles Counties are

30

frequently used as recreation access points for surfing, fishing, diving, boating, and general beach use.

### 2.2.2   University of California Santa Barbara Natural Reserve System

The Coal Oil Point Reserve is part of the University of California Natural Reserve System. The reserve protects coastal dune, estuarine, tidal lagoon, sandy beach, and rocky reef habitats to support research, education, outreach, and stewardship.

### 2.2.3   State Beaches

Within the spill-affected area, Gaviota State Park, Refugio, El Capitan, Carpinteria, Emma Wood and McGrath State Beaches are areas of high public use with amenities for overnight camping and shore access. The State Beaches along the Gaviota coast provide the public with unique camping and recreational opportunities that are highly sought after and are booked well in advance. Additionally, San Buenaventura and Mandalay State Beaches provide coastal day use access. The pier at Gaviota State Beach was closed in 2014 due to storm damage, so public use was precluded prior to the spill.

### 2.2.4   State Marine Protected Areas

In 1999, the State legislature enacted the Marine Life Protection Act. This directed the CDFW to restructure the state's MPA system to increase the ability to protect marine life, habitats, and ecosystems. In 2012, MPAs were designated along the Santa Barbara County coast south of Point Conception.

Seven state marine conservation areas occur in the spill-affected area with varying levels of resource protection ranging from no-take to limited take involving fishes, invertebrates, kelp, and restoration, maintenance, and operation of artificial structures; these are Kashtayit, Naples, Campus Point, Goleta Slough, Point Dume, and Point Vincente State Marine Conservation Areas (Figure 7). The Goleta Slough Ecological Reserve overlaps with a portion of the Goleta Slough State Marine Conservation Area where no human activities are allowed, except access on an established trail/bike path. Public access is limited because the airport is next to the Reserve. To the west of the spill-affected area is the Point Conception State Marine Reserve of no-take.

### 2.2.5   National Marine Sanctuary System

NOAA's Office of National Marine Sanctuaries serves as the trustee for a network of underwater parks encompassing more than 600,000 square miles of marine and Great Lakes waters. The network includes a system of 13 national marine sanctuaries and two marine national monuments. The program's function through the creation of National Marine Sanctuaries is to protect marine environments with special ecological, historical, cultural, archeological, scientific, educational, recreational, and aesthetic qualities.

There was no oil observed or collected matching Line 901 oil within the waters of the Channel Island National Marine Sanctuary (CINMS).  However according to the GNOME trajectory, it is

31

possible that scattered tarballs did travel through CINMS waters at some point in time. The CINMS, designated in 1980, warrants inclusion in this report for its importance with regards to environmental protection and public interest proximate to the spill. The CINMS (Figure 7) encompasses the waters surrounding five Channel Islands (San Miguel, Santa Rosa, Santa Cruz, Anacapa, and Santa Barbara) below the mean high tide level and out 6.9 miles (6 nautical miles, 11 km). Associated with the Channel Islands are 20 other MPAs. Within five Federal, and 11 State Marine Reserves, it is unlawful to injure, damage, take, or possess any living geological, or cultural marine resource. In another five State Marine Conservation Areas, limited take is allowed, and within two State Special Closure Areas boating activities are restricted in waters adjacent to sea bird rookeries and/or marine mammal haulout sites.

### 2.2.6   National Park System

The Channel Islands National Park consists of San Miguel, Santa Rosa, Santa Cruz, Anacapa, and Santa Barbara Islands (Figure 7) and the waters extending out one nautical mile around each island. Congress established the Channel Islands as a National Park in 1980 in order to protect their natural, scenic, wildlife, marine, ecological, archeological, cultural, and scientific values. The Islands are home to over 2,000 plant and animal species, of which 145 are found nowhere else in the world, and much of the terrestrial environment is managed as proposed or potential Wilderness Area. Important to this incident, West Anacapa and Santa Barbara Islands provide the only breeding colonies for the California Brown Pelican in the western United States. Tourism is allowed, and hiking, camping, and kayaking occur at varying levels on and around each island.

### 2.2.7   California Coastal National Monument

The California Coastal National Monument, managed by the Bureau of Land Management, consists of the rocky areas above the mean high tide level, including over 20,000 offshore rocks, islands, reefs, and pinnacles within 13.8 miles (12 nautical miles, 22 km) of the mainland shore. Sixty-two of these rocky features occur along the shore from the Gaviota Pier east to Campus Point at U.C. Santa Barbara. The monument provides untrammeled nesting habitat for breeding seabirds and protected haulout habitat for seals and sea lions.

## 2.3   Biological Resources

The affected area has one of the most diverse and abundant assemblages of marine organisms in the world. A rich array of habitats including the open ocean, rugged rocky shores, sandy beaches, lush kelp forests, and wetlands, support large numbers of seals and sea lions, whales, fish, otters, and seabirds. For many migratory species such as whales, seals, salmonids, and brown pelicans, the affected area is also an important link to other habitats. This section includes a broad description of all biological resources in areas that were affected by the spill, as well as resources that weren't affected by the spill but may be included in restoration projects. A description of resources that were injured is presented in Section 5.

32

### 2.3.1  Marine Mammals

The mainland coast of southern California that includes Santa Barbara County and the Channel Islands provides important breeding, pupping and resting areas for most of the pinniped species in the region. These include two species of sea lions (California sea lion and Stellar sea lion), four species of seals (northern elephant seal, Pacific harbor seal, northern fur seal, and the endangered Guadalupe fur seal). The threatened southern sea otter also occurs along the mainland coast of Santa Barbara County, primarily west of Gaviota.

California sea lions are the most abundant pinniped. Nearly all breeding and pupping occurs in the California Channel Islands area. Sea lions also haul out on offshore rocks and beaches on the mainland and Channel Islands.

Northern elephant seals breed in the winter months, molt in spring, and forage in offshore waters throughout the eastern North Pacific during summer and fall. Peak haul out abundances occur during spring when juveniles and females come ashore to molt.

Pacific harbor seals are year-round residents in the area. They haul out on several mainland beaches within the spill-affected area and on the Channel Islands. Mainland haulouts include near El Capitan State Beach, Naples, Haskell's, and a major rookery at Carpinteria, peaking in February-June when breeding, pupping and molting is occurring. Harbor seals typically forage relatively close to where they haul out.

More than 20 species of whales, dolphins, and porpoises occur regularly in the waters off Santa Barbara and Ventura Counties and the Channel Islands, but the following are the most common: gray, blue and humpback whales, long- and short-beaked common dolphins, common bottlenose dolphins, and Pacific white-sided dolphins. The whales are migratory and are most often sighted during spring and summer. Dolphins are considered year-round residents. The region is also the migratory pathway of gray whales (adult females and calves), which migrate within 1 km of shore as they travel north to their summer foraging grounds. Other large baleen whales also forage in the area. The coastal ecotype of common bottlenose dolphin, a distinct population, live within 1 km of shore, and both species of common dolphin can be regularly sighted from shore.

### 2.3.2  Seabirds

The spill-affected area is also within the Pacific Flyway, which is a major north-south flyway for migratory birds in America, extending from Alaska to Patagonia, South America. The spill-affected area includes several areas identified by the Audubon Society as Important Bird Areas (IBAs): Point Conception, Santa Barbara Basin, Point Mugu, Santa Cruz Basin, Northern Channel Islands, and Palos Verdes. The Goleta Coast IBA is also within the spill-affected area, and includes Coal Oil Point and Goleta Slough and the beaches between.

Seabirds characteristic of open water areas within the spill-affected area include surf and white-winged scoters; horned and western grebes; red-throated and common loons; brown pelicans;

33

Brandt's, double-crested, and pelagic cormorants; and many species of gulls and terns. Pelagic seabirds that were present in the area during the summer when the spill occurred include black-footed albatrosses, shearwaters, storm-petrels, phalaropes, jaegers, and several alcids including Scripp's murrelets.

Seabirds characteristic of rocky shores within the spill-affected area include black oystercatchers, Brandt's and pelagic cormorants, and pigeon guillemots. Rocky platforms exposed during low tide tend to be occupied by black and ruddy turnstones, great and snowy egrets, brown pelicans, black-crowned night-herons, shorebirds, and gulls. Western snowy plovers, California least terns, and horned larks all nest on sandy beaches and dune areas within the spill area; the same areas are also utilized by shorebirds that include black-bellied plovers, whimbrels, long-billed curlews, marbled godwits, sanderlings and willets, gulls (mew, ring-billed, western, California, glaucous-winged), and Forster's and royal terns. Beach wrack in the upper zones of sandy beaches are used by short-billed and long-billed dowitchers, black and Say's phoebes, American pipits, and yellow-rumped warblers.

### 2.3.3  Subtidal and Fish Habitats

Fish composition and abundance are both strongly associated with habitat type and structure, and each type of habitat generally supports its own characteristic assemblage of fishes. The Santa Barbara County nearshore coastal fish habitats described and defined here are the habitats inshore of the -66 ft (-20 m) depth contour relative to the mean lower low water (MLLW) tide level. This nearshore zone includes kelp forests, rocky reefs, sandy bottom, seagrass beds, and the pelagic water column.

Submerged rocky reefs support forests of giant kelp. Anchored by holdfasts to the rocky seafloor, the buoyant stipes and fronds rise through the water column and spread out on the sea surface. Kelp forests thus provide benthic (seafloor), mid-water, and surface habitats that are utilized by many fish species, many of which are residential in kelp forests (Schiel and Foster 2015). Fishes, such as kelp rockfish, surfperch, sheephead, opaleye, halfmoon, señorita, white seabass, and kelp bass tend to occur in the mid-water and swim about freely in the kelp forest. Kelp forests also provide habitat for certain sharks, such as leopard and smoothhound sharks.

In addition to kelp, submerged rocky reefs also support macroalgae and surfgrass species, often occurring as understory to giant kelp. Fish, such as gopher rockfish, grass rockfish, giant kelpfish, scorpion fish, cabezon, and painted greenlings are bottom-dwellers (demersal fishes) and are often associated with the foliose algal understory. Adult spiny lobsters inhabit cracks and crevices of the rocky reef, while juvenile spiny lobsters use surfgrass habitat in the shallow subtidal for refuge and feeding.

Along sand flats and in sand channels bisecting rocky reefs, rays, skates, and flat fishes (halibut, sandabs, flounders, soles) are more common. Seagrasses (eelgrass and surfgrass) occur as meadows of long grass-green leaves (blades) that provide refuge and foraging areas for many of

34

the same species of fish that occur in kelp forests and on sand flats. Eelgrass beds also provide spawning habitat for fish.

The pelagic water column habitat contains numerous species of plankton, or life forms that cannot swim against the current but rather move primarily by drifting. Many of these plankton are important food sources for fishes and other marine creatures, providing a foundation for the complex food webs that make up the marine environment in the marine region. The larvae and eggs of many fish and invertebrate species are also considered plankton, though their adult stages are sessile or free-swimming organisms. These marine larvae develop and grow while subject to the movement of ocean currents that can transport them many miles from their natal (spawning) habitat. Eventually, these planktonic larvae mature into their non-planktonic life stage and settle out in their adult habitats, which can include kelp forests, rocky reefs, seagrass beds, sand flats, and deep offshore water. The nearshore pelagic water column habitat is also the main habitat for many species of schooling fishes, such as anchovies, sardines, and topsmelt, and also includes mobile invertebrates (e.g., market squid). In turn, these forms are the basis food source for larger forms (e.g., predatory fishes, sharks, seabirds, and marine mammals).

The rocky intertidal zone, the shore between the high and low tidal levels, is also habitat for fishes. The fishes in this zone are characterized by a smaller group of species specially adapted for life in tidepools and in the spaces beneath and between cobbles and boulders. The most representative intertidal fish species are tidepool sculpins, juvenile opaleye, and blennies.

Sandy beaches are extensive along the Santa Barbara, Ventura, and Los Angeles County coasts, and many beaches in south Santa Barbara County are important spawning habitat for California grunion. A variety of other fish species, such as barred surfperch, walleye surfperch, and corbina, forage on the burrowing intertidal invertebrates in surf and swash zones.

Several fishes that occur in the area have special protections. The Southern California Coast Distinct Population Segment (DPS) of steelhead trout is a federally endangered species. Steelhead are rainbow trout that spend the majority of their life in the ocean and return to freshwater streams to spawn (anadromous species). However, unlike the closely related salmon that are also anadromous, adult steelhead return to spawn in freshwater several times, not just once. In addition to steelhead trout, coho (silver) salmon and Chinook (king) salmon can also occur in the marine region. The coho salmon is both a state and federally listed endangered species, and the Chinook (king) salmon is a federally threatened species in California coastal waters.

Giant (black) sea bass is a marine species prohibited from commercial and recreational fishery take, and the International Union for Conservation of Nature classifies giant (black) sea bass as a critically endangered species. However, one giant (black) sea bass may be taken incidentally per trip in gill or trammel nets in the commercial fisheries, which is not uncommon. Take of great white sharks is also prohibited, with exceptions for possible incidental and accidental take in

35

commercial fisheries. Broomtail grouper is another fully protected marine fish species with a large range (San Francisco-Peru, South America) that can occur along the Santa Barbara, Ventura, and Los Angeles County coasts. One of the more visible fishes is the garibaldi, a very recognizable, bright orange damselfish. California State Legislature designated the garibaldi as the state marine fish and prohibited from take in California coastal waters.

### 2.3.4  Shoreline Habitats

The richness and diversity of intertidal invertebrates in any given area is closely related to the composition, rugosity, and stability of the substrate, tidal level, depth, and exposure to waves. Much of the rocky intertidal habitat in the affected environment consists of low-lying shale or sandstone occurring as ridges parallel to shore with lower elevation portions heavily exposed to periodic sand burial and sand scour. Some intertidal areas near creek mouths can be characterized as being largely boulder fields. Mussel beds are limited to the areas of larger and harder rock substrate in areas above sand burial depths. Common intertidal invertebrates can also include sand castle (honeycomb) worms, acorn and gooseneck barnacles, sea anemones, purple sea urchins, bryozoans, tunicates, and sponges. Common mobile invertebrate species in the intertidal zone include ochre sea stars, bat stars, hermit crabs, turban snails, limpets, whelks, nudibranchs, chitons, lined shore crabs, polychaete and nemertean worms, and more. The high intertidal splash zone is inhabited by periwinkle snails and limpets. Many more invertebrates occur in the mid- and low-intertidal zone, and also in the subtidal zone. These include octopus, top snails, abalone, red sea urchins, clams, California spiny lobsters, shrimp, rock crabs, decorator crabs, cup corals, feather duster worms, and more.

Sandy beaches are the most common intertidal habitat in the spill-affected area, and support a diversity of invertebrates tolerant of the constantly shifting sands from wave action and strong directional longshore transport of sand. Bivalve mollusks, polychaete worms (including bloodworms), beach endemic insects, and crustaceans that include sand or mole crabs, and beach hoppers (i.e., talitrid amphipods) are the predominant invertebrates on sandy beaches. The accumulation of drift algae (wrack) that is stranded on sandy beaches provides food and habitat for many species of beach hoppers, terrestrial isopods, and insects. Insects include the kelp fly, flightless beetles such as the globose dune beetle (candidate for federal listing), and predatory rove beetles. The sand bottom of the surf zone and immediately beyond support sand dollars, clams, and gastropods such as the purple olive snail.

### 2.3.5  Algae and Seagrasses

Macroalgae such as kelp and marine grasses (discussed above in the Subtidal and Fish Habitats section) such as surfgrass and eelgrass are examples of foundational species for the nearshore environment along the Gaviota Coast. A foundational species is one where the organism itself creates ecological communities by providing habitat structure and primary productivity.

Intertidal algae tend to occur as bands parallel to shore and their distribution depends on exposure to waves, tidal height, and rock structure. The upper vertical range of an algal species

36

in the rocky intertidal is largely determined by its ability to withstand desiccation. Accordingly, the high intertidal zone that is only occasionally wetted by wave splash is sparsely populated with algae. The barren appearance of the splash zone disappears lower in the intertidal zone, below the +3 ft (1 m) Mean Low-Low Water (MLLW) tide level and lower, with algal cover being more prevalent and persistent. Algal forms can be blade/sheet-like, branch-like, turf, filamentous, and crustose. Some of the more conspicuous intertidal species include the turf-like nailbrush seaweed and the blade-like grapestone seaweed, which are perennial species. A species group characteristic of most mid-intertidal zones in California but conspicuously absent or in low abundances along the Santa Barbara, Ventura, and Los Angeles County coast are brown rockweed species of the order Fucales. In the low-intertidal, Turkish-towel seaweed can be abundant with articulated coralline algae. The lowest zones will include brown feather boa kelp, bladder kelp, and branched red alga.

Unlike algal species, seagrasses are true plants. They have vascular tissue to transport internal metabolites and nutrients, and they reproduce via flowers and seeds instead of spores, as is the case with algae. The plants are attached to the substrate by rhizomes, and the remaining structure consists of long narrow emerald green leaves (blades) up to 1.5 m long. Seagrasses are important primary producers, and they provide important habitat functions, including shelter and nursery grounds for invertebrates and fishes. Seagrasses also stabilize sand from shifting about. Surfgrass occurs on boulders and rocky reefs from the low-intertidal to as deep as approximately -23 ft (-7 m) MLLW with abundance declining with depth (Williams 1995). Along the south coast, eelgrass grows in soft sediments between depths of approximately -20 ft (-6 m) and -40 ft (-12 m) (J. Altstatt, personal communication, April 9, 2018). Seagrass habitat is classified as Essential Fish Habitat by NOAA, National Marine Fisheries Service (NMFS).

Subtidal algal composition is largely dependent on the stability of the substrate and available light based on water clarity and depth. Giant kelp are the predominant kelp along the coast, occurring as dense forests growing on rocky reefs from the low-intertidal to depths of approximately -18 m MLLW. Bladder chain kelp and feather boa kelp are common in shallower water along the inshore fringes of giant kelp forests. The algal understory is generally characterized by mostly red algal species of various sizes, morphology, distribution, and abundance.

The wrack created from the seasonal loss of these plants (e.g., beach-stranded drift algae and surf grass) through storms also fuels the productivity of local sand beach and nearshore sand bottom habitats. Loss of or damage to these plants, particularly in the spring and summer, have cascading consequences for multiple associated fish and invertebrate species in the affected area.

### 2.3.6  Threatened and Endangered Species

Federal and state levels of special-status designations include:

- Federally Endangered;
- Federally Threatened;

37

- State Endangered;
- State Threatened;
- State Fully Protected Species; and
- California Species of Special Concern (pursuant to the 2008 list).

The federal Endangered Species Act (ESA) of 1973 (16 USC Section 1531 et seq.) and the California Endangered Species Act (CESA) of 1970 (Ca. Fish and Game Code Section 2050 et seq.) require the protection and conservation of listed endangered and threatened fishes, plants, and wildlife. The habitat of endangered, threatened, and rare species also takes on special importance because of these laws, and the protection and conservation of these species requires diligent management. At least three state- and/or federally-listed species were exposed to Line 901 oil from the spill: the threatened western snowy plover, the endangered black abalone, and the endangered humpback whales.

Several other state- and federally-listed or protected species occur in areas exposed to the spill. However, these species are not thought to have been affected by the spill either because they were not present in the area at the time of the spill due to migration timing, low overall population density or scarcity, or because oil never reached their habitat. These species include the California red-legged frog, Gaviota tarplant, light-footed Ridgway rail, Belding's savannah sparrow, California least tern, southern sea otter, Steller sea lion, Guadalupe fur seal, blue whale and fin whale, green turtle, hawksbill turtle, leatherback turtle, and loggerhead turtle. For pelagic seabirds such as the Scripps's murrelet it is possible that these birds could have encountered oil from the spill, but there was no evidence of mortality.

Two federally endangered fish species, the tidewater goby and Southern California Coast Steelhead DPS, are known to occur in coastal watersheds along the Gaviota Coast (USFWS 2005; NMFS 2012). Following the spill, a visual assessment of the entrances to streams and estuaries was completed by USFWS and NOAA. It was determined that there were large natural berms or artificial booms in place at the entrances to the streams and estuaries in the spill-affected area, making exposure to oil unlikely. Thus, the Trustees did not pursue further studies in these watersheds.

## 2.4   Archeological and Cultural Resources

The affected environment along the Gaviota coast is home to a wide variety of culturally and historically important resources. A number of Federal and State laws, regulations, and policies govern the protection of cultural and historic resources during an emergency response and subsequent NRDA restoration, including the National Historic Preservation Act of 1966, The Native American Graves Protection and Repatriation Act of 1990, and California Executive Order B-10-11.

38

To protect cultural and archeological resources during the spill response, the Unified Command established a Cultural/Historic Group comprised of State, Federal and tribal representatives with knowledge and expertise of the cultural and historical resources in the area. The Unified Command invited California tribes listed by the Native American Heritage Commission, regardless of federal recognition status, to be a part of the response (CDFW 2016). The Cultural/Historic Group's participating tribes included:

- Santa Ynez Band of the Chumash Indians (federally-recognized);
- Coastal Band of the Chumash Nation, including the Owl Clan;
- Barbareno Band of Chumash Indians; and
- Barbareno Ventureno Band of Mission Indians.

A report of cultural resource monitoring that occurred during the spill, along with a summary of impacts to cultural resources, was compiled by Nocerino et al. (2016) of Applied Earth Works. Because it contains archeological site information, it is confidential. The sections below are excerpted largely from Nocerino et al. (2016) and contain the non-confidential details summarizing the general nature of archeological and cultural resources in the spill-affected area, as well as impacts to those resources from the spill and response activities.

The Chumash Indians and their Native American ancestors have occupied the Santa Barbara Channel region for at least 13,000 years and thousands of their descendants live in the area today. Prior to European contact, the coastal Chumash had some of the highest population densities recorded for hunter-gatherers in North America. The Chumash people lived in villages along the California coast from Malibu to Morro Bay, and extended to the northern Channel Islands (McGinnis et al. 2004). Along the Santa Barbara Channel, the antiquity and density of Chumash occupation has led to a very large number of archeological sites ranging from historic Chumash coastal towns to ancient villages, cemeteries, campsites, and temporary locations. The density of Native American sites is particularly high within the central response area along the western Santa Barbara Channel, where the narrow coastal plain concentrated settlement within a thin band of land. The area also contains numerous historical sites dating to the Spanish, Mexican, and American periods, including shipwrecks, homesteads, ranching and fishing facilities, roads, railroads, oil facilities, and more. In some cases, historical facilities such as piers and seawalls extended into the intertidal zone and into nearshore waters. As was the case with Native American sites, coastal erosion has also resulted in the exposure or redeposition of historic artifacts or properties in the intertidal zone or on beaches of the Santa Barbara Coast.

The archeological sites along the Gaviota coast demonstrate an intimate use of coastal resources for subsistence of native people and their cultural traditions through time. Sites dating back to at least 13,000 years contain stemmed points and flaked stone crescents associated with remains of shellfish, fish, marine mammals, seabirds, and waterfowl, including a number of species closely associated with kelp forest habitats. The Channel Islands region is considered the place of origin for the Chumash people and is central to their cosmology (Office of National Marine Sanctuaries 2019). A Chumash creation story tells of the crossing of Chumash people from the Channel Islands to the mainland across a wištoyo (rainbow), during which some become dizzy and fall

39

from the bridge and are transformed into 'alolk'oy (dolphins) by Hutash (Earth Goddess) (Tumamait-Stenslie 2014). This story exemplifies the foundational importance of the Santa Barbara Channel and its natural resources to the Chumash people, and illustrates the cultural importance of key species, such as dolphins. Dolphins and abalone are regarded as Chumash brothers and sisters of the ocean (Office of National Marine Sanctuaries 2019).

Applied Earthworks initiated a records search on May 20, 2015, in order to identify the types of cultural resources that may be encountered in the response area. The records search encompassed the area within 0.5 mile of the shoreline between Point Conception and Rincon Point. A review of the records identified 99 archeological sites were within the "response envelope" between Gaviota and Rincon Point, from the low tideline to 0.25 mile inland. Only one other cultural resource (a row of historic palm trees at Refugio State Beach) is within the response envelope. Of the 99 archeological sites within the response envelope, 26 sites plus the row of palm trees were assessed for potential impacts resulting from response activities. The remaining 73 sites were not in or near response activities and were not assessed. Three previously unrecorded archeological sites, six previously unrecorded historic seawalls, and a historical culvert were identified within the response envelope during the cleanup monitoring and survey.

During beach and shoreline cleaning operations, the Cultural/Historical Group, led by a Cultural/Historical Technical Specialist from CDFW, coordinated tribal representatives and non-tribal archeologists to be present to identify bones, artifacts, and potential artifacts encountered. Additional details of this coordination are available in the Refugio Oil Spill Response Evaluation Report (CDFW 2016). In several areas, access to beaches necessitated foot travel by cleanup crews across archeological sites because no safe alternatives could be identified. Trail delineations, carpet anchored with sandbags, and all–terrain vehicle restrictions were implemented for these locations. In addition, archaeologists and tribal representatives were present to ensure crews remained on the paths and protective measures remained in place.

During cleaning operations, isolated redeposited artifacts were noted in the intertidal zone at Refugio State Beach and El Capitan State Beach, within the jurisdiction of California State Parks, beginning on the first day of the incident response. The majority of the items were ground stone fragments (e.g., bowl or mortar fragments). These artifacts were evaluated by the Cultural/Historical Group. Because their original context could not be identified, these items were considered ineligible for listing on the National Register of Historic Places and California Register of Historical Resources. Some tribal representatives expressed concerns regarding sensitive cultural values associated with these intertidal artifacts and their desire to avoid oiling or other disturbance of these items during response activities.

The incident's Historic Properties Treatment Plan called for leaving isolated intertidal artifacts in place unless there was an imminent risk of oiling or disturbance by incoming tides, in which case such artifacts were to be temporarily collected until such risk abated. During the spill, the Cultural/Historical Group collected 37 artifacts from the intertidal zone, as well as numerous other items that were inspected and determined not to be artifacts. Of the items collected, two

40

were redeposited at sea during the response, following consultation among the Cultural/Historical Group. The remaining artifacts were archived at the La Purisima Mission State Historic Park following discussion and consent among California State Parks and the involved tribes.

Nocerino et al. (2016) conclude that there were no significant impacts to potentially significant archeological deposits due to the oil release or resulting response operations, and that efforts made by the Unified Command, and the Cultural/Historical Group successfully avoided significant impacts to cultural resources.

### 2.4.1  Coordination with Native American Tribes

During the course of the NRDA, the Trustees coordinated with several tribes identified during the oil spill response with cultural and traditional affiliation to the area affected by the spill, including:

- Santa Ynez Band of the Chumash Indians (federally-recognized);
- Coastal Band of the Chumash Nation, including the Owl Clan;
- Barbareño Band of Chumash Indians; and
- Barbareño/Ventureño Band of Mission Indians.

Most of these tribes participated in the oil spill response by providing monitors to protect historic sites during cleanup operations. Under OPA, federally-recognized tribes may designate tribal officials to act as trustee for their tribal natural resources and may make a claim for injuries to those resources, such as in cases where reservation lands or a treaty right has been injured by the spill. In this case, reservation lands of the Santa Ynez Band of Chumash Indians were not impacted, and no treaty rights were identified to have been injured by the spill. However, the natural resources that are the subject of the NRDA are culturally important to all of the affected tribes and, as such, the Trustees made efforts to communicate with the tribes throughout the NRDA process and to seek their input on restoration priorities.

While the other bands do not have trustee status under OPA, the trustees from the State of California communicated with as many tribes as possible throughout the process consistent with state law and policies. During the public comment period following the release of the Draft DARP/EA, the Trustees were informed that additional tribes, bands and clans may have an interest in some of the Tier 1 and 2 projects impact natural cultural resources important to the Chumash community and/or restore sensitive ecosystems critical to Chumash lifeways.

Following the public comment period, the Trustees contacted the Native American Heritage Commission to obtain an updated list of tribes with cultural and traditional affiliation to the area of impact.  In addition, through the public comment process the Trustees were provided the names of the additional tribes, bands and clans that may have an interest in some of the Tier 1 and 2 projects. Through these combined efforts, the following additional tribes were identified:

- Barbareño Chumash Tribal Council;

41

- Chumash Indian Council of Bakersfield of California;
- Northern Chumash Tribal Council;
- Salinan-Chumash Nation;
- San Luis Obispo County Chumash Council;
- Tejon Indian Tribe; and
- Yak Tityu Tityu Yak Tilhini Northern Chumash.

The Trustees conducted additional coordination with tribes following the public comment process and before finalizing the DARP/EA. We anticipate continued coordination with tribes throughout the implementation of restoration to ensure that restoration is conducted in a way that is protective of sacred sites and is respectful of cultural keystone species that have significance beyond their role in the ecosystem. This coordination will allow tribes to share traditional and local knowledge of managing the resources that were damaged as a result of the spill (Sea Grant Network 2018).

## 2.5   Recreational Services

The impacted beaches are some of the most popular in the state. Refugio and El Capitan State Beaches are among the few places on the California coast where one can camp immediately adjacent to the beach in the shade of coast live oaks, western sycamores, and in the case of Refugio, palm trees. These campgrounds are often full in the summer and require reservations made long in advance. In addition to these camping areas, there are numerous coastal access points where the public can enjoy beach access along undeveloped areas with a variety of recreation activities. The affected environment also supports boating and offshore recreation opportunities such as diving and fishing. There are significant recreational impacts from the spill that are described further in Section 5.5.

42

Exhibits Pg. 044

## 3.0    Coordination and Compliance

## 3.1    Federal and State Trustee Agencies

United States Department of Commerce represented by NOAA; the United States Department of the Interior represented by USFWS, NPS and BLM; the CDFW-OSPR; the CDPR; the CSLC; and the Regents of the University of California are the Trustees who are addressing the natural resources injured by the spill. NOAA and DOI are designated Trustees for natural resources pursuant to the Oil Pollution Act (33 U.S.C. §§ 2701–2762) and subpart G of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) (40 C.F.R § 300.600) and Executive Order 12580 (3 CFR, 1987 Comp., p. 193, 52 Fed. Reg. 2923 (January 23, 1987), as amended by Exec. Order No. 12777 (56 Fed. Reg. 54757 (October 22, 1991)). CDFW and CDPR have been designated as state trustees for natural resources pursuant to Section 1006(b)(3) of the OPA. In addition, CDFW has state natural resource trustee authority pursuant to Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (Government Code § 8670.1 et seq.). CDPR and UC Regents also have jurisdiction over natural resources within the state park system and the natural reserve system, respectively, which are held in trust for the people of the State of California. Finally, CSLC is participating as a Trustee pursuant to its jurisdiction under Public Resources Code §§ 6009 and 6301 over all state sovereign lands, including ungranted tidelands and submerged lands. As a designated Trustee, each agency is authorized to act on behalf of the public under state and/or federal law to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured as a result of a discharge of oil.

## 3.2    Coordination

### 3.2.1    Coordination Among the Trustees

Federal regulations implementing OPA with respect to natural resource damages ("OPA NRDA regulations") provide that where an oil spill affects the interests of multiple Trustees, they should act jointly to ensure that full restoration is achieved without double recovery of damages (15 CFR § 990.14(a)). The Trustees in this matter have worked together closely in a shared effort to fully assess the nature and extent of injuries to natural resources and plan appropriate actions to restore the injured resources.

At the beginning of the NRDA, the Trustees jointly designated CDFW as the Lead Administrative Trustee (LAT) to act as coordinator pursuant to 15 CFR § 990.14(a)(1). The Trustees also designated NOAA as the Federal Lead Administrative Trustee (FLAT) to coordinate those activities, such as NEPA compliance, that must be undertaken by a Federal agency. In addition to coordinating amongst themselves, the Trustees also coordinated NRDA activities with other affected entities, including Santa Barbara County, the City of Goleta and others.

43

### 3.2.2  Coordination with Federally Recognized and Non-Federally Recognized Tribes

The Trustees coordinated with several American Indian tribes in the course of this NRDA. These included:

- Santa Ynez Band of the Chumash Indians (federally-recognized);
- Coastal Band of the Chumash Nation, including the Owl Clan;
- Barbareno Band of Chumash Indians; and
- Barbareno Ventureno Band of Mission Indians.

These tribes participated in the oil spill response by providing monitors to protect historic sites during cleanup operations. Under OPA, federally-recognized tribes may serve as natural resource trustees and make a claim for NRD. In this case, the Santa Ynez Band of Chumash Indians elected not to join the claim, but remain interested in the restoration process generally. For this reason, the Trustees continue to engage with Santa Ynez Band of Chumash regularly, simultaneously fulfilling the federal Trustees' tribal consultation obligations. While the non-federally recognized tribes are not eligible to be a natural resource trustee under OPA, the state Trustees have communicated with these tribes throughout the process, regardless of recognition status.

### 3.2.3  Coordination with the Responsible Party

The OPA NRDA regulations encourage natural resource trustees and responsible parties to cooperate in the assessment and restoration process, providing broad discretion to the parties to determine the nature and extent of participation (15 C.F.R. § 990.14(c)). However, the Trustees retain sole authority to make determinations regarding injury and restoration (15 C.F.R. § 990.14(c)(4)).

In accordance with the regulations, the Trustees extended an invitation to the responsible party, Plains, within days of the Incident, and Plains accepted (15 C.F.R. § 990.14(c)). Thereafter, the Parties established an active cooperative assessment process, by which Trustee representatives would coordinate studies and other technical activities in the injury determination and quantification stages of the assessment with representatives of Plains. The Trustees formed technical working groups that included biologists, economists, toxicologists, and other specialists, and developed work plans that were used to guide injury assessment activities. Plains commented on work plans and participated in some studies.

This DARP/EA, while prepared solely by the Trustees, reflects consideration of the input provided by Plains' representatives. Plains does not agree with certain conclusions presented in this document.

### 3.2.4  Coordination with the Public

Throughout the NRDA process, the Trustees have made information available to the public. The Trustees held a public meeting in Santa Barbara shortly after the oil spill on January 20, 2016,

44

and they published a series of newsletters to keep the public up to date on the progress of the NRDA.

The Trustees published a Notice of Intent (NOI) to Conduct Restoration Planning on March 8, 2019, pursuant to the OPA NRDA regulations (15 C.F.R § 990.44), and concurrently opened an administrative record (15 CFR § 990.45). The Record includes documents relied upon or considered by the Trustees during the assessment and restoration planning process.

A 45-day public review period was held for the Draft DARP/EA that began on April 22, 2020 and closed on June 8, 2020. During the public review period, the Trustees received extensive comments on the DARP/EA, which can be found with the Trustees' responses in Appendix O.

The Trustees held virtual public meetings on May 13, 2020 at 1:00 and 6:00 pm PDT. At these meetings, the Trustees presented an overview of the Draft DARP/EA, answered questions, and accept public comments.

The Administrative Record is available at: https://www.diver.orr.noaa.gov/web/guest/diver-admin-record/6104. The administrative record is also available upon request at:

> Ventura Fish and Wildlife Office
> U.S. Fish and Wildlife Service
> 2493 Portola Road, Suite B
> Ventura, California 93004
> (805) 644-1766.

## 3.3    Compliance with Environmental Laws, Regulations, and Policies

### 3.3.1  The Oil Pollution Act

The Oil Pollution Act (33 U.S.C. § 2701–2762) establishes a liability regime for oil spills into navigable waters or adjacent shorelines that injure or are likely to injure natural resources and the services that those resources provide to the ecosystem or humans. Pursuant to OPA, federal and state agencies and Indian tribes may act as Trustees on behalf of the public to assess the injuries, scale restoration to compensate for those injuries, and implement restoration. The DARP/EA has been prepared jointly by DOI, NOAA, CDFW, CSPR, CSLC, and UC Regents. As described above, each of these agencies is a designated Trustee for natural resources injured by the spill.

OPA defines "natural resources" to include land, fish, wildlife, water sources, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any State or local government or Indian tribe, or any foreign government (33 U.S.C. § 2701(20)). OPA authorizes the Trustees to assess damages for injured natural resources under their trusteeship, and develop and implement a plan for the restoration, rehabilitation,

45

replacement, or acquisition of the equivalent of those injured natural resources (33 U.S.C. § 2706(c)).

The regulations for natural resource damage assessments under OPA are found at 15 C.F.R Part 990. These regulations provide the Trustees with guidelines on processes and methodologies for carrying out an NRDA, including guidelines for conducting assessments cooperatively with the responsible parties. While the decision whether or not to follow the NRDA regulations is left to the discretion of the Trustees, OPA provides that if the Trustees conduct the NRDA in accordance with the regulations, their determination or assessment of damages to natural resources will have the force and effect of a rebuttable presumption in an administrative or judicial proceeding under OPA (33 U.S.C. § 2706(e)(2); 15 C.F.R. § 990.13). In this case, the Trustees elected to conduct the NRDA in accordance with the OPA NRDA regulations.

### 3.3.2  National Marine Sanctuaries Act, 16 USC. § 1431, et seq.

The National Marine Sanctuaries Act (NMSA) authorizes the Secretary of Commerce (Secretary) to designate and manage areas of the marine environment with special national significance due to their conservation, recreational, ecological, historical, scientific, cultural, archeological, educational, or esthetic qualities as national marine sanctuaries. Day-to-day management of national marine sanctuaries has been delegated by the Secretary to the Office of National Marine Sanctuaries (ONMS). The primary objective of the NMSA is to protect marine resources, such as coral reefs, sunken historical vessels or unique habitats.

The NMSA prohibits the destruction, loss of, or injury to any sanctuary resource. The Secretary is required to conduct such enforcement activities as are necessary and reasonable to carry out the Act. The Secretary may issue special use permits which authorize specific activities in a sanctuary to establish conditions of access to and use of any sanctuary resource or to promote public use and understanding of a sanctuary resource. The NMSA also establishes, similar to OPA, liability for response costs and natural resource damages for injury to sanctuary natural resources.

In this case, the ONMS participated because of potential injury to the Channel Islands Marine Sanctuary (CINMS). CINMS staff participated as part of the Trustee group early on to identify potential injury to Sanctuary resources concurrently with similar work being conducted under OPA. However, no injuries were assessed within Sanctuary boundaries, although oiled marine mammals and birds use marine sanctuaries as part of their habitats.

The CINMS also participated in restoration planning, identifying appropriate restoration projects occurring within the CINMS. This coordination will continue for restoration projects that have the potential to affect resources within a sanctuary.

46

### 3.3.3  The National Environmental Policy Act

The National Environmental Policy Act (NEPA) is the basic national charter for the protection of the environment, and it sets forth a specific process of impact analysis and public review for federal agency actions that may significantly affect the environment (42 U.S.C. §§ 4321–4335; 40 C.F.R. § 1500.1). Its purposes are to "encourage productive and enjoyable harmony between man and the environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; and to enrich the understanding of the ecological systems and natural resources important to the Nation" 42 U.S.C. §4321. NEPA provides a mandate and a framework for federal agencies to consider all reasonably foreseeable environmental effects of their proposed actions and to potentially involve and inform the public in their process. NEPA also established the Council on Environmental Quality (CEQ) in the Executive Office of the President to formulate and recommend national policies which ensure that the programs of the federal government promote improvement of the quality of the environment. CEQ also promulgated regulations to provide Federal agencies with procedures to comply with NEPA (40 C.F.R. § 1500.1(a)).

Where potential environmental impacts are unknown or considered not likely to be significant, federal agencies will prepare an environmental assessment (EA). The EA may undergo a public review and comment period, and the process concludes with either a finding by the action agency of no significant impact (FONSI) or a determination that an Environmental Impact Statement (EIS) should be prepared. An EIS is prepared for actions considered to have significant effects on the environment, and after public review and comment, findings are documented in a record of decision (ROD).

In accordance with the regulations implementing the OPA NRDA process, the Trustees have integrated OPA restoration planning with the NEPA process (15 C.F.R. § 990.23). Accordingly, the DARP/EA serves as both an OPA restoration plan and a NEPA EA document. The Trustees anticipate that this DARP/EA will meet NEPA requirements for most of the restoration projects described herein. However, subsequent NEPA compliance may be required prior to implementation of some of the restoration actions pending development of sufficient project-level detail. The need for additional NEPA review will be determined once detailed engineering design work or operational plans are developed for selected projects. Additional review may also be required if any second tier projects are implemented.

### 3.3.4  Other Federal and State Laws, Regulations, and Policies

As described above, OPA, NMSA, and NEPA, and federal regulations implementing these laws are the major federal laws and regulations guiding the development of this DARP/EA for restoration of injured resources and services resulting from the spill. However, there are other federal and state laws, regulations or policies that may be pertinent to this DARP/EA or to implementation of the specific restoration actions described herein. Potentially relevant laws, regulations, and policies are set forth below.

47

***Clean Water Act***

The federal Water Pollution Control Act (commonly referred to as the Clean Water Act or CWA) is the principal federal statute governing water quality (33 U.S.C. §§ 1257–1387). The CWA's objective is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. The CWA regulates both the direct (point source) and indirect (non-point source) discharge of pollutants into the Nation's waters.

Section 402 of the CWA established the National Pollution Discharge Elimination System (NPDES) program. The CWA allows EPA to authorize state governments to implement the NPDES program. Section 301 of the CWA prohibits the discharge into navigable waters of any pollutant by any person from a point source unless it is in compliance with a National Pollution Discharge Elimination System (NPDES) permit. Section 319 of the CWA directs states to identify best management practices and measures to reduce non-point source pollution.

Section 311 of the CWA regulates, among other things, the discharge of oil and other hazardous substances into navigable waters, adjoining shorelines, and waters of the contiguous zone. The CWA allows the federal government to remove the discharges and assess the removal costs against the responsible party. The CWA defines removal costs to include costs for the restoration or replacement of natural resources damaged or destroyed as a result of a discharge of oil or a hazardous substance.

Section 404 of the CWA authorizes the U.S. Army Corps of Engineers (the Corps) to issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into the waters of the United States. Section 401 of the CWA provides that any applicant for a federal permit or license to conduct any activity which may result in any discharge into navigable waters must obtain certification of compliance with state water quality standards.

The Trustees anticipate that some restoration projects may trigger CWA permitting requirements. For those projects, such as the Ellwood seawall removal, the implementing entity will be required, as a condition of receiving restoration funds, to obtain the appropriate permits prior to project implementation.

***Rivers and Harbors Appropriation Act of 1899***

The Rivers and Harbors Appropriation Act of 1899 regulates the development and use of the nation's navigable waterways (33 USC. §§ 401–427). Section 10 of the Act prohibits unauthorized obstruction or alteration of navigable waters and vests the U.S. Army Corps of Engineers with authority to regulate discharges of fill and other materials into such waters.

The Trustees do not believe that any of the restoration projects set forth in this DARP/EA have the potential to negatively affect navigable waters because none of the projects will result in the obstruction or alteration of navigable waters.

48

*Coastal Zone Management Act*

The goal of the Coastal Zone Management Act (CZMA) is to encourage and assist states to preserve, protect, develop and, where possible, restore and enhance valuable natural coastal resources (16 U.S.C. §§ 1451–1466). Participation by states is voluntary. California developed the California Coastal Management Program pursuant to the requirements of the federal CZMA, and NOAA approved the program in 1977. The State has also enacted the federally approved California Coastal Act.

Section 1456 of the CZMA requires that any federal action inside or outside of the coastal zone that affects any land or water use or natural resources of the coastal zone shall be consistent to the maximum extent practicable with the enforceable policies of approved state management programs. It states that no federal license or permit may be granted without giving the State the opportunity to concur that the project is consistent with the state's coastal policies. The regulations implementing the CZMA outline the consistency procedures.

The California Coastal Commission (CCC) is designated under California's federally approved Coastal Management Program as the state agency responsible for reviewing all consistency documents concerning most coastal lands in California. Under the California Coastal Management Program, the CCC is empowered to use the authority of the federal CZMA to ensure that federal projects and activities within the coastal zone are consistent with the policies of the California Coastal Management Program and state law.

The Trustees believe that the projects set forth in this DARP/EA can be implemented in a manner that will either have no adverse effect on coastal resources or uses or will be consistent to the maximum extent practicable with the CZMA, the California Coastal Act (California Public Resources Code Sections 30000, et seq.), and the California Coastal Management Program. Prior to implementation, the Trustees and/or the project implementers, as appropriate, will seek concurrence from the CCC for these projects.

*Endangered Species Act*

The purpose of the Endangered Species Act (ESA) is to conserve endangered and threatened species and the ecosystems upon which they depend (16 U.S.C. §§ 1531–1544). The ESA, among other things, directs all federal agencies to utilize their authorities to further these purposes. Pursuant to Section 7 of the ESA, federal agencies shall, in consultation with the Secretaries of the Interior and/or Commerce, ensure that any action that they authorize, fund, or carry out is not likely to jeopardize the continued existence of any endangered or threatened species, or result in the destruction or adverse modification of designated critical habitat.

Under the ESA, the National Marine Fisheries Service (NFMS) and the USFWS publish lists of endangered and threatened species. Before initiating an action, the federal action agency (i.e., the federal agency authorizing, funding, or carrying out a discretionary activity or program), or its

49

non-federal permit applicant, must ask the USFWS and/or NMFS to provide a list of threatened, endangered, proposed, and candidate species and designated critical habitat that may be present in the project area. If no species or critical habitats are known to occur in the action area[7], the federal action agency has no further ESA obligations under Section 7. If the federal action agency determines that a project may affect a listed species or designated critical habitat, consultation is required.

If the federal action agency concludes that the project will not adversely affect listed species or critical habitat, the agency submits a "not likely to adversely affect" determination to the USFWS and/or NMFS. If the USFWS and/or NMFS concur with the federal action agency's determination of "not likely to adversely affect," then the consultation (informal to this point) is completed and the decision is put in writing.

If the federal action agency determines that the project is likely to adversely affect either a listed species or its critical habitat, then more formal consultation procedures are required. There is a designated period in which to consult (90 days), and beyond that, another set period for the USFWS and/or NMFS to prepare a biological opinion (45 days). The determination of whether or not the proposed action would be likely to jeopardize the species or adversely modify its critical habitat is contained in the biological opinion. If a jeopardy or adverse modification determination is made, the biological opinion must identify any reasonable and prudent alternatives that could allow the project to move forward.

Several federally-listed species occur in the project areas for this DARP/EA. For each selected project described in this Final DARP/EA, the Trustees and/or the project implementer, as appropriate, will evaluate the potential effects of the project on listed species and critical habitat. Based on this analysis, the Trustees and/or project implementer will perform the appropriate level of consultation with the USFWS and/or NMFS pursuant to Section 7 of the ESA.

***Magnuson-Stevens Fishery Conservation and Management Act***
The federal Magnuson-Stevens Fishery Conservation and Management Act, as amended and reauthorized by the Sustainable Fisheries Act of 1996, establishes a program to promote the protection of essential fish habitat (EFH) in the review of projects conducted under federal permits, licenses, or other authorities that affect or have the potential to affect such habitat (16 U.S.C. §§ 1801–1869). After EFH has been described and identified in fishery management plans by the regional fishery management councils, federal agencies are obligated to consult with the Secretary of Commerce with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any EFH.

---

[7] An "action area" consists of all areas that may be affected directly or indirectly by the proposed action and not merely the immediate area involved in the action.

50

EFH occurs within the project areas for this DARP/EA. For each selected project in this Final DARP/EA, the Trustees and/or the project implementer, as appropriate, will evaluate the potential effects of the project on EFH. Based on this analysis, the Trustees and/or project implementer will perform the appropriate level of consultation with NMFS.

### Fish and Wildlife Coordination Act

The Fish and Wildlife Coordination Act (FWCA) provides the basic authority for the USFWS involvement in the evaluation of impacts to fish and wildlife from proposed water resource development projects (16 U.S.C. §§ 661–667d). The FWCA requires that federal agencies consult with the USFWS (and/or NMFS as may be appropriate) and state wildlife agencies for activities that affect, control or modify waters of any stream or other bodies of water, in order to minimize the adverse impacts of such actions on fish and wildlife resources and habitat. This consultation is generally incorporated into the process of complying with Section 404 of the Clean Water Act, NEPA or other federal permit, license or review requirements.

The Trustees or the project implementer, as appropriate, will consult with the necessary agencies on any of the selected restoration projects that involve activities that affect, control, or modify streams or other bodies of water.

### Marine Mammal Protection Act

The Marine Mammal Protection Act (MMPA) prohibits, with certain exceptions, the take of marine mammals in US waters and by US citizens on the high seas, and the importation of marine mammals and marine mammal products into the United States. (16 U.S.C. §§ 1361–1423h). Under the MMPA, the Secretary of Commerce, through NMFS, is responsible for the conservation and management of pinnipeds (other than walruses) and cetaceans, and the Secretary of the Interior, through USFWS, is responsible for walruses, sea and marine otters, polar bears, manatees, and dugongs. Title II of the MMPA established an independent Marine Mammal Commission which provides independent oversight of the marine mammal conservation policies and programs being carried out by federal regulatory agencies. The Commission is charged with developing, reviewing, and making recommendations on domestic and international actions and policies of all federal agencies with respect to marine mammal protection and conservation. The MMPA provides for several exceptions to the moratorium on taking and importing marine mammals and marine mammal products. NMFS and USFWS may issue permits for take or importation for purposes of scientific research, public display, photography for educational or commercial purposes, enhancing the survival or recovery of a species or stock, importation of certain polar bear parts taken in sports hunting in Canada, and incidental taking in the course of commercial fishing operations.

The restoration actions set forth by the Trustees in this DARP/EA are permitted actions under the MMPA. The Trustees will consult with NMFS and/or USFWS to ensure the selected restoration projects do not violate the MMPA.

51

***Migratory Bird Treaty Act of 1918***

The Migratory Bird Treaty Act (MBTA) implements four international treaties involving protection of migratory birds, including all marine birds, and is one of the earliest statutes to provide for avian protection by the federal government (16 U.S.C. §§ 703–712). The MBTA generally prohibits actions to "pursue, hunt, take, capture, kill, attempt to take, kill, possess, offer for sale, sell, offer to purchase, deliver for shipment, ship, cause to be shipped, deliver for transportation, transport, cause to be transported, carry, or cause to be carried by any means whatever, receive for shipment, transportation or carriage, or export, at any time, or in any manner, any migratory bird...or any part, nest, or egg of such bird." Exceptions to these prohibitions are only allowed under regulations or permits issued by the USFWS. Hunting of migratory game birds is regulated annually through a process in which the USFWS sets "framework regulations" and "special regulations" designed to maintain sustainable hunting levels. All other actions prohibited by the MBTA are only allowed under specific permits issued by the USFWS Regional Bird Permit Offices.

Implementation of restoration projects selected in this Final DARP/EA will be conducted in full compliance with the MBTA.

***Executive Order 11988 – Construction in Flood Plains***

The 1977 Executive Order 11988 seeks to avoid, to the extent possible, the long-and short-term adverse impacts associated with the occupancy and modification of flood plains and to avoid direct or indirect support of development in flood plains wherever there is a practicable alternative. Each federal agency is responsible for evaluating the potential effects of any action it may take in a flood plain. Before taking an action, the federal agency should determine whether the proposed action would occur in a flood plain. For any major federal action significantly affecting the quality of the human environment, the evaluation would be included in the agency's environmental impact statement prepared pursuant to NEPA. The agency should consider alternatives to avoid adverse effects and incompatible development in flood plains. If the only practicable alternative requires siting in a flood plain, the agency should: (1) design or modify the action to minimize potential harm, and (2) prepare and circulate a notice containing an explanation of why the action is proposed to be located in the flood plain.

None of the restoration projects set forth in this DARP/EA involve construction in a floodplain.

***Executive Order 13112 – Invasive Species***

The 1999 Executive Order 13112 requires that all federal agencies whose actions may affect the status of invasive species shall, to the extent practicable and permitted by law, (1) identify such actions, and (2) take actions specified in the Order to address the problem consistent with their authorities and budgetary resources; and (3) not authorize, fund, or carry out actions that they believe are likely to cause or promote the introduction or spread of invasive species in the United States or elsewhere unless, "pursuant to guidelines that it has prescribed, the agency has determined and made public its determination that the benefits of such actions clearly outweigh

52

the potential harm caused by invasive species; and that all feasible and prudent measures to minimize risk of harm will be taken in conjunction with the actions."

The Trustees do not believe that any of the restoration projects set forth in this DARP/EA have the potential to cause or promote the introduction or spread of invasive species. However, some of the restoration projects considered in this DARP/EA are aimed at the removal or control of non-native species.

### *Executive Order 12898 – Environmental Justice*

The 1994 Executive Order 12898 requires each federal agency to identify and address, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority and low-income populations. In the memorandum to heads of departments and agencies that accompanied executive Order 12898, the President specifically recognized the importance of procedures under NEPA for identifying and addressing environmental justice concerns. The memorandum states that "each federal agency shall analyze the environmental effects, including human health, economic and social effects, of federal actions, including effects on minority communities and low-income communities, when such analysis is required by [NEPA]." The memorandum particularly emphasizes the importance of NEPA's public participation process, directing that "each federal agency shall provide opportunities for community input in the NEPA process." Agencies are further directed to "identify potential effects and mitigation measures in consultation with affected communities, and improve the accessibility of meetings, crucial documents, and notices." The CEQ has oversight of the federal government's compliance with Executive Order 12898 and NEPA.

The Trustees have involved the affected communities by providing notice to the public, seeking public comments, holding public meetings and providing public access to the Administrative Record. In addition, all selected actions described in this Final DARP/EA are expected to have positive environmental impacts and not to impose any adverse impacts on any community.

### *Information Quality Act, Public Law 106-554, Section 515*

Information disseminated by federal agencies to the public after October 1, 2002, is subject to information quality guidelines developed by each agency pursuant to Section 515 of Public Law 106-554 that are intended to ensure and maximize the quality of the objectivity, utility and integrity of such information. This DARP/EA is an information product covered by information quality guidelines established by NOAA and DOI for this purpose. The quality of the information contained herein is consistent with the applicable parts of these guidelines.

## 3.3.5  State Laws, Regulations, and Policies

### *California Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code § 9574.1, et seq.*

The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act became effective on September 24, 1990. This legislation and subsequent amendments are the key state compensatory

53

mechanism for oil spills and establishes a comprehensive liability scheme for damages resulting from oil spills into waters of the state, excluding groundwater. The legislation also established an Administrator for oil spill response, appointed by the Governor, and the Office of Spill Prevention and Response (OSPR) within the CDFW. The Administrator is required to ensure that, as part of the response to any significant spill, damages to natural resource are assessed. Recoverable damages include damages for the injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss, the cost of rehabilitating wildlife, habitat, and other resources, and the loss of use and enjoyment of natural resources, public beaches, and other public resources.

The Administrator, a chief deputy director of CDFW, must coordinate all actions required by state or local agencies to assess injury to, and provide full mitigation for injury to, or to restore, rehabilitate, or replace, natural resources, including wildlife, fisheries, wildlife or fisheries habitat, and beaches and other coastal areas, that are damaged by an oil spill. Such actions include actions required by state trustees under Section 1006 of OPA (requiring state trustees to assess natural resource damages under their trusteeship and to develop and implement a plan for restoration of natural resources).

In this case, the state Trustees participated as part of the Trustee group to identify and quantify injuries to natural resources, including wildlife, fisheries, wildlife or fisheries habitat, and beaches and other coastal areas, and the loss of their use, under the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act concurrently with similar work being conducted under OPA.

The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act does not contain public participation requirements like OPA; however, since the natural resources belonging to, managed by, controlled by, or appertaining to the State of California or political subdivision thereof that were injured by the spill are also compensable under OPA, they are dealt with concurrently in this document.

### *California Environmental Quality Act, Pub. Res. Code 21000-21178.1*

The California Environmental Quality Act (CEQA) was adopted in 1970. Its basic purposes are to inform California governmental agencies and the public about the potentially significant effects of proposed activities, to identify ways that environmental damage can be avoided or significantly reduced, to prevent significant avoidable damage to the environment through adoption of feasible alternatives or mitigation measures, and to disclose the reasons for agency approval of a project resulting in significant environmental effects.

The CEQA process begins with a preliminary review as to whether CEQA applies to the project in question. Generally, a project is subject to CEQA if it involves a discretionary action that is carried out, funded or authorized by an agency (i.e., the lead agency), and has the potential to impact the environment, including tribal cultural resources. Once the lead agency determines that the project is subject to CEQA, the lead agency must then determine whether the action is

54

exempt from CEQA compliance under either a statutory or categorical exemption. Examples of categorical exemptions include actions taken by regulatory agencies for protection of natural resources and actions by regulatory agencies for protection of the environment (Title 14 CCR, Chapter 3, §§ 15307-15308).

If the lead agency determines that the project is not exempt, then an Initial Study is generally prepared to determine whether the project may have a significant effect on the environment. Based on the results of the Initial Study, the lead agency determines whether to prepare a Negative Declaration (i.e., the project will not result in significant adverse effects to the environment) or an Environmental Impact Report (EIR). The test for determining whether an EIR or negative declaration must be prepared is whether a fair argument can be made based on substantial evidence that the project may have a significant adverse effect on the environment. Lead agencies must also provide notice to tribes that are traditionally and culturally affiliated with the geographic area of a proposed project and who have requested notice of projects proposed within that area. If the tribe requests consultation, the lead agency must consult with the tribe and consider any alternatives or mitigation measures recommended by the tribe.

CEQA encourages the use of a federal EIS or FONSI prepared pursuant to NEPA when such documents are available, or the preparation of joint state/federal documents, in lieu of preparing a separate EIR or negative declaration under CEQA. Accordingly, this DARP/EA and subsequent FONSI, if issued, may be relied upon by the lead agency towards compliance with CEQA as required for discretionary projects that are authorized, funded or carried out by California state or local agencies. Toward this end, the state Trustees will coordinate with the federal Trustees to ensure the Final DARP/EA and FONSI (if issued) are consistent with the provisions of CEQA Guidelines including state public review requirements. (Title 14 CCR, Chapter 3, § 15220 *et seq.*).

The Trustees anticipate that this DARP/EA and subsequent FONSI, if issued, will comply with the CEQA guidelines for most of the restoration projects described herein. However, subsequent CEQA compliance may be required prior to implementation of some of the restoration actions that are conceptual at this stage, pending development of sufficient project-level detail. This will be determined once detailed engineering design work or operational plans are developed for the selected projects, and once human use projects have been defined.

*California Coastal Act, California Public Resources Code § 30000, et seq.*
The California Coastal Act was enacted by the California State Legislature in 1976 to provide long-term protection of California's 1,100-mile coastline for the benefit of current and future generations. The Coastal Act created a partnership between the state (acting through the California Coastal Commission [Commission]) and coastal cities and counties to manage the conservation and development of land and water in the coastal zone through a comprehensive planning and regulatory program. New development in the coastal zone may require a permit from the Commission or the appropriate local governmental agency. Development activities are

55

broadly defined to include construction projects, divisions of land, and activities that change the intensity of use of land or public access to coastal waters. The Commission also reviews and approves Local Coastal Programs, which are the basic planning tools used by local governments to guide development in the coastal zone. The coastal zone established by the Coastal Act does not include San Francisco Bay which is regulated by the BCDC pursuant to the McAteer-Petris Act (California Government Code Sections 66690, et seq.).

While the Trustees do not anticipate that any of the restoration projects will adversely affect coastal resources, some of the projects may meet the definition of development under the California Coastal Act, such as the Ellwood seawall removal project. The implementing entity for each selected project will be required to apply for any necessary permits and approvals, including any required coastal development permit. In addition, the federal Trustees or the implementing entity, as appropriate, will conduct consultation with the CCC, as discussed above under the CZMA.

### *California Endangered Species Act, Fish and Game Code 2050 et seq.*
Pursuant to CESA (California Fish and Game Code Sections 2050 et seq.), it is the policy of the State of California that state agencies should not approve projects that would jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat essential to the continued existence of those species if there are reasonable and prudent alternatives available. However, if reasonable alternatives are infeasible, individual projects may be approved if appropriate mitigation and enhancement measures are provided.

Pursuant to the CESA, the Fish and Game Commission has established a list of threatened and endangered species based on criteria recommended by the California Department of Fish and Game. Section 2080 of the California Fish and Game Code prohibits "take" of any species that the Commission determines to be an endangered species or a threatened species. Take is defined in Section 86 of the Fish and Game Code as "hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill." The CESA allows for take incidental to otherwise lawful development projects. The CESA emphasizes early consultation to avoid potential impacts to rare, endangered, or threatened species and to develop appropriate mitigation planning to offset project-caused losses of populations of listed species and their essential habitats.

Several state-listed species occur in the spill-affected area. While the Trustees do not believe the restoration projects set forth in this DARP/EA will result in the take of any state-listed species, the Trustees will evaluate the potential effects of the projects on these species and consult with the CDFW as may be appropriate pursuant to the requirements of the CESA.

56

*Public Resources Code, Division 6, § 6001, et seq.*

The Public Resources Code, Division 6, gives the California State Lands Commission trustee ownership over State sovereign tide and submerged lands. Permits or leases may be required from the State Lands Commission if a restoration project is located on such lands.

### 3.3.6  Other Potentially Applicable Statues and Regulations

Additional legal requirements may be applicable to NRDA restoration planning activities. The statutes listed below, or their implementing regulations, may require permits from federal or state permitting authorities:

- National Park Service Organic Act of 1916, 54 U.S.C. 100101-104907;
- Archaeological Resources Protection Act, 16 USC 460, et seq.;
- National Historic Preservation Act of 1966 as amended (16 USC 470-470t, 110);
- Clean Air Act, 42 USC 7401, et seq.; and
- Porter-Cologne Water Quality Control Act, Water Code Sections 13000 et seq.

57

# 4.0   Injury Quantification and Restoration Planning Methods

The Oil Pollution Act NRDA regulations define injury as "an observable or measurable adverse change in a natural resource or impairment of a natural resource service." The goal of an injury assessment is to determine the nature, extent and severity of injuries to natural resources, thus providing the technical basis for evaluating and properly scaling potential restoration actions to compensate for resource injuries. An impairment or loss of human uses of the natural resources, e.g., lost recreation, is compensable under the OPA NRDA regulations, as well. In contrast, natural resource damages are the monetary damages recoverable by natural resource trustees to compensate the public for the injuries to natural resources and the loss or impairment of human uses of natural resources resulting from an oil spill. Such damages include the cost to restore the injured natural resources, the monetary value of spill-related human use impacts, as well as the reasonable cost of the assessment.

For each of the injury categories evaluated following the spill and discussed in this DARP/EA, the Trustees, informed in part by the contributions of the responsible party, selected assessment procedures based on (1) the range of procedures available under section 990.27(b) of the OPA regulations; (2) the time and cost necessary to implement the procedures, and considering whether the additional cost of more complex procedures were related to the expected increase in the quantity and/or quality of the information to be acquired; (3) the potential nature, degree, and spatial and temporal extent of the injury; (4) potential restoration actions for the injury; (5) the relevance and adequacy of information generated by the procedures to meet information requirements of planning appropriate restoration actions; and (6) input from scientific experts. (15 C.F.R. § 990.27(c)).

## 4.1   Quantification of Damages

Each injury assessment focused on determining both the magnitude of the injury to a resource or a natural resource service (e.g., number of animals killed, acres impacted, or days of lost recreational opportunity) and the time to full recovery. This produced an estimate of the initial and interim (from the time of injury until full recovery) losses resulting from the oil spill.

The Trustees' next task is to determine the scale of restoration actions that adequately compensate the public for the injuries resulting from the spill. For wildlife and habitat, the Trustees have used Resource Equivalency Analysis (REA) or Habitat Equivalency Analysis (HEA), an approach that quantifies both the injury from the spill and the benefits of potential restoration projects, such that they may be compared with each other. For human recreational losses, the Trustees have used a valuation approach, estimating the number of lost user days for various activities and locations, and then calculating the lost value, in dollars, of that lost use. These methods are further described below.

58

### 4.1.1  Equivalency Analysis

For the quantification of injuries to wildlife and habitat, the Trustees have relied on a service-to-service restoration-based approach, in accordance with 990.53(d)(2). In other words, the Trustees have sought appropriate restoration projects to both restore the injured resources and compensate for the interim losses between the time of the spill and full recovery to the conditions that would have existed had the spill not occurred (see NOAA 1997). Restoration scaling is the process of determining the appropriate size of a restoration project, so as to compensate for the injuries and lost services. These projects, because of their compensatory nature, are intended to restore, replace, rehabilitate, or acquire the equivalent resources "of the same type and quality, and of comparable value" as those injured (NOAA 1995). For this task, the Trustees relied upon equivalency methods, sometimes specified as HEA when applied to habitat injuries or REA when applied to resources in general. These methods are described in greater detail in Appendix C.

### 4.1.2  Value of Lost Human Uses

To quantify lost and impaired human uses resulting from the Incident, the Trustees, partially in cooperation with the responsible party, have gathered data regarding visitor use of impacted sites and associated activities. To value those lost uses the Trustees used a travel cost model for beach camping and are employing the benefits transfer method for other shoreline and offshore uses. In other words, the Trustees determined the lost monetary value of each lost trip, and multiplied the resulting value by the number of lost trips. To compensate for the lost and diminished human uses arising from the spill, the Trustees intend to solicit project ideas from public agencies, non-governmental organizations, as well as from the general public. The Trustees will then select restoration actions using a value to cost approach, by which the cost of the restoration actions is equivalent to the lost monetary value of human uses.

For a number of reasons, the value-to-cost method is the most commonly used approach to address lost recreational use in NRD cases across the nation. The Trustees' determined that a value-to-value or service-to-service approach, which attempts to compare the value or benefits of specific restoration actions to the injury, would be impractical as the scope and/or number of studies required to implement either approach would be prohibitively time-consuming and expensive, and therefore less desirable under the assessment procedure criteria laid out in 990.27(c) and listed above.

A wide variety of recreational activities were affected by the spill. Examples include camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, and dog-walking, as well as more specialized activities such as fishing, diving, boating, and surfing. Additionally, a wide variety of shoreline locations in Santa Barbara, Ventura, and Los Angeles Counties were impacted. The Trustees anticipate implementing a suite of restoration projects to compensate for impacts to various types of activities across the spill-affected area. The Trustees' anticipate that multiple projects will compensate for recreational use impacts. Each project will require significant coordination among the landowner or manager where the projects will be

59

implemented, the local governments and the public. To properly implement a value-to-value or service-to-service approach in these circumstances would have required the Trustees to separately study, evaluate and determine the value and benefits of each individual proposed project in a range of locales. Such studies of the potential benefits of the proposed projects could easily take several years and cost several times more than the value-to-cost method employed by the Trustees.

## 4.2    Restoration Project Selection Criteria

The Trustees considered numerous restoration alternatives to compensate the public for spill-related injuries. Each restoration alternative presented in this plan was evaluated using the factors outlined in section 990.54 of the OPA regulations, as well as additional criteria deemed necessary to identify the optimal suite of restoration projects. The criteria are described below. Applying these criteria to the restoration project concepts received to date resulted in the Trustees' selection of preferred restoration alternatives described in this Final DARP/EA. All restoration alternatives submitted by the public or developed by the Trustees, other than Human Use projects, are presented in Section 5 and/or Appendix N. Appendix N includes both selected projects and second tier projects (that may be implemented if funding allows), as well as projects that did not meet the Threshold Criteria and were not further evaluated.

| Threshold Criteria | If a project does not meet these criteria, it will not be considered further per OPA 990.53(a)(2). |
|---|---|
| 1. Consistency with Trustees' Restoration Goals | • Does the project provide tangible benefits to plants, animals, and their habitats that were affected by the spill (e.g., shoreline habitats and resources, subtidal and fish habitats and resources, birds, marine mammals)?<br>• Does the project provide tangible benefits for enhancing recreational opportunities that were affected by the spill? |
| 2. Technical Feasibility | • Is the project technically and procedurally sound, and not already been funded or completed? |
| **Evaluation Criteria** | |
| 1. Nexus between the Restoration Project and the Impacts of the spill on Natural Resources | • To what extent does the project benefit shoreline habitats and resources, subtidal habitats and resources, birds, marine mammals, or recreational opportunities and users that were affected by the spill?<br>• To what extent does the project location or geographic scope of project benefits correspond to areas impacted by the spill? |
| 2. Compliance with Applicable Laws | • Will the potential project implementer have the legal right to access the project site and conduct the project, including all necessary long-term maintenance?<br>• Are there willing landowners who support the project? |

60

| | |
|---|---|
| | • How difficult and complex are the permitting processes required to implement the project?<br>• How readily will the likely project implementer be able to meet all applicable laws and obtain all relevant permits. |
| 3. Cost-Effectiveness | • Projects that deliver greater benefits relative to their costs will be preferred over projects that provide fewer benefits relative to their costs. |
| 4. Range of Restoration Project Benefits | • Will the project benefit more than one natural resource and/or service?<br>• Does the project fit within a total suite of selected restoration projects that address the geographic distribution and types of injuries or recreation impacts associated with the spill?<br>• The Trustees consider the extent to which a project contributes to the overall restoration plan. This includes the degree to which a project may benefit any otherwise uncompensated spill injuries. |
| 5. Time to Provide Benefits | • Projects that begin providing benefits to the target resource or public sooner are preferred to projects where the onset of benefits is not expected until far into the future.<br>• For capital improvements, projects that are "shovel ready" will be preferred over those projects that are in the design or pre-design phases. Projects where permitting is completed (or otherwise straightforward) will be preferred to projects that require complex permitting processes that will take significant time.<br>• For projects in general, those projects that can articulate how target resource benefits or public benefits will begin in the near future will be preferred to projects that cannot. |
| 6. Duration of Project Benefits, and Maintenance Requirements | • Projects expected to have longer term benefits are favored over those that have shorter term benefits.<br>• If long term benefits are expected, is there a mechanism in place to ensure that those benefits are realized and maintained through time?<br>• Is there an entity that will be responsible for maintaining the project over time? |
| 7. Avoidance of Collateral Injury from Project Implementation | • Project should not benefit one natural resource to the detriment of others.<br>• A project that addresses ongoing diminishment of natural resources that resulted from the spill will be preferred. |
| 8. Likelihood of Project Success | • Projects with a higher likelihood of successful implementation (e.g., obtaining necessary permits, constructing improvements, carrying out project-related activities), and that are otherwise more technically feasible are preferred. |

61

| | |
|---|---|
| | • Will there be objective indicators to measure project success and demonstrate that the project has provided natural resource benefits? |
| 9. Total Project Cost and Accuracy of Estimate | • Trustees prefer the least costly project of otherwise equivalent alternatives<br>• Projects with greater certainty of the costs related to successful implementation will be preferred over projects with high budget uncertainty. |
| 10. Effect of Project on Public Health and Safety | • Projects that enhance public health and safety are preferred. |
| 11. Opportunities for Collaboration | • Projects with matching funds are preferred to projects without matching funds. |
| 12. Non-Duplication | • Projects funded through damages should not displace other funds.<br>• Project should not duplicate other efforts already ongoing at the same location. |
| 13. Education/Research Value | • Does the project have the potential for public education and outreach or to advance scientific knowledge for the benefit of natural resources management? |
| 14. Cultural Value | • Does the project have the potential for cultural resources conservation and/or education? |
| 15. Ability to Document Benefits to the Public | • The Trustees consider the ability to document receipt or delivery of benefits to the public as a result of a project or other use of funds. |

62

## 5.0   Injury Quantification and Restoration Alternatives

This section describes the nature, extent, and severity of injuries to natural resources and human uses resulting from the spill, as well as potential restoration alternatives, including selected alternatives, to compensate for these injuries. This section is divided into the following resource categories:

- Shoreline Habitats;
- Subtidal and Fish Habitats;
- Birds;
- Marine Mammals; and
- Human Uses.

At the time of the spill, the Trustees created these categories to organize the assessment of injuries to natural resources. The Trustees used available information, field data, focused studies, and expert scientific judgment to arrive at their best estimate of the injuries. Scientific investigators included state and federal scientists, academic research scientists, consultants with damage assessment experience, and recognized experts within each resource category. During, and for some time following the spill, field teams were organized that included the investigators above, as well as one or more representatives of Plains (see Section 3.2.3).

In addition, the Trustees divided the spill footprint into four geographic zones (Zones A, B, C, and D) based on level of oiling (Figure 8). This was primarily done for purposes of assessing injury to shoreline and subtidal habitat.

**Zone A**
- Location: Gaviota State Park to Arroyo Hondo (approximately 6 miles of coastline)
- Level of oiling: moderately to lightly oiled

**Zone B**
- Location: Arroyo Hondo to Coal Oil Point (approximately 18 miles of coastline)
- Level of oiling: heavy to moderately oiled

**Zone C**
- Location: Coal Oil Point to the Santa Barbara Harbor (approximately 18 miles of coastline)
- Level of oiling: moderately to lightly oiled

**Zone D**
- Location: Santa Barbara Harbor to Long Beach (approximately 296 miles of coastline)
- Level of oiling: intermittent oil, characterized as moderate to no observed oil.

63



**Figure 8.** Exposure zones A-D defined for the Refugio Beach Oil Spill NRDA (black lines) with shoreline oiling categories documented during Shoreline Cleanup Assessment Technique surveys conducted by the Unified Command. See Appendix B for data associated with this figure.

The Trustees assessed injury by comparing oiled areas to "baseline" conditions, as that term is used in the OPA regulations. Baseline describes the ecological services that are present "but for" the oil spill, including factors such as the abundance, biomass, diversity, age classes of characteristic plants and animals, the availability of suitable habitat for shelter, foraging, and reproduction, and the availability of food items for fish and wildlife.

As discussed throughout this section, the Trustees concluded that the magnitude of the injuries caused by the spill has been sufficiently delineated through the various studies described herein to enable the Trustees to identify and scale appropriate restoration. While there is some uncertainty inherent in the assessment of impacts from oil spills, and while collecting more information may increase the precision of the estimate of the impacts, the Trustees believe that the type and scale of potential restoration actions would not substantially change as a result of more studies. Therefore, the Trustees sought to balance the desire for more information with the reality that further research would be costly and would delay the implementation of the restoration projects.

Each resource category section below begins with an overview of the studies conducted during the assessment and the results of those studies. The pathway of the oil and exposure are discussed and the conclusions of the injury assessment are then summarized, and the injury is quantified. Finally, the potential restoration alternatives are described, with the selected projects described in greater detail. The project descriptions include a discussion of the anticipated environmental impacts, or consequences, of the selected projects. The second tier projects are also listed and described, in lesser detail, as well (Appendix N). These projects may be

64

reconsidered and selected for implementation if funds become available or if selected projects prove to be infeasible. Potential cumulative impacts of implementing restoration projects are summarized in Section 6.0.

## 5.1    Shoreline Habitats

After the release, Line 901 oil mixed into the surf and coated Refugio State Beach and nearby beaches. Oil was also carried offshore and down shore by wave action, currents and winds. The oil spread along the Gaviota coastline and then stranded intermittently downcoast for over 155 miles, depositing oil from Gaviota State Park to the north-west, along Santa Barbara County, and intermittently throughout Ventura and Los Angeles Counties to the southeast. Affected shorelines were assessed for injuries and losses to natural resource services that they provide. For the purposes of the shoreline injury assessment, separate analyses were conducted for sand beach and rocky intertidal habitats. Each habitat assessment relied upon field data and a variety of literature sources to examine effects of the spill on shoreline biota and document the effects of oil on beaches and intertidal flora and fauna. Injuries occurring within each habitat type were quantified within distinct exposure zones (Figure 8) based upon proximity to the oil release point and oiling characteristics. Potential restoration projects also were identified and scaled appropriately based on injuries quantified within each exposure zone.

### 5.1.1    Overview of Data Collection and Studies

The list below summarizes various field studies, data collection tasks, and analyses used by the Trustees to assess shoreline habitat injuries.

***Response Information - Compilation of Oiled Shoreline Data***
Immediately after and throughout the duration of the spill, Shoreline Cleanup and Assessment Technique (SCAT) Teams were dispatched to document the location and severity of shoreline oiling and to develop cleanup recommendations. These response teams reported on details concerning the approximate location, thickness, and percent cover of oil on intertidal habitats throughout the spill-affected shorelines. This information is primarily collected to assist response crews in prioritizing cleanup decisions. Along with NRDA team member observations, the Trustees used SCAT information during their injury assessment to gain an understanding of the severity of oiling along the affected shoreline segments over time.

***Extent of Oiling Quantification and Mapping***
The SCAT data and supplemental information described below were compiled to create maps showing the geographical extent and maximum observed degree of oiling along each shoreline segment. The oiling of shoreline habitats was quantified in terms of area in acres and degree of oiling using SCAT descriptions (e.g. heavy, moderate, light, very light) and mapped according to shoreline type (rocky intertidal, sandy beach, mixed rocky sandy shoreline, etc.). The area of affected shoreline, in acres, was calculated for each oiling category and each habitat type (Nixon

65

2018). The Trustees used the compilation from this effort to define the exposure zones discussed above (Figure 8).

### *Oil Sample Collection and Analysis*

Polycyclic aromatic hydrocarbons (PAHs) are a suite of chemical components found in petroleum products, and all oil sources display a "fingerprint" of the unique proportions of the different PAHs and other chemical markers. This enables forensic evaluation of the source(s). Forensic analyses were conducted on oil, tarballs, and tissues to confirm the shorelines affected by Line 901 oil (Stout et al. 2018).

### *Environmental Sample Collection and Chemical Analysis*

The Trustees collected invertebrate samples (i.e., mussels, sand crabs, beach hoppers, sand-associated polychaete worms, see Section 2.3.4) and water samples (surf zone, sediment pore water, Figure 9) from a wide variety of intertidal locations within the spill-affected area and analyzed for PAHs and other components of oil. Samples were collected before and after Line 901 oil impacted the shoreline to confirm and provide estimates of degree and duration of exposure to shoreline fauna. PAHs are toxic to organisms, and some of the animal body burden concentrations were compared to toxicology literature values as an indicator for potential health effects to marine invertebrates. PAHs were elevated in all media collected at locations oiled by Line 901 compared to reference locations. Chemistry data are provided in Appendix B and results are further discussed herein, in Appendix D, and in "Shoreline data summary" (Donohoe and Joab 2018).



**Figure 9.** Sediment porewater sample location showing oil sheen on the surface. Photo Credit: Natural Resource Damage Assessment Trustees.

66

### Sandy Beach Intertidal Invertebrate Population Surveys

Study sites were established by the Trustees to monitor changes in populations of beach hoppers. Sites were surveyed approximately 1 month after the oil spill, 4 months after the spill and again two years later to document changes in population abundance, biomass and size structure of these indicator animals. Data from previous surveys of populations of beach hoppers at a subset of the sites were also compared to post spill data. Study sites within the spill area showed reductions in population numbers, when compared to unoiled sites, indicative of oil spill-related impacts. For further information, see the report "Population survey results on talitrid amphipods for the Refugio Beach Oil Spill NRDA" (Dugan 2018).

### Rocky Intertidal Habitat Photo Transect

The Trustees conducted Rocky Intertidal substrate surveys to monitor changes in abundances of sessile organisms, substrate, and "condition" (oil/tar presence, bleaching), within fixed plots established along vertical or horizontal shoreline transects over time (post spill and six/twelve months post-spill). Assessment sites were selected throughout the primary spill area, using a survey protocol developed for oil spills. Additionally, teams visited permanent Long Term Monitoring plots (https://www.eeb.ucsc.edu/pacificrockyintertidal/index.html) that occur within the approximate spill area footprint for comparison to historical data. Photos were collected at fixed plots along the transects, i.e., photoplots, and were then scored and analyzed for substrate, condition (oiling/bleaching), species composition and proportion within the photo plot. Sites were re-visited in Fall 2015, and Spring 2016, to examine for community differences, presence/absence, or proportional changes to communities or substrate. Study sites within the Zone B showed most of the species examined were more common in sites that did not experience oiling, with the exception of Ulva and Porphyra, shorter lived opportunistic seaweeds that are often associated with disturbance. For further information, see the report "Assessment of potential impacts to rocky intertidal community following the Refugio Beach Oil Spill, Santa Barbara County" (Raimondi, 2019).

### Laboratory Tests with Shoreline Species

The Trustees performed laboratory studies (i.e., bioassays) with mussels and sand crabs to determine the aquatic toxicity of the Line 901 oil and its constituents. Results were then compared to the measured concentration of oil constituents in the surf zone and sediment porewater on sandy beaches. Toxicity of Line 901 oil was observed in juvenile sand crabs, mussel larvae, and larval silversides. Appendix E provides an overview of the Line 901 bioassays performed. Appendix D includes an evaluation of the toxic impacts of Line 901 oil on these organisms based on measured concentrations of PAHs in surf and pore water following the spill.

### Shoreline Clean Up Data

Clean up activities, primarily beach trampling and wrack (kelp/seaweed) removal, contributed to shoreline injuries caused by the spill. The Trustees compiled information on effort, such as number of days of cleaning, mass of materials removed by cleaning teams, and the types of

67

cleaning expected to affect shoreline organisms as summarized in the report "Refugio Beach Oil Spill shoreline cleanup effort data report 30 Aug 2016" (Hubbard 2016)

### 5.1.2  Shoreline Injury

As mentioned in Section 4.1.1, the Trustees used the HEA method to estimate injury for each of the shoreline habit types[8]. Inputs to the HEA include the area of shoreline habitat impacted, the reduction in ecological services because of the spill, and time and trajectory for recovery of the affected environment. The degree of injury was related to the degree of oiling and quantified by zones (Figure 8). All rocky intertidal, sandy beach and mixed rocky sandy shorelines within the spill area were quantified in terms of acreages impacted by the spill. Degree of injury to the ecological services provided by each habitat and duration of injury until full recovery were estimated based on evidence from collected data including chemical, biological, and toxicological studies, inputs from scientific literature, and consultation with regional ecologists. Benefits of potential restoration projects were estimated and quantified in terms of their likely long-term ecological benefits. In this way, each project was "scaled" to be appropriate in size to the injury that incurred in each habitat type. Details are provided below and in Appendix F.

### 5.1.3  Sandy Beach Habitat Injury

*Background*

Much of the sandy shoreline affected by the spill is a mixture of cobble, sand, and boulders. For sandy beach environments, the Trustees chose to focus the assessment largely on invertebrates that dwell on and in sand and serve as prey items for both fish and birds, and to use these invertebrates as indicators of both exposure to and injury from the oil and its chemical components.

Line 901 oil from the release site at Refugio State Beach washed over and stranded along the Gaviota coast, and also stranded sporadically in Ventura County and some Los Angeles County beaches. Services provided by the sandy beach habitat to fish, birds and other wildlife were affected. In the most heavily oiled areas, there was smothering and fouling of invertebrates and other fauna. In areas of oil deposition, the entire intertidal zone was exposed to the oil, as it traveled back and forth with individual waves throughout the tidal cycle, until it either washed back out to sea, was stranded on the shore by the receding tides, or was buried by cycles of sand accumulation on the beach. Oil moved into the substrate as droplets, tarballs or dissolved liquid into sediment pore water as wave run-up percolated into pore spaces during higher tides. Larger oil deposits formed and persisted for long periods during periods of sand accumulation following the spill. Injuries resulting from the spill were attributed to direct contact (i.e., fouling) with oil, as well as the toxic effects of oil, including those attributed to PAHs.

In addition, shoreline cleanup efforts extended for many months and caused impacts to intertidal habitats and organisms over an extended period. In heavily oiled areas, the macrophyte wrack

---

[8] Plains disagrees with the extent of shoreline injury assessed by the Trustees and asserts shoreline injury is materially lower than the Trustee's estimate.

68

(stranded drift algae and surfgrass) was often oiled, and initially wrack was removed as part of cleanup operations. Wrack is of prime importance as food and habitat for a variety of invertebrate species that are a critical food source for higher trophic level organisms, including birds, fish, and crabs. Suspended detritus is another major food source for the masses of invertebrates living in the intertidal zone, and can be fouled by adhesion to oil particles or film. Conceptual diagrams shown in Figure 10 illustrate the movement of beach invertebrates and predators with tidal flux, as well as sediment porewater flow with oiling.



**Figure 10.** Conceptual diagrams of Refugio coast shoreline, sandy beach environments at high tide (top) and low tide (bottom). Sand crabs, polychaete worms, and beach hoppers are prey for birds and fish. Porewater flow down the beach profile is shown at low tide.

69

### Sandy Beach Habitat Injury Assessment

*Area of Impact*

The Trustees split the area of impact into four geographic zones (Zones A through D, Figure 8) that covered the spill-affected area from west to east. Most data were collected in Zone B, the most heavily oiled zone. The area of affected shorelines within Zones A-D, in acres, was calculated based on beach width, tidal swell, and run-up data available during the oiling period. A summary of the shoreline acres affected and the duration of the injury is further discussed below and in Appendix F.

*Baseline Conditions*

The Trustees assessed injury by comparing oiled areas to baseline conditions, per the OPA regulations. The Trustees estimated those baseline conditions from the collection and chemical analysis of water and shoreline invertebrate samples, data on beach hopper populations from earlier studies, and other data and scientific literature pertinent to the occurrence and abundance of organisms by habitat type and location. These data were collected either before the spill, outside of the spill area or up to two years after the incident when the Trustees assumed continued exposure to Line 901 oil would have been eliminated or greatly reduced. For example, monthly to yearly sampling of sediment porewater and invertebrate tissues for chemical analysis over a two-year period in the spill area was used to estimate baseline conditions. See Appendix D for further details.



**Figure 11.** Oil on the shoreline at Refugio State Beach, May 19, 2015. Photo Credit: Natural Resource Damage Assessment Trustees.

70

*Injury*

The initial acute injury to sandy beach resources (direct smothering/fouling and toxicity) from the spill occurred over a period of many days. The incident started on May 19, 2015, at Refugio State Beach in Santa Barbara County, California, and the oil was transported up and down the coastline by winds and currents and deposited along the shoreline (Figure 11).

Near the end of May 2015, Line 901 oil from the spill eventually reached beaches in Ventura County and some beaches in Los Angeles County (i.e., Manhattan Beach and Redondo Beach). Spill impacts including impacts from cleanup were most severe and continued for months near the release site to El Capitan and then decreased downcoast. Mortality caused by the oil fouling and smothering of intertidal-associated organisms such as sand crabs and beach hoppers was also highest in areas near the release point to El Capitan and decreased downcoast (Figure 12; Figure 13).



**Figure 12.** Oiled young sand crabs on Refugio State Beach, May 19, 2015. Photo Credit: Natural Resource Damage Assessment Trustees.



**Figure 13.** Oiled beach hoppers (talitrid amphipods) on Refugio State Beach, May 22, 2015. Photo Credit: Natural Resource Damage Assessment Trustees.

71



**Figure 14.** Total PAH concentrations in sediment porewater measured at several locations over time. 2017 values indicated by the red circle are representative of baseline conditions. See Appendix B for data associated with this figure.

Sediment porewater concentrations of PAHs between Gaviota and Haskell's along the Gaviota Coast became elevated soon after the spill and remained elevated months later, as shown in Figure 14. While seep oil is known to occur on shorelines in this area, the porewater data demonstrated a pattern over space and time that shows the spilled Line 901 oil increased the amount of PAHs in the porewater to an appreciable extent in May of 2015 and beyond. Initial PAH concentrations were highest at the locations closest to the release site and decreased as distance from the spill site increased. For example, porewater PAH concentrations decreased at locations between June and September of 2015, and by 2017, all locations were found to have very low (baseline) PAH concentrations (Figure 14). These trends suggest that the peak concentrations at the sampling sites were immediately following the spill, and then they began to decrease over time. Following a similar trend as porewater, Figure 15 shows elevated tissue concentrations of PAHs in beach hopper tissues immediately after the spill, with lower concentrations in 2016 and 2017 when compared to 2015.

72



**Figure 15**. Total PAH concentrations in beach hopper tissue measured at several locations over time. See Appendix B for data associated with this figure.

Tissues of other shoreline organisms, including mussels, sand crabs, and sand-associated polychaete worms, also showed significant increases in tissue PAH concentrations (Appendix D, Donohoe and Joab 2018).

Sand crab toxicity thresholds for PAHs were exceeded in surf water, based on Line 901 bioassay results (Appendix D, Appendix E). Studies have shown that ultraviolet light (UV) from sunlight can enhance the toxicity of PAHs by a factor from 2-1000 (Barron 2017). Some PAHs in fish and invertebrate tissues are photo-activated by UV forming reactive products that cause oxidative damage. For the purpose of this evaluation, the Trustees adjusted $LC_{50}$ values by a 10-fold factor to estimate photo-enhanced toxicity.

73



**Figure 16.** Mean values (+1 standard error) for population abundance of talitrid amphipods in June 1999-2001 and June 2015 at four sites on the spill-affected shoreline including three sites in Zone B, and one site in Zone D.

The shoreline assessment focused on two categories of impacts: 1) fouling and removal of beach wrack as well as other cleanup impacts and 2) oil exposure to intertidal invertebrate populations. Treatment or cleaning options for oiled wrack or stranded seaweed were limited. Oiling of wrack results in invertebrate contamination and mortality, leading to lessened and contaminated prey resources for birds. The removal of wrack material from the beach removes an exposure mechanism to the oil, but also removes the associated invertebrates and has long-term effects on foraging options for birds due to reduced invertebrate community abundance and biomass (Dugan et al. 2003; Beeler 2009). Both of these occurred in the aftermath of the spill as oiled wrack was collected and removed from heavily oiled beaches, but remained in place on more lightly oiled or unvisited stretches.

Sand crabs and beach hoppers dominate the invertebrate biomass on southern California sandy beaches (Dugan et al. 2003). As a defining ecological characteristic of lower intertidal communities, sand crabs were used to estimate and describe injury to lower intertidal habitats. Beach hoppers were selected as a proxy for assessing impacts to the upper intertidal community, as they are an important part of the sandy beach ecosystem. Beach hoppers process organic matter such as wrack. In addition, they make up a significant portion of the diet for several shorebird and other bird species. Finally, because they dominate the upper-intertidal invertebrate community it was relatively easy to assess their populations through field sampling.

74

Large decreases in the abundance of beach hoppers (talitrid amphipods) were documented in Zone B as well, as can be seen in Figure 16. A similar trend was apparent with biomass measurements of these organism (Dugan 2018).

The degree of injury resulting from fouling, toxicity and cleanup was estimated by the Trustees within subzones (i.e., further described as "micro-zones" in Appendix F) of Zone B. The Trustees focused on Zone B for logistical reasons and because this was the zone where oiling was the heaviest and cleanup activities were the most intense. Injury was estimated separately for lower intertidal fauna and for upper intertidal fauna. Upper and lower intertidal results were then averaged to estimate 'whole-beach' injury for a given zone. The sandy beach injury and much of the resulting HEA details are shown in Figure 17 and in Table 1. In Zones A and C, injury per acre was estimated as a fixed percent of the average per-acre injury found in Zone B: 20% in Zone A and 25% in Zone C. Those percentages approximate impacts associated with a lesser amount of oiling in Zones A and C when compared to Zone B. Zone D was estimated to be 5% injured in year one only, with no injury in subsequent years. Impacts in Zone D were lower because they were primarily based on removal of organisms by direct contact with oil or tarballs and other cleanup activities, along with the removal of a portion of the wrack material during cleanup activities.

*Recovery*

The Trustees estimates of recovery time for injured sandy beach communities were based on literature values and life history patterns of California sandy beach species, as well as monitoring data. First consideration was given to recovery of heavily disturbed sites in which there was evidence that representative fauna (sand crabs and beach hoppers) had been substantially impacted (a large percentage of mortality in several age classes). Cleanup and driving impacted some sandy beaches through at least January 2016, approximately eight months after the spill. The animals on sandy beaches have highly seasonal reproduction and will take several years to re-establish populations with full size and age structures and biomass. In addition, some sandy beach animals are more sensitive to disturbance and can take much longer to recover from severe disturbances (i.e., Pismo clams, olive snails, upper beach isopods).

Recovery to baseline is the attainment of 100% of the ecological services that would be present but for the spill, including abundance, biomass, diversity, and age classes of organisms in the affected habitats. Time to recovery was based on monitoring data, observations, and the life histories of the specific flora and fauna present in each habitat type, and relative to the degree of initial acute injury.

Sand crabs lost substantial proportions of three age classes during the Refugio Beach Oil Spill incident, and because recruitment is seasonal and episodic, recovery time for lower intertidal portion of sandy beaches was assessed as approximately three years in Zone B.

Most of the upper beach species have life histories that do not include planktonic larval stages (i.e., beach hoppers, beetles, isopods). This means there is no recruitment from planktonic

75

sources to replenish their populations. These species rely exclusively on the reproduction of resident individuals for population replenishment. If local populations of these taxa are extinguished or severely depressed, population recovery will be protracted. Recovery time for upper beach species (i.e., beach hoppers) was therefore assessed as approximately four years in Zone B.

*Habitat Equivalency Analysis Results*

As previously described, injury in Zones A and C was estimated to be a percentage or fraction of the injury determined in Zone B, since the same mechanisms of injury were present, just with lesser amounts of oil and generally less severe impacts present. In Zone D, farthest from the spill location, injury resulted from contact with oil and the resulting fouling of organisms, as well as the cleanup activities, and was much more limited (Table 1, Figure 17).

**Table 1.** Summary of Sandy and Mixed Sand/Rocky Substrate Injury (losses) and Habitat Equivalency Analysis results by zone.

| Zone - Predominant max. oiling category | Acres exposed | Fraction of Zone B | dSAY[1] lost/ acre | Acre – years for compensation (dSAYs) |
|---|---|---|---|---|
| Zone A – Moderate/Lightly Oiled | 63.2 | 0.2 | 0.2954 | 18.66 |
| Zone B – Heavily Oiled | 345.8 | 1 | 1.4771 | 510.70 |
| Zone C – Moderately Oiled | 191.3 | 0.25 | 0.3693 | 70.64 |
| Zone D – Lightly Oiled | 888.0 | 0.034 | 0.0500 | 44.40 |
| Total | 1488 | --- | --- | **644.4** |

[1]dSAY = discounted service acre-year. See Appendix C.



**Figure 17.** Map showing the summary of shoreline injury by zones. See Appendix B for data associated with this figure.

76

A total of 1,488 acres of sandy beach habitat was exposed to and injured by the oil spill and is expected to recover within approximately four years, depending on oiling level. Appendix D provides additional information on the injury assessment and quantification of sandy beach habitat injuries, and the scaling details are further described in Appendix F.

## 5.1.4  Rocky Intertidal Habitat Injury

***Background***

The shoreline habitat within the area affected by the Refugio Beach Oil Spill includes a variety of rocky and mixed rocky/sand substrates, ranging from artificial to natural and an approximately six-foot tidal range. Substrates investigated by the Trustees included bedrock, boulder, cobble, and some man-made riprap and seawall. The habitat used by biota is three dimensional, with organisms on the surfaces of rocks, as well as along the sides, undersides, and between substrates. The biota present on these substrates vary depending upon tidal elevation. Figure 18 shows the conceptual diagrams of the rocky intertidal habitats and some of the immediate and longer-term impacts of oil exposure.

***Rocky Intertidal Habitat Injury Assessment***

*Area of Impact*

The Trustees quantified the number of impacted acres by using SCAT data, as described above. Injury categories were subdivided based on regional differences in biota and exposure and by differences between more natural rocky substrates and rip-rap as described below. The Gaviota Coast shoreline includes a mixture of sandy and rocky intertidal habitat. Sand migrates significantly throughout the year, burying boulders and rock outcroppings, a process that tends to scour any sessile organisms and prevent them from forming significant communities. The Trustees assessed that a total of 5.4 acres of pure rocky intertidal habitat was injured in the HEA (Appendix F), with the remainder of the shoreline (mixed rocky/sandy and sandy beach) included in the sandy beach assessment and quantification.

*Baseline Conditions*

The Trustees evaluated pre-spill data that provides a quantitative description of rocky intertidal biota within the spill-affected area. Historical long-term monitoring data, generated by the Multi-Agency Rocky Intertidal Network (MARINe) program, were used to determine general "pre-spill" conditions. Historical data are located at https://www.eeb.ucsc.edu/pacificrockyintertidal/index.html.

77



**Figure 18.** Conceptual model of oil immediate effects (top) and long-term effects (bottom) of oil in rocky intertidal habitats.

78



**Figure 19.** Photographs of oiled rocky habitat and organisms following the spill. Photo Credit: Natural Resource Damage Assessment Trustees.

*Injury*

The Trustees determined that the degree of impacts varied with the amount of oiling. The most significant fouling was noted in locations directly adjacent to the release site (rocky outcrops adjacent to Refugio, Corral Canyon, and El Capitan, Figure 19). Impacts to rocky intertidal habitat were assessed through a number of field-based studies. Similar to the sandy beach habitat, the degree of oiling was classified in rocky intertidal habitat based on descriptors used in the SCAT data. In additional to the field studies conducted after the oil spill, the Trustees also relied on other monitoring programs (e.g., MARINe) that had pre-existing, long-term monitoring data in locations affected by the spill. The Trustees determined that the initial acute injury was caused by direct smothering/fouling and toxicity of individual organisms and habitats at those

79

locations nearest to the oil release site. Subsequent injury was the result of tissue necrosis/bleaching of the sessile organisms populating these habitats within the same locations. Furthermore, injury due to trampling (from spill assessment and cleanup activities), physical cleaning of rocky intertidal habitats, and sublethal effects from exposure to PAHs were evaluated.

The Trustees collected mussels from intertidal habitats throughout the spill-affected area for PAH analysis, both immediately after the release and several weeks later. This provided an indication of those shorelines most significantly fouled by the oil, as well as the duration of exposure. Mussels collected soon after the spill from rocky shores adjacent to Refugio beach and El Capitan contained the highest PAH concentrations of all samples and continued to contain the highest concentrations two weeks later (Appendix B).

The Trustees conducted rocky intertidal photo-plot surveys to monitor changes within fixed plots over time. These were conducted at nearby long-term monitoring sites and compared to sites selected in the spill-affected area. The sites were re-visited in Fall 2015, and Spring 2016, to survey for community differences or proportional changes to communities or substrate. Study sites within the heaviest oiling areas (Refugio, El Capitan, and Coal Oil Point) documented oiled organisms and substrate after the spill. Further, community changes in follow-up surveys, potentially indicative of oil-related impacts, were noted when compared to less impacted sites away from the heaviest oiling area (Raimondi et. al., 2019).

*Recovery*
The Trustees based recovery on the life histories of affected biota and on notable increases of "disturbance indicator" species (sea lettuce and the red algae, *Porphyra*) quantified during anniversary surveys at the most impacted sites. In addition, recovery estimates were based upon the recovery time of key intertidal assemblages (fucoid, barnacle, mussel, and mid-intertidal red algae) following disturbance. Recovery was also estimated based upon key intertidal assemblages (fucoid, barnacle, mussel, and mid-intertidal red algae) as summarized in a UC Santa Cruz disturbance study (Conway-Cranos 2012).

*Habitat Equivalency Analysis Results*
 The Trustees estimated that a total of 5.4 acres of rocky intertidal habitat was exposed to and injured by the oil spill and is expected to have recovered after two years (Table 2). Appendix F provides additional information on the injury assessment and quantification of these habitat injuries.

80

**Table 2.** Summary of Rocky Intertidal Injury (losses) and Habitat Equivalency Analysis results

| Zone - Predominant max. oiling category | Acres exposed | dSAY[1] lost/acre | Acre – years for compensation (dSAYs) |
|---|---|---|---|
| Zone B– Heavily oiled | 5.4 | 0.34 | 1.83 |
| Total | 5.4 | --- | **1.83** |

[1]dSAY = discounted service acre-year. See Appendix C.

### 5.1.5  Summary of Injury

Shoreline habitats were subject to heavy oiling near the spill site in the days following the oil spill on May 19, 2015. Rocky (bedrock and cobble), sandy beach, and mixed shores received heavy coatings of liquid oil that were transported up and down the shore by waves and spring high tides. In the splash zone, oil was deposited much higher than the reach of the tides.

The oil remained in the environment in the weeks and months after the spill, attaching to rocky habitat, settling into intertidal cobble beds, and percolating into, or being buried by, accumulating sand on sandy beaches. As a result, beach porewater retained elevated concentrations of PAHs much longer than the surf zone water, with elevated values continuing for weeks and months after the spill.

Shoreline plants and animals at all intertidal levels were exposed to Line 901 oil and were fouled by it. Toxic effects on a variety of intertidal marine species were evident in field observations as well as in toxicity tests run in the laboratory with shoreline invertebrates.

Shoreline animal tissues sampled before the spill had low concentrations of PAHs. These concentrations increased dramatically after exposure to Line 901 oil and then declined over weeks to months.

Some elements of the shoreline cleanup continued until January 2016. Clean up involved removing oil, sand, and wrack from the shoreline, scraping, blasting, shoveling, sifting and driving on shoreline habitats. Two of these activities, removing wrack and driving, have significant impacts on beach ecosystems.

As the spill spread more than 155 miles east and southward, the character of the oil changed. The oil that landed on Los Angeles County beaches[9] was less liquid but still sticky and buoyant. It was deposited with kelp and other wrack in the intertidal zone where abundant beach organisms live. The decision was made that it should be removed from the shoreline. This cleanup effort removed oil, wrack, and the animals associated with that material.

---

[9] Tarballs matching Line 901 oil landed on two South Los Angeles County beaches – Manhattan Beach and Redondo Beach.

81

Recovery of the impacted shoreline zones is expected to vary from one to four years, varying by zone, and based on the severity of the initial acute injury.

## 5.1.6  Selected Restoration Projects

The Trustees selected four projects described below to compensate for injuries to sandy beach and rocky intertidal habitats caused by the oil spill (Table 3).

For the shoreline habitats, no single preferred restoration project was able to compensate for all the injury. For this reason, four restoration projects were selected. These projects ranked as providing the greatest benefits to the injured ecosystem.

**Table 3.** Four selected projects to compensate for shoreline injury

| ID# | SELECTED PROJECTS | BENEFITS |
|---|---|---|
| SHORE-1 | Ellwood Seawall Removal | shoreline habitats, sandy beach |
| SHORE-2 | Ventura County Dunes Restoration | shoreline habitats, sandy beach |
| SHORE-3 | Santa Monica Dune and Beach | shoreline habitats, sandy beach |
| SHORE-4 | Black Abalone Restoration and Relocation | shoreline habitats, rocky intertidal |

***Ellwood Seawall Removal (SHORE-1)***
The goal of this project is to restore sandy beach and mixed shoreline ecosystems and dynamics in Zone B, the area where the greatest impacts of the spill were realized. This project will also benefit subtidal and fish habitats offshore of the seawall (section 5.2.3). The project site is Ellwood Beach in Goleta, CA (Santa Barbara County). A wooden seawall currently constrains natural functioning of the ecosystem as well as lateral access along the shoreline at high tide.

*Affected Environment*
The project will have impacts to intertidal shoreline (currently sandy beach, mixed rocky habitat, sandy shore, artificial structures, creosote preserved timber bulkhead, and rock/concrete rubble revetments), coastal bluff and shallow subtidal habitats.

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* – The removal of the armoring structure will allow overall intertidal habitat to increase in width, functions and diversity, specifically restoring upper beach and supralittoral zone habitats that are currently absent from the armored coastline. Intertidal zones that have been lost will be restored along with ecosystem functions and biota dependent on those zones, including wrack deposition and processing, invertebrate abundance and diversity, bird abundance and diversity, and grunion spawning habitat.

82

There is potential adverse biological impact to vegetation and habitat established on the bluff faces and tops during the removal activities and from the removal activities and the expected erosion that takes place once the intact portions of the seawall are removed. During the removal activity there will be crushing of some of the sandy beach organisms, such as invertebrates in and under the surface of the sand, from the machinery used in the processes of removal. Birds are expected to temporarily be disturbed on the affected shoreline while removal activities are undertaken. These impacts are anticipated to affect a small number of organisms for a limited amount of time, and will have long-term beneficial effects for these biological resources.

2. *Physical Impacts* – Longer term, post removal, the beach is expected to be wider than it is currently where the seawall is intact, and there will be a reduction of reflective processes that remove sand from the beach. Removal will also eliminate the source for creosote-contaminated debris along the shoreline as the wall deteriorates and is broken up by wave action. Movement of equipment and machinery needed to remove the seawall is expected to temporarily block some portions of this shoreline and temporarily compact the substrate. Noise from this activity will be present in the short term, until the removals are completed. Short-term adverse effects from construction activities (potentially higher turbidity, sediment transport) are expected to be minimal but may occur. Longer term impacts will include a return to natural bluff erosion rates and mobilization of loose material at the bluff toe during extreme high tides.

3. *Human Impacts* – Lateral access to people along the shoreline at high tide is expected to increase where the seawall is currently intact. Temporary disturbance to recreation in the demolition area will occur during removal activities. Human uses of any land on the slope to and on top of the bluff, near the edge that is expected to erode, will be changed as erosion occurs; however, the removal of the seawall allows for the potential future installation of pathways to access the beach from the bluff. Overall, there will be a small temporary loss of beach use by the public during the construction, but an overall long-term increase in public access in the area where the seawall will be removed. Overall, there will be a small temporary loss of beach use by the public during the construction, but an overall increase in public access to the beach in the area where the seawall will be removed.

*Probability of Success*

Project success is likely as the implementation actions will lead to immediate adjustments in the physical properties of the shoreline. Project implementation will require a high level of planning and coordination to work within short tidal periods; however these factors have been considered and planned for, and the probability of success is high. Ecological services should respond within a few years of the physical changes. Longer term responses will depend on the balancing of sediment supply, bluff erosion and sea level rise. While the exact progression of bluff erosion is uncertain over the long term, this project removes a barrier that is interfering with natural coastal dynamics in the area, and removing that barrier is anticipated to benefit ecological resources.

83

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. The restoration of natural coastal dynamics at the restoration project site should allow for recovery of physical and ecological functions and services over time. Monitoring efforts should track indicators associated with the structure and function of the restored ecosystem. In addition, the responses of bluff topography, profile and vegetation should be monitored to document shoreline evolution at the site. Key physical and ecological indicators will be measured and monitored regularly at the project and reference site or sites for five years.

Performance criteria may include:
- Intertidal beach habitat area: area and distribution of ecological habitat zones;
- Marine subsidies: standing crop of marine macrophyte wrack;
- Sandy intertidal invertebrates: diversity, biomass and abundance of key taxa by intertidal zone; and
- Bird use: use of beach zones by shorebirds, gulls, roosting seabirds, other species.

Performance criteria will be calculated based on multiple surveys at an appropriate reference site or sites or multiple transects within the site.

*Evaluation*
The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. This type and scale of project will effectively provide appropriate compensation for injured sandy intertidal habitat because of the spill, and the Trustees have therefore selected this project as one of four preferred alternatives.

### Ventura County Dune Restoration (SHORE-2)
Three dune enhancement projects at Ormond Beach, San Buenaventura and McGrath State Beaches in Ventura County will reduce invasive plant abundance and restore native plants, dune forms and processes that will support rare coastal species. These projects are all located in Zone D.

*Affected Environment*
The project site will include intertidal sandy beach and degraded (trampled and invaded by non-native plants) dune habitat. Portions of the three project sites are nesting and brood-rearing areas for special status birds: western snowy plovers and California least terns.

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

84

1. *Biological Impacts* – The project will restore a higher level of ecological functioning to degraded dune habitat. The current ecosystem services of the degraded dune area are reduced by high cover of non-native plants, altered physical processes and trampling in un-fenced areas. Removal of invasive plants will increase the amount of useable nesting areas for the western snowy plover (threatened) and, in some locations, the California least tern (endangered) and reduce cover for predators of eggs, chicks and adult birds. The presence of workers to implement the non-native plant removal in the dunes, along with their equipment, may temporarily disturb or displace birds and other wildlife. These temporary adverse effects are anticipated to be minor, and the overall long-term biological impacts are anticipated to be make a tangible improvement in the habitat quality for listed birds and other coastal wildlife.

2. *Physical Impacts* – Enhancement of native vegetation also permits the development of more natural dune dynamics that promotes the maintenance of more suitable slope faces and important material exchanges between the dunes and the intertidal sandy beach that can buffer erosion on beaches. This allows the dunes to provide a physical benefit to the intertidal sandy beach. Any adverse physical impacts during the implementation of the project are expected to be negligible, and long term benefits to the physical environment are anticipated upon completion of the project through restoration of dune habitats and processes.

3. *Human Impacts* – The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. Increased bird use, such as by western snowy plover or California least tern could be expected to increase birdwatching interest in the restored dune areas. Dunes could become somewhat less stable and allow for movement to a greater extent than this sand currently does. If such movement affects parking, driving, or other developed areas, this may be undesired.

*Probability of Success*
The project is very likely to succeed in all three project sites. The proposed restoration methods—weed control and fencing to reduce trampling disturbance—have been shown to be effective in nearby sites and elsewhere in southern California as well as throughout the State.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. Key ecological indicators to be measured and monitored include cover of native and non-native vegetation, as well as nest monitoring of western snowy plovers and California least terns. These efforts will be compatible and complementary with existing monitoring programs and continue for a period of up to five years to evaluate the ecological integrity of the site following implementation of restoration.

85

- For dunes, the target goals may include but are not limited to:
  - ○ Restoring and increasing resiliency of dune habitat;
  - ○ Reducing non-native vegetation cover to <99% in project area during lifetime of project; non-native vegetation cover should remain at <1% throughout project monitoring phase; and
  - ○ Increasing native dune vegetation in areas where non-natives have been removed; native vegetation should persist into project monitoring phase.
- For bird use, the project will include monitoring the following attributes up to a period of five years:
  - ○ Number of nests per year;
  - ○ Number of fledglings per year; and
  - ○ Comparison with baseline assessment.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. The dune restoration projects in Ventura County are located within the spill-affected area, and are the closest option that the Trustees have identified for this type of restoration. This type and scale of project will effectively provide appropriate compensation for sandy beach habitat injured as a result of the spill, and the Trustees have therefore selected this project as one of four preferred alternatives.

### Santa Monica Bay Beach and Dune Restoration (SHORE-3)

The goal of this project is to restore sandy beach and coastal dune habitat that has been degraded by intensive mechanical grooming. The project site is a public beach in Santa Monica Bay in Zone D (Los Angeles County).

*Affected Environment*

The project site will include intertidal sandy beach and degraded (unvegetated) coastal strand and dune habitat.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

The project will restore ecosystem function of sandy beach, coastal strand and dune habitats by protecting approximately five acres from the daily disturbance caused by mechanical beach grooming with heavy equipment and vehicle traffic and by planting upland portions of the site with native dune plants. The project will restore a high level of ecological functioning to degraded beach and dune habitat. The current ecosystem services of the degraded dune area is close to zero due to mechanical grooming activities, and those of the beach habitat is severely depressed.

86

1.  *Biological Impacts* – By eliminating intense regular disturbance with heavy equipment, this restoration project will allow natural coastal processes to reshape the topography and ecology of the site, promoting the recovery of natural biodiversity and function. With appropriate stewardship, hummocks and vegetation will develop on the shoreline supporting native plants, birds and invertebrates that are currently extirpated at the site. The restored habitat will retain macrophyte wrack subsidies, increase intertidal and invertebrate abundance and diversity, increase the abundance and diversity of birds and will be more suitable for grunion spawning. No adverse biological impacts are anticipated, as the restoration area has very low sandy beach ecological services currently. Following restoration, the area is expected to increase in ecological functionality due to the foundational habitat that will be replaced where none currently exists.

2.  *Physical Impacts* – The topography is expected to change at the restored site, with the formation of natural hummocks which is consistent with increased resilience to sea level rise. Fencing around the site will be present once the restoration is underway. Any adverse physical impacts during the implementation of the project are expected to be negligible, and long term benefits to the physical environment are anticipated upon completion of the project.

3.  *Human Impacts* – The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. Fencing will restrict the access through and around the restored site to some extent, but human access will continue on the site, although the types of recreational activities may change somewhat toward wildlife viewing. Increased plant, floral, and wildlife activity on the site may attract increase interest from bird watchers and others interested in the flora and fauna that will repopulate the site.

*Probability of Success*
The project is very likely to succeed in both of the target habitat zones. Cessation of grooming has been shown to be an effective beach restoration technique. The dune restoration plan will be based on a pilot project currently underway in Santa Monica. This model has been effective through planning and early implementation phases.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. Project site selection will likely be based on very low initial function level (mechanically groomed with no vegetation or dunes, low nutrient beach sand). Ecological responses to restoration actions will likely begin slowly and increase over the five-year monitoring period. Performance criteria may be expressed as trajectories of increasing function over time and divergence from groomed reference sites.

87

Performance Criteria may include the following key physical and ecological indicators:
- Project Area: acres measured each year to ensure project is not encroached upon.
- Topography/elevation/profile:
  - Dune and hummock building (sand storage, increased topography and resilience);
  - Increased elevations of topography and sand storage;
  - Altered profile (formation of foredune); and
  - Criterion: maximum elevation of dune features to increase across the site to increase at 0.1 m per year in the first five years.
- Vegetation:
  - Absolute cover of native dune plant species;
  - Absolute cover of non-native plant species (less than 1%); and
  - Native dune plant species richness.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. The Santa Monica Bay beach and dune restoration project is conceived to be implemented within Los Angeles (LA) County. Since shoreline resources were the largest area of habitat impacted by the oil spill, implementing this restoration in LA County offers an opportunity to compensate for injured resources near the ends of the spill-impacted area. This type and scale of project will effectively provide appropriate compensation for sandy intertidal habitat injured as a result of the spill, and the Trustees have therefore selected this project as one of four preferred alternatives.

### Black Abalone Restoration and Relocation (SHORE-4)

The goal of this project is to aid in restoration of intertidal black abalone populations in areas affected by the spill. The project is comprised of four tasks: (1) characterization of the genetic structure of the donor and recipient population, (2) clearing areas of fouling organisms and placing recruitment modules to make habitat suitable for transplanted post-emergent black abalone and for settlement of larval black abalone, (3) transplantation of post-emergent black abalone from a donor population, and (4) adaptive assessment and management of transplants.

*Affected Environment*

Locations will be identified throughout the Gaviota coast, which are suitable for abalone. These will have the specific habitat attributes associated with abalone occupation (in general, deep cracks and crevices within the tidal range of black abalone).

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

88

1. *Biological Impacts* –This project seeks to ameliorate current conditions in suitable intertidal habitat, by preparing the substrate for better recruitment, while also transplanting adults to augment the likelihood of future recruitment. Recovery of a species from massive decline requires successful recruitment of new individuals into areas where local populations were impacted. Recruitment is dependent on both an available supply of new individuals and specific environmental conditions required to induce settlement. The goal is to restore a viable population of black abalone in suitable intertidal locations that are selected. Areas will be cleared of fouling organisms, leaving clean surfaces in the cracks and will be maintained until donor individuals are transplanted. The impacts of clearing the fouling organisms from the transplant areas are anticipated to be negligible to the ecosystem function, and will result in long term ecological benefits when viable populations of black abalone are reestablished.

2. *Physical Impacts* – The Trustees do not anticipate major impacts to the physical environment, such as water, air, sediment, etc. Any adverse physical impacts are expected to be negligible. Areas will be cleared of fouling organisms, leaving clean surfaces in the cracks and will be maintained until donor individuals are transplanted.

3. *Human Impacts* – The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc.

*Probability of Success*

Project implementers have been monitoring regional black abalone populations for nearly 25 years, and have been assessing the recruitment of new individuals and the biogenic habitats required for successful recruitment. The project implementers will strive to maximize the probability of success based on their knowledge and experience with black abalone.

*Performance Criteria and Monitoring*

The success of the project will be evaluated by assessing metrics associated with natural resource services. An important step towards recovery is the aggregation of abalone at densities high enough for successful fertilization, through both success of transplantation and aggregation of individuals, and recruitment of new juveniles. Because black abalone larvae have never been reared successfully in the lab to settlement stage, a field approach is required. Metrics for success include maintenance of an appropriate density of adult individuals (approximately 2 individuals per square meter), and the other is the recruitment of new juveniles. Based on previous studies, recruitment modules, consisting of small stacked tiles that mimic small crevice features of boulder fields, may be used to effectively attract new recruits. These modules may then be used to attract larvae to restored habitat areas, or move newly settled juveniles from sites with recruitment, to areas where recruits are absent. These modules will allow easy monitoring of recruitment and growth, for up to 10 years, to determine success of the project.

Success may be assessed relative to controls. Should greater recruitment occur in areas subjected to restoration via translocation of adults than in control areas, we would conclude the

89

translocation enhanced repopulation of black abalone. The ratio of recruitment in restored areas relative to controls could be a quantitative metric of enhancement value. Should no recruitment occur in either control or restoration areas we will compare results to other areas not demographically affected by withering disease. If recruitment occurred over the 10-year period in the unaffected sites but not in the restored areas, then the effectiveness of the restoration will be called into question and methods for future restoration efforts will be modified accordingly.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. The Trustees believe that this type and scale of project will effectively provide appropriate compensation for rocky intertidal habitat injured because of the spill and have therefore selected this project as a preferred alternative.

## 5.1.7   Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 4), and determined that many are valid projects that would provide benefits to shoreline habitat. However, these projects were not selected as preferred for various reasons described below. These projects may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

**Table 4.** Second tier shoreline restoration projects that may be implemented if funds allow.

| ID# | OTHER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| SHORE-5 | Surfer's Point Phase II | Sandy beach |
| SHORE-6 | Matilija Dam removal | Sandy beach, riparian |
| SHORE-7 | Gaviota Creek Watershed Restoration | Riparian, lagoon, sandy beach |
| SHORE-8 | El Capitan State Park Concrete Removal Project/Bike Path and Rip Rap Removal | Sandy beach |
| SHORE-9 | Santa Barbara County Seawall Removals | Sandy beach |
| SHORE-10 | Coastal Hazards Removal, Goleta Beaches from hazards removal, Arroyo Hondo to Coal Oil Point | Not clear. Sandy beach |
| SHORE-11 | Coal Oil Point Research and Education | Coal Oil Point Preserve |
| SHORE-12 | Devereux Slough Restoration | Slough and meadow |
| SHORE-13 | Funding a Quick Reaction Cleanup Crew for Tar Found on Beaches | Sandy and rocky shoreline |
| SHORE-14 | BEACON, San Ysidro and Cold Springs/Montecito Creek, and San Antonio Creek Debris Basin Removal Projects to Improve Sediment Transport for Beach Nourishment. Removal of Unnecessary Sediment Basins from the Gaviota Coast | Sandy beach |

90

| SHORE-15 | Refugio and Gaviota Coast Human Impact Mitigation and Protection Program (Tajiguas, Mariposa Reina South, and Vista) Human Impact Mitigation | Sanitation, recreational |
|----------|---------|---------|
| SHORE-16 | Other Dune Restoration Projects, including but not limited to, Hollywood Beach, Ellwood Invasive Plant Restoration, Ventura City Beaches, Vandenberg AFB | Sandy beach |
| SHORE-17 | Coal Oil Point Pilings and Debris Removal | Lagoon, human safety, possible sandy beach |
| SHORE-18 | Classroom Education and Outreach | Rocky intertidal |
| SHORE-19 | Refugio and El Capitan Rocky Intertidal Docent Program | Rocky intertidal |
| SHORE-20 | Increase Substrates for Rocky Intertidal Species | Rocky intertidal |
| SHORE-21 | Cessation of Beachgrooming | Sandy beach |
| SHORE-22 | Rindge Dam Removal | Sandy beach, riparian |

### Surfer's Point Phase II (SHORE-5)

This project includes infrastructure and habitat enhancements to the Surfer's Point shoreline area in Ventura. It is not currently among the preferred projects as its focus is on recreational use rather than ecological benefit. Therefore, it does not appear feasible at the time of this plan, unless it receives support from recreational use funding from the Trustees or other sources. Ecological restoration costs would be expected to be a small part of the total project.

### Matilija Dam Removal (SHORE-6)

This project is the removal of Matilija Dam, which is full of sediment and does not function as a drinking water reservoir which was its intended purpose. Removal of the dam would restore natural sediment flows, which enrich beaches through sand deposition. This project was not selected, as it is not yet clear if it is technically feasible, and due to the very high cost associated with the project (estimates over $100 million). Also, this project is too early in the planning and environmental review phase to be properly evaluated at the time this restoration plan was prepared.

### Gaviota Creek Watershed Restoration (SHORE-7)

This project includes the relocation of the Gaviota State Park entrance road along with riparian/estuarine enhancements. The relationship to injured resources directly on the shoreline is more tenuous, though it may have recreational benefits to human uses. The time to provide benefits to sandy beach resources is potentially distant. Also, while this project meets some sandy shore restoration goals as a beach nourishment project, it is not a preferred approach to achieving these benefits. The duration of benefits is projected to be short for the sandy beaches and the costs are relatively high (estimated at approximately $10 million). This project was not selected to be carried forward for implementation at this time because the project does not

91

contain sufficient information for the Trustees to understand the benefits to shoreline resources
injured by the spill.

### El Capitan State Park Concrete Removal Project/Bike Path and Rip Rap Removal (SHORE-8)
This project involves the removal of large rip-rap boulders and concrete that are located at the
base of a portion of the bicycle trail between Refugio and El Capitan State Parks. The concept is
to remove legacy rip-rap (currently serving no purpose) outside of the area where riprap
currently exists to protect the Exxon-owned pipeline located there. Removal of legacy rip-rap
may partially restore a segment of this shoreline to a more natural and unarmored condition.
Feasibility and cost-benefit of this project has not been fully assessed.

### Santa Barbara County Seawall Removals (SHORE-9)
This project would involve the removal of concrete seawall structures located in Santa Barbara
County to restore the shoreline to a less armored condition. The Trustees evaluated selected sites
proposed by the County and determined that seawall removal could cause structural
compromises to the railroad infrastructure. As of the release of this plan, no formal written
proposal has been submitted or reviewed on this effort, so it is not clear if this is a fully
developed plan or project.

### Coastal Hazards Removal, Goleta Beaches Extending From Arroyo Hondo To Coal Oil Point (SHORE-10)
This project would involve removal of coastal hazards other than the Ellwood seawall. The
elements evaluated to date by the Trustees, such as iron material protruding from the shoreline
surface, would not provide any tangible benefits to plants, animals, and their habitats that were
affected by the spill. The State Lands Commission, the proponent of this project, has
successfully pursued other funding sources for this work, primarily as an effort to reduce hazards
to humans. The nexus to restoring shoreline resource services that were injured during the spill
event is unclear, so this project is not currently among the selected projects.

### Coil Oil Point Research and Education (SHORE-11)
This is a proposal to fund staff to provide research and education at the Coal Oil Point Preserve.
The elements evaluated to date by the Trustees, such as funding an endowment for the education
coordinator at Coal Oil Point Preserve, would not provide any direct benefits to plants, animals,
and their habitats that were affected by the spill. Any identified benefits to the impacted
resources would be indirect.

### Devereux Slough Restoration (SHORE-12)
This is a proposal to restore Devereux Slough through acquisition of a former golf course to
expand the slough to a greater portion of its historical extent. The elements evaluated to date by
the Trustees, such as habitat enhancement and monitoring in the former golf course, while
beneficial to some natural resources, would not provide any tangible benefits to the shoreline
natural resources that were affected by the spill. While no slough or meadow habitats were
injured by the spill, this project may, however, provide broad ecosystem benefits for multiple

92

species that utilize shoreline habitats and its proximity to shoreline habitats creates ecosystem connectivity that may benefit coastal resources that were affected by the spill.

### Funding a Quick Reaction Cleanup Crew for Tar found on Beaches (SHORE-13)

This proposal is to fund a personnel that would respond quickly to perform cleanup duties on the shoreline when tar is found. The Trustees have concerns that the likelihood of success for this would be very difficult to determine. Cost effectiveness is likely to be low, and benefits to the public would be challenging to quantify. Duplication would also be high in the event of an oil spill incident, given that the spill response effort oversees the task of oil removal and cleanup. Hazardous material handling and disposal cost and liability questions are also significant considerations.

### Removal of unnecessary sediment basins from the Gaviota coast (SHORE-14)

This is a proposal to remove sedimentation basins to allow more natural transport of materials to the shorelines for the purposes of beach nourishment. Only basins that are deemed no longer necessary to protect public safety and property would be considered for removal. Recent fire and flow events call into question the viability of removing sediment basins along the Gaviota coast.

### Refugio and Gaviota Coast Human Impact Mitigation (SHORE-15)

This proposal aims to reduce human waste material on the Refugio and Gaviota shoreline by providing portable toilet facilities. The Trustees considered this to be less a sandy beach or shoreline restoration project and more of a sanitation project, given that it that would install restroom services. It does not provide significant tangible benefits to plants, animals, and their habitats that were affected by the spill. Any benefits that might exist would be challenging to quantify and primarily human sanitation and recreational in nature.

### Other Dune Restoration Projects (SHORE-16)

These are dune restoration projects similar to the other ones listed in the selected project section, but in different locations. Some of these projects lack owner consent, have a need for partner funding, or are not proximal to the spill area. Those with owner consent, funding resources, permitting in place, long term stewardship, and well described costs within the spill area have been selected as preferred. The remaining dune restoration projects would require more details to be better understood, or need more clarification regarding technical feasibility before being considered preferred projects. However, these projects may be considered at a later time, as more information on these projects is gathered or if the selected dune restoration projects become infeasible.

### Coal Oil Point Pilings and Debris Removal (SHORE-17)

This project involves removal of pilings and debris from a lagoon area. However, it appears to have benefits associated with human use and safety rather than the injured shoreline resources. There also appears to be some permitting issues associated with the removal effort that may disturb sensitive natural resources located at or near the lagoon. Much of the identified debris is associated with the lagoon habitat rather than shoreline, making the nexus to the injured

93

resources weaker. Benefits would be challenging to quantify and scale for the injured resources. Both ecological benefits and the cost benefit need to be more clearly understood before the Trustees would reconsider funding this project.

### Outdoor Classroom Education and Outreach (SHORE-18)

Building on the successful implementation of the Channel Islands Marine Sanctuary's Rocky Intertidal Protection Program, students from local schools would be engaged to learn about the ecology of rocky intertidal habitats, including hands-on implementation of rocky intertidal monitoring. Students would also be engaged in docent programs to share their knowledge of rocky intertidal habitats with the public at popular tidepool areas. Benefits would be less direct, as they would rely on an overall change in behavior and attitudes by users of rocky intertidal areas.

### Refugio and El Capitan State Beach Rocky Intertidal Docent Programs (SHORE-19)

This project involves the development and implementation of a docent program at rocky intertidal sites at Refugio and El Capitan State Beaches to educate and oversee visitors and contact law enforcement personnel, if needed. Benefits would be less direct and would rely on an overall change in behavior and attitudes by users of rocky intertidal areas.

### Increase Substrate for Rocky Intertidal Species (SHORE-20)

This project involves the creation of new shoreline habitat or modification of existing habitat to increase substrate for rocky intertidal species. Examples include wrapping pier pilings, or creating "living walls" at hardened shoreline structures such as breakwaters. No viable locations or methods were identified as of the drafting of this plan, but the concept may be viable in the future.

### Cessation of Beachgrooming (SHORE-21)

This project involves the cessation of beach grooming along beaches in Los Angeles and Ventura Counties. No specific locations identified as of the drafting of this plan. There is a need for a project proponent and partnerships that do not currently exist.

### Rindge Dam Removal (SHORE-22)

This project is the removal of the Rindge Dam and/or dams upstream. The Rindge Dam is full of sediment and does not function as a water reservoir which was its intended purpose. Removal of the dam would restore natural sediment flows, which enrich beaches through sand deposition. This has a very high cost associated with the project (estimates over $100 million) and is too early in the planning and environmental review phase to be properly evaluated at the time this restoration plan was prepared.

94

## 5.2    Subtidal and Fish Habitats

In the initial days and weeks after the Refugio Beach Oil Spill, the Trustees investigated the potential for injuries to subtidal fish, invertebrates, and aquatic vegetation. Animals and plants may be harmed by oil spills if they are exposed directly to the oil, to the fraction of the oil that dissolves into the water, or if they eat oil-contaminated prey. When the Line 901 oil reached the ocean, wave action actively mixed the oil throughout the water column within the surf zone. In addition, the oil was transported offshore and along shore by wind and currents (Figure 2). Offshore, much of the oil floating on the surface was mixed into the water column as oil droplets or particulates, some fraction of the oil dissolved into the water column, and some was taken up into the food chain (Figure 20).



**Figure 20.** Oil exposure in subtidal habitats.

As discussed in Section 2, the spill occurred along the Gaviota coast. Ocean waters in this area are generally in a transition zone where warmer waters off southern California mix with cooler waters off northern and central California. The Gaviota Coast subtidal habitats include sensitive rocky reefs where plants, such as kelp and surfgrass, provide a physical structure that connects the ocean floor to the sea surface. These habitats support diverse communities of plants and animals, and several are designated as Essential Fish Habitat (EFH) under the Magnuson-Stevens Fishery Conservation and Management Act. Other subtidal habitats include eelgrass beds and sand bottom. Given the ecological importance of rocky reef habitats, the Trustees conducted an in-depth assessment of the potential for injuries to coastal subtidal habitats.

Aquatic vegetation was used as a proxy for determining the health of subtidal habitats[10]. Surfgrass, eelgrass, and kelp provide essential food and habitat for a diverse group of fish and

---

[10] Plains does not agree with a number of Trustee interpretations in the subtidal and fish habitats section. In particular, Plains does not agree with Trustees use of a seagrass proxy for the deeper water column injury and does not agree that grunion are a valid indicator species for determining subtidal injury since grunion eggs are exposed on the beach.

95

invertebrate species. Fish in these habitats include California sheephead, kelp bass, rockfishes, red urchins, California spiny lobster, and sea cucumbers. These rocky reef habitats also serve as spawning and nursery grounds for fish and invertebrates. Early life stages of many species were present during the time of the spill and are expected to be sensitive to the effects of oil.



**Figure 21.** Exposure Zones defined for the Refugio Oil Spill NRDA showing shoreline tarball fingerprint matches (red circles). Zone B is the area of heaviest oiling and the extent of subtidal habitat injuries assessed. The inset shows the subtidal assessment area identifying the 10 m depth offshore extent of injury (red polygon). See Appendix B for data associated with this figure.

In the shallower, nearshore environment (0-3 m depth interval) within Zone B (Figure 21), surfgrass and many algal species were visibly coated with oil. Farther offshore (3-10 m depth interval) within Zone B, eelgrass beds and giant kelp attached to rocky reefs were exposed to oil in the water column, and there was documentation that the surface of the kelp forest canopy was oiled.

## 5.2.1 Overview of Data Collection and Studies

The list below summarizes the various field studies, data collection tasks, and analyses used to assess subtidal and fish habitat injuries.

### *Fish and Invertebrate Mortality Observations*

Immediately following the spill, and for several days after, dead fish and invertebrates were observed on the beaches along the Gaviota coast within Zone B. From May 19 to June 19, 2015, the Trustees deployed boxes as repositories for response crews to deposit dead animals during beach cleanup operations. Thereafter, on a daily basis, the Trustees photo-documented, counted, and identified the dead animals in the boxes (Figure 22). Dead fish and invertebrates were also recorded, when feasible, on wildlife search effort log forms and NRDA daily field forms. Fish and invertebrate species comprising well over 30 taxa that inhabit surfgrass, eelgrass, kelp and

96

open sand habitats were found dead on the beaches, primarily during the first week after the spill from Refugio State Beach to El Capitan State Beach. These dead animals indicate that subtidal fish and invertebrates were injured as a result of the spill, but the relatively opportunistic collection method and the limited number of collection times and locations prevented rigorous injury quantification from these data.

**Table 5.** Dead fish and invertebrates found in 2015 during the spill, and one year later in 2016.

| Dead Fish and Invertebrates (abridged) | 2015 | 2016 |
|---|---|---|
| Sand crabs | Y | N |
| Rock crabs | Y | Y |
| Shore crabs | Y | N |
| Kelp crabs | Y | Y |
| Spiny lobster | Y | Y* |
| Beach hopper | Y | N |
| Urchins | Y | N |
| Starfish | Y | N |
| Octopus | Y | N |
| Limpets | Y | N |
| Sea Hare | Y | Y |
| Skate/rays | Y | Y |
| Rockfish | Y | N |
| Kelp greenling | Y | N |
| Surfperch | Y | N |

*One lobster was identified that may or may not be a molt, all others were molts.*

In June 2016, the Trustees conducted a follow-up survey of dead organisms along the Gaviota Coast. While direct comparisons using statistical methods (comparing 2015 to 2016 data) were not possible due to differences in study designs, it appears that the species composition and apparent abundance of dead fish and invertebrates found on the beaches was substantially lower in 2016 than in 2015, supporting the conclusion that the oil spill caused acute mortality of fish and invertebrates (Table 5). For example, intact dead lobsters were frequently found during the 2015 collections; however, only one dead lobster was found in the 2016 survey, and may or may not have been a molt (see Table 5). A more detailed summary of the findings is presented in Appendix G-1.

97

Case 2:26-cv-05242-SVW-SSC    Document 15    Filed 05/14/26    Page 124 of 439   Page ID #:7379



**Figure 22.** Examples of unprecedented diversity of dead, oiled fish and invertebrates from diverse subtidal habitats found in the days immediately following the Line 901 spill (clockwise): a. spiny lobster; b. rockfish; c. guitarfish; d. octopus; e. midshipman. Photo Credit: Natural Resource Damage Assessment Trustees.

### *California Grunion Assessment*

California grunion were spawning on some beaches in the spill-affected area during and after the spill (May – September). During semi-lunar high tides these fish bury their eggs in the sand where they incubate until hatching approximately two weeks later during the next semi-lunar high tide (Martin, 2015) (Figure 23). Following the spill, adults and newly hatched larvae would have been exposed to oil in the surf zone, and the incubating eggs may have been adversely impacted by oil stranded on the beach or by cleanup activities (such as raking, machinery, trampling) disturbing nests. In addition to observing and evaluating direct impacts of Line 901 oil on grunion, the life history and accessibility of grunion early life stages make them an ideal model for evaluating the impacts of Line 901 oil on marine fish early life stages in field conditions. Accordingly, the Trustees studied grunion as an indicator of injury.

Grunion spawning was observed at oiled beaches (Refugio State Beach and El Capitan State Beach) and relatively unoiled beaches (East Beach and Topanga Beach) during 2015 and 2016. Based on predator behavior during the days of and immediately following the spill, adult grunion were staging for spawning runs at Refugio State Beach on those evenings. However, the Trustees were not able to access the beach to collect samples of eggs prior to shoreline oiling and/or cleanup activities, therefore, when the trustees attempted to collect eggs, none were found and were presumed to have been removed by cleanup activities. In areas were the Trustees were able to collect eggs from the observed spawning locations, eggs were incubated in the laboratory (Figure 23).

98



**Figure 22.** Examples of unprecedented diversity of dead, oiled fish and invertebrates from diverse subtidal habitats found in the days immediately following the Line 901 spill (clockwise): a. spiny lobster; b. rockfish; c. guitarfish; d. octopus; e. midshipman. Photo Credit: Natural Resource Damage Assessment Trustees.

### *California Grunion Assessment*

California grunion were spawning on some beaches in the spill-affected area during and after the spill (May – September). During semi-lunar high tides these fish bury their eggs in the sand where they incubate until hatching approximately two weeks later during the next semi-lunar high tide (Martin, 2015) (Figure 23). Following the spill, adults and newly hatched larvae would have been exposed to oil in the surf zone, and the incubating eggs may have been adversely impacted by oil stranded on the beach or by cleanup activities (such as raking, machinery, trampling) disturbing nests. In addition to observing and evaluating direct impacts of Line 901 oil on grunion, the life history and accessibility of grunion early life stages make them an ideal model for evaluating the impacts of Line 901 oil on marine fish early life stages in field conditions. Accordingly, the Trustees studied grunion as an indicator of injury.

Grunion spawning was observed at oiled beaches (Refugio State Beach and El Capitan State Beach) and relatively unoiled beaches (East Beach and Topanga Beach) during 2015 and 2016. Based on predator behavior during the days of and immediately following the spill, adult grunion were staging for spawning runs at Refugio State Beach on those evenings. However, the Trustees were not able to access the beach to collect samples of eggs prior to shoreline oiling and/or cleanup activities, therefore, when the trustees attempted to collect eggs, none were found and were presumed to have been removed by cleanup activities. In areas were the Trustees were able to collect eggs from the observed spawning locations, eggs were incubated in the laboratory (Figure 23).

98

*Water Chemistry and Effects to Fish and Invertebrate Early Life Stages*

In order to evaluate the toxicity of the spilled oil, the Trustees conducted bioassays using early life stages of inland silversides and sand crabs and exposed them to different concentrations of Line 901 oil. The bioassay was a seven-day exposure study for fish or a six-day exposure study for sand crabs to evaluate survival and growth (Appendix E). The inland silverside is representative of nearshore fish in the spill-affected area. It is in the same family as grunion and topsmelt, both common surf zone fish in the Santa Barbara area. Sand crabs are prey species of surfperch and other fish and birds in the Santa Barbara area. The bioassay studies quantified the relationships between PAH water concentrations and mortality for both juvenile fish and early life stage invertebrates. Bioassay results also were compared to PAH concentrations measured in surf water during the first two months after the spill. Surf water chemistry results were compared to crude oil bioassay results with other fish and invertebrate species that have been reported in the scientific literature. Surf water concentrations following the spill exceeded lethal PAH concentrations for fish and invertebrate early life stages. See Appendices D, E and G for more information.

As discussed previously, the Trustees also considered the potential for enhanced toxicity caused by exposure to UV light. Studies have shown that ultraviolet light (UV) from sunlight can enhance the toxicity of PAHs by a factor from 2-1000 (Barron 2017). Some PAHs in fish and invertebrate tissues are photo-activated by UV forming reactive products that cause oxidative damage. Oil sheen exposure was documented throughout the spill-affected area and is known to cause toxicity to fish and invertebrate early life stages. A summary of the evaluation is provided in Appendix G-4.

*Subtidal Habitat Exposure Assessment*

Divers from the University of California at Santa Barbara (UCSB) reported patches of oil and heavily oiled wrack on the seafloor in Refugio Bay four days after the spill occurred (Michel 2015). In response to this reported sighting of sunken oil, the Unified Command conducted a sunken oil assessment in Refugio Bay between 11 and 13 days after the spill. Methods included multi-beam sonar surveys, side scan sonar surveys, videos and photographs from a remotely operated vehicle and diver inspections at priority sites. The area surveyed was from near the shoreline to depths of 10m from the spill origin, north of Refugio State Beach, to El Capitan State Beach. Thirteen days after the spill, the divers only observed small tarballs near El Capitan Beach (Michel 2015). The Trustees also sent a team of divers to Refugio Bay 13 days after the spill to collect sediment, vegetation, and invertebrates from three habitat types: kelp bed habitat, eelgrass habitat, and surfgrass habitat in the bay. Tissues samples were analyzed for PAHs, and fingerprinting analyses were conducted (Stout, 2018). In each habitat type, oil (as PAHs) was detected in vegetation and fingerprinted to Line 901 oil. A variety of invertebrate species in the kelp and surfgrass habitats had detectable oil (as PAHs) that was consistent with Line 901 oil. Additionally, NOAA modelers estimated that, based on wave, wind and temperature conditions, dissolved oil and oil droplets likely mixed to a depth of approximately 14 m in this area. Overall,

100

the study showed that these subtidal habitats were exposed to Line 901 oil. A summary of the results is presented in Appendix G-6.

### PAHs in Nearshore Fish and Invertebrate Tissues

On May 19, 2015, the California Office of Environmental Health Hazard Assessment (OEHHA) recommended that CDFW initiate a fishing and shellfish harvesting closure for the coastal area near Refugio Beach. A closure was therefore initiated by CDFW on May 19, 2015, extending from approximately 1 mile upcoast of Refugio Beach to 1 mile downcoast of the beach, from the shoreline to one quarter mile offshore. The closure area was expanded on May 21, 2015, based on aerial observations and oil trajectory models, to include the coastal areas from Canada de Alegria downcoast to Coal Oil Point, and extending from the shoreline to 6 miles offshore (approximately 138 square miles). Between May 24 and June 18, 2015, OEHHA collected and analyzed several species of commonly caught fish and invertebrates, as well as kelp, to determine levels of contamination and safety for human consumption. After the last sampling period, benzo(a)pyrene PAH carcinogenic equivalents had fallen below the limit of concern for human health, and the closure was lifted on June 29, 2015 (OEHHA 2015). For the purposes of evaluating exposure of fish and invertebrates in the spill-affected area, the sum of 45 PAHs in the sampled tissues were evaluated. Elevated PAH concentrations were detected in drift kelp consumers (urchins and sea cucumbers) that were collected from fishing blocks close to the release point. PAH concentrations in tissue samples from animals collected from less than 10 m depth were higher than tissue samples collected from animals greater than 10 meters depth, supporting the conclusion that exposure was highest in the 0-10 m subtidal habitats near the spill origin. The analysis is provided in Appendix G-7.

### Surfgrass and Algae Surveys

Approximately two months after the spill, discolored and dead surfgrass was observed at Refugio State Beach and El Capitan State Beach—both areas of heavy oiling (Figure 8). Based on these



**Figure 24.** Surfgrass injury studies (left to right). The first two pictures show an example of how brown and necrotic surfgrass looked in the field. Middle picture shows an injured experimental plot. Far right shows a reference plot with bright green, healthy plants. Photo Credit: Natural Resource Damage Assessment Trustees.

101

observations, additional intertidal and subtidal surveys were initiated to quantify the extent of discolored surfgrass and algae. Condition and abundance of surfgrass and algae were assessed at eight sampling sites over several dates from July 2015 to June 2016. Oil-related injuries, including bleaching, necrosis, loss of biomass, cellular death and loss of surfgrass leaf tensile strength, occurred throughout the range of surfgrass habitats within Zone B (Figure 24). During the August 2015 survey, the proportion of dying surfgrass ranged from 37.4% at Arroyo Hondo to 82% at Corral Canyon, compared to 2.2% at the reference site (Mussel Shoals located in Zone D where shoreline oiling was absent, sporadic or light-to-moderate). For algae, the cover of dead and dying plants ranged from 86.1% at Coal Oil Point to 99.2% at Corral Canyon, compared to 6.1% at the reference site. An area-weighted average of the percent area of dead and dying plants was used to quantify injury for subtidal habitats. By the 2016 field season, surfgrass was not fully recovered at the heavily oiled Arroyo Hondo site. Survey methods and results are detailed in Appendix G-5.

## 5.2.2  Subtidal and Fish Habitat Injury

### *Area of Impact*

Due to the nature of the Refugio oil release into the surf zone, the nearshore coastal processes and the physical properties of the oil, the Trustees concluded that exposure of aquatic organisms was likely to be highest in nearshore, relatively shallow subtidal habitats[11]. Therefore, the Trustees focused the subtidal injury assessment within Zone B where oiling was heaviest, for depths of up to 10 meters (m) (Figure 21). The Trustees selected 10 m depth as the outer boundary for subtidal resources within Zone B based upon the following considerations:

1. Submerged oil droplets and masses were observed within Zone B to 10 m depth;
2. Ten meters is the depth at which there was fairly high confidence that oil would mix throughout the water column to the bottom (Appendix A);
3. There was direct evidence that animals and plants in the near shore environment within Zone B were injured and/or exposed to oil (Appendix G), and
4. Aquatic vegetation such as kelp or seagrass provide critical foundational subtidal habitat, and rarely extends beyond 10 m deep.

### *Baseline Condition*

The Trustees assessed injury by comparing oiled areas to baseline conditions, per the OPA regulations. The Trustees estimated those baseline conditions by using unoiled reference sites in 2015 (for grunion studies, surfgrass studies and surfperch exposure studies) and by repeating one-year, post-spill anniversary studies (grunion studies, surfperch studies and mortality observation studies), when the Trustees assumed continued exposure to Line 901 oil would have been eliminated or greatly reduced.

---

[11] Plains disagrees with the extent of subtidal injury assessed by the Trustees and asserts subtidal injury is materially lower than the Trustee's estimate.

102

*Injury Determination and Quantification*

For injury determination, the Trustees considered the presence and species composition of dead, oiled fish and invertebrates in mortality observation studies, the observed reduction in hatching success in grunion, the poor health of oiled macroalgae and seagrass, and a large number of recent toxicity studies on the effects of crude oil to early life stages of fish and macroinvertebrates. These provided, at a minimum, qualitative evidence for the Trustees to conclude that there was injury to natural resources in the shallow subtidal (0-10 m depth) area in Zone B.

For injury quantification, the Trustees used injury observed from surfgrass and algae studies as a proxy for general injuries to subtidal benthic[12] and water column habitats, and their associated biota. The Trustees determined that surfgrass/algal habitat (surfgrass habitat) was a reasonable proxy for other similar vegetated subtidal benthic habitats (e.g., kelp and eelgrass) because: (1) surfgrass is a foundational habitat for a highly diverse group of fish and invertebrates species that occupy the 0-10 m depth interval; (2) surfgrass habitat includes all of the major taxa found in other subtidal habitats (vascular plants, red and brown algae); and (3) surfgrass habitat is more accessible for the comprehensive surveys needed to quantify injury.

Surfgrass and algae surveys were conducted throughout Zone B (Figure 8) to identify the percent cover of discolored, dead, and dying surfgrass and algae (Figure 24). Injury was defined as the area-weighted average across all study sites, representing a maximum injury of 54%. This was used as the basis for the injury assessment for subtidal habitat (Figure 25), with weighting factors for relative habitat types and depth strata (i.e., 0-3 m versus 3-10 m depth interval):

*0-3 m Depth interval*
For the 0-3 m depths, the Trustees applied the weighted average 54% injury to all eelgrass, rocky reef, kelp, and surfgrass habitats within Zone B. Because sand bottom habitats are less biologically productive, the Trustees applied an ecological injury of 5.4%, representing one tenth of the injury of vegetated and rocky reef habitat (Appendix H).

*3-10m Depth interval*
For the 3-10 m depth interval, the Trustees assessed injury separately for benthic habitats, for surface water (top 2 m of water column), and for midwater (2-10 m depth interval) (Figure 26).

---

[12] Benthic means relating to the bottom of the ocean and to the organisms that live there.

103



**Figure 25.** The surfgrass and algal injury quantification was driven by studies where the area of discolored, dead and dying plants were assessed. Injury was defined as the percent cover of discolored, dead and dying surfgrass and algae at a study site. The overall area-weighted average percent injury was 54%. Green dots are sampling sites.

For the benthic habitat the Trustees calculated losses based on areal dispersion of submerged oil across the benthic footprint of Zone B to a depth of 10 m. Sunken oil would not necessarily dilute out into the water column, but would persist as small sediment-laden oil particles and droplets and spread across the sea bottom due to wave action and currents. Sunken oil also has a high likelihood of being trapped in or slowed by the bottom vegetation. The Trustees considered that injury to the benthic community would decrease linearly with distance from the shore. This would range from an 54% injury in the nearshore (0-3 m depth) to 0% injury at the 10 m depth, after calculating average offshore distances to the 10 m depth stratum. This resulted in the application of a 13% injury across the 3-10 depth range for benthic rocky reef, surfgrass, kelp, and eelgrass habitats. As with the 0-3 m zone, for sand bottom habitats in this depth stratum the Trustees are claiming one tenth of that loss due to lower productivity/services associated with sand bottom habitats. This resulted in a 1.3% loss for sand bottom habitats (Table 6). More detailed discussion of the injury quantification is presented in Appendix H.

For the top 2 m of the water column in the 3-10 m depth interval (Figure 26, light blue area), exposure would have primarily come from the short term exposure of surface oil in the approximately 2 weeks post spill. The Trustees determined there were short-term losses to the biota in the water column, ranging from 54% loss (determined by using surfgrass as a proxy) to 80% loss (based on literature). Studies in recent years have demonstrated high mortality (approximately 80%) to fish early life stages and planktonic organisms at low levels of PAH exposure, especially when exposed to UV light (Morris et al. 2015). The Trustees also assessed injuries to fish and planktonic organisms in the mid-water column of the 3-10 m depth stratum, at a 5% loss (Figure 26, dark blue area). The midwater injuries are based on the concept of oil

104

mixing from the surface and from the bottom, but with a recognition that dilution, weathering and dispersion will greatly reduce exposure, and thus, the level of injury (Table 6).



**Figure 26.** Summary of subtidal injury quantification. The average distance offshore from the 0 to 3 m depth range is 76 m. The average distance from 3 m to 10 m depth range is 232 m. The benthic habitat injury of 13% in the 3-10 m depth range was calculated by multiplying the injury in the 0-3 m depth range (54%) by the proportion of the offshore linear distance 0-3m depth compared to the total offshore linear distance of 0-10 m depth.

### *Habitat Equivalency Analysis Results*

The Trustees used HEA (Appendix C) to scale compensatory restoration for the subtidal benthic injury. The HEA was based on the percent injury for the various components of the subtidal environment, which in turn were based on the documented injury to surfgrass and algae. For the recovery component, the HEA calculations take into account the rapid initial loss that occurred in the first 6 months of the spill. This was evidenced by a high percentage of discolored, dying surfgrass and algae in August of 2015 and January 2016. Recovery was assumed to be rapid, -88% recovered after a year (consistent with 2016 study observations), 94% after two years, and 100% after 5 years. Applying the injury levels discussed above, this analysis resulted in a loss of 178.5 acre-years in the 0-3 m depth interval and 117.4 acre-years in the 3-10 m depth interval (Appendix H).

The Trustees considered how to address injuries to the upper- and mid-water zones of the 3-10 m depth interval and ultimately chose not scale restoration for these areas because the restoration projects selected to benefit benthic resources will likely provide significant benefits to water column resources as well. In addition, the injury to fish early life stages, while significant, would also have been ephemeral and the Trustees were unable to readily identify restoration projects that were both targeted to water column species and highly scalable to the estimated injury. Given these facts, the Trustees decided to defer until later a determination on how best to compensate for any remaining injury to water column species. The Trustees anticipate having subtidal restoration funds available after the completion of the projects discussed below. If selected, these projects should yield additional information on their beneficial impacts. The Trustees will then decide whether remaining funds should be spent to augment an existing subtidal project or implement a new water column-focused project.

105

**Table 6.** Subtidal injury (losses) and Habitat Equivalency Analysis results.

| Depth Zone | Habitat type | Max injury (% Loss) | Recovery time (years) | Habitat area (acres) | Acre – years for compensation (dSAY[1]) |
|---|---|---|---|---|---|
| Nearshore Benthic Habitats (0-3 m depth zone) | Rocky reef, kelp canopy, seagrass, and sand bottom | 54% | 5 | 514 | 178.5 |
| Offshore Benthic Habitats (3-10 m depth zone) | Rocky reef, kelp canopy, seagrass, and sand bottom | 13% | 5 | 1657 | 117.4 |

[1]dSAY = discounted service acre-year. See Appendix C.

### 5.2.3  Selected Restoration Projects

The Trustees identified four categories of restoration activities (abalone restoration, eelgrass restoration, kelp restoration, and seawall removal) to compensate for losses to subtidal habitats caused by the release of Line 901 oil. Subtidal projects were selected and prioritized by their ability to enhance and restore subtidal habitats in the region affected by the spill. Projects within Zone B were heavily prioritized over other projects that were located in the region affected by the spill but outside Zone B. These projects are discussed below in order of priority (Table 7).

**Table 7.** Subtidal selected restoration projects.

| ID# | SELECTED PROJECTS | BENEFITS |
|---|---|---|
| SubT-1 | Abalone Restoration | Rocky reef habitats and associated fish and invertebrates |
| SubT-2 | Coastal Eelgrass Restoration | Eelgrass habitats and associated fish and invertebrates |
| SubT-3 | Sand-dwelling Kelp Project | Kelp habitats, and associated fish and invertebrates |
| SubT-4 | Ellwood Seawall Removal | Rocky reef habitats |

***Abalone Restoration in Naples Reef and Campus Point MPAs (SubT-1)***
The goal of this project is to enhance the function of rocky reef habitats within the two Marine Protected Areas (Campus Point and Naples Reef) off the Gaviota Coast that were directly affected by the spill. This project would supplement abalone populations through outplanting of juvenile abalone and translocating adult abalone from a nearby system.

To maximize success, the Trustees propose applying multiple approaches when possible (e.g., adult translocation and juvenile captive propagation and outplanting) over a multi-year period, with repeated outplanting and translocation events. The Trustees propose a 10-acre restoration project (5 acres within each of the Marine Reserves) that will be implemented over a 5-year period and subsequently monitored for an additional 5 years.

*Affected Environment*

106

The restoration sites to which abalone will be translocated or outplanted comprise over 5 acres at each of the Naples Reef and Campus Point Marine Protected Areas. The donor population for adult abalone translocation is from San Miguel Island or another similarly robust southern California population. The Trustees will work with the appropriate local, state, and federal agencies, as well as abalone experts and NGOs to identify appropriate commercial or research abalone farm(s) for juvenile abalone outplants.

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* - The long term biological impacts of this project to the marine protected areas are highly beneficial to the public, as abalone become re-established. Red abalone are an iconic resident of California kelp forests. Ecologically, abalone are grazers that keep rocky habitat available for diverse algal and benthic invertebrate occupants of rocky reefs. Abalone are competitors with sea urchins, but are less destructive grazers than sea urchins, thus abalone promote a healthy rocky reef system. There is the potential for minor adverse biological impacts to the abalone population of San Miguel Island or other selected donor population through the removal of abalone adults. In addition, there is the potential for injury to the translocated abalone. However, any removal will be done under permit, using best practices, and carefully planned to avoid any injury to translocated abalone or adverse reduction to the donor population or associated habitats. In addition, the project proponents are fully aware of the potential for disease in abalone populations and will use local abalone experts to screen and test outplants and transplants to avoid any chance of introducing disease into a wild population.

2. *Physical Impacts* – The Trustees do not anticipate major impacts to the physical environment, such as water, air, sediments, etc. Any negative physical impacts (e.g., harm to reef structure) would be unlikely and, at worst, would likely be mitigated by the use of best practices. Ultimately, any adverse physical impacts are expected to be negligible.

3. *Human Impacts* - The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. There is likely a benefit to human recreational use as the presence of abalone and a more robust rocky reef/kelp habitat create a more diverse, healthy ecosystem, which will benefit divers and other recreational users of the MPAs.

*Probability of Success*
This project has high likelihood of success if implemented at this scale. In addition, abalone outplanting and translocation presents few environmental risks that are easily mitigated through established best management practices (BMPs). The CDFW has already developed many of

107

these BMPs as part of the red abalone outplanting work they have initiated in Los Angeles and San Diego Counties. Furthermore, abalone outplanting and translocation require no on site construction or physical modification of the sea floor, so permitting requirements will be limited to scientific collection and stocking permits, which will allow for a streamlined implementation process.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites. The success of this project will be measured through up to 10 years of post-transplant/outplant monitoring of abalone population density and size structure, as well as an evaluation of rocky reef ecosystem for success.

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:
- Number and size of abalone deployed to site per outplanting event as compared to pre-project levels pre-outplanting;
- Density of abalone present on site over time as compared to pre-project levels pre-outplanting; and
- Rocky reef ecosystem response will be measured through kelp density and stipe counts and fish, invertebrate and algae and habitat characterization surveys.

*Evaluation*
The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for injured subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

### Refugio Bay Eelgrass Restoration (SubT-2)
The goal of this project is to enhance habitat services within Zone B through the restoration of eelgrass. There are limited opportunities for coastal eelgrass restoration within Zone B because of depth, substrate and wave energy limitations. However, the Trustees have identified a subtidal site where the substrate, depth and wave energy are likely to support eelgrass, but which is far enough from existing beds that natural recruitment is unlikely (Altstatt, personal communication).

*Affected Environment*
The project includes creating additional eelgrass habitat in areas in or adjacent to Refugio Bay, including the southeastern portion of the Gaviota Coast, an area that was directly and heavily impacted by Line 901 oil. This would be accomplished through harvesting of plants from a donor site and transplanting them to the project site.

108

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* – This project would provide long-term beneficial biological impacts to the environment. Eelgrass habitat provides unique and critical ecosystem services to the shallow subtidal component of the California coastal shelf. Eelgrass beds are an important source of primary productivity and create 3-dimensional biogenic habitat that is used by a diverse assemblage of fish and invertebrates as nursery and foraging habitat. Eelgrass habitat is also identified by NOAA as a Habitat of Particular Concern under the Magnuson-Stevens Fishery Conservation and Management Act. There is a slight possibility of adverse biological impacts if the project implementer takes too much eelgrass from donor sites. However, given the Trustees' experience and expertise in eelgrass restoration, this risk is extremely small. The Trustees, in addition to having implemented similar projects successfully in the past, would draw on the expertise of local experts in implementing this project.

2. *Physical Impacts* – The Trustees anticipate only minor impacts to the physical environment. The project will likely create beneficial impacts because eelgrass provides a three-dimensional habitat for fish and invertebrate species and stabilizes sediments, reducing scour and enhancing light penetration in the water column. Any adverse impacts would be associated with implementation (i.e., project implementers moving in and around the donor and transplant sites) and are expected to be negligible.

3. *Human Impacts* – The Trustees do not anticipate any impacts from this project on socio-economics, aesthetics, health and safety, historical properties, recreational use, etc.

*Probability of Success*
Eelgrass restoration in southern California has proven successful in many coastal locations. However, most of these projects were conducted with estuarine species. Because this project focuses on the coastal species, the Trustees are proposing to implement the restoration based on the successful methods used by Altstatt (2014). Based on that work, it is expected that full maturation of the restored eelgrass bed may take 7-10 years.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites. The project includes up to 10 years of monitoring for restoration success. The specific details of the monitoring actions will be  outlined in the project monitoring plan

109

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Acres restored;
- Density of eelgrass shoots, cover, and blade length before and after; and
- Ecosystem response measured through fish and invertebrate and habitat characterization surveys.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for injured subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

### Sand-Dwelling Kelp Restoration (SubT-3)

The goal of this project is to support an existing effort to re-establish sand-dwelling kelp canopy to the Goleta Beach area. There are no other opportunities for direct kelp forest restoration within Zone B. The existing project is currently underway under separate funding, initiated by a small group of dedicated citizen scientists who are attempting to restore the kelp forest that once existed in Goleta Bay. While there is no rocky reef habitat in the bay that typically supports kelp forests, it has been speculated that the kelp had once established itself on tube-forming worm colonies that frequent open sand habitats (e.g., colonies of the tube worms belonging to the genus *Diopatra*). The project aims to restore these "sand-dwelling" kelp plants by inserting small granite columns into the sediment, exposing the top 10-20 cm of the column to kelp recruitment. The ultimate goal of this project is that kelp holdfasts will spread beyond the area occupied by the granite column and form a kelp forest of sufficient density to support kelp canopy.

The scope of the NRDA project is to extend the existing project by expanding the permits associated with the current one-acre project and to implement a systematic monitoring program. At this time, the Trustees are not proposing a larger scale buildout of this project because the results are still preliminary, and the longer-term viability of the approach is unknown. However, if the project continues to show success, the Trustees will consider expansion, subject to permits and other considerations.

*Affected Environment*

The location of the project currently encompasses sand bottom offshore of Goleta Beach, just outside of Zone B, the heaviest oiled area. The project would re-introduce sand-dwelling kelp to the area. There are limited opportunities for other kinds of kelp restoration due to lack of rocky reef habitat.

110

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* - The Trustees' proposal regarding this project does not include any additional active restoration work. Rather, it covers only an extension in the duration of the existing project and associated monitoring activities. Extending the current project will have no negative effects to the environment and may have beneficial effects, as the project currently provides some ecosystem benefits to fish and invertebrates. Kelp also provides food to subtidal, intertidal and beach communities (e.g., a large component of beach wrack is produced by giant kelp). If the Trustees extend the time period of the project, the beneficial impacts will increase accordingly. As the monitoring activities would be the Trustees' only physical interaction with the project, any adverse impacts are expected to be negligible.

2. *Physical Impacts* – As with biological impacts, the Trustees expect any physical impacts from this project to be negligible.

3. *Human Impacts* - The Trustees do not anticipate any impacts from this project on socio-economics, aesthetics, health and safety, historical properties, recreational use, etc.

*Probability of Success*

The project was implemented as a pilot project, and to date has shown some success, in that kelp plants have recruited to a number of the granite columns. Longer-term monitoring of the existing project will help the trustees evaluate success, especially from consequences of large storm events.

*Performance Criteria and Monitoring*

The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. This time series of metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites. This proposal calls for 5 years or more of monitoring for success of the pilot project. The specific details of the monitoring actions will be outlined in the project monitoring plan.

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Density of kelp plants as compared to pre-project conditions;
- Kelp stipe counts and canopy cover compared to pre-project conditions; and
- Ecosystem response will be measured through fish and invertebrate and habitat characterization surveys.

111

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

### Ellwood Seawall Removal (SubT-4)

This project will benefit shoreline (sandy beach) resources and is discussed in Section 5.1.6 (Shoreline) above. However, the Trustees agree that there are likely benefits to subtidal resources offshore of the existing structure. The subtidal component of this project consists of pre- and post-removal monitoring to confirm and document benefits.

*Affected Environment*

The project site is Ellwood Beach in Goleta, CA. A wooden seawall currently constrains natural functioning of the ecosystem as well as lateral access along the shoreline at high tide.

*Environmental Consequences (Beneficial and Adverse) (to the subtidal environment)*

This project will only be undertaken if it is ultimately selected to compensate for sandy beach injuries, as discussed in Section 5.1.6 above. Accordingly, its status as a preferred alternative to compensate for subtidal injuries will have no impact on the potential environmental impacts described above. The only additional activity associated with the subtidal "component" is non-invasive monitoring, which the Trustees anticipate will have negligible, if any, environmental impacts.

1. *Biological Impacts* – The project is expected to benefit the environment by reducing scour and turbidity to the nearshore environments (due to the reduction in reflective wave energy after removal of the seawall). Scour inhibits settlement and success of algal and seagrass species, as well as benthic invertebrates. Turbidity inhibits algal and seagrass growth. Reduction in scour is expected to increase species diversity and habitat function in the affected offshore area. Short-term adverse effects from construction are expected to be negligible with respect to the existing offshore environment.

2. *Physical Impacts* – The benefits to subtidal habitats include an expected reduction in turbidity and scour in the offshore habitats resulting from the reduction in reflective wave energy that will occur after the seawall has been removed. Short term adverse effects from construction activities (potentially higher turbidity, sediment transport) are expected to be negligible.

3. *Human Impacts* - The Trustees do not anticipate any impacts from this project on socio-economics, aesthetics, health and safety, historical properties, recreational use, etc. in the offshore environment.

112

*Probability of Success*
The Trustees consider this project to have a good likelihood of success in providing benefits to the nearshore subtidal habitats because wave reflectivity and scour will be significantly reduced compared to current conditions.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites.  The project envisions up to 10 monitoring events, pre- and post-removal over a five-year period. The specific details of the monitoring actions will be  outlined in the project monitoring plan

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:
- Presence of sessile macrofauna and macroalgae sensitive to scour relative to pre-project conditions; and
- Decrease in turbidity relative to pre-project conditions.

*Evaluation*
The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for injured subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

## 5.2.4  Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 8) and determined that many are valid projects that would provide benefits to subtidal and fish habitat. However, these projects were not selected for various reasons described below. These projects may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

113

**Table 8.** Second tier subtidal restoration projects that may be implemented if funds allow.

| ID# | OTHER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| SubT-5 | Net and Trap Removal (marine debris) | Fish, some benefit to benthic invertebrates |
| SubT-6 | Artificial Reef | Fish and subtidal habitats |
| SubT-7 | *Undaria* Removal at Anacapa Island | Subtidal habitat |
| SubT-8 | Marine Protected Area Management and Stewardship Program | Subtidal habitat |
| SubT-9 | Grunion Habitat Restoration and Education | Beach, subtidal and fish |
| SubT-10 | Slough and Salt Marsh Restoration | Early lifestage fish |
| SubT-11 | Kelp Restoration in Santa Barbara Channel Area | Subtidal habitat |
| SubT-12 | Sargassum Removal | Early lifestage fish |
| SubT-13 | Lobster Restoration | Lobster |
| SubT-14 | Boater Outreach to Reduce the Spread of Invasive Algae | Subtidal habitat |
| SubT-15 | Gaviota Creek Fish Barrier Removal | Fish |

### Net and Trap Removal (marine debris) (SubT-5)

This project was considered because marine debris removal, particularly derelict fishing gear, can have some benefits to marine habitats and can also reduce mortality of marine fish, birds, invertebrates and mammals. Marine debris removal is identified as a lower priority for a number of reasons. The degree of benefit that fishing gear removal has to each of these resources depends greatly on the location and habitat from which the gear is removed, and the nature of the items removed. While there are some opportunities to remove fishing gear from the greater southern California Bight, opportunities to remove gear from Zone B have proven to be limited. Thus, direct benefits of gear removal to the benthic marine habitats that were injured by the spill are also limited. Gear removal would be more likely to address injuries to water column species, so the Trustees may reconsider this project if they determine later that it is appropriate to conduct water column species-specific restoration (as opposed to using remaining funds to expand habitat projects with water column species benefits).

### Artificial Reef (SubT-6)

The Trustees considered proposed artificial reef creation via reef balls or imported rock near Bird Island. Artificial reef creates new hard structure, promoting rocky reef habitat enhancement, potentially including kelp establishment. However, for the purposes of NRDA, the Trustees determined that significant barriers, such as permitting and maintenance issues, exist. These barriers will lessen the likelihood of timely implementation of the project. Therefore, the Trustees dropped this project from further consideration at this time.

### Undaria Removal at Anacapa Island (SubT-7)

*Undaria pinnatifida* is an Asian seaweed of the intertidal and shallow subtidal zone, which was first discovered invading Anacapa Island in 2016. Invasive seaweeds crowd out native seaweeds

114

and potentially introduce co-occurring invertebrates, with potential for cascading effects to the ecosystem. The proposed project would implement an *Undaria* removal program in subtidal areas around the Channel Islands. Although the Trustees consider this a beneficial project, in general, there was concern that the project had high costs that may not achieve lasting benefits to subtidal habitats. Further, the habitat and ecosystem benefits occur outside of the subtidal area affected by the spill.

### Marine Protected Area Management and Stewardship Program (SubT-8)

This project focuses on ecological and human use monitoring to support adaptive management and agency enforcement of MPA regulations. This project may include cleanup of marine debris identified within MPAs, removal of invasive kelps, and education and outreach to promote awareness, compliance, and stewardship of MPAs. The project is heavily focused on monitoring, and the tangible subtidal benefits are undefined, making it a less attractive project for implementation than those listed as "preferred" in Table 7. The Trustees will consider whether this project can be combined with the abalone restoration project that is also focused within MPAs.

### Grunion Habitat Restoration and Education (SubT-9)

This project focuses on developing management practices that restrict grunion capture and other impacts to Grunion until after the first 2-3 days of spawning. Public outreach to raise awareness would be a necessary component of the project. Also, increased public awareness of this species' presence at Refugio and El Capitan State Beaches is directly attributed to the Refugio Beach Oil Spill cleanup, and an interpretive program would help to mitigate expected increased fishing pressure for grunion at these locations. Also, increasing the number of grunion greeters and/or increased CDFW enforcement would help protect grunion. The Trustees consider these measures to be beneficial to grunion. However, there are several other projects targeting shoreline restoration that provide significant benefits to grunion spawning habitat. This project would require a change in the current regulatory framework by the Fish and Game Commission, which is outside the authority of the Trustees. Thus, a specific grunion shoreline project is not preferred at this time.

### West Goleta, Carpinteria and Devereux Slough Restoration Projects (SubT-10)

These are three separate projects considered for wetland, tidal marsh and upland restoration to benefit estuarine and marsh habitats. These habitats benefit early life stage fish and crab species by serving as refugia and feeding habitat. While the habitat injured by the oil spill was marine, shallow subtidal habitats, these projects may provide broad ecosystem benefits and contribute to subtidal health by supporting early life stages of subtidal species and through indirect effects to subtidal habitats such as water quality improvement.

### Kelp Restoration in the Santa Barbara Channel Area (SubT-11)

Restoration of kelp could lend to protection of shoreline habitats from storms, provide habitat for prey of marine mammals and birds, provide additional habitat for fish, provide wrack for sandy beach, and improve recreational diving. However, the project lacked specific descriptions,

115

locations, and timelines to gauge its feasibility. The Trustees believe that the abalone project and the sand kelp project (identified as "selected" projects) meet the goals of restoring kelp habitat. The Trustees will continue to monitor opportunities and feasibility for such projects for the future.

### Sargassum Removal (SubT-12)

*Sargassum* is an invasive, floating kelp that has recently invaded southern California. Invasive seaweeds crowd out native seaweeds and potentially introduce co-occurring invasive invertebrates, with potential for cascading effects to the ecosystem. The Trustees agree that *Sargassum* establishment and dispersal in Santa Barbara Channel is a concern, but there was no project proposed that specified activities, timeframe, locations or scope to gauge feasibility for a *Sargassum* removal project. This project was not selected to be carried forward for implementation at this time because the project does not contain sufficient information for the Trustees to understand the benefits to subtidal resources injured by the spill.

### Lobster Restoration (SubT-13)

This project concept involves multiple methods for conducting lobster restoration including various studies, purchasing Global Positioning System units for permit holders, fishermen surveys, enforcement assistance, and education programs. The benefits of these projects are indirect to subtidal habitats and to lobsters. The ecosystem-level benefits from the projects listed as "selected" in Table 7 are anticipated to also provide benefits to lobsters.

### Boater Outreach to Reduce the Spread of Invasive Algae (SubT-14)

This project involves educating boaters about reducing the spread of invasive algae by sending educational materials to boaters along with their registration information, and providing resources for removing algae from boats at launch locations. The benefits of this project are anticipated to be less than would be achieved through direct restoration of habitat, and the effectiveness of education in reducing the spread of invasive algae is uncertain.

### Gaviota Creek fish barrier removal (SubT-15)

This project involves removing numerous fish barriers along the Gaviota Creek watershed. Some of these barriers restrict the ability of fish to migrate upstream while others interfere with the creek's natural functions. This project will benefit Southern California steelhead and other aquatic organisms that live within the Gaviota Creek Watershed. The removal of steelhead barriers is focused on one species that was not documented to be injured by the spill, therefore it did not rise to the level of a "selected" project. Furthermore the commencement of watershed-wide restoration is contingent on the relocation of the access road to Gaviota State Beach and Hollister Ranch, and removal of the current road that comprises a substantial impediment in the watershed. The scale of this project exceeds the resources that could be provided through NRDA settlement funds; however, the Trustees have included this as a second tier project.

116

## 5.3   Birds

Birds are especially vulnerable to oil spills, as the oil compromises the ability of their feathers to keep them warm in the cold ocean water (Moskoff 2000). For a species that forages in the water, even a relatively small amount of oil (e.g., the size of a nickel) may result in death. Like a hole in a wetsuit, the oil destroys the feathers' ability to insulate the bird, thus allowing cold ocean water to spread against the bird's skin. Birds which contact oil typically die of hypothermia. With their rapid metabolism, birds also suffer starvation when they cannot forage for a few days (Oka and Okuyama 2000). They can also ingest toxic amounts of oil while preening, as they attempt to clean themselves. Finally, larger amounts of oil can smother birds, affecting their mobility and ability to survive.

A total of 269 birds were collected live and dead after the oil spill, encompassing at least 28 species. The Trustees structured our assessment of bird injury into three injury categories based on the birds' behavior patterns and location of the affected species. These categories are:
- Brown pelicans;
- Western snowy plovers; and
- All other bird species.



**Figure 27.** Location of live and dead birds recovered during wildlife operations. The back lines show the NRDA Exposure Zone boundaries for reference; however these boundaries were not used in the quantification of injury to birds.

### 5.3.1   Overview of Data Collection and Studies

This section describes the data that were collected or analyzed by the Trustees in order to assess injury to birds resulting from the spill. These data were generated by several efforts, including studies that were conducted by the spill cleanup, data collected by the NRDA team, and studies that were not specifically developed for the spill but that provide relevant information for

117

understanding and determining injuries to birds resulting from the spill. These studies are listed below and described in more detail in Appendix I.

*Wildlife Reconnaissance Aerial Surveys*

On May 21, 2015, aerial surveys for pelagic birds were conducted roughly between Point Conception and the City of Goleta. The objective of these surveys was to understand the general location and quantity of seabirds in the vicinity of the spill-affected area in order to inform spill response activities. These surveys, conducted by the Unified Command, documented at least 13 unique pelagic bird species in groups ranging in size from a single individual to 120 individuals.

*Live and Dead Bird Intake Data*

Documentation of live and dead birds was collected as a normal part of the spill response. These data describe the collection of each bird, with such information as date, location, species, condition of bird, degree of oiling, etc. Locations of live and dead birds collected are shown in Figure 27, and the species collected are identified in Table 9. During spill response operations all live distressed birds were taken to rehabilitation centers for further care. All dead birds encountered within the spill area were collected. A total of 66 live birds and 203 dead bids comprised of over 28 species were collected between May 20, 2015 and June 24, 2015 (OWCN 2015).

**Table 9.** All birds collected live and dead by species (or closest known taxon).

| Species | Collected Live | Collected Dead | Total |
|---|---|---|---|
| Black storm-petrel | 0 | 1 | 1 |
| Barn owl | 0 | 1 | 1 |
| Black skimmer | 0 | 1 | 1 |
| Brandt's cormorant | 2 | 11 | 13 |
| Masked/Nazca booby | 0 | 1 | 1 |
| Brown pelican | 47 | 26 | 73 |
| California gull | 1 | 5 | 6 |
| Cassin's auklet | 0 | 1 | 1 |
| Clark's grebe | 0 | 2 | 2 |
| Common loon | 0 | 3 | 3 |
| Common murre | 5 | 33 | 38 |
| Cormorant sp. | 0 | 4 | 4 |
| Double-crested cormorant | 0 | 14 | 14 |
| Domestic duck sp. | 0 | 2 | 2 |
| Eared grebe | 0 | 1 | 1 |
| Elegant tern | 0 | 1 | 1 |
| Forster's tern | 0 | 1 | 1 |
| Grebe sp. | 0 | 3 | 3 |
| Heermann's gull | 0 | 3 | 3 |
| Loon sp. | 0 | 5 | 5 |
| Mew gull | 0 | 1 | 1 |
| Northern fulmar | 0 | 5 | 5 |

118

| | | | |
|---|---|---|---|
| Pacific loon | 6 | 17 | 23 |
| Pelagic cormorant | 0 | 2 | 2 |
| Pigeon guillemot | 0 | 1 | 1 |
| Rhinoceros auklet | 0 | 2 | 2 |
| Rock pigeon (feral) | 0 | 1 | 1 |
| Red-throated loon | 1 | 12 | 13 |
| California scrub-jay | 0 | 1 | 1 |
| Shorebird sp. | 0 | 1 | 1 |
| Sooty shearwater | 0 | 16 | 16 |
| Surf scoter | 1 | 2 | 3 |
| Western grebe | 1 | 8 | 9 |
| Western gull | 2 | 9 | 11 |
| Unknown | 0 | 6 | 6 |
| **TOTAL** | **66** | **203** | **269** |

### *Search Effort Data Compilation*

Understanding how well beaches within the spill area were searched is important to estimating how many carcasses may have been missed. The Trustees compiled and analyzed records from SCAT teams, wildlife reconnaissance teams, cleanup crews, and NRDA operations to understand the geographic extent and frequency of beach searches that would have had the potential to identify live and dead birds during the cleanup period.

119



**Figure 28.** Western snowy plover at Coal Oil Point during cleanup operations. Photo Credit: Coal Oil Point Reserve, UCSB.

### Western Snowy Plover Studies

Western snowy plovers utilize several sandy beaches within Santa Barbara and Ventura Counties for nesting, including Coal Oil Point Reserve, San Buenaventura State Beach, McGrath State Beach, Mandalay State Beach, Ormond Beach, Hollywood Beach, and on Naval Base Ventura County at Point Mugu. Routine monitoring of plovers nest numbers and nest success were conducted at each of these beaches during the 2015 nesting season (Coal Oil Point Reserve 2015; Hartley 2015; Barringer 2015; Frangis and Cox 2015). All nesting beaches are located in Ventura County, with the exception of Coal Oil Point Reserve in Santa Barbara County, which was subject to elevated oil exposure and extensive cleanup operations (Figure 28).

### Anacapa Island Brown Pelican Surveys

Anacapa Island is home to the largest breeding colony of California brown pelicans in the United States. The only other significant U.S. breeding colony is located on Santa Barbara Island, which is much farther from the mainland and was unlikely to be heavily impacted by the spill. A much larger number of pelicans breed in Baja California, Mexico. After breeding, many of these birds migrate north and make up the majority of pelicans in the state in summer and fall. During the oil spill, many of the Baja pelicans were already migrating north, due to a failed breeding season in Mexico, and were passing through the spill-affected area. A reconnaissance level, boat-based survey of the nesting colony on Anacapa was conducted by Channel Islands National Park staff on June 5, 2015 during the initial cleanup effort, and no oiled pelicans were observed (Larramendy et al. 2018); however, the survey did not include direct, on-island access. Ground

120

surveys were conducted later on September 20 and 21, 2015 (following the end of the nesting season).

Hundreds of nests were inspected for oiling. Evidence of oiling was limited to one juvenile brown pelican carcass on Middle Anacapa Island, in which a small amount of weathered oil was found on several wing tips, and a few specks on the downy feathers around its shoulder (Larramendy et al. 2018). The survey team estimated the bird was about 6 weeks of age at the time of death, which is essentially full grown.

### Brown Pelican Roost Surveys

Due to their large size, pelicans can survive for many days after oiling. In order to assess the extent of oiling of brown pelicans, surveys of known pelican roost sites on the mainland from Morro Bay to Los Angeles were performed in the days immediately after the spill (Jaques et al. 2015). Surveys were conducted by ground and by boat to evaluate the proportion of pelicans at each roost site that showed visible oiling. An aerial survey of pelican roosts were conducted on May 27, 2015 (Jaques et al. 2015). Aerial surveys are ideal for documenting the total number of individuals at each roost by taking photographs and counting brown pelicans (which are easily distinguishable from other birds due to their body size) at each roost. Because no single survey method is able to detect both the proportion of oiled individuals at any given roost and the total number of individuals at the roost, the Trustees analyzed these datasets together to estimate the total number of oiled pelicans at each roost site.

### Brown Pelican Rehabilitation Survival Studies

The Oiled Wildlife Care Network (OWCN) assisted with wildlife operations during the spill, including rehabilitation of oiled birds. In order to understand the survival rate of rehabilitated oiled wildlife, the OWCN and other collaborators tracked rehabilitated pelicans to determine their survival and distribution relative to birds that were not oiled and rehabilitated during the spill (Fiorello et al. 2017). Several individuals traveled >5000 km, migrating to northern California or central Oregon in late summer and early fall. In the spring, most birds traveled south, some as far as Baja California. It appeared that both pelicans from Anacapa and Baja were impacted because they flew to those locations after being released. Mortality was documented among both rehabilitated and control birds.

121

### *Sandpiper Pier Cormorant Colony Surveys*

Brandt's cormorants in the spill-affected area nest in a single colony on four nesting platforms that were constructed offshore of Ellwood Beach in Santa Barbara County. Surveys were conducted from the shore to assess the number and status of nests throughout the 2015 breeding season (Figure 29). Based on these observation, the Trustees concluded that nests were not abandoned and chicks successfully hatched during the spill period at a normal rate. Adverse effects from exposure to oil were not visibly apparent during these surveys. However, health effects from ingestion of oil may not have culminated during the survey period, and cannot be easily assessed based on a visual survey.



**Figure 29.** Cormorant nests on platform 1 during a May 22, 2015 survey. Red circles indicate nests that were monitored during the May and June surveys. Photo Credit: Natural Resource Damage Assessment Trustees.

### *Baseline Carcass Deposition Surveys*

Information about the baseline rate of bird deposition on beaches throughout the spill-affected area is available from information collected through the Beach Coastal Ocean Mammal and Bird Education & Research Surveys (BeachCOMBERS) program. The program utilizes highly trained citizen scientists to conduct monthly beach surveys using a dedicated protocol for documenting the number and status of beached birds and mammals within each survey segment. Data collected includes species identification, decomposition state, observations of carcass scavenging, observations of carcass oiling, and other factors. All carcasses encountered during a survey are marked to identify whether the carcass has been observed on previous surveys (a new mark is made each month). The goal of the BeachCOMBERS program is to establish long-term data on baseline bird and mammal stranding rates, so that when unusual mortality events occur (e.g., oil spills, disease events, etc.), resource managers can understand and explore the magnitude and cause of the bird and/or mammal mortality. The spill occurred within the South Coast Chapter of BeachCOMBERS which began collecting monthly data in January 2013.

122

### 5.3.2  Brown Pelican injury analysis

*Background*

The California brown pelican is a subspecies of brown pelican that ranges throughout the west coast of North America. It nests in Mexico and on the Channel Islands. The brown pelican was delisted as a protected species by the State in June 2009 and by the federal government in December 2009. During the spill, brown pelicans were nesting on the Channel Islands, and many were migrating north through the spill area following breeding failure in Mexico. Brown pelicans typically forage in relatively shallow coastal waters, feeding almost entirely on surface-schooling fish caught by plunge diving. Brown pelicans are rarely found away from salt water and do not normally venture more than 32 kilometers (20 miles) out to sea. During the non-breeding season, brown pelicans roost communally on offshore rocks and structures such as piers and wharfs. Brown pelicans have wettable plumage so they must have roost sites to dry after feeding or swimming (Jaques and Anderson 1987). Roost sites are also important for resting and preening. The essential characteristics of roosts include: nearness to adequate food supplies; presence of physical barriers to protect the bird from predation and disturbance; sufficient surface space for individuals to interact normally; and adequate protection from adverse environmental factors such as wind and surf (Jaques and Anderson 1987).

**Brown Pelican Injury Assessment**

Brown pelicans were the most numerous bird species to be found alive and dead during the spill period. Of the birds collected during the spill, 72% of the live birds (n=47), and 13% of the dead birds (n=26) were brown pelicans. Not all of the live and dead brown pelicans affected by the spill were captured or collected. Brown pelicans are capable of long-distance flights and oiled individuals can survive for several days to weeks before becoming weak and either succumb to their exposure or become lethargic enough to be captured. To estimate the total number of brown pelicans injured by the spill, the Trustees applied the following methodology which is discussed in detail in Appendix I.

1) Determine brown pelican distribution during the spill;
2) Determine brown pelican oiling rate;
3) Calculate brown pelicans injured within the cleanup zone;
4) Calculate brown pelicans injured outside the spill cleanup zone;
5) Adjust for rehabilitated birds; and
6) Calculate total number of brown pelicans injured.

*Summary of Brown Pelican Injury*

Based on the number of brown pelicans recovered live and collected dead during the cleanup, the estimated number injured by the spill but missed by the cleanup, and the rehabilitation success of pelicans that were treated and released, the Trustees estimate that a total of 319 brown pelicans were injured by the spill (Table 10)[13].

---

[13] Plains disagrees with the Trustee estimate of brown pelicans injured by the spill.

123

**Table 10.** Total Brown Pelican injury from the Refugio Beach Oil Spill.

| | |
|---|---|
| Brown pelicans injured within the spill cleanup zone | 72 |
| Brown pelicans missed by the spill cleanup | + 279 |
| Rehabilitation credit | - 32 |
| **TOTAL Brown Pelican Injury** | **319** |

## 5.3.3  Western snowy plover injury analysis

### Background

When the spill occurred, federally threatened western snowy plovers, were in the midst of their breeding season, with many chicks recently hatched and foraging on sandy beaches. Western snowy plovers are among very few species that nest directly on sandy beaches, which makes them vulnerable to conflicts with human activities. In the spill-affected area, there are several locations where plovers nest: Coal Oil Point Reserve (COPR) at University of California Santa Barbara, San Buenaventura State Beach, McGrath State Beach, Mandalay State Beach, Hollywood Beach, Ormond Beach, and Point Mugu (Figure 30). All of the beaches shown in Figure 30 received oiling and/or tar balls in varying degrees during the spill. The maximum amount of oil observed by SCAT teams ranged from heavy at COPR to very light at Ormond Beach. The presence of cleanup crews corresponded to the degree of oiling.

As COPR was exposed to the greatest oiling and most intense cleanup activities of any western snowy plover breeding sites within the spill-affected area, it was also the most intensively studied to determine injury to plovers from oil exposure and cleanup actions. Injury to plovers from cleanup actions, wrack removal, and food web impacts at McGrath Beach, Hollywood Beach, and Ormond Beach are incorporated into the assessment of shoreline habitat injury described in Section 5.1 of the DARP/EA.

### Western Snowy Plover Injury Assessment

Effects of the spill on western snowy plovers were assessed using the following methodology, which is described further in Appendix I.

1) Determine effect of the spill on western snowy plover population size at COPR;
2) Determine effect of the spill on behaviors and breeding success at COPR in 2015;
3) Determine amount of body oiling on western snowy plovers at COPR during the spill;
4) Conduct a literature review to identify risk of toxicity from oil ingestion;
5) Determine effects of the spill on western snowy plover fertility at COPR; and
6) Estimate western snowy plover injury.

124



**Figure 30.** Refugio oil spill release location relative to nesting western snowy plover nesting sites.

*Estimate of Western Snowy Plover Injury*

Western snowy plovers at Coal Oil Point Reserve in Santa Barbara County, and various locations within Ventura County, were exposed to Line 901 oil during the Refugio Beach Oil Spill. The spill occurred during the breeding season, and at the time of the spill many nests had been formed and eggs had been laid. COPR was exposed to heavy oiling and extensive cleanup actions, and the Trustees determined that an assessment of injury to this population was warranted.

All western snowy plover populations in Ventura County were also exposed to some level of tarball oiling and disturbance from cleanup actions. Due to the relatively low injury expected from this oiling and disturbance, these effects are captured as part of the shoreline habitat injury assessment which considers impacts to western snowy plover's prey base and disturbances to their habitat from cleanup actions.

Cleanup workers and land managers at COPR worked closely together to minimize impacts to western snowy plovers from oil spill cleanup actions. Managers documented oiling on western snowy plovers at COPR and disturbances to the birds from the presence of cleanup crews; however, no mortality was recorded and hatching and fledging rates met or exceeded long term averages. Therefore no injury to western snowy plovers at COPR was estimated in 2015, above impacts to food webs (through depressed beach invertebrate populations) and cleanup impacts that are quantified as part of the shoreline injury assessment.

The year following the spill (2016), western snowy plover infertility substantially increased compared to the long term average, with a total of 12 infertile eggs, none of which contained embryos. Background infertility under normal conditions is around 2%, therefore, of the 12

125

infertile eggs, two would be expected to occur without the effects of the spill. The additional 10 infertile eggs cannot be explained by background infertility rates. These infertilities were likely caused by oil exposure to western snowy plover adults during the 2015 breeding season. Adults were observed with oil on their plumage and beaks, which they preened and ingested. Adults were also observed foraging within oiled wrack, and their prey species (e.g., sandy beach invertebrates such as sand crabs) were documented to have increased hydrocarbons in their tissue. In 2017, the infertility rate reduced to a level that is within the range of normal variation. Based on typical hatching and fledging rates at COPR, the Trustees anticipate that of the 10 infertile eggs documented at COPR in 2016, four would have hatched and fledged. Therefore, we assert that at least four western snowy plovers at COPR were injured through reproductive injury from the Refugio Beach Oil Spill. Additional injury to western snowy plovers may have occurred from direct oil exposure, prey reduction, and impacts from cleanup operations. Effects to plovers from injuries to their habitat are captured in the shoreline injury analysis.

### 5.3.4  Other Bird Injury Analysis

***Background***

This category includes all birds other than brown pelicans and western snowy plovers that were impacted by the spill. This category includes at least 29 species of seabirds, shorebirds, and landbirds. Table 9 lists all the birds by species collected alive and dead during the spill cleanup. Figure 31 groups the species into related categories. After pelicans, impacts were spread among a variety of marine waterbirds. Because the spill occurred during the nesting season for most North American birds, and most affected species do not nest locally, the impacts to other birds were largely limited to non-nesting individuals, such as sub-adults that were likely over-summering in the area. Had the spill occurred in winter, many more individuals from these species groups would have been impacted.

126



**Figure 31.** Total live and dead birds captured and collected following the spill.

### *Other Bird Injury Assessment*

In order to estimate mortality for these species, the Trustees applied the following methodology, which is described in Appendix I.

1) Determine which of the collected birds were related to the spill:
   a. Identify species and numbers of birds collected;
   b. Identify number of oiled and non-visibly oiled birds;
   c. Oiled dead birds – adjust for baseline oiling from natural seeps; and
   d. Non-visibly oiled dead birds – adjust for background deposition.
2) Use the Beached Bird Model to identify how many birds were missed:
   a. Determine carcass persistence on beaches;
   b. Determine search effort and efficiency; and
   c. Calculate total injury.

### *Beached Bird Model*

As with the pelican assessment above, it is very likely that the actual number of other species impacted by the spill exceeds the number collected and attributed to the spill. Birds impacted by an oil spill may not be collected for a variety of reasons:

1. They may travel outside of the response area. As described above, this occurred with the large number of pelicans migrating north.
2. They may die at sea, sink, or be carried away from beaches that were searched.
3. They may come ashore on inaccessible beaches that cannot be searched.
4. Once on the beach, they may be removed by other animals scavenging on the beach.

127

5. For carcasses that do make it to accessible beaches and are not removed by scavengers, searchers may miss them.

In this case, with the non-pelican species, it is difficult to assess the first two reasons. Some species, such as loons, were migrating north, but most non-pelican species may have been more acutely debilitated by the oil, limiting their dispersal distance. Because the spill was nearshore, substantial loss of birds at sea was unlikely. Given these caveats, we did not specifically apply any correction factors for these first two reasons for non-pelican bird species.

The remaining three factors, inaccessible beaches, carcass removal, and search efficiency, can be incorporated into a Beached Bird Model in order to estimate total mortality. The model is based on the number of birds recovered, the probability of a beached bird persisting over a given time interval, and the likelihood that searchers will detect a beached bird. Derivation of the basic equation is from Ford et al. (1996) and Page et al. (1990). This approach has been used for most major oil spill bird mortality events for several decades. Using a simplified example, if the probability of a bird being removed by a scavenger in the course of a day is 50 percent, and the probability of it being overlooked by a searcher is 50 percent, then the probability of it being recovered is 25 percent. This would imply that, for every one bird found, three more are missed. This would result in a "beached bird multiplier" of four. That is, one bird found implies that four birds were impacted.

### Estimated Injury to Other Birds
The final results of the Beached Bird Model, incorporating scavenging, search efficiency, and unsearched areas, were that 236 birds, not including pelicans and western snowy plovers, were killed by the spill (Table 11).

**Table 11.** Summary of estimated mortality of "other birds" based on the results of the Beached Bird Model.

| Bird Taxon | Total Carcasses Collected[1] | Total Estimated Mortality |
|---|---|---|
| Alcids | 42 | 56 |
| Loons | 44 | 53 |
| Procellarids/Boobies | 23 | 35 |
| Gulls/Terns/Skimmer | 24 | 33 |
| Cormorants | 33 | 24 |
| Grebes | 15 | 21 |
| Surf Scoter | 3 | 6 |
| Other/Unknown | 9 | 8 |
| **TOTAL** | **193** | **236** |

[1] Not including pelicans, domestic ducks, rock pigeons, and three birds collected live, rehabilitated and released. Note that a proportion of these carcasses were found to not be spill-related.

128

## 5.3.5  Summary of Bird Injury

In summary, the assessment of injury to birds from the Refugio Beach Oil Spill was conducted by dividing all affected birds into three categories: brown pelicans, western snowy plovers, and all other birds. The assessment methods for each category were designed around the species' life history strategy and feasible methods for quantifying injury. Table 12 shows the overall summary of estimated bird mortality by species group.

**Table 12.** Summary of total estimated bird mortality caused by the Refugio Beach Oil Spill.

| Bird Taxon | Total Estimated Mortality |
|---|---|
| Brown Pelicans | 319 |
| Western Snowy Plovers | 4 |
| Alcids | 56 |
| Loons | 53 |
| Procellarids/Boobies | 35 |
| Gulls/Terns/Skimmer | 33 |
| Cormorants | 23 |
| Grebes | 21 |
| Surf Scoter | 6 |
| Other/Unknown | 8 |
| **TOTAL** | **558** |

## 5.3.6  Selected Restoration Projects

Restoration alternatives for brown pelicans fall into two broad categories: improvement or protection of nesting habitat, and reduction of human-caused mortality during the non-breeding season. Selected projects that benefit brown pelicans are listed in Table 13 below.

The Trustees selected brown pelican colony protection at Anacapa Island as the primary restoration project for brown pelicans. The Trustees also selected a project to reduce or prevent injury to seabirds from recreational fishing to restore brown pelicans. This project will also benefit other seabird species, and is the restoration project selected for other birds. To address injury to western snowy plovers, the Trustees selected a project to fund management actions at Coal Oil Point Reserve that protect western snowy plovers from human activities and predators during their nesting season. Each of these projects are described further below. Other proposed second tier projects (Table 14) were not selected due to concerns over feasibility or lower anticipated benefits, but could be implemented if funds allow.

**Table 13.** Selected restoration projects for birds

| ID# | SELECTED PROJECTS | SPECIES BENEFITS |
|---|---|---|
| BIRD-1 | Brown Pelican Colony Protection at Anacapa Island | Brown Pelican |
| BIRD-2 | Prevention of Injury to Seabirds Related to Recreational Fishing | Seabirds |
| BIRD-3 | Western Snowy Plover Management at Coal Oil Point Reserve | Western snowy plovers |

129

***Brown Pelican Colony Protection at Anacapa Island (BIRD-1)***

This project is intended to protect the largest United States breeding colony of California brown pelicans, on Anacapa Island, from nest displacement and loss caused by invasive Cape ivy.

The goal of this project is to eradicate the Cape ivy infestation on West Anacapa Island. Methods will include: 1) initial assessment of infested areas and baseline vegetation, along with pelican surveys, 2) two initial herbicide treatments to infested areas via helicopter and hand application in the first year, 3) follow-up treatment for the following 4 years, and 4) follow-up vegetation and pelican surveys. As part of the project, a water cache will be installed to allow for follow-up treatments over a longer timeframe. Treatments will occur outside the pelican breeding season, during fall/early winter when native vegetation is dormant and before winter rains.

*Affected Environment*

Anacapa Island is composed of a series of narrow islets, with the three main islets being East, Middle and West Anacapa. Despite its small size, Anacapa Island supports nearly 200 types of native plants from 50 plant families (Junak and Philbrick 2018). There are several infestations of Cape ivy on the north side of West Anacapa Island. This invasive plant displaces native vegetation and reduces the amount of available nesting and roosting habitat for pelicans. The largest infestation is in Summit Canyon (Figure 32). Anacapa Island has the largest breeding colony of the California brown pelican in the United States, and one of the only three in California. Middle and West Anacapa Islands serve as critical breeding and roosting habitat for the California brown pelican. Anacapa Island also supports the largest western gull (*Larus occidentalis*) colonies in the Channel Islands. A total of 17 landbird species are also known to breed on Anacapa Island (Davidson et al. 2014).



**Figure 32.** Project location for the brown pelican colony protection at Anacapa Island, the grey outline indicates a nesting area where Cape ivy is expanding and may decrease habitat suitability.

130

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* –This project will benefit brown pelicans by enhancing nesting and roosting habitat through controlling invasive Cape ivy. By targeting active areas of infestation, the project will reduce the non-native cover and allow for native vegetation recovery and use by brown pelicans. The eradication of this species will protect nesting habitat and the native plant community which brown pelicans use to construct and support its nests. An increase in suitable habitat will allow for an increase in the number of nesting birds and subsequent fledglings on Anacapa Island.

   In addition, control of this invasive plant at its current locations will prevent its spread and additional loss of adjacent occupied habitat for brown pelicans. Additionally, the eradication of Cape ivy will protect the native flora and fauna on West Anacapa Island, and will also help prevent the introduction to the other Anacapa islets, as well as the other northern Channel Islands where Cape ivy is currently not found. The eradication of Cape ivy on West Anacapa Island will also protect rare plants found throughout the islets, which are currently outcompeted by this invasive plant. Overall, a diverse assemblage of native flora and fauna depend on intact vegetation communities. This project will benefit a range of species, including nesting seabirds (in particular the brown pelican and western gull), terrestrial songbirds, migratory birds, rare plants, and invertebrates that depend on the native vegetation communities.

   Herbicide applications for invasive plant treatments are covered under a NPS Categorical Exclusion (NPS 2019). Herbicide treatments can have impacts to non-target native vegetation within the treatment area. To reduce potential impacts, efforts will be made to minimize over spray and drift onto non-target species, including spot treatment of invasive plants adjacent to intact native vegetation. Herbicides will be applied by a certified applicator and in accordance with application guidelines and the manufacturer label. Although there may be short-term impacts to native plants within the treatment area, the long-term, negative consequences of not treating the Cape ivy or other invasive plant species far outweigh impacts to individual plants. Another potential adverse consequence of this project could be the unintentional spread of invasive plants from the treatment sites to other parts of the island via due to foot traffic. In order to reduce this potential, extreme caution will be used to reduce the spread of seeds via clothing and footwear by implementing existing biosecurity protocols for the Channel Islands. Also, in order to avoid impacts to nesting birds, including seabirds and resident terrestrial birds, herbicide treatment and vegetation monitoring will occur in fall/early winter, well before nesting season begins. Overall, any biological impacts from the implementation of the project are anticipated to be

131

minor in comparison to the overall long-term beneficial impacts from restoring the native plant community to protect brown pelican nesting habitat.

2. *Physical Impacts* – The Trustees do not anticipate major adverse impacts to the physical environment, such as water, air, sediments, etc. Any negative physical impacts would be unlikely and, at worst, would likely be mitigated by the use of best practices. Ultimately, any adverse physical impacts are expected to be negligible.

3. *Human Impacts* – The Trustees do not anticipate adverse impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. There is likely a benefit to the public as the sustained or increased presence of brown pelicans would create more opportunities for wildlife viewing.

*Probability of Success*

With the relatively small footprint of Cape ivy on West Anacapa Island (1-2 acres as of September 2018), the probability of successfully eradicating this species from this location is high. This multi-year, sustained effort would enable successive treatments over a six-year period as needed. This continued follow-up after initial treatment is critical to retreating any sprouts and ensuring success.

The control of other invasive species (Russian thistle, ice plant, etc.) in the project area also has a high probability of success. Herbicide treatment and manual removal are proven techniques to help control populations and limit the spread of invasive weeds. The eradication and control methodologies proposed have been tested and utilized successfully on the Channel Islands.

*Performance Criteria and Monitoring*

The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. The success of this project will be measured with a minimum of three monitoring events are proposed which will be outlined in project monitoring plan. Additional monitoring of brown pelicans will continue post project as part of Channel Islands National Park's Inventory and Monitoring Program. Specifically, monitoring may include, but is not limited to:

- Documenting brown pelican abundance, distribution, phenology, and reproductive success in and adjacent to the treatment areas.
- Monitoring annual vegetation during all six years of the project within the project area. Monitoring will follow established protocols and will document treatment area, efficacy of treatments, and recovery of native vegetation communities.
- Analyzing treatment efficacy though post treatment monitoring. Post treatment monitoring will include both visual estimates of percent cover of Cape ivy and counts of stem number within permanent quadrats.
- Establishing photo points to document the progression of the treatment areas.

132

- Eradicating Cape ivy from Summit Canyon. Efforts to control other invasive weeds within the scope of this project will be prioritized upon initial assessments. Additional control efforts on Anacapa Island will be documented and mapped each year.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for brown pelicans injured as a result of the spill, and the Trustees have therefore selected this project as a preferred alternative.

### Birds and Fishing Conflict Reduction (BIRD-2)

In an analysis of all seabirds brought to International Bird Rescue rehabilitation centers in Los Angeles and San Francisco between 2002 and 2015, fishing hook and line injuries were by far the most common anthropogenic injury, totaling 2,957 birds (Duerr 2016). Brown pelicans and other seabirds, including cormorants and gulls, are often attracted to nearshore areas where schooling bait fish are abundant. If anglers are fishing in these areas (e.g., from coastal piers), seabirds can be inadvertently hooked or entangled in fishing line. In addition, discarded waste fishing line can entangle seabirds. This project would use outreach to raise public awareness and educate anglers about ways to reduce their chances of hooking birds and what to do if one is hooked. Outreach could include printed materials and/or training of docents. This project may also provide support to bird rehabilitation centers to help recover and rehabilitate seabirds with fishing hook and line injuries.

This project is also intended to reduce seabird injury in areas where birds are attracted to fishing waste disposal areas. Brown pelicans and various gull species are often attracted to commercial fishing vessels off-loading small fish (e.g., sardines and anchovies) and squid, and to fish waste receptacles used by recreational anglers. These birds may attempt to dive into open bins of fish and may get injured by off-loading machinery and vehicles. In addition, repeated bodily contact with fish and fish oil can lead to a loss of waterproofing on the birds, resulting in hypothermia and other health issues.

*Affected Environment*

This project will be located in various locations along the Santa Barbara, Ventura, and Los Angeles County coastlines where recreational and commercial fishing activities are causing injuries to seabirds. Locations with fishing piers, harbors, and other fishing facilities will be targeted. This project may also focus on offshore fishing activities, if needed.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

133

1. Biological Impacts – The Trustees do not anticipate any adverse effects to biological resources. Beneficial effects to seabirds are anticipated to be achieved by providing resources and training to recreational and commercial fishermen to reduce entanglements by implementing best practices, and being trained to capture and disentangle birds or transport birds to rehabilitation centers for professional treatment.

2. Physical Impacts – The Trustees do not anticipate any adverse impacts to the physical environment, such as water, air, sediments, etc. Beneficial effects to the physical environment are anticipated from reduced fishing line and fishing waste from entering coastal habitats.

3. Human Impacts – The Trustees do not anticipate adverse impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. This project is not intended to reduce any recreational and commercial fishing opportunities, rather it is focused on working with willing recreational and commercial fishermen and fisherwomen to allow them to continue fishing while reducing their impact on seabirds.

*Probability of Success*

The probability of success of implementing the project is high. The effectiveness of the project in reducing seabird entanglements, however is dependent on the willingness and ability of the target audience to effectively implement what they learn. In order to maximize the probability that the outreach efforts implemented are successful in reducing entanglements, the project will be implemented by people that are knowledgeable about seabird handling/rehabilitation and will seek to create opportunities for anglers to participate in the program in a way that is convenient and approachable for them. For example, trainings may be held at piers, or tackle shops.

*Performance Criteria and Monitoring*

The performance of this project will be measured by evaluating incidence of birds with fishing hook and line injuries that enter rehabilitation centers after the program is implemented. The goal of the project is to reduce 60 bird deaths per year from fishing hook and line entanglement. It is not possible to measure the performance of the project in terms of the exact number of birds saved; however, evaluating the instances of birds with fishing hook and line injuries being admitted to rehabilitation centers will be a proxy for estimating whether the program is successful.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for seabirds injured by the spill, and the Trustees have therefore selected this project as a preferred alternative.

134

***Western Snowy Plover Management at Coal Oil Point Reserve (BIRD-3)***

The goal of this project is to protect a breeding colony of threatened western snowy plovers from predation and human disturbance. The focal colony, one of the largest in the region, is located in UC Santa Barbara's Coal Oil Point Reserve and became established largely due to species management efforts. The project aims to compensate for lost fledges due to infertility, as well as for additional unquantified injuries resulting from the oil spill, such as low over-winter survival and decreased breeding effort. Activities may include: predator control, upgraded signage and fences, outreach to reduce disturbances, leashes to lend for pets, and eradication of iceplant in areas of nesting habitat on Ellwood Beach.

*Affected Environment*

Coal Oil Point Reserve is part of the University of California Natural Reserve system, and protects a variety of coastal and estuarine habitats and fauna, including the threatened western snowy plover. Specifically, this reserve protects coastal dune, estuarine, tidal lagoon, sandy beach, and rocky reef habitats. Coal Oil Point Reserve, which is utilized by western snowy plovers for nesting, was exposed to the greatest oiling and most intense cleanup activities of any plover breeding sites within the spill-affected area.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. Biological Impacts – This project benefits the population of western snowy plovers that was directly impacted by the spill. Management actions at Coal Oil Point Reserve aim to protect the plovers from predators and human activities during their nesting season. Benefits include maintaining the current colony of snowy plovers at COPR, along with preventing its displacement and loss. Many of the potential proposed activities will also be beneficial to other bird species and native plants in the area.

2. Physical Impacts – The Trustees do not anticipate any major or minor impacts to the physical environment, such as water, air, sediments, etc. Any physical impacts from activities such as installing symbolic fencing are temporary and negligible to the physical environment.

3. Human Impacts – The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. COPR has struck a balance between human recreation and access to the coastal environment, while protecting western snowy plovers and other wildlife species and their habitats. This project will seek to continue and expand that dual mission of allowing recreation and protecting natural resources.

135

*Probability of Success*

The probability of success is high. Western snowy plover breeding was extirpated at COPR in the 1980s due to high human use of the coastal environment in close proximity to UC Santa Barbara. Due to targeted protective measures, Coal Oil Point Reserve has established a robust nesting population that continues to thrive today. This project has a high probability of success due to the knowledge and expertise of staff at Coal Oil Point Reserve that will be implementing the project.

*Performance Criteria and Monitoring*

Metrics such as nest success will be compared to initial conditions at the project site. Staff at Coal Oil Point Reserve monitor the western snowy plover population annually to track the number of pairs, nest success, and other parameters. This monitoring will continue throughout the implementation of this project and will be used to determine the success of the project.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for western snowy plovers injured as a result of the spill, and the Trustees have therefore selected this project as a preferred alternative.

## 5.3.7  Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 14), and determined that many are valid projects that would provide benefits to seabirds. However, these projects were not selected for various reasons described below. These projects may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

**Table 14.** Second tier bird restoration projects that may be implemented if funds allow.

| ID# | OTHER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| BIRD-4 | Social Attraction for Brown Pelicans at Alcatraz Island | Brown pelicans |
| BIRD-5 | Enhancement of Brown Pelican Nesting Habitat at San Clemente Island | Brown pelicans |
| BIRD-6 | Continue Revegetation Projects on Santa Barbara Island to Promote and Expand Suitable Brown Pelican Nesting Habitat. | Brown pelicans |
| BIRD-7 | Western Snowy Plover Predator Control | Western snowy plovers |
| BIRD-8 | Raven Exclusion Devices for Nesting Ashy-storm Petrels on Channel Islands | Ashy-storm petrels |

136

| BIRD-9 | Western Snowy Plover Monitoring and Habitat Protection at McGrath, Mandalay, and San Buenaventura State Beaches | Western snowy plovers |
|---|---|---|
| BIRD-10 | Dune Restoration | Western snowy plovers |
| BIRD-11 | Reduction of Disturbances to Seabirds at the Channel Islands (Seabird Protection Network Channel Islands Chapter) | Various seabirds |
| BIRD-12 | Andre Clark Bird Refuge | Various seabirds |
| BIRD-13 | Protection of Nesting Grebes | Grebe species |
| BIRD-14 | Artificial Nest Habitat Creation at Anacapa, Santa Barbara, and/or San Clemente Island | Scripps's murrelets |
| BIRD-15 | Restore and Increase Artificial Nest Habitat at San Miguel Island | Scripps's murrelets, Cassin's auklets |
| BIRD-16 | Restore Native Habitat at Anacapa Island | Scripps's murrelets, western gulls |
| BIRD-17 | Establishment of Bird and Marine Mammal Rescue and Rehabilitation Facility | Various seabirds, marine mammals |

***Brown pelican restoration at Alcatraz Island (BIRD-4)***

This project involves restoring habitat and using social attraction to try and establish brown pelican breeding on Alcatraz Island. This project could be considered as a second tier project and social attraction could potentially result in recolonization of Alacatraz Island by breeding brown pelicans, but the feasibility of this project is unknown. Alcatraz Island is outside of the current breeding range for brown pelicans, and is substantially distant from the spill-affected area.

***Brown pelican restoration on San Clemente Island (BIRD-5)***

Brown pelicans have nested on San Clemente Island in the recent past and could benefit from protection actions such as the establishment of exclusion zones from cats, fox, and rats. This action may benefit other seabirds as well. The feasibility of this project is unknown at this time, and would require additional planning. Greater benefits to brown pelicans would be achieved where nesting densities are greater.

***Restoration through revegetation on Santa Barbara Island (BIRD-6)***

Building on restoration that has begun on Santa Barbara Island, this project would involve promoting suitable brown pelican nesting habitat by revegetating habitat areas. Currently access to Santa Barbara Island is limited due to a damaged boat landing. Upon repair of landing facilities at Santa Barbara Island, this project may become cost effective.

***Western snowy plover predator control (BIRD-7)***

Provide funding for control of ravens and other predators that kill nesting western snowy plovers in FWS recovery unit 5 (including the spill-affected area) and unit 4 (north of the spill-affected area). Predator control at COPR is listed as a preferred project because that is the location where

137

western snowy plovers were injured by the Refugio Beach Oil Spill. Predator control efforts could be expanded to other areas, if funds allow.

### *Raven Exclusion Devices for Nesting Ashy-Storm Petrels on the Channel Islands (BIRD-8)*
This project involves providing enhanced protection for nesting Ashy-storm petrels that are preyed upon by common ravens. This project may be funded as a second tier project if funds allow, as the impact of the spill on this species was low compared to other seabirds.

### *Western Snowy Plover Monitoring and Habitat Protection at McGrath, Mandalay, and San Buenaventura State Beaches (BIRD-9)*
Much of the suitable habitat for western snowy plovers and California least terns is within California State Parks ownership. This project would include monitoring and protecting western snowy plovers and California least terns in State Parks through installation of symbolic fencing, signage, docent programs, predator control, and other measures necessary to monitor and protect nesting shorebirds. These sites have been identified as secondary priorities, and could be implemented if preferred locations become infeasible.

### *Dune restoration (BIRD-10)*
By removing invasive non-native plants that degrade dune ecosystems, these projects will restore dune habitats, native species and landscapes, and enhance ecosystem functions. Removal of invasive plants will increase the amount of useable nesting areas for the western snowy plover and, in some locations, the California least tern. It will also reduce cover for predators of eggs, chicks and adult birds. This project is a selected project in the Shoreline Restoration section of this plan. Additional project locations could be funded if birds would benefit, and if funds allow.

### *Seabird Protection Network – Channel Islands (BIRD-11)*
This project would implement tasks identified by the Channel Islands Seabird Protection Network that are aimed at reducing human disturbances to seabirds at the Channel Islands. This is a second tier project, as the anthropogenic threats to seabirds are greater along the mainland coastline where the human population is greater. If funds allow, this project would be implemented.

### *Andre Clark Bird Refuge Restoration (BIRD-12)*
Located near the Santa Barbara Zoo, this project is designed to improve water quality and habitat for both bird and aquatic species, and to allow the bird refuge to function as nursery habitat for ocean going fish. The proposed project includes five primary components: 1) restoration of 1.5 acres of coastal dune habitat; 2) restoration of 5 acres of coastal salt marsh habitat; 3) construction of a new multi-use recreational loop trail around the restored lagoon; 4) dredging of flow channels and deep pools to improve circulation and provide refuge for fish and other aquatic organisms; and 5) removal of flow barriers to improve flushing between the ocean and the lagoon in order to improve water quality, bird, and fish habitat. The benefits of this project to bird species impacted by the spill are unclear. The existing habitat at the Andre Clark Bird

138

Refuge serves as resting habitat for seabirds, and the improvements from the project to seabirds are unclear.

### Protection of nesting grebes (BIRD-13)

Western and Clark's grebes have historically nested at Cachuma Lake in Santa Barbara County and Lake Casitas in Ventura County. This project would improve nesting success of grebes at these lakes. Restoration projects to improve grebe nesting success have been successfully implemented in northern California, focused primarily on outreach to reduce human disturbance at nesting colonies. No specific project has been proposed for lakes in Santa Barbara or Ventura Counties, and it is not known what management actions at these lakes would result in greater nesting success.

### Artificial nest habitat creation at Anacapa, Santa Barbara, and/or San Clemente Islands (BIRD-14)

This project would improve nesting success of Scripps's murrelets at Anacapa, Santa Barbara, and/or San Clemente Islands. On Anacapa Island, the project would benefit murrelet populations by placing structures in the habitat adjacent to traditional nesting areas in Landing Cove and newly restored upland habitat. Scripps's murrelets have been utilizing artificial nest burrows placed within the habitat restoration area near Landing Cove at Santa Barbara Island. Additional artificial modules placed in other restored areas on this island would enhance murrelet populations by providing additional nest sites that typically have high nest success. Scripps's murrelet populations are severely limited by nest sites on San Clemente Islands. Several areas occur at San Clemente Island within the Seal Cove area where artificial nest sites could be installed and significantly increase the size of the nesting population at this island. This project is a second tier project as there was no evidence of injury to Scripp's murrelets and other alcids by the spill and the damages were not quantified.

### Restore and increase artificial nest habitat at San Miguel Island (BIRD-15)

Increase the number of nesting boxes and improve older auklet boxes to protect the continued existence of this colony well into the future. Both Scripps's murrelet and Cassin's auklets could utilize artificial nests. This project is a second tier project as there was no evidence of injury to Scripp's murrelets and other alcids by the spill and the damages were not quantified.

### Restore native habitat at Anacapa Island (BIRD-16)

The project would benefits Scripps's murrelets, western gulls, as well as many other native birds, insects, amphibians, reptiles, and restores ecosystem functions. The project could contribute to ongoing efforts to restore native habitat at Anacapa Island and help restore additional nesting habitat for both Scripps's murrelets and western gulls. This project is a second tier project as there was no evidence of injury to Scripp's murrelets and other alcids by the spill and the damages were not quantified.

139

*Establishment of bird and marine mammal rescue and rehabilitation facility (BIRD-17)*

This project would facilitate the establishment of a bird and marine mammal rescue and rehabilitation facility in Ventura County. This project is a second tier project because establishing a new bird and mammal rescue is beyond the Trustees' ability to implement.

## 5.4    Marine Mammals

Marine mammal species exposed to oil may suffer immediate or long-term health problems, leading to death or reproductive impairment. Small doses of oil may impact and animal's physiology or behavior by causing skin or gastrointestinal irritation, impairing reproduction, and compromising its immune system. Marine mammals can be exposed to oil through ingestion of contaminated food and water, grooming, absorption through wounds or eyes, inhalation of oil-derived volatiles, and aspiration of oil droplets directly to the lungs.

Most marine mammal species of California occur in the waters adjacent to the Gaviota coast, some transitory, some resident. These include pinnipeds, such as California sea lions, harbor seals, Guadalupe fur seals, and northern elephant seals; mustelids, such as southern sea otters; and cetaceans, such as bottlenose dolphins, long beaked common dolphins, gray whales, and humpback whales.

Marine mammals are generally difficult to study because of their wide-ranging pelagic life styles. Accordingly, comprehensive marine mammal surveys and studies can be logistically prohibitive to conduct and may last years. Therefore, the Trustees relied heavily on mammal stranding[14] data in conducting their assessment because visible and easily-tracked strandings can provide an index to what is happening in the marine mammals' environment. Records of strandings from May 19, 2015, through July 7, 2015, formed the basis of the Trustees' assessment and quantification of injuries to marine mammals (Figure 33)[15].

---

[14] A stranding can be defined as (1) a dead marine mammal on the beach or in the water, (2) a live marine mammal on the beach and unable to return to the water, or (3) a live mammal in the water that is unable to function normally due to sickness or injury.

[15] Plains disagrees with the Trustees' injury quantification, scaling, and restoration projects for marine mammals.

140



**Figure 33.** Location of marine mammal strandings, live and dead, collected during the spill cleanup period. The back lines show the NRDA Exposure Zone boundaries for reference; however these boundaries were not used in the quantification of injury to marine mammals.

## 5.4.1  Overview of Data Collection and Studies

This list below summarizes field surveys, data collection tasks, and analyses for the assessment of marine mammal exposure and injuries.

### *Live and Dead Marine Mammal Intake Data—Unified Command*

Documentation of oiled live and dead animals is performed as a normal part of the spill response through the Unified Command. Intake logs describe the collection of each mammal, including the date, location, species, sex, condition (*e.g.* live or dead), and degree of oiling at the time of collection. These data provided the foundation for estimating mammal injury. Oiled wildlife were collected from May 19 through June 24, 2015.

### *California Marine Mammal Stranding Network Data*

In addition to the intake logs for the marine mammals collected as part of the spill response (including date, location, species, sex, and condition), data on stranded, or beached marine mammals are routinely collected along the Santa Barbara and Ventura County coast lines through NOAA's Marine Mammal Health and Stranding Response Program. These data collected by the stranding network from 2000-2015 provided key information for estimating total marine mammal mortality for this assessment. A total of 264 marine mammals were recovered between May 19 and July 7, 2015, the period considered for this assessment.

141



**Figure 34.** Oiled California sea lion recovered during cleanup operations. Photo Credit: Santa Barbara Channelkeeper.

## *Wildlife Response Reconnaissance surveys*

The Unified Command conducted aerial surveys on May 21, 2015, between Point Conception and Goleta to document wildlife in the area and search for oiled animals. Additional surveys were performed on May 24 and May 26, 2015. Marine mammal sightings included California sea lions (Figure 34), harbor seals and unidentified whales and dolphins. No sea otters were observed during the survey. One additional aerial survey was conducted on May 28, 2015, to document presence or exposure of southern sea otters in the area. During this survey, no southern sea otters were detected in the cleanup area, and were therefore not considered further for the NRDA.

**Table 15.** Daily summary of marine mammal sightings (and average group size per sighting) during boat-based surveys in 2015.

| Species | 6/2 | 6/3 | 6/4 | 6/5 | 6/6 | 6/7 | Total sighting |
|---|---|---|---|---|---|---|---|
| Dolphin, Coastal Bottlenose | 0 | 2 (5) | 3 (3) | 2 (6) | 2 (7) | 4 (4) | 13 |
| Dolphin, Long-beaked Common | 1 (1050) | 3 (42) | 0 | 1 (70) | 0 | 6 (205) | 11 |
| Dolphin, Common, unidentified to species | 1 (41) | 0 | 0 | 0 | 0 | 0 | 1 |
| Pinniped, California Sea Lion | 6 (7) | 3 (7) | 4 (1) | 3(1) | 8 (1) | 5(7) | 29 |
| Pinniped, Harbor Seal | 1 (1) | 1 (1) | 4 (1) | 0 | 6 (1) | 4 (2) | 16 |
| Whale, Gray | 1 (2) | 0 | 1 (2) | 0 | 0 | 1 (2) | 3 |
| Whale, Humpback | 0 | 1 (2) | 0 | 2(1) | 0 | 1 (14) | 4 |

## *Pre-Assessment Marine Mammal Surveys*

To estimate the number of common bottlenose dolphins in the affected area and to document exposure of marine mammals to oil, photo-identification surveys were conducted from small boats and from shore along the Santa Barbara and Ventura County coastline from May 24 to June 7, 2015. Figure 35 gives an example trackline of one of the survey days. Dolphins, whales

142

and pinnipeds were sighted on all days of the survey. Table 15 shows sightings from the boat-based surveys, which include group size estimates.



**Figure 35.** Tracklines of one day of NRDA mammal surveys, including sightings for that day. See Appendix B for data associated with this figure.

## 5.4.2  Pinniped Injury Analysis

### *Background*

California sea lions are the most frequently stranded marine mammal in California. The stranding numbers vary seasonally by age class and stranding patterns are correlated with the reproductive cycle. Pups strand in the highest numbers during the spring, when they are being weaned. The spill year, 2015, was an anomalous stranding year[16] for California sea lion pups, with unusually high numbers stranding much earlier in the year than usual. By the time of the oil spill, after this surge of unusual strandings, pup stranding rates had lowered. Typically, fewer older animals, i.e., non-pups, strand throughout the year although, reproductive females frequently strand in the spring, just prior to the annual birth pulse.

Northern elephant seals and Pacific harbor seals strand in much lower numbers than California sea lions, which largely reflects their relative population sizes. However, like the California sea lions, strandings vary seasonally and are correlated with the reproductive cycle. Stranding numbers are highest when pups are weaning, which is in late winter/early spring in the cleanup area. The Guadalupe fur seal, an endangered species, was not observed either stranded or at-sea during any NRDA post-spill surveys and so were not considered further for the assessment. Similarly, the northern fur seal, a depleted species, was not observed and therefore not considered for the assessment.

---

[16] This was the third year of an unusual mortality event for California sea lions, declared January 1, 2013. The unusual mortality event was in part attributed to reduced prey availability (McClatchie et al. 2016).

143

*Injury assessment*

The Trustees assessed injuries to California sea lions, northern elephant seals and harbor seals by determining the number of strandings that occurred in the spill-affected area (Santa Barbara and Ventura Counties) from May 19 through July 7, 2015, and comparing that number to the baseline stranding patterns for the region. This provided a framework for the Trustees' injury assessment by providing insight into how many strandings would be expected "but for" the oil spill.

In addition to quantifying stranding baseline numbers for each species, the Trustees reviewed the available data for individual strandings recorded during the assessment period to determine whether the recovered strandings could be attributed to non-spill related causes (e.g. fishery related deaths). The Trustees also reviewed carcass decomposition information to remove strandings that likely occurred before the spill (i.e., dead, highly decomposed animals). Once it was determined how many documented strandings were likely due to the spill, they applied a correction factor for animals that would likely have died from the spill but were not found due to drift, sinking, scavenging or other factors. No correction factor was applied to live stranding numbers to account for animals that might have been exposed to oil and moved out of the area. The number of observed strandings attributed to the spill are given in Table 16.

For harbor seals and northern elephant seals, past stranding numbers during the time of year in which the cleanup occurred were low (i.e., fewer than 5 per year) and often zero. Because of this and the highly unusual fact that the strandings of these species were alive and oiled and died during rehabilitation, no baseline correction was applied to the stranding numbers. That is, the observed number of strandings for both species were considered spill-related injuries after removing any pre-spill and fishery-related strandings.

**Table 16.** Strandings of pinnipeds recorded in Santa Barbara and Ventura Counties after the spill. Records for each stranding were reviewed to determine whether they likely died before the spill (i.e., "pre-spill") or had injuries consistent with fishery entanglement (i.e., "fishery related"). "Pre-spill" animals were removed prior to adjusting for stranding baseline.

| Species | Total Stranded May 19-July 7 | Stranded | | | |
| | | Pre-spill | Fishery-related | Baseline | Spill Period |
|---|---|---|---|---|---|
| California sea lion | 221 (89 live, 132 dead) | -40 | 0 | -87 | 94 |
| Northern elephant seal | 9 (8 live, 1 dead) | -1 | 0 | 0 | 8 |
| Harbor seal | 2 | 0 | 0 | 0 | 2 |

## 5.4.3  Cetaceans

*Background*

Long-beaked common dolphins (LBCO) are the most frequently stranded cetacean (whales, dolphins and porpoises) in the affected area and throughout southern California. Strandings of common bottlenose dolphins are rare, in part because their population off the California coast is

144

small (~500 individuals) and mobile, with dolphins ranging from Ensenada, Mexico, to San Francisco, California. From the pre-assessment survey, approximately 20% of the common bottlenose dolphin coastal ecotype population was estimated to be present in the area in the weeks following the spill. Dolphins of both species as well as other cetaceans were observed from shore and at sea in the weeks following the spill (Figure 36; Table 17)

No large whales stranded during the spill period, but several were observed (including a mother/calf pair) in the spill area both by local news agencies in the first days of the spill and during NRDA marine mammal boat surveys between May 27 and June 6, 2015 (see Figure 36).

### *Injury assessment*

Similar to pinnipeds, the Trustees assessed injuries to long-beaked common dolphins and bottlenose dolphins by comparing strandings observed during the assessment period to a baseline of strandings for the area, after removing records of strandings that likely occurred prior to the spill. A correction factor was applied to the strandings deemed to be likely spill related to account for animals that likely died but were not been found due to drift, sinking, scavenging or other factors

The number of observed strandings attributed to the spill is given in Table 17. For both dolphin species considered for the injury assessment, previous years' strandings are variable, and for the LBCO have been tied to episodic algal blooms. While algal blooms were present during the spill period, principally north of Point Conception, there were no data that tied dolphin deaths to algal blooms in the oil spill-affected area. The Trustees concluded that oil was the more likely causal factor in the dolphin strandings in Santa Barbara and Ventura Counties during the timeframe considered.

**Table 17.** Dead dolphin strandings collected after the spill. Records were reviewed and dolphins were not considered potential spill-related injuries if they were determined to have stranded before the spill (i.e., "pre-spill") or had injuries consistent with fishery entanglement (i.e., "fishery related"). Baseline refers to the expected "natural" deposition that would occur under non-spill conditions.

| Species | Total Stranded May 19-July 7, 2015 | Stranded | | | |
|---|---|---|---|---|---|
| | | Pre-spill | Fishery-related | Baseline | Spill period |
| Dolphin, long-beaked common | 22 | -2 | -2 | 0 | 18 |
| Dolphin, bottlenose | 1 | 0 | 0 | 0 | 1 |

145



**Figure 36.** Top - gray whale observed on June 7, 2015, near Gaviota State Beach during boat-based surveys. Bottom - long-beak common dolphins swimming in an oil slick during NRDA boat surveys. Photo Credit: Natural Resource Damage Assessment Trustees.

146

## 5.4.4  Final Injury Determination

The final step in quantifying marine mammal injuries for both pinnipeds and cetaceans was to account for animals that died but were not observed. The Trustees assumed that for mammals, all carcasses that reached the beach were found. However, the Trustees could not account for animals that died at sea and either sank, floated, or were scavenged before being observed and counted. Therefore, the Trustees applied a correction factor ('lost at sea factor') to the observed dead, spill-related strandings based on a study by local marine mammal scientists on common bottlenose dolphin carcass recovery off the southern California coastline (Table 17) (Carretta et al. 2016). The final injury numbers are given in Table 18[17].

**Table 18.** Final injury numbers for marine mammals affected by the Refugio Beach Oil Spill.

| Species | Dead | Live | Observed spill related strandings | Lost-at-sea factor (for dead animals) | Estimated number injured |
|---|---|---|---|---|---|
| California sea lion | 52 | 42 | 94 | 2 | 146 |
| Northern elephant seal | 0 | 8 | 8 | NA | 8 |
| Harbor seal | 0 | 2 | 2 | NA | 2 |
| Long-beaked common dolphin | 18 | 0 | 18 | 4 | 72 |
| Bottlenose dolphin | 1 | 0 | 1 | 4 | 4 |

## 5.4.5  Selected Restoration Projects

The Trustees are proposing the projects described below to compensate for injuries to marine mammals caused by the oil spill (Table 19). The two selected projects benefit pinnipeds (MAMM-1) and cetaceans (MAMM-2).

**Table 19.** Selected projects for marine mammals

| ID# | SELECTED PROJECTS | BENEFITS |
|---|---|---|
| MAMM-1 | Pinniped rehabilitation survival improvement | Pinnipeds |
| MAMM-2 | Cetacean entanglement response | Cetaceans |

***Pinniped Rehabilitation Survival Improvement (MAMM-1)***

The goal of this project is to supplement and improve stranding response capabilities in Santa Barbara and Ventura Counties by providing enhanced rehabilitation capacities and veterinary facilities for stranded marine mammals. The program will augment the stranding cleanup and treatment activities of an existing, local facility which is authorized and permitted to respond to and treat stranded marine mammals. The project includes labor and supplies to treat sick and injured pinnipeds, including food, medical evaluations and treatments.

---

[17] Plains does not agree with the Trustees' final injury numbers for marine mammals.

147

*Affected Environment*
The project area is mainland Santa Barbara and Ventura Counties. Sick or injured pinnipeds are rarely rescued at sea. Stranding response most often takes place on beaches and rehabilitation centers.

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only negligible, if any, adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts.* Stranding response removes sick and injured live pinnipeds from beaches, potentially reducing the spread of disease amongst other populations. Treatment of diseased and injured marine mammals improves animal health, and thus the biological environment. Because the activities will be carried out by personnel trained and experienced in marine mammal recovery, no adverse biological impacts are anticipated, as most outdoor project activities will occur on beaches, which are already heavily-trafficked by humans. There will be minimal, if any, interaction with particularly sensitive habitats. No adverse biological impacts are anticipated

2. *Physical Impacts.* This project involves trained personnel removing stranded mammals from beaches and treating them. The project is expected to have negligible adverse or beneficial impacts to the physical environment.

3. *Human Impact.* Removal of sick and injured live pinnipeds from beaches and rocky coast will reduce the risk of spread of disease and other adverse interactions with humans. Humans should experience improved beach experience with the removal and treatment of diseased animals. No adverse effects to humans are expected.

*Probability of Success*
This project will expand the rehabilitation facility's capacity to treat live pinnipeds and increase the number of healthy animals released, approximately 30% of animals treated. Rescue and rehabilitation/ treatment of pinnipeds under veterinary care has a successful track record. Increasing capabilities are expected to further improve the success rate.

*Performance Criteria and Monitoring*
This project will expand the rehabilitation facility's capacity to treat live pinnipeds and increase the number of healthy animals released, approximately 30% of animals treated. Rescue and rehabilitation/ treatment of pinnipeds under veterinary care has a successful track record. Increasing capabilities are expected to further improve the success rate.  The proposed time period of the project is three to seven years, depending on the need of the program with a goal of a total of 150 additional marine mammals successfully responded to and/or treated through the program.

148

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration.  Based on responses and outcomes from before implementation of the project, we will monitor:

- The number of animals (and species) taken in per year for treatment/rehabilitation;
- The number of live and dead animals responded to per year; and
- Outcomes from live strandings, including from treatment at the facility or in the field.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for pinnipeds injured as a result of the spill, and the Trustees have therefore selected this project.

### Cetacean Entanglement Response (MAMM-2)

Entanglement in fishing gear is a source of mortality to whales and dolphins off the California coast and nearly all entangled animals die. The program will augment an existing permitted and authorized program by providing additional gear and personnel to disentangle cetaceans in areas not currently covered off the southern California coast.

*Affected Environment*

This project will operate within the southern California to respond to entangled cetaceans reported off Santa Barbara, Ventura, Los Angeles and Orange County coastlines.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only negligible, if any, adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts.* Increased preparedness for entanglement response will provide a beneficial biological impact by reducing fishing gear-related mortality to whales and dolphins. Personnel implementing this this project would be trained and experienced in entanglement response and would operate using best practices to avoid adverse impacts to the environment. Therefore, no adverse biological effects are anticipated.

2. *Physical Impacts.* This activity will minimally increase boat use because of increased response capabilities. Personnel implementing this this project would be trained and experienced in entanglement response and would operate using best practices to avoid adverse impacts to the environment. Therefore, no adverse physical effects are anticipated.

149

3. *Human Impacts.* Human enjoyment of wildlife viewing will be enhanced by (1) encountering fewer dead cetaceans floating in the water or beached and (2) seeing fewer animals in distress due to gear entanglements. For larger whales, a dead whale can be a hazard to navigation, so reducing mortality will reduce the number of potential hazards. While this project will minimally increase boat use, the Trustees anticipate that this will have negligible adverse impacts to boaters.

*Probability of Success*

This Project is anticipated to double the response capacity of the current cetacean disentanglement program operating off California's coast, which has a proven record of success. For this reason, the probability of success for the project is very high.

*Performance Criteria and Monitoring*

The number of whales with gear successfully removed compared to the number of entangled whales reported will be the criteria used to measure success. These data will be available to the Trustees because entangled whales are reported to the NMFS, which authorizes and coordinates entanglement response activities. Disentanglement response meet the guidelines and protocols of the MMPA and Animal Welfare statutes.

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Increased capacity to respond to entanglement events, measured by numbers of responses during the funding period compared to past performance; and
- Outcomes from entanglement response, by species.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for cetaceans injured as a result of the spill, and the Trustees have therefore selected this project.

## 5.4.6  Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 20), and determined they are valid projects that would provide benefits to marine mammals. However, these projects were not selected for various reasons described below. They may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

150

**Table 20.** Second tier marine mammal restoration projects that may be implemented if funds allow

| ID# | SECOND TIER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| MAMM-3 | Reduce California Sea Lion Entanglement Mortality on San Miguel Island | Pinnipeds |
| MAMM-4 | Mitigate Entanglement Risk for Pinnipeds | Pinnipeds |
| MAMM-5 | Protect Marine Mammal Haulouts and Rookeries | Pinnipeds |
| MAMM-6 | Mitigate Cetacean Ship Strikes | Cetaceans |
| MAMM-7 | Remove Derelict Fishing Gear | Cetaceans/pinnipeds |
| MAMM-8 | Establish a Bottlenose Dolphin Protection Area | Cetaceans |

***Reduce California sea lion entanglement mortality on San Miguel Island (MAMM-3)***
The goal of this project is to remove fishing gear from live pinnipeds on San Miguel Island and identify the source fishery from the recovered gear. Individual pinnipeds would be branded and tagged to monitor their survival after gear removal. The project benefits pinnipeds by directly removing entangled gear, a known source of mortality. A secondary, unquantified benefit to all marine mammals is identifying the source fishery causing the entanglements and likely bycatch. The Trustees are satisfied with the feasibility of this project and consider it a potential alternative to the selected pinniped project, if necessary.

***Mitigate Entanglement Risk for Pinnipeds (MAMM-4)***
The goal of this project is to remove fishing gear from live pinnipeds that come ashore on mainland beaches in Orange, Los Angeles, Ventura and Santa Barbara Counties. The project was not selected because it did not specify how success would be measured, and it would be implementing new, unproven technology. This project could be reconsidered if the selected pinniped project is not feasible.

***Protect Mammal Haulouts and Rookeries (MAMM-5)***
The goal of this project is to further protect the Pacific harbor seal rookery and haulout areas at various areas throughout Santa Barbara and Ventura Counties. Other than Carpinteria, no specific locations or actions were identified.

A specific project at Carpinteria proposed to enhance protection by purchasing conservation easements at Carpinteria Beach to provide further buffers for the rookery. It would also consider other areas that that could provide additional protected rookery habitat. This proposal includes an outreach component to reduce human disturbance to marine mammals at rookeries. The rookery is already protected under the MMPA, and the proposed additional conservation easements would increase existing buffers to reduce risk of harassment. Routine monitoring of the rookery would provide data to estimate pupping success, but it would be difficult to specifically quantify the beneficial effects of the project separate from those protections already provided by the MMPA. This project was not selected to be carried forward for implementation at this time because the project does not contain sufficient information for the Trustees to understand the benefits to marine mammals injured by this spill.

151

### *Mitigate Cetacean Ships Strikes (MAMM-6)*

The goal of this project is to quantify ship strike risk to large whales attributable to a voluntary vessel speed reduction program in the Santa Barbara Channel shipping lane. This project would monitor ship speed and ship strike rate of large cetaceans to compare to historic data. This project may provide data to evaluate how much the vessel reduction program would reduce large ship-strike cetacean mortality. However, the program's methods to estimate and monitor ship strike risk are unclear, the voluntary nature of the program makes implementation uncertain, and metrics for measuring success in terms of whales saved are currently unavailable. The Trustees determined that this could be reconsidered as a pilot project if other preferred projects became infeasible.

### *Remove Derelict Fishing Gear (MAMM-7)*

The goal of this project is to reduce entanglement risk of lost fishing gear for marine mammals by removing large nets and traps. Based on recent past gear removal projects conducted in southern California, there appear to be a low number of marine mammals entangled in lost nets. The Trustees concluded that this program could be beneficial to both cetaceans and pinnipeds, but the benefits would be difficult to quantify. Other projects proposed and evaluated in this Plan provide more direct benefits to marine mammals. The Trustees could reconsider this project if the selected projects became infeasible.

### *Establish a Bottlenose Dolphin Protection Area (MAMM-8)*

The goal of this project is to improve habitat for the coastal population of bottlenose dolphin by establishing a bottlenose dolphin protection area along the Santa Barbara county coastline. The protection area would regulate chemical contamination and anthropogenic noise. The proposal did not identify a specific area, provide criteria to identify one, or indicate how success would be measured. This project would also be challenging, as it involves complex legal and regulatory issues that are not within the direct control of the Trustee agencies. The Trustees would consider this project if other projects to benefit cetaceans are not possible.

## 5.5   Human Uses

In the wake of an oil spill, some people may decide not to visit the shoreline. Others choose to visit alternative sites. Some visit affected shorelines but experience reduced enjoyment due to the spill. These all represent spill impacts.

The Trustees quantified impacts to selected human uses resulting from the Refugio Beach Oil Spill. Effects were identified from as far north as Gaviota State Beach to as far south as Long Beach. This stretch of coastline includes a range of public access points with rich natural resources and scenic vistas that provide exceptional recreational opportunities. People in the region engage in a variety of recreational activities. Examples include camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, and dog-walking, as well as more

152

specialized activities such as fishing, diving, boating, and surfing. Trustees did not quantify impacts from third-party claims (e.g., from non-government parties, such as commercial fisheries and affected businesses), pursuant to NRDA regulations.

The Refugio Beach Oil Spill entered the ocean in Santa Barbara County just west of Refugio State Beach. Spill impacts on human recreation were highest in this area. Refugio and El Capitan State Beaches, popular state campgrounds and day use areas, were closed for 59 and 37 days, respectively. Access to adjacent small pocket beaches was restricted through August 28, 2015. There was significant oiling along the Gaviota Coast down to the University of California Coal Oil Point Reserve, where cleanup operations and closures disrupted normal reserve operations. Recreational fishing in this region was closed for 41 days (see Figure 37).

Spill impacts on recreation were less severe south of Coal Oil Point Reserve. Although spill-related oiling, advisories, and significant media coverage of the incident occurred, no closures were identified along the remaining sections of the Santa Barbara and Ventura County coastlines. This stretch includes several incorporated cities (Santa Barbara, Carpinteria, Ventura, Oxnard), county properties, and additional State Park holdings. While the impacts were not as prominent as those found along the Gaviota Coast to the north, many of the affected beaches have significant visitation, particularly during and after Memorial Day weekend. Thus, even a small percentage decrease in use can translate into a sizeable reduction in the number of trips taken.

In Los Angeles County, there were two separate beach closures after an unusual amount of tar balls washed up on beaches. The first occurred in southern Santa Monica Bay from May 27 to 29, 2015. The second occurred in Long Beach (June 3 to 5, 2015). Both events triggered cleanup operations and resulted in closures of the beach seaward of the lifeguard towers.

This assessment and restoration plan focuses primarily on impacts to public recreational use and does not include private claims for losses to commercial fishing or recreation-based concessionaires. Impacts to commercial activities and other private party claims may be addressed through third party claims procedures under OPA or in private civil litigation.

153

**Figure 37.** Overview of posted Closures and Advisories after the Refugio Beach Oil Spill.

## 5.5.1 Scaling Approach

The natural resource damages for human uses are based on the monetary value of spill-related human use impacts. Monetary value is measured using the economic concept of "consumer surplus". For recreation, consumer surplus is the value that an individual places on their recreational activities above and beyond the cost they incur to engage in those activities. It is not a calculation of the cost of participating in various recreational activities, nor is it the resulting economic impact in the community. Lost income to recreational businesses, lost tax revenue to municipalities, and lost user fees to public parks, while related to lost public use, are third-party claims that are not compensable under NOAA's NRDA regulations under OPA. However, these losses are indicative of loss of public recreation.

For calculating lost value, human uses were broken up into four general categories. These categories were delineated based upon the qualitative character of the use and the inherent separability of the relevant data available to identify losses:

*Coastal Camping*

Coastal camping includes overnight stays at campgrounds that are within relatively short walking distance to the beach or shoreline. In addition to camping, these users typically engage in a range of related day use activities (e.g., general beach use, bike riding, swimming, fishing, picnicking). Coastal camping impacts were measured in camping nights at identified camping areas.

*Non-Camping Shoreline Recreation*

Non-camping shoreline recreation captures a broad range of day use activities pursued by non-campers. It includes traditional beach use activities, such as sunbathing, walking, exercising, picnicking, beach combing, wildlife viewing, swimming, and surfing. However, it also includes diving, kayaking, standup paddle boarding and similar activities that originate from the adjacent

154

shoreline, rather than from a marina or specified boat launch. Different quantification methods were used for (1) Santa Barbara and Ventura Counties (Section 5.5.4) and (2) Los Angeles County (Section 5.5.5). Impacts to non-camping shoreline use were measured in user days for the northern two counties and in direct lost value for Los Angeles County.

### *Boating and Offshore Recreation*

Boating and offshore recreation includes motor boating, sail boating, and use of the Channel Islands National Park, as well as non-motorized boating originating from harbor marinas or identified boat launches that are not associated with specific recreational day use shoreline areas. Non-motorized boating includes activities such as kayaking, standup paddle boarding, and canoeing, as long as they originate from a marina or specified boat launch. Launches associated with data connected to "Non-Camping Shoreline Recreation" are addressed under that category of use (Sections 5.5.4 and 5.5.5). Motorized boating includes charter fishing trips, charter dives, and charter boat-based wildlife viewing. Lost use for these activities was measured in user days.

### *Research, Education, and Outreach*

Research, Education, and Outreach refers to trips to the University of California Coal Oil Point Reserve for the purpose of conducting research, participating in university-level classes, and reserve related outreach activities. Lost use for these activities was measured in user days.

Our quantification of lost value incorporates measures of affected human use activity (e.g., lost, diminished, and substituted trips). Total lost value is further adjusted by a three-percent annual percentage rate (compounded monthly) to reflect the change in value associated with delaying compensation.

## 5.5.2  Overview of Data Collection and Studies

The list below summarizes various field studies, data collection tasks, and analyses used for the assessment of human use impacts.

### *Documentation of Closures, Advisories, and Spill-related Notifications*

The Trustees tracked site closures and posted advisories by location and date. The Trustees also evaluated conventional media coverage of the spill along with social media posts and public announcements from selected organizations (e.g., public agencies).

### *Data Collection around the Time of the Spill*

The Trustees conducted systematic counts of people on the beach in selected locations in Santa Barbara and Ventura Counties. The Trustees also tracked foot and bike entries to El Capitan State Beach and conducted daily monitoring of automatic car counters at Goleta Beach and Arroyo Burro County Parks. Finally, the Trustees contacted water- and shore-oriented recreation businesses regarding impacts to their customers.

155

### *Compilation and Evaluation of Existing Data Related to Spill-Effects or Baseline Use*

The Trustees compiled historical data related to the public use of various sites, and then assessed these data for their relevance and efficacy for estimating spill-effects and baseline use. The data sources compiled and evaluated included:

- o Paid vehicles at State Park properties from Gaviota to Point Mugu;
- o Overnight stays at State Park properties from Gaviota to Point Mugu;
- o Parking fee data from select coastal lots between Santa Barbara and Malibu;
- o Historic records of automated car counters at Santa Barbara County Parks;
- o Marine Protected Area (MPA) Watch shoreline user counts;
- o South Coast MPA Baseline Program survey data, collected by researchers at Point 97/Ecotrust and Natural Equity;
- o Jalama County Park Camping Occupancy;
- o Commercial Passenger Fishing Vessel (CPFV) log summaries;
- o California Recreational Fisheries Survey (CRFS) angler estimates;
- o Fuel Sales at Santa Barbara Harbor fuel dock;
- o Channel Islands National Park visitation;
- o University of California, Santa Barbara (UCSB) Coal Oil Point spot counts;
- o USCB Coal Oil Point Reserve annual estimates of research, education, and outreach use;
- o Long Beach lifeguard beach user estimates; and
- o Los Angeles County lifeguard beach user estimates.

### *Data Collection on the First Anniversary of the Spill*

The Trustees evaluated gaps in the assessment data listed above. These gaps guided the prioritization and research design of data collection around the first anniversary of the spill. The Trustees conducted interviews and user counts to estimate baseline use and augment existing data to estimate spill-related changes in use at selected sites.

### *Analysis of Camping Losses*

The Trustees evaluated data and other information on coastal camping in Santa Barbara and Ventura Counties. Data from the spillthe spill period were compared to historical information. Camping impacts were identified at Refugio State Beach, El Capitan State Beach, and Gaviota State Park. Site-specific economic models were developed from existing data on camping reservations to estimate the value of a camping night. See Appendix K.

### *Analysis of Non-Camping Shoreline Recreation Losses in Santa Barbara and Ventura Counties*

The Trustees examined data on recreational use along the Santa Barbara and Ventura County coast. In general, data from outside the spill period were used to create statistical predictions of recreational use had the spill not occurred. These predictions accounted for weather, day-of-the-week, and other site-specific factors. Where reductions in recreation were identified, the trustees translated these reductions into estimates of lost user days. Lost value was calculated by

156

multiplying the number of lost user days by an estimated dollar value per user day derived from economic research on shoreline recreation in California (English 2010). See Appendix L.

*Analysis of Shoreline Recreation Losses in Los Angeles County*

The Trustees' estimate of lost value in Los Angeles County focuses on the relatively short periods where shoreline areas were closed in southern Santa Monica Bay and in Long Beach. The estimate of lost value was determined utilizing the southern California Beach Recreation Valuation Model (Hanemann et al. 2004), a state of the art recreation demand model designed specifically for the Los Angeles County beaches affected by the spill. See Appendix L.

*Analysis of Boating and Offshore Recreation Losses*

The Trustees considered a range of data sources for evaluating losses to boating and offshore recreation. The estimate of offshore recreation losses was based upon a series of phone contacts to recreational businesses that collected information on the reduction in passenger trips that these businesses experienced following the spill. The estimate of lost value per trip was based on a study of the consumer surplus value of boating trips to the Channel Islands (Gornik et al. 2013). See Appendix M.

## 5.5.3   Coastal Camping

The trustees identified spill impacts at Refugio State Beach, El Capitan State Beach, and Gaviota State Park campgrounds. The Refugio State Beach campground was closed for the longest time period (59 days). El Capitan State Beach experienced a shorter closure period (37 days), but it has more campsites and therefore more users were affected per day of closure. Both of these campgrounds are popular and reach capacity in summer months. Once the closures were lifted, the campsite occupancy recovered to near baseline conditions rather quickly at both locations (i.e., within a few weeks). Thereafter, small trailing reductions in use occurred over the entire summer. Gaviota State Park did not experience a closure. However, reductions in camping use were identified during the first two weeks after the spill. A total of 49,188 camping nights were lost across all three sites.

Data on the origin of visitors (by zip code) was combined with census data to create an economic model to estimate the value per camping night. This analysis resulted in an estimate of $29.57 (July 2018 dollars) per camping night lost. The total undiscounted damages are therefore $1,454,663, and the resulting total lost value is $1,593,571 (July 2018 dollars and present value). The model, along with the analysis of lost camping nights, is described in more detail in Appendix K.

## 5.5.4   Non-Camping Shoreline Recreation Use: Santa Barbara and Ventura Counties

The Trustees identified impacts to recreational shoreline users at multiple locations along the Santa Barbara and Ventura County coastlines (Table 21). Reductions in recreational use were assessed through quantitative analyses of a range of data indicators related to shoreline recreation (see Appendix L).

157

The observed impacts were greatest upcoast of Coal Oil Point Reserve, where sections of shoreline were subject to relatively long access and recreational fishing restrictions. Refugio and El Capitan State Beaches, and associated day use recreation opportunities, were officially closed for extended periods (59 and 37 days, respectively). Access to pocket beaches at Tajiguas, Venadito, and Las Flores were limited through August 28, 2015 by spill-related restrictions to roadside parking at historic highway pull offs. After the closures, recreational use at most of the sites returned to expected levels relatively quickly, within two to four weeks. The only exception was Refugio State Beach, where recreational use did not return to baseline until 8 weeks after the park reopened.

Shoreline recreation impacts on the Santa Barbara and Ventura Coastlines downcoast of Coal Oil Point were less severe. These locations were subject to a range of posted advisories, oilings, and media coverage about the "Santa Barbara spill". However, relative reductions in recreational use were generally modest, returning to baseline within two to four weeks after the initial spill. The only exception to this was at Leadbetter Beach on the Santa Barbara Waterfront, where lower levels of recreational use were observed in the data for 12 weeks.

A total of 89,380 shoreline recreation user days in Santa Barbara and Ventura Counties were estimated as lost due to the spill. Each user day was assigned a value of $21.45 (July 2018 dollars) based on an evaluation of economic research of shoreline recreation in California. Associated undiscounted damages are $1,917,317, and total lost value is $2,101,467 (July 2018 dollars and present value) This analysis is described in detail in Appendix L.

**Table 21.** Non-Camping Shoreline Losses in Santa Barbara and Ventura Counties

| Section of Coastline | Estimate of Lost Value (July 2018 dollars) |
|---|---|
| Gaviota State Park through El Capitan State Beach | $ 723,987 |
| El Capitan to Coal Oil Point | $ 295,335 |
| Coal Oil Point to Santa Barbara Waterfront | $185,783 |
| Santa Barbara Waterfront | $297,957 |
| Santa Barbara Waterfront to Ventura County Line | $43,006 |
| Ventura County Line through Emma Wood State Beach | $21,635 |
| Surfers' Point/San Buenaventura to Pt. Mugu | $349,614 |
| Total Undiscounted Damages | $1,917,317 |
| **Total Value Lost** | **$2,101,467** |

## 5.5.5  Non-Camping Shoreline Recreation Use: Los Angeles County

The Trustees quantified spill-related losses in Los Angeles County based on the number of days with oil-related beach closures following the spill (Table 22). Closures in south Santa Monica Bay began on May 27 and ended on May 29. Closures at Long Beach City Beach were initiated

158

on June 3 and ended on June 5. The affected beaches were closed seaward of the lifeguard towers.

Damages for the Los Angeles County closures were based upon the southern California Beach Recreation Valuation Model (Hanemann et al. 2004), an economic model that was constructed to evaluate the impact of closures and water quality changes to recreational use on southern California beaches. Specific sites affected by the closures are included in the model (Manhattan Beach, Hermosa Beach, Redondo Beach, Long Beach, and Belmont Shore). See Appendix L.

**Table 22.** Non-camping shoreline recreation losses in Los Angeles County

| Section of Coastline | Estimate of Lost Value (July 2018 dollars) |
|---|---|
| South Santa Monica Bay (Manhattan Beach to Redondo Beach), May 27-29 | $445,125 |
| Long Beach (1st Place to 72nd Place), June 3-5 | $92,444 |
| Total Undiscounted Damages | $537,568 |
| **Total Lost Value** | **$590,067** |

## 5.5.6   Boating and Offshore Recreation

The spill closed an area of fishing off the Gaviota Coast for 41 days. Cleanup vessels conducted cleanup operations in the cove at Refugio State Beach and elsewhere in the days following the spill. Information about the spill was reported in the media throughout the summer. Businesses that provide boat transport and other services to recreational users reported a total loss of 2,379 client trips (See Appendix M). These trips originated from marinas along the Santa Barbara, Ventura, and Los Angeles County coastline. These trips do not include launches of non-motorized boats (e.g., canoes, kayaks, standup paddle boards) that occurred from shoreline areas covered in the estimated loss of "Non-Camping Shoreline Recreational Use". These trips were assigned a value of $59.01 (July 2018 dollars) based upon Gornik et al. (2013). Total undiscounted damages are $140,384. Total lost value for this category of human use is $153,867 (July 2018 dollars and present value).

## 5.5.7   Research, Education, and Outreach

The Coal Oil Point Reserve at the University of California, Santa Barbara was closed for 26 days. In addition to providing opportunities for traditional beach recreation (e.g., sunbathing, beach combing, exercising, and swimming, which are covered above), the University of California operates the reserve to benefit its mission to provide high quality educational opportunities and conduct research. The Coal Oil Point Reserve provides a real world laboratory in which these activities can occur.

The University of California Natural Reserve System reports 7,521 research, education, and outreach user days for the 339 days that the Coal Oil Point Reserve was open between July 1, 2014 to June 30, 2015. Staff at the reserve system believe that the amount of research, education,

159

and outreach activities on the days that the reserve was open provides a reasonable basis for estimating use over the 26 days that the reserve was closed. Applying the resulting overall rate of 22.2 users per day to the 26 days of closure yields a user day loss estimate of 577 user days.

A value of $47.00 (July 2018 dollars) was attached to each of these user days. The Trustees were not able to identify a direct measure of consumer surplus for research, education, and outreach. This estimate is based upon the approximate tuition and fee cost of a course-day of instruction at the University of California, Santa Barbara, accounting for the proportion of undergraduate versus graduate and in-state versus out-of-state students. This results in a $27,116 estimate of undiscounted damage, and a total lost value estimate of $29,735 for this category (July 2018 dollars and present value).

### 5.5.8  Summary of Injury

The lost recreation use value estimated by the Trustees (July 2018 dollars and present value) is summarized in Table 23 by general geography and type of use.

160

**Table 23.** Total lost value by section of shoreline and quantified human uses.

| Section of Shoreline | Camping | Non-Camping Shoreline | Boating, Offshore | Research, Education, Outreach | All Activities Combined |
|---|---|---|---|---|---|
| Gaviota SP to El Capitan SB | $1,593,571 | $792,815 | | | $2,386,385 |
| El Capitan to Ellwood | | $285,425 | | | $285,425 |
| Sands Beach / Coal Oil Point Reserve | | $38,392 | | $29,735 | $68,126 |
| Santa Barbara Waterfront | | $326,364 | $127,592 | | $453,956 |
| Santa Barbara County (Other)* | | $250,795 | | | $250,795 |
| Ventura County | | $407,677 | $1,580 | | $409,258 |
| Los Angeles County | | $590,067 | $24,695 | | $614,762 |
| **Total Lost Value** | **$1,593,571** | **$2,691,534** | **$153,867** | **$29,735** | **$4,468,707** |

*This includes sections of coastline both upcoast and downcoast of Santa Barbara Waterfront.

As explained above, the lost use value represents the lost consumer surplus value to the public. It does not represent the cost of participating in these activities, nor the sum of their travel expenditures and resulting economic impact in the community. Table 23 represents the Trustees' best estimate of lost value, i.e., $4.47 million[18].

### 5.5.9  Proposed Restoration

The Trustees (including the University of California) intend to select a suite of restoration projects to compensate the public for lost use of the recreational resources caused by the spill. The Trustees will work cooperatively with local government agencies and non-governmental organizations to identify a suite of potential restoration projects according to the relative magnitude of spill impacts. These projects may include improvements or enhancements to public piers, parks, bike paths, boat ramps, fishing areas, or other infrastructure in order to increase the value of recreational experiences involving beach use, boating, and/or fishing. Specific examples include, but are not limited to: beach and waterfront access; boardwalk construction and improvements; fishing pier and dock improvements; beach sand management and replacement; beach fire rings; beach shower and restroom improvements; picnic facilities; Coastal Trail improvements; public access components of large ecological restoration projects; interpretive, educational, and wildlife viewing facilities.

---

[18] This is less than the amount to be recovered for lost recreation through the pending settlement process, i.e., $3.90 million. However, the Trustees believe the amount to be recovered through the settlement is adequate based on the following considerations: the amount is within the range of values the Trustees deem plausible given the uncertainties in some of the data; the Trustees' desire to reach a settlement and commence restoration more quickly; and the inherent risks involved in litigation if a settlement is not reached.

161

It is a goal of the Trustees to select projects spanning the geographic area of the spill and to address the various types of activities (e.g. camping, fishing, day use, other uses) that were impacted by the spill. To that end, and to the extent feasible, funds will be allocated among the regions affected by the spill according to the relative magnitude of the spill impacts, as described in Table 24.

**Table 24.** Geographic distribution of lost value across all quantified human uses.

| Section of Shoreline | Share of Total Lost Value |
|---|---|
| Gaviota SP to El Capitan SB | 53.40% |
| El Capitan to Coal Oil Point (excluding Research, Education, Outreach) | 7.25% |
| Coal Oil Point Reserve (Research, Education, Outreach only) | 0.67% |
| Santa Barbara Waterfront | 10.16% |
| Santa Barbara County (Other)* | 5.61% |
| Ventura County | 9.16% |
| Los Angeles County | 13.76% |

*This includes sections of coastline both upcoast and downcoast of Santa Barbara Waterfront.

These percentages reflect the approximate estimated distribution of losses across the spill area. In the event funds allocated to one or more geographic area(s) remain, and such funds are insufficient to implement additional recreation project(s) and/or insufficient feasible recreation projects are identified for one or more geographic areas, the Trustees shall have discretion to spend the money in another geographic area identified in Table 23. Compliance with environmental and other applicable laws will be the responsibility of the implementing agency for each selected project.

The distribution of the $3.9 million in damages recovered for lost recreational value will be administered as follows:

***State Parks***
State Parks will administer 53.4% ($2.08 Million) of the restoration funds for projects to be selected by State Parks with the approval of the Trustee Council. State Parks will work cooperatively with Santa Barbara County and other local government and non-government organizations to identify appropriate projects located within State Parks' property. These projects are to benefit recreational activities associated with units of CDPR from Gaviota to El Capitan. Funds are intended to compensate for all shore-based recreation losses, with approximately two-thirds being directed to camping and approximately one-third being directed other shoreline uses (including non-camping day use, shore-based fishing, diving, etc.).

162

***South Coast Shoreline Parks and Outdoor Recreation Grants Program – Other Coastal Areas***
The State Trustees (including University of California) will administer 45.93% ($1.79 Million) of the restoration funds for projects to be selected by the Trustees to primarily benefit recreational activities to compensate for recreational losses downcoast of El Capitan State Beach. The Trustees will work cooperatively with Santa Barbara, Ventura, and Los Angeles Counties, local cities, and other public and private organizations to identify a suite of potential projects according to the relative magnitude of the spill impacts, considering the availability of viable projects and types of affected uses. Projects will then be selected for funding using a competitive grant process, until all funds are spent.

***University of California***
The University of California Natural Reserve System will administer 0.67% ($26,000) to fund projects selected by University of California in coordination with the Trustee Council and with input from the public. These will address the research, education, and outreach missions of the University of California at Coal Oil Point Reserve.

# 6.0   NEPA Alternatives Analysis

## 6.1   Preferred Alternatives

The preferred alternative involves the implementation of the projects listed in Table 25. Anticipated impacts to the environment from implementation of each of these projects is described in Section 5. In the event any of these projects cannot be implemented, the Trustees will look at second tier projects also described in Section 5. Recreation projects to compensate for oil impacts to human uses will be administered by State Parks or handled under a grants program, administered by the State Trustees, and may undergo additional environmental analyses in subsequent NEPA reviews as needed. Project ideas submitted by the public will be considered by State Parks or through this grants program. Appendix N lists all projects submitted by the public and considered by the Trustees.

**Table 25.** Restoration projects that would be implemented under the preferred alternative.

| Shoreline Habitat Restoration | | |
|---|---|---|
| Shore-1 | Ellwood Seawall Removal | Restore sandy beach and mixed shoreline ecosystems and dynamics by removing a wooden seawall at Ellwood Beach that is currently constraining natural functioning condition of the sandy beach ecosystem as well as lateral access along the shoreline at high tide. |
| Shore-2 | Ventura County Dunes Restoration | Remove invasive dune species, protect sensitive bird populations, and enhance public access routes. |
| Shore-3 | Santa Monica Beach Restoration Pilot Project | Restoration of a highly impacted beach system in Santa Monica by stopping beach grooming and |

163

| | | restoring a diverse, endemic-rich, coastal plant and wildlife community. |
|---|---|---|
| Shore-4 | Black Abalone Restoration and Relocation | Transplant black abalone into specific locations within rocky intertidal habitat to enhance the overall health of the rocky intertidal ecosystem by returning this important grazer to the community. |
| **Subtidal and Fish Habitat Restoration** | | |
| SubT-1 | Abalone Restoration | Transplant abalone from donor sites and cultivated populations to a target population within MPAs, in order to bolster the abalone population within MPAs that serve an important ecological role as benthic grazers. |
| SubT-2 | Eelgrass Restoration | Eelgrass restoration in Refugio Cove. |
| SubT-3 | Sand-Dwelling Kelp Restoration Offshore of Goleta Beach | Funding for this project would extend monitoring of the existing pilot project to assess long-term benefits of the project, and viability of the restoration design. |
| SubT-4 | Ellwood Seawall Removal | Removing the Ellwood seawall primarily benefits sandy beach ecosystems, but subtidal habitats adjacent to the seawall are also projected to improve. |
| **Bird Restoration** | | |
| Bird-1 | BRPE Colony Enhancement on Anacapa Island | Enhance brown pelican breeding habitat on Anacapa Island by removing invasive plants or taking other actions to improve breeding attempts and success. |
| Bird-2 | Prevention of Injury to Seabirds Related to Recreational Fishing | This project would use outreach to raise public awareness and educate anglers about ways to reduce their chances of hooking birds and what to do if one is hooked, and to make improvements to fishing areas to prevent fishing waste from entering the environment. |
| Bird-3 | Coal Oil Point Western Snowy Plover Protection | This may include: predator control; upgraded signage and fences; outreach to reduce disturbances at COPR; leashes to lend; and eradicate iceplant over nesting habitat on Ellwood Beach. |
| **Marine Mammal Restoration** | | |
| Mamm-1 | Improve Pinniped Rehabilitation Survival | Increase survival rates for live stranded pinnipeds recovered in Santa Barbara and Ventura Counties. |
| Mamm-2 | Cetacean Entanglement Response | Expand response capacity for cetacean entanglement response program to increase survival rates of cetaceans entangled in fishing gear by staging gear in additional locations for quick response to reports of entangled whales in the Santa Barbara Channel. |

164

Exhibits Pg. 166

## 6.2    Non-Preferred Alternatives

This alternative includes consideration of second tier projects. These projects are discussed in Section 5, and listed in Appendix N. The Trustees may consider these projects for implementation in the event that the preferred projects are no longer available or are infeasible due to unforeseen circumstances. A full environmental review in this DARP/EA was premature for second tier projects considered non-preferred, as they are not yet ready for NEPA analyses for various reasons (e.g., project details and feasibility unknown at this time). Should the Trustees consider these projects for implementation in the future, additional review may be required as project-specific details become available, in which case any subsequent NEPA analyses needed would tier from this DARP/EA.

## 6.3    No Action Alternative

NEPA requires the Trustees to consider a "no action" alternative, and the OPA regulations require consideration of a roughly equivalent "natural recovery" alternative. Under this alternative, the Trustees would take no direct action to restore injured natural resources or to compensate for lost services. Instead, the Trustees would rely on natural processes for recovery of the injured natural resources.

The principal advantages of the natural recovery approach are the ease of implementation and the absence of monetary costs. However, while natural recovery may occur over time for many of the injured resources, the public would not be compensated for interim losses under the "no action" alternative. In some cases, changing environmental conditions may prevent the environment from recovering to baseline. For example, native kelp species that were killed by the spill may be replaced by invasive kelp that do not support the same ecosystem functions as native species. OPA clearly establishes Trustee responsibility to seek compensation for interim losses pending recovery of natural resources. Losses were, and continue to be, suffered during the period of recovery from the spill, including the loss of an estimated 558 birds, 232 marine mammals, degradation of nearly 1,500 acres of shoreline habitat, degradation of over 2,200 acres of benthic subtidal habitat, and the loss of human uses estimated at 49,000 camping nights and over 80,000 other user days (i.e., general beach use, surfing, boating, fishing, research, etc.). Technically feasible project alternatives exist to compensate for these losses. Thus, the Trustees reject the "no action" alternative and instead have selected the appropriately scaled restoration projects described above as the preferred alternatives.

By definition, the no action alternative lacks physical interaction with the environment. Accordingly, the no action alternative would cause no direct biological, physical, or human impacts to the environment. However, if the Trustees undertook no action, the environment would not benefit from the ecological uplift created by active restoration. Active restoration would restore injured areas and resources, and potentially prevent further injury. The no action

165

alternative may have minor to moderate short or long-term adverse indirect effects on the environment.

## 6.4   Cumulative Impacts

The Trustees examined a variety of alternatives to restore resources and/or services lost because of the Refugio Beach Oil Spill. Anticipated environmental consequences arising from each of the selected projects are provided in Section 5. As required by NEPA, this section addresses the potential overall cumulative impacts of implementing the projects selected in this restoration plan.

Cumulative impacts are impacts that result from an action along with other past, present, and reasonably foreseeable near-term future actions taken together. Significant cumulative impacts can result from a combination of actions that do not have significant impacts individually. Taken collectively, the effects of several actions may be additive, countervailing, or synergistic. Impacts are considered regardless of the agencies or parties involved. Thus, in considering cumulative impacts, this analysis is not limited to the impacts of restoration projects detailed herein, but also considers other significant activities and anthropogenic impacts throughout the region.

Overall, the Trustees' selected restoration projects for the Refugio NRDA will result in long-term net improvement in fish and wildlife habitat, restored ecological balance in areas where disturbances have led to adverse impacts on sensitive native species, and improved natural resource services provided to and by fish and wildlife in the region. The Trustees evaluated the restoration projects selected in this DARP/EA in conjunction with other known past, proposed, or foreseeable closely related projects, activities, and anthropogenic impacts that could potentially add to or interact with these projects within the spill-affected area to determine whether significant cumulative impacts may occur. Each resource category is quite different regarding the geographic scope of restoration projects, so cumulative impacts for each category are first treated separately followed by a summary statement regarding aggregate cumulative impacts.

Cumulatively, it is anticipated that there would be a long-term adverse effect to the biological, physical, and cultural environment were the no action/natural recovery alternative selected because no active restoration would occur. However, relative to the magnitude of adverse ecological impacts that currently exist in the project area, the adverse cumulative effect of the no action alternative is not expected to be significant as defined under NEPA.

### 6.4.1   Shoreline

All shoreline restoration projects are proposed to occur within the habitats formed at the interface of the land and Pacific Ocean, including sandy beaches, rocky intertidal habitats, and rocky-sandy mixed habitats. Within Santa Barbara, Ventura, and Los Angeles Counties, the condition

166

of these habitats is influenced by a variety of anthropogenic activities including coastal armoring, sediment diversion/stabilization, beach nourishment, and beach grooming, as described further below.

### Cumulative Impacts Issues

Some projects may have minor, short-term adverse effects, such as heavy equipment use on the beaches adjacent to the Ellwood seawall removal area; however, the cumulative effects of any short-term effects are anticipated to be negligible to the overall shoreline environment.

### Geographic Scope of Restoration Projects

The geographic scope of the shoreline restoration projects includes sandy beach and rocky intertidal habitats in Santa Barbara, Ventura, and Los Angeles County.

### Timeframe for Project Implementation

After the DARP/EA is finalized, projects are anticipated to begin within one year, and will be implemented for a period between five and ten years.

### Other actions affecting the resources, ecosystems, and human communities of concern

Major anthropogenic stressors that affect the shoreline environment can be grouped into five categories:

1. *Sediment deficit*. Southern California beaches are now receiving less than 50% of their historical sand budgets. This loss of sediment has a significant negative affect on the extent of shoreline habitat, the ecosystem services provided by shoreline habitats, and the amount and intensity of coastal erosion.
2. *Coastal armoring*. Approximately 27% of the southern California coast is armored and shoreline armoring associated with sea level rise is increasing every year. This removes habitat directly from a finite and shrinking resource, and further diminishes ecological and public uses.
3. *Beach nourishment.* Nourishment is an expensive, and as practiced in southern California, only a short-term approach to address sand deficits. Unless nourishment is implemented with great skill and consideration, it can have negative impacts on beach and other coastal environments.
4. *Beach grooming*. Beach cleaning or grooming includes removing trash and kelp wrack with heavy equipment and causes substantial disturbance, loss of productivity, and reduction in species diversity to the shoreline ecosystem.
5. *Invasive species*. Invasive, non-native, plant species such as iceplant and European beach grass have been planted or introduced into the shoreline environment and have spread and out-competed native plant species. In some instances, the spread of these invasive plant species have degraded the diversity and quality of sand dune ecosystems, and precluded species such as the western snowy plover from using these habitats for breeding.

167

6. *Changing environmental conditions (e.g., sea level rise, ocean acidification, etc.)* Future climate scenarios predict rising sea levels, which results in increased overall coastal erosion. Ocean acidification is projected to cause impacts to animals with calcium-carbonate shells (oysters, abalone, sand crabs, etc.), which are a major component of shoreline habitats. Larger storms may also impact coastal areas in the future, causing shoreline habitat degradation and loss.

Individually and in aggregate, all of these stressors have reduced the environmental quality of the shoreline ecosystem. The shoreline restoration projects selected by the Trustees, aim to reverse a portion of the negative effects that these stressors have had. For example, the Ellwood seawall project will remove a section of unnecessary coastal armoring in the City of Goleta, the Santa Monica dune and beach restoration project will discontinue beach grooming in an area of high potential for ecological recovery, and the Ventura County dune restoration project will remove invasive non-native plants from dunes that can be used by rare birds. All selected shoreline restoration projects are anticipated to have long-term beneficial effects.

## 6.4.2  Subtidal and Fish Habitats

The Trustees believe that the projects selected in this restoration plan that address injuries to subtidal habitats, in conjunction with other existing and anticipated coastal restoration projects, including those funded from damage recoveries from other OPA and CERCLA cases, will have a local and regional, long term, moderate beneficial impact on the extent and productivity of subtidal habitats within the geographic scope of the project implementation footprint. The majority of projects are geared toward restoring or enhancing subtidal rocky reef, kelp forest and eelgrass habitats. All three of these habitats provide ecosystem benefits to a diverse community of fish and invertebrates. As an example, kelp forests provide food to subtidal, intertidal and beach communities (e.g., a large component of beach wrack is produced by giant kelp). Southern California kelp forests have experience profound losses in area coverage and in some cases losses in diversity and abundance of the key species that serve to regulate the complex community of algae and invertebrates that are foundational to the habitat.

*Cumulative Impacts Issues*
Some projects may have minor, short-term adverse effects, such as minor air quality impacts via the use of boats to transport divers and equipment to restoration sites and heavy equipment use on the beaches adjacent to the Ellwood seawall removal area; however, the cumulative effects of any short-term effects are anticipated to be negligible to the overall subtidal environment.

*Geographic Scope of Restoration Projects*
The geographic scope of the subtidal restoration projects is subtidal habitats within three miles of the Santa Barbara County coast.

168

***Timeframe for project Implementation***
After the DARP/EA is finalized, projects are anticipated to begin within one year, and will be implemented for a period between five and ten years.

***Other actions affecting the resources, ecosystems, and human communities of concern***
Major processes or anthropogenic stressors that affect the nearshore subtidal environment can be grouped into six categories:

1. *Loss of kelp forest substrate*. The Santa Barbara coast has experienced a loss of approximately 215 acres of productive kelp forest habitat due to the loss of appropriate structure for kelp holdfasts to attach.
2. *Loss of coastal marine eelgrass habitat*. Eelgrass habitat provides unique and critical ecosystem services to the shallow subtidal component of the California coastal shelf. Eel grass beds are an important source of primary productivity and create 3-dimensional biogenic habitat that is used by a diverse assemblage of fish and invertebrates as nursery and foraging habitat. Eelgrass habitat is also identified by NOAA as a Habitat of Particular Concern under the Magnuson-Stevens Fishery Conservation and Management Act.
3. *Invasive species.* Invasive, non-native, species such as *Sargassum horneri* and *Undaria pinnatifida* have been introduced into the southern California bight and have spread and out-competed native species. The spread of these invasive plant species have degraded the diversity and quality of giant kelp and other subtidal vegetated habitat, making restoration of native habitat critically important.
4. *Coastal erosion and associated turbidity and scour.* A variety of coastal activities (seawall armoring, excessive irrigation practices, beach nourishment, etc) have been shown to reduce productivity of subtidal habitats due to the impacts of sedimentation (leading to burial of structured habitats), chronic turbidity (leading to reductions in primary production and growth of algae and plants that create three dimensional habitat), and scour (sediment washing over hard substrate and removing algae, attached invertebrates and other living habitat elements).
5. *On-going activities associated with oil extraction*. Numerous activities associated with oil extraction can have significant cumulative impacts on subtidal habitats. Clearly pipeline ruptures and spills from other sources have catastrophic impacts, but ongoing impacts associated with establishing and maintenance of the infrastructure needed to support oil extraction (e.g., pipeline construction and maintenance) can result in impacts to marine habitats.
6. *Changing environmental conditions (e.g., warming temperatures, ocean acidification, altered circulation)*. Future climate scenarios predict rising sea levels, which results in increased overall coastal erosion. Ocean acidification is projected to cause impacts to animals with calcium-carbonate shells (oysters, abalone, sand crabs, etc.), which are a major component of shoreline habitats. Larger storms may also impact coastal areas in the future, causing shoreline habitat degradation and loss.

169

Individually and in aggregate, these processes or anthropogenic stressors have reduced the environmental quality of the subtidal ecosystem. The subtidal restoration projects selected by the Trustees, aim to reverse a portion of these negative effects. Projects were selected with the primary goal of creating positive benefits in the face of the numerous anthropogenic stressors described above. All selected and second tier subtidal restoration projects are anticipated to have beneficial effects. Any adverse effects would be temporary and minor, and are not anticipated to cumulatively have any substantial adverse effects on subtidal resources within the project area.

### 6.4.3  Bird and Marine Mammal Projects

Unlike shoreline and subtidal habitats, birds and marine mammals travel widely within and outside of the spill-affected area, and the restoration projects selected to benefit these species are likewise located both within and outside of the spill-affected area, in places where the projects can have the greatest benefits. The selected projects will create positive benefits to birds and mammals in the face of anthropogenic effects, such as the ones described above. In many cases, restoration projects were selected to counter-act negative effects that existing human activities are having on bird and mammal resources.

***Cumulative Impacts Issues***

All selected bird and mammal restoration projects are anticipated to have beneficial effects. Any adverse effects would be temporary and minor, and are not anticipated to cumulatively have any substantial adverse effects on bird and mammal resources within the project area.

***Geographic Scope of Restoration Projects***

Projects are proposed to occur along the California mainland coast of Santa Barbara, Ventura, and Los Angeles Counties, and on the Channel Islands.

***Timeframe for project Implementation***

After the Final DARP/EA is released, projects are anticipated to begin within one year, and will be implemented for a period between five and ten years.

Other actions affecting the resources, ecosystems, and human communities of concern: Environmental quality in the project areas has been affected by a number of anthropogenic stressors grouped into four categories as follows:

1. *Modification of the coastline.* Extensive modification and human use of the shoreline has drastically changed the use of the coastline by birds and marine mammals. Bird and mammal breeding activities are not well-tolerated by human disturbance, and so many birds and mammals have adjusted the location of breeding to move away for areas that humans have modified and inhabited.

170

2. *Fishing gear entanglement.* As described elsewhere in this document, fishing hook and line injuries are by far the leading source of anthropogenic injury to seabirds brought to rehabilitation centers in Los Angeles and San Francisco.

3. *Harmful algal blooms.* Harmful algal blooms, such as the acute proliferation of plankton that produce the neurotoxin domoic acid, are becoming somewhat more frequent in southern California. These acute harmful algal blooms affect birds and mammals, often lethally.

4. *Changing environmental conditions.* Warmer ocean waters in the southern California area in the past decade have effects on upwelling and primary productivity, which has cascading effects up the food chain. Low prey availability for birds and mammals has caused increased mortality due to starvation.

The selected projects aim to to create positive benefits to birds and mammals in the face of anthropogenic effects, such as the ones described above. In many cases, restoration projects were selected to counter-act negative effects that existing human activities are having on bird and mammal resources.

## 6.4.4   Human Uses

Human uses along the shoreline are comprised of a variety of activities including boating, camping, surfing, general beach use, and other forms of recreation. The Trustees believe that, overall, the alternatives selected in this restoration plan, when considered along with past and reasonably foreseeable future projects, will have long term local and regional beneficial impacts to natural resources and recreation. Any negative impacts are anticipated to be short term, and minor.

### *Cumulative Impacts Issues*
The proposed projects to improve human uses have not yet been selected and will be the subject of a future decision process. However, we anticipate that the benefits of these projects will significantly enhance recreational opportunities along the shoreline. Some projects may create a temporary closure or re-routing of coastal access. For example, one possible project is improved beach access from Ellwood Mesa to Ellwood Beach. Currently, there is a steep dirt trail, which could be improved by the installation of a ramp or staircase to provide safe public access. While the construction of this project may create a month or longer temporary closure of the trail, the completed project will ultimately improve coastal access and provide recreational benefits for many years to come.

### *Geographic Scope of Restoration Projects*
Projects are proposed to occur along the California coast of Santa Barbara, Ventura, and Los Angeles Counties.

**Timeframe for project Implementation:** CDPR will select projects that will enhance camping and/or other shoreline recreational activities associated with units of CDPR from Gaviota to El

171

Capitan at State Beaches. A grants program will be initiated to solicit and select proposals for remaining projects to compensate for lost recreation. The Trustees anticipate that projects would be implemented for a period between one and eight years after the grant program has begun.

***Other actions affecting the resources, ecosystems, and human communities of concern***
In many areas of the coastline within Santa Barbara, Ventura, and Los Angeles Counties, access to the coastline for recreation is precluded or curtailed due to private ownership of coastal property and potential access points. As part of the restoration project selection criteria [in Section 4.2], recreational use projects will be selected and prioritized based on the degree to which they provide positive benefits to recreation in the face of numerous conflicting private and public interests. For example, projects will be selected to ameliorate limitations that exist for public access due to private ownership or limited beach access points. All proposed projects are anticipated to have beneficial effects for human uses within the affected area. Any adverse effects would be temporary and minor, and would not be anticipated to have any substantial adverse cumulative effects. The types of human use projects that are anticipated to be implemented through this plan are generally described by the categories below. When specific projects are selected for implementation, project-specific environmental reviews will be completed and assess the impacts of each project to the environment. Types of projects being considered to be selected by the Trustees may be grouped into the following four categories:

1. Shoreline Access and Amenity Improvements. Create, improve, and maintain access or otherwise improve recreational enjoyment of a day use recreation sites and public amenities that are both adjacent to land along the coast or and on the water. This includes, but is not limited to:
    - Trail improvement;
    - Pier repair, construction and accessibility improvements;
    - Boardwalk repair, construction, and accessibility improvements;
    - Boat launch repair, construction, and accessibility improvements;
    - Beach sand management;
    - Parking improvements at day use recreation sites
    - General infrastructure upgrades that can facilitate access;
    - Signage designed to enhance recreational experience; and
    - Infrastructure upgrades that improve recreational enjoyment of shoreline recreation sites, including locations where on-water recreation is initiated (e.g., dive sites, boat launches, harbors, marinas).

2. Camping. Add, improve, and maintain camping amenities and associated day use amenities at campgrounds. This includes, but is not limited to:
    - Benches and/or picnic facilities;
    - Fire rings;
    - Restrooms/showers;
    - Parking lot improvements;

172

- Fish/bait cleaning stations, fishing rod holders;
- Interpretive programs and/or signage;
- Shoreline access improvements at campground sites; and
- General infrastructure improvements that increase the efficiency, utilization, or enjoyment of campground amenities.

3. Recreational Programs. Programs including but not limited to:
   - Guided trips;
   - Education aimed at increasing public utilization of shoreline and on-water recreation resources; and
   - Equipment that supports recreation programs (e.g., kayaks, fishing gear).

4. Research, Education, and Outreach at University of California, Santa Barbara property.

The Trustees believe that, overall, the alternatives selected in this restoration plan, when considered along with past and reasonably foreseeable future projects, will have long term local and regional beneficial impacts to natural resources, as well as short term, minor negative impacts to human uses.

173

# References

*Documents that are in the Refugio Beach Oil Spill Natural Resource Damage Assessment Administrative Record  (RBOS NRDA AR) can be accessed here:*
*https://www.diver.orr.noaa.gov/web/guest/diver-admin-record?diverWorkspaceSiteId=6104*

Altstatt, J., R. Ambrose, J. Carroll, J. Coyer, J. Wible, and J. Engle. 2014. Eelgrass meadows return to Frenchy's Cove, Anacapa Island: recovery ten years after successful transplantation. Monographs of the Western North American Naturalist 7:500-517.

Barron M.G. 2017. Photoenhanced toxicity of petroleum to aquatic invertebrates and fish. Archives of Environmental Contamination and Toxicology 73:40–46.

Baker G. 2018. Summary of the Trustees' Analysis of the Volume of Line 901 Oil Released to the Ocean. National Oceanic and Atmospheric Administration. Refugio Beach Oil Spill NRDA Administrative Record.

Barringer, D. 2015. Final 2015 breeding season monitoring report for Western Snowy Plover and California Least Tern. Submitted to U.S. Fish and Wildlife Service, Region 8, Ventura, California. Refugio Beach Oil Spill NRDA Administrative Record.

Beeler, H. 2009. Community succession in macroalgal wrack: implications for prey resources of breeding western snowy plovers (*Charadrius alexandrines nivosus*) on Northern California beaches. Thesis presented to Humboldt State University, Arcata, California.

California Department of Fish and Wildlife. 2016. Refugio oil spill response evaluation report: summary and recommendations from the Office of Spill Prevention and Response. Office of Spill Prevention and Response, Sacramento, California. Refugio Beach Oil Spill NRDA Administrative Record

Carretta, J.V., K. Danil, S. J. Chivers, D.W. Weller, D.S. Janiger, M. Berman-Kowalewski, K.M. Hernandez, J.T. Harvey, R.C. Dunkin, D.R. Casper, S. Stoudt, M. Flannery, K. Wilkinson, J. Huggins, and D.M. Lambourn. 2015. Carcass recovery rates of California coastal bottlenose dolphins. Marine Mammal Science 32:349-362.

Conway-Cranos, L.L. 2012. Geographic variation in resilience: an experimental evaluation of four rocky intertidal assemblages. Marine Ecology Progress Series 457:67-83.

Coal Oil Point Reserve. 2015. Final Report on the Western Snowy Plovers. University of California Natural Reserve System, Santa Barbara, California. Refugio Beach Oil Spill NRDA Administrative Record.

Davidson, A.D., A.K. McEachern, T.J. Coonan, W.T. Bean, A.J. Armstrong, and B.R. Hudgens. 2014. Channel Islands National Park: natural resource condition assessment. Natural Resource

174

Technical Report NPS/CHIS/NRTR—2014. National Park Service, Fort Collins, Colorado. Refugio Beach Oil Spill NRDA Administrative Record.

Del Sontro, T.S., I. Leifer, B.P. Luyendyk, and B.R. Broitman. 2007. Beach tar accumulation, transport mechanisms, and sources of variability at Coal Oil Point, California. Marine Pollution Bulletin 544:1461-1471.

Donohoe, R., and B. Joab. 2018. Shoreline assessment data summary. Prepared by the California Department of Fish and Wildlife, Office of Spill Prevention and Response, Sacremento, California. Refugio Beach Oil Spill NRDA Administrative Record.

Duerr, R. 2016. Assessment of anthropogenic injuries to California brown pelicans and other seabirds received by International Bird Rescue's Los Angeles and San Francisco Bay Wildlife Centers 2002-2015. International Bird Rescue, Fairfield, California. Prepared for California Department of Fish and Wildlife, Office of Spill Prevention and Response. Refugio Beach Oil Spill NRDA Administrative Record.

Dugan, J.E. 2018. Population survey results on intertidal talitrid amphipods for the Refugio Beach Oil Spill NRDA. Prepared for Refugio NRDA. Refugio Beach Oil Spill NRDA Administrative Record.

Dugan, J.E., D.M. Hubbard, M.D. McCrary, and M.O. Pierson. 2003. The response of macrofauna communities and shorebirds to macrophyte wrack subsidies on exposed sandy beaches of southern California. Estuarine, Coastal, and Shelf Science 2003:25-40.

English, E. 2010. Damage Estimate for Shoreline Recreation. Report prepared for Cosco Busan NRDA. Refugio Beach Oil Spill NRDA Administrative Record.

Fiorello, C., P. Jodice, J. Lamb, Y. Satge, K. Mills-Parker, D. Jaques, L. Henkel, R. Golightly, and M. Ziccardi. 2017. Post-release monitoring of oiled brown pelicans from the 2015 Refugio oil spill. International Oil Spill Conference Proceedings 2017:605-617.

Ford, R.G., M.L. Bonnell, D.H. Varoujean, G.W. Page, H.R. Carter, B.E. Sharp, D. Heinmann and J.L. Casey. 1996. Total direct mortality of seabirds from the Exxon Valdez oil spill. American Fisheries Society Symposium 18:684-711.

Frangis, A., and N. Cox. 2015. Western snowy plover annual report 2015. California State Parks, Channel Coast District, Ventura, California.  Refugio Beach Oil Spill NRDA Administrative Record.

Gornik, K., T. Lin, G. McDonald, N. Ng, C. Quigley, and D. Viana. 2013. The non-market value of private recreational boating in the Channel Islands National Marine Sanctuary. Bren School of Environmental Science & Management, University of California, Santa Barbara.

175

Hanemann, M., L. Pendleton, C. Mohn, J. Hilger, K. Kurisawa, D. Layton, and F. Vasquez. 2004. Using revealed preference models to estimate the effect of coastal water quality on beach choice in Southern California. University of California, Berkeley. Prepared for the U.S. National Oceanic and Atmospheric Administration.

Hartley, C. 2015. Western snowy plover and California least tern breeding survey. Submitted to U.S. Fish and Wildlife Service, Region 8, Ventura, California. Refugio Beach Oil Spill NRDA Administrative Record.

Hornafius, J.S., D. Quigley, B.P. Luyendyk. 1999. The world's most spectacular marine hydrocarbon seeps (Coal Oil Point, Santa Barbara Channel, California): quantification of emissions. Journal of Geophysical Research 104:20703-20711.

Hubbard, D. and J. Dugan. 2016. Refugio Beach Oil Spill Shoreline Clean Up Effort Data Report 30 Aug 2016. Refugio Beach Oil Spill NRDA Administrative Record.

Jaques, D.L. and D.W. Anderson. 1987. Conservation implications of habitat use and behavior of wintering Brown Pelicans. Page 49. Unpublished report. PSRDP program, University of California Davis, Davis, California

Jaques, D. L., P. J. Capitolo, and J. N. Davis. 2015. Brown pelican roost aerial photographic survey report.. Prepared by Pacific EcoLogic, Astoria Oregon, and Colibri Ecological Consulting, Fresno, California. Refugio Beach Oil Spill NRDA Administrative Record.

Jeffrey, A. 2016. Refugio Incident—Goleta CA. Page 19. Responsible Party Technical Report for Response. Prepared for CTEH, Arvada, Colorado. Refugio Beach Oil Spill NRDA Administrative Record.

Junak, S. and R. Philbrick. 2018. The flowering plants and ferns of Anacapa Island, California. Western North American Naturalist 78:652-673.

Larramendy, P.T., J.A. Howard, A.J. Duvall, D.M. Maxurkiewicz, M.W. Parker, C. Carter, F. Gress, and D.W. Anderson. 2018. Breeding status of the California brown pelican on Anacapa and Santa Barbara Islands, California, in 2015 and 2016. Unpublished report. Prepared byCalifornia Institute of Environmental Studies, Ventura, California. Refugio Beach Oil Spill NRDA Administrative Record.

Lorenson, T.D, F.D. Hostettler, R.J. Rosenbauer, K.E. Peters, K.A. Kvenvolden, J.A. Dougherty, C.E. Gutmacher, F.L. Wong, and W.R. Normark. 2009. Natural offshore seepage and related tarball accumulation on the California coastline; Santa Barbara Channel and the southern Santa Maria Basin; source identification and inventory. Page 116 and spreadsheets. U.S. Geological Survey Open-File Report 2009-1225 and MMS report 2009-030. U.S. Geological Survey, Menlo Park, California. Refugio Beach Oil Spill NRDA Administrative Record.

176

Lorenson, T.D., I. Leifer, F.L. Wong, R.J. Rosenbauer, P.L. Campbell, A. Lam, F.D. Hostettler, J. Greinert, D.P. Finlayson, E.S. Bradley, and B.P. Luyendyk. 2011. Biomarker chemistry and flux quantification methods for natural petroleum seeps and produced oils, offshore southern California. Page 45. U.S. Geological Survey Scientific Investigations Report 2011-5210 and Bureau of Ocean Energy Management OCS Study BOEM 2011-016. Pacific Coastal Marine Science Center, Santa Cruz, California. Available at https://pubs.usgs.gov/sir/2011/5210/

Martin, K.L. 2015. Beach-spawning fishes, reproduction in an endangered ecosystem. CRC Press, Boca Raton, Florida.

McClatchie, S., J. Field, A.R. Thompson, T. Gerrodette, M. Lowry, P.C. Fiedler, W. Watson, K.M. Nieto, and R.D. Vetter. 2016. Food limitation of sea lion pups and the decline of forage off central and sourthern California. Royal Society Open Science 3: 2-9.

McGinnis, M. V., R.R. Cordero, and M. Stadler. 2004. Tribal Marine Protected Areas: Protecting Maritime Ways and Practice, A Special White Paper for the Wishtoyo Foundation. Bioregional Planning Associates, Santa Barbara, California

Michel, J. 2015. Sunken oil assessment survey results: Refugio incident. Report prepared for the Incident Command, Santa Barbara, California.  Refugio Beach Oil Spill NRDA Administrative Record

Morris, J.M., H.P. Forth, C.R. Lay, R. Takeshita, and J. Lipton. 2015. Toxicity of thin floating oil slicks to fish and invertebrates. DWH-AR0280221. Technical Report for Deepwater Horizon Trustees. Prepared for National Oceanic and Atmospheric Administration, Washington, D.C.

Moskoff, W. 2000. The impact of oil spills on birds: Looking back at the Exxon Valdez. Birding February 2000: 44-49.

National Marine Fisheries Service. 2012. Southern California Steelhead Recovery Plan. Southwest Region, Protected Resources Division, Long Beach, California.

National Park Service 2019. Invasive Plant Treatments. Categorical Exclusion Form, issued February 22, 2019. Channel Islands National Park, Ventura, California.  Refugio Beach Oil Spill NRDA Administrative Record

National Oceanic Atmospheric Administration. 2016. 2015 state of the climate: El Niño came, saw, and conquered. Climate.gov, National Oceanic Atmospheric Administration, 2 August 2016. Available: <https://www.climate.gov/news-features/understanding-climate/2015-state-climate-el-ni%C3%B1o-came-saw-and-conquered>

177

Nishimoto, M.M., L. Washburn. 2002. Patterns of coastal eddy circulation and abundance of pelagic juvenile fish in the Santa Barbara Channel, California, USA. Marine Ecology Progress Series 241: 183-199.

Nixon, Z. 2018. Refugio Beach oil spill shoreline oil exposure quantification technical report. Prepared for California Department of Fish and Wildlife, Oil Spill Prevention and Response, Santa Barbara, California. Refugio Beach Oil Spill Administrative Record

Nocerino, E., J. M. Erlandson, J. Smallwood, C. G. Lebow, and A. M. Muns. 2016. Cultural resource monitoring and impact assessment Plains All American pipeline Refugio oil spill response, Santa Barbara County, California. Prepared for Plains All American Group LLC., Bakersfield, California.

Office of Environmental Health Hazard Assessment. 2015. Risk assessment of seafood consumption following the Refugio Beach Oil spill incident in Santa Barbara County, California. Page 44. Office of Environmental Health Hazard Assessment, California Environmental Protection Agency, Sacramento, California,Refugio Beach Oil Spill NRDA Administrative Record

Office of National Marine Sanctuaries. 2019. Channel Islands National Marine Sanctuary 2016 Condition Report. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Office of National Marine Sanctuaries, Silver Spring, MD. pp. 182-203

Oka, N. and M. Okuyama. 2000. Nutritional status of dead oiled rhinoceros auklets (*Cerorhinca monocerata*) in the Southern Japan Sea. Marine Pollution Bulletin 40:340-347.

Oiled Wildlife Care Network. 2015. OWCN oiled animal data log for the Refugio Beach oil spill. OWCN, Davis, California. Refugio Beach Oil Spill NRDA Administrative Record.

Page, G.W., H.R. Carter, R.G. Ford. Numbers of seabirds killed or debilitated in the 1986 Apex Houston oil spill in central California. 1990. Studies in Avian Biology 14:164-174.

Planning and Development Department, County of Santa Barbara. 2016. Gaviota Coast Plan. Available: < https://www.countyofsb.org/plndev/policy/communityplans/gaviota.sbc>

Raimondi, P., C. Bell, K. Ammann, R. Gaddam, D. Lohse, M. Douglas, M. George, N. Fletcher, L. Anderson, M. Miner. 2019. Assessment of potential impacts to rock intertidal community following the Refugio Beach Oil Spill, Santa Barbara County. Report prepared for California Department of Fish and Wildlife, Oil Spill Prevention and Response, Santa Barbara, California. Refugio Beach Oil Spill NRDA Administrative Record.

Southern California Coastal Ocean Observing System. 2019. El Niño. Southern California Coastal Ocean Observing System, La Jolla, California. Available: <http://sccoos.org/data/el-nino/>

178

Schiel, D.R. and M.S. Foster. 2015. The biology and ecology of giant kelp forests. University of California Press, Oakland, California.

Schulhof, M. and Grifman, P. 2019. Workshop report: Improving oil spill preparedness and response in Santa Barbara, CA. USCSG-TR-01-2019.

Sea Grant Network. 2018. Traditional and Local Knowledge: A Vision for the Sea Grant Network. NOAA.

Stephens J., D. Pondella, J. Steinbeck , J. Carrol, M. Love. 2016. Biography of the trawl-caught fishes of California and an examination of the point conception faunal break. CalCOFI Report 57:89-108.

Stout, S.A. 2016. Refugio Beach oil spill NRDA investigation: trustees forensic oil source analyses. Page 61. Refugio Beach Oil Spill NRDA Administrative Record.

Stout, S.A., D.L. Valentine, and C.M. Reddy. 2018. Refugio Beach oil spill NRDA investigation: supplemental chemical fingerprinting assessment. Page 83Refugio Beach Oil Spill NRDA Administrative Record.

Tumamait-Stenslie, J. 2014. Chumash story: the rainbow bridge. WilderUtopia, Los Angeles, California. Available: <https://www.youtube.com/watch?v=w0iyd68oBok>

U.S. Coast Guard. 2016. Refugio Beach Oil Spill Santa Barbara County, California Federal On-scene Coordinator's After Action Report. Page 47. U.S. Coast Guard, Sector Los Angeles, California.  Refugio Beach Oil Spill NRDA Administrative Record.

U.S. Coast Guard. 2017. Refugio Incident Closeout and Disestablishment of Unified Command memo. U.S. Coast Guard, Sector Los Angeles, California. Refugio Beach Oil Spill NRDA Administrative Record.

U.S. Department of Transportation. 2016. Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California. Failure Investigation Report. Refugio Beach Oil Spill NRDA Administrative Record.

U.S. Fish and Wildlife Service. 2005. Recovery plan for the tidewater goby (*Eucyclogobius newberryi*). U.S. Fish and Wildlife Service, Pacific Region 1, Portland, Oregon.

Valentine, D.L. 2015.  Forensic hydrocarbon analysis conducted in response to the Line 901 rupture at Refugio. Unified Command report. Prepared by Valentine Scientific and Consulting Services, Inc., Goleta, California. Refugio Beach Oil Spill NRDA Administrative Record.

179

Valentine, D.L. 2017. Latent transport of floating oil aggregates to California offshore waters, from the Line 901 rupture at Refugio: a compilation of evidence. Page 18. NRDA Technical Report.Refugio Beach Oil Spill NRDA Administrative Record.

Valentine, D.L. 2019. Benthic oiling from the 19 May 2015 Line 901 rupture at Refugio: a compilation of evidence. Page 14. NRDA Technical report. Refugio Beach Oil Spill NRDA Administrative Record.

Williams, S.L. 1995. Surfgrass (*Phyllospadix torreyi*) reproduction: reproductive phenology, resource allocation, and male rarity. Ecology Society of America 76:1953-1970.

Personal Communications

Altstatt, J. 2018. Long-term Monitoring Program and Experiential Training for Students Coordinator, National Marine Sanctuaries, Santa Barbara, California.

180

## Preparers

The following Trustees participated in the development of this DARP/EA:

**California Department of Fish and Wildlife, Office of Spill Prevention and Response**
Michael Anderson
Bruce Joab
Regina Donohoe
Matthew Zafonte
Bryand Duke
Steve Hampton
Katherine Verrue-Slater

**National Oceanic and Atmospheric Administration**
Laurie Sullivan
Robert Ricker
Mathew Dorsey
David Witting
Gregory Baker
Natalie Cosentino-Manning
Jennifer Boyce
Christopher Plaisted

**US Department of the Interior**
Clare Cragan

**US Fish and Wildlife Service**
Jenny Marek
Tobias McBride
Damian Higgins
Colleen Grant

**University of California State Barbara**
David Hubbard
Jenifer Dugan
Cristina Sandoval
Barton Lounsbury

**California State Parks**
Nathaniel Cox
Laura Reimche

181

# Acknowledgements

The Trustees acknowledge and thank the following individuals for providing expertise during injury assessment and restoration planning:

**GOVERNMENT AGENCIES:**

**California Department of Fish and Wildlife**
Laird Henkel
April DaSilva
Julia Coates
Kenneth Oda
Kimberly Walker
Ryan Denton
Heather Gliniak
Otis Horning
Carlos Mireles
Marsa Morse
Derek Stein
Rebecca Flores-Miller
Michael Prall
Steven Gibson

**California Office of Environmental Health Hazard Assessment**
Beckye Stanton
Susan Klasing

**California State Lands Commission**
Sara Mongano

**California State Parks**
Alexis Frangis
Brooke Sheridan

**National Oceanic and Atmospheric Administration**
Amy MacFadyen
Stacie Smith
Bernadita Anulacion
Chris Barker
Gina Ylitalo
John Incardona
Adam Domanski

**National Oceanic and Atmospheric Administration**
Ben Shorr
Sarah Wilkin
Nick Kellar

**U.S. Fish and Wildlife Service**
Lena Chang
Colleen Draguesku
Kendra Chan
Cathy Johnson
Carolyn Marn
Janet Whitlock
Jeff Phillips
Lilian Carswell
Cat Darst
Chris Kofron
Eric Morrissette
Mary Root
Roger Root
Ashley Spratt
Hazel Rodriguez
Carol Roberts
Katie Zeeman
Annie Little

**Bureau of Land Management**
Dave Ledig
Bill Standley
Jim Weigand

**National Park Service**
Russell Galipeau
David Kushner
Joshua Sprague
Stephen Whitaker
Ken Convery
David Mazurkiewicz

182

**County of Santa Barbara**
Dianne Black
Kathryn Lehr

**City of Goleta**
Anne Wells
Andy Newkirk

**TRIBES:**
*Santa Ynez Band of Chumash Indians*
Freddie Romero
Armenta Rose

**UNIVERSITIES:**
**University of California Davis,**
**Oiled Wildlife Care Network**
Mike Ziccardi
Kirsten Gilardi

**University of California Santa Cruz**
Pete Raimondi

**Pepperdine University**
Karen Martin

**PRIVATE ORGANIZATIONS:**
**Environmental Defense Center**
Linda Krop
Kristen Hislop

**Santa Barbara Channelkeepers**
Kira Redmond
Ben Pitterle
Jenna Driscoll

**NewFields Government Services**
Scott Stout

**Makepeace Environmental Solutions**
Chris Reddy

**Valentine Scientific and Consulting Services**
David Valentine

**Tenera Environmental Services**
Scott Kimura
Jessie Altstatt

**Industrial Economics**
Chris Leggett
Eric Horsch
Mark Curry

183

**Appendix A.   Oil Fate and Transport**

**Appendix B.   Data Management and Access**

**Appendix C.   Resource Equivalency Analysis**

**Appendix D.   Shoreline Exposure and Injury Evaluation Studies**

**Appendix E.   Supplemental Bioassay Report Information**

**Appendix F.   Shoreline Habitat Equivalency Analysis**

**Appendix G-1. Fish, Invertebrate, and Other Mortality Observations**

**Appendix G-2. Field and Laboratory Assessment of Injury to Grunion**

**Appendix G-3. Assessment of Surfperch Exposure**

**Appendix G-4: Oil Exposure and Potential Effects to Fish, Invertebrate Early Life Stages, and Kelp**

**Appendix G-5: Changes in the Condition of Surfgrass and Macroalgae**

**Appendix G-6: Field Assessment of Subtidal Exposure**

**Appendix G-7: Polycyclic Aromatic Hydrocarbons in Nearshore Fish and Invertebrate Tissues**

**Appendix H.   Subtidal Injury Quantification and Habitat Equivalency Analysis**

**Appendix I.   Bird Injury Assessment**

**Appendix J.   Marine Mammal Exposure, Injury, and Restoration**

**Appendix K.   Recreational Camping Damages**

**Appendix L.   Recreational Shoreline Use Damages**

**Appendix M.   Recreational Boating and Offshore Use Damages**

**Appendix N.   Summary of Proposed Restoration Projects**

**Appendix O.   Response to Public Comments on the Draft Damage Assessment and Restoration Plan/Environmental Assessment (DARP/EA)**

184

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On July 11, 2025, I served the above document(s) described as **PETITIONERS AND PLAINTIFF' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLICATION FOR STAY OR PRELIMINARY INJUNCTION, VOLUME 1** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒      **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 11, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

1
Proof of Service

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEY FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **PETITIONERS AND PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLICATION FOR STAY OR PRELIMINARY INJUNCTION, VOLUME 3** <br><br> Date:     July 18, 2025 <br> Time:     10:00 a.m. <br> Dept.:     4 <br> Judge:    Hon. Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

Petitioners and Plaintiffs' Request for Judicial Notice in support of Application for Stay or Preliminary Injunction, Volume 3

**EXHIBIT INDEX**

| Exhibit | Description | Vol. | Page No. |
|---|---|---|---|
| A | California Department of Fish and Wildlife (CDFW), *et al.*, Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment, dated June 2021 | 1 | 3-186 |
| B | U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) Failure Investigation Report, Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California, dated May 2016 | 2 | 189-699 |
| C | Staff Report Recommending that the California Coastal Commission (CCC) issue a Cease and Desist Order (CDO), Restoration Order, and Administrative Civil Penalty to Sable Offshore Corp. ("Sable"), dated March 28, 2025 | 3 | 702-791 |
| D | Letter from U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) stating it has no objection to the waiver for CA-324 by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 | 3 | 792-794 |
| E | Letter from PHMSA stating it has no objection to the waiver for CA-325A/B by CAL FIRE – Office of the State Fire Marshal (OSFM), dated February 11, 2025 | 3 | 795-797 |
| F | Notice of Violation from the Regional Water Quality Control Board to Sable, dated April 15, 2025 | 3 | 798-806 |
| G | OSFM letter granting the waiver for CA-324, dated December 17, 2024 | 3 | 807-822 |
| H | OSFM letter granting the waiver for CA-325A/B, dated December 17,2024 | 3 | 823-838 |
| I | Excerpts from Draft Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the Proposed Celeron/All American and Getty Pipeline Projects prepared by the California State Lands Commission (CSLC) and Bureau of Land Management, Department of the Interior (BLM) dated August 1984 | 3 | 839-844 |
| J | Excerpts from Final EIR and EIS for the Proposed Celeron/All American and Getty Pipeline Projects prepared by CSLC and BLM dated January 1985 | 3 | 845-857 |
| K | Santa Barbara County ("County") Webpage "901/903 Replacement Pipeline Project" (last accessed July 11, 2025) | 3 | 858-861 |
| L | PHMSA Webpage "Pipeline Special Permits and State Waivers Overview" (last accessed July 11, 2025) | 3 | 862-864 |
| M | California Natural Resources Agency's (CNRA) summary of state regulation of crude oil pipelines in the County prepared and maintained by CNRA, last updated on June 4, 2025 (last accessed July 11, 2025) | 3 | 865-875 |
| N | Excerpt of PHMSA's "Guidelines for State Participating in the Pipeline Safety Program" | 3 | 876-879 |

**EXHIBIT SEGMENT COVER PAGE**

Volume 3 of 3

Pages 700-879

# EXHIBIT C

STATE OF CALIFORNIA – CALIFORNIA NATURAL RESOURCES AGENCY                    GAVIN NEWSOM, *Governor*

## CALIFORNIA COASTAL COMMISSION

455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105-2421
VOICE (415) 904-5200
FAX (415) 904-5400



# Th8.1, Th8.2 & Th8.3

|  |  |
|---|---|
| Staff: | Stephanie Cook –SF |
| Staff Report: | March 28, 2025 |
| Hearing Date: | April 10, 2025 |

### STAFF REPORT: RECOMMENDATIONS AND FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY

**Cease and Desist Order No.:**          **CCC-25-CD-01**

**Restoration Order No.:**          **CCC-25-RO-01**

**Administrative Penalty No.:**          **CCC-25-AP3-01**

**Related Violation File:**          **V-9-24-0152**

**Entity Subject to this Order:**          **Sable Offshore Corp.**

**Location:** The properties that are subject to this proceeding are at various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Los Padres National Forest, and areas around those properties, that are being or could be impacted by the development activities at issue here, as described below, all within Santa Barbara County; as well as offshore locations in state waters, where the parties subject to this proceeding have undertaken unpermitted development in placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines, all as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.

**Violation Description:** Activities onshore including, but not limited to, excavation with heavy equipment; removal of

Exhibits Pg. 703

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

major vegetation; grading and widening of roads; installation of metal plates and other fill material within wetlands; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325; as well as offshore development including, but not necessarily limited to, placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines; all without the requisite Coastal Act authorization, as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.

| | |
|---|---|
| **Substantive File Documents:** | 1. Public documents in the files for Cease-and-Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-AP3-01 |
| | 2. Exhibits 1 through 130 and Appendix A of this staff report. |

## SUMMARY OF STAFF RECOMMENDATIONS

### Introduction

These proceedings pertain to several ongoing and extensive Coastal Act violations undertaken by Sable Offshore Corp. ("Sable") at various onshore locations along existing crude oil conveyance pipelines on the Gaviota coast in Santa Barbara County, as well as offshore, along sections of related oil and water pipelines, located within state waters, that connect the offshore Santa Ynez Unit oil production platforms to shore. All the violations are at sites along or offshore of the Gaviota Coast, in Santa Barbara County, and all of which have adversely impacted, and continue to adversely impact, coastal resources as a result of Sable's outright refusal to comply with the Coastal Act. Sable's development activities on the Pipelines have also been the concern of several other state environmental and natural resource agencies including the State Water Control Resources Board and Regional Water Quality Control Board, the California Department of Fish and Wildlife, and the Department of Parks and Recreation, all of which have similarly identified issues associated with Sable's lack of compliance with applicable environmental regulations. This issue has also generated concern from State legislators, culminating in a recent inter-agency Town Hall meeting where the aforementioned agencies, as well as some others, collectively met to discuss their respective roles, and interest, in this ongoing issue, as well as to answer questions from the public.

2

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Both the onshore portion of the Pipelines and the offshore oil and water pipelines are part of the larger Santa Ynez Unit, which consists of three offshore platforms (Hondo, Harmony, and Heritage), the Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil, water and natural gas transport pipelines. The Las Flores Pipelines CA-324 and CA-325 (previously Lines 901 and 903 respectively) ("Pipelines") are located onshore, with Line CA-324 following along the coastline between the Las Flores Canyon Plant processing facility and the Gaviota Pump Station, and line CA-325 extending inland from the pump station. Separate offshore oil and water pipelines extend from the Las Flores facility into state coastal waters and ultimately connect to the three platforms offshore in federal waters, mentioned above.

**Background**

This specific pipeline system is of particular historical importance as it is the source of the 2015 Refugio Beach oil spill, which caused significant environmental damage to approximately 150 miles of coastline. The oil spill occurred when a corroded portion of the onshore pipeline Line CA-324 ruptured, releasing more than 123,000 gallons of oil. Much of this oil flowed into a storm drain which traveled under the adjacent highway, before reaching the coast of Refugio State Beach, and continuing outward into the ocean.[1] The spill had a severe effect on the coast, negatively impacting wildlife and ecosystems along the coast, and requiring hundreds of millions of dollars in clean-up costs. In addition, the spill caused an estimated 140,000 lost recreation user days between Santa Barbara, Ventura, and Los Angeles Counties.[2] As a result of the oil spill, all production of oil was halted at the Santa Ynez Unit in 2015, and the pipelines have remained offline and out-of-service since that time.

The Las Flores Pipeline System was constructed in the 1980's after Celeron Pipeline Company ("Celeron") proposed to construct a pipeline that would transport crude oil produced from offshore platform locations to out-of-state refinery facilities. Celeron applied to Santa Barbara County and was granted a Conditional Use Permit ("CUP") and Final Development Permit ("FDP"). Additionally issued under the umbrella of the FDP were two coastal development permits, each of which incorporated by reference the language in the FDP. Celeron completed construction in 1990, and thereafter, the pipelines remained in service until the 2015 oil spill, at which point they were placed out of service.

Since that time, ownership of the Pipelines has been transferred from Plains Pipeline, L.P., owner and operator in 2015, when the lines were placed offline, to ExxonMobil Corporation ("Exxon") which purchased them on October 13, 2022. Exxon then entered into a purchase agreement with Sable one month later, on November 1, 2022. This purchase agreement between Exxon and Sable was finalized on February 14, 2024. Through this agreement, Sable purchased the entire Santa Ynez Unit ("SYU"), including the Pipelines, and all associated assets (the three offshore platforms, subsea pipelines and infrastructure, and Las Flores Canyon processing facility). As the new owner and operator of the Pipelines,

---

[1] https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline
[2] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 18 (June 2021) [hereinafter "NRDA"], available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.

3

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Sable began undertaking efforts to transfer necessary permits and to restart use of the Pipelines and SYU offshore oil production operations.

In brief, this case seeks to resolve Coastal Act violations where Sable, the current owner and operator of the SYU, including the Pipelines and other associated assets as described above, has undertaken, and continues to undertake, development activities onshore, along the Pipelines, and at locations at offshore pipelines, as well, all without prior Coastal Act authorization. Importantly, most of the activities undertaken at locations onshore, along the Pipelines, and which Sable has refused to suspend, have been carried out in direct violation of several Notice of Violation and Notice of Intent letters, and in direct violation of Commission staff warnings and even a formal Cease and Desist Order.

**Violation Description**

As described in greater detail below, Sable undertook development at locations onshore, along the Pipelines, as early as, if not before, September of 2024. Sable undertook such activities without prior communication or notification to the California Coastal Commission ("Commission") staff, and without Coastal Act authorization. More specifically, at locations onshore, Sable undertook development activities including the following: 1) excavation with heavy equipment; 2) removal of major vegetation; 3) grading and widening of roads; 4) installation of metal plates and other fill material within wetlands; 5) dewatering and discharge of water, including into coastal waterways; 6) pipeline removal, replacement, and reinforcement; 7) installation of shutoff valves; as well as other development associated with the inspection and anomaly correction work on Las Flores Pipelines CA-324 and CA-325. At locations offshore, Sable undertook development beginning on November 29, 2024, including the placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines.

After acquiring the Pipelines, Sable began conducting inspections along the Pipelines to assess the many sites where the pipeline had corroded and was at risk of rupture. These inspections showed over 100 locations along the Pipelines, and within the Coastal Zone, where Sable determined the pipeline was defective, and in need of repair. To complete these repairs, Sable brought in heavy equipment to excavate substantial areas, and began either, removing or replacing whole sections of pipe, or installing external sleeves or coatings to expand and reinforce the pipeline. With regard to the installation of shutoff valves, as mentioned above, 16 shutoff valves were installed at onshore locations of the Pipelines and of those 16 valves, a total of seven were located in the Coastal Zone. The shutoff valves are large structures with various apparatuses that are installed directly on the Pipelines. In certain locations, installation of this type of apparatus involved extensive grading and removal of vegetation. Importantly, the full extent of development undertaken in accordance with the above-listed Coastal Act violations, is not fully known by Commission staff as Sable has repeatedly declined requests from Commission staff to provide full-scale project plans and detailed information about the scope of work it carried out.

The onshore development along the Pipelines has resulted in adverse impacts to various sensitive habitat areas in order to create access routes and staging areas, and for the

4

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

excavations themselves. Although some of the work has been in areas of less sensitive habitat, they still raise some concerns.is pastureland, Some of these excavations extend for roughly 100 ft, with a depth of roughly 10 ft, and some occurred on steep slopes (Exh. 112 and Exh. 113 and in protected habitat areas including federal designated critical habitat for wildlife protected under the Endangered Species Act, or within streambed corridors and wetlands. Over the months in which Sable has continued to undertake this work, Commission staff received reports with concerning images depicting potential for damage of these critical habitats, including images of excavators staged in particularly sensitive areas, such as above a pool of water where a southwestern pond turtle was seen to be swimming, or alongside two southern California steelhead (See exhibit 67 for image of critical species in pool under excavator). Notably, the southwestern pond turtle is proposed for federal listing as a threatened species and designated as a species of special concern, and the southern California steelhead is listed as an endangered species under the federal Endangered Species Act and is a candidate for listing under California's Endangered Species Act.

Sable characterizes the work as routine maintenance and claims that it was authorized by the original entitlements received in the 1980s. However, despite many discussions with both Sable and the County and extensive research into the history, Commission staff has found no support for this position. Furthermore, the level of work conducted along the onshore portions of the Pipeline is extraordinary. A single campaign to excavate over 100 separate pipeline sections across a modest distance; sever, remove and replace some sections; and expose, reinforce, seal, and coat others goes beyond what could possibly have been considered by the original permit and supporting documents. The only way for this level of activity to have been contemplated at the time of the original permit would be if it were presumed that required inspections would be incapable of detecting corrosion and degradation throughout the line to the point that the pipeline ruptured at one location and was in imminent risk of rupturing at over 100 other locations. When a pipeline is operated legally and responsibly – as would have been assumed by the permit and supporting documents – this level of degradation and subsequent need for simultaneous and comprehensive remediation across the entire line would never happen.

The timing of Sable's onshore work is also problematic in that it has occurred during the breeding season for the federally listed southern California steelhead and the California red legged frog, a species which is listed as threatened under the federal Endangered Species Act. The work also occurred during the nesting season for most bird species, as well as the time of year in which ground disturbance is most likely to result in erosion, scarring, and discharge of sediment into wetlands and watercourses. Moreover, several work sites are in or adjacent to environmentally sensitive habitat areas (ESHA), including coastal scrub and chaparral habitats, and in, or near, areas mapped as wetlands and riparian habitat. Other work sites are in annual or native grassland, and woodlands. Importantly, native grasslands are ESHA, while certain non-native habitats such as annual grasslands can also be ESHA if rare species are present, under Policy NS-4 (Coastal) of Santa Barbara County's Gaviota Coast Plan.[3] While there appears to have been damage

---

[3] *See* Gaviota Coast Plan ("GCP"), Santa Barbara County (Certified by CCC in 2018), Policy NS-4 (Coastal) at 2-16 to 2-18, available at https://cosantabarbara.app.box.com/s/67cui9hpdphz64ajtmbdndqwq1x8tr5h

5

to these areas, it is difficult for Commission staff to assess the full extent since vegetation was removed without first providing the Commission with adequate information, and without site-specific biological surveys taken by resource agency-approved independent experts at the appropriate times of year.

It also appears that Sable carried out work on the Pipelines without implementation of appropriate coastal resource protection measures. Images taken during the first week of October, after work had already commenced, demonstrate several erosion control measures had been installed improperly, and were therefore ineffective. Thus, not only was this work undertaken in areas which require critical measures in place to safeguard against degradation of environmental resources, it appears that even the measures which were observed to have been put in place were done so haphazardly.  While Sable has maintained that this work was done with thorough analysis, and consideration of potential environmental impacts, it is unclear how successful these measures were, and whether they had meaningful benefits. Without input from or review by the Commission or other independent biologists as to methods, parameters, and other critical components of any such measures, it is likely that such measures did not, in fact, provide appropriate protection to surrounding sensitive habitat areas. The limited information and photos available from the public regarding the work undertaken supports these conclusions.

Further, as noted above, Sable asserts that it can rely on permits issued nearly 40 years ago for the original construction and installation of the pipeline as authorization for the work undertaken now.  There are many reasons why this is not accurate, as discussed below, but it should be noted that any measures required decades ago simply could not incorporate protections for the current habitat and species on the site, as many sensitive resources have developed on the site or been identified or provided with legal protection in the time after that initial environmental review. These include the listing of several species under the federal Endangered Species Act that are present along the pipeline corridor, as well as the designation of Critical Habitat supporting them. No analysis or consideration of these species was made in the original permit and supporting documents from the 1980s. The Southern California Distinct Population Segment of steelhead ("Southern California steelhead") was federally listed Endangered in 1997 and state listed in 2022; tidewater goby was federally listed Endangered in 1994; California red legged frog was federally listed Threatened in 1996; southwestern pond turtle was proposed as federally Threatened in 2023.

In addition to the onshore violations described above, Sable has also conducted unpermitted development at locations offshore, along the oil pipeline that connects the offshore SYU platforms to shore and an adjacent produced water discharge pipeline. This development, as mentioned above, included deployment and positioning of sand and concrete bags to provide structural support below sections from which the seafloor had scoured or eroded. Reinforcement of these pipelines was also carried out as part of an effort to restart SYU oil production operations and bring the pipelines back into use. Specifically, the project deployed a remotely operated vehicle ("ROV") to place concrete bags along more than 750 linear feet of the pipelines to create support piers along 14 identified "spans" (sections of pipeline that are unsupported by the seabed), each measuring between 41 and 70 feet.

6

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Commission staff and the Coastal Act provisions regarding oil and gas facilities support the thorough, and prompt, remediation of any problems that have the potential to adversely affect the structural integrity of active oil and gas pipelines, and the Coastal Act has a variety of regulatory review mechanisms to help ensure such efforts can be expedited and carried out in a timely manner. It is notable in this case, however, that Sable's pipelines were purged of oil and cleaned nearly ten years ago and currently have no potential to release or spill oil, thus reducing the time sensitive nature of the work Sable undertook. Whether expedited or carried out on a regular timeline, it is crucial, for the protection of coastal resources, that regulatory review occur in advance of construction activities to ensure that those activities are designed and carried out in a manner that avoids, minimizes and mitigates any adverse effects on coastal resources.  For example, certain methods of pipeline inspection and installation present enhanced risks of disturbance and displacement of commercial and recreational fishing activities and gear, marine mammal entanglement, sensitive habitat damage and disturbance, and marine debris generation and release, while others present lower risks. However, in refusing to apply for a coastal development permit ("CDP") for this type of work, and thereby not engaging in the thorough analysis that would be afforded through the CDP application and review process and having the work conditioned to minimize harms to coastal resources, Sable has engaged in activities for which the aforementioned risks are high. In contrast, because those risks could probably be lowered to the point where the work would be consistent with the Coastal Act and the County's Local Coastal Program, through the conditions and mitigations that can be provided in a CDP, it is likely this work would be approvable, if a permit were to be sought. Yet, instead, Sable opted to move forward with this work without seeking a CDP, despite being informed that doing so would be in violation of the Coastal Act.

**Initial Enforcement Actions**

Since learning of the development activities undertaken at onshore locations along the Pipelines in September, Commission staff have made repeated, and extensive, attempts to work with Sable, and their counsel, in an effort to resolve both onshore and offshore Coastal Act violations. Throughout this time, Sable sporadically indicated willingness to comply and take steps toward resolving these violations, which prompted Commission staff to exert considerable resources, time, and efforts toward trying to reach an amicable resolution, including Coastal Act authorization for the work being undertaken. Ultimately, these efforts have proven unsuccessful.  Sable twice indicated an interest in settling in the context of a consent order and twice they ceased negotiations and ended up not agreeing to do so.

After Commission staff became aware of the activities taking place at onshore locations along the Pipeline in September of 2024, Commission staff immediately initiated conversations with Sable to discuss the activities, and a potential consent order to resolve the potential violations.  As described in greater detail below, Commission staff issued a Notice of Violation letter regarding these activities (Exh, 2), and then a Notice of Intent for an Executive Director Cease and Desist Order ("EDCDO"), (Exh, 3), followed by discussions to attempt to resolve this matter amicably.  When that was unsuccessful, the

7

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Executive Director issued an EDCDO in November. (Exh.4) Importantly, after the issuance of the November EDCDO addressing the onshore work along the Pipelines, Sable did cease certain activities at those locations and complied with portions of the EDCDO. However, at this time, Sable also turned its focus to undertaking work at locations along its offshore pipelines, despite being advised by Commission permitting staff that such work would also require a CDP. In fact, mere weeks after the issuance of the November EDCDO, and after having been reminded that the planned offshore work also needed Coastal Act authorization, Sable undertook development activities at these offshore locations without Coastal Act authorization. Commission staff was unaware that they had undertaken this additional unpermitted work until January of the following year.

As noted, Commission staff have worked extensively with Sable in an attempt to resolve these issues, beginning with the activities conducted onshore along the Pipelines.  On September 18, 2024, after learning of the activities Sable was conducting at the onshore locations along the Pipelines, Commission staff initiated communications with Sable , to clarify, and confirm, that Sable was the current owner and operator of the Pipelines, as well as to confirm the specifics of the development undertaken at the onshore locations, and further to inform Sable that an application for an after the fact ("ATF") CDP would be required for the work undertaken, as well as a CDP application to address any future, proposed work. On September 20, 2024, Commission staff also initiated communications with Santa Barbara County Planning and Development Department ("County") staff, informing them of the development undertaken, the Commission's position that the development needed Coastal Act authorization and requesting that the County take enforcement action. These communications also noted that the Commission would assume jurisdiction under the Coastal Act provisions regarding enforcement jurisdiction if the County declined to act. The County responded that it would review and respond but no further response was received either indicating that the County was taking action or objecting to the Commission assuming jurisdiction over the matter. Exh.15)

On September 27, 2024, Commission staff issued Sable a Notice of Violation letter addressing the onshore Coastal Act violations and directing it to immediately cease any unpermitted activities within the coastal zone and to apply for both an ATF CDP for work undertaken, and a CDP for any future, planned work. Commission staff then met with Sable on October 1, 2024, to discuss the Notice of Violation letter, and actions to be taken. Commission staff, again, reiterated the imminent need to for Sable to immediately cease all work activities and, also asked for information as to the location and scale of Sable's work to date, as well as any additional planned work and requested full-scale project plans. At this time, Commission staff remained hopeful that Sable had undertaken the work without full understanding as to the requirements of the Coastal Act, and permit application processes. Commission staff discussed legal options, and discussed the potential permit options, as well as solicited input from Sable as to what measures they felt it was necessary to take to secure the open trench sites once work fully ceased.  Commission staff had hoped that they could work collaboratively to ensure the sites were secure, as Sable seemed receptive to applying to requisite CDPs, and finding an agreeable path forward to resolve the Coastal Act violations.

Exhibits Pg. 710

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Despite this conversation, Commission staff received reports that Sable had not ceased work in the Coastal Zone. On October 2, Commission staff received an email from Sable, in response to the September 27, 2024, Notice of Violation letter, which started that all work "subject to interim measures" had ceased. (Exh. 9)  Despite this, Commission staff continued to receive reports that work had not ceased. On October 4, Commission staff requested written assurance that work had ceased, including what Sable referred to as "interim measures," to be provided no later than 2 pm that day.  Commission staff additionally requested that Sable provide responses to staff's information request, in accordance with the September 27, 2024, Notice of Violation letter, no later than 5pm, the following Monday. At 1:57. on October 2, Sable, again, sent an email to Commission staff asserting that work had ceased. Yet again, Commission staff received reports that no cessation of work had occurred, and therefore, again, asked for written assurance from Sable, which was ultimately provided that afternoon. (Exh 135)  Sable did not, however, provide a full response to the request for information regarding what had been done, and where, by the 5pm deadline the following Monday. Sable did provide some information after the deadline regarding locations where work had been conducted within the Coastal Zone but asserted that the full information request could not be answered at that time.

Therefore, since Sable failed to satisfactorily provide information requested and, further, failed to provide written confirmation of an intent to apply for both an ATF CDP for work undertaken, and a CDP for future, proposed work, the Executive Director issued an Executive Director Cease and Desist Order ("EDCDO") to Sable.  This EDCDO directed Sable to cease all unpermitted development activities, undertake steps to temporarily secure the sites where Sable's development had temporarily ceased, and apply for CDPs, as described above. After issuance of the EDCDO, Sable ceased operations at locations in the Coastal Zone and instead shifted its focus to operations outside of the Coastal Zone. During this time, Sable undertook steps, pursuant to the EDCDO, to secure the sites where work had ceased, and Commission staff maintained regular communication with Sable's counsel, who indicated openness to submitting applications for CDPs, once time was afforded to more fully analyze the Pipelines' permitting history. As an accommodation, Commission staff provided a longer deadline for the application for CDPs, which extended beyond the February 10, 2025, expiration of the EDCDO, and provided Sable an additional 30 days, with a deadline of March 12, 2025, to submit such applications.

Regrettably, within a few days of the February 10, 2025, expiration of the EDCDO, Sable quickly resumed work, despite having not submitted any application for a CDP.  On February 14, 2025, Commission staff began to receive several reports of equipment having been staged at construction sites, as well as reports that development was being undertaken into evening hours, and through the weekend. (Exh. 100) Two days prior to receiving these messages, on February 12, 2024, Commission staff received a letter from the County (Exh. 38), responding to Commission's staff's previous, January 10, 2024 request that the County agree to the Commission's review of a consolidated permit application.  In the County's February 12th response, as discussed in greater detail in this staff report, the County asserted that Sable needed no permit for the work it had undertaken onshore, along the Pipelines, because that work was authorized by existing permits. The County also provided Commission staff with a copy of an additional letter, which the County sent to Sable, similarly notifying Sable that the work Sable had

9

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

undertaken onshore, along the Pipelines, which was the subject of the EDCDO issued in November, was, and is, covered by existing permits.

On February 14, Commission staff sent a letter to the County, objecting to the County's February 12 letter on procedural grounds and also explaining staff's disagreement with the County's position on the merits and asking for language in any permit that would support the County's position by potentially authorizing such development. (Exh, 40) This letter was also addressed to Sable. However, the County did not respond, and Sable continued its work and sent its own letter later that day defending the County's position. (Exh 38) Thus, on Sunday, February 16, Commission staff issued a notice of intent to issue a second EDCDO. (Exh. 6) In response to that notice, on February 17, 2025, Sable sent a letter to Commission staff challenging Commission staff's jurisdiction to proceed. The next day, the Commission's Executive Director issued the second EDCDO. (Exh. 7) The next day, Commission staff learned that Sable had sued the Commission over the actions to date, alleging that the Notices of Violation and the first EDCDO were illegal and effected a taking of Sable's property.

Commission staff have continued to attempt to reach an amicable settlement with Sable, including, in this instance, an offer to resolve the short-term issues with a consent EDCDO. While Sable chose to move forward with undertaking continued, unpermitted activities at the onshore locations along the Pipeline, Commission staff continued to engage in conversations with Sable, in hopes of finding an amicable resolution. In the weeks after issuance of the EDCDO, Sable, again, indicated willingness to engage in conversations with Commission staff that could lead to a potential consent agreement, in the form of a consent Cease and Desist Order, To this end, Commission staff spent extensive resources working to pull together proposed language for the potential orders, mentioned above, then spent days on intensive negotiations with Sable.

During a virtual meeting on March 11, 2025, Sable and Commission staff discussed the aforementioned language, and potential pathways forward. After this meeting, Sable provided language to be reviewed by Commission staff, which Commission staff worked late through that evening to provide. Unfortunately, before Commission staff had the opportunity to discuss this language with Sable, Sable informed Commission staff that they were terminating discussions.

To date, Sable has made no efforts to comply with this second EDCDO, has not submitted any application for a CDP, and has refused to cease operations despite being fully informed of the ongoing Coastal Act Violations and ongoing threats to coastal resources associated with its activities. Commission staff have worked exhaustively with Sable in an effort to find an agreeable path forward, and to achieve resolution of the numerous ongoing Coastal Act violations but, unfortunately, have been unable to reach any such agreement. Thus, Sable's actions, and inactions with regard to these violations have led to this action for the Commission to consider issuance of this unilateral Cease and Desist Order, Restoration Order, and Civil Administrative Penalty Order, as described below.

*Proposed Resolution*

10

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

The unpermitted development Sable has undertaken at both onshore and offshore locations has resulted in damage to coastal resources, but the extent of this damage is not fully known because of Sable's continued refusal to provide complete and detailed information as to the work that it has undertaken, as well as proposed, future plans. Additionally, Sable has continued to undertake development activities at onshore locations along the Pipelines, despite issuance of two separate Cease and Desist Orders and in direct contravention of the resource protection provisions of the Coastal Act.

Commission staff recommends the Commission approve Cease and Desist Order No. CCC-25-CD-01 to ensure that Sable ceases any further development activities along the Pipelines, until a complete CDP[4] application has been submitted and addressed for future, proposed activities, as well as an ATF CDP application for all development activities already undertaken at the onshore locations along the Pipelines, and for all development activities undertaken along offshore sections of Sable's oil and water pipelines.

Commission staff also recommends that, in conjunction with the proposed Cease and Desist Order, the Commission approve Restoration Order No. CCC-25-RO-01 to address the effects of the unpermitted work.

Lastly, Commission staff recommends that the Commission issue Civil Administrative Penalty Order No. CCC-25-AP3-01. The Coastal Act provides five factors for the Commission to consider in imposing a penalty. Applying those factors here, and grouping and treating the violations as proposed herein, the Commission could justify imposing a penalty up to a maximum of $18,022,500 in this case. Commission staff recommends that a substantial fine be imposed, given the nature of the multiple violations at both onshore and offshore locations; the lengthy and substantial amount of Commission staff resources expended in attempting to resolve these violations; the unprecedented manner in which Sable has continually refused to comply with any such attempts to resolve these violations and even a valid administrative order issued, and other public and legal policies at issue here, including the need to secure compliance with the Coastal Act CDP process. Commission staff is recommending a penalty in the range of $12,000,000- $15,000,000. Within that range, Commission staff is recommending the Commission, in its discretion, specify a penalty of $14,987,250.

To address these violations, Commission staff recommends that the Commission approve issuance of Cease and Desist Order No. CCC-25-CD-01; Restoration Order No. CCC-25-RO-01; and Civil Administrative Penalty Order No. CCC-25-AP3-01 (collectively "the Orders"). The proposed Sable Orders are included as Appendix A to this Staff Report.

---

[4] Although the orders require the submittal of an application for a CDP, that does not preclude a more expeditious form of review.  Indeed, it is not uncommon for the Commission to approve such applications by issuing a waiver of the CDP requirement if the application materials demonstrate that the project is eligible for that form of Coastal Act authorization.  This requirement for a complete CDP application is to ensure that the Commission has the necessary information to make the correct determination and is not in any way prejudging the outcome, either substantively or procedurally."

11

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Table of Contents

I.      MOTIONS AND RESOLUTIONS .................................................................16
II.     HEARING PROCEDURES ........................................................................17
III.    FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND
        ISSUANCE OF ADMINISTRATIVE PENALTIES..........................................18
        A.      DESCRIPTION OF PROPERTY ........................................................18
        B.      DESCRIPTION OF COASTAL ACT VIOLATIONS..................................18
        C.      ENFORCEMENT ACTIVITIES AND ATTEMPTS AT RESOLUTION ................19
IV.     BASIS FOR ISSUING CEASE AND DESIST ORDER .....................................25
        A.      STATUTORY PROVISION..............................................................25
        C.      APPLICATION TO FACTS ............................................................28
V.      BASIS FOR ISSUANCE OF RESTORATION ORDER......................................30
        A.      STATUTORY PROVISIONS............................................................30
        B.      APPLICATION OF FACTS .............................................................30
        C.      JURISDICTION ........................................................................33
VI.     BASIS FOR IMPOSITION OF ADMINISTRTIVE PENALTIES ...............................35
        A.      STATUTORY PROVISIONS............................................................35
        B.      APPLICATION TO THE FACTS ......................................................36
        C.      PENALTY AMOUNT ..................................................................38
VII.    DEFENSES ALLEGED AND RESPONSES THERETO .........................................55
        A.      SUMMARY .............................................................................55
        B.      DOCUMENTS ON WHICH SABLE RELIES FOR ITS PRE-AUTHORIZATION ARGUMENT56
        A.      ONSHORE ..............................................................................56
        I.      EIR/EIS................................................................................56
        II.     FINAL DEVELOPMENT PLAN (FDP) (85-DP-66CZ)/CUP (MARCH, 1986) (SABLE SOD
        DOC. 5) ......................................................................................58
        III.    SANTA BARBARA COUNTY CDPS ..................................................58
        IV.     CONDITIONS OF APPROVAL.........................................................59
        V.      SUMMARY WITH RESPECT TO THE AFOREMENTIONED ENTITLEMENT DOCUMENTS 59
        VI.     CONSENT DECREE ...................................................................60
        VII.    SANTA BARBARA COUNTY LETTERS ...............................................60
        B.      OFFSHORE..............................................................................61
        I.      EIR/EIS................................................................................61
        II.     DEVELOPMENT AND PRODUCTION PLAN (DPP).................................61
        III.    COASTAL DEVELOPMENT PERMIT CDP E-88-1 AND CONSISTENCY CERTIFICATION
        CC-64-87 ...................................................................................61
        IV.     BSEE AND SLC LETTERS ...........................................................62
        C.      OTHER THEMES IN SABLE'S SOD .................................................63
        A.      PREEMPTION .........................................................................63
        B.      JURISDICTION ........................................................................66

12

C.    BENEFITS AND HARMS OF THE WORK AT ISSUE ........................................ 68
D.    ADDITIONAL ARGUMENTS ................................................................... 69
VIII.  **CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA)** ...................................... **88**
IX.   **SUMMARY OF FINDINGS OF FACT** .............................................................. **89**

**APPENDICES**

**Appendix A** – Cease and Desist Order No. CCC-25-CD-01; Restoration Order CCC-25-RO-01; Civil Administrative Penalty No. CCC-25-AP3-01

**EXHIBITS**

Exhibit 1: Facilities Map
Exhibit 2: 9/27/24 NOV Letter
Exhibit 3: 10/4/24 NOI Letter
Exhibit 4: 11/12/24 Sable EDCDO
Exhibit 5: 2/11/25 Offshore NOV
Exhibit 6: 2/16/25 Sable NOI for EDCDO 2/16/25
Exhibit 7: 2/18/25 EDCDO & NOI
Exhibit 8: 11/21/24 Commission Staff email with Steve Rusch
Exhibit 9: 10/2/24 CCC/Sable Email RE: Cease Work
Exhibit 10: 10/2/24 Letter to Sable re: onshore
Exhibit 11: 11/12/24 CCC EDCDO Cover Letter
Exhibit 12: NOV Letter 2/14/25 Extension Request Granted
Exhibit 13: 10/8/24 Sable Letter to CCC
Exhibit 14: Sable NOV Response
Exhibit 15: 9/20/24 Email between CCC and County
Exhibit 16: Sable 10/7/24 Chart of Locations
Exhibit 17: 9/23/24 Land Trust for Santa Barbara County FM Report
Exhibit 18: 9/24/24 Land Trust for Santa Barbara County FM Report
Exhibit 19: 9/25/24 Land Trust for Santa Barbara County FM Report
Exhibit 20: 9/26/24 Land Trust for Santa Barbara County FM Report
Exhibit 21: 9/27/24 Land Trust for Santa Barbara County FM Report
Exhibit 22: 9/28/24 Land Trust for Santa Barbara County FM Report
Exhibit 23: 9/29/24 Land Trust for Santa Barbara County FM Report
Exhibit 24: 9/30/24 Land Trust for Santa Barbara County FM Report
Exhibit 25: 10/1/14 Land Trust for Santa Barbara County FM Report
Exhibit 26: 10/2/24 Land Trust for Santa Barbara County FM Report
Exhibit 27: 10/03/24 Environmental Defense Center Report
Exhibit 28: 12/12/24 Letter to Newsom
Exhibit 29: 3/3/25 Congressional Letter to Newsom
Exhibit 30: 1/22/25 CA SWRB Informational Request
Exhibit 31: 12/19/24 Sable IRP Final Report
Exhibit 32: EDC Report 2/28/25
Exhibit 33: 2/12/25 SBC Letter to Sable
Exhibit 34: Sable Settlement Agreement (1988)

13

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Exhibit 35: SLC letter re Span Remediation completion and dates
Exhibit 36: 12/06/24 Sable ZC Application
Exhibit 37: 11/22/24 Sable ZC Application
Exhibit 38: 2/12/25 SBC letter to CCC re: consolidated permit request
Exhibit 39: 2/17/25CCC letter to SBC request to initiate enforcement
Exhibit 40: 2/14/25 CCC letter to SBC and Sable
Exhibit 41: 2/17/25 CCC letter to SBC request to initiate enforcement
Exhibit 42: Letter to SBC 2/16/25 re: Dispute Resolution
Exhibit 43: 2/24/25 SBC letter to CCC re: Dispute Resolution
Exhibit 44: Sable Span Remediation letter
Exhibit 45: EDC Letter to CCC re: Dispute Resolution
Exhibit 46: Sable Offshore Corp. Response to Notice Prior to Issuance of Executive
          Director Cease and Desist Order
Exhibit 47: 11/20/24 CCC Approval of IRP
Exhibit 48: EDC Letter to CCC re: permit compliance
Exhibit 49: Celeron FDP 1986
Exhibit 50: Revised Celeron FDP
Exhibit 51: Permit E-88-1
Exhibit 52: Permit E-88-1 Exhibits
Exhibit 53: Consent Decree
Exhibit 54: 86-CDP-205
Exhibit 55: 86-CDP-189
Exhibit 56: 90-CDP-175
Exhibit 57: Oil and Gas Facilities Map
Exhibit 58: Sable SOD
Exhibit 59: Sable SOD appendices with docs
Exhibit 60: Draft EIR
Exhibit 61: Final EIR
Exhibit 62: Supplemental EIR
Exhibit 63: 1984 EIR for SYU; DPP
Exhibit 64: BSEE Email 12.17.24
Exhibit 65: CCC/Sable Offshore Work Communications (I, II, III)
Exhibit 66: CCC Email with SBC Communication 1/7/25
Exhibit 67: Critical Species, Southern Steelhead Swimming in Pool Below Excavator,
          2.20.25
Exhibit 68: Critical Species, Pond Turtle Swimming in Pool Below Excavator 2.20.25
Exhibit 69: Grease Fallen From Excavator, 2.18.25
Exhibit 70: Excavator Along Highway 101, 10.4.24
Exhibit 71: Backfilled Pit, No Erosion Control 2.19.2024
Exhibit 72: Backfilled Site, No Soil Compaction, 2.19.24
Exhibit 73: Excavator in Rain, 2.14.25
Exhibit 74: Construction at Pipeline, October
Exhibit 75: Construction on Safety Valve with Fence Covering Hole, October
Exhibit 76: Construction site at Land Trust Property, October
Exhibit 77: Construction site at Land Trust Property with Fencing, October
Exhibit 78: Cut Trees on Land Trust Property, October
Exhibit 79: Loose Rocks and Soil Near Stream, 2.19.25

14

Exhibits Pg. 716

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Exhibit 80: Excavations in or Near Wetlands, 2.20.25
Exhibit 81: Excavations in Potentially Mapped Wetlands, 2.18.25
Exhibit 82: Excavator and New Grading Bed in Banks, 2.18.25
Exhibit 83: Excavator on Land Trust Property, October
Exhibit 84: Multiple Excavators on Land Trust Property, October
Exhibit 85: Excavator on Slope, October
Exhibit 86: Excavator Removing Shoring Trench Walls Near Coastal Sage Scrub, 2.18.2025
Exhibit 87: Excavator in Riparian Area of Arroyo Quemada Creek, 2.21.25
Exhibit 88: Excavators Near Coastal Sage Scrub, March
Exhibit 89: Exposed Pipe, October
Exhibit 90: Exposed Pipe Along Work Site, October
Exhibit 91: Exposed Pipe, October
Exhibit 92: Fencing on Land Trust Property, October
Exhibit 93: Grading on Work Site, October
Exhibit 94: Steel Plate, October
Exhibit 95: Native Grassland Damage, 3/13/25
Exhibit 96: Native Grassland Damage Coastal Sage Coyote Brush I, 3/13/25
Exhibit 97: Native Grassland Damage Coastal Sage Coyote Brush II, 3/13/25
Exhibit 98: Coyote Brush Remnants, 3.13.25
Exhibit 99: Coyote Brush Removal, 3.13.25
Exhibit 100: Heavy Machinery, October
Exhibit 101: Inside Fencing on Land Trust Property, October
Exhibit 102: Las Flores Canyon Standing Water Accumulation, 2.14.25
Exhibit 103: Extensive Staging by Creek, 2.14.25
Exhibit 104: Las Flores Canyon Staging Near ESHA, 2.14.25
Exhibit 105: Las Flores Canyon Staging by ESHA II, 2.24.25
Exhibit 106: Las Flores Canyon Staging by Willows, 2.14.25
Exhibit 107: Grading, October
Exhibit 108: Tree Fall on Land Trust Property, November
Exhibit 109: Exposed Pipe, October
Exhibit 110: Night Work, 2.18.25
Exhibit 111: Open Pit Site and Grading, October
Exhibit 112: Open Trench on Slope, October
Exhibit 113: Open Trench on Slope II, October
Exhibit 114: Open Trench with Fencing, October
Exhibit 115: Open Trench Site with BMP, October
Exhibit 116: Staged Pipeline Replacement, 2.14.25
Exhibit 117: Recently Graded Area, 3.24.25
Exhibit 118: Refugio Sable Site (Grading), 10.2.24
Exhibit 119: Machinery, October
Exhibit 120: Machinery II, October
Exhibit 121: Exposed Pipeline Section, October
Exhibit 122: Exposed Pipe 2, October
Exhibit 123: Partially Buried Exposed Pipe, October
Exhibit 124: SB County Property Scrub Vegetation Mowed, ESHA, Equipment in Riparian Area, March

15

Exhibits Pg. 717

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Exhibit 125: SB County Property Vegetation Removed, March
Exhibit 126: SB County Property Work in Adjacent Riparian Area, March
Exhibit 127: Exposed Pipe and Debris, October
Exhibit 128: Exposed Pipe Section with Enclosure, October
Exhibit 129: Staged Machinery, October
Exhibit 130: Open Pit with Enclosure, October
Exhibit 131: Work Conducted in Riparian Area, March
Exhibit 132: EDC letter to County Re: Permit Transfer
Exhibit 133: SBC Letter to Sable Re Zoning Clearance
Exhibit 134: IRP Completion Report
Exhibit 135: Sable Offshore Corp. Carolyn Bertrand 10/1/2024

## I.    MOTIONS AND RESOLUTIONS

Motion1:  Cease and Desist Order

> *I move that the Commission issue Cease and Desist Order No. CCC-25-CD-01 to Sable Offshore Corp. pursuant to the staff recommendation.*

Staff recommends a YES vote on the foregoing motion. Passage of this motion will result in adoption of the resolution immediately below and issuance of the Cease and Desist Order. The motion passes only by an affirmative vote of the majority of Commissioners present.

Resolution to Issue a Cease and Desist Order:

> *The Commission hereby issues Cease and Desist Order No. CCC-25-CD-01, as set forth below in Appendix A, and adopts the findings set forth below on the ground that development has occurred without the requisite Coastal Development Permit, in violation of the Coastal Act and the Santa Barbara County Local Coastal Program; and that the requirements of the Cease and Desist Order are necessary to ensure compliance with the Coastal Act and the Coastal Development Permit.*

Motion 2: Restoration Order

> *I move that the Commission issue Restoration Order No. CCC-25-RO-01 to Sable Offshore Corp. pursuant to the staff recommendation.*

Staff recommends a YES vote on the foregoing motion. Passage of this motion will result in adoption of the resolution immediately below and issuance of the Restoration Order. The motion passes only by an affirmative vote of the majority of Commissioners present.

Resolution to Issue a Restoration Order:

16

Exhibits Pg. 718

*The Commission hereby issues Restoration Order No. CCC-25-RO-01, set forth below on the grounds that Sable Offshore Corp. has undertaken development without the requisite Coastal Act authorization, the development is inconsistent with the Coastal Act, and the development is causing continuing resource damage.*

Motion 3 Administrative Civil Penalty Action

*I move that the Commission find that the various actions and failure to act by Sable Offshore Corp., as described in the Commission's findings, are in violation of the resource protection provisions of the Coastal Act, and the Commission impose upon them an administrative penalty in the amount of $ 14,987,250.*

Staff recommends a YES vote on the foregoing motion. Passage of this motion will result in the assessment of an administrative penalty against Sable Offshore Corporation in the amount of $ *14,987,250.* The motion passes only by an affirmative vote of a majority of Commissioners present.

Resolution to Impose Administrative Penalties:

*The Commission hereby imposes an administrative civil penalty against Sable in the amount of $ 14,987,250 dollars and adopts the findings set forth below; on grounds that development has violated the resource protection provisions of the Coastal Act, and these activities have negatively impacted coastal resources and violated 30821.3 of the Coastal Act.*

## II.    HEARING PROCEDURES

The procedures for a hearing in which the Commission issues a Cease and Desist Order under Public Resources Code ("PRC") Section 30810 are described in the Commission's regulations at Section 13185 of Title 14 of the California Code of Regulations ("14 CCR") and the procedures for a hearing in which the Commission issues a Restoration Order under PRC Section 30811 are described in the regulations at Section 13195 of 14 CCR. Additionally, Section 30821(b) states that the imposition of administrative civil penalties by the Commission shall take place at a duly noticed public hearing in compliance with the requirements of Sections 30810, 30811, or 30812. Therefore, the procedures employed for a hearing to impose administrative penalties are the same as those for a Cease and Desist and Restoration Order, and the hearing on these Cease and Desist and Restoration Orders and Administrative Civil Penalty Actions shall proceed according to 14 CCR section 13185, including the following:

The Chair shall announce the matter and request that all parties or their representatives present at the hearing identify themselves for the record. The Chair shall announce the rules of proceeding, including time limits for presentations. The Chair shall also announce the right of any speaker to propose to the Commission, before the close of the hearing, any question(s) for any Commissioner, at his or her discretion to ask of any other party. Staff shall then present its report and recommendation to the Commission, after which the

17

alleged violators, or their representatives, may present their positions with particular attention to those areas where actual controversy exists. The Chair may then recognize other interested persons, after which the chair may allow the alleged violators to use any reserved rebuttal time to respond to comments from interested persons and may then have staff respond to specific points raised by the alleged violators or any of the other speakers.

The Commission will receive, consider, and evaluate evidence in accordance with the same standards it uses in its other quasi-judicial proceedings, as specified in 14 CCR Section 13186, which incorporates, by reference, Section 13065. The Chair will close the public hearing after the presentations are completed. The Commissioners may ask questions of any speaker at any time during the hearing or deliberations, including if any Commissioner so chooses, any questions proposed by any speaker in the manner noted above. The Commission shall determine, by a majority vote of those present and voting, whether to issue the Cease and Desist and Restoration Orders and impose Administrative Penalties, either in the forms recommended by staff, or as amended by the Commission. Passage of the motions above, per the staff recommendations, or as amended by the Commission, will result in issuance of the Cease and Desist and Restoration Orders and imposition of Administrative Penalties.

## III.  FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND ISSUANCE OF ADMINISTRATIVE PENALTIES[5]

### A.  DESCRIPTION OF PROPERTY

The properties subject to this enforcement action are at various locations along the Las Flores Pipelines CA-324 and CA -325 (formerly Lines 901, and 903). The Las Flores Pipelines are part of the greater Santa Ynez Unit which consists of three offshore platforms (Hondo, Harmony, and Heritage), Las Flores Canyon processing facility, and associated electrical transmission facilities and lines, oil, natural gas and produced water transport pipelines, (including offshore pipelines as well as CA-325 and CA-325 onshore) and associated rights-of-way and easements. (Exh.1) All Santa Ynez Unit infrastructure is located along or offshore of the Gaviota Coast, within Santa Barbara County.

### B.  DESCRIPTION OF COASTAL ACT VIOLATIONS

The Coastal Act violations, and threatened violations, addressed by the proposed Commission Cease and Desist Order, Restorations Order and Administrative Penalty ("Orders") involve development that has occurred in the Coastal Zone without the requisite

---

[5] These findings also hereby incorporate by reference the Summary at the beginning of the March 28, 2025, staff report ("STAFF REPORT: Recommendations and Findings for Cease and Desist Order, Restoration Order, and Administrative Civil Penalty") in which these findings appear, which section is entitled "Summary of Staff Recommendations."

Coastal act authorization, including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; placement of fill in wetlands and coastal waters; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; any installation of shutoff valves; and other development along onshore locations of the Pipelines, as well as development, including but not limited to, placement of sand and cement bags on the seafloor below and adjacent to out-of-service oil and water pipelines.

## C. ENFORCEMENT ACTIVITIES AND ATTEMPTS AT RESOLUTION

In mid-September of 2024, Commission staff became aware of development activities occurring at locations onshore, along the Las Flores Pipelines CA-324 and CA-325. On September 18, 2024, Commission staff initiated communications with Sable, through their representative Steve Rusch, to confirm Sable's position as owner and operator of the Pipelines, as well as to convey the need for Coastal Act authorization for any development activities on, or along, the Pipelines. After receiving confirmation of Sable's status as owner and operator, and that development activities were being undertaken at locations along the onshore Pipelines, on September 20, 2024 Commission staff sent an email to the County, providing notification that the Commission had learned of development activities being undertaken along the Pipelines, and informing the County of Commission staff's position that such work required Coastal Act Authorization. This email message further requested the County take formal enforcement action and provided "… the Commission will assume enforcement jurisdiction based on the understanding that you are declining this request unless you indicate otherwise by close of business on Sept. 23, 2024." In response, the County stated, in email, that they were looking into the issue, and would respond "ASAP". The County did not provide further response to this email, nor did the County affirmatively decline the Commission's request to take formal enforcement action, before the deadline provided. (Exh. 13)

Thus, on September 27, 2024, Commission staff sent a "Notice of Violation" letter regarding the unpermitted development activities taking place within the Coastal Zone, along the Pipelines. Commission staff requested Sable immediately cease all unpermitted development in state coastal waters, or elsewhere in the Coastal Zone.  Commission staff further detailed the need for Coastal Act authorization for any development in the Coastal Zone, which should be sought through the submittal of an application for an "after the fact" Coastal Development Permit ("ATF CDP"), and a Coastal Development Permit ("CDP") for any future, proposed development. The lack of a CDP with conditions to minimize adverse impacts to coastal resources was particularly concerning given the time of year in which the work was occurring was sensitive for a variety of protected wildlife species and also presented increased risks of erosion due to the pending start of the rainy season.

On October 1, 2024, Sable met with Commission staff on a video conference to discuss these Coastal Act violations. In this conversation, Commission staff conveyed to Sable that all unpermitted development activities along the Pipeline, must cease immediately. Recognizing that immediate cessation of all work would result in several open pit sites, where excavation activities had already begun, Commission staff discussed potential steps

19

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

necessary to safely, and temporarily, secure the sites. However, staff made it clear to Sable that all work must stop immediately, and that information must be provided so that staff could assess the full scope, nature and location of work before such measures to secure the sites could be evaluated and taken. Nonetheless, Commission staff received an email from Sable on the following day, October 2, 2024, stating that work had been suspended, "subject to taking interim measures." Images received after these communications and later on October 2, 2024, show an excavator, which appears to be actively excavating next to ESHA.[6](See. Exh.126 of excavator located adjacent to riparian area)

Despite receiving assurances from Sable that work had ceased, Commission staff continued to receive reports that work had continued and, again, met with Sable via video conference, on October 3, 2024, to reiterate that all work must fully cease, including any such "interim measures" which involved development requiring Coastal Act authorization.

However, Commission staff continued to receive reports that Sable had yet to cease all work, and, on October 4, 2024, Commission staff sent a letter ("EDCDO NOI") to Sable providing formal notice of the Executive Director's intent to issue an order to halt the ongoing work, and requested written assurances by 2:00 p.m. that day, that Sable had, in fact ceased work entirely. At 1:57 p.m., Sable sent an email to Commission staff asserting that all work, including the actions in which Sable characterized as "interim work measures", had ceased. Commission staff continued to receive messages, after receiving this confirmation from Sable, that work was ongoing. In response, Commission staff sent a second email to Sable, again, asking for assurance that work had completely stopped. In response, Sable, sent an email to Commission staff around 4 p.m. stating that all work had ceased.

In addition to the cessation of all work, the October 4, 2024 EDCDO NOI letter required Sable to provide information, as to work undertaken, or planned, along the Pipeline, including information regarding what work had been undertaken and where, as well as information about the project plans for the remainder of the work being done, and this information was to be provided no later than 5pm the following Monday, October 7, 2024. Additionally, the October 4, 2024, letter asked for written confirmation of intent to apply for a CDP(s) for ATF authorization for any work that had already occurred in the Coastal Zone and prospective authorization for any proposed future work. After 5 pm on October 7, 2024, Commission staff received an email from Sable's counsel, DJ Moore, which provided a spreadsheet as to locations where Sable had undertaken development, but they stated that the remainder of the information request could not be met by the deadline.

Because Sable did not provide a "satisfactory response", as required by PRC Section 30809, by not providing the information as requested in Commission staff's October 4 letter, and further, because it failed to provide written confirmation as to its commitment to apply for an ATF CDP for work previously undertaken within the Coastal Zone, the Executive Director issued a EDCDO on November 12, 2024.This EDCDO, directed Sable to complete an Interim Restoration Plan (the "Plan") to safely secure the open excavation

---

20

sites in the interim period necessary for Sable to apply for both an ATF CDP for all work previously undertaken along the Pipeline as well as apply for a CDP for future, proposed work. As an accommodation, to allow them additional time to apply for these CDPs, this letter provided for 120 days from the issuance of the EDCDO for Sable to apply for requisite CDPs, which provided Sable an additional 30 days, beyond the expiration date of the EDCDO, to submit the requisite CDP applications. Staff offered to meet with Sable and its representatives to assist them in the application process and to make the permit process as streamlined and efficient as possible. Throughout November, commission staff worked extensively with Sable's counsel to ensure effective implementation of the Plan and, on December 20, 2024, Sable submitted a completion report for the Plan. However, Sable declined to submit any application for a CDP, even through the extended deadline provided.  Further, Commission staff had repeatedly requested information as to the development which Sable had already undertaken, or planned to undertake, including any full-scale work plans, but did not receive adequate responses to the information required in the EDCDO.

Given the lack of information from Sable about what work they had actually undertaken, and where, (such as whether it was in or adjacent to environmentally sensitive habitat areas ("ESHA") or wetlands) it was difficult to determine fully the potential for adverse impacts on resources.  Commission staff did, however, begin to receive reports from the public about the activities and the potential harm to coastal resources they had and were likely to result in.

While Sable has maintained that it conducted its work onshore along the Pipelines with measures in place to minimize environmental harms, the work was done without any coordination with Commission staff, and it is unclear the extent to which any measures it may have undertaken did, in fact, protect coastal resources. Without communication with Commission staff, or a complete CDP application, which would have provided an opportunity to fully analyze the potential impacts of the work, it is highly likely that the extent of work undertaken by Sable caused greater damage than what Commission staff are currently aware of. Images provided to Commission staff, that were taken during the first week of October, show erosion control measures in place improperly and ineffectively. Further, there are several images depicting excavation work occurring on steep slopes, in, or near, riparian wetlands, and near ESHA. All of this leads Commission staff to have serious doubts as to the effectiveness of any potential measures taken to safeguard against coastal resources damage.

Further, in its February 14 letter arguing that its work was authorized, Sable relied heavily on environmental review documents from the 1980s, which it claimed had analyzed the impacts of future "maintenance" work and provided mitigation measures to address those impacts.  But if Sable's basis for the development of protection measures is the environmental review conducted 40 years ago, it could not have fully incorporated appropriate considerations. since many sensitive resources have been identified or designated since that initial environmental review occurred in 1985. In particular, several species that are present along the pipeline corridor have since been listed and protected under the federal Endangered Species Act, and areas have been designated as Critical Habitat for them No analysis or consideration of these species was made in the original

21

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

permit and supporting documents because these were drafted in the 1980s. In contrast, the Southern California Distinct Population Segment of Steelhead was federally listed as Endangered in 1997 under the Endangered Species Act and state listed in 2022; the tidewater goby was federally listed as Endangered in 1994; the California red legged frog was federally listed as Threatened in 1996; and the southwestern pond turtle was proposed as federally Threatened in 2023.[7]

Additionally, the manner of work currently being carried out on the Pipelines appears incompatible with the original design and construction authorized in 1987. Specifically, these Pipelines were designed, analyzed and permitted to be covered in a layer of insulation so they could transport heated oil that would otherwise be too viscous to transport by pipeline.  In fact, the Pipelines were one of the first of this kind to be constructed and operated. However, the work currently being carried out by Sable has resulted in the permanent removal of the pipeline's insulation from over 100 individual sections, some of which extend for close to 100 feet in length.  This is because we learned as a result of the 2015 spill that the original line's design was flawed.  The insulation layer, designed to keep the oil warm, also impaired the functioning of the cathodic protection system that was to prevent corrosion.  Sable is therefore actively removing insulation from the line as part of the current work – something that would have been unheard of as part of the original design and thus the authorizations provided for it.  Moreover, Sable has acknowledged, in its application to the Office of the State Fire Marshal (OSFM) for a "State Waiver" that the corrosion protection strategy described and approved in the original authorizations for the pipeline's construction and operation – namely, a cathodic protection system – cannot appropriately manage the risk of corrosion under the pipeline's insulation and an entirely new strategy and approach must be developed.  Sable proposes this new strategy and approach in its application to OSFM and in its December 17, 2024, letter in response to that application, OSFM provides Sable with 12 pages of specific protocols and conditions (67 in total) that must be added to further expand Sable's proposed approach. None of this was considered, analyzed, described or approved in the 1980s permits issued for the original construction of the pipeline. The removal of the pipeline's insulation and implementation of this new strategy for managing corrosion risk represents such a fundamental shift in the pipeline's design and operation that resuming operations under this new system would not be consistent with the existing permit and should necessitate an amendment to the original permit due to the significant deviation between what was analyzed, permitted and constructed and what Sable has been actively trying to transform the pipeline and its operation into through the current activities.

As also discussed here, several sites are in, or adjacent to, ESHA, including coastal sage scrub, lemonadeberry scrub, wetland or drainages, and are also in, or near, Mapped Wetlands. Other work sites are in annual or native grassland. Importantly, native grasslands are ESHA, while annual grasslands are ESHA if they support rare species, under Policy NS-4 (Coastal) of Santa Barabara County's Gaviota Coast Plan. While there appears to damage to these areas, the full extent of the damage is difficult for Commission staff to analyze fully as vegetation was removed, without first providing the Commission

---

22

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

with information, or biological surveys carried out by resource agency-approved independent experts at the appropriate times of year.

While Sable temporarily ceased operations on the onshore locations of the Pipeline after receiving the November EDCDO, the company quickly shifted operations offshore and carried out additional development activities, beginning on November 29, 2024, and without the benefit of a CDP. These activities include, but are not limited to, the deployment of an unspecified number of sand and concrete bags. Specifically, the project deployed a remotely operated vehicle ("ROV") to place concrete bags along more than 750 linear feet of the pipelines to create support piers along 14 identified spans of between 41 and 70 feet. These activities took place over three days from November 29, 2024, to December 1, 2024.

On December 13, 2024, Commission Staff met via video conference with Santa Barbara County Planning and Development staff ("County") staff. , Commission staff learned that during this conversation, instead of submitting application for CDPs for the onshore violations described in the EDCDO, Sable, instead, sought authorization for those onshore violations described above through the County's zoning clearance process. In this meeting, Commission staff were informed that Sable had submitted zoning clearance applications to the County on November 22, 2024, and December 5, 2024, requesting authorization for pipeline "anomaly repair work" conducted along the Las Flores Pipelines, CA-324 and CA-325. However, in this conversation, Commission staff were provided assurances that no such applications would be granted without follow up discussions with the Commission.

On January 10, 2025, Commission staff held a follow up video conference call with the County to, again, discuss Sable's pending zoning clearance applications, as well as the potential for a consolidated coastal development permit covering both onshore and offshore development activities. During this conversation, County staff agreed to follow up with information, including the citations and provisions within existing County issued permit(s) that the County believed might have pre-authorized the recently completed and proposed Pipeline work, as well as any other evidence Sable provided that the County found to be compelling. The parties to the call further confirmed that they would have a follow-up discussion before any County approval of Sable's Zoning Clearance applications. Despite this, however, no such information was received, and Commission staff, therefore, followed up on this conversation through email, on February 7, 2025, again requesting this information. (Exh 66)

On February 12, 2025, Commission staff received a letter from the County, in response to the prior request made by Commission staff that the County agree to the Commission's review of a consolidated permit application, pursuant to California Public Resources Code section 30601.3(a)(2). In this letter, the County stated that it had concluded that the "anomaly repair work" addressed in Sable's zoning clearance applications "is authorized by existing permits" and therefore no further application to, or action by, the County is required. However, the County expressed its support for the Commission's review of a consolidated permit application, if submitted by Sable.

23

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

In addition to this letter, the County provided Commission staff with copy of an additional letter, which the County sent to Sable, notifying Sable that work addressed in Sable's zoning clearance permits "is covered by prior permits," though neither letter provided any citation to or quotation of any language in any such permits to support this assertion.

In response to these two letters and a February 14, 2025, request from the Environmental Defense Center, (Exh, 48) on February 16, 2025, the Executive Director issued a letter to the County initiating a review of the County's determination, pursuant to Section 13569 of the Commission's regulations, and requesting a complete copy of any coastal development permit applications submitted by Sable and/or its predecessor(s) for the shutoff valve installation work on the Pipelines and Sable's application for the zoning clearance(s) for the repair anomaly work along the Pipelines.

Additionally, on February 16, 2025, the Executive Director, provided Sable with notice of her intent to issue a new EDCDO to Sable. In this letter, the Executive Director responded to arguments that Sable submitted on February 14, purporting to support the position the County had taken, and explained why, despite those arguments, based on the information Commission staff had received to date, she continued to believe that Sable's proposed activities lacked the necessary Coastal Act authorization. The Executive Director therefore directed Sable to confirm, in writing, by February 17, 2025, that Sable would cease all development as described in, and subject of, that letter unless and until Sable either: (a) demonstrates, to the Executive Director's satisfaction, that it already possesses the necessary Coastal Act authorization for the work, or (b) obtain a new, final, operative CDP or other valid Coastal Act authorization specifically covering the work at issue and comply with the terms of any final, validly issued CDPs. On February 17, 2025, Commission staff received a letter from Sable reiterating their position that Sable's work "does not constitute a violation of the Coastal Act or the County's LCP because it is authorized under the pipelines' existing CDPs and other approvals."

In the following weeks, Commission staff made a concerted effort to work with Sable to resolve both onshore, and offshore violations through numerous conversations. During these conversations, Sable indicated a willingness to submit ATF applications for the development undertaken at both onshore, and offshore locations, if such could be done under protest. Commission staff agreed to work with Sable, and assist in this application process, with hopes that this would be a productive step toward further fully resolving all violations. In addition, Commission staff spent a considerable amount of time engaging in several conversations with Sable as to terms for the proposed Cease and Desist, Restoration, and Administrative Penalty orders, as noticed in the February EDCDO. Over the course of these conversations, Sable continually indicated a willingness to find agreeable terms, and, to that end, Commission staff worked tirelessly to provide a mechanism that would provide resolution. Unfortunately, despite these efforts on the part of Commission staff, Sable ultimately refused to engage in any further productive conversations and declined to move forward with any potential consent order process.

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

## IV.   BASIS FOR ISSUING CEASE AND DESIST ORDER

### A.  Statutory Provision

The statutory authority for issuance of these Cease and Desist Orders is provided in Coastal Act Section 30810, which states, in relevant part:

> *(a) If the commission, after public hearing, determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing the permit, or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order directing that person or governmental agency to cease and desist.  The order may also be issued to enforce any requirements of a certified local coastal program*

Additionally, Section 30810 (b) provides that, in part

> (b) *The cease and desist order may be subject to such terms and conditions as the commission may determine are necessary to ensure compliance with this division, including immediate removal of any development material or the setting of a schedule within which steps shall be taken to obtain a permit pursuant to this division.*

### B.  Jurisdiction

Santa Barbara County's Local Coastal Program ("LCP") was adopted by the Board of Supervisors on January 7, 1980, and was partially certified by the Commission on March 17, 1981. After an LCP is certified by the Commission, review authority over new development within the coastal zone rests with the locality; development appealable to the Commission is defined in Section 35-58 of the LCP (and Section 30603 of the Coastal Act) to include development approved by the County between the sea and the first public road paralleling the sea.

Once the Commission has certified a locality's LCP, the locality has inherent authority, via its police power, to take enforcement actions for violations of its LCP. The Commission also retains enforcement authority including under Coastal Action section 30811 and in the specific circumstances enumerated in Coastal Act Sections 30810(a) to address violations of the LCP. Pursuant to Section 30810(a) of the Coastal Act, the Commission can issue a cease and desist order to address an LCP/Coastal Act violation within a certified area if 1) the local government requests the Commission assume enforcement responsibility; 2) the Commission requests that the local government take action and the local government declines to act or does not take action in a timely manner; or 3) if the local government is a party to the violation.

On September 20, 2024, Commission staff sent an email to the County, providing notification that the Commission learned of development activities being undertaken along the Pipelines and informing the County of Commission staff's position that such work

25

Exhibits Pg. 727

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

required Coastal Act authorization. This email message further requested the County take formal enforcement action and provided "… the Commission will assume enforcement jurisdiction based on the understanding that you are declining this request unless you indicate otherwise by close of business on Sept. 23, 2024." In response, the County stated, in email, that they were looking into the issue, and would respond "ASAP". The County did not provide further response to this email, nor did the County affirmatively decline the Commission's request to take formal enforcement action, before the deadline provided.

Commission staff, additionally, addressed the issue of jurisdiction through the exchange of several letters in February of 2025. On February 12, 2024, the County sent a letter to Commission staff responding the Commission staff's request that the County consent to the Commission's processing of a consolidated CDP covering both Sable's onshore activities along the Pipelines and its offshore work. In this letter, the County asserted that the pending onshore work, referred to as "anomaly repair work" was "…authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement. Thus, no further application to or action by the County is required." However, the County further stated that, despite their position that Sable's work was authorized, the County would agree to a consolidated CDP process, if Sable also agreed. Commission staff responded explaining that they disagreed with the County's assertion regarding the existing permits, and found them problematic for multiple reasons, both procedural and substantive. Substantively, Commission staff had repeatedly asked both the County and Sable, for any such specific language or permit conditions that would support this proposition that future work was pre-authorized through existing permits issued nearly 40 years ago. Commission staff had additionally carried out extensive efforts to locate any such language or permit condition. The County has not, to this day, provided any citations to any evidence to supports its conclusion. On February 14, 2024, Sable provided its own analysis, which it then repeated and expanded in its March 10, 2024 Statement of Defense, and that analysis is discussed in detail below, in Section VII, and that discussion is incorporated herein by reference.

Notably, and as discussed above, Commission staff had also continuously asked for detailed work plans relating the work in which Sable has undertaken. Without a detailed work plan to provide specifics as to the scope, nature, and location of the completed work, and future work that is proposed to occur, it is unclear to us how the County could conclude that such work is covered by prior permits. In other words, without knowing what work is going to be carried out, how could the County determine it was included in existing permits.  Further, while its letter additionally asserts that the County fully conducted an analysis of review of all relevant permit history, as well as potential implications of the County's coastal zone ordinance, the letter provided no citations or actual permit language to support that assertion.

Moreover, Commission staff found this letter to be procedurally problematic as the County provided no forewarning as to the issuance of this letter. In fact, in a January 10, 2024, video conference meeting between Commission staff and the County, the County agreed to follow up with Commission staff with information, including relevant citations and

26

Exhibits Pg. 728

provisions within existing County-issued permits that the County believed preauthorized the activities in which Sable conducted onshore, along the Pipelines, prior to taking action. In this conversation, Commission staff further confirmed the County and Commission staff, would have a follow-up discussion before any County approval of Sable's Zoning Clearance applications. The County provided no such citations or provisions, and Commission staff, therefore, followed up on this conversation through email, on February 7, 2025, again requesting this information. Unfortunately, Commission staff received no response before receiving the County's February 12, 2025, letters.

On February 14, 2024, Commission staff received a letter from the Environmental Defense Center requesting, pursuant to Section 13569(c) of the Commission's regulations, that Commission staff review the County's determinations regarding the activities undertaken by Sable at onshore locations, on the Pipeline, as asserted in the County's February 12, 2024, letter.

Thus, on February 16, 2024, Commission staff provided the County with a letter stating, pursuant to section 13569(c) of the Commission's regulations, the Executive Director was initiating a formal review process by requesting a copy of any coastal development permit applications submitted by Sable and/or its predecessor(s) for the safety valve installation work on the Pipeline and Sable's application the for the zoning clearance(s) for the repair anomaly work along the Pipelines, as well as the County's determinations on these matters, including the specific grounds for the determinations (and the permit files and records on which the County relies for its determinations. Further, Commission staff provided the County with an additional letter on February 17, 2024, again, requesting the County take formal enforcement action.

To date, Commission staff have not received a full response to this request. Though the County provided a follow up letter on February 24, 2025, asserting a claim that the Dispute Resolution process is inapplicable in this instance, Commission staff disagree and have attempted to obtain information from and have conversations with the County to resolve this interpretation. While the County has been responsive about providing documents to Commission staff, County staff continue to fail to respond to the core request, perpetuating a dynamic that has now persisted since at least January, 10, 2025, when Commission staff first asked County staff to identify the specific grounds for its determinations -- the exact section(s) within the County's 1987 coastal development permit and/or supporting documents that purportedly provide CDP authorization for the pipeline work at issue.

Commission staff have now requested this information from County staff on no less than seven separate occasions spanning nearly three months and have provided County staff with ample opportunity to provide it and demonstrate that a factual basis exists to support its position and determination regarding the scope of the County's 1987 coastal development permit. Commission staff have also thoroughly reviewed all of the documents County staff provided but have not located any basis for the County's position that there was prior CDP authorization for Sable's recent and current pipeline work.

27

As such, the second prong of Section 30810(a), has been met in that the County has declined to act to enforce its LCP, despite two separate instances in which Commission staff has requested the County do so.

### C. Application to Facts

This section and this Staff Report set forth the basis for the issuance of the proposed Cease and Desist Order by providing substantial evidence that existing development meets all of the required grounds listed in Coastal Act Section 30810 for the Commission to issue a Cease and Desist Order.

*Violations of the Coastal Act*
Development, as described below, that required a CDP has occurred at onshore locations of the Pipelines, and at offshore locations along separate oil and water pipelines, in state coastal waters, without the required CDP. Section 30600(a) of the Coastal Act, state that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the Coastal Zone must obtain a coastal development Permit. "Development" is defined broadly by Section 30106 of the Coastal Act as follows, in relevant part:

> *""Development' means, <u>on land, in or under water, the placement or erection of any solid material or structure</u>; <u>discharge</u> or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; <u>grading, removing</u>, dredging, mining, <u>or extraction of any materials</u>; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; <u>change in the intensity of use of water, or of access thereto</u>; <u>construction, reconstruction, demolition, or alteration of the size of any structure</u>, including any facility of any private, public, or municipal utility…" (emphasis added)*

In this case, development was undertaken at onshore locations of the Pipelines including, but not limited to; excavation of underground pipeline; removal of major vegetation; grading and widening of roads; placement of fill in wetlands; installation of metal plates over water courses; dewatering and discharge of water; removal, replacement, and reinforcement of a pipeline and pipeline infrastructure; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-3214 and CA-325, Development also occurred at offshore locations including, but not limited to, deploying sand/cement fill materials on the seafloor adjacent to, and below, Sable's out-of-service offshore oil and water pipelines. Each of these activities clearly meets the definition of development under Section 30106 and each required a CDP as required under the Coastal Act.

As indicated above, one may not perform such development in the Coastal Zone unless it is authorized by a CDP.  No CDP has been issued for any of the work described above. Sable argues that the work was authorized by permits granted in the 1980s to authorize

28

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

the original construction of the pipeline system and the Santa Ynez Unit development and production plan.  However, those permits do not specifically authorize any of the work at issue here, and this issue is discussed in much greater detail in Section VII, below, in which the Commission responds to Sable's Statement of Defense.

Further, construction equipment and material related to the unpermitted development activities, as well as placement of solid fill and other materials in some locations, all remain and are therefore causing continued resource damage as defined in the Coastal Act, and the Commission regulations, and therefore constitutes an ongoing violation of the Coastal Act, and its resource protection provisions. Commission staff understand that while the unpermitted development activities undertaken offshore, along Sable's oil and water pipelines, have been completed, the materials remain in place. In addition, unpermitted development activities, at onshore locations along the Pipelines have continued, and the removal of vegetation and placement of solid materials in many places remain.

Lastly, Section 30610(d) of the Coastal Act enumerates categories of development that are exempt from the requirement to obtain a permit; the development undertaken by Sable does not fit within these exempt categories and therefore required a coastal development permit.

Sable's work offshore is subject to the Commission's jurisdiction, and Sable's work onshore is largely subject to Santa Barbara's permitting jurisdiction (with areas subject to the Commission's appeals jurisdiction), but the Commission's retained enforcement authority is predicated, in part, on Section 30810(a) of the Coastal Act, which states the following:

> *The order may also be issued to enforce any requirements of a certified local coastal program or port master plan, or any requirements of this division which are subject to the jurisdiction of the certified program, or plan, under and of the following circumstances…the commission requests and the local government or port governing body declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources…"*

As described above, the County has declined to take formal enforcement a, regarding violations undertaken, by Sable, at locations onshore, along the Pipelines. On September 20, 2024, after learning of Sable's development activities undertaken onshore, along the Pipelines, Commission staff-initiated communications with the County, informing them of the development undertaken, the Commission's position that the development needed Coastal Act authorization and requesting that the County take enforcement action. These communications also noted that the Commission would assume jurisdiction under the Coastal Act provisions regarding enforcement jurisdiction if the County declined to act. The County responded that it would review and respond but no further response was received objecting to the Commission assuming jurisdiction over the matter Further, despite several conversations between Commission staff and the County, the County has taken the position that the work Sable has conducted onshore, along the Pipelines, is covered by prior permits issued nearly 40 years ago for the initial construction and installation of the

29

Pipelines, though the County has declined to provide any citation to or quotation of any language in any such existing permits to support this assertion. The Commission has reviewed the materials and disagree with this position as further analyzed in the Statement of Defense section of this Staff Report, and maintain that Sable must submit complete CDP applications, for both onshore, and offshore development activities.

In sum, the activities at issue clearly meet the definition of development under Section 30106, and no permit has been issued for the work.

Therefore, the development required a CDP and no CDP was issued.
It is only necessary to find that development has been undertaken without a required permit or in violation of a previously issued permit in order for the Commission to issue a cease and desist order.

## V.    Basis for Issuance of Restoration Order

### A.  Statutory Provisions

The statutory authority for issuance of this Restoration Order is provided in Section 30811 of the Coastal Act, which states, in relevant part:

> *In addition to any other authority to order restoration, the commission… may, after a public hearing, order restoration of a site if it finds that [a] the development has occurred without a coastal development permit from the commission, local government, or port governing body, [b] the development is inconsistent with this division, and [c] the development is causing continuing resource damage.*

The following paragraphs and this Staff Report set forth the basis for the issuance of the Cease and Desist and Restoration Orders by providing substantial evidence that the development meets all of the required grounds listed in Section 30810 and 30811 for the Commission to issue a Cease and Desist and Restoration Order.

### B.  Application of Facts

The following paragraphs and this Staff Report set forth the basis for the issuance of the Cease and Desist and Restoration Orders by providing substantial evidence that the development meets all of the required grounds listed in Section 30810 and 30811 for the Commission to issue a Cease and Desist and Restoration Order

#### 1.  Development Without a Permit

The statutory provision requires the Commission to demonstrate that Sable undertook or maintained development that requires a CDP from the Commission without first securing one.

This element for 30811 is the same as required for 30810 and is discussed above and incorporated here by reference.

30

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

## 2. Development Inconsistent with the Coastal Act

The unpermitted development described herein is inconsistent with several resource protection policies enumerated under the Coastal Act, including:

Section 30240 (requiring protection of environmentally sensitive habitat areas or ESHA);

Section 30233 (requiring protection of wetlands);

Section 30231 (requiring protection of biological productivity and water quality);

Section 30230 (protection of marine resources)

Section 30234 (protection of commercial fishing and recreational boating facilities).

The unpermitted development caused significant negative impacts to the above-listed coastal resources and was inconsistent with a number of Coastal Act policies including those mentioned above. The areas surrounding the Pipelines include ESHA in some locations including, but not limited to, coastal scrub, chaparral, riparian and wetland habitat, woodlands, and annual and native grasslands. Examples of specific sensitive plant species that have been adversely impacted by the development include but are not limited to: Lemonade berry scrub *(Rhus integrifolia)*, Red willow *(Salix laevigata)*, Coast Live Oak *(Quercus agrifolia)*, as well as other rare vegetation communities and alliances. Additionally, several development sites are within the known occurrence range of the Gaviota tarplant *(Deinandra* increscens), a federally and state listed special-status plant species. These areas also provide habitat to support several rare species, including the California red legged frog *(Rana draytonii)*, southern California steelhead *(Oncorhynchus mykiss)*, southwestern pond turtle *(Actinemys pallida)*, as well as the Dusky-footed Woodrat *(Neotoma macrotis)*. Federally designated critical habitat for several of these species is also located within areas Sable has and/or proposes to carry out pipeline excavation, inspection and replacement or reinforcement activities.  The activities also had likely impacts on water quality and biological productivity and marine resources via things such as erosion into streams, given the location of the work and the proximity to such resources, as documented in the photos of the work in progress noted above. In addition, the activities undertaken offshore, along the separate oil and water pipelines in state waters, had the potential to result in adverse impacts to marine resources such as damage or disturbance to sensitive seafloor habitats, degradation of water quality, disruption to commercial and/or recreational fishing, and release of marine debris. The coastal waters in this are known to support several species of marine mammals, including Harbor seals *(Phoca vitulina)*, California sea lions *(Zalophus californianus)*, and several species of common dolphin and whales. Project offshore activities had the potential to adversely impact these species. Given the location and the activities, the violations offshore also had the potential to adversely impact marine resources, commercial fishing and recreational boating facilities.

## 3. Continuing Resource Damage

31

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

The unpermitted development is causing 'continuing resource damage', as those terms are defined by 14 CCR Section 13190.

14 CCR Section 13190(a) defines the term 'resource' as it is used in Section 30811 of the Coastal Act as follows:

> 'Resource' means any resource that is afforded protection under the policies of Chapter 3 of the Coastal Act, including but not limited to public access, marine and other aquatic resources, environmentally sensitive wildlife habitat, and the visual quality of coastal areas. The unpermitted development here took place in and around environmentally sensitive habitat areas, wetlands, areas of scenic visual resources, and so coastal resources were affected here.

The term 'damage' in the context of Restoration Order proceedings is defined in 14 CCR Section 13190(b) as follows:

> Damage' means any degradation or other reduction in quality, abundance, or other quantitative or qualitative characteristic of the resource as compared to the condition the resource was in before it was disturbed by unpermitted development.

In this case, the damage caused by the unpermitted development includes degradation of environmentally sensitive habitat area and impairing of water quality. Thus, damage to coastal resources did occur here.

The term 'continuing' is defined by 14 CCR Section 13190(c) as follows:

> 'Continuing', when used to describe 'resource damage', means such damage, which continues to occur as of the date of issuance of the Restoration Order.

As of this time, the unpermitted development that is the subject of these proceedings and the results thereof is ongoing and in many cases the development remains in place, and the impacts of such development remain in place, with the result of continuing resource damage. As described above, the various types of unpermitted development result in a variety of impacts to coastal resources, as is discussed further below. For example, the removal of vegetation and the grading of environmentally sensitive habitat areas can continue to impact coastal resources by stimulating growth and establishment of invasive weedy species which can prevent native plants from returning and diminish the suitability of the area for rare and sensitive wildlife species. Fill in wetlands continues to impact the habitat and the species reliant thereon unless and until some restoration is successful. Because excavation occurred on steep slopes, without proper protections in place, can contribute to ongoing erosion and, with ineffective erosion controls in place, the potential for harm to coastal resources is even greater.

As described above, the unpermitted development is causing damage to resources protected by the Coastal Act that continue to occur as of the date of this proceeding, and therefore damage to resources is 'continuing' for purposes of Section 30811 of the Coastal

32

Exhibits Pg. 734

Act. The damage caused by the unpermitted development, which is described in the above paragraphs, satisfies the regulatory definition of 'continuing resource damage.' Thus, the third and final criterion for issuance of a Restoration Order is therefore satisfied.

## C. Jurisdiction

Santa Barbara County's Local Coastal Program ("LCP") was adopted by the Board of Supervisors on January 7, 1980, and was partially certified by the Commission on March 17, 1981. After an LCP is certified by the Commission, review authority over new development within the coastal zone rests with the locality; development appealable to the Commission is defined in Section 35-58 of the LCP (and Section 30603 of the Coastal Act) to include development approved by the County between the sea and the first public road paralleling the sea.

Once the Commission has certified a locality's LCP, the locality has inherent authority, via its police power, to take enforcement actions for violations of its LCP. The Commission also retains enforcement authority including under Coastal Action section 30811 and in the specific circumstances enumerated in Coastal Act Sections 30810(a) to address violations of the LCP. Pursuant to Section 30810(a) of the Coastal Act, the Commission can issue a cease and desist order to address an LCP/Coastal Act violation within a certified area if 1) the local government requests the Commission assume enforcement responsibility; 2) the Commission requests that the local government take action and the local government declines to act or does not take action in a timely manner; or 3) if the local government is a party to the violation.

On September 20, 2024, Commission staff sent an email to the County, providing notification that the Commission learned of development activities being undertaken along the Pipelines and informing the County of Commission staff's position that such work required Coastal Act authorization. This email message further requested the County take formal enforcement action and provided "… the Commission will assume enforcement jurisdiction based on the understanding that you are declining this request unless you indicate otherwise by close of business on Sept. 23, 2024." In response, the County stated, in email, that they were looking into the issue, and would respond "ASAP". The County did not provide further response to this email, nor did the County affirmatively decline the Commission's request to take formal enforcement action, before the deadline provided.

Commission staff, additionally, addressed the issue of jurisdiction through the exchange of several letters in February of 2025. On February 12, 2024, the County sent a letter to Commission staff responding the Commission staff's request that the County consent to the Commission's processing of a consolidated CDP covering both Sable's onshore activities along the Pipelines and its offshore work. In this letter, the County asserted that the pending onshore work, referred to as "anomaly repair work" was "…authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement. Thus, no further application to or action by the

33

County is required." However, the County further stated that, despite their position that Sable's work was authorized, the County would agree to a consolidated CDP process, if Sable also agreed. Commission staff responded explaining that they disagreed with the County's assertion regarding the existing permits, and found them problematic for multiple reasons, both procedural and substantive. Substantively, Commission staff had repeatedly asked both the County and Sable, for any such specific language or permit conditions that would support this proposition that future work was pre-authorized through existing permits issued nearly 40 years ago. Commission staff had additionally carried out extensive efforts to locate any such language or permit condition.  Although the County has not, to this day, provided any citations to any evidence to supports its conclusion, on February 14, Sable provided its own analysis, which it then repeated and expanded in its March 10 Statement of Defense, and that analysis is discussed in detail below, in Section VII, and that discussion is incorporated herein by reference.

Notably, and as discussed above, Commission staff had also continuously asked for detailed work plants relating the work in which Sable has undertaken. Without a detailed work plan to provide details as to the scope, nature and location of the completed work and future work that is proposed to occur, it is unclear to us how the County could conclude that such work is covered by prior permits. In other words, without knowing what work is going to be carried out, how could the County determine it was included in existing permits.  Further, while its letter additionally asserts that the County fully conducted an analysis of review of all relevant permit history, as well as potential implications of the County's coastal zone ordinance, the letter provided no citations or actual permit language to support that assertion.

Moreover, Commission staff found this letter to be procedurally problematic as the County provided no forewarning as to the issuance of this letter. In fact, in a January 10, 2024, video conference meeting between Commission staff and the County, the County agreed to follow up with Commission staff with information, including relevant citations and provisions within existing County-issued permits that the County believed preauthorized the activities in which Sable conducted onshore, along the Pipelines, prior to taking action. In this conversation, Commission staff further confirmed the County and Commission staff, would have a follow-up discussion before any County approval of Sable's Zoning Clearance applications. The County provided no such citations or provisions, and Commission staff, therefore, followed up on this conversation through email, on February 7, 2025, again requesting this information. Unfortunately, Commission staff received no response before receiving the County's February 12, 2025, letters.

On February 14, 2024, Commission staff received a letter from the Environmental Defense Center requesting, pursuant to Section 13569(c) of the Commission's regulations, that Commission staff review the County's determinations regarding the activities undertaken by Sable at onshore locations, on the Pipeline, as asserted in the County's February 12, 2024, letter.

Thus, on February 16, 2024, Commission staff provided the County with a letter stating, pursuant to section 13569(c) of the Commission's regulations, the Executive Director was initiating a formal review process by requesting a copy of any coastal development permit

34

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

applications submitted by Sable and/or its predecessor(s) for the safety valve installation work on the Pipeline and Sable's application the for the zoning clearance(s) for the repair anomaly work along the Pipelines, as well as the County's determinations on these matters, including the specific grounds for the determinations (and the permit files and records on which the County relies for its determinations. Further, Commission staff provided the County with an additional letter on February 17, 2024, again, requesting the County take formal enforcement action.

To date, Commission staff have not received a full response to this request. Though the County provided a follow up letter on February 24, 2025, asserting a claim that the Dispute Resolution process is inapplicable in this instance, Commission staff disagree and have attempted to obtain information from and have conversations with the County to resolve this interpretation. While the County has been responsive about providing documents to Commission staff, County staff continue to fail to respond to the core request, perpetuating a dynamic that has now persisted since at least January, 10, 2025, when Commission staff first asked County staff to identify the specific grounds for its determinations -- the exact section(s) within the County's 1987 coastal development permit and/or supporting documents that purportedly provide CDP authorization for the pipeline work at issue.

Commission staff have now requested this information from County staff on no less than seven separate occasions spanning nearly three months and have provided County staff with ample opportunity to provide it and demonstrate that a factual basis exists to support its position and determination regarding the scope of the County's 1987 coastal development permit. Commission staff have also thoroughly reviewed all of the documents County staff provided but have not located any basis for the County's position that there was prior CDP authorization for Sable's recent and current pipeline work.

As such, the second prong of Section 30810(a), has been met in that the County has declined to act to enforce its LCP, despite two separate instances in which Commission staff has requested the County do so.


## VI.    BASIS FOR IMPOSITION OF ADMINISTRTIVE PENALTIES

### A.  Statutory Provisions

The statutory authority for imposition of administrative penalties for violations of non-access provisions of the Coastal Act is provided in the Coastal Act in Public Resources Code Section 30821.3[8], which states, in relevant part:

(a) In addition to any other penalties imposed pursuant to this division, a person, including a landowner, who is in violation of any provision of this division other than public access, including, but not limited to, damage to archaeological and wetlands resources and damage to environmentally sensitive habitat areas, is subject to an

---

[8] All section references in this section, III.C, are to the California Public Resources Code, and as such, to the Coastal Act, unless otherwise indicated.

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

administrative civil penalty that may be imposed by the commission in an amount not to exceed 75 percent of the amount of the maximum penalty authorized pursuant to subdivision (b) of Section 30820 for each violation. The administrative civil penalty may be assessed for each day the violation persists, but for no more than five years.

Through the proposed Cease and Desist Order, Restoration Order, and Administrative Penalty Order, Sable Offshore Corp. would be required to pay penalties based on the Section 30821.3 as described above, and as detailed below.

## B.  Application to the Facts

1.   The Violations are Ongoing:

As the courts have consistently recognized, the Coastal Act should be interpreted broadly, since the Coastal Act and case law says that it is to be "liberally construed to accomplish [the act's] purposes and objectives." (See e.g., Pacific Palisades Bowl Mobile Estates, LLC. v. City of Los Angeles (2012) 55 Cal.4th 783, 796.) The various actions and inactions by Sable have led to ongoing adverse impacts to coastal resources and constitute ongoing violations of the Coastal Act's resources protection provisions generally. The impact to coastal resources from these actions and inactions is borne by the public every day and will be until this matter is resolved.

2.   Exceptions Do Not Apply:

De Minimis Violations

There are some statutory conditions on when the Commission can impose administrative penalties. One such limit is in Section 30821.3(f) of the Coastal Act, which provides that:

> In enacting this section, it is the intent of the Legislature to ensure that unintentional, minor violations of this division that only cause de minimis harm will not lead to the imposition of administrative penalties if the violator has acted expeditiously to correct the violation.

This language establishes four criteria, all of which must be met for the violation to be deemed de minimis under 30821.3(f). The violation must: (1) be unintentional, (2) be "minor," (3) cause only de minimis harm, and (4) be corrected expeditiously.

None of the Section 30821.3(f) criteria is applicable to this case. Sable's actions in undertaking development, at both onshore and offshore locations, without requisite CDPs were not unintentional. While unlikely, if Sable were initially unaware of the Coastal Act implications of the development they undertook at onshore locations, along the Pipelines, they were directly informed, first informally and then through a Notice of Violation letter, in September 2024, yet Sable has continued to undertake these activities through today. With specific regard to the activities taken at locations offshore, Sable was informed of the

36

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

need for Coastal Act authorization for proposed work, before it was undertaken, but chose to undertake the work without first securing a CDP, nonetheless. As such, the actions with regard to Coastal Act violations at both, onshore and offshore, locations have not been undertaken unintentionally. Moreover, these actions have resulted in ongoing harms to coastal resources, and although the full extent of this impact has not been fully disclosed to Commission staff, it is clear such impacts extend to the areas surrounding the onshore locations of the Pipelines and have potential to negatively impact important habitat areas which support rare and sensitive species, as more fully discussed above. These violations thus cannot be considered minor, nor have they resulted in *de minimis* harm. Lastly, Sable has declined to affirmative actions to correct the violations, at either onshore or offshore locations and further, has continued operations at onshore locations, along the Pipelines, despite an active Cease and Desist order.

Cure Period

In order to encourage quick and informal resolutions of violations, the Coastal Act also has a provision to allow, in certain limited circumstances, a period of time in which a party can "cure" the violation without penalties attaching.  This is set forth in Section 30821.3(h) of the Coastal Act, which lists circumstances in which a property owner can prevent the imposition of administrative penalties by correcting the violation within 30 days of receiving written notification from the Commission regarding the violation. Section 30821.3(h) is inapplicable to the matter at hand.

For 30821.3(h) to apply and prevent the issuance of an administrative penalty, there are several requirements, all of which must be met: 1) the violation must be remedied within 30 days of notice; and 2) the violation must be able to be resolved without needing to undertake additional development that would require Coastal Act authorization. In addition, opportunity for a cure does not apply to cases involving resolutions of violations of permit conditions, since the party with a permit would have had previous notice of the requirements of permits. This section does not apply here, for several reasons.

First, Sable did not resolve this within 30 days of receiving notice.  Sable received written notice of the onshore Coastal Act violations at issue in the form of a Notice of Violation letter dated September 27, 2024 (Exh. 2), which was followed up in the Notice of Intent to Issue an EDCDO on October 4, 2024 (Exh. 3), the issuance of the EDCDO on November 12, 2024 (Exh. 4), and by a second EDCDO issued on February 18, 2024 (Exh. 8) which additionally provided Notice of Intent to commence a formal proceeding before the Commission to consider issuance of a Commission Cease and Desist Order, Restoration Order and Administrative Penalty. Sable additionally received written notice of the offshore Coastal Act violations in the form of a Notice of Violation letter issued February 11, 2025 (Exh. 5). Sable was fully informed through all of these documents, and in numerous and extensive conversations over the course of multiple months, as detailed above. Sable has not fully complied with any of the above listed actions and has indicated their current position as continuing to refuse to comply in any manner. As such, the violations were not only not remedied in a period of 30 days, but remain unresolved, to date.

37

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Second, the violations need legal authorization to  be resolved, as has been reiterated to Sable consistently, in numerous letters, and over the course of multiple conversations, through a full and complete application for ATF CDP for all development, both onshore and offshore, that has been conducted to date, (as well as needing an application for a CDP for any onshore, or offshore, proposed, future development).

In summary, the cure pursuant to Section 30821.3(h) is inapplicable in this matter.

### C.  Penalty Amount

Under section 30821.3(a) of the Coastal Act, the Commission may impose penalties in "an amount not to exceed 75 percent of the amount of the maximum penalty authorized pursuant to subdivision (b) of Section 30820 for each violation." Section 30820(b) authorizes civil penalties that "shall not be less than one thousand dollars ($1,000), nor more than fifteen thousand dollars ($15,000), per day for each day in which the violation persists." Therefore, the Commission may impose penalties of up to $11,250 per day (75% of $15,000) for each separate violation. 30821.3(a) also specifies that the "administrative civil penalty may be assessed for each day the violation persists, but for no more than five years." Section 30821.3 and Section 30820's use of daily penalties reflects the legislative intent in the Coastal Act to encourage quick resolution of violations and to deter lengthy, on-going violations and thereby provide greater protection of coastal resources. The daily penalty amounts are also intended to encourage prompt and effective compliance with the Coastal Act.

### Number of Violations

In this case, staff grouped the violations into a total of 9 distinct categories or types of Coastal Act violations, based on what staff was able to identify, each of which they treated as one violation, even though each category arguably comprises many individual violations.  The Commission adopts this approach as a conservative approach to identifying the number of violations at issue. While the nature and extent of each separate violation may be slightly different, the cumulative impact of undertaking all of these actions, collectively, is considerable, especially as all actions were taken without specific, protective measures which could have been delineated through appropriate regulatory review processes, including by the Commission, California Department of Fish and Wildlife, California Department of Parks and Recreation and the Central Coast Regional Water Quality Control Board, all of which were avoided by Sable.

There are seven separate violations undertaken onshore along the Pipelines including, 1) excavation with heavy equipment; 2) removal of major vegetation; 3) grading and widening of roads; 4) installation of metal plates and fill in wetlands; 5) dewatering and discharge of water; 6) pipeline removal, replacement, and reinforcement; 7) installation of shutoff valves; as well as other development associated with the Las Flores Pipelines CA-324 and CA-325. There is an additional eighth violation which was undertaken at locations offshore in state waters: Sable undertook development including placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service oil and water pipelines. Lastly, the ninth violation arises from Sable's failures to comply with the EDCDOs issued in

38

this matter.  Sable failed to fully comply with the first EDCDO, issued in November 2024, in that Sable did not submit any application for CDP for, either activities undertaken onshore, along the Pipelines, or at offshore locations of the pipeline. Moreover, Sable knowingly, and completely, refused to comply with the terms of the second EDCDO issued in February 2025. Recognizing that Sable complied with at least a portion of the first EDCDO, issued in November, and in order to be conservative, Commission staff recommend assessment of penalties for noncompliance with the second EDCDO, issued in February only. Thus, this would amount to an additional violation, with a cumulative amount of nine penalties in total.

**Number of Days**

Penalties under Section 30821.3 may be "assessed for each day the violation persists" up to a period of five years. In this case, the violations have persisted for varying amounts of time. With regard to the activities undertaken at locations onshore along the Pipelines, since we were not given notice of the activities, Commission staff are not aware of the exact date of when activities began. Images show an excavated trench, at location along the Pipelines, as early as June 2024. However, Commission staff first learned of these activities in a call with the County, on September 9, 2024. Thus, these activities were being undertaken, at the very least, by that date, and we have used that date as a conservative marker for calculation of the number of days of the violations.

Because these activities have been ongoing, the conservative date range for the activities undertaken onshore used to calculate penalties under 30821.3 would begin on September 9, 2024, and run through April 10, 2024, the date of today's hearing, or for 214 days.

However, the Commission staff recognizes that Sable did, temporarily comply with the directive to cease and desist activities, provided in the November EDCDO, (Exh. 4) and are therefore recommending the Commission apply a tolling period to the assessment of certain penalties, as described below. (though Sable did immediately resume operations on February 14, 2024). Thus, staff is recommending that the penalties under 30821.3 not be assessed for the period of time in which Sable was complying, at least in large part, with the first EDCDO, for certain, specified violations namely the dewatering and discharge or water, pipeline removal, replacement, and reinforcement, and installation of shutoff valves, as described in detail below, While Commission staff have concerns about whether the work was fully ceased during this time, and, and whether work actually commenced earlier than September 9, 2024, for purposes of calculated these specific activities, Commission staff have taken a conservative approach. It is important to note that these specified activities did negatively impact coastal resources greatly, as discussed below. However, Commission staff recognize that such impacts, while not corrected, were, at least, partially abated during the period of time in which Sable complied with the first EDCDO.

However, and as also described in greater detail, Commission staff do not feel this tolling of penalties should be applied to the full list of Coastal Act violations undertaken, since the impacts of other violations could not be abated by simply ceasing actively undertaking additional such activities. More specifically, this tolling period should not be applied to

39

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

excavation with heavy equipment, installation of metal plates and fill in wetlands, removal of major vegetation, or grading and widening of roads, given that for these violations, coastal resource damage has been ongoing, despite temporary cessation of the additional activities itself.

There are 4 basic categories of violations: Onshore violations with tolling periods (as discussed above), Onshore violations without tolling periods, Offshore violations and violations of the Orders issued in this matter.  We discuss each in turn.

## Coastal Act Violations;
## Onshore, Along the Las Flores Pipelines CA-324 and CA-325

**Assessment of Penalties to Which Tolling Period is Applied:**

For those activities discussed above to which Commission staff believe it would be appropriate to toll the penalty period, the date range for assessment of penalties would be starting on December 19, 2024. On this date, Sable submitted to Commission staff an Interim Restoration Report, completed in compliance with the terms of the November EDCDO.  Commission staff recognize that the actions taken by Sable, in implementing the measures as required by the Interim Restoration Plan hopefully reduced the likelihood of certain environmental damage from worsening, and therefore believe this date is appropriate to begin the tolling period. However, once Sable resumed development activities on February 14, 2025, penalties should again be assessed after that date, as the damage to coastal resources would no longer be halted.

In sum, Commission staff recommend that three specified activities-- the, dewatering and discharge of water; pipeline removal, replacement, and reinforcement; and installation of shutoff valves, be assessed at lower penalty range, through tolling applied to the date range in which penalties are assessed. These activities, thus, would be assessed for a period of 156 days. The period of time between December 19, 2024, and February 14, 2025, amounts to a 58-day tolling period. Subtracting that tolling period (58 days) from the full date range in which violations would otherwise be assessed (which is period of 214 days, as described above), would result in a penalty assessment period, for these specific violations, of 156 days. For these three activities, Commission staff recommend that the penalty be assessed at $7,000 a day for a period of 156 days, (The full date range for violation, with tolling period of 58 days subtracted) for the three violations discussed above. In accordance with this calculation (156 days at $7,000/day), Commission staff specifically recommends a penalty in the amount of $1,092,000 for each of these three violations, or a total of $3,276,000.

**Assessment of Penalties to Which Tolling Period is Not Applied:**

For the remainder of the violations, as noted above, staff would not recommend applying a tolling period to the accrual of penalties. Again, in evaluating the severity of each violation and its impacts, it should be noted that even assuming there was a cessation of work during this time, certain activities and violations continued to have the potential to cause ongoing impacts to coastal resources, even when temporarily halted. Specifically, those

40

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

four activities are as follows: excavation with heavy equipment; removal of major vegetation; installation of metal plates and fill within wetlands, and the grading and widening of roads.  All of these activities caused significant environmental harms that temporary cessation of the physical activity does not alleviate. Without affirmative actions taken to correct these violations, their impacts are ongoing. Further, because of the extensive damage to coastal resources these activities caused, as described below, Commission staff recommend these three violations be assessed at the maximum daily penalty ($11,250) for the full period of 214 days, amounting to $2,407,500 for each of the violations or a total of $9,630,000.

## Coastal Act Violations;
## Offshore Locations of the Pipeline

In addition to the unpermitted development activities undertaken onshore, Sable has additionally undertaken unpermitted development activities at offshore locations of the pipeline, in state coastal waters, including the deployment of sand and cement bags on the seabed, along the pipeline, and span remediation work, as described above. After cessation of activities onshore, at areas covered by the EDCDO issued in November, Sable began undertaking activities at locations offshore, along the pipeline, commencing on November 29, 2025.

There were several communications between Commission permit staff and Sable, before these activities began. On September 24, 2024, Commission staff sent an email, as a follow-up to a phone call conversation on that day, informing Sable that work Sable intended to undertake, which was discussed during that phone call, would require a CDP, and encouraging Sable to work with the Commission before proceeding with any work. In fact, Commission staff specifically acknowledged in this email, that, though Sable intended to move quicky with the work, doing do would create a more complicated and challenging situation, and reiterated the need to coordination with Commission staff. Sable responded to this email and indicated, at least, a willingness to discuss the work further and planned to set up a future call. On November 7, 2024, Commission staff followed up with an email to Sable, in an effort to set up a phone call to, again, discuss Sable's plans for work at locations along the offshore pipelines. The following day, November 8, Commission staff and Sable shared email messages in a further attempt to set up a phone call and when they were unable to, Commission staff requested a written description of the work Sable planned to conduct. An email from Sable, sent on November 19, provided limited information as to the specifics of the work, and claimed that Sable was "committed to ensuring compliance with all necessary authorizations before proceeding with any work. In response, Commission staff reiterated that such work would require a complete CDP application. Further, Commission staff confirmed that, based on the previous conversations, Sable did not intend to proceed with work until Commission staff had the opportunity to more fully discuss the details of that work. Sable provided no response to this email, and thus, Commission staff sent a follow up email on January 10, 2024, again informing Sable of the need for CDP for the work Sable intended to undertake along the offshore locations of the pipeline and requested a status update as to any potential work. Sable provided no response to this email.

41

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Unfortunately, Commission staff instead received a letter from Sable's counsel on January 15, 2024, that Sable had conducted "inspections" along the offshore portions of the pipeline, then undertook the unpermitted activities discussed above. Again, this activity is one for which authorization, with appropriate conditions and mitigation if appropriate, likely could have been obtained through the Commission's CDP process, had they applied. In fact, the Commission has approved similar work on no less than seven separate occasions since 1996 as well as two emergency authorizations when expedited completion of the work was warranted. As discussed above, if Sable had secured a CDP for this work, the Commission would have had the opportunity to fully assess the proposed work, and ensure necessary measures were taken to prevent damage to coastal resources, such as limiting the fill material to sand rather than concrete (which can leach contaminants and degrade water quality), ensuring sensitive reef areas and marine habitats are avoided by the fill, coordinating the work to avoid conflicts with commercial and recreational fisheries, and including appropriately trained and independent on project vessels to minimize entanglement and ship strike risks.  Instead of working collaboratively with the Commission, Sable proceeded with these actions, with full knowledge that doing so would be a violation of the Coastal Act, and with blatant disregard for the jurisdiction of the Commission, and any potential damages that the work would inflict on coastal resources, including marine mammals, coastal water quality, fisheries and sensitive marine habitats. Moreover, the materials placed offshore as discussed here remain in place today and any impacts have not been reduced, conditioned to avoid, addressed or mitigated for. This flat refusal to comply with the Coastal Act warrants a high penalty, which would be assessed for a date range of 133 days which begins on November 29, 2024, the date in which these activities began, through April 10, 2024, the date of this hearing, at $11,250 daily, amounting to 1,496,250.

## Coastal Act Violation
## Failure to Comply with Executive Director Cease and Desist Order

Lastly, two separate EDCDOs have been issued to Sable, in this matter.
In November 2024, the Executive Director of the Commission issued an EDCDO directing Sable to, among other things, cease and desist all unpermitted development activities, temporarily secure the open trench work sites where work had ceased, and submit a complete CDP application for both works already undertaken as well as future, proposed work.  While Sable exhibited partial compliance with this order, it has, to date, not applied for any such CDP.  This is despite an extended deadline given for that requirement, as accommodation made by Commission staff in hopes of assisting Sable in successfully resolving all violations.

The second EDCDO, issued in February 2025, again directed Sable to cease and desist all unpermitted development activities, and, again, directed them to comply with the Coastal Act and submit a complete application for a CDP for both work already undertaken as well as any future, proposed work. In this instance, Sable blatantly, and egregiously, refused to comply with any aspect of this EDCDO. Sable, citing a variety of arguments described in fuller detail above and in the Response to the Statement of Defense section of this staff report, have refused to apply for any such CDP, and, instead restarted work

42

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

very quickly after expiration of the first EDCDO issued in November. They disregarded the EDCDO issued in February 2025 and not only restarted work, but they continued that work through evening hours, and weekends, at an alarmingly fast rate, before the action could be brought before this Commission. While Sable raised a number of arguments asserting that they have a reasoned basis for their outright refusal to comply with this EDCDO, as discussed above and at length in the Response to the Statement of Defense, this is not accurate and Commission staff repeatedly informed Sable of this and attempted to work with them to resolve the matter amicably, to no avail.

Despite Sable's lack of full compliance with the terms of the EDCDO, issued in November, Commission staff is only recommending assessment of penalties for Sable's noncompliance with the terms of the February EDCDO. The date range for this assessment would start on February 18, 2025, when the EDCDO was issued, and be assessed through April 10, 2025, the date of today's hearings. This date range amounts to 52 days. Because of the extreme nature Sable's actions in this instance, Commission staff recommend this penalty be assessed at the max daily penalty, $11,250, per day. Over 52 days this amounts to $585,000.

Thus, collectively, Commission staff recommend a penalty amount of $14,987,250.

Finally, we note that these penalty amounts were reached under an analysis of applying the factors set forth in the Coastal Act.  Under 30821.3(c), in determining the amount of administrative penalty to impose, "the commission shall take into account the factors set forth in subdivision (c) of Section 30820."

Section 30820(c) states:

> In determining the amount of civil liability, the following factors shall be considered:
>
> (1)    The nature, circumstance, extent, and gravity of the violation.
> (2)    Whether the violation is susceptible to restoration or other remedial measures
> (3)    The sensitivity of the resource affected by the violation
> (4)    The cost to the state of bringing the action.
> (5)    With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require

As is described in greater detail in accordance with these factors below, Sable's actions, and failures to acts constitute multiple violations and this analysis provides recommendations for the factors to be applied for each type of violation. Commission staff recommends that the Commission assess daily penalties for each of the categories of violations at a daily amount based on the factors in 30820(c) as analyzed below.

**Excavation and Grading with Heavy Equipment**

43

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Note that these two violations are discussed together because we find that the five factors apply in the same manner to each of these violations.

30820(c)(1) *The nature, circumstance, extent, and gravity of the violation.*

Sable conducted extensive grading and excavation activities, some of which were conducted in, or adjacent to, riparian ESHA. (Exh. 87) Images provided to Commission staff by members of the public show several instances in which excavators are located in, or near, these sensitive resources, including excavators parked atop a pool where a southwestern pond turtle was documented to be swimming, as well as two southern California steelhead. (Exh. 68) Commission staff were provided a report with details of, at least, one damaged woodrat nest, which was impacted in coastal sage scrub – potentially from the dusky footed woodrat, a species of special concern due to its rarity and ecosystem role. The full extent to this damage, and potential species mortality, is not fully known and Sable has not been forthcoming with information as to the work, forcing Commission staff to make assessments as to this damage based on the imagery and information gathered from other sources. (see: Exh.69 of grease pool which as fallen from an excavator) That being said, the imagery reviewed by Commission staff shows particularly concerning, and extensive, damage leading Commission staff to believe the full extent of coastal resource harm is potentially, in fact, much greater than has been disclosed by Sable. There was no justification for not coordinating with the Commission in advance, and this factor in the aggregate weighs in favor of a high penalty amount.

30820(c)(2) *Whether the violation is susceptible to restoration or other remedial measures*

The topography can be restored and the earth compacted, but the habitat and water quality (such as sedimentation) impacts cannot be undone. Further, Commission staff have received images, taken in October, showing excavated sites which, at least in one instance, the recompaction was done loosely, and ineffectively. (See: Exh. 72 image of backfilled trench site that has no soil compaction) This factor weighs in favor of a medium penalty amount.

30820(c)(3) *The sensitivity of the resource affected by the violation*

As stated above, the resources affected here are particularly sensitive since the work was conducted in, or adjacent to, riparian ESHA, (See: Exh. 124 image of Scrub Vegetation that has been removed, and construction equipment in the background, in a riparian area) and with damage to important habitat which support species such as the southwestern pond turtle, California steelhead, dusky footed woodrat, as well as other critical species. As described previously in this staff report, the timing of this development is important to consider as the work has been undertaken during the breeding season for certain rare and sensitive wildlife species, as well as bird nesting season. The presence of project personnel and the operation of machinery and other equipment within these sensitive habitats during these periods had the potential to temporarily disrupt or more permanently impact the breeding and nesting of individual species. This factor weighs in favor of a high penalty

44

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

30820(c)(4) *The cost to the state of bringing the action.*

The cost to the state has been high, with respondent repeatedly starting negotiations only to back out later and refusing to comply with orders, and given the vast, dispersed, and complicated nature of the project and the way information has or has not been shared. Sable's nonfeasance and malfeasance has, and continues to be, varied and extensive, and has required an incredible amount of Commission resources to unravel, and address. Sable has been consistently obstinate with regard to informational requests, and efforts to resolve the ongoing Coastal Act violations, onshore and offshore. As a result, Commission staff have spent an unreasonably high amount of time assessing information from various sources, traveling to the locations in an effort to more fully understand the scope of work conducted, and poring over reports from the public in an effort to gain some understanding of the full scope of work. To date, Sable continues to fail to provide full information, or any full-scale project plans relating to the work. In addition, Commission staff has spent an inordinate amount of time communicating with Sable's counsel, through weekends and late into evenings, under the guise of seeking compromise, and, on more than one occasion Sable has indicated willingness to work with Commission staff, only to change positions, last minute, forcing Commission staff to expend even greater resources. In addition to the great amount of resources expended to try and resolve the violations, Sable's lack of transparency, and refusal to provide full information requested about what they have done and where and when, things which are basic to any project and to the ability to assess legal options, has resulted in a tremendous drain of resources, and has required  a continually laborious effort on the part of Commission staff. As such, the cost to State in bringing the action is very high, and the Commission therefore finds that consideration of Section 30820(c)(4) warrants application of a high penalty.

30820(c)(5) *With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

Sable Offshore Corp, a company created in 2024, has no known history of violation, however the other elements in the (c)(5) factor weigh heavily against them.  They undertook no voluntary restoration or remedial measures, having only done some restoration in response to the first EDCDO, and they proceeded with this work even after, and in defiance of, the second such order.  This also reveals a high degree of culpability. The entire project is designed for economic profit, which may be a significant part of the motivation to proceed very quickly, in defiance of the order, if they believe the economic benefits will outweigh the amount of penalties imposed. This factor weighs in favor of a high penalty.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250, for the full date range of 214 days, amounting to $2,407,500 per violation, or $4,815,000 for the two violations.

**Removal of Major Vegetation**

45

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

### *30820(c)(1) The nature, circumstance, extent, and gravity of the violation.*

Several sites where activities were conducted are in or adjacent to potential ESHA, including coastal sage scrub, lemonadeberry scrub, wetland or drainages, and are also in, or near, mapped wetlands. Other work sites are in annual or native grassland, which is considered ESHA in certain situations. Many of the work sites are in, or near, coastal sage scrub. Construction equipment and other construction materials have been staged extensively near ESHA. (See. Exh 104 image of extensive construction equipment staged near EHSA, and Exh.106 image of staging of equipment near Willows.) Importantly, the violation involved a major amount of work at many different sites over a large area, with no justification for not coordinating with the Commission in advance and ensuring that the work was conditioned to protect these resources. Coordination with Commission staff would have allowed for full analysis of potential impacts, and safeguards to protect against coastal resource damage, yet this did not happen. Thus, so this factor weighs in favor of a medium-high penalty amount.

### *30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

The vegetation can be restored, though much of the work was done in sensitive areas, which may require greater measures to fully restore the vegetation. Moreover, the use of heavy machinery and other equipment within, or around, sensitive riparian areas can result in serious adverse impacts via trimming or removal of vegetation, which can reduce the habitat value of these areas as a result of the altered vegetation structure, with loss of cover, feeding areas, nest sites, and other similar functions. (Exh. 78) In addition to all of these potential impacts, these activities have the potential for to contribute to the release and dispersion of sediment and or release of hazardous materials into waterways, or sensitive riparian and wetland habitat areas. This factor weighs in favor of a high penalty amount.

### *30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is habitat, so this factor weighs in favor of a high penalty amount.

### *30820(c)(4) The cost to the state of bringing the action.*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount**.**

### *30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250 for the full date range of 214 days, amounting to $2,407,500

**Installation of Metal Plates and Fill Within Wetlands**

*30820(c)(1) The nature, circumstance, extent, and gravity of the violation*

Sable conducted extensive grading and excavation activities, some of which was conducted in, or adjacent to, riparian ESHA. Sable also applied an incorrect buffer of 50 feet from ESHA, instead of the requisite 100 foot buffer required by the County's Commission-certified Gaviota Coast Plan. Additionally, it does not appear that Sable delineated the locations of neighboring wetlands accurately, if at all. Without accurate ESHA mapping and wetland delineations mapping it is impossible to know the full extent of ESHA and wetlands at the development sites and it is unlikely that adequate protective measures were implemented to avoid or minimize adverse impacts to these habitats.  As such, there is a high potential for damage to those wetlands fill activities and thus, this factor weighs in favor of a high penalty amount

*30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

Violations, such as fill in wetlands, are difficult to remedy and, even if they are remedied successfully in the long run, the resource has been impacted in the interim, thus this factor weighs in favor of a high penalty amount. (See: Exh. 94 image of steel plate placed over installed culvert)

*30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is wetlands, so this factor weighs in favor of a high penalty amount

*30820(c)(4) The cost to the state of bringing the action.*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250, for the full date range of 214 days, amounting to $2,407,500

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

**Dewatering and Discharge of Water**

*30820(c)(1) The nature, circumstance, extent, and gravity of the violation*

The dewatering and discharge or water, which occurred as part of excavation and work conducted on, and along, the offshore Pipelines, was done in riparian areas. and those with elevated water tables, which created potentially damaging impacts to both surrounding habitat as well as potential increased erosion damage. Again, this work was conducted with no justification for lack of coordination with Commission staff which could have avoided the adverse impacts, and has the potential to create serious damage to surrounding habitat, and erosion. Thus, this factor weighs in favor of a mid to high penalty amount.

*30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

Habitat can be restored, though the extent of the damage affects the measures  which may be needed to fully do so. Sable undertook these activities without coordination with Commission staff which could have ensured proper parameters were in place  that could have prevented potential habitat damage. Further, Commission staff have received images that show the BMPs that Sable did use to while doing the work in an apparent attempt to limit erosion or other damage to surrounding coastal resources, were installed ineffectively. Thus, the damage may be far greater than can be adequately assessed through the material which Sable has shared, which makes assessment of the susceptibility to restoration difficult to fully analyze. Thus, this factor weighs in favor of a mid to high penalty amount.

*30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is wetlands, so this factor weighs in favor of a high penalty amount.

*30820(c)(4) The cost to the state of bringing the action.*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the mid-high end of the possible range and apply a daily penalty amount of $7,000, with the tolling period of 58 days subtracted from the full date range of 214 days, amounting to 156 days, amounting to $1,092,000

48

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

**Pipeline Removal, Replacement, and Reinforcement**

*30820(c)(1) The nature, circumstance, extent, and gravity of violation*

Sable brought in heavy equipment to excavate substantial areas, and began either, removing or replacing whole sections of pipe, or installing external sleeves or coatings to expand and reinforce the pipeline. These activities required extension excavation, and created the potential release of construction debris and hazardous materials into the surrounding environment. While these activities created damage to the surrounding environment, they may not necessarily present the same threat of ongoing damage as other violations here do. Thus, this factor weighs in favor of a mid-range penalty.

*30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures*

The vegetation and surrounding habitat damage can be restored, so this factor weighs in favor of a mid-range penalty amount

*30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is vegetation and habitat, so this factor weighs in favor of a high penalty amount

*30820(c)(4) The cost to the state of bringing the action.*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the mid to high end of the possible range and apply a daily penalty amount of $7,000 with the tolling period of 58 days subtracted from the full date range of 214 days, amounting to 156 days, amounting to $1,092,000.

**Installation of Shut off Valves**

30820(c)(1) The nature, circumstance, extent, and gravity of the violation

The installation of shutoff valves involved extensive grading, excavation, and removal of vegetation, as well as installation of an underground apparatus, all of which create a high potential to negatively impact surrounding coastal resources and important habitat areas. Many of these activities, such as the shutoff valve installation, could have been approved with a conditioned CDP and then accomplished in a manner that minimized the damage to

49

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

coastal resources that was created by Sable's refusal to apply for permits for these actions. This factor weighs in favor of a mid-range penalty.

### 30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures

The vegetation and surrounding habitat damage can be restored, so this factor weighs in favor of a mid-range penalty amount

### 30820(c)(3) The sensitivity of the resource affected by the violation

The resource affected by these violations is vegetation and habitat, so this factor weighs in favor of a high penalty amount.

### 30820(c)(4) The cost to the state of bringing the action.

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

### 30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the mid to high end of the possible range and apply a daily penalty amount of $7,000 with the tolling period of 58 days subtracted from the full date range of 214 days, amounting to 156 days, amounting to $ with the tolling period of 58 days subtracted from the full date range of 214 days, amounting to 156 days, amounting to $1,092,000.

## Placing of Sand and Cement Bags on the Seafloor Below and Adjacent to Out-of-Service Offshore Oil and Water Pipelines

### 30820(c)(1) The nature, circumstance, extent, and gravity of the violation

Both the type of inspection activities, and the type of work undertaken, have the potential for temporary and permanent adverse impacts to marine resources. For example, offshore activities required the United States Coast Guard to issue a Notice to Mariners which may have precluded commercial and recreational fishing activities within the area of the project during project activities. Marine mammals and marine reptiles could have become entangled in cables, including the cables connecting remotely operated vehicles (ROVs) to project vessels and those used to lower equipment and material to the seafloor. Sable does not appear to have completed detailed benthic surveys prior to project operations so it is possible that sensitive benthic habitats such as rocky substrate, sand dollar beds and/or rocky reef could have been smothered or damaged by the development. Thus, this factor weighs in favor of a high penalty.

### 30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures

50

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Without detailed Best Management Practices (BMPs) to govern project operations it is possible that construction debris and hazardous materials could have been released into the marine environment. Despite multiple communications with Commission staff before undertaking development activities offshore, in which Commission staff conveyed that an application for CDP was needed and that these activities could result in environmental harm, Sable proceeded to take these actions without such permit. As such, an analysis of environmentally superior alternatives could not be performed and no protective measures could be set in place by the Commission, such as qualified marine wildlife monitors, avoidance of rocky substrate, or other measures, in order to avoid or minimize adverse impacts. Importantly, because Sable used a cement/sand mixture in the bags that were deployed along the seabed, there is a potential for leaching of chemicals into the ocean and such potential increases over time. Because of this, remedial measures are likely much greater than they would otherwise be, if the work had been conducted with appropriate safeguards in place, and coordination with Commission staff. Therefore, this factor weighs in favor of a high penalty.

*30820(c)(3) The sensitivity of the resource affected by the violation*

The resource affected by these violations is vegetation and habitat, so this factor weighs in favor of a high penalty amount.

*30820(c)(4) The cost to the state of bringing the action*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250 for the date range in which the violation took place, beginning on November 29, 2024 when the activity began, through April 10, 2025, the date of this hearing, amounting to 133 days. A daily penalty of $11,250 for the period of 133 days amounts to $1,496,250.

**Failure to Comply with Executive Director Cease and Desist Order**

*30820(c)(1) The nature, circumstance, extent, and gravity of the violation*

The nature, gravity, and extent to which Sable flatly refused to comply with the EDCDO, issued in February, are very high and the degree of culpability to which they have exhibited with regard to the Coastal Act violations is extensive.  As has been described above, Sable continued to undertake work, after issuance of two separate Notice of Violation letters, and

51

Exhibits Pg. 753

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

two EDCDOs issued under Section 30809. Section 30821.3 applies to any violation of the division (other than public access), which includes Section 3089. With specific regard to Sable's refusal to comply with the terms of the EDCDO, issued in February, for purposes of this penalty assessment, Sable has indicated no intent to apply to complete CDP applications, as directed by the EDCDO, and after its issuance,  Sable continued unpermitted development activities, at the onshore locations, along the Pipelines. Further, it is relevant that Sable has not been forthcoming and reliable in its representations to Commission staff, throughout the course of their interactions with Commission staff.  In early conversations about the ongoing, onshore work, Sable indicated to Commission staff that work had ceased when, in fact, it had not. Despite an initial Notice of Violation, Sable continued to undertake development. Indeed, upon expiration of the November EDCDO, Sable resumed work within days and has done so with disregard to protection of surrounding coastal resources. Sable has continued to undertake activities at locations onshore. Moreover, it should be noted that the public policy implications are great. It is highly problematic, and very exceedingly rare, for an entity to refuse to comply with legal, validly issued orders.  To do so is to undercut the very tools available to protect valuable coastal resources, and the Coastal Act itself.  Such behavior from an entity that desires to operate multiple oil transport pipelines and production facilities in marine and coastal areas – some of which have already generated catastrophic spills and environmental damage - is troubling.  Thus, this factor weighs heavily in favor of a high penalty amount.

### 30820(c)(2) Whether the violation is susceptible to restoration or other remedial measures

As stated in this staff report several times, the damage to coastal resources caused by Sable's actions, and inactions, and decision to violate the EDCDO altogether could have been minimized if Sable had first coordinated with Commission staff and complied with the Coastal Act, before undertaking development activities. These activities, which effect a broad area, and on a large scale, impacted several coastal resources, and many of those impacts could have been avoided. As such, the extent to which those measures are required to will likely be extensive. As also stated here, the extent to which remedial or restorative measures must be taken, is likely much higher than what is currently known by Commission staff, due to Sable's refusal to provide information that would allow Commission to provide a fully analysis of those effects. This factor weighs heavily in favor of a high penalty amount.

### 30820(c)(3) The sensitivity of the resource affected by the violation

The extent, and sensitivity of the resources affected by the failure to comply with the EDCDO is great, including ESHA, riparian areas, wetlands, and other important habitat areas, many of which support critical species, as has been discussed in this staff report. Therefore, this factor weighs heavily in favor of a high penalty amount. (See. Exh 81 image of excavator in potentially Mapped Wetlands on February 20, 2025, as well as Exh. Image of an excavator removing shoring trench walls near Coastal Sage Scrub on February 18, 2025)

### 30820(c)(4) The cost to the state of bringing the action.

52

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

*30820(c)(5) With respect to the violator, any voluntary restoration or remedial measures undertaken, any prior history of violations, the degree of culpability, economic profits, if any, resulting from, or expected to result as a consequence of, the violation, and such other matters as justice may require*

As has been discussed in detail in this report, Sable's actions, and inactions, in this instance have been very problematic. It is unprecedented for a violator to ignore and violate an Order in this way.  As noted already, it is exceedingly rare that an entity acts in such an excessive, and repeated manner, and highly uncommon that and entity blatantly refuses, to comply with a legal, validly issued order.  Commission staff have made constant attempts to work with Sable,  and have repeatedly made themselves available to assist Sable in the CDP application process, and attempted to work with them to reach a consensual resolution of the whole situation, including trying to assist them in finding a path forward and a way to quickly resolve the enforcement and permitting cases.  Despite this, Sable has instead consistently wasted Commission resources by agreeing engage in discussions toward resolution of the violations discussed above, only to change course with little, to no, forewarning.  As discussed, Sable could have coordinated with Commission staff before undertaking activities at locations both onshore, and offshore, thereby ensuring appropriate parameters in place so as to prevent environmental damage, but instead, after direct communications with Commission staff informing them that work needed a permit and offering to work with them to obtain one, knowingly undertook work without such legal authorization and without conditions in place to ensure minimization and protection of coastal resources. This factor applies to this violation in the same way it applied to the prior one, so it weighs in favor of a high penalty amount.

Given the discussion above, we consider these violations to be at the high end of the possible range and apply a daily penalty amount of $11,250 applied to a date range beginning on February 18, 2025, when the EDCDO was issued, through April 10, 2025, the date of this hearing which amounts to 52 days. Thus, Commission staff recommends a total of $585,000.

## *Conclusion*

Aggregating the findings with respect to all 30820(c) the factors listed above, Commission staff believes the higher-range penalty would be appropriate. A high-range penalty of $12,000,000 - $15,000,000 is suggested. See table below:

| Violation | Days Assessed | $7,000 Daily Penalty | $11,250 Daily Penalty |
|---|---|---|---|
| Excavation and Grading with Heavy Equipment | 214 | | $2,407,500 |

53

Exhibits Pg. 755

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

| | | | |
|---|---|---|---|
| Grading and Widening of Roads | 214 | | $2,407,500 |
| Removal of Major Vegetation | 214 | | $2,407,500 |
| Installation of Metal Plates and Fill Within Wetlands | 214 | | $2,407,500 |
| Dewatering and Discharge of Water | 156* | $1,092,000 | |
| Pipeline Removal, Replacement, and Reinforcement | 156* | $1,092,000 | |
| Installation of Shutoff Valves | 156* | $1,092,000 | |
| Placing of Sand and Cement Bags on the Seafloor Below and Adjacent to Out-of-Service Offshore Oil and Water Pipelines | 133 days | | $1,496,250 |
| Failure to Comply with EDCDO | 52 | | $585,000 |

**Total:  $14,987,250**

*Note: Staff recommends that certain violations be assessed with a tolling period of 58 days, as described above.

## Potential Efficiency Discount

While the above-referenced penalty figures are factually and legally appropriate to the respective parties and violations at hand, to maximize the likelihood of compliance with these Orders and to rectify this matter in the most efficient manner possible, thereby limiting the costs to the state and increasing the potential for accelerated restoration and reduced impacts on resources, if Sable elects to proceed with consolidated CDP application[9], the Administrative Penalty will be reduced by 10% of the total amount (i.e., $1,498,725).  If however, at any point prior to the Commission staff filing the CDP application as complete, Sable takes any steps that would interfere with the processing of the CDP application, including any attempt to delay or avoid submittal of the CDP

---

[9] If Sable elects to proceed with a Consolidated CDP process, they must do so in accordance with Section 1.3.A of the Consent Cease and Desist Order CCC-25-CD-01. See: Appendix A

54

application, the penalty amount shall not be reduced, and Sable shall be required to pay any remaining penalty amount to bring the full payment up to $14,987,250

## VII.    DEFENSES ALLEGED AND RESPONSES THERETO

### A.  Summary

On March 10, 2025, Sable submitted a letter entitled "Statement of Defense and Response to Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order," which we will refer to simply as the "Statement of Defense," or "SOD."  This section provides responses to the arguments made in that SOD.

As an initial matter, although Sable makes many arguments in its Statement of Defense, a few recurrent themes stand out.  The most prominent argument running throughout the SOD is that the work at issue in this proceeding was anticipated, its impacts were evaluated, and it was authorized and even required through various actions taken in the 1980s.  Thus, Sable argues, the work required no further Coastal Act authorization and was not a violation of the Coastal Act.  In support of this argument, Sable points to several different documents, including combined Environmental Impact Reports (EIRs) and Environmental Impact Statements (EISs) that they claim reveal the evaluation of impacts and various types of approvals and permit conditions that they claim reveal the authorization and mandate for the work.

There are several problems with Sable's approach.  First, many of Sable's citations merely refer to ongoing operations, which Sable equates with maintenance.  However, assessments of the impacts of the "operation" of a facility do not necessarily include the impacts of maintenance projects.  Second, even where these documents discuss the need for future maintenance, none of them mentions the specific types of work at issue, nor do they imagine a project of this scope, so they could not have assessed or mitigated for its impacts.  Third, even if an EIR/EIS attempts to include a "life cycle assessment" of the impacts of a project by including an assessment of the impacts of future maintenance, and even if the EIR/EIS at issue here had done so and predicted work of this nature, that does not mean that the individual future maintenance projects whose impacts were evaluated were authorized as part of the approval that the EIR/EIS supports.  Such projects still require further review when they are proposed to occur, in order to ensure that they are performed in the least environmentally damaging fashion, especially where they are occurring decades in the future.  And finally, although some entitlements affirmatively require the maintenance of a system in perpetuity, that is not the same as authorizing each individual instance of maintenance work.  A maintenance requirement is to ensure that system integrity is maintained, but the recognition of the need for that and the requirement for that is totally independent of the question of whether the future work needed to achieve that will constitute development that will need to be reviewed to assess the potential that it will have its own impacts and then independently authorized. This is probably the primary recurrent theme throughout this document.

55

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

With that background, in Section B, we turn to an assessment of some of the individual documents upon which Sable relies in arguing that its work was pre-authorized, and we address each of these documents in turn. We then address some other recurrent themes in the SOD in Section C. Finally, in Section D, we address various other individual comments made throughout the Statement of Defense.

## B. Documents on Which Sable Relies for its Pre-Authorization Argument

### a. Onshore

#### i. EIR/EIS[10]

In the early 1980s, a pipeline project was proposed to construct and install an insulated underground pipeline – referred to as the Celeron/All American pipeline, after the two principal companies involved – to transport oil produced from the Santa Barbara Channel to refineries in Texas. The California State Lands Commission was designated as the lead agency under the California Environmental Quality Act and the Bureau of Land Management was designated as the lead agency under the National Environmental Policy Act. These agencies coordinated to develop a joint Environmental Impact Report/Environmental Impact Statement (EIR/EIS) for the project, a public draft was released in August of 1984. In its SOD, Sable contends that this 1984 EIR/EIS for construction of the Celeron/All American pipeline (Celeron project) also describes and analyzes the environmental impacts of the corrosion remediation and shut off valve installation work it began carrying out in late 2024 and continues to pursue.

Despite Sable's reliance on these documents, the EIR/EIS does not appear to cover the instances of "maintenance" development activities that have been observed and carried out by Sable over the past several months. The EIR/EIS does not refer to the types of activities undertaken, and it does not include an analysis of the types of impacts that would likely flow from the types of development at issue here.

Instead, the Draft EIR/EIS includes a July 17, 1984, cover letter with a "Project Description" that refers only to the proposal to "construct" the pipeline, not to future maintenance activities, much less substantial pipeline replacement projects, removal of pipeline insulation or the potential for the installation of additional shutoff valves decades later. Similarly, the "Abstract" at the beginning of the document, on page 2 (pdf page 8), states that the project proponents propose only to construct the pipeline.

Sable points out that the EIR/EIS goes on to say that the document analyzes the environmental effects of the proposed pipelines "through construction, operation, maintenance, and abandonment," but that does not mean that everything through abandonment was being pre-authorized. Further, even if the intent was to pre-authorize everything in that list, the document doesn't define the term "maintenance" or even elaborate on what is contemplated by the term until section 2.2.4. That section lists types of anticipated maintenance, but it doesn't mention any pipeline alteration, expansion,

---

[10] Sable cites to two versions of the combined EIR/EIS: (1) Final Environmental Impact Report Environmental Impact Statement; Proposed Celeron / All American and Getty Pipeline Projects; Calif. State Lands Comm'n and Bureau of Land Mgmt (DoI), January, 1985 (Sable SOD Doc. 3); and (2) the Draft of the same, from August, 1984 (Sable SOD Doc. 2).

Exhibits Pg. 758

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

replacement or earth movement at all.  It lists five bullet points as constituting the maintenance activities associated with the pipeline and the right-of-way.  Most relate to observation and inspection.  The only references to maintenance are to maintenance of the cathodic protection system and the pipeline mile-post and road-crossing markers (see pdf page 128), neither of which was performed by Respondent, and both of which are simply not at issue here.  The "Summary" section of the EIR/EIS states that operational impacts "would result primarily from potential oil spills and leaks" (p. S-2), without any indication of any consideration of impacts from maintenance, or the types of development undertaken recently by Sable and presently at issue.

The section of the EIR/IES on the environmental consequences of the Celeron project (§ 4.2) is broken down into subsections for each type of resource that could be affected, and does not discuss maintenance.  The first subsection, on air quality (§ 4.2.1) has subsections, and each of those subsections, in turn has two subsections of its own – one on construction and one on operation.  There is no section on the impacts of maintenance activities.  Similarly, the third subsection, on impacts of the project to soils (§ 4.2.3) has three subsections – construction, operation, and abandonment.  There is no discussion of maintenance, and the subsections on operation do not cover maintenance.  The subsection on operations in section 4.2.3 limits its assessment of the impacts of operation to the impacts that "would result from oil pipeline leaks and ruptures" (4-24, pdf 328).  The same is true for the sections on impacts to surface waters (§ 4.2.4, 4-30 to 4-32, pdf 334-336) and groundwater (§ 4.2.5, see, in particular, 4-35, pdf 339 [operational impacts "would only occur in the case of a leak or rupture"].

The word maintenance is only mentioned a few times in the more than 120 pages discussing impacts of the pipeline construction project, and none of those references discusses the type of work at issue here, much less any mitigation measures to avoid or minimize potential impacts specifically from this type of work.   Two mentions of the word are in the section on impacts to terrestrial biology (§ 4.2.7).  In that section, there is one mention that operational maintenance could increase the risk of fire (p.4-47) and one mention that maintenance traffic could increase habitat destruction (p. 4-53, pdf 357).  There is no discussion of grading new roads or of excavating or stockpiling soils.  The only other mentions are in the sections on socioeconomics (§ 4.2.8), discussing the fact that the project would employ people to maintain the pipeline (pp. 4-60 & 4-67), the section on cultural resources (§ 4.2.11),  and, again, in discussing oil spills and leaks (§ 4.2.15), where is refers to the maintenance discussed in section 2.2 as a means of preventing impacts, but does not discuss the impacts *of* maintenance (see pp. 4-114 & 4-117, pdf 418 & 421). Regarding cultural resources, Section 4.2.11 acknowledges that not all portions of the pipeline route had been surveyed for cultural resources and many known sites had not been evaluated for their eligibility for National Register designation. For these reasons, the cultural resource impact assessment at the time that the time of preparation of the EIR/EIS was incomplete and the EIR/EIS required a compliance plan to mitigate for potential impacts to cultural resources for all aspects of the project proposal. As discussed above, since the type of maintenance undertaken by Sable was not envisioned, analyzed, or approved in the EIR/EIS as part of the project proposal, the approved compliance plan may not be sufficient to adequately prevent adverse impacts to coastal resources as a result of the work.

57

The Final EIR/EIS released in 1985 contains no clear project description, but the section listing areas of environmental concern (§ 1.2) only discusses impacts from construction and spills (see p.1-3, pdf19).  Similarly, the section on impacts (§ 1.3) states only that the proposals have potential significant impacts from "construction and operation."  (p. 1-5, pdf21).  Otherwise, the discussion above regarding the Draft EIR/EIS pertains equally to the Final, and here again, there was no identification of additional development activities they are calling "maintenance" nor were there provisions to identify, reduce or mitigate such development activities. See, also, the discussion in the Summary of Staff Recommendations (on pages 5-6, above) and in Section III.C. (on pages 21-22), regarding changes in our understanding and listing of sensitive species and in the nature of the pipeline project's operation since these initial EIRs/EISs were produced

Finally, in any case, as Commission staff stated in the second half of the first paragraph on page 3 of the Notice of Intent for the second EDCDO (Exh. 8), even if an EIR is designed to do the equivalent of a "life cycle assessment" for a proposed project, to predict the impacts that will result over its full lifespan, including effects of future maintenance, that does not necessarily mean that the approval of the project includes advance approval of any and all maintenance that may be needed in the future, nor could it, without any way to know for sure what sort of maintenance will be needed, when and where it will be proposed, for how long into the future, or through what methods.

ii.  <u>Final Development Plan (FDP) (85-DP-66cz)/CUP (March, 1986)</u> (Sable SoD Doc. 5)

Commission staff also reviewed and analyzed the Final Development Plan, upon which Sable relies for "authorization" of the development undertaken here.  This Final Development Plan was approved by Santa Barbara County in March of 1986 for construction activities in Santa Barbara County for the Celeron/All American pipeline, the same one for which the EIR/EIS discussed above was prepared.  Page 2 of the Final Development Plan includes a section entitled "Project Description," and it refers to the construction of the pipeline, which will require a construction corridor, and three pump stations, but not to future maintenance activities.  In fact, Commission staff ran a search for the string "maint" in the document, and although it appears eight times, and the references show that maintenance was anticipated and even required, never does the FDP say that this plan was providing the necessary review and approval of specific, future maintenance activities in advance, nor could it, given that the nature and scope of any required maintenance activities, especially decades into the future, could not be anticipated.  This is critical because this is really the key document given the nature of the documents in the next section.

iii.  <u>Santa Barbara County CDPs</u>

The documents that provided Santa Barbara County's actual Coastal Act authorization for the Celeron pipeline project were two CDPs issued by the County in 1986 (CDPs number 86-CDP-189 and 86-CDP-205).[11] However, these documents are only two pages each and

---

[11] Sable SoD Doc. 6 and 7.

say almost nothing relevant to the "pre-authorization of future maintenance activities" issue, as they simply define the project being authorized by referring back to the FDP (which itself refers back to the EIR/EIS discussed above), defining the approved project as "[c]learing, grading and trenching for [the pipeline project] as approved by 85-DP-66cz" and as the "[r]emainder of all construction activities for [same] as approved by 85-DP-66cz," respectively.  Still, neither of these documents states that it is authorizing development activities beyond the specific Celeron pipeline construction project before it, particularly not things such as actions to replace portions of the pipeline with new materials and new methods, much less actions taken forty years in the future.

### iv.   Conditions of Approval

In its SOD, Sable also points to several conditions that they claim show that maintenance was approved from the start.  While these conditions show that maintenance was anticipated, and in some instances even required, that is not the same as pre-authorizing the specific activities that would be involved or have been carried out by Sable nearly 40 years in the future.  For example, condition P-2 requires the creation of a Safety Inspection, Maintenance, and Quality Assurance Program "which shall be implemented during construction and operations."  But although that condition requires maintenance, the fact that this program did not yet exist shows that the impacts could not possibly have been evaluated at that point.  Rather, the condition creates a requirement to generate a plan that will have to be implemented, but that requirement to implement the plan does not relieve the operator of the independent obligation to go through the permitting process prior to implementing any aspect of that plan that would normally require Coastal Act authorization.  Further, the plan specifically relates to "operation" of the pipeline.  The pipeline has not been in operation for almost a decade now and thus would not be covered by the plan.

Sable also points to condition A-13, which identifies certain types of changes to the pipeline or its throughput that would require a new or modified permit.  However, first, that list is expressly not exhaustive, stating that the types of changes that would require permitting "could include but not be limited to" the enumerated changes.  Secondly, that list appears to be focused on types of changes to the pipeline and its throughput, which raises different issues from maintenance work.

### v.   Summary with respect to the Aforementioned Entitlement Documents

The permitting documents from the 1980s for the original construction of the pipeline say nothing about pre-approving future maintenance activities.  The EIR/EIS has some limited discussion of maintenance and some of the potential impacts of maintenance, but that does not justify the inference that such maintenance was being pre-approved, and even if it did, the maintenance discussion did not cover the sort of activities at issue now. Instead, that discussion was focused on maintenance of the cathodic protection system and the pipeline mile-post and road-crossing markers, with isolated mentions of the facts that maintenance activities could be required to cover up the pipeline if it becomes exposed, could increase risk of fire, and could disturb cultural resources, and that maintenance traffic could disturb terrestrial habitat.  None of these documents contains any analysis of, or indication that they attempted to predict, or mitigate in advance for, all of the different

59

types of impacts that would result from the operator having to repeatedly access sites, excavate, expose and reinforce or replace stretches of pipeline, in perpetuity, for whatever type of work might be required and however it might be accomplished.

### vi.   Consent Decree

Sable also cites to the existence of a Consent Decree (Exh. 60) reached between Sable and the local government as somehow providing authorization under the Coastal Act for development undertaken at the site.  It does not, for a variety of reasons:

- The Commission wasn't a party to that litigation or to the Consent Decree, and it specifically says it doesn't limit the rights of third parties.  § 79.
- It also specifically says it was designed to resolve the issues raised in that litigation (§ 69), which couldn't have and didn't include anything relating to compliance with requirements for the work envisioned in the consent decree.
- It clearly envisions that the pipeline operator will restart use of the pipeline, and it says that they can't restart until they do certain things, but nowhere does it say that those steps are the *only* things Sable would need to do or that if Sable does those things, Sable can restart, notwithstanding any other applicable requirements.
- Conversely, it specifically says it's not a permit, that Sable will still have to comply with state and local laws and permits, and that compliance with the Consent Decree is not a defense.  § 78.  *See also* § 84.

### vii.   Santa Barbara County Letters

Finally, Sable relies on the letters from Santa Barbara County Planning and Development Department staff to Commission staff as establishing that the existing permits authorize the subject work, arguing that the Commission lacks the "authority to override or otherwise nullify" the County's letter regarding the anomaly repairs.[12]  However, Sable cites nothing to indicate that the County's letters had any independent legal effect or significance such that the Commission would need to "override or otherwise nullify" them, much less that they create any sort of conclusive presumption.  In fact, Sable later acknowledges that the County's letter regarding the anomaly repairs is nothing more than an "informal . . . assessment."[13]  Thus, it has no binding effect.

Sable also argues that the County's letter is entitled to a substantial evidence standard of review and due deference because it represents the County's interpretation of its own permit.  However, the substantial evidence standard is for judicial challenges, and even if it were to apply, the County cited no specific evidence, so there would be no way to determine whether the conclusion was supported by substantial evidence.  And for the reasons stated above, the Commission finds that the evidence that Sable submitted did not support the conclusion.  Finally, as indicated above, Sable acknowledges that the letter is not a formal determination by the County at all, but merely an informal assessment.

---

[12] Sable SOD at 2.  See also Sable SOD at 37 (making a similar argument with respect to the County's September 4, 2024 letter regarding the installation of the safety valves).
[13] Sable SOD at 23.

60

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Given both that fact and the fact that the assessment included no facts or analysis to support its conclusion, the Commission is entitled to reach a different conclusion.

### b. Offshore

#### i. EIR/EIS[14]

Similar to the EIR/EIS for the onshore work, the EIR/EIS Sable cites for the offshore work is focused on the construction of the system and not future maintenance. Its project descriptions in the Abstract and the Executive Summary do not mention future adjustments to the sea floor, and it never mentions the work currently at issue (span remediation) at all. Sable cites one line in a table that lists the following mitigation measure: "Monitor seafloor disturbances after construction using side scan sonar or equivalent to assess need for remedial measures which could include smoothing of seafloor mounds."[15] This mitigation measure does not even explicitly specify or discuss what sort of "remedial measures" might be warranted, much less analyze their impacts. And in any case, as discussed with respect to the EIR/EIS for the onshore work, even if the document did discuss potential impacts of necessary future maintenance work, in an attempt to assess the full life cycle impacts of the project, that would not mean that the approval of the original project was authorizing all such future work in advance without the need for further review at the time.

#### ii. Development and Production Plan (DPP)

The DPP is equally devoid of any discussion of span remediation. Sable argues that the DPP contains "a detailed discussion of the Offshore Pipelines that would be installed, maintained, and operated," but the only citation it provides is to a page that merely discusses the sizes and use of the pipes to be installed.[16] Although the DPP has a section specifically on the pipelines, with subsections on construction and operation, Sable cites to nothing in that section about the need to adjust the seafloor (including for span remediation) in the future. Sable cites one sentence in that 28-page section that states that the pipelines "will be maintained in good operating condition at all times."[17] This general statement about the need for pipeline maintenance doesn't even mention the environment of the pipelines and is reasonably interpreted to refer to the integrity of the pipes themselves. And while the DPP does discuss submerged weight and trenching in the context of establishing pipeline stability,[18] there is no indication that statement is intended to address activities beyond the initial deployment.

#### iii. Coastal Development Permit CDP E-88-1 and Consistency Certification CC-64-87

In 1988, the Commission issued a combined report for its CDP and its concurrence with Exxon's consistency certification for the Development and Production Plan. The "Project Description" on the caption page of that report included the "[i]ntallation of" the offshore

---

[14] Final Environmental Impact Statement/Report for Santa Ynez Unit/Las Flores Canyon Development and Production Plan (June, 1984).

[15] Sable SOD at 47, citing Final EIR/EIS at 6-53, table 6.3.6-1.

[16] Sable SOD at 45, n.214, citing DPP at VIII-2.

[17] SOD at 45-46, n.215, citing DPP at VIII-24.

[18] DPP at VIII-14.

61

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

pipelines, The more detailed description on pages 18-23 includes the following statements (all on page 21):

        - "Three principal pipelines will be installed from the onshore facilities to the SALM: a 48-inch diameter crude oil loading line and two 18-inch diameter vapor balance lines."

        - "Exxon proposes to install another two pipelines: one 20-inch crude oil pipeline; one 12-inch produced water outfall pipeline . . ."

        - "The construction method anticipated for pipeline installation is the conventional pipe lay barge stinger method.  Surf zone trenching operations may require the use of a trestle to prevent sanding in the trench.  Power cables will be installed in the same corridors as pipelines.  Nearshore pipeline construction is scheduled for late 1989 to early 1990, requiring about three months."

None of this, or anything else Sable has been able to cite in the report, says anything about future modifications to the sea floor to adjust for changes that may occur in the future, much less does it suggest that such actions were being approved in advance by this permit.

        It is also worth noting that Sable argues that the County's interpretation of its own permit is binding on the Commission.  The obvious logical extension of that principle would require deference to the Commission's interpretation of its permit as well.  It is also worth re-emphasizing that, as indicated above, Commission staff provided such an interpretation to Sable personnel prior to the commencement of the offshore work, informing them that such work would require a Coastal Development Permit.

### iv.   BSEE and SLC Letters

Sable claims that the State Lands Commission "emailed approval to Sable to proceed with the work" in November of 2024, followed by "an official approval letter on December 4."[19]  What Sable fails to note is that this approval letter specifically states (on page 2) that Sable must "obtain all necessary permits and approvals from other Federal, State, and local agencies having lawful authority and jurisdiction over the pipelines . . . before commencing the operations."  Nor would the fact that one agency approved work for purposes of its requirements insulate or immunize Sable from other regulatory requirements.  Sable also notes that in 2012, BSEE allowed Exxon to "conduct span remediation maintenance on the Santa Ynez Unit pipelines" without requiring any new approvals, and that the Commission did not object.[20]  BSEE's decision as to whether to allow this work to proceed, even if taken as an indication of how it interpreted the DPP, does not govern the Commission's interpretation of its permit.  As for the Commission's lack of objection, Sable presented no evidence indicating that the Commission was even asked to review the issue.  The only evidence Sable presented that the Commission was even aware of the matter is that it was listed as a cc on one letter.  Sable's attempt to draw inferences from the Commission's lack of response to that letter are entirely baseless and no evidence exists to indicate that the letter was ever received by Commission staff.  Moreover, even if Commission staff had affirmatively declined to object to that instance thirteen years ago, that would not constitute a waiver of its ability to enforce the Coastal Act with respect to similar development at a later time, nor would it bind the Commission to any particular interpretation of its permit.

---

[19] Sable SOD at 56
[20] Sable SOD at 60-61.

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Further, the Commission has actively reviewed and required authorization for the same type of span remediation work that Sable recently completed.  On no fewer than seven occasions in recent years, the Commission has considered CDP or waiver applications for this type of work on other offshore oil or intake pipelines and on two additional occasions emergency permits have been issued to allow similar work to be expedited.

## C. Other Themes in Sable's SOD

### a. Preemption

Sable argues that CDP review authority for Sable's anomaly repair and valve installation work is entirely preempted under federal and state law.[21]  This overstates the preemptive effect of federal and state law.  As the Commission stated in its initial September 27, 2024 Notice of Violation, although the California Office of the State Fire Marshall ("OSFM") has authority over pipeline safety under the federal Pipeline Safety Act (49 U.S.C § 60101 *et seq.*), any resulting preemption is limited in scope. Other state agencies, as well as local governments, may review and impose requirements related to other issues. Thus, the Commission and the County have jurisdiction to review and impose requirements relating to the consistency of the development activity with the Coastal Act and the LCP, as that does not pertain directly to pipeline safety.

Under the federal Pipeline Safety Act, the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA") has authority to regulate both interstate and intrastate gas pipelines to protect against "risks to life and property posed by pipeline transportation and pipeline facilities."  (49 USC § 30101(a).)  Through a state certification program that PHMSA must approve, various states, including California, may regulate intrastate pipelines under PHMSA's regulations.

The federal Pipeline Safety Act has express preemption provisions for both interstate and intrastate pipeline safety.   For intrastate pipelines, a certified state authority may adopt "additional or more stringent safety standards . . . only if those standards are compatible with the minimum standards prescribed under [the federal Pipeline Safety Act]."  49 U.S.C. § 60104(c).  In turn, California law designates OSFM as having "exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines and . . . may act as agent for the United States Secretary of Transportation to implement [the federal Pipeline Safety Act]."  Cal. Govt Code § 51010.  *See also Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 (9th Cir. 2006) (finding express preemption of city's safety regulations of intrastate pipeline). Thus, any resulting preemption is limited in scope and does not encompass all pipeline-related "development" (as defined in Section 30106 of the Coastal Act and Section 35-58 of the LCP).  The Commission and the County retain CDP jurisdiction to review any development activity undertaken in connection with achieving the pipeline safety standards.  For example, for pipeline-related development associated with vegetation clearance, grading, excavation, and construction activities, the Coastal Act requires those activities be reviewed to determine their impacts of those activities on environmentally sensitive habitat areas.

---

[21]  It does not appear that Sable argues that preemption applies to CDP review authority for the span remediation work that occurred offshore.

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Despite the limited scope of preemption, Sable argues that its predecessor's (Celeron) 1988 settlement agreement with the County creates a presumption that any CDP review of the valve installation work is entirely preempted.[22]  This is not accurate, nor is it supported by preemption law, for at least three reasons. First, the work putatively preempted in the settlement agreement isn't even that which is at issue here.  The 1988 settlement agreement purports to somehow preempt CDP review.  But the 1988 settlement agreement purports to create a "presumption" of preemption for work that is performed "one foot or more below the surface of the ground and related to the operation of the pipeline."[23]  Therefore, on its face, this term does not address any development activities aboveground or excavation above the one-foot depth threshold.[24]  Secondly, the Commission was not a party to this litigation or the settlement and is not bound by it or by the conclusion that the County's Coastal Act review authority is preempted.

Third, and more fundamentally, the scope of federal preemption cannot be contractually altered because "[f]ederal preemption is the allocation of power and decision-making authority between the federal government and state and local governments, based on the Supremacy Clause of the Constitution."  *Olympic Pipe Line Co. v*., 437 F.3d 872 at 882-83.  Because "[p]reemption is the power of the federal government" (i*d.* at 883), the scope of preemption under the settlement agreement is not greater than that under federal law.  Thus, it is federal law – not the 1988 Settlement Agreement – that establishes the scope of any federal preemption.  Federal law does not contain the "one foot or more" standard for preemptive effect, nor does it support the broad reading of preemption that Sable advances.

Sable also argues that any CDP review for the work at issue is preempted by a conflict with federal PHMSA requirements and with OSFM requirements pursuant to OSFM's certified authority to regulate pipeline safety.  Again, this is simply not accurate.  In particular, Sable refers to 49 C.F.R. § 195.452(h), which contains integrity management provisions applicable to pipelines in "High Consequence Areas."[25]  Under PHMSA regulations, when an pipeline operator's assessment identifies a potential problem with the condition of the pipeline, it must evaluate and "discover" the issue within 180 days after the operator receives an assessment that identifies the problem.  49 C.F.R. § 195.452(h)(2).

---

[22]  Settlement Agreement between County of Santa Barbara and Celeron Pipeline Company (Feb. 8, 1988).  The settlement agreement makes the presumption rebuttable if there is "clear language granting jurisdictional rights to the County under the terms of this Agreement . . . or by law binding upon the County and Celeron."  Settlement Agreement ¶ 3.2.

[23]  *Id.* ¶ 3.1.3.  The August 30, 2024 Conditional Settlement Agreement between Sable and the County referenced this presumption of preemption.

[24]  Furthermore, the settlement agreement also contains a presumption of preemption if it is covered by 49 C.F.R. Part 195, which are the federal pipeline safety regulations implemented under the federal Pipeline Safety Act.  As discussed above, the federal Pipeline Safety Act provide for express preemption of various pipeline safety requirements.

[25]  High Consequence Areas are defined in 49 C.F.R. § 195.450 to include "unusually sensitive areas" or certain population areas.  Unusually sensitive areas are defined in 49 C.F.R. § 195.6 as meeting certain ecological resource criteria.  In a 2024 report to OSFM, Sable indicated that Line 324 (10.86 miles from Las Flores Canyon to Gaviota) is a High Consequence Area because it is an "ecologically sensitive region (coastline)."  Pacific Pipeline Background Data, Attachment B of State Waiver Application, prepared by Pacific Pipeline Company (June 2023).

This 180-day discovery timeframe is not absolute, and the operator may notify PHMSA of any need for additional time if the 180 day timeframe is "impracticable." *Id*.

Even if this PHMSA provision, with its timing requirements, were to apply to a pipeline such as the one at issue, which was rendered inoperable and has sat inactive for a decade, Sable provides no reason why it could not both apply for a CDP and comply with these PHMSA requirements. For example, Sable could have applied for a CDP in advance of doing any discovery work, or it could have notified PHMSA of additional required time, if necessary. Or the Commission's permitting process could have simply taken less than 180 days. Indeed, the Commission has processed CDPs for other pipeline repair projects taken pursuant to PHMSA regulations.[26]

### i. There is No Conflict Preemption Here

Federal conflict preemption applies only where a state law conflicts with federal law, either because it is impossible to comply with both laws or because state law stands as an obstacle to accomplishing the purposes of federal law. *English v. Gen. Elec. Co.*, 486 U.S. 72, 79 (1990). In either case, there is a strong presumption against preemption. *Wyeth v. Levine*, 555 U.S. 555 n. 3 (2009). Conflict preemption is a demanding standard, as courts will not "seek[] out conflicts between state and federal regulation where none clearly exists." *English*, 496 U.S. at 90 (internal quotation marks omitted). In this case, there is no conflict between compliance with the safety requirements under PHMSA regulations in Part 195 and compliance with CDP requirements that do not directly pertain to those safety requirements. Likewise, there is no conflict between compliance with Gov. Code section 51013.1 (AB 864), which requires the use of best available technologies (such as shut-off valves) for pipelines near environmentally and ecologically sensitive areas in the coastal zone,[27] and compliance with CDP requirements that do not directly pertain to the safety issues within OSFM's review under AB 864. Finally, although the Consent Decree in the lawsuit arising out of the Refugio oil spill specified actions to be taken by the defendants (Sable's predecessors) in connection with proposed restart activities,[28] the Consent Decree does not relieve Sable from applying for a CDP for development activities that do not directly pertain to PHSMA and OSFM safety requirements. As the Consent Decree states:

> This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.[29]

---

[26] *See, e.g.*, CDP No. E-11-031 (approved March 9, 2012). SoCalGas sought a CDP for development activities, including excavation and vegetation clearance, relating to pipeline testing required under PHMSA regulations in 49 C.F.R. Part 192 (which applies to natural gas pipelines).

[27] AB 864 was enacted in 2015 after the Refugio oil spill, and it requires OSFM to develop implementing regulations requiring the use of best available technology.

[28] Consent Decree in *United States, et al. v. Plains All American Pipeline, L.P.., et al.,* Case No. 2:20-cv-02415, (C.D. Cal. Mar. 13, 2020).

[29] *Id.* at ¶ 78.

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Finally, Sable points to no published caselaw demonstrating any preemption here. Although Sable cites *San Diego Gas & Electric Co. v. City of Carlsbad*, 64 Cal.App.4th 785 (1998), that case is distinguishable. *Carlsbad* involved a city's floodplain ordinance that required the utility to obtain a permit to deposit sand from dredging operations. In that case, the utility company applied for the permit. The court held that the prescriptive requirements of the permit went into an area of state law that was "fully" occupied by the state. *Id.* at 803. *Carlsbad* did not involve the Pipeline Safety Act or its implementing regulations, nor did it involve AB 864, and it presents a different set of facts involving the deposition of dredging spoils under a different state law (Public Utilities Code § 701). Moreover, in *Carlsbad*, the utility company actually applied for and obtained a permit, which the court evaluated to determine whether the permit's scope entered an area occupied by state law. As the *Carlsbad* court noted, "[t]his record does not present the abstract question of whether a local entity may regulate, within its jurisdiction, the disposal of dredging soils taken in the operation of a public opinion, and we express no opinion on that subject." Thus, *Carlsbad* does not support Sable's conflict preemption argument.

### b. Jurisdiction

Sable divides its SOD into three sections. The first addresses the anomaly repair work, the second addresses the valve installations, and the third addresses the span remediation work. Each of those three sections ends with a similar discussion of the Commission's jurisdiction. Sable claims that the Commission has no jurisdiction to issue a CDO, an RO, or penalties. However, Sable's arguments are mostly derivative of their earlier arguments, in the sense that they rely on the substantive arguments Sable made earlier and only apply if their earlier arguments are correct, as is explained in the next four paragraphs.

With respect to the Commission's authority to issue a cease-and-desist order, Sable begins by arguing that the first two bases listed in Section 30810 for such an order (that the work at issue required a permit from the Commission or violated a condition of an existing permit) do not apply. But with the exception of the span remediation work, the Commission is not asserting otherwise, and for the span remediation work, again, the issue of whether the work required Coastal Act authorization beyond what was provided for the original installation of the pipes in the 1980s is addressed above. For the other two categories of development, the Commission's CDO is based on the third, alternative, and independently sufficient basis for the Commission's jurisdiction to issue a CDO, which is that the Commission is enforcing the County's LCP. Here again, Sable argues that the work is not a violation of the County's LCP because it was already authorized, but that issue is addressed above. The Commission's analysis from above is incorporated by reference.

There are three bases on which the Commission can enforce an LCP, listed in section 30810(a)(1)-(3). Here, as discussed above, the Commission is authorized to issue the CDO based on section 30810(a)(2), because the Commission requested that the County take enforcement action, and the County declined to act or did not act in a timely manner. Sable argues that it is not the case that the County declined to act, in that the County did issue letters, referring to the County letters asserting that the work at issue was authorized

66

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

by prior permits.  Section 30810(a)(2) authorizes the Commission to act whenever a local government declines the Commission's request to pursue enforcement.  The County's letters may be a type of act, but they certainly do not count as the County pursuing enforcement.  If anything, they are the opposite, as they explain why the County has declined to act.  Sable also argues that section 30810(a)(2) only allows the Commission to enforce if the actions at issue "could cause significant damage to coastal resources."  But this is, again, an issue that was addressed above, in the Commission's findings to establish its *prima facie* case on the merits.

With respect to the restoration order, Sable points out that there are three criteria that must be satisfied to support the Commission's authority to issue such an order.  Sable again argues that first criterion is not satisfied because the work required no permit, but again, that is addressed above throughout this report.  Sable next argues that the work did not cause continuing, or even any, resource damage, but that issue is addressed above as well.  Again, the Commission's prior analyses are incorporated herein by reference.

Finally, with respect to penalties, Sable makes arguments with respect to PRC sections 30820, 30821.6, and 30822, but none of those sections is at issue here.  Those sections govern the imposition of penalties by the courts.  The NOI for this proceeding stated that the Commission could impose penalties pursuant to section 30821.3.  The NOI then merely went on to mention that the Coastal Act "*also* includes several *other* penalty provisions that may be applicable as well" (emphasis added), meaning they may be applicable to the activities at issue, not that they would form the basis for the Commission's administrative action.  As for section 30821.3, Sable returns to its derivative argument, claiming that the work was already authorized.  Again, since that issue is at the heart of this report, the Commission's prior analysis is incorporated herein by reference.

The County also makes two other arguments that could be characterized as being jurisdictional arguments.  With respect to the valve installation work, Sable argues that, because it has submitted additional information to the County for its review, it would be "premature" for the Commission to address that issue at this point.[30]  The Commission has always been, and continues to be, interested in considering any additional materials Sable can provide regarding the work that was done and is still planning to do, or regarding Coastal Act authorization for that work.  In fact, Commission staff asked repeatedly for information and evidence that any of the work was covered by prior coastal development permits.  However, although Sable asserts that it is now returning to the County and argues that this divests the Commission of authority to act, Sable provides no indication of what sorts of materials were submitted to the County or why Sable didn't begin this process six months earlier, given that it acknowledges that it is submitting these materials "in light of" the letters it received from the Commission six months ago.[31]  In addition, the Commission's orders provide for the possibility that Sable could produce new evidence of existing Coastal Act authorization.  The prohibition on development in Section 1.1 of the Orders does not apply if the Commission's Executive Director confirms that Coastal Act authorization has been received.  Thus, if the County responds to Sable's new

---

[30] SOD at 3, 30, 37, 41, and 42.
[31] *Id.* at 30 and 37.

67

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

submittal by providing evidence of such authorization, the Orders will allow Sable to proceed.  At this point, however, since the County did not act in response to the Commission's request for enforcement, the Commission now has jurisdiction to proceed and need not wait for additional County review of this unspecified (and mysteriously timed) "new information." Second, Sable argues that the consolidated permitting process – which Commission staff mentioned in an attempt to help facilitate and expedite the process – does not apply because it requires that a permit be required from the local government. Based on its argument that no permit is required from the local government, Sable therefore argues that this process is not available.  Of course, this, too, is a derivative argument in the sense that, if that were true, the entire enforcement action would be improper, so the availability of this permitting approach would be irrelevant.  Conversely, however, assuming the Commission is correct that additional Coastal Act authorization is required, as is at the heart of this action, then this argument necessarily fails.  Sable also argues that the process is "procedurally improper" in that it has not consented to it (SOD at 27), but again, the process was offered as an accommodation, Commission staff and the County have agreed, and whether Sable provides the final consent to make the process available is within its control.  And finally, the orders merely provide this process as an option of which Sable may avail itself.

### c.  Benefits and Harms of the Work at Issue

Much of Sable's SOD contains arguments for the salutary nature of the work at issue, how it is consistent with industry standards,[32] how it promotes pipeline safety,[33] or how it is consistent with legislative mandates, such as AB 864[34].  All of this misses the point. Commission staff never stated that the work at issue does not improve the safety of the pipeline or that it should not ultimately be allowed.  Nor is the Commission taking that position now.  Indeed, it would be premature to do so without having received the normal application materials that would enable a complete review of the work.  Whether the work has benefits is beside the point.  Even if the work is ultimately found to be beneficial and approved, the question posed in this proceeding was a different one: whether the work must be approved through a permitting process that, if nothing else, allows the Commission to perform its responsibility of ensuring that the work is done in a manner that minimizes impacts to protected coastal resources.

Another significant portion of Sable's SOD argues that the various types of work it has been performing that are at issue here were performed in a safe and environmentally sensitive manner that protected the resources.  This is relevant to some of the analysis (for example with respect to the restoration order and the penalties), but it is not relevant to the cease-and-desist order, for the reason indicated in the prior paragraph.  I.e., the Commission's authority to issue a cease-and-desist order in this case is based on Sable's failure to secure the necessary Coastal Act authorization for the work, regardless of how it is performed and whether it harmed resources.  However, as is explained in the body of this report, the Commission also finds that it is not true that the work was all conducted in a manner that had no impacts, and the Coastal Act is designed such that it is through the permitting process that the Commission will obtain more detailed information in this regard.

---

[32] E.g., SOD at 11, n.33, and 48-49.
[33] E.g., SOD at 12, 32.
[34] E.g., SOD at 30-31.

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

## D. Additional Arguments

Respondent's Claim:
 "the Coastal Commission does not have the authority to override or otherwise nullify either the County's determination or the County's interpretation of its own previously issued coastal development permits for the Onshore Pipelines"
- Statement of Defense at page 2

Response:

The County's interpretation may be due some deference, but we are unaware of any authority to suggest that a permitting agency's interpretation creates a conclusive presumption.  Commission staff reviewed the relevant documents to try to determine whether the County's reading is correct, and they reached out to the County to share their reading of the permits and other documents and attempt to coordinate with them, but the County did not engage in any meaningful dialogue or provide useful documentation to support their position, despite numerous requests from Commission staff over the span of over two months.

Staff also initiated a review process pursuant to section 13569 of the Commission's regulations, in an attempt to foster further coordination with the County, understand the factual basis for its position and attempt to resolve this disagreement.  However, the County continued to ignore requests to identify the sections and analysis in its historic CDPs for the pipeline that could be interpreted as pre-authorizing Sable's current work.

The County has ignored these requests and consistently failed to identify any such information, leading Commission staff to reach the conclusions described above that no such information exists.

We are also unaware of any authority to suggest that the County's letter has any independent legal significance such that we would need "authority to override or otherwise nullify" it.  It is simply their position, and as such, we are free to disagree with it. Our positions are based on a reading of the relevant documents as discussed herein.

Respondent's Claim:
 "Commission staff appears to be asserting Commission jurisdiction over these already permitted activities in order to exert some influence over Sable's planned restart of the Santa Ynez Unit oil production operations."
- Statement of Defense at page 3

Response:

This speculation about the reasons for the Commission's assertion of jurisdiction is both baseless and irrelevant to the issues in this case.  The action being taken here, and those which were taken previously by the Executive Director of the Commission, were

69

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

taken to protect the coastal resources the Commission is charged with protecting and to ensure the integrity of the permit process.

In any event, the Commission has jurisdiction for the reasons stated in the body of this report, and as such, it can proceed regardless of Sable's speculation about motives or future issues.

Respondent's Claim:
"Jurisdiction over restart activities is entirely outside of the Commission's jurisdiction"
-    Statement of Defense at page 3 and fn. 7, citing the Consent Decree with the parenthetical "requiring, in part, approval of a Restart Plan by the Office of the State Fire Marshal."

Response:

Sable cites to nothing in the Consent Decree or any other authority for the proposition that restart is in the exclusive jurisdiction of the agencies that are parties that that document, and we are aware of nothing that would support this, but this point is irrelevant to the present dispute in any event, as the activities identified as having taken place without the required permit do not include restart of the pipeline, and the action here is addressing the need for Coastal Development Permits for development activities, and the importance of the associated protection of coastal resources under the permitting processes.

Respondent's Claim:
"Since these facilities were constructed, the Coastal Commission has never asserted that any new or amended coastal development permits would be required for the type of anomaly repair and maintenance activities, safety valve installation work, or span remediation work described in the EDCDO/NOI."
-    Statement of Defense at page 6

Response:

The Commission is unaware of any work of the nature or magnitude of the present project having occurred before.  In fact, the Commission is unaware of being notified of any anomaly repair work or valve installation work having occurred previously, and Sable has only identified one instance, more than a decade ago, where the Commission was merely cc'd on a letter regarding offshore span remediation work.  Thus, the fact that the Commission has never made an assertion regarding this sort of work before is indicative of nothing.  Moreover, even if the Commission had been aware of similar work and had not affirmatively asserted that it required a permit, such silence would not and could not create a waiver of the applicable legal requirements.

Respondent's Claim:
"Sable's anomaly repair work is an important protective measure for coastal resources and part of exercising the "utmost caution" urged by Commission staff –

70

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

not an activity that threatens coastal harm or increases the risk of a potential future oil spill.
- Statement of Defense at page 12

Response:

In addition to the general point made in the previous section, we note that here is no oil flowing through the pipelines at this time, so the only risk created by the current action is from the work being performed.  Leaving the anomalies unresolved while they seek a permit would create no risk as long as the pipeline is idle.  The Commission is merely saying that any such development activities need a CDP and with it a review of the methods, timing and impacts of work to determine whether the work can be conditioned to avoid or minimize impacts on coastal resources and made consistent with Coastal Act protections, and to determine what conditions and mitigations are appropriate and necessary.

Respondent's Claim:
"The Onshore EIR/EIS explains that its impact analysis extends through the Onshore Pipelines' entire lifetime, including both pipeline "operation" and "maintenance.""
- Statement of Defense at page 13

Response:
That page of the Final EIR/EIS also refers to impacts through abandonment.  Thus, the logical extension of Sable's argument would be that abandonment was also pre-authorized, which is an untenable position, given the extensive regulation of that process. That fact demonstrates that this reliance is a misreading of the provision.

In any case, as was stated on page 3 of the Notice of Intent for the second EDCDO, while it may be prudent and perhaps even required, as part of the CEQA and NEPA process, to predict the impacts that may occur down the line from a proposed project by taking into consideration future maintenance, that certainly is not the same as pre-authorizing all such maintenance.

Respondent's Claim:
"the Onshore EIR/EIS incorporates into the Pipeline Project's project description certain Oil Spill Contingency and Emergency Response Plans that address ongoing pipeline maintenance"
- Statement of Defense at page 13

Response:
Sable cites nothing in support of this claim, and it appears to be untrue.  The Draft EIR/EIS project description appears on pdf page 4 and says nothing about the oil spill contingency plan.  Section 2 provides more detail on the project, and section 2.2.4 (pdf pages 126-127) talks about maintenance, but it says nothing about the sort of work at issue now, or about the oil spill contingency plan as being incorporated.  It just says that such a plan would be prepared (2-12 & 2-33, pdf pages 108 & 129) and attaches a draft plan, but nothing in the document says that it was being incorporated as part of the project, and in fact, it is listed as being a preliminary draft.  Footnote 4 of the impacts table (S-13,

71

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

pdf page 21) says that use of such a contingency plan "as part of the project description, would" reduce the risk of an oil spill, but it doesn't say that such a plan is part of the project description.  The Final EIR/EIS is even clearer that no such plan is incorporated.  It does not even include such a plan as an exhibit, and it merely says that one will be prepared (2-62, 2-133, pdf pages 130, 201).  This also makes Sable's arguments about the details of the draft plan (discussed on pages 13-14 of the SOD) irrelevant.  Nor is it true, as Sable claims at page 13 (and Sable cites nothing to support this claim) that the EIR/EIS "incorporates [the oil spill contingency plan, which was still in draft form] into the Pipeline Project's project description."

Respondent's Claim:

> "The Onshore EIR/EIS concludes that compliance with these plans would "substantially reduce the oil spill risk" and reduce any significant impacts that would result from a major oil spill, including impacts related to soils, surface water, aquatic biology, and land use and recreation."
>
> - Statement of Defense at page 14

Response:

That doesn't mean that the impacts of all such work was addressed in the EIS/EIR.  This statement (which appears on pdf page 174 of the FEIR/FEIS) was in response to a SCAG comment saying that, in order to reduce the likelihood of failures, the pipeline should be monitored and segments should be replaced as they age and deteriorate; and the response was merely that faulty segments will be replaced as necessary.  In other words, it was merely noting that monitoring and maintenance were anticipated.  But there is no analysis of the impacts of repeatedly having to access sites and expose pipelines, much less a suggestion that the impacts of all such future work, for all time, and however accomplished, was being mitigated up front.

Respondent's Claim:

> "Significantly, in performing its analysis of future anomaly repairs along the pipelines' route, the Onshore EIR/EIS acknowledges that impacts to environmentally sensitive habitat areas (ESHA), such as oak woodlands, within the pipelines' right-of-way would be permanent (i.e., extending throughout the pipelines' lifetime due to anticipated and ongoing maintenance activities) and constitute a significant environmental impact."
>
> - Statement of Defense at page 14

Response:

The project involved the destruction of the existing oak woodland, and the Draft EIR/EIS recognized that this would be a permanent impact to an existing resource, but that doesn't

72

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

imply that all the other impacts that would result from repeated ground disturbance were also considered as part of the project. Moreover, it did not analyze or mitigate for other impacts to resources, nor did it anticipate or address the other resources that might exist or be impacted.

Respondent's Claim:

"The Anomaly Repair Work occurs within the boundaries of the right-of-way analyzed in the Onshore EIR/EIS, which was disturbed by Onshore Pipeline construction and has remained impacted."
- Statement of Defense at page 14

"the Onshore Pipelines' right-of-way has remained relatively devoid of mature vegetation."
- Statement of Defense at page 15

Response:

This only goes to the merits of whether the work is approvable, not whether it requires a CDP.  Moreover, the "Anomaly Repair Work" was done in a very significant number of places and habitats, and the claim that the areas were "disturbed by Onshore Pipeline construction" conducted over three decades ago and the claim that it" has remained impacted" is clearly not accurate. In many places, in the decades since the pipeline was constructed, the vegetation in the areas has grown back, and with it there have been animals and plants that have located in those areas, some of which are protected.  See the discussion regarding resources impacted.  This would mean that, in addition to not being legal or sufficient "preapproval" would also be not accurate or protective.

Respondent's Claim:
"an October 2020 Biological Resources Assessment confirmed that major work could be conducted in the Onshore Pipeline' maintenance corridor" without any substantial adverse effects on or significant impacts to biological, botanical, wetland or riparian habitat resources.
- Statement of Defense at page 15

Response:

There are several problems with reliance on this document.  First, there is no indication, nor could we find any evidence that this "biological resources assessment" was reviewed or approved by any regulatory agency, including the Commission.  It is impossible to verify that this was sufficient or accurate nor what it relied on.  Second, it is likely outdated and not reflective of current conditions, the field work having been conducted more than eight years ago.  Third, its conclusions are dependent on the implementation of certain "avoidance and mitigation measures" (see page 8), and without any regulatory oversight, it is impossible to confirm whether such measures were implemented.  Fourth, it appears to employ a definition of "short term and temporary" (in describing the work) that is not consistent with the Commission's understanding of how those terms apply to ecological impacts.  Moreover, it would be very difficult for such an assessment to predict any and all work that could be done, whatever the extent and

73

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

location, and flatly determine that there would be no impacts. Further, it seems very unlikely to have no significant impacts to, for example wetlands habitat, since some of the areas in which work was done include Environmentally Sensitive Habitat Areas (ESHA) and wetlands.

In any event, this is not relevant to the question of whether the work required a permit, and moreover, if it is true that there would be and were not impacts at all, then securing such a permit it should be easy.

Respondent's Claim:

"[FDP] Condition J-11 acknowledges that the Onshore Pipelines' right-of-way will be used for 'operational maintenance'."

"Condition J-11 is broadly drafted to cover the varied types of repair and maintenance activities discussed in the Onshore EIR/EIS"

- Statement of Defense at page 16

Response:

This is misrepresentation of the record.  The provision at issue actually says that use will be "restricted to" operational maintenance, which is a limitation on what can be done in that area, not a pre-authorization of work. Nor does it say anything about encompassing everything discussed in the EIR/EIS, but even were it to do so, that would merely make this argument derivative of Sable's overly-broad reading of that EIR/EIS, which does not state that maintenance is pre-authorized.  And even if it were, there are no "varied types of repair and maintenance activities discussed in the Onshore EIR/EIS."  The Final contains no discussion, and the Draft discusses a very limited scope of maintenance activities, as indicated above.

Respondent's Claim:
"Condition P-2 similarly contemplates that the pipeline operator will conduct 'regular maintenance and safety inspections'."
- Statement of Defense at page 16

Response:

First, that condition requires implementation of its requirements "during construction and operations," and neither of those is occurring now.  Second, it provides no detail as to what sort of maintenance is envisioned.  And third, even if it were requiring this sort of maintenance at a time when the pipeline is inoperative, that does not mean that it is authorizing that work in advance without needing to get a permit to regulate the manner in which that work is done.

Respondent's Claim:
"Condition P-2 states that 'permits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195'."
- Statement of Defense at page 16

Response:

74

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

This actually demonstrates that future permitting was, in fact, anticipated.  It also only applies to the County.  Third, the Commission is not proposing to withhold or suspend permits, but merely to be given the opportunity to conduct the permit review process.  And fourth, it's not clear that the cited regulation applies to an idle pipeline.

Respondent's Claim:

"Commission staff's interpretation is in direct conflict with the County's permitting history for the Onshore Pipelines over the past 30 years where the County consistently has authorized Anomaly Repair Work without requiring a new or amended coastal development permit"
- Statement of Defense at page 17

Response:

The County's past practices are not binding on the Commission or dispositive of the legal requirements of the Coastal Act. Further, the facts and circumstances of these alleged past activities have not been provided for review by Commission staff.  In certain locations and circumstances described in the Coastal Act and Commission's regulations, repair and maintenance activities may be exempt from Coastal Act review.  As such, past activities may legitimately not have required authorization.

Respondent's Claim:

"the Onshore EIR/EIS and Conditions of Approval addressed biological impacts from the installation of the Onshore Pipelines and their ongoing repair and maintenance, such as the Anomaly Repair Work and imposed mitigation to account for permanent impacts"
- Statement of Defense at page 17

Response:

Sable cites nothing to indicate that the sort of anomaly repair work at issue was ever contemplated, and the biological impacts envisioned in the EIR/EIS were only from the permanent removal of the oak woodlands, not from impacts to other sensitive habitats that might emerge over time nor any species they might support, or to water quality from runoff from work on steep slopes or being done during the rainy season.

Respondent's Claim:

"Similarly, Conditions H-10 and H-11 required the pipeline operator to, after construction, replace and revegetate any disturbed catalina mariposa lily and refugio manzanita in locations "in or near" the disturbed area, but "***exclusive of the operation [right-of-way]***.""
- Statement of Defense at page 18

Response:

This just shows that it was anticipated that the right-of-way would be disturbed again, so it would be pointless to plant sensitive species there.  That disturbance could be from driving directly on the area of the pipeline location, which has few (if any) of the significant adverse effects of grading whole new roads, excavating pipe, stockpiling dirt, etc.  In other words, this doesn't show that the current work was anticipated or mitigated, much less pre-authorized.

75

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Respondent's Claim:

"Sable also implemented several construction best management practices to ensure that impacts to coastal resources, biological resources, and archaeological resources were consistent with the Onshore Pipelines' prior impact analyses"
- Statement of Defense at page 18

Response:

This shows that Sable in fact recognized that this work could have impacts to existing resources, and they did not cite anything to show that these BMPs were required by the original approvals, which shows that they recognize that the original approvals did not provide the necessary regulation for the current work.  Moreover, these BMPs were not reviewed and approved by Commission ecology staff, and we have no information proving that they were adequate or even implemented.  Since there was no permit sought or obtained for this work, there wasn't oversight or on site monitors.  And again, whether the work was done in a sufficiently protective manner is not relevant to whether Coastal Act authorization was legally required, and thus, to the Commission's authority to issue a cease-and-desist order.

Respondent's Claim:

"the County's Statement of Overriding Considerations concluded that the pipeline operator's compliance with the Conditions of Approval would 'mitigate[] as completely as possible' all 'potential oil spill impacts' and other potentially significant impacts"
- Statement of Defense at page 18

Response:

Here again, the reliance is misplaced and misrepresents the document.  Tellingly, Sable *quotes* the phrase "oil spill impacts," but the reference to "other potentially significant impacts" is not a quote, because the Statement of Overriding Considerations doesn't use that phrasing, nor does the list on page 55 refer to impacts of future ground disturbance for maintenance.

Respondent's Claim:

"Anomaly Repair Work will serve as a protective measure for coastal resources and *reduce and avoid* any potential oil spill impacts."
- Statement of Defense at page 19

Response:

Again, this refers to oil spill impacts.  That is simply not what's at issue here.

Respondent's Claim:

Condition A-13 lists the types of changes that would require a further permit, stating:

"[The pipeline operator] shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgement of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to 1)

76

Exhibits Pg. 778

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above [noted as the outer continental shelf and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins], and 4) introduction of a different product from any source.79"
- Statement of Defense at page 19

Response:

This is about the sorts of changes in operations that require modifications to the existing permit (or a new permit), but (1) it does not say that it is intended to be an exhaustive list, and (2) it is focused on changes to the nature of the pipeline and its throughput, not to addressing significant maintenance work.

Respondent's Claim:
The County's review of Sable's Zoning Clearance applications reflected the County's understanding "that Zoning Clearances should be used before commencing *initial* construction approved under a final development plan and that Zoning Clearances should not be used for each individual element of the approved development or use throughout the life of a project."
- Statement of Defense at page 23

Response:

This is not relevant. Whether the Zoning Clearance process would be required if these activities were covered by the original permit is not the issue here.

Respondent's Claim:

"The County's Anomaly Repair Confirmation Letter is not appealable under the CZO or LCP."

"The County's confirmation that the work was authorized by the existing Onshore CDPs is 'not appealable to the … Coastal Commission'."

- Statement of Defense at page 23

Response:
This proceeding does not involve an appeal of this letter, so this is irrelevant.

Respondent's Claim:
"Over the last 30 years, the County has employed different procedures to confirm that anomaly repair work complies with the pipelines' existing FDP and Onshore CDPs. These procedures have included using the County's Land Use Permit process, the Zoning Clearance process, as well as informal communications between the pipeline operator"
- Statement of Defense at page 23

Response:

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

If, as Sable contends, it has always been understood that the intent of the County's original permit was to authorize all future anomaly repair work on the pipeline, the County shouldn't have needed to issue any sort of further authorization.  Thus, the fact that the County issued these additional permits shows that the work was not fully authorized in advance.  Moreover, the permits Sable cited (Sable SOD Doc. 19, 25, and 26) all included extensive conditions regulating the method of that work to protect natural resources, showing that, contrary to Sable's arguments, the County must have concluded that the original approvals did not adequately protect against the impacts of this future maintenance work.

Similarly, for the valve replacement work, as Sable notes, County staff initially issued an addendum to the EIR/EIS for that work.  Although it's true that the addendum proposed a conclusion that the work would not have significant new impacts, the fact that they concluded an addendum was needed at all shows that they did not view the original EIR/EIS as covering this work.  It's also notable that the Planning Commission rejected that addendum that staff had proposed, so it's conclusion that no significant adverse harm would occur was not adopted by the County

Respondent's Claim:

> In connection with the anomaly repairs, "Sable implemented several construction best management practices to ensure that impacts to coastal resources . . . were consistent with the Onshore Pipelines' prior impact analyses related to ongoing repair and maintenance, and subsequent ecological and archaeological resources analyses have confirmed that impacts resulting from such work remained within the scope of impacts previously analyzed and approved"
>
> -   Statement of Defense at page 25

Response:

This is an unsupported, and vague assertion.  Although there is disagreement between Commission staff and Sable that the work undertaken was previously reviewed and authorized by the EIR/EIS and subsequent permits, Sable has provided no discussion or analysis of how the identified Best Management Practices (BMPs) comport with requirements of the mitigation measures and permit conditions. Second, given that there was no permit application, analysis, or regulatory review, and that the work took place without regulatory oversight, it is impossible to evaluate the veracity of Sable's statement much less the effectiveness of the BMPs they may have implemented to avoid or minimize adverse impacts to coastal resources as a result of field work. Third, Commission staff have received reports indicating that Sable may not be in compliance with required conditions and mitigation measures, including these listed BMPs. For example, a BMP in one of the references provided by Sable requires that "All oak tree impacts are to be

78

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

avoided including no vehicles, equipment, or stockpile within the dripline of any oaks". Environmental Defense Center (EDC) shared a report with Commission staff dated March 24, 2025, for Sable work in Gaviota State Park (Exh. 27). Photos 8K and 8L of that report capture an excavator parked within the drip line of an oak tree on top of the west bank of Gaviota Creek.  This is clearly inconsistent with the relevant BMP and emphasizes the concern raised by Commission staff that without regulatory input on BMP development and regulatory and independent oversight of BMP implementation, BMPs may be inadequate, ignored or both.

Respondent's Claim:

"any dispute resolution process regarding the County's determination is not authorized by the Coastal Act Regulations.

-    Statement of Defense at page 27

Response:

This proceeding does not involve the dispute resolution process established by section 13569 of the Commission's regulations

Respondent's Claim:

"Pipeline operators subject to AB 864 were required to submit a risk analysis and plan to retrofit existing pipelines with BAT by October 1, 2021."

-    Statement of Defense at page 31

Response:

The section of the regulations that Sable cited in connection with this statement (19 C.C.R. § 2108(b)) just specifies when the regulations become enforceable. A subsequent section (section 2113(a)) requires submittal of an implementation plan "that outlines the time frame to implement the proposed best available technologies." It leaves it to the operator to propose a timeline and doesn't specify any maximum time.  Section 2113(c)(2) specifically says that the timeframe proposed must consider the time needed for "acquisition of permits." And 2113(d) provides for the possibility that the operator may have to provide "an explanation demonstrating good cause for delaying implementation past the deadline extensions."  Thus, the requirement Sable cites does not require that the work be completed by any particular time.

Respondent's Claim:

79

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

"OSFM anticipated that all pipeline BAT retrofits would be completed by April 1, 2023 – just eighteen months after operators were required to submit their plan for OSFM approval."

- Statement of Defense at page 31

Response:

Here too, Sable cites a regulation that does not support this statement.  However, even assuming it were true, "anticipated" is not the same as "required," so it would not mean that Sable was required to complete the valve installation by any particular time. However, again, the regulation does not say that OSFM anticipated all retrofits would be completed by April 1, 2023. Section 2108(c) says that's the date when OSFM must enforce the regulatory scheme "against an operator . . . that is required to complete retrofit of existing pipelines." In other words, if an operator is required to have completed the retrofit by that date, presumably per the schedule they proposed pursuant to 2113, then OSFM must enforce the regulatory scheme at that point. Sable presents no evidence that it had committed to complete the work by that date. And even if it did, again, section 2113 provides for the need for permits and for extensions for good cause.

Respondent's Claim:

"This timeline was based in part on an assumption that "[p]ermitting costs to install [AB 864's required safety valves] would be negligible" and that "'[i]n most cases, a permit [] may not be required'."

- Statement of Defense at page 31

Response:

This reinforces the fact that the regulatory system established by AB 864 envisioned that other permits would be necessary. In addition, any "assumption" the permitting costs would be negligible is not a requirement, nor could it be a requirement, that other agencies' permitting costs would be capped. And finally, even if this could somehow be a requirement that permitting costs be capped at some level reflective of negligibility and were, Sable has presented no evidence that this would not have been the case had it applied for a CDP.

In addition, the cited text says the determination of whether a permit would be required would be made on a case-by-case basis, but even if didn't say provide for that that, this is just a report of what OSFM was told in "[d]iscussions with local agency personnel."

Respondent's Claim:

80

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

"The Onshore EIR/EIS analyzed the installation of fifteen "[p]ipeline block and check valves"

"The Onshore Pipelines' FDP and CDPs also acknowledged that the operator would undertake certain safety valve installation work."

- Statement of Defense at page 32

Response:

These are different from the valves installed more recently, which are the subject of this matter, and any analysis of valves installed with the original project is irrelevant to the question of whether the installation process for new valves, that are almost certainly of a different sort, 40 years later, requires a permit.

Respondent's Claim:

"the additional valves were located within the Onshore Pipelines' already-disturbed operational right-of-way where permanent impacts to terrestrial biology were assumed to extend throughout the pipelines' lifetime.[163]"

-Statement of Defense at page 33

Response:

The cited page only says that "220 acres of oak woodlands would be removed for the life of the project," not that all terrestrial biology would be. And for all the reasons stated previously, it does not appear that the approval of the original project was intended to approve specific maintenance projects 40 years in the future without review of the methods, much less the installation of additional valves that was not contemplated as maintenance. And clearly, it did not analyze the impacts of such additional valves or means to best avoid adverse impacts in their installation.

Respondent's Claim:

"County staff's analysis confirmed that installing these valves would not result in any new or substantially more severe impacts"

-Statement of Defense at page 33

Response:

First, this was a staff-level determination that was overturned by the Planning Commission, so it is not binding.  Second, it was only comparing the impacts of the new valve installation work to the impacts of the original project, not assessing whether the new work would have its own impacts.  Third, if this work were truly pre-approved, as Sable argues, then County staff shouldn't have had to assess this question at all.  Fourth, impacts analyses are not the standard for whether a permit application is required. The

81

requirement is based on the performance of development, not the resource impacts. Lack of resource impacts just means the permit will be approved, or that the permit requirement may be waived.  Here as elsewhere, Sable is jumping to a conclusion on what may be approvable with out the process leading to that.  And in fact, there are often minor tweaks as to timing or manner that can make a development activity much more protective of coastal resources.

Respondent's Claim:

"County staff initially opted to prepare discrete amendments to the Onshore Pipelines' FDP and Onshore CDPs related to the proposed safety valve installation work."

-Statement of Defense at page 33

Response:

This shows that even the County originally viewed this project as requiring an amendment to the existing approvals. In fact, it was only after Sable sued the County that the County reversed its position on this and found that the work was covered by the original permits and didn't need an amendment

Respondent's Claim:

To support the amendments, County staff prepared a draft addendum to the EIR/EIS, which "concluded that safety valve installation work "presents minor incremental impacts *that remain less than those identified for the originally approved*"

-Statement of Defense at page 33

Response:

This is all irrelevant to the issue at hand, as it once again conflates impacts with the need for a CDP.  However, as to the impacts analysis, although it's true that the staff's draft addendum to the EIR stated that the impacts of the proposed project would be minor and less than the impacts of the original project, if Sable were correct that the work was covered by the original EIR/EIS, no addendum would have been necessary at all.  In fact, that addendum explains that it was created to address "changes and additions from the project described in the certified SEIR to the proposed project." Page C1-2. Thus, far from supporting Sable's position, this actually shows that this was always seen as an expansion beyond the project described in the original EIR/EIS. See also page C1-4 ("The project is a request . . . for an amendment to the . . . [FDP] to allow for the installation of 16 new valves")

Respondent's Claim:

82

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

"Sable undertook [the valve installation] work based on the County's . . . Letter, which confirmed that no further County authorization was required to complete this safety valve installation work. The County has delegated local permitting authority under the Coastal Act and therefore the County's prior authorization was understood by Sable to extend to Coastal Act permitting as well"

-Statement of Defense at page 37

Response:

The County issued its letter on September 4, 2024. That same month, Sable received a Notice of Violation letter from the Coastal Commission explaining Commission staff's contrary position, and the rationale therefor.  Thus, Sable was fully aware of the Commission's opposition to this analysis and of its concerns when Sabe undertook this work.

Respondent's Claim:

"Sable requested a two-day extension from Commission staff to submit this Statement of Defense, which would have allowed Sable to submit the valve installation materials to the County and provide those materials with the initial submission of the Statement of Defense. Commission staff rejected that request."

-Statement of Defense at page 37, fn.176

Response:

The Commission's Executive Director's issued a cease-and-desist order to, among other things, preserve the *status quo* until this matter could be brought before the full Commission. However, because Sable has disregarded that order and proceeded with its work, Commission staff had no choice but to rush this matter onto the next Commission meeting to obtain further relief. It would not have been possible to do that if Sable had been given an extension on the deadline for the Statement of Defense. Therefore, it was Sable's own refusal to comply with the ED-CDO that resulted in the denial of this extension request.

Respondent's Claim:

Sable claims that the Commission lacks jurisdiction because the County acted in a timely manner to the request from the Commission for enforcement action, as provided for in Section 30810, and cites, as evidence, that the "County issued the Safety Valve Confirmation Letter"

-Statement of Defense at page 38

83

Exhibits Pg. 785

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

Response:

Again, that letter from the County was issued on September 4, 2024.  Commission staff requested the County act on September 20, 2024, and February 17, 2025.  Thus, the County's letter could not have been responsive to the Commission's requests.  Nor did it constitute taking action to address the violations that staff was alleging. To the contrary, it showed the County took a different perspective that precluded it from acting on Commission staff's request.  At most, the County's letter reveals *why* the County *declined* to take action.

Respondent's Claim:

Sable claims that the valve installation work "could not 'cause significant damage to coastal resources' as required for a cease and desist order."

-Statement of Defense at page 38

Response:

The work at hand was done over a broad area within the County's Gaviota Coast which is an incredibly diverse ecologically region with a variety of habitats and other coastal resources. The original valve installation project for the above ground safety valves was previously approved by the County zoning administrator and the zoning administrator's approval was appealed to the County Planning Commission. County Planning staff recommended that the Planning Commission deny the appeals, but the Planning Commission voted against County Planning staff and upheld the appeals. The Planning Commission decision was appealed to the County Board of Supervisors and the Board of Supervisors decision ended in a tied vote. Meaning no action was taken by the Board of Supervisors and the action by the Planning Commission stood. Next, Sable and the County entered litigation resulting in the above ground safety valve project being replaced with a proposal to install the safety valves below ground. No application was prepared for the below ground valves and the County provided no  regulatory oversight regarding the work.

What this history demonstrates is that although an application was filed for the original above ground valve installation project and County Planning staff made findings regarding that project, because the Planning Commission voted against staff and the Board of Supervisors decision resulted in no action, the County never formally adopted any findings demonstrating that the above ground valve installation project was consistent with the coastal resource protection policies and provisions of the County's certified Local Coastal Program. And since Sable undertook the belowground valve installation work without ever submitting an application to the County and the County never provided any regulatory review or oversight, it is impossible to know whether that project was sited,

84

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

designed and constructed in a manner to avoid, minimize and mitigate any potential adverse impacts to coastal resources.

There were many different development activities undertaken, including some that presented the potential to have a very significant damage to coastal resources.  For example, the timing of Sable's work occurred during the breeding season for southern California steelhead and California red legged frog. The work also occurred during the nesting season for most bird species, as well as during the time of year in which ground disturbances would most likely result in erosion, scarring, and discharge of sediment into wetland and watercourses. It also appears that several work sites are in or adjacent to ESHA.

Section 30810(a)(2) does not require a showing that significant damage occurred. The operative phrase is that the alleged violation "**could** cause significant damage to coastal resources."  The phrase, as used in both Sections 30809 and 30810, reflects the precautionary nature of the Coastal Act and of these orders in particular.  The idea is not to have harm befall coastal resources before the Commission can act to prevent it.  Here Commission staff went to great lengths to determine what Sable was doing, and where, so that such potential harm could be evaluated, reduced and mitigated.  As the record reflects, Commission permit and enforcement staff reached out repeatedly to Sable for this information and offered to work collaboratively to resolve the situation in a legal way to find a way to evaluate impacts and minimize any potential harms, but this did not bear fruit. Sable has repeatedly claimed that the valve work remained within the scope of the impacts previously analyzed and approved. However, as discussed previously in this staff report, there is no evidence demonstrating that this valve installation work was considered, analyzed, mitigated or approved in the EIR/EIS or any of the County's permits.

Moreover, as we have stated in response to their other comments, even if the work, such as the valve installation, is not in and of itself a bad idea or even a good idea, it does not mean that it should not be done in a manner that is protective of coastal resources. This is the whole point of the permit process—to evaluate alternatives and find the one with the least impacts and to condition the work in a way that is protective.

Respondent's Claim:

"Commission staff also assert that Coastal Act sections 30820, 30821.3, 30821.6, and 30822 authorize penalties to be levied against Sable related to the safety valve installation work. None of those sections apply here and thus no penalties may be levied."

-Statement of Defense at page 39

Response:

85

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

To the extent Sable may be objecting to the idea of the Commission invoking these provisions as a basis for imposing an administrative penalty, that is not what the Commission is doing in this proceeding, as the Commission cannot impose penalties administratively pursuant to any of those sections other than 30821.3, and staff never suggested otherwise. The NOI raises those penalty provisions in saying that the "Coastal Act also includes several other penalty provisions that may be applicable" (emphasis added), meaning that these "other" penalty provisions may apply to the acts at issue, not that the Commission can invoke them to impose penalties administratively.

Respondent's Claim:

Sable claims that because the Commission "did not include the Span Remediation Work performed in federal waters" in this action, that "indicates staff's understanding that this work was in fact contemplated and authorized in the DPP"

-Statement of Defense at page 43, fn. 205, and 51

Response:

The inference Sable attempts to draw is not only unjustified, but absurd.  The reason Commission staff limited the seaward extent of its pursuit of this matter is that the "federal waters" to which Sable alludes are outside Coastal Zone and the Commission's enforcement jurisdiction.  Commission staff actually did inquire about this issue with the federal agency in charge; however, the Commission also has no enforcement jurisdiction over federal agencies.

Respondent's Claim:

Sable claims that the Commission's findings in support of its action on the CDP for the DPP and the related consistency certification "highlighted the importance of addressing potential geologic constraints through 'proper mitigation,' which included 'avoidance or … engineering design'," which Sable argues shows that the Commission authorized alterations to the seafloor.

-Statement of Defense at page 50, citing the findings at page 78

Response:

Not only is the language Sable cites much more general than Sable would suggest, but more importantly, Sable points to nothing to indicate that the language referred to any work beyond the initial deployment.

Respondent's Claim:

Sable claims the Commission's findings in support of its action on the CDP for the DPP and the related consistency certification "also recognized the need for flexibility in pipeline construction methods, acknowledging that '[p]ipeline construction

86

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

methods are presently undefined' and allowing Exxon the latitude to 'propose their own design solutions,'" suggesting that this, too, "permits the adaptation of construction techniques," such as the span remediation work at issue.

-Statement of Defense at page 50, citing the findings at page 44

Response:

The very next sentence in the cited findings states that the range of possible alternatives and their impacts are nevertheless discussed below, showing that the Commission was not creating an open-ended authorization for any sort of work that could fit into this description.  In addition, again, the Commission is not saying that the approach at issue is not allowable, but only that it needs to be reviewed through the permit process.

Respondent's Claim:

Sable claims that a plan the Commission required in the CDP for the DPP, and which the Commission subsequently approved, "specifically approved future Span Remediation Work to (1) inspect the pipelines for unacceptable free spans, and (2) 'modify' the seafloor to remediate any identified unacceptable spans as part of the Offshore CDP."

-Statement of Defense at page 51, citing CDP condition 9 and the 1989 "Final Comprehensive Plan for Marine Biological Impact Reduction and Mitigation in Nearshore Waters off Las Flores Canyon, at 19.

Response:

The language quoted only reflected Exxon's proposal to "modify" certain "bedrock ridges" as part of its initial construction and then to identify unacceptable free spans "following pulling of the pipelines," meaning in the immediate aftermath of the deployment, not decades into the future.  Moreover, even if it were to have been referring to future work, the statement is only about "identify[ing]" those spans. It doesn't say they will be making additional modifications in response to those unacceptable free spans without further review and regulation

Respondent's Claim:

Sable notes that leases issued by the State Lands Commission require that the pipelines be kept 'in good order and repair and safe condition'" and "also require that should inspections on the pipeline 'show bridging…then further detailed inspections shall be made and corrective action taken, if necessary.'"

-Statement of Defense at page 52

Response:

87

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

One agency's requirement to take corrective action does not create immunity from other regulatory requirements.  In fact, the current leases specifically require compliance with all other regulatory requirements.

## VIII.    CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA)

The Commission finds that imposition and implementation of this Cease and Desist Order, to compel Sable Offshore Corporation to apply for Coastal Development Permits for, both, work undertaken at onshore locations along the Pipelines, as well as offshore locations of the pipeline located in state, coastal waters; as well as application for future, proposed work, among other things, is exempt from the requirements of the California Environmental Quality Act of 1970 (CEQA), Cal. Pub. Res. Code §§ 21000 *et seq.*, for the following reasons. First, the CEQA statue (section 21084) provides for the identification of "classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from [CEQA]." The CEQA Guidelines (which, like the Commission's regulations, are codified in 14 CCR) provide the list of such projects, which are known as "categorical exemptions," in Article 19 (14 CCR §§15300 *et seq.*). Because this is an enforcement action and because the Commission's process, as demonstrated above, involves ensuring that the environment is protected throughout the process, the exemption covering enforcement actions by regulatory agencies (14 CCR § 15321) applies here.

Secondly although the CEQA Guidelines provide for exceptions to the application of these categorical exemptions (14 CCR § 15300.2), the Commission finds that none of those exceptions applies here. Section 15300.2(c), in particular, states that:

> *A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.*

CEQA defines the phrase "significant effect on the environment" (in Section 21068) to mean "a substantial, or potentially substantial, adverse change in the environment." This Cease and Desist Order is designed to protect and enhance the coastal resources, and contain provisions to ensure, and to allow the Executive Director to ensure, that they are implemented in a manner that will protect the environment. Thus, this action will not have any significant effect on the environment, within the meaning of CEQA, and the exception to the categorical exemptions listed in 14 CCR § 15300.2(c) does not apply. An independent but equally sufficient reason why that exception in Section 15300.2(c) does not apply is that this case does not involve any "unusual circumstances" within the meaning of that section, in that it has not significant feature that would distinguish it from other activities in the exempt classes listed above. This case is a typical Commission enforcement action to protect and restore coastal resources.

Finally, it is not even clear that this order will not result in a physical change in the environment, as that concept is used in CEQA, rending the project exempt pursuant to 14

88

CCC-25-CD-01/CCC-25-RO-01/CCC-25-AP3-01
(Sable)

CCR § 15060(c)(2), and it may not constitute a project within the meaning of CEQA, rendering it exempt pursuant to 14 CCR § 15060(c)(3).

In sum, given the nature of this matter as an enforcement action to protect and restore coastal resources and the environment, and since there is no reasonable possibility that it will result in any significant adverse change in the environment, it is exempt and also categorically exempt for CEQA.

## IX.    SUMMARY OF FINDINGS OF FACT

1. Sable Offshore Corp. ("Sable") is the owner and operator of the Santa Ynez Unit, and associated assets, consisting of three offshore platforms (Hondo, Harmony and Heritage), the Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil and gas transport pipelines including Las Flores Pipelines CA-324 and CA-325 (Formerly lies 901 and 903, respectively)
2. On February 14, 2024, Sable finalized a purchase agreement with ExxonMobil Corporation, to which Sable purchased the entire Santa Ynez Unit ("SYU"), including the Las Flores Pipelines, and all associated assets (the three offshore platforms, subsea pipelines and infrastructure, and Las Flores Canyon processing facility).
3. Coastal Act Section 30810 authorizes the Commission to issue a cease and desist order when the Commission determines that any person has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the Commission without securing a permit, or (2) is inconsistent with a permit previously issued by the Commission. It may also be issued to enforce any requirements of a certified local coastal program or port master plan.
4. Coastal Act Section 30811 authorizes the Commission to issue a cease and desist order when the Commission determines that development has (1) occurred without a coastal development permit from the Commission or local government (2) is inconsistent with this division, and (3) and the development is causing continuing resource damage.
5. Coastal Act Section 30921.3 provides for administrative civil penalties for violations of any provision of the Coastal Act other than public access.

**APPENDICES**

Appendix A – Cease and Desist Order No. CCC-25-CD-01; Restoration Order CCC-25-RO-01; Civil Administrative Penalty No. CCC-25-AP3-01

Exhibits Pg. 791

# EXHIBIT D



U.S. Department
of Transportation
Pipeline and Hazardous
Materials Safety
Administration

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0002**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (Sable CA-324) between Las Flores Canyon and Gaviota, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Exhibits Pg. 793

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

**PHMSA-2025-0002 – California Office of the State Fire Marshall**          **Page 2 of 2**

# EXHIBIT E



U.S. Department
of Transportation
Pipeline and Hazardous
Materials Safety
Administration

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0003**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

Alan K. Mayberry,
Associate Administrator for Pipeline
Safety

**PHMSA-2025-0003 – California Office of the State Fire Marshall**          **Page 2 of 2**

Exhibits Pg. 797

# EXHIBIT F





# Central Coast Regional Water Quality Control Board

April 15, 2025

Sable Offshore Corp.
Steven Rusch, Vice President
845 Texas Avenue, Ste 2920
Houston, Texas 77002
Email: SRusch@sableoffshore.com

**VIA CERTIFIED MAIL AND EMAIL**
**RETURN RECEIPT REQUESTED**
**9589 0710 5270 0883 4147 17**

Sable Offshore Corp.
Amanda Garcia
Agent for Service of Process
330 N Brand Blvd
Glendale, CA 91203

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**9589 0710 5270 0883 4146 70**

Dear Steven Rusch and Amanda Garcia:

**ENFORCEMENT PROGRAM: SABLE OFFSHORE CORP. - NOTICE OF VIOLATION FOR UNAUTHORIZED DISCHARGES OF WASTE TO WATERS OF THE STATE AND UNITED STATES AND FAILURE TO REPORT, SANTA BARBARA AND SAN LUIS OBISPO COUNTIES**

The California Regional Water Quality Control Board, Central Coast Region (Central Coast Water Board) is a state regulatory agency with responsibility for protecting the quality of the waters of the state within its area of jurisdiction. The Central Coast Water Board has authority to require submission of information, direct action, establish regulations, levy penalties, and bring legal action when necessary to protect water quality.

The Central Coast Water Board has evidence of a series of unauthorized discharges of waste by Sable Offshore Corp. (Sable) to waters of the state and United States related to Sable's pipeline remediation and planned restart of Line 324 (formerly Line 901) and Line 325 (formerly Line 903). In addition, Sable has not reported all of the information required by the Central Coast Water Board's January 22, 2025 investigative order issued pursuant to California Water Code section 13267. The unauthorized discharges of waste and failure to submit the information required by the investigative order are potential violations of the California Water Code. This notice of violation describes the alleged violations, summarizes potential monetary liability, and provides direction on corrective actions.

Sable Offshore Corp.                         - 2 -                              April 15, 2025

a       round

In August 2024, Central Coast Water Board staff were made aware by the public of Sable's pipeline remediation work along the Gaviota Coast in Santa Barbara County. When contacted by Central Coast Water Board staff, Sable representative Steve Rusch confirmed his knowledge of the regulatory requirements and confirmed Sable had surveyed all work locations and found no project impacts to waters of the state, which he confirmed to understand includes intermittent and ephemeral streams. In October 2024, the Central Coast Water Board received a complaint from the public of multiple land disturbances across what appeared to be waters of the state on the Gaviota Coast at various Sable pipeline remediation project sites.  On November 4, 2024, Central Coast Water Board staff inspected various project work locations along the Gaviota Coast which led to the positive identification of unauthorized discharges to waters of the state.

On December 13, 2024, the Central Coast Water Board issued a notice of violation to Sable notifying it that any person discharging waste, or proposing to discharge waste, that could affect the quality of waters of the state is required to file a report of discharge prior to initiating the discharge; that Sable's activities observed at the November 4, 2024 inspection constituted a violation of the California Water Code; and that Sable's activities were likely also subject to stormwater permitting. On December 13, 2024, the Central Coast Water Board also issued a California Water Code section 13260 directive to Sable to submit a report of waste discharge for the unauthorized discharges of waste and a Notice of Non-Compliance notifying Sable that it had been identified as requiring a stormwater permit. On January 22, 2025, the Central Coast Water Board issued a second Notice of Non-Compliance for failure to apply for stormwater permitting.

Since the issuance of the December 13, 2024 notice of violation, Sable has continued to commit alleged violations of the California Water Code. For example, while Sable submitted an after-the-fact notice of intent to obtain coverage for work in waters of the state at the location cited in the December 13, 2024 notice of violation, it resumed unauthorized work at the subject site in mid-February prior to obtaining the permit and authorization for the work.

On January 22, 2025, the Central Coast Water Board issued an order, pursuant to California Water Code section 13267, requiring Sable to submit a technical report addressing discharges of waste to waters of the state (13267 Technical Report Order). Among other things, Sable was required to include in the technical report an inventory of all Sable land disturbance activities that were or are currently active in the Central Coast region pertaining to remediation of the Las Flores Pipeline System lines, a detailed assessment of the presence of waters of the state at inventoried land disturbance locations, and a detailed assessment of all waste discharges to waters of the state. While Sable submitted a report in response to the 13267 Technical Report Order on March 8, 2025, its report was deficient, lacking information in response to 13267 Technical Report Order item numbers 2.f and 3.

Exhibits Pg. 800

Sable Offshore Corp.                                    - 3 -                                    April 15, 2025

    a.  13267 Technical Report Order number 2.f required submittal of a detailed assessment of the presence of any of the following in or adjacent to areas disturbed by Sable pipeline remediation activities: wetlands; perennial, intermittent, or ephemeral streams; rivers; lakes; swales; drainages; ditches; or any other depressional features with evidence of bed, bank, or channel. Sable's response refers to the October 5, 2020 Biological Resources Assessment (2nd Revised) prepared by SCS Engineers for Pacific Pipeline Company. This document does not include the required assessment. While the document identifies some waters of the state in the project area, it does not identify all of the waters of the state, nor does it assess the proximity of all waters of the state to areas disturbed by Sable's pipeline remediation activities. For example, the unnamed ephemeral drainage at approximately 34° 28' 6.4" N, 120° 06' 22.5" W, upstream of Hwy 101 at postmile 39, just east of Baron Ranch Trailhead, that was subject to the Central Coast Water Board's December 13, 2024 notice of violation, is not identified in the document.

    b.  13267 Technical Report Order numbers 3.a-c required Sable to identify the locations and sizes of the areas of waters of the state and United States affected by the unauthorized waste discharges; estimate the amount of waste discharged to waters of the state; and assess the biology of areas of the waters of the state impacted by the waste discharges. Sable's response states this information will be submitted late, by April 15, 2025. Sable's response does not provide an explanation for the late submittal.

On February 21, 2025, in response to the December 13, 2024 Notice of Noncompliance, Pacific Pipeline Company submitted an application for construction stormwater general permit (CGP) enrollment for coverage under a facilty/site name of Sable Land Base, however the documents submitted as part of this application were incomplete. State Water Resources Control Board staff notified Pacific Pipeline Company that the application was deficient and instructed it to resubmit the application with a complete Stormwater Pollution Prevention Plan on March 12, 2025. Through phone conversation (on February 22, 2025) and via email (on March 18, 2025) with Central Coast Water Board staff, Sable representatives communicated that Sable intends to complete the CGP enrollment only if land disturbance activities outside the existing right-of-way exceed the permit applicability threshold of one acre.

In response to ongoing public complaints, on February 28, 2025, Central Coast Water Board staff made a second site visit to Sable pipeline remediation sites along the Gaviota Coast. Central Coast Water Board staff observed and documented unauthorized discharges of waste at various locations that could affect the quality of waters of the state and Untied States.

    a.  Site 1, Venadito Canyon Road (34.4649° N, -120.052° W) – Riparian vegetation at this location had been cleared and grubbed, with loose bare soil and slash at the site. The loose bare soil and slash at the site are unauthorized discharges of waste that could affect the quality of waters of the state.

Exhibits Pg. 801

Sable Offshore Corp.                              - 4 -                              April 15, 2025

   b.  Site 7, Arroyo Quemado (34.4734° N, -120.119° W) – An access road had been graded, leaving bare loose soil without erosion and sediment control in several locations. Riparian vegetation at this location had also been cleared and grubbed, with loose bare soil and slash at the site. Freshly cut tree branches and other vegetation, which appeared to have been generated from work conducted by Sable in the riparian area, was observed as dumped waste in the flowing stream. The loose bare soil and slash at the site are unauthorized discharges of waste that could affect the quality of waters of the state and waters of the United States. The cut tree branches and other vegetation into the flowing stream are unauthorized discharges of waste and pollutants to waters of the state and waters of the United States.

   c.  Site F7/F8, unnamed drainage (34.4737° N, -120.176° W) – At this location, the bed and banks of an unnamed drainage had been graded, with loose bare soil in the drainage bed. The disturbance of soil on the drainage bed and banks and loose bare soil left in the drainage bed are unauthorized discharges of waste that could affect the quality of waters of the state.

   d.  Site F10, unnamed drainage (34.4758° N, -120.196° W) – At this location, a slope had been graded, without erosion and sediment controls. Loose sediment was also discharged into the bank and bed of the unnamed drainage. Riparian vegetation had also been cleared. The loose bare soil and discharge of loose sediment into the drainage at the site are unauthorized discharges of waste that could affect the quality of waters of the state.

On March 12 and 13, 2025, Padre Associates, Inc., on behalf of Sable, submitted a series of after-the-fact notices of intent to obtain authorization for previously conducted unauthorized discharges of waste to waters of the state and waters of the United States and restoration at various locations. Sites R5-1 and R5-3 are within waters of the United States.

   a.  R4-1, tributary to Cuyama River (35.059463° N, -119.933144° W)

   b.  R5-2, tributary to Peterson Creek (34.627952° N, -120.200412° W)

   c.  R5-1, tributary to Nojoqui Creek (34.573883° N, -120.19567° W)

   d.  R5-3, tributary to Foxen Canyon (34.80723° N, -120.192° W)

On April 10, 2025, at a California Coastal Commission hearing, Sable confirmed it had placed sand and cement filled bags on the ocean floor below and adjacent to Sable's out-of-service offshore oil and water pipelines.

Sable Offshore Corp.                              - 5 -                              April 15, 2025

Alleged Violations

1. <u>Violation of California Water Code Section 13260</u>
California Water Code section 13260 requires any person discharging waste, or proposing to discharge waste, within any region that could affect the quality of waters of the state, to file with the appropriate regional board a report of the discharge. The conditions at Sites 1, 7, F7/F8, F10, R4-1, R5-1, R5-2, and R5-3 represent violations of California Water Code section 13260, because Sable cleared vegetation and excavated and graded sediment at the sites within waters of the state, resulting in discharges of waste that could affect the quality of waters of the state, without having filed reports of waste discharge. Sable's discharge of waste by placing sand and cement filled bags on the ocean floor below and adjacent to Sable's out-of-service offshore oil and water pipelines without having filed a report of waste discharge is also a violation of California Water Code section 13260.

2. <u>Violation of California Water Code Section 13264</u>
California Water Code section 13264 states in part that no person shall initiate any new discharge of waste or make any material changes in any discharge prior to the filing of the report required by California Water Code section 13260. The conditions at the various sites represent violations of California Water Code section 13264, because Sable discharged waste that could affect the quality of waters of the state without obtaining waste discharge requirements from the Central Coast Water Board.

3. <u>Violation of California Water Code Section 13267</u>
California Water Code section 13267 authorizes the regional boards to require that any person who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge waste within its region shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires. Sable was required to submit a technical report to the Central Coast Water Board by March 10, 2025. Sable's submitted technical report did not include the information required by items 2.f and 3.a-c of the Central Coast Water Board's March 10, 2025 13267 Technical Report Order. Sable's failure to include the required information is a violation of California Water Code section 13267.

4. <u>Violation of California Water Code Section 13376</u>
Section 13376 of the California Water Code requires any person discharging pollutants or fill material, or proposing to discharge pollutants fill material, to waters of the United States to file a report of waste discharge. In addition, California Water Code section 13376 prohibits the discharge of pollutants or fill material to waters of the United States except as authorized by waste discharge requirements. Federal Clean Water Action section 301 also prohibits the discharge of pollutants or fill material to waters of the United States without a permit. Sable did not submit a report of waste discharge or obtain waste discharge requirements from the Central Coast Water Board for the discharge of pollutants at Site 7. Sable also did not submit a report of waste discharge or obtain waste discharge requirements from the

Sable Offshore Corp.                              - 6 -                              April 15, 2025

Central Coast Water Board prior to discharging fill material to waters of the United States at Sites R5-1 and R5-3. In addition, Sable did not submit a report of waste discharge or obtain waste discharge requirements from the Central Coast Water Board prior to discharging fill material (sand and cement filled bags) to waters of the United States (Pacific Ocean) on the ocean floor below and adjacent to Sable's out-of-service offshore oil and water pipelines. Conducting these activities in waters of the United States without submittal of a report of waste discharge and issuance of waste discharge requirements are violations of California Water Code section 13376 and Clean Water Act section 301.

5. <u>Violations of Prohibitions in Water Quality Control Plan for the Central Coastal Basin (Basin Plan)</u>, June 2019 Edition

The Basin Plan prohibits, pursuant to California Water Code section 13243, the following:

   1) the discharge or threatened discharge of earthen and organic materials into any stream in the basin in quantities deleterious to beneficial uses; and,

   2) unless otherwise authorized, waste discharges to all coastal surface streams and natural drainageways that flow directly to the ocean within the South Coast Hydrologic Units 1 except where discharge is associated with an approved wastewater reclamation program.

Sable may have violated one or both of these Basin Plan prohibitions as a result of its unauthorized work.

Required Corrective Actions

Sable must obtain all required authorizations for corrective restoration and compensatory mitigation activities and submit the missing information from the required technical report. Sable must control all threatened discharges of earthen and organic materials to prevent their discharge to waters of the state and United States. Sable must take action to correct the alleged violations as soon as possible.

To avoid further unauthorized discharges during any restoration and compensatory mitigation implementation in waters of the state or waters of the United States, pursuant to California Water Code sections 13260 and 13376, Sable must apply for and obtain waste discharge requirements from the Central Coast Water Board prior to discharging waste, or proposing to discharge waste, including prior to any material removal, new disturbance, or restoration activity, that could affect the quality of waters of the state or United States.

Potential Enforcement Actions

The alleged violations cited above may subject Sable to enforcement by the Central Coast Water Board for every day the violations continue. Sable must correct the violations as soon as possible. Sable's receipt of this notice of violation does not preclude the Central Coast Water Board from taking further enforcement action for the

Exhibits Pg. 804

Sable Offshore Corp.                    - 7 -                    April 15, 2025

alleged violations cited in this notice of violation, and the Central Coast Water Board reserves the right to take any enforcement action authorized by law. In making its determination of whether and how to proceed with further enforcement action regarding the alleged violations in this letter, the Central Coast Water Board will consider the information submitted in response to this notice of violation, the time it takes to correct the identified violations, and the adequacy of the corrections and actions taken.

California Water Code section 13268 provides that failure to submit technical or monitoring program reports required by subdivision (b) of California Water Code section 13267 by the specified compliance date, or falsifying any information provided therein, is a misdemeanor and may result in administrative civil liability of up to $1,000 for each day of violation.  California Water Code section 13385 provides that any person who violates Clean Water Act section 301 and/or California Water Code section 13376, and/or a prohibition issued pursuant to 13243, is subject to administrative civil liability of up to $10,000 per day of violation, and up to $10 per gallon of waste discharged but not cleaned up over 1,000 gallons. If the Central Coast Water Board elects to refer the matter to the Attorney General, the superior court may impose civil liability for up to $25,000 per day for each violation, and up to $25 per gallon of waste discharged but not cleaned up over 1,000 gallons. California Water Code sections 13261, 13265, and 13350 also provide for per day administrative liabilities or liability per gallon discharged, as specified in the California Water Code.

The Central Coast Water Board may also require cleanup or abatement of the effects of the unauthorized activities pursuant to California Water Code section 13304, that Sable immediately cease and desist from the activities pursuant to California Water Code section 13301, or may require other actions pursuant to other injunctive authorities. The Central Coast Water Board reserves the right to take any enforcement action authorized by law.

If you have questions about this letter, please contact April Woods at April.Woods@waterboards.ca.gov or Phil Hammer at Phillip.Hammer@waterboards.ca.gov.

Sincerely,


Angela V. Schroeter
Assistant Executive Officer

cc:

Nicole Granquist, Counsel for Sable, Nicole.Granquist@Stoel.com
Stephanie Cook, California Coastal Commission, Stephanie.Cook@coastal.ca.gov
Wesley Horn, California Coastal Commission, Wesley.Horn@coastal.ca.gov
Errin Briggs, Santa Barbara County Planning & Development, EBriggs@countyofsb.org

Sable Offshore Corp.                                    - 8 -                                    April 15, 2025

Jim Hosler, CAL FIRE, Jim.Hosler@fire.ca.gov
Julie Vance, California Department of Fish and Wildlife, Julie.Vance@wildlife.ca.gov
Linda Connolly, California Department of Fish and Wildlife,
Linda.Connolly@wildlife.ca.gov
Naomi Rubin, State Water Resources Control Board,
Naomi.Rubin@waterboards.ca.gov
Ryan Lodge, Central Coast Water Board, Ryan.Lodge@waterboards.ca.gov
Angela Schroeter, Central Coast Water Board, Angela.Schroeter@waterboards.ca.gov
Todd Stanley, Central Coast Water Board, Todd.Stanley@waterboards.ca.gov
Harvey Packard, Central Coast Water Board, Harvey.Packard@waterboards.ca.gov
Phil Hammer, Central Coast Water Board, Phillip.Hammer@waterboards.ca.gov
Tamara Anderson, Central Coast Water Board, Tamara.Anderson@waterboards.ca.gov
Leah Lemoine, Central Coast Water Board, Leah.Lemoine@Waterboards.ca.gov
April Woods, Central Coast Water Board, April.Woods@waterboards.ca.gov
Jesse Woodard, Central Coast Water Board, Jesse.Woodard@waterboards.ca.gov
Jacqueline Tkac, Central Coast Water Board, Jacqueline.Tkac@waterboards.ca.gov


R:\RB3\Enforcement\Case Files\Sable Pipeline\NOVs\Second NOV\Sable Offshore
Corp_NOV_4-15-2025.docx

# EXHIBIT G

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



### CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:   Sable Offshore Corp
            OPID# 40851
            845 Texas Avenue, # 2920
            Houston, Texas 77002

Pipeline:   OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Exhibits Pg. 808

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Exhibits Pg. 810

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

## In-Line Inspection (ILI) Assessment and Frequency

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a)  Dates for integrity assessment

   b)  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 6

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

   c) In-line inspection tool vendor(s)
   d) Required tool specifications including operational specifications and anomaly sizing tolerances
   e) Tool validation methodology
   f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
   g) Criteria used to identify locations for excavation and field verification
   h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

   a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

   b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Exhibits Pg. 813

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

 a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

 b. USCD Performance Specification Requirements

  i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

  ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

  iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

  iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**Discovery of Condition**

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**Immediate Repair Conditions[7]**

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a.  Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 11

   b.  Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
   c.  After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.
45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.
46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]
47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
   a.  Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
   b.  Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).
49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.
50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 87418E7A-ED76-4884-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
   a. Technical approach used for the analysis
   b. All data used and analyzed
   c. Pipe and longitudinal weld seam properties
   d. Procedures used to implement state waiver conditions

Exhibits Pg. 819

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 13

    e.  Evaluation methodology used
    f.  Models used
    g.  Direct in situ examination data
    h.  All in-line inspection tool assessments information evaluated
    i.  Pressure test data and results
    j.  All in-the-ditch assessments performed on the pipeline segments
    k.  All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l.  All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
    n.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
    o.  Safety factors used for fatigue life and/or predicted failure pressure calculations
    p.  Reassessment time interval and safety factors
    q.  The date of the review
    r.  Confirmation of the results by qualified technical subject matter expert(s)
    s.  Approval by responsible Sable management personnel
    t.  Records of additional preventive and mitigative (P&M) measures performed
    u.  Reports required by this State Waiver.

## Reporting

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification*.[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324*. The email notification shall include, if applicable:
    a.  Tool type and run date
    b.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c.  Dig sheets
    d.  Field contact information for Sable
    e.  Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Exhibits Pg. 820

Lance Yearwood
December 17, 2024
Page 14

     a. Tool type
     b. Run date
     c. Summary of Conditions Report[18]
     d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:

     a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
          1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
     b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
     c. The third-party ILI expert reviews in accordance with Condition 52
     d. AC and DC Interference surveys that are due in accordance with Condition 53
     e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 87418E7A-ED76-4891-86B3-BCE5F180F5D7

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

Exhibits Pg. 822

# EXHIBIT H

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY

Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:   LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of
Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa
Barbara County, San Luis Obispo County, and Kern County, California as
described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under
insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Exhibits Pg. 824

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1.  The pipeline can only be used to transport crude oil as stated in the application.
2.  The maximum operating pressure (MOP) cannot exceed:
    a.  1000 pounds per square inch gauge (psig) for CA-325A.
    b.  1292 psig for CA-325B.
3.  The maximum operating temperature of the crude oil must not exceed:
    a.  125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
    b.  110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4.  Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5.  This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6.  This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7.  In-line inspection must include:
    a.  Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
        i.  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
        ii.  General corrosion means uniform or gradually varying loss of wall thickness over an area.
    b.  Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
    c.  Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8.  Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
    a.  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
    b.  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
    At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]
9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.
10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.
11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 6

## In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

> any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i)* *Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

### 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

### Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Exhibits Pg. 832

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB9560053B

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Exhibits Pg. 835

Lance Yearwood
December 17, 2024
Page 13

    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
    o. Safety factors used for fatigue life and/or predicted failure pressure calculations
    p. Reassessment time interval and safety factors
    q. The date of the review
    r. Confirmation of the results by qualified technical subject matter expert(s)
    s. Approval by responsible Sable management personnel
    t. Records of additional preventive and mitigative (P&M) measures performed
    u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:
    d. Tool type and run date
    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    f. Dig sheets
    g. Field contact information for Sable
    h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:
    i. Tool type
    j. Run date
    k. Summary of Conditions Report[18]
    l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:
   a. A Closure Report for the previous calendar (CY) which contains:
         i. Features that were remediated in previous CY
               1. Provide documentation for the in-the-ditch assessments and repairs
         ii. Identify features that remain to be assessed
         iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
   c. The third-party ILI expert reviews in accordance with Condition 53
   d. AC and DC Interference surveys that are due in accordance with Condition 54
   e. A copy of the CGRA for prior year including:
         i. Mean corrosion growth rate for the pipeline
         ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

Exhibits Pg. 838

# EXHIBIT I

# DRAFT
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



# PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

## CALIFORNIA STATE LANDS COMMISSION
### AND
## BUREAU OF LAND MANAGEMENT
## DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# AUGUST 1984

CALIFORNIA STATE LANDS COMMISSION AND
BUREAU OF LAND MANAGEMENT, DEPARTMENT OF THE INTERIOR

DRAFT

ENVIRONMENTAL IMPACT REPORT/ENVIRONMENTAL IMPACT
STATEMENT FOR THE CELERON/ALL AMERICAN AND
GETTY PIPELINE PROJECTS

Prepared by

ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.

Prepared for

STATE LANDS COMMISSION AND BUREAU OF LAND MANAGEMENT

August 1984

_____
Claire Dedrick, Executive Officer, State Lands Commission

_____
Edward Hastey, California State Director, Bureau of Land Management

State Clearing House Number 83110902
Contract Number R 8353

- 2 pumping stations,
- 1 heating station,
- 10 pumping and heating stations,
- 20-acre tank farm at Cadiz,
- 2 delivery stations.

No new access roads longer than 2,600 feet (ft) would be required to reach the pumping stations. Utility requirements (electricity and natural gas) for the Celeron/All American pipeline are shown in Table 2-4.

The Celeron/All American pipeline used for analysis in this EIR/EIS would have the following specifications: 30-inch outside diameter; 0.344 to 0.562-inch wall thicknesses, with corresponding maximum operating pressures of 991 to 1,618 psig, respectively. The entire Celeron pipeline segment and a minimum of 20 miles of pipe downstream from each heating station on the All American pipeline segment would be insulated. Inlet temperature of the crude oil would average 160°F. The pipelines would be insulated with 1.5 inches of polyurethane with a vinyl outer jacket to minimize heat loss from the line. The pipe coating, where not insulated, would be a double wrap of plastic tape; in selected areas, such as river crossings, the pipe would have a coal tar coating overlaid with a concrete jacket.

The entire pipeline would be protected from corrosion with cathodic protection systems consisting of groundbeds and rectifiers. The number and location of these systems would be based on tests of pipe-to-soil potential after construction. Corrosion protection test stations would be installed at least every 10 miles to test the performance of the cathodic protection system. These stations, which are about the size of a parking meter, would be within the ROW.

Pipeline block and check valves would be located at strategic locations along the route (see Map 1-2). Block valves at the pump stations and on the upstream (of oil flow) side of major stream crossings (Refugio Creek, Gaviota Creek, Santa Ynez River, Sisquoc River, La Brea Creek, Cuyama River, Mojave River, Colorado River, Gila River, Wild Cat Canyon Creek, Rio Grande, and Pecos River) would be remotely operated. Check valves would be installed on the downstream (of oil flow) side of all major river and stream crossings, and block valves would be installed on both sides of all pump stations. Each block valve setting would require a 10-ft by 20-ft area. Figure 2-1 shows a typical block valve installation.

Remote control block valves installed at the sensitive areas identified above would be operated in two basic ways. The more traditional way would be to use an electric motor to open and close the valve. This system requires both power and communications. The second method would use a pneumatic or hydraulic actuator and requires only communications. Energy would be supplied by bottled nitrogen gas or solar panels operating a small hydraulic pump. The second method would be used at block valve sites which are too remote to be supplied with line power.

valves to minimize the volume of oil spilled from a failure. No violations of codes or standards were noted.

Corrosion Design Criteria and Corrosion Control Procedures. Protection of a pipeline from corrosion is of critical importance to the environment as well as the pipeline operator. Pitting of the pipeline can occur due to chemical reaction between the soil and the carbon steel pipe if it is not adequately protected. This pitting would eventually reduce the strength of the pipe sufficiently to cause a break and allow an oil leak. Therefore, Getty and Celeron/All American intend to wrap the pipelines in accordance with applicable regulations. Additionally, cathodic protection would be installed as required within 12 months of the pipeline installation dependent upon soil and chemical conditions. Corrosion control test stations would be installed with which to test the integrity of the corrosion protection. This is all in accordance with 49CFR-195.

Due to the low inlet concentrations of $H_2S$ (less than 15 ppm) and water allowed by the pipeline companies, internal corrosion is not anticipated to be a problem. During final design, detailed metallurgical studies would be conducted to confirm initial conclusions.

Pressure Relief and Relief Liquid Disposal System. Emergency shutdowns, valve closures, and other phenomena can cause the pressure in the pipeline to suddenly increase. This pressure must be relieved or the pipe could potentially burst. ANSI B31.4 guides the design of pressure relief systems. All applicants have incorporated pressure relief provisions into their respective pipelines as follows:

- Getty - pressure relief valves and disposal system at their terminus in the San Joaquin Valley.

- Celeron/All American - pressure relief valves and above-ground relief tanks at stations where elevation differences dictate (such as Emidio) as well as additional pressure relief devices and tankage as required at Cadiz, California and Wink, Texas.

On the basis of available information, the preliminary design appears adequate. Details and exact locations would be worked out during the final design phase of the project.

Control Logic and Soundness of Design for Leak Detection System. Getty and Celeron/All American have proposed to use a leak detection system using the volume balance method in conjunction with a mathematical pipeline model. This is a widely used and accepted method for leak detection in pipelines. Careful consideration must be given by all three companies to the setting of pipeline condition monitoring frequency and the short and long-term volume balance calculation periods. The short-term period is used to detect large leaks and the long-term period is used to detect small leaks. The response to the leak detection system is addressed in Section 4.2.15.

The supervisory control systems proposed, of which the leak detection system is a part, would have totally redundant computers and

4-106

Exhibits Pg. 843

TABLE 4-25

CURRENT AND FUTURE PROBABILITIES OF TANK FARM SPILLS

| Spill Volume (bbls) | Spills/Barrel Year of Storage | 1,500,000 bbl (3 tanks)/Barrel Year of Storage | Spills Over Life of Project (30 years) |
|---|---|---|---|
| $\geq 10$ | $2.52 \times 10^{-7}$ | $3.8 \times 10^{-1}$ | 11.4 |
| $\geq 100$ | $5.7 \times 10^{-8}$ | $8.6 \times 10^{-2}$ | 2.58 |
| $\geq 1,000$ | $4.9 \times 10^{-9}$ | $7.5 \times 10^{-3}$ | 0.225 |
| $\geq 10,000$ | 0 | 0 | 0 |

Source: OIW (1978)

The pipe would be 0.344 to 0.562-inch wall thickness for Celeron/ All American and 0.5-inch wall thickness for Getty. The pipe would be buried a minimum of 3 ft deep and its location would be marked by signs to DOT standards. All stream crossings would be analyzed for 100-year scour depth and the pipeline would be buried 4 ft below that depth. In bedrock the pipe would be buried to a depth of 18 inches. A concrete coating would also be applied at underwater crossings and a double casing used at road crossings.

Before burial, the welds would be subjected to nondestructive tests including radiography (x-ray), magnetic particle inspection, and dye penetrant or ultrasonic tests. A minimum of 10 percent of the welds made by each welder each day would be radiographically inspected. Hydrostatic testing of the pipeline would be completed at a pressure 1.25 times (or greater) than the maximum operating pressures.

The corrosion protection system includes special pipe coating on the exterior and a cathodic protection system. The pipeline coating would be tested before burial. The cathodic protection system would be inspected and maintained at 6-month intervals.

Block valve and check valve systems would be installed at sensitive water crossings to minimize oil losses into streams should the pipeline fail or be damaged (see individual resource sections for discussions of oil spill impacts).

4.2.15.5   Oil Spill Contingency and Cleanup Plans.   Despite the engineering design, specifications, and safeguards built into a pipeline system, the potential for oil spills still exist and additional containment and cleanup measures must be addressed. The conceptual oil spill contingency plans reviewed for Getty and Celeron/All American incorporate procedures for responding to an oil spill. These procedures begin with personnel training, an established communications network, standard reporting system, and defined responsibilities and lines of authority.

Appendix H of this EIS/EIR contains a preliminary draft of the applicants' oil spill contingency plan. The preliminary draft oil spill contingency plan incorporates much of the general information found in

4-117

# EXHIBIT J

# FINAL
# ENVIRONMENTAL IMPACT REPORT
# ENVIRONMENTAL IMPACT STATEMENT



## PROPOSED CELERON / ALL AMERICAN AND GETTY PIPELINE PROJECTS

### CALIFORNIA STATE LANDS COMMISSION
AND
### BUREAU OF LAND MANAGEMENT
### DEPARTMENT OF THE INTERIOR

State Clearing House No. 83110902
Contract No. R-8353



**ERT**

A COMSAT COMPANY
ENVIRONMENTAL RESEARCH & TECHNOLOGY, INC.
ANCHORAGE · CHICAGO · CONCORD, MA · FORT COLLINS, CO
HOUSTON · LOS ANGELES · PITTSBURGH · WASHINGTON, DC

# JANUARY 1985

Exhibits Pg. 846

-5-

**18-51 cont.** now by the McCamey to Freeport route. The reviewer will not get concerns answered otherwise. This seems to us to be a major oversight. In addition you should list specific mitigation measures to show how each Federal and state sensitive species will be protected.

**18-52** 52.) On page 4-143 you need the information on cultural resources now. Later is not good enough.

**18-53** 53.) On page 4-153 where will low permeability backfill be used. Please name sites.

**18-54** 54.) On page 4-154 as mentioned before measure 11 should be done for all sections of the pipeline.

**18-55** 55.) On page 4-156, measure 17 needs to be utilized for all major stream crossings. Spill equipment must be in place at sensitive sites and pump stations.

**18-56** 56.) On page 4-162 it is absurd to say no additional oil spill mitigation is needed. Surely a more specific oil spill contingency plan is needed.

**18-57** 57.) On page 4-174, Table 4-33 since it is not clear how you will prevent groundwater contamination we feel it is premature to say short or long-term impacts are not anticipated..

**18-58** 58.) On page B-33 you list state species of concern but you still say nothing about how damage to each will be mitigated.

**18-59** 59.) On page G-1 you say nothing hear of the higher SO2, VOC, metals, and O3 levels that are expected in Houston as a result of this pipeline and loading and unloading barges and tankers. This is especially important because the entire area is nonattainment for O3 and because ship loading and unloading emissions of VOC's are not now controlled by Either TACB or EPA. In addition you need to explain how

**18-60** a heavy crude oil spill, like the one that happened about a month ago - the Alvenus, will react differently than lighter crude oil spills, how easy it will be to clean-up, its effects, etc.

**18-61** 60.) On page G-11 you again say most of the oil will be loaded on ships and barges to be taken to refineries from Corpus to Mississippi but you do not discuss air pollution and oil spill problems.

**18-62** 61.) On page H-34, Table 10-2 you fail to take into account the McCamey to Freeport route and its sensitive areas.

In summary we find that this document does not give sufficient information on different types of alternative, does not explore all alternatives equally, piecemeals the project, does not look adequately at oil spill prevention and control measures, does not give adequate coverage to state and Federal species of concern and minimizing the impacts of the project on them, and does not treat the problems of air pollution at the end of the pipeline, and does not look closely at impacts on groundwater and sensitive area and how to mitigate them. Finally the statement does not address the unequal and unfair Public participation program provided Texas as compared to all other states effected. We request that this document be redrafted and brought out again for Public comment.

Sincerely, Brandt Mannchen, Wildlife Chairperson, Lone Star Chapter, Sierra Club, 1822 Richmond #2, Houston, Texas 77098, H713-522-1489, W713-645-5316

**18-27** Should Celeron of Texas proceed with construction of a McCamey to Freeport pipeline, they would need to complete geological studies to determine the vulnerability of the pipeline to surface faults and provide an appropriate design that would meet all Federal, state and local requirements. See Mitigation Measures 1, 2, and 3.

**18-28** Slope instability is not a common failure for large diameter pipelines and documentation in the literature is limited. Thus, there are no statistics per se to estimate the frequency of this failure. The risk of such a break would be similar to other portions of the pipeline which is 0.0003 spill/mile/year for a new pipeline.

**18-29** Based on your comment, text changes to page 3-123 in the DEIR/EIS are included in the Modifications and Corrections Section.

**18-30** Although the risk of spills or leaks occurring is low (Section 4.2.15 of DEIR/EIS), the potential impacts from such a spill are significant. Potential aquifer contamination from oil spills or pipeline leaks would be a non-mitigable impact. Mitigation Measures 5, 6, 7, and 7a would reduce the potential impacts in identified sensitive groundwater basins by reducing the likelihood of pipeline breaks, providing for early leak detection and prompt spill response. These measures cannot, however, completely eliminate the potential for aquifer contamination.

Additional pipeline design criteria, construction procedures, and operational leak detection systems are described in Chapter 2 of the DEIR/EIS for the proposed pipelines. These are procedures used throughout the industry and are in accordance with D.O.T. regulations. They are included in the Applicants' proposals and are not listed as mitigation measures. These measures would be very effective in reducing the risk of groundwater contamination along the entire pipeline alignment. Among the procedures described in Chapter 2 are pipeline coating, hydrostatic testing, burial 4 feet below the 100-year, 24-hour storm stream scour depth, cathodic corrosion protection, welding and x-ray inspection of joints, leak detection by volumetric balance, pressure loss and flow measurements, and aerial reconnaissance during pipeline operation. All below-ground connections would be welded; there would be no flanged joints below ground.

**18-31** Appropriate environmental documentation and agency approvals would be required and would consider sensitive fish, animal, and plant populations if the McCamey to Freeport Alternative is proposed by Celeron of Texas.

**18-32** Golden-cheeked warblers are known to nest in the region where the pipeline could cross. Site-specific impacts and mitigation measures for this and other state-listed sensitive species would be evaluated as required.

**18-33** See Mitigation Measure 30.

Case 2:26-cv-05242-SVW-SSC Document 15 Filed 05/14/26 Page 361 of 439 Page ID #:7616

Case 2:26-cv-05242-SVW-SSC   Document 15   Filed 05/14/26   Page 362 of 439   Page ID #:7617

**United States Department of the Interior**

GEOLOGICAL SURVEY
RESTON, VA. 22092

In Reply Refer To:
WGS-Mail Stop 423

OCT  3 1984

Ms. Mary Griggs
State Lands Commission
1807 13th Street
Sacramento, California  95814

Dear Ms. Griggs:

We have reviewed the environmental impact report/statement for the Celeron/All American and Getty Pipeline projects and have the following comments:

**31-1** The document indicates that in sensitive ground-water areas the bottom and sides of trenches will be covered with low-permeability backfill materials before the pipeline is laid (p. 4-153). We suggest that in especially sensitive situations the low-permeability materials should surround the pipeline to hinder lateral movement of contaminants from leaks or breaks in the pipe. For example, such a measure would be useful near the margins of valleys or prior to descending steep slopes into valleys where permeable materials such as alluvium can be anticipated. Other examples could be found in approaching features of high permeability in karstic terrains or when approaching a slope above a municipal water supply.

**31-2** If any of the cathodic protection devices to be used (p. 2-35, 4-117) will be of the deep well type discussed by Ritchie (Ritchie, E.A., 1976, Cathodic protection wells and ground-water pollution: Ground Water, vol. 14, no. 3, p. 146-149), the statement should indicate how the aquifer(s) involved will be protected against pollutants traveling down the well annulus.

**31-3** Heavy rainfall during or following an oilspill can increase greatly the infiltration rate and distance traveled by components of crude oil, particularly water-soluble components (Duffy, J.J., Mohtadi, M.F., and Peake, E., 1977, Subsurface persistence of crude oil spilled on land and its transport in groundwater: in Proceedings 1977 Oilspill Conference of American Petroleum Institute, Environmental Protection Agency, and U.S. Coast Guard, New Orleans, March 8-10, 1977, p. 475-478). This should be considered in evaluating the potential for impacts on ground water. Effects of petroleum

**31-1** See response to Comment 8-1.

**31-2** The cathodic protection system would be designed to minimize impacts on groundwater. The design would include a) locating the anode bed away from shallow groundwater aquifers; b) case the bore, grout between the case and the bore, and seal the annulus where an anode proceeds into a shallow groundwater aquifer; or c) install a shallowbed anode system.

**31-3** These conditions have been considered in the evaluation of potential oil spills and associated impacts to groundwater as described in the DEIR/EIS. The adverse effects of taste and odor have also been addressed (page 4-35) and the broad significance criteron (page 4-34) defines any contamination of groundwater by crude oil to be a significant impact, even though toxic concentration levels might not be exceeded.

2-94

APPENDIX 4.3
SYSTEM SAFETY

The following table provides a summary of the major oil spill and system safety issues and concerns related to the Getty and Celeron/All American Pipeline Projects. Column 1 of the table describes a series of events that are viewed as having some type of impact on the environment if the event were to occur. Also included below each event listed are the possible causes of such an event.

Column 2 presents the probability that the event would occur, based on historical accident rate data throughout the industry.

Column 3 describes the environmental consequences that may result if the event took place. A "worst-case" approach was taken when describing these environmental consequences.

Column 4 provides a summary of various design specifications that the Applicants have incorporated into their projects that would reduce the probability of an event occurring and/or would reduce the environmental consequences if an event had in fact occurred. More detailed information is cross referenced to Appendices H and I and Chapter 2 of the DEIR/EIS.

Sub-columns 5 and 6, Mitigation Measures, summarize mitigation measures and stipulations presented in the Final EIR that would further reduce the probability or consequences resulting from an event. Cross references are provided for locating detailed descriptions of the mitigation measures within the FEIR document.

Finally, the last column in the table evaluates the effectiveness of design specifications and mitigation measures.

Exhibits Pg. 849

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| Oil spill onto irrigated agricultural lands (see Tables 3-22, 3-25, and 4-5) caused by: seam failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio[1] 21 miles irrigated 6.3 x 10⁻³ spills/yr (> 50 bbl) 0.19 spills during life of project (30 yrs) | Contamination of soils, reduced productivity, maximum of 16 acres affected per spill. | Minimum cover 42 inches, cathodic protection, block and check values, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. Continuous manned monitoring and control of all data. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | | Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective. |
| | Las Flores to Blythe[1] 50 miles irrigated 1.5 x 10⁻² spills/yr (> 50 bbl) 0.45 spills during life of project (30 yrs) | | | Pipeline location markers above ground. Buried cable or fluorescent plastic below ground just above pipeline. | | Increase awareness of pipeline location thereby reducing potential of mechanical damage occurring. |
| | Blythe to McCamey[1] 52.8 miles irrigated 1.6 x 10⁻² spills/yr (> 50 bbl) 0.48 spills during life of project (30 yrs) | | | Periodic information contact with land owner. | | Same as above. |
| | | | | Provide extra pipeline depth in areas where deep plowing or ripping could result in damage to pipeline. Depth should be at least 1 ft below maximum plow depth. | | Will reduce risk of mechanical damage. |
| | | | | | Replace contaminated soil. | Decrease loss of productivity. |
| | | | | | Monetary compensation for lost product. | Eliminate financial loss to landowner/tenant. |
| Oil spill into a stream[2] (see Tables 3-11 and 3-12) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 11 miles 3.3 x 10⁻³ spills/yr (> 50 bbl) 0.09 spill during life of project (30 yrs) | Contamination of surface water lasting up to several weeks. Loss of aquatic life up to 2 years. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan (see Appendix H). Continuous manned monitoring and control of all operational data. | Monitor pipe burial depth at stream crossings (M-5). Periodic site inspections. Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | | Early indication of abnormal bottom scouring. Earthquake-resistant design is sufficiently advanced so that these measures should prove very effective. |
| | Las Flores to Blythe 25 miles 7.5 x 10⁻³ spills/yr (> 50 bbl) 0.23 spill during life of project (30 yrs) | | | | | |

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| | Blythe to McCamey 17 miles 5.1 x 10^3 spills/yr (>50 bbl) 0.15 spill for life of project (30 yrs) | | | | | |
| Oil spill into a sensitive groundwater basin (see Table 3-14) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 30 miles 9.0 x 10^-3 spill/yr (> 50 bbl) 0.27 spill during life of project (30 yrs) Las Flores to Blythe 42 miles 1.3 x 10^-2 spill/year (> 50 bbl) 0.39 spill during life of project (30 yrs) Blythe to McCamey 395 miles 1.2 x 10^1 spill/yr (> 50 bbl) 3.60 spills during life of project (30 yrs) | Contamination of groundwater by a small leak (less than 3 BPH). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geologic hazards (M-1, 2, and 3). | Identify areas to monitor in case of spill (M-6); use low permeability backfill in sensitive areas (M-7). | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. |
| Oil spill into a sensitive stream[2] (see Table 4-6) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error | Gaviota to Emidio 1 mile 3.0 x 10^-4 spills/yr (> 50 bbl) 0.01 spill during life of project (30 yrs) Las Flores to Blythe 3 miles 9.0 x 10^-4 spills/yr (> 50 bbl) 0.03 spill during life of project (30 yrs) Blythe to McCamey 4 miles 1.2 x 10^-3 spills/yr (> 50 bbl) 0.04 spill during life of project (30 yrs) | Game and T&E fishes could be affected for several months to 2 years (see Appendix B). | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic tesing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accomodate geologic hazards (M-1, 2, and 3). Monitor pipeline burial depths at crossings including periodic diving inspections of deep water crossings (M-S). | | It is possible to design the pipeline to survive most geohazards through the latest seismic design and engineering practices. Early indication of abnormal bottom scouring. |

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures Reduce Probability | Mitigation Measures Reduce Consequences | Effectiveness |
|---|---|---|---|---|---|---|
| Oil spill into sensitive terrestrial habitats (see Table 4-8) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Gaviota to Emidio 50 miles sensitive habitat $1.5 \times 10^{-2}$ spills/yr 0.45 spill during life of project (30 yrs) Las Flores to Blythe 314 miles sensitive habitat $9.5 \times 10^{-2}$ spills/yr (> 50 bbl) 2.85 spills during life of project (30 yrs) Blythe to McCamey 15 miles sensitive habitat $4.5 \times 10^{-3}$ spills/yr (> 50 bbl) 0.14 spill during life of project (30 yrs) | Destruction of T&E species and/or their habitats (see Appendix B). | Cathodic protection, block and check valves, 3 ft minimum cover, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | Relocate pipeline out of sensitive habitats in the Cuyama Valley (M-15). | Eliminates potential exposure for sensitive wildlife and terrestrial habitats. |
| Oil spill into the Colorado River or Hot Springs Creek[2] caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American $6.0 \times 10^{-4}$ spills/yr (> 50 bbl) 0.02 spill during life of project (30 yrs) | Destruction of riparian habitat and possible effects on T&E species (see Appendix B); disruption of water recreational activities. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5). | Oil spill booms to redirect oil to skimmers and to block entry into backwaters of the Colorado River (M-17). | For the Colorado River this will protect nearby backwaters from contamination and aid in the clean-up downstream. For Hot Springs Creek the impacts will be minimized. The methods will not be 100% effective. |
| Oil spill into a coastal stream[3] (see Table 3-11) caused by: seam failure weld failure corrosion excavation equipment natural causes flow control error. | Celeron/All American $2.4 \times 10^{-3}$ spills/yr (>50 bbl) 0.07 spill during life of project (30 yrs) Getty $3.0 \times 10^{-4}$ spills/yr (> 50 bbl) 0.01 spill during life of project (30 yrs) | Oil spills could reach recreational beaches along the Gaviota coast. | Concrete casing, cathodic protection, block and check valves, 4 ft below 100-year scour, x-ray and hydrostatic testing, leak detection system, aerial surveys, spill contingency plan. | Monitor pipe burial depths at crossings (M-5). Design and construct pipeline to accommodate geological hazards (M-1, 2, and 3). | | If all designs and plans are implemented properly, oil will not reach the coastal waters and impacts to the streams will be minimized. |

4-55

Exhibits Pg. 852

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Oil spill at the Cadiz tank farm (Celeron/All American) caused by: faulty valves overfilling tanks natural causes. | **Spills per Year**<br>$\geq$ 10 bbl  $3.8 \times 10^{-1}$<br>$\geq$ 100 bbl  $8.6 \times 10^{-2}$<br>$\geq$ 1,000 bbl  $7.5 \times 10^{-3}$<br><br>**Spills During Life of Project**<br>$\geq$  10 bbl  11.4<br>$\geq$  100 bbl  2.6<br>$\geq$ 1,000 bbl  0.2 | Oil would be contained by the dike system surrounding each storage tank. | Leak detection system, automatic overflow alarm system, containment dikes for 125 percent of tank capacity, spill contingency plan. | Redundant sensor and control system to prevent tank overfilling (p J-2). | | No spilled oil would be released beyond the diked containment area, reducing environmental consequences. Sensors would reduce the probability of overflowing tanks. |
| Fire/explosion at a pump station with natural gas supply caused by: leak with an ignition source. | $3.8 \times 10^{-3}$ fire/explosion per year[4]<br>0.11 fire/explosion during life of project | Possible damage to structures and injury to people. Possible source of wildfire. | Block and bypass valves on both sides of station, fuel gas shutdown system, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automatic station shutdown system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around pump station. | At stations with gas-fired turbines and, Waste Heat Recovery Units (WHRU), there will be extended purging of both units with interlocks to prevent starting before purging is complete. At stations without turbines, gas-fired heaters will also have extended purging before starting. | | Will effectively reduce the probability of explosion/fire. None of the proposed stations are close enough to dwellings or common areas for non-pipeline employees to be damaged. |

## SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|-------|-------------|--------------|-----------------------------------------------------------|---------------------|---|---------------|
| | | | | Reduce Probability | Reduce Consequences | |
| Fire/explosion at a pump station without gas supply caused by: leak with an ignition source. | $3.8 \times 10^{-3}$ fire/explosion per year[4] 0.11 fire/explosion during life of project | Possible damage to structures and injury to people. Possible wild-fire source | Block and bypass valves on both sides of station, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automatic station shut-down system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around pump station. | Explosions are caused by leaks coupled with an ignition source. Pumps are equipped with seal leak detectors that will stop unit if leak detected. Other leaks will be reduced by checking valve stem packing during regular visits to the site. | | Will effectively reduce the probability of explosion/fire. No human receptors or dwellings near proposed pump stations (except employees). |

4-57

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Reduce Probability | Reduce Consequences | |
| Fire/explosion at the Cadiz tank farm caused by: personnel error equipment failure natural disaster fire outside facility externally caused fire (i.e., airplane crashes, sabotage, etc.). | See Note 5 | Possible damage to structures and injury to people. Possible source of wild fire. | Block and bypass valves on both sides of station, fuel gas shutdown system, onsite fire fighting equipment, 2-way radios in vehicles, station monitoring system including smoke detectors and fire sensors, remote data integration and station control system, automatic station shutdown system, local-reset lockout system, emergency helicopter access to stations, fire protection plan, fire fighting training and fire drills, cleared and fenced land around tank farm, automatic overflow alarm system, open-top floating roof tanks, integrated tank farm control center. | Redundant sensor and control system to prevent tank overfilling (p J-2). Tank roof sensor to detect jammed roof. | Automated foam extinguisher system for tank seal fires (p J-2). | Would reduce the probability of fire/explosion and reduce consequences if either should occur. If an event does occur, the proper authorities on control and containment would be notified. The system would not control a fire if a tank started by an airplane crash or sabotage. The system would prevent additional oil from flowing into the affected area. Provides immediate knowledge of potential vapor build-up that could lead to an explosion |

Case 2:26-cv-05242-SVW-SSC   Document 15   Filed 05/14/26   Page 369 of 439   Page ID #:7624

Case 2:26-cv-05242-SVW-SSC   Document 15   Filed 05/14/26   Page 370 of 439   Page ID #:7625

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
|---|---|---|---|---|---|---|
| | | | | Reduce Probability | Reduce Consequences | |
| Loss of power at a pump station with natural gas supply. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS (Uninterruptable Power Supply) System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. The other pump stations will maintain flow until the down station is repaired. |
| Loss of power at a pump station without natural gas supply. Transmission line down or power plant down. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. The other pump stations will maintain flow until the down pumps are repaired. |
| Loss of power at the Cadiz tank farm. Transmission line down or power plant down. | Cannot be predicted, no statistical data base. | No direct environmental consequences. | UPS System at pump stations for monitoring equipment (RTUs). | | | Will prevent system shutdown due to loss of power. Oil will bypass tank farm. |
| Loss of communications to/from a pump station with natural gas supply. Telephone lines or microwave system failure because of human error, sabatage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |
| Loss of communications to/from a pump station without natural gas supply. Telephone lines or microwave system failure because of human error, sabotage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |

Case 2:26-cv-05242-SVW-SSC   Document 15   Filed 05/14/26   Page 371 of 439   Page ID #:7626

SUMMARY TABLE FOR SYSTEM SAFETY

| Event | Probability | Consequences | Design Specifications (Chapter 2 and Appendices H and I) | Mitigation Measures | | Effectiveness |
| | | | | Reduce Probability | Reduce Consequences | |
|---|---|---|---|---|---|---|
| Loss of communication to/from Cadiz tank farm. Telephone lines or microwave system failure because of human error, sabotage, storm, system breakdown. | Cannot be predicted, no statistical data base. | Station would continue to run as long as preset limits are not exceeded. Maintenance personnel would be dispatched to correct problem. | Station controls designed for unattended fail-safe operation. | | | Will prevent system shutdown due to loss of communications. |

Note 1:   Gaviota to Emidio = Getty pipeline; Las Flores to Blythe = Celeron/All American pipeline in California; Blythe to McCamey = Celeron/All American pipeline in Arizona, New Mexico, and Texas.

Note 2:   Assumes spill would occur within one-half mile of a stream.

Note 3:   Assumes a spill occurring anywhere within the 10-mile coastal segment would reach a coastal stream.

Note 4:   Source:  OIW, September 1979.

Note 5:

Fire/Explosion Damage Magnitude

| | | |
|---|---|---|
| > $ 1,000 | $1.6 \times 10^{-2}$ per year | (0.48 fires in 30 years) |
| $ 1,000 - $ 10,000 | $6.9 \times 10^{-3}$ per year | (0.21 fires in 30 years) |
| $ 10,000 - $ 100,000 | $3.4 \times 10^{-3}$ per year | (0.10 fires in 30 years) |
| $ 100,000 - $ 500,000 | $4.4 \times 10^{-3}$ per year | (0.13 fires in 30 years) |
| Over - $ 500,000 | $9.4 \times 10^{-4}$ per year | (0.03 fires in 30 years) |

Source:  OIW, September 1979

Note 6:   Oil fire emissions (lb/bbl)

| | |
|---|---|
| $SO_2$ (assumes 5% sulfur) | 30.6 |
| CO | 16.5 |
| Hydrocarbons | 16.5 |
| Particulates | 3.3 |
| $NO_x$ | 1.1 |

4-60

# EXHIBIT K

How may we help you?…

Select Language ∨

Google **Translate**

# 901/903 Replacement Pipeline Project

## Overview Details

- **Project Title**: 901/903 Replacement Pipeline Project
- **Case Number(s)**: 17DVP-00000-00010; 17CUP-00000-00027; 17DRP-00000-00002; 17CDP-00000-00060
- **Project Location**: Santa Barbara County, San Luis Obispo County, Kern County
- **Assigned Staff and Division**: Jacquelynn Ybarra, Energy, Minerals and Compliance Division

## Status

On October 24, 2023, Pacific Pipeline Company formally withdrew their application for the proposed 901/903 Replacement Pipeline Project. No further work on this project will proceed. You may view the Withdrawal Letter for more information <u>here</u>.

## Project Description

The project includes the replacement of the existing 24- and 30-inch-diameter Lines 901 and 903 insulated pipeline system with a 12-, 14- and 16-inch-diameter uninsulated steel pipeline, referred to as Lines 901R and 903R. Line 901R would include two sections:  (1) a 12-inch-diameter, approximately 10.6-mile-long pipeline extending from the Las Flores Canyon Pump Station to the Gaviota Pump Station in Santa Barbara County; and (2) a 16-inch-diameter, approximately 38.4-mile-long pipeline extending from the Gaviota Pump Station to the Sisquoc Pump Station in Santa Barbara County. Line 903R would consist of a 14-inch-diameter, approximately 74-mile-long pipeline extending from the Sisquoc Pump Station in Santa Barbara County to the Pentland Delivery Point in Kern County.

The project would modify two existing pump stations in Santa Barbara County (Las Flores, Gaviota) and one pump station in Kern County (Pentland), upgrade and expand the Sisquoc Pump Station in Santa Barbara County, and add two new pump stations (West Cuyama and Russell Ranch) in San Luis Obispo County. Pipeline-related ancillary equipment would be updated or installed including: pipeline location markers,

cathodic protection, fiber-optic lines, a Supervisory Control and Data Acquisition (SCADA) system, remote communication equipment, emergency battery systems, diesel-powered backup generators, and/or solar panels. Pipeline control valves would be operated along the length of the pipeline system and within the pump station facilities. The project also includes construction and operation of a new 3.8-mile-long natural gas pipeline between an existing Southern California Gas Company (SoCalGas) pipeline near the community of Garey and the Sisquoc Pump Station.

The pipeline route generally follows the existing alignment of Line 901 and Line 903 with a notable exception around the City of Buellton. Existing Lines 901 and 903 would be removed to the extent practicable during the installation of Lines 901R and 903R.

## Timeline

- **October 24, 2023** – Pacific Pipeline Company formerly withdrew their application regarding the proposed 901/903 replacement project.
- **November 1, 2022** – Pacific Pipeline Company submitted project application forms to change the Applicant from Plains Pipeline L.P. to Pacific Pipeline Company.
- **April 26, 2022** – A Revised Notice of Preparation was published to reflect: 1) a change from preparing an EIR to preparing a joint EIR/EIS; 2) a change in the baseline conditions used for the draft EIR/EIS from the baseline conditions described in the original EIR NOP; and 3) inclusion of minor revisions to the Project Description.
- **February 2022** – Existing efforts on the Draft EIR and Draft EIS were combined to prepare a joint EIR/EIS.
- **May 18, 2021** - The Board of Supervisors approved a Contract Amendment for work not included in the original Agreement for Services to complete the EIR and EIS.
- **April 3, 2020** - Plains submitted updated project documents due to several changes to the proposed project.
- **February 14, 2019** – The Notice of Preparation was published. Public scoping meetings were held on February 27, 2019 in Santa Barbara County, and February 28, 2019 in San Luis Obispo County.
- **April 20, 2018** - The application for a Development Plan, Conditional Use Permit, Demolition and Reclamation Plan, and Coastal Development Permit were determined to be complete.
- **August 15, 2017** - Plains submitted an application for the replacement of their existing, and currently shut down, Line 901 and 903 pipeline system.

## Documents
**CEQA Materials**

- Revised Notice of Preparation – April 26, 2020

- Scoping Reports

- Notice of Preparation - February 14, 2019

**Permit Application Materials**

Application Withdrawal Letter, October 24, 2023

Application Documents

## Additional Information

If you have any comments or questions, please contact the project planner, Jacquelynn Ybarra

Click Here To Apply!

ReadySBC          Board of          Agendas          Employment          COVID-19          Public Record
                  Supervisors                                            Information          Requests

Government Websites by CivicPlus®

# EXHIBIT L

ne /

ECTION

ndards & Rulemaking Overview

isory Committees

olished Rulemakings

emakings (pre-1995)

nits and State Waivers

ns

Advisory Bulletins

Us

andards and Rulemaking
ment of Transportation, Pipeline and Hazardous Materials Safety Administration
ersey Avenue, SE
n, DC 20590
es

-366-4595☎
66-4566🖷
**Hours:**
0pm ET, M-F

eaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

# Special Permits and State Waivers Overview

## ermits

nit (previously called a waiver) is an order that waives or modifies compliance with a regulatory requirement if the p
emonstrates the need and PHMSA determines that granting a special permit would be consistent with pipeline saf
uthorized by statute in 49 USC § 60118(c) and the application process is set forth in 49 CFR 190.341. PHMSA performs
ysis on special permit applications and typically conditions a grant of a special permit on the performance of altern
de an equal or greater level of safety. PHMSA is committed to public involvement and transparency in special perm

with state waivers or the application process, send an email to PHMSAOPSStateWaivers@dot.gov

al State Waivers (1970-Present)

aivers Denial

aivers Withdrawn, Expired or Terminated

# Register Notices Related to Special Permit Applications

**Federal Register Notices Related to Special Permits Applications**

| gister (FR) Notices | Description | Publish Da |
|---|---|---|
| 5-0011 | Class Location & MAOP | Apr 21, 202 |
| 4-0055 | Class Location | Oct 15, 202 |
| 4-0011 | Valve Spacing | Oct 30, 202 |
| 3-0136 | Class Location | Apr 24, 202 |
| 3-0126 | Class Location | Sept 4, 202 |
| 3-0071 | Odorization | Mar 1, 202 |

Wednesday, May 7, 2025

IENT OF TRANSPORTATION

**Hazardous Materials Safety Administration**

SEY AVENUE, SE

, DC 20590

stration Help Desk: 202-366-4109

aterials Information Center: 1-800-467-4922

ine Safety Hotline: 202-366-4595 or phmsa.pipelinesafety@dot.gov

y Concerns or Feedback on our Performance and Conduct: 202-366-4595 or phmsa.pipelinesafety@dot.gov

Fraud, Abuse or Mismanagement https://www.oig.dot.gov/hotline

erns or Feedback: phmsawebsitemanager@dot.gov

# EXHIBIT M

# Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County

June 4, 2025
(Updates in red)

Sable Offshore Corporation is attempting to restart the Santa Ynez Unit oil and gas operation in Santa Barbara County. The Santa Ynez Unit includes three offshore platforms in federal waters connected to shore by offshore pipelines, onshore pipelines, the Ellwood Pier, mooring buoys, and the Las Flores Canyon Processing Facility.  The onshore pipelines include pipelines identified as CA-324 and CA-325 that were responsible for the 2015 Refugio Oil Spill.

This summary outlines the many state agencies that oversee the Santa Ynez Unit operations, including oil pipeline construction, maintenance and operations, which would need to approve various actions to allow these pipelines to restart. This summary has been assembled to build public understanding of the regulatory processes over these pipelines.

## Overview

California's lands and offshore waters have hosted significant crude oil extraction for well over a century. Since the mid-1980's, however, crude oil extraction has declined each year largely due to decreasing levels of easily accessible crude oil.

Today, the state has three active crude oil/petroleum extraction platforms off its coast in state waters and eight active platforms in federal waters. These platforms are connected to the shore via undersea pipelines that transport crude oil from the offshore platforms to onshore facilities that process the oil for sale. This oil is eventually transported to refineries to be converted into products such as gasoline and diesel fuel.

California state government enforces a broad set of laws and regulations over many aspects of crude oil infrastructure. This includes oversight of the extraction, transport, and refining of crude oil. These laws and regulations exist to protect public health and safety and to safeguard California's natural resources and environment.

## Oversight By Agency

Multiple state agencies regulate the pipelines owned and operated (pipelines CA-324 and CA-325) by Sable Offshore Corporation in Santa Barbara County that the company is attempting to restart. Each of these state entities has specific authorities and obligations over these pipelines that is detailed in state law and discharges these responsibilities through regulatory and oversight processes.

The state entities with oversight over these pipelines include (in alphabetical order):

1. California Coastal Commission
2. California Department of Conservation, California Geologic Energy Management Division (CalGEM)

3. California Department of Fish and Wildlife (CDFW), including the Office of Oil Spill Prevention and Response (OSPR)
4. California Department of Forestry and Fire Protection (CAL FIRE), Office of the State Fire Marshal (OSFM)
5. California Department of Parks and Recreation (State Parks)
6. Central Coast Regional Water Quality Control Board
7. Central Valley Regional Water Quality Control Board
8. State Lands Commission

These state entities, with the exception of the two regional Water Quality Control Boards, exist within the California Natural Resources Agency. The regional Water Boards fall under the umbrella of the California Environmental Protection Agency.

Below is a short summary of the referenced state entities with regulatory oversight over these pipelines.

**CALIFORNIA COASTAL COMMISSION**
*Issues permits for approved development activity in coastal areas.*

- FOCUS: Environmental protection and public access to state coastal areas.
- ROLE & AUTHORITY: Under the California Coastal Act of 1976, the California Coastal Commission has permitting responsibility for non-exempt pipeline work and other development associated with the pipeline in the Coastal Zone, including any enforcement actions for permitting requirements. The Commission also has federal consistency review authority under the Coastal Zone Management Act of certain pipeline-related activities in federal waters.
- ACTIONS UNDERWAY: Commission staff is coordinating with Santa Barbara County, which shares the permitting jurisdiction, on permitting processes related to Sable's work along the pipeline.  Commission staff continues to direct Sable to apply for a Coastal Development Permit to resolve Coastal Act violations that occurred both onshore and offshore.
  - *On September 27, 2024*, Commission staff issued a Notice of Violation letter to Sable due to then recent and ongoing development activities that were occurring on and around the pipeline within the Coastal Zone without any Coastal Act authorization, requesting that Sable cease and desist.
  - *On October 4, 2024,* Commission staff issued a Notice of Intent to issue an Executive Director Cease and Desist Order and requested confirmation that all work on the pipeline had ceased and that Sable would apply for a Coastal Development Permit for the work that had already occurred.
  - *On November 12, 2024,* the Commission's Executive Director issued a Cease and Desist Order to Sable, directing Sable, among other things, to submit an application for a Coastal Development Permit *"for any proposed future work to be undertaken along the Pipelines, as well as for after-the-fact ('ATF') authorization for unpermitted development that has already occurred."*
    - Sable temporarily ceased its onshore activities.  The Cease and Desist Order expired on February 10, 2025.  The deadline established in the Order

2

for Sable to apply for a Coastal Development Permit expired on March 12, 2025.  Sable has not filed an application.

- *On February 18, 2025*, Sable filed a complaint against the Commission in Santa Barbara Superior Court, challenging two Notices of Violation and the Executive Director Cease and Desist Order issued on November 12, 2024. Sable is seeking declaratory and injunctive relief and inverse condemnation damages.

o *On February 11, 2025*, Commission staff issued a Notice of Violation letter to Sable regarding unpermitted development activities which had taken place offshore, in state coastal waters. This letter asked Sable to cease any further unpermitted development activities and apply for after-the-fact authorization for those development activities already undertaken.

o *Around February 14, 2025*, four days after the Executive Director Cease-and-Desist order had expired, Sable recommenced its onshore activities in the coastal zone, and *on February 18, 2025*, the Commission's Executive Director issued a second Executive Director Cease and Desist order addressing the unpermitted development activities Sable had recommenced onshore. This order, among other things, directed Sable to, again, cease any further development activities at the onshore locations. This Executive Director Cease and Desist Order also included notice of the Executive Director's intent to pursue a future Cease and Desist Order and other further enforcement actions from the Coastal Commission.  Sable did not cease its activities or comply with the order.

o On *April 10, 2025*, the Commission held a five-hour noticed, public hearing, at the conclusion of which it issued Sable a Cease and Desist Order and Restoration Order and imposed an administrative penalty.  The Cease and Desist Order required, among other things, that Sable cease operations until securing Coastal Act authorization or a formal, final exemption determination for any work it wished to pursue.  It also required that Sable seek after-the-fact Coastal Act authorization for work already completed and prospective authorization for anticipated work.  The administrative penalty requires Sable to pay approximately $18 million, with a potential reduction to approximately $15 million if Sable complies with the requirement to seek Coastal Act authorization and pursues the most expeditious permitting approach.  Sable continued its work and did not apply for authorization under the Coastal Act.

o *On April 16, 2025*, the Commission filed a cross-complaint and an application for a temporary restraining order (TRO) and preliminary injunction (PI) against Sable to enforce the April 10, 2025 Cease and Desist Order.  That same day, Sable amended its complaint against the Commission to add a challenge to the Commission's April 10 actions.

o *On April 17, 2025*, the trial court reversed its tentative ruling in favor of the Commission, denied the Commission's request for a TRO, and set a hearing for May 14, 2025, on an Order to Show Cause (OSC) why a PI should not issue.

o *On April 21, 2025*, the Commission filed a notice of appeal of the denial of the TRO, and on April 22, 2025, the Commission filed a writ petition with the Court of Appeal

3

seeking immediate injunctive relief. ~~To date, the Court of Appeal has issued no ruling on that petition.~~

- o *On May 6, 2025*, the trial court issued an order moving the OSC hearing to May 2~~9~~8, 2025, and requiring the parties to submit briefs by May 14, 2025, on the question of whether the trial court retains jurisdiction to consider the issuance of a PI at an OSC hearing, given the appeal.
- o *On May 15, 2025*, the Court of Appeal denied the Commission's April 22, 2025 request for a writ but confirmed that the trial court retained jurisdiction to act on the Commission's request for a PI.
- o *On May 28, 2025*, the trial court granted the Commission's request for a PI. The Commission expects a written order from the court the week of June 9, 2025.
- o On *June 4, 2025*, the court held a case management conference and set the case (including both Sable's case against the Commission and the Commission's cross-complaint against Sable to enforce its orders) for trial in October 2025.
- FOR MORE INFORMATION: Contact the California Coastal Commission at ExecutiveStaff@coastal.ca.gov or the Commission's Public Information Officer at (415) 200-8052.

**CALIFORNIA DEPARTMENT OF CONSERVATION: GEOLOGIC ENERGY MANAGEMENT DIVISION (CalGEM)**

*Oversees and regulates oil processing and production facilities.*

- FOCUS: Public health and safety, environmental quality.
- ROLE & AUTHORITY: The Department of Conservation oversees compliance for oil production facility management. While the department has oversight of the Los Flores Canyon oil processing facility, CalGEM approval is not required prior to restarting the pipeline. CalGEM does, however, have a role in ensuring compliance with other regulatory partners in completing an oil spill plan, a pipeline management plan, various testing and maintenance requirements, bonding to cover decommissioning costs, and oversight of any potential oil production work happening near communities (called health protection zones).
- ACTIONS UNDERWAY:
  - o *On December 17, 2024*, the Department of Conservation sent a letter to Sable notifying them of the need for an additional inspection of facilities, and production and bonding requirements.
  - o On *May 9, 2025,* the Department of Conservation sent a letter to Sable notifying them that a bond in the amount of $31.9 million must be filed and outlining additional production facility requirements.
- FOR MORE INFORMATION: Contact Department of Conservation Public Affairs at PAO@conservation.ca.gov or the Office of the Director at (916) 322-1080.

4

**CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE/CDFW OFFICE OF SPILL PREVENTION AND RESPONSE**
*Manages natural resources for their ecological value and for public use.*

- FOCUS: Protecting wildlife.
- ROLE & AUTHORITY:  Exercises oversight as a landowner, as well as through its authority to protect fish and wildlife, and separately through one of its offices that oversees prevention, preparation for, and response to oil spills. CDFW-OSPR reviews and approves oil spill response plans and works to ensure that facilities have the financial resources necessary to cover the costs of oil spill scenarios. Under the Endangered Species Act and other Fish and Game Code laws, CDFW also oversees the review and approval process for evaluating impacts to wildlife due to altering the adjacent landscape.
- ACTIONS UNDERWAY:
  - *In October 2024*, CDFW-OSPR certified that Sable had the financial resources to cover the costs of a reasonable worst-case scenario oil spill.
  - *On November 22, 2024*, CDFW-OSPR sent a second notice to Sable sharing that its offshore contingency plan (C-Plan #CA-00-7239) was deficient.  On December 20, 2024, Sable submitted corrections to its plan.  CDFW-OSPR is reviewing these corrections and must respond by January 19, 2025.
    - Additional corrections were submitted by Sable on December 20, 2024 and January 17, 2025. CDFW-OSPR has reviewed the plan and found no deficiencies.
    - *On March 26, 2025*, following the completion of a formal review, CDFW OSPR issued an approval letter for the C-Plan and an updated COFR for #CA-00-7239.
  - *On December 17, 2024*, CDFW-OSPR sent a third notice to Sable sharing that its onshore contingency plan (C-Plan #CA-00-7217) was deficient.  On January 9, 2025, Sable submitted corrections to its plan.  CDFW-OSPR is reviewing these corrections and must respond by February 9, 2025.
    - OSPR has reviewed the plan and found no deficiencies.
    - On *March 26, 2025*, following the completion of a formal review, CDFW OSPR issued an approval letter for C-Plan #CA-00-7217
  - *On December 17, 2024,* CDFW also issued a notice of potential violation (NOPV) for Fish and Game Code violations.  This notice requests that Sable discontinue any work on CDFW properties and contact CDFW to discuss remedial measures and other actions to address impacts.  Specifically, the NOPV explained that Sable appeared to have: (a) violated Fish and Game Code section 1602(a)(1) by failing to notify CDFW prior to undertaking activities subject to that section, as well as sections 5650 and 5652; and (b) conducted work outside a 50-foot-wide pipeline easement on CDFW property. The NOPV requested Sable to discontinue any work on CDFW property inconsistent with the easement and to contact CDFW to discuss remedial measures and other actions to address impacts on fish and wildlife resources at the locations identified in the NOPV.

5

- Sable submitted three notifications to CDFW under Fish and Game Code section 1602(a)(1), all to complete remediation work at the locations identified in the notifications.
  - *On February 18, 2025*, CDFW received a notification (No. EPIMS-SBA-57481-R5) pertaining to Sable's previous work at Site 280.65.19 (Unnamed Drainage East of Baron Ranch). *On March 18, 2025*, CDFW notified Sable that its notification was complete and because the project would not substantially adversely affect an existing fish or wildlife resource, a streambed alteration agreement was not required.
  - *On March 13, 2025*, CDFW received a second notification (No. EPIMS-SBA-58088-R5) pertaining to the three locations in Santa Barbara County that CDFW identified in the NOPV: Sites R5-1, R5-2, and R5-3. *On April 14, 2025*, CDFW determined the notification was complete. CDFW also determined the work at the three locations identified in the notification will not substantially adversely affect an existing fish or wildlife resource, and therefore a streambed alteration agreement would not be needed for any of the work. CDFW explained this in a letter to Sable dated April 14, 2025.
  - *On March 4, 2025*, CDFW received a third notification (No. EPIMS-SLO-57972-R4) pertaining to the location that CDFW identified in the NOPV: Site R4-1.
  - *On April 3, 2025*, CDFW sent Sable a letter, explaining the notification was incomplete. *On April 25, 2025*, Sable submitted additional information to CDFW in response to CDFW's April 3, 2025, letter. ~~CDFW has 30 days to review the notification a second time to determine if the notification with additional information is complete.~~ <span style="color:red">On *May 27, 2025*, CDFW sent Sable a letter explaining the notification with the additional information was complete. The letter also explained that CDFW will have until *July 28, 2025*, to submit to Sable a draft streambed alteration agreement for the work described in the notification if CDFW determines an agreement is needed.</span>
- *On February 7, 2025*, one of Sable's contractors, SCS Engineers, requested a letter of permission from CDFW to access the Carrizo Plains Ecological Reserve. CDFW has not acted on the request.
- FOR MORE INFORMATION: Contact Department of Fish and Wildlife Public Information Officer at Steve.Gonzalez@wildlife.ca.gov or (916) 804-1714.

**CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION (CAL FIRE): OFFICE OF THE STATE FIRE MARSHAL**
*Oversees and regulates the safety and operation of intrastate pipelines moving hazardous liquid in California.*

- FOCUS: Protecting public safety and spill prevention.

6

Exhibits Pg. 871

- ROLE & AUTHORITY: With other regulatory partners, inspects, regulates, and oversees the overall safety of hazardous liquid pipelines. Prior to restarting any pipeline, the State Fire Marshal must approve a thorough list of requirements and regulations, including Sable's proposed plans for using technology to minimize oil spill impacts, a detailed risk analysis, safety compliance reports, pipeline integrity evaluations, field verifications and maintenance plans, start-up and safety inspection plans, and waiver applications proving equal or greater levels of safety than required regulations.
- ACTIONS UNDERWAY:
  - CAL FIRE Office of the State Fire Marshal (OSFM) approved a risk analysis and implementation plan for Sable's use of best available technologies in 2021.
  - *On December 17, 2024*, OSFM submitted waivers for federal review.
    - *On February 11, 2025,* PHMSA provided its notification of non-objection.
  - Sable has completed most of the required pipeline repairs, and OSFM has inspected the field work and is verifying records of those repairs.
  - All remaining oversight items listed above, including pressure testing of lines and Sable's submission of an updated start-up plan, which OSFM must review and approve, remain open and must be completed prior to restarting the pipeline.
  - *On June 2, 2025*, Center for Biological Diversity and Environmental Defense Center separately moved ex parte for temporary restraining orders in Santa Barbara County Superior Court to prevent OSFM from issuing authorizations or proceeding with restart of the Las Flores Pipeline System.  The Superior Court granted each petitioner's request for a temporary restraining order and the judge clarified from the bench that the orders would stop not just approval of the restart plan, but all activity by CAL FIRE relating to Lines 324 and 325. The court set a hearing on the requests for preliminary injunction for July 18, 2025.

FOR MORE INFORMATION: Contact CAL FIRE Communications at calfire.dutypio@fire.ca.gov or (916) 651-FIRE (3473).


**CALIFORNIA DEPARTMENT OF PARKS AND RECREATION**
*Protecting and managing California state park land in areas where onshore pipelines are located.*

- FOCUS: Environmental protection, state-owned land stewardship.
- ROLE & AUTHORITY: The California Department of Parks and Recreation manages public land for public benefits in areas where onshore pipelines may cross. The Department may grant easements for pipelines on this property. Specifically, this would include an easement to accommodate a four-mile section for pipeline maintenance in Gaviota State Park. The previous 30-year easement expired in 2016. Since then, the Department has issued individual permits for accessing and maintaining the pipeline.
- ACTIONS UNDERWAY:
  - *On December 20, 2024*, the Department of Parks and Recreation sent a letter to Sable requesting a full project description to evaluate their request for an easement.

7

- The Department of Parks and Recreation evaluated a request to perform maintenance anomaly digs and associated repair work along a four-mile section of pipeline on State Parks property.
- *On May 9, 2025*, the Department of Parks and Recreation issued a Right of Entry Permit to Sable to perform the 18 anomaly digs within Gaviota State Park, with work to commence on May 12, 2025.
- *As of June 6, 2025*, the work authorized by the Right of Entry Permit is complete, except for some of the restoration requirements, including restoring San Julian Road, which provides access to a local elementary school and some park visitor access. The section of road is not within the Coastal Zone.

- FOR MORE INFORMATION: Contact Department of Parks and Recreation Communications at newsroom@parks.ca.gov.

**CENTRAL COAST AND CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARDS**
*Protecting the state's water ways and drinking water.*

- FOCUS: Water quality and environmental public health.
- ROLE & AUTHORITY: The Central Coast and Central Valley Regional Water Quality Control Boards oversee water resources for the State of California within their respective jurisdictions, implementing the Clean Water Act and the Porter-Cologne Water Quality Control Act.  The Regional Water Boards regulate the discharge of waste, such as sediment, that could occur during pipeline repair or construction. This includes issuing permits for dredging and land disturbances, and discharges of waste and stormwater.
- ACTIONS UNDERWAY:
  - *On December 13, 2024*, following an inspection, the Central Coast Regional Water Quality Control Board issued violation and non-compliance notices for unauthorized waste discharge into Santa Barbara County waterways, as well as a directive to seek permit coverage. Sable must take corrective action, submit a waste discharge report, and apply for appropriate permits.
  - *On January 22, 2025*, the Central Coast Regional Water Quality Control Board issued Sable a directive to submit a technical report describing Sable's activities at all pipeline work locations and associated potential discharges to waterways. The technical report was due March 10, 2025.
    - *On March 8, 2025,* Sable submitted an incomplete response to the Central Coast Regional Water Quality Control Board's January 22, 2025 directive to submit a technical report.
    - *On April 15, 2025*, Sable submitted additional incomplete information in response to the Central Coast Regional Water Quality Control Board's January 22, 2025 directive to submit a technical report.
  - *On January 31, 2025,* Sable submitted an application for waste discharge requirements for its work at one waterway location.
    - *On March 20, 2025,* the Central Coast Regional Water Quality Control Board issued authorization to Sable to restore the one waterway location identified in its January 31, 2025 application.

8

- o On *February 28, 2025*, the Central Coast Regional Water Quality Control Board inspected additional project work locations discovered as a result of public complaints.  Staff observed unauthorized work within waters of the state and discharges of waste to waters of the United States.
- o *On March 4, 2025,* Sable submitted two applications for coverage under the statewide permit for stormwater discharges associated with construction and land disturbing activities. The applications are under review.
- o *On March 13, 2025,* Sable submitted applications for waste discharge requirements for its work at four additional waterway locations.
  - On *June 2, 2025*, the Central Coast Regional Water Quality Control Board issued authorization to Sable to restore the four waterway locations identified in its March 13, 2025 applications.
- o *On April 7, 2025*, Central Coast Regional Water Quality Control Board staff notified Sable and the public that the Board will consider adopting a resolution to refer alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General at a public hearing on April 17, 2025.
- o *On April 17, 2025*, at a public hearing, the Central Coast Regional Water Quality Control Board adopted a resolution referring alleged violations of the California Water Code for potential civil judicial enforcement to the California Office of the Attorney General.
- o On *May 27, 2025,* Central Coast Regional Water Quality Control Board staff inspected recently conducted work sites in Gaviota State Park and adjacent to the Park.
- FOR MORE INFORMATION: Contact the State Water Resources Control Board at opa@waterboards.ca.gov or (916) 341-5252.


**STATE LANDS COMMISSION**
*Oversees and approves leases for offshore pipelines, piers, and buoys.*

- FOCUS: Safety of offshore pipelines to shore, spill prevention, environmental protection.
- ROLE & AUTHORITY: Under the Public Resources Code, the State Lands Commission must review and approve assignment of leases from the current owner (ExxonMobil) to Sable for offshore pipelines from federal platforms to shore, piers, and mooring buoys. Per this role and overview, Sable could restart the pipelines only if the terms and requirements of the current lease and operating agreements are met. This includes Sable performing detailed inspections of the pipeline line (in-line inspections), pressure testing (called hydrotesting), and using remotely operated vehicles to monitor the pipeline.
- ACTIONS UNDERWAY:
  - o Ongoing review of assignment of leases as of December 20, 2024, with the most recent discussion at the State Lands Commission on December 17, 2024.
  - o *On May 9, 2025*, Staff issued a letter to Exxon and Sable stating that the inspections required by the Commission's leases, for the portion of the offshore pipelines in

state waters, and under the Commission's jurisdiction, have been completed and reviewed. This is not directly related to the repair work on the onshore pipeline.

- FOR MORE INFORMATION: Contact the State Lands Commission External Affairs at ExternalAffairsChief.Public@slc.ca.gov or (916) 574-1992.

10

# EXHIBIT N

# 3   State Regulatory Responsibility

### 3.1   Adoption of Federal Regulations and Requirements

A State Agency participating in the pipeline safety program under a Certification is required to adopt Federal pipeline safety regulations or take steps to adopt such regulations.  Adoption of applicable Federal regulations may be automatic, require State rulemaking actions, or necessitate State legislative action, and should be adopted within 24 months of the effective date or two general sessions of the State Legislature, whichever is longer. In addition, a state agency may issue additional or more stringent standards concerning intrastate pipelines if they are compatible with Federal regulations. Any interpretation of a regulation adopted by a State Agency must not conflict with any opinion/interpretation issued by PHMSA.

Federal pipeline safety regulations incorporate by reference certain Industry Standards.   Some standards are available through TechStreet.  For standards that cannot be found in Techstreet, contact Jill Nelson – Jill.Nelson@dot.gov for assistance.   New requests shall be evaluated on a one-on-one basis in accordance with the PHMSA policy (see Appendix K).  Based on an approved request the requester shall obtain either a paper copy of a standard or access to an electronic copy whichever is more cost and/or mission efficient. Incorporated by reference documents may also be available for review on the organization website.

### 3.2   WinDOT

OPS maintains subscriptions through ViaData LP. ViaData has created a new automated system for processing inspector subscriptions to WinDOT. Please visit the following webpage to submit requests: (https://www.viadata.com/government). Users can also make requests through Blackboard or by emailing PHMSA TQ at sharon.webb@dot.gov.  Software issues and problems should be addressed directly to sharon.webb@dot.gov. ViaData can be reached at support@viadata.com, at (800) 817-6649, or on the contact page: https://www.viadata.com/contact.

### 3.3   Waiver of Federal Regulations

#### 3.3.1  Interstate Pipelines

Waivers of Federal regulations concerning interstate facilities may be considered only by PHMSA. Interstate agents may not consider such waivers. PHMSA will consult with the interstate agent when an interstate operator requests a waiver.  PHMSA currently refers to a waiver as a Special Permit.

Exhibits Pg. 877

### 3.3.2 Intrastate Pipelines

Upon application by an operator, a State Agency may consider a waiver of pipeline safety requirements subject to PHMSA concurrence.   Waiver applications for state pipeline safety requirements that are more stringent than the federal minimum pipeline safety standards are not subject to PHMSA concurrence.  A waiver may be granted when it is not practical for an operator to comply with a regulation of general applicability. The information found in 49 CFR 190.341(c) provides basic information that should be included in the waiver request.  The State Agency is encouraged to consult with OPS on the appropriateness of granting a waiver before formal action is taken.  The State Agency should send the proposed waiver request and the contact information for the State Agency technical expert assigned to the waiver review to the following group email:   PHMSAOPSStateWaivers@dot.gov.  OPS will assign a technical point of contact for the State Agency to work with the State Agency's technical expert throughout the State Agency's waiver review process. PHMSA may require additional considerations or conditions to be included in the State Agency's approval of the waiver.  The inclusion of these considerations or conditions in the State Agency's written approval could avoid PHMSA's objection to the waiver during PHMSA's 60-day deliberative process.

If a State Agency finds that a waiver request is consistent with pipeline safety and is justified, it may issue written approval under such terms and conditions as are appropriate. Written approval should include a statement of reasons for granting the waiver.

If a State Agency finds that a waiver request is not consistent with pipeline safety or is not otherwise justified, it must issue written denial of the request. Written denial should include a statement of reasons.

A State Agency must notify PHMSA in writing by registered or certified mail of each waiver granted by the State Agency. Each notice must provide the following information:

1. The name, address, and telephone number of the applicant

2. The safety regulation involved

3. A description of the pipeline facilities involved

4. The justification for approving the waiver, including the reasons why the regulations are not appropriate and why the waiver is consistent with pipeline safety

5. A copy of the State Agency's order or letter to the applicant

6. All correspondence concerning waivers should be addressed to:

Associate Administrator for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Second Floor, East Building
Washington, DC 20590

PHMSA will acknowledge receipt of each notice and consider each in the order it was received. PHMSA may provide further opportunity for public comment.

If PHMSA does not object to the waiver, it will so notify the State Agency. The waiver is effective upon approval by PHMSA or if there is no action by PHMSA 60 days after the receipt of waiver from State Agency. If, before a waiver is to become effective, PHMSA notifies the State Agency that it objects to the waiver, the action granting the waiver will be stayed. PHMSA will then allow the State Agency an opportunity to present its arguments with opportunity for a hearing. Thereafter, PHMSA will make the final determination whether the waiver may be granted and will notify the State Agency of its decision.

In the event of an emergency waiver, the PHMSA written notice and hearing requirements may be omitted if the State Agency finds that notice is impracticable, unnecessary, or not in the public interest. However, the State Agency must immediately notify the PHMSA Director of State Programs of its decision to grant the emergency waiver and follow up with written notification to the Director with 48 hours. After granting the emergency waiver, the State Agency must investigate the circumstances causing the specific emergency and require the operator to act to prevent its reoccurrence in the future. Each State Agency should follow the emergency waiver methods prescribed in 49 U.S.C. 60118(c) (2) of the Pipeline Safety Act (See Appendix A).

For all waivers in effect, State Agencies are required to verify that the conditions of those waivers are being met. This includes having the operator amend procedures. Where appropriate, State Agencies must terminate a waiver if it is no longer valid. For all waivers that are no longer in effect (e.g., project is completed, time frame has expired, State Agency termination, code change), State Agencies must notify PHMSAOPSStateWaivers@dot.gov that the waiver is no longer in effect.

Exhibits Pg. 879

## PROOF OF SERVICE

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On July 11, 2025, I served the above document(s) described as **PETITIONERS AND PLAINTIFF' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLICATION FOR STAY OR PRELIMINARY INJUNCTION, VOLUME 3** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 11, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

---

1
Proof of Service

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEY FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 5:12 PM
By: Terri Chavez , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, | Case No.: 25CV02247 |
| | **DECLARATION OF LINDA KROP IN SUPPORT OF PETITIONERS' APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** |
| Petitioners and Plaintiffs, | |
| vs. | [*Filed concurrently with Petitioners and Plaintiffs' Combined Reply to Respondents and Real Parties in Interests' Opposition to Application for Stay or Preliminary Injunction*] |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, | Date:    July 18, 2025<br>Time:    10:00 a.m.<br>Dept.:    4<br>Judge:    Honorable Donna D. Geck |
| Respondents and Defendants, | Action Filed: April 15, 2025<br>Trial: None Set |
| and | |
| SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, | |
| Real Parties in Interest. | |

---

1

Declaration of Linda Krop in Support of Petitioners and Plaintiffs' Application for Stay or Preliminary Injunction

**DECLARATION OF LINDA KROP**

I, Linda Krop, hereby declare as follows:

1.      I am Chief Counsel for the non-profit, public interest law firm Environmental Defense Center (EDC) and am counsel for Petitioners in this action. I am duly licensed to practice law before this Court. I have personal knowledge of the following and, if called as a witness, would and could testify competently thereto.

2.      On July 11, 2025, Sable Offshore Corp. ("Sable") filed a Form 8-K with the Securities and Exchange Commission. The report states that:

> Sable continues to produce from the Santa Ynez Unit and flow to the crude oil storage tanks at Las Flores Canyon in anticipation of receiving approval to restart the Las Flores Pipeline System, with **first oil sales expected August 1, 2025**.

**Exhibit A**, attached hereto, is a true and correct copy of the Form 8-K that I downloaded from SEC's website on July 11, 2025, at

https://www.sec.gov/Archives/edgar/data/1831481/000183148125000051/socc-20250709.htm.

3.      On July 11, 2025, I visited the California Air Resources Board website, which has an interactive Pollution Mapping Tool that shows annual greenhouse gas ("GHG") emissions from facilities throughout the state. The Pollution Mapping Tool is available at the following web address:

https://www.arb.ca.gov/carbapps/pollution-map/?_ga=2.125413642.1625019584.1752255600-685077060.1742851211. The Pollution Mapping Tool allows users to search for facilities/emissions by county and by year, and provides a report showing each facility in the county, the amount of GHG emissions they produced in that particular year, and the total amount of GHG emissions that year from stationary sources.

4.      On July 11, 2025, I used the publicly available Pollution Mapping Tool and searched for emissions in Santa Barbara County during 2014 — the last full year that the Las Flores Pipeline System, and the facilities that it services, were active. As set forth in the Verified Petition and Complaint in this action, one of those facilities is the Las Flores Canyon processing facility, which processes oil from the Santa Ynez Unit before it is transported by the Las Flores Pipeline System. According to the pollution mapping tool, in 2014, the Las Flores Canyon processing facility emitted 281,616 metric tons of GHGs.

The total amount of GHG emissions for Santa Barbara County that year from stationary sources was 663,126 metric tons.

5.      In other words, when last active, the Las Flores Canyon processing facility alone accounted for more than 50% of all GHG emissions from stationary sources in Santa Barbara County. That does not include emissions from Sable's onshore gas processing plant, or emissions from its three offshore platforms.

6.      According to the Pollution Mapping Tool, in 2022 — the most recent year with data publicly available — the total amount of GHG emissions in Santa Barbara County in 2022 was 236,773 metric tons. Restarting the Las Flores Pipeline System — which, in turn, would allow Sable's other facilities to restart, including the Las Flores Canyon processing facility — would more than double that amount according to the above-cited data from 2014.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 11th day of July, 2025, in Santa Barbara, California.



_____
Linda Krop

Declaration of Linda Krop in Support of Petitioners and Plaintiffs' Application for Stay or Preliminary Injunction

# EXHIBIT A

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

---

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): **July 9, 2025**

---

# Sable Offshore Corp.

(Exact name of registrant as specified in its charter)

---

| **Delaware** | **001-40111** | **85-3514078** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |

| **845 Texas Avenue, Suite 2920** | |
|:---:|:---:|
| **Houston, TX** | **77002** |
| (Address of Principal Executive Offices) | (Zip code) |

**(713) 579-6161**

(Registrant's telephone number, including area code)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Common stock, par value $0.0001 | SOC | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company                    ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01        Other Events.**

*California Coastal Commission Matter*

On July 9, 2025, in the matter of *Sable Offshore Corp., et al. v. California Coastal Commission, et al.* (25CV00974), the Santa Barbara County Superior Court (the "**Superior Court**") denied a motion to stay the California Coastal Commission's April 10, 2025 Cease and Desist Order regarding Sable Offshore Corp.'s ("**Sable**") maintenance and repair work in the coastal zone.

Also on July 9, 2025, Sable filed a Notice of Appeal of the Superior Court's May 28, 2025 Order Granting Application for Preliminary Injunction (the "**Order**"). Sable intends to prosecute this appeal in the California Court of Appeal in an effort to lift the Order.

Sable continues to produce from the Santa Ynez Unit and flow to the crude oil storage tanks at Las Flores Canyon in anticipation of receiving approval to restart the Las Flores Pipeline System, with first oil sales expected August 1, 2025.

**Cautionary Statement Regarding Forward-Looking Statements**

The information in this Current Report on Form 8-K includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," " may," " believe," " anticipate," " intend," " estimate," "expect," "project," "continue," "plan," forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence production of the SYU assets and the cost and time required therefor; litigation, complaints and/or adverse publicity; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2024, and any subsequent Quarterly Report on Form 10-Q or Current Report on Form 8-K, which are filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this Current Report on Form 8-K.

**Item 9.01        Financial Statements and Exhibits**

(d) Exhibits:

| Exhibit No. | Description of Exhibits |
| --- | --- |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sable Offshore Corp.**

Date:    July 11, 2025

By:    /s/ Gregory D. Patrinely

Name:    Gregory D. Patrinely

Title:    Executive Vice President and Chief Financial Officer

## PROOF OF SERVICE

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On July 11, 2025, I served the above document(s) described as **DECLARATION OF LINDA KROP IN SUPPORT OF PETITIONERS AND PLAINTIFFS' APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒     **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 11, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

1
Proof of Service

# SERVICE LIST

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEY FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 5:12 PM
By: Terri Chavez , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **DECLARATION OF PAASHA MAHDAVI IN SUPPORT OF PETITIONERS AND PLAINTIFFS' APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** <br><br> [*Filed concurrently with Petitioners and Plaintiffs' Combined Reply to Respondents and Real Parties in Interests' Opposition to Application for Stay or Preliminary Injunction*] <br><br> Date:  July 18, 2025 <br> Time:  10:00 a.m. <br> Dept.:  4 <br> Judge:  Honorable Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

---

1

Declaration of Paasha Mahdavi in Support of Plaintiff and Petitioners' Application for Stay or Preliminary Injunction

**DECLARATION OF PAASHA MAHDAVI**

I, Paasha Mahdavi, hereby declare as follows:

1.  I have personal knowledge of the matters set forth in this declaration and, if called as a witness, could and would competently testify thereto.

2.  I am an Associate Professor and the Director of the Energy Governance and Political Economy (EGAPE) Lab at U.C. Santa Barbara. I hold degrees in economics (B.A.), international energy policy (M.A.), statistics (M.S.), and political science (Ph.D.) from Columbia University, Stanford University, and UCLA.

3.  I am an expert in energy economics, statistics, and global energy policy based on my training, education, and experience. My research focuses on the impact of oil and gas resources on governance and environmental politics. Attached as **Exhibit A** is my curriculum vitae.

4.  In 2024, Sable Offshore Corp. ("Sable") announced that restarting oil and gas production from three offshore platforms that comprise the Santa Ynez Unit (SYU) would reduce the need to import foreign oil and that without SYU production, foreign imports and domestic production would increase. I evaluated the evidence relating to these claims in my report, titled *Economic Analysis of Market Impacts of Resuming Oil and Gas Production from the Santa Ynez Unit*, dated February 2025. A true and correct copy of this report is attached hereto as **Exhibit B**.

5.  The report sets forth my opinion, based on my review of historical data on oil supply offers, Sable's 2024 investor reports, California agency energy reports, and economic and statistics studies, including: crude oil supply data sourced from California Air Resources Board; Sable Offshore Corp.'s "Investor Presentation September 2024" and "Investor Presentation November 2024;" California Energy Commission's "Draft 2024 Integrated Energy Policy Report Update" and "Foreign Sources of Crude Oil Imports to California;" and "Estimated Carbon Intensity Values for the Crude Lookup Table, App. F to Proposed Amendments to the Low Carbon Fuel Standard Regulations," authored by California Air Resources Board. My opinion additionally draws on emissions data from the "Oil Production Greenhouse gas Emissions Estimator (OPGEE)," authored by researchers at Stanford University and California Air Resources Board, and supported by California Environmental Protection Agency and California Air Resources Board.

Declaration of Paasha Mahdavi in Support of Plaintiff and Petitioners' Application for Stay or Preliminary Injunction

6.    My opinion, as set forth in my report, is as follows:

a.    Restarting SYU production will not significantly reduce foreign imports, based on both statistical analysis of the 2015 pause and an economic analysis of costs compared to major suppliers of crude oil.

b.    Not restarting SYU will not have significant impacts on consumer markets over time, given declining demand for petroleum products in California through 2045 outpaces the loss of supply from SYU production.

c.    Production from SYU will increase global greenhouse gas emissions given the higher greenhouse gas intensity of operations compared to industry averages for operations from commensurate fields.

7.    Based on the facts I have reviewed and my professional analysis, in my opinion restarting the Las Flores Pipeline will not markedly benefit California's environment or economy.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 8th day of July, 2025, in Santa Barbara, California.


Paasha Mahdavi

---

3

Declaration of Paasha Mahdavi in Support of Plaintiff and Petitioners' Application for Stay or Preliminary Injunction

# EXHIBIT A

# Paasha Mahdavi

| | | |
|---|---|---|
| CONTACT | Ellison 3807<br>Mail Code 9420<br>Santa Barbara, CA 93106 | *Mobile:* 858 243 1840<br>*E-mail:* paasha@ucsb.edu<br>*Site:* www.paashamahdavi.com |

ACADEMIC POSITIONS

Vice Chair, Department of Political Science, UCSB, 2024–

Associate Professor (with tenure), Political Science, UCSB, 2022–

Director, Energy Governance and Political Economy (EGAPE) Lab, 2021–

Assistant Professor, Political Science, UCSB, 2018–2022

Assistant Professor, McCourt School of Public Policy, Georgetown University, 2015–2018

EDUCATION

UCLA: Ph.D. in Political Science (2015), M.S. in Statistics (2015)

Stanford University: M.A. in International Policy, *concentration in Energy Policy* (2009).

Columbia University: B.A. in Economics, *with Departmental Honors* (2006).

AFFILIATIONS

Co-founder, The 2035 Initiative at UCSB, 2022–

Affiliated faculty, Bren School of Environmental Science & Management, 2021–

Visiting faculty, Johns Hopkins SAIS, Spring 2024

Campbell Visiting Fellow, Hoover Institution, 2021–2022

Term Member, Council on Foreign Relations, 2019–2024

Payne Institute Non-resident Fellow, Colorado School of Mines, 2018–

Initiative for Sustainable Energy Policy (ISEP) Fellow, Johns Hopkins SAIS, 2017–

GFC Fellow for the Council on the Future of Energy, World Economic Forum, 2016–2018

BOOK

Paasha Mahdavi. 2020. *Power Grab: Political Survival Through Extractive Resource Nationalization.* Cambridge University Press (Series on Business and Public Policy).

* Reviews: *Democratization*, *Perspectives on Politics*, *Texas National Security Review*, *China International Strategy Review*
* Media coverage: *Huffington Post, Grist, Washington Examiner, New Books Network Podcast, The Elucidators Podcast, Eqtesād bā t'am siāsat (Economy with a Taste of Politics channel; in Persian), The New Republic*

PEER-REVIEWED ARTICLES

16. Matto Mildenberger, Sara M. Constantino, Paasha Mahdavi, Parrish Bergquist, Gabriel De Roche, Emma Franzblau, Cesar Martinez-Alvarez, Ingmar Sturm. 2025. "How vulnerable publics in small-island states view climate change and international responses to it." Forthcoming, *Proceedings of the National Academy of Sciences*

15. Paasha Mahdavi, Eve Simoni, and Michael Ross. 2025. "Fossil fuel subsidy reforms have grown more fragile." *Nature Climate Change.* 15: 569–574. [Cover article]

14. Parrish Bergquist and Paasha Mahdavi. 2023. "Examining the effect of cost information and framing on support for methane regulations in Europe." *Environmental Research Letters.* 18(9): 094046.

13. Cesar Martinez-Alvarez, Chad Hazlett, Paasha Mahdavi, and Michael Ross. 2022. "Political leadership has limited impact on fossil fuel taxes and subsidies." *Proceedings of the National Academy of Sciences*. 119(47): e2208024119, 1-8.

    ↪ "Reply to van den Bergh and Savin: Fossil fuel taxes are politically hard to change." *Proceedings of the National Academy of Sciences*. 120(14): e2302318120

12. Adam Crepelle, Paasha Mahdavi, and Dominic Parker. 2024. "Effects of per capita payments on governance: Evidence from tribal casinos." *Public Choice*. 199: 319–340.

11. Paasha Mahdavi, Cesar Martinez-Alvarez, and Michael Ross. 2022. "Why do governments tax or subsidize fossil fuels?" *Journal of Politics*. 84(4): 2123-2139.

10. Jessica Green, Jennifer Hadden, Thomas Hale, Paasha Mahdavi. 2022. "Transition, hedge, or resist? Understanding political and economic behavior toward decarbonization in the oil and gas industry." *Review of International Political Economy*. 29(6): 2036-2063.

 9. Noel P. Johnston, Nicole Janz, and Paasha Mahdavi. 2022. "Expropriation and Human Rights: Does the seizure of FDI signal wider repression?" *Review of International Organizations*. 17: 847–875.

 8. Paasha Mahdavi, Jessica Green, Jennifer Hadden, and Thomas Hale. 2021. "Using earnings calls to uderstand the political behavior of major polluters." *Global Environmental Politics*. 22(1): 159–174.

 7. Raphael Calel and Paasha Mahdavi. 2020. "Unintended consequences of anti-flaring policies and measures for mitigation." *Proceedings of the National Academy of Sciences*. 117(23): 12503-12507.

 6. Paasha Mahdavi. 2020. "Institutions and the 'resource curse': Evidence from cases of oil-related bribery." *Comparative Political Studies*. 53(1): 3–40.

 5. Paasha Mahdavi and John Ishiyama. 2020. "Dynamics of the inner elite in dictatorships: Evidence from North Korea." *Comparative Politics*. 52(2): 221–249.

 4. Paasha Mahdavi. 2019. "Scraping public co-occurrences for statistical network analysis of political elites." *Political Science Research and Methods*. 7(2): 385–392.

 3. Michael Ross, Chad Hazlett, and Paasha Mahdavi. 2017. "Global progress and backsliding on gasoline taxes and subsidies." *Nature Energy*. 2(16201): 1-6.

 2. Paasha Mahdavi. 2015. "Explaining the oil advantage: Effects of natural resource wealth on incumbent reelection in Iran." *World Politics*. 67(2): 226–267.

 1. Paasha Mahdavi. 2014. "Why do leaders nationalize the oil industry? The politics of resource expropriation." *Energy Policy*. 75(C): 228–243.

BOOK
CHAPTERS

 3. Paasha Mahdavi and Noosha Uddin. 2021. "Governance amidst the transition to alternative energy in the Middle East and North Africa." In Robin Mills and Li-Chen Sim (eds.) *Low Carbon Energy in the Middle East and North Africa*. London, UK: Palgrave Macmillan (International Political Economy Series).

 2. Miriam Golden and Paasha Mahdavi. 2015. "The institutional components of political corruption." 2015. In Ruben Ruiz-Rufino and Jennifer Gandhi (eds.), *Handbook of Comparative Political Institutions*. New York, NY: Routledge Press.

1. Paasha Mahdavi. 2012. "Oil, monarchy, revolution, and theocracy: A study on the National Iranian Oil Company (NIOC)." In David Victor, David Hults and Mark Thurber (eds.), *Oil and Governance: State-owned Enterprises and the World Energy Supply*. Cambridge, UK: Cambridge University Press.

SELECTED
WORKS IN
PROGRESS

5. Coordinated Financial Crisis Resolution (with Christina Schneider and Jennifer Tobin). Conditionally Accepted, *Review of International Political Economy*

4. Public Opinion on Economic Transition Challenges and Opportunities in Oil Communities (with Matto Mildenberger, Dustin Tingley, Ranjit Deshmukh, and Cesar Martinez-Alvarez)

3. Limited Impacts of Shareholder Pressure on Climate Strategy of Fossil Firms (with Denis Lomov)

2. Measuring firm climate strategy using transformer-based language models (with Denis Lomov)

1. Developing an Indigenous Governance and Political Representation Database (with Christopher Alcantara and Dominic Parker)

PUBLISHED
DATA SETS

1. Michael Ross and Paasha Mahdavi. 2015 (September). Oil and Gas Data, 1932–2014. Harvard Dataverse, V2.

REPORTS &
OTHER
WRITINGS

30. "Government efforts to reduce fossil fuel subsidies have failed at a very high rate." 2025. *Nature Climate Change*: Policy Brief. (with Michael Ross and Evelyn Simoni).

29. "It's Time to Phase Out Oil in our County." 2025. *Santa Barbara Independent*. (with Leah Stokes).

28. "Restarting Sable's Pipeline Would Harm Our Communities, Environment, and Economy." 2025. *Santa Barbara Independent*.

27. "The Economic, Health, and Environmental Benefits of Phasing Out Onshore Oil Development in Santa Barbara County." 2025. Report. (with Olivia Quinn, Eleanor Thomas, Carrie Fernandes, and Leah Stokes).

26. "Green Backlash and Fossil Societies." 2025. IGCC Essay.

25. "Economic analysis of market impacts of resuming oil and gas production from the Santa Ynez Unit." Report submitted to Santa Barbara County Board of Supervisors in re: item 25-00144, Feb 25, 2025.

24. "National Oil Companies and the Global Methane Opportunity." 2024. *Global Policy*. (with Andrew Howell).

23. "Collaborative Levers for Methane Abatement in National Oil Companies." 2024. *Environmental Defense Fund*, Report.

22. "Strategies for Building Power to Shift Climate Politics and Policy." 2024. *The 2035 Initiative*, Evidence Review. (with Leah Stokes, Matto Mildenberger, and Lucas Boyd).

21. "Assessing National Oil Companies transition plans: an essential tool for banks, investors and regulators." 2023. *World Benchmarking Alliance*, Policy Brief. (with J. Roth, R. Poivet, N. Jones, and A. Picciariello)

20. "Opportunity NOCs: How investors can jumpstart energy transitions in national oil companies." 2023. *The 2035 Initiative* and *IISD*, Policy Brief. (with A. Picciariello)

19. "Bold vs. BS in corporate climate pledges." 2022. *A Matter of Degrees Podcast.* (Guest host with L. Stokes and K. Wilkinson)

18. "Paving a Credible Investment Pathway to Net Zero for Oil and Gas." 2022. *OECD Consultation on Investment Treaties and Climate Change.*

17. "Inuit Language and Community Engagement." 2022. Public report prepared for communities in Inuit-speaking parts of northern and northwest Alaska. (with U. Okleasik)

16. "Cultural programs and opportunities for engagement with CIRI." 2021. Report prepared for the the Cook Inlet Region Inc (CIRI) Alaska Native Regional Corporation.

15. "National Oil Companies and Climate Change: Insights for Advocates." 2021. *IISD and NRGI Policy Brief.* (with A. Gillies, P.R.P. Heller, D. Manley, V. Marcel, L. Melgar, F. Monaldi, G. Muttitt, A. Picciariello, and J. Roth)

14. Book review of *Crude Intentions: How Oil Corruption Contaminates the World* by Alexandra Gillies. 2021. *Perspectives on Politics* 19(1): 323–24.

13. "Oil companies aren't actually going green—but some are heading there faster than others." 2020. *Washington Post / Monkey Cage.* (with Jessica Green, Jennifer Hadden, and Thomas Hale)

12. "Stop Oil Production in Santa Barbara Once and for All." 2020. *Santa Barbara Independent.*

11. "Power Grabs and Crude Decisions." 2020. *Invisible Histories* caption essay, Harvard Center for History and Economics.

10. "New Oil Finds Could Mean a Tripling of Guyana's GDP." 2019. *Foreign Policy.* (with Morgan Bazilian)

9. "Recommendations on the Draft Lebanese National Oil Company Bill." 2018. Report prepared for the Lebanese Parliamentary Committee on Public Works, Transportation, Energy, and Water.

8. "Four things to know about nationalizations in the energy industry." 2017. *Initiative for Sustainable Energy Policy (ISEP) Blog.*

7. "Oil Conflict and Kurdish Independence." 2017. *Global Policy.* (with Morgan Bazilian, Peri-Khan Aqrawi-Whitcomb, and Cyril Widdershoven)

6. "How to get reelected if you are an Iranian MP." 2015. *Washington Post/Monkey Cage.*

5. 'Will Iran's parliament block the nuclear deal?" 2015. *Washington Post/Monkey Cage.*

   - Reprinted in Marc Lynch (ed.), *Iran and the Nuclear Deal*. The Project on Middle East Political Science (POMEPS) Studies, Vol. 13.

4. "Oil and Politics in Iran's *Majles-e Shurā-ye Eslāmi.*" 2014. *The International Society for Iranian Studies Newsletter.* 34(4): 10-13.

3. "Reforming National Oil Companies: Nine Recommendations." 2014. *Natural Resource Governance Institute Briefing.* (with Patrick Heller and Johannes Schreuder)

2. "The Petroleum Industry Bill and the Future of NNPC." 2012. *Revenue Watch Institute Briefing.* (with Aaron Sayne, Patrick Heller, and Johannes Schreuder)

1. "The Future Impact of Climate Change on the California Wine Industry."  2009. Stanford IPS Report, prepared for California State Assembly Member Noreen Evans. (with Jonathan Gatto, Byung-oh Kim, Hirochika Namekawa, and Hung Tran)

AWARDS, GRANTS, & FELLOWSHIPS

External

- Grant, Tara Foundation, 2025
- Resilient Energy Economies Initiative grant, joint from Bezos Earth Fund, Columbia Center for Global Energy Policy, and Resources for the Future, 2025
- Grant, Quadrature Climate Foundation, 2024
- FINOC grant, Environmental Defense Fund, 2023–2024
- Campbell Visiting Fellowship, Hoover Institution, 2021–2022.
- Governance, Liberty, and Prosperity for American Indians, Hoover Institution, 2021
- Balzan Foundation grant (with Matto Mildenberger and Leah Stokes, co-PIs), via Princeton University, 2018–2020
- Balzan Foundation grant (with Jessica Green, Jennifer Hadden, and Thomas Hale, co-PIs), via Princeton University, 2018–2020
- Energy for Economic Growth Research Programme, U.K. Department for International Development (DfID) seed grant (with Michael Ross, PI), 2016–2020
- Data Collection Grant, Natural Resource Governance Institute, 2014–15
- Adam Smith Fellowship, Mercatus Center at George Mason University, 2013–14
- Research Grant, Revenue Watch Institute and DfID, 2012

Internal

- Outstanding Service to Community Award, UCSB Political Science, 2025
- Cohen-Jennings Award for Excellence in Graduate Mentorship, UCSB PSGSA, 2021
- UCSB Academic Senate Research Grant, 2021
- UCSB Research Assistance Program, 2021
- UCSB ISBER Social Science Research Grants Program, 2019–2020
- Leslie Whittington Outstanding Faculty Member of the Year Award, McCourt School of Public Policy, 2017
- Seed grant (PI), Georgetown Environment Initiative, 2017–2018
- Seed grant (with Raphael Calel), Georgetown Environment Initiative, 2016–17
- Dissertation Year Fellowship, UCLA Graduate Division, 2014–15
- Graduate Research Mentorship, UCLA Graduate Division, 2012–13
- Graduate Summer Research Mentorship, UCLA Graduate Division, 2010 & 2011
- Graduate Research Opportunity Grant, Program on Energy and Sustainable Development, Stanford University, 2008–09
- Susan Ford Dorsey International Policy Fellowship, Stanford University, 2007–08
- Departmental Honors, Columbia University Department of Economics, 2006

MEDIA

**For full list of media interviews and research coverage**: www.egapelab.com/media

INVITED TALKS, WORKSHOPS & CONFERENCE PRESENTATIONS

2025: Climate Change, Green Backlash, and Democracy workshop at IGCC; London School of Economics and Political Science (online); Resilient Energy Economies; Environmental Defense Fund.

2024: Environmental Politics & Governance Deep Climate Conversations; Occidental College Geopolitics of the Green Energy Transition; Georgetown University Political Economy Seminar; Johns Hopkins SAIS Political Economy Speaker Series; Environmental Defense

Fund; Columbia University International Politics Seminar; Resilient Energy Economies; International Institute for Sustainable Development.

2023: UC Berkeley MIRTH Seminar Series; Public Choice Society (Seattle); Preparing for a Changing Climate Conference (Stanford University); American Political Science Association (APSA); Markets vs. Mandates for the Environment and Energy Workshop (Hoover/West Creek); Workshop on Economic and Politics of Tribal Governance, Past and Present (Hoover Institution).

2022: Public Choice Workshop (Hoover Institution); Western Political Science Association (WPSA); UC Riverside Political Science Speaker Series; Climate Futures Initiative (Princeton University); Climate Pipeline Engaged Scholarship Workshop (Harvard University); UCSB Ground-breaking Research/Innovative Technology (GRIT) talks; First Alaskans Institute (virtual).

2021: Midwestern Political Science Association (MPSA); UC-National Lab Fees Research Program Workshop; Governance, Liberty, and Prosperity for American Indians (Hoover Institution, held in Bozeman, MT); Climate Futures Initiative (Princeton University); International Institute for Sustainable Development and Natural Resources Governance Institute (webinar); University of KwaZulu Natal (webinar); APSA (virtual); Renewing Indigenous Economies (Hoover Institution); New Producers Group (Chatham House).

2020: Global Comparative Politics of Climate Change Policy Workshop (Stanford University); University of California Conference on International Cooperation (UC Riverside); International Studies Association (ISA)*; MPSA*; Claremont Graduate University*; UC Riverside*; Colorado School of Mines (webinar); Charting the Future Political Economy of Oil Workshop (ANU Crawford School of Public Policy, virtual); APSA (virtual); Global Research in International Political Economy (webinar); Johns Hopkins SAIS (webinar); World Bank, Office of Chief Economist of Sustainable Development (webinar).

2019: Global Comparative Politics of Climate Change Policy Workshop (Stanford University); WPSA (San Diego); APSA (Washington, DC); Southern California Methods Workshop (UC Riverside); University of Toronto; Ostrom Symposium on Natural Resource Governance for Young Scholars (Indiana University); RAI Inequality and Representation Workshop (Oxford University).

2018: Global Comparative Politics of Climate Change Policy Workshop (Stanford University); Research Frontiers in the Political Economy of Energy Policy (Princeton University); Stanley Kaplan Program in American Foreign Policy Keynote Lecture (Williams College).

2017: DC Area Climate & Energy Research Workshop (GWU); MPSA; University of Alaska Anchorage; Environmental Politics & Governance (Indiana University); APSA (San Francisco); Johns Hopkins SAIS; Harvard University Growth Lab.

2016: Columbia University International Politics Seminar; MPSA; Oxford University Department of Politics & International Relations; APSA (Philadelphia); Energy and Economic Growth Research and Matchmaking Conference (Center for Strategic & International Studies); Harvard University Comparative Politics Speaker Series.

2015: Energy & Extractives Communities of Practice (World Bank); MPSA; University of California Board of Visitors for Political Science (UCLA); APSA (San Francisco); Extractive Resources & Global Governance Workshop in Memory of Natasha Chichilnisky-Heal (Yale University); International Political Economy Society (Palo Alto).

TEACHING   PS 15: Introduction to Research in Political Science. Undergraduate lecture (methods requirement). Winter 2019, Spring 2020, Spring 2021, Spring 2022, Fall 2022, Winter 2025.

PS 106ET: Comparative Political Economy of the Energy Transition. Undergraduate lecture. Fall 2023.

PS 196: Climate and Extractive Politics. Undergraduate seminar. Spring 2022.

PS 205: Political Research Methods I. Graduate seminar (part one of core methods sequence). Fall 2022.

PS 206: Political Research Methods II. Graduate seminar (part two of core methods sequence). Winter 2019, Winter 2020, Winter 2021, Winter 2025.

PS 211: Research Design in Political Science. Graduate seminar. Spring 2020, Spring 2021, Spring 2022.

PS 295 / ESM 526: Environmental Politics Workshop. Weekly graduate workshop and seminar. 2018, 2019, 2020, 2021, 2023.

PS 594EE: Political Economy of Energy and Environment. Graduate seminar. Fall 2023.

PPOL 637: Comparative Politics & Policy of Energy. Graduate seminar (elective). Fall 2015, Fall 2016, Fall 2017.

PPOL 502: Regression Methods for Policy Analysis. Graduate seminar (part two of required three-semester statistics sequence). Spring 2016, Spring 2017, Spring 2018.

PH.D. ADVISING     * *Chair;*     ** *Co-Chair;*     ‡ *outside member*

- Corah Walker*
- So-Yeon Ellen Park (Postdoc, UC-IGCC)
- Navid Yousefian (Teaching Associate, Cambridge University)
- Jeff Feng (Postdoc, Northwestern University)
- Khobaib Osailan (Assistant Professor, King AbdulAziz University)
- Ariana Salas Castillo (Postdoc, Columbia University)
- Gabriela Alberola (Postdoc, University of Amsterdam)
- Noosha Uddin**
- Daniel Gamarnik
- Mohammad Sulaimani‡ (Assistant Professor, King Fahd University)
- Saber Khani‡
- Renae Marshall
- Denis Lomov* (pre-prospectus)
- Zhai Gen Tan* (pre-prospectus)

ACADEMIC SERVICE

At UCSB:
- Department Vice Chair, 2024-.
- Department Undergraduate Committee, Chair, 2024-2025.
- Decarbonization Study Project Committee, faculty advisor, 2023–2024.
- Lancaster Chair search committee, 2022–2023; 2024-2025.
- Diversity, Equity & Inclusion officer, Environmental Justice search committee, 2021–2022.
- Council on Research and Instructional Resources, Committee on Research Policy and Procedures and Committee on Faculty Grants, 2020–2023.
- Coordinator, Comparative Politics & Political Economy Webinar Series, 2020–2022.
- Committee on Mentoring Expectations in Political Science, 2020–2021.
- Dept. Liaison, Planning Committee for an Undergraduate Major in Data Science, 2019–
- Data Science Undergraduate Education Committee, 2019–
- Faculty mentor for PS 15, Department of Political Science, 2019–
- Faculty Advisor for UCSB Pi Sigma Alpha Political Science Honors Society, 2019–2022.

- Graduate Admissions Committee, Department of Political Science, 2019–2020.
- Chair, Comparative Politics Comprehensive Exam, Spring 2019.
- Awards Committee, Department of Political Science, 2018–2019.
- Subfield Coordinator, Political Methodology, 2018–

At Georgetown:
- Co-organizer, Energy & Climate Policy Research Seminar, 2015–18
- Advisory committee, Massive Data Institute, 2016–18
- Masters in Public Policy Thesis Prize committee, 2016.
- Steering committee, Georgetown Environment Initiative, 2016–18.
- Faculty search committee, Assistant Professor in Data Science, 2017.
- Judge, Georgetown University Energy Prize panel, 2017.
- Steering committee, Data Analytics Program, 2017–18.

Profession
- Discussant: APSA 2015–2016, 2019–2023; DC Area Climate & Energy Research Workshop 2016; Environmental Politics & Governance 2019; Virtual International Political Economy Society (V-IPES) 2020; MPSA 2014–2017, 2020; WPSA 2019; USC Political Economy of Native American Policy 2024; USC Political Economy of Energy 2024.
- Book workshops: Leah Stokes, UCSB, *Short-Circuiting Policy*, Feb 2018; Faisal Ahmed, Princeton University, *Conquest and Rents*, June 2020; Helen Milner and Alex Gazmararian, Princeton University (hosted at UCSB), *Climate Fault Lines*, Nov 2024.
- Committee member: APSA Public Policy Mentoring Award Committee; APSA Best Dissertation in Public Policy Award Committe; WPSA Climate Action Committee; WPSA Pi Sigma Alpha Award Committee; WPSA Climate Action Task Force.
- Reviewer/Advisor: Climate Pipeline Project; Political Economy of Climate and the Environment.
- Editorial Board: *Public Choice*

Referee
- *American Journal of Political Science, American Political Science Review, British Journal of Political Science, Comparative Political Studies, Comparative Politics, Communist and Post-Communist Studies, Electoral Studies, Energy Research & Social Science, Governance, International Organization, International Studies Quarterly, Journal of East Asian Studies, Journal of International Development, Journal of Politics, Journal of Public Policy, Nature Energy, Political Analysis, Political Research Quarterly, Proceedings of the National Academy of Sciences, Research & Politics, Resources Policy, Review of International Organizations, Review of Policy Research, Science, World Development, World Politics*, Cambridge University Press, Oxford University Press, Princeton University Press, National Science Foundation, Swiss National Science Foundation.

SPECIALIZED TRAINING

*Languages*: English (native), Persian (intermediate), Italian (intermediate)

*Field Work*: Iran (June-July 2009); United Arab Emirates (July 2012); Qatar (August 2012); British Petroleum Archives, Coventry UK (June 2016); Alaska (May 2017, July 2019)

PRIOR EMPLOYMENT

ICF International
- Wholesale Power (Electric Utilities) division, Analyst, 2006–07.

*Updated June 2025*

# <u>EXHIBIT B</u>

EGAPE
Lab

# Economic analysis of market impacts of resuming oil and gas production from the Santa Ynez Unit

*Prepared by Paasha Mahdavi[1]*

February 2025

## Introduction

Sable Offshore Corp ("Sable") plans to restart oil and gas production from three offshore platforms that comprise the Santa Ynez Unit ("SYU"), located in federal waters off the southern coast of Santa Barbara County. The company claims that restarting the SYU will reduce the need to import foreign oil and that, without SYU production, foreign imports and domestic production will increase.[2]

An economic analysis shows little evidence to support these claims. By contrast, well-established economic models of oil supply and a statistical evaluation of the SYU show that (1) foreign imports are not likely to increase in the absence of SYU production and (2) restarting oil production will have limited to no impacts on California oil markets through 2045.

The most substantial impacts of restarting the SYU are on emissions: if production resumes, global greenhouse gas emissions are likely to increase by 2.5 million tons of $CO_2e$, given higher greenhouse gas intensity of SYU oil and gas production compared to the typical blend of crude oil around the world.

---

[1] *Associate Professor and Director of the Energy Governance and Political Economy (EGAPE) Lab at UC Santa Barbara. Mahdavi holds degrees in economics (B.A), international energy policy (M.A.), statistics (M.S.), and political science (Ph.D.) from Columbia University, Stanford University, and UCLA. Mahdavi is solely responsible for the analysis contained in this report, which does not represent or reflect the positions of the University of California.*

[2] Based on Sable's statement to the County of Santa Barbara Planning Commission on October 30, 2024: "In our case, we're gonna be displacing a million barrels a month of foreign-based crude tankering into our ports in LA and San Francisco. The carbon index on the SYU crude is 3.5. You're displacing Iraq, Iranian, Iraqi crude at 12.6 or Libya… so that's up to a fourth cleaner fuel. And that's greenhouse gases. So when we bring the cogen on, that's already factored into it. So if it's a global issue then it's actually a net benefit to the environment by bringing this project back on." Video for the statement can be found here, starting at 6:30:32: https://sbcounty.granicus.com/player/clip/4837?view_id=3&redirect=true



**Figure 1: SYU production within overall crude oil supply to California, 2010-23**
*Author analysis. Data Sources: CARB, Enverus PRISM*

## SYU production in historical perspective

Production from the SYU averaged 29,000 barrels of oil per day and 27 million cubic feet of gas per day in 2014, the last complete year of production prior to the 2015 pipeline spill and subsequent pause in extraction.[3] This is roughly 30% of peak production from the SYU in 1996, consistent with expected depletion of the reservoir.

For the last full year of production, SYU oil supply averaged 1.8% of total statewide crude oil supply, including domestic and foreign imports (Figure 1).[4] These data also show that crude oil supplied to California has noticeably declined since 2018, reflective not just of the pandemic shock in 2020 but a reduction in consumer demand for petroleum products.[5]

---

[3] Sable Offshore Corp. (2024) *Investor Presentation November 2024*. Accessed in February 2025 from https://sableoffshore.com/events-and-presentations/default.aspx.
[4] CARB, *Major Sources of Crude Supplied to California*. Updated 2024, Accessed in February 2025 from https://ww2.arb.ca.gov/sites/default/files/2024-12/LCFS%20Crude%20Sources_0.xlsx.
[5] California Energy Commission. (2024). *Report - Draft 2024 Integrated Energy Policy Report Update*.

**The SYU pause had no statistical effect on imports of foreign oil**

Historical data on oil supply offers an opportunity to assess whether not restarting SYU production would lead to increases in foreign supply, given that markets responded to the loss of production from the SYU in 2015.

Data on crude oil supplied to California refineries from 2010 to 2023 show that domestic supply declined from 2010 to 2023, while imports increased over the same timespan (Figure 1). The primary shift in foreign import supply came during the 2010-2014 period of high prices, as foreign sources of crude exceeded domestic supply in 2011. Aside from a peak in imports in 2017-2019, and the pandemic collapse in 2020, foreign import levels in 2023 were roughly the same as in 2014-2015  (Figure 2). Looking at the period directly after the SYU went offline, there was no increase in foreign imports:  imports actually fell to 316 million barrels in 2016 from 320 million barrels in 2014 and 318 million barrels in 2015.

Applying a statistical model to the data shows that the pause in SYU production since May 2015 did not significantly impact changes in foreign imports despite declining domestic supply. Specifically, using the difference-in-difference estimator widely used in statistics and econometrics,[6] modeling indicates that the SYU pause caused a modest annual increase in imports by 463,936 barrels per year, though the increase is not statistically distinguishable from a scenario in which the pause had no effect.[7]

To put this number in perspective, all three SYU fields produced roughly 11 million barrels in 2014. Putting these numbers together, for every 1 barrel not produced from SYU fields, there was only a 0.04 barrel replacement by foreign imports to California refineries; the remaining 0.96 barrels to account for the loss of SYU production were offset by reduced demand, and to a lesser extent, increased Alaskan oil supply.[8]

Comparing non-SYU OCS production to imports also shows little impact. Here a model is applied to estimate how changes in non-SYU OCS production influence imports pre/post SYU pause. Results from this model show that declining production from non-SYU OCS had no statistical effect on changes in imports over the 2015-2023 period.[9]

---

[6] Abadie, A. (2005). Semiparametric difference-in-differences estimators. *Review of Economic Studies*, 72(1), 1-19.
[7] The model-estimated increase in foreign imports relative to declining domestic imports is 463,936 barrels per year with a p-value of 0.917, indicating that the difference in imports is not statistically significantly different from 0.
[8] Based on data from the California Energy Commission, crude oil supply to California from Alaska increased from 70.4 million barrels in 2014 and 73.6 million barrels in 2015 to 84.2 million barrels in 2023, though this increase primarily replaced the loss of crude oil supply from California (onshore and state offshore) over the same period. See footnote 3 for a review of declining consumer demand over time.
[9] The model-estimated effect on foreign imports relative to declining non-SYU OCS production is 30,237 barrels per day with a p-value of 0.759, indicating that the difference in imports is not statistically significantly different from 0.



**Figure 2: Foreign vs. domestic supply to California before and after SYU pause in 2015**
*Author analysis. Data Source: CARB.*

## Future SYU production will not displace foreign imports on a cost basis

One objection to the above finding would be that SYU barrels would replace production from California onshore fields given SYU's lower operating costs on a per-barrel basis. Purely from an operating cost and up-front capital cost perspective, the SYU is more cost-competitive than roughly 80% of California's onshore oil fields using data from a widely-used industry database.[10]

These figures are likely underestimated given non-accounting of remediation and retirement costs, which the BSEE estimates to range between $34,700,743 and $38,149,826 per platform given the SYU's platform depths of 850'-1,200', which are roughly 10 times the remediation costs for onshore California wells on a per-well basis.[11]

---

[10] This estimate is a comparison of Sable's projected costs from the November 2024 Investor Presentation (see footnote 1), and statewide data from Rystad Energy's UCube. Sable's projected revenues from a low-estimate base forecast of 133 total MMBoe of oil, gas, and NGL resources give an estimated present value cash flow of $2.3 billion assuming a 10% discount rate. Backing out operating costs based on Sable's market price assumptions gives an estimated break-even price between $41 and $47 per barrel, depending on assumed depletion rates over a 5-year period. By comparison, the cost curve for California's onshore and state-water offshore fields projected out to 2030 indicates that roughly 20% of fields have a break-even price below $44/barrel.

[11] Bureau of Safety and Environmental Enforcement and ICF International, *Decommissioning*

Yet even without accounting for retirement costs, SYU's barrels are not more cost-competitive than existing *foreign* suppliers to California. Assuming operating costs of roughly \$44/barrel for SYU,[12] this would still exceed average per-barrel total costs—including capital expenditures, taxes, transport, and administrative costs—for California's top foreign suppliers of oil. This includes Saudi Arabia (\$9/barrel), Iraq (\$11/barrel), Colombia (\$11/barrel), Ecuador (\$7-\$20/barrel), and Brazil (\$21-28/barrel).[13]

This suggests that restarting SYU production would not lead to a reduction in imports on a strictly economic basis.

**SYU production will have limited impacts on statewide oil consumption**

From a demand perspective, there is limited opportunity cost to consumption for not restarting SYU oil production. This is because there is no "perfect substitution" of supply and demand in global oil markets at the local level: one barrel not produced locally is not perfectly replaced by one barrel produced elsewhere to fill local demand. As a result, a production shock tends to reduce demand despite the relative fungibility of global oil markets.

This pattern particularly holds for oil produced in California, where studies estimate that for every barrel of oil not produced in California, oil consumption declines by between 0.2 and 0.6 barrels.[14] This estimate is consistent with a broad range of economic models from government sources, think tanks, energy consultants, and academic researchers, showing that a one-barrel loss in production corresponds to an average reduction in consumption by 0.5 barrels.[15] Extrapolating these results to the

---

*Methodology and Cost Evaluation.* BPA No. E13PA00010. These estimates are based on an assumed 60 wells per platform, which is roughly in line with Sable's development plans given 112 existing wells and 102 infill drilling and step-out opportunities across three platforms.

[12] See footnote 10 for sources on estimated opex at \$44/barrel. Even sell-side models which reflect a lower opex in the \$27/barrel range would show that SYU crude is still not competitive with imports, with the exception of a small range of Brazilian crudes.

[13] Saudi and Iraqi oil costs are drawn from Rystad Energy; Colombia estimates are from Ecopetrol via the *Rio Times*; Ecuador estimates are from PetroAmazonas via the Baker Institute; and Brazil estimates are drawn from Enverus data on pre-salt breakeven costs, plus an assumed \$3/barrel administrative and transportation cost. For a list of all foreign suppliers to California, see California Energy Commision, *Foreign Sources of Crude Oil Imports to California*, Accessed from: https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports

[14] Erickson, P. and Lazarus, M. (2018). *How limiting oil production could help California meet its climate goals*. Stockholm Environment Institute discussion briefing report; Erickson, P. and Lazarus, M. (2014). Impact of the Keystone XL pipeline on global oil markets and greenhouse gas emissions. *Nature Climate Change*, 4(9). 778–81.

[15] Wolvovsky, E. and Anderson, W. (2016). *OCS Oil and Natural Gas: Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon*. BOEM OCS Report 2016-065. U.S. Department of Interior, Bureau of Ocean Energy Management; Metcalf, G. (2016). The Impact of Removing Tax Preferences for U.S. Oil and Gas Production. Council on Foreign Relations; ICF and Ensys (2014). *The Impacts of U.S. Crude Oil Exports on Domestic Crude Production,*

SYU based on hypothetical production at 10 million barrels per year in 2025, this suggests that on average there would be a 0.93% reduction in annual statewide consumption if production from the SYU is not restarted.[16]

Looking at future consumption, there is no support in existing demand models for additional supply needed over time. Modeling by the Institute for Transportation Studies (ITS) shows that under a conservative business-as-usual forecast—based on historical demand and future demand in the absence of new policies—there is an expected 30% decline in fuel consumption, from roughly 19 billion gasoline gallon-equivalent (GGE) in 2020 to roughly 13 GGE in 2045, corresponding to a 1.5% compound annual decline rate.[17] In this scenario, demand is still driven predominantly by petroleum-based fuels, but consumption declines due to efficiency improvements. In more extreme cases with substantial fuel replacement, such as the CARB 2022 Scoping Plan, demand reduction for liquid petroleum fuels declines 94% from 2020 to 2045, for a 10.9% compound annual decline rate.[18]

In either extreme—from business-as-usual with no change in statewide policy to a considerable shift in energy policy to achieve carbon neutrality—the impact of the loss of supply from not restarting the SYU is outweighed by declining consumer demand. Instead, it is likely that the over-time economic gains Sable aims to achieve from restarting the SYU will come from exporting the oil from California to other markets.

**Restarting the SYU will increase global greenhouse gas emissions**

If production were to resume from the SYU, estimates from the Oil Production Greenhouse Gas Emissions Estimator (OPGEE) used by CARB suggest that per-unit emissions from production from the Hondo, Pescado, and Sacate fields would be roughly 87% higher than per-unit emissions from the onshore Aliso Canyon fields in LA

---

GDP, Employment, Trade, and Consumer Costs. ICF International for the American Petroleum Institute; Bordoff, J. and Houser, T. (2015). *Navigating the U.S. Oil Export Debate*. Columbia University, Center on Global Energy Policy and Rhodium Group; and Rajagopal, D. and Plevin, R. J. (2013). Implications of market-mediated emissions and uncertainty for biofuel policies. *Energy Policy*, 56 75–82.

[16] SYU annual production of 10 million barrels/year is estimated from an expected 28,100 barrels/day production once online, from Sable Offshore Corp. (2024). *Investor Presentation September 2024*, accessed from https://sableoffshore.com/events-and-presentations/default.aspx. This is compared to 2023 statewide consumption of 532 million barrels based on CARB data.

[17] Brown, A. L; Sperling, D.; Austin, B.; DeShazo, JR; Fulton, L.; Lipman, T., et al. (2021). *Driving California's Transportation Emissions to Zero*. UC Office of the President: University of California Institute of Transportation Studies. http://dx.doi.org/10.7922/G2MC8X9X.

[18] California Air Resources Board. (2022). *2022 Scoping Plan for Achieving Carbon Neutrality*. Data extracted from: https://ww2.arb.ca.gov/sites/default/files/2022-11/2022-sp-PATHWAYS-data-E3.xlsx

County.[19] Existing models of the greenhouse gas intensity of oil and gas production show that these carbon intensity levels are underestimated as they do not capture methane emissions and poorly estimate emissions from flaring.[20] Nonetheless, they provide a comparison on an emissions basis to the SYU.

Using Aliso Canyon as an emissions-intensity comparison, the operational emissions intensity of production from the SYU would be roughly 440 kg $CO_2$e per barrel of oil and barrel-equivalent of gas using the OCI+ metrics of emissions intensity.[21] This is considerably higher than nearly all other fields rated by OCI+, which typically range between 80 kg $CO_2$e/mboe and 400 kg $CO_2$e/mboe. Iraqi crude, for example, has intensities of 175 $CO_2$e/mboe (Rumaila, medium oil), 234 $CO_2$e/mboe (Ahdab, medium/heavy oil), and 255 $CO_2$e/mboe (Fakka, heavy oil), all of which include emissions from production, gathering, storage, and transportation.[22]

The quality of SYU crude is a mix of heavy oil (18° API gravity) from the primary reservoir and light oil (37° API gravity) from the secondary reservoir.[23] Comparisons by quality also show that the greenhouse gas intensity of SYU crude exceeds that of commensurate foreign imports. Among heavy oil comparisons, SYU greenhouse gas intensity would be higher than any field rated by OCI+.[24] Among light oil comparisons, SYU greenhouse gas intensity exceeds all estimated fields with the exception of four that are not currently exported to California.[25]

Compared to production from Elk Hills in Kern County—which produces medium/light oil that is near global averages in emissions intensity taking methane emissions into account, and approximately equivalent to SYU barrels in terms of estimated break-even

---

[19] CARB. (2023). Estimated Carbon Intensity Values for the Crude Lookup Table, App. F to Proposed Amendments to the Low Carbon Fuel Standard Regulations. These values are roughly double what Sable stated at the October 30, 2024, Planning Commission hearing (see footnote 1). The 2010 carbon intensity (gCO2/MJ) for Hondo, Pescado, and Sacate is estimated at 6.84, 6.13, and 4.85, respectively, with a production-weighted average at 6.09 gCO2/MJ. This is compared to Aliso Canyon with carbon intensity of 3.26 gCO2/MJ.

[20] RMI, *Oil Climate Index plus Gas Model v.2.1.0* (2024); Mohammad S. Masnadi et al., Global carbon intensity of crude oil production. *Science* 361,851-853 (2018); Scarpelli, T. R., Jacob, D. J., Grossman, S., Lu, X., Qu, Z., Sulprizio, M. P., Zhang, Y., Reuland, F., Gordon, D., and Worden, J. R.: Updated Global Fuel Exploitation Inventory (GFEI) for methane emissions from the oil, gas, and coal sectors: evaluation with inversions of atmospheric methane observations. *Atmos. Chem. Phys.*, 22, 3235–3249 (2022).

[21] Based on data from the Oil Climate Index plus Gas (OCI+), accessed from https://ociplus.rmi.org/analysis. Aliso Canyon is rated at 235.84 kg CO2e/mboe industry GHG emissions intensity.

[22] Ibid.

[23] Based on information for Platform Hondo from: Air Pollution Control District, Santa Barbara County. (April 2024). *Draft Permit to Operate 9100 – R8 and Part 70 Operating Permit 9100: Sable Offshore – SYU Project Platform Hondo*. Accessed in February 2025 from https://www.ourair.org/wp-content/uploads/Draft-PT-70-09100-R8-Platform-Hondo-4-8-2024.pdf

[24] The highest intensity rated among heavy or extra heavy oil is Canada Peace River at 419 CO2e/mboe. Data drawn from OCI+ (see footnote 21).

[25] The exceptions are industry GHG intensities of 490 CO2e/mboe (Gabon Koula), 639 CO2e/mboe (Iran Agha Jari), 806 CO2e/mboe (Russia Kuyumbinskoye), and 964 CO2e/mboe (Mexico Teotleco). Data drawn from OCI+ (see footnote 21).

price per barrel—every barrel of oil from SYU would add 245 kg $CO_2e$ above and beyond emissions from barrels from Elk Hills (195 kg CO2e/mboe). Considering the anticipated annual volume of production, this translates to roughly 2.5 million tons of $CO_2e$ above what would be emitted if the SYU were not producing.

**Conclusion**

An overview of the economic analysis performed here of the market impacts of production from the SYU finds support for the following three claims:

(1) Restarting SYU production will not reduce foreign imports, based on both statistical analysis of the 2015 pause and an economic analysis of costs compared to major suppliers of crude;

(2) Not restarting SYU will not have significant impacts on consumer markets over time, given declining demand for petroleum products in California through 2045 outpaces the loss of supply from SYU production;

(3) Production from the SYU will increase global greenhouse gas emissions given the higher greenhouse gas intensity of operations compared to industry averages for operations from commensurate fields.

8

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On July 11, 2025, I served the above document(s) described as **DECLARATION OF PAASHA MAHDAVI IN SUPPORT OF PETITIONERS AND PLAINTIFFS' APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒       **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 11, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEY FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2025 5:12 PM
By: Terri Chavez , Deputy

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **DECLARATION OF ALEX KATZ IN SUPPORT OF PETITIONERS AND PLAINTIFFS' APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** <br><br> [*Filed concurrently with Petitioners and Plaintiffs' Combined Reply to Respondents and Real Parties in Interests' Opposition to Application for Stay or Preliminary Injunction*] <br><br> Date: July 18, 2025 <br> Time: 10:00 a.m. <br> Dept.: 4 <br> Judge: Honorable Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

---

1

Declaration of Alex Katz in Support of Petitioners and Plaintiffs' Application for Stay or Preliminary Injunction

**DECLARATION OF ALEX KATZ**

I, Alex Katz, hereby declare as follows:

1.     I am over eighteen years old. I have personal knowledge of the matters stated herein and, if called as a witness, could and would competently testify thereto.

2.     I currently reside in Santa Barbara, California, and I have lived in Santa Barbara County for more than two years.

3.     I am the Executive Director of the Environmental Defense Center ("EDC"). My business address and phone number are 906 Garden Street, Santa Barbara, CA 93101, (805) 963-1622. I have served as the Executive Director of EDC since March 2023.

4.     EDC is a non-profit public interest environmental law firm that was founded in 1977 in the wake of the devastating 1969 oil spill off the coast of Santa Barbara. EDC's mission is to defend nature and advance environmental justice on California's Central Coast through advocacy and legal action. EDC's program areas include climate and energy, environmental justice, ocean protection, and land and water. Our service area includes Ventura, Santa Barbara, and San Luis Obispo Counties. EDC has approximately 2,400 members.

5.     Since our founding, EDC has been a leader on issues related to oil and gas development in our region. In addition to administrative advocacy and litigation, EDC often promotes policies to respond to emerging threats or improve protection for natural resources and public health.

6.     Many of EDC's members live, work, and recreate near and along the Gaviota coast, as well as the remaining route of the Las Flores Pipeline System.

7.     Restarting the Las Flores Pipeline System, which also allow the resumption of oil and gas drilling in the Santa Ynez Unit (SYU), would cause EDC's members irreparable harm from air pollution, water pollution, and, potentially, risk of another catastrophic oil spill in the places where EDC's members live and recreate. Another oil spill could impact major groundwater supply sources for Santa Barbara County; areas where EDC and its members frequent and recreate, including beaches, State Parks, and National Forest areas; and a variety of sensitive habitat areas, including coastal habitats, rivers, creeks, and wetlands that the pipelines cross.

8.      EDC's members are also affected by the failure of the Office of State Fire Marshal (OSFM) to conduct environmental and public review of the waivers that are the subject of this litigation. Central to EDC's mission is to ensure compliance with environmental and public safety laws, and to provide a voice to those affected by agency decisions. EDC and its members have an interest in reviewing and commenting on proposals that affect the environment and the public. The failure of the OSFM to provide a formal public review process negatively and irreparably affects our members' ability to raise concerns and influence agency decision-making.

9.      I personally would be negatively affected by the restart of the pipeline system and operations of the SYU. My family and I rely on the ocean and the coast — including Gaviota State Park, El Capitán State Beach, and Refugio State Beach — for recreation, exercise, physical and spiritual health, and in the case of my daughter, for school and learning. In the event of another oil spill, the loss of access to these places, the destruction of nature in our region, and the potential contamination of groundwater and air quality would have a direct negative impact on our wellbeing. In addition to the danger of another spill, operation of the SYU is expected to increase greenhouse gas emissions in Santa Barbara County by 100%, directly affecting air quality and public health in our region. I am also a property owner in Santa Barbara County, and I am concerned that the threat or the reality of another major spill in our area may result in significant loss of property value. Importantly, like many local residents, I place a high value on public places and wilderness along the pipeline route, including the Coastal Zone, major rivers, and the Los Padres National Forest, and major harm to these natural resources resulting from another oil spill would detrimentally impact the quality of my life, as well as the lives and livelihoods of many people in this area.

10.      EDC seeks a preliminary injunction because restarting the Las Flores Pipeline System would cause EDC's members irreparable harm from the air pollution, water pollution, and risk of another oil spill in the places where they members live and recreate. Another oil spill would also impact major groundwater supply sources for Santa Barbara County.

11.      EDC also seeks a preliminary injunction to ensure that no further action is taken in reliance on the waivers until and unless the OSFM conducts environmental and formal public review.

Declaration of Alex Katz in Support of Petitioners and Plaintiffs' Application for Stay or Preliminary Injunction

12.     The OSFM's decision to grant waivers of pipeline safety laws and refusal to conduct an environmental analysis puts the health, safety, and well-being of EDC members at imminent risk.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 10th day of July, 2025, in Santa Barbara, California.

_____
Alex Katz
Executive Director
Environmental Defense Center

Declaration of Alex Katz in Support of Petitioners and Plaintiffs' Application for Stay or Preliminary Injunction

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On July 11, 2025, I served the above document(s) described as **DECLARATION OF ALEX KATZ IN SUPPORT OF PETITIONERS AND PLAINTIFFS' APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 11, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEY FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622; Fax: (805) 962-3152

*Attorneys for Petitioners/Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation, <br><br> Petitioners and Plaintiffs, <br><br> vs. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, by and through the OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10, inclusive, <br><br> Respondents and Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., a Delaware corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation, <br><br> Real Parties in Interest. | Case No.: 25CV02247 <br><br> **DECLARATION OF MICHAEL LYONS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** <br><br> [*Filed concurrently with Petitioners and Plaintiffs Combined Reply to Respondents and Real Party in Interests' Opposition to Application for Stay or Preliminary Injunction*] <br><br> Date:  July 18, 2025 <br> Time:  10:00 a.m. <br> Dept.:  4 <br> Judge:  Honorable Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

---

1

Declaration of Michael Lyons in Support of Petitioners and Plaintiffs' Application for Stay or Preliminary Injunction

## DECLARATION OF MICHAEL LYONS

I, Michael Lyons, hereby declare as follows:

1.      I am over eighteen years old. I have personal knowledge of the matters stated herein and, if called as a witness, could and would competently testify thereto.

2.      My current address is 223 West Figueroa Street, Unit A, Santa Barbara, California. I have lived in Santa Barbara County for fifty-six years.

3.      I have been a member of Get Oil Out! for twenty-six years; I remain a current member and am the current Board president.

4.      Founded in response to the devastating 1969 Santa Barbara Oil Spill, Get Oil Out!'s mission for the past fifty-six years has been to rid the Santa Barbara Channel of existing oil development and to prevent any new oil projects from being approved in order to prevent oil spills and any other environmental degradation in the Santa Barbara Channel and surrounding region. As provided in our bylaws, Get Oil Out's purpose includes preserving and conserving Santa Barbara's unique natural environment, scenic beauty, and resources by opposing offshore and onshore fossil fuel development which pose a significant danger to that environment.

5.      Get Oil Out! has approximately 1,500 members, many of whom recreate in areas along the pipeline route, especially at the beaches along the Gaviota Coast.

6.      I am an avid outdoorsman and I frequently use, and recreate in and around, the area where the Santa Ynez Unit facilities are located. My uses in this area include surfing, bike riding, running, hiking, fishing, swimming, bird watching, camping, star gazing, photography, disc golfing, golfing, mobile working, driving, and picnicking. Specifically, I regularly use and enjoy El Capitan State Park/Beach, Refugio State Park/Beach, Gaviota State Park/Beach, Gaviota Peak, and Nojoqui Falls Park.

7.      I was in the Santa Barbara area when the Plains All American Pipeline failed. I drove to Refugio and took pictures starting the first day of the oil spill. I was astonished and upset. I could smell the oil and see it in the ocean.

8.      Following the 2015 Plains All American Oil Spill, I received calls from people all over the world. I spent a lot of time responding to their questions and concerns. I represented Get Oil Out! in

Declaration of Michael Lyons in Support of Petitioners and Plaintiffs' Request for Preliminary Relief

several interviews with the media and spoke at press conferences to educate the public about the impacts of the spill.

9.    Because of the spill, I was not able to go to the beach. Several beaches were closed, so I could not go surfing or swimming. I also avoided the beaches because I was concerned about the presence of the oil, and I found it too upsetting.

10.    Get Oil Out! is concerned about Sable's operational and financial capacity to safely operate the Santa Ynez Unit or respond to an oil spill. We are concerned about the risk of another oil spill, and the potential that Sable will not have the financial resources to respond to or clean up a spill.

11.    Get Oil Out! also has an interest in public participation and informed decision-making. Our organization strives to educate and engage our members and the public when oil development activities threaten our community and the environment. We notify our members about issues and opportunities to voice their concerns by submitting comments, and by attending and testifying at hearings.

12.    Get Oil Out's members are harmed by the failure of the Fire Marshal to conduct environmental review, solicit public comments, or hold a public hearing. Our members were deprived of the formal opportunity to raise concerns before a decision was made to approve the waivers for Sable's pipelines.

13.    Get Oil Out! seeks a preliminary injunction because our members live and recreate in and around the areas where the Santa Ynez Unit facilities are located. The facilities associated with the SYU include three offshore platforms, onshore processing facilities in Las Flores Canyon, and onshore pipelines that transport oil approximately 120 miles from the Gaviota Coast to Kern County. The resumption of drilling, transporting, and processing of oil using the same SYU infrastructure that failed ten years ago threatens another catastrophic oil spill, which would harm our members by preventing them from recreating along and enjoying the Gaviota coast. Restarting the Las Flores Pipeline System would also cause Get Oil Out! and its members irreparable harm from the air pollution and water pollution that results from oil drilling and transportation.

Declaration of Michael Lyons in Support of Petitioners and Plaintiffs' Request for Preliminary Relief

14.    Get Oil Out! also seeks a preliminary injunction to ensure that no further action is taken in reliance on the waivers until and unless the Fire Marshal conducts environmental and formal public review.

15.    The Office of State Fire Marshal's decision to grant waivers of pipeline safety laws and refusal to conduct an environmental analysis puts the health, safety, and well-being of Get Oil Out! members at imminent risk.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 9ᵗʰ day of July, 2025, in Santa Barbara, California.

Michael Lyons
President
Get Oil Out!

4

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On July 11, 2025, I served the above document(s) described as **DECLARATION OF MICHAEL LYONS IN SUPPORT OF PETITIONERS AND PLAINTIFFS' APPLICATION FOR STAY OR PRELIMINARY INJUNCTION** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒      **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 11, 2025, at Santa Barbara, California.

_____
Jeremy M. Frankel

**SERVICE LIST**

| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEY FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
|---|---|
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

Proof of Service