# EXHIBIT V

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
4/1/2026 11:35 PM
By: Narzralli Baksh , Deputy

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS**
DUNCAN JOSEPH MOORE, SBN 233955
djmoore@paulhastings.com
BENJAMIN J. HANELIN (SBN 237595)
benjaminhanelin@paulhastings.com
NATALIE C. Rogers (SBN 301254)
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants,<br><br>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No. 25CV02244<br><br>Assigned for all purposes to:<br>Hon. Donna D. Geck<br><br>**DECLARATION OF STEVE RUSCH IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF EX PARTE NOTICE OF DEFENSE PRODUCTION ACT ORDER**<br><br>[Filed concurrently with Request for Judicial Notice and Declarations of Michael A. Mische and Garrett B. Stanton]<br><br>Date:   April 17, 2026<br>Time:   10:00 a.m.<br>Dept.:   4<br>Complaint Filed:       April 15, 2025<br>Trial Date:             None set |

1

DECLARATION OF STEVE RUSCH

## DECLARATION OF STEVE RUSCH

I, Steve Rusch, declare as follows:

1.      I am the Vice President, Regulatory & Environmental Affairs of Sable Offshore Corp. ("Sable"). I have over 45 years of experience in the oil and gas industry. Before my current position with Sable, I was the Vice President, Environment, Health and Safety ("EHS") and Government Affairs at Freeport-McMoRan Oil & Gas, a Senior Staff Engineer at Exxon Mobil Corporation, and the Principal at Rusch Consulting. I have a Bachelor of Science degree in Civil Engineering from the University of California at Berkeley and have been licensed by the State of California as a Professional Engineer. I make this in support of Real Parties in Interest Sable Offshore Corp. ("Sable") and Pacific Pipeline Company ("PPC") (collectively, "Real Parties") Supplemental Brief in Support of Ex Parte Notice of Defense Production Act Order (the "Supplement Brief"). I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2.      Sable is a publicly traded oil and gas company focused on responsibly developing the Santa Ynez Unit ("SYU") and its Las Flores Pipelines and Santa Ynez Unit Pipelines in waters offshore California, which include portions that are within the Coastal Zone.

3.      Sable owns 16 federal oil and gas leases covering approximately 76,000 acres in federal waters of the Outer Continental Shelf ("OCS"), offshore California, and Sable's leases cover the most remaining resources among current OCS-producing fields in the United States. The federal government owns the mineral rights, in fee, for the minerals that are the subject of Sable's 16 oil and gas leases with the federal government. Under the terms of those oil and gas leases, Sable is provided the "exclusive right and privilege to drill for, mine, extract, remove, and dispose of all oil and gas deposits except helium gas[,]" and Sable takes ownership of the hydrocarbons it produces, pumps, and transports through the Santa Ynez Pipeline System. In consideration, Sable pays rental fees and royalties to the federal government. True and correct copies of Sable's federal oil and gas leases are attached hereto as **Exhibit 1**.

4.      Under Sable's oil and gas leases with the federal government, Sable produces crude oil and natural gas from Platforms Hondo, Harmony, and Heritage, located in federal waters off the

California Coast in the Santa Barbara Channel. Sable transports the hydrocarbons produced subject to those lease agreements with the federal government through the Santa Ynez Pipeline System to Pentland Station, where the oil enters third-party owned and operated infrastructure and is transported to a refinery.

5. Real Parties have invested significant capital, time, resources, and energy to resume oil production along the Outer Continental Shelf and transportation of crude oil through the Santa Ynez Pipeline System.

6. In September 2024, Sable installed twenty-seven (27) safety valves along the Pipeline Segments in compliance with California Assembly Bill 864 and consistent with Consent Decree requirements and reducing the worst-case potential release volumes by 40% or more.

7. On July 25, 2024, and again on July 17, 2025, Sable held an oil spill response preparedness drill which included approximately 35 representatives from the U.S. Environmental Protection Agency, PHMSA, U.S. Coast Guard, National Oceanic and Atmospheric Administration Office of National Marine Sanctuaries, California Department of Fish and Wildlife's Office of Spill Prevention and Response, Santa Barbara County Air Pollution Control Department, Santa Barbara County Office of Emergency Management, the Santa Barbara County Fire Department, and the Santa Barbara County Certified Unified Program Agency.

8. Sable conducted successful hydrotests along the Pipeline Segments under OSFM's supervision, which confirmed that Segments CA-324 and CA-325 could be operated at pressures in exceedance of Segments CA-324's and CA-325's maximum operating pressures for both short periods ("spike" hydrotests) and during longer durations.

9. On March 13, 2026, the Secretary of Energy issued a Pipeline Capacity Prioritization and Allocation Order ("DPA Order") to Sable pursuant to the delegated authority of the President under the Defense Production Act of 1950. (See Declaration of Jeffrey D. Dintzer, Ex. A [DPA Order].) The DPA Order directed Sable to, among other directives, immediately commence hydrocarbon transportation through the interstate Santa Ynez Pipeline System. (See *id.*)

10. Real Parties are complying with the DPA Order.

11. Real Parties cannot meet both the Preliminary Injunction's requirements for restart and

the DPA Order's requirements to "immediately" restart and operate the Santa Ynez Pipeline System. Thus, if the Preliminary Injunction remains, Real Parties must choose whether to abide by the DPA Order or the Preliminary Injunction.

12. If Real Parties halt the flow of hydrocarbons through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, Sable's performance under Sable's existing contracts, will be significantly frustrated.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 1, 2026, at Thousand Oaks, California.

_____
STEVE RUSCH

4
DECLARATION OF STEVE RUSCH

# EXHIBIT 1

O R I G I N A L

Exxon Lease

**816499**

Form 3380—1
(February 1966)
(formerly 4—1255)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0195 |
| Cash Bonus | $1,532,638.40 |
| Rental Rate | $3 per acre |
| Minimum Royalty Rate | $3 per acre |
| Royalty Rate | 1/6th |

This indenture of lease entered into and effective as of   **MAR 1  1968**   , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

**Atlantic Richfield Company**

**Humble Oil & Refining Company**

**Standard Oil Company of California**

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

Block 53N 79W; 54N 79W  All those portions lying seaward of a line 3 geographical miles distant from the coastline of California (as said coastline is defined in the Submerged Lands Act of 1953)  Official Leasing Map. Channel Islands Area Map No. 6A.

ORIGINAL DOCUMENT IS BELOW STANDARD
LEGIBLE IMAGE NOT POSSIBLE

containing  5,695  acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) Rentals and royalties. (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) Bonds. To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) Cooperative or unit plan. Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) Wells. (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) Payments. To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, except that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) Contracts for disposal of products. To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) Statements, plats, and reports. At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) Inspection. To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) Diligence. To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: Provided, That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) Freedom of purchase. To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) Equal Opportunity clause. During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

shall be considered productive of drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. *(a)* Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8*(j)* of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4*(b)* of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

*(b) Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph *(a)* of this Section, or pursuant to Section 8*(i)* of the Act.

*(c) Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

HUMBLE OIL & REFINING COMPANY

By _____
Its Attorney in Fact
(Signature of Lessee)

Standard Oil Company of California

By _____
(Signature of Lessee)

By _____
Assistant Secretary

_____
(Signature of Lessee)

ATLANTIC RICHFIELD COMPANY

By _____
(Signature of Lessee)
Vice President

If this lease is executed by a corporation, it must bear the corporate seal.

THE UNITED STATES OF AMERICA

By William E. Grant
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 8 1968    MAR 1 2 1968
(Date)

GPO

STATE OF CALIFORNIA ⎱ ss
City and County of San Francisco ⎰

On _February 23, 1968_, before me, the undersigned, a Notary Public in and for the City and County of San Francisco, State of California, duly commissioned and sworn, personally appeared A. T. SMITH and E. A. HANSEN to me known to be the Contract Agent and Assistant Secretary, respectively, of STANDARD OIL COMPANY OF CALIFORNIA, the corporation that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath state that they were authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.



EDMOND LEE KELLY
NOTARY PUBLIC · CALIFORNIA
CITY AND COUNTY OF
SAN FRANCISCO
My Commission Expires January 22, 1972

EDMOND LEE KELLY
Notary Public in and for the City and County of San Francisco, State of California
residing at San Francisco

(Week.)

33.1

rials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs,

[ST]ATE OF CALIFORNIA ⎱ ss.
[CO]UNTY OF LOS ANGELES ⎰

SUE M. MASON
NOTARY PUBLIC · CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

On this 1ST day of MARCH, A. D., 19 68, before me SUE M. MASON, Notary Public in and for said County and State, personally appeared J. W. GENDRON [kn]own to me to be the VICE President, and [kn]own to me to be the Secretary of ATLANTIC RICHFIELD COMPANY [th]e corporation that executed the within instrument, known to me to be the persons who executed the within instrument on [be]half of the corporation therein named, and acknowledged to me that such corporation executed the same, and acknowledged to [me] that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate [se]t above written.

Commission expires: MAY 4, 1968

Notary Public in and for said County and State.

HUMBLE OIL & REFINING COMPANY

THE UNITED STATES OF AMERICA

STATE OF CALIFORNIA ⎱ ss.
COUNTY OF LOS ANGELES ⎰

ON THIS 15th day of February, 19 68, before me, the undersigned, a Notary Public in and for said County and State personally appeared NIBERT J. JOHNSON known to me to be the person whose name is subscribed to the within instrument, as the Attorney in Fact of HUMBLE OIL & REFINING COMPANY, a corporation, and acknowledged to me that he subscribed the name of HUMBLE OIL & REFINING COMPANY thereto as principal and his own name as Attorney in Fact. WITNESS my hand and official seal.

KATHERINE BIDNER
NOTARY PUBLIC · CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

KATHERINE BIDNER
MY COMMISSION EXPIRES JUNE 12, 1969

(Print, stamp or type name)
Notary Public in and for Said County and State.

By _____
(Signature of Lessee) Vice President

[I]f this lease is executed by a corporation, it must bear the corporate seal

GPO

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

## 0195
(Lease Serial Number)

STIPULATIONS FOR OIL AND GAS LEASES
OUTER CONTINENTAL SHELF
CALIFORNIA

1.  The lessee, recognizing that mineral explorations and exploitation and recovery operations on the leased areas of tide and submerged lands can impede tactical military operations, hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations of the lessee under this lease in the interests of national security requirements.  Such temporary suspension of operations, including the evacuation of personnel, will come into effect upon the order of the Air Force Western Test Range Safety Officer, or higher authority, that national security interests necessitates such action.  It is understood that any temporary suspension of operations ordered by said official may not exceed seventy-two hours, however, any suspension may be extended by order of the Secretary of Defense.  During such periods equipment may remain in place.

2.   The lessee assumes all risk of damage or injury to any person or persons who are the agents, employees or invitees of the lessee, its agents, sub-contractors or any independent contractor doing business with the lessee in connection with any activities being performed by the lessee on the leased premises, and of any damage to any property of the lessee, its agents, employees, invitees, sub-contractors or independent contractors doing business with the lessee and which occurs on the leased premises, and which injury to such person or property occurs by reason of the activities of any agency of the United States Government being conducted as a part of or in connection with the programs and activities of the Air Force Western Test Range, whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States or its contractors, or any of their officers, agents or employees, and whether or not based upon any concept of strict or absolute liability or otherwise; and the lessee agrees to indemnify and save harmless the United States against, and to defend at its own expense, all such claims for loss, damage or injury sustained by the lessee, its agents, employees, invitees, sub-contractors, or any independent contractors doing business with the lessee in connection with its activities on the leased premises, or their agents or employees, which such claims may arise by reason of injury or damage occurring in connection with the programs and activities of the said Air Force Western Test Range, whether the same be caused in whole or in part, by the negligence or fault of the United States or its contractors or any of their officers, agents and employees, or based upon any concept of strict liability or otherwise.



confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

ORIGINAL

816463

Form 3380—1
(February 1966)
(formerly 4—1255)

### UNITED STATES
### DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT

### OIL AND GAS LEASE OF SUBMERGED LANDS
#### UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0180 |
| Cash Bonus | $1,180,800.00 |
| Rental Rate | $3 per acre |

| Minimum Royalty Rate | Royalty Rate |
|---|---|
| $3 per acre | 1/6th |

This indenture of lease entered into and effective as of APR 1 1969 , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

### Humble Oil & Refining Company

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

### All Block 52N 74W Official Leasing Map, Channel Islands Area Map No. 6A.

containing 5,760 acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) Bonds. To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) Cooperative or unit plan. Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) Wells. (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) Payments. To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, except that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) Contracts for disposal of products. To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) Statements, plats, and reports. At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) Inspection. To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) Diligence. To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: Provided, That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) Freedom of purchase. To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) Equal Opportunity clause. During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.





confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3.    Reservations to Lessor.    The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection *(b)* of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. *(a)* Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8*(j)* of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4*(b)* of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

*(b) Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph *(a)* of this Section, or pursuant to Section 8*(i)* of the Act.

*(c) Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

HUMBLE OIL & REFINING COMPANY

THE UNITED STATES OF AMERICA

By _____
(Signature of Lessee)

Its Attorney in Fact

By _____
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

(Signature of Lessee)

MAR 1 2 1968
(Date)

(Signature of Lessee)

(Signature of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal*

GPO 855-238

O R I G I N A L

Form 3380—1
(February 1966)
(formerly 4—1255)

### UNITED STATES
### DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT

## OIL AND GAS LEASE OF SUBMERGED LANDS
### UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0181 |
| Cash Bonus | $6,664,320.00 |
| Rental Rate | $3 per acre |
| Minimum Royalty Rate $3 per acre | Royalty Rate 1/6th |

This indenture of lease entered into and effective as of **APR 1 1968**, by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

### Humble Oil & Refining Company

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

**All Block 52N 75W Official Leasing Map, Channel Islands Area Map No. 6A.**

containing **5,760** acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of **$3.00** per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of **$3.00** per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

*(b) Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

*(c) Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

*(d) Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

*(e) Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau

of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

*(f) Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

*(g) Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

*(h) Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

*(i) Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

*(j) Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

*(k) Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

(*l*) *Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

(b) *Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

(d) *Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

(e) *Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

(f) *Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

(h) *Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. *Surrender and termination of lease.* The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. *Removal of property on termination of lease.* Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. *Remedies in case of default.* (*a*) Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(*j*) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(*b*) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(*b*) *Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (*a*) of this Section, or pursuant to Section 8(*i*) of the Act.

(*c*) *Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. *Heirs and successors in interest.* Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. *Unlawful interest.* No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)
**Its Attorney in Fact**

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

THE UNITED STATES OF AMERICA

By _William E. Grant_
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 1 2 1968
(Date)

*If this lease is executed by a corporation, it must bear the corporate seal*

GPO 855-238

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(b) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(b) *Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this Section, or pursuant to Section 8(i) of the Act.

(c) *Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

STATE OF CALIFORNIA }
COUNTY OF LOS ANGELES } ss.

ON THIS 15th day of February, 19 68, before me, the undersigned, a Notary Public in and for said County and State personally appeared NIBERT J. JOHNSON, known to me to be the person whose name is subscribed to the within instrument, as the Attorney in Fact of HUMBLE OIL & REFINING COMPANY, a corporation, and acknowledged to me that he subscribed the name of HUMBLE OIL & REFINING COMPANY thereto as principal and his own name as Attorney in Fact.

WITNESS my hand and official seal.

*Katherine Bidner*

KATHERINE BIDNER
MY COMMISSION EXPIRES JUNE 12, 1969
(Print, stamp or type name)
Notary Public in and for Said County and State.

KATHERINE BIDNER
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)
Its Attorney in Fact

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

THE UNITED STATES OF AMERICA

By William E. Grant
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 1 2 1968
(Date)

If this lease is executed by a corporation, it must bear the corporate seal

GPO 855-238

confidential
Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

Form 3380-1
(February 1966)
(formerly 4-1255)

**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0182 |
| Cash Bonus | $2,062,771.20 |
| Rental Rate | $3 per acre |
| Minimum Royalty Rate $3 per acre | Royalty Rate 1/16th |

This indenture of lease entered into and effective as of                    APR 1  1968                    , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

**Humble Oil & Refining Company**

**Standard Oil Company of California**

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

**All Block 52N 77W. Official Leasing Map. Channel Islands Area Map No. 6A.**

ORIGINAL DOCUMENT IS BELOW STANDARD
LEGIBLE IMAGE NOT POSSIBLE

containing     **5,760**     acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties*. (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16·2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matter. Each such determination shall be made only after

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) *Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) *Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) *Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

## 0182

(Lease Serial Number)

STIPULATIONS FOR OIL AND GAS LEASES
OUTER CONTINENTAL SHELF
CALIFORNIA

1. ~~The lessee, recognizing that mineral explorations and exploitation~~ and recovery operations on the leased areas of tide and submerged lands can impede tactical military operations, hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations of the lessee under this lease in the interests of national security require- ments. Such temporary suspension of operations, including the evacuation of personnel, will come into effect upon the order of the Air Force Western Test Range Safety Officer, or higher authority, that national security interests necessitates such action. It is understood that any temporary suspension of operations ordered by said official may not exceed seventy-two hours, however, any suspension may be extended by order of the Secretary of ~~Defense. During such periods equipment may remain in place.~~

2. The lessee assumes all risk of damage or injury to any person or persons who are the agents, employees or invitees of the lessee, its agents, sub-contractors or any independent contractor doing business with the lessee in connection with any activities being performed by the lessee on the leased premises, and of any damage to any property of the lessee, its agents, employees, invitees, sub-contractors or independent contractors doing business with the lessee and which occurs on the leased premises, and which injury to such person or property occurs by reason of the activities of any agency of the United States Government being conducted as a part of or in connection with the programs and activities of the Air Force Western Test Range, whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States or its contractors, or any of their officers, agents or employees, and whether or not based upon any concept of strict or absolute liability or otherwise; and the lessee agrees to indemnify and save harmless the United States against, and to defend at its own expense, all such claims for loss, damage or injury sustained by the lessee, its agents, employees, invitees, sub-contractors, or any independent contractors doing business with the lessee in connection with its activities on the leased premises, or their agents or employees, which such claims may arise by reason of injury or damage occurring in connection with the programs and activities of the said Air Force Western Test Range, whether the same be caused in whole or in part, by the negligence or fault of the United States or its contractors or any of their officers, agents and employees, or based upon any concept of strict liability or otherwise.

created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

(a) Geological and geophysical exploration; rights-of-way. The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and pro- duction of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional we

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection *(b)* of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional we

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(*j*) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(*b*) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(b) *Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (*a*) of this Section, or pursuant to Section 8(*i*) of the Act.

(c) *Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

---

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)

Its Attorney in Fact

By _____
(Signature of Lessee)

Standard Oil Company of California

By _____
(Signature of Lessee)
Contract Agent

By _____
Assistant Secretary

_____
(Signature of Lessee)

If this lease is executed by a corporation, it must bear the corporate seal

THE UNITED STATES OF AMERICA

By _____
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
_____
(Title)

MAR 1 2 1968
_____
(Date)

GPO 855-238

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(b) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(b) *Other remedies.* If any such default continues for the period of 30 days after mailing of notice by

---

STATE OF CALIFORNIA }
COUNTY OF LOS ANGELES } ss.

ON THIS___15th___day of___February___, 19_68_, before me, the undersigned, a Notary Public in and for said County and State personally appeared___NIBERT J. JOHNSON___, known to me to be the person whose name is subscribed to the within instrument, as the Attorney in Fact of HUMBLE OIL & REFINING COMPANY, a corporation, and acknowledged to me that he subscribed the name of HUMBLE OIL & REFINING COMPANY thereto as principal and his own name as Attorney in Fact. WITNESS my hand and official seal.



KATHERINE BIDNER
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

*Katherine Bidner*
KATHERINE BIDNER
MY COMMISSION EXPIRES JUNE 12, 1969

(Print, stamp or type name)
Notary Public in and for Said County and State.

---

Sec. 7. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at _____ or is

executors, administrators, _____, ____. the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and _____ employee of the Department of the

---

STATE OF CALIFORNIA )
City and County of San Francisco ) ss

On___February 23 1968___, before me, the undersigned, a Notary Public in and for the City and County of San Francisco, State of California, duly commissioned and sworn, personally appeared A. T. SMITH and E. A. HANSEN to me known to be the Contract Agent and Assistant Secretary, respectively, of STANDARD OIL COMPANY OF CALIFORNIA, the corporation that executed the within instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath state that they were authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.



EDMOND LEE KELLY
NOTARY PUBLIC - CALIFORNIA
CITY AND COUNTY OF
SAN FRANCISCO
My Commission Expires January 22, 1972

EDMOND LEE KELLY
Notary Public in and for the City and County of San Francisco, State of California
residing at San Francisco

(Wash.)

---

(Signature of Lessee)

33.1

Standard Oil Company of California

MAR 1 2 1968

By_____
(Signature of Lessee)
Contract Agent

By_____
Assistant Secretary

(Signature of Lessee)

(Date)

If this lease is executed by a corporation, it must bear the corporate seal

GPO 855-236

Slaperouse Slaperouse
sableoffshore.com

ORIGINAL

Exxon Lease
816465

Form 3380-1
(February 1966)
(formerly 4-1255)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0183 |
| Cash Bonus | $11,600,640.00 |
| Rental Rate | $3 per acre |
| Minimum Royalty Rate $3 per acre | Royalty Rate 1/6th |

This indenture of lease entered into and effective as of    APR 1  1969    , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

**Humble Oil & Refining Company**

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

**All Block 52N 78W. Official Leasing Map. Channel Islands Area Map No. 6A.**

ORIGINAL DOCUMENT IS BELOW STANDARD
LEGIBLE IMAGE NOT POSSIBLE

containing   **5,760**   acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00  per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

Exxon Lease No. 816465-001

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) *Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) *Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) *Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

confidential
Slaperouse Slaperouse
oiloffshore.com
Mar 21, 2024 6:23 PM EDT

confidential
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

## 0183
(Lease Serial Number)

STIPULATIONS FOR OIL AND GAS LEASES
OUTER CONTINENTAL SHELF
CALIFORNIA

1. The lessee, recognising that mineral explorations and exploitation and recovery operations on the leased areas of tide and submerged lands can impede tactical military operations, hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations of the lessee under this lease in the interests of national security requirements.  Such temporary suspension of operations, including the evacuation of personnel, will come into effect upon the order of the Air Force Western Test Range Safety Officer, or higher authority, that national security interests necessitates such action.  It is understood that any temporary suspension of operations ordered by said official may not exceed seventy-two hours, however, any suspension may be extended by order of the Secretary of Defense.  During such periods equipment may remain in place.

2.    The lessee assumes all risk of damage or injury to any person or persons who are the agents, employees or invitees of the lessee, its agents, sub-contractors or any independent contractor doing business with the lessee in connection with any activities being performed by the lessee on the leased premises, and of any damage to any property of the lessee, its agents, employees, invitees, sub-contractors or independent contractors doing business with the lessee and which occurs on the leased premises, and which injury to such person or property occurs by reason of the activities of any agency of the United States Government being conducted as a part of or in connection with the programs and activities of the Air Force Western Test Range, whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States or its contractors, or any of their officers, agents or employees, and whether or not based upon any concept of strict or absolute liability or otherwise; and the lessee agrees to indemnify and save harmless the United States against, and to defend at its own expense, all such claims for loss, damage or injury sustained by the lessee, its agents, employees, invitees, sub-contractors, or any independent contractors doing business with the lessee in connection with its activities on the leased premises, or their agents or employees, which such claims may arise by reason of injury or damage occurring in connection with the programs and activities of the said Air Force Western Test Range, whether the same be caused in whole or in part, by the negligence or fault of the United States or its contractors or any of their officers, agents and employees, or based upon any concept of strict liability or otherwise.

created or transferred without requirement for filing or approval.  Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

(a) Geological and geophysical exploration; rights-of-way. The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease.  In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

Slapehouse Slapehouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. *Surrender and termination of lease.* The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate,* which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. *Removal of property on termination of lease.* Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. *Remedies in case of default.* (a) Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:
(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(*j*) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(*b*) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(b) *Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this Section, or pursuant to Section 8(*i*) of the Act.

(c) *Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. *Heirs and successors in interest.* Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. *Unlawful interest.* No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

---

**HUMBLE OIL & REFINING COMPANY**

By _____
(Signature of Lessee)

**Its Attorney in Fact**

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

**THE UNITED STATES OF AMERICA**

By _William E. Grant_____
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 1 2 1968
(Date)

HUMBLE 876465

*If this lease is executed by a corporation, it must bear the corporate seal*

GPO 855-238

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. *(a)* Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease,

(*Cancellation of producing lease.*) If at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(*b*) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

*(b) Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph *(a)* of this Section, or pursuant to Section 8(*i*) of the Act.

*(c) Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after

---

STATE OF CALIFORNIA } ss.
COUNTY OF LOS ANGELES }

ON THIS ___15th___ day of ___February___, 19 _68_, before me, the undersigned, a Notary Public in and for said County and State personally appeared ___NIBERT J. JOHNSON___, known to me to be the person whose name is subscribed to the within instrument, as the Attorney in Fact of HUMBLE OIL & REFINING COMPANY, a corporation, and acknowledged to me that he subscribed the name of HUMBLE OIL & REFINING COMPANY thereto as principal and his own name as Attorney in Fact.

WITNESS my hand and official seal.

KATHERINE BIDNER
NOTARY PUBLIC - CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

*Katherine Bidner*
KATHERINE BIDNER
MY COMMISSION EXPIRES JUNE 12, 1969

(Print, stamp or type name)
Notary Public in and for Said County and State.

---

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)
Its Attorney in Fact

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

THE UNITED STATES OF AMERICA

By ___William E. Grant___
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 1 2 1969
(Date)

If this lease is executed by a corporation, it must bear the corporate seal

GPO 855-238

81646

Form 3380-1
(February 1966)
(formerly 4—1255)

## UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT

### OIL AND GAS LEASE OF SUBMERGED LANDS
### UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0187 |
| Cash Bonus | $27,831,142.00 |
| Rental Rate | $3 per acre |

| Minimum Royalty Rate | Royalty Rate |
|---|---|
| $3 per acre | 1/6th |

This indenture of lease entered into and effective as of **APR 1 1968**, by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

## Humble Oil & Refining Company

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

Block 53N 73W  All that portion lying seaward of a line 3 geographical miles distant from the coastline of California (as said coastline is defined in the Submerged Lands Act of 1953)  Official Leasing Map, Channel Islands Area Map No. 6A.

containing **4,946** acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

Case 2:26-cv-05242-SVW-SSC Document 18 Filed 05/14/26 Page 36 of 246 Page ID #:8755

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) *Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) *Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) *Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.



confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

shall be considered production or drilling or development operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. *(a)* Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(*j*) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(*b*) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

*(b) Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph *(a)* of this Section, or pursuant to Section 8(*i*) of the Act.

*(c) Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

---

HUMBLE OIL & REFINING COMPANY

THE UNITED STATES OF AMERICA

By _____
(Signature of Lessee)

By _____
(Authorized Officer)

Its Attorney in Fact.

Manager, Bureau of Land Management
Los Angeles Office

_____
(Signature of Lessee)

_____
(Title)

HUMBLE    816467

MAR 1 2 1968

_____
(Signature of Lessee)

_____
(Date)

_____
(Signature of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal*

GPO 855-238

Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

O R I G I N A L

**816468**

Form 3380—1
(February 1966)
(formerly 4—1255)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0188 |
| Cash Bonus | $12,123,254.00 |
| Rental Rate | $3 per acre |
| Minimum Royalty Rate $3 per acre | Royalty Rate 1/6th |

This indenture of lease entered into and effective as of     APR 1 1960   APR 1 1968   , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

**Humble Oil & Refining Company**

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

Blocks 53N 74 W; 54N 74W  All those portions lying seaward of a line 3 geographical miles distant from the coastline of California (as said coastline is defined in the Submerged Lands Act of 1953) Official Leasing Map, Channel Islands Area Map No. 6A.

containing  5,681       acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00   per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3)   When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4)   Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b)   *Bonds.*   To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c)   *Cooperative or unit plan.*   Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d)   *Wells.*   (1)  To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2)   After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3)   At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e)   *Payments.*   To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f)   *Contracts for disposal of products.*   To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g)   *Statements, plats, and reports.*   At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h)   *Inspection.*   To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i)   *Diligence.*   To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost:   *Provided,*  That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j)   *Freedom of purchase.*   To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k)   *Equal Opportunity clause.*   During the performance of this contract the lessee agrees as follows:

(1)   The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following:   employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2)   The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.




confidential
Slaperouse Slaperouse
sableoffshore
Mar 21, 2024 6:23 PM EDT

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

(l) Assignment of lease. To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

(a) Geological and geophysical exploration; rights-of-way. The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

(b) Leases of sulfur and other mineral. The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; Provided, That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) Purchase of production. In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

(d) Taking of royalties. All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

(e) Fissionable materials. All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

(f) Helium. Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) Suspension of operations during war or national emergency. Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: Provided, That just compensation shall be paid by the Lessor to the Lessee.

(h) Restriction of exploration and operations. The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. *Surrender and termination of lease.* The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. *Removal of property on termination of lease.* Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. *Remedies in case of default.* (a) Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(j) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(b) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(b) *Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this Section, or pursuant to Section 8(i) of the Act.

(c) *Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)
Its Attorney in Fact

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

THE UNITED STATES OF AMERICA

By _William E. Grant_
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 1 2 1968
(Date)

If this lease is executed by a corporation, it must bear the corporate seal

GPO 855-238

Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

ORIGINAL

**816481**

Form 3380—1
(February 1966)
(formerly 4—1255)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0189 |
| Cash Bonus | $323,020.80 |
| Rental Rate | $3 per acre |

| Minimum Royalty Rate | Royalty Rate |
|---|---|
| $3 per acre | 1/6th |

This indenture of lease entered into and effective as of   APR 1   1969   , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

**Humble Oil & Refining Company**

**Standard Oil Company of California**

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

N½ Block 53N 75W; Block 54N 75W – All those portions lying seaward of a line 3 geographical miles distant from the coastline of California (as said coastline is defined in the Submerged Lands Act of 1953) Official Leasing Map, Channel Islands Area Map No. 6A.

ORIGINAL DOCUMENT IS BELOW STANDARD LEGIBLE IMAGE NOT POSSIBLE

containing   **3,840**   acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of ____ percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) *Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) *Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) *Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) Cancellation of nonproducing lease. If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(j) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) Cancellation of producing lease. If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(b) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(b) Other remedies. If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this Section, or pursuant to Section 8(i) of the Act.

(c) Effect of waiver of default. A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)
**Its Attorney in Fact**

_____
(Signature of Lessee)

Standard Oil Company of California

By _____
(Signature of Lessee)
Contract Agent

By _____
Assistant Secretary

_____
(Signature of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal*

THE UNITED STATES OF AMERICA

By _____
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
_____
(Title)

MAR 1 2 1968
_____
(Date)

GPO 855-238

confidential
sableoffshore.com
Mar 21, 2024 6:23 PM EDT
Not for sale off shore
confidential
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

shall be considered production or drilling or reworking operations (as the case may be)

STATE OF CALIFORNIA        )
                           ) ss
City and County of San Francisco)

On _____, 19__, before me, the undersigned, a Notary Public in and for the City and County of San Francisco, State of California, duly commissioned and sworn, personally appeared A. T. SMITH and E. A. HANSEN to me known to be the Contract Agent and Assistant Secretary, respectively, of STANDARD OIL COMPANY OF CALIFORNIA, the corporation that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath state that they were authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

EDMOND LEE KELLY
Notary Public in and for the City and County of San Francisco, State of California
residing at San Francisco

33.1

(Wash.)

... property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after

STATE OF CALIFORNIA    }
                       } ss.
COUNTY OF LOS ANGELES  }

ON THIS 15th day of February, 19 68, before me, the undersigned, a Notary Public in and for said County and State personally appeared NIBERT J. JOHNSON, known to me to be the person whose name is subscribed to the within instrument, as the Attorney in Fact of HUMBLE OIL & REFINING COMPANY, a corporation, and acknowledged to me that he subscribed the name of HUMBLE OIL & REFINING COMPANY thereto as principal and his own name as Attorney in Fact.

WITNESS my hand and official seal.

KATHERINE BIDNER
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

KATHERINE BIDNER
MY COMMISSION EXPIRES JUNE 12, 1969

(Print, stamp or type name)
Notary Public in and for Said County and State.

THE UNITED STATES OF AMERICA

By _____
(Signature of Lessee)
Its Attorney in Fact

By William E. Grant
(Authorized Officer)

By _____
(Signature of Lessee)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

Standard Oil Company of California

By _____
Contract Agent

By _____
Assistant Secretary

MAR 1 2 1968
(Date)

(Signature of Lessee)

If this lease is executed by a corporation, it must bear the corporate seal

GPO 855-238

confidential
superouse Superouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

ORIGINAL
Mar 21, 2024 6:23 PM EDT

**816469**

Form 3380—1
(February 1966)
(formerly 4—1255)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0190 |
| Cash Bonus | $21,021,120.00 |
| Rental Rate | $3 per acre |
| Minimum Royalty Rate | $3 per acre |
| Royalty Rate | 1/6th |

This indenture of lease entered into and effective as of **APR 1** 1968 , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

**Humble Oil & Refining Company**

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

**Block 53N 75W S½, Official Leasing Map, Channel Islands Area Map No. 6A.**

containing **2,880** acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) *Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) *Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) *Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. *(a)* Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows: (1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(*j*) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(*b*) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

*(b) Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph *(a)* of this Section, or pursuant to Section 8(*i*) of the Act.

*(c) Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

HUMBLE OIL & REFINING COMPANY

THE UNITED STATES OF AMERICA

By _____
(Signature of Lessee)
Its Attorney in Fact

By _____
(Authorized Officer)

_____
(Signature of Lessee)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 1 2 1968

_____
(Signature of Lessee)

(Date)

_____
(Signature of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal*

GPO 855-238

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. *(a)* Whenever the Lessee fails to comply with any of the provisions

(2) *Cancellation of producing lease*. If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4*(b)* of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

*(b) Other remedies*. If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph *(a)* of this Section, or pursuant to Section 8*(i)* of the Act.

*(c) Effect of waiver of default*. A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

STATE OF CALIFORNIA } ss.
COUNTY OF LOS ANGELES }

ON THIS 15th day of February, 19 68, before me, the undersigned, a Notary Public in and for said County and State personally appeared NIBERT J. JOHNSON, known to me to be the person whose name is subscribed to the within instrument, as the Attorney in Fact of HUMBLE OIL & REFINING COMPANY, a corporation, and acknowledged to me that he subscribed the name of HUMBLE OIL & REFINING COMPANY thereto as principal and his own name as Attorney in Fact.
WITNESS my hand and official seal.

KATHERINE BIDNER
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

*Katherine Bidner*
KATHERINE BIDNER
MY COMMISSION EXPIRES JUNE 12, 1969

(Print, stamp or type name)
Notary Public in and for Said County and State.

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)
Its Attorney in Fact

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

THE UNITED STATES OF AMERICA

By William E. Grant
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 1 2 1968
(Date)

If this lease is executed by a corporation, it must bear the corporate seal

GPO 855-238

confidential
Sable Slaperou...
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

ORIGINAL

816498

Form 3380—1
(February 1966)
(formerly 4—1255)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0191 |
| Cash Bonus | $213,811.20 |
| Rental Rate | $3 per acre |

| Minimum Royalty Rate | Royalty Rate |
|---|---|
| $3 per acre | 1/6th |

This indenture of lease entered into and effective as of   APR 1   1968   , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

**Atlantic Richfield Company**

**Humble Oil & Refining Company**

**Standard Oil Company of California**

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

**All Block 53N 76W Official Leasing Map, Channel Islands Area Map No. 6A.**

containing   **5,760**   acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16 2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

confidential
Slaperouse Slaperouse.com
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) *Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) *Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) *Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

*(a) Geological and geophysical exploration: rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. *(a)* Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(*j*) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4′(*b*) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

*(b) Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph *(a)* of this Section, or pursuant to Section 8(*i*) of the Act.

*(c) Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

HUMBLE OIL & REFINING COMPANY

THE UNITED STATES OF AMERICA

By _____
(Signature of Lessee)
Its Attorney in Fact

By _William E. Grant_
(Authorized Officer)

Standard Oil Company of California

By _____
(Signature of Lessee)
Contract Agent

Manager, Bureau of Land Management
Los Angeles Office

By _____
Assistant Secretary

(Title)

_____
(Signature of Lessee)

MAR 1 2 1968

ATLANTIC RICHFIELD COMPANY

(Date)

By _____
(Signature of Lessee)   Vice President

If this lease is executed by a corporation, it must bear the corporate seal

GPO 855-238

STATE OF CALIFORNIA }
} ss
City and County of San Francisco )

On _February 23 1968_, before me, the undersigned, a Notary Public in and for the City and County of San Francisco, State of California, duly commissioned and sworn, personally appeared A. T. SMITH and E. A. HANSEN to me known to be the Contract Agent and Assistant Secretary, respectively, of STANDARD OIL COMPANY OF CALIFORNIA, the corporation that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath state that they were authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.



EDMOND LEE KELLY
NOTARY PUBLIC - CALIFORNIA
CITY AND COUNTY OF SAN FRANCISCO
My Commission Expires January 22, 1972

EDMOND LEE KELLY
Notary Public in and for the City and County of San Francisco, State of California.
residing at San Francisco

(~~Mash~~)

33·1

---

all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to the h...

STATE OF CALIFORNIA }
} ss.
COUNTY OF LOS ANGELES }



SUE M. MASON
NOTARY PUBLIC - CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

On this 1ST day of MARCH, A. D., 19 68, before me, SUE M. MASON, a Notary Public in and for said County and State, personally appeared J. W. GENDRON VICE President, and ATLANTIC RICHFIELD COMPANY known to me to be the known to me to be the Secretary of the corporation that executed the within instrument, known to me to be the persons who executed the within instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the same, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My Commission expires: MAY 4, 1968

Notary Public in and for said County and State.

---

HUMBLE OIL & REFINING COMPANY                    THE UNITED STATES OF AMERICA

By _____    By _William E. Grant_

STATE OF CALIFORNIA }
} ss.
COUNTY OF LOS ANGELES }

ON THIS _15th_ day of _February_, 19 _65_, before me, the undersigned, a Notary Public in and for said County and State personally appeared NIBERT J. JOHNSON, known to me to be the person whose name is subscribed to the within instrument, as the Attorney in Fact of HUMBLE OIL & REFINING COMPANY, a corporation, and acknowledged to me that he subscribed the name of HUMBLE OIL & REFINING COMPANY thereto as principal and his own name as Attorney in Fact.

WITNESS my hand and official seal.

KATHERINE BIDNER
NOTARY PUBLIC - CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

KATHERINE BIDNER
MY COMMISSION EXPIRES JUNE 12, 1969

(Print, stamp or type name)
Notary Public in and for Said County and State.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT



IN REPLY REFER TO:

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
BUREAU OF LAND MANAGEMENT
Pacific Coast OCS Office
300 N. Los Angeles St.
Los Angeles, Calif. 90012

OCS-P 0192

| | |
|---|---|
| Date | February 6, 1968 |
| State | California |
| Area | Channel Islands |

DECISION

| Tract Number | Block Number |
|---|---|
| Cal. 336 | N½-53N77W; 54N77W |

| Name | Description |
|---|---|
| Union Oil Co. of California<br>Union Oil Center<br>Los Angeles, Cal. 90017 | All those portions, etc. |

| Rental | Balance of Bonus |
|---|---|
| $ 11,553 | $608,000.00 |

*11,553*
*619,553*

### LEASE FORMS TRANSMITTED FOR EXECUTION

Pursuant to Section 8 of the Outer Continental Shelf Lands Act (67 Stat. 462; 43 U.S.C. 1337), and the regulations pertaining thereto (43 CFR 3380 *et seq.*), your bid for the above tract is accepted.

Your qualifications have been examined and are satisfactory. Accordingly, in order to perfect your rights hereunder, the following action *must* be taken:

[X] 1. Execute and return the three copies of attached lease. *(If lease is executed by an agent, evidence must be furnished of agent's authorization.)*

[X] 2. Pay the balance of bonus bid and the first year's rental indicated above.

Thirty days from receipt of this decision are allowed for compliance with the above requirements, failing in which your rights to acquire a lease and the deposit of 1/5 of the bonus bid will be forfeited.

IMPORTANT: *The lease form requires the attachment of the CORPORATE SEAL to all leases executed by corporations.*

Attachments

Wm. E. Grant                                 (Manager)

Form 3380—9  (July 1966)   (formerly 4—1700)                    GPO 858-885

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

File No. 816863-001

Form 3380-1
(February 1966)
(formerly 4-1255)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| Office | Los Angeles, Calif. | |
|---|---|---|
| Serial Number | OCS-P 0192 | |
| Cash Bonus | $760,000.00 | |
| Rental Rate | $3 per acre | |
| Minimum Royalty Rate $3 per acre | Royalty Rate 1/6th | |

This indenture of lease entered into and effective as of __APR 1 1968__ , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

1 Union Oil Company of California

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

N½ Block 53N 77W; Block 54N 77W - All those portions lying seaward of a line 3 geographical miles distant from the coastline of California (as said coastline is defined in the Submerged Lands Act of 1953) Official Leasing Map, Channel Islands Area Map No. 6A.

*1925.5*

containing 3,851 acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16 2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3)  When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance *to such* delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

*(b) Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

*(c) Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

*(d) Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

*(e) Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

*(f) Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

*(g) Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

*(h) Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

*(i) Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

*(j) Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

*(k) Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate,* which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. *(a)* Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8*(j)* of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4*(b)* of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

*(b) Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph *(a)* of this Section, or pursuant to Section 8*(i)* of the Act.

*(c) Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

UNION OIL COMPANY OF CALIFORNIA

By _____
Herbert S. Harry
Its Attorney in Fact
Evidence of Authority filed
in L.A. Misc. 9

R. O. HEDLEY
ASSISTANT SECRETARY
(Signature of Lessee)

SEAL

_____
(Signature of Lessee)

_____
(Signature of Lessee)

THE UNITED STATES OF AMERICA

By _____
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
_____
(Title)

MAR 8   1968
_____
(Date)

_____
(Signature of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal*

GPO 855-238

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

Exxon Lease

Slaperou...fidenti...
sableoffsh...aper...com
Mar 21, 2024 6:23 PM EDT

O R I G I N A L   816482

Form 3380—1
(February 1966)
(formerly 4—1255)

**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

**OIL AND GAS LEASE OF SUBMERGED LANDS**
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | Los Angeles, Calif. |
| Serial Number | OCS-P 0193 |
| Cash Bonus | $2,822,313.92 |
| Rental Rate | $3 per acre |
| Minimum Royalty Rate $3 per acre | Royalty Rate 1/6th |

This indenture of lease entered into and effective as of **APR 1 1969**, by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

**Humble Oil & Refining Company**

**Standard Oil Company of California**

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

N½ Block 53N 78W; Block 54N 78W - All those portions lying seaward of a line 3 geographical miles distant from the coastline of California (as said coastline is defined in the Submerged Lands Act of 1953) Official Leasing Map, Channel Islands Area Map No. 6A.

containing **3,316** acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) Rentals and royalties. (1) To pay rentals and royalties as follows:

Rentals. To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

Minimum royalty. To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

Royalty on production. To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

ORIGINAL DOCUMENT IS BELOW STANDARD
LEGIBLE IMAGE NOT POSSIBLE

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) *Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and tendered to the Manager of the appropriate field office of that Bureau.

(f) *Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) *Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

## 0193
(Lease Serial Number)

STIPULATIONS FOR OIL AND GAS LEASES
OUTER CONTINENTAL SHELF
CALIFORNIA

1. The lessee, recognizing that mineral explorations and exploitation and recovery operations on the leased areas of tide and submerged lands can impede tactical military operations, hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations of the lessee under this lease in the interests of national security requirements. Such temporary suspension of operations, including the evacuation of personnel, will come into effect upon the order of the Air Force Western Test Range Safety Officer, or higher authority, that national security interests necessitate such action. It is understood that any temporary suspension of operations ordered by said official may not exceed seventy-two hours, however, any suspension may be extended by order of the Secretary of Defense. During such periods equipment may remain in place.

2. The lessee assumes all risk of damage or injury to any person or persons who are the agents, employees or invitees of the lessee, its agents, sub-contractors or any independent contractor doing business with the lessee in connection with any activities being performed by the lessee on the leased premises, and of any damage to any property of the lessee, its agents, employees, invitees, sub-contractors or independent contractors doing business with the lessee and which occurs on the leased premises, and which injury to such person or property occurs by reason of the activities of any agency of the United States Government being conducted as a part of or in connection with the programs and activities of the Air Force Western Test Range, whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States or its contractors, or any of their officers, agents or employees, and whether or not based upon any concept of strict or absolute liability or otherwise; and the lessee agrees to indemnify and save harmless the United States against, and to defend at its own expense, all such claims for loss, damage or injury sustained by the lessee, its agents, employees, invitees, sub-contractors, or any independent contractors doing business with the lessee in connection with its activities on the leased premises, or their agents or employees, which such claims may arise by reason of injury or damage occurring in connection with the programs and activities of the said Air Force Western Test Range, whether the same be caused in whole or in part, by the negligence or fault of the United States or its contractors or any of their officers, agents and employees, or based upon any concept of strict liability or otherwise.

approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

(a) Geological and geophysical exploration; rights-of-way. The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

tions and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

**Sec. 3. Reservations to Lessor.** The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 4. Directional drilling.** This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

shall be considered productic a if drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(j) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(b) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(b) *Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this Section, or pursuant to Section 8(i) of the Act.

(c) *Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)
Its Attorney in Fact

_____
(Signature of Lessee)

Standard Oil Company of California

By _____
Contract Agent

By _____
Assistant Secretary

_____
(Signature of Lessee)

If this lease is executed by a corporation, it must bear the corporate seal

THE UNITED STATES OF AMERICA

By _William E. Grant_
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 1 2 1969.

(Date)

GPO 855-238

STATE OF CALIFORNIA ) ss.
City and County of San Francisco )

On _____ 23 1968 _____, before me, the undersigned, a Notary Public in and for the City and County of San Francisco, State of California, duly commissioned and sworn, personally appeared A. T. SMITH and E. A. HANSEN to me known to be the Contract Agent and Assistant Secretary, respectively, of STANDARD OIL COMPANY OF CALIFORNIA, the corporation that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath state that they were authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

> EDMOND LEE KELLY
> NOTARY PUBLIC - CALIFORNIA
> CITY AND COUNTY OF
> SAN FRANCISCO
> My Commission Expires January 22, 1972

EDMOND LEE KELLY
Notary Public in and for the City and County of San Francisco, State of California
residing at San Francisco

33.1

( ____ )

all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions

same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

STATE OF CALIFORNIA ) ss.
COUNTY OF LOS ANGELES )

ON THIS 15th day of February, 19 68, before me, the undersigned, a Notary Public in and for said County and State personally appeared NIBERT J. JOHNSON, known to me to be the person whose name is subscribed to the within instrument, as the Attorney in Fact of HUMBLE OIL & REFINING COMPANY, a corporation, and acknowledged to me that he subscribed the name of HUMBLE OIL & REFINING COMPANY thereto as principal and his own name as Attorney in Fact.
WITNESS my hand and official seal.

> KATHERINE BIDNER
> NOTARY PUBLIC - CALIFORNIA
> PRINCIPAL OFFICE IN
> LOS ANGELES COUNTY

KATHERINE BIDNER
MY COMMISSION EXPIRES JUNE 12, 1969
(Print, stamp or type name)
Notary Public in and for Said County and State.

HUMBLE OIL & REFINING COMPANY

THE UNITED STATES OF AMERICA

By _____
(Signature of Lessee)
Its Attorney in Fact

By William E. Grant
(Authorized Officer)

By _____
(Signature of Lessee)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

Standard Oil Company of California

By _____
Contract Agent

By _____
Assistant Secretary

MAR 1 2 1969.

(Date)

_____
(Signature of Lessee)

If this lease is executed by a corporation, it must bear the corporate seal

GPO 855-236

Confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

EXXON LEASE

ORIGINAL 816483

Form 3380 (February 1966) (formerly 4—1255)

### UNITED STATES
### DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

Office Los Angeles, California

| | |
|---|---|
| Serial Number | OCS-P 0194 |
| Cash Bonus | $582,105.60 |
| Rental Rate | $3 per acre |
| Minimum Royalty Rate | $3 per acre | Royalty Rate 1/6th |

This indenture of lease entered into and effective as of APR 1 1968 , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

**Humble Oil & Refining Company**

**Standard Oil Company of California**

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

**Block 53N 78 W - S½; Official Leasing Map, Channel Islands Area Map No. 6A.**

confidential Slaperouse Slaperouse.com sableoffshore.com Mar 21, 2024 6:23 PM EDT

containing **2,880** acres, more or less (hereinafter referred to as the leased area), together with:

*(a)* the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

*(b)* the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

*(c)* the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject hereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

*(a) Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

sableoffshore.com Mar 21, 2024 6:23 PM EDT

notice to the Lessee and every reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Cooperative or unit plan.* Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) *Wells.* (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) *Contracts for disposal of products.* To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.* At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.* To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: *Provided,* That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) *Freedom of purchase.* To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Equal Opportunity clause.* During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.


confidential
Slaperouse Slaperouse
sableoffshore.com

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(1) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3.    Reservations to Lessor.    The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4.    Directional drilling.    This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. **Surrender and termination of lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. **Removal of property on termination of lease.** Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. **Remedies in case of default.** (a) Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8(j) of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4(b) of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(b) *Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this Section, or pursuant to Section 8(i) of the Act.

(c) *Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. **Heirs and successors in interest.** Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. **Unlawful interest.** No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)
**Its Attorney in Fact**

By _____
(Signature of Lessee)

Standard Oil Company of California

By _____
(Signature of Lessee)
Contract Agent

By _____
Assistant Secretary

(Signature of Lessee)

HUMBLE 816483

THE UNITED STATES OF AMERICA

By _William E. Grant_
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 1 2 1968
(Date)

_If this lease is executed by a corporation, it must bear the corporate seal_

GPO 855-238

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for (2) ... ... ... of producing lease. If, at the time of such default, any well is producing, or is

STATE OF CALIFORNIA } ss
City and County of San Francisco }

On February 23 1968, before me, the undersigned, a Notary Public in and for the City and County of San Francisco, State of California, duly commissioned and sworn, personally appeared A. T. SMITH and E. A. HANSEN to me known to be the Contract Agent and Assistant Secretary, respectively, of STANDARD OIL COMPANY OF CALIFORNIA, the corporation that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath state that they were authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

EDMOND LEE KELLY
NOTARY PUBLIC - CALIFORNIA
CITY AND COUNTY OF
SAN FRANCISCO
My Commission Expires January 22, 1972

EDMOND LEE KELLY
Notary Public in and for the City and County of San Francisco, State of California
residing at San Francisco

(Seal.)

33.1

wells ...
other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. (a) Whenever the Lessee fails to comply with ...

obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

STATE OF CALIFORNIA } ss.
COUNTY OF LOS ANGELES }

ON THIS 15th day of February, 19 68, before me, the undersigned, a Notary Public in and for said County and State personally appeared NIBERT J. JOHNSON, known to me to be the person whose name is subscribed to the within instrument, as the Attorney in Fact of HUMBLE OIL & REFINING COMPANY, a corporation, and acknowledged to me that he subscribed the name of HUMBLE OIL & REFINING COMPANY thereto as principal and his own name as Attorney in Fact.
WITNESS my hand and official seal.

KATHERINE BIDNER
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY

KATHERINE BIDNER
MY COMMISSION EXPIRES JUNE 12, 1969
(Print, stamp or type name)
Notary Public in and for Said County and State.

HUMBLE OIL & REFINING COMPANY

By _____
(Signature of Lessee)
Its Attorney in Fact

_____
(Signature of Lessee)

Standard Oil Company of California
By _____
Contract Agent
By _____
Assistant Secretary
_____
(Signature of Lessee)

If this lease is executed by a corporation, it must bear the corporate seal

THE UNITED STATES OF AMERICA

By William E. Grant
(Authorized Officer)

Manager, Bureau of Land Management
Los Angeles Office
(Title)

MAR 12 1968
(Date)

ORIGINAL DOCUMENT IS BELOW STANDARD
LEGIBLE IMAGE NOT POSSIBLE

GPO 855-238

Confidential
Slaperouse
Sableoffshore.com
Mar 21, 2024 6:23 PM EDT

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**0194**

(Lease Serial Number)

STIPULATIONS FOR OIL AND GAS LEASES
OUTER CONTINENTAL SHELF
CALIFORNIA

1. ~~The lessee, recognizing that mineral explorations and exploitation~~ and recovery operations on the leased areas of tide and submerged lands can impede tactical military operations, hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations of the lessee under this lease in the interests of national security requirements. Such temporary suspension of operations, including the evacuation of personnel, will come into effect upon the order of the Air Force Western Test Range Safety Officer, or higher authority, that national security interests necessitates such action. It is understood that any temporary suspension of operations ordered by said official may not exceed seventy-two hours, however, any suspension may be extended by order of the Secretary of ~~Defense. During such periods equipment may remain in place.~~

2. The lessee assumes all risk of damage or injury to any person or persons who are the agents, employees or invitees of the lessee, its agents, sub-contractors or any independent contractor doing business with the lessee in connection with any activities being performed by the lessee on the leased premises, and of any damage to any property of the lessee, its agents, employees, invitees, sub-contractors or independent contractors doing business with the lessee and which occurs on the leased premises, and which injury to such person or property occurs by reason of the activities of any agency of the United States Government being conducted as a part of or in connection with the programs and activities of the Air Force Western Test Range, whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States or its contractors, or any of their officers, agents or employees, and whether or not based upon any concept of strict or absolute liability or otherwise; and the lessee agrees to indemnify and save harmless the United States against, and to defend at its own expense, all such claims for loss, damage or injury sustained by the lessee, its agents, employees, invitees, sub-contractors, or any independent contractors doing business with the lessee in connection with its activities on the leased premises, or their agents or employees, which such claims may arise by reason of injury or damage occurring in connection with the programs and activities of the said Air Force Western Test Range, whether the same be caused in whole or in part, by the negligence or fault of the United States or its contractors or any of their officers, agents and employees, or based upon any concept of strict liability or otherwise.

Form 3300—1
(September 1978)

| Office | Serial number |
|---|---|
| Los Angeles, CA | OCS-P 0326 |
| Cash bonus | Rental rate |
| $ 7,600,608.00 | $3.00 per acre |
| Minimum royalty rate | Royalty rate Fixed |
| $3.00 per acre | Sliding Scale |
| Work commitment | Profit share rate |

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT**

This lease is effective as of **SEP 1 1979** (hereinafter called the "Effective Date") by and between the United States of America (hereinafter called the "Lessor"), by the Manager, Pacific OCS Office, Bureau of Land Management, its authorized officer, and

Chevron U.S.A. Inc.                    100%

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered 1-A, 2, 3, 4, 5, 6, 8 and 13 attached hereto, the Lessee and Lessor agree as follows:

Sec. 1. Statutes and Regulations. This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462 as amended; 43 U S.C. 1331 et. seq. (hereinafter called the "Act"). The lease is issued subject to the Act; Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. 7152 and 7153; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

Sec. 2. Rights of Lessee. The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf described as follows:

S1/2 of Block 53N 77W, OCS Leasing Map, Channel Islands Area, CAL-Map No. 6A.

*(Continued on reverse)*

containing approximately 2880.00 acres, or ____ hectares (hereinafter referred to as the "leased area").

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the United States Geological Survey or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

Sec. 3. Term. This lease shall continue for an initial period of  five  years from the Effective Date of the lease and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon.

Sec. 4. Rentals. The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental of $3.00  per acre ( ____ per hectare) or fraction thereof.

Sec. 5. Minimum Royalty. The Lessee shall pay the Lessor at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty of $3.00  per acre ( ____ per hectare) or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

* Sec. 6. Royalty on Production. (a) The Lessee shall pay a fixed royalty of ____ percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium) is subject to royalty. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated, will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty paid in amount in excess of tankage required when royalty is paid in value. When royalties are paid in amount, the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

Sec. 7. Payments. The Lessee shall make all payments to the Lessor by check, bank draft, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the United States Geological Survey and tendered to the Director, except that filing charges, bonuses, first year's rental, and other payments due upon lease issuance, shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

Sec. 8. Bonds. The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

Sec. 9. Plans. The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans, and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

Sec. 10. Performance. The Lessee shall comply with all regulations and orders relating to exploration, development, and production. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

Sec. 11. Directional Drilling. A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Sec. 12. Safety Requirements. The Lessee shall (a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the leased area;

(b) maintain all operations within the leased area in compliance with regulations intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

Sec. 13. Suspension and Cancellation. (a) The Lessor may suspend or cancel this lease during the initial lease term or thereafter pursuant to Section 5 of the Act and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in Section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

Sec. 14. Indemnification. The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

Sec. 15. Disposition of Production. (a) As provided in Section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16-2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price, or if no regulated price applies, at the fair market value at the well head of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) As provided in Section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal agency pursuant to Section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price, or if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in Section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war, or when the President of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

Sec. 16. Unitization, Pooling, and Drilling Agreements. Within in such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

Sec. 17. Equal Opportunity Clause. During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60–1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

Sec. 18. Certification of Nonsegregated Facilities. By entering into this lease, the Lessee certifies, as specified in 41 CFR 60–1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term ''segregated facilities'' means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 50–1.5.

Sec. 19. Reservations to Lessor. All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights include:

(a) the right to authorize geological and geophysical exploration in the leased area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in Section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being with an area needed for national defense, and so long as such designation remains in effect no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within, any desig-

nated area extended pursuant to this paragraph and payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 20. Transfer of Lease. The Lessee shall file for approval with the appropriate field office of the Bureau of Land Management any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

Sec. 21. Surrender of Lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Bureau of Land Management a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

Sec. 22. Removal of Property on Termination of Lease. Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

Sec. 23. Remedies in Case of Default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of Section 24 of the Act. Furthermore, pursuant to Section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

Sec. 24. Unlawful Interest. No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified, and during this continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 7, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431–433, relating to contracts made or entered into, or accepted by or on behalf of the United States, from a part of this lease insofar as they may be applicable.

\* For amendment to Sec. 6.(a) "Royalty on Production" see rider attached.

CHEVRON U.S.A. INC.

<u>(Lessee)</u>

By: _____
<u>(Signature of Authorized Officer)</u>

CLAIR GHYLIN
<u>(Name of Signatory)</u>

Its Attorney-in-Fact
<u>(Title)</u>

August 8, 1979
<u>(Date)</u>

EVIDENCE OF AUTHORITY OF ATTORNEY-IN-FACT TO ACT FOR PRINCIPAL IS FILED IN _L.A. 1078_ SUCH AUTHORITY IS STILL IN EFFECT.

P. O. Box 7643
San Francisco, CA 94120

<u>(Address of Lessee)</u>

THE UNITED STATES OF AMERICA, Lessor

_____
<u>(Signature of Authorized Officer)</u>

Manager, Pacific OCS Office
Bureau of Land Management
<u>(Name of Signatory)</u>

WILLIAM E. GRANT
<u>(Title)</u>

AUG 28 1979
<u>(Date)</u>

xxxxxxxxxxxxxxxxx (Continued on following page)

Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

_____
(Signature of Lessee)

If this lease is executed by a corporation it must bear the corporate seal.                 GPO 848 - 137

Rider for Amendment to Sec. 6.(a) of Lease Form 3300-1 (September 1978)

Sec. 6. Royalty on Production.  (a)  The Lessee agrees to pay the lessor a royalty of that percent in amount or value of production saved, removed or sold from the leased area as determined by the sliding scale royalty formula as follows.  When the quarterly value of production, adjusted for inflation, is less than or equal to $13.236229 million, a royalty of 16.66667 percent in amount or value of production saved, removed or sold will be due on the unadjusted value or amount of production.  When the adjusted quarterly value of production is equal to or greater than $13.236230 million, but less than or equal to $1662.854082 million, the royalty percent due on the unadjusted value or amount of production is given by

$$R_j = b[Ln\ (V_j/S)]$$

where

$R_j$ = the percent royalty that is due and payable on the unadjusted amount or value of all production saved, removed or sold in quarter j

$b$ = 10.0

$Ln$ = natural logarithm

$V_j$ = the value of production in quarter j, adjusted for inflation, in millions of dollars

$S$ = 2.5

When the adjusted quarterly value of production is equal to or greater than $1662.854083 million, a royalty of 65.00000 percent in amount or value of production saved, removed or sold will be due on the unadjusted quarterly value of production.  Thus, in no instance will the quarterly royalty due exceed 65.00000 percent in amount or value of quarterly production saved, removed or sold.

In determining the quarterly percent royalty due, $R_j$, the calculation will be rounded to five decimal places (for example, 18.17612 percent).  This calculation will incorporate the adjusted quarterly value of production, $V_j$, in millions of dollars, rounded to the sixth digit, i.e., to the nearest dollar (for example, 15.392847 millions of dollars).

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-018    BLOCK NO. 53N 77W    MAP NO. CAL 6A    OCS-P 0326

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 1-A

(a)  The lessee agrees that prior to operating or causing to be operated on its behalf boat or aircraft traffic into individual, designated warning areas, the lessee shall coordinate and comply with instructions from the Commander, Space and Missile Test Center (SAMTEC) and the Commander, Pacific Missile Test Center (PMTC), or other appropriate military agency.  Such coordination and instruction will provide for positive control of boats and aircraft operating into the warning areas at all times.

(b)  The lessee, recognizing that mineral exploration and exploitation and recovery operations on the leased areas of submerged lands can impede tactical military operations, hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations of the lessee under this lease in the interests of national security requirements.  Such temporary suspension of operations, including the evacuation of personnel, and appropriate sheltering of personnel not evacuated (an appropriate shelter shall mean the protection of all lessee personnel for the entire duration of any Department of Defense activity from flying or falling objects or substances), will come into effect upon the order of the Supervisor, after consultation with the Commander, Space and Missile Test Center (SAMTEC) and the Commander, Pacific Missile Test Center (PMTC), or other appropriate military agency, or higher authority, when national security interests necessitate such action.  It is understood that any temporary suspension of operations for national security may not exceed seventy-two hours; however, any such suspension may be extended by order of the Supervisor.  During such periods equipment may remain in place.

(c)  The lessee agrees to control his own electromagnetic emissions and those of his agents, employees, invitees, independent contractors or subcontractors emanating from individual, designated defense warning areas in accordance with requirements specified by the Commander, Space and Missile Test Center (SAMTEC) and the Commander, Pacific Missile Test Center (PMTC), or other appropriate military agency, to the degree necessary to prevent damage to, or unacceptable interference with, Department of Defense flight, testing or operational activities conducted within individual, designated warning areas.  Necessary monitoring, control, and coordination with the lessee, his agents, employees, invitees, independent contractors or subcontractors, will be effected by the Commander of the appropriate onshore military installation conducting operations in the particular warning area:  Provided, however, that control of such electromagnetic emissions shall permit at least one continuous channel of communication between a lessee, its agents, employees, invitees, independent contractors or subcontractors and onshore facilities.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-018     BLOCK NO. 53N 77W     MAP NO. CAL 6A     OCS-P 0326

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 2

Whether or not compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occurs in, on, or above the Outer Continental Shelf, to any person or persons or to any property of any person or persons who are agents, employees or invitees of the lessee, its agents, independent contractors or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the Outer Continental Shelf, if such injury or damage to such person or property occurs by reason of the activities of any agency of the U.S. Government, its contractors, or subcontractors, or any of their officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the Space and Missile Test Center (SAMTEC), the Pacific Missile Test Center (PMTC), or other appropriate military agency.

Not withstanding any limitations of the lessee's liability in section 14 of the lease, the lessee assumes the risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of their officers, agents, or employees. The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, and to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installations and agencies, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of their officers, agents, or employees and whether such claims might be sustained under theories of strict or absolute liability or otherwise.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-018      BLOCK NO. 53N 77W      MAP NO. CAL 6A      OCS-P 0326

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 3

If the Supervisor, having reason to believe that a site, structure or object of
historical or archaeological significance, hereinafter referred to as a "cultural
resource," may exist in the lease area, gives the lessee written notice that the
lessor is invoking the provisions of this stipulation, the lessee shall upon receipt
of such notice comply with the following requirements:

Prior to any drilling activity or the construction or placement of any structure for
exploration or development on the lease, including but not limited to, well drilling
and pipeline and platform placement, hereinafter in this stipulation referred to as
"operation," the lessee shall conduct remote sensing surveys to determine the
potential existence of any cultural resource that may be affected by such operations.
All data produced by such remote sensing surveys as well as other pertinent natural
and cultural environmental data shall be examined by a qualified marine survey
archaeologist to determine if indications are present suggesting the existence of a
cultural resource that may be adversely affected by any lease operation.  A report of
this survey and assessment prepared by the marine survey archaeologist shall be
submitted by the lessee to the Supervisor and the Manager, Bureau of Land Management
(BLM), Outer Continental Shelf (OCS) Office for review.

If such cultural resource indicators are present the lessee shall (1) locate the site
of such operation so as not to adversely affect the identified location; or (2)
establish, to the satisfaction of the Supervisor, on the basis of further
archaeological investigation conducted by a qualified marine survey archaeologist or
underwater archaeologist using such survey equipment and techniques as deemed
necessary by the Supervisor, either that such operation shall not adversely affect the
location identified or that the potential cultural resource suggested by the
occurrence of the indicators does not exist.

A report of this investigation prepared by the marine survey archaeologist or
underwater archaeologist shall be submitted to the Supervisor and the Manager, BLM OCS
Office for their review.  Should the Supervisor determine that the existence of a
cultural resource which may be adversely affected by such operation is sufficiently
established to warrant protection, the lessee shall take no action that may result in
an adverse effect on such cultural resource until the Supervisor has given directions
as to its preservation.

The lessee agrees that if any site, structure, or object of historical or archae-
ological significance should be discovered during the conduct of any operations on the
leased area, he shall report immediately such findings to the Supervisor and make
every reasonable effort to preserve and protect the cultural resource from damage
until the Supervisor has given directions as to its preservation.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. __48-018__   BLOCK NO. __53N 77W__   MAP NO. __CAL 6A__   OCS-P _0326_

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 4

(a) <u>Wells</u>: Subsea well-heads and temporary abandonments, or suspended operations that leave protrusions above the sea floor, shall be protected, if feasible, by a shroud which will allow commercial trawl gear to pass over the structure without snagging or otherwise damaging the structure or the fishing gear. Latitude and longitude coordinates of these structures along with water depths, shall be submitted to the Supervisor. The coordinates of such structures will be determined by the lessee utilizing state-of-the-art navigation systems with accuracy of at least $\pm$ 50 feet (15.25 meters) at 200 miles (322 kilometers).

(b) <u>Pipelines</u>: All pipelines, unless buried, including gathering lines, shall have a smooth-surface design. In the event that an irregular pipe surface is unavoidable due to the need for valves, anodes or other structures, they shall be protected by shrouds which will allow trawl gear to pass over the object without snagging or otherwise damaging the structure or the fishing gear.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-018      BLOCK NO. 53N 77W      MAP NO. CAL 6A      OCS-P 0326

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 5

(a)  If the Supervisor has reason to believe that areas of special biological interest in the lease area contain biological communities or species of such extraordinary or unusual value (even though unquantifiable) that no threat of damage, injury, or other harm to the community or species would be acceptable, he shall give the lessee written notice that the lessor is invoking the provisions of this stipulation and the lessee shall comply with the following requirements:  Prior to any drilling activity or the construction or placement of any structure for exploration or development on lease areas including, but not limited to, well drilling and pipeline and platform placement, hereinafter referred to as "operation," the lessee shall conduct site specific surveys as approved by the Supervisor and in accordance with prescribed biological survey requirements to determine the existence of any special biological resource including, but not limited to:

   (1)  Very unusual, rare, or uncommon ecosystems or ecotones.

   (2)  A species of limited regional distribution that may be adversely affected by any lease operations

If the results of such surveys suggest the existence of a special biological resource that may be adversely affected by any lease operation, the lessee shall:  (1) relocate the site of such operation so as not to adversely affect the resources identified; (2) establish to the satisfaction of the Supervisor, on the basis of the site-specific survey, either that such operation will not have a significant adverse effect upon the resource identified or that a special biological resource does not exist.  The Supervisor will review all data submitted and determine, in writing, whether a special biological resource exists or may be significantly affected by lessee's operations. The lessee may take no action until the Supervisor has given the lessee written directions on how to proceed.

(b)  The lessee agrees that if any area of biological significance should be discovered during the conduct of any operations on the leased area, he shall report immediately such findings to the Supervisor, and make every reasonable effort to preserve and protect the biological resource from damage until the Supervisor has given the lessee directions with respect to its protection.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-018      BLOCK NO. 53N 77W      MAP NO. CAL 6A      OCS-P 0326

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 6

(a)  Pipelines will be required, (1) if pipeline rights-of-way can be determined and obtained, (2) if laying of such pipelines is technologically feasible and environmentally preferable, and (3) if, in the opinion of the lessor, pipelines can be laid without net social loss, taking into account any incremental costs of pipelines over alternative methods of transportation and any incremental benefits in the form of increased environmental protection or reduced multiple use conflicts.  The lessor specifically reserves the right to require that any pipeline used for transporting production to shore be placed in certain designated management areas.  In selecting the means of transportation, consideration will be given to any recommendation of the intergovernmental planning program for leasing and management of transportation of Outer Continental Shelf oil and gas with the participation of Federal, State, and local government and the industry.  Where feasible, and environmentally preferable, all pipelines, including both flow lines and gathering lines for oil and gas, shall be buried to a depth suitable for adequate protection from water currents, sand waves, storm scouring, fisheries' trawling gear, and other uses as determined on a case-by-case basis.

(b)  Following the completion of pipeline installation, no crude oil production will be transported by surface vessel from offshore production sites, except in the case of emergency.  Determinations as to emergency conditions and appropriate responses to these conditions will be made by the Supervisor.  Where the three criteria set forth in the first sentence of this stipulation are not met and surface transporation must be employed, all vessels used for carrying hydrocarbons to shore from the leased area will conform with all standards established for such vessels, pursuant to the Ports and Waterways Safety Act of 1972 (46 U.S.C., 391a), as amended.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT


Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California


TRACT NO. 48-018     BLOCK NO. 53N 77W     MAP NO. CAL 6A     OCS-P 0326

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 8

(a)  The royalty rate on production saved, removed or sold from this lease is subject
to consideration for reduction under the same authority that applies to all other oil
and gas leases on the Outer Continental Shelf (30 CFR 250.12 (e)).  The Director,
Geological Survey, may grant a reduction for only one year at a time.  Reduction of
royalty rates will not be approved unless production has been underway for one year or
more.

(b)  Although the royalty rate specified in Sec. 6 (a) of this lease or as
subsequently modified in accordance with applicable regulations and stipulations is
applicable to all production under this lease, not more than 16 2/3 percent of the
production saved, removed or sold from the lease area may be taken as royalty in
amount, except as provided in Sec. 15 (d) of this lease:  the royalty on any portion
of the production saved, removed or sold from the lease in excess of 16 2/3 percent
may only be taken in value of the production saved, removed or sold from the lease
area.

Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO._48-018_     BLOCK NO._53N 77W_     MAP NO._CAL 6A_          OCS-P_0326_

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 13

No producing well may be drilled so that the well bore in the producing intervals is closer than 500 feet to the seaward boundary of the State except that the 500 feet constraint shall not apply:

(a)  If oil or gas pools or fields underlying both the Outer Continental Shelf and lands subject to the the jurisdiction of California are included in a production unit entered into by the relevant lessees and approved by the lessors.

(b)  If, in the absence of a production unit as described in (a) above, the State of California permits production from State lands from a point closer than 500 feet from the Federal-State boundary.  In the event that such production from State lands does occur, the Federal lessee shall be allowed to produce from offset wells equally close to the boundary in the area of Federal jurisdiction.

Form 3300-1
(September 1978)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT**

| Office | Serial number |
|---|---|
| Los Angeles, CA | OCS-P 0329 |
| Cash bonus | Rental rate |
| $17,115,000.00 | $3.00 per acre |
| Minimum royalty rate | Royalty rate Fixed |
| $3.00 per acre | Sliding Scale |
| Work commitment | Profit share rate |

This lease is effective as of **SEP 1 1979** (hereinafter called the "Effective Date") by and between the United States of America (hereinafter called the "Lessor"), by the Manager, Pacific OCS Office, Bureau of Land Management, its authorized officer, and

Exxon Corporation                                    100%

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered 1-A, 2, 3, 4, 5, 6 and 8 attached hereto, the Lessee and Lessor agree as follows:

Sec. 1. Statutes and Regulations. This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462 as amended; 43 U S.C. 1331 et. seq. (hereinafter called the "Act"). The lease is issued subject to the Act; Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. 7152 and 7153; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

Sec. 2. Rights of Lessee. The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf described as follows:

All Block 52N 76W, OCS Leasing Map, Channel Islands Area, CAL-Map No. 6A

*(Continued on reverse)*

containing approximately 5760.00 acres of hectares (hereinafter referred to as the "leased area").
These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the United States Geological Survey or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

Sec. 3. Term. This lease shall continue for an initial period of five years from the Effective Date of the lease and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon.

Sec. 4. Rentals. The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental of $3.00 per acre ( per hectare) or fraction thereof.

Sec. 5. Minimum Royalty. The Lessee shall pay the Lessor at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty of $3.00 per acre ( per hectare) or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

Sec. 6. Royalty on Production. (a) The Lessee shall pay a fixed royalty of percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium) is subject to royalty. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated, will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty paid in amount in excess of tankage required when royalty is paid in value. When royalties are paid in amount, the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

Sec. 7. Payments. The Lessee shall make all payments to the Lessor by check, bank draft, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the United States Geological Survey and tendered to the Director, except that filing charges, bonuses, first year's rental, and other payments due upon lease issuance, shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

Sec. 8. Bonds. The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

Sec. 9. Plans. The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans, and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

Sec. 10. Performance. The Lessee shall comply with all regulations and orders relating to exploration, development, and production. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

Sec. 11. Directional Drilling. A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Sec. 12. Safety Requirements. The Lessee shall (a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the leased area;

(b) maintain all operations within the leased area in compliance with regulations intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

Sec. 13. Suspension and Cancellation. (a) The Lessor may suspend or cancel this lease during the initial lease term or thereafter pursuant to Section 5 of the Act and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in Section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

Sec. 14. Indemnification. The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

Sec. 15. Disposition of Production. (a) As provided in Section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16-2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price, or if no regulated price applies, at the fair market value at the well head of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) As provided in Section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal agency pursuant to Section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price, or if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in Section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war, or when the President of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

Sec. 16. Unitization, Pooling, or Drilling Agreement. With-in such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or neces-sary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

Sec. 17. Equal Opportunity Clause. During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60—1.4(a)), and the imple-menting regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

Sec. 18. Certification of Nonsegregated Facilities. By enter-ing into this lease, the Lessee certifies, as specified in 41 CFR 60—1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or enter-tainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and sub-contractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60—1.5.

Sec. 19. Reservations to Lessor. All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights include:

(a) the right to authorize geological and geophysical exploration in the leased area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appro-priate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in Section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being with an area needed for national defense, and so long as such designation remains in effect no operations may be conducted on the surface of the leased area or the part thereof included within the designation ex-cept with the concurrence of the Secretary of Defense. If operations or production under this lease within, any desig-

leased area pursuant to this paragraph, any payment of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such com-pensation as is required to be paid under the Constitution of the United States.

Sec. 20. Transfer of Lease. The Lessee shall file for approv-al with the appropriate field office of the Bureau of Land Management any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

Sec. 21. Surrender of Lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Bureau of Land Management a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surren-dered in a manner satisfactory to the Director.

Sec. 22. Removal of Property on Termination of Lease. Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

Sec. 23. Remedies in Case of Default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of Section 24 of the Act. Furthermore, pursuant to Section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regula-tions issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exer-cise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

Sec. 24. Unlawful Interest. No member of, or Delegate to, Congress, or Resident Commissioner, after election or appoint-ment, or either before or after they have qualified, and during this continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 7, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431—433, relating to contracts made or entered into, or accepted by or on behalf of the United States, from a part of this lease insofar as they may be applicable.

\* For amendment to Sec. 6.(a) "Royalty on Production" see rider attached.

| EXXON CORPORATION | THE UNITED STATES OF AMERICA, Lessor |
|---|---|
| (Lessee) | |
| *(signature)* | *(signature)* William E. Grant |
| (Signature of Authorized Officer) | (Signature of Authorized Officer) |
| W. M. SELVIDGE | Manager, Pacific OCS Office |
| (Name of Signatory) | Bureau of Land Management |
| | (Name of Signatory) |
| ATTORNEY-IN-FACT | WILLIAM E. GRANT |
| (Title) | (Title) |
| AUGUST 14, 1979 | AUG 28 1979 |
| (Date) | (Date) |
| SEAL | |
| P. O. Box 2180 | |
| Houston, Texas 77001 | |
| (Address of Lessee) | |

*(Continued on reverse)*

confidential
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

_____ (Signature of Lessee)

If this lease is executed by a corporation it must bear the corporate seal.

GPO 848 – 137

Rider for Amendment to Sec. 6.(a) of Lease Form 3300-1 (September 1978)

Sec. 6. <u>Royalty on Production.</u> (a) The Lessee agrees to pay the lessor a royalty of that percent in amount or value of production saved, removed or sold from the leased area as determined by the sliding scale royalty formula as follows. When the quarterly value of production, adjusted for inflation, is less than or equal to $13.236229 million, a royalty of 16.66667 percent in amount or value of production saved, removed or sold will be due on the unadjusted value or amount of production. When the adjusted quarterly value of production is equal to or greater than $13.236230 million, but less than or equal to $1662.854082 million, the royalty percent due on the unadjusted value or amount of production is given by

$$R_j = b[Ln (V_j/S)]$$

where

$R_j$ = the percent royalty that is due and payable on the unadjusted amount or value of all production saved, removed or sold in quarter $j$

$b$ = 10.0

$Ln$ = natural logarithm

$V_j$ = the value of production in quarter $j$, adjusted for inflation, in millions of dollars

$S$ = 2.5

When the adjusted quarterly value of production is equal to or greater than $1662.854083 million, a royalty of 65.00000 percent in amount or value of production saved, removed or sold will be due on the unadjusted quarterly value of production. Thus, in no instance will the quarterly royalty due exceed 65.00000 percent in amount or value of quarterly production saved, removed or sold.

In determining the quarterly percent royalty due, $R_j$, the calculation will be rounded to five decimal places (for example, 18.17612 percent). This calculation will incorporate the adjusted quarterly value of production, $V_j$, in millions of dollars, rounded to the sixth digit, i.e., to the nearest dollar (for example, 15.392847 millions of dollars).

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026     BLOCK NO. 52N 76W     MAP NO. CAL 6A     OCS-P 0329,

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 1-A

(a)  The lessee agrees that prior to operating or causing to be operated on its behalf boat or aircraft traffic into individual, designated warning areas, the lessee shall coordinate and comply with instructions from the Commander, Space and Missile Test Center (SAMTEC) and the Commander, Pacific Missile Test Center (PMTC), or other appropriate military agency.  Such coordination and instruction will provide for positive control of boats and aircraft operating into the warning areas at all times.

(b)  The lessee, recognizing that mineral exploration and exploitation and recovery operations on the leased areas of submerged lands can impede tactical military operations, hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations of the lessee under this lease in the interests of national security requirements.  Such temporary suspension of operations, including the evacuation of personnel, and appropriate sheltering of personnel not evacuated (an appropriate shelter shall mean the protection of all lessee personnel for the entire duration of any Department of Defense activity from flying or falling objects or substances), will come into effect upon the order of the Supervisor, after consultation with the Commander, Space and Missile Test Center (SAMTEC) and the Commander, Pacific Missile Test Center (PMTC), or other appropriate military agency, or higher authority, when national security interests necessitate such action.  It is understood that any temporary suspension of operations for national security may not exceed seventy-two hours; however, any such suspension may be extended by order of the Supervisor.  During such periods equipment may remain in place.

(c)  The lessee agrees to control his own electromagnetic emissions and those of his agents, employees, invitees, independent contractors or subcontractors emanating from individual, designated defense warning areas in accordance with requirements specified by the Commander, Space and Missile Test Center (SAMTEC) and the Commander, Pacific Missile Test Center (PMTC), or other appropriate military agency, to the degree necessary to prevent damage to, or unacceptable interference with, Department of Defense flight, testing or operational activities conducted within individual, designated warning areas.  Necessary monitoring, control, and coordination with the lessee, his agents, employees, invitees, independent contractors or subcontractors, will be effected by the Commander of the appropriate onshore military installation conducting operations in the particular warning area:  Provided, however, that control of such electromagnetic emissions shall permit at least one continuous channel of communication between a lessee, its agents, employees, invitees, independent contractors or subcontractors and onshore facilities.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026      BLOCK NO. 52N 76W      MAP NO. CAL 6A      OCS-P 0329

The area described in Section 2 of this instrument is subject to the following
stipulation:

<u>Stipulation No. 2</u>

Whether or not compensation for such damage or injury might be due under a theory of
strict or absolute liability or otherwise, the lessee assumes all risks of damage or
injury to persons or property, which occurs in, on, or above the Outer Continental
Shelf, to any person or persons or to any property of any person or persons who are
agents, employees or invitees of the lessee, its agents, independent contractors or
subcontractors doing business with the lessee in connection with any activities being
performed by the lessee in, on, or above the Outer Continental Shelf, if such injury
or damage to such person or property occurs by reason of the activities of any agency
of the U.S. Government, its contractors, or subcontractors, or any of their officers,
agents or employees, being conducted as a part of, or in connection with, the programs
and activities of the Space and Missile Test Center (SAMTEC), the Pacific Missile Test
Center (PMTC), or other appropriate military agency.

Not withstanding any limitations of the lessee's liability in section 14 of the lease,
the lessee assumes the risk whether such injury or damage is caused in whole or in
part by any act or omission, regardless of negligence or fault, of the United States,
its contractors or subcontractors, or any of their officers, agents, or employees.
The lessee further agrees to indemnify and save harmless the United States against all
claims for loss, damage, or injury sustained by the lessee, and to indemnify and save
harmless the United States against all claims for loss, damage, or injury sustained by
the agents, employees, or invitees of the lessee, its agents or any independent
contractors or subcontractors doing business with the lessee in connection with the
programs and activities of the aforementioned military installations and agencies,
whether the same be caused in whole or in part by the negligence or fault of the
United States, its contractors, or subcontractors, or any of their officers, agents,
or employees and whether such claims might be sustained under theories of strict or
absolute liability or otherwise.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California


TRACT NO. 48-026   BLOCK NO. 52N 76W   MAP NO. CAL 6A   OCS-P 0329

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 3

If the Supervisor, having reason to believe that a site, structure or object of historical or archaeological significance, hereinafter referred to as a "cultural resource," may exist in the lease area, gives the lessee written notice that the lessor is invoking the provisions of this stipulation, the lessee shall upon receipt of such notice comply with the following requirements:

Prior to any drilling activity or the construction or placement of any structure for exploration or development on the lease, including but not limited to, well drilling and pipeline and platform placement, hereinafter in this stipulation referred to as "operation," the lessee shall conduct remote sensing surveys to determine the potential existence of any cultural resource that may be affected by such operations. All data produced by such remote sensing surveys as well as other pertinent natural and cultural environmental data shall be examined by a qualified marine survey archaeologist to determine if indications are present suggesting the existence of a cultural resource that may be adversely affected by any lease operation. A report of this survey and assessment prepared by the marine survey archaeologist shall be submitted by the lessee to the Supervisor and the Manager, Bureau of Land Management (BLM), Outer Continental Shelf (OCS) Office for review.

If such cultural resource indicators are present the lessee shall (1) locate the site of such operation so as not to adversely affect the identified location; or (2) establish, to the satisfaction of the Supervisor, on the basis of further archaeological investigation conducted by a qualified marine survey archaeologist or underwater archaeologist using such survey equipment and techniques as deemed necessary by the Supervisor, either that such operation shall not adversely affect the location identified or that the potential cultural resource suggested by the occurrence of the indicators does not exist.

A report of this investigation prepared by the marine survey archaeologist or underwater archaeologist shall be submitted to the Supervisor and the Manager, BLM OCS Office for their review. Should the Supervisor determine that the existence of a cultural resource which may be adversely affected by such operation is sufficiently established to warrant protection, the lessee shall take no action that may result in an adverse effect on such cultural resource until the Supervisor has given directions as to its preservation.

The lessee agrees that if any site, structure, or object of historical or archaeological significance should be discovered during the conduct of any operations on the leased area, he shall report immediately such findings to the Supervisor and make every reasonable effort to preserve and protect the cultural resource from damage until the Supervisor has given directions as to its preservation.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026      BLOCK NO. 52N 76W      MAP NO. CAL 6A      OCS-P 0329

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 4

(a) Wells: Subsea well-heads and temporary abandonments, or suspended operations that leave protrusions above the sea floor, shall be protected, if feasible, by a shroud which will allow commercial trawl gear to pass over the structure without snagging or otherwise damaging the structure or the fishing gear. Latitude and longitude coordinates of these structures along with water depths, shall be submitted to the Supervisor. The coordinates of such structures will be determined by the lessee utilizing state-of-the-art navigation systems with accuracy of at least ± 50 feet (15.25 meters) at 200 miles (322 kilometers).

(b) Pipelines: All pipelines, unless buried, including gathering lines, shall have a smooth-surface design. In the event that an irregular pipe surface is unavoidable due to the need for valves, anodes or other structures, they shall be protected by shrouds which will allow trawl gear to pass over the object without snagging or otherwise damaging the structure or the fishing gear.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026     BLOCK NO. 52N 76W     MAP NO. CAL 6A     OCS-P 0329

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 5

(a)  If the Supervisor has reason to believe that areas of special biological interest in the lease area contain biological communities or species of such extraordinary or unusual value (even though unquantifiable) that no threat of damage, injury, or other harm to the community or species would be acceptable, he shall give the lessee written notice that the lessor is invoking the provisions of this stipulation and the lessee shall comply with the following requirements:  Prior to any drilling activity or the construction or placement of any structure for exploration or development on lease areas including, but not limited to, well drilling and pipeline and platform placement, hereinafter referred to as "operation," the lessee shall conduct site specific surveys as approved by the Supervisor and in accordance with prescribed biological survey requirements to determine the existence of any special biological resource including, but not limited to:

(1)  Very unusual, rare, or uncommon ecosystems or ecotones.

(2)  A species of limited regional distribution that may be adversely affected by any lease operations

If the results of such surveys suggest the existence of a special biological resource that may be adversely affected by any lease operation, the lessee shall:  (1) relocate the site of such operation so as not to adversely affect the resources identified; (2) establish to the satisfaction of the Supervisor, on the basis of the site-specific survey, either that such operation will not have a significant adverse effect upon the resource identified or that a special biological resource does not exist.  The Supervisor will review all data submitted and determine, in writing, whether a special biological resource exists or may be significantly affected by lessee's operations. The lessee may take no action until the Supervisor has given the lessee written directions on how to proceed.

(b)  The lessee agrees that if any area of biological significance should be discovered during the conduct of any operations on the leased area, he shall report immediately such findings to the Supervisor, and make every reasonable effort to preserve and protect the biological resource from damage until the Supervisor has given the lessee directions with respect to its protection.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026      BLOCK NO. 52N 76W      MAP NO. CAL 6A      OCS-P 0329

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 6

(a)  Pipelines will be required, (1) if pipeline rights-of-way can be determined and obtained, (2) if laying of such pipelines is technologically feasible and environmentally preferable, and (3) if, in the opinion of the lessor, pipelines can be laid without net social loss, taking into account any incremental costs of pipelines over alternative methods of transportation and any incremental benefits in the form of increased environmental protection or reduced multiple use conflicts.  The lessor specifically reserves the right to require that any pipeline used for transporting production to shore be placed in certain designated management areas.  In selecting the means of transportation, consideration will be given to any recommendation of the intergovernmental planning program for leasing and management of transportation of Outer Continental Shelf oil and gas with the participation of Federal, State, and local government and the industry.  Where feasible, and environmentally preferable, all pipelines, including both flow lines and gathering lines for oil and gas, shall be buried to a depth suitable for adequate protection from water currents, sand waves, storm scouring, fisheries' trawling gear, and other uses as determined on a case-by-case basis.

(b)  Following the completion of pipeline installation, no crude oil production will be transported by surface vessel from offshore production sites, except in the case of emergency.  Determinations as to emergency conditions and appropriate responses to these conditions will be made by the Supervisor.  Where the three criteria set forth in the first sentence of this stipulation are not met and surface transporation must be employed, all vessels used for carrying hydrocarbons to shore from the leased area will conform with all standards established for such vessels, pursuant to the Ports and Waterways Safety Act of 1972 (46 U.S.C., 391a), as amended.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026      BLOCK NO. 52N 76W      MAP NO. CAL 6A      OCS-P 0329

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 8

(a)  The royalty rate on production saved, removed or sold from this lease is subject to consideration for reduction under the same authority that applies to all other oil and gas leases on the Outer Continental Shelf (30 CFR 250.12 (e)).  The Director, Geological Survey, may grant a reduction for only one year at a time.  Reduction of royalty rates will not be approved unless production has been underway for one year or more.

(b)  Although the royalty rate specified in Sec. 6 (a) of this lease or as subsequently modified in accordance with applicable regulations and stipulations is applicable to all production under this lease, not more than 16 2/3 percent of the production saved, removed or sold from the lease area may be taken as royalty in amount, except as provided in Sec. 15 (d) of this lease:  the royalty on any portion of the production saved, removed or sold from the lease in excess of 16 2/3 percent may only be taken in value of the production saved, removed or sold from the lease area.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

Form 3300—1
(September 1978)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT**

| Office | Serial number |
|---|---|
| Los Angeles, CA | OCS-P 0461 |
| Cash bonus | Rental rate |
| $5,240,000.00 | $3.00 per acre |
| Minimum royalty rate | Royalty rate |
| $3.00 per acre | 12 1/2% |
| Work commitment | Profit share rate |

This lease is effective as of **AUG 1 1982**                    (hereinafter called the "Effective Date") by and between the United States of America (hereinafter called the "Lessor"), by the Minerals Manager, Pacific OCS Region Bureau of Land Management, its authorized officer, and

Exxon Corporation        100%

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered   1,2,3,4,5,7,8 and 9                    attached hereto, the Lessee and Lessor agree as follows:

Sec. 1. Statutes and Regulations.  This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462 as amended; 43 U S.C. 1331 et. seq. (hereinafter called the "Act").  The lease is issued subject to the Act; Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. 7152 and 7153; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

Sec. 2. Rights of Lessee.  The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf described as follows:

All Block 52N 73W, Channel Islands Area, OCS Leasing Map No. 6A

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

(Tract 68-018)

*(Continued on reverse)*

containing approximately    5760    acres or    hectares (hereinafter referred to as the "leased area").
These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the United States Geological Survey or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

Sec. 3. Term. This lease shall continue for an initial period of five years from the Effective Date of the lease and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor. are conducted thereon.

Sec. 4. Rentals. The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental of $3.00 per acre ( per hectare) or fraction thereof.

Sec. 5. Minimum Royalty. The Lessee shall pay the Lessor at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty of $3.00 per acre ( per hectare) or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

Sec. 6. Royalty on Production. (a) The Lessee shall pay a fixed royalty of 12.5/2 percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium) is subject to royalty. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated, will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty paid in amount in excess of tankage required when royalty is paid in value. When royalties are paid in amount, the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

Sec. 7. Payments. The Lessee shall make all payments to the Lessor by check, bank draft, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the United States Geological Survey and tendered to the Director, except that filing charges, bonuses, first year's rental, and other payments due upon lease issuance, shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

Sec. 8. Bonds. The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

Sec. 9. Plans. The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans, and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

Sec. 10. Performance. The Lessee shall comply with all regulations and orders relating to exploration, development, and production. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

Sec. 11. Directional Drilling. A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Sec. 12. Safety Requirements. The Lessee shall (a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the leased area;

(b) maintain all operations within the leased area in compliance with regulations intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

Sec. 13. Suspension and Cancellation. (a) The Lessor may suspend or cancel this lease during the initial lease term or thereafter pursuant to Section 5 of the Act and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in Section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

Sec. 14. Indemnification. The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

Sec. 15. Disposition of Production. (a) As provided in Section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16-2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price, or if no regulated price applies, at the fair market value at the well head of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) As provided in Section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal agency pursuant to Section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price, or if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in Section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war, or when the President of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil and gas produced from the leased area, as provided in Section (b) of the Act.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale No. 68
Outer Continental Shelf
Southern California

## STIPULATION NO. 1

(a) If the DMMOFO has reason to believe that biological populations or habitats exist and require protection, he shall give the lessee notice that the lessor is invoking the provisions of this stipulation and the lessee shall comply with the following requirements. Prior to any drilling activity or the construction or placement of any structure for exploration or development on lease areas including, but not limited to, well drilling and pipeline and platform placement, hereinafter referred to as "operation," the lessee shall conduct site-specific surveys as approved by the DMMOFO and in accordance with prescribed biological survey requirements to determine the existence of any special biological resource including, but not limited to:

   (1) Very unusual, rare, or uncommon ecosystems or ecotones.

   (2) A species of limited regional distribution that may be adversely affected
       by any lease operations.

If the results of such surveys suggest the existence of a special biological resource that may be adversely affected by any lease operation, the lessee shall: (1) relocate the site of such operation so as not to adversely affect the resources identified; or (2) establish to the satisfaction of the DMMOFO, on the basis of the site-specific survey, either that such operation will not have a significant adverse effect upon the resource identified or that a special biological resource does not exist. The DMMOFO will review all data submitted and determine, in writing, whether a special biological resource exists and whether it may be significantly affected by the lessee's operations. The lessee may take no action until the DMMOFO has given the lessee written directions on how to proceed.

(b) The lessee agrees that if any area of biological significance should be discovered during the conduct of any operations on the leased area, he shall report immediately such findings to the DMMOFO, and make every reasonable effort to preserve and protect the biological resource from damage until the DMMOFO has given the lessee directions with respect to its protection.

## STIPULATION NO. 2

If the DMMOFO has reason to believe that a site, structure, or object of historical or archaeological significance, hereinafter referred to as a "cultural resource," may exist in the lease area, and gives the lessee written notice that the lessor is invoking the provisions of this stipulation, the lessee shall upon receipt of such notice comply with the following requirements:

Prior to any drilling activity or the construction or placement of any structure for exploration or development on the lease, including but not limited to, well drilling and pipeline and platform placement, hereinafter in this stipulation referred to as "operation," the lessee shall conduct remote sensing surveys to determine the potential existence of any cultural resource that may be affected by such operations. All data produced by such remote sensing surveys as well as other pertinent natural and cultural environmental data shall be examined by a qualified marine survey archaeologist to determine if indicators are present suggesting the existence of a cultural resource that may be adversely affected by any lease operation. A report of this survey and assessment prepared by the marine survey archaeologist shall be submitted by the lessee to the DMMOFO and the Manager for review.

If such cultural resource indicators are present the lessee shall: (1) locate the site of such operation so as not to adversely affect the identified location; or (2) establish, to the satisfaction of the DMMOFO, on the basis of further archaeological investigation conducted by a qualified marine survey archaeologist or underwater archaeologist using such survey equipment and techniques as deemed necessary by the DMMOFO, either that such operation shall not adversely affect the location identified or that the potential cultural resource suggested by the occurrence of the indicators does not exist.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

A report of this investigation prepared by the marine survey archaeologist or underwater archaeologist shall be submitted to the DMMOFO and the Manager for their review. Should the DMMOFO determine that the existence of a cultural resource which may be adversely affected by such operation is sufficiently established to warrant protection, the lessee shall take no action that may result in an adverse effect on such cultural resource until the DMMOFO has given directions as to its preservation.

The lessee agrees that if any site, structure, or object of historical or archaeological significance should be discovered during the conduct of any operations on the leased area, he shall report immediately such findings to the DMMOFO and make every reasonable effort to preserve and protect the cultural resource from damage until the DMMOFO has given directions as to its preservation.

## STIPULATION NO. 3

All or portions of this tract may contain mass transport deposits, steep slopes, or active faulting. Exploratory drilling operations, emplacement of structures (platforms) or seafloor wellheads for production or storage of oil or gas, and the emplacement of pipelines will not be allowed within the potentially unstable portions of this lease block unless or until the lessee has demonstrated to the DMMOFO's satisfaction that mass transport of sediments or faulting is unlikely, or that exploratory drilling operations, structures (platforms), casing, wellheads, and pipelines can be safely designed to protect the environment in case such mass transport or faulting occurs at the proposed location. This may necessitate that all exploration for and development of oil or gas be performed from locations outside of the area of instability, either within or outside of this lease block.

If exploratory drilling operations are allowed, site-specific surveys shall be conducted to determine the potential for faulting and mass transport of sediments. If emplacement of structures (platforms) or seafloor wellheads for production or storage of oil or gas is allowed, all active faults or mass transport deposits in the lease block must be mapped. The DMMOFO may also require soil testing before exploration and production operations are allowed.

## STIPULATION NO. 4

(a)  The lessee agrees that prior to operating or causing to be operated on its behalf boat or aircraft traffic into individual, designated warning areas, the lessee shall coordinate and comply with instructions from the Commander, Western Space and Missile Center (WSMC), the Commander, Pacific Missile Test Center (PMTC), and the Commander, Fleet Area Control and Surveillance Facility (FACSFAC), or other appropriate military agency. Such coordination and instruction will provide for positive control of boats and aircraft operating in the warning areas at all times.

(b)  The lessee, recognizing that mineral exploration and exploitation and recovery operations of the leased areas of submerged lands can impede tactical military operations, hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations of the lessee under this lease in the interests of national security requirements. Such temporary suspension of operations, including the evacuation of personnel, and appropriate sheltering of personnel not evacuated (an appropriate shelter shall mean the protection of all lessee personnel for the entire duration of any Department of Defense activity from flying or falling objects or substances), will come into effect upon the order of the DMMOFO, after consultation with the Commander, Western Space and Missile Center (WSMC), the Commander, Pacific Missile Test Center (PMTC), and the Commander, Fleet Area Control and Surveillance Facility (FACSFAC), or other appropriate military agency, or higher authority, when national security interests necessitate such action. It is understood that any temporary suspension of operations for national security may not exceed 72 hours; however, any such suspension may be extended by order of the DMMOFO. During such periods equipment may remain in place.

(c)  The lessee agrees to control his own electromagnetic emissions and those of his agents, employees, invitees, independent contractors or subcontractors emanating from individual, designated defense warning areas in accordance with requirements specified by the Commander, Western Space and Missile Center (WSMC), the Commander, Pacific Missile Test Center (PMTC), and the Commander, Fleet Area Control and Surveillance Facility (FACSFAC), or other appropriate military agency, to the degree necessary to prevent damage to, or unacceptable interference with Department of Defense flight, testing or operations activities conducted within

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT





individual, designated warning areas. Necessary monitoring, control, and coordination with the lessee, his agents, employees, invitees, independent contractors or subcontractors, will be effected by the Commander of the appropriate onshore military installation conducting operations in the particular warning area: provided, however, that control of such electromagnetic emissions shall permit at least one continuous channel of communication between a lessee, its agents, employees, invitees, independent contractors or subcontractors and onshore facilities.

## STIPULATION NO. 5

Whether or not compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occurs in, on, or above the Outer Continental Shelf, to any person or persons or to any property of any person or persons who are agents, employees or invitees of the lessee, its agents, independent contractors or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the Outer Continental Shelf, if such injury or damage to such person or property occurs by reason of the activities of any agency of the U.S. Government, its contractors, or subcontractors, or any of their officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the Western Space and Missile Center (WSMC), the Pacific Missile Test Center (PMTC), or other appropriate military agency.

Notwithstanding any limitations of the lessee's liability in section 14 of the lease, the lessee assumes the risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of their officers, agents, or employees. The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, and to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installations and agencies, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of their officers, agents, or employees and whether such claims might be sustained under theories of strict or absolute liability or otherwise.

## STIPULATION NO. 7

(a)  Pipelines will be required: 1) if pipeline rights-of-way can be determined and obtained; 2) if laying of such pipelines is technologically feasible and environmentally preferable; and 3) if, in the opinion of the lessor, pipelines can be laid without net social loss, taking into account any incremental costs of pipelines over alternative methods of transportation and any incremental benefits in the form of increased environmental protection or reduced multiple use conflicts. The lessor specifically reserves the right to require that any pipeline used for transporting production to shore be placed in certain designated management areas. In selecting the means of transportation, consideration will be given to any recommendation of the intergovernmental planning program for assessment and management of transportation of Outer Continental Shelf oil and gas with the participation of Federal, State, and local governments and the industry.

(b)  Following the development of sufficient pipeline capacity, no crude oil production will be transported by surface vessel from offshore production sites, except in the case of emergency. Determinations as to emergency conditions and appropriate responses to these conditions will be made by the DMMOFO.

(c)  Where the three criteria set forth in the first sentence of this stipulation are not met and surface transportation must be employed, all vessels used for carrying hydrocarbons to shore from the leased area will conform with all standards established for such vessels, pursuant to the Port and Tanker Safety Act of 1978 (33 U.S.C. 1221 et seq.).

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

## STIPULATION NO. 8

(a) _Wells._ Subsea wellheads and temporary abandonments, or suspended operations that leave protrusions above the seafloor, shall be protected, if feasible and as appropriate, in such a manner as to allow commercial fisheries trawling gear to pass over the structure without snagging or otherwise damaging the structures or the fishing gear. Latitude and longitude coordinates of these structures, along with water depths, shall be submitted to the DMMOFO. The coordinates of such structures will be determined by the lessee utilizing state-of-the-art navigation systems with accuracy of at least ±50 feet (15.25 meters) at 200 miles (322 kilometers).

(b) _Pipelines._ All pipelines, unless buried, including gathering lines, shall have a smooth surface design. In the event that an irregular pipe surface is unavoidable due to the need for valves, anodes or other structures, it shall, as appropriate, be protected in such a manner as to allow trawling gear to pass over the object without snagging or otherwise damaging the structure or the fishing gear.

## STIPULATION NO. 9

(1)  No producing well may be drilled where the well bore in the producing intervals is closer to the seaward boundary of the State of California than the distance agreed to between the State and the Department based on analysis of pertinent site-specific data, except that in no event shall the agreed distance be further than 750 feet from the seaward boundary of the State. In the absence of an agreed distance, no well shall be drilled closer than 500 feet to the seaward boundary of the State.

(2)  The constraint in paragraph (1) shall not apply:

    (a) If oil or gas pools or fields underlying both the Outer Continental Shelf and lands subject to the jurisdiction of California are included in a production unit entered into by the relevant lessees and approved by the lessors, or in a production unit entered into by the Federal lessee and the State of California when it is a carried, nonoperating owner.

    (b) If, in the absence of a production unit as described in (a) above, the State of California permits production from State lands from a point closer than 750 feet from the Federal-State boundary. In the event that such production from State lands does occur, the Federal lessee shall be allowed to produce from offset wells equally close to the boundary in the area of Federal jurisdiction.

confidential
Slaperouse Slaperouse
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

Sec. 16. Unitization, Pooling, or Drilling Agreements. Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

Sec. 17. Equal Opportunity Clause. During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60—1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

Sec. 18. Certification of Nonsegregated Facilities. By entering into this lease, the Lessee certifies, as specified in 41 CFR 60—1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60—1.5.

Sec. 19. Reservations to Lessor. All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights include:

(a) the right to authorize geological and geophysical exploration in the leased area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in Section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being with an area needed for national defense, and so long as such designation remains in effect no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within, any desig-

nated area is suspended pursuant to this paragraph, any payment of rental or royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 20. Transfer of Lease. The Lessee shall file for approval with the appropriate field office of the Bureau of Land Management any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

Sec. 21. Surrender of Lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Bureau of Land Management a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

Sec. 22. Removal of Property on Termination of Lease. Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

Sec. 23. Remedies in Case of Default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of Section 24 of the Act. Furthermore, pursuant to Section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

Sec. 24. Unlawful Interest. No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified, and during this continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 7, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431—433, relating to contracts made or entered into, or accepted by or on behalf of the United States, from a part of this lease insofar as they may be applicable.

**SEAL**

| | |
|---|---|
| Exxon Corporation | THE UNITED STATES OF AMERICA, Lessor |
| (Lessee) | |
| | |
| (Signature of Authorized Officer) | (Signature of Authorized Officer) |
| | **WILLIAM E. GRANT** |
| Nibert J. Johnson | |
| (Name of Signatory) | (Name of Signatory) |
| | Acting Minerals Manager |
| Attorney-in-Fact | Pacific OCS Region |
| | Minerals Management Service |
| (Title) | (Title) |
| | |
| June 29, 1981 | JUL 2 1982 |
| (Date) | (Date) |
| | |
| P. O. Box 4279 | |
| Houston, Texas 77001 | |
| | |
| (Address of Lessee) | |

*(Continued on reverse)*

confidential
Slaperouse Slaperou
sableoffshore.com
Mar 21, 2024 6:23 PM EDT

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

---

_(Signature of Lessee)_

**ATTACHMENT TO FORM 3300-1**

This form does not constitute an information collection as defined under the provisions of 44 U.S.C. 3502, and therefore does not require approval by the Office of Management and Budget.




_If this lease is executed by a corporation, it must bear the corporate seal._

GPO 846-137

**PROOF OF SERVICE**

I, Josie Cisneros, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On **April 1, 2026**, I served the document(s) **DECLARATION OF STEVE RUSCH IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF EX PARTE NOTICE OF DEFENSE PRODUCTION ACT ORDER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☒     BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on April 1, 2026, at Los Angeles, California.

*/s/ Josie Cisneros*
_____
Josie Cisneros

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000 | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire* |

| San Francisco, CA 94102 Tel.: (415) 510-3802 Michael.dorsi@doj.ca.gov | *Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
| --- | --- |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
4/1/2026 11:35 PM
By: Narzralli Baksh , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>Respondents/Defendants. | Case No.: 25CV02244<br>[Consolidated with 25CV02247]<br><br>**DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER**<br><br>[*Filed concurrently with Supplemental Brief, Request for Judicial Notice, and Declarations of Garett B. Stanton and Steve Rusch*]<br><br>Date:    April 17, 2026<br>Time:    10:00 a.m. |

1

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

|  | Dept.:    4 |
|---|---|
|  | Complaint Filed: April 15, 2025 |
|  | [Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |
| SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>        Real Parties in Interest |  |
| ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,<br><br>        Petitioners/Plaintiffs,<br><br>            v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,<br><br>        Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.<br><br>        Real Parties in Interest. | Case No.: 25CV02247 |

2

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

## I.    INTRODUCTION AND QUALIFICATIONS

### A.    Assignment and Scope of Work Performed

1.    I have been retained as an expert on certain aspects of the oil and gas industry for Sable Offshore Corp., a Delaware corporation, and its three offshore platforms, and Pacific Pipeline Company, a Delaware corporation ("Plaintiffs" or collectively, "Sable") with specific reference to Segments CA-324 and CA-325 of the Santa Ynez Pipeline System (collectively the "Las Flores Onshore Pipeline Segments") in matters regarding the Center for Biological Diversity and Wishtoyo Foundation's efforts to challenge the California Office of the State Fire Marshal's approval of modified regulatory requirements, known as "State Waivers," to Sable.[1] I have based my analysis and have formulated my conclusions and opinions on my academic and professional training and experiences, and would and could testify in court on my analysis and to these conclusions and opinions. I make this declaration and provide the opinions stated below based upon my experience and my personal knowledge and would and could testify to the matters contained herein.

2.    The scope of work for which I was retained involved the collection, assessment, and structuring of data necessary to perform the following analytical assessment and form opinions on Pipeline Capacity Prioritization and Allocation Order 91 Fed Reg. ___ (March 13, 2026) (the "DPA Order") as related to Sable Offshore Corp.:

    a.    Need and impact of the Defense Production Act, 50 U.S.C., as applied to the order of Sable Offshore Corp. to commence production.

    b.    Assessment of California oil production and refinery capacities.

    c.    Assessment of California's influence on U.S. force readiness and national security as related to California oil and refinery policies, and capabilities.

---

[1] *Center for Biological Diversity and Wishtoyo Foundation v. California Department of Forestry and Fire Protection, et al.* (Santa Barbara Sup. Ct. April 15, 2025), Case No. 25CV02244.

3

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

    d. Assessment of California's reliance on foreign sourced oil and gasoline from petrostates.

    e. Assessment of Sable Offshore Corp.'s ability to commence production on California oil production, imports and U.S. interests in seeing Sable's production commence immediately by, among other things, transmission of crude through the Segments CA-324 and CA-325.

3. My work and the opinions expressed herein are restricted to the performance of this assignment and of the scope of work performed described above, and I express no opinion on any other matters that are external to the purview of this Assignment and Scope of Work Performed.

**B.    Qualifications and Background**

4. I am an Associate Professor of Management and Professional Practice at the Marshall School of Business, University of Southern California ("USC") in Los Angeles, CA. I am currently also a Co-Founder and Chairman of the Board of Synergy Consulting Group, Inc., a management consulting firm. I hold a B.S. degree with honors in finance and economics from New York University and an MBA from Stern School of Business, New York University. I also hold an MS degree in Federal Taxation from Golden Gate University and a certification in AI from the Massachusetts Institute of Technology.

5. I have over 40 years of experience in the management consulting industry and 28 years in higher education. Prior to joining the USC faculty, I had two decades of experience in the management consulting industry. From 1983 to 1992, I worked at KPMG, one of the largest global accounting and consulting firms in the world and eventually became one of the youngest consulting partners (*i.e.*, "Principals") elected in the history of KPMG. At KPMG, I was a member of the Practices & Methods Review Committee. My practice focused on, among other things, strategy and transformation, transaction management services, and innovation and advanced technologies. From 1991 to 1993, I also served as a Principal of Management Consulting Services at A.T. Kearney, one of the leading management consulting firms in the world. From 1995 to

4

1997, I served as a consultant to the senior leadership of Andersen Consulting (now Accenture) for the development of several practice methodologies related to process transformation and innovation. I have served as Chairman of the Board since 1993 and CEO from 1995 through 2016 for Synergy Consulting Group, Inc. Throughout my consulting career, I have led and managed numerous consulting projects for a variety of clients in the private, public, and non-profit sectors, many of which involved benefit analysis and economic impact of strategies and strategic investments. I have consulted with a variety of industries and organizations, including Fortune 100 companies, elite management consulting firms and investment banks, national, state, and local governments, foreign governments, and heads of state and key policymakers.

6.    Since becoming a faculty member at USC in 1997, I have taught numerous MBA courses on the management consulting industry and strategic change, including, among others, The Business of Energy in the 21st Century, Strategic Innovation & Change, Management Consulting, Strategic Transformation & Renewal, Case Analysis for Consultants, Organizational Behavior, and Leading High-Performance Teams. I am also responsible for USC's Certificate in Management Consulting Program and am a senior advisor to USC Management Consulting and Strategy Club, the largest club in the MBA program. I have received the Management and Organization Department Service Excellence Award and the Marshall Golden Apple Teaching Award. I have published eight books on management, organization, and consulting and have been cited in over 400 articles, interviews, reviews, and studies, including The Wall Street Journal, Fortune, New York Post, London Times, San Francisco Chronicle, and LA Times, as well as numerous television and social media such as but is not limited to KNBC-LA, KCRA, KCBS- San Diego, KFI-640, KNX-97.1, YouTube and TikTok. I have also served as a material or expert witness several times. My academic and research interests in the oil and gas industry span over 50 years and began in October 1973 with the Arab Oil Embargo of the United States when I was a student at New York University.

5

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

7.      A detailed list of my experience, publications, interviews, and prior expert work, including a list of my testimony in the past four years is included as **Appendix A** to this report.

**C.      Materials and Evidence Considered**

8.      Addressing the objectives required extensive analysis of data and comparative analytical methods. The research involved in this work and in supporting the opinions expressed herein is widely available and includes but is not limited to verifiable sources such as the California Energy Commission, U.S. Energy Information Administration, Bloomberg, U.S. Department of Energy, Sable SEC filings, International Energy Agency, the California Department of Tax and Fee Administration, the U.S. EPA, California Air Resources Board, Statista, the California Attorney General's Office, the California Legislative Analyst's Office, the U.S. Department of Energy, the U.S. Department of Interior, the U.S. Department of War, and other publicly available sources and scholarly research articles and papers.

9.      In addition to the public materials, I relied upon the evidential and supporting documents associated with this action.

**D.      Compensation**

10.      Fee and compensation arrangements for this work are based on time and materials. My hourly rate for this assignment is $1,000.00, and payment for my services does not depend in any way on the opinions that I form or on the outcome of this matter. I have no equity interests in Sable Offshore Corp. or any of its affiliates. Furthermore, I have no equity or business interests or conflicts that may be related to any other oil and gas producer or any nation-state that derives most of its income from oil and gas. Like many people who have professionally managed pension plans, including those who are members of CalPERS, one of my pension funds may own the stock of one or several petroleum or petroleum-related companies. In this regard, I may have a distant and indirect interest, but in all situations, any interests are immaterial and are not pertinent, and do not have any influence on my work and the opinions expressed herein.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

## II.    SUMMARY OF CONCLUSIONS

### A.    California's Energy Crisis

11.    The oil and gas industry in California accounts for around 8% of the state's GDP, but it is, critically, the first 8% of its overall GDP. Without oil and gasoline, the other 92% would be impossible to attain. Petroleum is used in over 6,000 products and is found in products ranging from lipstick, to flooring, to Tesla EVs. Without petroleum, asphalt cannot be made, and steel cannot be produced. Even in a state as environmentally conscious as California, fossil fuels still generate around 40% of all electricity. Without that 40%, there would be no Silicon Valley. Without gasoline and diesel fuels, California agricultural production would be a fraction of what it is today. Without jet fuel, California would not be a focal point for international travel.

12.    California faces immediate risks to gasoline supply due to declining in-state production, refinery closures, and an imminent northbound pipeline collapse. With the AAA price of gasoline in California 51% higher than the national average, Californians are already paying the highest prices in the U.S. [2] The impending loss of two refineries and the collapse of the only remaining northern crude oil pipeline, together with increasing dependency on non-U.S. gasoline sources to California, could drive the price of gasoline to double that of the national average by calendar year end 2026.

13.    With the continuing decline of in-state oil production, the permanent shutdown of two major California oil refineries collectively representing the loss of  6.2 to 10.5 million gallons of gasoline per day, growing dependencies on non-U.S. sources for oil and, now gasoline, as well as the highest retail gasoline prices in the U.S., California is confronting a potential energy crisis.

- While overall U.S. field production has increased 66% from 1990 levels, California's field production declined 68% from its peak production in 1985.

---

[2] As of 11/28/25. https://gasprices.aaa.com/?state=CA.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

- California is the 2nd largest consumer of petroleum and the largest consumer of aviation fuel in the U.S.[3] In 2023, Californians consumed over 500 million barrels of oil (1.8 million per day), 13.1 billion gallons of gasoline, 3.6 billion gallons of diesel fuel, and over 216 million gallons of aviation fuel.

- Over 98% of California's non-U.S. sourced imported oil is delivered to its refineries via maritime vessels, which are significant contributors to GHG emissions.

- California is highly vulnerable to oil supplies and prices of foreign providers. Since 2005, California's dependency on non-U.S. foreign oil has increased by 19.43% while its in-state oil production has fallen by 55.22%.

- California's oil and gas industry represents around 8% of its total GDP, and employs over 148,000 workers directly, and over 536,000, indirectly and generated around $47.9 billion in state and local tax revenues for 2022.

- California oil and gasoline consumption is relatively inelastic. Since 2001, consumption of gasoline has decreased by only 11%; total oil consumption has decreased 22% (mostly due to the switch to renewables for power generation).

- California's dependency on foreign oil sourced from petrostates such as Iraq, Saudi Arabia, and the U.A.E, as well as Brazil, Ecuador and Guyana is expected to increase in the coming years making the state more vulnerable to geopolitical events and swings in Brent oil market prices.

- California's dependency on foreign gasoline and diesel fuels sourced from Singapore, India, Japan, South Korea, and the Bahamas is expected to increase in the coming years making the state more vulnerable to geopolitical events and disruptions in the supply chain and exposing the United States to greater existential threats from rival such as China and enemies such as North Korea.

---

[3] U.S. EIA, Crude Oil Production, Annual, Thousand Barrels, 2023.

8

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

14.     Other than increasing reliance on oil and gasoline from non-U.S. suppliers and foreign-owned tankers for transport, <u>California's government and leadership have no real plan to address its pending gasoline and aviation fuels crisis</u>. More importantly, California leadership has woefully underestimated the implications of its actions on overall U.S. national security. For example:

15.     The Phillips 66 Rodeo refinery, formerly a 120 kbpd crude facility, has already transitioned to renewable diesel and no longer contributes CARB-compliant gasoline or jet fuel to the state supply. With no local reserves and only working stocks at Defense Fuel Support Point ("DFSPs"), every disruption must be absorbed in real time by an already strained supply chain.

16.     Recent incidents further illustrate the magnitude of capacity attrition. The PBF Martinez refinery sustained a maintenance fire on February 1, 2025, forcing the refinery offline until late April. It did not return to full restoration until the third quarter of 2025.

17.     Marathon Martinez, a formerly 161,000 BPD crude oil refinery which was converted to a renewable diesel refinery in late 2022, was idled by a fire on November 19, 2023, and has yet to resume full operations, effectively removing roughly 161,000 BPD of crude-mode capacity from the state's system.

18.     Up to <u>100,000 barrels or 4.2 million gallons per day</u> could be produced from Sable leases in the federal waters in or near the Santa Barbara channel. This oil can be directed south to the Los Angeles area refineries thereby freeing up tens of thousands of barrels of Kern County oil compatible with Northern California refineries to be redirected north to the surviving PBF-Martinez refinery thereby helping to restore the San Pablo Bay pipeline (routinely referred to as the "Crimson" pipeline), which has been shut down since December 2025. The Crimson pipeline is the largest inland pipeline in California and the only major line linking Northern and Southern California. The Crimson Pipeline is designed to supply crude to Northern California refineries, which in turn supply Travis and Beale Air Force Bases, San Francisco International Airport, Oakland International Airport, and Sacramento International Airport, as well as smaller municipal

9

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

and private airports. The Crimson pipeline has an approximate northbound capacity of 210,000 barrels or 8,820,000 gallons a day. However, due to declining in-state production, the pipeline was operating at 15% to 20% capacity, which was well below financial breakeven and the operator was sustaining severe financial losses of $2.0-$3.0 million monthly,[4] before it was idled in mid-December 2025.[5] The pipeline is essential to moving Kern County oil production to the refineries in a cost-effective and safe manner. For perspective, moving the equivalent amount of oil by road would require <u>760 tanker trucks operating on California highways and interstates 24 hours a day, 365 days a year</u>. This would create significant exposures and compromises to national security, highway safety, and escalate environmental greenhouse emissions. The reality of the Crimson pipeline's closure is already manifesting in California. As reported by Transportation Topics, around 100 trucks a day are being used in Kern County to transport oil that would have been directed to the pipeline.[6]

### B.    Effect on Neighboring States

19.    California's oil production and gasoline refinery infrastructures are essential to its economy and new production is needed. Based on current models and assumptions, California will require approximately 578,000,000 to 581,000,000 barrels of petroleum annually to support its current economic activity, as well as its exports to Arizona and Nevada. In terms of gasoline consumption, California, along with the <u>fuel it supplies to Nevada and Arizona</u>, is estimated to

---

[4] https://www.politico.com/newsletters/california-climate/2025/12/05/this-california-oil-pipeline-exec-is-running-out-of-cash-00679551.

[5] https://tanktransport.com/2026/03/california-crude-by-truck/#:~:text=The%20demand%2Dside%20change%20is,are%20properly%20idled%20by%20April.

[6] https://www.ttnews.com/articles/calif-tanker-truck-oil-route#:~:text=Nearly%20100%20trucks%20a%20day,Independent%20Petroleum%20President%20Rock%20Zierman. See also https://www.bloomberg.com/news/articles/2026-03-12/oil-drillers-resort-to-trucks-as-key-california-pipeline-idled.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

require between 14.2 to 15.5 billion gallons of gasoline per year, or about 38,900,000 to 42,470,000 gallons per day.

20.     California energy policies also have far-reaching impacts outside the state. On September 10, 2024, Arizona Governor Hobbs and Nevada Governor Lombardo sent Governor Newsom a joint and bi-partisan letter on the potential impacts of ABX2-1 and other similar legislation on their respective states.[7] Within 48 hours of the passage of ABX2-1 on October 14, 2024, Phillips 66 announced the closure of their Los Angeles refinery on October 16, 2024.[8] As indicated in Governor Lombardo's most recent March 9, 2026 letter to Governor Newsom, California's "policy decisions that materially affect refinery operations in your state directly and immediately impact fuel availability, pricing, and economic stability in Nevada."[9] As recognized by these neighboring governors, California policies are detrimental to the fuel availability, fuel prices, and economic interests not only in California but in the Western United States. Sable production of crude oil in federal waters is essential to addressing the needs of California, Arizona, Nevada, and the nation at large.

21.     EIA data indicates that California and the broader West Coast have no strategic refined-fuel reserve. At any given time, the total volume of transportation fuel in transit or storage across the region equals only about two to three weeks of normal demand—roughly fourteen to twenty-one days of supply. In a national emergency, the federal government could requisition commercial fuel stocks for military-priority use, but without active resupply, even those operational reserves would be exhausted within roughly two weeks. Replenishment would rely on

[7] https://gov.nv.gov/Newsroom/PRs/2024/2024-09-10_governor-lombardo-and-hobbs-urge-governor-newsom-to-halt-legislation/.

[8] https://investor.phillips66.com/financial-information/news-releases/news-release-details/2024/Phillips-66-provides-notice-of-its-plan-to-cease-operations-at-Los-Angeles-area-refinery/default.aspx.

[9] https://www.2news.com/townnews/hydrography/governor-lombardo-sends-letter-to-governor-newsom-about-california-fuel-regulations/article_2b607cd7-7ea2-44e2-a1ff-ca7e21e5a6b6.html.

11

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

long-distance imports that take additional weeks to arrive, especially as in-state production continues to shrink.

### C.     Effect on Military Readiness

22.     America faces dangers from a variety of foreign foes and California is the vanguard against those in the Indo-Pacific Region. California is a major base for U.S. military assets and force readiness. Iran controls the Strait of Hormuz where 20% of world's oil must pass through. Because of its policies and restrictions on in-state production, California is dependent on Middle Eastern oil that must transit the Strait of Hormuz.

23.     California received 295,717,000 barrels of crude from foreign sources while producing only 110,679,000 barrels in 2025.[10] That is 2.6 times in-state production and 61.1% of all oil sources to the state for 2025. Collectively, crude oil supplied to California from the Middle East was around 83,252,000 barrels or 28% of total imports in 2025.[11] This oil moves through the Strait of Hormuz, which as of March 29, 2026, is functionally closed.[12]

24.     California's long-term reduction in state crude production, the low impact of SB 237 (which allows for up to 2,000 new oil and gas drilling permits per year in Kern County), and extreme dependency on foreign oil and gasoline clearly demonstrate how state policies and regulations and political sentiment compromise U.S. force readiness and national security in times of global oil production stress and supply chain disruption. Forward U.S. bases cannot rely upon fuel shipments or crude oil from the Middle East or refineries located in Asia. The fuels to prosecute and win a conflict must come from the U.S. and California plays an essential role in that

---

[10] https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california.

[11] https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports.

[12] For reference purposes: Shipping through the Strait of Hormuz has plummeted by 90% per day. On average around 150 vessels transit the Strait. As of March 30, 2026, the count was around 7 vessels per day. (Bloomberg).

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

effort. The addition of Sable Offshore Corp.'s production will help mitigate some of this stress and is essential to U.S. national interests and war readiness.

### D. The Defense Production Act Order

25. Years of over regulation and industry demonization have now left California with limited choices and a critical call to action. California can navigate its way out of this government-created crisis and avoid supply vulnerabilities and escalating consumer prices by implementing the following action steps:

 a. The nation's and California's most immediate, viable and sustainable option is to increase in-state crude oil production.

 b. The best and essentially only way to achieve and sustain this benefit is to reopen the Santa Ynez Pipeline System on the Central Coast and safely increase offshore crude oil production federal waters via the Santa Ynez Unit (SYU) through the Santa Ynez Pipeline System (SYPS).

 c. Restoring production in this region would immediately provide upwards of 50,000 barrels or 2.14 million gallons per day of clean, low-decline California crude suited for Southern California refinery configurations and have an immediate affirmation influence on U.S. national security, especially at this very important moment.

26. Failure to act and failure to increase in-state crude oil production will only accelerate the exit of California refineries from the state, increase global GHG emissions, further California's contributions to environmental destruction, force greater reliance on foreign suppliers, increase consumer prices, negatively affect climate change by adding to carbon burden, and diminish U.S. national security.

27. The invocation of the National Production Act by President Donald J. Trump was necessary to maintain U.S. national security and consistent with the President's DCPD-202500123

13

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

- Executive Order 14156—Declaring a National Energy Emergency.[13] Failure to intervene on behalf of the common defense of the nation, as the President has, would have placed unnecessary stress on U.S. military forces and quite possibly, placed U.S. national security at considerable and unnecessary risk.

28.    California's policies and actions affect the U.S. We are already seeing the impact of more maritime tankers being diverted to California from east coast states and the need to import considerably more jet fuel from China and India to sustain commercial air operations in the state. This is especially dangerous during times of geopolitical unrest. California has made the choice to rely upon Iraq, U.A.E., Brazil, South Korea, India, Singapore, and the Bahamas for crude oil which it could produce itself and gasoline and jet fuel which it must now import in historical quantities due its inability to retain refineries. In the instance of a national emergency, increased military operations, or the need to intervene on behalf of another nation, it is questionable whether the U.S. could fully engage, given California's choices to reduce in-state crude oil production and overregulate its refiners.

29.    Because California is essential to the U.S. economy and sits as the vanguard of U.S. defense and military readiness for Asia Pacific, and because California has overregulated and failed to preserve its refineries and dissuaded in-state crude production, the President's intervention ordering Sable production from federal waters and duly leased properties from the U.S. Government and use of the existing pipeline structures was entirely consistent with the national security interests of the nation. <u>Invocation of the Defense Production Act by President Trump allowing Sable production and use of pipelines is in the best interests of national security and in the best interests of California</u> energy security and consumers, especially lower and fixed income Californians. In the absence of the DPA Order the potential alternatives are depicted in the figure below.

---

[13] https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/.

14

Figure 1.0.



## III.   ANALYSIS

### A.   Industry Prominence

#### 1.   Global

30.   Petroleum is essential to any modern economy. Although oil is universally known as a source of energy, petroleum and petroleum derivatives and by-products are used in over 6,000 products including electric vehicles (EV), such as Tesla, and in the manufacturing of fibers, such as polyester and nylon, lipstick, skin creams, certain types of medical devices, the screens that are used in monitors, televisions, cell phones, computers, as well as cement, asphalt, wind turbines, steel, herbicides, and fertilizers.[14] Petroleum, in the form of gasoline, diesel, and aviation fuels, is the primary fuel for transportation and the movement of products. Jet fuel is made from petroleum, as are diesel fuels.[15]

---

[14] IOGP. (2022, October 11). *Oil and gas in everyday life*. https://www.iogp.org/workstreams/advocacy/oil-natgas-in-everyday-life/.

[15] In California, Phillips 66 in the San Francisco Bay Area and Chevron in El Segundo produce jet fuel from renewable sources.

15

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

31.     Total world oil reserves are estimated to be around 1.7-2.1 trillion barrels of proven reserves[16] and upwards of 3 trillion barrels in unproven reserves[17], as of 2025. Oil consumption is around 104,700,000 barrels per day or 38.2 billion barrels per year.[18] Irrespective of renewables, oil remains the largest source of energy in the world suppling around 34% to energy and energy generation.[19] Globally, for 2025, around 106.1 million barrels of oil were produced per day.[20] The U.S. was the largest producer of oil in 2024 and 2025, with Saudi Arabia and Russia following.[21] Goldman Sachs estimates that daily world crude oil demand will increase by 11.0% to 113 million barrels a day.[22] World oil production capacity is expected to increase to 114.7 million barrels a day by 2030.[23] According to the International Energy Agency (IEA), the energy sector, including the oil and gas industry, employs some 65 million people worldwide (2019 est.), representing about 2% of all global employment.[24] According to a Stanford University report, between 2020 and 2023, the global energy sector attracted around $9.8 billion in private investment in AI, with over half of that investment occurring in the United States.[25]

---

[16] https://www.worldometers.info/oil/#:~:text=World%20Oil%20Reserves%20(2025)&text=There%20are%201.77%20trillion%20barrels,levels%20and%20excluding%20unproven%20reserves).

[17] https://courses.ems.psu.edu/earth104/node/1298.

[18] https://www.eia.gov/todayinenergy/detail.php?id=65285#:~:text=Although%20oil%20consumption%20will%20still,Outlook%2C%20January%20and%20May%202025.

[19] https://www.energyinst.org/statistical-review.

[20] *Frequently Asked Questions (FAQs) - U.S. Energy Information Administration (EIA)*. (2024, April 11). Www.eia.gov. https://www.eia.gov/tools/faqs/faq.php?id=709&t=6.

[21] https://www.energyinst.org/statistical-review.

[22] Peak oil demand is still a decade away. (2024, June 17). *Goldman Sachs*. https://www.goldmansachs.com/insights/articles/peak-oil-demand-is-still-a-decade-away.

[23] https://www.iea.org/reports/oil-2025/executive-summary.

[24] *World Energy Employment*. (n.d.). https://iea.blob.core.windows.net/assets/a0432c97-14af-4fc7-b3bf-c409fb7e4ab8/WorldEnergyEmployment.pdf.

[25] Stanford University. (2024). *The 2024 AI Index Report | Stanford HAI*. Stanford.edu. https://hai.stanford.edu/ai-index/2024-ai-index-report.

16

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

32.     Petroleum products and prices are of particular interest to national, economic and food security. Petroleum fuels, derivatives and by-products are used in the production of agricultural fertilizers, animal production, and food production. Due to the petroleum and refinery activities in the Middle East, around 30% of the world's ammonia, 45% of the world's urea, and 50% of the world's sulfur used for fertilizer in agriculture move through the Strait of Hormuz.[26] As Iran has controlled this region, there is growing concern that fertilizer costs will increase, thereby increasing the cost of food across the globe, including California.

33.     As indicated in the figure below, as gasoline prices increase, the cost of staples such as milk, ground beef, and sugar also increase. Longitudinal studies of the influence of crude oil on food prices indicate "statistically significant evidence in favor of the existence of a long-run causal relationship, solely running from oil prices to food prices."[27] One study calculated that a 1% increase in the crude oil price index results in food prices increasing by .08%.[28] As was indicated during the inflationary period of 2021 to 2024, when general inflation outpaced real wages and peaked at 9.1%, and crude oil and gasoline prices peaked at a 40-year high, food prices for consumers increased. By example, from 2019 to 2023, the average retail price for milk increased 41.78%, while ground beef and sugar surged 34% and 107%, respectively. In the U.S., the oil and gas industry hourly wages, on average, are around 85% higher than the national average.[29]

---

[26] *Experts warn that Strait of Hormuz fertilizer and fuel blockage could lead to a global food crisis*. (2026, March 18). ETC Group. https://www.etcgroup.org/content/experts-warn-strait-hormuz-fertilizer-and-fuel-blockage-could-lead-global-food-crisis#:~:text=The%20global%20agro%2Dindustrial%20production,quarter%20of%20seaborne%20oil%20trade.

[27] Karakotsios, Achillefs, et al. "The Dynamic Linkages between Food Prices and Oil Prices. Does Asymmetry Matter?" *The Journal of Economic Asymmetries*, vol. 23, June 2021, p. e00203, https://doi.org/10.1016/j.jeca.2021.e00203. Accessed 9 June 2021.

[28] *Asymmetries*, vol. 23, June 2021, p. e00203, https://doi.org/10.1016/j.jeca.2021.e00203. Accessed 9 June 2021.

[29] American Petroleum Institute. (2019). *Oil & Natural Gas Contribution to U.S. Economy Fact Sheet*. Api.org. https://www.api.org/news-policy-and-issues/taxes/oil-and-natural-gas-contribution-to-us-economy-fact-sheet.

17

34.     Crude oil prices, as has been studied and documented over the years, have a direct influence on agricultural costs and the cost of food at the grocery store.[30] When considered in entirety, "food is one of the most fossil fuel-intensive sectors in the economy.[31] Food production and the distribution of food require petroleum. As provided in the figure below for the January 1997 to January 2022 period, there is a relatively high and positive correlation between crude oil prices and food prices.[32] This attributable, in part, to the influence that crude oil and refinery costs have on the price of fertilizer ingredients, as well as agricultural operating and food transportation costs.

Figure 2.0[33]



---

[30] https://extension.psu.edu/fuel-ethanol-hero-or-villain#:~:text=Gasoline%20is%20not%20water%20soluble,performance%20if%20not%20dealt%20with.

[31] https://www.montana.edu/ageconmt/newsandposts/foodandoilpriceslinked.html#:~:text=So%20when%20considering%20the%20entire,and%20gas%20markets%20as%20well.

[32] https://www.montana.edu/ageconmt/newsandposts/foodandoilpriceslinked.html#:~:text=So%20when%20considering%20the%20entire,and%20gas%20markets%20as%20well.

[33] https://www.researchgate.net/figure/nternational-food-and-crude-oil-prices-from-January-1997-to-January-2022-Source-Crude_fig1_361545553.

18

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

35.    Crude oil and refinery costs have an impact on farming operational costs, as well as the price of fertilizers. Crude oil is also the main ingredient used in the production of diesel fuels which are used in framing equipment tractors and trucks that move production from the field to the market. By example, when diesel prices exceed $4.54, Federal Express adds a 24.25% fuel surcharge, driving up the cost of delivery. For perspective, the AAA national average for diesel fuel on March 31, 2026, was $5.454, while the average in California was $7.455, or 36% higher.

36.    California is home to some 70,000 farms and collectively contributes $100 billion to the California economy.[34] Agricultural production is around 3% of California's GDP.[35] More significantly, California is reliant on fertilizer ingredients, crude oil and gasoline that is produced in the Middle East and transported through the Strait of Hormuz. That reliance creates a threat to California's agricultural production and ability to "feed the nation," as well as to the state's economy. California is the nation's largest food producing state and higher costs of in-state production and higher interstate transportation costs that are attributable to California's lack of in-state crude oil production and disappearing refinery output have a direct and detrimental effect on overall U.S. inflation and national security.

**2.    United States**

37.    In response to demand for the growth of the U.S. economy, U.S. production of oil has increased significantly in recent years. The increase in oil production can be attributed to many factors, among the most prominent being new oil deposit discoveries, new discovery and production technologies, innovation in refining processes, and the growing demand of both American businesses and consumers, as well as favorable governmental policies at the federal level associated with both Trump Administrations.

[34] https://www.cdfa.ca.gov/CDFA-History.html.

[35] https://www.communitywestbank.com/blog/the-importance-of-agriculture-to-the-california-economy#:~:text=Today%2C%20California's%20agricultural%20exports%20top,approximately%203%25%20of%20California's%20GDP.

19

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

38.     The U.S. oil and gas industry generates over 61 trillion in GDP and represents around 7% of total GDP.[36] The oil and gas industry supports around 10.8 million jobs or 5.4% of total U.S. employment.[37] Average annual U.S. crude oil production has increased 17.0% from 11.336 million barrels a day in January 2025 to 13.246 million barrels a day in for January 2026.[38]

Figure 3.0

39.     For 2025, the EIA reports that the U.S. has proven reserves of at least 48.3 billion barrels of oil.[39] Comparatively, the <u>U.S. has the 9th largest proven oil reserves in the world</u>. However, U.S. technologies and the opening of previously closed areas could significantly increase U.S.-proven reserves. Based on current and planned consumption rates and EIA current

---

[36] https://www.investopedia.com/ask/answers/030915/what-percentage-global-economy-comprised-oil-gas-drilling-sector.asp#:~:text=What%20Portion%20of%20U.S.%20GDP,12.

[37] https://www.api.org/-/media/files/policy/american-energy/pwc/2023/api-pwc-national-2023.

[38] https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrfpus2&f=m.

[39] U.S. Energy Information Administration. (2017). *U.S. Crude Oil, Natural Gas, and Natural Gas Proved Reserves, Year-end 2017*. Eia.gov. https://www.eia.gov/naturalgas/crudeoilreserves/.

20

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

estimates, the U.S. has about 290 years of proven and technically recoverable oil reserves.[40] OPEC members control around 113 billion barrels of oil or 80% of the world's petroleum reserves.[41] Venezuela has the largest reserves in the world, followed by Saudi Arabia, Iran, Iraq, and the United Arab Emirates (U.A.E.).[42]

### 3. California

40.     California was once a leading producer and exporter of oil and crude oil products in the world. Since the 1860s and throughout the twentieth century, California produced and refined enough in-state oil to provide the lion's share of the gasoline it needed. At one time, California was the world's largest exporter of oil. Crude oil production in California provided fuel to U.S. military forces during World War-II, the Korean War, Vietnam War, and supported the state's rapid population and economic expansion that began in the 1950s and continued through to 2022. Fossil fuels provide around 38% of California's electrical generation.[43]

41.     Just 25 years ago, California produced roughly half of the oil it consumed. Today, California only produces around 20% of its needed crude oil and imports over 65% of its oil needs from non-U.S. sources, via highly pollutive maritime tankers which are predominantly owned and operated by foreign-flagged carriers. Much of California's 20th century economy was predicated on oil and gasoline production which, in turn, provided the fuel to support its population growth, agricultural production, the defense industry, the entertainment industry, and later, the tech industry. In the 1980s, California was self-sufficient and imported only around 6% of its oil needs from non-U.S. foreign sources.

---

[40] Ier. (2022, June 22). *Global Oil and Gas proved reserves increase in 2021 - IER*. IER. https://www.instituteforenergyresearch.org/fossil-fuels/gas-and-oil/global-oil-and-gas-proved-reserves-increase-in-2021/.

[41] https://publications.opec.org/asb/chapter/show/139/2524/2527.

[42] https://publications.opec.org/asb/chapter/show/139/2524/2527.

[43] California Energy Commission. (2025). *2024 total system electric generation.* https://www.energy.ca.gov/data-reports/energy-almanac/california-electricity-data/2024-total-system-electric-generation.

21

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

42.    In 1982, California produced 61% of its oil needs in the state.[44] Commencing in the mid-1990s, as California's imports of domestically produced oil from Alaska and in-state oil production began a long-term decline, its need for foreign-produced oil began to accelerate. While imports of non-U.S. domestically sourced oil from OPEC and other states increased by 850%, California imports of U.S. domestically produced oil from Alaska plummeted by 57.32%.[45]

Figure 4.0[46]



<hr />

[44] California Energy Commission. (n.d.-a). *Annual oil supply sources to California refineries*.https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california.

[45] Alaska North Slope oil field production declined but accounted for 15% of California's oil in 2021. Today, the Alaskan Pipeline operates at 20-25% of its original capacity due to lower field production. However, both field production and pipeline capacity utilization are expected to increase in 2025. See https://www.californiaenergyatlas.com/crude-oil.

[46]https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california.

22

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

43. As of March 26, 2026, the AAA price of mid-grade (89) gasoline was $6.02 or 35% higher than the national average.[47] In Mono County, the AAA average price for regular gasoline was $6.579, while in Los Angeles a station was shown charging over $8.71 a gallon.[48] Compared to Texas, California gasoline prices are 61% higher based on AAA reporting.

44. Policies, regulations and a strategy of relying on foreign governments to support economic vitality have implications: nowhere are those implications more profound than in California, Australia, New Zealand, and the Philippines. Those countries and California are experiencing the consequences of oil and gasoline policies that have placed the interest of their consumers and national security in the hands of foreign governments and companies.

45. Notwithstanding the political narratives about "midstream transitions," EV adoption rates and planned "demand destruction," gasoline consumption in California is not declining anywhere near the rates projected by policymakers. In fact, based on CDFTA data, in-state consumption of gasoline has fallen by less than 2% annually and has rebounded to nearly 90% of pre-Covid 2019 levels.[49]

46. With the loss of two refineries and the potential to lose several more in the next few years, California is increasingly dependent on gasoline imports from foreign providers. Since 2023, California has lost 22% of its in-state refinery capacity and the state's oil field production has plummeted 75% since 1981 while imports of crude oil ballooned 866%.[50] California gasoline prices were creeping upwards, irrespective of the conflict in Iran (Operation Epic Fury). However,

---

[47] *AAA fuel prices*. (n.d.). https://gasprices.aaa.com/?state=CA.

[48] Farr, D. (2026, March 25). Infamous LA gas station charging close to $9 per gallon. *New York Post*. https://nypost.com/2026/03/25/us-news/gas-station-in-las-chinatown-charging-close-to-9-per-gallon/.

[49] https://cdtfa.ca.gov/taxes-and-fees/spftrpts.htm.

[50] https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california.

23

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

price increases in California were accelerated by Operation Epic Fury and grew by 19% from 2/16/26 to 3/16/26.[51]

47.     In the face of collapsing in-state crude production, extreme reliance on the beneficence of foreign governments as sources of crude oil,[52] gasoline and jet fuels,[53] the loss of two major in-state oil refineries, California is experiencing an inevitable tightening of gasoline supplies and the potential for severe shortages. Severe gasoline shortages, as well as shortages in diesel fuels and jet fuels are potentially catastrophic to the economy of California, as well as to the national security of the U.S. military bases in California, Arizona and Nevada that rely on California refineries to provide the fuels necessary to ensure force readiness and national security.

48.     Under conditions of shortages and tight inventories, gasoline prices could, as discussed in a May 5, 2025, study,[54] easily exceed $8.00 a gallon and could approach $10.00 a gallon. Consequently, food prices will increase, the price of airline travel will increase, and the California Consumer Price Index (CCPI), which is already higher than the general U.S. average, will accelerate. By example, California's state excise tax on gasoline, which is the highest in the U.S., is indexed to the CCPI, will automatically increase on July 1, 2026, feeding into an inflationary spiral of gasoline prices.

49.     Additionally, California's retail gasoline crisis is further compounded by the shrinkage in the number of gasoline stations, around 500,[55] related to California's SB 445 passed

---

[51] Based on AAA prices for midgrade gasoline.

[52] California's 2025 top sources of crude oil were Brazil, Iraq, Guyana, Canada and Ecuador. See https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports.

[53] California is heavily dependent on gasoline supplied by India, South Korea, and the Bahamas and jet fuel from South Korea, Malaysia, India, and Singapore.

[54] Mische, Michael A. "Ensuring California's Gasoline Security for the 21st Century." USC Business of Energy Transition Briefing. (5/5/25). https://drive.google.com/file/d/1CVsBHQ0s4FX57xQD2iy0ZD1V_MlKJMZX/view?pli=1.

[55] Ballard, R. (2026, January 12). California's fuel crisis. *ShastaUnfiltered.com*. https://www.shastaunfiltered.com/post/california-s-fuel-crisis.

24

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

in 2014,[56] which required gas station owners/operators to invest upwards of $2.0 million to comply with regulations.

**B.      Imports**

50.      Today, despite having the 5th largest crude reserves in the U.S., CA is the most heavily dependent of the lower 48-states on foreign sources oil and now, foreign sourced gasoline.

51.      For perspective, in 1981, California imports of foreign crude oil were less than 6% of its need. However, since 1991, California in-state oil production has plummeted by 68%. Today, California is far from self-sufficient with respect to its crude oil needs. The state produces less than 23% of its own in-state petroleum needs, and imports over 61% of its crude oil from non-U.S. foreign sources, including Iraq, Saudi Arabia, the U.A.E., Brazil, Ecuador, Guyana and Canada.[57]

---

[56] California Senate Bill 445 (SB 445), signed in 2014, mandates that all single-walled underground storage tanks (USTs) containing hazardous substances be permanently closed or replaced by December 31, 2025.

[57] https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california.

25

Figure 5.0[58]



52.    Furthermore, because CA has no inbound pipelines supplying either crude oil or gasoline to the state, California is completely dependent on (98%+) and held captive to maritime vessels for the importing of crude oil and gasoline into the state. The maritime fleet which California relies upon is composed of around 7,000 vessels, is dominated by China, South Korea, and Russia ownership. Transit times for crude oil and gasoline range from 15 to over 40 days, depending on source, size of vessel, route, and speed.

---

[58] https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports#:~:text=Table_title:%20Foreign%20Sources%20of%20Crude%20Oil%20Imports,of%20Barrels:%2035%2C402%20%7C%20Percentage:%2012.22%25%20%7C.

26

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Figure 6.0[59]



53.     According to CEC data, over 98% of California's non-U.S. sourced imported oil is delivered to its refineries via maritime vessels.[60] Since California imports almost 29% of its foreign-sourced oil from Middle Eastern, its oil moves through the Strait of Hormuz.[61] The Strait of Hormuz is controlled by Iran. Approximately 20-22% of the world's oil supplies moves through the Strait of Hormuz.[62] The GHG emissions generated in transit to California maritime terminals are higher due to the distance, time, and speed required to transport the oil stock. Oil tankers, such as those used to transport crude oil to California, generate over 114 million tons of $CO_2$ annually.[63] Many factors, such as the age of the tanker, the propulsion technology of the

---

[59]https://www.eia.gov/todayinenergy/detail.php?id=30092#:~:text=Although%20crude%20oil%20exports%20from,the%20southern%20tip%20of%20Africa.

[60] Commission, C. E. (n.d.). *Foreign Sources of Crude Oil Imports to California 2020*. California Energy Commission. https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports.

[61] https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports.

[62] https://www.eia.gov/todayinenergy/detail.php?id=65504.

[63] Olmer, N., Comer, B., Roy, B., Mao, X. and Rutherford, D. Greenhouse Gas Emissions from Global Shipping, 2013-2015. (2017), https://theicct.org/publications/GHG-emissions-global-shipping-2013-2015.

27

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

tanker, load capacity, percent utilization of load capacity, speed of travel, as well as distance and trading lanes used, are just a few factors that impact total GHG emissions as related to oil production, transportation, and gasoline production. Other factors, including weather, geopolitical events, and destination port, can increase GHG emissions. The longer that the tanker is "anchor hoteling" and waiting for a berth and (idling) for lading and unlading its cargo, the greater the level of GHG emissions created.

54.    Notably, while overall U.S. dependency on foreign oil has declined dramatically, California's dependency on non- U.S. oil and gasoline increased. The over dependency on foreign oil providers and foreign-flagged oil tankers contributes to U.S. military readiness concerns, as well as the potential for compromised national security.

### C.    California Consumption

55.    <u>Gasoline demand in California has not declined</u> anywhere near the rate anticipated by state agencies such as the CEC and CARB. Rather than the steep annual declines originally forecasted by the CEC and CARB under overly optimistic electrification scenarios, real-world demand for gasoline in California has only decreased 11% over the past 23 years. In fact, since the low point in 2020 due to the pandemic, gasoline demand in California has increased by 7.5%.[64] Jet fuel consumption, which is the fastest growing fuel segment in California, is expected to increase over 25% by 2040 to 125,000,000 barrels per year.[65]

---

[64] *Fuel Taxes Statistics & Reports*. (2025). Ca.gov. https://cdtfa.ca.gov/taxes-and-fees/spftrpts.htm.

[65] California Energy Commission. (2024, November 7). *Transportation Energy Demand Forecast: Major Updates and Results* (Prepared by A. Freeman, N. Saxena, & F. Kabir; TN No. 259930). 2024 Integrated Energy Policy Report Update, Docket No. 24-IEPR-03. https://efiling.energy.ca.gov/getdocument.aspx?tn=259930.

28

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Figure 7.0[66]



56. The largest drop in California gasoline consumption since the 1980s came during the pandemic years of 2020 to 2021, when demand fell 19%. Since the pandemic trough of 2020, California's GDP increased by 13%, while gasoline consumption has rebounded by 6.8%.[67] For 2024, CDFTA consumption data indicated a slight decline of 0.945% from 37,163,227 gallons per day in 2023 to 36,812,038 per day. For 2025, gasoline consumption remained about the same as 2024, with plateauing of EV sales in California and the revocation of federal subsidies and tax credits.[68] Notably, in California, consumer demand for aviation fuel increased 113% from 2001 to 2022. For the 2015 to 2024 period, CDFTA data indicates that jet fuel consumption in California, which is the fastest growing fuel product category in the state, increased by 31%.[69]

---

[66] https://cdtfa.ca.gov/taxes-and-fees/spftrpts.htm.

[67] *Fuel Taxes Statistics & Reports*. (2020). Ca.gov. https://cdtfa.ca.gov/taxes-and-fees/spftrpts.htm.

[68] CARB's estimate of 35% adoption rates for EVs in 2026 exceed actual DMV data which shows a 9.6% decline to 22.6% in EV registrations for the first half of 2025. Furthermore, adoption rates appear to have plateaued, for the time being, at 25.03% in 2023, and 25.01% in 2024. Federal subsidies and tax credits were also rescinded on October 1, 2025.

[69] *Fuel Taxes Statistics & Reports*. (2020). Ca.gov. https://cdtfa.ca.gov/taxes-and-fees/spftrpts.htm.

29

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

57.    The combination and consequences of these events implies that for decades to come, and well into the latter half of the twenty-first century, California will still need a robust crude oil supply chain and operating refinery system to meet fuel needs even as EV adoption continues. The currently mandated total phaseout of in-state oil production by 2045 is increasingly implausible given these structural realities and the fact that oil and gas provides 8% of California's GDP[70] and is essential to national security and defense. California will still need its oil pipeline and refinery infrastructure well into the latter part of the 21st century to remain a viable and competitive economy. Ending or continuing to reduce California drilling and oil production by 2045 is simply impractical. Jets require fuel, roads are made of asphalt, and touch screens use hydrocarbon molecules.

## IV.    U.S. MILITARY READINESS

### A.    Overview of Combat Assets[71]

58.    The U.S. Air Force maintains over 5,000 aircraft, including the B-1, B-2 and B-52 strategic bombers and F-35, F-16, F-22, F-15, A-10 aircrafts, as well as tankers, transport and specialized aircraft. A B-2 bomber, the asset that was deployed in Operation Midnight Hammer, consumes around 3,300 gallons per hour of operation. The U.S. Air Force also operates the Air Mobility Command (AMC). The AMC is responsible for the rapid deployment of combat material, and aerial refueling, as well as the delivery of humanitarian aid anywhere in the world in a matter of hours. According to its website, "The command operates the C-5 Galaxy, KC-10 Extender, KC-46A Pegasus, C-17 Globemaster III, C-130 Hercules, C-130J Super Hercules and KC-135 Stratotanker. Operational support aircraft are the VC-25 (Air Force One), C-20, C-21, C-32, C-37, and C-40." By example, a C-5 Galaxy transport plane can load up to 51,000 gallons of jet fuel. By

[70] California Governor's Office. (2021, April 23). *Governor Newsom takes action to phase out oil extraction in California.* https://www.gov.ca.gov/2021/04/23/governor-newsom-takes-action-to-phase-out-oil-extraction-in-california/.

[71] Nuclear forces are omitted.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

example, one KC-10 extender mid-air refueling plane can take on 54,000 gallons. And the C-17 Globemaster has capacity for 35,000 gallons. These planes are routinely used in aerial refueling especially where vast distances are involved as would be the case in Pacific Theater and were essential to Operation Midnight Hammer. Some of AMC air assets are assigned to Travis Air Force Base, California, which functions as a primary west coast installation hub. There are additional capabilities on the west coast associated with Washington state, and Peral Harbor.

59.    The U.S. Navy has around 300 battle force surface ships in its fleet, including 11 aircraft carriers. By comparison, China, America's main Asian threat, maintains a fleet nearing 400 surface and subsurface battle force boats. For the U.S. an F-18 carrier-based airwing consumes up to 800,000 gallons (19,050 barrels) a day if operating in combat conditions. Supplying the fleet are approximately 28 to 30 fuel replenishment tankers of various class sizes and designations (military and civilian) as part of the Tanker Security Program.[72] The U.S. Navy also has around 70 nuclear submarines composed of attack and ballistic boats, the largest of which is the Ohio-class ballistic submarine. The U.S. Navy also operates the Military Sealift Command (MSC) which is responsible for maritime transport. The MSC operates a variety of vessels, including the cargo, mine countermeasure ships, submarine tenders, and underway replenishment oilers (T-AO) which supply Navy vessels with fuels and jet fuel while deployed at sea.

60.    The U.S. Army also has around 4,600 to 5,000 M1 Abrams main battle tanks. Weighing 68 tons, the M1A2 is the most advanced and formidable tank in world and has a top speed more than 40-mph.[73] The M1 is powered by a 1,500-horsepower turbine engine and burns JP-8 jet fuel as its preferred fuel but can also operate on other fuels. In addition, the U.S. military has thousands of other military and combat vehicles such as the M2 Bradley and new M10

---

[72] https://www.maritime.dot.gov/national-security/strategic-sealift/tanker-security-program#:~:text=The%20Tanker%20Security%20Program%20(TSP)%20aims%20to:,useful%20*%20%20Privately%2Downed%20*%20Product%20tank%20vessels.

[73] Note, there are various versions of the M1 including but not limited to the M1A1SA, and M1A2SEPv3.

31

Booker[74] assault vehicles. The M2 Bradley uses JP-8 jet fuel while the new M10 uses standard military grade diesel fuel in its 800-horsepower engine.[75]

61. The figure below summarizes, in general terms, the fuel requirements for U.S. military assets.

Figure 8.0

| Military Branch | Fuel Type | Usage |
|---|---|---|
| U.S. Air Force | JP-8 | **JP-8 -** Jet fuel for virtually all aircraft; smaller quantities of diesel for ground support equipment |
| U.S. Navy | JP-5<br>F-76<br>JP-8 | **JP-5 -** Jet fuel for carrier-based aircraft<br>**F-76 -** Naval diesel for ships and auxiliary vessels<br>**JP-8 -** Land-based Navy aircraft |
| U.S. Army | JP-8<br>JP-8+F-24 | **JP-8 / JP-8+F-24 (kerosene-based diesel) -** As the primary fuel for ground vehicles, generators, and rotary-wing aircraft; minimal gasoline usage |
| U.S. Marine Corps | JP-8 / Diesel<br>JP-5 | **JP-8 / Diesel -** Ground vehicles and expeditionary equipment<br>**JP-5 -** Aviation assets operating on Navy carriers or amphibious ships. |

**B. Fuel Storage: Pacific Operations.**

62. Since before 1940, the U.S. has used Hawaii as the central fuel repository for the Pacific Theater. The Roosevelt Administration designated a site called Red Hill as the central fuels depot for the Pacific and commenced construction in 1940. The site stored gasoline, jet fuel, aviation gasoline, diesel fuels, etc. Collectively, the facility was massive and had the capacity to store upwards of 250 million gallons of fuel in underground storage tanks.[76] That is about seven

---

[74] https://defence-blog.com/us-army-secures-322m-for-m10-booker-production/.

[75]https://www.army.mil/article/283010/m10_booker_tested_at_us_army_yuma_proving_ground#:~:text=in%20a%20C17.%E2%80%9D-,The%20M10's%20main%20weapon%20is%20a%20M35%20105mm%20low%2Drecoil,to%2040%20miles%20per%20hour.

[76] https://cnrh.cnic.navy.mil/Operations-and-Management/Red-Hill/DEPARTMENT-OF-DEFENSE-CLOSURE-PLAN-RED-HILL-BULK-FUEL-STORAGE-FACILITY/#:~:text=Red%20Hill%20is%20the%20Department,250%20million%20gallons%20of%20fuel.

32

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

days of fuel for California at current rates. The facility is in the mountain range above Pearl Harbor and connected to Pearl Harbor and Hickman Field via pipeline which were based on gravity. Over the years, Red Hill decayed and required expensive maintenance and environmental remediation. Consequently, during the Biden Administration the fuel depot was slated to commence decommissioning.[77] The facility is currently closed but is still in the decommissioning phase.[78]

63.     The U. S. Navy maintains a 1.0-million-barrel storage facility at Point Loma, California. Point Loma is the largest naval fuels storage facility on the west coast and dispenses 400 million gallons of fuel annually with a high-speed transfer rate of 300,000 gallons per hour.[79] JP-5 jet fuel, and F-76 marine fuel are stored in a state-of-the-art facility composed of eight 125,000 barrels above ground tanks and 17 fueling stations. For comparative purposes, Point Loma's capacity equates to about 1.0 to 1.2 days of California gasoline consumption.

64.     With the closure of Red Hill Depot, military fuel is now distributed among new and expanded bulk sites in Australia (Darwin ~ 80 million gallons), Guam, Japan, Korea, and the Philippines. Guam is a central storage fuel facility for the U.S. Air Force. The U.S. operates a 66-million-barrel jet fuel facility and over 26 miles of pipelines on Guam, plus additional capacity more than 350,000 barrels.[80] Additionally, there is some storage capacity on Okinawa, Japan, but it is limited and within easy reach of Chinese missiles. In the cases of Guam and Okinawa, fuel is delivered to those bases via maritime vessels which are vulnerable to air and seaborne threats

[77]https://www.navyclosuretaskforce.navy.mil/#:~:text=The%20mission%20of%20the%20Navy,order%20to%20protect%20public%20health.

[78] https://www.epa.gov/red-hill/closure#:~:text=Learn%20More,Plan%20and%20a%20Closure%20Plan.

[79] https://www.dla.mil/About-DLA/News/Energy/Article/1450698/point-loma-celebrates-fuel-pier-upgrade/#:~:text=The%20Defense%20Fuel%20Support%20Point,ships%2C%20submarines%20and%20transient%20vessels.

[80] https://www.airandspaceforces.com/article/pacific-refueling/#:~:text=Rust%2Dtinged%2C%20white%20fuel%20storage,face%20a%20war%20with%20China.

33

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

during times of conflict. Thus, crude oil and refining capacity in California becomes increasingly important given the potential exposures.

65.    However, reliance on friendly nations for fuel is proving to be problematic for the U.S. and any nation relying on Middle Eastern oil passing through the Strait of Hormuz. The current conflict in Iran creates national security and consumer pricing concerns.[81]

66.    As of March 29, 2026, Australia is experiencing fuel supply stresses and increasing consumer prices because of the Strait of Hormuz constraints and is down to only 33 days' supply of fuel for the entire nation.[82] The Philippines, a long-time base for U.S. Asian operations, receives 90% of its oil from the Middle East. As of March 24, 20926, the Philippines had about 40-45 days supplies of gasoline and has declared a national emergency.[83] New Zealand has about 49 days, while South Korea, with its refineries has 200 days.[84] South Korea supplies California with about 22% of its imported fuel and is the state's third largest source of gasoline behind India (26%) and the Bahamas (22%) for 2024/25, according to the CEC.

67.    While this distributed model may diversify storage sources, the U.S. cannot rely upon it as it considerably amplifies vulnerabilities to national defense. Under prevailing conditions, California's policies on in-state crude oil production and refinery operations, as well as pipeline usage, further amplify vulnerabilities.

---

[81] See https://www.lawfaremedia.org/article/the-strait-of-hormuz-and-the-limits-of-maritime-law for a more thorough discussion.

[82] https://www.9news.com.au/national/fuel-shortage-australia-how-does-emergency-stockpile-compare-to-rest-of-the-world/bb0711c1-11b5-4767-b349-fd46344a8b99.

[83] https://www.nytimes.com/2026/03/24/world/middleeast/philippines-national-emergency-high-fuel-prices.html#:~:text=The%20Southeast%20Asian%20country%20imports,to%20deal%20with%20the%20situation.

[84] https://www.9news.com.au/national/fuel-shortage-australia-how-does-emergency-stockpile-compare-to-rest-of-the-world/bb0711c1-11b5-4767-b349-fd46344a8b99.

34

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

## V.   ANALYSIS OF CALIFORNIA'S IMPACT ON NATIONAL SECURITY AND FORCE READINESS

### A.   Military Presence in California

68.   California's military installations sit as the vanguard of U.S. forces with direct facing to potential nuclear adversaries such as North Korea, Russia, and the People's Republic of China (PRC), and transnational terrorist organizations in the Philippines, Malysia, and Middle East. California-based military forces are under the command of U.S. Indo-Pacific Command (USINDOPACOM) and can provide forces, at strength and scale, as needed, anywhere in the world within 72 hours, assuming, of course, that those forces have sufficient fuel to reach the designated theaters and threats to prosecute continuous war operations. To help put the U.S. commitment to the Asia-Pacific Theater and California's role in perspective, two of the largest U.S. military installations are in Japan and South Korea. With exception of current conditions, total U.S. troop strength in the Asia-Pacific Command deployed to Japan and South Korea outnumbers that of Europe.

69.   For 2023, California received $60.8 billion in Defense spending.[85] California is home to over 30 U.S. military installations, which include, but are not limited to: the Pacific Fleet based in San Diego, Alameda, and Point Loma, United States Marines stationed at Camp Pendleton, Twenty-Nine Palms, Miramar, and Barstow, U.S. Coast Guard ports and stations located inland and along the state's 840-mile coastline, and from bases inland, U.S. Air Force bases, including Beale, Los Angeles, Edwards and Travis and missile bases such as Vandenberg, and the U.S. Navy Post-Graduate College located in Monterey. Edwards Air Force Base is home to the B-1 supersonic bomber and KC-46 Pegasus tanker aircraft. Camp Roberts, located in the central coastline area, is home to the California National Guard and is the stagging point for U.S. Army and Marine Reserves mobilization and training site for armor, infantry and artillery.

---

[85] https://www.repi.mol/Portals/44/Documents/State-Packages/California_ALLFacts.pdf.

35

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Figure 9.0- List of California Miliary Installations- 2026[86]

- Beale Air Force Base

- Channel Islands Air National Guard Base

- Edwards Air Force Base

- Fresno Air National Guard Base

- Los Angeles Air Force Base

- March Air Force Base

- Travis Air Force Base

- Vandenberg Air Force Base

- Camp Parks

- Camp Roberts

- Camp San Luis Obispo

- Fort Hunter Liggett

- Fort Irwin

- Presidio of Monterey

- Sierra Army Depot

- Navy Air Facility El Centro

- Naval Air Station Lemoore

- Naval Air Weapons Station China Lake

- Naval Base Coronado

- Naval Base Point Loma

---

[86] https://www.operationmilitarykids.org/military-bases-in-california/#:~:text=What%20is%20this?,What%20is%20this?

36

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

- Naval Base San Diego
- Naval Base Ventura County
- Naval Support Activity Monterey
- Naval Weapons Station Seal Branch
- Camp Pendleton
- Marine Corps Logistics Base Barstow
- Marine Corps Air Station Miramar
- Twentynine Palms
- Integrated Support Command Alameda
- Training Center Petaluma Coast Guard Base
- Joint Forces Training Base – Los Alamitos

Figure 10.0- CA Army Bases

Figure 11.0- CA Air Force Bases





37

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

## B.    Fuel Distribution: Pipelines

70.    Although California has no in-bound crude oil or gasoline pipelines, the state does have an extensive network of intrastate pipelines that connect oil producing regions and maritime ports to refineries. There are two major intrastate pipeline systems which connect and move San Joaquin Valley (SJV) production: (1) the primary northbound artery is the San Pablo Bay (SPB) pipeline, and (2) the Plains Pipeline Line 2000 and PBF Line M70 pipelines which compose the southern artery. Feeding these two major pipelines are multiple smaller "gathering" lines. Collectively, these pipelines had the capacity to transport 520,000 barrels of crude oil daily, distributed 40% northbound on the Crimson SPB pipeline and 60% southbound on the Plains 2000 and PBF M70, M1 and M55 lines. Of critical note, Crimson's SPB pipeline is the only major northbound line feeding refineries from the SJV and is now idled and functionally eased line operations effective December 2025, resulting in 40% or 290,000 barrels a day reduction in total throughput capacity.[87]

71.    California's refineries and pipelines provide fuels to U.S. bases located in Arizona and Nevada. The various types of fuels are summarized in the figure below.

Figure 12.0

Example of California Fuel Supplies to U.S. Military Installations- (Partial List Only)

| Major Installation | State | Active-Duty Personnel | Civilian / Contractor Personnel | Approx. Fuel Use (gal/day, peacetime) | Primary Supply Source |
|---|---|---|---|---|---|
| Edwards AFB | CA | ~8,000 | ~2,000 | ~250,000 JP-8 | Local refineries / Watson Station |
| NAS Lemoore | CA | ~7,000 | ~1,300 | ~180,000 JP-5 / JP-8 | Fresno spur pipeline |

[87] https://lodi411.com/lodi-eye/california-oil-industry-refinery-closures-pipeline-shutdowns-and-the-roadahead#:~:text=Volume%20collapse:%20When%20Valero's%20Benicia,the%20fundamental%20economics%20remain%20challenged

38

| Camp Pendleton | CA | ~38,000 | ~1,200 | ~400,000 Diesel / JP-8 | SoCal refineries |
|---|---|---|---|---|---|
| Nellis AFB | NV | ~10,000 | ~3,500 | ~500,000 JP-8 | CalNev pipeline |
| Luke AFB | AZ | ~5,500 | ~2,000 | ~300,000 JP-8 | SFPP East Line |
| Naval Base San Diego | CA | ~20,000 | ~10,000 | ~600,000 F-76 / JP-5 | El Segundo / Watson Station |
| Travis AFB | CA | ~6,600 | ~2,600 | ~160,000 JP-8 | Bay Area refineries / Richmond Wharf |

72.    Intrastate and interstate pipelines move refined fuel products from various California refineries and distribution points to U.S. military installations. In situations where pipelines cannot be used, tanker trucks are generally used for short periods of time. The figures below illustrate the pipeline network for both Northern and Southern California.

73.    In Northern California, the refinery and pipeline network was originally configured around crude production from Kern, Kings, Fresno, and Monterey Counties, particularly the heavy crude grades found in the San Joaquin Valley (SJV) and was transported north via the San Pablo Bay (SPB) Crimson pipeline. Only two large Northern California refineries survive and operate today: Chevron Richmond (which now has no pipeline connections and relies entirely on tanker imports), and PBF Martinez. Valero Benicia has ceased refining activities. The PBF Martinez and Valero Benicia refineries were supplied by the SFB-Crimson pipeline, a subsidiary of Crimson Midstream, LLP. The SPB-Crimson pipeline was the only remaining northbound crude pipeline in the entire state. With the closure of the Valero Benicia refinery, PBF Martinez will be the sole surviving Bay Area refinery with pipeline access to California-produced crude, though that access has ceased, at least temporarily, effective December 2025 with the idling of the SPB pipeline. Significantly, there is no indication that the SFB-Crimson Pipeline will reanimate its operations at

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

any time soon and is, for all purposes, functionally shutdown.[88] However, the PBF Martinez refinery is positioned to accept both maritime and pipeline crude stock and its operations are not contingent on pipelines and are not reliant on the SPB pipeline.

Figure 13.0- Northern California Pipeline Infrastructure[89]



74.    Southern California, by contrast, has six major refineries—Chevron El Segundo, Marathon Los Angeles, PBF Torrance, Valero Wilmington, Kern Energy, and San Joaquin Refining—all of which are pipeline-connected to SJV crude. With Valero's Benicia closing, Los

---

[88] ttps://www.politico.com/f/?id=0000019a-a35a-d51c-a39e-af5bf8de0000#:~:text=approaching%20capacity%20–%20in%20the%20event,the%20Valero%20Benicia%20refinery.

[89] https://www.eia.gov/analysis/transportationfuels/padd5/#:~:text=Demand%20includes%20in%2Dregion%20consumption,Rocky%20Mountains)%20transportation%20fuels%20markets.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Angeles will have 5.7 times more pipeline-connected refining capacity than the entire Bay Area. This structural imbalance, together with refinery economics, strongly incentivizes Central Valley producers to ship crude south, where the market is larger, more competitive, and more flexible.

Figure 14.0- Southern California Pipeline Infrastructure[90]



75.     Summarized in the figure below are the various capacities and status of California's remaining pipelines.

[90]https://www.eia.gov/analysis/transportationfuels/padd5/#:~:text=Demand%20includes%20in%2Dregion%20consumption,Rocky%20Mountains)%20transportation%20fuels%20markets.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Figure 15.0- CA Intrastate Pipelines & Capacities

| California Intrastate Crude Oil Primary Pipelines -as of 3/31/26 | | | |
|---|---|---|---|
| Primary Pipeline | Pipeline Capacity (barrels per day) | Length (approx.) | Status |
| **Northbound** | | | |
| San Pablo Bay (SPB)- Crimson | 210,000 | 373 miles | Idled-12/25 |
| **Southbound** | | | |
| PBF M70 (excludes M-1 & M-55) | 85,000 | 189 miles | Active |
| Plains All American Pipeline | 235,000 | 132 miles | Active |
| **Combined Active Capacity** | 320,000 | | |
| Note: If all PBF lines included, then capacity is 110,000 barrels a day | | | |

76.     In early 2025, on average, approximately 35,000 barrels per day of crude oil were transported via the San Pablo Bay-Crimson pipeline to Northern California refineries—about 17% of pipeline capacity, which is far below both economic and operational breakeven levels. Ultimately, that shipping volume dropped to only about 22,000 barrels per day being shipped in the SPB pipeline before the line was idled in December 2025. These small volumes are increasing operating costs per barrel transported resulting in a $2.0 million a month loss for Crimson Midstream, the owner/operator, as well as incurring substantial costs in deferred maintenance. Consequently, Crimson Midstream, the owner-operator of the pipeline, has notified the Governor that they will need to shut the pipeline down without relief.[91] Based on current information, the complete shutdown of the SPB pipeline is imminent.

77.     The lack of sufficient in-state crude oil production and the closure of the Valero's Benicia refinery created an imbalance which was the root cause of the crisis that faced the SPB pipeline and California. Once one of several northbound options, the SPB pipeline handled about

---

[91] https://www.politico.com/f/?id=0000019a-a35a-d51c-a39e-af5bf8de0000

42

22,000 barrels per day as of November 2025, but has been idled since December 2025.[92] In early 2025, Crimson Midstream (the pipeline operator) filed a tariff based on 62,700 barrels per day or 63% of capacity throughput that would support a $3.61/bbl tariff rate.[93] But as volumes rapidly fell—due to PBF shifting to marine supply for Martinez, Chevron permanently rerouting its SJV crude to El Segundo, falling in-state crude production, and general producer preference for southern pipelines—the economics of the SPB pipeline rapidly deteriorated.

78.    In June 2025, and in response to decreasing volumes and escalating financial losses, Crimson California Pipeline, L.P., the owner and operator, initiated an emergency filing with the California Public Utilities Commission (CPUC) seeking an increase in its tariff rate to $3.75/bbl. Analysis of the higher tariff indicates that it may help slightly but will assure continuity of operations. The higher tariff rate will, at best, only cover the cash operating expenses and lessen losses, it will address or alleviate LTIP and CorEnergy expenses. With actual volumes now at 29,600 barrels per day, the "true" cashflow breakeven tariff is $4.42/bbl, which is substantially above regulatory and producer tolerance limits. Stated differently, increasing the tariff to $4.42 does not provide an attractive economic value to the producers and would, in most likely terms, force more maritime shipments northward with any cost associated with the increase in pipeline tariff granted to Crimson, simply passed along to the California consumer who already pays the highest prices in the nation for gasoline.

79.    By contrast, the Plains Line 2000/63 (southbound) charges $1.68–$2.36/bbl.[94] Furthermore, as a captive private pipeline, PBF's Plains-2000, which moves crude oil to its

---

[92] Bloomberg News. (2026, March 12). *Oil drillers resort to trucks as key California pipeline idled.* https://www.bloomberg.com/news/articles/2026-03-12/oil-drillers-resort-to-trucks-as-key-california-pipeline-idled.

[93] E&E News. (2025, November 21). *California approves rate hike for distressed oil pipeline operator.* https://www.eenews.net/articles/california-approves-rate-hike-for-distressed-oil-pipeline-operator/.

[94] Plains All American Pipeline. (n.d.). *Tariffs.* https://www.plains.com/customers/tariffs/.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Torrance refinery, has marginal costs below $1.00/bbl. The figure below provides a map of California pipelines.

Figure 16.0

Current crude oil production regions in Southern California along with daily refinery and pipeline throughput



(Source: Mische, Rector, & Silvia)

80.     As noted, California supplies Luke Air Force base, the USMC base in Yuma, and the Air National Guard based in Arizona, as well as Nellis and Clark Air Force bases in Nevada.

**C.     California Crude Production**

81.     California has an abundance of naturally occurring crude oil. Routinely, California is considered to have the 5th largest reserves in the U.S. but other estimates place it with much higher reserves. Irrespective, crude oil production in California has declined considerably. The decline is due to factors such as cost of production and lower priced oil from alternative sources. The decline is also attributed to high operating costs in California, high regulatory compliance costs, and the harshest environmental restrictions and enforcement in the nation. Irrespective of the

44

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

reasons, the figure below illustrates the reduction in California in-state crude oil production and its growing and considerable dependency on oil imports from petrostates.

Figure 17.0



82.     Reductions in in-state production without corresponding decreases in consumption force greater dependencies on foreign crude oil suppliers and petrostates.

**D.     California Refineries**

83.     Crude oil producers have refineries as customers. Refiners take crude oil and produce gasoline, diesel fuel, jet fuel, heating fuels, distillates, and other products from the refining process. At one time California was home to over 40 operating refineries. However, due to high operating and regulatory compliance costs which are 26% to 37% than the national average for refineries, a harsh political environment, conversions to bio and renewable fuels, and Governor Newsom's 2020 directive banning the sale of new internal combustion vehicles in the state, the number of refiners has declined by 84% from 43 in 1982 to just 7 survivors in 2026.

45

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

84. As Chevron Upstream President Andy Walz noted, "I think it's been a tyranny of about 25 years to get the refining business to leave California."[95] In this sense, correlation and causality are clear: Due to high operating and regulatory compliance costs, a harsh political environment, political vitriol,[96] conversions to bio and renewable fuels, and Governor Newsom's 2020 directive banning the sale of new internal combustion vehicles in the state, the number of refiners has declined by 84% from 43 in 1982 to just 7 survivors in 2026 (estimated). For example, according to the California Joint Agency Report dated May 2024, refinery operating costs in California are, on average, 128% higher (non-weighted) than the overall U.S. average. Likewise, California's general business operating costs incurred by businesses such as refiners, wholesalers, shippers, and gas station operators are, on average, 38% higher in California. Higher operating costs are reflected in consumer prices at the pump.

85. As a result of legislative actions, California has lost the Phillips 66 Los Angeles refinery with 139,000 barrels a day capacity in 2025 and the Valero Benecia refinery with 145,000 barrels a day capacity in 2026. By example, within 72 hours of passing ABX-1-2, which required California refiners to hold additional inventories of finished gasoline stock, Phillips 66 announced the closing of its Los Angeles refinery by the end of 2025.[97] [98] And California could well

---

[95] U.S. News & World Report. (2025, September 23). California trying to keep oil and gas firms from leaving the state. Fox Business. https://www.foxbusiness.com/economy/california-trying-keep-oil-gas-firms-from-leaving-state.

[96] By example, "They are lining their pockets by ripping off Californians…" (Gov. Newsom.) "(CA) is committed to phase out gasoline-powered cars and using our market power to push zero-emission vehicle innovation." (Gov. Newsom) Big Oil has been lying and gouging Californians." (Gov. Newsom).

[97] *Phillips 66 provides notice of its plan to cease operations at Los Angeles-area refinery*. (2022). Phillips66.com. https://investor.phillips66.com/financial-information/news-releases/news-release-details/2024/Phillips-66-provides-notice-of-its-plan-to-cease-operations-at-Los-Angeles-area-refinery/default.aspx.

[98] Zavala, A. (2024, October 16). *Days after Newsom signs bill aimed at "big oil," Phillips 66 says it plans to stop operating refinery*. KCRA. https://www.kcra.com/article/phillips-66-california-refinery-announcement-gas-prices/62629019.

46

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

experience the loss of more refineries due to regulatory actions. Commenting on the new regulations proposed by the California Air Resources Board (CARB) Chevron noted in its March 3, 2026, letter to Governor Newsom, "The proposed regulation will cripple the survivability of the state's remaining refineries, which will result in California losing the entire industry to this misguided program." In its February 25, 2026, letter to Governor Newsom, PBF stated that proposed regulations "will severely undermine the viability of in-state refining, with potentially devastating consequences for California's fuel supply, economy, and workers." The figure below indicates the significant reduction in the number of refineries in California.

Figure 18.0[99]



86. California refineries are configured to produce the state-specific CARBOB gasoline and ultra-low-sulfur diesel fuel. CARBOB and ultra-low sulfur diesel fuels (CARB ULSD) are the

---

[99] https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=8_NA_8O0_SCA_C&f=A.

47

result of California's regulatory-mandated air quality mandates, which are the strictest in the world. Because of their unique formulations most out-of-state refineries cannot produce CARBOB or CARB ULSD without costly retrofits and retrofits. Because of California's mandated special gasoline formula, there are only a handful of refineries outside of California in the world that can or will produce it.

Figure 19.0[100]

| CALIFORNIA REFINEIRES | | Existing | Projected 2026 |
|---|---|---|---|
| CA Refinery Capacity- CARBOB Fuels Only | Location | 2025 | 2026 |
| Southern California Refineries | | | |
| Marathon Petroleum Corp., Los Angeles Refinery* | Los Angeles | 365,000 | 365,000 |
| Chevron U.S.A. Inc., El Segundo Refinery | Los Angeles | 285,000 | 285,000 |
| PBF Energy, Torrance Refinery | Los Angeles | 160,000 | 160,000 |
| Phillips 66, Los Angeles Refinery** | Los Angeles | 100,000 | 0 |
| Valero Energy, Wilmington Refinery | Los Angeles | 85,000 | 85,000 |
| Sub-total: | | 995,000 | 895,000 |
| Northern California Refineries | | | |
| Chevron U.S.A. Inc., Richmond Refinery | NorCal | 245,271 | 245,271 |
| PBF Energy, Martinez Refinery | NorCal | 156,400 | 156,400 |
| Valero Energy, Benicia Refinery | NorCal | 145,000 | 0 |
| Kern Energy, Bakersfield Refinery | Kern Co. | 26,000 | 26,000 |
| Sub-total: | | 572,671 | 427,671 |
| Grand Total-Refinery Capacity- B/D | | 1,567,671.00 | 1,322,671.00 |
| Gallons Per Barrel = 42 | | 65,842,182.00 | 55,552,182.00 |
| Total Production- Gasoline Conversion Ratio = 49.64% | | 32,684,059.14 | 27,576,103.14 |
| Percentage Loss in Gasoline Production | | | -15.62% |

87.    Collectively, inclusive of refineries that have converted to renewable fuels and with the loss of the Phillips 66 and Valero refineries, California will have lost close to 21% or 6.2 million gallons a day of its in-state gasoline production capacity since 2023. Pragmatically, with the loss of both Phillips 66 and Valero, in-state gasoline production will be reduced by at least 6.2 million gallons a day, with progressively worse-case estimates totaling 9.33 million gallons a day. In addition, jet fuel production from Valero will drop by 600,000 gallons a day. Travis Air Force

---

[100] https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/californias-oil-refineries. Calculations provided by expert and adjusted for CARBOB production. (Note: * = combined refinery unit reporting; ** = closed 2025 & Valero has now ceased refining operations.)

48

base consumes around 200,000 gallons a day in normal operations. Based on current projections, California could possibly lose more refineries between 2027 and 2032, resulting in further substantial reductions in in-state gasoline production, increasing dependency on imports, greater exposures to existential events, and further price increases.

88.     The figure below depicts the possible imbalance between California refinery production and California gasoline consumption for 2026.



Figure 20.0

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER



Figure 21.0

89.     To compensate for the imbalance in demand (consumption) and in-state production of gasoline, California has been forced into importing tens of millions of barrels of refined products from refineries in China, India, Saudi Arabia, and South Korea, demonstrating the state's ongoing and growing vulnerability to supply disruptions, geopolitical unrest, weather, labor disruptions, vessel availability, and foreign dependence. For example, in 2024, California imported most of its jet fuel from China predominantly through the Port of Los Angeles, demonstrating the state's increased reliance on foreign-sourced fuels produced in regions with inferior environmental standards. Today, India is also a source of jet fuel.[101] Both India, and especially China, represent potential political and economic conflicts with national policies and U.S. national security interests.

---

[101] U.S. Energy Information Administration. (n.d.). *Company level imports.* U.S. Department of Energy. https://www.eia.gov/petroleum/imports/companylevel/.

50

### E.    Days' Supply - Inventory Availability of Fuels

90.    Further exasperating California's energy issues is the lack of petroleum reserves and low days' inventory of petroleum crude oil stocks and gasoline supplies. Refinery petroleum inventory is stored either onsite in large tanks or in storage depots located near refineries.[102] With no inbound pipelines for crude oil or finished fuels, California's fuel system evolved into a tightly "closed" and highly choreographed loop of in-state production, crude and finished product imports and in-state rude refinement. That system worked well for decades, until dependency on foreign suppliers of crude grew and major refiners exited the state. Today, California operates with a very tight margin for days' supply or inventory for crude oil and gasoline and other finished fuels such as diesel and jet fuel. State data for 2024 from the California Energy Commission show that under normal conditions, the combined stock of gasoline, diesel, and jet fuel stored in California tanks averages about 18-20 days of supply (roughly two to three weeks) based on an in-state demand of around 1.25 million barrels per day. For perspective, U.S. refiners collectively maintained around 426 million barrels of crude oil or 21.03 days' supply in 2024.[103]

91.    By comparison, other U.S. regions, such as the East Coast, or the federal Strategic Petroleum Reserve maintain far greater volumes, though those reserves consist primarily of crude oil and are located thousands of miles away on the Gulf Coast. In total, U.S. refiners collectively maintain around 426 million barrels of crude oil or 21.03 days' supply.[104] According to the CEC, California refiners have a maximum crude oil and gasoline and gasoline blendstocks of 13.3 and 12.7 million barrels of oil and gasoline, respectively, for 2024. This equates to approximately

---

[102] Energy Information Administration. (2025). Weekly Petroleum status report. In *Energy Information Administration*. https://www.eia.gov/petroleum/supply/weekly/pdf/table1.pdf.

[103] *Weekly Petroleum Status Report/Energy Information Administration 1*. (n.d.). https://www.eia.gov/petroleum/supply/weekly/pdf/table1.pdf.

[104] *Weekly Petroleum Status Report/Energy Information Administration 1*. (n.d.). https://www.eia.gov/petroleum/supply/weekly/pdf/table1.pdf.

51

558.6 and 533.4 million gallons of oil and gasoline, respectively, held as available "inventory" stock.

Figure 22.0[105]



92.    On average, California uses around 33,000,000 to 36,000,000 million gallons of gasoline per day.[106] Based on the most recent data from the Energy Information Administration, PADD 5, the CEC, and various industry sources, our modeling indicates that California has approximately 8.2 million barrels of gasoline comprised of 6.7 million barrels and roughly 1.5 million barrels of finished CARB gasoline in terminals, readily deliverable as California gasoline inventory or 281 million gallons of available gasoline, exclusive of any in-bound tankers or forward contracts.

93.    Based on the latest modeling and assumptions for consumption and using the estimated 8.2 million barrels of available gasoline as immediate inventory, it is estimated that California has **9 to 12 days of gasoline supplies**, based on current known data and assumptions,

[105] https://www.energy.ca.gov/sites/default/files/2024-06/CEC-200-2024-010.pdf.

[106] Based on CDFTA 10-year data, as updated. See https://cdtfa.ca.gov/taxes-and-fees/spftrpts.htm.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

inclusive of an estimated 1.5 million barrels of gasoline (63 million gallons) or about one day supply in transit as of March 27, 2026,[107] for a collective maximum total days' of immediate and available gasoline supply of **10 to 13 days**, as of March 27, 2026. This alone creates a national security exposure as well as presenting a direct threat to the economic vitality of the California economy.

94.     For 2025, the CEC reports that India supplied 26%, South Korean supplied 22% and the Bahamas supplied 23% of California's gasoline imports. South Korea, typically the largest supplier of gasoline and blendstocks into California (on the order of 25,000–60,000 barrels per day), began curtailing exports in mid-March and had effectively halted shipments by approximately March 20–22. South Korea gets its crude oil to refine gasoline from Saudi Arabia, Kuwait, the U.A. E. and the U.S. Singapore, which function primarily as a trading and blending hub dependent on upstream Middle Eastern flows, began declining earlier, around March 8–15, and have largely withdrawn. Indian exports, typically in the range of 15,000–40,000 barrels per day, have fallen to effectively zero as of March 20 as refiners prioritize domestic and regional demand. India receives its crude stock from Russia, Iraq, Saudi Arabia, and the U.A.E.

95.     Transit times from India can range up to 32 to 40 days, 22 to 26 days from Singapore, and 14 to 16 days from South Korea, all of which create a lag and slack in the supply chain. This has created a brief period (late March to early April) in which supply appears more resilient than it is, producing a tapered decline rather than an immediate drop. However, once this in-transit pipeline is exhausted (roughly after the first week in April), the full extent of the supply loss will become more visible.

96.     Compounding the gasoline imports issue, reduction of Saudi and Iraqi crude imports will begin to reduce crude inventories by mid-April, but more importantly will begin to degrade California refinery feedstock quality. California refineries are optimized for medium and

---

[107] Estimate does not include forward purchase contracts, tankers at anchorage, tankers at the port of origin or inbound tankers that are outside U.S. territorial waters.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

heavy sour crudes; substitution with lighter or otherwise mismatched feedstocks reduces the availability of intermediate streams needed for efficient gasoline production. This lowers gasoline yield and limits the system's ability to compensate for lost imports, reinforcing the structural deficit. Consequently, JP-8 jet fuel will become increasingly expensive to produce and most likely will be produced in lower quantities. Either or conditions are detrimental to the U.S. national security and the California economy.

### F.      Implications to National Security and Force Readiness

97.      California is confronting multiple crude oil, gasoline and jet fuel challenges, which, for the most part, are self-created and self-inflicted. With Valero's planned closure of Benicia and Phillips 66's shutdown of its Wilmington refinery, California is projected to lose about 17 percent (~284,000 bpd out of 1.68 million bpd state capacity) of its total nameplate capacity by 2026, and roughly 25 percent in effective operating capacity once partial-rate operations at the Martinez refineries and the Rodeo conversion are included. Crude runs and crude imports decline as the two refineries shut, and the backfill comes as finished-product imports, rising from ~10 percent of supply in 2024 to ~27 percent in 2026 (~432,000 barrels per day). After the closures, about 70–75 percent of California's total fuel supply will depend on external sources, and roughly 90 percent of the transportation fuel Californians consume will originate outside the state's own crude and refining base—either as imported finished products or as fuels refined in-state from imported crude. The Phillips 66 Rodeo refinery, formerly a 120,000 barrels per day crude facility, has already transitioned to renewable diesel and no longer contributes CARB-compliant gasoline or jet fuel to the state supply. With no local reserves and only working stocks at DFSPs, every disruption must be absorbed in real time by an already strained supply chain.

98.      For purposes of this analysis, I focused on a "worst-case" scenario involving multi-point failures. The simulation indicates:

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

- **Day 1:** Within the first 24 hours, refineries and terminals exhaust operational buffers and activate allocation orders. DFSP suspends all non-mission fuel activity and re-route limited deliveries to priority installations.

- **Days 2 & 3:** Regional airports, including LAX and Phoenix, begin rationing jet fuel; interior corridors such as Las Vegas approach critical supply. Retail shortages expand rapidly, forcing fuel-priority declarations for emergency services and potential shortages at retail gasoline stations. Nevada or interior Arizona markets supplied by the CalNev or SFPP East pipelines would fall below 48-hour cover.

- **Days 4 to 7:** Routine flight training ceases entirely to preserve JP-8/JP-5, hospitals and water utilities will near diesel exhaustion, and consumer panic drives queueing and sporadic unrest due to shortages.

99.     The figure below illustrates the potential sequential decline of refining capacity, pipeline throughput, and fuel inventories following a multi-node outage. As illustrated, jet fuel would collapse first, which would reduce operational readiness within 72 hours. By Week 2, operational readiness falls below 40% of baseline, confirming that cascading logistics failures drive exponential loss of capability and are not linear. In this scenario, the loss will most likely accelerate, exasperating U.S. operational efficacy and war readiness.

55

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Figure 23.0[108]



100.   A concurrent disruption, such as a major refinery casualty combined with a CalNev/SFPP East pipeline shutdown and temporary marine-terminal outage, would eliminate 70–90 percent refined-product inflow across California and the interior Southwest for at least one week.

101.   Without rapid restoration, regional readiness degrades sharply by the end of the first week. The initial marine backfill arrives only after three to six weeks (average Asia–California voyage plus terminal delay), confirming that import cadence cannot stabilize inventories before collapse. Under this stress test, a two- to four-week period of severe operational degradation emerges—a pattern consistent with DOE CESER and RAND interdependency models and observed colonial-scale disruptions.

102.   While the probability of simultaneous multi-node failure is low, correlation rises sharply under major seismic events, coordinated cyber intrusion, or deliberate sabotage. This scenario therefore defines the upper bound of regional vulnerability and validates the trigger

---

[108] Eq. E1 (Inventory with Transport Lags), Eq. E9 (Economic Loss from Shortages); EIA PADD 5 2024; CEC Petroleum Watch 2024; DLA Energy Dat.

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

thresholds established in days' supplies parameters as the points at which immediate federal allocation, waiver, and unified-command actions must be taken.

### G. Sable Offshore Production And The Pipeline Capacity Prioritization and Allocation Order 91 Fed Reg. ___ (March 13, 2026) (the DPA Order)

103. California's oil production and gasoline refinery infrastructure are at a significant crossroads. Unfortunately, years of over regulation and political demonization have now left California with limited choices and at the mercy of foreign suppliers and geopolitical events.

104. The Governor, Legislature and CEC have extolled that the passage of SB 237 increasing in-state oil production, and AB 30 which allows for the sale of E15 gasoline, as the centerpieces of their legislative solution, will alleviate gasoline supply insecurity, moderate consumer prices and stabilize the markets. Unfortunately, SB 237 is too little and too late, and AB 30 is overly optimistic and borderline unrealistic in its claims. At best, SB 237 and AB 30 will be of some value but are largely inadequate to address the potential supply insecurities, national security implications, and anticipated increases in consumer gasoline prices associated with declining in-state crude oil production. the loss of two refineries, and the collapse of a vital pipeline. As indicated in the figure below, even under the most generous scenario, the implementation of SB 237 alone will not satisfy California's crude oil needs nor sustain the operations of the SPB pipeline. Even with additional drilling permits from SB 237, existing regulations and crude oil prices will hamper meaningful increases in oil production.

Figure 24.0 [109]



105.    New Kern production stimulated by <u>SB 237 will not be enough to stem the natural decline of Kern County oil production</u> due to existing regulatory roadblocks, which will not be resolved by SB 237. Production models indicate that over the longer term, as California production in the SJV continues to decline, additional offshore resources (Santa Ynez Unit (SYU)), expanded South Ellwood output, and new onshore developments in the Los Angeles Basin could maintain the balance needed to support a long-term orderly transition to lower consumption.

106.    New production is needed. The most likely estimate is that demand will be substantial for the foreseeable future and that declines in consumption will be minimal in accordance with historical rates. Despite various claims of significantly reduced consumption, <u>there is no indication that California gasoline consumption has or will decline at any material rate</u> for the foreseeable future. In fact, the data is to the contrary. Consumption based on California Department of Tax and Fee Administration (CDFTA) data for the 2001 to 2024 period indicates that gasoline consumption declined 11.01%, or less than one percent annually. The 10-year

---

[109] Silvi, J. B., Rector, J. W., & Mische, M. A. (2025, October). *A Study of SB 237 to Stabilize Oil Production in California*.

average annual gasoline consumption, based on calendar year and CDFTA data, is 14.406 billion barrels of gasoline per day.[110] On average, California consumes between 36 and 40 million gallons of gasoline per day, or 13.1 to 14.6 billion gallons of gasoline annually.[111] CDFTA data for 2024 indicates that California consumed approximately 36.2 million gallons of gasoline per day. The CEC reported that California also consumed around 11.51 million gallons per day, or about 4.2 billion gallons annually of aviation jet fuel in 2024.[112] At this time, there are no indications that consumption will decline faster or further, ceteris paribus, than historical averages. The most realistic decline in consumption of crude derived fuels and products is associated with historical behaviors, which indicate a 27.18% decline in consumption from 2026 to 2045. A more managed, moderately aggressive approach indicates a 36.05% decline in consumption given realistic EV and hybrid adoption rates.

107. Based on current assumptions, California will require approximately 578,000,000 to 581,000,000 barrels of petroleum annually to support its current economic activity, as well as its exports to Arizona and Nevada. In terms of gasoline consumption, California, alongside the fuel it supplies to Nevada and Arizona, is estimated to require between 14.2 to 15.5 billion gallons of gasoline per year, or about 38,900,000 to 42,470,000 gallons per day. Notably, in California, consumer demand for aviation fuel increased 113% from 2001 to 2022. For the 2015 to 2024 period, CDFTA data indicates that jet fuel consumption in California, which is the fastest growing fuel product category in the state, increased by 31%.[113]

---

[110] *Fuel Taxes Division Statistics & Reports – 2010*. (2025). Ca.gov. https://www.cdtfa.ca.gov/taxes-and-fees/spftrpts10.htm.

[111] Various including CEC and EIA and authors.

[112] California Energy Commission. (2024, November 7). *Transportation Energy Demand Forecast: Major Updates and Results* (Prepared by A. Freeman, N. Saxena, & F. Kabir; TN No. 259930). 2024 Integrated Energy Policy Report Update, Docket No. 24-IEPR-03. https://efiling.energy.ca.gov/getdocument.aspx?tn=259930.

[113] *Fuel Taxes Statistics & Reports*. (2020). Ca.gov. https://cdtfa.ca.gov/taxes-and-fees/spftrpts.htm.

59

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

108.     California is highly vulnerable to oil supplies and prices of foreign providers. Based on current events, prices could very well approach and exceed $8.00 a gallon. Indeed, in some local markets, prices have breached $8.00 a gallon[114] in some parts of Los Angels County and in some parts of Menlo Park.

Figure 25.0

Photographs of Actual Prices

Menlo Park, CA                         Los Angeles, CA



109.     Sable Offshore Corp. (Sable) production is achieved by wells and platforms located off the shore of California in federal waters. The drilling production rights to those waters have been secured through leases with the federal government. The production of oil from Sable's three offshore platforms, and the use of Sable's Santa Ynez Pipeline System (including Segments CA-324 and CA-325) to transport its offshore production to California refineries, will have an immediate and favorable impact on U.S. national security, as well as having a favorable influence

---

[114] https://nypost.com/2026/03/25/us-news/gas-station-in-las-chinatown-charging-close-to-9-per-gallon/. See also https://www.latimes.com/california/story/2026-03-25/fuel-prices-are-surging-la-gas-station#:~:text=Pedestrians%20walk%20across%20the%20street,behalf%20of%20the%20gas%20stations.

60

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

on local employment and tax revenues and consumer retail gasoline, diesel and aviation fuel prices. The introduction of Sable production will displace a portion of foreign crude imports and will eliminate a portion of the risk and vulnerabilities created by over-reliance on foreign producers and foreign owned maritime shippers.

110.    As currently configured, Sable can produce 30,000 to 50,000 barrels of oil per day from its three offshore platforms. At that level, Sable's production would represent <u>17% of all California in-state production</u> based on 2025 levels. This is a significant contribution at the regional level. Furthermore, Sable's cost of production is highly competitive. By directing this offshore production south, Southern California refineries would require fewer barrels of crude oil from the SJV thereby allowing a substantial portion of Kern County crude which is highly compatible with Bay Area refinery designs, to be redirected north and quickly reinject life into Crimson's San Pablo Bay pipeline.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 1st day of April, 2026, in Los Angeles, California.

_____

Michael A. Mische

61

DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

# EXHIBIT A

# MICHAEL A. MISCHE
**MBA, MS, Cert-AI.**
**Associate Professor of Professional Practice**
**Email: mamische@gmail.com**

## INTRODUCTION

Widely quoted in the media, including, The Wall Street Journal, Business Insider, The Washington Examiner, San Jose Mercury News, The Irish Business Post, FOX News, FOX Business, KNX-LA, KFI-LA, CBS and NBC, Professor Michael A. Mische is recognized as one of the world's foremost authorities on the management consulting and oil and gas industries. He has testified as an expert before the Senate, in high-profile litigation and criminal cases involving management consulting, and has been cited in over 1,100 mainstream publications, interviews, reviews, and research papers. He is highly regarded for his Management Consulting Annual Outlook Report, his published research on oil in Venezuela, and for his major publication on Bidenomics, which was the most comprehensive comparative examination of the U.S. economy for the 2019 to 2023 period, and his *A Study of California Gasoline Prices* (2025) which is a fifty-year study of the price determinants in the Golden State. In 2023, Michael released his eighth book, *"CasePro: The Consultant's Critical Thinking Approach to Case Analysis,"* and is the author of seven other books, including a world-wide best-seller with co-author, the late Warren G. Bennis.

Mische joined USC in 1997 as an adjunct professor after a career with KPMG where he was a Principal in the consulting and advisory groups. Since 2016, Michael has been a fulltime faculty member of the Marshall School of Business, University of Southern California while maintaining an exceptionally high-profile presence as a thought leader in the consulting industry. He is the 2018 recipient of USC's Golden Apple Award for Teaching Excellence and a co-recipient of the 2019 Service Excellence Award. Mische maintains a highly active consulting profile among elite consulting firms and governments with projects spanning major consulting issues, oil & gas prices, the economy, AI in consulting, and issues related to national economic security.

## POSITIONS HELD (ACADEMIA)

- **University of Southern California**, Marshall School of Business. Los Angeles, CA. (1997- Present).
  - Associate Professor of Professional Practice & Curriculum Leader: Management Consulting.
    - Faculty Lead for the Certificate in Strategy & Management Consulting.
    - Redesigned consulting curriculum to be more relevant and competitive with Harvard.
    - Designed & implemented a new MOR course offering, *Case Analysis for Consultants: A Critical Thinking Approach*, MOR 499, which provided for interactions between MBAs from the MOR 557 class with UGs from MOR 462.
    - Co-designed & co-teach a new MBA course offering with Prof. Shon Hiatt titled, *"MOR 599- The Business of Energy in the 21st Century."* Scheduled for Spring 2025.
    - Co-designed & co-taught, with Jerry Giaquinta, a new course in 2020, (BUCO/MOR 499), a cross-cultural, project-based course; simultaneously taught via Zoom with ICU in Tokyo, Japan.
    - Redesigned and upgraded USC's Certificate in Strategy & Management Consulting. (2023).

  - **USC Service Activities**
    - Conducted recruiting bootcamps for both MBA and MS students for placement into consulting. (2023-2024).
    - Co-hosted KPMG CEO Paul Knoop on campus for recruiting purposes. (2024).
    - Co-leading, with Paul Adler, Deloitte Sustainability Consulting Case. (2024).
    - Authored new Experiential Learning Center (ELC) exercise based on an actual management consulting situation. (2023).
    - Faculty recruiter, USC Football. Speak with non-committed football recruits and their families about USC academics and the "life of a student athlete." (2022-present).
    - Faculty Adviser, MCSC, the largest MBA student club at Marshall. (2022-present).

*Prof. Michael A. Mische*
*Resume- Academic*
*August 1, 2025*

1

- o    Implemented career coaching services for MBAs with USC's Career Resources Center. (2023).
- o    Faculty coach (informal) USC Marshall MBA Black Students Case Competition Team. (2022).
- o    Co-coached (with Carl Voigt) USC Marshall Case Competition Team. (1999 – 2001).

- **USC Awards**
  - o    USC Golden Apple Teaching Award. (2018).
  - o    MOR Service Award. Co-recipient. (2019).

- **USC Marshall School of Business- Teaching Responsibilities:**

  - o    **MBA-Graduate**

    | Course | Year |
    |---|---|
    | MOR 599 | The Business of Energy in the 21st Century | 2025- Present |
    | MOR 554 | Strategy Innovation & Change | 2015- Present |
    | MOR 557 | Management Consulting | 2015- Present |
    | MOR 559 | Strategic Transformation & Renewal | 1997- Present |

  - o    **Undergraduate**

    | Course | Year |
    |---|---|
    | MOR 473 | Leading High-Performance Teams- Proj. Based | 2016- Present |
    | MOR 462 | Management Consulting | 2014- Present |
    | BUAD 497 | Strategy- Case Based | 2014 -2016 |
    | MOR 463 | Organizational Behavior | 2013- 2018 |

## POSITIONS HELD- PRIVATE SECTOR (FOR PROFIT)

- **Synergy Consulting Group, Inc.** (1993-Present). *CEO & Chairperson of the Board.* Scottsdale, AZ and State College, PA.
  - o    Significant clients include United States, Kingdom of Saudi Arabia, several Fortune 50s and several Elite 8 management consulting firms.
  - o    Special consultant to HRH, Kingdom of Saudi Arabia. (2020-2022).
  - o    Special consultant to U.S. Government. (Ongoing).
  - o    Practice specializations include:
    - ▪ Strategic Assessment & Positioning.
    - ▪ Organizational Performance.
    - ▪ Strategic Innovation .
    - ▪ Energy Policy as Related to Oil & Gas.

- **Andersen Consulting (Accenture).** (1995-2000). *Special Consultant to Senior Practice Leadership & Management Committee of the Firm.* Chicago & Los Angeles.
  - o    Advisor on Global Repositioning & Practice Lines Restructuring relating to "Process Transformation."
  - o    Co-authored "Building Process Excellence: Lessons from the Leaders."
  - o    Co-developed/Contributor to the AC Reengineering & Strategic Planning Methodology.
  - o    Keynote Speaker: Andersen Partners & Consultants Innovation & Software Spectacular Meeting, San Antonio. (1996).
  - o    Designated "Associate Partner" for administrative, NDA, and confidentiality purposes.

- **AT Kearney.** (1991 to 1993). *Principal, Management Consulting Services.* Chicago, IL.
  - o    Special Project- Internal Restructuring and Cost Reduction.
  - o    Special Project- Repositioning Strategic Technology Services for Sale.

- **KPMG.** (1983 to 1992). *Principal, Management Consulting Services.* Montvale, NJ.
  - o    One of the youngest consulting partners elected in the history of the Firm.
  - o    PIC & Practice responsibilities included leading/co-leading national services in:
    - ▪ Strategy & Transformation Consulting.

*Prof. Michael A. Mische*
*Resume- Academic*
*August 1, 2025*

2

- ▪ Transactions Management Services (M&A).
- ▪ Innovation & Advanced Technologies.
  - o Instructor, SDLC, Software Implementation, and Project Management.
  - o Co-led/managed over $58 million in direct engagement billings (Over $100 million in aggregate).
  - o Maintained one of the highest Net to Gross ratios in the firm.
  - o Member, KPMG Practices & Methods Review Committee.
  - o Member, AICPA Peer Review for PwC.

**NOTEABLE CONSULTING ACTIVITIES (Partial)**
- **2025.** U.S. Energy Production as Related to Oil & Gasoline Independence.
- **2024.** Lead Consultant. Bidenomics: Facts, Figures & Everything that Americans Should Know. (February 2024).
- **2023.** Lead Consultant. Analysis of the Implications of the Strategic Petroleum Reserve on U.S. War Readiness. Classified. (2023).
- **2023.** Analysis of California's Profit Gouging Tax. (January 2023).
- **2023.** Analysis of Biden Administration's Oil & Gas Policies. (November 2022).
- **2023.** Analysis of U. S. Oil & Gas Prices. Oil & Gas Association. Distributed to U.S. Congress. (October 2022).
- **2018-2021.** Kingdom of Saudi Arabia. Lead Advisor for the development of the strategic plan for the "Innovation Superhighway" linked to Vision 2030. https://www.vision2030.gov.sa/media/rc0b5oy1/saudi_vision203.pdf.
- **2018-2021.** Kingdom of Saudi Arabia. Appointed Senior Advisor to the Saudi Public Investment Fund (Taqnia), a $925 billion investment fund for the design and implementation of co-innovation and co-investment funding and investment selection processes and organization capable of supporting 13 different economic sectors. https://www.pif.gov.sa.
- **1997.** Reengineering Government Initiative for Vice President Al Gore. (May- August 1997).

**EXPERT WITNESS & PANEL PARTICIPATION (Partial)**
- **2025.** Expert Witness. Superior Court of California, State of California.
- **2023/2024.** Expert Witness. U.S. Federal District Court.
- **2024.** Opined (informal comments) on draft Senate Bill *"To prohibit conflict of interests among consulting firms that simultaneously contract with the Government of the People's Republic of China and the United States Government, and for other purposes."* https://www.hawley.senate.gov/sites/default/files/2024-02/Hawley-Time-to-Choose-Act.pdf.
- **2023.** Expert Witness. Testimony before California Senate on California Oil & Gas Price Gouging. (February 22, 2023). See, Mische at 2-hour, 3 min. mark. https://www.senate.ca.gov/media/senate-energy-utilities-communications-committee-20230222/video
- **2023.** Opined on the "Effects of a Windfall Profit Tax" on U.S. Oil & Gas Competitiveness. United States House of Representatives. +Washington, D.C. (January 2023).
- **2023.** Expert Witness. Presentation before the California Foundation on The Environment and The Economy on why California gasoline prices are higher than national averages and the accretive costs of a windfall profit tax. February 10, 2023. Napa, California.
- **2023.** Moderator. "Innovation Factories, Unicorns and Competitive Positioning." Featuring Linda K. Yates, Author and CEO, Mach 49. (November 2022).
- **2023.** Expert Witness, California Senate.  "Why Are Oil & Gas Prices So High in California?" Californians Against Higher Taxes Press Conference. Carried live and covered by AP. (November 28, 2022).
- **Prior 2022 (partial).**
  - o Material Witness, FARA case. Subpoenaed for and on behalf of the U.S. Government, Southern District of New York (U. S. v. Zuberi). Los Angeles, CA.

*Prof. Michael A. Mische*
*Resume- Academic*
*August 1, 2025*

**3**

- o Subpoenaed as material witness on behalf of the U.S. Government in a political financial and foreign influence investigation (FARA).
- o Testified before United States Grand Jury, 2019/20.
- o Testimony contributed to a conviction and 12-year sentencing in a federal penitentiary on FARA violations. https://www.justice.gov/usao-cdca/pr/political-donor-sentenced-12-years-prison-lobbying-and-campaign-contribution-crimes-tax
- o Expert Witness, for and behalf of major Fortune 500. Witness in the analysis of movie theater operations as related to the Supreme Court Consent Decree of 1948, 2016/17. Los Angeles, CA.
- o Expert Witness, for and behalf of Plaintiff, Magic Chef (Owned by Berkshire Hathaway).
- o Expert Witness, for and on behalf of a Private Client. Witness in the analysis of management consulting services, project management and the application of AICPA Code of Professional Ethics as related to management advisory services, 1988. Miami, FLA.

**MEDIA COVERAGE & CITATIONS: 2022-2025** (partial list)
- Quoted or cited over **1,225** times in academic and research works (Academia.com).
- Quoted over **500** times in the media in 2022 - 2025.
- **2025.** Mische interviewed. **NBC Los Angeles.** *"News Conference- The Real Story Behind the High Cost of Gas."* (July 13, 2025). https://www.nbclosangeles.com/video/on-air/newsconference-the-real-story-behind-the-high-cost-of-gas/3743837/
- **2025.** Mische op. ed. **The Los Angeles Times.** *"We Still Rely on Gasoline. Why is California Adding to the Cost and Pollution?"* (July 6, 2025). https://www.latimes.com/opinion/story/2025-07-06/california-gasoline-costs-refineries-pollution-imports.
- **2025.** Mische interviewed. **California Insider.** *" What's Behind the Wave of Refinery Closures in California."* (June 13, 2025). https://www.youtube.com/watch?v=CgEDT57yIjk.
- 2025. Mische interviewed. **Veriten.** *"It's Probably Time for a DOGE Approach to California Government."* (June 28, 2025). https://veriten.com/stream/cobt-279/.
- **2025.** Mische interviewed. **Fox Business.** *University of Southern California Professor Michael Mische explains his study on gas prices being driven up due to high taxes and policies.* (2025, April 4). https://www.foxbusiness.com/video/6370989691112.
- **2025.** Mische interviewed. **John Kobylt Show; KFI AM 640.** (2025, April 8). *Why Are CA Gas Prices So High?* https://kfiam640.iheart.com/featured/the-john-kobylt-show/content/2025-04-08-1119-the-john-kobylt-show-why-are-ca-gas-prices-so-high-0408/.
- **2025.** Mische quoted. **Washington Examiner.** Faria, Z. (2025, April). *California Democrats are responsible for high gas prices.* https://www.washingtonexaminer.com/opinion/beltway-confidential/3366221/california-democrats-responsible-high-gas-prices/.
- **2025.** Mische quoted. **California Globe.** (April 3, 2025). *California's High Gas Prices Climbing Over $5.00 Per Gallon – Again.* https://californiaglobe.com/fr/californias-high-gas-prices-climbing-over-5-00-per-gallon-again/.
- **2025.** Mische quoted. **Business Insider.** Thompson, P. (2025, April 8). *5 consulting contracts cut by DOGE show what government is targeting.* https://www.businessinsider.com/doge-consulting-crackdown-what-contracts-are-being-cut-2025-4.
- **2025.** Mische quoted. **Pleasanton Weekly.** Hunt, T. (2025, April 10). *USC study confirms state policies drive up gas prices.* https://www.pleasantonweekly.com/blogs/tim-talk/2025/04/10/usc-study-confirms-state-policies-drive-up-gas-prices/.
- **2025.** Mische quoted. **Daily News.** Board, T. E. (2025, April 6). *Can California get real about high gas prices?* https://www.dailynews.com/2025/04/06/can-california-get-real-about-high-gas-prices/
- **2025.** Mische quoted. **KTLA.** Turner, A., & Sternfield, M. (2025, March 31). *Policies, not greed, driving California's sky-high gas prices, study finds.* https://ktla.com/news/california/policies-not-price-gouging-to-blame-for-californias-soaring-gas-prices-study-finds/.

*Prof. Michael A. Mische*
*Resume- Academic*
*August 1, 2025*

4

- **2024.** Mische quoted. *Washington Examiner,* "USC estimates California fuel could rise by up to 90 cents per gallon next year." (11/20/24). https://www.washingtonexaminer.com/news/3235752/usc-estimates-california-fuel-could-rise-by-up-to-90-cents-per-gallon-next-year/.

- **2024.** Mische quoted. *The Irish Business Post,* "Grant Thornton Irish Partners Mull Debt Deal in Growth Plan" (July 21, 2024). https://www.businesspost.ie/news/debt-deal-on-table-as-grant-thornton-mulls-overhaul-of-partnership-structure/.

- **2024.** Mische quoted. *The Wall Street Journal,* "Consultants Are Paid to Fix Businesses. Why Can't They Fix Their Own? (March 16, 2024). https://www.wsj.com/lifestyle/careers/consultants-are-paid-to-fix-businesses-why-cant-they-fix-their-own-1ed9bb04?st=6lijni2puvf4t7s&reflink=desktopwebshare_permalink.

- **2024.** Mische quoted. *Newsweek, "Californians Need $1,000 More To Pay 2025 Gas Prices."* (11/21/24). https://www.newsweek.com/california-2025-gas-prices-increase-1989321.

- **2024.** Mische quoted. *Institute of Energy Research.* "California Gasoline Prices Will Skyrocket." (11/29/24). https://www.instituteforenergyresearch.org/fossil-fuels/gas-and-oil/california-gasoline-prices-will-skyrocket/.

- **2024.** Mische quoted. *CBS 8, San Diego.* (11/21/24.) https://www.cbs8.com/article/news/local/california-drivers-gas-costs-2025/509-0ec7e8d0-8d2e-4540-9235-c6620628fcdb.

- **2024.** Mische quoted. *FOX 11, LA.* (11/20/24). https://www.foxla.com/news/californians-will-pay-much-more-next-year-keep-up-2025-gas-prices-study

- **2024.** Mische interviewed. *860 AM, LA.* (12/26/24). https://860amtheanswer.com/news/regional/1f1b8870-c3bd-11ef-8dfd-d3251992d201

- **2024.** Mische quoted. *Arizona Daily Sun.* "USC estimates California fuel could rise by up to $1.15 cents per gallon next year." (11/20/24). https://azdailysun.com/usc-estimates-california-fuel-could-rise-by-up-to-1-15-cents-per-gallon-next/article_7aa9d45c-a75d-11ef-aee1-df0e25f64341.html.

- **2024.** Mische quoted. *Courthouse News Services.* "California Lawmakers Consider Newsom's Oil Profit Penalty." (2/23/23). https://www.mresearch.com/wp-content/uploads/California-lawmakers-consider-Newsoms-oil-profit-penalty-plan-_-Courthouse-News-Service.pdf

- **2023.** Mische quoted. *The Wall Street Journal*, "For Once, Rookie Consultants Don't Have Enough to Do." (August 4, 2023). https://www.wsj.com/articles/consultants-bain-kmpg-ernst-young-boston-consulting-bcg-recruits-layoffs-1a2629fd.

- **2023.** Mische quoted. *ExtractingFact.com*, "Three Things Governor Newsom Should Learn from the Special Hearing Session." (March 14, 2023). As <u>University of Southern California professor Michael Mische</u> put it:  *"The fact is, we haven't proven any cases of price gouging by oil companies or refiners … As recently as November 2022, we had a court case in the U.S. District Court in San Diego tossed out. The list goes on and on."* https://www.extractingfact.com/news/statewide/three-things-newsom-should-learn-from-the-special-session-hearing/.

- 2022. Mische quoted. *Seattle Times*, "California Eyes Penalties for Oil Companies Big Profits." (December 4, 2022). https://www.seattletimes.com/business/california-lawmakers-to-meet-eye-big-oils-high-gas-prices/.

- 2022. Mische quoted. *San Jose Mercury News*, "Should California Tax Oil Profits." (November 29, 2022). https://www.mercurynews.com/2022/11/29/should-california-tax-oil-profits-gas-spike-hearing-sets-stage-for-contentious-debate/.

- 2022. Mische quoted. *Consumer Watchdog,* "Should California Tax Oil Profits: Gas Spike Hearing Sets Stage for Contentious Debate." (November 29, 2022). https://consumerwatchdog.org/news-story/should-california-tax-oil-profits-gas-spike-hearing-sets-stage-contentious-debate.

- 2022. Mische quoted. *East Bay Times,* on oil and gas prices in California. (November 2022). https://www.eastbaytimes.com/2022/11/29/should-california-tax-oil-profits-gas-spike-hearing-sets-stage-for-contentious-debate/.

*Prof. Michael A. Mische*
*Resume- Academic*
*August 1, 2025*

5

- 2022. Mische quoted. *ArcaMax Business,* on oil and gas taxes. (November 29. 2022). https://www.arcamax.com/business/businessnews/s-2755516-p2.
- 2021. Mische quoted. *Politico*, on political pay for play. (February 2021). https://www.politico.com/news/2021/02/12/imaad-zuberi-biden-inner-circle-468816.
- 2021. Mische quoted. *Washington Examiner*, on FARA conviction. (February 2021). https://www.washingtonexaminer.com/news/donor-ties-biden-trump-clinton-obama-sentenced-12-years-prison.

## BOOKS BY MICHAEL MISCHE

- **2025.** Pending & Under Contract: *Management Consulting: Professional Practice, Responsibility & Ethics.* Target publication date August 2026.
- **2023.** *CasePro! The Consultant's Critical Thinking Approach to Case Analysis.* Author. ISBN: 978-1-7935-1400-4. (Cognella Publications, January 2023).
- **2017.** *Management Consulting: Today & Tomorrow.* Contributing Author. ISBN: 978-1-138-12428-8 (Routledge, 2017).
- **2000.** *Strategic Renewal: Becoming a High-Performance Organization.* Author. ISBN: 0-13-021919-3. (Prentice Hall, 2000). Adopted for use by 8 MBA programs.
- **1996.** *The 21st Century Organization: Reinventing Through Reengineering.* Co-Authors- Warren Bennis & Michael Mische. ISBN: 0-89384-273-7. (Jossey-Bass, 1996). Reached Top-25 on both U.S. and international best seller's list, published in 5 languages.
- **1996.** *Reengineering Systems Integration Success, Volumes 1 & 2.* Editor. ISBM: 1-8493-9952-1. (Auerbach, 1997- 1999).
- **1996.** *Step-by-Step Reengineering: The Comprehensive Guide to Process Change.* Author. ISBM: 0-8839-0476-4. (Jossey-Bass, 1996). This book was adopted by virtually every major consulting firm and has served as a foundation for many firms' proprietary methodologies. Also used by President Clinton & Vice President Al Gore in their "Reinventing Government," initiative. (1992-94). See, https://www.govexec.com/management/2013/04/what-reinvention-wrought/62836/
- Contributing author and/or editor to 3 other books (Auerbach) on process and system integration.

## PAPERS BY MICHAEL MISCHE (partial)

- **2025.** *"Ensuring California's Gasoline Security for the 21st Century."* USC Business of Energy Transition Initiative (BET). (May 5, 2025). https://drive.google.com/file/d/1CVsBHQ0s4FX57xQD2iy0ZD1V_MlKJMZX/view
- **2025.** *"A Study of California Gasoline Prices."* USC Business of Energy Transition Initiative (BET). (March 16, 2025). https://drive.google.com/file/d/1YK_IxHVQokM6-fMXhTs9fmW2ZW0zdhuj/view
- 2024. *"Brace for Impact- California Gasoline Prices to Increase in 2025."* (November 11, 2024). https://drive.google.com/file/d/1J9aNp1NPSzsNAEE9b4b6aUtYFoHiZtIm/view
- **2024.** *"Not All Oil is Created Equally: Understanding the Venezuela Petrostate."* USC Business of Energy Transition Initiative (BET). (September 2024). https://drive.google.com/file/d/1wq-EX-19ztzgkRaqRfTNuCbSKmZpHnni/view
- **2024.** *"Bidenomics…Facts, Figures and Everything Americans Should Know."* Co-authored with Torri Kyes. Over 40,000 reads as of September 1, 2024. (February 2024).
- **2024.** *"Is Venezuela the Answer to U.S. Oil Woes?"* USC Business of Energy Transition Initiative. (May 2024) (BET).
- **2024.** *"Understanding the Implications of Iranian Oil & U.S. Sanctions: What the Facts, Figures & Data Tell Us."* Oil & Gas Association. (April 2024).
- **2024.** *"2024 Management Consulting Annual Outlook."* Over 40,000 reads. (January 2024).
- **2024.** *"Management Consulting Annual Outlook & Firm Rankings: 2024."* Over 40,000 reads. (January 2024).
- 2023. *"The Fiction, Fallacy, Facts & Realities of California's Profit Gouging Tax."* (January 2023).

*Prof. Michael A. Mische*
*Resume- Academic*
*August 1, 2025*

**6**

- 2023. *"When it Comes to Energy the Stupidity of Biden Administration Knows No End."* (Feb. 2023).
- 2023. *"Twenty-five Questions that all Americans Should Ask About Oil & Gas Prices."* Oil & Gas Association. (Oct. 2022).
- **Prior Papers: 1984 to 2022** (Partial List)
  - "Ranking the Top MBA Programs for Management Consulting." (2018, 2019, 2020, 2021).
  - "A Comparative Survey of Top Twenty MBA Management Consulting Programs." (2018).
  - "Federal Tax Implications of Unclaimed Property," (TAF, 2014).
  - "Alternative Asset Class Investments: The Case for Classic Cars." (SCG, 2013).
  - "The Contagion Effect of Greek Default & It's Impact on the Eurozone: A Working Paper," (2013).
  - "Innovation: The Engine of Strategic Renewal." (Accenture, 1996).
  - "Symptoms of a Terminally Ill Integration Project," (Auerbach, 1997- 1999).
  - "Transnational IT Architecture," (Auerbach 1997- 1999).
  - "Building Process Excellence: Lessons from The Leaders." (The Economist/EIU, 1996).
  - "Remedies to Wrongful Seizure: A Discussion of IRS Liens & Levies." Jerome Horvitz and Michael Mische. (Warren Gorham & Lamont, 1984.)

## EDUCATION

- **Massachusetts Institute of Technology,** Sloan School of Management. MA. (August 2020).
  - Certificate, Executive Education Program, AI: Implications for Business Strategy.
  - Modules completed included:
    - Introduction to AI
    - Machine Learning in Business
    - Natural Language Processing in Business
    - Robotics in Business
    - AI in Business and Society
    - The Future of AI

- **New York University**, Stern School of Business. NY, NY. (February 1978).
  - Master of Business Administration, Finance. Minor: Management.
  - Completed both BS & MBA is less than 5 years.
  - Thesis: "Business Cycles & Capital Investment Theory." Advisor, Prof. Robert Kavesh, Chairman, NYU Economics Dept.
  - Honors Paper: "Price Level Adjusted Financial Statements." Advisor, Prof. Barbara Marino.
  - NYU Graduate Assistant to Prof. Alexander Melamid & Prof. Rolf E. Wubbles.

- **Golden Gate University**, Graduate School of Taxation.  San Francisco, CA. (June 1984)
  - Master of Science, Federal Taxation.
  - Publications: "Remedies to Wrongful Seizure." (Warren, Gorham & Lamont. 1984).

- **New York University**, Stern School of Business. NY, NY. (October 1976).
  - Bachelor of Science, with Honors in Banking & Finance.
  - Double Major: Finance & Economics.
  - Minor: Political Science (Soviet Economic System).
  - Honors Thesis: "Industry Analysis of Nonferrous Metals," Advisor, Prof. Rolf E. Wubbles.
  - Five-year accelerated BS/MBA degree program (Awarded MBA at age of 23).
  - Recipient: Jules Bachman & Boris Kostelanetz Academic Scholarships - Economics.
  - Beta Gamma Sigma & Phi Alpha Kappa, national academic honors societies.
  - Student Athlete. NYU Men's Varsity Swimming Team.
  - Vice President, NYU Finance Society.
  - Member, Phi Gamma Delta.

*Prof. Michael A. Mische*
*Resume- Academic*
*August 1, 2025*

7

**COMMUNITY SERVICE ACTIVITIES (Partial)**
- Active in sexual assault prevention initiatives and counseling young men. (On-going.)
- Active financial supporter, LA Catholic Good Shepard Shelter for Battered & Abused Women. (On-going).
- Active financial supporter, USC Women's Basketball. (On-going).
- Active financial supporter, Phi Gamma Delta Educational Scholarship Fund. (1980 to present).
- Passionate supporter of Title IX initiatives for women athletics. (1977-present).
- Past Member, City of Pasadena, "We Must Breathe Task Force," for police reform and underrepresented economic opportunity programs. Chaired by the late Council Member, John J. Kennedy. (2020).

**MISCELLANEOUS AWARDS (Partial)**
- "Man, of the Year," elected by the NYU Chapter. (1992).
- Nominated for "Who's Who in America." (2001, 2024).
- Nominated for "Who's Who in American Business." (2011, 2024).
- "Most Influential Graduate Brother of the Year." (2023).

**BOARD MEMBERSHIPS**
- Due to the potential for conflicts of interest and publicity, Michael restricts his for-profit board affiliations to private organizations.
- Past non-profit board affiliations include, but are not limited to:
  - NYU-Stern, Annual Alumni Fund. Co-Chairman. (1990-91).
  - NYU-Stern, Haskins Fund. Board Member. (1992).
  - NYU-Stern, Dean's Advisory Board. Board Member. (1988-1992).
  - NYU-Stern, New Building Fund Board. Fundraiser. (1990-1992).
  - Phi Gamma Delta Educational Foundation. Board Member. (1990-1994).
  - Gamma Phi House Corporation. Board Member. (1990-2001).

**PERSONAL INTERESTS**
- Lifetime Member: International Fraternity of Phi Gamma Delta. Member. (1973 – present).
- Interesting Fact: Former elite-level two-sport athlete. (1969-1975).
- Passions: Classic American muscle cars, Formula 1 racing, writing, American military history, architecture, classical music, weightlifting, boxing, developing consulting talent, and PSU & USC football.
- Most notable influences: NYU Profs. Alexander Melamid, Rolf. E. Wubbels, Wassily Leontief (Nobel Recipient), & Ed Altman; KPMG Partners CEO Larry D. Horner & Hilliard M. Eure-III; my incredible athletic coaches & trainers; and most of all, my mother, Jane and father, Albert.

**LINKS**
- https://www.linkedin.com/in/michael-a-mische-987b30a/
- https://www.youtube.com/watch?v=dC5lLcSK-1I&t=13s
- https://www.youtube.com/watch?v=HvP2ELGHdjQ
- https://www.youtube.com/watch?v=2Rv7l2qhCSw&t=12s

*Prof. Michael A. Mische*
*Resume- Academic*
*August 1, 2025*

**8**

**PROOF OF SERVICE**

I, **Josie Cisneros**, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On April 1, 2026, I served the document(s) **DECLARATION OF MICHAEL A. MISCHE IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S** *EX PARTE* **NOTICE OF DEFENSE PRODUCTION ACT ORDER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☐ (BY U.S. MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐ (BY FACSIMILE) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐ (BY OVERNIGHT MAIL) I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒ BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on April 1, 2026, at Los Angeles, California.

/s/ Josie Cisneros
Josie Cisneros

## SERVICE LIST

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102 | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire* |

| Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
|---|---|

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
4/8/2026 4:59 PM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100
*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
*Attorneys for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**PETITIONERS' COMBINED REPLY IN SUPPORT OF EX PARTE APPLICATION FOR ENFORCEMENT OF PRELIMINARY INJUNCTION AND FOR AN ORDER TO SHOW CAUSE WHY REAL PARTIES IN INTEREST SHOULD NOT BE FOUND IN CONTEMPT OF COURT**<br><br>Date:       April 17, 2026<br>Time:      10:00 a.m.<br>Dept.:      4<br>Judge:     Honorable Donna D. Geck<br><br>Action Filed: April 15, 2026 |

Petitioners' Combined Reply ISO Ex Parte Application for Enforcement of Preliminary Injunction and OSC Re: Contempt

## I.    <u>INTRODUCTION</u>

Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") style their April 1, 2026, supplemental brief not as an opposition to Petitioners' Ex Parte Application ("Petitioners' Application"), but as further briefing in support of their own Ex Parte Application ("Sable's Application"), departing from the briefing schedule ordered by the Court. (*See* March 17, 2026, Minute Order ["Supplemental *Opposition* paperwork shall be filed no later than 4/1/2026"] [emphasis added].) Thus, the Court should strike the brief, or at the very least not consider any new arguments or evidence that were not first raised in Sable's moving papers; per the briefing schedule ordered by the Court, Petitioners have already filed their supplemental opposition to Sable's Application, and Petitioners no longer have a chance to further respond. That would include, for example, Sable's attempt to relitigate the underlying equities of the Court's July 29, 2025, Orders for Preliminary Injunction (the "PI Orders"), as well as its newly filed evidentiary declarations in support of its requested relief. As to the arguments that *were* preserved in Sable's moving papers, Petitioners have addressed those at length in their Combined Supplemental Opposition to Sable's Application ("Supplemental Opposition").

That said, to the extent that the Court construes Sable's brief as a supplemental opposition to Petitioners' Application, Petitioners address below why it fails to rebut Petitioners' factual showing of contempt, why it fails to raise a colorable defense to contempt, and, thus, why the Court should grant Petitioners' requested relief. Such relief includes issuing an order to show cause why Sable is not in contempt of the PI Orders, as well as enforcing the PI Orders by ordering Sable to immediately shut down and cease operating pipelines CA-324 and CA-325 (the "Pipelines").

## II.    <u>ARGUMENT</u>

### A.    **Sable Does Not Dispute that Petitioners Have Met Their Factual Burden to Establish Contempt.**

"The essential facts to establish contempt for violation of a court order are '(1) the making of the order; (2) knowledge of the order; (3) ability of the respondent to render compliance; and (4) willful disobedience of the order.'" (*Moore v. Superior Court* (2020) 57 Cal.App.5th 441, 456 [citation omitted].) Petitioners discussed each of these factors in their Application. (*See* Petitioners' Application, pp. 11-12.) Nowhere in Sable's supplemental brief does it address the standard for establishing contempt

2

Petitioners' Combined Reply ISO *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

or dispute the factual allegations in Petitioners' Application. Given Sable's lack of response, the Court should accept Petitioners' undisputed factual assertions as true. (*See People v. Stanley* (1995) 10 Cal.4th 764, 793 ["Every brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration."] [citation omitted]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-85 [when a party fails to address an issue, or fails to support their position with reasoned argument, it forfeits the issue]; *see also Rudick v. State Bd. Of Optometry* (2019) 41 Cal.App.5th 77, 89-90 [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].)

In any event, it is beyond dispute that the Court issued the PI Orders on July 29, 2025; that Sable had knowledge of the Orders; and that Sable has willfully disobeyed the Orders. Nor can it be disputed that Sable had the ability to comply with the Orders. As explained in Petitioners' Supplemental Opposition, Sable has been aware of its obligations under the PI Orders since last July. Sable could have complied with the Orders by pursuing the necessary approvals for restart and by providing the required 10 court days' notice prior to restart. As the Court noted, "Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without *first* providing such adequate notice." (PI Orders, p. 18 [emphasis added].) Petitioners would then have had an opportunity to respond, and *the Court* would have decided whether compliance had been achieved and the PI Orders should be terminated. Sable has not provided any evidence that such compliance was infeasible. To the extent Sable suggests that the Secretary of Energy's March 13, 2026, Defense Production Act Order (the "DPA Order") left it unable to comply—including, even, with the Court's modest requirement to provide notice of restart—Sable is incorrect, as explained at length in Petitioners' Supplemental Opposition and again below. (*See* Petitioners' Supplemental Opposition, pp. 10-12.)

**B.     Sable Does Not Raise Any Valid Defense to Petitioners' Contempt Charge and Requested Relief.**

As noted, Sable does not contest that it willfully and knowingly violated the PI Orders. Instead, Sable's supplemental brief, generously construed, suggests that it was excused from complying with the Orders because (1) Petitioners' claims are moot by virtue of Sable's relinquishment of the State

Petitioners' Combined Reply ISO *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

Waivers; (2) the PI Orders were rendered invalid by the DPA Order; and (3) the equities underlying the PI Orders now weigh in favor of Sable. For the reasons that follow, none of Sable's arguments provide a colorable defense to Petitioners' contempt charge or otherwise excuse Sable's from complying with the PI Orders.

        1.      <u>If Sable Wanted Relief from the PI Orders, Its Recourse Was to Seek Rescission *Before* Restarting the Pipelines, not to Violate the Orders in Open Defiance of this Court's Authority.</u>

As an initial matter, to the extent Sable attempts to collaterally attack the PI Orders *after* violating them—particularly by inviting the Court to reexamine the merits and equities underlying the Orders—it is prohibited from doing so.

"An injunction duly issuing out of a court of general jurisdiction with equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within its jurisdiction, must be obeyed by them however erroneous the action of the court may be . . . ." (*Signal Oil & Gas Co. v. Ashland Oil & Refining Co.* (1958) 49 Cal.2d 764, 776, n. 6 [quoting *Howat v. Kansas* (1922) 258 U.S. 181, 189-190].) "[U]ntil its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." (*Id.* [quoting *Howat*, 258 U.S. at 189-190].) Indeed, "a party may not defy a legally erroneous court order and then challenge it collaterally in proceedings brought to enforce the order." (*City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1080, n. 13 [citing *People v. Gonzalez* (1996) 12 Cal.4th 804, 817].)

The one apparent exception to this is where an order was, at the outset, "made in excess of the court's jurisdiction," (*Carrnshimba*, 215 Cal.App.4th at 1080, n. 13), or was otherwise not "lawfully issued," (*Gonzales*, 12 Cal.4th at 816). In other words, if the PI Orders were not "lawfully issued," i.e., void, as opposed to simply erroneous, that may form a defense to contempt. (*Gonzales*, 12 Cal.4th at 816.) But Sable does not contend that the PI Orders in this case were not "lawfully issued." Nor does it assert that this Court lacked jurisdiction *at the time the PI Orders were issued.* And while it may now believe that a change in circumstances in the interim have rendered the PI Orders invalid, it cannot raise that in defense of Petitioners' contempt charge. Sable's recourse was to present its arguments to the

Petitioners' Combined Reply ISO *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

Court and seek rescission, not to unilaterally disregard this Court's authority and raise them after the fact. (*See Signal Oil & Gas Co.*, 49 Cal.2d at 776, n. 6 [quoting *Howat*, 258 U.S. at 189-190]; *Carrnshimba*, 215 Cal.App.4th at 1080, n. 13.)

        2.    <u>Sable's Purported Relinquishment of the State Waivers Does Not Invalidate the PI Orders.</u>

Sable suggests that it was excused from complying with the PI Orders by virtue of its relinquishment of the State Waivers, which it contends has rendered Petitioners' claims moot. Notwithstanding that this is improper to raise in defense to a contempt charge (see above), Sable is incorrect.

As explained at length in Petitioners' Supplemental Opposition, (*see* pp. 15-18), simply because a project approval has been rescinded—or in this case, relinquished—does not in itself render a case moot. (*See Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 873; *see also Friends of the Eel River v. North Coast Railroad Authority* (2014) 178 Cal.Rptr.3d 752, 767, *rev'd on other grounds*, 3 Cal.5th 677 (2017).) The pertinent inquiry in such circumstances is whether the project applicant has *abandoned* the project; if not, it may still be possible, as here, for the court to grant effective relief to petitioners. (*E.g., City of Lodi*, 144 Cal.App.4th at 873.)

Sable has, quite obviously, *not* abandoned the project challenged in this matter—restarting the Pipelines—and is instead pursuing it at all costs. And while Sable may prefer otherwise, it still needs approvals from the Office of the State Fire Marshal (OSFM) to pursue the project, as expressly required by the Consent Decree, and as this Court has already recognized. (February 27, 2026, Minute Order, p. 9 ["[T]he Federal Consent Decree by its terms requires authorization from OSFM"].) Because Petitioners' challenge here asks for declaratory relief regarding what process OSFM must follow in issuing those approvals, and regarding the corollary rights of Petitioners to participate in that process, this Court can still afford effective relief to Petitioners notwithstanding Sable's purported relinquishment of the State Waivers. In other words, so long as the Consent Decree—which compels Sable to proceed through OSFM—remains in effect, and Sable has not abandoned its efforts to restart and operate the Pipelines, the relief requested by Petitioners will have a "practical impact" on OSFM's review, and thus their claims are not moot. (*Woodward Park Homeowners Ass'n v. Garreks, Inc.* (2000) 77 Cal.App.4th 880,

5

Petitioners' Combined Reply ISO *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

888; s*ee Lodi*, 144 Cal.App.4th at 873; *Friends of the Eel River*, 178 Cal.Rptr.3d at 767.)

Sable tries to escape this inevitability by suggesting that Petitioners are improperly attempting to enforce the Consent Decree in this action, which, in its view, is an "extra-jurisdictional" matter that the Court should not engage in. Petitioners are not asking the Court to enforce the Consent Decree. Petitioners merely ask this Court to afford full faith and credit to the Consent Decree— a final judgment (*see Mi Familia Vota v. Fontes* (9th Cir. 2025) 129 F.4th 691, 717–18)—by recognizing that the plain language of the Consent Decree compels Sable to proceed with its restart project through OSFM. And indeed, the Court has already done so. (*See* February 27, 2026, Minute Order, p. 9 ["[T]he Federal Consent Decree by its terms requires authorization from the OSFM"].)[1]

Ironically, what would be "extra-jurisdictional" is for the Court to simply ignore the Consent Decree, as Sable urges it to do, which would have the practical effect of setting aside a binding federal court judgment. Whether the Consent Decree can be set aside or modified is a question for the federal district court that retains jurisdiction over the decree. And, as of March 30, 2026, that question is pending in that court, though not with great urgency: the United States has noticed the issue for a hearing in June. (*See* Motion for Order for Termination or Modification, Dkt. No. 49, *United States v. Plains All American*, No. 2:20-cv-02415 (C.D. Cal.).)

Moreover, it should not be lost on this Court that Sable has itself recognized the effect of the Consent Decree on multiple occasions. (*See, e.g.,* Sable's Opposition to Application for Preliminary Injunction, p. 8 ["The Consent Decree imposes a series of prerequisites that the operator must satisfy before restarting the Pipelines, including 'appl[ying] for a State Waiver *through the OSFM*'" . . . .] [emphasis added].) But more importantly, Sable has also substantively relied on it, including in opposing the very PI Orders at issue. (*See id.* at 18 ["The federal Consent Decree precludes Petitioners from asserting that they will be irreparably harmed by the restart of the pipelines."].) Thus, to the extent Sable now disclaims the binding effect of the Consent Decree, it is estopped from doing so. (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 ["Judicial estoppel prevents a party from

---

[1] For the same reason, Sable's reliance on the "doctrine of exclusive concurrent jurisdiction" is misplaced. Petitioners are not litigating the same claims here that are presented in the Consent Decree case (or any other case Sable cites). Nor could they, as Petitioners are not a party to the Consent Decree.

asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. The doctrine serves a clear purpose: to protect the integrity of the judicial process"] [quoting *Cleveland v. Policy Management Systems Corp.* (5th Cir.1997) 120 F.3d 513, 517].)

In sum, so long as OSFM has oversight over the restart project at issue—either via the Consent Decree or by virtue of the Pipelines' intrastate status—and Sable has not abandoned its efforts to restart and operate the Pipelines, Petitioners' claims are not moot and Sable's purported relinquishment of the Waivers is of no moment.[2]

### 3.    The PI Orders are Not Preempted by the DPA Order.

Next, Sable again argues that the DPA Order preempts the PI Orders and thus renders them invalid. This argument, too, improperly relies on intervening events to defend against Petitioners' contempt charge; it has no bearing on whether, at the time the Court issued the PI Orders, it did so unlawfully or in excess of its jurisdiction. (*See Carrnshimba*, 215 Cal.App.4th at 1080, n. 13; *Signal Oil & Gas Co.*, 49 Cal.2d at 776, n. 6 [quoting *Howat*, 258 U.S. at 189-190].) But even if the Court were to consider it, the Court should roundly reject the tenuous and unfounded theory of preemption that Sable advances.

To begin, Petitioners are obliged to address Sable's mischaracterization of the DPA Order, and to lay bare the ruse that it is.

First and foremost, the DPA Order was issued at *Sable's* behest, after months of solicitation, for one reason: Sable's "view" that an order requiring restart would excuse its compliance with the Consent Decree and any conflicting state laws. (Sable's Ex Parte Application, p. 6.) Undersigned counsel are not aware of any other instance where a private party solicited an order from the federal government under the DPA. That is likely because an order issued under the DPA is intended to be a *burden* on an affected party. Its use here, to confer on Sable a purported *benefit*, is fundamentally at odds with the DPA's

---

[2] Consent Decree aside, so long as OSFM separately retains oversight of the Pipelines by virtue of their *intra*state status, Sable is required to obtain State Waivers from OSFM to operate without effective cathodic protection. (*See* 49 U.S.C. § 60105(a) [states with valid certifications, like California, have exclusive regulatory jurisdiction over intrastate pipelines]; 49 U.S.C. § 60118(d) [where a pipeline is under exclusive state jurisdiction, waivers of pipeline safety regulations must be obtained from state authorities].)

Petitioners' Combined Reply ISO *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

statutory scheme; hence, unsurprisingly, the DPA Order exceeds the scope of authority delegated under the DPA, and it does not have the preemptive effect Sable claims. Nonetheless, beginning the day after the DPA Order was issued, Sable began wielding it as a blank check to disregard state (and even federal) requirements standing as impediments to restart of the Pipelines, including this Court's PI Orders.

Now, as Sable tells it, the DPA Order "commanded Sable to commence the flow of crude oil through the [Pipelines]." (Sable Ex Parte Notice, p. 4.) But the Order does not, in fact, direct Sable to commence the "flow" of anything. All it does is instruct Sable "to immediately *prioritize* and *allocate* pipeline transportation services for hydrocarbons from the [Santa Ynez Unit] through the [Pipelines]." (Dintzer Decl., Exh. B at 3 [emphasis added].) Indeed, the Secretary conspicuously stopped short of "requiring" Sable to restart the Pipelines, as Sable had apparently requested.

Turning to the merits of Sable's preemption theory, Petitioners have addressed Sable's arguments at length in their Supplemental Opposition. (*See* Supplemental Opposition, pp. 8-15.) However, to briefly summarize, the PI Orders, like Petitioners' claims, flow from a federal Consent Decree that requires Sable to obtain approvals from OSFM before restarting the Pipelines, as this Court has recognized. (February 27, 2026, Minute Order, p. 9.) The DPA Order does not displace the Consent Decree, which remains binding on Sable. Whatever conflict remains is one between federal authorities that are incapable of preempting one another. And so long as that conflict persists, this Court's PI Orders remain consistent with federal law and cannot be preempted.

But even if the Court were to nonetheless delve into the potential preemptive effect of the DPA Order, it would find none, for at least two reasons. First, it is not impossible for Sable to comply with both this Court's PI Orders and the DPA Order, as Sable suggests. (*See* Supplemental Opposition, pp. 10-12.) Second, even if it were, that would not end the inquiry: for the DPA Order to preempt state law, Sable must show that Congress clearly and manifestly intended to delegate the power (1) to issue an order of this nature, unprecedented under the DPA, *and* (2) to override state law requirements. (*See* *Wyeth v. Levine* (2009) 555 U.S. 555, 565 [Courts assume that Congress does not supersede state law unless that is its "clear and manifest" intent.].) Sable has not, and cannot, identify any such clear intent. (*See* Supplemental Opposition, pp. 12-15.)

Accordingly, the DPA Order has no preemptive effect on the PI Orders.

Petitioners' Combined Reply ISO *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

4.    Sable Improperly Attempts to Relitigate the Equities Underlying the PI Orders.

Sable devotes much of its supplemental brief to rehashing the equities underlying the PI Orders. Its arguments in this regard, and the evidence it submits in support, are wholly irrelevant.[3] The equities here have no bearing on whether Sable should be held in contempt. (*See Carrnshimba*, 215 Cal.App.4th at 1080, n. 13; *Signal Oil & Gas Co.*, 49 Cal.2d at 776, n. 6 [quoting *Howat*, 258 U.S. at 189-190].) Indeed, Sable cannot ignore the PI Orders on the basis that doing so, in its view, is good policy.

In any event, the principle animating the Court's narrow PI Orders remains: there is no harm to Sable so long as it does not have all necessary permits and approvals to restart the Pipelines. (PI Orders, p. 18.) The parade of horribles Sable now complains of in its supplemental brief does not change that calculus. To date, Sable has not obtained all necessary approvals nor provided any notice that it purportedly has done so.

Thus, Sable's invitation to this Court to reweigh the equities here is improper and unavailing. Nevertheless, Petitioners briefly respond to several misleading assertions in Sable's brief.

First, Sable claims that there is no threat of irreparable harm to Petitioners or the public because it restarted the Pipelines without causing a spill. (Sable Supp. Brief, p. 10.) This ignores that the underlying defect in the Pipelines—namely, their lack of effective protection from corrosion—has not been resolved. As pervasive corrosion of the Pipelines continues unabated, the risk of a spill increases with each passing day.

Second, Sable appears to suggest that its restart project was subject to "comprehensive environmental review." (Sable Supp. Brief, p. 10.) It is unclear what environmental review Sable refers to. If Sable is referring to the original 1985 Environmental Impact Report/Environmental Impact Statement (EIR/EIS) prepared for the Pipelines, that review never contemplated operating—or restarting—the Pipelines without effective cathodic protection. Indeed, the 1985 EIR/EIS's analysis of risks and impacts was premised on the Pipelines having an effective cathodic protection system that

---

[3] Nor, as noted at the outset, should these arguments and evidence be considered in the context of Sable's affirmative Application to rescind the PI Orders. They were not presented in Sable's original moving papers, and Petitioners, having already submitted their supplemental opposition, have no chance to respond and submit countervailing evidence.

9

Petitioners' Combined Reply ISO *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

would prevent external corrosion and, thus, minimize the risk of an oil spill. As we now know, by flaw of design, the system is not effective on the Pipelines, leaving them vulnerable to pervasive, progressive corrosion, which is what ultimately caused the 2015 Refugio Oil Spill.

Third, Sable complains that, should it comply with the Court's PI Orders, it would have to violate the DPA Order, which may subject it to criminal and civil penalties. As explained above and in Petitioners' Supplemental Opposition, Sable can readily comply with both the Court's PI Orders and the DPA Order and, in any event, Sable need only comply with the DPA Order "to the fullest extent possible." (10 C.F.R. § 217.55.) Moreover, any risk of penalties is a problem of Sable's own making: Sable, again, solicited the DPA Order knowing full well it was enjoined by this Court's PI Orders.

**C.    Sable Does Not Address Petitioners' Request for Immediate Enforcement of the PI Orders.**

Lastly, Sable makes no argument as to why, if this Court finds Petitioners have established a prima facie case for contempt, it should not issue an order appurtenant to the PI Orders directing Sable to immediately shut down and cease operating the Pipelines.

Sable's open defiance of the PI Orders poses an immediate and exigent threat to the public, the environment, and to law and order, and thus warrants immediate enforcement measures from the Court to deter continued violation. (Code Civ. Proc. § 525 [an injunction "may be enforced as an order of the court"]; *Conn v. Superior Court* (1987) 196 Cal.App.3d 774, 785 ["[T]he court has the inherent power to control the proceedings before it and to make orders which prevent the frustration, abuse, or disregard of the court's processes."].) For the reasons expressed in Petitioners' Application, Petitioners request that the Court exercise its inherent authority to issue an order directing Sable to immediately shut down and cease operating the Pipelines until it has all necessary approvals to restart and provides 10 court days' notice of its intent to do so, as required by the PI Orders.

**III.    CONCLUSION**

For over two years, Sable has routinely disregarded all manner of state laws and agency directives, resulting in monetary penalties (that it refuses to pay), multiple lawsuits, and felony criminal charges. Now, Sable has somehow managed to descend even deeper into lawlessness by willfully violating this Court's PI Orders and upending all norms of judicial process. The gravity of its conduct

cannot be overstated, and it must be met in equal force by severe and immediate action from the Court whose authority it has openly flouted.

Petitioners request that the Court issue an Order to Show Cause directing Sable to show why it should not be found in contempt of this Court's PI Orders. Additionally, Petitioners' request that the Court simultaneously issue an enforcement order requiring Sable to immediately shut down operations, and, should it do so, order Sable to show cause why it is not in contempt of that order.

Dated: April 8, 2026

Respectfully submitted,

/s/ Linda Krop
Linda Krop
Jeremy Frankel
ENVIRONMENTAL DEFENSE CENTER
906 Garden St.,
Santa Barbara, CA 93101
Tel. (805) 963-1622

*Attorneys for Petitioners Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

/s/ Talia Nimmer
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

11

Petitioners' Combined Reply ISO *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On April 8, 2026, I served the above document(s) described as **PETITIONERS' COMBINED REPLY IN SUPPORT OF EX PARTE APPLICATION FOR ENFORCEMENT OF PRELIMINARY INJUNCTION AND FOR AN ORDER TO SHOW CAUSE WHY REAL PARTIES IN INTEREST SHOULD NOT BE FOUND IN CONTEMPT OF COURT** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒ **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 8, 2026, at Santa Barbara, California.

_____
Jeremy M. Frankel

Proof of Service

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR<br>RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

Petitioners' Combined Reply ISO *Ex Parte* Application for Enforcement of Preliminary Injunction and OSC re: Contempt

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
4/8/2026 6:39 PM
By: Narzralli Baksh , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA BARBARA

CENTER FOR BIOLOGICAL DIVERSITY
and WISHTOYO FOUNDATION,

            Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF
FORESTRY AND FIRE PROTECTION;
OFFICE OF THE STATE FIRE MARSHAL;
DANIEL BERLANT, in his official capacity
as State Fire Marshal; and DOES 1 through
10; inclusive,

            Respondents/Defendants.

Case No.: 25CV02244
[Consolidated with 25CV02247]

**REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S SUPPLEMENTAL REPLY IN SUPPORT OF *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER**

Date:    April 17, 2026
Time:    10:00 a.m.
Dept.:    4

Complaint Filed: April 15, 2025



[Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4]

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

REAL PARTIES IN INTERESTS SUPPLEMENTAL REPLY IN SUPPORT OF *EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Petitioners' and OSFM's Oppositions[1] to Sable's *Ex Parte* Application present a legal chameleon, transforming Sable's request to dissolve the Preliminary Injunction based on inoperative State Waivers into a sideshow about the validity of the DPA Order, enforceability of the Consent Decree, and OSFM's attempts to reclaim jurisdiction over the Santa Ynez Pipeline System. But neither "familiarity with the ongoing proceedings" nor "experience and competence" (see OSFM Opp. at p. 8) vest this Court with jurisdiction to hear and decide matters that are outside the four corners of the Petitions and outside the basis for the Preliminary Injunction. The only question before this Court is whether an injunction premised on State Waivers that no longer have any effect must completely yield to a conflicting federal executive mandate directing Sable to immediately flow oil through the Santa Ynez Pipeline System. For the reasons set forth in Sable's *Ex Parte* Application, Supplemental Brief, and below, the answer can only be yes.

**A. This Court is Not the Venue to Enforce the Terms of the Consent Decree, which the United States has Moved to Terminate.**

Both Petitioners and OSFM ask this Court to make findings regarding the requirement of the Consent Decree and to enforce such requirements against Sable. (Petitioners' Opp. at pp. 1, 7-10, 17-18; OSFM Opp. at pp. 19-20.) But paragraph 97 of the Consent Decree provides that the *Central District* "shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of the Consent Decree." (Stanton Decl., Ex. O [Dintzer Decl. ISO Mot. for Reconsideration], Ex. 1, p. 3, ¶ 97.) Neither Petitioners nor OSFM have pointed to any authority in the Consent Decree or state or federal law that would allow a state court to usurp this exclusive review jurisdiction or make contrary findings.

In fact, the Consent Decree's obligations, the extent to which they apply to Sable, and whether those obligations have been satisfied are actively being considered by the Central District.

[1] This consolidated reply responds to Petitioners' Combined Opposition to Sable's *Ex Parte* Application for Immediate Rescission of Preliminary Injunction and OSFM's Brief on Motions re: Enforcement or Modification of Preliminary Injunction, both filed April 1, 2026, addressing each separately as appropriate.

1

REAL PARTIES IN INTERESTS SUPPLEMENTAL REPLY IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

The United States has moved to terminate the Consent Decree altogether on the basis that the standard for termination has been satisfied, and the State is improperly attempting to use the Consent Decree as a license to impose open-ended obligations "on a nonparty whose conduct is not even the subject of the underlying enforcement action." (See *United States of America et al. v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*; see also Stanton Decl., ¶ 6, Ex. L, p. 12.)

Further, the Central District has already denied the State's request to enforce the Consent Decree against Sable, finding there was "no evidence to support a showing of irreparable prejudice." (Stanton Decl., ¶ 3, Ex. I [State's *Ex Parte* Motion to Enforce Consent Decree]; see also *id.*, ¶ 4, Ex. J [3/23/2026 Minute Order, Case No. 2:20-cv-02415-SVW-SSC, ECF No. 47].)

In attempting to enforce the Consent Decree against Sable here, OSFM continues to confuse the Consent Decree's provisions. Specifically, OSFM argues the Emergency Special Permit is a general operating permit, which Sable currently lacks. (See OSFM Opp. at p. 20 ["But even if exclusive federal jurisdiction over the Pipelines were established, Sable would need a permit from PHMSA, and Sable's Emergency Special Permit from PHMSA expired on February 21, 2026."].) It is not.

Under the Pipeline Safety Act, PHMSA-regulated pipelines (such as the Santa Ynez Pipeline System) are not required to obtain operating permits. (See also 89 Fed. Reg. 99327, 99329 [Dec. 10, 2024 Proposed PHMSA NEPA Implementing Procedures] ["PHMSA does not site, permit, or authorize transportation infrastructure."].) Although 49 U.S.C. 60118(c) authorizes PHMSA to waive compliance with certain standards on an operator-by-operator basis through "special permits," these are not permits to operate or construct a pipeline. Rather, they are intended to provide relief from otherwise applicable safety standards and flexibility where the operator can show that it will implement alternative standards that achieve an equivalent or greater level of safety as required in 49 CFR Part 195. Sable is currently working with PHMSA on additional operating conditions and has committed to following the conditions of the Emergency Special

REAL PARTIES IN INTERESTS SUPPLEMENTAL REPLY IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Permit in the interim. (See Stanton Decl., Ex. O [Dintzer Decl. ISO Mot. for Reconsideration], Ex. 4.) In any event, it is not for this Court to clear the State's confusion. Any dispute as to the terms of the Consent Decree or their applicability to a non-party, Sable, are solely within the purview of the Central District.

In short, Petitioners' and OSFM's request to continue the Preliminary Injunction are a camouflaged motion to enforce the Consent Decree, which this Court does not have the jurisdiction to hear or grant. Because the requirements of the Consent Decree (including any requirements related to special permits) are under the exclusive review jurisdiction of the Central District, which has determined there is no justification for preliminary relief and is actively considering the United States' termination request, this Court should not use the Preliminary Injunction as a mechanism to enforce the Consent Decree.

**B.  The Preliminary Injunction is Preempted and Invalidated, and Therefore Cannot Be Stayed.**

The Preliminary Injunction must be dissolved, not simply stayed. Petitioners and OSFM have no authority for a stay when a court's injunction has been preempted by federal law. To the contrary, the controlling authorities hold that such an injunction is void and must be rescinded. By staying the Preliminary Injunction, the Court would be exercising jurisdiction it no longer retains where federal agencies and the President of the United States have interceded. That posture is untenable, both factually and legally. Further, a stay would be futile because, as discussed in greater detail below in Section C, Petitioners' claims challenging the State Waivers—which are the bases for the Preliminary Injunction—are moot.

The Preliminary Injunction enjoins restart of Segments CA-324 and CA-325 based upon the universe of jurisdictional facts at the time—which involved State Waivers issued pursuant to OSFM's regulatory purview over those pipeline segments. This Court's order granting the Preliminary Injunction is instructive: "As discussed below, because ***the petitions focus on deficiencies in the State Waivers as issued by OSFM*** and because additional approvals are

REAL PARTIES IN INTERESTS SUPPLEMENTAL REPLY IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

required before the pipelines **subject to the State Waivers** may be restarted, the court finds that no party has made a strong showing that it would suffer greater harm by the erroneous grant or denial of the preliminary injunction." (July 29, 2025 Order, at p. 17, emphasis added.) But Segments CA-324 and CA-325 are now under PHMSA's exclusive federal jurisdiction as portions of a single interstate pipeline that has successfully resumed oil transportation under PHMSA's supervision.

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States," as well as the Constitution and treaties, "shall be the supreme Law of the Land," notwithstanding "any Thing in the Constitution or Laws of any State to the Contrary." (U.S. Const. art. VI, cl. 2.) Where state law conflicts with federal law, either directly or implicitly, federal law must prevail under this constitutional hierarchy. And "when a regulated party cannot comply with both federal and state directives, the Supremacy Clause tells us the state law must yield." (*Martin v. United States* (2025) 145 S. Ct. 1689, 1700.)

OSFM argues that "there is no deference to the federal government on questions of preemption." (OSFM Opp. at p. 8.) But the Supreme Court of the United States is indisputably the ultimate authority on matters of federal preemption, and federal courts in general have Article III powers to revise the judgments of state courts on matters of federal law. (See *Martin v. Hunter's Lessee* (1816) 14 U.S. 304, 344.) The Supreme Court has "identified three different types of preemption – conflict, express, and field – but all of them work in the same way." (*Murphy v. Nat'l Collegiate Athletic Ass'n* (2018) 584 U.S. 453.) Where federal law "imposes restrictions or confers rights on private actors" and "a state law confers rights or imposes restrictions that conflict with the federal law[,]" "the federal law takes precedence and the state law is preempted." (*Ibid*.) Here, a federal executive order mandates precisely what a state injunction restricts. The DPA Order therefore takes precedence, and the Preliminary Injunction is preempted and must be rescinded.

The Preliminary Injunction must also dissolve because it cannot be carried into execution and is therefore invalid. In *Pennsylvania v. Wheeling & Belmont Bridge Co.*, the construction of a bridge had been enjoined. (See (1856) 59 U.S. 421, 436 ("*Pennsylvania*").) Thereafter, Congress

enacted a statute declaring the bridge lawful. Faced with that intervention, the Supreme Court held that the injunction "could not [ ] be carried into execution," **and ordered "the injunction dissolved."** (*Pennsylvania*, *supra*, 59 U.S. at pp. 436-37, emphasis added.) When the legal predicate for an injunction has disappeared, the injunction has "no current validity, **and must be set aside."** (*Tully v. Mobil Oil Corp.* (1982) 455 U.S. 245, 247, emphasis added; see also *McGrath v. Potash* (D.C. Cir. 1952) 199 F.2d 166, 168 [explaining that where the legal basis of an injunction has disappeared, **"the injunction should be vacated"**], emphasis added.)  Similarly, in *Takeda v. Northwest National Life Insurance Co.*, where a court was divested of jurisdiction over a matter, the Ninth Circuit held that the lower court must **"vacate its orders, [] dissolve [its] injunction** . . . and [] remand."** ((9th Cir. 1985) 765 F.2d 815, 822, emphasis added.)

California echoes this analysis. *In re Berry* holds that "the violation of an order in excess of the jurisdiction of the issuing court cannot produce a valid judgment of contempt," and that acts in excess of jurisdiction include "any acts which exceed the defined power of a court in any instance." ((1968) 68 Cal. 2d 137, 147; see also *People v. Gonzalez* (1996) 12 Cal. 4th 804, 823 [holding that "there can be no contempt of a void injunctive order"].)

The same logic controls here. Because the DPA Order preempts the state-law restraint embodied by the Preliminary Injunction, the Court cannot solve that conflict by staying execution of the injunction. The Court must immediately terminate the Preliminary Injunction.

Petitioners also cannot use this litigation to collaterally attack the validity of the DPA Order. The State has already sued the U.S. Secretary Energy in the Central District, challenging the legality of the DPA Order. (See *State of California v. Wright*, Case No. 2:26-cv-336.) The Central District—not this Court—is the appropriate venue for resolution of that issue.

Moreover, Sable's timely compliance with the DPA Order does not weigh against lifting the Preliminary Injunction. Sable was directed by a federal executive mandate to immediately begin the flow of hydrocarbons through the Santa Ynez Pipeline System, with which it promptly complied. The DPA Order was issued on March 13, 2026 at approximately 4:20 p.m. PST, and

REAL PARTIES IN INTERESTS SUPPLEMENTAL REPLY IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

Sable flowed oil through Segments CA-324 and CA-325 under PHMSA's oversight the following day.[2] (Stanton Decl., Ex. M [Hubbard Decl.], ¶¶ 14-33.) Petitioners attempt to litigate the meaning of the word "immediately" to introduce ambiguity where none exists. The term should be given its ordinary meaning, which is "[w]ithout any delay or lapse of time; instantly, directly, straightaway; at once."[3] Not "weeks or months." (See Petitioners' Opp. at p. 11.) But the question before this Court is not whether "immediately" means immediately. Rather, it is whether an injunction based on State Waivers that no longer have any effect can continue in direct contrast with a supreme federal directive. The answer is no.

### C.  Petitioners' Claims are Moot.

Finally, Petitioners and OSFM attempt to argue this case is not moot because Sable has not abandoned the Santa Ynez Pipeline System, citing to authorities interpreting when a CEQA challenge becomes moot. (See *id.* at pp. 15-18; OSFM Opp. at p. 21.) But the Preliminary Injunction enjoins restart pursuant to the State Waivers, not CEQA approvals.

In fact, this Court has already determined the State Waivers are not a "project" under CEQA. (See July 29, 2025 Order at p. 9 ["The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval. (Cal. Code Regs., tit. 14, § 15378, subd. (c).) Under this definition, the issuance of the State Waivers does not appear to constitute a 'project' separately subject to CEQA review."].) This Court further found Petitioners were not likely to succeed on the merits on their CEQA claims: "However, this analysis, like the

---

[2] OSFM misrepresents the timing of Sable's *ex parte* notice. (See OSFM Opp. at p. 1 ["Sable restarted the Las Flores Pipelines on March 14, 2026 without first providing the ten-day notice that the injunction required, and then three days later gave notice of its Ex Parte Application."].) Sable first gave notice of its *Ex Parte* Application on March 13, 2026 at 9:54 a.m. to be heard on Monday, March 16, 2026 at 8:30 a.m. then subsequently withdrew its notice at 2:30 p.m. (See Dintzer Decl., Ex. C.) Following the issuance of the DPA Order later that afternoon, Sable re-noticed its *Ex Parte* Application on Saturday, March 14, 2026 for Tuesday, March 17, 2026, the next available court date. (*Ibid.*)

[3] Oxford English Dictionary (3d Ed. 1989).

---

REAL PARTIES IN INTERESTS SUPPLEMENTAL REPLY IN SUPPORT OF
*EX PARTE* NOTICE OF DEFENSE PRODUCTION ACT ORDER

discussion above, is an analysis of a 'project,' and in particular the restart of pipeline operations as compared with the State Waivers at issue here. The court concludes that, in the present administrative posture, petitioners are not likely to succeed on the merits of showing a violation of CEQA." (July 29, 2025 Order at p. 12.)

Once PHMSA assumed jurisdiction over the Santa Ynez Pipeline System and revoked OSFM's regulatory authority, the State Waivers became ineffective and Sable relinquished them. (See Dintzer Decl., ¶ 6, Ex. E; see also Stanton Decl., ¶ 5, Ex. K.) In the CEQA mootness cases cited by Petitioners and OSFM, rescission of the CEQA approvals at issue did not moot the case because the same underlying project approval process remained subject to judicial correction through CEQA remedies. Here, by contrast, the State Waivers did not constitute a "project" under CEQA, and once Sable relinquished the challenged State Waivers, there was no longer any state action for the Court to review because the State Waivers have been surrendered. The CEQA cases are thus inapposite, and this Court should not consider their applicability here.

## I.      CONCLUSION

The Preliminary Injunction must be rescinded because it (1) directly conflicts with the DPA Order and is therefore preempted and invalid; and (2) rests on a moot controversy. This Court is the wrong forum, and the Preliminary Injunction is the wrong vehicle by which to adjudicate all of Petitioners' and OSFM's other complaints.

DATED:  April 8, 2026                              Respectfully submitted,

**ALSTON & BIRD, LLP**

By: _____
                                                        Jeffrey D. Dintzer

Attorneys for Real Parties in Interest
**SABLE OFFSHORE CORP. and PACIFIC
PIPELINE COMPANY**

---

7

**PROOF OF SERVICE**

I, **Josie Cisneros**, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On April 8, 2026, I served the document(s) **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S SUPPLEMENTAL REPLY IN SUPPORT OF EX PARTE NOTICE OF DEFENSE PRODUCTION ACT ORDER** on the interested parties stated below, by the following means of service:

**See Attached Service List**

☐    (BY U.S. MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for mailing with the United States Parcel Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

☐    (BY FACSIMILE)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☐    (BY OVERNIGHT MAIL)  I am personally and readily familiar with the business practice of Alston & Bird LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on April 8, 2026, at Los Angeles, California.

/s/   *Josie Cisneros*_____
Josie Cisneros

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102 | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire* |

| Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
|---|---|

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

Dated and Entered:  04/17/2026                             Time:  10:00 AM
Judicial Officer:      Donna D Geck
Deputy Clerk:        Preston Frye                           Dept:  SB Dept 4
Bailiff/Court Officer:  Eduardo Munoz                  Case No: 25CV02244
Court Reporter:      Michele McNeil

---

**Center for Biological Diversity  et al vs California Department of Forestry and Fire Protection  et al**

Parties Present:
Dintzer, Jeffrey D              Attorney for Real Parties in Interest
Dorsi, Michael S               Attorney for Respondents
Krop, Linda J                   Attorney for Petitioners Environmental Defense Center, Get Oil Oult!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center
Large, Trevor                  Attorney for Real Parties in Interest
Stanton, Garrett B            Attorney for Real Parties in Interest
Nimmer, Talia                 Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation
Frankel, Jeremy              Attorney for Petitioners Environmental Defense Center, Get Oil Outt!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center
Simmonds, Julie Teel       Attorney for Petitioner (via Zoom)
Roessler, Alicia               Attorney for Respondents

---

**NATURE OF PROCEEDINGS*:*  Ex Parte Hearing re Application for Enforcement of Preliminary Injunction and for an Order to Show Cause Why Real Parties in Interest Should not be Found in Contempt of Court; Ex Parte Hearing re Request for Immediate Recission of Preliminary Injunction**

The matter was called with appearances as stated above.

Mr. Dintzler, Mr. Dorsi, and Ms. Krop provided oral argument as to the Court's Tentative Ruling.

At the conclusion of oral argument, the Court adopted its Tentative Ruling as follows:

# Tentative Ruling

1. (1)      For the reasons set forth herein, the motion of real parties in interest Sable Offshore Corp. and Pacific Pipeline Company to dissolve or modify the preliminary injunction issued in this case is denied.
2. (2)      The application of petitioners for issuance of an order to show cause why real parties should not be found in contempt and to enter additional orders is continued to May 22, 2026.

These are two consolidated cases involving the same underlying incidents and activity.

---

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

The court has reviewed all of the papers filed by the parties in reaching this decision. The discussion below provides background to understand the court's reasoning; the discussion is not intended to be a comprehensive summary of the facts or arguments of the parties.
**Background:**

As alleged in the petitioners' respective petitions:

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)
In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (CBD Petition, ¶¶ 59-62; EDC Petition, ¶¶ 85-88 & fn. 3 [the Federal Consent Decree].)

The Federal Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery." (CBD Petition, ¶ 60.) The Federal Consent Decree also expressly required that prior to any restart, the operator

"shall apply for a State Waiver through [OSFM] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [OSFM] prior to restarting." (CBD Petition, ¶ 61.) The Federal Consent Decree stated that OSFM has the discretion to require additional terms and conditions if it grants any request for a State Waiver. (CBD Petition, ¶ 62.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

---

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)
On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (EDC Petition, ¶ 115; CBD Petition, ¶ 71.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (EDC Petition, ¶ 117.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for July 18, 2025.

On July 8, 2025, Sable filed demurrers and motions to strike as to the CBD Petition and EDC Petition, all noticed for hearing on September 19, 2025.

On July 18, 2025, the court granted in part petitioners' applications for issuance of preliminary injunctions.

On July 29, 2025, the court entered its written orders granting preliminary injunctions. The orders provide:

"The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has

received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction." (Order, filed July 29, 2025, exhibit A.)

On August 27, 2025, petitioners filed their motions to bifurcate "procedural" from "substantive" claims.

On September 8, 2025, Sable withdrew their demurrers and motions to strike. On September 17, 2025, Sable filed their answers to the petitions, admitting and denying allegations in the petitions and asserting 25 (in answer to the CBD Petition) and 19 (in answer to the EDC Petition) affirmative defenses.

On September 19, 2025, the court denied the motions to bifurcate.

On December 2, 2025, on the stipulation of the parties, the court entered its order consolidating both cases with case No. 25CV02244 as the lead case.

On January 5, 2026, Sable filed their motion for reconsideration of the preliminary injunction. The basis for this motion was the assertion of jurisdiction over the Las Flores Pipelines by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA).

On February 27, 2026, the court denied Sable's motion for reconsideration.

On March 16, 2026, petitioners filed their ex parte application for an order to show cause (OSC) why Sable should not be held in contempt for violating the preliminary injunction. Also on March 16, Sable filed their ex parte application for an order dissolving the preliminary injunction.

The court held a hearing on the two ex parte applications on March 17, 2026. Noting that the two applications raised issues too complex reasonably to address at an ex parte hearing, the court continued the hearing on both applications to this hearing date of April 17, allowing all parties to file supplemental briefs.

The parties have filed extensive papers both in connection with the original applications and as supplemental briefing.

**Analysis:**

(1)    Requests for Judicial Notice

In support of its application, Sable requests that the court take judicial notice of the following documents: (Sable Request for Judicial Notice, filed Mar. 16, 2026 [Sable RJN], exhibit A) the Pipeline Capacity Prioritization and Allocation Order, dated March 13, 2026; and (exhibit F) Executive Order No. 14391 (91 Fed.Reg. 13199 (Mar. 13, 2026)).
In further support of its application, Sable also requests that the court take judicial notice of the following documents: (Sable Second Request for Judicial Notice, filed Apr. 1, 2026 [Sable RJN2], exhibit H) Executive Order No. 14156 (90 Fed.Reg. 8433 (Jan. 20, 2025)); and (exhibit J) a minute order, dated

March 23, 2026, in *United States v. Plains All American Pipeline L.P.*, United States District Court for the Central District of California, case No. 2:20-cv-02415-SVW-SSC.

The court will grant judicial notice as to these documents, all of which constitute court records or official acts. (See Evid. Code, § 452, subds. (c), (d).) Judicial notice does not extend to the truth of factual matters set forth in such documents. (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 120; *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)

(2)    Application to Dissolve Preliminary Injunction

"In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

The party seeking modification or dissolution of an injunction bears the burden to show that changed circumstances justifies modification or dissolution of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

Sable argues that the order of the Secretary of Energy (Sable RJN, exhibit A) constitutes a material change justifying dissolution of the preliminary injunction order.

(A)    Prior Ruling on Preliminary Injunction and Subsequent Events

The court need not here repeat the background and analysis set forth in the court's July 2025 ruling granting plaintiffs' applications for preliminary injunction, which ruling is incorporated by this reference. However, it is useful to highlight past events reflected in the court's record in order to evaluate Sable's motion for dissolution.

In ruling on plaintiffs' applications for preliminary injunction, the court did not find that plaintiffs had made a sufficient evidentiary showing of a likelihood of success on the merits of plaintiffs' causes of action except as related to the State Fire Marshal's findings under the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51010 et seq.).

In opposing the issuance of the preliminary injunction, Sable and OSFM argued that much, if not all, of plaintiffs' claims of harm were premature because those claims depended upon the restart of the Las Flores Pipelines and that multiple approvals were necessary before such restart. As argued by Sable in that opposition:

"Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition re Preliminary Injunction, filed July 8, 2025, at p. 19.)

Accepting this argument in part, the court granted the preliminary injunction narrowly. As the court stated in its July 18 ruling:

"As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to

address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

"Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. 'Restart' shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

"Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits." (Minute Order, filed July 18, 2025, at pp. 13-14.)

Sable has not filed and served a notice under the existing terms of the preliminary injunction to restart the Las Flores Pipelines.

Subsequent to the court's grant of the preliminary injunction, the PHMSA has asserted that the Las Flores Pipelines constitute an interstate pipeline subject to PHMSA's exclusive jurisdiction. (Flores decl., dated Jan. 5, 2026, ¶ 3 & exhibit A.) The PHMSA further issued their own approvals and an emergency special permit. (Flores decl., dated Jan. 5, 2026, ¶¶ 4-7 & exhibits B, C.) These approvals are the subject of proceedings in the Ninth Circuit Court of Appeals, which has not issued a final ruling. (OSFM RJN, filed Feb. 13, 2026, exhibit A; Simmonds decl., dated Jan. 6, 2026, ¶¶ 7-11 & exhibits F-J.)

In denying Sable's request for reconsideration or for modification or dissolution of the preliminary injunction on the grounds of the PHMSA actions, the court stated:

"Sable argues that because the PHMSA has asserted exclusive jurisdiction over the Las Flores Pipelines, the preliminary injunction issued by this court has been preempted. Acknowledging that preemption issues are being resolved in other jurisdictions, including the Ninth Circuit Court of Appeals, OSFM and Petitioners argue that, at least until there is binding authority otherwise, this court is bound by the terms of the Federal Consent Degree and the preliminary injunction remains on a firm foundation.

"The Federal Consent Decree provides, among other things, that 'Plains must receive a State Waiver from the OSFM prior to restarting Line 901.' (Federal Consent Decree, appen. B, art. I, § 1(A).) While Sable now argues that it is not a party to the proceedings in which the Federal Consent Decree was entered, Sable's authority to operate the Las Flores Pipelines derives from rights obtained by Plains, for which Plains was, and remains, subject to conditions including conditions set forth in the Federal Consent Decree. Sable has not demonstrated any right to operate the Las Flores Pipelines separate from the rights derived from Plains and subject to the Federal Consent Decree. (See, e.g., Federal Consent Decree, art. III, § 4 [obligations binding on successors and assigns].)

"The arguments raised by Sable thus question the continuing authority of the Federal Consent Decree. " 'In a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment. [Citations.] As the high court has recognized, stipulated judgments bear the earmarks both of judgments entered after litigation and contracts derived through mutual agreement: "[C]onsent decrees 'have attributes both of contracts and of judicial decrees'; a dual character that has resulted in different treatment for different purposes." As in [*Firefighters v. City of Cleveland* (1986) 478 U.S. 501 [106 S.Ct. 3063, 92 L.Ed.2d 405]*, the issue before us is "not whether we can label a consent decree as a 'contract' or a 'judgment,' for we can do both." [Citation.]' (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 663–664.)

"For purposes of this discussion, it is sufficient to observe that by the Federal Consent Decree, the Las Flores Pipelines may not be restarted (as defined therein) without obtaining a State Waiver from the OSFM. Thus, the Federal Consent Decree by its terms requires authorization from the OSFM, whether that authorization is couched in regulatory, contract, or collateral estoppel terms. The court is not persuaded on this record that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process.

"As pertinent to the preliminary injunction ruling, Petitioners' actions challenge whether OSFM meets OSFM's statutory and regulatory obligations in providing the authorization directed by the Federal Consent Decree. The court's grant of the preliminary injunction is narrow precisely so that all parties will have the opportunity to put this matter in a procedural posture specific to the circumstances existing when Sable is, by its own reckoning, fully authorized and ready to restart the Las Flores Pipelines. At that time the court can resolve, to the extent necessary, the restart issues presented by the parties without being sidetracked by speculative harms (such as those highlighted previously by Sable) and with the benefit of any then-existing legal developments from the federal courts." (Minute Order, filed Feb. 27, 2026, pp. 8-9.)

After the court denied Sable's application on February 27, the President issued an Executive Order which was followed by an order (DPA Order) from the Secretary of Energy under the Defense Production Act of 1950 (DPA, 50 U.S.C. § 4501 et seq.). Sable's current application is based upon Sable's argument that the DPA Order preempts the preliminary injunction. Petitioners and OSFM dispute the effect of the DPA Order on the preliminary injunction.

      (B)     Defense Production Act

As set forth in the DPA Order: "Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California." (DPA Order, § IV(A).) The authority for this order, and the other orders in the DPA Order, is listed as section 101 of the DPA. (DPA Order, § I.)

Section 101 of the DPA is codified in title 50 United States Code section 4511. (See 64 Stat. 799, ch. 932 (Sept. 8, 1950).)

"The President is hereby authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." (50 U.S.C. § 4511(a).)

"(1)    Notwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders (other than contracts of employment) relating to, materials, equipment, and services in order to maximize domestic energy supplies if he makes the findings required by paragraph (3) of this subsection.

"(2)    The authority granted by this subsection may not be used to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that--

"(A)    such materials, services, and facilities are scarce, critical, and essential--

"(i)    to maintain or expand exploration, production, refining, transportation;

"(ii)    to conserve energy supplies; or

"(iii)    to construct or maintain energy facilities; and

"(B)    maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection.

"(3)    During any period when the authority conferred by this subsection is being exercised, the President shall take such action as may be appropriate to assure that such authority is being exercised in a manner which assures the coordinated administration of such authority with any priorities or allocations established under subsection (a) of this section and in effect during the same period." (50 U.S.C. § 4511(c).)

"No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. No person shall discriminate against orders or contracts to which priority is assigned or for which materials or facilities are allocated under subchapter I of this chapter or under any rule, regulation, or order issued thereunder, by charging higher prices or by imposing different terms and conditions for such orders or contracts than for other generally comparable orders or contracts, or in any other manner." (50 U.S.C. § 4557.)

(C)    Preemption

Sable argues that the DPA Order is inconsistent with the preliminary injunction and therefore the preliminary injunction is preempted by the federal order. "[C]onflict preemption will be found when simultaneous compliance with both state and federal directives is impossible." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.) " ' "[C]ourts are

reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." ' [Citations.]" (*Ibid.*)

In order to consider this issue, it is important to re-emphasize the limited scope of the court's preliminary injunction. The court determined to enter the preliminary injunction based upon its conclusion that the Federal Consent Decree by its terms requires that Sable, whose rights to use the Las Flores Pipelines are derivative of Plains, obtain State Waivers from the OSFM. The entry of the preliminary injunction rested upon noncompliance of the OSFM to the required State Waivers.

By design, performance consistent with the Federal Consent Decree is performance permitted under the preliminary injunction. Correspondingly, there is no conflict between the Federal Consent Decree and the preliminary injunction. The conflict issue raised by Sable is not a conflict between state law and federal law, but a conflict between the DPA Order, as interpreted here by Sable, and the Federal Consent Decree. To the extent that the Federal Consent Decree is binding on the parties, there is no preemption issue.

(D)    DPA Order and the Federal Consent Decree

The parties have informed this court of the multiple actions and proceedings pending in the federal courts regarding the operation of the Las Flores Pipelines, including particularly efforts to modify the Federal Consent Decree. Nonetheless, in the present, the Federal Consent Decree remains a binding determination as to the requirements for operations of the Las Flores Pipelines. Against this legal backdrop, Sable argues that the DPA Order supersedes the requirements of the Federal Consent Decree.

As quoted above, the DPA is concerned with allocation of resources and performance of contracts. This is backed by the immunity provision of section 4557. Two cases are instructive as to the scope of the DPA in the present context, *Hercules Inc. v. U.S.* (Fed. Cir. 1994) 24 F.3d 188 (*Hercules*), affirmed on other grounds (1996) 516 U.S. 417 [116 S.Ct. 981, 134 L.Ed.2d 47], and *U.S. v. Vertac Chemical Corp.* (8th Cir. 1995) 46 F.3d 803 (*Vertac*).

In *Hercules*, plaintiff chemical manufacturers of Agent Orange (a defoliant used for military purposes during the Vietnam War) were involved in numerous tort actions filed by Vietnam veterans and their families alleging that the veterans' exposure to components in Agent Orange caused cancer and other health problems. (*Hercules*, *supra*, 24 F.3d at p. 191.) Following settlement of the tort actions, the plaintiffs brought an action against the United States in the Claims Court seeking indemnification for their respective contributions to the settlement. (*Id.* at p. 193.) The Claims Court held for the United States. (*Id.* at pp. 195-196.) Among other things, the Claims Court "rejected the contention that an implied-in-fact contract indemnification term arose from section 707 of the DPA [now, 50 U.S.C. § 4557], because that section merely 'excuses a Government contractor's breach of its other, non-Government contracts which were adversely affected by the priority given to the Government's procurement demands under the DPA.' [Citation.]" (*Id.* at p. 195.)

In affirming the judgment of the Claims Court, the Federal Circuit in *Hercules* stated:

"The language of section 101(a) [now, 50 U.S.C. § 4511(a)] makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts which are necessary to promote the national defense. Indeed, section 101 is titled 'Priority in contracts and orders.' Although Thompson correctly observes that the statute authorizes the President to compel both contract performance and contract acceptance, section 101(a) expressly states that the granting of such authority is 'for the purpose of assuring ... priority.' Significantly, section 101(a) does not mention either the specific nature of performance under a DPA contract, or the subsequent use of goods produced under such a contract. Therefore, we conclude that, while the risk imposed by section 101(a) does include the possible need of a contractor to break its contracts with third parties in order to give preference to a DPA

contract, it does not include the risk that the product produced under the DPA contract will be inherently unsafe to users.

"Once a contractor has been compelled to accept a national defense contract under section 101(a), section 707 acts to shield the contractor from liability resulting from compliance with that section. At issue in this case is the nature of the liability against which the contractor is shielded.

"As noted above, in complying with DPA section 101(a) a contractor may have to re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA contract. It stands to reason that the protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization. First, it is a settled rule of statutory interpretation that separate provisions of a statute are to be construed and interpreted together and in light of each other to ascertain the true legislative intent. This court has explained:
" [']When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident. This rather straightforward homily is captured in the more pretentious proposition that parts of a statute *in pari materia* must be construed together.[']

"[Citations.] To hold that section 707 protects contractors against a risk which is greater than that created by the statute with which it operates would violate this rule.
"Furthermore, the language of section 707 itself supports the conclusion that the section does not extend the kind of indemnity asserted by Hercules. The second sentence of section 707, which prohibits discrimination 'against contracts to which priority is assigned ...,' reinforces the view that the immunity from suit provided by section 707 does not extend to tort suits in which it is alleged that the item produced by the DPA contractor is inherently unsafe to users. Rather, we conclude that to the extent relevant here, the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed. [Citation.] We also agree with the district court, [citation], that if Congress had intended section 707 to impose upon the government the kind of liability asserted by Thompson, it would have said so in clear and unequivocal terms. [Citation.]" (*Hercules*, *supra*, 24 F.3d at pp. 203–204.)
As explained in *Vertac*, back in 1967, the United States issued a DPA directive ordering a chemical company to accelerate its production and delivery of Agent Orange. (*Vertac*, *supra*, 46 F.3d at p. 807.) As a result, the chemical company devoted all of its efforts at its Jacksonville, Arkansas, facility to producing Agent Orange. (*Ibid*.) The production of Agent Orange produces hazardous waste, which the chemical company buried on-site. (*Ibid*.) Much later, the United States brought a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA, 42 U.S.C. § 9601 et seq.) because of the disposal of waste at the Jacksonville facility. (*Vertac*, *supra*, at pp. 805-806.) Among other things, the District Court held as a matter of law that the chemical company was not entitled to immunity under the DPA. (*Id*. at p. 807.)
On appeal in *Vertac*, the chemical company argued that "the language of § 707 is clear and unambiguous and that nothing in its language supports an interpretation that would exclude [the chemical company's] CERCLA liability, or any other liability, arising out of its performance of the Agent Orange contracts. In response, the United States argues that the language of § 707 is not clear and unambiguous and that the interpretation advanced by [the chemical company] would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." (*Vertac*, *supra*, 46 F.3d at p. 812.)
The *Vertac* court agreed with *Hercules*, *supra*, that " 'the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA.' [Citation.]" (*Vertac*, *supra*, 46 F.3d at p. 812.) The *Vertac* court thus held that the immunity of section 707 did not shield the chemical

company from liability it may have under CERCLA arising out if its performance of the Agent Orange contracts because such immunity would exceed the risk imposed by section 101(a). (*Ibid*.)

In both *Hercules* and *Vertac*, the federal circuit courts held that the scope of immunity under current section 4557 only extends to the risk imposed by section 4511(a) in prioritizing contracts with the United States pursuant to a DPA order. Nothing in section 4511 or, by implication, in section 4557, permits a party subject to a DPA Order to violate other laws, especially including applicable other federal law. Moreover, the reasoning of *Hercules* and *Vertac* strongly implies that the DPA order, by itself, does not permit the violation of applicable state regulatory law—for example, no one suggests that Sable could steal materials or money to fulfill a DPA order without state law consequence under the section 4557 immunity.

There is now, albeit subject to pending proceedings, a binding federal judgment in the Federal Consent Decree which requires favorable action by the OSFM before Sable is permitted to restart the Las Flores Pipelines. As construed by the federal courts, a DPA Order does not by itself permit violation of other federal law to accomplish the goals of the DPA Order. Consequently, in the present procedural posture of the requirements binding on Sable, Sable continues to be obligated to the requirements of the Federal Consent Decree. The DPA Order therefore does not constitute a basis for dissolving or modifying the preliminary injunction.

(E)    Mootness

Sable also argues that this matter, and the preliminary injunction in particular, is moot because Sable has voluntarily relinquished the State Waivers and the preliminary injunction is premised on the procedures involved with the State Waivers. This argument fails to persuade that the preliminary injunction should be dissolved for two reasons. First, Sable admittedly has not abandoned the project of restarting the Las Flores Pipelines. For the reasons explained above, under the Federal Consent Decree, Sable remains required to obtain approvals from the OSFM. In order to implement the restart project consistent with the Federal Consent Decree, the sufficiency of the OSFM's procedures remain at issue. (See *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 872-873 [absent abandonment of project, effective relief may still be awarded].) Sable's argument for mootness depends upon its argument that the OSFM can have no further involvement in the project. Under the current procedural posture of the project, the OSFM remains involved.

Second, in granting the preliminary injunction on a limited basis, the court partially agreed with Sable that much of the basis for petitioners' claims were premature because Sable remained engaged in obtaining authorization required under the Federal Consent Decree. Given the continuing requirements of the Federal Consent Decree and the voluntary relinquishment of the State Waivers by Sable, it is unclear that petitioners' other claims are now premature. Again, Sable's argument begins and ends with state law playing no further part in the project. Since the OSFM is bound by state law procedures, in the present circumstances, essential parts of state procedures are incorporated into the Federal Consent Decree. Sable has not persuasively shown that subsequent events make this matter moot and so warrant dissolution of the preliminary injunction.

(F)    Conclusion

The court is mindful that there are many moving judicial and administrative parts relating to the restart of the Las Flores Pipelines. Sable has not persuaded the court that the DPA Order renders compliance with Federal Consent Decree unnecessary. The Federal Consent Decree requires approvals from the OSFM, which in turn must comply with state procedures in granting such approvals. Sable has not met its burden to show that the preliminary injunction should be dissolved or modified. Sable's motion will therefore be denied.

(3)    Application for Order to Show Cause re Contempt

SC-2411 (Revised July 1, 2013)                **MINUTE ORDER**

As discussed above, the court makes its position clear as to the current vitality of the preliminary injunction in light of recent events. Considering this position, the court is deeply concerned with noncompliance with the preliminary injunction. At the same time, the court is again mindful of the pendency of numerous other proceedings bearing on the Las Flores Pipelines. The court concludes that the most reasonable approach to addressing compliance with the injunction is to continue the hearing on the application for the order to show cause to allow the parties to take whatever steps they deem appropriate based upon this court's conclusions on the status of the preliminary injunction.

*Future Scheduled Hearings:*
May 22, 2026 10:00 AM Ex Parte Hearing
Geck, Donna D- SB Dept 4

ANGELA BRAUN, EXECUTIVE OFFICER          Minutes Prepared by:

_____ Preston Frye _____ , Deputy

SC-2411 (Revised July 1, 2013)              **MINUTE ORDER**

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
4/28/2026 2:52 PM
By: Narzralli Baksh , Deputy

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100
*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

Linda Krop (Bar No. 118773)
lkrop@environmentaldefensecenter.org
Jeremy M. Frankel (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
*Attorneys for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>Respondents/Defendants.<br><br>SABLE OFFSHORE CORP., a Delaware Corporation; PACIFIC PIPELINE COMPANY, a Delaware Corporation; and DOES 11 through 20, inclusive,<br><br>Real Parties in Interest. | Case No.: 25CV02244<br>[Consolidated with Case No. 25CV02247]<br><br>**NOTICE OF ENTRY OF ORDER (1) DENYING REAL PARTIES IN INTEREST'S EX PARTE APPLICATION FOR IMMEDIATE RESCISSION OF PRELIMINARY INJUNCTION AND (2) CONTINUING PETITIONERS' EX PARTE APPLICATION FOR ENFORCEMENT OF PRELIMINARY INJUNCTION AND FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT**<br><br>Date:      April 17, 2026<br>Time:     10:00 a.m.<br>Dept.:    4<br>Judge:   Honorable Donna D. Geck<br><br>Action Filed: April 15, 2025 |

NOTICE OF ENTRY OF ORDER DENYING REAL PARTIES' EX PARTE APPLICATION FOR IMMEDIATE RESCISSION OF PRELIMINARY INJUNCTION AND CONTINUING PETITIONERS' EX PARTE APPLICATION

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the  State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation; and PACIFIC PIPELINE COMPANY, a Delaware Corporation,

Real Parties in Interest.

NOTICE OF ENTRY OF ORDER DENYING REAL PARTIES' EX PARTE APPLICATION FOR IMMEDIATE RESCISSION OF PRELIMINARY INJUNCTION AND CONTINUING PETITIONERS' EX PARTE APPLICATION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Please take notice that on April 17, 2026, the Court entered an order in the above-captioned consolidated matters (1) **DENYING** Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's ("Real Parties") Ex Parte Application for Immediate Rescission of this Court's July 29, 2025, Orders for Preliminary Injunction (the "PI Orders"); and (2) **CONTINUING** Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Center for Biological Diversity, and Wishtoyo Foundation's ("Petitioners") Ex Parte Application to enforce the PI Orders and for an Order to Show Cause why Real Parties should not be found in contempt for violation of the PI Orders.

The order of the Court is attached hereto as **Exhibit A**.

Dated: April 28, 2026                    Respectfully submitted,


/s/ *Linda Krop*
Linda Krop
Jeremy M. Frankel
Tara C. Rengifo
ENVIRONMENTAL DEFENSE CENTER
906 Garden St.,
Santa Barbara, CA 93101
Tel. (805) 963-1622

*Attorneys for Petitioners Environmental Defense Center, Get Out Oil!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

/s/ *Julie Teel Simmonds*
Julie Teel Simmonds
David Pettit
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

# EXHIBIT A

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

Dated and Entered:  04/17/2026                    Time:   10:00 AM
Judicial Officer:      Donna D Geck
Deputy Clerk:         Preston Frye                      Dept:   SB Dept 4
Bailiff/Court Officer:  Eduardo Munoz            Case No: 25CV02244
Court Reporter:       Michele McNeil

---

**Center for Biological Diversity  et al vs California Department of Forestry and Fire Protection  et al**

Parties Present:
Dintzer, Jeffrey D              Attorney for Real Parties in Interest
Dorsi, Michael S               Attorney for Respondents
Krop, Linda J                    Attorney for Petitioners Environmental Defense Center, Get Oil Oult!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center
Large, Trevor                   Attorney for Real Parties in Interest
Stanton, Garrett B             Attorney for Real Parties in Interest
Nimmer, Talia                   Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation
Frankel, Jeremy               Attorney for Petitioners Environmental Defense Center, Get Oil Outt!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center
Simmonds, Julie Teel       Attorney for Petitioner (via Zoom)
Roessler, Alicia                Attorney for Respondents

---

**NATURE OF PROCEEDINGS***:  **Ex Parte Hearing re Application for Enforcement of Preliminary Injunction and for an Order to Show Cause Why Real Parties in Interest Should not be Found in Contempt of Court; Ex Parte Hearing re Request for Immediate Recission of Preliminary Injunction**

The matter was called with appearances as stated above.

Mr. Dintzler, Mr. Dorsi, and Ms. Krop provided oral argument as to the Court's Tentative Ruling.

At the conclusion of oral argument, the Court adopted its Tentative Ruling as follows:

# Tentative Ruling

1. (1)     For the reasons set forth herein, the motion of real parties in interest Sable Offshore Corp. and Pacific Pipeline Company to dissolve or modify the preliminary injunction issued in this case is denied.
2. (2)     The application of petitioners for issuance of an order to show cause why real parties should not be found in contempt and to enter additional orders is continued to May 22, 2026.

These are two consolidated cases involving the same underlying incidents and activity.

---

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

The court has reviewed all of the papers filed by the parties in reaching this decision. The discussion below provides background to understand the court's reasoning; the discussion is not intended to be a comprehensive summary of the facts or arguments of the parties.

**Background:**

As alleged in the petitioners' respective petitions:

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (CBD Petition, ¶¶ 59-62; EDC Petition, ¶¶ 85-88 & fn. 3 [the Federal Consent Decree].)

The Federal Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery." (CBD Petition, ¶ 60.) The Federal Consent Decree also expressly required that prior to any restart, the operator

"shall apply for a State Waiver through [OSFM] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [OSFM] prior to restarting." (CBD Petition, ¶ 61.) The Federal Consent Decree stated that OSFM has the discretion to require additional terms and conditions if it grants any request for a State Waiver. (CBD Petition, ¶ 62.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)
On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (EDC Petition, ¶ 115; CBD Petition, ¶ 71.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (EDC Petition, ¶ 117.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for July 18, 2025.

On July 8, 2025, Sable filed demurrers and motions to strike as to the CBD Petition and EDC Petition, all noticed for hearing on September 19, 2025.

On July 18, 2025, the court granted in part petitioners' applications for issuance of preliminary injunctions.

On July 29, 2025, the court entered its written orders granting preliminary injunctions. The orders provide:

"The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has

received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction." (Order, filed July 29, 2025, exhibit A.)

On August 27, 2025, petitioners filed their motions to bifurcate "procedural" from "substantive" claims.

On September 8, 2025, Sable withdrew their demurrers and motions to strike. On September 17, 2025, Sable filed their answers to the petitions, admitting and denying allegations in the petitions and asserting 25 (in answer to the CBD Petition) and 19 (in answer to the EDC Petition) affirmative defenses.

On September 19, 2025, the court denied the motions to bifurcate.

On December 2, 2025, on the stipulation of the parties, the court entered its order consolidating both cases with case No. 25CV02244 as the lead case.

On January 5, 2026, Sable filed their motion for reconsideration of the preliminary injunction. The basis for this motion was the assertion of jurisdiction over the Las Flores Pipelines by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA).

On February 27, 2026, the court denied Sable's motion for reconsideration.

On March 16, 2026, petitioners filed their ex parte application for an order to show cause (OSC) why Sable should not be held in contempt for violating the preliminary injunction. Also on March 16, Sable filed their ex parte application for an order dissolving the preliminary injunction.

The court held a hearing on the two ex parte applications on March 17, 2026. Noting that the two applications raised issues too complex reasonably to address at an ex parte hearing, the court continued the hearing on both applications to this hearing date of April 17, allowing all parties to file supplemental briefs.

The parties have filed extensive papers both in connection with the original applications and as supplemental briefing.
**Analysis:**

(1)     Requests for Judicial Notice

In support of its application, Sable requests that the court take judicial notice of the following documents: (Sable Request for Judicial Notice, filed Mar. 16, 2026 [Sable RJN], exhibit A) the Pipeline Capacity Prioritization and Allocation Order, dated March 13, 2026; and (exhibit F) Executive Order No. 14391 (91 Fed.Reg. 13199 (Mar. 13, 2026)).
In further support of its application, Sable also requests that the court take judicial notice of the following documents: (Sable Second Request for Judicial Notice, filed Apr. 1, 2026 [Sable RJN2], exhibit H) Executive Order No. 14156 (90 Fed.Reg. 8433 (Jan. 20, 2025)); and (exhibit J) a minute order, dated

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

March 23, 2026, in *United States v. Plains All American Pipeline L.P.*, United States District Court for the Central District of California, case No. 2:20-cv-02415-SVW-SSC.

The court will grant judicial notice as to these documents, all of which constitute court records or official acts. (See Evid. Code, § 452, subds. (c), (d).) Judicial notice does not extend to the truth of factual matters set forth in such documents. (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 120; *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)

(2)    Application to Dissolve Preliminary Injunction

"In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

The party seeking modification or dissolution of an injunction bears the burden to show that changed circumstances justifies modification or dissolution of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

Sable argues that the order of the Secretary of Energy (Sable RJN, exhibit A) constitutes a material change justifying dissolution of the preliminary injunction order.

(A)    Prior Ruling on Preliminary Injunction and Subsequent Events

The court need not here repeat the background and analysis set forth in the court's July 2025 ruling granting plaintiffs' applications for preliminary injunction, which ruling is incorporated by this reference. However, it is useful to highlight past events reflected in the court's record in order to evaluate Sable's motion for dissolution.

In ruling on plaintiffs' applications for preliminary injunction, the court did not find that plaintiffs had made a sufficient evidentiary showing of a likelihood of success on the merits of plaintiffs' causes of action except as related to the State Fire Marshal's findings under the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51010 et seq.).

In opposing the issuance of the preliminary injunction, Sable and OSFM argued that much, if not all, of plaintiffs' claims of harm were premature because those claims depended upon the restart of the Las Flores Pipelines and that multiple approvals were necessary before such restart. As argued by Sable in that opposition:

"Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition re Preliminary Injunction, filed July 8, 2025, at p. 19.)

Accepting this argument in part, the court granted the preliminary injunction narrowly. As the court stated in its July 18 ruling:

"As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to

address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

"Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. 'Restart' shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

"Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits." (Minute Order, filed July 18, 2025, at pp. 13-14.)

Sable has not filed and served a notice under the existing terms of the preliminary injunction to restart the Las Flores Pipelines.

Subsequent to the court's grant of the preliminary injunction, the PHMSA has asserted that the Las Flores Pipelines constitute an interstate pipeline subject to PHMSA's exclusive jurisdiction. (Flores decl., dated Jan. 5, 2026, ¶ 3 & exhibit A.) The PHMSA further issued their own approvals and an emergency special permit. (Flores decl., dated Jan. 5, 2026, ¶¶ 4-7 & exhibits B, C.) These approvals are the subject of proceedings in the Ninth Circuit Court of Appeals, which has not issued a final ruling. (OSFM RJN, filed Feb. 13, 2026, exhibit A; Simmonds decl., dated Jan. 6, 2026, ¶¶ 7-11 & exhibits F-J.)

In denying Sable's request for reconsideration or for modification or dissolution of the preliminary injunction on the grounds of the PHMSA actions, the court stated:

"Sable argues that because the PHMSA has asserted exclusive jurisdiction over the Las Flores Pipelines, the preliminary injunction issued by this court has been preempted. Acknowledging that preemption issues are being resolved in other jurisdictions, including the Ninth Circuit Court of Appeals, OSFM and Petitioners argue that, at least until there is binding authority otherwise, this court is bound by the terms of the Federal Consent Degree and the preliminary injunction remains on a firm foundation.

"The Federal Consent Decree provides, among other things, that 'Plains must receive a State Waiver from the OSFM prior to restarting Line 901.' (Federal Consent Decree, appen. B, art. I, § 1(A).) While Sable now argues that it is not a party to the proceedings in which the Federal Consent Decree was entered, Sable's authority to operate the Las Flores Pipelines derives from rights obtained by Plains, for which Plains was, and remains, subject to conditions including conditions set forth in the Federal Consent Decree. Sable has not demonstrated any right to operate the Las Flores Pipelines separate from the rights derived from Plains and subject to the Federal Consent Decree. (See, e.g., Federal Consent Decree, art. III, § 4 [obligations binding on successors and assigns].)

"The arguments raised by Sable thus question the continuing authority of the Federal Consent Decree. " 'In a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment. [Citations.] As the high court has recognized, stipulated judgments bear the earmarks both of judgments entered after litigation and contracts derived through mutual agreement: "[C]onsent decrees 'have attributes both of contracts and of judicial decrees'; a dual character that has resulted in different treatment for different purposes." As in [*Firefighters v. City of Cleveland* (1986) 478 U.S. 501 [106 S.Ct. 3063, 92 L.Ed.2d 405], the issue before us is "not whether we can label a consent decree as a 'contract' or a 'judgment,' for we can do both." [Citation.]' (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 663–664.)

"For purposes of this discussion, it is sufficient to observe that by the Federal Consent Decree, the Las Flores Pipelines may not be restarted (as defined therein) without obtaining a State Waiver from the OSFM. Thus, the Federal Consent Decree by its terms requires authorization from the OSFM, whether that authorization is couched in regulatory, contract, or collateral estoppel terms. The court is not persuaded on this record that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process.

"As pertinent to the preliminary injunction ruling, Petitioners' actions challenge whether OSFM meets OSFM's statutory and regulatory obligations in providing the authorization directed by the Federal Consent Decree. The court's grant of the preliminary injunction is narrow precisely so that all parties will have the opportunity to put this matter in a procedural posture specific to the circumstances existing when Sable is, by its own reckoning, fully authorized and ready to restart the Las Flores Pipelines. At that time the court can resolve, to the extent necessary, the restart issues presented by the parties without being sidetracked by speculative harms (such as those highlighted previously by Sable) and with the benefit of any then-existing legal developments from the federal courts." (Minute Order, filed Feb. 27, 2026, pp. 8-9.)

After the court denied Sable's application on February 27, the President issued an Executive Order which was followed by an order (DPA Order) from the Secretary of Energy under the Defense Production Act of 1950 (DPA, 50 U.S.C. § 4501 et seq.). Sable's current application is based upon Sable's argument that the DPA Order preempts the preliminary injunction. Petitioners and OSFM dispute the effect of the DPA Order on the preliminary injunction.

      (B)     Defense Production Act

As set forth in the DPA Order: "Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California." (DPA Order, § IV(A).) The authority for this order, and the other orders in the DPA Order, is listed as section 101 of the DPA. (DPA Order, § I.)

---

**MINUTE ORDER**

Section 101 of the DPA is codified in title 50 United States Code section 4511. (See 64 Stat. 799, ch. 932 (Sept. 8, 1950).)

"The President is hereby authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." (50 U.S.C. § 4511(a).)

"(1)     Notwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders (other than contracts of employment) relating to, materials, equipment, and services in order to maximize domestic energy supplies if he makes the findings required by paragraph (3) of this subsection.

"(2)     The authority granted by this subsection may not be used to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that--

"(A)     such materials, services, and facilities are scarce, critical, and essential--

"(i)     to maintain or expand exploration, production, refining, transportation;

"(ii)     to conserve energy supplies; or

"(iii)    to construct or maintain energy facilities; and

"(B)     maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection.

"(3)     During any period when the authority conferred by this subsection is being exercised, the President shall take such action as may be appropriate to assure that such authority is being exercised in a manner which assures the coordinated administration of such authority with any priorities or allocations established under subsection (a) of this section and in effect during the same period." (50 U.S.C. § 4511(c).)

"No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. No person shall discriminate against orders or contracts to which priority is assigned or for which materials or facilities are allocated under subchapter I of this chapter or under any rule, regulation, or order issued thereunder, by charging higher prices or by imposing different terms and conditions for such orders or contracts than for other generally comparable orders or contracts, or in any other manner." (50 U.S.C. § 4557.)

          (C)     Preemption
Sable argues that the DPA Order is inconsistent with the preliminary injunction and therefore the preliminary injunction is preempted by the federal order. "[C]onflict preemption will be found when simultaneous compliance with both state and federal directives is impossible." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.) " ' "[C]ourts are

reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." ' [Citations.]" (*Ibid*.)

In order to consider this issue, it is important to re-emphasize the limited scope of the court's preliminary injunction. The court determined to enter the preliminary injunction based upon its conclusion that the Federal Consent Decree by its terms requires that Sable, whose rights to use the Las Flores Pipelines are derivative of Plains, obtain State Waivers from the OSFM. The entry of the preliminary injunction rested upon noncompliance of the OSFM to the required State Waivers.

By design, performance consistent with the Federal Consent Decree is performance permitted under the preliminary injunction. Correspondingly, there is no conflict between the Federal Consent Decree and the preliminary injunction. The conflict issue raised by Sable is not a conflict between state law and federal law, but a conflict between the DPA Order, as interpreted here by Sable, and the Federal Consent Decree. To the extent that the Federal Consent Decree is binding on the parties, there is no preemption issue.

(D)     DPA Order and the Federal Consent Decree

The parties have informed this court of the multiple actions and proceedings pending in the federal courts regarding the operation of the Las Flores Pipelines, including particularly efforts to modify the Federal Consent Decree. Nonetheless, in the present, the Federal Consent Decree remains a binding determination as to the requirements for operations of the Las Flores Pipelines. Against this legal backdrop, Sable argues that the DPA Order supersedes the requirements of the Federal Consent Decree.

As quoted above, the DPA is concerned with allocation of resources and performance of contracts. This is backed by the immunity provision of section 4557. Two cases are instructive as to the scope of the DPA in the present context, *Hercules Inc. v. U.S.* (Fed. Cir. 1994) 24 F.3d 188 (*Hercules*), affirmed on other grounds (1996) 516 U.S. 417 [116 S.Ct. 981, 134 L.Ed.2d 47], and *U.S. v. Vertac Chemical Corp.* (8th Cir. 1995) 46 F.3d 803 (*Vertac*).

In *Hercules*, plaintiff chemical manufacturers of Agent Orange (a defoliant used for military purposes during the Vietnam War) were involved in numerous tort actions filed by Vietnam veterans and their families alleging that the veterans' exposure to components in Agent Orange caused cancer and other health problems. (*Hercules*, *supra*, 24 F.3d at p. 191.) Following settlement of the tort actions, the plaintiffs brought an action against the United States in the Claims Court seeking indemnification for their respective contributions to the settlement. (*Id*. at p. 193.) The Claims Court held for the United States. (*Id*. at pp. 195-196.) Among other things, the Claims Court "rejected the contention that an implied-in-fact contract indemnification term arose from section 707 of the DPA [now, 50 U.S.C. § 4557], because that section merely 'excuses a Government contractor's breach of its other, non-Government contracts which were adversely affected by the priority given to the Government's procurement demands under the DPA.' [Citation.]" (*Id*. at p. 195.)

In affirming the judgment of the Claims Court, the Federal Circuit in *Hercules* stated:

"The language of section 101(a) [now, 50 U.S.C. § 4511(a)] makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts which are necessary to promote the national defense. Indeed, section 101 is titled 'Priority in contracts and orders.' Although Thompson correctly observes that the statute authorizes the President to compel both contract performance and contract acceptance, section 101(a) expressly states that the granting of such authority is 'for the purpose of assuring ... priority.' Significantly, section 101(a) does not mention either the specific nature of performance under a DPA contract, or the subsequent use of goods produced under such a contract. Therefore, we conclude that, while the risk imposed by section 101(a) does include the possible need of a contractor to break its contracts with third parties in order to give preference to a DPA

contract, it does not include the risk that the product produced under the DPA contract will be inherently unsafe to users.

"Once a contractor has been compelled to accept a national defense contract under section 101(a), section 707 acts to shield the contractor from liability resulting from compliance with that section. At issue in this case is the nature of the liability against which the contractor is shielded.

"As noted above, in complying with DPA section 101(a) a contractor may have to re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA contract. It stands to reason that the protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization. First, it is a settled rule of statutory interpretation that separate provisions of a statute are to be construed and interpreted together and in light of each other to ascertain the true legislative intent. This court has explained:
" [']When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident. This rather straightforward homily is captured in the more pretentious proposition that parts of a statute *in pari materia* must be construed together.[']

"[Citations.] To hold that section 707 protects contractors against a risk which is greater than that created by the statute with which it operates would violate this rule.
"Furthermore, the language of section 707 itself supports the conclusion that the section does not extend the kind of indemnity asserted by Hercules. The second sentence of section 707, which prohibits discrimination 'against contracts to which priority is assigned ...,' reinforces the view that the immunity from suit provided by section 707 does not extend to tort suits in which it is alleged that the item produced by the DPA contractor is inherently unsafe to users. Rather, we conclude that to the extent relevant here, the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed. [Citation.] We also agree with the district court, [citation], that if Congress had intended section 707 to impose upon the government the kind of liability asserted by Thompson, it would have said so in clear and unequivocal terms. [Citation.]" (*Hercules, supra*, 24 F.3d at pp. 203–204.)
As explained in *Vertac*, back in 1967, the United States issued a DPA directive ordering a chemical company to accelerate its production and delivery of Agent Orange. (*Vertac, supra*, 46 F.3d at p. 807.) As a result, the chemical company devoted all of its efforts at its Jacksonville, Arkansas, facility to producing Agent Orange. (*Ibid*.) The production of Agent Orange produces hazardous waste, which the chemical company buried on-site. (*Ibid*.) Much later, the United States brought a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA, 42 U.S.C. § 9601 et seq.) because of the disposal of waste at the Jacksonville facility. (*Vertac, supra*, at pp. 805-806.) Among other things, the District Court held as a matter of law that the chemical company was not entitled to immunity under the DPA. (*Id*. at p. 807.)
On appeal in *Vertac*, the chemical company argued that "the language of § 707 is clear and unambiguous and that nothing in its language supports an interpretation that would exclude [the chemical company's] CERCLA liability, or any other liability, arising out of its performance of the Agent Orange contracts. In response, the United States argues that the language of § 707 is not clear and unambiguous and that the interpretation advanced by [the chemical company] would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." (*Vertac, supra*, 46 F.3d at p. 812.)
The *Vertac* court agreed with *Hercules, supra*, that " 'the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA.' [Citation.]" (*Vertac, supra*, 46 F.3d at p. 812.) The *Vertac* court thus held that the immunity of section 707 did not shield the chemical

company from liability it may have under CERCLA arising out if its performance of the Agent Orange contracts because such immunity would exceed the risk imposed by section 101(a). (*Ibid.*)
In both *Hercules* and *Vertac*, the federal circuit courts held that the scope of immunity under current section 4557 only extends to the risk imposed by section 4511(a) in prioritizing contracts with the United States pursuant to a DPA order. Nothing in section 4511 or, by implication, in section 4557, permits a party subject to a DPA Order to violate other laws, especially including applicable other federal law. Moreover, the reasoning of *Hercules* and *Vertac* strongly implies that the DPA order, by itself, does not permit the violation of applicable state regulatory law—for example, no one suggests that Sable could steal materials or money to fulfill a DPA order without state law consequence under the section 4557 immunity.

There is now, albeit subject to pending proceedings, a binding federal judgment in the Federal Consent Decree which requires favorable action by the OSFM before Sable is permitted to restart the Las Flores Pipelines. As construed by the federal courts, a DPA Order does not by itself permit violation of other federal law to accomplish the goals of the DPA Order. Consequently, in the present procedural posture of the requirements binding on Sable, Sable continues to be obligated to the requirements of the Federal Consent Decree. The DPA Order therefore does not constitute a basis for dissolving or modifying the preliminary injunction.

(E)    Mootness

Sable also argues that this matter, and the preliminary injunction in particular, is moot because Sable has voluntarily relinquished the State Waivers and the preliminary injunction is premised on the procedures involved with the State Waivers. This argument fails to persuade that the preliminary injunction should be dissolved for two reasons. First, Sable admittedly has not abandoned the project of restarting the Las Flores Pipelines. For the reasons explained above, under the Federal Consent Decree, Sable remains required to obtain approvals from the OSFM. In order to implement the restart project consistent with the Federal Consent Decree, the sufficiency of the OSFM's procedures remain at issue. (See *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 872-873 [absent abandonment of project, effective relief may still be awarded].) Sable's argument for mootness depends upon its argument that the OSFM can have no further involvement in the project. Under the current procedural posture of the project, the OSFM remains involved.

Second, in granting the preliminary injunction on a limited basis, the court partially agreed with Sable that much of the basis for petitioners' claims were premature because Sable remained engaged in obtaining authorization required under the Federal Consent Decree. Given the continuing requirements of the Federal Consent Decree and the voluntary relinquishment of the State Waivers by Sable, it is unclear that petitioners' other claims are now premature. Again, Sable's argument begins and ends with state law playing no further part in the project. Since the OSFM is bound by state law procedures, in the present circumstances, essential parts of state procedures are incorporated into the Federal Consent Decree. Sable has not persuasively shown that subsequent events make this matter moot and so warrant dissolution of the preliminary injunction.

(F)    Conclusion

The court is mindful that there are many moving judicial and administrative parts relating to the restart of the Las Flores Pipelines. Sable has not persuaded the court that the DPA Order renders compliance with Federal Consent Decree unnecessary. The Federal Consent Decree requires approvals from the OSFM, which in turn must comply with state procedures in granting such approvals. Sable has not met its burden to show that the preliminary injunction should be dissolved or modified. Sable's motion will therefore be denied.

(3)    Application for Order to Show Cause re Contempt

---

As discussed above, the court makes its position clear as to the current vitality of the preliminary injunction in light of recent events. Considering this position, the court is deeply concerned with noncompliance with the preliminary injunction. At the same time, the court is again mindful of the pendency of numerous other proceedings bearing on the Las Flores Pipelines. The court concludes that the most reasonable approach to addressing compliance with the injunction is to continue the hearing on the application for the order to show cause to allow the parties to take whatever steps they deem appropriate based upon this court's conclusions on the status of the preliminary injunction.

*Future Scheduled Hearings:*
May 22, 2026 10:00 AM Ex Parte Hearing
Geck, Donna D- SB Dept 4

ANGELA BRAUN, EXECUTIVE OFFICER            Minutes Prepared by:

                                    _____Preston Frye_____ , Deputy

SC-2411 (Revised July 1, 2013)            **MINUTE ORDER**

**PROOF OF SERVICE**

I, Jeremy M. Frankel, declare:

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to this action. My business address is 906 Garden Street, Santa Barbara, California 93101.

On April 28, 2026, I served the above document(s) described as **NOTICE OF ENTRY OF ORDER DENYING REAL PARTIES' REQUEST FOR IMMEDIATE RESCISSION OF PRELIMINARY INJUNCTION AND CONTINUING PETITIONERS' EX PARTE APPLICATION** on the interested parties in this action, stated below, by the following means of service:

**See Attached Service List**

☒    **By e-mail or electronic transmission.** On the date above, I caused a copy of the document(s) described above to be served electronically on the recipients designated in the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 28, 2026, at Santa Barbara, California.

_____
Jeremy M. Frankel

---

1
PROOF OF SERVICE

**SERVICE LIST**

| | |
|---|---|
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

Superior Court of California
County of Santa Barbara
Angela Braun, Executive Officer
5/4/2026 4:06 PM
By: Narzralli Baksh , Deputy

HOLLAND & KNIGHT LLP
Andrew Klair (SBN 334960)
560 Mission Street, Suite 1900
San Francisco, CA  94105
Telephone:  +1.415.743.6900
Fax:  +1.415.743.6910
Email: Andrew.Klair@hklaw.com

Rafe Petersen (*Pro Hac Vice Forthcoming*)
Jim Noe (*Pro Hac Vice Forthcoming*)
Matthew Leopold (*Pro Hac Vice Forthcoming*)
800 17th Street N.W., Suite 1100
Washington, District of Columbia 20006
Telephone: +1.202.955.3000
Fax: +1. 202.955.5564
Email: Rafe.Petersen@hklaw.com
Email: Jim.Noe@hklaw.com
Email: Matthew.Leopold@hklaw.com

Attorneys for Real Party in Interest
Sable Offshore Corp.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: +1.415.743.6900
Fax: +1.415.743.6910

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, | Case No.: 25CV02244 |
| | [Consolidated with 25CV02247] |
| Plaintiffs, | NOTICE OF APPEARANCE |
| vs. | Date: |
| | Time: |
| CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,, | Dept.:   4 |
| | Judge:   Honorable Donna D. Geck |
| | Complaint Filed:    April 15, 2025 |
| | Trial Date:        None Set |
| Defendants. | |
| SABLE OFFSHORE CORP., a Delaware Co oration, PACIFIC PIPELINE, COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, | |
| Real Parties in Interest, | |
| | Case No.: 25CV02247 |

1
NOTICE OF APPEARANCE

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: +1.415.743.6900
Fax: +1.415.743.6910

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Plaintiffs,

vs.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.,

2
NOTICE OF APPEARANCE

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: +1.415.743.6900
Fax: +1.415.743.6910

TO THE HONORABLE COURT AND ALL COUNSEL OF RECORD:

PLEASE TAKE NOTICE, of the appearance of ANDREW KLAIR, Rafe Petersen, Jim Noe, and Matthew Leopold of Holland & Knight LLP as counsel of record for Sable Offshore Corp. in the above-entitled action.

Andrew Klair is licensed to practice law in the State of California and is a member in good standing of the California State Bar.

Rafe Peterson is licensed to practice law in the District of Columbia and is a member in good standing of the DC Bar. His application to appear *pro hac vice* is forthcoming.

Jim Noe is licensed to practice law in the District of Columbia, the State of Texas, and the State of Louisiana and is a member in good standing of the DC Bar, the Louisiana State Bar Association, and the State Bar of Texas. His application to appear *pro hac vice* is forthcoming.

Matthew Leopold is licensed to practice law in the District of Columbia and the State of Florida and is a member in good standing of the DC Bar and the Florida Bar. His application to appear *pro hac vice* is forthcoming.

Dated: May 4, 2026

HOLLAND & KNIGHT LLP

Andrew Klair
Rafe Peterson
Jim Noe
Matthew Leopold

Attorneys for Real Parties in Interest
Sable Offshore Corp. and Pacifica Pipeline Company

NOTICE OF APPEARANCE

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: +1.415.743.6900
Fax: +1.415.743.6910

**PROOF OF SERVICE**

I, the undersigned, hereby declare that I am over the age of 18 years and not a party to the above-captioned action; that my business address is 560 Mission Street, Suite 1900, San Francisco, CA 94105. On May 4, 2026, the following document(s) were served:

- **NOTICE OF APPEARANCE**

on the interested parties in this action addressed as follows:

**SERVICE LIST ATTACHED**

☒   **(BY ELECTRONIC MAIL)** I caused a true and correct scanned image (.PDF file) copy to be transmitted via the electronic mail transfer system in place at Holland & Knight, LLP, originating from the undersigned at 560 Mission Street, Suite 1900, San Francisco, CA 94105, to the address(es) indicated above.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed May 4, 2026, at New York, New York.

_____
Reena Kaur

4
PROOF OF SERVICE

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: +1.415.743.6900
Fax: +1.415.743.6910

## SERVICE LIST

| | |
|---|---|
| Julie Teel Simmonds<br>jteelsimmonds@biologicaldiversity.org<br>David Pettit<br>dpettit@biologicaldiversity.org<br>Talia Nimmer<br>tnimmer@biologicaldiversity.org<br>CENTER FOR BIOLOGICAL DIVERSITY<br>2100 Franklin St., Ste. 375<br>Oakland, CA 94612 | ATTORNEYS FOR PETITIONERS<br>Center for Biological Diversity and Wishtoyo Foundation |
| Linda Krop<br>lkrop@environmentaldefensecenter.org<br>Jeremy M. Frankel<br>jfrankel@environmentaldefensecenter.org<br>ENVIRONMENTAL DEFENSE CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101 | ATTORNEYS FOR PETITIONERS<br>Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper |
| Michael S. Dorsi<br>Michael.Dorsi@doj.ca.gov<br>Myung Park<br>Myung.Park@doj.ca.gov<br>Matthew Bullock<br>Matthew.Bullock@doj.ca.gov<br>California Attorney General's Office<br>55 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102 | ATTORNEYS FOR RESPONDENTS/DEFENDANTS<br>California Department of Forestry and Fire Protection, Office of the State Fire Marshal; and Daniel Berlant, in his official capacity as State Fire Marshal |
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | ATTORNEYS FOR REAL PARTIES IN INTEREST<br>Sable Offshore Corp. and Pacific Pipeline Company |

PROOF OF SERVICE